GREGORY A. KASPER
kasperg@sec.gov
ZACHARY T. CARLYLE
carlylez@sec.gov
TERRY E. MILLER
millerte@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                                   Plaintiff,<br><br>       - against -<br><br>ALPINE SECURITIES CORPORATION,<br><br>                                   Defendant. | CASE NO.:<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**ECF CASE** |

Plaintiff, United States Securities and Exchange Commission (the "Commission"), for its

Complaint against defendant Alpine Securities Corporation ("Alpine"), alleges as follows:

### SUMMARY

1.      This case concerns Alpine's practices relating to filing Suspicious Activity

Reports ("SARs") with the U.S. Treasury Department's Financial Crimes Enforcement Network

("FinCEN").  Alpine acts as a clearing firm for many microcap over-the-counter ("OTC") stock

transactions.  Since 2011, Alpine has cleared thousands of deposits of microcap securities, most

of them involving Scottsdale Capital Advisors Corp. ("Scottsdale") as the introducing broker, and many of which were used as part of various stock manipulation and other schemes.

2.      The Bank Secrecy Act (Currency and Financial Transactions Reporting Act of 1970, 31 U.S.C. §§ 5311-5330, as amended by the USA PATRIOT Act (Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 296 (2001)), commonly referred to as the "BSA") and its implementing regulations require broker-dealers to file SARs with FinCEN to report certain suspicious transactions conducted by, at, or through their firms.  *See* 31 C.F.R. § 1023.320(a)(2).  The instructions to FinCEN's SAR form generally require broker-dealers to submit SARs with narratives that describe what is unusual, irregular, or suspicious about the transactions.  FinCEN's regulations further impose deadlines for filing SARs and impose record keeping requirements related to broker-dealer SAR filings.  Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 17a-8 thereunder require broker-dealers to comply with the recordkeeping, retention, and reporting obligations of the BSA and its implementing regulations.

3.      Alpine had a BSA Compliance Program that included, among other things, Written Supervisory Procedures ("WSPs") and formal and informal training.  From at least May 17, 2011 through December 31, 2015 (the "relevant period"), Alpine's BSA Compliance Program did not accurately represent what Alpine did in practice.  As implemented in practice, Alpine's policies and procedures did not result in the filing of SARs in the manner required by the BSA and by Alpine's BSA Compliance Program.  Alpine routinely and systematically failed

to identify and report suspicious activity in its SAR filings of which it was aware.  Alpine's failures included:

- Systematically omitting from at least 1,950 SARs material, "red-flag" information of which it was aware and was required to report under its own BSA Compliance Program, such as a customer or issuer's criminal or regulatory history, evidence of stock promotion, or whether a customer was a foreign financial institution, including at least 1,150 SARs which included only the customer name, date of deposit, dollar value of deposit, and the name of the security deposited;

- Filing SARs only on the deposit of stock in approximately 1,900 instances in which the stock was subsequently liquidated, but failing to file required SARs on subsequent related transactions such as the liquidation, or transfer of funds resulting from the liquidation, even though it had identified the deposit of the security as suspicious; and

- Failing to file at least 250 SARs within the required 30 days after the date the suspicious activity was detected.

4.    Alpine's failure to meaningfully implement its BSA Compliance Program and file SARs as required by the rules implementing the BSA and its own BSA Compliance Program undermined the purposes of the BSA and deprived U.S. regulators and law enforcement of key financial intelligence.  A properly designed and implemented BSA Compliance Program makes it difficult for illicit actors to operate through legitimate financial institutions without detection by bringing suspicious activity to light.  However, by failing to file SARs when required, and omitting material indicia of suspicious activity from the SARs it did file, Alpine's deficient implementation of its BSA Compliance Program and resulting deficient SAR filings facilitated

illicit actors' evasion of scrutiny by U.S. regulators and law enforcement, and provided them with access to the markets they might otherwise have been denied.

5.      Alpine's written BSA Compliance Program did not accurately reflect what the firm did in practice.  Alpine's day to day BSA Compliance Program operation fell short of what was actually prescribed by its policies and procedures.  As a result, Alpine routinely failed to identify and report suspicious activity as required by Section 17(a) of the Exchange Act and Rule 17a-8 thereunder, and its own BSA Compliance Program.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

6.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and seeks permanent injunctions against Alpine enjoining it from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint.  The Commission also seeks civil penalties against Alpine pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.      Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Alpine transacts business in the Southern District of New York and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or

the facilities of a national securities exchange.  For example, Alpine operates as a clearing firm and deposits securities with Depository Trust Company ("DTC"), which is headquartered in New York, New York, to clear securities transactions.  Alpine deposited securities with DTC in connection with transactions that are subjects of this Complaint.  In connection with some of the deposit transactions that are subjects of this Complaint, Alpine delivered physical stock certificates to DTC for DTC to hold in a vault located in Manhattan.  Alpine also uses National Securities Clearing Corporation ("NSCC"), which is headquartered in New York, New York, to clear its securities transactions.  Alpine used NSCC's services to clear transactions that are subjects of this Complaint.

## DEFENDANT

9.      Alpine is a Utah corporation headquartered in Salt Lake City, Utah.  Alpine is a self-clearing broker-dealer and has been registered with the Commission since 1984.  Alpine is subject to the requirements of the BSA.  The majority of its business involves clearing microcap stock transactions for other firms.  Alpine has a history of disciplinary actions brought against it by the Financial Industry Regulatory Authority ("FINRA") for various violations, including failure to maintain adequate written supervisory procedures and for participating in unregistered offerings and sales of securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act").  In 2011, Alpine was acquired by John Joseph Hurry, who also owns Scottsdale Capital Advisors Corp.  Hurry is the sole director of Alpine and the managing member of Alpine's parent entity.

## OTHER RELEVANT ENTITY

10.     Scottsdale Capital Advisors Corp. ("Scottsdale") is a retail and institutional broker-dealer located in Scottsdale, Arizona.  It has been registered as a broker-dealer with the Commission since 2002 and is currently registered as an investment adviser with the states of Arizona and California.  Scottsdale introduced customers to Alpine, including those who conducted the majority of the transactions that are the subject of this matter.  Like Alpine, Scottsdale's business focuses on microcap stock transactions.  Hurry is a trustee of Scottsdale's parent entity.

## FACTS

### FinCEN Rule and Forms

11.     The BSA, as implemented under rules promulgated by FinCEN, requires that broker-dealers file SARs with FinCEN to report a transaction (or a pattern of transactions of which the transaction is a part) involving or aggregating to at least $5,000 that the broker-dealer knows, suspects or has reason to suspect:  (1) involves funds derived from illegal activity or that were conducted to disguise funds derived from illegal activities; (2) were designed to evade any requirements of the BSA; (3) had no business or apparent lawful purpose; or (4) involved use of the broker-dealer to facilitate criminal activity.  *See* 31 C.F.R. § 1023.320(a)(2).

12.     FinCEN's regulations implementing the BSA require that: "A suspicious transaction shall be reported by completing a Suspicious Activity Report by the Securities and Futures Industry ('SAR-SF')".  *See* 31 C.F.R. 1023.320(b)(1).  The SAR-SF form required by FinCEN (and used by Alpine) until April 2013 explains that the narrative section of the SAR "is critical," and instructs the broker to "[p]rovide a clear, complete and chronological description . .

. of the activity, including what is unusual, irregular or suspicious about the transactions(s)." *See* FinCEN, FinCEN Form 101—Suspicious Activity Report by the Securities and Futures Industry. The SAR form required by FinCEN (and employed by Alpine) beginning in April 2013 included instructions directing the filer to "provide a clear, complete, and concise description of the activity, including what was unusual or irregular that caused suspicion" in the narrative and to "include any other information necessary to explain the nature and circumstances of the suspicious activity." *See* FinCEN, FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements p. 110 (October 2012).

13.     FinCEN's AML program rule requires broker-dealers to "implement[] and maintain[] an anti-money laundering program that complies with the rules, regulations, or requirements of its self-regulatory organization governing such programs." *See* 31 C.F.R. 1023.210.  In turn, FINRA Rule 3310 requires member broker-dealers to "develop and implement a written anti-money laundering program reasonably designed to achieve and monitor the member's compliance with the requirements of the [BSA], and the implementing regulations promulgated thereunder by the Department of the Treasury." *See* FINRA Rule 3310, Anti-Money Laundering Compliance Program.

### Alpine's Background and BSA Compliance Program

14.     Since 2011, Scottsdale has been the source of most of Alpine's business.  In 2011, Scottsdale was the subject of a FINRA enforcement action alleging, in addition to other violations, that Scottsdale filed deficient SARs.  *See* Order Accepting Offer of Settlement *In the Matter of FINRA Department of Enforcement v. Scottsdale Capital Advisors Corp. and Justine Hurry*, Disciplinary No. 2008011593301, (November 14, 2011) at p. 21 (finding that Scottsdale

"filed approximately 290 SARS from on or about August 2009 through April 2010 which contained inaccurate or incomplete information" and "filed SARS that failed to provide adequate information for determining that the reported activity was suspicious.")

15.     Many Scottsdale and Alpine customers have been charged with violations of the federal securities laws, including violations relating to transactions that cleared through Alpine.

16.     Alpine seldom closed Scottsdale-related accounts or refused to clear trades generated by such accounts during the relevant period.  Alpine instead allowed Scottsdale's customers to engage in suspicious transactions and filed thousands of SARs per year, more than any other individual broker-dealer.  For its services, Alpine charged fees that were significantly higher than those charged by other clearing firms.

17.     Throughout the relevant period, Alpine's WSPs stated that it is "important that Alpine, as well as all employees, remain diligent and active participants in Alpine's anti-money laundering (AML) program" and that "Alpine will file Suspicious Activity Reports (SARs) for transactions that may be indicative of money laundering activity."  Alpine's WSPs specifically delineated as "red flags that may suggest potential money laundering":

- The customer, for no apparent reason or in conjunction with other "red flags," engages in transactions involving certain types of securities, such as penny stocks . . . which, although legitimate, have been used in connection with fraudulent schemes and money laundering activity.

- The customer engages in suspicious activity involving the practice of depositing penny stocks, liquidates them, and wires proceeds [sic].

- The customer, issuer, (or a person publicly associated with the customer or issuer) has a questionable background or is the subject of news reports indicating possible criminal, civil, or regulatory violations.

- The customer maintains multiple accounts, or maintains accounts in the names of family members or corporate entities, for no apparent business purpose or other purpose.

- The customer realizes out of the ordinary returns on its investment.

18.     Alpine's BSA Compliance Program included the WSPs, as well as formal and informal training that integrated FinCEN guidance, and required SAR filers—consistent with the BSA implementing regulations, FinCEN's guidance, and FinCEN's SAR forms—to describe within the SAR narrative the material red flags of which the firm was aware.

19.     Alpine's BSA Compliance Program did not accurately reflect what the firm did in practice.  Alpine's day to day BSA Compliance Program operation fell short of what was actually prescribed by its policies and procedures.  As a result, Alpine filed hundreds of SARs that omitted material information that was in Alpine's possession and was required to be reported pursuant to Alpine's BSA Compliance Program, which incorporated FinCEN guidance, the SAR Form instructions, and the regulations implementing the BSA.  Many SARs identified no suspicious activity at all.  Even when Alpine reported some suspicious activity in some of its SARs, it systematically omitted other known material information in such a way that the SARs deprived law enforcement, regulatory, and intelligence consumers, including the Commission, of valuable and timely intelligence and undermined the very purpose for which BSA obligations are imposed on financial institutions.

20.     For 2011 and most of 2012, Alpine's "Standard Operating Procedures" for SAR filings provided for two templates to be used for SAR narratives:

> [Account holder] is a client of [brokerage firm on customer's account], a firm for which Alpine Securities provides clearing services.  On or around [date or date range], [account holder] deposited a large quantity [number of shares] of [issuer full name] ([symbol]), a low-priced ($0. [estimated price per share]/share)

security.  This transaction amounted to approximately $[total dollar amount from question 22 and the OTC deposit form].

-OR-

John Doe is a client of Scottsdale Capital a firm for which Alpine Securities provides clearing services.  On or around 06/21/2012, John Doe deposited a large quantity (1,234,567 shares) of ABCDEFG (ABCD), a low-priced ($0.001/share) security.  This transaction amounted to approximately $1,234.00.

21.     Although Alpine was aware of the importance of including—and, consistent with guidance from FinCEN that was incorporated into Alpine's BSA Compliance Program, was required by its program to include—a description of any material red flag information in its SAR filings, neither template even contemplated the inclusion of any of the red flags or other material information that caused Alpine to file the SAR.  As a result, in practice Alpine routinely failed to describe suspicious activity of which it was aware—and was required to report under its BSA Compliance Program, consistent with the BSA implementing regulations, FinCEN's guidance, and FinCEN's SAR forms—in hundreds of SAR filings.

**Although Regulators Have Repeatedly Cited Alpine for SAR Failures, Alpine Has Not Meaningfully Improved the Implementation of its BSA Compliance Program.**

22.     Beginning in about May 2012, FINRA conducted an examination of Alpine and inquired regarding the substantive content of Alpine's SAR narratives.  FINRA reviewed 823 SARs filed between March 2011 and January 2012, and found that every SAR it reviewed failed to meet the requirements of FinCEN rules implementing the BSA.  In its Examination Disposition Letter provided to Alpine on September 28, 2012, FINRA stated:

> The narratives for all SARs reviewed were *substantively inadequate* as they failed to fully describe why the activity was suspicious.  For the SARs reviewed, the narrative just described isolated events of activity without any detail or support of why the firm actually considered the activity to be suspicious and therefore failing

[sic] to justify at the basic core the legitimacy of the SAR filing. (emphasis added).

Further, FINRA found that Alpine relied on the two templates set forth above, and stated: "neither . . . were substantively adequate as they failed to fully describe why the activity was suspicious."

23. Alpine took no meaningful steps to ensure that the deficiencies in the implementation of its BSA Compliance Program raised by FINRA were adequately addressed. Instead, Alpine continued to rely on junior entry-level employees with little or no experience or training to draft its SARs without adequate review or quality control from management. From 2013 through 2015, Alpine filed hundreds more blatantly deficient SARs that failed to describe known material red flags or other information regarding Alpine's customers and their trading activity that were required to be reported pursuant to Alpine's BSA Compliance Program, consistent with the BSA implementing regulations, FinCEN's guidance, and FinCEN's SAR forms.

24. In approximately April 2015, the SEC's Office of Compliance Inspections and Examinations ("OCIE") found that the BSA compliance issues identified by FINRA remained ongoing. OCIE issued Alpine an examination deficiency letter, finding that "the Firm failed to disclose in the SAR narrative . . . material information that was contained in the Firm's investigative files." Even after receiving OCIE's deficiency letter, Alpine continued its pattern of omitting material red flag and other information from its SARs.

25. During the relevant period, Alpine:

- Systematically omitted from at least 1,950 SARs material red-flag and other information of which it was aware and was required to report under its own BSA Compliance Program, such as a customer or issuer's criminal or regulatory history,

evidence of stock promotion, or whether a customer was a foreign financial institution;

- Filed SARs only on the deposit of stock in approximately 1,900 instances in which the stock was subsequently liquidated, and failed to file required SARs on related transactions such as the liquidation, or transfer of funds resulting from the liquidation, even though it had identified the deposit of the security as suspicious.

26.     Many of Scottsdale's customers -- who combined comprised the significant majority of Alpine's clearing business -- have been charged by the Commission for improper conduct relating to transactions that cleared through Alpine.  Prior to these customers being charged, Alpine filed hundreds of SARs relating to these customers, but the majority of these SARs omitted material red flags and other material information that were in Alpine's possession and that were required to be reported pursuant to Alpine's BSA Compliance Program, consistent with the BSA implementing regulations, FinCEN's guidance, and FinCEN's SAR forms.

27.     Despite repeated warnings, Alpine has failed to adequately remedy the defects in the implementation of its BSA Compliance Program, and as such, it facilitates and enables illicit financial activity.

**Alpine Omitted Material Red Flag Information From at Least 1,950 SARs.**

28.     During the relevant period, Alpine's records contained information reflecting material red flags of money laundering, securities fraud, or other illicit financial activities relating to its customers and their transactions.  Alpine failed to describe the material red flags of which it was aware and which were required to be reported pursuant to Alpine's BSA Compliance Program, consistent with the BSA implementing regulations, FinCEN's guidance, and FinCEN's SAR forms, in at least 1,950 SARs it filed during the relevant period.

29.     FinCEN has provided substantial guidance regarding the content of SAR filings.

For example, FinCEN's guidance to broker-dealers instructs SAR filers to "identify the five

essential elements of information—*who? what? when? where? and why?*—of the suspicious

activity being reported" and to include "a summary of the 'red flags' and suspicious patterns of

activity that initiated the SAR."  *See* FinCEN, *Guidance on Preparing A Complete & Sufficient*

*Suspicious Activity Report Narrative* (November 2003) at pp. 3, 7.  FinCEN guidance also states

that "SAR narratives should describe, as fully as possible, why the activity or transaction is

unusual for the customer, taking into consideration the types of products and services offered by

your industry and the nature and typical activities of similar customers.  *Explaining why the*

*transaction is suspicious is critical*."  *See* FinCEN, *Suggestions for Addressing Common Errors*

*Noted in Suspicious Activity Reporting* (October 10, 2007) at p. 2 (emphasis added).  FinCEN

guidance regarding SARs further states: "In answering this question, a filer should describe why

the transaction is unusual for the customer or *why the activity created a red flag for the filer or*

*triggered an alert within their system.*"  *See* FinCEN, *The SAR Activity Review, Trends Tips &*

*Issues*, Issue 22 (October 2012) at p. 40 (emphasis added).  Alpine incorporated this guidance

into its BSA Compliance Program.

30.     During the relevant period, Alpine filed at least 1,950 SARs that omitted material

information Alpine was aware of related to what was "unusual, irregular or suspicious" or

"caused suspicion" regarding the transactions being reported.  Alpine was required to report this

information in its SAR filings under its BSA Compliance Program, consistent with the BSA

implementing regulations, FinCEN's guidance, and FinCEN's SAR forms.  The document

packets provided to Alpine by correspondent firms—such as Scottsdale—in connection with

each deposit frequently included criminal and regulatory history of the customers, and a copy of any SEC complaints filed against the customer.  In addition, the packets frequently contained information reflecting whether there was evidence that the stock was being promoted, whether the issuer was formerly a shell company, and other red flags relating to the customers or their transactions.  Alpine, however, often omitted this type of information—which formed the basis for Alpine knowing, suspecting, or having reason to suspect that the transaction was suspicious—from its SARs.

31.     For example, in early 2012, several Alpine accounts for which Scottsdale was the introducing broker deposited shares of Ticker A.  In April 2012, Alpine received a document request from FINRA regarding trading in Ticker A.  Alpine's CFO forwarded the request to Alpine's trader responsible for selling the deposits, stating: "FYI FINRA Fraud detection."  A few weeks later, Alpine's general counsel placed a freeze on two accounts trading shares of Ticker A because the account holders were listed as officers of the company on the company website, but stated in their deposit paperwork that they were not, and never had been, officers. The next day, Alpine's CFO emailed Alpine's general counsel regarding the deposits, and stated that the issuer had "[t]oo many discrepancies and too many suspicious red flags."  The general counsel then emailed Alpine's trader responsible for selling the deposits and stated:  "We are extremely concerned about this issuer.  In order to protect you and Alpine . . . from here on out we will not be accepting new deposits."  A few days later, however, Alpine accepted deposits from two new customers with the same last names as the two account holders who were listed as officers of the Ticker A company.  Alpine filed SARs for both deposits, but the SARs simply stated the name of the customer, the number of shares, the ticker symbol, the date of the deposit,

the price per share, and the total value of the deposit.  Despite the specific information and red flags known to Alpine and required to be reported pursuant to Alpine's BSA Compliance Program, consistent with the BSA implementing regulations, FinCEN's guidance, and FinCEN's SAR forms, no additional information was provided in the SARs, and no SARs were filed on the liquidation of the securities or the disposition of the sales proceeds.

32.     As another example, account opening documents for Customer A indicate that Customer A has a "criminal background of bank fraud, mail fraud and wire fraud" and had pleaded guilty to conspiracy charges in January 2012.  On August 6, 2012, Customer A deposited 25 million shares of a penny stock that had zero trading volume prior to June 18, 2012, and only averaged a few thousand shares per day in the six weeks prior to the deposit.  Alpine filed a SAR on August 21, 2012, that simply stated the name of the customer, the number of shares, the ticker symbol, the date of the deposit, the price per share, and the total value of the deposit, and added that the deposit involved a large volume of shares of a low-priced security with a high estimated value.  The SAR did not include any information regarding Customer A's criminal background, or the fact that the stock had almost no trading prior to the deposit, both of which formed the basis for the transaction being suspicious.  Further, although Customer A sold millions of shares in the weeks following his deposit, Alpine did not file a SAR on the liquidation of the securities or the disposition of proceeds.

33.     Alpine frequently omitted from the SAR narratives additional material red flags or other information it was aware of and that were required to be included in the narratives by its BSA Compliance Program, consistent with the BSA implementing regulations, FinCEN's guidance, and FinCEN's SAR forms, including:

- Hundreds of instances in which its customer had prior or ongoing financial fraud charges;

- Approximately 100 instances in which the issuer was previously a shell company, or had filed for bankruptcy, or frequently changed its business;

- Approximately 100 instances in which the ticker being deposited was the subject on an ongoing promotional campaign;

- Approximately 100 instances in which its customer was a foreign financial institution; and

- Dozens of instances in which its customer was depositing millions or billions of shares of a security that had little or no previous trading activity, and dozens more instances in which the issuer could not be verified as an operating entity.

**Alpine Failed to File any SARs at All on the Liquidation of Approximately 1,900 Deposits Identified by Alpine as Suspicious.**

34.     Pursuant to FinCEN rules promulgated under the BSA, a broker-dealer must file a SAR on "any suspicious transaction." 31 C.F.R. § 1023.320(a).  As relevant to Alpine's reporting obligations as a broker-dealer, a FinCEN rule defines a "transaction" as:

> a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument . . . or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.  [31 C.F.R. § 1010.100(bbb)(1)].

35.     During the relevant period, Alpine filed a SAR on approximately 1,900 deposits of a security, but did not file a subsequent SAR when the deposits were liquidated, or when the proceeds from the liquidated deposits were transferred to the customer or a third-party, despite the fact that the subsequent liquidations and transfers were additional suspicious transactions.

36.     For example, during the relevant period, Alpine filed more than 800 SARs relating to large deposits by Customer B of multiple issuers' thinly-traded low-volume

microcap securities.  Throughout the relevant period, Customer B was a defendant in a fraud case brought by the Commission.  Although Customer B liquidated at least 600 of these deposits, Alpine failed to file a SAR regarding the liquidations for at least 450 deposits.

37.     Each liquidation and subsequent transfer of the proceeds constitutes additional "transactions" within the meaning of the BSA.  Each failure to report subsequent suspicious transactions either independently or as part of the original SAR constitutes a separate failure to comply with the SAR reporting requirement.

38.     In at least 1,400 instances, including several hundred instances related to the deposits by Customer B, Alpine's customer had already liquidated the deposit in the time period between when the security was deposited and when the SAR was filed. Accordingly, in at least these instances, Alpine actually knew at the time of filing the SAR that the deposit had been liquidated, yet failed to report the liquidation in the original SAR, or to file an additional SAR identifying the liquidation of its customers' deposits.

### Alpine Failed to File More than 250 SARs Within the Required 30 days After the Date the Suspicious Activity was Detected.

39.     A FinCEN rule promulgated under the BSA requires that a SAR be filed "no later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing" a SAR.  31 C.F.R. § 1023.320(b)(3).

40.     Between approximately August 16, 2011 and December 13, 2011, Alpine filed no SARs.  Upon discovering the failure, in December 2011, Alpine began filing

SARs regarding suspicious securities deposits that it had detected at various times over the prior four months.  Between approximately December 13, 2011 and May 25, 2012, Alpine filed more than 250 SARs after the expiration of the 30-day time limit.

41.    Further, approximately 50 of these late-filed SARs included inaccurate and/or misleading information regarding when the suspicious activity occurred. Although many of these SARs stated that the suspicious deposit occurred within a date range—for example, "from December 2011 through May 2012"—that would appear to place the conduct within the 30-day window, the deposit was actually made at the start of the date range provided, and no reported activity related to that deposit occurred on any subsequent date.  The use of these date ranges thus obfuscated from regulators the fact that the SARs were filed outside of the 30-day time limit.

### Alpine Failed to Maintain and/or Retain Approximately 1,000 Underlying Files Supporting its SAR Filings.

42.    A FinCEN rule under the BSA requires broker-dealers to maintain a copy of any SAR filed and the original or business record equivalent of any supporting documentation for a period of five years from the date of filing the SAR.  See 31 C.F.R. 1023.320(d).

43.    For as many as 1,000 SARs filed by Alpine during the relevant period, the underlying files either never existed or were lost by Alpine.

### CLAIM FOR RELIEF

### Violations of Exchange Act Section 17(a) of the Exchange Act and Rule 17a-8 Thereunder [15 U.S.C. § 78q(a) and 17 C.F.R. § 240.17a-8]

44.     The Commission realleges and incorporates by reference paragraphs 1 through 43, as though fully set forth herein.

45.     In violation of Exchange Act 17(a) and Rule 17a-8 promulgated thereunder, Alpine failed to comply with the reporting, recordkeeping, and record retention requirements of FinCEN's regulations implementing the BSA, Chapter x of title 31 of the Code of Federal Regulations, which, among other things, require broker-dealers to "implement[] and maintain[] an anti-money laundering program that complies with the rules, regulations, or requirements of its self-regulatory organization governing such programs" (31 C.F.R. 1023.210) and that a broker-dealer, such as Alpine, must file SARs with FinCEN.

46.     As detailed above, Alpine violated Exchange Act 17(a) and Rule 17a-8, by:  failing to file SARs as required by the BSA and its implementing regulations, filing SARs that do not comply with the BSA and its implementing regulations, and failing to maintain and/or retain SAR documentation as required by the BSA and its implementing regulations.

47.     By virtue of the foregoing, Alpine violated, and unless restrained and enjoined, will again violate, Section 17(a) of the Exchange Act [15 U.S.C. § 78q(a)] and Rule 17a-8 thereunder [17 C.F.R. § 240.17a-8].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

Find that Alpine committed the violations alleged in this Complaint;

## II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Alpine from violating, directly or indirectly, the laws and rules alleged in this Complaint;

## III.

Order that Alpine pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], in an amount to be determined by the Court, plus post-judgment interest;

## IV.

Grant such other relief as this Court may deem just or appropriate.

## JURY DEMAND

The Commission demands a trial by jury on all claims so triable.


Respectfully submitted this 5th day of June, 2017.

*/s/ Gregory A. Kasper*
Gregory A. Kasper (NY2735404; SDNY GK6596)
Regional Trial Counsel
Zachary T. Carlyle (*pro hac* admission pending)
Senior Trial Counsel
Terry E. Miller (*pro hac* admission pending)
Senior Trial Counsel
Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000