H9fWalpC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES SECURITIES AND
    EXCHANGE COMMISSION,
4
                    Plaintiff,
5
            v.                              17 Civ. 4179 (DLC)
6

7   ALPINE SECURITIES CORPORATION,
                                            Conference
8
                    Defendant.
9
    ------------------------------x
10                                          New York, N.Y.
                                            September 15, 2017
11                                          2:30 p.m.

12  Before:

13                      HON. DENISE L. COTE,

14                                          District Judge

15                          APPEARANCES

16
    ZACHARY T. CARLYLE
17  TERRY R. MILLER
         Attorneys for Plaintiff
18       U.S. Securities and Exchange Commission

19

20
    CLYDE SNOW & SESSIONS, P.C.
21       Attorneys for Defendant
    BY:  BRENT R. BAKER
22       AARON D. LEBENTA
         JONATHAN D. BLETZACKER
23

24

25
```

H9fWalpC

1          (Case called)

2          MR. CARLYLE:  Zachary Carlyle, and with me today is

3     Terry Miller.

4          MR. BAKER:  Brent Baker, Aaron Lebenta and Jon

5     Bletzacker, for Alpine Securities.

6          THE COURT:  And in addition, your client is with you

7     at the table?

8          MR. BAKER:  Yes.  We have Chris Frankel, who is

9     representing the client here today.

10         THE COURT:  Thank you.

11         This is a case in which the SEC has brought a

12    securities action in New York, and there is a motion that was

13    brought raising a number of issues: lack of personal

14    jurisdiction as a matter of New York's long-arm statute and the

15    due process clause; a venue argument and motion for transfer

16    pursuant to Section 1404, and related issues.  At least one of

17    those issues has fallen by the wayside in course of briefing,

18    and I'm prepared to rule on that motion today but want to give

19    the parties an opportunity to add anything that they feel is

20    necessary to their papers.

21         This is the defendant's motion.  Mr. Baker, is there

22    anything else you wanted to say?

23         MR. BAKER:  With respect to the personal jurisdiction

24    issue?

25         THE COURT:  Anything on the motion.

H9fWalpC

```
1                    MR. BAKER:  Yes.

2                    THE COURT:  Anything on the motion.

3                    MR. BAKER:  I'd like to add a few things.  I'll be

4      brief.

5                    THE COURT:  Yes.

6                    MR. BAKER:  OK.  As your Honor correctly stated, we

7      brought this motion based on three separate issues and we

8      fully, on the case law, understand that we're going forward on

9      our strongest two arguments, the venue and the transfer motion,

10     and we are happy to answer any questions you have but would

11     rely on the briefing for the personal jurisdiction motion.

12                   THE COURT:  I think you've abandoned New York long-arm

13     statute as a ground, but you continue to argue due process.  Am

14     I right?

15                   MR. BAKER:  Correct.

16                   THE COURT:  Fine.

17                   MR. BAKER:  OK.

18                   Again, we appreciate the chance, understanding this

19     was originally set as a scheduling conference, and we're

20     grateful to be able to at least argue the substance in part,

21     and we can speak to the Rule 26(f) components.

22                   THE COURT:  We'll do that separately after I rule on

23     the motion.

24                   MR. BAKER:  Great.  OK.

25                   Our goal, of course, is to get your Honor to transfer
```

H9fWalpC

1    this matter to the most convenient forum, which is not the

2    Southern District of New York.  We want to transfer to the

3    District of Utah where a hundred percent of the witnesses, a

4    hundred percent of the parties, and frankly, even it's more

5    convenient for the plaintiffs, who are out of the Denver

6    office.  There are 15 flights a day, and it's an hour flight,

7    but there are no parties, more importantly, at all relative to

8    the operative facts, the underlying facts, in this district.

9          The complaint alleges not a trading violation, not

10   fraud, but books-and-records violations.  17(a) and Rule 17a-8,

11   under the Exchange Act, are the record keeping and retention

12   requirements, and they spend considerable time in their

13   opposition to laying out the process of clearing a trade

14   through DTC and NSCC, but that is completely separate from the

15   operative facts of this case.  Again, it's a books-and-records

16   case.  It's based on a violation that could be succinctly said

17   that their Bank Secrecy Act compliance program was inadequate

18   and that caused suspicious activity reports, SARs, to be filed

19   improperly, incorrectly.  I'm sure there are others.

20         There are several categories that they allude to in

21   the complaint, but if I take maybe two minutes here to unpack

22   the filing of a SAR, there are many places in the business of a

23   broker-dealer where a SAR could be filed that have nothing to

24   do with the actual trading in the security.  So if a client,

25   new client comes to you and says, I want to open an account,

H9fWalpC

1    and you, based on whatever your metrics are, your red flags

2    are, say, Sorry, we're not opening that account, go on your

3    way, you are required to file a suspicious activity report,

4    that report will never make its way to the DTC or NSCC in New

5    York.

6              Second point in the chain of a securities transaction

7    is when an existing client comes in to deposit a block of

8    stock, sophisticated block of a million shares of XYZ Corp.

9    Well, there's a deposit review team at the broker-dealer that

10   looks at that, and if they detect that there's something

11   suspicious about it, they say, Sorry, we reject this deposit,

12   and again, they hand them back their stock certificate and they

13   file a SAR.  Both of those circumstances are pre initiation of

14   a securities trade, but in no circumstance, even though there

15   are two types that I just mentioned, that clearly are pre

16   initiation of a trade, there are no circumstances when DTC will

17   ever intersect with the SAR filings.  The time horizons are

18   different.

19             As of, I think, this week, you have three days to

20   clear and settle a trade through DTC and NSCC.  You have 30

21   days from the day of the detected suspicious activity to file

22   your SAR with FinCEN, wherever that may be in Washington, D.C.,

23   so they're two time horizons.  They are two totally separate

24   events.

25             Let me turn to just the convenience side here, because

H9fWalpC

1    I know your Honor's time is limited.

2              THE COURT:  Before you turn to that, I understood,

3    though, that while as a theoretical matter, not every SAR

4    filing is related to a transaction in securities that would

5    clear through New York, and you've given two examples of that

6    kind of situation, but in this case, the SAR violations at

7    issue, as alleged, relate to transactions that resulted in

8    clearing through New York.  Am I right?

9              MR. BAKER:  It's impossible for me to tell.  They have

10   alleged, I think the best you can say is by category, types of

11   SAR filings.  I can't tell.  They haven't identified specific

12   SARs or specific transactions.  That's what discovery, I

13   assume, will be for.  But even so, there isn't a situation

14   where DTC will ever intersect with a SAR.

15             A SAR could be filed, and that transaction may make

16   its way on to DTC or NSCC, but it's unrelated to the filing of

17   a SAR or the maintenance of proper books and records within the

18   four walls of Alpine Securities.  That's the case they brought.

19   They investigated this matter for two years.  I assume they

20   brought their best factual case, and that is, Alpine

21   Securities, as an entity, your books and records were not

22   accurate at a given point in time.  That's all I know from

23   their complaint.

24             Certainly, under 1404(a), to transfer this to a more

25   convenient district is where most courts turn first, and

H9fWalpC

1    there's case law that supports that.  We've cited that in our

2    brief, but again, there are no parties in this district.  There

3    are no transactions.  There are no operative facts.  The

4    witnesses, again, to use the language that the commission, or

5    the SEC, used, are scattered across the country, but that's not

6    entirely accurate because most of the witnesses identified are

7    either current or former Alpine employees, and they are all

8    located in the general Salt Lake City, Utah, area.

9             There are a couple who are outside of Salt Lake City,

10   Utah, but none of them are in this district.

11            THE COURT:  They're in Iowa and Maine.

12            MR. BAKER:  Iowa and Maine.  That's not the Southern

13   District of New York, and I'm certain that they would agree

14   that it's just as inconvenient for them to come here as it is

15   for them to go to Salt Lake City.  In fact, the one in Maine is

16   a current employee and maintains a condominium in Salt Lake

17   City for the two weeks a month he spends there.  So as far as

18   convenience goes, there's no question that it's substantially

19   more convenient for parties, witnesses.

20            The lone witness that they claim, that the commission

21   claims, or the SEC claims, is in this district or actually not

22   even in this district -- they just say in the New York area,

23   which I suppose could be anywhere from Philadelphia to

24   Connecticut, but are these two homeland security agents, who

25   sat through some of the proffer interviews and took notes of

H9fWalpC

1    some of the witnesses.

2              Now, mind you, those same homeland security agents and

3    same SEC staffers all went to Salt Lake a couple of times too,

4    but they have no independent knowledge of any of the facts, and

5    there's no guarantee they'll even be called as witnesses.  They

6    will be used as impeachment witnesses, in any event, certainly

7    once discovery starts.

8              It's imperative that you understand that this is not a

9    trading case.  This is not a manipulation case.  This is a

10   books-and-records case, and that whether or not a SAR is filed

11   will never trigger anything as part of the clearance and

12   settlement system, and certainly institutionally, the

13   commission understands that because they issued guidance last

14   week on shortening the clearance and settlement from D plus

15   three to D plus two, so they have three days to clear and

16   settle a trade.  You have 30 days to file a SAR, or a

17   suspicious activity report, but it is unquestionable that the

18   center of gravity, and I use that language because it comes

19   from many cases, the center of gravity in this litigation is in

20   Utah.  There are very educated, capable federal district court

21   judges there.  I do have to concede that in this district,

22   you're more likely to know the securities laws, but these are

23   very smart judges.  These are capable judges.

24             I won't bother to track through the factors that

25   relate to convenience, but every single one of them applies in

H9fWalpC

1    Alpine certainly.  There really are no connections to this

2    district, and certainly the homeland security agents can't be a

3    connection because they are witnesses well after the operative

4    facts, and they may not even be witnesses unless somebody

5    changes their story.

6                THE COURT:  Excuse me one minute, counsel.  Sorry.

7                Thank you.

8                MR. BAKER:  Sure.

9                I'll finish by saying that I've been a lawyer for over

10   25 years.  I spent 13 years at the commission, at the SEC.  In

11   all those years, I have never seen a case filed in a district

12   where there was so little connection.  It's blatant forum

13   shopping, and in their opposition papers, they admit twice --

14   and we don't have to guess why they filed it here, they admit

15   it twice -- they want to make the biggest media splash they can

16   make.  They want to send a message, and they think only the

17   Southern District cases can send a message to the brokerage

18   community on Wall Street, and they're using blatant and brazen

19   forum shopping to be able to do that, and that is improper and

20   should not be allowed to stand.  And I'll be interested in

21   knowing how they can justify hauling Utah defendants,

22   witnesses, documents into this court simply because they want

23   to send a message to Wall Street, simply because they want the

24   biggest media splash.  That is brazen forum shopping, and that

25   is improper under any rule.

H9fWalpC

<table>
<tr><td>1</td><td>THE COURT:  Thank you.</td></tr>
<tr><td>2</td><td>MR. BAKER:  I think that about does it, your Honor.</td></tr>
<tr><td>3</td><td>THE COURT:  Thank you.</td></tr>
</table>

1          THE COURT:  Thank you.

2          MR. BAKER:  I think that about does it, your Honor.

3          THE COURT:  Thank you.

4          Counsel, I'm going to take a recess in this civil case

5  and hear the criminal case, which is prepared.  I'm very sorry

6  that I have to do this, but I need to interrupt you for this

7  criminal case.

8          (Recess)

9          THE COURT:  Counsel in the SEC case, thank you very

10 much for letting me take that break.

11         Let me ask you, Mr. Carlyle, is there anything you

12 wish to say in response to the argument presented by Mr. Baker?

13         MR. CARLYLE:  Your Honor, my cocounsel, Mr. Miller,

14 briefed this issue, and I believe he has some issues that he

15 would like to address.

16         MR. MILLER:  Thank you, your Honor.

17         The first thing I want to address is the connection

18 between our allegations in the district that counsel spoke

19 about, or argued the lack of.

20         Just to back up, what Alpine does is, at least with

21 respect to this case -- it's a clearing firm -- it clears

22 trades on behalf of its clients, and it can't run its model

23 business without the type of platform that's provided by DTC

24 and NSCC.  That platform is what allows clearing brokers like

25 Alpine to work at the high volumes that it does, and many of

H9fWalpC

1    those trades that are the subject of this complaint that flow

2    through Alpine and that Alpine directs to DTC are fraudulent.

3         There are a number of examples in there, and we allege

4    that many of Alpine's customers are violating securities laws

5    by having Alpine send securities transactions to the DTC

6    platform, and it's Alpine's failure to adequately report this

7    suspicious activity which is the entire basis of our complaint.

8         There was a comment that counsel made about the

9    difficulty or apparent difficulty to tell from the complaint

10   what we were alleging, and I think I'll point to paragraph 8 of

11   the complaint, where we allege that most of the transactions

12   that are the subject of the complaint did flow into DTC in this

13   district, and it's the failure to report those suspicious

14   transactions which are the basis for the alleged violations.

15        In short, I'll just finish that point by repeating

16   this comment in our briefs, that there is no requirement to

17   file a suspicious activity report without a suspicious

18   transaction.  Those suspicious transactions in this case flow

19   predominantly into this district, and that's the reason why

20   venue is proper here under Section 27.

21        I think that shifts into the Section 1404 argument.

22   I'll start there with just commenting on the purpose for the

23   commission's choice of forum, which is I think the predominant

24   issue before you get into all the others.  The purpose that we

25   explained in our brief was that Alpine has repeatedly failed to

H9fWalpC

1   report this suspicious activity that it directs to this

2   district.  FINRA has told Alpine that its reports are

3   inadequate, and it's continued to do that.  The point of filing

4   in this district is to prevent future misconduct by Alpine, and

5   in a way we're asking the Court's preventive injunctive relief

6   in this case.

7        Now, the secondary purpose that's related to prevent

8   further misconduct by Alpine in this district is the

9   precedential effect that a judgment in this district would have

10  on the industry, and this is definitely not to say that courts

11  in Utah are not as equally capable of applying federal law;

12  it's more of the reality of the fact that this is the nation's

13  financial center and that so many of the brokers and dealers

14  that do business here don't do business in Utah, and when there

15  are litigated disputes, a judgment from this Court just carries

16  more weight in most of those cases.

17       Finally, I think the only other factor that's really

18  disputed once you get to the reply is the convenience of

19  witnesses.  Most of the other factors, I think, were based on

20  another misapprehension of Section 27 of the Exchange Act.  We

21  can get into those factors if the Court wants, but there's no

22  problem compelling witnesses to attend trial in this district.

23  There's no problem with this Court requiring anybody in the

24  nation to respond to a document subpoena or a deposition

25  subpoena.  And with respect to the convenience of the

H9fWalpC

1   witnesses, I think the Court doesn't have to go past the

2   motion, which is that Alpine wholly failed to follow just the

3   basic requirement of submitting a declaration that explains the

4   content of anticipated testimony in a way that allows the Court

5   to weigh the significance of the witnesses and to understand

6   who the primary witnesses are.

7       Now, there's a supplemental declaration that was

8   attached to the reply that I think the Court can disregard, but

9   even if we want to look at it, it doesn't cure any of the

10  defects.  If you look through, again, it's a laundry list of 20

11  witnesses in a books-and-records case, many of whom have, I

12  think, copied and pasted the same description of testimony, so

13  at best it's cumulative.  At worst, it's irrelevant, and

14  there's just no explanation of who Alpine thinks the primary

15  witnesses are, and there's no indication from the complaint or

16  the briefs why Alpine would need to call 20 employees to

17  testify about a books-and-records case.

18      I think the last point I want to address that counsel

19  brought up was the argument about the homeland security agents,

20  and it was actually the supplemental declaration, the last

21  paragraph, that made a point that Alpine witnesses, current

22  Alpine employees disagree with the SEC's summary of what they

23  anticipate their testimony to be.  The declaration, if it does

24  anything, elevates the importance of these homeland security

25  agents to be there to testify about what the employees said the

H9fWalpC

1   first time they were interviewed.

2          Unless the Court has questions, I think that the

3   jurisdiction argument is clearly something that should be

4   summarily rejected.  The fact that it was the thousands of

5   suspicious transactions that were sent to this district that

6   are the core basis the complaint gets us past 1406, and the

7   commission's choice of forum is not outweighed by any of the

8   other factors that are relevant under 1404.

9          THE COURT:  Thank you.

10          I'm prepared to rule on the motion.

11          There were essentially three grounds raised.  One was

12   the personal jurisdiction argument.  That's been largely

13   abandoned.  The original personal jurisdiction argument was

14   brought under New York long-arm statute, which is not the

15   controlling law with respect to that issue.  There is a remnant

16   of that personal jurisdiction argument which has to do with the

17   due process clause, which is, of course, always relevant, but

18   the test there is as broad as everyone realizes.

19          Here, due process is not offended.  The defendant's

20   entire business activity was directed to New York.  It

21   purposefully avails itself every day it is in business of the

22   privilege of conducting activities in the Southern District of

23   New York, and this litigation is directly related to those

24   activities.

25          The essence of this dispute is whether SARs should

H9fWalpC

have been filed in connection with transactions cleared through

the Southern District of New York financial institutions, so

there's no problem under the due process clause with pursuing

this litigation by an exercise of personal jurisdiction, which

the federal securities laws allow throughout the geographic

boundaries of the United States.

        The second argument is one connected with, as counsel

describe it, venue.  It stems from Section 27, and that

provision of the law allows a suit or action to enforce

liability, under the relevant securities laws, to be brought in

any district wherein the defendant transacts business, and

there's no dispute that it is a core part of the defendant's

business -- that is, Alpine Securities Corporation -- to

transact business in the Southern District of New York.

        I think that brings us, then, to the 1404 argument,

and as Mr. Baker acknowledged, that's the heart of the dispute

here.  Counsel are familiar with opinions I've written in this

area.  There are many, many opinions under 1404 that I and the

circuits and other district judges have issued, but I'll just

refer to my description of the law in the Poseidon case, 2016

WL 3017395, just for convenience.  Each side has addressed that

and is familiar with that decision.

        Of course, the first issue is whether or not the

plaintiff's choice of forum should be granted deference.

Normally it is granted deference, but under Second Circuit law,

H9fWalpC

         the degree of deference can vary based on the circumstances in
         the individual case.  Here, it is appropriate to grant the
         SEC's choice of forum -- that is, the Southern District of New
         York -- deference.  It is not chosen for an improper purpose.
         As everyone acknowledges, New York is the financial center of
         this country, and securities litigation is regularly conducted
         in this district.  It is not improper to seek to pursue this
         litigation that is so central to the defendant's business in
         the Southern District of New York.

                  Let's turn, then, to the private and public interests
         that must be weighed under Section 1404.

                  Again, the defendant bears the burden here of showing
         that these factors tilt in its favor.  The private factors
         include the relative ease of access to sources of proof; the
         availability of compulsory process for the attendance of any
         unwilling witness; the cost of obtaining attendance of willing
         witness; the possibility of viewing a premises not at issue
         here, and all other practical problems that may be associated
         with making a trial easy, expeditious and inexpensive.

                  Then one would turn to the public factors, including
         congestion in the court; the interests of forums in having
         localized controversies decided at home; the interest in not
         imposing jury duty on people with no interest in the litigation
         and any unfamiliarity with the law that applies that would be
         greater in one district versus the other.

H9fWalpC

1          The defendant has not shown that these factors tilt in

2     its favor and certainly not sufficiently to overcome the

3     deference to be shown the plaintiff's choice of forum.

4          This is primarily a document case, and therefore the

5     records are equally available to both parties in whatever

6     district this case would be prosecuted or pursued.  There's no

7     dispute that process would require the attendance of witnesses

8     in the Southern District of New York in this action, and there

9     will be some burden with respect to witnesses having to travel

10    to this district from Utah and other locations, including Maine

11    and Iowa, but not a sufficient showing of how many such

12    witnesses there are that are realistically needed for a trial

13    or hearing in this district.  It was the defendant's burden to

14    make that showing, and it has failed to do so.

15         In terms of public interest factors, there is no

16    problem with court congestion here.  I'm able to speedily

17    address this case on my docket.  Certainly there's no burden on

18    a New York jury of addressing issues related to the enforcement

19    of the securities laws, which are at the heart of much of the

20    financial lifeblood of this district and its businesses and

21    people, and certainly no inability for this Court to understand

22    the relevant law, though that doesn't give me any advantage

23    over the District of Utah.  We're all federal judges.  We can

24    all apply and understand federal law.  I don't have an

25    advantage here, but I don't have a disadvantage there either.

H9fWalpC

1   Therefore, the application to transfer is denied.

2           Let's turn to the initial conference issues.  I have

3   the Rule 26(f) report.  It indicates that the parties are going

4   to make their initial disclosures in this case in a week,

5   September 22.  That's just fine.

6           The SEC has provided the defendant with a protective

7   order, and I know the defendant has been reviewing that, so why

8   don't I also expect a protective order to be submitted to me

9   for signature next Friday, the 22nd.  If there's any

10  disagreement about a particular provision, just give one order

11  with the disputed language in bold so I can read that disputed

12  language in context, but I expect to be able to review that and

13  approve it, or not, next Friday.

14          Then let's talk about schedule generally for fact

15  discovery.  I'm going to assume that in early October, initial

16  interrogatories and document demands will be served and they'll

17  be responded to in early November.

18          How many depositions does the SEC wish to take?

19          MR. CARLYLE:  Your Honor, we had originally discussed

20  a limit of 10 deposition, but that was before we saw, in this

21  briefing here, that the defendants intend to rely on up to, I

22  think, 20 witnesses that they've listed.  As you noted, we have

23  yet to exchange 26(a)(1) disclosures, but if indeed it looks

24  like the defendant intends to rely on the 20 witnesses, we may

25  well seek to take that many depositions.

H9fWalpC

1          THE COURT:  OK.  Let's approach this anew.  You've

2     described this to me as a books-and-records case, so you're

3     going to need a 30(b)(6).  Who do you need besides the

4     30(b)(6)?  Was there a compliance officer?

5          MR. CARLYLE:  Your Honor, yes.  I must say I think my

6     cocounsel is more familiar with the folks who are on that list

7     right now.

8          THE COURT:  Don't look at the defendant's list.  That

9     was a list prepared for this motion.  I'm talking about who you

10    think you want.

11         MR. CARLYLE:  Yes, your Honor.  We have a list.  It's,

12    I believe, five witnesses.  I think it's two different chief

13    compliance officers.

14         THE COURT:  So a 30(b)(6), two compliance officers,

15    and who else?

16         MR. CARLYLE:  A general counsel.

17         THE COURT:  And is that someone, if there's an

18    advice-of-counsel defense, or general counsel you think is

19    going to be able to give deposition testimony?

20         MR. CARLYLE:  It's someone that we anticipate being

21    able to give deposition testimony as a fact witness based on

22    involvement in the process of providing and submitting the SARs

23    reports.

24         THE COURT:  OK.

25         MR. CARLYLE:  OK?

H9fWalpC

1            THE COURT:  That's four.

2            MR. CARLYLE:  Yes.

3            THE COURT:  Anyone else?

4            MR. CARLYLE:  I apologize.  It's the chief compliance

5    officer, the general counsel, an AML officer.  I'm sorry.

6    There are three people that are described as AML officers, who

7    are within the compliance function but are not actually the

8    chief compliance officer.

9            THE COURT:  When you say AML, what does that mean?

10           MR. CARLYLE:  I apologize.  It's antimoney laundering,

11   and it's the function under which the SAR filings fall.

12           THE COURT:  OK.  Let's assume you only need one of

13   those.

14           MR. CARLYLE:  OK.

15           THE COURT:  I mean, this is a business practice case,

16   right?

17           MR. CARLYLE:  Understood, your Honor, but those folks

18   worked at Alpine during different points in time during the

19   relevant period, so they do have different --

20           THE COURT:  Oh.

21           MR. CARLYLE:  It's not three people who had

22   overlapping responsibilities.

23           THE COURT:  OK.  To cover each of the periods at

24   issue, you need three people.

25           MR. CARLYLE:  Yes, your Honor.

H9fWalpC

1          THE COURT:  OK.  Anyone else?

2          MR. CARLYLE:  That's our list right now, save for the

3     homeland security agents that have been referenced before that

4     may or may not be needed.

5          THE COURT:  You're not planning to take their

6     depositions.

7          MR. CARLYLE:  No.  That's correct, your Honor.  Sorry.

8          THE COURT:  OK.  That's six depositions.  Great.

9          Mr. Baker, how many do you need?

10          MR. LABENTA:  Your Honor, Aaron Lebenta, if I might

11     address this.

12          The problem we're having right now is we don't

13     actually know which SARs are at issue.  They haven't identified

14     them in the complaint.  The reason we identified so many

15     individuals within our declaration and supplemental declaration

16     is we just identified those folks responsible for the BSA

17     compliance program during the relevant time period.

18          We will need at least to take the depositions of at

19     least the former employees of Alpine, which I think there's six

20     as well, but there may be more.  We're going to have to have

21     expert depositions.

22          THE COURT:  I'm just dealing with fact witnesses.

23          MR. LABENTA:  Just fact witnesses.

24          THE COURT:  Fact witness.

25          MR. LABENTA:  At this point in time, without knowing

H9fWalpC

1    which SARs are at issue, your Honor, we would like ten.

2              THE COURT:  OK.

3              MR. LABENTA:  Because I don't know which witnesses we

4    need.

5              THE COURT:  Let's step back here.  It's a program that

6    you ran.

7              MR. LABENTA:  Yes.

8              THE COURT:  You had procedures, you had policies.

9              MR. LABENTA:  Yes.

10             THE COURT:  You've heard who the SEC wants.

11             MR. LABENTA:  Yes.

12             THE COURT:  There will be a 30(b)(6).

13             MR. LABENTA:  Right.

14             THE COURT:  Two compliance officers, because they had

15   different periods of time in which they were in charge; general

16   counsel; and three AML personnel, again because there are three

17   different periods.

18             MR. LABENTA:  Right.

19             THE COURT:  OK.  Who do you want besides that?

20             MR. LABENTA:  We're going to want one more.  Any

21   former employee, including Ms. Farmer.

22             THE COURT:  I don't know what her position is.

23             MR. LABENTA:  She was an AML officer, but she appears

24   to be the key witness that they're relying upon.  She's the

25   individual who is now in Iowa.

H9fWalpC

1          THE COURT:  So not one of the three?

2          MR. LABENTA:  I don't know.

3          Go ahead.

4          MR. CARLYLE:  To clarify, she was one of the witnesses

5     that I described as the chief compliance officer.  I understand

6     that wasn't her title for a period of time.

7          MR. LABENTA:  OK.

8          THE COURT:  She's already being deposed.

9          MR. LABENTA:  That's fine.  I guess if I had names --

10    it's tough, because I don't know who's qualified.

11         THE COURT:  You have the titles.

12         MR. LABENTA:  There's a number of them, your Honor.

13    That's the only issue.

14         THE COURT:  OK, counsel.  Let's deal with it this way.

15    This is for planning purposes.  I'm not sure the defendant is

16    going to want to take any depositions, but it may.  I'm not

17    going to let you take more than six.

18         MR. LABENTA:  OK.

19         THE COURT:  Without coming to me and making a specific

20    showing as to why you need more than six.

21         MR. LABENTA:  OK.

22         THE COURT:  All in all, we're making a plan here that

23    there will be twelve depositions in this case, fact

24    depositions.  I'm not sure that we're going to have any more

25    than six.  It may not be in the defendant's interest to take

H9fWalpC

1   any depositions; I have no idea.

2                    MR. LABENTA:  Yes.

3                    THE COURT:  We're now in a position to make a plan.

4                    The initial interrogatories and document demands are

5   served, roughly, under our plan early in October and responded

6   to in early November.  You then spend the rest of November

7   looking at the documents that have been produced.

8                    You can start depositions in December.  You have

9   twelve depositions in all, so fact discovery will end March 30.

10  You folks want expert discovery, so April 20 will be the expert

11  report by the party bearing the burden.  May 11 will be

12  rebuttal expert reports, and June 1, expert discovery will

13  close.

14                   I saw here that there was a desire for summary

15  judgment practice.  If there is going to be a summary judgment

16  motion, it will be filed June 13.  Opposition will be August 3.

17  Reply will be August 17.

18                   Is there a demand for a jury, or is this a nonjury

19  case?

20                   MR. CARLYLE:  There is, your Honor.

21                   THE COURT:  There is what?

22                   MR. CARLYLE:  I'm sorry.  There is a demand for a

23  jury.

24                   THE COURT:  OK.  If there is no summary judgment

25  motion, then the pretrial order in this jury case will be due

H9fWalpC

1    July 13.

2            OK.  Now, let's talk about settlement.  We have a

3    mediation program in this district.  We also have an

4    opportunity to send you to a magistrate judge for settlement

5    discussions.  Your magistrate judge is Judge Ellis.

6            Let's talk about a schedule for settlement

7    discussions.  I'm going to suggest that you pursue settlement

8    discussions probably in February.  That would give you a chance

9    to have taken a couple of depositions, to have a really good

10   handle on the case and yet save you some of the expense of

11   expert discovery.  Does February for settlement discussions

12   sound about right?

13           MR. CARLYLE:  For the SEC, yes, your Honor.

14           THE COURT:  Mr. Labenta.

15           MR. LABENTA:  No problem.  Yes, that would be fine.

16           THE COURT:  February for settlement discussions.  And

17   do you want to go before a mediator or Magistrate Judge Ellis?

18           MR. CARLYLE:  The SEC would be happy with either,

19   prefer the magistrate judge.

20           THE COURT:  Mr. Baker, Mr. Labenta.

21           MR. LABENTA:  That would be fine with us as well, the

22   magistrate judge, but either would be fine.

23           THE COURT:  If either would be fine, I'm going to send

24   you to a mediator.  I'll get out a scheduling order with these

25   critical dates, but fact discovery will conclude March 30;

H9fWalpC

1    expert discovery June 1; any summary judgment motion, or in its

2    absence, a pretrial order in this jury case will be due July 13

3    next year.

4           Let's talk about discovery.

5           Yes, counsel.

6           MR. LABENTA:  Your Honor, just from the defendant's

7    position, they've alleged over 5,000 individual SARs

8    violations.  They've been investigating this case for literally

9    years.  We don't even know at this stage what violations

10   they're talking about, which SARs they actually claim are in

11   violation.  Respectfully, your Honor, March 30 seems kind of

12   tight for us to conduct this analysis of thousands when they

13   have had literally years to do their front end.  We're in a

14   defensive position.  We don't know from their complaint which

15   ones they claim or why they claim they're inadequate.

16          In order to get depositions done in December, I'm not

17   quite sure how we're going to get the very base, foundational

18   knowledge we need to have in order to conduct those depositions

19   in such a tight schedule.  I do appreciate the Court moving it

20   forward, but I'm concerned about the schedule.

21          THE COURT:  This is part of the Rule 26(f) conference

22   among the parties.  Have you discussed with each other how

23   you're going to get those transactions identified?

24          Not yet?  Why don't we take a break.  Why don't we

25   take a break.  You're here.  It makes sense for everybody to

H9fWalpC

1    try to get on the same page and have those discussions,

2    complete your 26(f) conference.  Try to make as much progress

3    as you can, and my law clerk will let you know how to get in

4    touch with my chambers, and I'll resume this conference when

5    you're ready to discuss these issues in more detail with me.

6              Let me just complete this portion of the conference by

7    telling you how we're going to conduct discovery.  If you have

8    a discovery problem, you have to meet and confer, try to

9    resolve it in good faith.  If you have any problem after that

10   meet-and-confer process that remains unresolved, write me a

11   letter no longer than two pages.  I'll get you on the phone,

12   hear you out, and give you a ruling.

13             If you want discovery, you have to be diligent and

14   pursue it.  Move forward, if March comes and you haven't taken

15   any deposition, it's too late.

16             Good.  My law clerk will tell you how to get in touch

17   with me.  You can use my jury room for your consultations.

18   Good luck.

19             (Recess)

20             THE COURT:  You may be seated.

21             Mr. Baker, have you had an opportunity to confer with

22   the SEC?

23             MR. BAKER:  Yes, we have, your Honor, and I think I'll

24   have Mr. Labenta speak to that.

25             MR. LABENTA:  Your Honor, it's my understanding -- you

H9fWalpC

1    guys will correct me if I've overstated something -- that they

2    will provide us with the documents as soon as we have the

3    protective order entered, and they're going to provide a

4    schedule.  Just having the documents isn't all that helpful.

5    We need to know what they claim is wrong with them.  They said

6    they could have a schedule prepared of what they claim is wrong

7    with each SAR by the end of October, which means we can't

8    really start what we're doing until the end of October, which,

9    given that, I would like if we could to push everything out

10   maybe 30 days, just given that we're not going to be able to

11   start.  It is what it is, that it can't be provided until then.

12             THE COURT:  Mr. Carlyle.

13             MR. CARLYLE:  Your Honor, Mr. Miller will address this

14   line.

15             MR. MILLER:  That's the gist of the agreement we just

16   got to, and the SEC's going to put together that schedule

17   regardless of the timeline, so we'll get it to the other side

18   as soon as we can, but we have no strong objection to an extra

19   30 days, and we also have no problem with the current schedule

20   the Court laid out, so we'd defer to the Court.

21             THE COURT:  Mr. Miller, you don't have such a

22   schedule?

23             MR. MILLER:  What we have is a, I'll call it a big

24   step towards a schedule, and so there are some mechanical

25   things that have to happen in sequence, and one of them is as

H9fWalpC

simple as making sure that the schedule is citing to the

correct pages and those pages get labeled once they're

produced.  It's more of a big, I guess I'll just call it a

housekeeping project.

          Like I said, if it gets done mid-October or earlier

than that, we'll send it over the day it's ready.  I'd say

we've been working on it, and definitely we're not starting

from scratch, but it's not complete in a product that we could

call a response to a discovery request yet.

          THE COURT:  How about two weeks?

          MR. MILLER:  Two weeks from?

          THE COURT:  Today.

          MR. MILLER:  I think that we'll definitely give it a

shot, and perhaps if we get close to two weeks and it looks

like there's something unforeseen that came up, we can address

it with defendant first.  And if then if there's still a

problem, we can address the Court, but we'll definitely make a

shot for two weeks.  And assuming the protective order is in by

then, I think we'll be OK on that end.

          THE COURT:  Good.  Terrific.  I didn't put down an

actual date for the protective order on my notes.  I think we

were just talking about it informally.

          Who is producing the draft?

          MR. MILLER:  We're working together.  The SEC will

take the lead in actually submitting it.  It should be a joint

H9fWalpC

1    proposal, and I think the Court did mention that we should be

2    filing it by no later than the 22nd, when we do our initial

3    disclosures.  Again, if it's something we get to on Monday or

4    Tuesday, the commission will submit it as soon as it's ready,

5    but no later than next week.

6            THE COURT:  OK, but in any event, we talked about a

7    schedule which would have it signed far in advance, at least a

8    week in advance, of your production of the chart.

9            MR. LABENTA:  Yes.

10           THE COURT:  Good.

11           Good luck, counsel.  Thank you.

12           (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25