H9fWalpC

1    UNITED STATES DISTRICT COURT                **EXHIBIT A**
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES SECURITIES AND
     EXCHANGE COMMISSION,
4
                    Plaintiff,
5
                 v.                              17 Civ. 4179 (DLC)
6

7    ALPINE SECURITIES CORPORATION,
                                                 Conference
8
                    Defendant.
9
     ------------------------------x
10                                               New York, N.Y.
                                                 September 15, 2017
11                                               2:30 p.m.

12   Before:

13                      HON. DENISE L. COTE,

14                                               District Judge

15
                          APPEARANCES
16
     ZACHARY T. CARLYLE
17   TERRY R. MILLER
          Attorneys for Plaintiff
18        U.S. Securities and Exchange Commission

19

20
     CLYDE SNOW & SESSIONS, P.C.
21        Attorneys for Defendant
     BY:  BRENT R. BAKER
22        AARON D. LEBENTA
          JONATHAN D. BLETZACKER
23

24

25

2

H9fWalpC

1          (Case called)

2          MR. CARLYLE:  Zachary Carlyle, and with me today is

3     Terry Miller.

4          MR. BAKER:  Brent Baker, Aaron Lebenta and Jon

5     Bletzacker, for Alpine Securities.

6          THE COURT:  And in addition, your client is with you

7     at the table?

8          MR. BAKER:  Yes.  We have Chris Frankel, who is

9     representing the client here today.

10          THE COURT:  Thank you.

11          This is a case in which the SEC has brought a

12     securities action in New York, and there is a motion that was

13     brought raising a number of issues: lack of personal

14     jurisdiction as a matter of New York's long-arm statute and the

15     due process clause; a venue argument and motion for transfer

16     pursuant to Section 1404, and related issues.  At least one of

17     those issues has fallen by the wayside in course of briefing,

18     and I'm prepared to rule on that motion today but want to give

19     the parties an opportunity to add anything that they feel is

20     necessary to their papers.

21          This is the defendant's motion.  Mr. Baker, is there

22     anything else you wanted to say?

23          MR. BAKER:  With respect to the personal jurisdiction

24     issue?

25          THE COURT:  Anything on the motion.

H9fWalpC

1           MR. BAKER:  Yes.

2           THE COURT:  Anything on the motion.

3           MR. BAKER:  I'd like to add a few things.  I'll be

4   brief.

5           THE COURT:  Yes.

6           MR. BAKER:  OK.  As your Honor correctly stated, we

7   brought this motion based on three separate issues and we

8   fully, on the case law, understand that we're going forward on

9   our strongest two arguments, the venue and the transfer motion,

10  and we are happy to answer any questions you have but would

11  rely on the briefing for the personal jurisdiction motion.

12          THE COURT:  I think you've abandoned New York long-arm

13  statute as a ground, but you continue to argue due process.  Am

14  I right?

15          MR. BAKER:  Correct.

16          THE COURT:  Fine.

17          MR. BAKER:  OK.

18          Again, we appreciate the chance, understanding this

19  was originally set as a scheduling conference, and we're

20  grateful to be able to at least argue the substance in part,

21  and we can speak to the Rule 26(f) components.

22          THE COURT:  We'll do that separately after I rule on

23  the motion.

24          MR. BAKER:  Great.  OK.

25          Our goal, of course, is to get your Honor to transfer

H9fWalpC

1    this matter to the most convenient forum, which is not the

2    Southern District of New York.  We want to transfer to the

3    District of Utah where a hundred percent of the witnesses, a

4    hundred percent of the parties, and frankly, even it's more

5    convenient for the plaintiffs, who are out of the Denver

6    office.  There are 15 flights a day, and it's an hour flight,

7    but there are no parties, more importantly, at all relative to

8    the operative facts, the underlying facts, in this district.

9         The complaint alleges not a trading violation, not

10   fraud, but books-and-records violations.  17(a) and Rule 17a-8,

11   under the Exchange Act, are the record keeping and retention

12   requirements, and they spend considerable time in their

13   opposition to laying out the process of clearing a trade

14   through DTC and NSCC, but that is completely separate from the

15   operative facts of this case.  Again, it's a books-and-records

16   case.  It's based on a violation that could be succinctly said

17   that their Bank Secrecy Act compliance program was inadequate

18   and that caused suspicious activity reports, SARs, to be filed

19   improperly, incorrectly.  I'm sure there are others.

20        There are several categories that they allude to in

21   the complaint, but if I take maybe two minutes here to unpack

22   the filing of a SAR, there are many places in the business of a

23   broker-dealer where a SAR could be filed that have nothing to

24   do with the actual trading in the security.  So if a client,

25   new client comes to you and says, I want to open an account,

H9fWalpC

1      and you, based on whatever your metrics are, your red flags

2      are, say, Sorry, we're not opening that account, go on your

3      way, you are required to file a suspicious activity report,

4      that report will never make its way to the DTC or NSCC in New

5      York.

6              Second point in the chain of a securities transaction

7      is when an existing client comes in to deposit a block of

8      stock, sophisticated block of a million shares of XYZ Corp.

9      Well, there's a deposit review team at the broker-dealer that

10     looks at that, and if they detect that there's something

11     suspicious about it, they say, Sorry, we reject this deposit,

12     and again, they hand them back their stock certificate and they

13     file a SAR.  Both of those circumstances are pre initiation of

14     a securities trade, but in no circumstance, even though there

15     are two types that I just mentioned, that clearly are pre

16     initiation of a trade, there are no circumstances when DTC will

17     ever intersect with the SAR filings.  The time horizons are

18     different.

19             As of, I think, this week, you have three days to

20     clear and settle a trade through DTC and NSCC.  You have 30

21     days from the day of the detected suspicious activity to file

22     your SAR with FinCEN, wherever that may be in Washington, D.C.,

23     so they're two time horizons.  They are two totally separate

24     events.

25             Let me turn to just the convenience side here, because

H9fWalpC

1    I know your Honor's time is limited.

2              THE COURT:  Before you turn to that, I understood,

3    though, that while as a theoretical matter, not every SAR

4    filing is related to a transaction in securities that would

5    clear through New York, and you've given two examples of that

6    kind of situation, but in this case, the SAR violations at

7    issue, as alleged, relate to transactions that resulted in

8    clearing through New York.  Am I right?

9              MR. BAKER:  It's impossible for me to tell.  They have

10   alleged, I think the best you can say is by category, types of

11   SAR filings.  I can't tell.  They haven't identified specific

12   SARs or specific transactions.  That's what discovery, I

13   assume, will be for.  But even so, there isn't a situation

14   where DTC will ever intersect with a SAR.

15             A SAR could be filed, and that transaction may make

16   its way on to DTC or NSCC, but it's unrelated to the filing of

17   a SAR or the maintenance of proper books and records within the

18   four walls of Alpine Securities.  That's the case they brought.

19   They investigated this matter for two years.  I assume they

20   brought their best factual case, and that is, Alpine

21   Securities, as an entity, your books and records were not

22   accurate at a given point in time.  That's all I know from

23   their complaint.

24             Certainly, under 1404(a), to transfer this to a more

25   convenient district is where most courts turn first, and

H9fWalpC

1    there's case law that supports that.  We've cited that in our

2    brief, but again, there are no parties in this district.  There

3    are no transactions.  There are no operative facts.  The

4    witnesses, again, to use the language that the commission, or

5    the SEC, used, are scattered across the country, but that's not

6    entirely accurate because most of the witnesses identified are

7    either current or former Alpine employees, and they are all

8    located in the general Salt Lake City, Utah, area.

9           There are a couple who are outside of Salt Lake City,

10   Utah, but none of them are in this district.

11          THE COURT:  They're in Iowa and Maine.

12          MR. BAKER:  Iowa and Maine.  That's not the Southern

13   District of New York, and I'm certain that they would agree

14   that it's just as inconvenient for them to come here as it is

15   for them to go to Salt Lake City.  In fact, the one in Maine is

16   a current employee and maintains a condominium in Salt Lake

17   City for the two weeks a month he spends there.  So as far as

18   convenience goes, there's no question that it's substantially

19   more convenient for parties, witnesses.

20          The lone witness that they claim, that the commission

21   claims, or the SEC claims, is in this district or actually not

22   even in this district -- they just say in the New York area,

23   which I suppose could be anywhere from Philadelphia to

24   Connecticut, but are these two homeland security agents, who

25   sat through some of the proffer interviews and took notes of

H9fWalpC

1    some of the witnesses.

2            Now, mind you, those same homeland security agents and

3    same SEC staffers all went to Salt Lake a couple of times too,

4    but they have no independent knowledge of any of the facts, and

5    there's no guarantee they'll even be called as witnesses.  They

6    will be used as impeachment witnesses, in any event, certainly

7    once discovery starts.

8            It's imperative that you understand that this is not a

9    trading case.  This is not a manipulation case.  This is a

10   books-and-records case, and that whether or not a SAR is filed

11   will never trigger anything as part of the clearance and

12   settlement system, and certainly institutionally, the

13   commission understands that because they issued guidance last

14   week on shortening the clearance and settlement from D plus

15   three to D plus two, so they have three days to clear and

16   settle a trade.  You have 30 days to file a SAR, or a

17   suspicious activity report, but it is unquestionable that the

18   center of gravity, and I use that language because it comes

19   from many cases, the center of gravity in this litigation is in

20   Utah.  There are very educated, capable federal district court

21   judges there.  I do have to concede that in this district,

22   you're more likely to know the securities laws, but these are

23   very smart judges.  These are capable judges.

24           I won't bother to track through the factors that

25   relate to convenience, but every single one of them applies in

H9fWalpC

1     Alpine certainly.  There really are no connections to this

2     district, and certainly the homeland security agents can't be a

3     connection because they are witnesses well after the operative

4     facts, and they may not even be witnesses unless somebody

5     changes their story.

6             THE COURT:  Excuse me one minute, counsel.  Sorry.

7             Thank you.

8             MR. BAKER:  Sure.

9             I'll finish by saying that I've been a lawyer for over

10    25 years.  I spent 13 years at the commission, at the SEC.  In

11    all those years, I have never seen a case filed in a district

12    where there was so little connection.  It's blatant forum

13    shopping, and in their opposition papers, they admit twice --

14    and we don't have to guess why they filed it here, they admit

15    it twice -- they want to make the biggest media splash they can

16    make.  They want to send a message, and they think only the

17    Southern District cases can send a message to the brokerage

18    community on Wall Street, and they're using blatant and brazen

19    forum shopping to be able to do that, and that is improper and

20    should not be allowed to stand.  And I'll be interested in

21    knowing how they can justify hauling Utah defendants,

22    witnesses, documents into this court simply because they want

23    to send a message to Wall Street, simply because they want the

24    biggest media splash.  That is brazen forum shopping, and that

25    is improper under any rule.

H9fWalpC

1          THE COURT:  Thank you.

2          MR. BAKER:  I think that about does it, your Honor.

3          THE COURT:  Thank you.

4          Counsel, I'm going to take a recess in this civil case

5   and hear the criminal case, which is prepared.  I'm very sorry

6   that I have to do this, but I need to interrupt you for this

7   criminal case.

8          (Recess)

9          THE COURT:  Counsel in the SEC case, thank you very

10  much for letting me take that break.

11         Let me ask you, Mr. Carlyle, is there anything you

12  wish to say in response to the argument presented by Mr. Baker?

13         MR. CARLYLE:  Your Honor, my cocounsel, Mr. Miller,

14  briefed this issue, and I believe he has some issues that he

15  would like to address.

16         MR. MILLER:  Thank you, your Honor.

17         The first thing I want to address is the connection

18  between our allegations in the district that counsel spoke

19  about, or argued the lack of.

20         Just to back up, what Alpine does is, at least with

21  respect to this case -- it's a clearing firm -- it clears

22  trades on behalf of its clients, and it can't run its model

23  business without the type of platform that's provided by DTC

24  and NSCC.  That platform is what allows clearing brokers like

25  Alpine to work at the high volumes that it does, and many of

H9fWalpC

1    those trades that are the subject of this complaint that flow

2    through Alpine and that Alpine directs to DTC are fraudulent.

3         There are a number of examples in there, and we allege

4    that many of Alpine's customers are violating securities laws

5    by having Alpine send securities transactions to the DTC

6    platform, and it's Alpine's failure to adequately report this

7    suspicious activity which is the entire basis of our complaint.

8         There was a comment that counsel made about the

9    difficulty or apparent difficulty to tell from the complaint

10   what we were alleging, and I think I'll point to paragraph 8 of

11   the complaint, where we allege that most of the transactions

12   that are the subject of the complaint did flow into DTC in this

13   district, and it's the failure to report those suspicious

14   transactions which are the basis for the alleged violations.

15        In short, I'll just finish that point by repeating

16   this comment in our briefs, that there is no requirement to

17   file a suspicious activity report without a suspicious

18   transaction.  Those suspicious transactions in this case flow

19   predominantly into this district, and that's the reason why

20   venue is proper here under Section 27.

21        I think that shifts into the Section 1404 argument.

22   I'll start there with just commenting on the purpose for the

23   commission's choice of forum, which is I think the predominant

24   issue before you get into all the others.  The purpose that we

25   explained in our brief was that Alpine has repeatedly failed to

H9fWalpC

1    report this suspicious activity that it directs to this

2    district.  FINRA has told Alpine that its reports are

3    inadequate, and it's continued to do that.  The point of filing

4    in this district is to prevent future misconduct by Alpine, and

5    in a way we're asking the Court's preventive injunctive relief

6    in this case.

7         Now, the secondary purpose that's related to prevent

8    further misconduct by Alpine in this district is the

9    precedential effect that a judgment in this district would have

10   on the industry, and this is definitely not to say that courts

11   in Utah are not as equally capable of applying federal law;

12   it's more of the reality of the fact that this is the nation's

13   financial center and that so many of the brokers and dealers

14   that do business here don't do business in Utah, and when there

15   are litigated disputes, a judgment from this Court just carries

16   more weight in most of those cases.

17        Finally, I think the only other factor that's really

18   disputed once you get to the reply is the convenience of

19   witnesses.  Most of the other factors, I think, were based on

20   another misapprehension of Section 27 of the Exchange Act.  We

21   can get into those factors if the Court wants, but there's no

22   problem compelling witnesses to attend trial in this district.

23   There's no problem with this Court requiring anybody in the

24   nation to respond to a document subpoena or a deposition

25   subpoena.  And with respect to the convenience of the

H9fWalpC

witnesses, I think the Court doesn't have to go past the

motion, which is that Alpine wholly failed to follow just the

basic requirement of submitting a declaration that explains the

content of anticipated testimony in a way that allows the Court

to weigh the significance of the witnesses and to understand

who the primary witnesses are.

Now, there's a supplemental declaration that was

attached to the reply that I think the Court can disregard, but

even if we want to look at it, it doesn't cure any of the

defects.  If you look through, again, it's a laundry list of 20

witnesses in a books-and-records case, many of whom have, I

think, copied and pasted the same description of testimony, so

at best it's cumulative.  At worst, it's irrelevant, and

there's just no explanation of who Alpine thinks the primary

witnesses are, and there's no indication from the complaint or

the briefs why Alpine would need to call 20 employees to

testify about a books-and-records case.

I think the last point I want to address that counsel

brought up was the argument about the homeland security agents,

and it was actually the supplemental declaration, the last

paragraph, that made a point that Alpine witnesses, current

Alpine employees disagree with the SEC's summary of what they

anticipate their testimony to be.  The declaration, if it does

anything, elevates the importance of these homeland security

agents to be there to testify about what the employees said the

H9fWalpC

1     first time they were interviewed.

2            Unless the Court has questions, I think that the

3     jurisdiction argument is clearly something that should be

4     summarily rejected.  The fact that it was the thousands of

5     suspicious transactions that were sent to this district that

6     are the core basis the complaint gets us past 1406, and the

7     commission's choice of forum is not outweighed by any of the

8     other factors that are relevant under 1404.

9            THE COURT:  Thank you.

10           I'm prepared to rule on the motion.

11           There were essentially three grounds raised.  One was

12    the personal jurisdiction argument.  That's been largely

13    abandoned.  The original personal jurisdiction argument was

14    brought under New York long-arm statute, which is not the

15    controlling law with respect to that issue.  There is a remnant

16    of that personal jurisdiction argument which has to do with the

17    due process clause, which is, of course, always relevant, but

18    the test there is as broad as everyone realizes.

19           Here, due process is not offended.  The defendant's

20    entire business activity was directed to New York.  It

21    purposefully avails itself every day it is in business of the

22    privilege of conducting activities in the Southern District of

23    New York, and this litigation is directly related to those

24    activities.

25           The essence of this dispute is whether SARs should

H9fWalpC

1   have been filed in connection with transactions cleared through

2   the Southern District of New York financial institutions, so

3   there's no problem under the due process clause with pursuing

4   this litigation by an exercise of personal jurisdiction, which

5   the federal securities laws allow throughout the geographic

6   boundaries of the United States.

7          The second argument is one connected with, as counsel

8   describe it, venue.  It stems from Section 27, and that

9   provision of the law allows a suit or action to enforce

10  liability, under the relevant securities laws, to be brought in

11  any district wherein the defendant transacts business, and

12  there's no dispute that it is a core part of the defendant's

13  business -- that is, Alpine Securities Corporation -- to

14  transact business in the Southern District of New York.

15         I think that brings us, then, to the 1404 argument,

16  and as Mr. Baker acknowledged, that's the heart of the dispute

17  here.  Counsel are familiar with opinions I've written in this

18  area.  There are many, many opinions under 1404 that I and the

19  circuits and other district judges have issued, but I'll just

20  refer to my description of the law in the <u>Poseidon</u> case, 2016

21  WL 3017395, just for convenience.  Each side has addressed that

22  and is familiar with that decision.

23         Of course, the first issue is whether or not the

24  plaintiff's choice of forum should be granted deference.

25  Normally it is granted deference, but under Second Circuit law,

H9fWalpC

1    the degree of deference can vary based on the circumstances in

2    the individual case.  Here, it is appropriate to grant the

3    SEC's choice of forum -- that is, the Southern District of New

4    York -- deference.  It is not chosen for an improper purpose.

5    As everyone acknowledges, New York is the financial center of

6    this country, and securities litigation is regularly conducted

7    in this district.  It is not improper to seek to pursue this

8    litigation that is so central to the defendant's business in

9    the Southern District of New York.

10             Let's turn, then, to the private and public interests

11   that must be weighed under Section 1404.

12             Again, the defendant bears the burden here of showing

13   that these factors tilt in its favor.  The private factors

14   include the relative ease of access to sources of proof; the

15   availability of compulsory process for the attendance of any

16   unwilling witness; the cost of obtaining attendance of willing

17   witness; the possibility of viewing a premises not at issue

18   here, and all other practical problems that may be associated

19   with making a trial easy, expeditious and inexpensive.

20             Then one would turn to the public factors, including

21   congestion in the court; the interests of forums in having

22   localized controversies decided at home; the interest in not

23   imposing jury duty on people with no interest in the litigation

24   and any unfamiliarity with the law that applies that would be

25   greater in one district versus the other.

H9fWalpC

1      The defendant has not shown that these factors tilt in

2 its favor and certainly not sufficiently to overcome the

3 deference to be shown the plaintiff's choice of forum.

4      This is primarily a document case, and therefore the

5 records are equally available to both parties in whatever

6 district this case would be prosecuted or pursued.  There's no

7 dispute that process would require the attendance of witnesses

8 in the Southern District of New York in this action, and there

9 will be some burden with respect to witnesses having to travel

10 to this district from Utah and other locations, including Maine

11 and Iowa, but not a sufficient showing of how many such

12 witnesses there are that are realistically needed for a trial

13 or hearing in this district.  It was the defendant's burden to

14 make that showing, and it has failed to do so.

15      In terms of public interest factors, there is no

16 problem with court congestion here.  I'm able to speedily

17 address this case on my docket.  Certainly there's no burden on

18 a New York jury of addressing issues related to the enforcement

19 of the securities laws, which are at the heart of much of the

20 financial lifeblood of this district and its businesses and

21 people, and certainly no inability for this Court to understand

22 the relevant law, though that doesn't give me any advantage

23 over the District of Utah.  We're all federal judges.  We can

24 all apply and understand federal law.  I don't have an

25 advantage here, but I don't have a disadvantage there either.

H9fWalpC

1    Therefore, the application to transfer is denied.

2            Let's turn to the initial conference issues.  I have

3    the Rule 26(f) report.  It indicates that the parties are going

4    to make their initial disclosures in this case in a week,

5    September 22.  That's just fine.

6            The SEC has provided the defendant with a protective

7    order, and I know the defendant has been reviewing that, so why

8    don't I also expect a protective order to be submitted to me

9    for signature next Friday, the 22nd.  If there's any

10   disagreement about a particular provision, just give one order

11   with the disputed language in bold so I can read that disputed

12   language in context, but I expect to be able to review that and

13   approve it, or not, next Friday.

14           Then let's talk about schedule generally for fact

15   discovery.  I'm going to assume that in early October, initial

16   interrogatories and document demands will be served and they'll

17   be responded to in early November.

18           How many depositions does the SEC wish to take?

19           MR. CARLYLE:  Your Honor, we had originally discussed

20   a limit of 10 deposition, but that was before we saw, in this

21   briefing here, that the defendants intend to rely on up to, I

22   think, 20 witnesses that they've listed.  As you noted, we have

23   yet to exchange 26(a)(1) disclosures, but if indeed it looks

24   like the defendant intends to rely on the 20 witnesses, we may

25   well seek to take that many depositions.

H9fWalpC

1          THE COURT:  OK.  Let's approach this anew.  You've

2     described this to me as a books-and-records case, so you're

3     going to need a 30(b)(6).  Who do you need besides the

4     30(b)(6)?  Was there a compliance officer?

5          MR. CARLYLE:  Your Honor, yes.  I must say I think my

6     cocounsel is more familiar with the folks who are on that list

7     right now.

8          THE COURT:  Don't look at the defendant's list.  That

9     was a list prepared for this motion.  I'm talking about who you

10    think you want.

11         MR. CARLYLE:  Yes, your Honor.  We have a list.  It's,

12    I believe, five witnesses.  I think it's two different chief

13    compliance officers.

14         THE COURT:  So a 30(b)(6), two compliance officers,

15    and who else?

16         MR. CARLYLE:  A general counsel.

17         THE COURT:  And is that someone, if there's an

18    advice-of-counsel defense, or general counsel you think is

19    going to be able to give deposition testimony?

20         MR. CARLYLE:  It's someone that we anticipate being

21    able to give deposition testimony as a fact witness based on

22    involvement in the process of providing and submitting the SARs

23    reports.

24         THE COURT:  OK.

25         MR. CARLYLE:  OK?

H9fWalpC

1          THE COURT:  That's four.

2          MR. CARLYLE:  Yes.

3          THE COURT:  Anyone else?

4          MR. CARLYLE:  I apologize.  It's the chief compliance

5   officer, the general counsel, an AML officer.  I'm sorry.

6   There are three people that are described as AML officers, who

7   are within the compliance function but are not actually the

8   chief compliance officer.

9          THE COURT:  When you say AML, what does that mean?

10         MR. CARLYLE:  I apologize.  It's antimoney laundering,

11  and it's the function under which the SAR filings fall.

12         THE COURT:  OK.  Let's assume you only need one of

13  those.

14         MR. CARLYLE:  OK.

15         THE COURT:  I mean, this is a business practice case,

16  right?

17         MR. CARLYLE:  Understood, your Honor, but those folks

18  worked at Alpine during different points in time during the

19  relevant period, so they do have different --

20         THE COURT:  Oh.

21         MR. CARLYLE:  It's not three people who had

22  overlapping responsibilities.

23         THE COURT:  OK.  To cover each of the periods at

24  issue, you need three people.

25         MR. CARLYLE:  Yes, your Honor.

H9fWalpC

1              THE COURT:  OK.  Anyone else?

2              MR. CARLYLE:  That's our list right now, save for the

3    homeland security agents that have been referenced before that

4    may or may not be needed.

5              THE COURT:  You're not planning to take their

6    depositions.

7              MR. CARLYLE:  No.  That's correct, your Honor.  Sorry.

8              THE COURT:  OK.  That's six depositions.  Great.

9              Mr. Baker, how many do you need?

10             MR. LABENTA:  Your Honor, Aaron Lebenta, if I might

11   address this.

12             The problem we're having right now is we don't

13   actually know which SARs are at issue.  They haven't identified

14   them in the complaint.  The reason we identified so many

15   individuals within our declaration and supplemental declaration

16   is we just identified those folks responsible for the BSA

17   compliance program during the relevant time period.

18             We will need at least to take the depositions of at

19   least the former employees of Alpine, which I think there's six

20   as well, but there may be more.  We're going to have to have

21   expert depositions.

22             THE COURT:  I'm just dealing with fact witnesses.

23             MR. LABENTA:  Just fact witnesses.

24             THE COURT:  Fact witness.

25             MR. LABENTA:  At this point in time, without knowing

H9fWalpC

1    which SARs are at issue, your Honor, we would like ten.

2                THE COURT:  OK.

3                MR. LABENTA:  Because I don't know which witnesses we

4    need.

5                THE COURT:  Let's step back here.  It's a program that

6    you ran.

7                MR. LABENTA:  Yes.

8                THE COURT:  You had procedures, you had policies.

9                MR. LABENTA:  Yes.

10               THE COURT:  You've heard who the SEC wants.

11               MR. LABENTA:  Yes.

12               THE COURT:  There will be a 30(b)(6).

13               MR. LABENTA:  Right.

14               THE COURT:  Two compliance officers, because they had

15   different periods of time in which they were in charge; general

16   counsel; and three AML personnel, again because there are three

17   different periods.

18               MR. LABENTA:  Right.

19               THE COURT:  OK.  Who do you want besides that?

20               MR. LABENTA:  We're going to want one more.  Any

21   former employee, including Ms. Farmer.

22               THE COURT:  I don't know what her position is.

23               MR. LABENTA:  She was an AML officer, but she appears

24   to be the key witness that they're relying upon.  She's the

25   individual who is now in Iowa.

H9fWalpC

| 1 | THE COURT:  So not one of the three?

| 2 | MR. LABENTA:  I don't know.

| 3 | Go ahead.

| 4 | MR. CARLYLE:  To clarify, she was one of the witnesses

| 5 | that I described as the chief compliance officer.  I understand

| 6 | that wasn't her title for a period of time.

| 7 | MR. LABENTA:  OK.

| 8 | THE COURT:  She's already being deposed.

| 9 | MR. LABENTA:  That's fine.  I guess if I had names --

| 10 | it's tough, because I don't know who's qualified.

| 11 | THE COURT:  You have the titles.

| 12 | MR. LABENTA:  There's a number of them, your Honor.

| 13 | That's the only issue.

| 14 | THE COURT:  OK, counsel.  Let's deal with it this way.

| 15 | This is for planning purposes.  I'm not sure the defendant is

| 16 | going to want to take any depositions, but it may.  I'm not

| 17 | going to let you take more than six.

| 18 | MR. LABENTA:  OK.

| 19 | THE COURT:  Without coming to me and making a specific

| 20 | showing as to why you need more than six.

| 21 | MR. LABENTA:  OK.

| 22 | THE COURT:  All in all, we're making a plan here that

| 23 | there will be twelve depositions in this case, fact

| 24 | depositions.  I'm not sure that we're going to have any more

| 25 | than six.  It may not be in the defendant's interest to take

H9fWalpC

```
 1    any depositions; I have no idea.

 2                MR. LABENTA:  Yes.

 3                THE COURT:  We're now in a position to make a plan.

 4                The initial interrogatories and document demands are

 5    served, roughly, under our plan early in October and responded

 6    to in early November.  You then spend the rest of November

 7    looking at the documents that have been produced.

 8                You can start depositions in December.  You have

 9    twelve depositions in all, so fact discovery will end March 30.

10    You folks want expert discovery, so April 20 will be the expert

11    report by the party bearing the burden.  May 11 will be

12    rebuttal expert reports, and June 1, expert discovery will

13    close.

14                I saw here that there was a desire for summary

15    judgment practice.  If there is going to be a summary judgment

16    motion, it will be filed June 13.  Opposition will be August 3.

17    Reply will be August 17.

18                Is there a demand for a jury, or is this a nonjury

19    case?

20                MR. CARLYLE:  There is, your Honor.

21                THE COURT:  There is what?

22                MR. CARLYLE:  I'm sorry.  There is a demand for a

23    jury.

24                THE COURT:  OK.  If there is no summary judgment

25    motion, then the pretrial order in this jury case will be due
```

25

H9fWalpC

1    July 13.

2             OK.  Now, let's talk about settlement.  We have a

3    mediation program in this district.  We also have an

4    opportunity to send you to a magistrate judge for settlement

5    discussions.  Your magistrate judge is Judge Ellis.

6             Let's talk about a schedule for settlement

7    discussions.  I'm going to suggest that you pursue settlement

8    discussions probably in February.  That would give you a chance

9    to have taken a couple of depositions, to have a really good

10   handle on the case and yet save you some of the expense of

11   expert discovery.  Does February for settlement discussions

12   sound about right?

13            MR. CARLYLE:  For the SEC, yes, your Honor.

14            THE COURT:  Mr. Labenta.

15            MR. LABENTA:  No problem.  Yes, that would be fine.

16            THE COURT:  February for settlement discussions.  And

17   do you want to go before a mediator or Magistrate Judge Ellis?

18            MR. CARLYLE:  The SEC would be happy with either,

19   prefer the magistrate judge.

20            THE COURT:  Mr. Baker, Mr. Labenta.

21            MR. LABENTA:  That would be fine with us as well, the

22   magistrate judge, but either would be fine.

23            THE COURT:  If either would be fine, I'm going to send

24   you to a mediator.  I'll get out a scheduling order with these

25   critical dates, but fact discovery will conclude March 30;

H9fWalpC

expert discovery June 1; any summary judgment motion, or in its

absence, a pretrial order in this jury case will be due July 13

next year.

          Let's talk about discovery.

          Yes, counsel.

          MR. LABENTA:  Your Honor, just from the defendant's

position, they've alleged over 5,000 individual SARs

violations.  They've been investigating this case for literally

years.  We don't even know at this stage what violations

they're talking about, which SARs they actually claim are in

violation.  Respectfully, your Honor, March 30 seems kind of

tight for us to conduct this analysis of thousands when they

have had literally years to do their front end.  We're in a

defensive position.  We don't know from their complaint which

ones they claim or why they claim they're inadequate.

          In order to get depositions done in December, I'm not

quite sure how we're going to get the very base, foundational

knowledge we need to have in order to conduct those depositions

in such a tight schedule.  I do appreciate the Court moving it

forward, but I'm concerned about the schedule.

          THE COURT:  This is part of the Rule 26(f) conference

among the parties.  Have you discussed with each other how

you're going to get those transactions identified?

          Not yet?  Why don't we take a break.  Why don't we

take a break.  You're here.  It makes sense for everybody to

H9fWalpC

1    try to get on the same page and have those discussions,

2    complete your 26(f) conference.  Try to make as much progress

3    as you can, and my law clerk will let you know how to get in

4    touch with my chambers, and I'll resume this conference when

5    you're ready to discuss these issues in more detail with me.

6            Let me just complete this portion of the conference by

7    telling you how we're going to conduct discovery.  If you have

8    a discovery problem, you have to meet and confer, try to

9    resolve it in good faith.  If you have any problem after that

10   meet-and-confer process that remains unresolved, write me a

11   letter no longer than two pages.  I'll get you on the phone,

12   hear you out, and give you a ruling.

13           If you want discovery, you have to be diligent and

14   pursue it.  Move forward, if March comes and you haven't taken

15   any deposition, it's too late.

16           Good.  My law clerk will tell you how to get in touch

17   with me.  You can use my jury room for your consultations.

18   Good luck.

19           (Recess)

20           THE COURT:  You may be seated.

21           Mr. Baker, have you had an opportunity to confer with

22   the SEC?

23           MR. BAKER:  Yes, we have, your Honor, and I think I'll

24   have Mr. Labenta speak to that.

25           MR. LABENTA:  Your Honor, it's my understanding -- you

H9fWalpC

1    guys will correct me if I've overstated something -- that they

2    will provide us with the documents as soon as we have the

3    protective order entered, and they're going to provide a

4    schedule.  Just having the documents isn't all that helpful.

5    We need to know what they claim is wrong with them.  They said

6    they could have a schedule prepared of what they claim is wrong

7    with each SAR by the end of October, which means we can't

8    really start what we're doing until the end of October, which,

9    given that, I would like if we could to push everything out

10   maybe 30 days, just given that we're not going to be able to

11   start.  It is what it is, that it can't be provided until then.

12            THE COURT:  Mr. Carlyle.

13            MR. CARLYLE:  Your Honor, Mr. Miller will address this

14   line.

15            MR. MILLER:  That's the gist of the agreement we just

16   got to, and the SEC's going to put together that schedule

17   regardless of the timeline, so we'll get it to the other side

18   as soon as we can, but we have no strong objection to an extra

19   30 days, and we also have no problem with the current schedule

20   the Court laid out, so we'd defer to the Court.

21            THE COURT:  Mr. Miller, you don't have such a

22   schedule?

23            MR. MILLER:  What we have is a, I'll call it a big

24   step towards a schedule, and so there are some mechanical

25   things that have to happen in sequence, and one of them is as

1    simple as making sure that the schedule is citing to the

2    correct pages and those pages get labeled once they're

3    produced.  It's more of a big, I guess I'll just call it a

4    housekeeping project.

5         Like I said, if it gets done mid-October or earlier

6    than that, we'll send it over the day it's ready.  I'd say

7    we've been working on it, and definitely we're not starting

8    from scratch, but it's not complete in a product that we could

9    call a response to a discovery request yet.

10        THE COURT:  How about two weeks?

11        MR. MILLER:  Two weeks from?

12        THE COURT:  Today.

13        MR. MILLER:  I think that we'll definitely give it a

14   shot, and perhaps if we get close to two weeks and it looks

15   like there's something unforeseen that came up, we can address

16   it with defendant first.  And if then if there's still a

17   problem, we can address the Court, but we'll definitely make a

18   shot for two weeks.  And assuming the protective order is in by

19   then, I think we'll be OK on that end.

20        THE COURT:  Good.  Terrific.  I didn't put down an

21   actual date for the protective order on my notes.  I think we

22   were just talking about it informally.

23        Who is producing the draft?

24        MR. MILLER:  We're working together.  The SEC will

25   take the lead in actually submitting it.  It should be a joint

H9fWalpC

1    proposal, and I think the Court did mention that we should be

2    filing it by no later than the 22nd, when we do our initial

3    disclosures.  Again, if it's something we get to on Monday or

4    Tuesday, the commission will submit it as soon as it's ready,

5    but no later than next week.

6              THE COURT:  OK, but in any event, we talked about a

7    schedule which would have it signed far in advance, at least a

8    week in advance, of your production of the chart.

9              MR. LABENTA:  Yes.

10             THE COURT:  Good.

11             Good luck, counsel.  Thank you.

12             (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25