1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES SECURITIES
     AND EXCHANGE COMMISSION,
4
                    Plaintiff,
5
                 v.                        17 CV 4179 (DLC)
6
     ALPINE SECURITIES CORPORATION,
7                                          Conference
                    Defendant.
8
     ------------------------------x
9
                                           New York, N.Y.
10                                         November 2, 2017
                                           5:35 p.m.
11
     Before:
12
              HON. DENISE COTE
13
                                           District Judge
14

15

16
              APPEARANCES
17

18   ZACHARY T. CARLYLE
     TERRY R. MILLER
19        Securities and Exchange Commission
          Attorneys for Plaintiff
20

21   CLYDE SNOW & SESSIONS
          Attorneys for Defendant
22   BY:  BRENT R. BAKER
          AARON D. LEBENTA
23

24   THOMPSON HINE LLP
          Attorneys for Defendant
25   BY:  MARANDA E. FRITZ

1              (In the robing room)

2              THE COURT:  I appreciate everyone traveling to get

3      here.  This is a pretty important issue for both sides that we

4      need to address.  I have reviewed again the September 15th

5      transcript.  I've looked at your letters.  I've looked at the

6      documents in the binder which give you three exemplars of SARS,

7      three SARS that are exemplars that might be helpful to us in

8      working through the dispute.

9              I am going to start with a few questions, and then of

10     course I will give everybody a chance to be heard.  Mr.

11     Carlyle, are you speaking, or Mr. Miller?

12             MR. LEBENTA:  Mr. Miller will be handling this.

13             THE COURT:  Mr. Miller, looking at the SAR and

14     attachments for Exhibit 1, how are the defendants to know what

15     the SEC contends is deficient about that SAR?

16             MR. MILLER:  Your Honor, we have been calling it, so

17     we are all on the same page, violation 48.  Right?

18             THE COURT:  Yes.

19             MR. MILLER:  This SAR is actually a good example of

20     the need for further discovery.

21             THE COURT:  What do you mean need for further

22     discovery?

23             MR. MILLER:  The SEC needs discovery from Alpine to

24     complete the support file.  You want to compare Exhibit 1 to

25     Exhibit 2 in your binder.  You will see what we have so far

1   that's been identified as a support file from Alpine is a

2   one-page email.  It actually is difficult to look at the SAR

3   area in the email and to understand completely what is wrong

4   with the SAR.

5          THE COURT:  Let's look at Exhibit 1.  Maybe I'm not

6   understanding correctly what I'm looking at.  I have Exhibit 1

7   and I have an eight-page document which I understood to be the

8   SAR.

9          MR. MILLER:  Back up just a little bit.  We are

10  talking about SARS in what we have been calling table A.  That

11  just one group of the violations alleged in the complaint.

12         THE COURT:  That's the only thing I asked for.  When

13  you list the SARS where one wasn't filed where it should have

14  been, that's a different category.

15         MR. MILLER:  Right.

16         THE COURT:  Here they are filed but deficient from the

17  plaintiff's point of view.

18         MR. MILLER:  That's right.  This one is an example of

19  one that is in two buckets.  This SAR is in table A because it

20  doesn't adequately explain suspicious activity in the

21  narrative, which is on the last page of the SAR.

22         THE COURT:  The narrative page 8 I've looked at.  What

23  is deficient about page 8?

24         MR. MILLER:  Specifically, what is deficient here is

25  that the owner of customer, KBM Worldwide, and the authorized

1    user of the account has a conviction for mortgage fraud.  The

2    SEC's contention in the complaint is that SARS that omit

3    criminal history and regulatory history of a key player

4    involved in the transaction needs to be included in this

5    narrative.

6              THE COURT:  That's very helpful.  It's an omission of

7    conviction, criminal conviction, or regulatory finding.  Any

8    other deficiency?

9              MR. MILLER:  That's it for this one.

10             THE COURT:  Let's go to 2.  I'll go to page 8 again.

11             MR. MILLER:  This SAR, your Honor, is a better example

12   of what you will typically see in table A because it does have

13   a complete support file behind it.

14             THE COURT:  Where was that?  That support file was

15   assembled by whom?

16             MR. MILLER:  I want to back up and explain where some

17   of this stuff came from.  We got a very incomplete and dis-

18   organized production from Alpine.  A lot of this work was done

19   by the SEC to try to link SARS with their supporting files.

20   SARS are supposed to have supporting files.

21             THE COURT:  Explain that that to me.

22             MR. MILLER:  When Alpine suspects suspicious activity

23   and they decide to file a suspicious activity report, they

24   submit that 8-page document to FINRA.  The rules and

25   regulations also require them to have in their own files what

1  we call now the support file, something that looks like the

2  77-page document that was submitted with Exhibit 2, starting

3  with Bates number 263402.  This is the first page of the

4  support file.

5        THE COURT:  I think a lot of what I am looking at

6  doesn't have Bates numbers on it.

7        MR. MILLER:  It is the very first page, your Honor.

8        THE COURT:  Exhibit 2 starts with the SAR.

9        MR. MILLER:  Right.  We didn't get the same submission

10  that you did.  I'm assuming you have in front of you what we

11  have been calling violation 199.

12        THE COURT:  You didn't get a binder?

13        MS. FRITZ:  We had agreed on three SARS.  What you

14  received is exactly what we agreed on to submit along with the

15  joint letter that we provided.

16        MR. BAKER:  They already have the binder.

17        MR. MILLER:  That's why I say I assume we are looking

18  at the same thing.

19        THE COURT:  I have on Exhibit 2 an 8-page SAR and then

20  a bundle of material that doesn't have Bates numbers.

21        MS. FRITZ:  Yes.

22        THE COURT:  Let me hand you my binder.

23        MR. CARLYLE:  Why does it not have Bates numbers?

24        MR. LEBENTA:  Are you saying yours does?

25        MR. CARLYLE:  Yes.

 1                 MR. LEBENTA:  I don't know the answer to that.

 2                 MR. MILLER:  It looks like it is the same document.

 3                 MS. FRITZ:  This is exactly what we had sent over to

 4     you guys yesterday.

 5                 THE COURT:  You sent over a binder?

 6                 MS. FRITZ:  Well, no.  Maybe we just identified.

 7                 MR. BAKER:  We were looking at the three.

 8                 MR. MILLER:  I think we have the same document.  It's

 9     just mine is numbered, yours isn't.  If we have an extra copy

10     with numbers on it --

11                 MR. LEBENTA:  I don't know why the Bates numbers are

12     not on there.

13                 THE COURT:  This is a problem, counsel.  I don't want

14     in the future to get something that the other side hasn't

15     gotten.  Clearly I have something that the SEC wasn't given.

16     They may have the same underlying documents, but they don't

17     know if they do, and now we have wasted time trying to figure

18     out if they do.  I certainly have something without Bates

19     numbers.

20                 MR. LEBENTA:  Understood.

21                 THE COURT:  Good.  Mr. Miller, you were telling me

22     that the submitter of the SAR is supposed to have a support

23     file in their custody.

24                 MR. MILLER:  That's right.  There are a lot of reasons

25     for that.

1      THE COURT:  FINRA can ask for it and the SEC can ask

2  for it, I take it?

3      MR. MILLER:  All law enforcement.  Well, not all.

4  More than just us.

5      THE COURT:  What is the deficiency with the second

6  SAR?

7      MR. MILLER:  I am going to give you what is the same

8  document so we can be on the same page.  Ours is double-sided.

9      THE COURT:  I'm not going to take the time here to see

10  if I have the same thing in my binder.

11      MR. MILLER:  I will represent that I think that is the

12  same because I haven't seen yours either.

13      There are two deficiencies with this one.  The first

14  one it is easy to tell.  The SAR narrative itself mentions a

15  high volume of shares deposited, 5 million shares.  There is

16  nothing in the SAR that indicates the average daily volume that

17  is traded for this share.  If you look in the support file a

18  few pages in, there is a document called Alpine Securities

19  Deposit Securities Request Form.  This is in most support

20  files.  If the support file is complete, it should have --

21      THE COURT:  Bates 3405.

22      MR. MILLER:  Correct.  On the left side, one of the

23  rows close to the top says average volume 5 million.  What that

24  means is in the last three months before the SAR was submitted

25  the average daily volume of trading was 5 million shares.  What

1   you have is a transaction where the average daily volume is

2   5 million.  This deposit equals the entire average daily volume

3   for the last three months.  There is no way you can tell that

4   from the face of the SAR.  It's described in our complaint as a

5   deficiency because it is suspicious of a pump-and-dump scheme.

6         Further, on page 263470, a little closer to the back

7   of that document, this is again part of the supporting file

8   that Alpine put together to support the reasons why there is

9   suspicious activity they are reporting.  This chart at the

10  bottom shows that the average daily volume is actually really

11  heavily weighted toward the beginning of that 3-month period.

12  You will see closer to the date of the SAR it barely even gets

13  close to 2 million.  That is this chart right here, the small

14  numbers.

15        The point is these are things that you can look for.

16  When you read the narrative and you see that there is a deposit

17  of a high number of shares, it's very easy to quickly look into

18  the support file to see evidence of average trading volume.  If

19  the average trading volume is close to or is lower than the

20  deposit, that is suspicious activity we allege should have been

21  included in the narrative of the SAR.

22        MS. FRITZ:  If it is equal to --

23        THE COURT:  Excuse me.

24        MS. FRITZ:  I'm sorry.

25        MR. MILLER:  If the deposit is equal to or more or

1    even roughly ballpark close to the average daily trading

2    volume, it is an indicator of a pump-and-dump scheme.  It is

3    suspicious.  When you have a large number of shares that are

4    deposited that are described in the narrative of the SAR

5    without reference to a lower average trading volume, that is a

6    red flag that we allege should be included and aren't.

7         THE COURT:  Are there regulations governing contents

8    of SARS that indicate what you have just described to me, or is

9    it a more generically stated obligation for what must be

10   described in the SAR?

11        MR. MILLER:  To the best of my knowledge, I think it

12   is a little more of the latter.  It is a collection of guidance

13   from FINRA and I think industry experience that is actually

14   committed to be prescriptive in Alpine's own written compliance

15   procedures.  There is some judgment you have to use.  Somebody

16   with experience and expertise in the industry has to know what

17   I just said.  I'll admit that before looking into this I wasn't

18   sure what a suspicious number or ratio of deposit to average

19   trading volume is suspicious.  That takes somebody from the

20   industry, an expert, for example, to opine on.

21        There is one more deficiency that is a lot easier.

22        THE COURT:  Yes.

23        MR. MILLER:  Overall our position is all or nearly all

24   of these SARS should be subject to resolution on summary

25   judgment.  If that first deficiency is not, the second one

 1  surely is.  The SAR narrative doesn't mention anything about

 2  the foreign individuals and entities involved in this trans-

 3  action.  And there is a number here.  I can do the page cites

 4  if you want.  I can go one by one.  But I'll summarize.

 5         The customer acquired the stock that he is depositing

 6  from a Canadian citizen.  The issuer is based in China.

 7  Although it is a Nevada corporation, it is based in China.  The

 8  Chinese addresses are all over support file.  The Canadian

 9  citizen who the customer acquired the shares from, this person

10  made payments to entities in Colombia and Panama in connection

11  with the transaction.  All of those entities and individuals,

12  their status as foreign citizens or entities should have been

13  included in the narrative.  That is another thing.  That is a

14  simple one to find.

15         THE COURT:  Is the SEC building its case based on a

16  comparison of the information in the support file for the SAR

17  and what was disclosed in the SAR?

18         MR. MILLER:  That's one platform we are building our

19  case on, yes.

20         THE COURT:  I'm just talking about table A, of course.

21         MR. MILLER:  That is one platform in table A.  There

22  are hundreds of SARS in table A that we still don't have a

23  support file for, including the first one, Exhibit 1, that we

24  looked at.  The SAR that is in Exhibit 1, just so we are all

25  clear, is also in table E, which we allege is a separate

1   violation that Alpine committed by not maintaining a support

2   file for that SAR.

3           So there are SARS in table A that don't have any

4   support file that we are aware of or have incomplete support

5   files.  Obviously, the ones that have no support file that we

6   are aware of that we included in table A we claim are deficient

7   on their face.

8           THE COURT:  Let's go to your third example.

9           MR. MILLER:  Here I have the narrative on the last

10  page of Exhibit 3, the first document.  What I have is a Bates

11  number that ends in 90218 and then underscore 7.

12          THE COURT:  Yes.

13          MR. MILLER:  This has two deficiencies.  I'll start

14  with the easy one this time.  The issuer here was a shell

15  company at the time that the debt referenced in the narrative

16  was issued.  You can see that by looking at one of the first

17  pages of the support file.  Here, this is numbered, our

18  separate copy, close to the front, actually the second page.

19          This is a common checklist.  When we do get a complete

20  support file we see a checklist that looks like this.  I think

21  it may have evolved over the relevant time period.  Down at the

22  bottom part of this checklist, whoever is preparing the SAR

23  gets to look at shell company issues.  Here you see that it has

24  been a shell company and it was a shell company prior to

25  December 14, 2012.  It is our allegation that that information

1    should have been included in the narrative.

2          The second one, this is another issue where the

3    deposit is much higher, suspiciously high compared to its

4    average trading volume.  The average trading volume is on I

5    think it is the fifth page of this document.  It ends in 205.

6          THE COURT:  I've got it.

7          MR. MILLER:  We looked at the same format before, but

8    the average trading volume listed here is just under 100,000

9    shares per day for the last three months.  The deposit in the

10   narrative is described as one that is almost three times that.

11         THE COURT:  This is very helpful to me in under-

12   standing the process.  Ballpark, how many separate categories,

13   types of deficiencies, are there for the SARS in table A?  You

14   have described:

15         First the omission of a conviction or regulatory

16   finding;

17         Second, the failure to list average daily volume

18   compared to a deposit when that is of significance;

19         Third, the failure to identify foreign individuals or

20   entities involved in the transaction;

21         Fourth, the failure to disclose shell companies when

22   they have a relevant role.

23         You have described to me four separate types of error.

24   You have mentioned also, of course, the failure to have a

25   support file, so that's five.

1        MR. MILLER:  The short answer is to prepare the

2   complaint we had our team look for up to eight categories.

3        THE COURT:  What are the additional three?

4        MR. MILLER:  Let me go through the list to make sure

5   that we are all on the same page.  I think there was one in

6   there that was not.  The failure to maintain a support file is

7   actually a totally separate.

8        THE COURT:  Problem?

9        MR. MILLER:  Yes.

10        THE COURT:  That's fine.  Keep going.

11        MR. MILLER:  The subcategories within table A, we

12   asked our team to identify eight to prepare the complaint.  The

13   first is what we call the who, what, where, when, and why test.

14   That is described in paragraph 29 of the complaint.  That

15   basically says you've got to describe, sort of like newspaper

16   journalist attributes of the suspicious activity.

17        The second one is what we talked about, the criminal

18   or regulatory history of a key player.

19        The third category we asked them to identify was

20   whether the stock at issue is subject to suspension or other

21   derogatory history, which means the issuer filed for bankruptcy

22   or the issuer is a shell company.  That's why the shell company

23   issue is part of a bigger group.

24        The fourth one is evidence of stock promotion history.

25        The fifth one is where it indicated in the support

1   file that Alpine was unable to verify that the issuer is a

2   legitimate operating business.  For example, the support file

3   indicates that there is no website for the company, there is no

4   valid phone number or a bad address.

5          The sixth one is when the support file indicates that

6   the stock has a low or nonexistent trading volume compared to

7   the deposit.  We could talk about that one.

8          The seventh one is what we talked about already,

9   whether there is a key player that is a foreign individual or

10  entity.

11         I hesitate about even calling this a category because

12  I think at most there are maybe 10 or 20 at most.  We have just

13  kind of a collection of other red flags.

14         For all intents and purposes of that whole list, there

15  are seven real categories that our team went through to compare

16  the SAR narrative to what we believed was the best we could

17  compile of the SAR supporting file.  That was the basis for our

18  complaint.

19         That process was then a senior attorney looked at all

20  of the work and confirmed that SARS should be our violation.

21  Actually, to be precise, that senior attorney's review of the

22  team's work is both the good faith basis that we made our

23  allegations on and it is also the information that we were able

24  to generate, the tables that we produced about a month ago.

25         THE COURT:  When did you get the supporting files?

1           MR. MILLER:  I think they rolled in during the course

2    of the investigation.  I don't know the dates.

3           THE COURT:  What years?

4           MR. MILLER:  Within the last two years.

5           THE COURT:  One of the things you said earlier was it

6    was hard for you to match up the SARS with the correct

7    supporting file, if I understood you correctly.

8           MR. MILLER:  That's right.

9           THE COURT:  But that was not what you have experienced

10   in the last couple of months because of discovery in this

11   litigation; it's because of what was produced over the last

12   couple of years during the investigative stage of the case?

13          MR. MILLER:  Exactly, yes.  The deadline for our

14   initial request for production --

15          THE COURT:  Excuse me.

16          (Pause)

17          THE COURT:  Have you disclosed the seven -- I'm going

18   to call it seven.  We are going to skip the other for a moment.

19          MR. MILLER:  Seven is a good number.

20          THE COURT:  Have you disclosed the seven categories to

21   defense counsel?

22          MR. MILLER:  Yes.  They are also described in the

23   complaint.

24          THE COURT:  Is your expert, when you file an expert

25   report, going to be identifying other categories?  I know we

 1    have the other.

 2              MR. MILLER:  For a lot of reasons, both efficiency and

 3    for our expert's own accuracy and credibility, we are given

 4    some leeway.  One thing we are asking the expert to do is to

 5    test what we think is wrong.  Our preliminary analysis that was

 6    the basis for the complaint, one thing we are going to do is

 7    ask the expert to test that.  If the expert finds other,

 8    additional problems and deficiencies with those SARS that are

 9    already in the universe, the expert is going to opine on that.

10              The last thing that the expert might opine on that is

11    not even within the SEC's -- the information we have right now,

12    we still need to take discovery.  We have asked for additional

13    supporting files, which, if they exist, may alter whether there

14    are additional deficiencies.

15              THE COURT:  When did you make that request?

16              MR. MILLER:  A couple of weeks ago.  It was our first,

17    initial request for production.  For example, Exhibit 1: if we

18    get a complete supporting file that indicates additional

19    suspicious activity, our expert is certainly going to opine

20    that that SAR was deficient for additional reasons.

21              On top of that we need to take a 30(b)(6) deposition

22    after any supporting files that exist are produced to tie up

23    and confirm what some of the things in those checklists mean --

24    we are not sure what they all mean -- and to confirm that for

25    the ones that we don't believe have complete files, they

1    actually just don't exist so that we are not chasing things

2    later down the road.

3          Additional discovery will influence, at least has a

4    very good possible of influencing, our expert's final opinion.

5    What I can say is that we are going to ask our expert to look

6    only at the SARS that are listed for this issue in table A.

7          For background for your Honor, over the relevant time

8    period there are over 14,000 SARS that Alpine filed.  During

9    the investigation, Alpine turned over less than 7,000.

10          THE COURT:  What do you mean?  7,000 supporting files?

11          MR. MILLER:  SARS.

12          THE COURT:  They filed 14,000.

13          MR. MILLER:  Yes.

14          THE COURT:  But in response to investigative subpoenas

15    only produced 7,000?

16          MR. MILLER:  A little less than 7,000.  I can tell you

17    from our point of view we thought 6900 or 6800 SARS had enough

18    deficiencies in them to make a pretty big case.  The fact that

19    we didn't follow up and ask for the additional 7,000 is no

20    indication from our end that we think those are adequate.  We

21    haven't even seen them.  I'm explaining all this to say that

22    what we ask our expert to do is just going to be limited to the

23    SARS that we have already looked at.

24          THE COURT:  The 7,000?

25          MR. MILLER:  Less than that.  The ones that made it

1   through, for example, into table A.

2            THE COURT:  Why didn't you get 14,000, since 14,000

3   were filed?  I don't understand the difference between the 14

4   and the 7.

5            MR. MILLER:  I wasn't there, but my understanding was

6   that Alpine pushed that on the volume of things that were being

7   requested and turned over what they did.  It was in a dis-

8   organized fashion, but we got what we got and started our

9   analysis.  I don't know the reason why they weren't all

10  disclosed.

11           THE COURT:  You are proceeding on a theory of

12  deficiency with respect to how many of the 7,000?

13           MR. MILLER:  I know -- since we have been talking

14  about it, it is fresh in my mind -- the ones in table A are

15  about 1,950.  The complaint has these numbers in them.  A

16  separate big category, table B, is 1900 violations we are

17  alleging.

18           (Continued on next page)

19

20

21

22

23

24

25

1      I'm sorry.  Yes.  It might be a lot more violations

2  than that.  But if you want, I can explain what the numbers

3  are, where they come from.

4      So the second group of allegations that we have in

5  paragraphs 34 to 38 of the complaint allege that there was a

6  lot of liquidation transactions, for which no SAR was filed.

7  And the way that we're going to present our case to prove that

8  a SAR should have been filed is to submit a SAR that was filed

9  on the deposit.  And so there that's where the 1900 comes from.

10  There are 1900 SARs filed on deposit that are connected to

11  liquidations that we claim should have had a SAR filed with

12  them, or some continuing report, that were not.  And so there's

13  actually a lot more than 1900 liquidations, because sometimes a

14  deposit is a big chunk of shares and there might be

15  liquidations that come out of that.  But that's the sort of

16  second big bucket of allegations that we made.

17      And, again, it's our case that it's subject to summary

18  judgment because if there's a SAR that's filed on a deposit,

19  there should be one on observation.  There's no fact dispute

20  that.  That's our case.

21      Then the third group is 250 SARs that we claim were

22  filed untimely.  And just for counsel's benefit, I think these

23  are the SARs that we have put in table C and --

24      THE COURT:  C and?

25      MR. MILLER:  D.

 1          THE COURT:  D.

 2          MR. MILLER:  And then the fourth large group are SARs

 3     that were submitted which do not have supporting files.  We had

 4     discussed these.  And these are what we have, and listed in

 5     table E.

 6          THE COURT:  So this means during the investigation and

 7     now again during discovery, you're asking for the supporting

 8     files and, if none are produced, then that's a violation on its

 9     face.  If a supporting file is finally located and produced, it

10     may disclose other violations, or it may eliminate that

11     allegation.

12          MR. MILLER:  Right.  If there's a complete supporting

13     file, obviously it would eliminate the one from table E.  And

14     our expert needs to look to see if that will then trigger the

15     grounds for violation in A.

16          THE COURT:  Right.  Or not.

17          MR. MILLER:  Right.

18          THE COURT:  This is very helpful to understand some of

19     the representations that were made to me in the September 15th

20     conference.  So you have one layer of review in-house.  You're

21     using your expert to confirm it, sort of do due diligence on it

22     and make sure it is firm enough from the SEC's point of view to

23     proceed on.

24          MR. MILLER:  Right.  And for efficiency, at the end of

25     the day, somebody is going to have to put together a list that

1    specifically says, for example, what entities have foreign

2    status that should have been mentioned in the SAR.  And that's

3    where our expert is going to make the final complete

4    description for each SAR.  And because it was always going to

5    be just done once, on such a big project, we think the

6    efficient way to do it was to have our expert do it.  So that's

7    why you'll see in the correspondence, I think sometimes the

8    parties are talking past each other, is, when, I think, the

9    defense want a precise recitation of what is missing from a

10   particular SAR, they are asking for something that -- that's

11   what we say it doesn't exist.  We don't have that.  We've never

12   compiled that information to that level of detail.  And the

13   plan was always to go through the normal course of discovery

14   and not do that until we have all of the fact discovery in and,

15   through the normal course of litigation, have our expert do it

16   at the close of fact discovery.

17          THE COURT:  Are you telling me your expert hasn't

18   begun on this?

19          MR. MILLER:  No.  They definitely have.

20          THE COURT:  Oh, OK.

21          MR. MILLER:  But to be fair, they have been a little

22   bit -- they have to wait until we have a protective order

23   entered.  So they haven't been, you know, working for years on

24   this.  They have been working since the protective order was

25   entered.  And for the same reason that I think we were having a

1    hard time matching support files to SARs, there's a learning

2    curve on even just the technical side of managing this much

3    data.  So obviously, you know, we got them working as soon as

4    we could, but they are in the middle of their work.

5          THE COURT:  So before I hear from defense counsel,

6    this doesn't seem subject to a lot of fact dispute.  I mean,

7    either there are foreign individuals and entities connected to

8    the transactions, as shown in the supporting file, or not.  And

9    either there was a disclosure or not of that in the SAR.  And

10   then you can debate whether that was material or not or there

11   was a duty to disclose.  I don't know the correct standards

12   yet.  I'm sure counsel will educate me.  But each of these

13   categories, if there was an individual with a criminal

14   conviction or adverse regulatory finding, as reflected in the

15   supporting material and not disclosed in the SAR, then that is

16   what it is, and you argue to me the significance of it.

17         MR. MILLER:  Your Honor, I think you're exactly right.

18   I think that most of, like I said earlier, we believe that all

19   if not nearly all of these alleged violations should be subject

20   to resolution on summary judgment.  So the work our expert is

21   completing is really going to be used for two platforms.  Or

22   it's one platform used for two purposes.  The first is summary

23   judgment.  But the rest of the expert analysis still has to be

24   done on the rest of -- on all of the SARs, really, for the

25   event, however likely or unlikely it is that some of these

1    violations survive summary judgment.

2           THE COURT:  So what is your view of the significance

3    of fact discovery to this?

4           MR. MILLER:  So the significance of fact discovery, in

5    our minds, will add to -- if -- the biggest one is, if we do

6    get additional information that Alpine was aware of that should

7    have been included in the narrative, that will bolster our

8    claims.

9           THE COURT:  So to the extent they locate more

10   supporting files, that would be of interest to you.

11          MR. MILLER:  Exactly.

12          THE COURT:  But is any testimony that anybody has to

13   give going to make any difference whatsoever to this analysis?

14          MR. MILLER:  None.  I think, like I said, a 30(b)(6)

15   witness might be helpful to just have a clean record to show

16   that no document exists.  But even that's not necessary.

17   That's more preference.  There is no testimony that needs to be

18   taken to determine whether we've met our burden or not on any

19   of these.  For example, the reasons why suspicious activity was

20   not included in narrative don't matter.  It's not relevant.

21          THE COURT:  And why, if your theory is right, why

22   doesn't it make a lot of sense to have the SEC identify five

23   SARs in each of these categories, the defendant identify five

24   SARs in each of these categories, you do a quick summary

25   judgment motion, I rule, you educate me on the law and the

1    standards, you have guidance, and we just figure out, as a

2    matter of law, whether or not we need a trial?  I mean, why do

3    we have to do this for thousands of files, from the SEC's point

4    of view?

5            MR. MILLER:  From our point of view, there's -- if --

6            THE COURT:  You want to consult.  Great time.

7            MR. CARYLE:  Can we consult?

8            THE COURT:  You want to consult?  OK. I'm going to put

9    that off for a moment.  You don't have to answer.  But that's

10   the ultimate question.

11           MR. MILLER:  I just -- yeah, I think if we can say

12   it's partial summary judgment on liability, on the number of

13   violations that we put forward in summary judgment motion, I

14   think that makes a lot of sense.  The rest of these are in

15   there.  We want them to be resolved in some way.

16           THE COURT:  Right.

17           MR. MILLER:  I think it's a fantastic idea to do

18   summary judgment so that the issue of law can be decided and

19   the parties know going forward what legal standards apply,

20   whether there are fact issues that need to be developed,

21   whether there are expert issues that actually need to be

22   developed, because most of what we're doing is, it's the

23   prudence, right, of not knowing exactly how things are going to

24   shake out is why we're doing everything at once.  But if we did

25   know, have an order from your Honor on a summary judgment on a

1    test of different -- small number, I think that guidance would

2    go a very long way to narrowing all types of discovery and

3    argument and perhaps even trial.

4              THE COURT:  OK.  All right.

5              MS. FRITZ:  And what we're going to hear is a very

6    different point of view.  Your Honor began by asking, where is

7    this guidance, is this written down somewhere, that a foreign

8    individual then triggers a disclosure obligation.  And the

9    answer is no.  The answer is that the SEC has made these

10   leaping assumptions based on all kinds of different red flag

11   iterations.

12             And I would point out, part of the reason why we're

13   having so much trouble figuring this out is, as we sat here

14   today, the information that was provided to your Honor as the

15   "deficiencies" is not in the complaint, in at least three

16   different instances.  And let me give your Honor an example.

17   Now we're being told that the problem was in two different

18   instances trading volume that was way below the deposit.  Well,

19   in their red flags --

20             THE COURT:  Or equivalent to the average.

21             MS. FRITZ:  Correct.  OK.  And that was a very clear

22   iteration, wasn't it.  But in their complaint, the red flag is

23   little or no previous trading volume.  None of these would have

24   fallen into that category.  They all had trading volume.  So

25   how were we supposed to glean that this new iteration is the

1   alleged deficiency?

2          Let me give your Honor another example.  In one of the

3   instances there are foreign financial entities that are

4   associated with the issuer, right.  And so we hear, well, that

5   obviously is a red flag and that triggers it right then and

6   there, in the complaint, we're told, if the customer is a

7   foreign financial entity.

8          So when we said in our correspondence to you, we feel

9   like we've got a moving target here, it just moved, today.

10         Now, what we went through today was enormously

11  helpful, even though it's not in the complaint -- and that's a

12  whole 'nother issue.  What we heard today is what we needed to

13  understand in order to go forward and address these issues,

14  because now, let's go to this idea that all of this can be

15  resolved easily on summary judgment.  No.  There will be a

16  significant issue of whether we knew -- again, the standard is,

17  we have to file and disclose, under the BSA, if we knew, had

18  reason to know -- had reason to suspect that the transaction --

19  and the subheading that they're relying on is -- was

20  facilitating criminal activity.  And so there is a huge chasm

21  between the idea that a red flag, gosh, your customer is

22  foreign, or even the issuer involved foreigners.  The idea that

23  that translates to we, on the Alpine side, should have known

24  that that should have been disclosed and that we have engaged

25  in some kind of a violation for failing to do so, that's not

1   even supported by the red flag concept.

2          But let's go one step further.  There is also a hugely

3   subjective component to this.  And so where the SEC would say

4   we don't need discovery, I would say the following: if you're

5   telling me the deficiency has to do with a mortgage fraud

6   conviction, for example, we're only responsible for disclosing

7   that if we knew it or suspected it.  So did we know it is a

8   fact issue, and if we did, in every instance, what you're

9   saying here is a whole lot of analysis that went into this.

10  And so what I've tried to explain to the SEC is, if you tell me

11  that you think that the issuer's transactions in Colombia --

12  which, by the way, that was their business model.  It was a

13  gold company that owned mines in Colombia, so don't think that

14  this is suspect on its face.  It is entirely consistent with

15  the business model.  And so what we need to be able to do is

16  say to the folks at Alpine, why did you not think that was

17  suspicious?  Why did you not believe that that transaction was

18  facilitating criminal activity?  And that's a very high

19  standard.

20         So from the Alpine side, this case is being layered

21  one sort of set of assumptions on top of another to get to a

22  violation, where, in reality, a violation of the BSA is a very

23  limited thing: Did you, did the company, did Alpine actually

24  know, suspect, have reason to suspect this was facilitating

25  criminal activity?  And that has to do with our process.  It

1   has to do with our program.  It has to do with how we approach

2   these things.

3           Bear in mind, no one is suggesting that we're going to

4   get it right every time.  There's enormous commentary that

5   says, FinCEN, which oversees this program, understands we're

6   not trained law enforcement.  We're not going to get it right

7   every time.  And FinCEN has no intention of going after those

8   who are engaging in a reasonable process if there are instances

9   where something is not disclosed.  They have the ability to

10  follow up if they need more information.

11          So all of these factual issues are critical from our

12  side.

13          What we weren't able to do, we felt, is to understand

14  how we should be developing that information.  If we don't know

15  what the alleged deficiency is on those 2,000 SARs, then how do

16  we then talk to our witnesses and develop factual information?

17  That goes very simply to the basic point, why is that not in

18  the SAR?

19          These people, the evidence is going to show that these

20  people had built out a program that was robust, that it was

21  populated.  It had enormous documentary sort of issues

22  associated with it.  And your Honor is only seeing the tip of

23  the iceberg here in terms of the kind of documentation that was

24  required to deposit a stock.

25          And so what we are going to be developing is the

```
 1    process, the fact that this was being undertaken in good faith,
 2    the reason why certain SARs were filed, and then to explore
 3    this particular issue of, if they pointed to a deficiency, why
 4    didn't you highlight the fact that the issuer's associate was
 5    paying money to a foreign country?  Well, that's not even
 6    identified in the complaint.  And so our witness may well say,
 7    first of all, I don't even understand that to be a red flag.
 8    But a red flag means nothing more than, it's an issue that
 9    should be considered.  It doesn't mean it is an issue that
10    requires disclosure.
11        THE COURT:  So when the defendant, when Alpine
12    considered it, is that consideration supposed to be reflected
13    in supporting documentation?
14        MS. FRITZ:  No.  No.
15        THE COURT:  Where would be the record of what was
16    considered, what judgment was made?
17        MS. FRITZ:  Sometimes there may be a document.
18    Sometimes it may be testimonial.  It may be sitting with the
19    gal and saying, somebody is saying you failed to -- you know,
20    look at this page, it reflects X, why didn't you put that in
21    the SAR?  It may be that simple sometimes.
22        THE COURT:  And the individual is going to have a
23    recollection with no supporting documentation.
24        MS. FRITZ:  Well, in the examples we've just been
25    using, we could certainly show the individual, here's the
```

 1   trading volume, it was not equal to -- the deposit was equal to

 2   or greater than that, why did you not disclose that?  In that

 3   instance -- and we can point to it -- the individual may well

 4   say, that's not a red flag, it's not alleged to be a red flag,

 5   nor did we understand it to be a red flag, and therefore we did

 6   not believe that that was indicative of a criminal transaction.

 7            So that's the process that we took.

 8            THE COURT:  OK.  Just a quick reaction.  On some of

 9   these high-volume cases, if there is no document in a file for

10   an individual transaction, the likelihood that an individual

11   can present credible testimony about, "Aha, I remember this, I

12   remember why I made this judgment, I remember what I did," I

13   don't think that's going to work.

14            MS. FRITZ:  I understand that.  And maybe that's true

15   in many instances.  But that's why I said a moment ago, it's

16   about the process also.  It's about whether -- and, you know,

17   the allegation here is, our program was deficient; witness the

18   fact that we failed to file SARs.  So we're going to be dealing

19   with that whole program issue, which is a very compelling set

20   of facts that ultimately, I think, really negates the notion

21   that there was any failure, any significant failure on the part

22   of Alpine or, on the other hand, was their program reasonable.

23            THE COURT:  So if you had what you thought was a

24   reliable list from the SEC of the categories of deficiencies,

25   you know, written, the who, what, when, where, why, criminal

1    conviction, adverse regulatory finding, etc., I understand that

2    you have a defense you wish to pursue that, even if there was a

3    deficiency with respect to an individual SAR, you have a strong

4    program, a robust program, and the fact that you failed to file

5    one or two, or whatever small number, when you should have

6    shouldn't be held against you.  But even if that is your

7    defense, would it not be of assistance to you to know that, as

8    a matter of law, the deficiency exists or not with respect to

9    an individual SAR?

10            MS. FRITZ:  I hope I'm understanding this.  First of

11    all, it would be invaluable for us to understand what it was.

12    But if what your Honor is suggesting is that we would begin to

13    hash out legally whether that deficiency equals a bad SAR, I

14    think it's very premature because our witnesses can explain

15    why -- I mean, again, the example of --

16            THE COURT:  Excuse me.  My hypothetical question

17    assumes that no one is going to have a recollection that can be

18    credible when there is no documentation to support the

19    decision.

20            MS. FRITZ:  But the witness could say, this idea of

21    daily volume greater than or less than has in no way ever been

22    identified to us as a red flag, and neither has the fact that

23    the issuer has property in Colombia.  So they could, sometimes,

24    they could address it in terms of saying, what the SEC claims

25    is the deficiency is not even a red flag, much less indicative

1    of a facilitation of criminal activity.

2         THE COURT:  Yes.  My point exactly.  So would it not

3    be helpful for you, with respect to a discrete number -- and

4    you could identify your five, the SEC could identify their five

5    in each category, and we can just have motion practice.  And

6    you can put in affidavits, this was not material because X, Y,

7    Z, look and the file shows this versus that.  I'm not depriving

8    you of your opportunity to defend on the bigger point of, even

9    if there is a deficiency with respect to individual SARs, we

10   had a robust process and program in place.

11        MS. FRITZ:  Right.  It still worries me that there are

12   instances where an individual would remember a fact and we

13   would not have that available to us.

14        THE COURT:  OK.  So you would.  And I would say, the

15   document on its face indicate a deficiency.  However, a

16   question of fact has been created because of the affidavit put

17   in, in opposition, that there's an independent recollection or

18   memory coming out of the ether and unsupported by any

19   documentation that, oh, yes, I remember this one, the, you

20   know, three thousandth I dealt with that week and this was my

21   thinking on that one.

22        MS. FRITZ:  I would like to think that the

23   presentation would be more effective than that, but I

24   understand what you're saying.  Yes.  That would be helpful.

25             There's another issue that I think could slice and

 1    dice this case down considerably.

 2              THE COURT:  Good.

 3              MS. FRITZ:  When the SEC was saying a moment ago,

 4    there's a reason why they put 5,000 of these things in there,

 5    it's our understanding that it's because they want to pursue a

 6    per-SAR penalty that exists under the BSA.  Our position is

 7    that that is not something that can be done.

 8              THE COURT:  Oh, great.  Another legal issue.

 9              MS. FRITZ:  So that could also be resolved.  And might

10    really narrow this case considerably.

11              THE COURT:  Isn't that an issue that, you know, I rule

12    on one way or the other?  Not that you won't ultimately appeal

13    me, but least you have one judge's view?

14              MR. CARYLE:  Sure.  And I'm not sure what they're

15    talking about in terms of a per-violation under the BSA.  You

16    know, we're seeking civil penalties under the Exchange Act,

17    which can be assessed on a per-violation basis.  And a way to

18    calculate violations is a bad SAR filing.  That's a record that

19    you're supposed to keep.  So I think there might be a

20    misunderstanding here, but, you know, there's interrogatories.

21    We're very early in discovery.  It certainly wasn't in our

22    complaint where it suggests that we are seeking anything under

23    the BSA.

24              THE COURT:  OK.  So it looks like, preliminarily, here

25    are some reactions I have.  And thank you.  This has been very

1    helpful education.

2           I'm not going to require the SEC to identify, per SAR

3    in table A, with more detail what specific kinds of violations

4    for that individual SAR exist.  I would like, though, the SEC

5    to identify the seven/eight categories with some care and

6    specificity.  Is that possible?

7           MR. MILLER:  Yes, your Honor.  It's something we've

8    already done.  And we'll make it a very formal disclosure so

9    that there's no question about it.  Through our discussion it's

10   something that's already been presented, but we're happy to do

11   it again.

12          THE COURT:  When could you do that in a more formal

13   document that has a date and a signature?

14          MR. MILLER:  It is something that we could do tomorrow

15   or for sure by Monday.

16          MR. CARYLE:  To make it absolutely clear, your Honor,

17   are you asking for a listing of what the seven or eight

18   categories are?

19          THE COURT:  Yes.

20          MR. MILLER:  See, your Honor, I have it -- this is my

21   own memo.  But I would say basically copy and paste this into a

22   formal document, sign it.  And that's what you need, just a

23   one-page description of the seven categories we talked about

24   today.

25          THE COURT:  Yes.

1          MR. MILLER:  Yes.  That's something we can do very

2   quickly.

3          THE COURT:  I am not expecting you to list all the

4   things that may be in the eighth category, which is the

5   miscellaneous "other" category.  Nor am I restricting your

6   expert from listing other things.  But I'm trying to set up,

7   because I think the bulk of the litigation, if we can cut

8   through this and save people some expense and provide you some

9   guidance so you can have some meaningful discussion, sooner

10  rather than later, I'd like to give you that as a possibility.

11         If, on reflection -- and, you know, we're going to

12  work out a proposal -- if on reflection both of you think that

13  this is a waste of time and is in fact imposing an additional

14  burden on you, then we're not going to do it.

15         So the SEC by Monday will, for the table A, list the

16  seven categories with specificity.  Again, their expert may

17  have other categories the expert has.  I'm not expecting

18  specificity with respect to the miscellaneous eighth category

19  known as "other."

20         Then what I'm going to propose is, I think, something

21  like the following -- and I'd like you to consider it and

22  discuss it.  The SEC chooses five.  If the defendant wants to

23  from the same category, I'm open to that, and you just add it

24  to what the SEC would move on.  So they would move on five or

25  ten, that fall in each of the seven categories, as well as five

1    or ten from table B, five or ten from the untimely grouping in

2    tables C and D, five or ten from E -- well, E.  I mean, when

3    are the supporting files supposed to be produced where they

4    haven't already been?  When does that shut down?

5             MR. MILLER:  I can't --

6             MR. CARYLE:  I don't recall --

7             THE COURT:  Somewhere in November?

8             MR. CARYLE:  A couple of weeks, yes.

9             THE COURT:  OK.  Well, we could fold that in or not.

10   But that doesn't seem to be requiring, perhaps, motion

11   practice.

12            MR. MILLER:  I think that's right, because that seems

13   to be a simple issue that can be resolved later on, once, I

14   think, we're in agreement that if the files exist, then we have

15   them, but if they don't, they don't.  But that might take more

16   time, I think, than November.

17            THE COURT:  So at sometime -- I'm going to just throw

18   it out -- sometime in November the SEC moves.  Sometime in

19   December the defendant responds.  Sometime in early January the

20   SEC replies.  Meanwhile you're taking your depositions, you're

21   going forth.  The defendant can pursue the defense about, we

22   had a great process even if there were some individual

23   failings.  But sometime early next year I try to give you --

24   I'm not staying the rest of discovery or staying the case.  But

25   I'm trying to get you a ruling sooner rather than later on

1    these individual exemplars.  And obviously if you could brief

2    it faster, that would be great.  But life is short and you're

3    busy.

4              MR. MILLER:  Just for planning purposes, if I can

5    clarify, your Honor, the proposal, on table A, it could be up

6    to at least 35 or even 70 SARs if we do five to ten from each

7    category?

8              THE COURT:  Yes.  But you may talk with each other and

9    think that, you know, giving me one or two is enough.  I don't

10   know.  You're closer to it.  Maybe one is enough to get the

11   legal point, one for each.

12             MR. MILLER:  Yes.  I think that makes sense.  Some

13   might need more than others, but I think there's definitely a

14   way we can narrow it down.

15             THE COURT:  Do you think you would be able to talk

16   with each other about this -- I know there's traveling

17   happening -- early next week and maybe even tonight?  I'll give

18   you my jury room if you want, but you might not have me back.

19   And maybe get me something on Thursday about a proposal or your

20   disagreements about the proposal?  What do you think?

21             MS. FRITZ:  Yes.  That sounds doable.

22             MR. MILLER:  I was going to say, I need to check with

23   our own staff, with the holidays and things.  So I think

24   something other than tonight would be very helpful on this.

25   But Thursday is plenty of time.

```
 1              MS. FRITZ:  Yes.  If I could just sort of express an

 2     overarching concern.  It's our view that the subjectivity of

 3     the SAR process almost in and of itself is ultimately going to

 4     preclude summary judgment, in virtually every instance.  And so

 5     we still remain concerned that we're going to be continuing

 6     discovery without having this additional piece of information.

 7              THE COURT:  What additional piece?

 8              MS. FRITZ:  The Which SAR in table A fits which

 9     category, like column A, column B.

10              THE COURT:  I'm denying that request.  You'll get it

11     at the time of expert discovery.

12              MR. LEBENTA:  Might I speak?

13              THE COURT:  Yes.

14              MR. LEBENTA:  So the eight categories which were

15     listed --

16              THE COURT:  For table A?

17              MR. LEBENTA:  -- for table A, those can expand over

18     time?

19              THE COURT:  With the expert report, yes.

20              If they expand and you feel you've been prejudiced in

21     any way, obviously you have a right to be heard.  I'm not

22     restricting the expert report about something -- I can't rule

23     right now on how they could or couldn't expand.  So all I'm

24     doing is saying, I want the SEC to identify in a way that you

25     can rely on for now the seven categories.  If you feel the
```

1   expert expands the deficiencies in a way that prejudices you

2   because fact discovery has closed or whatever arguments you

3   wish to make, absolutely you have a right to be heard.  Move to

4   strike.

5          Anything else?

6          MR. MILLER:  No, your Honor.

7          MR. CARYLE:  No.  Thank you.

8          THE COURT:  OK.  Go forth.  Do justice.

9                              o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25