ZACHARY T. CARLYLE
carlylez@sec.gov
TERRY R. MILLER
millerte@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br> - against -<br><br>ALPINE SECURITIES CORPORATION,<br><br>        Defendant. | **17-cv-4179-DLC**<br><br><br><br>**ECF CASE** |

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE
COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................2

    A.    FinCEN Requires Broker Dealers to Report Suspicious Transactions ...................2

    B.    Alpine's Business and AML Compliance Program ................................................3

ARGUMENT ..................................................................................................................4

I.    ALPINE VIOLATES SECTION 17(a) BY VIOLATING THE BSA'S
REQUIREMENT TO FILE ADEQUATE SARS ..............................................................4

II.    ALPINE VIOLATED SECTION 17(a) BY FILING DEFICIENT SARS .......................6

    A.    Alpine must provide a complete description of suspicious activity in each
SAR ........................................................................................................................6

    B.    Alpine omitted required elements from Sample SARs A-P ...................................9

        1.    The Five Basic Elements ...........................................................................9

        2.    Criminal or Regulatory History ...............................................................10

        3.    Shell Companies and Derogatory History of Stock ..................................11

        4.    Evidence of Stock Promotion ...................................................................12

        5.    Unverifiable Issuers .................................................................................13

        6.    Low Trading Volume ................................................................................14

        7.    Foreign Individual or Entity ......................................................................15

III.    ALPINE FAILED TO FILE SARS ON LIQUIDATIONS THAT FOLLOWED
SUSPICIOUS DEPOSITS ...............................................................................................16

    A.    SARs must be filed to report liquidation transactions that follow
suspicious deposits ...............................................................................................17

    B.    Alpine violated Section 17(a) each time it failed to file a SAR on the
Sample Liquidations .............................................................................................18

i

IV.    ALPINE FILED LATE SARS.............................................................................................22

V.     ALPINE FAILED TO MAINTAIN SAR SUPPORT FILES...........................................22

CONCLUSION.............................................................................................................................23

# TABLE OF AUTHORITIES

## Federal Cases

*AFSCME v. Am. Int'l Grp., Inc.*, 462 F.3d 121 (2d Cir. 2006) ...................................................... 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 4

*Auer v. Robbins*, 519 U.S. 452 (1997) ...................................................................................... 7-8

*Curtis v. Cenlar F.S.B.*, No. 13cv3007 (DLC), 2014 WL 5778046 (S.D.N.Y. Nov. 5, 2014) ...... 4

*In re Albert Fried & Co.*, Rel. No. 77971 ¶¶ 13, 19 (June 1, 2016) .................................... 13, 17

*In re Oppenheimer & Co. Inc.*, Rel. No. 9711 ............................................................................ 17

*Wells Fargo Advisors, LLC*, Rel No. 82054 (Nov. 13, 2017) ...................................................... 5

*Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005) ................................................................ 4

*Ridinger v. Dow Jones & Co.*, 651 F.3d 309 (2d Cir. 2011) ....................................................... 4

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) ................................................................... 4

*SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587 (S.D.N.Y. 1993) ............................ 5-6

*United States v. Clark*, 717 F.3d 790 (10th Cir. 2013) ....................................................... 12-13

*Wonsover v. SEC*, 205 F.3d 408 (D.C. Cir. 2000) ...................................................................... 6

## Federal Statutes

31 U.S.C. § 17(a) ................................................................................................................ *passim*

31 U.S.C. § 310 ...................................................................................................................... 2, 6

31 U.S.C. § 5311 ......................................................................................................................... 2

31 U.S.C. § 5318(g)(1) ............................................................................................................... 6

## Other

17 C.F.R. § 240.17a-8 ................................................................................................................. 5

31 C.F.R. § 1010.100(bbb)(1) ................................................................................................... 17

31 C.F.R. § 1010.605(f)(1)(iii) .................................................................................................. 15

31 C.F.R. § 1023.210(c) ............................................................................................................. 5

31 C.F.R. § 1023.320 ......................................................................................................... 3, 17-18

31 C.F.R. § 1023.320(a) ........................................................................................................... 17

31 C.F.R. § 1023.320(a)(2) ........................................................................................................ 5

31 C.F.R. § 1023.320(b)(1) ........................................................................................................ 7

31 C.F.R. § 1023.320(b)(3) ....................................................................................................... 22

31 C.F.R. § 1023.320(d) ........................................................................................................... 22

67 Fed. Reg. 44,048 (July 1, 2002) ................................................................................ 5

77 Fed. Reg. 12,367 (Feb. 29, 2012) ....................................................................... 6, 7

Fed. R. Civ. P. 34 ...................................................................................................... 23

Fed. R. Civ. P. 56(c) ................................................................................................... 4

Plaintiff United States Securities and Exchange Commission (the "Commission") submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment ("Motion"). The Motion seeks summary judgment that, for each of the examples below, Defendant Alpine Securities Corporation ("Alpine") failed to comply with Bank Secrecy Act ("BSA") regulations in violation of Section 17(a) of the Securities Exchange Act ("Exchange Act") and Rule 17a-8 thereunder.

## INTRODUCTION

Alpine systematically failed to comply with reporting requirements mandated under BSA regulations that require broker-dealers like Alpine to submit suspicious activity reports, or "SARs," to report suspicious transactions executed at or through their firms. Alpine's own records show that it failed to comply with the BSA regulations thousands of times from May 2011 to December 2015. The failures pursued by the Commission in this action fit within four main categories of violations: (1) Alpine failed to describe suspicious activity adequately in at least 2,000 SARs; (2) Alpine failed to report at least 3,600 suspicious liquidations of stock; (3) Alpine filed over 200 untimely SARs; and (4) Alpine failed to maintain supporting records of over 1,000 SARs. These failures undermined the very purpose of the SARs and the BSA which is to aid law enforcement efforts to investigate a host of potential crime.

Because of the large number of violations, the Commission elected to pursue violations in this action that occurred at a high frequency and can be established by reference to undisputed facts in Alpine's own records. It cannot be disputed that Alpine repeatedly omitted suspicious information contained in its own records. It cannot be disputed that that Alpine had an obligation to file SARs on suspicious liquidations of securities in instances where Alpine previously filed

SARs reporting deposits of the same stock by the same customers. It cannot be disputed that Alpine filed untimely SARs because the SARs themselves show the dates when Alpine became aware of the suspicious activity. It cannot be disputed that Alpine failed to maintain SAR supporting files because Alpine has not produced copies of the files. The evidence establishing these violations cannot be genuinely disputed, and no evidence extrinsic to Alpine's records could create a material dispute of fact.

Summary judgment on illustrative samples from each category would streamline discovery and trial in this case. Below, the Commission presents samples pulled from each category of violation and shows that the Commission is entitled to summary judgment that, for each sample violation, Alpine violated the BSA regulations (and Alpine's own written procedures) and, consequently, Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.

## BACKGROUND

### A.      FinCEN Requires Broker-Dealers to Report Suspicious Transactions.

Congress enacted the BSA to require reports useful in criminal, tax, or regulatory investigations or in the conduct of intelligence activities to protect against international terrorism. 31 U.S.C. § 5311. The Financial Crimes Enforcement Network ("FinCEN") is a bureau within the Treasury Department, 31 U.S.C. § 310, which has been delegated the authority to implement the BSA, as amended by the USA PATRIOT Act. TREASURY ORDER 180-01.[1]

Pursuant to the BSA, FinCEN requires certain financial institutions to file SARs to report suspicious transactions and activity. These reports have been instrumental in the investigations of

---

[1] Available at https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/to180-01.aspx

money laundering and terrorist financing, fraud, embezzlement, and tax violations. SOF 1.[2]

SARs also play a critical role in the investigation of securities law violations. SOF 2.

FinCEN requires broker-dealers like Alpine to report certain suspicious transactions executed at or through their firms. 31 C.F.R. § 1023.320. Broker-dealers must file reports on standard SAR forms, which require the filer to provide a complete description of the suspicious transaction. Like all SARs, the purpose of the SARs filed by broker-dealers is to provide law enforcement with a description of suspicious activity sufficient to allow the investigators a full understanding of the suspicious activity and its possible criminal nature. The "failure to adequately describe the factors making the transaction or activity suspicious undermines the very purpose of the SAR and lessens its usefulness to law enforcement." SOF 3.

### B.      Alpine's Business and AML Compliance Program

Alpine is a clearing broker subject to FinCEN's SAR rules for broker-dealers. During the time relevant to the Motion, May 17, 2011 to December 31, 2015, Alpine maintained anti-money laundering ("AML") written procedures that purport to comply with FinCEN's BSA regulations, among other rules. Alpine's written procedures and written training materials incorporated the robust body of guidance published by FinCEN and FINRA that clarifies the requirement that SAR filers provide complete descriptions of suspicious transactions. SOF 4.

While Alpine's written materials purport to mirror FinCEN and FINRA guidance, in practice Alpine systematically failed to comply with the BSA regulations during the relevant time period. As illustrated below with sample violations of BSA regulations, Alpine routinely failed to provide complete descriptions of suspicious activity in SARs, failed to file SARs on

---

[2] Citations to "SOF" refer to the Commission's Rule 56.1 Statement Of Material Facts In Support Of Its Motion For Partial Summary Judgment attached to the Motion.

suspicious liquidations, filed untimely SARs, and failed to comply with the BSA regulation requirement that it retain supporting documentation for filed SARs.

Alpine's violations persisted well after regulators advised Alpine of its failure to comply with BSA regulations. For example, in September 2012, FINRA advised Alpine of its findings that the narratives for all SARs reviewed by FINRA were substantively inadequate because they failed to fully describe why the activity was suspicious. SOF 5. Alpine continued to file substantively inadequate SARs.

## ARGUMENT

Summary judgment is appropriate if the Commission shows that there is no genuine issue as to any material fact and that the Commission is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the Commission meets its burden, Alpine must set forth specific facts showing a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." *Curtis v. Cenlar FSB*, No. 13-CV-3007-DLC, 2014 WL 5778046, at *3 (S.D.N.Y. Nov. 6, 2014) (quoting *Ridinger v. Dow Jones & Co. Inc.,* 651 F.3d 309, 317 (2d Cir.2011)). "The mere existence of a scintilla of evidence in support of [Alpine's] position will be insufficient." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

## I.     ALPINE VIOLATES SECTION 17(a) BY VIOLATING THE BSA'S REQUIREMENT TO FILE ADEQUATE SARS.

Alpine's failure to comply with BSA regulations constitutes a violation of Section 17(a) and Rule 17a-8 thereunder pursuant to a set of interlinked regulations and rules. First, Rule 17a-8 requires broker-dealers like Alpine to "comply with the reporting, recordkeeping and record

4

retention requirements of chapter X of title 31 of the Code of Federal Regulations," which FinCEN promulgated to implement the BSA. 17 C.F.R. § 240.17a-8; *see also* 67 Fed. Reg. 44048, 44049 (July 1, 2002) ("The SEC adopted rule 17a-8 in 1981 under the [Exchange Act], which enables the SROs, subject to SEC oversight, to examine for BSA compliance. Accordingly, both the SEC and SROs will address broker-dealer compliance with this rule."); *see, e.g.*, *In re Wells Fargo Advisors, LLC*, Rel No. 82054 (Nov. 13, 2017) (settled order) at SOF 6 (SEC enforcement of FinCEN's SAR regulations pursuant to Rule 17a-8).

Next, FinCEN's SAR Rule requires broker-dealers like Alpine to report a transaction involving at least $5,000 that the broker-dealer knows, suspects or has reason to suspect: (1) involves funds derived from illegal activity or was conducted to disguise funds derived from illegal activity; (2) is designed to evade any requirements of the BSA; (3) has no business or apparent lawful purpose; or (4) involves use of the broker-dealer to facilitate criminal activity. 31 C.F.R. § 1023.320(a)(2). Chapter X of Title 31 also requires broker-dealers like Alpine to implement and maintain "an anti-money laundering program that complies with the rules, regulations, or requirements of" FINRA, the "self-regulatory organization governing such programs." 31 C.F.R. 1023.210(c). In turn, FINRA Rule 3310 requires member broker-dealers like Alpine to "develop and implement a written anti-money laundering program reasonably designed to achieve and monitor the member's compliance with the requirements of the [BSA], and the implementing regulations promulgated thereunder by the Department of the Treasury."

Pursuant to this body of regulations and rules, the Commission can establish a violation of Rule 17a-8 by showing that Alpine failed to comply with Chapter X of the BSA regulations. The Commission need not prove scienter, *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp.

587, 610 (S.D.N.Y. 1993) ("Scienter need not be shown to prove a violation of section 17(a)(1)

of the Exchange Act and the rules thereunder."), and need not show that Alpine was aware that

its conduct violated the BSA regulations or the Exchange Act. *Wonsover v. SEC*, 205 F.3d 408,

414 (D.C. Cir. 2000).

## II.     ALPINE VIOLATED SECTION 17(a) BY FILING DEFICIENT SARS.

Chapter X of Title 31 requires broker-dealers to report suspicious transactions using the

SAR forms required by FinCEN. Among other things, the forms require broker-dealers to

explain suspicious activities in a narrative form with a clear, complete, and chronological

description. Together with FINRA, FinCEN has published a robust set of interpretive guidance

to clarify the information that broker-dealers must include to provide a complete description of

suspicious activity. In at least 2000 instances, Alpine filed SARs that failed to provide complete

descriptions of suspicious activity because they omitted one or more pieces of key information of

which Alpine was aware. The omitted information was required to be reported pursuant to

Alpine's own BSA compliance program, BSA regulations, FinCEN's guidance, and FinCEN's

SAR forms. The "Sample SARs" described in this section illustrate these failures, and the

Commission is entitled to summary judgment on each of them.

### A.     Alpine must provide a complete description of suspicious activity in each SAR.

FinCEN created standard SAR forms required for broker-dealers. 31 C.F.R. §

1023.320(b)(1); *see also* 31 U.S.C. § 5318(g)(1); 31 U.S.C. § 310 (rulemaking authority over

SARs is delegated to FinCEN); 77 Fed. Reg. 12367, 12367 (Feb. 29, 2012) (final rule mandating

use of electronic SAR form); SOF 7. The forms state that the narrative section of the report is

"critical" and must be completed with care so investigators can understand the described activity

and its possible criminal nature. SOF 7. "Form 101" which was required during the relevant period until 2013, required the filer to provide in the narrative section a "clear" and "complete" description of the suspicious activity, including what is "unusual, irregular, or suspicious about the transactions(s), using the checklist below as a guide…." SOF 8. The form also directed filers to a FinCEN website with tips on SAR form preparation and filing. *Id.* "Form 111," which was required from 2013 through the end of the relevant period, provided similar instructions and a similar checklist. *Id.* Among other things, the checklists on each form directed broker-dealers like Alpine to describe in the SAR narrative the conduct that raised suspicion, indicate whether any information has been excluded from the report, indicate whether there is any related litigation, and describe foreign banks, foreign nationals and the transfer of funds to or from a foreign country involved in the transaction. SOF 9.

In sum, FinCEN's required forms mandated Alpine to provide in the narrative section of SAR forms a complete description of suspicious activity, including why it was unusual, irregular, or suspicious and other suspicious facts of which Alpine was aware.

FinCEN guidance, including links referenced in the required forms, further clarifies the type of information required in the narrative section of the standard SAR forms. This guidance is persuasive to give meaning to 31 C.F.R. § 1023.320(b)(1) and the required forms promulgated by FinCEN wherever an ambiguity arises. *AFSCME v. Am. Int'l Grp., Inc.*, 462 F.3d 121, 126 (2d Cir. 2006) ("When the language of a regulation is ambiguous, we typically look for guidance in any interpretation made by the agency that promulgated the regulation in question."); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) ("Because the salary-basis test is a creature of the

Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation.") (quotation omitted).

FinCEN's guidance instructs broker-dealers like Alpine to "identify the five essential elements of information—*who? what? when? where? and why?*—of the suspicious activity being reported" and to include "a summary of the 'red flags' and suspicious patterns of activity that initiated the SAR." SOF 10. The "why?" element is particularly important and requires Alpine to answer the question "*Why does the filer think the activity is suspicious?*" SOF 10.

In addition to describing the five elements essential to every SAR, firms like Alpine also have a duty to detect red flags and perform additional due diligence and describe those red flags in the SAR narrative, particularly when the red flags are related to penny stock transactions. Guidance from FinCEN and FINRA describes a set of "red flags" relevant to broker-dealers like Alpine that should be included in the narrative section of a SAR where present. In April 2002, the NASD (FINRA's predecessor) published a non-exhaustive list of red flags for which broker-dealers should monitor transactions to detect suspicious activity, including customers with criminal or regulatory history, involvement of foreign individuals or entities, and transactions involving penny stocks. SOF 11. In January 2009, FINRA published a set of red flags for broker-dealers that included shell companies and issuers without current or complete SEC filings. SOF 12. In 2010, FINRA published a template for AML programs that identified red flags for broker dealers, including red flags associated with transactions involving penny stock companies. SOF 13. FinCEN also published a set of red flags relevant to potentially suspicious transactions involving low-priced securities known as "penny stocks" that included large deposits and transfers of thinly-traded securities. SOF 14.

Alpine agreed with the guidance of FinCEN and FINRA and incorporated such guidance in its written materials documenting its AML compliance program. For example, Alpine's training materials incorporate FinCEN guidance on the five essential elements published by FinCEN. SOF 4. Alpine's Written Supervisory Procedures ("WSP") also incorporates a list of red flags that mirrors the lists published by FinCEN and FINRA. SOF 15.

**B.      Alpine omitted required elements from Sample SARs A-P.**

Alpine failed to provide adequate descriptions of suspicious activity in at least 2000 SARs during the relevant period. These failures generally fall into seven categories of omitted information, which are illustrated below with Sample SARs selected from each category.

1.  The Five Basic Elements.  As explained above, Alpine must describe the five basic elements—who, what, when, where, and why—to provide a complete description of suspicious activity required by the BSA regulations and Alpine's own written procedures. However, in Sample SAR A, Alpine merely reported that a customer deposited a large quantity of a low priced security:

> [Customer] is a client of [], a firm for which Alpine Securities provides clearing services. On or around [date, the customer] deposited a large quantity [x shares] of [issuer], a low-priced [$X/share] security. This transaction amounted to approximately [$X].

SOF 16. The narrative fails to explain the customer's business or how the customer conducted potentially illicit activity. Critically, the narrative does not explain why the transaction triggered the filing or why the transaction is suspicious. Alpine thus failed to provide a complete description required by the SAR form and BSA regulations.

Sample SAR B is similar. SOF 17. This SAR does not describe the customer or its business and does not explain why the transaction is suspicious. Instead, it states that Alpine filed the SAR due to "heightened sensitivity surrounding the client" but does not explain what that means. "Heightened sensitivity" is not a known phrase or term of art with special meaning; the reader cannot understand what it means without going outside of the four corners of the SAR.

Sample SAR C is similar to Sample SAR B. SOF 18. This SAR states that the customer is on Alpine's Heightened Supervisory List but, again, the reader has no idea what that means or what Alpine knows about the customer that makes the transaction suspicious.

The investigators reading these sample SARs cannot understand the reported transactions or their possible criminal nature. Filing these deficient SARs is akin to filing no SAR at all, and permitting Alpine to file meaningless SARs without descriptions of the basic elements would render FinCEN's SAR rule meaningless. Accordingly, for each of these samples, Alpine failed to comply with the BSA regulations (and its own procedures) and therefore violated Rule 17a-8. These samples, like many of the SARs that omit some or all of the five required basic elements, also omit one or more red flags, as described below.

2.  Criminal or Regulatory History. If Alpine knows or has reason to know of criminal or regulatory history of key players in a reported transaction, Alpine must include that information in the SAR narrative. The fact that a customer or person associated with the customer has a questionable background or is the subject of relevant criminal, civil, or regulatory violations is a recognized red flag of suspicious activity. SOF 19. Once potentially suspicious activity is identified, a broker-dealer must "use readily available public information about a customer's

criminal or regulatory history when evaluating potentially suspicious activity" and describe it in the SAR form required for broker-dealers. SOF 20.

Alpine included a customer's criminal and regulatory history as a red flag in its own written procedures, and at times did state in SAR narratives the facts that "the authorized signer for [the customer] is currently the subject of an ongoing SEC investigation" or that the "authorized signer for [the customer] has been the subject of recent regulatory action(s). For this reason this deposit may also be suspicious." SOF 21. However, many times—hundreds of them—Alpine failed to do so.

Alpine filed Sample SAR D on January 13, 2012, and omitted the fact that the customer and the customer's CEO were subject to ongoing SEC litigation. SOF 22. The support file for Sample SAR D contains screenshots of Alpine's searches on the SEC website dated September 29, 2011, which reveal the ongoing litigation. SOF 23. Alpine filed Sample SAR E on August 21, 2012, and omitted the fact that the customer had a criminal background involving bank fraud, mail fraud, and wire fraud. SOF 24. Alpine was made aware of this history in a letter dated July 23, 2012. SOF 25. Finally, Alpine filed Sample SAR F on May 5, 2014, but omitted the fact that the customer had regulatory history with the SEC for misrepresentation and misappropriation of client funds. SOF 26. Alpine was aware of this history at the time it filed Sample SAR F. SOF 27. Accordingly, Alpine violated the BSA regulations (and its own procedures) each time it omitted relevant criminal or regulatory history from Sample SARs D, E, and F.

    3.  Shell Companies and Derogatory History of Stock.  Another red flag often omitted from Alpine SARs is an indication that stock is subject to suspension or that the issuer is or was

a shell company,[3] or is not current with its SEC filings. Shell companies are common tools for money laundering and other financial crimes. SOF 28. FinCEN instructs that "[e]xamples of common patterns of suspicious activity are … suspected shell entities" and requires identification of shell companies in SARs. SOF 29. Alpine incorporated this guidance into its Written Supervisory Procedures and policies. SOF 30. Alpine's standardized Deposited Securities Checklist also requires verification of whether an issuer is a shell company. SOF 31. A related red flag exists where the "issuer's SEC filings are not current, are incomplete, or nonexistent." SOF 32.

Alpine omitted from Sample SAR C the fact that the issuer was a shell company "w/in last year," a fact which was included in Alpine's records at the time the SAR was filed. SOF 18 & 33. Similarly, Alpine omitted from Sample SAR A the fact that the issuer was a shell company, also a fact included in Alpine's records. SOF 16 & 34. In another example, Alpine omitted from Sample SAR G the fact that the issuer was not current in its SEC filings, that no company website was found, and that OTC Markets placed a stop signal on the issuer's stock. SOF 35-36. Alpine's omission of the red-flag facts about the issuer in Sample SARs C, A, and G constitutes three separate violations of the BSA regulations (and Alpine's own written procedures).

4.  Evidence of Stock Promotion.  Evidence of stock promotion involving low-priced securities is a suspicious red flag because it is typical of illegal pump-and-dump schemes. *United States v. Clark*, 717 F.3d 790, 796 n.1 (10th Cir. 2013) ("A pump and dump scheme involves the

---

[3] The term shell company "refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence (other than a mailing address) and generate little to no independent economic value." SOF 28.

artificial manipulation of the *price* and volume of a particular stock…. The pump also usually involves disseminating false and misleading promotional materials."). A transaction involving penny-stocks in conjunction with other red flags like stock promotion is suspicious because, as FINRA and Alpine recognize, these transactions have been used in connection with fraudulent schemes. SOF 37; *see also In re Albert Fried & Co.*, Rel. No. 77971 ¶¶ 13, 19 (June 1, 2016) (trades involving issuers with ongoing penny stock promotional campaigns are suspicious).[4]

Alpine omitted evidence of stock promotion from Sample SAR H, which reported a deposit of a large quantity of shares. SOF 38. Alpine's own files reflect that the stock was subject to a recent promotional campaign. SOF 39. Alpine also omitted evidence of stock promotion from SAR J, which reported a deposit of a large quantity of shares. SOF 40. Alpine's support file contained evidence of the promotion, including a news article titled ████████████ ███████████████████████ and indicated promotion activity in the Alpine Deposited Securities Checklist contained in the file. SOF 41. In a third example, Alpine omitted evidence of stock promotion from Sample SAR G. SOF 42. Alpine's support file contains a screen shot of search results that, if reasonably explored, would have led to the discovery of stock promotion. SOF 42. Alpine's omission of the red-flag facts about stock promotion in SARs H, J, and G constitutes three separate violations of the BSA regulations (and Alpine's own written procedures).

5. Unverifiable Issuers. Another red flag commonly omitted by Alpine is the fact that Alpine could not verify the issuer as a legitimate operating business. SOF 43. Alpine omitted from Sample SAR G and Sample SAR K the fact that it could not verify the website of the

---

[4] Available at https://www.sec.gov/litigation/admin/2016/34-77971.pdf

issuers involved in the underlying transactions. SOF 35-36, 44-45. In Sample SAR L, Alpine omitted the fact that the issuer corporation was in default status in its state of incorporation at the time of the deposit. SOF 46-47. Alpine's omission of the fact that it could not verify a legitimate issuer in Sample SARs G, K, and L constitutes three separate violations of the BSA regulations (and Alpine's own written procedures).

      6.  Low Trading Volume.  A deposit of a large volume of shares in relation to the trading volume of the shares is a red flag because "[s]uch activity could signify manipulative measures such as wash trades[5] or pre-arranged trades to create the appearance of unrealistic demand for securities." SOF 48. It is not enough to report the volume of the deposit because law enforcement cannot measure the abnormal size of the deposit without a comparison point, and therefore cannot detect manipulation. Because the trading volume is necessary to understand whether there is a substantial deposit of a thinly traded security, "a substantial deposit … of a very low-priced *and thinly traded* securities" is a red flag. SOF 49.

      In Sample SAR M, Alpine reported a deposit of 5,954,252 shares but omitted that the security had a three-month average trading volume of 59,108 per day. SOF 50. In Sample SAR N, Alpine reported a deposit of 65,000,000 shares but, notwithstanding handwritten notes on multiple pages in the supporting file of "Low Volume," Alpine omitted a volume of 101,100 per day. SOF 51. In Sample SAR P, Alpine reported a deposit of 500,000 shares but omitted the share's trading volume of 10,971 per day. SOF 52. Alpine's omission from Sample SARs M, N, and P of the suspiciously low trading volumes compared to the deposits constitutes three separate violations of the BSA regulations (and Alpine's own written procedures).

---

[5] A wash trade involves the simultaneous or near-simultaneous purchase and sale of a security to make it appear actively traded without an actual change in beneficial ownership of the stock.

7. <u>Foreign Individual or Entity.</u> In many SARs Alpine also omitted the fact that a customer, corresponding firm, account holder, or key player was a foreign individual or entity. The foreign status of individuals or entities is a red flag according to numerous sources of rules and guidance. FinCEN's required SAR forms instruct broker-dealers to indicate whether the suspicious transaction involves foreign nationals, foreign currency, foreign accounts, and transfer of funds to a foreign country together with related information for each of these facts. SOF 53.

SAR guidance also instructs Alpine to indicate involvement of foreign individuals or entities: "[f]ilers should also specify whether the activity involved a foreign jurisdiction, such as funds wired overseas, and the foreign jurisdiction and/or financial institution involved, as well as any account numbers associated with the subject of the suspect transaction(s)." SOF 54.  The BSA defines a "foreign financial institution" to include any foreign entity that, were it located in the United States, would be considered a broker or dealer in securities. 31 C.F.R. § 1010.605(f)(1)(iii). FinCEN directs broker-dealers to use the SAR narrative to "specify if the suspected activity or transaction(s) involved a foreign jurisdiction. If so, provide the name of the foreign jurisdiction, financial institution, address and any account numbers involved in, or affiliated with the suspected activity or transaction(s)." SOF 55. Alpine included this guidance in its training materials, which directed in its "minimum items for SAR inclusion" that the SAR narrative include information about foreign entities and accounts: "if [a transaction] involves a foreign jurisdiction, note this (including any identifiers concerning the transaction, name of jurisdiction, financial institution, address, account numbers, etc.)." SOF 56. At times, Alpine followed this guidance by reporting the fact that a customer is a foreign-broker dealer in SAR narratives. *E.g.* SOF 57. However, many times Alpine failed to do so.

15

Alpine omitted from the narrative in Sample SAR C the fact that the customer was a foreign broker-dealer based in the Bahamas, a country identified by the United States Department of State as a Jurisdiction of Primary Concern for Money Laundering and Financial Crimes throughout the relevant period. SOF 18, 58. Alpine omitted from Sample SAR A the fact that the customer was a broker-dealer based in Belize, another country identified by the United States Department of State as a Jurisdiction of Primary Concern for Money Laundering and Financial Crimes throughout the relevant period. SOF 16, 59. Alpine also omitted the fact that multiple beneficial owners involved in the transaction were Belize corporations with foreign mailing addresses. SOF 60. Finally, Alpine omitted from Sample SAR H the fact that the customer acquired shares from a Bermuda entity by wiring funds to a Bermuda bank account. SOF 38, 61. These three examples constitute three violations of the BSA regulations.

* * * *

Each violation discussed above can be resolved in the Commission's favor on summary judgment based upon the evidence in Alpine's own records. Alpine's own files establish that in the Sample SARs, Alpine failed to identify one or more of the five essential elements of information or failed to include a summary of suspicious "red flags." Accordingly, the Commission is entitled to summary judgment that the omissions described in this section each constitute a violation of Section 17(a) of the Exchange Act and Rule 17a-8 for a total of 21 violations.

## III.    ALPINE FAILED TO FILE SARS ON LIQUIDATIONS THAT FOLLOWED SUSPICIOUS DEPOSITS.

Alpine also violated the BSA regulations by failing to file SARs on at least 3,600 suspicious transactions. Alpine frequently filed a SAR on the deposit of a security, but did not

file a subsequent SAR when the deposit was liquidated soon after the deposit. Often the subsequent liquidation occurred almost immediately after the deposit—which is itself a red flag—and the liquidation and transfer of proceeds added material facts to an already suspicious transaction.

A.      **SARs must be filed to report liquidation transactions that follow suspicious deposits.**

The BSA regulations require Alpine to file a SAR on "any suspicious transaction." 31 C.F.R. § 1023.320(a). The BSA defines a "transaction" broadly to include both a deposit and a sale of stock:

> a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument . . . or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected.

31 C.F.R. § 1010.100(bbb)(1). Accordingly, both the deposit and subsequent liquidation constitute a separate "transaction" within the meaning of the BSA and the SAR requirement. FinCEN guidance identified transactions involving penny stocks that raise red flags of suspicious activity, including the "systematic sale of . . . low priced securities shortly after being deposited, transferred or journaled into [an] account." SOF 62; *see also In re Albert Fried & Co.*, Rel. No. 77971 ¶¶ 18-21 (example of BSA violation for failure to file SARs to report transactions suspicious of manipulation schemes); *In re Oppenheimer & Co. Inc.*, Rel. No. 9711, ¶ 33(e) (Jan. 27, 2015 (example of BSA violation for failure to report suspicious deposits and subsequent transfers of penny stocks).[6]

---

[6] Available at https://www.sec.gov/litigation/admin/2015/33-9711.pdf

Where Alpine found sufficient suspicion to report a deposit, the customer's subsequent liquidation and withdrawal must be equally or even more suspicious. A liquidation of the same shares following a suspicious deposit—particularly when the liquidation is close in time to the deposit—is a separate suspicious event which triggers a new obligation to report, either with a separate SAR or continuing report. SOF 62. Alpine's failure to file SARs on these suspicious liquidations constitutes violations of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder. The "Sample Liquidations" described below illustrate the larger pattern of violations.

**B.     Alpine violated Section 17(a) each time it failed to file a SAR on the Sample Liquidations.**

The first set of Sample Liquidations consists of 20 separate liquidations of the same stock executed by Customer A between February 24, 2012 and November 20, 2012. SOF 63. According to Alpine, the two deposits on February 7 and 27 were suspicious because of the high number of low-priced shares deposited, and Alpine filed separate SARs for each deposit for that reason. SOF 63. Alpine waited until March 1 to file a SAR on the February 7 deposit, but by that date Customer A had already liquidated shares in five separate transactions:

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value |
|---|---|---|---|---|---|
| 2/07/12 | 6,200,000 | $58,900 | | | |
| 2/24/12 | | | | 90,000 | $10,179.00 |
| 2/27/12 | 6,200,000 | $62,000 | | | |
| 2/27/12 | | | | 394,601 | $6,731.89 |
| 2/28/12 | | | | 400,000 | $5,940.00 |
| 2/29/12 | | | | 1,403,000 | $22,602.33 |
| 3/01/12 | | | | 651,000 | $10,448.55 |
| 3/01/12 | | | SAR filed on 2/7 deposit | | |

SOF 63. Customer A then executed seven more liquidations before March 29, the day that

Alpine filed a SAR to report the February 27 deposit:

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value |
|---|---|---|---|---|---|
| 3/02/12 | | | | 746,749 | $12,172.01 |
| 3/05/12 | | | | 2,600,000 | $57,122.00 |
| 3/06/12 | | | | 1,334,183 | $36,970.21 |
| 3/06/12 | | | | 1,000,000 | $25,640.00 |
| 3/09/12 | | | | 709,151 | $10,630.17 |
| 3/14/12 | | | | 268,561 | $5,586.07 |
| 3/19/12 | | | | 449,226 | $10,493.92 |
| 3/29/12 | | | SAR filed on 2/27 deposit | | |

SOF 63. Alpine did not file a SAR on these liquidations, all of which occurred after the first two

deposits, but before Alpine even filed a SAR on both deposits. Indeed, Customer A executed five

of the liquidations before Alpine filed any of the SARs. Thus, Alpine clearly had reason to

believe these first eleven liquidations were suspicious but did not file a SAR on any of them.

The pattern continued. Alpine filed SARs on deposits by Customer A of the same stock

dated April 16, April 26, and September 11, and cleared liquidations of the same stock for the

same customer on eight separate dates from April 19 to September 20:

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value |
|---|---|---|---|---|---|
| 4/02/12 | 8,000,000 | $180,000 | | | |
| 4/16/12 | | | SAR filed on 4/2 deposit | | |
| 4/19/12 | | | | 519,243 | $9,472.03 |
| 4/20/12 | | | | 347,382 | $6,687.10 |
| 4/26/12 | 6,200,000 | $117,800 | | | |
| 5/17/12 | | | | 2,876,100 | $48,260.96 |

19

| 5/25/12 | | | SAR filed on 4/26 deposit | | |
|---|---|---|---|---|---|
| 6/8/12 | | | | 800,000 | $7,920.00 |
| 7/27/12 | | | | 920,000 | $6,256.00 |
| 8/6/12 | | | | 1,300,000 | $6,565.00 |
| 8/17/12 | | | | 1,865,700 | $16,753.99 |
| 9/11/12 | 11,120,000 | $88,960 | SAR filed on 9/11 deposit | | |
| 9/20/12 | | | | 571,000 | $5,595.80 |

SOF 63. The SAR filings on the deposits show that Alpine had reason to know that the liquidations were suspicious but did not file a SAR to report any of the liquidations—a total of 20 separate violations.

The second set of Sample Liquidations consists of five separate liquidations of the same stock executed by Customer B between July 15, 2014 and August 18, 2014. SOF 64. Customer B made three initial deposits on April 25, June 12, and June 18. Alpine filed a SAR to report each of these three deposits as suspicious for various reasons, including that the account had historically made deposits of large volumes of low-priced securities, the volume of the reported deposits was high, the customer obtained the shares under suspicious circumstances, and the authorized signer for the account had been the subject of recent regulatory action. Alpine filed the third SAR on July 14, the same day that Customer B made a fourth large deposit. Customer B made a fifth large deposit the next day, July 15. SOF 63.

Beginning on July 15, the same day as the fifth deposit and just one day after Alpine filed the third SAR, Customer B executed three separate liquidations over a four-day period. SOF 64. After these three liquidations, Alpine filed SARs to report the July 14 and July 15 deposits but omitted the liquidations and did not file separate SARs for the liquidations. SOF 64. Customer B

then executed two more liquidations in the same stock, one on August 13, the day after Alpine reported the fifth deposit, and the second five days later on August 18, but failed to report this activity. SOF 64. The five SARs on the large deposits, including the suspicious circumstances indicated in the five SARs, show that Alpine knew or had reason to know that the five liquidations were suspicious; especially the liquidations that occurred *before* Alpine filed SARs to report the suspicious deposits.

In the third set of Sample Liquidations, Customer C liquidated the same stock in four transactions between September 19, 2013, and October 16, 2013. SOF 65. The customer initially made a large deposit on September 18, which Alpine reported in a SAR filed after the customer already executed three of the liquidations. SOF 65. Alpine's stated reasons for the SAR on the first deposit: the account historically makes large deposits like the September 18 deposit, the customer obtained the shares with an unusually high return on investment, and the authorized signer on the account was the subject of an ongoing SEC investigation. SOF 65. The customer made another large deposit on September 17, which Alpine reported in a SAR filed on October 5. SOF 65. The customer executed the fourth liquidation on October 16. SOF 65. Alpine filed no SARs to report the four liquidations, but the SAR filings on the deposits show that Alpine knew or had reason to know that the transactions were suspicious—they involved the same account Alpine deemed suspicious, the same individual under SEC investigation, and the same stock underlying the suspicious deposits Alpine reported. Further, the customer liquidated the stock the day after depositing it, which itself is an additional red flag that was never reported in any SAR.

The Commission is entitled to summary judgment that Alpine violated Section 17(a) and Rule 17a-8 for each of the 29 Sample Liquidations for which it failed to file a SAR.

## IV.     ALPINE FILED LATE SARS.

The BSA regulations require Alpine to file a SAR "no later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing" a SAR. 31 C.F.R. § 1023.320(b)(3). Alpine's failures to file SARs within 30-days of reviewing the corresponding deposit thus constitutes violations of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.

As five examples, Alpine filed SARs late by 211, 206, 207, 205, and 189 days, respectively. SOF 66. In the narrative section of each of these untimely SARs, Alpine described only the date of the deposit, and the quantity, price, and issuer of the stock involved in the transaction, all of which Alpine must have known at the time of the transaction. SOF 66.

There is no dispute of material fact that Alpine filed each of these samples more than 30 days after Alpine knew or should have known the facts that constituted the basis for filing a SAR, because that date appears in the SAR. Accordingly, the Commission is entitled to summary judgment that Alpine violated Section 17(a) and Rule 17a-8 each time it filed one of the Sample Late SARs.

## V.      ALPINE FAILED TO MAINTAIN SAR SUPPORT FILES.

Alpine also violated the BSA regulation to maintain SAR supporting documentation. The BSA regulations required Alpine to maintain supporting documentation for each SAR filed for a period of five years from the date of filing the SAR. 31 C.F.R. 1023.320(d). The purpose of this

22

regulation is to ensure that law enforcement agencies have ready access to the information in the supporting documentation, and Alpine must provide the records upon request. *Id.*

The Commission requested Alpine's supporting documentation for the sample Missing File SARs numerous times, including in a request for production served pursuant to Fed. R. Civ. P. 34 in this action. Alpine has not produced the supporting documentation for these SARs and, for that reason, could not possibly provide the records upon request as required by BSA regulations. SOF 67. The Commission is entitled to summary judgment that Alpine violated Section 17(a) of the Exchange Act and Rule 17a-8 thereunder for each of the five sample Missing File SARs.

## CONCLUSION

For the reasons above, the Commission respectfully requests partial summary judgment that Alpine violated Section 17(a) of the Exchange Act and Rule 17a-8 for each of the sample violations raised in the Motion. Summary judgment on the samples presented in the Motion will help to narrow the claims and defenses in this action, which will render discovery and trial, if necessary, more efficient.

Respectfully submitted this 6th day of December, 2017.

/s/ Terry R. Miller
Zachary T. Carlyle (*pro hac*)
Terry R. Miller (*pro hac*)
Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 6, 2017, a copy of the foregoing document was served via

email upon the following:

Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker
CLYDE SNOW & SESSIONS
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah 84111-2216

Maranda E. Fritz
Thompson Hine LLP (NYC)
335 Madison Avenue, 12th Floor
New York, NY 10017

*Counsel for Alpine Securities Corporation*

/s/ Marla J. Pinkston
Marla J. Pinkston