# Regulatory Notice 09-05

## Unregistered Resales of Restricted Securities

**FINRA Reminds Firms of Their Obligations to Determine Whether Securities are Eligible for Public Sale**

### Executive Summary

FINRA reminds firms[1] of their responsibilities to ensure that they comply with the federal securities laws and FINRA rules when participating in unregistered resales of restricted securities. These responsibilities are particularly important in situations where the surrounding circumstances place the firm on notice that it may be participating in illegal, unregistered resales of restricted securities, such as when a customer physically deposits certificates or transfers in large blocks of securities and the firm does not know the source of the securities.

Recent FINRA investigations have revealed instances in which firms failed to recognize certain "red flags" that signaled the possibility of an illegal, unregistered distribution. This *Notice* identifies situations in which firms should conduct a searching inquiry to comply with their regulatory obligations under the federal securities laws and FINRA rules. FINRA also has reviewed procedures provided by a number of large, medium and small firms that are designed to address compliance. This *Notice* describes and discusses those procedures.

Questions concerning this *Notice* should be directed to:

- Gary L. Goldsholle, Vice President and Associate General Counsel, Office of the General Counsel, at (202) 728-8104;
- Joseph E. Price, Vice President, Corporate Financing, at (240) 386-4623; or
- Lisa Jones Toms, Counsel, Corporate Financing, at (240) 386-4661.

**January 2009**

**Notice Type**
- Guidance

**Suggested Routing**
- Compliance
- Registered Representatives
- Trading
- Training

**Key Topic(s)**
- Unregistered Resale of Restricted Securities
- Unregistered Distributions

**Referenced Rules & Notices**
- NASD Rule 2710
- NASD Rule 2720
- NASD Rule 2810
- NASD Rule 3010
- SEC Rule 144
- Section 4(1) of the Securities Act
- Section 4(2) of the Securities Act
- Section 4(4) of the Securities Act



FINRA — Financial Industry Regulatory Authority

1

## Background & Discussion

Firms play a critical role in helping prevent illegal, unregistered resales of restricted securities into the public markets. It is a violation of the federal securities laws for a firm to offer or sell a security without an effective registration statement or an applicable exemption from the Securities Act of 1933 (Securities Act). In addition, such sales may violate NASD Rules 2710 (Corporate Financing Rule – Underwriting Terms and Arrangements)[2], 2720 (Distribution of Securities and Affiliates – Conflicts of Interest) and 2810 (Direct Participation Programs).[3]

All firms must have procedures reasonably designed to avoid becoming participants in the potential unregistered distribution of securities. The nature of those procedures and the required level of firm inquiry concerning the customer and the source of the securities will depend on the particular circumstances. In addition, firms may not rely solely on others, such as clearing firms, transfer agents, or issuers' counsel, to fulfill these obligations. Firms' specific obligations are discussed in more detail below.

The Securities Act prohibits the sale of securities unless the sale is made pursuant to an effective registration statement, or falls within an available exemption from registration. Before selling securities in reliance on an exemption, a firm must take reasonable steps to ensure that the transaction qualifies for the exemption, regardless of whether the sale is for its own accounts or on behalf of customers. This includes taking whatever steps necessary to ensure that the sale does not involve an issuer, a person in a control relationship with an issuer, or an underwriter with a view to offer or sell the securities in connection with an unregistered distribution.[4]

Section 4(1) of the Securities Act provides an exemption for the routine trading of already-issued securities. It does not, however, exempt sales by an issuer, or a control person of the issuer, or an underwriter or dealer. Section 4(2) of the Securities Act exempts sales made by an issuer not involving a public offering. Whether a sale is one that involves a public offering, however, is a question of fact which requires an inquiry regarding the surrounding circumstances, including such factors as the relationship between the seller and the issuer, and the nature, scope, size, type and manner of the offering. Section 4(4) of the Securities Act provides an exemption for unsolicited brokers' transactions. However, this exemption is available only if a broker is not aware, after a reasonable inquiry, of circumstances indicating that the selling customer is participating in a distribution of securities.

Recently, FINRA has investigated and brought several enforcement actions concerning unregistered distributions.[5] A common theme in these cases was that firms resold large amounts of low-priced equity securities in over-the-counter transactions. Among the allegations in these cases are that the inquiries necessary to uncover the facts of the unregistered distribution were not done or were inadequate, and the firms lacked proper supervisory controls to ensure that their written procedures were being followed. More specifically, in some instances, firms failed to take steps to determine when or how their customers had received the share certificates at issue, whether their customers were control persons of the issuers, or what percentage of the outstanding shares of these companies their customers owned. In some instances, physical certificates for shares were repeatedly deposited into accounts and then sold by firms that participated in unregistered distributions.

## Red Flags and the Duty to Make an Inquiry

Firms typically serve as the channel of distribution through which issuers, affiliates and promoters can access the public securities markets. Firms that do not adequately supervise or manage their role in such distributions run the risk of participating in an illegal, unregistered distribution. As recent investigations have shown, problems can arise when firms fail to recognize or take appropriate steps when confronted with "red flags" that signal the possibility of an illegal, unregistered distribution.

The following are examples of red flags (these are by no means comprehensive and should not be considered a "roadmap" for compliance purposes):

➤ A customer opens a new account and delivers physical certificates representing a large block of thinly traded or low-priced securities;

➤ A customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale;

➤ A customer deposits share certificates that are recently issued or represent a large percentage of the float for the security;

➤ Share certificates reference a company or customer name that has been changed or that does not match the name on the account;

➤ The lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired the securities or the nature of the transaction in which the securities were acquired;

➤ There is a sudden spike in investor demand for, coupled with a rising price in, a thinly traded or low-priced security;

➤ The company was a shell company when it issued the shares;

➤ A customer with limited or no other assets under management at the firm receives an electronic transfer or journal transactions of large amounts of low-priced, unlisted securities;

➤ The issuer has been through several recent name changes, business combinations or recapitalizations, or the company's officers are also officers of numerous similar companies;

➤ The issuer's SEC filings are not current, are incomplete, or nonexistent.

As noted above, these examples are merely illustrative. There are many other situations that may signal that a firm should take a closer look at the circumstances of a proposed resale transaction.

Regarding the duty of firms to determine whether restricted securities are eligible for public sale, the SEC has said that:

> [A] dealer who offers to sell, or is asked to sell a substantial amount of securities must take whatever steps are necessary to be sure that this is a transaction not involving an issuer, person in a control relationship with an issuer or an underwriter. For this purpose, it is not sufficient for him merely to accept "self-serving statements of his sellers and their counsel without reasonably exploring the possibility of contrary facts."(footnote omitted)

> The amount of inquiry called for necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to him, may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for.

> The problem becomes particularly acute where substantial amounts of a previously little known security appear in the trading markets within a fairly short period of time and without the benefit of registration under the Securities Act of 1933. In such situations, it must be assumed that these securities emanate from the issuer or from persons controlling the issuer, unless some other source is known and the fact that the certificates may be registered in the names of various individuals could merely indicate that those responsible for the distribution are attempting to cover their tracks.[6]

## Inquiry Obligations under Securities Act Rule 144

A firm that distributes securities for its own account or on behalf of a customer may be considered a statutory underwriter. Securities Act Rule 144 establishes a non-exclusive "safe harbor" from being deemed an underwriter if the securities are sold in compliance with its requirements. Unregistered securities that are not freely transferable are considered "restricted securities" when they are acquired in a private transaction or are acquired by a control person of the issuer.[7]

The SEC recently revised Rule 144 and made substantial changes to the requirements governing resales of restricted securities.[8] The amendments, which became effective on February 15, 2008, continue to impose a one-year holding period prior to any public resale on restricted securities of companies that are not subject to the Exchange Act reporting requirements. The amendments eliminated the sales volume and manner of sale limitations on resales made by non-affiliates. Revised Rule 144 also includes more stringent restrictions on the resale of shares issued by shell companies. Accordingly, firms should review whether the company that issued the subject shares was a shell company when the shares were issued.

Before reselling restricted securities, firms must take reasonable steps to ensure that the transaction complies with Rule 144 or another available exemption. The factors set forth in the Notes to Rule 144(g) serve as a pragmatic guideline in determining what questions firms should ask their customers before engaging in an unregistered resale of securities:[9]

➤ How long has the customer held the security?
➤ How did the customer acquire the securities?
➤ Does the customer intend to sell additional shares of the same class of securities through other means?
➤ Has the customer solicited or made any arrangement for the solicitation of buy orders in connection with the proposed resale of unregistered securities?
➤ Has the customer made any payment to any other person in connection with the proposed resale of the securities? and
➤ How many shares or other units of the class are outstanding, and what is the relevant trading volume?

Firms should also try to physically inspect share certificates, if possible, as an opportunity to identify red flags and deter risks from forgery and fraudulent certificates.

## Supervisory Procedures and Controls for Unregistered Resales of Securities

NASD Rule 3010 (Supervision) requires a firm to establish a supervisory system and corresponding written procedures to supervise its businesses and associated persons' activities. Accordingly, firms that accept delivery of large quantities of low-priced OTC securities, in either certificate form or by electronic transfer, and effect sales in these securities, should have written procedures and controls in place to prevent participation in an illegal, unregistered distribution of securities.

To help firms evaluate their procedures for supervising these resale transactions, FINRA has reviewed the procedures of a number of large, medium and small firms. The procedures noted below are not intended to be a comprehensive roadmap for compliance and supervision with respect to unregistered resales of restricted securities, but rather highlight measures that some firms are using to ensure better compliance with their obligations. While a particular practice may work well for one firm, the same approach may not be effective or economically feasible for another. Firms must adopt procedures and controls that are effective given their size, structure and operations.

The procedures we surveyed varied depending on the firms' business models; nevertheless, the most comprehensive ones tended to include a mandatory, standardized process that requires formal approval of the proposed resale transaction and thorough accompanying documentation that:

➤ Clearly communicates each step in the review, approval and post-approval process through the various stages of background inquiry, information gathering, required documentation, review, final approval, execution and recordkeeping of the transaction;

➤ Assigns clear "ownership" of each step of the transaction review, approval and execution process to the responsible representative, principal, legal or compliance specialist, business unit or department; and

➤ Is easily accessible to the personnel involved in the process, often through internal Web-based applications that are clear, instructive and encourage process standardization.

Standardized procedures should be accompanied by supervisory controls to ensure that a reasonable and meaningful investigation of the surrounding circumstances is conducted and that the information obtained is evaluated to identify whether a proposed resale transaction could amount to an illegal, unregistered distribution of a restricted security on behalf of an underwriter, an issuer, or a control person of the issuer. As a general matter, the procedures and controls should apply to not only proposed resales, but also the transfer of securities from one account to another by journal or book entry.

Among the compliance procedures FINRA reviewed are:

**A.    Initial Assessment and Review**

A number of firms had procedures that required a comprehensive initial review of the proposed resale, which includes gathering information concerning how, when, and under what circumstances a customer obtained the securities; whether the securities are registered pursuant to an effective Securities Act registration statement; how much of the stock is owned by or under the control of the customer; whether the stock was paid for by the customer; what relationship, if any, the customer has with the issuer or its control persons; and how much stock has been sold by the customer. Some procedures also contained brief descriptions of how holders of unregistered securities may acquire them, such as via private placements, corporate reorganizations, business combinations and stock options plans, and explained that the requirements for resales of such securities can vary depending on the nature of the transaction and the status of the seller, *i.e.*, whether the seller is considered an affiliate of the issuer.

Some firms prohibited their representatives from accepting large blocks of securities in certificate form or required supervisory approval before a transfer of restricted securities would be accepted.

Many firms required the results of the initial review to be documented and held the persons performing the review accountable for completion of the fact-gathering and documentation process. As part of this process, firm procedures required the use of questionnaires completed by the selling customer regarding the proposed resale transaction, form letters completed by the customer and registered representative, and other standardized documentation depending on the transaction.

Some firms deferred the documentation requirements to the person or department responsible for approval. Most firms required the completed documentation to be reviewed for any unusual circumstances and for completeness before submitting it for formal approval of the transaction. This assessment may also alert the firm to unusual or suspicious circumstances that may trigger other compliance procedures (such as Anti-Money Laundering (AML) reporting) or additional approvals given the size or nature of the transaction.

### B. Formal Review and Approval

Most of the procedures we reviewed required formal approval by a person, unit or department that is independent of the initial assessment and review of the proposed resale transaction. The person or department responsible for such approval was required to document the steps taken and was accountable for the final approval. For many firms, the final approval process is more than a verification of the adequacy of the documentation. It included an investigation of the customer's and issuer's background; a formal process to confirm the seller's affiliation status and the conditions upon which the shares can be resold; verification that the issuer is current in its filings and the issuer's information is publicly available; and a thorough review of the opinion of counsel, restricted stock legend, offering materials or prospectus, and other documents for reasonableness of the information and representations. It also took into account any previous sales by the customer through any accounts at the firm. Approval from a designated principal or legal and compliance specialist generally is required in these instances *before* executing or submitting the trade for execution. The approval document also specifies whether there are any conditions to the resale, such as volume, manner of sale or other applicable requirements.

### C. Recordkeeping Obligations and Post-Approval Review

Because of the manner of sale and other requirements that apply to unregistered resales of restricted securities by affiliates, some firms' procedures included steps to monitor executions of approved transactions to ensure they comply with applicable volume or manner of sale requirements. Other firms have a process in place, post-approval of the resale transaction, to examine repeated resales by the same account or accounts under common control and to review and monitor aggregated resales in the same securities.

Some procedures we reviewed did not assign specific recordkeeping obligations. Other procedures designated a registered representative at the firm as the person responsible for retaining all documents related to the resale as opposed to having another entity such as the firm's legal or compliance group or securities transfer unit designated as primarily responsible for document retention or, at least, to receive and retain copies of the documentation related to the resale.

## Other Considerations

### A.     Reliance on Third Parties

In considering their obligations, firms should be aware that there are limitations on their ability to discharge those obligations by relying on others. FINRA, the SEC and the courts have repeatedly held that firms cannot rely on outside counsel, clearing firms, transfer agents, issuers, or issuer's counsel to discharge their obligations to undertake an inquiry. Moreover, the fact that securities have been issued by a transfer agent without a restrictive legend, or have been put into trading status by a clearing firm, does not mean that those securities can be resold immediately and without limitation under the Securities Act.[10]

### B.     AML Compliance

A firm must also ensure that its AML compliance program adequately addresses red flags that may be associated with unregistered resales conducted through the firm.[11] In recent investigations, FINRA has found that firms that participated in unregistered resales of restricted securities also may have ignored a number of red flags that indicate not only that the resale was part of an unregistered distribution, but also that action may have been required under AML reporting requirements.[12] Failure to conduct appropriate inquiry and respond to red flags may have consequences under both the federal securities laws and AML requirements.

## Conclusion

Firms must have written procedures that are reasonably designed to avoid becoming participants in the illegal, unregistered resale of restricted securities into the public markets. As noted above, these procedures and the required level of firm inquiry depend on the facts and circumstances of the proposed resale. FINRA urges firms to pay careful attention to these obligations and the implementation of these procedures.

## Endnotes

1   This *Notice* refers to broker-dealers and their associated persons collectively as "firms" unless otherwise specified.

2   NASD Rule 2710 is being re-designated as FINRA Rule 5110. See SR-FINRA-2008-039.

3   *See, e.g.,* FINRA's Corporate Financing Rules (NASD Rules 2710, 2720 and 2810), which apply to public offerings, and NASD Rule 2110, which requires firms to act under just and equitable principles of trade. Regulation M under the Exchange Act and other FINRA and SEC rules may also apply to an unregistered public distribution in addition to civil liabilities under the Securities Act.

4   The term "underwriter" is broadly defined in the Securities Act to include any person or entity that purchases securities from an issuer with a view to distribute, or offers or sells for an issuer in connection with a distribution, and any person or entity participating, directly or indirectly, in a distribution of securities. The term "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. *See* Sec. 2(a)(11), Securities Act of 1933. Whether a customer is acting as an underwriter, is a control person, or is acting on behalf of an underwriter or control person, depends on the particular facts and circumstances of the transaction.

5   *See, e.g., Network 1 Financial Securities, Inc.* NASD AWC No. EAF0400940001, July 11, 2007; *NevWest Securities Corporation*, NASD AWC E0220040112-01, March 21, 2007, and related case SEC v. CMKM Diamonds, Inc., *et. al*, U.S. Dist. Court for the District of Nevada, Civil Action No. 08- CV 0437 (Lit. Rel. No. 20519 / April 7, 2008); and *Cardinal Capital Management, Inc*. NASD AWC E072003004201, July 22, 2005. In addition, FINRA has numerous ongoing investigations involving allegations of unregistered distributions. *Barron Moore, Inc.*, Disc. Proceeding No. 2005000075703, July 21, 2008.

6   *See*, Securities Act Rel. No. 4445, 1962 SEC LEXIS 74 (February 2, 1962); *see also* Section 21(a) Report, *Transactions in the Securities of Laser Arms Corp. by Certain Broker-Dealers,* 50 S.E.C. 489 (1991).

7   *See* Preliminary Note to Securities Act Rule 144. 17 CFR 230.144. The term "restricted securities" is defined in Rule 144(a)(3), and includes securities acquired directly or indirectly from the issuer or an affiliate of the issuer in a transaction or chain of transactions not involving a public offering.

8    Securities Act Release No. 8869, 72 FR 71546 (December 17, 2007).

9   Securities Act Rule 144(g).  17 CFR 230.144(g).

©2009. FINRA. All rights reserved. *Regulatory Notices* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

10   Recent investigations have uncovered fact patterns in which firms inappropriately relied on stock certificates issued without restrictive legends or certificates accompanied by false attorney opinions, or assumed that their clearing agent had the responsibility to determine if shares could be sold without restriction. FINRA has noted in previous guidance that firms are still responsible for the discharge of their obligations, even if they rely on third parties to perform certain activities and functions related to their business operations and regulatory responsibilities. Additionally, FINRA guidance makes clear that firms may not contract supervisory and compliance activities away from their direct control. *See Notice to Members 05-48* (Members' Responsibilities When Outsourcing Activities to Third-Party Service Providers).

11   *See* NASD Rule 3011 (Anti-Money Laundering Compliance Program) and *Notice to Members 02-21* (Guidance to Member Firms Concerning Anti-Money Laundering Compliance Programs Required by Federal Law).

12   *See, e.g, NevWest Securities Corporation*, and related case SEC v. CMKM Diamonds, Inc., *et. al*, U.S. Dist. Court for the District of Nevada, Civil Action No. 08- CV 0437 (Lit. Rel. No. 20519 / April 7, 2008) (failure to take action in response to the suspicious circumstances surrounding accounts controlled by certain customers, including the practice of depositing penny stocks, liquidating them and wiring the proceeds to bank accounts.) *Barron Moore, Inc.*, Disc. Proceeding No. 2005000075703, July 21, 2008.