# EXHIBIT 36

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## LETTER OF ACCEPTANCE, WAIVER AND CONSENT
### NO. 2013035821401

**TO:**   Department of Enforcement
Financial Industry Regulatory Authority ("FINRA")

**RE:**   Brown Brothers Harriman & Co., Respondent
CRD No. 104487

Harold A. Crawford, Respondent
CRD No. 5326696

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, Respondents submit this Letter of Acceptance, Waiver and Consent (AWC) for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against Respondents alleging violations based on the same factual findings described herein.

### I.

### ACCEPTANCE AND CONSENT

**A.**   Respondents hereby accept and consent, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

### BACKGROUND

Respondent Brown Brothers Harriman & Co. ("BBH" or the "Firm") is a FINRA registered member firm with its principal place of business in New York, New York. BBH's primary business is as a custodian bank. BBH was established in 1818 and was a member of the New York Stock Exchange. BBH became registered with FINRA in 2008. The Firm operates from four registered branch office locations and is comprised of 134 registered individuals and approximately 4,100 non-registered individuals.

Respondent Harold A. Crawford ("Crawford") became a non-registered person associated with the Firm in May 2007. At that time, Crawford began employment with the Firm as its Global Anti Money Laundering ("AML") Compliance Officer. Crawford continued in that role through December 31, 2013. Crawford is currently employed by a Firm affiliate. Pursuant to Article V, Section 4 of FINRA's By-Laws, FINRA retains jurisdiction over Crawford until at least December 30, 2015.

## RELEVANT DISCIPLINARY HISTORY

In August 2007, the Firm and the then named New York State Banking Department[1] entered into a written agreement which required the Firm to improve its system of internal controls, policies and procedures regarding, among other things, the verification of the identities of account holders and to devote the necessary resources to implement and maintain an effective program for compliance with all applicable AML regulatory requirements.

Crawford has no disciplinary history.

## OVERVIEW

From January 1, 2009 through June 30, 2013 (the "Relevant Period"), BBH and Crawford, failed to establish and implement an AML program reasonably designed to detect and cause the reporting of potentially suspicious activity.  The Firm directly executed sales or, as a custodian, delivered to other firms the securities underlying the sale of, at least 6 billion shares of low-priced securities ("penny stocks").[2]  These transactions generated at least $850 Million in proceeds to the sellers of those securities, less than 20% of which was attributable to transactions for which BBH acted as the executing broker.  The remainder of the proceeds derived from transactions for which BBH acted as custodian, delivering the securities to other brokers who sold them.

Trading in penny stocks typically poses a higher than average risk, because of the possibility of low trading volumes and relative lack of information regarding issuers.  The U. S. Securities and Exchange Commission ("SEC") has warned investors that, while many penny stocks are issued by legitimate businesses with real products and services, such stocks may be easily manipulated by fraudsters who distribute false information about the issuer company in order to create demand for the stock.[3]  As trading in the stock increases and the stock price rises, the fraudsters (who may be company insiders or paid promoters) sell their own shares at inflated prices.  After they have realized a profit and discontinued their stock promotion, the stock price falls and investors lose their investment.

BBH was obligated under federal law to investigate customer activity on a risk basis; omnibus accounts transacting in higher-risk activity, such as suspicious penny stock transactions, merited additional scrutiny.  The Firm conducted penny stock transactions on behalf of certain bank customers in known bank secrecy havens, such as Switzerland, Guernsey and Jersey.  The Firm allowed these omnibus accounts to conduct penny stock transactions for undisclosed underlying

---

[1] Currently known as the New York State Department of Financial Services.
[2] Penny stocks include securities that trade at less than $5 per share and are quoted over-the-counter.  *See* SEC, Penny Stock Rules, available at http://www.sec.gov/answers/penny.htm (May 9, 2013).
[3] *See* SEC Microcap Stock:  A Guide for Investors, available at http://www.sec.gov/investor/pubs/microcapstock.htm (Sept.18, 2013).

customers of the foreign banks, even though the Firm could not generally obtain critical information such as the identity of the stock's beneficial owner, how the stock was obtained, or the beneficial owner's relationship with the issuer. BBH and Crawford were aware through AML investigations, regulatory inquiries and other sources, that certain clients were depositing, and shortly thereafter selling, large blocks of low-priced securities. Indeed, BBH and Crawford were aware that the Firm's brokerage activity had expanded when its Swiss bank clients "realized they could offer their underlying clients anonymous access to U.S. Securities markets."

The Firm had an AML compliance program that included suspicious activity surveillance; however, the system failed to adequately monitor brokerage execution and custodial banking activity involving penny stock transactions, including Delivery versus Payment ("DVP") transactions. The Firm's AML program failed to adequately monitor and detect potentially suspicious penny stock activity, and sufficiently investigate potentially suspicious penny stock transactions that were raised to the Firm's attention. In addition, the Firm's AML program failed to ensure that suspicious activity was reported in instances where the Firm had already responded to regulatory requests regarding information deemed to be suspicious and failed to update prior Suspicious Activity Report ("SAR") filings when activity continued through the Firm more than 90 days after a previous SAR was filed.

As a result, BBH and Crawford violated NASD Rule 3011(a) (for conduct before January 1, 2010) and FINRA Rules 3310(a) (for conduct after December 31, 2009) and 2010.

In addition, BBH, failed to establish a system reasonably designed to achieve compliance with the requirements of the Bank Secrecy Act and 31 C.F.R. 1010.610 by failing to adequately conduct due diligence on correspondent accounts for its foreign financial institution customers ("FFIs"). Specifically, the Firm did not adequately conduct periodic activity reviews of the accounts for foreign financial institutions to determine whether securities activity was consistent with the information provided by the account holder at the account's inception, including the type, purpose and anticipated activity.

BBH also failed to conduct adequate AML independent testing that addressed the primary AML risks associated with the Firm's securities brokerage business, involving penny stock activity. BBH also failed to adequately train its AML staff to understand the purpose of alerts relating to penny stock activity generated by the Firm's automated AML surveillance systems and to understand the risks involved with penny stock activity.

As a result, BBH violated NASD Rules 3011(b), 3011(c) and 3011(e) (for conduct before January 1, 2010) and FINRA Rules 3310(b), 3310(c) and 3310(e) (for conduct after December 31, 2009) and 2010.

3

During the Relevant Period, BBH also failed to establish, maintain, and enforce a supervisory system, including written supervisory procedures, reasonably designed to ensure compliance with Section 5 of the Securities Act of 1933 ("Section 5") and the applicable rules and regulations with respect to the distribution of unregistered and non-exempt securities. BBH was aware that customers were depositing and selling large blocks of penny stocks. Contrary to its obligations under FINRA rules, BBH failed to ensure that adequate supervisory reviews were performed to determine whether the securities sold were registered or if an exemption to registration applied. BBH failed, prior to the sale of penny stocks, to take the appropriate steps to conduct a searching inquiry in the face of red flags posed by the type of securities being deposited, the method of deposit, the volume of securities deposited, and the lack of transparency into the ultimate beneficial owners of those securities.

As a result, BBH violated NASD Rule 3010 and FINRA Rule 2010.

## FACTS AND VIOLATIVE CONDUCT

1.    BBH's Business Model

The Firm acted as a custodian bank for domestic institutions and FFIs and provided brokerage execution services for those customers who selected that service. Firm customers utilizing both the custodial banking and brokerage execution services did so through one account for all related custody transactions, security transfers, fund transfers and trade executions.

Throughout the Relevant Period, the Firm's customer accounts included omnibus accounts for FFIs operating in bank secrecy havens that were conducting business for underlying customers whose identity was not disclosed to the Firm. The Firm provided these FFIs with custody and brokerage execution services for, among other things, their underlying customers' penny stock transactions.

2.    BBH and Crawford Failed to Establish and Implement an Adequate AML Program, In Violation of NASD Rule 3011(a) and FINRA Rules 3310(a) and 2010.

NASD Conduct Rule 3011(a), effected in April 2002, which was replaced by FINRA Rule 3310(a) on January 1, 2010, requires each member to "Establish and implement policies and procedures that can be reasonably expected to detect and cause the reporting of transactions required under 31 U.S.C. § 5318(g) and the implementing regulations promulgated thereunder."

In April 2002, Special NASD Notice to Members 02-21 stated that "each financial institution should have the flexibility to tailor its AML program to fit its

4

business." The Notice further stated that "each broker/dealer, in developing an appropriate AML program that complies with the Money Laundering Abatement Act, should consider factors such as its size, location, business activities, the types of accounts it maintains, and the types of transactions in which its customers engage."

In July 2002, the U. S. Department of the Treasury issued regulations (31 C.F.R. Section 103.19(a)(1))[4] requiring suspicious transaction reporting by broker-dealers. Specifically, broker-dealers should report suspicious transactions involving at least $5,000 and conducted by, at, or through the broker-dealer. A continuing report should be filed on suspicious activity that continues after an initial SAR is filed.

Throughout the Relevant Period, Crawford, as the Firm's Global AML Compliance Officer, was responsible for ensuring that the AML program was adequately tailored to the Firm's business and appropriately monitoring, detecting and reporting suspicious activity. In addition, Crawford managed the Firm's AML staff, was personally, or through his designee, responsible for making determinations as to whether to file SARs on behalf of the Firm and was ultimately responsible for establishing and implementing a program reasonably expected to detect and cause the reporting of suspicious activity when appropriate.

BBH and Crawford were aware of the heightened risks associated with penny stock activity and the Firm's severely limited ability, where bank secrecy-havens were involved, to obtain information about the beneficial owners of those stocks. In light of these risks, the Firm failed to have an adequate surveillance system to review penny stock transactions conducted through the Firm's custodial and brokerage execution services. Similarly, BBH and Crawford failed to tailor the Firm's AML procedures to adequately detect, investigate and report suspicious activity, particularly patterns of suspicious penny stock activity, or red flags related to penny stock transactions.

      a.      Inadequate AML Procedures, Detection, and Investigation

Throughout the Relevant Period, BBH and Crawford were aware of the inherent risks associated with allowing Firm clients who were operating in secrecy havens to continue to conduct penny stock activity on behalf of undisclosed underlying clients. In May 2011, Crawford forwarded an email with a draft of an AML Compliance presentation that was to be the basis for a discussion with bank clients in Switzerland and for a presentation made to a Firm committee in June 2011 regarding the Firm's involvement in penny stocks. The draft presentation stated that: "Brokerage is being offered as an ancillary service to BBH's Custody clients. The service expanded on the brokerage platform once Swiss banks

---

[4] On March 1, 2011, FinCEN transferred its regulations from 31 CFR Part 103 to 31 CFR Chapter X as part of an ongoing effort to increase the efficiency and effectiveness of its regulatory oversight. As part of this transfer, 31 C.F.R. 103.19 was renamed 31 C.F.R. 1023.320.

realized they could offer their underlying clients anonymous access to U.S. Securities markets…Anonymity is 'ensured' throughout the life of the trade."

BBH and Crawford were aware that there was more than a risk of suspicious activity; they knew that BBH clients in secrecy havens had underlying clients that were actually engaged in suspicious activity. By May 2011, Crawford was personally aware of numerous instances of suspicious activity relating to penny stocks, including possible insider trading by an "unknown suspect in client omnibus account" located in Belgium, who transacted in shares of a company that was later acquired; and an investigation of possible insider trading by another "unknown suspect" using a sub-account of a BBH client located in Jersey, who purchased shares of a company just before the company announced its acquisition, and delivered the shares out of the account the day after the announcement. In fact, in June 2011, the Firm and Crawford were aware that the SEC had recently suspended trading on 17 penny stocks, each of which were traded and/or held in custody by BBH and involved clients in secrecy havens.

Throughout the Relevant Period, AML staff were also aware of BBH's increasing penny stock business and the major risks associated with the Firm's involvement in such activity. AML analysts noted among themselves in internal communications that the Firm's AML program was ineffective and inadequate for purposes of monitoring penny stock transactions. They also commented on the massive amount of penny stock activity that was flowing through the Firm.

In November 2011, an internal BBH Compliance memorandum stated:

- "We continue to note a substantial increase in the volume of… securities classified as microcap… FINRA and the SEC have set precedence [sic] against other financial institutions that engage in the facilitation of custody movements and brokerage transactions for these securities, defining these actions as aiding and abetting the microcap fraudulent life cycle."
- "BBH's awareness of this activity has increased in recent years and, upon review, appears to be directly correlated to a change in our clients' underlying model. Specifically, our clients are offering their underlying clients straight through processing as an entry point to the U.S. market."

In that memorandum, the AML Compliance group, including Crawford, recommended that, among other things, BBH stop executing trades for penny stocks below a certain threshold value. It also recommended that BBH consider discontinuing its omnibus brokerage account structure, and require clients who wished to offer brokerage to their underlying customers to set up a disclosed sub account in the name of the underlying customer. However, the Firm did not take any such step to limit its execution of penny stock transactions until June 2013.

In addition to conducting trades in penny stocks for omnibus accounts in secrecy havens acting on behalf of undisclosed beneficial owners, the Firm failed to

6

adequately monitor trading activity in a variety of additional ways, as described further below.

        i.      Trading Activity

The Firm and Crawford failed to establish and implement appropriate systems to adequately monitor for suspicious trading activity of high-risk penny stock trading without adequate knowledge of the beneficial owners or the circumstances under which the shares were acquired.

From January 2009 through December 2010, BBH and Crawford relied on the Firm's brokerage line of business to conduct a manual review of the Firm's brokerage execution trading activity to identify and escalate potentially suspicious activity. This reliance was improper because during this time, BBH and Crawford, failed to take adequate steps to determine whether the manner in which trading activity was being monitored was adequate in order for the Firm to properly report suspicious activity. The Firm was executing approximately 7,000 trades per day and approximately 1,500 of those trades involved penny stocks. Given the level of staffing, the manual system could not monitor for patterns of potentially suspicious trading and provided no historical basis to assist in assessing suspicious trades. These deficiencies were further compounded given the risks posed by penny stock liquidations and their potential for market manipulation and abuse.

From December 2010 through June 2013, BBH and Crawford implemented an automated system that was not adequately tailored to detect or investigate the volume of penny stock transactions conducted through Firm accounts. Around December 2010, the Firm and Crawford implemented a low priced equities report ("LPE") in order to identify trading in penny stocks. The Firm, however, failed to establish written procedures for instructing the AML staff about how to review the LPE report until May 2011. Once reviewed by the analyst, potentially suspicious activity identified through the LPE report was added to a Firm "watch list". However, AML staff were not adequately instructed to review the underlying trading activity identified through the LPE report within a reasonable amount of time or report the suspicious activity, if warranted.

In addition, the Firm did not address or review activity identified through LPE reports for several months after LPE reporting was implemented. For example, four LPE reports generated in January 2011 identified Firm customers selling a penny stock that was previously known to the Firm as being the subject of regulatory requests. Moreover, the analyst's due diligence identified a 2008 message post describing the issuer's CEO as having "ripped off" countless people. Firm clients sold the security through January and February 2011 resulting in over $5,000,000 in proceeds to the clients. However, there was no review of the LPE report that identified this activity until at least April 2011. At that time the analyst simply added the security and customers involved to the

"watch list" rather than fully investigating, and, if necessary, reporting the activity. This was inadequate given that penny stock fraud rarely, if ever, involves the repeat use of the same low-priced security and often occurs during a short life-cycle.

In the context of penny stock fraud, a red flag indicating potentially manipulative activity is the sudden increase in the price of a low-priced security. For example, touting campaigns are conducted to create artificial interest in an issuer, which often take the form of positive press-releases about company events. The Firm was unable to systematically track anomalies to market events, such as a significant increase of the share price of a security, until it implemented a trading-ahead-of-market-events ("ITN") alert into its automated client transaction review system in August 2011. Although the ITN alert was implemented in August 2011, the Firm failed to create any procedures regarding how the ITN alerts were to be addressed until December 2011.

In addition, certain ITN alerts that were generated by the Firm were improperly handled. For example, in July 2012 an ITN alert was generated by the Firm regarding Firm client AA, located in Switzerland. The alert identified the sale of 4,509,200 shares of a particular penny stock for proceeds to the client of $634,189, in advance of the stock's intraday price decrease of 56% and volume increase of 35%. The analyst's disposition of the alert stated: "[n]o news noted" and "no suspicious activity." Yet, a week prior to the alert the penny stock incurred a reverse merger, name change and symbol change. The penny stock had also been the subject of previous alerts and several suspicious news articles touting the stock. In addition, two different shareholders deposited physical certificates into the Firm at the same time through the same Firm customer. In June and July 2012, Firm client AA sold 6,142,964 shares of the penny stock for proceeds to the client of $936,138 through the Firm.

Another red flag indicating potential manipulation of a penny stock is where the trading activity of a firm client or a group of clients represents a significant percentage of the overall trading volume in a stock on a given day. Such activity could signify manipulative measures such as wash trades or pre-arranged trades to create the appearance of unrealistic demand for securities. The Firm added a monitoring price manipulation trade alert ("MPM") module to its automated client transaction review system in order to track high representation of Firm clients in a stock's daily trading volume, but did not do so until May 2012. On at least one occasion, an MPM alert improperly compared the total trade volume conducted through the Firm versus the daily total market volume by using different dates for the two measures. For example, it compared Firm volume on Monday vs. market volume on Thursday, resulting in a meaningless comparison. As a result, the MPM alert failed to accurately monitor the significance of trading conducted through the Firm in relation to the entire market.

8

In addition, certain MPM alerts that were generated by the Firm were inadequately investigated. For example, in November 2012, an MPM alert was generated by the Firm regarding entity BB, located in Switzerland. The MPM alert identified the sale of 2,000,000 shares of a penny stock for proceeds of $37,658 to the client, based on a price fluctuation of 63.86% and the Firm's market share participation of 6.26%. The analyst's disposition of the alert stated: "bbh participation less than 50%." However, the analyst failed to take into account the fact that there was a previous investigation into the penny stock or that Firm-wide trading in the penny stock indicated that another Firm client sold over 15,000,000 shares for over $970,000 in proceeds to the client through the Firm during that week.

The Firm failed to provide the adequate guidance to the AML staff that were handling these alerts, including the need to conduct a review of historical activity, contemporaneous market activity and relevant news developments. As a result, activity identified through alerts was not properly investigated to reveal the potentially suspicious activity in which the Firm's customers were involved. In addition, AML staff:

- Failed to identify news alleging that the securities were part of a "pump and dump" scheme;
- Failed to note whether any previous alerts had been generated for the security yet mirrored their alert comments to the exact language used in prior alerts for the same security;
- Failed to note whether any previous regulatory requests had been received by the Firm;
- Failed to review the DVP transactions and other custody movements of Firm customers who had also engaged in brokerage execution transactions associated with the same security; and
- Did not adequately conduct reviews of publicly available information.

ii.      Custody Movements

Throughout the Relevant Period, the Firm's AML program monitored custody movements and associated DVP and Receipt versus Payment ("RVP") activity by, among other things, using "Posted Term" alerts which were generated based on a keyword list established by the Firm. While the Firm added keywords to the list from time to time based on new information, the Firm failed to properly investigate information that continued to be accumulated through the Firm's system on entities it previously knew to be a concern. The Firm failed to adequately instruct AML staff how to investigate alerts generated from activity involving previously noted keywords and the Firm's investigative files were not updated to reflect the ongoing activity which stemmed from such alerts.

For example, in January 2011, the Firm placed customer CC, an FFI based in Switzerland, on its Posted Terms list due to suspicious penny stock trading in

9

CC's account at BBH. Between April 2011 and August 2011, the Firm received at least eight Posted Term alerts regarding money movements through a separate Firm client account, also located in Switzerland, naming CC as the beneficiary. None of these alerts resulted in an investigation and no additional due diligence was performed to determine whether the source of the activity originated from penny stock activity that prompted CC's inclusion on the Posted Terms list. In August 2011, due to continuing concerns with respect to activity in CC's account and based on Crawford's recommendation, the Firm closed the account and informed other Swiss customers that the Firm no longer wanted to conduct business with CC directly or indirectly. However, during the time period September 2011 through November 2012 the Firm received at least 45 Posted Term alerts regarding wires sent through multiple Swiss customer accounts to CC. None of these alerts resulted in an investigation into whether CC was continuing to conduct suspicious penny stock activity indirectly through other financial institutions' omnibus accounts. Yet from September 2011 through November 2012 the Firm sent outgoing wire transfers of over $417 Million to accounts at various financial institutions in the name of CC.

The Firm also failed to adequately instruct its AML staff to conduct ongoing due diligence of the persons or entities contained in the Posted Term keyword bank. As a result, entities that were known to the Firm as potentially engaging in suspicious activity but that had undergone a name change were able to continue conducting business through BBH. For example, in January 2011, based on Crawford's recommendation, the Firm placed entity DD on its Posted Terms keyword list and the Firm asked a client to discontinue transacting business for DD through BBH. Prior to that time, DD underwent a name change and became known as EE. Despite the fact that the entity underwent a name change prior to when it was added to the list, only the previous name of the entity was added to the list. In 2012, the Firm sent outgoing wire transfers of over $95 Million in the name of EE, through a Firm client located in Switzerland. The Firm's asset movement surveillance was inadequate as it partially relied on keyword searches for potentially suspicious beneficiaries or remitters that were added to an internal list that was not monitored or updated to reflect changes to subjects of concern. Additionally, once keywords were added, analysts were not provided guidance on how to handle alerts when transactions triggered the need for additional review.

Further, the Firm did not implement an adequate system to identify suspicious penny stock activity occurring through custody movements, including DVP transactions, where BBH transferred shares to other broker-dealers for settlement. For example, from February 2011 through May 2011, three BBH customers deposited over 27 million shares of a penny stock through a combination of physical certificate deposits (both restricted and unrestricted), electronic deliveries sent from the transfer agent (Deposit/Withdrawal at Custodian), and electronic transfers through the Depository Trust Clearing Corporation. During the same period, shares of that penny stock were delivered to other broker-dealers to settle sale transactions via DVP movements. The total proceeds to clients

10

generated via these DVP transactions was approximately $40 Million.  Prior to February 2011, the price of the penny stock was below $0.70 per share, there was limited trading activity and no news concerning the penny stock.  From April 21, 2011 to May 13, 2011, the price of the penny stock increased from $1.85 per share to $5.21 per share.  In the penny stock issuer's SEC filings, it disclosed that it had no current assets, no revenue, limited employees and limited operations.  During 2010, the CEO of the issuer, who was later the CEO of an operating subsidiary of the issuer, was identified in a series of news articles as a stock promoter and alleged to be involved in pump and dump schemes.  During the period of activity in that penny stock at the Firm, the issuer was the subject of two paid promotional campaigns projecting drastic price increases in the stock.  In May and June 2011, numerous articles were published alleging that the penny stock was part of a pump and dump scheme.  Although this activity was identified as part of an AML investigation resulting from a regulatory inquiry received from the SEC, the Firm did not have an adequate system to identify suspicious penny stock activity occurring in custody transactions, the Firm system did not detect that there were multiple customers depositing the same little known security around the same time, did not identify that there was a sudden increase in the price of the penny stock and failed to uncover numerous other negative news articles regarding the security.

        b.        Inadequate Reporting of Suspicious Activity

During the Relevant Period, the Firm failed to file SARs in several instances because certain AML staff erroneously believed that, even if activity was otherwise reportable, the Firm did not need to file a SAR if it had received and responded to a Blue Sheet Request from FINRA or the SEC.  In addition, the Firm failed to update prior SAR filings when activity continued through the Firm more than 90 days after a previous SAR was filed.  For example, the Firm filed a SAR on activity involving trading in a penny stock at the Firm.  During the 5 months after the SAR filing, the Firm received at least 30 alerts related to custody movements and brokerage executions totaling at least 3,600,000 shares of the penny stock through Firm clients, located in secrecy havens.  However, the Firm closed the alerts without any action or SAR filing.

As a result, BBH and Crawford violated NASD Rule 3011(a) (for conduct before January 1, 2010) and FINRA Rules 3310(a) (for conduct after December 31, 2009) and 2010.

3.   <u>BBH Failed to Adequately Supervise Activity in Foreign Financial
Institution Accounts, In Violation of NASD Rule 3011(b) and FINRA
Rules 3310 (b) and 2010.</u>

NASD Conduct Rule 3011(b), effected in April 2002, which was replaced by
FINRA Rule 3310(b) on January 1, 2010, requires each member to "Establish and
implement policies, procedures, and internal controls reasonably designed to
achieve and monitor the Firm's compliance with the requirements of the Bank
Secrecy Act and the implementing regulations promulgated thereunder".

Section 312 of the Patriot Act, which amended the Bank Secrecy Act, requires all
financial institutions to conduct due diligence on correspondent accounts for
foreign financial institutions. 31 U.S.C. § 5318(i). The due diligence must
include "appropriate, specific, risk-based, and, where necessary, enhanced
policies, procedures, and controls that are reasonably designed to enable the
covered financial institution to detect and report, on an ongoing basis, any known
or suspected money laundering activity conducted through or involving any
correspondent account . . . ." 31 C.F.R. 1010.610(a). The risk-based procedures
for monitoring the correspondent account must include "a periodic review of the
correspondent account activity sufficient to determine consistency with
information obtained about the type, purpose, and anticipated activity of the
account." 31 CFR 1010.610(a)(3).

BBH procedures required that it obtain the necessary information regarding FFI
customer correspondent accounts including the (i) nature of the FFI's business; (ii)
the type, purpose, and anticipated activity of such correspondent accounts; and
(iii) the FFI's anti-money laundering record.

During the Relevant Period, for at least six of the Firm's FFI customers, the Firm
failed to record information relating to their expected business activity. At least
three of the Firm's FFI customers identified expected activity as U.S. and global
custody but failed to indicate restricted securities activity as an expected activity,
yet accounts for all three customers engaged in the activity and two of the three
customers utilized their accounts primarily for this purpose. The Firm failed to
periodically review the activity in the FFI accounts; had it done so, it might have
realized that the accounts were being utilized for higher risk activity than
originally forecast by the customer.

As a result, BBH violated NASD Rule 3011(b) (for conduct before January 1,
2010) and FINRA Rules 3310(b) (for conduct after December 31, 2009) and
2010.

4.   **BBH Failed to Conduct Adequate AML Testing, In Violation of NASD Rule 3011(c) and FINRA Rules 3310(c) and 2010.**

NASD Conduct Rule 3011(c), effected in April 2002, which was replaced by FINRA Rule 3310(c) on January 1, 2010, requires a member to arrange for independent testing for compliance with the AML procedures by its own personnel or by qualified outside parties. The testing is required annually, unless the member does not execute transactions for customers or otherwise hold customer accounts or act as an introducing broker with respect to customer accounts.

From at least January 2010 through January 2013, the Firm's Internal Audit Group performed a total of three tests of the Firm's AML Program.  Each report noted that AML Program transaction surveillance and investigations were reviewed with no findings or recommendations made.  The independent tests failed to uncover any of the shortcomings in the trade monitoring and asset movement monitoring related to penny stocks during any of these three years. In addition, the 2011 and 2012 tests failed to address penny stocks despite the fact that it was a high risk activity for the Firm's customers.  The AML independent tests also failed to evidence any review of recently established surveillance systems in any manner.

As a result, BBH violated NASD Rule 3011(c) (for conduct before January 1, 2010) and FINRA Rules 3310(c) (for conduct after December 31, 2009) and 2010.

5.   **BBH Failed to Conduct Adequate AML Training, In Violation of NASD Rule 3011(e) and FINRA Rules 3310(e) and 2010.**

NASD Conduct Rule 3011(e), effected in April 2002, which was replaced by FINRA Rule 3310(e) on January 1, 2010, mandates that firms "provide ongoing [AML] training for appropriate personnel."

NASD Notice to Members 02-21 advised that a broker dealer "should scrutinize its operations to determine if there are certain employees who may need additional or specialized training due to their duties and responsibilities."

During the Relevant Period, the Firm failed to provide its AML staff with adequate materials regarding the risks and red flags associated with penny stock activity.  BBH failed to provide adequate training necessary for AML staff to accurately review and detect suspicious activity related to penny stock transactions.  Firm training did not adequately instruct staff how to address alerts generated through the established surveillance systems implemented by the Firm. As a result, AML staff members responsible for conducting investigations were not properly trained to do their job.  For example, certain AML staff members held the misconception that suspicious activity investigated by the Firm need not

13

be reported in instances where the suspicious activity was the subject of regulatory requests previously received and responded to by the Firm. In one instance, after responding to an SEC Blue Sheet request, the Firm noted in its investigative file record that "after review of the information requested [by the] SEC, there is no indicia of additionally suspicious activity beyond what was requested by the regulatory agency".

As a result, BBH violated NASD Rule 3011(e) (for conduct before January 1, 2010) and FINRA Rules 3310(e) (for conduct after December 31, 2009) and 2010.

6.      BBH Failed to Establish, Maintain and Enforce a Supervisory System to Achieve Compliance with Section 5 of the Securities Act of 1933, In Violation of NASD Rule 3010 and FINRA Rule 2010.

NASD Conduct Rule 3010(a) requires firms to "establish and maintain a system to supervise activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules." Under NASD Rule 3010(b), these systems must be documented in the firm's written supervisory procedures. The procedures also must be tailored to the business lines in which the firm engages. They also must set out mechanisms for ensuring compliance and detecting violations, and must not merely set out what conduct is prohibited.

Section 5 of the Securities Act of 1933 prohibits the sale of any security through the mails or in interstate commerce, unless a registration statement is in effect as to the security or an applicable exemption from registration.

FINRA Regulatory Notice 09-05 reiterated members' obligations to comply with securities laws as they relate to unregistered security distributions. The Notice states that "All firms must have procedures reasonably designed to avoid becoming participants in the potential unregistered distribution of securities" and, "firms may not rely solely on others, such as clearing firms, transfer agents, or issuers' counsel, to fulfill these obligations."

During the Relevant Period, BBH customers deposited and sold penny stock shares through the Firm that should have raised numerous red flags indicating that the shares potentially were not registered or subject to an exemption, including that: (1) the transactions involved penny stocks for which no registration statement was in effect for the sale, (2) the customers made deposits of large blocks of the securities, (3) many of the securities were deposited in certificate form, (4) the deposits consisted of a large percentage of the outstanding shares, (5) multiple purportedly unrelated entities deposited shares of the same penny stock at the same time, (6) customers sold the securities immediately after depositing them into accounts at the Firm, (7) the

14

issuers' public filings noted serious financial concerns, (8) suspicious press releases touted the securities and (9) news sources indicated the securities were subject to "pump and dump" schemes.

      a.      Securities Deposited at BBH without a Restrictive Legend

BBH failed to establish adequate written supervisory procedures to fulfill its obligations to conduct a searching inquiry, prior to executing any trades in those securities, to determine whether the securities deposited at the Firm without a restrictive legend were registered or subject to an exemption from registration. Specifically, the procedures failed to instruct Firm employees to inquire, in the face of red flags, as to whether the shares were actually subject to a restriction. As a result, Firm customers were able to deposit and liquidate penny stock shares that should have been subject to greater scrutiny by the Firm.

For example, in March 2012 the Firm received 16,380,000 shares of a penny stock through physical stock certificates for two Firm customers, both located in Switzerland. From June 2012 through February 2013 the two Firm customers sold a total of 13,984,017 shares for $2,380,941 in proceeds to the clients. Prior to executing the sales, BBH failed to perform a searching inquiry regarding the penny stock shares that, if conducted, might have raised concerns regarding the legitimacy of the stock. Specifically, the shares sold equated to 48% of the public float and 19% of the total number of outstanding shares.

      b.      Securities Deposited at BBH with a Restrictive Legend

BBH failed to establish and implement adequate written supervisory procedures to fulfill its obligations to conduct a searching inquiry to determine whether the securities deposited at the Firm with a restrictive legend were eligible for immediate resale to the public. Specifically, the Firm's procedures, and its implementation of those procedures, failed to adequately address: (1) how to review for potentially suspicious activity related to the legitimacy of the exemption being claimed, (2) how to conduct inquiries to determine tradability, and (3) how to determine compliance with SEC and FINRA guidance for securities deposited at the Firm with a restrictive legend. The Firm primarily relied on attorneys and transfer agents to lift the restricted legends, where the attorneys and transfer agents were selected by the penny stock issuers in direct contravention of regulatory guidance. As a result, Firm customers were able to deposit and liquidate penny stock shares that should have been subject to greater scrutiny by the Firm.

For example, in March 2011, 5,400,000 restricted shares of a penny stock were deposited into the Firm via physical certificates for a customer, located in Switzerland. Although the Firm conducted due diligence with respect to the

restriction lifting, prior to executing sales in those securities, the Firm failed to inquire into the trading history of the issuer, determine the shares outstanding, the size of the public float, analyze the financial condition of the issuer, or obtain any of its own information regarding how the shareholder obtained its shares to determine whether the sales were in compliance with an exemption under Section 4 of the Securities Act of 1933. Yet, in September 2011, the stock was being touted as a "feature company" by a known stock promotion website and the Firm customer's deposit equated to 6.5% of the public float and 4.3% of the total number of outstanding shares. Between April and October 2011, the Firm customer sold 2,222,995 shares of the penny stock through the Firm for a total of $475,144 in proceeds to the client.

As a result, BBH violated NASD Rule 3010 and FINRA Rule 2010.

B.    Respondents also consent to the imposition of the following sanctions:

1.    BBH:
      a.  a censure; and
      b.  a fine in the amount of $8,000,000.

2.    Crawford:
      a.  a one-month suspension from association with any FINRA member in any capacity; and
      b.  a fine in the amount of $25,000.

Each Respondent agrees to pay the monetary sanctions upon notice that this AWC has been accepted and that such payments are due and payable. Each Respondent has submitted Election of Payment forms showing the method by which each Respondent proposes to pay the fine imposed.

Each Respondent specifically and voluntarily waives any right to claim that they are unable to pay, now or at any time hereafter, the monetary sanctions imposed in this matter.

Respondent Crawford understands that if he is barred or suspended from associating with any FINRA member, he will become subject to a statutory disqualification as that term is defined in Article III, Section 4 of FINRA's By-Laws, incorporating Section 3(a)(39) of the Securities Exchange Act of 1934. Accordingly, he may not be associated with any FINRA member in any capacity, including clerical or ministerial functions, during the period of the bar or suspension (see FINRA Rules 8310 and 8311).

The sanctions imposed herein shall be effective on a date set by FINRA staff. The suspension of Respondent Crawford shall commence on a date set by FINRA staff.

## II.

## WAIVER OF PROCEDURAL RIGHTS

Respondents specifically and voluntarily waive the following rights granted under FINRA's Code of Procedure:

A.   To have a Complaint issued specifying the allegations against Respondents;

B.   To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.   To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondents specifically and voluntarily waive any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

Respondents further specifically and voluntarily waive any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.

## OTHER MATTERS

Respondents understand that:

A.   Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.   If this AWC is not accepted, its submission will not be used as evidence to prove

17

any of the allegations against any Respondent; and

C.    If accepted:

    1.    this AWC will become part of each Respondents' permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against any Respondent;

    2.    this AWC will be made available through FINRA's public disclosure program in response to public inquiries about Respondents' disciplinary record;

    3.    FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

    4.    Respondents may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. Respondents may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects Respondents: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.    Respondents may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. Respondents understand that they may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

Respondent Crawford and the undersigned, on behalf of the Firm who certifies that he a person duly authorized to act on the Firm's behalf, have each read, and understand all of the provisions of this AWC and have been given a full opportunity to ask questions about it; that each Respondent has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce any Respondent to submit it.

Brown Brothers Harriman & Co.

_1/31/2014_
Date (mm/dd/yyyy)

By: David E. Sternberg, General Counsel

_____
Date (mm/dd/yyyy)

_____
Harold A. Crawford, Respondent

Reviewed by:

_Betty Santangelo_
Betty Santangelo, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
betty.santangelo@srz.com
*Counsel for Brown Brothers Harriman & Co. and Harold A. Crawford*

_____
Barry Goldsmith, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
bgoldsmith@gibsondunn.com
*Counsel for Brown Brothers Harriman & Co.*

_____
Richard Weinberg, Esq.
Morvillo Abramowitz Grand Iason & Anello P.C.
565 Fifth Avenue
New York, New York 10017
rweinberg@maglaw.com
*Counsel for Harold A. Crawford*

19

Respondent Crawford and the undersigned, on behalf of the Firm who certifies that he a person duly authorized to act on the Firm's behalf, have each read, and understand all of the provisions of this AWC and have been given a full opportunity to ask questions about it; that each Respondent has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce any Respondent to submit it.

Brown Brothers Harriman & Co.

_____        _____
Date (mm/dd/yyyy)                   By:  David E. Sternberg, General Counsel

_01/30/2014_____        _____
Date (mm/dd/yyyy)                   Harold A. Crawford, Respondent

Reviewed by:


_____
Betty Santangelo, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
betty.santangelo@srz.com
*Counsel for Brown Brothers Harriman & Co. and Harold A. Crawford*


_____
Barry Goldsmith, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
bgoldsmith@gibsondunn.com
*Counsel for Brown Brothers Harriman & Co.*


_____
Richard Weinberg, Esq.
Morvillo Abramowitz Grand Iason & Anello P.C.
565 Fifth Avenue
New York, New York 10017
rweinberg@maglaw.com
*Counsel for Harold A. Crawford*

19

Respondent Crawford and the undersigned, on behalf of the Firm who certifies that he a person duly authorized to act on the Firm's behalf, have each read, and understand all of the provisions of this AWC and have been given a full opportunity to ask questions about it; that each Respondent has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce any Respondent to submit it.

Brown Brothers Harriman & Co.

_____          _____
Date (mm/dd/yyyy)                By:  David E. Sternberg, General Counsel


_____          _____
Date (mm/dd/yyyy)                Harold A. Crawford, Respondent


Reviewed by:


_____
Betty Santangelo, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
betty.santangelo@srz.com
*Counsel for Brown Brothers Harriman & Co. and Harold A. Crawford*


_____
Barry Goldsmith, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
bgoldsmith@gibsondunn.com
*Counsel for Brown Brothers Harriman & Co.*


_____
Richard Weinberg, Esq.
Morvillo Abramowitz Grand Iason & Anello P.C.
565 Fifth Avenue
New York, New York 10017
rweinberg@maglaw.com
*Counsel for Harold A. Crawford*

19

Reviewed by:

_____

Betty Santangelo, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
betty.santangelo@srz.com
Counsel for Brown Brothers Harriman & Co. and Harold A. Crawford


_____

Barry Goldsmith, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
bgoldsmith@gibsondunn.com
Counsel for Brown Brothers Harriman & Co.


_____

Richard Weinberg, Esq.
Morvillo Abramowitz Grand Iason & Anello P.C.
565 Fifth Avenue
New York, New York 10017
Rweinberg@maglaw.com
Counsel for Harold A. Crawford


Accepted by FINRA:


Date                                          Signed on behalf of the
                                              Director of ODA, by delegated authority


                                              _____

                                              Richard R. Best
                                              Chief Counsel
                                              FINRA Department of Enforcement
                                              One World Financial Center
                                              200 Liberty Street, 11th Floor
                                              New York, NY  10281
                                              Phone: (646) 315-7308

Accepted by FINRA:

__2 · 4 · 14__
Date

Signed on behalf of the
Director of ODA, by delegated authority


Richard R. Best
Chief Counsel
FINRA Department of Enforcement
One World Financial Center
200 Liberty Street, 11th Floor
New York, New York 10281
Phone: (646) 315-7308

20

<u>Corrective Action Statement of Brown Brothers Harriman & Co., No. 2013035821401</u>

This Corrective Action Statement is submitted by the Respondent, Brown Brothers Harriman & Co. (BBH).

## Background

BBH is a private partnership, operating as a New York private bank under Article IV of the New York Banking Law. Established in 1818, BBH's primary business is the offering of global custody and U.S. sub-custody services to asset managers and banks.

As a small part of its business—accounting for less than 1% of annual revenues in 2013—BBH has provided an equity brokerage service to clients, including foreign banks, on an agency basis. Revenue from trades in low priced securities (defined as securities trading at less than $5 per share) has, in turn, historically been an even smaller part of the Firm's overall revenue. Beginning in 2012, after a business review, BBH reduced its product offerings in equity brokerage, closing its equity strategy research department and ending non-U.S. equity brokerage. Then, in 2013, BBH conducted a further review of its remaining equity brokerage activities resulting in the Firm's decision, announced in December 2013, to close its equity brokerage business effective June 2014.

While the Firm's decision to close its brokerage business resulted from a strategic business review, it also has the effect of eliminating the risks associated with executing low priced securities.

BBH has undertaken a series of personnel, systems, and policy and procedure enhancements in its Operations and AML Compliance areas in response to its changed business mix and/or to address the issues raised by FINRA.

## Corrective Actions Taken

In addition to various actions initiated during the relevant time period of the AWC, BBH has done the following:

1. <u>Closing of BBH's Restricted Securities Processing Unit</u>

Effective June 2013, BBH announced that it would no longer lift restrictions on U.S. equity securities held by its bank intermediary clients. The elimination of this service removed the risks associated with lifting restrictions on low priced securities.

2. <u>Ceasing Sales of Low Priced and Restricted Securities</u>

Effective June 2013, BBH also announced that it would no longer sell for bank intermediary clients (i) restricted securities otherwise available for sale under an exemption; (ii) securities priced under $1 per share and traded on the pink sheet, OTC or grey list markets;

---

This Corrective Action Statement is submitted by Brown Brothers Harriman & Co. It does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA, or its staff.

and (iii) securities held in the form of physical certificates. These prohibitions, which will be superseded by the discontinuation of the brokerage business, reduced the risks inherent in processing restricted and low priced securities.

3.     <u>Internal Audit Review of Trade Surveillance</u>

BBH's Internal Audit department conducted its review of trade surveillance, not as part of its separate review of the AML program, but instead as part of its review of core Compliance. Thus, while Internal Audit reviewed the trade surveillance system during the relevant period (including in December 2011), it conducted its audit of trade surveillance on an 18-month risk-based audit cycle rather than the annual audit schedule that applies to components of an AML program. Going forward, Internal Audit will review trade surveillance on an annual cycle in conjunction with its AML testing. As it has since 2008, Internal Audit plans to continue to use an independent consultant with experience in AML to provide objective and further independent input and assistance during the AML Program audit.

4.     <u>Training</u>

In 2013, BBH enhanced employee training with respect to low priced securities transactions. BBH also provided AML staff with enhanced training regarding the standards for filing SARs.

5.     <u>Periodic Review of Accounts</u>

As part of a new account opening process, for certain accounts, the Firm is required to identify and record various products and activities expected to be engaged in by that new account and conduct periodic reviews of that activity. To assist in identifying potentially suspicious activity resulting from activity outside of an account's expected profile, BBH is implementing enhancements to its review processes of actual activity versus expected activity.

6.     <u>Compliance with Section 5 Requirements</u>

The Firm has adopted additional policies and procedures to enhance compliance with its obligations under Section 5 of the Securities Act of 1933.

<b>Conclusion</b>

Consistent with its longstanding practice, BBH has cooperated fully throughout the FINRA examination. BBH has taken prompt and comprehensive action to address the issues covered by the AWC. BBH remains committed to compliance with the laws and regulations governing its business. The Firm looks forward to a continued constructive working relationship with its regulators as part of the dynamic process of assessing and improving upon Firm policies and procedures in response to ever-changing challenges in the marketplace.