# EXHIBIT 7

.

Prepared Remarks of James H. Freis, Jr.,

Director of FinCEN, "The Objectives and

Conduct of Bank Secrecy Act

Enforcement," delivered at the ABA Money

Laundering Enforcement Conference, Wash.

D.C., Oct. 20, 2008



**PREPARED REMARKS OF JAMES H. FREIS, JR.**
**DIRECTOR, FINANCIAL CRIMES ENFORCEMENT NETWORK**
**U.S. DEPARTMENT OF THE TREASURY**

**"THE OBJECTIVES AND CONDUCT OF BANK SECRECY ACT ENFORCEMENT"**

**DELIVERED AT THE ABA/ABA MONEY LAUNDERING ENFORCEMENT CONFERENCE**

**WASHINGTON, D.C.**

**OCTOBER 20, 2008**

Good afternoon. A year ago, I addressed the 2007 ABA/ABA Money Laundering Enforcement Conference for the first time as the Director of the Financial Crimes Enforcement Network.[1] I discussed a series of initiatives undertaken by FinCEN as part of the Department of the Treasury's effort to achieve regulatory effectiveness and efficiency. An important part of that effort is our commitment to provide ongoing feedback to the industries we regulate – especially regarding the powerful messages that are sent when we exercise our enforcement authority against what amounts to a small subset of financial institutions that violate the Bank Secrecy Act (BSA).

A year later, I would like to take a further step in this initiative by providing explicit clarity on the purpose and conduct of FinCEN's enforcement program. Effective enforcement is based on the just and consistent application of the rules and enforcement penalties. Misperceptions about these matters will erode the trust and confidence in our financial system that the BSA seeks to protect. In this regard, FinCEN's general policy is to reserve civil money penalties for the most significant and systemic violations of the BSA. This is a view that I believe the banking industry shares. While lesser BSA infractions should not be ignored, FinCEN has other vehicles to address these deficiencies outside of the context of enforcement.

By way of example, FinCEN's enforcement statistics reflect that FinCEN penalizes financial institutions rarely, and only when appropriate. To illustrate further, FinCEN has assessed three civil money penalties under the BSA this year, and only one

---

[1] *See* Prepared Remarks of James H. Freis, Jr., Director, Financial Crimes Enforcement Network, ABA/ABA Money Laundering Enforcement Conference, October 22, 2007, available at http://www.fincen.gov/news_room/speech/html/20071022.pdf.

involved a bank.  In 2007, FinCEN assessed five civil money penalties, two against banks.  To put these figures into context, there are tens-of-thousands of financial institutions subject to the BSA, including over 17,000 depository institutions.

My objective today is to go behind the penalty actions and provide a better understanding of FinCEN's enforcement program.  I will outline the statutory and policy basis of our enforcement program and the procedures we follow in determining whether a particular case warrants an enforcement action.  I will also discuss global enforcement actions with other stakeholder government agencies.  In so doing, I hope to give you a better appreciation of how FinCEN acts responsibly in holding accountable a financial institution that flouts its legal obligation.

By making this process more transparent, we hope to assist banks in allocating resources in a manner commensurate with their actual money laundering and terrorist financing risks, in furtherance of the goals of the BSA.  The ABA/ABA conference today is an ideal venue for me to share this message with the financial industry and the legal community that advises them.

## I.      The Statutory and Policy Basis of BSA Enforcement

FinCEN's primary purpose is to collect, analyze and disseminate relevant financial information with a high degree of usefulness in criminal, tax or regulatory investigations or proceedings or in the conduct of intelligence or counterintelligence activities related to terrorism.  Our enforcement responsibilities are invoked when a financial institution exhibits a systemic breakdown in BSA compliance that results in a vulnerability to abuse and/or failures to provide law enforcement and regulatory authorities with valuable information by way of currency transaction, suspicious activity, and other reports and records required by the BSA.

An essential principle of FinCEN's enforcement program is to uphold the public policy choice made by the Congress when it enacted the BSA in 1970, and expanded it with the passage of Annunzio-Wylie Anti-Money Laundering Act of 1992, The Money Laundering Suppression Act of 1994, and the USA PATRIOT Act of 2001.[2]  The very nature of the BSA relies upon the financial institutions that serve as gatekeepers to combat money laundering and terrorist financing.  To facilitate the detection, investigation and prosecution of financial crimes, the BSA requires financial institutions to develop anti-money laundering programs and to make available to the government, through recordkeeping and reporting, information vital to our shared goals in combating financial crime.  FinCEN has a mandate from Congress to take all necessary and appropriate action to administer the provisions of the BSA, including the assessment of penalties.[3]

---

[2] *See* Pub. L. No. 91-508; Pub. L. No. 102-550; Pub. L. No. 103-325; Pub. L. No. 107-56.
[3] *See* Treasury Order 105-08, "Establishment of the Financial Crimes Enforcement Network" (April 25, 1990) (establishing FinCEN as an office within the Department of the Treasury); Treasury Order 180-01, "Financial Crimes Enforcement Network" (September 26, 2002) (re-establishing FinCEN as a Bureau within the Treasury Department, pursuant to Section 361 of the USA PATRIOT Act, Pub. L. No. 107-56).

Monetary penalties are necessary and justified when a financial institution violates the BSA in ways that enable abuse of the financial system. Under the risk-based approach to BSA compliance, FinCEN does not expect that banks will develop anti-money laundering programs meeting an unnecessary and arbitrarily high standard, or will detect and report every single unusual and suspicious transaction. Nonetheless, we must continue to ensure that anti-money laundering programs are designed and implemented in a manner to avoid facilitation of illicit financial activity. An effective enforcement program, applied justly and consistently, will deter actions or omissions in contravention of law, and thereby promote more consistent compliance across financial institutions that is necessary to safeguard the integrity of the financial system as a whole.

FinCEN fully recognizes that anti-money laundering programs should be tailored to the unique risk profiles of individual banks, and that even a reasonably designed compliance program will occasionally suffer from minor and isolated compliance deficiencies. Good faith efforts to establish, implement, and maintain a sound BSA compliance program and to prevent money laundering and terrorist financing, will not result in the assessment of penalties. However, if a bank fails to establish and maintain an anti-money laundering program reasonably designed to ensure compliance with the BSA, or deprives law enforcement of valuable information by failing to report currency and suspicious transactions in accordance with the law or regulation, FinCEN may assess penalties under the provisions of the BSA.[4]

For example, in one case, FinCEN issued a civil money penalty against a bank for failure to implement an anti-money laundering program with adequate controls, independent testing and other measures to detect and report potential money laundering, terrorist financing and other suspicious activity. These program deficiencies led, in turn, to the bank's failure to file accurate and complete and/or timely suspicious activity reports involving tens of millions of dollars, including with respect to wire transfers to regions of the world with elevated risk. The bank also improperly exempted customers involved in higher-risk activities, resulting in hundreds of CTRs not being filed.

The banking industry has consistently responded in good faith and adapted to long standing and recently promulgated obligations of the BSA. The opinion that BSA compliance on a national basis has improved, perhaps significantly, is further supported by the number of penalty actions recently issued by FinCEN. In the vast majority of suspected BSA violations referred to FinCEN, we have not imposed any penalty following our careful evaluation of the alleged violations and whether a penalty is warranted.

To illustrate, since January 1, 2006, FinCEN has received 593 referrals of significant BSA deficiencies from our federal and state regulatory partners. Of these matters, 6 percent (38) were transferred to our Office of Enforcement for investigation and only about 2 percent (14) resulted in civil money penalties. To put these low percentages into further perspective, the referrals to, and penalties imposed by, FinCEN

---

[4] 31 U.S.C. § 5321, 5322.

were spread among tens of thousands of financial institutions under our purview including banks, broker-dealers, casinos and money services businesses (MSBs).[5]

We hope to continue to facilitate the trend toward improved BSA compliance, on a national basis, with our guidance, outreach and educational efforts. Our upcoming Chapter X initiative will provide a simplified, centralized and industry specific codification of the BSA for the banking industry and other financial services industries, including those recently brought under the BSA umbrella that lack an historical perspective on BSA compliance. The regulations will be reorganized and numbered under a new chapter entitled Title 31 Chapter X, Financial Crimes Enforcement Network. The conceptually simple step of making the rules more accessible and easier to understand will facilitate compliance.

## II.     Civil Money Penalty Actions

### A.     Purpose

The overarching goal of FinCEN in the conduct of its enforcement program is to ensure BSA compliance, on a national basis, to make financial institutions hostile to abuse by criminal actors and to preserve the flow of valuable information to appropriate authorities and assist in the detection, investigation and prosecution of money laundering, terrorist financing and other financial crimes. While financial institutions that violate the law should be held accountable, as appropriate and warranted, we do not pursue enforcement actions against financial institutions for technical, isolated failures to comply with the BSA, including the untimely filing of currency transaction and suspicious activity reports.

We also do not pursue enforcement actions in instances where we may disagree with a financial institution's reasoned judgment in good faith regarding the development and implementation of its anti-money laundering program, under the risk-based approach. We consider enforcement actions only when a financial institution exhibits a systemic breakdown in BSA compliance that results in relatively significant violations of the reporting, recordkeeping and other obligations of the BSA.

### B.     Penalty Provisions

The BSA authorizes penalties from $500 to $50,000 for *negligent* violations of the BSA.[6]  However, understanding the challenges that accompany compliance with the BSA, FinCEN has not historically assessed penalties for *negligent* violations of the BSA.

---

[5] The financial institutions subject to the BSA include approximately 17,000 depository institutions (Banks, Thrifts and Credit Unions), 5,000 Broker/Dealers, over 8,000 Mutual Funds, 1,700 Insurance Companies, 197 Futures Commission Merchants (FCMs), 1,700 Introducing Brokers in Commodities (IBs), 912 Casinos and a multitude of MSBs.

[6] For each negligent violation, a penalty of up to $500 is authorized. 31 U.S.C. § 5321(a)(6)(A), 31 C.F.R. § 103.57(h). For a pattern of negligent violations, a penalty of up to $50,000 is authorized. 31 U.S.C. § 5321(a)(6)(B). The penalty for violations of international counter money laundering provisions is authorized without a willfulness requirement. 31 U.S.C. § 5321(a)(7).

The most significant civil penalty provisions of the BSA apply to parties "willfully violating" the BSA.[7]  Concentrating the enforcement program penalties on willful violations furthers our objectives by taking action for the most significant and systemic violations of the BSA, rather than punishing financial institutions for less severe infractions under the negligence provisions of the BSA.

Furthermore, when FinCEN assesses penalties against financial institutions, we generally do so on a scale far smaller than the maximum penalties authorized by law. The BSA authorizes civil money penalties of $25,000 *per day* for failure to implement an adequate anti-money laundering program.[8]  For *each* failure to timely file a suspicious activity report or currency transaction report, an institution is liable for a penalty of the greater of $25,000 or the amount of the transaction, up to $100,000.[9]

Many of the recent enforcement actions at FinCEN have involved failures to implement adequate anti-money laundering programs stretching over periods of several years, and resulting failures to file hundreds or thousands of reports in accordance with the BSA, subjecting the entity to civil money penalties of tens of millions or even hundreds of millions of dollars.  FinCEN believes we have exercised our authority responsibly with appropriate discretion.  In all cases thus far, we have assessed penalties in amounts significantly lower than the maximum authorized by the statute.[10]

## C.    Enforcement Process

To determine whether to impose a monetary penalty, the Office of Enforcement evaluates many factors including the volume, severity, types, time span, repetitiveness and nature of the violations.  We also consider the comprehensive nature and timeliness of any corrective action undertaken by the institution, and whether the violations were self-discovered, or discovered by regulatory examination or law enforcement investigation.  Whether the institution is subject to other supervisory or law enforcement actions may also influence our final disposition of a case.

For example, in global proceedings with the federal banking agencies (FBAs) and/or U.S. Department of Justice, FinCEN views the case in an aggregate context incorporating other penalties and mandates for remedial actions into our final penalty calculations.  In addition, barring extraordinary circumstances, we consider the financial health of the institution and the likely economic effect of our enforcement action to avoid unreasonable or unwarranted consequences for the financial institution and its

---

[7] *See,* e.g., 31 U.S.C. § 5321(a)(1).  *See* also 31 C.F.R. § 103.57(a)-(c), (e)-(g).
[8] 31 U.S.C. § 5321(a)(1).  Furthermore, a separate violation occurs at each office, branch, or place of business at which a violation occurs or continues.  Id.
[9] 31 U.S.C. § 5321(a)(1); 31 C.F.R. § 103.57(f).
[10] The BSA authorizes civil money penalties for additional violations of the BSA, including the following: for structured transaction violations, up to the amount of the transactions, 31 U.S.C. § 5321(a)(4), 31 C.F.R. § 103.57(e); for violations of recordkeeping requirements, up to $1,000, 31 C.F.R. § 103.57(c); for violations of international counter money laundering provisions, two times the amount of the transaction, up to $1 million, 31 U.S.C. § 5321(a)(7).  FinCEN may also seek injunctive actions.  Injunctive actions against violations of the BSA are also authorized.  31 U.S.C. § 5320.

shareholders and customers.  In assessing each of these factors, the Office of
Enforcement weighs the full body of evidence to arrive at a reasonable, fair and equitable
resolution of the case.

Depending on the matter, FinCEN will develop evidence and review other
relevant materials including reports of examinations, cease & desist orders, memoranda
of understanding, supervisory letters and other enforcement related supervisory tools.
The information that FinCEN receives from the FBAs, or directly from banks, sometimes
includes transaction reviews for suspicious activity.  FinCEN does not incorporate the
results of transaction reviews into enforcement cases on a strict liability basis.  We
analyze the results of a transaction review critically, and exclude certain types of
suspicious activity reports generated from the review as potential reporting violations in
enforcement matters.[11]

We view transaction reviews as part of the remediation process which can, if
conducted in a good faith manner, serve as a mitigator in enforcement matters.  That said,
FinCEN cannot ignore the fact that an ineffective anti-money laundering program
resulted in the filing of suspicious activity reports on a delinquent basis.  Each case is
different and viewed in its entirety, including the volume, dollar value, time-span and
nature of the suspicious activity reported, as a result of the transaction review.[12]

FinCEN understands that these transaction reviews, normally conducted at the
direction of supervisory authorities, are expensive, time-consuming and resource-
intensive for banks, and we acknowledge the industry's concerns about them.  However,
while I cannot speak for my colleagues at the FBAs, we can assure you that transaction
reviews are judiciously undertaken, recognizing the costs borne by all parties.
Transaction reviews often provide law enforcement users of BSA data with valuable
information that would have otherwise gone unreported.  Moreover, transaction reviews
provide a financial institution with a fairly detailed assessment of the effectiveness of its
suspicious activity reporting compliance program.  Undertaking a transaction review
subjects an institution's compliance program to a stringent test of the effectiveness of its
systems and controls for transaction monitoring and reporting, and the results can assist
an institution in identifying and remedying flaws in its compliance program.

If the Office of Enforcement determines that the assessment of a civil money
penalty may be warranted, it will initiate an iterative process to determine whether a
penalty is necessary and, if so, the appropriate penalty amount.  FinCEN always provides
the financial institution a full understanding of the BSA charges, and the opportunity to
provide additional facts and perspective on the matter.  The process begins when the
Office of Enforcement issues a charging letter describing in detail the facts of the case

---

[11] The types of suspicious activity reports typically excluded are supplemental or amended forms, voluntary
or cautionary forms, and forms filed within a reasonable amount of time after the expiration of the 30 or 60
day requirement to accommodate the investigative and review process within the financial institution.
[12] FinCEN has required transaction reviews for compliance with the currency transaction reporting
requirements for many years, and may also incorporate the findings of these reviews into its enforcement
cases.

6

and the nature of the BSA violations. The letter also invites a response from the financial institution with any information relevant to whether a civil money penalty is warranted for the alleged violations. The Office of Enforcement will review the institution's response, engage in settlement negotiations and determine whether a penalty is warranted.

In determining the appropriateness and amount of a civil money penalty, FinCEN weighs all the relevant facts and circumstances of each case. A significant challenge to a consistent enforcement policy at FinCEN is the incredible diversity of financial institutions under our jurisdiction. Recent enforcement actions at FinCEN have encompassed small convenience stores with money services business operations, casinos, broker/dealer firms and large banks.

In the vast majority of cases, FinCEN concludes matters by consent. Based on historical experience, settlement negotiations between FinCEN and banks have proceeded in a very orderly manner due in large part to cooperation by the banks and the comprehensive information FinCEN provides to financial institutions about the nature of the BSA charges. If a financial institution refuses to enter into consent with FinCEN, we are authorized to assess a penalty. The matter would then be referred to the U.S. Department of Justice, Civil Division, Federal Programs Branch, for potential litigation "de novo" in a U.S. District Court.[13]

A notable point is that during customary settlement negotiations with FinCEN, the final terms and conditions of settlements are offered for consent. Upon refusal to enter into consent with FinCEN, any such offers, including the dollar amount of the penalty, are generally withdrawn and no longer available to the financial institution. As a result, the Department of Justice could seek a higher penalty, including amounts up to the maximum allowed by law.

In matters involving joint or concurrent enforcement actions, the civil money penalties are divided among FinCEN, the primary federal regulatory agency, and any state regulatory agencies involved in the enforcement action. FinCEN's share of the civil money penalties are deposited into the Department of the Treasury's General Fund and not retained by FinCEN for any purposes.

Civil money penalties assessed by the FBAs, under Title 12 for BSA based violations, are also sent to the General Fund at Treasury. As evidenced by our recent cases, FinCEN can deem its portion of the penalty as satisfied by penalties imposed by other federal or state regulatory agencies, or penalties and forfeitures by the U.S. Department of Justice. As stated previously, this approach allows FinCEN to view the final disposition of matters in an aggregate and complete context.

**D.      Public Notice of Enforcement Actions**

---

[13] 31 U.S.C. § 5321(b)(2).

To provide interested parties with insight into the conduct of our BSA enforcement program, we prepare consent and assessment documents for each civil money penalty action.  The assessments are published on our public website.[14]  These assessment documents provide fairly detailed descriptions of the underlying conduct that led to each penalty and the BSA provisions violated by the financial institution.  We understand that the financial industry watches closely FinCEN's enforcement actions and as we have stated in support of the effectiveness and efficiency initiatives announced by Secretary Paulson in June 2007, we are committed to ensuring that when we take enforcement actions, we provide as much information as possible about the underlying facts and violations of law that led to the penalties.[15]

We hope that these assessment documents provide some benefit to financial institutions in reviewing and responding to the risks of their operations with respect to money laundering and terrorist financing.  Our enforcement actions are by nature reactive to the unique events, circumstances and conduct in each case.  As a result, our assessment documents are not intended to serve as guidance.  Nevertheless, when passages in our assessments address compliance issues of concern to the industry, we expect that financial institutions will take them into account in the development and implementation of risk management strategies.

I would like to re-emphasize that FinCEN closes many matters involving breakdowns in BSA compliance without monetary penalties, because the overall commitment of the financial institutions was at a level that outweighed the breakdowns.  In arriving at the appropriate resolution of such cases, FinCEN does not focus exclusively on the deficiencies and violations.  Instead, we view violations in the context of the institution's entire anti-money laundering program, including management of the risk profile and the cost and resource commitment required to establish and maintain a sound program.  FinCEN's enforcement program aims to support the overall goal of promoting compliance with the BSA, to further the anti-money laundering and counter terrorist financing objectives we all share.

## III.    Interagency Collaboration

In exercising our statutory authority, FinCEN works closely with a wide variety of federal and state regulatory and law enforcement agencies.  FinCEN's authority to examine institutions for compliance with the BSA has been delegated to the five federal banking agencies - the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the National Credit Union Administration and the Office of Thrift Supervision - and to the Securities

---

[14] http://www.fincen.gov/news_room/ea/.
[15] *See* Bank Secrecy Act Effectiveness and Efficiency Fact Sheet, available at http://www.fincen.gov/news_room/rp/rulings/pdf/bsa_fact_sheet.pdf; Prepared Remarks of James H. Freis, Jr., Director, Financial Crimes Enforcement Network, ABA/ABA Money Laundering Enforcement Conference, 9-10 (Oct. 22, 2007).  http://www.fincen.gov/news_room/speech/pdf/20071022.pdf

and Exchange Commission, the Commodity Futures Trading Commission and the Internal Revenue Service.[16]

FinCEN benefits from leveraging the resources and knowledge of the supervisory agencies. To establish procedures for the sharing of reports of examinations and other information, FinCEN has entered into memoranda of understanding (MOUs) with each of these federal agencies and with state regulators.[17] Under the MOUs, FinCEN receives referrals of suspected BSA violations discovered during the examination process from the Federal financial regulators, the Internal Revenue Service and forty-six state regulatory agencies.

These MOUs are vital to FinCEN's role as administrator of the BSA. The MOUs provide an infrastructure for information sharing and close collaboration between FinCEN and the examination authorities. I would like to underscore that FinCEN uses the system created by the MOUs to further ensure a consistent and uniform approach to compliance and enforcement efforts, across the spectrum of the financial service industries covered by the BSA.

As you might imagine, as the financial services industry evolves, we continue to consider the application of the BSA to additional financial service providers and accompanying supervisory or oversight authorities and we will build upon the success of the MOU process with our federal and state regulatory partners. We will also use the information obtained under the MOUs to facilitate improved compliance with the BSA by way of our guidance, outreach and educational efforts.

Whenever possible, FinCEN and the regulators seek to conduct joint and concurrent enforcement actions, as warranted, against financial institutions that violate the BSA. FinCEN retains authority to take enforcement actions for violations of the BSA found by the regulatory agencies acting under delegated authority.[18] The FBAs retain separate authority to conduct enforcement actions, such as cease and desist proceedings for unsafe or unsound practices or violations of law, rule or regulation.[19] While FinCEN and the FBAs operate under distinct jurisdictional authorities, we have built an infrastructure that fosters close collaboration on BSA enforcement matters. As a result, we are normally able to proceed jointly and concurrently, as warranted, to better ensure a consistent and uniform approach to BSA enforcement.

---

[16] *See* 31 C.F.R. § 103.56(b). FinCEN has also delegated authority for investigating criminal violations of the BSA and its implementing regulations to the Department of Homeland Security (formerly the Commissioner of Customs) with respect to violations of the requirement to file reports of transportation of currency or monetary instruments, and to the Commissioner of Internal Revenue with respect to other violations of the BSA. 31 C.F.R. § 103.56(c).

[17] As of September 30, 2008, FinCEN had executed MOUs with the FBAs, the Internal Revenue Service, the Securities and Exchange Commission, and 46 state and territorial regulatory agencies. See, e.g., http://www.treas.gov/press/releases/reports/fincenbankingregulatorsmou.pdf (Memorandum of Understanding between the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, National Credit Union Administration, Financial Crimes Enforcement Network, Office of the Comptroller of the Currency, and Office of Thrift Supervision).

[18] *See* Treasury Order 180-01.

[19] 12 U.S.C. § 1818(b).

9

Since January 1, 2005, 68 percent of civil money penalty cases undertaken at FinCEN have involved joint or concurrent penalty actions with other stakeholder federal or state agencies, including the U.S. Department of Justice. A vast majority of the penalty actions not concluded jointly involved non-bank financial institutions, particularly casinos and money services businesses, for which FinCEN retains exclusive regulatory penalty authority.

The conduct of interagency collaboration and information sharing in addressing violations of the BSA is initially the responsibility of FinCEN's Office of Compliance. Congress amended the BSA to mandate the formation of the Office of Compliance.[20] The Office of Compliance was established in the later part of 2004, and continues to build staff and experience to strengthen relationships and communication with our federal and state regulatory partners under the MOUs.[21]

Moreover, the Office of Compliance conducts the initial review of BSA violations, in collaboration with our partner agencies. Under the terms of the MOUs, when an agency determines through the examination process that a financial institution has exhibited significant BSA violations or deficiencies, it will refer the case to FinCEN for parallel review. The Office of Compliance may also develop cases through self-disclosure by an institution or through review of BSA data. In each instance, the Office of Compliance will use the information provided by our partner agencies and from other sources to assess the severity of the unique noncompliance issues in each case.

The majority of matters received by FinCEN under the MOUs are reviewed and closed by the Office of Compliance. The Office of Compliance may decide to close the case with no further action, close the case with a notification letter (previously called a cautionary or warning letter), or present the matter to FinCEN's Regulatory Enforcement Committee. Closure with no further action has been the most frequent outcome, followed by closure with a notification letter. The Regulatory Enforcement Committee at FinCEN convenes monthly to determine whether certain matters should be transferred to our Office of Enforcement for investigation.

The low percentage of cases considered for enforcement action (6% of referrals) and the even lower percentage of cases that result in civil money penalty actions (approximately 2% of referrals) reflects the discretion FinCEN exercises in the conduct

---

[20] 31 U.S.C. § 313(a)(7)(B).
[21] The Office of Compliance also represents FinCEN in interagency work with the Federal Financial Institutions Examination Council, including participation in any updates or amendments to the *Bank Secrecy Act/Anti-Money Laundering Examination Manual*, which preserves a consistent approach to anti-money laundering compliance among federal and state supervisory agencies. The Council also enables a consistent examination approach with respect to new rules promulgated under the BSA. The Manual together with the body of any new rule, including the preamble, guidance and educational outreach all serve as vital tools in adapting to new requirements. While notice of BSA rules are always provided well in advance of effective dates, we recognize that systems, controls, personnel, training and other measures must be put in place to adapt to new requirements.

of its enforcement program.  Simply stated, FinCEN proceeds against banks with monetary penalty actions only in the most significant and systemic cases.

Historically, most BSA enforcement actions have been civil in nature.  More recently, a number of significant cases have involved concurrent civil and criminal actions by FinCEN, the FBAs and the U.S. Department of Justice.  The U.S. financial system remains an attractive vehicle for money launderers and other illicit actors, and when financial institutions themselves engage in money laundering or willfully violate the BSA, a combination of civil and criminal enforcement actions may be the appropriate response by the government.[22]  Whenever possible, we strive to coordinate civil and criminal enforcement actions to avoid multiple government actions against the same financial institution at different times for the same or related conduct.

While the decision and the responsibility to institute criminal actions for BSA violations rest exclusively with the U.S. Department of Justice,[23] when concurrent civil and criminal actions against a financial institution are contemplated, the U.S. Department of Justice, FinCEN and the appropriate FBA will collaborate on potential civil or criminal charges under our respective jurisdictions, including the collateral consequences of a prosecution and the appropriateness of civil and/or criminal remedies by the U.S. Government.[24]

## Concluding Remarks

In the conduct of our enforcement program, FinCEN seeks to strike an important balance.  We view BSA compliance as a matter of national security in the context of

---

[22] The BSA authorizes criminal money penalties and prison terms for willful violations. 31 U.S.C. § 5322; 31 C.F.R. § 103.59.  Financial institutions also may be liable for criminal money laundering offenses under Title 18 of the U.S. Code.  Applicable provisions of Title 18 include laundering of monetary instruments, 18 U.S.C. § 1956; monetary transactions in criminally derived property, 18 U.S.C. § 1957; conducting an unlicensed money transmitting business, 18 U.S.C. § 1960; and false statements, 18 U.S.C. § 1001.  Property involved in transactions in violation of Sections 1956, 1957 or 1960 of Title 18 is subject to civil and criminal forfeiture.  18 U.S.C. § 981, 982.

[23] The Department of Justice laid out the principles that it will follow in prosecuting business organizations in a Memorandum from Deputy Attorney General Paul J. McNulty entitled Principles of Federal Prosecution of Business Organizations (December 12, 2006) (the "McNulty Memorandum").  See http://www.usdoj.gov/dag/speeches/2006/mcnulty_memo.pdf.  The Department of Justice codified these principles in Title 9, Chapter 9-28.000 of the United States Attorney's Manual, revised in August 2008. See Principles of Federal Prosecution of Business Organizations, USAM 9-28.000, available at http://www.usdoj.gov/opa/documents/corp-charging-guidelines.pdf.

[24] To address the concern that United States Attorneys may prosecute financial institutions for money laundering in a manner inconsistent with the Department of the Treasury's application of the BSA and its implementing regulations, the Department of Justice, in consultation with the Department of the Treasury, amended the United States Attorneys' Manual to require that all money laundering prosecutions of financial institutions be coordinated with, and approved by, the Criminal Division.  United States Attorneys' Manual, 9-105.300.  Furthermore, the Department of Justice stated the following in the McNulty Memorandum and in Title 9, Chapter 9-28.000 of the United States Attorney's Manual: "Many corporations operate in complex regulatory environments outside the normal experience of criminal prosecutors.  Accordingly, prosecutors should consult with relevant federal and state agencies with the expertise to evaluate the adequacy of a program's design and implementation."  See McNulty Memorandum at 15; USAM 9-28.800.

combating money laundering and terrorist financing.  At the same time, we must carry out this mission in a way that avoids unwarranted costs to the industry and does not punish good faith efforts at compliance.  FinCEN strives to never lose sight of the broader goal that Congress intended – the co-dependent and value added nature of the partnership between the government and the financial industry to fight crime.  Neither of us can afford to let the other partner down.  We believe that we have achieved this balance in the conduct of our enforcement program, and we intend to maintain it in the future.

While the purpose of today's speech was to lay out the statutory and policy basis and practical application of FinCEN's enforcement program, I also hope my remarks today will help those involved in possible actions as well as those who learn of a penalty from a public notice, to better understand how and why the action has occurred.

I would like to add one final piece of context that is relevant to understanding FinCEN's approach to BSA compliance and enforcement actions.  We use the lessons learned from our review of BSA compliance cases, whether referred by the examining authority or developed internally, to support our broader regulatory and outreach efforts.  As we assess priorities to administer the BSA, we note issues that will most likely have broad application and where the financial industry could benefit from addressing compliance deficiencies or perceived ambiguities in the BSA.

For example, when patterns of noncompliance indicate a lack of clarity or understanding in some aspect of the regulations, this observation may spur additional public guidance on our website or be considered in future iterations of the FFIEC Examination Manual.  We continuously review and reassess our regulatory framework, based not only on the evolution of risks but also to facilitate better compliance, with our outreach efforts, Regulatory Helpline, speaking engagements, guidance materials and codification of the BSA such as our soon-to-be proposed revisions to the definition of MSBs, which I previewed in my speech here last year.[25]  Whether we focus on educating the financial industry as to risks, or on enforcement actions as we have done today, in the exercise of all of FinCEN's authorities, we must never lose sight of the purposes behind the BSA.

I look forward to ongoing dialogue with you about FinCEN's enforcement program.  Participating in events such as this one is essential to increasing our understanding of each other's concerns, and our efforts will foster effective cooperation between the public and private sectors that will help us to achieve our collective goals.  Thank you for your time.

### 

---

[25] *See* Prepared Remarks of James H. Freis, Jr., Director, Financial Crimes Enforcement Network, ABA/ABA Money Laundering Enforcement Conference, at http://www.fincen.gov/news_room/speech/pdf/20071022.pdf.