# EXHIBIT 8

Written Testimony of Samuel W. Bodman,

Deputy Sec'y U.S. Dep't of the Treasury

Before the House Fin. Servs. Subcomm. On

Oversight & Investigations, Tres. JS-1728

(June 16, 2004)

# EXHIBIT H

Case 1:17-cv-04179-DLC   Document 85-8   Filed 01/19/18   Page 3 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

Treas. JS-1728 (Dept.Treas.), 2004 WL 1346442

Department of the Treasury

(NEWS RELEASE)

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY SECRETARY
U.S. DEPARTMENT OF THE TREASURY BEFORE THE HOUSE FINANCIAL
SERVICES SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

June 16, 2004

## I. Introduction

Madam Chairman Kelly, Congressman Gutierrez and Members of the Committee, thank you for inviting me to testify before you today. As you have requested, I plan to address a number of specific Treasury issues in my statement, and would be pleased to address any other issues during my testimony.

The Treasury Department is currently undertaking significant steps to advance our campaign against terrorist financing and financial crime, largely through the creation of the Office of Terrorism and Financial Intelligence. We are also addressing a number of significant regulatory and oversight issues associated with compliance and enforcement of the Bank Secrecy Act. Secretary Snow has asked me to focus a considerable amount of my time on these important matters, and I welcome this opportunity to explain our progress and vision for moving forward in meeting these challenges.

Treasury has broad authorities, relationships and expertise in the financial arena. As importantly, we have a cadre of dedicated and diligent individuals who work hard every day - along with countless others in the U.S. government - to fight the financial war on terror and to protect the integrity of the financial system.

We have had very real and concrete successes in fighting this war, but as the recent attacks around the world demonstrate, our work must continue at an even higher pace. Our enemies are numerous, resourceful, and dedicated, and they continually adapt to the changing environment. We must do the same, using every tool that we have. We also recognize that, unfortunately, we are in this fight for the long term. And so the Department must be organized to reflect that reality.

## II. The Office of Terrorism and Financial Intelligence

The dynamic and long-term challenges that we face in the war on terror will require unwavering political will, active and continuous leadership by senior policymakers, and sustained commitment from all of us. This is precisely why the Administration has collaborated with Congress to develop a new Treasury structure: a high profile office led by an Under Secretary - one of only three in the Department - and two Assistant Secretaries. This office, called the Office of Terrorism and Financial Intelligence (TFI), will bring together Treasury's intelligence, regulatory, law enforcement, sanctions, and policy components.

The creation of TFI will augment Treasury's efforts in several ways. First, it will allow us to better develop and target our intelligence analysis and financial data to detect how terrorists are exploiting financial systems and to design methods to stop them and their financial infrastructure. Second, it will allow us to better coordinate aggressive law, sanctions and regulatory enforcement programs, working with other components of our government and the private sector, and using important new tools provided by Congress to Treasury under the USA PATRIOT Act (Patriot Act). Third, it will help us continue to develop the strong international coalition required to combat terrorist financing, in part by facilitating

Case 1:17-cv-04179-DLC Document 85-8 Filed 01/19/18 Page 4 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

the development and exchange of financial information that supports our requests for collaborative action. Fourth, it will ensure accountability and help achieve results for this essential mission

TFI will have two major components. One Assistant Secretary will lead the Office of Terrorist Financing. This office will build on the functions that have been underway at Treasury over the past year by developing, organizing, and implementing U.S. government strategies to combat terrorist financing and financial crime, both internationally and domestically. In essence, this will be the policy and outreach apparatus for the Treasury Department on the issues of terrorist financing, money laundering, financial crime, and sanctions. This will mean increased coordination with other elements of the US government, including law enforcement and regulatory agencies.

This office will continue to represent the United States at international bodies dedicated to fighting terrorist financing and financial crime such as the Financial Action Task Force and will increase our multilateral and bilateral efforts in this field. We will use this office to create global solutions to these evolving international problems, attacking financial crime and safeguarding the financial system by advancing international standards, conducting assessments, administering technical assistance and applying protective measures against high risk jurisdictions. In this regard, we will also have a more vigorous role in the implementation of measures that can affect the behavior of rogue actors abroad.

Domestically, the office will be charged with continuing to develop and implement our government's national money laundering strategy as well as other policies and programs to fight financial crimes.

It will continue to develop and help implement our policies and regulations in support of the Bank Secrecy Act and the Patriot Act. We will further increase our interaction with federal law enforcement and continue to work closely with the criminal investigators at the IRS to deal with emerging domestic and international financial crimes of concern. Finally, this office will serve as a primary outreach body - to the private sector and other stakeholders - to ensure that we are maximizing the effectiveness of our efforts.

A second Assistant Secretary will lead the Office of Intelligence and Analysis (OIA). The overall purpose of this office is to ensure that the Treasury Department properly analyzes relevant intelligence - adding our own unique expertise and capabilities - to create actionable financial intelligence that Treasury and rest of the U.S. Government can use effectively. We recognize that OIA must focus its efforts on filling any gaps in intelligence targets and on adding value and expertise - not on duplicating the efforts of other Federal agencies. Our priorities will include identifying and attacking the financial infrastructure of terrorist groups; assisting in efforts to identify and address vulnerabilities that may be exploited by terrorists and criminals in domestic and international financial systems; and promoting stronger relationships with our partners in the U.S. and around the world.

In determining the structure of OIA, we first focused on meeting our urgent short-term needs. Accordingly, we have already assembled a small team of analysts to closely monitor and review current intelligence threat reporting. These analysts, who are sitting together in secure space in the Main Treasury building, are ensuring that Treasury can track, analyze any financial angles, and then refer these threats to relevant Treasury and U.S. government interests for appropriate action.

In the near term, the Department plans to further develop our analytical capability through OIA in untapped areas, such as strategic targeting of terrorist financial networks. We also plan to analyze trends and patterns and non-traditional targets such as hawalas and couriers. In order to accomplish these goals, we are in the process of hiring several new analysts as well as considering drawing on additional resources from OFAC and FinCEN. In addition, enhancing our working relationships with other agencies will be a key job for the new Assistant Secretary.

Case 1:17-cv-04179-DLC   Document 85-8   Filed 01/19/18   Page 5 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

Overall, the twin components of TFI will complement the important work being done by the Department of Justice, the Department of Homeland Security, the State Department, and the various intelligence and law enforcement agencies, and will be fully integrated into established task forces and processes.

I would like to underscore this point. It is impossible to overstate the importance of coordinating the assets, resources and expertise of the Treasury and other government agencies in our mission to identify, disrupt and dismantle terrorist and other criminal networks. Since 9/11, the Treasury Department, together with departments and agencies across the federal government, has made unparalleled strides in coordinating its efforts towards creating a seamless front in the war on terror.

However, we are continuing to look for ways that can improve our management of Treasury authorities and resources to facilitate information-sharing and coordination across the Department and the government as a whole to safeguard the financial system from terrorist and criminal abuse. The creation of TFI will help us advance these interests.

We are in the process of working out the budget for TFI and its impact on the rest of the Department. For both fiscal years 2004 and 2005, we believe that we will be able to re-prioritize existing resources in order to fund the personnel and other related start-up costs for the operation. We expect to hire up to 15 new personnel for the remainder of 2004, as well as additional staff during 2005. At the same time, we have realized that we will likely incur information technology and infrastructure costs to make TFI, and especially OIA, into a world class organization. We are currently looking at other possible funding sources, including the Asset Forfeiture Fund and reprogramming authorities, and will work with OMB and the Congress to resolve this issue.

### III. Treasury's Regulatory Authorities under the BSA and Associated Compliance Issues

Another area that I would like to discuss is Treasury's responsibility to protect the integrity of the financial system by administering the Bank Secrecy Act (BSA), as enhanced by Title III of the Patriot Act. When Congress enacted the BSA in 1970, it charged the Secretary of the Treasury with the responsibility for enforcing compliance with the law. For the last three decades, Treasury has satisfied this responsibility by relying on a diverse group of existing regulators - by delegating to them the authority to actually examine the institutions subject to BSA requirements.

In light of recent events, Secretary Snow and I are taking a fresh look at this arrangement. There have been some clear benefits. We have been able to maximize our government's existing resources and have been able to capitalize on the unique expertise and examination capabilities of the regulatory agencies most familiar with the specific financial industries. But there are also some clear risks. Without sufficient attention and control, this decentralized approach may devolve into a situation where there is a lack of transparency, accountability, and timeliness. This is a potentially serious problem, and it is one that the Secretary and I are committed to addressing.

I am going to take a few minutes to discuss the current structure, and then describe for you some of the things that we are doing to evaluate its effectiveness.

The overall purpose of the original BSA - and its subsequent modifications -- is to promote transparency and accountability in the U.S. financial system in order to preserve its integrity and to protect it from criminal abuse. When originally passed in 1970, the BSA simply mandated that covered institutions identify the source, volume and movement of large amounts of currency and other monetary instruments into or out of the United States or being deposited in U.S. financial institutions.

Since that time, the Congress has amended the BSA on numerous occasions in light of the ongoing development of our financial system and evolving criminal abuses of that system. For example, in 1992, Congress amended the Act to authorize the Treasury to require institutions to report suspicious activities - so called suspicious activity reports or SARs

Case 1:17-cv-04179-DLC  Document 85-8  Filed 01/19/18  Page 6 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

-- regardless of whether they met a certain monetary threshold. In 2001, the Patriot Act strengthened and expanded BSA regulation to include enhanced due diligence and customer identification requirements, expanded information sharing authorities, and new industries subject to BSA regulatory obligations.

It is worth noting that the BSA places the actual responsibility for compliance - for filing appropriate reports, for checking the identity of its customers, for having a sufficient system in place - on the private sector institutions that fall under its framework. Treasury's job is to make sure that those private sector institutions fulfill their legal responsibilities - in other words, to enforce compliance.

According to Treasury regulations and orders, the Secretary has delegated the overall authority for enforcement and compliance of this system to one of Treasury's bureaus, the Financial Crimes Enforcement Network (FinCEN). The Director of FinCEN retains the authority from the Secretary to pursue civil enforcement actions against financial institutions for non-compliance with the BSA and the implementing regulations. FinCEN has been empowered to assess civil monetary penalties against, or require corrective action by, a financial institution committing negligent or willful violations.

The Secretary has also delegated the authority to examine institutions to determine BSA compliance to eight separate federal regulators:

The Board of Governors of the Federal Reserve System

The Office of the Comptroller of the Currency (OCC)

The Federal Deposit Insurance Corporation (FDIC)

The Office of Thrift Supervision (OTS)

The National Credit Union Administration (NCUA)

The Securities and Exchange Commission (SEC)

The Commodity Futures Trading Commission (CFTC)

The Internal Revenue Service (IRS)

Each one of these regulators has a distinct group of institutions for which they are responsible:
  * the Federal Reserve Board covers state chartered banks that are members of the Federal Reserve System;
  * the OCC covers nationally chartered banks;
  * the FDIC covers non-Federal Reserve System member banks;
  * the OTS covers federally chartered thrifts;
  * the NCUA covers federally insured credit unions;
  * the SEC covers securities broker-dealers and mutual funds;
  * the CFTC covers futures commission merchants and futures introducing brokers; and
  * the IRS covers primarily money service businesses and casinos outside of Nevada.

We have made significant strides lately - for example, registering thousands of MSBs in the last few years, but the magnitude of the task of ensuring compliance in this area is enormous.

Case 1:17-cv-04179-DLC Document 85-8 Filed 01/19/18 Page 7 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

In trying to coordinate this overall structure, it is important to keep in mind the varying levels of independence of each of the participating regulators. I mention this not because the Department has any desire to exercise full control over all of these other agencies - which we certainly do not - but simply to make clear the operational realities of the current arrangement. FinCEN and the IRS are bureaus of the Treasury, and like most of the other Treasury bureaus, the Secretary has a significant degree of direct authority over them. OCC and OTS are also Treasury bureaus, and are subject to the general oversight of the Secretary. However, Congress has provided them a level of independence from Departmental involvement for various functions of those agencies, such as specific matters or proceedings, including agency enforcement actions. Finally, the Federal Reserve, FDIC, NCUA, SEC, and CFTC are agencies over which the Secretary has no direct authority at all.

As I already mentioned, Secretary Snow and I are in the process of reviewing the system in its entirety. We are considering whether any systemic changes that should be made in order to ensure that we are in a position to successfully carry out Treasury's duties. To this end, we have hosted a series of meetings on this topic. Two weeks ago, I brought together some of the relevant Treasury components - FinCEN, the Office of Thrift Supervision, and the Office of the Comptroller of the Currency, and OFAC to discuss that question. We talked about ways of improving the transparency of compliance and enforcement efforts by developing and enhancing regular reporting and information sharing on: examination policies and procedures; aggregate results of examinations across each of the regulated financial industries; deficiency trends in BSA compliance; and enforcement actions contemplated in response to these deficiencies. Some of this reporting already occurs, but it is sporadic and not comprehensive. Such enhanced transparency should assist us in harmonizing the administration of the BSA across the financial system and in responding to compliance and risk trends with appropriate guidance to the regulatory community.

At that meeting, I was encouraged to hear that OTS Director Jim Gilleran, who is the current chair of the Federal Financial Institutions Examination Council (FFIEC), plans to use that body to re-emphasize the importance of BSA compliance. I also understand that William Fox, the Director of FinCEN, will be invited to participate with that regulatory group. This is important, as the Secretary has delegated to FinCEN his responsibility for ensuring BSA compliance across the banking system.

Earlier this week, Secretary Snow hosted a principals-level gathering of all of the banking regulators. Secretary Snow and I expressed serious concerns about our ability to vouch for the effectiveness of the current system. We discussed the need for regular reporting and information sharing. We also began exploring possible ways that to build a sustainable process and capacity to validate the effectiveness of the regulators' compliance programs. To the extent that there are administrative or legal barriers that we encounter, we will identify them and then see how we can resolve them.

In focusing on these issues, we are also relying on the useful work done over the past few years by the Treasury Inspector General and by the Treasury Inspector General for Tax Administration. Their reports have identified some deficiencies, and have outlined some steps to improve the system. We are currently analyzing the reports, seeing what additional measures they recommended still need to be taken, and working with them to address our concerns.

Ensuring that the banks and other financial institutions comply with provisions of the Bank Secrecy Act is only one part of the equation. It is equally important that we make the best possible use of this reporting in order to protect the financial system and to attack those who use the system for unlawful or improper purposes. Shortly after arriving at Treasury, I learned that there were some historical problems with the administration of BSA data - as FinCEN has the responsibility for making sure the system works, but the IRS actually handles the data collection and dissemination. I immediately brought in IRS Commissioner Everson and Director Fox to resolve any issues. In the short term, IRS has committed to fulfilling FinCEN's requirements for the data, and in the longer term, the Department will remain committed to constructing BSA Direct, an updated electronic system for efficiently analyzing and retrieving relevant data.

Case 1:17-cv-04179-DLC Document 85-8 Filed 01/19/18 Page 8 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

We are also exploring the idea of more electronic filing. There are currently only a small percentage of suspicious activity reports and currency transaction reports that are filed electronically, and there are numerous benefits of increasing the share of electronically filed reports. Just like in the tax system, electronic filing means faster and less expensive processing, as well less chance of error. I recognize that increased electronic filing could impose a burden on many of the less sophisticated filers, and so we will evaluate both costs and benefits as we move forward.

In administering the BSA, Treasury uses various mechanisms to maintain relationships between the private sector, law enforcement, and other regulatory agencies. These include rule making processes, interagency working groups, joint task forces, detailed liaisons, cross-training seminars, conferences and outreach events. These mechanisms coordinate the development, implementation, and administration of BSA policies across the field of effected federal agencies, the industries they supervise, and the criminal justice system.

A good example of this can be seen in the workings of the Bank Secrecy Act Advisory Group (BSAAG), a congressionally chartered group that is chaired by the Treasury Department.

This group, which is comprised of regulatory, law enforcement and private sector representatives, meets on a regular basis to discuss issues of concern in the administration of the BSA. At the group's most recent meeting - about 4 weeks ago - I asked them to assist me in evaluating the effectiveness of BSA compliance generally. I understand that a subset of the group has been looking at this question, and I am looking forward to hearing and discussing their initial findings.

While there is always more work to be done, I do think that as a general matter, the government and the private sector have done a good job of developing and implementing the regulatory changes to the BSA following the passage of the Patriot Act. One good example, for instance, is the implementation and effectiveness of Section 314(a) of the Patriot Act.

Broadly speaking, Section 314(a) authorizes law enforcement to request information about suspected terrorists and money launderers from U.S. financial institutions, and financial institutions to communicate among themselves about such targets. Given the size of the U.S. financial system, this authority posed an enormous implementation challenge. Yet, pursuant to the relationship mechanisms described above, Treasury has worked with the private sector, law enforcement and the regulatory community to develop, implement and administer a comprehensive and effective Section 314(a) process. Under revised procedures, law enforcement sends 314(a) requests through FinCEN, customarily on a batched basis issued every two weeks, and financial institutions have two weeks to respond back to FinCEN with any matches and an identified point of contact for appropriate law enforcement follow up. In administering this process, FinCEN maintains an electronic database of 314(a) contacts for over 26,000 financial institutions, demonstrating overwhelming initial compliance with 314(a) contact requirements by the financial sector.

Most importantly, the 314(a) process has achieved significant results for law enforcement. For example, between April 1, 2003 and April 26, 2004, IRS-CI submitted 16 requests to FinCEN pertaining to 66 individuals and 17 businesses. These requests generated 646 positive matches with over 1274 financial institutions. Since Section 314(a)'s creation, the system has been used to send the names of 1,547 persons suspected of terrorism financing or money laundering to over 26,000 financial institutions, and has produced in 10,560 matches that were passed on to law enforcement. These results suggest substantial compliance with 314(a) across the financial sector, generating substantial leads for law enforcement.

Before concluding, I would like to briefly address issues of concern regarding the Terrorism Risk Insurance Act, Government Sponsored Enterprises and financial education.

**IV. Terrorism Risk Insurance Act of 2002 (TRIA)**

Congress enacted TRIA in the fall of 2002 to address disruptions in the market for commercial property and casualty terrorism risk insurance caused by the terrorist attacks of September 11, 2001. TRIA establishes a temporary Federal

Case 1:17-cv-04179-DLC   Document 85-8   Filed 01/19/18   Page 9 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

program of shared public and private compensation for insured commercial property and casualty losses resulting from acts of terrorism covered by the Act. Treasury has the chief responsibility for implementing TRIA and has issued regulations, created and staffed the Terrorism Risk Insurance Program office, and begun mandated studies and data collection efforts. It is important to note that as Treasury has moved through the rule making process, the program from the beginning has been, and continues to be, fully operational. Treasury still has some important tasks to complete, including the required determination by September 1, 2004, as to whether TRIA's "make available" provisions should be extended into 2005 - the third year of the program. Treasury is now in the process of developing a base of information from which the Secretary can make this required determination. Another remaining task is to report to Congress by June 30, 2005, on specific issues associated with the Act, including the effectiveness of the program and the likely capacity of the property and casualty insurance industry to offer insurance for terrorism risk after expiration of the Program.

On May 5th, Treasury published a request for comment in the Federal Register to solicit views from all interested parties as to whether the make available provision of the Terrorism Risk Insurance Act should be extended through the life of the program. The comment period ended on June 4th, and we are now analyzing the approximately 180 comments that we received.

### V. Government Sponsored Enterprises

Our nation has a world-class system of housing finance. Unfortunately, we do not have a world-class system of supervision of the housing government sponsored enterprises (GSEs), even though the importance of the housing financial system that the GSEs serve demands the best in supervision to ensure the long-term vitality of that system. Therefore, the Administration has called for a new, first class, regulatory supervisor for the three housing GSEs: Fannie Mae, Freddie Mac, and the Federal Home Loan Banking System. This new supervisor should have all the powers and tools necessary to oversee the activities of housing GSEs with the goal of promoting the continued strength and vitality of the housing finance markets. The Administration has set forth several elements that must be included in any GSE regulatory reform bill in order for the supervisory system to be credible. These elements - which were set forth in testimony presented to this Committee last fall by Secretary Snow and former Secretary Martinez - include: (1) broader authority for HUD to set and enforce meaningful housing goals; (2) independent funding and litigation authority; (3) control over both minimum and risk based capital; (4) receivership authority; and (5) authority to review and approve or reject new and existing activities.

At the same time, the Administration will continue to review what existing authorities can be exercised to improve supervision. However, exercise of existing authorities cannot replace need for legislation to correct deficiencies in those existing statutory authorities.

### VI. Treasury's Office of Financial Education

The Committee has also asked that I address what the Department is doing in the area of financial education. The Department of the Treasury has established an Office of Financial Education to promote access to financial education programs that help Americans obtain practical knowledge and skills to make informed financial choices throughout their lives. The Office carries out this mission in several ways: coordinating the federal effort on financial education, performing public outreach to increase awareness, setting standards to help raise the effectiveness of financial education programs, and brokering relationships between those who need and those who provide financial education.

The Department leads the Financial Literacy and Education Commission, a group of twenty federal government agencies charged with improving the level of financial education in the country. Congress created the Commission last year, as part of the Fair and Accurate Credit Transactions Act. The Commission has held two meetings this year, the most recent one on May 20, which was attended by many of your staff. Significant progress has been made toward the establishment of a toll free hotline for financial education as well as towards a financial education website to help the public find

Case 1:17-cv-04179-DLC Document 85-8 Filed 01/19/18 Page 10 of 10

WRITTEN TESTIMONY OF SAMUEL W. BODMAN, DEPUTY..., Treas. JS-1728 (2004)

information about financial education resources and programs. The website and hotline will provide more convenient access to public information on financial education. The Commission has also heard from a number of public and private sector organizations, something which will help it to formulate a national strategy for financial education.

In addition, the Treasury Department maintains a highly visible public profile through testimony before lawmakers on Capitol Hill, public speaking engagements and newsletters.

The OFE has also developed standards by which to evaluate and highlight successful financial education programs throughout the country and communicates those standards by awarding certificates of recognition to exemplary programs which meet those standards. The standards are available in the OFE newsletter and on the OFE website. This effort also enables the honored programs to achieve greater esteem and participation within their respective communities.

### VII. Conclusion

I thank you for the opportunity to be here today. The Treasury Department is charged with enormous responsibilities in attacking terrorist financing and financial crime, and in protecting the integrity of our financial systems. TFI and the other developments that I have discussed will improve Treasury's ability to meet these challenges.

I look forward to your comments and questions. And I hope this will be the start of an ongoing dialogue with this Committee as we move forward with this important effort, and with the rest of Treasury's activities.

Thank you. I will be happy to answer any questions.

Treas. JS-1728 (Dept.Treas.), 2004 WL 1346442

End of Document         © 2017 Thomson Reuters. No claim to original U.S. Government Works.