# EXHIBIT 9

Statement of William J. Fox, Director

Financial Crimes Enforcement United States

Department of Treasury Before the House of

Representatives, June 16, 2004

STATEMENT OF WILLIAM J. FOX
DIRECTOR
FINANCIAL CRIMES ENFORCEMENT NETWORK
UNITED STATES DEPARTMENT OF THE TREASURY

BEFORE
HOUSE COMMITTEE ON FINANCIAL SERVICES
SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

JUNE 16, 2004

Chairwoman Kelly, Congressman Gutierrez, and members of the Subcommittee, thank you for this opportunity to appear before you today to discuss the mission of the Financial Crimes Enforcement Network (FinCEN) and the important role it plays in the Department of the Treasury and the United States government's efforts as a whole to understand, detect, and prevent financial crimes and terrorist financing. Although this is my first time as a witness before this Subcommittee, I have followed the committee's leadership on issues relating to terrorist financing and money laundering and am very honored to appear before you today.

I became FinCEN's fourth director on December 1, 2003. Before I came to FinCEN, I was working as the principal assistant to the General Counsel of the Treasury Department on issues relating to terrorist financing, which were issues that occupied a great deal of my time. Coming from the Department, I understood, to a large extent, the nature of FinCEN's responsibilities and what it was doing to carry out the obligations imposed by these responsibilities. In these six months, I have done a great deal of listening and learning from inside and outside of FinCEN. I have met extensively with the law enforcement and intelligence communities that we serve and the financial industry that we help regulate. I have met with and listened to the staffs of interested committees in the Congress – including this committee. I have met with some of my counterparts in foreign governments and communicated with many more; and, of course, I have had a continuous dialogue and received tremendous support from those at Treasury – including Secretary Snow, Deputy Secretary Bodman, and Deputy Assistant Secretary Zarate.

Now, six months later I believe I have a clear idea of what FinCEN's mission means in real terms -- the challenges FinCEN is facing in carrying out its obligations; what needs to be done to meet those challenges and how FinCEN's mission supports the Department of the Treasury's efforts to safeguard the nation's financial system. Let me begin with a discussion of our mission and its attendant responsibilities. I believe it is essential to have a clear understanding of FinCEN and its role in preventing financial crime to understand how its ability to fulfill its obligations will be enhanced under the Office of Terrorism and Financial Intelligence.

FinCEN is charged with helping to safeguard the financial system of the United States from being abused by criminals and terrorists. FinCEN works to accomplish its mission through: (1) administration of the Bank Secrecy Act – a regulatory regime that provides for the reporting of highly sensitive financial data that are critical to investigations of financial crime; (2) dissemination of the data reported under the Bank Secrecy Act to law enforcement and, under appropriate circumstances, the intelligence community; (3) analysis of information related to illicit finance – both strategic and tactical analysis; and, (4) education and outreach provided to law enforcement and the financial industry on issues relating to illicit finance. FinCEN has many attributes that are key to understanding the agency:

- *FinCEN is a regulatory agency.* FinCEN has an obligation to administer the Bank Secrecy Act, the principal regulatory statute aimed at addressing the problems of money laundering and other forms of illicit finance, including terrorist financing. It is responsible for shaping and implementing this regulatory regime and, in concert with the functional bank regulators and the Internal Revenue Service, for ensuring compliance with the regime. The agency is also charged with protecting the integrity and confidentiality of the information collected under the Bank Secrecy Act.

- *FinCEN is a financial intelligence agency.* While not a member of the intelligence community, FinCEN is responsible for ensuring the efficient and timely collection, maintenance, analyses and dissemination of financial information critical to investigations of illicit finance.

- *FinCEN is a law enforcement support agency.* While FinCEN has no criminal investigative or arrest authority, much of our effort supports the investigation and successful prosecution of financial crime.

- *FinCEN is a network.* We are not directed to support one agency or a select group of agencies. We make our information, products and services available to all agencies that have a role in investigating illicit finance. In fact, we network these agencies. Our technology tells us when different agencies are searching the same data and we put those agencies together – avoiding investigative overlap and permitting the agencies to leverage resources and information.

FinCEN fits perfectly in the Department of the Treasury, possibly even more so after the Homeland Security reorganization than before that reorganization. The creation of the Office of Terrorism and Financial Intelligence within Treasury only enhances that fit. FinCEN will be able to help "operationalize" Treasury's policy priorities on these important issues and our operational analytic work will complement the analysis that will eventually be done in the newly created Office of Financial Intelligence. I believe this coordinated effort will lead to a greater emphasis and understanding of money laundering, terrorist financing and other forms of illicit finance not only at Treasury, but

2

within the United States, and that will make us all safer.  FinCEN will also benefit from the Department-wide, policy-coordinating role this office will provide.

## I.  *Background*

By virtue of a delegation order from the Secretary of the Treasury and a statute passed as part of the USA PATRIOT Act, FinCEN is charged with the responsibility of administering the regulatory regime of the Bank Secrecy Act.  Among other things, we issue regulations and accompanying interpretive guidance; collect, analyze and maintain the reports and information filed by financial institutions under the Bank Secrecy Act; make those reports and information available to law enforcement and regulators; and ensure financial institution compliance with the regulations through enforcement actions aimed at applying the regulations in consistent manner across the financial services industry.  FinCEN also plays an important role in analyzing the Bank Secrecy Act information collected to support law enforcement, identifying strategic money laundering and terrorist financing trends and patterns, and identifying Bank Secrecy Act compliance issues.

FinCEN was created as an office within Treasury in 1990.  Its original mission was focused on analysis – both tactical and strategic – of data collected under the Bank Secrecy Act along with other financial data.  Treasury's Office of Financial Enforcement (OFE) was originally responsible for the administration of the Bank Secrecy Act regulatory regime.  In 1994, Treasury merged OFE into FinCEN and delegated the responsibility to administer the regulatory regime to FinCEN.  Treasury sought to link the analytical functions with the administration of the regulatory regime that dictated the information that financial institutions were required to record and report.  Adding responsibilities for administering the regulatory regime strengthened and expanded FinCEN's analytical and intelligence abilities.

While FinCEN is responsible for ensuring compliance with the Bank Secrecy Act regulatory regime, FinCEN does not itself examine financial institutions for compliance. Instead, FinCEN taps the resources and expertise of other Federal agencies and self-regulatory organizations by relying on these agencies to conduct compliance exams, through delegations of authority that largely predated FinCEN.  Examination responsibility has been delegated to other federal regulators as follows:

- *Depository Institutions* – The Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration have been delegated authority to examine the depository institutions they regulate for Bank Secrecy Act compliance.

- *Securities Broker-Dealers, Mutual Funds, and Futures Commission Merchants/Introducing Brokers* – FinCEN has delegated examination authority to the Securities and Exchange Commission and the Commodity Futures Trading Commission, and relies on their self-regulatory agencies

(such as the NASD, the NYSE, and the NFA) to examine these entities for compliance.

- *Other Financial Institutions* – The Internal Revenue Service (Small Business/Self-Employed Division) has been delegated responsibility for examining all other financial institutions subject to Bank Secrecy Act regulation for compliance, including, for example, depository institutions with no federal regulator, casinos, and Money Services Businesses (MSBs).

Even in the absence of examiners, FinCEN has an important role in supporting the examination regime created through our delegations. FinCEN's role involves providing prompt Bank Secrecy Act interpretive guidance to regulators, policy makers and the financial services industry, and ensuring the consistent application of the Bank Secrecy Act regulations across industry lines, most notably through the rule-making process and subsequent guidance. We promote Bank Secrecy Act compliance by all financial institutions through training, education and outreach. We support the examination functions performed by the other agencies by providing them access to information filed by financial institutions in suspicious activity reports, currency transaction reports, and other Bank Secrecy Act reports. We also facilitate cooperation and the sharing of information among the various financial institution regulators to enhance the effectiveness of Bank Secrecy Act examination and, ultimately, industry compliance.

FinCEN has retained the authority to pursue civil enforcement actions against financial institutions for non-compliance with the Bank Secrecy Act and the implementing regulations. Under the Bank Secrecy Act, FinCEN is empowered to assess civil monetary penalties against, or require corrective action by, a financial institution committing negligent or willful violations.

Generally, FinCEN identifies potential enforcement cases through (1) referrals from the agencies examining for Bank Secrecy Act compliance; (2) self-disclosures by financial institutions; and, (3) FinCEN's own inquiry to the extent it becomes aware of possible violations. Referrals from the examining agencies are regularly made to FinCEN. It should be noted that under Title 12, the banking regulators have authority to enforce certain regulations that fall under that statute as well as under the Bank Secrecy Act, such as the requirement that depository institutions have anti-money laundering programs. In addition, the Internal Revenue Service has authority to enforce certain Bank Secrecy Act requirements including the IRS/FinCEN Form 8300 reporting for non-financial trades and businesses, and the Report of Foreign Bank and Financial Accounts by individual and entities.

## II.     *FinCEN's Counter-Terrorism Strategy*

The single, most important operational priority for FinCEN is counter-terrorism support to law enforcement and the intelligence community. To emphasize the importance of this work we have improved and are now implementing a comprehensive counter-terrorism strategy that draws from our analytic support to law enforcement, our

regulatory tools and expertise, and our international networking capabilities. We believe the implementation of this strategy will strengthen our focus and ensure that FinCEN is more active and aggressive rather than reactive on issues relating to terrorism. The strategy has five basic components.

A.    *Analysis of Terrorist Financing Suspicious Activity Reports*

FinCEN analyzes suspicious activity reports for both tactical and strategic value. At the tactical level, we are implementing a program in which every report that indicates a connection to terrorism is immediately reviewed and validated and then analyzed with other available information. This information will be packaged and referred to the Terrorist Threat Integration Center (TTIC), FBI-TFOS, and other relevant law enforcement. Moreover, this information will be stored in a manner that facilitates its access and availability for analysis.

At the strategic level, we are also devoting analysts to studying Bank Secrecy Act data and all other available information to gain an increased understanding of methodologies, typologies, geographic patterns of activity and systemic vulnerabilities relating to terrorist financing. These analysts will focus on regional and systemic "hot spots" for terrorist financing, studying and analyzing all sources of information. Such focus, which produced the study mandated by the Congress on Informal Value Transfer Systems, can significantly add to the knowledge base of law enforcement. For example, we have begun a process to comprehensively study illicit trade in diamonds and other precious stones and metals and the links to terrorist finance. Although this initiative is currently underway, in order to fully implement it, we will need to upgrade analysts' security clearances and obtain equipment appropriate for the handling of national security information.

B.    *USA PATRIOT Act Sections 311 and 314 Implementation*

Some of the new tools afforded us through the USA PATRIOT Act are proving to be invaluable in the war against terrorist financing, particularly Section 314 of the Act. FinCEN also has initiated a program to provide the analytic, regulatory and legal resources needed to support effective implementation of Section 311 by the Treasury Department. While this program captures targets involved in money laundering and other illicit finance, I have directed my staff to give priority to the pro-active targeting of those financial institutions and jurisdictions that are involved, wittingly or unwittingly, in the financing of terror. This prophylactic measure goes to the very heart of FinCEN's mission – to safeguard the financial system of the United States from money launderers and the financiers of terror.

Building on a successful pilot program that we began with the Bureau of Immigration and Customs on a 314(a) money-laundering request, FinCEN is now dedicating several analysts to apply this program to all 314(a) terrorism requests. Specifically, the analysts will run all 314(a) terrorism-related requests against Bank Secrecy Act data concurrent with these requests being sent to financial institutions.

Based on this initial data review, the law enforcement requester will then be able to request a more in-depth analysis if desired. I will provide additional details on this valuable tool later in my testimony.

C.     *International Cooperation and Information Sharing*

FinCEN will increase the exchange of terrorist financing investigative and analytical information with other foreign financial intelligence units around the world. We are implementing a program where FinCEN will automatically request information from relevant financial-intelligence-unit counterparts as part of any terrorism-related analysis project. As part of this program, we are also upgrading our response to incoming requests for information from financial intelligence units by providing appropriate information and analysis from all sources of information.

D.     *Terrorism Regulatory Outreach*

We will continue our work in improving our ability to provide information to the regulated community to better identify potential terrorist financing activity. One area of particular focus will be money services businesses. Money services businesses continue to require more attention and resources, and FinCEN will undertake an initiative to educate segments of the industry most vulnerable to terrorist abuse. These segments include small businesses that typically offer money remittance services, check cashing, money orders, stored value products and other informal value transfer systems. As we learned from the attacks of September 11th, funds used to finance terrorist operations can be and have been moved in small amounts using, for example, wire transfer, traveler's check and automated teller machine services. I have directed FinCEN's Office of Regulatory Programs and the Office of Strategic Analysis to enhance our outreach program to include: training on how terrorists have used and continue to use money services businesses; the reason for and importance of the registration requirement for money services businesses; and the importance of complying with the reporting requirements of the Bank Secrecy Act, especially suspicious activity reporting. We are planning to streamline suspicious activity reporting for small money services businesses with a simplified form.

E.     *Analytic Skill Development*

As a general matter, I have directed that FinCEN make training of personnel the highest human resource management priority. The top priority of this new program will be analytic skill development relating to terrorist financing. We plan to begin by seeking reciprocal opportunities for terrorist finance analytic skill development within law enforcement, the Egmont Group, the intelligence community and the financial industry. This initiative is intended to build a foundation for continuous improvement of our analytic assets through: cross training and diversification; production of joint terrorist-financing threat assessments and other reports; and, understanding intelligence processes and the international context of terrorist financing, as well as the financial industry perspective. In addition, we will need to support training focused on financial forensics,

language skills, and geographically targeted studies that focus on culture, infrastructure and other unique aspects of a particular region.

I believe the full implementation of this strategy will materially assist the Department of the Treasury and the United States in addressing the financing of terror. Approaching this problem in a systemic way with dedicated resources is, in our view, the best way to make this strategy a success.

### III. *FinCEN's Near Term Challenges*

As I mentioned before, FinCEN is facing a number of significant challenges. Because each of these challenges affects FinCEN's effectiveness in contributing to the important issues addressed at this hearing today, I would like to raise these challenges with the committee.

### A. *Security and Dissemination of Bank Secrecy Act Information*

As the administrator of the Bank Secrecy Act, there is no duty I view as critical as the effective collection, management and dissemination of the highly sensitive and confidential information collected under that Act. If FinCEN does nothing else, it must ensure that data are properly collected, are secure and are appropriately and efficiently disseminated. This is FinCEN's core responsibility.

Regarding security of information, recent press reports have reported the unauthorized disclosure of suspicious activity reports. Such disclosures simply cannot be tolerated, as they undermine the entire reporting program. Those who report this information will become increasingly reticent to file what amounts to a confidential tip to law enforcement if they believe their report will end up on the front page of the *Washington Post* or the *Wall Street Journal*. The release of this information by those to whom it was entrusted threatens everything that we all have worked so hard to build. I know I do not have to convince this Subcommittee of the importance of this reporting system. It has yielded, and will continue to yield, information that is critical to the investigation of money laundering and illicit finance. I also wish to assure this Subcommittee and the American people that FinCEN is acutely aware of the privacy interests implicated in this reporting and the need to guard against inappropriate disclosure of such information. Unauthorized disclosure of information will be immediately referred to law enforcement for investigation and dealt with as severely as the law permits. Our international partners who inappropriately disclose information we have entrusted to them will jeopardize our agreements to share information with them.

However, this issue goes deeper than unauthorized disclosures. In my view, FinCEN must change the way it houses and provides access to information collected under the Bank Secrecy Act. Currently, our data are accessed by most of our customers through an outmoded data retrieval system. This system does not have the robust data mining capabilities or analytical tools we employ at FinCEN. This has led many of our customers to ask for wholesale copies of the data, or direct access to the data in a way

7

that will not permit us to perform our responsibilities relating to the administration and management of the data. This is not simply a question of employing better technology. It is a matter of sound governance. FinCEN cannot permit this inability to control the data we are charged with managing to continue. Accordingly, we must create a system that provides robust data mining and analytical tools to our customers in law enforcement and that preserves our ability to: (1) effectively administer and secure the information; (2) network those persons who are querying the data to prevent overlapping investigations and encourage efficient use of law enforcement resources; and, (3) develop and provide adequate feedback to the financial industries we regulate, which will ensure better reporting. That system is called "BSA Direct."

When fully implemented, BSA Direct will make available robust, state-of-the-art, data mining capabilities and other analytic tools directly to law enforcement. We plan to provide all access to these data through BSA Direct, working with our law enforcement customers to ensure their systems extract the maximum value from the Bank Secrecy Act reporting. We will be exploring ways to enable these agencies to integrate the Bank Secrecy Act reporting with their other systems while maintaining, and even improving our ability to audit and network the use of the data and obtain feedback concerning their value. This system will provide us the capability to discharge our responsibilities relating to the administration of these sensitive data: security and access control, networking, and feedback. This system will also significantly enhance our coordination and information sharing abilities, as well as our ability to safeguard the privacy of the information. We have already started work on this system. Based on preliminary studies, we estimate that this system will cost approximately $6 million to build. We are in the process of developing BSA Direct with resources in the FY2005 request and the forfeiture fund.

B.    *Enhancing FinCEN's Analytical Capabilities*

Another challenge FinCEN is facing relates to its analytic capabilities. In my view, FinCEN must move away from its current emphasis on data checks and data retrieval, and move its analytic resources toward more robust and sophisticated analysis. FinCEN had moved to data checks and data retrieval in response to criticisms about turn around times on often simple requests for information. Now, as our systems improve, our customers will be able to retrieve data themselves, which will give FinCEN more time and resources for analysis.

I believe that FinCEN can and must provide value through the application of our focused financial analytic expertise to mining information and providing link analyses that follow the money of criminals and terrorists, or identify systemic or geographic weaknesses to uncover its source or the existence of terrorist networks. For example, in addition to providing geographic threat analysis for law enforcement, FinCEN has been studying systemic trends in money laundering and terrorist financing. We were instrumental in bringing the black market peso exchange system to the forefront of policy decisions, and we are focusing on other trends and patterns that we now see emerging in the global market. I recently made a trip to Dubai to participate in the growing dialogue on the potential use of diamonds and other commodities for illicit purposes, including

money laundering and terrorist financing.  This is part of our focus on and study of what may be another iteration of money laundering and terrorist financing – commodity-based systems.

In my view, while FinCEN has some of the best financial analytic talent in the United States government, the challenges we face require us to further develop that talent to enable the full exploitation and integration of all categories of financial information – well beyond Bank Secrecy Act information.  I have directed FinCEN's managers to concentrate on training, as well as the hiring of new, diverse financial analytic expertise.

C.    *Enhancing FinCEN's Technology*

As I have mentioned, information sharing is critical to our collective efforts to detect and thwart criminal activity and that is why I believe enhancing our technological capabilities is extremely important.  Section 314(a) of the USA PATRIOT Act allows law enforcement to query United States financial institutions about suspects, businesses and accounts in money laundering and counter terrorism investigations.  FinCEN facilitates this interaction between the financial industry and law enforcement by electronically sending law enforcement requests to various banks who in turn check their records and relay the information back to FinCEN to then provide to the requestor.  This saves law enforcement time and resources.  We are currently enhancing the Section 314(a) electronic capabilities to allow for the originating request to be made to FinCEN via a secure website.  This system is an example of how critical technology is to our law enforcement counterparts.

We must continue to work to enhance the development of the BSA e-filing system—a system that permits the electronic filing of reports required under the Bank Secrecy Act.  This system was developed and brought on-line under a very tight legislative deadline.  FinCEN received the E-GOV award for its work on this system. Filing these forms on-line is not only more efficient; it will help eliminate some of the data errors and omissions.

As of April 19, 2004, 1.2 million Bank Secrecy Act forms had been electronically filed through this system.  We now support nearly 1,100 users, which include 15 of the top 25 filers of Bank Secrecy Act information.  These top 25 filers accounted for approximately 50% of all Bank Secrecy Act forms filed in fiscal year 2003.  While this is all good news, the bad news is that the current number of forms filed electronically remains quite small on a percentage basis.  The 1.2 million forms filed represents only approximately 5% of the universe of all Bank Secrecy Act reports filed.  I have directed our PATRIOT Act Communications System team to reach out to the financial industry and determine what needs to be done to convince them to file electronically.  As we learn about what is holding institutions back from filing, I have directed our team to work closely with system developers to build the system stability and tools necessary to improve the overall percentage of filing.

FinCEN presently lacks the capacity to detect Bank Secrecy Act form filing anomalies on a proactive, micro level. BSA Direct, which will integrate Bank Secrecy Act data (including currency transactions reports, currency transaction reports by casinos, and currency transaction reports by casinos – Nevada) into a modern data warehouse environment, will include tools to flag Bank Secrecy Act form filing anomalies for action by FinCEN and/or referral to appropriate authorities. In the meantime, FinCEN is developing a request to the Internal Revenue Service's Detroit Computing Center to provide periodic exception reports on financial institutions whose Bank Secrecy Act form filing-volume varies beyond prescribed parameters during prescribed time frames. While we will not be able to conduct the sophisticated monitoring that will be available with BSA Direct, this interim step should produce an alert in the event of a catastrophic failure to file forms, as was experienced in the Mirage case in which the Mirage Casino in Las Vegas failed to file over 14,000 currency transaction reports in an 18-month period.

D.    *Enhancing FinCEN's Regulatory Programs*

The administration of the regulatory regime under the Bank Secrecy Act is a core responsibility for FinCEN. Given the nature of our regulatory regime – a risk-based regime – our partnership with the diverse businesses in the financial services industry is the key to our success. The industry's cooperation with FinCEN in implementing many of the provisions of the USA PATRIOT Act has strengthened the foundation of our efforts to safeguard the financial system from criminal abuse and terrorist financing. I have met with many of our industry partners in the last several months, both old and new, and I have been struck with how concerned they are that the information they provide is helpful and that it is being reviewed and used. In turn, FinCEN is committed to enhancing the guidance they need as they strive to meet the requirements and objectives of new regulations.

The challenge before FinCEN on this issue is simple: we must ensure the remaining regulatory packages required by the USA PATRIOT Act are completed and implemented. Moreover, as we work with our regulatory partners to implement this regulatory regime, we must provide constant feedback and guidance. We have asked the industry to create anti-money laundering programs that are risk-based – custom tailored to each institution based upon the business in which that institution engages and the customers that institution has. We must find ways to help the industry define that risk. Development of secure web-based systems that will foster the communication discussed above is a step in the right direction. But we must continue to find new and better ways to reach out to the industry. They understand the threat money laundering and illicit finance poses to our financial system and they are willing to help.

Perhaps the most significant challenge lies in ensuring that financial institutions are appropriately examined for compliance. As you know, we have issued and will continue to issue anti-money laundering program regulations that will bring new categories of businesses under this form of Bank Secrecy Act regulation for the first time. This reflects the judgment of this Committee embodied in the USA PATRIOT Act, as well as ours, that to effectively guard against money laundering and the financing of

terrorism, we must ensure that industries with potential vulnerabilities are taking reasonable steps to protect themselves.

But the expansion of the anti-money laundering regime comes with the additional responsibility and challenges of examining thousands of businesses for compliance. We have relied on the Internal Revenue Service to examine those non-bank institutions. The addition of the insurance industry and dealers in precious stones, metals, and jewels, two categories of financial institutions for which we will shortly issue final anti-money laundering program regulations, will themselves stretch the resources of agencies responsible for examination. We must find ways to ensure that these regulatory programs are implemented in a fair and consistent manner that is focused on achieving the goals of the Bank Secrecy Act. Although difficult, this is an issue that must be resolved.

E.     *Improving Coordination Among our Regulatory, Industry & Law Enforcement Partners*

Coordination among the regulators, industry, and law enforcement is the lynchpin of effective Bank Secrecy Act compliance. Since the passage of the USA PATRIOT Act, cooperation has only improved. On our side, we have developed a much closer working and collaborative relationship with the regulators on all aspects of Bank Secrecy Act administration. This has been reflected in the process of developing the new regulations, conducting outreach and training for the industry, and focusing on specific compliance issues. Indeed, provisions of the Act such as the customer identification section required that FinCEN and the regulators issue regulations jointly.

With respect to examinations, last month the Bank Secrecy Act Advisory Group formed a subcommittee devoted to identifying ways to better ensure examination consistency among the various regulatory agencies and industries. Representatives from industry, the regulatory agencies, and law enforcement will participate. This subcommittee is yet another vehicle through which FinCEN and the regulators can address the range of examination issues with the common goal of enhancing compliance on a national basis.

In this context and elsewhere, we will all have to identify creative ways to facilitate continued cooperation. Some ideas that I hope to explore with my colleagues include:

- *Identification of Common Compliance Deficiencies*

Better identification of compliance issues revealed through the examination process on an interagency scale is an essential aspect of enhancing the overall effectiveness of the Bank Secrecy Act regulatory regime. FinCEN must play a key role in facilitating that process by encouraging the regular sharing of common compliance deficiencies uncovered by the regulators. Summaries of deficiencies identified in financial institutions will expose areas to be addressed, interpretive questions to be answered, or even inconsistencies with the regulations themselves. Based on this information, FinCEN and the regulators would be able to focus its outreach and guidance efforts on emerging, possibly systemic problem areas affecting one or more financial

industries. Similarly, regulators would be able to better focus their examination resources on such areas. This data would also enhance the ability of FinCEN and the regulators to target their examinations and develop strategic examination goals across industry lines.

- *Creation of an Examination Program Office*

Within FinCEN's regulatory office, we will create a new program office devoted solely to the Bank Secrecy Act examination function. Currently, the affected substantive program area handles examination related issues on an ad-hoc basis. For example, individuals responsible for the Money Services Business program have taken a primary role in working with the Internal Revenue Service to develop and enhance their examination regime. The new structure will consolidate all examination support functions and better enable FinCEN to provide the necessary support to regulatory agencies conducting Bank Secrecy Act compliance exams. As an initial priority, FinCEN plans to focus on assisting the Internal Revenue Service in its examination function, particularly in light of the new regulations that FinCEN has and will issue to bring thousands of additional businesses under the Bank Secrecy Act anti-money laundering program provision.

- *Joint Examiner Training*

As a complement to the established mechanisms through which the regulators train their examiners, we will explore joint training opportunities that will afford FinCEN the opportunity to supplement the training provided with programs specifically targeted toward our Bank Secrecy Act compliance goals, including the possibility of our participating in multi-agency, anti-money laundering training at the Federal Financial Institution Examination Council.

We have done such training already. For example, FinCEN has conducted joint training of Internal Revenue Service examiners on various Title 31 and USA PATRIOT Act requirements in recent IRS Examiner training classes. FinCEN also will be conducting training at an upcoming meeting of Internal Revenue Service supervisory level personnel who have Bank Secrecy Act examination responsibility. By training at the supervisory level (training–the-trainer), FinCEN can leverage its limited resources to help ensure that IRS Bank Secrecy Act supervisory personnel deliver the appropriate message concerning the content of Bank Secrecy Act examinations to the Internal Revenue Service field examinations staff.

F.   *Enhancing FinCEN's International Programs*

FinCEN's international initiatives and programs are driven by a stark reality: finance knows no borders. Next year will mark the tenth anniversary of the founding of the Egmont Group. The Egmont Group is an international body of "financial intelligence units" – entities, which, like FinCEN, are charged with the collection and analysis of financial information to help prevent money laundering and other illicit activities. The Egmont Group has achieved remarkable growth since its inception in 1995. Membership has risen from six charter members to eighty-four.

12

The Egmont Group serves as an international network, fostering improved communication and interaction among financial intelligence units (FIUs) in such areas as information sharing and training coordination. The goal of the Group is to provide a forum for FIUs around the world to improve support to their respective governments in the fight against financial crimes. This support includes expanding and systematizing the exchange of financial intelligence information, improving expertise and capabilities of personnel employed by such organizations, and fostering better and more secure communication among FIUs through the application of technology.

Egmont's secure web system permits members of the group to communicate with one another via secure e-mail, posting and assessing information regarding trends, analytical tools, and technological developments. FinCEN, on behalf of the Egmont Group, maintains the Egmont Secure Web. Currently, seventy-six of the eighty-four members (90%) are connected to the secure web site. I am very pleased to announce that FinCEN will launch a new and more efficient secure web site for Egmont in June. We expect this new site will generate more robust usage, which will enhance international cooperation between members.

FinCEN has played a significant role in the growth and health of the Egmont Group, and it maintains bilateral information sharing agreements with financial intelligence units around the world. However, in my view, this program has not received the priority it should have in recent times. Merely because of the simple statement I made earlier – that finance knows no borders – we must step up our international engagement with our counterparts around the world. Our plan is to do three principal things:

1.    Lead the Egmont Group to begin focusing on actual member collaboration. Egmont members should be collaborating in a more systemic way together to address issues relating to terrorist financing, money laundering and other illicit finance at both a tactical and strategic level.

2.    Enhance the FinCEN analytical products we provide to our global counterparts when asked for information. Today, we are principally providing the results of a data check. We think we owe our colleagues more. As noted before, we will also be making more requests for information and analysis from our partners – particularly when the issue involves terrorist financing or money laundering.

3.    Foster exchanges of personnel with financial intelligence units around the world. We have already begun discussions with certain counterparts about such an exchange, and we are hopeful we can begin this program soon. The benefits of this type of exchange are obvious. It is the best way we can learn together how to address a truly global problem.

FinCEN will also enhance its support for Treasury policy officials' work in the Financial Action Task Force (FATF) and FATF regional bodies. We will continue our

13

work with the State Department in the drafting and editing of the "International Narcotics Control Strategy Report." Finally, we will continue our important efforts on financial intelligence unit outreach and training. Recently, we conducted, in conjunction with the United Arab Emirates, a South Asia FIU Conference for Afghanistan, Bangladesh, India, Maldives, Pakistan and Sri Lanka.

Additionally, FinCEN has given its support and participation to the "3 + 1" Working Group on terrorist financing in the Tri-border Area. The issues of information sharing and the bolstering of FIUs in the participating states of Argentina, Brazil and Paraguay are critical issues for the U.S. delegation to the "3+1" Working Group led by the Department of State's Office of Counter-Terrorism.

## IV.    *Conclusion*

Madam Chairwoman, I appreciate the Subcommittee's continued support as we endeavor to enhance our contributions to the war on financial crime and terrorist financing. This concludes my remarks today. I will be happy to answer your questions.