UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>      Defendant. | Civil No. 1:17-CV-04179-DLC<br><br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis<br><br>**ECF CASE** |

**ALPINE SECURITIES CORP.'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT</u>**



335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680



One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

SUMMARY JUDGMENT STANDARD .................................................................. 4

ARGUMENT ...................................................................................................... 5

I.    THE SEC'S THEORY OF AUTOMATIC SAR REQUIREMENTS IS CONTRARY
TO THE BSA'S GOVERNING REGULATIONS AND OVERARCHING POLICY ..... 5

    A.    The SEC's Motion Hinges on the Notion of Automatic SAR Requirements........ 5

    B.    The SEC's Position that the Presence of a Potential Red Flag Triggers an
Automatic Duty to Report the "Flag" Lacks Authority and Contravenes the
Policy Considerations of the BSA. ........................................................ 7

        1.    The Governing BSA Regulation Does Not, and Has Never Been,
Interpreted To Impose Automatic SAR Reporting Obligations. ................ 7

        2.    The SAR-BD Forms Do Not Support the SEC's Theory......................... 13

        3.    The Guidance Cited by the SEC Is Not Binding and Does Not
Support Its Position that Supposed "Red Flags" Automatically
Mandate the Filing of a SAR or Must Be Included in a SAR
Narrative..................................................................................... 14

    C.    The SEC's Attempt to Graft Requirements onto the BSA Would Violate
Constitutional Notice and Due Process Requirements. ....................... 23

II.    THERE ARE PERVASIVE ISSUES OF MATERIAL FACT THAT PRECLUDE
SUMMARY JUDGMENT FOR THE SEC. .......................................... 24

    A.    The SEC Has Failed to Allege or Demonstrate that Alpine Willfully or
Negligently Committed Any Violations of the BSA or Its Implementing
Regulations. ............................................................................... 25

    B.    The SEC has Not Established, as a Matter Of Law, that the SARs or
Transactions  at Issue Were Mandatory, Rather than Voluntary, SAR Filings. ... 27

    C.    The SEC's Summary Judgment Motion Should Be Denied or Deferred
Because the  SEC Has Failed to Establish that No SARs Were Filed by
Introducing Brokers on the  Transactions at Issue................................. 30

    D.    The Adequacy of Alpine's SAR Narratives Cannot Be Resolved on Summary
Judgment. .................................................................................. 32

    E.    Fact Issues Exist Regarding Whether the "Liquidation Transactions" Were
Required To Be Reported. .............................................................. 35

    F.    Fact Issues Exist on Whether Certain of Alpine's SAR Filings Were
Untimely. .................................................................................. 37

    G.    Alpine Maintains SAR Support Files and Has Produced All Support Files at
Issue to the SEC. ......................................................................... 39

CONCLUSION.................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)..........................................................................................16

*California Bankers Ass'n v. Shultz*,
    416 U.S. 21 (1974)........................................................................................16, 23

*Casissa v. First Republic Bank*,
    2012 WL 3020193 (N.D. Cal. July 24, 2012).......................................................11

*Chauffeur's Training Sch., Inc. v. Spellings*,
    478 F.3d 117 (2d Cir. 2007)..............................................................................16

*Chechele v. Elstain*,
    2012 WL 607448 (S.D.N.Y. Feb. 24, 2012).........................................................8

*Cheung v. Bristol-Myers Squibb Co.*,
    F. Supp. 3d , 2017 WL 4570792 (S.D.N.Y. Oct. 12, 2017)................................8

*Christensen v. Harris County*,
    529 U.S. 576 (2000)...........................................................................................16

*Donovan v. Skandia Inv. Holding Corp.*,
    2003 WL 217572260 ...........................................................................................16

*Etheredge-Brown v. Am. Media, Inc.*,
    13 F. Supp. 3d 303 (S.D.N.Y. 2014)..........................................................27, 30, 36

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)........................................................................................23, 24

*Flanagan v. Continental Apparel Corp.*,
    1996 WL 471201 (S.D.N.Y. Aug. 20, 1996).......................................................26

*Gates & Fox Co. v. O.S.H.A.*,
    790 F.2d 154 (D.C. Cir. 1986)............................................................................23

*Gen. Elec. Co. v. E.P.A.*,
    53 F.3d 1324 (D.C. Cir. 1995)............................................................................23

*Giannullo v. City of New York*,
    322 F.3d 139 (2d Cir. 2003).......................................................................24, 27, 30, 33

*INA Aviation Corp. v. United States*,
    468 F. Supp. 695 (E.D.N.Y. 1979), *aff'd*, 610 F.2d 806 (2d Cir. 1979)................................26

*McClellan v. Smith*,
    439 F.3d 137 (2d Cir. 2006)...................................................................4, 5, 30, 32, 36

*N.L.R.B. v. Smith Indus., Inc.*,
    403 F.2d 889 (5th Cir. 1968) .................................................................................7, 24

*Perez v. Mortg. Bk. Ass'n*,
    135 S. Ct. 1199 (2015)................................................................................................15

*Ratzlaf v. United States*,
    510 U.S. 135 (1994)....................................................................................................25

*River Light V, L.P. v. Lin & J Int'l, Inc.*,
    2014 WL 6850966 (S.D.N.Y. Dec. 4, 2014) ............................................................4, 5

*S.E.C. v. Biovail Corp.*,
    2010 WL 2465482 (S.D.N.Y., June 16, 2010) ...........................................................33

*In re Sterne, Agee & Leach, Inc.*,
    No. E052005007501 ......................................................................................11, 12, 20

*U.S. Department of Air Force v. F.L.R.A.*,
    952 F.3d 446 (D.C. Cir. 1991) ...................................................................................16

*United States v. Budovsky*,
    2015 WL 5602853 (S.D.N.Y., Sept. 23, 2015)....................................................15, 16

*United States v. Reinis*,
    794 F.2d 506 (9th Cir. 1986) ......................................................................................16

*United States v. Shearson Lehman Bros.*,
    650 F. Supp. 490 (E.D. Pa. 1986) ..............................................................................16

*United States v. Two Hundred Thousand Dollars ($200,000) in U.S. Currency*,
    590 F. Supp. 866 (S.D. Fla. 1984) .............................................................................16

*W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.*,
    1989 WL 206492 (S.D.N.Y., December 5, 1989) ......................................................33

## Statutes & Rules

12 U.S.C. § 3305(a) ...............................................................................................11

31 U.S.C.
    § 5318(g) ................................................................................................8, 23
    § 5318(g)(1) ................................................................................................8
    § 5318(g)(2) ..............................................................................................32
    § 5321(a)(1) ..............................................................................................25
    § 5321(a)(6) ..............................................................................................25

Administrative Procedures Act, 5 U.S.C. § 553 ........................................................16

Bank Secrecy Act, 31 U.S.C. §§ 5311-5332..........................................................*passim*

Securities Exchange Act
    § 17(a) ...........................................................................................2, 25, 26
    § 17(b) .......................................................................................................20

12 CFR
    § 21.11(c) ....................................................................................................8
    § 208.62(c) ..................................................................................................8
    § 353.3(a) ....................................................................................................8

31 C.F.R.
    § 1010.311.................................................................................................11
    § 1010.820.................................................................................................25
    § 1010.820(f) ............................................................................................28
    § 1023.320.................................................................................8, 14, 15, 22, 27
    § 1023.320(a) ...........................................................................................23
    § 1023.320(a)(1) .....................................................................................8, 28
    § 1023.320(a)(2) .....................................................8, 9, 27, 28, 29, 30
    § 1023.320(a)(3) .................................................................................10, 30
    § 1023.320(b)(3) .................................................................................37, 38
    § 1023.320(c)(1)(ii)....................................................................................9
    § 1023.320(d) ...........................................................................................39
    § 1023.320(e)(1)(i)...................................................................................32
    § 1023.320(e)(1)(ii)(A)(1) ......................................................................31
    § 1023.320(g) ...........................................................................................28

67 Fed. Reg. 44048 (July 1, 2002)............................................................8, 9, 19, 30

73 Fed. Reg. 74010 (Dec. 5, 2008) ............................................................10, 11

Fed. R. Civ. P.
    56(c) ............................................................................................................4
    56(d) ..........................................................................................................32

FINRA Rules

2090.............................................................................................................................................31

4311.............................................................................................................................................31

Defendant Alpine Securities Corporation ("Alpine"), hereby files this Memorandum in Opposition to Plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Partial Summary Judgment ("Motion").

## **INTRODUCTION**

The SEC's argument that it is entitled to summary judgment in this case rests on not just one but a pile of unprecedented and insupportable assertions.  At bedrock is the SEC's claim that there exist automatic requirements under the Bank Secrecy Act ("BSA") that a firm must both: (a) discuss a purported "red flag" in the narrative portion of the Suspicious Activity Report ("SAR"); and (b) file a SAR on any "liquidation transaction" where a SAR was filed on a prior deposit of stock into that account.  Because neither the language of the relevant statute, the regulation, nor any decisional authority articulate that mechanical approach, the SEC argues that its theory is supported by various forms of industry "guidance." It cobbles together snippets from issuances that refer to "red flags;" it recasts those "flags" as circumstances that are always and by definition "suspicious;" and it thereby concludes that a BSA violation occurs even when a SAR *was* filed if the firm fails to include a reference to a particular "red flag" in the narrative portion. To that erroneous construction, the SEC adds the contention that it is entitled to summary judgment without any consideration of the issues of intent that are embedded in the BSA, the facts and circumstances of the underlying transaction, the significance of the purported red flag, or the analysis that was employed at Alpine in relation to a SAR.

At every level, the SEC's aggressive stance is irreconcilable with the actual governing SAR regulations and represents a dramatic departure from more than a decade of settled interpretation and implementation of the BSA.  The governing SAR regulation, and the directives from the Financial Crimes Enforcement Network ("FinCEN"), establish that the decision-making process associated with the filing of a SAR is a subjective determination – a

1

"judgment call" – necessarily dependent on the filer's subjective evaluation of the customer, the circumstances of the transaction, and perhaps most importantly whether there is anything unusual about the transaction that bespeaks criminal conduct – all  issues that would rarely be susceptible of summary judgment. The SEC ignores all of those factors, and any consideration of Alpine's actual program and process, in a deeply misguided and inappropriate effort to rewrite the SAR regulations and the process by which firms have been directed to make their SAR determinations.

The only support the SEC musters for its effort to effect this sea change in SAR analysis consists of portions of "guidance." The SEC fails to acknowledge that "guidance" does not constitute a basis for a violation and is entitled to consideration only if it is promulgated by the agency that possesses rulemaking and interpretive authority, FinCEN.  Further, the issuances cited by the SEC do not even purport to set forth the kind of compulsory SAR requirements that the SEC propounds and are, in fact, contrary to the SEC's theory.  While they may discuss "suggested" or desirable practices, they do not transform a deviation from a "best practice" into a statutory violation and provide no support for the SEC's effort to recast the SAR regulations, and the process by which firms have been directed to make their SAR determinations.

The errors of the SEC's approach become even more pronounced when the SEC combines its flawed premise of automatic SAR requirements with the insistence that it need not establish scienter.  The SEC maintains that the language of Rule 17a-8 incorporates the provisions of the BSA such that the SEC can pursue claims of violations of the BSA, but it assiduously ignores those provisions of the BSA that define the element of intent necessary for imposition of a penalty.   That parsing of the pertinent provisions of the BSA is contrary to both the structure and purpose of the BSA and the Due Process Clause of the Constitution.

Finally, the SEC is not entitled to summary judgment because, even under its construct that "red flags" must  automatically be included in a SAR narrative, there remain numerous critical factual issues in dispute relating to Alpine's compliance program and its decisions to file, or not to file, the SARs at issue.  The SEC cannot invoke generic categories to shortcut the factual analysis or substitute its after-the-fact views for the subjectivity inherent in the SAR decision-making process – including the weeding out of potential red flags – that guides the preparation and filing of the SAR.

The SEC's position not only is demonstrably wrong but also, as a policy matter, is utterly misguided, potentially damaging to the SAR program that it purports to enforce and inevitably destructive of a significant sector of the securities markets, *i.e.,* microcap securities.  The SEC's contention that a BSA violation flows as a matter of law from the omission of a flag is based on the references to "red flags" in industry publications.  In this case the SEC selected only a few of those "red flags" to claim violations against Alpine, but its argument that the "red flags" *must* be included in a SAR narrative is not based on the view that these specific "flags" are particularly "suspicious" or otherwise distinguishable from the innumerable other "flags" in the cited authorities.  Its argument would, therefore, apply equally to the literally dozens of other "flags" that are listed in SEC, NASD or FINRA guidance.  Combined with its claim that scienter is not required, and that it can obtain summary judgment based on a simple showing of a missing "red flag," the SEC's theory here would have far reaching and undesirable consequences, triggering the filing of a flood of mechanical and useless SARs and leaving firms endlessly exposed to expansive and evolving liability and debilitating penalties.

The SEC's new and troubling iteration of a BSA violation – the "inadequate" SAR – would also stun industry participants. Financial institutions have long understood that BSA

reporting requirements must be complied with, and that the *failure to report* a transaction when required would constitute a BSA violation.  At the same time, broker-dealers like Alpine have been encouraged by regulators to file SARs to report, for example, a deposit of low priced securities, even where the broker-dealer has not concluded that the transaction was "suspicious" within the meaning of the BSA.  It has *never* been understood, however, that where a firm filed a SAR that reported the transaction, the SEC would claim the SAR was not good enough and constituted a BSA violation, as a matter of law, because a "red flag" did not appear in a SAR filed for other reasons.  Again, this Court's endorsement of that argument would cause firms to either decline to file a SAR to avoid claims of "inadequacy," delay SAR filings until they can say with certainty that they uncovered and described every possible red flag listed in any guidance, or "derisk" entirely by ceasing to conduct the microcap business.

The SEC's approach in this case of "red flags," its disregard for the elements and the enforcement structure contained within the BSA, and its contention that it can obtain summary judgment absent consideration of the facts inherent in Alpine's SAR decision-making process are all contrary to both law and policy and its Motion should be denied in its entirety.

## SUMMARY JUDGMENT STANDARD

"'Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party . . . is entitled to a judgment as a matter of law.'" *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting Fed.R.Civ.P. 56(c)).  "'Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production,' and 'the court must determine whether the legal theory of the motion is sound.'" *River Light V, L.P. v. Lin & J Int'l, Inc.*, 2014 WL 6850966, at *8 (S.D.N.Y. Dec. 4, 2014) (citation omitted).

"In ruling on a motion for summary judgment, a court must resolve all ambiguities and

draw all factual inferences in favor of the nonmoving party." *McClellan,* 439 F.3d at 144. "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *Id.* (citation omitted).

## ARGUMENT

### I. THE SEC'S THEORY OF AUTOMATIC SAR REQUIREMENTS IS CONTRARY TO THE BSA'S GOVERNING REGULATIONS AND OVERARCHING POLICY

#### A. The SEC's Motion Hinges on the Notion of Automatic SAR Requirements.

The SEC's position is grounded on an assumption that is unsupported and untenable: that there are bright-line rules for what must be included in a SAR narrative and for what triggers a duty to file a SAR. The SEC uses that assumption as the cornerstone for two related and overlapping claims. First, the SEC claims a broker-dealer is required to discuss in a SAR narrative the purported "red flags" that the SEC has culled from various FinCEN and regulatory publications, and that thousands of Alpine's SARs are deficient as matter of law because they failed to include those purported "red flags" in the SAR narrative.[1] Second, the SEC claims that Alpine was automatically required to file a SAR on every liquidation of stock – another group of more than 3000 transactions – because it filed a SAR in relation to the deposit. (*See* SEC Complaint, at ¶¶ 28-38.) In both cases, the SEC maintains that the duty to report was automatic.

In this Motion, the SEC not only reiterates those claims but goes the much farther step of insisting it is entitled to summary judgment based on application of those automatic SAR requirements to a handful of "Sample SARs" or transactions. (*See* SEC Motion for Partial Summary Judgment "SEC Br." at 9-18.) Thus, the SEC takes the position that it can, with the

---

[1] For example, in its Complaint the SEC alleges, *inter alia,* that (a) "Alpine frequently omitted from the SAR narratives additional material red flags or other information it was aware of *and that were required to be included in the narratives"* (SEC's Complaint, Dkt. No. 1, at ¶33 (emphasis added)); (b) "Alpine failed to describe the red flags of which it was aware and *which were required to be reported* . . . ." (*id.* at ¶ 28 (emphasis added)); and (c) "Alpine was required to report" red flag information in its SAR filings. (*id.,* at ¶ 30).

advantage of hindsight,  challenge Alpine's SAR filing decisions and obtain judgment, as a matter of law, without providing any evidence of Alpine's SAR decision-making process on any of the transactions at issue.

That this is the SEC's position is readily apparent from its Motion.  According to the SEC, Alpine's SAR narratives are inadequate and violative, as a matter of law, because Alpine "omitted one or more pieces of key information of which Alpine was aware," without reference to any of the facts concerning the transaction or Alpine's decisions regarding the SARs. (SEC's SEC Br., at 6.) The SEC describes the purported duties that arise from the existence of one of the red flags in absolute terms, arguing that "if Alpine knows or has reason to know" of those flags, it "must include that information in the SAR narrative" as a matter of law.  (*See* SEC's Summary Judgment Memo., at 10, 11-16.)  According to the SEC, the <u>fourteen</u> allegedly incomplete "Sample SARs A-P" constitute <u>twenty-one</u> separate violations of the BSA and its implementing regulations.  (*Id.* at 16.).  The SEC thus focuses not on the allegedly incomplete SAR narrative itself as the basis for the violation, but on each alleged omission of a purported red flag.[2] According to the SEC, then, a "red flag" translates to an automatic SAR reporting requirement.

The SEC is more blunt in its assertion that filing a SAR on a deposit creates an automatic duty to file a SAR in connection with every sale.  According to the SEC, where a SAR is filed to report a deposit, a SAR must be filed on every subsequent liquidation and withdrawal as a matter of law regardless of whether Alpine actually considered each liquidation to require reporting under one of the four categories set forth in the regulation. (*Id.* at 17-18.).  A violation therefore occurred, according to the SEC, every time the customer sold stock but a SAR was not filed.

---

[2] Notably, the SEC provides no authority for the astonishing position that each omission from a SAR constitutes a separate violation.  Even if Alpine were obligated to include all possible "red flags" that might exist in a SAR narrative, which it is not, and even if the failure to do so were a violation, there is no basis to conclude that each alleged omission within a single SAR narrative is a separate violation.  A SAR could only be "incomplete" once.

Both positions are unequivocally wrong.

**B.      The SEC's Position that the Presence of a Potential Red Flag Triggers an Automatic Duty to Report the "Flag" Lacks Authority and Contravenes the Policy Considerations of the BSA.**

It is well settled that decisions regarding reporting of suspicious activity in a SAR are not mechanical or automatic.  As detailed below, FinCEN has consistently maintained that a violation of the BSA should not be predicated on individual SAR decisions, but instead depends on the reasonableness of the firm's program and the firm's decision-making based on the facts and circumstances of a transaction. Any issue regarding a particular SAR  requires a review and consideration of the firm's subjective assessments of the transaction in the context of its business, and the business generally conducted by the customer.  And the SEC's claim that a SAR that was filed is "inadequate" – a novel and nebulous contention – would have to take into account the firm's determination of whether the transaction involved anything "unusual" or indicative of illegality.  These are issues that would rarely be susceptible of summary judgment, particularly on this record. "If the Court must rely 'upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law.'" *N.L.R.B. v. Smith Indus., Inc.*, 403 F.2d 889, 893 (5th Cir. 1968). It is the SEC's burden, and it has not met it.

**1.      The Governing BSA Regulation Does Not, and Has Never Been, Interpreted To Impose Automatic SAR Reporting Obligations.**

The starting place for the analysis of SAR requirements is, as always, the plain language of the pertinent statute and implementing regulation.[3]  "The Secretary was granted authority in

---

[3]   The plain language of statutes and a properly promulgated regulation are controlling as to the requirements therein.  *See, e.g., Cheung v. Bristol-Myers Squibb Co.,* 2017 WL 4570792, *3-4 (S.D.N.Y. Oct. 12, 2017) (stating that "the plain meaning of the statute is controlling absent ambiguity," and observing that "[t]he merits of following plain statutory language are many, including predictability, fairness, and efficiency."); *Chechele v. Elstain*, 2012

1992, with the enactment of 31 U.S.C. § 5318(g), to require financial institutions to report

suspicious transactions."  67 Fed. Reg. 44048, 44048 (July 1, 2002).  Section 5318(g) states:

> The **Secretary may require** any financial institution, and any director, officer, employee, or agent of any financial institution, to report a suspicious transaction relevant to a possible violation of law or regulation.

31 U.S.C. § 5318(g)(1) (emphasis added).

With respect to broker-dealers, the implementing regulations promulgated by the

Secretary, effective as of December 30, 2002, are set forth in 31 C.F.R. § 1023.320.  67 Fed.

Reg. at 44057.  Pursuant to 31 C.F.R. § 1023.320(a)(1), "Every broker-dealer in securities within

the United States . . . shall file with FinCEN, *to the extent and in the manner required by this*

*section,*[4] a report of any suspicious transaction relevant to a possible violation of law or

regulation." *Id.* (emphasis added)).  The extent to which a SAR filing is required is specified in §

1023.320(a)(2), which states:

> **(a)(2)** A transaction **requires reporting** under the terms of this section if it is conducted or attempted by, at, or through a broker-dealer, it involves or aggregates funds or other assets of at least $5,000, and the broker-dealer **knows, suspects, or has reason to suspect** that the transaction (or a pattern of transactions of which the transaction is a part):
>
> > **(i)** Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation;

---

WL 607448, at *2 (S.D.N.Y. Feb. 24, 2012) ("The same principle applies to the interpretation of a regulation: 'The plain language in a regulation governs unless that meaning would lead to absurd results.'" (citation omitted)).

[4] This broker-dealer regulation direct that the SAR filing must comply with  "this section" unlike corresponding language in provisions applicable to the banking industry which require that a SAR be filed "in accordance with the form's instructions."  12 CFR 208.62(c) ("A member bank shall file a SAR with the appropriate Federal law enforcement agencies and the Department of the Treasury in accordance with the form's instructions by sending a completed SAR to FinCEN in the following circumstances."); 12 CFR 21.11(c)) ("A national bank shall file a SAR with the appropriate Federal law enforcement agencies and the Department of the Treasury on the form prescribed by the OCC and in accordance with the form's instructions."); 12 CFR 353.3(a) ("A bank shall file a suspicious activity report with the appropriate federal law enforcement agencies and the Department of the Treasury, in accordance with the form's instructions ….").

(ii) Is designed, whether through structuring or other means, to evade any requirements of this chapter or of any other regulations promulgated under the Bank Secrecy Act;

(iii) Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

(iv) Involves use of the broker-dealer to facilitate criminal activity.

*Id.* § 1023.320(a)(2) (emphasis added).  Notwithstanding the use of the word "suspicious" in discussions regarding SARs, the provision makes clear that a filing is not triggered by some skepticism or concern about a customer or transaction.  Only if the broker-dealer knows or suspects that the transaction involves criminal activity or lacks any business or lawful purpose is SAR reporting required and only then would a violation occur. *Id.*

In connection with the issuance of the broker-dealer provision, FinCEN made clear that it does not expect firms to detect and file SARs on every "suspicious" transaction.  The adopting release for the regulation issued by FinCEN explains that "the rule is not intended to require broker-dealers *mechanically* to review every transaction that exceeds the reporting threshold." 67 Fed. Reg. at 44053 (emphasis added).  Rather, it is intended "to encourage" broker-dealers to use a "risk-based approach" in designing a review program.  67 Fed. Reg. at 44053.

The regulation also defines various exceptions to the SAR filing requirement that must be considered in determining whether a SAR is required to be filed.  Pursuant to those exceptions, a broker-dealer is not required to file a SAR if the transaction has otherwise been reported.  31 C.F.R. § 1023.320(c)(1)(ii). A clearing firm would not be required to file a SAR if, for example, the introducing broker filed a SAR on the transaction.  *See id.* § 1023.320(a)(3).

FinCEN has consistently stated, for well over a decade, that the determination of whether to file a SAR must be based on a firms' subjective assessment of whether the transaction

involves illegality.[5]  As explained by the then Director of FinCEN:

> The cornerstone of the Bank Secrecy Act, suspicious activity reporting, requires financial institutions to make judgment calls.  If we fail in properly implementing this regime, if we get it wrong, then the system will fail.  For example, if as regulators we are either too aggressive or too passive in supervising and examining the financial industries that we regulate, there could be two equally unacceptable outcomes.  Compliance should not be about second guessing individual judgment calls on whether a particular transaction is suspicious. If we are overzealous in our examination, financial institutions, as small "c" conservative institutions, will merely defensively file SARs file on anything and everything to protect themselves from regulatory risk.

Statement of William J. Fox, Director Financial Crimes Enforcement United States Department

of Treasury Before the House of Representatives, at p. 5, June 16, 2004.[6]  (Alpine Add'l SOF

13).  FinCEN made similar statements in the Federal Register, observing that a SAR "requires a

financial institution to make a subjective determination of what is suspicious prior to its filing

. . . ." 73 Fed. Reg. 74010, 74011 (Dec. 5, 2008).[7]

Similarly, FinCEN described in guidance for the mutual fund industry – a close cousin to

broker-dealers – the process that should be applied "to determine what is 'suspicious activity'":

"The means of commerce and the techniques of money launderers are continually evolving, and

there is no way to provide an exhaustive list of potentially suspicious transactions.  A mutual

fund must consider ***all of the facts and circumstances related to the transaction***[8] and the

---

[5] Each of the subsections includes a determination by the firm as to whether the transaction involves criminal activity, focusing on whether funds were derived from illegal activity, the transaction is an effort to evade reporting; the transaction appears to have no "lawful purpose," or the transaction "facilitates criminal activity."

[6] Fox also emphasized that it is FinCEN that is charged with responsibility for administration of the Bank Secrecy Act which "means exercising oversight, coordination *and ensuring consistency of application*" a goal that would be defeated by colliding interpretations of the requisites of the BSA and the elements of a violation.  (Alpine Add'l SOF 14.)

[7]  *See also* Statement of William F. Baity, Deputy Director, FinCEN, May 10, 2007, before the House Financial Services Subcommittee on Oversight and Investigations (Alpine Add'l SOF 16) (stating, "[f]inancial institutions file Suspicious Activity Reports (SARs) after a subjective review of numerous variables . . . ."). *See* Alpine Add'l SOF 16 for similar additional statements.

[8]  Alpine's WSPs incorporate this established standard in relation to the filing of a SAR: "Determining whether an activity or series of activities is suspicious is a facts and circumstance analysis and will be made by the AML officer or designee." (*See* Alpine Add'l SOF 31; *see also* Alpine Add'l SOF 30 -- "It is always the AML Officer's (or designee's) discretion, when taking into consideration all factors, when a SAR should be filed.").

customer in question." (Alpine Add'l SOF 15, emphasis added.)

It is because of the analysis and subjectivity inherent in deciding whether activity is suspicious that regulators have directed examiners to focus on whether a broker-dealer's decision-making process was "reasonable," rather than on individual SAR decisions.[9] As FinCEN explained:

> Examiners will accept a firm's decision not to file a SAR-SF as long as the firm demonstrates that it had a reasonable, risk-based controls and a reasonable decision-making process, and the examiners must find that the firm's decision not to file a particular SAR was reasonable under the facts and circumstances.

(*See* SEC's Ex. 3, at p. 23.) Consistent with FinCEN's directives, the Federal Financial Institutions Examination Counsel ("FFIEC") in its online examination manual stated that the "'decision to file a SAR is an inherently subjective judgment," and thus "[e]xaminers should focus on whether the [financial institution] has an effective SAR decision-making process, not [on] individual SAR decisions."[10] (*See* Alpine Add'l SOF 11.)

The SEC's position of automatic filing requirements, and corresponding violations, has been rejected even by FINRA. In *In re Sterne, Agee & Leach, Inc.,* No. E052005007501, enforcement claimed that the "weaknesses" in the respondent's AML procedures resulted in late SARs. *Id.* at 31. In rejecting this contention, the hearing panel cited the FFIEC manual as the "applicable legal standard," and stressed that "'[t]he decision to file a SAR is an inherently subject judgment,'" emphasizing "the importance of focusing on the process, rather than on

---

[9]  The SAR regulation in distinct in this regard from the other prong of the BSA, the currency transaction reporting requirements, which impose clear, objective and automatic directives predicated on the amount of a transaction. *See* 31 C.F.R. § 1010.311 (stating that "[e]ach financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through or to such financial institution which involves a transaction in currency of more than $10,000 . . . ."); *accord* 73 Fed. Reg. at 74011 (distinguishing between the subjectivity of a SAR decision, and the objectivity of a CTR decision).

[10]  "The FFIEC is an interagency body established by Congress and charged with 'establish[ing] uniform principles and standards and report forms for the examination of financial institutions which shall be applied by the Federal financial institutions regulatory agencies.'" *Cassissa v. First Republic Bank*, 2012 WL 3020193, at *9 (N.D. Cal. July 24, 2012) (quoting 12 U.S.C. § 3305(a)).

whether a particular SAR was filed."  *Id.* at 32-33 (citation omitted).

The hearing panel rejected arguments similar to those that the SEC makes here regarding purported omissions of "red flag" items from SARs:

> Respondent's procedures in monitoring the Introduced Accounts were sound and support the Hearing Panel's finding that the overall AML program was sound.  Respondent was aware of the Introduced Accounts, regularly monitored them, and regularly communicated with the Introducing Firm about the accounts.  While finding some red flags, it made a reasonable determination that it was not appropriate to file a SAR until the cumulative activity, plus a changed view of the regulatory climate, caused sufficient concerns to prompt the filing of a SAR.

> Respondent was aware of almost every issue raised by Enforcement with respect to the Introduced Accounts.  It was aware of the U.S. National's disciplinary history, but it did not regard it as a money-laundering risk because it involved a matter that had been resolved several years earlier, and because of the nature of the matter.

> Respondent knew that several of the accounts were domiciled in an offshore jurisdiction; that large blocks of stock were being deposited and liquidated; and that the proceeds of the sales were being wired to offshore accounts.  The AML compliance officer looked into the activity, and concluded that there was a reasonable business explanation for all of it . . . .

> Enforcement contends that Respondent should have gone farther in investigating the accounts.  For example, Respondent was not aware that XYZ was a defendant in a case brought by the SEC.  While Respondent might have learned more with further investigation, its investigation was adequate under the facts and circumstances of this case.  Sterne Agee obtained a substantial amount of information about these accounts, monitored them, discussed them, and came to a reasonable conclusion that there was a reasonable business explanation for the activity in the accounts.  Enforcement has provided no authority for any requirement to go beyond the sources of information that Sterne Agee used, and conduct Internet searches under these circumstances.

*Id.* at 32-33 (footnotes omitted). [11]

Unquestionably, therefore, the filing of a SAR requires analysis by the firm of whether a transaction is within the regulation's four categories – a fact-dependent, subjective determination and, ultimately, a judgment call.  The regulation does not support, nor has FinCEN advocated for, a one-size-fits-all approach to the filing of a SAR.  If FinCEN wanted to impose automatic

---

[11]  Alpine does not agree that FINRA has the authority to bring enforcement actions for alleged violations of the BSA. However, it is notable that even FINRA has taken positions contrary to the SEC's position here.

SAR filing requirements, it certainly could have done so.  Instead, FinCEN has discouraged the practice of "defensive" SARs that became prevalent amidst concerns that the regulators would criticize a failure to file if certain circumstances were present.  Alpine Add'l SOF at 13.  Thus, the question of whether a violation would exist focuses on the firm's process, and any issue relating to a particular SAR would look not to a mechanistic listing of "flags" but to the reasonableness of a firm's judgment call in light of the facts and circumstances.

### 2.    The SAR-BD Forms Do Not Support the SEC's Theory.

Unsupported by the regulation, the SEC turns to the instructions to SAR Forms 101 and 111 (collectively, "SAR-BD Forms") arguing that they impose specific requirements for what must be in a SAR narrative.  They do not.  The instructions for the "Suspicious Activity Information—Narrative" section of the SAR-BD Forms direct filers to provide a "clear, complete and concise description of the activity, including what was unusual or irregular *that caused suspicion*." (*See* SAR Form 111, at p. 110, SEC's Ex. 9 (emphasis added); SAR Form 101, at Part VI, SEC Ex. 8 (similar instructions).  The instructions quite clearly do not require the discussion of any "red flags" that did *not* cause suspicion.

The Forms also include "checklists" couched in permissive, rather than mandatory language:  "[f]ilers *should* use the checklist . . . as a *guide* for preparing the narratives." (*See* SEC Ex. 9 at pp. 110-11 (emphasis added); *see also* SEC Ex. 8, at Part VI.)  By using such language, FinCEN chose not to require inclusion of all checklist categories. In fact, because neither the Form "checklist", nor the instructions that list categories of "suspicious activities" relating to securities, correspond to the SEC's list of required "red flags," the instructions appear to contradict the SEC's position.[12]

---

[12] (*Compare* SEC Ex. 8, Part IV *and* SEC Ex. 9, pp. 98, 111-12 *with* SEC's Summary Judgment Memo., at pp. 10-16 – listing the mandatory red flags.)

The SAR-BD Forms, then, require only that the broker-dealer provide in the narrative section an account of what *the broker-dealer determined* was suspicious about the transaction. By design, there is no set requirement concerning what must be in a SAR narrative in either § 1023.320 or the SAR-BD Forms because, as indicated, the analysis of whether conduct involves criminal activity is subjective and the circumstances giving rise to suspicion will vary based on any number of circumstances, including, *inter alia,* the business of a particular broker-dealer, the investigation done by the broker-dealer to resolve potential red flags, and even the individual(s) at the broker-dealer responsible for conducting the analysis and preparing the SAR.

Similarly, nothing in the SAR-BD Forms state that the filing of a SAR on a deposit of stock requires an automatic follow-on SAR on a liquidation transaction, where the liquidation transaction did not cause suspicion. To the contrary, such a reflexive SAR filing would actually be inconsistent with the very narrative requirements that the SEC propounds. Thus, if Alpine had filed on each liquidation transaction solely because it filed a SAR on the deposit, presumably the SEC would then claim the narratives on such SARs were inadequate. It cannot be both ways.

      **3.    The Guidance Cited by the SEC Is Not Binding and Does Not Support Its Position that Supposed "Red Flags" Automatically Mandate the Filing of a SAR or Must Be Included in a SAR Narrative.**

Because there is no binding authority to support its argument, the SEC relies most heavily on extractions from an assortment of various other forms of "guidance," mixing references to FinCEN statements, including plainly nonbinding publications called "Trends & Tips," with NASD publications that predate the SAR requirements and that relate to other securities issues.[13] To try to convince the Court to accept "guidance" as authority for its claim of a violation of the BSA, the SEC takes a startling position: that the regulation, § 1023.320, is

---

[13] The SEC also attempts to argue that Alpine's own WSPs, by referencing industry statements, confirm that Alpine must describe each and every possible red flag listed in the WSPs in a SAR narrative. The WSPs do not contain that requirement; they reflect that red flags should be considered in the analysis and state that a SAR will be filed when a transaction meets the requirements of 31 C.F.R. § 1023.320. (Alpine Add'l SOF 32-33.)

"ambiguous." (*See* SEC's SEC Br., at p. 7.)  But the SEC cites no authority, and provides no reasoned analysis, to support that conclusory claim.  Nor is the regulation ambiguous: it articulates a clear directive that firms must *report* a transaction that it identifies as falling within one of four specific categories.  Equally clear, the regulation does not state that a firm that has filed a SAR has nonetheless violated the regulation if the SAR narrative simply presents the circumstances that prompted the filing of the SAR.

Further, the SEC treats the guidance as if it imposes substantive obligations upon which a violation could be predicated.  It does not.  Even if there were ambiguities in the regulation, this does not imbue the guidance with controlling weight such that it can be used as the basis for a violation.  As the U.S. Supreme Court has observed:

> [T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. ***But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'***

*Perez v. Mortg. Bk. Ass'n*, 135 S. Ct. 1199, 1203-04 (2015) (citations omitted) (emphasis added).

This Court relied on these principles with respect to FinCEN guidance in particular in *United States v. Budovsky*, 2015 WL 5602853 (S.D.N.Y., Sept. 23, 2015), stating "FinCEN Guidance did not create new law.  It is, as it announces, merely interpretive guidance," which "do not have the force of law."  *Id.* at 26.[14]  *See California Bankers Ass'n v. Shultz,* 416 U.S. 21, 26 (1974) ("the Act's civil and criminal penalties attach only ***upon regulations promulgated by the Secretary***; if the Secretary were to do nothing, the Act itself would impose no penalties on

---

[14]  The same principles apply to other agency guidance. *See, e.g., Donovan v. Skandia Inv. Holding Corp.,* 2003 WL 217572260, at *1 (S.D.N.Y. July 31, 2003 ("NASD notices, however, are not law and noncompliance therewith cannot itself constitute a violation of the federal securities laws.")

anyone." (emphasis added)).[15]  Here, too, the Court should afford the guidance no more weight

than it deserves: a measure of "respect" for guidance issued by FinCEN, *Christensen v. Harris

County*, 529 U.S. 576, 587 (2000), but no deference to litigation positions advanced by an

agency that is *not* authorized to interpret or enforce the provision. [16]

Because the FinCEN guidance is unhelpful to the SEC's approach, the SEC relies more

heavily on guidance issued by the NASD and FINRA.  Notably, unlike with respect to FinCEN,

the SEC does not even claim that the NASD's or FINRA's guidance is "persuasive authority, and

it is not. The publications of the NASD and FINRA are not entitled even to the level of deference

accorded to FinCEN guidance for the simple reason that they were not issued by the agency

charged with administering the BSA. *See* n.16, *supra.* The hodgepodge of guidance relied upon

by the SEC does not, in any event, support the SEC's argument that it can obtain summary

judgment on a claim that its categories of "red flags" must automatically be contained in the

SAR narrative or that a SAR filed on deposit always compels a SAR on a later liquidation.

The SEC begins by citing guidance that provides advice on the composition of a SAR

narrative, including the "who, what, when, where, why" concept.  (SEC's SEC Br. at 8.)

According to the SEC, because FinCEN described a particular format and style of narrative as

---

[15]   *See also See United States v. Reinis,* 794 F.2d 506, 508 (9th Cir. 1986) (holding that a Currency Transaction
Reporting Form 4789 was "not effective as a regulation" under the BSA and could not serve as the basis for a
violation because it was "never promulgated pursuant to the rule making requirements of the Administrative
Procedures Act, 5 U.S.C. § 553"); *United States v. Shearson Lehman Bros.,*  650 F. Supp. 490, 495-97 (E.D. Pa.
1986) (same); *United States v. Two Hundred Thousand Dollars ($200,000) in U.S. Currency*, 590 F. Supp. 866, 869
(S.D. Fla. 1984) (relying on *California Bankers* to hold that a violation could not be predicated on an unpromulgated
BSA form – Customs Form 4790).

[16]   An agency may not authoritatively construe other agencies regulations.  *See, e.g., U.S. Department of Air Force
v. F.L.R.A.*, 952 F.3d 446, 450 (D.C. Cir. 1991) (stating "we do not defer to the [agency's] interpretation of
regulations promulgated by other agencies."); *cf. Chauffeur's Training Sch., Inc. v. Spellings*, 478 F.3d 117, 125 (2d
Cir. 2007) (stating, courts "defer" to "interpretations of agencies when (1) the agency is charged with implementing
the statutory scheme, and (2) its interpretation is reasonable."). This applies with even greater force where the
position is taken by attorneys for an outside agency during an enforcement proceeding, rather in a position
articulated by the administrative official tasked with implementing the act.  *See, e.g., Bowen v. Georgetown Univ.
Hosp.*, 488 U.S. 204, 213 (1988) (observing, "[d]eference to what appears to be nothing more than an agency's
convenient litigating position would be entirely inappropriate.").

being desirable, a firm that files a SAR, and includes all of the relevant data in the relevant fields, has nonetheless violated the BSA if it fails to provide what the SEC considers an adequate iteration of "why" the transaction is suspicious.

As a matter of law and logic, the SEC is wrong.  The guidance itself makes that clear, stating that it "is provided *solely to assist* respective financial institutions in strengthening existing due diligence initiatives and anti-money laundering programs." (*See* SEC's Ex. 1 at 2 (emphasis added).) Guidance language that "suggests" tips for how to compose a SAR does not have the force of law nor can it be interpreted to state a violation of the BSA.  (*Id.* at 7.) Where, for example, a broker-dealer does not find a particular transaction to be suspicious, but is filing a SAR because it has been advised that FINRA expects a filing on that kind of transaction, *e.g.,* a large deposit of low priced securities, the broker-dealer may not be able to articulate why it is suspicious beyond citing the red flag itself.  That does not constitute a violation of the governing regulation because the basis for the filing has been described.

Similarly, the fact that a BSA violation cannot be based on the language of the other cited source is evident even from its title: "Suggestions for Addressing Common Errors Noted in Suspicious Activity Reporting." (*See* SEC's Ex. 10.)  Whether a filer adhered to all of those "suggestions" does not determine whether the BSA was violated.  To the contrary, that memo confirms that the "critical" aspect of the narrative is that it describe "why the activity or transaction is unusual for the customer." (*Id.* at 2.)

The SEC then puts forth the sweeping proposition that a broker-dealer has the "duty to detect red flags" and "describe those red flags in the SAR narrative."  (*See* SEC's SEC Br. at 8.) A review of the cited sources demonstrates, again, that the SEC is taking its contents, or even the entire document, out of context.  *None* of the cited sources state that a broker dealer is required to

describe all possible "red flags" that might exist in a SAR narrative. It again points to  Exhibit

10, the "Suggestions" memo, claiming that it requires a "summary of the 'red flags,' but that

language literally does not appear in the cited document.  Rather, in other guidance, FinCEN

"suggests" financial institutions could provide a "summary of the 'red flags' . . . *that initiated*

*the SAR*."  (*See* SEC's Ex. 1 at 7 (emphasis added).) The SEC thus omits the very language that

disproves its point.

The SEC cites to NASD Notice 02-21, which is of questionable weight and which refutes

the SEC's argument. NASD Notice 02-21 focuses on the establishment and elements of an AML

compliance program.  (*See* SEC's Ex. 11 at 1-8.)  After extensively discussing AML programs,

the Notice includes a laundry list of "money laundering red flags" that is two pages long, and

explains that if those flags exist, the firm should "perform additional due diligence before

proceeding with the transaction." (*Id.* at 10.)  It does not contain any directive that each of the

more than twenty red flags is, in and of itself, indicative of criminal activity nor does it suggest

that a SAR narrative should include all of those items.[17]

FinCEN itself has stated the limited purpose for which NASD Notice 02-21 should be

considered.  In its release regarding the SAR rule for broker-dealers, FinCEN stated that NASD

02-21 could help the broker dealer "determine whether a transaction 'appears to have no business

or apparent lawful purpose or is not the sort of transactions in which the particular customer

would be expected to engage."  67 Fed. Reg. at 44054-55.  Thus, the significance of NASD 02-

21, according to FinCEN, lies not in a requirement that any of its "red flags" be reported in a

---

[17] NASD Notice 02-21 states that "Broker/dealers need to ***look for signs*** of suspicious activity that suggest money laundering.  If a broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding with the transaction."  (*See* SEC Ex. 11 at 10 (emphasis added).) Accordingly, if an individual has "a questionable background or is the subject of news reports indicating possible criminal, civil, or regulatory violations," for example, then Alpine should continue to perform due diligence and ascertain whether there is any suspicious activity warranting the filing of a SAR.  (*Id.*)

SAR but in the firm's use of those factors to determine for itself whether the transaction "var[ies] substantially from normal practices" and should be reported at all. *Id.*

The SEC's reliance on FINRA Notice 09-05 reflects a similar dissonance between the actual content of that regulatory guidance, and the SEC's insistence that the guidance proves the claimed violations of the BSA. That particular issuance, "Unregistered Sales of Restricted Securities," deals at length with the separate and highly technical assessment of compliance with Section 5 including the components of exemptions from registration. *See* FINRA Notice 09-05 (SEC's Ex. 12.) It emphasizes a firm's obligation to ensure that it is not participating in unregistered sales of securities and, in that context, provides an "illustrative" list of "red flags" "that may signal that a firm should take a closer look at the circumstances of a proposed resale transaction" to assess whether it is exempt from registration. (*Id.* at 4.) As with NASD Notice 02-21, FINRA Notice 09-05 describes a duty of inquiry and does not support the compulsory SAR-filing position taken by the SEC in this action. (*See id.* at 3-4, 7.) Notably, if the clearing firm conducts its due diligence on the Section 5 analysis, reviews the relevant "red flags," and concludes that the transaction may proceed, it would likely *not* at the same time conclude that the transaction is being used "to facilitate criminal activity." That a Section 5 red flag is listed in FINRA's Notice 09-05 thus also would not translate to an automatic SAR reporting obligation.

As for the SEC's identification of particular "categories" of omitted "red flags," they also are unsupported by, and even contrary to, the authority cited by the SEC. For example, the SEC takes the position that the mere fact that an "issuer is or was a shell company" is always suspicious and must be included in all SAR narratives. (*See* SEC's SEC Br. at 11-12.) However, the cited FinCEN guidance from November of 2006, Exhibit 23, contains no such directive. The FinCEN memo, while noting that shell entities "have been used for illicit

19

purposes," emphasizes at the outset of its discussion states that "[m]ost shell companies are formed by individuals and businesses for legitimate reasons."  In the end, FinCEN simply reminds financial institutions to "assess the risks involved in each shell company relationship and take steps to ensure that the risks are appropriately and effectively identified and managed in accordance with their BSA obligations." (*Id.*)

The SEC's insistence that a broker dealer must detect and report any evidence of stock promotion is not based on *any* regulatory authority.  (*See* SEC Br. at 13.)  Nor is it consistent with the plain fact that stock promotions are governed by Section 17(b) and are lawful so long as the requisite disclosures accompany any promotional issuance.  That claim illustrates, therefore, that the SEC's view of automatic reporting obligations and liability goes even beyond the various lists of "red flags" to  also include  evolving SEC arguments and actions.  And notably, the SEC contends that the liability exists even if the firm did not have knowledge of the promotion; the SEC seeks summary judgment because the firm *could* have explored and found the information – the very argument rejected in FINRA's decision in *In re Sterne Agee,* discussed above.

Also completely unsupported is the SEC's category of "unverifiable issuers." (*See id.*) The SEC does not cite FinCEN guidance in support of this assertion, but instead points to the FINRA Small Firm Template and FINRA 09-05.  The Template, however, discusses the separate and distinct issue of a customer's provision of "suspicious identification documentation" while FINRA 09-05 discusses an issuer which has undergone a name change or has no SEC filings. Nonetheless, the SEC proceeds apace to construct that category and to assert that it is entitled to judgment as to two BSA violations because the SAR narrative failed to include, in one instance, an indication that the company's website was not functioning, and in another, that the corporate entity was in default status.  In addition to lacking support, the SEC's reliance on those particular

circumstances serves to illustrate the breadth of the kind of factual items the SEC would use to support a claim of a BSA violation.

The purported requirement regarding "low trading volume" is one of the more expansive and elastic of the SEC's claims.  That category, according to the SEC, requires reporting of a *deposit of stock* where the deposit consists of "a large volume of shares in relation to the trading volume of the shares." (*Id.* at 14.)  A deposit must therefore be reported and the reporting must also include a calculation of and reporting also of average trading volume.  (*Id.*)  For this category, the SEC actually cites the AWC relating to Brown Brothers, apparently claiming that the settlement, and presumably any such settlement, establishes SAR filing requirements.  The SEC also cites again to FinCEN's "Trends, Tips & Issues No. 15" and its reference to a "substantial deposit, transfer or journal of very low priced and thinly traded securities." (*See id.*) But the cited source nowhere states that the existence of this alleged "red flag" must always be included in the SAR narrative.  The SEC's contention does illustrate, however, its counterintuitive claim that such factors should be included in the SAR narrative even where the filer did not consider them to be "unusual" or "suspicious."

Similarly, the SEC's claim regarding foreign individuals and entities is a mischaracterization of the sources on which it relies. The SEC points to the SAR Forms and FinCEN's "Trends, Tips & Issues No. 22, but the language on which the SEC relies does not support its claim that the involvement of any "foreign individual" is a suspicious circumstance, indicative of criminal activity that must be contained in  a SAR narrative.  To the contrary, the Forms articulate the more precise requisite pertaining to whether  the customer, accounts or the currency are foreign, and whether funds are being transferred to another country.  (*See* SEC's Ex. 8, at Part IV; SEC's Ex. 9 at 111-112.)

An analysis of FinCEN's guidance, even taking into account other regulatory issuances, demonstrates there is no bright-line or automatic rule directing that a SAR narrative must include the purported "red flags."  That assertion is certainly inconsistent with the governing provision, 31 C.F.R. § 1023.320.  FinCEN's guidance refers to "red flags" but confirms they are circumstances to be "monitor[ed]" and "investigated thoroughly by the firm" when evaluating a transaction for a potential SAR filing. (*See* SEC's Ex. 3 at 24-25.)  The guidance does not state that the existence of a potential "red flag" compels a SAR filing in all circumstances or that a "red flag" must be described in the narrative of the SAR unless they prompted the SAR filing. (*Id.*)   Significantly, the SEC's misinterpretation of FinCEN's guidance may be explained by its admission that it "did not discuss any specific SARs or their content, and did not discuss interpretation of FinCEN guidance with individuals at FinCEN in connection with this case at any time." (Alpine Add'l SOF 21.)

The "authorities" the SEC relies on in support of its argument that Alpine was required to file a SAR on all liquidation transaction solely because it filed a SAR on the deposit warrant less discussion.  The SEC relies on two sources.  First, it cites a single "red flag" listed in FinCEN's "Trends and Tips" No. 15. (*See* SEC Br., at 17, citing SEC Ex. 3 at 24.)  The SEC reads this guidance out of context; the guidance states that the "systematic sale of . . . low-priced securities shortly after deposit" is a "common examination finding" to "be investigated thoroughly by the firm." (SEC Ex. at 24.)  As with other "red flags," the guidance does not state it creates an automatic duty to file a new SAR on a liquidation transaction as the SEC asserts.  Furthermore, as indicated above, the guidance is not binding.

Second, the SEC cites to a couple of *settled* SEC administrative actions from 2015 – years after the liquidation transactions at issue.  (*See* SEC's SEC Br.at 17.)  Not only could these

not have provided fair notice to Alpine prior to the events in question, but settled, and thus *unlitigated*, administrative actions by an outside agency, are not justifiable bases to anchor the new, sweeping and onerous rule the SEC seeks to impose.[18]

### C.  The SEC's Attempt to Graft Requirements onto the BSA Would Violate Constitutional Notice and Due Process Requirements.

Because the SEC's position is unsupported by and often contrary to existing authority, it raises fundamental constitutional concerns of due process and fair notice. "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Gen. Elec.*, 53 F.3d at 1328-29; *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" (citation omitted)).

FinCEN has not imposed the bright-line rules for SAR reporting advocated by the SEC. To impose such requirements for the first time in an enforcement action by the SEC would deprive Alpine of its constitutional right to fair notice and due process.[19]  It would also render the SAR filing obligations under 31 U.S.C. § 5318(g) and 31 C.F.R. § 1023.320(a) impermissibly

---

[18]  *See Gen. Elec. Co. v. E.P.A.*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (observing that an agency's use of "'citation [or other punishment] as the initial means for announcing a particular interpretation," or "for making its interpretation clear" may "raise a question of the adequacy of the notice," and requires a court to ask if "by reviewing the regulations and other public statements *issued by the agency,* a regulated party acting in good faith would be able to identify, with 'ascertainable certainty," the standards with which the agency expects the parties to conform." (emphasis added) (alteration in original) (citations omitted).

[19]  *See California Bankers*, 416 U.S. at 26. ("the Act's civil and criminal penalties attach only upon regulations promulgated by the Secretary . . . ."); *General Elec.,* 53 F.3d at 1329, *supra* fn. 18;  *Gates & Fox Co. v. O.S.H.A.,* 790 F.2d 154, 156-57 (D.C. Cir. 1986) (setting aside agency sanction where it failed to provide a regulated entity with "constitutionally adequate notice" of what was required, and holding that pre-suit warning was not adequate because it did not come from the agency itself and "therefore was not an authoritative interpretation of the regulation").

vague by subjecting Alpine to discriminatory enforcement on a heretofore undisclosed theory. *See Fox Television,* 567 U.S. at 253.[20]  To the extent this Court concludes that those automatic SAR triggers and requirements exist, any imposition of liability against Alpine in this case would violate due process.

## II.    THERE ARE PERVASIVE ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT FOR THE SEC.

To establish a violation of the BSA based on a failure to file a SAR in relation to, for example, liquidation of a security, the SEC is required to demonstrate, as a matter of law, that the firm concluded that the transaction fell within one of the categories set forth in the BSA, but nonetheless failed to report the transaction.  To support its new enforcement theory of an "inadequate" SAR, it would have to demonstrate that Alpine improperly omitted from its narrative a description of that which it viewed as unusual or suspicious.  The SEC has plainly not made that showing and so summary judgment should be denied.  *See N.L.R.B.*, 403 F.2d at 893 (court should "refuse to grant summary judgment" where it must inquire "into the surrounding facts and circumstances" until it has a sufficient factual record); *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) ("[W]here the movant 'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,'  for ***the non-movant is not required to rebut an insufficient showing***." (emphasis added) (quotation and citations omitted)).

But, the SEC insists, the SAR requirements are so cut-and–dried that evidence of the "red flag" proves  the violation.  Even if the SAR requirements were as compulsory and rigid as the SEC contends, its Motion would fail because it disregards critical issues of material fact that

---

[20] These principles are set forth in greater detail in Alpine's Consolidated Memorandum, at p. 25, which is incorporated by reference herein.

exist in relation to the elements necessary to establish a "violation" of the BSA.

> **A.    The SEC Has Failed to Allege or Demonstrate that Alpine Willfully or Negligently Committed Any Violations of the BSA or Its Implementing Regulations.**

The SEC does not even acknowledge one of the most critical elements of the alleged violation necessary to prevail on this Motion: that Alpine acted "willfully" or "negligently" in its purported violations of the BSA.  Embedded in that issue of intent are substantial material factual issues that preclude a grant of summary judgment.

The SEC maintains that, because it brings this action under Section 17(a) of the Securities Exchange Act, and Rule 17a-8 thereunder, it "need not prove scienter" or even "show that Alpine was aware that its conduct violated the BSA regulations" to establish liability and obtain civil money penalties and other remedies, even in a claim indisputably predicated on a violation of the BSA and its implementing regulations. (SEC's SEC Br., at 5-6.)  As discussed in Alpine's Consolidated Memorandum, the SEC cannot seek to enforce one provision of the BSA while ignoring the provision that defines an actionable violation.  It cannot ignore the fact that the BSA carries with it a higher burden of proof on the issue of intent, requiring evidence of a violation of a known legal duty.[21]

If FinCEN, pursuant to its delegated authority, made the same allegations as the SEC, it would have to prove Alpine acted "willfully" or "negligently" to establish a violation and impose liability.  *See* 31 U.S.C. § 5321(a)(1), (6); 31 C.F.R. § 1010.820.  The SEC cannot side-step Congress's intent to obtain something not available to FinCEN:  summary judgment for a purported violation of the BSA or its implementing regulations on a strict-liability basis.  (*See* Alpine's Consolidated Memorandum, Point I, for discussion and authorities.)  Even assuming

---

[21]  *See Ratzlaf v. United States,* 510 U.S. 135, 141 (1994) (holding that the "omnibus 'willfulness' requirement" of the BSA "consistently has been read by the Courts of Appeals to require both 'knowledge of the reporting requirement' *and* a 'specific intent to commit the crime,' *i.e.,* 'a purpose to disobey the law.'")

this action could be pursued under Rule 17a-8, the SEC cannot strip away those provisions of the BSA that set forth the requirement of scienter or fault.  That the SEC takes this position actually illustrates the wisdom of FinCEN's deliberate retention of enforcement authority to ensure "consistent" interpretation and enforcement of the BSA.  (*See* n.6, *supra*; Alpine SOF 14.)

This applies with even greater force in the context of summary judgment. Issues of willfulness and negligence are fraught with factual considerations and are rarely, if ever, appropriate for resolution on summary judgment.[22]  Here, the SEC has failed to allege, much less prove, that Alpine acted with the requisite degree of scienter or fault.  Despite claiming that each of the "Sample SARs," "Sample Liquidations," and "Missing File SARs" identified in its Motion is a separate violation upon which it is entitled to summary judgment, (SEC's SEC Br., at pp. 18, 21-23), the SEC has provided no argument and no evidence that any of the purportedly violative conduct was done willfully or negligently.  (*Id.*)

Perhaps most importantly, there is significant material evidence that Alpine has made continuous efforts to implement and improve its AML program, which bears on the question of whether any violation of the BSA was willful.  As set forth in Alpine's Statement of Additional Facts 54-59, Alpine has increased the number of compliance personnel, and improved its suspicious activity monitoring and reporting over time.  One stark example of these efforts can be found by comparing the narratives in Alpine's SARs from 2013-2014. (SEC's Exs. 50-54, 56-57) with some of the earlier sample SARs provided by the SEC from 2011 and 2012 (SEC's Exs. 14, 16, 17, 19.)  These later SARs provide significant additional detail.  Notably, in September of 2012 – in between these two SAR sample groups – FINRA issued an "examination report"

---

[22]  *See, e.g.*, *Flanagan v. Continental Apparel Corp.*, 1996 WL 471201, at *1 (S.D.N.Y. Aug. 20, 1996) ("Ordinarily, willfulness is a question of fact to be determined by the fact-finder, in this case the jury."); *INA Aviation Corp. v. United States*, 468 F. Supp. 695, 699 (E.D.N.Y. 1979) ("As a general proposition, negligence questions are properly resolved at trial because, upon a motion for summary judgment, a court may not try issues of fact; it may only determine whether there are factual issues to be tried."), *aff'd*, 610 F.2d 806 (2d Cir. 1979).

indicating *inter alia,* that it believed Alpine's SAR narratives were inadequate.  Although Alpine

disputes FINRA's position in this regard, it made efforts to improve its SAR narratives after this

report, as exemplified by the 2013-2014 SAR narratives. (*See* SEC's Exs. 50-54, 56-57.)  This

type of remedial effort is inconsistent with a conclusion that Alpine willfully or negligently

violated any provision of the BSA or its implementing regulations.  Furthermore, it shows that

the SEC's so-called Sample SARs are not "exemplary"; they are cherry-picked and primarily

focused on earlier time periods.[23]

By not offering evidence of scienter or fault, the SEC has failed to carry its "burden on

summary judgment" to provide undisputed "evidence on each element of [its] claim . . .

illustrating [its] entitlement to relief."  *Etheredge-Brown v. Am. Media, Inc.*, 13 F. Supp. 3d 303,

305 (S.D.N.Y. 2014); *see also Giannullo,* 322 F.3d at 141 (non-movant is not required to "rebut

an insufficient showing" to defeat summary judgment)).

### B.    The SEC has Not Established, as a Matter Of Law, that the SARs or Transactions  at Issue Were Mandatory, Rather than Voluntary, SAR Filings.

Fatal also to the SEC's Summary Judgment Motion is its failure to allege and prove that

all the SARs at issue, including those sample SARs or transactions at issue in its Motion, were

required or mandatory SARs filings that would support a claim of a BSA reporting violation.

The governing regulation, 31 C.F.R. § 1023.320, expressly distinguishes between

mandatory and voluntary SAR filings.  A SAR is only required to be filed on those transactions

which meet the requirements of 31 C.F.R. § 1023.320(a)(2) – those transactions, *inter alia,*

which a broker-dealer "knows, suspects or has reason to suspect" meets one of the four

---

[23] Other potential issues of fact include whether Alpine intentionally failed to file a SAR on one or more liquidation transactions when it knew a SAR filing was required to, for example, conceal suspicious activity from law enforcement; whether Alpine negligently failed to file a SAR on a liquidation transaction where it had a duty to do so; whether Alpine intentionally or negligently omitted a red flag of suspicious activity from a SAR narrative that was required to be filed; whether Alpine intentionally or negligently filed SARs late; or whether Alpine intentionally or negligently failed to maintain SAR support files

categories of criminal conduct set forth in the regulation.  *See* 31 C.F.R. § 1023.320(a)(2)("A

transaction *requires reporting* under the terms of this section if  . . . ." (emphasis added)). "A

broker-dealer may also file with FinCEN a report of any suspicious transaction that it believes is

relevant to the possible violation of any law or regulation *but whose reporting is not required by*

*this section*."  *Id.* § 1023.320(a)(1) (emphasis added).

A "violation" only occurs, and liability can only be imposed, for failure to file a SAR

when required.  Subsection 1023.320(g) states that "[f]ailure to satisfy *the requirements* of this

section may be a violation of the Bank Secrecy Act and of this chapter."  *Id.* (emphasis added);

*see also* 31 C.F.R. § 1010.820(f) (authorizing penalties any "willful violation . . . of any

reporting *requirement*" (emphasis added)).   The import of this language is clear:  a violation can

only occur, and liability attach, with respect to a mandatory SAR filing under § 1023.320(a)(2),

not for a voluntary SAR.  Thus, if a SAR filing was not required, then there can be no liability

for a purportedly invalid SAR narrative, or a purportedly late-filed SAR. Similarly, a SAR

voluntarily filed on a deposit of securities could not create an automatic mandatory SAR-filing

obligation on the liquidation of that deposit, even assuming *arguendo* that the SEC's legal theory

on this issue were correct, which it is not.

The question of whether a particular SAR filing was mandatory or voluntary is a fact-

intensive one.  It depends on whether Alpine, following its due diligence and in the exercise of

its subjective judgment, "knew, suspected or had reason to suspect" that the transaction fell

within one of the four categories of criminal conduct under 31 C.F.R. § 1023.320(a)(2) to require

a SAR filing, or instead voluntarily filed a SAR,  for example, because it was told or believed

that the regulators expected a filing.   The SEC improperly attempts to circumvent this necessary

fact-intensive analysis by not even acknowledging that it exists.

In fact, a review of the narratives from the SARs at issue indicate they were not mandatory.  For example, the narratives of every Sample SAR submitted by the SEC indicates they were filed, at least in part because they involved a large deposit of low priced securities. Many of the Sample SARs – Sample SARs A-H, J, P, as well as SEC Exs 44-47, 58-62 – indicate they were filed exclusively or primarily for that reason.  As indicated above, there is nothing inherently suspicious, and certainly nothing criminal about a large deposit of low-priced securities.  Alpine filed SARs on such transactions because FINRA described this type of transaction as a potential red flag in its guidance, and because Alpine understood from discussions with FINRA that it should file SARs on all such transactions, not because Alpine determined that "red flag" was suspicious of the categories of criminal activity that required a SAR filing under § 1023.320(a)(2).  (Alpine Add'l SOF 60-75.)  In fact, the AML review checklists in the support files for at least Sample SARs D and J further drive home the voluntary nature of these types of SARs filings because the Alpine AML officer reviewing the transactions expressly indicated that the transactions did not meet any of the elements of 31 C.F.R. § 1023.320(a)(2).  (SEC Ex. 18, at p. 2 *and* SEC Ex. 31, at p. 2.)

Similarly, a number of the SARs at issue were filed by Alpine because a customer or account had been placed on its "heightened sensitivity" list, [24] including Sample SARs B-D, G, H, J-L, and SEC Exs. 47, 48, 58, 59 and 62. Accounts were placed on that list as an aid to Alpine employees conducting AML review, and to ensure Alpine's own enhanced scrutiny of transactions.  (Alpine Add'l SOF 45.)  The reasons for inclusion in the list vary and inclusion on the list, or reference to the list, did not constitute any finding by Alpine that there was anything criminally suspicious about the transaction itself.  (*Id*; *see also* SEC Ex. 18, at p. 2 *and* Ex. 31, at

---

[24] The development of just such a list for this purpose was suggested in guidance issued by NASD.  (*See* SEC Ex. 11, NASD Notice 02-21, at p. 12 – stating that firms "should form lists of high-risk clients whose activities may warrant further scrutiny.").

p. 2.)  In filing SARs on this basis, and highlighting the list in the SAR narrative, Alpine was

providing what it understood to be useful information to regulators, even though a SAR filing

was not required.  (*Id*.)

The SEC has introduced no evidence and provides no analysis to prove that each of the

sample SARs were mandatory SAR filings under § 1023.320(a)(2).  The SEC has thus failed to

carry its burden to demonstrate that there is no issue of material fact and that it is entitled to

judgment as a matter of law.  *See McClellan,* 439 F.3d at 144; *Etheredge-Brown,* 13 F. Supp. 3d

at 305; *see also Giannullo,* 322 F.3d at 141 (non-movant is not required to "rebut an insufficient

showing" to defeat summary judgment)).

### C. The SEC's Summary Judgment Motion Should Be Denied or Deferred Because the   SEC Has Failed to Establish that No SARs Were Filed by Introducing Brokers on the Transactions at Issue.

The governing regulation provides that "[t]he obligation to identify and properly and

timely to report a suspicious transaction rests with each broker-dealer involved in the transaction,

***provided that no more than one report is required to be filed by the broker-dealers involved in***

***a particular transaction*** (so long as the report filed contains all relevant facts)."  31 C.F.R. §

1023.320(a)(3) (emphasis added). This provision expressly relates to the "introducing broker"

and "clearing broker" relationship.  67 Fed. Reg. 44048, 44051 (July 1, 2002).  "The purpose of

including this provision in the rule is to allow two broker-dealers who have participated in the

same transaction to only file one SAR-BD."  *Id.* at 44052.

Alpine acted as clearing broker for each of the Sample SARs and other transactions at

issue in the SEC's Summary Judgment Motion.  (Alpine Add'l SOF 10.)  Each of the

transactions at issue were introduced by other broker-dealers. (*Id*.) To the extent the SEC is

correct that SARs were required to be filed on the transactions at issue, one would expect that the

introducing broker-dealers would have filed SARs on these transactions.  The filing of a SAR by

the introducing broker is particularly significant in relation to the SEC's claims regarding a customer's regulatory history or foreign status.  Alpine acted as a clearing broker on all of the transactions at issue in the SEC's Motion, pursuant to "fully disclosed clearing agreements" with the introducing brokers, and thus does not have "know-your-customer" obligations.[25] (Alpine Add'l SOF 2-10.)  Introducing and clearing brokers typically divide responsibilities, such that introducing brokers are responsible for  the "essential facts" regarding the customer such as a criminal history – whereas clearing firms provide a specialized role as back-office providers of clearing and settlement services.[26] As a result of these different roles, it would be the introducing broker-dealers that would be primarily focused on the characteristics of the customer, and would be the first to file SARs where a customer's regulatory history made a transaction suspicious.

The SEC has failed even to consider, much less demonstrate as a matter of law, that SARs were not filed by the introducing brokers in relation to the transaction at issue, and that those SARs did not report the information the SEC claims was omitted.  The SEC has the authority to access and to review SARs filed by every broker-dealer.  *See* 31 C.F.R. § 1023.320(e)(1)(ii)(A)(1).[27]  If "complete" SARs were filed by the introducing brokers on these

---

[25]  *See*  FINRA Rules 2090 and 4311 (permitting clearing and introducing firms to allocate regulatory and operational functions between them, including the responsibility for opening, approving, and monitoring accounts; extending credit; maintaining books and records; receiving and delivering funds and securities; safeguarding customer funds and securities; issuing trade confirmations and account statements; and accepting orders and executing transactions.)  To be clear, Alpine does not contend that this relieves it of its duty under the BSA to establish policies, procedures, and controls that are reasonably designed to detect and report suspicious activity that is attempted or conducted through it, but this indicates that there are likely SARs from introducing brokers on the transactions at issue.

[26]  *See generally* Santangelo, Betty & Davis, Harry, *Broker Dealer Regulation,* Chapter 24, at pp.1-6, and 13-18, Ex. 2 hereto – describing the division of responsibilities.  *See also id.* at Chapter 24, pp. 14-16 — observing, *inter alia,* that Treasury has explained that clearing brokers generally have due diligence obligations with the institution with which it has a clearing agreement, but not with respect to the introduced accountholder (who is the customer of the introducing broker), and thus clearing brokers are generally "not obligated to make a suitability determination with respect to securities transactions through an introduced account," including where foreign accounts are involved.

[27]  Alpine has served a Request for Production upon the SEC for all SARs filed by any broker-dealer on the transactions at issue in the SEC's complaint.  (Alpine Add'l SOF 93.)  The SEC has refused to produce any of these SARs, identifying only the documents "referenced on Tables A-F." (*Id.* at 94.)  Given the SAR confidentiality

transactions, there would be no basis for liability on the SEC's claim for Alpine's allegedly deficient SAR narratives, alleged failure to file SARs on liquidation transactions, or allegedly late-filed SARs.  Until such time as the SEC produces the requested SARs, or provides undisputed evidence that no such SARs exist, the SEC's request for summary judgment is premature, at best. In the event the Court were otherwise inclined to grant summary judgment for the SEC, the decision should be denied or deferred until this issue can be resolved.  *See* Fed. R. Civ. P. 56(d); *see also* Rule 56(d) Declaration, Alpine Add'l SOF 90-96, Ex. 26.

> **D.      The Adequacy of Alpine's SAR Narratives Cannot Be Resolved on Summary Judgment.**

As indicated, the filing and the content of a SAR by definition requires analysis and constitutes a judgment call. Thus, the SEC would be entitled to summary judgment only if it demonstrated that there are no issues of fact as to whether Alpine "knew" or "had reason to suspect" that the transaction involved criminal activity, and that it viewed particular information as significant to its determination but nonetheless omitted it from the narrative.  The SEC has provided only two items of evidence: a filed SAR and evidence of a supposed "red flag."  It has provided not one piece of evidence regarding whether Alpine knew or suspected that a transaction involved criminality, or the basis on which it included items in a SAR narrative.  This gives rise to material issues of fact on the adequacy Alpine's SAR narratives on each of the fourteen sample Sample SARs A-P in the SEC's motion. *McClellan*, 439 F.3d at 144.

The factual issues here abound.  Because there are no set requirements for what must be included in a SAR narrative, reasonable jurors could differ as to whether the narrative on any given SAR that was required to be filed is incomplete under the circumstances that prompted the filing of that SAR.  Those subjective judgments and questions of materiality are both

---

requirements of the BSA, however, Alpine is unable to procure the SARs filed by the introducing firms directly from the introducing firms. *See, e.g.*, 31 U.S.C. § 5318(g)(2); 31 C.F.R. § 1023.320(e)(1)(i).

inappropriate for summary judgment.[28]  Whether Alpine adequately described what was

"unusual or irregular that caused suspicion" in the narratives in any of the SARs at issue, which

is all it is instructed to do by the SAR Forms-BD, cannot be resolved on summary judgment

without impermissibly resolving inferences or ambiguities against Alpine.  Because the SEC has

failed to carry its burden in this regard, there is nothing for Alpine to rebut, and summary

judgment must be denied.  *See Giannullo,* 322 F.3d at 141.

    There are also fact issues imbedded in the SEC's arguments on the Sample SARs

themselves.  For example:

- <u>"Ongoing SEC litigation."</u> In Sample SAR D, the SEC claims Alpine omitted that the
  "customer" was engaged in "ongoing SEC litigation."  The SEC omits that the fact of
  litigation is both public record and, of course, known to the SEC.  Nor does the SEC
  provide any details as to what the litigation was about or any discussion of how it
  may be relevant to this transaction, let alone how it could make this transaction
  suspicious.  Thus, its inclusion would have added nothing of substance to the
  narrative, as a matter of law. Further, Alpine's customer on the transaction was the
  introducing broker, not the introduced account holder who was involved in the
  litigation.  (Alpine Add'l SOF 7; *and* Section II(D), above.

- <u>"Criminal or Regulatory History."</u>  In Sample SARs E and F the SEC claims Alpine
  omitted that the "customer" had a criminal or regulatory history.  As with SAR D,
  however, this history is public information, and the SEC has not provided any details
  as to when, in relation to the transaction, the conviction or adverse regulatory finding
  occurred to establish it was relevant to this transaction or to any potentially suspicious
  activity therewith, and that its inclusion would have added anything of substance to
  the narrative, as a matter of law. Also, the SEC also again misidentifies Alpine's
  "customer."

- <u>"Shell Companies."</u>  In Sample SARs A and C, the SEC claims Alpine omitted that
  the "issuer" *was* a "shell company."  The SEC has not shown how this was relevant to
  the transaction or made it suspicious.  As stated above, FinCEN has stated that most
  "shell companies" are formed for "legitimate reasons," and focuses not on whether
  the "issuer" was a shell company, but rather on whether the financial institution is
  engaged in a "relationship" with an existing shell.  (Alpine Add'l SOF 36)  The SEC

---

[28]  *See W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 1989 WL 206492, at *1 (S.D.N.Y., December 5, 1989)
("subjective issues . . . are singularly inappropriate for determination on summary judgment."); *see also S.E.C. v.
Biovail Corp.,* 2010 WL 2465482, at *2 (S.D.N.Y., June 16, 2010) (observing that issues of "materiality are difficult
ones on which to grant summary judgment as they are particularly fact and context dependent," and noting that
"summary judgment on the issue of materiality may be inappropriate even when the material facts are undisputed.").

has thus not established how the fact that an issuer was a shell was relevant to the transaction or suspicious, or that its inclusion would added anything of substance to the narrative as a matter of law.

- "Evidence of Stock Promotion." In Sample SARs H and J and G, the SEC claims Alpine omitted evidence that the stocks had been promoted.  The SEC has not shown how the promotions in the support file were relevant to these transaction or rendered it suspicious as a matter of law.  Certainly, the SEC cannot credibly claim that any promotion of a particular stock is suspicious of unlawful activity.  The internet is littered with publications that recommend stock purchases, including CNBC, Yahoo, and Seeking Alpha.  The mere fact of stock promotion were suspicious, nearly every security transaction would require a SAR.  A promotion would only be suspicious if the promotional activity were misleading or were connected to a "pump and dump" scheme.  The SEC has not established that Alpine's records evidenced misleading materials or a "pump and dump."  Moreover, the guidance cited by the SEC to argue that evidence of stock promotion of penny stocks is suspicious is dated 2016 – years after the transactions at issue. (*See* SEC Br., at 13 n. 4.)

- "Unverifiable Issuers." In Sample SAR G, K and L, the SEC argues Alpine omitted from the SAR narrative that:  Alpine could not find the issuers' websites (Sample SARs G and K); the issuer's certificate of incorporation was in "default" status (Sample SAR L); that the issuer had not filed an "form 10" with the SEC (Sample SAR G); and that OTC placed a stop signal on the issuer's stock (Sample SAR G). This is perhaps the most heavy-handed and baseless of the SEC's positions. Not being able to locate a website or confirm an issuer timely renewed its incorporation is indicative of nothing, and the SEC cites nothing stating otherwise.   The SEC also has not provided any discussion on why an issuer's failure to file "a form 10" makes this transaction suspicious, or what OTC Market is or what an OTC Market "stop" signal even means. Moreover, once again, Alpine's customer was not the issuer, and the SEC has not shown that an introducing broker depositing shares of an issuer with these characteristics suspicious as a matter of law.

- "Low Trading Volume." In Sample SARs M, N, and P, the SEC argues Alpine omitted that the stock had a low trading volume. This is one of the murkier categories of allegedly omitted red flags. The SEC claims this "could" indicate "manipulative measures" like "wash trades," (*see* SEC's SEC Br., at 14) but has not introduced any evidence to show that this was occurring in these transactions.  The SEC has thus failed to show how a low trading volume was relevant to these transaction or rendered them suspicious as a matter of law.

- "Foreign Individual or Entity."  In Sample SARs A, C and H, the SEC claims Alpine omitted information that a "key player" in the transaction was a foreign individual or entity.  However, again, the SEC has not shown how this was relevant to these transactions or rendered them suspicious as a matter of law, or that including this information in the SAR narrative would add anything of substance to the SAR. That the introducing broker is a foreign entity (Sample SARs A and C) is identified in the

Part I of the SARs, (*see* SEC Ex. 14, at 2; SEC Ex. 16, at 2.)  On Sample SAR C, Alpine also identified in the narrative that it is its policy to file SARs on all deposits of securities into this account. (*See* SEC's Ex. 16 at p. 4.) Further, Alpine's "customer" on Sample SAR A and H was the introducing broker (Scottsdale Capital), not the subject of the SAR.  (*See* SEC's Ex. 14, at p. 4; SEC's Ex. 28, at 8.) On SAR H, the support file shows there were no funds wired to a foreign jurisdiction as a result of the transaction on which the SAR was filed – the deposit of securities in August of 2013.  Rather, that apparently occurred as part of a different transaction in July of 2013, which did not involve Alpine. (SEC's Ex. 29, at ALPINE00229572.) Finally, as indicated in Section II(D), above, monitoring for these types of details is generally performed by the introducing broker, not the clearing firm.

These are just some of the many fact issues require resolution at trial on the adequacy of Alpine's SAR narratives.   The SEC's Motion on this ground must be denied.

**E.**     **Fact Issues Exist Regarding Whether the "Liquidation Transactions" Were Required To Be Reported.**

As indicated above, the SEC's position that the filing of a SAR on a deposit of stock creates an automatic requirement to file a SAR on every sale of the stock should be rejected because it lacks legal support, is unworkable, and furthers bad policy.  The SEC's request for summary judgment on the so-called "Sample Liquidations" also fails because of fact disputes.

First, here again the SEC has not put forth any evidence of Alpine's SAR decision-making process in relation to any of the Sample Liquidations – i.e., why, in its subjective judgment, Alpine determined the sales transactions were not suspicious.  They are separate transactions from the deposit that must be analyzed separately.

Second, the guidance the SEC relies on states that a "continuing report should be filed on *suspicious activity that continues* after an initial FinCEN SAR is filed."  (*See* SEC Ex. 9, at 84.) Even if a violation could rest upon language in guidance, which it cannot, the SEC has provided no evidence to establish that the sale of stock is a continuation of the potentially suspicious activity that prompted the SAR on any of the deposit transactions at issue.  By logic it is not, particularly where the SAR was filed because it involved a large *deposit* of low-priced securities.

Furthermore, the SEC's tables demonstrate that the liquidations did not happen all-at-once, but over time in amounts that were generally significantly less than the amount of the deposit. The SEC has made no effort to tie the liquidations to activity to criminally suspicious activity, i.e., an illegal pump-and-dump scheme to meet its burden to show a SAR was required.

Third, the SEC assumes that each of the liquidation transactions at issue traces to a specific SAR filed on a deposit of stock. But the SEC has provided no foundation for this position; it relies solely upon tables *it* prepared, without identifying how the tables were prepared or what information it relied upon. (*See* SEC Exs. 43, 49 and 55.) The SEC also fails to account for the fact that Alpine, much like other broker-dealers, aggregates stock by stock-symbol within each customer's brokerage accounts. (Alpine Add'l SOF 80-81.) Thus, where there are multiple deposits of the same stock-symbol by the same introduced account over time, one cannot determine which sales transaction relates to which stock deposit solely by looking at the sales-transaction history.[29] (*Id.*) Yet, the SEC has pointed only to purported sales transactions to try to establish they trace to a specific deposit of stock and to a specific SAR filed on the deposit. No additional facts are provided to link the two together. This is insufficient to carry the SEC's burden on summary judgment to provide undisputed facts that support its legal theory, giving all reasonable inferences to Alpine. *Etheredge-Brown,* 13 F. Supp. 3d at 305; *McClellan,* 439 F.3d at 144.

The SEC's argument with respect to the "Customer B"/"Company B" transactions highlights its failings in this regard. (*See* SEC's SEC Br., at p. 20 and Fact 64.) The total number of shares sold by Customer B of Company B in the SEC's table (20,795,783 shares) actually exceed the total number of shares deposited (18,986,826) in the table. Thus, there were

---

[29] In much the same way, in a bank account, one could not determine the deposit to which a specific withdrawal of money relates solely by looking at the withdrawal history. Additional facts would be needed.

deposits of shares of Company B by Customer B on which the SEC has not established a SAR was filed, undermining the factual basis on which the SEC's theory is based. Because the SEC has not provided undisputed evidence that traces the sales transactions to a specific SAR filed on a specific stock deposit, it has not proved its theory as a matter of law.

> ### F.      Fact Issues Exist on Whether Certain of Alpine's SAR Filings Were Untimely.

In support of summary judgment, the SEC identifies five sample SARs that it claims were untimely filed.  The SEC argues that each of the samples were filed "more than 30 days after Alpine knew or should have known the facts that constituted the basis for filing a SAR," because Alpine described only the circumstances of the deposit of stock in the SAR narrative, which "Alpine must have known at the time of the transaction."  (SEC Br., at p. 22.)  The SEC's oversimplified analysis is incorrect and undercut by fact issues.

 The governing regulation provides, in pertinent part, that a "SAR shall be filed no later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing a SAR under this section."  31 C.F.R. § 1023.320(b)(3).  FinCEN has stated that "'initial detection' does not mean the moment a transaction is highlighted for review."  (*See* Ex. 3 to the SEC Br., at p. 15.)  Rather:

> [t]he time to file  a SAR starts when a firm, in the course of its review or on account of other factors, is able to make the determination that it knows, or has reason to suspect, that the activity or transactions under review meet one or more of the definitions of suspicious activity.  Specifically, the 30-day (or 60-day) period **does not begin until an appropriate review is conducted and a determination is made that the transaction under review is 'suspicious' within the meaning of the SAR regulation**.  Of course, a review must be initiated promptly and completed within a reasonable period of time.

(*Id.* (emphasis added) (footnote omitted).)

The SEC ignores the language of the regulation and guidance by focusing only on the date of transaction underlying the SAR.  Under the SEC's circuitous theory, Alpine must have

known the transaction was suspicious the moment it occurred because Alpine described the transaction in its SAR narrative.  But this is what Alpine was supposed to do in the narrative; all SAR narratives describe the underlying transaction.  However, this is not the date from which the 30-day filing period begins to run.  (*See id.*) That period does not start until Alpine was able to conduct "an appropriate review" and made its "determination" that the transaction may be suspicious within the meaning of the regulation. (*See id.*) There is no time-frame within which an "appropriate" suspicious-activity "review" and SAR filing "determination" must occur.  (*Id.*); *see also* 31 C.F.R. § 1023.320(b)(3). Because the SEC has not established when Alpine conducted an appropriate review and determined it was suspicious, it has not met its burden.

Moreover, at the time of the transactions at issue, in 2011, the AML officer responsible for reviewing these transactions, subjectively determined that the transactions were not suspicious and thus did not file a SAR.  (Alpine Add'l SOF 65-66.) After that employee left Alpine, FINRA contacted Alpine and expressed the view that a SAR should be filed on all large microcap or "penny stock" deposits.  Following these discussions, other employees of Alpine undertook in essence a look-back, reviewing transaction cleared through Alpine during the former employees' tenure, including the five sample transactions at issue, to determine whether any of those transactions could warrant a SAR filing. (*Id.* at 68.)  In light of the directive that Alpine received from FINRA, Alpine specifically focused on large, low-priced security deposits and filed as to each of those deposits.  Alpine's SAR filings include each of the five sample SARs identified by the SEC, and reflect that, in those filings, Alpine described as the basis for the SAR the very characteristics identified by FINRA – large deposits of low-priced securities – along with some other information, where applicable. (*Id.* at 69-73; *see also* SEC's Exs. 58-62.)

The SEC has failed to establish as a matter of law that those SARs were late.  The time

period for filing a SAR starts when an "appropriate review is conducted and a determination is made that the transaction under review is 'suspicious'" under the regulation.  (*See* SEC Ex. 3, at p. 15).  Alpine's prior employee, in her discretion, decided the transactions were not suspicious, and so the 30-day period could not start at that time. (*Id.* at 66, 71.) That time-period could only commence when another AML Officer conducted his review and determined that the transaction warranted the filing of a SAR.[30] (*Id.* at 74.)  At the very least, there is a fact issue of whether Alpine completed its review within a reasonable time-frame under the circumstances.

Alpine's conduct in relation to those transactions, including its re-review of transactions to make sure nothing slipped-through-the-cracks, is entirely consistent with an effective AML program and represents another example of the damage that would be done by an over-aggressive prosecution that penalizes the firm's compliance efforts.

### G.    Alpine Maintains SAR Support Files and Has Produced All Support Files at Issue to the SEC.

The SEC alleges that Alpine has violated 31 C.F.R § 1023.320(d) by failing to maintain supporting files for certain SARs it has filed.  In support of summary judgment, the SEC has identified five sample "Missing SAR files." Contrary to the SEC's position, Alpine maintains supporting documentation, within the meaning of the regulation, for all SARs that it files.

Although Alpine does not necessarily agree with the SEC as to what constitutes "the original or business record equivalent of any supporting documentation" under § 1023.320(d),[31] Alpine has always believed and maintained it produced in good faith all documents requested by the SEC during the investigative phase, including each supporting file at issue.  Alpine, through

---

[30]  Because those SARs were filed not based on a determination that the transaction was suspicious, but rather in response to FINRA's directive, the 30 day clock for the filing of a SAR would not apply.

[31]   The phrase is vague, at best. It is unclear what the SEC's believes this includes.  However, FinCEN guidance states that "'[s]upporting documentation refers to all documents or records that assisted the financial institution in making the determination that certain activity required a SAR filing." (Alpine Add'l SOF 82; Fin-2007-G003, June 13, 2007.)

counsel, worked for a long period of time with the SEC to produce both thousands of SAR and supporting files for each SAR.  The production was requested and produced on a rolling basis. To attempt to resolve this issue, Alpine has again produced the supporting files to the SARs identified on "Table E" in this action, including for each of the sample SARs at issue.  (Alpine Add'l SOF 88-89.)

## CONCLUSION

For all of the foregoing reasons, and those set forth in Alpine's Consolidated Memorandum in Support of its Cross-Motions, the SEC's Summary Judgment Motion should be denied.

Dated:  New York, New York                                  Respectfully submitted,
              January 19, 2018

                                                      By:   /s/ *Maranda E. Fritz*
                                                            Maranda E. Fritz
                                                            THOMPSON HINE LLP
                                                            335 Madison Avenue, 12th Floor
                                                            New York, New York 10017-4611
                                                            Tel. (212) 344-5680
                                                            Fax (212) 344-6101
                                                            Maranda.Fritz@thompsonhine.com

                                                            Brent R. Baker (BB 8285)
                                                            Aaron D. Lebenta (*Pro Hac Vice*)
                                                            Jonathan D. Bletzacker (*Pro Hac Vice*)
                                                            CLYDE SNOW & SESSIONS
                                                            One Utah Center
                                                            201 South Main Street, Suite 1300
                                                            Salt Lake City, Utah 84111-2216
                                                            Telephone 801.322.2516
                                                            Facsimile 801.521.6280
                                                            brb@clydesnow.com
                                                            adl@clydesnow.com
                                                            jdb@clydesnow.com

                                                            *Attorneys for Defendant Alpine Securities
                                                            Corporation*