UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

v.

ALPINE SECURITIES CORPORATION,

       Defendant.

Civil No. 1:17-CV-04179-DLC

Honorable Judge Denise L. Cote
Magistrate Judge Ronald L. Ellis

---

### ALPINE SECURITIES CORP.'S
### (I) RESPONSE TO SEC'S STATEMENT OF MATERIAL FACTS, AND
### (II) ADDITIONAL STATEMENT OF MATERIAL FACTS

## I.   ALPINE'S RESPONSE TO SEC'S STATEMENT OF MATERIAL FACTS

Alpine Securities Corporation ("Alpine"), by and through its undersigned counsel,

pursuant to Local Rule 56.1, hereby submits this Response to the Statement of Material Facts

submitted by the SEC in Support of its Motion for Partial Summary Judgment.

**SEC'S SOF No. 1.**  SARs have been instrumental in the investigations of major money

laundering or terrorist financing and other criminal cases. FinCEN, *Guidance on Preparing a*

*Complete & Sufficient Suspicious Activity Report Narrative* at 1 (November 2003) ("*Preparing a*

*Complete & Sufficient SAR Narrative*"); attached as Ex 1. SARs are also used to investigate

fraud, embezzlement, and tax violations. FinCEN, *The SAR Activity Review, Trends Tips &*

*Issues, Issue 22* at 13-15 (October 2012) ("*SAR Activity Review Issue 22*"), attached as Ex. 2.

**ALPINE'S RESPONSE TO SOF No. 1.**  Undisputed.

**SEC'S SOF No. 2.** SARs also play a critical role in the investigation of securities law violations. FinCEN, *The SAR Activity Review: Trends Tips & Issues, Issue 15* at 26-30 (May 2009) ("*SAR Activity Review Issue 15*"), attached as Ex. 3.

**ALPINE'S RESPONSE TO SOF No. 2.**  Undisputed.

**SEC'S SOF No. 3.**  According to FinCEN, the "failure to adequately describe the factors making the transaction or activity suspicious undermines the very purpose of the SAR and lessens its usefulness to law enforcement." Ex. 1 at 1 (*Preparing a Complete & Sufficient SAR Narrative*); *see also* Ex. 9 at 110 (FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements (October 2012) ("Electronic Filing Requirements").

**ALPINE'S RESPONSE TO SOF No. 3.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

First, the guidance does not have the "force of law" and cannot serve as the basis for a violation because it is not promulgated pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551-559.  *See United States v. Budovsky*, 2015 WL 5602853, at *10 (S.D.N.Y. Sept. 23, 2015) ("The FinCEN Guidance did not create new law. It is, as it announces, merely interpretive guidance.") (citing *Perez v. Mortgage Bankers Ass'n,* 135 S.Ct. 1199, 1204 (2015) ("interpretive rules do not have the force of law."); *accord Donovan v. American Skandia Life Assurance Corp.,* 2003 WL 217572260, at *1 (S.D.N.Y., July 31, 2003 ("NASD notices, however, are not law and noncompliance therewith cannot itself constitute a violation of the federal securities laws.").

Second, the SEC mischaracterizes the language and intended meaning of the guidance by

citing it out of context and omitting other relevant provisions. The cited guidance states that it provides "suggest[ions]" for preparing a SAR narrative and that it is "provided solely to assist respective financial institutions in strengthening existing due diligence initiatives and anti-money laundering programs." *See* SEC's Ex. 1, at pp. 2, 4, 7.  Further, in the section of the guidance that discusses how to identify "why does the filer think the activity is suspicious," the guidance states: "We ***suggest*** that you first describe briefly your industry or business . . . . Then describe, as fully as possible, why the activity or transaction is unusual for the customer; ***consider*** the types of products and services offered by your industry, and the nature and normally expected activities of similar customers."  *Id.* at p. 4 (emphasis added).

Third, the guidance cited by the SEC cannot be read in isolation, but must be read in conjunction with other relevant sources discussing the subjective judgment and decision-making process that is inherent in both a financial institution's decision to file a SAR and preparation of a SAR.  These additional sources are set forth in detail in Alpine's Add'l SOF Nos. 11-21, and are incorporated by reference herein.  By way of example here, the SEC disregards the following:

- Statements by the Director of FinCEN that "[t]he cornerstone of the Bank Secrecy Act, suspicious activity reporting, requires financial institutions to make judgment calls."  Alpine Add'l SOF No. 13.

- Statements of FinCEN in the Federal Register that a SAR "requires a financial institution to make a subjective determination of what is suspicious prior to its filing. . . ."  73 Fed. Reg. 74010, 74011 (December 5, 2008).

- Statements of FinCEN that the analysis of suspicious activity and decisions to file a SAR is based on "all of the facts and circumstances of the transaction." Alpine Add'l SOF No. 15.

- Statements from FinCEN that "examiners will accept a firm's decision not to file a SAR-SF as long as the firm demonstrates that it had reasonable, risk-based controls and a reasonable decision making process" and the SAR decision "was reasonable under the facts and circumstances." SEC Ex. 3, at p. 23.

- Statements of the Federal Financial Institutions Examination Counsel ("FFIEC") that

the "decision to file a SAR is an inherently subjective judgment," and thus "[e]xaminers should focus on whether the [financial institution] has an effective SAR decision-making process, not [on] individual SAR decisions." Alpine Add'l SOF No. 11.

- The instructions to the SAR Form 101 and 111 directing files to describe in the narrative "what was unusual or irregular *that caused suspicion.*" SEC Ex. 9, p. 110; *accord* SEC Ex. 8, Part IV (providing similar instruction).

- Statements in NASD Notice 02-21 that "[b]roker/dealers need to **look for signs** of suspicious activity that suggest money laundering. If a broker/dealer detects 'red flags,' *it should perform additional due diligence before proceeding with the transaction*," and noting that "the obligation to develop and implement an AML compliance program is not a 'one-size-fits-all' requirement," but should "reflect[] Congressional intent that each financial institution should have the flexibility to tailor its AML program to fit its business." *See* SEC's Ex. 11 at pp. 4, 10 (emphasis added).

Fourth, the phrase in the portion of the guidance cited by the SEC – "failure to adequately describe the factors" – is vague and ambiguous.

**SEC'S SOF No. 4.** Alpine's written procedures and written training materials incorporated the robust body of guidance published by FinCEN and FINRA that clarifies the requirement that SAR filers provide complete descriptions of suspicious transactions. *See* Ex. 4 at 40 (excerpts from Alpine's "WSP Manual"); Ex. 5 (Alpine training material that incorporates a presentation published by FinCEN titled *Keys to Writing a Complete and Sufficient SAR Narrative*). Alpine's training materials incorporate FinCEN guidance on the five essential elements published by FinCEN. Ex. 5 at SEC-ALPINE-E-0687773 ("The 5 'W's' of Information").

**ALPINE'S RESPONSE TO SOF No. 4.** Alpine disputes the SEC's characterization of Alpine's WSPs and training materials because, as set forth below, it removes the language from its proper context, which should be considered in its entirety and which sets forth Alpine's actual policies and process.

First, the SEC mischaracterizes the language and intended meaning of Alpine's WSPs

and omits other relevant provisions. The cited page of Alpine's WSPs does not support the
SEC's statement that Alpine "incorporated" unidentified guidance "that clarifies the requirement
that SAR filers provide complete descriptions of suspicious transactions." Rather, at most, the
cited page of Alpine's WSPs reference NASD Notice 02-21 in connection with a list of "risk
indicators . . . that *may* suggest potential money laundering." *See* SEC's Ex. 4, at 40 (emphasis
added). Accordingly, if a red flag is present, it may indicate money laundering or it may not.
The SEC also omits relevant provisions of Alpine's WSPs, including but not limited to, the
provision stating: "Determining whether an activity or series of activities is suspicious is a facts
and circumstance analysis . . . made by the AML Compliance Officer or designee." *See* Alpine
Add'l SOF 31; *see also id.* at 24-36 for additional relevant provisions of Alpine's WSPs.

Second, the SEC also mischaracterizes Alpine's "training materials" and views them out
of context. Alpine's training materials do not "incorporate" the guidance; the training materials
discusses the guidance as a "helpful" "resource." *See* SEC Ex. 5 at SEC-ALPINE-E-0687763.
Additionally, the citation to one set of written training materials omits the fact that Alpine's
AML program includes a system of review, due diligence and additional analysis by multiple
parties in order to come to the ultimate conclusion of whether to file a SAR and what to include
in the SAR narrative, which would not include a "red flag" if such a flag did not raise suspicion
after review. *See* Alpine's Add'l SOF 38-53.

Third, Alpine disputes the citation to the guidance for the reasons stated in Alpine's
*Dispute of SOF 3.*

**SEC'S SOF No. 5.** In September 2012, FINRA advised Alpine of its findings that the
narratives for all 823 SARs reviewed by FINRA were substantively inadequate because they

failed to fully describe why the activity was suspicious. Ex. 6 at 3-5 (FINRA Report of Examination of Alpine Securities Corporation dated September 28, 2012).

**ALPINE'S RESPONSE TO SOF No. 5.**  Alpine disputes the SEC's citation to the FINRA Report of Examination because, as discussed below, it removes the language from its proper context in the document, which should be considered in its entirety, and thereby alters the meaning.

Alpine directs the Court to other portions of the Report that set forth discussions between Alpine and FINRA leading up to, and during the examination.  *See* Alpine Add'l SOF 65-66.

**SEC'S SOF No. 6.**  Attached as Exhibit 7 is a copy of a settled order in *In re Wells Fargo Advisors, LLC*, Rel No. 82054 (Nov. 13, 2017) (settled order).

**ALPINE'S RESPONSE TO SOF No. 6.**  Undisputed, but immaterial.  The matter referenced in the SEC's Ex. 7 is a settled matter, and the issues discussed therein were not developed through the adversary process and do not constitute authority.  *See, e.g., U.S. Department of Air Force v. F.L.R.A.,* 952 F.3d 446, 450 (D.C. Cir. 1991) (stating "we do not defer to the [agency's] interpretation of regulations promulgated by other agencies."); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (observing, "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

**SEC'S SOF No. 7.**  Attached as Exhibit 8 is a copy of FinCEN Form 101-Suspicious Activity Report by the Securities and Futures Industries, effective May 2004 ("Form 101"). Attached as Exhibit 9 is a copy of FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements (October 2012) ("Electronic Filing Requirements"), which applies to FinCEN's electronic SAR form. Both documents state that the narrative section of the report is

"critical" and must be completed with care so investigators can understand the described activity and its possible criminal nature. Ex. 8 at part VI (Form 101); Ex. 9 at 110 (Electronic Filing Requirements).

**ALPINE'S RESPONSE TO SOF No. 7.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC mischaracterizes and presents the language of the Forms out of context; presents the Form instructions as having the force of law without support; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the SEC's characterization of the language of the Forms omits its statement that "information already provided in earlier parts of this form need not necessarily be repeated if the meaning is clear."  Discussion of who, what, when, and where and other details of the transaction at issue in the SAR are set forth in the other parts of the Form.  (*See* SEC Ex. 8, at Parts I-III.)

**SEC'S SOF No. 8.**  Form 101, which was required during the relevant period until 2013, required the filer to provide in the narrative section a "clear" and "complete" description of the suspicious activity, including what is "unusual, irregular, or suspicious about the transaction(s), using the checklist below as a guide…." Ex. 8 at part VI (Form 101). The form also directed filers to a FinCEN website with tips on SAR form preparation and filing. *Id.* "Form 111," which was required from 2013 through the end of the relevant period, provided similar instructions and a similar checklist. Ex. 9 at 110-112 (Electronic Filing Requirements).

**ALPINE'S RESPONSE TO SOF No. 8.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC mischaracterizes and presents the language of the Forms out of context; presents the Form instructions as having the force of law

without support; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

First, the SEC mischaracterizes the language and intended meaning of the Form because the instructions in the Forms do not impose any set requirements for what must be included in a SAR narrative, or state that any of the red flags cited by the SEC must be included in the narrative. *See* SEC Ex. 8, at Part IV; SEC Ex. 9, at 98, 110-112.  Rather, the instructions to Form 101 direct the filer to describe "what is unusual, irregular or suspicious ***about the transaction(s)***." SEC Ex 8, Part IV (emphasis added).  The instructions to Form 111 direct the filer to describe "what was usual or irregular that ***caused suspicion***." SEC. Ex. 9 (emphasis added). The forms do not require Alpine to describe anything in the narrative that did not cause suspicion to the AML Officer in his or her subjective judgment, under the facts and circumstances of the transaction, in preparing and filing the Form.  *See* SEC's Ex. 8 and 9; *see also* Alpine's Add'l SOF 42, 46, 49-50, 53.

Furthermore, contrary to the SEC's characterization, the instructions use permissive language with respect including items on the checklist:  "Filers ***should*** use the following checklist as a ***guide*** for preparing the narrative." SEC Ex. 9 at p. 111 (emphasis added); *accord* SEC Ex. 8 (using very similar language).  The checklist thus does not impose mandatory content requirements, or require the inclusion of any of the red flags identified by the SEC.  It is intended to serve as a guide to help the filer describe what caused it suspicion. The checklist item to "[i]indicate whether any information has been excluded from the report," for example, cannot be read to require the listing of information that was unrelated to the filer's determination of what was suspicious about the transaction.  (*See* SEC Ex. 8, Part IV, ¶ K.) Otherwise, a filer would have to identify an unlimited universe of information that had nothing to do with the SAR filing.

8

Second, the SEC has not established the "instructions" for SAR Form 111 were promulgated in accordance with the requirements of the APA to give them "force of law" for the reasons stated in Alpine's *Dispute of SOF 3. See also, e.g., United States v. Reinis,* 794 F.2d 506, 508 (9th Cir. 1986) (holding that a Currency Transaction Reporting Form 4789 was "not effective as a regulation" under the BSA and could not serve as the basis for a violation because it was "never promulgated pursuant to the rule making requirements of the Administrative Procedures Act, 5 U.S.C. § 553").

Third, the SEC's citation to the form is incomplete for the reasons stated in Alpine's *Dispute of SOF 7*.

**SEC'S SOF No. 9.**  The checklists in the required SAR form instructions directed Alpine to describe in the SAR narrative the conduct that raised suspicion, indicate whether any information has been excluded from the report, indicate whether there is any related litigation, and describe foreign banks, foreign nationals and the transfer of funds to or from a foreign country involved in the transaction. Ex. 8 at Part VI (Form 101); Ex. 9 at 110 (Electronic Filing Requirements).

**ALPINE'S RESPONSE TO SOF No. 9.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below: the SEC mischaracterizes and presents the language of the Forms out of context; presents the Form instructions as having the force of law without support; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, Alpine directs the Court to Alpine's *Dispute of SOFs 7 and 8.*

Additionally, the SEC's characterization of the checklist provisions with respect to "foreign" matter is not supported by the cited source.  The checklists state on these issues:

- "Indicate whether U.S. or foreign currency and/or U.S. or foreign negotiable instrument(s) were involved [in the transaction at issue].  If foreign, provide the amount, name of currency, and country of origin."  SEC Ex. 8, Part IV, ¶ L; SEC Ex. 9 at p. 112.

- "Indicate . . . any foreign bank(s) account number(s), which may be involved [in the transaction at issue]." SEC Ex. 8, Part IV, ¶ O; SEC Ex. 9 at p. 112.

- "Indicate for a foreign national any available information on subject's passport(s), visa(s) and/or identification card(s).  Include date, country, city of issue, issuing authority, and nationality." SEC Ex. 8, Part IV, ¶ P; SEC Ex. 9 at p. 112.

- "Describe any suspicious activities that involve transfer of funds to or from a foreign country, or transactions in a foreign currency." SEC Ex. 8, Part IV, ¶ Q; SEC Ex. 9 at p. 112.

None of these checklist items is as broad as the SEC states.  Further, the language of each, when read in the context of the form, clearly indicates that the information should be included only if it relates to the activity that caused suspicion.  The Forms thus cannot be read to suggest that the existence of a red flag imposes an automatic SAR reporting requirement.

**SEC'S SOF No. 10.**  FinCEN's guidance instructs broker-dealers like Alpine to "identify the five essential elements of information—*who? what? when? where? and why?*—of the suspicious activity being reported" and to include "a summary of the 'red flags' and suspicious patterns of activity that initiated the SAR." *Suggestions for Addressing Common Errors Noted in Suspicious Activity Reporting* (Oct. 10, 2007) at p. 2 & n. 3 (citing *Preparing a Complete & Sufficient SAR Narrative* at 3) ("*Suggestions for Addressing Common Errors*"), attached hereto as Ex. 10. According to FinCEN, the "why?" element requires broker-dealers to answer the question "*Why does the filer think the activity is suspicious?*" Ex. 1 at 4 (*Preparing a Complete & Sufficient SAR Narrative*); *see also* Ex. 2 at 40 (*SAR Activity Review Issue 22*).

**ALPINE'S RESPONSE TO SOF No. 10.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which

confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the guidance cited in SEC's Ex. 10 does not state that a broker-dealer must "include a 'summary of the "red flags" and suspicious patterns of activity . . . .'" That language does not appear in the SEC's Ex. 10 and the term "red flags" is not even mentioned therein.

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance as having "force of law," and omits other relevant industry materials.

**SEC'S SOF No. 11.**  In 2002, NASD published examples of red flags relevant to broker-dealers. NASD Special Notice to Members 02-21, *NASD Provides Guidance to Member Firms Concerning Anti-Money Laundering Compliance Programs Required by Federal Law* at 10-11 (April 2002) ("Notice 02-21"), attached as Ex. 11.

**ALPINE'S RESPONSE TO SOF No. 11.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, NASD Notice 02-21 was issued before the SAR regulation for broker-dealers went into effect, and focuses on money laundering program requirements.  *See* SEC Ex. 11, at 1-9.  By focusing only on the "red flag" language, the SEC omits that the guidance states, "Treasury notes that a risk-based approach to developing compliance procedures that can be reasonably expected to promote the detection and reporting of suspicious activities should be the focus of a broker/dealer's AML compliance program."  *See id.,* at 9.  The SEC also omits language from the guidance stating that "[b]roker/dealers should file a SAR . . . of all transactions that arouse ***articulable suspicion that proceeds of criminal, terrorist or corrupt activities may be involved***."  *Id.* (emphasis added).

11

With respect to the portion of the Notice discussing the "red flags," the SEC mischaracterizes the stated purpose of those red flags.  The lead-in language to the "red flag" list states: "Broker/dealers need to look for signs of suspicious activity that suggests money laundering.  If a broker/dealer detects 'red flags,' it should perform ***additional due diligence*** before proceeding with the transaction."  *Id.* at p. 10 (emphasis added).  The Notice further states that an "awareness of the 'red flags' will help ensure that broker/dealer personnel can identify circumstances warranting ***further due diligence.***" *Id.* at p. 11 (emphasis added).  Thus, according to the Notice, the broker-dealers should use "red flags" as part of its "risk-based approach" to monitor for suspicious activity. Where the broker-dealer identifies a red flag, it triggers a duty to investigate further.  The firm would be required to file a SAR only when, as a result of its investigation, it has an "articulable suspicion that proceeds of criminal, terrorist or corrupt activities may be involved." *Id.*  at 9-11.

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance as having "force of law," and omits other relevant industry materials.

**SEC'S SOF No. 12.**  In January 2009, FINRA published a set of red flags for broker-dealers that included shell companies and issuers without current or complete SEC filings. FINRA Regulatory Notice 09-05, *Unregistered Resale of Restricted Securities* at 3-4 (January 2009) ("Notice 09-05"), attached as Ex. 12.

**ALPINE'S RESPONSE TO SOF No. 12.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the SEC mischaracterizes the language and intended meaning of the

guidance by citing it out of context and omitting other relevant provisions.  Notice 09-05 deals with the issue of resales of unregistered securities, as indicated by the title of the Notice, and is of dubious relevance to the issues in this case.  *See* SEC Ex. 12, at pp. 1-7.  Given its intended purpose, the list of "red flags" are directed to looking for signs of whether an "unregistered distribution[]" of securities complies with an exemption from registration.  *Id.* at pp. 3-4.

The Notice further indicates that the listed "red flags" should not be considered a "'roadmap' for compliance purposes," but rather may signal that the "firm should take a closer look at the circumstances of a proposed resale transaction," to assess whether "restricted securities are eligible for public resale." *Id.* at 4.  The Notice states that this is a "question of fact which requires an inquiry regarding the surrounding circumstances," *id.* at p. 2, and that the "amount of inquiry called for necessarily varies with the circumstances of a particular case." *Id.* at p. 4; *see also id.* at p. 9.

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance as having "force of law," and omits other relevant industry materials.

**SEC'S SOF No. 13.**  In 2010, FINRA published a template for AML programs that identified red flags for broker dealers, including red flags associated with transactions involving penny stock companies in FINRA's *Updated Small Firm Template Anti-Money Laundering (AML) Program* at 34-35 (updated as of January 1, 2010) ("*Small Firm Template*"), attached as Ex. 13.

**ALPINE'S RESPONSE TO SOF No. 13.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

13

Specifically, by focusing only on the "red flag" list, the SEC reads the guidance out of context and ignores that the Small Firm Template (the "Template") is simply provides language that firms can employ in developing an AML program. *See id.,* at p. 1. The "red flag" list is provided as language that firms could include in their written AML program procedures, not as any form of notice that any of these red flags creates automatic grounds for suspicion and requires either a SAR filing or inclusion in a SAR narrative. *See id.,* at p. 33 ("TEXT EXAMPLE: Red flags that signal possible money laundering or terrorist financing include, but are not limited to . . . ."). Thus, firms can choose to include these red flags in their written AML program or not. *Id.* at 1, 33. The Template also suggests language that could be included in written AML program procedures for "Responding To Red Flags and Suspicious Activity": "TEXT EXAMPLE: When an employee of the firm detects any red flag, or other activity that may be suspicious, he or she will notify . . . . Under the direction of the AML Compliance Person, the firm will determine ***whether or not and how*** to ***further investigate the matter***. This may include gathering additional information . . . and/or filing a SAR-SF." *Id.* at 36 (emphasis added).

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC omits other relevant industry materials and improperly treats this guidance as having "force of law." On this latter point, the Template itself makes clear its non-binding nature by expressly stating that "[n]othing in this template creates any new requirements for AML programs." SEC Ex. 13, at p. 1.

**SEC'S SOF No. 14.** In May 2009, FinCEN published a set of red flags relevant to potentially suspicious transactions involving low-priced securities known as "penny stocks" that included large deposits and transfers of thinly-traded securities. Ex. 3 at 24 (*SAR Activity Review Issue 15*).

**ALPINE'S RESPONSE TO SOF No. 14.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law" removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the SEC mischaracterizes the language and intended meaning of the guidance by citing it out of context and omitting other relevant provisions.  The cited portion of the guidance is in the section titled: "Common Examination Findings." SEC Ex. 3, at p. 23.  The guidance then indicates that it is a "common examination finding" that "firms have failed to identify and report, as necessary, potentially suspicious transaction s involving low-priced securities known as 'penny-stocks,' including the scenario identified by the SEC.  *Id.*, at p. 24. The guidance continues, again as a common examination finding, that "[t]ransactions like these are red flags for the sale of unregistered securities, and possibly even fraud and market manipulation; ***they need to be investigated thoroughly by the firm*.**"  *Id.* (emphasis added).

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance as having "force of law," and omits other relevant industry materials.

**SEC'S SOF No. 15.**  Alpine's Written Supervisory Procedures contains a list of red flags that mirrors the lists published by FinCEN and FINRA. Ex 4 at 40 (WSP).

**ALPINE'S RESPONSE TO SOF No. 15.**  Alpine disputes the SEC's characterization of Alpine's WSPs because, as set forth below, it removes the language from its proper context, which should be considered in its entirety and which sets forth Alpine's actual policies and process.

Specifically, the SEC mischaracterizes the language and intended meaning of Alpine's WSPs.  The WSPs cited by the SEC contain "examples of risk indicators (red flags) that may

suggest possible money laundering." *See* SEC Ex. 4. The fact that Alpine's WSPs contain risk

indicators does not translate to an automatic duty to file a SAR or report a "risk indicator" in the

narrative of a SAR filed for other reasons. The SEC cites no provision of the WSPs that impose

such a duty. Rather, Alpine's WSPs state that "[i]t is always the manager or AML compliance

officer's discretion, when taking into consideration all factors, when a SAR must be filed." *See*

SEC Ex. 4, at p. 157. Additionally, the WSPs list the elements of 31 C.F.R. § 1023.320 for

describing when a "SAR must be filed." *Id.* at pp. 157-58.  Thus, only if the AML compliance

officer determines, in his or her subjective judgment, based on all facts and circumstances of the

transaction, that it is suspicious within the meaning of the SAR regulation, 31 C.F.R. § 1023.320,

must a SAR be filed. Alpine further directs the Court to its *Dispute of SOF 4.*

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats

this guidance purportedly incorporated into Alpine's WSPs as having "force of law,"  and omits

other relevant industry materials.

**SEC'S SOF No. 16.**  Alpine filed Sample SAR A and prepared the content that appears

in the narrative section of the SAR. Ex. 14 at 4 ("Sample SAR A").

**ALPINE'S RESPONSE TO SOF No. 16.**  Undisputed.

**SEC'S SOF No. 17.**  Alpine filed Sample SAR B and prepared the content that appears

in the narrative section of the SAR. Ex. 15 at 8 ("Sample SAR B").

**ALPINE'S RESPONSE TO SOF No. 17.** Undisputed.

**SEC'S SOF No. 18.**  Alpine filed Sample SAR C and prepared the content that appears

in the narrative section of the SAR. Ex. 16 at 4 ("Sample SAR C").

**ALPINE'S RESPONSE TO SOF No. 18.**  Undisputed.

**SEC'S SOF No. 19.**  NASD published a notice to members stating that the fact that a customer or person associated with the customer has a questionable background or is the subject criminal, civil, or regulatory violations is a recognized red flag of suspicious activity. Ex. 11 at 10 (Notice 02-21).

**ALPINE'S RESPONSE TO SOF No. 19.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Alpine directs the Court to its *Disputes of SOF 3 and 11.*

**SEC'S SOF No. 20.**  FinCEN published guidance stating that, once potentially suspicious activity is identified, a broker-dealer must "use readily available public information about a customer's criminal or regulatory history when evaluating potentially suspicious activity" for the SAR form required for broker-dealers. Ex. 3 at 24 (*SAR Activity Review Issue 15*).

**ALPINE'S RESPONSE TO SOF No. 20.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the SEC mischaracterizes the language and the intended meaning of the guidance by citing it out of context and omitting language.  As indicated in Alpine's *Dispute of SOF 14,* incorporated herein by reference, the portion of the guidance cited by the SEC here sets forth a "common examination finding." SEC Ex. 3, at p. 24.  The actual language referenced states that it is a "common examination finding" that:

**Inadequate due diligence conducted once potentially suspicious activity is identified**; for example, a firm may fail to use readily available public information about a customer's criminal or regulatory history when evaluating potentially suspicious activity.

*Id.* (emphasis added). When the full language is considered in its proper context, it is clear that FinCEN is only identifying a common examination finding of inadequate due diligence in some circumstances, not stating that it requires a filing of or inclusion in a SAR.

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance purportedly incorporated into Alpine's WSPs as having "force of law," and omits other relevant industry materials.

**SEC'S SOF No. 21.**  Alpine incorporated a customer's criminal and regulatory history as a red flag into its own written procedures. Ex. 4 at 40 ("WSP Manual"). Alpine submits SARs with a narrative section stating that "the authorized signer for [the customer] is currently the subject of an ongoing SEC investigation" or that the "authorized signer for [the customer] has been the subject of recent regulatory action(s). For this reason this deposit may also be suspicious." Ex. 57 at 8; Ex. 52 at 8.

**ALPINE'S RESPONSE TO SOF No. 21.**  Alpine disputes the SEC's characterization of Alpine's WSPs and the statements in SAR N because, as set forth below, the SEC removes the language from its proper context, which should be considered in its entirety and which sets forth Alpine's actual policies and process.

With respect to the SEC's mischaracterization of Alpine's WSPs, Alpine directs the Court to its *Disputes of SOF 4 and 15.*

Further, the information regarding SAR N is taken out of context because the fact that Alpine, in connection with the facts and circumstances of the transaction at issue in SAR N, determined that the ongoing litigation was relevant to that SAR filing decision, does not suggest

that it constitutes an automatic requirement or that it is relevant to any other SAR determinations. This is consistent with FinCEN and other regulatory guidance. *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 22.**  Alpine filed Sample SAR D and prepared the content that appears in the narrative section of the SAR. Ex. 17 at 4 ("Sample SAR D").

**ALPINE'S RESPONSE TO SOF No. 22.**  Undisputed.

**SEC'S SOF No. 23.** The support file for Sample SAR D contains screenshots of Alpine's searches on the SEC website dated September 29, 2011, which reveal ongoing litigation. Ex. 18 at ALPINE00165141-42 ("SAR D Support File").

**ALPINE'S RESPONSE TO SOF No. 23.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 24.**  Alpine filed Sample SAR E and prepared the content that appears in the narrative section of the SAR. Ex. 19 at 4 ("Sample SAR E").

**ALPINE'S RESPONSE TO SOF No. 24.**  Undisputed.

**SEC'S SOF No. 25.** Alpine received a letter dated July 23, 2012 that the customer in SAR E had a criminal background involving bank fraud, mail fraud, and wire fraud. Ex. 20 at SEC-ALPINE-E-1338380 ("SAR E Support File").

**ALPINE'S RESPONSE TO SOF No. 25.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a

SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

Additionally, the SEC misidentifies Alpine's "customer" on this transaction.  Alpine's "customer" is the introducing broker.  *See* Alpine Add'l SOF 7. The individual referenced in the support file of SAR E is the introducing broker's "customer."  *See* SEC Ex. 20, at SEC-ALPINE-E-1338379, 1338390.

**SEC'S SOF No. 26.**  Alpine filed Sample SAR F and prepared the content that appears in the narrative section of the SAR. Ex. 21 at 8 ("Sample SAR F").

**ALPINE'S RESPONSE TO SOF No. 26.**  Undisputed.

**SEC'S SOF No. 27.** Alpine's records show that the customer in SAR F had regulatory history with the SEC for misrepresentation and misappropriation of client funds. Ex. 22 at ALPINE_SUPP_PROD_SEC 00027703 ("SAR F Support File").

**ALPINE'S RESPONSE TO SOF No. 27.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

Additionally, the SEC again misidentifies Alpine's "customer" on this transaction.  Alpine's "customer" is the introducing broker.  *See* Alpine Add'l SOF 7.  The individual referenced in the support file of SAR F is the introducing broker's "customer."  *See* SEC Ex. 22, at ALPINE_SUPP_PROD_SEC 00027702.

**SEC'S SOF No. 28.** Shell companies are common tools for money laundering and other financial crimes. FIN-2006-G014, *Potential Money Laundering Risks Related to Shell*

*Companies* at 2 (Nov. 9, 2006) ("*Potential Money Laundering Risks*"), attached as Ex. 23. The term shell company "refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence (other than a mailing address) and generate little to no independent economic value." *Id.* at 1.

**ALPINE'S RESPONSE TO SOF No. 28.**   Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the referenced guidance states that "[m]ost shell companies are formed by individuals and businesses for legitimate reasons."  *See* SEC Ex. 23, at pp. 1, 4. FinCEN continues, however, that "these entities have also been used for illicit purposes," and thus reminds financial institutions to "assess the risks involved in each shell company relationship and take steps to ensure that the risks are appropriately and effectively identified and managed in accordance with their BSA obligations."  *Id.* at p. 4.

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance purportedly incorporated into Alpine's WSPs as having "force of law,"  and omits other relevant industry materials.

**SEC'S SOF No. 29.**  FinCEN guidance states that "[e]xamples of common patterns of suspicious activity are … suspected shell entities." Ex. 1 at 5 (*Preparing a Complete & Sufficient SAR Narrative*). FinCEN also directs financial institutions to include identification of shell companies in SARs. Ex. 23 at 5 (*Potential Money Laundering Risks*). FINRA states that that a

red flag for broker-dealers exists in stock transactions where the issuer was a shell company when it issued the shares.  Ex. 12 at 3 (Notice 09-05).

**ALPINE'S RESPONSE TO SOF No. 29.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law"; misquotes the guidance and removes it from its proper context; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the SEC misquotes FinCEN's guidance in SEC Ex. 23.  That guidance does not "direct financial institutions to include identification of shell companies in SARs," unless the shell company caused suspicion.  SEC Ex. 23, at p. 5 ("The narrative should use the term 'shell' *as appropriate.*"); *see also Alpine's Dispute of SOF 28;* SEC Ex. 8, at Part IV *and* SEC 9 at 110 (filer should use the narrative to describe what caused suspicion).

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance purportedly incorporated into Alpine's WSPs as having "force of law,"  and omits other relevant industry materials.

**SEC'S SOF No. 30.** Chapter 9 of Alpine WSP, which concerns Alpine's Anti-Money Laundering (AML) Program, includes a subchapter on shell companies that cites FinCEN's *Potential Money Laundering Risks* and reproduces a portion of the text. Ex. 4 at 172.

**ALPINE'S RESPONSE TO SOF No. 30.** Undisputed.

**SEC'S SOF No. 31.** Alpine uses standardized "Deposited Securities Checklist," which is included in many of the SAR support files created by Alpine. These forms contain a section titled "Shell Company" that requires verification of whether an issuer of the deposited stock is or ever was a shell company. *E.g.* Ex. 18 at ALPINE00165090 ("SAR D Support File").

**ALPINE'S RESPONSE TO SOF No. 31.**   For the reasons stated below, Alpine disputes the SEC's characterization of the use of the Deposited Securities Checklist by Alpine, and its alleged presence in "many of the SAR support filed created by Alpine."

Specifically, the Deposited Securities Checklist in Ex. 18 was not created or completed by Alpine.  Rather, the Checklist was created and completed by the introducing broker on the account.  *See* SEC Ex. 18 at ALPINE00165090.  Additionally, the statement that the Deposited Securities Checklist is in many of Alpine's SAR support files is not supported by the cited source.

**SEC'S SOF No. 32.** FinCEN instructs that a red flag exists where the "issuer's SEC filings are not current, are incomplete, or nonexistent." Ex. 12 at 4 (Notice 09-05).

**ALPINE'S RESPONSE TO SOF No. 32.**   Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law"; misquotes the guidance and removes it from its proper context; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the cited source, Notice 09-05 was not issued by "FinCEN," but by FINRA. Additionally, Alpine directs the Court to its *Dispute of Fact 12* with respect to the SEC's extraction and use of the language from Notice 09-05.

Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this guidance purportedly incorporated into Alpine's WSPs as having "force of law,"  and omits other relevant industry materials.

**SEC'S SOF No. 33.** The support file for Sample SAR C contains a handwritten note stating that the issuer of the deposited stock was a shell company "w/in last year." Ex. 24 at ALPINE00220209 ("SAR C Support File").

**ALPINE'S RESPONSE TO SOF No. 33.** Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination. *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 34.** The support file for Sample SAR A states that the issuer of the deposited stock was a shell company. Ex. 25 at SEC-ALPINE-E-1690740 ("SAR A Support File").

**ALPINE'S RESPONSE TO SOF No. 34.** Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination. *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 35.** Alpine filed Sample SAR G and prepared the content that appears in the narrative section of the SAR. Ex. 26 at 4 ("Sample SAR G").

**ALPINE'S RESPONSE TO SOF No. 35.** Undisputed.

**SEC'S SOF No. 36.** The support file for Sample SAR G states that with respect to the issuer, "SEC reporting, not current in filings – no form 10 information filed since period ending …, no company website found." Ex. 27 at ALPINE0243435 ("SAR G Support File"). The SAR

G Support File also contains a screenshot of the OTC Markets website for the issuer that contains a stop sign signal. *Id.* at ALPINE00243460.

**ALPINE'S RESPONSE TO SOF No. 36.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

Additionally, this fact is conclusory and vague. The SEC has not provided any discussion on what a "form 10" is or how it is relevant.  Nor has the SEC provided any information on who OTC Markets is, or what a "stop sign" symbol on an OTC Markets' website means.

**SEC'S SOF No. 37.** NASD states in Notice 02-21 that transactions in penny stocks with no apparent reason or in conjunction with other red flags are suspicious because they have been used in connection with fraudulent schemes. Ex. 11 at 11 (Notice 02-21). Alpine's WSP Manual includes the same language in a list of red flags. Ex. 4 at 41 (WSP Manual).

**ALPINE'S RESPONSE TO SOF No. 37.** Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Alpine directs the Court to its *Disputes of SOF 3 and 11*.

**SEC'S SOF No. 38.** Alpine filed Sample SAR H and prepared the content that appears in the narrative section of the SAR. Ex. 28 at 8 ("Sample SAR H").

**ALPINE'S RESPONSE TO SOF No. 38.**  Undisputed.

**SEC'S SOF No. 39.** The support file for SAR H contains a Deposited Securities Checklist, which contains a section titled "Current Information Available" that pertains to the issuer. This section states: "latest PR as of 07/09/12 per company website (Company secured potable water supply. 1 newsletter on 07/30/13 – per stokpromoters.com [sic] – does not appear to be related to client."). Ex 29 at ALPINE0229540 ("SAR H Support File"). The SAR H Support File also contains one page of a four page printed copy of a stock promotion search that stock promoter "Sizzling Stock Picks" received compensation to advertise the stock. *Id.* at ALPINE00229634 (SAR H Support File).

**ALPINE'S RESPONSE TO SOF No. 39.** Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination. *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 40.** Alpine filed Sample SAR J and prepared the content that appears in the narrative section of the SAR. Ex. 30 at 4 ("Sample SAR J").

**ALPINE'S RESPONSE TO SOF No. 40.** Undisputed.

**SEC'S SOF No. 41.** The support file for SAR J contains a Deposited Securities Checklist, which contains a section titled "Current Information Available" that pertains to the issuer. This section states that "latest PR as of 5/21/12 per PS Outside News Source." Ex 31 at ALPINE00180431 ("SAR J Support File"). The SAR J Support File also contains a copy of a news article titled "[XXXX] Stock – Fluff News Makes [XXXX] a Hot Stock." *Id.* at ALPINE00180538 (SAR J Support File).

**ALPINE'S RESPONSE TO SOF No. 41.** Alpine disputes this fact because the SEC

26

presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 42.**  The SAR G Support File contains a printed version of a Google search results, the second of which links to an article promoting the issuer. Ex. 27 at ALPINE00243476 (SAR G Support File).

**ALPINE'S RESPONSE TO SOF No. 42.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 43.** In the *Small Firm Template*, FINRA provides a list of red flags, one of which is where a customer "[p]rovides unusual or suspicious identification documents that cannot be readily verified." Ex. 13 at 33 (*Small Firm Template*). In Notice 09-05, FINRA includes in the list of red flags the facts that an issuer name changes or has nonexistent SEC filings. Ex. 12 at 4 (09-05 Notice).

**ALPINE'S RESPONSE TO SOF No. 43.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA

Alpine directs the Court to its *Disputes of SOF 3 and 13*.

**SEC'S SOF No. 44.**  Alpine filed Sample SAR K and prepared the content that appears in the narrative section of the SAR. Ex. 32 at 8 ("Sample SAR K").

**ALPINE'S RESPONSE TO SOF No. 44.**  Undisputed.

**SEC'S SOF No. 45.**  The support file for Sample SAR K states that issuer's website "is not currently functioning." Ex. 33 at ALPINE00235733 ("SAR K Support File").

**ALPINE'S RESPONSE TO SOF No. 45.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 46.**  Alpine filed Sample SAR L and prepared the content that appears in the narrative section of the SAR. Ex. 34 at 8 ("Sample SAR L").

**ALPINE'S RESPONSE TO SOF No. 46.**  Undisputed.

**SEC'S SOF No. 47.**  The support file for Sample SAR L contains a document showing that issuer corporation was in default status in its state of incorporation at the time of the deposit. Ex. 35 at ALPINE00243156-57 ("SAR L Support File").

**ALPINE'S RESPONSE TO SOF No. 47.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 48.**  A letter of acceptance made available by FINRA states a red flag indicating potential manipulation of a penny stock is where trading activity represents a

28

significant percentage of the overall trading volume in a stock on a given day. Such activity could signify manipulative measures such as wash trades or pre-arranged trades to create the appearance of unrealistic demand for securities. Ex. 36 at 8, *Letter of Acceptance, Waiver, and Consent, In re Brown Brothers Harriman & Co.*, No. 2013035821401 (Feb. 4, 2014).

**ALPINE'S RESPONSE TO SOF No. 48.** Undisputed, but immaterial. This is a settled matter, and the issues discussed therein were not developed through the adversary process and do not constitute authority. Alpine also directs the Court to its *Dispute of SOF 7.*

**SEC'S SOF No. 49.** In *SAR Activity Review Issue 15*, FinCEN provides a list of red flags associated with penny-stocks, which includes a "substantial deposit, transfer or journal of very low-priced and thinly traded securities." Ex. 3 at 24 (emphasis added) (*SAR Activity Review Issue 15*).

**ALPINE'S RESPONSE TO SOF No. 49.** Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law", removes it from its proper context, and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Alpine directs the Court to its *Disputes of SOF 3 and 14.*

**ALPINE'S RESPONSE TO SOF No. 50.** Disputed in part. Alpine does not dispute it filed Sample SAR M. Alpine disputes the references to the information in the support file because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination. *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3.*

**SEC'S SOF No. 51.**  Alpine filed Sample SAR N and prepared the content that appears in the narrative section of the SAR. Ex. 39 at 8 ("Sample SAR N"). The SAR reports a deposit of 65,000,000 shares. *Id.* The support file for Sample SAR N contains multiple pages with handwritten notes of "Low Volume" and states that the volume of the deposited stock was 101,100 per day. Ex. 40 at ALPINE00267609 (Volume of 101,100 and note of "low volume"), ALPINE00267656 ("low volume"); ALPINE00267657 ("low volume") ("SAR N Support File").

**ALPINE'S RESPONSE TO SOF No. 51.**  Disputed in part.  Alpine does not dispute it filed Sample SAR N.  Alpine disputes the references to the information in the support file because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3.*

**SEC'S SOF No. 52.**  Alpine filed Sample SAR P and prepared the content that appears in the narrative section of the SAR. Ex. 41 at 8 ("Sample SAR P"). The SAR reports a deposit of 500,000 shares. *Id.* The support file for Sample SAR P states that the daily volume for the stock described in SAR P is 10,971. Ex. 42 at ALPINE00265096 ("SAR P Support File").

**ALPINE'S RESPONSE TO SOF No. 52.**  Disputed in part.  Alpine does not dispute it filed Sample SAR N.  Alpine disputes the references to the information in the support file because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3.*

**SEC'S SOF No. 53.** FinCEN's required SAR forms instruct broker-dealers to indicate whether the suspicious transaction involves foreign nationals, foreign currency, foreign accounts, and transfer of funds to a foreign country together with related information for each of these facts. Ex. 8 (Instructions to Narrative items l, o, p, and q); Ex. 9 at 111-112 (Electronic Filing Requirements).

**ALPINE'S RESPONSE TO SOF No. 53.** Alpine disputes the SEC's extraction and use of the cited language because, as set forth below: the SEC mischaracterizes and presents the language of the Forms out of context; presents the Form instructions as having the force of law without support; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Alpine directs the Court to its *Disputes of SOF 7-9.*

**SEC'S SOF No. 54.** SAR guidance also instructs Alpine to indicate involvement of foreign individuals or entities: "Filers should also specify whether the activity involved a foreign jurisdiction, such as funds wired overseas, and the foreign jurisdiction and/or financial institution involved, as well as any account numbers associated with the subject of the suspect transaction(s)." Ex. 2 at 40 (*SAR Activity Review Issue 22*).

**ALPINE'S RESPONSE TO SOF No. 54.** Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law"; misquotes it and removes it from its proper context; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Specifically, the cited page of the guidance does not refer to "foreign individuals." Additionally, as set forth in Alpine's *Dispute of SOF 3,* the SEC also improperly treats this

guidance as having "force of law," and omits other relevant industry materials Alpine directs the Court to its *Dispute of SOF 3*

**SEC'S SOF No. 55.**  FinCEN directs broker-dealers to use the SAR narrative to "[s]pecify if the suspected activity or transaction(s) involved a foreign jurisdiction. If so, provide the name of the foreign jurisdiction, financial institution, address and any account numbers involved in, or affiliated with the suspected activity or transaction(s)." Ex. 1 at 4 (*Preparing a Complete & Sufficient SAR Narrative*); *see also id.* at 5 ("Examples of common patterns of suspicious activity are … beneficiaries maintaining accounts at foreign banks that have been subjects of previous SAR filings.").

**ALPINE'S RESPONSE TO SOF No. 55.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law"; removes it from its proper context; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Alpine directs the Court to its *Disputes of SOF 3.*

**SEC'S SOF No. 56.**  Alpine stated in its training materials that, at a minimum, "if [a transaction] involves a foreign jurisdiction, note this (including any identifiers concerning the transaction, name of jurisdiction, financial institution, address, account numbers, etc.)." Ex. 5 at SEC-ALPINE-E-0667765.

**ALPINE'S RESPONSE TO SOF No. 56.**  Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC removes it from its proper context.

Specifically, the SEC refers to the training materials in relation to Sample SARs A and C which were filed prior to August 2012, when the training materials were circulated. *See* SEC Ex. 16, 18; Ex. 5 at SEC-ALPINE-E-0667763, 0667765.   The quoted language appears in the

section of Alpine's training materials regarding a response to "[w]here did the suspicious activity

take place," not in relation to describing "why [] the institution think[s] the activity is

suspicious." Ex. 5 at SEC-ALPINE-E-0667765-66.  The SAR Form 101 also states that

"information already provided in earlier parts of this form need not necessarily be repeated if the

meaning is clear."  Discussion of where a transaction took place are set forth in the other parts of

the Form.  (*See* SEC Ex. 8, at Parts I-III.)

**SEC'S SOF No. 57.**  Alpine reported in Sample SAR N the fact that a customer is a

foreign broker-dealer. Ex. 39 at 8 (Sample SAR N).

**ALPINE'S RESPONSE TO SOF No. 57.**  Alpine disputes this statement as not

supported by the cited source, and taken out of context, for the reasons stated below.

Specifically, the SEC misidentifies Alpine's "customer."  Sample SAR N indicates that

the subject of the SAR was the introducing broker's client, and states only that "the entity is a

foreign broker dealer." *See* SEC Ex. 39, at p. 8; *see also* Alpine's Add'l Facts 7.

The information is taken out of context because the fact that Alpine, in connection with

the facts and circumstances of the transaction at issue in SAR N, determined that the foreign

status was relevant to that SAR filing decision, does not mean it is relevant to any other SAR

determination. This is consistent with FinCEN and other regulatory guidance. *See* Alpine Add'l

SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

**SEC'S SOF No. 58.**  Throughout the relevant period, the Bahamas was identified by the

United States Department of State as a Jurisdiction of Primary Concern for Money Laundering

and Financial Crimes. *See* Bureau Of International Narcotics And Law Enforcement Affairs,

2011 International Narcotics Control Strategy Report (INCSR) (Mar.3, 2011)

https://www.state.gov/j/inl/rls/nrcrpt/2011/vol2/156374.htm#bahamas

**ALPINE'S RESPONSE TO SOF No. 58.**  Undisputed.

**SEC'S SOF No. 59.**  Throughout the relevant period, Belize was by identified by the United States Department of State as a Jurisdiction of Primary Concern for Money Laundering and Financial Crimes. *See* Bureau Of International Narcotics And Law Enforcement Affairs, 2012 International Narcotics Control Strategy Report (INCSR) (Mar. 7, 2012) https://www.state.gov/j/inl/rls/nrcrpt/2012/vol2/184115.htm#Belize

**ALPINE'S RESPONSE TO SOF No. 59.**  Alpine disputes this statement because the "relevant period" in this case began May 17, 2011, and the citation in SOF 59 indicates that Belize was not included until March 7, 2012.

**SEC'S SOF No. 60.**  The SAR A Support File states that one beneficial owner has and address in Belize and that Belize is its jurisdiction of incorporation, Ex. 25 at SEC-ALPINE-E-1690753 (SAR A Support File); one beneficial owner has an address in China and Belize is its jurisdiction of incorporation, *id.* at SEC-ALPINE-E-1690755; and another beneficial owner has an address in Belize and Belize is its jurisdiction of incorporation, *id.* at SEC-ALPINE-E-1690757.

**ALPINE'S RESPONSE TO SOF No. 60.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

Additionally, the fact that the subject of Sample SAR A is a foreign-based broker is identified in on the first page of SAR A.  *See* SEC Ex. 14, at p. 2.   The SAR Form 101 states

that "information already provided in earlier parts of this form need not necessarily be repeated if the meaning is clear."  (*See* SEC Ex. 8, at Parts I-III.)

**SEC'S SOF No. 61.**  The support file for Sample SAR H indicates that Alpine's customer acquired the underlying shares from a Bermuda entity by transferring funds to a Bermuda bank account. Ex. 29 at ALPINE00229540 (customer acquired shares from Whalehaven); ALPINE 00229572 (Whalehaven received payment in a Bermuda bank account) (SAR H Support File).

**ALPINE'S RESPONSE TO SOF No. 61.**  Alpine disputes this fact because the SEC presents this information out of the context of all of the facts and circumstances of the transaction, which under FINCEN's guidance and Alpine's WSPs, must form the basis for a SAR determination.  *See* Alpine Add'l SOF 13-16, 30-33, 42, 50, and 53; *see also* sources cited in Alpine's *Dispute of SOF 3*.

Additionally, the SEC misidentifies Alpine's "customer" on this transaction.  Alpine's "customer" is the introducing broker.  *See* Alpine Add'l SOF 7. The individual referenced in the support file of SAR H is not Alpine's customer.  *See* SEC Ex. 28 (SAR H), at p. 8; *see also* ALPINE00229539-40 (indicating the subject of the SAR was the introducing broker's "client"). Further, the support file for SAR H shows that there were no funds wired to a foreign jurisdiction as a result of the transaction on which the SAR was filed – the deposit of securities in August of 2013.  Rather, that apparently occurred as part of a different transaction in July of 2013, which did not involve Alpine. SEC's Ex. 29, at ALPINE00229572.

**SEC'S SOF No. 62.**  FinCEN guidance identified transactions involving penny stocks that raise red flags of suspicious activity, including the "systematic sale of . . . low priced securities shortly after being deposited, transferred or journaled into [an] account." Ex. 3 at 24

(*SAR Activity Review Issue 15*). FinCEN instructions direct that a suspicious liquidation following the filing of a SAR triggers an obligation to file a new SAR and/or a continuing report. Ex. 9 at 84 ("A continuing report should be filed on suspicious activity that continues after an initial FinCEN SAR is filed.").

**ALPINE'S RESPONSE TO SOF No. 62.**   Alpine disputes the SEC's extraction and use of the cited language because, as set forth below, the SEC improperly presents it as if it has the "force of law"; removes it from its proper context; and disregards other industry materials which confirm that the cited language does not constitute a basis for claiming a violation of the BSA.

Alpine directs the Court to its *Disputes of SOF 3 and 14*.

**SEC'S SOF No. 63.** The following table shows transactions involving Customer A and the securities of Company A:

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value | Exhibit |
|---|---|---|---|---|---|---|
| 2/07/12 | 6,200,000 | $58,900 | | | | 44 |
| 2/24/12 | | | | 90,000 | $10,179.00 | 44 |
| 2/27/12 | 6,200,000 | $62,000 | | | | 45 |
| 2/27/12 | | | | 394,601 | $6,731.89 | 43 |
| 2/28/12 | | | | 400,000 | $5,940.00 | 43 |
| 2/29/12 | | | | 1,403,000 | $22,602.33 | 43 |
| 3/01/12 | | | | 651,000 | $10,448.55 | 43 |
| 3/01/12 | | | SAR filed on 2/7 deposit | | | 44 |
| 3/02/12 | | | | 746,749 | $12,172.01 | 43 |
| 3/05/12 | | | | 2,600,000 | $57,122.00 | 43 |
| 3/06/12 | | | | 1,334,183 | $36,970.21 | 43 |

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value | Exhibit |
|---|---|---|---|---|---|---|
| 3/06/12 | | | | 1,000,000 | $25,640.00 | 43 |
| 3/09/12 | | | | 709,151 | $10,630.17 | 43 |
| 3/14/12 | | | | 268,561 | $5,586.07 | 43 |
| 3/19/12 | | | | 449,226 | $10,493.92 | 43 |
| 3/29/12 | | | SAR filed on 2/27 deposit | | | 45 |
| 4/02/12 | 8,000,000 | $180,000 | | | | 46 |
| 4/16/12 | | | SAR filed on 4/2 deposit | | | 46 |
| 4/19/12 | | | | 519,243 | $9,472.03 | 43 |
| 4/20/12 | | | | 347,382 | $6,687.10 | 43 |
| 4/26/12 | 6,200,000 | $117,800 | | | | 47 |
| 5/17/12 | | | | 2,876,100 | $48,260.96 | 43 |
| 5/25/12 | | | SAR filed on 4/26 deposit | | | 47 |
| 6/8/12 | | | | 800,000 | $7,920.00 | 43 |
| 7/27/12 | | | | 920,000 | $6,256.00 | 43 |
| 8/6/12 | | | | 1,300,000 | $6,565.00 | 43 |
| 8/17/12 | | | | 1,865,700 | $16,753.99 | 43 |
| 9/11/12 | 11,120,000 | $88,960 | SAR filed on 9/11 deposit | | | 48 |
| 9/20/12 | | | | 571,000 | $5,595.80 | 43 |

**ALPINE'S RESPONSE TO SOF No. 63.**  Alpine disputes this fact because, as set forth below, the charts lack foundation.

Specifically, the chart lacks foundation and authentication because the SEC has provided no information regarding who prepared the chart, how it was prepared, and what information was

used to compile it to demonstrate that it fairly and accurately represents what it purports to represent – sales transactions at Alpine.  *See* F.R.E. 901. The SEC submits a Declaration from Counsel stating that it was prepared from "data filtered from a large set of electronic information provided by Defendant in response to Commission requests."  *See* Declaration of Terry R. Miller, at ¶ 5, SEC's Ex. 68.   But again does not identify what "data" or "electronic information" was used to compile the report.

Alpine also directs the Court to Alpine Add'l SOF 80-81 regarding how, as a clearing firm, Alpine aggregates deposits, by journal entry, by stock-type (ticker symbol) within each introduced brokerage account.

### SEC'S SOF No. 64.

The following table shows transactions involving Customer B and the securities of Company B:

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value | Exhibit |
|---|---|---|---|---|---|---|
| 4/25/14 | 802,139 | $21,577.54 | | | | 50 |
| 5/15/14 | | | SAR filed on 4/25 deposit | | | 50 |
| 6/12/14 | 2,679,245 | $23,041.00 | | | | 51 |
| 6/18/14 | 4,081,633 | $32,653.00 | | | | 52 |
| 7/07/14 | | | SAR filed on 6/12 deposit | | | 51 |
| 7/14/14 | | | SAR filed on 6/18 deposit | | | 52 |
| 7/14/14 | 6,333,333 | $63,966.00 | | | | 53 |
| 7/15/14 | 5,090,476 | $23,925.00 | | | | 54 |
| 7/15/14 | | | | 6,333,333 | $30,210.00 | 49 |

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value | Exhibit |
|------|------------------|---------------|----------------------|-------------------|-------------------|---------|
| 7/17/14 | | | | 1,283,000 | $5,132.00 | 49 |
| 7/18/14 | | | | 2,090,500 | $7,588.52 | 49 |
| 8/08/14 | | | SAR filed on 7/14 deposit | | | 53 |
| 8/12/14 | | | SAR filed on 7/15 deposit | | | 54 |
| 8/13/14 | | | | 6,056,250 | $10,901.25 | 49 |
| 8/18/14 | | | | 6,187,400 | $8,352.99 | 49 |

**ALPINE'S RESPONSE TO SOF No. 64.** Alpine disputes this fact because the chart lacks foundation and authentication for the reasons stated in Alpine's *Dispute of SOF 63,* and directs the Court to Alpine Add'l SOF 77-81 regarding Alpine's aggregations of multiple deposits.

**SEC'S SOF No. 65.**

The following table shows transactions involving Customer C and the securities of Company C:

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value | Exhibit |
|------|------------------|---------------|----------------------|-------------------|-------------------|---------|
| 9/18/13 | 14,553,571 | $59,669.00 | | | | 56 |
| 9/19/13 | | | | 2,791,300 | $6,450.69 | 55 |
| 9/23/13 | | | | 4,914,460 | $7,322.55 | 55 |
| 9/24/13 | | | | 5,960,311 | $8,284.83 | 55 |
| 9/27/13 | 10,915,179 | $19,647.00 | | | | 57 |
| 9/28/13 | | | SAR filed on 9/18 deposit | | | 56 |
| 10/5/13 | | | SAR filed | | | 57 |

| Date | Deposited Shares | Deposit Value | SAR Filed on Deposit | Liquidated Shares | Liquidation Value | Exhibit |
|---|---|---|---|---|---|---|
| | | | on 9/27 deposit | | | |
| 10/16/13 | | | | 5,627,472 | $6,173.34 | 55 |

**ALPINE'S RESPONSE TO SOF No. 65.**  Alpine disputes this fact because the chart lacks foundation and authentication for the reasons stated in Alpine's *Dispute of SOF 63,* and directs the Court to Alpine Add'l SOF 77-81 regarding Alpine's aggregations of multiple deposits.

**SEC'S SOF No. 66.**

The following table shows illustrative Late SARs:

| Sample Late SAR | Transaction Date | 30 Calendar Days from Transaction | SAR Date | Days Late | Exhibit |
|---|---|---|---|---|---|
| 1 | 9/02/11 | 10/02/11 | 4/30/12 | 211 | 58 |
| 2 | 9/07/11 | 10/07/11 | 4/30/12 | 206 | 59 |
| 3 | 9/13/11 | 10/13/11 | 5/07/12 | 207 | 60 |
| 4 | 9/15/11 | 10/15/11 | 5/07/12 | 205 | 61 |
| 5 | 9/28/11 | 10/28/11 | 5/04/12 | 189 | 62 |

**ALPINE'S RESPONSE TO SOF No. 66.**  Alpine disputes the contention that any of the "Sample Late SARs" identified in this fact were filed late.  Alpine directs the Court to Alpine Add'l SOF 60-76 in support of this dispute.

**SEC'S SOF No. 67.**  Five samples of SARs for which Alpine failed to maintain supporting documentation that are dated within the previous five years include: Exs. 63 (SAR date 10/30/13); 64 (SAR date 4/30/15); 65 (SAR date 3/08/14); 66 (SAR date 4/10/15); and 67 (SAR date 9/15/14).

**ALPINE'S RESPONSE TO SOF No. 67.**  Alpine disputes this for the reasons set forth in Alpine's SOF Nos. 82-89.  In summary, Alpine has maintained all supporting files and

produced such files in good faith in response to the SEC's investigative subpoenas issued prior to the commencement of this action.  Alpine has again produced documents responsive to the SEC's Table E in this action, identified as ALPINE_LIT000001-ALPINE_167366.  The supporting files for the SARs identified as SEC's Exhibits 63-67 were produced along with all other supporting files for the SARs listed on Table E, identified as follows: SEC's Ex. 63 (ALPINE_LIT020160-020313); SEC's Ex. 64 (ALPINE_LIT157371-157433); SEC's Ex. 65 (ALPINE_LIT035645-036009); SEC's Ex. 66 (ALPINE_LIT083748-083824); and SEC's Ex. 67 (ALPINE_LIT082355-082541).

## II.   ALPINE'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Alpine, by and through undersigned counsel, pursuant to Local Rule 56.1, hereby submits this Statement of Additional Material Facts ("**SOF**") in Support of its Memorandum in Opposition to the SEC's Motion for Partial Summary Judgment.

### Index of Exhibits

1.    Declaration of Erin Zipprich

2.    Santangelo, Betty & Davis, Harry, *Broker Dealer Regulation*, Chapter 24

3.    Updated Small Firm Template

4.    SCA Fully Disclosed Clearing Agreement

5.    ACAP Fully Disclosed Clearing Agreement

6.    Irving M. Einhorn, Opinion Letter

7.    Online Manual BSA Infobase, *Federal Financial Institutions Examination Council*

8.    GAO-09-226, "Suspicious Activity Report Use Is Increasing, but FinCEN Needs to Further Develop and Document Its Form Revision Process," (Feb. 2009)

9.    Statement of William J. Fox, Director Financial Crimes Enforcement United States Department of Treasury Before the House of Representatives, June 16, 2004

10.   FinCEN Guidance (FIN-2006-G013), October 4, 2006

11.   Statement of William F. Baity, Deputy Director, FinCEN, May 10, 2007, before the House Financial Services Subcommittee on Oversight and Investigations

12.   NASD Notice 02-21

13.     NASD Notice 02-47

14.     SEC Letter, December 22, 2017

15.     Alpine's WSPs, April 11, 2013

16.     Alpine's WSPs, August 29, 2014

17.     Alpine's WSPs, October 1, 2015

18.     FIN-2006-G014, November 9, 2006

19.     Declaration of Randall D. Jones

20.     The SAR Activity Review: Trends, Tips & Issues, Issue No. 15

21.     The SAR Activity Review: Trends, Tips & Issues, Issue No. 1

22.     FINRA Report of Examination, September 28, 2012

23.     FinCEN Guidance (Fin-2007-G003, June 13, 2007)

24.     Rule 56(d) Declaration

25.     SEC's Response to Alpine's Requests for Production

26.     Declaration of Counsel

*Alpine's Background as a Clearing Firm*

1.      Alpine is primarily a clearing broker-dealer.  Alpine's business involves, among other things, clearing microcap securities that are traded in the over-the-counter marketplace.  As part of its clearing agency function, it clears trades for other introducing brokers on a "fully disclosed" basis pursuant to contractual clearing agreements.  *See* E. Zipprich Decl., at ¶ 3, Ex. 1.

2.      Introducing and clearing brokers under contractual clearing arrangements typically divide responsibilities based on their respective capabilities and expertise.  As a general rule, the introducing brokers have the "know-your-customer" obligations, including knowing "essential facts" regarding the client; "opening, approving and monitoring customer accounts"; directly interacting with the client; and "executing customer orders."  A clearing broker, conversely, generally has "back office" or "ministerial duties," such as "preparing written trade confirmations and account statements for the introducing broker's customer"; "receiving or delivering funds or securities to or from the introducing firm's customers"; "maintaining accounts' books and records"; "maintaining custody of customer funds and securities"; and "clearing and settling transactions in customer accounts." *See* Santangelo, Betty & Davis, Harry, *Broker Dealer Regulation,* Chapter 24, at pp. 3-6 (citing authorities), attached as Ex. 2 (excerpt only).

3.      The Department of the Treasury has explained that the "clearing broker has a due diligence obligation with respect to the financial institution within which it has a clearing or carrying agreement," but does not have a "due diligence obligation . . . with respect to the introduced accountholder unless the clearing broker establishes a relationship with the introduced accountholder such that the clearing broker is obligated to make a suitability determination with respect to the securities transactions conducted through the introduced

account." This division of "due diligence" obligations applies to "foreign correspondent accounts" and relationships with "foreign introducing brokers." *Id.,* at 13-18 (citing authorities).

4.      FINRA's Updated Small Firm Template states the following regarding the differing obligations between introducing firms and clearing firms: "Note that a clearing firm does not have an obligation to perform CIP [customer identification program] for an introduced customer if the clearing firm and the introducing firm have entered into a clearing agreement under which the functions of opening and approving customer accounts and directly receiving and accepting orders from the introduced customer are allocated exclusively to the introducing firm and the functions of extending credit, safeguarding funds and securities, and issuing confirmations and statements are allocated to the clearing firm." *See* Updated Small Firm Template (Jan. 1, 2010), at p. 11, Ex. 3.

5.      Alpine, as a clearing firm, entered into and executed a "Fully Disclosed Clearing Agreement" on February 26, 2009, with Scottsdale Capital Advisors, Inc. ("**SCA**") serving as the introducing firm. *See* SCA Fully Disclosed Clearing Agreement, Ex. 4.

6.      Alpine's Fully Disclose Clearing Agreement provides that SCA has the sole responsibility for (1) complying with all applicable laws, regulations, and self-regulatory requirements regarding transactions and accounts, including AML, (2) maintaining procedures to ensure compliance, and (3) knowledge of the customer, including "all essential facts" relating to each customer and their accounts. *See id*., at Sec. 4.1.4, 5.1-5.3 and 6.1-6.8, Ex. 4.

7.      Alpine's Fully Disclosed Clearing Agreement with SCA provides that Alpine "may rely without inquiry on the validity of all customer information furnished to it by broker." *See id*., at Sec. 6.4, Ex. 4. In fact, pursuant to the Fully Disclosed Clearing Agreement, Alpine's "customer" is only the introducing broker as "all customers receiving services pursuant to this

Agreement shall remain customers of Broker [SCA]."  See id., at Sec. 3.2, 6.4, Ex. 4.

8.      Alpine, as a clearing firm, entered into and executed a similar "Fully Disclosed

Clearing Agreement" on October 30, 2009, with ACAP Financial Corporation serving as the

introducing firm.  See ACAP Fully Disclosed Clearing Agreement, Ex. 5.

9.      Alpine sought a legal opinion in October of 2010 from Irving Einhorn, who had

been the head of the SEC's Los Angeles regional office.  After analyzing the relevant facts and

applicable law governing clearing firms, Mr. Einhorn confirmed that Alpine performs primarily a

cashiering or ministerial function with respect to the physical certificate business, in keeping

with the clearing firm's typical functions.  Among other things, Mr. Einhorn concluded that the

contractual relationships between Alpine and its introducing firms, including the allocation of

suitability and "Know Your Customer" obligations, was fully consistent with applicable law.  As

a clearing firm, "Alpine cannot be held responsible for the wrongful conduct of either the

introducing firm or the introducing firm's customer and has no obligation, absent actual

knowledge of an impropriety, to conduct any further inquiry into a security tendered for deposit

into the account of a customer of the introducing firm."  See Irving M. Einhorn, Opinion Letter,

Ex. 6.

10.      Each of the exemplary SARs submitted by the SEC in its Motion for Partial

Summary Judgment involved a transaction introduced by SCA, except for one transaction which

was introduced by ACAP Financial.  Thus, Alpine was acting as the clearing firm in each

transaction at issue in the SEC's Motion for Partial Summary Judgment.  See E. Zipprich Decl.,

at ¶ 17, Ex. 1.

### Guidance on Suspicious Activity Reporting Decision-making

11.      In the Federal Financial Institutions Examination Counsel' online manual, it

confirms that the decision whether to file a Suspicious Activity Report ("**SAR**") is a subjective determination:  "The decision to file a SAR is an inherently subjective judgment.  Examiners should focus on whether the bank has an effective SAR decision-making process, not individual SAR decisions.  Examiners may review individual SAR decisions as a means to test the effectiveness of the SAR monitoring, reporting, and decision-making process.  In those instances where the bank has an established SAR decision-making process, has followed existing policies, procedures, and processes, and has determined not to file a SAR, the bank should not be criticized for the failure to file a SAR unless the failure is significant or accompanied by evidence of bad faith."  *See Online Manual BSA Infobase, Federal Financial Institutions Examination Council*, Ex. 7, (excerpt only) found at:

https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_015.htm

12.     The GAO Report on the Bank Secrecy Act, states: "The SAR guidance in the interagency examination manual that regulators use states that the decision to file a SAR is inherently subjective and directs examiners to focus on whether the institution has an effective SAR decisionmaking process, rather than on individual SAR filing decisions. According to the manual, in those instances where the institution has an established SAR decisionmaking process; has followed existing policies, procedures, and processes; and has decided not to file a SAR, examiners generally should not criticize the institution for not filing a SAR."  GAO-09-226, "Suspicious Activity Report Use Is Increasing, but FinCEN Needs to Further Develop and Document Its Form Revision Process," at p. 19 (Feb. 2009), Ex. 8.

13.     William J. Fox, Director of FinCEN, made the following statement before the House of Representatives regarding FinCEN's approach to compliance under the BSA:

> The cornerstone of the Bank Secrecy Act, suspicious activity reporting, requires
> financial institutions to make judgment calls.  If we fail in properly implementing

this regime, if we get it wrong, then the system will fail.  For example, if as regulators we are either too aggressive or too passive in supervising and examining the financial industries that we regulate, there could be two equally acceptable outcomes.   Compliance should not be about second guessing individual judgment calls on whether a particular transaction is suspicious. If we are overzealous in our examination, financial institutions, as small "c" conservative institutions, will merely defensively file SARs file on anything and everything to protect themselves from regulatory risk.

Statement of William J. Fox, Director Financial Crimes Enforcement United States Department of Treasury Before the House of Representatives, June 16, 2004, Ex. 9.

14.     Mr. Fox also emphasized that it is FinCEN that is charged with responsibility for administration of the BSA which "means exercising oversight, coordination *and ensuring consistency of application*" a goal that would be defeated by colliding interpretations of the requisites of the BSA and the elements of a violation.  *Id*. (emphasis added).

15.     FinCEN guidance states the following regarding the evolving nature of suspicious activities and the need for firms to consider "all" facts and "circumstances": "The means of commerce and the techniques of money launderers are continually evolving, and there is no way to provide an exhaustive list of potentially suspicious transactions.  A mutual fund must consider *all of the facts and circumstances related to the transaction* and the customer in question."  *See* FinCEN Guidance (FIN-2006-G013), October 4, 2006, at pp. 3-4, Ex. 10 (emphasis added).

16.     William F. Baity, Deputy Director, FinCEN, before the House Financial Services Subcommittee on Oversight and Investigations, stated that "[f]inancial institutions file Suspicious Activity Reports (SARs) after a subjective review of numerous variables . . . .").  *See* Statement of William F. Baity, Deputy Director, FinCEN, May 10, 2007, before the House Financial Services Subcommittee on Oversight and Investigations, attached as Ex. 11.

17.     NASD Special Notice to Members 02-21 states, in part, that "[b]roker/dealers need to look for signs of suspicious activity that suggest money laundering. If a broker/dealer

detects 'red flags,' it should perform additional due diligence before proceeding with the transaction."  *See* NASD Notice 02-21, at p. 10, April 2002, "NASD Notice 02-21", Ex. 12.

18.     NASD Notice 02-21 further states that "an awareness of the 'red flags' will help ensure that broker/dealer personnel can identify circumstances ***warranting further due diligence***," and indicates that "[a]ppropriate 'red flags' should be described in the written policies and AML compliance procedures of the broker/dealer." *Id.* at p. 11 (emphasis added).

19.     NASD Notice 02-47, refers to NASD Notice 02-21 as being pertinent to a determination of "whether activities vary substantially from normal practice as to raise suspicions of possible illegality." NASD Notice 02-47, at p. 459, August 2002, attached as Ex. 13.

20.     NASD Notice 02-47 further states that the provisions of 31 C.F.R. 1023.320(a)(2) that requires broker-dealers to disclose transactions that "'involve use of the broker/dealer to facilitate criminal activity,'" is "intended to detect activities that appear to have a criminal purpose but apparently involve legally derived funds."  *Id.*

21.     The SEC, in correspondence dated December 22, 2017, admitted it did not consult or even communicate with FinCEN in relation to the substantive allegations in this case, confirming it "did not discuss any specific SARs or their content, and did not discuss interpretation of FinCEN guidance with individuals at FinCEN in connection with this case at any time." *See* SEC Letter, December 22, 2017, at 5, Ex. 14.

### *Overview of Alpine's Written AML Program Requirements*

22.     A broker-dealer is required to "develop and implement a written anti-money laundering program reasonably designed to achieve and monitor the [broker-dealer's] compliance with the requirements of the Bank Secrecy Act (31 U.S.C. § 5311, et seq.), and the

implementing regulations promulgated thereunder by the Department of the Treasury." FINRA Rule 3310; *see also* 31 U.S.C. § 5318(h); 31 C.F.R. § 1023.210 (setting forth minimum requirements for "anti-money laundering programs").

23.     NASD Notice 02-21 states: "Members should keep in mind that the obligation to develop and implement an AML compliance program is not a 'one-size-fits-all' requirement. The general nature of the requirement reflects Congressional intent that each financial institution should have the flexibility to tailor its AML program to fit its business." *See* NASD Notice 02-21, at p. 4, Ex. 12.

24.     In its Written Standard Procedures ("**WSPs**"), Alpine developed and implemented procedures for both anti-money laundering ("**AML**") review and suspicious activity reporting under the Bank Secrecy Act. *See* Alpine's WSPs, dated April 11, 2013, August 29, 2014, and October 1, 2015, attached hereto as Exhibits 15 through 17 respectively (excerpts only).

25.     Alpine's AML program includes risk-based procedures that are reasonably designed to detect and report known or suspected money laundering activity, including monitoring for suspicious activity and complying with the suspicious activity reporting and recordkeeping requirements of the BSA. *See* E. Zipprich Dec., ¶ 14, Ex. 1; *see also* WSPs, April 11, 2013, at Sec. 3.14 and 9, Ex. 15; WSPs, August 29, 2014, at Sec. 3.14 and 9, Ex. 16; WSPs, October 1, 2015, at Sec. 3.14 and 9, Ex. 17.

26.     Alpine continually updates its WSPs over time, including the AML program and SAR requirements, to address and reflect new developments and incorporate issues and advice from regulators regarding potential money laundering activities, and to ensure that its AML and suspicious activity monitoring programs were effective. *See* E. Zipprich Decl., at ¶ 15, Ex. 1.

27.     Alpine's WSPs confirm, *inter alia,* that "Alpine will file Suspicious Activity

50

Reports (SARs) for transactions that may be indicative of money laundering."  *See* WSPs, April 11, 2013, at p. 152, Ex. 15; WSPs, August 29, 2014, at p. 180, Ex. 16; WSPs, October 1, 2015, at p. 194, Ex. 17.

28.     Alpine's WSPs define "money laundering" as "the movement of criminally derived funds to conceal the true source, ownership, or use of the funds.  The funds are filtered through a maze or series of transactions, so the funds are 'cleaned' to look like proceeds from legal activities."  *See* WSPs, April 11, 2013, at p. 138, Ex. 15; *see also similar language in* WSPs, August 29, 2014, at p. 153-154, Ex. 16 and WSPs, October 1, 2015, at p. 168, Ex. 17.

29.     As to when a SAR "must be filed," Alpine's WSPs state that:

> A SAR must be filed for any transaction that alone, or in the aggregate, involves at least $5,000 in funds or other assets, if Alpine knows, suspects or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is part) falls into one of the following categories:

- Transactions involving funds derived from illegal activity or intended or conducted to hide or disguise funds or assets derived from illegal activity.

- Transactions designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act (BSA).

- Transactions that appear to serve no business or apparent lawful purpose or are not the sort of transactions in which a particular customer would be expected to engage, and for which Alpine knows of no reasonable explanation after examining the available facts.

- Transactions that involve the use of Alpine to facilitate criminal activity.

*See* WSPs, April 11, 2013, at p. 154, Ex. 15; WSPs, August 29, 2014, at p. 186, Ex. 16; WSPs, October 1, 2015, at p. 201, Ex. 17.

30.     In accordance with FinCEN's guidance, all of Alpine's WSPs make clear:  "It is always at the manager or AML compliance officer's discretion, when taking into consideration all factors, when a SAR[] should be filed."  *See* WSPs, April 11, 2013, at p. 154, Ex. 15; WSPs, August 29, 2014, at p. 186, Ex. 16; WSPs, October 1, 2015, at p. 200, Ex. 17.

31.     Alpine's WSPs, as of April 11, 2013, further state, again in accordance with FinCEN's guidance, that "[d]etermining whether an activity or series of activities is suspicious is a facts and circumstance analysis.  Such determinations will be made by the AML Compliance Officer or designee."  *See* WSPs, April 11, 2013, at p. 152, Ex. 15; WSPs, August 29, 2014, at p. 180, Ex. 16; WSPs, October 1, 2015, at p. 194, Ex. 17.

32.     All of Alpine's WSP's contain "examples of risk indicators (red flags) that may suggest potential money laundering" to be considered by employees in the SAR decision making process.  *See* WSPs, April 11, 2013, at p. 152, Ex. 15; WSPs, August 29, 2014, at p. 181, Ex. 16; WSPs, October 1, 2015, at p. 195, Ex. 17.

33.     None of Alpine's WSP's state that Alpine must file a SAR where any of the "risk indicators" exist or that Alpine will include any specific "risk indicator" in the narrative of any and all SARs filed.  *See id.*

34.     Rather, as indicated by NASD Notice 02-21, Alpine's WSPs note that "[i]f a broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding with the transaction."  *See* NASD Notice 02-21, at 10, Ex. 12.

35.     Alpine's WSPs also state the following regarding the use of a shell company, cited by the SEC as a red flag (*see* SEC's SOF, No. 29): "Shell companies can represent a potential money laundering risk.  Most shell companies are formed for legitimate business reasons, but some have been used for illicit purposes. . . . Shell companies ***are subject to review*** which may include [multiple issues]."  *See* WSPs, April 11, 2013, at pp. 176-177, Ex. 15; WSPs, August 29, 2014, at p. 194, Ex. 16; WSPs, October 1, 2015, at pp. 208-209, Ex. 17.

36.     Alpine's WSPs regarding shell companies derives from FinCEN guidance from November of 2006.  The FinCEN guidance does not state that the fact that an issuer is or was a

shell is a red flag.  Rather, FinCEN states that "[m]ost shell companies are formed by individuals and businesses for legitimate reasons," but warns that "these entities have also been used for illicit purposes," and thus reminds financial institutions to "assess the risks involved in each shell company relationship and take steps to ensure that the risks are appropriately and effectively identified and managed in accordance with their BSA obligations."  *See* FIN-2006-G014, November 9, 2006, Ex. 18.

37.     The FinCEN guidance also includes a list of potentially suspicious activities that commonly involve a shell company, such as an "inability to obtain . . . information necessary to identify originators or beneficiaries of wire transfers," or that the "goods and services of the [shell] company do not match the company's profile based on information previously provided to financial institutions," or "multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose."  *Id.*  Importantly, in accordance with 31 C.F.R. § 1023.320(a)(2), FinCEN then states that "if a financial institution discovers suspicious activities such as those listed above *and* knows, suspects or has reason to suspect the transactions involve the use of a United States or foreign-based shell business entities *to **launder illicit funds or enable the furtherance of a crime***, the institution must file a [SAR]" and use the narrative to describe the suspicious conduct that prompted the SAR.  *Id.* (emphasis added).

### *Overview of Alpine's AML review process*

38.     During the relevant time period at issue in this action (May 17, 2011 through December 31, 2015), Alpine received a due diligence packet for each stock deposit from the introducing firm.  The due diligence packet contained information regarding the customer and the transaction.  *See* E. Zipprich Decl., at ¶ 18, Ex. 1; *see also* SEC Complaint, Dkt. No. 1, at ¶ 3.

39.     Since around 2010, Alpine has utilized DocuWare software to facilitate the

workflow process of reviewing and approving the stock deposit.  *See* E. Zipprich Decl., at ¶ 19, Ex. 1.

40.     The review process begins when Alpine's compliance analyst receives the due diligence packet from the introducing firm and fills-out a "cover sheet" which includes all the basic information about the deposit.  *See id*., at ¶ 20.

41.     The compliance analyst was directed by Alpine's compliance, legal, and senior management personnel to consider various pre-determined issues of focus.  *See id*., at ¶ 21.

42.     Among the issues that an analyst was instructed to consider were those listed in (a) the regulations, and (b) the specific circumstances of the transaction.  *See id*., at ¶ 22.

43.     Among the circumstances to be considered, at all times, included the following:

- Transactions involving funds derived from illegal activity or intended or conducted to hide or disguise funds or assets derived from illegal activity.
- Transactions designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act (BSA).
- Transactions that appear to serve no business or apparent lawful purpose or are not the sort of transactions in which a particular customer would be expected to engage, and for which Alpine knows of no reasonable explanation after examining the available facts.
- Transactions that involve the use of Alpine to facilitate criminal activity.

*See id*., at ¶ 23.

44.     The items to be evaluated has evolved over time as Alpine has responded to changes in the industry and sought to ensure that it is compliant with record keeping and reporting under the BSA.  *See id*., at ¶ 24.

45.     Among the items that an analyst was directed to consider was whether an account was subject to "heightened supervision."  The "heightened supervision" list was developed by Alpine as an aid to Alpine employees conducting AML review, and to ensure Alpine's own enhanced scrutiny of transactions.  The reasons for inclusion in the list vary and inclusion on the

list, or reference to the list, did not constitute any finding by Alpine that there was anything criminally suspicious about the transaction itself.  In filing SARs on this basis, and highlighting the list in the SAR narrative, Alpine was providing what it understood to be useful information to regulators, even though a SAR filing was not required.  *See id*., at ¶ 25.

46.    Alpine continuously updated its directives to incorporate industry guidance as well as circumstances that it independently determined were applicable to Alpine's particular business.  *See id*., at ¶ 26.

47.    Based on evolving standards in the industry as found in various changes and updates to FINRA and FinCEN guidance, communications with regulators, including during exams, and Alpine's own risk assessment of policies and procedures in filing SARs, Alpine routinely filed voluntary SARs on transactions that did not meet the requirements for when "[a] SAR must be filed," under Alpine's WSPs (*see* SOF No. 29) and the governing BSA regulation 31 C.F.R. § 1023.320.  *See id*., at ¶ 27.

48.    NASD states that "voluntary reporting is useful to the government and helpful to firms in order to provide a defense to charges of aiding and abetting money laundering violations." at 11.  *See* NASD Notice 02-21, at 11, Ex. 12.

49.    Based on the review process, a compliance analyst would prepare initial drafts of SARs after initial review of transactions and prepare narratives based on the facts of the transactions.  *See* E. Zipprich Decl., at ¶ 28, Ex. 1.

50.    The SAR draft was then reviewed by the AML Officer, CCO, and/or a legal analyst.  Further review of a transaction included, among other things, and depending on the facts of the transaction, additional review of the due diligence packet from the introducing broker, additional research on Google of the parties involved, research of any stock promotions,

and review of trading volume, including discussions with the trading desk if necessary.  *See id.*, at ¶ 29.

51.     After completion of the review, the reviewing attorney would ask the compliance analyst to either include additional information in a previously drafted SAR or to prepare a SAR if a draft did not exist.  *See id.*, at ¶ 30.

52.     In accordance with the WSPs, final decision on whether to file a SAR on a transaction is in the discretion of the AML Officer or his or her designee.  *See id.*, at ¶ 31.

53.     The existence of any factor which required consideration of a particular circumstance did not automatically trigger a duty to include that factor in the SAR narrative or file a SAR at all.  Those circumstances only triggered a duty to further investigate and consider all facts before an ultimate decision was made that any particular factor or fact raised suspicion to the degree that it was appropriate to file a SAR or include certain information in a SAR narrative.  *See id.*, at ¶ 32; *see also* NASD Notice 02-21, at p. 10, Ex. 12 ("[b]roker/dealers need to look for signs of suspicious activity that suggest money laundering. If a broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding with the transaction.").

### *Ongoing Improvements to Alpine's AML Program*

54.     Alpine has improved its suspicious activity monitoring and reporting over time.  *See* E. Zipprich Decl., at ¶ 33, Ex. 1.

55.     Alpine has always diligently sought to hire and retain employees devoted to compliance.  Particularly, in 2012, during the timeframe of a FINRA Exam, Alpine hired additional qualified compliance employees for its AML program, including Erin Zipprich, a certified Anti-Money Laundering Specialist, and Leia Farmer, who has a strong background in compliance.  *Id.* at ¶ 34.

56.     During 2012, Compliance personnel drafted Standard Operating Procedures regarding specific tasks assigned to their area of compliance to further help define each employee's role and assist in the overall AML program goals of a culture of compliance.  *Id*. at ¶ 35.

57.     Throughout 2012, Alpine continuously updated its AML review process.  *Id*. at ¶ 36.

58.     Also during 2012, Alpine updated its back-office computers software which included multiple new compliance features and generated new compliance reports.  Alpine's compliance personnel could run a number of different queries, including the use of searching the Office of Foreign Assets Control ("**OFAC**") report.  *Id*. at ¶ 37.

59.     Since 2012, Alpine has continued to improve its AML program by implementing, among other things, an improved mechanism to track drafted SAR reports during the review stage, an improved escalation process to senior management of any accounts of concern, and additional training on trade surveillance.  *Id*. at ¶ 38.

### *Alleged Late Filed SARs*

60.     The SEC's submitted five SARs in its Motion for Partial Summary Judgment, identified as Exhibits 58-62 (the "**Subject SARs**"), alleging that each of the Subject SARs was filed untimely.  *See* R. Jones Decl., at ¶ 7, Ex. 19.

61.     The Subject SARs involved transactions which occurred at Alpine during one month, September of 2011, and SARs were filed on each of the transactions between April 30, 2012 and May 7, 2012.  *See id*., at ¶ 9.

62.     With respect to a SAR being filed within 30 days of "detection" (31 C.F.R. § 1023.320(b)(3)), FinCEN guidance states that "'initial detection' does not mean the moment a

transaction is highlighted for review." *See* "The SAR Activity Review: Trends, Tips & Issues,"
Issue No. 15, at 15, Ex. 20.

63.     Instead, FinCEN states:  "It may be appropriate for organizations to conduct a
review of the activity to determine whether a need exists to file a SAR. The fact that a review of
customer activity or transactions is determined to be necessary is not necessarily indicative of the
need to file a SAR, even if a reasonable review of the activity or transactions might take an
extended period of time.  The time to file a SAR starts when the organization, in the course of its
review or on account of other facts, reaches the position in which it knows, or has reason to
suspect, that the activity under review meets one or more of the definitions of suspicious activity.
Specifically, the 30-day (or 60-day) period *does not begin until an appropriate review is
conducted and a determination is made that the transaction under review is 'suspicious'
within the meaning of the SAR regulation*." *See* "The SAR Activity Review: Trends, Tips &
Issues," Issue No. 1, at 28, Ex. 21 (emphasis added).

64.     During the period in question (September, 2011), and through March, 2012,
Elisha Werner was the AML Officer for Alpine and was responsible for the filing of SARs,
including the Subject SARs.  *See* R. Jones Decl., at ¶ 10, Ex. 19.

65.     As noted in FINRA Examination Report of Alpine from September 2012, James
Walker, the AML Officer prior to Ms. Werner, had "numerous conversations different
regulators" who "indicated that Alpine Securities was filing too many SARs."  Thus, Mr. Walker
"reexamined the thresholds that the firm established and more closely examined the criteria
outlined in the SARs report to determine what should be filed.  Mr. Walker's "review indicated
that nothing needed to be filed based on his analysis and criteria."  *See* FINRA Report of
Examination, September 28, 2012, at p. 4, attached as Ex. 6 to SEC's Summary Judgment

Memorandum, Ex. 22.

66.     Accordingly to Ms. Werner, when she then became Alpine's AML Officer, she also determined that none of the transactions required SARs, and therefore did not file SARs, including on the transactions involved in the Subject SARs.  *Id.*

67.     Ms. Werner left Alpine in March of 2012 and Randall D. Jones became the AML Officer at that time.  *See* R. Jones Decl., at ¶ 11, Ex. 19.

68.     In light of Ms. Werner's exit from Alpine, and because she was the AML Officer for a very brief period of time, Alpine decided to review transactions which occurred during her time as the AML Officer.  Alpine employees engaged in a "look-back" of the transactions during Ms. Werner tenure as the AML Officer, including the five sample transactions at issue in the SEC's Motion for Partial Summary Judgment, to determine whether any of those transactions warranted the filing of a SAR filing.  *See id.* at ¶ 12.

69.     At or around this same time (early 2012), FINRA communicated to Alpine that the firm should provide additional scrutiny and file SARs on deposits of low-priced securities. *See id.* at ¶ 13.

70.     Randall Jones was part of Alpine's review team of the transactions that occurred during Ms. Werner's tenure as AML Officer, and was the person listed as the "Contact for Assistance" on Part V of each of the Subject SARs.  *See id.* at ¶ 8; *see also* Exhibits 58-62 to the SEC's Summary Judgment Memorandum.

71.     Based on Alpine's review of the transactions that had occurred during Ms. Werner tenure as the AML Officer, Alpine did not find any transactions that Ms. Werner had identified as suspicious or earmarked for a SAR filing.  *See* R. Jones Decl., at ¶ 14, Ex. 19.

72.     Although Mr. Jones did not necessarily agree that the transactions involving large

59

deposits of low-priced securities were suspicious within the meaning of the regulation, in light of FINRA's comments, he specifically focused on transactions involving large deposits of low-priced securities.  Because of the communication from FINRA, Mr. Jones determined to file SARs on transactions involving large deposits of low-priced securities.  *See id*. at ¶ 15.

73.     Each of the Subject SARs states in the narrative that the deposit included a large quantity of a low-priced security.  In addition, the Subject SARs state that "[d]ue to the activity within this account, it has been placed on a Heightened Supervisory list.  It is policy of Alpine to file a SAR[] related to each deposit of securities into accounts of this nature."  *See* SEC's SOF, No. 66, Exs. 58-59 and 62, Dkt. 75 (Ex. 58 omits the phrase "of this nature" after the foregoing cited language).  *See id*. at ¶ 16.

74.     Each of the Subject SARs was filed within 30 days of when Alpine determined after the review by Mr. Jones and Alpine's decision to file in accordance with FINRA's communications that a SAR should be filed on transactions involving low-priced securities.  *See id*. at ¶ 17.

75.     Mr. Jones did not conclude that the transactions were "suspicious" within the meaning of the BSA and so did not include in the narrative a reason for that conclusion.  *See id*. at ¶ 18.

76.     The GAO Report on the Bank Secrecy Act, states: "Furthermore, officials from the federal banking regulators and FinCEN provided varying perspectives on what could be considered defensive SAR filing. According to Federal Reserve officials, SARs filed as a result of the bank's effort to comply with the 30-day requirement could be considered defensive if, to meet the deadline, depository institutions filed SARs before fully investigating anomalous transactions. According to FinCEN officials, even when the institution is not certain the observed

activity is suspicious, an institution's decision to file fulfills the obligation to report the activity. FinCEN officials said they would not consider it to be defensive filing if an institution erred on the side of caution and filed a complete and accurate SAR, even when the institution was not certain that the observed activity was suspicious. ***Filing the SAR would fulfill the requirement to report***." GAO-09-226, "Suspicious Activity Report Use Is Increasing, but FinCEN Needs to Further Develop and Document Its Form Revision Process" at p. 19 (Feb. 2009), Ex. 8 (emphasis added).

### *SEC's Claim that SARs Filed on Deposits Must also be Filed on Later Liquidations*

77.     The SEC's submitted charts showing deposits and liquidations for "Customer A", "Customer B" and "Customer C" listed as SEC's Statement of Facts, Numbers 63-65, and the charts identified SARs on each deposit for "Customer A", "Customer B", and "Customer C" which were attached as Exhibits 43-57. *See* SEC's SOF, Nos. 63-65, Ex. 43-57, Dkt. 75.

78.     The SEC's charts for "Customer A", "Customer B", and "Customer C" purport to show multiple deposits of stocks and multiple liquidations of that same stock from the same customer. *See* R. Jones Decl., at ¶ 20, Ex. 19.

79.     The SEC's cited charts was not prepared by Alpine and the SEC has provided no information regarding who prepared the charts or what information it relied on in preparing the charts. *See id*., at ¶ 21; *see also* Decl. of Terry R. Miller, Ex. 68 to SEC's Motion for Partial Summary Judgment.

80.     As a clearing firm, Alpine aggregates deposits, by journal entry, by stock-type (ticker symbol) within each introduced brokerage account. Alpine does, however, keep records of each stock deposit, and can determine the date and number of shares deposited into a particular introduced account. *See id*., at ¶ 22.

81.     As a result of its aggregation, however, where there are multiple deposits into the same introduced account of the same stock-symbol, one cannot determine which sales transactions relate to which stock deposit solely by looking at the sales-transaction history.  For example, if there are three deposits of 1,000 shares each of stock symbol XYZ into account for "introduced client A," they would be aggregated within the account as 3,000 shares of stock symbol XYZ.  If introduced client A thereafter sells 1,500 shares of XYZ, Alpine cannot determine the specific deposit to which those shares relate, particularly by looking only at sales or trade data for the customer.  *See id.*, at ¶ 23.

### *SEC's Allegation that Alpine Failed to Maintain Supporting Files*

82.     FinCEN guidance states that "'[s]upporting documentation' refers to all documents or records that assisted the financial institution in making the determination that certain activity **required a SAR filing**."  *See* FinCEN Guidance (Fin-2007-G003, June 13, 2007), Ex. 23 (emphasis added).

83.     Prior to the commencement of this action, the SEC served document subpoenas on Alpine to produce both SARs and their supporting files.  During 2016, Alpine produced in good faith all the supporting files that the SEC requested.  *See* E. Zipprich Decl., at ¶ 40, Ex. 1.

84.     After completing the production of supporting files pursuant to the SEC's requests, Alpine received a spreadsheet from the SEC listing SAR files as to the SEC alleged it could not locate the supporting files in Alpine's production.  *See id.*, at ¶ 41.

85.     Erin Zipprich, Alpine's AML Officer, who worked on the initial production of Alpine's supporting files to the SEC, again copied the supporting files listed on the SEC's spreadsheet.  *See id.*, at ¶ 42.

86.     The SEC's Table E, appears to be the same list as the spreadsheet that was

previously sent to Alpine during 2016.  *See id*., at ¶ 43.

87.    Alpine believes that the supporting files listed on Table E have been previously produced to the SEC.  *See id*., at ¶ 44.

88.    Alpine has again copied the supporting files for the SARs listed on Table E and produced all files to the SEC labeled as ALPINE_LIT000001-ALPINE_167366.

89.    The supporting files for the SARs identified as SEC's Exhibits 63-67 were produced along with all other supporting files for the SARs listed on Table E, identified as follows: SEC's Ex. 63 (ALPINE_LIT020160-020313); SEC's Ex. 64 (ALPINE_LIT157371-157433); SEC's Ex. 65 (ALPINE_LIT035645-036009); SEC's Ex. 66 (ALPINE_LIT083748-083824); and SEC's Ex. 67 (ALPINE_LIT082355-082541).

### *Discovery is Needed on SARs filed by Introducing Broker Dealers.*

90.    As indicated in Alpine's SOF No. 10, above, Alpine acted a clearing broker on all transactions at issue in the SEC's Motion for Summary Judgment.

91.    31 C.F.R. § 1023.320(a)(3) provides that "[t]he obligation to identify and properly and timely to report a suspicious transaction rests with each broker-dealer involved in the transaction, ***provided that no more than one report is required to be filed by the broker-dealers involved in a particular transaction*** (so long as the report filed contains all relevant facts)." This provision expressly relates to "introducing" broker" and "clearing broker" relationship and allows "to broker-dealers who have participated in the same transaction to only file one SAR-BD."  *See* Declaration of Maranda Fritz, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, ¶ 5, ("Rule 56(d) Decl.") attached hereto as Ex. 24 (quoting 31 C.F.R. § 1023.320(a)(3) and 67 Fed. Reg. 44048, 44051-52 (July 1, 2002)).

92.    Due to the confidentiality provisions with respect to SARs under the BSA, Alpine

cannot obtain SARs directly from other broker-dealers.  There is no such limitation on the SEC, however. *Id.,* at ¶ 6.

93.     Alpine requested that the SEC "produce any and all SARs filed by any broker dealer, or any financial institution, with respect to the transactions that are the subject of the SARs at issue in the Complaint or which are the subject of this Action."  *See* SEC's Response to Alpine's Requests for Production, at No. 19, p. 14, Ex. 25.

94.     The SEC's answer was nonresponsive to the key issue of other SARs filed by other broker-dealers by stating that "it has produced responsive documents, specifically the documents referenced in Tables A-F."  *Id.*; *see also* Rule 56(d) Decl., at ¶ 8, Ex. 24.

95.     The SEC has not, to date, produced any SARs filed by other broker-dealers, including introducing broker-dealers, on the transactions at issue in this case.  *See* Rule 56(d) Decl., at ¶ 9, Ex. 24.

96.     Alpine needs this information to prepare and support an available defense in the allegations in this case. *Id.* at ¶ 10.


Dated: New York, New York                Respectfully submitted,
            January 19, 2018


                                                    By:   /s/ *Maranda E. Fritz*
                                                           Maranda E. Fritz
                                                           THOMPSON HINE LLP
                                                           335 Madison Avenue, 12th Floor
                                                           New York, New York 10017-4611
                                                           Tel. (212) 344-5680
                                                           Fax (212) 344-6101
                                                           Maranda.Fritz@thompsonhine.com


                                                    *Additional Counsel Listed on Following Page*

64

Brent R. Baker (BB 8285)
Aaron D. Lebenta (*Pro Hac Vice*)
Jonathan D. Bletzacker (*Pro Hac Vice*)
CLYDE SNOW & SESSIONS
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
brb@clydesnow.com
adl@clydesnow.com
jdb@clydesnow.com

*Attorneys for Defendant Alpine Securities*
*Corporation*