# Exhibit 4

# FULLY DISCLOSED CLEARING AGREEMENT

This Fully Disclosed Clearing Agreement (this "Agreement") is made and entered into as of the 26 day of February 2009, by and between Alpine Securities Corporation, a Utah corporation ("Alpine"), 440 East 400 South, Salt Lake City, Utah and Scottsdale Capital Advisors, a Arizona corporation ("Broker"), 7170 E McDonald Drive, Suite 6, Scottsdale, AZ 85253.

## 1.0 APPROVAL

This Agreement shall be subject to approval by the Financial Industry Regulatory Authority ("FINRA") and by any other self-regulatory organization vested with the authority to review or approve it. Alpine and Broker shall each submit the Agreement to the FINRA for approval. In the event of disapproval, the parties shall bargain in good faith to achieve the requisite approval.

## 2.0 AGREEMENT

From the date of this Agreement until the termination of this Agreement as provided for in Paragraph 22 hereof, Alpine shall carry the cash accounts of the customers of Broker introduced by Broker to Alpine, and accepted by Alpine, and shall clear transactions on a fully disclosed basis for such accounts, in the manner and to the extent set forth in this Agreement.

## 3.0 ALLOCATION OF RESPONSIBILITY

### 3.1 Responsibilities of the Parties.

Pursuant to NASD Rule 3230, responsibility for compliance with all applicable laws, rules, and regulations of the Securities and Exchange Commission ("SEC"), the NASD, the New York Stock Exchange ("NYSE"), and any other regulatory or self-regulatory agency or organization shall be allocated between Alpine and Broker as set forth in this Agreement. To the extent that a particular function is allocated to one party under this Agreement, the other party shall supply that party with information in its possession pertinent to the proper performance and supervision of that function.

### 3.2 Relationship with Customers.

Except as provided in Paragraph 27.11 of this Agreement, all customers receiving services pursuant to this Agreement shall remain customers of Broker. Alpine shall provide services under this Agreement to Broker only to the extent explicitly required by specific provisions contained in this Agreement and shall not be responsible for any duties or obligations not specifically allocated to Alpine pursuant to this Agreement. Broker shall enter into appropriate contractual arrangements with customers on its own behalf and such agreements shall make Broker, and not Alpine, responsible to customers for the provision of services. Broker shall not be deemed to be an agent of Alpine for any purpose, except to the limited extent expressly set forth in paragraph 9.1.8 of this Agreement, nor shall Alpine be deemed to have a fiduciary relationship with any of Broker's customers. Broker acknowledges that Alpine does not control the business or operations of Broker.

**4.0    REPRESENTATIONS AND WARRANTIES**

4.1    Broker. Broker represents and warrants that:

**4.1.1    Corporation Duly Organized.** Broker is a corporation duly organized, validly existing, and in good standing under the laws of the state of California.

**4.1.2    Registration.** Broker is duly registered and in good standing as a broker dealer with the SEC and is a member firm in good standing of the FINRA.

**4.1.3    Authority to Enter into Agreement.** Broker has all requisite authority, whether arising under applicable federal or state law or the rules and regulations of any regulatory or self-regulatory organization to which Broker is subject, to enter into this Agreement and to retain the services of Alpine in accordance with the terms of this Agreement.

**4.1.4    Substantial Compliance with Rules and Regulations.** Broker and each of its employees is in substantial compliance with, and during the term of this Agreement shall remain in substantial compliance with, the registration, qualification, capital, financial reporting, customer protection, and other requirements of every self-regulatory organization of which Broker is a member, of the SEC, and of every state to the extent that Broker or any of its employees is subject to the jurisdiction of that state.

**4.1.5    No Pending Action, Suit, Investigation or Inquiry.** Broker has disclosed to Alpine every action, suit, investigation, inquiry, or proceeding (formal or informal) pending or threatened against or affecting Broker, any of its affiliates, or any officer, director, or general securities principal or financial and operations principal of Broker, or their respective properties or assets, by or before any court or other tribunal, any arbitrator, any Governmental authority, or any self-regulatory organization of which any of them is a member. Broker shall notify Alpine promptly, but in any event within three business days, of the initiation of any such action, suit, investigation, inquiry, or proceeding that may have a material impact on the business or financial condition of Broker.

**4.1.6    Current Form BD.** Broker has filed a Form BD that is current and complete in all respects. Broker shall provide to Alpine a copy of its currently filed Form BD and shall provide a copy of any amendments thereto at the time that such amendments are filed.

4.2    Alpine. Alpine represents and warrants that:

**4.2.1    Corporation Duly Organized.** Alpine is a corporation duly organized, validly existing, and in good standing under the laws of the state of Utah.

**4.2.2    Registration.** Alpine is duly registered and in good standing as a broker dealer with the SEC and is a member firm in good standing of the FINRA.

**4.2.3    Authority to Enter Agreement.** Alpine has all requisite authority, whether arising under applicable federal or state law, or the rules and regulations of any regulatory or self-regulatory organization to which Alpine is subject, to enter into this Agreement and provide services in accordance with the terms of this Agreement.

**4.2.4    Compliance with Registration.** Alpine and each of its employees is in substantial compliance with, and during the term of this Agreement shall remain in substantial compliance with the registration, qualification, capital, financial reporting, customer protection, and other requirements of every self-

ALPINE_LIT167368

regulatory organization of which Alpine is a member, of the SEC, and in every state in which it conducts business.

## 5.0   ESTABLISHING AND ACCEPTING NEW ACCOUNTS

**5.1**   Acceptance of New Accounts.   Broker shall be responsible for opening and approving new accounts. The residential address of all new accounts shall only be in states in which Alpine is registered as a Broker/Dealer.

**5.2**   Maintenance of Account Information.   Alpine may rely without inquiry on the validity of all customer information furnished to it by Broker. Broker shall undertake a search to determine if the Broker's customer is listed on The Office of Foreign Assets Control ("OFAC") sanctioned list and Broker shall undertake an ongoing review of its customers through updated OFAC sanctioned lists.

**5.3**   Anti-Money Laundering Program.   Broker shall maintain an ("AML") program administered by an AML Compliance officer to assure compliance with the Bank Secrecy Act and the USA Patriot Act. Broker shall be responsible for compliance with the supervisory requirements in Section 15(b)(4) of the Securities Exchange Act of 1934, as amended, NASD Rule 3010 and similar rules adopted by any other regulatory or self-regulatory agency or organization, to the extent applicable.

## 6.0   SUPERVISION OF ORDERS AND ACCOUNTS

**6.1**   Responsibility for Compliance.   Broker shall be solely responsible for compliance with suitability, "Know Your Customer" rules and other requirements of federal and state law and regulatory and self-regulatory rules and regulations governing transactions and accounts. Alpine shall not be required to make any investigation into the facts surrounding any transaction that it may execute or clear for Broker or any customer of Broker.

**6.2**   Compliance Procedures.   Broker agrees to diligently supervise compliance with all applicable laws, rules, and regulations of the SEC, NASD and any other regulatory or self-regulatory agency or organization having jurisdiction over Broker through the use of a compliance manual and other written supervisory procedures. Broker shall review transactions and accounts to assure compliance with prohibitions against manipulative practices, sales of unregistered securities pursuant to Rule 144 of the Securities Act of 1933, insider trading and other requirements of federal and state law and applicable regulatory and self-regulatory rules and regulations to which Broker or its customer are subject. Without limiting the above, Broker shall be responsible for compliance with the supervisory requirements in Section 15(b)(4) of the Securities Exchange Act of 1934, as amended, NASD Rule 3010 and similar rules adopted by any other regulatory or self-regulatory agency or organization, to the extent applicable.

**6.3**   Knowledge of Customer's Financial Resources and Investment Objectives.   Broker shall comply with Rules 2310 and 2315 of the NASD or comparable requirements of similar rules of any other self-regulatory organization to which Broker is subject. Broker shall obtain all essential facts relating to each customer, each cash account, each order, and each person holding a power of attorney over any account, in order to assess the suitability of transactions when required by applicable rules, the authenticity of orders, signatures, endorsements, certificates, or other documentation, and the frequency of trading. Broker warrants that, to the best of its knowledge, it will not open or maintain accounts for persons who are minors or who are otherwise legally incompetent and that it will comply with NASD Rules 3050 and 3090 and other laws, rules, or regulations that govern the manner and circumstances in which accounts may be opened or transactions authorized.

3

ALPINE_LIT167369

6.4     Opening and Approving New Accounts. Broker shall be responsible for opening and approving all new accounts. The residential address of all new accounts shall only be in states in which Alpine is registered as a Broker/Dealer. Alpine may rely without inquiry on the validity of all customer information furnished to it by broker. Broker shall undertake a search to determine if broker's customer is listed on the Office of Foreign Assets Control ("OFAC") sanctioned list and broker shall undertake an ongoing review of its customers through updated OFAC sanctioned lists.

6.5     Furnishing of Investment Advice. Broker shall be solely responsible for any recommendation or advice it may offer to its customers.

6.6     Discretionary Accounts. Broker shall be solely responsible for obtaining customer approval for and supervising discretionary accounts.

6.7     Accounts of Employees of Member Organizations, Self-Regulatory Organizations, and Financial Institutions. Broker shall give required notices and obtain required approvals of employers in each case in which a customer is an employee of a broker-dealer, a self-regulatory organization, or a financial institution.

6.8     Anti-Money Laundering ("AML") Program. Broker shall have an AML Program administered by an AML Compliance officer to assure compliance with the Bank Secrecy Act and the USA Patriot Act.

6.9     Compliance with Regulation S-P. Broker and Alpine shall comply with all provisions of Regulation S-P ("Privacy of Consumer Financial Information").

7.0     NO EXTENSION OF CREDIT

7.1     No Margin Transactions. Alpine shall not permit customers of Broker to purchase securities on margin and all transactions for a customer will be cash transactions.

7.2     Unsecured Debits or Unsecured Short Positions. Alpine shall charge against the account of Broker an amount equal to the value of any unsecured debit or short position (on a "mark to market" basis) in a customer account if that position has not been promptly resolved by payment or delivery. Any remaining debit shall be charged against Broker's Deposit Account and be considered a claim against Broker pursuant to Paragraph 19 of this Agreement.

7.3     Trading in Stock Options. Broker shall not place any orders with Alpine for the purchase or sale of listed stock options.

8.0     MAINTENANCE OF BOOKS AND RECORDS

8.1     Stock Records. Alpine shall maintain stock records and other prescribed books and records of all transactions executed or cleared through it in accordance with generally accepted practices in the securities industry.

8.2     Regulators' Reports and Records. Broker shall prepare, submit, and maintain copies of all reports, records, and regulatory filings required of Broker by any entity that regulates it, including, but not limited to, copies of all account agreements and similar documentation obtained pursuant to paragraph 5.0 of this Agreement and any reports and records required to be made or kept under the Currency and Foreign Transactions Reporting Act of 1970, the Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, the Bank Secrecy Act, the USA Patriot Act and any rules and regulations

4

ALPINE_LIT167370

promulgated pursuant thereto. To the extent that Alpine is required to prepare or submit any reports or records by any entity that regulates it, Broker shall cooperate in providing Alpine with any information needed in order to prepare such reports or records.

8.3     Audio Taping of Telephone Conversations.  Broker understands that for quality control, dispute resolution or other business purposes, Alpine may record some or all telephone conversations between Broker and Alpine.  Broker hereby consents to such recording and will inform its employees, representatives and agents of this practice.  It is further understood that all such conversations are deemed to be solely for business purposes.

9.0     RECEIPT AND DELIVERY OF FUNDS AND SECURITIES

9.1     Receipt and Delivery of Funds and Securities.

9.1.1   Cashiering Functions.  Alpine shall perform normal and reasonable cashiering functions for customer accounts introduced by Broker.  These functions shall include receipt and delivery of securities purchased and sold; receipt and payment of funds owed by or to customers; and provision of custody for securities and funds.  Broker shall provide Alpine with the basic data and documents that are necessary or appropriate to permit Alpine to perform its obligations under this Paragraph, including but not limited to copies of records documenting receipt of customers' funds and securities received directly by Broker.  Such data and documents must be compatible with the requirements of Alpine's data processing systems.

9.1.2   Purchases.  Broker shall be responsible for purchases made for customers until actual and complete payment has been received by Alpine.  When payment is tendered to Alpine in the form of a check, Broker shall remain responsible until the check has been paid and the proceeds actually received and finally credited to Alpine (without any subsequent chargeback) by its bank.  Alpine shall use due diligence in depositing any checks that it receives directly from customers of Broker.

9.1.3   Sales.  Broker shall be responsible for sales until Alpine has received, in acceptable form, the securities involved in a transaction.  If Alpine does not receive delivery of securities in an acceptable form, Alpine may buy-in all or part of the securities for the accounts of the customer of Broker or Broker.

9.1.4   When Issued and Delayed Delivery Transactions.  In the case of the purchase or sale of securities on a "when issued" basis, and in the case of a purchase or sale where distribution or delivery is otherwise delayed, Broker shall remain responsible, as set forth in this Agreement, until necessary and satisfactory payment of funds or delivery of securities has been received by Alpine.

9.1.5   Funds and Securities Received by Broker.  Broker shall promptly deposit with Alpine funds or securities received by Broker from its customers, together with such information as may be relevant or necessary to enable Alpine to record such remittances and receipts in the respective customer accounts.

9.1.6   Failure to Settle or Pay.  In the event of a failure to timely deposit required funds or securities, Alpine may take appropriate remedial action. Without waiving or otherwise limiting its right to take other remedial action, Alpine may at its option charge interest at a rate of 1½% over the prime lending rate prevailing in Salt Lake City, Utah. Alpine may pass such charges on to its customers but Broker remains responsible therefore until actually paid.

9.1.7   Settlement and Delivery.  Broker shall obtain each customer's agreement to accept partial deliveries and to abide by other clearance arrangements as may be directed by any exchange or association. With respect to any settlements which involve the drafting of securities, draft charges, including interest expense, will be borne by Broker.

ALPINE_LIT167371

**9.1.8** <u>Dreyfus Money Market Funds</u>. Any free credit balances resulting from the sale of securities or from cash deposits into Broker's customer accounts are not segregated and may be used in Alpine's business in accordance with federal securities laws. Upon Broker's request, free credit balances may be invested in a money market fund managed by The Dreyfus Corporation ("Dreyfus"), which is not under Alpine's control and is not FDIC or SIPC insured. Alpine may receive a fee for services it performs in respect to the Dreyfus money market funds.

**9.2** <u>Transfer of Securities and Accounts</u>. Upon receiving written or oral instructions from Broker, or written instructions from a customer, Alpine shall make reasonable efforts to effectuate such transfers of securities or accounts as may be requested. With respect to requests to transfer securities or accounts from Alpine to another Broker/Dealer, Alpine shall charge the Broker's customer a service charge of $50.00. Whenever practicable, Alpine shall first notify the Broker before acting on a customer's written request.

**9.3** <u>Restricted and Control Stock Requirements</u>. Broker shall be responsible for determining whether any securities held in Broker's or its customer accounts are restricted or control securities as defined by applicable laws, rules, or regulations.  Broker is responsible for assuring that orders executed for such securities comply with such laws, rules, and regulations.

**9.4** <u>Payment of Dividends and Handling of Exchange or Tender Offers, Rights, Warrants and Redemptions</u>.  Whenever Alpine has been instructed to retain custody of the securities in any account, Alpine may hold the securities in the customer's name, the name of Alpine or its nominee or in the names of nominees of any depository used by Alpine. Alpine shall perform the services required in connection with holding the securities in custody in each account, including (1) collection and payment of dividends and interest; (2) transmittal and handling (through Broker) of tenders or exchanges pursuant to tender offers and exchange offers; (3) transmittal of proxy materials and other shareholder communications if Alpine is appropriately compensated; and (4) handling of exercises or expirations of rights, warrants and redemptions.

**9.5** <u>Corporate Action Requests / Soliciting Dealer Agreements</u>.  Broker requests and authorizes Alpine to execute as Broker's agent-in-fact any and all Soliciting Dealer Agreements for corporate actions involving securities or other interests held by Broker's customers on the books of Alpine. Alpine agrees to provide notice of the pending corporate action to Broker at its designated location. Alpine further agrees to collect and submit corporate action requests from Broker and submit them to the soliciting party in accordance with the instructions received from the soliciting party.  Alpine agrees to use its best efforts to communicate corporate action information to Broker and, where applicable, Broker's customers, but shall not be liable for a) any delays in the communication of corporate action information or b) delays in the transmission of collected corporate action requests to the soliciting party unless caused by Alpine's gross negligence.  All fees received from the soliciting party will be credited to Broker.  In consideration of providing this service to Broker, Broker agrees to indemnify and hold harmless Alpine, its affiliates, officers, agents and employees from all claims, suits, investigations, damages and defense costs (including reasonable attorneys fees) that arise in connection with this paragraph.

**9.6** <u>COD Orders</u>. Broker shall not introduce any retail or individual accounts requiring settlement on a "delivery versus payment" or "receive versus payment" basis without the prior written approval of Alpine.  If such approval has been given, Broker shall arrange for timely settlement of all such transactions. Broker shall be responsible for complying with the requirements of NASD Rule 11860 with respect to those transactions, except that Alpine shall be responsible for delivering confirmations pursuant to NASD Rule 11860.

6

ALPINE_LIT167372

**10.0   SAFEGUARDING OF FUNDS AND SECURITIES**

Except as otherwise provided in this Agreement, Alpine shall be responsible for the safekeeping of all money and securities received by it pursuant to this Agreement. However, Alpine will not be responsible for any funds or securities delivered by a customer to Broker until such funds or securities are actually received by Alpine or deposited in bank accounts maintained by Alpine.

**11.0   CONFIRMATIONS AND STATEMENTS**

**11.1**   Preparation and Transmission of Confirmations and Statements. Alpine shall prepare confirmations and summary quarterly statements and shall, to the extent required, transmit them to customers and Broker in a timely fashion. Confirmations and statements shall be prepared on forms disclosing that the account is carried on a fully disclosed basis for the Broker in accordance with applicable rules, regulations and interpretations. Broker will have the ultimate regulatory responsibility for compliance with the prospectus delivery requirements of the Securities Act of 1933, as amended, regardless of its retention of a prospectus fulfillment service to perform delivery of same.

**11.2**   Examination and Notification of Errors. Broker shall examine promptly all confirmations, statements, and other reports provided to Broker by Alpine. Broker must promptly notify Alpine of any error claimed by Broker or Broker's customers in any account. If Broker fails to notify Alpine promptly of any error the existence of which was, or should reasonably have been, discoverable by review of confirmations, statements, and reports provided to Broker by Alpine, Broker shall be deemed to have waived its right to make any claim against Alpine with respect to such error.

**12.0   ACCEPTANCE AND EXECUTION OF TRANSACTIONS**

**12.1**   Responsibility to Accept or Reject Trades. Alpine shall execute transactions in Broker's customers' accounts and release or deposit money or securities to or for accounts only upon Broker's instructions. Alpine reserves the right to accept written or oral transaction orders from Broker's customers in circumstances where it determines that the customers are unable to execute those transactions through Broker. Any instructions received directly from Broker's customers must be approved by a principal of Alpine. Notwithstanding any instructions to the contrary, Alpine may, after giving reasonable notice, (i) refuse to confirm a transaction or cancel a confirmation, (ii) reject a delivery or receipt of securities or money, (iii) refuse to clear a trade executed by Broker, or (iv) refuse to execute a trade for the account of the Broker or Broker's customer.

**12.2**   Responsibility for Errors in Execution. Broker shall be responsible for transmission to Alpine of all customer orders and for any errors in the Broker's recording or transmission of such orders. Alpine shall be responsible for any errors it might make in the further transmission and execution of such orders after their receipt, in proper and complete form, from Broker.

**12.3**   Settlement of Contracts and Transactions. Unless otherwise agreed in writing, Alpine shall have no obligation to settle contracts and transactions in securities (i) between Broker and other broker dealers, (ii) between Broker and its customers, and (iii) between Broker and third persons.

**13.0   OTHER OBLIGATIONS AND RESPONSIBILITIES OF BROKER**

**13.1**   Other Clearing Agreements. During the term of this Agreement, Broker may be allowed to enter into other similar agreements or obtain the services contemplated by this Agreement from other parties or supply the services contemplated by the Agreement with the prior written approval of Alpine. Approval

7

ALPINE_LIT167373

shall not be unreasonably withheld.  Agreements that were in place prior to this agreement will be deemed approved.

13.2    Disciplinary Action, Suspension or Restriction.  If Broker becomes subject to disciplinary action, suspension, or restriction by a federal or state agency, stock exchange, or regulatory or self regulatory organization having jurisdiction over Broker or Broker's securities business, Broker shall notify Alpine immediately, orally and in writing, and provide Alpine with a copy of any decision relating to such action, suspension, or restriction.  Broker shall reimburse Alpine for the fees and expenses associated with any legal advice Alpine may seek with respect to the effect of such action, suspension, or restriction on the rights and obligations of Alpine under this Agreement.  Alpine may take any action it reasonably deems to be necessary (i) to assure that it will continue to comply with all applicable legal, regulatory, and self-regulatory requirements, notwithstanding such action, suspension, or restriction, and (ii) to comply with any requests, directives, or demands made upon Alpine by any such federal or state agency, stock exchange, or regulatory or self-regulatory organization.

13.3    Provision of Financial Information.  Broker shall furnish Alpine with copies of FOCUS Reports, financial statements for the current fiscal year, the executed Forms X-17a-5 (Parts I and IIA) filed with the SEC, any amendments to Broker's Form BD, and any other regulatory or financial reports Alpine may from time to time require.  Broker shall provide such reports to Alpine at the time Broker files such reports with its primary examining authority. Broker shall also notify Alpine in advance of withdrawals of more than 10% of its net capital.

13.4    Fidelity Bond.  Broker shall maintain throughout the term of this Agreement fidelity insurance coverage in at least the minimum amount required under NASD rules. Alpine may require that Broker obtain additional fidelity insurance coverage if it reasonably determines that such coverage is necessary to assure Broker's performance of its obligations under this Agreement.

13.5    Execution Broker.  If Broker wishes to act as an "Executing Broker" as such term is understood in that certain letter dated January 25, 1994 from the Division of Market Regulation of the Securities and Exchange Commission, as the same may be amended, modified or supplemented from time to time (the "No-Action Letter") then all terms herein shall have the same meaning as ascribed thereto either in the Agreement or in the No-Action Letter as the sense thereof shall require. Broker may, from time to time, execute trades (either directly or through Alpine) for Prime Brokerage Accounts in compliance with the requirements of the No-Action Letter. (The No-Action Letter requires, Inter Alia, that a contract be executed between Alpine and Prime Broker, and between Broker and Prime Brokerage Customer prior to the transaction of any business hereunder). Broker shall promptly notify Alpine, but in no event later than 2:00 p.m. Salt Lake City, Utah time of trade date in a mutually acceptable fashion, of such trades in sufficient detail for Alpine to be able to report and transfer any trade executed by Broker on behalf of a Prime Brokerage Account to the relevant Prime Broker. Broker understands and agrees that if Prime Broker shall disaffirm or "dk" any trade executed by Broker on behalf of a Prime Brokerage Account; Broker shall open an account for such Prime Brokerage Account in its range of accounts and shall transfer or deliver the trade to such account at the risk and expense of Broker to the same extent as for any account introduced by Broker pursuant to the Agreement. Broker understands and agrees that all Prime Brokerage Accounts shall be conducted in accordance with the requirements of the No-Action Letter and any relevant agreement between Broker and a Prime Brokerage Customer, or between Alpine and relevant Prime Broker. Broker further agrees to supply Alpine with such documents, papers and things, which from time to time are reasonably required by Alpine to carry out the intention of this Paragraph. Broker agrees that it shall know its customer, obtain appropriate documentation, including new account form, and conduct its own credit check. Broker shall maintain facilities to clear any disaffirmed trades.

8

ALPINE_LIT167374

**14.0   OTHER OBLIGATIONS AND RESPONSIBILITIES OF ALPINE**

14.1   Use of Third Party Services.   Alpine may, at its reasonable option, and consistent with common industry practice, retain one or more independent data processing or other service bureaus to perform functions (including, but not necessarily limited to pricing services or proxy mailing services) superfluous to those assigned to Alpine under this Agreement.   If any such service bureau fails to perform an assigned function accurately, in accordance with specifications, or within the customary time periods, Alpine shall cause the service bureau to correct any error in its next regularly scheduled processing operation and to deliver any overdue work as soon as reasonably practicable.   Except as stated in this subparagraph, Alpine shall not be responsible for any losses, damages, liability, or expenses claimed by Broker or its customers arising from any such failure beyond the amount of such losses, damages or expense which Alpine is able to recover pursuant to the terms of its agreement with such service bureau.

14.2   Backup Withholding.   Broker hereby agrees to take necessary measures to comply with the backup withholding requirements of Section 3406 and the nonresident alien withholding requirements of Section 1441 of the Internal Revenue Code of 1986, as amended, with respect to its customer accounts. Broker agrees to furnish to Alpine in writing or by electronic transmission any tax information in its possession relating to each customer account transferred to Alpine and to each future customer (including the customer's taxpayer identification number and any certifications provided by the customer on IRS Forms W-9, W-8, or 1001 or any authorized substitute) and agrees that Alpine may rely on such information. Alpine agrees to notify Broker of any account not in compliance with such back-up withholding requirements. Broker hereby authorizes Alpine to employ any procedures permitted under applicable law or regulation to achieve compliance with withholding obligations under the federal income tax law, including procedures pertaining to backup withholding on orders to purchase or sell securities which are received from customers by telephone or electronic transmission.

**15.0   SERVICES FOR WHICH ALPINE IS NOT RESPONSIBLE**

Unless otherwise expressly agreed in writing, Alpine shall not provide nor be responsible for providing any of the following services:

15.1   Accounting, Etc.   Accounting, bookkeeping, record-keeping, cashiering, or other services involving commodity transactions, or any other transactions not involving securities; or any matter not contemplated by the Agreement.

15.2   Payroll, Financial Statements, Etc.   Preparation of Broker's payroll records, financial statements, or any analysis thereof;

15.3   Checks.   Preparation or issuance of checks in payment of Broker's expenses, other than expenses incurred by Alpine on behalf of Broker pursuant to this Agreement;

15.4   Payment of Commissions.   Payment of commissions to Broker's sales personnel.

**16.0   LIABILITY OF ALPINE**

16.1   Alpine Indemnification.   In addition to any other obligations it may possess under other provisions of this Agreement, Alpine shall indemnify, defend, and hold harmless Broker from and against all claims, demands, proceedings, suits, actions, liabilities, expenses, attorney's fees, and costs in connection therewith arising out of any reckless, dishonest, fraudulent, or criminal acts or omissions on the part of any of its officers or employees with respect to the services provided by Alpine under this Agreement. Notwithstanding the foregoing, Alpine shall have no liability to any of Broker's customers

ALPINE_LIT167375

for any loss suffered by any customer. Alpine's liability will be only to Broker and then only to the extent expressly set forth in this Agreement.

16.2    Defense of Third Party Claims. If, within 10 days after receiving written notice of any claim, demand, suit, proceeding, or action with respect to which Broker may have any colorable claims to indemnification under this Agreement, Alpine shall fail to institute the defense of Broker in connection with such claim, demand, suit, proceeding, or action, or if thereafter Alpine shall fail diligently to pursue such defense, Broker shall have the right to defend such action or settle such action. The reasonable costs and expenses, including attorney's fees, associated with such a defense or settlement shall be borne by Alpine. The exercise of the right to participate in or assume the responsibility for any such defense shall not limit in any way Broker's right to indemnification under this Paragraph.

16.3    Damages. Alpine shall not be liable for special, indirect, incidental, consequential or punitive damages which Broker, a customer of Broker, or any other third party may incur or experience, whether such damages are incurred or experienced as a result of entering into or relying on this Agreement or otherwise, even if Alpine has been advised of the possibility of such damages. Broker and Alpine each agree not to assist any claim for punitive damages against the other.

16.4    Alpine's Right to Compete. Nothing in this Agreement shall be deemed to restrict in any way the right of Alpine or any affiliate of Alpine to compete with Broker in any or all aspects of Broker's business.

16.5    Broker's customer accounts. Alpine shall not use any information obtained from Broker's customers' accounts to entice, solicit or otherwise induce Broker's customers to become Alpine's customers.

## 17.0    LIABILITY OF BROKER

17.1    Broker Indemnification. In addition to any other obligations it may possess under other provisions of this Agreement, except any act or failure to act which is the result of gross negligence or willful misconduct on the part of any such Alpine indemnified person Broker shall indemnify, defend, and hold harmless Alpine, any controlling person of Alpine, any principal of Alpine, and any shareholder of Alpine, from and against all claims, demands, proceedings, suits, and actions and all liabilities, expenses, attorney's fees (including fees and costs incurred in enforcing it's right to indemnification), and costs in connection therewith arising out of one or more of Broker's or any of its employee's negligent, dishonest, fraudulent or criminal acts or omissions.

17.1.1    Failure to Make a Payment or Deliver Securities. The failure of Broker or a Broker's customer to make any payment or deliver any securities when due shall be cured by Broker in accordance with Regulation T and/or Regulation SHO, and/or other applicable rules or regulations. A check received by Alpine from a customer shall be credited to customer's account; nevertheless, Broker shall be liable until such check has cleared through the banking system and the proceeds are actually received and credited to Alpine (without any subsequent chargeback) by its bank.

17.1.2    Broker's Failure to Perform. Failure of Broker to perform any duty, obligation, or responsibility with respect to customer accounts as set forth in this Agreement. Broker's indemnification obligation under this subparagraph shall not be affected by the participation of Alpine or any person controlling it or controlled by it within the meaning of the Securities Exchange Act of 1934, as amended, in any transaction giving rise to such an obligation, unless such participation constitutes recklessness, fraud, or criminal conduct.

10

ALPINE_LIT167376

**17.1.3** <u>Improper Conduct by Agents</u>. Broker assumes any liabilities incurred as a result of any negligent, dishonest, fraudulent, or criminal act or omission on the part of any of Broker's officers, directors, employees or agents.

**17.1.4** <u>Failure of a Customer to Perform Obligations</u>. Any failure by any of Broker's customers to perform any commitment or obligation with respect to a transaction carried by Alpine under this Agreement, whether or not such failure was under the control of Broker, shall be the Broker's responsibility.

**17.1.5** <u>Customer Claims and Disputes</u>. Any claim or dispute between Broker and a customer with respect to services provided under this Agreement, including but not limited to any claim or dispute concerning the validity of a customer order in the form the order was transmitted to Alpine by Broker and any claim arising in connection with Alpine's guarantee of any signature of any customer of Broker.

**17.1.6** <u>Warranties</u>. Any adverse claim with respect to any security delivered or cleared by Alpine, including a claim of a defect in title with respect to securities that are alleged to have been forged, counterfeited, raised or otherwise altered, or if they are alleged to have been lost or stolen. The parties agree that Alpine shall be deemed to be an intermediary between Broker and customer and shall be deemed to make no warranties other than as provided in Section 8-306(3) of the Uniform Commercial Code.

**17.1.7** <u>Default of Third Party Broker</u>. Any default by a third party broker with whom the Broker deals on a principal or agency basis in a transaction either not executed by Alpine or not cleared by Alpine even if permitted by Alpine as provided herein.

**17.1.8** <u>Prior Self-Clearing Arrangements</u>. Any guarantee, indemnification, or hold harmless agreement in connection with Broker's business or customers that Alpine may provide to the National Securities Clearing Corporation, the Depository Trust Company, or any other clearing, depository, or self regulatory organization with respect to transactions self-cleared by Broker prior to transfer of such functions to Alpine.

**17.1.9** <u>Breach of Warranty by Broker</u>. Any breach by Broker of any representation or warranty made by it under this Agreement.

**17.1.10** <u>Deposit of Checks to Customer's Accounts</u>. Any failure to exercise due diligence in reviewing checks received from Broker's customers to insure that same are in proper form, or in the issuance of instructions to Alpine regarding the accounts into which checks are to be deposited.

**17.1.11** <u>Assets Not Held in Brokerage Account</u>. Any claim asserted against Alpine alleging the inaccuracy of any information appearing on Broker's customer brokerage account statements with respect to assets not held in the brokerage account, regardless of whether such information was provided by Broker, customer or a third-party.

**17.2** <u>Defense of Third Party Claims</u>. If, within 10 days after receiving written notice of any claim, demand, suit, proceeding, or action with respect to which Alpine may have any colorable claim to indemnification under this Agreement, Broker shall fail to institute the defense of Alpine in connection with such claim, demand, suit, proceeding, or action, or if thereafter Broker shall fail diligently to pursue such defense, Alpine shall have the right to defend such action or settle such action. The costs and expenses, including attorney's fees, associated with such a defense or settlement shall be borne by Broker. The exercise of the right to participate in or assume the responsibility for any such defense shall not limit in any way Alpine's rights to indemnification under this Paragraph. If Alpine has to cover expenses or

11

ALPINE_LIT167377

retain counsel of its own, all such proper expenses related thereto, including legal fees, not paid within thirty (30) days after an invoice is rendered therefore to Broker shall bear interest at t rate equal to eighteen percent (18%) per annum until paid by Broker.

## 18.0   FEES AND SETTLEMENTS FOR SECURITIES TRANSACTIONS

18.1   Commissions. Alpine shall charge each of Broker's customers the commission, markup and any other charge or expense that Broker instructs it to charge for each transaction, subject to the "5% guideline". If instructions are not received with respect to a transaction in the time period required by Alpine to implement those instructions, Alpine shall charge the customer the commission, markup, or other charge or expense prescribed in the basic commission schedule delivered to Alpine by Broker. This basic schedule may be amended from time to time by Broker by written instructions delivered to Alpine. Alpine, shall only be required to implement such amendments to the basic schedule to the extent such amendments are within the usual capabilities of Alpine's data processing and operations systems and only within such reasonable time limitations as Alpine may deem necessary to avoid disruption of its normal operating capabilities.

18.2   Responsibility for Pricing. Broker shall establish the commissions, mark-ups and other charges or expenses to be charged to customers in accordance with all applicable laws, rules, and regulations of the SEC, NASD, NYSE, and other regulatory and self-regulatory agencies and organizations. Alpine shall exercise no control or influence over the establishment of such commissions, mark-ups or other charges or expenses. This provision shall not affect Alpine's right to charge Broker or Broker's customers reasonable fees for the services provided under this Agreement, including SEC transaction fees, fees for inactive accounts, fees to transfer a Broker's customer account to another Broker/Dealer and other appropriate fees. Broker may instruct Alpine to charge such fees to its customers but remains liable for the payment thereof. Broker shall notify its customers of fees charged to them.

18.3   Settlement. Commissions charged Broker's customers shall be collected by Alpine and credited to Broker, after deducting Alpine's compensation referred to in Subparagraph 18.4 below and any other amount owed to Alpine pursuant to this Agreement. Such commissions shall be remitted to Broker on a monthly basis, approximately ten days after the final settlement date of each month. More frequent remittances may be advanced to Broker if the parties so agree and if the estimated current activity in the accounts and prior experience justify such advances.

18.4   Fees for Clearing Services. As compensation for services provided pursuant to this Agreement, Alpine shall deduct from the commissions, mark-up, mark-down or fees charged Broker's customers a fee of Twenty Dollars ($20.00) for each transaction cleared by Alpine on behalf of Broker. (See Schedule A). The compensation pursuant to this paragraph may be changed by Alpine at any time on thirty days prior written notice to Broker or from time to time as may be agreed by both parties. Broker shall promptly notify Alpine of any change in the nature or mix of the business engaged in by Broker. The minimum monthly fee to Alpine shall be two-thousand dollars ($2000.00).

## 19.0   DEPOSIT ACCOUNT

19.1   Establishment of Deposit Account. To further assure Broker's performance of its obligations under this Agreement, including but not limited to its indemnification obligations under Paragraph 17, Broker shall, on or before the execution of this Agreement, establish an account at Alpine to be designated as the Broker's Deposit Account (the "Deposit Account"). The Deposit Account shall at all times contain cash, securities, or a combination of both, having a market value of at least the amount set forth in Schedule A. The securities placed in the Deposit Account shall consist only of direct obligations issued by or guaranteed as to principal and interest by the United States Government. In the event of a

12

ALPINE_LIT167378

substantial change in the nature and extent of Broker's business operations, Alpine may require immediately that an additional amount be deposited in the Deposit Account. If such a deposit is not made in the amount specified whether or not Broker agrees that the amount is justified under this subparagraph, Alpine shall have the right to terminate this Agreement forthwith.

19.2   Ownership Interest.  The Scottsdale Capital Advisor cash deposit does not represent ownership interest in the clearing broker, Alpine Securities.

19.3   Alpine's Right to Offset Commissions and Deposit Account. For any claim Alpine may have against Broker or any customer of Broker, Broker grants Alpine a continuing security interest and general lien upon the Deposit Account and all other accounts of Broker held at Alpine, and acknowledges Alpine shall have a right of setoff against such Deposit Account and other accounts at Alpine to the extent of any account debit, claim or liability including any attorneys' fees incurred by Alpine related thereto or to the indemnification provisions of Section 17 hereof. In connection therewith, Broker further grants Alpine a security interest and right of setoff against all the moneys, securities and other property belonging to Broker in the possession or control of Alpine or a financial intermediary for the account of Broker and authorizes Alpine to perfect such security interest by giving notice thereof to such financial intermediary. If (i) Alpine shall have any claim against Broker or a customer of Broker which has not been resolved within five business days after Alpine presents such claim to Broker, or (ii) if Alpine shall suffer any loss or incur any expense for which it is entitled to be indemnified pursuant to this Agreement, and Broker shall fail to make such indemnification within five business days after being requested to do so, Alpine may deduct the amount of such claim, loss, or expense from the commissions to be credited to Broker on the next monthly or other periodic settlement date pursuant to Paragraph 18.3. If the amount of these commissions is less than the amount of such claim, loss, or expense, Alpine may withdraw from the Deposit Account cash or securities (or both) having a market value equal to the amount of such deficiency. Broker shall be obligated to make an immediate deposit in the Deposit Account of cash or securities sufficient to bring the Account back to a value of at least the amount required by Schedule A. Alpine shall further have the right to satisfy the claim, liability or deficiency by liquidating any securities or other property and withdrawing the amount, in any order from the following: (i) the relevant account; (ii) the Deposit Account; and (iii) any other account with Alpine or with such other organizations as Alpine has been granted a security interest in. Alpine shall notify Broker of any such liquidations and withdrawals.

19.4   Termination of Deposit Account. Upon the termination of this Agreement, or as soon there after as practical, (within 30 calendar days), Alpine shall pay and deliver to Broker the funds and securities in the Deposit Account, less any amounts which it is entitled under the preceding paragraph; provided, however, that Alpine may retain in the Deposit Account such amount for such period as it deems appropriate for its protection from any claim or proceeding of any type, then pending or threatened, until the final determination of such claim or proceeding is made. If a threatened claim or proceeding is not resolved or if a legal action or proceeding is not concluded, any amount retained with respect to such claim, proceeding, or action shall be instituted within a reasonable time after the termination paid or delivered to Broker.

19.5   Issuance of Protective Decree.  In the event that Scottsdale Capital Advisors, (the introducing Broker-Dealer), is the subject of the issuance of a protective decree pursuant to the Securities Investor Protection Act of 1970 (15 USC 78aaa-lll), Alpine Securities claim for payment of a termination fee under this agreement shall be subordinate to claims of Scottsdale Capital Advisor's customers that have been approved by the Trustee appointed by the Securities Investor Protection Corporation pursuant to the issuance of such protective decree.

13

ALPINE_LIT167379

## 20.0   PROPRIETARY ACCOUNTS OF INTRODUCING BROKERS AND DEALERS (PAIB)

Alpine agrees to establish a separate reserve account for proprietary assets held by Broker so that Broker can treat these assets as allowable assets under SEC Rule 1 Sc3-1. Alpine agrees to perform the required computation on behalf of Broker in accordance with the following provisions, procedures and interpretations set forth in the SEC's No-Action Letter regarding Proprietary Accounts of Introducing Brokers and Dealers (PAIB) dated November 3, 1998:

Broker has agreed to not have proprietary trading accounts cleared by Alpine.

20.1   **PAIB Computation.**  Alpine will perform a separate computation for PAIB assets (PAIB reserve computation) of Broker in accordance with the customer reserve computation set forth in SEC Rule 15c3-3 (customer reserve formula) with the following modifications:

(a)  Any credit (including a credit applied to reduce a debit) that is included in the customer reserve formula will not be included as a credit in the PAIB reserve computation:

(b)  Note E(3) to Rule 15c3-3a which reduces debit balances by one percent under the basic method and subparagraph (a)(I)(ii)(A) of Rule 15c3-1 which reduces debit balances by three percent under the alternative method will not apply; and

(c)  Neither Note E(I) to Rule 15c3-3a nor NYSE Interpretation /04 to Item 10 of Rule 15c3-3a regarding securities concentration charges is applicable to the PAIB reserve computation.

20.2   **PAIB Assets Separate.**  PAIB reserve computation will include all the proprietary accounts of Broker. All PAIB assets will be kept separate and distinct from customer assets under the customer reserve computation set forth in SEC Rule 15c3-3.

20.3   **PAIB Computation Time Frame.**  PAIB reserve computation will be prepared within the same time frames as those prescribed by Rule 15c3-3 for the customer reserve formula.

20.4   **Special Reserve Account.**  Alpine will establish and maintain a separate "Special Reserve Account for the Exclusive Benefit of PAIB Customers" with a bank in conformity with the standards of Rule 15c3-3(f) (PAIB Reserve Account). Cash and/or qualified securities as defined in the Rule will be maintained in the PAIB Reserve Account in an amount equal to the PAIB reserve requirement.

20.5   **Deposit Requirement.**  If the PAIB reserve computation results in a deposit requirement, the requirement can be satisfied to the extent of any excess debit in the customer reserve formula of the same date.  However, a deposit requirement resulting from the customer reserve formula cannot be satisfied with excess debits from the PAIB reserve computation.

20.6   **Notification.**  Within two business days of entering into this agreement, Broker must notify its designated examining authority (DEA) in writing that it has entered into a PAIB agreement with its clearing broker-dealer.

20.7   **Insufficient Deposits.**  Upon discovery that any deposit made to the PAIB Reserve Account did not satisfy its deposit requirement, Alpine will immediately notify its DEA and the SEC. Unless a corrective plan is found to be acceptable by the SEC and the DEA, Alpine will provide written notification within five business days of the date of discovery to Broker that PAIB assets held by Alpine will not be deemed allowable assets for net capital purposes.

14

ALPINE_LIT167380

### 21.0   COMMUNICATION WITH CUSTOMERS

21.1   <u>Notice to Customers</u>.  Alpine shall, upon the opening of an account pursuant to paragraph 5 of this Agreement, mail to each customer a copy of the Notice to Customers required by NASD Rule 3230(g).

21.2   <u>Customer Inquiries and Complaints</u>.  Broker and Alpine each agree to forward to the other any written complaint received from a customer regarding a function the other has agreed to perform pursuant to this Agreement.

21.3   <u>Restriction on Advertising</u>.  Neither Alpine nor Broker shall utilize the name of the other in any way without the other's prior written consent nor shall either party employ the other's name in such a manner as to create the impression that the relationship between them is anything other than that of clearing broker and introducing broker. Broker shall not hold itself out as an agent of Alpine or as a subsidiary or company controlled directly or indirectly by or affiliated with Alpine.

### 22.0   TERMINATION OF AGREEMENT

This Agreement shall continue until terminated as hereinafter provided:

22.1   <u>Termination Upon 60-Day Notice</u>.  This Agreement may be terminated by either party without cause upon sixty days prior written notice delivered in person or by registered or certified mail. If either party terminates the Agreement pursuant to this subparagraph, Alpine shall have the right to impose reasonable limitations upon Broker's activities during the period between the giving of notice and the transfer of Broker's accounts.

22.2   <u>Change in Compensation Schedule</u>.  If, pursuant to paragraph 18.4 of this Agreement, Alpine shall make any unilateral change in the compensation schedule described in that subparagraph, and that change causes the increase in Alpine's compensation to exceed 20 percent during any calendar year, Broker may, upon 60 days prior written notice to Alpine, terminate this Agreement on the effective date of such unilateral change.

22.3   <u>Default</u>.  If either party defaults in the performance of its obligations under this Agreement, or otherwise violates the provisions of this Agreement, the nondefaulting party may terminate this Agreement by delivering written notice to the defaulting party (i) specifying the nature of the default and (ii) notifying the defaulting party that unless the default is cured within a period of ten days from receipt of the notice, this Agreement will be terminated without further proceedings by the nondefaulting party.

22.4   <u>Disability</u>.  This Agreement may be terminated by Alpine or Broker immediately in the event that the other party is enjoined, disabled, suspended, prohibited, or otherwise becomes unable to engage in the securities business or any part of it by operation of law or as a result of any administrative or judicial proceeding or action by the SEC, any state securities law administrator, or any regulatory or self-regulatory organization having jurisdiction over such party.

22.5   <u>Conversion of Accounts</u>.  In the event that this Agreement is terminated for any reason, Broker shall arrange for the conversion of Broker's and its customer accounts to another clearing broker or to Broker if it becomes self-clearing. Broker shall give Alpine notice (the "Conversion Notice") of (i) the name of the broker that will assume responsibility for clearing services for Broker and Broker's customers, (ii) the date on which such broker will commence providing such services, (iii) Broker's undertaking, in form and substance satisfactory to Alpine, that Broker's agreement with such broker provides that such broker will accept on conversion all Broker and its customers accounts then maintained

ALPINE_LIT167381

by Alpine, and (iv) the name of an individual or individuals within the new clearing broker's organization whom Alpine may contact to coordinate the conversion. The Conversion Notice shall accompany Broker's notice of termination given pursuant to this paragraph. If Broker fails to give Conversion Notice to Alpine, Alpine may give to Broker's customers such notice as Alpine deems appropriate of the termination of this Agreement and may make such arrangements as Alpine deems appropriate for transfer or delivery Broker and its customer accounts. The expense of providing such notice and making such arrangements shall be charged to Broker.

22.6   Survival. Termination of this Agreement in any manner shall not release Broker or Alpine from any liability or responsibility to the other with respect to transactions effected prior to the effective date of such termination, whether or not claims relating to such transactions shall have been made before or after such termination.

## 23.0   CONFIDENTIAL NATURE OF DOCUMENTS AND OTHER INFORMATION

Neither Alpine nor Broker shall disclose the terms of this Agreement or information obtained as a result thereof to any outside party except to regulatory or self-regulatory organizations with appropriate jurisdiction, pursuant to judicial process or to authorized employees of the other on a need-to-know basis. Any other publication or disclosure of the terms of this Agreement may be made only with the prior written consent of the other party. Broker and Alpine shall each maintain the confidentiality of documents and information received from the other party pursuant to this Agreement. Alpine and Broker each agree that any information regarding the identity of the other's customers shall be kept confidential and not used by the other except as required in connection with obligations under this agreement.

Broker acknowledges that the services Alpine provides hereunder involve Broker access to proprietary technology, trading and other systems, and that techniques, algorithms and processes contained in such systems constitute trade secrets and shall be safeguarded by Broker, and the Broker shall exercise reasonable care to protect Alpine's interest in such trade secrets. Broker agrees to make the proprietary nature of such systems known to those of its consultants, staff, agents or clients who may reasonably be expected to come into contact with such systems. Broker agrees that any breach of this confidentiality provision may result in its being liable for damages as provided by law.

## 24.0   ACTION AGAINST CUSTOMERS BY ALPINE

Alpine may, in its sole discretion and at its own expense, upon written notice to Broker institute and prosecute in its name any action or proceeding against any of Broker's customers in relation to any controversy or claim arising out of Alpine's transactions with Broker or with Broker's customers. Nothing contained in this Agreement shall be deemed either (a) to require Alpine to institute or prosecute such an action or proceeding; or (b) to impair or prejudice its right to do so, should it so elect, nor shall the institution or prosecution of any such action or proceeding relieve Broker of any liability or responsibility which Broker would otherwise have had under this Agreement. Broker shall assign to Alpine its rights against its customers to the extent requested by Alpine and necessary to effectuate the provisions of this Paragraph.

16

ALPINE_LIT167382

## 25.0   NOTICES

Any notice or request required or permitted to be given under this Agreement shall be sufficient if it is in writing and sent by hand or by certified mail, return receipt requested, to the parties at the following address:

Broker:   Scottsdale Capital Advisors, Inc.
7170 E McDonald Drive, Suite 6
Scottsdale, AZ 85253

Attn:   John Hurry  / Justine Hurry

Alpine:   Alpine Securities Corporation
440 East 400 South
Salt Lake City, Utah 84111
Attn: Todd Groskreutz

## 26.0   ARBITRATION

26.1   <u>Arbitration Requirement</u>.  Any dispute between Broker and Alpine that cannot be settled shall be taken to arbitration as set forth in paragraph 26.3 below.

. 26.2   <u>Arbitration Disclosure</u>.

* ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

* THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

* PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

* THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

* THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

26.3   <u>Arbitration Agreement</u>.

ANY CONTROVERSY BETWEEN ALPINE AND BROKER ARISING OUT OF BROKER'S BUSINESS OR THIS AGREEMENT SHALL BE SUBMITTED TO ARBITRATION CONDUCTED ~~BEFORE THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. AND IN~~ ACCORDANCE WITH THE RULES PERTAINING THERETO AND SHALL BE CONDUCTED AS A BROKER TO BROKER OR MEMBER VS MEMBER DISPUTE. ARBITRATION MUST BE COMMENCED BY SERVICE UPON THE OTHER PARTY OF A WRITTEN DEMAND FOR

17

ARBITRATION OR A WRITTEN NOTICE OF INTENTION TO ARBITRATE, THEREIN ELECTING THE ARBITRATION TRIBUNAL.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION AND WHO IS A MEMBER OF A PUTATIVE CLASS AND WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL: (i) THE CLASS CERTIFICATION IS DENIED; (ii) THE CLASS IS DECERTIFIED; OR (iii) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT.  SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

## 27.0    GENERAL PROVISIONS

27.1    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the respective permitted successors and assigns of Broker and Alpine. No assignment of this Agreement by Broker shall be effective unless Alpine's written consent shall be first obtained.

27.2    Severability.  If any provision or condition of this Agreement shall be held to be invalid or unenforceable, the validity or enforceability of the remaining provisions and conditions shall not be affected hereby.

27.3    Counterparts.  This Agreement may be executed in one or more counterparts, all of which taken together shall constitute a single agreement.

27.4    Entire Agreement / Amendments.  This Agreement represents the entire agreement between the parties with respect to the subject matter contained herein.  This Agreement may not be changed orally, but only by an agreement in writing signed by the parties.

27.5    Captions and Headings.  Captions and headings herein are for convenience only and are not of substantive effect.

27.6    Applicable Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Utah, without giving effect to the conflicts of laws principles thereof.

27.7    Citations.  Any references to the rules or regulations of the SEC, the NASD or any other regulatory or self-regulatory organization are current citations. Any changes in the citations (whether or not there are any changes in the text of such rules or regulations) shall be automatically incorporated herein.

27.8    Construction of Agreement.  Neither this Agreement nor the performance of the services hereunder shall be considered to create a joint venture or partnership between Alpine and Broker or between Broker and other brokers for whom Alpine may perform the same or similar service.

27.9    No Third Party Beneficiaries.  This Agreement is between the parties hereto and is not intended to confer any benefits on third parties, including, but not limited to, customers of Broker.

27.10    Non-Exclusivity of Remedies.  The enumeration herein of specific remedies shall not be exclusive of any other remedies.  Any delay or failure by a party to this Agreement to exercise any right, power, remedy or privilege herein contained, or now or hereafter existing under any applicable statute or law,

18

ALPINE_LIT167384

shall not be construed to be a waiver of such right, power, remedy, or privilege. No single, partial, or other exercise of any such right power, remedy, or privilege shall preclude the further exercise thereof or the exercise of any other right, power, remedy, or privilege.

27.11   SEC Release 34-31511 Provision.  Pursuant to the interpretation of Introducing Accounts on a Fully Disclosed Basis contained in SEC Release 34-41511, it is hereby agreed between Broker and Alpine that, insofar as the "financial responsibility rules" of the SEC and Securities Investor Protection Act are concerned, the accounts Broker introduces to Alpine on a fully disclosed basis shall be considered to be accounts of Alpine and not Broker's accounts. Nothing in this paragraph will otherwise change or affect the provisions of this Agreement which provide that the customer account remains Broker's customer account for all other purposes, including but not limited to, supervision, suitability and indemnification.

IN WITNESS WHEREOF the parties have hereto affixed their hands and seals by their duly authorized officers as of the date first above written.

This Agreement contains a pre-dispute arbitration clause in paragraph 26 on page 20. Broker acknowledges receiving a copy of this Agreement.

BROKER:

Scottsdale Capital Advisors, Inc.

By:

Name:

Title:

ALPINE:

Alpine Securities Corporation

By:
Name:   Todd Oroskreutz
Title:   Chief Financial Officer

19

ALPINE_LIT167385

**Schedule A to Fully Disclosed Clearing Agreement**
**Between Alpine Securities Corporation and Scottsdale Capital Advisors, Inc.**

Transfer charges, Wire Fees, Account Transfer charges, DWAC and DO charges, and all other charges generated by Scottsdale Capital Advisors, ("SCOTTSDALE") customers shall be charged directly to such customer or to SCOTTSDALE at brokers election. (Certificate deposits are billed to the customer at $75.00 per physical certificate deposit, per CUSIP per deposit).

SCOTTSDALE will route orders for which Alpine is acting as clearing agent, through Alpines on-line order management system, (Go-Trader). Alpine will use this system to restrict SCOTTSDALE from selling stock that is not long in the account and from buying securities for which there are not sufficient funds to cover the purchase.

Any sales of securities deemed to be illiquid by NSCC must be executed x-clearing. Illiquid securities are defined as sales of at least 100,000 shares AND position must be at least 25% of the average daily volume, (ADV). Purchases are subject to the same execution requirements if at least 10,000,000 shares are purchased within trade date and settlement date, (T + 3).

The Deposit Account shall have a minimum cash balance of $25,000. Additional funds may be required based on activity. Any special charges due to NSCC generated by broker will also be required to be included in the deposit account.

No long or short positions may be carried by broker for its proprietary trading account.

| | |
|---|---|
| Fees for clearing services shall be as follows: | $20.00 per order, per day. $2000.00 per month minimum |
| Go-Trader terminal fees: | $75.00/terminal per month |
| Aspire Posse terminal fees: | $25.00/terminal per month |
| Citrix license: | $300 install per user, $150 per year per user |
| Blue Sheet charge: | $75.00 per request |

20

ALPINE_LIT167386