# Exhibit 6

Law Offices Of
**IRVING M. EINHORN**
A PROFESSIONAL CORPORATION
1710 10™ STREET
MANHATTAN BEACH, CALIFORNIA 90266
TELEPHONE: (310) 798-7216
FACSIMILE: (310) 798-5910
EMAIL: ime@einhornlaw.com

October 5, 2010

Todd Groskreutz
Alpine Securities Corporation
440 East 400 South
Salt Lake City, UT 84111

    Re:    Clearing firm obligations regarding the receipt of physical certificates from customers of introducing firm

Dear Mr. Groskreutz:

    You have asked me to advise you and your firm, Alpine Securities Corporation ("Alpine") regarding your regulatory obligations and responsibilities as a clearing firm in the securities industry, when receiving physical share certificates from an introducing firm's customers.

Background

    It is my understanding that Alpine is a full service self-clearing brokerage firm. The term "self-clearing" is indicative of the fact that Alpine has been approved to clear its own trades through the securities settlement process. Alpine also clears trades for other brokerage firms (the "introducing firm") on a fully disclosed basis - meaning that the introducing firm advises its clients of the fact that its transactions are processed by Alpine. In this relationship, Alpine handles all securities and funds of the introducing firm's clients and processes all of the transactions for each customer of the introducing firm. Alpine, as part of its responsibilities also sends the introducing firm's clients monthly account statements and confirmations of all transactions that the customer executed.

    As part of this process, Alpine will receive payment from customer's of the introducing firm for deposit into their securities brokerage account held at Alpine. Alpine will also, upon request of the customer of the introducing firm, send checks requested by the customer to the customer directly. Likewise, if a customer possesses a physical stock

ALPINE_LIT167419

Todd Groskreutz
Alpine Securities Corporation
October 5, 2010
Page 2

certificate which it wishes to deposit into its account, the certificate will be sent to Alpine by the introducing firm for deposit or directly by the customer to Alpine for credit to the customer's account. After the security is deposited into the account held at Alpine, the position is reflected in the customer's account and can be held in street name or sold upon instructions from the customer.

It appears that questions have arisen regarding Alpine's responsibilities when receiving and/or processing/clearing certificated shares. Specifically, you have asked me what duty Alpine has, besides clearing the certificate and depositing it into the customer's account, with regard to conducting due diligence on the certificate to insure that the customer is not engaging in the sale of unregistered securities without an appropriate exemption from the registration requirements of the Federal Securities laws.

## Discussion

Clearing arrangements and clearing brokers are integral parts of the securities industry. Approximately ninety percent of all broker-dealers registered with the Securities and Exchange Commission (SEC) hire clearing brokers and utilize clearing arrangements. In 2008, according to the SEC, there were 4,708 registered brokerage firms doing a public business. There were 504 clearing firms during that period who cleared transactions and kept custody and possession of the introducing firm's customers' funds and securities positions. .

NYSE RULE 382

On February 19, 1982, the SEC approved amendments to NYSE Rule 382. Rule 382, as amended, permitted clearing and introducing firms to contractually allocate between themselves responsibility for the performance and supervision of all functions related to transactions in customer accounts. Significantly, amended Rule 382 relieved clearing firms from their prior regulatory duty under NYSE Rule 405 to supervise introducing firms, including their sales activities. The continuation of that burden could no longer be justified after May Day as clearing firms were no longer receiving fixed commissions, which had permitted them to hire and maintain legal and compliance staff and systems to police

Todd Groskreutz
Alpine Securities Corporation
October 5, 2010
Page 3

introducing firms. Under amended Rule 382, "know your customer" responsibilities--establishing a customer's investment objectives, determining the suitability of recommended investments--remained only with the introducing firm. Amended Rule 382 eliminated the heretofore duplicative responsibility of clearing firms to "know the customers" of introducing firms and to supervise the sales practices of such firms. In brief, under amended Rule 382, clearing brokers became responsible for the performance of only those functions outsourced and allocated to them under the clearing agreement.

1999 AMENDMENTS

Effective July 19, 1999, the SEC approved substantially identical amendments to NYSE Rule 382 and NASD Rule 3230. The 1999 Amendments were the first to Rule 382 since 1982 and the first to Rule 3230 since its promulgation in 1994 and reflected the SEC's and self regulatory organization's ("SROs'") response to the "micro-cap" fraud committed by a small, but highly visible, number of rogue introducing firms in the bull markets of the 1990s. Not only did these firms defraud their customers, but one such firm caused the collapse of its clearing firm in 1995.

The 1999 Amendments imposed two new requirements on clearing firms: (1) to forward customer complaints received by them, relating to conduct by their introducing firms, promptly to the introducing firms' DEA (usually the NASD) to enable that DEA to investigate the introducing firms on a timely basis and (2) to offer the introducing firms "exception" reports pertaining to their proprietary and customer trading activities. n85 These reports, based upon raw data in the computer system of the clearing firm, organize information into various categories, such as commissions generated by salesperson in any or all securities bought or sold by customers. Utilization of these reports enhances the ability of introducing firms to supervise their own sales personnel.

The legislative history of the 1999 Amendments to NYSE Rule 382 and NASD Rule 3230 acknowledges the regulatory responsibility of SROs to supervise introducing firms. Specifically, the NYSE noted that the amendments to Rule 382 are intended to "provide a reporting mechanism to SROs for complaints received by the carrying organization regarding functions or responsibilities of the introducing organization, and exception

Todd Groskreutz
Alpine Securities Corporation
October 5, 2010
Page 4

reports offered by carrying organizations and provided [by them] to introducing organizations." NASDR observed that the amendments are intended "to provide [NASDR] with early warning indicators to generate a regulatory response to problems." NASDR stated further that the "receipt by clearing firms of large numbers of complaints regarding introducing firms may be indicative of sales practice problems requiring prompt regulatory attention." In approving the amendments, the SEC expressed a similar view:

> The NASDR proposes to revise NASD Rule 3230 to enhance the ability of the Association and other securities self-regulatory organizations . . . to monitor the activities of introducing firms . . . . The Commission believes that the proposed rule change, by assisting the NASD to better monitor the activities of introducing brokers, should help to prevent fraudulent and manipulative acts and practices.

Significantly, the 1999 Amendments did not impose upon clearing firms a duty to analyze or investigate customer complaints about introducing firms or to monitor and investigate the conduct of introducing firms in light of such complaints or data reflected on exception reports provided to introducing firms. To the contrary, in announcing the SEC's approval of the amendments, NASDR advised its member firms that the amendments "are not intended to change the fundamental nature of the relationship between introducing and clearing firms, or otherwise affect any existing rights, responsibilities, or liabilities under law or contract." The NYSE articulated a similar position in advising its members of the SEC's approval of the amendments: "The Exchange believes that the amendments to Rule 382 will further clarify the relationship and responsibilities between introducing and carrying [i.e., clearing] organizations without altering the fundamental carrying/clearing contractual relationship."

It appears from the regulatory history that the SEC and SRO's were comfortable with allowing clearing firms to contract with introducing firms and allocate responsibilities between them according to contractual agreement. It is abundantly clear that clearing members did not have "know your customer" responsibilities for customers of the introducing members if that responsibility was not accepted by them in the clearing

Todd Groskreutz
Alpine Securities Corporation
October 5, 2010
Page 5

agreement. It goes without saying that any analysis of the authenticity or provenance of a physical certificate obtained from a customer of the introducing firm would come under the auspices of the know your customer rule and that a clearing firms' only realistic obligation with respect to the receipt of physical certificates from customers of an introducing firm would be to promptly and expeditiously clear them for deposit into the customer's account. Similarly, a clearing firm's obligation, upon receipt of funds from a customer of an introducing firm would be to promptly deposit those funds into the banking system and credit them to the customer's account for immediate use. No one would suggest that a clearing firm should hold customer's checks to conduct a due diligence inquiry into the source of the funds used to cover the tendered check. A properly endorsed stock certificate is a negotiable instrument under the Uniform Commercial Code and must be treated as such and should be promptly cleared. If not expeditiously handled, a clearing firm could be exposed to potential liability from a customer if that customer was unable to sell a security in a rapidly declining market due to a failure of the clearing firm to clear the certificate in the ordinary course of business.

The only known exception to this general rule is when the clearing firm has actual notice of facts and circumstances which would put it on notice that there is some actual or apparent problem with the certificate or check tendered for deposit. In an SEC Administrative Proceeding[1], the Administrative Law Judge stated in a decision in which she found that the clearing broker was not liable for conduct engaged in by an introducing firm:

> There are essentially no cases in which clearing brokers have been held liable for antifraud violations or secondarily liable for an introducing firm's fraud, even when they knew of it. See Blech Sec. Litig., 961 F. Supp. 569, 584 (S.D.N.Y. 1997) (clearing firm not primarily liable for antifraud violations

---

[1] In the Matter of Del Mar Financial Services, Inc., Kevin C. Dills, Private Brokers Corporation, Robert A. Roberts, Matthew R. Jennings, Philip S. Brandon, and Jai Chaudhuri Administrative Proceeding File No. 3-9959, Release No. 188 (S.E.C. Release No.), 75 S.E.C. Docket 1473 (S.E.C. Release No.), Release No. ID - 188 (S.E.C. Release No.), 2001 WL 919968

when its conduct is no more than the performance of routine clearing functions); see also Bolton, 904 F.2d at 824 (clearing firm has no fiduciary duty to introducing firm's customer; aiding and abetting charge fails absent actual intent to defraud by clearing firm); Edwards & Hanly v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 484-85 (2d Cir. 1979) (clearing firm is generally under no fiduciary duty to owners of securities that pass through its hands; aiding and abetting liability for an antifraud violation requires close to an actual intent to aid in a fraud in the absence of a fiduciary duty); Blech Sec. Litig., 928 F. Supp. 1279, 1295-96 (S.D.N.Y. 1996) (no material omission even if clearing firm knew and failed to disclose a material fact because a clearing broker owes no duty of disclosure to introducing firm's customer); Dillon v. Militano, 731 F. Supp. 634, 636- 39 (S.D.N.Y. 1990) (clearing broker performs clerical functions; not liable for introducing broker's fraud; no aiding and abetting liability as clearing firm owed no duty to customers of introducing firm).

The limited precedent for holding a clearing broker liable for fraud is found in cases in which courts denied motions to dismiss complaints against clearing brokers that alleged long-running, egregious situations in which the clearing broker was a full partner in the introducing broker's wrongdoing. Roberts and Private Brokers's conduct on May 7 was far from a long-running partnership in wrongdoing. See Blech Sec. Litig., 961 F. Supp. at 582-85 (allegation that clearing broker Bear Stearns, knowing the history of sham trading of Blech & Co., demanded that it reduce its debit balance and then cleared its fraudulent parking transactions); Atlantic Fin. Mgmt., Inc., Sec. Litig., 658 F. Supp. 380, 381 (D. Mass. 1986) (allegation that clearing broker had close working relationship with individual defendants and knew of their conflict of interest in plaintiffs' transactions); Margaret Hall Found., Inc. v. Atlantic Fin. Mgmt., Inc. 572 F. Supp. 1475, 1480-81 (D. Mass. 1983) (allegation that clearing broker had close relationship with introducing firm, rented offices to it, and promoted the same fraudulent investment). Similarly, recent Commission settlements[61] with Bear, Stearns Securities Corp. (Bear Stearns) and its president Richard Harriton involved an egregious,

ALPINE_LIT167424

Todd Groskreutz
Alpine Securities Corporation
October 5, 2010
Page 7

long-running situation.

Conclusion

From the foregoing analysis and precedent, it appears that Alpine, as a clearing firm, is only responsible for performing duties which it obligated itself to perform under its clearing agreement with an introducing firm. Typically, and most importantly, a review of your clearing agreements with introducing firms make it abundantly clear that your firm, with regard to the receipt of securities, performs only a cashiering or ministerial function. Your firm has no obligation under these agreements to do more than accept securities which are tendered and process them for credit to the customer's account. Without actual knowledge on Alpine's part of an irregularity, Alpine cannot be held responsible for the wrongful conduct of either the introducing firm or the introducing firm's customer and has no obligation, absent actual knowledge of an impropriety, to conduct any further inquiry into a security tendered for deposit into the account of a customer of the introducing firm.

Very truly yours,


Irving M. Einhorn