# Exhibit 8

United States Government Accountability Office

# GAO

## Report to Congressional Requesters

February 2009

# BANK SECRECY ACT

## Suspicious Activity Report Use Is Increasing, but FinCEN Needs to Further Develop and Document Its Form Revision Process



**GAO**
Accountability * Integrity * Reliability



**GAO**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-09-226, a report to congressional requesters

**February 2009**

# BANK SECRECY ACT

## Suspicious Activity Report Use Is Increasing, but FinCEN Needs to Further Develop and Document Its Form Revision Process

## Why GAO Did This Study

To assist law enforcement agencies in their efforts to combat money laundering, terrorist financing, and other financial crimes, the Bank Secrecy Act (BSA) requires financial institutions to file suspicious activity reports (SAR) to inform the federal government of transactions related to possible violations of law or regulation. Depository institutions have been concerned about the resources required to file SARs and the extent to which SARs are used. GAO was asked to examine (1) factors affecting the number of SARs filed, (2) actions agencies have taken to improve the usefulness of SARs, (3) federal agencies' use of SARs, and (4) the effectiveness of the process used to revise SAR forms. GAO reviewed laws and agency documents; analyzed SAR filings; and interviewed representatives from the Financial Crimes Enforcement Network (FinCEN), law enforcement agencies, bank regulators, and depository institutions.

## What GAO Recommends

GAO recommends that the Secretary of the Treasury direct FinCEN to further develop a strategy that fully incorporates certain GAO-identified practices to enhance and sustain collaboration among federal agencies into the forms-change process. The FinCEN Director generally agreed with the recommendation.

To view the full product, including the scope and methodology, click on GAO-09-226. For more information, contact Jack Edwards at (202) 512-8678 or edwardsj@gao.gov.

## What GAO Found

In 2000 through 2007, SAR filings by depository institutions increased from about 163,000 to 649,000 per year; representatives from federal regulators, law enforcement, and depository institutions with whom GAO spoke attributed the increase mainly to two factors. First, automated monitoring systems can flag multiple indicators of suspicious activities and identify significantly more unusual activity than manual monitoring. Second, several public enforcement actions against a few depository institutions prompted other institutions to look more closely at client and account activities. Other factors include institutions' greater awareness of and training on BSA requirements after September 11, and more regulator guidance for BSA examinations.

FinCEN and law enforcement agencies have taken actions to improve the quality of SAR filings and educate filers about their usefulness. Since 2000, FinCEN has issued written products with the purpose of making SAR filings more useful to law enforcement. FinCEN and federal law enforcement agency representatives regularly participate in outreach on BSA/anti-money laundering, including events focused on SARs. Law enforcement agency representatives said they also establish relationships with depository institutions to communicate with staff about crafting useful SAR narratives.

FinCEN, law enforcement agencies, and financial regulators use SARs in investigations and financial institution examinations and have taken steps in recent years to make better use of them. FinCEN uses SARs to provide public and nonpublic analytical products to law enforcement agencies and depository institution regulators. Some federal law enforcement agencies have facilitated complex analyses by using SAR data with their own data sets. Federal, state, and local law enforcement agencies collaborate to review and start investigations based on SARs filed in their areas. Regulators use SARs in their examination process to assess compliance and take action against abuse by depository institution insiders.

After revising a SAR form in 2006 that still cannot be used because of information technology limitations, in 2008, FinCEN developed a new process for revising BSA forms, including SARs, that may increase collaboration with some stakeholders, including some law enforcement groups concerned that certain of the 2006 revisions could be detrimental to investigations. However, the limited documentation on the process does not provide details to determine the degree to which the new process will incorporate GAO-identified best practices for enhancing and sustaining federal agency collaboration. For example, it does not specify roles and responsibilities for stakeholders or depict monitoring, evaluating, and reporting mechanisms. By incorporating some of these key collaboration practices and more fully developing and documenting its new process for form revisions, FinCEN could achieve some potential benefits that could come from closer adherence to the practices—such as greater consensus from all stakeholders on proposed SAR form revisions.

_United States Government Accountability Office_

# Contents

**Letter**                                                                      1

    Results in Brief                                         4
    Background                                               7
    A Number of Factors Influenced the Large Increase in SARs Filed
        by Depository Institutions in 2000 through 2007       14
    FinCEN and Law Enforcement Agencies Took Multiple Actions to
        Improve SAR Filings and Educate Filers about Their Usefulness
        in Investigations                                    20
    Federal Agencies Use SARs in a Variety of Ways and Have Taken a
        Number of Actions in Recent Years to Make Better Use of Them   23
    The Process FinCEN Used to Revise the SAR Did Not Result in a
        Usable Form and Its New Process Provides Few Details on How
        Past Problems Will Be Overcome                       33
    Conclusions                                             38
    Recommendation for Executive Action                      40
    Agency Comments and Our Evaluation                       40

**Appendix I**        **Objectives, Scope, and Methodology**                    42

**Appendix II**       **Comments from the Financial Crimes Enforcement
                      Network**                                                 46

**Appendix III**      **GAO Contact and Staff Acknowledgments**                 48

**Tables**
    Table 1: Number of SARs Filed by Industry, Calendar Years 2000–
        2007                                                 15
    Table 2: Entities at Which Interviewees Provided Perspectives and
        Documentary Evidence for the Objectives              43

**Figures**
    Figure 1: The Process for Filing and Accessing SARs      13
    Figure 2: Change in Percentage of SARs Filed by Filing Type,
        Calendar Years 2004–2007                             16

Figure 3: SARs Filed by Banks, Thrifts, and Credits Unions by Asset Size, Calendar Year 2007                                                                    17

**Abbreviations**

| | |
|---|---|
| AML | anti-money laundering |
| BSA | Bank Secrecy Act |
| CBRS | Currency and Banking Retrieval System |
| CMP | civil money penalty |
| DEA | Drug Enforcement Administration |
| DOJ | Department of Justice |
| FBI | Federal Bureau of Investigation |
| FDIC | Federal Deposit Insurance Corporation |
| FinCEN | Financial Crimes Enforcement Network |
| HIFCA | High Intensity Financial Crime Area |
| IAP | institution-affiliated party |
| ICE | Immigration and Customs Enforcement |
| IRS | Internal Revenue Service |
| IRS-CI | Internal Revenue Service–Criminal Investigation |
| NCUA | National Credit Union Administration |
| OCC | Office of the Comptroller of the Currency |
| OTS | Office of Thrift Supervision |
| PRA | Paperwork Reduction Act |
| SAR | suspicious activity report |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
Washington, DC 20548

February 27, 2009

The Honorable Barney Frank
Chairman
The Honorable Spencer Bachus
Ranking Member
Committee on Financial Services
House of Representatives

The Honorable Stephen F. Lynch
House of Representatives

In part, to assist law enforcement agencies in their efforts to combat money laundering, the financing of terrorist activities, and other financial crimes, the Bank Secrecy Act (BSA) requires financial institutions to inform the federal government of any suspicious transaction related to a possible violation of law or regulation.[1] BSA—which the U.S. Department of the Treasury's (Treasury) Financial Crimes Enforcement Network (FinCEN) administers—and its implementing regulations provide for the filing of suspicious activity reports (SAR) by depository institutions when they detect a known or suspected violation of any law or regulation. Under the regulations administered by FinCEN, a SAR is required when the suspicious activity involves a transaction of at least $5,000 conducted or attempted by, at, or through the institution; involves funds derived from illegal activities; is designed to evade any reporting requirement under federal law or other BSA requirement; has no business or apparent lawful purpose; or the transaction is not the sort in which the customer normally engages and there is no reasonable explanation known for the transaction. Suspicious activity reporting is one component of broader anti-money laundering (AML) programs that depository institutions (banks, thrifts, and credit unions) and other financial institutions implement to comply with BSA. A financial institution's decision to file a SAR may be subjective and is based on its knowledge of the customer and the customer's usual banking activity.

---

[1]Pub. L. No. 91-508, titles I and II, 84 Stat. 1114 to 1124 (Oct. 26, 1970), as amended, *codified at* 12 U.S.C. §§ 1829b, 1951-1959, and 31 U.S.C. §§ 5311 et seq. Specifically, 31 U.S.C. § 5318(g) provides for the reporting of suspicious activities. FinCEN's SAR regulations may be found at 31 C.F.R. § § 103.15 to 103.21.

Federal banking regulators—the Board of Governors of the Federal Reserve System (Federal Reserve), the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the National Credit Union Administration (NCUA)—and state banking regulators examine depository institutions for compliance with BSA, generally as part of their regularly scheduled safety and soundness examinations.[2] Depository institutions have been required to submit SARs since 1996, longer than any other type of financial institutions, and they file the majority of these reports. FinCEN issued regulations subsequent to passage of the USA PATRIOT Act of 2001 that added SAR filing requirements for securities and futures firms, money services businesses, casinos, and insurance companies, among others.[3]

Depository institutions have expressed concerns in congressional testimony about the resource challenges involved in complying with SAR-related requirements and the extent to which law enforcement agencies use SARs and other reports required under BSA. Federal law enforcement agency officials have testified they review and use SARs proactively—separately and in multiagency teams, which often include state and local agencies—to identify potential money laundering cases and money laundering trends, in addition to using them in ongoing investigations of financing of terrorism and other financial crimes. They contend that SARs can be useful in investigations months or years after they have been filed, as the actions of subjects or co-conspirators are uncovered. Depository institution officials have commented they lack clear guidance on what law enforcement is looking for and finds useful in these reports.

In this context, you requested that we examine a number of issues related to suspicious activity reporting, which is part of a larger body of work we are doing about FinCEN and its administration of BSA. Specifically, this report examines (1) the underlying factors that affected the number of SARs filed by depository institutions from 2000 through 2007, (2) actions

---

[2]For the purposes of this report, GAO uses "federal banking regulators" to refer collectively to the regulators of depository institutions (banks, thrifts, and federally chartered credit unions).

[3]The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001). The Securities and Exchange Commission, Commodity Futures Trading Commission, and the Internal Revenue Service carry out BSA responsibilities. Also, according to FinCEN, many state regulators have authority pursuant to state law to ensure that financial institutions comply with anti-money laundering laws and regulations.

that federal agencies have taken to improve the usefulness of SARs for law enforcement, (3) ways in which federal agencies use SARs and actions they have taken to make better use of them, and (4) whether the process FinCEN uses to revise SAR forms is effective in assuring that information collected is appropriate for law enforcement needs. As agreed with your office, we focused our work on depository institutions. Related and ongoing GAO efforts will address other BSA-related issues.

To address our objectives, we reviewed relevant laws, regulations, agency documents, and past GAO work. We interviewed representatives from FinCEN, the Federal Reserve, FDIC, OCC, OTS, and NCUA, as well as representatives from federal law enforcement agencies, including the Secret Service, the Internal Revenue Service–Criminal Investigation (IRS-CI), Immigration and Customs Enforcement (ICE), the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Department of Justice (DOJ). We also obtained and analyzed data from FinCEN on depository institutions' SAR filings for calendar years from 2000 through 2007. We assessed the reliability of these data and found them sufficient for the purposes of this report. We interviewed representatives of the five largest depository institutions by number of SAR filings in 2007. We established 3 categories of depository institutions SAR filing numbers in 2007 and interviewed representatives from 15 depository institutions randomly selected from these categories about their experiences with SAR filing. We obtained data about SAR review teams (multiagency teams with federal, state, and local law enforcement representation) and interviewed staff from 13 teams randomly selected from these data. Similarly, we interviewed law enforcement representatives from High Intensity Financial Crime Areas (HIFCA) in Chicago, Illinois; Los Angeles, California; Miami, Florida; and New York, New York.[4] We also obtained information from IRS (which stores and

---

[4]HIFCAs were conceived in the Money Laundering and Financial Crimes Strategy Act of 1998 as a means of concentrating law enforcement efforts at the federal, state, and local levels in areas of high-intensity money laundering. HIFCAs were first announced in the 1999 National Money Laundering Strategy. Pub. L. No. 105-310, 112 Stat. 2941 (Oct. 30, 1998) *codified at* 31 U.S.C. §§ 5340-5342 and 5351-5355. There are seven areas designated as HIFCAs: Chicago, Illinois; Los Angeles, California; San Francisco, California; Miami, Florida; San Juan, Puerto Rico; the southwest border (Texas and Arizona); and New York and New Jersey. HIFCA designations were designed to allow law enforcement to concentrate resources in areas where money laundering or related financial crimes were occurring at a higher-than-average rate.

maintains BSA data for FinCEN) to determine the frequency with which federal and state law enforcement agencies access SAR data.[5]

We conducted this performance audit in from July 2007 through February 2009 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. Appendix I explains our scope and methodology in greater detail.

## Results in Brief

From 2000 through 2007, depository institutions filed an increasing number of SARs each year and representatives from federal regulators, law enforcement, and depository institutions with whom we spoke attributed the increase to a number of factors. According to FinCEN data, SAR filings by depository institutions increased from approximately 163,000 in 2000 to more than 649,000 in 2007. Our analysis of SAR and banking data from 2004 through 2007 indicates that the growth rates in SAR filings varied over time among depository institutions of different asset sizes. For example, the greatest increase in SARs filed during this period by the largest depository institutions occurred from 2004 to 2005, and SARs filed by small credit unions nearly doubled from 2005 to 2006. Representatives of federal banking regulators, law enforcement agencies, and depository institutions most frequently attributed the increase to two factors: technological advances in detecting suspicious activity and the effect of public enforcement actions on institutions. According to the representatives, automated transaction monitoring systems can flag multiple indicators of suspicious activity and identify much more unusual activity than could be identified manually. At the largest depository institutions, these systems conduct complex analyses incorporating customer profiles. The representatives also said that issuance of several public enforcement actions in 2004 and 2005 with civil money penalties (CMP) and forfeitures up to $40 million against a few depository institutions prompted many institutions to file more SARs after looking more closely at their clients and their account activities. FinCEN and the

[5]For the purposes of this report, we define "BSA data" as SARs and other forms that include currency transaction reports, reports of international transportation of currency or monetary instruments, and reports of foreign bank and financial accounts. The BSA database is accessible to law enforcement agencies.

federal banking regulators took the actions because of systemic BSA program noncompliance, which sometimes included failures to meet SAR filing requirements. DOJ also has taken action against a limited number of depository institutions that involved fines and penalties of up to $40 million. Depository institution representatives with whom we spoke also cited a third factor that influenced the increase—concerns they would receive criticisms during examinations about decisions not to file SARs. To avoid such criticism, they said their institutions filed SARs even when they thought a SAR may have been unnecessary—a practice sometimes referred to as "defensive SAR filing." However, according to the federal regulators and some law enforcement officials with whom we spoke, there is no means of determining what, if any, portion of the increase in filings could be attributed to defensive filing. Additional factors representatives suggested as contributing to the increase include institutions' greater awareness of BSA requirements after September 2001, more regulator guidance for BSA examinations, and increased BSA-related training at the institutions.

FinCEN and law enforcement agencies have taken multiple actions to improve the quality of SAR filings and educate filers about their usefulness. Since 2000, FinCEN has issued written products with the purpose of making SAR filings more useful to law enforcement. These include (1) a regularly issued publication for all financial institutions that gives tips on topics such as the preparation of SARs and (2) SAR-related guidance for depository institutions and other SAR filers. For example, FinCEN issued guidance on addressing common errors in suspicious activity reporting in 2007 and filing SARs about the proceeds of foreign corruption in early 2008. FinCEN representatives also help educate filers by regularly participating in outreach events on BSA/AML issues, including events focused on SARs. FinCEN chairs the Bank Secrecy Act Advisory Group—a forum for federal agencies and financial industry representatives—to discuss BSA administration, including SAR-related issues. Federal law enforcement agency representatives said actions they have taken to improve SARs' usefulness include conducting outreach events and establishing relationships with depository institutions in their local areas to communicate with staff about crafting useful SAR narratives. Representatives from some multiagency law enforcement teams told us that they subsequently noticed improved SAR narratives from local depository institutions.

FinCEN, law enforcement agencies, and banking regulators use SARs in investigations and depository institution examinations and have taken steps in recent years to make better use of them. FinCEN uses SARs to

provide a number of public and nonpublic analytical products to law enforcement agencies and depository institution regulators. In 2004 and 2005, several federal law enforcement agencies signed memorandums of understanding with FinCEN to receive bulk BSA data, including SARs. They combined these data with information from their law enforcement databases to facilitate more complex and comprehensive analyses. Different types of team structures have been established to better analyze SARs. For example, in 2000 and again in 2003, DOJ issued guidance that encouraged the formation of SAR review teams with federal, state, and local representation. These teams review SARs filed in their area on a monthly basis to determine which would merit additional investigation for a variety of suspected financial crimes. In 2006, DOJ and IRS-CI collaborated on a pilot to create task forces and add federal prosecutors to augment SAR review teams in selected districts. These task forces specifically investigate possible BSA violations that have the potential for seizures or forfeitures. The regulators use SARs in their depository institution examination scoping and also review SARs relating to known or suspected unlawful activities by current and former institution-affiliated parties, including officers, directors, and employees. Although law enforcement agency representatives generally were satisfied with their ability to access BSA data, various agencies and multiagency teams we interviewed said that formatting and other issues related to the data system slowed their downloads and reviews. FinCEN and IRS officials said that, when budgetary resources are available, these and other data management challenges will be addressed as part of FinCEN's technology modernization plan, developed in collaboration with IRS.

FinCEN encountered a number of problems in its most recent revision of the SAR form; although FinCEN has developed a new process for form revisions, the information currently available on the process is limited and does not fully indicate how FinCEN will avoid or address some of the problems previously encountered. FinCEN and the federal banking regulators issued proposed substantive and formatting revisions to the SAR form in 2006. The revisions to the form were finalized but, because of technology limitations with IRS's data management system, the revised form has not been implemented. Law enforcement agency officials we interviewed had mixed views on the proposed revisions to the form. They generally supported most of the proposed revisions, but some felt they had been insufficiently consulted and also expressed concerns that some revisions could affect their work negatively. For example, one change would replace the name and title of a person with personal knowledge about the suspicious activity with a contact office, possibly increasing the time it would take law enforcement investigators to reach a person

knowledgeable about the suspicious activity. However, banking regulators supported this change because of concerns that a SAR with a named contact listed could jeopardize the safety and privacy of that person if it were inappropriately disclosed. FinCEN has developed a new form revision process that it says it will use to revise BSA forms, including SARs. The documentation of the planned process suggests some greater stakeholder involvement at an early stage of the process, but the documentation for the new process that we received does not indicate FinCEN has fully incorporated certain GAO-identified practices that can enhance and sustain collaboration among federal agencies. In a previous report, we identified such practices—for example, that collaborating agencies define a common outcome; agree on their respective roles and responsibilities, including how the collaborative effort will be led; and create the means to collect information on, monitor, evaluate, and report their efforts to enable them to identify areas for improvement.[6] If FinCEN more fully incorporated some of these key collaboration practices FinCEN might achieve some potential benefits from closer adherence to the practices—such as greater consensus from all stakeholders on proposed SAR form revisions.

We are recommending that the Secretary of the Treasury direct the Director of FinCEN to further develop and document its strategy to fully incorporate certain GAO-identified practices to enhance and sustain collaboration among federal agencies into the form change process and distribute that documentation to all stakeholders. In written comments on this report, the FinCEN Director said he generally agreed with our recommendation and that FinCEN recognized the need to work with a diverse range of stakeholders to revise BSA forms.

## Background

This section provides general information on how federal agencies carry out BSA responsibilities, what their SAR reporting requirements are, the mechanisms they use to monitor suspicious activity, and law enforcement agencies that use SARs.

---

[6]GAO, *Results-Oriented Government: Practices That Can Help Enhance and Sustain Collaboration among Federal Agencies*, GAO-06-15 (Washington, D.C.: Oct. 21, 2005).

## FinCEN and Other Federal Agencies Carry Out BSA Responsibilities

The Secretary of the Treasury delegated overall authority for enforcement of, and compliance with, BSA and its implementing regulations to the Director of FinCEN. FinCEN's role is to oversee BSA administration. To fulfill this role, FinCEN develops policy and provides guidance to other agencies, analyzes BSA data for trends and patterns, and pursues enforcement actions when warranted. However, FinCEN also relies on other agencies in implementing the BSA framework. These activities include (1) ensuring compliance with BSA requirements to report suspicious activity and certain financial transactions and taking enforcement actions, when necessary; (2) collecting and storing the reported information; and (3) taking enforcement actions or conducting investigations of criminal financial activity.

FinCEN relies on other agencies to conduct examinations to determine compliance with, BSA and its implementing regulations. The Secretary of the Treasury delegated BSA examination authority for depository institutions to five banking regulators—the Federal Reserve, OCC, OTS, FDIC, and NCUA.[7] The federal regulators examine an institution's policies and procedures for monitoring and detecting suspicious activity as part of their examination programs.[8] Periodic on-site safety and soundness and compliance examinations are conducted to assess an institution's financial condition, policies and procedures, adherence to BSA regulations (for example, filing of SARs and other BSA-related reports), and compliance with other laws and regulations. These examinations generally are conducted every 12 to 18 months at small-to-midsized depository institutions (such as community banks, midsize banks, savings associations, and credit unions) on the basis of the regulator's rating of the institution's risk. At large complex banking organizations and large banks, federal regulators conduct examinations on a continuous basis in cycles of 12 to 18 months. Banking regulators use SARs in their scoping for these examinations.

Depository institutions file SARs and other BSA reports with FinCEN. Under a long-standing cooperative arrangement with FinCEN, IRS's

---

[7] 31 C.F.R. § 103.56(b)(1)-(5). Each examination of an insured depository institution also must include a review of the institution's BSA compliance procedures by the appropriate federal regulator, which has independent examination authority. 12 U.S.C. § 1818(s) and 12 U.S.C. §1786(q)(2).

[8] The Federal Reserve, FDIC, OTS, and NCUA share safety and soundness examination responsibility with state banking departments for state-chartered institutions.

GAO-09-226 Suspicious Activity Reports

Enterprise Computing Center–Detroit serves as the central point of collection and storage of these data. The center maintains the infrastructure needed to collect the reports, convert paper and magnetic tape submissions to electronic media, and correct errors in submitted forms through correspondence with filers.[9] IRS investigators and other authorized officials access the data system directly through IRS's intranet site in what is known as the Web Currency and Banking Retrieval System (WebCBRS). FinCEN controls non-IRS law enforcement users' access to BSA data in WebCBRS through a portal called Secure Outreach.[10]

Federal regulators and FinCEN can bring formal enforcement actions, including CMPs, against institutions for violations of BSA. For instance, federal regulators and FinCEN may assess a CMP against depository institutions for significant BSA violations, including the failure to file SARs and establish and implement an AML program that conforms to federal regulations as required by BSA. Formal enforcement actions generally are used to address cases involving systemic, repeated noncompliance; failure to respond to supervisory warnings; and other violations. However, most cases of BSA noncompliance are corrected within the examination framework through supervisory actions or letters that document the institution's commitment to take correction action.

Whereas FinCEN and the regulators can take a variety of civil actions against depository and other financial institutions, DOJ may bring criminal actions against individuals and corporations, including depository and other financial institutions, for money laundering offenses and certain BSA violations. The actions may result in criminal fines, imprisonment, and forfeiture actions. Institutions and individuals willfully violating BSA and its implementing regulations, and structuring transactions to evade BSA reporting requirements, are subject to criminal fines, prison, or both.[11] DOJ

---

[9]For more information on these data management roles and responsibilities, see GAO, *Bank Secrecy Act: FinCEN and IRS Need to Improve and Better Coordinate Compliance and Data Management Efforts*, GAO-07-212 (Washington, D.C.: Dec. 15, 2006). In July 2008, FinCEN announced that current magnetic media filers of BSA reports had to transition to BSA Electronic Filing (E-Filing) no later than December 31, 2008, in an effort to make BSA filing requirements more secure, efficient, and effective.

[10]Non-IRS users access BSA data through FinCEN's Secure Outreach, which functions as a portal through FinCEN's information technology infrastructure to BSA data, which are housed at IRS's Enterprise Computing Center–Detroit. Agencies without direct access may visit FinCEN's offices and access BSA data directly; these users are referred to as "platform users."

[11]31 U.S.C. §§ 5322 and 5324(d).

generally identifies institutions violating BSA regulations through criminal investigations of the institutions' customers. Some corrective actions taken against depository institutions have resulted in guilty pleas and others resulted in deferred prosecution agreements, contingent on the depository institutions' cooperation and implementation of corrective actions. In each case, the depository institution paid a monetary penalty or was required to forfeit assets, or both.

Law enforcement agencies in DOJ and the Department of Homeland Security use SARs in their investigations of money laundering, terrorist financing, and other financial crimes. Entities in DOJ that are involved in efforts to combat money laundering and terrorist financing include FBI; DEA; the Department's Criminal and National Security Divisions; the Bureau of Alcohol, Tobacco, Firearms, and Explosives; the Executive Office for U.S. Attorneys; and U.S. Attorneys' Offices. The Secret Service and ICE; (in the Department of Homeland Security) also investigate cases involving money laundering and terrorist activities. IRS-CI uses BSA information to investigate possible cases of money laundering and terrorist financing activities. Federal and multiagency law enforcement teams, which may include state and local law enforcement representatives, also use SAR data to provide additional information about subjects, such as previously unknown addresses; businesses and personal associations; and banking activity during ongoing investigations.

**BSA Requires Depository Institutions to Report Suspicious Activity and the Institutions Implement Policies and Procedures to Facilitate Such Reporting**

Among its provisions, the Annunzio-Wylie Anti-Money Laundering Act (Annunzio-Wylie) amended BSA by authorizing Treasury to require financial institutions to report any suspicious transaction relevant to a possible violation of a law.[12] As authorized by Annunzio-Wylie, FinCEN issued a regulation in 1996 requiring banks and other depository institutions to report, using a SAR form, certain suspicious transactions involving possible violations of law or regulation, including money laundering.[13] During the same year, the federal banking regulators issued regulations requiring all depository institutions to report suspected money laundering, as well as other suspicious activities, using the SAR form.

In general, depository institutions are required to file a SAR for suspected insider abuse by an employee; known or suspected violations of law for transactions aggregating $5,000 or more where a suspect can be identified; known or suspected violations of law for transactions aggregating to $25,000 or more regardless of a potential suspect; and potential money laundering or violations of BSA for transactions aggregating to $5,000 or more.[14] The SAR rules require that a SAR be filed no later than 30 calendar

---

[12]Pub. L. No. 102-550, title XV, § 1517(b), 106 Stat. 3672 (Oct. 28, 1992). Before 1996, depository institutions reported suspicious activity using criminal referral forms that were filed with their respective primary federal financial regulator and with federal law enforcement agencies. See 60 Fed. Reg. 46556, 46557 (Sept. 7, 1995). In 2001, the USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001), expanded SAR reporting requirements to include nondepository institutions such as money services businesses, the securities and futures industries, and insurance companies. FinCEN has developed additional SAR forms to be used solely by money services businesses—68 Fed. Reg. 6613, 6615 (Feb. 10, 2003) and 67 Fed. Reg. 48704 (July 18, 2002)—and also forms for other types of financial institutions. FinCEN has not released a SAR form for insurance companies. During the interim, insurance companies use the form for the securities and futures industries. See FinCEN, *Guidance (Frequently Asked Questions)–Anti-Money Laundering Program and Suspicious Activity Reporting Requirements for Insurance Companies* (May 31, 2006), available at http://www.fincen.gov/financial_institutions/insurance/guidance.html. Recently revised forms to facilitate joint filing by depository institutions, casinos and card clubs, insurance companies, and the securities and futures industries have been postponed until a future date because of data quality initiatives. 72 Fed. Reg. 23891 (May 1, 2007). We discuss this issue in more detail later in this report.

[13]61 Fed. Reg. 4326 (Feb. 5, 1996).

[14]The federal banking regulators have SAR regulations in place for institutions they supervise. These rules were issued in coordination with FinCEN's SAR regulation for depository institutions and set forth similar requirements with regard to reportable activity and dollar thresholds. In addition, the banking regulator regulations provide that suspected criminal activity by an insider must be reported, regardless of the dollar amount involved. See § C.F.R. 21.11 (OCC); 12 C.F.R. §§ 208.62, 211.5(k), 211.24(f) and 225.4(f) (Federal Reserve); 12 C.F.R. § 353.3 (FDIC); 12 C.F.R. § 563.180 (OTS); and 12 C.F.R. § 748.1 (NCUA).

days from the date of the initial detection of the suspicious activity, unless no suspect can be identified. If no suspect can be identified, the filing period is extended to 60 days. In addition, banks should report continuing suspicious activity by filing a report at least every 90 days. Depository institutions can file a SAR through the mail or electronically through FinCEN's BSA E-File program.

Depository institutions implement policies, procedures, and systems to monitor for and identify suspicious activity.[15] In addition to following regulations and guidance related to identifying suspicious activities, depository institutions develop monitoring procedures, which typically encompass identification or referrals by employees who conducted the transaction for the customer, manual systems, automated systems, or any combination thereof. Manual monitoring might consist of staff reviewing reports generated by the institution's management information systems. Large depository institutions that operate in many locations or have a relatively large number of high-risk customers generally use automated account-monitoring systems—computer programs that are developed in-house or purchased from vendors for the purpose of identifying individual transactions, patterns of unusual activity, or deviations from expected activity. In general, these systems capture a wide range of activity, such as deposits, withdrawals, funds transfers, automated clearing house transactions, and automated teller machine transactions directly from the institution's core data processing system. After identification of unusual activity, depository institution staff conduct additional research to determine whether to file a SAR. (The process is summarized in fig. 1, which also depicts SAR data collection, storage, and access.)

---

[15]Under section 1359 of the Money Laundering Control Act of 1986, Pub. L. No. 99-570, title I, subtitle H, 100 Stat. 3207-18 (Oct. 27, 1986), banking regulators must issue regulations that require insured depository institutions to develop and maintain procedures to ensure and monitor compliance with the reporting and recordkeeping requirements of BSA. 12 U.S.C. § 1818(s)(1).

**Figure 1: The Process for Filing and Accessing SARs**



Sources: GAO analysis; Art Explosion (images).

The interagency examination manual that the regulators use says that depository institutions are encouraged to document SAR decisions.[16] Additionally, banks must retain copies of SARs including supporting documentation for 5 years from the date of the report.[17] In addition to filing a timely SAR, an institution must notify an appropriate law enforcement authority, such as IRS-CI or FBI, for situations involving violations that require immediate attention.

## A Number of Factors Influenced the Large Increase in SARs Filed by Depository Institutions in 2000 through 2007

For calendar years 2000 through 2007, SAR filings almost quadrupled. Although depository institutions accounted for the majority of SAR filings, other institutions increased the number of their filings also. Representatives of depository institutions, federal banking regulators, and law enforcement agencies identified a number of factors that, in their view, collectively contributed to the increase in SAR filings. The most frequently cited were technology (in the form of automated monitoring systems) and the effects of public enforcement actions. Representatives also cited an increased awareness of the risks of terrorist financing and other financial crimes after September 11 and improved knowledge of BSA requirements and issues resulting from regulator and institution guidance and training.

---

[16]The Federal Financial Institutions Examination Council issued its BSA/AML interagency examination manual in 2005. The council comprises the five federal banking regulators and the Chairperson of a State Liaison Committee, a committee of five representatives of state agencies that supervise financial institutions. It prescribes uniform principles, standards, and report forms for the federal examination of financial institutions and makes recommendations to promote uniformity in the supervision of financial institutions. The council issued revisions to the examination manual in 2006 and 2007 to provide updated guidance to examiners and the banking industry. The development of the examination manual was a collaborative effort of the federal banking regulators and FinCEN to ensure consistency in the application of BSA/AML requirements.

[17]31 C.F.R. § 103.18(d). Supporting documentation refers to all documents or records that assisted a depository institution in making the determination that certain activity required a SAR filing.

**Depository Institutions Filed the Majority of SARs from 2000 through 2007, and Filings Varied across Asset Size Categories**

FinCEN data show that for calendar years 2000 through 2007, SAR filings by depository institutions increased, from approximately 163,000 in 2000 to more than 649,000 in 2007. In 2007, depository institutions filed approximately 52 percent of all SARs.[18] Depository institutions have been subject to SAR-related requirements for a longer period of time than any other financial services industry and they have filed more SARs every year from 2000 through 2007 than other industries (see table 1).[19] The number of SARs filed by depository institutions also increased faster in some years than in others.

**Table 1: Number of SARs Filed by Industry, Calendar Years 2000–2007**

| Industry | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| Depository institutions | 162,720 | 203,528 | 273,823 | 288,343 | 381,671 | 522,655 | 567,080 | 649,176 |
| Money services businesses | - | - | 5,723 | 209,512 | 296,284 | 383,567 | 496,400 | 578,439 |
| Casinos and card clubs | 464 | 1,377 | 1,827 | 5,095 | 5,754 | 6,072 | 7,285 | 9,943 |
| Securities and futures firms | - | - | - | 4,267 | 5,705 | 6,936 | 8,129 | 12,881 |
| **Total** | **163,184** | **204,905** | **281,373** | **507,217** | **689,414** | **919,230** | **1,078,894** | **1,250,439** |

Source: FinCEN.

Note: The following are the number of SARs filed from January 1, 2008, through June 30, 2008: depository institutions, 343,974; money services businesses, 250,180; casinos and card clubs, 5,377; securities and futures firms, 7,058.

Our analysis of FinCEN and banking asset data indicated that in 2004 through 2007, the number of SARs filed varied across depository institutions of different asset sizes (see fig. 2) and the variations occurred at different points in time. The largest yearly increase in the number of SARs filed by very large banks and thrifts (those with total assets of $50 billion or more) occurred from 2004 to 2005, whereas the greatest increase in the number of SARs filed by small credit unions (those less than $10 million in total assets) occurred from 2005 to 2006.

[18]Filings by nondepository institutions have increased since 2003, after implementation of the USA PATRIOT Act, which provides for money services businesses and firms in the securities and futures industries to adopt AML compliance programs and adhere to SAR requirements.

[19]Depository institutions have been required to report known or suspected criminal violations since the late 1980s. In 1996, the SAR replaced different criminal referral forms as the standard form to report suspicious activity to FinCEN.

**Figure 2: Change in Percentage of SARs Filed by Filing Type, Calendar Years 2004–2007**



Source: GAO analysis of FinCEN, Federal Reserve, and NCUA data.

In 2007, the 31 very large banks and thrifts accounted for almost half (about 44 percent) of SARs filed by depository institutions, although such institutions represented less than 0.5 percent of depository institutions (see fig. 3). In addition, banks and thrifts with total assets from $1 billion up to $50 billion filed more than 30 percent of SARs during the same period. Credit unions of all asset sizes filed less than 10 percent of all SARs filed by depository institutions, despite constituting nearly 35 percent of all depository institutions.

**Figure 3: SARs Filed by Banks, Thrifts, and Credits Unions by Asset Size, Calendar Year 2007**

| | Categories of institutions assets | Percent of all SARs filed | Percent of all institutions that filed SARS | Institutions that filed SARS |
|---|---|---|---|---|
| Banks and thrifts | Very large ($50B or more) | 44.2% | 0.3% | 31 |
| | Large ($1B - <$50B) | 32.5 | 5.9 | 550 |
| | Mid-sized ($100M - <$1B) | 11.1 | 39.6 | 3.693 |
| | Small (<$100M) | 2.5 | 19.5 | 1,823 |
| Credit unions | Large ($100M or more) | 7.7 | 11.8 | 1,105 |
| | Mid-sized ($10M - <$100M) | 1.8 | 18.5 | 1,729 |
| | Small (<$10M) | 0.2 | 4.3 | 399 |
| | | 100 | 100 | 9,330 |

Source: GAO analysis of FinCEN, Federal Reserve, and NCUA data.

## Multiple Factors Contributed to the Increases in Depository Institutions' SAR Filings from 2000 through 2007

Representatives from depository institutions, federal banking regulators, and law enforcement agencies identified a number of factors that, in their view, collectively contributed to the increases in SAR filings by depository institutions from 2000 through 2007. Because of the subjective nature of these factors, the relative influence of individual factors on SAR filing increases cannot be determined. One of the most frequently identified reasons for the increases was the implementation of automated monitoring systems at depository institutions. According to most users of such systems at depository institutions and federal regulator representatives, these systems are capable of identifying significantly more unusual transactions than could be identified manually by institution staff. For example, FinCEN representatives said most institutions have adopted systems that are capable of identifying possible structuring activity—currency transactions carried out in a manner that would avoid the $10,000 threshold that would trigger mandatory currency transaction reporting by depository institutions.[20] Representatives from OCC noted that more sophisticated systems at larger institutions also are capable of

[20]The definition of structuring, as set forth in 31 C.F.R. § 103.11 (gg) states, "a person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of other persons, conducts or attempts to conduct one or more transactions in currency in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the [currency transaction report filing requirements]. In any manner includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition."

GAO-09-226  Suspicious Activity Reports

incorporating demographic information about the customers and their transaction histories into system alerts of potentially suspicious activity. Depository institution staff use the information in the alerts to assist in their investigations and decide whether to file a SAR.

Representatives from various federal agencies and depository institutions we interviewed said that highly publicized enforcement actions taken by the federal banking regulators and FinCEN, and criminal fines by DOJ against systemic BSA noncompliance—some of which included significant SAR failures—also have contributed to the increases in SAR filings. Specifically, they noted that in 2004 FinCEN and OCC concurrently assessed $25 million in CMPs against Riggs Bank for significant and willful BSA violations. In 2005, DOJ announced that Riggs Bank pled guilty to criminal violations of BSA, involving repeated and systemic SAR-related failures. Similarly, representatives noted the 2004 $40 million forfeiture and deferred prosecution agreement into which DOJ entered with AmSouth Bank for SAR failures, and the concurrent assessment by FinCEN and the Federal Reserve of a $10 million CMP against AmSouth Bank to address significant BSA reporting failures and serious weaknesses in BSA compliance policies and procedures. Many of our depository institution interviewees said that the DOJ action against AmSouth Bank and other actions raised concerns in the banking industry that institutions would be targeted routinely for criminal investigation and prosecution for failure to properly implement BSA requirements, such as the failure to file a SAR. However, in past work, we noted that DOJ pursued investigations against a limited number of depository institutions.[21] DOJ officials said that investigations of depository institutions for criminal violations of BSA generally have not involved negligence in reporting a limited number of suspicious transactions. Furthermore, DOJ officials said that depository institutions that have been cited for "one-off" BSA violations generally would not face law enforcement investigation or charges of criminal violation of BSA if they were otherwise had effective BSA compliance programs.

Most representatives from depository institutions of varying asset sizes we interviewed said that SARs filed to avoid potential criticism during examinations were referred to as "defensive" filings and also contributed

---

[21]See GAO, *Bank Secrecy Act: Opportunities Exist for FinCEN and the Banking Regulators to Further Strengthen the Framework for Consistent BSA Oversight,* GAO-06-386 (Washington: D.C.: Apr. 28, 2006).

to the increases in SAR filings. Although representatives from most institutions said that filed relatively few SARs that they sometimes filed defensive SARs, representatives from some institutions that filed higher numbers of SARs said their institutions generally did not. We asked Federal Reserve, FDIC, and NCUA officials whether defensive filing was occurring, and they characterized the information as anecdotal. Additionally, officials at FinCEN and OCC said their agencies separately conducted analyses of the practice, and those analyses indicated little evidence of defensive filing. The SAR guidance in the interagency examination manual that regulators use states the decision to file a SAR is inherently subjective and directs examiners to focus on whether the institution has an effective SAR decisionmaking process, rather than on individual SAR filing decisions. According to the manual, in those instances where the institution has an established SAR decisionmaking process; has followed existing policies, procedures, and processes; and has decided not to file a SAR, examiners generally should not criticize the institution for not filing a SAR.[22] The federal banking regulators and FinCEN characterized the issue as less frequently discussed within the banking industry now than earlier in the decade.

Furthermore, officials from the federal banking regulators and FinCEN provided varying perspectives on what could be considered defensive SAR filing. According to Federal Reserve officials, SARs filed as a result of the bank's effort to comply with the 30-day requirement could be considered defensive if, to meet the deadline, depository institutions filed SARs before fully investigating anomalous transactions. According to FinCEN officials, even when the institution is not certain the observed activity is suspicious, an institution's decision to file fulfills the obligation to report the activity. FinCEN officials said they would not consider it to be defensive filing if an institution erred on the side of caution and filed a complete and accurate SAR, even when the institution was not certain that the observed activity was suspicious. Filing the SAR would fulfill the requirement to report.

Federal regulators and depository institution representatives we interviewed generally indicated that the passage of the USA PATRIOT Act in 2001 and issuance of the interagency examination manual likely contributed to increases in SAR filings. According to Federal Reserve officials, the act generally increased awareness among depository

---

[22]The manual further indicates that the institution should not be criticized unless the failure is significant or accompanied by evidence of bad faith.

institutions of SAR requirements. Representatives from several depository institutions also said that they used the interagency manual to train staff on SAR filing and supporting documentation requirements, and that the manual has helped improve their BSA compliance programs in general. Many depository institution representatives we interviewed said that their SAR filings increased because of their improved BSA compliance programs.

## FinCEN and Law Enforcement Agencies Took Multiple Actions to Improve SAR Filings and Educate Filers about Their Usefulness in Investigations

FinCEN and law enforcement agencies have taken several steps to improve SAR filings and educate filers about their usefulness in investigations. FinCEN has issued written products that report trends in SAR data, provide tips on filing SARs and present examples of SAR use in law enforcement investigations. It issued guidance to improve the quality of SARs filed. Additionally, FinCEN representatives regularly participated in conferences and outreach events for BSA/AML issues, including events focused on SARs. FinCEN also chairs a group of federal agency and financial industry representatives that discusses BSA administration, including SAR-related issues. Federal law enforcement representatives said they conduct outreach events and work with depository institutions to improve SAR narratives.

## FinCEN Has Issued Written Products and Worked with Other Agencies to Make Financial Institution SARs More Useful

Since 2000, FinCEN regularly has provided tips about SAR preparation in publications for all financial institutions, including depository institutions. In October 2000, FinCEN first published *The SAR Activity Review: Trends, Tips and Issues*, which addresses topics related to suspicious activity reporting, trends and analyses regarding BSA data, law enforcement cases assisted by BSA data, and other issues. FinCEN describes this typically semiannual publication as the product of continuing dialogue and close collaboration among the nation's financial institutions, law enforcement officials, and financial regulators. Its goal is to provide meaningful information about the preparation, use, and value of SARs and other BSA reports filed by financial institutions.[23] Most recently,

---

[23]Since 2003, FinCEN also has published *The SAR Activity Review: By the Numbers*, a compilation of numerical data gathered from SARs filed by financial institutions. *By the Numbers* generally is published twice a year to cover two filing periods: January 1–June 30 and July 1–December 31, and serves as a companion piece to *The SAR Activity Review: Trends, Tips and Issues*.

the publication addressed issues such as how to determine when the 30-day deadline to report suspicious activity begins. According to FinCEN's annual report for fiscal year 2007, 70 percent of financial institutions that participated in a survey conducted by an external contractor found *The SAR Activity Review* to be "highly useful."

FinCEN also has posted on its Web site a variety of written guidance documents for depository institutions and other SAR filers to assist them in making the filings more useful to law enforcement agencies. For example, in April 2008, FinCEN posted guidance that addressed SAR filings about the proceeds of foreign corruption. In the guidance, FinCEN directed filers, when appropriate, to include the term "foreign corruption" in their narratives to ensure that law enforcement agencies identify these transactions as soon as possible. In 2007, FinCEN issued guidance regarding 10 of the most common SAR filing errors and ways filers could avoid them.[24] Among other issues, the guidance addressed the importance of explaining why the reported transaction was suspicious, and said that not including an explanation would diminish the usefulness of the SAR to law enforcement and other users. More specifically, FinCEN asserted that most inadequate SAR narratives repeated information from other fields on the form and did not sufficiently describe why the transaction was suspicious in light of the nature and expected activity of the customer.

In addition to providing guidance on SAR filing and usefulness, FinCEN representatives regularly participated in outreach events about BSA/AML issues. According to FinCEN, its representatives participated in more than 300 conferences and intergovernmental meetings during fiscal years 2006 through 2008, a number of which focused on SAR-related issues. The Bank Secrecy Act Advisory Group, which FinCEN chairs, and its two SAR-focused subcommittees have served as a forum for industry, regulators, and law enforcement to communicate about how law enforcement uses SARs and other BSA data.[25] The advisory group's subcommittees facilitate

---

[24]According to FinCEN, FinCEN identified the common errors in SARs through analysis of SARs filed by money services business. However, FinCEN published the guidance to help inform the efforts of all SAR filers and produce more accurate and complete SARs.

[25]Congress directed the Secretary of the Treasury in 1992 to establish the Bank Secrecy Act Advisory Group to actively solicit advice on the administration of BSA. The advisory group comprises high-level representatives from financial institutions, certain federal law enforcement agencies, regulatory authorities (for example, federal banking regulators), and the Department of the Treasury and other interested persons from the private sector. 31 U.S.C. § 5311 note (Advisory Group on Reporting Requirements).

discussion about how record-keeping and reporting requirements can be improved to enhance use and minimize costs to filers. FinCEN officials said they began outreach in 2008 to the largest depository institutions in the country to learn more about how their AML programs function, which they said will enhance their ability to provide industry feedback and ensure that the administration of the BSA regulatory program is based on sound knowledge of industry practices and the challenges of implementing AML programs. FinCEN said it plans to expand this outreach to other industries in 2009.

## Law Enforcement Agencies Conduct Outreach Efforts and Build Relationships to Improve the Quality of SAR Narratives and Communication with Institutions

Representatives from federal law enforcement agencies we interviewed said that they conducted outreach events and developed relationships with local depository institutions to improve SAR narratives and alert the institutions to criminal activity the agencies are targeting in investigations. Although representatives of federal and state law enforcement agencies and multiagency teams generally described depository institutions' SAR narratives as adequate, many described efforts aimed at improving the quality of SAR narratives and establishing relationships with the institutions. For example, according to ICE representatives, more than 100 of their investigators serve as points of contact for financial institutions through ICE's Cornerstone program, which is intended to develop working partnerships and information-sharing strategies with private industry to target activities of criminal organizations in the financial system. They said that since 2004, ICE has carried out about 4,000 "contacts" or presentations made to the financial services industry through the program. FBI representatives said that in addition to national outreach efforts, field offices have sponsored conferences at their local banks. DEA representatives said that specific outreach efforts at several institutions— intended to assist institutions in assessing their detection and monitoring protocols and improving their SAR narratives—also allowed them to establish relationships with compliance staff and obtain a working knowledge of institutions' compliance programs.

In addition, representatives from most multiagency law enforcement teams we interviewed said that their teams conducted some type of regional or local outreach that included instruction on drafting SAR narrative statements. Representatives from multiple teams noted that regional conferences in their respective areas sponsored by IRS and U.S. Attorneys Offices provided feedback on writing good narrative statements and discussed examples of well- and poorly written narratives. Representatives from one team said they noticed an improvement in the quality of SAR narratives immediately following the events.

## Federal Agencies Use SARs in a Variety of Ways and Have Taken a Number of Actions in Recent Years to Make Better Use of Them

FinCEN, law enforcement agencies, and financial regulators use SARs in investigations and financial institution examinations and have taken steps in recent years to make better use of them. FinCEN uses SARs to provide a number of public and nonpublic analytical products to law enforcement agencies and depository institution regulators. For example, in 2005, FinCEN agreed to provide several federal law enforcement agencies access to bulk BSA data, including SARs. They combined these data with information from their law enforcement databases to facilitate more complex and comprehensive analyses. In 2000 and again 2003, DOJ issued guidance that encouraged the formation of SAR review teams with federal, state, and local representation. In 2006, DOJ and IRS-CI collaborated on a pilot effort to create task forces and add federal prosecutors to augment SAR review teams in selected districts. The regulators use SARs in their depository institution examination scoping and also review SARs regarding known or suspected unlawful activities by current and former institution-affiliated parties (IAP), including officers, directors, and employees. Although law enforcement agency representatives generally were satisfied with WebCBRS, various agencies and multiagency teams we interviewed said that formatting and other issues related to the data system slowed their downloads and reviews. FinCEN and IRS officials said these and other data management challenges will be addressed as part of FinCEN's technology modernization plan, developed in collaboration with IRS.

## FinCEN Uses SARs to Provide a Variety of Analytical Products and Support to Federal and State Agencies

FinCEN uses SAR data to provide various types of nonpublic analytical products to federal and state agencies in addition to publicly available reports. Since 2002, FinCEN has combined BSA data with its own data sets to produce reports. In addition to BSA data, FinCEN analysts have access to criminal report information through the National Crime Information Center, law enforcement databases, or FinCEN's law enforcement agency liaisons. FinCEN also maintains a database of its own proactive casework and its support of other agencies' investigations. FinCEN analysts also have access to commercial databases that contain identifying information on individuals and businesses. FinCEN has conducted many nonpublic analyses using SAR data, in response to requests from law enforcement agencies. For example, in 2007, FinCEN provided a federal law enforcement agency with a complex, large-scale BSA data analysis about subjects of interest that were identified in SARs filed by depository institutions and other entities. In another example, FinCEN provided a similar analysis to another law enforcement agency on suspicious currency flows between the United States and foreign governments targeted by law enforcement. In 2007, FinCEN also began providing

banking departments in the 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands with nonpublic analyses of SAR data and other selected BSA reports in what are called BSA Data Profiles, which are based on SAR filings throughout the year in their respective state or territory. According to FinCEN's fiscal year 2008 annual report, it added new content to the 2008 data profiles and plans to continue to provide these to the states annually.

FinCEN has issued public analyses using SAR data that identified trends and typologies in the reporting of suspicious activity in key businesses and professions. For example, in 2006 and 2008, FinCEN conducted a self-initiated assessment to identify trends or patterns among SARs about suspected mortgage loan fraud. The SARs on which the 2006 assessment was based reported that suspected mortgage loan fraud in the United States continues to rise, and has risen 35 percent in the past year. The 2006 report stated that SARs included in this assessment reported suspicious activity related to mortgage fraud in all 50 states, the District of Columbia, Puerto Rico, Guam, and American Samoa. Also, in 2008, FinCEN conducted a separate study of suspected money laundering in the residential real estate industry based on SARs.

FinCEN provides other types of support to law enforcement agencies. For example, FinCEN provides a full-time analyst to most HIFCAs to help them more effectively analyze SAR data. Representatives from one HIFCA we interviewed said their FinCEN analyst has done analyses of SARs and other data related to their region. FinCEN also provides training and a database template to law enforcement agencies with access to BSA data to help them download and analyze SARs more effectively. In addition, several law enforcement officials we spoke with told us that they receive FinCEN alerts when more than one user has queried its WebCBRS about the same SAR to help them avoid duplicating investigations.

## Law Enforcement Agencies Have Taken a Variety of Actions to Increase Their Use of SARs in Their Investigations

Federal law enforcement agencies have taken actions to more effectively analyze SAR data including obtaining access to bulk downloads of BSA data, which they integrate with their own data sets. Different types of team structures have been established to better analyze SARs. According to DOJ, some districts began SAR review teams in the 1990s. In 2006, DOJ and IRS collaborated on a pilot effort to create task forces to pursue SAR-initiated investigations. Tracking of SAR use by law enforcement agencies varies.

**Some Federal Law Enforcement Agencies Have Facilitated Complex Analyses by Using SAR Data with Their Own Data Sets**

Federal agencies, separately and in collaboration with other agencies, have taken actions to more effectively analyze SAR data, particularly by better integrating BSA data with other law enforcement data. Beginning in 2004, several federal law enforcement agencies (including FBI, the Secret Service, ICE, and the Organized Crime Drug Enforcement Task Force's Fusion Center) signed memorandums of understanding with FinCEN that allowed them to obtain access to bulk downloads of SARs and other BSA data.[25] The agencies conduct sophisticated and wide-ranging analyses more readily with the bulk downloads than is possible by accessing the BSA database remotely and querying it for specific records. According to these officials, the analyses they conduct using SAR data and their own data sets further their investigations by enabling them to make links they could not make without access to bulk SAR data. For example:

- FBI incorporates SARs into its Investigative Data Warehouse, a database that includes 50 different data sets, which facilitates complex analyses. FBI identifies financial patterns associated with money laundering, bank fraud, and other aberrant financial activities. FBI officials told GAO that FBI uses the results from SAR analyses in cross-program investigations of criminal, terrorist, and intelligence networks. In addition, FBI has developed a new tool that allows users in the field to quickly and easily categorize, prioritize, and analyze suspects named in SARs and other available intelligence.

- Secret Service representatives said their agents use combined data from the bulk downloads and their own repositories with various analytical models to map and track trends in financial crimes. They said the information is being used to model present and future financial crime trends; identify, locate, and link suspects involved in complex criminal cases; and identify financial accounts for asset forfeiture proceedings.

- ICE has combined BSA data, including SARs, with import and export data for selected countries to help identify and detect discrepancies or anomalies in international commerce that might indicate trade-based money laundering.

- The Organized Crime Drug Enforcement Task Force's Fusion Center integrates information from bulk BSA and other law enforcement

---

[25]Other reports required by the BSA include Currency Transaction Reports, Report of Cash Payments over $10,000 Received in a Trade or Business (IRS Form 8300), Report of International Transportation of Currency or Monetary Instruments, and Report of Foreign Bank and Financial Accounts.

databases and conducts investigative analyses.[27] Center staff can search the databases of several federal entities at one time rather then relying on individual searches. Users indicated they can easily produce comprehensive integrated intelligence products and charts without having to take independent information from various sources for manual compilation.

- IRS integrates SARs and other BSA data that it maintains for FinCEN with other information to advance its own investigative efforts. For example, IRS-CI investigators said the agency's Reveal system integrates BSA, tax, and counterterrorism data and allows them to conduct remote queries to identify financial crimes, including individual and corporate tax frauds, and terrorist activity. Reveal also allows users to sort, group, and export data from multiple information repositories, including combinations of databases, as well as discover and graphically show relationships among entities and patterns in the data. IRS-CI can generate reports from the system that contain names, Social Security numbers, addresses, and other personal information of individuals suspected of financial crimes.

- Multiagency law enforcement teams also incorporate SAR data into their analyses. IRS and DEA agents at one HIFCA combined resources and said they can now conduct investigative analyses of all SARs in the region within DEA's Narcotics and Dangerous Drugs Information System. Representatives from another HIFCA also said they analyze criminal activities and SAR filings in those areas known to be problematic, such as a known drug trafficking area.

## DOJ Encouraged the Development of Law Enforcement Teams to Review SARs and Initiate Investigations

In 2000 and 2003, DOJ issued guidance to encourage the use of SAR data by multiple federal and state law enforcement agencies in what are known as SAR review teams. As of February 2008, the over 80 SAR review teams located across the country vary in level of human capital and other resources. Typically, an IRS agent serving as the coordinator downloads the SARs and prioritizes them for review during a team's monthly meetings. Some SAR review teams screen SARs against criteria such as the dollar amount involved in the transaction, number of SARs filed on the same subject, pattern for structuring, criminal history of the subject,

---

[27]DOJ established the Organized Crime Drug Enforcement Task Force program in 1982 to conduct comprehensive attacks on major drug trafficking and money laundering organizations. The program combines the resources and expertise of multiple agencies: FBI; DEA; Bureau of Alcohol, Tobacco, Firearms, and Explosives; IRS; Customs and Border Protection; U.S. Marshals Service; U.S. Attorneys' Offices; U.S. Postal Inspection Service; and U.S. Coast Guard.

business the subject may be in, and agency interest. The number of SARs downloaded and reviewed varies across geographical areas. For example, some teams may download and review as many as a thousand SARs per month; and others, 50–100. Coordinators generally told us that although some SARs are not discussed at the meetings and some do not result in investigations, someone from the team reviews all SARs that were filed in their area. Although the downloaded SARs may come from several industries (such as money services businesses, or mortgage lenders), a number of the teams we interviewed said the great majority of the SARs they reviewed came from the depository institutions.

Some of the SAR review team representatives we interviewed said they mostly review SARs proactively to generate investigative leads and reactively to support ongoing investigations. According to some DOJ officials, the proactive use of SARs by a team is aimed at initiating a variety of investigations and increasing synergies. Some review team participants also told us a SAR may have more value to law enforcement at a later stage, as more SARs are filed on the same individual. They also said these review groups generally invite representatives from federal law enforcement agencies, financial regulators, U.S. Attorneys' Offices, local prosecutors, and local police departments to discuss recently filed SARs pertinent to their geographic area. Participants also learn which agencies are interested in following up on information provided in the SARs. Some of the investigations that are the result of SAR review team efforts focused on money laundering, tax evasion, drug trafficking, and mortgage fraud. According to DOJ officials, other goals in developing SAR review teams included reducing duplication of investigative efforts across investigative agencies and increasing the efficient use of resources.

DOJ and other agencies also participate in proactive reviews of SARs through the National SAR Review Team. DOJ's Asset Forfeiture and Money Laundering Section created the National SAR Review Team in May 2007. The national team, which this DOJ section leads, was created to pursue cases that fall outside the scope of a local SAR review team. Representatives from federal law enforcement agencies and FinCEN participate on the national team and meet monthly. According to DOJ, the team and all participants make recommendations on which cases to pursue. The national team reviews SARs that report on activities that are complex and/or multijurisdictional in nature, often involving foreign nationals. According to DOJ representatives, the national team asks FinCEN for assistance on a case-by-case basis, and FinCEN has referred multijurisdictional cases to the team.

DOJ and IRS Collaborated on a Pilot Effort to Create Task Forces to Work on SAR-initiated Investigations

In 2006, DOJ and IRS collaborated on a pilot effort to create task forces of full-time investigators and added federal prosecutors to work on SAR-initiated investigations. The Attorney General's Advisory Council identified the districts in which the task forces were to operate. IRS and DOJ also wanted state and local enforcement agencies to be actively involved in this effort because they could present state and local crime perspectives.[28] Some DOJ officials also noted that this multiagency initiative could translate to more synergies and coordination to avoid duplication of efforts. IRS staff in task force districts currently serve on both the task forces and SAR review teams. An IRS representative said that IRS expected that its staff would continue participating in both teams. Further, IRS representatives said the task forces and SAR review teams complemented each other, and maintaining the relationship with SAR review teams was integral to avoiding duplicative investigative efforts.

However, the task forces and SAR review teams differ in key respects. IRS staff generally characterized the task forces as more focused than the SAR review teams. According to IRS staff, the task force model lends itself to investigations of BSA violations that have the potential for seizure or forfeiture under BSA, as well as prosecution. IRS staff further noted these types of investigations generally involve BSA violations for which IRS has investigative responsibility—currency and cash structuring, and certain money laundering offenses. According to an IRS-CI official, task forces are able to dedicate more staff and staff time to cases. For example, Treasury's Executive Office of Asset Forfeiture funds the operating costs for most task force members to work on the task force full time, thereby enabling them to work on more cases and on more complex problems. In contrast, the IRS representative said SAR review team members typically serve on a part-time basis and conduct SAR-related investigations in addition to other responsibilities.

Some Federal and State Agencies and Law Enforcement Teams Track Varying Types of Information about SAR Use

FinCEN, IRS, and federal law enforcement agencies and teams track information about SAR data access and how SAR information has been used in investigations in varying degrees. Through its Gateway program, FinCEN tracks the numbers of WebCBRS users' queries and views of BSA data that are conducted as discrete downloads of individual BSA reports,

---

[28] According to IRS officials, from six to eight fully established task forces were operating as of October 2008, and from four to six were in the development stage.

including SARs.[29] IRS-CI staff access WebCBRS directly through IRS's intranet. According to IRS staff, IRS provides its users the ability to capture additional details about SAR use through IRS-CI's case management system, which captures certain information related to investigations and tracks the use and value of BSA information in three ways. First, the system identifies all investigations where the source of the investigation is a SAR (or another BSA document). Second, for all nontax investigations, it may identify what types of BSA documents were of use or value to the investigation. Third, the system tracks all investigations developed with the SAR review teams and their general investigation case numbers. IRS-CI representatives said they also use a program that aids in the review and tracking of team decisions about SARs that were reviewed to avoid duplicative investigations.

In general, IRS-CI staff serving on SAR review teams or HIFCAs track which SARs they download for the teams and which agencies are pursuing investigations based on the SARs the team reviewed. Although DOJ does not require SAR review teams to compile statistics about their SAR use, some SAR review team representatives we interviewed said they have plans to track their use of SARs in greater detail. For example, some teams track or have plans to track the number of seizures and indictments associated with the investigations initiated from SARs they have reviewed.

Finally, representatives from some of the state and local enforcement agencies we interviewed said they track the number of SARs they reviewed while others said they did not.

## Federal Banking Regulators Use SARs in Their Supervision of Depository Institutions

According to the interagency BSA/AML examination manual the regulators are to assess depository institutions' SAR compliance during examinations. The regulators conduct periodic on-site examinations to assess an institution's financial condition, policies and procedures, and adherence to laws and regulations such as BSA. During examinations, examiners download and review SARs as part of their efforts to assess institutions' (1) suspicious activity monitoring and reporting systems, (2)

---

[29]According to FinCEN officials, Secure Outreach is a secure portal that provides access to WebCBRS. Secure Outreach users have the ability to use this portal to send each other secure e-mail (including attachments). Reports, current news, and other relevant information also are posted on the Secure Outreach Portal. The Gateway Program is an application that records law enforcement case/subject information and is used to match agencies that potentially are researching the same subjects.

the decisionmaking process for SAR filings, (3) SAR quality, and (4) assess a bank's internal controls. For example, examiners conduct transaction testing on samples of downloaded SARs to determine whether institutions' SAR-related policies, procedures, and processes are adequate and effectively implemented and whether the filed SARs were complete and accurate.[30]

In addition to examining depository institutions for compliance with SAR requirements, the regulators track and review SAR information as part of their enforcement actions against institution-affiliated parties (IAP)—that are known or suspected of being involved in unlawful activities and breaches of trust.[31] The Federal Deposit Insurance Act generally allows the federal bank and thrift regulators to suspend, remove, or prohibit IAPs from participating in the affairs of depository institutions or working in the banking industry if the IAP is charged or convicted with certain crimes involving dishonesty, breach of trust, or money laundering. For example, according to federal banking regulator representatives, their agencies generally track and review information from SARs filed by the depository institutions they supervise that indicate suspected abuse by someone inside the institution. Depository institutions are required to file SARs to report insider abuse including all known or suspected criminal activity committed or attempted against the institution. Officials from the Federal Reserve, OCC, FDIC, and OTS said their respective agencies have

---

[30]The Federal Financial Institutions Examinations Council's BSA/AML examination manual generally directs examiners to make assessments within the context of a risk assessment, prior examination reports, and a review of institutions' audit findings.

[31]12 U.S.C. § 1813(u) provides that, the term "institution-affiliated party" means

(1) any director, officer, employee, or controlling stockholder (other than a bank holding company) of, or agent for, an insured depository institution;
(2) any other person who has filed or is required to file a change-in-control notice with the appropriate federal banking agency under section 1817(j) of [title 12 of the United States Code];
(3) any shareholder (other than a bank holding company), consultant, joint venture partner, and any other person as determined by the appropriate federal banking agency (by regulation or case-by-case) who participates in the conduct of the affairs of an insured depository institution; and
(4) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in
   (A) any violation of any law or regulation;
   (B) any breach of fiduciary duty; or
   (C) any unsafe or unsound practice,
which caused or is likely to cause more than a minimal financial loss to, or a significant adverse effect on, the insured depository institution.

programs in place to track and review SARs about IAPs. They described how information from these SARs is used as part of efforts to take action against IAPs involved in theft, fraud, and other unlawful activity at the depository institutions.[32] For example, OCC has a Fast Track Enforcement Program that implements streamlined enforcement procedures to be used in specific situations in which there is a conviction of, and admission by, or clear evidence that an IAP has committed a criminal act or other significant acts of wrong doing involving a national bank that are actionable under the OCC's enforcement authority. The Federal Credit Union Act provides the same enforcement authority to NCUA. NCUA reviews all SARs filed by credit unions on IAPs to determine whether it is appropriate to pursue administrative action to remove or prohibit the person from working in the banking industry or require restitution.

## BSA Database Issues Present Some Challenges for Law Enforcement and Banking Agencies when Downloading and Reviewing SARs

Federal, state, and local agencies have experienced some data management challenges when downloading and reviewing SARs and other BSA reports. Although law enforcement agency representatives noted they were generally satisfied with WebCBRS, representatives from various law enforcement agencies and multiagency law enforcement teams we interviewed expressed some specific concerns related to the formatting and the efficiency of downloading of SARs from the database. For example, representatives from some SAR review teams said the SAR data they download through WebCBRS appear in all capital letters and without other formatting, which makes reviewing SARs more difficult and time consuming. Other SAR review team representatives said that another formatting problem arises when filers organize information about transactions and dates within tables included in their SAR narratives; when downloaded from WebCBRS, the tables appear as lines of unformatted information without columns or headings. An IRS-CI official commented that these formatting issues are particularly challenging for law enforcement teams that review large numbers of SARs. Representatives from some SAR review teams and HIFCAs we interviewed said their teams download and review approximately 1,000 or more SARs each month. Data management staff at IRS and FinCEN identified limitations in the mainframe environment from which WebCBRS evolved as the cause of these formatting concerns and noted that SARs appear this

---

[32]OCC is the only regulator that has requested SAR bulk download access with FinCEN. Representatives from the other regulators said their agencies opted not to request such access, citing additional security protocols that would need to be implemented, among other issues.

way for all WebCBRS users. An IRS data management representative commented that depository institutions and commercial software companies often prepare formatted tables within SAR narratives as part of their AML software packages. The representative noted that WebCBRS is unable to retain such formatting.

Representatives from the federal banking regulators and a state banking department we interviewed also described limits on the amount of BSA information that can be downloaded in the examination process. Specifically, they said that during examinations of institutions that file more than 20,000 reports within an examination cycle, examiners are unable to download all of the SARs or other BSA reports in a single download session. According to representatives from the federal banking regulators, examiners at each agency must divide their SAR downloads into multiple batches. Data management staff at FinCEN said the purpose of the 20,000 limit is to prevent users with large download requests from diminishing the speed of the system for other users. Although federal banking regulators have taken steps to deal with these challenges, representatives from these agencies still generally characterized the download process as inefficient because of the additional time needed to conduct separate queries. They also noted that download sessions for SARs and other BSA reports, such as currency transaction reports, sometimes expire before completing the data request.

Representatives from FDIC, the Federal Reserve, OTS, and OCC expressed concerns about the quality of data obtained through WebCBRS. FDIC representatives said the inability to download all appropriate SARs in one attempt raises concerns about whether any of the downloads are complete, as well as concerns about the possibility of citing a bank for an apparent violation for failure to file a SAR because that record was not in the information downloaded from WebCBRS. Federal Reserve and OTS representatives cited concerns about the integrity of WebCBRS and whether all SAR and currency transaction report data are properly uploaded. OCC representatives also expressed concerns about the quality of BSA data in WebCBRS. They noted that because of these concerns and data management issues, in 2004, they requested and obtained bulk access to SAR data for the institutions OCC supervises. OCC representatives also said they then spent a significant amount of funds and resources to develop a customized data system to conduct analyses of SARs.

FinCEN and IRS officials said these and other data management challenges will be addressed as part of FinCEN's information technology modernization plan, developed in collaboration with IRS. In response to a

recommendation we made in 2006, FinCEN, in collaboration with IRS, is developing a long-term comprehensive plan for re-engineering BSA data management activities.[31] In fiscal year 2007, FinCEN launched an initiative to maximize BSA data quality and value by more consistently identifying, documenting, prioritizing, and addressing BSA data requirements and quality issues. As part of the initiative, FinCEN established a Data Management Council to provide internal and external data users with a clear means of identifying and communicating data issues, requirements, and business priorities; validating resolution of data issues; and jointly establishing priorities for taking data management actions. The council consists of approximately 35 representatives from FinCEN, financial regulators, law enforcement agencies, and IRS. FinCEN officials also said that FinCEN has an Integrated Product team, consisting of FinCEN staff, which developed a strategy for the information technology modernization plan. FinCEN officials expected implementation of the modernization plan to take from 3 to 5 years. According to FinCEN, the team also developed a list of approximately 300 capabilities that are desired in a new system. FinCEN officials also said that team spent 2007 and 2008 focusing on repairing identified problems with the current system, reformulating processes, and working to make the system as effective as possible. FinCEN officials were reluctant to commit to a timeline, as the work will depend on budget allocations and FinCEN's working relationship with IRS counterparts.

## The Process FinCEN Used to Revise the SAR Did Not Result in a Usable Form and Its New Process Provides Few Details on How Past Problems Will Be Overcome

FinCEN worked with other agencies in 2006 to create a new SAR form for depository institutions that was not implemented, and a recently developed document outlining a new form revision process appears to address some—but not all—of the collaboration-related problems encountered in 2006. FinCEN and the federal banking regulators issued proposed substantive and formatting revisions to the SAR form in 2006; however, because of technology limitations, the revised form was not implemented. Law enforcement agency officials we interviewed had mixed views on the proposed revisions to the form. They generally supported most of the proposed revisions, but some felt they had been insufficiently consulted and also expressed concerns to us that some revisions could affect their work negatively. We have identified practices that can help enhance agencies' collaborative efforts such as those needed to revise the

---

[31] GAO-07-212.

SAR form.[34] FinCEN has identified some steps it intends to use to improve collaboration; however, details on the process are limited. For example, the documentation for the new process that we received does not indicate that FinCEN has incorporated practices for agency collaboration, such as defining a common outcome; agreeing on agency or individual roles and responsibilities; and including a mechanism to monitor, evaluate, and report on how the process worked. Although not all of the practices we identified for collaboration are applicable to the forms revision process, if FinCEN implemented such collaboration practices for SAR form revisions, it may achieve greater consensus from all stakeholders.

## FinCEN Postponed Implementation of a Revised SAR for Depository Institutions Due to Technology Limitations

In 2006, FinCEN revised the form that depository institutions use to report suspicious activities, but the revised form still cannot be used because of continuing information technology limitations. In accordance with the Paperwork Reduction Act (PRA) of 1995, FinCEN and the federal banking regulators must periodically renew the SAR form used by depository institutions and seek public comment.[35] Among other things, PRA requires the balancing of two potentially competing purposes: minimizing the paperwork burden on filers and maximizing the utility of the information collected in forms required by the government. To satisfy PRA requirements, FinCEN and other agencies assess the SAR forms approximately every 3 years to determine if revisions should be made.

In February 2006, in advance of the form's expiration, FinCEN and the federal banking regulators issued proposed revisions to and reformatting of the SAR form.[36] An important goal in revising the form was allowing affiliated institutions to jointly file a SAR. FinCEN and the federal banking regulators submitted the proposed revisions to the Office of Management and Budget for approval and published them in the *Federal Register* for public comment. In June 2006, FinCEN and OCC, OTS, FDIC and NCUA advised the public that the agencies had submitted the proposed revisions

---

[34]GAO-06-15.

[35]Pub. L. No. 104-13, 109 Stat. 163, (May 22, 1995). FinCEN and regulators for other industries also were assessing other SAR forms for potential revisions at the same time as the revision of the SAR form for depository institutions was occurring. Some proposed revisions were aimed at standardizing the forms across industries to enable affiliated institutions to jointly file a SAR. Details of those revisions are not provided in this report because we limited our scope to depository institutions.

[36]71 Fed. Reg. 8640 (Feb. 17, 2006).

to the Office of Management and Budget for approval, summarized the comments received and the disposition of issues raised by respondents, and requested additional comments on the proposed changes.[37] The Federal Reserve issued notice of final approval by the Federal Reserve Board of Governors in a separate *Federal Register* notice on July 5, 2006.[38] In December 2006, FinCEN announced on its Web site that SAR-filing institutions would begin using the revised form on June 30, 2007. However, in May 2007, FinCEN announced in a *Federal Register* notice it would postpone implementation of the revised form.[39] In the May 2007 notice, FinCEN identified the cause of the delay as "recently implemented data quality initiatives."

When we discussed the delay with FinCEN officials, they indicated data management staff had identified problems in implementing a BSA data quality management program, which was part of a larger and recently initiated information technology modernization strategy with IRS. FinCEN and IRS agreed to focus on optimizing the current database environment before introducing any new products or procedures. According to a senior FinCEN official, FinCEN thus delayed implementation of the revised SAR to focus on the overall modernization effort. Rather than undertake another revision of the form in 2009 (3 years from the prior revision), FinCEN plans to renew but make no changes to the form the Office of Management and Budget approved in 2006, and direct filers to continue to use the 2003 form.

## Some Law Enforcement Agencies Had Mixed Views on the Proposed Revisions to the SAR Form

Law enforcement agency representatives we interviewed had mixed views on the proposed revisions to the SAR form. Although they generally supported a key proposed revision, some law enforcement agency representatives we interviewed believed certain proposed revisions could be detrimental to their investigations. Representatives from DOJ, FBI, Secret Service, ICE, the New York HIFCA, and some SAR review teams generally expressed support for the change allowing affiliated institutions to jointly file a SAR (that is, two entities belonging to the same financial organization could file a single SAR for a suspicious activity that affected both). However, representatives from IRS-CI and some HIFCAs and SAR

[37]71 Fed. Reg. 35325 (June 19, 2006).

[38]71 Fed. Reg. 38651 (July 5, 2006).

[39]72 Fed. Reg. 23891 (May 1, 2007).

review teams said other revisions could affect their work negatively. One revision causing concern involved replacing the name and title of a person with personal knowledge about the suspicious activity with a contact office. IRS-CI officials, some Assistant U.S. Attorneys, coordinators from other SAR review teams, and HIFCA representatives said the revision might make it more difficult for investigators to reach an individual with personal knowledge of the suspicious activity. However, the Federal Register notice indicated that this action was taken with the approval of the banking agencies and law enforcement as a measure to protect the filer if information from a SAR-Depository Institution was inadvertently disclosed.

Similarly, representatives from some SAR review teams and HIFCAs we interviewed expressed concerns about removing the field that SAR filers currently use to indicate they have contacted a law enforcement agency and instead relying on filers to include this information in the SAR narrative. The Federal Register notice indicates this change was being made to simplify the form. Most SAR review team coordinators and HIFCA representatives we interviewed said they use this information to avoid duplicating or jeopardizing ongoing investigations related to the SAR.

Furthermore, the process used to revise the form may have contributed to these unresolved differences of opinions about what should be changed on the SAR form and the potential effects of the revisions that were made. FinCEN officials said they developed draft revisions from a running list of recommendations and comments related to suspicious activity reporting from law enforcement investigators and other agencies. Representatives from agencies that have liaisons at FinCEN, including DEA, FBI, ICE, IRS-CI, and the Secret Service, noted they were not involved in identifying the issues or concerns that could be addressed through revisions to the SAR form.[40] According to some law enforcement officials, they did not have an opportunity to provide input at all (for example, SAR review teams), other than providing public comments. When we subsequently asked FinCEN officials about these participation concerns, they indicated that federal law enforcement agency liaisons, whose agencies participate on SAR review teams, had not expressed similar concerns to them and then

---

[40]Other agencies include the Air Force Office of Special Investigations; Army Criminal Investigation Command; U.S. Postal Inspection Services; Bureau of Alcohol, Tobacco, Firearms, and Explosives; Naval Criminal Investigative Service; U.S. Department of Agriculture Office of the Inspector General; U.S. Housing and Urban Development Office of Inspector General; and the Special Inspector General for Iraq Reconstruction.

discussed the process they had used to develop the form and solicit feedback from law enforcement. FinCEN sought and obtained feedback through e-mail from law enforcement agency liaisons stationed at FinCEN. FinCEN officials characterized this feedback to us as not involving any significant objections to the proposed revisions and described it as editorial in nature. FinCEN officials noted they also did not know the extent to which law enforcement agency liaisons sought feedback from staff at the field office level within their respective agencies.

## FinCEN Has Developed a New Process for Revising Forms, but Details about the Process Are Limited and Do Not Include Some Important Collaborative Practices and Mechanisms

FinCEN has developed a new process it intends to use in the future when revising SAR and other forms; however, documentation on the process does not include some collaborative practices. In May 2008, FinCEN developed a new form change management process under the auspices of its Data Management Council. FinCEN indicated the goals of the process include improving implementation of revisions to BSA forms by FinCEN, other agencies, and parties, as well as communication among them. FinCEN provided us with a briefing and some documentation on its new process.

FinCEN's briefing and documentation indicate that FinCEN has begun to address some of the previously identified collaboration-related problems. The information we received generally covered issues such as interactions among external and internal stakeholders, and general steps used to develop and propose form changes. For instance, the early stages of the new process include collaboration with IRS data management staff regarding system applications and other data-related issues. This early involvement could help avoid a repeat of the problems related to implementation of the 2006 revision. Similarly, FinCEN officials said they plan to include a representative for SAR review teams on the Data Management Council.

However, neither the briefing nor the documentation provided much detail on some considerations and activities important to such a collaborative effort such as the timeline for completing the various stages in the process; the different roles and responsibilities of the stakeholders in the various stages of the process (for instance, FinCEN has not identified specific council members that would be involved in providing input on proposed changes); or a mechanism to monitor, evaluate, and report on the process. Nor did the documentation reflect collaboration with federal prosecutors. Although FinCEN officials said that they plan to include a representative for SAR review teams on the Data Management Council, the documentation did not indicate collaboration with these teams or other

multiagency law enforcement teams, such as HIFCAs. Our prior report on practices that help enhance collaboration emphasizes the usefulness of these missing elements.[41] For example, we noted that to work effectively across agency lines, agency staff ought to define and articulate the common federal outcome or purpose they are seeking to achieve, consistent with their respective agency goals and missions; define and agree on their respective roles and responsibilities, including how the collaborative effort will be led; and have processes to monitor, evaluate, and report on their efforts to enable them to identify areas for improvement. As noted above, FinCEN was unaware of some law enforcement representatives' concerns about some of the changes to the SAR form in 2006 and bank regulators relied on FinCEN to get law enforcement's input. This situation indicates that stakeholders in the SAR revision process had not agreed the common outcome they wanted to achieve and that communication and collaboration among SAR form stakeholders might not have been adequate.

If FinCEN continues to use the process as it is currently outlined, it may not achieve some potential benefits that could come from closer adherence to practices that can help enhance and sustain collaboration, such as greater consensus from all stakeholders on proposed SAR form revisions, and fuller documentation of the process. The lack of information developed for monitoring and evaluating the process could impede agency management as it seeks to make future improvements to the SAR form and respond to the concerns and needs of both SAR filers and users. The gathering of such information could provide empirical evidence about how well the process worked, what problems occurred, or what issues were identified. Furthermore, more detailed documentation about the process could advance collaborative efforts involving a wide variety of stakeholders by providing all stakeholders with a better understanding of how the process is designed to work, thereby building trust and facilitating communication.

## Conclusions

The issues associated with the most recent revisions to the SAR form for depository institutions present challenges for FinCEN. They highlight the difficulties of addressing potentially competing objectives stemming from PRA requirements—that new federal forms be designed not only to maximize their usefulness but also minimize burden on filers—and

---

[41]GAO-06-15.

engaging a wide variety of stakeholders. SARs are a key information source for federal, state, and local law enforcement agencies, as well as the federal regulators. Because the information they contain is critical for investigations of money laundering, terrorist financing, and other financial crimes, it is important that the SAR form be designed to collect the information that is most useful for law enforcement. Similarly, federal regulators use them during examinations of depository institutions' compliance with BSA. Yet given the potential burden of SAR filings, especially for depository institutions—the most frequent filers—it is important the process used to revise the form be a collaborative effort that helps to ensure all stakeholders' concerns are considered and potential problems identified.

While FinCEN and other agencies worked to create and finalize a new SAR form for depository institutions through the PRA, data management issues suspended the implementation of the 2006 revision. Although law enforcement representatives' views on the revised form were mixed, we found that the process FinCEN used may not have addressed some law enforcement concerns and introduced changes that some law enforcement representatives said could diminish the utility of the form for their investigative purposes. In addition, some law enforcement representatives expressed concerns that they were not involved in the process early. Bank regulators, on the other hand, were satisfied with the proposed changes. Many such problems in multiagency efforts could be mitigated with greater attention to the practices we have outlined for enhancing and sustaining collaboration among federal agencies. Implementation of such practices also may enable law enforcement and regulators to reach greater consensus on proposed changes. However, FinCEN's documentation for implementing the forms change management process does not necessarily include all law enforcement stakeholders, such as federal prosecutors and multiagency law enforcement teams.

Although FinCEN may be able to address some of the issues it encountered in the 2006 revision, FinCEN does not appear to have fully developed a process detailed enough to help ensure such an outcome. It does not provide details on some important considerations (such as the articulation of a common outcome or agreed-upon roles and responsibilities of individuals and agencies at each stage of the process) and omits another critical practice entirely—a mechanism for monitoring, evaluating, and reporting. By better incorporating collaborative practices, such as detailing individual and agency roles and responsibilities and documenting the entire process, FinCEN can further develop a strategy that will improve the SAR form and balance the possibly competing needs

of different stakeholders. And, by incorporating mechanisms to document, monitor, evaluate, and report on the process, key decisionmakers within agencies can obtain valuable information and assessments that could improve both policy and operational effectiveness. Finally, by more fully documenting its process, FinCEN likely will enhance its communications and collaboration with stakeholders.

## Recommendation for Executive Action

To better ensure that future revisions to the SAR form result in changes that can be implemented and balance the differing needs of all stakeholders, we recommend that the Secretary of the Treasury direct the Director of FinCEN to further develop and document its strategy to fully incorporate certain GAO-identified practices to help enhance and sustain collaboration among federal agencies into the form change process and distribute that documentation to all stakeholders. Such practices could include defining and articulating the common federal outcome or purpose they are seeking to achieve; defining and agreeing on their respective roles and responsibilities; and having processes to monitor, evaluate, and report on their efforts to enable them to identify areas for improvement.

## Agency Comments and Our Evaluation

We provided a draft of this report to the heads of the Departments of Homeland Security, Justice, and the Treasury; the Federal Reserve, FDIC, NCUA, OCC, OTS, and IRS. We received written comments from FinCEN, which are summarized below and reprinted in appendix II. DOJ, FinCEN, the Federal Reserve, FDIC, NCUA, OCC, OTS, and IRS provided technical comments, which we incorporated into this report, where appropriate. The Department of Homeland Security had no comments.

Through discussions with FinCEN officials and FinCEN technical comments, FinCEN provided us with additional information showing that it had begun developing a strategy that incorporated certain GAO-identified practices to enhance and sustain collaboration, but that it was not yet complete. As a result, we modified the recommendation language in our draft report to reflect the work that FinCEN already had done. In written comments on this report the FinCEN director said he generally agreed with our recommendation and that FinCEN recognized the need to work with a diverse range of stakeholders to revise BSA forms, including regulatory, law enforcement, and intelligence agencies, as well as financial industries responsible for filing BSA reports.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution of this report until 30 days from the report date. At that time we will send copies to interested congressional parties, Treasury, FinCEN, FDIC, the Federal Reserve, OCC, OTS, NCUA, IRS, DOJ, and the Department of Homeland Security. The report also will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or you staff have questions about this report, please contact me at (202) 512-8678 or edwardsj@gao.gov. GAO staff who made major contributions to this report are listed in appendix III.

Jack E. Edwards
Acting Director, Financial Markets and
    Community Investment

# Appendix I: Objectives, Scope, and Methodology

This report examines (1) the underlying factors that affected the number of suspicious activity reports (SAR) filed by depository institutions from 2000 through 2007, (2) actions that federal agencies have taken to improve the usefulness of SARs for law enforcement, (3) ways in which federal agencies use SARs and actions they have taken to make better use of them, and (4) whether the process the Financial Crimes Enforcement Network (FinCEN) uses to revise SAR forms is effective in assuring that the information collected is appropriate for law enforcement needs.

As agreed with the requesters' offices, we focused our data gathering and analyses largely on depository institutions and the SARs they file. In some instances, we considered, analyzed, and reported on information from other types of financial institutions. Additionally, our quantitative analyses were limited to 2004 through 2007 to minimize the likelihood that the presented information would be out-of-date.

To examine the increase in depository institutions' SAR filings, we reviewed published findings that FinCEN supplied, as well as obtained and reviewed statistics and related information from the banking regulators. FinCEN also provided us with SAR data for calendar years 2000 through 2007 so we could conduct independent quantitative analyses.[1] We then combined that information with another set of information (such as amount of assets) for specific institutions that we obtained from the Federal Reserve and the National Credit Union Administration. We took multiple steps to assess the reliability of the data. We asked bank regulators' information technology staff to answer a data reliability questionnaire (for example, about data cleaning and maintenance procedures). We found the data to be sufficiently reliable for the purposes of our report.

To address the second part of the first objective, we interviewed many types of stakeholder and obtained agency documents from the interviewees to identify factors that may have contributed to the increase in the number of SARs filed from calendar year 2000 through 2007. Because of the subjective nature of this type of information, we based our findings on the most frequently cited factors. The types of people interviewed are identified in table 2. Representatives from depository institutions constituted another type of interviewee. As part of the process to select the depository institutions, we grouped the depository

---

[1]The data we requested and obtained from FinCEN were unrelated to SAR narratives.

Appendix I: Objectives, Scope, and
Methodology

institutions into four categories, depending on the number of SARs filed in
calendar year 2007. We interviewed representatives from all 5 institutions
that had the largest number of SAR filings in 2007 as well as
representatives from 15 randomly selected institutions. The 15 institutions
represented different categories of SAR filings: small (0-5 SARs filed in
2007), medium (6-17), and large (176 or more—excluding the 5 largest).

**Table 2: Entities at Which Interviewees Provided Perspectives and Documentary Evidence for the Objectives**

| Place of employment/assignment for interviewee and source of documentary evidence | Objective | | | |
| --- | :-: | :-: | :-: | :-: |
| | 1 | 2 | 3 | 4 |
| Department of the Treasury | | | | |
|   FinCEN | x | x | x | x |
|   Internal Revenue Service | | | | |
|     Criminal Investigation (a law enforcement unit) | x | x | x | x |
|     Modernization and Information Technology Services | x | | x | x |
|     Small Business/Self-Employed Division | x | | x | x |
| Regulators | | | | |
|   Federal banking regulators | | | | |
|     The Board of Governors of the Federal Reserve System | x | | x | x |
|     Federal Deposit Insurance Corporation | x | | x | x |
|     Office of the Comptroller of the Currency | x | | x | x |
|     Office of Thrift Supervision | x | | x | x |
|     National Credit Union Administration | x | | x | x |
|   State banking agencies[a] | x | | x | |
| Law enforcement | | | | |
|   Federal agencies | | | | |
|     Department of Justice | x | x | x | x |
|       Criminal Division--Asset Forfeiture and Money Laundering Section | x | x | x | x |
|       Federal Bureau of Investigation | x | x | x | x |
|       Executive Office of U.S. Attorneys | x | x | x | |
|       Drug Enforcement Administration | x | x | x | x |
|     Department of Homeland Security | | | | |
|       Immigration and Customs Enforcement | x | x | x | x |
|       U.S. Secret Service | x | x | x | x |
| Multiagency teams (composed of federal, state, and local law enforcement) | | | | |
|   National SAR Review Team | x | x | x | x |
|   SAR review teams (random sample of 15 teams throughout the United States)[b] | x | x | x | x |

| | Objective | | | |
|---|:---:|:---:|:---:|:---:|
| Place of employment/assignment for interviewee and source of documentary evidence | 1 | 2 | 3 | 4 |
| High Intensity Financial Crime Area (HIFCA)[c] | x | x | x | x |
| State and local law enforcement officials[d] | x | x | x | x |

Source: GAO.

[a]The state banking agencies were located in Arizona, California, Florida, Illinois, Louisiana, Massachusetts, New York, and Texas.

[b]SAR review teams located in Sacramento, California; Tampa, Florida; Atlanta, Georgia; New Orleans, Louisiana; Boston, Massachusetts; St. Paul, Minnesota; St. Louis, Missouri; Las Vegas, Nevada; Charlotte, North Carolina; Philadelphia and Pittsburgh, Pennsylvania; Dallas, Texas; Alexandria and Richmond, Virginia; and Milwaukee, Wisconsin.

[c]The HIFCAs were located in Chicago, Illinois; Los Angeles, California; Miami, Florida; and New York, New York.

[d]The state and local law enforcement officials (not attached to a multiagency team) were located in Connecticut, Florida, Louisiana, Oklahoma, Mississippi, North Carolina, New York, and Texas.

To identify the actions that federal agencies have taken to improve the usefulness of SARs for law enforcement, we interviewed officials from FinCEN, federal law enforcement agencies, and IRS and reviewed agency documents, as indicated for objective 2 in table 2. To examine the ways in which federal agencies use SARs and actions they have taken to make better use of them, we contacted representatives of the various law enforcement groups that are indicated for objective 3 in table 2. For example, federal prosecutors at U.S. Attorneys' Offices as well as federal law enforcement officials involved in the national SAR review team were some of the types of individuals who provided information. Among the issues that we discussed with the law enforcement agencies were how SAR review teams function and the results of their collaborative efforts. We obtained information from IRS about SAR review teams and interviewed representatives from 13 randomly selected teams. We reviewed reports from GAO, FinCEN, and other governmental agencies to glean additional actions. We obtained information from the IRS that indicated the frequency with which law enforcement agencies accessed SAR information and interviewed representatives from 8 randomly selected state and local law enforcement agencies. All five federal regulators and some state banking agencies also provided information on how SARs are used in compliance examinations, and one regulator provided us with a demonstration of how the system is accessed and the display of the information in the system.

To assess whether the process FinCEN uses is effective in assuring that SAR forms are appropriate for law enforcement needs, we conducted legal

**Appendix I: Objectives, Scope, and Methodology**

analysis related to the Paperwork Reduction Act of 1995 and reviewed relevant Federal Register Notices. We also reviewed comment letters about proposed revisions to the SAR form submitted during the public comment period. We interviewed FinCEN, federal law enforcement, and bank regulatory representatives about the process to revise the form. Finally, we discussed the new forms change management process with FinCEN representatives.

We conducted this performance audit from July 2007 through February 2009 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Comments from the Financial Crimes Enforcement Network



**DEPARTMENT OF THE TREASURY**
**FINANCIAL CRIMES ENFORCEMENT NETWORK**

DIRECTOR

February 17, 2009

Mr. Jack Edwards
Acting Director, Financial Markets and Community Investment
U.S. Government Accountability Office
441 G Street N.W.
Washington, D.C. 20515

Dear Mr. Edwards:

Thank you for the opportunity to review and comment on the Government Accountability Office (GAO) draft report entitled, *BANK SECRECY ACT: Suspicious Activity Report Use Is Increasing but FinCEN Needs to Further Develop and Document Its Form Revision Process*. One of Treasury's goals is to promote the nation's security through strengthened financial systems. Suspicious Activity Reports (SARs) filed by financial institutions under the Bank Secrecy Act (BSA) support this goal by increasing transparency of our financial system.

As administrator of the BSA, the Financial Crimes Enforcement Network (FinCEN) is responsible for ensuring effective, efficient, and consistent application of the BSA, which includes the filing of BSA reports such as SARs. We appreciate GAO's recognition that federal agencies, both within and outside of the Treasury Department, and the regulated industry have taken actions to improve SAR filings and usefulness. The increasing requests for SAR access and analysis received from law enforcement and regulators in recent years firmly reinforce the draft report's findings of increasing use and awareness of SAR value across both of these communities.

While revisions of BSA forms occur infrequently and the changes made are often only at the margins, careful thought and consideration goes into the decisions associated with every proposed BSA form revision. FinCEN recognizes the need to work with a diverse range of stakeholders to revise the various BSA forms, including regulatory, law enforcement, and intelligence agencies, as well as the financial industries responsible for filing the BSA reports.

Ensuring that BSA reports yield useful information, while at the same time recognizing limitations of the current information technology infrastructure, often requires compromise among the diverse interests and needs of all stakeholders. The formal processes recently implemented by FinCEN for both BSA data and forms management, as acknowledged in GAO's report, will ensure better understanding among stakeholders of the challenges associated with increasing the usefulness of BSA reports. FinCEN generally agrees with the recommendation to further document and communicate the recently revised forms change process to strengthen collaboration among all stakeholders.

www.fincen.gov

GAO-09-226  Suspicious Activity Reports

**Appendix II: Comments from the Financial
Crimes Enforcement Network**

Mr. Jack Edwards

February 17, 2009                                                           Page 2

We appreciate GAO's efforts in reviewing SAR usefulness.  If you have any
questions, please feel free to contact Diane Wade, Associate Director, Management
Programs Division, 703-905-5061.

Sincerely,

/s/

James H. Freis, Jr.

# Appendix III: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Jack E. Edwards (202) 512-8678 or edwardsj@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Barbara I. Keller (Assistant Director); Toni Gillich; M'Baye Diagne; Natalie Maddox; John W. Mingus, Jr.; Marc Molino; Carl Ramirez; Linda Rego; and Barbara Roesmann made key contributions to this report. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |