# Exhibit 9

STATEMENT OF WILLIAM J. FOX
DIRECTOR
FINANCIAL CRIMES ENFORCEMENT NETWORK
UNITED STATES DEPARTMENT OF THE TREASURY

BEFORE THE

UNITED STATES HOUSE OF REPRESENTATIVES
COMMITTEE ON FINANCIAL SERVICES
SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

June 16, 2004

Madam Chairman, Congressman Gutierrez, and distinguished members of the Committee, thank you for the opportunity to appear before you today to discuss our vision for the Financial Crimes Enforcement Network. This is my first opportunity to appear before a House Committee, and I would like you to know that I consider it a great honor to be here. We very much appreciate the leadership and commitment of the House Financial Services Committee – particularly this Subcommittee on Oversight – on the important issues that are the focus of today's hearing. We also appreciate the diligent work of your staff – both majority and minority. They have been great to work with and, in my view, are serving you well. I have a prepared statement that we have submitted for the record. I will keep these remarks brief.

Madam Chairman, I was appointed to be FinCEN's fourth Director in December 2003. Before I came to FinCEN, I was the principal assistant to David Aufhauser as he led the Treasury Department and the Government on issues relating to the financing of terror. Working with David, I quickly gained a very keen appreciation for the importance of what has been referred to as the "financial" front of the war against terrorism. That importance can be stated quite simply: money does not lie. A good part of the time, financial intelligence *is* actionable intelligence. It can be extremely useful for identifying, locating and capturing terrorists and defining their networks; and, just as important, financial intelligence can lead to effective strategic action that stops or disrupts the flow of money to terrorists and their networks, which, in turn, serves to halt or impede terrorist operations.

The Financial Crimes Enforcement Network is right in the middle of these two aspects of exploiting financial information. We have been learning about, understanding and exploiting financial information for fourteen years. My job is clear: to lead FinCEN in a direction that ensures we are the gold standard when it comes to collecting, understanding, analyzing, employing, and disseminating financial information to combat terrorism and financial crime. Let me tell you what I have found in my first 150 days on the job.

Page 2

I have found an agency populated with highly motivated employees with diverse, and in many ways, specialized talents and skills who are very dedicated to FinCEN and its mission. But, I have also found an agency that is facing many significant challenges.

Let me highlight a couple of specifics. An important and fundamental challenge facing FinCEN relates to the security and dissemination of the data we have been charged with safeguarding: the data collected under the Bank Secrecy Act. FinCEN must ensure that this data is properly collected, is kept secure and is appropriately, efficiently, and securely disseminated to the law enforcement, intelligence and regulatory agencies. This is one of FinCEN's core responsibilities. We believe our "BSA Direct" project, which is discussed at length in my statement, will address many of these issues. In my view, this project is critical to our future success.

Another of FinCEN's core responsibilities relates to the administration of the Bank Secrecy Act. As you know, FinCEN is the delegated administrator of the Bank Secrecy Act. Through that delegation, FinCEN is answerable to the Secretary of the Treasury for ensuring that the ultimate goals of this Act are achieved. While we eagerly accept this responsibility, the responsibility is not ours alone. The federal bank regulators, as well as other agencies such as the Securities and Exchange

Commission, the Commodities Futures Trading Commission and the Internal Revenue Service have been delegated responsibility to supervise and examine financial institutions for Bank Secrecy Act compliance. Indeed, presently, implementation of the Bank Secrecy Act's regulatory regime involves eight different federal agencies and three SROs. This unusual structure is both a strength and a weakness. The weaknesses are obvious and, sometimes, are clearly manifested. To diffuse responsibility across so many bureaucracies can cause, and indeed on occasion has caused, inconsistency in application, lack of clarity of purpose and, most importantly, diffusion of accountability. However, if managed properly, this structure can also be a strength because it builds upon the existing expertise, knowledge base and examination functions of the regulators who know their industries best. This structure leverages resources where resources would otherwise be completely insufficient and possibly duplicative.

    I view it as my responsibility to work with my colleagues in these agencies to help manage this structure in a manner that builds on the strengths that our diverse partners bring to the table. In other words, administration of the Bank Secrecy Act means exercising oversight, coordination and ensuring consistency of application. In my view, of all the challenges facing FinCEN, there are no challenges as important as the

proper and appropriate implementation of the Bank Secrecy Act regulatory regime. We have several ideas on how to better manage and coordinate the implementation of this regulatory regime. The specifics of those priorities and ideas are set forth in my written statement, so I will not recite them here. What I want you to know, Madam Chairman, is that I clearly understand how important this set of issues is to the success of our country's anti-money laundering and counter-terrorist financing efforts.

The implementation of this risk-based regulatory system is a delicate matter that demands balance, consistency and clarity. The cornerstone of the Bank Secrecy Act, suspicious activity reporting, requires financial institutions to make judgment calls. If we fail in properly implementing this regime – if we get it wrong – then the system will fail. For example, if as regulators, we are either too aggressive or too passive in supervising and examining the financial industries we regulate, there could be two equally unacceptable outcomes. Compliance should not be about second guessing individual judgment calls on whether a particular transaction is suspicious. If we are overzealous in our supervision and examination, financial institutions, as "small 'c'" conservative institutions, will merely defensively file on anything and everything to protect themselves from regulatory risk. If, on the other hand, we are too lax when it comes to ensuring institutions

are implementing these programs, proper reporting will not be generated. Either scenario represents a failure. Madam Chairman and distinguished members of the Committee, you should know that you have my commitment, and the commitment of the women and men at FinCEN, to do all in our power to ensure the implementation of this critical regulatory regime does not fail.

Again, Madam Chairman, we appreciate this Committee's continued support and focus on these critical issues. I hope our presence here today will add to this important conversation. I will be happy to answer any questions you may have.