# Exhibit 10



# Department of the Treasury
# Financial Crimes Enforcement Network

### Guidance

**FIN-2006-G013**
**Issued:** October 4, 2006
**Subject:** Frequently Asked Questions
Suspicious Activity Reporting Requirements for Mutual Funds

The Financial Crimes Enforcement Network is issuing these frequently asked questions to clarify the suspicious activity reporting obligations of investment companies pursuant to the applicable Bank Secrecy Act regulation located at 31 C.F.R. § 103.15 ("Reports by mutual funds of suspicious transactions").[1] This regulation is applicable to investment companies (as defined in section 3 of the Investment Company Act of 1940 (the "1940 Act")) that are open-end investment companies (as defined in section 5 of the 1940 Act) and that are registered, or required to register, with the U.S. Securities and Exchange Commission (SEC). For purposes of this regulation, these investment companies are referred to as "mutual funds." These frequently asked questions are being issued following consultation with the staff of the SEC.

While the purpose of this document is to provide interpretive guidance with respect to the suspicious activity reporting requirements applicable to mutual funds, we recognize that it does not answer every question that may arise in connection with the applicable regulation. Mutual funds are encouraged to use the basic principles set forth in the rule, as articulated in these frequently asked questions, to address variations on these questions that may arise. Mutual funds are expected to implement their suspicious activity reporting program in accordance with the nature of their business.

We note that the suspicious activity reporting requirement, while important, is only one part of a mutual fund's Bank Secrecy Act compliance program and adequate observation of this requirement, standing alone, will not be sufficient to meet a mutual fund's other obligations under the Bank Secrecy Act. Moreover, these frequently asked questions are designed solely to help mutual funds comply with their suspicious activity reporting requirements, and they do not address the applicability of any other Federal or state laws.

---

[1] Please note that this regulation is an extension of the Department of the Treasury's authority, pursuant to 31 U.S.C. 5318(g), to require financial institutions to report suspicious transactions.

### 31 C.F.R. § 103.15(a)(1) – Reports by mutual funds of suspicious transactions

#### 1. What is the suspicious activity reporting requirement?

On May 4, 2006, FinCEN published in the *Federal Register* its final rule requiring mutual funds to file reports that identify and describe transactions that raise suspicions of illegal activity. The requirement to file Suspicious Activity Reports, which FinCEN believes are highly useful in preventing money laundering and an important component of the anti-money laundering regime for all covered financial institutions, applies to transactions occurring after October 31, 2006. Suspicious Activity Reports must be filed on a specific form called SAR-SF (FinCEN Form 101).[2]

### 31 C.F.R. § 103.15(a)(2) – Reports by mutual funds of suspicious transactions

#### 1. What are the specific requirements for filing Suspicious Activity Reports?

The final rule requires mutual funds to report to FinCEN any transaction conducted or attempted by, at, or through a mutual fund that, alone or in the aggregate, involves at least $5,000 in funds or other assets, if the mutual fund knows, suspects, or has reason to suspect that the transaction:
- Involves funds derived from illegal activity or is intended or conducted to hide or disguise funds or assets derived from illegal activity;
- Is designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act;
- Has no business (including investment) or other apparent lawful purpose or is not the sort of transaction in which the particular customer would be expected to engage, and for which the mutual fund knows of no reasonable explanation after examining the available facts, including the background and possible purpose of the transaction; or
- Involves the use of the mutual fund to facilitate criminal activity, including those transactions in which legally derived funds are used for criminal activity.

#### 2. Is a mutual fund expected to obtain additional information (*i.e.*, that it does not already have) to meet the "knows, suspects, or has reason to suspect" standard of section 103.15(a)(2)?

FinCEN expects that a mutual fund: (1) should be able to meet the "knows, suspects, or has reason to suspect" standard of section 103.15(a)(2) based on information available to the mutual fund that was obtained through the account opening process and in the course of processing transactions, consistent with the mutual fund's required anti-money laundering procedures; and (2) will include any such information in any Suspicious Activity Report.

---

[2] The term "SF" is an abbreviation for "Securities and Futures Industries," and refers to the form that is used for reporting by members of those industries. The form is available on FinCEN's website at http://www.fincen.gov/reg_bsaforms.html.

**3. Is a mutual fund required to report suspicious transactions in fund shares by a broker-dealer or other financial institution (collectively "intermediaries") on behalf of its customers through the Fund/SERV system operated by the National Securities Clearing Corporation (the "NSCC")?**

Yes. Broker-dealers and other intermediaries typically conduct transactions in fund shares through the NSCC Fund/SERV system (which streamlines the clearance and settlement of mutual fund transactions by enabling NSCC members to transact business with hundreds of mutual fund families and thousands of mutual funds through a single standardized process). These accounts may include sub-accounts for individual customers of the broker-dealer, but only limited information (if any information at all) about the individual customers is provided to the mutual fund. These accounts therefore function in a manner similar to omnibus accounts. Although the intermediary would be considered the customer of the mutual fund, and the mutual fund may have limited information about the customers of the intermediary, a mutual fund is required to report a transaction if the fund determines that the transaction meets the "knows, suspects, or has reason to suspect" standard of section 103.15(a)(2), based on the information available to the fund in the course of establishing a shareholder relationship or processing transactions.

**4. Is the suspicious activity reporting requirement limited to individual transactions?**

No. The rule extends to patterns of transactions. If a particular transaction in a series of transactions would not independently trigger the suspicion of a mutual fund, but the series of transactions, when taken together, form a suspicious pattern of activity, the mutual fund must file a Suspicious Activity Report.

**5. What about transactions that fall below the $5,000 threshold?**

Mutual funds are encouraged to report voluntarily transactions that appear relevant to violations of law or regulation, even in cases in which the rule does not explicitly require filing of a Suspicious Activity Report – such as transactions that, alone or in the aggregate, fall below the $5,000 threshold. Such voluntary reporting would enjoy the same protection from civil liability as mandatory reporting.

**6. Is the requirement to report suspicious activity limited to transactions that involve currency?**

No. The obligation to report a transaction as suspicious applies regardless of whether the transaction involves currency. Many non-currency transactions (*e.g.,* fund transfers) can be indicative of suspicious or illicit activity.

**7. How does a mutual fund determine what is a "suspicious activity?"**

3

The means of commerce and the techniques of money launderers are continually evolving, and there is no way to provide an exhaustive list of potentially suspicious transactions. A mutual fund must consider all of the facts and circumstances relating to the transaction and the customer in question. However, there are some general guidelines and "red flags" that may indicate a need to file a Suspicious Activity Report. They include:

- The activities vary substantially from the customer's normal practices.
- A customer refuses to provide information necessary for the mutual fund to verify the customer's identity, make reports, or keep records required by the Bank Secrecy Act.
- A customer provides information that the mutual fund determines to be false.
- Transmission or receipt of fund transfers without normal identifying information, or in a manner that may indicate an attempt to disguise or hide the country of origin or destination, or the identity of the person sending or receiving the funds, or the identity of the beneficiary receiving the funds.
- A customer seeks to change or cancel a transaction after being informed of information verification or recordkeeping requirements.
- Repeated use of the mutual fund as a temporary resting place for funds from multiple sources without a clear business (including investment) purpose.

**8. Is a mutual fund permitted to contract with a service provider to perform the reporting obligation as the fund's agent?**

Yes. A mutual fund may contract with an affiliated or unaffiliated service provider to perform the reporting obligation as the fund's agent. However, the mutual fund remains responsible for assuring compliance with the regulation and must monitor performance by the service provider. The mutual fund should take steps to assure itself that the service provider has implemented effective compliance policies and procedures administered by competent personnel, and also maintain an active working relationship with the service provider's compliance personnel.[3]

### 31 C.F.R. § 103.15(a)(3) – Reports by mutual funds of suspicious transactions

**1. Who has to file form SAR-SF?**

Each mutual fund involved in a transaction has an independent obligation to monitor for, identify, and report suspicious activities.

**2. If more than one mutual fund is obligated to report the same transaction or series of transactions, is each mutual fund required to file a SAR-SF?**

---

[3] For discussion of the oversight responsibilities of mutual funds over their service providers, see 68 FR 74714 (Dec. 24, 2003) nn.91-92 and accompanying text.

4

No. Only one Suspicious Activity Report is required to be filed if there is more than one mutual fund involved in the suspicious transaction. Since individual mutual funds are frequently part of a complex of related funds, it is possible that more than one mutual fund would be obligated to report the same transaction or series of transactions. Section 103.15(a)(3) permits one mutual fund to file a single SAR-SF on behalf of all mutual funds involved in a particular transaction or series of transactions, as long as the report contains all relevant facts, including the identification in the narrative section of all mutual funds on whose behalf the report is being filed. Also, a service provider which performs reporting obligations under contract with multiple mutual funds may file a single form SAR-SF on behalf of all funds involved in a transaction or series of transactions. Until the revised SAR- SF form, which is being revised to support joint filing, becomes available for mutual funds to use in January 2007, the narrative section in the SAR-SF should contain the words "Joint Filing," and each institution should maintain a copy of the SAR-SF filed and any supporting documentation.

**3. Is it permissible for a broker-dealer or other financial institution that is involved in the same transaction with one or more mutual funds to file a joint Suspicious Activity Report on behalf of the mutual fund or funds?**

Yes. A broker-dealer or other financial institution involved in the same transaction or series of transactions with one or more mutual funds are typically subject to their own separate suspicious activity reporting requirements. Section 103.15(a)(3) permits a joint Suspicious Activity Report filed by another financial institution to satisfy the reporting obligation of the mutual fund(s). As with a form SAR-SF filed by a mutual fund on behalf of other mutual funds, the report must contain all relevant facts and the narrative section should clearly identify all entities on whose behalf the report is being filed. The narrative section should contain the words "Joint Filing," and each institution should maintain a copy of the Suspicious Activity Report filed and any supporting documentation.

**4. A mutual fund, broker-dealer, or other financial institution that files a form SAR-SF on behalf of other mutual funds must exchange information with the other entities involved. Does such an exchange of information violate the non-disclosure provisions of section 103.15(d)?**

No. To avoid duplicative filings, all entities involved in a transaction or series of transactions need to exchange information with one another to determine whether the transaction must be reported, to determine which entity will file the Suspicious Activity Report, to provide the filer with comprehensive information and supporting documentation, and to provide confirmation of the filing to each entity. To clarify the circumstances under which sharing of information is permitted, section 103.15(d) contains a cross-reference to section 103.15(a)(3) – FinCEN interprets this provision to permit a mutual fund to share information pertaining to a suspicious transaction with any other mutual fund or financial institution involved in the transaction, providing that such mutual fund or financial institution is not expected to be the subject of the report. See 71 FR 27217 (May 4, 2006). Likewise, if a service provider is performing the reporting

5

obligations of one or more mutual funds under contract with the fund(s), the service provider may share the information as an agent of the mutual fund(s). Underlying information may be shared with appropriate entities before and after a Suspicious Activity Report is filed; however, after filing, further disclosure of the fact that a Suspicious Activity Report was filed is prohibited except as permitted under section 103.15(d).

**5. How should suspicious activity involving variable insurance products funded by separate accounts that meet the definition of a "mutual fund" be reported?**

Some insurance companies issue variable insurance products funded by separate accounts, some of which are organized as managed separate accounts and meet the definition of a mutual fund. To avoid a duplicate filing requirement, FinCEN amended the suspicious activity reporting regulation applicable to insurance companies such that these insurance companies are required to report suspicious activity involving such variable insurance products under the rule applicable to mutual funds. The provisions regarding the delegation of tasks to service providers and the filing of a joint report with a broker-dealer or other financial institution involved in the same transaction, discussed above, apply to situations in which the transaction(s) occur through an insurance agent or other third party.

## 31 C.F.R. § 103.15(b) – Filing procedures

**1. What is form SAR-SF?**

Form SAR-SF (FinCEN Form 101) is the form that mutual funds must use to report suspicious activity. Securities broker-dealers, futures commission merchants, and introducing brokers in commodities also use form SAR-SF to report suspicious activity to FinCEN.

**2. What is the timeframe for filing form SAR-SF?**

A mutual fund must file a form SAR-SF within 30 days after the initial detection of a suspicious transaction. If the mutual fund is unable to identify a suspect when the activity is first detected, it may delay filing form SAR-SF for an additional 30 days; however, it may not delay filing more than 60 days after the date of the initial detection.

**3. What actions should a mutual fund take in situations that require immediate attention?**

In situations involving violations that require immediate attention, such as terrorist financing or ongoing money laundering schemes, a mutual fund must notify an appropriate law enforcement agency by telephone in addition to timely filing form SAR-SF. Although not required to do so, the mutual fund also may contact the SEC in such situations. A mutual fund that chooses to contact the SEC should contact the Office of Compliance Inspections and Examinations. In addition, a mutual fund is urged to call

FinCEN's Financial Institutions Hotline at (866) 556-3974 to report suspicious activity that may relate to terrorist financing. Mutual funds that report suspicious activity by calling the Financial Institutions Hotline must still file a timely form SAR-SF.

### 31 C.F.R. § 103.15(c) – Retention of records

**1. What records are mutual funds required to maintain in connection with suspicious transactions?**

Mutual funds must maintain copies of all form SAR-SFs that they file as well as the original supporting documentation. If a mutual fund has not filed a Form SAR-SF because another mutual fund or financial institution filed a joint report covering the same transaction, the mutual fund must maintain a copy of the report filed by the other mutual fund or financial institution, along with any supporting documentation.

**2. How long must a mutual fund keep these records?**

Section 103.15(c) requires a mutual fund to maintain these above records for a period of five years from the date of filing of the form SAR-SF for purposes of this regulation. However, the regulation does not change any other recordkeeping obligations of a mutual fund. For any other purposes, records must be maintained pursuant to SEC rules and regulations.

**3. To whom must a mutual fund make these records available?**

Mutual funds must make records available upon request to FinCEN, the SEC, and appropriate law enforcement and regulatory authorities. To the extent a mutual fund maintains a joint report and supporting documentation related to a form SAR-SF filed by a broker-dealer, it must make the report and documentation available upon request to a self-regulatory organization registered with the SEC for purposes of an examination pursuant to 31 C.F.R. § 103.19(g).

### 31 C.F.R. § 103.15(d) – Confidentiality of reports

**1. To whom may a mutual fund disclose information concerning Suspicious Activity Reports?**

A mutual fund, its directors, officers, employees, and agents are prohibited from disclosing that the mutual fund filed a Suspicious Activity Report or from providing any information that would disclose that a report has been prepared or filed, except to the extent permitted by 31 C.F.R. § 103.15(a)(3). 31 C.F.R. § 103.15(a)(3), however, permits the joint filing of a Suspicious Activity Report and, by extension, authorizes the sharing of such a report and the information contained therein between financial institutions for the purpose of determining whether to file, and which institution should file, a report. Likewise, if a service provider is performing the reporting obligations of one or more mutual funds under contract with the fund(s), the service provider may share

the information as an agent of the mutual fund(s). Moreover, as discussed in the prior question, a mutual fund must disclose information to FinCEN, the SEC, appropriate law enforcement or regulatory agencies, or a self-regulatory organization registered with the SEC conducting an examination pursuant to 31 C.F.R. § 103.19(g). Notwithstanding this obligation, a mutual fund may not disclose a Suspicious Activity Report to the subject of the report.

**2. Does the prohibition against a mutual fund disclosing that it has filed a Suspicious Activity Report extend to the fund sharing that information with the investment adviser that controls the fund?**

We have considered this issue carefully, balancing the need to protect Suspicious Activity Report confidentiality with the legitimate need for investment advisers to be able to implement enterprise-wide risk management and compliance functions over all of the mutual funds that they control.[4] Furthermore, to meet those responsibilities, investment advisers also may have a valid need to review compliance by mutual funds that they control with the mutual funds' legal requirements to identify and report suspicious activity.

The importance of that responsibility is sufficient to outweigh the general prohibition against disclosing that a Suspicious Activity Report has been filed. Accordingly, we have determined that a U.S. mutual fund may share a Suspicious Activity Report with the investment adviser that controls the fund, whether domestic or foreign, for these purposes. In the event that the corporate structure of an investment adviser includes multiple parent companies, the filing institution's Suspicious Activity Report may be shared with each entity in the chain of control.

There may be circumstances under which a mutual fund would be liable for direct or indirect disclosure of a Suspicious Activity Report by the investment adviser that controls the fund, or the fact that a Suspicious Activity Report had been filed. Therefore, the mutual fund, as part of its anti-money laundering program, must have written confidentiality agreements or arrangements in place specifying that the investment adviser must protect the confidentiality of the Suspicious Activity Report through appropriate internal controls.

The sharing of a Suspicious Activity Report with a non-U.S. entity raises additional concerns about the ability of the foreign entity to protect the Suspicious Activity Report in light of possible requests for disclosure abroad that may be subject to foreign law. These concerns will need to be addressed in the confidentiality agreements or arrangements. The recipient investment adviser may not disclose further any Suspicious

---

[4] "Control" is defined in section 2(a)(9) of the 1940 Act (15 U.S.C. 80a-2(a)(9)) to mean "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." A mutual fund typically is organized and operated by an investment adviser that controls the fund. By contrast, an investment adviser that performs limited functions in managing a mutual fund's securities portfolio (also known as a "subadviser") would not typically control the fund and therefore would be outside the scope of this guidance.

Activity Report, or the fact that such report has been filed; however, the foreign investment adviser may disclose underlying information (that is, information about the customer and transaction(s) reported) that does not explicitly reveal that a Suspicious Activity Report was filed and that is not otherwise subject to disclosure restrictions.

### 3. What should a mutual fund do if it receives a subpoena requesting disclosure of a Suspicious Activity Report?

Except where such disclosure is requested by FinCEN, the SEC, appropriate law enforcement or regulatory agencies, or, in the case of a joint report involving a broker-dealer, a self-regulatory organization registered with the SEC conducting an examination of such broker-dealer pursuant to 31 C.F.R. § 103.19(g), the mutual fund must decline to produce the Suspicious Activity Report or provide any information that would disclose that a form SAR-SF has been prepared or filed, citing section 103.15(d) of this regulation and 31 U.S.C. 5318(g)(2). The mutual fund must also notify FinCEN of any such request by contacting its Office of Chief Counsel at (703) 905-3590.

## 31 C.F.R. § 103.15(e) – Limitation of liability

### 1. Is there any protection from civil liability for filing a Suspicious Activity Report and for failing to disclose the fact that a report was prepared or filed?

Yes. In 1992, Congress passed the Annunzio-Wylie Anti-Money Laundering Act and provided a safe harbor for financial institutions and their employees from civil liability for reporting known or suspected criminal offenses or suspicious activity by filing a Suspicious Activity Report. This law is codified at 31 U.S.C. 5318(g)(3). FinCEN incorporated the safe harbor provision into the suspicious activity reporting regulations for mutual funds. A recent court case, *Whitney Nat'l Bank v. Karam*, 306 F. Supp.2d 678 (S.D. Tex. 2004), reaffirmed the scope of the statutory protection.[5]

### 2. Are voluntary Suspicious Activity Reports subject to the same protection from liability as mandatory reports?

Yes. Mutual funds that file voluntary Suspicious Activity Reports are subject to the same protection from civil liability. Section 5318(g)(3) of title 31 was amended by the USA PATRIOT Act and includes specific application of the safe harbor to voluntary reports of suspicious transactions.

## 31 C.F.R. § 103.15(f) – Examinations and enforcement

### 1. Who examines mutual funds for compliance with the requirement to report suspicious transactions and for compliance with the Bank Secrecy Act and its implementing regulations?

---

[5] For a more detailed discussion of the court case, see *Interagency Advisory: Federal Court Reaffirms Protections for Financial Institutions Filing Suspicious Activity Reports* (May 24, 2004), which is available on FinCEN's public website (*www.fincen.gov*).

9

The Department of the Treasury has delegated to the SEC its authority to examine mutual funds for compliance with the requirement to report suspicious transactions and for compliance with the Bank Secrecy Act and its implementing regulations.[6]

### 31 C.F.R. § 103.15(g) – Effective date

**1. When are mutual funds required to start filing Suspicious Activity Reports?**

Mutual funds must file Suspicious Activity Reports with regard to transactions occurring after October 31, 2006.

---

[6] See 31 C.F.R. § 103.56(b)(6) (delegating authority to examine investment companies to the SEC).