# Exhibit 11


FINANCIAL CRIMES ENFORCEMENT NETWORK
UNITED STATES DEPARTMENT OF THE TREASURY

STATEMENT OF WILLIAM F. BAITY
DEPUTY DIRECTOR
FINANCIAL CRIMES ENFORCEMENT NETWORK
UNITED STATES DEPARTMENT OF THE TREASURY

BEFORE THE
HOUSE FINANCIAL SERVICES SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

MAY 10, 2007

Chairman Watt, Ranking Member Miller and distinguished members of the Subcommittee, on behalf of our Director and the men and women of the Financial Crimes Enforcement Network (FinCEN), we appreciate this opportunity to appear before you today to discuss the utility of information provided by financial institutions in accordance with the provisions of the Bank Secrecy Act (BSA). As the administrator of the BSA, FinCEN continually strives to maintain the proper balance between the reporting requirements imposed upon the financial services industry, and the need to ensure an unimpeded flow of important information to law enforcement officials. We take this responsibility very seriously, and we look forward to working with the Members of this Subcommittee in our united fight to safeguard the U.S. financial system against all types of illicit financial activities.

I am also honored to appear today with Salvador Hernandez, Deputy Assistant Director for the Criminal Investigative Division of the Federal Bureau of Investigations (FBI). Our partnership with the FBI, as well as other law enforcement agencies, allows for a seamless flow and effective utilization of BSA information in our united fight against terrorist financing and money laundering.

As you know, FinCEN's mission is to safeguard the financial system from the abuses of financial crime, including terrorist financing, money laundering, and other illicit financial activity. FinCEN works to achieve its mission through a broad range of interrelated strategies, including:

➢ Administering the Bank Secrecy Act - the United States' primary anti-money laundering/counter-terrorist financing regulatory regime;

> ➢ Supporting law enforcement, intelligence, and regulatory agencies through the sharing and analysis of financial intelligence; and
> ➢ Building global cooperation and technical expertise among financial intelligence units throughout the world.

To accomplish these activities, FinCEN employs a team comprised of approximately 300 dedicated federal employees, including analysts, regulatory specialists, international specialists, technology experts, administrators, managers, and Federal agents who fall within one of the following mission areas at FinCEN:

- **Regulatory Policy and Programs** - FinCEN issues regulations, regulatory rulings, and interpretive guidance; assists state and federal regulatory agencies to consistently apply BSA compliance standards in their examination of financial institutions; and takes enforcement action against financial institutions that demonstrate systemic non-compliance. These activities span the breadth of the financial services industries, including – but not limited to – banks and other depository institutions; money services businesses; securities broker-dealers; futures commission merchants and introducing brokers in securities; dealers in precious metals, stones, or jewels; insurance companies; and casinos.

- **Analysis and Law Enforcement Support** – FinCEN provides federal, state, and local law enforcement and regulatory authorities with different methods of direct access to reports financial institutions submit pursuant to the BSA. FinCEN also combines BSA data with other sources of information to produce analytic products supporting the needs of law enforcement, intelligence, regulatory, and other financial intelligence unit customers. Products range in complexity from traditional subject-related research to more advanced analytic work including geographic assessments of money laundering threats. It is this latter type of analytical work that we believe is where FinCEN can and should focus its' limited resources to have the greatest impact. I will discuss this in more detail later in my statement.

- **International Cooperation** – FinCEN is one of 100 recognized national financial intelligence units around the globe that collectively constitute the Egmont Group. FinCEN plays a lead role in fostering international efforts to combat money laundering and terrorist financing among these financial intelligence units, focusing our efforts on intensifying international cooperation and collaboration, and promoting international best practices to maximize information sharing.

## ADMINISTERING THE BSA

The BSA is the nation's first and most comprehensive federal anti-money laundering statute. Since it was enacted in 1970, the BSA has been amended on numerous occasions, most recently by the USA PATRIOT Act. Essentially the BSA is a recordkeeping and reporting statute. The BSA authorizes the Secretary of the Treasury to issue regulations requiring identified types of financial institutions to submit certain information, to maintain certain records, to implement appropriate anti-money laundering programs. Under the BSA, these efforts are focused on obtaining the information that has a high degree of usefulness in criminal, tax, regulatory investigations and proceedings, and certain intelligence and counter-terrorism matters. The BSA data received through Currency Transaction Reports (CTRs), Suspicious Activity Reports (SARs), and other forms have proved to be highly valuable to our law enforcement customers, who use the information on a daily basis as they work to investigate, uncover, and disrupt the vast networks of money launderers, terrorist financiers and other criminals. In addition to obtaining information for law enforcement, BSA programs help financial institutions protect themselves, and subsequently the U.S. financial system, from abuse from criminal actors.

Part of FinCEN's mission is to push for the appropriate level of transparency in the U.S. financial system so that money laundering, terrorist financing and other economic crime can be deterred, detected, investigated, and prosecuted. Our ability to tie together and integrate our regulatory, international, and law enforcement efforts assists us to achieve consistency across our regulatory regime.

The efficient administration of the BSA is much more than simply issuing regulations. To work, it requires an ongoing partnership between the government and private sector, which is critical in order to achieve the goals of the system. One way to make this partnership work is the ongoing effort of the Bank Secrecy Act Advisory Group (BSAAG). The BSAAG includes membership from a diverse group of the types of financial institutions subject to the BSA, law enforcement, federal and state, regulators, federal and state that come together twice a year with FinCEN to discuss ways in which the BSA can be administered more efficiently. These discussions are open, frank and comprehensive. Within the BSAAG there are formulated sub-committees to address specific issues. They include ways to improve exemption programs for the filing of CTRs, the registration processes for money service businesses (MSBs), general issues associated with SAR forms, examination concerns, privacy issues, and the SAR Activity Review, which provides bi-annual SAR statistics. FinCEN will continue to explore ways in which financial institutions can take advantage of the exemption processes.

We have partnered with the federal and state regulators to encourage financial institutions subject to the BSA to develop risk-based anti-money laundering programs tailored to their businesses, and provide guidance in this regard. Such programs include the development and implementation of policies, procedures, and internal controls needed to address financial crime, including money laundering, terrorist financing, and other risks posed by that financial institution's products, geographic locations served, and customer base.

We have learned that in order for this system to work, the government must provide guidance and feedback to the industry in ways that support their understanding of potential vulnerabilities, effective ways to address those vulnerabilities and the benefits derived from information reported by them. The risk-based nature of the regulatory scheme also recognizes that financial institutions are in the best position to design anti-money laundering/counter-terrorist financing programs that address the specific risks that they face. In other words, the success of this regime depends upon the government and financial institutions acting in true partnership – each committed to the goal of taking reasonable steps to ensure that the financial system is protected from criminals and terrorists to the greatest extent possible through the development of appropriate programs and the sharing and dissemination of information.

Ensuring that we strike the right balance between the cost and benefit of this regulatory regime is one of FinCEN's central responsibilities. Accordingly, it is vital that we continue to examine how we can more effectively tailor this regime to minimize the costs borne by financial institutions while at the same time ensuring that the law enforcement, intelligence, and regulatory communities receive the information they need.

## SUBMISSION OF BSA REPORTS

In accordance with the committee's request, we have included relevant statistics regarding the submission of reports pursuant to the BSA. The BSA's record keeping and reporting requirements increase transparency in the financial system and help to create a financial "paper trail" that law enforcement and intelligence agencies use to track criminals, their activities, and their assets.

Currently the forms for submitting information pursuant to the BSA include:

- Currency Transaction Reports (CTR) - currency transactions of $10,000 or more or structuring

- Currency Transaction Reports by Casinos (CTR-C)

- Currency Transaction Reports by Casinos – Nevada[1]

- Suspicious Activity Report (SAR) - depository institutions

- Suspicious Activity Report by Casinos and Card Clubs (SAR-C)

- Suspicious Activity Report by a Money Service Business (SAR-MSB)

- Suspicious Activity Report by Securities and Futures Industries (SAR-SF)

- Suspicious Activity Report by Casinos and Card Clubs (SAR-C)

- Report of International Transportation of Currency or Monetary Instruments (CMIR)[2]

- Report of Foreign Bank and Financial Accounts (FBAR)

- Registration of Money Services Business

- Report of Cash Payments over $10,000 Received in a Trade or Business (Form 8300)

Preliminary data received from the Internal Revenue Service's Enterprise Computing Center in Detroit, which receives and processes BSA reports on behalf of FinCEN shows the number of BSA reports filed in Fiscal Year 2006 rose to approximately 17.6 million, compared to about 15.6 million in Fiscal Year 2005. The reports filed most often are:

1. **CTRs** all types - 15,994,484 – which are filed in connection with cash deposits, withdrawals, exchanges of currency, or other payments or transfers by, through, or to a financial institution involving a transaction *(or multiple transactions by or on behalf of the same person)* in currency exceeding $10,000.

2. **SARs** - all covered institutions - 1,049,149 - which are filed in connection with transactions that financial institutions know, suspect, or have reason to believe, may be related to illicit activity. These reports are especially useful to law enforcement and other relevant agencies because they reflect activity considered problematic or unusual by financial institutions, casinos, MSBs, and the securities industry.

---

[1] Nevada will be assimilated into the national system of BSA administration effective July 1, 2007.
[2] Collected by U.S. Customs and Border Protection.

In FY2006, approximately 43% of the CTRs viewed by Gateway users were identified as "of interest" to users at the time they were viewed. A review of closed FinCEN investigative cases for FY 2006 revealed CTRs were included in almost a third of the total cases. Moreover, nearly half of the cases completed for domestic customers and almost a quarter of the cases completed for foreign partners included CTRs.

**BSA DIRECT**

Given the magnitude of reporting, we believe it is incumbent on FinCEN as the administrator to examine how this data is collected. BSA Direct is an overall umbrella project with several components, including: electronic filing, retrieval and sharing, and secure access. It is meant to be a system to handling the data received, from submission to analysis to dissemination to our various stakeholders.

The electronic filing and secure access components of BSA Direct have been operational for a number of years. The retrieval and sharing development began conceptually in September of 2003, with a contract awarded on June 30, 2004. The retrieval and sharing (R&S) component of BSA Direct was, in part, aimed at improving authorized users' access and ability to analyze the BSA data. It was designed to apply data warehousing technology to cleanse and structure the data in a single, integrated, secure web-based environment, and provide sophisticated business intelligence and other analytical tools in a user-friendly web portal. Under this design, law enforcement and regulatory agencies would gain easier, faster data access and enhanced ability to query and analyze the BSA data - improvements that were expected to lead to increased use of the BSA data and enhancements of its utility.

On March 15, 2006, FinCEN notified Congress of its intention to issue a temporary 90-day "stop-work" order on this project. This action was necessary due to the project's inability to meet performance milestones. An assessment team, comprised of management, analysts, technology specialists, and independent consultants, was created shortly after the issuance of the stop-work order to assess and refine core requirements for BSA information retrieval, dissemination, sharing, and analysis; to determine whether this component of BSA Direct could be salvaged and/or leveraged by other alternatives; and to define the best path to ensure business continuity.

On July 10, 2006, the assessment team reported its findings and concluded that BSA Direct R&S was a partially built system that integrated a number of best-in-class products that did not, in its present state, function well together. As a result, the system could not be deployed to any of FinCEN's users in the short term. Moreover, FinCEN, the contractor, and our external consultants could not

definitively predict how close the system was to meeting the envisioned requirements or the time, resources, and risks involved in completing the system.

Based on these findings, the assessment team recommended that FinCEN terminate the existing contract, assess immediate needs, and plan for new capabilities. Based on the underlying information and analysis, FinCEN supported this recommendation and, therefore, on July 13, 2006, terminated the BSA Direct R&S contract.

FinCEN is undergoing a bureau-wide IT management analysis and planning effort re-planning effort for BSA Direct R&S to address strategic, technical, and resource planning issues with all of its IT systems, as well as stakeholder analysis, in order to identify a path forward. In addition, we will continue our efforts with the Internal Revenue Service to implement WebCBRS as a means of meeting internal and customer needs for BSA data query.

## UTILITY OF THE INFORMATION SUBMITTED PURSANT TO THE BSA

FinCEN's Analysis and Liaison Division is responsible for analyzing BSA data and other information to produce analytic products supporting domestic law enforcement, intelligence, and foreign financial intelligence unit (FIU) customers. In addition, this division acts as a liaison with domestic law enforcement agencies and with counterpart FIUs in other countries. They also provide direct secure access to BSA data for domestic law enforcement and regulatory agencies. Their analytic products range in complexity from traditional suspect-related reports to policy-level assessments of financial crime threats. Consistent with FinCEN's strategic plan, analytic resources are being transitioned toward analysis that focuses increasingly on FinCEN's unique skills and knowledge of BSA data.

In Fiscal Year 2006, FinCEN produced 1,284 "Basic" analytical products which consist of suspect-based database queries and reports requiring relatively straightforward interpretation of findings. By contrast, FinCEN produced 176 "Complex" analytical products. These products include synthesis of data from multiple sources, interpretation of findings and recommendations for action and/or policy. Examples are geographic threat assessments, analyses of money laundering/illicit financing methodologies, analytic support for major law enforcement investigations, and analysis of BSA compliance patterns. Listed below are a few examples of "complex" analytic products produced by FinCEN:

*Mortgage Loan Fraud* - FinCEN's Office of Regulatory Analysis conducted this assessment to identify any trends or patterns that may be ascertained from an analysis of SARs regarding suspected mortgage loan fraud. Analysts searched the BSA database for SARs from depository institutions filed between April 1, 1996 and March 31, 2006 that contained "Mortgage Loan Fraud" as a

characterization of suspicious activity. The search retrieved 82,851 reports, which were examined to discern the trends and patterns revealed in this assessment. A random sample of 1,054 narratives was reviewed for additional analysis and revealed - among other trends addressed in this report - a sharp increase in the number of SARs reporting mortgage loan fraud beginning in 2002. We have received substantial positive feedback from the law enforcement, regulatory and financial communities on this report.

*Domestic Shell Companies* - In response to concerns raised by law enforcement, regulators, and financial institutions regarding the lack of transparency associated with the formation of shell companies, FinCEN prepared an internal report in 2005 on the role of domestic shell companies (and particularly LLCs) in financial crime and money laundering. An updated version of this report was publicly released in November 2006, along with an advisory to financial institutions reminding them of the importance of identifying, assessing and managing the potential risks associated with providing financial services to shell companies. FinCEN found that abuse of shell companies for illicit financial purposes is not limited to activity within the U.S. A review of SAR data indicates that suspected shell companies incorporated or organized in the U.S. have moved billions of dollars globally from bank accounts located in foreign countries, such as Russia and Latvia.

*Domestic Geographic Threat Assessments* – In response to requests from the Texas Department of Public Safety and the Arizona Attorney General's Office, FinCEN prepared three major assessments of financial activity along the U.S. southwest border to support state and federal drug and cash interdiction efforts. These three assessments, based on analysis of all BSA reports filed in border countries, identified potential money laundering hotspots and significant changes in financial activity to help states and federal authorities allocate resources on the southwest border.

   To understand the overall value of BSA reports, it is important to obtain an understanding of how they collectively work in the detection/prevention of financial crime. For example, CTRs generally capture a transaction at a point in time. If a customer makes a deposit in cash for $12,000 at his bank, within fifteen days of the transaction the bank files a CTR. The CTR provides law enforcement information that can be invaluable in an investigation including the following: (1) who benefited from the transaction; (2) who conducted the transaction; (3) the dollar amount of the transaction; (4) how the transaction was conducted (*in person, ATM, night deposit, etc*); (5) the purpose of the transaction (*deposit, withdrawal, purchase of monetary instruments, etc.*); (6) what account numbers are affected; (7) where the transaction took place; and (8) when the transaction occurred.

   Financial institutions file Suspicious Activity Reports (SARs) after a

subjective review of numerous variables, including the appearance of avoiding other filing requirements. While this subjective review can often lead to a more fulsome provision of facts to law enforcement, it works best in conjunction the availability of the more objective reporting requirements.

Both SARs and CTRs and work in conjunction to protect the US financial system. Although difficult to quantify, there is arguably some deterrence value associated with CTRs. Nearly half (48%) of all SARs filed relate to structuring/BSA/money laundering. Structuring is the process a person performs to avoid a CTR and is illegal. The CTR, therefore, serves as a benchmark for financial institutions and for those engaged in illegal activity. Much of the SAR data law enforcement employs in protecting the U.S. financial system derives from those who attempt to avoid a CTR. FinCEN continues to view CTRs useful in their own right because of the paper trail they create which we analyze. Moreover, a well balanced and managed CTR regime also provides a means of deterrence for illicit financial actors.

In conclusion, Mr. Chairman, we are grateful for your leadership and that of the other Members of this Subcommittee on these issues, and we stand ready to assist in your continuing efforts to ensure the safety and soundness of our financial system. Thank you for the opportunity to appear before you today. I look forward to any questions you have regarding my testimony.