UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>     Defendant. | Civil No. 1:17-CV-04179-DLC<br><br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis<br><br>**ECF CASE** |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR RECONSIDERATION OF THE COURT'S
MARCH 30, 2018 OPINION AND ORDER GRANTING, IN PART, PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**



335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680



One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

THE COURT'S RULINGS PRELIMINARILY GRANTING THE SEC'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ARE CLEARLY ERRONEOUS AND SHOULD BE
RECONSIDERED ................................................................................................................ 3

    A.    The Court Erred In Ruling That Summary Judgment Was Appropriate on the Issue of
    Alpine's Omission Of Certain "Red Flags." ................................................................ 3

        1.    The Court's Approach, Ruling on the Content of a SAR without Information
        Regarding the Reason for the SAR Filing, Inverts the Proper Analysis and
        Ignores Disputed Material Facts. ..................................................................... 5

        2.    The Court Clearly Erred in its Treatment and Interpretation of Guidance and the
        SAR-BD Forms for What Must Be Included in a SAR Narrative. .................... 10

            a.    Guidance does not have the force of law. .................................................. 10

            b.    The Court Misinterpreted the Guidance and SAR Forms. ......................... 12

        3.    The Court Erred in its Application of the SAR Form Checklists and Guidance
        To the Evidence Presented by the SEC. .......................................................... 16

        4.    Predicating Judgment on the SEC's Red Flag Theory Would Deprive Alpine of
        its Constitutional right to "fair notice." .......................................................... 20

    B.    Questions of Law and Issues of Material Fact Preclude the Court's Ruling that SARs
    Were Required on The Liquidation Transactions. ...................................................... 22

    C.    The Court's Ruling that Certain of Alpine' s SARs were Filed Late as a Matter of
    Law was Clear Error because it Ignored Material Issues of Fact. ............................. 23

    D.    The Court's Ruling on the SAR Support Files Misconstrues the SEC's Claim. ........ 25

CONCLUSION ................................................................................................................... 26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Albert Fried & Co.*,
  SEC Release No. 77971, 2016 WL 3072175 (June 1, 2016).....................................14

*California Bankers Ass'n v. Shultz*,
  416 U.S. 21 (1974)........................................................................................21

*Capitol Records, LLC v. Vimeo*, LLC,
  972 F. Supp. 2d 537 (S.D.N.Y. 2013), *affirmed in part and vacated in part by,*
  *remanded by*, 826 F.3d 78 (2d Cir. 2016)..............................................................3

*Casissa v. First Republic Bank*,
  No. C 09-4129 CW, 2012 WL 3020193 (N.D. Cal. July 24, 2012) ...........................6

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)...................................................................................1, 11

*Christensen v. Harris Cty.*,
  529 U.S. 576 (2000).......................................................................................11

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)..................................................................................12, 21

*Donovan v. Skandia Inv. Holdings Corp.*,
  No. 02CV9859 (MP), 2003 WL 217572260 (S.D.N.Y. July 31, 2003) ....................11

*Gates & Fox Co. v. O.S.H.A.*,
  790 F.2d 154 (D.C. Cir. 1986) .........................................................................21

*General Elec. Co. v. E.P.A.*,
  53 F.3d 1324 (D.C. Cir. 1995) .........................................................................21

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015)...................................................................................11

*In re Sterne, Agee & Leach, Inc.*,
  No. E052005007501 (Mar. 5, 2010)..................................................................6, 8

*U.S. Dep't of Air Force v. F.L.R.A.*,
  952 F.2d 446 (D.C. Cir. 1991) .....................................................................10, 19

*United States v. Budovsky*,
  No. 13-cr-368 (DLC), 2015 WL 5602853 (S.D.N.Y. Sept. 23, 2015) .....................11

**Statutes**

17 C.F.R. § 230.405 ...................................................................................................................18

31 C.F.R. § 1023.320(a)................................................................................................7, 10, 22, 23

31 U.S.C. § 5318(g) ....................................................................................................................21

Defendant Alpine Securities Corporation ("Alpine"), files this Memorandum of Law in Support of its Motion for Reconsideration of the Court's March 30, 2018 Opinion And Order ("Opinion") granting, in part, the Plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Partial Summary Judgment.

## INTRODUCTION

In granting summary judgment for the SEC, this Court held that the SEC can devise and enforce a new  definition of a BSA violation predicated on snippets from a few items of guidance, in disregard of decades of the consistent and comprehensive statements of FinCEN and its established approach to enforcement.  To reach that result, the Court turned the fundamental SAR process completely on its head.  FinCEN has continuously defined the BSA analysis as a subjective determination by the filing firm predicated on all of the facts and circumstances relating to its business and a particular transaction, with a narrative that explains "why" *the firm was filing the SAR*.[1]  At no time has FinCEN ever stated or even suggested that, having filed a SAR, a firm nonetheless violates the BSA if the firm fails to include any of the myriad  potential red flags scattered across  guidance, without regard for the reasons the firm filed the SAR. This Court concluded the opposite, holding that  the reasons for the filing of the SAR, and the question of whether a SAR needed to be filed in the first place, are *irrelevant* to an evaluation of the SAR narrative.  Equally troubling is that the Court accomplished this sea change in the meaning of the BSA, and the nature of a BSA violation,  without the benefit of any input from FinCEN or consideration of the views of experts with knowledge of the history of interpretation and enforcement of the BSA.  Instead, grounded on an unprecedented application of *Chevron*

---

[1]  As explained below, the Court relies heavily on the concept of "why" to support its grant of partial summary judgment, but the Court's interpretation of "why" is not consistent with pertinent guidance.  While the Court appears to conclude that the explanation of "why" must include a recitation to every potential "red flag" that regulators have identified as being "potentially suspicious" and  relevant to the firm's investigation, FinCEN has repeatedly stated that the "why" refers to the *firm's own reasons for filing the SAR*.

deference, the Court endorsed the *SEC's* interpretation not of its own statute, regulation and guidance but the provisions and guidance that are the purview of a different agency.

The Court not only created a new form of "deficient" SAR offense, but also held this new offense can be adjudicated as a matter of law, without consideration of evidence of the firm's specific business, its decision-making or the relevant market.   That outcome transforms a valuable information gathering tool regarding the movement of money into a sledgehammer to be deployed against industry participants who fail to abide by mechanical "red flag" requisites that did not exist.   In the process, the Court has actually proved the havoc that would be wreaked when multiple agencies impose their own interpretations of the BSA, because the decision permits the SEC to construct a violation of the BSA that is wholly at odds with the interpretation put forth over decades by Treasury and which is applied to other financial institutions.

The Court also clearly erred in other key respects.   The Court overlooked the SEC's failure to produce a record sufficient to obtain summary judgment, as well as material issues of fact raised by Alpine, on all the SEC's categories of alleged violations.   Additionally, the Court's ruling that a deposit of a low-priced stock followed by a sale of that stock constitute a suspicious "pattern" of activity for which a SAR filing is required as a matter of law is clearly erroneous because, *inter alia,* it is based on a misinterpretation of the SAR regulation and guidance and an inadequate evidentiary record.   The SEC presented no evidence to show that Alpine "knew," "suspected," or even had "reason to suspect" that the sample sales transactions were suspicious patterns of activity– indeed, this was not even the SEC's theory.   The Court also clearly erred by holding the SEC was entitled to summary judgment on the alleged "late" SARs where the SEC did not establish that any of these SARs were mandatory SAR filings and where the Court overlooked material issues of fact as to whether Alpine conducted an "appropriate" suspicious

activity review in a "reasonable time" under the circumstances. Finally, the Court's ruling that the SEC can still obtain judgment on its claim that Alpine failed to maintain support files, even after Alpine has produced the files, is contrary to the fact that the SEC has never brought a claim for failure to timely produce the files.

This decision should be reconsidered by the Court, with the benefit of expert submissions and the recently developed evidence bearing directly on facts relating to Alpine's SAR filings.[2] The defendant also again requests oral argument.

## ARGUMENT

**THE COURT'S RULINGS PRELIMINARILY GRANTING THE SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ARE CLEARLY ERRONEOUS AND SHOULD BE RECONSIDERED[3]**

### A.  The Court Erred In Ruling That Summary Judgment Was Appropriate on the Issue of Alpine's Omission Of Certain "Red Flags."

The Court's rulings granting portions of the SEC's Motion for Partial Summary Judgment based on omission of "red flags" from the SAR narratives are grounded on conclusions and assumptions that ignore disputed issues of material fact and are clearly erroneous.  As discussed below, the Court employed the wrong analytical model;  erred in its treatment and interpretation of the SAR Forms and the guidance, and the obligations they impose on a SAR filer;  erred in its application of the SAR forms and guidance to the record before the Court; and

---

[2] Accompanying this filing is a motion for leave to file additional materials, i.e., the Declaration of Beverly Loew, formerly with FinCEN and expert in the field of AML regulations and BSA enforcement;  excerpts from depositions of Alpine and its compliance professionals conducted after the summary judgment briefing, explaining the reasons that certain SARs were filed, and why the information was, or was not, included in the SAR narratives; and examples of SARs filed by Alpine illustrating that, in contrast to the deposit SARs, Alpine conducted substantial investigations and filed robust and detailed SARs in those instances where it determined that the conduct was actually suspicious.

[3]  The standards governing motions for reconsideration under S.D.N.Y. Rule 6.3 are well established. For a motion for reconsideration to be granted, the moving party must "'point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" *Capitol Records, LLC v. Vimeo*, LLC, 972 F. Supp. 2d 537, 543 (S.D.N.Y. 2013) (citation omitted), *affirmed in part and vacated in part by, remanded by*, 826 F.3d 78 (2d Cir. 2016). "Courts may also grant reconsideration because of an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Id.* (citation omitted).

erred in allowing the SEC to pursue a new theory of liability under FinCEN's SAR regulations in this enforcement action, without providing fair notice to Alpine.

Fundamentally, the Court concluded that it could adjudge the requisites for the SAR narrative, as a matter of law, on a plainly inadequate record. Alpine pressed this point in the earliest discussions with the Court, maintaining that summary judgment was inappropriate because analysis of a SAR requires consideration of all of the facts and circumstances relating to the filing. (Hr'g Tr. 31:10-15, 32:11-13 Nov. 2, 2017.) The Court, in response, expressed skepticism that there could be any credible evidence regarding the contents of any particular SAR. (*Id.* at 30:8-13; 31:16-19, 32:14-21.) The Court then, in its Opinion, held that the SEC had failed to meet its burden of proving that a SAR was required to be filed on each transaction at issue  (Opinion at 46, 64.) and that the "analysis" of whether a particular SAR is deficient is "necessarily . . . context-specific."[4] (*Id.* at 65.)  But the Court then proceeded apace to rule on each of the SAR narratives, as a matter of law, without consideration of the context of any of the SAR filings, or whether a SAR needed to be filed at all.

The end result is a decision that proves Alpine's point: the evidence of the firm's process and analysis are critical facts bearing on the sufficiency of a SAR filing and where the SEC presented no such evidence, and where Alpine had not even had the opportunity to develop that evidence in discovery, much less present it, summary judgment was inappropriate. *Regardless of whether the firm's employees could recall the preparation of a particular SAR, they can and they*

---

[4] The Court apparently based its decision on summary judgment on the assumption that all of Alpine's SARs were the very limited deposit SARs that reported only the facts of a large deposit of low priced securities.  As discussed in note 2, Alpine is submitting, with its motion to leave to file additional materials, examples of other SARs that are part of the SEC's various Tables but that reflect the level of analysis and description engaged in by Alpine where a transaction was actually considered suspicious."

*have explained that the generic "red flag" categories propounded by the SEC would often be irrelevant to the firm's reason for filing a SAR and therefore not included in the narrative.*[5]

Nor did the Court have the benefit of experts to describe the proper interpretation of FinCEN's issuances, its approach to enforcement or the ramifications of oversimplified and overly aggressive enforcement activity.  The Court's Opinion cites the lack of expert evidence, attributable to the unusual scheduling of these motions as the first step in the case and acknowledged that, by virtue of that sequence, it lacked evidence regarding "the penny stock market, the manipulation of that market, as well as various other market and broker-dealer practices." (*Id.* at 46 n.21.)  And just prior to issuing the Opinion, the Court stated that it would be issuing a preliminary decision "laying out what I understand the law is and was at the relevant period," and "to the extent that [the parties] have further authority to provide to [the Court] on those issues, they'll feel free to do so . . . ."  (Hr'g Tr. 11:18-24 Mar. 30, 2018.)  But still the Court rendered a decision that relies heavily on assumptions that are contrary to expert testimony that has been and will be developed.

> 1.      **The Court's Approach, Ruling on the Content of a SAR without Information Regarding the Reason for the SAR Filing, Inverts the Proper Analysis and Ignores Disputed Material Facts.**

In concluding that Alpine's SAR narratives are deficient as a matter of law – without consideration of the underlying facts and circumstances of the transaction – the Court upended the SAR analysis.  As detailed in Alpine's Summary Judgment Opposition (pp. 9-13; Alpine's Response to SEC SOF 3; Alpine's Add'l SOF 11-16), and not addressed by the Court, FinCEN has continuously defined the SAR analysis as a "subjective determination" by a firm predicated

---

[5] This is among the additional evidence Alpine seeks leave to present, and which will be further developed through expert discovery.

on all of the "facts and circumstances" relating to its business and a particular transaction, with a narrative explaining "why" the firm was filing the SAR.  For example:

- William J. Fox, Director of FinCEN, stated that "suspicious activity reporting, requires financial institutions to make judgment calls," and that "[c]ompliance should not be about second guessing individual judgment calls on whether a particular transaction is suspicious."  (Alpine Add'l SOF 13.)

- William F. Bailey, Deputy Director of FinCEN, stated that "[f]inancial institutions file Suspicious Activity Reports (SARS) after a subjective review of many variables." (Alpine Add'l SOF 16).

- FinCEN states in the Federal Register that a SAR "requires a financial institution to make a subjective determination of what is suspicious prior to its filing . . . ." 73 Fed. Reg. 74010, 74011 (Dec. 5, 2008) (Alpine Summ. J. Opp. at 10.)

- The Federal Financial Institutions Examination Counsel's ("FFIEC")[6] examination manual states that the "decision to file a SAR is an inherently subjective judgment, and thus "examiners should focus on whether the [financial institution] has an effective SAR decision-making process, not [on] individual SAR decisions." (Alpine Add'l SOF 11.)

- Alpine's WSPs incorporate this standard, including by stating that "[d]etermining whether an activity or series of activities is suspicious is a facts and circumstances analysis . . . made by the AML Compliance Officer or its Designee." (Alpine Add'l SOF 31; *see also id.* SOF 30, 32-33.)

As an initial matter, the Court appears to have overlooked this core aspect of the SAR process, dismissing Alpine's argument on the subjectivity of the SAR determination with the statement that "Rule 17a-8 contains no scienter element."  (Opinion at 67 n.25.)  This ruling conflates Alpine's argument that the BSA requires a showing of willfulness or negligence as a predicate for liability for civil money penalties, with the subjectivity inherent in the decision to prepare and file as SAR, and suggests that the Court misapprehended the SAR process.

That a broker-dealer is only required to describe in the SAR narrative the factors that caused it suspicion is driven home by the SAR Forms, which require "[f]ilers" to "provide a

---

[6]  The FFIEC was "established by Congress" and "'charged with establish[ing] uniform principles and standards . . . for examination of financial institutions'" for BSA compliance. *See Casissa v. First Republic Bank,* No. C 09-4129 CW, 2012 WL 3020193, at *9 (N.D. Cal. July 24, 2012) (citation omitted).  In the *Sterne Agee* decision, cited in Alpine's Summary Judgment Opposition (p. 12), the hearing panel described the FFIEC examination manual as the "applicable legal standard[]."  *In re Sterne, Agee & Leach, Inc.,* No. E052005007501, at 32 (Mar. 5, 2010).

clear, complete, and concise description of the activity, including what was unusual or irregular that **caused suspicion.**"  ("2012 SAR Form," SEC SOF Ex. 9, at 110) (emphasis added); *see also* "2002 SAR Form," SEC SOF Ex. 8, Part IV(a) (providing similar instructions to "[d]escribe conduct that raised suspicion"). In fact, guidance quoted by the Court explains that the 'why' includes "'why the activity is unusual for the customer; considering the types of products and services offered by the filer's industry, and the nature of normally expected activities of similar customers.'"  (Opinion at 27) (quoting FinCEN Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative, at 3-4). Neither the SAR Forms, nor any guidance cited by the SEC or the Court in its Opinion, require the filer to include in the narrative anything that was not relevant to the firm's decision to file the SAR or that did not cause the firm suspicion.

Because the "why" aspect of a SAR is by definition an outgrowth and a reflection of the firm's reasoning, it cannot be judged in the absence of evidence of the firm's business and its process.  This is nowhere more obvious than in relation to SARs that were filed by Alpine on large deposits of low-priced securities.  Alpine demonstrated that it filed those SARs, not because it believed that the transaction met any of the four categories of a required SAR filing,[7] but because it understood from its closest regulator, FINRA, that it should file SARs on such transactions.  (*See* Alpine's Add'l SOF 47, 69, 72, and 75.)  Alpine does not view those transactions as being inherently suspicious or unusual.  (*Id.*)  In fact, deposition testimony has confirmed that such transactions are routine under Alpine's business model, which focuses on microcap securities and receives deposits of  certificates that are being processed by its owner for purposes of selling the stock.  The SEC does not, and could not claim that a large deposit or sale

---

[7]  The SAR regulation itself requires a broker-dealer to file a SAR only where it "knows, suspects, or has reason to suspect" that a SAR falls within one of four defined categories, all of which involve either a violation of law or have "no business or apparent lawful purpose or [are] not the sort in which the particular customer would normally be expected to engage." 31 C.F.R. § 1023.320(a)(2) and (a)(2)(iii).  Where a transaction does not fit within those categories, a SAR can still be filed, but it is not required to be filed.  *See id.* § 1023.320(a)(1).

of low-priced securities processed by Alpine violates any law or is indicative of criminal activity within the meaning of the BSA.  Where Alpine filed SARs in such circumstances, it described the circumstances of the transaction because it could not elaborate grounds for suspicion on a transaction it did not believe was suspicious.  (*See id.* SOF 69, 72, and 75.) The Court's preliminary holding that the BSA was violated because Alpine did not articulate "why" the transaction was suspicious makes no sense when returned to its proper factual context, and it would suddenly create a BSA violation in relation to any voluntary SAR that by definition would lack an explanation of the finding of suspicion.[8]

FINRA's decision in *In re Sterne, Agee & Leach, Inc.,* No. E052005007501 (March 5, 2010), discussed at pages 11-12 of Alpine's Opposition and not addressed by the Court, illustrates that the Industry has never adhered to the mechanical approach advocated by the SEC and adopted by the Court.  Rather, SAR filings, and purported "red flags," must be evaluated in context.  In that case, the panel emphasized the "importance of focusing on the process," rather than on individual SAR decisions, and held that the respondent acted reasonably by not even filing a SAR even though it knew of evidence that the customer had a "disciplinary history"; that "several of the accounts were domiciled in an offshore jurisdiction"; that "large blocks of stock were being deposited and liquidated"; and "that the proceeds of the sales were being wired to offshore accounts."  *Id.* at 32-33. The panel noted that the "AML compliance officer looked into the activity, and concluded that there was a reasonable business explanation for all of it . . . ." *Id.* at 33.  Thus, assessment of SAR filing decisions by definition hinges on the evidence relating to the particular segment of the market in which the firm operates, its knowledge of its customers and their business activities, and the firm's own process and analysis.  As FinCEN stated in the

---

[8]  Alpine seeks leave to provide some sample SARs that it prepared for transactions it truly found suspicious of illegal activity, to help further illustrate this point.

adopting release for the regulation, "the rule is not intended to require broker-dealers mechanically to review every transaction that exceeds the reporting threshold.  Rather, it is intended that broker-dealers . . . will evaluate customer activity and relationships for money laundering risks, and design a suspicious transaction monitoring program that is appropriate for the particular broker-dealer in light of such risks."  67 Fed. Reg. 44,048, 44,053 (July 1, 2002).  The "reporting standard reflects a concept of due diligence."  *Id.*

Here, the Court skipped the critical step of considering why *Alpine* filed the SARs at issue and Alpine's subjective view of the generic categories of "red flags" in the context of Alpine's business – an inherently fact specific analysis advocated by FinCEN.  The Court acknowledged it lacked sufficient foundational evidence regarding the "penny stock market, and manipulation of that market, as well as various other market and broker-dealer practices," to inform its analysis of whether any of allegedly omitted red flags were suspicious or unusual for these types of transactions.  (Opinion, at 46 n.21.) The Court replaced this analysis with an unprecedented shortcut:  adoption of a bright-line rule that a SAR narrative is deficient as a matter of law unless it mechanically lists all red flags identified in guidance even if they have no relevance to the underlying transaction or to the reason why the SAR was actually filed, thereby substituting the SEC's judgment of what is suspicious for Alpine's.

Because the SEC did not provide any evidence of Alpine's decision-making process with respect to  any of the SARs at issue, while Alpine demonstrated the relevance and importance of its process and analysis, the SEC failed to carry its burden to show any of the Sample SARs narratives were deficient, and summary judgment should have been denied.

2. **The Court Clearly Erred in its Treatment and Interpretation of Guidance and the SAR-BD Forms for What Must Be Included in a SAR Narrative.**

The Court's rulings that Alpine's SAR narratives are deficient as a matter of law relies almost exclusively on a few selected "red flags" that are discussed in the instructions to the SAR Forms and in four pieces of informal guidance.[9] (Opinion at 42-65.) The Court's reliance on these materials was clear error for two reasons. First, the Court erred in treating the guidance as creating substantive reporting requirements with the "force of law," upon which a violation could be based. Second, the Court erred in accepting the SEC's interpretation of FinCEN's guidance and SAR Forms – an area in which the SEC is entitled to no deference[10] – to create automatic SAR reporting requirements.

a. **Guidance does not have the force of law.**

In its motion for summary judgment, the SEC insisted that pertinent guidance included issuances from the SEC, FINRA and NASD, in addition to FinCEN. For the most part, it appears the Court rejected that claim and concluded – properly – that only FinCEN guidance could be relevant. However, the Court then concluded that, given "the breadth of Section 1023.320," FinCEN guidance "is entitled to deference and is binding so long as it is reasonable and consistent with earlier and later pronouncements." (Opinion at 24-25.) But, because FinCEN is not a litigant here, the Court applied this holding to imbue the *SEC's* view of FinCEN's guidance with the "force of law," such that noncompliance therewith can constitute a violation of the SAR regulations. This is plain error, not only because FinCEN's informal

---

[9] The informal FinCEN guidance cited by the Court consists of (1) *Guidance on Preparing a Complete & Sufficient Suspicious Activity Narrative* (2003) (SEC Ex. 1) (2) *SAR Activity Review, Trends Tips & Issues #22* (October 2012) (SEC Ex. 2)*; and* (3) *SAR Activity Review, Trends Tips & Issues # 15* (May 2009) (SEC SOF Ex. 3)*; and* (4) FIN-2006-G014, Potential Money Laundering Risks Related to Shell Companies (Nov. 9, 2006) (SEC SOF Ex. 23).

[10] No deference is owed to an agency's interpretation of another agency's regulations, let alone to an agency's interpretation of another agency's informal guidance documents. *See, e.g., U.S. Dep't of Air Force v. F.L.R.A.,* 952 F.2d 446, 450 (D.C. Cir. 1991) (stating "we do not defer to the [agency's] interpretation of regulations promulgated by other agencies.").

guidance does not have the "force of law," but also because the Court deferred to the wrong agency.  It is not FinCEN that is advocating for this mechanical interpretation of its guidance nor has it ever endorsed the enforcement approach reflected in this case. *See fn. 10, supra.*

It is well established that guidance which does not undergo notice and comment procedures of the APA is not entitled to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), deference and cannot impose substantive obligations upon which a violation could be predicated.  *See Perez v. Mortg. Bankers Ass'n,* 135 S. Ct. 1199, 1204 (2015) ("'Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'") (citation omitted); *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations [of even an ambiguous statute] such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference.").[11]

In fact, this Court has previously ruled that "FinCEN Guidance" does not have the "force of law."  *United States v. Budovsky,* No. 13-cr-368 (DLC), 2015 WL 5602853, at *10 (S.D.N.Y. Sept. 23, 2015); *accord Donovan v. Skandia Inv. Holdings Corp.,* No. 02CV9859 (MP), 2003 WL 217572260, at *1 (S.D.N.Y. July 31, 2003) ("NASD notices, however, are not law and noncompliance therewith cannot itself constitute a violation of the federal securities laws.") (emphasis added).

Further undermining the Court's decision to give deference to the *SAR Activity Review Trends, Tips and Issues #15* and *#22* guidance is the fact that these publications include a combination of articles issued by multiple different agencies.  (*See generally* SEC SOF Exs. 2-3.) Notably, the section from *SAR Acivity Review* Issue #15 containing the red flags utilized in

---

[11] Furthermore, as indicated in Alpine's Reply Memorandum in Support of its Cross-Motion (p. 10 *and* Exhibits A and B thereto), and not addressed by the Court, both the Attorney General and Department of Justice have recently issued memoranda expressly prohibiting the use of guidance documents as a basis for proving violations of applicable law.

the Court's analysis was *not* authored by FinCEN, but by the SEC and FINRA to describe their "common examination findings," and was not intended to create SAR narrative content requirements.  (SEC SOF Ex. 3 at 20-25.)  Such a document '"does not reflect the agency's [FinCEN's] fair and considered judgment on the matter'" for which deference would be appropriate. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (citation omitted).  The Court's treatment of this guidance was clearly erroneous and should be reconsidered.

### b.    The Court Misinterpreted the Guidance and SAR Forms.

The Court also erred in its interpretation of the guidance and SAR Form instructions, including by disregarding other relevant guidance. There is no language in the SAR regulation, the guidance or the SAR Forms cited by the Court to support the SEC's argument that Alpine is required by law to automatically include, in every SAR narrative, all "red flags" that may be associated with a transaction, regardless of their irrelevance.  The Court first relies on the checklists in the SAR Form instructions to support its conclusion that various items must be incorporated into the narrative.  But the Forms do not impose such mandatory SAR narrative requirements.  Rather, the Form instructions expressly use permissive language, stating that filers "should use the . . . checklist as a guide" for preparing the SAR narrative.  (*See* 2012 SAR Form Instructions, SEC SOF Ex. 9 at 111 (emphasis added); 2002 SAR Form, SEC SOF Ex. 8, Part IV.)  FinCEN knows how to impose mandatory requirements, and its failure to use words like "shall" or "must," identifies this checklist as hortatory rather than obligatory.  As indicated, the Forms make clear the only narrative requirement is that the filer describe "why" the transaction caused *the filer* to conclude the transaction fell within one of  the four categories of the regulation.

The other guidance cited by the Court likewise does not support its red-flag ruling.  None of the cited guidance states that any of the red flags identified therein must be reflexively reported in all SAR narratives in a report concerning something else the firm found potentially suspicious.  Rather, the guidance describes the red flags as items to be "investigated" when conducting due diligence on a transaction for purposes of determining whether a SAR filing is required.[12]

Furthermore, other guidance not cited by the Court further refutes the notion that any "red flag" which may exist with respect to a transaction automatically requires reporting.  For example, in the preamble to its list of 129 "red flags of money laundering and terrorist financing," the FFIEC manual states:

> The following examples are red flags that, when encountered, <u>may warrant additional scrutiny</u>.  <u>The mere presence of a red flag is not by itself evidence of criminal activity</u>. Closer scrutiny should help to determine whether the activity is suspicious or one for which there does not appear to be a reasonable business or legal purpose.[13]

FinCEN itself has made similar statements in guidance.  *See* Fin-2017-A007, at 4 (Oct. 31 2017) (emphasis added). Advisory to Financial Institutions Regarding Disaster – Related Fraud ("The presence or absence of a red flag in any given transaction is not by itself determinative of whether a transaction is suspicious.").[14]  The Court's SAR narrative ruling departs from this guidance by not treating  red flags as something to consider  when encountered, but rather views the red flags as "evidence of criminal activity" that must always be reported.  This is error.

---

[12]  *See, e.g.,* SAR Activity Review, Issue 15 (SEC SOF Ex. 3 at 24) (transactions involving red flags "need to be investigated thoroughly by the firm"); 67 Fed. Reg. at 44,053 (stating, "the rule is not intended to require broker-dealers mechanically review every transaction that exceeds the reporting threshold. Rather, it is intended that broker-dealers . . . will <u>evaluate</u> customer activity and relationship for money laundering risks . . . ." (emphasis added)); FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual (Feb. 27, 2015) ("FFIEC Manual") at App'x F-1, available at https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_106.htm, *discussed infra.*

[13]  FFIEC Manual, App'x F-1 (emphasis added).

[14]  Available at https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2017-a007-0.

Moreover, the SEC's position on the narrative requirements that the Court has now stamped into a rule of law is neither logical nor workable.  There are dozens upon dozens of red flags scattered throughout dozens of various guidance documents, and they are continually evolving.[15]  The necessary consequence of the Court's ruling is to impose a SAR narrative requirement not just for the categories selected by the SEC here but for each and every one of the dozens of red flags listed in the guidance – and even ones not identified in guidance.[16]  (Opinion at 54, 56-57.) It is both unduly burdensome to the industry, and counterproductive to law enforcement, to require every financial institution to mechanically list all of the potential "flags" that are uncovered or referenced in a file, even if completely irrelevant to the transaction, in every single SAR filed. Further discussion of the deleterious impact of the Court's ruling on the industry is set forth in the Declaration of Beverly Loew, which Alpine asks the Court to consider.

FinCEN's statements reflect a completely different approach, designed to derive benefit from information developed by industry participants, not superimposed on them by regulators or the various authors of *Trends, Tips and Issues.*  FinCEN's Director expressly decried the practice of "second guessing individual judgment calls" on what is "suspicious" as "overzealous" examination. (Alpine Add'l SOF 13.) While FinCEN has published a variety of informal guidance documents relating specifically to SAR narratives, they are clearly an iteration of

---

[15]  *See, e.g.,* 23 annual volumes of SAR "Trends, Tips & Issues" published by FinCEN, https://www.fincen.gov/sar-activity-review-trends-tips-issues (collecting all issues of this publication), including FinCEN, "SAR Activity Review – Trends, Tips & Issues, Issue 15 (May 2009), at 24 (1 red flag); FinCEN, "SAR Activity Review – Trends, Tips & Issues, Issue 22 (Oct. 2012), at 22-23 (13 red flags); *see also* Guidance on Preparing a Complete & Sufficient SAR Narrative at 5-6 (14 red flags); *see also* FFIEC Manual at Appendix F-1 to F-10 (129 red flags).

[16] At least one of the mandatory requirements established by the Court is information concerning a stock promotion.  The Court did not even find that the requirement stemmed from guidance, but rather based it on a settled SEC administrative decision, *In re Albert Fried & Co.*, SEC Release No. 77971, 2016 WL 3072175, at *5 (June 1, 2016)*, that was published in 2016 – after the relevant period.

preferred or "best" practices, not legal requisites.[17]  FinCEN itself has characterized its guidance on "who, what, when, and where" as an aid to encourage better reporting, rather than a statement of substantive requirements.[18]  The clear focus of the guidance is to encourage filers to explain "why" the financial institution considered a reported transaction to be suspicious.  Indeed, in 2007 guidance, FinCEN explains that "[i]f the narrative field is left blank, the information in the SAR only addresses the 'who/what/when/ where' of the transaction."  FinCEN, "Suggestions for Addressing Common Errors Noted in Suspicious Activity Reporting" at 2 (Oct. 10, 2007).

Finally, the Court should have rejected the SEC's interpretation because it would allow the SEC to penalize broker-dealers for failing to abide by any stray admonition found in informal guidance, treating any SAR that did not follow suit as a violation equivalent to a failure to file a SAR at all.  This becomes especially egregious when combined with the fact that the SEC purports to enforce BSA rules but wants to penalize Alpine and other broker-dealers under the higher penalties and lower scienter requirements of the Exchange Act.

In sum, the Court has created a rule for what must be included in SAR narratives, from a mishmash of SAR Form checklists, four pieces of guidance, and a settled SEC administrative action from 2016 (*In re Albert Fried*), while ignoring other more persuasive statements from FinCEN.  But none of this guidance states directly or indirectly that the lists and pages of "red flags" identified therein must be automatically included in all SAR narratives, regardless of their relevance to the firm's reasons for filing the SAR or its subjective evaluation of the facts and circumstances of the transaction. This alone is plain error that requires reconsideration.

---

[17] *See, e.g.,* FinCEN, "Guidance on Preparing a Complete & Sufficient Suspicious Activity Narrative" (Nov. 2003) ("2003 Guidance"), at 3; FinCEN, "Suggestions for Addressing Common Errors Noted in Suspicious Activity Reporting" (Oct. 10, 2007) ("Suggestions for Addressing Common Errors"), at 2; FFIEC Manual, App'x L-1.

[18] *See, e.g.,* "Guidance on Preparing a Complete & Sufficient Suspicious Activity Narrative" at 1 (explaining "[t]he purpose of [this guidance] is to educate SAR filers on how to organize and write narrative details that maximizes [sic] the value of each SAR form"), *see id.* at 2 ("The information in [this guidance] is provided solely to assist respective financial institutions in strengthening existing due diligence initiatives and anti-money laundering programs.").

### 3. The Court Erred in its Application of the SAR Form Checklists and Guidance To the Evidence Presented by the SEC.

In its rulings that each of the SAR narratives in Sample SARs A-P are deficient as a matter of law, the Court disregarded material issues of fact that preclude summary judgment and misinterpreted the language of the guidance within the specific "red flag" categories identified by the SEC. Alpine pressed these points in its Opposition to the Plaintiff's motion and has since developed additional evidence that amplifies these fact issues for <u>each</u> of these Sample SARs, which it requests leave to submit. As the discussion below will highlight, the Court first needed to  consider lay and expert testimony regarding the relevant market and broker-dealer practices to inform its analysis of the meaning of various items in Alpine's SAR support files and then consider evidence of their relevance to Alpine's analysis.

Examples of the errors in the Court's rulings on each of these categories include:

1.    <u>Alleged Facially Deficient Narratives</u>.  The Court ruled that Sample SARs A-C had deficient narratives that  failed to identify "who the client is" and "why Alpine thought the transaction was suspicious." (Opinion at 42-43.)  However, the "who" is described in earlier portions of the Form, and the SAR Forms expressly instruct filers not to repeat such information.[19]  Further, the narratives for all the SARs identify both the introducing broker and the subject of the SARs as a client of the introducing broker. (*See* SEC SOF Exs. 14-16.) With respect to Alpine's description of why the conduct was suspicious, the ruling imposes a requirement that is meaningless in the context of the particular SARs: where Alpine filed a SAR to report a large deposit of low priced securities, in response to statements from FINRA that such an event should be reported, the reason for the filing would be self-evident to anyone in the industry who viewed that SAR, and failure to use specific language, given the absence of any regulatory requirement to do so, does not rise to the level of a BSA violation.

Moreover, SARs A-C do describe the reason they were filed.  SAR A states that it was filed because of  a large deposit of low-priced securities.  (SEC Ex. 14). SAR B states that it was filed because it involved a large deposit of low-priced securities, and because of heightened sensitivity surrounding the client.  (*Id.* Ex. 15) SAR C states that it was filed because it involved a large deposit of low-priced securities, and because the account has been placed on a "heightened supervisory list" due to activity in the account and because it is Alpine's "policy to file SARs related to each deposit of securities into its account."  (*Id.* Ex. 16.)  Information

---

[19]  *See* 2002 SAR Form (SEC SOF Ex. 8, Part IV) ("information already provided in earlier parts of this form," such as the specific fields, "need not necessarily be repeated if the meaning is clear."); 2012 SAR Form Instructions (SEC SOF Ex. 9 at 111) ("[i]nformation provided in other sections of the FinCEN SAR need not be repeated in the narrative").

developed during discovery,, further explains the reason for these filings and, as indicated above, the Court must take into account the facts and circumstances under which Alpine filed the SARs.

      2.   <u>Criminal or Regulatory History</u>.  The Court erred in ruling that Sample SARs D, E and F were "deficient as a matter of law for their "omission of the criminal or regulatory history of a related party."[20]  (Opinion at 48.)  Contrary to the SEC's theory, neither the SAR Forms nor the guidance automatically require reporting of *any* criminal or regulatory history of any "related party."  Rather, the SAR Form checklist, itself only a guide,  states that the filer should "[i]ndicate whether there is any <u>related litigation</u>."  (SAR Forms, SEC SOF Ex. 8, Part IV(i)) (emphasis added).  The SEC did not establish that any of the regulatory or criminal history is related to the transaction on which the SAR was filed, certainly as a matter of law.  Nor does the other guidance cited by the Court articulate a rule that *any* criminal or regulatory history, even relating to the subject of the SAR, must be disclosed in a SAR narrative. (*See* Opinion at 47) (citing SAR Narrative Review, Issue #15, at 24.)  As indicated, that guidance merely sets forth "common examination findings" by the SEC and FINRA arising from particular factual circumstances; it does not purport to contain mandatory directives.   The guidance further indicates only that "criminal or regulatory history" is something to be "evaluated" and upon which "due diligence" should be conducted.  (Opinion at 47) (quoting guidance).  In fact, the support files for these SARs show that the history was unrelated to the transactions at issue in both time and nature, and   creates a fact issue on the relevance of unrelated criminal or regulatory history under the facts and circumstances of these transactions:

      In the support file for Sample SAR D, the Deposited Securities Checklist received from the introducing broker states that there "no" prior or pending regulatory actions, (SEC SOF Ex. 18, at ALPINE00165091), but contains blurbs of internet searches from the SEC's website indicating that the SEC had filed a regulatory action in October of 2010  in a transaction that had nothing to do with the transaction on which the SAR was filed. (*Id.* at ALPINE00165141-42.) Further, the file does not reflect any judgment or other finding of wrongdoing.

      The support file for SAR E indicates that the subject of the SAR had "no pending criminal or regulatory investigation" and had "never been investigated for securities or related transaction," but had a criminal conviction for conduct occurring in 2006 – years before, and completely unrelated to the transaction on which the SAR was filed.  (SEC SOF Ex. 20, at SEC-Alpine-E-1338391-92).

      The support file for SAR F indicates that the subject of the SAR has an "SEC *history* for misrepresentation and misappropriation of client funds," however, there is no indication that it is related to the transaction on which the SAR is filed. (SEC SOF Ex. 22, at ALPINE_SUPP_PROD_SEC0027703.)

---

[20] The Court failed to address the issue, well known in the industry and critical to industry participants, of the established demarcation of obligations as between an introducing broker and a clearing firm.  It is the introducing broker that bears the know-your-customer obligation and clearing firms like Alpine operate on the understanding that issues concerning the background of a customer are the primary focus and obligation of the introducing broker.  Here, for example, Alpine has argued that it is likely that certain items of background information were included in SARs filed by the introducing broker and so would not support a claim of a violation of the BSA.  Alpine has sought those SARs from the Plaintiff but the Plaintiff has refused to produce them. Alpine will be filing a motion to compel responses to those and other requests for production.

3.     Shell Company Involvement.   The Court clearly erred by ruling that "involvement of a shell company" must be included in a SAR narrative. (Opinion at 51.)  Notably, the Court's ruling is based on an erroneous conclusion that "[g]iven the paucity of information in the SAR narratives for SARs A and C, the identity of *the customer as a shell entity* engaged in a large deposit of penny stock shares was particularly critical." (*Id.* at 51-52) (emphasis added).  The SEC did not establish that any of Alpine's "customers" were ever "shell companies."[21]  Alpine's records for SARs A and C establish that it was the *issuers* of the underlying stock who were shells *at one point.*  Further, the Opinion incorrectly indicates that the SAR support files indicate that the transactions were "conducted through a shell company."  (*Id.* at 52.) There is no evidence that Alpine was interacting with a shell company on either of these transactions.  In fact, while the SAR support files for SARs A and C both include a checked-box on the Deposited Securities Checklist that the "issuer is, or was ever, a shell company," this does not mean the issuer remained a shell as the time of the transaction.  Notably, both Deposited Securities Checklists include handwritten notes indicating that the issuers are **"not shells,"** because they are conducting active business and have Forms S-1 filed, evidencing freely tradable shares and that, as a filing company, investors had access to financial and operational information regarding to the issuer in order to make an informed investment decision.[22]  Certainly, the fact that an *issuer* was at one time a "shell company" is not automatically suspicious as a matter of law, and the FinCEN shell company guidance does not support such a ruling.[23]

4.     Derogatory History of Stock.   The Court clearly erred by holding that Sample SAR G was deficient as a matter of law for failure to include  "derogatory history of the stock" – for which the SEC cites the lack of an issuer website, OTC markets "stop" sign, and that the issuer was not current in its regulatory filings. (Opinion at 52.)  The Opinion cites no authority and no guidance stating that these are even "red flags" of suspicious activity identified by FinCEN. As has been discussed in deposition testimony, neither the lack of an issuer website nor a delay in filings would automatically be considered suspicious to Alpine dependent on the facts and circumstances of the transaction.To hold that such information must automatically be included in a SAR narrative if noted in the support file is plainly erroneous, particularly where the SEC presented no evidence to describe how or why this would be relevant to the transaction or Alpine's decision to file a SAR.

5.     Stock Promotion.   The Court clearly erred in holding that the narratives in Sample SARs G, H, and I are deficient as a matter of law for failure to "add to the SAR narrative the evidence of stock promotional activity that appeared in Alpine's files."  (Opinion at 55.)  As support for this supposed red flag, the Court accepted the SEC's defective citation to a single a *settled* administrative action by the *SEC* from 2016 – after the relevant period. (Opinion, at p.

---

[21]  A shell company is a registrant that has "[n]o or nominal operations" and either "[n]o or nominal assets," "[a]ssets consisting solely of cash or cash equivalents," or "assets consisting of any amount of cash and cash equivalents and nominal other assets." *See* 17 C.F.R. § 230.405.

[22]  For SAR A, *see* SEC Ex. 25, at SEC-ALPINE-E-1690740 (indicating a Form S-1 was filed making the shares "free trading") *and* SEC-Alpine-E-1690741 (containing handwritten notes stating "no shell").  For SAR C, *see* SEC Ex. 24, at ALPINE00220201 (indicating the "security is free-trading with no resale restrictions" because of a Form S-1 filing), *and* ALPINE00220210 (containing handwritten notes stating "no shell" as of 12/31/10).

[23]  *See* FIN-2006-014, at 4-5 (SEC SOF Ex. 23) (stating that "most shell companies" are formed for "legitimate reason," and only become relevant where the financial institution believes the transactions "involve the use of United States or foreign-based shell business entities to launder illicit funds or to enable furtherance of a crime.")

54.)   However, as indicated, settled findings are  entitled to no deference with respect to the requirements of the BSA. *See Dep't of Air Force,* 952 F.3d at 450, discussed *supra*.  In fact, this "red flag" illustrates that the Court's ruling is unworkable; the industry needs to adhere not only to some selected bits of guidance but also has to understand that an issue in a settled action can form the basis for a claim of a BSA violation for conduct occurring years before.  Furthermore, stock promotion is legal and nearly every business, public or private, uses some form of promotional activity to market its business. As Alpine stated in its Summary Judgment Opposition (p. 20), and overlooked by the Court, Section 17(b) of the Securities Act of 1933 expressly allows stock promotion with proper disclosures of compensation. The SEC presented no evidence that any of the shares at issue in SARs G-I were deposited by persons connected to the promotional activity, let alone that were connected a  pump-and-dump scheme – information that would make stock promotion relevant.

   6.   Unverified Issuers.  The Court clearly erred in holding that the narratives in Sample SARs G, K and L were deficient as a matter of law because Alpine failed to include in the SAR narratives that it could not verify the issuer's website (SARs G and K) or that the issuer's corporate registration was in "default." (SAR L).  (*See* Opinion at 56-57.)  The guidance cited by the Court does not support the ruling that these items were required to be included in all SAR narratives: it is generic, vague and couched in permissive terms.  The Court also misapplied this guidance to the SEC's categories.  The guidance does not refer to an "issuer" at all, let alone mandate that an inability to verify an "issuer's website" must be disclosed in a SAR narrative. Rather, it is limited to providing information about "the subject(s) of the SAR." (*Id.*)

      The SEC also provided no evidence of how these items were relevant to the transactions at issue.  For example, in SAR L, that Alpine's records contain a notation that the issuer's corporate registration is in default does not mean that Alpine would or should suspect that this company is being used as a vehicle for money laundering, particularly where the records also indicate that the issuer is current in its SEC filings. (*See* SEC SOF Ex. 35, at ALPINE00243158.) To go a step further and hold that the omission of that information constitutes a violation of the BSA, without considering any evidence of what this meant to Alpine or in the industry is error.

   7.   Low Trading Volume.  The Court clearly erred in holding that the narratives in Sample SARs M, N, and P were "defective as a matter of law" because Alpine failed to disclose "the low trading volume" in the shares being deposited. (Opinion at 59) (ruling that the SEC is entitled to summary judgment because "[t]he sizable deposits, when combined with the low trading volume of a low-priced security, constitute red flags.") As support for its ruling, the Court cites to the following red flag: "'substantial deposit, transfer or journal of very low-priced and thinly traded securities.'" (Opinion at 58) (quoting SAR Activity Review, Issue 15, at 24). From that language in an "examination finding,"  the Court concludes that *"three elements" must be reported*:  a substantial deposit, the low price of the security, and the low trading volume in the security." (*Id.*)  To hold, as a matter of law, that Alpine's SAR narratives are deficient for failure to describe  low trading volume, without the SEC producing any evidence that this would have been material to Alpine's decision to file a SAR on a *deposit* of stock is plain error.

   8.   Foreign Involvement.  The Court clearly erred in holding that the narratives in Sample SARs A, C and H are "defective as a matter of law," to extent SARs were required to be

filed on these transactions, for failure "to include in the narrative sections for the SARs the information about the foreign connections to the transaction that it had in its files." (Opinion at 62.)  As an initial matter, Alpine notes that none of the checklist items from the SAR Forms, even if they did impose mandatory reporting requirements, supports the broad reporting requirement adopted by the Court.  As Alpine explained in its Summary Judgment Opposition (p.21), the checklist items are limited to the movement of money to a foreign jurisdiction. (*See* 2002 SAR Form, SEC SOF Ex. 8, Part IV(l), (p) and (q).)  Further, the foreign status of the introducing broker (SARs A and C) is stated in an earlier part of the SAR, and the Form instructions expressly state that it  need not be repeated.  The "SAR Narrative Guidance" cited by the Court is also not applicable to these transactions because the "suspected activity" did not involve a foreign jurisdiction.  (Opinion at 61.) For example, the transaction for which SAR H was filed was the large deposit of shares; that transaction did not involve a foreign jurisdiction. The SEC produced no evidence how the so-called foreign involvement was relevant to any of these transactions, and thus summary judgment was improper.

### 4. Predicating Judgment on the SEC's Red Flag Theory Would Deprive Alpine of its Constitutional right to "fair notice."

In its Summary Judgment Opposition, Alpine argued that that the SEC's red-flag theory would deprive Alpine of its constitutional right to fair notice because it is predicated on a new "red flag" theory, based on cobbled together red flags listed in certain selected bits of guidance that has never been condoned by FinCEN in guidance or through formal adjudication.  (Alpine's Summ. J. Opp. at 23-24.)  Notably, even the Court and the SEC did not agree on the definition of a BSA violation: the SEC placed enormous emphasis on FINRA and SEC issuances; the Court, on the other hand, rejects the view that SEC or FINRA guidance establishes mandatory SAR narrative requirements.  This purported rule appears clearly to be a work in progress, being constructed in the course of this litigation from those items of guidance that the SEC happened to select *and* which the Court accepted, in order to impose on the industry mandatory requirements for some undefined universe of "red flag" characteristics.  Nonetheless, and without addressing Alpine's  'fair notice'argument, the Court engaged in its own selection of particular guidance to establish, as a matter of law, mandatory SAR narrative requirements.

Even assuming arguendo that the SEC had authority under Rule 17a-8 to pursue an enforcement action predicated on a violation of the SAR regulations under the BSA, it does not

have the authority to graft requirements or regulations onto the BSA.[24] In cases where civil monetary penalties are sought in particular, the authorities are clear that an agency must give "fair warning" that allegedly violative conduct was prohibited, and courts will reject an agency's expansive interpretations and application of a regulation for the first time in litigation. *See, e.g., Christopher*, 567 U.S. at 155–57 and n.15.[25]

This doctrine is especially compelling here because it is not even FinCEN seeking to pursue an expansive new theory of liability under its regulations through enforcement; it is the SEC.  (*See fn.* 9, *supra.*)  Furthermore, the lack of fair notice is particularly acute with respect to categories of red flags culled from suggestions in guidance or forms and, in some cases, where no FinCEN guidance is cited at all, *e.g.*, stock promotion or "derogatory history of the stock," or where it is mischaracterized, *e.g.,* "criminal/regulatory history," "shell company involvement," and "unverified issuers." (*see* Section A(3) above.) Indeed, the lone item cited by the Court for "stock promotion" was a settled SEC administrative action that occurred *after* the relevant period at issue in this lawsuit, and thus could not have put Alpine on notice.

Alpine can also provide deposition testimony acquired after the summary judgment briefing, demonstrating that neither the SEC nor FINRA disclosed this omitted-red-flag theory during regulatory examinations. To hold Alpine liable for massive fines – indeed, as indicated, the SEC maintains that it can seek a separate penalty for each of the over 2,000 allegedly inadequate SAR narratives, totaling in the hundreds of millions of dollars -- under a theory

---

[24]   *See California Bankers Ass'n v. Shultz,* 416 U.S. 21, 26 (1974) ("the Act's civil and criminal penalties attach only upon regulations promulgated <u>by the Secretary</u> . . . .") (emphasis added); *accord* 31 U.S.C. § 5318(g).

[25]   *Accord General Elec. Co. v. E.P.A.,* 53 F.3d 1324, 1329 (D.C. Cir. 1995) (observing that an agency's use of "'citation [or other punishment] as the initial means for announcing a particular interpretation," or "for making its interpretation clear" may "raise a question of the 'adequacy of the notice,'" and requires a court to ask if "by reviewing the regulations and other public statements *issued by the agency,* a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,'" the standards with which the agency expects the parties to conform." (emphasis added) (alteration in original) (citations omitted); *Gates & Fox Co. v. O.S.H.A.,* 790 F.2d 154, 156-57 (D.C. Cir. 1986) (setting aside agency sanction where it failed to provide a regulated entity with "constitutionally adequate notice" of what was required, and holding that pre-suit warning was not adequate because it did not come from the agency itself and "therefore was not an authoritative interpretation of the regulation").

espoused for the first time in the present action by the SEC, deprives Alpine of its constitutional right to fair warning, and it was error for the Court not to address it.

**B.**  **Questions of Law and Issues of Material Fact Preclude the Court's Ruling that SARs Were Required on The Liquidation Transactions.**

The Court provisionally entered summary judgment for the SEC on the sample liquidations based on a new, unraised theory: that the deposit-and-liquidation transactions constitute suspicious "pattern of transactions."[26]  (Opinion at 66.)  This was not the SEC's argument; the term "pattern" is not used by the SEC with respect to this argument a single time in its moving papers.  The SEC instead claimed that the filing of a SAR on a deposit of stock automatically triggered a duty to file a SAR on subsequent liquidations of the stock.  The Court apparently rejected the SEC's theory but held the sample transactions were suspicious deposit-liquidation "patterns" as a matter of law, or which a SAR filing was required.  (Opinion at 66.) That conclusion constitutes clear error in several respects.

First, the Court lacked a sufficient record to rule, as a matter of law and before or during discovery, that the sample liquidation transactions constitute a suspicious pattern of activity. Similar to a stand-alone transaction, the regulation states that a SAR must be filed on a so-called "pattern of transactions" only if the broker dealer "knows, suspects or has reason to suspect" that "pattern of transactions of which the transaction is part" falls within one of the four categories of unlawful  conduct or unusual activity set forth in the regulation.   *See* 31 C.F.R. § 1023.320(a)(2).  Stated otherwise, the fact that a series of transactions may indicate  a pattern does not render those transactions  suspicious or require reporting.

The SEC has presented no evidence to establish that Alpine knew, suspected or even had reason to suspect that the sample transactions formed suspicious patterns of activity that required

---

[26]  The Court conditioned its grant of summary judgment on the SEC meeting its burden of "showing the existence of the deposit-and-sale patterns on which it relies."  (Opinion at 66.)

a SAR filing.  The SEC made no effort to show that, from Alpine's perspective as a firm primarily engaged in clearing over-the-counter and microcap securities transactions, these deposits and sales were unlawful, or unusual for the customers at issue, to support such a ruling.[27]  The Court itself acknowledged a lack of expert testimony and necessary foundational evidence regarding the markets and broker-dealer practices.   (Opinion at 46 n.21.)  Alpine, on the other hand, has demonstrated, and is providing further information to illustrate, that the deposit and liquidation transactions are routine in the microcap market, and were not viewed as inherently suspicious.  Alpine also established that it did conduct reviews of trading activity and filed where that trading was indicative of criminal activity.[28]  The Court could not determine whether there was a suspicious pattern that required reporting on this record, and therefore should have denied outright the SEC's motion for summary judgment.[29]

### C.   The Court's Ruling that Certain of Alpine's SARs were Filed Late as a Matter of Law was Clear Error because it Ignored Material Issues of Fact.

The Court ruled that the SEC is entitled to summary judgment on the five Sample SARs which it claimed were untimely filed.  (Opinion at 69, 75.)  This ruling is clear error because the Court overlooked material issues of fact that precluded summary judgment.

First, as with the Sample SARs that allegedly contained inadequate narratives, the SEC has not shown that any of the allegedly late-filed SARs were required SAR filing under 31

---

[27] 67 Fed. Reg. at 44,053 (the "reason-to-suspect standard means that, on the facts existing at the time, a reasonable broker-dealer in similar circumstances would have suspected the transaction was subject to SAR reporting.")

[28] For example, Alpine seeks leave to present excerpts from its Rule 30(b)(6) deposition, where the deponent made clear that it is not unusual for Alpine's clients to sell securities shortly after the deposit given the market they are in, and Alpine does not consider such sales to be suspicious of unlawful activity. Alpine also seeks leave to submit sample SARs Alpine filed after a review of unusual or suspicious patters of trading activity.

[29]  Additionally, according to the adopting release for the regulation, FinCEN "anticipate[d] that the final rule will result in an annual filing of a total of 2,000 SAR-BD forms" by all broker-dealers.  *See* 67 Fed. Reg. at 44,053. Based on this estimate, FinCEN could not have intended that broker-dealers would be required to file SARs on all large deposits of stock and on all liquidations of the large deposit solely because a low-priced security was involved.  The number of SARs that would be filed in such circumstances by all broker-dealers would be exponentially higher than the 2,000 estimated SARs, and be a tremendous and unwarranted burden to both the industry preparing the SARs and to law enforcement reviewing the SARs.

C.F.R. § 1023.320(a)(2). If the SARs were never required to be filed at all, Alpine could not be held liable for filing them late.  FinCEN endorsed this view in guidance.[30]

Second, the Court ignored material issues of fact as to whether Alpine conducted an "appropriate review" of the transactions at issue within a "reasonable period of time" under the circumstances.  As noted in the guidance cited by the Court, the time period to file a SAR does not commence the moment a transaction is "highlighted for review."   (Opinion at 71-72.) Rather, "the 30-day (or 60-day) period does not begin until an appropriate review is conducted <u>and</u> a determination is made that the transaction under review is 'suspicious' <u>within the meaning of the SAR regulation</u>." (Opinion at 72-73) (different emphasis added).  The guidance further noted that, while the "appropriate review" should be completed within a "reasonable period of time," that period   "will vary according to the facts and circumstances of the matter being reviewed" and the firm's SAR decision-making process under its AML program.  (*Id.*)

Here, Alpine presented evidence that the SARs at issue were filed within 30 days of the date Alpine conducted an "appropriate review" of the transactions and made the "determination" to file the SARs at issue.  Specifically, Alpine submitted evidence that the AML officer at the time of the underlying sample transactions determined that they were not suspicious.  (Alpine Add'l SOF 66 and 71.)  Alpine submitted evidence that it later conducted a look-back of the transactions that occurred during a former AML officer's tenure.  (*Id.* at SOF 68.)  As a result of the look-back, Alpine elected to file SARs on the sample transactions at issue within 30 days of the review in order to try to comply with its understanding of FINRA's directive to file on all large microcap deposits, even though Alpine did not believe such deposits were suspicious within the meaning of the SAR regulation.  (*Id.,* at SOF 69, 72, 74 and 75.) Whether Alpine

---

[30]  *See* SEC SOF Ex. 3 at 15 (stating "the 30-day (or 60-day) period does not begin until an appropriate review is conducted and a determination is made that the transaction under review is <u>'suspicious' within the meaning of the SAR regulations</u>.") (emphasis added).

made such filings in a "reasonable time" under the circumstances is a question that must be resolved by the trier of fact, not the Court on summary judgment.

> ### D. The Court's Ruling on the SAR Support Files Misconstrues the SEC's Claim.

The Court denied summary judgment for the SEC on its claim that Alpine failed to maintain SAR supporting documentation for five Sample SARs.  (Opinion at 76.)  However, the Court also stated that "[t]o the extent that Alpine seeks to avoid liability on this claim by relying on a more recent production of supporting files in the course of discovery, this effort is futile. Alpine was required to produce the files when they were requested in 2016."  (*Id.* at 77.) Although Alpine maintains that produced the documents at issue in 2016, Alpine seeks reconsideration of this portion of the Court's ruling on the basis that the Court overlooked that the SEC has not brought a claim for failure to produce the support files in 2016.

The SEC's Complaint on this issue alleged that "Alpine violated Exchange Act 17(a) and Rule 17a-8 by . . . failing to maintain and/or retain SAR documentation as requirement by the BSA."  (SEC Complaint ¶ 46); *see also id.* ¶ 43 (*same*). The SEC did not allege, anywhere in the Complaint, that Alpine is liable for failure to produce the files in 2016, and this is not a subpoena enforcement action.  Furthermore, in describing its claim at the November 2, 2017 hearing, counsel for the SEC represented to the Court that "[i]f there's a complete supporting file [that is located and produced], obviously it would eliminate the one from table E." (Hr'g Tr. 20: 2-17 Nov. 2, 2017) (emphasis added).  Alpine asks the Court to remove from its ruling any issue about production in 2016 as it is not relevant to SEC's claim.

## CONCLUSION

For all of the foregoing reasons, the Court should reconsider its preliminary rulings in the

Opinion granting summary judgment for the SEC on the sample SARs and transactions and deny

the Plaintiff's motion.

DATED this 20th day of April 2018.

/s/Maranda E. Fritz
Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email: Maranda.Fritz@thompsonhine.com


Brent R. Baker (BB 8285)
Aaron D. Lebenta (*Pro Hac Vice*)
Jonathan D. Bletzacker (*Pro Hac Vice*)
**CLYDE SNOW & SESSIONS**
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email: brb@clydesnow.com
adl@clydesnow.com
jdb@clydesnow.com

*Attorneys for Defendant*
*Alpine Securities Corporation*