# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
                             :

UNITED STATES SECURITIES AND       :
EXCHANGE COMMISSION,               :
                             :
                             :       Index No. 17cv4179 (DLC)
                 Plaintiff,     :
                             :
             -v.-           :       **DECLARATION OF**
                             :       **BEVERLY E. LOEW**
ALPINE SECURITIES CORPORATION,   :
                             :
                Defendant.     :
-------------------------------------------------------------------- x


COMMONWEALTH OF VIRGINIA      )
                             )     ss.:
COUNTY OF ARLINGTON           )


       I, BEVERLY E. LOEW, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

## INTRODUCTION

       1.      I am the founder and principal of Rangeley Holdings, LLC, a consulting firm that provides expert and advisory services to government officials and private sector stakeholders in connection with matters involving the development, implementation and enforcement of financial regulatory programs, including the Bank Secrecy Act of 1970 ("BSA"), as amended by the USA PATRIOT Act, and other anti-money laundering ("AML") policy and compliance programs, in the United States and abroad.  I am also an attorney licensed to practice law in New York and Virginia.

2.      As discussed in greater detail below, I have been engaged by counsel for Alpine

Securities Corporation ("Alpine") to serve as an expert with respect to BSA history and AML

regulations, including the implementation and enforcement of that regulatory scheme,

particularly as it relates to broker-dealers.  Although my engagement in this matter initially was

intended to coincide with the timing for expert disclosure pursuant to the operative scheduling

order, I have since been asked by counsel for Alpine to address issues regarding the Court's

Decision and Order, dated March 30, 2018 (the "March 2018 Decision" or the "Decision").

### SUMMARY OF QUALIFICATIONS

3.      I have approximately 30 years professional work experience in and around the

financial industry.  I spent the first 15 years of my career focused on trading markets, legal and

regulatory reform and developing market infrastructure to support privatization in emerging

former Eastern Bloc economies.  Since that time, I have focused primarily on the BSA and cross-

border AML issues, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-

Frank Act"), federal administrative law, and federal tax matters.

4.      Throughout my career, I have gained significant experience in the financial

markets, including emerging and thinly traded markets, which operate similarly to microcap

markets; issues relating to the Administrative Procedures Act ("APA"), in particular, the APA's

notice and comment requirements and judicial review standards; issues relating to the BSA and

AML history (most notably with respect to jurisdictional issues) and regulatory development;

and particular issues relating to clearing firms, including their AML obligations with respect to

the customers of introducing firms, on which I developed BSA policy with respect to customer

identification, certain foreign accounts, and suspicious activity reporting.

Loew Declaration
April 20, 2018

5.      Early in my career, I was employed in sales and trading at Kidder, Peabody & Co., Smith Barney Harris Upham & Co., Lehman Brothers, Inc., and PaineWebber, where I gained experience in pricing and trading patterns with respect to illiquid securities and those lacking in price transparency, similar to the microcap securities at issue in this case.  Moreover, as a program and project manager with the U.S. Agency for International Development ("USAID"), I was responsible for developing trading markets to support privatization of state-owned industries and small business concerns in the former Eastern Bloc, which were predominantly small cap and microcap securities, as well as regulations and surveillance practices for that market.  And through an interagency agreement with the U.S. Securities and Exchange Commission ("SEC"), I engaged senior SEC staff and a former SEC Commissioner to address some of the most complex issues that faced these privatization markets as they became operational and subject to regulation.

6.      Since 2014, I have provided legal and consulting services to a number of governments and regulated entities regarding the development of, and compliance with, effective AML law and policy.  For example, since mid-2017, I have been working with the Central Bank of a developing European country to effect wholesale legal and regulatory reform to help modernize that country's AML laws, enhance regulatory enforcement authority in light of concerns about the ability of the judiciary in that country to successfully resolve cases involving highly complex international money laundering and related financial schemes, and resolve jurisdictional disputes between the Central Bank and other ministries and agencies with roles in the country's AML compliance regime.

7.      Prior to establishing my own practice in 2014, I worked as a program or policy officer and as a senior attorney in various capacities within the United States government for

3

over 15 years.  This included positions at the U.S. Department of the Treasury's Financial

Crimes Enforcement Network ("FinCEN"), USAID, and, most recently, the Commodity Futures

Trading Commission ("CFTC").

8.    For three and a half years, from April 2005 through October 2008, I served as

Regulatory Policy Officer at FinCEN, a bureau of the U.S. Department of the Treasury

("Treasury") responsible for administering the BSA, assisting law enforcement, intelligence and

regulatory agencies by analyzing and sharing financial information, and facilitating cooperation

and technical expertise among the world's financial intelligence units.[1]  To carry out that

mission, FinCEN oversees and implements policies designed to facilitate the receipt and analysis

of transaction data from financial institutions, and the dissemination of information about

suspicious activities to law enforcement, intelligence, regulatory and financial communities and

institutions, domestically and abroad.

9.    As Regulatory Policy Officer, my responsibilities at FinCEN included overseeing

efforts to harmonize the federal government's application of the BSA across various financial

services industries.  I also advised the Treasury on the development, interpretation, and

implementation of written recommendations to enhance the United States' AML regulatory

scheme in connection with the United States' participation in the Financial Action Task Force,

an intergovernmental organization consisting of more than 35 member jurisdictions formed for

the express purpose of developing international policies to combat money laundering activities.

In this capacity, I worked on the AML rules applicable to the banking, securities and futures

industries, and money services businesses.  I was assigned these responsibilities and projects in

---

[1] *See generally* FinCEN Dir. James H. Freis, Jr., Statement Before the United States House of Representatives Committee on Financial Services (May 6, 2009), *available at* https://www.fincen.gov/news/testimony/statement-james-h-freis-jr-director-financial-crimes-enforcement-network-united-2.

large measure because of my background working in the securities industry prior to joining

FinCEN, particularly my transactional experience on Wall Street and experience in developing

trading market infrastructure to support the efficient movement of funds and securities.  The

years I worked at FinCEN were among the most significant in the development of BSA guidance

for the securities and futures industries.  Based on my work there, in 2007 I was the honored

recipient of its Visionary of the Year Award.

      10.     From October 2008 through March 2014, I served as an Assistant General

Counsel at the CFTC, where I engaged in oversight of the rulemaking and adjudicatory programs

administering the Commodity Exchange Act.  In that capacity, I led the Office of the General

Counsel's administrative law efforts with respect to the proposed rulemakings to implement the

landmark Dodd-Frank Act, coordinated the development of various internal orders and guidance

documents related to the CFTC's rulemaking process, and regularly advised on matters involving

the interaction between the BSA with the Commodity Exchange Act, which intersects with the

BSA in the same manner as does the Securities Exchange Act of 1934 (the "Exchange Act"),

particularly the review of self-regulatory organization ("SRO") examination reports and

disciplinary actions, and the limits of the CFTC's rulemaking, guidance, and enforcement

authority under the BSA.

      11.     In addition to my decades of work as an attorney and advisor in both the public

and private sectors focusing on domestic and foreign AML matters and related financial

regulatory issues, I was an adjunct professor at New York Law School where, together with

another industry AML expert, I taught a graduate-level course on the BSA and AML regulations.

I have also guest lectured at Howard University Law School on topics including the BSA, AML

and sanctions compliance obligations of U.S. broker-dealers.  While at FinCEN, I was a frequent

speaker at industry conferences and seminars regarding developments in the domestic and

international financial regulatory arena and compliance best practices.  I also frequently spoke on

the distinctions between BSA compliance obligations of clearing and introducing firms in the

securities industry and of clearing and executing brokers in the futures industry.  As noted

herein, I produced and published a significant body of interpretive guidance with respect to this

issue and the application of the suspicious activity report ("SAR") regulations resulting from the

interpretive guidance.

12.     I received my Juris Doctor in 1994 from New York Law School, and my

undergraduate degree from Wheaton College in 1986.  A copy of my curriculum vitae is attached

hereto as Exhibit A.

## BACKGROUND OF ASSIGNMENT

13.     It is my understanding that Alpine has challenged the jurisdiction of the SEC to

bring the instant enforcement action and has sought summary judgment on that issue.  It is

further my understanding that this action stems from allegations that Alpine violated 17 C.F.R.

§ 240.17a-8 ("Rule 17a-8"), promulgated under the Exchange Act, by: (i) filing fatally deficient

SARs in connection with thousands of transactions for which Alpine provided clearing services;

(ii) failing to file any SAR when it allegedly had a duty to do so; (iii) filing untimely SARs; and

(iv) failing to maintain SAR support files.  It is also my understanding that the Court's March

2018 Decision granted partial summary judgment to the SEC with respect to certain alleged

violations and denied Alpine's cross-motion for summary judgment and for judgment on the

pleadings.

14.     Given the number of alleged violations in this action, the March 2018 Decision

resolves preliminary motions for summary judgment relating to a set of 36 sample SARs.  As

explained therein, those motions were made at the Court's invitation prior to the close of

discovery, including the time for initial expert disclosures under the operative scheduling order.

The March 2018 Decision notes expressly that the parties' submissions—and, consequently, the

Court's Decision—assume familiarity with a number of key subjects on which expert testimony

would be beneficial, including relevant market and broker-dealer customs and practices, and the

application of BSA regulations thereto.

15.     I have been asked by counsel for Alpine to provide my preliminary assessment

and to opine upon the regulatory scheme applicable to the AML reporting obligations at issue in

this case.  In particular, I have been asked to opine on how those regulatory rules have been and

are commonly applied in practice, as well as customary practices and procedures within the

broker-dealer industry to appropriately address and comply with SAR obligations as part of an

effective AML compliance program.

16.     In connection with my engagement, I have reviewed numerous materials,

including copies of the parties' pleadings, the papers filed in support of and in opposition to the

parties' cross motions for partial summary judgment and the March 2018 Decision, as well as the

regulatory rules, statutory authority and associated guidance and commentary cited herein.  A

complete list of these materials is attached as Exhibit B.  While the opinions expressed herein are

based on the materials cited in this declaration and on my review of the materials listed in

Exhibit B, particularly given the timing of this declaration before the deadline for expert

disclosure in this case, I reserve the right to consider additional materials after the date of this

declaration, including but not limited to the SARs at issue in this case, the reports of any other

expert witnesses proffered by either party, as well as the evidence presented at trial, and to

conduct further and additional research and analysis in connection with rendering opinions in this matter.

17.     I am being compensated for my work in this matter at an hourly rate of $325.  My compensation is not contingent on, or otherwise affected by, the outcome of this litigation.  I am also prepared to provide further details on my opinions if asked to do so.

## SUMMARY OF OPINIONS

**Jurisdiction.**

18.     The SEC has no jurisdiction in this matter because Congress has never authorized the SEC to substantively regulate or impose any civil penalty with respect to currency reporting, AML compliance, suspicious activity reporting, or any other matter contained within the BSA except as the Secretary of the Treasury may delegate.

19.     The Secretary of the Treasury's delegation of authority to the SEC pursuant to the BSA was limited to engaging in compliance examinations—not enforcement actions—and did not substantively incorporate any BSA regulations by rule or order issued pursuant to the APA or through the adoption of Rule 17a-8.

20.     The SEC's BSA authority is substantially similar to the authority of all other agencies that have been delegated examination authority by the Secretary of the Treasury.  To the extent there are distinctions with respect to other agencies, those distinctions were articulated by Congress with express statutory language.  The SEC is unable to point to any statutory provision that supports the broad interpretation of its authority to impose substantive AML regulations and enforce them by application of civil penalties, as it seeks to do in this matter, because no such express statutory authority exists.

21.     At the very least, the issue of the SEC's jurisdiction should be reexamined, with the benefit of expert input, considering the Congressional intent underlying the BSA and all amendments thereto, which did not purport to expand the SEC's substantive rulemaking and enforcement authority under the Exchange Act or any other statute.

**Suspicious Activity Reports.**

22.     The SAR filing theories offered by the SEC in this case not only stand contrary to FinCEN's regulations and interpretive guidance, but would, if required to be adopted as a result of this Court's March 2018 Decision, amount to entirely new SAR rulemaking, imposing significant costs on securities firms and all other industries subject to BSA regulation without having been subject to the notice and comment requirements of the APA.

23.     Based on my experience, it is critical that the issues in this case be understood in the context of the entire AML regulatory scheme whereby, with limited exceptions, FinCEN has adopted the same SAR regulations and interpretive guidance for all of the industries it regulates. As a result, the institutions subject to substantively the same regulations and guidance include a broad cross-section of the U.S. financial system as a whole, such as banks and other depository institutions, futures commission merchants ("FCMs"), money services businesses, and casinos, among others.

24.     Based on the information currently available to me, the March 2018 Decision appears to be based on various incorrect references to and interpretations of the AML rules in general and the SAR rules in particular, which in my view undermines the Court's analysis and muddies the waters for those responsible for monitoring and reporting suspicious activity under the established regulations and interpretive guidance developed by Treasury and FinCEN over the past two decades.

25.     By adopting in this case the SEC's unique interpretation of the SAR rules that are applied across all industries, the Court will effectively rewrite portions of Treasury's well-settled substantive regulations and interpretive guidance on SARs.  Given the common body of law and guidance applicable to all BSA-regulated industries, the inescapable (even if unintended) consequence of the March 2018 Decision is that all institutions with BSA compliance obligations will be forced to bear the full brunt of the SEC's unofficial rulemaking without any input and regardless of whether they are subject to SEC jurisdiction.

26.     In order to comply with these new and substantially different SAR rules, implemented without the benefit of the APA's notice and comment requirement, these institutions will be required to expend substantial and scarce compliance resources to amend their AML programs, develop new methodologies, and revise existing technology used to detect, investigate, and report suspicious activities.  Ironically, the trade-off during the transition from Treasury-adopted rules to those the SEC seeks to impose likely would be the redirection of resources that otherwise would be employed to detect and report suspicious activity.

27.     Given those significant consequences on the securities industry in particular and on all BSA-regulated entities in general, it is my view that the Court's consideration of these issues would benefit from the conclusion of discovery in this case, including the exchange of all expert reports and the completion of associated depositions.

## ANALYSIS

## I.     The SEC Is Overstepping Its Delegated Authority in This Action.

28.     I have read Alpine's briefs in support of its cross-motion for summary judgment and judgment on the pleadings.  The jurisdictional legal arguments and analysis contained

therein are consistent with FinCEN's position on jurisdiction during my tenure, as well as with Treasury's long-standing position in that regard.

29.     In my roles at FinCEN and the CFTC, I spent a substantial portion of my time analyzing the jurisdictional boundaries with respect to implementing the AML regulatory scheme articulated by Congress in order to ensure that the SEC, the CFTC, and other agencies (as well as the SROs subject to their oversight) did not overreach or fail to perform the BSA examination functions that were delegated by Treasury (in the case of the SEC and the CFTC), or on which FinCEN and its delegates were relying (in the case of the SROs).

30.     While at the CFTC, I also frequently worked on matters involving the exercise of the examination authority FinCEN had delegated to the CFTC under the BSA in the same manner as it had delegated such authority to the SEC, and under a statute that in all respects relevant to this case mirrored the Exchange Act.  In that capacity, I negotiated an information sharing memorandum of understanding ("MOU") between the CFTC and FinCEN, using FinCEN's previously executed MOU with the SEC as a template, that established that FinCEN was operating as the sole administrator and enforcement authority with respect to the BSA, and that the SEC's role was limited to conducting BSA compliance examinations and an examination authority subject to delegation of BSA authority.

31.     There have been no material changes to the BSA or to the federal securities laws since that MOU between the SEC and FinCEN.  In fact, the examination and enforcement referral provisions of both the SEC's and the CFTC's MOUs with FinCEN are summarized in FinCEN's enforcement regulation, 31 C.F.R. § 1010.810, which states, in pertinent part:

> (a)     Overall authority for enforcement and compliance, including coordination and direction of procedures and activities of all other agencies exercising delegated authority under this chapter, is delegated to the Director, FinCEN.

Loew Declaration
April 20, 2018

(b)    Authority to examine institutions to determine compliance with the requirements of this chapter is delegated as follows:

*        *        *

(6)    To the Securities and Exchange Commission with respect to brokers and dealers in securities and investment companies as that term is defined in the Investment Company Act of 1940 (15 U.S.C. 80-1 *et seq*.);

*        *        *

(e)    Periodic reports shall be made to the Director, FinCEN by each agency to which compliance authority has been delegated under paragraph (b) of this section. These reports shall be in such a form and submitted at such intervals as the Director, FinCEN may direct. Evidence of specific violations of any of the requirements of this chapter may be submitted to the Director, FinCEN at any time.

(f)    The Director, FinCEN or his delegate, and any agency to which compliance has been delegated under paragraph (b) of this section, may examine any books, papers, records, or other data of domestic financial institutions relevant to the recordkeeping or reporting requirements of this chapter.

32.    In my experience, FinCEN has always maintained that the SEC did not have enforcement authority with respect to the BSA.  Specifically, FinCEN took the position that while the SEC had authority to examine brokers and dealers for compliance with the BSA, FinCEN itself retained exclusive rulemaking, interpretive, and enforcement authority and that the Secretary of the Treasury did not delegate enforcement authority, including with respect to SAR reporting, to the SEC.

33.    Moreover, on the occasions where the SEC, or the SROs subject to its oversight, attempted to assert BSA rulemaking, interpretive or enforcement authority, Treasury through FinCEN was steadfast in its position that the SEC did not have such authority.  In other words, Treasury through FinCEN alone had enforcement authority over broker-dealers for failure to comply with the BSA.

34.     In fact, I authored comment letters to the SEC that were based on Treasury and

FinCEN's jurisdictional position.  Specifically, I authored two comment letters with respect to

the limits of the SEC's BSA authority, and the authority of the SROs subject to its oversight.

35.     The first of those comment letters related to an AML rule change by what is now

the Financial Industry Regulatory Authority ("FINRA") (previously, the National Association of

Securities Dealers, Inc.), which FinCEN believed was contrary to Treasury's longstanding

interpretation of the BSA.  Specifically, in FinCEN's view, the proposed rule improperly

attempted to expand the authority of the SEC and SROs to establish AML rules under the BSA.

*Cf.* 31 C.F.R. § 1023.210.

36.     The second comment letter concerned a question posed by the SEC, in the context

of a proposed rule change with respect to the regulation of foreign broker-dealers in the U.S.,

regarding the effect the proposed rule might have on AML rules that the SEC may need to

address in its final rule.  As FinCEN wrote, the proposed rule would cause no gaps in BSA

policy and, if there were gaps, they should be addressed by FinCEN—as administrator of the

BSA—rather than by the SEC in light of Congress' choice to address the issue of foreign broker-

dealer AML due diligence in amendments to the BSA contained in Section 312 the USA

PATRIOT Act.[2]

37.     These comment letters were based on Treasury's and FinCEN's position that

Congress was neither ambiguous nor silent with respect to the SEC's substantive jurisdiction

over currency transactions and recordkeeping.  On the contrary, there has never been any express

or implicit authority in the Exchange Act or any of the other statutes administered by the SEC

because Congress never intended to grant any such authority to the SEC.

---

[2] *See* 31 U.S.C. § 5318(i).

38.     Instead, when the BSA was first enacted in 1970, Congress expressly delegated authority solely to the Secretary of the Treasury to administer the statute, which established recordkeeping and reporting requirements related to domestic currency transactions, imports and exports of monetary instruments, and transactions with foreign financial agencies.  The Secretary of the Treasury's authority extended not only to banks and other depository institutions, but also to other "financial institutions" as that term was defined in the BSA.  The definition of "financial institution" expressly and prominently included "broker[s] or dealer[s] registered with the Securities and Exchange Commission under the Securities and Exchange Act of 1934," as well as "broker[s] or dealer[s] in securities and commodities."  There could not have been a less ambiguous expression of Congressional intent that the authority to substantively regulate broker-dealers under the BSA was meant to be exercised by the Secretary of the Treasury, not the SEC.

39.     The statute did give the Secretary of the Treasury discretion to delegate his responsibility to conduct compliance examinations of BSA subject depository and financial institutions to an appropriate bank supervisory agency or other supervisory agency.  Authority was first delegated to the SEC, among other federal supervisory agencies, in 1972.

40.     In amendments to the BSA that were adopted seven times between 1982 and 2004 (citations omitted), Congress has directed the bank regulatory agencies to engage in certain examination-related activities related to BSA compliance that did not require the direct coordination of the Secretary of the Treasury.  Notably, in those same amendments, Congress never provided any substantive direction or BSA authority to the SEC.

41.     Even after the passage of the USA PATRIOT Act, when significant BSA regulations applicable to broker-dealers were finally being adopted, the SEC's BSA role was still circumscribed.  For example, Treasury was obligated to consult with the SEC and other federal

14

functional regulators before adopting AML program rules, 31 U.S.C. § 5318(h)(2), but there was no provision for joint rulemaking by Treasury and the functional regulators.  Additionally, the Secretary of the Treasury was obligated under Section 356 of the USA PATRIOT Act to adopt SAR rules for broker-dealers after consultation with the SEC, but the Secretary of the Treasury was directed to designate "a single officer or agency of the United States to whom such reports shall be made."  31 U.S.C. § 5318(g)(4).  In consequence, any authority the SEC or other agencies have to require information relating to a suspicious activity report must stem from a statute other than the BSA or pursuant to authority delegated by Treasury pursuant to the BSA.

42.     As a result, the SEC cannot point to any act of Congress indicating Congressional intent to give to the SEC substantive authority to adopt regulations, interpretations, or enforcement policy with respect to the BSA, whether through the BSA itself or as an ancillary matter through the Exchange Act, and regardless of whether it was adopted by notice and comment.

43.     Accordingly, Rule 17a-8, both at the time it was adopted and presently, cannot reasonably be viewed as a substantive adoption of the BSA and its implementing regulations capable of being administered by the SEC independently of Treasury and FinCEN.

**II.     Granting Partial Summary Judgment on the SEC's SAR Allegations.**

44.     As set forth below, the grant of summary judgment is premature and without the benefit of discovery and expert assistance.

**A.     Background on Clearing Firms.**

45.     It is my understanding that, to a certain extent, the questions in this case revolve around the AML responsibilities of clearing firms with respect to customers of introducing brokers.  Given the importance of those relationships to smoothly functioning financial markets

generally, a developed body of law exists addressing the obligations that clearing firms and introducing brokers have with respect to the appropriate allocation of their regulatory responsibilities, including those with respect to AML issues and obligations. In the course of my professional work, I have worked extensively with regulators and industry participants in developing, implementing and interpreting the regulatory framework governing those obligations.

46.     In fact, with respect to the AML rules, much of that framework is the product of dialogue that occurred beginning in late 2005 among FinCEN, the SEC and industry participants addressing the obligations of the clearing firm whose obligations are more limited than the introducing firm. Those distinctions derive, in part, from the fact that the customer of the clearing firm is the introducing broker, while the underlying introduced account is the customer of the introducing broker, and form the basis for allocation of functional responsibilities between them in the securities industries,[3] analogous to the relationship between correspondent and respondent banks with respect to dollar clearing.[4] In each industry, the introducing firm or respondent bank operate as the principals in a principal-clearing agent relationship, and as such have the primary relationship with the underlying individual account holder.

47.     To ensure that AML regulations were applied consistently to substantively similar relationships across industries, I authored several FinCEN interpretive rules setting forth the AML responsibilities between clearing firms and introducing firms.[5]

---

[3] This well-established principle is contrary to the view expressed by the Court in the Decision at 5 n.3, but consistent with settled FinCEN policy cited herein.

[4] *See, e.g.*, Anti-Money Laundering Programs; Special Due Diligence Programs for Certain Foreign Accounts, 72 Fed. Reg. 44,769 (Aug. 9, 2007).

[5] *See, e.g.*, FinCEN, FIN-2008-G002, Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements According to Certain Functional Allocations (Mar. 4, 2008), *available at* https://www.fincen.gov/sites/default/files/shared/fin-2008-g002.pdf; FinCEN, FIN-2006-

Loew Declaration
April 20, 2018

48.     In light of the well-established regulatory framework governing introduced account relationships and the customary allocation of responsibilities between clearing and introducing brokers, and because the clearing firm is not in the same position as the introducing firm with respect to interaction with accountholders and persons authorized to effect transactions, the AML regulatory framework that developed places greater responsibility for introduced accounts on the introducing broker than the clearing broker, including with respect to monitoring.  In fact, FinCEN has expressly stated that the SAR rule "does not require a firm to alter its relationship with its customers in a way that is inconsistent with industry practice," a common sense approach that takes into consideration industry norms whereby "based on the nature of the services that a broker-dealer provides to their customers, certain types of broker-dealers will have more information available to them in making suspicious activity determinations than other types of broker-dealers."[6]

### B.     Subjectivity of SAR Decision Making.

49.     Fundamental to the AML program requirements and the obligation to file SARs is the fact that the decision to file a SAR is a subjective one made by the filing firm.  The Federal Financial Institutions Examination Council's ("FFIEC") Bank Secrecy Act / Anti-Money Laundering Examination Manual ("FFIEC Examination Manual"), which is the examination manual issued by the federal banking regulators, in collaboration with FinCEN, and which is the

---

G009, Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries (May 10, 2006), *available at* https://www.fincen.gov/resources/statutes-regulations/guidance/application-regulations-requiring-special-due-diligence-0; FinCEN Ruling FIN-2008-R008, Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Financial Institution (June 3, 2008), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/fin-2008-r008.pdf.

[6]   FinCEN, The SAR Activity Review, Issue 15, at 16 (May 2009), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_15.pdf.

Loew Declaration
April 20, 2018

only AML manual issued publicly by regulators, describes this subjectivity.  The 2010 FFIEC

Examination Manual states, for example:

> "The decision to file a SAR is an inherently subjective judgment.  Examiners
> should focus on whether the bank has an effective SAR decision-making process,
> not individual SAR decisions. . . . In those instances where the bank has an
> established SAR decision-making process, has followed existing policies,
> procedures and processes, and has determined not to file a SAR the bank should
> not be criticized for the failure to file a SAR unless the failure is significant or
> accompanied by evidence of bad faith."[7]

50.     Although adopted for the banks and FinCEN, the SEC cites to the FFIEC

Examination Manual as support for the securities industry, which has declined to publish an BSA

examination manual of its own.[8]  Guidance applicable to banks with respect to SARs also is

equally applicable to broker-dealers, as the SAR regulations for each industry are based on the

same statutory provisions, contain substantially similar reporting requirements, and are subject to

the same body of interpretive guidance.  Indeed, this Court recognizes the applicability of this

FFIEC Examination Manual to other industries with suspicious activity reporting requirements.

Decision at 72 n.41.

51.     The Court does not, however, address the subjectivity articulated in the FFIEC

Examination Manual and, as noted below, by FinCEN directors.  Instead, it appears the Court

may have confused this concept of subjectivity with scienter.  *See* Decision at 67 n.25

(discussing Alpine's subjectivity argument which the Court apparently understands as an

---

[7]     FFIEC     Examination     Manual,     at     75-76     (Apr.     29,     2010),     *available     at*
https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2010.pdf     (hereinafter     "FFIEC     Examination
Manual     2010");     *see     also*     FFIEC     Examination     Manual,     at     68     (2015),     *available     at*
https://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2014_v2.pdf     (hereinafter     "FFIEC
Examination Manual 2014").

[8] *See* SEC's Office of Compliance Inspections and Examinations, Anti-Money Laundering (AML) Source Tool for
Broker-Dealers (Jan. 11, 2017), *available at* https://www.sec.gov/about/offices/ocie/amlsourcetool.htm (citing
FFIEC Examination Manual 2014).

Loew Declaration
April 20, 2018

argument in support of a scienter element in Rule 17a-8).  SAR filer subjectivity and scienter are

different concepts.

52.     The Court also refers to the fact that 31 C.F.R. § 1023.320(a)(2) requires that a

SAR be filed when a broker-dealer has "reason to suspect" that the transaction requires the filing

and concludes that language establishes an "objective test."  *See* Decision at 43-44.  As discussed

above, however, regulators have consistently taken the position that, when it comes to

enforcement of this requirement, so long as firms have effective SAR-decision making

processes, they will not second-guess a firm's decision as to whether there is "reason to suspect"

that the transaction in question requires a filing.[9]  This is so even when a regulator may have

come to a different conclusion.[10]

53.     Even in *Department of Enforcement v. Sterne, Agee & Leach, Inc.*, a FINRA

Hearing Panel cited the FFIEC Examination Manual's subjectivity standard as the appropriate

standard.  In that case, FINRA's Enforcement Division disagreed with Sterne, Agee & Leach,

Inc.'s decision not to file SARs with respect to various introduced accounts, and insisted that the

firm should have "gone further in investigating the accounts," including with respect to large

blocks of stock being deposited and liquidated.  The Hearing Panel disagreed with the

Enforcement Division, and, while noting that the firm "might have learned more with further

investigation," held that the firm's investigations adequate under the facts and circumstances

given that "Sterne Agee obtained a substantial amount of information about these accounts,

monitored them, discussed them, and came to a reasonable conclusion that there was a

---

[9] *See* 31 C.F.R. § 1023.320(a)(2) (broker-dealer SAR regulation).

[10] *See also* FinCEN Final Rule, Requirement That Mutual Funds Report Suspicious Transactions, 71 Fed. Reg. 26,213,  26,215,  *available  at*  https://www.sec.gov/about/offices/ocie/amlmf/71fr26213.pdf  (noting  that  the "triggering factors" for SARs are largely subjective).

Loew Declaration
April 20, 2018

reasonable business explanation for the activity in the accounts." *Sterne, Agee & Leach, Inc.*,
Hearing Panel Decision at 31-33. Notably, in reaching this conclusion, the Hearing Panel relied
on testimony by the firm's expert regarding the sufficiency of the firm's processes of monitoring
the introduced accounts, who articulated, among other things, that the decision to file a SAR is
"not based on a mathematical formula." *Id.* at 31.

54.    There are sound reasons behind the SAR enforcement policy, derived from
FinCEN regulatory policy and the penalty provisions of the BSA, as articulated in the FFIEC
Examination Manual and by the Hearing Panel, which are integral to the development of a firm's
AML program and the SAR filing framework. Significantly, as pointed out above, regulators
themselves have recognized that, if compliance becomes about second-guessing individual
judgment calls as to whether activity is suspicious or not, there is a significant danger that firms
will defensively file SARs, which "results when an institution files a suspicious activity report on
an activity or transaction that really is not suspicious" in order to protect themselves from
regulator risk.[11] If that occurs, the SAR filing system will become overwhelmed with worthless
SARs, and the entire purpose of SAR filings will be undermined.[12]

55.    FinCEN itself has also stated its view that SAR filings require "a financial
institution to make a subjective determination of what is suspicious prior to its filing."[13] Put
differently, as William J. Fox, the then-Director of FinCEN stated to the House of
Representatives, "[t]he cornerstone of the Bank Secrecy Act, suspicious activity reporting,

---

[11] FinCEN Dir. William J. Fox, Remarks Provided to the American Bankers Association / American Bar Association
Money Laundering Enforcement Seminar (Oct. 25, 2004), *available at*
https://www.fincen.gov/news/speeches/remarks-william-j-fox-director-financial-crimes-enforcement-network-
united-states-0.

[12] *See generally id.*

[13] FinCEN Final Rule, Exemptions From the Requirement to Report Transactions in Currency, 73 Fed. Reg. 74010,
74011 (Dec. 5, 2008), *available at* https://www.gpo.gov/fdsys/pkg/FR-2008-12-05/pdf/E8-28858.pdf.

requires financial institutions to make judgment calls,"[14] and those judgment calls are to be based on all of the facts and circumstances of a transaction.[15]  According to Director Fox, "[c]ompliance should not be about second guessing individual judgment calls on whether a particular transaction is suspicious."[16]

56.     In my opinion, the Court's decision undermines the well-established enforcement policy that has been applied by regulators and relied upon by the BSA regulated industry, particularly in light of the fact that the Court rendered its decision without the benefit of any testimony regarding the firm's investigation of the activity at issue or bases for their decision not to file SARs, and without the benefit of any expert analysis regarding the adequacy of the firm's process of monitoring the accounts at issue.

## C.    "Fatally Deficient" SAR Theory.

57.     As a matter of law, there are no FinCEN implementing regulations or any AML laws that state that a firm can be charged for filing "fatally deficient" SARs.  Rather, civil penalties may be imposed under the BSA for willful or negligent violations of the statute.  In circumstances where a firm files a SAR that contains meaningful information—the identification

---

[14] FinCEN Dir. William J. Fox, Statement on Behalf of United States Department of Treasury Before the House of Representatives (June 16, 2004), *available at* https://www.fincen.gov/news/speeches/statement-william-j-fox-director-financial-crimes-enforcement-network-united-states (hereinafter "FinCEN Dir. Fox Statement June 2004").

[15] *See* FinCEN, FIN-2006-G013, Frequently Asked Questions Suspicious Activity Reporting Requirements for Mutual Funds, FAQ 7 at 3-4 (Oct. 4, 2006), *available at* https://www.fincen.gov/sites/default/files/shared/guidance_faqs_sar_10042006.pdf.

[16] FinCEN Dir. Fox Statement June 2004; *see also* FinCEN Deputy Dir. William F. Baity, Statement Before the House Financial Services Subcommittee on Oversight and Investigations (May 10, 2007) (stating that "financial institutions file Suspicious Activity Reports (SARs) after a subjective review of numerous variables"); U.S. Gov't Accountability Office, Suspicious Activity Report Use Is Increasing, But FinCEN Needs to Further Develop and Document Its Form Revision Process, GAO-09-226, at 19 (Feb. 2009), *available at* https://www.gao.gov/new.items/d09226.pdf ("The SAR guidance in the interagency examination manual that regulators use states that the decision to file a SAR is inherently subjective and directs examiners to focus on whether the institution has an effective SAR decision-making process, rather than on individual SAR filing decisions. According to the manual, in those instances where the institution has an established SAR decision-making process; has followed existing policies, procedures, and processes; and has decided not to file a SAR, examiners generally should not criticize the institution for not filing a SAR.").

Loew Declaration
April 20, 2018

of an account, a description of the transaction, the rationale for filing the SAR if one can be articulated beyond the mere fact that the transaction occurred, and other information that enables a querying law enforcement or regulatory or supervisory agency to request additional information during an investigation or proceeding related to some aspect of the report—then the SAR is sufficient on its face.

58.     With respect to SARs and their subjectivity, the objective is to make available to law enforcement and regulatory or supervisory authorities information that they may need to engage in further investigation.  Because firms do not have police powers, it is not expected or likely that a firm can provide these authorities with all of the information they may want or that would immediately enable enforcement authorities to establish a *prima facie* case.  Rather, the firm's obligation under the SAR rule is simply to provide enforcement authorities with a reasonable "lead."

59.     It is my view that the Court's ruling that Alpine filed "fatally deficient" SARs as a matter of law could have benefited from expert opinion regarding industry standards and practice.  In addition, I respectfully submit, based on my industry knowledge and experience, that a ruling that firms could be charged with filing "fatally deficient" SARs, as a matter of law and prior to discovery, is contrary to current industry expectations for the following reasons:

> *1.     Violation of Subjectivity Standard*

60.     First, it is my opinion that the Court's ruling failed to sufficiently appreciate the concept that SAR filings, and the bases for those filings, are subjective judgment calls, as discussed above.  Specifically, insofar as the Court held that specific information needed to be included in SAR narratives as a matter of law, the Court effectively substituted its judgment for that of the firm, and, by doing so, it risks undermining the well-established principle that an

AML officer's subjective determination should not be questioned without a showing of a significant failure or bad faith,[17] in BSA terms, willfulness or negligence.  *See* 31 U.S.C. § 5321.

61.    Similarly, if not even more so, it is within the judgment of the firm filing the SAR to determine what information to include in the SAR narrative and to explain why that information is relevant to its judgment call that a SAR should be filed, based on the firm's knowledge of the client, the client's historic and anticipated activity, the product at issue, as well as a myriad number of other considerations.

62.    Indeed, it is difficult to understand how the Court could determine, as it did, what information must be in a SAR without knowing why the SAR was filed.  Given the purpose of the SAR narrative, and the information regulators have indicated they expect to see in such narratives, a decision about what ought to be in the SAR narrative cannot be made prior to a determination that a SAR is necessary.  Indeed, SARs are often filed by firms on direct or indirect indications from examining authorities that SARs should be or should have been filed, even when it is not in line with the firm's factual knowledge or considered judgment.

### 2.    *Undue Weight on Guidance*

63.    Second, it is my opinion that the Court's ruling places undue weight on guidance, treating it as if it were law and the failure to follow that guidance constitutes a violation of law.  *See, e.g.*, March 2018 Decision at 26-28.[18]  Such guidance is helpful to industry participants in

---

[17] *See* FFIEC Examination Manual 2010 at 75-76; FFIEC Examination Manual 2014 at 68.

[18] In these pages of the Court's order, the Court cites and relies on several FinCEN guidance documents, including: FinCEN, Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative, at 3-6 (Nov. 2003), *available at* https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf ("SAR Narrative Guidance"); FinCEN, SAR Activity Review, Issue 22, at 39-40 (Oct. 2012), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_22.pdf; SAR Activity Review, Issue 15, at 24 (May 2009); FinCEN, FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Instructions, at 110-12 (Oct. 2012), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20SAR%20ElectronicFilingInstructions-%20Stand%20Alone%20doc.pdf (hereinafter "2012 SAR Electronic Filing Instructions").

better understanding FinCEN's expectations regarding a requirement of law.  It does not,

however, have the force of law, and should not be used in judicial proceedings as the basis for its

decision.

64.     Among other things, such guidance is not subject to notice and comment, which is

required for all substantive rules promulgated under the authority of the APA.[19]  This comment

and notice period is critical in the AML space, which, although perhaps on its face not seemingly

complicated, is, in fact, quite complicated in operation and application.  For example, the most

recent customer due diligence rule, which will not become effective until May 11, 2018,

required extensive hearings and input from the industry over a nearly four-year period.  The

March 2018 Decision concluding that informal guidance is law will create wholesale confusion

in the securities industry, and will effectively create new, rigid law in an area where flexibility is

critical.

65.     Specifically, in its decision, the District Court cites to one of FinCEN's

publications, the SAR Activity Review—Trends, Tips & Issues ("SAR Activity Review") issued

on a periodic basis over the years, to provide examples of common scenarios identified by

FinCEN as suspicious, implying that, if a financial institution encountered a similar scenario, it

should always file a SAR with FinCEN and describe the scenario in the SAR narrative.  *See, e.g.*,

March 2018 Decision at 27-28 (citing SAR Activity Review, Issue 15, at 24).  The Court's

citation to such publications misperceives the purpose of the SAR Activity Review.

66.     The SAR Activity Review represents one of a series of documents issued by

FinCEN in collaboration with law enforcement, other regulators and groups supporting the

---

[19] *See* 5 U.S.C. § 553(b)(3)(A); U.S. Department of Justice, Attorney General's Manual on the Administrative Procedures Act of 1947 at 22-23 (1947), *available at* https://archive.org/details/AttorneyGeneralsManualOnTheAdministrativeProcedureActOf1947.

industry, such as the American Bankers Association and the Securities Industry Association, that were all members of the BSA Advisory Group ("BSAAG") of Treasury.[20]  I served as FinCEN's liaison to the BSAAG's securities and futures industry subcommittee for most of my tenure at FinCEN.  As noted in the first publication of the SAR Activity Review in 2000, the publication "is the product of a continuing collaboration among the nation's financial institutions, federal law enforcement and regulatory agencies to provide meaningful information about the preparation, use and utility of Suspicious Activity Reports (SARs) filed by financial institutions."[21]  Further, the publication reflects the recognition of both the relevant government agencies and the nation's financial institutions of the desirability of a continuing public exchange of the utility of information contained in the federal database that stores and maintained SAR filings.  Similar language is contained in the introduction to the SAR Activity Reviews that the Court referenced in its decision.  As noted in the documentation itself, this publication is "a product of continual dialogue and close collaboration among the nation's financial institutions, law enforcement officials and regulatory agencies, to provide meaningful information about the preparation, use and value of [SARS] and other [BSA] reports filed by financial institutions."[22]

---

[20] BSAAG was established in 1992 by the Annunzio-Wylie Anti-Money Laundering Act of 1992 and consists of representatives from federal regulatory and law enforcement agencies, financial institutions, and trade associations whose members are financial institutions subject to the BSA, to obtain feedback on opportunities to improve the BSA framework.  BSAAG is chaired by FinCEN and its membership is solicited via public notice in the Federal Register and members serve three-year terms.  FinCEN makes all membership decisions.

[21] SAR Activity Review, Issue 1, at 1 (Oct. 2000), *available at* https://www.fincen.gov/sites/default/files/sar_report/sar_tti_01.pdf.

[22] SAR Activity Review, Issue 15, at 1.  The list of participants in such dialogue include a variety of public and private sector views, and both regulatory and law enforcement agencies, such as, among others, "the American Bankers Association; Independent Community Bankers of America; American Institute of Certified Public Accountants; Securities and Financial Markets Association; Board of Governors of the Federal Reserve System; Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation; Office of Thrift Supervision; National Credit Union Administration; U.S. Securities and Exchange Commission; U.S. Department of Justice's Criminal Division and Asset Forfeiture & Money Laundering Section and the Federal Bureau of Investigation; Drug Enforcement Administration; U.S. Department of Homeland Security's Bureau of Immigration and Customs Enforcement and U.S. Secret Service; U.S. Department of the Treasury's Office of Terrorism and Financial

67.      Clearly, a document issued under this introduction is not law and was never intended to be so.  Moreover, it was not subject to notice and comment.  While at FinCEN, I was involved in the preparation of these SAR Activity Review publications, which were designed to provide feedback to the industry regarding the utility of SAR filings to law enforcement, in response to the industry's continuing request for feedback.[23]  While these reports were helpful to the industry, as well as to the regulators, they were not intended to set forth requirements that would create violations of law.  Indeed, FinCEN itself describes these reports as "feedback."[24] Accordingly, the views presented in such publications should not be relied upon as law or as creating reporting obligations under the law.

68.      Further on this point, the "common scenarios" upon which the Court relied from SAR Activity Review, Issue 15, at 24, as discussed above, were from a section prepared by the staff of the SEC and FINRA, not FinCEN, titled *Suspicious Activity Reviews by Securities Regulators,* to describe "common examination findings" by the SEC and FINRA.  The description of these scenarios were not intended to create, and should not have been interpreted as creating, SAR reporting requirements.  SAR Activity Review, Issue 15, at 20-25.

69.      The Court also cites to FinCEN's Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative ("SAR Narrative Guidance") to provide examples of what

---

Intelligence, Internal Revenue Service, and the Financial Crimes Enforcement Network." *Id.*  Notably, in the initial publication of the SAR Activity Review the SEC was not even included, as in the early years of BSAAG they were not a member, and it was BSAAG that issued these series of publications.  SAR Activity Review, Issue 1, at 1 (Oct. 2000).

[23]     *See, e.g.*, SAR Activity Review, Issue 10, at 39 (May 2006), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_10.pdf; SAR Activity Review, Issue 9, at 43 (Oct. 2005), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_09.pdf.

[24]     SAR Narrative Guidance, a*vailable at* https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf. ("FinCEN provides feedback to financial institutions in the form of advisories, bulletins and other publications such as The SAR Activity Review – Trends, Tips & Issues and By the Numbers.").

FinCEN considers as useful information to include in SAR narratives.  Again, the SAR Narrative

Guidance is not law.  The introduction to this 33-page publication clearly states that it is

"provided solely to assist respective financial institutions in strengthening existing due diligence

initiatives and anti-money laundering programs" and that the information presented in the

guidance "should be used in conjunction with the instructions provided with the appropriate SAR

forms, guidance provided in other FinCEN publications . . . , and respective industry advisories

from the federal regulatory authorities."  SAR Narrative Guidance at 2.  This Introduction makes

clear that the SAR Narrative Guidance is to be used as a tool to aid filers in completing SAR

forms in a manner that will be most helpful to law enforcement, but doing so, and to the degree

requested by FinCEN, has never been mandated in a FinCEN rulemaking.  Further detailing this

point, later in the SAR Narrative Guidance, FinCEN expressly couches the document as

providing "suggest[ions]" for preparing a SAR narrative.  *Id.* at 7.

> 3.     *Function of "Who, What, When, Where and Why"*

70.     Third, the Court created new law insofar as it concluded that Alpine was required,

as a matter of law, to include each narrative with a description of the "Who, What, When, Where

and Why" of the suspicious activity it was reporting.  Decision at 26 (citing *SAR Activity Review,*

Issue 22, at 39-40).  The broker-dealer SAR regulation (31 C.F.R. § 1023.320 (2016)) does not

require that a financial institution complete each narrative with a description of the "Who, What,

When, Where, and Why" of the suspicious activity, and neither do the SAR instructions

themselves.

71.     Contrary to the suggestions by the SEC, the instructions to SAR forms used by

the securities industry between 2002 and 2012 (Form 101 or SAR-SF) and 2012 to the present

(FinCEN Form 111, which is an electronic form submitted online through the BSA E-filing

27

portal) (collectively, "SAR-BD Forms") do not impose specific requirements for what must be included in a SAR narrative.[25]  The instructions for the narrative section of the SAR-BD Forms state "Filers *must* provide a clear, complete and concise description of the activity, including what was unusual or irregular *that caused suspicion*."[26]  The SAR-BD Forms, then, require only that the broker-dealer provide in the narrative section an account of what *the broker-dealer determined* was suspicious about the transaction.  Indeed, that is the very point of the narrative: to help law enforcement understand what the firm concluded about the nature and circumstances of the activity at issue that led to the judgment that the activity at issue was suspicious.[27]

72.    The instructions also include "checklists" couched in similarly permissive, rather than mandatory language: "[f]ilers *should* use the checklist as a *guide* for preparing the narratives."[28]  By using such language, FinCEN chose not to require inclusion of all checklist categories in the SAR narrative.  Purposely, there is no requirement concerning what must be included in a SAR narrative in either the SAR regulations itself (31 C.F.R. § 1023.320 (2016)) or in the instructions to the SAR-BD Forms.  This is directly a result of the fact that the decision to

---

[25] *See* Suspicious Activity Report, 67 Fed. Reg. 50,751 (Aug. 5, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-08-05/pdf/02-19662.pdf; Suspicious Activity Report,77 Fed. Reg. 552 (Jan. 5, 2012) *available at* https://www.gpo.gov/fdsys/pkg/FR-2012-01-05/pdf/2011-33855.pdf; and Suspicious Activity Report, 80 Fed. Reg. 9506 (Feb. 23, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-23/pdf/2015-03584.pdf.

[26] FinCEN, Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements, at 111 (March 2015), *available at* https://bsaefiling.fincen.treas.gov/docs/FinCENSARElectronicFilingRequirements.pdf (emphasis added) ("2015 SAR Electronic Filing Instructions"); *see also* SAR Form 101 at Part VI (similar language).

[27] *See* 2015 SAR Electronic Filing Instructions at 111(stating that filers "should include any other information necessary to explain the nature and circumstances of the suspicious activity.  *Filers should provide any information the filers believe necessary to better enable investigators to understand the reported suspicious activity.*" (emphasis added)).  Given the purpose of the narratives, and the information regulators have indicated they expect to see in such narratives, a decision about what ought to be in the SAR narrative cannot be made prior to a determination that a SAR is necessary.

[28] *Id.* (emphasis added); *see also* SAR Form 101 at Part VI (similar language).

file a SAR and what to include in a SAR narrative are subjective ones and the circumstances that give rise to the suspicion vary.

73.     Even if the "Who, What, When, Where and Why" of the suspicious activity were required, as a matter of law, to be included in each narrative section, however, it is not the case that the narrative must include every piece of information in the firm's supporting documentation or in its AML program as guidance for analyzing activity that may be suspicious, even if that information might be deemed from a third party's perspective as potentially relevant to a suspiciousness determination. Rather, the purpose of the narrative is to explain why the firm, *in its subjective determination*, concluded—based on, among other things, the firm's knowledge of the client, the client's historic and anticipated activity, and the product at issue—that the particular transaction at issue was potentially suspicious. The "why", in other words, is the *firm's rationale* for filing the SAR at the time, not the rationale of another hypothetical third party who might have filed the SAR for different, or additional reasons, perhaps with the benefit of hindsight and additional time.

                            *4.     Not Every "Red Flag" Need Be Included In The SAR Narrative*

74.     Fourth, the SEC has taken the position, and the Court has adopted the position, that if a firm identifies activity by recognizing one or more "red flags," the firm must, as a matter of law, include each and every such "red flag" in the SAR narrative. That is not accurate.

75.     There simply is no requirement in the SAR instructions or guidance requiring the discussion of specific, or any, "red flags." To read these requirements into the rule imposes obligations over and above what is mandated.

76.     While I was at FinCEN, I was heavily engaged in clarifying the manner in which the BSA regulations should be applied to clearing and introducing brokers, both with respect to

which had customer identification and Section 312 compliance obligations, and the extent to which each should be expected to identify and report suspicious activity.  I wrote regularly for the SAR Activity Review, including guidance that was published noting that the existence of a "red flag" did not necessarily mean that the "red flag" itself was relevant for inclusion in the SAR that may be submitted.[29]

77.     Based on my experience, "red flags" are not *per se* suspicious scenarios, but rather, are indicators that might prompt an inquiry into an activity that may or may not rise to the level of reportable activity.  As the Court observed, Alpine's WSPs are consistent with this principle.  *See* Decision at 4.

78.     "Red flags" are means by which a firm may identify activity that should be examined to determine if there may be suspicious activity for which a SAR should be filed.  However, the "red flag" often will have nothing to do with suspicious activity that may ultimately be identified.

79.     If firms are required to include every "red flag" in the firm's possession in the SAR narrative, regardless of whether such "red flag," upon investigation, is truly indicative of suspicious activity, there is a significant risk that SAR narratives will include irrelevant and extraneous information, which will water down the information contained in the BSA database and ultimately be counterproductive to law enforcement that utilizes the database.  In other words, if firms are required to include in their narratives every potential red flag regarding the transaction and relevant parties, the basis for the firm's decision that the activity is suspicious may well get lost in the weeds. It is also not always possible for a firm to develop "red flag" information because that information may be unavailable to the firm and the firm will not have,

---

[29] SAR Activity Review, Issue 10, at 44-46 (May 2006).

Loew Declaration
April 20, 2018

as law enforcement and regulatory authorities do, police powers that may be used to compel
production of the information.

80.     Insofar as the SEC argues, and the Court has agreed, that particular "red flags"
must necessarily be included in the SAR narrative as a matter of law whenever such information
is available to the firm, that position is not consistent with the fundamental principle that the
point of the narrative is to identify *the firm's basis* for concluding that the activity at issue is
suspicious.  If that "red flag" did not lead to the firm's decision to file a SAR, it simply is not a
required element of the SAR narrative.

81.     With respect to the "red flags" discussed by the Court, the Court read as
mandatory the permissive guidance issued by FinCEN and the permissive language included in
the SAR instructions regarding the completion of the checklist.  The mere existence of a "red
flag" does not necessarily mean that the "red flag" itself is either relevant for inclusion in the
SAR that may be submitted, nor is it required to be included in the SAR narrative.  Indeed, firms
may well conclude, after investigating, that the "red flags" that prompted their investigation were
not sufficient to warrant a SAR filing, but that other information the firm uncovers in its
investigation does warrant a SAR filing.  In that instance, the information that led to the SAR
filing should be included in the SAR narrative, not the "red flags" that the firm concluded after
investigation could be explained or were irrelevant.  By way of example, the fact that an issuer's
CEO was convicted of a DUI when he was 22, with no subsequent criminal history in the next 40
years, may well not be relevant to an analysis as to whether that issuer's stock is the subject of
market manipulation.  And providing that information in a SAR will not likely be helpful to law
enforcement.  Accordingly, creating a bright-line rule, for the first time in the history of the BSA,

that criminal history *must* be included in the narrative as a matter of law simply does not advance the fundamental purpose of SARs; in fact, it is counterproductive.

82.     It is also worth noting that there is no published, comprehensive list of "red flags" that industry participants can use to satisfy the standard the SEC would have the Court adopt. While there are some advisories and pieces of guidance that define certain potential "red flags" for particular kinds of activity, products, clients, and markets, those lists are neither comprehensive nor stagnant.[30]  Rather, as demonstrated by the fact that the SEC was relegated to relying on settled cases to identify certain "red flags" it claims Alpine should have included in its SAR narratives, regulators and industry participants are continually identifying new "red flags" as criminals become more sophisticated or change strategies, financial products change and evolve, and as industry participants and regulators identify new ways of identifying potentially illegal conduct.  To suggest that firms are required to include in each SAR narrative each "red flag" that the SEC has in its mind, when those "red flags" are not defined in a comprehensive manner in any particular piece (or even pieces) of guidance by the SEC (or any other regulator) is fundamentally unfair to industry participants and sets a changing and evolving standard that, practically speaking, no firm can ever live up to.  Moreover, insofar as the SEC has relied on "red flags" identified for the first and only time in settled cases,[31] the SEC seeks to elevate settled cases to settled law, bypassing appropriate rule-making procedures or even independently adjudicated decision-making.

---

[30] *See* FinCEN, FIN-2006-G013, Frequently Asked Questions Suspicious Activity Reporting Requirements for Mutual Funds, FAQ 7 at 4 (Oct. 4, 2006) ("The means of commerce and the techniques of money launderers are continually evolving, and there is no way to provide an exhaustive list of potentially suspicious transactions.").

[31] *See, e.g., In re Albert Fried & Co.*, SEC Release No. 77971, 2016 WL 3072175, at *5 (June 1, 2016) (cited by the Court in its Decision at 54 & n.24).  Contrary to the Court's Decisions at 54 this was not an adjudicated decision by the SEC.

83.     Not only is it fundamentally unfair, unwieldy, and inconsistent with regulatory guidance to require firms to include in each SAR narrative every "red flag" it happens to have information about, it is also unnecessary.  It should be recognized that there are all types of SARs.  Some necessitate more explanation than others.  Indeed, the fact that a person with a criminal history conducts a financial transaction does not necessarily indicate that the transaction is inherently suspicious.  If so, every transaction over $5,000 of every felon who is now gainfully employed, including a routine paycheck, would trigger a suspicious activity inquiry and filing.  What is, however, new and potentially helpful information is the firm's explanation as to why, based on the facts and circumstances of a particular transaction, the firm concluded the activity was suspicious, assuming sufficient information exists the allows the firm to articulate what the suspicion is.  Often, a correspondent firm in any industry will be one or more places removed from an initial transaction.  It may not have the ability to articulate its suspicion, or even identify the person(s) conducting the suspicious transactions.  Neither of these render a SAR fatally flawed.  Indeed, in the Tax Haven report of the Senate's Permanent Subcommittee on Investigations, a tax evasion scheme of the founders of a national retailer was identified through the filing of a SAR by a clearing firm that could only develop alternate theories as to why the activity it reported might be suspicious and that could not identify the persons engaged in the identified transactions.  As imprecise as it was, the SAR was sufficient as filed and additionally fulfilled its purpose.[32]

84.     As a rule, securities regulators are knowledgeable regarding low priced securities and may not need to have information spelled out that is evident from the SAR, and have access

---

[32] *See* U.S. Senate Permanent Subcomm. on Investigations, Tax Haven Abuses: The Enablers, The Tools, and Secrecy, at 316-49 (Aug. 2006).

to an enormous breadth of information relevant to low priced securities.  This case is noteworthy for its treatment of guidance as effectively creating new AML regulatory requirements.  For firms, and especially clearing firms, that have significant low priced stock transactions, this case may portend a sea change.

>    5.    *SAR Supporting Documentation Is Deemed Incorporated Into The SAR*

85.    Fifth, a conclusion that SAR narratives must include each and every piece of information about the transaction or the subject of the SAR in order to avoid being "fatally defective" does not take into account the fact that SAR supporting documentation is deemed incorporated into the SAR.

86.    Specifically, under FinCEN regulations, SAR supporting documentation is "deemed to have been filed with the SAR."[33]  The rationale for that is that it enabled FinCEN, law enforcement and supervisory agencies in the exercise of its supervisory functions to obtain the SAR or SAR supporting documentation underlying the SAR without a subpoena.[34] If such information is deemed to have been filed with the SAR, therefore, the inclusion of the alleged missing information in the supporting documentation provided to law enforcement upon request cures any such alleged deficiencies in the narrative.

87.    FinCEN defines SAR supporting documentation as "all documents or records that assisted a financial institution in making the determination that certain activity required a SAR

---

[33] 31 C.F.R. § 1023.320(d).

[34] *See* FinCEN, FIN-2007-G003, Suspicious Activity Report Supporting Documentation at 2 (June 13, 2007), *available at* https://www.sec.gov/about/offices/ocie/amlmf/fin-2007-g003.pdf.  This provision provided relief from the Right to Financial Privacy Act, which generally prohibits financial institutions from disclosing a customer's financial records to a government agency without service of legal process, notice to the customer and an opportunity to challenge the disclosure.

filing," which "depends on the facts and circumstances of each filing."[35]  According to FinCEN

guidance, SAR supporting documentation may include "transaction records, new account

information, tape recordings, e-mail messages, and correspondence"[36] and "copies of

instruments; receipts; sale, transaction or clearing records; photographs; and surveillance audio

or video recordings."[37]

88.     The Court concluded that the information in the supporting documentation should

have been included in the SAR.  The Court's decision was apparently made without the

knowledge that such information is deemed filed with the SAR, and is available to appropriate

law enforcement and regulatory authorities on request, who may seek the information without

exercising its subpoena authority.

**D.     "Failure to File" Theory.**

89.     I likewise believe that the Court would have benefited from expert testimony prior

to rendering a decision as to whether Alpine, as a matter of law, failed to file SARs with respect

to liquidations of securities.

90.     First, as described above, the decision whether to file a SAR is a judgment call by

a firm based on all the facts and circumstances and information available to the firm at the time

of its determination as to whether to file a SAR.  Regulators have clearly stated that those

judgment calls ought not be second-guessed absent good reason.

91.     Second, given that SAR decision-making is based on the facts and circumstances

available to the firm, rendering a decision as a matter of law without the benefit of discovery

---

[35] FinCEN, FIN-2007-G003, Suspicious Activity Report Supporting Documentation at 2 (June 13, 2007), *available at* https://www.sec.gov/about/offices/ocie/amlmf/fin-2007-g003.pdf.

[36] *Id.*

[37] 2012 SAR Electronic Filing Instructions at 85.

from the individuals at the firm who made the decision not to file a SAR, to understand why they determined that a SAR was not necessary, is unfair, particularly considering there is no requirement, but rather only a best practice, that a firm document the bases for the conclusion that activity does not warrant a SAR filing.[38]

92.     Third, it is not the case, based on my experience, that every liquidation following a deposit is necessarily suspicious.  To the contrary, it is common in the microcap market that liquidations are followed by deposits, and that fact alone is not *per se* suspicious.  Consistent with the relevant guidance, courts and regulators need to understand the facts and circumstances surrounding the liquidations to determine whether the liquidation is, in fact, potentially suspicious.

93.     Fourth, insofar as the Court concluded that SARs needed to be filed on liquidations because the liquidations were a "pattern of activity," the Court could have benefited from expert testimony on that subject.  A deposit and sale is a normal transaction in the securities business—not a pattern of activity.  To suggest that a SAR be filed both on deposit and on liquidation, when that is a typical pattern with respect to securities in general and microcaps in particular, would require firms to over-paper the SAR database, making the data therein more difficult to parse through and less useful for law enforcement and regulatory authorities.  In any event, without more, a pattern of activity is not in and of itself suspicious.

94.     Finally, insofar as the Court's ruling was premised on a view that firms are required to file continuing activity SARs, I note that the SEC apparently did not rely on a continuing activity theory.  Nor could it have, given that FinCEN's instructions regarding

---

[38] FFIEC Examination Manual 2014 at 68; FFIEC Examination Manual 2010  at 75-76.

continuing activity SARs are guidance and are not required by law.[39]  In fact, the SEC could not

rely on a continuing activity theory because a liquidation or sale is not the same as a deposit, and

certainly is not a continuation of the same activity.  As a result, by definition, a continuing

activity SAR would not have been required as a matter of law.

       E.       **"Failure to Timely File" Theory.**

95.      The Court concluded that certain SARS were untimely, erroneously calculating

the start of the timeframe for filing from the date the transaction occurred.  The Court set forth

FinCEN's guidance relating to timing of SARs correctly, but the application of that guidance is

wanting because the Court was not informed about the rationale for the issuance of the guidance.

The Court may have found it helpful to understand why that guidance was issued and the

purpose of the guidance.

96.      As it happened, many firms were concerned that with the volume of alerts that

they receive, they could not research the suspicious nature of the alerts within the 30 day time

period.  The industry was concerned that it would be expected to analyze a transaction as soon as

it became aware of it, which was clearly impossible given the numbers of transactions that

generated potentially suspicious activity alerts.  As a result, there was dialogue between FinCEN

and the BSAAG over a number of years, which resulted in the guidance that was issued.  In

---

[39] The SAR Activity Review cited by the Court is clearly described as guidance throughout the publication. *See* SAR Activity Review, Issue 21, at 53 (May 2012), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_21.pdf (listed under Section titled "Issues & Guidance" where FinCEN provides guidance that "[f]inancial institutions with SAR requirements *may* file SARs for continuing activity"); SAR Activity Review, Issue 8, at 32-33 (April 2005), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_08.pdf ("Technically, FinCEN's suspicious activity reporting rules require a Suspicious Activity Report for each suspicious transaction. However, for ongoing suspicious activity, and to reduce the burden on financial institutions and law enforcement, FinCEN provided the above *guidance* to allow for updates every 90 days. FinCEN welcomes discussion of this *guidance* and will continue to consider the issue within the context of current regulations." (emphasis added)).

particular, FinCEN explained that it was not their expectation that a decision regarding SAR

filings be reached from the time when the activity alerted, but from when the decision was

reached that the activity was suspicious.  Here, as I understand the facts, and as the Court pointed

out, the AML officer reviewed the transaction and determined that it was not suspicious.  Under

these circumstances, this would not be a case of negligence, as the Court implied, but an exercise

of the subjective judgment that was made at the time of a SAR filing (or no SAR filing)

determination.

   97. It appears to me, based on the timing of the filing of the SARs at issue that the

firm may have filed the allegedly untimely SARs after it was encouraged or directed by an

examining authority or independent auditor to do a lookback with respect to certain transactions.

*See* Alpine Sec. Corp.'s Memorandum of Law in Opposition to Plaintiff's Motion For Partial

Summary Judgment at 38 (Jan. 19, 2018) (ECF No. 87) ("[E]mployees of Alpine undertook in

essence a look-back, reviewing transactions cleared through Alpine during the former

employees' tenure, including the five sample transactions at issue, to determine whether any of

those transactions could warrant a SAR filing.").  Lookbacks are often undertaken after internal

or external audits or compliance examinations, and often are directed in examination or

deficiency reports, cease and desist orders, and as part of the imposition of civil penalties for

willful or negligent systemic breakdowns of AML programs.  When the firm conducted its

review of prior activity, for whatever reason, and then determined to file a SAR based on the

results of that prior review, the time frame for filing the SAR began, and not before.

   98. I note that the Court rests its conclusion that Alpine only had 30 days from the

date of the transaction to file its SAR, on its reading of the Customer Due Diligence Rule's

("CDD") rule.  That rule, however, is not yet effective, and regulators have not even had an

opportunity to interpret, apply, and charge firms with failure to comply with it.  In any event, the

primary focus of that rule is customer due diligence; it does not purport to impose new

requirements with respect to SAR filings.  For the Court to apply it in this way, before regulators

have even had a chance to do so, will create significant confusion in the industry, and indeed

new substantive rules that have not been subject to notice and comment as required by the APA.

99.     While the CDD rule does state that, effective May 11, 2018, firms have an

obligation to conduct "ongoing monitoring," there is no language anywhere in the rule that states

that a firm must determine on the day the activity happens whether such activity is suspicious.

Likewise, there is no language in the CDD rule that suggests Treasury is overruling its prior

guidance about when a SAR must be filed.  In that regard, as the Court acknowledged, prior

guidance is clear that the date of the transaction is not the measuring date for SAR filings.  *See,*

*e.g.*, SAR Activity Review, Issue 15, at 15-16 (holding that reviews must be completed in a

"reasonable period of time"—not immediately upon the occurrence of the transaction). In other

words, no party contends that Alpine violated the new CDD rule, and it would be anomalous,

improper, and fundamentally unfair for a Court to apply and interpret a rule that is not yet

effective.[40]

100.     The Court also appears to rely in its analysis with respect to the timeliness of SAR

filings on its belief that FINRA approved Alpine's AML procedures.  March 2018 Decision at

33, 71.  As noted in FINRA's Small Firm AML Template, *it is senior management of the broker-*

---

[40] The Court also cites to FINRA Rule 2090 for support for why customer due diligence is required for AML purposes. *See* Decision at 32, n.14.  This citation is misplaced, however, as FINRA Rule 2090 is not an AML rule; rather, it requires that broker-dealers obtain sufficient information from a customer for know-your-customer purposes and suitability purposes.  *See* FINRA, Anti-Money Laundering Template for Small Firms, *available at* http://www.finra.org/industry/anti-money-laundering-template-small-firms.   Information that is obtained by a broker-dealer from a customer for a suitability determination is not necessarily shared with the firm's compliance department for AML purposes. Indeed, it is not required to be shared and FINRA Rule 2090 is not even cited in the SEC's AML Source Tool for Broker-Dealers.

*dealer* that approves the policies and procedures of the firm, not FINRA.  *See* Small Firm AML

Template at 53 (emphasis added).[41]

101.    The Court's suggestion that FINRA was delegated AML responsibility from

FinCEN and approves AML policies and procedures (*see* March 2018 Decision at 33) is not

accurate and may well create confusion.  Indeed, Rule 17a-8 and FinCEN's AML rule, each of

which was developed to leverage the examination capabilities of the SROs, were designed *not* to

be delegations of authority to the SROs.

102.    At bottom, broker-dealers require the time and flexibility regulators have plainly

afforded the industry to adequately review and assess alerts.  Indeed, firms simply do not have

the time to assess each and every alert the day such alerts trigger.  Moreover, even after the alerts

are reviewed and indicia of something suspicious appears, cases need to be commenced, and an

investigation must be conducted.  Those investigations require time, frequently more than 30

days.  The 30-day filing requirement has been liberally interpreted since at least 2005, when I

first joined FinCEN.

**F.      Violations of the SAR Rules Require A Showing of Scienter.**

103.    In denying Alpine's motion for judgment on the pleadings, the Court held that,

because Section 17(a) of the Exchange Act and Rule 17(a)(8) are the SEC's basis for bringing

claims against Alpine, and those authorities do not require a showing of scienter, the SEC need

not demonstrate scienter in order to establish liability for the alleged SARs violations at issue.

*See* March 2018 Decision at 40-41.  It is my opinion based on my years of experience

---

[41] The FINRA Small Firm AML Template provides text examples, instructions, relevant rules and websites and other resources that are useful for developing an AML plan for a small firm. I reviewed and provided comprehensive comments on proposed revisions to FINRA's Small Firm AML Template, which were submitted by FINRA to FinCEN.

administering and advising on the federal AML regulatory scheme that, if adhered to, that

holding dramatically rewrites the BSA and its implementing regulations.

104.    Specifically, despite being cloaked as a claim under Section 17(a) of the

Exchange Act and Rule 17a-8 promulgated thereunder, the SEC's claims in this case are

fundamentally grounded in alleged violations of the SAR requirements of the BSA and its

implementing regulations.  The broker-dealer rule, notably, was adopted solely by FinCEN after

Congressionally-directed consultation with the SEC.  This indicates that Congress never intended

for the BSA to be administered by the SEC under the Exchange Act.  FinCEN administers and

enforces the BSA through information about compliance by BSA-regulated entities through

delegations of examination authority among numerous other federal agencies. The manner in

which Congress amended the BSA in 2001 fails to follow the joint administration provisions that

have long been employed by Congress.

105.    Notably, unlike the strict liability standard applicable to claims under Section

17(a) and Rule 17a-8, liability for civil monetary penalties arising from violations of the BSA

and its implementing regulations expressly requires the government to plead and prove that the

violations were committed willfully or negligently.[42]

106.    Even if it were the case that the SEC has enforcement authority for violations of

the BSA, there is no justification for allowing the SEC to cherry pick which aspects of the BSA

and its implementing regulations apply when purportedly exercising that enforcement authority.

Under the March 2018 Decision, the resulting construct is one in which either FinCEN or the

SEC can bring an enforcement action for an alleged violation of the BSA, with the former

required to plead and prove scienter and the latter operating under a strict liability standard.  That

---

[42] *See* 31 U.S.C. § 5321(a)(1), (6); *see also* 31 C.F.R. § 1010.820(f), (h).

Loew Declaration
April 20, 2018

end run around the plain language of the BSA and its implementing regulations is irreconcilable with Congressional intent.

107.    Moreover, such a rule not only gives the SEC enforcement powers more powerful than those available to FinCEN, but also paves the way for broker-dealers subject to the Exchange Act to be treated more harshly than other financial institutions for alleged violations of SAR reporting Rules.  This is because, under the Court's decision, broker-dealers will now be subject to a strict liability standard for BSA violations, while other financial institutions will not. Accordingly, if a broker-dealer and financial institution were to have the exact same unwitting SAR filing deficiencies, the broker-dealer would be subject to penalties, whereas the other financial institution would not.   This is contrary to FinCEN's "ongoing efforts to level the compliance playing field across all financial sectors in the AML arena."[43]

### G.    Unintended Consequences to the Securities Industry and Other Financial Institutions Subject to the BSA.

108.    Given the broad impact that the March 2018 Decision will have on the industry, I believe it is important that the Court have a better understanding of the AML obligations of the securities industry, the relationships between clearing firms and introducing firms, and how the industry presently handles its AML responsibilities.  As written, it is my view that the Decision creates unintended consequences and changes how the industry performs its AML obligations. This is particularly problematic in this case because the Court did not have the benefit of any expert opinion or input from FinCEN, the agency that is responsible for administering the BSA and interpreting the AML obligations of the industry.

---

[43] FinCEN Dir. Jennifer Shasky Calvery, Statement at ABA/ABA Money Laundering Enforcement Conference (Nov. 16, 2015), *available at* https://www.fincen.gov/news/speeches/jennifer-shasky-calvery-director-financial-crimes-enforcement-network-5.

109.     It is my considered opinion that the March 2018 Decision imposes obligations above and beyond what industry participants understand is required, as well as above and beyond the standards to which their regulators have to date held them.  As a result, firms will be required to undertake significant reassessments of their SAR filing programs and incorporate requirements that have not until this point been in place.  Firms will, moreover, be held to standards that are impossible or nearly impossible to satisfy.  For example, as discussed above, the notion that a firm must—as a matter of law—file a SAR within 30 days of a transaction in order to be in accord with the law, simply does not reflect a realistic expectation or a full understanding of the importance of the guidance that the industry worked in tandem with regulators to develop.

110.     Moreover, requiring incredibly detailed narratives that will be second-guessed by regulators and treated with the same severity as a failure to file a SAR will likely compel firms to be overly detail-oriented, which may have minimal benefit to law enforcement.  Seasoned readers of these SARs likely do not require such level of detail in making a determination regarding whether to further investigate a matter.  Similarly, requiring a discussion of "red flags" listed in guidance in the SAR narrative that are not relevant to the reason the financial institution determined the transaction was suspicious or filed the SAR would have little to no benefit to law enforcement.

111.     Furthermore, according to the notices for comment from both August and November of 2002 relating to the SAR-SF form, the burden for completing the SAR-SF form was to be approximately 40 minutes.[44]  In 2015, the expected burden had risen to one hour,

---

[44]     *See* Suspicious Activity Report, 67 Fed. Reg. 70,808 (Nov. 26, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-11-26/pdf/02-30055.pdf; Suspicious Activity Report, 67 Fed. Reg. 50,751, 50,752 (Aug. 5, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-08-05/pdf/02-19662.pdf.

Loew Declaration
April 20, 2018

where it remains today.[45]  If the industry were completing SARs in the manner the Court's

Decision requires, financial institutions would be forced to dedicate significantly more time and

resources than was initially estimated under the SAR rulemaking.  Indeed, financial institutions

would also be forced to dedicate significantly more resources to completing SARs in a manner

that is not required by regulation.


WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 20th day of April, 2018

_____

BEVERLY E. LOEW

---

[45] *See* Suspicious Activity Report Submission for OMB Review; Comment Request, 80 Fed. Reg. 33,339, 33,339 (June 11, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-06-11/pdf/2015-14280.pdf.

# Exhibit A

## Exhibit A

# *Rangeley Holdings, LLC*

**Beverly E. Loew**

+1 (703) 665-9486 (p)  •  +1 (571) 418-8123 (f)

Credentials of Beverly E. Loew

Bank Secrecy Act and Anti-Money Laundering Regulations

Spring 2018

---

### SUMMARY

Beverly Loew has spent more than 30 years as a legal, regulatory, transactional, and management professional in and around the financial industries. Based in the U.S. for most of her career, Loew has extensive experience advising government officials and business leaders overseas. A financial regulatory and commercial attorney and advisor on matters involving the administration of government agencies, she is best known for her expertise in the Bank Secrecy Act and the regulations implementing it (collectively, the "BSA"), which have been adopted to protect the financial system from money laundering, terrorist financing, and other unlawful financial activity.

**Private Legal Practice**. In early 2014, Loew established a boutique law practice specializing in the BSA, economic sanctions programs, and anti-corruption law, including their intersection with the Commodity Exchange Act ("CEA") as it was amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act, federal securities laws, regulation of the swap markets, federal banking, consumer protection, tax, and privacy laws. Attention is particularly

3650 South Glebe Road, Unit 340, Arlington, Virginia 22202
bel@beverlyloew.com • www.beverlyloew.com

placed on the efficiency and effectiveness of client compliance programs, managing compliance costs, ensuring that audits and regulatory examinations are consistent with established regulatory policy, and mitigating enforcement risk. She also provided litigation services to a leading law firm in the U.S. in the defense of clients offering financial services in high-risk jurisdictions, revising responsive pleadings to address the complainant's examination practices and regulatory interpretations, which led to pre-hearing settlements in favor of the clients.

Among other engagements, Loew presently is advising the Central Bank of a developing European country engaged in regulatory reform to establish a risk-based anti-money laundering regime and modernize its enforcement mechanisms.  One aspect of that work has focused on analyzing and resolving jurisdictional disputes between the Central Bank and other ministries and agencies with roles in the country's AML compliance scheme similar to those of various federal agencies in the United States, including the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") and the Securities and Exchange Commission.

Loew additionally has represented a holding company with regulated market utilities on three continents, recommending policies, procedures and controls, which included supplementing transaction monitoring criteria, developing a central records repository to facilitate regulatory reporting, adopting global audit practices, and harmonizing practices for responding to regulatory inquiries and compliance examinations. She advised a multinational Fortune 500 company achieving compliance with derivatives regulations that would permit the company to register as a swap dealer with the Commodity Futures Trading Commission, providing regulatory analysis on registration timing that allowed the company to delay program implementation and redirect budget to more immediate priorities.

With a partner attorney, she advised the founders of a start-up company seeking to raise capital on how to do so pursuant to the Securities Exchange Act, including providing an analysis of the costs and benefits of using the exemption for private placements or recently finalized crowdfunding regulations. When practicing law earlier in her career, she advised a derivatives clearing organization for merchant energy trades – predominantly bilateral swaps in the electricity and natural gas markets – initially established with a governance structure that was inconsistent with then-applicable federal law, revising its rules and by-laws to allow it to commence operations consistently with the Commodity Exchange Act and the Public Utility Holding Company Act.

**Commodity Futures Trading Commission**. Previously, Loew spent more than five years as an assistant general counsel at the U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") where she was engaged in oversight of the rulemaking and adjudicatory programs administering the CEA. She led the Office of General Counsel's administrative law efforts for the rulemakings that were proposed to implement section VII of Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which added commodity swap dealers, trading mechanisms, and clearing into the Commission's regulatory jurisdiction.

Loew coordinated assistance to more than 30 Dodd-Frank rulemaking teams and agency leaders on compliance with applicable statutes, which included overseeing the drafting and publication of more than 30 Federal Register releases. She additionally coordinated the development of internal orders, and guidance documents developed to harmonize and publicize agency-wide practices for engaging with industry and other interested parties, focused

significantly on statutes related to government accountability to ensure agency transparency and inclusiveness in its rulemaking process.

She provided training to Commission staff on specialized topics, including compliance with the Federal Register's publication requirements, the Government in the Sunshine Act, and the Freedom of Information Act, and defenses to Right to Financial Privacy Act challenges in enforcement proceedings. She drafted, reviewed, and/or negotiated memoranda of understanding with other federal financial regulators and foreign regulatory authorities for purposes of facilitating regulatory cooperation and information sharing within the limits of each regulator's statutory jurisdiction and legal authority.

Loew routinely advised the Commission and its enforcement division on the BSA obligations of CFTC-designated and regulated entities, most notably related to identifying and reporting suspicious activity of individual market participants who were charged with violations of the CEA after conducting transactions through those entities. She notably led negotiations with FinCEN on behalf of the Commission to secure appropriate access to reports filed with Treasury under the BSA for the enforcement activities of the Commission and the registration functions of National Futures Association, the self-regulatory organization delegated to perform those functions for the Commission subject to express statutory authority.

As part of the BSA information sharing and report access effort, she counseled the Commission, its officers, employees, and agents on the limits of BSA implementing and enforcement authority of all self-regulatory organizations operating as non-governmental actors under the CEA. Because of her ability to interpret the BSA and the CEA at their crossroads, the Commission was granted broader access to BSA reports than any other federal or state supervisory or civil regulatory agency.

Loew – 4

**<u>Department of Treasury, Financial Crimes Enforcement Network</u>**. Loew joined the CFTC after serving as a regulatory policy officer at FinCEN, where she received its Visionary of the Year award in 2007 for leading efforts to apply the Bank Secrecy Act most notably to the securities, futures, and money services industries, harmonizing those industries' rules with others also subject to BSA compliance. She engaged eight stakeholder agencies in those efforts, coordinated the activities of numerous staff members on a regular and project-by-project basis, advised the Department of Treasury's main office on responding to high-risk industry activities with foreign policy implications, and counseled Department of Justice officials on applying the Bank Secrecy Act in then-novel prosecutions.

Loew represented the agency at key industry conferences and trade association meetings each year, before Congressional oversight committee staff and with foreign regulatory authorities, and as liaison to the U.S. Department of Treasury's Bank Secrecy Act Advisory Group Securities and Futures Subcommittee. She traveled with a Treasury and State Department delegation to Latvia after section 311 special measures were imposed on two of its banking institutions and to Madrid for discussions with Spain's Ministry of Finance and the secretariat of the International Organization of Securities Commissions. She advised the Department of State on how and whether to impose Bank Secrecy Act provisions to the banks in a frozen conflict region to apply pressure to regional separatists and the governments that facilitated them.

She was engaged on numerous matters related to Financial Action Task Force ("FATF/GATI") recommendations. This included advising the Department of Treasury on the development, interpretation, and implementation of FATF/GATI's recommendations in general, as well as contributing to the department's written response to FATF/GATI's mutual evaluation of U.S. anti-money laundering regime and working with the delegation of FAFT/GATI members

who visited the U.S. to follow up on key issues in the response. She routinely briefed senior Treasury staff, who often had little or no exposure to the structure of financial markets overseas or the operations of intermediaries and market mechanisms outside the U.S., preparing them to participate in comprehensive mutual evaluations of other FATF members, particularly with respect to identifying and addressing complex policy issues as they related to local laws, industry operations, and customs.

**Adjunct Professorship**. Loew additionally spent a year as an adjunct professor at New York Law School, co-teaching a highly regarded, graduate-level seminar on the Bank Secrecy Act and Anti-Money Laundering Regulation. The course in particular covered the regulation of banks, broker-dealers, futures commission merchants, and money services businesses, the cross-section of the BSA with functional and other financial regulation, as well as the Privacy Act, the Gramm-Leach-Bliley safeguards, the Right to Financial Privacy Act, and U.S. sanctions programs.

**U.S. Agency for International Development**. Earlier in her career, Loew spent four years at the U.S. Agency for International Development ("USAID") and with USAID-funded projects, implementing programs to develop financial market regulatory regimes and market infrastructure to support privatization in emerging former Eastern Bloc economies. She and her colleagues implemented early rule of law projects, most significantly anti-corruption and corporate governance efforts, in addition to advising a Central Bank in the region on addressing Russian money laundering through its banks and securities depository.

She notably implemented a project to open a securities clearinghouse in the agency's flagship program, in efforts that included establishing the first regional contract for evaluation services. She successfully worked with the central banks, financial regulators, and

clearinghouses in two countries to develop subsequently adopted legislative initiatives to establish netting by novation and nominee-name ownership to support clearing and global custody facilities.

**Early Career**. Before joining USAID, Loew spent several years in trading and sales management in the institutional bond departments at major Wall Street firms, and as an advisor to non-profit companies engaged in activities related to government and the financial industry.

**Education and Licenses**. Loew was graduated cum laude from Wheaton College in Norton, Massachusetts and from New York Law School. She is a member of the New York and Virginia bars.

## BSA-RELATED PROFESSIONAL ACHIEVEMENTS

**Visionary of the Year Award, 2007**

Loew was one of two FinCEN officers to receive FinCEN's Visionary award in the five years after it was established. The award "recognizes a FinCEN employee who has been a catalyst for change, who searched for opportunities to change the status quo, sharing innovative ways to improve FinCEN products and services through creative ways to increase productivity and efficiency. This person not only envisions the future but also enlists others in their quest to reach that future by sharing power, information and maintaining an optimal team spirit."

## SPEAKING ENGAGEMENTS

- **2005**

Anti-money laundering seminar sponsored by the U.S. Embassy in Riga, Latvia (Sept. 14, 2005). "The Dangers of Money Laundering and Terrorist Financing."

Investment Adviser Association Hedge Fund Advisers Compliance Conference, (Nov. 9-10, 2005). Substituted for FinCEN Associate Director William Langford on a panel discussing proposed anti-money laundering rules for hedge funds and investment advisers.

- **2006**

Bloomberg LLP: Hedge Funds Enter the World of Anti-Money Laundering Compliance (Mar. 23, 2006).

SIA Anti-Money Laundering and Financial Crimes Conference (Mar. 28, 2006). Substituted for FinCEN's Langford on a "recent developments" panel to discuss the implementation issues facing clearing brokers with respect to the recently published special due diligence program rules for correspondent and private banking accounts (implementing section 312 of the USA PATRIOT Act), and FinCEN's plan to address them.

Futures Industry Association Law and Compliance Division Annual Seminar (Apr. 2006). Served as AML expert on the international regulation panel. Discussed section 312 and customer identification program implementation issues facing executing and clearing futures commission merchants with respect to the special due diligence rules for correspondent and private banking accounts, particularly with respect to tri-party give-up agreements.

USA PATRIOT Act: Recent Developments on Money Laundering for Broker-Dealers, D.C. Bar Continuing Legal Education (June 26, 2006). Substituted for FinCEN's Langford.

12th Annual Anti-Money Laundering & Compliance Forum (Sept. 19-21, 2006). "The Proposed AML Rule for Hedge Funds: A Great Leap Forward into Deep Water?"

SIA Compliance and Legal Division Fall Compliance Seminar, New York (Nov. 13, 2006). Served on the anti-money laundering compliance panel, addressing recent FinCEN rules and guidance, FinCEN's shell company study and guidance, the pending section 312 enhanced due

diligence rules that were not finalized earlier that year, and the applicability of general themes from significant enforcement cases in the banking arena, including the civil money penalty actions against ABN Amro, Arab Bank, and Israel Discount Bank.

NASD Fall Securities Conference, Los Angeles (Nov. 16, 2006). Spoke on AML compliance panel on the obligations of broker-dealers conducting securities business through clearing brokers under varying clearing contract allocations, as well as piggybacking relationships. Topics included compliance with the section 312 and SAR reporting rules, as well as pending guidance on section 314(a)/313/319(b) certifications.

FIA "Know Your Customer" Compliance Luncheon, in New York with audio to Chicago (Nov. 8, 2006). Spoke about longstanding AML implementation issues facing futures commission merchants and introducing brokers, including the section 312 guidance that was issued in response to an industry inquiry in Spring 2006, and a request that was submitted jointly to FinCEN and the CFTC on the application of customer identification programs. Was the second most highly attended monthly luncheon in more than a decade.

Institutional Investor Anti-Money Laundering and Counter-Terrorist Financing Forum (Nov. 13-14, 2006). Addressed the harmonization of BSA rules across industries, and the application of BSA regulation to new industries.

- **2007**

AMLAC (Anti-Money Laundering & Compliance Forum) West (Feb. 26-28, 2007). Spoke on a panels addressing "the challenges of complying with section 312 of the US[A] Patriot Act for private banking operations," "analyzing section 312 compliance issues for correspondent accounts," and "managing section 312 and OFAC compliance issues for broker-dealers, hedge funds, clearing firms, mutual funds, and other institutional businesses."

SIFMA Anti-Money Laundering and Financial Crimes Conference (Mar. 12, 2007). Served on the section 312 panel, addressing implementation and ongoing compliance issues for broker-dealers, most notably clearing and introducing brokers, following the issuance of comprehensive guidance previously. Additionally addressed complex definitions, including the difficulty of identifying broker-dealers, futures commission merchants, and mutual funds, defined as foreign financial institutions, when serving customers in universal banking environments, as well as the difficulty applying the term private banking in the securities industry context.

Futures Industry Association Law and Compliance Division Annual Seminar (Spring 2007). Served as AML expert on the "Soup to Nuts" panels and addressed recent regulatory events on the international regulation panel.

Investment Company Institute Transfer Agent Committee. Invited by members to give a post-luncheon address on the value of BSA data to law enforcement (civil and criminal), and the life cycle of a suspicious activity report.

FFIEC Advanced Examiner Training (Fall 2007). Presented key compliance issues contained in the recently published enhanced due diligence rule for correspondent accounts (rule implementing section 312 of the USA PATRIOT Act).

American Bankers Association/American Bar Association Money Laundering Enforcement Conference (Fall 2007). Served on the section 312 compliance panel, discussing all relevant section 312 implementation and enforcement issues, focusing primarily on the recently published enhanced due diligence rules for correspondent banks.

SIFMA Compliance and Legal Division Fall Compliance Seminar (New York) (Nov. 2007). Served as FinCEN representative on the Anti-Money Laundering panel, focusing primarily on recent enforcement actions in the banking and money services industries and drawing appropriate parallels to transactions and customer relationships in the securities industry.

Institutional Investor 2nd Annual Anti-Money Laundering and Counter-Terrorist Financing Forum (Nov. 28-29, 2007). Keynoted day one of the conference, discussing the new FinCEN Director's BSA efficiency and effectiveness initiative, law enforcement's use of BSA data, most particularly SARs, and non-law enforcement uses, including for supervisory scoping and trend analysis.

AML Strategic Leadership Group (Fall 2007). Invited to speak to an audience of more than 250 senior compliance professionals during their monthly conference call to address specified topics, including the publication of the FFIEC BSA/AML Compliance Manual and its application to the securities industry, issues involving ongoing section 312 implementation, including the enhanced due diligence rule for correspondent accounts published in August 2007, shell companies, beneficial ownership, how to interpret the "PEP" requirements in the BSA (senior foreign political figures in the section 312 rules for private banking accounts), and lessons learned from Riggs Bank, Bank Atlantic, and American Express.

- **2008**

SIFMA Anti-Money Laundering and Financial Crimes Conference (Mar. 5, 2008). Served on the "introducing and clearing firm AML issues" panel. Prepared talking points for the FinCEN officer serving on the regulatory updates panel, and co-authored the remarks of FinCEN's director, coordinating each to ensure that FinCEN delivered a common message on the application of the BSA regulations to correspondent clearing, in response to a multi-year controversy between clearing firms and examining authorities.

SIFMA Compliance and Legal Division Annual Seminar (Orlando) (Spring 2008). Served as FinCEN representative on the "Hot Topics in AML Compliance" panel.

Futures Industry Association Law and Compliance Division Annual Seminar (Spring 2008). Served as the AML expert on the "Soup to Nuts" panels.

- **2009**

Futures Industry Association Law and Compliance Division Annual Seminar (Spring 2009). Served as the AML expert on the "Soup to Nuts" panels.

**QUOTED IN**

"Not So-Innocents Abroad: AML Compliance and Correspondent Banks," The State of the Investment Management and Funds Industry (Apr. 6, 2006) KPMG Financial Practices Group. At page 12, "'we understand that the industry looks at this and may say 'Yikes, what does [the government] expect,'" [Loew added]. "But 312 is not much of a departure from what firms are doing now. What we expect is that people treat this as you would treat customer identification programs or suspicious activity reports; as one part of an overall AML program."

"FinCEN Retooling SARs," Compliance Reporter (Nov. 20, 2006). "[T]he Financial Crimes Enforcement Network is harmonizing suspicious activity reporting forms, said… Loew… . There will be an updated SAR form coming out in the next couple of months to facilitate joint filing through which the SAR reporting obligation can be satisfied by one form."

"Guidance on Cross-Border Account Transfers Coming," Institutional Investor (Nov. 17, 2006). "In response to a delegate's question, Loew said FinCEN is developing a feasibility study on reporting of cross-border transfers. Loew illustrated the prospects of money laundering chains and [s]ection 312 procedures. The closer the financial institution is to one, the more it should know and see… . Loew said FinCEN is taking into account the costs and benefits of [cross-border reporting]."

**PUBLISHED REGULATORY WORK**

- **Primary or Sole Authorship**

    Authored the CFTC's comment letter to FinCEN on recently adopted amendments to the CEA that created a loophole in FinCEN's money services business regulations, with respect to the proposed redefinition of "foreign exchange dealer." See Letter from Terry Arbit, General Counsel, CFTC, to Susan Lang, Assistant Director, Office of Regulatory Policy, FinCEN (Sept. 9, 2009).

    Withdrawal of the Notice of Proposed Rulemaking; Anti-Money Laundering Programs for Unregistered Investment Companies, 73 Fed. Reg. 65569 (Oct. 30, 2008)

    Withdrawal of the Notice of Proposed Rulemaking; Anti-Money Laundering Programs for Investment Advisers, 73 Fed. Reg. 65568 (Oct. 30, 2008)

    Withdrawal of the Notice of Proposed Rulemaking; Anti-Money Laundering Programs for Commodity Trading Advisors, 73 Fed. Reg. 65567 (Oct. 30, 2008)

    Application of the Definition of Money Transmitter to Brokers and Dealers in Currency and other Commodities (FIN-2008-G008) (Sept. 10, 2008)

    Authored FinCEN's comment letter to the Securities Exchange Commission on proposed changes to Rule 15a-6, addressing the manner in which the BSA and its implementing regulations covered activities of foreign brokers effecting transactions within the United States, obviating the need to include anti-money laundering provisions in Rule 15a-6. See

Letter from Susan D. Lang, Assistant Director, Office of Regulatory Policy, FinCEN, to Florence E. Harmon, Acting Secretary, SEC (Sept. 8, 2008)

Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Financial Institution (FIN-2008-R008) (June 18, 2008)

Ruling on Whether a Foreign Exchange Consultant is a Currency Dealer or Exchanger or Money Transmitter (FIN-2008-R004) (May 9, 2008)

Ruling on Whether a Person That is Engaged in the Business of Foreign Exchange Risk Management is a Currency Dealer or Exchanger or Money Transmitter (FIN-2008-R003) (May 9, 2008)

Ruling on Whether a Foreign Exchange Dealer is a Currency Dealer or Exchanger or Money Transmitter (FIN-2008-R002) (May 9, 2008)

Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements According to Certain Functional Allocations (FIN-2008-G002) (Mar. 4, 2008)

Application of the Correspondent Account Rule to Executing Dealers Operating in Over-The-Counter Foreign Exchange and Derivatives Markets Pursuant to Prime Brokerage Arrangements (FIN-2007-G004) (Sept. 5, 2007)

Authored FinCEN's comment letter to the Securities and Exchange Commission ("SEC") on the proposed harmonization of New York Stock Exchange and National Association of Securities Dealers rules, addressing provisions that would have excluded certain broker-dealers from the independent testing requirements of the Bank Secrecy Act. See Letter from Jamal El-Hindi, Associate Director, Regulatory Policy & Programs Division, FinCEN, to Nancy M. Morris, Secretary, SEC (Aug. 22, 2007)

Special Due Diligence Programs for Certain Foreign Accounts, 72 Fed. Reg. 44768 (Aug. 8, 2007)

Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to Certain Introduced Accounts and Give-Up Arrangements in the Futures Industries (FIN-2006-G011) (June 8, 2006)

"Grand Jury Subpoenas and Suspicious Activity Reporting," SAR Activity Review Trends, Tips, and Issues at 42 (Issue 10, May 2006)

Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries (FIN-2006-G009) (May 10, 2006)

Special Due Diligence Programs for Certain Foreign Accounts, 71 Fed. Reg. 16040 (Mar. 30, 2006)

"Providing Suspicious Activity Reports to Appropriate Law Enforcement," <u>SAR Activity Review Trends, Tips, and Issues</u> at 43 (Issue 9, Oct. 2005)

- **Co-Authorship**

  Definitions and Other Regulations Relating to Money Services Businesses, 74 Fed. Reg. 22129 (Proposed Rule, May 12, 2009)

  Prepared Remarks of James H. Freis, Jr., Director, Financial Crimes Enforcement Network, SIFMA Anti-Money Laundering Compliance Conference (Mar. 5, 2008)

  Application of Correspondent Account Rules to the Presentation of Negotiable Instruments Received by a Covered Financial Institution for Payment (FIN-2008-G001) (Jan. 30, 2008)

  Application of the Customer Identification Program Rule to Future Commission Merchants Operating as Executing and Clearing Brokers in Give-Up Arrangements (FIN- 2007-G001) (Apr. 20, 2007)

  Application of Regulations regarding Special Due Diligence Programs for Certain Foreign Accounts to NSCC Fund/SERV Accounts (FIN-2006-G008) (May 3, 2006)

  Customer Identification Program Responsibilities under the Agency Lending Disclosure Initiative (Guidance–Frequently Asked Questions) (FIN-2006-G007) (Apr. 25, 2006)

- **Supervising Policy Officer**

  Defining Mutual Funds as Financial Institutions, 74 Fed. Reg. 26996 (Proposed Rule, June 5, 2009)

  Ruling on Whether a Company that Engages in Microfinance is a Money Services Business (FIN-2008-R011) (Feb. 20, 2009)

  Ruling on Whether a Company that Engages in Certain Operations as an Authorized Agent for Collection of Social Security and Veteran Benefits is a Money Services Business (FIN-2008-R010) (Feb. 20, 2009)

  Ruling on Whether a Company that Offers a Loan Acceleration Product for Consumer Financing is a Money Services Business (FIN-2008-R009) (Jan. 12, 2009)

  Ruling on Whether an Authorized Agent for the Receipt of Utility Payments is a Money Transmitter (FIN-2008-R006) (June 11, 2008)

  Ruling on Reporting of Certain Currency Transactions for Sole Proprietorships and Legal Entities Operating Under a "Doing Business As" ("DBA") Name (FIN-2008-R001) (Jan. 25, 2008)

  Customer Identification Programs and Banks Serving as Insurance Agents (Guidance– Frequently Asked Questions) (FIN-2006-G015) (Dec. 12, 2006)

**OTHER BSA/AML-RELATED ACTIVITIES**

Reviewed and provided comprehensive comments on proposed revisions to FINRA's "small firm AML template," submitted by FINRA to FinCEN pursuant to early AML rules. Coordinated commentary with that of trainees in FinCEN's Office of Regulatory Policy.

Contributed to the development of the BSA examination manuals developed by the Federal Financial Institutions Examination Council, drafting and editing subsections on the interaction of banks with securities market activities.

Contributed to the response of Treasury to the Financial Action Task Force's mutual evaluation of U.S. anti-money laundering activities, particularly with respect to the application of the BSA to securities and futures intermediaries and the history of nominee-level recordkeeping in those markets.

Regularly drafted talking points for FinCEN's director on AML issues affecting the securities and futures industries, as well as the scope of the section 312 rules, for key industry conferences, including the ABA/ABA Money Laundering Enforcement Conference, the SIFMA AML Conference, and the NASD Fall Seminar (2006).

Contributed to talking points and prepared remarks of Treasury officials, including FinCEN's director, for meetings with members of Congress and testimony on numerous BSA topics, including the cost of compliance, delays in rulemaking and rulemaking controversies, cross-border issues, and the use of BSA data.

# Exhibit B

# Exhibit B
# Materials Considered by Beverly E. Loew

**Legal Documents**

- Complaint and Jury Demand, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (June 5, 2017)

- Answer to Plaintiff's Complaint and Jury Demand, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Sept. 29, 2017)

- Plaintiff United States Securities and Exchange Commission's Memorandum of Law in Support of its Motion for Partial Summary Judgment, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Dec. 14, 2017)

- Alpine Securities Corp.'s Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Jan. 19, 2018)

- Alpine Securities Corp.'s Memorandum of Law in Support of Cross-Motion for Summary Judgment and Motion for Judgment on the Pleading, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Jan. 19, 2018)

- Plaintiff United States Securities and Exchange Commission's Reply Memorandum of Law in Support of its Motion for Partial Summary Judgment, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Feb. 9, 2018)

- Plaintiff United States Securities and Exchange Commission's Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgment and Motion for Judgment on the Pleadings, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Feb. 9, 2018)

- Alpine Securities Corp.'s Reply Memorandum of Law in Support of Cross-Motion for Summary Judgment and Motion for Judgment on the Pleading, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Feb. 26, 2018)

- Opinion & Order, *United States Securities and Exchange Commission v. Alpine Securities Corp.*, Case No. 17-cv-04179-DLC (Mar. 30, 2018)

**Federal Register**

- Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6,912 (Apr. 5, 1972), *available at* http://cdn.loc.gov/service/ll/fedreg/fr037/fr037066/fr037066.pdf

- Suspicious Activity Report, 67 Fed. Reg. 50,751 (Aug. 5, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-08-05/pdf/02-19662.pdf

- Suspicious Activity Report, 67 Fed. Reg. 70,808 (Nov. 26, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-11-26/pdf/02-30055.pdf

- FinCEN Final Rule, Requirement That Mutual Funds Report Suspicious Transactions, 71 Fed. Reg. 26213, 26215 (May 4, 2006),  *available at* https://www.sec.gov/about/offices/ocie/amlmf/71fr26213.pdf

- Anti-Money Laundering Programs; Special Due Diligence Programs for Certain Foreign Accounts , 72 Fed. Reg. 44,769 (Aug. 9, 2007), *available at* https://www.sec.gov/about/offices/ocie/aml2007/67fr48348-52.pdf

- FinCEN Final Rule, Exemptions From the Requirement to Report Transactions in Currency, 73 Fed. Reg. 74,010, 74,011 (Dec. 5, 2008), *available at* https://www.gpo.gov/fdsys/pkg/FR-2008-12-05/pdf/E8-28858.pdf.

- Suspicious Activity Report, 80 Fed. Reg. 9,506 (Feb. 23, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-23/pdf/2015-03584.pdf

- Submission for OMB Review; Comment Request, 80 Fed. Reg. 33,339 (June 11, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-06-11/pdf/2015-14280.pdf

**Articles, Guidance, and Agency Documents**

*SAR Activity Reviews*

- FinCEN, The SAR Activity Review: Trends Tips & Issues ("SAR Activity Review"), Issue 1, (Oct. 2000), *available at* https://www.fincen.gov/sites/default/files/sar_report/sar_tti_01.pdf

- FinCEN, SAR Activity Review, Issue 8, (Apr. 2005), *available at* http://www.fincen.gov/news_room/rp/files/sar_tti_08.pdf

- FinCEN, SAR Activity Review, Issue 9, (Oct. 2005), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_09.pdf

- FinCEN, SAR Activity Review, Issue 10, (May 2006), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_10.pdf

- FinCEN, The SAR Activity Review: Trends Tips & Issues, Issue 15 (May 2009), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_15.pdf

- FinCEN, The SAR Activity Review: Trends Tips & Issues, Issue 21(May 2012), *available at* http://www.fincen.gov/news_room/rp/files/sar_tti_21.pdf

- FinCEN, The SAR Activity Review: Trends Tips & Issues, Issue 22 (Oct. 2012), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_22.pdf

*Guidance*

- FinCEN, Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative (Nov. 2003), *available at* https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf

- FinCEN, FIN-2006-G009, Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries (May 10, 2006), *available at* https://www.sec.gov/about/offices/ocie/aml2007/fin-2006-g009.pdf

- FinCEN, FIN-2006-G011, Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to Certain Introduced Accounts and Give-Up Arrangements in the Futures Industries (June 7, 2006), *available at* https://www.fincen.gov/sites/default/files/shared/futures_guidance_06072006.pdf

- FinCEN, FIN-2006-G013, Frequently Asked Questions Suspicious Activity Reporting Requirements for *Mutual* Funds (Oct. 4, 2006), *available at* https://www.fincen.gov/sites/default/files/shared/guidance_faqs_sar_10042006.pdf

- FinCEN, FIN-2007-G003, Suspicious Activity Report Supporting Documentation (June 13, 2007), *available at* https://www.sec.gov/about/offices/ocie/amlmf/fin-2007-g003.pdf

- FinCEN, FIN-2008-G002, Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements According to Certain Functional Allocations (Mar. 4, 2008), *available at* https://www.sec.gov/about/offices/ocie/aml/fin-2008-g002.pdf

- FinCEN, FIN-2008-G002, Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Financial Institution (June 3, 2008), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/fin-2008-r008.pdf

- U.S. Gov't Accountability Office, Suspicious Activity Report Use Is Increasing, But FinCEN Needs to Further Develop and Document Its Form Revision Process, GAO-09-226 (Feb. 2009), *available at* https://www.gao.gov/new.items/d09226.pdf

- FinCEN, FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Instructions 110-12 (Oct. 2012), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20SAR%20ElectronicFilingInstructions-%20Stand%20Alone%20doc.pdf

- FinCEN, Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements (Mar. 2015), *available at* https://bsaefiling.fincen.treas.gov/docs/FinCENSARElectronicFilingRequirements.pdf

- Federal Financial Institutions Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual (Apr. 29, 2010), *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2010.pdf

- Federal Financial Institutions Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual (Feb. 27, 2015), *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2014_v2.pdf

- SEC's Office of Compliance Inspections and Examinations, Anti-Money Laundering (AML) Source Tool for Broker-Dealers (Jan. 11, 2017), *available at* https://www.sec.gov/about/offices/ocie/amlsourcetool.htm#13

*Speeches*

- FinCEN Dir. William J. Fox, Statement on Behalf of United States Department of Treasury Before the House of Representatives (June 16, 2004), *available at* https://www.fincen.gov/news/speeches/statement-william-j-fox-director-financial-crimes-enforcement-network-united-states

- FinCEN Dir. William J. Fox, Remarks Provided to the American Bankers Association / American Bar Association Money Laundering Enforcement Seminar (Oct. 25, 2004), *available at* https://www.fincen.gov/news/speeches/remarks-william-j-fox-director-financial-crimes-enforcement-network-united-states-0

- FinCEN Deputy Director William F. Baity, Statement Before the House Financial Services Subcommittee on Oversight and Investigations (May 10, 2007), *available at* https://www.fincen.gov/news/testimony/statement-william-f-baity-deputy-director-financial-crimes-enforcement-network

- FinCEN Dir. James H. Freis, Jr., Statement Before the United States House of Representatives Committee on Financial Services (May 6, 2009), *available at* https://www.fincen.gov/news/testimony/statement-james-h-freis-jr-director-financial-crimes-enforcement-network-united-2

- FinCEN Dir. Jennifer Shasky Calvery, Statement at ABA/ABA Money Laundering Enforcement Conference (Nov. 16, 2015), *available at* https://www.fincen.gov/news/speeches/jennifer-shasky-calvery-director-financial-crimes-enforcement-network-5

**Statutes, Regulations, and Miscellaneous**

- Administrative Procedure Act, 5. U.S.C. §§ 500 *et seq.* (1946)

- Attorney General's Manual on the APA (1947)

- Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311 *et seq.* (1970)

- 17 C.F.R. § 240.17a-8 (2011)

- 31 C.F.R. § 1023.210 (2016)

- 31 C.F.R. § 1023.320 (2016)

- 31 C.F.R. § 1010.810 (2014)

- 31 C.F.R. § 1010.820 (2016)

- FINRA Rule 2090 (July 9, 2012)

- *In re Albert Fried & Co.*, SEC Release No. 77971, 2016 WL 3072175 (June 1, 2016)

- *Dep't of Enforcement v. Sterne, Agee & Leach, Inc.*, FINRA Hearing Decision, No. E052005007501 (Mar. 5, 2010)

- FINRA, Anti-Money Laundering Template for Small Firms (updated Apr. 4, 2018), *available at* http://www.finra.org/industry/anti-money-laundering-template-small-firms

- FinCEN Form 101
- FinCEN Form 111

**All other authority cited in this declaration, the parties' briefing, and the Court's decision listed herein.**