# Exhibit B

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - -

5    UNITED STATES SECURITIES      )

6    AND EXCHANGE COMMISSION,       )

7          Plaintiff,              )    CASE NO.

8    vs.                            )    17-cv-4179-DLC

9    ALPINE SECURITIES             )

10   CORPORATION,                   )

11         Defendant.              )

12   - - - - - - - - - - - - - -

13       HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

14           30(b)(6) VIDEOTAPED DEPOSITION OF

15             ALPINE SECURITIES CORPORATION,

16       THROUGH ITS DESIGNATED REPRESENTATIVE

17             CHRISTOPHER L. FRANKEL

18             TUESDAY, MARCH 13, 2018

19

20            BEHMKE REPORTING AND VIDEO SERVICES, INC.

21            BY:  TERI HANSEN CRONENWETT, CRR, RMR

22               UTAH LICENSE NO. 91-109812-7801

23                160 SPEAR STREET, SUITE 300

24               SAN FRANCISCO, CALIFORNIA 94105

25                    (415) 597-5600

1      A.    I am trying to think of the best way to answer

2    that question.  So there is a process that is at Alpine

3    that has been continually sort of tweaked over time with

4    AML, which to me, I think it's like that at every firm.

5           But the -- the fundamental process, I think,

6    soon after the beginning of the time period in question,

7    has remained largely the same in terms of -- so Alpine's

8    business, and again, I guess it just depends on what

9    type of SARs that we're talking about.  But Alpine's

10   business largely consists of, and it starts at the

11   deposit process, when a -- the customer of an

12   introducing firm, or a customer of Alpine's introduces a

13   security for deposit purposes.

14          The security first comes in and it goes

15   through sort of a compliance, I think they call it

16   compliance specialist.  We take that deposit and put a

17   cover sheet on it.  Sometimes they would, sometimes they

18   wouldn't.  They would look at certain information.

19          That information would be things like, one of

20   the thresholds that the firm had in place was --

21   concerned a large deposit of penny stocks and how the

22   firm defined a large deposit of penny stocks.  And so

23   generally, that was very objective, mundane -- what I

24   would call mundane type of cursory analysis.

25          Then the deposit would go to a legal group.

1    The legal group would then take a look at it,

2    overwhelmingly -- well, really for two things.  One is

3    to look to ensure that the deposit was in compliance

4    with Section 5.  And then also they would look for

5    various AML triggers.  That would be concerning the

6    background of the account holder, sometimes people

7    associated with the issuer, the actual depositor or

8    their associates as well.

9         Then you would have that same deposit would be

10   vetted by the operations group.  And again, that was

11   much more concerning to clearing and settlement was, you

12   know, can the securities be properly deposited and

13   transferred.  And then, you know, any of those sort of

14   flags would then if -- if the legal team saw flags or

15   the operations team saw flags or there were cursory

16   information, then it would go for an AML review of the

17   AML people, to make a determination of whether a SARs

18   should be filed.  Some of those determinations were

19   objective.  Some of them were subjective.

20        Q.   All right.  I heard you say, please tell me if

21   I got it wrong.  I heard you say there was a -- a few

22   groups in there.  There was a compliance specialist that

23   first gets the transaction?

24        A.   That would get the initial deposit package.

25        Q.   Okay.  And am I right that a compliance

1    specialist would look at every transaction that comes

2    through?

3        A.   They would look at every proposed deposit,

4    would cross through that process, yeah.

5        Q.   And then from compliance specialist it goes to

6    a legal group?

7        A.   It would go to a legal group, yes.

8        Q.   Who makes up that legal group?  Just by title?

9        A.   Generally staff attorneys.

10       Q.   So these are licensed attorneys?

11       A.    Not always licensed attorneys.  To the best of

12   my knowledge, over that period of time, everybody that

13   worked in that group had gone to law school.

14       Q.   Okay.

15       A.   I don't know if they had all passed the bar.

16       Q.   Okay.  And am I right in understanding in your

17   description that every proposed deposit went through the

18   legal group as well?

19       A.   Yes.

20       Q.   And then from the legal group it goes to the

21   operation group?

22       A.   It would go to the operations group.

23       Q.   And what -- again, you can just go by titles.

24   Who makes up the operations group?

25       A.   I think it, you know, starting in 2011, I -- I

1        A.    I'd have to say no.

2        Q.    So a compliance specialist would look at a

3   potential sale when it was --

4        A.    Virtually every deposit at Alpine was looked

5   at as a deposit and sale.  People didn't deposit

6   securities generally at Alpine to leave securities long

7   in their brokerage account.  So it was kind of one and

8   the same.

9        Q.    All right.  Now, let's move to just the AML

10  review portion you talked about.  Who is the first

11  person in the ALM review process that gets a referral,

12  and again by title?

13            MS. FRITZ:  That gets a referral?

14       Q.    (By Mr. Miller)  All right.  I'll back up if I

15  need to.  Potential deposits sometimes get reviewed to

16  an AML program, correct?

17       A.    That is correct.

18       Q.    Who is the employee that the referral is sent

19  to?

20       A.    It would either go to one of the AML

21  specialists or the AML officer.  And I believe more

22  often than not to the AML officer, or the AML analyst,

23  I'm sorry.  I am mixing terms here.

24            MS. FRITZ:  Is analyst the same as specialist?

25            THE WITNESS:  Analyst is a glorified clerk in

```
 1    Alpine parlance.
 2         Q.   (By Mr. Miller)  All right.
 3         A.   I almost wouldn't even call it a glorified
 4    clerk.  I would call it a clerk.
 5         Q.   So the AML specialist is a clerk?
 6         A.   No, AML analyst was the title used.
 7         Q.   I'm sorry if I -- I got lost in there.  Is
 8    there a title AML specialist?
 9         A.   No.
10         Q.   Okay.  So we'll stick with --
11         A.   No, I apologize.
12         Q.   No, that's fine.  So there's an AML analyst is
13    typically the person who would get the referral first?
14         A.   Not typically.  I would say typically the
15    referral would go straight to the AML officer.
16         Q.   All right.  What happens next to the referral?
17         A.   The AML officer would look at it and make a
18    determination as to whether they are going to file a
19    SARs.
20         Q.   All right.
21         A.   After doing an investigation.
22         Q.   What --
23         A.   Well, and I would also have to add just --
24    just to answer your question, is that I think there was
25    largely a determination made, was there an investigation
```

1    required or was the SAR filed as purely an objective

2    type filing, which candidly, I mean, you didn't ask the

3    question, but that's one of the issues at controversy.

4        Q.   Well, tell me what you mean by an objective

5    filing.

6        A.   The firm basically had a practice in place

7    that, for example, where they would file on a voluntary

8    SARs on a large deposit of microcap securities.  And the

9    criteria for making that determination was largely a

10   very objective criteria for commencing with that action.

11       Q.   What were the criteria?

12       A.   The criteria, I think, sometimes changed a

13   little bit over time.  But the -- the -- the last

14   criteria that was in force for several years was, I

15   believe, a deposit of, that was greater than five

16   million shares or $50,000 in notional value.

17       Q.   Okay.  If it hit either of the -- if a deposit

18   hit either of those criterion or criteria, sorry, it was

19   a automatic filing?

20       A.   For the most part --

21       Q.   Alpine did?

22       A.   -- yes.

23       Q.   And was any other investigation -- did the

24   process involve any other investigation after Alpine

25   determined those -- one of those criteria was satisfied?

1     A.    There would -- there would be a continuation

2     of the normal process.  It was just that triggered an

3     automatic filing, in an attempt to comply with what the

4     firm felt FINRA was looking for the firm to do.

5     Q.    You said "voluntary."  What -- what did you

6     mean by that?

7     A.    Well, I mean, when you file SARs, I mean,

8     generally there's four tenets, right, for filing a SARs

9     according to the BSA, and then there's also provision

10    for doing a voluntary filing.  So if you have an

11    instance that comes up that's outside of sort of one of

12    those four fundamental tenets of the BSA, you can do a

13    voluntary SARs filing.

14    Q.    So what were the reasons for the criteria you

15    mentioned for an objective filing?  Why five million

16    shares or $50,000?

17    A.    Well, I think largely the firm was trying to

18    be responsive to what they felt -- I keep saying they, I

19    guess I got to answer as we.  So what we felt, we being

20    Alpine, felt were being responsive largely to what FINRA

21    wanted to see.  And a lot of that was driven by FINRA's

22    notice to members, 0905, and conversations with various

23    people at FINRA.

24          So FINRA defines it as suspicious, a large

25    deposit of low priced securities, but they don't define

1    necessarily what constitutes large.  So the firm kind of

2    came up with its own definition of large to try to

3    comply with what the firm believes that FINRA wanted to

4    see.

5        Q.   Did the fact that a transaction satisfied one

6    of those criteria, would that cause Alpine to believe

7    that the transaction was suspicious?

8        A.   Not necessarily.

9        Q.   Okay.  But the satisfying of those criteria

10   would cause Alpine to file a SAR, correct?

11       A.   That's correct.

12       Q.   So am I right that Alpine would file SARs that

13   it didn't necessarily think were suspicious?

14       A.   Yes.

15       Q.   Does Alpine have a sense of how often it filed

16   SARs on transactions it did not think were suspicious?

17       A.   The sense would be very often.

18       Q.   And in those instances where Alpine filed a

19   SAR on transactions it did not think were suspicious,

20   did it document that decision making process?

21       A.   I don't know what you mean by document the

22   decision making process.

23       Q.   Were there any notes or memos that Alpine

24   would create to explain that it was filing a SAR on

25   something it thought was not suspicious?

1      A.   Not that I am aware of.

2      Q.   Okay.  Is there a way to go back, either

3   looking at the SARs themselves or the documentation that

4   supports the SARs, to understand whether Alpine believed

5   at the time that the reported transaction was

6   suspicious?

7      A.   Will you ask that question again.

8      Q.   Yeah.

9      A.   You don't need to -- I just was thinking ahead

10  instead of listening to your question.  So you didn't --

11  you didn't say something that was not -- or something

12  that was ambiguous.  I just want you to ask it again.

13     Q.   No worries.  The -- I'll break it up a little.

14  Am I correct that -- that Alpine routinely kept support

15  documentation for the SARs that it filed?

16     A.   Yes.

17     Q.   Now, is there any way to go back and look at

18  the SARs themselves or that support documentation to

19  understand whether Alpine thought the reported

20  transaction was suspicious at the time?

21     A.   I believe there is, yes.

22     Q.   And what would you look for?

23     A.   I would look for the templated SARs.

24     Q.   What do you mean by template?

25     A.   I think that the overwhelming volume of the

1   used?

2       A.   I think it's -- not that I am aware of, no.

3       Q.   During the 2011, the 2015 time period, what

4   was Alpine's view of the red flags listed here as in

5   terms of their function and the AML program?

6            MS. FRITZ:  Objection, form.

7            MR. MILLER:  I can ask it a better way.

8       Q.   (By Mr. Miller)  How did Alpine use red flags

9   in its program from 2011 and 2015?

10      A.    In general, Alpine would use red flags in its

11  program to cause the activity that would trigger a red

12  flag to cause that activity to be subject to further

13  review.

14      Q.   Once Alpine determined to file a SAR, do the

15  red flags identified by FINRA play any role in the

16  completion of the SAR?

17      A.   Sometimes they would.  Sometimes they would

18  not.

19      Q.   And describe how they would be used sometimes.

20      A.    Well, I think if it was -- if that red flag

21  was relevant to the reason why the SARs was filed, it

22  should be on the SARs.

23           MS. FRITZ:  Are you specifically asking about

24  the narrative?

25      Q.   (By Mr. Miller)  I didn't specify, but does it

1    change your answer if it was specific to the narrative?

2         A.   No.

3              MS. FRITZ:  Okay.

4         Q.   (By Mr. Miller)  So are the -- were there

5    times that a -- Alpine identified a red flag and made a

6    conscious decision to not report it in a SAR?

7              MS. FRITZ:  Objection, form.  Are you

8    referring to Alpine identifying the items, specific

9    characteristics that are listed in 0905?

10             MR. MILLER:  Yeah.  I can make it simpler if

11   you want.

12        A.   I understand.

13        Q.   (By Mr. Miller)  Okay.

14        A.   I am -- I'm trying to apologize for yawning.

15   It's daylight savings time.

16             So your question, just to repeat it was, is

17   Alpine aware of any circumstances when there was a red

18   flag and it specifically didn't include it in a SARs?

19   Is that your question?

20        Q.   Yes.

21        A.   I would say yes.

22        Q.   And is that be -- in those instances, is the

23   reason it was not included because Alpine made a

24   determination that it was -- the red flag was not

25   relevant to the transaction?

1      A.   No.

2      Q.   All right.  Where Alpine identified a red flag

3  listed in 0905 and filed a SAR, but did not include the

4  red flag in the narrative, what is the reason or reasons

5  the red flag wasn't included?

6           MS. FRITZ:  Objection, form.  Go ahead.

7      A.   I'd say the reason why it wasn't included is

8  if the filer of that SARs didn't feel it was relevant to

9  the reason why the SARs was filed, which continues to be

10 the $64,000 question of the fundamental aspect of this

11 case.

12          MS. FRITZ:  Terry, whenever there's a good

13 break, if we could take another break.  Whenever there's

14 a good opportunity.

15          MR. MILLER:  Are you going to shush me again?

16 I'm just kidding.  I am joking.  Yeah, this is fine.  We

17 can go off the record.

18          THE VIDEOGRAPHER:  Going off the record.  The

19 time is 10:52.

20          (Recess from 10:52 a.m. to 11:11 a.m.)

21          THE VIDEOGRAPHER:  Back on the record.  The

22 time is 11:11.

23          (Deposition Exhibit No. 5 was marked.)

24          MS. FRITZ:  One for me?

25          MR. MILLER:  Yes, I got one here.

1      A.   -- don't see it contained in this part.

2      Q.   (By Mr. Miller)  Do -- does Alpine know of any

3  other place it might be in written form?

4      A.   No.

5      Q.   Can you go to page 40 of Exhibit 5?

6      A.   40?

7      Q.   Yeah.

8      A.   This is by far the most I have ever worn

9  reading glasses.

10          MS. FRITZ:  It's a good look.

11     A.   Yeah, I'm sure it is.  I feel like an owl.

12     Q.   (By Mr. Miller)  Okay.  Page 40 contains a

13  table under Section 3 dot 14 dot 5 dot 2?

14     A.   I am with you.

15     Q.   All right.  Do you see the notation that in

16  brackets that NASD notice to members, 0221?  What does

17  that mean?

18     A.   I'm trying to find it.

19     Q.   It's right under the heading risk indicators?

20     A.   Oh, okay.  Okay.  Sorry.  So you're asking

21  what is that -- what do those brackets mean?

22     Q.   Yeah.  What's -- what's the notation there

23  for?  Why is it there?

24     A.   I don't know for certainty, but I would assume

25  they are referencing that notice to members number for

1    this -- this particular section.

2         Q.   And what's -- what's the purpose of this

3    table?

4         A.   I mean, to list potential circumstances that

5    might be indicative of somebody who was trying to pursue

6    some violative conduct.

7         Q.   Did Alpine use this table in any way to

8    identify transactions that needed to be reported to

9    FinCEN as suspicious?

10        A.   Can you repeat that question again?

11        Q.   Yes.  The table starting on page 40, did

12   Alpine use this table in any way to identify

13   transactions that should be reported in a SAR?

14        A.   Yes.

15        Q.   How was it used?

16        A.   I'd say generally these were red flag

17   indicators that would cause a transaction to come under

18   heightened scrutiny.

19        Q.   What do you mean by "heightened scrutiny"?

20   What does it look like at Alpine?

21        A.   Well, I would say that, look, if a transaction

22   were to prospectively sort of hit one of these criteria,

23   it would merit looking into further.

24        Q.   Who is tasked with identifying the existence

25   of the red flags?

1    think just a very sort of existence of this template

2    process is indicative of it.

3         Q.   Okay.  Is that because the templates were

4    created with an eye toward what Alpine thought

5    regulators wanted to see?

6         A.   Yes.  Done with two --

7         Q.   Yeah.

8         A.   -- for the moment?

9         Q.   Yeah.  Can we go back to No. 6, please?  Same

10   page, No. 4?

11             MS. FRITZ:  Huh-uh.

12             MR. MILLER:  Yeah, the FINRA letter is six.

13        A.   Okay, I'm sorry.  I got it.

14             MS. FRITZ:  He promises he's not going to ask

15   you about that any more.

16        A.   That's all right.  I am pretty familiar with

17   that.  Go ahead.  I'll get to it.

18        Q.   (By Mr. Miller)  Okay.  Exception No. 7 on

19   page 4, under the heading detail, the second paragraph

20   states that the narratives for all SARs reviewed were

21   substantively inadequate as they failed to fully

22   describe why the activity was suspicious.  Do you see

23   that?

24        A.   I do.

25        Q.   What, if anything, did Alpine do to change its

1    procedures in response to that finding by FINRA?

2         A.   I'm going to double-check something.   I know

3    Alpine responded specifically to that, and what I am

4    trying to check is my recollection of this was that

5    Alpine came back to FINRA and said that they thought

6    that the narrative that was given was in compliance with

7    the BSA guidance, and then as a result of this, FINRA

8    ended up taking no action.   So Alpine's perception was,

9    is that somebody in the hierarchy at FINRA agreed with

10   their response.

11        MS. FRITZ:   If you could just indicate for the

12   record what you are looking at.

13        A.   Yeah, I am looking at --

14        MS. FRITZ:   -- in relation to Alpine's

15   response.

16        A.   I am looking at the response letter that

17   Alpine sent back to FINRA.

18        Q.   (By Mr. Miller)  And I think, I am not trying

19   to read your notes --

20        A.   No, no, go ahead.

21        Q.   -- but I think that document --

22        A.   No.   I mean, these are just -- these are

23   documents you guys have.

24        Q.   Yeah.   I just want to -- just for the record,

25   if you maybe go to the first page and read the Bates

1    number of the document into the record.

2              MS. FRITZ:  And the date.

3        A.   Is there a Bates number on these?  I didn't

4    even look.

5        Q.   (By Mr. Miller)  Yeah, bottom right corner.

6        A.   Okay.

7        Q.   Of the first page.

8        A.   So it's Farmer dash 000132.  And I am looking

9    at the Alpine response to item No. 7.

10       Q.   Okay.  You mentioned there was a perception at

11   Alpine that someone at FINRA agreed with Alpine's

12   response.  Is there anything that FINRA conveyed to

13   Alpine directly to support that perception?

14             MS. FRITZ:  Objection.  Asked and answered.

15       A.   Yes.  The fact that FINRA didn't pursue an

16   action.

17       Q.   (By Mr. Miller)  Okay.  So is the absence of

18   any communication from FINRA that led to the perception

19   that FINRA agreed?

20       A.   That is -- that's correct.

21       Q.   So there was no letter from FINRA that says we

22   agree.

23       A.   Not that I am aware of, no.

24             MS. FRITZ:  It says you are right.

25       Q.   (By Mr. Miller)  Okay.  There was a

1    enforcement referral that came after this FINRA report,

2    correct?

3              MS. FRITZ:  If we could just -- the witness

4    wants to just clarify his last answer in terms of what

5    was done in response to the FINRA letter.

6         Q.   (By Mr. Miller)  Okay.

7              MS. FRITZ:  At Alpine.

8         A.   Well, yeah, I think Alpine did make some

9    changes to its process with regard to SARs.  But I don't

10    know that it was directly germane to item No. 7 so...

11              MS. FRITZ:  Okay.

12         Q.   (By Mr. Miller)  Okay.  Was there an

13    enforcement referral that FINRA made after this report

14    in Exhibit 6?

15         A.   You know, I don't -- I believe there was.  I

16    don't -- I don't know for certainty, but I think there

17    was a referral to enforcement.

18         Q.   Did that referral have any impact on Alpine's

19    perception of whether FINRA agreed with its response to

20    exception 7?

21         A.   I think -- I think Alpine -- part of Alpine's

22    perception was the fact that enforcement -- again, this

23    is my understanding, is that enforcement, because

24    enforcement didn't pursue the matter, and I think

25    actually -- but because they didn't pursue the matter

1    that -- that they felt comfortable in their position.

2    And I am trying to sit there and think whether I have

3    seen a dismissal letter or not, and I don't recall.

4        Q.   Okay.  Going back to Exhibit 6, that same

5    paragraph, on page 4.  The -- I mean, read it for

6    yourself but -- and tell me if you think this is an

7    unfair characterization.  But I think the gist of it is

8    that FINRA is stating that Alpine should describe why

9    the firm thought reported activity was suspicious.  Do

10   you see that?

11              MS. FRITZ:  Objection.  Document speaks for

12   itself.  Go ahead.

13       A.   I mean, I see the paragraph that you are

14   referring to, yes.

15       Q.   (By Mr. Miller)  So during the time period,

16   you know, again 2011 to 2015, did Alpine agree that the

17   SAR rules required it to explain why Alpine believed

18   transactions were suspicious when it was reporting them

19   in a SAR?

20       A.   Yes.

21       Q.   And did Alpine believe during that time period

22   that it was complying with that requirement by using the

23   templates we were just reviewing?

24       A.   Yeah.  I believe the firm most certainly

25   thought that it was in compliance.

1      Q.   And specifically with the requirement to

2   explain why Alpine thought activity was suspicious?

3      A.   I think it was the firm's belief that they

4   were in compliance at all times with all aspects that

5   they needed to adhere to with regard to the BSA

6   guidelines to the best of its ability and knowledge.  It

7   doesn't mean it was, but they thought they were.

8           (Laughing.)

9           MS. FRITZ:  Let the record reflect absolutely

10  nothing.

11     Q.   (By Mr. Miller)  All right.

12     A.   Well, that's what the whole argument is about,

13  isn't it?

14     Q.   Okay.

15     A.   There's no big secret there.

16          (Deposition Exhibit No. 7 was marked.)

17          COURT REPORTER:  No. 7.

18     Q.   (By Mr. Miller)  Okay.  Just handed you

19  Exhibit 7.  This is a letter from Alpine to the SEC,

20  correct?

21     A.   It is.

22     Q.   All right.  And am I correct that this letter

23  is a response to a letter sent from SEC to Alpine?

24     A.   Yes.

25     Q.   And I have copies of that letter.  If it would

1   help you answering these questions, just let me know.

2   If you can go to page 3, the question about some of the

3   items there.  See the last paragraph on the page that

4   starts "in addition"?

5        A.   Yes.

6        Q.   This paragraph describes Alpine's view of a

7   treasury rule that allows for voluntary disclosure of

8   information.  Can you explain for me that policy?

9             MS. FRITZ:  Objection.  Document speaks for

10   itself.

11       A.   I don't know that when you say explain the

12   policy.

13       Q.   (By Mr. Miller)  Yeah, let me back up.  Is --

14   is there a policy at Alpine, again, just stick with the

15   2011-2015 time period.  Is there a policy at Alpine that

16   Alpine can file, make -- make voluntary disclosures?

17             MS. FRITZ:  Objection.

18       Q.   (By Mr. Miller) In a SAR?

19             MS. FRITZ:  Objection.  The letter identifies

20   the fact that this is not a policy.  It's part of the

21   underlying statute.  It's not a policy.

22       Q.   (By Mr. Miller)  Okay.  I think you just

23   answered my question.  I am asking if it was a policy.

24   I am trying to --

25             MS. FRITZ:  To the extent that there is a

1    statute that is being cited here by Alpine, I don't know

2    whether you would describe it as a policy or not.  But

3    Alpine's position with respect to that particular

4    provision is laid out right in the letter.  I don't know

5    if the witness can add anything to the fact that Alpine

6    has articulated its position.

7         Q.   (By Mr. Miller)  Okay.  And that's actually

8    what I want to get -- get on the record.  Okay.  So, and

9    you can -- if it makes it -- I only put this in front of

10   you to make it easier to reference this concept of a

11   voluntary disclosure.

12        A.   Uh-huh.

13        Q.   But I want to ask something that's --

14        A.   Sure.

15        Q.   -- separate from the letter.  Is there

16   anything in Alpine's AML program procedures that

17   concerns a voluntary disclosures of information in SARs?

18             MS. FRITZ:  Objection.  You are talking about

19   all the WSPs?

20             MR. MILLER:  Right.

21        A.   To the best of my knowledge, there's nothing

22   in there that specifically labels it voluntary

23   disclosure.

24        Q.   (By Mr. Miller)  Okay.  Is there anything that

25   directs whether it's -- strike that.

1          Are there any written materials prepared or

2     made by, or used by Alpine, that describe when voluntary

3     disclosure should be made?

4          MS. FRITZ:   I'm sorry.  Could you repeat that?

5     Are there any written materials at Alpine?

6          MR. MILLER:   Right.

7     A.    I would answer similarly that there's nothing

8     that I'm aware of that describes the term "voluntary

9     disclosure."  I would say that again, in the opinion of

10    the firm, that a huge number of the SARs that are at

11    issue in this case, which concern the large deposit of

12    penny stocks, would constitute a voluntary disclosure.

13    Q.    (By Mr. Miller)  How --

14    A.    Am I being responsive to you, I mean?

15    Q.    Yeah.  And how does Alpine distinguish between

16    what it believes is a mandatory disclosure and a

17    voluntary disclosure?

18         MS. FRITZ:   Objection, asked and answered.  Go

19    ahead.

20    A.    I think that mandatory disclosure is again

21    when you have something that rises to sort of one of the

22    four fundamental premises of filing a SARs pursuant to

23    the BSA, and a voluntary disclosure would be something

24    that falls outside of that.

25    Q.    Okay.

1          Q.   Okay.  How do filers in the AML program know

2     when to file voluntary disclosures?

3               MS. FRITZ:  Objection.  Asked and answered.

4          A.   I think that again, on certain criteria there

5     was an objective criteria that was established that, as

6     we talked about earlier, like on the large deposit of

7     microcap securities, that it sort of -- the latest

8     iteration was that it was going to be filed if there was

9     a deposit that was greater than five million shares or

10    had a notional value of $50,000.

11         Q.   (By Mr. Miller)  And is it Alpine's view

12    during the 2011 to 2015 time period that it could file

13    voluntary SARs even when it believed that the

14    transaction was nonsuspicious?

15              MS. FRITZ:  Objection, asked and answered.  Go

16    ahead.

17         A.   Yes.

18         Q.   (By Mr. Miller)  Okay.

19         A.   When the transaction was not.  Let me clarify

20    that if I could.  I think it was Alpine's belief that

21    they could do this voluntary SARs when they believed a

22    transaction wasn't necessarily suspicious to them but

23    that they thought it might be suspicious to someone

24    else, namely the regulatory authorities.

25         Q.   Okay.  So even when filing a voluntary SAR, am

1    that's not marked by you already, how's that?

2              MR. MILLER:  I think I --

3              MS. FRITZ:  From here on in.

4              MR. MILLER:  I think I see where we are at

5    here.

6              MR. LEBENTA:  It looks like it's No. 2 on F's

7    Table F-1.

8              MR. MILLER:  Will you mark that?

9              (Deposition Exhibit No. 11 was marked.)

10             MS. FRITZ:  Thank you.

11             COURT REPORTER:  That's 11.

12        Q.   (By Mr. Miller)  Okay.  I just handed you

13   what's been marked Exhibit 11.  Is this the full

14   document that contains the page you were just reading?

15        A.   Yes.  It appears to be.

16        Q.   Okay.  So comparing Exhibit 10 and Exhibit 11,

17   the narrative sections in each one, how does Alpine

18   determine when to include information like the facts

19   about Seth Kramer and his relation to Curt Kramer?

20        A.   How does Alpine determine when to include that

21   and when not to include that?

22        Q.   Right.

23        A.   I think to a great extent it is on -- you

24   know, again, whether you file or not is subjective, and

25   what you put in there is, is it rel -- relevant to the

1    reason why you are filing the SARs?  If it is, it goes

2    in.  If it's not, it doesn't.

3         Q.   Looking at the transactions --

4         A.   I don't think there's a pure systematic

5    determination.

6         Q.   Looking at the transactions described in

7    Exhibits 10 and 11, can you tell us why the information

8    about Curt Kramer would be relevant to one of the

9    transactions and not the other?

10        A.   I am sorry.  Can you ask that question again?

11        Q.   Sure.  Looking at the transactions described

12   in Exhibits 10 and 11, can you tell us why the

13   information about Curt Kramer would be relevant to one

14   of the transactions but not the other?

15        A.   Partially.  And partially I think because this

16   is something that I believe the preparer thought that

17   this was potentially a truly suspicious transaction, and

18   this one was driven -- that was basically done by way of

19   doing some investigation, and this one was purely metric

20   driven.

21        Q.   All right.  The one that you say is purely

22   metric driven, was that 10 or 11?

23        A.   That would be 10.  Again, this is sort of

24   educated speculation.

25        Q.   So in No. 11, the SAR that does reference Curt

 1    Alpine was preparing Exhibits 27 or 28?

 2         A.   Is there a way for them to know that those

 3    exhibits were being prepared -- or those SARs were being

 4    prepared?  It depends on who that is.  I mean the,

 5    again, the AML officer would approve all eventual SAR

 6    filings, and they would know.

 7              So you would have somebody -- if you were

 8    talking about doing trade surveillance, and I don't want

 9    to assume anything here, guys, but if you are talking

10    about trade surveillance, which I'm not sure that's what

11    you are talking about, then that person would sit there

12    and say -- they might see something perhaps that was --

13    they thought was potential market manipulation.

14              So they would say, "Well, we potentially need

15    to file a SARs on this."  It would go to the AMLO, and

16    the AMLO would be familiar with these two.  So I don't

17    know if that's being responsive.  I'm not sure if that's

18    what you are asking.

19              I think that -- I am trying to -- look, I

20    think that -- I don't know whether this is purposeful or

21    not purposeful, but I think one of the things where

22    there's a, a miscommunication is that, I think, Alpine

23    views that any time somebody deposits a security,

24    there's going to be a sale.

25              Nobody deposits securities in general and

1        Q.    All right.  The sales listed on Table B-1 date

2    August 8th, 2011.

3        A.    Uh-huh.

4        Q.    When those were being reviewed by Alpine, did

5    Alpine consider the fact that it had just previously

6    filed a SAR on August 1st?

7        A.    When the sales were being -- I don't know that

8    they would have.

9        Q.    Would the answer be the same for the rest of

10   the sales on here?

11       A.    To that question?  Yes.

12       Q.    All right.

13             MR. CARLYLE:  If you can read it.

14             THE WITNESS:  Do you want to borrow these?

15             MR. CARLYLE:  That's not the problem.

16       Q.    (By Mr. Miller)  I don't think that's the

17   problem.  Now, just -- look.  I know it's late in the

18   day and just want to be crystal clear that sales are

19   reviewed for potential SAR and AML issues, correct?

20       A.    Sure.

21       Q.    Okay.

22       A.    I am trying to get -- they are.  You want me

23   to keep one out?

24       Q.    No.  I think we're good.

25       A.    I'm trying to keep these together for you