# Exhibit C

1

1

2

3

4

5

6          ROUGH DRAFT

7

8      VIDEOTAPED DEPOSITION OF LEIA FARMER

9

10          4-19-18

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

1   from Randall to -- to Doug, but I don't recall

2   specifically when that transition took place.

3       Q.   Okay.  Do you have a recollection at

4   the time you arrived of what the process was in

5   connection with the SAR filing activity?

6       A.   I'm not sure I understand the question.

7   Would you clarify?

8       Q.   At the time that you arrived, was there

9   a sort of step-by-step process that occurred

10   that would ultimately lead either to the filing

11   of a SAR or a SAR not being filed?

12      A.   Yes, there was a process.

13      Q.   And what was that process?

14      A.   The process was to -- as I understood

15   it and observed at the time was to -- the

16   deposit team members would essentially receive a

17   deposit, review information on what we call kind

18   of a red flags indicator list, and then submit

19   that to the AML officer or designee for review.

20      Q.   Okay.  And did that process change

21   after you came on board?

22      A.   Yes.

23      Q.   There was a period of time when you

24   were CCO but not yet AMLO; correct?

25      A.   Correct.

19

1      Q.  And that lasted for the better part of

2   a year; is that correct?

3      A.  Just a little bit over a year.  A year

4   and a couple months.

5      Q.  So could you describe for us what

6   actually -- what activities you engaged in

7   during that year in relation to the AML program?

8   What steps, if any, did you take?

9      A.  A portion of it was really observing

10   the -- the program generally, among all the

11   other duties I was responsible for.  Spending

12   time with -- with Randy, who was the AML

13   officer, speaking with other members of the

14   organization that were there at the time that I

15   joined the organization.  To get a better sense

16   of what they were doing.  Sitting in on the --

17   the meetings that we would have around AML and

18   the AML program generally and compliance.  In

19   the -- in roughly -- responding to various

20   regulatory queries, some relating to our

21   program, some not relating to the program.  In

22   roughly the summer, maybe the fall I gathered

23   some material together to meet with members of

24   the compliance department as well as the legal

25   team to provide training on -- on suspicious

26

1      Q.  And does that relate to these first two

2    boxes that I see on this checklist?

3      A.  It does.

4      Q.  So what are these boxes referring to?

5      A.  The transaction.

6      Q.  And do they set thresholds over which

7    Alpine would just go ahead and file a SAR

8    relating to a deposit?

9            MR. CARLYLE:  Object to the form.

10     A.

11     Q.  The over 25,000 and over 5 million

12   shares.

13     A.  These would be indicators of where the

14   transaction may be potentially suspicious.

15     Q.  And were those sort of thresholds

16   pursuant to which Alpine would go ahead and file

17   a SAR?

18     A.  Correct.

19            MR. CARLYLE:  Object.

20     Q.  Okay.  The next box, increased

21   supervision account, what does that refer to?

22     A.  That refers to -- it's my

23   understanding, my recollection is that refers to

24   heightened supervision accounts, so --

25     Q.  And what were those?

28

1   review.  And that's what this was intended to

2   cover.

3      Q.  Okay.  The folks that are -- that are

4   using this checklist, are they conducting an

5   initial review that would relate to whether a

6   SAR would ultimately be filed?

7      A.  They were -- they were the -- yes, that

8   is correct.  They were ultimately the first

9   group, which is both the compliance team and the

10   legal team looking at those.

11     Q.  Okay.  And what materials would those

12   individuals have?  What -- what documents would

13   they be reviewing?

14     A.  They would in most cases be looking at

15   -- in the case of a deposit transaction, looking

16   at the deposit packet.  So the details about how

17   the client acquired those -- that security.  All

18   the relevant details associated with the -- the

19   purchase of that transaction.

20     Q.  Okay.  Now, Alpine is obviously a

21   clearing firm.  So is it correct that it doesn't

22   have direct contact with the actual customer?

23         MR. CARLYLE:  Object to form.

24     A.  The -- Alpine was also a retail

25   broker-dealer.

31

1  customer obligation.  The clearing firm does

2  not.

3      Q.  Okay.  All right.  So these materials

4  are received from the introducing broker, and

5  they're reviewed by this compliance analyst at

6  Alpine; is that correct?

7      A.  Correct.

8      Q.  Okay.  What does that compliance

9  analyst then do with that information?

10     A.  They're performing an AML review.  So

11  to be clear, they're not performing a review

12  with respect to suitability, they're not

13  performing a review with respect to the

14  customer.  It is truly looking at the -- the --

15  what is known about that particular security and

16  that client based on the documentation.  And so

17  the person from the deposit team or from the

18  legal team is simply reviewing that information

19  to determine whether -- essentially performing

20  an AML review, determining whether the activity

21  is -- is or is not suspicious.

22     Q.  Okay.  I'd like you to take a look at

23  what I would ask to be marked as Exhibit 48.

24          (Exhibit 48 was marked for

25           identification by the reporter.)

34

1    SAR -- a draft SAR; is that correct?

2        A.  That is correct.

3        Q.  Okay.  This thing includes on page 2 a

4    step in which the preparer would pull what's

5    described as a template.  And that's in item

6    number 5.  Do you see that?

7        A.  Yes.

8        Q.  Okay.  At the time that you came to

9    Alpine, was it your understanding that Alpine

10   was routinely filing SARs on large deposits of

11   low priced securities regardless of whether

12   Alpine determined them to be suspicious?

13           MR. CARLYLE:  Object to form.

14       A.  That's my understanding.

15       Q.  Okay.  And does this reflect the

16   preparation of a SAR like that?

17       A.  It does.

18       Q.  Would this be the be all and end all of

19   the SAR filing process?  What's described in

20   this particular SOP?

21       A.  Not necessarily.

22       Q.  Okay.  So what would happen next after

23   this step?

24       A.  So once the -- the narrative is

25   prepped, it would then be reviewed by an AML

35

1    officer or designee.  Actually, let me back up

2    and say there's one other group, the legal team

3    would also review these or I should say provide

4    input.  They might not necessarily review them,

5    but provide input.  It would then go to the AML

6    officer or designee who would then review it and

7    may or may -- may or may not add additional

8    information.

9        Q.  Okay.  Now, during the -- during your

10   initial period at Alpine were you taking a look

11   at this policy or practice of Alpine routinely

12   filing SARs with connection -- in connection

13   with large deposits of low priced securities?

14   Was that something you were evaluating?

15           MR. CARLYLE:  Objection to form.

16       A.  Yes.

17       Q.  Okay.  And what was your approach to

18   that issue of whether Alpine should be filing

19   SARs solely on deposits of low priced

20   securities?

21           MR. CARLYLE:  Objection to form.

22       A.  Well, the approach was to -- was to

23   continue the practice.  I mean, we didn't

24   discontinue the practice of -- of not filing

25   SARs or filing SARs.  It was to -- but it was to

45

1    specifically he was an AML officer.

2        Q.  Okay.  According to this, the -- the

3    firm had explained to the regulators that Jim

4    had received information from the regulators

5    that Alpine Securities was filing too many SARs.

6    Do you see that question there?

7        A.  I do.

8        Q.  And in connection with responding to

9    this, did you take a look, research that issue

10   and Jim's conversations?

11       A.  Yes.  Specifically I spoke with Jim.

12       Q.  Okay.  And --

13       A.  That's the basis for the research.

14       Q.  Okay.  And what did you learn from Jim

15   with respect to this exchange with regulators?

16       A.  He essentially reaffirmed that there

17   was an exchange.  I was not able to find really

18   any -- any written documentation that would

19   align with his -- what he shared.

20       Q.  Okay.  The idea of filing too many

21   SARs, do you have an understanding of the kind

22   of SARs that that related to?

23       A.  It's my understanding that it was

24   specific to deposits.

25       Q.  So does this -- was it your

46

1    understanding that this related to the kind of

2    SARs that were filed by Alpine that simply

3    reported the fact of a large deposit of low

4    priced securities?

5        A.   That was my understanding.

6        Q.   All right.  And you then respond here

7    in this letter regarding that issue; correct?

8        A.   Yes.

9        Q.   Okay.  Now, in this letter you indicate

10   that Jim had said that the fact of a deposit of

11   a low priced security -- that that may not be a

12   reason to file a SAR.  Do you see that language?

13       A.   I do.  That first step, yep.

14       Q.   And then you go on each review resulted

15   in a facts and circumstances analysis to

16   determine whether or not to file a SAR?

17       A.   Yes.

18       Q.   Okay.  Was that -- based on this

19   information that you had as of the fall of 2012,

20   did you add that into your approach to

21   evaluating whether Alpine should continue to

22   file SARs simply on deposits?

23       A.   That was definitely a consideration as

24   we -- as I was looking to augment the program.

25       Q.   Okay.  And did -- to the best of your

47

1    recollection, did you have Alpine cease that

2    practice at that point, or did the practice

3    continue at least for some period of time?

4        A.  The practice --

5            MR. CARLYLE:  Object to form.

6        A.  The practice continued for some period

7    of time.  The intent wasn't to respond to have

8    kind of a knee jerk reaction to that and simply

9    stop filing altogether.  It was to develop and

10   build the program and then look to -- to move

11   away from a defensive filing to a more

12   deliberate thoughtful process.

13       Q.  Okay.  I'd like you to take a look at

14   the next communication, if we could mark this as

15   52.

16           (Exhibit 52 was marked for

17            identification by the reporter.)

18       Q.  And if you could tell me if you

19   recognize this.

20       A.  I do.

21       Q.  And is this a subsequent response to

22   Eric Citrin at FINRA in New York?

23       A.  Yes.

24       Q.  And this document is Bates Farmer 0132

25   dated October 24th of 2012.  Does this document

48

1    also address this issue of the filing of SARs?

2    If you want to take a look at page 5.

3        A.  Yes, it does.

4        Q.  And in this particular document, do you

5    address an issue regarding periods of time when

6    there were no SARs that were filed by Alpine?

7        A.  Yes, I do.

8        Q.  Okay.  If we look at page 5, it looks

9    like, again, you explain the conversation that

10   Walker had had with regulators with respect to,

11   quote, filing too many SARs.  Do you see that?

12       A.  Actually, I think that's FINRA's

13   response.  It's on page 5?

14       Q.  Okay.

15       A.  FINRA.  In that section.

16       Q.  Okay.  So they're referring to that.

17   Your response then deals with, if we look at

18   page 6, Alpine's view of this issue of whether

19   or not these SARs should be filed; is that

20   correct?

21       A.  Yes.

22       Q.  I just want you to take a look at the

23   paragraph that begins as a firm subject to

24   multiple regulatory agencies.  Do you see that

25   paragraph?

49

1       A.  I do.

2       Q.  You say in here Alpine, like other

3   broker-dealers, must often choose between filing

4   SARs when there is no indicia of suspicious

5   activity other than activity that in general has

6   been the subject of scrutiny of FINRA, such as

7   activity in low priced securities, and not

8   filing at all and risking backward looking

9   criticism.  Do you see that?

10      A.  I do.

11      Q.  All right.  Can you just explain to us

12  a little -- was that a tension that you dealt

13  with at Alpine?

14      A.  Yes.  There was definitely a balancing

15  act between defensive filings, filing for

16  everything, versus not -- a period of not filing

17  or not filing in a very specific instance, and

18  then having it be questioned later.

19      Q.  Okay.  Now, you described this as --

20  you're using the phrase defensive filing.

21  During the time that you were at Alpine did you

22  have an understanding of whether this particular

23  issue, a large deposit of low priced securities,

24  had been repeatedly cited by the regulators as

25  being an issue about which they were concerned?

50

1    A.  Yes.

2        Q.  Was there a particular -- were there

3    particular issuances, for example, that you were

4    reviewing and trying to interpret as you were

5    dealing with this issue of whether these SARs

6    should be filed?

7            MR. CARLYLE:  Object to form.

8        A.  Yes.  There was very -- very specific

9    guidance by FINRA and a notice to members that

10   specifically identified activity occurring in a

11   low priced security as being suspicious in

12   nature.

13       Q.  And based on all the information that

14   you had at the time, did you -- did Alpine

15   continue to file deposit SARs -- by that I mean

16   SARs that simply reported to the regulators the

17   large deposits of low priced securities?

18           MR. CARLYLE:  Object to form.

19       A.  We did.

20       Q.  This explains here that Alpine was

21   filing SARs where there was no indicia of

22   suspicious activity.  Do you see that?

23       A.  I do.

24           MR. CARLYLE:  Object to form.

25       Q.  Okay.  That's in the letter.

51

1        So at the time that these SARs

2   were being filed, were these SARs based on the

3   actual evaluation by Alpine that this activity,

4   the large deposit of a low priced security, was

5   actually suspicious?

6        A.  It is my understanding that that was

7   the case.

8        Q.  That Alpine itself thought these

9   transactions were suspicious?

10       A.  No.  No.  That -- that Alpine had

11   reason to believe that -- that it needed to

12   perform these types of filings based on feedback

13   that it had received in the past.

14       Q.  Okay.

15       A.  Prior to my affiliation.

16       Q.  All right.  So going back, had Alpine

17   -- when it looked at these transactions, did

18   Alpine consider the transactions to be

19   suspicious where -- such that a filing would be

20   required under the BSA?

21       MR. CARLYLE:  Object to form.

22       A.  Well, initially, no.

23       Q.  Okay.

24       A.  I mean, that's the subject of what's

25   identified at some point elsewhere in this

52

1    document.

2        Q.  Okay.  Does this document go on to

3    describe the fact that the AML officer who is

4    there -- this is the next paragraph beginning

5    the two periods.  That the then AML officer

6    reviewed conduct that previously might have

7    resulted in a SAR but determined partially as a

8    result of conversations with other regulators

9    that there was nothing suspicious to justify a

10   filing?

11       A.  That is my understanding, yes.

12       Q.  And that was information that you,

13   yourself, had received with respect to why there

14   had not been SAR filings over a period of time?

15       A.  Correct.

16       Q.  Just going on, the next thing that you

17   say is indeed the conduct at issue here, the

18   deposit and liquidation of low priced

19   securities, even when done repeatedly, need not

20   without more be considered suspicious.

21           So is that -- was that your view

22   at the time with respect to this issue of large

23   deposits of low priced securities?

24       A.  Yes, that was -- that was my position.

25       Q.  And you even cite the stern A G

53

1    decision?

2        A.  That is correct.

3        Q.  And is that -- is it your recollection

4    that that was a conclusion that was -- that was

5    contained within the FINRA decision in the stern

6    A G case?

7        A.  That is my understanding, correct.

8        Q.  Okay.  This particular document, if you

9    go down to the bottom of the page, also refers

10   to an issue of whether filings were late.  Do

11   you see that?

12       A.  I do.

13       Q.  Okay.  FINRA had cited the firm for

14   filing with respect to transactions that had

15   occurred more than 30 days prior to the filing

16   of the SAR; correct?

17       A.  Yes.

18       Q.  Okay.  And what was the firm's view in

19   terms of the timetable that relates to the

20   filing of a SAR?

21       A.  Well, the view is that one has 30 days

22   to file a SAR upon making the determination that

23   the activity is suspicious in nature.

24       Q.  Okay.  So does that mean that the SAR

25   must be filed within 30 days of the transaction?

54

1    A.  No.

2       Q.  In this particular case was the SAR

3    filed, to your knowledge, within 30 days of

4    Alpine determining that a SAR should be filed?

5           MR. CARLYLE:  Object to form.

6    Foundation.

7       A.  It is my understanding that once Alpine

8    made the determination that the activity was

9    suspicious in nature, a filing subsequently

10   occurred.

11      Q.  Okay.  Do you know, by the way, whether

12   Alpine's filings -- whether those particular

13   filings were predicated on a determination that

14   the conduct was suspicious or whether it was one

15   of the filings that was done because Alpine

16   understood that the regulators wanted to see

17   those kinds of deposit filings?

18      A.  Are you referring to the subsequent

19   filing by the firm?

20   Q.  Yes.

21   A.  The latter.

22   Q.  Okay.  All right.  Flip to the next

23   page.  It just goes on and on.

24          On page 7 there is an exception

25   with respect to the narratives of SAR filings.

55

1    Do you see that?

2         A.  I do.

3         Q.  Okay.  And the words substantively

4    inadequate are used by FINRA with respect to at

5    least certain -- well, with respect to certain

6    of the filings -- SAR filings done by Alpine;

7    correct?

8         A.  Yes.

9         Q.  Now, this specifically references the

10   -- the kind of template language that we had

11   looked at previously; correct?  That's -- that's

12   what FINRA is specifically pointing to; is that

13   correct?

14        A.  Yes.

15        Q.  Okay.  Does this -- does this thing

16   tell you that your SARs are deficient for

17   failure to include in the SAR narrative every

18   single red flag that has been cited in FinCEN

19   guidance?

20             MR. CARLYLE:  Object to form.

21        A.  No, it does not.

22        Q.  Let me just ask you, to the best of

23   your recollection, prior to the 2015 SEC

24   examination report, had Alpine ever been told by

25   the regulators that a SAR narrative must

56

1    automatically include a red flag.

2               MR. CARLYLE:  Object to the form.

3        A.  Not that I can recall, no.

4        Q.  In fact, had the regulators ever

5    conveyed to Alpine any identifiable list of red

6    flags that would have to be included in a SAR

7    narrative?

8        A.  I wish it was that simple.  No.  No.

9        Q.  Okay.  Let me just drop to the bottom

10   of the page and ask you, your -- your response

11   with respect to the template is that you're

12   providing the information that you consider

13   relevant.  Is that generally correct?

14       A.  Yes.

15       Q.   What was Alpine's understanding of what

16   should be included in the narrative?  If you

17   could just sum it up for me.

18       A.  The -- we believe that the pertinent

19   details of the transaction should be included.

20       Q.  Okay.

21       A.  In the SAR filing.

22       Q.  All right.  And there are -- there's

23   guidance about the fact that the SAR filings

24   should include explanation of why.  Do you

25   recall that guidance coming from --

57

1      A.  I do.

2      Q.  What's the meaning of that word why in

3   that context?

4      A.  It really -- it's my understanding that

5   it's -- it's really an attempt to have the

6   broker-dealer articulate the reason why the BD

7   believes that activity will be suspicious in

8   nature.  In other words, what is it about this

9   activity that deviates from what we know about

10   that customer.

11      Q.  Okay.  The last line here talks about

12   the fact that the information that's provided in

13   the SAR narrative is sufficient for any

14   regulator to request further information from

15   Alpine or investigate the activity.  Do you see

16   that?

17      A.  I do.

18      Q.  Was there a procedure or a process that

19   existed in the SAR filing structure with respect

20   to follow-up requests coming from the regulators

21   on a SAR?

22      A.  There was information on the SAR to

23   identify the broker-dealer and their contact

24   information, including the AML officer.  So

25   there was a mechanism to be able to reach out to

62

1      A.  Yes.  Yes.

2      Q.  Okay.  In that 2014 time frame did the

3    SEC advise you or Alpine that it was required to

4    include red flag circumstances in every SAR

5    narrative?

6      A.  In the examination that preceded this

7    examination?

8      Q.  That's right.

9      A.  No, they did not.

10     Q.  Okay.  In fact, did they have any

11    criticisms with respect to Alpine failing to

12    file SARs in that 2014 period?

13     A.  No, not that I can recall.

14     Q.  Okay.  So now we're a year along, and

15    you get this examination finding.  Can you just

16    explain to us what steps you took in response to

17    this?

18     A.  In terms of preparing the response?

19     Q.  In terms of addressing these

20    examination findings.

21     A.  So it was meeting with my staff and --

22    and looking through the -- the feedback that the

23    SEC provided.  Didn't really see a whole lot of

24    very specific concrete examples attached to

25    that, but saw what was -- the issues that were

66

1    Alpine's response, it looks like you're in this

2    section trying to explain Alpine's process and

3    how it deals with this tension with respect to

4    activity that is considered a red flag by FINRA;

5    is that correct?

6        A.  Yes.

7        Q.  If you look at the paragraph that

8    begins as the majority, you say as the majority

9    of Alpine's business involves the deposit of

10   penny stock, Alpine strives to achieve balance

11   between understanding when the activity is

12   suspicious and acknowledging when the activity

13   aligns with the client's typical account

14   activity.  Right?

15       A.  Correct.

16       Q.  So what -- why is the client's typical

17   account activity significant to Alpine's

18   assessment of whether conduct is suspicious?

19       A.  Well, because if the activity is

20   consistent with what we know about that

21   customer, based on their prior activity and

22   prior history, then the activity is deemed not

23   to be suspicious by the firm.

24       Q.  Okay.  You also indicate that there may

25   be circumstances that are reflected in the file

67

1    that may constitute a red flag but that would

2    not cause Alpine to file a SAR.  And I'm talking

3    here about the paragraph above that, where you

4    explain the process of determining whether

5    activity is suspicious is a subjective one.  And

6    there may be times when Alpine's AML officer

7    will determine not to file a suspicious activity

8    report on certain referred activity due to the

9    firm's familiarity with the client and whether

10   the activity is consistent with their normal

11   course of business.

12          So again, are you talking about

13   the kind of analysis that occurred at Alpine?

14          MR. CARLYLE:  Object to form.

15   You read only a part of that sentence.

16     Q.  Okay.  Sorry.  Are you -- but just

17   generally is that describing or referring to

18   Alpine's own process?

19     A.  Correct.

20     Q.  So let me ask you about that.  Where

21   there may be a red flag, for example, a criminal

22   or a regulatory history, does that

23   automatically, in the view of Alpine, constitute

24   something that has to be included in the SAR

25   narrative?

68

1     A.  Not necessarily.

2     Q.  So how would that determination be

3  made, and what would -- what would it be based

4  on?

5     A.  Well, in -- in those instances we may

6  look at the specific activity occurring in the

7  account to determine its relevance to that

8  adverse history.  And --

9     Q.  Stop there.  I'm sorry.  Why does it --

10  why would it matter if it's relevant?

11     A.  Well, because we're determining whether

12  the activity is suspicious in nature.  So we're

13  attempting to understand what the -- what the

14  activity was that -- that triggered further

15  review by the firm and then determining whether

16  that specific activity would be something that

17  we would identify as suspicious in nature.

18     Q.  Okay.  Did Alpine in its determination

19  about what should be in the narrative, would

20  Alpine include some history that the customer

21  may have that in Alpine's view isn't relevant to

22  the pending transaction?

23     A.  Not necessarily.

24     Q.  Okay.  What are the factors, by the

25  way, that would make a customer's history

69

1    relevant or not relevant?

2        A.   Well, it really depends on the facts

3    and circumstances in that case.  But certainly

4    one could look at the proximity of the -- of the

5    activity for which that person -- you know, the

6    infraction, if you will, using the example of

7    regulatory or criminal history.

8        Q.   Um-hum.

9        A.   And also whether that specific activity

10   in the case of regulatory history or criminal

11   activity is actually what -- actually is

12   relevant to the activity.  So, for example, you

13   may have a scenario where -- I'm not thinking of

14   any specific case, but you may have a scenario

15   where someone had a criminal background.

16   Perhaps they had a -- were arrested and

17   convicted for operating a dog fighting ring.

18   And that person -- and that was, you know, 20

19   years ago, 15 years ago.  Most recently they

20   have been a customer of the firm and/or a new

21   customer, depending upon the facts and

22   circumstances, and there is nothing else in that

23   person's history.  That person is buying a -- a

24   security that they've held for an extended

25   period of time.  The facts and circumstances in

73

1   to take a look at page 3.  Specifically the

2   paragraph beginning in addition.

3       A.  Yes.

4       Q.  Okay.  Is that -- is that an

5   explanation again of the fact that certain --

6   first of all, that voluntary filings are

7   permissible?  Is that correct?

8       A.  Correct.

9       Q.  Okay.  And how did you know that?

10      A.  The -- there's very specific FINRA

11  guidance -- or excuse me.  Excuse me.  Not

12  FINRA.  U.S. treasury guidance around that.

13      Q.  Okay.  And a voluntary SAR filing would

14  occur when?  Under what circumstances?

15      A.  When we really want to bring -- it's

16  not necessarily indicative of a violation or

17  suspicious activity but we really want to bring

18  a matter to the attention of a regulator or law

19  enforcement.

20      Q.  On that issue, again, you highlight the

21  fact Alpine's main business is providing

22  clearing and trade processing services for micro

23  cap stocks.  The firm is well aware the

24  regulatory scrutiny of such transactions and the

25  wide ranging cases the SEC and other regulators

74

1    have brought to reduce violative activity in

2    this area.  Alpine wants the various regulatory

3    agencies to have the benefit of seeing

4    information it has in its possession.  So is

5    that a statement with respect to Alpine

6    continuing to report deposits even if it had not

7    found the transaction to be suspicious within

8    the meaning of the BSA.

9           MR. CARLYLE:  Object to form.

10      A.  Yes.  Previously I think you referenced

11   the term tension kind of between the two areas.

12   And it really was a balancing act.

13      Q.  Okay.  And this is laying it out very

14   plainly for the regulators, that this is the

15   approach that Alpine is taking?

16           MR. CARLYLE:  Object to form.

17      A.  Correct.

18      Q.  Okay.  If you'd turn to page 5.  Now,

19   this examination finding actually did highlight

20   certain bits of information and criticized

21   Alpine for not including those bits of

22   information in its SAR narratives; correct?

23           MR. CARLYLE:  Object to form.

24      A.  Correct.

25      Q.  Okay.  And we've talked about the fact

75

1    that that -- that notion that these red flag

2    items must be included in the narrative, that

3    that had not previously been asserted in -- in

4    the examinations of Alpine; correct?

5        A.  Correct.

6        Q.  Okay.  So now we have this information

7    -- we have this assertion.  If you look at the

8    top of page 5, initially you seem to be --

9    you're talking here about whether certain

10   information -- background information regarding

11   the customer should have been or was included in

12   the SAR filing.  And you use the phrase Alpine

13   will generally include this information in the

14   initial or subsequent SAR filings if multiple

15   filings occur over the lifetime of a customer

16   relationship.

17            So where there is some piece of

18   background information that Alpine views as --

19   as relevant, would that be included in every SAR

20   that Alpine filed that might relate to anything

21   that that customer did?

22       A.  Not necessarily.

23       Q.  Okay.  Why not?

24       A.  There could be a number of reasons.

25   One, that we're not aware of that particular

76

1    activity at that time, meaning we don't have the

2    knowledge of that background at that time or

3    have determined that that isn't necessarily

4    relevant or specific to a deposit transaction

5    but may be more relevant as part of any

6    subsequent transaction.  So generally those are

7    the two that come to mind.

8        Q.  Okay.  Let me ask you something.  If

9    there has been a regulatory -- I'm just curious,

10   if there has been a regulatory action filed, and

11   that's -- and that is visible to Alpine, does

12   the fact that an action was filed, is that

13   enough for Alpine to view that as indicative of

14   criminalality or something that must be included

15   in the narrative if there hasn't been any

16   decision in the action.  Do you see what I'm

17   saying?

18       A.  I do.

19       Q.  Okay.

20       A.  But would you mind repeating your

21   question again?

22       Q.  Okay.  If -- if Alpine learns that

23   there is a regulatory action of some kind that

24   was filed but there has been no decision,

25   there's no resolution of it, would that in and

77

1    of itself be something that Alpine would

2    consider suspicious and it should go into the

3    narrative?

4              MR. CARLYLE:  Object to the form.

5         A.  No, not necessarily.

6         Q.  What about if the act -- is it

7    different if the action has actually concluded,

8    if there's actually some decision?

9         A.  That would -- we would look at that as

10   well.  To the extent that the firm knew about

11   it, we would look at that to determine relevancy

12   to the -- to the suspicious activity report.

13        Q.  Okay.  The next section of the

14   paragraph talks about this idea that stock

15   promotion -- one of the criticisms had been

16   leveled bit SEC had been that Alpine had not

17   included information that the security that was

18   the subject of a SAR had been the subject of a

19   recent stock promotion.

20              And so it appears here that

21   you're responding to that particular issue.  Was

22   it Alpine's view that the fact that a stock

23   promotion had occurred with respect to a

24   particular security, should that -- was that

25   viewed as suspicious and something that should

78

1    be included in the narrative?

2        A.  No, not necessarily.

3        Q.  Okay.  Were there circumstances where

4    that could be relevant and included in the

5    narrative?

6        A.  Yes, there could be scenarios where

7    that might be relevant.  Perhaps we were filing

8    on the security and wanted to share that there

9    were details regarding a stock promotion.

10       Q.  Okay.

11       A.  As just -- as an example.

12       Q.  All right.  You say here where the

13   firm's investigation reveals that the promotion

14   activity is not germane to the intent of the SAR

15   filing, the firm employs its best judgment on

16   which information may be relevant to provide.

17               So was it Alpine's view that a

18   stock promotion may or may not be relevant to

19   the reason that Alpine is filing a SAR?

20       A.  Specific to a transaction, yes.

21       Q.  Okay.  You go onto say, though, if

22   Alpine knows that the -- the customer is tied to

23   the stock promotion, well, then it's relevant.

24   Do you see that in the next paragraph?

25       A.  Yes.

79

1      Q.  So is that an example of a stock -- of

2    information with respect to a stock promotion

3    that is relevant to the particular filing, where

4    the client is somehow involved or associated

5    with the promotional activity?

6      A.  Correct.

7      Q.  Would that include, for example,

8    deposits of stock by somebody who's actually a

9    promoter?

10      A.  Not necessarily, because that -- that

11    in and of itself, in that very specific example,

12    doesn't -- doesn't represent or indicate that

13    suspicious activity is occurring.

14      Q.  Okay.  Would that be something that

15    Alpine would take another look at?

16      A.  It is one of the things that we would

17    look at.

18      Q.  A closer look?

19      A.  Yes.

20      Q.  Okay.  With respect to all these

21    various red flags that we've been talking about,

22    what was your understanding of -- of what a red

23    flag means in -- in terms of an AML analysis?

24      A.  A red flag is simply a trigger.  It's

25    simply a flag or something that we would then

80

1    review, monitor more carefully, look more

2    closely to determine whether it really truly --

3    whether the activity based on what we knew about

4    the client either directly or indirectly,

5    meaning through the introducing broker-dealer,

6    would be enough to determine whether to file or

7    not file a SAR.

8        Q.  Okay.  You used the word trigger.  So

9    that -- are you -- is it correct that it

10   triggers a look but it's not a SAR filing

11   trigger?

12       A.  Correct.  There -- there is a -- all

13   we're simply doing is determining whether the

14   activity -- whether by looking at the activity

15   that activity is suspicious in nature.  And at

16   that point determining whether -- if it is

17   suspicious, to file the SAR.

18       Q.  Okay.  There is -- there are any number

19   of pieces of industry guidance that -- that make

20   reference to this concept of red flags.  For

21   example, are you familiar with 0905?

22       A.  Yeah.  Notice of members?  I am.

23       Q.  Okay.  And that was -- were you

24   familiar with 0905 at the time that you were

25   performing all of these services for Alpine?

81

1     A.  Yes, I was.

2        Q.  And do you have a recollection of

3    whether 0905 references some things that are

4    maybe red flags?

5     A.  Yes.

6        Q.  Was it your understanding that -- that

7    that guidance said this activity is suspicious,

8    or was it saying something else?  What was your

9    understanding?

10        A.   My recollection is that FINRA put

11    together a list of -- of, you know, bulleted

12    points where they believed that the activity

13    could be suspicious in nature.  They were very

14    clear to say it could be.  Not necessarily that

15    it was.  But that firm's ought to consider this

16    as part of their program.

17        Q.  Okay.  And as you were working to

18    develop further the AML program at Alpine, did

19    you take that guidance into account?

20     A.  I did.

21        Q.   And did you make every effort to insure

22    that those red flags that are discussed in the

23    guidance would be considered by Alpine as it

24    made a decision?

25        A.   I believe that I did, to the extent

82

1    that it was specific to the firm.

2        Q.  Applicable to your particular business?

3        A.  Correct.

4        Q.  Very good.  Okay.  All right.  If you

5    keep going on down the page, there was a

6    criticism that Alpine had filed SARs with

7    respect to certain deposits but did not file

8    SARs relating to sales of the securities that

9    had been deposited.  So if you look at the

10   paragraph beginning the staff did not identify.

11       A.  I see that.

12       Q.  Okay.  In every instance where Alpine

13   filed a SAR that reported a large deposit of a

14   low priced security, did that mean that Alpine

15   had determined that the transaction itself was

16   suspicious within the meaning of the BSA?

17       A.  Not in every case.

18       Q.  And did that mean that Alpine in every

19   case would file when any of that stock was then

20   sold?

21       A.  Not necessarily.

22       Q.  How did Alpine evaluate whether a SAR

23   should be filed in connection with sales of

24   stock?

25       A.  We would look at the -- evaluate the

83

1    history of the client, consult with the

2    introducing broker-dealers to the extent that it

3    was one of their clients to assess whether the

4    activity was -- what deviated from what we knew

5    about that particular client.

6        Q.  Okay.

7        A.  And to the extent that it did, we would

8    file a SAR.

9        Q.  Was there also a market surveillance

10   component to the issue of whether a SAR would be

11   filed on liquidations?

12       A.  What do you mean by a market

13   surveillance component?

14       Q.  Did Alpine also look at the trading

15   activity that was occurring in connection with

16   liquidations of stock?  Would they look at the

17   pattern of trading activity occurring in the

18   marketplace?

19       A.  We would.

20       Q.  Okay.  And who -- who handled that job?

21       A.  That was our surveillance.  We had a

22   surveillance analyst within the compliance

23   department.

24       Q.  Okay.  And what was he looking for, if

25   you know?

84

1    A.  He was looking for really, you know,

2   movement in the market, looking for activity

3   that moved the market in a particular direction.

4    Q.  Okay.  So he's looking for indicators

5   that there is some kind of improper conduct or

6   manipulation occurring in the market?

7    A.  That is correct.

8    Q.  And if a liquidation of stock was

9   occurring and those indicators were present,

10   would that trigger the filing of a SAR?

11    A.  That would trigger a referral for --

12   for additional review.

13    Q.  Okay.  And who did that referral go to?

14    A.  That would go to the AML officer or the

15   designee.

16    Q.  Okay.  So markets -- if market

17   surveillance sees something that's fishy in the

18   marketplace, they -- they spot that and refer it

19   over to the AML officer?

20    A.  Or designee, correct.

21    Q.  Okay.  If you go to page 6, if you look

22   at the paragraph at the top of the page, there's

23   discussion in -- in this paragraph about what

24   Alpine understood should be included in the SAR

25   narrative.  Do you see that?

85

1      A.  I do.

2      Q.  You make reference here to the five Ws.

3   What is that referring to?

4      A.  Specifically who, what, where, when,

5   and why.

6      Q.  Okay.  And was that an idea that was

7   included in some of the FinCEN guidance with

8   respect to how to -- how to do a SAR narrative?

9      A.  It was.

10      Q.  And was that guidance that you used at

11   Alpine in connection with your training of

12   employees?

13      A.  It was.

14      Q.  And how -- how did you use that

15   guidance?

16      A.  It was used in, you know, training

17   meetings that I had with compliance staff and --

18   and legal and other personnel.

19      Q.  Okay.  Did you -- excuse me.

20          All right.  In connection with

21   the why piece of the five Ws, what was Alpine's

22   understanding of what the narrative was supposed

23   to include with respect to the question why?

24      A.  The intent was to address why the firm

25   believed the activity to be suspicious in

86

1    nature.

2        Q.  Did Alpine have any understanding that

3    red flags that the -- that industry guidance had

4    referenced as being possibly suspicious, that

5    those by definition had to be part of the

6    narrative, the why, the answer to the why?

7        A.  No, I don't believe so.

8        Q.  You know, I note here -- and let me go

9    back to 2012 for a minute.  We've talked about

10   the fact that in response to the 2012 FINRA

11   examination that you provided a response that

12   talked about Alpine's view that its SAR filings

13   were compliant with the BSA.  Do you recall

14   that?

15       A.  I do.

16       Q.  Okay.  But having said that, did you

17   just decide to ignore FINRA's statements?

18       A.  With respect to red flags or --

19       Q.  Or any -- any of the FINRA criticisms.

20       A.  No, not at all.

21       Q.  What did you do?

22       A.  The -- I took that as an opportunity to

23   develop -- further develop the program for all

24   of us to be more educated about -- about how we

25   might be able to better partner with our law

87

1   enforcement.

2       Q.  Okay.  Throughout your time when you

3   were CCO and then AMLO at Alpine were you making

4   your best effort to insure that Alpine was

5   complying with the AML requirements, including

6   the SAR filing requirements?

7       A.  I believe that I was.

8       Q.  At any time were you seeking to evade

9   those requirements by, for example, doing

10  defensive SAR filings that you felt weren't --

11  weren't appropriate?

12      A.  No, not to evade.

13      Q.  Okay.  Even the deposit SARs that we've

14  talked about, were those being done because of a

15  view that this was something that regulators

16  expected to see?

17          MR. CARLYLE:  Object to form.

18      A.  It was done in light of that view,

19  based on feedback that we'd received in the

20  past.

21      Q.  Okay.  During the period 2012 and

22  through -- even through the time that you left

23  Alpine, did you make efforts to develop and

24  improve its AML program?

25      A.  Yes.

88

1      Q.  Can you just describe for us some of

2   the ways that you did that?

3      A.  One was -- a couple -- a few different

4   ways.  One, bringing in surveillance.  A

5   surveillance team.

6      Q.  So you brought that in?

7      A.  Yes.

8      Q.  Okay.

9      A.  The -- to really focus on the training

10   activity occurring within the organization.

11   Looking to bring in an AML analyst, someone who

12   was separate from the general compliance deposit

13   processing piece of it.  And then to -- really

14   to expand the AML -- the size of the team but

15   also the AML officer going from -- moving away

16   from a part-time trader to a part-time legal

17   person, he was doing legal and also AML, with

18   the hopes to -- and it was a bit stymie because

19   it took awhile to find someone, but looking to

20   bring in a full-time AML person.  And it took --

21   it took awhile to do that.

22      Q.  Okay.

23      A.  With the expectation that we would

24   continue to -- to develop a growth in the

25   program.  Looking to refine policies and

97

1    of your question?

2        Q.  Did the SEC ever say, you know, going

3    beyond this particular language, that if there's

4    anybody involved in the transaction who's a

5    foreigner, that's a red flag?

6        A.  Yeah, not that I can recall.

7        Q.  For example, did the -- did you ever

8    understand from the guidelines that if your

9    customer had -- had acquired stock from someone

10   who happens to be foreign that that's something

11   that has to be disclosed?

12       A.  No, not that I can recall.

13       Q.  Then on page 4 -- I apologize.  Page 5.

14   In the second full paragraph there is a response

15   here to this issue with respect to a foreign

16   location or incorporation.  Do you see that?

17       A.  I do.

18       Q.  Okay.  Your response was the sub

19   account holder's locale is not an indication of

20   or evidence of suspicious activity.

21           So what was -- what was your view

22   with respect to the significance of the location

23   of the sub account holder?

24       A.  I didn't place any significance on

25   that.

1    Q.  Okay.  Let me ask you this, by the way.

2    And there's some reference in here.  What about

3    -- there's -- there's lists -- OFAC lists, for

4    example, and jurisdiction lists where there is

5    heightened scrutiny.  Did Alpine consider those

6    when it was dealing with its SAR filings?

7    A.  We -- I can't recall actually having

8    any specific examples where a client either

9    acquired an asset from someone who was from an

10    OFAC S T N or someone who was subject to that

11    list.

12    Q.  Okay.

13    A.  So to the extent that we certainly

14    would look at that as part of any -- any other

15    rule or reg.  OFAC or otherwise.  But the --

16    simply the presence of a -- of a client who

17    resides in another country in and of itself is

18    not an indicator.

19    Q.  Okay.  You used the phrase there sub

20    account holder.  Can you just explain what that

21    means?

22    A.  In this context, I'm referring to the

23    underlying account holders of an account.  So,

24    for example, you may have a -- an introducing

25    broker-dealer who's brought their client to --

101

1    of 2015.  So part of that was looking again at

2    the program, something that we continually did

3    throughout my tenure.  But looking at the

4    program, looking at opportunities to enhance it.

5        Q.  Okay.  There was reference in the

6    criticisms by the SEC with respect to whether an

7    issuer of securities was previously a shell

8    company.  Okay?

9        A.  Yes.

10       Q.  So let me ask you this.  Is there an

11   indication on the paperwork generally speaking

12   about whether or not the issuer of the

13   securities was ever a shell?  Is that an item

14   that appears on the paperwork that Alpine

15   reviews?

16       A.  The -- in some instances, correct.

17       Q.  Okay.

18       A.  Yep.

19       Q.  Is the fact that an issuer was at some

20   point in its life a shell company, did Alpine

21   view that as something that was automatically

22   suspicious and that should -- and that must be

23   incorporated in the narrative?

24       A.  Not necessarily.

25       Q.  Why not?

102

1      A.   The -- the mere fact that a company was

2   a shell company and no longer ceases to be a

3   shell company wasn't necessarily indicative of

4   suspicious activity.  It is something that we

5   would look at on a facts and circumstance

6   analysis to determine whether that specific fact

7   was relevant to that particular filing.

8      Q.   Okay.  Let me ask you this.  Whether an

9   issuer was a shell, does it make a difference if

10  the securities that are -- that are being

11  deposited are the result of an S 1 offering?

12  Does that impact the significance of whether a

13  company was a shell?

14     A.   It's been awhile since I've had to

15  think about the various registrations.  But my

16  recollection is that had some bearing on it.

17     Q.   Okay.  Let me ask it the reverse way.

18  If stock is represented to be free trading under

19  rule 144, is there any significance to whether a

20  company is a shell?

21     A.   That would be important to know.

22     Q.   Okay.  So if it's not under rule 144,

23  what would be the impact of that in terms of

24  shell status?

25     A.   The -- generally none that I can --

103

1    that I can think of.  But again, it would be

2    something we would look at holistically as part

3    of the entire package.

4        Q.  Okay.  If you could take a look at page

5    10, there's a discussion there regarding

6    Alpine's heightened supervision list.  Under 2 A

7    1, this reflects the criticism relating to

8    customers or accounts that appeared on the

9    heightened supervision list.  Do you see that?

10        A.  I do.

11        Q.  Okay.  Does this -- does this criticism

12    suggest that Alpine must elaborate in its SAR

13    narrative on the particular facts and

14    circumstances that led to the account being on

15    the heightened supervision list?

16        A.  No.

17        Q.  In fact, doesn't this cite a very

18    different issue, which is the firm failed to

19    demonstrate what its follow-up was, whether

20    meaningful review was taken with respect to

21    future activity?

22        A.  Yeah, that's what's being represented

23    here.

24        Q.  Okay.  So in this -- in this document

25    is there any criticism that Alpine or any

104

1    directive that Alpine had failed by using that

2    heightened supervision designation that that in

3    and of itself was a failure of Alpine in its SAR

4    narrative?

5        A.   I -- I don't believe so.

6        Q.   Okay.  All right.  And the last of the

7    criticisms that's leveled by the SEC is the firm

8    was unable to access the website of an issuer.

9               Would that in and of itself be

10   something that Alpine viewed as suspicious or

11   indicative of criminal activity?

12       A.   No, not necessarily.

13       Q.   Okay.  All right.  We've talked about

14   the fact that in here you reference what you

15   call the five Ws, in terms of how -- what should

16   be included in a SAR filing; correct?

17       A.   Correct.

18       Q.   Now, the who, what, when, where kind of

19   stuff, that is part of the SAR form itself;

20   correct?  So there's specific boxes looking for

21   the who and the when and all that?

22       A.   Correct.

23       Q.   Okay.  With respect to the narrative,

24   that's more of a why question; right?  Why is

25   the firm filing this SAR?

105

1       A.  Correct.

2       Q.  Okay.  Now I would like you to take a

3    look at what we're going to mark as Exhibit 54.

4              (Exhibit 54 was marked for

5          identification by the reporter.)

6       Q.  And I'm going to direct your attention

7    really to the third and fourth pages.  And do

8    you recognize this document?

9       A.  I do.

10      Q.  Okay.  This is a memo from you to Doug,

11   Erin, Mandee, and Tom; is that correct?

12      A.  Yes.

13      Q.  Dated August 30th of 2012; correct?

14      A.  Yes.

15      Q.  And what did this -- what did this

16   package memo and the attachments relate to?

17      A.  It appears to relate to training

18   provided by me earlier in the day.

19      Q.  Okay.  Now I'm going to ask you to look

20   at the third page and the fourth page.  Does

21   this memo really walk through the five Ws that

22   you're referring to also in this letter, the

23   who, what, when, where, why?

24      A.  Yes.

25      Q.  Okay.  And let me just focus you on the