# Exhibit D

```
 1                UNITED STATES DISTRICT COURT
 2                SOUTHERN DISTRICT OF NEW YORK
 3
 4   - - - - - - - - - - - - - -
 5   UNITED STATES SECURITIES      )
 6   AND EXCHANGE COMMISSION,      )
 7          Plaintiff,             )   CASE NO.
 8   vs.                           )   17-cv-4179-DLC
 9   ALPINE SECURITIES             )
10   CORPORATION,                  )
11          Defendant.             )
12   - - - - - - - - - - - - - -
13
14
15      HIGHLY CONFIDENTIAL - CONTAINS BSA MATERIAL
16         VIDEOTAPED DEPOSITION OF RANDALL JONES
17               TUESDAY, MARCH 20, 2018
18
19
20         BEHMKE REPORTING AND VIDEO SERVICES, INC.
21              BY:  TERI HANSEN CRONENWETT, CRR, RMR
22                   UTAH LICENSE NO. 91-109812-7801
23                      160 SPEAR STREET, SUITE 300
24                   SAN FRANCISCO, CALIFORNIA 94105
25                                   (415) 597-5600
```

1  Q.  What were your responsibilities as a
2  compliance analyst?
3  A.  I would take deposit paperwork that we
4  received in from our own clients, as well as
5  correspondents, and assemble it in the correct fashion.
6  While doing that, I would look for anything that I might
7  determine to be abnormal or suspicious with the deposit.
8  I was also tasked with producing some
9  compliance reports on a weekly basis.  I think that was
10 surrounding deposits, number of deposits coming in, that
11 sort of thing.  You know, six years ago, so kind of
12 forgotten the majority of it, but that's kind of the
13 nitty gritty.
14 Q.  Great.  Okay.  You mentioned a correspondent
15 client or correspondent.  I'm not sure if you used the
16 word "client."  Describe what you mean by the
17 correspondent.
18 A.  Correspondent clients, yes.  So Alpine is a
19 clearing firm.  We clear for correspondent clients.
20 Currently we have four.  Back then I think we had maybe
21 seven.  So they -- they ask us to provide essentially
22 back office services for them, and they introduce their
23 clients.  They still have their clients, they work with
24 them, but we do and provide the back office functions as
25 well as, at the time, we would review for Section 5 on

1 their deposits.
2     Q. Okay. Is -- is a correspondent client
3 sometimes known as an introducing broker?
4     A. Yes.
5     Q. You said you reviewed deposit paperwork. Was
6 it -- well, first let me back up. How many other
7 compliance analysts were there when you were a
8 compliance analyst?
9     A. When I first started, it was just me. I was
10 the first hire when Alpine started hiring again. They
11 went through a period in time where they had downsized
12 quite a bit, and I was subsequently the first hire when
13 they started to hire more people.
14     Q. And was it either your or Alpine's procedure
15 to review every deposit that comes in, or were you
16 referred deposits to review?
17     A. Since I have been at Alpine, we have not once,
18 ever not reviewed every single deposit. Every single
19 deposit that comes in the door is reviewed.
20     Q. Oh, yeah, I understand. But I was, like, the
21 role that you were describing, was that -- when you were
22 just looking at deposit paperwork, was it just every
23 deposit that comes in you look at the paperwork?
24     A. Yes.
25     Q. Okay. All right. And what types of things

1    Q.   During your time as a compliance analyst, did
2  you have any role in preparing suspicious activity
3  reports, or we'll call them SARs, if that's okay?
4    A.   Sure.  I did.  I would help Elisha Werner
5  prepare the SARs.  There was -- I want to say I was
6  running a report to help out at some point as well with
7  that, but it was some preparing, helping her prepare
8  them.
9    Q.   All right.  And I want to walk through some of
10 the details on your preparation there.  And maybe you
11 can start by telling me, how did you know when to start
12 preparing a SAR?
13   A.   We had a checklist that, if it hit one of the
14 thresholds on the checklist, you had to take a much
15 closer look at it.  Ultimately at the time, I was not
16 AML officer, I am not sure what determination she used;
17 she meaning Elisha, or on whether or not to file a SAR.
18 So I don't want to have to go answer that because I am
19 not quite sure.
20      But as far as I am concerned, when I was
21 tasked with helping to prepare a SAR, I prepared the
22 SAR.  Does that make sense?
23   Q.   Yeah.  And I am asking, did -- in each
24 instance that you were helping to prepare a SAR, did
25 somebody tell you that you needed to do that, or was it

1  something that you initiated on your own?
2      A.   I believe Elisha would have told me this
3  should be prepared.
4      Q.   Okay.  And so was it her that would do the
5  checklist first or you?
6      A.   I think it might have been both of us --
7      Q.   Okay.
8      A.   -- at the time.  I think we were both
9  reviewing deposit documentation.
10     Q.   And when you were preparing SARs as a
11 compliance analyst, am I correct that you didn't know
12 for sure whether that it would actually be filed; you
13 were just preparing it for somebody to look at?
14     A.   Correct.
15     Q.   And which parts were -- maybe it's perhaps all
16 parts.  Which parts of the SAR form were you tasked with
17 preparing for that initial round?
18     A.   As I recall, it would have been the entire SAR
19 form.
20     Q.   Okay.  Including the narrative section?
21     A.   I believe so.
22     Q.   Okay.  Did you use templates to prepare the
23 narrative section?
24     A.   I don't remember having any templates.
25     Q.   Did you start from scratch for each SAR

1    A.   Am I -- sorry, just so I can keep on task.  Am
2  I done with 37 for now?
3    Q.   Yeah, just --
4    A.   I'll keep it close.  That's fine.  I don't
5  like to mix things up.
6    Q.   Sure.  All right.  Now I want to talk about
7  just now your role as an AML officer, and if it helps, I
8  think I want to exclude from all of these questions the
9  work you did on the lookback period.
10    A.   So all my time as AMLO excluding lookback
11 period?
12    Q.   Right.  I just want to, you know, just same
13 type of questions as before, to just understand your
14 responsibilities during the time as an AML officer with
15 respect to deposits that were sort of coming in under
16 your watch.
17    A.   Sure.
18    Q.   Okay.  All right.  So I guess you could start
19 at a general level and just tell me what your
20 responsibilities were as to new deposits once you became
21 AML officer.
22    A.   It -- each and every deposit that comes into
23 Alpine is reviewed by the review team, and then if
24 there's a SAR referral now, I think it gets reviewed.
25 Back then, I was -- I believe I was reviewing each and

```
 1  every deposit to make the determination.  I don't know
 2  that much would have changed between the review period
 3  and something else.  Does that make sense?
 4       Q.   Yeah.  I'll follow up on a few things.  Who is
 5  on the review team that you mentioned?  You can just go
 6  by title itself.
 7       A.   Back then or currently?
 8       Q.   No.
 9       A.   During this time?
10       Q.   As your time as AML officer.
11       A.   Jeez, I think Travis Standiford.  I believe
12  Betsy was review.  Mandee Jacob would have been there as
13  well.  Kelly Poping was operations, so she would not
14  have been on the review team.  I am trying to remember
15  whether Erin -- she goes by Erin Green now, but it was
16  Zipprich at the time.  She was on the team at some point
17  during my tenure as AML.  I don't remember specific
18  dates though.
19       Q.   And when you refer to the review team, were
20  you included -- would you -- were you part of the review
21  team?
22       A.   You know, I think I was for a time.  I
23  don't -- I am trying to remember back on exactly how it
24  all played out, and having moved on from that and gone
25  to different positions within the firm, and having that
```

1  anyone prepare drafts of SARs for you?
2      A.   I believe that I did.
3      Q.   All right.
4      A.   I believe I had somebody helping me.  I can't
5  recall who it would have been exactly.  Again, six years
6  ago.
7      Q.   All right.  And you, I think, said earlier
8  that Betsy Voter was the final reviewer before a deposit
9  got to you; is that right?
10     A.   As I recall.
11     Q.   And once a deposit came on your desk as AML
12 officer, what did you do?
13     A.   Reviewed the deposit to determine whether I
14 found anything to be suspicious with that deposit, and
15 then subsequently, if I needed to, file a SAR or not
16 file a SAR.
17     Q.   What criteria did you use as AML officer to
18 determine whether to file a SAR?
19     A.   It would have been the same criteria that we
20 had used in the past, including anything new that -- you
21 know, industry guidelines, regulations were put out in
22 that time period.  It was a short time period so to
23 speak.
24          So, and I was -- I had been groomed
25 effectively to take on the AMLO position.  I know it

1  A.  Yes.
2  Q.  Did you have a view, at the time you were AML
3  officer, that checking yes to any of these could be
4  self-incriminating?
5      MR. LEBENTA: Objection to form. Calls for a
6  legal conclusion. Argumentative. I -- maybe I didn't
7  understand the question.
8  A.  Yeah.  Could you -- what shall -- I guess,
9  what do you mean by self-incriminating?
10 Q.  Did you think that in any way, if -- that
11 Alpine checked yes to any of these four questions that
12 they would be admitting -- that Alpine would be
13 admitting any kind of wrongdoing?
14 A.  No.
15 Q.  During your time as AML officer, did you ever
16 see any of these questions, one through four, marked
17 yes?
18 A.  Six years ago, I don't recall.
19 Q.  Just based on your memory, would it have
20 surprised you to see a checkmark in the yes column?
21     MR. LEBENTA: Objection, asked and answered.
22 Go ahead.
23 A.  Again, I -- I don't recall seeing any six
24 years ago. I have had two kids and loss of -- lots of
25 sleep since then, so.

```
 1            And if you don't mind, could we go off the
 2   record so I could use the restroom again?  Is that okay?
 3       Q.   Yes, this is a good time.
 4       A.   Okay.  Cool.  Thank you.
 5            THE VIDEOGRAPHER:  We're going off the record.
 6   This marks the end of Media No. 1.  Time is 10:42.
 7            (Recess from 10:42 a.m. to 10:54 a.m.)
 8            THE VIDEOGRAPHER:  We are back on the record.
 9   Here marks the beginning of DVD No. 2, in the deposition
10   of Randall Jones.  The time is 10:54.
11       Q.   (By Mr. Miller)  All right, Mr. Jones, I have
12   a few more questions about the checklist on the second
13   page of exhibit --
14       A.   41.
15       Q.   -- 41.
16       A.   Okay.
17       Q.   During your time as AML officer, did you
18   believe that Alpine could still process a deposit even
19   if one of the four questions here that are numbered is
20   checked yes?
21       A.   To be honest with you, I don't recall what I
22   would have thought about that.
23       Q.   As an AML officer, did you do anything to
24   investigate whether the answers to the numbered
25   paragraphs 1 through 4 were correct?
```

1          MR. LEBENTA: Objection as to form. Go ahead.
2          MR. MILLER: Actually, yeah, thanks. Let me
3   ask it a little different.
4       A.   Sure.
5       Q.   (By Mr. Miller) Did you do anything to
6   investigate a transaction to determine whether you
7   agreed with the answers to the numbers one through four
8   on this checklist?
9       A.   I -- I don't remember any specific
10  transactions to speak of. You know, there's one
11  transaction that just sticks out in my head, and I don't
12  even think it was from when I was AML. But it was pay
13  phones in western New York.
14          I went to school in western New York, and I
15  know what's out there, and there's a whole lot of
16  nothing. And I also know a lot of people have land
17  lines there, and this was the big thing. They were
18  going to be, you know, putting pay phones in, and I
19  thought that was suspicious. I can remember researching
20  that.
21          Just again, I went to school in western New
22  York. It seems a bit odd. That I believe I actually
23  spoke to Elisha Werner about that. And I am sorry to go
24  back, but that's just something that kind of sticks out.
25          I don't recall a specific instance though,

1  when I was AMLO, of researching. I'm sure I did at some
2  point, but I just don't recall specific instance.
3      Q.  Okay. You have -- it's a little bit of a long
4  answer, and I am just going to ask if I understand it
5  right --
6      A.  Sure.
7      Q.  -- is -- or, that you don't recall an instance
8  where you investigated a transaction to determine
9  whether you agreed with the checks in items one through
10 four on this checklist?
11     MR. LEBENTA: Just objection. Pardon me.
12 Asked and answered. Go ahead.
13     A.  Again, I don't recall a specific instance.
14 I'm sure that I more than likely did at some point. I
15 just don't recall.
16     Q.  (By Mr. Miller) When you were AML officer,
17 was it your decision alone on whether to file a SAR or
18 not?
19     A.  For anything that I reviewed, it would have
20 been. I believe Todd Groskreutz, being CCO of the firm,
21 had authority to do that as well. I can't remember if
22 he had a login or not. But as I recall, it would have
23 been the two of us. And then eventually that would have
24 gone to Elisha -- or not Elisha, I apologize, Leia, when
25 she became CCO as well. She would have had the dual

1  designation so to speak.
2      Q.   So as an AML officer -- when you were the AML
3  officer, and you make a decision to file a SAR?
4      A.   Uh-huh.
5      Q.   What did you do next?
6      A.   File a SAR.
7      Q.   What did you do next to file a SAR?
8      A.   File the SAR.  Fill out the form, file the
9  SAR.  Is there something else I should have been doing?
10     Q.   No.  I am asking did you -- so you already had
11 a draft SAR ready for you when you made that decision?
12     A.   I could have had a draft SAR ready or it would
13 have been a SAR I prepared on my own.
14     Q.   Okay.
15     A.   If -- if it was a draft SAR, I would have
16 looked at the SAR, determined whether I found anything
17 to be suspicious.  If it was a deposit, I would have
18 looked at the deposit to determine whether I found
19 anything suspicious.
20     Q.   Do you recall instances when you revised any
21 of the draft SARs that you were given?
22     A.   I don't recall any specific instances.  I'm
23 sure I might have along the way.  I'm sure I did.  But I
24 don't recall any specific instances.
25     Q.   Turn to the third page of Exhibit 41.

1  at that?
2      A.   Again, it's part of the packet that's involved
3  in the deposit.  If something seems suspicious about
4  that, then I would make note of it.  If I found it to be
5  suspicious, I would have added it into a SAR.  Again,
6  we -- we review the documentation that's in front of us
7  to make a determination on things, whether it be resale
8  exemption with a client can sell, or whether I need to
9  file a SAR.
10     Q.   At the time you were an AML officer, did you
11 have an understanding about when the size of the deposit
12 compared to the trading volume might be suspicious?
13          MR. LEBENTA:  Objection to form.  Lacks
14 foundation and -- that's it.
15     A.   I guess I don't understand the question.
16 Could you --
17     Q.   (By Mr. Miller)  Yeah.  I mean, earlier this
18 morning we talked about things like bump and dump
19 schemes.
20     A.   Uh-huh.
21     Q.   Match trades.
22     A.   Uh-huh.
23     Q.   Does the size of a deposit, relative to the
24 average trading volume, have anything to do, in your
25 mind, with those kinds of market manipulations we talked

1  about earlier?
2     A.  It can.  I don't think it always does.  Just,
3  I mean, there's -- there's a laundry list of items that
4  you would bring into consideration when you look at
5  manipulative trading.  It's not just the deposit and
6  number of shares that were deposited.  This -- in this
7  case this client could have taken six months to get out
8  of that.  Could have taken a week.  I don't know the
9  time line in which they got out of that stock.
10        You could have an instance where the CEO of an
11 issuer wants to deposit stock.  They have a large block.
12 It has low trading volume, but they have a large block,
13 and they just want to put it in for safe keeping.  So
14 they give us this large block, knowing that they will
15 need to sell under 144, have these 90 day windows.  They
16 will need to notify the SEC when they're -- they're
17 selling through the 144 grid.
18        But I don't -- I don't think it's necessarily
19 suspicious to have that CEO put the stock in just for
20 safe keeping.  And I don't know specifically what the
21 trading was on this account with this security after
22 this.  So I -- I wouldn't be able to tell you whether
23 this is suspicious or not.
24    Q.  As AML officer, was there a threshold or
25 guideline about when to look into market manipulation?

1      A.   An Alpine guideline or industry guideline?
2  Just for clarity.
3      Q.   How about any guideline that you used as AML
4  officer?
5      A.   Sure.  Yeah, if I noticed in my -- my due
6  diligence there was a spike in volume or a spike in
7  price or anything like that, and then, yeah, that's
8  something you note.  It's not that I blindly did this
9  stuff and rubber stamped it and said I don't care.  It's
10  quite the opposite.
11      You know, I -- in -- in part, and I -- I --
12  I'll side track here for a second, because this -- you
13  know, my dad was in the Trade Center on 9/11.  Okay.  So
14  I think that anti-money laundering is an integral part
15  of this business and every business that surrounds
16  financial services on the whole.
17      I think it plays a very, very, very important
18  part.  It is the cornerstone of what I use on a daily
19  basis in interacting with clients.  If I find something
20  suspicious nowadays, I'm more than happy to refer it and
21  even shut the account down.  Because it directly
22  affected me, right?
23      I understand BSA was in existence long before
24  9/11, but I also realize what we have done since 9/11
25  with BSA and under other guidelines.

1       At no point in my career, whether it be at
2  Goldman, Alpine or anywhere else, have I ever thought,
3  ah, it's AML.  Who cares?  We just got to check the
4  boxes, right?  We just got to do what we need to do.
5  It's been quite the opposite.  It's, we have an integral
6  part to play in each and everything we do, and I take
7  the job seriously now, and I took it extremely seriously
8  then as well.  I think everybody should.
9       And one of the things I have loved about
10 Alpine is that it is a culture of compliance.  Everybody
11 does the best they can possibly do, and we try and
12 improve things when we can.  I have tried interacting
13 with FINRA and FinCEN in the past.  Got almost nowhere.
14 They didn't want to offer assistance on what we could do
15 better.
16      But no one at Alpine, including myself, has
17 ever thought, who cares?  We'll just do what we need to
18 do and it doesn't matter.  So I apologize for side
19 tracking on to that.  But I -- this stuff, it kind of
20 hits hard, right?  Because I have all that in my
21 background, and it's extremely important to me.
22     Q.  Okay.  Yeah, no apologies.  That's fine.
23         As AML officer, did you ever consider
24 including potential red flags in a SAR narrative?
25             MR. LEBENTA:  Objection to form.  Go ahead.

1    A.    If I determine something to be suspicious and
2 needed it to be included in the SAR, I would have put it
3 in the SAR.
4    Q.    (By Mr. Miller)  And, you know, you have told
5 me a few times that it's been quite a while since you
6 were AML officer.  Do you have a independent memory of
7 any of the thought processes that you used to make those
8 kinds of decisions?
9    A.    Of whether to put it in the SAR?
10   Q.    Yeah.
11   A.    No.  I don't remember any specific instances
12 or, but I guess, by independent memory, do you mean like
13 a specific instance of this or --
14   Q.    Right.
15   A.    Yeah, I -- I don't.  I -- I wished I did, so I
16 could be helpful, but I don't.
17   Q.    Okay.  All right.  We have been talking a lot
18 today about deposits, and I want to focus on sales that
19 Alpine --
20   A.    Okay.  So I'm done with 41 for now --
21   Q.    For now.
22   A.    -- I assume?  Okay.
23   Q.    We can break it up by different roles between
24 your role as a compliance analyst or an AML officer if
25 it -- if it makes sense, but I want to know just

1  generally, did you have a role while in the AML program
2  reviewing sales?
3      A.   Yes.  So at some point in -- I don't remember
4  exactly when, but after I became AML officer, and even
5  when I was AML officer, I was reviewing -- and I -- I
6  focus on one more than the prior just because I was -- I
7  had eventually moved up to trading as well.  They had an
8  opening there, found that to be maybe more -- more in
9  line with what I wanted to do in the long run.
10          I distinctly remember reviewing trading
11 information.  I can remember making referrals to Leia
12 Farmer at multiple points throughout my tenure at
13 Alpine, both as AMLO and I think after that.  It's
14 something I still do to this day.  You know, even up
15 until two weeks ago, we shut an account down because
16 the -- I think it was trading on one account and maybe
17 the -- something else happened on the other.  But
18 something I have always looked at.
19      Q.   So during your time as an AML officer, did
20 every sale that went through Alpine get to the AML
21 department?
22          MR. LEBENTA:  Objection to form, foundation.
23 Go ahead.
24      A.   You mean was there an order ticket that was
25 given to the AML department for each and every sale,