# Exhibit E

Case 1:17-cv-04179-DLC   Document 115-5   Filed 04/20/18   Page 2 of 12

```
1                UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF NEW YORK
3
4   - - - - - - - - - - - - - - -
5   UNITED STATES SECURITIES      )
6   AND EXCHANGE COMMISSION,      )
7          Plaintiff,             )   CASE NO.
8   vs.                           )   17-cv-4179-DLC
9   ALPINE SECURITIES             )
10  CORPORATION,                  )
11         Defendant.             )
12  - - - - - - - - - - - - - - -
13
14
15            VIDEOTAPED DEPOSITION OF ERIN GREEN
16                 WEDNESDAY, MARCH 14, 2018
17
18
19
20         BEHMKE REPORTING AND VIDEO SERVICES, INC.
21              BY:  TERI HANSEN CRONENWETT, CRR, RMR
22                    UTAH LICENSE NO. 91-109812-7801
23                         160 SPEAR STREET, SUITE 300
24                       SAN FRANCISCO, CALIFORNIA 94105
25                                      (415) 597-5600
```

              (415) 597-5600

```
 1  the SAR trigger referenced in the document?
 2       Q.   (By Mr. Carlyle)  Well, the document refers to
 3  SAR triggers throughout it.  What is a SAR trigger at
 4  Alpine to your understanding?
 5       A.   An occurrence of a fact or activity that could
 6  lead to the preparation and filing of a suspicious
 7  activity report.
 8       Q.   In this e-mail to you and others, Ms. Farmer
 9  says, "Below are some additional examples of potential
10  SAR triggers to consider when reviewing the initial
11  reviews or final in Tom's case.  If as part of your
12  review you see the following, let's prep a SAR filing."
13  Do you see that?
14       A.   Uh-huh.
15       Q.   Was it your understanding that Ms. Farmer was
16  directing you to prepare a SAR if any of the factors in
17  this e-mail were present based on your review of the
18  deposit documents?
19            MR. LEBENTA:  Objection as to form, and the
20  document speaks for itself.
21       A.   You are asking me to speak to my knowledge of
22  this at the time that I received it?
23       Q.   (By Mr. Carlyle)  Yes.
24       A.   I don't recall from August of 2012.
25       Q.   Okay.  So where Ms. Farmer says, "If as part
```

1  of your review, you see the following, let's prep a SAR
2  filing," you are saying that -- that you do not recall
3  whether you understood that to be a direction to prepare
4  a SAR filing if these factors were present?
5         MR. LEBENTA:  Objection.  Mischaracterizes her
6  testimony, and to form.
7    A.   Can you repeat that please?
8    Q.   (By Mr. Carlyle)  So where Ms. Farmer says,
9  "If as part of your review you see the following, let's
10 prep a SAR filing," you are saying now that you do not
11 recall whether you understood that to be a direction to
12 prepare a SAR filing if these factors were present; is
13 that correct?
14        MR. LEBENTA:  Objection, mischaracterizes her
15 testimony.
16   A.   I don't recall receiving and reading this
17 e-mail.
18   Q.   (By Mr. Carlyle)  Okay.  So when you look at
19 the e-mail, the first SAR trigger that Ms. Farmer told
20 you about was, "The issuers, control, persons, customer
21 or any third party from whom the customer received the
22 shares has a regulatory disciplinary history involving
23 fraud or other securities-related violations."  Do you
24 see that?
25        MR. LEBENTA:  Objection.  She -- to the form.

1      MR. LEBENTA:  Objection.  The document speaks
2  for itself.  Go ahead.
3      A.   One of Leia's first objectives when she came
4  to Alpine was to have each employee write a description
5  of each function of their job, which she then redlined,
6  edited.  We discussed it in meetings, went back and
7  forth until she felt it was sufficient to save as a
8  formal document.
9      Q.   (By Mr. Carlyle)  Does this document describe
10 your role as a compliance analyst in the suspicious
11 activity report preparation process?
12     A.   Yes.
13     Q.   Looking at the detailed steps in item 1.1, it
14 says, "Choose the appropriate template.  It should
15 correspond with the client on your OTC deposit form."
16 What does that refer to?
17     A.   There were -- for administrative relief, I
18 would say -- there were template versions saved which
19 were appropriate for OTC deposits which were made by an
20 introducing firm or by a retail client.
21     Q.   Next it says, 1.2.  It says, "For heightened
22 supervision accounts, use the template with the client's
23 name at the end."  What does that refer to?
24     A.   For -- as -- as a compliance analyst, if there
25 was a customer we were filing a large number of SARs on,

1  again for administrative relief, we would prepare a -- a
2  template.  And by template I mean as a compliance
3  analyst, I would fill out the subject information for
4  that person and save that as a means to make the process
5  more efficient.
6          The way that those were saved, physically
7  saved on our network, the -- that's referring to how I
8  would locate that electronic file.
9      Q.  Okay.  Do you recall what information the
10 templates contained for the heightened supervision
11 accounts?
12     A.  Which part of the template?
13     Q.  Oh, was -- was there a narrative component to
14 the heightened supervision account template?
15     A.  I don't recall.
16     Q.  Okay.  You don't remember?
17     A.  (Witness shakes head.)
18     Q.  It says, "For any other account than the hyper
19 supervision accounts," or "the heightened supervision
20 accounts, use the general template."  What does that
21 refer to?
22     A.  That would refer to a version that didn't have
23 the subject information already filled in.
24     Q.  Did those templates contain information for
25 the narrative sections?

1   A.   Members of compliance, chief compliance
2   officer.  Potentially legal staff.  I -- I don't
3   remember dates, name, words and specific conversations.
4   But it's been a subject that we have been aware of and
5   have discussed.  And obviously, as I have become more
6   educated, moved up in the company, I have been privy to
7   more of those conversations, some of which occurred
8   during the relevant time period and some of which have
9   occurred after.
10  Q.   (By Mr. Carlyle)  And these are individuals
11  that you are saying that you spoke to about Leia Farmer
12  having spoken to regulators, including during exams,
13  regarding Alpine routinely filing SARs?
14       MR. LEBENTA:  Objection, mischaracterizes her
15  testimony.  You can answer.
16  A.   These are people that -- that I have discussed
17  in a -- in a grand scheme the concept of what you are
18  referring to.  Discussed that situation, among many
19  other things.  And like I said, what can we learn from
20  that guidance by enforcement.  How can we improve
21  policies and procedures on a continual basis?
22  Q.   (By Mr. Carlyle)  If you can look at paragraph
23  32 of the same declaration.  It starts out, where you
24  say, "The existence of any factor which required
25  consideration of a particular circumstance did not

1   automatically trigger a duty to include that factor in
2   the SAR narrative or file a SAR at all."
3           Do you see that sentence?
4       A.  Yes.
5       Q.  Okay. What was your basis for making that
6   statement?
7       A.  Again, we go back to the -- the -- the
8   requirements to file a SAR under a -- under the BSA.
9   That does not -- as an AML officer now, if someone
10  approaches me with a concern, whether or not it falls
11  under one of those four requirements, I have an
12  obligation to listen, investigate, and see whether
13  there's an opportunity to escalate, to file a SAR, to
14  take other action, which may be appropriate to, you
15  know, mitigate potential risk.
16          If someone walked in and told me that they saw
17  a black cat walk across the street and they thought that
18  maybe that had something to do with stock fraud, I would
19  give, you know, that person the time of day to perform
20  that investigation based on their concerns. That's part
21  of -- that's part of AML.
22      Q.  Were there any specific factors that you are
23  referring to here that did not automatically trigger a
24  duty to include that factor in the SAR narrative or file
25  a SAR?

1    A.   Basically what I am saying is, a red flag,
2  whether or not it triggers a filing requirement under
3  the BSA, should always be considered by -- you know,
4  ultimately an AML officer is -- is typically the person
5  that decides the SAR decision.  Red flags should be
6  considered.  That's, you know, whether or not it is a
7  trigger under the BSA to file a SAR, those things that
8  should still be considered and implemented into a policy
9  or program.
10   Q.   That first sentence of paragraph 32, is that a
11 conclusion that you reached during that 2011 to 2015
12 time period?
13        MS. FRITZ:  As clarified by the following
14 sentence, taken in conjunction.  Am I correct?  You are
15 not trying to pull the first sentence out of context?
16        MR. CARLYLE:  Yeah, no.  That's -- that's
17 fine.
18        MS. FRITZ:  Yeah.
19   A.   And what was your question again?
20   Q.   (By Mr. Carlyle)  All of paragraph 32,
21 rephrase that.  Well, let's focus still on that first
22 sentence of paragraph 32.  Is that a conclusion that you
23 reached during the time period of 2011 to 2015?
24        MS. FRITZ:  Maybe we could take a break.  And
25 if we could just take a break and talk for a minute.

```
 1   When you were -- what was your position after compliance
 2   analyst?  Was it AML?
 3       A.   AML analyst.
 4       Q.   Analyst.  So when you were an AML analyst, you
 5   know, realizing there can be different circumstances,
 6   can you just generally describe what you did to
 7   investigate red flags that you became aware of?
 8            MS. FRITZ:  You can use an example if you
 9   want.
10       A.   Well, it's just -- it's tough based on the
11   nature of Alpine's business.  Every situation is
12   different.  Every situation would have required me to
13   consult with a different person, make a phone call,
14   review a website if I needed to.  Review a, you know,
15   documentation to support a stock deposit, a wire form.
16   Anything that was at my -- anything that I could access
17   that -- that could be of assistance.
18            You know, communications with legal counsel,
19   public information.  It's hard for me -- it's hard for
20   me to give you a specific example because everything is
21   so different, and you know, it's -- it's part of the
22   business of high risk.  It's out of the ordinary.  It's
23   constantly changing.  You just have to move your feet as
24   fast as you can to -- to move with it.
25            I can think of a specific example, if that
```

1  would be helpful.
2      Q.   (By Mr. Carlyle)  Sure, that would be helpful.
3      A.   For what I would do in an investigation.
4           MR. LEBENTA:  Sure.
5      A.   If there was a situation where a member of
6  the, you know, a member of the firm was concerned about
7  the identity of a customer and whether they were being
8  forthcoming about who they really were, I performed a
9  review of all of their account documentation that was
10 saved into our document imaging system.  Their stock
11 deposits, Google searches, up the wazoo, Lexus Nexus.
12 Actually ended up picking through a court docket and
13 uncovered that that person had been lying to us about
14 their identity.
15          We shut down the account, and it was one of my
16 great triumphs.  Whatever lengths are available that,
17 you know, you have you to go to and sometimes mold to be
18 appropriate to the situation.  That's what makes you a
19 good AML officer or good AML analyst.  You work your
20 butt off, if I may be so bold.
21     Q.   Okay.  So then focusing on the position after
22 the -- or starting with the AML compliance.  I'm sorry,
23 was it compliance analyst?
24     A.   Analyst.
25     Q.   Sorry.

```
 1            MS. FRITZ:  Was it compliance analyst or AML
 2   analyst?
 3       Q.   (By Mr. Carlyle)  Was it AML analyst?
 4       A.   Yes.
 5       Q.   Threw in compliance in there.  So when you
 6   were in that role, you know, can you describe what you
 7   did with information gleaned from the investigations of
 8   red flags?
 9       A.   If it was appropriate or I had any questions,
10   I would escalate the situation, discuss it with Leia,
11   prepare a SAR, if she required it.  Write her a memo,
12   portray it to the legal staff if I thought it was
13   pertinent.  Like I said, anything and everything that I
14   felt I needed to do.  Most importantly, if I identified
15   a red flag, and it was, you know, to escalate it to the
16   appropriate person in that role.
17       Q.   And how was that done, the escalation?
18       A.   Either verbally or via e-mail.  There may have
19   been, you know, other phone conversations.  But -- but
20   most commonly, it -- it would have been in an e-mail or
21   a meeting, verbal conversation.
22            MR. LEBENTA:  Do you need anything?  Are you
23   good?
24            THE WITNESS:  I'm good.
25       Q.   (By Mr. Carlyle)  In your view did staffing
```