# Exhibit N



# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

May 20, 2015

**Sent via U.S. mail**

Ms. Denise S. Saxon, Assistant Regional Director
U.S. Securities and Exchange Commission
Denver Regional Office
Byron G. Rogers Federal Building
1961 Stout Street, Suite 1700
Denver, CO 80294-1961

Courtesy copy to:
Lance Burkett, District Director
Financial Industry Regulatory Authority (FINRA), District 3
1400 S. Syracuse, Suite 1400
Denver CO 80237

Re: Alpine's Response to SEC Examination Findings, SEC No. 008-31646; DRO Exam No. BD2014DRO00025

Dear Ms. Saxon:

This letter is sent to acknowledge receipt of the SEC Staff's written examination findings dated April 9, 2015 and received in our office on April 15, 2015. We wish to thank you for granting our extension to deliver this response by May 20, 2015. For clarity, the Staff's findings followed by the firm's responses are set out below.

I. **31 C.F.R. § 1023.320 – Reports by Brokers or Dealers in Securities of Suspicious Transactions**
   **Rule 17a-8 under the Exchange Act of 1934 – Financial Recordkeeping of Currency and Foreign Transactions**
   **FINRA Rule 3310(a) – Anti-Money Laundering Compliance Program**

A. **Failure to File Complete and Accurate Suspicious Activity Reports**

Our examination found that, in a significant portion of SARS in the staff's sample, Alpine failed to completely and accurately disclose key information of which the Firm was aware at the time of filing – in contravention of the SAR Rule and Exchange Act Rule 17a-8.

1



# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

1. Deficiencies Identified From Information in Investigative Files vs. Information Reported in SARs

**[For ease of reference, Alpine is denoting this section as subsection (i)]**

The staff compared the SARs filed by Alpine against Alpine's investigative files relating to each SAR. The majority of Alpine's SARs described the same activity: deposits of penny stocks in customer accounts. Even though the narratives involved different customers and different securities, the narratives generally contained "boilerplate" language and very little – if any – specific and material information that Alpine identified in its investigations of the matters. Specifically, in 125 SAR filings (50% of the sample), the staff found that the Firm failed to disclose in the SAR narrative the following types of material information that was contained in the Firm's investigative files.[1]

The staff is particularly concerned about the gravity of some of the information about which Alpine knew, but chose not to disclose in SARs. For example, the Firm failed to disclose that:

- A customer who was the subject of a SAR had pled guilty to charges of fraud including conspiracy to commit securities fraud prior to the date of the SAR filing;
- A customer who was the subject of a SAR had been previously charged by the SEC with securities law violations;
- A customer who was the subject of a SAR had a criminal record;
- Evidence in the investigative file indicated that the security that was the subject of the SAR had been the subject of a recent stock promotion;
- The same or substantially similar activity described in a SAR had been previously conducted by the customer through the Firm and/or with the Firm's knowledge;
- A subaccount holder who was the subject of a SAR had a foreign location/incorporation;
- An issuer of securities that were the subject of the SAR was previously a shell company; and
- The Firm was unable to access the website of an issuer that was the subject of a SAR.

**[For ease of reference, Alpine is denoting this section as subsection (ii)]**

In addition, 30 SARs in the staff's sample disclosed only a deposit of micro-cap securities into a customer's account as the underlying suspicious activity. The staff found in all 30 instances, however, that at the time the Firm filed the SAR, the customer had also sold the same shares from his/her account at Alpine. Inexplicably, Alpine failed to disclose the sales in the SARs.

**[For ease of reference, Alpine is denoting this section as subsection (iii)]**

All of the information noted above was of critical importance to adequately and accurately describe the nature and extent of the suspicious activity that was the subject of each SAR. And, as evidenced by Alpine's own investigative files, Alpine knew of the omitted information at the time each SAR was filed. By excluding the information described above, Alpine failed to "provide a clear, complete, and concise description of the activity, including what was unusual or irregular that caused suspicion" and failed to show the degree of care required by FinCEN to complete the narrative. (In fact, we note that the amount and type of actual material information in SARs filed by Alpine is very similar to the sample SAR that FinCEN has identified in its public guidance as being insufficient or incomplete. This rendered the

---

[1] Additional details provided by the staff in *Exhibit A – SAR Findings* included in the staff's letter dated April 9, 2015.



ALPINE SECURITIES
Stock Brokerage & Investment Company

SARs less valuable to investigators trying to understand the activity and any criminal or administrative implications thereof. As a result, the Firm is in contravention of FinCEN's SAR Rule and Exchange Act Rule 17a-8. These deficiencies also evidence a weakness in the Firm's system to monitor and report suspicious activity in contravention of FINRA Rule 3310(a) and the Treasury's AML Program Rule, as discussed further below in Section II.

This is also *recidivist* activity. FINRA's 2012 Cycle Examination also found that the Firm's SARs were substantively inadequate, as the narratives of SARs reviewed by FINRA failed to fully describe why the activity was suspicious, in contravention of the SAR rule.

### Alpine's Response

For ease of reference, Alpine has demarcated certain sections above by line item to assist in directing SEC staff to a specific issue or question raised in the staff's Examination Findings and to provide Alpine with a reference point for our written response.

Alpine respectfully disagrees with these findings and takes exception that this is "recidivist" conduct. Alpine's policies and procedures are reasonably designed to achieve compliance with the Treasury's SAR Rule ("SAR Rule") and Exchange Act Rule 17a-8 ("17a-8"). The SAR Rule requires broker-dealers to file with FinCEN a report of any suspicious transactions relevant to a possible violation of law or regulation that is conducted or attempted by, at or through the broker-dealer; that involves or aggregates funds or other assets of at least $5,000; that the broker-dealer knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part): (1) involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation; (2) is designed, whether through structuring or other means, to evade any requirements of this chapter or any other regulations promulgated under the BSA; (3) has no business purpose or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or (4) involves use of the broker-dealer to facilitate criminal activity.[2] Exchange Act Rule 17a-8 requires the reporting, recordkeeping and retention of BSA documents.

In addition, that same Treasury Rule allows for the *voluntary* disclosure of information even if the information does not comport with the other requirements for a SAR. The Treasury Rule provides that a "broker-dealer may also file with FinCEN a report of any suspicious transaction that it believes is relevant to the possible violation of any law or regulation but whose reporting is not required by this section."[3] This is consistent with the central purpose of the Treasury Rule, which is to provide government agencies with material that might help inform it of possible violations. The Staff's finding of "inadequate" SARs on the basis of standards that are not found in the Treasury's SAR Rule or Exchange Act Rule 17a-8 is inconsistent with this language, and would have the paradoxical effect of reducing the

---

[2] 31 C.F.R. §1023.320(a).

[3] 31 C.F.R. §10319(a).

3



**ALPINE SECURITIES**
*Stock Brokerage & Investment Company*

information available to the SEC or other agencies through the process. Accordingly, its filings can certainly be considered in the nature of the alternative, voluntary filing process. As you are aware, Alpine's main business line is providing clearing and trade processing services for microcap stocks, primarily in physical form. The firm is well aware of the regulatory scrutiny of such transactions, and the wide-ranging cases the SEC and other regulators have brought to reduce violative activity in this area. Alpine wants the various regulatory agencies to have the benefit of seeing information it has in its possession, especially in areas where those agencies have been active, such as the realm of microcap securities. Alpine has developed a tailored AML approach in light of its business model that strives to identify information in which the regulatory agencies may find of interest and is in compliance with the Treasury SAR Rule and Exchange Act Rule 17a-8.

*i)* Alpine respectfully disagrees with the finding that it was not in compliance with the SAR Rule and Exchange Act Rule 17a-8, which the staff cites to support its conclusion that the SARs filed by the firm were "substantively inadequate." The Staff is employing a standard that is not contained in the SAR Rule or 17a-8, and is inconsistent with the regulatory language that provides for voluntary disclosure of any information "relevant" to a possible violation of law or regulation. Nor is Alpine aware of any guidance demonstrating that the manner in which Alpine described the conduct in its SARs was inadequate. Rather, Alpine typically would describe the issuer, customer or introducing firm, and the relevant transaction details, which is sufficient information for any regulator or law enforcement personnel to further request information from Alpine or investigate the activity. The central tenet of the SAR Rule entails detecting and reporting suspicious activity. Additional guidance, though useful, is supplementary to the core requirement that suspicious activity be reported. Alpine's program complies with the SAR Rule and 17a-8. Though Alpine constantly seeks ways to improve its program, Alpine undertakes a myriad of measures to ensure it is meeting its reporting obligation and to provide narratives that meet the guidance provided by FinCEN.

A firm's AML program should be "risk-based" in that the policies, procedures and controls are designed to address the money laundering risks inherent to that firm. The firm should look to the type of customers it serves, where its customers are located, and the type of services it offers when designing that program.[4] As noted, the majority of business conducted through Alpine involves the deposit, clearance and trading of microcap securities. As a result, the majority of red flags identified and reported by Alpine entail activity that accompanies the deposit, clearance and trading of microcap securities. The staff alleges that many of the narratives utilized "boilerplate" language, even though the reports involved different customers and different securities. Arguably, since Alpine sees a lot of the same type of activity typical for the microcap sphere, the majority of information reported by Alpine reasonably will be red flags related to customers depositing and trading in microcap securities. Alpine provides specific information about the subject client and subject security, as well as other salient information in its specific SAR filings. SEC Staff did not provide specific examples so that Alpine could review these specific SAR filings and prepare a more tailored response, and Alpine reserves the right to supplement or provide more information should the Staff identify those SARs. However, Alpine can address some of the issues raised by SEC Staff and provide a general explanation.

---

[4] FINRA's Small Firm Template Anti-Money Laundering (AML) Program: Compliance and Supervisory Procedures, http://www.finra.org/Industry/Issues/AML/p006340.



**ALPINE SECURITIES**
*Stock Brokerage & Investment Company*

Due to the sheer volume of filings (which supports our position that Alpine's AML program is a reasonable one), information that may have been previously reported on a client may not always be included in each SAR. In general, if in the course of the firm's investigation, Alpine determines that the other investigation's findings have some bearing on whether the activity is potentially suspicious, Alpine will generally include this information in the initial or subsequent SAR filing, if multiple filings occur over the lifetime of the customer relationship. In a case where an investigation reveals that the subject of a SAR (a security) had been the subject of a recent stock promotion, information about a security's promotion may or may not be salient to a SAR report and may not be referenced in those cases where the firm's investigation reveals that the promotion activity is not germane to the intent of the SAR filing. The firm employs its best judgment on which information may be relevant to provide.

A client-specific report seeks to detail suspicious activity Alpine believes the *client* may be engaged in. It can be very difficult to determine whether a specific client is actively or retroactively involved in stock promotion. When Alpine suspects or is privy to information that ties a client to stock promotion, Alpine includes such information in the report. Further, in the case where an investigation reveals that the "a subaccount holder who was the subject of a SAR had a foreign location/incorporation", the subaccount holder's locale is not an indication of, or evidence of, suspicious activity. However, mindful of the Staff's concerns, Alpine will assess whether that specific fact is or is not an indication of suspicious activity and will evaluate whether to include such information in a subsequent SAR filing.

Further, in the case where an investigation reveals that the "same or substantially similar activity described in a SAR had been previously conducted by a customer through the Firm and/or with the Firm's knowledge", an identification of, and subsequent reporting of potentially suspicious activity is not an indication of, or evidence of, customer wrongdoing. If Alpine's investigation reveals evidence of customer wrongdoing, Alpine will take steps to close or restrict the account. If Alpine is unable to determine whether there is evidence of customer wrongdoing, it may elect to continue to monitor the account and, where appropriate, file a SAR. While Alpine asserts it is in compliance with SAR Rules, Alpine is committed to continually refining the quality and integrity of our SAR filings. Alpine has taken steps to ensure that material information known about the client is included in each SAR filing.

*ii)* The Staff did not identify the SARs referenced in this finding, and so Alpine reserves the right to supplement or provide additional detail should the Staff wish to share the SARs forming the basis of this exception. However, in general, Alpine reviews stock deposit activity and trade activity separately. Red flags identified during the review process for stock deposits are generally reported separately from red flags identified during reviews of trade activity, as the two distinct types of reviews may reveal different types of suspicious activity. For this reason, information about whether the shares were sold was not included in the SAR narrative for the deposit activity. Such information would be included in a later report, should the trade review identify any red flags associated with trade activity.

*iii)* The staff alleges that the quality of Alpine's narratives makes the SARs "less valuable to investigators" and as a result, Alpine is in contravention of FinCEN's SAR Rule and Exchange Act Rule 17a-8. As previously communicated, Alpine respectfully disagrees with this finding that it was not in compliance with the SAR Rule and Rule 17a-8. The "less valuable" standard is nowhere in the regulatory language, which as previously noted, allows broker-dealers to submit any information that might be "relevant" to a violation of law or regulation. Respectfully, the Staff's language does not provide

5



# ALPINE SECURITIES
Stock Brokerage & Investment Company

guidance to Alpine as to what kinds of information might be more or less valuable so as to assist it to enhance its AML program. Alpine strives to clearly and concisely provide information regarding the known or suspected violation or suspicious activity, identifying the "5 W's" in a chronological and complete matter. In each report, to the extent the information is known to Alpine, Alpine reports the subject of the suspicious activity, the instruments or mechanisms used to facilitate the suspected activity, the date or date range of activity, the location of the activity and why Alpine believes the activity to be suspicious, in line with FinCEN guidance.[5] It is our belief that we provide sufficient information that typically would describe the issuer, customer or introducing firm, and the relevant transaction details, which is sufficient information for any regulator or law enforcement personnel to further request information from Alpine or investigate the activity.

Further, Alpine disagrees with staff's representations that "Alpine failed to 'provide a clear, complete, and concise description of the activity, including what was unusual or irregular that caused suspicion' and failed to show the degree of care required by FinCEN to complete the narrative." Failure to provide such information (as perceived by SEC Staff) is not a violation of FINRA Rule 3310. As a FINRA Hearing Panel has found, "the Federal Financial Institutions Examination Council ("FFIEC") has emphasized the importance of focusing on the process, rather than on whether a particular SAR was filed. In its examination manual for banks, FFIEC states, 'The decision to file a SAR is an inherently subjective judgment. Examiners should focus on whether the [financial institution] has an effective SAR decision-making process, not individual SAR decisions.'" *Department of Enforcement v. Sterne, Agee & Leach, Inc.*, No.E052005007501 (Mar. 5, 2010). A broker-dealer's AML program must accordingly be looked at as a whole. Here, Alpine had a reasonable AML program and was in compliance with Rule 3310.

However, mindful of the Staff's concerns, Alpine will review its program and seek ways to enhance the information provided in its SAR filings.

2. Inaccurate Descriptions of Reported Suspicious Activity as "Initial" and "Other"

### [For ease of reference, Alpine is denoting this section as subsection (i)]
The staff identified 97 SARs in the sample (38% of the sample) in which the Firm designated a deposit of micro-cap securities into a customer's account as "Initial" despite documentation in the investigative file indicating at least one previous occurrence of the same type of activity, in the same security(ies), by the same customer who was the subject of the SAR reviewed by the staff. FinCEN has stated that "a continuing report should be filed on suspicious activity that continues after an initial FinCEN SAR is filed."

### [For ease of reference, Alpine is denoting this section as subsection (ii)]
In addition, in 242 SARs in the sample (96% of the sample), Alpine responded to Question 37 by stating "Other" and manually entering "Penny Stocks." However, Question 37 requests that the reporting entity enter information about the type of activity (*e.g.*, insider trading, market manipulation)—not the type of security that is the subject of the activity. In same 242 SARs, the Firm

---

[5] *See* Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative http://www.fincen.gov/statutes_regs/files/sarnarrcompletguidfinal_112003.pdf

6



also responded to Question 39 by writing in "Stocks" instead of selecting the more accurate specific field on the SAR for "Penny Stocks/Microcap Securities."[6]

By failing to: (1) designate a significant percentage of SARs in the staff's sample as "Continuing Activity Reports," and (2) select obviously accurate and relevant fields for virtually all of the SARs filed by the Firm in the staff's sample, the Firm obscured the true nature of the suspicious activity and securities involved, and weakened each report's value as a tool for law enforcement. These fields are used by law enforcement to identify broad trends and larger patterns of suspicious activity, often using analytical means, which might not otherwise have been detected if the fields are left blank or are completed incorrectly. In fact, the Firm's filing of a large number of SARs with inaccurate or incomplete fields would appear to indicate that the Firm is intentionally trying to obfuscate or distort the truly suspicious nature of the activity that the Firm is required to report to law enforcement.

As a result, the Firm failed to meet its obligations under the SAR Rule and Exchange Act Rule 17a-8 to provide clear, complete, and concise descriptions of the activity that was the subject of a SAR, including what was unusual or irregular that caused suspicion. This also evidences a deficiency in the Firm's system to monitor for and report suspicious activity in contravention of FINRA Rule 3310(a) and the AML Program Rule.

### Alpine's Response

As a general matter, respectfully, the assertion that Alpine is intentionally trying to obfuscate or distort the truly suspicious nature of the activity the Firm reports to law enforcement is baseless. Alpine takes its AML responsibilities seriously and welcomes guidance to enhance its AML program.

For ease of reference, Alpine has numbered certain sections above by line item to assist us in directing SEC staff to a specific issue or question raised in the staff's Examination Findings and to provide Alpine with a reference point for our written response.

*i)* It is Alpine's policy to review each stock deposit as a new instance of potentially suspicious activity. This policy is largely based on the volume of stock deposits received and reviewed by Alpine and the fact that to do otherwise would prove an administrative burden on Alpine. In the SAR Activity Review, Tips and Trends Issue 21[7], FinCEN provided guidance regarding continuing activity reports. The issue indicates that the original intent of the continuing activity report was to provide administrative relief for financial firms by providing an extended deadline for filing in instances of continuing activity. Under Alpine's business model, the intended administrative relief is gained by filing each stock deposit as an initial event.

Additional FinCEN guidance indicates that the continuing activity report should be used by banks to

---

[6] Additional details provided by the staff in *Exhibit A – SAR Findings* included in the staff's letter dated April 9, 2015.

[7] SAR Activity Review, Tips and Trends Issue 21, published May 2012, http://www.fincen.gov/news_room/rp/files/sar_tti_21.pdf



develop policies, procedures and processes indicating when to escalate issues or problems identified as the result of repeat SAR filings on accounts. These procedures should include: reviews by senior management and legal staff (e.g., BSA compliance officer or SAR committee); criteria for when analysis of the overall customer relationship is necessary; and criteria for whether, and if so, when to close the account. Alpine is a small broker-dealer and operates under a business model that is very different than that of a banking institution. While this guidance is directed towards banking financial institutions, Alpine recognizes its ongoing obligations to involve senior management when appropriate to address and resolve escalated issues designed to address the issues raised in the FinCEN guidance represented above. Issues raised by the Chief Compliance Officer and/or AML Officer are addressed with Senior Management where appropriate. Senior Management is consulted in those cases where the firm detects potential suspicious activity, conducts and investigation and determines that there is evidence of wrongdoing. When such evidence is identified, Alpine will take steps to close or restrict the account and where appropriate file a SAR. Senior Management is also apprised in those cases involving the repeat reporting of potential suspicious activity. If Alpine is unable to determine that there is evidence of customer wrongdoing, Alpine may elect to continue to monitor the account, and where appropriate, SARs are filed.

*ii*) Alpine periodically reviews its SAR preparation policies in order to tailor its procedures to FinCEN guidance, as it is released. On or around January 26, 2015, Alpine reviewed the recently issued SAR Stats Issue—July 2014[8], which provided instructive guidance for better utilizing sections 37 and 39 of the SAR Form. As a result, Alpine enhanced its process for providing more detailed information in those boxes. Prior to this guidance, Alpine was using the phrase "penny stocks" in section 37(z) to describe to law enforcement the type of activity deemed suspicious, and was utilizing Part V of the SAR form to provide more detailed information. Beginning January 2015, Alpine provides more specific information in section 37. Alpine integrates guidance as it is received to improve its AML program and the quality of reports. The adoption of more specific identifiers in sections 37 and 39 evidences the fact that the Firm takes active steps to improve its AML program and achieve compliance with FINRA Rule 3310(a) and the AML Program Rule.

## B. Failure to File Reports on Identified Suspicious Activity

As discussed above, FinCEN's SAR Rule requires every broker-dealer to report suspicious activity that meets the criteria described in the rule. The staff reviewed 28 transactions that Alpine evaluated as potentially suspicious but upon which the Firm ultimately determined not to file a SAR. The staff also reviewed supporting documentation provided by the Firm, which detailed the nature and circumstances of each transaction, and the Firm's conclusion regarding the same. The review disclosed that 13 of the 28 transactions (nearly half) met one or more criteria in the SAR Rule, yet there was inadequate documentation in the Firm's investigative file supporting the Firm's determination not to file a SAR.[9] Furthermore, the staff noted that the activity identified by the Firm as possibly suspicious for these 13 transactions was very similar in nature to activity upon which the Firm routinely filed SARs (*i.e.*, deposits of penny stocks). By failing to SARs on the 13 transactions, or adequately document why the activity did not meet the SAR Rule filing requirements, the Firm is in contravention of the FinCEN's SAR Rule and

---

[8] SAR Stats Issue—July 2014, published July 2014,
http://www.fincen.gov/news_room/rp/files/SAR01/SAR_Stats_proof_2.pdf
[9] Additional details provided by the staff in *Exhibit B – No SAR Filings*



# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

Exchange Act Rule 17a-8. This also evidences a deficiency in the Firm's system to monitor and report suspicious activity in contravention of FINRA Rule 3310(a) and the AML Program Rule.

### Alpine's Response

It is the firm's position that Alpine is in compliance with FINRA Rule 3310(a) and the AML Program Rule. Alpine's policies and procedures are reasonably designed for the review of potentially suspicious activity referred to the AML Department. Upon review of the activity, Alpine may choose to close the account, continue to monitor the account, or to file a SAR, where appropriate. The process of determining whether activity is suspicious is a subjective one and there may be times when Alpine's AML Officer will determine not to file a suspicious activity report on certain referred activity, due to the firm's familiarity with the client and whether the activity is consistent with their normal course of business, a lack of aggravating red flags, or when the decision is made to further monitor the account to determine if additional activity warrants reporting.

As the majority of Alpine's business involves the deposit of penny stock, Alpine strives to achieve balance between understanding when the activity is suspicious and acknowledging when the activity aligns with the client's typical account activity. In these cases, the AML Officer has the sole and exclusive right to determine whether a transaction in question is or is not suspicious in nature.

Alpine disagrees with staff's representations that the examples cited above are evidence of a weakness in the firm's system to monitor and report suspicious activity in contravention of FINRA Rule 3310(a) and the Treasury's AML Program. Alpine's AML Officer determined in those instances represented by SEC Staff that the activity was not suspicious in nature. Alpine strives to be fully compliant in all respects. However, Alpine, like other broker-dealers, must often choose between filing SARs when there is no indicia of suspicious activity and not filing at all and risking backward-looking criticism. SEC Staff's representations that Alpine failed to file suspicious activity reports in 28 instances cannot be viewed as a violation of FINRA Rule 3310. As a FINRA Hearing Panel has found, "the Federal Financial Institutions Examination Council ("FFIEC") has emphasized the importance of focusing on the process, rather than on whether a particular SAR was filed. In its examination manual for banks, FFIEC states, 'The decision to file a SAR is an inherently subjective judgment. Examiners should focus on whether the [financial institution] has an effective SAR decision-making process, not individual SAR decisions.'" [10] A broker-dealer's AML program must accordingly be looked at as a whole. Here, Alpine had a reasonable AML program and was in compliance with Rule 3310. ("[I]n those instances where the institution has an established SAR decision making process; has followed existing policies, procedures, and processes; and has decided not to file a SAR, examiners generally should not criticize the institution for not filing a SAR.").[11]

Alpine's AML program is reasonably designed to detect and report suspicious activity. Once potential suspicious activity is identified, an investigation occurs and the determination as to when to file is affirmatively determined by the AML Officer or designee in accordance with Alpine's AML policies and procedures.

---

[10] *See Department of Enforcement v. Sterne, Agee & Leach, Inc.*, No.E052005007501 (Mar. 5, 2010).

[11] *See olso* GAO Report, Suspicious Activity Report Use Is Increasing, but FinCEN Needs to Further Develop and Document Its Form Revision Process (Feb. 2009) at 19



ALPINE SECURITIES
*Stock Brokerage & Investment Company*

## II. 31 C.F.R. §1023.210 – Anti-Money Laundering Program Requirements for Brokers or Dealers in Securities
## FINRA Rule 3310 – Anti-Money Laundering Compliance Program

### A. Deficient AML Compliance Program Procedures

#### 1. Deficient Procedures Regarding Accounts with Extensive Suspicious Activity

The staff identified nine customer accounts maintained by Alpine that were each the subject of over 50 SARs filed by the Firm during the period of January 1, 2013 through April 30, 2014. Each of these nine accounts appeared on the Firm's "heightened supervision" list during the staff's review period. The Firm told the staff (and its procedures described) that accounts with such status were monitored "on a weekly basis to detect for potentially manipulative practices such as insider trading, free-riding, wash trading, match trading, layering, bunching, coordinated trading, market domination, pre-arranged trading and price manipulations." Even though these accounts were on the "heightened supervision" list, the Firm failed to demonstrate that any meaningful review or other steps (*e.g.*, account closure, account restriction, additional approvals) were taken to prevent further possible violations of federal securities laws and/or SRO rules from occurring in the accounts. In fact, the numerous SARs filed on the same nine customers over this period of time evidence the failure of Alpine's system. Alpine's failure to establish and implement policies, procedures, and internal controls that are reasonably designed to achieve compliance with the BSA is in contravention of FINRA Rule 3310(a) and the AML Program Rule.

#### Alpine's Response

The Firm respectfully disagrees with this exception. The Firm monitors and reports suspicious activity as required by FINRA Rule 3310(a) and the AML Program Rule. A firm's AML program should be "risk-based" in that the policies, procedures and controls are designed to address money laundering risks applicable to that firm. The firm should look to the type of customers it serves, where its customers are located, and the type of services it offers when designing that program.[12] In assessing the risks inherent to its main line of business, Alpine has adopted policies and procedures reasonably designed to detect and report red flags. The numerous SARs filed by Alpine on the customers referenced above evidence that Alpine's policies, procedures, and internal controls are reasonably designed to achieve compliance with the BSA and the USA PATRIOT Act.

A client's inclusion on the heightened supervision list could occur for a variety of reasons, including known regulatory history or high volume of deposit and trade activity. The accounts referenced above are active accounts that make multiple, frequent deposits of microcap securities, liquidate the securities and often wire out the proceeds shortly thereafter. These activities have been identified as red flags, and thus, Alpine closely monitors the accounts that frequently engage in this type of activity.

Furthermore, depending on the reason an account is on Alpine's heightened supervision list and risk ranking tier, Alpine will tailor its reviews of account activity. Reviews vary in the breadth and depth of scope and the frequency of reviews depending on whether account has been risked ranked as low,

---

[12] FINRA's Small Firm Template Anti-Money Laundering (AML) Program: Compliance and Supervisory Procedures, http://www.finra.org/Industry/Issues/AML/p006340.



medium or high. The higher the risk rank, the more frequent the review of the account activity accordingly.

Alpine respectfully disagrees with SEC Staff's representations that the firm failed to demonstrate that any meaningful review or other steps were taken to prevent further possible violations of federal securities laws and/or SRO rules from occurring in the accounts. Alpine maintains records of these tiered reviews, as well as any subsequent investigations and any referrals that derive from these reviews and investigations.

Alpine further notes that an identification of, and subsequent reporting of potentially suspicious activity, is not an indication of or evidence of customer wrongdoing. Alpine uses the remedies afforded under the USA PATRIOT Act and BSA to identify, detect, and report activity so that appropriate law enforcement personnel and others can be informed about potentially suspicious activity. Alpine's ability to report potentially suspicious information are limited to the information Alpine has in its possession or control. Alpine reports the information it does have in its possession and control so that the appropriate law enforcement personnel and others may pursue the allegations further. Alpine conducts tailored investigations and if evidence of wrongdoing is present, Alpine will take steps to close or restrict the account. If Alpine is unable to determine whether there is evidence of customer wrongdoing, it may elect to continue to monitor the account and, where appropriate, file a SAR.

Numerous filings on the same accounts evidence the strength of Alpine's AML program and Alpine's commitment to monitor and report suspicious activity in compliance with the AML Program Rule.

2. Deficient Procedures re: Monitoring of Transaction Thresholds

The SAR Rule requires that each transaction that "meets the terms" of the rule "conducted or attempted by, at, or through a broker-dealer" must be reported if it "involves or aggregates funds or other assets of at least $5,000."

Our exam revealed that Alpine does not maintain ongoing procedures to review movement of funds in customer accounts for amounts less than $75,000. Amounts lower than this could be required to be reported by the Firm under the BSA. In the absence of lower monitoring thresholds, the Firm would be unable to detect all activity required to be reported on SARs, including patterns of low-dollar amount transactions designed to evade reporting requirements (*i.e.*, structuring). Alpine's failure to establish and implement policies and procedures that can reasonably be expected to detect and cause the reporting of transactions required under 31 U.S.C. 5318(g) and the implementing regulations thereunder (including Exchange Act Rule 17a-8) is in contravention of FINRA Rule 3310(a) and the AML Program Rule.

Alpine's Response

Alpine respectfully disagrees with this exception. Alpine's policies and procedures are reasonably designed to detect and report transactions as required under 31 U.S.C. 5318(g) and the implementing regulations thereunder (including Exchange Act Rule 17a-8)) in compliance with FINRA Rule 3310(a) and the AML Program Rule. Alpine does monitor customer transmittal activity in amounts less than $75,000. Alpine's Written Supervisory Procedures §9.11.4, Monitoring Accounts for Suspicious Activity provides

11



# ALPINE SECURITIES
Stock Brokerage & Investment Company

that Alpine conducts reviews of Currency Activity between $5,000 and $1,000,000. Alpine does, in fact, undertake a regular review of client transmittal activity in order to detect potentially suspicious activity including patterns of low-dollar amount transactions that may be designed to evade the reporting requirements, an unusually high number of requests (in comparison to the customer's normal volume), multiple requests made in close succession, and other suspicious indicia, and reports that activity where appropriate. As such, Alpine is in compliance with 31 U.S.C. 5318(g) and the implementing regulations thereunder (including Exchange Act Rule 17a-8) and in compliance with FINRA Rule 3310(a) and the AML Program, and has been since August 2013.

3. Deficient Procedures re: Customers' Funds Transmittal (*i.e.*, Wire) Activity

**[For ease of reference, Alpine is denoting this subsection (i)]**

Prior to approximately August 2014, Alpine did not adequately monitor customers' funds transmittal activity. Beginning in August 2014, Alpine implemented a monitoring system (*i.e.*, "Cash Transmittal Query") to track the transfer of customers' funds. Alpine also performed a historical analysis of transfers from August 2014 back to at least October 2013. This retrospective review identified a significant number of transactions the Firm deemed to be suspicious, and the Firm filed SARs on these transactions in August 2014 and September 2014. However, a significant amount of time had elapsed between the occurrence of many of these transactions and when they were identified as suspicious by Alpine (up to 10 months). Alpine's failure to detect the suspicious nature of these transactions in a timely manner and file SARs as required by the SAR Rule is in contravention of FINRA Rule 3310(a) and the AML Program Rule.

**[For ease of reference, Alpine is denoting this subsection (ii)]**

The staff also identified a weakness in Alpine's internal control environment related to its process for reviewing customer funds transmittal activity. Specifically, the staff found one instance in which the amount of an outgoing customer account wire transfer request did not match the amount of the wire transfer that was processed and transmitted by the Firm. The Firm was unable to determine the reason for the difference. This weakness could lead to additional deficiencies in this area.

**[For ease of reference, Alpine is denoting this subsection (iii)]**

Finally, the staff identified concerns with the Firm's use of letters sent to customers subsequent to the third-party cash transmittals. In our sample of 95 third-party transfers, the staff identified 80 instances (84% of the sample) in which Alpine was unable to demonstrate that it had obtained appropriate authorization from customers prior to executing the third-party transfers of cash and securities. This weakness could lead to losses in customer accounts from unauthorized wire transfers to third parties.

### Alpine's Response

*i*) Alpine respectfully disagrees with SEC Staff's representation that "Alpine did not adequately monitor customers' funds transmittal activity. Beginning in August 2014, Alpine implemented a monitoring system (*i.e.*, "Cash Transmittal Query") to track the transfer of customers' funds. Alpine has had a system in place to reasonably monitor for customers' funds transmittal activity and when such activity was determined to be suspicious, Alpine filed suspicious activity reports, where appropriate.



# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

Due to a number of staffing and personnel changes within the AML Department in 2013 and 2014, and due to changes in policy to further refine and enhance the firm's review of customers' funds transmittal activity, in response to feedback the firm receives from law enforcement personnel, regulatory guidance and its peers, Alpine's AML Officer performed a historical analysis of customers' funds transmittal activity to identify any cases where due to changes in policy, the activity may be determined to be suspicious in nature for the period of October 2013 through August 2014. This retrospective review identified additional transactions the Firm later deemed to be suspicious, and the Firm filed SARs on these transactions in accordance with the firm's policies and procedures.

Alpine is committed to continually enhance its AML program in light of guidance the firm receives from law enforcement personnel, regulatory guidance and its peers. FinCEN has provided guidance indicating the timeframe for filing a SAR "starts when a firm, in the course of its review or on account of other factors, is able to make the determination that it knows, or has reason to suspect, that the activity or transactions under review meet one or more of the definitions of suspicious activity."[13] The guidance does provide that an expeditious review is "recommended" as it is more helpful to law enforcement, however, the requirement of the rule is that the filing be made within 30 days of the firm's determination that the activity may be suspicious, not 30 days from the time the activity actually occurred. For that reason, Alpine disagrees with the SEC Staff's characterization that the detection of suspicious transactions did not occur in a timely manner.

*ii)* Further, Alpine respectfully disagrees with SEC Staff's characterization that one instance in which the firm was not able to explain the reason that the amount of an outgoing customer account wire transfer request did not match the amount of the wire transfer that was processed as a "weakness in Alpine's internal control environment". Alpine has a reasonable system designed to detect and report potential suspicious activity and one instance in which the firm was not able to account for the discrepancy does not negate this point.

*iii)* As a general policy, Alpine will permit intra-account journals (i.e. transfer funds) between un-related accounts (third parties) at Alpine in the following scenarios: 1) accounts with the same beneficial ownership; 2) family members where both members maintain accounts at Alpine; and 3) intra-account journals between unrelated accounts to facilitate a charitable donation. Alpine will also, in very limited scenarios, permit an account holder to withdraw funds from his/her account to an account held in escrow solely for the benefit of the client (e.g. mortgage escrow account). Alpine does not permit the transfer of funds or securities between unrelated accounts without an accompanying Letter of Authorization ("LOA") For Change of Ownership. The LOA is signed and dated by the client prior to being processed by Alpine's Operations Department.

Alpine reviewed the letters provided to the SEC staff and did not identify any cases in which the customer did not provide authorization prior to the transmittal of customer funds. Alpine has previously provided copies of these customer authorizations to the Staff, demonstrating that Alpine received the appropriate authorizations. A review of these letters of authorization demonstrates that the SEC findings in this instance have no basis.

---

[13] *See* The SAR Activity Review: Trends Tips & Issues, Issue 15,
http://www.fincen.gov/news_room/rp/files/sar_tti_15.pdf



## ALPINE SECURITIES
*Stock Brokerage & Investment Company*

### 4. Deficient Procedures re: Consideration of Layered Wire Transfers

The staff found that Alpine did not maintain specific procedures for monitoring customer wire transfers that go through a financial intermediary (also known as "correspondent banking" transactions or "layered" wire transfers), including when the wire transfers are for further credit to a foreign account holder. The staff found that for the period of March 17, 2014 through March 31, 2014, outgoing wire transfers from customer accounts through an intermediary represented approximately 6% of all outgoing customer wire transfers, and 8% of the total dollar amount of outgoing customer wire transfer during this time period.

This type of layered wire transfer has been recognized as a technique employed in money laundering. However, Alpine neither detected these transactions as suspicious nor filed SARs on these transactions. Therefore, the Firm's Written Supervisory Procedures and AML program are not adequately designed to monitor this prevalent risk of the Firm's operations, in contravention of FINRA Rule 3310(a) and the AML Program Rule.

#### Alpine's Response
SEC Staff makes references to "correspondent banking" but does not cite any specific examples of wires involving "correspondent banking". It is Alpine's understanding that correspondent banking refers to a financial institution that provides regular services to another financial institution. Correspondent banks can accept deposits, among other things, on behalf of other financial institutions and may be more likely to be used to conduct business in foreign countries, and act as a domestic bank's agent abroad.

The use of an intermediary financial institution is not suspicious in and of itself. It is Alpine's understanding that it is a common practice for clients, especially those domiciled in foreign jurisdictions, to make use of an intermediary financial institution. Alpine reviews transmittal activity and reports of unusual or suspicious activity, paying careful attention to transmittals to high risk jurisdictions, beneficiary banks in geographic locations that do not align with the client's purported address(es) of record, or are inconsistent with what is typically known about the customer's transmittal activity.

Alpine has policies and procedures reasonably designed to monitor and identify potentially suspicious activity, including transmittal activity and these policies and procedures are in compliance with FINRA Rule 3310 and the AML Program Rule. Alpine regularly reviews transmittal activity, comparing the client's signed wire authorization request to prior transmittal records. In conjunction with that review, Alpine reviews the client's account application information, including the client's address of record and disclosed primary financial institution. Alpine monitored these transactions and in those cases where the firm identified suspicious activity relating to the use of a financial intermediary, Alpine filed a SAR, where applicable. The fact that Alpine did not file a SAR in every case involving a financial intermediary means that Alpine did not determine that the activity was suspicious in nature. Alpine respectfully disagrees with SEC Staff's findings that the Firm's Written Supervisory Procedures and AML program were not adequately designed to monitor for this type of risk and thus in contravention of FINRA Rule 3310 and the AML Program Rule. Alpine's policies and procedures in this area were, and continue to be, reasonable.

14



ALPINE SECURITIES

*Stock Brokerage & Investment Company*

5. Weak Procedures re: Wire Transfers under Economic and Trade Sanctions Programs

Separate and distinct from the AML requirements imposed on broker-dealers under the BSA are the economic and trade sanctions programs administered by the Treasury Department's Office of Foreign Assets Control ("OFAC"). OFAC publishes lists of sanctioned countries and Specially Designated Nationals and Blocked Persons ("SDNs") with whom U.S. broker-dealers are prohibited from conducting business.

In general, OFAC regulations require broker-dealers to:

- Block accounts and other property of entities and individuals that appear on the SDN list;
- Block accounts and other property of entities and individuals that appear on the SDN list;
- Block accounts and other property of entities and individuals subject to blocking under OFAC's country-based programs; and
- Block or reject unlicensed financial transactions (including wire transfers) with OFAC-specified countries, entities, or individuals.

The staff found that Alpine does not conduct pre-emptive OFAC searches before processing outgoing wire transfers from customer accounts, including wire transfers that are not directed to the customer but are instead directed to third parties ("third party transfers"). Alpine indicated that the Firm relies on two mitigating controls: 1) the ongoing/daily screening of customer accounts against OFAC Lists through its use of a third-party vendor, and 2) its use of letters sent to customers subsequent to the third-party transfers. However, the staff identified three concerns with the Firm's reliance on these controls:

- Since Alpine fails to conduct OFAC checks on the recipients of third-party transfers, it follows that Alpine would be unable to determine whether a third-party recipient is on OFAC's list of sanctioned countries or SDNs to which the Firm is prohibited from sending funds;
- The practice of sending letters to account holders after third-party transfers would not prevent the transfer of funds to SDNs or OFAC listed countries; and
- The staff found that Alpine was not consistently performing its daily review of the OFAC screening report provided by a third-party vendor in a timely manner.

Accordingly, the Firm's current procedures would not appear to prevent Alpine from violating OFAC regulations and U.S. economic sanctions. This is a weakness in the Firm's internal control environment.

### Alpine's Response
It is the firm's belief that the SEC Staff may not fully understand Alpine's policies concerning third party wire transfers. Alpine does not generally permit or process outgoing third party wire transfers. Thus, Alpine does not need to conduct pre-emptive OFAC searches before processing outgoing wire transfers from customer accounts, including wire transfers that are not directed to the customer but are instead directed to third parties ("third party transfers"), as such transactions typically are not permitted and do not occur. In the samples of outgoing wire transfer documentation provided by Alpine personnel

15



ALPINE SECURITIES
*Stock Brokerage & Investment Company*

to SEC Staff, none of the outgoing wire transfer requests involved an outgoing wire to a third party.[14] Accordingly, we are unsure of the basis of the Staff's concern. Alpine's current procedure is reasonably designed to prevent Alpine from violating OFAC rules and regulations and U.S. economic sanctions.

As a general policy, Alpine will permit intra-account journals (i.e. transfer funds) between un-related accounts (third parties) at Alpine in the following scenarios: 1) accounts with the same beneficial ownership; 2) family members where both members maintain accounts at Alpine; and 3) intra-account journals between unrelated accounts to facilitate a charitable donation. Alpine will also, in very limited scenarios, permit an account holder to withdraw funds from his/her account to an account held in escrow solely for the benefit of the client (e.g. mortgage escrow account). On a nightly basis, the entire list of account holders, including authorized agents, is compared against the OFAC SDN List and other sanctions lists. In each of the typical scenarios described above, if the recipient of the funds appears on the OFAC SDN List or similar lists, Alpine receives a notification about a potential match. The potential match is then reviewed by a member of Alpine's Anti-Money Laundering Team consistent with the firm's policies in this area. The policy is designed reasonably to prevent non-Alpine, non-OFAC screened clients from receiving disbursed funds from Alpine and prevents Alpine from violating OFAC regulations and U.S. economic sanctions.

The practice of sending third-party verification letters to customers is intended to comply with certain supervisory control requirements under former NASD Rule 3012, not to comply with OFAC rules and regulations as represented by SEC Staff based on its understanding of conversations with Alpine personnel. This former NASD Rule covers a broad spectrum of activity deemed to be "third-party" and includes the following:

- all transmittals of funds (e.g., wires or checks, etc.) or securities from customers to third party accounts (i.e., a transmittal that would result in a change of beneficial ownership);
- from customer accounts to outside entities (e.g., banks, investment companies, etc.);
- from customer accounts to locations other than a customer's primary residence (e.g., post office box, "in care of" accounts, alternate address, etc.); and
- between customers and registered representatives, including the hand-delivery of checks;

Compliance with this portion of the securities rules and regulations promulgated by FINRA was not intended to comply with the very separate and distinct OFAC rules promulgated by the U.S. Department of Treasury, nor did Alpine make any representations to that effect.

Lastly, SEC Staff represents that Alpine was not consistently performing its daily review of the OFAC screening report provided by a third-party vendor in a timely manner. SEC Staff did not provide specific examples. For that reason, Alpine cannot specifically address the SEC Staff's concerns. Alpine's current procedures are reasonably designed to prevent Alpine from violating OFAC regulations and U.S. economic sanctions.

6. Deficient Procedures re: Review of Subpoenas for Possible SAR Reporting and/or Heightened Account Monitoring

---

[14] Please note that Alpine has previously provided these documents to the Staff.



ALPINE SECURITIES
*Stock Brokerage & Investment Company*

Alpine received 18 subpoenas with respect to customer accounts between January 1, 2013 and June 17, 2014. The Firm told the staff that no specific action is taken in response to receiving the documents (*e.g.*, specific review of allegations to determine if it meets the definition of suspicious activity required to be reported on a SAR or causes the account to be subject to enhanced monitoring or supervision).

The issuance of a subpoena indicates the possible violation of law. The BSA requires, among other things, the reporting of transactions conducted or attempted by, at, or through a broker-dealer designed to violate or evade any Federal law or regulation. The Firm's lack of procedures describing what steps it will take to determine if the allegations in any particular subpoena trigger a requirement under the SAR Rule is in contravention of FINRA Rule 3310(a) and the AML Program Rule. This deficiency in the Firm's AML program could result in violations of Exchange Rule 17a-8.

This is also *recidivist* activity. The SEC staff's examination conducted during 2013 also found that the Firm allowed the opening of accounts and continuing suspicious activity by high risk accounts placed under "heightened supervision." Furthermore, the 2013 SEC exam also found that the Firm allowed activity to continue in accounts on which Alpine had received significant regulatory inquiries.

### Alpine's Response

SEC Staff's comments that "the Firm told the staff that no specific action is taken in response to receiving the documents (*e.g.*, specific review of allegations to determine if it meets the definition of suspicious activity required to be reported on a SAR or causes the account to be subject to enhanced monitoring or supervision)" appears to be a mischaracterization of what Alpine represented. It is Alpine's position that a subpoena request is either a request for specific documents or, in some cases, may require an agent of the firm to appear in court to discuss certain books and records of the firm. The mere receipt of a subpoena does not, by itself, warrant a formal investigation or require the filing of a SAR, nor does every subpoena (for example, those issued in a purely civil proceeding) constitute a "possible violation of law." Indeed, even subpoenas issued by the SEC states that it should *not* be taken 'as an indication by the Commission or its Staff that a violation has occurred." However, Alpine has reviewed in the past, and continues to review, subpoena requests and other similar document requests and depending on the issues raised will conduct an investigation and file suspicious activity reports, where appropriate consistent with the firm's policies and procedures.

As part of Alpine's AML program in general, Alpine has an established process to perform regular reviews of trade, transmittal and deposit activity. Alpine disagrees with staff's representations that the examples cited are evidence of a lack of procedures in contravention of FINRA Rule 3310(a) and the Treasury's AML Program. On page 38 of Alpine's AML policy, under the "Red Flags" section, subsection "other Suspicious Customer Activity" Alpine cites the receipt of a "law enforcement subpoena" as a potential red flag which is then reviewed for potential concerns in the same manner that Alpine monitors for other potentially suspicious activity. Accordingly, the basis for the Staff's concern is unclear.

While Alpine has had a policy and process in this area, Alpine recognizes that this process could have been better documented to demonstrate that such reviews are occurring consistent with how the firm monitors for other reviews involving potentially suspicious activity. For that reason, and mindful of the

17



# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

Staff's concerns, Alpine adopted a standard operating procedure in January 2015 (to support our AML policies and procedures) and published these changes in February 2015 for reviewing the activity of a customer subject of a subpoena for indicia of suspicious activity (attached is a copy of Alpine's standard operating procedure governing such reviews).

## B. Deficient AML Compliance Program Procedures Regarding Annual AML Testing and Concerns about 2013 AML Compliance Program Test

The Firm failed to demonstrate that its AML Compliance Program procedures are reasonably designed to ensure that annual testing is completed by a qualified outside party and that the testing is designed to address the risks inherent in the Firm's business. In fact, the Firm's September 13, 2013 test of its AML Compliance Program ("2013 Test") by public accounting firm Sorenson, Vance and Company evidenced these deficiencies in the Firm's AML Compliance Program procedures, as described below.

### 1. Inadequate Evaluation of High-Risk Areas

FINRA's "Small Firm Template" which was published to provide AML compliance guidance to the broker-dealer community, states that, among other things, "independent testing of your firm's AML compliance program should include, at a minimum:...(5) evaluating your firm's transactions, with an emphasis on high-risk areas;...(9) evaluating your firm's policy for reviewing accounts that generate multiple SAR-SF filings; and (10) evaluating your firm's response to previously identified deficiencies.

The Firm's AML Compliance Program procedures did not address these three areas described in the Small Firm Template. Nor could the Firm demonstrate that the 2013 Test was premised on a meaningful and complete evaluation of the areas. Specifically, the 2013 Test did not evaluate whether the Compliance Program procedures adequately addressed: (1) accounts with known disciplinary histories; (2) accounts that were subject of multiple SAR filings; (3) accounts that were the subject of subpoenas; (4) accounts that had been placed on heightened supervision; or (5) the adequacy of the Firm's response to regulatory findings regarding its AML Compliance Program during the review period, including the findings from FINRA and SEC examinations that concluded during the review period (*e.g.*, FINRA's 2013 Cycle Examination of the Firm).

We also noted that the audit procedures performed appeared to be primarily interview-based, and Alpine was unable to provide documentation of the auditor's testing of Alpine's compliance with the BSA or implementing rules. Without review of transactions and/or accounts, the Firm did not demonstrate that "transactions, with an emphasis on high-risk areas" were adequately considered in the 2013 Test, in contravention of FINRA Rule 3310(c).

#### Alpine's Response
We respectfully disagree with the Staff's exception. We note that the FINRA AML Small Firm template does not create "any new requirements for AML programs." It is, as the Staff indicated, meant only to "assist" firms in developing their own AML programs. Accordingly, we do not believe variance from the Small Firm Template can, itself, form the basis for a violation of FINRA Rules.



**ALPINE SECURITIES**
*Stock Brokerage & Investment Company*

The independent firm retained to perform the 2013 AML audit did, as indicated in its report, perform procedures to test various areas of the firm's AML program. These procedures were not only interview-based, but also relied on a review of the Firm's policies and procedures, transaction reports, training attendance records, account application records and customer identification records, among other data. Among those procedures tested were whether the Firm had procedures for wire transfers, monitoring beneficial owners, and other areas of compliance with the Firm's Written Supervisory Procedures.

Alpine undertook an annual independent audit of its AML program, in compliance with FINRA Rule 3310(c).

2. Inadequate Evaluation of Qualifications

In the Small Firm Template, FINRA instructs that a Firm's AML Compliance Procedures should require a firm to "evaluate the qualifications of the independent third party [selected to test its AML Compliance Program] to ensure that they have a working knowledge of applicable requirements under the BSA and its implementing regulations."

Alpine was unable to demonstrate that it performed due diligence on Sorenson, Vance and Company to ascertain the firm's knowledge of the BSA and implementing regulations thereunder. Additionally, Alpine provided few documents that evidenced the actual work performed by the auditors to ensure that all relevant risk areas were adequately evaluated.

As a result of the above deficiencies, the Firm's procedures for independent testing of its AML Compliance Program are in contravention of FINRA Rule 3310(c). And because of its deficient procedures and the concerns noted above with respect to the 2013 Test, it appears that in 2013 the Firm failed to comply in a meaningful way with the requirement that it perform an annual test of its AML Compliance Program.

This is also *recidivist* activity. FINRA's 2012 Cycle Examination also found that the Firm's 2011 AML audit was inadequate as it failed to identify inadequacies in the Firm's detection and reporting of suspicious activity in contravention of FINRA Rule 3310(c).

### Alpine's Response

Sorenson and Vance is a PCAOB firm with extensive auditing experience in anti-money laundering rules and regulations. Alpine conducted significant due diligence on the company and the specific auditor performing the review of Alpine's AML program, including evaluating the depth of their experience, skills and abilities. Alpine consulted with current clients of Sorenson and Vance to evaluate the quality and breadth and depth of AML audits performed by the entity. Alpine's conversations with these references-- other broker-dealers-- did not identify any concerns with the quality and breadth and depth of the audits performed of their firms by Sorenson and Vance. Sorenson and Vance tested the firm's controls in a number of areas and determined that the firm's overall controls, policies and procedures relating to its AML program were reasonable. While SEC Staff may have identified issues within Alpine's AML program, that does not necessarily mean that presence of these issues amounts to a contravention of FINRA Rule 3310(c).



ALPINE SECURITIES

Stock Brokerage & Investment Company

However, mindful of the Staff's concerns, Alpine will make a better effort to document its diligence in selecting an independent auditor provider.

## III.    31 C.F.R. §1023.220(a)(4) – Customer Identification Program
## FINRA Rule 3310(b) – Anti-Money Laundering Compliance Program

To comply with the BSA, a broker-dealer is required by Treasury's Customer Identification Program ("CIP") Rule (31 C.F.R. 1023.220) to establish, documents, and maintain a written CIP appropriate for its size and business that includes, at a minimum, procedures for (i) obtaining customer identifying information from each customer prior to account opening maintaining such records; (ii) verifying the identity of each customer; and (iii) determining whether a customer appears on the OFAC list of SDNs. The CIP Rule defines a customer as "a person that opens a new account," and an account is defined as "a formal relationship with a broker-dealer established to effect transactions in securities." Under FINRA Rule 3310(b), a broker-dealer must "establish and implement policies, procedures, and controls reasonably designed to achieve compliance with the Bank Secrecy Act and the implementing regulations thereunder."

The staff found that Alpine did not perform a comparison of the customer who opened account number 900009020 to OFAC's listing of SDNs and blocked countries prior to allowing the customer to execute transactions in the account. The Firm indicated that it did not believe the account holder met the definition of "customer" as defined in the BSA because it was a "financial institution regulated by a Federal functional regulator as defined by 31 U.S.C. §5312(a)(2) and therefore...not required to undertake any OFAC obligation on the account." We acknowledge that the CIP Rule excludes from the definition of "customer" financial institutions regulated by a federal functional regulator. However, it appears that the account holder in question is a foreign financial institution not regulated by any United States federal functional regulator (i.e., the United States banking agencies, the SEC, or the CFTC). As such, Alpine should have performed an OFAC search for the account holder's name at the time the new account was opened, in compliance with its AML program procedures.

As a result of the Firm's failure to perform the OFAC search on the account holder, the Firm failed to enforce its WSPs to carry out the requirements of the BSA in contravention of 31 C.F.R. §1023.220(a)(4) and FINRA Rule 3310(b).

### Alpine's Response

Alpine is in compliance with 31 C.F.R. §1023.220(a)(4) and FINRA Rule 3310(b). Rule 31 C.F.R. §1023.220 requires, at a minimum, that a firm establish procedures for (i) obtaining customer identifying information from each customer prior to account opening maintaining such records; (ii) verifying the identity of each customer; and (iii) determining whether a customer appears on the OFAC list of SDNs. The CIP Rule defines a customer as "a person that opens a new account," and an account is defined as "a formal relationship with a broker-dealer established to effect transactions in securities."[15]

---

[15] See C.F.R. §1023.220 and Guidance on Customer Identification Regulations, Jan. 2004, http://www.fincen.gov/statutes_regs/guidance/pdf/finalciprule.pdf.



# ALPINE SECURITIES
*Stock Brokerage & Investment Company*

Shard Capital does not meet the definition of a customer and, as such, Alpine was not required to perform an OFAC search on the entity. Shard Capital was not a customer under 31 C.F.R. §1023.220, as the relationship was not a formal relationship, rather the account was established to facilitate the sale of shares from an OFAC-checked client of Alpine to Shard Capital, and thus falls outside the requirements of 31 C.F.R. §1023.220(a)(4). In May of 2013, Alpine client Bluestone Advisor, account number 153620105, sold shares of Secure Alert, Inc. (SCRA) to Shard Capital. Shard Capital is a brokerage firm located in the United Kingdom. The shares were not eligible for settlement through the Depository Trust Company ("DTC") and Alpine had to perform the trade ex-clearing (also referred to as ex-CNS). Ex-clearing means that the trade comparison process is performed manually without the assistance of an electronic clearing house, like DTC. In order to facilitate the clearance of the shares, Alpine set up an account so that the trade could be manually settled. The account was not an account for Shard Capital; rather, it acted as a temporary holding account while the buy side and sell side manually settled the trade. As no formal relationship was established, Shard Capital was not a client of Alpine and; therefore, Alpine was not required to perform an OFAC check on the entity.

For the reasons stated above, Alpine is not in violation of 31 C.F.R. §1023.220(a)(4) and FINRA Rule 3310(b).

Should you have additional questions, please contact me.

Sincerely,

Leia Farmer
Chief Compliance Officer
Alpine Securities Corporation
Member FINRA, NQX and SIPC
39 Exchange Place
Salt Lake City, UT 84111

[Enclosures]

21



**ALPINE SECURITIES**
*Stock Brokerage & Investment Company*

### STANDARD OPERATING PROCEDURES

Subject: Monthly Review of Regulatory Inquiries

Created: 02/23/2015

Function(s) Performed by: AML Officer or Designee

Frequency of Review: Monthly

Major Steps Overview

| |
|---|
| 1. Open Document Requests- Subpoena and Document Requests- Regulatory Inquiries spreadsheets. |
| 2. Open document request and review information requested for potential red flags. Repeat for all requests received since last review. |
| 3. Open Monthly Regulatory Inquiries Review spreadsheet. |
| 4. Document review on Subpoena or Regulatory Inquiries Review spreadsheet, noting any potential red flags identified and any follow-up action taken. |
| 5. Save the spreadsheet, indicating in the column entitled 'date of review' the date the review was performed with the reviewer's name or initials. |
| 6. Retain initialed report for a period of five (5) years. |

Detailed Steps

| |
|---|
| 1. Open Document Requests- Subpoena and Document Requests- Regulatory Inquiries spreadsheets. |
|     1.1.    Spreadsheets can be found in the following location→ S:\Compliance\Record Keeping |
| 2. Open document request and review information requested for potential red flags. Repeat for all requests received since last review. |
|     2.1.    If request asks for trade information, review trade data for potential red flags. |
|     2.1.1. See S:\Compliance\Written Supervisory Procedures (WSPs)\Standard Operating Procedures\Surveillance Compliance Officer for SOPs relating to trade surveillance. |
|     2.2.    If requests ask for account information, review account |

For Internal Use Only

|  | activity such as stock deposit and transmittal activity for potential red flags. |
|  | 2.2.1. See S:\Compliance\Written Supervisory Procedures (WSPs)\Standard Operating Procedures\AML Processes for SOPs relating to deposit and transmittal activity review. |
| 3. | Open Monthly Regulatory Inquiries Review spreadsheet. |
|  | 3.1.    Spreadsheet located at S:\Compliance\AML\AML Reports\Monthly Regulatory Inquiries Review |
| 4. | Document review on Subpoena and Document Request spreadsheet (located S:\Compliance\AML\AML Reports, noting any potential red flags identified and any follow-up action taken. Identify specific red flags identified and determine whether further action is needed or whether a Suspicious Activity Report (SAR) needs to be filed |
|  | 4.1.1. If SAR filing is warranted follow filing process |
|  | 4.1.1.1.   See S:\Compliance\Written Supervisory Procedures (WSPs)\Standard Operating Procedures\AML Processes\ Suspicious Activity Report (SAR) 2014 0311 |
| 5. | Save the spreadsheet, indicating in the column entitled 'date of review' the date the review was performed with the reviewer's name or initials and any follow-up action taken. |
| 6. | Retain the record for five (5) years from the date of the last entry. |

For Internal Use Only