UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>    Defendant. | Civil No. 1:17-CV-04179-DLC<br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis<br><br>**ECF CASE** |

**DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION FOR RECONSIDERATION OF THE COURT'S
MARCH 30, 2018 OPINION AND ORDER AND MOTION
TO CERTIFY THE COURT'S ORDER FOR INTERLOCUTORY APPEAL**



335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680



One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................3

    POINT I ........................................................................................................................3
    THIS IS A PROPER CASE FOR RECONSIDERATION BECAUSE THE COURT
    OVERLOOKED THE AUTHORITIES RELATING TO THE DELEGATION OF
    AUTHORITY AND THE REQUIREMENTS OF THE APA ..................................................3

    POINT II .......................................................................................................................4
    THE COURT FAILED TO ACKNOWLEDGE THE EXPRESS DELEGATION BY
    CONGRESS OF ENFORCEMENT AUTHORITY UNDER THE BSA TO FINCEN,
    NOT THE SEC, AND THE LEGAL IMPACT OF THAT DELEGATION ............................4

    POINT III......................................................................................................................8
    THE COURT ERRED IN IGNORING THE REQUIREMENTS OF THE APA......................8

    POINT IV....................................................................................................................14
    CERTIFICATION FOR APPEAL IS APPROPRIATE .........................................................14

CONCLUSION.................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Catskill Mts. Chptr. of Trout Unlimited v. EPA*,
   846 F.3d 492 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1164 (Feb. 26, 2018) ..........................13

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ......................................................................................................................9

*City of Idaho Falls v. F.E.R.C.*,
   629 F.3d 222 (D.C. Cir. 2011) ...............................................................................................11, 12

*Digital Realty Trust v. Somers*,
   139 S. Ct. 767 (2018) (Opp. .) ......................................................................................................6

*Encino Motorcars LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ................................................................................................................13

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ......................................................................................................................6

*Kuzinski v. Schering Corp.*,
   614 F. Supp. 2d 247 (D. Conn. 2009) .........................................................................................14

*Nutritional Health Alliance v. FDA*,
   318 F.3d 92 (2d Cir. 2003) ........................................................................................................5, 6

*S.E.C. v. Conaway*,
   697 F. Supp. 2d 733 (E.D. Mich. 2010) ......................................................................................12

*SAS Inst. Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ..............................................................................................................2, 6

*SEC v. Credit Bancorp, Ltd.*,
   No. 99 Civ. 11395 (RWS), 2002 WL 31422602 (S.D.N.Y. Oct. 29, 2002) ...............................12

*United States v. Picciotto*,
   875 F.2d 345 (D.C. Cir. 1989) ....................................................................................................12

*Vidal v. Nielsen*,
   No. 16-CV-4756 (NGG), 2018 WL 333515 (E.D.N.Y. Jan. 8, 2018) ...................................13, 14

**Statutes**

1 CFR § 51.1, *et seq.* ..........................................................................................................................9

1 C.F.R. § 51.1(f) ...................................................................................................................10

1 C.F.R. § 51.3 ......................................................................................................................10

1 C.F.R. § 51.7(c)(2) .............................................................................................................10

17 C.F.R. § 240.17a-8 .............................................................................................................4

31 C.F.R. § 1010.810(a) .........................................................................................................6

31 C.F.R. § 1010.810(d) .........................................................................................................6

31 C.F.R. § 1010.820(f) ..........................................................................................................7

31 C.F.R. § 1010.820(h) ......................................................................................................7, 8

5 U.S.C. § 551 *et seq*. ............................................................................................................9

5 U.S.C. § 553 ...................................................................................................................8, 12

5 U.S.C. § 706(2) ....................................................................................................................9

31 U.S.C. § 5321 .....................................................................................................................6

31 U.S.C. § 5321(a)(1) ............................................................................................................7

31 U.S.C. § 5321(a)(6) ............................................................................................................7

Administrative Procedure Act .................................................................................................1

Administrative Procedure Act ........................................................................................ *passim*

Bank Secrecy Act ........................................................................................................... *passim*

Freedom of Information Act, 5 U.S.C. § 552 .....................................................................8, 9

Poison Prevention Packaging Act and the Food, Drug and Cosmetics Act ..........................5

Securities Enforcement Remedies and Penny Stock Reform Act of 1990, 15
    U.S.C. § 78u(d) ..............................................................................................................12

**Other Authorities**

Emily S. Bremer, *Incorporation by Reference in an Open-Governemnt Age*, 36
    Harv. J.L. & Pub. Pol'y 131, 142 (Winter 2013) ............................................................9

# **INTRODUCTION**

The Court in its decision, and the SEC in its Opposition, turn a blind eye to critical undisputed facts, and the immutable consequences that flow from those facts:

- In 1981, the SEC issued Rule 17a-8 which referenced a broker-dealer's obligation to comply with the currency transaction reporting ("CTR") regulations previously issued pursuant to the Bank Secrecy Act ("BSA").

- In 1992, a decade *after* the Commission's issuance of Rule 17a-8, Congress enacted a new regulatory reporting regime requiring "suspicious activity reports" ("SARs") and then, in 2002, extended that requirement to broker-dealers.

- Congress expressly delegated authority for the administration, interpretation and enforcement of those SAR filing requirements to Treasury, not to the SEC; the SEC has admitted that it never received any delegation of authority to enforce the BSA or its implementing regulations;[1] and FinCEN has consistently and explicitly stated in both regulation and public comments that the SEC has only examination authority while FinCEN retained enforcement authority.

- At no time, when those SAR provisions were enacted or in the decades since, has the Commission even purported to engage in any rulemaking process relating to those SAR provisions.

Application of these facts to fundamental legal principles concerning Congressional grants of authority, the extent of agency authority, and the procedural requisites of the Administrative Procedure Act ("APA"), all lead to the same conclusion: the SEC does not have authority to enforce alleged violations of the SAR provisions of the BSA.

While the analysis that confirms the SEC's lack of authority is a straightforward application of clear and controlling authority, the winding pathway the SEC employs to support the Court's decision is awash with legally insupportable assertions. The legal import of the Congressional delegation of authority for BSA enforcement is so clear that the SEC is forced to pretend that it does not exist. The SEC's failure to adhere to the requirements of the APA is also clear, so much so that the SEC declines even to argue that it complied with the extensive rule-

---

[1] *See* Alpine's Rule 56.1 Statement in Support of Cross-Motion for Summary Judgment, SOF 1-2.

1

making procedures required under the APA.  Neither the SEC in any of its briefs, nor the Court in its decision, cited a single authority that condoned an attempt by any agency to do what the SEC is trying to do here.

Because the SEC possesses no grant of authority to enforce the BSA, and never incorporated its terms into a properly promulgated rule, the SEC is forced to try to recast the issue before the Court in terms of a hypothetical that does not exist, *i.e.*, *could* the SEC have promulgated a reporting requirement that it could then enforce?  (Opp. at 1, 5.)  That is not the case here.  The SEC did not promulgate reporting requirements.  Instead, the SEC attempted to co-opt the SAR reporting requirements contained in the BSA, applicable generally to a host of financial institutions, and entrusted by Congress to Treasury.  Once the analysis is properly returned to the realities of this case, and considered in the context of the Congressional delegation of authority under the BSA and the authorities that confirm the impact of that delegation, the conclusion is inescapable: the SEC did not and could not confer on itself authority to interpret and enforce the BSA provisions.

The Court's application of *Chevron* deference to endorse the SEC's assertion of jurisdiction stands as a separate analytical failure.[2]  First, where Congress has spoken on an issue, no *Chevron* analysis is appropriate, and the Second Circuit has laid out in clear terms that a plain grant to another agency precludes invasion of that authority.  Second, even if a *Chevron* analysis were appropriate, no deference can or should be afforded to the SEC's claim that it can interpret and enforce a *different* agency's provisions and impose on all financial institutions its skewed interpretations of Treasury provisions and its aggressive and reflexive approach to

---

[2] The continued vitality and/or extent of *Chevron* deference has been widely questioned since the appointment of Justice Neil Gorsuch, and his opinion last month in *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348 (2018).  While leaving the question of "whether *Chevron* should remain … for another day," a five member majority of the Court stated in no uncertain terms that "we owe an agency's interpretation of the law no deference" unless the Court is unable to discern the plain meaning of a pertinent statute. *See id.* at 1358.

enforcement.

Even if this Court adheres to its prior decision, it should nonetheless certify the decision for interlocutory appeal because there are, at the least, substantial questions concerning whether express delegation can be overridden by the SEC, the absence of any proper rulemaking process under the APA, and the invalidity of the SEC's purported incorporation by reference. Further, a reversal of this Court's decision on these issues would clearly advance the termination of the litigation: it would end the case.  Because there is at least a substantial question as to whether the plaintiff has the authority to bring this action in the first place, there is every reason not to proceed through the remaining and substantial phases of this case, and subject Alpine to entry of a judgment that could well destroy Alpine's business.

## ARGUMENT

### POINT I

### THIS IS A PROPER CASE FOR RECONSIDERATION BECAUSE THE COURT OVERLOOKED THE AUTHORITIES RELATING TO THE CONGRESSIONAL DELEGATION OF AUTHORITY TO FINCEN AND THE REQUIREMENTS OF THE APA

Although the SEC argues that reconsideration should be denied, it also cites the standard for reconsideration that is the precise circumstance present here, *i.e.,* where "'the moving party can point to controlling decisions or data that the court overlooked.'"  Opp. at 2-3 (quoting *SEC v. Cope*, No. 14-CV-7575 (DLC), 2017 WL 519256, at *1 (S.D.N.Y. Feb. 8, 2017)).  By this motion, Alpine has not revisited matters that were considered and decided by the Court.  It has discussed both controlling and persuasive authorities regarding the effect of SEC's lack of delegated authority, the requisites of the APA, and the invalidity of the claimed incorporation by reference, cited by Alpine in its motion, that were never addressed or resolved by the Court in its prior decision.

3

Even the SEC acknowledges that the Court failed to address the raft of authorities cited by Alpine relating to these substantial issues, and is left to try to posit a "plausible explanation" for the Court's failure. (Opp. at 6, 11.) While the SEC suggests that the Court can simply decline to acknowledge or adhere to those decisions, the controlling precedent on issues of this consequence should not be ignored. Because critical issues and a substantial volume of applicable authorities were not addressed by the Court, this motion for reconsideration is proper and should be granted.

## POINT II

### THE COURT FAILED TO ACKNOWLEDGE THE EXPRESS DELEGATION BY CONGRESS OF ENFORCEMENT AUTHORITY UNDER THE BSA TO FINCEN, NOT THE SEC, AND THE LEGAL IMPACT OF THAT DELEGATION

The SEC tries to recast the issue as one of its authority under the Exchange Act. According to the SEC, as "the Court concluded, the only relevant questions are whether Rule 17a-8 is a permissible and properly promulgated interpretation of the Exchange Act."[3] (Opp. at 5.) Focusing on that question, the SEC insists that it has authority under the Exchange Act "to regulate reporting of suspicious activity by broker-dealers." (*Id.*) But that question ignores the three critical facts at issue here: first, the SEC did *not* promulgate its own rules, it merely incorporated a regulatory scheme promulgated by a separate agency under *its own delegation of authority*; second, the SEC did *not* properly promulgate any rules because it ignored the APA; and third, even if it had properly adhered to the procedures required by the APA, its rulemaking would be invalid because it usurped the authority delegated to another agency.

By looking only at the SEC's authority pursuant to Section 17(a), while ignoring that

---

[3] In its Motion, Alpine also disputed this Court's characterization of the SEC's "principal allegation," *i.e.,* that "Alpine's AML program failed to comply with Section 1023.320." (Opinion at 6.) Notably, *the SEC also disputes the Court's description of its Complaint as alleging an AML program violation*. (*See* SEC's Opposition to Alpine's Motion For Reconsideration Regarding Partial Summary Judgment, at 6.). The SEC likely disputes the Court's statement because the SEC cannot pursue an AML program violation under Rule 17a-8 -- it is a books and records provision. *See* 17 C.F.R. § 240.17a-8.

4

which was expressly delegated by Congress to Treasury in relation to the BSA, the Court ran afoul of both law and logic. In relation to logic and policy, the Court did acknowledge the concerns that led to the passage of the BSA: "Congress specifically found that money laundering was being used to finance terrorist organizations." (Opinion at 26.) Congress therefore "sought to increase reporting of transactions that potentially involved money laundering." (*Id.*) Given that focus, Congress also, logically enough, delegated to Treasury authority over provisions designed to address money laundering and apply across the board to a host of financial institutions. This Court nonetheless treated the BSA as if it were a piece of securities legislation, improperly disregarding the purposeful delegation to Treasury of the formidable task of coordinating, administering and enforcing the provisions across various industries.

Most importantly, controlling authority, not followed by this Court, establishes that the Court could not properly interpret the reach of Rule 17a-8 without considering the extent to which it invades the purview of another agency or contravenes other Congressional legislation. The Second Circuit's decision in *Nutritional Health Alliance v. FDA,* 318 F.3d 92 (2d Cir. 2003), is dispositive on this issue, and the SEC's efforts to distinguish it fail. First, the SEC provides a patently misleading description of the case: the SEC acknowledges that Congress had previously authorized the FDA to regulate poison prevention packaging but also insists that the FDA never possessed such authority. (Opp. at 8-9.) In fact, the FDA claimed it *continued* to possess that authority under the Poison Prevention Packaging Act and the Food, Drug and Cosmetics Act, notwithstanding a subsequent conferral of that authority to the Consumer Product Safety Commission ("CPSC"). *Id.* at 103-04. The Second Circuit clearly stated that it did not; the *subsequent* conferral of authority to the CPSC acted to deprive the FDA of that authority. *Id.* at 104. As the Second Circuit observed: "'[t]he meaning of one statute may be affected by other

5

Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.'" *Id.* at 103 (quotations and citations omitted).  Under *Nutritional Health*, the SEC cannot rely on the provisions of the Exchange Act as its authority to enforce the later-enacted, specific provisions of the BSA entrusted by Congress to Treasury.

The SEC also attempts to distinguish *Nutritional Health* by claiming that the decision was predicated on an explicit "stripping" of the FDA's authority, as if stripping away authority is legally distinct from conferring it elsewhere. (Opp. at 9.)  Fortunately for Congress, explicit "stripping" of authority as to every other conceivable agency is not required when it expressly confers authority on one agency.  The authorities cited by Alpine confirm that Congress' silence will not be construed as acquiescence where it has affirmatively spoken on an issue.[4]

The SEC next attempts to support the Court's ruling by claiming that "concurrent jurisdiction" can exist where one statute "complements" the other.  But this assertion again requires the Court to pretend that Congress did not expressly delegate BSA enforcement authority solely to Treasury.  *See* 31 U.S.C. § 5321; 31 C.F.R. § 1010.810(a), (d).  Likewise the SEC's discussion of *F.D.A. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000), disregards the import of that decision, *i.e.*, that the scope of authority of one agency can be circumscribed by the delegation of authority to a different agency in a later, more specific statute – an analysis abjured by the Court here.  *Id.* at 143. The SEC even claims that *Brown & Williamson* is distinguishable because *the SEC* has made "consistent and repeated statements" in settled actions concerning the scope of its authority (Opp. at 6),[5] literally ignoring the fact that

---

[4]  Not only does *Nutritional Health* not stand for such a proposition, but the SEC ignores the numerous authorities cited by Alpine that also held otherwise.  For a discussion of these authorities, Alpine refers the Court to Alpine's Opening Motion, at 10 n.9, as well as to its Reply Memorandum in Support of Cross-Motion, at 3-4, 8-9.

[5]  The SEC tries to down play the Court's reliance on settled administrative actions.  (Opp. at 10).  In its decision, the Court looked to "several settled orders" for the fact that the SEC has previously "express[ed] its view that a broker-dealer's failure to file SARs violates Rule 17a-8" and those views had been "consistent over the years."  (Opinion at 40.)  Alpine pointed to the authorities confirming that the court should not have given any weight to such pronouncements (*see* Motion at 15-16).

6

here, the relevant agency, *FinCEN,* has consistently and repeatedly stated by both regulation (31 C.F.R. § 1010.810(a), (d)), and in public comments that it retained enforcement authority over the BSA, and that the SEC possesses only *examination* authority.[6]

Precisely the same defect exists in the SEC's discussion of *Digital Realty Trust v. Somers*, 139 S. Ct. 767 (2018) (Opp. at 9.)  There, the Court found that *Chevron* deference was not warranted because Congress had addressed the issue. *See id.* at 772; *SAS,* 138 S. Ct. at 1358 (same).  Here, too, the SEC ignores the relevant Congressional delegation of authority under the BSA, and the holding in *Nutritional Health* that rejected *Chevron* deference in analogous circumstances.  According to the SEC, the fact that Rule 17a-8 references a separate Congressional enactment, the BSA, is essentially irrelevant: the SEC could add into Rule 17a-8 any "recordkeeping" or "reporting" requirement promulgated by any agency – the IRS for example – and thereby confer on itself enforcement authority.[7]  Application of these controlling authorities demonstrates, however, that the provisions of the BSA cannot be ignored.

Finally, the SEC relies on this Court's assertion that "no conflict exists between the Exchange Act and the BSA."  (Opp. at 7 (citing Opinion at 37)).  That statement, however, ignores the importance to Treasury of maintaining control of the interpretation and enforcement of the BSA provisions, avoiding the havoc that would be wreaked if each of eight other regulatory agencies could impose its own interpretations and enforcement regime on BSA provisions.

The actual conflict between the provisions of the two statutes is also clear.  For example, their penalty provisions differ in material ways that render the proposed SEC enforcement

---

[6] *See* Alpine's Rule 56.1 Statement in Support of Cross-Motion for Summary Judgment, SOF Nos. 3-5.
[7] While this Court, in its decision, derided that concern, calling it a "parade of horribles," the SEC's latest filing confirms that it is unquestionably taking the position that it can incorporate and give itself plenary authority to enforce virtually any other agency's reporting requirements without regard for Congressional mandates.

scheme overly harsh and far more destructive to business than the provisions of the BSA.  The SEC insists that it can pursue a claim of a SAR violation under the Exchange Act, and thereby obtain summary judgment on a strict-liability theory and obtain penalties on a per-violation basis starting at $80,000 per violation. The SEC here claims that there are thousands of violations, and thus insists that it can seek per SAR penalties in the hundreds of millions of dollars.

Neither strict liability, nor such penalty amounts, are available under the BSA.  For FinCEN to pursue the exact same alleged violations, it would have to prove willfulness *and knowledge* of a violation of the law, and even then penalties would be capped at $25,000 per violation.  31 U.S.C. §5321(a)(1); 31 C.F.R. § 1010.820(f).  If FinCEN were only able to establish a negligent violation, penalties would be capped at $500 per violation; where a "pattern" of negligent violations is established, the penalty is set at no more than $50,000.00. *See* 31 U.S.C. § 5321(a)(6); 31 C.F.R. § 1010.820(h). If FinCEN were unable to demonstrate willfulness or negligence, it could not recover any penalties. *See id.*  The conflicts in the statutory provisions, and interpretation and enforcement of those provisions, abound, and illustrate the unmanageable and unproductive splintering that would occur if multiple agencies across different industries could formulate their own interpretations and enforcement regimes.[8]

## POINT III
## THE COURT ERRED IN IGNORING THE REQUIREMENTS OF THE APA

The SEC agrees that the Court failed to address the authorities cited by Alpine on the issue of whether Rule 17a-8 constitutes a valid incorporation of the SAR filing requirements that were promulgated a decade after its issuance.  (Opp. at 11.)  Those authorities confirm that the

---

[8]  A further example of the conflict between these statutory schemes exists in relation to where an enforcement action could be brought. The SEC relied on the broad provisions of Section 27 of the Exchange Act to establish personal jurisdiction and venue over Alpine in this Court.  However, there is no provision of the BSA that is analogous to Section 27, and thus FinCEN would have to meet more exacting standards of general and specific jurisdiction and venue to file in this Court. For the reasons detailed in Alpine's Motion to Dismiss, FinCEN would not be able to do so because none of the alleged violations at issue have any connection to this District.  Thus, the statutes also conflict on the fundamental question of this Court's authority to consider this action.

8

Court's assumption – that the SEC could use the 1981 issuance of Rule 17a-8 to absorb in perpetuity all subsequently enacted provisions of the BSA – is invalid on multiple grounds. (*See* Opinion, at 38-39 – holding that Rule 17a-8 was able to validly "evolve over time through Treasury's regulations" simply by "incorporat[ing]" them in 1981). Contrary to the Court's view, not only did the SEC fail to comply with the provisions of the APA but also the mechanism that it supposedly adopted to accomplish perpetual incorporation of BSA provisions is invalid.

The Court's decision, and the SEC's opposition, actually avoid any acknowledgement of the detailed and extensive procedural requirements imposed by the APA, including the notice and comment procedures of 5 U.S.C. § 553. The SEC instead chooses to address only the far narrower issue of incorporation by reference, couching its discussion in terms of the related – but distinct – requirements of the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). In the process, the SEC admits, because it must, that it engaged in no rulemaking in relating to the SAR broker dealer regulations, violating "the procedural requirements [of the APA] which 'assure fairness and mature consideration of rules of general application.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979) (citation omitted) (holding that where an agency fails to adhere to the APA, its rule does not have the "force of law").

The SEC's repeated references to FOIA so obfuscate the actual issue that a recap of the pertinent provisions is necessary. The APA, 5 U.S.C. § 551 *et seq*., initially passed in 1946, governs the process by which United States administrative agencies promulgate regulations, setting forth extensive notice and comment provisions as well as administrative due process protections. It states also that a court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," in "excess of statutory jurisdiction, authority, or limitations, or short on statutory right," or "without

9

observance of procedure required by law." 5 U.S.C. § 706(2).  Twenty years later, in 1966, the APA was amended to add FOIA, 5 U.S.C. § 552, which addresses the related issue of *publication* of government records, but otherwise has no relation to the extensive requirements of the APA.[9]

However, even Section 552 does not support the Court's ruling.  Among the numerous authorities that preclude an agency's attempt to incorporate not yet extant provisions into a regulation are the specific and binding issuances of the Director of the Federal Register, contained in 1 CFR § 51.1, *et seq.*  In connection with the publication requirement embedded within the APA, the OFR regulations specifically address the extent to which an agency could satisfy its publication obligation through incorporation by reference, expressly prohibit the device purportedly used by the SEC in Rule 17a-8, and render invalid any claim that the rule could automatically absorb subsequent legislative enactments.  In particular, the OFR prohibits incorporation by reference unless *inter alia* it (1) is submitted to and approved by the Director; (2) refers to a publication that is eligible for incorporation by reference; and (3) specifically identifies the version of the material and "is limited to the edition of the publication that is approved."  1 C.F.R. § 51.1(f); *see also* 1 C.F.R. § 51.3.

> Under these regulations, material is available for incorporation by reference only if it fits within the Federal Register's incorporation by reference policy, which requires that regulations conform to and not detract from applicable publication and Administrative Procedure Act (APA) requirements, assumes that incorporations by reference are 'intended to benefit both the Federal Government and the members of the class affected,' and demands that the reference be limited to a particular edition of the incorporated material.

---

[9] The incorporation by reference practice generally involves agencies referencing "technical "consensus standards" developed by private sector organizations using an open process that respects due process, includes an appeal process, and results in a consensus among participants representing a balance of interests." Bremer at 134 and n. 5.  The SEC latches on to the phrase "voluntary consensus standards" without any seeming understanding that is has no bearing on this case.  It refers to "technical standards created by voluntary consensus setting organizations" and generally includes highly technical standards developed by the National Institute of Standards and Technology ("NIST") or other similar organizations in the environmental , energy and aeronautics industries.  Bremer, 145-47.  Incorporated material must consist of "published data, criteria, standards, specifications, techniques, illustrations or similar material" and may not include "agency pronouncements with general legal effect."  Emily S. Bremer, *Incorporation by Reference in an Open-Governemnt Age*, 36 Harv. J.L. & Pub. Pol'y 131, 142 (Winter 2013).

10

Bremer, *supra*, at 142 (citation omitted).  Notably, the rules also prohibit what was attempted in Rule 17a-8, incorporation by reference of material in the United States Code, or material published previously in the Federal Register.  1 C.F.R. § 51.7(c)(2).

As Bremer notes, dynamic incorporation is attractive to an agency because the agency need not take any action to update the regulation when the incorporated material is revised; the most recent version is always and necessarily the one incorporated by reference.  But it is prohibited:

> Several legal provisions prohibit dynamic incorporations and for good reason.  OFR's regulations, and Document Drafting Handbook (DDH), require agencies to identify the particular version of any material incorporated by reference.  Indeed, OFR regulations expressly state that '[f]uture amendments or revisions of [an incorporated] publication are not included.' ….  This requirements of static incorporation is consistent with the purpose of the publication requirement because it ensures clear notice of regulatory requirements.  Relatedly, it prevents confusion regarding the requirements of the law at any point in time, both for the agency and for regulated parties.  Perhaps most crucially, it preserves an agency's regulatory authority and responsibility.  That the first version of a standard serves the public interest and warrants incorporation does not necessarily mean that subsequent incarnations of that standard will do the same.  It is critical that agencies' exercise independent judgment over each version to make certain that, as revised, the standard continues to carry out the public interest.
>
> Dynamic incorporation may also offend more fundamental legal principles, including nondelegation principles and notice-and-comment requirements.

Bremer, *supra*, 184-85.

That preclusion of "dynamic" incorporation is only one of many reasons that the SEC's claim concerning the scope of Rule 17a-8 is invalid.  In addition, and even if the SEC viewed the language of Rule 17a-8 as being broad enough to capture the subsequently enacted SAR reporting requirements, the SEC was *still* required to comply with the APA in relation to that substantial change in the content of the regulation.  As confirmed by the authorities cited by Alpine, and overlooked by the Court, the APA precludes an agency from sweeping into a regulation any "revised" or "updated" material that alters a regulated party's obligations.  In *City*

11

*of Idaho Falls v. F.E.R.C.,* 629 F.3d 222, 227-29 (D.C. Cir. 2011), for example, an agency's incorporation of a revised fee schedule, developed by a different agency, was held to be invalid. While the SEC seeks to distinguish that case, focusing on only one of two separate deficiencies cited by the D.C. Circuit, its discussion actually underscores that *both* defects also exist in this case. In *Idaho Falls*, the court determined that FERC violated the APA because the "revised" fee schedule was actually materially different from that which had been previously incorporated into the statute, and FERC could only effect such a modification through proper notice and comment. *Id.* at 227-29. *In addition*, the court confirmed that FERC's passive acceptance of material developed by a separate agency would contravene the agency's obligations to actually promulgate and to confirm the reasonableness of any directive that was being included in its regulations. *Id.* at 228-29. As the D.C. Circuit explained, it is FERC that has the responsibility to set annual charges "and its duty to ensure that rates are reasonable is both mandatory and non-delegable." *Id.* at 229. In the end, the holding was clear:

> Because FERC previously approved and used the old Forest Service methodology, its implicit acceptance of the new methodology in the 2009 Update ***marked a change in its own regulations. For FERC to make such a change, APA section 553 required notice-and-comment rulemaking.***

*Id.* at 230 (emphasis added).

The decision in *United States v. Picciotto,* 875 F.2d 345 (D.C. Cir. 1989), likewise illustrates that the SEC's 1981 issuance of Rule 17a-8 did not and could not subsume the new reporting regime enacted under the BSA in 1992. There, the Park Service claimed that it had the authority to impose "additional conditions" on Park activities without publication, notice or comment, arguing that it had granted to itself "a valid exemption to the APA for all future regulations [regarding restrictions on Park activity] and would be free of APA's troublesome rulemaking procedures forever after." *Id.* at 346-47. That reading of its regulation, the Court

12

succinctly stated, was "implausible as well as unlawful." *Id.*

Furthermore, the claim that the SEC, when it promulgated Rule 17a-8 in 1981, contemplated that the rule would authorize it to pursue civil money penalties for a violation of the incorporated BSA regulations is pure fiction. The SEC did not even have the authority to impose penalties for a violation of the federal securities laws in 1981. Congress did not grant that authority until the Securities Enforcement Remedies and Penny Stock Reform Act of 1990.[10]

Again, each of these issues is only one of the layers of the invalidity of Rule 17a-8, at least as employed by the SEC here, as the basis for an enforcement action for alleged violations of the SAR requirements of the BSA. Each is supported by authority, while the SEC cites nothing to support its contrary view. Taken in chronological order, the SEC improperly attempted to incorporate, *ad infinitum* and without rulemaking, further adaptations of the BSA and its implementing regulations; it attempted to incorporate a publication that is not eligible for incorporation by reference; it failed to comply with the requirement that it specify the edition and version of the incorporated material; and it failed, in 2002, to conduct the required rule-making that would have been necessary to update its regulation "[w]hen a more recent version of [the BSA] became available." Bremer, *supra*, at 184. Thus, even *if* Rule 17a-8 itself is valid, it did not accomplish an automatic and continual absorption of amendments to a separate piece of legislation.[11] As the SEC well knows, whether on this motion or on review, the procedures employed by the SEC and its plain failure to comply with the APA will be subject to "the much stricter and more exacting review of the agency's rationale and decision-making process" than

---

[10] 15 U.S.C. § 78u(d); *see also S.E.C. v. Conaway*, 697 F. Supp. 2d 733, 747 (E.D. Mich. 2010) ("Congress incorporated penalties into the securities laws when it enacted the Securities Law Enforcement Remedies Act of 1990); *SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395 (RWS), 2002 WL 31422602, at *1 (S.D.N.Y. Oct. 29, 2002) (same).
[11] The SEC notes in passing at one point that Treasury apparently did comply with the APA (Opp. at 15) but not even the SEC claims that its process would satisfy the requirements that apply to Commission action, nor would that process have addressed the critical issues of duplication of enforcement, absorption of the provisions into a strict liability statute and/or inconsistent interpretation and enforcement.

13

exists under the *Chevron* analysis.[12] The SEC's actions will not survive that exacting review.

## POINT IV

## CERTIFICATION FOR APPEAL IS APPROPRIATE

The SEC errs in its application of the factors the Court should consider when deciding a motion for certification of appeal. On the issue of whether there is a "substantial ground for difference of opinion," this case presents as strong a circumstance as can be envisioned for certification for appeal. An order presents "'substantial ground for difference of opinion'" when it, *inter alia,* presents issues that are "'difficult and of first impression.'" *Vidal v. Nielsen*, No. 16-CV-4756 (NGG), 2018 WL 333515, at *2 (E.D.N.Y. Jan. 8, 2018) (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990)).

Obviously, in every instance where certification is sought, the movant would have lost the argument in the district court. Nonetheless, Alpine has shown, and the SEC concedes, that this is an issue of first impression, and no precedent cited by the SEC supports its claims. It has no case that would support assertion of jurisdiction by one agency where Congress delegated it to another. It cites no case permitting the promulgation of a rule that purports to incorporate the regulations of another agency. It can point to no authority for the illogical assertion that a regulation can automatically evolve to incorporate not even existing regulations relating to a not even existing statutory reporting regime. Alpine, on the other hand, cited abundant authority to support its point that Rule 17a-8 does not permit the SEC to pursue claims for violations of the SAR provisions of the BSA. There is at least a substantial ground for dispute as to the issues of both Congressional delegation of authority and failure to comply with the APA.

With respect to the preeminent factor of whether immediate appeal would advance

---

[12] *See Catskill Mts. Chptr. of Trout Unlimited v. EPA,* 846 F.3d 492, 521 (2d Cir. 2017) (explaining that the *State Farm* standard, not the *Chevron* standard, "is used to evaluate whether a rule is procedurally defective" because of failures in the agency's rulemaking process), *cert. denied*, 138 S. Ct. 1164 (Feb. 26, 2018); *see also Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("where a proper challenge is raised to the agency procedures, and those procedures are defective, a court should not accord *Chevron* deference to the agency interpretation").

termination of the litigation, Alpine maintains that the appellate court will find that the SEC lacks authority to pursue these claims, and the matter will end. The SEC cites no authority for its perplexing position that a reversal that would end a litigation would not advance its termination, and the authority is to the contrary.[13] The SEC's only response is to presume that it can end this matter quickly, obtaining a final judgment on thousands of claimed BSA violations and procuring an astronomical penalty without any significant ado. (Opp. at 18). But the SEC still faces the significant burden of proving, *inter alia,* that each of thousands of SARs were "required," *i.e*., that the totality of the circumstances relating to the transactions at issue demonstrated that the transaction was intended to facilitate criminal activity or possessed no lawful business purpose. There will be disputes of fact on this issue, and the witnesses have already provided substantial information concerning whether the purported red flags would have led Alpine, or any reasonable firm under similar circumstances, to decide that a SAR was required.[14] The penalty phase is also complex, and will require the Court to take into account Alpine's actual processes and its efforts to comply with the BSA and constantly improve its AML program over time. This case is therefore likely to involve "protracted litigation" that can be averted by certifying the Order for interlocutory appeal.

## CONCLUSION

For the foregoing reasons, and those more specifically stated in Alpine's opening Memorandum of Law, Alpine's Motion for Reconsideration should be granted.

---

[13] *See, e.g., Kuzinski v. Schering Corp*., 614 F. Supp. 2d 247, 250–51 (D. Conn. 2009); *Vidal,* 2018 WL 333515, at *3 (granting motion for certification of APA issue would advance termination of litigation because it would "eliminate issues thus making discovery much easier and less costly," even where it would not entirely dispose of the case).

[14] The SEC goes to great length to say Alpine presented nothing new in its Oppositions to both of Alpine's Motions for Reconsideration. This assertion underscores that the Court should have considered the additional evidence submitted by Alpine in connections with its Motions for Reconsideration, including the deposition testimony and the expert declaration of Beverly Loew. The highly unusual scheduling of these summary judgment motions by the Court, in advance of discovery, prevented Alpine from presenting this evidence in support of its positions.

DATED this 25th day of May 2018.

       /s/Maranda E. Fritz
       Maranda E. Fritz
       **THOMPSON HINE**
       335 Madison Avenue, 12th Floor
       New York, New York 10017-4611
       Tel. 212.344.5680
       Fax 212.344.6101
       Email: Maranda.Fritz@thompsonhine.com

       Brent R. Baker (BB 8285)
       Aaron D. Lebenta (Pro Hac Vice)
       Jonathan D. Bletzacker (Pro Hac Vice)
       **CLYDE SNOW & SESSIONS**
       One Utah Center
       201 South Main Street, Suite 1300
       Salt Lake City, Utah 84111-2216
       Telephone 801.322.2516
       Facsimile 801.521.6280
       Email: brb@clydesnow.com
          adl@clydesnow.com
          jdb@clydesnow.com
       *Attorneys for Defendant*
       *Alpine Securities Corporation*