# Exhibit 3

Brent R. Baker (5247)
Aaron D. Lebenta (10180)
Jonathan D. Bletzacker (12034)
**CLYDE SNOW & SESSIONS**
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email: brb@clydesnow.com
       adl@clydesnow.com
       jdb@clydesnow.com

Maranda E. Fritz (*Pro Hac Vice Pending*)
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email: Maranda.Fritz@thompsonhine.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation, SCOTTSDALE CAPITAL ADVISORS, an Arizona corporation<br><br>        Plaintiffs,<br>  v.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION<br><br>        Defendant. | **COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY INJUNCTION**<br><br><br>Case No. _____<br><br>  Judge _____ |

Plaintiffs Alpine Securities Corporation ("Alpine") and Scottsdale Capital Advisors ("SCA") (collectively, sometimes "Plaintiffs") file this Complaint against Defendant United States Securities and Exchange Commission ("SEC" or "Defendant") and allege, by and through undersigned counsel, on knowledge of Plaintiffs and upon information and belief as to all other matters, as follows:

## **INTRODUCTION**

1.     This is a suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 550, *et seq.,* to establish the invalidity of the SEC's attempt to use Exchange Act Rule 17a-8, 17 C.F.R. § 240.17a-8, to pursue claims against Alpine and others for purported violations of suspicious activity reporting ("SAR") regulations of the Bank Secrecy Act (also known as the Currency and Financial Transactions Reporting Act of 1970), 31 U.S.C. §§ 5311-5330 (the "BSA") administered by the United States Department of Treasury ("Treasury").

2.     The SEC's attempt to pursue claims for alleged violations of the SAR provisions of the BSA pursuant to Exchange Act Rule 17a-8 of is defective on several procedural and substantive grounds.

3.     First, the SEC asserts that Rule 17a-8, promulgated in 1981, automatically expanded over the course of years to encompass any subsequent provisions of the BSA, and permits the SEC to bring enforcement actions for

2

violations of the SAR regulations, 31 C.F.R. § 1023.320, that were issued *twenty years later* by the Treasury Department's Financial Crimes Enforcement Network ("FinCEN") under the BSA. The SEC, however, failed to engage in *any* of the procedures required by the APA to actually effect such a rule. In fact, this case is highly unusual: while most actions under the APA present the issue of whether an agency's process and analysis under the APA was deficient, here, the agency failed to engage in any process whatsoever.

4.      That the SEC's present interpretation of Rule 17a-8 constitutes a violation of the APA is evident from the sequence of events relating to the rule and to the passage of the relevant provisions of the BSA as detailed immediately below.

5.      Rule 17a-8 was adopted in 1981 and, in pertinent part, required "[e]very registered broker or dealer who is subject to the requirements of the Currency and Foreign Transactions Reporting Act of 1970 [to] comply with the reporting, recordkeeping and record retention requirements of Part 103 of Title 31 of the Code of Federal Regulations." At the time Rule 17a-8 was adopted, that statute required only that broker-dealers file currency transaction reports in three circumstances: (1) a transaction in currency involving $10,000 or more; (2) any export or import of $5,000 of currency or monetary instruments; and (3) a person

3

subject to the jurisdiction of the United States with any financial interest or authority over a bank, securities or other financial account in a foreign country.[1]

6.     More than ten years later, in 1992, Congress granted to the Secretary of the Treasury the authority to require financial institutions to report suspicious transactions.  31 U.S.C. § 5318(g).  Another decade later, in Section 356 of the USA Patriot Act, Congress directed the Secretary of the Treasury, after consultation with the SEC and the Federal Reserve, to publish regulations requiring various other financial institutions, including broker-dealers, to file SARs.

7.     In 2002, FinCEN, pursuant to authority delegated by the Secretary of the Treasury, adopted final regulations amending the BSA Regulations to require broker-dealers to file suspicious activity reports with Treasury (*see* 66 Fed. Reg. 67670 (December 31, 2001) (publishing notice of proposed amendments to the BSA regulations); *see also* 67 Fed. Reg. 44048 (July 1, 2002) (publishing final rule amending the BSA regulations).  FinCEN's broker-dealer SAR regulation is codified at 31 C.F.R. § 1023.320.

---

[1] *See* SEC Notice of Proposed Rulemaking, 46 Fed. Reg. 44775 (Sept. 8, 1981) (summarizing existing Treasury regulations and reporting requirements); SEC Notice of Adoption of Final Rule, 46 Fed. Reg. 61454 (Dec. 19, 1981) (same). *See also* 31 C.F.R. §§ 103.22 (transactions involving $10,000 or more), 103.23 (export or import of currency, 103.24 (reports of foreign accounts).

8.     At no time – when the SAR regulations were first promulgated, when they were later extended to broker-dealers in 2002, or since then – has the SEC engaged in any of the procedures or analysis required under the APA to promulgate a regulation relating to those SAR requirements.  The SEC ignored all of the critical requirements of the APA, including requirements to: publish notice in the Federal Register; solicit, evaluate and reconcile comments from the industry; address relevant and important jurisdictional issues; and conduct mandatory cost-benefit analyses.  Despite FinCEN's numerous amendments, revisions, and substantive additions to the BSA regulations – most notably FinCEN's creation of the SAR regime for banks and depository institutions in 1996 and its adoption of SAR requirements for broker-dealers in 2002 – the SEC for more than 25 years engaged in no rulemaking action relating to Rule 17a-8, confirming to the entire industry that Rule 17a-8 remained unchanged and unaltered since its adoption.

9.     Notably, while the SEC failed to comply with any of the requirements of the APA in relation to the SAR provisions of the BSA, it plainly acknowledged in 2011 that it was obligated to comply with the APA to include in Rule 17a-8 even *technical* changes to the BSA.  In 2010, FinCEN undertook a purely technical reorganization of its BSA regulations, transferring them from "Part 103" of Title 31 to a new section, "Chapter X" of Title 31 in the Code of Federal Regulations

(*see* 75 Fed. Reg. 65806 (Oct. 26, 2010). On February 23, 2011, the SEC, for the first time since Rule 17a-8 was initially promulgated, published a notice of amendments to Rule 17a-8 in order to "update [the] reference within the rule to the implementing regulations of the Currency and Foreign Transactions Reporting Act of 1970" in light of FinCEN's reorganization of the referenced regulations. To accomplish this, the SEC replaced the reference to "Part 103" with "Chapter X" in Rule 17a-8.

10. From this sequence of events, broker-dealers and related industry participants reached the *only* reasonable conclusion: Rule 17a-8 addressed the currency transaction report requirements that existed at the time the rule was adopted in 1981. It imposed **no** additional obligations, subject to SEC enforcement, with respect to the suspicious activity reporting requirements adopted by FinCEN twenty years later.

11. Having engaged in no rulemaking process of any kind in relation to the SAR provisions, but eager to pursue enforcement actions, the SEC has put forth the wholly after-the-fact claim that Rule 17a-8 somehow automatically absorbed the subsequent BSA provisions because they were "incorporated by reference." That claim is equally defective: the kind of boundless and never-ending incorporation that the SEC describes is expressly prohibited by specific and clear

administrative process and rules.  Under those rules, Rule 17a-8, because it was enacted decades *before* the SAR provisions came into existence and specifically addressed only the currency transaction reporting that then existed, did not and *could not* incorporate future provisions merely by referring to the BSA.

12.     Second, *if* the SEC had engaged in procedures consistent with the APA, that process would have confirmed that a rule purporting to confer enforcement authority on the SEC is invalid.  Congress expressly delegated enforcement authority under the BSA to Treasury, which properly conferred that authority on FinCEN.  The SEC is not permitted to confer on itself authority to pursue violations of the BSA that is contrary to and in derogation of a clear Congressional delegation of authority to Treasury, and the clear and consistent retention of enforcement authority by FinCEN.

13.     It was only in recent years, many years after FinCEN's application of SAR rules to broker-dealers, that the SEC began to claim that it possessed authority to enforce the SAR provisions of the BSA.  It started by inserting those claims into settled administrative enforcement actions against broker-dealers who, the SEC alleged, failed to comply with FinCEN's SAR reporting requirements and thereby violated Rule 17a-8.  Ensconced behind the veil of its own administrative process, and seizing on the penchant of industry participants to quickly acquiesce

and settle alleged violations by means of consent decrees and cease-and-desist orders, the SEC has avoided any judicial scrutiny of its unlawful and defective expansion of its jurisdiction and application of Rule 17a-8.

14. Then, in June 2017, the SEC filed an enforcement action against Alpine in the United States District Court for the Southern District of New York, *S.E.C. v. Alpine Securities Corp.,* Case No. 17-cv-4179-DLC, relying on Rule 17a-8 to claim that Alpine failed to comply with FinCEN's SAR regulations, 31 C.F.R. § 1023.320, on thousands of occasions. For the first time, the SEC pursued an enforcement action against a litigant who did not immediately capitulate *and* who was aware that authority to enforce the BSA was conferred solely on Treasury, and is not possessed by the SEC.

15. Upon information and belief, the SEC commenced the enforcement action against Alpine in New York, even though the SEC lacks the proper authority to do so for the reasons stated herein, because of, or in retaliation for, Alpine's participation as a clearing firm in the microcap over-the-counter ("OTC") stock market, which is looked upon with disfavor by the SEC, with the purpose of trying to penalize and make an example of Alpine and send a message to other participants in the OTC stock market through enforcement rather than regulation; and (b) because of, or in retaliation for, formal and informal statements or

complaints made by Alpine and/or certain affiliated entities or individuals regarding FINRA and/or Plaintiff,

16. In motions filed in that Action in New York, Alpine asserted that the New York court lacked jurisdiction over Alpine, given its location in Utah. The SEC, in response, acknowledged that it was pursuing the action in New York to garner greater attention and publicity, and argued that the processing of stock certificates in Manhattan constituted a sufficient basis for jurisdiction.

17. Alpine also argued to the New York Court that the SEC failed to comply with the APA. That Court declined to address the issue of whether the SEC had violated the provisions of the APA, and Alpine is not permitted to file any counterclaims against the SEC in that enforcement action. The New York Court rejected Alpine's arguments without substantively addressing Alpine's authorities and arguments that the SEC failed to comply with the APA, and without ruling that the SEC complied with the APA, including as recently as June 18, 2018 when the Court denied Alpine's Motion to Reconsider its rulings on the APA issues.

18. SCA, as a broker-dealer, is subject to regulation by both FinCEN (under the BSA) and the SEC (under the Exchange Act). As a result of the SEC's unfounded and unlawful enforcement of the BSA, and new interpretation of

violations of the BSA as alleged in the New York action, SCA is forced to devote substantial time and resources to evaluate and take any necessary steps in its BSA program to avoid regulatory inquiry, excessive penalties, or an enforcement actions. Moreover, through SCA's Fully Disclosed Clearing Agreement with Alpine, it may be required to indemnify Alpine for liability imposed in the New York action.

19.     For these reasons, and for the reasons explained below, Plaintiffs bring this action and respectfully request that this Court declare unlawful the SEC's newly-minted and administratively defective application of Rule 17a-8, and enjoin the SEC from implementing or enforcing that provision or giving it effect in any manner, and order such other relief as the Court may deem just and appropriate.

## **THE PARTIES**

20.     Plaintiff Alpine is a Utah corporation headquartered in Salt Lake City, Utah.  Alpine is a self-clearing broker-dealer and has been registered with the SEC since 1984.  Alpine has been charged by the SEC with violating Rule 17a-8 based on allegations that it had failed to comply with the requirements of FinCEN's SAR reporting requirements, codified at 31 C.F.R. § 1023.320.

21.     Plaintiff SCA is an Arizona corporation, headquartered in Scottsdale,

Arizona. SCA is a retail brokerage firm that trades securities, and has been registered with the SEC as a broker-dealer since 2002.

22. Alpine, as a clearing firm, entered into and executed a "Fully Disclosed Clearing Agreement" on February 26, 2009, with SCA serving as the introducing firm. *See* SCA Fully Disclosed Clearing Agreement, Ex. A.

23. Alpine's and SCA's Fully Disclosed Clearing Agreement provides that SCA has the sole responsibility for (1) complying with all applicable laws, regulations, and self-regulatory requirements regarding transactions and accounts, including AML obligations, (2) maintaining procedures to ensure compliance, and (3) knowledge of the customer, including "all essential facts" relating to each customer and their accounts. *See id*., at Sec. 4.1.4, 5.1-5.3 and 6.1-6.8, Ex. A. In the event of a failure to comply with those requirements, and if Alpine incurs liability based on those failures, SCA is required to indemnify Alpine. Pursuant to this agreement, SCA has acted, and continues to act, as an introducing broker-dealer for transactions cleared through Alpine.

24. Defendant SEC is an agency of the United States government, subject to the Administrative Procedure Act (*see* 5 U.S.C. § 551(1); 15 U.S.C. § 78(d)(a)).

## JURISDICTION AND VENUE

25. This action arises under the APA, 5 U.S.C. §§ 500 *et seq.*, the

Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601, *et seq.,* the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331.

26.  The APA provides for judicial review to any party aggrieved by agency action, and waives sovereign immunity for all equitable actions for specific relief against a federal agency.  5 U.S.C. § 702.

27.  Venue is proper in this District under 28 U.S.C. § 1391(c) and (e)(1), and Rule 20(a)(1) of the Federal Rules of Civil Procedure, because the Defendant resides in this District as an agency of the United States that maintains a regional office in this District, and because at least one Plaintiff, Alpine, resides in this district and no real property is involved in this action.  SCA asserts rights to relief jointly with Alpine and based on common questions of law and fact.

## GENERAL ALLEGATIONS

### The Bank Secrecy Act

28.  The BSA was enacted by Congress in 1970 to authorize and establish a currency transaction reporting and recordkeeping regime to address concerns regarding the movement of funds derived from or related to illicit activity through financial institutions. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26-28,

38 (1974) (describing Congress' motive in adopting the BSA as "recogniz[ing] the importance of reports of large and unusual currency transactions in ferreting out criminal activity" through financial institutions).

29. Congress expressly delegated authority to administer and implement the BSA to the Secretary of Treasury, including both rulemaking and enforcement authority. *See, e.g., California Bankers,* 416 U.S. at 26 (recognizing Secretary's broad rule-making authority under the BSA; *see also* 31 U.S.C. §§ 5320, 5321 (authorizing "the Secretary" to seek civil penalties and injunctive relief for violations of the BSA or its implementing regulations). As confirmed by a comprehensive amendment to the implementing regulations for the BSA in 1987, the Secretary of Treasury delegated "overall authority for enforcement and compliance . . . to the Assistant Secretary (Enforcement)." 31 C.F.R. § 103.46(a) (now at 31 C.F.R. § 1010.810(a)); *see also* 52 Fed. Reg. 114,36 114,40 cmt. 19 (Apr. 8, 1987) (final rule) (stating the intent of the amendment to "[c]larify the overall Bank Secrecy Act enforcement and compliance authority of the Assistant Secretary (Enforcement)"). The Secretary of the Treasury further confirmed the Treasury "Department's exclusive authority to impose civil penalties under the Bank Secrecy Act." 52 Fed. Reg. at 114,40 cmt. 19; *see also* 31 C.F.R. § 103.46(d) ("Authority for the imposition of civil penalties for violations of this part

lies with the Assistant Secretary, and in the Assistant Secretary's absence, the Deputy Assistant Secretary (Law Enforcement)").

30.     Between 1970 and 1981, and pursuant to its delegated authority, Treasury adopted regulations requiring the reporting of specific currency and foreign transactions, i.e, each "deposit, withdrawal, exchange of currency or other payment or transfer" involving "currency of more than $10,000 (31 C.F.R § 103.22(a) (now at Ch. X, tit. 31 C.F.R. § 1010.311); *see also* 37 Fed. Reg. 6913 (Apr. 5, 1972) (notice of final rule)); any export or import of $5,000 or more of currency or monetary instruments (31 C.F.R. § 103.23(b) (now at Ch. X, tit. 31 C.F.R. § 1010.340); [2] *see also* 37 Fed. Reg. 6913 (Apr. 5, 1972) (notice of final rule)); and any person subject to the jurisdiction of the United States with any financial interest or authority over a bank, securities or other financial account in a foreign country if deemed necessary by the Secretary of the Treasury (31 C.F.R. § 103.24 (now at Ch. X, tit. 31 C.F.R. § 1010.350); *see also* 37 Fed. Reg. 6913 (Apr. 5, 1972) (notice of final rule)).

31.     At *no* time between enactment of the BSA and the SEC's adoption of Rule 17a-8 in 1981 did Treasury adopt any rule or regulation requiring SARs or

---

[2] The current version of this rule states a monetary threshold of $10,000 rather than the $5,000 threshold established in the 1972 rule; this was a result of an amendment to the rule adopted in 1985.  *See* 50 Fed. Reg. 18479 (May 1, 1985).

recordkeeping of SARs by broker-dealers (or any financial institution, for that matter).

32.     Congress did not delegate any authority to the SEC to administer or enforce the BSA, or to issue regulations thereunder. *See* 31 U.S.C. §§ 5311-5332.

33.     In connection with its delegation to the Secretary of Treasury of authority over implementing the BSA, Congress authorized the Secretary to delegate its duties and powers to another officer or employee *within* Treasury. *See* 31 U.S.C. § 310(b)(2)(I), (J).  Exercising this authority, the Secretary delegated BSA responsibilities to the Director of FinCEN in 1990 (*see* Treasury Order No. 105-08 (Apr. 25, 1990)), and renewed this delegation in 2002, including (a) authority to "[t]ake all necessary and appropriate actions to implement and administer the provisions of" the BSA, including "the promulgation and amendment of regulations and the assessment of penalties" and (b) "[e]xercise authority for enforcement of and compliance with the regulations at 31 CFR part 103 [since renumbered to 31 CFR chapter X] . . . ."  (*see* Treasury Order No. 180-01(3)(a)-(b).

34.     FinCEN has consistently confirmed the scope of its overall authority as the "Administrator" of the BSA, and its retention of enforcement authority as well as the limited examination authority delegated to other agencies such as the

SEC, in a series of reports and official statements.  *See* 31 C.F.R. § 1010.810(a), (d); *see also, e.g.*, FinCEN, "Feasibility of a Cross-Border Electronic Funds Transfer Reporting system under the Bank Secrecy Act" (Oct. 2006) ("FinCEN has retained the authority to pursue civil enforcement actions against financial institutions for non-compliance with the Bank Secrecy Act and the implementing regulations"); *Bank Regulation*, Banking & Fin. Servs. Pol'y Rep., Dec. 2016 ("[a]lthough it delegates BSA compliance examination authority to other federal regulators, FinCEN retains enforcement authority, including the authority to impose [civil monetary penalties] for violations")).

35.    The Secretary delegated to the SEC *only* the "authority to *examine* institutions to determine their compliance with the provisions of [Part 103]" and amended the rule accordingly.  *See* 52 Fed. Reg. at 114,40 cmt. 19 (emphasis added); *see also* 31 C.F.R. § 103.46(b)(6) (now at 31 C.F.R. § 1010.810(b)(6)). Such "examination" authority is limited to:  (1) the power to "examine any books, papers, records or other data of domestic financial institutions relevant to the recordkeeping or reporting requirements of this chapter," (31 C.F.R. § 103.46(f) (now at 31 C.F.R. § 1010.810(f)); and (2) the duty to make "periodic reports" and to submit "[e]vidence of specific violations of any of the requirements of this chapter" to the "Assistant Secretary," 31 C.F.R. § 103.46(e), and later to the

16

Director of FinCEN.  31 C.F.R. § 1010.810(e).

### The Promulgation of Rule 17a-8 in 1981
### – Years Before a SAR Rule Existed and
### Decades Before It Applied to Broker Dealers

36.    In 1981, the SEC proposed Rule 17a-8 to require broker-dealers to

"comply with" the *currency and foreign transaction reporting* requirements

contained in the Treasury regulations. *See* 46 Fed. Reg. 44776 (Sep. 8, 1981).

Rule 17a-8 states:

> "Every registered broker or dealer who is subject to the
> requirements of the Currency and Foreign Transactions
> Reporting Act of 1970 shall comply with the reporting,
> recordkeeping and record retention requirements of Part
> 103 of Title 31 of the Code of Federal Regulations.
> Where Part 103 of Title 31 of the Code of Federal
> Regulations and § 240.17a-4 of this chapter require the
> same records or reports to be preserved for different
> periods of time, such records or reports shall be
> preserved for the longer period of time."

17 C.F.R. § 204.17a-8; *see also* 46 Fed. Reg. 61454 (setting forth text of Rule 17a-

8).

37.    In its notice of proposed rule, the SEC detailed the specific currency

transaction reporting and recordkeeping requirements that were the subject of the

proposed rule.  The SEC identified "three different reports" that broker-dealers

were required to file (those listed, *supra*, ¶¶ 5, 30) and further specifically

identified the six recordkeeping requirements that had also been previously

17

enacted. *See* 46 Fed. Reg. 44776 (Sep. 8, 1981). This exact information was repeated verbatim in the SEC's notice of final rule. *See* 46 Fed. Reg. 61454 (Dec. 17, 1981).

38.    The SEC confirmed that Rule 17a-8 pertained to those "existing" currency transaction reporting provisions and revisions to them. The SEC specifically stated that the rule "codifies as part of the Commission's rules the *existing* requirements contained in the Treasury regulations with which brokers and dealers *currently* must comply." 46 Fed. Reg. 44776 (Sep. 8, 1981) (emphasis added). This exact language was repeated verbatim in the SEC's notice of final rule. *See* 46 Fed. Reg. 61454 (Dec. 17, 1981).

39.    In its notice of proposed rulemaking, the SEC also conveyed its clear understanding of its limited "examination" authority, explaining that the rule was adopted for the purposes of "on-site examinations of broker-dealer firms" -- not for purposes of trying to procure some broader authority. *Id.*; *see also* 46 Fed. Reg. 61454 (Dec. 17, 1981) (notice of final rule).

### Ten Years Later,
### FinCEN Adopts Suspicious Activity Reporting Regulations

40.    Beginning more than ten years after the SEC's promulgation of Rule 17a-8, and pursuant to the conferral by Congress of authority for the "overall administration and enforcement of the BSA" (Office of the Inspector General,

Dep't of Treasury Audit Report, OIG-17-016 (Nov. 16, 2016)), FinCEN adopted a number of regulations imposing reporting and recordkeeping requirements related to "suspicious" transactions by, at or through financial institutions.

41.     Specifically, between 1992 and 1994, Congress adopted a series of amendments to the BSA (*see* Pub. L. 102-550 (1992); Pub. L. 103-325 (1994)) that authorized the Secretary of the Treasury to require reporting of suspicious transactions, codified at 31 U.S.C. § 5318(g).

42.     Pursuant to those amendments, FinCEN published a notice of proposed rulemaking in 1995, describing a rule requiring banks and other depository financial institutions to file SARs with Treasury. *See* 60 Fed. Reg. 46556 (Sep. 7, 1995). The rule was adopted on February 5, 1996. *See* 61 Fed. Reg. 4326 (February 5, 1996).

43.     At the time FinCEN adopted the suspicious activity reporting regime with respect to banks, it did not have explicit statutory authority to impose similar requirements on broker-dealers or other financial institutions.

44.     In 2001, however, Congress enacted the USA Patriot Act, Pub. L. No. 107-56, which directed the Secretary of the Treasury to adopt suspicious activity reporting requirements for a number of other financial institutions. Section 356 *inter alia* directed the Secretary of the Treasury to consult with the SEC and

publish rules requiring broker-dealers to report suspicious transactions pursuant to 31 U.S.C. § 5318(g).

45.     Complying with this directive, the Secretary of the Treasury, through the Director of FinCEN, published a notice of proposed rulemaking on December 31, 2001 (*see* 66 Fed. Reg. 67670).  In this notice, FinCEN confirmed the scope of the SEC's authority under Rule 17a-8 as described above: "[t]he [SEC] adopted Rule 17a-8 in 1981 . . . which enables *the [self-regulatory organizations ("SROs")]*, subject to [SEC] oversight, to *examine* for [BSA] compliance." *Id.* (emphasis added).

46.     On July 1, 2002, FinCEN published a notice of final rule, thereby promulgating section 103.19 (now Ch. X, tit. 31 C.F.R. § 1023.320) and requiring broker-dealers to file SARs and maintain certain records. *See* 67 Fed. Reg. 44048. Again, FinCEN noted that the role of the SEC in respect of this rule was to "examine" broker-dealers. 67 Fed. Reg. at 44055, n. 19 (noting that under section 103.19(g) (now Ch. X, tit. 31 C.F.R. § 1023.320(g)), broker dealers "will be examined by FinCEN or its delegees" and specifically identifying the SEC as a delegee having "examination authority" pursuant to 31 C.F.R. § 103.56(b)(6) (now Ch. X, tit. 31 C.F.R. § 1010.810(b)(6)).

47.     These new SAR reporting requirements were not "revisions" to the

earlier BSA currency transaction reporting and other requirements (detailed in
Paragraphs 37-38, *supra*) that existed at the time of the issuance of Rule 17a-8.
The SAR provisions contained entirely new and materially different requirements,
and FinCEN itself plainly identified these new obligations as "amendments," in
both its notice of proposed rulemaking and notice of final rule. *See* 66 Fed. Reg.
67670 (Dec. 31, 2001); 67 Fed. Reg. 44048 (July 1, 2002).

### The SEC Failed to Engage in Any
### Rule Making Process Relating to the SAR Provisions

48.    The SEC failed properly to promulgate any rule, or even engage in
any semblance of rulemaking process[3] in relation to the SAR requirements of the
BSA, although it later recognized that just such processes were necessary to
incorporate even mere "technical amendments" to the BSA (*see* SEC Rel. No. 34-
63949 (Feb. 23, 2011)).

49.    Specifically, the APA requires that an agency publish "general notice
of proposed rule making" explaining the basis and authority for the proposed rule

---

[3] In fact, FinCEN's notice of proposed rulemaking serves to highlight the SEC's
remarkable lack of action in response to the new SAR rules.  When FinCEN
previously adopted its SAR regime for banks and depository institutions, other
bank regulators, including the Board of Governors of the Federal Reserve, adopted
new rules regarding suspicious transaction reporting. *See* 66 Fed. Reg. at 67671
("[i]n April 1996 . . . the federal bank supervisors . . . concurrently issued
suspicious transaction reporting rules")).

(5 U.S.C. § 553(b)), receive and respond to public comment (5 U.S.C. § 553(c)), and provide notice of any final rule at least 30 days before it becomes effective (5 U.S.C. § 553(d)).

50.    Additionally, the RFA requires an agency to consider the impact of any proposed rule on small entities by describing in an "initial regulatory flexibility assessment" the following: why the rule is under consideration, the objectives and legal basis of the rule, the number of small entities estimated to be affected by the rule, any reporting and recordkeeping requirements of the rule, and all relevant Federal rules which may "duplicate, overlap or conflict with" the rule. 5 U.S.C. § 603(b).  When a final rule is promulgated, the agency must provide further assessment in a "final regulatory flexibility analysis." 5 U.S.C. § 604.

51.    The Exchange Act itself imposes procedural requirements that must be observed whenever the SEC promulgates a rule under the auspices of the Exchange Act.  Pursuant to sections 3(f) and 23(a)(2) (15 U.S.C. § 78c(f) and § 78w(a)(2)), the SEC must consider, in addition to considering whether the proposed action is necessary or appropriate in the public interest and serves to protect investors, whether the action will promote efficiency, competition, and capital formation, and consider the impact any new rule would have on competition.  In fact, section 23(a)(2) directs that the SEC "shall not adopt any

22

such rule or regulation which would impose a burden on competition not necessary or appropriate" to further the purposes of the Exchange Act. 15 U.S.C. § 78w(a)(2).

52.   The SEC's claim that Rule 17a-8 incorporated, in perpetuity, all BSA provisions after 1981 also implicates, and violates, the regulations of the Office of the Federal Register ("OFR") concerning proper incorporation by reference.[4]  These regulations specifically state that "incorporation by reference of a publication is limited to the edition of the publication that is approved.  Future amendments or revisions of the publication are not included."  1 C.F.R. § 51.1(f). They also require formal procedure and publication of notice in order to amend or update material incorporate by reference.  1 C.F.R. § 51.11(a).

53.   The SEC, however, ignored all of these mandatory requirements of the APA, the RFA, its own governing statute, and the regulations of the OFR. Instead, the SEC has asserted, years later and *ipse dixit*, that it had acquired enforcement authority over the 2002 SAR provisions by virtue of its 1981 rule.

### Summary of the Impact on Alpine and Scottsdale

54.   In November 2017, relying on Rule 17a-8, the SEC filed a civil

---

[4] OFR's regulations are controlling on this issue under the APA.  *See* 1 C.F.R. § 51.1(a)-(c)

enforcement action against Alpine, asserting jurisdiction in the Southern District of New York, and seeking to enforce FinCEN's SAR regulations by alleging that Alpine failed to comply with them. In that enforcement action, the SEC purported to predicate liability under FinCEN's SAR regulations on its own theories and interpretations of those SAR rules -- interpretations that are not set forth in, or supported by the BSA or FinCEN's SAR regulations, and which have never been endorsed by FinCEN through any substantive or interpretive rule, including, *inter alia,* that Alpine's SAR narratives are substantively deficient for failure to mechanically list "red flags" identified in guidance documents; that the filing of a SAR on a deposit of a stock requires the filing of a SAR on subsequent liquidations of the stock; and that the SEC can premise liability and obtain civil monetary penalties for an alleged violation of FinCEN's SAR rules on a strict liability basis under the Exchange Act, whereas the BSA requires a showing of scienter or fault.

55.    SCA, as a broker-dealer, is subject to regulation by both FinCEN (under the BSA) and the SEC (under the Exchange Act), has suffered, and will suffer, economic injury due to the SEC's unlawful expansion of its authority under Rule 17a-8. Among other things, given the SEC's attempted imposition of new SAR requirements through its enforcement action against Alpine, SCA has and will be forced to devote substantial time and resources to evaluate and take any

steps necessary to update its BSA compliance program to avoid regulatory inquiry and enforcement action based on the SEC's unprecedented and unlawful attempt to impose new requirements onto FinCEN's SAR regulations pursuant to Rule 17a-8, as first announced in the SEC's action against Alpine. Thus, the SEC's unlawful position in the enforcement action against Alpine has a likely chilling effect on SCA and all other similarly situated broker dealers. SCA is forced to comply with the SEC's newly asserted interpretations of the BSA requirements or risk serious penalties.

56. In addition, under the Fully Disclosed Clearing Agreement with Alpine, SCA may be required to indemnify Alpine against any liability imposed in the SEC's enforcement action against Alpine. Accordingly, SCA has a direct and substantial interest in preventing the SEC from pursuing an invalid action and seeking to impose enormous penalties in relation to the filing of SARs – conduct for which SCA would be subject to claims under the indemnification provision of the Fully Disclosed Clearing Agreement.

57. Immediate judicial review and action is necessary to stop and mitigate the harm that Plaintiffs have suffered, and will continue to suffer, as a result of the SEC's unlawful conduct. Any delay in review will result in further injury and damages.

## COUNT ONE
### Violation of the Administrative Procedure Act – Failure to Follow Notice and Comment Requirements, 5 U.S.C. §§ 553, 706(2)(D)

58.     Plaintiffs affirm and re-allege each of the preceding allegations set forth in paragraphs 1 through 57, and incorporate those as if set forth fully herein.

59.     The APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register" and "shall include . . . the time, place and nature of public rule making proceedings; . . . the legal authority under which the rule is proposed; and . . . the terms or substance of the proposed rule or a description of the subjects and issues involved," (5 U.S.C. § 553(b)).

60.     After publishing the required notice, an agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and "after consideration . . . the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose," (5 U.S.C. § 553(c)).

61.     Finally, an agency must publish notice of adoption of a final rule "not less than 30 days before its effective date," (5 U.S.C. § 553(d)).

62.     The SEC did none of this with respect to its purported authority to enforce the BSA SAR regulations.

63.     Rule 17a-8 was adopted in 1981 and incorporated the currency

transaction reporting and recordkeeping requirements under the BSA that existed at that time. It did not include any SAR reporting or recordkeeping requirements because they did not exist.

64. To the extent the SEC wished to incorporate those requirements into Rule 17a-8, it was required to follow the notice and comment requirements of the APA. It did not.

65. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(D), including declaratory relief and the issuance of a preliminary and permanent injunction against the SEC's continued unlawful attempts to enforce the SAR regulations of the BSA through civil enforcement actions under the Exchange Act and Rule 17a-8.

## COUNT TWO
**Violation of the Administrative Procedure Act – Arbitrary and Capricious Agency Action in Seeking Enforcement of An Unauthorized and Defective Rule, 5 U.S.C. § 706(2)(A)**

66. Plaintiffs affirm and re-allege each of the preceding allegations set forth in paragraphs 1 through 65, and incorporate those as if set forth fully herein.

67. The SEC has attempted to incorporate into Rule 17a-8 the ability to enforce the SAR requirements of the BSA.

68. But the SEC has failed to comply with any administrative process required under the APA, such as notice and comment, a regulatory flexibility

assessment, or other cost-benefit analyses.  In fact, the SEC did nothing with respect to this new authority.

69.     To take action without complying with such legal requirements was arbitrary and capricious, an abuse of discretion, and plainly "not in accordance with law." 5 U.S.C. § 706(2)(A).

70.     Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(A), including declaratory relief and the issuance of a preliminary and permanent injunction against the SEC's continued unlawful attempts to enforce the SAR regulations of the BSA through civil enforcement actions under the Exchange Act and Rule 17a-8.

### **COUNT THREE**
**Violation of the Administrative Procedure Act – Agency Action in Excess of Statutory Jurisdiction and Authority, 5 U.S.C. § 706(2)(C)**

71.     Plaintiffs affirm and re-allege each of the preceding allegations set forth in paragraphs 1 through 70, and incorporate those as if set forth fully herein.

72.     The SEC was delegated limited examination authority by the Secretary of Treasury.  The Secretary expressly retained "overall administration and enforcement" authority, vesting that in FinCEN, a unit within Treasury.

73.     No provision of the BSA, and no regulation promulgated by the Treasury Department pursuant to its rulemaking authority under the BSA,

authorize the SEC to enforce the provisions of the BSA or the regulations promulgated thereunder.

74. No provision of the Exchange Act authorizes the SEC to enforce the provisions of the BSA or the regulations promulgated thereunder.

75. The SEC has taken action to enforce the SAR regulations promulgated by FinCEN to implement the BSA. This cannot be done.

76. The SEC has therefore acted in excess of both its statutory jurisdiction, and in excess of the limited examination authority delegated to it.

77. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706(2)(C), including declaratory relief and the issuance of a preliminary and permanent injunction against the SEC's continued unlawful attempts to enforce the SAR regulations of the BSA through civil enforcement actions under the Exchange Act and Rule 17a-8.

## COUNT FOUR
**Violation of the Administrative Procedure Act and Regulatory Flexibility Act – Failure to Provide Initial and Final Regulatory Flexibility Analyses, 5 U.S.C. §§ 603, 604,  5 U.S.C. § 706(2)(D), 5 U.S.C. § 611**

78. Plaintiffs affirm and re-allege each of the preceding allegations set forth in paragraphs 1 through 77, and incorporate those as if set forth fully herein.

79. The RFA requires an agency to undertake two specific assessments whenever the agency engages in rulemaking pursuant to section 553 of the APA.

29

80.     First, at the time an agency publishes notice of proposed rulemaking, it must include an "initial regulatory flexibility analysis." 5 U.S.C. § 603(a).  An initial regulatory flexibility analysis must contain: (1) a description of the reasons why action by the agency is being considered; (2) a statement of the objectives of, and legal basis for, the proposed rule; (3) a description of and estimate of the number of small entities to which the proposed rule will apply; (4) a description of projected reporting and recordkeeping requirements of the proposed rule – to include an estimate of the classes of small entities that will be subject to the requirement and the type of "professional skills necessary" for preparation of such reports or records; and (5) an identification of any relevant Federal rules which may "duplicate, overlap or conflict with the proposed rule." 5 U.S.C. § 603(b)(1)-(5).

81.     Moreover, an initial regulatory flexibility analysis shall discuss "any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." 5 U.S.C. § 603(c).

82.     At the time an agency publishes notice of final rule, it must include a "final regulatory flexibility analysis." 5 U.S.C. § 604(a).  This must include information similar to that of an initial regulatory flexibility analysis, and also state

"steps . . . taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted." 5 U.S.C. § 604(a)(1)-(6).

83.     In expanding Rule 17a-8 to require broker-dealers to comply with the SAR reporting regulations promulgated by FinCEN (see 31 C.F.R. § 1023.320), the SEC utterly failed to discharge these mandatory statutory directives.

84.     Since the SEC did not publish any notice or solicit comment regarding its expansion of Rule 17a-8, it could not have and did not provide either an initial or final regulatory flexibility analysis.

85.     By failing to perform these mandatory analyses, the SEC has violated the requirements imposed by the RFA, and acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

86.     Plaintiffs are therefore entitled to judicial review and relief pursuant to 5 U.S.C. §§ 702, 706(2)(D) and 5 U.S.C. § 611, including declaratory relief and the issuance of a preliminary and permanent injunction against the SEC's continued unlawful attempts to enforce the SAR regulations of the BSA through civil enforcement actions under the Exchange Act and Rule 17a-8.

## COUNT FIVE

**Violation of the Administrative Procedure Act and Securities Exchange Act of 1934 – Failure to Consider Competitive Effects, 15 U.S.C. §§ 78c(f), 78w(a)(2) and 5 U.S.C. § 706(2)(C), (D)**

87.     Plaintiffs affirm and re-allege each of the preceding allegations set forth in paragraphs 1 through 86, and incorporate those as if set forth fully herein.

88.     The SEC, whenever it "is engaged in rulemaking . . . and is required to consider or determine whether an action is necessary or appropriate in the public interest," it "shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. § 78c(f) (emphasis added).

89.     For every rule and regulation promulgated by the SEC pursuant to the Exchange Act, the SEC "shall consider . . . the impact any such rule or regulation would have on competition . . . [and] shall not adopt any such rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of" the Exchange Act.  15 U.S.C. § 78w(a)(2).

90.     Further, the SEC "shall include in the statement of basis and purpose incorporated in any rule or regulation adopted under this chapter, the reason for the [SEC's] determination that any burden on competition imposed by such rule or regulation is necessary or appropriate in furtherance of the purposes of" the Exchange Act.  *Id.*

91.     In expanding Rule 17a-8 to require broker-dealers to comply with the SAR reporting regulations promulgated by FinCEN (see 31 C.F.R. § 1023.320), the SEC utterly failed to discharge these mandatory statutory directives.

92.     Since the SEC did not publish any notice or solicit comment regarding its expansion of Rule 17a-8, it could not, and did not, consider "protection of investors," "efficiency, competition, and capital formation," 15 U.S.C. § 78c(f), or whether the rule "would impose a burden on competition." 15 U.S.C. § 78w(a)(2).

93.     Further, the SEC did not "include in the statement of basis and purpose . . . the reason for [it's] determination", *id.*, and it could not have done so, because there was no statement of basis and purpose at all.

94.     By failing to address the statutory mandates of sections 78c(f) and 78w(a)(2) of the Exchange Act, the SEC violated a "statutory obligation to determine as best it can the economic implications of the rule." *See Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011).

95.     In light of these clear violations, the SEC has failed to adequately assess the economic effects of its new rule, and has proceeded in violation of the APA by taking agency action in excess of statutory authority and limitations and without observance of procedures required by law.

96.     Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702,

706(2)(C), (D), including declaratory relief and the issuance of a preliminary and permanent injunction against the SEC's continued unlawful attempts to enforce the SAR regulations of the BSA through civil enforcement actions under the Exchange Act and Rule 17a-8.

## COUNT SIX
### Declaratory Relief

97. Plaintiffs affirm and re-allege each of the preceding allegations set forth in paragraphs 1 through 96, and incorporate those as if set forth fully herein

98. Plaintiffs bring this claim for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

99. An actual controversy exists among the parties regarding the SEC's authority to enforce through civil enforcement proceedings under the Exchange Act the SAR provisions of the BSA through Rule 17a-8, for the reasons detailed herein.

100. Plaintiffs respectfully request a judgment from this Court declaring that:

a. The SEC violated the APA, RFA and the Exchange Act, and acted arbitrarily and capriciously, by taking agency action in excess of statutory authority and limitations (acting *ultra vires*), and without observance of procedures required by law, through its attempts to secretly

expand Rule 17a-8 to incorporate the SAR provisions of the BSA and to maintain civil enforcement actions predicated on purported violations of the SAR provisions of the BSA;

    b.    The SEC cannot bring civil enforcement actions for alleged violations of the SAR provisions of the BSA;

    c.    The SEC lacks the authority, through either formal or informal rulemaking or adjudication, to graft requirements onto FinCEN's SAR regulations; and/or

    d.    Rule 17a-8, to the extent it purports to the incorporate the SAR provisions of the BSA, is void.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an order and judgment:

1.    Declaring the SEC's expansion of Rule 17a-8 to include the SAR reporting requirements adopted by FinCEN thirty years after the Rule's adoption unlawful as arbitrary and capricious agency action within the meaning of 5 U.S.C. § 706(2)(A); in excess of statutory jurisdiction, authority, and limitation within the meaning of 5 U.S.C. § 706(C); and without observance of procedure required by law within the meaning of 5 U.S.C. § 706(2)(D);

2.    Setting aside the SEC's expansion of Rule 17a-8;

3.      Issuing a preliminary and permanent injunction enjoining the SEC and all its officers, employees, and agents from implementing, applying, enforcing, or taking any action whatsoever under the expanded Rule 17a-8;

4.      Awarding Plaintiff reasonable costs, including attorney's fees, incurred in bringing this action; and

5.      Granting such other and further relief as this Court deems just and proper.

Dated this 22nd day of June, 2018

**Clyde Snow & Sessions**

*/s/ Brent R. Baker*
Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker

Maranda E. Fritz
**THOMPSON HINE**

*Attorneys for Plaintiffs*