Exhibit 4

Brent R. Baker (10411)
Aaron D. Lebenta (10180)
Jonathan D. Bletzacker (12034)
**CLYDE SNOW & SESSIONS**
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email: brb@clydesnow.com
       adl@clydesnow.com
       jdb@clydesnow.com

Maranda E. Fritz (*Pro Hac Vice Pending*)
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email: Maranda.Fritz@thompsonhine.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALPINE SECURITIES CORPORATION, a Utah corporation, SCOTTSDALE CAPITAL ADVISORS, an Arizona corporation<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION<br>Defendant. | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Immediate Oral Argument Requested)**<br><br><br>Case No. 2:18-cv-00504-CW<br><br>Judge Clark Waddoups |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES .................................................................................... iv

MOTION FOR PRELIMINARY INJUNCTION .................................................... 1

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION ............. 1

I.      INTRODUCTION ........................................................................................ 1

II.     STATEMENT OF FACTS ........................................................................... 6

III.    ARGUMENT ............................................................................................... 7

       A.      Plaintiffs Have a Likelihood of Success on the Merits That the SEC May Not Invoke Rule 17a-8 to Enforce the SAR Provisions of the BSA ................................. 7

               1.      The SEC Violated the APA by Failing to Follow Notice and Comment Requirements regarding the Use of Rule 17a-8 to Enforce the SAR Provisions of the BSA ................................. 8

               2.      The SEC Violated the RFA, APA, and Exchange Act by Failing to Provide a Flexibility Analysis and Disclose Conflicts between the Exchange Act and the BSA ................................. 12

               3.      The SEC's New Use of Rule 17a-8 to Enforce the SAR Provisions of the BSA Directly Contravenes an Express Delegation to Treasury ............... 15

                      a.     Authority to Enforce the Provisions of the BSA Lies with FinCEN ................................. 16

                      b.     The SEC Has Only Examination Authority and May Not Pursue Violations of the BSA ................................. 18

       B.      Plaintiffs are Suffering and Will Continue to Suffer Irreparable Harm Absent the Requested Injunctive Relief ................................. 23

       C.      The Balance of Equities Tips in Favor of Plaintiffs' Request for Preliminary Injunctive Relief ................................. 24

       D.      Issuance of Injunctive Relief is in the Public Interest ........................................... 24

IV.     NO BOND SHOULD BE REQUIRED ..............................................................................25

V.     CONCLUSION AND RELIEF REQUESTED ................................................................25

# TABLE OF AUTHORITIES

## CASES

**U.S. Supreme Court**

*Adams Fruit Co. v. Barrett*
    494 U.S. 638 (1990) ……………………………………………………………22

*California Bankers Ass'n v. Shultz*
    416 U.S. 21, 26-28 (1974) ………………………………………………….. 9, 17

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*
    467 U.S. 837 (1984) ……………………………………………………………16

*Cudahy Packing Co. v. Holland*
    315 U.S. 357 (1942) ……………………………………………………………21

*F.D.A. v. Brown & Williamson Tobacco Corp.*
    529 U.S. 120 (2000) …………………………………………………….17, 21

*Louisiana Pub. Serv. Comm'n v. F.C.C.*
    476 U.S. 355 (1986) ……………………………………………………………16

*United States v. Giordano*
    416 U.S. 505 (1974) ……………………………………………………………22

**U.S. Circuit Courts of Appeal**

*American Bankers Association v. S.E.C.*
    804 F.2d 739 (D.C. Cir. 1986) …………………………………………………22

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*
    713 F.3d 1080 (11th Cir. 2013) …………………………………………………22

*California v. Klepp*
    604 F.2d 1187 (9th Cir. 1979) …………………………………………………22

*City of Chanute v. Kansas Gas & Elec. Co.*
    754 F.2d 310 (10th Cir. 1985) …………………………………………………24

*City of Idaho Falls v. F.E.R.C.*
    629 F.3d 222 (D.C. Cir 2011) …………………………………………………10, 11

*Davis v. Minetta*
    302 F.3d 1104 (10th Cir. 2002) ...................................................................24

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
    356 F.3d 1256 (10th Cir. 2004) ...................................................................23

*Halverson v. Slater*
    129 F.3d 180 (D.C. Cir. 1997) .....................................................................21

*Natural Res. Def. Council v. Abraham*
    355 F.3d 179 (2d Cir. 2004) ........................................................................16

*Nutritional Health Alliance v. F.D.A.*
    318 F.3d 92 (2d Cir. 2003) ..........................................................................21

*Planned Parenthood Ass'n of Utah v. Herbert*
    828 F.3d 1245 (10th Cir. 2016) .....................................................................7

*RoDa Drilling Co. v. Siegal*
    552 F.3d 1203 (10th Cir. 2009) ...................................................................25

*United States v. Piccoitto*
    875 F.2d 345 (D.C. Cir. 1988) .....................................................................11


**U.S. District Courts**

*American Society for Testing and Materials v. Public.Resource.org, Inc.*
    2017 WL 473822 (D.D.C., February 2, 2017) .......................................12

*Cmty. Television of Utah, LLC v. Aereo, Inc.*
    997 F.Supp.2d 1191 (D. Utah 2014) ..........................................................7

*Faircloth v. Colo. Dep't of Corr.*
    2016 WL 2343456 (D. Colo. May 2, 2016) .............................................25

*Haitian Ctrs. Council, Inc. v. Sale*
    823 F. Supp. 1028 (E.D.N.Y. 1993) ..........................................................16

*MonaVie, LLC*
    2011 WL 1233274 (D. Utah, March 31, 2011) .......................................23

*Morgan Stanley Smith Barney LLC v. O'Brien*
    2013 WL 5962103 (D. Conn. Nov. 6, 2013) ...........................................24

*S.E.C. v. Drexel Burnham Lambert Inc.*
    837 F.Supp. 587 (S.D.N.Y. 1993) ......................................................13

*Tootsie Roll Indus., Inc. v. Sathers, Inc.*
    666 F.Supp. 655 (D. Del. 1987) .......................................................25


## STATUTES

Administrative Procedure Act, 5 U.S.C. §§ 550, *et seq.* .................................... *passim*

Bank Secrecy Act, 31 U.S.C. §§ 5311-5330 ...................................................... *passim*

5 U.S.C § 552 ...................................................................................................10

5 U.S.C § 553 ................................................................................................8, 11

5 U.S.C. § 558 ..................................................................................................16

5 U.S.C. § 603 .............................................................................................12, 13

5 U.S.C. § 604 ..................................................................................................13

5 U.S.C. § 706 ..................................................................................8, 13, 15, 16

15 U.S.C. § 78c ................................................................................................15

15 U.S.C. § 78q ................................................................................................11

15 U.S.C. § 78u ..................................................................................................3

15 U.S.C. § 78w ...............................................................................................15

31 U.S.C. § 310 ................................................................................................17

31 U.S.C. § 321 ................................................................................................17

31 U.S.C. §§ 5311-5332 ..................................................................................18

31 U.S.C. § 5314 ..............................................................................................20

31 U.S.C. § 5318 ................................................................................................9

31 U.S.C. § 5320 ..............................................................................................17

31 U.S.C. §5321 ...................................................................................14, 17, 20


## REGULATIONS

1 C.F.R. § 51.1 .................................................................................................10

1 C.F.R. § 51.5 .................................................................................................10

1 C.F.R. § 51.9 .................................................................................................10

1 C.F.R. § 51.11 ...............................................................................................10

Exchange Act Rule 17a-8 (17 C.F.R. § 240.17a-8) ............................................ *passim*

31 C.F.R. §§ 103.22 ................................................................................................4

31 C.F.R. §§ 103.23 ................................................................................................4

31 C.F.R. §§ 103.24 ................................................................................................4

31 C.F.R. § 1010.350 ............................................................................................20

31 C.F.R. § 1010.420 ............................................................................................20

31 C.F.R. § 1010.810 ..........................................................................17, 18, 19, 20

31 C.F.R. § 1010.820 ....................................................................................14, 17

31 C.F.R. § 1023.320 ........................................................................................3, 9

46 Fed. Reg. 44,775 ...............................................................................................4

46 Fed. Reg. at 61,455 .........................................................................................10

46 Fed. Reg. 61,454 ...........................................................................................4, 9

46 Fed. Reg. 61,454-55 .........................................................................................9

52 Fed. Reg. 11,436 .............................................................................................18

52 Fed. Reg. 11,440 *cmt. 19* ......................................................................18, 19

52 Fed. Reg. 11,445 .............................................................................................18

67 Fed. Reg. 44,048 ...........................................................................................4, 9

76 Fed. Reg. 33,590 .............................................................................................12

76 Fed. Reg. 33,593 .............................................................................................12

Treasury Order 180-01 ........................................................................................17

## RULES

Fed. R. Civ. P. 65 .............................................................................................7, 25

<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

Plaintiffs Alpine Securities Corporation ("Alpine") and Scottsdale Capital Advisors ("SCA") (collectively referred to as "Plaintiffs") hereby move the Court for a preliminary injunction against Defendant United States Securities and Exchange Commission ("SEC" or "Defendant").

Plaintiffs' Motion is based on the following grounds: (1) the SEC's current enforcement action against Alpine in the Southern District of New York violates the requirements of the Administrative Procedures Act; (2) the SEC's New York action directly contravenes an express delegation to Treasury to enforce the suspicious activity reporting requirements of the Bank Secrecy Act; (3) Plaintiffs are suffering and will continue to suffer irreparable harm as a result of the SEC's actions, including loss of goodwill and competitive market positioning; (4) the balancing of equities tips heavily in favor of issuing Plaintiffs' requested injunctive relief as a result of their irreparable harm, pending adjudication of the issue, because the SEC's action may drive Alpine out of business; and (5) issuance of injunctive relief is in the public interest as it preliminarily enjoins unlawful actions by a governmental agency and maintains the pre-litigation status quo.

Therefore, Plaintiffs respectfully request that this Court preliminarily enjoin the SEC and all its officers, employees, and agents from using Exchange Act Rule 17a-8 to enforce and penalize purported violations of the Bank Secrecy Act, pending adjudication of the issue, as discussed below.

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

**I.      INTRODUCTION**

Alpine has been a broker-dealer and clearing firm since about 1984 operating in Salt Lake City, Utah.  It currently resides in the former Salt Lake Stock and Mining Exchange

1

building – a historic site.  It has about 30 employees who live and work in the Sale Lake City area.  Alpine plays a critical role in the financial markets by providing liquidity to investors in thousands of small company, micro-cap issuers in the over-the-counter market.  The SEC and other regulators strongly disfavor this segment of the securities market and have unfairly targeted smaller broker-dealers like Alpine through the vehicle of enforcement actions.  Alpine is one of a few remaining small clearing firms that still participates in the microcap market.  SCA is a broker-dealer headquartered in Scottsdale, Arizona, which similarly focuses on providing a liquidity to investors in micro-cap stocks and relies upon Alpine to clear its transactions.

The SEC has filed an action against Alpine in the Southern District of New York, *S.E.C. v. Alpine Securities Corp.,* Case No. 17-cv-4179-DLC.  The SEC's alleges that Alpine violated the suspicious activity reporting ("SAR") requirements of the Bank Secrecy Act, 31 U.S.C. §§ 5311-5330 (the "BSA") administered by the United States Department of Treasury ("Treasury"), but posits its action as a violation of Exchange Act Rule 17a-8 (17 C.F.R. § 240.17a-8).[1]  Thus, the SEC has brought a strict liability books-and-records enforcement action against Alpine under the Section 17(a) and Rule 17a-8 alleging that Alpine violated the BSA by failing to include certain material in its SAR filings.  Alpine is not alleged to have engaged in any fraud or intentional misconduct, or even that it failed to file SARs that were related to some larger terrorist act or criminal activity regarding money laundering.  The SEC's action confirms that Alpine's *filed* SARs, but claims that Alpine omitted some categories of information.  The

---

[1] Rule 17a-8 requires broker-dealers to "comply with the reporting, recordkeeping and record retention requirements of chapter X of title 31 of the Code of Federal Regulations," which is a reference to the rules promulgated by Treasury Department's Financial Crimes Enforcement Network ("FinCEN") to implement the BSA. *See* 17 C.F.R. § 240.17a-8.

claimed violations represent novel concepts and radical changes to industry practice regarding SAR filings that the SEC admits is a matter of first impression. This is a hyper-technical argument, mostly regarding SARs dated back to 2011 and 2012.

Alpine is defending on the merits the SEC's books and records claim in the New York action. However, there are threshold legal issues regarding the SEC's reliance on Rule 17a-8 for authority to bring an enforcement action regarding the BSA. Because Alpine was prohibited from filing a counterclaim in the New York Action pursuant to 15 U.S.C. § 78u(g), Alpine, along with SCA, who is also harmed by the SEC's action, have filed their claims in this Court under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 550, *et seq.,* to establish the invalidity of the SEC's attempt to use Rule 17a-8 to pursue claims against Alpine and others for purported violations of SAR regulations of the BSA.

The SEC's attempt to pursue claims for alleged violations of the SAR provisions of the BSA pursuant to Rule 17a-8 is defective on multiple procedural and substantive grounds. The SEC asserts that Rule 17a-8, promulgated in 1981, automatically expanded over the course of years to encompass any subsequent provisions of the BSA, and permits the SEC to bring enforcement actions for violations of the SAR regulations, 31 C.F.R. § 1023.320, that were issued *twenty years later* by FinCEN under the BSA. The SEC failed to engage in *any* of the procedures required by the APA to actually effect such a rule. In fact, this case is highly unusual: while most actions under the APA involve whether an agency's process and analysis under the APA were deficient, here, the agency failed to engage in any process whatsoever.

The events relating to the passage of Rule 17a-8 and the BSA provisions highlight the SEC's current misinterpretation. At the time Rule 17a-8 was adopted in 1981, the BSA required

broker-dealers only to file currency transaction reports. *See* SEC Notice of Proposed Rulemaking, 46 Fed. Reg. 44,775 (Sept. 8, 1981); SEC Notice of Adoption of Final Rule, 46 Fed. Reg. 61454 (Dec. 19, 1981). *See also* 31 C.F.R. §§ 103.22 - 24. Only in 1992, more than ten years after the issuance of Rule 17a-8, did Congress establish a new reporting requirements and grant to the Secretary of the Treasury the authority to require financial institutions to report suspicious transactions (SARs). 31 U.S.C. § 5318(g). Not until another decade later, in Section 356 of the USA Patriot Act, did Congress expand that requirement to included broker-dealers directing the Secretary of the Treasury to publish regulations requiring various other financial institutions, including broker-dealers, to file SARs. In 2002, FinCEN, pursuant to authority delegated by the Secretary of the Treasury, adopted final regulations amending the BSA Regulations to require broker-dealers to file SARs with Treasury. *See* 67 Fed. Reg. 44,048 (July 1, 2002) (publishing final rule amending the BSA regulations). FinCEN's broker-dealer SAR regulation is codified at 31 C.F.R. § 1023.320.

The SEC has never engaged in any of the procedures required under the APA to promulgate a regulation relating to those SAR requirements. The SEC ignored all of the critical requirements of the APA, including requirements to: publish notice in the Federal Register; solicit, evaluate and reconcile comments from the industry; address relevant and important jurisdictional issues; and conduct mandatory cost-benefit analyses. Despite FinCEN's numerous amendments, revisions, and substantive additions to the BSA regulations – most notably FinCEN's creation of the SAR regime for banks and depository institutions in 1996 and its adoption of SAR requirements for broker-dealers in 2002 – the SEC for more than 25 years engaged in no rulemaking action relating to Rule 17a-8, confirming to the industry that Rule 17a-

8 remained unchanged and unaltered since its adoption.

It was only in recent years that the SEC began to claim that it possessed authority to enforce the SAR provisions of the BSA. It started by inserting those claims into settled administrative enforcement actions against broker-dealers who, the SEC alleged, failed to comply with FinCEN's SAR reporting requirements and thereby violated Rule 17a-8. Ensconced behind the veil of its own administrative process, and seizing on the penchant of industry participants to quickly acquiesce and settle alleged violations by means of consent decrees and cease-and-desist orders, the SEC has avoided any judicial scrutiny of its unlawful and defective expansion of its jurisdiction and application of Rule 17a-8.

Then, in June 2017, the SEC filed its enforcement action against Alpine in New York, relying on Rule 17a-8 to claim that Alpine failed to comply with FinCEN's SAR regulations. For the first time, the SEC pursued an enforcement action against a litigant who did not immediately capitulate *and* who was aware that authority to enforce the BSA was conferred solely on Treasury. The SEC is not permitted to confer on itself authority to pursue violations of the BSA that is contrary to a clear Congressional delegation of authority to Treasury, and FinCEN's clear and consistent retention of enforcement authority

To try to justify its action, the SEC now argues that Rule 17a-8 somehow automatically absorbed the subsequent BSA provisions, without any need for APA compliance, because they were "incorporated by reference." That claim is equally defective. The kind of boundless and never-ending incorporation that the SEC describes is expressly prohibited by specific and clear administrative process, rules and the constitution. Simply stated, a rule promulgated in 1981 to address currency transaction reporting, *and never amended,* cannot incorporate the new

requirements, such as the SAR provisions, issued by FinCEN decades later. *If* the SEC had

engaged in procedures consistent with the APA, that process would have confirmed that a rule

purporting to confer enforcement authority on the SEC is invalid.

Alpine argued to the New York Court that the SEC failed to comply with the APA. That

Court declined to address the issue of whether the SEC had violated the provisions of the APA

and did not rule that the SEC complied with the APA. Accordingly, Plaintiffs request that this

Court preliminarily enjoin the SEC from using Rule 17a-8 to enforce and penalize purported

violations of the BSA, pending adjudication of the issue.

## II.     STATEMENT OF FACTS[2]

1.      Alpine, as a clearing firm, entered into a "Fully Disclosed Clearing Agreement" with

SCA, as the introducing firm. Under that agreement, if Alpine incurs liability regarding its AML

obligations, SCA may be required to indemnify Alpine. *See* SCA Fully Disclosed Clearing

Agreement, at Sec. 4.1.4, 5.1-5.3, 6.1-6.8, and 17, Ex. A.

2.      Alpine's Expert Witness in the New York action, Beverly E. Loew, who formerly

worked at FinCEN, prepared a Declaration outlining her assessment and opinion as to, *inter alia*,

the SEC's failures to comply with the requirements of the APA, the SEC's lack of authority to

enforce the SAR provisions of the BSA, and details regarding her authored comment letters to the

SEC regarding the same. *See* Decl. Beverly E. Loew, at ¶¶ 18-21, 28-43, Ex. B.

---

[2] This Motion presents legal questions. Therefore, Plaintiffs have submitted a limited factual
statement from their expert, who formally worked at FinCEN and has additional knowledge on
FinCEN's policy and position on the issue raised in this action. There is no need for expedited
discovery or an evidentiary hearing as oral argument will suffice.

## III.    ARGUMENT

A federal court may issue a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure when the movant establishes "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *See Cmty. Television of Utah, LLC v. Aereo, Inc.*, 997 F.Supp.2d 1191, 1197 (D. Utah 2014) (quotations and citation omitted).

### A.    Plaintiffs Have a Likelihood of Success on the Merits That the SEC May Not Invoke Rule 17a-8 to Enforce the SAR Provisions of the BSA.

With respect to likelihood of success, the Tenth Circuit has stated the following:

> The very purpose of an injunction under Rule 65 (a) is to give temporary relief based on a *preliminary estimate* of the strength of the plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case. Although the courts use a bewildering variety of formulations of the need for showing some likelihood of success, all courts agree that plaintiff must present a prima facie case but *need not show a certainty of winning*.

*Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1252 (10th Cir. 2016) (emphases added) (internal alternation, quotations and citations omitted).  Further, Plaintiffs need not establish a likelihood of success on *all* of its raised claims; instead, Plaintiffs are entitled to an injunction even if they meet the standard as to just one of its claims.  *See e.g. id*. at 1252-53.

In this action, Plaintiffs' Complaint alleges five counts of violations of the APA and requests declaratory relief.  As demonstrated below, Plaintiffs are likely to succeed on the merits of their claims, including that the SEC violated the APA, and has acted arbitrarily and capriciously, by: (1)  failing to follow required notice and comment  and other procedural requirements of the APA regarding its newly asserted use of Rule 17a-8; (2) failing to provide a

7

flexibility analysis required by the APA and the Regulatory Flexibility Act ("RFA"), including

the conflict existing between the provisions of the Exchange Act and BSA; and (3) acting in

excess of its statutory authority, and ultra vires, by trying to enforce the SAR provisions of the

BSA without, and contrary to, a Congressional delegation of authority.

### 1. The SEC Violated the APA by Failing to Follow Notice and Comment Requirements regarding the Use of Rule 17a-8 to Enforce the SAR Provisions of the BSA.

Counts One and Two of Plaintiffs' Complaint allege that the SEC's attempt to enforce the

SAR requirements of the BSA under Rule 17a-8 violates the APA's notice and comment and

other requirements, and constitutes arbitrary and capricious agency action, which should be held

unlawful pursuant to 5 U.S.C. § 706(2)(A) and (D). The APA requires that "[g]eneral notice of

proposed rule making shall be published in the Federal Register" and "shall include . . . the time,

place and nature of public rule making proceedings; . . . the legal authority under which the rule

is proposed; and . . . the terms or substance of the proposed rule or a description of the subjects

and issues involved." 5 U.S.C. § 553(b). An agency must then "give interested persons an

opportunity to participate in the rule making through submission of written data, views, or

arguments," and "after consideration . . . the agency shall incorporate in the rules adopted a

concise general statement of their basis and purpose." *Id.* at § 553(c). Notice of adoption of a

final rule must be published "not less than 30 days before its effective date." *Id.* at § 553(d).

The SEC complied with none of these requirements, which establishes that Rule 17a-8

does not, and cannot, lawfully incorporate the SAR requirements of the BSA. The SEC adopted

Rule 17a-8 in 1981. Not surprisingly, the adopting release for the rule referenced only the

currency transaction reporting and recordkeeping requirements under the BSA that existed at that

time.  46 Fed. Reg. 61,454, 61,454-55 (December 17, 1981).  The BSA, as originally enacted in

1970, was designed and remained, for decades, a currency transaction reporting and

recordkeeping requirement established to address concerns regarding movement of illicit funds

through financial institutions.  *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26-28, 38

(1974) (stating that, "in passing the [BSA]," *inter alia*, "Congress recognized the importance of

reports of large and unusual currency transactions in ferreting out criminal activity" through

financial institutions "both domestic and foreign").

      As indicated, the reporting requirement was expanded in 1992 with the enactment of 31

U.S.C. § 5318(g), to require financial institutions to report suspicious transactions.  67 Fed. Reg.

44,048 (July 1, 2002).  A decade later, in 2002, the SAR reporting and recordkeeping obligations

were extended to broker-dealers through regulations promulgated by the Secretary of the

Treasury and set forth in 31 C.F.R. § 1023.320.  *See* 31 C.F.R. § 1023.320(a)(1)-(2); 67 Fed.

Reg. at 44,048.  Pursuant to this regulation, a suspicious transaction must be reported only if it

exceeds $5,000 *and* the broker dealer "knows, suspects or has reason to suspect" that the

transaction involves or facilitates criminal conduct in four described circumstances.  31 C.F.R. §

1023.320(a)(2).  When Rule 17a-8 was adopted in 1981, it plainly could not reference or include

any of the BSA's SAR requirements because they did not exist.

      Setting momentarily aside the SEC's lack of authority to administer or enforce BSA's

regulatory scheme, to the extent the SEC wanted to try to expand Rule 17a-8 to incorporate the

new and distinct SAR requirements of the BSA, it was required to follow the notice and

comment requirements of the APA and then promulgate an amended version of the rule.

However, the SEC never prescribed or properly published for notice and comment, or

promulgated any such rule relating to SARs. Nor did it consider the implications, the costs or the industry's concerns regarding a wholesale incorporation, in a strict liability books and records provision, of a sweeping set of requirements. *See* 5 U.S.C §§ 552-553.

The SEC purports to justify its position that Rule 17a-8 includes the SAR regulations of the BSA because the SEC stated in the adopting release for Rule 17a-8 that the rule is worded "so as to allow for any revisions the Treasury may adopt in the future." 46 Fed. Reg. at 61,455. However, an agency cannot *dynamically* incorporate another agency's presently nonexistent regulations so that that automatically evolve over time without adherence to the rigors of the APA requirements to incorporate new requirements. Rather, the regulations of the Office of the Federal Register ("OFR"), *which are controlling authority on incorporation by reference under the APA,*[3] require agencies to identify the particular version of any material incorporated by reference, and obtain formal approval to incorporate any materials by reference. *See* 1 C.F.R. §§ 51.5(b), 51.9. More important here, the OFR regulations expressly state that "incorporation by reference of a publication is limited to the edition of the publication that is approved. *Future amendments or revisions of the publication are not included.*" 1 C.F.R. § 51.1(f) (emphasis added); *see also id.* § 51.11(a) (providing unambiguous instructions to agencies regarding the formal procedure necessary to amend or update material incorporated by reference, including publishing notice of the change in the Federal Register). Thus, the promulgation of new reporting requirements, whether accomplished expressly or through a purported incorporation mechanism, would still require compliance with the APA. *See City of Idaho Falls v. F.E.R.C.*, 629 F.3d 222, 227-29 (D.C. Cir 2011) (holding FERC violated APA by attempting to adopt, without additional

---

[3] *See* 1 C.F.R. 51.1(a)-(c).

notice and comment, updated Forest Service fee schedules, after a previous version of fee schedule was incorporated by reference in FERC's regulations); *United States v. Piccoitto*, 875 F.2d 345, 346 (D.C. Cir. 1988) (rejecting a similar attempt by the Park Service, which argued that because its original regulation "went through notice and comment, the new restrictions [purportedly imposed under that regulation] do not need to.").[4]

A further, and more fundamental, problem with the SEC's attempt to dynamically incorporate Treasury's future regulations is that it would constitute an improper delegation to FinCEN of rulemaking authority under Section 17(a) of the Exchange Act.  Section 17(a) provides that broker-dealers must make and keep records "*as the Commission, by rule, prescribes* as necessary and appropriate."  15 U.S.C. § 78q(a). If the requirements of Rule 17a-8 automatically change every time FinCEN amends its BSA regulations, then it is FinCEN, not the SEC, that is engaging in rulemaking under Section 17(a).  The SEC would have abdicated its responsibility to "prescribe" rules, and FinCEN would be effectively imposing regulations under Section 17(a), regardless of whether those rules have any rational application to broker-dealers. *See City of Idaho Falls,* 629 F.3d at 229-30 (describing abdication of rulemaking as a "second fatal defect" to FERC's use of updated Forest Service fee schedules).[5]

---

[4]  The *Piccoitto* Court reasoned:  "In essence, the Park Service is claiming that an agency can grant itself a valid exemption to the APA for all future regulations, and be free of APA's troublesome rulemaking procedures forever after, simply by announcing its independence in a general rule. That is not the law. Such agency-generated exemptions would frustrate Congress' underlying policy in enacting the APA by rendering compliance optional. The statute's direct mandate requires notice and comment procedures for any rule that does not fall within certain express exceptions." *Id.* at 346-47 (citing 5 U.S.C. § 553(b)–(e)).

[5]  *See also* Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 HARV. J.L. & PUB. POL'Y 131, 183–86 (2013) (noting one of the "challenge[s] of incorporation by reference is updating regulations to reflect revised versions of incorporated materials" and observing that "[a]lthough dynamic incorporation is an obvious way to avoid the updating

Therefore, as a result of the SEC's failure to comply with the notice and comment requirements of the APA, the SEC has acted without observance of procedure required by law, as well as arbitrarily and capriciously.

> **2.** **The SEC Violated the RFA, APA, and Exchange Act by Failing to Provide a Flexibility Analysis and Disclose Conflicts between the Exchange Act and the BSA.**

Plaintiffs' Complaint alleges that the SEC has violated Section 706(2)(D) of the APA by failing to comply with the RFA, 5 U.S.C. §§ 601, *et seq.*, (Count Four of the Compl.). The RFA requires an agency conduct an "initial regulatory flexibility analysis," 5 U.S.C. § 603(a), that contains (1) a description of the reasons why action by the agency is being considered; (2) a statement of the objectives of, and legal basis for, the proposed rule; (3) a description and estimate of the number of small entities to which the proposed rule will apply; (4) a description of projected reporting and recordkeeping requirements of the proposed rule – to include an estimate of the classes of small entities that will be subject to the requirement and the type of "professional skills necessary" for preparation of such reports or records; and (5) an identification of any relevant Federal rules which may "duplicate, overlap or conflict with the proposed rule." 5 U.S.C. § 603(b)(1)-(5). An initial regulatory flexibility analysis must also discuss "any significant alternatives to the proposed rule which accomplish the stated objectives

---

conundrum it is prohibited," and citing authorities that prohibit dynamic incorporation including the APA, the OFR regulations, and the constitutional "nondelegation doctrine"). This article was cited as authoritative in *American Society for Testing and Materials v. Public.Resource.org, Inc.,* 2017 WL 473822 *3 (D.D.C., February 2, 2017); *see also* OSHA, Standards Improvement Project--Phase III, 76 Fed. Reg. 33,590, 33,593 (2011) ("The Agency notes that it cannot incorporate by reference the latest editions of consensus standards without undertaking new rulemaking because such action would delegate the government's regulatory authority to consensus standards developing organizations, as well as deprive the public of the notice-and-comment period required by law.").

of applicable statutes and which minimize any significant economic impact of the proposed rule

on small entities." *Id.*. § 603(c).  At the time an agency publishes notice of final rule, it must

include a "final regulatory flexibility analysis." *Id.* § 604(a).  This must include information

similar to that of an initial regulatory flexibility analysis, and also state "steps . . . taken to

minimize the significant economic impact on small entities . . . including a statement of the

factual, policy, and legal reasons for selecting the alternative adopted…" *Id.*. § 604(a)(1)-(6).

In purporting to surreptitiously expand Rule 17a-8 to require broker-dealers to comply

with the SAR reporting regulations promulgated by FinCEN, the SEC utterly failed to discharge

these mandatory statutory directives.  By failing to perform these mandatory analyses, the SEC

has violated the requirements imposed by the RFA, and acted "without observance of procedure

required by law." 5 U.S.C. § 706(2)(D).

Perhaps the most glaring and egregious result of the SEC's failure to comply with the

APA and RFA is the conflict between the penalties and scienter (or lack thereof) requirements in

the Exchange Act as opposed to the penalties and scienter requirements in the BSA.  Had the

SEC gone through the required RFA assessment and analysis on smaller entities in the market,

the conflict between the two different code sections would have been obvious, and would have

generated significant industry concern and comment. The penalty provisions differ in material

ways that render the proposed SEC enforcement scheme overly harsh and far more destructive to

business than the provisions of the BSA.  The SEC insists that it can pursue a claim of a SAR

violation under the Exchange Act, and thereby a judgment on a strict-liability theory.  *See S.E.C.

v. Drexel Burnham Lambert Inc.*, 837 F.Supp. 587, 610 (S.D.N.Y. 1993) ("Scienter need not be

shown to prove a violation of section 17(a)(1) of the Exchange Act and the rules thereunder.").

Moreover, the Exchange Act allows for penalties starting at $80,000 per violation.[6]  In the New York action, the SEC claims that there are thousands of violations, and thus insists that it is entitled to per SAR penalties in the hundreds of millions of dollars – on a purported non-scienter books-and-records violation wherein the SEC does not even allege that any actual criminal or terrorist activity went unreported by Alpine.

Neither strict liability, nor such penalty amounts, are available under the BSA.  For FinCEN to pursue the exact same alleged violations, it would have to prove willfulness *and knowledge* of a violation of the law, and even then penalties would be capped at $25,000 per violation.  31 U.S.C. §5321(a)(1); 31 C.F.R. § 1010.820(f).  If FinCEN were only able to establish a negligent violation, penalties would be capped at $500 per violation; where a pattern of negligent violations is established, the penalty is set at no more than $50,000.00.  *See* 31 U.S.C. § 5321(a)(6); 31 C.F.R. § 1010.820(h). If FinCEN could demonstrate neither willfulness nor negligence, it could not recover any penalties. *See id.*  The conflicts in the statutory provisions, and interpretation and enforcement of those provisions, abound and allowing the SEC to set the terms of the statute would result in unmanageable and unproductive splintering and conflict among agencies and industries, and impermissibly allow the SEC to bypass Congress's expressed intent in the BSA for imposing penalties for violations of the BSA. It makes no sense, and is certainly arbitrary and capricious, for the SEC to maintain that it can obtain different penalties, with a lesser showing, than FinCEN –the agency actually charged with enforcing the SAR provision of the BSA – could obtain for the same purported violations.

Finally, not only did the SEC violate the RFA by failing to perform and publish such

---

[6] *See* Section 21(d)(3) of the Exchange Act (15 U.S.C. § 78u(d)(3).

analysis, but the SEC's position results in an position that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of Section 706(2)(A) of the APA (Count Two of Plaintiffs' Compl.).  Similarly, the SEC's abject failures to comply with the RFA and APA alleged herein also results in violations of the Exchange Act (Count Five of Plaintiffs' Compl.).  The SEC "is required to consider or determine whether an action is necessary or appropriate in the public interest," and to "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. § 78c(f) (emphasis added).  Since the SEC did not publish any notice or solicit comment regarding its expansion of Rule 17a-8, it could not, and did not, consider "protection of investors," "efficiency, competition, and capital formation," 15 U.S.C. § 78c(f), or whether the rule "would impose a burden on competition."  15 U.S.C. § 78w(a)(2).

### 3.  The SEC's New Use of Rule 17a-8 to Enforce the SAR Provisions of the BSA Directly Contravenes an Express Delegation to Treasury.

Count Three of Plaintiffs' Complaint alleges that the SEC violated Section 706(2)(C) of the APA by attempting to enforce the SAR provisions of the BSA "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. 706(2)(C). Specifically, the SEC is not permitted to pursue an enforcement action for violations of the BSA because the SEC has never received authority to do so; in fact, Congress vested Treasury with that authority.  The SEC is now attempting to use Rule 17a-8 to circumvent Congress's intent by granting authority on itself to enforce the SAR provisions of the BSA.  The SEC's position is wholly unlawful and impermissible.

15

a.   ***Authority to Enforce the Provisions of the BSA Lies with FinCEN.***

A "federal agency" has "'*only* those authorities conferred upon it by Congress.'"  *Natural Res. Def. Council v. Abraham,* 355 F.3d 179, 202 (2d Cir. 2004) (citation omitted).  "An agency may not confer power upon itself.  To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374-75 (1986)..  Congress codified these principles in the APA:  "A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law."  5 U.S.C. § 558(b).  Agency action must be set aside if it exceeds the agency's statutory jurisdiction or authority. 5 U.S.C. § 706(2)(c). "Agency actions that do not fall within the scope of a statutory delegation of authority are *ultra vires* and must be invalidated by reviewing courts." *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1046 (E.D.N.Y. 1993).

In determining questions of agency authority, Courts look first to the plain language of the statute to determine intent.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id*. To determine whether Congress intended to authorize the SEC to enforce the BSA SAR provisions, the court must look beyond Exchange Act Section 17(a) – the purported enabling authority for Rule 17-8 – to the more specific provisions of the BSA:

> [T]he implications of a statute may be altered by the implications of a later statute. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand . . . . "[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended."

16

*F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (citation omitted)

Here, that controlling foundational question of Congressional delegation is easily answered: Congress delegated plenary authority to the Treasury Secretary to issue regulations to implement the BSA, *see California Bankers*, 416 U.S. at 26, and to enforce the BSA through, *inter alia,* imposition of civil money penalties and actions for injunctive relief.[7]  Separately, Congress authorized the Treasury Secretary to "delegate duties and powers of the Secretary to another officer or employee of the Department of the Treasury," *see* 31 U.S.C. § 321(b)(2), and, with respect to the BSA specifically, to FinCEN.[8]  *See* 31 U.S.C. § 310(b)(2)(I), (J).  As permitted by Congress, the Secretary re-delegated authority to the Director of FinCEN to, *inter alia,* (a) "[t]ake all necessary and appropriate actions to implement and administer the provisions of" the BSA, including "the promulgation and amendment of regulations and the assessment of penalties"; and (b) "[e]xercise authority for enforcement of and compliance with the regulations at 31 CFR part 103 [since renumbered to 31 CFR chapter X] with respect to the activities of agencies exercising authority thereunder that has been redelegated to such agencies by FinCEN . . . ."  Treasury Order 180-01(3)(a), (b).  Consistent with Treasury Order 180-01, the pertinent BSA regulation states that "[o]verall authority for enforcement and compliance, including coordination and direction of procedures and activities of all other agencies exercising delegated authority under this chapter, is delegated to the Director, FinCEN."  31 C.F.R. § 1010.810(a).

---

[7] *See* 31 U.S.C. §§ 5321(a)(1), (a)(6), *and* (b)(2) (stating "the Secretary" may penalties for "willful[]" or "negligent[]" violations of the BSA); 31 C.F.R. § 1010.820(f), (h) (same); 31 U.S.C. § 5320 (stating "the Secretary" may seek injunctive relief).

[8] FinCEN is a "bureau in the Department of the Treasury," and has the power to "[a]dminister the requirements of subchapter II of chapter 53 of this title" – the BSA – "to the extent delegated such authority by the Secretary of the Treasury."  31 U.S.C. § 310(a), (b)(2)(I).

The regulation unambiguously continues: "[a]uthority for the imposition of civil penalties for violations of this chapter [the BSA] lies with the Director of FinCEN." *Id.* § 1010.810(d). As confirmed in comments to a 1987 amendment to the BSA regulations, the Treasury Department has "*exclusive* authority to impose civil penalties under the Bank Secrecy Act." *See* 52 Fed. Reg. 11,436, 11,440 *cmt. 19*, 11,445 (Apr. 8, 1987) (emphasis added).

Accordingly, Congress's intent, as expressed in the plain language of the BSA, could not have been more clearly stated. Under the BSA, only the Secretary, and those in the Treasury Department to whom the Secretary has validly re-delegated its authority, have jurisdiction to promulgate regulations that govern a financial institution's obligations and potential liabilities under the BSA, and bring an enforcement proceeding seeking remedies for violations of the SAR requirements of the BSA and its implementing regulations.

### b. *The SEC Has Only Examination Authority and May Not Pursue Violations of the BSA.*

Conversely, there is no provision of the BSA in which Congress delegated authority to the SEC to promulgate rules to implement the BSA or bring civil enforcement actions for alleged violations of the BSA. *See* 31 U.S.C. §§ 5311-5332. *Notably, the SEC admits as much.*[9] This is determinative of the SEC's lack of authority in this regard.

The Secretary and FinCEN only re-delegated to the SEC the "[a]uthority to examine institutions to determine compliance with the requirements of this chapter." 31 C.F.R. §

---

[9] In its action against Alpine in New York admitted it possesses "no documents reflecting any grants of authority to [the SEC] from FinCEN, the United States Department of the Treasury, or other governmental authority to pursue an enforcement action, including but not limited to seeking penalties or other remedies, for violations of the BSA against broker dealers or other financial institutions, including but not limited to the instant Action against Alpine" . . . . (*See* SEC's Response to Alpine's Request for Production No. 26, Ex. C.)

1010.810(b). As indicated, however, within the *same regulation,* FinCEN expressly retained "[o]verall authority for enforcement and compliance," including the *exclusive* "[a]uthority for the imposition of civil penalties. *See id.* § 1010.810(a), (d); 52 Fed. Reg. at 11,440 *cmt 19.*[10]

This specific allocation and division of authority by FinCEN is plain and purposeful, and designed to ensure consistency of application. Provisions of § 1010.810 manifestly delineate the rights and duties that accompany the delegation of authority *to examine* for compliance with the BSA as: (1) the power to "examine any books, papers, records or other data of domestic financial institutions relevant to the recordkeeping or reporting requirements of this chapter," 31 C.F.R. § 1010.810(f); and (2) the duty to make periodic reports to the Director of FinCEN and to submit "[e]vidence of specific violations of any of the requirements of this chapter" to the Director of FinCEN. *Id.* § 1010.810(e). No additional powers from the delegation of examination authority can be reasonably inferred from the language of § 1010.810.

FinCEN has repeatedly emphasized its enforcement authority and the extent and purpose of its delegation of "examination" authority. For example, in December of 2016, FinCEN stated:

> FinCEN is responsible for the overall administration and enforcement of the BSA. Although it delegates BSA compliance examination authority to other federal regulators, FinCEN retains enforcement authority, including the authority to impose CMPs [civil monetary penalties] for violations.

Bank Regulation, Banking & Fin. Services Pol'y Rep., Dec. 2016, Ex. E.[11]

---

[10] *See also* Decl. of Beverly E. Loew, ¶¶ 28-43, Ex. B (SOF No. 2) (Alpine's expert witness affirming that the SEC has only *examination* authority as to the BSA, not enforcement authority).
[11] Similarly, in a Report to Congress, FinCEN stated:
> FinCEN has retained the authority to pursue civil enforcement actions against financial institutions for non-compliance with the Bank Secrecy Act and the implementing regulations. Under the Bank Secrecy Act, FinCEN is empowered to assess civil monetary penalties against, or require corrective action by a financial institution committing negligent or willful violations of the Bank Secrecy Act. Generally, FinCEN

These statements, which track the language of § 1010.810, highlight the procedures applicable to identification of violations of the BSA. If the SEC, pursuant to its examination authority, believes that Alpine or any other firm subject to the SEC's jurisdiction violated the BSA, it must refer the matter to FinCEN for enforcement, it may not pursue the action itself. If FinCEN elects not to take enforcement action or impose penalties, that is within its sole discretion. *See* 31 C.F.R. § 1010.810(a), (d).

That the SEC was imbued only with examination authority, not enforcement authority, is evident also from the fact that Congress did permit Treasury to re-delegate authority for other provisions of the BSA to other agencies, most importantly the banking regulators. For example, in 31 U.S.C. § 5321(e), Congress authorized the Secretary to delegate "any authority of the Secretary to assess a civil money penalty under this section on depository institutions (as defined in section 3 of the Federal Deposit Insurance Act) to the appropriate Federal banking [] agencies . . . ." 31 U.S.C. § 5321(e)(1). Similarly, in 31 C.F.R. § 1010.810(g), FinCEN "redelegates" the "authority to enforce" provisions of 31 U.S.C. § 5314 and 31 C.F.R. §§ 1010.350 and 1010.420 from FinCEN to the Commissioner of the IRS, including, to "assess and collect civil penalties under 31 U.S.C. § 5321 and 31 C.F.R. § 1010.820" and "investigate possible civil violations of these provisions." 31 C.F.R. § 1010.810(g). That these provisions expressly grant certain agencies authority to enforce the BSA and seek penalties is compelling

---

identifies potential enforcement cases through: (1) referrals from the agencies examining for Bank Secrecy Act compliance; (2) self-disclosures by financial institutions; and, (3) FinCEN's own inquiry to the extent it becomes aware of possible violations.
FinCEN Feasibility of a Cross-Border Electronic Funds Transfer Reporting System under the Bank Secrecy Act, App. A – Financial Crimes Enforcement Network Program, Ex. F.

evidence that such authority was withheld from the SEC.[12]

The Second Circuit's decision in *Nutritional Health Alliance v. F.D.A.,* 318 F.3d 92 (2d Cir. 2003) is also instructive on the SEC's lack of authority to bring an enforcement action predicated on alleged violations of the SAR provisions of the BSA. There, the Court held that the FDA had not been delegated authority by Congress to regulate "packaging" of drugs and dietary supplements for "poison prevention purposes," *id.* at 95, despite the FDA's "broad authority" under the FDCA to regulate "food and drugs in order to protect public health." *Id.* at 98. The Court noted that later-enacted statutes specifically targeted poison-prevention packaging and transferred the regulation of poison-prevention packaging from the FDA to another agency, the Consumer Product Safety Commission ("CPSC"). *See id.* at 94, 102-03. The Court, citing *Brown & Williamson* (*supra*), observed that it would not defer to, or adopt an interpretation of, the FDCA proffered by the FDA that allowed it to "circumvent the detailed regulatory scheme" put in place by Congress for poison-prevention packaging because of the specificity of the subsequent legislation granting the authority to another agency and the "discordant tone" struck by the FDA's claim of "concurrent jurisdiction." *Id.* at 104.

So it is here. The BSA, enacted decades after the Exchange Act, expressly stated that rulemaking, administration and enforcement authority with respect to the BSA reside solely in the Treasury Department. The BSA and its implementing regulations "specifically and unambiguously" cover the subject matter of SAR reporting requirements. As in *Nutritional*

---

[12] *See, e.g., Cudahy Packing Co. v. Holland,* 315 U.S. 357, 364 (1942) ("[T]he grant of authority to delegate the power of inspection, and the omission of authority to delegate the subpoena power, shows a legislative intention to withhold the latter."). Moreover, under the canon *expressio unius est exclusio alterius,* that FinCEN delegated only the authority to examine broker-dealers to the SEC shows an intent to prevent the SEC from exercising any other authority. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997).

*Health,* the SEC's assertion of "concurrent jurisdiction" to enforce the SAR requirements of the BSA under Section 17(a) of the Exchange Act "rings a discordant tone with the regulatory structure created by Congress." 318 F.3d at 104. Numerous additional authorities have also rejected similar attempts by agencies to act without, or contrary to, an express delegation of statutory authority, specifically in situations where Congress had delegated authority to a different agency or official.[13] Simply put, the SEC cannot unilaterally usurp for itself authority delegated to FinCEN to create a plenary right to bring an enforcement action to seek remedies for alleged BSA violations; it may only examine broker dealers for BSA compliance.

Accordingly, for all of the foregoing reasons, Plaintiffs have established a substantial likelihood of success on the merits of its claims, and the SEC should be preliminarily enjoined from using Rule 17a-8 to enforce purported violations of the BSA, pending adjudication.

---

[13] *See also, e.g., Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649–650, (1990) (holding that a delegation of authority to promulgate motor vehicle safety "standards" did not include the authority to decide the pre-emptive scope of the federal statute because "[n]o such delegation regarding [the statute's] enforcement provisions is evident in the statute" and "an agency may not bootstrap itself into an area in which it has no jurisdiction."); *United States v. Giordano,* 416 U.S. 505, 508 (1974) (where statute at issue, 18 U.S.C. § 2516, "conferr[ed] power on the 'Attorney General, or any Assistant Attorney General specially designated by the Attorney General'" to authorize wiretap applications, held that authority could not "be exercised by any individuals other than the Attorney General or an Assistant Attorney General specially designated by him."); *American Bankers Association v. S.E.C.,* 804 F.2d 739 (D.C. Cir. 1986) ("[t]he SEC cannot use its definitional authority to expand its own jurisdiction and to invade the jurisdiction of other agencies, including the Board of Governors" of the Federal Reserve Board); *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084-85 (11th Cir. 2013) (where rulemaking authority was granted to the Department of Homeland Security ("DHS"), court rejected as an "absurd reading of the statute," the Department of Labor's ("DOL" ) argument that because DHS was required to "consult" with DOL, that this "empowered [DOL] to engage in rulemaking, even *without* the DHS," and finding that DOL "cannot bootstrap that supporting role into a co-equal one."); *California v. Klepp,* 604 F.2d 1187 (9th Cir. 1979) (holding that the Environmental Protection Agency could not exercise control of air quality in the outer continental shelf ("OCS") under the Clean Air Act because it conflicted with the delegation of authority to regulate air quality in the OCS to the Secretary of the Interior ("Interior Secretary") under the later enacted amendments to the Outer Continental Shelf Lands Act).

**B.  Plaintiffs are Suffering and Will Continue to Suffer Irreparable Harm Absent the Requested Injunctive Relief.**

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction . . . ." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks and citations omitted). Irreparable harm "may be based on factors such as the 'difficulty in calculating damages … and [the] existence of intangible harms such as loss of goodwill or competitive market position.'" *See MonaVie, LLC*, 2011 WL 1233274, *4 (D. Utah, March 31, 2011) (citation omitted).

Alpine's irreparable harm as a result of the SEC's unlawful enforcement action in the Southern District of New York is evident on its face.  The SEC, without delegated authority to enforce the SAR provisions of the BSA, and without complying with the requirements of the APA, has unlawfully and improperly filed a crippling case against Alpine.  The SEC's allegations, that Alpine has violated the SAR provisions of the BSA thousands of times, has eroded Alpine's goodwill and place in the competitive broker-dealer market of microcap trading and clearing.  The SEC's allegations against Alpine are patently deficient; the SEC does not even have the authority to pursue an action for alleged violations of the SAR provisions of the BSA – that authority and duty lies only with FinCEN, as discussed above.

Alpine's goodwill in the market suffers as a result of the SEC's wrongful enforcement action.  In fact, in responding to Alpine Motion to Dismiss for lack of venue or transfer, the SEC admitted that it filed its enforcement action in the Southern District of New York in order to use Alpine to send a message to the market.  *See* SEC's Mem. in Opp. to Mot. to Dismiss, Case No. 1:17-cv-04179-DLC, Dkt. 30, at p. 16-17.  In addition, the SEC is seeking civil monetary penalties under the Exchange Act which calculates out to a potential penalty in the hundreds of

millions of dollars. Such a penalty, would result in the total collapse of Alpine's business, especially in light of Alpine's net capital requirements under SEA Rule 15c3-1.

SCA's irreparable harm is akin to Alpine as SCA and Alpine have entered into and executed a "Fully Disclosed Clearing Agreement" and, under that agreement, if Alpine incurs liability regarding its AML obligations, SCA may be required to indemnify Alpine. *See* SOF, No. 2. Thus, SCA's market position is being held in the balance by the SEC's improper action.

> **C.      The Balance of Equities Tips in Favor of Plaintiffs' Request for Preliminary Injunctive Relief.**

In determining whether to grant an injunction, consideration must be given to whether the defendant would suffer greater harm than the plaintiff if the requested injunctive relief is granted. *See Davis v. Minetta*, 302 F.3d 1104, 1116 (10th Cir. 2002). If a defendant's alleged harm from the injunction is of a "self-inflicted nature," this consideration will weigh in favor of granting injunctive relief. *Id.* The equities in this case weigh strongly in favor of granting Plaintiffs' requested injunctive relief. Alpine has and will continue to suffer significant irreparable harm to its reputation and goodwill and will lose substantial business, or may be completely eliminated from the market, without issuance of the injunctive relief. By contrast, there is no harm to the SEC; it will simply be preliminarily enjoined from using Rule 17a-8 to enforce and penalize purported violations of the BSA, pending adjudication of the issue.

> **D.      Issuance of Injunctive Relief is in the Public Interest.**

To prevail on this element, Plaintiffs need only establish that injunctive relief will not be adverse to the public interest. *See City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.2d 310, 312 (10th Cir. 1985). The public interest favors protection of the goodwill of businesses. *See e.g.*, *Morgan Stanley Smith Barney LLC v. O'Brien*, 2013 WL 5962103, *8 (D. Conn. Nov. 6, 2013)

(explaining that "there is a public interest in the protection of the goodwill of businesses."); *accord Tootsie Roll Indus., Inc. v. Sathers, Inc.*, 666 F.Supp. 655, 661 (D. Del. 1987).

The proposed preliminary injunctive relief will serve the public interest as it enjoins unlawful and impermissible actions by a governmental agency. Moreover, the proposed preliminary injunctive relief will prevent additional harm to Plaintiffs and preserve their businesses, goodwill, and place in the market during the pendency of this action.

## IV.   NO BOND SHOULD BE REQUIRED

This case warrants an injunction without issuance of a bond. Because "trial courts have 'wide discretion under Rule 65(c) in determining whether to require security,' we do not find an abuse of that discretion' where no bond is required." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009). The SEC will not suffer any wrong or harm by maintaining the status quo during the pendency of this action. "[T]he primary goal of a preliminary injunction is to preserve the pre-trial status quo." *Faircloth v. Colo. Dep't of Corr.*, 2016 WL 2343456, *2 (D. Colo. May 2, 2016). The "pre-trial status quo" applies to Alpine's pre-trial posture prior to the SEC's unlawful enforcement action in New York. The pre-trial posture of that matter was that Alpine, and all other broker-dealers, including SCA, were subject to enforcement actions brought by FinCEN regarding the SAR provisions of the BSA and the SEC had examination authority only. Issuance of the preliminary injunction will preserve that status quo.

## V.   CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, Plaintiffs' request that the Court grant Plaintiffs' Motion for a preliminary injunction without bond, enjoining the SEC from using Rule 17a-8 to enforce and penalize purported violations of the BSA, pending adjudication of the issue.

Dated this 22nd day of June, 2018

**Clyde Snow & Sessions**

*/s/ Brent R. Baker*
Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker

Maranda E. Fritz (*Pro Hac Vice Pending*)
**THOMPSON HINE**

*Attorneys for Plaintiffs*