UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                                    :

UNITED STATES SECURITIES AND            :
EXCHANGE COMMISSION,                     :

                                                         :      Index No. 17cv4179 (DLC)

                               Plaintiff,           :

                                                        :
                                -v.-               :

ALPINE SECURITIES CORPORATION,   :

                             Defendant.       :
------------------------------------------------------------------ x

# **REPORT OF REBUTTAL EXPERT**
# **BEVERLY E. LOEW**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

SUMMARY OF QUALIFICATIONS ....................................................................1

BACKGROUND OF ASSIGNMENT ...................................................................9

SUMMARY OF OPINIONS .................................................................................10

ANALYSIS............................................................................................................13

I.     BSA Legal and Regulatory Framework.........................................................13

      A.    Authority to Administer and Enforce the BSA Against BSA-Defined Financial Institutions Has Been Granted Solely to the Secretary of the Treasury Since 1970 ...................................................................14

           1.    The Bank Secrecy Act of 1970 ..................................................14

           2.    1970-1998 Amendments to the BSA .........................................18

           3.    USA PATRIOT Act of 2001.......................................................20

      B.    Using Rule 17a-8 to Manufacture SEC Enforcement Authority Over Violations of the SAR Rules and Substantive Authority Over Other BSA Requirements Is Contrary to Congressional Intent and Makes No Sense. ...........22

           1.    The SEC Reaches Beyond its Delegated Authority Each Time it Imposes or Seeks to Impose Civil Money Penalties for BSA Violations....................................................................................22

           2.    The Exchange Act Contains No Authority to Adopt or Enforce Substantive AML Regulations ....................................................25

           3.    There is a Proper, Limited Purpose, for Rule 17a-8 .................28

           4.    The Limitations on the SEC's BSA Authority Were Addressed by Congressional Action in 1999....................................................29

C.    Unlike the SEC, Federal Banking Agencies Have Independent Statutory
      Authority to Promulgate and Enforce BSA-Related Regulations.........................31

D.    The Role of FINRA in the BSA Regulatory Scheme Has Been Significantly
      Over-Represented in the Navigant Report. ...........................................................33

      1.    FINRA's Role in the BSA Scheme was Expressly Limited to the
            Performance of SRO Functions ................................................................34

      2.    FINRA Was Not Delegated Authority to Approve AML Programs,
            Nor Was it Delegated any Other Substantive Authority............................35

      3.    The FINRA AML Template Was Not Approved by FinCEN .................37

II.   SAR Filing Requirements ...................................................................................38

A.    Overview of the SEC's Expert Witness's Perspective Regarding SAR Filing
      Requirements ........................................................................................................38

B.    Legal and Regulatory Framework for SAR Reporting Obligations .....................41

C.    Purpose of SARs ..................................................................................................46

D.    General SAR Reporting Principles That Were Misapplied In the Context of
      This Case to Alpine..............................................................................................49

      1.    Alpine's SAR Obligations Are Limited By Its Position as a Clearing
            Broker, In Which It Has No Direct Relationship to an Introduced
            Customer ...................................................................................................50

      2.    The Improper Use of Guidance in Determining SAR Filing
            Obligations ...............................................................................................55

            i.     Undue Reliance on The SAR Activity Review.............................57

            ii.    Undue Reliance on the SAR Narrative Guidance.........................60

            iii.   Mischaracterization of SAR Forms .............................................64

            iv.    Undue Reliance on FINRA Documents........................................65

      3.    Subjective Versus Objective Standard for SAR Filing Obligations ..........67

      4.    Microcap SAR Determinations...................................................................73

      5.    Voluntary SARs .........................................................................................75

      6.    SAR Content Requirements........................................................................79

III.  Analysis of SAR Requirements Applicable to Alpine's SAR Determinations and Filings .................................................................................................. 81

   A.  Arbitrary and Misguided Application of Selected Red Flags and SAR Analysis ................................................................................................ 81

        1.  Significance of Red Flags ......................................................... 81

        2.  Conclusory and Overly Simplistic Application of Red Flags And Flawed Opinions With Respect to the Alpine SARs ................................ 85

   B.  Flawed Expert Analysis of SARs ......................................................... 86

        1.  Navigant Category 1: Basic customer and suspiciousness information .... 86

        2.  Navigant Category 2: Criminal or regulatory history ........................ 90

        3.  Navigant Category 3: Shell company involvement or derogatory stock history .......................................................................... 93

        4.  Navigant Categories 4 and 5: Stock promotion and Unverified Issuers: ... 95

        5.  Navigant Category 6: Low trading volume ................................... 96

        6.  Navigant Category 7: Foreign involvement ................................... 97

   C.  Liquidations .................................................................................. 99

   D.  Timeliness of SAR Filing—The SEC's Expert Witness Analysis Ignores Relevant Guidance and Industry Standards ........................................... 102

   E.  The SEC's Expert Witness Improperly Concluded that Alpine Had a Structural AML Program Failure ....................................................... 106

## INTRODUCTION

1.       I am the founder and principal of Rangeley Holdings, LLC, a consulting firm that

provides expert and advisory services to government officials and private sector stakeholders in

connection with matters involving the development, implementation and enforcement of

financial regulatory programs, including the Bank Secrecy Act of 1970 ("BSA"), as amended

from its initial enactment, including by the USA PATRIOT Act of 2001 (the "USA PATRIOT

ACT").  In that regard, I have provided advice and services relating to anti-money laundering

("AML") policy and compliance programs, in the United States and abroad.  I am also an

attorney licensed to practice law in New York and Virginia, and do so as The Loew Firm, PLLC.

2.       As discussed in greater detail below, I have been engaged by counsel for Alpine

Securities Corporation ("Alpine") to serve as an expert with respect to BSA history and AML

regulations, including the implementation and enforcement of that regulatory scheme,

particularly as it relates to broker-dealers and the suspicious activity reporting obligations of

broker-dealers.  Specifically, I have been asked by counsel for Alpine to evaluate the Expert

Witness Report of Alma Angotti (the "SEC's expert witness") of Navigant Consulting Inc., dated

May 25, 2018 ("Navigant" and the "Navigant Report"), submitted in this matter on behalf of the

U.S. Securities and Exchange Commission ("SEC").

## SUMMARY OF QUALIFICATIONS

3.       I have approximately 30 years professional work experience in and around the

financial industry.  I spent the first 15 years of my career focused on trading markets, legal and

regulatory reform and developing market infrastructure to support privatization in emerging

former Eastern Bloc economies.  Since that time, I have focused primarily on the BSA, the USA

PATRIOT Act and cross-border AML issues, the Dodd-Frank Wall Street Reform and Consumer

Protection Act ("Dodd-Frank Act"), federal administrative law, and federal tax matters.

4.      Throughout my career, I have gained significant experience in the financial markets, including emerging, thinly traded, and illiquid markets, which operate similarly to the markets involved in this matter; issues relating to the Administrative Procedures Act ("APA"), in particular, the APA's notice and comment requirements and judicial review standards; issues relating to the BSA and AML history (most notably with respect to jurisdictional issues) and regulatory development; and particular issues relating to clearing firms, including their AML obligations with respect to the customers of introducing firms, on which I developed regulatory policy with respect to customer identification, certain foreign accounts, and suspicious activity reporting.

5.      Early in my career, I was employed in sales and trading at Kidder, Peabody & Co., Smith Barney Harris Upham & Co., Lehman Brothers, Inc., and PaineWebber, where I gained experience in pricing and trading patterns with respect to illiquid securities and those lacking in price transparency, similar to the securities at issue in this case.  As a Congressional Fellow, assigned to the majority staff of the Committee on Small Business, U.S. House of Representatives, I prepared analyses of the federal securities laws and state blue sky laws about their effect on the ability of small businesses use the securities markets.[1]

6.      Moreover, as a program and project manager with the U.S. Agency for International Development ("USAID"), I was responsible for developing trading markets to support privatization of state-owned industries and small business concerns in the former Eastern Bloc, which were predominantly small cap and microcap securities, as well as regulations applicable to the disclosure obligations of issuers, the sales practices, capital requirements, and recordkeeping of market intermediaries, and surveillance practices for those markets.  Through

---

[1] *Small Business' Access to Capital, Impediments and Options Before the H. Comm. on Small Business*, 107th Cong. 9, 12 (1996).

an interagency agreement with the SEC, I engaged senior SEC staff and a former SEC Commissioner to address some of the most complex issues that faced these privatization markets as they became operational and subject to regulation. Also at USAID, colleagues and I established anti-corruption efforts that were piloted in select countries in the region.

7.      Since 2014, I have provided legal and consulting services to a number of governments and regulated entities regarding the development of, and compliance with, effective AML law and policy.  Since mid-2017, I have been working with the central bank of a developing European country to effect wholesale legal and regulatory reform to help modernize that country's AML laws, enhance regulatory enforcement authority in light of concerns about the ability of the judiciary in that country to successfully resolve cases involving highly complex international money laundering and related financial schemes, and resolve jurisdictional disputes between the central bank and other ministries and agencies with roles in the country's AML compliance regime. I have also advised broker-dealers as well as other BSA-defined and regulated institutions with respect to compliance with the BSA and related laws, a provider of trading and clearing activities operating on three continents with respect to derivatives market compliance globally, and law firms representing clients in BSA-related enforcement actions.

8.      Prior to establishing my own law and consulting practices in 2014, I worked as a program or policy officer and as a senior attorney in various capacities within the United States government for over 15 years.  In addition to my experience with USAID and USAID-funded projects, I held positions at the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") and, most recently, the Commodity Futures Trading Commission ("CFTC").

9.      From April 2005 through October 2008, I served as Regulatory Policy Officer at

3

FinCEN, a bureau of the U.S. Department of the Treasury ("Treasury") responsible for administering the BSA, assisting law enforcement, intelligence and regulatory agencies by analyzing and sharing financial information, and facilitating cooperation and technical expertise among the world's financial intelligence units.[2]  To carry out that mission, FinCEN oversees and implements policies designed to facilitate the receipt and analysis of transaction data from financial institutions, and the dissemination of information about suspicious activities to law enforcement, intelligence, regulatory and financial communities and institutions, domestically and abroad.

10.      As Regulatory Policy Officer, my responsibilities at FinCEN included overseeing efforts to harmonize the federal government's application of the BSA across various financial services industries.  I also advised the Treasury on the development, interpretation, and implementation of written recommendations to enhance the United States' AML regulatory scheme in connection with the United States' participation in the Financial Action Task Force, an intergovernmental organization consisting of more than 35-member jurisdictions formed for the express purpose of developing international policies to combat money laundering activities.

11.      In this capacity, I worked on the AML rules applicable to the banking, securities and futures industries and money services businesses, and served as FinCEN's liaison to the securities and futures subcommittee of Treasury's Bank Secrecy Act Advisory Group.[3]  Among other things, I drafted for publication interpretive rules that aligned the BSA obligations of

---

[2] *See generally* FinCEN Dir. James H. Freis, Jr., Statement Before the United States House of Representatives Committee on Financial Services (May 6, 2009), *available at* https://www.fincen.gov/news/testimony/statement-james-h-freis-jr-director-financial-crimes-enforcement-network-united-2.

[3] The Bank Secrecy Act Advisory Group ("BSAAG") was established in 1992 by the Annunzio-Wylie Anti-Money Laundering Act of 1992 for the purpose of obtaining feedback on opportunities to improve the BSA framework and consists of representatives from federal regulatory and law enforcement agencies, financial institutions, and trade associations whose members are financial institutions subject to the BSA.  BSAAG is chaired by FinCEN and its membership is solicited via public notice in the Federal Register and members serve three-year terms.  FinCEN makes all membership decisions.

clearing and introducing broker-dealers with other institutions that processed transactions in

substantially the same manner, and I separately interpreted the obligations of other institutions in

the banking context that were structured similarly to introducing and clearing brokers.[4]  I also

developed the original framework for the filing of a common suspicious activity report ("SAR")

form by all BSA-regulated financial institutions subject to reporting obligations, which

eventually was incorporated into FinCEN's electronic filing platform.

12.     While at FinCEN, I also spent a substantial portion of my time analyzing and

addressing the jurisdictional boundaries with respect to implementing the AML regulatory

scheme articulated by Congress.  This work included collaborating with FinCEN's Office of

Chief Counsel to define the outer limits of BSA data sharing with regulatory and law

enforcement agencies.

13.     My work at FinCEN also involved ensuring that the SEC, the CFTC, and other

agencies (as well as the Self-Regulatory Organizations ("SROs") subject to their oversight) did

not overreach or fail to perform the BSA examination functions that were delegated by Treasury

(in the case of the SEC and the CFTC), or on which FinCEN and its delegates were relying (in

the case of the SROs).  These responsibilities stemmed from the position that Treasury has taken

---

[4] *See, e.g.*, FIN-2008-R008, Customer Identification Program Rule No-Action Position Respecting Broker-Dealers
Operating Under Fully Disclosed Clearing Agreements According to Certain Functional Allocations (Mar. 4, 2008),
*available at* https://www.fincen.gov/resources/statutes-regulations/administrative-rulings/bank-secrecy-act-
obligations-us-clearing;  FIN-2007-G004, Application of the Correspondent Account Rule to Executing Dealers
Operating in Over- The-Counter Foreign Exchange and Derivatives Markets Pursuant to Prime Brokerage
Arrangements (Sept. 5, 2007), *available at* https://www.fincen.gov/resources/statutes-
regulations/guidance/application-correspondent-account-rule-executing-dealers; FIN-2007-G001, Application of the
Customer Identification Program Rule to Future Commission Merchants Operating as Executing and Clearing
Brokers in Give-Up Arrangements (Apr. 20, 2007), *available at* https://www.fincen.gov/resources/statutes-
regulations/guidance/application-customer-identification-program-rule-future; FIN-2006-G0011, Application of the
Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to Certain Introduced
Accounts and Give-Up Arrangements in the Futures Industries (June 8, 2006), *available at*
https://www.fincen.gov/resources/statutes-regulations/guidance/application-regulations-requiring-special-due-
diligence; and FIN-2006-G009, Application of the Regulations Requiring Special Due Diligence Programs for
Certain Foreign Accounts to the Securities and Futures Industries (May 10, 2006), *available at*
https://www.fincen.gov/resources/statutes-regulations/guidance/application-regulations-requiring-special-due-
diligence-0.

since the BSA's adoption in 1970; namely, that neither the SEC, nor the CFTC, nor any SRO has been delegated Treasury's enforcement authority with respect to the BSA.

14.     I was assigned these responsibilities and projects in large measure because of my background working in the securities industry prior to joining FinCEN, particularly my transactional experience on Wall Street and experience in developing trading market infrastructure to support the efficient movement of funds and securities.  The years I worked at FinCEN were critical in the development of BSA guidance for the securities, futures, and money services industries.  Based on my work there, in 2007, I was the honored recipient of its Visionary of the Year Award.

15.     From October 2008 through February 2014, I served as Assistant General Counsel for Regulation and Administration at the CFTC, where I engaged in oversight of the rulemaking and adjudicatory programs administering the Commodity Exchange Act (the "CEA").  In that capacity, among other things, I led the Office of the General Counsel's administrative law efforts with respect to the proposed rulemakings to implement the landmark Dodd-Frank Act, coordinated the development of various internal orders and guidance documents related to the CFTC's rulemaking process, and provided guidance on the scope of newly established CEA authority, applying well-established principles of statutory interpretation.

16.     In addition, because of my unique experience with the BSA, I was frequently asked by the CFTC's Chairman and his office, the General Counsel, and the Division of Enforcement to advise on matters involving the interaction between the BSA and the CEA.  By way of background, the CEA intersects with the BSA in the same manner as does the Securities Exchange Act of 1934 (the "Exchange Act"), including with respect to the review of self-regulatory organization ("SRO") examination reports and disciplinary actions, and the limits of

the rulemaking, guidance, and enforcement authority under the BSA.  For example, the CFTC's examination authority was delegated in the same manner as the authority delegated to the SEC and was implemented by adopting a rule requiring futures firms to comply with the BSA and its implementing regulations.[5]

17.     While at the CFTC, I led negotiations of two memoranda of understanding with FinCEN.  The first established the parameters by which the CFTC would be allowed to access and use the BSA databases in the course of its regulatory and enforcement processes, which was similar to memoranda of understanding FinCEN had executed with the SEC, the federal banking agencies, and law enforcement agencies.  The second established a framework for information sharing between FinCEN and the CFTC (the "Information Sharing MOU") by which the two agencies would share information related to the CFTC's examination of futures firms for BSA compliance and included provisions for information sharing between the two agencies with respect to the compliance examinations that were conducted by the SROs subject to CFTC oversight.

18.     Although it contained additional provisions addressing issues unique to the CEA not relevant to this matter, the Information Sharing MOU that I negotiated with FinCEN on behalf of the CFTC was modeled on a prior information sharing memorandum of understanding between FinCEN and the SEC.  The provisions of both documents effectively established that FinCEN was operating as the sole administrator and enforcement authority with respect to the

---

[5] 31 C.F.R. § 1026.210(c) ("Complies with the rules, regulations, or requirements of its self-regulatory organization governing such programs, provided that the rules, regulations, or requirements of the self-regulatory organization governing such programs have been made effective under the Commodity Exchange Act by the appropriate Federal functional regulator in consultation with FinCEN."); NFA Notice I-02-09, NFA Adopts Amendment to NFA Compliance Rule 2-9 and a Related Interpretive Notice Requiring FCMs and IBs to Implement an Anti-Money Laundering Compliance Program (April 23, 2002), *available at* https://www.nfa.futures.org/news/newsNotice.asp?ArticleID=261 ("The Commodity Futures Trading Commission, at the direction of the Department of the Treasury, asked NFA to adopt minimum standards for anti-money laundering programs applicable to the futures industry.").

BSA, and the CFTC's role, like the SEC's role, was limited to conducting BSA compliance examinations.  As I recall from both my work on the SEC and CFTC MOUs at FinCEN, as well as the MOU negotiations at the CFTC, it was recognized in the MOUs that the SEC and CFTC were relying on the examination functions of SROs to implement the BSA examination authority delegated to the SEC and CFTC, but established no direct relationship between FinCEN and the SROs.

19.     In addition to my decades of work as an attorney and advisor in both the public and private sectors focusing on domestic and foreign AML matters and related financial regulatory issues, I was an adjunct professor at New York Law School where, together with another industry AML expert, I taught a graduate-level course on the BSA and AML regulations. I have also guest lectured at Howard University Law School on topics including the BSA, AML and sanctions compliance obligations of U.S. broker-dealers.

20.     While at FinCEN, I was a frequent speaker at industry conferences and seminars regarding developments in the domestic and international financial regulatory arena and compliance best practices.  I also frequently spoke on the distinctions between BSA compliance obligations of clearing and introducing firms in the securities industry and of clearing and executing brokers in the futures industry.  As noted herein, I produced and published a significant body of interpretive guidance with respect to this issue and the application of the SAR regulations resulting from the interpretive guidance.

21.     I received my Juris Doctor in 1994 from New York Law School, and my Bachelor of Arts degree, with honors, from Wheaton College (Massachusetts) in 1986.  A copy of my curriculum vitae is attached hereto as Exhibit A.

## BACKGROUND OF ASSIGNMENT

22.     I have reviewed the Navigant Report, prepared by and for the SEC's expert

witness, and in response thereto have been asked by counsel for Alpine to respond to the topics

discussed in the Report and to its conclusions.  My response includes a comprehensive

description of the applicable statutes and regulatory rules, the way in which they have been

interpreted and are commonly applied in practice, and customary practices and procedures within

the broker-dealer industry to appropriately address and comply with SAR obligations as part of

an effective AML compliance program.

23.     In connection with my engagement, I have reviewed numerous materials,

including the Navigant Report, copies of the parties' pleadings, the papers filed in support of and

in opposition to the parties' cross motions for partial summary judgment and the Court's

Decision and Order on those motions, dated March 30, 2018 (the "March 2018 Decision"), the

Court's Memorandum Opinion and Order Decision denying reconsideration of the March 2018

Decision, dated June 18, 2018, as well as the regulatory rules, statutory authority, related history,

and associated guidance and commentary cited herein.  A complete list of these materials is

attached as Exhibit B.

24.     While the opinions expressed herein are based on the materials cited in this

declaration and on my review of the materials listed in Exhibit B, I reserve the right to consider

additional materials after the date of this declaration, including but not limited to the SARs at

issue in this case, further reports, analyses or testimony provided by Navigant or any other expert

witnesses proffered by either party, as well as the evidence presented at trial, and to conduct

further and additional research and analysis in connection with rendering opinions in this matter.

25.     I am being compensated for my work in this matter at an hourly rate of $325.  My

compensation is not contingent on, or otherwise affected by, the outcome of this litigation.  I am

also prepared to provide further details on my opinions if asked to do so.

## SUMMARY OF OPINIONS

26.     The Navigant Report is premised on the incorrect assumption that the SEC has

enforcement authority over BSA violations.  In reality, however, Congress has never directly

authorized the SEC to substantively regulate or impose any civil penalty with respect to currency

reporting, AML compliance, suspicious activity reporting, or any other matter contained within

the BSA.  As the legislative and regulatory history make clear, Congress vested that authority

exclusively in the Secretary of the Treasury and gave the Secretary some ability to delegate

authority for certain BSA functions in his discretion.  To date, the Secretary of Treasury has only

delegated limited authority to the SEC under the BSA to initiate and conduct compliance

examinations—*not* enforcement actions.  Neither the Exchange Act nor any other statutory

provision provides the SEC with any BSA enforcement authority.

27.     The SEC's attempt to use Rule 17a-8 of the Exchange Act to engage in BSA

enforcement is improper.  In addition to being in clear contravention of the statutory scheme

implemented by Congress, the SEC's attempt to usurp Treasury's responsibility for

implementing and enforcing the BSA runs afoul of the Treasury's longstanding position that it

alone has BSA enforcement authority.  In my personal experience, Treasury (and subsequently,

FinCEN) consistently has emphasized that its delegation of BSA-related authority to the SEC

was limited to examination authority, while the ability to commence enforcement actions and

impose civil monetary penalties for violations was retained by FinCEN.  What is more, even if

the SEC could otherwise piggyback off FinCEN's substantive regulations, Rule 17a-8 was

promulgated by the SEC over two decades before the FinCEN issued the SAR rules at issue in

this case and the SEC has not taken the necessary steps under the APA to properly incorporate those rules by reference.

28.     Contrary to the implications contained in the Navigant Report, FinCEN's communication or coordination with the SEC or FINRA with respect to BSA-related matters *does not* amount to FinCEN expressly or tacitly conferring or ceding interpretive or enforcement authority to either the SEC or FINRA.  In fact, FinCEN is permitted to delegate such authority to government agencies outside of Treasury (such as the SEC) only if expressly permitted by law to do so.  No such law exists.  And nothing in the BSA or elsewhere purports to give Treasury any ability to delegate any substantive BSA authority to FINRA or any other non-governmental SRO.

29.     Navigant's criticisms of Alpine's SAR filings are based on a fundamentally flawed view of well-settled SAR filing requirements and the underlying purpose of SARs in the BSA/AML regulatory scheme.  Neither the SAR regulations nor FinCEN's guidance about those regulations even remotely support Navigant's ultimate conclusions that every time a firm files a SAR, every conceivable so-called "red flag" that the firm knows or should have known about a customer, transaction, issuer or security is *per se* suspicious, and therefore automatically triggers an obligation to file a SAR detailing all potential "red flags."

30.     Navigant fundamentally misstates and misapplies the SAR filing standards, which are meant to be flexible.  The whole point of the SAR regulations is to provide law enforcement with concise information about a transaction the filer deemed suspicious.  As a result, the triggering event for a SAR filing is a subjective determination by the filer that certain information does, in fact, provide reason for suspicion.  And in that event, the required content for the SAR filing is a basic explanation of the transaction and the factor(s) that led the filer to

conclude that there is reason for suspicion.  Requiring firms to inundate law enforcement and regulators with extraneous information about potential "red flags" the filer did not find suspicious – or worse yet, with SARs concerning transactions the filer ultimately concluded were not suspicious, but that nevertheless involved at least one so-called "red flag" swill overwhelm the BSA database with information that is not useful to the law enforcement authorities that rely on it..

31.     Apart from making SARs less useful to law enforcement and regulators by flooding them with useless information, the inflexible SAR standards advanced in the Navigant Report would, if adopted, wreak havoc on the BSA/AML regulatory scheme and ripple across numerous industries.  With limited exceptions, FinCEN has adopted the same SAR regulations and interpretive guidance for all of the industries it regulates.  As a result, the institutions subject to substantively the same regulations and guidance include a broad cross-section of the U.S. financial system as a whole, such as banks and other depository institutions, futures commission merchants ("FCMs"), money services businesses, and casinos, among others.  Given the common body of law and guidance applicable to all BSA-regulated industries, the inescapable (even if unintended) consequence of the position taken by the SEC as embodied in the Navigant Report is that it will (a) create substantive and unsustainable new reporting obligations for tens of thousands of financial institutions, as that term is defined in the BSA, and (b) effectively impose on those financial institutions the legal obligation to conduct the level of investigatory review and analysis intended to be the province of law enforcement and regulatory agencies.

32.     Many of Navigant's criticisms with respect to Alpine's SARs stem from an overblown skepticism of microcap and penny stocks, shell companies, low trading volume and foreign jurisdictions.  None of these attributes is inherently negative or suspicious.  Not every

12

liquidation following a deposit of microcap securities is necessarily suspicious.  Not all activity

involving foreign jurisdictions warrant reporting.  Not every transaction conducted by a person

with a past personal or regulatory transgression is inherently suspect.

33.     In my considered opinion, the SEC's expert witness has not established that

Alpine SARs were, in every instance, required filings or that those SARs were deficient or

untimely and, in fact, there is significant evidence to the contrary.   Based on my review of the

Navigant Report and attached exhibits, it appears to me that Alpine implemented guidelines

established to detect and manage risk and detect and report suspicious activity.  The SAR

supporting documentation files to which Navigant cites, and the SEC expert witness's analysis of

the SARs themselves, show that Alpine had robust due diligence practices they employed and

which they improved and enhanced over time.

<u>**ANALYSIS**</u>

**I.      BSA Legal and Regulatory Framework**

34.     The Navigant Report is grounded entirely on the presumption that the SEC has

significant authority to implement and enforce the BSA independent of FinCEN and Treasury.

Indeed, while not stated expressly anywhere in the document, through selective and disjointed

references to the BSA and certain aspects of the AML regulatory framework developed since the

BSA's passage, the Navigant Report creates a misimpression that AML regulatory and

enforcement authority rests with the SEC, in conjunction with the SROs, with Treasury and

FinCEN merely playing supporting and limited roles.  Notably, the Navigant Report is careful to

stop short of offering an outright opinion endorsing the SEC's view of the scope of its AML

regulatory authority for an obvious reason – it is contrary to the statutory framework put in place by Congress and decades of relevant pronouncements.[6]

### A. Authority to Administer and Enforce the BSA Against BSA-Defined Financial Institutions Has Been Granted Solely to the Secretary of the Treasury Since 1970

35.     As demonstrated by a full and fair presentation of the BSA legislative and regulatory landscape, there could not be a less ambiguous expression of Congressional intent than that the authority to substantively regulate "financial institutions," including broker-dealers, under the BSA was meant to be exercised by the Secretary of Treasury, not the SEC.

#### 1.      The Bank Secrecy Act of 1970

36.     Since it was first enacted in 1970, authority to administer the BSA has been granted expressly and exclusively to the Secretary of the Treasury.[7]  The BSA itself actually limits the Secretary of the Treasury's ability to delegate authority to the SEC and does not authorize the Secretary to delegate authority to private, non-state actors such as the SROs that are subject to SEC regulatory oversight.  Notwithstanding various amendments to the BSA since that time, that has not changed.  Indeed, contrary to the impression left by Navigant, the BSA and its amendments not only failed to provide the SEC with the authority it seeks to exercise here, but actually ring-fenced the SEC's limited role.[8]

37.     Among other things, the BSA established recordkeeping and reporting requirements related to domestic currency transactions and imports and exports of monetary instruments and transactions.  The BSA-related authority that Congress granted exclusively to

---

[6] Navigant Report at 8-10.

[7] *See* Act to Amend the Federal Deposit Insurance Act to Require Insured Banks to Maintain Certain Records, to Require that Certain Transaction in U.S. Currency be Reported to the Department of the Treasury, and for Other Purposes, Pub. L. No. 91-508, § 101, 84 Stat. 1114 (1970).

[8] Navigant Report at 8-9.

the Secretary of Treasury extended not only to banks and other depository institutions, but also to other "financial institutions."  As defined in the BSA, the term "financial institution" included "broker[s] or dealer[s] registered with the Securities and Exchange Commission under the Securities and Exchange Act of 1934" as well as "broker[s] or dealer[s] in securities and commodities."[9]

38.     Despite vesting exclusive authority to administer the statute in the Secretary of Treasury, the BSA did give the Secretary of Treasury discretion to delegate responsibility for conducting compliance examinations of BSA-subject depository and financial institutions to an appropriate bank supervisory agency or other supervisory agency.  It is through this limited delegation authority that, in 1972, the Secretary of Treasury ultimately tasked the SEC with discrete responsibility for conducting certain BSA-compliance examinations, while expressly retaining for itself all rulemaking, civil enforcement, and other BSA-related authority relevant to this matter.[10]

39.     This solitary function of the Secretary is critical, as Treasury regulates many different types of financial institutions pursuant to the same statutory provisions and substantive regulations that use similar (if not identical) language and have been adopted across industries.[11]

---

[9] *See* Act to Amend the Federal Deposit Insurance Act to Require Insured Banks to Maintain Certain Records, to Require that Certain Transaction in U.S. Currency be Reported to the Department of the Treasury, and for Other Purposes, §§ 203(e)(7) and (8).

[10] *See* Part 103—Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912 (Apr. 5, 1972), *available at*  https://cdn.loc.gov/service/ll/fedreg/fr037/fr037066/fr037066.pdf (adopting 31 C.F.R. §§ 103.46 (discussing delegation) and 103.47 (discussing civil penalty authority)).  The same material provisions have remained in place since 1972.

[11] Following the Money Laundering Act of 1994, discussed *infra*, the same provision in the BSA also permits the Treasury Secretary to delegate civil penalty assessment authority to the federal banking agencies under terms and conditions that the Secretary may prescribe.  Notably, however, the amendments do not permit the delegation of such authority to either the SEC and the CFTC.  *See* 31 U.S.C. § 5321(e).  And in any event, to date, the Treasury Secretary has not exercised this delegation authority.

40.     Accordingly, the limited scope of authority initially delegated by Treasury to the SEC in 1972 substantively mirrors the language of FinCEN's current examination and enforcement regulations, which state in pertinent part:

(a) Overall authority for enforcement and compliance, including coordination and direction of procedures and activities of all other agencies exercising delegated authority under this chapter, is delegated to the Director, FinCEN.

(b) *Authority to examine institutions to determine compliance* with the requirements of this chapter is delegated as follows:

*        *        *

(6) *To the Securities and Exchange Commission with respect to brokers and dealers in securities* and investment companies as that term is defined in the Investment Company Act of 1940 (15 U.S.C. 80-1 et seq.);

*        *        *

(e) Periodic reports shall be made to the Director, FinCEN by each agency to which compliance authority has been delegated under paragraph (b) of this section. These reports shall be in such a form and submitted at such intervals as the Director, FinCEN may direct. Evidence of specific violations of any of the requirements of this chapter may be submitted to the Director, FinCEN at any time.

(f) The Director, FinCEN or his delegate, and any agency to which compliance has been delegated under paragraph (b) of this section, may examine any books, papers, records, or other data of domestic financial institutions relevant to the recordkeeping or reporting requirements of this chapter.[12]

This delegation is unambiguous.

41.     Despite several significant Congressional amendments to the BSA since 1970, discussed below, none reasonably can be interpreted to have given the SEC substantive authority to interpret or enforce the BSA, and the delegation scheme as it was first adopted remains in place to this day.[13]  This is consistent with my personal experience at FinCEN, during which

---

[12] 31 C.F.R. § 1010.810 (emphasis added).

[13] *Compare* 31 U.S.C. § 1010.810 *with* Part 103—Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912, 6915 (Apr. 5l ,1972) (adopting 31 C.F.R. §§ 103.46 (delegation of examination authority) and 103.47 (civil penalty authority).

16

time FinCEN took the position that while the SEC had authority to examine brokers and dealers

for compliance with the BSA, FinCEN itself retained exclusive rulemaking,[14] interpretive, and

enforcement authority, and that the Secretary of the Treasury did not delegate enforcement

authority to the SEC.

      42.    Consistent with that position, while at FinCEN, I authored a letter to the National

Association of Securities Dealers ("NASD") (which has since merged its functions with the

NYSE to form FINRA) rejecting the NASD's demand for wholesale access to SARs filed under

the BSA by institutions that were not NASD member firms as being inconsistent with the BSA's

provisions and purpose.  I also authored two comment letters regarding SEC and SRO

rulemaking regarding the BSA.

      43.    The first of those comment letters related to a proposed AML rule change by the

NASD, which FinCEN believed was contrary to Treasury's longstanding interpretation of the

BSA.[15]  The second comment letter concerned the effect of a proposed SEC due diligence rule

on AML regulation under the BSA, including, specifically, the appropriate means of addressing

any AML-related gaps or inconsistencies.[16]  Then, as now, FinCEN's position as articulated in

---

[14] "Rulemaking" authority includes the ability to propose and adopt not only "substantive" (also known as "legislative") rules, but also "interpretative" (or "interpretive") rules, the latter of which is more frequently referred to as regulatory guidance.  *See* 5 U.S.C. 553(a)-(d); U.S. Department of Justice, "Attorney General's Manual on the Administrative Procedures Act of 1947" at 12-13 (1947), *available at* https://archive.org/details/AttorneyGeneralsManualOnTheAdministrativeProcedureActOf1947.

[15] Letter from Jamal El-Hindi to Nancy M. Morris, Notice of Filing of Proposed Rulemaking and Amendment No. 1 Thereto Relating to the Harmonization of NYSE and NASD Regulatory Standards and Clarification of Certain NYSE Rules in Connection with the Harmonization Process (Aug 22, 2007), *available at* https://www.sec.gov/comments/sr-nyse-2007-22/nyse200722-2.pdf, and FINRA's response thereto, Order Approving Proposed Rule Change To Adopt FINRA Rule 3310 (Anti-Money Laundering Compliance Program) in the Consolidated FINRA Rulebook, 74 Fed. Reg. 47,630, 47631 n.10 (Sept. 16, 2009), *available at* https://www.gpo.gov/fdsys/pkg/FR-2009-09-16/pdf/E9-22240.pdf.

[16] Letter from Susan D. Lang to Florence E. Harmon, File Number S7-16-08; Securities Exchange Act Release No. 34-58047; Exemption of Certain Foreign Brokers or Dealers (Sep. 8, 2008), *available at* https://www.sec.gov/comments/s7-16-08/s71608-27.pdf.

the comment letter was that any necessary AML rulemaking under the BSA is the province of FinCEN, not the SEC.

        2.      **1970-1998 Amendments to the BSA**

44.     In 1986, Congress amended the BSA for the first time.  Among other things, the Money Laundering Control Act of 1986 first established money laundering as a federal crime, established civil and criminal forfeiture authority for BSA violations, and required banks to maintain procedures to ensure compliance with BSA recordkeeping and reporting.[17]  Notably, the 1986 amendments did not extend any new or direct authority to the SEC with respect to the BSA or other AML-related laws.

45.     Indeed, despite establishing securities fraud as a predicate crime to money laundering, the Money Laundering Control Act did not extend to the SEC (or any other federal functional regulator charged with policing other predicate violations)[18] authority to engage in AML rulemaking or bring AML enforcement actions.[19]  In fact, the sole reference to the SEC found in the Money Laundering Control Act of 1986 was contained in the civil forfeiture provisions and related to a limitation on the civil forfeiture authority conferred on the Department of Justice – not the delegation of any additional authority to the SEC.[20]

46.     So too in 1988, Congress amended the BSA by expanding the definition of "financial institution" to include "businesses similar to financial institutions," and requiring

---

[17] *See* the Money Laundering Control Act of 1986, Pub. L. No. 99-570, §§1151-1153, 1351-1367, 100 Stat. 3207.

[18] *See* 18 U.S.C. § 1956(c)(7)(D)-(F).

[19] *See* Money Laundering Control Act of 1986, §§ 1151-1153, 1366.

[20] *See id.* at § 1366, *codified at* 18 U.S.C. § 981 (providing that "[a]ny coin and currency (or other monetary instrument as the Secretary of the Treasury may prescribe) or any interest in other property, including any deposit in a financial institution, traceable to such coin or currency involved in a transaction or attempted transaction in violation of section 5313(a) or 5324 of title 31 may be seized and forfeited to the United States Government," except that "[n]o property or interest in property shall be seized or forfeited if the violation is by a domestic financial institution examined by a Federal bank supervisory agency or a financial institution regulated by the Securities and Exchange Commission or a partner, director, officer, or employee thereof").

verification of purchasers of certain monetary instruments over $3,000.[21]  The only references to the SEC were in an amendment to the United State Code's civil forfeiture provision, 18 U.S.C. § 981, and a companion criminal forfeiture provision; neither could be interpreted to extend to the SEC any interpretive or enforcement authority with respect to violations of the BSA or its implementing regulations.[22]

47.      In 1992, Congress passed the Annunzio-Wylie Anti-Money Laundering Act, which amended the BSA by increasing sanctions for BSA violations, eliminating the Criminal Referral Forms used by banks and replacing them with suspicious activity reporting requirements, and requiring verification and recordkeeping for wire transfers.[23]  The Annunzio-Wylie Anti-Money Laundering Act not only amended the provisions of the BSA administered by the Secretary of the Treasury, but also amended federal banking laws to give federal banking agencies greater powers and obligations over the depository institutions subject to their oversight.[24]  There was not a single reference to the SEC in the Annunzio-Wylie Anti-Money Laundering Act, nor was there any amendment of any law administered by the SEC including, most prominently, the Exchange Act.

48.      Subsequent amendments to the BSA were similarly inconsequential vis-à-vis the SEC's lack of enforcement authority.  In 1994, the Money Laundering Suppression Act authorized the Secretary of Treasury to delegate enforcement authority to the federal banking

---

[21] *See* the Anti-Drug Abuse Amendments Act of 1988, Pub. L. No. 100-690, §§ 6184-6185, 102 Stat. 4181.

[22] *Id.* at § 6463.

[23] *See* the Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102-550, title XV, 106 Stat. 4044 (1992).  As noted *infra*, certain reporting requirements of the Criminal Referral Form were retained in the bank regulators' SAR rule.

[24] *See, e.g., id.* at §§ 1501-1507.

agencies.[25]  The Act did not grant BSA enforcement authority to the SEC, nor did it extend the

Secretary's delegation authority to the SEC under the BSA.

### 3.    USA PATRIOT Act of 2001

49.    In response to the terrorist attacks of September 11, 2001, the USA PATRIOT

Act was enacted in late 2001 as means of combatting terrorism by enhancing the surveillance

and investigative powers of certain government agencies.[26]  Among other things, the USA

PATRIOT Act significantly amended the AML regulatory scheme, including the BSA, to

facilitate the detection, prosecution and prevention of international money laundering activities

financing terrorism.  As with prior amendments to the BSA, not a single provision of the USA

PATRIOT Act allocated to the SEC any enforcement authority over BSA violations, either by

way of expanding the Treasury Secretary's existing delegation authority under the BSA or by

conferring new AML enforcement authority to the SEC through amendments to the Exchange

Act.

50.    While Navigant references "new and strengthened" BSA obligations resulting

from the USA PATRIOT Act applicable to broker-dealers, for example, (a) special due diligence

for correspondent accounts and private banking accounts, (b) verification of identification

(commonly referred to as "CIP"), (c) AML programs, and (d) reporting of suspicious activities

by securities brokers and dealers,[27] none shifted authority. One discrete section of the Act

directed Treasury to adopt rules jointly with the SEC, as well as the federal banking agencies and

---

[25] Money Laundering Suppression Act of 1994, Pub. L. No. 103-325, § 406, 108 Stat. 2243.

[26] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001) ("USA PATRIOT Act").

[27] USA PATRIOT Act §§ 312, 326, 352, and 358, codified at 31 U.S.C. §§ 5318(g)-(i) and (l), respectively.

the CFTC,[28] but none extended to the SEC any BSA enforcement authority or amended the Exchange Act to include substantive BSA authority.

51.     In short, the SEC's limited role in the AML regulatory scheme reflects deliberate decision-making by Congress over more than 40 years.  In fact, a larger BSA role for the SEC was considered but rejected by Congress, with the SEC participating in the policy discussion.  In particular, in 1970, then-SEC Chairman Hamer H. Budge, then-Director of the Division of Trading and Markets Irving Pollack, then-SEC General Counsel Philip A. Loomis and others testified before the Subcommittee on Financial Institutions of the Senate Committee on Banking and Currency about a bill that would later that year be adopted as the BSA.  Chairman Budge addressed, among other things, provisions contained in title IV of the Senate Bill (but not included in the House Bill) that would have amended the Exchange Act to include a BSA-related provision "prohibit[ing] U.S. brokers from accepting securities orders from foreign banks unless the foreign bank discloses the party for whom it is acting or certifies it is not acting for a U.S. citizen or resident."[29]

52.     Ultimately, and consistent with the recommendation of Treasury,[30] title IV of the Senate Bill – which would have given the SEC a substantive role in the administration and

---

[28] Sec. 326 of the USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001).

[29] *Foreign Bank Secrecy*: Hearings on S. 3678 and H.R. 15073 Before the Subcomm. on Financial Institutions of the S. Comm. On Banking and Currency, 91st Cong 73, 79, 83, and 86. (June 8-11, 1970) (Statement of Hamer H. Budge, Chairman, Securities and Exchange Commission, Accompanied by Irving M. Pollack, Director, Division of Trading and Markets; Stanley Sporkin, Associate Director (Enforcement), Division of Trading and Markets; Philip A. Loomis, Jr., General Counsel; Ira H. Pearce, Special Counsel; *see also* S. 3678, 91st Cong., (1970) (Title IV pertaining to "securities transactions involving foreign financial agencies," which would have been administered by the SEC if it had been enacted); H. R. 15073, 91st Cong. (1970) (Title III contains nothing akin to title IV in the S. 3678).

[30] The Department of Treasury, in its recommendations to the Committee, recommended deletion of title IV, with Eugene T. Rossides, Assistant Secretary of the Treasury for Enforcement and Operations testifying that "[w]e must be careful to avoid provisions that are too stringent and which may have the effect of impeding the channels of trade and this defect exists in title IV." *Id.* at 157.  Mr. Rossides also suggested that "the information obtained under title IV would in part duplicate information obtainable under other provisions of the bill which will achieve many of the

enforcement of the BSA – was not enacted into law.[31]  And as discussed above, none of the amendments to the BSA since 1970 have given the SEC any such authority.

**B.      Using Rule 17a-8 to Manufacture SEC Enforcement Authority Over Violations of the SAR Rules and Substantive Authority Over Other BSA Requirements Is Contrary to Congressional Intent and Makes No Sense.**

53.      In its report, Navigant asserts in a conclusory manner that because the SEC "is the primary federal regulator of broker-dealers," it also has authority to enforce SAR regulations as against broker-dealers through Rule 17a-8, which the SEC promulgated under Section 17(a) of the Exchange Act and adopted in 1981.[32]  But consistent with the history and construct of the BSA itself, as amended, there are no provisions of the Exchange Act that authorize the SEC to establish or enforce money laundering rules.  Navigant's attempt to propound Rule 17a-8 as a means of creating BSA enforcement authority for the SEC where none otherwise exists should be rejected.

**1.      The SEC Reaches Beyond its Delegated Authority Each Time it Imposes or Seeks to Impose Civil Money Penalties for BSA Violations**

54.      As discussed above, the BSA vests authority to issue the BSA's implementing regulations and to bring enforcement actions for violations of those regulations solely in the Secretary of the Treasury.[33]  The Secretary delegated the plenary authority to implement the BSA to FinCEN,[34] a bureau of the Department of Treasury, which inherited and has never

---

same objectives as those sought to be accomplished by title IV, but without the significant drawbacks of this provision."  *Id.* at 157-158.

[31] *Compare* S. 3678, 91st Cong., (1970) and H. R. 15073 91st Cong. (1970) *with* Bank Secrecy Act of 1970, Pub. L. No. 91-508 (enacting only common Titles I-III in the Senate and House bills, while not adopting Title IV of the Senate Bill, which would have given the SEC substantive BSA authority in addition to the Secretary of the Treasury).

[32] Navigant Report at 10.

[33] 31 U.S.C. §§ 5318(g) and (h).

[34] *See* 31 U.S.C. § 310(b)(2)(I); *see also* Treasury Order 180-01 at ¶(3)(a), (b) (July 1, 2014), *available at* https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/to180-01.aspx (authorizing FinCEN, *inter alia*, to "[e]xercise authority for enforcement of and compliance with the regulations at 31 CFR part 103 [since

altered the delegations of examination authority that were conferred on other federal regulatory agencies long before FinCEN was established.

55.     Among those delegations is a rulemaking by which the Secretary authorized the SEC to perform a single BSA function, the examination of broker-dealers, and later mutual funds, "to determine compliance with the requirements of [the BSA]."[35]  That limited delegation of authority to examine for compliance with the BSA conferred on the SEC only (1) the power to *"examine any books, papers, records or other data* of domestic financial institutions relevant to the recordkeeping or reporting requirements of this chapter,"[36] and (2) the duty to make periodic reports to the Director of FinCEN and *to submit "[e]vidence of specific violations of any of the requirements of this chapter"* to the Director of FinCEN.[37]

56.     Consistent with that statutory scheme, FinCEN itself has repeatedly emphasized its enforcement authority and explained the limited extent and purpose of its delegation of "examination" authority.  For example, as explained in a December 2016 report from the Treasury Inspector General:

> FinCEN is responsible for the overall administration and enforcement of the BSA. FinCEN delegated BSA compliance examination authority to the Federal banking agencies, the U.S. Securities and Exchange Commission, the Commodities Futures Trading Commission, and the Internal Revenue Service (IRS).  These regulators, in addition to securities and futures and self-regulatory organizations and State agencies, use their independent authorities to examine entities under their supervision for compliance with the BSA.  FinCEN, however, retains

---

renumbered to 31 CFR chapter X] with respect to the activities of agencies exercising authority thereunder that has been redelegated to such agencies by FinCEN . . . ."); 31 C.F.R. § 1010.810(a) (stating "[o]verall authority for enforcement and compliance, including coordination and direction of procedures and activities of all other agencies exercising delegated authority under this chapter, is delegated to the Director, FinCEN.").  FinCEN also retained the exclusive "[a]uthority for the imposition of civil penalties for violations of" the BSA and its implementing regulations.  *See id.* § 1010.810(a), (d); Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed. Reg. at 11,436, 11,440 (April 8, 1987), *available at* http://cdn.loc.gov/service/ll/fedreg/fr052/fr052067/fr052067.pdf (relevant discussion in response to comment 19).

[35] 31 C.F.R. § 1010.810(b).

[36] *Id*. at § 1010.810(f) (emphasis added).

[37] *Id*. at § 1010.810(e) (emphasis added).

enforcement authority, including authority to impose CMPs [civil monetary penalties] for violations.[38]

57.     Notwithstanding that clear statutory scheme, the Navigant Report attempts to blur the delineation of authority between FinCEN and the SEC by stating that "FinCEN has worked closely with both the SEC and FINRA to coordinate guidance and enforcement actions" with respect to the BSA, and that "FinCEN and the SEC have coordinated several parallel enforcement actions."[39]  But unlike the settled parallel actions cited in the Navigant Report where public releases indicate that the assessments were made by the SEC in conjunction with FinCEN (*e.g.*, Navigant Report at 11 n.25, citing Pinnacle Capital Markets LLC and In the Matter of Oppenheimer & Co.), which is consistent with FinCEN administering the BSA and effectively controlling its interpretation, here FinCEN has not been involved.  Indeed, the SEC has admitted that FinCEN's views on the instant case are unknown.  Notably, moreover, both of the referenced actions were settled matters, and FinCEN's Assessment of Civil Money Penalty in these actions indicate that it is FinCEN assessing the stipulated penalty under the BSA.[40] Significantly, the SEC can point to no concurrent authority to substantively administer the BSA with the Secretary of the Treasury.  But even if Navigant's vague assertions are assumed to be true, mere coordination between FinCEN and the SEC regarding BSA-related matters does *not* mean that a different agency can act unilaterally to construct, develop and pursue claims predicated on purported violations of the BSA.[41]

---

[38] Office of Inspector General, Dep't. of Treasury, OIG-17-016, FinCEN Needs to Improve Administration of Civil Monetary Penalty Cases, at 3-4 (Nov. 16, 2016), *available at* https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-17-016.pdf.

[39] Navigant Report at 10-11 & n.25.

[40] *See In re Pinnacle Capital Markets, LLC*, FinCEN No 2010-4 at 8 (Aug. 26, 2010); *In re Oppenheimer & Co.* No. 2015-01 at 14 (Jan. 27, 2015).

[41] *See generally* Office of Inspector General, Dep't. of Treasury, *Audit Report: FinCEN Needs to Improve Administration of Civil Monetary Penalty Cases* at 9-10 (Nov. 16, 2016), *available at* https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-17-

58.     Indeed, as the Navigant Report acknowledges, the SEC is required to make periodic reports to FinCEN regarding the results of BSA compliance examination activities, in accord with FinCEN's retention of enforcement authority over BSA-related violations.[42]  In fact, a common feature of FinCEN's information sharing MOUs—including both the MOU that FinCEN negotiated with the SEC and the subsequent Information Sharing MOU that I negotiated with FinCEN while at the CFTC—is that they contain a jurisdictional section setting forth the bases of FinCEN's examination and enforcement authority under the BSA.  Each has a clause stating that Treasury "*has delegated BSA examination authority, but not enforcement authority*" to its federal agency counterparty.[43]  Moreover and in any event, FinCEN lacks the authority to give enforcement power to the SEC unless expressly authorized to do so by law.[44]  No such law exists, and in fact, the one provision of the BSA that permits Treasury to delegate enforcement authority **excludes** the SEC.[45]

### 2.     The Exchange Act Contains No Authority to Adopt or Enforce Substantive AML Regulations

59.     The Exchange Act, by its terms, could not even confer on the SEC the authority to regulate the matters covered by the BSA.  It permits the SEC to regulate the market for

---

016.pdf (providing that although "cases were worked cooperatively with other regulators . . . relying on examination and other supervisory documentation to support the assessments[,] FinCEN could have supported its enforcement decisions regardless of whether a case was concurrent because FinCEN has separate enforcement authority.").

[42] Navigant Report at 11.

[43] *See, e.g.,* Memorandum of Understanding between FinCEN and the Federal Banking Regulators, *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/fincen_docs/memo_understand_sept04.pdf, at 2 (emphasis added); *see also* Joint Release 2006-217, SEC and FinCEN Sign Information Sharing Agreement (Dec. 21, 2006), *available at* https://www.sec.gov/news/press/2006/2006-217.htm (noting that the FinCEN-SEC information sharing MOU "is consistent with those that FinCEN has reached with the federal banking agencies and the Internal Revenue Service").

[44] *See* Treasury Order 180-01 at ¶4(b) ("The Director of FinCEN may redelegate any authority vested in the Director to an officer or employee of an agency other than the Treasury Department, when authorized by law.")

[45] 13 U.S.C. § 5321.

"securities," but not currency,[46] which historically is the focus of the BSA.  The Exchange Act does not endow the SEC with any investigative, injunctive, and other enforcement authority beyond the provisions of U.S. Code Title 15 and the rules or regulations adopted to implement it.[47]  Likewise, the only rulemaking authority conferred on the SEC by the Exchange Act is the "power to make such rules and regulations as may be necessary or appropriate to implement the provisions of *this chapter*… or for the execution of the functions vested in [it] by this chapter."[48]  Neither the Exchange Act (located in Title 15) nor the BSA (located in Title 12 (for banks) and Title 31 (for all financial institutions)) contain any cross-provisions that would authorize the SEC to administer or enforce the provisions of Title 12, or otherwise perform Treasury's authorized functions, or vice versa.

60.    Navigant's assertion that, through its adoption of Rule 17a-8 in 1981, the SEC effectively required broker-dealers to comply with any and all recordkeeping and reporting obligations under the BSA in perpetuity is blatantly wrong.[49]  Significantly, the statutory basis cited by the SEC is a public interest clause that limits the SEC's recordkeeping and reporting rules to "furtherance of the purposes of this chapter,"[50] specifically chapter 2B of title 15 of the

---

[46] *See* Section (3)(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10) ("[t]he term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture… any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency… *but shall not include currency or any note, draft, bill of exchange, or banker's acceptance, which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited*") (emphasis added).

[47] *See, e.g.*, 15 U.S.C. § 78u(a) and (d)(3)(A).

[48] 15 U.S.C. § 78w(a) (emphasis added).  Section 23(a)(1) of the Securities Exchange Act of 1934, Pub. L. 73-291 contained substantially similar authority and provides "The Commission, the Board of Governors of the Federal Reserve System, and the other agencies enumerated in Section 78c(a)(34) of this title shall each have power to make such rules and regulations as may be necessary  . . . for the execution of the functions vested in them by this chapter, and may for such purpose classify persons, securities, transactions, statements, applications, reports, and other matters within their respective jurisdictions."

[49] Navigant Report at 10.

[50] 15 U.S.C. § 78q(a)(1).

U.S. Code, in which the Exchange Act has been codified.  Promulgation and enforcement of

AML provisions is not within the purposes of that chapter.

61.     It is apparent, from the cited public interest clause, that the Exchange Act is in

large measure an investor protection statute.  Moreover, Congress established the necessity for

Exchange Act regulation in 1934, long before regulating currency transactions and AML

practices of financial institutions was envisioned and adopted in the BSA.[51]

62.     In contrast, the Bank Secrecy Act's purpose is "to require certain reports or

records where they have a high degree of usefulness in criminal, tax, or regulatory investigations

or proceedings, or in the conduct of intelligence or counterintelligence activities, including

analysis, to protect against international terrorism."[52]  Relatedly, AML programs are not meant to

provide investor protection, but rather are required to be established to "guard against money

laundering through financial institutions,"[53] thereby protecting the integrity of the financial

system from financial crime and other illicit activity.[54]  The authority to require financial

institutions to adopt an AML program and maintain reports and records related to money

laundering cannot be inferred from the statement of necessity that is contained in the Exchange

Act.

63.     Simply put, the purposes and necessity for the Exchange Act and the BSA are

wholly inapposite.

---

[51] *See* section 2 of the Exchange Act of 1934, Pub. L. No. 73-291 (original adoption) and *compare* section 2 of the Exchange Act, 15 U.S.C. § 78b (2018).

[52] 31 U.S.C. § 5311.

[53] 31 U.S.C. § 5318(h).

[54] For example, 31 U.S.C. § 312 established the Office of Terrorism and Financial Intelligence within the Department of the Treasury ("OTFI"), which is a member of the U.S. intelligence community and of which FinCEN is a component, and established among OTFI's other functions enumerated at § 312(a)(4), "combating financial crimes, including money laundering, counterfeiting, and other offenses threatening the integrity of the banking and financial systems."

### 3.    There is a Proper, Limited Purpose, for Rule 17a-8

64.    In short, contrary to the conclusions reached in the Navigant Report, the SEC does not now have, nor has it ever had, any authority to bring BSA enforcement actions for purported SAR violations through Rule 17a-8.  Neither the SEC nor Navigant can point to any law indicating Congressional intent to give to the SEC directly—or indirectly to permit Treasury or FinCEN to delegate to the SEC —substantive authority to issue regulations, interpretations, or enforcement policy with respect to the BSA, and express provisions of the BSA are to the contrary.  The BSA's civil penalty authority excludes the SEC.[55]

65.    This does not mean that the SEC was without any authority to adopt Rule 17a-8 in 1981 or to employ it for its intended purposes at present.  Rule 17a-8 was adopted almost entirely to implement the delegation of examination authority it received from the Secretary in 1972.  As the SEC described when it adopted Rule 17a-8, the rule was meant:  (1) to provide notice to broker-dealers that the SEC would be examining for BSA compliance as the delegated agent of the Secretary of the Treasury,[56] (2) to clarify the examination authority of the SROs subject to the SEC's oversight,[57] and (3) to ensure that the documents required to be kept under the recordkeeping provisions of the Exchange Act and the BSA would be subject to the longest

---

[55] 31 U.S.C. § 5321.

[56] *See* Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 61,454 (Dec. 17, 1981), in which the SEC stated in its final rulemaking:

> According to the Currency Act, the Treasury is responsible for implementing and administering the reporting and recordkeeping requirements of the Currency Act. With respect to securities brokers and dealers, the Treasury has delegated to the Commission the responsibility for assuring compliance with the Currency Act and Treasury regulations.

> The most effective means of enforcing compliance with the reporting and recordkeeping requirements is through on-site examinations of broker-dealer firms conducted by the Commission and the self-regulatory organizations (the "SROs").

(Internal citation omitted); *see also* Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 44,775 (Sep. 8, 1981) (same).

[57] *See* Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 61,454; Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 44,775; *see also* 15 U.S.C. §§ 78o-3 and 78f(b)(1).

applicable retention period.[58]  The third purpose of Rule 17a-8 recognized explicitly that the Exchange Act and BSA, and the regulations implementing them, contained similar recordkeeping requirements, but that those requirements were subject to two different statutory schemes.

66.     The SEC's interpretation today of Rule 17a-8 goes beyond Congressional and agency intent.  Indeed, if the SEC's interpretation today were correct, the Rule would have been required to undergo notice and comment under the APA on the subject of whether and to what extent the SEC has authority to bring BSA enforcement actions for purported SAR violations through Rule 17a-8.  The Rule, however, plainly was not subject to notice and comment on that subject.  Nor, in fact, did the Commission, when the rule was amended in 2002, even issue any statement advising firms of its claim that the rule now required compliance with SAR requirements.  In short, the SEC's and its expert's interpretation of Rule 17a-8 is invalid under the APA.

### 4.     The Limitations on the SEC's BSA Authority Were Addressed by Congressional Action in 1999

67.     Finally, the limitations of Rule 17a-8 under both the BSA and Exchange Act were reinforced in 1999, when Congress for the first time addressed BSA compliance in the Exchange Act itself.  When, as part of the Gramm-Leach-Bliley Act, the Exchange Act was amended to grant to the SEC substantive authority to regulate newly established Investment Bank Holding Companies,[59] the BSA authority granted by Congress to the SEC over these entities was strictly

---

[58] *See* Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 44,775 ("[W]here an Exchange Act rule and Treasury regulation require the retention of identical records for varying periods of time, brokers and dealers would be required to retain the records for the longer period of time so as to satisfy the requirements of both the Exchange Act and the Currency Act."); Recordkeeping by Brokers and Dealers , 46 Fed. Reg. 61,454 (same).

[59] *See* Gramm-Leach-Bliley Act, Pub. L. No. 106-102 § 231(a)(i)(3)(A), (C)(i)(II), (C)(ii), (C)(iii), 113 Stat. 1338 (1999)(amending section 17 of the Exchange Act, 15 U.S.C. § 78q, by inserting the authority of the SEC to supervise investment bank holding companies).

limited to compliance examinations.  Specifically, the SEC's authority was limited to, in

pertinent part:

> (i) Supervision of investment bank holding companies.
>      (A) Recordkeeping and reporting.
>           (i) In general. Every supervised investment bank holding company and
> each affiliate thereof shall make and keep for prescribed periods such records,
> furnish copies thereof, and make such reports, as the Commission may require by
> rule, in order to keep the Commission informed as to--
>                                    *        *        *
>      "(C) Examination authority.
>           (i) Focus of examination authority. The Commission may make
> examinations of any supervised investment bank holding company and any
> affiliate of such company in order to--
>                                    *        *        *
>           "(II) monitor compliance with the provisions of this subsection,
> provisions governing transactions and relationships between any broker or dealer
> affiliated with the supervised investment bank holding company and any of the
> company's other affiliates, and applicable provisions of subchapter II of chapter
> 53, title 31, United States Code (commonly referred to as the "*Bank Secrecy Act*")
> and regulations thereunder.
>           "(ii) Restricted focus of examinations. The Commission shall limit the
> focus and scope of any examination of a supervised investment bank holding
> company to--
>           "(I) the company; and
>           "(II) any affiliate of the company that, because of its size, condition, or
> activities, the nature or size of the transactions between such affiliate and any
> affiliated broker or dealer, or the centralization of functions within the holding
> company system, could, in the discretion of the Commission, have a materially
> adverse effect on the operational or financial condition of the broker or dealer.
>           "(iii) Deference to other examinations. For purposes of this subparagraph,
> the Commission shall, to the fullest extent possible, use the reports of examination
> of an institution described in subparagraph (D), (F), or (G) of section 2(c)(2), or
> held under section 4(f), of the Bank Holding Company Act of 1956 made by the
> appropriate regulatory agency, or of a licensed insurance company made by the
> appropriate State insurance regulator.  (*Emphasis added*.)

Investment Bank Holding Companies were abolished by the Dodd-Frank Wall Street Reform and

Consumer Protection Act of 2010.[60]

---

[60] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 § 617(a), 124 Stat. 1376 (Jul. 21, 2010).

68.     Before GLBA and after Dodd-Frank, the SEC was not granted any express

authority in the Exchange Act with respect to the BSA.

69.     In sum, the SEC cannot point to any act of Congress indicating Congressional

intent to give to the SEC substantive authority to adopt regulations, interpretations, or

enforcement policy with respect to the BSA.  It cannot do so either under authority contained in

the BSA itself, or as an ancillary matter through the Exchange Act, as Exchange Act rulemaking

authority limits the SEC to "mak[ing] such rules and regulations as may be necessary or

appropriate to implement the provisions of *this chapter*… or for the execution of the functions

vested in [it] *by this title*."[61]   (The Exchange Act may be found in title 15 of the U.S. Code, while

the Bank Secrecy Act may be found in titles 12 and 31 of the U.S. Code.)  In any event, no

notice was given of the SEC's intent to use 17a-8 for the purpose now proposed.

### C.     Unlike the SEC, Federal Banking Agencies Have Independent Statutory Authority to Promulgate and Enforce BSA-Related Regulations.

70.     Congressional incorporation of the federal banking agencies into the BSA

statutory scheme highlights the deficiencies in the SEC's claim that it can lawfully conduct

"parallel enforcement actions."[62]   In fact, Congress has expanded the authority of other

agencies—but not the SEC.  Unlike its treatment of the SEC, Congress specifically provided

federal banking agencies with independent statutory authority to prescribe BSA-related

regulations and undertake enforcement activity for BSA-related violations.

71.     For example, with respect to rulemaking authority, Congress expressly authorized

federal banking agencies to issue regulations "requiring insured depository institutions to

establish and maintain procedures reasonably designed to assure and monitor the compliance of

---

[61] 15 U.S.C. § 78w(a) (*emphasis added*).  Section 23(a) of the Securities Exchange Act of 1934, Pub. L. 73-291 contained substantially similar authority.

[62] *See* Navigant Report at 11.

such depository institutions with the requirements of [the BSA]."[63]  Consistent with that clearly

expressed authority, federal banking agencies have in fact prescribed such regulations.[64]

72.       Similarly, with respect to enforcement authority, Congress has given federal

banking agencies independent statutory authority to take remedial action against an insured

depository institution for failure to comply with the federal banking agencies' regulations

implementing the BSA.[65]  Specifically, federal banking agencies are expressly permitted to issue

cease and desist orders to any insured depository institution found to have violated 12 U.S.C. §

1818(s) or any regulation prescribed thereunder.[66]  Federal banking agencies have express

authority to issue civil money penalties against any insured depository institution that violates

such cease and desist orders.[67]

---

[63] 12 U.S.C. § 1818(s).

[64] *See* 12 C.F.R. § 208.63, 12 C.F.R. § 211.5(m), and 12 C.F.R. § 211.24(j) (Federal Reserve); 12 C.F.R. § 326.8 (FDIC); 12 C.F.R. § 748.2 (NCUA); 12 C.F.R. § 21.21 (OCC).

[65] 12 U.S.C. § 1818(s)(3) ("If the appropriate Federal banking agency determines that an insured depository institution—(A) has failed to establish and maintain the procedures described in paragraph (1); or (B) has failed to correct any problem with the procedures maintained by such depository institution which was previously reported to the depository institution by such agency, the agency shall issue an order . . . requiring such depository institution to cease and desist from its violation of this subsection or regulations prescribed under this subsection.").

[66] *See id.*

[67] *See* 12 U.S.C. § 1818(i).  (granting the federal banking regulators the authority to issue civil money penalties against "any insured depository institution . . . who - (i) violates any law or regulation; (ii) violates any final order or temporary order issued pursuant to subsection . . . (s) . . .; (iii) violates any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or other request by the depository institution or institution-affiliated party; or (iv) violates any written agreement between such depository institution and such agency.")  Notwithstanding that grant of express statutory authority, however, the federal banking agencies view their civil money penalty authority as being concurrent with FinCEN's overall authority for enforcement of and compliance with the BSA.  As a result, in practice, the federal banking agencies typically issue a cease and desist order and refer the matter to FinCEN for the issuance of a civil money penalty for such BSA violations.  *See, e.g.,* FinCEN Assessment of Civil Money Penalty 2013-01, In the Matter of: TD Bank, N.A., (Sept. 22, 2013), *available at* https://www.fincen.gov/sites/default/files/enforcement_action/TD_ASSESSMENT_09222013.pdf ("To resolve this matter, and only for that purpose, TD Bank consents to the assessment of a civil money penalty in the sum of $37.5 million. This ASSESSMENT shall be concurrent with the assessment of a civil money penalty, in the amount of $37.5 million, by the OCC, and shall be satisfied by one payment of $37.5 million to the Department of the Treasury.").

73.     By imbuing banking agencies with that authority, Congress has demonstrated the proper way another agency would be empowered to enforce provisions of the BSA, and it has declined to confer that authority on the SEC.

**D.     The Role of FINRA in the BSA Regulatory Scheme Has Been Significantly Over-Represented in the Navigant Report.**

74.     In its discussion of the SAR regulatory framework, the Navigant Report touts FINRA's role as a key player in the regulatory scheme.  To that end, the Navigant Report claims that "FINRA has been delegated the authority to approve AML programs," and that FINRA's Small Firm Template was "reviewed and approved" by FinCEN and therefore "is probative of whether a firm's [AML] program complies with the BSA."[68]  But that overstates dramatically FINRA's place and scope of authority in the BSA regulatory landscape.

75.     By way of background, FINRA's existence traces back to the Maloney Act of 1938, an amendment to the Exchange Act that authorized the SEC to register national securities associations, which permitted the establishment of the NASD with authority to self-regulate certain securities markets subject to SEC oversight.[69]  In mid-2007, FINRA was created when the SEC approved consolidation of the NASD and the member regulation, enforcement and arbitration operations of the New York Stock Exchange.[70]

76.     As an SRO, FINRA has its own rules that member organizations are required to follow.  FINRA is not, however, a peer regulatory bureau or agency with FinCEN or the SEC.  Rather, as stated in the release announcing its creation, FINRA is "the largest *non-governmental*

---

[68] Navigant Report at 10-11, 19.

[69] 15 U. S. C. §§ 78o-3, 78q(a), 78cc(a), 78ff (2012).

[70] FINRA, NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority – FINRA, (July 30, 2007), *available at* http://www.finra.org/newsroom/2007/nasd-and-nyse-member-regulation-combine-form-financial-industry-regulatory-authority.

regulatory organization for securities brokers and dealers doing business in the United States."[71]

It is a private corporation organized under the laws of Delaware, and its activities as an SRO are

subject to SEC oversight.[72]

### 1. FINRA's Role in the BSA Scheme was Expressly Limited to the Performance of SRO Functions

77.     The SEC's expert witness may be basing her outsized assertions of FINRA's role

on the AML rule FinCEN adopted as an interim final rule in 2002.[73]  FINRA adopted its own

AML program rule applicable to broker-dealers, pursuant to FinCEN regulations, which deems

that a broker dealer who complies with this rule meets the FinCEN requirements "provided that

the rules, regulations, or requirements of the self-regulatory organization governing such

programs have been made effective under the Securities Exchange Act of 1934 by the

appropriate Federal functional regulator in consultation with FinCEN."[74]

78.     FinCEN recognized the role that the SROs would play in the BSA compliance

examination scheme and was persuaded to permit the SROs to adopt AML rules applicable to

their members.  FinCEN agreed, but only if the SROs would limit their rulemakings to the four

structural pillars of an AML program,[75] and to otherwise provide that broker-dealers would be

obligated to comply with the BSA and its substantive regulations, which would be implemented,

---

[71] *Id.* (emphasis added).

[72] *See* FINRA, FINRA Manual: Corporate Organization; Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc. *available at*
http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4589.

[73] *See* FinCEN Interim Final Rule, Anti-Money Laundering Programs for Financial Institutions, 67 Fed. Reg. 21110, 21111 (Apr. 29, 2002) *available at*  https://www.sec.gov/about/offices/ocie/aml2007/67fr21110.pdf  ("Following consultation between Treasury and the SEC, the two principal securities industry SROs have each adopted a rule requiring their members to implement anti-money laundering programs.  These rules, which incorporate the requirements of section 5318(h)(1), apply to essentially all securities broker-dealers that do business with the public and were approved by the SEC on April 22, 2002." (internal citations omitted)).

[74] 31 C.F.R. § 1023.210(c) (2016).

[75] *See* 31 U.S.C. § 5318(h) (2012).

interpreted, and enforced by FinCEN.[76]  Once the SRO structural rules for AML programs were

established, FinCEN adopted the substantive regulations that would be incorporated into the

AML program structure.[77]

> ## 2. FINRA Was Not Delegated Authority to Approve AML Programs, Nor Was it Delegated any Other Substantive Authority

79.     Navigant's unsupported statement that FINRA has been "delegated authority to

approve AML programs" is flatly incorrect.[78]  There are no provisions of the BSA that authorize

the SEC or FinCEN to approve AML programs, nor are there any provisions of the Exchange

Act or the BSA that would permit the SEC or FinCEN to delegate any such regulatory authority

---

[76] *See, e.g.,* FINRA Rule 3310, *available at*
http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=8656 (SRO Rule applicable to
securities broker-dealers) and NFA Compliance Rule 2-9(c), *available at*
https://www.nfa.futures.org/rulebook/rules.aspx?RuleID=RULE%202-9&Section=4 (SRO rule applicable to the
futures industry); *compare* 12 C.F.R. § 21.21 (Office of the Comptroller of the Currency), 12 C.F.R. § 208.63
(Board of Governors of the Federal Reserve System); 12 C.F.R. § 326.8 (Federal Deposit Insurance Corporation);
12 C.F.R. § 390.354 (same); 12 C.F.R. § 563.17 (Office of Thrift Supervision, to be removed from the C.F.R.
effective Oct. 11, 2018); and 12 C.F.R. § 12 C.F.R. 748.2 (National Credit Union Administration).

[77] *See* Order Approving Proposed Rule Changes Relating to Anti-Money Laundering Compliance Programs, 67 Fed.
Reg. 20,854 (Apr. 26, 2002), *available at https://www.sec.gov/about/offices/ocie/aml2007/34-45798fr.pdf* (SEC
approval of AML rules adopted by the NYSE (Rule 445) and NASD (Rule 3011)); Anti-Money Laundering
Programs for Financial Institutions, 67 Fed. Reg. 21,110, 21,111 (Apr. 29, 2002), *available at*
https://www.gpo.gov/fdsys/pkg/FR-2002-07-01/pdf/02-16416.pdf; Amendment to the Bank Secrecy Act
Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg.
44,048 (Jul. 1, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-07-01/pdf/02-16416.pdf; Customer
Identification Programs for Broker-Dealers, 68 Fed. Reg. 25,113 (May 9, 2003), *available at*
https://www.gpo.gov/fdsys/pkg/FR-2003-05-09/pdf/03-11017.pdf (jointly issued by FinCEN and the SEC); Special
Due Diligence Programs for Certain Foreign Accounts, 71 Fed. Reg. 496 (Jan. 4, 2006), *available at*
https://www.gpo.gov/fdsys/pkg/FR-2003-05-09/pdf/03-11017.pdf, 71 Fed. Reg. 16040 (Mar. 30, 2006), *available at*
https://www.sec.gov/about/offices/ocie/aml2007/71fr16040-42.pdf; and Special Due Diligence Programs for Certain
Foreign Accounts, 72 Fed. Reg. 44,769 (Aug. 9, 2007), *available at* https://www.gpo.gov/fdsys/pkg/FR-2007-08-
09/pdf/E7-15467.pdf.

[78] Navigant Report at 19.  The SEC's expert witness's failure to cite any supporting authority for such a foundational
statement makes the point particularly puzzling and suggests that Navigant may be confusing a separate BSA rule
requiring firms to establish written AML programs approved by the firm's senior management.  *See* 31 C.F.R. §
1023.210 (2016).  Even then, however, the rule makes clear that the written AML program approved by the firm's
management must also comply with SRO rules and regulations governing such programs, but *only if* those rules
"have been made effective under the Securities Exchange Act of 1934 by the appropriate Federal functional
regulator *in consultation with FinCEN*." *Id.* at § 1023.210(c) (emphasis added).  Accordingly, any suggestion that
this rule confers upon FINRA any independent authority to approve AML programs is off base.

to a private corporation such as FINRA.[79]  The statements of the BSA and FinCEN are nothing other than an acknowledgement that the SRO has, under the auspices of its agreement with its members, established certain AML program requirements that are to be administered and enforced by that SRO.

80.     Even if the SEC had substantive BSA rulemaking or enforcement authority (which, as discussed above, it does not), the SEC would not have the power to delegate that authority to FINRA.[80]  And even if Treasury  had attempted to delegate substantive BSA rulemaking or enforcement authority to FINRA, nothing in the BSA authorizes the Secretary of Treasury to delegate such authority to a private company.[81]

---

[79] The limited role Congress intended for SROs in the AML/BSA regulatory scheme was reinforced by amendments to the SAR confidentiality provisions in the BSA enacted as part of the USA PATRIOT Act.  *See* 31 U.S.C. § 5318(g)(2) (2012).  As interpreted in FinCEN's SAR regulations – adopted after consultation with the SEC and CFTC – the confidentiality provisions enacted by Congress do not envision SROs having access to SARs other than during the examination process.  *See* 31 CFR §§ 103.17(e) and (g), 103.19(e) and (g) (2003).  *See also* S. Rep. No. 94-75 at 21-23 considering the Securities Acts Amendments of 1975, which expanded, *inter alia,* Securities and Exchange Commission authority over self-regulatory organizations, warned of "a common and serious misunderstanding of the nature and limits of the concept of self-regulation").

[80] *See* 15 U.S.C. § 78d-1 (2012) (SEC can delegate authority for its functions "to a division of the Commission, an individual Commissioner, an administrative law judge, or an employee or employee board, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter"); *see also* 15 U.S.C. 78o-3 (2012)(SEC is limited to conducting oversight over the SROs).

[81] Moreover, to the extent the SEC or Treasury ever attempted to delegate such authority to FINRA by contract or rule, FINRA would thereby become a "state actor," necessitating a wholesale change in FINRA's current practices, given the Constitutional and other protections required of a government agency when conducting compliance examinations, undertaking disciplinary actions, and engaging with witnesses, among other things.  *See, e.g.*, *Desiderio v. Nat'l Ass'n of Sec Dealers, Inc.*, 191 F. 3d 198, 206 (2d Cir. 1999), *cert. denied* 531 U.S. 1069 (2001) ("NASD is a private actor, not a state actor.  It is a private corporation that receives no federal or state funding.  Its creation was not mandated by statute, nor does the government appoint its members or serve on any NASD board or committee"); *Jones v. U.S. Sec. & Exch. Comm'n*, 115 F. 3d 1173, 1180-83 (4th Cir. 1997), *cert. denied* 523 U.S. 1072 (1998) (an NASD disciplinary order "amounts to a final, internal order sanctioning [a member or an associated person] for violating the NASD's established rules.  [A Commission] action, in contrast, is a public, administrative proceeding designed. . . . to vindicate the public interest as determined by an agency of government created by Congress to enforce the securities laws. . . .[Commission review] over NASD disciplinary action… does not convert the NASD's interest into the same interest as that of the regulating agency… NASD is a closely regulated corporation, it is not a governmental agency"); *see also* S. Rep. No. 94-75 at 21-23 (considering the Securities Acts Amendments of 1975, which expanded, *inter alia,* Securities and Exchange Commission authority over self-regulatory organizations, warned of "a common and serious misunderstanding of the nature and limits of the concept of self-regulation").

### 3.      The FINRA AML Template Was Not Approved by FinCEN

81.     Likewise, Navigant's suggestion that "FinCEN reviewed and approved FINRA's Small Firm Template for AML programs," thus making it "probative of whether a firm's program complies with the BSA," is misleading at best.[82]  As an initial matter, the template and updates that FINRA published in 2004, 2010, and 2018 do not contain any representations that FinCEN approved the template.  Nor am I aware of any FinCEN releases indicating that FinCEN approved any of the FINRA templates.[83]  To the contrary, my own experience while at FinCEN confirms that FinCEN did not approve, and in fact criticized, FINRA's proposed template.

82.     In 2008, I was one of several recipients at FinCEN of a request from FINRA's Office of General Counsel (on which SEC's expert witness also was copied) to provide comments to a proposed update to FINRA's Small Firm Template.  In my position as Regulatory Policy Officer, I led a review team at FinCEN and prepared a submission to FINRA in response to that request.  Among other things, the response from FinCEN that I drafted and sent to FINRA (on which SEC's expert witness again was a copied recipient) was highly critical of the proposed updated template for several reasons.  For example, FinCEN's policy staff commented that FINRA misstated numerous FinCEN regulations; frequently cited policy, but failed to give examples of any possible procedures or controls; failed to give sufficient guidance on the ways a small firm could structure a program, combining policies, procedures, and controls to comply with multiple rules for efficiency; and failed to sufficiently disclose that certain provisions of the BSA and FinCEN's regulations that could be adopted voluntarily were not mandatory.

---

[82] Navigant Report at 11, 19.

[83] Indeed, FinCEN approval would not be appropriate because there is no relationship between FinCEN and FINRA.  Only the SEC, not FinCEN, has statutory authority to provide oversight over SROs in the securities industry.  *See* Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97; Luis A. Aguilar, Commissioner U.S. Sec. & Exch. Comm'n Public Statement on the Need for Robust SEC Oversight of SROs (May 8, 2013) (transcript available at https://www.sec.gov/news/public-statement/2013-spch050813laahtm).

83.     Put simply, I know first-hand that the communication from FINRA to FinCEN did not request "approval" of FINRA's template and, if requested, FinCEN would have declined to do so.  Moreover, FINRA was not obligated to adopt FinCEN's comments, and it is not clear that FINRA ever revised the template to address FinCEN's commentary.  In any event, regardless of whether a broker-dealer's compliance with FINRA's Firm Template is "probative" of compliance with the BSA insofar as FinCEN deems such compliance to be sufficient,[84] the reverse is *not* true.  Non-compliance with the Small Firm Template is not tantamount to a BSA violation – FINRA has no authority to override FinCEN's guidance and determinations regarding the meaning of, and sufficient means of complying with, the BSA and its implementing regulations.

## II.     SAR Filing Requirements

### A.     Overview of the SEC's Expert Witness's Perspective Regarding SAR Filing Requirements

84.     Fundamentally, the SEC's expert witness's view regarding SAR filing requirements appears to be that when a broker-dealer is alerted to a potential red flag regarding customer activity in the context of microcap or penny stocks, the firm is required to file a SAR, and to include in the SAR narrative every possible red flag the firm knows or should have known about that customer, the transaction, the issuer, the security and its trading history, and whether there is any foreign involvement whatsoever.[85]  That view ignores the SAR regulations themselves, as well as the well-established SAR-filing principles and practice, particularly with respect to clearing firms, and it depends for its validity on cherry-picked guidance, settled (not litigated) disciplinary actions, a skewed view of the penny stock and microcap spaces, and the

---

[84] Navigant Report at 19.

[85] *See* Navigant Report at 52-64.

supposed inability of users of the SAR database to understand the purpose and content of the SAR filing.

85.     The SEC's expert witness's view also appears to be premised on a misunderstanding of the purpose and uses of SARs.  The SEC's expert witness's discussion on those topics leads the reader to believe that it is the obligation of a BSA-regulated entity, when filing a SAR, to include in the SAR narrative highly detailed information, which often may be irrelevant to the reason for filing a SAR, that either may be available to law enforcement from the SAR documentation that is deemed to have been filed with the SAR or that law enforcement, including securities regulators, is more than equipped, and in a better position, to obtain and analyze.

86.     Contrary to the SEC's expert witness's opinion, the BSA does not contain provisions that require regulated entities to assume the investigative functions of law enforcement.  Instead, the primary purpose of SARs is merely to provide law enforcement with information or leads that may cause it to commence investigations into possible unlawful activity and a means by which to "follow the money" in an investigation.  This balanced approach is a result of a Congressional recognition of costs and benefits, and reflects the basic fact that financial institutions are not law enforcement experts.

87.     The emphasis that the SEC's expert witness appears to place on the SAR reports is overstated.  Significantly, there are numerous exclusions to the SAR reporting requirements. These exclusions include, for example, any activity that does not meet the $5,000 threshold, any information that a broker-dealer is required to and does report on a Form U4 (the Uniform Application for Securities Industry Registration or Transfer) or Form U5 (Uniform Termination Notice for Securities Industry Registration), "a robbery or burglary committed or attempted of

39

the broker-dealer that is reported to appropriate law enforcement authorities," as well as any lost, missing, counterfeit, or stolen securities with respect to which the broker-dealer files a report pursuant to reporting requirements implemented under the Exchange Act.

88.   Each of these exclusions was adopted to ease the regulatory burden on broker-dealers, and also to accommodate previously adopted regulatory requirements of the SEC and the SROs.  Each of these exclusions demonstrates that, contrary to the extraordinary weight on which the SEC's expert witness places on SARs and their contents, they are not nor should they be considered to be a substitute for the investigative powers of law enforcement and regulatory agencies including, for example, the market surveillance capabilities of the SEC.  Rather, they are meant to be a supplement.

89.   It appears that the SEC's expert witness's view of the SAR filing requirements is based on policy considerations—a highly subjective standard of "what might help law enforcement"—that are not considerations or standards that have been established in the rule itself and that have been inflated far beyond what the SAR regulations require.   Simply put, as set forth in greater detail below, the SEC's expert witness's view regarding SAR-filing requirements ultimately does not comport with FinCEN's long-standing regulations, interpretations of those regulations, enforcement philosophy, or practices.

90.   Implementing the SEC's expert witness's considerations also would result in an unworkable SAR filing standard that has significant implications not just for this case, or even just for SEC-regulated entities, but, indeed, quite possibly for all entities subject to SAR-reporting requirements under the BSA.  It additionally would result in profound amounts of irrelevant information clogging the BSA database and making the SAR reports unusable,

because agencies seeking to use the data would not be able to distinguish the red herrings contained in them from pertinent information about the suspicious activity that was reported.

### B.   Legal and Regulatory Framework for SAR Reporting Obligations

91.   Because the SEC's expert witness's presentation of the SAR rule is highly truncated, it is presented here in more detail.  First, the source of the obligation to file SARs is the BSA, as amended by the USA PATRIOT Act, which provides that "the Secretary may require [a] financial institution… to report any suspicious transaction relevant to a possible violation of law or regulation."[86]

92.   SAR reports were first required of banks, for which Treasury adopted a rule in 1996,[87] with rules applicable to money service businesses following in 2000.[88]

93.   After the USA PATRIOT Act amended the BSA in October 2001, broker-dealers and other BSA-defined financial institutions first became subject to the requirement to implement an AML program containing four structural pillars.[89]  Thereafter, FinCEN adopted rules articulating certain components  of the AML program, including the suspicious activity reporting rules,[90] customer identification program rules,[91] and the special due diligence rule for

---

[86] 31 U.S.C. § 5318(g)(1).

[87] Amendment to the Bank Secrecy Act Regulations; Requirement To Report Suspicious Transactions, 61 Fed. Reg. 4326 (Feb. 5, 1996), *available at* https://www.gpo.gov/fdsys/pkg/FR-1996-02-05/pdf/96-2272.pdf.

[88] Amendments to the Bank Secrecy Act Regulations—Requirement that Money Transmitters and Money Order and Traveler's Check Issuers, Sellers, and Redeemers Report Suspicious Transactions, 65 Fed. Reg. 13,683 (Mar. 14, 2000), *available at* https://www.gpo.gov/fdsys/pkg/FR-2000-03-14/pdf/00-5919.pdf.

[89] USA PATRIOT Act § 352.  Thereafter, FinCEN adopted an interim final rule establishing minimum requirements for complying with the AML program requirement.  *See* Anti-Money Laundering Programs for Financial Institutions, 67 Fed. Reg. 21,110 (Apr. 29, 2002), *available at* https://www.sec.gov/about/offices/ocie/aml2007/67fr21110.pdf.

[90] Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44048 (Jul. 1, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-07-01/pdf/02-16416.pdf.

[91] Customer Identification Programs for Broker-Dealers, 68 Fed. Reg. 25,113 (May 9, 2003), *available at* https://www.gpo.gov/fdsys/pkg/FR-2003-05-09/pdf/03-11017.pdf.

correspondent accounts and private banking accounts, all of which were applicable to broker-dealers.[92]

94.     The SAR rules applicable to broker-dealers contain materially the same reporting requirements as the FinCEN SAR rules for other BSA-defined financial institutions.[93]  The broker-dealer SAR rule provides, in pertinent part:

> [E]very [broker-dealer] within the United States… shall file with FinCEN, to the extent and in the manner required by this section, a report of any suspicious transaction relevant to a possible violation of law or regulation. A broker-dealer may also file with FinCEN a report of any suspicious transaction that it believes is relevant to the possible violation of any law or regulation but whose reporting is not required by this section….
>
> A transaction requires reporting under the terms of this section if it is conducted or attempted by, at, or through a broker-dealer, it involves or aggregates funds or other assets of at least $5,000, and the broker-dealer knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):
>
> (i) Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;
>
> (ii) Is designed, whether through structuring or other means, to evade any requirements of this part or of any other regulations promulgated under the Bank Secrecy Act…

---

[92] Special Due Diligence Programs for Certain Foreign Accounts, 71 Fed. Reg. 496 (Jan. 4, 2006), *available at* https://www.gpo.gov/fdsys/pkg/FR-2003-05-09/pdf/03-11017.pdf, 71 Fed. Reg. 16,040 (Mar. 30, 2006), *available at* https://www.sec.gov/about/offices/ocie/aml2007/71fr16040-42.pdf, and 72 Fed. Reg. 44,768 (Aug. 9, 2007), *available at* https://www.gpo.gov/fdsys/pkg/FR-2007-08-09/pdf/E7-15467.pdf.

[93] *See, e.g.,* 31 C.F.R. § 1026.320 (formerly 31 C.F.R. § 103.17) (SAR reporting rule for futures firms, containing the same four prongs as the broker-dealer SAR rule, and the same general exceptions).  In addition, the FinCEN SAR rule for depository institutions is similar, though not identical, to the SAR rule for broker-dealers, but generally will lead to similar filing results, and may be interpreted using the same general regulatory principles.  31 C.F.R. § 1020.320 (formerly 31 C.F.R. § 103.18).  Prior to 1996, banks were required to report suspicious activity using criminal referral forms that were filed with their respective primary federal financial regulator. *See* Proposed Amendment to the Bank Secrecy Act Regulations—Requirement to Report Suspicious Transactions, 60 Fed. Reg. 46,556, 46,557 (Sept. 7, 1995), *available at* https://www.gpo.gov/fdsys/pkg/FR-1995-09-07/pdf/95-22223.pdf.  The current bank SAR rule includes legacy requirements from the criminal referral form, such as, for example, filing a SAR for suspected insider abuse by an employee.  12 C.F.R. § 21.11.

(iii) Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

(iv) Involves use of the broker-dealer to facilitate criminal activity.[94]

95.     Notably, while the SEC's expert witness repeatedly references the "reasonable explanation" language in category (iii) throughout her report, she does not claim that the transactions at issue here triggered that category and instead places virtually all of the allegedly required filings in this case in category (iv).

96.     The broker-dealer SAR rule, in addition to excluding the required reporting of transactions under the $5,000 threshold, also provides for exemptions to the SAR reporting obligation.[95] By way of example, a broker-dealer is generally not obligated to file a SAR when the activity at issue is the subject of information that must be reported to the SROs on Forms U4 and U5.[96]

97.     SARs are required to be filed within 30 calendar days after the date of initial detection of the suspicious activity unless no suspect is identified within that time, in which case the SAR must be filed within 60 days.[97] Subsequent to the adoption of the SAR rules for broker-dealers and other financial institutions, FinCEN has issued guidance on the interpretation of "initial detection," which makes clear that the 30 calendar days timeframe does not run from the

---

[94] 31 C.F.R. § 1023.320(a)(2).

[95] 31 C.F.R. § 1023.320(c).

[96] 31 C.F.R. § 1023.320(c)(2).

[97] 31 C.F.R. § 1023.320(b)(3).

date the suspicious activity was conducted, but rather from the date the suspicious activity was identified and subject to reasonable inquiry.[98]

98.     If a SAR is filed, the SAR rule also requires SAR supporting documentation to be maintained by the filing institution, which, along with the SAR, must be maintained for five years:

> A broker-dealer shall maintain a copy of any SAR[-BD] filed and the original or business record equivalent of any supporting documentation for a period of five years from the date of filing the SAR[-BD]. Supporting documentation shall be identified as such and maintained by the broker-dealer, and shall be deemed to have been filed with the SAR[-BD]. A broker-dealer shall make all supporting documentation available to FinCEN or any Federal, State, or local law enforcement agency, or any Federal regulatory authority that examines the broker-dealer for compliance with the Bank Secrecy Act, upon request; or to any SRO that examines the broker-dealer for compliance with the requirements of this section, upon the request of the Securities and Exchange Commission.[99]

99.     Supporting documentation is defined as "all documents or records that assisted a financial institution in making the determination that certain activity required a SAR filing," which "depends on the facts and circumstances of each filing."[100]  Notably, under FinCEN regulations, SAR supporting documentation is "deemed to have been filed with the SAR."[101] Because the supporting documentation is deemed to have been filed with the SAR, appropriate law enforcement, regulatory, and supervisory agencies are able to acquire them from the filing firm without initiating legal process.[102]

---

[98] *See* FinCEN, *SAR Activity Review*, Issue 14, at 36-38 (October 2008) (*citing* SAR Activity Review – Trends, Tips & Issues, Issue 10, at 44-46), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_14.pdf.

[99] 31 C.F.R. § 1023.320(d).

[100] FinCEN, FIN-2007-G003, Suspicious Activity Report Supporting Documentation at 2 (June 13, 2007), *available at* https://www.sec.gov/about/offices/ocie/amlmf/fin-2007-g003.pdf.

[101] 31 C.F.R. § 1023.320(d).

[102] *See* Amendment to the Bank Secrecy Act Regulations; Requirement to Report Suspicious Transactions, 61 Fed. Reg. 4326, 4330 (Feb. 5, 1996) (final SAR regulation for depository institutions).

100.    Because of certain relationships in the securities industry, particularly those between clearing and introducing brokers, the final rule contained a clause permitting joint SAR filings that had not been contained in the SAR rules adopted in the 1990s.  Specifically, the broker-dealer SAR rule provided that:

> The obligation to identify and properly and timely to report a suspicious transaction rests with each broker-dealer involved in the transaction, provided that no more than one report is required to be filed by the broker-dealers involved in a particular transaction (so long as the report filed contains all relevant facts).[103]

101.    Finally, a SAR is reported in a format developed by FinCEN.  Originally, SARs were filed on paper forms specific to each industry, and contained pre-set data fields for the collection of information in which customer and transaction information was captured, such as subject information, suspicious activity information, including the date or date range of suspicious activity, and reporting financial institution information.[104]  The form included check boxes for common suspicious activity in that industry, which were vetted through federal regulatory agencies including the SEC.[105]  SARs are now filed electronically on one form applicable to all industries subject to the SAR regulations.[106]  The pre-set fields have been

---

[103] 31 C.F.R. § 1023.320(a) (formerly 31 C.F.R. § 103.19(a)).

[104] *See* Proposed Collection; Comment Request; Suspicious Activity Report by the Securities and Futures Industry, 67 Fed. Reg. 50,751 (Aug. 5, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-08-05/pdf/02-19662.pdf; Each– the so-called "Who, What, When, Where and Why" that the SEC's expert witness failed to recognize was addressed in provisions outside the narrative, obviating the need to provide the information again in the narrative. Proposed Collection; Comment Request; Suspicious Activity Report by the Securities and Futures Trading Industry, 70 Fed. Reg. 30,514, 30,516 (May 26, 2005), *available at* https://www.gpo.gov/fdsys/pkg/FR-2005-05-26/pdf/05-10503.pdf; Proposed Collection; Comment Request; Renewal of Suspicious Activity Reporting by the Securities and Futures Industry,77 Fed. Reg. 552 (Jan. 5, 2012), *available at* https://www.gpo.gov/fdsys/pkg/FR-2012-01-05/pdf/2011-33855.pdf.

[105] *See e.g.,* Proposed Collection; Comment Request; Suspicious Activity Report by the Securities and Futures Industry, 67 Fed. Reg. 50,751, 50,733; Proposed Collection; Comment Request; Suspicious Activity Report by the Securities and Futures Trading Industry, 70 Fed. Reg. 30,514, 30,516.

[106] *See* Electronic SAR Test Form, *available at* https://sdtmut.fincen.*treas.*gov/news/FinCENBSAR.pdf; Proposed Collection; Comment Request; Proposed Collection; Comment Request; Renewal of Suspicious Activity Reporting Requirements by Brokers or Dealers in the Securities and Futures Commission Merchants and Introducing Brokers in Commodities, 80 Fed. Reg. 9506 (Feb. 23, 2015) *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-23/pdf/2015-03584.pdf; Proposed Collection; Comment Request; Update and Revision of the FinCEN Suspicious

expanded,[107] while FinCEN has shrunk the size of the narrative field,[108] apparently placing more emphasis on the pre-set fields, which are easier to search, as well as the availability of supporting documentation retained by each filing institution.

### C.   Purpose of SARs

102.   As amended by the USA PATRIOT Act, the requirement to report suspicious transactions provides that "the Secretary may require [a] financial institution… to report any suspicious transaction relevant to a possible violation of law or regulation."[109]   The SAR reporting obligations are just one of several sets of substantive regulations that make up the component parts of an AML program.

103.   SARs serve two significant purposes under the BSA.  First, they may provide tips to law enforcement, regulatory, and supervisory agencies with authority to conduct criminal, tax, or regulatory investigations and to prosecute any alleged violations.[110]  Second, as discussed above, they may assist law enforcement, regulatory, supervisory, and intelligence agencies, as part of a broader database of reports, to "follow the money" with respect to an investigatory matter, whether or not the matter resulted from a tip in the SAR itself.[111]

104.   Critically, though, reporting a possible violation of law or regulation on a SAR by a broker-dealer or any other institution subject to SAR filing is not meant to substitute for the

---

Activity Reports Electronic Data Fields, 82 Fed. Reg. 9109 (Feb. 2, 2017), *available at* https://www.fincen.gov/sites/default/files/federal_register_notices/2017-02-08/BSAR_2017-02235.pdf.

[107] *See* Proposed Collection; Comment Request; Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields, 82 Fed. Reg. 9109.

[108] FinCEN, *SAR Activity Review*, Issue 22, at 39 (Oct. 2012), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_22.pdf.

[109] 31 U.S.C. § 5318(g)(1).

[110] U.S. Gov't Accountability Office, *FinCEN Needs to Further Develop Its Form Revision Process for Suspicious Activity Reports  Statement of Richard J. Hillman, Managing Director Financial Markets and Community Investment, Testimony Before the House Financial Services Subcommittee on Oversight and Investigations*, GAO-10-609T, at Introduction ¶ 3 (April 28, 2010) (transcript available at https://www.gao.gov/assets/130/124551.pdf).

[111] *See id.* at 8.

surveillance, investigative, or other powers of a law enforcement or regulatory agency.  Rather, the reporting is supposed to give an agency data points that may lead to a new investigation or support current surveillance or investigatory matters and supplement the inherently objective transaction reports that had been required to be filed since the 1970s by gathering all of the reports required of BSA-defined financial institutions, among others, in a single repository.[112]

105.    Stated simply, the purpose of SARs is to provide discrete information so that law enforcement and regulators can identify the people and institutions relevant to potentially suspicious activity, to permit law enforcement to inquire about the activity by seeking the SAR documentation of the filing firm and, *inter alia,* to use its own, much more powerful, investigative abilities and specialized knowledge to determine whether the activity reported should be prosecuted or if it identifies a trail of funds from institution-to-institution.[113]

106.    Perhaps most importantly, the information contained in SARs has been used to establish a database, available to law enforcement to gather information relating to any of the innumerable data fields and transactions that are reported in a SAR.  The significance of a SAR filing lies not in the information presented in any individual filing but in the fact that data is continuously collected from multiple sources across the financial industry and compiled in a searchable database.  Based on my professional experience, law enforcement does not expect that all of the information about suspicious activity will come from any one source.  It is not seeking to have a financial institution do its investigatory footwork for it or describe in narrative

---

[112] *See* Proposed Amendment to the Bank Secrecy Act Regulations—Requirement to Report Suspicious Transactions, 60 Fed. Reg. 46,556, 46,558 (Sep.7, 1995), *available at* https://www.gpo.gov/fdsys/pkg/FR-1995-09-07/pdf/95-22223.pdf (proposed SAR regulation for depository institutions).

[113] FinCEN's Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative, at 1, *available at* https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf  ("SAR Narrative Guidance") ("SARs have been instrumental in enabling law enforcement to initiate or supplement major money laundering or terrorist financing investigations and other criminal cases. . . .The information about [the] trends and patterns [associated with financial crimes] is vital to law enforcement agencies[.]"

fashion the elements of criminal conduct. Rather, it is seeking from financial institutions the pieces of a puzzle that law enforcement can put together to initiate a new investigation or support one that is ongoing.[114]

107.     The SEC's expert witness also failed to identify how law enforcement uses far more objective transactional information contained in other reports required to be filed pursuant to the BSA and its implementing regulations. Information provided in SAR filings is generally accessed not through the review of a particular SAR but through searches of that database which will provide search results of all data previously input relating to the subject of the search. Thus, a search of a particular individual will aggregate all of the data filed by any financial entity to provide a comprehensive view of any information and activity contained in any of those filings.

108.     The search frequently will elicit  not  an individual SAR filing by a clearing firm, but instead  all SAR filings generated  by introducing firms that filed a SAR on the same activity and even a bank through which the funds associated with the transaction may have flowed. Other BSA forms also may be obtained, providing law enforcement and regulatory agencies with the information contained in other BSA transactional reports, such as Currency Transaction Reports (CTRs), Reports of Foreign Financial Accounts (FBARs), Report of International Transportation of Currency or Monetary Instruments (CMIRs), and Reports of Cash Payments Over $10,000 Received in a Trade or Business (Form 8300).[115]

109.     Those  SARs are used and reviewed by experienced law enforcement, regulatory, and supervisory personnel who are well trained in locating relevant information in the SARs that

---

[114] *See* U.S. Gov't Accountability Office, *FinCEN Needs to Further Develop Its Form Revision Process for Suspicious Activity Reports Statement of Richard J. Hillman, Managing Director Financial Markets and Community Investment, Testimony Before the House Financial Services Subcommittee on Oversight and Investigations*, GAO-10-609T, at 8.

[115] *See* 31 C.F.R. §§ 1010.310-1010.314, 1010.350, 1010.340, and 1010.330, respectively.

are filed, who locate information using the whole SAR – not just the narrative portion – and who can access reports other than SARs that may be related to a suspicious activity or suspect. Contrary to the SEC's expert witness's intimation, SARs are not, in other words, reviewed by individuals or groups who do not know what they are looking at or who are unfamiliar with securities.[116] Indeed, it is well known that law enforcement in general and the SEC, in particular, have established task forces for reviewing the information reported in SAR filings.[117] It is also well-known that the SEC works closely with the Department of Justice to refer matters that may be related to criminal violations of the securities acts.[118]

### D.     General SAR Reporting Principles That Were Misapplied In the Context of This Case to Alpine

110.     Throughout the Navigant Report, it appears that the SEC's expert witness failed to properly characterize many of the SAR reporting principles that have been in place since SAR regulations were first adopted more than 20 years ago. This mischaracterization has resulted in a misapplication of those principles to Alpine, and apparently has led Navigant to wrongly conclude that Alpine did not file SARs in the manner intended under the applicable SAR regulations. These mischaracterized principles are described below, as is the misapplication to Alpine and its SAR filings.

---

[116] *See* Navigant Report at 16.

[117] *See* Andrew Ceresney, Director of Enforcement, U.S. Sec. & Exch. Comm'n, Remarks at SIFMA's 2015 Anti-Money Laundering & Financial Crimes Conference (Feb. 25, 2015) (transcript available at https://www.sec.gov/news/speech/022515-spchc.html) ("Our Division has an Office of Market Intelligence (OMI), which reviews all tips, complaints, and referrals. Within OMI sits a Bank Secrecy Act Review Group. In the course of a year, this group reviews between 27,000 and 30,000 SARs. If a SAR is filed by a broker-dealer, that group will see it, along with any other SARs filed by any other type of financial institution about any entity, person or transaction within our jurisdiction.").

[118] *See, e.g.,* 17 C.F.R. § 200.21 (among other things, the SEC's General Counsel is responsible for the review of cases which the Division of Enforcement recommends be referred to the Department of Justice with a recommendation for criminal prosecution).

1.     **Alpine's SAR Obligations Are Limited By Its Position as a Clearing Broker, In Which It Has No Direct Relationship to an Introduced Customer**

111.    Given the broad impact that the outcome of this case may have on the industry, understanding the AML obligations of the securities industry, the relationships between clearing firms and introducing firms, and how the industry presently handles its AML responsibilities, is critical.  When summarizing the roles and AML responsibilities of clearing and introducing brokers, the SEC's expert implies but does not specifically state that for purposes of her analysis she considers the underlying introduced accounts as customers of both the clearing firm and the introducing firm.[119]  It is not true that any customer of an introducing firm operating pursuant to a standard allocation of responsibilities in its clearing agreement is also the customer of a clearing firm for purposes of applying the SAR rules, or any other AML rule, for that matter.

112.    The customer of a clearing firm in these circumstances is the introducing broker, while the underlying introduced accountholder is the customer of the introducing broker.  These relationships, and the  manner in which clearing firms operate was recognized, for example, in a Second Circuit case cited by Navigant, in which it is explained:

> Major clearing firms … handle millions of trades daily on behalf of customers of hundreds of [introducing broker-dealers].  A clearing broker's involvement in any given transaction typically begins after the execution of a trade, when the clearing firm processes, settles, and clears the transaction and prepares an appropriate trade confirmation to send to the customer….
>
> The [introducing] broker-dealer typically retains all customer-contact functions, including soliciting customers, recommending the purchase or sale of securities to customers, and monitoring customers' transactions. Under the most common form of agreement between clearing brokers and introducing firms, known as a fully disclosed agreement, the introducing firm discloses the identity of each of its customers to its clearing firm. The clearing firm then establishes on its books and records an account in the name of each introduced customer and 'carries' that

---

[119] Navigant Report at 24 n.87 ("I understand that Alpine considers its customer to be the introducing firm, but my analysis and opinions consider both the introducing firms and the ultimate customers of those firms.").

> account with its own net capital. Under these circumstances, the clearing firm's
> primary (and frequently only) source of information about the customer is the
> introducing firm[.][120]

In light of the customary allocation of responsibilities between clearing and introducing brokers

recognized by the Second Circuit, and because the clearing firm is not in the same position as the

introducing firm with respect to interaction with accountholders and persons authorized to effect

transactions for them, the AML regulatory framework requires that clearing firms file SARs, but

does so in the context of the greater responsibility placed on the introducing broker for

substantive information concerning introduced accounts.

113.    Under its functional allocation with its introducing brokers, a firm such as Alpine

has no direct relationship with the customers of an introducing broker, and therefore is not

assumed to have the same understanding of the customer's background as the introducing broker.

That introducing broker will be in the best position to provide more detailed information in

their SAR filings and, given its greater knowledge of a customer, may also possess information

that causes the introducing broker not to file a SAR based on its determination that a customer's

activity is not suspicious.

114.    This disparity in information has been expressly recognized by FinCEN, which

has stated that the SAR rule "does not require a firm to alter its relationship with its customers in

a way that is inconsistent with industry practice," and has adopted a common sense approach that

takes into consideration industry norms whereby "based on the nature of the services that a

broker-dealer provides to their customers, certain types of broker-dealers will have more

---

[120] *See Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 457-58 (2d Cir. 2013) (internal citations, footnotes, quotations, and emphasis omitted).

information available to them in making suspicious activity determinations than other types of broker-dealers."[121]

115.    That acknowledgement of the different roles of clearing and introducing firms stems in part from guidance that was issued shortly after the adoption of FinCEN's regulations implementing section 312 of the USA PATRIOT Act, which was authored primarily by me. Responding to a request for interpretive guidance from the securities industry, FinCEN stated:

> a clearing firm is not subject to the due diligence requirements of the correspondent account rule in circumstances where it has not established a relationship with an introduced accountholder that would cause it to recommend securities or strategies to that accountholder.[122]

116.    Though written in the context of foreign introducing firms, the guidance is equally applicable to domestic introducing firms that operated under the same transactional arrangements with a clearing firm.  The only meaningful distinction between foreign and domestic introducing firms, in terms of the level of due diligence to be performed by a clearing broker, is that foreign introducing firms are subject to special due diligence because, unlike domestic introducing firms, they are not subject to U.S. regulation and are not subject to BSA compliance examinations.[123]

117.    The distinctions inherent in the  applicability of AML laws to clearing and introducing brokers was further elaborated in an administrative ruling drafted solely by me in 2008, in which it was stated:

---

[121] FinCEN, The SAR Activity Review, Issue 15, at 16 (May 2009), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_15.pdf.

[122] FIN-2006-G009, Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries at n14 and accompanying text (May 10, 2006), *available at https://www.fincen.gov/resources/statutes-regulations/guidance/application-regulations-requiring-special-due-diligence*.

[123] *See, e.g.,* Federal Financial Institutions Examination Council, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* (Feb. 27, 2015), at 177-178 *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2014_v2.pdf (hereinafter "FFIEC Examination Manual 2014").

FinCEN previously clarified that the relationship between a clearing firm and a customer that has been introduced to it is not a formal relationship for the purposes of complying with the correspondent account rule when the customer is introduced to the clearing firm according to a fully disclosed clearing agreement under which an introducing firm, and not the clearing firm, is responsible for receiving and accepting orders for securities from the customer … A clearing firm typically is not required to look through the fully disclosed clearing relationship to perform due diligence directly on the customers that may be introduced to it by a foreign introducing firm …  The clearing firm is expected to monitor transactions conducted for introduced customers through the fully disclosed clearing agreement with the foreign introducing broker incorporating, among other information, any information the clearing firm acquires about the customers that are introduced by the foreign introducing firm in the ordinary course of its business.[124]

118.    Again, though written in the context of foreign introducing firms, the administrative ruling is equally applicable to domestic introducing firms operating under the same transactional arrangements with a clearing firm.  Moreover, with respect to clearing and introducing firms subject to U.S. regulation, it has been clarified that "while [FinCEN does] recognize that clearing brokers often play important roles as service providers to introducing firms and have made accommodations for that in our rule makings, [FinCEN effectively has] clarified that [it does] not expect that clearing brokers will operate as *de facto* regulators of introducing firms, or vice versa."[125]

119.    In short, contrary to  the view of the SEC's expert witness, a clearing firm such as Alpine has no direct relationship with any introduced customer and generally  handles far greater

---

[124] FIN-2008-R008, *Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Financial Institution*, (Jun. 18, 2008), *available at* https://www.fincen.gov/resources/statutes-regulations/administrative-rulings/bank-secrecy-act-obligations-us-clearing (emphasis added, internal footnotes omitted).

[125] Prepared Remarks of James H. Freis, Jr., Director, Financial Crimes Enforcement Network, delivered at the SIFMA Anti-Money Laundering Compliance Conference (Mar. 5, 2008), *available at* https://www.fincen.gov/news/speeches/prepared-remarks-james-h-freis-jr-director-financial-crimes-enforcement-network-2; see also* FFIEC Examination Manual 2014 at 68 ("neither FinCEN nor the federal banking agencies expect, banks to serve as the *de facto* regulator of any [non-bank financial institution (NBFI)] industry or individual NBFI customer"); *FinCEN Statement on Providing Banking Services to Money Services Businesses* at 3 (Nov. 10, 2014), *available at https://www.fincen.gov/news/news-releases/statement; Interagency Interpretive Guidance on Providing Banking Services to Money Services Businesses Operating in the United States* at 7 (Apr. 26, 2005), *available at https://www.fincen.gov/sites/default/files/guidance/guidance04262005.pdf.*

volumes and types of activities than any one of its introducing firms.  Accordingly, FinCEN has

recognized, by application of the interpretive guidance presented above, that clearing firms like

Alpine will be less able to provide a substantial SAR narrative than an introducing firm.  As a

result, contrary to the SEC's expert witness's opinion, it is both typical and expected that

clearing firm SAR narratives will not contain the level of  information regarding the underlying

customer as those of an introducing firm and instead most frequently focus on transaction

activity including trading activity.

120.    The SEC's expert witness appears to ignore the substantial body of guidance

issued by FinCEN on clearing and introducing broker obligations with respect to BSA

compliance in general and SAR filing in particular.  Ignoring it allows the SEC's expert witness

apparently to conclude that Alpine is in no different position than its introducing brokers to

examine and understand, for example, the transactional motivations of a customer with whom it

does not have a direct and meaningful relationship as lawfully established by contract.  It further

enables  the SEC's expert witness to assert that clearing and introducing brokers are equally

responsible for monitoring introduced accounts for suspicious activity and reporting suspicious

activity,[126] and may be expected to do so together.[127]

121.    There is no requirement in the SAR rules that would require a clearing and

introducing firm to engage in joint SAR monitoring or reporting activities.[128]  To the contrary,

though the SAR rules permit Alpine to file SARs jointly with its introducing firms, it is not

---

[126] Navigant Report at 24 & n.87.

[127] *See id.* at 25-26 (internal footnotes excluded; *emphasis added*) ("Under the SAR rule, introducing brokers and clearing brokers may file joint SARs, and may share the SARs with each other for the preparation of a joint SAR, but they are not required to do so…. If the firms identify suspicious activity in transactions "at, by or through" both of them, as in accounts introduced by Alpine's introducing brokers, the firms *should can [sic]* work together to understand the activity, the customer, and whether a SAR is appropriate. The firms, may also, but are not required to file a SAR jointly. Significantly, *however*, the SARs filed by Alpine that are addressed in this report, *however*, do not indicate that they are joint filings by the introducing firms and Alpine.).

[128] *See* ¶ 100, in which the permissive joint filing provisions in the broker-dealer SAR rule are quoted.

obligated to and there may be valid business reasons for not doing so.  Among them, a clearing firm may not wish to expose its AML compliance program to risks it is unable to sufficiently mitigate with respect to the AML compliance program of an introducing firm.

122.    As noted previously, clearing brokers are not expected to be the *de facto* regulators of introducing firms, and the costs of auditing an introducing firm to develop a comfort level with respect to SAR monitoring and filing would involve examining an introducing broker in the manner a regulator or other examining authority would do.  FinCEN apparently did not impose such a requirement on domestic clearing firms because introducing brokers are subject to BSA compliance examinations just as clearing brokers are.[129]  Even with respect to a foreign introducing firm, clearing brokers are merely required to conduct special due diligence under the rules implementing section 312 of the USA PATRIOT Act, which requires the clearing firm to consider the AML regime in which the foreign firm is located.[130]

### 2.    The Improper Use of Guidance in Determining SAR Filing Obligations

123.    The SEC's expert witness attempts to justify many of her opinions about SAR filing obligations by application of an amalgam of guidance, interpreting it as if it imposed obligations on Alpine equal to or greater than the BSA and its implementing regulations.  It is true that guidance may be helpful to industry participants in better understanding FinCEN's policy views regarding general compliance principles.  In other cases, it may be used to interpret past rules or guidance that lacked sufficient clarity to permit them to be implemented by regulated entities.

---

[129] *See generally* n.123.

[130] *See* 31 C.F.R. §§ 1023.610 and 1023.620; *see also* FFIEC Manual 2014 at 177-180.

124.    Such guidance, however, does not have the clarity or force of law.  Among other things, such statements of policy or interpretive guidance are not required to be adopted by notice and comment rulemaking as required by the APA because they are not intended to, nor can they, impose new regulatory obligations on the parties for whom the guidance is published.[131]

125.    This  principle – that guidance does not have the force of law -- is, in fact, so important that, on November 16, 2017, the United States Department of Justice ("DOJ") disseminated  a memorandum prohibiting DOJ employees "from issuing guidance documents that effectively bind the public without undergoing the notice-and-comment rulemaking process."[132]  That memorandum, among other things, "prohibits the Department from using its guidance documents to coerce regulated parties into taking any action or refraining from taking any action beyond what is required by the terms of the applicable statute or lawful regulation."[133]

126.    In addition, on January 25, 2018, the Department of Justice issued a second memorandum further reminding DOJ employees that "[g]uidance documents cannot create binding requirements that do not already exist by statute or regulation," and, accordingly, "the Department may not use its enforcement authority to effectively convert agency guidance

---

[131] *See* 5 U.S.C. § 553(b) (notice and comment required for substantive rules but not required for interpretive rules or general statements of policy) and 553(d) (no minimum effective date required for interpretive rules or statements of policy); U.S. Department of Justice, *Attorney General's Manual on the Administrative Procedures Act of 1947* at 22-23, 30 (1947) (interpretive rules and statements of policy are not subject to notice and comment because they will not impose new legal obligations on any party at whom they may be directed, though they are subject to publication in the Federal Register)  *available at* https://archive.org/details/AttorneyGeneralsManualOnTheAdministrativeProcedureActOf1947.

[132] *See* Memorandum from The Associate Attorney General to Heads of Civil Litigating Components United States Attorneys titled "Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018), available at  https://www.justice.gov/file/1028756/download  (citing Memorandum from the Attorney General to All Components titled "Prohibition on Improper Guidance Documents" (Nov. 16, 2017), available at https://www.justice.gov/opa/press-release/file/1012271/download).

[133] *Id.*

documents into binding rules."[134]  Simply put,  guidance is not law, a principle even the United

States Attorney General has articulated in the last year, and ought not be treated as such.  The

SEC's expert witness, however, does just that.

127.    This precept regarding guidance is based not just on the fact that it emanates

without legal or rulemaking processes but also because it is diffuse.  In the securities industry

alone, there are literally dozens of publications containing so called "red flags."  Transforming

into law general publications that are periodically issued for the benefit of the industry, which are

not carefully considered, vetted or precisely drawn, will disrupt the established enforcement

framework and divert scarce resources toward satisfaction of mechanical but often irrelevant

criteria.  Treating informal guidance as law is inconsistent with industry expectations and will

effectively create new, rigid law in an area where flexibility is critical.

128.    If FinCEN or any other agency attempted to impose its statements of policy and

interpretive guidance against a financial firm, a court reviewing the matter would be obligated to

"set aside the agency action [as] arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law … and without observance of procedure required by law."[135]  Where, as

here, the agency attempting to  impose such guidance lacks the authority to administer the

relevant statute, the agency action additionally would be set aside as "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right."[136]

### i.    Undue Reliance on The SAR Activity Review

129.    As an example of the guidance that supposedly articulates legal requisites, the

SEC's expert witness treats as mandatory certain selected items from  one of FinCEN's

---

[134] *Id.*

[135] *See* 5 U.S.C. § 706(2).

[136] *See id.*

publications, the SAR Activity Review—Trends, Tips & Issues ("SAR Activity Review") issued

on a periodic basis over the years, among other things, to provide examples of common scenarios

identified by FinCEN as suspicious.[137]   The SEC's expert witness misperceives the purpose of

the SAR Activity Review and improperly relies on it as dispositive of the issues in this matter,

when in fact, the Reviews cannot  reasonably be viewed as acts of substantive rulemaking.

130.    The SAR Activity Review represents one of a series of documents issued by

FinCEN in collaboration with law enforcement, other regulators and groups supporting the

industry, such as the American Bankers Association and the Securities Industry Association, that

were all members of the BSAAG.[138]   As noted in the first issuance of the SAR Activity Review

in 2000, the publication "is the product of a continuing collaboration among the nation's

financial institutions, federal law enforcement and regulatory agencies to provide meaningful

information about the preparation, use and utility of Suspicious Activity Reports (SARs) filed by

financial institutions."[139]

131.    Further, the publication reflects the recognition by both the relevant government

agencies and the nation's financial institutions of the desirability of a continuing exchange of

information contained in the federal database that stores and maintained SAR filings.  Similar

language is contained in the introduction to the SAR Activity Reviews.  As noted in the

documentation itself, this publication is "a product of continuing dialogue and close

collaboration among the nation's financial institutions, law enforcement officials and regulatory

---

[137] See, e.g., Navigant Report at 15 n.42, 16 n.46, 18 n.57, 19 n.59, 22 n.73.

[138] BSAAG was established in 1992 by the Annunzio-Wylie Anti-Money Laundering Act of 1992 and consists of representatives from federal regulatory and law enforcement agencies, financial institutions, and trade associations whose members are financial institutions subject to the BSA, to obtain feedback on opportunities to improve the BSA framework.  BSAAG is chaired by FinCEN and its membership is solicited via public notice in the Federal Register and members serve three-year terms.  FinCEN makes all membership decisions.

[139] SAR Activity Review, Issue 1, at 1 (Oct. 2000), available at
https://www.fincen.gov/sites/default/files/sar_report/sar_tti_01.pdf.

agencies, to provide meaningful information about the preparation, use and value of [SARS] and other [BSA] reports filed by financial institutions."[140]

132.    Clearly, documents issued under this introduction were never intended to be adopted as law, nor were they issued in the form of agency-made law, which is subject to APA rulemaking requirements including notice and comment.  Based on my experience, both at FinCEN and afterwards, I am aware that these Reviews were designed to foster a dialogue with the industry and respond to the industry's continuous request for "feedback."[141]  While these Reviews were helpful to the industry, as well as to the regulators, they were not intended to set forth requirements that would create violations of law.  Accordingly, the views presented in such publications should not be relied upon as law or used as the predicate to charge financial institutions with violations of law.

133.    Further on this point, the "common scenarios" upon which the SEC's expert witness relies from SAR Activity Review, Issue 15, at 24, as discussed above, were from a section prepared by the staff of the SEC and FINRA, not FinCEN, titled *Suspicious Activity Reviews by Securities Regulators,* to describe "common examination findings" by the SEC and

---

[140] SAR Activity Review, Issue 15, at 1.  The list of participants in such dialogue include a variety of public and private sector views, and both regulatory and law enforcement agencies, such as, among others, "the American Bankers Association; Independent Community Bankers of America; American Institute of Certified Public Accountants; Securities and Financial Markets Association; Board of Governors of the Federal Reserve System; Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation; Office of Thrift Supervision; National Credit Union Administration; U.S. Securities and Exchange Commission; U.S. Department of Justice's Criminal Division and Asset Forfeiture & Money Laundering Section and the Federal Bureau of Investigation; Drug Enforcement Administration; U.S. Department of Homeland Security's Bureau of Immigration and Customs Enforcement and U.S. Secret Service; U.S. Department of the Treasury's Office of Terrorism and Financial Intelligence, Internal Revenue Service, and the Financial Crimes Enforcement Network." *Id.*  Notably, in the initial publication of the SAR Activity Review the SEC was not even included, as in the early years of BSAAG they were not a member, and it was BSAAG that issued these series of publications.  SAR Activity Review, Issue 1, at 1 (Oct. 2000).

[141] SAR Narrative Guidance, at 1 n.1 ("FinCEN provides feedback to financial institutions in the form of advisories, bulletins and other publications such as The SAR Activity Review – Trends, Tips & Issues and By the Numbers."); s*ee, e.g.*, FinCEN, SAR Activity Review, Issue 10, at 39 (May 2006), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_10.pdf; SAR Activity Review, Issue 9, at 43 (Oct. 2005), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_09.pdf.

FINRA.  The description of these scenarios was not intended to create, and should not have been interpreted as creating, legal requisites for SAR reporting.[142]

<strong>ii.       Undue Reliance on the SAR Narrative Guidance</strong>

134.     The SEC's expert witness also cites to FinCEN's Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative ("SAR Narrative Guidance") to provide examples of what FinCEN considers useful information to include in SAR narratives. Again, the SAR Narrative Guidance is not law.  The introduction to this 33-page publication clearly states that it is "provided solely to assist respective financial institutions in strengthening existing due diligence initiatives and anti-money laundering programs" and that the information presented in the guidance "should be used in conjunction with the instructions provided with the appropriate SAR forms, guidance provided in other FinCEN publications … and respective industry advisories from the federal regulatory authorities."[143]

135.     This introduction makes clear that the SAR Narrative Guidance is in the nature of best practices, a tool to aid filers in completing SAR forms in a manner that will be most helpful to law enforcement, but doing so, has never been mandated in a FinCEN rulemaking.  Further detailing this point, later in the SAR Narrative Guidance, FinCEN expressly couches the document as providing "suggest[ions]" for preparing a SAR narrative.[144]  It was not a statute or rule enacted and disseminated to advise industry participants of actual statutory requirements nor is there any  broker-dealer SAR regulation that requires that a financial institution complete each

---

[142] *See* SAR Activity Review, Issue 15, at 20-25.

[143] SAR Narrative Guidance at 2.

[144] *Id.* at 7.

narrative with a description of the "Who, What, When, Where, and Why" of the suspicious activity.[145] Neither do the SAR instructions themselves.

136.     Nonetheless, the Navigant Report seeks to transform those suggestions into a legal requirement that a filer include in each narrative a description of the "Who, What, When, Where and Why" of the suspicious activity it was reporting.[146]  Failure to include each of those "Who, What, When, Where, and Why" descriptions, according to Navigant, constitutes a BSA violation. That assertion is not only baseless, but also, as a practical matter, is illogical, unproductive and often senseless.

137.     It is apparent from a plain reading of the SAR rule that one or more of the "Who, What, When, Where, and Whys" associated with a suspicious activity ultimately may not be reported in a SAR.  Significantly, though SARs must be filed within 30 days after the date of initial detection of the suspicious activity, a requirement that FinCEN has interpreted liberally: a SAR may be delayed by an additional 30 days if no suspect can be identified.  A suspect-less SAR requires reporting within 60 days even if the suspect still has not been identified.  In that case, despite the conclusion of the SEC's expert witness, the "who" may not be available for inclusion in the narrative.  The absence of a "who" may additionally cause one or more of the other elements of the narrative, claimed by the SEC's expert witness to be a mandatory element of a SAR narrative, to also be unavailable.

138.     Further, Navigant's conclusion that SAR narratives must include each and every piece of information about the transaction or the subject of the SAR contained in SAR supporting documentation in order to avoid being "fatally defective" does not take into account the fact that the SAR form contains numerous preset and readily searchable data fields in which

---

[145] *See* 31 C.F.R. § 1023.320 (2016).

[146]

much of the "Who, What, When, Where, and Why" information may be populated.[147]  These data fields include checkboxes for suspicious activities associated with particular industries, which were developed in consultation with the SEC, among other federal regulators.[148]  There is, and should be, no need for a broker-dealer to provide the information required in the preset data fields, which are far more conducive to law enforcement searches than the narrative portion of the SAR, which might not contain keywords being used in a search.  FinCEN made this clear in the instructions to the form, stating that information provided in other parts of the form need not be repeated. [149]

139.   Even if the "Who, What, When, Where and Why" of the suspicious activity were a legal requirement pertaining to the narrative section, however, it is not the case that the narrative must include every piece of information in the firm's supporting documentation or in its AML program as guidance for analyzing activity that may be suspicious, even if that information might be deemed from a third party's perspective to be potentially relevant to a suspiciousness determination.  Rather, the purpose of the narrative is to explain why the firm, *in its subjective determination*, concluded—based on, among other things, the firm's knowledge of the client, the client's historic and anticipated activity, and the product at issue—that the particular transaction at issue was potentially suspicious.  The "why," in other words, is the *firm's rationale* for filing the SAR at the time, not the rationale of another hypothetical third

---

[147] *See* Electronic SAR Test Form, *available at* https://sdtmut.fincen.*treas*.gov/news/FinCENBSAR.pdf; Proposed Collection; Comment Request; Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields, 82 Fed. Reg. 9109; Suspicious Activity Report by the Securities and Futures Industry, 67 Fed. Reg. 50,751; Proposed Collection; Comment Request; Suspicious Activity Report by the Securities and Futures Trading Industry, 70 Fed. Reg. 30,514.

[148] *See* Electronic SAR Test Form, *available at* https://sdtmut.fincen.*treas*.gov/news/FinCENBSAR.pdf; Proposed Collection; Comment Request; Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields, 82 Fed. Reg. 9109.

[149] SAR Form 101 at 3; SAR form 111 at 111.

party who might have filed the SAR for different, or additional reasons, typically with the benefit of hindsight and additional time.

140.    Navigant also fails take into account the fact that SAR supporting documentation is deemed incorporated into the SAR.  Specifically, under FinCEN regulations, SAR supporting documentation is "deemed to have been filed with the SAR."[150]  This makes the SAR supporting documentation available to appropriate law enforcement and regulatory agencies on request.[151]

141.    Finally, the SEC's expert witness's opinion wholly ignores that fact that – as set forth above, and as the authorities to which she herself cites at other parts of her report – clearing firms may not have full details regarding the "who, what, when, where and why."  Given clearing firms' limited roles in securities transactions, clearing firms generally do not have full account opening documentation associated with the customer of the introducing firms that clear through them.  Often, a clearing firm may not have the ability to articulate its suspicion, or even identify the person(s) conducting the suspicious transactions.  Neither of these render a SAR fatally flawed.

142.    Indeed, in the Tax Haven report of the Senate's Permanent Subcommittee on Investigations, a tax evasion scheme of the founders of a national retailer was identified through the filing of a SAR by a clearing firm that could only develop alternate theories as to why the activity it reported might be suspicious and that could not identify the persons engaged in the identified transactions.  As imprecise as it was, the SAR was sufficient as filed and additionally fulfilled its purpose.[152]

---

[150] 31 C.F.R. § 1023.320(d).

[151] *See id.*

[152] *See* U.S. Senate Permanent Subcomm. on Investigations, Tax Haven Abuses:  The Enablers, The Tools, and Secrecy, at 316-49 (Aug. 2006)

143.    Two points sum up the undue reliance on the SAR Narrative Guidance in the Navigant Report.  First, as guidance, it was meant to be instructive to the industry, but it was not issued in the manner in which it reasonably could be viewed as a regulation applicable to Alpine. Secondly, reviewing the guidance as a whole, a case cannot be made that the Alpine SARs did not contain the information the SEC's expert witness represented to be missing, nor can the Alpine SARs be viewed as deficient when compared to  the deficient narratives that were offered as examples in that guidance.

### iii.    Mischaracterization of SAR Forms

144.    Contrary to the suggestions by the SEC's expert witness, the instructions to SAR forms used by the securities industry between 2002 and 2012 (Form 101 or SAR-SF) and 2012 to the present (FinCEN Form 111, which is an electronic form submitted online through the BSA E-filing portal) (collectively, "SAR-BD Forms") do not impose specific requirements for what must be included in a SAR narrative.[153] The instructions for the narrative section of the SAR-BD Forms state "Filers *must* provide a clear, complete and concise description of the activity, including what was unusual or irregular *that caused suspicion*."[154]  The SAR-BD Forms, then, require only that the broker-dealer provide in the narrative section an account of what *the broker-dealer determined, with its experience in the particular market and information concerning the transaction,* was suspicious about the transaction.  Indeed, that is the very point of the narrative: to help law enforcement understand what the firm concluded about the nature and circumstances

---

[153] Suspicious Activity Reporting by the Securities and Futures Industry, 67 Fed. Reg. 50,751 (Aug. 5, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-08-05/pdf/02-19662.pdf; Suspicious Activity Reporting by the Securities and Futures Industry,77 Fed. Reg. 552 (Jan. 5, 2012) *available at* https://www.gpo.gov/fdsys/pkg/FR-2012-01-05/pdf/2011-33855.pdf; and Suspicious Activity Reporting Requirements by Brokers or Dealers in Securities and Futures Commission Merchants and Introducing Brokers in Commodities, 80 Fed. Reg. 9506 (Feb. 23, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-23/pdf/2015-03584.pdf

[154] FinCEN, Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements, at 111 (March 2015), *available at* https://bsaefiling.fincen.treas.gov/docs/FinCENSAREelectronicFilingRequirements.pdf (emphasis added) ("2015 SAR Electronic Filing Instructions"); *see also* SAR Form 101 at Part VI (similar language).

of the activity at issue that led to the judgment that the activity at issue was suspicious.[155]

145.    The instructions also include "checklists" couched in similarly permissive, rather than mandatory language: "[f]ilers *should* use the following checklist as a *guide* for preparing the narratives."[156]  This checklist on the SAR Form is as close as FinCEN has come to defining what should be included by the filer in the SAR narrative but even then, by using permissive language, FinCEN chose not to require inclusion of all checklist categories in the SAR narrative.  Purposely, there is no requirement concerning what must be included in a SAR narrative in either the SAR regulations itself (31 C.F.R. § 1023.320 (2016)) or in the instructions to the SAR-BD Form.  This is directly a result of the fact that the decisions to file a SAR and what to include in a SAR narrative are subjective ones and the circumstances that give rise to the suspicion vary.

146.    Notably, even if the SAR Form checklists were considered mandatory – not the "guides" that they are -- those checklists do not even contain the various "red flag" categories identified by the SEC and so actually contradict the SEC's expert witness' position.

### iv.    Undue Reliance on FINRA Documents

147.    The SEC's expert witness cites repeatedly to the FINRA small firm template[157] and  suggests, without further citation, that FINRA "has been delegated the authority to approve AML programs" and that "this template is probative of whether a firm's program complies with the BSA."[158]  The SEC's expert witness is, however, incorrect in both regards.

---

[155] *See* 2015 SAR Electronic Filing Instructions at 111 (stating that filers "should include any other information necessary to explain the nature and circumstances of the suspicious activity.  *Filers should provide any information the filers believe necessary to better enable investigators to understand the reported suspicious activity*." (emphasis added)).  Given the purpose of the narratives, and the information regulators have indicated they expect to see in such narratives, a decision about what ought to be in the SAR narrative cannot be made prior to a determination that a SAR is necessary.

[156] *Id.* (emphasis added); *see also* SAR Form 101 at Part VI (similar language).

[157] *See*, *e.g.*, Navigant Report at 19-22, 26.

[158] Navigant Report at 19.

148.     In fact, FINRA does not approve AML programs.  Rather, senior management of each firm approves that firm's AML program.[159]  Moreover, as discussed above, FINRA is a private association of broker-dealers.  It has not been authorized to establish rules or undertake disciplinary or regulatory functions  that in any way bind Treasury or FinCEN.

149.     FINRA is not a government agency or agent either under the Exchange Act or the BSA.  FINRA has no governmental authority, and no government agency has authorized it to interpret, revise, or amend FinCEN's substantive regulations, to which its AML rule requires compliance.

150.     FINRA was solely expected to adopt a structural AML rule that is substantively identical to the rules adopted by the federal regulators and the other SROs who perform compliance examinations on which those regulators rely.[160]  The substantive components of an AML program, including the SAR rules, are established not by any SRO but only by  FinCEN and Treasury.

151.     As a matter of federal law, broker-dealers are obligated to comply with these BSA and its implementing regulations as administered by FinCEN, not with a recast of those regulations by a Delaware corporation that generates revenue from, among other things, imposing fines in member disciplinary actions.

152.     A broker-dealer's separate obligations to comply with FINRA's rules derive from being a FINRA member or a person associated with a member.  They do not derive from FinCEN.

---

[159] FINRA Rule 3310.

[160] *See id*. and *compare* 12 C.F.R. § 21.21 (Office of the Comptroller of the Currency), 12 C.F.R. § 208.63 (Board of Governors of the Federal Reserve System); 12 C.F.R. § 326.8 (Federal Deposit Insurance Corporation); 12 C.F.R. § 390.354 (same); 12 C.F.R. § 563.17 (Office of Thrift Supervision, to be removed from the C.F.R. effective Oct. 11, 2018); 12 C.F.R. § 12 C.F.R. 748.2 (National Credit Union Administration); and NFA Compliance Rule 2-9(c), *available at* https://www.nfa.futures.org/rulebook/rules.aspx?RuleID=RULE%202-9&Section=4 (SRO rule applicable to the futures industry).

153.     In sum, it is my view, based on my industry knowledge and experience and review of the relevant law and guidance, that a conclusion that Alpine could be charged with filing "fatally deficient" SARs, based on guidance and without reference to the reason the firm filed its SARs, is not supported by the law.  Rather, such a charge not only establishes a novel BSA enforcement theory, but also is contrary to the SAR regulations themselves, current industry expectations, and SAR guidance, as well as the construct of the SAR reporting forms as a whole.

154.     It would be fundamentally unfair to subject Alpine and other securities broker-dealers to regulatory standards under the BSA that would be different from those applied to other financial institutions, *e.g*., different SAR filing requirements, different SAR content requirements, different standards of knowledge, and different penalties.  It would also be unfair for the SEC to establish SAR-filing standards that are inconsistent with the standards applied to other financial institutions regulated by different financial supervisory agencies.  Yet, that would be the result if the SEC expert witness's views are adopted.

### 3.     Subjective Versus Objective Standard for SAR Filing Obligations

155.     The SEC's expert witness appears to take the position that the standard for determining whether a SAR is required to be filed is an objective standard.  This position is inaccurate, based on cherry-picked and misinterpreted discussion in the broker-dealer SAR rulemakings, and fundamentally inconsistent not only with a plethora of regulatory guidance and industry expectations, but also with authority that she herself cites.

156.     Fundamental to the AML program requirements and the obligation to file SARs is the fact that the decision to file a SAR is a subjective one made by the filing firm.  As set forth in the preamble to the final SAR rulemaking itself, it was intended to be "a flexible standard that adequately takes into account the differences in operating realities among various types of

67

broker-dealers."[161]  Among other things, these operating realities may include the separation of the institution from the customer, as in a situation in which the filing institution is a clearing firm, as is Alpine, as further discussed above.

157.    The Federal Financial Institutions Examination Council's ("FFIEC") Bank Secrecy Act / Anti-Money Laundering Examination Manual ("FFIEC Examination Manual"), which is the examination manual issued by the federal banking regulators, in collaboration with FinCEN, and which is the only AML manual issued publicly by regulators, describes this subjectivity.  The 2010 FFIEC Examination Manual states, for example:

> The decision to file a SAR is an inherently subjective judgment.  Examiners should focus on whether the bank has an effective SAR decision-making process, not individual SAR decisions … In those instances where the bank has an established SAR decision-making process, has followed existing policies, procedures and processes, and has determined not to file a SAR, the bank should not be criticized for the failure to file a SAR unless the failure is significant or accompanied by evidence of bad faith.[162]

158.    Although adopted for the banks and FinCEN, the SEC's expert witness and the SEC have both cited to the FFIEC Examination Manual as relevant for the securities industry.[163] Guidance applicable to banks with respect to SARs also is generally applicable to broker-dealers,[164] as the SAR regulations for each industry are based on the same statutory provisions, contain substantially similar reporting requirements, and are subject to the same body of interpretive guidance.  Although the Navigant Report recognizes the applicability of the FFIEC

---

[161] Department of the Treasury, FinCEN, Amendment to the Bank Secrecy Act Regulations – Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44048, 44053 (July 1, 2002).

[162] FFIEC Examination Manual,  at 75-76 (Apr. 29, 2010), *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2010.pdf (hereinafter "FFIEC Examination Manual 2010"); *see also* FFIEC Examination Manual, at 68 (Feb. 27, 2015), *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2014_v2.pdf (hereinafter "FFIEC Examination Manual 2014").

[163] *See* Navigant Report at 15 n.36.

[164] SEC's Office of Compliance Inspections and Examinations, Anti-Money Laundering (AML) Source Tool for Broker-Dealers (Jan. 11, 2017), *available at* https://www.sec.gov/about/offices/ocie/amlsourcetool.htm (citing FFIEC Examination Manual 2014).

Examination Manual to various industries, including the securities industry with respect to suspicious activity reporting requirements, the Navigant Report does not address the inherent subjectivity of SAR filing decisions as articulated in the FFIEC Examination Manual and, as noted herein, by FinCEN directors.

159.    The Navigant Report refers to the fact that 31 C.F.R. § 1023.320(a)(2) requires that a SAR be filed when a broker-dealer has "reason to suspect" that the transaction requires the filing and concludes that language establishes an "objective test."[165]  The reason to suspect test is meant to require the filing institution to view activity that may be suspicious as an objective, reasonable, and informed person would view it.

160.    As discussed above, however, regulators have consistently taken the position that, when it comes to enforcement of this requirement, so long as firms have effective SAR-decision making processes, they will not second-guess a firm's decision as to whether there is "reason to suspect" that the transaction in question requires a filing.[166]  This is so even when a regulator may have come to a different conclusion.[167]

161.    In *Department of Enforcement v. Sterne, Agee & Leach, Inc.*, a FINRA Hearing Panel cited the FFIEC Examination Manual's subjectivity standard as the appropriate standard.  In that case, FINRA's Enforcement Division disagreed with Sterne, Agee & Leach, Inc.'s decision not to file SARs with respect to various introduced accounts and insisted that the firm should have "gone further in investigating the accounts," including with respect to large blocks of stock being deposited and liquidated.

---

[165] *See* Navigant Report at 12.

[166] *See* 31 C.F.R. § 1023.320(a)(2) (broker-dealer SAR regulation).

[167] *See also* FinCEN Final Rule, Requirement That Mutual Funds Report Suspicious Transactions, 71 Fed. Reg. 26,213, 26,215, *available at* https://www.sec.gov/about/offices/ocie/amlmf/71fr26213.pdf (noting that the "triggering factors" for SARs are largely subjective).

162.    The Hearing Panel disagreed with the Enforcement Division, and, while noting that the firm "might have learned more with further investigation," held that the firm's investigations were adequate under the facts and circumstances given that Sterne Agee obtained a substantial amount of information about these accounts, monitored them, discussed them, and came to a reasonable conclusion that there was a reasonable business explanation for the activity in the accounts.[168]

163.    In reaching this conclusion, the Hearing Panel relied on testimony by the firm's expert regarding the sufficiency of the firm's processes of monitoring the introduced accounts and explaining  that the decision to file a SAR is "not based on a mathematical formula."[169]

164.    FinCEN itself has also stated its view that SAR filings require "a financial institution to make a subjective determination of what is suspicious prior to its filing."[170]  Put differently, as William J. Fox, the then-Director of FinCEN stated to the House of Representatives, "[t]he cornerstone of the Bank Secrecy Act, suspicious activity reporting, requires financial institutions to make judgment calls,"[171] and those judgment calls are to be based on all of the facts and circumstances of a transaction.[172]  According to then Director Fox, "[c]ompliance should not be about second guessing individual judgment calls on whether a

---

[168] *Dep't of Enforcement v. Sterne, Agee & Leach, Inc.*, No. E052005007501 at 31-33 (Mar. 5, 2010).

[169] *Id.* at 31.

[170] FinCEN Final Rule, Exemptions From the Requirement to Report Transactions in Currency, 73 Fed. Reg. 74010, 74011 (Dec. 5, 2008), *available at* https://www.gpo.gov/fdsys/pkg/FR-2008-12-05/pdf/E8-28858.pdf .

[171] FinCEN Dir. William J. Fox, Statement on Behalf of United States Department of Treasury Before the House of Representatives (June 16, 2004), *available at* https://www.fincen.gov/news/speeches/statement-william-j-fox-director-financial-crimes-enforcement-network-united-states (hereinafter "FinCEN Dir. Fox Statement June 2004").

[172] *See* FinCEN, FIN-2006-G013, Frequently Asked Questions Suspicious Activity Reporting Requirements for Mutual Funds, FAQ 7 at 3-4 (Oct. 4, 2006), *available at* https://www.fincen.gov/sites/default/files/shared/guidance_faqs_sar_10042006.pdf.

particular transaction is suspicious."[173]

165.    There are sound reasons behind the SAR enforcement policy, derived from

FinCEN regulatory policy and the penalty provisions of the BSA, as articulated in the FFIEC

Examination Manual and by the Hearing Panel, which are integral to the development of a firm's

AML program and the SAR filing framework.  Significantly, as pointed out above, regulators

themselves have recognized that, if compliance becomes about second-guessing individual

judgment calls as to whether activity is suspicious or not, there is a significant danger that firms

will defensively file SARs, which "results when an institution files a suspicious activity report on

an activity or transaction that really is not suspicious" in order to protect themselves from

regulator risk.[174]  If that occurs, the SAR filing system will become overwhelmed with worthless

SARs, and the entire purpose of SAR filings will be undermined.[175]

166.    In my opinion, the SEC's expert witness's position undermines the well-

established enforcement policy that has been applied by regulators and relied upon by the BSA

regulated industry and contradicts the very same pronouncements by FinCEN that the SEC's

expert witness herself quotes in her report.  As the authority the SEC expert witness herself

---

[173] FinCEN Dir. Fox Statement June 2004; *see also* FinCEN Deputy Dir. William F. Baity, Statement Before the House Financial Services Subcommittee on Oversight and Investigations (May 10, 2007), *available at* https://www.fincen.gov/news/testimony/statement-william-f-baity-deputy-director-financial-crimes-enforcement-network (stating that "[f]inancial institutions file Suspicious Activity Reports (SARs) after a subjective review of numerous variables"); U.S. Gov't Accountability Office,  Suspicious Activity Report Use Is Increasing, But FinCEN Needs to Further Develop and Document Its Form Revision Process, GAO-09-226, at 19 (Feb. 2009), *available at* https://www.gao.gov/new.items/d09226.pdf ("The SAR guidance in the interagency examination manual that regulators use states the decision to file a SAR is inherently subjective and directs examiners to focus on whether the institution has an effective SAR decision-making process, rather than on individual SAR filing decisions. According to the manual, in those instances where the institution has an established SAR decision-making process; has followed existing policies, procedures, and processes; and has decided not to file a SAR, examiners generally should not criticize the institution for not filing a SAR.").

[174] FinCEN Dir. William J. Fox, Remarks Provided to the American Bankers Association / American Bar Association Money Laundering Enforcement Seminar (Oct. 25, 2004), *available at* https://www.fincen.gov/news/speeches/remarks-william-j-fox-director-financial-crimes-enforcement-network-united-states-0.

[175] *See generally id.*

quotes — the preamble to the final SAR rule for broker-dealers — makes clear, the SAR standard is a flexible one that requires consideration of all of the facts and circumstances that are reasonably known to, and analyzed by, the filing firm, and adequately takes into account the differences in operating realities among various types of broker-dealers, including any regulated intermediaries or other institutions that may stand between the filing firm and the subject of the filing.[176]

167.    At bottom, by broadly asserting that the determination to file a SAR is objective, the SEC's expert witness seeks to supplant the subjective SAR filing standard with a strict liability filing requirement.   By ultimately failing to acknowledge the subjectivity involved in SAR filings and the flexibility built into the standard when analyzing the Alpine SARs, the SEC's expert witness has effectively attempted to substitute her judgment for that of the firm.

168.    By doing so and attempting to induce a court to upend more than 20 years of regulatory development, the SEC's expert witness risks undermining the well-established principle that an AML officer's subjective determination should not be questioned without a showing of a significant failure or bad faith,[177] willfulness or negligence.[178]   In its place, the SEC's expert witness seeks to adopt a strict liability regime, one in which any irregularity with respect to a transactional activity must be reported because it may be suspicious, without inquiry into or consideration of the facts and circumstances of the activity, and without regard to whether the SEC has demonstrated willfulness or negligence on the part of the firm under scrutiny.[179]

---

[176] Navigant Report at 12.

[177] *See* FFIEC Examination Manual 2010 at 75-76; FFIEC Examination Manual 2014 at 68.

[178] *See* 31 U.S.C. § 5321.

[179] In support of her position that the SAR filing standard is objective, the SEC's expert witness purports to cite to a number of cases that she claims regulators have "successfully pursued . . . involving misconduct involving the failure to file SARs, particularly with respect to transactions in microcap securities."  Navigant Report at 13-14. The SEC's expert witness, however, wholly overlooks the fact that the cases upon which she relies are settled cases, not

### 4.       Microcap SAR Determinations

169.     At the heart of the SEC's expert witness's conclusions in this case is a deep-seated skepticism of the penny stock and microcap markets.  Indeed, the Navigant Report states expressly the SEC's expert witness's view that "Section 5 violations are often associated with large deposits of low-priced securities" and that "substantial deposits also may be involved in fraud in the penny stock market, which has long been subject to abusive practices."[180]

170.     While risks are inherent in all markets, particularly in those that are thinly traded and lacking in transparency in varying degrees,[181] the adoption by Congress of the Penny Stock Reform Act, cited by Navigant, indicates that Congress appears to have concluded that the value of the market outweighs any view that the transactions therein are inherently suspect.  The same applies to the more recent Jumpstart Our Business Startups (JOBS) Act; Congress has determined that access to capital for companies *of all sizes* is critical to the health of the U.S. economy.[182]

171.     The microcap and penny stock markets serve legitimate economic functions, which includes providing a means by which start-up and small companies may access capital and a means by which holders of securities may lawfully seek buyers for their holdings. Nonetheless, the SEC's expert witness effectively treats penny stock and microcap securities,

---

adjudicated cases; in none of those cases did the SEC prevail in an adjudicated matter on a theory that the SAR filing standard is objective.

[180] Navigant Report at 28.

[181] *See, e.g.,* U.S. Securities and Exchange Commission, Microcap Stock: A Guide for Investors (Sept. 18, 2013), *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html (providing investors with suggestions for how to engage in research before buying microcap stocks so that they may distinguish those that are legitimate from those that may be scams or involved in trading schemes).

[182] *See Jumpstart Our Business Startups Act*, Pub. L. No. 112-106, 126 Stat. 306 (2012) (in which Congress sought to "increase American job creation and economic growth by improving access to the public capital markets for emerging growth companies" by adopting, for example, a crowdfunding exclusion with respect to the Securities Act of 1933 (sec. 302) by prescribing exemptions for small company capital formation (sec. 401), and an by excluding persons who hold a security acquired by them through an employee stock ownership plan from the number of security holders that would trigger registration (sec. 502).

and transactions in them, as *per se* illegitimate in the conclusions she draws about the SARs filed by Alpine.

172.    Displacement of legitimate business activities by outsized BSA concerns with respect to segments of the financial services industry is not a new concept, and it can have disruptive, even destructive effects. A notable example in the domestic economy is the fear that spread throughout the banking industry in 2004, which resulted in the de-banking of money services businesses over more than a decade.[183]

173.    It is concerning, therefore, that the implementation of the approach implied by the Navigant Report has great potential to chill the microcap markets, as financial institutions that facilitate access to them fear regulatory retaliation for merely engaging in transactions in those securities.  While this may have a positive effect on the fraudsters that operate in the margins of all markets, those who will be harmed most will be legitimate companies and investors who will be foreclosed from accessing the markets if for no other reason than divesting themselves of their holdings.

174.    Moreover, the conclusion the SEC's expert witness appears to reach, if adopted, effectively would trigger a SAR filing for every large deposit of illiquid and "low-priced" securities.  Not only would this impose an unnecessary and destructive burden on firms and on the markets, it would render SAR filings in that market useless by the sheer volume of them. The result would include an inordinately large number of SARs that were filed on activity that would not be suspicious under any of the four prongs of the SAR rule and volumes of information that would be valueless to law enforcement and that would clog the BSA database to

---

[183] FinCEN Statement on Providing Banking Services to Money Services Businesses at 3 (Nov. 10, 2014), *available at* https://www.fincen.gov/news/news-releases/statement; Interagency Interpretive Guidance on Providing Banking Services to Money Services Businesses Operating in the United States at 7 (Apr. 26, 2005), *available at* https://www.fincen.gov/sites/default/files/guidance/guidance04262005.pdf.

the point that meaningful SARs related to microcap and penny stock fraud would be difficult, if not impossible, to identify.

### 5. Voluntary SARs

175. As the SEC's expert witness correctly states, "[t]he rule concerning SARs contemplates that a broker-dealer may file a voluntary SAR, even when a filing is not required by law."[184] Firms may file voluntary SARs in a variety of situations, including where:

- the activity being reported in aggregate does not reach the $5,000 reporting threshold,

- the activity has been determined not to fall into one of the four filing categories, but nonetheless is determined by the broker-dealer to be worthy of reporting for some reason,

- the activity involves activity that is excepted from the reporting requirement in the rule including robbery, burglary, or attempts that are reported to law enforcement, or for lost, missing, counterfeit, or stolen securities that are reported to the SEC, or activity that is reported on a Form U4 or U5, or

- is being filed based upon the suggestion or determination by a third-party that a SAR should be filed, even though the broker-dealer had determined the activity in question was not required to be reported.[185]

176. Congress adopted a safe harbor into the SAR statutory scheme and applied it to all voluntary reports of suspicious activity.[186] By making the safe harbor applicable to voluntary SARs, neither regulators nor the courts would have to struggle to second-guess whether the determination of a financial institution to file a SAR was voluntary or mandatory under the BSA;

---

[184] Navigant Report at 49.

[185] SAR Activity Review, Trends, Tips and Issues, Issue 20, at 74-75, n.79 (Oct. 2011), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_20.pdf#page=47.

[186] 31 U.S.C. § 5318(g)(3)(A) ("Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation . . . or makes a disclosure pursuant to this subsection or any other authority . . . shall not be liable to any person under any law or regulation of the United States[.]").

the safe harbor would insulate the filing firm from liability to the subject for harm resulting from report, regardless of whether the SAR was voluntary or mandatory.[187]

177.     There is no statutory or regulatory directive requiring that a filer distinguish between a SAR that must be reported or one that has been reported voluntarily.  In light of this, no special requirements have been adopted for when a firm may determine to file a SAR voluntarily or do so inadvertently.

178.     When determining whether some or all of the SARs filed by Alpine were "mandatory" or voluntary SARs, the SEC's expert witness erroneously asserts that there are standards that would apply to voluntary SARs.  Contrary to the suggestion of the SEC's expert witness, there is no requirement that voluntary SARs be identified as such on the face of the SAR, that a SAR can only be considered to be voluntary when it does not meet the $5,000 aggregate threshold, or that the SAR narrative or supporting documentation must show that the firm conducted an investigation and "uncovered facts to negate a reason to suspect criminal activity."[188]

179.     The SEC's expert witness cited no authority for the propositions above, nor is there any authority she could cite to support those views.  There is no rule requiring that firms expressly provide that a SAR is being filed voluntarily.  Nor is there any rule requiring firms that file voluntary SARs to justify their conclusion that the activity is not, in the firm's view suspicious, or that the SAR may not actually be required.

180.     Nor do the contents of a firm's AML program cause a SAR that is not required to be reported to become "mandatory," as the SEC's expert witness asserts.  The conclusion that

---

[187] *See* Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048, 44,055 (July 1, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-07-01/pdf/02-16416.pdf.

[188] Navigant Report at 50.

"Alpine's own procedures indicate that the practice of a customer who deposits penny stocks, liquidates the shares, and wires out the proceeds is suspicious activity,"[189] and that Alpine's SARs therefore were "mandatory" is, quite frankly, baseless.

181.    The conclusion appears to be premised on the belief that the establishment of a risk-based AML program under the BSA and its implementing regulations, which leaves room for a firm to make judgment calls, cannot be applied flexibly once adopted by management. Indeed, it appears that the SEC's expert witness has developed a unique interpretation of "a pattern of transactions" in order to permit the aggregation of the deposit and liquidation of a single deposit-for-sale transaction in order to cause many of the low dollar transactions effected through Alpine to exceed the $5,000 filing threshold and become reportable.  Neither the conclusion nor the interpretation has any basis in law, nor does the SEC's expert witness make any credible attempt to cite one.

182.    First, as the SEC's expert witness herself acknowledges elsewhere in the Navigant Report, penalizing a firm for failing to file a SAR requires evidence that the firm knew or suspected that the transaction involved criminal activity, the firm found no reasonable explanation for the transaction, or that—at the least—"on the facts existing at the time, a reasonable broker-dealer in similar circumstances would have suspected the transaction was subject to SAR reporting."[190]  With respect to Alpine, however, the SEC's expert witness has not offered any such examination of the facts and circumstances of any transaction applicable at the time Alpine would have reviewed the transactions to determine whether to file a SAR.  Failing to do so is fundamentally inconsistent with the SAR rule and makes the conclusion in this instance hollow and unsupportable.  As such, it should be rejected.

---

[189] See Navigant Report at 33, 35-37.

[190] Navigant Report at 12.

183.    Second, the SEC's expert witness's apparent antagonism toward the microcap and penny stock markets, as discussed above, colors her conclusions in inappropriate ways.  It simply is not the law or the factual reality that every transaction involving "low-priced" securities is inherently suspect.  Insofar as the SEC's expert witness's conclusion that the SARs were mandatory is based on the simple fact that they involved "low-priced" securities, that is not, in and of itself, a sufficient basis for concluding that the SARs were mandatory.

184.    Third, as the SEC's expert witness herself acknowledges earlier in the Navigant Report, "[t]he presence of red flags alone, of course, does not mean that a transaction is suspicious and reportable."[191]  Rather, a red flag is an indication that the transaction should be examined by the Firm.  Here, there can be no real dispute that the transactions were, in fact, examined and SARs were filed.  Insofar as the SEC's expert witness takes issue with the fact that Alpine did not explain the basis for a decision not to file a SAR, the SEC's expert witness has cited no authority imposing such a requirement.  Nor am I aware of any.  In fact, even if Alpine did not file a SAR at all, there is no regulatory requirement that a firm document its rationale for every conclusion that a SAR is not required.

185.    Finally, it is worth noting that, although the SEC's expert witness repeatedly states that Alpine possessed sufficient information to suspect that the transactions at issue either had no apparent business or lawful purpose or resulted from the use of Alpine to facilitate criminal activity—particularly the sale of unregistered securities—neither the SEC nor Navigant has pointed to a single transaction that actually did amount to an unregistered sale of securities, or any evidence that Alpine could have discovered that the securities were unregistered at the relevant time.

---

[191] Navigant Report at 20.

186.    In sum, the analyses and conclusions in the Navigant Report about the voluntary or "mandatory" nature of the Alpine SARs appear to be based more on generalized suspicion and assumptions, rather than a thorough analysis by Navigant of all of the facts and circumstances relating to a transaction.

### 6.    SAR Content Requirements

187.    Seeking to justify the SEC's theory that thousands of SARs that were filed by Alpine were "fatally deficient," the Navigant Report concludes that SAR narratives "should" "include any information readily available to the filer regarding the transactions or the customers that has been obtained through the account opening process and during any due diligence effort."[192]  Although ultimately stopping just short of pronouncing a rule that each and every red flag must be included in each and every SAR narrative, as applied, that is effectively the rule that would be established if Navigant's analysis were adopted.  Indeed, the majority of the SEC expert witness's analysis of the SARs in Category A, which are the filed SARs the SEC claims are deficient, consists of identifying red flags that were missing from the SAR narratives and concluding that, on the basis of those missing red flags, the relevant SARs were "inadequate on their face," "deficient" or otherwise "improper."[193]

188.    But that standard is plainly overbroad and untethered to applicable regulations.  In fact, the SAR narrative need only include "a clear, complete and concise description" of the activity *that caused the firm suspicion*.[194]  There is no rule or regulation that requires a firm to include "all information readily available to the filer," and the Report does not consider the

---

[192] Navigant Report at 15.

[193] *See*, *e.g.*, Navigant Report at 52, 54, 57, 60, 61, 62, 63.

[194] FinCEN, Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements, at 111 (March 2015), *available at* https://bsaefiling.fincen.treas.gov/docs/FinCENSARElectronicFilingRequirements.pdf (emphasis added) ("2015 SAR Electronic Filing Instructions"); *see also* SAR Form 101 at Part VI (similar language).

authority confirming that the content of a SAR narrative is also a subjective determination by the firm.

189.    There is no provision of the SAR rules that would support penalizing a firm that filed a SAR that contains the requisite data—the identification of an account, a description of the transaction, the rationale for filing the SAR if one can be articulated beyond the mere fact that the transaction occurred, and other information that enables a querying law enforcement or regulatory or supervisory agency to request additional information during an investigation or proceeding related to some aspect of the report—or that would support imposing penalties on the filer to the same extent as if no SAR had been filed at all.

190.    The ultimate objective of the SAR narrative is to make available to law enforcement and regulatory or supervisory authorities information that they may need to engage in further investigation, and, according to the very guidance the SEC's expert witness cites to extensively, to do so concisely.[195]  Because firms do not have police powers, it is not expected or likely that a firm can provide these authorities with all of the information they may want or that would immediately enable enforcement authorities to establish a *prima facie* case against the subject of a SAR.

191.    Indeed, the subject of a SAR may not even have engaged in any wrongdoing; if such wrongdoing has occurred, that is a matter for law enforcement authorities to determine, as reporting firms ultimately do not have the investigative tools to do so.  Rather, the firm's obligation under the SAR rule is simply to provide enforcement authorities with a reasonable

---

[195] *See* SAR Narrative Guidance at 1-2 (explaining that the purpose of the Guidance is to educate SAR filers on how to organize and write narrative details that maximize the value of each SAR form by, among other things, "providing a general guideline on how to organize the SAR narrative so that critical details are concise and follow a logical order of presentation"); *id.* at 7 ("When all applicable information is gathered, analyzed, and documented and the financial institution decides that a SAR is required, the information should be described in the SAR Narrative in a concise and chronological format.").

"lead," as well as the potential to "follow the money."

III.    **Analysis of SAR Requirements Applicable to Alpine's SAR Determinations and Filings**

192.    It is my considered opinion that the SEC and SEC's expert witness have drawn conclusions about the Alpine SARs that fit neither within the SAR regulations nor within the SAR filing principles.  In fact, in certain instances, conclusions were drawn that were contrary to the discussion of the legal and regulatory framework contained in the Navigant Report itself.

A.    **Arbitrary and Misguided Application of Selected Red Flags and SAR Analysis**

1.    **Significance of Red Flags**

193.    In addition to improperly relying on guidance, the SEC's expert witness's analysis fundamentally misstates the significance of red flags, even according to the very guidance she relies upon.  The SEC's expert witness ultimately takes the position in her Report that if a firm identifies "red flags" associated with a customer's activity, the firm must, as a matter of law, file a SAR and include such "red flags" in the SAR narratives.[196]  Not only is that inaccurate, but such a requirement would hopelessly muddy the SAR database with useless information.  To try to figure out what the issue is in connection with a particular SAR, a law enforcement or supervisory agency would have to weed through all the "red flags" that turned out to be red herrings to try to determine which one may have turned out, after examination, to have been an actual indicator of suspicious activity and, thus, triggered the SAR filing.

194.    Notwithstanding its final conclusions, even the Navigant Report actually confirms that the presence of supposed "red flags" does not mean "that a transaction is suspicious and

---

[196] *See* Navigant Report at 52-64 (identifying SARs that omitted selected red flags and concluding that those SAR were, on the basis of the omitted red flags, "inadequate" "deficient" or otherwise "improper").

reportable."[197]  The SEC's Office of Compliance Inspections and Examinations ("OCIE") has expressly acknowledged as much in guidance as well. Thus, as OCIE itself concedes: "[t]he Staff does not contend that the existence of any of these examples, which may indicate suspicious activity, necessarily triggers the broker-dealer's obligation to file a SAR.  Whether the broker-dealer has such an obligation depends on the totality of facts and circumstances in a particular situation."[198]

195.    Moreover, Navigant also agrees that red flags should not be viewed as automatic triggers; instead they "require the firm to 'ask the next logical question' to understand whether there is a reasonable explanation for the transaction.  If there is no reasonable explanation, the firm must file a SAR."[199]  That focus on whether there is a "reasonable explanation" for a transaction is appropriate and critical: money laundering transactions frequently involve economically unreasonable transfers.  Yet the Navigant Report then abandons that rational approach in favor of its myopic focus on the mere presence of a red flag.  The SEC expert never goes the next step of applying its own analysis, and does not reach any conclusion that Alpine failed to conclude that there were reasonable explanations for the transactions at issue.  Rather, the SEC's expert witness presumes as much from the fact that there is no written record outlining the firm's rationale.

196.    Nor is there any requirement in the SAR instructions or guidance requiring the discussion of specific, or any, "red flags."  While FinCEN has provided instructions in the SAR Form regarding items to consider including in the narrative, none of the "red flags" articulated in

---

[197] *See* Navigant Report at 20.

[198] *See* U.S. Sec. & Exch. Comm'n Office of Compliance Inspections and Examinations, *National Examination Program Risk Alert: Broker-Dealer Controls Regarding Customer Sales of Microcap Securities* at 5 n.17 (Oct. 9, 2014), *available at* https://www.sec.gov/about/offices/ocie/broker-dealer-controls-microcap-securities.pdf.

[199] Navigant Report at 20.

the Navigant Report are included in that list.  To read these requirements into the rule imposes obligations over and above what is mandated.

197.    Based on my experience, "red flags" are not *per se* suspicious scenarios, but rather, are indicators that might prompt an inquiry into an activity that may or may not rise to the level of reportable activity.  "Red flags" are, in other words, simply a means by which a firm may identify activity that should be examined to determine if there may be suspicious activity for which a SAR should be filed.  However, the "red flag" often will have nothing to do with suspicious activity that may ultimately be identified.

198.    If firms are required to identify and include every "red flag" in the firm's possession in the SAR narrative, regardless of whether such "red flag," upon investigation, is truly indicative of suspicious activity, there is a significant risk that SAR narratives will include irrelevant and extraneous information, which will water down the information contained in the BSA database and ultimately be counterproductive to law enforcement that utilizes the database.   In other words, if firms are required to include in their narratives every potential red flag regarding the transaction and relevant parties, the basis for the firm's decision that the activity is suspicious may well get lost in the weeds.  Moreover, it is also not always possible for a firm to develop "red flag" information because that information may be unavailable to the firm and the firm will not have, as law enforcement and regulatory authorities do, police powers that may be used to compel production of the information.

199.    Insofar as the SEC's expert witness argues that particular "red flags" must necessarily be included in the SAR narrative as a matter of law whenever such information is available to the firm, that position is not consistent with the fundamental purpose of the narrative: to identify the firm's basis for concluding that the activity at issue is suspicious.  If that

"red flag" did not lead to the firm's decision to file a SAR, it is not a required element of the SAR narrative. Indeed, firms may well conclude, after investigating, that the "red flags" that prompted their investigation were not sufficient to warrant a SAR filing, but that other information the firm uncovers in its investigation does warrant a SAR filing.  In that instance, the information that led to the SAR filing should be included in the SAR narrative, not the "red flags" that the firm concluded after investigation could be explained or were irrelevant.

200.    Further, the "red flag" rule created by Navigant is, as a practical matter, unfair and unworkable. There is no published, comprehensive list of "red flags" that industry participants can use to satisfy the standard the SEC's expert witness would have the Court adopt. While there are some advisories and various and sundry pieces of guidance that discuss certain potential "red flags" for particular kinds of activity, products, clients, and markets, those lists are neither comprehensive nor stagnant.[200]  Rather, as demonstrated by the fact that the SEC was relegated to relying on settled enforcement cases to identify certain "red flags" it claims Alpine should have included in its SAR narratives, regulators and industry participants are continually identifying new "red flags" as criminals become more sophisticated or change strategies, financial products change and evolve, and as industry participants and regulators identify new ways of identifying potentially illegal conduct.

201.    To suggest that firms are required to include in each SAR narrative each "red flag" that the SEC has in its mind, when those "red flags" are not defined in a comprehensive manner in any particular piece (or even pieces) of guidance by the SEC (or any other regulator) is fundamentally unfair to industry participants and sets a changing and evolving standard that,

---

[200] *See* FinCEN, FIN-2006-G013, Frequently Asked Questions Suspicious Activity Reporting Requirements for Mutual Funds, FAQ 7 at 4 (Oct. 4, 2006), *available at* https://www.fincen.gov/sites/default/files/shared/guidance_faqs_sar_10042006.pdf ("The means of commerce and the techniques of money launderers are continually evolving, and there is no way to provide an exhaustive list of potentially suspicious transactions.").

practically speaking, no firm can ever live up to. Moreover, insofar as the SEC and the SEC's expert witness have relied on "red flags" identified for the first and only time in settled cases,[201] the SEC and SEC's expert witness seek to elevate not only guidance but also settled cases to settled law, bypassing appropriate rule-making procedures or even independently adjudicated decision-making.

202.    Not only is it fundamentally unfair, unwieldy, and inconsistent with regulatory guidance to require firms to include in each SAR narrative every "red flag" it happens to have information about, it is also unnecessary. It should be recognized that there are all types of SARs. Some necessitate more explanation than others, and, in the case of some SARs, the checkboxes associated with common "red flags" on the SAR form, combined with a concise narrative, provide sufficient information to law enforcement and applicable regulators.

203.    Indeed, as noted above, the SAR form, now established in electronic forms, contains searchable fields separate from the narrative component that answers these questions with sufficient detail to permit enforcement agencies to query persons, types of transactions, common suspicious activities, and geographic locations, and unlike the narrative, are far more efficiently queried because of their standardization than the narrative, which is free form. Regardless of what is in the narrative, a search result permits an enforcement agency to query the filing firm and seek additional information about the transaction in the form of the SAR supporting information.

### 2.    Conclusory and Overly Simplistic Application of Red Flags And Flawed Opinions With Respect to the Alpine SARs

204.    The SEC expert witness's analysis with respect to the SAR narratives she has analyzed is erroneous not just for the reasons set forth above, but also because (i) the selection of

---

[201] *See, e.g.*, *In re Albert Fried & Co.*, SEC Release No. 77971, 2016 WL 3072175, at *5 (June 1, 2016).

the particular red flags she has identified as a basis for critiquing Alpine is arbitrary, providing

no cogent methodology for the identification of required red flags or adequate explanation for the

selection of the particular red flags she chose to highlight, and (ii) her analysis and application of

the red flags she selected is misguided for the reasons set forth below.

205.     In her report, the SEC's expert witness opines that approximately 1800 SARs that

Alpine filed and that are listed on Exhibit A to her report were deficient because the SARs did

not contain a discussion of various "red flags".  In particular, the SEC's expert witness opines

that:  (i) 1,105 SARs omitted "basic customer and suspiciousness information"; (ii) 675 SARs

omitted criminal or regulatory history of subjects or related parties; (iii) 241 SARs omitted shell

company involvement or derogatory history of stock; (iv) 55 SARs omitted evidence of stock

promotion; (v) 42 SARs omitted facts showing that issuers could not be verified; (vi) 707 SARs

did not adequately disclose low trading volume; (vii) 298 SARs did not adequately disclose

involvement of a foreign individual or entity in connection with the reported transaction.[202]  With

respect to each of these purported flag categories, the SEC's expert witness's assertions and

criticisms  are flawed.

    **B.      Flawed Expert Analysis of SARs**

        **1.      Navigant Category 1: Basic customer and suspiciousness information**

206.    The SEC's expert witness criticizes 1,015 of Alpine's filed SARs, and

particularly the SARs that contained Alpine's narrative template language, on the basis that the

SARs did not adequately describe the "Who, What, When, Where, and Why" relating to the

transactions being reported.[203]  Specifically, as asserted by Navigant, many SARs filed by

---

[202] Navigant Report at 52-64. In some cases, the same SAR is criticized for omitting red flags in more than one of the categories above.

[203] Navigant Report at 52-54.

Alpine contained a bare-bones narrative, "identifying only the name of the depositor, introducing firm, and the security, the quantity, ticker symbol, price, and the value of the transaction." What is particularly interesting about the Navigant discussion of the SAR deficiencies it identified with respect to "basic customer and suspiciousness information" is that it provides nothing but bare-bones, conclusory statements as to why certain information should have been included in an Alpine SAR. Navigant's criticisms with respect to the alleged deficiencies in this category are also misplaced for the following reasons:

207.   First, as discussed throughout this report, there is no regulatory requirement that firms report in every SAR the information the SEC's expert witness now claims is required as a matter of law. Her opinion is based entirely on selected excerpts from various forms of guidance, which plainly does not have the force of law.

208.   Second, the SEC's expert witness is wrong insofar as she claims that many, if not most, of Alpine's SARs did not contain sufficient information to comply with the broker-dealer SAR rule. This includes not only those that were filed using the two templates criticized by the SEC and its expert witness, but also a substantial number of the SARs described by the SEC's expert witness in Exhibits to the Navigant Report.

209.   As reflected by the example that Navigant itself uses, the information that Alpine included in its SAR narratives did present the "who/what/where/when/why" that the SEC and Navigant claim was missing from the SARs:

NAVIGANT EXAMPLE

Alpine Narrative: John Doe is a client of Scottsdale Capital a firm for which Alpine Securities provides clearing services. On or around 06/21/2012, John Doe deposited a large quantity (1,234,567 shares) of ABCDEFG (ABCD), a "low-priced" ($0.001/share) security. This transaction amounted to approximately $1,234.00.

| Who: | John Doe, through Scottsdale Capital |
|---|---|

| What: | Deposit of 1,234,567 shares of ABCDEFG (ABCD) |
|-------|------------------------------------------------|
| When: | On or about 6/21/2012 |
| Where: | Through Alpine, via Scottsdale Advisors |
| Why: | Deposit of large quantity of a "low-priced" security (cited by Navigant and the SEC as a red flag) |

210.    The "customer and suspiciousness" information provided by Alpine, together with the standardized and searchable fields in the electronic form would have permitted any enforcement agency seeking information about large quantity, "low-priced" securities, which are common traits of transactions in penny stocks and microcap securities, or about persons who were reported in the SAR, to identify the Alpine transactions and make inquiries of the firm.

211.    Because Alpine's SARs obviously explained the actual transaction being reported, *e.g.*, a specific quantity of low priced securities deposited by an identified customer at a particular time, the Navigant Report is left to argue only the claimed absence of a "why," the reason for the filing.  Given the fact that Navigant insists that a large deposit of "low-priced" securities is a red flag in and of itself, it cannot also claim that the identification of that transaction would leave the reader mystified as to the reason for the filing.

212.    The Report also criticizes SARs that stated in the narrative that the subject was on Alpine's Heightened Supervisory List.[204]  In addition to the information provided in the narrative, of course, Alpine provided other information in the SAR, specifically in the searchable, non-free form fields of the SAR form.  These completed fields include, for example, subject information, including identifying information; suspicious activity information, including what the SEC and the SEC's expert witness would call "red flag" information, such as the

---

[204] *Id.*

customer's location (domestic or foreign), any identifiable securities fraud, transaction out of

pattern for customer(s), transaction with no apparent business or lawful purpose, proceeds sent to

or received from an unrelated third party, insider trading, market manipulation; product

information, such as microcap securities; instrument type or "payment mechanism" including

"market where traded;" and sub-type of financial institution, including clearing broker—

securities and introducing broker—securities.[205]

213.    Third, although the Navigant Report contains a discussion of allocations of

responsibilities between clearing and introducing firms, and the authorities the SEC's expert

witness cites acknowledge that clearing firms generally do not have as much information

regarding the customer, in particular, as the introducing firms, the SEC's expert witness

apparently disregards these allocations and relative disparities in both information and emphasis.

In reaching her conclusions regarding what information Alpine was required to include in its

SARs, the SEC's expert witness has wholly overlooked FinCEN's plain statement that the SAR

filing standard is meant to be "a flexible standard that adequately takes into account the

differences in operating realities among various types of broker-dealers".[206]

214.    Finally, to the extent the SEC's expert witness's general criticism is premised on

the fact that the SARs did not provide sufficient information for law enforcement, it is my view

that the template narrative, together with other information provided elsewhere in the SAR

narrative, should, as a general matter, have provided law enforcement with sufficient information

---

[205] *See Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields*, 82 Fed, Reg. 9109, 9112 (Feb. 2, 2017), *available at* https://www.gpo.gov/fdsys/pkg/FR-2017-02-02/pdf/2017-02235.pdf (Appendix—SAR Comprehensive Summary of Data Fields), a Paperwork Reduction Act preapproval notice, which was approved by the Office of Management and Budget, Office of Information and Regulatory Affairs, at https://reginfo.gov/public/do/PRAViewICR?ref_nbr=201710-1506-002. Prior to the most recent update, which became effective in 2018, the term "penny stock" was included in the form for all periods relevant to this matter (February 2007 proposal, removing the term at 9110).

[206] *See* Navigant Report at 12 (quoting FinCEN, Amendment to the Bank Secrecy Act Regulations – Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048, 44,053 (July 1, 2002)).

to perform their jobs.  This is particularly true given that law enforcement has the right to request any supporting documentation for the SARs Alpine filed, and the SEC's expert witness herself implicitly acknowledges that such supporting documentation provides additional information not necessarily discussed in the SAR narratives.

215.    Moreover, if those SARs were  required filings,  law enforcement should have had access to SARs from at least two other sources to fill in any information it purportedly needed.  Specifically, the introducing broker would have filed a SAR with respect to the same general transaction.  Likewise, if the transaction involved moving customer funds in and out of bank accounts, U.S. banks would have been involved; those institutions also have SAR reporting obligations.  No single financial institution is required to be the source of all potentially helpful information.

### 2.    Navigant Category 2: Criminal or regulatory history

216.    The SEC's expert witness's conclusion that 675 SARs were deficient because they lacked information about criminal or regulatory history is flawed for several reasons.[207]

217.    First, the SEC's expert witness fails to point to any basis for the requirement to include in the narrative that particular item of information, and fails even to acknowledge that the SAR Form Instruction is much narrower, noting on the checklist the existence of "related litigation."

218.    There is no basis in law or regulation that requires the contents Navigant asserts is critical, and it fails to demonstrate any that the regulatory histories formed the basis for Alpine's determination to file the SARs in question.

---

[207] Navigant Report at 54-60.

219.     Perhaps because there is no such articulated requirement, the SEC's expert witness herself is not even consistent about whose criminal or regulatory history is relevant.  At some points, she suggests that it is the history of Alpine's customers, at other points it is the history of the SAR subjects (which may not be Alpine's customers), and at yet other points, it is the history of undefined "related parties."[208]  Likewise, the standard she has articulated – that the firm must "refer to, or adequately describe" criminal or regulatory history – is entirely too vague. Is it sufficient to mention the criminal or regulatory history?  Or does the narrative have to go into specifics with regard to that history?  To suggest that Alpine should be penalized for failing to include information, but not even be clear about what information was omitted, or about whom, is simply not a fair standard, nor is such a rule consistent with industry standard.

220.     Second, the fact that a person or entity with a criminal or regulatory history – information equally accessible to law enforcement – conducts a financial transaction does not necessarily indicate that the transaction is inherently suspicious.  If so, every transaction over $5,000 of every felon who is now gainfully employed, including a routine paycheck, would trigger a suspicious activity inquiry and filing.  The fact that an issuer's CEO was convicted of a DUI when he was 22, with no subsequent criminal history in the next 40 years, may well not be relevant to an analysis as to whether that issuer's stock is the subject of market manipulation. And providing that information in a SAR will not likely be helpful to law enforcement. Accordingly, creating a bright-line rule, for the first time in the history of the BSA, that criminal or regulatory history must be included in the narrative as a matter of law simply does not advance the fundamental purpose of SARs; in fact, it is counterproductive.

---

[208] *See* Navigant Report at 40-41, 54.

221.    Of course, there may be circumstances in which a firm determines that the history is relevant to its actual determination that the activity being investigated is suspicious.  But the fact that information about past criminal or regulatory history may have been contained in Alpine SAR documentation does not mean it should be contained in all SARs.

222.    Third, with respect to the particular SARs with which the SEC's expert witness takes issue, it is worth noting that:  (i) criminal history of underlying customers of Alpine's introducing broker customers is information more readily available to, and reportable by, the introducing brokers, (ii) the fact that individuals or entities are the subject of litigation with, or have been the subject of, law enforcement or regulatory proceedings, is information readily available to the SEC and other regulators and law enforcement personnel who review SARs, and (iii) the SEC's expert witness has provided no analysis suggesting that criminal or regulatory history was related in any way or relevant to the particular transactions that the SEC's expert witness claims were mandatory filings, or that such history was the reason Alpine decided to file a SAR.

223.    Finally, insofar as the SEC's expert witness focuses on the regulatory history relating to Scottsdale and Justine and Joseph Hurry, or ACAP and Kirk Lynn Ferguson, the SEC's expert witness's opinion that those entities' and individuals' regulatory histories were required to be filed in every SAR Alpine filed after each regulatory action relating to them is not supported by any authority.  The fact that a person or entity has been involved in regulatory proceedings – or in the case of FINRA, nongovernmental disciplinary hearings – does not need to be included in every SAR in which that person or entity is a subject.  Indeed, Navigant did not and cannot establish that the past regulatory history of persons and entities would cause every transaction they effected to lack an apparent business or lawful purpose or constitute an attempt

by them to use of Alpine to facilitate criminal activity.  It does not stand to reason that every transaction conducted by those entities or individuals over the past seven years lacks any legitimate business or lawful purpose or is one that involves the use of Alpine to facilitate criminal activity, merely because they consented to a FINRA disciplinary action or were alleged by FINRA to have been engaged in misconduct.  If that were the case, each transaction would be reportable simply for that fact; that is not the law.

### 3.    Navigant Category 3: Shell company involvement or derogatory stock history

224.    The SEC's expert witness claims that 241 SARs omitted "shell company involvement or derogatory history of stock."[209]  As support for this "red flag" category, the Navigant Report relies on a 2006 FinCEN issuance concerning money laundering risks relating to shell companies.[210]  But that FinCEN guidance specifically explains that "[t]he term 'shell company' . . . refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence."[211]  Likewise, the SAR Activity Review uses the term "shell company" or "shell corporation" to describe a company that "is registered or licensed in the state or country in which it is incorporated, is not traded on a securities exchange, and does not operate on its own."[212]  In other words, "shell companies" – as that term is defined and applied by FinCEN – are not publicly traded; the SEC expert witness's criticism of Alpine for

---

[209] Navigant Report at 60-61.

[210] Navigant Report at 30 & n. 118-119.

[211] FinCEN, FIN-2006-G014, *Potential Money Laundering Risks Related to Shell Companies,* at 1 (Nov. 9, 2006) (emphasis added), *available at*  https://www.sec.gov/about/offices/ocie/aml2007/fin-2006-g014.pdf.

[212] FinCEN, the SAR Activity Review, Issue 7, at 4 (Aug. 2004) (emphasis added), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_07.pdf.

purportedly failing to disclose in certain SARs "information about the issuer of stock being a shell," which by definition confirms that the company is publicly trading, is nonsensical.[213]

225.    The SEC's expert witness's analysis of shell company involvement, moreover, is not tethered to any discussion of how such involvement would have contributed to a conclusion that the activity being reported was suspicious.  Nor does the Navigant Report suggest in any manner that shell company involvement was the basis for Alpine's decision to file the SAR.

226.    Moreover, to the extent the SEC's expert witness is suggesting that the fact that an issuer is "a shell or former shell company" is a red flag that must automatically be reported in a SAR, that reflects a fundamental misunderstanding of the relevant guidance.  Specifically, the SEC's expert witness's analysis fails to acknowledge that there is no guidance that would support the creation of a red flag where the issuer was formerly a shell company at some time previous to the issuance of the securities that are involved in the transaction at issue.  Yet of the 241 SARs with which she takes issue, 104 of those SARs involved issuers that were "formerly" shell companies.

227.    Contrary to the SEC's expert witness's view, however, FinCEN guidance says nothing at all about a former shell company being a potential risk factor, let alone inherently suspicious.  In fact, FinCEN recognizes that most shell companies are formed and used for legitimate business purposes.[214]  For that reason, the guidance explains that a financial institution should file a SAR and report shell company involvement in the narrative "if a financial institution discovers suspicious activities such as those listed above and knows, suspects or has reason to suspect the transactions involve the use of United States or foreign-based shell business

---

[213] Navigant Report at 60-61.

[214] FinCEN, FIN-2006-G014, Potential Money Laundering Risks Related to Shell Companies, at 1-2 (Nov. 9, 2006), *available at*  https://www.sec.gov/about/offices/ocie/aml2007/fin-2006-g014.pdf.

entities to launder illicit funds or to enable the furtherance of a crime."[215]  That is, according to

FinCEN, the key is not the presence of a shell company in a transaction; the key is whether there

are indications that a company is presently a shell company that is being used for money

laundering or in furtherance of a crime.

### 4. Navigant Categories 4 and 5: Stock promotion and Unverified Issuers:

228.    The SEC's expert witness claims that 55 of the SARs Alpine filed omitted

"evidence of stock promotion" and 42 of the SARs Alpine filed omitted information "showing

that issuers could not be verified."[216]

229.    Initially, the SEC's expert witness's suggestion that the SAR narratives at issue

were deficient because they were "missing information about unverified issuers" is wrong

because it is a made-up "red flag."  The SEC expert not only does not explain what this term

means, but does not cite to even a single law, regulation, rule, or guidance that uses this term.[217]

There is no support for the proposition that Alpine can or should be penalized for failing to

include in its narratives a category of information that is conjured by an expert witness years

after the SARs at issue were filed.

230.    Stock promotion, like missing information, is a "red flag" of Navigant's making.

The Report does not and cannot claim that promotion is unlawful nor does it offer any support

for the claim that a filer must report every instance in which stock promotion has occurred or is

occurring.

231.    Further, even if "unverified issuers" and "stock promotion" were recognized "red

flags," as with the other categories of red flags, the SEC's expert witness's analysis is not tied to

---

[215] *Id.* at 5 (emphasis added).

[216] Navigant Report at 61-62.

[217] *See* Navigant Report at 44, 61-62.

any discussion of how such evidence would have contributed to a conclusion that the activity being reported was suspicious. Nor does the SEC's expert witness suggest in any manner that evidence of stock promotion or lack of issuer verification was the basis for Alpine's decision to file the SAR.

### 5.    Navigant Category 6: Low trading volume

232.    The SEC's expert witness claims that 707 SARs that Alpine filed failed to explicitly mention that the securities identified in the SARs had low trading volumes.[218]   This criticism is not well-founded for at least three reasons.

233.    First, low trading volume is not a red flag. To the contrary, it is a hallmark of microcap stocks and it does not provide any basis to conclude that a transaction is being used to facilitate criminal activity.[219]   Further, to the extent it is clear from the filed SARs that the stock involved in the transaction was a microcap, low trading volume should – and would have been – understood and assumed by law enforcement and the SEC regulators reviewing the SARs. The converse also is true: if low volume were a red flag, then filing would be required on the majority of microcap transactions.

234.    Second, the SEC's expert witness has not defined what "low trading volume" means. If, as she claims, low trading volume must be reported as a matter of law and in every circumstance it exists, one would expect that regulators would have provided clarity about what quantity of trading volume would qualify as sufficiently "low" to require reporting. The SEC's expert witness posits a calculation of 300 percent of average trading volume over the three

---

[218] Navigant Report at 62-63.

[219] *See* U.S. Sec. & Exch. Comm'n, Microcap Stock: A Guide for Investors (Sept. 18, 2013), *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html ("Microcap companies typically have limited assets and operations. Microcap stocks tend to be "low-priced" and trade in low volumes.")

months preceding the deposit.[220]  Once again, the Navigant Report cites to no authority to support that purported SAR filing obligation.

235.    Third, as with many of the other categories of information the SEC's expert witness claims renders Alpine's filed SARs fatally deficient, information about trading volumes is publicly available, and certainly available to law enforcement.  Accordingly, while perhaps helpful to law enforcement, information about the stock's trading volume is not critical information for SAR narratives or information that is uniquely within Alpine's knowledge.

### 6.    Navigant Category 7: Foreign involvement

236.    The SEC's expert witness opines that 298 SARs were deficient because they omitted information regarding foreign involvement.[221]  The Navigant Report is flawed insofar as it contains this opinion, for several reasons.

237.    First, like other categories of red flags discussed above, the SEC's expert witness's analysis does not include any discussion of how or whether the involvement of foreign individuals or entities were the basis for the SAR filings at issue.  As stated above, the obligation on financial institutions in completing a SAR narrative is to "provide a clear, complete, and concise description of the activity, including what was unusual or irregular that caused suspicion."[222] The SEC's expert witness, however, does not purport to claim that the foreign involvement was, in fact, what was unusual or irregular that caused Alpine suspicion.  Nor does the SEC's expert witness provide any rationale as to why the foreign involvement should have caused Alpine to view the transaction as unusual or irregular, or otherwise suspicious.

---

[220] Navigant Report at 44.

[221] Navigant Report at 63-64.

[222] FinCEN, Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements, at 110 (October 2012), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20SAR%20ElectronicFilingInstructions-%20Stand%20Alone%20doc.pdf.

238.     In sum and substance, therefore, the SEC's expert witness's opinion would effectively create a bright line rule that every transaction involving a foreign person or entity will be a suspicious transaction for which a SAR should be filed, and whether or not that foreign involvement is, in fact, suspicious or irregular, it must be included in the SAR narrative.  That is not the law, nor should it be.  The fact that there may be an international aspect to a particular transaction does not necessarily indicate that the transaction is inherently suspicious, and where it is not, including such information in the SAR narrative is likely to cause confusion and runs counter to the principle that SAR narratives must be concise.

239.     Second, SEC's expert witness's analysis is flawed insofar as it assumes that any and all non-U.S. involvement in the transaction should be reported, even if that activity involves a jurisdiction that is not high-risk, such as the United Kingdom or Canada.[223]  And, in fact, Canada and the United Kingdom are among the "foreign jurisdictions" that were involved in the 298 SARs that the SEC's expert witness criticizes.

240.     Third, the SAR form itself identifies the pertinent information relating to the foreign nature of the transaction, specifically seeking information about transfers to foreign jurisdictions. The SEC's expert witness asserts that Alpine's SARs were deficient because the narratives failed to report foreign involvement.  She implicitly acknowledges that  foreign involvement will be indicated  in other fields of the SAR form, for example,  when the SAR filer reports foreign addresses for the persons and entities that are subject of the SARs , or completes the "Country Code", or  "Non-US Financial Institution" fields.[224]  She argues, however, that

---

[223] Canada and the United Kingdom are members of Financial Action Task Force ("FATF") since 1990 and have been evaluated by FATF as having strong anti-money laundering and combating the financing of terrorism regimes. *See* FATF website for additional information, which is available at www.fatf-gafi.org.

[224] *See* Electronic SAR Test Form, Fields 12 and 24, *available at* https://sdtmut.fincen.*treas*.gov/news/FinCENBSAR.pdf; Proposed Collection; Comment Request; Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields, 82 Fed. Reg. 9109, 9111 (Feb. 2,

completing such information does not satisfy the filer's obligations, and that the BSA was nonetheless violated.  The SEC's expert witness offers no authority for this position, nor am I aware of any.

### C.    Liquidations

241.    The SEC's expert witness opines in conclusory fashion that Alpine should have filed SARs on the liquidations listed on Table B.[225]  In support of her position, the SEC's expert witness argues that if the deposits of the securities at issue were suspicious and reported on SARs, the liquidations, too, are necessarily suspicious and were required to be reported "to continue to advise law enforcement and regulators of further potentially fraudulent activity in microcap securities."[226]  The SEC's expert witness's opinion and reasoning for her opinion are, in my view, overly simplistic and misguided.

242.    First, as described above, the decision whether to file a SAR is a judgment call by a firm based on all the facts and circumstances and information available to the firm at the time of its determination as to whether to file a SAR.  Regulators have clearly stated that those judgment calls ought not be second-guessed absent good reason.

243.    Second, given that SAR decision-making is based on the facts and circumstances available to the firm, rendering an opinion without reference to the testimony of or rationales from the individuals at the firm who actually reviewed the transaction, and if necessary, made the decision not to file a SAR, to understand why they determined that a SAR was not necessary,

---

2017), *available at* https://www.fincen.gov/sites/default/files/federal_register_notices/2017-02-08/BSAR_2017-02235.pdf.

[225] Navigant Report at 64.

[226] *Id.*

is improper, particularly considering there is no requirement that a firm document the bases for the conclusion that activity does not warrant a SAR filing.[227]

244.     Third, it is not the case, based on my experience, that every liquidation following a deposit is necessarily suspicious.  Of note, it is relatively common in the markets associated with this case that liquidations of securities follow deposits of "low-priced" securities, including those in the form of physical certificates, and that fact alone is not *per se* suspicious.  Consistent with the relevant guidance, courts and regulators need to understand the facts and circumstances surrounding the liquidations to determine whether the liquidation is, in fact, potentially suspicious.

245.     Fourth, the SEC's expert witness's argument that it is "crucial" to law enforcement to report liquidations of "low-priced" securities where a firm previously filed a SAR on deposits of those "low-priced" securities is not accurate.  When a firm files a SAR on deposits of "low-priced" securities, and identifies the depositor, the securities, and the size of the position, law enforcement has sufficient information to follow up on the transaction if they think there is misconduct occurring in the market for that security.  Requiring SARs in these circumstances is overkill, requiring firms to over-paper the SAR database, making the data therein more difficult to parse through and less useful for law enforcement and regulatory authorities.

246.     Fifth, insofar as the SEC's expert witness concluded that SARs needed to be filed on liquidations because the liquidations were a "pattern of activity," as the SEC's expert witness herself acknowledges, the "AML/BSA regulations do not define the term 'pattern of

---

[227] FFIEC Examination Manual 2014 at 68; FFIEC Examination Manual 2010 at 75-76.

transactions' found in the FinCEN rule."[228]   The notice of final rulemaking that the expert herself cites, however, makes clear that "[t]he language in the rule requiring the reporting of patterns of transactions is not intended to impose an additional reporting burden on broker-dealers," but instead is simply meant to make explicit the rule that if transactions viewed in isolation do not trigger suspicion, but, taken together, a "series of transactions" form a suspicious pattern of activity, a SAR ought to be filed.[229]

247.     Here, to my knowledge, there is no allegation that each liquidation was part of a pattern of transactions, other than that it related to a deposit, which does not in and of itself make a pattern.  Indeed, one liquidation is not a pattern of transactions, as a pattern involves a series of transactions.  Moreover, if a SAR is filed on the deposit, the liquidation standing alone is not part of a series of transactions, and therefore a SAR is not required.   Indeed, without more, a pattern of activity in and of itself is not suspicious.

248.     Finally, insofar as the SEC's expert witness's opinion was premised on a view that firms are required to file continuing activity SARs,[230] I note that the SEC apparently did not rely on a continuing activity theory.  Nor could it have, given that FinCEN's instructions regarding continuing activity SARs are guidance and are not required by law.[231]  In fact, the SEC

---

[228] Navigant Report at 14.

[229] *Id.* (quoting FinCEN, Amendment to the Bank Secrecy Act Regulations – Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048, 44,053 (July 1, 2002)).

[230] Navigant Report at 64 n.226.

[231] The SAR Activity Review cited by the SEC's expert witness is clearly described as guidance throughout the publication. *See* SAR Activity Review, Issue 21, at 53 (May 2012), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_21.pdf (listed under Section titled "Issues & Guidance" where FinCEN provides guidance that "[f]inancial institutions with SAR requirements *may* file SARs for continuing activity"); SAR Activity Review, Issue 8, at 32-33 (April 2005), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_08.pdf ("Technically, FinCEN's suspicious activity reporting rules require a Suspicious Activity Report for each suspicious transaction. However, for ongoing suspicious activity, and to reduce the burden on financial institutions and law enforcement, FinCEN provided the above *guidance* to allow for updates every 90 days. FinCEN welcomes discussion of this *guidance* and will continue to consider the issue within the context of current regulations." (emphasis added)).

could not rely on a continuing activity theory because a liquidation or sale is not the same as a deposit, and certainly is not a continuation of the same activity. As a result, by definition, a continuing activity SAR would not have been required as a matter of law.

**D.    Timeliness of SAR Filing—The SEC's Expert Witness Analysis Ignores Relevant Guidance and Industry Standards**

249.    The SEC's expert witness opines that 251 SARs were late.[232]  This opinion, however, wholly disregards the fact that FinCEN guidance makes clear, as does industry expectation, that FinCEN does not measure timeliness from the time when the transaction occurs, or even when the activity is alerted, but, instead, from the time when the firm reaches a decision that the activity was suspicious. Accordingly, the SEC's expert witness's measurement of the time period in Alpine was required to file a SAR from "the first date mentioned in the date range specified in the SAR," *i.e.*, when the transaction occurred, or any time other than when Alpine decided that the activity was suspicious, is contrary to FinCEN guidance and industry practice.

250.    Under the SAR Rule, required SARs are to be filed:

[N]o later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing a [SAR] under this section. If no suspect is identified on the date of such initial detection, a broker-dealer may delay filing a SAR for an additional 30 calendar days to identify a suspect, but in no case shall reporting be delayed more than 60 calendar days after the date of such initial detection.[233]

251.    As firms were beginning to comply with the rules, many firms were concerned that with the volume of alerts that they were receiving, they could not research the associated activity to determine whether a SAR was required to be filed within the time periods set forth in

---

[232] Navigant Report at 47-48.

[233] 31 C.F.R. § 1023.320(b)(3) (originally, 31 C.F.R. § 103.19(b)(3)).

the SAR rule without incurring outsized costs.  They needed the time and flexibility FinCEN

subsequently afforded the industry to adequately review and assess alerts.  Even after the alerts

are reviewed and indicia of something suspicious appears, cases need to be opened and an

inquiry must be conducted.  Those inquiries require time, frequently more than 30 days.

252.    As a result of discussions between FinCEN and the BSAAG, guidance was issued

to reinforce the liberal interpretation of the term "initial detection," which had first been issued

prior to the 2001 enactment of the USA PATRIOT Act.[234]  In particular, FinCEN explained in

guidance that the term "initial detection" was not meant to be construed narrowly, and

specifically not from the time when a firm first received an activity alert, or "red flag," but rather

from the time when the decision was reached after analysis that the activity was suspicious.[235]

253.    Thus, the strict interpretation in the Navigant Report about when the SAR filing

clock starts ticking appears to be uninformed by any meaningful knowledge of the manner in

which of the SAR rules have been applied for close to 20 years, nor by the BSA regulations and

interpretations that play into them.[236]

254.    Moreover, there are numerous reasons why a firm may file SARs long after a

transaction has been effected.  Among them, the transaction may not appear to be suspicious

until subsequent activity raises a red flag that indicates that the prior activity should be reviewed,

as the "pattern of transaction" language in the SAR rule is meant to cover.  Additionally, in some

instances, FinCEN due diligence regulations require periodic reviews of accounts on a risk-

---

[234] SAR Activity Review, Issue 1, at 27-28 (Oct. 2000).

[235] *See* SAR Activity Review, Issue 14, at 36-38 (Oct. 2008) (*citing* SAR Activity Review, Issue 10, at 44-46 (May 2006); FFIEC Manual 2014 at 70-71 (timing of a SAR filing), *available at* https://www.ffiec.gov/bsa_aml_infobase/pages_manual/olm_047.htm; *see also* 5 U.S.C. § 553(d)(1), (2) (advance publication or service of a rule is not required when it is a substantive rule which … relieves a restriction or an interpretative rule or statement of policy.)

[236] *See*, *e.g.,* 31 C.F.R. § 1010.610(a)(3) (requiring periodic reviews for foreign correspondent accounts); 31 C.F.R. § 1010.620(b)(4) (reviews of foreign private banking accounts); 31 C.F.R. § 1020.315(d), (g)(2)(ii), and (h)(2) (annual reviews and monitoring systems related to currency transactions by exempt persons).

assessed basis.[237]  One of these periodic reviews may reveal activity that was not identified as

being suspicious when it was first effected.  Internal or external audits, as well as regulatory

scrutiny and auditor or regulatory second-guessing, also may result in SAR filings that occur

outside the 30-day reporting period, whether narrowly or liberally reviewed.

255.    SARs filed outside the 30-day period for these various reasons typically should

not be viewed as untimely.  A periodic review or internal or external audit, for example, should

be reviewed as a program control to ensure that monitoring programs are properly calibrated and

activity that may have been suspicious in the first instance, or that may, with hindsight, appear to

be suspicious, eventually is reported and included in the SAR database for use by law

enforcement in conjunction with other BSA reports.  There are frequently instances in which a

compliance examiner may have an alternative view about whether a transaction or series of

transactions should be subject to SAR filing.  Before FinCEN adopted electronic filing for SARs,

examiners often would file a SAR themselves in paper format.  Now, any SAR filing that may

result from the substitution of an examiner's judgment most likely will be filed, if at all, by the

firm being examined.

256.    With that as backdrop, it appears that the determination that the Alpine SARs

were late overlooked facts and circumstances that appear to be evident from the Navigant Report

itself and contained in in the SEC's complaint.[238]  The SEC identified a date range that was

reported on Alpine SARs as being from December 2011 through May 2012.[239]  It also revealed

that a FINRA examination of Alpine was conducted beginning "in or about May 2012,"[240] the

---

[237] *See id.*

[238] *See* Navigant Report at 47, 64-66.

[239] SEC Complaint and Jury Demand,  at ¶41 (June 5, 2017).

[240] *Id.* at ¶ 22.

same month as the SAR filings.  In consequence, it appears to me, based on the timing of the filing of the SARs at issue that the firm may have filed the allegedly untimely SARs after it was encouraged or directed by an examiner to do a lookback with respect to certain transactions.[241] Lookbacks are often undertaken after internal or external audits or compliance examinations. When the firm conducted its review of prior activity, for whatever reason, and then determined to file a SAR based on the results of that prior review, the time frame for filing the SAR begins then, and not before.

257.    Alpine should not, in my opinion, be penalized for filing SARs late, when it filed such SARs in good faith to satisfy its regulators and upon undertaking a voluntary lookback to satisfy them.  There is nothing in the Navigant report or the SEC's complaint and other filings other than pure speculation that Alpine filed the SARs late in bad faith.  Penalizing Alpine in such circumstances is both contrary to good policy – it would discourage firms from undertaking periodic lookbacks – and also the applicable guidance and industry standard, which provides that the time within which a SAR must be filed runs from the date the firm determines that there is reportable activity, not from some earlier date.

258.    Finally, the SEC's expert witness has determined, without consideration for any facts and circumstances beyond that date range that appears in the SARs, that the date range used on the SARs by Alpine was a willful attempt to obscure a violation of the SAR rules.  That bald conclusion is wholly unfounded, as a full analysis of the facts and circumstances presented by the SEC and Navigant indicates that Alpine was attempting to respond in good faith to a regulatory inquiry.

---

[241] *See* Alpine Sec. Corp.'s Memorandum of Law in Opposition to Plaintiff's Motion For Partial Summary Judgment at 38 (Jan. 19, 2018) (ECF No. 87) ("[E]mployees of Alpine undertook in essence a look-back, reviewing transactions cleared through Alpine during the former employees' tenure, including the five sample transactions at issue, to determine whether any of those transactions could warrant a SAR filing.").

259.    As is clear from the FINRA examination report and Alpine's response thereto, activity occurred in late 2011 that was determined at the time not to be suspicious.  On a second review concluding in May 2012, a determination was made that SARs should be filed.  Thus, it may be reasonable for Alpine to use, in the SAR, the date on or about the suspicious activity occurred, and the date on which the suspicious activity was determined to be suspicious and therefore identified.

260.    With these circumstances viewed in context, there appears to be no reason for Alpine to have attempted to cover anything up.  Rather, it appears that Alpine was attempting, in good faith, to figure out a way to file SARs to appease a third-party's judgment when it may not have not believed that the SARs were required according to their judgment either in December or the following May.  Trying to figure out a way to do that, by using the date ranges that it did to demonstrate that the activity occurred in the past, but that the determination to file a SAR was the result of actions that occurred months later, in no way appears to have been an improper cover-up by Alpine.

**E.    The SEC's Expert Witness Improperly Concluded that Alpine Had a Structural AML Program Failure**

261.    The SEC's expert witness takes the position that "Alpine did not comply with its own written procedures and did not act as a reasonable broker-dealer would in the design and implementation of its BSA/AML program."[242]  As set forth on page 1 of the Navigant Report, however, that contention  is beyond the scope of that which  the SEC's expert witness was asked to consider.  Nor is it within the scope of this proceeding.  The SEC does not have an AML program rule nor did the SEC in this action charge Alpine for AML program failures.[243]  That the

---

[242] Navigant Report at 66.

[243] Mem. Op. & Order, ECF No 129 at 5.

SEC's expert witness nonetheless proffered an opinion on that issue, in the absence of any adequate information concerning Alpine's personnel or program, is improper.

262.    Of note, while Alpine and other BSA-regulated financial institutions have an obligation to establish and implement an AML program that enables them to comply with the BSA and to protect themselves from being used for money laundering and other illicit financial activity, an AML program is not a hard-and-fast rulebook, against which penalties may be imposed whenever a circumstance may indicate that a deviation or evolution is appropriate.

263.    Moreover, the SEC's expert witness bases her conclusion on statements of policy and guidance, as well as communications about the Alpine program that obviously were issued in the context of attempting to improve the program.  It does not appear, even as  the SEC's expert witness claims that Alpine failed to apply its own procedures, that any specific program procedures were even cited.  Indeed, there is nothing in the Navigant Report other than bald conclusions based on insufficient facts to support the conclusion drawn on this point.

264.    The evidence reflected in the Navigant Report actually supports a contrary conclusion.  Information regarding  Alpine's compliance personnel, their actual processes, the evolution and development of the program  evidenced by the data presented in the report, the firm's  consideration of Section 5 issues, and its market surveillance activities, all demonstrate that Alpine had in place processes and controls that were targeted to its principal risks and permitted it to identify and report suspicious activity.

265.    Certainly Alpine filed many SARs, which belies a claim that it did not have a reasonable AML program that reviewed and considered SAR filing issues.  The Navigant report is replete with examples that demonstrate that Alpine had a robust system for conducting due diligence on a transaction to  determine whether a SAR should be filed.

266.     The sufficiency of its AML program was evidenced also by the rapid decline in so-called fatally deficient SAR filings.  As reflected in  the Navigant exhibits, that decline began in 2012, even before the FINRA compliance examination was concluded,  and continued past the SEC compliance examination in 2015.  The SEC's expert witness's criticism is based almost entirely on SARs filed before 2013.  Of the 1,597 SARs listed on Tables A-1 through A-7, for example, 1,157 of those SARs were filed before January 1, 2013.  Of the 1,015 SARs listed on Table A-1, 990 SARs are dated before 8/22/2012.  The SEC's expert witness wholly ignores the fact that, in the wake of  criticism by FINRA, Alpine immediately began completing more robust narratives.  It is clear that compliance personnel at Alpine implemented processes to comply with its AML obligations and continuously developed and improved its AML procedures.

267.     Fundamentally, this case is about whether Alpine improperly failed to file SARs with respect to certain liquidations during a defined time period in which it filed SARs that provided all the information needed for law enforcement to conduct an inquiry into suspect market activity in the related security or into the suspects reported in the SAR, whether the contents of the SARs Alpine did file contained sufficient information to serve their purpose, and whether Alpine should be disciplined for filing SARs following a voluntary lookback and attempting to figure out the correct way to file the form when the lookback was triggered by a self-regulatory examination.

268.     It is my view that even assuming the SEC and Navigant were successful in convincing the factfinder as to each of these SAR related issues, that would not be sufficient to warrant a conclusion that there was a programmatic failure here.  But, as set forth above, it is my view that the SEC's expert witness is wrong with respect to the failures she alleges as predicates for her conclusion that Alpine had a structural AML program failure.  Alpine was not, as a

matter of law, required to file on the liquidations about which the SEC and SEC's expert witness complain.  Moreover, the SEC's and SEC's expert witness's views with respect to the sufficiency of the SAR narratives are not well-founded.  And, finally, the fact that Alpine conducted a lookback and ultimately filed SARs following that lookback should not be the basis of a charge of failing to timely file SARs.  Indeed, each of these allegations is not supported by long-established BSA policy and the BSA regulations themselves.

Exhibit A

# Rangeley Holdings, LLC

**Beverly E. Loew**

+1 (703) 665-9486 (p)  •  +1 (571) 418-8123 (f)

Credentials of Beverly E. Loew

Bank Secrecy Act and Anti-Money Laundering Regulations

Summer 2018

## SUMMARY

Beverly Loew has spent more than 30 years as a legal, regulatory, transactional, and management professional in and around the financial industries. Based in the U.S. for most of her career, Loew has extensive experience advising government officials and business leaders overseas. A financial regulatory and commercial attorney and advisor on matters involving the administration of government agencies, she is best known for her expertise in the Bank Secrecy Act and the regulations implementing it (collectively, the "BSA"), which have been adopted to protect the financial system from money laundering, terrorist financing, and other unlawful financial activity.

**Private Legal Practice**. In early 2014, Loew established a boutique law practice specializing in the BSA, economic sanctions programs, and anti-corruption law, including their intersection with the Commodity Exchange Act ("CEA") as it was amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), federal securities laws, regulation of the swap markets, federal banking, consumer protection, tax, and privacy laws. Attention is particularly placed on the efficiency and effectiveness of client compliance

programs, managing compliance costs, ensuring that audits and regulatory examinations are consistent with established regulatory policy, and mitigating enforcement risk. She also provided litigation services to a leading law firm in the U.S. in the defense of clients offering financial services in high-risk jurisdictions, revising responsive pleadings to address the complainant's examination practices and regulatory interpretations, which led to pre-hearing settlements in favor of the clients.

Among other engagements, Loew presently is advising the Central Bank of a developing European country engaged in regulatory reform to establish a risk-based anti-money laundering ("AML") regime and modernize its enforcement mechanisms.  One aspect of that work has focused on analyzing and resolving jurisdictional disputes between the Central Bank and other ministries and agencies with roles in the country's AML compliance scheme similar to those of various federal agencies in the United States, including the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") and the Securities and Exchange Commission.

Loew additionally has represented a holding company with regulated market utilities on three continents, recommending policies, procedures, and controls, which included supplementing transaction monitoring criteria, developing a central records repository to facilitate regulatory reporting, adopting global audit practices, and harmonizing practices for responding to regulatory inquiries and compliance examinations. She advised a multinational Fortune 500 company achieving compliance with derivatives regulations that would permit the company to register as a swap dealer with the Commodity Futures Trading Commission, providing regulatory analysis on registration timing that allowed the company to delay program implementation and redirect budget to more immediate priorities.

With a partner attorney, she advised the founders of a start-up company seeking to raise capital on how to do so pursuant to the Securities Exchange Act, including providing an analysis of the costs and benefits of using the exemption for private placements or recently finalized crowdfunding regulations. When practicing law earlier in her career, she advised a derivatives clearing organization for merchant energy trades—predominantly bilateral swaps in the electricity and natural gas markets—initially established with a governance structure that was inconsistent with then-applicable federal law, revising its rules and by-laws to allow it to commence operations consistently with the CEA and the Public Utility Holding Company Act.

**Commodity Futures Trading Commission**. Previously, Loew spent over five years as an assistant general counsel at the U.S. Commodity Futures Trading Commission ("CFTC" or "Commission") where she was engaged in oversight of the rulemaking and adjudicatory programs administering the CEA. She led the Office of General Counsel's administrative law efforts for the rulemakings that were proposed to implement section VII of Dodd-Frank, which added commodity swap dealers, trading mechanisms, and clearing into the Commission's regulatory jurisdiction.

Loew coordinated assistance to more than 30 Dodd-Frank rulemaking teams and agency leaders on compliance with applicable statutes, which included overseeing the drafting and publication of more than 30 Federal Register releases. She additionally coordinated the development of internal orders and guidance documents developed to harmonize and publicize agency-wide practices for engaging with industry and other interested parties, focused significantly on statutes related to government accountability to ensure agency transparency and inclusiveness in its rulemaking process.

She provided training to Commission staff on specialized topics, including compliance with the Federal Register's publication requirements, the Government in the Sunshine Act, and the Freedom of Information Act, and defenses to Right to Financial Privacy Act challenges in enforcement proceedings. She drafted, reviewed, and/or negotiated memoranda of understanding with other federal financial regulators and foreign regulatory authorities for purposes of facilitating regulatory cooperation and information sharing within the limits of each regulator's statutory jurisdiction and legal authority.

Loew routinely advised the Commission and its enforcement division on the BSA obligations of CFTC-designated and regulated entities, most notably related to identifying and reporting suspicious activity of individual market participants who were charged with violations of the CEA after conducting transactions through those entities. She notably led negotiations with FinCEN on behalf of the Commission to secure appropriate access to reports filed with Treasury under the BSA for the enforcement activities of the Commission and the registration functions of National Futures Association, the self-regulatory organization delegated to perform those functions for the Commission subject to express statutory authority.

As part of the BSA information-sharing and report-access effort, she counseled the Commission, its officers, employees, and agents on the limits of BSA implementing and enforcement authority of all self-regulatory organizations operating as non-governmental actors under the CEA. Because of her ability to interpret the BSA and the CEA at their crossroads, the Commission was granted broader access to BSA reports than any other federal or state supervisory or civil regulatory agency.

**Department of Treasury, Financial Crimes Enforcement Network**. Loew joined the CFTC after serving as a regulatory policy officer at FinCEN, where she received its Visionary of

the Year award in 2007 for leading efforts to apply the BSA, most notably to the securities, futures, and money services industries, harmonizing those industries' rules with others also subject to BSA compliance. She engaged eight stakeholder agencies in those efforts, coordinated the activities of numerous staff members on a regular and project-by-project basis, advised the Department of Treasury's main office on responding to high-risk industry activities with foreign policy implications, and counseled Department of Justice officials on applying the BSA in then-novel prosecutions.

Loew represented the agency at key industry conferences and trade association meetings each year, before Congressional oversight committee staff and with foreign regulatory authorities, and as liaison to the U.S. Department of Treasury's Bank Secrecy Act Advisory Group Securities and Futures Subcommittee. She traveled with a Treasury and State Department delegation to Latvia after section 311 special measures were imposed on two of its banking institutions and to Madrid for discussions with Spain's Ministry of Finance and the secretariat of the International Organization of Securities Commissions. She advised the Department of State on how and whether to impose BSA provisions to the banks in a frozen conflict region to apply pressure to regional separatists and the governments that facilitated them.

She was engaged on numerous matters related to Financial Action Task Force ("FATF/GATI") recommendations. This included advising the Department of Treasury on the development, interpretation, and implementation of FATF/GATI's recommendations in general, as well as contributing to the department's written response to FATF/GATI's mutual evaluation of the U.S. AML regime and working with the delegation of FAFT/GATI members who visited the U.S. to follow up on key issues in the response. She routinely briefed senior Treasury staff, who often had limited exposure to the structure of financial markets overseas or the operations of

intermediaries and market mechanisms outside the U.S., preparing them to participate in comprehensive mutual evaluations of other FATF/GATI members, particularly with respect to identifying and addressing complex policy issues as they related to local laws, industry operations, and customs.

**Adjunct Professorship**. Loew additionally spent a year as an adjunct professor at New York Law School, co-teaching a graduate-level seminar on the BSA and AML regulation. The course focused on the regulation of banks, broker-dealers, futures commission merchants, and money services businesses; the cross-section of the BSA with functional and other financial regulation, as well as the Privacy Act; the Gramm-Leach-Bliley safeguards; the Right to Financial Privacy Act; and U.S. sanctions programs.

**U.S. Agency for International Development**. Earlier in her career, Loew spent four years at the U.S. Agency for International Development ("USAID") and with USAID-funded projects, implementing programs to develop financial market regulatory regimes and market infrastructure to support privatization in emerging former Eastern Bloc economies. She and her colleagues implemented early rule of law projects, most significantly anti-corruption and corporate governance efforts, in addition to advising a Central Bank in the region on addressing Russian money laundering through its banks and securities depository.

She notably implemented a project to open a securities clearinghouse in the agency's flagship program, in efforts that included establishing the first regional contract for evaluation services. She successfully worked with the central banks, financial regulators, and clearinghouses in two countries to develop subsequently adopted legislative initiatives to establish netting by novation and nominee-name ownership to support clearing and global custody facilities.

**Early Career**. Before joining USAID, Loew spent several years in trading and sales management in the institutional bond departments at major Wall Street firms, and as an advisor to non-profit companies engaged in activities related to government and the financial industry. She also was a Congressional Fellow, where she researched and drafted position papers on access to capital for small business, which included analysis of the Securities Act of 1933 and state blue sky laws, particularly the laws and practices in states that engaged in merit review.

**Education and Licenses**. Loew was graduated cum laude from Wheaton College in Norton, Massachusetts and from New York Law School. She is a member of the New York and Virginia bars.

## BSA-RELATED PROFESSIONAL ACHIEVEMENTS

**Visionary of the Year Award, 2007**

Loew was one of two FinCEN officers to receive FinCEN's Visionary award in the five years after it was established. The award "recognizes a FinCEN employee who has been a catalyst for change, who searched for opportunities to change the status quo, sharing innovative ways to improve FinCEN products and services through creative ways to increase productivity and efficiency. This person not only envisions the future but also enlists others in their quest to reach that future by sharing power, information and maintaining an optimal team spirit."

## SPEAKING ENGAGEMENTS

- **2005**

The Dangers of Money Laundering and Terrorist Financing, (Sept. 14, 2005).  AML seminar sponsored by the U.S. Embassy in Riga, Latvia with Daniel Glaser, Deputy Assistant Secretary of the Treasury for Terrorist Financing and Financial Crimes, and Suzanne Williams, Federal Reserve Board.

Investment Adviser Association Hedge Fund Advisers Compliance Conference, (Nov. 9-10, 2005). Substituted for FinCEN Associate Director William Langford on a panel discussing proposed AML rules for hedge funds and investment advisers.  Co-panelists:  Karen L. Barr, general counsel, IAA (moderating); William E. Grayson, president, EGM Capital LLC; Jamey Basham, special counsel, Division of Investment Management, SEC.

- **2006**

Bloomberg LLP: Hedge Funds Enter the World of Anti-Money Laundering Compliance (Mar. 23, 2006). With Gary Sutton, Office of General Counsel, Treasury; William E. Grayson, president, EGM Capital LLC; Ross Delston, Managing Director, Kalorama Partners LLC.

SIA Anti-Money Laundering and Financial Crimes Conference (Mar. 28, 2006). Substituted for FinCEN's Langford on a "recent developments" panel to discuss the implementation issues facing clearing brokers with respect to the recently published special due diligence program rules for correspondent and private banking accounts (implementing section 312 of the USA PATRIOT Act), and FinCEN's plan to address them.

Futures Industry Association Law and Compliance Division Annual Seminar (Apr. 2006). Served as AML expert on the international regulation panel.  With Bruce Beatus, general counsel, Calyon Financial (moderating), discussed section 312 and customer identification program implementation issues facing executing and clearing futures commission merchants with respect to the special due diligence rules for correspondent and private banking accounts, particularly with respect to tri-party give-up agreements.

USA PATRIOT Act: Recent Developments on Money Laundering for Broker-Dealers, D.C. Bar Continuing Legal Education (June 26, 2006). Substituted for FinCEN's Langford.  With Emily Gordy, senior vice president and director of regional enforcement, NASD; Daniel Stipano,

deputy general counsel, Office of the Comptroller of the Currency; Alan Sorcher, vice president and associate general counsel, Securities Industry Association.

12th Annual Anti-Money Laundering & Compliance Forum (Sept. 19-21, 2006). "The Proposed AML Rule for Hedge Funds: A Great Leap Forward into Deep Water?"  With Ross Delston, Managing Director, Kalorama Partners LLC (moderating); Gary Sutton, Office of General Counsel, Treasury; William E. Grayson, president, EGM Capital LLC.

SIA Compliance and Legal Division Fall Compliance Seminar, New York (Nov. 13, 2006). Served on the AML compliance panel, addressing recent FinCEN rules and guidance, FinCEN's shell company study and guidance, the pending section 312 enhanced due diligence rules that were not finalized earlier that year, and the applicability of general themes from significant enforcement cases in the banking arena, including the civil money penalty actions against ABN Amro, Arab Bank, and Israel Discount Bank.

NASD Fall Securities Conference, Los Angeles (Nov. 16, 2006). Spoke on AML compliance panel on the obligations of broker-dealers conducting securities business through clearing brokers under varying clearing contract allocations, as well as piggybacking relationships. Topics included compliance with the section 312 and SAR reporting rules, as well as pending guidance on section 314(a)/313/319(b) certifications.  Panel included Alma Angotti, Enforcement Counsel, NASD (moderating); Emily Zimiles, Daylight Forensic & Advisory; and Aaron Fox, compliance director, RBC Capital Markets.

FIA "Know Your Customer" Compliance Luncheon, in New York with audio to Chicago (Nov. 8, 2006). Spoke about longstanding AML implementation issues facing futures commission merchants and introducing brokers, including the section 312 guidance that was issued in response to an industry inquiry in Spring 2006, and a request that was submitted jointly to FinCEN and the CFTC on the application of customer identification programs. Was the second most highly attended monthly luncheon in more than a decade.  With Barbara W. Bishop, Senior Managing Director, Bear Stearns; Terry Arbit, Associate General Counsel, CFTC; Carol A. Wooding, Assistant General Counsel, National Futures Association; and Betty Santangelo, Member, Schulte Roth and Zabel.

Institutional Investor Anti-Money Laundering and Counter-Terrorist Financing Forum (Nov. 13-14, 2006). Addressed the harmonization of BSA rules across industries, and the application of BSA regulation to new industries.

- **2007**

AMLAC (Anti-Money Laundering & Compliance Forum) West (Feb. 26-28, 2007). Spoke on panels addressing "the challenges of complying with section 312 of the US[A] Patriot Act for private banking operations," "analyzing section 312 compliance issues for correspondent accounts," and "managing section 312 and OFAC compliance issues for broker-dealers, hedge funds, clearing firms, mutual funds, and other institutional businesses."  Fellow panelists included Steve Byron, senior vice president, City National Bank; Paige Baumann, vice president and deputy AML officer, Fidelity Investments; William E. Grayson, president, EGM Capital; Jeffrey Horowitz, managing director, Global head of AML and OFAC compliance, Pershing

Loew – 9

LLC; Meg Zucker, executive director, Morgan Stanley; Jennet Zundel, assistant district administrator, SEC; and Katherine Nelson, director, corporate and investment bank group, Citibank.

<u>SIFMA Anti-Money Laundering and Financial Crimes Conference</u> (Mar. 12, 2007). Served on the section 312 panel, addressing implementation and ongoing compliance issues for broker-dealers, most notably clearing and introducing brokers, following the issuance of comprehensive guidance previously. Additionally addressed complex definitions, including the difficulty of identifying broker-dealers, futures commission merchants, and mutual funds, defined as foreign financial institutions, when serving customers in universal banking environments, as well as the difficulty applying the term private banking in the securities industry context.  With Michelle Neufeld, JPMorgan Chase (moderating); Linda Busby, Raymond, James Financial Group; Jeff Horowitz, managing director, Pershing LLC; Mihal Nahari, senior vice president, Bank of America.

<u>Futures Industry Association Law and Compliance Division Annual Seminar</u> (Spring 2007). Served as AML expert on the "Soup to Nuts" panels and addressed recent regulatory events on the international regulation panel.

<u>Investment Company Institute Transfer Agent Committee</u>. Invited by members to give a post-luncheon address on the value of BSA data to law enforcement (civil and criminal), and the life cycle of a suspicious activity report.

<u>FFIEC Advanced Examiner Training</u> (Fall 2007). Presented key compliance issues contained in the recently published enhanced due diligence rule for correspondent accounts (rule implementing section 312 of the USA PATRIOT Act).

<u>American Bankers Association/American Bar Association Money Laundering Enforcement Conference</u> (Fall 2007). Served on the section 312 compliance panel, discussing all relevant section 312 implementation and enforcement issues, focusing primarily on the recently published enhanced due diligence rules for correspondent banks.  With Megan Hodge, Royal Bank of Canada (moderating); Thomas J. Burnside, JPMorgan Chase; Thomas Obermaier, Global Head of Risk Management; and Jonathan I. Polk, Vice President, Federal Reserve Bank of New York.

<u>SIFMA Compliance and Legal Division Fall Compliance Seminar</u> (New York) (Nov. 2007). Served as FinCEN representative on the AML panel, focusing primarily on recent enforcement actions in the banking and money services industries and drawing appropriate parallels to transactions and customer relationships in the securities industry.  With Betty Santangelo, Schulte Roth & Zabel (moderating); Sheila Haney, FINRA; Stephen Shine, Senior Vice President and Associate General Counsel, Prudential Securities Group; and Arlene Semaya, Senior Managing Director, Bear Stearns.

<u>Institutional Investor 2nd Annual Anti-Money Laundering and Counter-Terrorist Financing Forum</u> (Nov. 28-29, 2007). Keynoted day one of the conference, discussing the new FinCEN Director's BSA efficiency and effectiveness initiative, law enforcement's use of BSA data, most particularly SARs, and non-law enforcement uses, including for supervisory scoping and trend analysis.

<u>AML Strategic Leadership Group</u> (Fall 2007). Invited to speak to an audience of more than 250 senior compliance professionals during their monthly conference call to address specified topics, including the publication of the FFIEC BSA/AML Compliance Manual and its application to the securities industry, issues involving ongoing section 312 implementation, including the enhanced due diligence rule for correspondent accounts published in August 2007, shell companies, beneficial ownership, how to interpret the "PEP" requirements in the BSA (senior foreign political figures in the section 312 rules for private banking accounts), and lessons learned from Riggs Bank, Bank Atlantic, and American Express.

- **2008**

<u>SIFMA Anti-Money Laundering and Financial Crimes Conference</u> (Mar. 5, 2008). Served on the "introducing and clearing firm AML issues" panel. Prepared talking points for the FinCEN officer serving on the regulatory updates panel, and co-authored the remarks of FinCEN's director, coordinating each to ensure that FinCEN delivered a common message on the application of the BSA regulations to correspondent clearing, in response to a multi-year controversy between clearing firms and examining authorities.

<u>SIFMA Compliance and Legal Division Annual Seminar</u> (Orlando) (Spring 2008). Served as FinCEN representative on the "Hot Topics in AML Compliance" panel with Lynne Johnston, Lehman Brothers (moderating); James McGinnis, BNP Paribas Securities; Karen O'Toole, Associate General Counsel, Fidelity Investments; and Betty Santangelo, Schulte Roth and Zabel.

<u>Futures Industry Association Law and Compliance Division Annual Seminar</u> (Spring 2008). Served as the AML expert on the "Soup to Nuts" panels.

- **2009**

<u>Futures Industry Association Law and Compliance Division Annual Seminar</u> (Spring 2009). Served as the AML expert on the "Soup to Nuts" panels.

**QUOTED IN**

"Not So-Innocents Abroad: AML Compliance and Correspondent Banks," <u>The State of the Investment Management and Funds Industry</u> (Apr. 6, 2006) KPMG Financial Practices Group. At page 12, "'we understand that the industry looks at this and may say 'Yikes, what does [the government] expect,'" [Loew added]. "But 312 is not much of a departure from what firms are doing now. What we expect is that people treat this as you would treat customer identification programs or suspicious activity reports; as one part of an overall AML program."

"FinCEN Retooling SARs," <u>Compliance Reporter</u> (Nov. 20, 2006). "[T]he Financial Crimes Enforcement Network is harmonizing suspicious activity reporting forms, said... Loew.... There will be an updated SAR form coming out in the next couple of months to facilitate joint filing through which the SAR reporting obligation can be satisfied by one form."

"Guidance on Cross-Border Account Transfers Coming," <u>Institutional Investor</u> (Nov. 17, 2006). "In response to a delegate's question, Loew said FinCEN is developing a feasibility study on reporting of cross-border transfers. Loew illustrated the prospects of money laundering chains

and [s]ection 312 procedures. The closer the financial institution is to one, the more it should know and see… . Loew said FinCEN is taking into account the costs and benefits of [cross-border reporting].”

**PUBLISHED REGULATORY WORK**

- **Primary or Sole Authorship**

  Authored the CFTC's comment letter to FinCEN on recently adopted amendments to the CEA that created a loophole in FinCEN's money services business regulations, with respect to the proposed redefinition of "foreign exchange dealer." <u>See</u> Letter from Terry Arbit, General Counsel, CFTC, to Susan Lang, Assistant Director, Office of Regulatory Policy, FinCEN (Sept. 9, 2009).

  Withdrawal of the Notice of Proposed Rulemaking; Anti-Money Laundering Programs for Unregistered Investment Companies, 73 Fed. Reg. 65569 (Oct. 30, 2008)

  Withdrawal of the Notice of Proposed Rulemaking; Anti-Money Laundering Programs for Investment Advisers, 73 Fed. Reg. 65568 (Oct. 30, 2008)

  Withdrawal of the Notice of Proposed Rulemaking; Anti-Money Laundering Programs for Commodity Trading Advisors, 73 Fed. Reg. 65567 (Oct. 30, 2008)

  Application of the Definition of Money Transmitter to Brokers and Dealers in Currency and other Commodities (FIN-2008-G008) (Sept. 10, 2008)

  Authored FinCEN's comment letter to the Securities Exchange Commission on proposed changes to Rule 15a-6, addressing the manner in which the BSA and its implementing regulations covered activities of foreign brokers effecting transactions within the United States, obviating the need to include AML provisions in Rule 15a-6. <u>See</u> Letter from Susan D. Lang, Assistant Director, Office of Regulatory Policy, FinCEN, to Florence E. Harmon, Acting Secretary, SEC (Sept. 8, 2008)

  Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Financial Institution (FIN-2008-R008) (June 18, 2008)

  Ruling on Whether a Foreign Exchange Consultant is a Currency Dealer or Exchanger or Money Transmitter (FIN-2008-R004) (May 9, 2008)

  Ruling on Whether a Person That is Engaged in the Business of Foreign Exchange Risk Management is a Currency Dealer or Exchanger or Money Transmitter (FIN-2008-R003) (May 9, 2008)

  Ruling on Whether a Foreign Exchange Dealer is a Currency Dealer or Exchanger or Money Transmitter (FIN-2008-R002) (May 9, 2008)

Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements According to Certain Functional Allocations (FIN-2008-G002) (Mar. 4, 2008)

Application of the Correspondent Account Rule to Executing Dealers Operating in Over-The-Counter Foreign Exchange and Derivatives Markets Pursuant to Prime Brokerage Arrangements (FIN-2007-G004) (Sept. 5, 2007)

Authored FinCEN's comment letter to the Securities and Exchange Commission ("SEC") on the proposed harmonization of New York Stock Exchange and National Association of Securities Dealers rules, addressing provisions that would have excluded certain broker-dealers from the independent testing requirements of the Bank Secrecy Act. See Letter from Jamal El-Hindi, Associate Director, Regulatory Policy & Programs Division, FinCEN, to Nancy M. Morris, Secretary, SEC (Aug. 22, 2007)

Special Due Diligence Programs for Certain Foreign Accounts, 72 Fed. Reg. 44768 (Aug. 8, 2007)

Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to Certain Introduced Accounts and Give-Up Arrangements in the Futures Industries (FIN-2006-G011) (June 8, 2006)

"Grand Jury Subpoenas and Suspicious Activity Reporting," SAR Activity Review Trends, Tips, and Issues at 42 (Issue 10, May 2006)

Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries (FIN-2006-G009) (May 10, 2006)

Special Due Diligence Programs for Certain Foreign Accounts, 71 Fed. Reg. 16040 (Mar. 30, 2006)

"Providing Suspicious Activity Reports to Appropriate Law Enforcement," SAR Activity Review Trends, Tips, and Issues at 43 (Issue 9, Oct. 2005)

- **Co-Authorship**

Definitions and Other Regulations Relating to Money Services Businesses, 74 Fed. Reg. 22129 (Proposed Rule, May 12, 2009)

Prepared Remarks of James H. Freis, Jr., Director, Financial Crimes Enforcement Network, SIFMA Anti-Money Laundering Compliance Conference (Mar. 5, 2008)

Application of Correspondent Account Rules to the Presentation of Negotiable Instruments Received by a Covered Financial Institution for Payment (FIN-2008-G001) (Jan. 30, 2008)

Application of the Customer Identification Program Rule to Future Commission Merchants Operating as Executing and Clearing Brokers in Give-Up Arrangements (FIN- 2007-G001) (Apr. 20, 2007)

Application of Regulations regarding Special Due Diligence Programs for Certain Foreign Accounts to NSCC Fund/SERV Accounts (FIN-2006-G008) (May 3, 2006)

Customer Identification Program Responsibilities under the Agency Lending Disclosure Initiative (Guidance–Frequently Asked Questions) (FIN-2006-G007) (Apr. 25, 2006)

- **Supervising Policy Officer**

Defining Mutual Funds as Financial Institutions, 74 Fed. Reg. 26996 (Proposed Rule, June 5, 2009)

Ruling on Whether a Company that Engages in Microfinance is a Money Services Business (FIN-2008-R011) (Feb. 20, 2009)

Ruling on Whether a Company that Engages in Certain Operations as an Authorized Agent for Collection of Social Security and Veteran Benefits is a Money Services Business (FIN-2008-R010) (Feb. 20, 2009)

Ruling on Whether a Company that Offers a Loan Acceleration Product for Consumer Financing is a Money Services Business (FIN-2008-R009) (Jan. 12, 2009)

Ruling on Whether an Authorized Agent for the Receipt of Utility Payments is a Money Transmitter (FIN-2008-R006) (June 11, 2008)

Ruling on Reporting of Certain Currency Transactions for Sole Proprietorships and Legal Entities Operating Under a "Doing Business As" ("DBA") Name (FIN-2008-R001) (Jan. 25, 2008)

Customer Identification Programs and Banks Serving as Insurance Agents (Guidance– Frequently Asked Questions) (FIN-2006-G015) (Dec. 12, 2006)

## OTHER BSA/AML-RELATED ACTIVITIES

Led FinCEN review team, which included Office of Regulatory Policy personnel, and provided comprehensive comments on proposed revisions to FINRA's "small firm AML template," submitted by FINRA to FinCEN pursuant to early AML rules.

Contributed to the development of the BSA examination manuals developed by the Federal Financial Institutions Examination Council, drafting and editing subsections on the interaction of banks with securities market activities.

Contributed to the response of Treasury to the Financial Action Task Force's mutual evaluation of U.S. AML activities, particularly with respect to the application of the BSA to securities and futures intermediaries and the history of nominee-level recordkeeping in those markets.

Regularly drafted talking points for FinCEN's director on AML issues affecting the securities and futures industries, as well as the scope of the section 312 rules, for key industry conferences,

including the ABA/ABA Money Laundering Enforcement Conference, the SIFMA AML Conference, and the NASD Fall Seminar (2006).

Contributed to talking points and prepared remarks of Treasury officials, including FinCEN's director, for meetings with members of Congress and testimony on numerous BSA topics, including the cost of compliance, delays in rulemaking and rulemaking controversies, cross-border issues, and the use of BSA data.

# Exhibit B
# Materials Considered by Beverly E. Loew

**Documents from *U.S. Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 1:17-cv-04179-DLC (S.D.N.Y., filed June 5, 2017)**

- Complaint and Jury Demand, 2017 WL 2439016 (June 5, 2017), ECF No. 1

- Answer to Plaintiff's Complaint and Jury Demand, (Sept. 29, 2017), ECF No. 39

- Plaintiff United States Securities and Exchange Commission's Memorandum of Law in Support of its Motion for Partial Summary Judgment, 2017 WL 8940079(Dec. 14, 2017), ECF No. 74

- Alpine Securities Corp.'s Memorandum of Law in Support of Cross-Motion for Summary Judgment and Motion for Judgment on the Pleading, 2018 WL 1905401 (Jan. 19, 2018), ECF No. 84

- Alpine Securities Corp.'s Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment, 2018 WL 1905403 (Jan. 19, 2018),  ECF No. 87

- Plaintiff United States Securities and Exchange Commission's Reply Memorandum of Law in Support of its Motion for Partial Summary Judgment, (Feb. 9, 2018), ECF No. 91

- Plaintiff United States Securities and Exchange Commission's Memorandum of Law in Opposition to Defendant's Cross-Motion for Summary Judgment and Motion for Judgment on the Pleadings, 2018 WL 1905402 (Feb. 9, 2018), ECF No. 92

- Alpine Securities Corp.'s Reply Memorandum of Law in Support of Cross-Motion for Summary Judgment and Motion for Judgment on the Pleading, 2018 WL 1905399 (Feb. 26, 2018), ECF No. 94

- Opinion & Order, 2018 WL 1633818 (Mar. 30, 2018), ECF No. 101

- Memorandum Opinion & Order, 2018 WL 3198889 (June 18, 2018), ECF No. 129

**Federal Register**

- Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 37 Fed. Reg. 6912 (Apr. 5, 1972), *available at* http://cdn.loc.gov/service/ll/fedreg/fr037/fr037066/fr037066.pdf

- SEC Proposed and Final Rulemakings, Rule 17a-8

- Amendments to Implementing Regulations Under the Bank Secrecy Act, 52 Fed.Reg. 11,436 (Apr. 8, 1987) (to be codified at 31 C.F.R. pt. 103), *available at* http://cdn.loc.gov/service/ll/fedreg/fr052/fr052067/fr052067.pdf

- Proposed Amendment to the Bank Secrecy Act Regulations—Requirement to Report Suspicious Transactions, 60 Fed. Reg. 46,556 (Sept. 7, 1995), *available at* https://www.gpo.gov/fdsys/pkg/FR-1995-09-07/pdf/95-22223.pdf

- Amendment to the Bank Secrecy Act Regulations; Requirement To Report Suspicious Transactions, 61 Fed. Reg. 4326 (Feb. 5, 1996), *available at* https://www.gpo.gov/fdsys/pkg/FR-1996-02-05/pdf/96-2272.pdf

- Amendments to the Bank Secrecy Act Regulations—Requirement that Money Transmitters and Money Order and Traveler's Check Issuers, Sellers, and Redeemers Report Suspicious Transactions, 65 Fed. Reg. 13,683 (Mar. 14, 2000), *available at* https://www.gpo.gov/fdsys/pkg/FR-2000-03-14/pdf/00-5919.pdf

- Proposed Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 66 Fed. Reg. 67,670 (Dec. 31, 2001)

- Anti-Money Laundering Programs for Financial Institutions, 67 Fed. Reg. 21,110 (Apr. 29, 2002), *available at*  https://www.sec.gov/about/offices/ocie/aml2007/67fr21110.pdf

- Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048 (July 1, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-07-01/pdf/02-16416.pdf

- Proposed Collection; Comment Request; Suspicious Activity Report by the Securities and Futures Industry, 67 Fed. Reg. 50,751 (Aug. 5, 2002), *available at* https://www.gpo.gov/fdsys/pkg/FR-2002-08-05/pdf/02-19662.pdf

- Customer Identification Programs for Broker-Dealers, 68 Fed. Reg. 25,113 (May 9, 2003), available at https://www.gpo.gov/fdsys/pkg/FR-2003-05-09/pdf/03-11017.pdf

- Special Due Diligence Programs for Certain Foreign Accounts, 71 Fed. Reg. 496 (Jan. 4, 2006), *available at* https://www.gpo.gov/fdsys/pkg/FR-2006-01-04/pdf/06-5.pdf

- Special Due Diligence Programs for Certain Foreign Accounts, 71 Fed. Reg. 16,040 (Mar. 30, 2006), *available at* https://www.sec.gov/about/offices/ocie/aml2007/71fr16040-42.pdf

- Amendment to the Bank Secrecy Act Regulations—Requirement That Mutual Funds Report Suspicious Transactions, 71 Fed. Reg. 26,213 (May 4, 2006),  *available at* https://www.sec.gov/about/offices/ocie/amlmf/71fr26213.pdf

- Special Due Diligence Programs for Certain Foreign Accounts, 72 Fed. Reg. 44,769 (Aug. 9, 2007), *available at* https://www.sec.gov/about/offices/ocie/aml2007/67fr48348-52.pdf

- Exemptions From the Requirement to Report Transactions in Currency, 73 Fed. Reg. 74,010 (Dec. 5, 2008), *available at* https://www.gpo.gov/fdsys/pkg/FR-2008-12-05/pdf/E8-28858.pdf

- Policy Statement on Obtaining and Retaining Beneficial Ownership Information for Anti-Money Laundering Purposes, 75 Fed. Reg. 11,207 (Mar. 10, 2010), *available at* https://www.gpo.gov/fdsys/pkg/FR-2010-03-10/pdf/2010-5075.pdf

2

- Technical Amendments to Rule 17a-8:  Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 76 Fed. Reg. 11,327 (Mar. 2, 2011), *available at* https://www.sec.gov/rules/final/2011/34-63949fr.pdf

- Proposed Collection; Comment Request; Renewal of Suspicious Activity Reporting by the Securities and Futures Industry, 77 Fed. Reg. 552 (Jan. 5, 2012), *available at* https://www.gpo.gov/fdsys/pkg/FR-2012-01-05/pdf/2011-33855.pdf

- Proposed Information Collection; Comment Request; Renewal of Suspicious Activity Reporting Requirements by Brokers or Dealers in Securities and Futures Commission Merchants and Introducing Brokers in Commodities, 80 Fed. Reg. 9506 (Feb. 23, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-02-23/pdf/2015-03584.pdf

- Submission for OMB Review; Comment Request, 80 Fed. Reg. 33,339 (June 11, 2015), *available at* https://www.gpo.gov/fdsys/pkg/FR-2015-06-11/pdf/2015-14280.pdf

- Proposed Collection; Comment Request; Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields, 82 Fed, Reg. 9109, 9112 (Feb. 2, 2017), *available at* https://www.gpo.gov/fdsys/pkg/FR-2017-02-02/pdf/2017-02235.pdf


**Articles, Guidance, and Agency Documents**

- Electronic SAR Test Form, Fields 12 and 24, *available at* https://sdtmut.fincen.*treas*.gov/news/FinCENBSAR.pdf

- U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedures Act of 1947* (1947), *available at* https://archive.org/details/AttorneyGeneralsManualOnTheAdministrativeProcedureActOf1947

- FinCEN, *The SAR Activity Review: Trends Tips & Issues* ("*SAR Activity Review*"), Issue 1, (Oct. 2000), *available at* https://www.fincen.gov/sites/default/files/sar_report/sar_tti_01.pdf

- Nat'l Ass'n of Sec. Dealers, *Special NASD Notice to Members 02-21* (Apr. 2002), *available at* http://www.finra.org/sites/default/files/NoticeDocument/p003704.pdf

- Nat'l Futures Ass'n, *NFA Adopts Amendment to NFA Compliance Rule 2-9 and a Related Interpretive Notice Requiring FCMs and IBs to Implement an Anti-Money Laundering Compliance Program* (Apr. 23, 2002), *available at* https://www.nfa.futures.org/news/newsNotice.asp?ArticleID=261

- FinCEN, *Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative* (Nov. 2003), *available at* https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf

- William J. Fox, Director, FinCEN, Statement on Behalf of United States Department of Treasury Before the House of Representatives (June 16, 2004) (transcript available at https://www.fincen.gov/news/speeches/statement-william-j-fox-director-financial-crimes-enforcement-network-united-states)

- FinCEN, *SAR Activity Review*, Issue 7, (Aug. 2004), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_07.pdf

- Bd. of Governors of the Fed. Reserve Sys. et al., *Memorandum of Understanding* (Sept. 30, 2004) *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/fincen_docs/memo_understand_sept04.pdf

- William J. Fox, Director, FinCEN, Remarks Provided to the American Bankers Association / American Bar Association Money Laundering Enforcement Seminar (Oct. 25, 2004) (transcript available at https://www.fincen.gov/news/speeches/remarks-william-j-fox-director-financial-crimes-enforcement-network-united-states-0)

- FinCEN, *SAR Activity Review*, Issue 8, (Apr. 2005), *available at* http://www.fincen.gov/news_room/rp/files/sar_tti_08.pdf

- FinCEN, *SAR Activity Review*, Issue 9, (Oct. 2005), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_09.pdf

- FinCEN, *Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries*, FIN-2006-G009 (May 10, 2006), *available at* https://www.sec.gov/about/offices/ocie/aml2007/fin-2006-g009.pdf

- FinCEN, *SAR Activity Review*, Issue 10, (May 2006), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_10.pdf

- FinCEN, *Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to Certain Introduced Accounts and Give-Up Arrangements in the Futures Industries*, FIN-2006-G011 (June 7, 2006), *available at* https://www.fincen.gov/sites/default/files/shared/futures_guidance_06072006.pdf

- FinCEN, *Frequently Asked Questions Suspicious Activity Reporting Requirements for Mutual Funds*, FIN-2006-G013 (Oct. 4, 2006), *available at* https://www.fincen.gov/sites/default/files/shared/guidance_faqs_sar_10042006.pdf

- FinCEN, *Potential Money Laundering Risks Related to Shell Companies*, FIN-2006-G014 (Nov. 9, 2006) (emphasis added), *available at* https://www.sec.gov/about/offices/ocie/aml2007/fin-2006-g014.pdf

- Joint Release, U.S. Sec. & Exch. Comm'n & FinCEN, SEC and FinCEN Sign Information Sharing Agreement (Dec. 21, 2006), *available at* https://www.sec.gov/news/press/2006/2006-217.htm

- William F. Baity, Deputy Director, FinCEN, Statement Before the House Financial Services Subcommittee on Oversight and Investigations (May 10, 2007) (transcript available at https://www.fincen.gov/news/testimony/statement-william-f-baity-deputy-director-financial-crimes-enforcement-network)

- FinCEN, *Suspicious Activity Report Supporting Documentation*, FIN-2007-G003 (June 13, 2007), *available at* https://www.sec.gov/about/offices/ocie/amlmf/fin-2007-g003.pdf

- FINRA, *NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority – FINRA* (July 30, 2007), *available at* http://www.finra.org/newsroom/2007/nasd-and-nyse-member-regulation-combine-form-financial-industry-regulatory-authority

- FinCEN, *Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements According to Certain Functional Allocations*, FIN-2008-G002 (Mar. 4, 2008), *available at* https://www.sec.gov/about/offices/ocie/aml/fin-2008-g002.pdf

- FinCEN, *Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Financial Institution*, FIN-2008-R008 (June 3, 2008), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/fin-2008-r008.pdf

- U.S. Gov't Accountability Office, *Suspicious Activity Report Use Is Increasing, But FinCEN Needs to Further Develop and Document Its Form Revision Process*, GAO-09-226 (Feb. 2009), *available at* https://www.gao.gov/new.items/d09226.pdf

- James H. Freis, Jr., Director, FinCEN, Statement Before the United States House of Representatives Committee on Financial Services (May 6, 2009) (transcript available at https://www.fincen.gov/news/testimony/statement-james-h-freis-jr-director-financial-crimes-enforcement-network-united-2)

- FinCEN, *SAR Activity Review*, Issue 15 (May 2009), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_15.pdf

- Federal Financial Institutions Examination Council, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* (Apr. 29, 2010), *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2010.pdf

- FinCEN, *SAR Activity Review*, Issue 21(May 2012), *available at* http://www.fincen.gov/news_room/rp/files/sar_tti_21.pdf

- FinCEN, *SAR Activity Review*, Issue 22 (Oct. 2012), *available at* https://www.fincen.gov/sites/default/files/shared/sar_tti_22.pdf

- FinCEN, *FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Instructions*, 110–12 (Oct. 2012), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20SAR%20ElectronicFilingInstructions-%20Stand%20Alone%20doc.pdf

- Luis A. Aguilar, Commisioner, U.S. Sec. & Exch. Comm'n, Public Statement on the Need for Robust SEC Oversight of SROs (May 8, 2013) (transcript available at https://www.sec.gov/news/public-statement/2013-spch050813laahtm)

- U.S. Sec. & Exch. Comm'n, *Microcap Stock: A Guide for Investors* (Sept. 18, 2013), *available at* https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html

- U.S. Sec. & Exch. Comm'n Office of Compliance Inspections and Examinations, *National Examination Program Risk Alert: Broker-Dealer Controls Regarding Customer Sales of Microcap Securities* at 5 n.17 (Oct. 9, 2014), *available at* https://www.sec.gov/about/offices/ocie/broker-dealer-controls-microcap-securities.pdf

- Andrew Ceresney, Director of Enforcement, U.S. Sec. & Exch. Comm'n, Remarks at SIFMA's 2015 Anti-Money Laundering & Financial Crimes Conference (Feb. 25, 2015) (transcript available at https://www.sec.gov/news/speech/022515-spchc.html)

- Federal Financial Institutions Examination Council, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* (Feb. 27, 2015), *available at* https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_aml_man_2014_v2.pdf

- FinCEN, *Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements* (Mar. 2015), *available at* https://bsaefiling.fincen.treas.gov/docs/FinCENSARElectronicFilingRequirements.pdf

- U.S. Sec. & Exch. Comm'n Denver Regional Office, Letter from Denise S. Saxon to Leia Farmer, Examination of Alpine Securities Corporation, SEC File No. 008-31464, DRO Exam No. BD2014DRO00025

- FINRA, Letter from Eric Citrin to Robert Tew, *2012 Cycle Examination of Alpine Securities Corporation,* Exam. No. 20120302314, Firm CRD 14952

- Jennifer Shasky Calvery, Director, FinCEN, Statement at ABA/ABA Money Laundering Enforcement Conference (Nov. 16, 2015) (transcript available at https://www.fincen.gov/news/speeches/jennifer-shasky-calvery-director-financial-crimes-enforcement-network-5)

- Office of Inspector General, Dep't. of Treasury, *Audit Report: FinCEN Needs to Improve Administration of Civil Monetary Penalty Cases* (Nov. 16, 2016), *available at* https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-17-016.pdf

- U.S. Sec. & Exch. Comm'n Division of Economic and Risk Analysis, Joshua T. White, *Outcomes of Investing in OTC Stocks* (Dec. 16, 2016), *available at* https://www.sec.gov/files/White_OutcomesOTCinvesting.pdf

- SEC's Office of Compliance Inspections and Examinations, *Anti-Money Laundering (AML) Source Tool for Broker-Dealers* (Jan. 11, 2017), *available at* https://www.sec.gov/about/offices/ocie/amlsourcetool.htm#13

- Office of the Attorney General, U.S. Dep't of Justice, *Prohibition on Improper Guidance Documents* (Nov. 16, 2017), *available at* https://www.justice.gov/opa/press-release/file/1012271/download

- Office of the United States Attorneys, U.S. Dep't of Justice, U.S. Attorneys' Manual, 1-12.000 – *Coordination of Parallel Criminal, Civil, Regulatory, and Administrative Proceedings* (2018), *available at* https://www.justice.gov/usam/usam-1-12000-coordination-parallel-criminal-civil-regulatory-and-administrative-proceedings

**Cases**

- *Jones v. U.S. Sec. & Exch. Comm'n*, 115 F. 3d 1173 (4th Cir. 1997), *cert. denied* 523 U.S. 1072 (1998)

- *Desiderio v. Nati'l Ass'n of Sec. Dealers, Inc.*, 191 F. 3d 198, 206 (2d Cir. 1999), *cert. denied* 531 U.S. 1069 (2001)

- *Dep't of Enf't v. Sterne, Agee & Leach, Inc.*, FINRA Hearing Decision, No. E052005007501 (Mar. 5, 2010)

- *Pinnacle Capital Markets, L.L.C.*, FinCEN Assessment of Civil Money Penalty, No. 2010-04 (Aug. 26, 2010)

- *Pinnacle Capital Markets LLC*, Exchange Act Release No. 62811 (Sept. 1, 2010)

- *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454 (2d Cir. 2013)

- *TD Bank, N.A.*, FinCEN Assessment of Civil Money Penalty, No. 2013-01 (Sept. 22, 2013)

- *Oppenheimer & Co., Inc.*, FinCEN Assesement of Civil Money Penalty, No. 2015-01 (Jan. 26, 2015)

- *Oppenheimer & Co. Inc.*, Exchange Act Release No. 74171 (Jan. 27, 2015)

- *Albert Fried & Co.*, Exchange Act Release No. 77971, 2016 WL 3072175 (June 1, 2016)

**Statutes, Regulations, and Miscellaneous**

- Administrative Procedure Act, 5. U.S.C. §§ 500 *et seq.* (1946)

- Termination of Status as Insured Depository Institution, 12 U.S.C. § 1818 (2012)

- Necessity for Regulation, 15 U.S.C. § 78b (2012)

- Registered Securities Associations, 15 U.S.C. § 78o-3 (2012)

- Investigations and Actions, 15 U.S.C. § 78u (2012)

- Civil Remedies in Administrative Proceedings, 15 U.S.C. § 78u-2 (2012)

- Rules, Regulations, and Orders; Annual Reports, 15 U.S.C. § 78w (2012)

- Court Review of Orders and Rules, 15 U.S.C. § 78y (2012)

- Civil Forfeiture, 18 U.S.C. § 981 (2012)

- Laundering of Monetary Instruments, 18 U.S.C. § 1956 (2012)

- Financial Crimes Enforcement Network, 31 U.S.C. § 310 (2012)

- Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311 *et seq.* (2012)

- Compliance, Exemptions, and Summons Authority, 31 U.S.C. §§ 5318 (2012)

- Civil Penalties, 31 U.S.C. § 5321(e) (2012)

- 1 C.F.R. § 51 (1982)

- 12 C.F.R. § 21.11 (2010)

- 12 C.F.R. § 208.63 (2003)

- 12 C.F.R. § 211.5(m) (2006)

- 12 C.F.R. § 211.24(j) (2010)
- 12 C.F.R. § 326.8 (2012)
- 12 C.F.R. § 748.2 (2011)
- 12 C.F.R. § 21.21 (2014)
- 17 C.F.R. § 240.17a-8 (2011)
- 31 CFR § 103.17 (2003)
- 31 CFR § 103.19 (2003)
- 31 C.F.R. § 1010.810 (2014)
- 31 C.F.R. § 1010.820 (2016)
- 31 C.F.R. § 1023.210 (2016)
- 31 C.F.R. § 1023.320 (2016)
- 31 C.F.R. § 1026.210 (2016)
- 31 C.F.R. § 1026.320 (2016)
- Act of Oct. 26, 1970, , Pub. L. No. 91-508, 84 Stat. 1114 (1970)
- Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (codified at 5 U.S.C. § 552a)
- Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97
- Money Laundering Control Act of 1986, Pub. L. No. 99-570, § 1151-1153, 1351-1367, 100 Stat. 3207
- Anti-Drug Abuse Amendments Act of 1988, Pub. L. No. 100-690, § 6184-6185, 102 Stat. 4181
- Securities Enforcement Remedies and Penny Stock Reform Act of 1990, Pub. L. No. 101-429, 104 Stat. 931
- Annunzio-Wylie Anti-Money Laundering Act, Pub. L. No. 102-550, title XV, 106 Stat. 4044 (1992)
- Money Laundering Suppression Act of 1994,  Pub. L. No. 103-325, § 406, 108 Stat. 2243
- Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999)
- Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001) ("USA PATRIOT Act")
- Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010)
- Jumpstart Our Business Startups Act, Pub. L. No. 112-106, 126 Stat. 306 (2012)
- Treasury Order 180-01

- FINRA, *FINRA Manual: Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc.*, *available at* http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4589

- FINRA, *Anti-Money Laundering Template for Small Firms* (updated Jan. 23, 2004, Jan. 1, 2010, and Apr. 4, 2018), *available at* http://www.finra.org/industry/anti-money-laundering-template-small-firms

- FinCEN Forms 101 and 101a (SAR SF) (May 2004)

- FinCEN Forms 111 and 111a (SAR-DI) (June 20, 2007)

- FINRA Rule 2090 (July 9, 2012)

- FINRA Rule 3310 (Jan. 1, 2010)

- *Tax Haven Abuses:  The Enablers, The Tools, and Secrecy: Hearing Before Permanent Subcomm. on Investigations of S. Comm. Homeland Security and Government Affairs*, 109th Cong, 316-49 (Aug. 2006)

- *Foreign Bank Secrecy: Hearings on S. 3678 and H.R. 15073 Before the Subcomm. on Financial Institutions of the S. Comm. On Banking and Currency*, 91st Cong 73, 79, 83, and 86. (June 8-11, 1970) (Statement of Hamer H. Budge, Chairman, Securities and Exchange Commission, Accompanied by Irving M. Pollack, Director, Division of Trading and Markets; Stanley Sporking, Associate Director (Enforcement), Division of Trading and Markets; Philip A. Loomis, Jr., General Counsel; Ira H. Pearce, Special Counsel)

- S. 3678, 91st Cong. (1970)

- H. R. 15073, 91st Cong. (1970)

- *Small Business' Access to Capital, Impediments and Options Before the H. Comm. on Small Business*, 107th Cong. 9, 12 (1996)

- S. Rep. No. 94-75 at 21-23 (1975)

**All other authority cited in this report, the parties' briefing, and the Court's decisions listed herein.**