ZACHARY T. CARLYLE
carlylez@sec.gov
TERRY R. MILLER
millerte@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>    - against -<br><br>ALPINE SECURITIES CORPORATION,<br><br>                              Defendant. | 17-cv-4179-DLC<br><br>**ECF CASE** |

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE
COMMISSION'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

## Index of Exhibits

1. Declaration of Alma Angotti

2. Report of Alma Angotti, Navigant Consulting Inc.

3. Table of SARs Missing Basic Customer and Suspicious Information

4. Table of SARs Missing Criminal or Regulatory History

5. Table of SARs Missing Information about Shell Company or Derogatory History of Stock

6. Table of SARs Missing Information about Stock Promotion

7. Table of SARs Missing Information Unverifiable Issuers

8. Table of SARs Missing Information about Low Trading Volume

9. Table of SARs Missing Information about Foreign Involvement

10. Table of "Deficient SARs"

11. Table of "Unreported Liquidations"

12. Table of "Late-Filed SARs"

13. Deposition transcript excerpt of Randall Jones, March 20, 2018

14. Deposition transcript excerpt of Christopher L. Frankel for Alpine Securities Corporation, March 13, 2018

15. Declaration of L. James Lyman

16. Alpine Securities Corporation's Response to SEC's First Set of Written Discovery

17. Table of SARs with "Missing Support Documents"

18. Deposition transcript excerpt of Erin Green, March 14, 2018

19. Alpine Securities Corporation's Response to SEC's Second Set of Written Discovery

Plaintiff United States Securities and Exchange Commission (the "Commission") submits this statement of material facts pursuant to Rule 56.1 and in support of the Commission's Motion for Summary Judgment on Liability.

## BACKGROUND

1. Clearing brokers like Alpine have relationships with introducing brokers, which are firms that provide investing advice or counsel to an investor, but do not actually handle the transactions. Clearing brokers execute the trades on the introducing broker's instructions. Declaration of Alma Angotti ¶ 10, attached hereto as Exhibit 1 ("Angotti Declaration").

2. Clearing firms usually maintain records of all trading, receive and deliver funds pursuant to instructions, and issues trade confirmations and statements. This type of relationship allows smaller firms that may not have the resources to implement their own clearing operations to enter into and participate in the securities markets. Angotti Decl. ¶ 11.

3. Clearing firms cannot delegate or allocate away its BSA responsibilities. Angotti Decl. ¶¶ 12-13.

4. As a clearing firm for many microcap securities transactions, Alpine was obligated to consider the known risks and abuses in the penny stock and microcap markets when discharging its obligations imposed by Section 1023.320. Angotti Decl. ¶ 14

5. Large deposits of low-priced securities, or "penny stocks," may involve fraud, market manipulation, and other violations of securities laws. Angotti Decl. ¶ 15.

6. Penny stocks generally are those securities with low prices that are not traded on an exchange or quoted on NASDAQ; instead, they typically are quoted over-the-counter

("OTC"). OTC trading is basically any trading that occurs off an established marketplace. Angotti Decl. ¶ 16.

7. As a general matter, the companies issuing penny stocks typically do not meet requirements necessary to be listed on an exchange, such as meeting thresholds for the number of publicly traded shares and having those shares trade above a minimum price. Angotti Decl. ¶ 16.

8. Small-cap, or microcap stocks, are stocks with a small market capitalization. A penny stock is one that trades at a low price and trades over-the counter. Angotti Decl. ¶ 17.

9. The definition of a microcap stock is based only on the company's market capitalization, that is, the total value of the company's stock. Angotti Decl. ¶ 17.

10. Before selling stock in reliance on an exemption available in Section 4 of the Securities Act, clearing firms must take appropriate steps to ensure that the transaction qualifies for the exemption. Angotti Decl. ¶ 19

11. Among other things, a clearing firm must ensure that the sale does not involve an issuer, a person in control with an issuer, or an underwriter, with a view to offer or sell the securities in connection with an unregistered distribution. This exemption is available only if a broker is not aware, after a reasonable inquiry, of circumstances indicating that the selling customer is participating in a distribution of securities. Angotti Decl. ¶ 19

12. Securities Act Rule 144 creates a non-exclusive "safe harbor" from a firm being deemed an underwriter if the securities are sold in compliance with its requirements. An unregistered security that is not freely transferable is considered a "restricted security" if is acquired in a private transaction or is acquired by a control person of the issuer. Angotti Decl. ¶ 20.

13. Firms like Alpine who clear large deposits of low-priced securities also must be aware that Section 5 violations are often associated with large deposits of low-priced securities. Many of the SARs filed by Alpine involved the heightened sensitivity around accounts that historically made deposits of large volumes of low-priced securities. Angotti Decl. ¶ 21.

14. Penny stocks are vulnerable to abusive practices, including for the following reasons:

   a. they can be sold at a large volume, frequently to unsophisticated investors, generating enormous profits for unscrupulous broker-dealers;

   b. they are usually issued by smaller, little-known companies that attract little attention outside that generated by the offering broker-dealer; and

   c. there is no reliable quotation system for the non-NASDAQ OTC market, providing an opportunity for decreased supervision and increased abuse.

Angotti Decl. ¶ 22.

15. One common abuse of penny stocks is the pump and dump scheme. This scheme involves thinly traded stocks (penny stocks or microcap stocks). In such a scheme, promoters will tout a thinly-traded microcap stock through false and misleading statements about the company. They purchase the stock at a low price, and then pump the stock price higher by creating the appearance of market activity. Then they dump the stock to make profits by selling it into the market at the higher price. Angotti Decl. ¶ 23.

16. Deposits of physical security certificates can also be a sign of suspicious activity. The stock deposits that were reported to have been deposited at Alpine occurred in either physical or electronic form. As the clearing firm for the transactions, Alpine dealt with the

Depository Trust & Clearing Corporation Company ("DTCC"), which clears and settles nearly all broker-to-broker transactions in the U.S. equities markets. The transactions that were the subject of Alpine's SARs were handled by one of the DTCC subsidiaries, the Depository Trust Company, the central securities depository subsidiary of DTCC. Angotti Decl. ¶ 24-25.

17. DTC provides settlement services for virtually all broker-to-broker equity transactions in the U.S. which is registered with the SEC as a clearing agency. Trade settlement is a consolidated end-of-day process and the final step of a securities trade; it completes the transfer between trading parties of securities ownership and cash. The DTC's Deposit and Withdrawal at Custodian (DWAC) service provides participants with the ability to make electronic book-entry deposits and withdrawals of eligible securities into and out of their DTC book-entry accounts. Angotti Decl. ¶ 25.

18. Deposits of physical certificates representing large amounts of low priced securities have been associated with illegal unregistered distributions. FINRA has noted that red flags involving the deposits of physical certificates include: A customer opens a new account and delivers physical certificates representing a large block of thinly traded or low-priced securities, or a customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale. Angotti Decl. ¶ 25.

19. Regardless of whether low-priced securities are in physical form or in electronic form, the fact that the stocks are low-priced makes them susceptible to market manipulation and fraud. Angotti Decl. ¶ 26.

20. Randall Jones is a current Alpine employee and was the AML Officer of Alpine during part of 2012. Deposition of Randall Jones at 10[13-15], 30[23]-31[1]; attached as Exhibit 13 ("Jones Depo.").

21. Mr. Jones has no memory of facts specific to any transaction. Depo.at 43[11]-44[4] ("I can't speak to that, just by virtue of the fact that I don't remember the transaction. It was six years ago….Again, I don't remember the specific transaction with six years later, almost seven at this point. Do I remember writing this narrative? No, I don't. Could I have? Potentially."); *see also id.* at 45[10-11]; 51[20]-52[3]; 53[9-24]; 60[16-21]; 62[15-25]; 65[13-15]; 66[22-24]; 68[16-20]; 71[21-24].

22. Mr. Jones has no memory of his thought processes used to make decisions to include red flags in the narrative section of specific SARs. Jones Depo. at 76[4-16].

23. Alpine has no institutional memory of the mindset of the individuals at Alpine who prepared SARs. *See, e.g.*, Alpine Rule 30(b)(6) Deposition of Christopher L. Frankel at 121[21-24], attached hereto as Exhibit 14 ("Alpine Depo.") ("I can't speak directly to the mindset of the person that prepared the SARs….I can speculate."); 154[23]-155[8]; 156[1-2] ("Again, I just can't crawl in the mind of the preparer."); 160[10-18]; 166[1-20] ("I can't necessarily get in the mind of the author."); 179[4-11].

## MATERIAL FACTS SUPPORTING ARGUMENT SECTION

**I.     Deficient SARs**

24. The table attached to Exhibit 10 summarizes the "Deficient SARs" on which the Commission seeks Judgment. Exhibit 10 summarizes the information from the seven subcategories that was missing from the narratives of each SAR reflected in the Exhibit and also

5

identifies the customer who ordered the underlying transactions. Each of the SARs that appear in Exhibit 10 also appear in one or more of Exhibits 3-9 to the Motion, which list the Deficient SARs by subcategory of red flags: <u>Basic Customer and Suspicious Information</u> (Exhibit 3) <u>Criminal or Regulator History.</u> (Exhibit 4), <u>Shell Company or Derogatory History of Stock</u> (Exhibit 5), <u>Stock Promotion</u> (Exhibit 6)  <u>Unverified Users</u> (Exhibit 7), <u>Low Trading Volume</u> (Exhibit 8), and <u>Foreign Involvement</u> (Exhibit 9). Angotti Decl. ¶ 29-31. The documents summarized in Exhibits 3-10 are in Alpine's possession and can be made available to Alpine or the Court for examination, copying, or both. *See* Fed. R. Evid. 1006

25. Each of the Deficient SARs involved at least $5,000 of assets or funds. *See* Exhibits 3-9.

26. Because stock cannot be sold on a large scale and the price cannot be manipulated without first placing the securities into the financial system through a broker-dealer like Alpine, a large deposit of low priced securities is a necessary step to unregistered securities offerings or market manipulation. Angotti Decl. ¶ 36.

27. Large deposits of low-priced securities provide a broker-dealer a reason to suspect an unregistered offer or sale of securities. Angotti Decl. ¶ 37.

28. Large deposits of low-priced securities also provide a broker-dealer a reason to suspect pump-and-dump and other manipulation schemes. Angotti Decl. ¶ 38.

29. Low-priced and thinly traded securities have long been subject to abusive practices known to broker-dealers like Alpine. Angotti Decl. ¶ 39.

30. FINRA advised Alpine that FINRA had defined a large deposit of low-priced securities as suspicious. Alpine Depo. at 43[4]-45[4]; 98[8-23].

31.     1302 out of the 1594 of the transactions reported in the SARs summarized in Exhibit 10 involved one or more of the six subcategories of red flags set forth in the Order that provided Alpine with reason to suspect criminal activity: criminal or regulatory history (particularly history involving securities or other financial frauds), involvement a shell company or derogatory history of stock, evidence of stock promotion history, unverifiable issuers, low trading volume, and the involvement of foreign entities. Angotti Decl. ¶ 32; *see also* Exhibits 3-9.

32.     1466 out of 1594 of the transactions reported in the SARs summarized in Exhibit 10 were cleared by Alpine for the accounts of just six customers, whom were connected to criminal or regulatory history involving securities or other financial fraud. Angotti Decl. ¶ 33. 702 of the Deficient SARs described deposits made for the account of "Customer A," which was tightly connected to an individual with regulatory history. Angotti Decl. ¶ 33.

33.     Alpine did not state in the narrative section of its SARs that Alpine viewed the SARs to be voluntary. Alpine Depo. at 147[7-15].

34.     A large deposit of a low-priced security coupled with either suspicious red flags or larger patterns of SARs filed on the same accounts (and often both) gave Alpine reason to suspect that the transactions reported in the Deficient SARs involved criminal activity because a reasonable broker-dealer in similar circumstances would have suspected criminal activity involving the customer depositing the stock. Angotti Decl. ¶ 41.

35.     Exhibit 3 (also referred to as Exhibit A-1) shows 1,015 SARs that did not include basic customer and suspicious information. Navigant created Exhibit 3 by reviewing each SAR narrative to determine whether on its face, a SAR included all sufficient pertinent information

7

about the subject parties, the transactions, and other indications of what Alpine knew, suspected, or had reason to suspect about the transaction in relation to the four categories in the SAR Rule. Angotti Decl. ¶¶ 42-43.

36. Exhibit 4 (also referred to as Exhibit A-2) shows 675 SARs that omitted criminal or regulatory history of an individual or entity involved in the underlying transaction. Exhibit 4 was created by reviewing the supporting documents for indications of criminal or regulatory actions involving any of the subject parties, where such indications were not identified in the SAR narrative. Where appropriate, Exhibit 4 identifies the missing information about criminal or regulatory history, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 44-45.

37. Exhibit 5 (also referred to as Exhibit A-3) shows 241 SARs that omitted evidence that the stock involved in the transaction was a shell or former shell company, or subject to suspension or other derogatory history. Exhibit 5 was created by reviewing supporting documents indicating shell company involvement or derogatory history as to the issuer. Where appropriate, Exhibit 5 identifies the missing information, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 46-47.

38. Exhibit 6 (also referred to as Exhibit A-4) shows 55 SARs that omitted information about stock promotion history. Exhibit 6 was created by reviewing supporting documents indicating the existence of stock promotions and comparing them to the narrative section of related SARs. Where appropriate, Exhibit 6 identifies the missing information about stock promotional activity, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 48-49.

39. Exhibit 7 (also referred to as Exhibit A-5) shows 42 SARs that omitted critical information about problems with the issuers of securities. Exhibit 7 was created by reviewing supporting documents indicating the presence of unverified issuers and comparing them to the narrative section of related SARs. Where appropriate, Exhibit 7 identifies the missing information about unverified issuers, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶ 49.

40. Exhibit 8 (also referred to as Exhibit A-6) shows 707 SARS that omitted low or nonexistent trading volume. To create Exhibit 8, Navigant identified stocks with low or nonexistent trading volume by identifying circumstances in which the reported deposit of a security was, according to the support file provided by Alpine, approximately 300% or more of that security's average daily trading volume, for the three months preceding that deposit. Where appropriate, Exhibit 8 identifies the missing information about low trading volume, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 50-51.

41. Exhibit 9 (also referred to as Exhibit A-7) shows 298 SARs that omitted involvement in the reported transaction of a foreign individual or entity. Exhibit 9 was created by reviewing supporting documents indicating the existence of foreign involvement. Where appropriate, Exhibit 9 identifies the missing information about foreign involvement, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 52.

**II.     Unreported Liquidations**

42. Exhibit 11 summarizes the "Unreported Liquidations" by grouping related sales and deposits together. Navigant created Exhibit 11 by arranging the sale information provided by the Commission and deposit information derived from SARs filed on deposits, separately, as to

each customer and each security in chronological order. Navigant combined the tables by linking the deposits to subsequent liquidations of the same security, by the same customer, as identified in Alpine's blotter information. Each separate grouping of related transactions has been assigned a "group number" for reference purposes. A total of 1,242 groups appear in this Exhibit 11. SEC staff members reviewed the SAR narratives for information regarding the stated volume and value of each transaction and supplied that data to Navigant. Navigant reviewed a sample of this information to confirm its accuracy and included it in Exhibit 11. Angotti Decl. ¶ 54.

43. The information about sales in Exhibit 11 was provided to the Commission by Alpine. Declaration of L. James Lyman ¶¶ 12-13, attached hereto as Exhibit 15 ("Lyman Decl."). The documents summarized in Exhibit 11 are in Alpine's possession and can be made available to Alpine or the Court for examination, copying, or both. *See* Fed. R. Evid. 1006.

44. Exhibit 11 contains 3,568 separate liquidation transactions grouped with 1,667 deposits. Exhibit 11.

45. Alpine did not file SARs on the liquidations listed in Exhibit 11. Lyman Decl. ¶ 14; Alpine Securities Corporation's Response to SEC's First Set of Written Discovery at Responses to Request for Admission No. 2 at pp. 4-5, attached hereto as Exhibit 16 ("Alpine's First Discovery Responses").

46. In approximately 40% of the Unreported Liquidations, the liquidation happened so quickly that the stock was already liquidated before Alpine even filed a SAR on the deposit. *See* Exhibit 11.

47. Alpine's AML process to determine whether to file a SAR focused on deposits. Alpine did not routinely check potential sales for related deposits when clearing the sales for

customers because, in Alpine's view, deposits are "somewhat synonymous" with sales because customers do not "park" their deposits in Alpine's "coffers" and instead sell them "as soon as possible." Alpine Depo. at 174[6]-176[5]; *see also* 179[1-11]; Jones Depo. at 78[19]-80[1].

### III. Late-Filed SARs

48. Exhibit 12 to the Motion is a summary of dates of SARs filed by Alpine and the dates of the deposits reported in the SARs. Exhibit 12 also details the number of days between the deposit and the SAR filing, and the number of days after the 30-day time period permitted for filing. Exhibit 12 also identifies each SAR by Bates number. Angotti Decl. ¶ 56.These documents are in Alpine's possession and can be made available to Alpine or the Court for examination, copying, or both. *See* Fed. R. Evid. 1006.

49. In the spring of 2012, Alpine's AML Officer, Randall Jones, reviewed a set of deposits for which Alpine filed no SAR. Alpine engaged in this so-called "lookback" because it determined that a former employee may not have been filing SARs on suspicious transactions and the AML Officer and his team determined to "have this lookback to determine whether I found anything out of these depositions to be suspicious. If I did, then to file a SAR." Deposition of Randall Jones at 31[11]-32[14]; 33[14-23].

50. During this lookback review, Mr. Jones reviewed documents related to a deposit in a packet that had been assembled at the time of deposit. Jones Depo. at 35[4-14]; 35[25]-36[25]. When determining whether to file a SAR during the lookback, Alpine relied only on information available at the time of the deposit. Jones Depo. at 43[1]-45[4].

51. In the narrative section of some of the SARs filed as a result of the lookback, Alpine stated that the deposit occurred over a range of dates. For example, Exhibit 37 to Mr.

Jones's deposition was a SAR filed by Alpine in which the narrative section stated that the deposit occurred "[o]n or around 12-8-2011 to 5-4-2012." Jones Depo. at 39[9]-40[10]. Alpine used date ranges for the deposit not because the deposit took five months, but because the deposit occurred on the first date and Alpine determined that the deposit was suspicious on the second date. *Id.* at 44[5]-45[4].

52. According to Alpine's AML Officer at the time, using a date range to describe when the deposit occurred was the "open and honest" way to explain that Alpine received the information about a deposit on the first date and determined it was suspicious on the second date. Jones Depo. at 53[9-24]. For these SARs, Alpine made the decision that the deposit was suspicious on the date it filed the SAR. Jones Depo. at 51[5]-52[3] ("The date I found it suspicious would have been the date that I filed the SAR….[the date Alpine found the information to be suspicious] would have been the date that I signed the SAR.").

## IV.     Missing Support Documents

53. Exhibit 17 lists 496 SARs with "Missing Support Documents." Lyman Decl. ¶ 9. These are SARs for which the Commission requested support documents from Alpine and for which the Commission has searched multiple times and found no evidence of support files produced in 2016. Lyman Decl. ¶¶ 9-11. The SARs listed in Exhibit 17 are documents in Alpine's possession and can be made available to Alpine or the Court for examination, copying, or both. *See* Fed. R. Evid. 1006.

54. The Commission requested the Missing Support Documents, among other things, in an investigatory subpoena served in June 2015. Lyman Decl. ¶¶ 4-5.

55. The Commission also requested the documents by emails of January 14, February 19, and March 8, and August 8, 2016. Lyman Decl. 5.

56. The Commission searched for them several times and requested them several times. Lyman Decl. ¶¶ 6-7.

57. Alpine's counsel produced some supporting documents, but failed to produce many other. On November 15, counsel for Alpine explained during a telephone call that some missing support documents "simply don't exist" and that Alpine was trying to gather and organize others. Lyman Decl. ¶ 8.

58. Alpine failed to identify any of the Missing Support Documents by Bates number or other means in its discovery responses served on November 17, 2017. Ex. 16 at Responses to Interrogatory 4 on p. 10 and Request for Production No. 2 at p. 13.

59. Alpine lacks the knowledge whether its counsel actually produced the Missing Support Documents to the Commission. Alpine Depo. at 186[6]-187[6]. Similarly, the Alpine employee who stated in a declaration in support of Alpine's opposition to the Partial Motion that "I believe that these files have been previously produced to the SEC….I have again copied the supporting files of the SARs listed on Table E and made them available to Alpine's legal counsel," Doc. No. 88-1 ¶¶ 44-45, later testified that, in fact, she has no personal knowledge that the documents were produced to the Commission. Deposition of Erin Green at 137[17-20]; 139[24]-140[2]; 146[9-23], attached hereto as Exhibit 18.

60. The Commission served an interrogatory asking Alpine to identify by Bates number each document Alpine contends is "supporting documentation" within the meaning of 31 C.F.R. § 1023.320(d) for each of the SARs identified by the Commission as missing support

files. In its responses served on March 28, 2018, Alpine failed to identify any of the Missing Documents by Bates number or otherwise. Alpine Securities Corporation's Response to SEC's Second Set of Written Discovery at Responses to Interrogatory Nos. 9-10 at pp. 4-5 & Response to Request for Production No. 5 at p. 6, attached hereto as Exhibit 19.

Respectfully submitted this 13th day of July, 2018.

>
> */s/ Terry R. Miller*
> Zachary T. Carlyle (*pro hac*)
> Terry R. Miller (*pro hac*)
> Attorneys for Plaintiff
> UNITED STATES SECURITIES AND
> EXCHANGE COMMISSION
> 1961 Stout Street, 17th Floor
> Denver, Colorado 80294
> (303) 844-1000

## CERTIFICATE OF SERVICE

I certify that on July 13, 2018, a copy of the foregoing document was served via email upon the following:

Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker
CLYDE SNOW & SESSIONS
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah 84111-2216

Maranda E. Fritz
Thompson Hine LLP (NYC)
335 Madison Avenue, 12th Floor
New York, NY 10017

*Counsel for Alpine Securities Corporation*

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Marla J. Pinkston*