# Exhibit 6

# Chapter 24

# Clearing Broker Liability and Responsibilities

Harry S. Davis

*Partner, Schulte Roth & Zabel LLP*

Betty Santangelo[*]

*Of Counsel, Schulte Roth & Zabel LLP*

*[Chapter 24 is current as of June 15, 2015.]*

§ 24:1   Introduction
§ 24:2   The Role of the Clearing Firm in the Brokerage Industry
　§ 24:2.1   Evolution of Responsibilities of Clearing Versus Introducing Brokers—NYSE Rule 382, NASD Conduct Rule 3230
　§ 24:2.2   Regulatory Developments
　§ 24:2.3   Anti-Money Laundering Obligations of Clearing Brokers
§ 24:3   Litigation Exposure of Clearing Firms
　§ 24:3.1   Pre-*Blech*: Most Courts Summarily Rejected a Variety of Customer Claims Against Clearing Brokers
　§ 24:3.2   *In re Blech*
　§ 24:3.3   Post-*Blech Decisions*

---

[*]　Harry S. Davis is a litigation partner and Betty Santangelo is formerly a partner, now of counsel, in the litigation group at Schulte Roth & Zabel LLP. Harry S. Davis specializes in securities, regulatory and antitrust litigation, and Betty Santangelo specializes in white collar, securities and regulatory litigation, and anti-money laundering compliance. The authors express their appreciation to special counsel Michael G. Cutini, and associates Nicole Geoglis and Russell S Yavner for their contributions to this chapter.

§ 24:3.4    Isolated Victories for Customers of Introducing Firms
            [A]   Breach of Fiduciary Duty/Apparent Authority/Aiding and Abetting Fraud
            [B]   State Blue Sky Laws
§ 24:3.5    Alternate Theories of Clearing Broker Liability in the Context of a Bankruptcy by the Introducing Firm's Customer
            [A]   Overview of Fraudulent Transfer Law
            [B]   *Gredd v. Bear, Stearns Securities Corp.*
            [C]   Additional Cases Reflecting the Emergence of Potential "Transferee" Liability for Clearing Brokers
§ 24:3.6    Arbitrations: More Dangerous Ground for Clearing Brokers
§ 24:4   Conclusion

## § 24:1   Introduction

For many years, U.S. courts and regulators have acknowledged the historic allocation of functions and responsibilities between introducing brokers that accept trade instructions from their investing customers and the clearing firms that process those trades. Despite one significant case denying a motion for summary judgment in a lawsuit against a clearing firm alleged to be integrally involved in the transactions of an introducing firm, and another, more recent bankruptcy case, courts have repeatedly upheld the traditional rule that clearing firms performing routine back office functions are not liable for the misconduct of their introducing brokers or the customers of those introducing brokers. The basic rationale underlying these decisions is that clearing brokers are deemed not to owe any fiduciary duty to customers of the introducing brokers.[1]

Still, certain relatively new regulatory duties, such as forwarding customer complaints to regulators and obtaining additional background information on introducing brokers, present the potential for additional regulatory exposure. Regulators have also promulgated anti-money laundering regulations under the USA PATRIOT Act of 2001 ("PATRIOT Act"),[2] potentially altering the traditional allocation of responsibility between introducing and clearing brokers.

---

1. Certain commentators have argued in favor of greater clearing firm liability. *See* J. Fillipone, *Clearer Skies for Investors: Clearing Firm Liability Under the Uniform Securities Act*, 39 SAN DIEGO L. REV. 1327 (2002); D. Abrams, *A Second Look at Clearing Firm Liability*, 67 BROOK. L. REV. 479 (2001); J. Bellwoar, *Bar Baron at the Gate: An Argument for Expanding the Liability of Securities Clearing Brokers for the Fraud of Introducing Brokers*, 74 N.Y.U. L. REV. 1014 (1999).
2. The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT), Pub. L. No. 107-56, 115 Stat. 296 (2001).

On the litigation front, isolated court decisions upholding alternate legal theories, such as liability under "blue sky laws"—which create liability for parties that "materially aid" a fraud—also present the potential for ongoing litigation exposure. Moreover, clearing brokers may face exposure to liability in bankruptcy contexts under fraudulent transfer law stemming from the fraudulent misconduct of the introducing brokers' customers. Significantly, in the wake of a federal district court decision holding that clearing brokers may be liable as the "initial transferee" of account deposits made by an introducing broker's customer into its own account held at the clearing broker where the introducing broker's customer was engaged in a fraud against its own investors, even where the clearing broker was not alleged to have actual knowledge of the underlying fraud, two clearing brokers have faced trial on the issue of whether they conducted a sufficiently diligent inquiry after being put on inquiry notice of the alleged fraud in order to avail themselves of a "good faith" affirmative defense. Finally, arbitration continues to be unpredictable, since arbitrators occasionally use their latitude for "creative" application of the law to protect investors, to the detriment of "deep pocket" clearing firms.

### § 24:2   The Role of the Clearing Firm in the Brokerage Industry

The clearing broker and the introducing broker together perform all of the functions of a single broker, but, pursuant to certain regulatory mandates, they typically allocate those tasks between themselves based on their respective capabilities and expertise. As a general rule, the introducing broker conducts the face-to-face interactions with the client, while the clearing firm performs back-office administration of any transactions.

As most liability issues arise in "fully-disclosed" relationships, where the introducing broker's customers are disclosed to the clearing broker, our discussion will focus on such arrangements.

#### § 24:2.1   Evolution of Responsibilities of Clearing Versus Introducing Brokers—NYSE Rule 382, NASD Conduct Rule 3230

The modern regulatory framework that governs clearing brokers began in 1975. Before then, all exchange members, including clearing brokers, were required to charge minimum commissions for all transactions executed on the exchanges. This system discouraged clearing arrangements because an introducing broker that cleared through another firm would have to impose on its customer both its own commission and the mandated commission of the clearing firm.

The lack of an efficient clearance and settlement system caused the 1967–70 "Paper Crunch," by which exchanges became so overwhelmed with the volume of trades to be processed that some firms were forced to close on Wednesdays and otherwise shorten hours to catch up with paperwork. About 160 NYSE member firms closed as a result.[3] In 1975, in response to this, Congress amended the Securities Exchange Act of 1934 ("Exchange Act") and directed the Securities and Exchange Commission (SEC) to establish "a national system for the prompt and accurate clearance and settlement of . . . securities."[4]

Pursuant to this congressional mandate, the SEC eliminated fixed minimum commissions on national securities exchanges[5] and promulgated a Uniform Net Capital Rule, which made it possible for an introducing broker to engage in the securities business with only $5,000 in net capital.[6] These developments spawned the growth of small introducing brokers that did not have the resources to clear and settle trades themselves. The growth of small introducing brokers in turn required that there be well-capitalized clearing brokers willing to "stand behind" their trades, and regulators subsequently issued rules and rule amendments to provide clearing firms with an incentive to perform that vital function.

For example, in 1982, former the New York Stock Exchange (NYSE) relieved clearing firms of NYSE Rule 405 "know-your-customer" responsibility to the customers of introducing firms.[7] Prior to 1982,

---

3. *See generally* Minnerop, *Clearing Arrangements*, 58 BUS. LAW. 917 (2003) [hereinafter Minnerop].
4. Exchange Act of 1934, § 17A(a)(2)(A)(i), 15 U.S.C. § 78q-1(a)(2)(A)(i).
5. Exchange Act Release No. 11,204 (1975).
6. 17 C.F.R. § 240.15c3-1.
7. Notably, 2 2008 district court case dismissed a complaint against a clearing broker alleged to have breached a fiduciary duty to an introduced customer with regard to its role in the account-holder's stock transactions (reasoning that clearing brokers do not have fiduciary duties to individual investors absent "extenuating" circumstances none of which were alleged) but, in doing so, noted that under certain circumstances (such as the presence of irregularities or suspicious circumstances putting the clearing broker on notice), clearing brokers could be liable for violations of Rule 405 if a private right of action under Rule 405 exists. *See* Wehrs v. Benson York Grp., No. 07C3312, 2008 WL 753916, at *1–4 (N.D. Ill. Mar. 18, 2008). As discussed below, the "know-your-customer" obligations under former NYSE Rule 405 subsequently were replaced by FINRA Rule 2090 as part of an ongoing regulatory effort to consolidate disparate and, at times, conflicting sets of rules. But as noted in the adopting release, prior case law and regulatory notices remain applicable if they "do not conflict with new rule requirements or interpretations" and "depending on the facts and circumstances of the particular case." *See* FINRA Regulatory Notice 11-02, 2011 WL 127154, at *7 n.3 (Jan. 10, 2011).

Rule 405 had applied equally to clearing brokers, and so imposed upon them some duty to supervise the sales practices of introducing firms. Cognizant of this duty, clearing firms maintained compliance staffs that were large enough to supervise introducing brokers, and the clearing firms' fees reflected these expenses.[8] During that same time period, the few early clearing broker cases that addressed these issues frequently found clearing firms liable for failing to supervise the activities of introducing brokers.[9]

In addition to amending Rule 405 in 1982, the SEC approved an amendment to NYSE Rule 382, which addressed clearing relationships for clearing brokers that are members of the NYSE. Those amendments allowed introducing and clearing brokers, with respect to fully disclosed arrangements, to allocate contractually the various responsibilities regarding performance and supervision of customer accounts and transactions.[10] Thus, clearing firms became free, as they are today, to relieve themselves by agreement of supervisory responsibility over introducing brokers—at least for purposes of NYSE rules.[11]

---

8. *See generally* Minnerop, *supra* note 3, at 935.
9. *See, e.g.*, Faturik v. Woodmere Sec., Inc., 442 F. Supp. 943, 945–46 (S.D.N.Y. 1977) (clearing firm could be held liable for violation of Rule 405's "Know Your Customer" requirement and for aiding and abetting); Cannizaro v. Bache, Halsey Stuart Shields, Inc., 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (refusing to dismiss aiding and abetting claim, since clearing firm knew of introducing broker's fraud "and assisted in it by 'clearing' the orders" it received). *See also In re* D.H. Blair & Co., 44 S.E.C. 320, 1970 WL 103691, at *6 (May 21, 1970) (clearing firm liable; where firm is aware of "serious irregularities," it has "independent obligation to make appropriate inquiry and take prompt steps to terminate any participation in activity violative of the securities laws").
10. NYSE Information Memo No. 82-18 at 1. *See also In re* Adler Coleman Clearing Corp., 198 B.R. 70, 74 n.4 (S.D.N.Y. 1996) (describing the amendment of Rules 382 and 405 to relieve clearing firms on a fully disclosed basis of Rule 405 responsibilities with respect to introduced accounts).
11. Nevertheless, clearing firms historically were required to complete a NYSE Risk Management Questionnaire as part of the clearing relationship approval process under NYSE Rule 382, which effectively imposed upon them an affirmative duty to conduct thorough background checks of every proposed introducing broker (or correspondent) at the inception of each new clearing relationship. While the necessity of conducting those background checks ultimately was left to the clearing broker's discretion under NYSE Rule 382 (with a comply-or-explain approach used in the questionnaire accompanied by the prospect of hindsight review by the NYSE), as explained below, clearing firms today are required to conduct extensive due diligence on introducing firms before entering into new relationships under FINRA Rule 4311(b)(4).

§ 24:2.1         Broker-Dealer Regulation

In 1994, the NASD (now The Financial Industry Regulatory Authority (FINRA))[12] adopted Conduct Rule 3230, a comparable rule, that required the clearing agreement between an introducing and a clearing broker to allocate between the two brokers responsibility for the functions listed in the NASD rules.

Typical allocations of responsibility to the introducing firm include:

- opening, approving, and monitoring customer accounts;
- having direct personal contact with the customer;
- providing investment recommendations and accepting customer orders; and
- executing customer orders (though sometimes this is done through the clearing broker).

A clearing broker typically has the following responsibilities, which are generally characterized as "back office" or "ministerial":

- preparing written trade confirmations and account statements for the introducing broker's customer;
- receiving or delivering funds or securities to or from the introducing firm's customers;
- maintaining accounts' books and records;
- providing monthly account statements;
- maintaining custody of customer funds and securities;
- clearing and settling transactions in customer accounts; and
- extending credit in margin accounts (including lending stock for short sales).[13]

Clearing firms also are required to disclose to customers the applicable allocation of functions with the introducing firm. The disclosure typically specifies that the introducing broker will provide all investment advice and investment management services, while the clearing broker will provide particular record keeping and operational services. The disclosure further indicates that the clearing firm will accept orders and instructions from the introducing firm for the customer's account *without inquiry or investigation* unless specifically notified otherwise. Introducing firms must give notice, and typically request the customer's consent to change clearing firms.

---

12. When the reference is historical, we refer to this SRO as NASD; when the reference involves the present tense, we refer to this SRO as FINRA.
13. *See generally* Minnerop, *supra* note 3, at 919.

*Clearing Broker Liability and Responsibilities* § 24:2.2

### § 24:2.2 Regulatory Developments

In response to the revelation in the mid 1990s of fraud in the sale of micro-cap securities among a handful of small introducing firms, and the involvement of their clearing firms (see below), regulators revised the rules governing clearing brokers. Thus, in 1999 the NYSE and NASD amended Rules 382 and 3230, respectively, requiring clearing firms to forward customer complaints about introducing brokers to the introducing firm in question and to its designated examining authority (DEA), and to provide introducing firms and their respective DEAs annually with a list of exception reports and similar documents.[14] The rules do not require clearing brokers to report to regulators any activity by introducing brokers that they consider improper, although failure to comply with the specific information processing requirements could conceivably become a basis for liability. At the time that the new rules were adopted, both the NYSE and the NASD stated that they were "not intended to change the fundamental nature of the relationship between introducing and clearing firms."[15]

The most controversial proposal, a requirement that clearing firms notify complaining customers of their right to transfer their account to another introducing broker, was deleted from the NYSE proposal after the Securities Industry Association protested that this would unfairly imply to customers that such a transfer was warranted.[16]

In 2001, the NASD introduced a separate information collection initiative called "INSITE" (Integrated National Surveillance and Information Technology Enhancements) designed to gather electronic data as part of the surveillance component of its National Examination Program.[17] This program requires member clearing firms to forward various types of raw data to FINRA on a daily basis regarding

---

14. As part of FINRA's rulebook consolidation process discussed below, these requirements have since been incorporated into the provisions of FINRA Rule 4311(g)(1) and (h), respectively.
15. NASD Notice to Members 99-57 (July 1999); NYSE Information Memo No. 99-33 (July 1999). *See also* Betty Santangelo & Jess Velona, *SEC Approves NYSE and NASD Rules Regarding Responsibilities of Securities Clearing Firms for Their Introducing Brokers*, SECURITIES LAW DEVELOPMENTS (Summer 1999).
16. R. Devere, *SEC OKs New Clearing Regulations Supported by NYSE, NASD*, SEC. INDUS. NEWS, June 7, 1999, at 6.
17. *See* Special Notice to Members 01-84, 2001 WL 1627939 (Dec. 10, 2001); NASD Conduct Rule 3150 (Reporting Requirements for Clearing Firms). FINRA presently is working to overhaul the system by which it collects electronic customer account information from clearing and introducing firms. *See* FINRA Regulatory Notice 13-42, 2013 WL 6836921 (Dec. 23,

§ 24:2.2                BROKER-DEALER REGULATION

its activities and that of its customers, which in turn creates exception reports for its own use that may then trigger follow-up regulatory action.[18] Clearing firms are not required to review any of the data it provides to FINRA or the exception reports generated from that data.[19]

On August 26, 2005, the SEC approved amendments to NASD Rules 3150 and 3230 in recognition of the difficulties that so-called "piggybacking" clearing relationships—situations in which an introducing broker obtains clearing services by contracting with an intermediary introducing broker, which in turn contracts with the clearing broker for clearing services—posed to the existing regulatory regime.[20] Prior to the amendments, piggybacking relationships challenged regulatory efforts to obtain useful and accurate data from clearing brokers about the introducing brokers with whom they did business due to inherently suspect data reported by clearing brokers about accounts purportedly attributable to a single introducing broker but that, in

---

      2013) (Comprehensive Automated Risk Data System); FINRA Regulatory Notice 14-37, 2014 WL 4952281 (Sept. 30, 2014) (Comprehensive Automated Risk Data System). While still in the early stages of the rulemaking process, the Comprehensive Automated Risk Data System (CARDS) would replace INSITE and, as currently conceived, permit clearing and introducing brokers to contractually allocate responsibility pertaining to information associated with the introducing broker's customers' accounts that clearing firms typically do not require for clearing purposes. *See* FINRA Regulatory Notice 14-37, 2014 WL 4952281, at *7–9. Notably, even in situations where the CARDS reporting obligation is allocated to the clearing broker, the proposal explains that "if a third party is simply passing on the information to CARDS, and does not otherwise use the information for its customer reviews, that third party would not be held to any new supervisory or compliance obligation relating to the information." *Id.* at 9.

18. Special Notice to Members 01-84, 2001 WL 1627939, at *1. Specifically, the INSITE program requires clearing firms to electronically file, on a daily basis, data regarding: the aggregate and net liquidating equity in each correspondent firm's proprietary accounts; the number and dollar value of exchange and non-exchange equity trades, options transactions, and debt transactions in each account, and the sales credits or commissions generated by such transactions; the number of customer accounts with securities positions and/or credit balances and the total dollar value of margin debits in those accounts and initial or maintenance margin calls aged more than five business days; the number of customer accounts with open short positions and the share count and dollar value associated with those uncovered short positions; the aggregate unsecured net equity for all correspondent firms' customer accounts; and the number of, and details concerning, canceled or as-of trades made by each correspondent firm.
19. *Id.; see also* NASD Special Notice to Members 05-48, 2005 WL 1767505 (July 22, 2005).
20. NASD Special Notice to Members 05-72 (Oct. 2005).

reality, may have represented an aggregate of the accounts for all introducing firms in the piggybacking relationship.[21]

To resolve these issues, and to afford regulators greater transparency in the data reported, the amendment to Rule 3150 requires clearing firms to distinguish introducing firms from any piggybackers by reporting data about each piggybacking firm separately from the introducing broker with whom the clearing broker has its contractual relationship. Notably, the amended rule requiring separate reporting applies only to relationships between piggybacking and intermediary firms established on or after February 20, 2006. Moreover, to ease problems created under the pre-amended rules if an introducing broker with whom a clearing broker is contracted was to go into SIPC liquidation, Rule 3230 was amended such that clearing agreements must now require the intermediary firms in piggybacking clearing relationships to maintain their data in a manner that allows clearing firms and regulators to distinguish between assets of the intermediary and those of any piggybacking firms. Similar to the Rule 3150 amendment, the new requirements of Rule 3230 also applied only to piggybacking relationships established on or after February 20, 2006.[22]

More recently, the regulatory oversight of brokerage firms continued to evolve with the July 2007 merger of the NASD and the regulatory, enforcement, and arbitration functions of the NYSE. FINRA, the consolidated regulatory body resulting from the merger, continues the surveillance and oversight functions previously administered concurrently pursuant to rules promulgated by the NASD and NYSE, and is in the process of developing a consolidated FINRA rulebook eliminating obsolete or otherwise duplicative NASD and NYSE rules, harmonizing existing competing rules, and promulgating additional rules in light of the current economic environment and financial industry realities.[23]

---

21. *Id.*
22. *Id.* As part of FINRA's rulebook consolidation process discussed below, the requirements of NASD Rule 3230 have since been incorporated into FINRA Rule 4311(i).
23. *See, e.g.,* FINRA Information Notice, 2008 WL 698461 (Mar. 12, 2008) (Rulebook Consolidation Process); FINRA Regulatory Notice 08-80, 2008 WL 5263216 (Dec. 16, 2008) (Best Execution); FINRA Regulatory Notice 08-83, 2008 WL 5395150 (Dec. 24, 2008) (Front Running); FINRA Regulatory Notice 09-03, 2009 WL 48283 (Jan. 6, 2009) (Financial Responsibility and Related Operational Rules); SEC Exchange Act Release No. 61,090 (Dec. 1, 2009), 74 Fed. Reg. 64,776 (Dec. 8, 2009) (publishing for comment amended proposed rules regarding Retail Forex); FINRA Regulatory Notice 09-64, 2009 WL 3872340 (Nov. 13, 2009) (Customer Assets); SEC Exchange

§ 24:2.2    BROKER-DEALER REGULATION

As part of the process, the SEC approved new rules in November 2010 and March 2011 governing broker-dealers' "know-your-customer" obligations and the allocation of certain functions between introducing and clearing firms in agreements for clearing services, including FINRA Rules 2090 and 4311.[24]

As explained in the adopting release, FINRA Rule 2090 is intended both to "retain the core features of" and to "strengthen, streamline and clarify" former NYSE Rule 405.[25] In that regard, Rule 2090 requires firms to use "reasonable diligence" when opening and maintaining every account and to "know (and retain) the essential facts concerning every customer."[26] In addition to explaining which facts are deemed "essential" for purposes of "knowing the customer,"[27] the adopting release makes clear FINRA's view that broker-dealers are required to know their customers "not only at account opening but also throughout the life of its relationship with customers."[28] Accordingly, FINRA notes that "a firm should verify the 'essential facts' about a customer under the know-your-customer rule at intervals reasonably calculated

---

Act Release No. 60,933 (Nov. 4, 2009), 74 Fed. Reg. 50,334 (Nov. 12, 2009) (approving rules regarding Financial Responsibility); FINRA Regulatory Notice 11-02, 2011 WL 127154 (Jan. 10, 2011) (Know Your Customer and Suitability); FINRA Regulatory Notice 11-06, 2011 WL 381740 (Feb. 3, 2011) (announcing approval of FINRA Rule 4560 addressing Reporting Requirements); FINRA Regulatory Notice 11-25, 2011 WL 2006978 (May 18, 2011) (New Implementation Date for and Additional Guidance on the Consolidated FINRA Rules Governing Know-Your-Customer and Suitability Obligations); FINRA Regulatory Notice 12-29, 2012 WL 2365699 (June 14, 2012) (announcing approval of FINRA Rules 2210 and 2212 through 2216 addressing Communications with the Public); FINRA Regulatory Notice 12-44, 2012 WL 5377600 (Oct. 26, 2012) (announcing approval of amendments to FINRA Rule 4210 addressing Margin Requirements); FINRA Regulatory Notice 12-52, 2012 WL 6067393 (Dec. 6, 2012) (announcing approval of FINRA Rule 5270 addressing Front Running).

24. See FINRA Regulatory Notice 11-02, 2011 WL 127154 (Jan. 10, 2011) (Know Your Customer and Suitability); Exchange Act Release No. 63,325 (Nov. 17, 2010), 75 Fed. Reg. 71,479 (Nov. 23, 2010) (approving FINRA Rules 2090 and 2111); see also FINRA Regulatory Notice 11-26, 2011 WL 2163375 (May 27, 2011) (Financial Responsibility); Exchange Act Release No. 63,999 (Mar. 1, 2011), 76 Fed. Reg. 12,380 (Mar. 7, 2010) (approving FINRA Rules 4150, 4311, 4522 and 4523).
25. FINRA Regulatory Notice 11-02, 2011 WL 127154, at *1.
26. Id. at *5 (quoting Rule 2090).
27. Id. (stating that "[f]or purposes of this Rule, facts 'essential' to 'knowing the customer' are those required to (a) effectively service the customer's account, (b) act in accordance with any special handling instructions for the account, (c) understand the authority of each person acting on behalf of the customer, and (d) comply with applicable laws, regulations, and rules").
28. Id. at *7 n.5.

to prevent and detect any mishandling of a customer's account" resulting from a change in circumstances.[29]

Similarly, while based largely on NASD Rule 3230 and NYSE Rule 382, FINRA Rule 4311 contains significant additional requirements not found under its predecessors. For example, Rule 4311(a)(1) requires that introducing firms notify clearing brokers of the existence of any piggybacking relationships the introducing firm has, and further requires that clearing agreements subsequently identify and bind each of the introducing firms in the piggybacking relationship as a party to the clearing agreement.[30] Additionally, Rule 4311(b)(4) mandates that clearing brokers now must conduct extensive due diligence on introducing firms prior to entering into new clearing agreements. Importantly, and in FINRA's discretion, clearing brokers' due diligence obligations under the rule may include, among other things, "inquiry by the carrying firm into the introducing firm's business model and product mix, proprietary and customer positions, FOCUS and similar reports, audited financial statements and complaint and disciplinary history."[31] As a result, and despite FINRA's effort to clarify that the required due diligence is generally intended to "assess the financial, operational, credit and reputational risk" that the piggybacking clearing relationship may have upon the clearing broker,[32] compliance with Rules 2090 and 4311 throughout the relationship may significantly increase the obstacles clearing brokers face when attempting to prove statutory "good faith" defenses in litigation stemming from fraudulent activity engaged in by an introduced account unbeknownst to the clearing broker.[33]

The SEC also recently approved amendments to NASD Rule 2340 modifying how per share estimated values of Direct Participation

---

29. *Id.*
30. *See* FINRA Regulatory Notice 11-26, 2011 WL 2163375, at *9 (quoting Rule 4311(a)(1)).
31. *Id.* at *9, *12 (quoting Rules 4311(b)(4) and 4311.03).
32. *Id.* at *9 (quoting Rule 4311(b)(4)).
33. As one clearing broker noted in comments submitted to FINRA, Rule 4311 presents risks of being "misconstrued" to suggest that due diligence required of a clearing broker under the rule includes taking measures "to proactively determine the appropriateness of [introducing broker's] activities or compliance profile, which could lead to the potential for unintended consequences," including an environment where the clearing broker "becomes a default 'gatekeeper' to the marketplace by determining whether to extend its services to an [introducing broker] based upon its due diligence evaluations." As a result, the clearing broker urged FINRA to implement "a more prudential approach" to the due diligence obligations imposed under Rule 4311 to "avoid setting a false expectation that [clearing brokers] are responsible for oversight and monitoring of [introducing brokers'] activities and compliance responsibilities." *See* Letter

§ 24:2.2                BROKER-DEALER REGULATION

Programs and unlisted Real Estate Investment Trusts are to be reported on customer account statements.[34] As initially proposed by FINRA, the amended rule would have expressly prohibited broker-dealers "from providing a per share estimated value, from any source, if it knows or has reason to know the value is unreliable, based upon publicly available information or nonpublic information that has come to the [firm's] attention."[35] Citing the traditional allocation of responsibilities between clearing firms and introducing brokers, the Clearing Firms Committee of Security Industry and Financial Markets Association (SIFMA) expressed concerns that "[t]he broad language of the Proposed Amendments would in essence require the clearing firm to act as insurer or guarantor of estimated valuations received from third parties who have far more expertise in providing valuations—or face regulatory exposure and potential civil liability after the fact," thus imposing new obligations and potential liability that are "inconsistent with clearing firms' specialized role as 'back office' providers of clearing and settlement services."[36] Although FINRA ultimately scaled back amended Rule 2340 in response to SIFMA's comments,[37] even as revised FINRA has explained that if "a firm is aware of red flags as to the reliability of a per share estimated value," then "at a minimum" amended Rule 2340 obligates the firm to: (i) "follow up with the issuer

---

        from Claire Santaniello, Managing Dir. and Chief Compliance Officer,? Pershing, to Marcia Asquith, FINRA (Apr. 27, 2009) (in response to Notice 09-03), *available at* www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/noticecomments/p118616.pdf. Whether Rule 4311(b)(4) as approved adequately addressed these concerns remains to?be seen and, ultimately, may depend upon the level of due diligence a clearing broker was required to conduct in the context of a specific?rela?tionship in FINRA's discretion.

34.   *See* FINRA Regulatory Notice 15-02, 2015 WL 126979, at *1–3 (Jan. 5, 2015) (DPP and Unlisted REIT Securities); Exchange Act Release No. 73,339 (Oct. 10, 2014), 79 Fed. Reg. 62,489 (Oct. 17, 2014) (approving proposed changes to FINRA Rule 2310 and NASD Rule 2340, effective April 11, 2016).

35.   *See* FINRA Regulatory Notice 11-44, 2011 WL 4632501, at *1, *5 (Sept. 29, 2011) (Customer Account Statements).

36.   *See* Letter from Thomas F. Price, Managing Dir., SIFMA Clearing Firms Comm., to Marcia E. Asquith, FINRA, at *2–3 (Nov. 10, 2011), *available at* www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/notice comments/p125137.pdf ("SIFMA is concerned that this broader language may impose on clearing firms a new and on-going affirmative duty to monitor and confirm the reliability of valuations received from [independent third-party valuation services] . . . for thousands of unlisted DPPs and REITs.").

37.   *See* FINRA Regulatory Notice 12-14, 2012 WL 764516, at *5 (Mar. 7, 2012) (Customer Account Statements).

or its independent valuation service and ask [them] to reconsider the valuation in light of the information"; and (ii) "evaluate the response received to determine whether continuing to include the per share estimated NAV is appropriate in light of the red flags identified."[38] If the firm does not reasonably believe the per share valuation is reliable, then it is not required to include the value on the customer account statement.[39]

### § 24:2.3  Anti-Money Laundering Obligations of Clearing Brokers

Clearing brokers, as well as introducing brokers, have long been subject to anti-money laundering (AML) obligations under the Bank Secrecy Act (BSA).[40] Those obligations have included the reporting of transactions involving currency of over $10,000;[41] the reporting of transportation of currency or monetary instruments of over $10,000 into or outside of the United States;[42] and the collection and retention of certain identification information for domestic or international funds transfers and maintenance of that information as it travels with the funds.[43]

However, the events of September 11, 2001, generated a particular focus by Congress and the regulators on money laundering through financial institutions, as well as expanded attention to terrorist financing (see chapter 18). Thus, on October 26, 2001, Congress enacted the PATRIOT Act, which added a number of AML requirements to the BSA directed at financial institutions, including broker-dealers registered with the SEC, that are intended to prevent money laundering and terrorist acts.[44]

---

38. *Id.* at *6.
39. *Id.* As explained in the SEC's request for comment on the proposed amendment to NASD Rule 2340, "[t]he question of whether a valuation is 'unreliable' may be difficult under particular facts [and] would require consideration of the circumstances under which it was developed, the evidence of any 'red flags' that indicate it may be unreliable and the?sig? nificance of various aspects of the methodology" used to develop it. SEC Exchange Act Release No. 71,545, 79 Fed. Reg. 9535, 9539 (Feb. 19, 2014).
40. Bank Secrecy Act of 1970, Pub. L. No. 91-508, 84 Stat. 1114 (1970), 31 U.S.C. §§ 5311–30 (2012).
41. 31 U.S.C. § 5313 (2012); 31 C.F.R. § 1010.311 (2015).
42. 31 U.S.C. § 5316 (2012); 31 C.F.R. § 1010.340 (2015).
43. 31 C.F.R. §§ 1020.410(a), 1010.410(e), (f) (2015).
44. *See* The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT), Pub. L. No. 107-56, 115 Stat. 272 (2001). For more information on the AML regulations applicable to broker-dealers generally, see Anti-Money Laundering Regulations Applicable to Broker-Dealers, chapter 26 herein.

In contrast to existing SRO rules—such as FINRA Rule 4311, which allows introducing brokers and clearing brokers to allocate functions and therefore responsibilities between them—with respect to the PATRIOT Act AML rules, regulators have stated generally that brokers *cannot* allocate such responsibilities, since they are independently responsible. Thus, each must have its own AML program and meet its own AML obligations.[45] The regulators have, however, provided guidance in certain areas with respect to the sharing of accounts between introducing and clearing brokers.

Pursuant to section 326 of the PATRIOT Act, the U.S. Department of the Treasury ("Treasury") issued a rule, effective as of October 1, 2003, that requires broker-dealers, among other financial institutions, to implement customer identification and verification programs (CIPs).[46] Under that rule (the "CIP Rule"), broker-dealers must collect information concerning the customer's identity at account opening, and then verify the customer's identity through documentary or nondocumentary means, using the information obtained.

The CIP Rule permitted broker-dealers, including clearing brokers and introducing brokers, to rely on one another to meet this obligation, and for many years, clearing brokers and introducing brokers executed such reliance agreements between them.[47] In 2008, however, Treasury issued guidance clarifying that under most circumstances, the introducing broker was the customer of the clearing broker, and the introduced account was the customer of the introducing broker.[48] Specifically, Treasury advised that, under the CIP Rule, where a

---

45. *See, e.g.,* CMG Institutional Trading, LLC, FINRA Disciplinary Proceeding No. 2006006890801 (Oct. 14, 2008) (allegations included failure to conduct independent AML testing where the introducing broker improperly asserted that its clearing firm tested its AML procedures), *aff'd,* (National Adjudicatory Council, May 3, 2010). Although the NASD Notice to Members 02-21 initially indicated that these obligations could be allocated (*see* NASD, Notice to Members 02-21, *NASD Provides Guidance to Member Firms Concerning Anti-Money Laundering Compliance Programs Required by Federal Law,* 2002 WL 544766, at *18 (Apr. 10, 2002)), the SEC staff orally advised the SIA AML Committee that NYSE Rule 382 did not apply to the anti-money laundering obligations, and therefore these responsibilities could not be allocated.
46. 31 C.F.R. §§ 1023.100, 1023.220 (2015).
47. Under the CIP Rule, brokers can rely on each other to fulfill the identification and verification responsibilities for shared customers if the contractual arrangement satisfies the reliance requirements. So long as the reliance is reasonable and the relying broker has obtained the necessary contract and annual certifications from the other broker, the relying broker will be protected by a safe harbor so that it would not be responsible for any failure of the other broker to fulfill its obligations under the CIP Rule. 31 C.F.R. § 1023.220(a)(6)(i)–(iii) (2015).
48. Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements

clearing agreement allocates the functions of opening and approving customer accounts, and directly receiving and accepting orders from the introduced customer exclusively to the introducing broker, and the functions of extending credit, safeguarding funds and securities, and issuing confirmations and statements are allocated to the clearing broker, the introducing broker is responsible for meeting the requirements of the CIP Rule with respect to introduced customers.[49] Treasury also extended the guidance to include piggybacking arrangements, providing that where the piggybacking broker agrees, pursuant to an arrangement with the introducing broker, to retain the functions described above with respect to opening and approving accounts, and receiving and accepting orders, the piggybacking broker, and not the introducing broker or the clearing broker, will be responsible for the CIP requirements with respect to the customers introduced by the piggybacking broker.[50] Nonetheless, introducing brokers are permitted to continue to enter into service agreements with clearing brokers that may or may not include CIP reliance provisions.

Similarly, with respect to the due diligence requirements directed at foreign correspondent and private banking accounts under section 312 of the PATRIOT Act, Treasury has provided guidance that it did not intend to impose a section 312 due diligence obligation on clearing brokers in most instances.[51] When a clearing broker does not impose the minimum account requirements for a "private banking account" on an introduced account for a non-U.S. person and does not assign an officer, employee, or agent to act as a liaison between the clearing broker and such an account,[52] the introduced account will not be considered a private banking account of the clearing broker and the clearing broker will not have its own obligation to perform due

---

According to Certain Functional Allocations [hereinafter CIP No-Action Letter], at 1–2, FIN 2008-G002 (Mar. 4, 2008), *available at* www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-g002.pdf.
49. *Id.*
50. *Id.* at 2.
51. Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries [hereinafter Guidance to Securities and Futures Industries], at 5, FIN-2006-G009 (May 10, 2006), *available at* www.fincen.gov/statutes_regs/guidance/pdf/312securities_futures_guidance.pdf.
52. The definition of "private banking account" is "an account (or . . . combination of accounts) . . . maintained at a covered financial institution that . . . [r]equires a minimum aggregate deposit of funds or other assets of not less than $1,000,000 . . . [i]s established on behalf of or for the benefit of one or more non-U.S. persons who are direct or beneficial owners of the account [and is] assigned to, or is administered or managed by, in whole or in part, an officer, employee, or agent of a covered financial institution acting as a liaison between the covered financial institution and the direct or beneficial owner of the account." 31 C.F.R. § 1010.605(m) (2015).

§ 24:2.3 Broker-Dealer Regulation

diligence. However, if the introducing broker offers accounts that meet the definitional requirements of private banking accounts, the introducing broker would itself have the section 312 obligation. As part of its AML program, a clearing broker is expected to consider the money laundering risks posed by the introducing broker, including the information it obtains about the account base of the introducing broker and whether the introducing broker offers or maintains private banking accounts to non-U.S. persons and the nature and scope of that business. A clearing broker's procedures should also address the performance of additional due diligence in high-risk situations.

Treasury applied a similar rationale regarding the due diligence obligations of clearing brokers directed at foreign correspondent accounts under section 312.[53] Treasury explained that the clearing broker has a due diligence obligation with respect to the financial institution with which it has a clearing or carrying agreement. A clearing broker would not, however, have a due diligence obligation under section 312 with respect to the introduced accountholder unless the clearing broker establishes a relationship with the introduced accountholder such that the clearing broker is obligated to make a suitability determination with respect to the securities transactions conducted through the introduced account. As with due diligence for private banking accounts, however, a clearing broker's AML program should include risk-based procedures to assess, among other things, whether the introducing broker establishes or maintains correspondent accounts for foreign financial institutions and the customer base of the introducing broker, as well as to address the high-risk situations in which additional due diligence may be required with respect to certain introduced accounts.[54]

Treasury has also issued additional guidance with respect to clearing relationships with foreign introducing brokers. Specifically, it

---

53. Guidance to Securities and Futures Industries, *supra* note 51, at 3–4. The definition of "correspondent account" for purposes of the due diligence obligations is "an account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign financial institution, or to handle other financial transactions related to such foreign financial institution." 31 C.F.R. § 1010.605(c)(1)(i). As applied to securities broker-dealers, "account" is defined as "any formal relationship established with a broker or dealer in securities to provide regular services to effect transactions in securities, including, but not limited to, the purchase or sale of securities and securities loaned and borrowed activity, and to hold securities or other assets for safekeeping or as collateral." 31 C.F.R. § 1010.605(c)(2)(ii) (2015).
54. Guidance to Securities and Futures Industries, *supra* note 51, at 3–4.

*Clearing Broker Liability and Responsibilities*  § 24:2.3

notes that both its previous guidance on the due diligence obligations of clearing brokers under section 312,[55] and its no-action position on clearing broker compliance with the CIP Rule,[56] apply to accountholders introduced by foreign introducing brokers.[57] This guidance also provides that clearing brokers are not required to obligate foreign introducing brokers to comply with the CIP Rule, section 312 or any other U.S. anti-money laundering regulations, with respect to introduced accounts.[58] Instead, clearing brokers are obligated to apply risk-based procedures to each correspondent account that are reasonably designed to detect and report known or suspected money laundering activity, including monitoring transactions for such introduced accounts and incorporating any information the clearing broker acquires about such introduced customers in the ordinary course of business.[59]

Treasury has also specifically addressed the clearing broker/introducing broker relationship in the context of suspicious activity reporting. Both introducing brokers and clearing brokers are required to implement an AML program that is reasonably designed to detect and report suspicious transactions. However, Treasury has acknowledged that, under certain circumstances and subject to certain caveats, the parties may act jointly to meet their responsibilities. Pursuant to section 356(b) of the PATRIOT Act, on June 25, 2002, Treasury issued a rule requiring all registered broker-dealers to file reports of suspicious financial transactions under certain circumstances (the "SAR Rule").[60] The SAR Rule explicitly states that if more than one broker-dealer is involved in a transaction, the brokers may file a single SAR.[61] Thus, depending on the circumstances of the transaction (for example, which broker discovered or had reason to discover the suspicious activity), the introducing broker and clearing broker can determine together which one should file the SAR, relieving the other of the reporting responsibility, provided that the filing contains all relevant facts. FinCEN refers to such a joint filing as a "joint SAR."[62] Each broker involved in the joint filing must maintain supporting

---

55. *See id.*
56. *See* CIP No-Action Letter, *supra* note 48, at 2.
57. Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Institution, FIN 2008-R008 (June 3, 2008), *available at* www.fincen.gov/statutes_regs/guidance/pdf/fin-2008-r008.pdf.
58. *Id.* at 3.
59. *Id.*
60. 31 C.F.R. § 1023.320 (2015).
61. 31 C.F.R. § 1023.320(a)(3)(2015).
62. *See, e.g.*, FinCEN, *The SAR Activity Review, Trends, Tips and Issues*, Issue 15 (May 2009), *available at* www.fincen.gov/news_room/rp/files/sar_tti_15.pdf#41.

§ 24:2.3   BROKER-DEALER REGULATION

documentation on the SAR filing.[63] In cases where a SAR is not jointly filed, the filing institution may not disclose to the other broker that a SAR has been filed.[64]

Treasury has not addressed the scope of the monitoring obligations of clearing brokers other than in the context of the CIP Rule and section 312, as discussed above, which appears to be addressed primarily to the monitoring of the introducing broker, and the nature of its customer base.[65] FINRA has brought a number of enforcement cases in this area. The cases take the position that both clearing brokers[66] and introducing brokers[67] have independent monitoring obligations.

---

63. *Id.* at 40.
64. *Id.*
65. The Chicago Board Options Exchange has issued guidance addressing the monitoring obligation of clearing broker-dealers in the context of master accounts and sub-accounts in those instances where the clearing broker-dealer knows that its clients break an account or accounts into sub-accounts; in those cases the clearing firms should review the activity as if the clearing broker-dealer was offering sub-accounts itself. *See* Master Accounts and Sub-Accounts, CBOE Regulatory Circular RG10-101, at 1 (Oct. 1, 2010), *available at* www.cboe.com/publish/RegCir/RG10-101.pdf.
66. *See, e.g.,* Dep't of Enforcement v. Lek Sec. Corp., CRD No. 33135, Disciplinary Proceeding No. 2009020941801 (Dec. 30, 2014) (clearing firm had no automated AML exception reports for monitoring potentially manipulative trading); Dep't of Enforcement v. Legent Clearing LLC (n/k/a COR Clearing LLC), CRD No. 117176, Disciplinary Proceeding No. 2009016234701 (Dec. 16, 2013) (clearing firm had an inadequate system for identifying introducing firms with high-risk clients and improperly relied on its introducing firms for suspicious activity surveillance); First Clearing, LLC, FINRA AWC No. 2008012791101 (Dec. 9, 2010), and Penson Financial Services, Inc., FINRA AWC No. 2008011615801 (Oct. 12, 2009) (the clearing firms had inadequate systems reasonably designed to detect and report suspicious trading activity); Mesirow Financial, Inc., FINRA AWC No. 2008012747801 (Sept. 17, 2009), and Wells Fargo Investments, LLC, FINRA AWC No. 2007007306901 (June 25, 2008) (the clearing firms impermissibly allocated the detection and reporting of suspicious trading activity in the introduced accounts to the introducing firms); Legent Clearing LLC, FINRA AWC No. 2007007133001 (Dec. 5, 2008) (the clearing firm failed to adequately consider the money laundering risks posed by its introducing firms). However, in Dep't of Enforcement v. Sterne, Agee & Leach., Inc., CRD No. 791, Disciplinary Proceeding No. E052005007501 (Mar. 5, 2010), although FINRA alleged that the clearing firm's AML system was insufficiently automated to adequately monitor introduced accounts for suspicious activity, the hearing panel found that the clearing firm's AML program, including the combined manual and automated system, was reasonable for detecting suspicious activity.
67. *See, e.g.,* Capital Path Securities, Inc., CRD No. 104363, Disciplinary Proceeding No. 2011025869201 (May 8, 2014) (the firm, contrary to its written procedures, did not utilize exception reports provided by its clearing firm and did not adequately investigate or report suspicious

As is the case with all U.S. financial institutions, broker-dealers, including clearing brokers and introducing brokers, must also comply with the sanctions programs administered by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC).

### § 24:3  Litigation Exposure of Clearing Firms

At the same time that regulators were developing new approaches to the introducing firm/clearing firm relationship and their respective responsibilities, so too were courts developing a body of case law that slowly defined the contours of civil liability with respect to that relationship. Once the regulatory scheme allocating responsibilities was established, for many years, with few exceptions, courts rejected claims asserted by customers of introducing brokers against their clearing brokers. Whether the claim was for fraud, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, control person liability, apparent authority, violation of state blue sky laws or negligence, such lawsuits met with minimal success, until a series of decisions in *In re Blech*, beginning in 1996, created new concerns for clearing brokers. More recently, clearing brokers have at face potential liability in fraudulent transfer cases brought in bankruptcy court in circumstances where a customer of the introducing broker was defrauding its own investors and a bankruptcy trustee (or creditors' committee) alleges that the clearing firm did not accept deposits into the customers' brokerage account in good faith.

---

activity brought its attention by its clearing firm, including heavy trading in low-priced securities); Banorte-Ixe Securities Int'l, Ltd., FINRA AWC No. 2010025241301 (Jan. 28, 2014) (the firm failed to properly investigate and report suspicious activity brought to its attention by its clearing firm and failed to appropriately customize exception reports provided by its clearing firm to the firm's customer base); The Vertical Trading Group, LLC, FINRA AWC No. 2010022017301 (Jan. 10, 2014) (the firm's AML program was inadequate as it relied on exception reports from its clearing firm and random manual reviews of customer trading); Title Securities Inc., FINRA AWC No. 2010022913901 (Sept. 26, 2012) (the firm principally relied on its clearing firm to identify and notify it of suspicious trading activity and failed to both adequately review such information and create/contribute to the clearing firm's monitoring parameters); Euro Pacific Capital, Inc., FINRA AWC 2009016300801 (Sept. 16, 2011) (the firm did not consistently utilize exception reports made available by its then clearing firm and when notified by its clearing firm of possible suspect activity, on at least thirteen occasions, the firm did not promptly and fully respond to the clearing firm's inquiries); Kensington Capital Corp., FINRA Disciplinary Proceeding No. 2005000094003 (Feb. 25, 2008) (the introducing broker improperly understood, and its AML procedures improperly stated, that it could rely upon its clearing firm to detect any red flags associated with suspicious activity).