# Exhibit 7

**EXHIBIT 13**

# Updated Small Firm Template
# [Firm Name]
# Anti-Money Laundering (AML) Program:
# Compliance and Supervisory Procedures

UPDATED AS OF JANUARY 1, 2010

This template is provided to assist small firms in fulfilling their responsibilities to establish an Anti-Money Laundering (AML) Program as required by the Bank Secrecy Act (BSA) and its implementing regulations and FINRA Rule 3310 (AML Compliance Program). Nothing in this template creates any new requirements for AML programs. **Furthermore, following this template does not guarantee compliance with AML Program requirements or provide a safe harbor from regulatory responsibility.** There is no exemption from the AML rules for small broker-dealers.

Your firm's AML program should be "risk-based." That means that the program's AML policies, procedures and internal controls should be designed to address the risk of money laundering specific to your firm. Your firm can identify that risk by looking at the type of customers it serves, where its customers are located, and the types of services it offers. It is a good practice to develop a written analysis of your firm's money laundering and terrorist financing risk and how your firm's AML procedures manage that risk. This "risk-assessment" will help to ensure that the AML program is the right one for your firm and is a useful tool for demonstrating to your firm's examiner that the firm used a reasonable approach for designing its AML program.

In addition, where certain AML rules may be inapplicable due to the limited nature of your firm's business, FINRA expects your firm to have internal controls in place to identify when circumstances change in such a way as to trigger previously inapplicable AML requirements and to amend your AML policies and procedures to accurately reflect all AML requirements that are applicable to your business. For example, a firm with no customer accounts within the definition of the Customer Identification Program (CIP) rule would not be expected to have a CIP. However, the firm must have procedures in place to identify when the firm's business activities have shifted in such a way as to require compliance with the CIP rule. In addition, notwithstanding the fact that the firm does not have accounts for CIP purposes, the firm is expected to identify and develop procedures for any additional AML requirements that do apply (*e.g.*, suspicious activity monitoring and reporting).

The language in this template is provided only as a **helpful starting point** to walk you through developing your firm's program. If any of the language does not adequately address your firm's business situation in any respect, you will need to prepare your own

language. **You** are responsible for ensuring that the program fits your firm's risk level and that you implement the program.

TEXT EXAMPLES are provided to give you sample language that you can modify, as necessary, to fit your firm's needs in creating your firm's program.

Material in *italics* provides instructions and citations to the relevant rules, and other resources that you can use to develop your firm's program.

The FINRA AML Web page includes important information and links to other Web sites with useful information. You should also consult the Web sites maintained by the Financial Crimes Enforcement Network (FinCEN) and the Securities and Exchange Commission (SEC), including the SEC's AML Source Tool and Spotlight on AML Rulemaking for additional information and guidance. For historical guidance and background, you may wish to consult NASD Notices to Members (NTM) 02-21, 02-47, 02-50, 02-78, 02-80, 03-34 and 06-07, which provide extensive guidance on setting up AML programs and related relevant information about firms' AML obligations. In addition, FinCEN has a mechanism in place by which firms can electronically fulfill their BSA reporting requirements (BSA E-Filing System). We strongly encourage firms to use the BSA E-Filing System.

## 1.    Firm Policy

TEXT EXAMPLE: It is the policy of the firm to prohibit and actively prevent money laundering and any activity that facilitates money laundering or the funding of terrorist or criminal activities by complying with all applicable requirements under the Bank Secrecy Act (BSA) and its implementing regulations.

Money laundering is generally defined as engaging in acts designed to conceal or disguise the true origins of criminally derived proceeds so that the proceeds appear to have derived from legitimate origins or constitute legitimate assets. Generally, money laundering occurs in three stages. Cash first enters the financial system at the "placement" stage, where the cash generated from criminal activities is converted into monetary instruments, such as money orders or traveler's checks, or deposited into accounts at financial institutions. At the "layering" stage, the funds are transferred or moved into other accounts or other financial institutions to further separate the money from its criminal origin. At the "integration" stage, the funds are reintroduced into the economy and used to purchase legitimate assets or to fund other criminal activities or legitimate businesses.

Terrorist financing may not involve the proceeds of criminal conduct, but rather an attempt to conceal either the origin of the funds or their intended use, which could be for criminal purposes. Legitimate sources of funds are a key difference between terrorist

financiers and traditional criminal organizations. In addition to charitable donations, legitimate sources include foreign government sponsors, business ownership and personal employment. Although the motivation differs between traditional money launderers and terrorist financiers, the actual methods used to fund terrorist operations can be the same as or similar to methods used by other criminals to launder funds. Funding for terrorist attacks does not always require large sums of money and the associated transactions may not be complex.

Our AML policies, procedures and internal controls are designed to ensure compliance with all applicable BSA regulations and FINRA rules and will be reviewed and updated on a regular basis to ensure appropriate policies, procedures and internal controls are in place to account for both changes in regulations and changes in our business.

*Rules: 31 C.F.R. § 103.120(c); FINRA Rule 3310.*

## 2.      AML Compliance Person Designation and Duties

*Designate your firm's AML Compliance Person and describe his or her duties.*

TEXT EXAMPLE: The firm has designated [*Name*] as its Anti-Money Laundering Program Compliance Person (AML Compliance Person), with full responsibility for the firm's AML program. [*Name*] has a working knowledge of the BSA and its implementing regulations and is qualified by experience, knowledge and training, including [*describe*]. The duties of the AML Compliance Person will include monitoring the firm's compliance with AML obligations, overseeing communication and training for employees, and [*add any other duties your firm will assign to the AML Compliance Person; review NASD Rules 1021 and 1031 for any applicable registration requirements*]. The AML Compliance Person will also ensure that the firm keeps and maintains all of the required AML records and will ensure that Suspicious Activity Reports (SAR-SFs) are filed with the Financial Crimes Enforcement Network (FinCEN) when appropriate. The AML Compliance Person is vested with full responsibility and authority to enforce the firm's AML program.

The firm will provide FINRA with contact information for the AML Compliance Person, including: (1) name; (2) title; (3) mailing address; (4) email address; (5) telephone number; and (6) facsimile number through the FINRA Contact System (FCS). The firm will promptly notify FINRA of any change in this information through FCS and will review, and if necessary update, this information within 17 business days after the end of each calendar year. The annual review of FCS information will be conducted by [*Name*] and will be completed with all necessary updates being provided no later than 17 business days following the end of each calendar year. In addition, if there is any change to the information, [*Name*] will update the information promptly, but in any event not later than 30 days following the change.

*Rules: 31 C.F.R. § 103.120; FINRA Rule 3310, NASD Rule 1160.*

3

*Resources: NTM 06-07; NTM 02-78. Firms can submit their AML Compliance Person information through FINRA's FCS Web page.*

### 3.     Giving AML Information to Federal Law Enforcement Agencies and Other Financial Institutions

#### a.      FinCEN Requests Under USA PATRIOT Act Section 314(a)

*Pursuant to the BSA and its implementing regulations, financial institutions are required to make certain searches of their records upon receiving an information request from FinCEN. Describe your firm's procedures for FinCEN requests for information on money laundering or terrorist activity.*

*In order for a firm to obtain information requests from FinCEN, the firm must first designate an AML Contact Person in FCS. You should be aware that if you want to change the person who receives FinCEN requests, you must change the AML contact information in FCS. When you are faced with a change in personnel who will receive this information, you should be aware that FinCEN receives a data feed of this revised information from FCS every other week and that it may take several weeks for a firm's new AML contact person to receive information from FinCEN. Therefore, it is advisable for a firm that is aware that a person who had been receiving FinCEN is leaving the firm to change the information on FCS as soon as practical to ensure continuity of receiving FinCEN information.*

TEXT EXAMPLE: We will respond to a Financial Crimes Enforcement Network (FinCEN) request concerning accounts and transactions (a 314(a) Request) by immediately searching our records to determine whether we maintain or have maintained any account for, or have engaged in any transaction with, each individual, entity or organization named in the 314(a) Request as outlined in the Frequently Asked Questions (FAQ) located on FinCEN's secure Web site. We understand that we have 14 days (unless otherwise specified by FinCEN) from the transmission date of the request to respond to a 314(a) Request. We will designate through the FINRA Contact System (FCS) one or more persons to be the point of contact (POC) for 314(a) Requests and will promptly update the POC information following any change in such information. (*See also* Section 2 above regarding updating of contact information for the AML Compliance Person.) Unless otherwise stated in the 314(a) Request or specified by FinCEN, we are required to search those documents outlined in FinCEN's FAQ. If we find a match, [*Name*] will report it to FinCEN via FinCEN's Web-based 314(a) Secure Information Sharing System within 14 days or within the time requested by FinCEN in the request. If the search parameters differ from those mentioned above (for example, if FinCEN limits the search to a geographic location), [*Name*] will structure our search accordingly.

If [*Name*] searches our records and does not find a matching account or transaction, then [*Name*] will not reply to the 314(a) Request. We will maintain documentation that we have performed the required search by [*add the details on how your firm will document*

*its searches here. For example, printing a search self-verification document from FinCEN's 314(a) Secure Information Sharing System confirming that your firm has searched the 314(a) subject information against your records OR maintaining a log showing the date of the request, the number of accounts searched, the name of the individual conducting the search and a notation of whether or not a match was found*].

We will not disclose the fact that FinCEN has requested or obtained information from us, except to the extent necessary to comply with the information request. [*Name*] will review, maintain and implement procedures to protect the security and confidentiality of requests from FinCEN similar to those procedures established to satisfy the requirements of Section 501 of the Gramm-Leach-Bliley Act with regard to the protection of customers' nonpublic information.

We will direct any questions we have about the 314(a) Request to the requesting federal law enforcement agency as designated in the request.

Unless otherwise stated in the 314(a) Request, we will not be required to treat the information request as continuing in nature, and we will not be required to treat the periodic 314(a) Requests as a government provided list of suspected terrorists for purposes of the customer identification and verification requirements.

*Rule: 31 C.F.R. § 103.100.*
*Resources: [FinCEN press release (2/6/03)](#); [FinCEN press release (2/12/03)](#); [NASD Member Alert (2/14/03)](#); [FinCEN's 314(a) Fact Sheet (11/18/08)](#). FinCEN also provides financial institutions with General Instructions and Frequently Asked Questions relating to 314(a) requests through the 314(a) Secured Information Sharing System or by contacting FinCEN at (800) 949-2732.*

## b.    National Security Letters

*National Security Letters (NSLs) are written investigative demands that may be issued by the local Federal Bureau of Investigation and other federal government authorities conducting counterintelligence and counterterrorism investigations to obtain, among other things, financial records of broker-dealers. **NSLs are highly confidential. No broker-dealer, officer, employee or agent of the broker-dealer can disclose to any person that a government authority or the FBI has sought or obtained access to records. Firms that receive NSLs must have policies and procedures in place for processing and maintaining the confidentiality of NSLs.** If you file a Suspicious Activity Report (SAR-SF) after receiving a NSL, the SAR-SF should not contain any reference to the receipt or existence of the NSL.*

*Resource: [FinCEN SAR Activity Review, Trends, Tips & Issues, Issue 8 (National Security Letters and Suspicious Activity Reporting) (4/2005)](#).*

## c.    Grand Jury Subpoenas

*Grand juries may issue subpoenas as part of their investigative proceedings. The receipt of a grand jury subpoena does not in itself require the filing of a Suspicious Activity Report (SAR-SF). However, broker-dealers should conduct a risk assessment of the customer who is the subject of the grand jury subpoena, as well as review the customer's account activity. If suspicious activity is uncovered during this review, broker-dealers should consider elevating the risk profile of the customer and file a SAR-SF in accordance with the SAR-SF filing requirements. Grand jury proceedings are confidential, and a broker-dealer that receives a subpoena is prohibited from directly or indirectly notifying the person who is the subject of the investigation about the existence of the grand jury subpoena, its contents or the information used to reply to it. If you file a SAR-SF after receiving a grand jury subpoena, the SAR-SF should not contain any reference to the receipt or existence of it. The SAR-SF should provide detailed information about the facts and circumstances of the detected suspicious activity.*

TEXT EXAMPLE: We understand that the receipt of a grand jury subpoena concerning a customer does not in itself require that we file a Suspicious Activity Report (SAR-SF). When we receive a grand jury subpoena, we will conduct a risk assessment of the customer subject to the subpoena as well as review the customer's account activity. If we uncover suspicious activity during our risk assessment and review, we will elevate that customer's risk assessment and file a SAR-SF in accordance with the SAR-SF filing requirements. We understand that none of our officers, employees or agents may directly or indirectly disclose to the person who is the subject of the subpoena its existence, its contents or the information we used to respond to it. To maintain the confidentiality of any grand jury subpoena we receive, we will process and maintain the subpoena by [*describe procedure*]. If we file a SAR-SF after receiving a grand jury subpoena, the SAR-SF will not contain any reference to the receipt or existence of the subpoena. The SAR-SF will only contain detailed information about the facts and circumstances of the detected suspicious activity.

*Resources*: *FinCEN SAR Activity Review, Trends, Tips & Issues, Issue 10 (Grand Jury Subpoenas and Suspicious Activity Reporting) (5/2006)*.

### d.      Voluntary Information Sharing With Other Financial Institutions Under USA PATRIOT Act Section 314(b)

*BSA regulations permit financial institutions to share information with other financial institutions under the protection of a safe harbor if certain procedures are followed. If your firm shares or plans to share information with other financial institutions, describe your firm's procedures for such sharing.*

TEXT EXAMPLE: We will share information with other financial institutions regarding individuals, entities, organizations and countries for purposes of identifying and, where appropriate, reporting activities that we suspect may involve possible terrorist activity or money laundering. [*Name*] will ensure that the firm files with FinCEN an initial notice before any sharing occurs and annual notices thereafter. We will use the notice form found at FinCEN's Web site. Before we share information with another financial institution, we will take reasonable steps to verify that the other financial institution has

submitted the requisite notice to FinCEN, either by obtaining confirmation from the financial institution or by consulting a list of such financial institutions that FinCEN will make available. We understand that this requirement applies even to financial institutions *with which we are affiliated*, and that we will obtain the requisite notices from affiliates and follow all required procedures.

We will employ strict procedures both to ensure that only relevant information is shared and to protect the security and confidentiality of this information, for example, by segregating it from the firm's other books and records and [*describe any other procedures*].

We also will employ procedures to ensure that any information received from another financial institution shall not be used for any purpose other than:

- identifying and, where appropriate, reporting on money laundering or terrorist activities;

- determining whether to establish or maintain an account, or to engage in a transaction; or

- assisting the financial institution in complying with performing such activities.

*Rule*: 31 C.F.R. § 103.110.
*Resources*: FinCEN Financial Institution Notification Form; FIN-2009-G002: Guidance on the Scope of Permissible Information Sharing Covered by Section 314(b) Safe Harbor of the USA PATRIOT Act (06/16/2009).

### e.     Joint Filing of SARs by Broker-Dealers and Other Financial Institutions

*The obligation to identify and properly report a suspicious transaction and to timely file a SAR-SF rests separately with each broker-dealer. However, one SAR-SF may be filed for a suspicious activity by all broker-dealers involved in a transaction (so long as the report filed contains all relevant and required information) if the SAR-SF is jointly filed. In addition, if a broker-dealer and another financial institution that is subject to the SAR regulations are involved in the same suspicious transaction, the financial institution may also file a SAR jointly (so long as the report filed contains all relevant and required information). For example, a broker-dealer and an insurance company may file one SAR with respect to suspicious activity involving the sale of variable insurance products. Disclosures that are made for the purposes of jointly filing a SAR are protected by the safe harbor contained in the SAR regulations. The financial institutions that jointly file a SAR shall each be separately responsible for maintaining a copy of the SAR and should maintain their own SAR supporting documentation in accordance with BSA recordkeeping requirements. See generally Section 12 (Suspicious Transaction and BSA Reporting) for information on a broker-dealer's obligation to file a SAR to report suspicious transactions.*

TEXT EXAMPLE: We will file joint SARs in the following circumstances, according to [*describe procedures*]. We will also share information about a particular suspicious transaction with any broker-dealer, as appropriate, involved in that particular transaction for purposes of determining whether we will file jointly a SAR-SF.

[*If an introducing firm:*] We will share information about particular suspicious transactions with our clearing broker for purposes of determining whether we and our clearing broker will file jointly a SAR-SF. In cases in which we file a joint SAR-SF for a transaction that has been handled both by us and by the clearing broker, we may share with the clearing broker a copy of the filed SAR-SF.

If we determine it is appropriate to jointly file a SAR-SF, we understand that we cannot disclose that we have filed a SAR-SF to any financial institution except the financial institution that is filing jointly. If we determine it is not appropriate to file jointly (*e.g.*, because the SAR-SF concerns the other broker-dealer or one of its employees), we understand that we cannot disclose that we have filed a SAR-SF to any other financial institution or insurance company.

*Rules: 31 C.F.R. §103.19; 31 C.F.R. § 103.38; 31 C.F.R. § 103.110.*

### f.     Sharing SAR-SFs With Parent Companies

*On January 20, 2006, FinCEN issued guidance permitting under certain conditions the sharing of SAR-SFs with either foreign or domestic parent entities.*

TEXT EXAMPLE: Because we are a subsidiary, we may share SAR-SFs with [*Name of parent entity (or parent entities)*]. Before we share SAR-SFs with [*Name(s)*], we will have in place written confidentiality agreements or written arrangements that [*Name(s)*] protect the confidentiality of the SAR-SFs through appropriate internal controls.

[*If parent company is a non-U.S. entity:*] The confidentiality agreement will state that the recipient foreign parent entity (or entities) may not disclose further any SAR-SF, or the fact that such report has been filed. The agreement will allow for the foreign parent entity (or entities) to disclose without permission underlying information (that is, information about the customers and transaction(s) reported) that forms the basis for the SAR-SF and that does not explicitly reveal that a SAR-SF was filed and that is not otherwise subject to disclosure restrictions.

*Resources: FinCEN Guidance on Sharing of Suspicious Activity Reports by Securities Broker-Dealers, Futures Commission Merchants, and Introducing Brokers in Commodities (1/20/06).*

## 4.     Checking the Office of Foreign Assets Control Listings

*Although not part of the BSA and its implementing regulations, the Office of Foreign Assets Control ( OFAC) compliance is often performed in conjunction with AML compliance. OFAC is an office of the U.S. Treasury that administers and enforces economic sanctions and embargoes based on U.S. foreign policy and national security goals that target geographic regions and governments (e.g., Cuba, Sudan and Syria), as well as individuals or entities that could be anywhere (e.g., international narcotics traffickers, foreign terrorists and proliferators of weapons of mass destruction). As part of its enforcement efforts, OFAC publishes a list of Specially Designated Nationals and Blocked Persons (SDN list), which includes names of companies and individuals who are connected with the sanctions targets. U.S. persons are prohibited from dealing with SDNs wherever they are located, and all SDN assets must be blocked. Because OFAC's programs are constantly changing, describe how you will check with OFAC to ensure that your SDN list is current and also that you have complete information regarding the listings of economic sanctions and embargoes enforced by OFAC affecting countries and parties before opening an account and for existing accounts.*

TEXT EXAMPLE: Before opening an account, and on an ongoing basis, [*Name*] will check to ensure that a customer does not appear on the SDN list or is not engaging in transactions that are prohibited by the economic sanctions and embargoes administered and enforced by OFAC. (*See* the OFAC Web site for the SDN list and listings of current sanctions and embargoes). Because the SDN list and listings of economic sanctions and embargoes are updated frequently, we will consult them on a regular basis and subscribe to receive any available updates when they occur. With respect to the SDN list, we may also access that list through various software programs to ensure speed and accuracy. *See also* FINRA's OFAC Search Tool that screens names against the SDN list. [*Name*] will also review existing accounts against the SDN list and listings of current sanctions and embargoes when they are updated and [*he or she*] will document the review.

If we determine that a customer is on the SDN list or is engaging in transactions that are prohibited by the economic sanctions and embargoes administered and enforced by OFAC, we will reject the transaction and/or block the customer's assets and file a blocked assets and/or rejected transaction form with OFAC within 10 days. We will also call the OFAC Hotline at (800) 540-6322 immediately.

Our review will include customer accounts, transactions involving customers (including activity that passes through the firm such as wires) and the review of customer transactions that involve physical security certificates or application-based investments (*e.g.*, mutual funds).

*Resources: SEC AML Source Tool, Item 12; OFAC Lists Web page (including links to the SDN List and lists of sanctioned countries); FINRA's OFAC Search Tool. You can also subscribe to receive updates on the OFAC Subscription Web page. See also the following OFAC forms: Blocked Properties Reporting Form; Voluntary Form for Reporting Blocked Transactions; Voluntary Form for Reporting Rejected Transactions; OFAC Guidance Regarding Foreign Assets Control Regulations for the Securities Industry.*

### 5.    Customer Identification Program

*Firms are required to have and follow reasonable procedures to document and verify the identity of their customers who open new accounts. These procedures must address the types of information the firm will collect from the customer and how it will verify the customer's identity. These procedures must enable the firm to form a reasonable belief that it knows the true identity of its customers. The final rule, which FinCEN and the SEC jointly issued on April 30, 2003, applies to all new accounts opened on or after October 1, 2003.*

*The firm's customer identification program (CIP) must be in writing and be part of the firm's AML compliance program.*

*Note that the CIP rule applies only to "customers" who open new "accounts" with a broker-dealer. Specifically, the CIP rule defines a "customer" as (1) a person that opens a new account or (2) an individual who opens a new account for an individual who lacks legal capacity or for an entity that is not a legal person. "Customer" does not refer to persons who fill out account opening paperwork or who provide information necessary to establish an account, if such persons are not the accountholder as well.*

*Also, for purposes of the CIP rule's definition of customer, the following entities are excluded from the definition of "customer":*

- *a financial institution regulated by a federal functional regulator (that is, an institution regulated by the Board of Governors of the Federal Reserve;*
- *Federal Deposit Insurance Corporation;*
- *National Credit Union Administration;*
- *Office of the Comptroller of the Currency;*
- *Office of Thrift Supervision; Securities and Exchange Commission; or*
- *Commodity Futures Trading Commission) or a bank regulated by a state bank regulator;*
- *a department or agency of the United States, of any State, or of any political subdivision of any State;*
- *any entity established under the laws of the United States, of any State, or of any political subdivision of a State that exercises governmental authority on behalf of the United States, any State, or any political subdivision of a State;*
- *any entity, other than a bank, whose common stock or analogous equity interests are listed on the New York Stock Exchange or the American Stock Exchange or have been designated as a NASDAQ National Market Security (now designated as either a NASDAQ Global Market Security or a NASDAQ Global Select Market Security) listed on the NASDAQ Stock Market, with the exception of stock or interests listed under the separate "NASDAQ Small-Cap Issues" (now known as NASDAQ Capital Markets) heading (but only to the extent of domestic operations for any such persons that are financial institutions, other than banks); or*
- *a person that has an existing account with the broker-dealer, provided the broker-dealer has a reasonable belief that it knows the true identity of the person.*

10

*Accordingly, a broker-dealer is not required to verify the identities of persons with existing accounts at the firm, as long as the broker-dealer has a reasonable belief that it knows the true identity of the customer.*

*For purposes of the CIP rule, an "account" is defined as a formal relationship with a broker-dealer established to effect transactions in securities, including, but not limited to, the purchase or sale of securities, securities loan and borrowing activity, and the holding of securities or other assets for safekeeping or as collateral. The following are excluded from the definition of "account": (1) an account that the broker-dealer acquires through any acquisition, merger, purchase of assets or assumption of liabilities and (2) an account opened for the purpose of participating in an employee benefit plan established under the Employee Retirement Income Security Act of 1974 (ERISA).*

*Rule: 31 C.F.R. §103.122(a)(1)(i)(ii) and 103.122(a)(4)(i)(ii).*
*Resources: SEC Staff Q&A Regarding the Broker-Dealer Customer Identification Program Rule (October 1, 2003); NTM 03-34; FIN-2006-G007: Frequently Asked Question: Customer Identification Program Responsibilities under the Agency Lending Disclosure Initiative (April 25, 2006).*

*Describe how you will identify customers and verify their identities.*

*Note that a clearing firm does not have an obligation to perform CIP for an introduced customer if the clearing firm and the introducing firm have entered into a clearing agreement under which the functions of opening and approving customer accounts and directly receiving and accepting orders from the introduced customer are allocated exclusively to the introducing firm and the functions of extending credit, safeguarding funds and securities, and issuing confirmations and statements are allocated to the clearing firm. This position also extends to piggybacking arrangements[1] where, pursuant to a piggybacking arrangement with an introducing firm, the piggybacking firm retains the functions of opening and approving customer accounts and directly receiving and accepting orders from introduced customers. Thus, under a piggybacking arrangement, the clearing firm and the introducing firm are not obligated to perform CIP for the customers introduced by the piggybacking firm.*

*Please note that a clearing firm's and introducing firm's AML programs should contain risk-based policies, procedures, and controls for assessing the money laundering risk posed by its fully disclosed clearing arrangements, for monitoring and mitigating that risk, and for detecting and reporting suspicious activity.*

*Resources: FIN-2008-G002: Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements*

---

[1] In a "piggybacking" arrangement, an introducing firm (the piggybacking firm) does not enter into a clearing agreement with a clearing firm, but rather establishes a relationship with an introducing firm that has established a clearing arrangement with a clearing firm, thus piggybacking off the introducing firm's clearing agreement. FIN-2008-G002 at p.2.

*According to Certain Functional Allocations (March 4, 2008)* and *FIN-2008-R008 (Bank Secrecy Act Obligations of a U.S. Clearing Broker-Dealer Establishing a Fully Disclosed Clearing Relationship with a Foreign Financial Institution) (June 3, 2008)*.

TEXT EXAMPLE:

EITHER:

In addition to the information we must collect under FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade), NASD Rules 2310 (Recommendations to Customers - Suitability) and 3110 (Books and Records) and Securities Exchange Act of 1934 (Exchange Act) Rules 17a-3(a)(9) (Beneficial Ownership regarding Cash and Margin Accounts) and 17a-3(a)(17) (Customer Accounts), we have established, documented and maintained a written Customer Identification Program (CIP). We will collect certain minimum customer identification information from each customer who opens an account; utilize risk-based measures to verify the identity of each customer who opens an account; record customer identification information and the verification methods and results; provide the required adequate CIP notice to customers that we will seek identification information to verify their identities; and compare customer identification information with government-provided lists of suspected terrorists, once such lists have been issued by the government. *See* Section 5.g. (Notice to Customers) for additional information.

OR:

We do not open or maintain "customer accounts" within the meaning of 31 CFR 103.122(a)(1)(i), in that we do not establish formal relationships with "customers" for the purpose of effecting transactions in securities. If in the future the firm elects to open customer accounts or to establish formal relationships with customers for the purpose of effecting transactions in securities, we will first establish, document and ensure the implementation of appropriate CIP procedures. *(Note that a change in the firm's business to accept customer accounts may be a material change in business requiring an application, review and approval by FINRA. See NASD Rule 1017).*

**NOTE:** *If your firm deals only with entities that are exempt from the definition of "customer," describe how your firm will confirm and document that the entities are exempt.*

TEXT EXAMPLE: We will collect information to determine whether any entity opening an account would be excluded as a "customer," pursuant to the exceptions outlined in 31 CFR 103.122(a)(4)(ii) (*e.g.*, documentation of a company's listing information, licensing or registration of a financial institution in the U.S, and status or verification of the authenticity of a government agency or department).

*Rule: 31 C.F.R. §103.122.*

_Resources: SEC Staff Q&A Regarding the Broker-Dealer Customer Identification Program Rule (October 1, 2003); NTM 03-34._

### a.   Required Customer Information

_Prior_ to opening an account, [_Name of person or category of associated person_] will collect the following information for all accounts, if applicable, for any person, entity or organization that is opening a new account and whose name is on the account:

    (1) the name;

    (2) date of birth (for an individual);

    (3) an address, which will be a residential or business street address (for an individual), an Army Post Office (APO) or Fleet Post Office (FPO) box number, or residential or business street address of next of kin or another contact individual (for an individual who does not have a residential or business street address), or a principal place of business, local office, or other physical location (for a person other than an individual); and

    (4) an identification number, which will be a taxpayer identification number (for U.S. persons), or one or more of the following: a taxpayer identification number, passport number and country of issuance, alien identification card number, or number and country of issuance of any other government-issued document evidencing nationality or residence <u>and</u> bearing a photograph or other similar safeguard (for non-U.S. persons).

In the event that a customer has applied for, but has not received, a taxpayer identification number, we will _[add procedures describing who, what, when and how]_ to confirm that the application was filed before the customer opens the account and to obtain the taxpayer identification number within a reasonable period of time after the account is opened.

When opening an account for a foreign business or enterprise that does not have an identification number, we will request alternative government-issued documentation certifying the existence of the business or enterprise.

_Rule: 31 C.F.R. §103.122(b)(2)(i)(A) & § 103.122(b)(2)(i)(B)._

### b.   Customers Who Refuse to Provide Information

_Describe your firm's policy for customers who do not provide requested information._

TEXT EXAMPLE: If a potential or existing customer either refuses to provide the information described above when requested, or appears to have intentionally provided misleading information, our firm will not open a new account and, after considering the risks involved, consider closing any existing account. In either case, our AML Compliance Person will be notified so that we can determine whether we should report the situation to FinCEN on a SAR-SF.

### c.   Verifying Information

*Describe how you will verify customers' identities using the information described above. The information you gather may vary according to the risks posed by the type of account. The procedures must enable you to form a reasonable belief that you know the true identity of each customer. Among the risks to consider are the various types of accounts maintained by the firm, the various methods the firm uses to open accounts, the various types of identifying information available, and the firm's size, location and customer base. If you believe that some of these risk factors increase the likelihood that you will need more information to know the true identity of your customers, you should determine what additional identifying information might be necessary for a reasonable belief that you know the true identity of your customer and when such additional information should be obtained.*

TEXT EXAMPLE: Based on the risk, and to the extent reasonable and practicable, we will ensure that we have a reasonable belief that we know the true identity of our customers by using risk-based procedures to verify and document the accuracy of the information we get about our customers. [*Name*] will analyze the information we obtain to determine whether the information is sufficient to form a reasonable belief that we know the true identity of the customer (*e.g.*, whether the information is logical or contains inconsistencies).

We will verify customer identity through documentary means, non-documentary means or both. [*Tailor the sentence to your actual situation.*] We will use documents to verify customer identity when appropriate documents are available. In light of the increased instances of identity fraud, we will supplement the use of documentary evidence by using the non-documentary means described below whenever necessary. We may also use non-documentary means, if we are still uncertain about whether we know the true identity of the customer. In verifying the information, we will consider whether the identifying information that we receive, such as the customer's name, street address, zip code, telephone number (if provided), date of birth and Social Security number, allow us to determine that we have a reasonable belief that we know the true identity of the customer (*e.g.*, whether the information is logical or contains inconsistencies).

Appropriate documents for verifying the identity of customers include the following:

- For an individual, an unexpired government-issued identification evidencing nationality or residence and bearing a photograph or similar safeguard, such as a driver's license or passport; and

- For a person other than an individual, documents showing the existence of the entity, such as certified articles of incorporation, a government-issued business license, a partnership agreement or a trust instrument.

We understand that we are not required to take steps to determine whether the document that the customer has provided to us for identity verification has been validly issued and that we may rely on a government-issued identification as verification of a customer's identity. If, however, we note that the document shows some obvious form of fraud, we

must consider that factor in determining whether we can form a reasonable belief that we know the customer's true identity.

We will use the following non-documentary methods of verifying identity:

- Independently verifying the customer's identity through the comparison of information provided by the customer with information obtained from a consumer reporting agency, public database or other source *[identify reporting agency, database, etc.]*;

- Checking references with other financial institutions; or

- Obtaining a financial statement.

- [*add other non-documentary methods, if applicable*]

We will use non-documentary methods of verification when:
(1) the customer is unable to present an unexpired government-issued identification document with a photograph or other similar safeguard;
(2) the firm is unfamiliar with the documents the customer presents for identification verification;
(3) the customer and firm do not have face-to-face contact; and
(4) there are other circumstances that increase the risk that the firm will be unable to verify the true identity of the customer through documentary means.

We will verify the information within a reasonable time before or after the account is opened. Depending on the nature of the account and requested transactions, we may refuse to complete a transaction before we have verified the information, or in some instances when we need more time, we may, pending verification, restrict the types of transactions or dollar amount of transactions. If we find suspicious information that indicates possible money laundering, terrorist financing activity, or other suspicious activity, we will, after internal consultation with the firm's AML Compliance Person, file a SAR-SF in accordance with applicable laws and regulations.

We recognize that the risk that we may not know the customer's true identity may be heightened for certain types of accounts, such as an account opened in the name of a corporation, partnership or trust that is created or conducts substantial business in a jurisdiction that has been designated by the U.S. as a primary money laundering jurisdiction, a terrorist concern, or has been designated as a non-cooperative country or territory. We will identify customers that pose a heightened risk of not being properly identified. We will also take the following additional measures that may be used to obtain information about the identity of the individuals associated with the customer when standard documentary methods prove to be insufficient: [*Add additional procedures for verifying identity of certain customers, such as obtaining information about beneficial ownership, individuals with authority or control over such account. Remember to*

*describe who will take the action, when and how they will obtain the information and what courses of action may be required.*]

*Rule: 31 C.F.R. §103.122(b).*

### d.      Lack of Verification

*Describe your procedures for responding to circumstances in which the firm cannot form a reasonable belief that it knows the true identity of a customer.*

TEXT EXAMPLE: When we cannot form a reasonable belief that we know the true identity of a customer, we will do the following: (1) not open an account; (2) impose terms under which a customer may conduct transactions while we attempt to verify the customer's identity; (3) close an account after attempts to verify customer's identity fail; and (4) determine whether it is necessary to file a SAR-SF in accordance with applicable laws and regulations.

*Rule: 31 C.F.R. §103.122(b)(2)(iii).*

### e.      Recordkeeping

*Describe your recordkeeping procedures.*

TEXT EXAMPLE: We will document our verification, including all identifying information provided by a customer, the methods used and results of verification, and the resolution of any discrepancies identified in the verification process. We will keep records containing a description of any document that we relied on to verify a customer's identity, noting the type of document, any identification number contained in the document, the place of issuance, and if any, the date of issuance and expiration date. With respect to non-documentary verification, we will retain documents that describe the methods and the results of any measures we took to verify the identity of a customer. We will also keep records containing a description of the resolution of each substantive discrepancy discovered when verifying the identifying information obtained. We will retain records of all identification information for five years after the account has been closed; we will retain records made about verification of the customer's identity for five years after the record is made.

*Rule: 31 C.F.R. §103.122(b)(3).*

### f.      Comparison with Government-Provided Lists of Terrorists

*Describe how you will check government lists within a reasonable period of time after opening an account (or earlier, if required by another federal law or regulation or federal directive issued in connection with an applicable list). See NTM 02-21, page 6. There currently are no government-provided lists of suspected terrorists that firms are required to use as part of their CIP.*

TEXT EXAMPLE: At such time as we receive notice that a federal government agency has issued a list of known or suspected terrorists and identified the list as a list for CIP purposes, we will, within a reasonable period of time after an account is opened (or earlier, if required by another federal law or regulation or federal directive issued in connection with an applicable list), determine whether a customer appears on any such list of known or suspected terrorists or terrorist organizations issued by any federal government agency and designated as such by Treasury in consultation with the federal functional regulators. We will follow all federal directives issued in connection with such lists.

We will continue to comply separately with OFAC rules prohibiting transactions with certain foreign countries or their nationals.

*Rule*: *31 C.F.R. §103.122(b)(4).*
*Resources*: *[NTM 02-21](), page 6, n.24; 31 C.F.R. § 103.122.*

**g.    Notice to Customers**

*The CIP Rule requires you to provide adequate notice to customers that you are requesting information from them to verify their identities. You may provide such notice by a sign in your lobby, through other oral or written notice, or, for accounts opened online, notice posted on your Web site. No matter which methods of giving notice you choose, you must give it before an account is opened.*

**FINRA has produced a [Customer Identification Program Notice]() to assist firms in fulfilling this notification requirement. Please refer to [FINRA's AML Web page]() for further details.**

TEXT EXAMPLE: We will provide notice to customers that the firm is requesting information from them to verify their identities, as required by federal law. We will use the following method to provide notice to customers: [*describe notice you will provide for each method of account-opening your firm uses (i.e., telephone, online, walk-in, etc.); the final rule provides the following sample language for notice to be provided to a firm's customers, if appropriate:*]

> **Important Information About Procedures for Opening a New Account**
> To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.
>
> **What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.**

17

*Rule*: 31 C.F.R. §103.122(b)(5).

**h.    Reliance on Another Financial Institution for Identity Verification**

We may, under the following circumstances, rely on the performance by another financial institution (including an affiliate) of some or all of the elements of our CIP with respect to any customer that is opening an account or has established an account or similar business relationship with the other financial institution to provide or engage in services, dealings or other financial transactions:

- when such reliance is reasonable under the circumstances;
- when the other financial institution is subject to a rule implementing the anti-money laundering compliance program requirements of 31 U.S.C. § 5318(h), and is regulated by a federal functional regulator; <u>and</u>
- when the other financial institution has entered into a contract with our firm requiring it to certify annually to us that it has implemented its anti-money laundering program and that it will perform (or its agent will perform) specified requirements of the customer identification program.

*[You will not be held responsible for the failure of the other financial institution to fulfill adequately your CIP responsibilities, <u>provided that</u> you can establish that your reliance was reasonable and you have obtained the requisite contracts and certifications.]*

*Rule*: 31 C.F.R. § 103.122(b)(6).
*Resources*: *No-Action Letters to the Securities Industry and Financial Markets Association (SIFMA) (formerly known as the Securities Industry Association (SIA)) (February 12, 2004; February 10, 2005; July 11, 2006; and January 10, 2008). (The letters provide staff guidance regarding the extent to which a broker-dealer may rely on an investment adviser to conduct the required elements of the CIP rule, prior to such adviser being subject to an AML rule.)*

# 6.    General Customer Due Diligence

*Customer Due Diligence (CDD) is the foundation of a strong AML compliance program that is broader than CIP. While CDD is not specifically required by the AML rules, it is not possible to have an adequate AML program or suspicious activity reporting program without conducting appropriate ongoing customer due diligence. CDD enables the firm to evaluate the risk presented by each customer and provides the firm with a baseline for evaluating customer transactions to determine whether the transactions are suspicious and need to be reported. See NTM 02-21, page 7.*

*You may deem some accounts to be of higher risk based on:*

- *customer's actual or anticipated business activity;*
- *customer's ownership structure;*
- *anticipated or actual volume and types of transactions;*

- *transactions involving high-risk jurisdictions.*

*Higher risk accounts should be subject to greater due diligence.*

TEXT EXAMPLE: It is important to our AML and SAR-SF reporting program that we obtain sufficient information about each customer to allow us to evaluate the risk presented by that customer and to detect and report suspicious activity. When we open an account for a customer, the due diligence we perform may be in addition to customer information obtained for purposes of our CIP.

For each account meeting the following criteria [*enter thresholds for account value or specific account types or specific customer types where you believe that additional customer due diligence is warranted*], we will take steps to obtain sufficient customer information to comply with our suspicious activity reporting requirements. Such information should include [*include any additional information that you deem to be appropriate*]:

- the customer's business;
- the customer's anticipated account activity (both volume and type);
- the source of the customer's funds.

For accounts that we have deemed to be higher risk, we will obtain the following information [*choose from the following or additional information as appropriate*]:

- the purpose of the account;
- the source of funds and wealth;
- the beneficial owners of the accounts;
- the customer's (or beneficial owner's) occupation or type of business;
- financial statements;
- banking references;
- domicile (where the customer's business is organized);
- description of customer's primary trade area and whether international transactions are expected to be routine;
- description of the business operations and anticipated volume of trading;
- explanations for any changes in account activity.

We will also ensure that the customer information remains accurate by [*insert procedures to determine that due diligence information remains accurate*].

## 7.      Correspondent Accounts for Foreign Shell Banks

### a.      Detecting and Closing Correspondent Accounts of Foreign Shell Banks

*Broker-dealers are prohibited from establishing, maintaining, administering or managing correspondent accounts in the United States for foreign shell banks. Broker-dealers also must take reasonable steps to ensure that any correspondent account established, maintained, administered or managed by the broker-dealer in the United States for a foreign bank is not being used by that foreign bank to indirectly provide banking services to a foreign shell bank. The BSA regulations allow covered financial institutions to receive a safe harbor for compliance with these requirements if they use the certification process described in the regulations. A covered financial institution must obtain a certification from each foreign bank for which it maintains a correspondent account "at least once every three years" to maintain the safe harbor.*

*In the context above, "correspondent account" is an account established for a foreign bank to receive deposits from, or to make payments or other disbursements on behalf of, the foreign bank, or to handle other financial transactions related to such foreign bank.*

*Foreign shell banks are foreign banks without a physical presence in any country. A "foreign bank" is any bank organized under foreign law or an agency, branch or office of a bank located outside the U.S. The term does not include an agent, agency, branch or office within the U.S. of a bank organized under foreign law.*

*The prohibition does not include foreign shell banks that are regulated affiliates. Foreign shell banks that are regulated affiliates are affiliates of a depository institution, credit union or foreign bank that maintains a physical presence in the U.S., or a foreign country, and are subject to supervision by a banking authority in the country regulating that affiliated depository institution, credit union or foreign bank. Foreign branches of a U.S. broker-dealer are not subject to this requirement, and "correspondent accounts" of foreign banks that are clearly established, maintained, administered or managed only at foreign branches are not subject to this regulation.*

*Describe how your firm will identify foreign banks with which the firm has accounts, and then detect and close correspondent accounts for foreign shell banks.*

**NOTE:** *If your firm does not establish, maintain, administer or manage correspondent accounts for foreign banks, state that this is your firm's policy and describe the internal controls that your firm will implement to detect any attempt to open a correspondent account.*

TEXT EXAMPLE: We will identify foreign bank accounts and any such account that is a correspondent account (any account that is established for a foreign bank to receive deposits from, or to make payments or other disbursements on behalf of, the foreign bank, or to handle other financial transactions related to such foreign bank) for foreign shell banks by [*describe procedure to detect such accounts*]. Upon finding or suspecting such accounts, firm employees will notify the AML Compliance Person, who will terminate any verified correspondent account in the United States for a foreign shell bank. We will also terminate any correspondent account that we have determined is not maintained by a foreign shell bank but is being used to provide services to such a shell

bank. We will exercise caution regarding liquidating positions in such accounts and take reasonable steps to ensure that no new positions are established in these accounts during the termination period. We will terminate any correspondent account for which we have not obtained the information described in Appendix A of the regulations regarding shell banks within the time periods specified in those regulations.

*Rules: 31 C.F.R. §§103.175, 103.177.*

### b.   Certifications

*Describe your process for obtaining certain required information from any foreign bank account holders and for obtaining the necessary certifications at least once every three years to rely on the safe harbor provided by the BSA regulations.*

TEXT EXAMPLE: We will require our foreign bank account holders to identify the owners of the foreign bank if it is not publicly traded, the name and street address of a person who resides in the United States and is authorized and has agreed to act as agent for acceptance of legal process, and an assurance that the foreign bank is not a shell bank nor is it facilitating activity of a shell bank. In lieu of this information the foreign bank may submit the Certification Regarding Correspondent Accounts For Foreign Banks provided in the BSA regulations. We will re-certify when we believe that the information is no longer accurate or at least once every three years.

*Rules: 31 C.F.R. §§ 103.175, 103.177.*
*Resources: 31 C.F.R., Pt. 103, Subpt. I, App. A (Certification Regarding Correspondent Accounts for Foreign Banks); FIN-2006-G003: Frequently Asked Questions: Foreign Bank Recertifications under 31 C.F.R. § 103.77 (February 3, 2006).*

### c.   Recordkeeping for Correspondent Accounts for Foreign Banks

*Firms must keep records identifying the owners of foreign banks with U.S. correspondent accounts and the name and address of the U.S. agent for service of legal process for those banks.*

TEXT EXAMPLE: We will keep records identifying the owners of foreign banks with U.S. correspondent accounts and the name and address of the U.S. agent for service of legal process for those banks.

*Rules: 31 C.F.R. §§ 103.175, 103.177.*

### d.   Summons or Subpoena of Foreign Bank Records; Termination of Correspondent Relationships with Foreign Bank

*The Secretary of the Treasury or the Attorney General of the United States may issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States and may request records related to such correspondent account, including*

*records maintained outside of the United States relating to the deposit of funds into the foreign bank. The summons or subpoena may be served on the foreign bank in the United States if the foreign bank has a representative in the United States, or in a foreign country pursuant to any mutual legal assistance treaty, multilateral agreement or other request for international law enforcement assistance.*

*A broker-dealer that maintains a correspondent account for a foreign bank in the United States must maintain records in the United States identifying the owners of such foreign bank whose shares are not publicly traded and the name and street address of a person who resides in the United States and is authorized, and has agreed to be an agent to accept service of legal process for the foreign bank's correspondent account. Upon receipt of a written request from a federal law enforcement officer for this information, the broker-dealer must provide such information to the requesting officer no later than seven days after receipt of the request.*

*Additionally, such broker-dealer must terminate any correspondent relationship with a foreign bank not later than 10 business days after receipt of written notice from the Secretary of the Treasury or the Attorney General of the United States that the foreign bank has failed to: (1) comply with a summons or subpoena issued by these two entities; or (2) initiate proceedings in a United States court contesting such summons or subpoena.*

*Describe your firm's procedures for handling requests from federal law enforcement officers for the information described above, and if necessary, terminating a correspondent relationship with a foreign bank that has failed to comply or contest a summons or subpoena issued by the Secretary of the Treasury or the Attorney General of the United States.*

TEXT EXAMPLE: When we receive a written request from a federal law enforcement officer for information identifying the non-publicly held owners of any foreign bank for which we maintain a correspondent account in the United States and/or the name and address of a person residing in the United States who is an agent to accept service of legal process for a foreign bank's correspondent account, we will provide that information to the requesting officer not later than seven days after receipt of the request. We will close, within 10 days, any correspondent account for a foreign bank that we learn from FinCEN or the Department of Justice has failed to comply with a summons or subpoena issued by the Secretary of the Treasury or the Attorney General of the United States or has failed to contest such a summons or subpoena. We will scrutinize any correspondent account activity during that 10-day period to ensure that any suspicious activity is appropriately reported and to ensure that no new positions are established in these correspondent accounts.

*Rule*: *31 C.F.R. § 103.185.*

## 8.      Due Diligence and Enhanced Due Diligence Requirements for Correspondent Accounts of Foreign Financial Institutions

### a.      Due Diligence for Correspondent Accounts of Foreign Financial Institutions

*The BSA, as amended by Section 312 of the USA PATRIOT Act, and the rules promulgated thereunder require, in part, that a firm, as part of its anti-money laundering program, establish a due diligence program that includes appropriate, specific, risk-based and, where necessary, enhanced policies, procedures and controls that are reasonably designed to enable the firm to detect and report, on an ongoing basis, any known or suspected money laundering activity conducted through or involving any correspondent account established, maintained, administered or managed by the firm for a foreign financial institution.*

*A foreign financial institution is:*
*(1) a foreign bank;*
*(2) any branch or office located outside the United States of a broker-dealer; futures commission merchant or introducing broker; or open-end mutual fund company;*
*(3) any other person organized under foreign law (other than a branch or office of such person in the United States) that, if it were located in the United States, would be a broker-dealer; futures commission merchant or introducing broker; or open-end mutual fund company; and*
*(4) any person organized under foreign law (other than a branch or office of such person in the United States) that is engaged in the business of, and is readily identifiable as: (a) a currency dealer or exchanger; or (b) a money transmitter.*

*A person, however, is not "engaged in the business" of a currency dealer, a currency exchanger or a money transmitter if such transactions are merely incidental to the person's business.*

*A "correspondent account" is defined in this context as any account established for a foreign financial institution to receive deposits from, or to make payments or other disbursement on behalf of, the foreign financial institution, or to handle other financial transactions for the foreign financial institution. "Account" is defined as any formal relationship established with a broker or dealer in securities to provide regular services to effect transactions in securities, including but not limited to, the purchase or sale of securities and securities loaned and borrowed activity, and to hold securities or other assets for safekeeping or as collateral.*

*For broker-dealers, correspondent accounts established on behalf of foreign financial institutions include, but are not limited to: (1) accounts to purchase, sell, lend, or otherwise hold securities, including securities repurchase programs; (2) prime brokerage accounts that clear and settle securities transactions for clients; (3) accounts for trading foreign currency; (4) custody accounts for holding securities or other assets in*

*connection with securities transactions as collateral; and (5) over-the-counter derivative contracts.*

*On January 30, 2008, FinCEN issued guidance clarifying that covered financial institutions (which includes U.S. broker-dealers) presenting a negotiable instrument for payment to a foreign financial institution on which the instrument is drawn would not, by itself, be establishing a correspondent account between the covered financial institution and the paying institution. See FinCEN Guidance on Application of Correspondent Account Rules to the Presentation of Negotiable Instruments Received by a Covered Financial Institution for Payment (1/30/08).*

*Describe your firm's due diligence program for any correspondent accounts established on behalf of foreign financial institutions.*

TEXT EXAMPLE: We will conduct an inquiry to determine whether a foreign financial institution has a correspondent account established, maintained, administered or managed by the firm.

If we have correspondent accounts for foreign financial institutions, we will assess the money laundering risk posed, based on a consideration of relevant risk factors. We can apply all or a subset of these risk factors depending on the nature of the foreign financial institutions and the relative money laundering risk posed by such institutions.

The relevant risk factors can include:

- the nature of the foreign financial institution's business and the markets it serves;

- the type, purpose and anticipated activity of such correspondent account;

- the nature and duration of the firm's relationship with the foreign financial institution and its affiliates;

- the anti-money laundering and supervisory regime of the jurisdiction that issued the foreign financial institution's charter or license and, to the extent reasonably available, the jurisdiction in which any company that is an owner of the foreign financial institution is incorporated or chartered; and

- information known or reasonably available to the covered financial institution about the foreign financial institution's anti-money laundering record.

In addition, our due diligence program will consider additional factors that have not been enumerated above when assessing foreign financial institutions that pose a higher risk of money laundering.

We will apply our risk-based due diligence procedures and controls to each financial foreign institution correspondent account on an ongoing basis. This includes periodically reviewing the activity of each foreign financial institution correspondent sufficient to ensure whether the nature and volume of account activity is generally consistent with the information regarding the purpose and expected account activity and to ensure that the firm can adequately identify suspicious transactions. Ordinarily, we will not conduct this periodic review by scrutinizing every transaction taking place within the account. One procedure we may use instead is to use any account profiles for our correspondent accounts (to the extent we maintain these) that we ordinarily use to anticipate how the account might be used and the expected volume of activity to help establish baselines for detecting unusual activity. [*Describe in detail all of the firm's procedures for periodically reviewing foreign financial institution account activity*].

OR:

We have reviewed our accounts and we do not have, nor do we intend to open or maintain, correspondent accounts for foreign financial institutions [*and describe the internal controls that your firm will implement to detect any attempt to open one of these types of accounts*].

*Rules*: 31 C.F.R. §§ 103.175, 103.176.
*Resources*: *FIN-2006-G009 Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries (May 10, 2006)*.

### b.    Enhanced Due Diligence

*The BSA, as amended by Section 312 of the USA PATRIOT Act, and the rules promulgated thereunder require, in part, that a firm's due diligence program for correspondent accounts of foreign financial institutions include the performance of enhanced due diligence on correspondent accounts for any foreign bank that operates under:*

*(1) an offshore banking license;*
*(2) a banking license issued by a foreign country that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member and with which designation the U.S. representative to the group or organization concurs; or*
*(3) a banking license issued by a foreign country that has been designated by the Secretary of the Treasury as warranting special measures due to money laundering concerns.*

TEXT EXAMPLE: We will assess any correspondent accounts for foreign financial institutions to determine whether they are correspondent accounts that have been

established, maintained, administered or managed for any foreign bank that operates under:

    (1) an offshore banking license;

    (2) a banking license issued by a foreign country that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member and with which designation the U.S. representative to the group or organization concurs; or

    (3) a banking license issued by a foreign country that has been designated by the Secretary of the Treasury as warranting special measures due to money laundering concerns.

If we determine that we have any correspondent accounts for these specified foreign banks, we will perform enhanced due diligence on these correspondent accounts. The enhanced due diligence that we will perform for each correspondent account will include, at a minimum, procedures to take reasonable steps to:

    (1)    conduct enhanced scrutiny of the correspondent account to guard against money laundering and to identify and report any suspicious transactions. Such scrutiny will not only reflect the risk assessment that is described in Section 8.a. above, but will also include procedures to, as appropriate:

        (i)    obtain (*e.g.,* using a questionnaire) and consider information related to the foreign bank's AML program to assess the extent to which the foreign bank's correspondent account may expose us to any risk of money laundering;

        (ii)    monitor transactions to, from or through the correspondent account in a manner reasonably designed to detect money laundering and suspicious activity (this monitoring may be conducted manually or electronically and may be done on an individual account basis or by product activity); and

        (iii)    obtain information from the foreign bank about the identity of any person with authority to direct transactions through any correspondent account that is a payable-through account (a correspondent account maintained for a foreign bank through which the foreign bank permits its customer to engage, either directly or through a subaccount, in banking activities) and the sources and beneficial owners of funds or other assets in the payable-through account.

    (2)    determine whether the foreign bank maintains correspondent accounts for other foreign banks that enable those other foreign banks to gain access to the correspondent account under review and, if so, to take reasonable steps to obtain information to assess and mitigate the money laundering risks

associated with such accounts, including, as appropriate, the identity of those other foreign banks; and

(3) if the foreign bank's shares are not publicly traded, determine the identity of each owner and the nature and extent of each owner's ownership interest. We understand that for purposes of determining a private foreign bank's ownership, an "owner" is any person who directly or indirectly owns, controls or has the power to vote 10 percent or more of any class of securities of a foreign bank. We also understand that members of the same family shall be considered to be one person.

*Rules: 31 C.F.R. §§ 103.175, 103.176.*

### c. Special Procedures When Due Diligence or Enhanced Due Diligence Cannot Be Performed

*A firm must include procedures to follow in circumstances where the firm cannot perform appropriate due diligence for a correspondent account of a foreign financial institution or the enhanced due diligence that is required for correspondent accounts for certain foreign banks.*

<u>TEXT EXAMPLE</u>: In the event there are circumstances in which we cannot perform appropriate due diligence with respect to a correspondent account, we will determine, at a minimum, whether to refuse to open the account, suspend transaction activity, file a SAR-SF, close the correspondent account and/or take other appropriate action.

*Rules: 31 C.F.R. §§ 103.175, 103.176.*

## 9. Due Diligence and Enhanced Due Diligence Requirements for Private Banking Accounts/Senior Foreign Political Figures

*Describe your firm's due diligence program for "private banking" accounts for non-U.S. persons. Firms must have a due diligence program that is reasonably designed to detect and report any known or suspected money laundering conducted through or involving any private banking account maintained by or on behalf of a non-U.S. person, as well as the existence of the proceeds of foreign corruption in any such account. This requirement applies to all private banking accounts for non-U.S. persons, regardless of when they were opened. Accounts requested or maintained by or on behalf of "senior foreign political figures," which is defined below and includes their immediate family members and close known associates, require enhanced scrutiny. Senior foreign political figures are often referred to as "politically exposed persons" or "PEPs."*

*A "private banking" account is an account (or any combination of accounts) that requires a minimum aggregate deposit of $1,000,000, is established for one or more individuals and is assigned to or administered or managed by, in whole or in part, an*

*officer, employee or agent of a financial institution acting as a liaison between the financial institution and the direct or beneficial owner of the account.*

*A "senior foreign political figure" includes a current or former senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned commercial enterprise; a corporation, business, or other entity formed by or for the benefit of any such individual; an immediate family member of such an individual; or any individual widely and publicly known (or actually known by the firm) to be a close personal or professional associate of such an individual.*

**NOTE: *If your firm does not open or maintain private banking accounts, state that this is your firm's policy.***

TEXT EXAMPLE:

EITHER:

We will review our accounts to determine whether we offer any private banking accounts and we will conduct due diligence on such accounts. This due diligence will include, at least, (1) ascertaining the identity of all nominal holders and holders of any beneficial ownership interest in the account (including information on those holders' lines of business and sources of wealth); (2) ascertaining the source of funds deposited into the account; (3) ascertaining whether any such holder may be a senior foreign political figure; and (4) detecting and reporting, in accordance with applicable laws and regulations, any known or suspected money laundering, or use of the proceeds of foreign corruption.

We will review public information, including information available in Internet databases, to determine whether any private banking account holders are senior foreign political figures. If we discover information indicating that a particular private banking account holder may be a senior foreign political figure, and upon taking additional reasonable steps to confirm this information, we determine that the individual is, in fact, a senior foreign political figure, we will conduct additional enhanced due diligence to detect and report transactions that may involve money laundering or the proceeds of foreign corruption.

In so doing, we will consider the risks that the funds in the account may be the proceeds of foreign corruption by determining the purpose and use of the private banking account, location of the account holder(s), source of funds in the account, type of transactions conducted through the account and jurisdictions involved in such transactions. The degree of scrutiny we will apply will depend on various risk factors, including, but not limited to, whether the jurisdiction the senior foreign political figure is from is one in which current or former political figures have been implicated in corruption and the length of time that a former political figure was in office. Our enhanced due diligence

might include, depending on the risk factors, probing the account holder's employment history, scrutinizing the account holder's source(s) of funds, and monitoring transactions to the extent necessary to detect and report proceeds of foreign corruption, and reviewing monies coming from government, government controlled or government enterprise accounts (beyond salary amounts).

If we do not find information indicating that a private banking account holder is a senior foreign political figure, and the account holder states that he or she is not a senior foreign political figure, then we may make an assessment if a higher risk for money laundering, nevertheless, exists independent of the classification. If a higher risk is apparent, we will consider additional due diligence measures such as [*describe in detail the additional measures*].

In either case, if due diligence (or the required enhanced due diligence, if the account holder is a senior foreign political figure) cannot be performed adequately, we will, after consultation with the firm's AML Compliance Person and, as appropriate, not open the account, suspend the transaction activity, file a SAR-SF or close the account.

OR:

We do not open or maintain private banking accounts.

*Rules: 31 C.F.R. §§ 103.175, 103.178.*
*Resource: Guidance on Enhanced Scrutiny for Transactions that May Involve the Proceeds of Foreign Official Corruption.*

## 10. Compliance with FinCEN's Issuance of Special Measures Against Foreign Jurisdictions, Financial Institutions or International Transactions of Primary Money Laundering Concern

*Describe how your firm will comply with the BSA, as amended by Section 311 of the USA PATRIOT Act, which grants the Secretary of the Treasury the authority, after finding that reasonable grounds exist for concluding that (1) a jurisdiction outside of the United States; (2) one or more financial institutions operating outside of the United States; (3) one or more classes of transactions within, or involving, a jurisdiction outside of the United States; or (4) one or more types of accounts is of "primary money laundering concern," to require domestic financial institutions, such as broker-dealers, to take certain "special measures" against the primary money laundering concern. There is a special section on the FinCEN Web site where all the Section 311 designations are listed. See Section 311 – Special Measures.*

TEXT EXAMPLE:

EITHER:

We do not maintain any accounts (including correspondent accounts) with any foreign jurisdiction or financial institution. However, if FinCEN issues a final rule imposing a special measure against one or more foreign jurisdictions or financial institutions, classes of international transactions or types of accounts deeming them to be of primary money laundering concern, we understand that we must read FinCEN's final rule and follow any prescriptions or prohibitions contained in that rule.

OR:

If FinCEN issues a final rule imposing a special measure against one or more foreign jurisdictions or financial institutions, classes of international transactions or types of accounts deeming them to be of primary money laundering concern, we understand that we must read FinCEN's final rule and follow any prescriptions or prohibitions contained in that rule. For example, if the final rule deems a certain bank and its subsidiaries (Specified Bank) to be of primary money laundering concerns, a special measure may be a prohibition from opening or maintaining a correspondent account in the United States for, or on behalf of, the Specified Banks. In that case, we will take the following steps:

    (1)    We will review our account records, including correspondent account records, to ensure that our accountholders and correspondent accountholders maintain no accounts directly for, or on behalf of, the Specified Banks; and

    (2)    We will apply due diligence procedures to our correspondent accounts that are reasonably designed to guard against indirect use of those accounts by the Specified Banks. Such due diligence may include:

       •    Notification to Correspondent Accountholders

           We will notify our correspondent accountholders that the account may not be used to provide the Specified Banks with access to us [*provide details of what the language of the notice will state*].

           We will transmit the notice to our correspondent accounts using the following method [*specify*], and we shall retain documentation of such notice.

       •    Identification of Indirect Use

           We will take reasonable steps in order to identify any indirect use of our correspondent accounts by the Specified Banks. We will determine if such indirect use is occurring from transactional records that we maintain in the normal course of business. We will take a risk-based approach when deciding what, if any, additional due diligence measures we should adopt to guard against the indirect use of correspondent accounts by the Specified Banks,

based on risk factors such as the type of services offered by, and geographic locations of, their correspondents.

We understand that we have an ongoing obligation to take reasonable steps to identify all correspondent account services our correspondent accountholders may directly or indirectly provide to the Specified Banks.

*Rules*: 31 C.F.R. §§ 103.186, 103.187, 103.188, 103.192, 103.193.
*Resources*: *Section 311 – Special Measures* (for information on all special measures issued by FinCEN); *NTM 07-17*; *NTM 06-41*.

## 11.    Monitoring Accounts for Suspicious Activity

*Broker-dealers must establish risk-based procedures reasonably designed to detect and report suspicious transactions in order to comply with the BSA and FINRA Rule 3310. The risk of suspicious activity will vary for each firm depending on its size and location and based on its business model and the products and services it offers. Your firm can identify that risk by looking at the type of customers it serves, where its customers are located, and the types of products and services it offers. Given the wide variety of business models employed by small firms, it is paramount that your firm's monitoring procedures be tailored to your firm's business and identified risks. Additionally, your procedures should identify "red flags" or indicators of possible suspicious activity to identify circumstances warranting further due diligence by the firm. Higher risk accounts and transactions generally need to be subjected to greater scrutiny.*

*Your procedures should also describe how the firm will monitor for or otherwise identify these "red flags." Your firm may monitor transactions manually or through automated systems or a combination of the two, as long as the system is reasonably designed to identify and report suspicious activity. Note that the types of suspicious activity that are reportable on SAR-SF are very broad and include, among other things, securities fraud.*

*It is important that your procedures provide specific details regarding your firm's monitoring system (e.g.,  who, what, when, where and how).*

TEXT EXAMPLE:

We will monitor account activity for unusual size, volume, pattern or type of transactions, taking into account risk factors and red flags that are appropriate to our business. (Red flags are identified in Section 11.b. below.) Monitoring will be conducted through the following methods: [*describe*]. [*If automated monitoring is utilized, your procedures should include a list of reports as well as their purpose and description. If manual monitoring is utilized, your procedures should include a list of documents/systems to be*

*reviewed and the purpose of the review. Regardless of the method, your procedures should address how this monitoring will be conducted and the frequency with which it will be conducted.*] The AML Compliance Person or his or her designee [*Add if appropriate: in consultation with {Name or title} OR with the approval of {Name or title}*] will be responsible for this monitoring, will review any activity that our monitoring system detects, will determine whether any additional steps are required, will document when and how this monitoring is carried out, and will report suspicious activities to the appropriate authorities.

We will conduct the following reviews of activity that our monitoring system detects: [*describe*]. We will document our monitoring and reviews as follows: [*describe*]. The AML Compliance Person or his or her designee will conduct an appropriate investigation and review relevant information from internal or third-party sources before a SAR-SF is filed. Relevant information can include, but not be limited to, the following: [*describe*].

*Rules: 31 C.F.R. §103.19; FINRA Rule 3310(a).*
*Resource: Final Rule Release: 67 Fed. Reg. 44048 (July 1, 2002) ("it is intended that broker-dealers, and indeed every type of financial institution to which the suspicious transaction reporting rules of 31 CFR part 103 apply, will evaluate customer activity and relationships for money laundering risks, and design a suspicious transaction monitoring program that is appropriate for the particular broker-dealer in light of such risks").*

### a.   Emergency Notification to Law Enforcement by Telephone

*Describe when and how your firm will call the appropriate law enforcement authority in emergencies.*

TEXT EXAMPLE: In situations involving violations that require immediate attention, such as terrorist financing or ongoing money laundering schemes, we will immediately call an appropriate law enforcement authority. If a customer or company appears on OFAC's SDN list, we will call the OFAC Hotline at (800) 540-6322. Other contact numbers we will use are: FinCEN's Financial Institutions Hotline ((866) 556-3974) (especially to report transactions relating to terrorist activity), local U.S. Attorney's office (*insert contact number*), local FBI office (*insert contact number*) and local SEC office (*insert contact number*) (to voluntarily report such violations to the SEC in addition to contacting the appropriate law enforcement authority). If we notify the appropriate law enforcement authority of any such activity, we must still file a timely SAR-SF.

Although we are not required to, in cases where we have filed a SAR-SF that may require immediate attention by the SEC, we may contact the SEC via the SEC SAR Alert Message Line at (202) 551-SARS (7277) to alert the SEC about the filing. We understand that calling the SEC SAR Alert Message Line does not alleviate our obligations to file a SAR-SF or notify an appropriate law enforcement authority.

*Rule: 31 C.F.R. § 103.19.*
*Resources*: *FinCEN's Web site*; *OFAC Web page*; *NTM 02-21*; *NTM 02-47*.

### b.      Red Flags

TEXT EXAMPLE: Red flags that signal possible money laundering or terrorist financing include, but are not limited to:

#### Customers – Insufficient or Suspicious Information

- Provides unusual or suspicious identification documents that cannot be readily verified.

- Reluctant to provide complete information about nature and purpose of business, prior banking relationships, anticipated account activity, officers and directors or business location.

- Refuses to identify a legitimate source for funds or information is false, misleading or substantially incorrect.

- Background is questionable or differs from expectations based on business activities.

- Customer with no discernable reason for using the firm's service.

#### Efforts to Avoid Reporting and Recordkeeping

- Reluctant to provide information needed to file reports or fails to proceed with transaction.

- Tries to persuade an employee not to file required reports or not to maintain required records.

- "Structures" deposits, withdrawals or purchase of monetary instruments below a certain amount to avoid reporting or recordkeeping requirements.

- Unusual concern with the firm's compliance with government reporting requirements and firm's AML policies.

#### Certain Funds Transfer Activities

- Wire transfers to/from financial secrecy havens or high-risk geographic location without an apparent business reason.

- Many small, incoming wire transfers or deposits made using checks and money orders. Almost immediately withdrawn or wired out in manner inconsistent with customer's business or history. May indicate a Ponzi scheme.

- Wire activity that is unexplained, repetitive, unusually large or shows unusual patterns or with no apparent business purpose.

**Certain Deposits or Dispositions of Physical Certificates**

- Physical certificate is titled differently than the account.

- Physical certificate does not bear a restrictive legend, but based on history of the stock and/or volume of shares trading, it should have such a legend.

- Customer's explanation of how he or she acquired the certificate does not make sense or changes.

- Customer deposits the certificate with a request to journal the shares to multiple accounts, or to sell or otherwise transfer ownership of the shares.

**Certain Securities Transactions**

- Customer engages in prearranged or other non-competitive trading, including wash or cross trades of illiquid securities.

- Two or more accounts trade an illiquid stock suddenly and simultaneously.

- Customer journals securities between unrelated accounts for no apparent business reason.

- Customer has opened multiple accounts with the same beneficial owners or controlling parties for no apparent business reason.

- . Customer transactions include a pattern of receiving stock in physical form or the incoming transfer of shares, selling the position and wiring out proceeds.

- Customer's trading patterns suggest that he or she may have inside information.

**Transactions Involving Penny Stock Companies**

- Company has no business, no revenues and no product.

- Company has experienced frequent or continuous changes in its business structure.

- Officers or insiders of the issuer are associated with multiple penny stock issuers.

- Company undergoes frequent material changes in business strategy or its line of business.

- Officers or insiders of the issuer have a history of securities violations.

- Company has not made disclosures in SEC or other regulatory filings.

- Company has been the subject of a prior trading suspension.

## Transactions Involving Insurance Products

- Cancels an insurance contract and directs funds to a third party.

- Structures withdrawals of funds following deposits of insurance annuity checks signaling an effort to avoid BSA reporting requirements.

- Rapidly withdraws funds shortly after a deposit of a large insurance check when the purpose of the fund withdrawal cannot be determined.

- Cancels annuity products within the free look period which, although could be legitimate, may signal a method of laundering funds if accompanied with other suspicious indicia.

- Opens and closes accounts with one insurance company then reopens a new account shortly thereafter with the same insurance company, each time with new ownership information.

- Purchases an insurance product with no concern for investment objective or performance.

- Purchases an insurance product with unknown or unverifiable sources of funds, such as cash, official checks or sequentially numbered money orders.

## Activity Inconsistent With Business

- Transactions patterns show a sudden change inconsistent with normal activities.

- Unusual transfers of funds or journal entries among accounts without any apparent business purpose.

- Maintains multiple accounts, or maintains accounts in the names of family members or corporate entities with no apparent business or other purpose.

- Appears to be acting as an agent for an undisclosed principal, but is reluctant to provide information.

## Other Suspicious Customer Activity

- Unexplained high level of account activity with very low levels of securities transactions.

- Funds deposits for purchase of a long-term investment followed shortly by a request to liquidate the position and transfer the proceeds out of the account.

- Law enforcement subpoenas.

- Large numbers of securities transactions across a number of jurisdictions.

- Buying and selling securities with no purpose or in unusual circumstances (*e.g.*, churning at customer's request).

- Payment by third-party check or money transfer without an apparent connection to the customer.

- Payments to third-party without apparent connection to customer.

- No concern regarding the cost of transactions or fees (*i.e.*, surrender fees, higher than necessary commissions, etc.).

### c.    Responding to Red Flags and Suspicious Activity

TEXT EXAMPLE: When an employee of the firm detects any red flag, or other activity that may be suspicious, he or she will notify [*include procedures for escalation of suspicious activity*]. Under the direction of the AML Compliance Person, the firm will determine whether or not and how to further investigate the matter. This may include gathering additional information internally or from third-party sources, contacting the government, freezing the account and/or filing a SAR-SF.

## 12.   Suspicious Transactions and BSA Reporting

*Describe your firm's procedures for identifying any suspicious transactions and determining if they need further investigation or warrant filing a SAR-SF. These procedures should also cover the maintenance of SAR documentation and the preservation of its confidentiality, and BSA reporting. Note that firms must exercise due diligence in monitoring suspicious activity as the regulations require firms to file a SAR-SF when they "know, suspect, or have reason to suspect" that transactions involve certain suspicious activities.*

*Firms are exempt from reporting on a SAR-SF the following violations: (1) a robbery or burglary that is committed or attempted and already reported to appropriate law enforcement authorities; (2) lost, missing, counterfeit or stolen securities that the firm has reported pursuant to Exchange Act Rule 17f-1; and (3) violations of the Federal securities laws or self-regulatory organization (SRO) rules by the firm, its officers, directors, employees or registered representatives, that are reported appropriately to the SEC or SRO, except for a violation of Exchange Act Rule 17a-8, which must be reported on a SAR-SF. However, if a firm relies on one of these exemptions, it may be required to*

36

*demonstrate that it relied on one of these exemptions and must maintain records, for at least five years, of its determination not to file a SAR-SF based on the exemption.*

*Rule: 31 C.F.R. §103.19.*

### a.   Filing a SAR-SF

TEXT EXAMPLE: We will file SAR-SFs with FinCEN for any transactions (including deposits and transfers) conducted or attempted by, at or through our firm involving $5,000 or more of funds or assets (either individually or in the aggregate) where we know, suspect or have reason to suspect:

(1) the transaction involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity as part of a plan to violate or evade federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;

(2) the transaction is designed, whether through structuring or otherwise, to evade any requirements of the BSA regulations;

(3) the transaction has no business or apparent lawful purpose or is not the sort in which the customer would normally be expected to engage, and after examining the background, possible purpose of the transaction and other facts, we know of no reasonable explanation for the transaction; or

(4) the transaction involves the use of the firm to facilitate criminal activity.

We will also file a SAR-SF and notify the appropriate law enforcement authority in situations involving violations that require immediate attention, such as terrorist financing or ongoing money laundering schemes. In addition, although we are not required to, we may contact that SEC in cases where a SAR-SF we have filed may require immediate attention by the SEC. *See* Section 11 for contact numbers. We also understand that, even if we notify a regulator of a violation, unless it is specifically covered by one of the exceptions in the SAR rule, we must file a SAR-SF reporting the violation.

We may file a voluntary SAR-SF for any suspicious transaction that we believe is relevant to the possible violation of any law or regulation but that is not required to be reported by us under the SAR rule. It is our policy that all SAR-SFs will be reported regularly to the Board of Directors and appropriate senior management, with a clear reminder of the need to maintain the confidentiality of the SAR-SF.

We will report suspicious transactions by completing a SAR-SF, and we will collect and maintain supporting documentation as required by the BSA regulations. We will file a SAR-SF no later than 30 calendar days after the date of the initial detection of the facts that constitute a basis for filing a SAR-SF. If no suspect is identified on the date of initial detection, we may delay filing the SAR-SF for an additional 30 calendar days pending identification of a suspect, but in no case will the reporting be delayed more than 60 calendar days after the date of initial detection. The phrase "initial detection" does not mean the moment a transaction is highlighted for review. The 30-day (or 60-day) period begins when an appropriate review is conducted and a determination is made that the

transaction under review is "suspicious" within the meaning of the SAR requirements. A review must be initiated promptly upon identification of unusual activity that warrants investigation.

We will retain copies of any SAR-SF filed and the original or business record equivalent of any supporting documentation for five years from the date of filing the SAR-SF. We will identify and maintain supporting documentation and make such information available to FinCEN, any other appropriate law enforcement agencies, federal or state securities regulators or SROs upon request.

We will not notify any person involved in the transaction that the transaction has been reported, except as permitted by the BSA regulations. We understand that anyone who is subpoenaed or required to disclose a SAR-SF or the information contained in the SAR-SF will, except where disclosure is requested by FinCEN, the SEC, or another appropriate law enforcement or regulatory agency, or an SRO registered with the SEC, decline to produce the SAR-SF or to provide any information that would disclose that a SAR-SF was prepared or filed. We will notify FinCEN of any such request and our response.

*Rules: 31 C.F.R. §103.19, FINRA Rule 3310(a).*
*Resources: FinCEN's Web site contains additional information, including information on the BSA E-Filing System, the SAR-SF Form (fill-in version), and the biannual SAR Activity Reviews and SAR Bulletins, which discuss trends in suspicious reporting and give helpful tips. SAR Activity Review, Issue 10 (May 2006) (documentation of decision not to file a SAR; grand jury subpoenas and suspicious activity reporting, and commencement of 30-day time period to file a SAR); FinCEN SAR Narrative Guidance Package (11/2003), FinCEN Suggestions for Addressing Common Errors Noted in Suspicious Activity Reporting (10/10/2007);NTM 02-21; NTM 02-47.*

### b.    Currency Transaction Reports

*A firm must file a currency transaction report (CTR) for each deposit, withdrawal, exchange of currency, or other payment or transfer by, through or to the firm that involves a transaction in currency of more than $10,000 or for multiple transactions in currency of more than $10,000 when a financial institution knows that the transactions are by or on behalf of the same person during any one business day, unless the transaction is subject to certain exemptions. "Currency" is defined as "coin and paper money of the United States or of any other country" that is "customarily used and accepted as a medium of exchange in the country of issuance." Currency includes U.S. silver certificates, U.S. notes, Federal Reserve notes, and official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country.*

TEXT EXAMPLE: [*Include this language if your firm prohibits transactions involving currency]* Our firm prohibits transactions involving currency and has the following procedures to prevent such transactions: [*Describe*]. If we discover such transactions have occurred, we will file with FinCEN CTRs for currency transactions that exceed $10,000. Also, we will treat multiple transactions involving currency as a single

transaction for purposes of determining whether to file a CTR if they total more than $10,000 and are made by or on behalf of the same person during any one business day. We will use the CTR Form provided on FinCEN's Web site.

*Rules: 31 C.F.R.§§103.11, 103.22.*
*Resource: BSA E-Filing System.*

### c.        Currency and Monetary Instrument Transportation Reports

*A currency and monetary instrument transportation report (CMIR) must be filed whenever more than $10,000 in currency or other monetary instruments is physically transported, mailed or shipped into or from the United States. A CMIR also must be filed whenever a person receives more than $10,000 in currency or other monetary instruments that has been physically transported, mailed or shipped from outside the United States and a CMIR has not already been filed with respect to the currency or other monetary instruments received. A CMIR is not required to be filed by a securities broker-dealer mailing or shipping currency or other monetary instruments through the postal service or by common carrier. "Monetary instruments" include the following: currency (defined above); traveler's checks in any form; all negotiable instruments (including personal and business checks, official bank checks, cashier's checks, third-party checks, promissory notes and money orders) that are either in bearer form, endorsed without restriction, made out to a fictitious payee or otherwise in such form that title passes upon delivery; incomplete negotiable instruments that are signed but omit the payee's name; and securities or stock in bearer form or otherwise in such form that title passes upon delivery.*

TEXT EXAMPLE: [*Include this language if your firm prohibits both the receipt of currency or other monetary instruments that have been transported, mailed or shipped to the firm from outside of the United States and the physical transportation, mailing or shipment of currency or other monetary instruments by any means other than through the postal service or by common carrier:*] Our firm prohibits both the receipt of currency or other monetary instruments that have been transported, mailed or shipped to us from outside of the United States, and the physical transportation, mailing or shipment of currency or other monetary instruments by any means other than through the postal service or by common carrier. We will file a CMIR with the Commissioner of Customs if we discover that we have received or caused or attempted to receive from outside of the U.S. currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time (on one calendar day or, if for the purposes of evading reporting requirements, on one or more days). We will also file a CMIR if we discover that we have physically transported, mailed or shipped or caused or attempted to physically transport, mail or ship by any means other than through the postal service or by common carrier currency or other monetary instruments of more than $10,000 at one time (on one calendar day or, if for the purpose of evading the reporting requirements, on one or more days). We will use the CMIR Form provided on FinCEN's Web site.

*Rules: 31 C.F.R. §§103.11, 103.23.*

### d.  Foreign Bank and Financial Accounts Reports

*The regulations under the BSA require broker-dealers to report and keep records related to any financial interest in, or signature authority over, a bank account, securities account or other financial account that the firm has in a foreign country in which the aggregate value of any accounts exceed $10,000. Foreign bank and financial accounts reports (FBARs) must be filed with the Commissioner of the IRS on or before June 30th of each calendar year for the previous year in which such accounts exist.*

TEXT EXAMPLE: We will file a FBAR with the IRS for any financial accounts of more than $10,000 that we hold, or for which we have signature or other authority over, in a foreign country. We will use the FBAR Form provided on the IRS's Web site.

*Rule: 31 C.F.R. §103.24.*
*Resource: FBAR Form.*

### e.  Monetary Instrument Purchases

*No financial institution may issue or sell a bank check or draft, cashier's check, money order or traveler's check for $3,000 to $10,000 inclusive in currency unless it obtains and records certain information when issuing or selling one or more of these instruments to any individual purchaser. A financial institution issuing or selling one or more of these instruments to any individual purchaser in excess of $10,000 will also need to file a CTR. See Section 12.b.*

TEXT EXAMPLE:

EITHER:

We do not issue bank checks or drafts, cashier's checks, money orders or traveler's checks in the amount of $3,000 or more.

OR:

When we issue or sell a bank check or draft, cashier's check, money order or traveler's check in the amounts of $3,000 to $10,000 inclusive, we will maintain records of the following information:

(a)     (1)     If the purchaser has a deposit account with us:

        (i)     (A)     the name of the purchaser;

                (B)     the date of purchase;

                (C)     the type(s) of instrument(s) purchased;

(D) the serial number(s) of each of the instrument(s) purchased; and

(E) the amount in dollars of each of the instrument(s) purchased.

(ii) In addition, we must verify that the individual is a deposit accountholder or must verify the individual's identity. Verification may be either through a signature card or other file or record provided the deposit accountholder's name and address were verified previously and that information was recorded on the signature card or other file or record; or by examination of a document which is normally acceptable as a means of identification when cashing checks for nondepositors and which contains the name and address of the purchaser. If the deposit accountholder's identity has not been verified previously, we shall verify the deposit accountholder's identity by examination of a document which is normally acceptable within the community as a means of identification when cashing checks for nondepositors and which contains the name and address of the purchaser, and shall record the specific identifying information (*e.g.*, driver's license number and state of issuance).

(2) If the purchaser does not have a deposit account with us:

(i) (A) the name and address of the purchaser;

(B) the Social Security number of the purchaser, or if the purchaser is an alien and does not have a Social Security number, the alien identification number;

(C) the date of birth of the purchaser;

(D) the date of purchase;

(E) the type(s) of instrument(s) purchased;

(F) the serial number(s) of the instrument(s) purchased; and

(G) the amount in dollars of each of the instrument(s) purchased.

(ii) In addition, we shall verify the purchaser's name and address by examination of a document which is normally acceptable within the community as a means of identification when cashing checks for nondepositors and which contains the name and address of the

purchaser, and shall record the specific identifying information (*e.g.*, driver's license number and state of issuance).

(b)     Contemporaneous purchases of the same or different types of instruments totaling $3,000 or more shall be treated as one purchase. Multiple purchases during one business day totaling $3,000 or more shall be treated as one purchase if an individual employee, director, officer or partner of the [*Name of Firm*] has knowledge that these purchases have occurred.

(c)     We shall keep records required to be kept for a period of five years, and such records shall be made available to the federal and state authorities or SROs upon request at any time.

*Rule*: 31 C.F.R. § 103.29. See also 31 C.F.R. 103.22(b).
*Resources*: 52 Fed. Reg. 52250 (October 17, 1994) (Final Rule Amendments to BSA Regulations Relating to Identification Required to Purchase Bank Checks and Drafts, Cashier's Checks, Money Orders, and Traveler's Checks).

## f.     Funds Transmittals of $3,000 or More Under the Travel Rule

TEXT EXAMPLE: When we are the transmittor's financial institution in funds of $3,000 or more, we will retain either the original or a copy (*e.g.*, microfilm, electronic record) of the transmittal order. We will also record on the transmittal order the following information: (1) the name and address of the transmittor; (2) if the payment is ordered from an account, the account number; (3) the amount of the transmittal order; (4) the execution date of the transmittal order; and (5) the identity of the recipient's financial institution. In addition, we will include on the transmittal order as many of the following items of information as are received with the transmittal order: (1) the name and address of the recipient; (2) the account number of the recipient; (3) any other specific identifier of the recipient; and (4) any form relating to the transmittal of funds that is completed or signed by the person placing the transmittal order.

We will also verify the identity of the person placing the transmittal order (if we are the transmitting firm), provided the transmittal order is placed in person and the transmittor is not an established customer of the firm (*i.e.*, a customer of the firm who has not previously maintained an account with us or for whom we have not obtained and maintained a file with the customer's name, address, taxpayer identification number, or, if none, alien identification number or passport number and country of issuance). If a transmittor or recipient is conducting business in person, we will obtain: (1) the person's name and address; (2) the type of identification reviewed and the number of the identification document (*e.g.,* driver's license); and (3) the person's taxpayer identification number (*e.g.,* Social Security or employer identification number) or, if none, alien identification number or passport number and country of issuance, or a notation in the record the lack thereof. If a transmittor or recipient is not conducting business in person, we shall obtain the person's name, address, and a copy or record of the method of payment (*e.g.,* check or credit card transaction). In the case of transmittors only, we shall also obtain the transmittor's taxpayer identification number (*e.g.,* Social

Security or employer identification number) or, if none, alien identification number or passport number and country of issuance, or a notation in the record of the lack thereof. In the case of recipients only, we shall obtain the name and address of the person to which the transmittal was sent.

_Rule: 31 C.F.R. §103.33(f) and (g)._

# 13.    AML Recordkeeping

### a.    Responsibility for Required AML Records and SAR-SF Filing

*Your firm must establish procedures to maintain all applicable AML program records and reviews.*

TEXT EXAMPLE: Our AML Compliance Person and his or her designee will be responsible for ensuring that AML records are maintained properly and that SAR-SFs are filed as required.

In addition, as part of our AML program, our firm will create and maintain SAR-SFs, CTRs, CMIRs, FBARs, and relevant documentation on customer identity and verification (_See_ Section 5 above) and funds transmittals. We will maintain SAR-SFs and their accompanying documentation for at least five years. We will keep other documents according to existing BSA and other recordkeeping requirements, including certain SEC rules that require six-year retention periods (_e.g._, Exchange Act Rule 17a-4(a) requiring firms to preserve for a period of not less than six years, all records required to be retained by Exchange Act Rule 17a-3(a)(1)-(3), (a)(5), and (a)(21)-(22) and Exchange Act Rule 17a-4(e)(5) requiring firms to retain for six years account record information required pursuant to Exchange Act Rule 17a-3(a)(17)).

_Rules: 31 C.F.R. § 103.38, Exchange Act Rule 17a-8 (requiring registered broker-dealers subject to the Currency and Foreign Transactions Reporting Act of 1970 to comply with the BSA regulations regarding reporting, recordkeeping and record retention requirements), FINRA Rule 3310._

### b.    SAR-SF Maintenance and Confidentiality

*Describe your firm's retention and confidentiality requirements for SAR-SFs.*

TEXT EXAMPLE: We will hold SAR-SFs and any supporting documentation confidential. We will not inform anyone outside of FinCEN, the SEC, an SRO registered with the SEC or other appropriate law enforcement or regulatory agency about a SAR-SF. We will refuse any subpoena requests for SAR-SFs or for information that would disclose that a SAR-SF has been prepared or filed and immediately notify FinCEN of any such subpoena requests that we receive. _See_ Section 11 for contact numbers. We will segregate SAR-SF filings and copies of supporting documentation from other firm books and records to avoid disclosing SAR-SF filings. Our AML Compliance Person will

handle all subpoenas or other requests for SAR-SFs. [*Describe any other retention or confidentiality procedures of your firm for SAR-SFs.*] We may share information with another financial institution about suspicious transactions in order to determine whether we will jointly file a SAR according to the provisions of Section 3.d. In cases in which we file a joint SAR for a transaction that has been handled both by us and another financial institution, both financial institutions will maintain a copy of the filed SAR.

*Rules: 31 C.F.R. §103.19(e); 67 Fed. Reg. 44048, 44054 (July 1, 2002).*
*Resources:* NTM 02-47.

### c.   Additional Records

*A firm is required by the BSA to retain either an original or a microfilm copy or some other form of copy of certain records. 31 C.F.R. §§ 103.33 and 103.35(b).*

TEXT: We shall retain either the original or a microfilm or other copy or reproduction of each of the following:

- A record of each extension of credit in an amount in excess of $10,000, except an extension of credit secured by an interest in real property. The record shall contain the name and address of the person to whom the extension of credit is made, the amount thereof, the nature or purpose thereof and the date thereof;

- A record of each advice, request or instruction received or given regarding any transaction resulting (or intended to result and later canceled if such a record is normally made) in the transfer of currency or other monetary instruments, funds, checks, investment securities or credit, of more than $10,000 to or from any person, account or place outside the U.S.;

- A record of each advice, request or instruction given to another financial institution (which includes broker-dealers) or other person located within or without the U.S., regarding a transaction intended to result in the transfer of funds, or of currency, other monetary instruments, checks, investment securities or credit, of more than $10,000 to a person, account or place outside the U.S.;

- Each document granting signature or trading authority over each customer's account;

- Each record described in Exchange Act Rule 17a-3(a): (1) (blotters), (2) (ledgers for assets and liabilities, income, and expense and capital accounts), (3) (ledgers for cash and margin accounts), (4) (securities log), (5) (ledgers for securities in transfer, dividends and interest received, and securities borrowed and loaned), (6) (order tickets), (7) (purchase and sale tickets), (8) (confirms), and (9) (identity of owners of cash and margin accounts);

- A record of each remittance or transfer of funds, or of currency, checks, other monetary instruments, investment securities or credit, of more than $10,000 to a person, account or place, outside the U.S.; and

- A record of each receipt of currency, other monetary instruments, checks or investment securities and of each transfer of funds or credit, of more than $10,000 received on any one occasion directly and not through a domestic financial institution, from any person, account or place outside the U.S.

*Rules: 31 C.F.R. §§ 103.33, 103.35(b).*

## 14.    Clearing/Introducing Firm Relationships

*Describe how you and your clearing firm will comply with your independent AML obligations, which include describing the exception reports, if any, you obtain from your clearing firm, how frequently the reports will be reviewed and by whom, what review or inquiry will be conducted regarding exceptions, and how that review will be evidenced.*

TEXT EXAMPLE: We will work closely with our clearing firm to detect money laundering. We will exchange information, records, data and exception reports as necessary to comply [with our contractual obligations and] with AML laws. Both our firm and our clearing firm have filed (and kept updated) the necessary annual certifications for such information sharing, which can be found on FinCEN's Web site. As a general matter, we will obtain and use the following exception reports offered by our clearing firm in order to monitor customer activity [*identify reports and the manner in which they will be used*] and we will provide our clearing firm with proper customer identification and due diligence information as required to successfully monitor customer transactions. We have discussed how each firm will apportion customer and transaction functions and how we will share information and set forth our understanding in a written document. We understand that the apportionment of functions will not relieve either of us from our independent obligation to comply with AML laws, except as specifically allowed under the BSA and its implementing regulations.

*Rules: 31 CFR 103.110; FINRA Rule 3310, NASD Rule 3230.*
*Resources: FIN-2006-G003: Frequently Asked Questions: Foreign Bank Recertifications under 31 C.F.R. § 103.77 (February 3, 2006).*

## 15.    Training Programs

*Describe your AML ongoing employee training and programs.*

TEXT EXAMPLE: We will develop ongoing employee training under the leadership of the AML Compliance Person and senior management. Our training will occur on at least

an annual basis. It will be based on our firm's size, its customer base, and its resources and be updated as necessary to reflect any new developments in the law.

Our training will include, at a minimum: (1) how to identify red flags and signs of money laundering that arise during the course of the employees' duties; (2) what to do once the risk is identified (including how, when and to whom to escalate unusual customer activity or other red flags for analysis and, where appropriate, the filing of SAR-SFs); (3) what employees' roles are in the firm's compliance efforts and how to perform them; (4) the firm's record retention policy; and (5) the disciplinary consequences (including civil and criminal penalties) for non-compliance with the BSA.

We will develop training in our firm, or contract for it. Delivery of the training may include educational pamphlets, videos, intranet systems, in-person lectures and explanatory memos. Currently our training program is: [*insert specifics, such as "all registered representatives must view the video entitled "Spotting Money Laundering" by X date or within two weeks of being hired, etc.*] We will maintain records to show the persons trained, the dates of training and the subject matter of their training.

We will review our operations to see if certain employees, such as those in compliance, margin and corporate security, require specialized additional training. Our written procedures will be updated to reflect any such changes.

*Rule:* FINRA Rule 3310.
*Resources:* See *NTM 02-21, FinCEN SAR Narrative Guidance Package (11/2003), FinCEN Suggestions for Addressing Common Errors Noted in Suspicious Activity Reporting (10/10/2007).*

## 16.    Program to Independently Test AML Program

*Describe your firm's independent testing function to assess its AML compliance program. You must choose whether your firm's personnel or a qualified outside party will perform this function. Your decision will depend on your firm's size and resources. Independent testing is generally to be performed annually (on a calendar year basis). A firm that does not execute transactions for customers or otherwise hold customer accounts and does not act as an introducing broker with respect to customer accounts (e.g., engages solely in proprietary trading or conducts business only with other broker-dealers) may generally perform an independent test every two calendar years. All firms should undertake more frequent testing than required if circumstances warrant.*

*As a general matter, independent testing of your firm's AML compliance program should include, at a minimum: (1) evaluating the overall integrity and effectiveness of your firm's AML compliance program; (2) evaluating your firm's procedures for BSA reporting and recordkeeping requirements; (3) evaluating the implementation and maintenance of your firm's CIP; (4) evaluating your firm's customer due diligence requirements; (5) evaluating your firm's transactions, with an emphasis on high-risk*

*areas; (6) evaluating the adequacy of your firm's staff training program; (7) evaluating your firm's systems, whether automated or manual, for identifying suspicious activity; (8) evaluating your firm's system for reporting suspicious activity; (9) evaluating your firm's policy for reviewing accounts that generate multiple SAR-SF filings; and (10) evaluating your firm's response to previously identified deficiencies.*

### a.    Staffing

TEXT EXAMPLE*:*

EITHER

The testing of our AML program will be performed at least annually (on a calendar year basis) [*or if a firm is eligible, the firm may state "every two calendar years"*] by [*Name*], an independent third party. We will evaluate the qualifications of the independent third party to ensure they have a working knowledge of applicable requirements under the BSA and its implementing regulations. [*Name*] also has [*describe background in more detail*]. Independent testing will be performed more frequently if circumstances warrant.

OR

The testing of our AML program will be performed at least annually (on a calendar year basis) [*or, if the firm is eligible, every two calendar years*] by [*Names*], personnel of our firm, none of whom are [*who is not*] the AML Compliance Person nor do they [*he/she*] perform the AML functions being tested nor do they report to any such persons. Their [*his/her*] qualifications include a working knowledge of applicable requirements under the BSA and its implementing regulations [*and—describe any additional qualifications*]. To ensure that they [*he/she*] remain independent, we will separate their [*his/her*] functions from other AML activities by [*describe*]. Independent testing will be performed more frequently if circumstances warrant.

*Rules: 31 C.F.R. § 103.120; FINRA Rule 3310.*
*Resource: NTM 06-07.*

### b.    Evaluation and Reporting

TEXT EXAMPLE: After we have completed the independent testing, staff will report its findings to senior management [*or to an internal audit committee*]. We will promptly address each of the resulting recommendations and keep a record of how each noted deficiency was resolved.

*Rules: 31 C.F.R. § 103.120; FINRA Rule 3310.*

## 17.    Monitoring Employee Conduct and Accounts

*Describe how your firm will monitor employee accounts for potential signs of money laundering. Your firm must subject employee accounts to the same account identifying and monitoring procedures as customer accounts. Your firm should also review supervisors' performance of their AML responsibilities.*

TEXT EXAMPLE: We will subject employee accounts to the same AML procedures as customer accounts, under the supervision of the AML Compliance Person. We will also review the AML performance of supervisors, as part of their annual performance review. The AML Compliance Person's accounts will be reviewed by [*Name – another member of senior management*.]

*Rules: 31 C.F.R. §§ 103.19, 103.120; FINRA Rule 3310.*

## 18.    Confidential Reporting of AML Non-Compliance

*Describe how you ensure that employees who report suspected violations of AML compliance are protected from retaliation.*

TEXT EXAMPLE: Employees will promptly report any potential violations of the firm's AML compliance program to the AML Compliance Person, unless the violations implicate the AML Compliance Person, in which case the employee shall report to [*the president/chairman of the board/audit committee chair*]. Such reports will be confidential, and the employee will suffer no retaliation for making them.

*Rules: 31 C.F.R. § 103.120; FINRA Rule 3310.*

## 19.    Additional Risk Areas

TEXT EXAMPLE: The firm has reviewed all areas of its business to identify potential money laundering risks that may not be covered in the procedures described above. The major additional areas of risk include [*describe*]. Additional procedures to address these major risks are [*describe*].

## 20.    Senior Manager Approval

*A firm's AML compliance program must be approved, in writing, by a member of senior management.*

TEXT EXAMPLE: Senior management has approved this AML compliance program in writing as reasonably designed to achieve and monitor our firm's ongoing compliance with the requirements of the BSA and the implementing regulations under it. This approval is indicated by signatures below.

*Rules*: *31 C.F.R. § 103.120; FINRA Rule 3310.*

Signed:

Title:

Date: