# Exhibit 12

# WSP Manual

# Alpine Securities Corporation

**April 11, 2013**

ALPINE_LIT167859

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1
1 DESIGNATION OF SUPERVISORS AND OFFICES ...........................................................3
  1.1 Designation Of Supervisors ..............................................................................................3
  1.2 Designation Of Offices ......................................................................................................5
  1.3 Organization Chart and Line of Authority ..........................................................................6
2 OFFICES ..................................................................................................................................8
  2.1 Office Designations ...........................................................................................................8
    2.1.1 Offices Of Supervisory Jurisdiction (OSJ) ...................................................................8
    2.1.2 Branch Offices Assigned To OSJs ...............................................................................8
    2.1.3 Non-Branch Business Locations ..................................................................................8
  2.2 Use Of Office Space By Outsiders .....................................................................................9
  2.3 Office Records ...................................................................................................................9
    2.3.1 Retention Of Records At The Office ...........................................................................10
    2.3.2 Regulatory Requests For Records .............................................................................10
  2.4 Changes In Branch Offices ..............................................................................................10
  2.5 Office Inspections ............................................................................................................11
    2.5.1 Inspection Cycle .......................................................................................................11
    2.5.2 Conducting Inspections ............................................................................................11
    2.5.3 Heightened Inspection Requirements ........................................................................12
    2.5.4 Reports ....................................................................................................................12
  2.6 Display Of Certificates .....................................................................................................13
  2.7 Availability Of Rules .........................................................................................................13
3 GENERAL EMPLOYEE POLICIES ........................................................................................14
  3.1 Standards Of Conduct .....................................................................................................14
  3.2 Outside Business Activities ..............................................................................................14
  3.3 Private Securities Transactions ........................................................................................15
  3.4 Employee And Employee Related Accounts .....................................................................16
    3.4.1 Employee And Employee Related Accounts Defined ..................................................16
    3.4.2 Outside Accounts .....................................................................................................16
    3.4.3 Review Of Transactions ............................................................................................17
    3.4.4 Insider Trading .........................................................................................................17
    3.4.5 Sharing In Accounts .................................................................................................18
    3.4.6 Prohibition On Purchases Of Initial Public Offerings (IPOs) .......................................19
    3.4.7 Research Restrictions ...............................................................................................19
    3.4.8 Restrictions On Personal Accounts Of Certain Alpine Personnel ...............................19
  3.5 Gifts, Gratuities And Entertainment .................................................................................19
    3.5.1 Gifts To Others .........................................................................................................20
    3.5.2 Accepting Gifts ........................................................................................................20
    3.5.3 Entertainment ..........................................................................................................20
    3.5.4 Gifts, Loans, And Entertainment Involving Unions And Union-Affiliated Individuals .........21
  3.6 Privacy Policy ..................................................................................................................21
  3.7 Reporting Possible Law Or Rule Violations ......................................................................22
    3.7.1 Reporting .................................................................................................................23
    3.7.2 Confidentiality Of Employee Reporting ......................................................................23
    3.7.3 Notification Of Chief Compliance Officer ...................................................................23
    3.7.4 Investigation ............................................................................................................23
    3.7.5 Anti-Retaliation ........................................................................................................23
    3.7.6 Federal Whistleblower Laws And Rules .....................................................................23
  3.8 Charitable Contributions ..................................................................................................23
  3.9 Media Contact Is Limited To Certain Authorized Employees .............................................24
  3.10 Requests For Information From Outside Sources ............................................................25
  3.11 Internal Reviews And Investigations ..............................................................................25
  3.12 Internal Disciplinary Actions ..........................................................................................25
  3.13 Employee Obligation To Notify The Firm And The Firm's Obligation To Report ................25

ALPINE_LIT167860

3.13.1 Reporting Requirements.................................................................................27
3.14 Money Laundering..........................................................................................28
3.14.1 Reports Of AML Non-Compliance And Other Potential Crimes .......................28
3.14.2 Identity Theft.............................................................................................28
3.15 Emergency Business Recovery Procedures ......................................................29
3.16 Prohibited Activities ......................................................................................30
3.16.1 Registered Representatives .........................................................................30
3.16.2 Use Of Firm Name......................................................................................32
3.16.3 High Pressure Sales Tactics ........................................................................32
3.16.4 Providing Tax Advice Not Permitted..............................................................32
3.16.5 Rebates Of Commission..............................................................................33
3.16.6 Sharing Commissions Or Fees With Non-Registered Persons .........................33
3.16.7 Settling Complaints Or Errors Directly With Customers ...................................33
3.16.8 Borrowing From And Lending To Customers ..................................................33
3.16.9 Personal Funds Deposited In Customer Accounts...........................................34
3.16.10 Prohibition Against Guarantees..................................................................34
3.16.11 Fees And Other Charges...........................................................................34
3.16.12 Customer Signatures ...............................................................................34
3.16.13 Rumors...................................................................................................34
3.16.14 Misrepresentations ..................................................................................34
3.16.15 Bribes ....................................................................................................34
3.16.16 Acting Without Registration .......................................................................35
3.16.17 Improperly Influencing Research Analysts ...................................................35
3.17 Computer Records, Equipment And Software ...................................................35
3.17.1 Laptop Computers .....................................................................................36
3.17.2 Prohibited Downloading..............................................................................36
3.18 Electronic Communications Policy ..................................................................37
3.19 Electronic Communications Policy ..................................................................38
3.19.1 Introduction..............................................................................................38
3.19.2 Summary Of Policy ....................................................................................38
3.19.3 Electronic Communications Defined..............................................................39
3.19.4 Instant Messaging .....................................................................................39
3.19.5 Guidelines For Proper Use ..........................................................................40
3.19.6 E-Mail .....................................................................................................41
3.19.7 Personal Digital Assistants (PDAs) ..............................................................42
3.19.8 Internet ...................................................................................................42
3.19.9 Failure To Comply .....................................................................................43
3.19.10 Consent To Policy ....................................................................................43
3.20 Mobile Devices .............................................................................................44
3.21 Advertising And Publishing Activities..............................................................44
3.22 Employees Acting As Trustees, Executors, Or Other Fiduciary Capacities .........45
3.23 Use Of Titles ................................................................................................45
3.24 Annual Certification.......................................................................................45
3.25 Sales of Unregistered Securities ....................................................................45
3.25.1 Preventing Sales of Unregistered Securities .................................................46
3.25.2 Knowing the Customer and the Securities ....................................................46
3.25.3 Reports of Suspected or Attempted Sales of Unregistered Securities ..............47
3.25.4 Actions to be Taken to Prevent Sales of Unregistered Securities .....................47
4 TRAINING AND EDUCATION .................................................................................49
4.1 Annual Compliance Meeting .............................................................................49
4.2 Continuing Education.......................................................................................49
4.2.1 Regulatory Element ....................................................................................49
4.2.2 Firm Element .............................................................................................50
4.2.3 Registered Persons Who Fail To Complete Requirements................................52
5 EMPLOYMENT, REGISTRATION AND LICENSING ...................................................53
5.1 Employment...................................................................................................53
5.1.1 Hiring Procedures .......................................................................................53
5.1.2 Termination Procedures ..............................................................................56

ALPINE_LIT167861

5.2 Registration And Licensing ................................................................................................57
    5.2.1 CRD Electronic Filings.................................................................................................58
    5.2.2 Registration Requirement ...........................................................................................58
    5.2.3 Requests For Waivers .................................................................................................58
    5.2.4 State Registrations ......................................................................................................59
    5.2.5 Parking Registrations ..................................................................................................59
    5.2.6 Form U4 .......................................................................................................................59
    5.2.7 Amendments To Form U4 Or Form U5 ........................................................................59
    5.2.8 Assignment Of RR Numbers .......................................................................................59
5.3 Statutorily Disqualified Persons ........................................................................................60
    5.3.1 Introduction ..................................................................................................................60
    5.3.2 Hiring A Statutorily Disqualified Person .......................................................................60
    5.3.3 Regulatory Filings ........................................................................................................60
    5.3.4 Supervision ..................................................................................................................60
    5.3.5 Reporting Statutory Disqualifications...........................................................................61
5.4 Broker-Dealer Registration ...............................................................................................61
    5.4.1 Form BD .......................................................................................................................61
    5.4.2 Change In Ownership, Control, Or Business Operations ..............................................61
    5.4.3 Regulatory Contact Information ....................................................................................62
    5.4.4 Regulatory Filings ........................................................................................................62
    5.4.5 Reporting Requirements ..............................................................................................62
5.5 Heightened Supervision .....................................................................................................63
    5.5.1 Introduction ..................................................................................................................63
    5.5.2 Identifying RRs For Heightened Supervision...............................................................64
    5.5.3 Criteria For Identifying Candidates For Heightened Supervision .................................64
    5.5.4 Heightened Supervision Memorandum ........................................................................64
    5.5.5 Scope Of Potential Heightened Supervision ................................................................64
    5.5.6 Certification By RR's Supervisor ..................................................................................65
6 INDEPENDENT CONTRACTORS...........................................................................................66
  6.1 Independent Contractor Defined ........................................................................................66
  6.2 Supervision ........................................................................................................................66
  6.3 Agreements ........................................................................................................................66
  6.4 Use And Display Of The Firm's Name ................................................................................66
  6.5 Display Of SIPC Symbol .....................................................................................................66
  6.6 Use Of Other Names ..........................................................................................................67
  6.7 ICs As Investment Advisers ...............................................................................................67
  6.8 Outside Business Activities And Outside Accounts ............................................................67
7 COMMUNICATIONS WITH THE PUBLIC ...............................................................................68
  7.1 Advertising And Sales Literature ........................................................................................68
    7.1.1 Advertising And Sales Literature Defined....................................................................68
    7.1.2 General Guidelines.......................................................................................................68
    7.1.3 Required Information ....................................................................................................69
    7.1.4 Approval Prior To Publication ......................................................................................69
    7.1.5 Disclosure Of Prices For Recommended Corporate Securities ...................................69
    7.1.6 Sales Material Provided By Third Parties .....................................................................69
    7.1.7 SIPC Membership ........................................................................................................70
    7.1.8 FINRA Membership ......................................................................................................71
    7.1.9 Telemarketing Scripts ..................................................................................................71
    7.1.10 Special Filing Or Approval Requirements...................................................................71
    7.1.11 Institutional Sales Material .........................................................................................73
    7.1.12 Records Of Advertising And Sales Literature .............................................................73
    7.1.13 Options .......................................................................................................................74
    7.1.14 Mutual Funds .............................................................................................................74
    7.1.15 Municipal Securities....................................................................................................74
    7.1.16 Advertisements Involving Non-Branch Locations .......................................................74
    7.1.17 Testimonials ...............................................................................................................74
  7.2 Communications Defined as Research ...............................................................................74

ALPINE_LIT167862

7.2.1 Adoption of Policies and Procedures to Comply with Rule 2711 and Annual Certification by Senior Officer................................................................................................................................74
7.3 Outgoing Correspondence...................................................................................................75
   7.3.1 Prohibition Against Sending Correspondence From Personal Computers And Other Non-Firm Facilities.........................................................................................................................75
   7.3.2 Review And Approval ...................................................................................................75
   7.3.3 Content Guidelines .......................................................................................................77
   7.3.4 Letters And Notes ........................................................................................................77
   7.3.5 Facsimiles ....................................................................................................................77
7.4 Incoming Correspondence..................................................................................................78
   7.4.1 Review Of Incoming Correspondence ..........................................................................78
   7.4.2 Personal Mail ...............................................................................................................79
7.5 Legends And Footnotes .....................................................................................................79
7.6 Internal Communications ....................................................................................................79
   7.6.1 Inter-Office Communications ........................................................................................79
   7.6.2 Internal Use Only ..........................................................................................................79
   7.6.3 Squawk Box, Conference Calls, And Other Internal Communication Systems.................79
7.7 Investment Analysis Tools ..................................................................................................79
   7.7.1 Disclosures ...................................................................................................................80
   7.7.2 Filing Requirements.......................................................................................................80
7.8 Complaints .........................................................................................................................81
   7.8.1 Complaint Defined ........................................................................................................82
   7.8.2 Handling Of Customer Complaints ...............................................................................82
   7.8.3 Oral Complaints ...........................................................................................................82
   7.8.4 Records Of Complaints .................................................................................................82
   7.8.5 Notice To Customers ....................................................................................................82
   7.8.6 Reporting Of Customer Complaints...............................................................................83
7.9 Customer Privacy Policies And Procedures ........................................................................83
   7.9.1 Introduction...................................................................................................................84
   7.9.2 Public vs. Nonpublic Personal Information About Customers .........................................84
   7.9.3 Sharing Nonpublic Financial Information .......................................................................85
   7.9.4 Annual Notification........................................................................................................85
   7.9.5 Protection Of Customer Information And Records ..........................................................85
   7.9.6 Access To Customer Information Via Wi-Fi...................................................................85
   7.9.7 Remote Access To Customer Accounts ........................................................................86
   7.9.8 Disposal Of Consumer Report Information And Records ................................................86
7.10 Scripts..............................................................................................................................86
7.11 Prohibition Against Payments Involving Publications To Influence Market Prices ................87
7.12 Pre-recorded Voice Messages And Automatic Telephone Dialing Systems (Autodialers).......87
7.13 Calling (Telemarketing) And Fax Restrictions ...................................................................87
   7.13.1 Introduction .................................................................................................................88
   7.13.2 Telephone Calls..........................................................................................................88
   7.13.3 Wireless Communications ...........................................................................................89
   7.13.4 Outsourcing Telemarketing .........................................................................................89
   7.13.5 Unencrypted Consumer Account Numbers ..................................................................89
   7.13.6 Submission Of Billing Information.................................................................................89
   7.13.7 Abandoned Calls ........................................................................................................89
   7.13.8 Credit Card Laundering ...............................................................................................90
   7.13.9 Other Prohibited Activities ..........................................................................................90
   7.13.10 Do Not Call Lists .......................................................................................................90
   7.13.11 National Do-Not-Call Registry ...................................................................................91
   7.13.12 State Restrictions ......................................................................................................91
   7.13.13 Internal Do Not Call List.............................................................................................91
   7.13.14 Facsimile Transmissions ...........................................................................................91
   7.13.15 Established Business Relationship...............................................................................92
7.14 Public Speaking ...............................................................................................................92
   7.14.1 General Guidelines ......................................................................................................93
   7.14.2 Approval .....................................................................................................................93

ALPINE_LIT167863

7.14.3 Radio, TV, And Other Extemporaneous Presentations ........................................93
7.14.4 Securities Sold By Prospectus .......................................................................93
7.14.5 Options .....................................................................................................93
7.14.6 Collateralized Mortgage Obligations (CMOs) ....................................................93
7.14.7 Mutual Funds ............................................................................................94
7.15 Cold Callers ...................................................................................................94
7.15.1 Cold Caller Requirements ............................................................................94
7.15.2 Permissible Cold Caller Activities ..................................................................94
7.15.3 Prohibited Cold Caller Activities ...................................................................94
7.15.4 Telemarketing Restrictions ..........................................................................94
7.15.5 Scripts .....................................................................................................94
7.16 Electronic Communications ...............................................................................94
7.16.1 Electronic Communications Policy ..................................................................95
7.16.2 Electronic Mail (E-mail) ...............................................................................95
7.16.3 Instant Messaging ......................................................................................98
7.16.4 Advertising ...............................................................................................99
7.16.5 Bulletin Boards, Web Sites And Other Electronic Communication Systems ...............99
7.16.6 Hyperlinks ................................................................................................100
7.17 Identification Of Sources ..................................................................................101
8 FINANCIAL AND OPERATIONS PROCEDURES .............................................................102
8.1 Qualification Of Operations Personnel .................................................................102
8.2 Books And Records .........................................................................................102
8.2.1 Introduction ..............................................................................................102
8.2.2 Electronic Storage Of Records ......................................................................102
8.3 Calculation And Reporting Of Net Capital ............................................................104
8.4 Annual Audit Reports ......................................................................................105
8.5 Reconciliations And Bank Records ......................................................................105
8.6 Financial Reporting .........................................................................................105
8.6.1 Preparation Of Financial Reports ...................................................................106
8.6.2 Disclosure Of Financial Condition ...................................................................106
8.7 Fees And Service Charges ................................................................................107
8.7.1 Notification Of Customers .............................................................................107
8.8 Fidelity Bonding .............................................................................................107
8.9 Cash Deposits ...............................................................................................108
8.10 Risk Management ..........................................................................................108
8.10.1 Risk Assessment .......................................................................................108
8.10.2 Risk Practices Regarding Employment And Employees ......................................108
8.10.3 New Accounts ...........................................................................................109
8.10.4 Handling Customer Funds And Securities ........................................................109
8.10.5 Firm Computers And Computerized Data .........................................................109
8.10.6 Extension Of Credit ....................................................................................110
8.10.7 Proprietary Accounts ..................................................................................110
8.10.8 New Products ...........................................................................................110
8.11 Business Continuity Plan .................................................................................111
8.11.1 Designation Of Responsibilities .....................................................................111
8.11.2 Retention And Location Of The Plan ...............................................................112
8.11.3 Implementation Of The Plan .........................................................................112
8.11.4 Emergency Response Team ..........................................................................112
8.11.5 Emergency Contact List ..............................................................................113
8.11.6 Alternative Business Locations ......................................................................114
8.11.7 Data Back-Up And Recovery .........................................................................114
8.11.8 Mission Critical Systems ..............................................................................114
8.11.9 Financial And Operational Assessments ...........................................................114
8.11.10 Alternative Communications ........................................................................115
8.11.11 Business Constituent, Bank, And Counter-Party Impact ....................................115
8.11.12 Other Obligations To Customers ..................................................................116
8.11.13 Emergency Contact Information ....................................................................116
8.11.14 Widespread Health Emergencies ..................................................................117

ALPINE_LIT167864

8.11.15 Education Of Employees ...................................................................................117
8.11.16 Updating, Annual Review, And Testing ................................................................117
8.12 Customer Payments For Purchases .............................................................................118
8.13 Regulation T And Extension Of Credit To Customers .....................................................118
8.13.1 Guaranteed Accounts .......................................................................................119
8.14 Transmittals Of Customer Funds And Securities ...........................................................119
8.14.1 Issuing Checks To Customer ..............................................................................120
8.14.2 Transmittals To Third Parties ............................................................................120
8.14.3 Transmittals To An Alternate Address ..................................................................120
8.14.4 Transmittals To Outside Entities .........................................................................121
8.14.5 Transmittals Between Customers And Registered Representatives ..............................122
8.14.6 Prepayments And Extensions ............................................................................122
8.14.7 Suspicious Or Questionable Activities ..................................................................122
8.15 Safekeeping Of Customer Funds And Securities ...........................................................122
8.15.1 Introduction ....................................................................................................122
8.15.2 Exemption From 15c3-3 ....................................................................................123
8.16 Checking Account Safeguards ....................................................................................123
8.16.1 Checking Account Safeguards ............................................................................123
8.17 Customer Protection .................................................................................................124
8.17.1 Introduction ....................................................................................................124
8.17.2 Possession And Control Of Securities ..................................................................124
8.17.3 Special Reserve Bank Account ...........................................................................127
8.18 Customer Confirmations And Statements .....................................................................127
8.18.1 Control Of Blank Confirmations And Statements ....................................................127
8.18.2 Change Of Customer Addresses On Accounts .......................................................127
8.18.3 Holding Customer Mail Prohibited .......................................................................128
8.18.4 Confirmation Disclosures ..................................................................................128
8.19 Subordination Agreements With Investors ....................................................................129
8.20 Expense-Sharing Agreements ....................................................................................129
8.21 Transfer Of Accounts ...............................................................................................129
8.22 Solicitation Of Proxies ..............................................................................................133
8.23 Customer Requests For References ............................................................................133
8.24 Audit Letters ...........................................................................................................133
8.25 Annual Disclosure Of FINRA BrokerCheck ...................................................................134
8.26 Short Interest Report ................................................................................................134
8.27 Electronic Blue Sheets ..............................................................................................134
8.28 Other SEC Regulatory Inquiries .................................................................................135
8.29 Regulatory Fees And Assessments .............................................................................135
8.30 Regulatory Requests ................................................................................................135
8.30.1 Information Provided Via Portable Media Device .....................................................135
8.31 INSITE Reporting Requirements .................................................................................135
8.32 Outsourcing ...........................................................................................................135
8.33 Correspondent Clearing ............................................................................................137
9 ANTI-MONEY LAUNDERING (AML) PROGRAM ................................................................138
9.1 Background ..............................................................................................................138
9.2 Shell Companies .......................................................................................................139
9.3 Penalties .................................................................................................................140
9.4 AML Compliance Officer .............................................................................................140
9.5 Independent Testing ..................................................................................................141
9.6 Training Program .......................................................................................................142
9.7 OFAC List And Blocked Property ..................................................................................142
9.7.1 Prohibited Transactions ......................................................................................144
9.7.2 Blocking Requirements .......................................................................................144
9.7.3 Monitoring Procedures ........................................................................................144
9.7.4 Other Requests To Monitor Accounts ....................................................................145
9.7.5 Blocking Property And Disbursements ...................................................................145
9.7.6 Reporting Blocked Property And Legal Actions ........................................................145
9.7.7 Reporting Obligations for All Alpine Employees .......................................................146

ALPINE_LIT167865

9.8 Currency Reporting Requirements .............................................................................147
   9.8.1 Transactions Involving Currency Over $10,000 ................................................147
   9.8.2 Transactions Involving Currency Or Bearer Instruments Over $10,000 Transferred Into Or
   Outside The U.S. .......................................................................................................147
   9.8.3 Prohibition Against Structuring Deposits To Avoid Reporting ...........................148
   9.8.4 State Reporting Requirements .........................................................................148
9.9 Foreign Financial Account Reporting Requirements And Recordkeeping (FBAR).............148
9.10 Recordkeeping Requirements ................................................................................149
   9.10.1 Fund Transfers And Transmittals ...................................................................149
   9.10.2 Other Recordkeeping Requirements ..............................................................149
9.11 Detecting Potential Money Laundering ....................................................................150
   9.11.1 Foreign Currency Transactions .....................................................................151
9.12 Information Sharing Between Financial Institutions ...................................................151
9.13 Alpine's Employee Reporting Obligations ................................................................151
9.14 Suspicious Activity Reports (SARs) ........................................................................151
   9.14.1 Potential Risk Indicators ...............................................................................152
   9.14.2 Identifying Potential Suspicious Activity .........................................................154
   9.14.3 When A Report Must Be Filed .......................................................................154
   9.14.4 Filing A Report And Emergency Notification ...................................................154
   9.14.5 Retention Of Records ....................................................................................155
   9.14.6 Providing SARs Information To SROs .............................................................155
   9.14.7 Prohibition Against Disclosure .......................................................................155
9.15 Requests And Written Notices From Enforcement Agencies ......................................156
   9.15.1 Federal Banking Agency Requests -- 120-Hour Rule .......................................156
   9.15.2 FinCEN Requests For Information ..................................................................156
   9.15.3 Foreign Bank Correspondent Accounts ..........................................................157
9.16 Knowing the Customer .........................................................................................157
9.17 Customer Identification Program (CIP) ...................................................................157
   9.17.1 Accounts Requiring Approval By The AML Compliance Officer .........................158
   9.17.2 Customer Identity Verification .......................................................................158
   9.17.3 Customer Identification Program Records .......................................................161
   9.17.4 Comparison With Government Lists ................................................................162
9.18 Identity Theft Prevention Program (FTC FACT Act Red Flags Rule) ............................162
   9.18.1 Firm Policy ..................................................................................................164
   9.18.2 ITPP Approval and Administration ..................................................................164
   9.18.3 Relationship to Other Firm Programs .............................................................164
   9.18.4 Identifying Relevant Red Flags ......................................................................164
   9.18.5 Detecting Red Flags .....................................................................................165
   9.18.6 Preventing and Mitigating Identity Theft ........................................................165
   9.18.7 Alpine Employees Reporting Obligations ........................................................167
   9.18.8 Service Providers .........................................................................................167
   9.18.9 Internal Compliance Reporting ......................................................................167
   9.18.10 Updates and Annual Review ........................................................................168
   9.18.11 Red Flag Identification and Detection Grid ....................................................168
9.19 Due Diligence For Correspondent And Private Banking Accounts ...............................171
   9.19.1 Definitions ...................................................................................................172
   9.19.2 Due Diligence For Correspondent Accounts For Foreign Financial Institutions ..............173
   9.19.3 Due Diligence For Private Banking Accounts ...................................................175
   9.19.4 Enhanced Scrutiny For Accounts Of Senior Foreign Political Figures .................176
9.20 Shell Companies ..................................................................................................176
   9.20.1 Confidential Reporting of AML Non-Compliance ..............................................177
10 INSIDER TRADING ..................................................................................................178
10.1 Insider Trading Policies And Procedures .................................................................178
10.2 Prohibition Against Acting On Or Disclosing Inside Information ..................................179
10.3 Tippees Are Insiders ............................................................................................179
10.4 Misuse Constitutes Fraud .....................................................................................179
10.5 Annual Certification .............................................................................................179
10.6 Firm Policy Memorandum Regarding Insider Trading ................................................179

ALPINE_LIT167866

10.7 Employee, Employee-Related, And Proprietary Trading ........................................................ 182
10.8 Information Barrier Procedures ......................................................................................... 183
   10.8.1 Introduction .............................................................................................................. 183
   10.8.2 Departments Subject To Information Barrier Confidentiality Procedures ................ 184
   10.8.3 Confidentiality Procedures ....................................................................................... 184
   10.8.4 Access To Confidential Information Limited To Certain Employees .......................... 184
   10.8.5 Bringing An Employee Over the Wall ......................................................................... 184
   10.8.6 Notification To Compliance ....................................................................................... 185
   10.8.7 Monitoring The Information Barrier ........................................................................... 185
   10.8.8 Education And Training Of Employees ...................................................................... 185
10.9 Watch List ........................................................................................................................ 185
11 ACCOUNTS ........................................................................................................................... 187
11.1 New Accounts ................................................................................................................... 187
   11.1.1 Customer Identity Verification ................................................................................... 187
   11.1.2 Identity Theft ............................................................................................................. 194
   11.1.3 SIPC Disclosure ........................................................................................................ 194
   11.1.4 Approval .................................................................................................................... 194
   11.1.5 Customer Account Information .................................................................................. 195
   11.1.6 Addresses On Customer Accounts ........................................................................... 196
   11.1.7 Account Documents .................................................................................................. 197
   11.1.8 Predispute Arbitration Agreements With Customers ................................................. 197
   11.1.9 Revisions To Customer Agreements ......................................................................... 197
   11.1.10 Accounts Requiring Notification To Customer's Employer ...................................... 197
   11.1.11 Post Office Addresses ............................................................................................. 198
   11.1.12 Unacceptable Accounts .......................................................................................... 198
11.2 Accounts And Securities Subject To Blocking .................................................................. 198
11.3 Updating Account Information And Periodic Affirmation .................................................... 199
11.4 Customer Account Sweeps To Banks ............................................................................... 200
11.5 Third Party Accounts ........................................................................................................ 201
11.6 Discretion For Orders And Accounts ................................................................................. 201
11.7 Accounts For Minors ......................................................................................................... 201
11.8 Accounts For Senior Investors .......................................................................................... 202
   11.8.1 Diminished Mental Capacity ..................................................................................... 202
11.9 Incompetent Persons ........................................................................................................ 203
11.10 Trust Accounts ................................................................................................................ 203
11.11 Correspondent And Private Banking Accounts And Accounts For Senior Foreign Political
Figures ...................................................................................................................................... 203
   11.11.1 Summary Of Requirements ..................................................................................... 203
   11.11.2 Definitions ............................................................................................................... 204
   11.11.3 Prohibition Against Correspondent Accounts For Foreign Shell Banks .................. 205
   11.11.4 Foreign Bank Certification ....................................................................................... 205
   11.11.5 Accounts For Foreign Political Figures ..................................................................... 205
11.12 Collateral/Escrow Accounts ............................................................................................ 205
11.13 Pension And Retirement Accounts .................................................................................. 205
   11.13.1 Employee Retirement Income Security Act (ERISA) ............................................... 206
   11.13.2 General Guidelines When Offering Retirement Plans .............................................. 209
   11.13.3 Individual Retirement Accounts (IRAs) .................................................................... 210
   11.13.4 Employer-Sponsored Plans ..................................................................................... 211
11.14 Foreign Accounts ............................................................................................................ 212
11.15 Referrals .......................................................................................................................... 212
11.16 Death Of A Customer ...................................................................................................... 214
11.17 Customer Portfolio And Cross-Reference Records ......................................................... 214
11.18 Active Accounts ............................................................................................................... 215
   11.18.1 Penny Stock Rules .................................................................................................. 216
   11.18.2 Rule 15g□1 et. seq. ................................................................................................ 216
11.19 Concentrations ................................................................................................................ 222
   11.19.1 Introduction ............................................................................................................. 222
   11.19.2 Review Of Firm-Wide Positions .............................................................................. 222

ALPINE_LIT167867

12 ORDERS.............................................................................................................223
12.1 Acceptance And Prompt Entry Of Orders ....................................................223
12.2 Orders Requiring Approval .........................................................................223
12.3 Solicited And Unsolicited Orders ................................................................224
    12.3.1 Definition Of Solicited Order ...............................................................224
    12.3.2 Solicited Orders Should Be Indicated ..................................................224
    12.3.3 Prohibited Solicitations .......................................................................224
12.4 Suitability Of Recommendations .................................................................225
    12.4.1 General Requirements .........................................................................226
    12.4.2 Institutional Accounts ..........................................................................228
    12.4.3 Recommendations Of OTC Equity Securities ......................................229
    12.4.4 Proprietary Products ...........................................................................231
12.5 Fair Prices ...................................................................................................232
    12.5.1 Commissions .......................................................................................232
    12.5.2 Mark-Ups And Mark-Downs ................................................................232
    12.5.3 Prohibition Against Trading Ahead Of Customer Orders.......................233
    12.5.4 Best Execution.....................................................................................234
    12.5.5 Best Execution.....................................................................................236
12.6 Regulation NMS ..........................................................................................237
12.7 Orders In Volatile Stocks ............................................................................237
12.8 Illiquid Investments .....................................................................................238
12.9 Account Designation And Cancels/Rebills ..................................................238
12.10 Trading Halts .............................................................................................239
12.11 Trade Reporting By Third Parties ..............................................................239
12.12 Trading Systems And Electronic Transmission Of Orders .........................240
12.13 Order Records ...........................................................................................241
12.14 Conflicts Of Interest ..................................................................................241
    12.14.1 Adverse Interest ................................................................................241
    12.14.2 Precedence Of Customer Orders ......................................................242
12.15 Review Of Customer Transactions ............................................................242
    12.15.1 Review Of Daily Transactions ...........................................................242
    12.15.2 Unauthorized Transactions ...............................................................243
    12.15.3 Review Of Transactions For Excessive Commissions .......................243
    12.15.4 Review Of Account Activity By Designated Supervisors .....................244
    12.15.5 Review Of Account Activity By Compliance ........................................244
12.16 Trade Errors ..............................................................................................244
12.17 Sellouts .....................................................................................................245
12.18 Time Clock Synchronization ......................................................................245
12.19 Blue Sky Of Securities ..............................................................................246
    12.19.1 General Requirements .......................................................................247
12.20 Short Sales ................................................................................................247
    12.20.1 Marking Orders ..................................................................................248
12.21 Sale Of Control Or Restricted Stock .........................................................249
    12.21.1 Introduction .......................................................................................249
    12.21.2 Restricted Securities Defined ............................................................249
    12.21.3 Affiliate Defined .................................................................................250
    12.21.4 Control Person And Control Securities ..............................................250
    12.21.5 Holding Period ...................................................................................250
    12.21.6 Limitations On Amount Sold ..............................................................250
    12.21.7 Filing Requirements ..........................................................................250
    12.21.8 New Account Information Regarding Affiliates ....................................250
    12.21.9 Reporting Of Insider Transactions .....................................................250
12.22 Unregistered Resales Of Restricted Securities .........................................251
12.23 Reporting Of Insider Transactions ............................................................254
12.24 Penny Stocks .............................................................................................255
    12.24.1 General Requirements .......................................................................255
    12.24.2 Penny Stock Defined .........................................................................256
    12.24.3 Established Customer Defined ...........................................................256

ALPINE_LIT167868

12.24.4 Suitability Information .................................................................................257
12.24.5 Risk Disclosure Document ...........................................................................257
12.24.6 Two-Business-Day Waiting Period ...............................................................257
12.24.7 Disclosure Of Quotations And Other Information .........................................257
12.24.8 Disclosure Of Compensation ......................................................................257
12.25 Tax Switching Transactions ...........................................................................258
12.26 Order Audit Trail System (OATS) ...................................................................258
12.26.1 Who And What Orders Are Subject To OATS Requirements .........................258
12.26.2 Registering With OATS ...............................................................................259
12.26.3 List Of Contact Persons ..............................................................................259
12.26.4 Capture Of Required OATS Information .......................................................260
12.26.5 Reporting Of OATS Information ...................................................................260
12.26.6 Clock Synchronization .................................................................................261
12.26.7 OATS Contact Information ...........................................................................261
12.27 Disclosure Of Order Execution Procedures ....................................................261
12.28 Order Routing And Reporting .........................................................................261
12.28.1 Disclosure Of Order Routing .......................................................................262
12.28.2 Orders Covered By The Rule .......................................................................262
12.28.3 Information Included In The Reports .............................................................263
12.28.4 Customer Requests For Order Routing Information ........................................263
12.29 Distribution, Consolidation, And Display Of Information ..................................263
12.30 Cash And Non-Cash Compensation Policy .....................................................263
12.30.1 Definitions ...................................................................................................264
12.30.2 Approval ......................................................................................................264
12.30.3 Types Of Permissible Non-Cash Compensation ...........................................264
12.31 Prohibited Transactions And Practices ...........................................................265
12.31.1 Introduction .................................................................................................265
12.31.2 Unauthorized Trading ..................................................................................265
12.31.3 Prearranged Trading ...................................................................................266
12.31.4 Adjusted Trading .........................................................................................266
12.31.5 Overtrading Or Undertrading .......................................................................266
12.31.6 Wash Transactions ......................................................................................266
12.31.7 Cross Transactions ......................................................................................266
12.31.8 Orders At The Opening Or Close .................................................................266
12.31.9 Parking Securities ........................................................................................266
12.31.10 Churning ...................................................................................................267
12.31.11 Prohibition Against Acting On Knowledge Of Other Orders .........................267
12.31.12 Trade Shredding ........................................................................................267
13 OTC EQUITY TRADING AND MARKET MAKING .................................................268
13.1 Minimum Pricing Increment .............................................................................268
13.1.1 Minimum Quotation Size ...............................................................................268
13.2 Introduction ....................................................................................................269
13.2.1 Supervisory Reviews .....................................................................................269
13.2.2 Regulation NMS ............................................................................................270
13.3 General Requirements For OTC Traders ..........................................................275
13.3.1 Qualification And Registration Of OTC Traders .............................................275
13.3.2 Continuing Education .....................................................................................276
13.3.3 Training .........................................................................................................276
13.3.4 Annual Compliance Meeting ..........................................................................276
13.3.5 Traders' Personal Accounts ..........................................................................276
13.3.6 Information Barrier Procedures (Chinese Walls) ..............................................277
13.3.7 Annual Certification .......................................................................................277
13.3.8 Disciplinary Policy .........................................................................................278
13.4 Initial Market Maker Requirements ..................................................................279
13.4.1 Selection Of Securities ..................................................................................279
13.4.2 NGM And NASDAQ Capital Market Securities ...............................................279
13.4.3 IPOs And Syndicates ....................................................................................280
13.4.4 Non-Exchange-Listed Securities ....................................................................280

ALPINE_LIT167869

13.4.5 MPIDs (Market Participant Identifiers) .................................................................282
13.4.6 Prohibition Against Receiving Payments ...............................................................282
13.5 Quotations ...............................................................................................................282
    13.5.1 Quotation Requirements And Obligations ..........................................................284
    13.5.2 Dissemination Of Quotations .............................................................................284
    13.5.3 Firm Quote Obligations ......................................................................................284
    13.5.4 Non-Exchange Listed Security Quotations Displayed In Multiple Quotation Mediums ...285
    13.5.5 Requirement To Publish An Inferior Quote .........................................................285
    13.5.6 Reasonable Spreads ..........................................................................................285
    13.5.7 Backing-Away .....................................................................................................285
    13.5.8 Improving Public Quotes: Limit Orders ..............................................................286
    13.5.9 NNOTC Securities Quoted In Different Quotation Mediums ..............................286
    13.5.10 OTCBB Continuing Quotation Requirements ...................................................286
    13.5.11 NASDAQ Market Opening Process ..................................................................286
    13.5.12 NASDAQ Closing Cross ...................................................................................287
    13.5.13 Locked And Crossed Markets ..........................................................................287
    13.5.14 Quotation Recording And Reporting .................................................................288
    13.5.15 Termination Of Market Maker Registration And Withdrawal Of Quotes ...........288
    13.5.16 After Hours Trading ..........................................................................................289
    13.5.17 Prohibited Practices Relating To Publication Of Quotations ............................289
13.6 Handling Orders And Executions .............................................................................289
    13.6.1 Best Execution ...................................................................................................290
    13.6.2 Fair Prices ..........................................................................................................295
    13.6.3 Prohibition Against Trading Ahead Of Customer Orders ...................................297
    13.6.4 Market Orders .....................................................................................................299
    13.6.5 Limit Orders ........................................................................................................300
    13.6.6 Marking Orders ...................................................................................................303
    13.6.7 Block-Sized Orders ............................................................................................305
    13.6.8 Not Held Orders ..................................................................................................305
    13.6.9 Orders With Special Terms Or Conditions .........................................................306
    13.6.10 Average Price Transactions .............................................................................306
    13.6.11 Net Trading .......................................................................................................307
    13.6.12 Phone Orders ....................................................................................................308
    13.6.13 Rule 144 Transactions ......................................................................................308
    13.6.14 Trading Halts .....................................................................................................308
13.7 NASDAQ Execution Services/BATS/ARCA .............................................................309
    13.7.1 NASDAQ Market Center .....................................................................................311
    13.7.2 Sponsored Access ..............................................................................................311
13.8 Consolidated Quotation System (CQS) Securities ...................................................312
    13.8.1 Trade-Throughs ..................................................................................................312
    13.8.2 Short Sales In CQS Securities ...........................................................................312
    13.8.3 CQS Security Subject To An IPO ........................................................................313
    13.8.4 Reporting Transactions in CQS Securities .........................................................313
    13.8.5 Limit Order Protection Interpretation (Manning Obligations) ..............................313
13.9 CQS Market Maker Requirements ............................................................................313
    13.9.1 One Percent (1%) Rule (Statutory Market Maker) ..............................................314
13.10 FINRA Alternative Display Facility (ADF) ...............................................................314
    13.10.1 Changing From An Automated To A Manual Quotation ....................................315
    13.10.2 Access Requirements .......................................................................................315
    13.10.3 ADF Trade Reporting ........................................................................................315
13.11 Other Requirements ...............................................................................................316
    13.11.1 Inventory Positions ...........................................................................................316
    13.11.2 Schedule 13G Reports ......................................................................................316
    13.11.3 Authorized Use Of NASDAQ Workstations ......................................................317
    13.11.4 Adequate Staffing .............................................................................................317
    13.11.5 Issuer Repurchases Of Common Stock ............................................................317
    13.11.6 Errors ................................................................................................................318
    13.11.7 Clearly Erroneous Transaction Procedures ......................................................319

ALPINE_LIT167870

13.11.8 Customer Order Errors ...................................................................................320
13.11.9 System Outages ...........................................................................................320
13.12 Distributions Of Securities ..............................................................................320
13.12.1 Introduction .................................................................................................321
13.12.2 Overview Of Requirements .........................................................................321
13.12.3 Restrictions When Passive Market Making Is Not Conducted .....................321
13.12.4 Trader Responsibilities ................................................................................322
13.12.5 Stabilizing Bids ...........................................................................................322
13.13 Trade Reporting ...............................................................................................322
13.13.1 Trade Reporting Facility (TRF, formerly ACT) ............................................324
13.13.2 Prohibition Against Delayed Trade Reporting - SEC 21(a) Report.............325
13.13.3 Riskless Principal Transactions ...................................................................325
13.13.4 Transactions And Transfers Not Requiring Reporting ..................................325
13.13.5 Short Sales ...................................................................................................326
13.13.6 Review Of Trade Modifiers ..........................................................................326
13.13.7 Obligation To Provide Accurate Information To The Marketplace................326
13.13.8 Order Audit Trail System (OATS) ................................................................327
13.13.9 Trade Reporting By Third Parties .................................................................327
13.14 Other Reports ..................................................................................................327
13.14.1 Short Interest Report For NASDAQ Securities.............................................327
13.15 Large Trader Reporting ....................................................................................328
13.15.1 Large Trader Definition ................................................................................329
13.15.2 Identifying Activity Level .............................................................................329
13.15.3 Large Trader Identification Number (LTID) ..................................................330
13.15.4 Filings .........................................................................................................330
13.15.5 Records .......................................................................................................330
13.16 Procedures For Clock Synchronization ............................................................330
13.16.1 Independent Contractors .............................................................................331
13.17 Prohibited Activities ........................................................................................331
13.17.1 Acting To Benefit Alpine vs. The Customer .................................................331
13.17.2 Anti-Competitive And Anti-Trust Procedures ..............................................331
13.17.3 Unauthorized Trading ..................................................................................333
13.17.4 Expiration And Rebalance Days ...................................................................335
13.17.5 Other Prohibited Activities ..........................................................................335
13.17.6 Self-Preferencing ........................................................................................336
13.17.7 Parking Securities ........................................................................................336
13.17.8 Interpositioning ...........................................................................................336
13.17.9 Secret Profits ...............................................................................................336
13.17.10 Adjusted Trading .......................................................................................337
13.18 Books And Records .........................................................................................337
14 MUTUAL FUNDS ...................................................................................................339
14.1 Introduction ......................................................................................................339
14.2 Mutual Funds Offered By Alpine ......................................................................339
14.2.1 Dealer Agreements .......................................................................................340
14.2.2 Anti-Reciprocal Rule .....................................................................................340
14.3 Sales Charges ...................................................................................................341
14.3.1 Breakpoints ..................................................................................................342
14.3.2 Letters Of Intent ...........................................................................................344
14.3.3 Rights Of Accumulation ................................................................................344
14.3.4 Reinstatement Privilege ................................................................................344
14.3.5 Sales Charge Reductions/Waiver Or NAV Transfer Program .......................344
14.3.6 Deferred Sales Charges ................................................................................345
14.3.7 Direct Application And Wire Order Accounts ................................................345
14.3.8 Sales Charge Discounts Must Be Marked On Mutual Fund Orders ..............345
14.4 Switching ...........................................................................................................345
14.5 Market Timing Transactions ..............................................................................346
14.6 Selling Dividends ..............................................................................................346
14.7 Misrepresenting No-Load Funds ......................................................................346

ALPINE_LIT167871

14.8 Reinvestment Of Maturing Certificates Of Deposit In Mutual Funds .................................346
14.9 Suitability ...............................................................................................................................347
    14.9.1 Multi-Class Mutual Funds ..........................................................................................347
    14.9.2 Considerations For Newly-Hired RRs ........................................................................348
14.10 Late Trading And Market Timing .........................................................................................349
14.11 Block Letter Restrictions .....................................................................................................350
14.12 Correspondence ....................................................................................................................351
14.13 Disclosure Of Material Facts ...............................................................................................351
14.14 Disclosure Of Fees, Expenses And Performance ...............................................................352
14.15 Prospectuses .........................................................................................................................352
14.16 Advertising And Sales Literature ........................................................................................352
14.17 Dealer-Use-Only Material ....................................................................................................353
14.18 Seminars And Other Public Presentations ..........................................................................353
14.19 Sales Contests And Incentive Programs ..............................................................................354
14.20 Prompt Transmission Of Applications And Payments .........................................................354
14.21 Redemption Of Outside Funds .............................................................................................355
14.22 Closed-End Funds .................................................................................................................355
14.23 Unit Investment Trusts (UITs) .............................................................................................356
    14.23.1 Suitability ..................................................................................................................356
    14.23.2 Primary Offerings ......................................................................................................356
    14.23.3 Secondary Market Transactions ...............................................................................356
    14.23.4 Other Sales Practice Considerations ........................................................................356
14.24 Funds Of Hedge Funds .........................................................................................................356
    14.24.1 Characteristics And Risks Of Hedge Funds .............................................................357
14.25 Exchange-Traded Funds (ETFs) ..........................................................................................357
15 PRIVATE PLACEMENTS AND OFFERINGS ...............................................................................359
15.1 Introduction ...........................................................................................................................359
    15.1.1 Definition Of Terms .....................................................................................................359
    15.1.2 Private Placement Defined ...........................................................................................360
15.2 Private Investment In Public Equity (PIPE) .........................................................................361
    15.2.1 Introduction .................................................................................................................361
    15.2.2 Underwriting ...............................................................................................................361
    15.2.3 Compliance Notification .............................................................................................361
    15.2.4 Registration Statement Integration ............................................................................361
    15.2.5 Eligible Investors ........................................................................................................361
    15.2.6 Marketing Restrictions ................................................................................................362
    15.2.7 Information Flow ..........................................................................................................363
15.3 Blue Sky Requirements .........................................................................................................365
15.4 Alpine's Participation In Private Placements .......................................................................365
    15.4.1 Due Diligence ..............................................................................................................365
    15.4.2 Agreement With The Issuer .........................................................................................366
    15.4.3 Dollar Amount Of The Offering And Integration Issues ...........................................366
    15.4.4 Form D .........................................................................................................................366
15.5 Sales Of Private Placements .................................................................................................366
    15.5.1 Suitability ....................................................................................................................367
    15.5.2 Restricted Nature Of Private Placement Securities ...................................................367
    15.5.3 Purchaser Questionnaires ...........................................................................................367
    15.5.4 Purchaser Representatives ..........................................................................................368
    15.5.5 Offering Memorandum ................................................................................................368
    15.5.6 Oral Representations ...................................................................................................368
    15.5.7 Offeree Access To Information ....................................................................................369
    15.5.8 Limits On Solicitation .................................................................................................369
    15.5.9 Investment Seminars Or Meetings ..............................................................................369
    15.5.10 Subscription Agreements ...........................................................................................369
    15.5.11 Section 1031 Tax-Deferred Exchanges.....................................................................370
16 CORPORATE SECURITIES UNDERWRITING ............................................................................372
16.1 Deal File .................................................................................................................................372
16.2 Managing Underwriter ..........................................................................................................372

ALPINE_LIT167872

16.2.1 Letter Of Intent .............................................................................372
16.2.2 Due Diligence ..............................................................................373
16.2.3 Net Capital Considerations ........................................................373
16.2.4 Forming The Underwriting Group ...............................................374
16.2.5 Underwriting Compensation ......................................................374
16.2.6 Preliminary And Final Prospectuses..........................................375
16.2.7 Regulatory Filings And Notifications..........................................375
16.2.8 Road Shows ...............................................................................377
16.2.9 Pricing The Underwriting ...........................................................378
16.2.10 Aftermarket Activities...............................................................378
16.3 Syndicate Member Procedures .............................................................379
16.3.1 Tombstone Ads ..........................................................................380
16.3.2 Research ....................................................................................380
16.4 Selling Group Member Procedures .......................................................380
16.4.1 Returning Unsold Allotment .......................................................381
16.4.2 Tombstone Ads ..........................................................................381
16.4.3 Research ....................................................................................381
16.5 Communications Around The Time Of Registered Offerings .................381
16.5.1 Categories Of Issuers ................................................................381
16.5.2 Other Definitions ........................................................................382
16.5.3 Permitted Offering Activity And Communications.......................382
16.6 Sales To The Public...............................................................................383
16.6.1 Indications Of Interest ................................................................383
16.6.2 Prospectuses And Confirmations To Purchasers.......................383
16.6.3 Restrictions On Purchase And Sale Of IPOs Of Equity Securities............385
16.6.4 Disclosure Of Interest In Distribution ........................................390
16.6.5 State Blue Sky Requirements.....................................................390
16.6.6 Cancellation Policy .....................................................................390
16.6.7 Designated Orders .....................................................................390
16.6.8 Securities Taken In Trade ..........................................................391
16.6.9 Flipping ......................................................................................391
16.7 Transactions With Related Persons .......................................................391
16.8 Trading Restrictions While Participating In A Distribution......................391
16.8.1 Distribution Participant Restrictions ...........................................392
16.8.2 Issuer And Selling Security Holder Restrictions .........................392
16.8.3 Short Sales .................................................................................392
16.8.4 Prohibited Conduct ....................................................................393
16.9 Market Making Activities ........................................................................393
16.10 Regulation S Underwritings ..................................................................394
16.10.1 Introduction ..............................................................................394
16.10.2 Purchaser Questionnaires .......................................................394
16.10.3 Monitor Of Purchasers.............................................................395
16.11 Regulation A Offerings .........................................................................395
16.11.1 Introduction ..............................................................................395
16.11.2 Dollar Limitation Of Offering ...................................................395
16.11.3 Initiation Of Offers And Sales .................................................396
16.12 Best Efforts Underwritings ....................................................................396
16.12.1 Introduction ..............................................................................396
16.12.2 Customer Funds - Escrow Account .........................................396
16.12.3 Purchasers ...............................................................................397
16.13 Prohibited Activities ..............................................................................397
16.13.1 Misrepresentation Of Registration With Regulators ................397
16.13.2 Anti-Competitive Activities .......................................................397
16.13.3 Tying .........................................................................................398
16.13.4 Laddering..................................................................................398
16.13.5 Quid Pro Quo............................................................................398
16.13.6 Spinning ...................................................................................398
16.13.7 After-Market Sales....................................................................398

ALPINE_LIT167873

16.13.8 Misrepresenting Pricing ................................................................................398
17 SUPERVISORY SYSTEM, PROCEDURES, AND CONTROLS ...................................399
  17.1 Introduction ..........................................................................................................399
  17.2 Responsibility.......................................................................................................400
  17.3 Controls ...............................................................................................................400
    17.3.1 Controls to Ensure Supervisory Procedures Remain Current ......................400
    17.3.2 Designation of Principal for Supervisory Control Procedures......................400
    17.3.3 Verification And Testing..............................................................................400
    17.3.4 Creation and Amendment of Supervisory Procedures as a Result of Verification and Testing......................................................................................................................401
  17.4 3012 Controls .....................................................................................................402
    17.4.1 Transmittal of Funds ..................................................................................402
    17.4.2 Change of Customer Addresses ..................................................................406
    17.4.3 Change of Investment Objectives................................................................407
    17.4.4 Supervision of Producing Managers ...........................................................408
    17.4.5 Risk Management .......................................................................................409
    17.4.6 Outside Auditors ........................................................................................409
  17.5 Written Compliance And Supervisory Procedures (WSP) ....................................409
  17.6 Designation of Chief Compliance Officer (CCO) ................................................410
  17.7 Annual Compliance Report To Senior Management and The Board of Directors ...410
    17.7.1 Annual Report ............................................................................................410
  17.8 Meetings between CEO and CCO ........................................................................411
    17.8.1 Required Language for the Annual Certification...........................................411
  17.9 Direct Market Access ..........................................................................................412
  17.10 Cross Reference To Other WSP Supervisory Control Subjects ...........................415
18 ALPINE'S INFORMATION DESTRUCTION POLICY ..............................................416
  18.1 Introduction and Overview ..................................................................................416
    18.1.1 Information Destruction Policy....................................................................416
    18.1.2 Policy Development, Implementation and Oversight.....................................416
    18.1.3 Employee Orientation/Training ...................................................................416
    18.1.4 Information Destruction Policy....................................................................417
  18.2 Information Destruction Procedures .....................................................................417
    18.2.1 Paper Media ...............................................................................................417
    18.2.2 Other Media Disposal .................................................................................418
  18.3 Qualifications and Selection of an Approved Service Provider...............................418
  18.4 Retention Requirements .......................................................................................418
    18.4.1 Books and Records/Retention Requirements ...............................................418
    18.4.2 Default Retention Requirement ...................................................................418
  18.5 Policy Compliance ...............................................................................................418
    18.5.1 Auditing Internal Compliance.....................................................................418
    18.5.2 Litigation Hold/Stop Destruction Order ......................................................418

ALPINE_LIT167874

# INTRODUCTION

Alpine Securities Corporation ("Alpine") will conduct its business consistent with the highest standards of commercial honor and just and equitable principles of trade. Keeping our customers' interest foremost is key to Alpine's success. The trust of our customers and Alpine's reputation are of paramount importance. Effective supervision is an integral part of achieving our goals in serving our customers.

"Compliance" is not a static event; it is a process which evolves in tandem with regulations that govern our industry and the circumstances of each particular interaction. This Written Supervisory Procedures Manual ("WSP" or "Manual") includes Alpine's supervisory policies and procedures to provide guidance to designated supervisors in their oversight of Alpine's business. It is a working document and reference for supervisors and will be updated when necessary.

It is recognized that supervision must be a flexible tool for use by those charged with managing Alpine's various activities. While it is generally expected these procedures will be followed, supervisors are encouraged to adapt these procedures to the needs of Alpine, their particular department, and the employees and customers of Alpine. These procedures are meant to be a basic framework upon which supervisors oversee the Alpine's activities.

This Manual does not attempt to set forth all of the rules and regulations with which employees must be familiar, nor does it attempt to deal with all situations involving unusual circumstances. When questions arise, refer them to the Chief Compliance Officer ("CCO") for assistance.

Supervision may be delegated to others, where appropriate; however, designated supervisors are responsible for ultimate supervision of assigned areas. The term "employee" as used in this Manual includes the registered representative ("RR") (and others as identified by Alpine) who may be an independent contractor for tax and compensation purposes.

This Manual is the property of Alpine and may not be provided to anyone outside of Alpine without the permission of the Chief Compliance Officer, Chief Financial Officer ("CFO") or Alpine's legal counsel.

This Manual should accomplish two objectives:

¨ First, it should provide Alpine's personnel with an awareness of the requirements of the laws, rules, and regulations governing broker-dealer and RRs activities.

¨ Second, it should provide procedures that ensure that Alpine's operations meet those requirements.

This Manual should be kept on hand for easy reference. You are encouraged to ask any questions you may have about the Manual. We expect you to be thoroughly familiar with our procedures and policies as set forth in this Manual. It is extremely important that compliance with these procedures and policies be of utmost importance.

Finally, it is not the intent of this Manual to provide an all inclusive guide concerning the legality of the numerous activities that may give rise to regulatory problems and, should an RR have a question concerning the legality or propriety of a transaction or activity, he or she should seek further guidance

ALPINE_LIT167875

from an appropriate principal of Alpine before taking any further action with respect thereto. Ultimately however, it is each RR's personal responsibility to learn and understand the legal and other requirements governing conduct of day-to-day business.

## Introduction

[FINRA Rule 2200 Series; FINRA Regulatory Notice 12-29]

This chapter explains regulatory and policy requirements when dealing with the public through a wide range of media including electronic media. In general,

- All communications must be truthful and balanced.
- Communications (incoming and outgoing) are subject to review by [The Firm]. Do not expect confidentiality for any communications that are received by you or that you send from [The Firm].
- [The Firm]'s facilities and systems (email, fax, *etc.*) should be used for business purposes only.
- Records of communications (incoming and outgoing) are retained by [The Firm] and are subject to review by regulators and subpoena in civil actions.

ALPINE_LIT167876

# 1 DESIGNATION OF SUPERVISORS AND OFFICES

## 1.1 Designation Of Supervisors

[NASD Rule 3010]

Applicable Rules: 3012(a)(1), 3010(b)(3), EDGA Rule 5.2, EDGX Rule 5.2, Nasdaq Rule 3012, Nasdaq OMX BX Rule 3012, Nasdaq OMX Phlx Rule 748, NYSE-Arca Rule 6.18

This section includes Alpine's designated supervisors responsible for supervision of the areas of business indicated.

**Date: November 1, 2012**

| Area/Department Supervised | Name/Title/ Location of Supervisor | Registration Status | Effective Date of Supervision | Responsibilities | RRs Supervised |
|---|---|---|---|---|---|
| FINRA and SEC Compliance | Leia Farmer | S-7, S-63, S-24, S-4, S-66 | May 14, 2012 | Compliance | Compliance personnel only |
| Retail Trading, Mutual Funds, Registered Representatives | Robert Tew, President, Salt Lake City | Principal, S-7, S-24, S-55, S-63 | May 1, 2011 | Retail trading, Registered Representatives | All Registered Representative |
| All Back Office Operations, Financial Records, General Operations | Todd Groskreutz, CFO, Financial and Operations Principal, COO, Branch Manager, Salt Lake City | Principal, S-7, S-24, S-27, S-63 | June 1, 1988 | Back Office Operations | Only as Specific to Financial Operations |
| CRD Electronic Filings | Todd Groskreutz, CFO, Financial and Operations Principal, Branch Manager, Salt Lake City | Principal, S-7, S-24, S-27, S-63 | June 1, 1988 | Financial and Electronic Reporting Requirements | Only as Specific to Financial and Electronic Reporting |
| | Leia Farmer, | S-7, S-63, S-24, S-4, S-66 | May 14, 2012 | Registration, Complaint, | Only as specific to |

ALPINE_LIT167877

| | CCO | | | Disclosure and other Compliance related filings | Registration, Disclosure, Complaint and Related filings |
|---|---|---|---|---|---|
| Trading, OATS, Market Making, Order Execution, Best Execution, Order Handling, Trade Reporting, Sales Transactions, NMS Rule 612, Regulation Sho | Robert Tew, Head Trader, Salt Lake City | Principal, S-7, S-24, S-55, S-63 | August 1, 2003 | Go-Trader Trading System, Review and Approval of New Accounts, Daily Order Ticket Review, SEC 21(a) Report, Monitoring Insider Trading, Other Trading Related Activities and Reporting and Reg Sho | All Traders |
| Incoming and Outgoing Communications | Leia Farmer | S-7, S-63, S-24, S-4, S-66 | May 14, 2012 | Review Communications including E-mail, Fax, Instant Messaging | Only Relative to Communications |
| Underwritings and Private Placements | Robert Tew, Syndicate, Underwriting and Private Placement Supervisor, Salt Lake City | S-7, S-24, S-55, S-63, | May 1, 2011 | Private and Public Offerings, Chinese Wall Procedures | Only Relative to Underwritings and Private Placements |
| Anti-Money Laundering (AML)/ Identity Theft Prevention Officer | Douglas Wawrzynski | | October 5, 2012 | AML Compliance and Reporting; Identity Theft Prevention Program | Only Relative to AML and Identity Theft Prevention Program |
| OSJ and Branch Office Management | Todd Groskreutz CFO, COO Financial and Operations Principal, Branch Manager, Salt Lake | Principal, S-7, S-24, S-27, S-63 | June 1, 2006 | Manage, Review and Supervise OSJ and Branch Offices | Only as specific to OSJ and Branch Management Functions |

ALPINE_LIT167878

| | City | | | | |
|---|---|---|---|---|---|
| Information Technology | IT Committee | | September 19, 2012 | Computer and Communication Systems, Data security, back-up, protection, and retrieval | None |
| Supervisory Controls<br><br>Direct Market Access (SEC Rule 15c3-5) | Todd Groskreutz | S-7, S-63 | March 5, 2012<br><br>November 1, 2012 | Establish, maintain, and enforce supervisory control policies and procedures | Only as specific to supervisory controls |
| Producing Managers | Todd Groskreutz | Principal S-7,S-24, S-27, S-63 | January 1, 2010 | Supervise and Review producing managers including customer activity | January 1, 2010 |

## 1.2 Designation Of Offices

[NASD Rule 3010; NASD Notice to Members 05-67; MSRB Rule G-27(b)(iii) and G-27(g)]

Alpine maintains the following office:

| Office Location | Type of Office* | Designated Supervisor(s) | Designated Person To Explain Office Records | Type(s) of Business Conducted at Office |
|---|---|---|---|---|
| Salt Lake City, Utah | OSJ | President, Branch Manager, Trading Supervisor, Communications Supervisor, Chief Compliance Officer, AML Compliance Officer | Todd Groskreutz | Retail, Trading; Private Placements; Correspondent Clearing |

*OSJ = Office of Supervisory Jurisdiction
*BR = Branch Office

ALPINE_LIT167879

**Non-Branch locations (if applicable):**

˙NSA = Non-sales location (limited to customer service, back office functions, *etc.*)
˙NSE = Non-securities location (associated person(s) primarily engaged in non-securities activities)
˙PR = Primary residence (associated person's primary residence used for securities business)
˙OPR = Locations other than primary residences (*e.g.,* other location used less than 30 business days/year for securities business)
˙OC = Office of convenience (location used occasionally and exclusively by appointment to meet with customers)
˙NON = Location used primarily to engage in non-securities transactions (no more than 25 securities transactions in a calendar year; advertising or sales literature (including business cards) must include location of supervising office)
˙TEMP = Temporary office established because of implementation of business continuity plan

## 1.3 Organization Chart and Line of Authority

| | | |
|---|---|---|
| Board of Directors: John Hurry, Chairman | | |
| The following positions and individuals report to the Board of Directors: | | |
| President:Robert Tew | Secretary / Treasurer; Chief Financial Officer; Branch Manager; Chief Operations Officer: Todd Groskreutz | |
| The following positions and individuals report to the President: | | |
| Trading Supervisor / Head Trader: Rob Tew | Chief Compliance Officer, Leia Farmer<br><br><br>Chief Legal Officer, Betsy Voter | AML Compliance Officer, Douglas Wawzyrinski | All Registered Representatives |
| The following positions and individuals report to the CFO: | | |
| Non-licensed employees | | |
| The following are identified as producing managers and supervisor is Todd Groskreutz: | | |
| Robert Tew, Head Trader | | |

ALPINE_LIT167880

ALPINE_LIT167881

# 2 OFFICES

## 2.1 Office Designations

[NASD Rule 3010; NASD Notice to Members 06-12, 05-67 and 05-66]

Main Office: 440 East 400 South, Salt Lake City, Utah 84111

### 2.1.1 Offices Of Supervisory Jurisdiction (OSJ)

[NASD Rule 3010(g)(1)]

An office that includes any of the following activities will be designated as an Office of Supervisory Jurisdiction (OSJ) with a resident principal responsible for supervision:

- Order execution and/or market making
- Structuring of public offerings or private placements
- Maintaining custody of customers' funds and/or securities
- Final acceptance (approval) of new accounts
- Review and approval of customer orders
- Final approval of advertising or sales literature
- Supervision of RRs at one or more other branch offices

### 2.1.2 Branch Offices Assigned To OSJs

[NASD Rule 3010(g)(2)]

Alpine may open branch offices. To the extent that Alpine establishes a branch office, each branch office that is not an OSJ will be supervised by an OSJ. A designated supervisor will be required to visit non-OSJ branch offices on a periodic basis and record the visit in a memorandum or other record to be retained by the designated supervisor for the branch location. All business transacted by non-OSJ branch offices must be processed through the supervising OSJ. The designated supervisor is responsible for supervision of the branch office's activities and maintaining files for complaints, correspondence, new accounts, advertising, and transactions originating from the branch office.

A branch office may be a "supervisory branch office" that has responsibility to supervise one or more other offices or a "non-supervisory branch office" that has no supervision over other offices.

### 2.1.3 Non-Branch Business Locations

| Responsibility | - The President of Alpine with respect to RR<br>- The Branch Manager with respect to locations<br>- The CCO with respect to compliance |
|---|---|
| Resources | - The use of a Location of Convenience must be submitted in writing by the RR to the President<br>- List of off-site RRs<br>- Order Records<br>- Daily Transaction Report<br>- Customer Quarterly Statements<br>- Correspondence<br>- Reg T records including prepayment requests, *etc.* |

ALPINE_LIT167882

| | |
|---|---|
| | • Other various records reviewed by the Branch Manager for supervision |
| **Frequency** | • Ongoing |
| **Action** | • Conduct ongoing supervisory reviews by the President<br>• Branch Manager will visit the non-branch location at least quarterly or require the RR(s) to visit the OSJ at least quarterly<br>• Branch Manager completes the Supervisor's Monthly Checklist and submits it monthly to the CCO |
| **Record** | • Branch Manager will retain a list of all Locations of Convenience<br>• Records as described in other sections of the Manual<br>• Branch Manager will record visits to non-branches and/or meetings with non-branch RRs |

Locations used occasionally and exclusively for appointments from time to time between RRs and Alpine's customers ("Locations of Convenience") and where Alpine has no other tangible presence are not deemed to be "branch offices." RRs conducting business at such locations are required to submit the address of such location to the Branch Manager and provide each customer with the address and telephone number of the branch office or OSJ supervises the RR.

Each non-branch business location will be assigned to Branch Manager for supervision. This includes RRs who are assigned to a branch office but transact business at a separate location. These RRs are referred to as off-site RRs. The Branch Manager is required to visit non-branch business locations and off-site RRs at least once in each quarter and record the visit in a memorandum or other record to be retained by the Branch Manager in a file for that location. Off-site RRs are required to process all business through the assigned branch office or OSJ. The Branch Manager is responsible for supervision of the non-branch office's activities and maintaining files for complaints, correspondence, new accounts, option accounts, advertising, and transactions originating from the office.

FINRA Notice To Members 98-38 should be considered part of this manual and consulted regarding supervisory obligations.

## 2.2 Use Of Office Space By Outsiders

Persons not affiliated with Alpine are not permitted to conduct business or maintain offices on Alpine premises. Office-sharing arrangements require the prior approval of the CFO.

## 2.3 Office Records

[SEC Securities Exchange Act of 1934 Rule 17a-3 and Rule 17a-4]

Each office is required to maintain or have access to certain records relating to the business conducted in the office. "Office," for records purposes, means any location where an associated person conducts business (not including a home office or the office of a customer that an RR visits regularly). "Conducting business" includes handling funds or securities or soliciting/accepting orders. The Branch Manager is the designated person who can explain the office records to regulators.

ALPINE_LIT167883

Following is a list of office records for the most recent two-year period that must be produced in office locations, upon request by regulators. It is not necessary to maintain physical records in office locations if they can be retrieved and reproduced promptly at the office where they are being requested. "Promptly" is generally understood to mean within 24 hours of the request.

- Order records (daily trade blotters, order tickets/memoranda, including for Alpine's account)
- Receipts/deliveries of securities, receipts/disbursements of cash, all other debits/credits
- Employee records (Forms U4 and U5, employment application, compensation agreements, CRD numbers, internal identifying numbers, offices where RR conducts business)
- Customer account records
- Complaints, until four years after the disposition of the complaint
- Transactions, by RR, including compensation earned, commission schedules, method by which compensation is determined
- Communications with the public (originals of communications received, copies of communications sent; approval of outgoing communications including correspondence, advertising and sales literature, sales scripts, and other outgoing communications requiring the supervisor's approval)
- Record naming the person in the office who can explain records
- Record listing the person responsible for policies and procedures
- WSP, including updates and revisions, until three years after termination of the use of the Manual

### 2.3.1 Retention Of Records At The Office

Offices are required to retain the following records:

- Order records (3 years, 2 recent years in an accessible location)
- New account records (6 years after account closing, in an accessible location)
- Correspondence, incoming and outgoing (3 years, 2 recent years in an accessible location)
- Advertising (3 years, 2 recent years in an accessible location)
- Operations records including records of receipt/delivery of securities or funds (3 years, 2 recent years in an accessible location)
- Complaints (4 years, 2 recent years in an accessible location)
- All other books and records for which there is no specified period under FINRA rules or applicable Exchange Act rules (6 years, 2 recent years in an accessible location)

### 2.3.2 Regulatory Requests For Records

If a regulator (SEC, SRO, state regulator, or other) requests office records (in person or by another means), the CCO should be contacted immediately. Alpine's CCO is obligated and responsible to provide prompt response to regulators' requests for information, therefore record retrieval procedure must begin immediately or as soon as possible after receipt of the request.

## 2.4 Changes In Branch Offices

[FINRA By-Laws, Article IV Section 8]

The CCO is responsible for filing the uniform branch office registration form (Form BR) with the CRD to reflect changes to existing offices or to register new offices. The CCO retains records of branch registration filings.

In addition, the CCO will verify state requirements before an office is opened and will file any necessary application or documents with state authorities which may include the secretary of state, taxing authorities, and/or broker-dealer licensing authorities.

ALPINE_LIT167884

## 2.5 Office Inspections

[NASD Rule 3010(c)(1); NASD IM 3010-1; FINRA Regulatory Notice 11-54]

| | |
|---|---|
| **Responsibility** | • CCO |
| **Resources** | • Various reports/information regarding office activities |
| **Frequency** | • Annual - prepare inspection schedule<br>• Per inspection schedule - conduct inspections |
| **Action** | • Maintain inspection program (and revise, as needed)<br>• Prepare schedule<br>• Conduct inspections<br>• Prepare reports and provide to management |
| **Record** | • The CCO retains the inspection program, schedule of inspections, reports, and the back-up files to the reports |

### 2.5.1 Inspection Cycle

Offices will be inspected according to the following schedule:

- OSJ and Branch offices - annually (includes offices that supervise other offices)
- Non-supervisory branch offices - at minimum every 3 years
- Non-branch offices - periodically as established by the CCO based on factors which may include:
    - Types of business conducted in the office
    - Volume of business conducted
    - Proximity of supervisors
    - Number of RRs and other personnel
    - Customer complaints, disciplinary actions and/or regulatory actions filed against office personnel
    - Prior year's inspection report findings
    - Other factors determined by the CCO

Some inspections will be conducted on an unannounced basis. Inspections are also scheduled based on additional risk-based factors, as explained in the next section.

### 2.5.2 Conducting Inspections

Inspections must be conducted by the CCO, who is independent of all other supervisors of the office being inspected. Inspections may not be conducted by anyone who:

- supervises the office being inspected (branch manager, *etc.*);
- is another supervisor in that office, unless such person is the CCO; or,
- is directly or indirectly supervised by either of the prior-listed supervisors.

Inspections generally include the following:

- Pre-inspection document/information review including review of prior report(s) for the office
- Scheduling a visit on either an announced or unannounced basis

ALPINE_LIT167885

- For branch offices, scheduling reviews at the supervising office to examine records of supervision
- During a physical inspection, reviewing records and interviewing personnel in accordance with the inspection program
- CCO may prepare a draft of findings and review those findings with the Branch Manager
- Preparing a final report incorporating the aforementioned responses, if a draft of findings was discussed
- Submission of the final report to the Board of Directors

The CCO, at its discretion, will initiate unscheduled inspections. Unscheduled inspections may occur when potential significant problems are identified, a change in office management warrants a special review, or at the request of the Board of Directors.

## 2.5.3 Heightened Inspection Requirements

[NASD Rule 3010(c)(3)]

| | |
|---|---|
| **Responsibility** | • CFO |
| **Resources** | • Revenue/commission records |
| **Frequency** | • As required |
| **Action** | • Evaluate revenue to determine whether the office is subject to heightened inspection procedures<br>• If it is, expand inspection program |
| **Record** | • The CFO retains records of revenue calculation and heightened inspection of offices subject to the requirement |

Heightened office inspection requirements apply if:

- a supervisor identified in Chapter 1.1 generates 20% or more of the revenue of the business of a branch office or OSJ.

Heightened inspections may include:

- unannounced visits
- increased frequency of inspections
- broadened scope of the inspections

## 2.5.4 Reports

[NASD Rule 3010(c)(2)]

Written reports of inspections will include:

- the name of the person who conducted the inspection and prepared the report

ALPINE_LIT167886

- the date(s) of the inspection
- areas reviewed which will include, at minimum (depending on types of business conducted in the office)
    - safeguarding customer funds and securities;
    - maintaining books and records;
    - supervising customer accounts serviced by the branch manager ("producing manager");
    - transmitting funds between customers and RRs and between customers and third parties;
    - validating customer address changes; and,
    - validating changes in customer account information.
- for any of the above areas **not** included in the report, an explanation of why they were not included (*i.e.*, the office does not accept funds or securities, the office does not have a producing manager, *etc.*).
- observations and exceptions regarding compliance with policies and procedures
- the office supervisor's response regarding exceptions and corrective action

Final reports will be distributed to the Board of Directors.

## 2.6 Display Of Certificates

[SIPC By-Laws, Article 11 Section 4(b)]

Branch offices are required to display certificates on their premises, including:

- SIPC symbol

## 2.7 Availability Of Rules

Each office that deals with public customers will maintain copies of rules for regulators where Alpine is a member. Where Internet access is available, this requirement is satisfied by providing access to the rules published on the regulators' web sites.

ALPINE_LIT167887

# 3 GENERAL EMPLOYEE POLICIES

## 3.1 Standards Of Conduct

[FINRA Rule 2010]

It is Alpine's policy and mandate to its employees to conduct Alpine's business under the high standards and principles of the rules governing its industry. Employees are expected to deal with customers in a fair and honest way and with the customer's interest of primary concern. It is against Alpine's policy that RRs and non-licensed employees suggest or otherwise encourage a customer to sign a form that has not been completed by that customer.

The CCO will distribute compliance policies and procedures to all employees and from time to time will issue updates, as needed.

As a licensed representative of Alpine Securities, you are engaged in a professional task which requires integrity, know-how and dedication. As such, you are expected to behave in a moral and ethical manner at all times. Any representative acting contrary to the above will be jeopardizing his/her position with the firm.

## 3.2 Outside Business Activities

[FINRA Rule 3270]

| | |
|---|---|
| **Responsibility** | • CCO or designee<br>• The CFO with respect to the CCO<br>• The Board of Directors with respect to the CFO |
| **Resources** | • Requests to engage in outside business activities<br>• Annual certifications<br>• Other potential indicators such as incoming or outgoing correspondence |
| **Frequency** | • As requests are received<br>• Annually |
| **Action** | • CCO, CFO or Board of Directors:<br>  o Question employee regarding potential unapproved outside business activities referenced in correspondence or other indicators of outside business activity<br>  o Refer requests to the Chief Compliance Officer<br>  o Review requests for any potential conflict with Alpine's business<br>  o Notify employee in writing of approval/disapproval and any limitations |
| **Record** | • Retain request and approval in employee's file |

ALPINE_LIT167888

Employees are required to disclose to Alpine, in writing, any outside business activities prior to engaging in such activity. Charitable activities are not included in this requirement unless the employee is being compensated. Outside business activities may include a wide range of activities including but not limited to the following:

- Employment with an outside entity
- Acting as an independent contractor to an outside party
- Serving as an officer, director, or partner
- Acting as a finder
- Referring someone and receiving a referral fee
- Receiving other compensation for services rendered outside the scope of employment with Alpine

Compensation may include salary, stock options or warrants, referral fees, or providing of services or products as remuneration. Generally, remuneration consisting of anything of present or future value for services rendered may be considered compensation.

Employees requesting approval to engage in outside business activities must complete the Outside Business Activity Request form and submit it to the CCO **prior to** engaging in the activity. The CCO will approve or disapprove the outside business activity in writing and notify the employee and the employee's supervisor.

## 3.3 Private Securities Transactions

[FINRA Rule 3040]

| | |
|---|---|
| **Responsibility** | • CCO<br>• CFO with respect to the CCO<br>• The Board of Directors with respect to CFO |
| **Resources** | • Requests to engage in private securities transactions<br>• Annual certifications<br>• Other indications of potential "selling away" such as in correspondence |
| **Frequency** | • As requests are received |
| **Action** | • Employee submits:<br>  ○ Requests or indications of private securities transactions to the CCO<br>• CCO:<br>  ○ Review requests and certifications<br>  ○ Follow up with employee regarding indicators of selling away<br>  ○ Notify employee in writing that private securities transaction is permitted or denied |
| **Record** | • Both the request and subsequent response are filed in employee's file |

Employees are not permitted to engage in private securities transactions without approval in writing (as defined by the FINRA), whether or not there is compensation paid for effecting the transaction. Private securities transactions are defined by the FINRA as any securities transaction outside the regular course or scope of an employee's employment with Alpine (sometimes referred to as "selling

ALPINE_LIT167889

away"). This does not include outside securities accounts approved by Alpine, transactions with immediate family members where the employee receives no selling compensation, and personal transactions in investment company and variable annuity securities.

RRs should note that promissory notes often are securities. Even if a promissory note is not deemed a security, the RR has the obligation to obtain Alpine's permission **before** engaging in any outside business activity involving the offer of promissory notes.

RRs are required to conduct their non-private selling activities through Alpine.

## 3.4 Employee And Employee Related Accounts

### 3.4.1 Employee And Employee Related Accounts Defined

Employee accounts include any accounts where an employee has a personal financial interest; the employee is the named trustee or custodian; or the employee otherwise has control over the account. "Accounts" include securities or commodities accounts at Alpine or other financial institutions including foreign or domestic broker-dealers, investment advisers, banks and other financial institutions.

Employee related accounts include accounts for relatives residing with the employee and accounts for any person who is supported, directly or indirectly, to a material extent by the employee.

### 3.4.2 Outside Accounts

[FINRA Rule 3050]

| | |
|---|---|
| **Responsibility** | • CCO<br>• CFO with respect to the CCO |
| **Resources** | • Requests for outside accounts<br>• Notification of existing outside accounts at time of hire<br>• Annual certifications<br>• Other |
| **Frequency** | • As required |
| **Action** | • Employee:<br>   o Refer requests to the CCO<br>• CCO:<br>   o Review requests and certifications<br>   o Notify employee by memo of approval or disapproval<br>   o Notify firm carrying the employee's outside account by letter regarding to whom duplicate confirmations and statements should be sent<br>   o Review confirmations and statements as they are received. Review for:<br>      ▪ Transactions in securities restricted by Alpine<br>      ▪ Transactions in new issues<br>      ▪ Large debit balances, very active trading, or other trading activity that may be of concern<br>   o For transactions in restricted securities, contact the employee and take corrective action which may include cancellation of the transaction<br>   o For trading activity that may be of concern, confer with |

ALPINE_LIT167890

| | employee directly regarding the nature of the activity and take appropriate corrective action, if necessary |
|---|---|
| **Record** | • Approval/disapproval memo to the employee's file<br>• Confirmations/statements initialed and filed in employee's file<br>• Contact with employee and corrective action, if appropriate, is documented on confirmations or statements or in a memo or note to the employee's file |

It is the general policy of Alpine to permit employees to maintain their securities accounts at Alpine. Alpine will permit its employees to maintain their securities account at another broker-dealer provided that duplicate confirmations and statements from the other dealer carrying the employee's account except for accounts set forth below are received by Alpine. This includes accounts with a commodities firm to trade security futures.

These requirements do not apply to accounts limited exclusively to transactions in unit investment trusts and variable contracts or redeemable securities in mutual funds or managed accounts. Employees are not required to have statements for accounts in unit investment trusts, variable contracts or redeemable secuities in mutual funds or in managed accounts delivered to Alpine.

### 3.4.3 Review Of Transactions

[NASD Rule 3010(d)]

| **Responsibility** | • CCO |
|---|---|
| **Resources** | • Employee and employee related account statements<br>• Employee and employee related trading activity |
| **Frequency** | • Monthly |
| **Action** | • Review employee and employee related accounts for possible concerns regarding:<br>    ○ Very active trading<br>    ○ Sizeable debit balances<br>    ○ Bounced checks<br>    ○ High risk trading patterns<br>    ○ Transfers between accounts, particularly employee or related accounts and customer accounts<br>    ○ Insider trading<br>• Where items of concern are identified, action to be taken depends on the circumstances, confer with the employee and his/her supervisor |
| **Record** | • Initials on customer monthly statements<br>• Records retained in employee account files |

Employees will be contacted about transactions that are potentially contrary to rules or Alpine policy.

### 3.4.4 Insider Trading

ALPINE_LIT167891

[SEC Securities Exchange Act of 1934 Rule 10b-5 and Section 10]

Employees are prohibited from effecting transactions based on knowledge of material, non-public information. The chapter *INSIDER TRADING* explains Alpine's policy and all employees are expected to be familiar with and adhere to the policy.

### 3.4.5 Sharing In Accounts

[FINRA Rule 2150]

| | |
|---|---|
| **Responsibility** | • President<br>• CFO |
| **Resources** | • New account forms<br>• Requests to open accounts jointly with customers must be approved by the President |
| **Frequency** | • As required |
| **Action** | • President:<br>   o When approving new accounts, identify accounts where an RR is potentially sharing in the account<br>   o Confer with employee as to the nature of the shared account (what is the relationship between the employee and the other account owner, allocation of profits and losses)<br>   o Refer shared accounts or requests to share in an account to the CFO<br>• CFO:<br>   o Require written request from employee and written authorization from customer<br>   o Review and determine whether shared account is appropriate<br>   o Approve or disapprove the request in writing<br>   o Notify employee and President of approval or disapproval |
| **Record** | • Copies of employee request, customer's written authorization, and notation of approval or disapproval is retained with the new account records for the account and in RRs file |

Alpine and its RRs may not share directly or indirectly in the profits or losses of a customer's account (with the exception of performance-based fees specifically permitted under rules governing investment adviser and other permitted arrangements). As a general policy, RRs may not participate in an account that includes customers who are not family members of the employee.

An RR may be a joint owner in an account with a customer only under the following conditions:

- the RR submits a written request to the CFO accompanied by signed authorization from the customer
- the RR is a disclosed owner of the account
- the RR shares in losses and gains only in proportion to the RR's monetary contribution to the account (not applicable to accounts shared with immediate family members)
- the RR receives written approval from CFO

ALPINE_LIT167892

### 3.4.6 Prohibition On Purchases Of Initial Public Offerings (IPOs)

[FINRA Rule 5130]

Employees and their immediate families (parents, spouse, children, in-laws, siblings) are prohibited from purchasing IPOs. This includes sales to anyone materially supported by an employee or a member of the employee's immediate family.

### 3.4.7 Research Restrictions

Employee accounts are restricted from acting on a new or changed research recommendation for 24 hours from the time of announcement or publication. Restrictions are announced internally and trading activity is monitored for compliance. Failure to comply may result in cancellation of the transaction, and any resulting loss will be charged to the employee.

### 3.4.8 Restrictions On Personal Accounts Of Certain Alpine Personnel

Personnel in certain departments such as research, trading, and investment banking may be subject to additional requirements or restrictions on the trading in their personal accounts. Affected personnel will be provided with any additional policies affecting their personal transactions.

## 3.5 Gifts, Gratuities And Entertainment

[FINRA Rule 2310(c)(2)(A), 2320(g)(4)(A), 2830(l)(5)(A) and 3220; FINRA Report on Examination Findings Regarding Gifts and Gratuities: http://www.finra.org/web/groups/rules_regs/documents/rules_regs/p018025.pdf; NASDAQ Rule 3060]

| | |
|---|---|
| **Responsibility** | • President<br>• CFO |
| **Resources** | • Requests to give or receive gifts<br>• Expense reports<br>• Annual certification |
| **Frequency** | • As required |
| **Action** | • President:<br>   o Refer requests regarding gifts and gratuities to the CFO<br>   o Review expense reports for reasonableness and compliance with expense policies and approve or disapprove<br>• CFO:<br>   o Review and approve or disapprove gifts and gratuities to be given, aggregated on a calendar year basis to determine compliance with the $100 annual limit |
| **Record** | • Expense reports<br>• Expense reports and requests for approval in employee file |

Gifts, gratuities, and entertainment are subject to regulators' limitations. Failure to comply may result in fines or other regulatory actions against the employee and Alpine. **It is important for all employees to know and comply with this policy.** Questions regarding this policy on gifts and entertainment should be referred to the CCO. Key requirements include:

- **Gifts to others are limited to $100 per year per person** (other than "personal gifts" defined in the policy).
  - Multiple gifts to the same person are aggregated, *i.e.,* the total of all gifts in any year cannot exceed $100 to one person.

ALPINE_LIT167893

- o   "Personal gifts" are excluded (as discussed below).
- **Receiving** gifts is limited.
- An **employee must host entertainment** to avoid entertainment being considered a "gift" subject to limitations.
- **Records of entertainment** must include details of who was entertained and the nature of entertainment.
- **Gifts to labor union employees** must be reported to the government.
- **The CFO must be notified** of gifts to others.
- **The CFO must be notified** of gifts received (other than personal gifts).
- Gift requirements (whether the gift is given or received) **do not apply to personal gifts** to immediate family members (parents, children, grandparents, siblings, spouse, in-laws) who also happen to be customers and where the gift is unrelated to Alpine's business. The policy also does not apply to occasional personal gifts to others (such as a wedding gift or a congratulatory gift for the birth of a child).
- **If Alpine pays for the gift** or reimburses the employee for the cost of the gift, the gift is subject to the requirements of this policy.
- **Gifts incidental to entertainment** (*e.g.,* a golf shirt given during a golf outing, *etc.* ) are considered gifts subject to reporting to the CFO and the gift limitations.

### 3.5.1 Gifts To Others

Gifts relating to Alpine's business are limited to $100 per year per person. Gifts of tickets to sporting events or similar gifts where the employee does not accompany the recipient are subject to the limitations on gifts and gratuities. Such gifts may not be so frequent or so expensive as to raise a suggestion of unethical conduct.


Employees of regulators are also subject to rule limitations regarding gifts to them from broker-dealers and their employees. The CCO should be contacted for guidance before giving gifts to employees of regulators.


Gifts and gratuities are not permitted when given for the purpose of influencing or rewarding the action of a person in connection with the publication of information which has or is intended to have an effect upon the market price of any security.

### 3.5.2 Accepting Gifts

Employees may not solicit gifts or gratuities from customers or other persons maintaining business dealings with Alpine. Employees are not permitted to accept gifts from outside vendors currently doing business with Alpine or seeking future business without the written approval of the CFO. This policy does not include customary business lunches or entertainment; promotional items (caps, T-shirts, pens, *etc.*); or gifts of nominal (less than $100.00) value.

### 3.5.3 Entertainment

Entertainment of customers or prospective customers must be reasonable and not so expensive it raises a suggestion of unethical conduct. All entertainment and related expenses must be detailed on an expense form with receipts attached for expenses over $100.00. Expense forms should be submitted to the CFO within 30 days of incurring the expenses.


The limitation on gifts and gratuities does not apply to usual business entertainment such as dinners or sporting events where the employee hosts the entertainment, though such expenses should be reasonable. "Entertainment" includes a broad range of activities such as trips, parties, and other activities where an employee hosts someone related to Alpine's business. Questions regarding the reasonableness of proposed entertainment and related expenses should be referred to the CCO.

ALPINE_LIT167894

### 3.5.4 Gifts, Loans, And Entertainment Involving Unions And Union-Affiliated Individuals

[Labor-Management Reporting And Disclosure Act of 1959 (LMRDA) and DOL Q and A http://www.dol.gov/esa/regs/compliance/olms/LM30_LM10_Trusts_Info.htm; DOL advisory memo at http://www.dol.gov/esa/regs/compliance/olms/lm10_advisory.htm]

| Responsibility | • CFO |
|---|---|
| Resources | • Expense reports<br>• Annual Employee Certification |
| Frequency | • Monthly<br>• Annually |
| Action | • File Form LM-10 within 90 days of fiscal year end<br>• Include reportable gifts, loans, entertainment, *etc.* excluding de minimis amounts of $250 or less<br>• Review Annual Employee Certifications to identify union-related gifts, loans, *etc.* and follow up to include item in annual reporting on Form LM-10 |
| Record | • Vouchers, worksheets, receipts, and other records<br>• Filed Form LM-10 (retained for 5 years)<br>• Annual Employee Certifications with notes of action taken, if any |

The Department of Labor (DOL), under a federal act, requires Alpine to report any payment or loan, direct or indirect, of money or other things of value (including reimbursed expenses), or any promise or agreement to make such payments, to any labor organization or officer, agent, shop steward or other representative or employee of a labor organization. This includes entertainment (cost of meals, *etc.*), expenses, or giving gifts or other things that exceed $250.00 in value where the recipient or beneficiary involves a union or union-affiliated individual.

When reporting gifts, entertainment, loans, and other payments, employees must identify when a union or union-affiliated individual is involved. Employees are obligated to report such items to Alpine regardless of the dollar amount involved.

## 3.6 Privacy Policy

[SEC Regulation S-P]

Information regarding customer accounts for individuals is subject to SEC Regulation S-P "Privacy Of Consumer Financial Information." This section explains employees' obligation to maintain the privacy of information. A section *Customer Privacy Policies And Procedures* in the chapter *COMMUNICATIONS WITH THE PUBLIC* outlines firm procedures.

1. Regulation S-P requirements apply to individual and not institutional accounts and include U.S. and foreign accounts.
2. Protected information is termed "nonpublic personal information." This is information obtained by [The Firm] that is not deemed "public information" which is defined as information that may

ALPINE_LIT167895

be obtained from three sources: federal, state or local government records; widely distributed media; or disclosures to the general public that are required to be made by federal, state, or local law.

3. At the time an account is opened the customer is provided with [The Firm]'s privacy policy and is given the opportunity to opt out of arrangements to share nonpublic information with nonaffiliated third parties. The privacy policy is also provided to customers on an annual basis.

4. Employees are prohibited from sharing or releasing nonpublic personal information other than to authorized parties. This includes a prohibition against:
   o Sending internal reports or other information about firm customers to a non-affiliated 3rd party (unless authorized).
   o Sending internal or other documents that include customer non public information to your personal e-mail address.

Questions about providing customer information should be referred to Compliance.

## 3.7 Reporting Possible Law Or Rule Violations

[SEC Securities Exchange Act of 1934 Section 21F; SEC Rule 21F; FINRA Rule 4530(b)]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer (or, if the CCO is involved in the potential wrongdoing, an alternate senior manager) |
| **Resources** | • Reports of possible law or rule violations from employees<br>• Referrals from outside sources such as regulators |
| **Frequency** | • Investigate reports: As required<br>• Employee education: At least annually |
| **Action** | • Acknowledge the employee's report and advise confidentiality will be maintained and there will be no retaliation for reporting<br>• Determine who will be involved in the investigation and notify those persons of the confidentiality of the investigation<br>• Conduct the investigation using tools appropriate to the issue (interviewing employees, reviewing internal/external reports, engaging counsel, etc.)<br>• Determine whether there was potential wrongdoing and decide whether a report should be made to regulators<br>• Take internal corrective action, as appropriate<br>• Advise the reporting employee of the status of the investigation<br>• Include reporting of possible law or rule violations and Alpine's process for internal investigations as part of regular employee education |
| **Record** | • Report from employee<br>• Information regarding the investigation including records reviewed, who is involved, what steps taken, reports to regulators (if appropriate), conclusion of investigation<br>• Records of employee education including how education is conducted (classes, online education, compliance memos, etc.), who participates, subjects included, and when it occurs |

It is the intent of Alpine to adhere to all laws and regulations that apply to the organization; the underlying purpose of this policy is to support the organization's goal of legal compliance. The support of all employees is necessary to achieve compliance with various laws and regulations.

ALPINE_LIT167896

### 3.7.1 Reporting

Employees should report possible crimes or rule violations involving Alpine, a department, or an employee or employees as well as outside vendors or service providers. Reporting may be made to any or all of the following, particularly where the employee's supervisor may be involved in the possible wrongdoing.

1. Your supervisor
2. Your supervisor's supervisor
3. The Chief Compliance Officer
4. The General Counsel
5. The Chief Executive Officer and/or President

### 3.7.2 Confidentiality Of Employee Reporting

All reports will be treated as confidential. The employee's identification will be kept confidential other than to those who need to know such as the compliance officer or counsel or someone else conducting an investigation. Any person identified in the report as a potential wrongdoer will not be provided the name of the person who has filed a report.

### 3.7.3 Notification Of Chief Compliance Officer

A supervisor or other manager who receives a report of possible violations should immediately refer the matter to the Chief Compliance Officer who is responsible for conducting an investigation and overseeing the review until its conclusion, including potential reporting to a regulator. If the Chief Compliance Officer is involved in the potential wrongdoing, the member of management to whom the issue is reported will be responsible for conducting the investigation.

### 3.7.4 Investigation

Alpine will promptly investigate the reported possible wrongdoing and determine what action is required. Outside counsel may be engaged as part of the investigation. The reporting employee will be advised of the conclusion or resolution of the investigation.

### 3.7.5 Anti-Retaliation

[The Firm] will not retaliate against an employee who reports some practice of [The Firm], a department, or employee(s) or of another individual or entity with whom [The Firm] has a business relationship that may represent a rule or law violation. [The Firm] will not retaliate against employees who disclose or threaten to disclose (to [The Firm] or a public body such as a regulator) any activity, policy, or practice of [The Firm] that the employee believes is in violation of a law, or a rule, or regulation mandated pursuant to law.

Supervisors and others are prohibited from engaging in discipline, threats, or discriminatory actions against employees for engaging in whistleblowing activities.

### 3.7.6 Federal Whistleblower Laws And Rules

The Securities Exchange Act includes Sec. 21F and the SEC has adopted Rule 21F to implement Sec. 21F that provides for reporting possible violation of federal securities laws and potential rewards for information that leads to successful enforcement of a covered judicial or administrative action where monetary sanctions equal $1,000,000 or more. The Sarbanes-Oxley Act of 2002 (which governs public companies) and the Foreign Corrupt Practices Act (FCPA) also have whistleblower provisions.

## 3.8 Charitable Contributions

[FINRA Notice to Members 06-21]

ALPINE_LIT167897

| Responsibility | • CFO |
|---|---|
| Resources | • Requests to make charitable contributions |
| Frequency | • As requests are received |
| Action | • Review contribution to identify potential conflicts of interest<br>• Approve or disapprove in writing |
| Record | • Record of requests and approval or disapproval, including date reviewed and placed in RR's file |

When an employee or an agent of a customer such as a mutual fund, pension plan, or investment manager solicits a substantial charitable contribution from Alpine or an RR, there may be a conflict of interest. For example, if an investment manager requests a $10,000 contribution to a charity, this could be construed as a condition for the investment manager to direct business to Alpine. There can be no quid pro quo between contributions and business conducted with Alpine.

To avoid potential conflicts of interest, Alpine has established the following guidelines for handling such requests.

1. Charitable giving by Alpine or foundations created by Alpine is subject to review by the Board of Directors at least annually.
2. Contributions of $10,000 or more solicited by an employee or agent of a customer require the prior approval of the CFO and will require the approval of someone representing the customer other than the person soliciting the contribution.
3. Contributions cannot be based on the actual or anticipated level of business done by the customer.
4. These requirements do not apply to a retail customer who solicits a charitable contribution when acting in his or her individual capacity.

## 3.9 Media Contact Is Limited To Certain Authorized Employees

| Responsibility | • Chief Compliance Officer |
|---|---|
| Resources | • Requests to communicate with the media<br>• Indications an unauthorized person has had media contact |
| Frequency | • As required |
| Action | • For requests, determine nature of contact and whether the individual is or should be authorized to engage in the contact<br>• If necessary, notify the employee whether contact will be permitted and if so, provide guidelines<br>• For unauthorized contact, confer with the employee |
| Record | • Maintain a list of authorized persons and limitations on their contact, if appropriate |

Alpine is sometimes contacted by media representatives (television, radio, newspapers, magazines, and other types of media). Employees who are contacted by media representatives are not permitted to comment but must refer the representative to one of the following individuals within Alpine:

ALPINE_LIT167898

- Board of Directors
- CCO

Individuals authorized to speak to the media are expected to make comments consistent with good taste and Alpine's opinion or position on matters discussed.

## 3.10 Requests For Information From Outside Sources

| Responsibility | • CCO |
|---|---|
| Resources | • Written or oral requests for information<br>• Subpoenas<br>• Other |
| Frequency | • As required |
| Action | • CCO responds, as appropriate |
| Record | • Retain record of response in legal, regulatory, or other files |

Alpine and its employees are sometimes contacted by outside parties such as regulators (SEC, FINRA, exchanges, state and other regulators), attorneys and governmental agencies (*e.g.,* the IRS) that request information about customer accounts, Alpine activities, or an individual employee's activities.

Information regarding customer accounts, Alpine and its employees is considered confidential and may be released only to those authorized to receive it. Any requests from outside parties (other than the principal or authorized person on behalf of an account requesting information on the account) should be immediately referred to the CCO for response. This includes requests received in any form whether written, by phone, or in person. This also includes visits by regulators. Proof of identification should be requested and the CCO immediately notified.

## 3.11 Internal Reviews And Investigations

If necessary, Alpine may conduct an internal review or investigation. Employees may be requested for information that may include an employee's signed written statement. Failure to provide requested information may result in disciplinary action, including termination.

## 3.12 Internal Disciplinary Actions

The Firm's goal in administering discipline is to take measures to maintain the quality of service provided to our customers by encouraging appropriate behavior. The expected result of these measures is the deterrence of inappropriate behavior and, when improper activity occurs, to take corrective action commensurate with the activity.

## 3.13 Employee Obligation To Notify The Firm And The Firm's Obligation To Report

[FINRA Rule 4530]

| Responsibility | • Designated Supervisor |
|---|---|

ALPINE_LIT167899

| | |
|---|---|
| **Resources** | • Information provided by employees including information from Annual Employee Certifications<br>• Lawsuits and arbitrations<br>• Regulatory actions<br>• Criminal actions<br>• FINRA compliance reports |
| **Frequency** | • As required |
| **Action** | • Determine whether information or events are reportable including updating the RR's Form U4 or U5<br>• File information electronically with FINRA |
| **Record** | • Record of electronic filings<br>• Records of updates to Form U4 or U5 |

Regulators require reporting of certain events and updating of Forms U4 and U5 when previously-filed information changes. **Employees are obligated to notify Compliance if there are changes to Form U4 responses and report other information required by rule or by Alpine.**

The following is an excerpt from FINRA Rule 4530 that outlines events that require reporting:

1. the member or an associated person of the member:
   o has been found to have violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body, self-regulatory organization or business or professional organization;
   o is the subject of any written customer complaint involving allegations of theft or misappropriation of funds or securities or of forgery;
   o is named as a defendant or respondent in any proceeding brought by a domestic or foreign regulatory body or self-regulatory organization alleging the violation of any provision of the Exchange Act, or of any other federal, state or foreign securities, insurance or commodities statute, or of any rule or regulation thereunder, or of any provision of the by-laws, rules or similar governing instruments of any securities, insurance or commodities domestic or foreign regulatory body or self-regulatory organization;
   o is denied registration or is expelled, enjoined, directed to cease and desist, suspended or otherwise disciplined by any securities, insurance or commodities industry domestic or foreign regulatory body or self-regulatory organization or is denied membership or continued membership in any such self-regulatory organization; or is barred from becoming associated with any member of any such self-regulatory organization;
   o is indicted, or convicted of, or pleads guilty to, or pleads no contest to, any felony; or any misdemeanor that involves the purchase or sale of any security, the taking of a false oath, the making of a false report, bribery, perjury, burglary, larceny, theft, robbery, extortion, forgery, counterfeiting, fraudulent concealment, embezzlement, fraudulent conversion, or misappropriation of funds, or securities, or a conspiracy to commit any of these offenses, or substantially equivalent activity in a domestic, military or foreign court;

ALPINE_LIT167900

- o is a director, controlling stockholder, partner, officer or sole proprietor of, or an associated person with, a broker, dealer, investment company, investment advisor, underwriter or insurance company that was suspended, expelled or had its registration denied or revoked by any domestic or foreign regulatory body, jurisdiction or organization or is associated in such a capacity with a bank, trust company or other financial institution that was convicted of or pleaded no contest to, any felony or misdemeanor in a domestic or foreign court;
- o is a defendant or respondent in any securities- or commodities-related civil litigation or arbitration, is a defendant or respondent in any financial-related insurance civil litigation or arbitration, or is the subject of any claim for damages by a customer, broker or dealer that relates to the provision of financial services or relates to a financial transaction, and such civil litigation, arbitration or claim for damages has been disposed of by judgment, award or settlement for an amount exceeding $15,000. However, when the member is the defendant or respondent or is the subject of any claim for damages by a customer, broker or dealer, then the reporting to FINRA shall be required only when such judgment, award or settlement is for an amount exceeding $25,000; or
- o is, or is involved in the sale of any financial instrument, the provision of any investment advice or the financing of any such activities with any person who is, subject to a "statutory disqualification" as that term is defined in the Exchange Act. The report shall include the name of the person subject to the statutory disqualification and details concerning the disqualification; or
2. an associated person of the member is the subject of any disciplinary action taken by the member involving suspension, termination, the withholding of compensation or of any other remuneration in excess of $2,500, the imposition of fines in excess of $2,500 or is otherwise disciplined in any manner that would have a significant limitation on the individual's activities on a temporary or permanent basis.

In addition, employees are required to promptly report any of the following to Compliance:

- A temporary or permanent injunction issued by any court and involving securities, commodities, insurance, or banking matters
- Any customer complaint (securities or commodities) including a written complaint, civil litigation, or arbitration
- An arrest, indictment, arraignment, conviction, pleading guilty or no contest to any felony or misdemeanor (other than misdemeanor traffic offenses)
- A bankruptcy proceeding or unsatisfied liens or judgments

### 3.13.1 Reporting Requirements

Alpine will report specified events involving the firm or an associated person to FINRA via the Regulatory Filings Application on the FINRA Firm Gateway no later than 30 calendar days after Alpine knows of the event. This is in addition to any obligation to update an associated person's U4 or U5 or Alpine's Form BD.

Alpine will promptly report to FINRA (not later than 30 calendar days after Alpine has concluded or reasonably should have concluded) that an associated person of Alpine or Alpine itself has violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body or self-regulatory organization.

Relating to reported events, Alpine will file with FINRA copies of the following. Events already reported on Form U4 with an affirmative request to satisfy Rule 4530 reporting requirements and FINRA findings and actions will not be reported separately.

ALPINE_LIT167901

1. any indictment, information or other criminal complaint or plea agreement for conduct reportable under paragraph (a)(1)(E) of this Rule;
2. any complaint in which a member is named as a defendant or respondent in any securities- or commodities-related private civil litigation, or is named as a defendant or respondent in any financial-related insurance private civil litigation;
3. any securities- or commodities-related arbitration claim, or financial-related insurance arbitration claim, filed against a member in any forum other than the FINRA Dispute Resolution forum;
4. any indictment, information or other criminal complaint, any plea agreement, or any private civil complaint or arbitration claim against a person associated with a member that is reportable under question 14 on Form U4, irrespective of any dollar thresholds Form U4 imposes for notification, unless, in the case of an arbitration claim, the claim has been filed in the FINRA Dispute Resolution forum.

## 3.14 Money Laundering

[FINRA Rule 3310; Bank Secrecy Act]

This section provides a brief overview of the employee's responsibilities concerning the prevention and detection of money laundering. Please refer to the chapter titled "*Anti-Money Laundering (AML) Program*" for more detailed information about Alpine's AML Program.

### 3.14.1 Reports Of AML Non-Compliance And Other Potential Crimes

All employees are obligated to promptly report to the AML Compliance Officer or designee any known or suspected violations of anti-money laundering policies as well as other suspected violations or crimes. If the potential violation implicates the AML Officer, it should be reported to a senior officer of Alpine. All reports are confidential and the employee will suffer no retaliation for making them.

**What to report:** Crimes or suspected crimes by individuals (whether associated with Alpine, a customer, or prospective customer) are required to be reported. This includes suspicion that Alpine is being used as a conduit for criminal activity such as money laundering or structuring transactions (discussed below) to evade the Bank Secrecy Act reporting requirements. There is no clear definition of what constitutes a "crime." If you believe some improper or illegal activity is occurring, it is your obligation to be attentive and alert to the red flags and report to the AML Compliance Officer or designee any new or existing customers who may be engaged in violations of anti-money laundering regulations.

**SAR reports:** By law, Alpine and its employees cannot disclose to the customer or anyone other than authorized parties that it has filed a SAR or provide information that would reveal the existence of a SAR. Questions regarding SAR filings should be referred to Compliance. If you become aware of an unauthorized disclosure of an SAR or you receive a subpoena for an SAR, **immediately contact the Compliance Department**. Designated Compliance personnel will be responsible for contacting FINCEN to report the unauthorized disclosure.

### 3.14.2 Identity Theft

Identity thieves use someone's personal identifying information to open new accounts and misuse existing accounts. Alpine has established an Identity Theft Prevention Program (ITPP) to help detect and prevent identity theft. Many elements of detecting or preventing identity theft utilize similar techniques to that of the anti-money laundering (AML) requirements included within these policies.

The ITPP is based on identifying "red flags" which may indicate an occurrence of identity theft. *It is the responsibility of all employees to be attentive and alert to the red flags and report to the AML Compliance Officer any new or existing customers who may be engaged in violations of*

ALPINE_LIT167902

*anti-money laundering regulations, identity theft or who have reported an instance of identity theft.*

For a list of potential identity theft red flags, refer to the section titled "*Red Flag Identification and Detection Grid*" located in the ***Identity Theft Prevention Program (FTC Fact Act Red Flags Rule)*** section.

## 3.15 Emergency Business Recovery Procedures

[FINRA Rule 4370]

Alpine has a *Business Continuity Plan* ("BCP") that assigns responsibilities and outlines procedures in the event of a disaster, emergency or pandemic which impacts the ability of Alpine to continue conducting business (also termed a "significant business disruption"). Examples of a significant business disruption include a regional power outage; disruption at another company that provides services critical to Alpine; and destruction of an office or other facilities by natural causes or by other means. The BCP designates employees who are responsible for employee safety and protection of firm property, records, and customer assets.

In the event of a disruption, employees will be given instructions by authorized personnel. Depending on the nature of the emergency, it may be necessary to use alternate communication systems; transfer personnel and/or business activities to alternate office space; or transfer Alpine's business to other brokerage firms or financial institutions until normal operations can be resumed.

Alpine has established procedures for contacting employees in the event of an emergency. If Alpine conducts a test of its emergency procedures, all employees are required to participate as if the emergency were real. Past emergencies affecting the securities industry have shown that preparedness and cooperation are key to maximizing the safety of employees and minimizing business interruptions. It is important for all employees to follow instructions from senior management and other authorized key personnel during any drill or when an emergency occurs.

Questions regarding Alpine's Business Continuity Plan may be referred to the Chief Operating Officer.

| Responsibility | • COO |
|---|---|
| Resources | • Business Continuity Records |
| Frequency | • Annually or as required |
| Action | • Administer the Business Continuity Plan<br>• Perform annual tests for compliance with the policy |
| Record | • Copies of Alpine's business continuity plan<br>• Copies of dates in which the plan is tested |

[Insert Section Here]

ALPINE_LIT167903

## 3.16 Prohibited Activities

| | |
|---|---|
| **Responsibility** | • President for RR<br>• Branch Manager for non-licensed employees |
| **Resources** | • Various (referral of items, direct identification, review of transactions, correspondence, *etc.* depending on the nature of the prohibited activity) |
| **Frequency** | • As required |
| **Action** | • Take corrective action which may include:<br>  ○ Conferring with the employee<br>  ○ Referring the matter to the CCO<br>  ○ Issuing a written admonition<br>  ○ Restricting the activities of or transactions handled by the employee<br>  ○ Suspending the employee<br>  ○ Termination |
| **Record** | • The record of action taken depends on the nature and seriousness of the prohibited activity. Records, if needed, may be in different forms, including the following:<br>  ○ Designated supervisors may record action taken in supervisory logs, Daytimers, memos to employees' files, *etc.*<br>  ○ The Branch Manager or President may record action by memo to the employee's file |

### 3.16.1 Registered Representatives

RRs (including principals handling customer accounts) are specifically prohibited from doing any of the following. A RR may not:

(1) Engage in "private" securities transactions or any transaction not sponsored or authorized by Alpine. A RR may not effect securities transactions for any person or entity outside of the scope of his or her employment with Alpine, unless he or she gives the CCO prior written notice of the proposed transaction and the CCO (or the CFO if this involves the CCO) gives the RR written approval of such transaction. This prohibition is intended to cover any investment transaction;

(2) Raise money individually or as an agent for any business enterprise whatsoever without the advance written consent of the CCO;

(3) Warrant or guarantee the present or future value or price of any security or warrant that any company, partnership, or issuer of securities will meet its obligations, promises, or comply with its representations to investors;

(4) Agree to repurchase a security at some future time from a client for the RR's account, for Alpine's account, or for any other account;

ALPINE_LIT167904

(5) Raise money for a charitable or political organization without informing the CFO prior to the commencement of such activity;

(6) Act as personal custodian of securities, stock powers, money, or other property belonging to a client;

(7) Arrange for or accept authority to be granted access to a safety deposit box or other safekeeping place belonging to a customer;

(8) Borrow money or securities from a client;

(9) Receive compensation for securities transactions from anyone, including clients or other securities dealers other than from Alpine, for services rendered. This includes finder's fees, purchaser representative fees, investment advisory fees, and commissions of any sort. This prohibition can be waived in writing only by the CCO or CFO, in advance of any transaction;

(10) Make arrangements for borrowing of monies by a client for the purpose of purchasing securities;

(11) Maintain a joint account in securities with any client, or share any benefit, profit, or loss with any client, resulting from a securities transaction, without prior approval of the President or CFO;

(12) Enter into any business transaction or relationship jointly with a client without the specific advance written approval of the CCO;

(13) Make any written or oral representations regarding securities, other than those contained in the official offering prospectus if the issue is under registration, or in materials specifically authorized by Alpine if the securities are the subject of a private placement;

(14) Accept an account from a customer on a discretionary basis, unless approval is first received from the CCO;

(15) Make arrangements for the purchase or sale of securities for a customer/client, except through Alpine, unless specifically authorized by the CCO;

(16) Advertise in any newspaper or publication without obtaining written approval of the CCO;

(17) Offer or sell securities in any state in which the registered representative is not registered with the applicable state securities authority;

(18) Recommend the purchase of securities or the continuing purchase of securities in amounts which are inconsistent with the reasonable expectation that the customer has the financial ability to meet such a commitment;

ALPINE_LIT167905

(19) Compensate any person, firm, or entity, other than a RR of Alpine, for any services rendered in connection with the sale of a security to a customer without express written advance approval of the CCO;

(20) Forward, or agree to forward, confirmations or statements of account other than to the official post office address of the customer;

(21) Execute an order for the RR's own account prior to executing an order by a customer for the same security when both orders originate at or about the same time;

(22) "Churn" customers' accounts;

(23) Accept a gift in excess of $150 from any customer, business associate, member firm, associated person of a member firm, or person having a beneficial interest during the past twelve months in any issuer in which Alpine makes a market or for which Alpine acted as underwriter or selling agent;

(24) Require that the purchase or sale of a security on behalf of a customer be tied to the purchase or sale by the customer of a different security;

(25) Trade on inside information (for further information see "Insider Transactions" below);

(26) Execute transactions for a customer's account if said transactions have not been authorized by the customer;

(27) Engage in any business activity outside of Alpine without first disclosing said business activity to Alpine and obtaining the prior approval of the cco in writing. Business activity would include but not be limited to, maintaining a brokerage or investment account away from Alpine. The definition specifically excludes any non-equities based insurance products and any bank accounts or products that are FDIC insured. Alpine attributes any brokerage or investment account to which the RR is a beneficial owner to the RR for the purposes of this prohibition. The maintenance of brokerage accounts away from Alpine poses additional compliance problems when the firm is required to monitor a RR's personal trading. To remedy this difficulty, a RR who wishes to maintain or be a beneficial owner of a brokerage or investment account away from Alpine must not only disclose the behavior, but have duplicate account statements sent directly to Alpine, c/o Compliance or CCO. The records will be kept confidential and will be used only to comply with the Rules proscribed by the FINRA.

## 3.16.2 Use Of Firm Name

No employee may use Alpine's name in any manner which could be reasonably misinterpreted to indicate a tie-in between Alpine and any outside activity of the employee.

## 3.16.3 High Pressure Sales Tactics

Alpine and its RRs will not engage in high pressure sales tactics which may include excessive telephone calls, implying that a price may change on a security if the customer doesn't act immediately, or falsely representing that there is a limited supply of a security at a particular price.

## 3.16.4 Providing Tax Advice Not Permitted

Employees may not give tax advice to customers since Alpine and its employees are not engaged in the practice of providing tax advice. Customers requiring specific tax guidance should be referred to their personal tax advisers.

ALPINE_LIT167906

### 3.16.5 Rebates Of Commission

[FINRA Rule 2420]

Employees are prohibited from rebating to anyone, directly or indirectly, any commission or compensation received.

### 3.16.6 Sharing Commissions Or Fees With Non-Registered Persons

[FINRA Rule 2420]

| Responsibility | • CFO |
|---|---|
| Resources | • Payroll/commissions reports<br>• Requests to share commissions |
| Frequency | • Ongoing (payroll/commission reports)<br>• As required (requests) |
| Action | • President:<br>   o Refer all requests to the CFO for approval<br>   o Discontinue any unapproved arrangements identified until they are approved |
| Record | • The CFO will retain a record of approval of commission sharing arrangements in each RR's file |

With few exceptions, regulations generally prohibit the sharing of commissions or compensation with non-registered persons. Any payment or sharing arrangement to a non-registered person must be referred to the CFO for review.

### 3.16.7 Settling Complaints Or Errors Directly With Customers

Employees may not make payments to customers of any kind to resolve an error or customer complaint. Errors and complaints must be brought to the attention of the President.

### 3.16.8 Borrowing From And Lending To Customers

[FINRA Rule 3240; FINRA Notice to Members 04-14]

RRs are generally not permitted to borrow from or lend to customers.

This restriction does NOT apply when a RR enters into a loan arrangement with a customer who is:

1. an immediate family member (defined as parents; grandparents; in-laws; spouse; siblings; children; grandchildren; cousins; aunts or uncles; nieces or nephews; and any other person whom the RR supports, directly or indirectly, to a material extent);
2. a financial institution in the business of providing credit, financing, or loans AND where the terms of the lending arrangement are those that would also be available to the general public doing business with those institutions;
3. another RR of Alpine;

ALPINE_LIT167907

4. someone (or an entity) who has a personal relationship with the RR and the lending arrangement arises from the personal relationship rather than an RR's customer relationship; or,

5. someone (or an entity) that has a business relationship outside the RR's customer relationship.

Any proposed loan with the RR's customer (other than a loan with a family member or financial institution in item numbers 1 and 2 above) requires the PRIOR review and approval by the CCO. RRs requesting exceptions must complete the RR's Customer Lending Arrangement Request form and submit it to the CCO prior to effecting the loan arrangement.

### 3.16.9 Personal Funds Deposited In Customer Accounts

In general, employees are not permitted to deposit personal funds or securities in customers' accounts or deposit customers' personal funds or securities in employee accounts. The same prohibitions apply to withdrawals. Exceptions should be reviewed by the CCO.

### 3.16.10 Prohibition Against Guarantees

[FINRA Rule 2150]

Alpine and its employees are prohibited from guaranteeing a customer against loss in any securities transaction. Designated supervisors are responsible for identifying prohibited guarantees in correspondence or other written communications with public customers. Options or written agreements that establish the future price of a transaction such as repurchase agreements are not included in this prohibition.

### 3.16.11 Fees And Other Charges

Employees are not permitted to charge fees or assess other charges to customers or customers' accounts unless they are expressly permitted by Alpine.

### 3.16.12 Customer Signatures

Employees are not permitted to sign documents on behalf of customers, even when doing so is meant to accommodate a customer's request. Customer signatures must be original (if they are going to be medallion guaranteed) by the customer on all documents.

### 3.16.13 Rumors

[FINRA Rule 6140(e)]

No employee may spread any rumors or misinformation that the employee knows to be false or misleading. This includes rumors of a sensational character that might reasonably be expected to affect market conditions. Discussion of unsubstantiated information published by a widely circulated public media is not prohibited, providing the source and unsubstantiated nature are also disclosed.

### 3.16.14 Misrepresentations

Employees may not disseminate any information that falsely states or implies guarantees or approval of securities by the government or other institution such as government guarantee of securities that carry no such guarantee. SIPC may not be misrepresented as a guarantor of a customer's account against losses from transactions.

### 3.16.15 Bribes

No employee may offer or solicit explicit inducements to or from employees or representatives of other institutions or foreign governmental or political officials to obtain business. Entertainment and gifts in reasonable amounts are not included in this prohibition and are discussed in the section *Gifts, Gratuities And Entertainment.*

ALPINE_LIT167908

### 3.16.16 Acting Without Registration

| Responsibility | • President |
|---|---|
| Resources | • New account forms<br>• Notices of registration status from CCO<br>• Reports of transactions effected by RRs not licensed in the customer's state of residency |
| Frequency | • Ongoing |
| Action | • Review new account forms to identify any out-of-state accounts where the RR may not be registered<br>• Review reports of transactions identifying unlicensed activity and follow up with RR<br>• Immediately refer any RRs requiring state registration to the CCO |
| Record | • Include a notation on the New Account form or report noting action taken<br>• Supervisor's log, daytimer, or other record, as needed |

No employee may engage in activities that require registration (selling securities, soliciting accounts, trading, *etc.*) unless registered in the appropriate capacities. Questions regarding the need for registration should be referred to the CCO.

### 3.16.17 Improperly Influencing Research Analysts

To the extent that Alpine employs research analysts, non-research personnel are prohibited from attempting to coerce research analysts to: (1) alter their views regarding the content of a research report or the timing of its publication; or (2) change the investment conclusions in a research report other than as appropriate to correct factual inaccuracies or verify market information such as prevailing market prices or to ensure consistency with established firm policies.

## 3.17 Computer Records, Equipment And Software

| Responsibility | • Alpine's IT Committee |
|---|---|
| Resources | • Records of employees with company-issued laptops or other devices<br>• Disks and other computer records maintained by a terminating employee |
| Frequency | • As required |
| Action | • Issue laptops or other electronic equipment to employees and maintain a record of laptops<br>• Provide employees with education and policy information about proper use of computer and other electronic equipment including appropriate security measures<br>• Instruct all employees to secure equipment and information<br>• Secure disks, computers, software, and other property when an employee terminates<br>• Do not permit removal of Alpine's equipment without approval |

ALPINE_LIT167909

| | |
|---|---|
| **Record** | • Records of laptops or other electronic devices and to whom they are provided<br>• Confirm to the President that terminated employee's computer and access to Alpine's records have been secured |

Alpine considers its computer records, systems, and software to be corporate assets. Employees are responsible for protecting these assets from unauthorized use, destruction, or unauthorized modification. This includes a prohibition against violating copyright laws or licensing agreements applicable to computer software.

Physical equipment (PCs, printers, software, diskettes, *etc.*) must be placed in a secure location to avoid theft, tampering, unauthorized use, and environmental hazards (water, smoke, magnets, *etc.*). The use of personal computers for Alpine business is subject to the same guidelines and restrictions as Alpine computers.

When an employee terminates, any disks or other storage medium that includes proprietary information, including customer information, are considered property of Alpine and must be left with Alpine.

## 3.17.1 Laptop Computers

Employees who use laptops are responsible for the security of the laptop and the information contained on the laptop. Serious security breaches can occur if a laptop containing confidential information is lost or stolen.

Employees who use laptops for Alpine business are required to comply with the following requirements:

- Only laptops issued by Alpine may be used for Alpine related business.
- Laptops containing confidential Alpine records such as payroll records and sensitive customer account records (including social security numbers) **cannot be removed** from Alpine's premises unless:
  - The employee is authorized to have such information on a laptop and remove it from Alpine's premises.
  - Confidential information is encrypted.
- All confidential data must be accessed only on Alpine's servers and may not be stored on laptops.
- Employees must use passwords that are changed periodically and include random letters and numbers. Passwords may not be readily-identifiable words or sequences such as the user's city name, home address, *etc.*
- Laptops must be physically locked with a cable to a stationary object while in use at Alpine's offices or at home.
- When traveling, laptops must be locked up unless tracking software has been installed.
- Employee training includes potential security breaches and proper handling of computer equipment and confidential information.

## 3.17.2 Prohibited Downloading

Employees are prohibited from:

- Downloading customer and other confidential information from Alpine's mainframe or other central records, unless specifically authorized

**ALPINE_LIT167910**

- Using portable devices such as USB key drives, MP3 players, mobile phones, and other devices for downloading information
- Downloading programs from the Web to Alpine's computers unless specifically authorized

## 3.18 Electronic Communications Policy

This policy governs the use of electronic communications by employees . It applies during business hours and after-business hours. ***This is an important policy; employees will be required to certify annually that they are familiar with and will comply with the policy.***

**1. Firm electronic systems or communications devices are for firm business purposes and business communications must conform to accepted business standards and regulatory requirements.**

- Inappropriate communications (profanity, obscenity, threats, otherwise offensive content) are prohibited. Report threatening or harassing communications to Compliance.
- Communications must include current and valid information.
- Copyrighted material cannot be sent unless authorized; contact Compliance for assistance.
- Copyrighted software cannot be copied or transmitted to others unless authorized.
- References and/or links to web sites may be a form of sales literature or advertising requiring Compliance approval prior to use.
- Communications that must be accompanied by a prospectus may not be sent electronically unless the prospectus is available as an electronic attachment.

**2. Electronic business communications must be accessed and transmitted only through firm-sponsored systems.**

- Regulators require retention of business communications and firm systems are designed to comply with retention requirements.
- Approved firm-sponsored systems include:
  - E-mail and e-faxes through desk-top computers in Firm offices (the use of personal e-mail accounts for business communications is prohibited)
  - PDAs (personal digital assistants such as Blackberrys) issued by [The Firm]
  - Instant messaging limited to Compliance-approved departments or employees
  - Compliance-approved external systems/computers (requires specific approval for departments and/or employees)
  - Internal systems for internal-use only (employees are notified of appropriate use of internal-use systems)
- Encryption of information may be required by [The Firm]; employees may not independently encrypt communications on firm systems.
- Home computers or other personal devices and external systems may not be used for business purposes (unless specifically approved by Compliance).

**3. Consider electronic communications as public communications; protect confidential information.**

- Do not confuse phone conversations or face-to-face communications with electronic communications. Your electronic conversation is subject to review and retention and may be the subject of subpoena in a civil or regulatory action.
- Confidential communications must not be sent on portable devices in public places unless encrypted.
- Do not view confidential information where unauthorized persons may have access (elevators, other public places).

ALPINE_LIT167911

- Safeguard portable devices to avoid unauthorized access to firm business.
- Safeguard passwords.
- Close open pages and sign out when the device is not in use.

**4. There are restrictions on unsolicited e-mails under the CAN-SPAM Act of 2003.**

- Unsolicited "mass" commercial e-mails are prohibited.
- "Commercial" e-mail includes any electronic messages that send a commercial advertisement or promote a commercial product or service. It does not include e-mail where there is an existing business relationship.
- Recipients may "opt-out" of receiving future e-mails. Forward such requests to Compliance.
- "Address harvesting" or "dictionary attacks" may not be used to obtain e-mail addresses off the Internet.
- E-mails sent from firm systems will include required identification of [The Firm] and disclosures or disclaimers.

**5. Social media sites, blogs, and other electronic forums or communications systems may NOT be used for business communications.**
Employees may not participate in social networking sites (Facebook, LinkedIn, Twitter, etc.), chat rooms, message boards, web logs, blogging, or other electronic forums or external communications systems for business communications. Personal use of social media sites, blogs and other electronic forums or communications systems is permitted.

**6. Electronic communications will be reviewed, monitored and audited by [The Firm].**

- All electronic communications are subject to review and retention.
- Communications that require pre-use approval may not be transmitted prior to review by the designated supervisor. This includes:
  - Communications to be sent to 25 or more investors within any 30 calendar-day period and that make any financial or investment recommendation or otherwise promote a product or service.
  - Communications that must be accompanied by a prospectus (Compliance approval required).
  - Advertising, sales literature, and market letters (Compliance approval required).

**7. Use of the Internet related to [The Firm]'s business is subject to restrictions.**

- Employees are prohibited from posting information to the Internet without prior firm approval.
- Accessing offensive sites is prohibited. [The Firm] may block sites that are offensive or contrary to the conduct of business.

# 3.19 Electronic Communications Policy

## 3.19.1 Introduction
This policy governs the use of electronic communications by personnel of Alpine. This policy also extends to off-hours usage of electronic communications systems.

## 3.19.2 Summary Of Policy
The following summarizes key points of this policy. It is important that the policy be read in its entirety.

- All Alpine personnel are subject to this policy.

ALPINE_LIT167912

- Unless prior authorization is received, Alpine's electronic communications systems are to be used for Alpine's business purposes.
- Employees are prohibited from using web-based personal e-mail accounts for company business.
- Electronic communications should not be considered private.
- Electronic communications are subject to monitoring and audit by Alpine.
- E-mails are subject to federal law restricting the sending of unsolicited electronic mail.
- Posting information and participating in chat rooms or instant messaging systems for Alpine-related communications require prior approval.
- Certain public communications require approval and retention.
- To avoid downloading a computer virus, do not open attached documents from unknown sources.

An employee's failure to comply with this policy may lead to disciplinary action.

### 3.19.3 Electronic Communications Defined

The following list identifies, but is not limited to electronic communications:

- Electronic mail (e-mail)
- Third-party e-mail systems
- Internet Telephone
- Facsimile transmissions
- News Groups
- File Transfer Protocol (FTP)
- World Wide Web browsing (WWW)
- Intranet
- Electronic Bulletin Boards
- Internet Relay Chat (IRC) or similar "Chat Rooms"
- Instant Messaging Systems
- Web logs/blogging
- Remote Host Access (Telnet or TN3270)
- Other information transmissions via the Internet

### 3.19.4 Instant Messaging

[FINRA Notice to Members 03-33]

Instant messaging is included in some internet services and provides the ability to conduct instant, online interactive "conversations." Employees must be aware that because instant messaging provides a method of recording and potentially keeping such conversations, they are treated as written communications subject to advertising, sales literature, and correspondence recordkeeping review and retention requirements. The use of instant messaging subjects those communications to review by Alpine, retention in its records, and potential delivery to regulators, legal authorities, or others in civil litigation or arbitrations. Instant messages are not appropriate for "confidential" communications.

**Employees are not permitted to use instant messaging to conduct Alpine's business, except for intra-department communications or personnel specifically authorized to use such method of communication by the CCO or designee.**

ALPINE_LIT167913

### 3.19.5 Guidelines For Proper Use

Alpine electronic communications systems should be used for business purposes only. Electronic communications with customers and/or the public are permitted only through company-sponsored or alternative facilities approved by the Communications Officer.

### 3.19.5.1 Electronic Communications Are Not Private

**Employees should not confuse phone conversations or face-to-face conversations with communications through electronic means.** Newspaper articles, regulatory actions, and legal actions abound with the consequences of employees who do not take what they say in electronic communications seriously. The repercussions of casual or poorly worded communications have potential adverse consequences for both Alpine and the employee. While electronic communications often seem like one-on-one conversations, and many people converse in electronic communications in a casual and non-business manner, it is important to understand that the use of Alpine's electronic communications systems or approved alternative systems are communications that may be seen by others either through Alpine's review system or outsiders who access this information through official and authorized means or sometimes through unauthorized means.

Electronic communications and residual or temporary files resulting from participation in electronic communications can be widely disseminated. It is possible that such communications be saved to disk, printed, forwarded to another party, subpoenaed in litigation, viewed by system administrators or regulatory agents, and/or intercepted by anyone at a variety of points. Electronic communications are not suitable for communications that must remain confidential or private, unless Alpine has arranged for encryption of confidential messages. There should be no expectations of privacy in electronic communications.

### 3.19.5.2 Communications Must Conform To Appropriate Business Standards And The Law

Users of Alpine's electronic communications systems are expected to follow appropriate business communication standards. Sending or receiving communications that are inappropriate, profane, obscene, discriminatory, threatening or otherwise offensive is prohibited. Sending or receiving jokes, puzzles, games, chain messages, pictures, video/sound files and frequent or long personal correspondence are some examples of inappropriate use. Use of electronic communication must comply with applicable local, state, federal and international laws.

### 3.19.5.3 Electronic Communications Are Business Communications And Should Be Treated As Such

- Electronic communications sent should contain the most recent, valid information available.
- Alpine's employees are required to report threatening, harassing or otherwise inappropriate communications to the President, Branch Manager or CCO.
- Communications received with inappropriate content must be deleted/discarded immediately without forwarding.
- Unauthorized dissemination of proprietary information is prohibited.
- Unauthorized copying or transmitting software or other materials protected by copyright is prohibited. Personnel must obtain Alpine's IT Committee's approval before distributing copyrighted material.
- References and/or links to Web sites may be a form of sales literature or advertising and therefore require the CCO's approval prior to use.
- Newly developed, non-company-sponsored electronic communication technologies are inappropriate for Alpine communications without prior approval of tAlpine's IT Committee.
- Because of the nature of electronic communications systems in general, there is no guarantee that a message will reach its destination in a timely manner or that it will reach its destination at all.

ALPINE_LIT167914

### 3.19.5.4 Encryption

- Alpine may require encryption of certain confidential communications.
- Users are responsible for controlling access to their own computer and encrypted messages.
- Employees may not use unauthorized encryption unless authorized or directed by Alpine's IT Committee.
- Employees must use encryption when required by Alpine's IT Committee.
- Passwords should be safeguarded.

### 3.19.5.5 Special Requirements/Restrictions

- Securities licensing requirements necessary for public communications apply to electronic communications.
- Recommendations or communications that require an accompanying prospectus may not be sent unless the prospectus can be sent via e-mail.
- If a message is received from a party requesting that they not be contacted, the Alpine employee should notify the designated party responsible for administering Alpine's Do Not Call List.
- E-mail to customers or prospective customers regarding Alpine's products, services, or other Alpine-related business communications may NOT be sent from a home computer and/or using non-company sponsored electronic communications.

### 3.19.5.6 Record Retention Requirements

Regulation's require that Alpine retain records of business communications. Alpine's Communications Officer retains electronic communications in accordance with these regulations.

### 3.19.5.7 Required Pre-Use Review And Approval

Electronic communications sent to external recipients may need approval or pre-approval in accordance with Alpine policies and procedures established for written communications. Refer to the chapter *COMMUNICATIONS WITH THE PUBLIC* for further policies regarding correspondence and other communications with the public.

### 3.19.5.8 Monitoring, Audit And Control

Electronic communications through Alpine's systems are the property of Alpine. Alpine reserves the right to monitor and audit electronic communications at any time for appropriate business usage, standards and compliance with this policy and applicable procedures.

## 3.19.6 E-Mail

### 3.19.6.1 Web-based Personal E-Mail Accounts Prohibited

Employees are prohibited from using their personal web-based e-mail accounts for company business. Using a personal account may expose the employee and Alpine to:

- Regulatory actions for failure to retain e-mails
- Civil court actions for failure to retain e-mails required in litigation
- Access to confidential business communications by unauthorized persons
- Access to Alpine's e-mail systems by hackers, viruses, and other intrusions that may impede or damage Alpine's systems

### 3.19.6.2 Standard Disclosures Included With Outgoing E-Mail Communications

All outgoing e-mail communications transmitted through Alpine's system automatically include standard disclosures regarding Alpine's identity and other necessary or required disclosures.

ALPINE_LIT167915

### 3.19.6.3 System Maintenance

As part of routine maintenance, e-mail messages that are of a certain age or file-size will be automatically deleted from the system.

### 3.19.6.4 Attachments

In order to avoid downloading a computer virus, do not open attachments unless you are familiar with the source.

### 3.19.6.5 Restrictions On Unsolicited E-Mails

[CAN-SPAM Act of 2003]

Federal law imposes restrictions on commercial e-mail, particularly unsolicited "mass" e-mail messages. "Commercial electronic mail" includes any electronic mail message primarily for the purpose of sending a commercial advertisement or promotion of a commercial product or service. It does not include electronic mail relating to transactions or where there is a relationship between the sender and the recipient.

Recipients of commercial e-mail must be provided the opportunity to "opt-out" and not receive future e-mails. Anyone receiving notification from a customer or anyone else asking not to receive electronic mail, must forward that information to the Communications Officer.

Senders of commercial e-mail may not:

- Use false or misleading e-mail header information or deceptive subject headings or otherwise deceive the recipient regarding the sender's address.
- Without prior authorization, use computers owned by others to transmit messages.
- Register for an e-mail address or domain name using materially false information or falsely represent themselves to be the registrants for Internet protocol addresses.
- Use "address harvesting" or "dictionary attacks" to obtain e-mail addresses from the Internet.
- Use automated means to create multiple e-mail addresses from which to send commercial e-mail (*e.g.,* using a computer program to create multiple "Yahoo" accounts).

Each commercial e-mail must include clear and conspicuous identification that the message is an advertisement or solicitation; a valid physical postal address of the sender; and a valid return address or other method for the recipient to "opt-out" from receiving further e-mails.

## 3.19.7 Personal Digital Assistants (PDAs)

If Personal Digital Assistants (PDAs) or similar devices are to be used for Alpine business, they will be issued by Alpine's IT Committee to Alpine's employees. If Alpine issues PDAs, messages will be routed through a central system that permits retention of messages as required by regulations.

## 3.19.8 Internet

**Personnel may not post any Alpine advertising or any business-related information without the CCO's authorization.**

Alpine maintains a corporate Web site as its official Internet presence. Only designated personnel, with prior authorization from the CCO, may direct an individual to post information to the Internet containing any of the following:

- references to or information about Alpine,

ALPINE_LIT167916

- communications involving investment advice,
- references to investment-related issues, or
- links to any of the above.

This includes posting such information to the Internet through such means including, but not limited to, the World Wide Web, Electronic Bulletin Boards, File Transfer Protocol (FTP) sites or any other method to establish their own Internet presence.

### 3.19.8.1 Chat Rooms

As interactive, extemporaneous conversations, chat rooms are considered a public forum. Participation in chat rooms is generally prohibited. If an employee wishes to participate in a chat room for business purposes, he or she must obtain prior written authorization from the CCO.

### 3.19.8.2 Web Logs/Blogging

A web log or "blog" is an Internet online personal journal established and frequently updated by an individual and is of a very public nature. A blog is searchable through Google and other search engines and other blogs can link to it, potentially carrying the blogger's message to millions of viewers. Blogging encourages free-wheeling discussion of topics, the direction of which is often beyond the blogger's control. The millions of potential viewers include Alpine's existing and potential customers and law enforcement officials.

Employees are prohibited from creating or participating in blogs that deal with Alpine, Alpine's employees, its customers, and its business. Unauthorized use of third party intellectual property and disclosure of Alpine's secrets and confidential information can result in criminal and civil liabilities. Such disclosures may violate laws regulating inside information or violate internal "blackout" periods.

Engaging in harmful conduct including disclosure of confidential Alpine information, workplace gossip, posting racially or sexually offensive language or graphics, and disparaging Alpine, co-employees, vendors, and customers will not be tolerated.

Questions regarding blogging and this policy should be referred to the CCO.

## 3.19.9 Failure To Comply

*Failure to comply with this policy may lead to disciplinary action.* Non-compliance may generate one or more of the following:

- Oral and/or written warning or notification of violation communicated to Alpine's personnel involved and their supervisor.
- Suspension of electronic communications privileges permanently or for a set period of time.
- Messages may be blocked or rejected if the message contains inappropriate content.
- Written warning to the employee's file.
- Suspension from work.
- Training/education course related to the infraction, and paid for by the employee.
- Regulatory discipline or censure.
- Suspension or termination of employment.

## 3.19.10 Consent To Policy

Use of Alpine's electronic communications systems represents the employee's consent to the terms outlined in this policy, including consent for Alpine to monitor and audit content and/or usage.

ALPINE_LIT167917

## 3.20 Mobile Devices

Mobile computer devices such as (but not limited to) smartphones, Blackberrys and tablets are subject to the following requirements and restrictions:

- The use of mobile devices is limited to those issued and authorized by the Firm.
- All employees permitted to use mobile devices will receive training regarding usage, restrictions, risks of using mobile devices, and other requirements.
- All devices will include security and anti-virus programs.
- Operating systems, security and anti-virus programs will be set for automatic updating to prevent security vulnerabilities.
- The Firm has a system to identify threats and intrusions.
- In the event of an intrusion, systems will be checked and access blocked, upgrades or new software may be installed to prevent future intrusions. Compliance and IT will determine whether the intrusion breached customer information security and whether customers should be notified.
- All data will be encrypted on the devices and on removable memory.
- Configuration and security settings will be determined by the Firm; employees may not change settings without approval from Compliance, IT or the designated supervisor.
- Permissible data to be stored on a device is limited to customer/prospect contact information (names, phone numbers, email addresses). Devices may NOT include confidential financial information.
- Only approved applications may be installed on the device. Unnecessary applications or services will be removed prior to assigning the device to an employee.
- Access to Firm internal systems requires authentication; passwords will be periodically changed.
- Remote access to the Firm's systems (other than Citrix) is limited to those employees authorized such access.
- Data transmission to or from the mobile device will be encrypted.
- Employees may not share devices with others and passwords are confidential to the person assigned the password or other access capability.
- Mobile devices must not be left unattended, even on desks. These devices should be treated like cash, not to be left out in the open.
- When travelling, mobile devices must be carried in carry-on luggage and not in checked luggage.
- If a device is lost or stolen, the employee must immediately, upon discovery, notify Compliance.
- If an employee transfers to another position with the Firm, the assigned mobile device(s) will be wiped or re-set, if necessary, to provide access only to data, internal systems, and other capabilities consistent with the employee's new position.
- Upon termination, employees must return all Firm mobile devices to the Firm. Data will be wiped before re-use, donation, or destruction to ensure data cannot be accessed.
- The Information Technology Department will maintain lists of approved applications.
- The Information Technology Department will retain a record of mobile devices, to whom they are assigned, permitted access to Firm systems (or non-permission), permitted communication or access features (email, text messaging, PIN to PIN, etc.), and other information regarding permissible usage by the assigned employee.
- An annual review will be conducted by Compliance and IT or Internal Audit to verify proper implementation of policies and controls, including testing of devices (all or a sampling), and assurance that current technology is up to date and functioning to protect Firm and customer information.

## 3.21 Advertising And Publishing Activities

Prior to issuing any advertising or writing any books, articles, newsletters, or other materials to be published in public media (magazines, newspaper, computer bulletin boards, Internet, *etc.* ) for public

ALPINE_LIT167918

access, employees must contact both the President and the CCO for review and approval. Approval is not required for use of Alpine-issued research or other materials approved by Alpine and intended for public distribution.

## 3.22 Employees Acting As Trustees, Executors, Or Other Fiduciary Capacities

Employees usually will not act in a fiduciary capacity (*e.g.,* trustee, executor) for a customer's account unless the account is for a relative of the employee. Exceptions require the approval of the President and the CCO who should be notified by written memo requesting the exception and the reasons for the exception.

## 3.23 Use Of Titles

Employees may not use titles unrelated to their activities with Alpine. The use of any other title requires the prior approval of the CCO. Examples of the types of titles not specifically related to Alpine's activities include (but are not limited to) C.P.A., J.D., M.B.A., or Attorney at Law.

## 3.24 Annual Certification

| Responsibility | • CCO |
|---|---|
| Resources | • Annual certification form |
| Frequency | • Annual, during January of each year |
| Action | • Send forms to employees for completion<br>• Review completed forms<br>• Take appropriate action which may include:<br>    o Inquiring regarding reported outside business activities<br>    o Inquiring regarding reported outside securities accounts<br>    o Conferring with the employee and/or the President for any other reported information requiring follow up<br>    o Filing updates to the employee's Form U4, if necessary |
| Record | • Annual certifications are retained in each employee's file |

Alpine will, on an annual basis, ask employees to complete an Annual Certification form. The purpose of this form is to ensure Alpine's records are current regarding items to be reported to Alpine (outside business activities, outside accounts, *etc.*).

## 3.25 Sales of Unregistered Securities

### 3.21 Sales of Unregistered Securities

ALPINE_LIT167919

The firm and its registered representatives have a responsibility to assist in the detection and prevention of sales of unregistered securities. In general terms, the sale of unregistered securities involves (i) sales of securities which have not been registered under the Securities Act and for which no exemption from registration is available, and (ii) sales by affiliates of the issuer (its officers, directors and 10% or greater stockholders), other than sales made in compliance with Rule 144.

With respect to securities that have not been registered under the Securities Act, such as private placements, issuers and their transfer agents have primary responsibility for ensuring that unregistered securities are not sold unlawfully. The stock certificates for securities which have not been registered under the Securities Act of 1933 should be imprinted with a restricted stock legend alerting broker-dealers and others that the securities have not been registered. However, in some cases the issuer may have been negligent in not placing a legend on the subject stock certificates or the legend may have been improperly removed. As a result, registered representatives should make inquiry as to how a customer acquired the securities to be sold and if the securities were acquired in a transaction other than an open market purchase, the registered representative should conduct further inquiry to determine whether the securities constitute restricted securities and whether they may be sold without restriction.

With respect to sales of stock by affiliates of the issuer, the issuer's officers, directors and 10% and greater stockholders generally are not permitted to sell securities without complying with Rule 144. With regard to sales by officers and directors, information as to the identity of the issuer's officers and directors is publicly available and registered representatives should know whether their customers are officers or directors of a public company. However, it may be difficult to detect sales by controlling stockholders because the stock certificates may not bear restricted stock legends and the stock may have been acquired in open market transactions, private transactions or a combination thereof. If a stockholder acquires a control position in an issuer's stock, that stock cannot be resold without registration under the Securities Act or compliance with Rule 144. Sales made from a control position without registration or compliance with Rule 144 are sometimes referred to as "sales from a control position" or as "unregistered public distributions of securities." If a customer deposits a substantial block of a little known security, and is reluctant to disclose exactly where the securities came from or if the surrounding circumstances raise a question as to whether or not the ostensible seller may be merely an intermediary for controlling persons or statutory underwriters, then the registered representative should obtain additional information.

### 3.25.1 Preventing Sales of Unregistered Securities

There are a number of ways Alpine and its registered representatives can avoid participating in sales of unregistered securities.

### 3.25.2 Knowing the Customer and the Securities

Being familiar with the customer's financial resources, business activities and employment relationships are avenues for knowing the customer and knowing whether he, she or it is an officer or director of an issuer or the owner of 10% or more of its outstanding securities. Making inquiry of a customer as to original acquisition of securities to be sold, is an avenue for knowing whether the securities were acquired in transactions other than open market transactions, which will require a RR to make further inquiry. Knowing the customer and the securities occurs at the time when a new account is opened as well as during the operation of a customer's account.

ALPINE_LIT167920

**3.25.2.1 Risk Indicators**

The following are examples of risk indicators that may suggest potential sales of unregistered securities.

· A customer attempts to sell a number of shares that is significantly larger than the number of shares that are ordinarily deposited by customers holding securities of companies with similar market capitalization and market value.

· A new customer attempts to sell a large number of shares of a non-reporting issuer about which little public information is available.

· A customer is unwilling to provide information as to how and when it acquired securities to be sold by it or is evasive in responding to such inquiries.

· A customer attempts to make repeated sales of the same security and the aggregate amount of such sales involves a large number of shares in relation to the usual market transaction.

· A customer makes repeated deposits into its account of securities of the same issuer from different sources such as transfers from other broker-dealers and other customer accounts.

· A customer attempts to sell securities that were acquired in a transaction with or involving the issuer or an affiliate of the issuer in reliance on a legal opinion that does not clearly state the facts underlying counsel's conclusion that the shares are freely tradable or which is based solely on hypothetical facts.

· A customer attempts to sell securities that he acquired from a third party or parties and is unwilling to provide information about such person or persons' relationship to the issuer or the number of shares of the issuer's stock owned by such person or persons, or is evasive in responding to such inquiries.

## 3.25.3 Reports of Suspected or Attempted Sales of Unregistered Securities

The sale of unregistered securities for which no exemption is available is a crime. All RRs are obligated to report any suspected or attempted deposits or sales of unregistered securities to the AML Compliance Officer.

## 3.25.4 Actions to be Taken to Prevent Sales of Unregistered Securities

Set forth below are the minimum actions required to detect and prevent sales of unregistered securities. However, there may be situations not covered below in which a prudent person would be suspicious. In those instances, a RR should conduct the investigation specified even though the deposited securities do not meet the specified minimum value.

New Customers. Each new customer shall complete a new account form disclosing whether he, she or it is an officer, director or other affiliate of any public company.

ALPINE_LIT167921

<u>No Street Stock</u>. Alpine will not accept for deposit in any customer's account stock certificates registered in a name other than that of the customer or a person with whom the customer has a family relationship.

<u>Know the Securities Being Sold</u>. Each registered representative shall inquire how and from whom a customer acquired the securities it has deposited in its account. If the securities were acquired other than in open market transactions, the broker shall notify the AML Compliance Officer who shall conduct an additional inquiry to determine the manner in which the securities were acquired and whether they may be freely sold without registration under the Securities Act. This determination may require a legal conclusion that can only be made after the firm has reviewed the facts surrounding the acquisition of the shares. The firm may also require that the customer provide a legal opinion from competent legal counsel that describes the relevant facts in sufficient detail as to provide an adequate basis for the legal conclusion stated.

<u>Special Inquiries</u>. If a customer deposits stock of an issuer (other than issuers listed on the NYSE, AMEX or NASDAQ) having an aggregate value greater than $100,000, the registered representative who handles the account shall conduct further inquiry to determine whether the securities in question constitute more than 5% of the issuer's outstanding shares. If they do or if the registered representative is unable to determine the percentage of outstanding shares owned by the customer, he or she shall conduct additional inquiry as appropriate under the circumstances, which may include any or all of the following:

- review the reports filed by the issuer with the SEC (or 15c2-11 information if the issuer is not a reporting company) to determine whether the customer is an officer, director or 10% stockholder of the Issuer
- inquire of the Issuer's transfer agent as to the number of shares of the Issuer's stock that are issued and outstanding and compare that number to the number of shares owned by the customer
- contact the issuer to obtain written confirmation that the customer is not an affiliate of the Issuer and that such person is not prohibited from selling the shares
- require the customer to obtain an opinion from competent legal counsel that the sale may be made in accordance with applicable laws and regulations.

<u>Correspondent Firms</u>. Correspondent firms of Alpine are responsible for establishing and maintaining their own procedures to detect and prevent the sale of unregistered securities.

ALPINE_LIT167922

# 4 TRAINING AND EDUCATION

## 4.1 Annual Compliance Meeting

[NASD Rule 3010(a)(7); FINRA Interpretive Letter November 30, 2006 to Evan Charkes of Citigroup regarding webcasts]

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • List of RRs and registered principals for Alpine |
| **Frequency** | • Annually |
| **Action** | • Determine appropriate subjects to include in meetings, depending on RRs and principals who are participants<br>• Conduct compliance meetings or interviews with RRs and principals<br>• Ensure all subject RRs and principals complete the required annual meeting or interview<br>• For RRs and principals who do not complete the requirement, take corrective action which may include contact with the RR's; limitation on business activities until the requirement is completed; other corrective action determined as appropriate for the circumstances |
| **Record** | • A record of when and where meetings are conducted, subjects discussed, and who attended is retained by the CCO or designee<br>• A record of corrective action is retained in the RR's file |

As required by FINRA rules, registered representatives and registered principals are required to attend an annual compliance meeting or interview on an annual basis.

## 4.2 Continuing Education

[FINRA Rule 1250]

Registered employees are subject to SRO continuing education requirements composed of two distinct elements. Registered employees are required to complete both elements at specified time intervals. The two elements are:

**Regulatory Element:** This element is a computer-based training program that focuses on compliance, regulatory, ethical, and sales practice standards. Its content is derived from rules and regulations as well as standards and practices widely accepted within the industry. This element is administered at designated testing centers or through an in-firm program.

**Firm Element:** All registered employees dealing with public customers and their supervisors are required to complete continuing education administered by Alpine.

### 4.2.1 Regulatory Element

| | |
|---|---|
| **Responsibility** | • CCO or designee |

ALPINE_LIT167923

| | |
|---|---|
| **Resources** | • CRD Firm Queues and related reports<br>• CRD e-mail notifications of inactive registrations |
| **Frequency** | • Ongoing |
| **Action** | • Review Alpine's CRD queue<br>• Request queue reports<br>• Notify affected persons of requirements<br>• Schedule computer based training<br>• Review CRD e-mail notifications of inactive registrations<br>• Notify President of restricted persons |
| **Record** | • Queue reports, e-mail notices, and records of notifying employees are maintained in employee's file |

### 4.2.1.1 Who Is Subject To The Requirements

All registered persons are subject to the regulatory element.

### 4.2.1.2 When Requirements Must Be Completed

The regulatory element is to be completed within 120 days of the 2nd anniversary of the individual's original registration date and every three years thereafter. For registered persons who become subject to statutory disqualification or disciplinary action as defined under the rules, the regulatory element must be completed within 120 days of the posting date of the disciplinary action and every three years after that date.

### 4.2.1.3 Regulatory Element Contact Person

[FINRA Rule 1250(a)(7)]

The CCO or designee will notify the FINRA of the name and email address of the contact person to receive CRD notices. On an annual basis (by the 17th business day of the month following the end of the calendar year) the contact person information will be reviewed by the CCO and updated, if necessary.

### 4.2.1.4 CRD Notices And Appointments For Training Sessions

The CCO or designee is responsible for: (1) notifying employees of pending Regulatory Element requirements; and, (2) scheduling training sessions at designated training centers. CRD notices are retained in the registered person's file.

### 4.2.2 Firm Element

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • Information regarding firm products, services, training needs<br>• Guidance from regulators<br>• Current regulatory concerns<br>• Disciplinary actions<br>• Internal and external audits |

ALPINE_LIT167924

| Frequency | • Annual and ongoing |
|---|---|
| **Action** | • Develop needs analyses; training plans; and training materials<br>• Identify employees who are subject to the requirement (covered persons)<br>• Monitor completion of requirements<br>• Restrict covered persons who do not complete requirements<br>• At year-end, determine whether objectives were met and whether training was effective |
| **Record** | • Needs analyses; training plans; training materials<br>• Dates of training, contents of training, lists of attendees<br>• Copies of training material used<br>• Certifications<br>• Webcast Usage Reports<br>• Evaluations<br>• Records (memos, notes, *etc.*) of actions restricting covered persons |

## 4.2.2.1 Who Is Subject To The Requirements

All registered persons who do business with the public and their supervisors are subject to the firm element. This group of professionals will be referred to as covered persons as it relates to the Firm Element continuing education requirement. Firm element continuing education is required regardless of the length of registration or employment in the securities industry. Covered persons who join Alpine or who become securities licensed on or before September 1 of each year will be required to participate in the current year's program. Covered persons who join Alpine or existing employees who become securities licensed, after September 1 will not be required to participate in the current year's program.

## 4.2.2.2 Firm Requirements

Under the direction of Alpine's President, Alpine will:

- identify job functions and persons subject to the requirement
- prepare an annual needs analysis including gathering information about products and services and training topics
- determine training objectives
- develop a written training plan
- implement the training plan
- retain a record of participation
- develop a method of evaluating the effectiveness of the training
- consider the evaluations in developing the next year's needs analysis
- restrict covered persons who do not complete the requirement

Alpine's internal program may include videos, computer training, in-person presentations, and other methods of conveying training material including a combination of methods. Alpine may not solely rely on teleconferences or other remote training methods.

## 4.2.2.3 Annual Needs Analysis

An annual needs analysis is prepared for covered persons. In developing the needs analysis, Alpine may employ one or more of the following channels:

ALPINE_LIT167925

- Incorporation of applicable information from regulatory authority and industry organizations (i.e. feedback from regulators including recent audits, regulatory alerts, and other notices)
- Customer complaints, arbitrations, and other litigation involving Alpine will be evaluated
- New business lines/new initatives or marketing strategies to identify development or future needs
- Focus group discussion with representatives from the various business units
- Feedback from the prior year's continuing education program
- Results of the Regulatory Element Continuing Education
- Management input
- NASD Notice to Members 03-57
- Feedback from compliance, legal and internal audit on critical issues
- Review of previously used training materials and other material that may be reveal unaddressed needs;
- External audits

Needs analyses will be completed by the end of the first quarter each year for the current year.

### 4.2.2.4 Evaluating The Firm Element Program

Participants are asked to evaluate the effectiveness of the firm element continuing education program. These evaluations are considered when designing the next year's continuing education program.

## 4.2.3 Registered Persons Who Fail To Complete Requirements

### Non Compliance with Regulatory CE Requirement and Firm Element CE Requirement

Registered persons who fail to complete the requirements of the regulatory element continuing education or the firm element continuing education may not engage in any activities that require securities registration or earn commissions or other compensation related to such activities. Registrations are considered "inactive" until continuing education requirements are completed.

The President or designee will notify affected persons by written memorandum when their registration becomes inactive and when the requirement is satisfied and inactive status is lifted. The CFO and CCO will also be notified by memorandum. Copies of memos will be retained in the Continuing Education folder and a copy may be retained in the individual's file.

ALPINE_LIT167926

# 5 EMPLOYMENT, REGISTRATION AND LICENSING

## 5.1 Employment

### 5.1.1 Hiring Procedures

[FINRA Regulatory Notice 07-55]

#### 5.1.1.1 RR Interview Guidelines

[FINRA Notice to Members 07-06]

At the time an RR is being considered for hire, the following are areas that the President should consider:

1. Discuss with the applicant the nature of the applicant's prior customers and the types of securities sold while associated with prior employers. If customers' investments include investment company products (mutual funds, variable annuities), determine whether Alpine has dealer or servicing agreements in place and, if not and the RR is hired, plan for suitability reviews and notification to customers of investment options and costs of switching investments.
2. Obtain the applicant's explanations regarding any customer complaints and regulatory actions to determine the merit, to the extent practicable, of each before hiring.
3. Ask the applicant about the existence of and nature of any pending proceedings, customer complaints, regulatory investigations, or arbitrations not listed in the CRD.
4. Discuss the reasons for the applicant's frequent change of employers, if applicable.
5. Obtain the RR's prior year W-2.
6. Ask the RR whether he or she signed an employment contract with the present or prior employer and if so, obtain a copy from the RR.

#### 5.1.1.2 Qualification Of Supervisors

[NASD Rule 1014(a)(10)(D) and 3010(a)(6)]

[FINRA Rule 3010(a)(6)]

| Responsibility | • Hiring Supervisor - confirm qualifications<br>• Compliance - determine registration requirements |
|---|---|
| Resources | • Individuals identified as potential supervisors<br>• Background information on candidate including registration status |
| Frequency | • As required when a supervisory position is to be filled |
| Action | • Hiring supervisor:<br>  o Evaluate candidate's qualifications including experience and knowledge<br>  o Arrange for training, if necessary<br>• Compliance:<br>  o Confirm individual has required registration qualifications and, if not, arrange for the individual to complete the required exams<br>  o Notify the hiring supervisor of added qualifications required and remind him/her the individual may not act as a supervisor until necessary registrations are obtained (unless a regulator allows for a grace period to act as a supervisor before registration is |

ALPINE_LIT167927

| | |
|---|---|
| | completed) |
| | ○  Provide supervisory policies/procedures to the candidate if not already available to him/her |
| **Record** | • Hiring manager's consent to appoint the candidate to a supervisory position<br>• Background and registration information in candidate's file<br>• Record of training (if necessary) including a description of training and completion date of training<br>• Record of providing supervisory policies/procedures |

The manager who hires or appoints a supervisor is responsible for determining that the individual is qualified for the supervisory position.

### 5.1.1.2.1 Multiple CCO Designations

[FINRA Rule 3130.02]

| **Responsibility** | • Designated Supervisor |
|---|---|
| **Resources** | • Proposed multiple CCOs |
| **Frequency** | • As required |
| **Action** | • Confirm principal status of candidate<br>• Document areas of responsibility and provide to each CCO and his/her supervisor<br>• Confirm each CCO meets the requirements of Rule 3013 and IM-3013<br>• Coordinate multiple certifications to the CEO |
| **Record** | • Records of qualification review<br>• Documentation of areas of responsibility and provision to CCO and supervisor |

If Alpine designates multiple chief compliance officers (CCOs), it will meet the following requirements:

- CCOs will be designated on Schedule A of Form BD.
- Each designated CCO is a principal.
- Each CCO's areas of compliance responsibility are defined and documented with identification of primary responsibility in areas that overlap.
- Each CCO meets the requirements of Rule 3013 and IM-3013 regarding the defined area of primary compliance responsibility.
- The designated CCOs have the responsibilities and expertise enabling them to consult with the CEO on the totality of subject matters included in certification requirements.

### 5.1.1.3 Background Investigation

ALPINE_LIT167928

[NASD Rule 3010(a)(6) and 3010(e)]

The CFO will conduct a background investigation for all new employees including the following:

- Contact the new employee's employer for at least the last three years
- For RR, obtain a copy of and review the RR's Form U5 from the prior firm or inquire for the U5 information through the Web CRD system
- For RR who were employed with an FCM (Futures Commission Merchant) or IB (Introducing Broker) registered as a commodities firm but "notice-registered" with the SEC because of security futures business, obtain and review a copy of CFTC Form 8-T, Notice of Termination of Associated Person, NFA Associate, Branch Office Manager, Designated Supervisor or Principal
- Any "Yes" answers or termination for cause on Form U5 or similar information reported on CFTC Form 8-T that were not previously known will be reviewed by the CCO

### 5.1.1.4 Fingerprints

[SEC Securities Exchange Act of 1934 Rule 17f-2; FINRA Rule 1010(d)]

['34 Act Rule 17f-2; FINRA Rule 1010(d)]

| Responsibility | • CCO |
|---|---|
| Resources | • Notifications regarding registration and other applicants |
| Frequency | • As required |
| Action | • Utilize the services of a third party (local law enforcement officials, *etc.*) to take fingerprints and:<br>   o Notify the third party of securities industry fingerprinting requirements including identification verification procedures<br>   o Provide applicants with a list of acceptable third-party vendors<br>• Submit electronic filing to CRD<br>• Obtain fingerprints<br>• Submit fingerprints to CRD with barcode<br>• If fingerprints are not received by the CRD within 30 days of filing Form U4, notify the President that activities requiring registration must cease |
| Record | • Registration files for employees include records of CRD filings and submission of fingerprints |

The CCO will obtain and submit fingerprints on all new RRs for receipt by the CRD within 30 days of filing Form U4. Fingerprints for other personnel will also be obtained and submitted by the CCO.

If fingerprints are not received by the CRD within 30 days, the employee must cease engaging in activities that require registration. The CCO will notify the President of deficiencies, and the President is responsible for restricting the applicant's activities until fingerprints have been received by the CRD.

ALPINE_LIT167929

**5.1.1.5 Policies And Procedures**

At the time of hire, the CCO will provide the RR with a current copy of Alpine's policies and procedures either in hard copy or by notifying the RR of the location of policies and procedures in electronic format. The RR will be asked to acknowledge, in writing or electroninncally, that the policies were received and that the RR is responsible for complying. In addition, RRs may be required to sign an employment agreement.

**5.1.1.6 Enhanced Compensation**

[SEC Chairman letter to broker-dealers dated August 31, 2009: http://www.sec.gov/news/press/2009/2009-189-letter.pdf]

| | |
|---|---|
| **Responsibility** | • Designated Supervisor |
| **Resources** | • Details of RR compensation agreements |
| **Frequency** | • As required when RRs are hired with enhanced compensation agreements |
| **Action** | • Determine the terms of any enhanced compensation<br>• Where commission targets or higher payouts on specific securities or products are included in compensation arrangements, include consideration of those incentives in regular reviews of the RR's business during the term of the compensation agreement to identify any improper activity to maximize commissions such as churning or unsuitable recommendations<br>• Where potential improper activities are identified, take corrective action which may include conferring with the RR, conferring with Compliance, contacting customers, cancelling transactions, or any other corrective action deemed appropriate for the situation |
| **Record** | • Compensation agreements<br>• Review of RR transactions including notation of corrective action taken, where appropriate |

Alpine may hire experienced RRs from other broker-dealers and offer enhanced compensation to attract qualified individuals for employment and to assist in the transition period when an RR moves from another firm. Compensation agreements may include up-front bonuses, higher payouts for a period of time, payment of licensing fees (where Alpine otherwise would not pay them), and other enhanced compensation determined at the time an offer is made.

## 5.1.2 Termination Procedures

[FINRA Corporation By-Laws, Article V Section 3; FINRA Information Notice February 21, 2008]

| | |
|---|---|
| **Responsibility** | • The President with respect to terminations of RR<br>• The CFO with respect to terminations of non-licensed employee |
| **Resources** | • Notification from RR, non-licensed employee or supervisor of termination |
| **Frequency** | • As required |

ALPINE_LIT167930

| Action | • Immediately notify the CCO of terminating registered employees<br>• Immediately notify the CCO of terminating non-registered employees where termination was caused by theft or fraud<br>• Immediately notify the CFO of terminating RR<br>• Immediately notify Alpine's IT Committee to secure computers and computer files<br>• Retrieve office keys, company credit cards, *etc.* from terminated employee<br>• Reassign accounts<br>• Notify customers of newly-assigned RR<br>• The CCO will file Form U5 for terminating RRs<br>• The CCO will provide the terminated RR with a copy of the RR's Form U5 within 30 days of termination |
|---|---|
| Record | • <u>CRD retains copies of Form U5</u> |

### 5.1.2.1 Notification To Compliance

Whenever an employee terminates employment from Alpine, the President (for RR) or the CFO (for non-licensed employees when caused by theft or fraud) is responsible for immediately notifying the CCO. Notification to the CCO regarding registered employees should include:

- Name of terminated person and the RR's number
- Type of termination (voluntary, permitted to resign, discharged, *etc.*)
- If the termination is not voluntary, an explanation of the reason for termination
- Date of termination
- Any known compliance problems at the time of termination

### 5.1.2.2 Securing And Retrieving Alpine Property

The President or CFO, depending on employee, in conjunction with Alpine's IT Committee, is responsible for retrieving Alpine property from terminated employees including office keys, company credit cards, computer files, customer files, and any other items which are the property of Alpine.

### 5.1.2.3 Reassignment Of Accounts

The President is responsible for reassigning the accounts of terminated RRs.

### 5.1.2.4 Responding To Customer Inquiries

The President or CFO, depending on employee, should instruct all other employees, including RRs receiving reassigned accounts or otherwise, to only indicate the employee is no longer with Alpine. No details or speculation regarding the departure should be given to customers or anyone else outside Alpine unless authorized by the CCO.

### 5.1.2.5 Form U5

The CCO is responsible for filing Form U5 for any terminated RR. The CCO will also mail, within 30 days of termination, a copy of Form U5 to the former employee.

## 5.2 Registration And Licensing

[FINRA Corporation By-Laws Article V; NASD Rule 1000-1150; FINRA Regulatory Notice 07-41; FINRA Information Notice February 21, 2008; NASDAQ Rule 1000 series]

| Responsibility | • CCO |
|---|---|

ALPINE_LIT167931

| | |
|---|---|
| **Resources** | • Requests for registration<br>• CRD Late Filing Fee Report |
| **Frequency** | • Quarterly - review CRD Late Filing Fee Report<br>• As required for new hires and requests for registration |
| **Action** | • Identify employees who require registration<br>• Submit required filings to the CRD<br>• Acknowledge electronic filings are on behalf of Alpine and its employees<br>• Request employee to schedule examinations if needed<br>• Ensure employees who require registrations obtain them<br>• Review the CRD Late Filing Fee Report to identify late filings and to take corrective action |
| **Record** | • Registration records including CRD notices, approvals, and other registration records are maintained in employee files<br>• Where the registered person's signature is not required on U4 amendments, the Firm may rely on the CRD for recordkeeping |
| | |

## 5.2.1 CRD Electronic Filings

[FINRA Rule 1010]

The CFO and CCO is responsible for electronic filings in their areas of responsibility. The CFO is a registered principal or a corporate officer and is responsible for reviewing and approving all electronic filings and acknowledging electronically that the forms are filed on behalf of Alpine and its associated persons. The CCO is a registered principal and is responsible for reviewing and approving electronic filings and acknowledging electronically that the forms are filed on behalf of Alpine and its associated persons.

## 5.2.2 Registration Requirement

All individuals engaged in activities (including selling or trading products such as stocks, bonds, options, insurance, *etc.*) subject to registration requirements of SROs or other regulators must complete the necessary registration and licensing prior to engaging in such activities. Employees may not conduct business with public customers until required registrations or licenses are effective.

RRs who assume duties that require registration with the FINRA as a principal, have 90 calendar days to pass the appropriate principal's examination. RRs may not conduct any activities that require registration as a principal until the appropriate examination(s) are passed.

## 5.2.3 Requests For Waivers

[FINRA Rule 9600]

Regulators seldom grant waivers of training period requirements or examinations. In those very few instances where waivers are granted, the candidate must be able to demonstrate comparable work

ALPINE_LIT167932

experience or other successfully completed examinations that could, in the view of the regulator, constitute satisfying their requirements.

Any requests for waivers will be submitted by the CCO.

### 5.2.4 State Registrations

RRs must be registered in the state from which they conduct business and may be required to be registered in other states where customers are domiciled. Most states require successful completion of the Series 63 Uniform State Agent Securities Law Examination. Successful completion of the exam does not automatically confer registered status on the examinee. Application must be made to the CRD to obtain each state registration.

The CCO is responsible for identifying transactions in states where registration may be required.

### 5.2.5 Parking Registrations

[NASD Rule 1031(a)]

Alpine does not permit individuals to "park" licenses. Parking occurs when Alpine maintains a registration on behalf of an individual that does not work for Alpine or who does not need that registration for their job function. Registration status is retained only for those persons where it is required. Alpine may, however, maintain registration for legal, compliance, or other non-sales employees as permitted under regulators' rules.

### 5.2.6 Form U4

[FINRA Rule 1010 and 2263]

All applicants for registration are required to complete Form U4. It is the RR's responsibility to include accurate information and promptly notify Alpine of any updates that may require amendment to Form U4.

At the time a new or amended Form U4 is signed, the applicant will be provided the *Form U4 Disclosure To Associated Persons,* which discloses information about the predispute arbitration clause included in Form U4.

### 5.2.7 Amendments To Form U4 Or Form U5

The Firm will submit amendments to Form U4 when an RR advises of updates that require amendment. Compliance is responsible for determining whether reportable events or other matters require the filing of an amendment to an RR's Form U4. Compliance is also responsible for identifying disciplinary or complaint matters to be reported on Form U5 termination notices including amendments required after termination. Required reportable events include the receipt of an SEC Wells notice.
The CCO is responsible for providing requested information.

### 5.2.8 Assignment Of RR Numbers

RR numbers are assigned by the CFO. New numbers will not be assigned to individuals who are not yet registered with Alpine. An RR number may be assigned prior to registration approval when customer accounts are being transferred and the RR number is needed to transfer accounts. However, the number is not approved for conducting business until all registration approvals have been received.

ALPINE_LIT167933

## 5.3 Statutorily Disqualified Persons

[SEC Securities Exchange Act of 1934 Rule 19h-1 and Section 3(a)(39); FINRA By-Laws, Article III Section 3 and Section 4; FINRA Regulatory Notice 09-19]

| Responsibility | • CCO |
|---|---|
| Resources | • Employee disclosures |
| Frequency | • As required |
| Action | • The CCO:<br>    ○ Complete the required regulatory forms<br>    ○ Establish procedures for conducting required supervision<br>• The President will:<br>    ○ Conduct required supervision<br>    ○ Provide the CCO with certifications of supervision, if required |
| Record | • Regulatory applications/forms and related documents are retained in the RR's file<br>• Certifications of supervision, if required, are retained in the RR's file |

### 5.3.1 Introduction

Individuals may become subject to statutory disqualifications as a result of a felony conviction or regulatory suspension, revocation of registrations or injunctions (including actions by domestic regulators including the CFTC and actions by foreign regulators). The definition of statutory disqualification is included in Section 3(a)(39) of the Securities Exchange Act of 1934.

### 5.3.2 Hiring A Statutorily Disqualified Person

All prospective employees (including those engaged solely in clerical and/or ministerial activities) are subject to background investigations that include identification of potential statutory disqualification. Prior to hiring an individual subject to a statutory disqualification, the CCO should be consulted to review the nature of the statutory disqualification and potential special supervision that may be required upon hiring.

### 5.3.3 Regulatory Filings

The CCO is responsible for completion and filing of the appropriate regulatory form or application, which will be signed by the CFO, an officer and principal of Alpine. The Board of Directors may be required to provide prior approval before an individual becomes associated with Alpine. The individual may not conduct any activities requiring registration until approval is received from the appropriate regulatory authorities.

### 5.3.4 Supervision

The CCO will establish procedures to carry out the supervision required under agreement with the SRO reviewing the disqualified person, including records of supervision to be conducted by the President. The President will be provided a copy of the procedures and will be responsible for carrying them out.

ALPINE_LIT167934

### 5.3.5 Reporting Statutory Disqualifications

When an employee becomes subject to a statutory disqualification, the CCO will file the necessary registration updates and, in addition, the required notification on the quarterly complaint report will be made to regulators consistent with those SRO's reporting requirements.

## 5.4 Broker-Dealer Registration

### 5.4.1 Form BD

| Responsibility | • CCO |
|---|---|
| Resources | • Information regarding reportable items including civil and regulatory actions<br>• Records regarding officers and directors to be included on Form BD<br>• Other information as required by Form BD |
| Frequency | • As required - updates<br>• Quarterly - review for potential updates |
| Action | • Prepare updates as required; consult with legal counsel, as required<br>• File Form BD updates<br>• At least quarterly review Form BD for potential updates |
| Record | • File of BD amendments |

The CCO is responsible for updating Form BD when necessary and filing with the required SROs and other regulatory agencies.

### 5.4.2 Change In Ownership, Control, Or Business Operations

[NASD Rule 1011(i) and 1017; FINRA IM 1011-1; FINRA Regulatory Notice 09-21; NASD Notice to Members 06-56; FINRA web site re mergers, acquisitions, and business transfers: http://www.finra.org/Industry/Issues/Mergers/index.htm; FINRA checklist for organizational change: http://www.finra.org/RegistrationQualifications/MemberFirms/p014283; NASDAQ Rule 1017]

When Alpine anticipates a material change in its business, Compliance will file requests for approval by the appropriate SROs. Events that require approval include merger with or acquisition of another broker-dealer or acquisition of 25% or more of the assets of another dealer; a change in ownership or control; and a material change in business operations. In addition, material changes include removing or modifying a membership agreement restriction; market making for the first time; adding business activities that require a higher level of minimum net capital; and engaging in activities beyond proprietary trading as defined in NASDAQ rules.

Certain types of expansions are presumed to not be a "material change in business operations" and do not require FINRA approval. However, this safe harbor is not available to firms that, among other things, have a "disciplinary history" as defined in IM-1011-1. The interpretation must be consulted to determine what changes are not material and what constitutes disciplinary history precluding use of the safe harbor.

If Alpine operates under a Restriction Letter, it will conduct business consistent with the Letter and Compliance will contact FINRA if a change is necessary.

ALPINE_LIT167935

### 5.4.3 Regulatory Contact Information

Alpine's CCO is responsible to maintain current contact information with regulators.

### 5.4.3.1 FINRA and NASDAQ Contact Information

[NASD Rule 1160; FINRA Regulatory Notice 07-42; FINRA Contact System web page:
http://www.finra.org/Industry/Compliance/RegulatoryFilings/FCS/P005666]

Updates to contact information will be made within 30 days following any change. In addition, by the 17th business day after the end of each calendar year, Alpine is required to verify contact information through the FINRA Contact System.

The CCO or designee will update the following information through FINRA's Contact System when necessary and will conduct the mandatory annual verification:

- Executive Representative [NASD By-Laws Article IV, Section 3 and Rule 1150; NASDAQ Rule 1150]
- Regulatory Element Continuing Education Contact Person [NASD Rule 1120]
- Emergency contact persons [FINRA Rule 4370]
- AML contact person(s) [FINRA Rule 3310.02]
- Other contacts mandated by FINRA rules

Contact information will be provided promptly to FINRA upon request or within the timeline agreed upon by Alpine and the regulator.

### 5.4.4 Regulatory Filings

[NASD Rule 3170; FINRA Regulatory Notice 08-11; NASD Notice to Members 06-61]

Alpine will submit regulatory filings electronically where required. Filing procedures are included in appropriate sections of this manual.

### 5.4.5 Reporting Requirements

[FINRA Rule 4530; FINRA Regulatory Notice 11-32]

| | |
|---|---|
| **Responsibility** | • Designated Supervisor |
| **Resources** | • Criminal, civil, and arbitration actions against Alpine |
| **Frequency** | • As required |
| **Action** | • Determine whether information or events are reportable<br>• File information [including copies of information specified in Rule 4530(e)(1)] with FINRA within 30 calendar days after knowing of the event |
| **Record** | • Record of filings |

ALPINE_LIT167936

Alpine will file information with FINRA for reportable events involving Alpine under FINRA Rule 4530 within 30 calendar days of becoming aware of the reportable event. When the Firm concludes the Firm has violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body or self-regulatory organization, such reported violations will include only conduct that has widespread or potential widespread impact to the Firm, its customers or markets, or conduct that arises from a material failure of the Firm's systems, policies or practices involving numerous customers, multiple errors or significant dollar amounts.

Refer to the section *Reporting Possible Law Or Rule Violations* in the chapter *GENERAL EMPLOYEE POLICIES* for procedures addressing the identification of violations, escalation of internal reporting, and reporting of internal conclusions.

## 5.5 Heightened Supervision

[NASD Notice to Members 97-19]

| | |
|---|---|
| **Responsibility** | • CFO |
| **Resources** | • Form U4 information<br>• CRD<br>• Customer complaints<br>• Regulatory actions<br>• Other activity that may warrant heightened supervision |
| **Frequency** | • As required |
| **Action** | • the CFO:<br>   o Identifies employees subject to heightened supervision<br>   o Notifies the President and CCO<br>• the CCO:<br>   o Determines the scope of heightened supervision<br>   o Collect certifications from the President<br>• the President:<br>   o Conducts required heightened supervision<br>   o Prepare and send certifications to the CCO |
| **Record** | • Reviews of employees for potential heightened supervision are retained by the CFO<br>• Memos and certifications pertaining to a specific employee are retained in the employee's file |

### 5.5.1 Introduction

Alpine will institute heightened supervision for RRs or others when appropriate. The following sections describe Alpine's procedures for identifying RRs subject to heightened supervision and the types of supervision that may be conducted.

ALPINE_LIT167937

### 5.5.2 Identifying RRs For Heightened Supervision

It is the responsibility of the CFO to identify RRs for potential heightened supervision. RRs will be identified at the time of hire or when an RR becomes subject to regulatory action and/or a pattern of customer complaints. Unregistered individuals who were previously registered and the subject of customer or regulatory complaints are also subject to consideration for heightened supervision.

### 5.5.3 Criteria For Identifying Candidates For Heightened Supervision

The following are criteria that will trigger a review by the CFO to determine whether an RR should be subject to heightened supervision. Pending as well as resolved matters will be considered. The criteria are subjective and the details of the complaints and/or regulatory actions must be considered in determining whether heightened supervision is necessary.

- Three or more customer complaints alleging sales practice abuse within the past two years (complaints include written complaints, arbitrations, other civil actions)
- Complaint filed by a regulator
- Injunction in connection with an investment-related activity
- Termination for cause or permitted to resign from a former employer where the termination appears to involve a significant sales practice or regulatory violation
- Employment with three or more broker-dealers in the past five years

### 5.5.4 Heightened Supervision Memorandum

When a candidate is identified for possible heightened supervision the CFO, in consultation with the CCO and the President, will consider whether heightened supervision will be established. After the determination is made, the CFO will prepare a memorandum outlining action taken (or not taken).

Where it is determined that Alpine's existing supervision is adequate to address oversight of the candidate, the CFO will document in the memorandum the reasons why existing supervision is adequate. Where it is decided heightened supervision will be conducted, the CCO will outline the supervision to be conducted (including type, frequency, time period of heightened supervision, and how supervision should be documented) and provide copies of the memorandum to the subject RR and the President outlining the terms of the heightened supervision. The RR and the President will sign and return copies of the memorandum to the CCO.

### 5.5.5 Scope Of Potential Heightened Supervision

Heightened supervision will be established after considering the specifics that apply to the RR. Heightened supervision may take many forms and may include some of the following, to be determined by the CCO. This list does not limit or prescribe how heightened supervision should be structured for any one RR, since each case must be reviewed individually.

- Limits on type of business (option, futures, *etc.*)
- Limits on types of accounts (discretionary, certain age groups or other demographics, *etc.*)
- Verification with customers of new account information when accounts are opened
- Pre-approval of some or all trades entered
- Pre-approval of certain types of accounts
- Contact with the RR's customers by the President
- Pre-approval of all written public communications originated by the RR
- Extra training or continuing education in areas subject to heightened supervision
- Assignment of the RR to a "mentor" or partner

ALPINE_LIT167938

### 5.5.6 Certification By RR's Supervisor

During the term of heightened supervision, the President will certify to the CCO, in writing, that the heightened supervision has been conducted. The form and frequency of certification will be determined by the CCO and will be explained to the President.

ALPINE_LIT167939

# 6 INDEPENDENT CONTRACTORS

[FINRA Notices to Members 01-80, 99-45, 98-38 and 86-65]

| Responsibility | • CFO or designee |
|---|---|
| Resources | • Order records or transaction reports for review of sales activities |
| Frequency | • At time of hire - obtain contracts<br>• Daily - supervise sales activities |
| Action | • Obtain necessary Independent Contractor ("IC") contract<br>• Review daily transactions and take corrective action where necessary |
| Record | • IC contracts retained in files by IC<br>• Initials and date of review on order records or transaction reports reviewed |

## 6.1 Independent Contractor Defined

Certain individuals are associated with Alpine as "independent contractors" as defined under current IRS guidelines. Independent contractors are not "employees" of Alpine for purposes of compensation and other considerations under IRS guidelines.

## 6.2 Supervision

Independent contractors are subject to the supervision of Alpine and are responsible for complying with Alpine's policies and procedures and the rules and regulations governing the activities of Alpine and its associated persons.

## 6.3 Agreements

RRs who are ICs will, at the time of association with Alpine, sign an agreement outlining the conditions under which the IC provides services to Alpine. No commission or other payments will be made to the IC until a signed agreement is on file. The CFO is responsible for ensuring signed agreements are submitted to Alpine prior to making any payments to the IC.

## 6.4 Use And Display Of The Firm's Name

Alpine's name may be used only in conjunction with the products or services provided by Alpine. Alpine's letterhead may be used only for correspondence related to Alpine's business.

Alpine's name may be displayed only in authorized locations and in a manner approved by Alpine.

## 6.5 Display Of SIPC Symbol

In authorized branch locations, the SIPC symbol will be displayed. The CCO is responsible for identifying the office locations that require the necessary SIPC display.

ALPINE_LIT167940

## 6.6 Use Of Other Names

Alpine does not allow IC RRs to use names other than their own and Alpine's in conjunction with the ICs securities business.

## 6.7 ICs As Investment Advisers

[FINRA Rule 3040; FINRA Notice to Members 96-33, 94-44 and 91-32]

Alpine does not allow its IC RRs to be registered as investment advisers.

## 6.8 Outside Business Activities And Outside Accounts

[FINRA Rule 3270; NASD Rule 3050]

As stated previously, ICs are subject to all provisions of Alpine's policies and procedures. An IC status does not relieve the individual from complying with the requirements to disclose and obtain approval of all outside business activities and outside securities accounts. The chapter *GENERAL EMPLOYEE POLICIES* includes the policies in these and other areas affecting all individuals associated with Alpine.

ALPINE_LIT167941

# 7 COMMUNICATIONS WITH THE PUBLIC

[FINRA Notice to Members 97-19]

## 7.1 Advertising And Sales Literature

[NASD Rule 2210]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer |
| **Resources** | • Requests regarding advertising or sales literature |
| **Frequency** | • As required |
| **Action** | • Review proposed advertising or sales literature<br>• Make revisions as needed<br>• Provide requestor with approved copy or notify of disapproval |
| **Record** | • Copies of reviewed advertising, including the reviewer's initials, are retained in an Advertising file in Compliance |

### 7.1.1 Advertising And Sales Literature Defined

Advertising generally includes material published or designed for use in newspapers, magazines or other periodicals, radio, television, telephone or tape recordings, telephone directory advertising (other than routine listings), computer bulletin boards or other electronic messages, videotape displays, signs or billboards, movies, or other material published in public media.

Sales literature generally includes circulars, research reports, form letters sent to more than one person, market letters, newsletters, seminar texts and reprints, or other material originated by Alpine or its employees and to be reproduced and provided to multiple customers or prospective customers. Sales literature also includes telemarketing scripts. The terms "advertising" and "sales literature" are interchangeable in this chapter.

### 7.1.2 General Guidelines

All advertising and sales literature must meet the general standards of good taste and accuracy and should fairly represent the products or services included in the advertisement or sales literature. Promissory, exaggerated, or false statements as well as language inferring guarantees are not permitted. Projections and predictions are not permitted within advertising and sales literature. Past performance is not a guarantee of future performance and should be identified as such if included in advertising or sales literature. Portraying the performance of past recommendations or actual transactions must include an acceptable universe over a reasonable period of time.

In addition, if a recommendation is included in advertising or sales literature, the following disclosures must be included (if applicable):

- Alpine acts as market maker in the recommended security or the underlying security or that Alpine associated persons will sell to or buy from customers on a principal basis.

ALPINE_LIT167942

- Alpine and/or its officers or partners have a financial interest in any of the issuer's securities and the nature of that interest (options, warrants, short/long positions, *etc.*) unless the interest is nominal.
- Alpine was a manager or co-manager of the issuer's securities within the past 12 months.

### 7.1.3 Required Information

All advertisements and sales literature will contain Alpine's name. "Blind" ads are not permitted except for recruiting personnel. Exceptions to use Alpine's name must comply with rules that deal with generic, derivative, and other potential variations on a member's name.

Sales literature is also required to include the name of the person or other entity as preparing the material, if other than Alpine, and the date on which it is first published, circulated, or distributed. If the information in the material is not current, this fact should be stated.

Inclusion of other names, such as an RR's separate corporation, in advertising and sales literature regarding Alpine's services, may not be permitted. The Chief Compliance Officer's review of advertising will consider such requests on a case-by-case basis.

### 7.1.4 Approval Prior To Publication

All advertising or sales literature must be submitted to the Chief Compliance Officer for approval prior to publication or use with the exception of certain materials such as research that may be approved by the President.

### 7.1.5 Disclosure Of Prices For Recommended Corporate Securities

In communications where corporate securities are recommended, the price of the security at the time of the recommendation must be disclosed. While this requirement does not extend to other securities, inclusion of the price would be required if price information is deemed "material" and necessary to make the communication not misleading.

### 7.1.6 Sales Material Provided By Third Parties

[NASD Rule 2210(b)(1)(D) and 2210(b)(2); FINRA Regulatory Notice 08-27 and 08-12]

[FINRA Rule 2210(b)(1)(D) and (2), Regulatory Notices 08-27 and 08-12]

| Responsibility | • Chief Compliance Officer |
|---|---|
| Resources | • Proposed sales material from third parties |
| Frequency | • As required |
| Action | • For all third-party sales material review for:<br>   o Clear indication the material is advertising in the event the Firm or the RR paid for it<br>   o Suggestions or inferences the RR authored the material when in fact that is not the case<br>   o Acceptable RR titles, if titles are included<br>   o Pre-determined interviews (written or otherwise) are identified as such and include disclosure the Q&A is pre-determined and not a spontaneous interview<br>• For third-party material previously filed with and approved by FINRA: |

ALPINE_LIT167943

| | |
|---|---|
| | <ul><li>○ Obtain a copy of FINRA approval</li><li>○ Allow use if no material changes are made</li><li>For third-party material NOT previously filed with FINRA:<ul><li>○ Review the material for consistency with FINRA standards</li><li>○ File with FINRA, if required<ul><li>▪ Upon receipt of review letter, make necessary changes</li><li>▪ Indicate approval including date of approval</li></ul></li></ul></li></ul> |
| **Record** | <ul><li>Copy of sales material with notations, as necessary</li><li>Copy of FINRA review letter, if one has been obtained</li><li>Record of date first used and (if applicable) date of last use</li><li>Retain for three years from date of last use</li></ul> |

Sales material provided by outside (third) parties such as newspaper or magazine articles, books or pamphlets, handouts, and other third-party provided material **must be reviewed and approved by the Chief Compliance Officer or designee prior to use**. When participating in an interview (written or otherwise) where the questions are pre-determined by the third party, disclosure must be made that questions and answers were pre-determined and the interview was not spontaneous. Some sales material requires the prior approval of FINRA.

The following guidelines apply when using third-party sales material:

- RRs may **not** suggest or infer that they authored investment-related books, articles, or other sales material not written by them.
- If the Firm or RR has paid for the publication, production, or distribution of any communication that appears to be a magazine, article or interview, then the communication must be clearly identified as an advertisement.
- Sales material may **not** include RR titles other than those normally conferred by the Firm (account executive, financial consultant, *etc.*) unless previously approved by the Chief Compliance Officer or designee. RRs particularly may **not** use titles inferring expertise in dealing with senior investors.

## 7.1.7 SIPC Membership

[Securities Investor Protection Act of 1970; United States Code Title 15 Chapter 2B-1; SIPC web site at www.sipc.org/how/sipclogo.cfm]

Advertising must include a notation that Alpine is a member of SIPC, *e.g.,* "Member, SIPC." If an explanatory statement will be included in advertising explaining what SIPC is, one of the following two standardized phrases must be included:

- Member of SIPC, which protects securities customers of its members up to $500,000 (including $250,000 for claims for cash). Explanatory brochure available upon request or at *www.sipc.org.*
- Member of SIPC. Securities in your account protected up to $500,000. For details, please see *www.sipc.org.*

The words "Member, SIPC" may be omitted if the official explanatory statement is used in conjunction with the official SIPC symbol.

ALPINE_LIT167944

When SIPC is referenced in Alpine's web site, the site will include a hyperlink to the SIPC web site.

"Advertising" is defined under SIPC rules as any promotional material used in or on any newspaper, magazine, or other periodical, radio, television, telephone or tape recording, videotape display, motion picture, slide presentation, telephone directory, sign or billboard, electronic or other public media.

### 7.1.8 FINRA Membership

[NASD IM 2210-4; FINRA Regulatory Notice 11-49; FINRA Information Notice Use of FINRA Logo, April 29, 2009; FINRA email address for questions: trademarks@finra.org]

[The Firm] may indicate its FINRA membership in only one of three ways:

1. In a communication that complies with the standards of NASD Rule 2210 and neither states nor implies that FINRA or any other corporate name or facility owned by FINRA, or any other regulatory organization, endorses, indemnifies or guarantees [The Firm]'s business practices, selling methods, the class or type of securities offered, or any specific security;
2. In a confirmation statement for an OTC transaction that includes a specified legend; or
3. On [The Firm]'s website, as long as [The Firm] provides a hyperlink to the homepage of FINRA's website in close proximity to [The Firm]'s indication of FINRA membership.

Member firms are prohibited from including FINRA's logo on web sites, business cards, stationery, or other marketing materials. The FINRA trademark or references to membership may not be included in any trademark of [The Firm] or associated person. [The Firm] may, however, include "FINRA Member Firm" or "Member of FINRA" on such materials.

### 7.1.9 Telemarketing Scripts

All scripts used for telemarketing calls require the approval of the Chief Compliance Officer or designee prior to use. The section *Cold Callers* includes further information regarding the use of scripts and callers.

### 7.1.10 Special Filing Or Approval Requirements

[NASD Rule 2210(c); NASD Notice to Members 89-11; FINRA Regulatory Notice 11-49]

There are special filing or approval requirements for certain products and broker-dealers, as outlined below.

- Filings must be accompanied by FINRA's Advertising and Sales Literature Filing Cover Sheet.
- Filings to FINRA should identify the reference number of any communication previously submitted by [The Firm] and already reviewed by FINRA that is similar to the current filing.
- All advertising or sales literature to be submitted to FINRA must be approved by the designated supervisor prior to submission to FINRA.
- The actual or expected date of first use or publication must be included with FINRA filing.

FINRA rules should be consulted for specific requirements and some exclusions from the requirements.

| Who | What | When | Rule |
|-----|------|------|------|

ALPINE_LIT167945

| Members who have never filed | All advertisements1 | 10 business days prior to first use for one year dating from the first submission | **2210(c)(5)(A)** |
|---|---|---|---|
| All members | Options communications used prior to the delivery of the Options Disclosure Document2 | 10 calendar days prior to first use; wait for FINRA staff approval | **2220(c)(1)** |
| All members | Sales literature that contains bond mutual fund volatility ratings | 10 business days prior to first use; wait for FINRA staff approval | **2210(c)(3)** |
| All members | CMO advertisements3 | 10 business days prior to first use; cannot use until changes required by the Department have been made | **2210(c)(4)(B)** |
| All members | Investment company advertisements or sales literature that use rankings or performance comparison information that is not generally published or is created by the investment company, its underwriter or affiliate, must be filed with corroborating data | 10 business days prior to first use; cannot use until changes required by the Department have been made | **2210(c)(4)(A)** |
| All members | Investment company advertisements and sales literature | Within 10 business days of first use | **2210(c)(2)(A)** |
| All members | Public direct participation program advertisements and sales literature | Within 10 business days of first use | **2210(c)(2)(A)** |
| All members | Security Futures advertisements4 | 10 business days prior to first use; cannot use until changes required by the Department have been made | **2210(c)(4)(C)** |
| All members | Final version of TV and Video advertisements | Within 10 business days of first use or broadcast | **2210(c)(6)** |
| All members | Certain 529 Plans advertisements and sales literature offering registered investment company products5 | Within 10 business days of first use | **2210(c)(2)(A)** |
| All members | Government securities advertisements | Within 10 business days of first use | **2210(c)(1)** |
| All members | Investment analysis tool, report templates, and sales literature and advertisements6 | Within 10 business days of first use | **IM-2210-6(a)** |

ALPINE_LIT167946

[1] "Advertisements" are communications with the public that appear in media (e.g., newspaper, radio, television, websites) whereas "sales literature" is directed to a specific audience or group (e.g., mailers, brochures, password protected websites). For complete definitions see NASD Conduct Rule 2210(a).
[2] See Conduct Rule 2220 Options Communications with the Public.
[3] See IM-2210-8 Communications with the Public About Collateralized Mortgage Obligations.
[4] See IM-2210-7 Guidelines for Communications with the Public Regarding Security Futures.
[5] See Special NTM 03-17 for additional guidance.
[6] See NTM 04-86 for additional guidance.

It is not necessary to file with FINRA any advertising and sales literature which has previously been filed and is used without any changes. There are other requirements regarding advertising of certain products including CMOs, municipal securities, mutual funds, and options. Refer to those specific sections for further information.

## 7.1.11 Institutional Sales Material

[FINRA Rule 2211]

Sales material prepared for institutional investors is not subject to the same requirements as material prepared for non-institutional investors. This does **not** include material that Alpine has reason to believe will be distributed to anyone who is not an institutional investor. For example, if sales material is provided to an institution for distribution to employees participating in a 401K plan, the sales material would be treated as distributed to retail investors. "Institutional investor" includes a(n):

- bank, savings and loan association, insurance company, or registered investment company
- registered investment adviser
- entity (natural person, corporation partnership, trust, or other) with total assets of at least $50 million
- government entity
- employee benefit plan under Internal Revenue Code Section 403(b) or 457 with at least 100 participants
- qualified plan under Section 3(a)(12)(C) of the '34 act with at least 100 participants
- FINRA member or someone registered with a FINRA member firm
- someone acting solely on behalf of an institutional investor

Institutional sales material is subject to Alpine's correspondence review procedures and does not require pre-use approval and filing with the FINRA.

## 7.1.12 Records Of Advertising And Sales Literature

The Chief Compliance Officer or designee maintains a central file of all advertising and sales literature approved by Alpine. The file will include, for each item reviewed:

- the approval by the designated supervisor
- any revisions, if necessary
- a record that the item was filed with an SRO and when (if required)
- approval received from the SRO (if required)
- when the item was used (if undated on the item)
- in what media the item appeared (if applicable)

ALPINE_LIT167947

### 7.1.13 Options

Refer to the chapter *OPTIONS* regarding requirements for options advertising.

### 7.1.14 Mutual Funds

Refer to the chapter *MUTUAL FUNDS* regarding requirements for mutual funds advertising.

### 7.1.15 Municipal Securities

Refer to the chapter *MUNICIPAL SECURITIES* regarding requirements for municipal securities advertising.

### 7.1.16 Advertisements Involving Non-Branch Locations

FINRA rules specify that any non-branch location referenced in an advertisement or sales literature by its local telephone number and/or local post office box is permitted if the advertisement does NOT include the street address of the non-branch location and INCLUDES the address and telephone number of the branch office or OSJ directly supervising the non-branch location.

Alpine's central office address and telephone number may be substituted for the supervisory branch or OSJ only with the approval of the Chief Compliance Officer. Refer to the chapter *OFFICES* for further information.

### 7.1.17 Testimonials

[NASD Rule 2210(d)(1)(E) and 2210(d)(2); FTC Guides Concerning the Use of Endorsements and Testimonials: http://ftc.gov/os/2009/10/091005revisedendorsementguides.pdf]

There are specific requirements when using testimonials in communications with the public. The Chief Compliance Officer or designee should be contacted before preparing any communications that include testimonials.

## 7.2 Communications Defined as "Research"

[SEC Regulation AC; FINRA Rule 2711(a)(9)(A)]

Alpine is not subject to this rule because we do not engage in research activities. Alpine registered representatives and other associated persons are not permitted to send communications that may be deemed "research" since there are complex requirements that apply to the issuance of research reports. Federal and SRO rule interpretations define "research" as including a customer communication that analyzes individual securities or companies and provides information reasonably sufficient upon which to base an investment decision and that is distributed to at least 15 persons. This applies even if the author does not hold the title of "research analyst" and does not work in a research department.

Questions regarding what communications constitute "research" should be referred to the Chief Compliance Officer.

### 7.2.1 Adoption of Policies and Procedures to Comply with Rule 2711 and Annual Certification by Senior Officer

Alpine is not subject to this rule currently as we do not engage nor do we allow our associated persons to engage in research activities. If this were to change and Alpine were to engage in such activities, Alpine would be required to adopt and implement written supervisory procedures reasonably designed to ensure that the member and its employees comply with the provisions of this rule (including the attestation requirements of Rule 2711(d)(2)), and a senior officer of Alpine must attest annually to FINRA by April 1 of each year that it has adopted and implemented those procedures.

ALPINE_LIT167948

## 7.3 Outgoing Correspondence

[NASD Rule 3010(d); FINRA Rule 2010(c)]

FINRA Rules 2211, 3010(d) and 3110(c)(4)

### 7.3.1 Prohibition Against Sending Correspondence From Personal Computers And Other Non-Firm Facilities

Outgoing public correspondence must be sent or transmitted only through Alpine sponsored facilities or systems. Written correspondence must be sent through channels that permit review by the Communication Supervisor. Correspondence may not be sent through an RR's personal computer, PDA (unless issued by the Firm), or other device, third-party system or facility that circumvents the Firm review.

### 7.3.2 Review And Approval

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer |
| **Resources** | • Outgoing customer correspondence |
| **Frequency** | • Monthly or in conjunction with sampling described in Section 7.2.4.2 |
| **Action** | • Review correspondence for appropriateness of language<br>• Identify outgoing correspondence that may constitute "research" and limit distribution to fewer than 15 persons<br>• Consult with designated supervisor to take corrective action, if necessary, which may include consultation with the RR, sending corrected correspondence, added training for the RR, restrictions on correspondence, or other action considered appropriate for the circumstance |
| **Record** | • Initial correspondence reviewed and maintained in outgoing customer correspondence files |

Outgoing customer correspondence is subject to review and approval by the Chief Compliance Officer or designee. Pre-approved form letters and group e-mails **used without change** (other than customer name, address) may be sent to customers or prospective customers without additional approval. Records of to whom form letters and group e-mails are sent must be retained in the Firm's records.

### 7.3.2.1 Reviewing On A Sampling Basis

[NASD Rule 3010(d)(2); FINRA Notice to Members 98-11]

| | |
|---|---|
| **Responsibility** | Chief Compliance Officer |
| **Resources** | • Evaluation of the firm's size, types of business, supervisory structure |

ALPINE_LIT167949

| | |
|---|---|
| **Frequency** | • At inception of sampling procedures and ongoing |
| **Action** | • Determine types of sampling permissible<br>• Develop procedures and update as necessary<br>• Provide procedures and education/training to correspondence reviewers<br>• Include correspondence requirements in RR training<br>• Include sampling procedures in periodic reviews of Alpine's office, supervisory system, controls and procedures<br>• Identify RRs with complaint/disciplinary history necessitating review of ALL correspondence and notify the President ("heightened supervision") |
| **Record** | • Procedures for sampling reviews are included in the WSP manual<br>• Updates to procedures are retained by the Chief Compliance Officer or designee<br>• Education and training are documented including how conducted, who attended, and dates of education/training including educational memoranda<br>• Records of "heightened supervision" retained in RR's file |

The Chief Compliance Officer or designee may review written outgoing correspondence on a sampling basis using the guidelines that follow, or, if sampling is not adopted, review all outgoing correspondence prior to sending.

Sampling guidelines include the following. "Pre-review" refers to review and approval of written correspondence **before** it is sent. Correspondence subject to "post-review" may be reviewed after sending. All RRs are subject to review of at least some of their correspondence on a regular basis. Sampling is permitted for the following type(s) of outgoing correspondence:

- Written (hard-copy) correspondence
- E-mails
- Instant messaging
- Faxes

- Pre-review:
  - All correspondence for any RR with a history of complaints/discipline that necessitates heightened supervision (The Chief Compliance Officer or designee will notify the Designated Supervisor of RRs subject to heightened supervision)
- Post-review:
  - Alpine has a program that performs a "key word" review on all electronic correspondence
- Refer to the section *Content Guidelines* that follows for guidance on acceptable content
- For correspondence that includes a recommendation, determine that the information presented balances the benefits and risks of the recommendation and, if the subject security is high-risk, determine the recommendation is appropriate for the customer by conferring with the RR and/or reviewing new account information
- If there are problems with an RR's correspondence that is being minimally sampled, reviews will be increased and the change noted in the RR's file or on a supervisory log.

ALPINE_LIT167950

### 7.3.3 Content Guidelines

Items to consider when preparing and reviewing outgoing correspondence (and other forms of written or electronic communications) include:

- Truthfulness and good taste are required.
- Exaggerated, unwarranted, or misleading statements or claims are prohibited.
- Promises or guarantees: past performance may not be used to promise, guarantee, or imply future profits or income from securities.
- Projections and predictions are not permitted.
- Comparisons of personnel, facilities, or charges with those of other broker-dealers should not be made unless supported by the facts, and other firms' names should not be included.
- Correspondence or other written communications regarding securities subject to pending distributions (underwritings) are generally not permitted.
- Correspondence regarding securities sold by prospectus (mutual funds, limited partnerships, *etc.*) must be approved by the Chief Compliance Officer or designee prior to sending (except for pre-approved correspondence where no changes are made).
- Only Alpine-approved hedge clauses may be used.
- Tax advice must not be provided; the customer should be referred to his or her tax adviser for such issues.
- Photocopying and distributing copyrighted material may violate copyright laws.
- Profit and loss or other portfolio analyses should include a disclaimer that the customer should rely on customer statements provided by Alpine and any analysis or calculation is provided for information purposes only.
- The use of Alpine letterhead should be restricted to Alpine-related matters.
- Correspondence regarding options is subject to specific requirements which are discussed in the chapter *OPTIONS*.

### 7.3.4 Letters And Notes

Copies of letters, notes, and similar correspondence sent to customers or their representatives (e.g. power of attorney, etc.) must be provided to the Chief Compliance Officer or designee on a monthly basis.

### 7.3.5 Facsimiles

| Responsibility | Chief Compliance Officer |
|---|---|
| **Resources** | • Outgoing faxes to customers |
| **Frequency** | • Monthly |
| **Action** | • Review outgoing faxes as follows:<br>  o Review faxes sent to, or received by, customers<br>• For faxes with questionable content:<br>  o Confer with RR<br>  o Take corrective action which may include:<br>    ▪ Sending a revised fax to the recipient<br>    ▪ Training for RR<br>    ▪ Disciplinary action against RR which may include a reprimand, suspension, or termination |
| **Record** | • Outgoing faxes with reviewer's initials<br>• Records of corrective action taken |

ALPINE_LIT167951

Facsimiles are included in the definition of "outgoing correspondence" and are subject to review by the designated supervisor.

Facsimile transmissions may NOT be used for unsolicited advertising. Refer to the section *Calling (Telemarketing) And Fax Restrictions* in this chapter.

# 7.4 Incoming Correspondence

[NASD Rule 3010(d)]

## 7.4.1 Review Of Incoming Correspondence

| | |
|---|---|
| **Responsibility** | • Back Office Manager or designee |
| **Resources** | • Incoming correspondence, including correspondence marked "personal and confidential" |
| **Frequency** | • Periodically as required |
| **Action** | • Review all incoming correspondence<br>• Refer customer securities and checks directly to Operations<br>• Refer customer complaints to the Chief Compliance Officer<br>• Refer audit letters to the Branch Manager |
| **Record** | • Retain each original customer correspondence in an incoming correspondence file. |

All incoming written correspondence will be opened and reviewed by the Back Office Manager or designee. This review includes letters, courier deliveries, and other forms of written communication. Electronic mail is subject to specific procedures for review; see the section *Electronic Mail* in this chapter and the section *Electronic Communications Policy* in the chapter *GENERAL EMPLOYEE POLICIES*.

The following guidelines for review apply:

• Correspondence identified as "Confidential" will be forwarded to the CFO, when and where appropriate.
• Obvious non-customer correspondence (bank statements, advertising, *etc.*) will not be opened and will be forwarded directly to the addressee.
• Audit letters (requests from customers' auditors for verification of account positions) will be forwarded directly to the Branch Manager for response.
• Complaints will be immediately forwarded to the Chief Compliance Officer or designee.
• Checks or securities will be immediately deposited with the appropriate operations personnel.
• Original customer correspondence will be retained for Alpine's files and forwarded to the Chief Compliance Officer or designee on a weekly basis. The Chief Compliance Officer or designee will review, initial and retain on behalf of Alpine. The addressee will receive a copy of the original customer correspondence received.

ALPINE_LIT167952

### 7.4.2 Personal Mail

Employees should direct all personal mail to their home address. Personal mail is subject to incoming correspondence and electronic mail review policies.

## 7.5 Legends And Footnotes

[FINRA Rule 2210(d)(1)(C)]

When legends or footnotes are included in public communications, they cannot be placed or sized in a way that limits the investor's ability to read or understand the information. Small fonts may inhibit reading the information or may inappropriately diminish the importance of the information. Bold claims balanced by a footnote may also mislead the reader.

## 7.6 Internal Communications

### 7.6.1 Inter-Office Communications

[SEC Securities Exchange Act of 1934 Rule 17a-4(b)(4)]

Inter-office memos and other communications are subject to retention requirements. Copies of written inter-office communications must be retained for 3 years with the 2 most recent years in an accessible location. Electronic communications are retained for 3 years in an accessible and retrievable format.

### 7.6.2 Internal Use Only

Printed or electronic information marked "internal use only" or "investment professional use only" may not be sent or otherwise provided to individuals outside Alpine.

### 7.6.3 Squawk Box, Conference Calls, And Other Internal Communication Systems

Non-employees may not listen to squawk box or conference calls unless specifically allowed by the person controlling the communication or by the Chief Compliance Officer. Proprietary, confidential information communicated to employees in such venues may not be shared with outsiders. For example, sharing information (either by allowing an outsider to listen to or participate in or by giving the information to an outsider) about proprietary trading, block orders, or other information intended for internal use only could give an outsider an unfair advantage to act on the information and is prohibited.


The President should question the participation of outsiders and exclude them unless participation is specifically permitted.

## 7.7 Investment Analysis Tools

[FINRA Rule 2214]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer or designee |
| **Resources** | • Description of proposed investment analysis tools |
| **Frequency** | • As required |
| **Action** | • Evaluate efficacy of tool, its source, and its proposed use<br>• Approve tool or return to submitter for changes or disapprove |

ALPINE_LIT167953

| | |
|---|---|
| | • If required, make filing with FINRA |
| **Record** | • Review of tool including approval or disapproval<br>• Vendors approved<br>• FINRA filings, if any are required |

Alpine may use investment analysis tools for use by customers either independently or with assistance from an RR. An "investment analysis tool" is an interactive technological tool that produces simulations and statistical analyses that present the likelihood of various investment outcomes if certain investments are made or certain investment strategies or styles are undertaken, serving as a resource to investors in evaluating the potential risks and return of investment choices.

Recommendations based on use of the tool are subject to suitability rule requirements and other rules about fair dealing with customers. **Proposals for investment analysis tools (including methodology, proposed use, types of investors who will use the tool) must be submitted to Compliance for review and approval prior to use unless provided by an already-approved vendor that created the tool. Vendors must be cleared with the Chief Compliance Officer or designee prior to using tools provided by them.**

## 7.7.1 Disclosures

Disclosures are required when using investment analysis tools. Investment analysis tools (including mention in written reports indicating the results generated by such tool and related retail communications) may be used if the tool, written report, or related retail communication:

- describes the criteria and methodology used (including the tool's limitations and key assumptions);
- explains that results may vary with each use and over time;
- if applicable, describes the universe of investments considered, explains how the tool determines which securities to select, and states that other investments not considered may have characteristics similar or superior to those analyzed *(must indicate whether the tool favors certain securities within the universe of securities considered based on Firm revenue from sales of the securities or understandings between [The Firm] and the entity that created the tool and whether the tool is limited to searching, analyzing or in any other way favoring securities in which [The Firm] makes a market, serves as underwriter, or has any other direct or indirect interest)*; and
- displays the following additional disclosure: "IMPORTANT: The projections or other information generated by *(name of investment analysis tool)* regarding the likelihood of various investment outcomes are hypothetical in nature, do not reflect actual investment results and are not guarantees of future results."

Disclosures must be clear and prominent and in written (including electronic) narrative form. Refer to FINRA Rule 2214.06 for exceptions to requirements for incidental references to tools in retail communications. Users may not imply that FINRA endorses or approves the use of any tool or any recommendation based on the tool.

## 7.7.2 Filing Requirements

Within 10 business days of first use, Alpine must:

ALPINE_LIT167954

- provide FINRA's Advertising Regulation Department access to the investment analysis tool; and
- file with FINRA any template for written reports produced by, or retail communications concerning, the tool.

A tool offered exclusively to institutional investors [FINRA Rule 2210(a)(4)] is not subject to the post-use access and filing requirement if the communication relating to or produced by the tool meet the criteria for an "institutional communication" [FINRA Rule 2210(a)(3)]. If the tool or any related report will be used with a retail investor [FINRA Rule 2210(a)(6)] (such as an employee benefit plan participant or retail customer), the tool is subject to the filing and access requirements.

## 7.8 Complaints

[FINRA Rule 4513 and 4530]

| | |
|---|---|
| **Responsibility** | • Branch Manager or Chief Compliance Officer |
| **Resources** | • Customers' written or oral complaints<br>• FINRA reports (Report Center, Risk Monitoring Reports):<br>   ○ FINRA Sales Practice Complaint Report<br>   ○ FINRA Customer Complaint Report |
| **Frequency** | • As required |
| **Action** | • Branch Manager:<br>   ○ Resolve complaints of an operational nature such as late dividends, delayed delivery of stock, *etc.* If written, forward a copy to the Chief Compliance Officer or designee with description of resolution<br>   ○ Refer all other complaints (mishandling of account by RR, improper transactions, churning, *etc.*) to the Chief Compliance Officer or designee<br>• Chief Compliance Officer or designee:<br>   ○ Send initial acknowledgment of receipt of complaint, if needed<br>   ○ Gather needed information and investigate the complaint<br>   ○ Provide a response and resolution to the customer with a copy to the RR and RR's supervisor<br>   ○ If necessary, amend the RR's U4 (or, in the case of a terminated RR, amend Form U5)<br>   ○ Include the complaint in the quarterly report of complaints to Alpine's SRO<br>   ○ For formal civil actions (lawsuits, arbitrations), refer the matter to Alpine's legal counsel for response<br>   ○ Review the FINRA report for trends in complaints |
| **Record** | • Copies of complaint and related correspondence are retained in:<br>   ○ Branch Manager's file for complaints<br>   ○ Chief Compliance Officer's file of complaints<br>• *Note:* options complaints are retained in separate files both by the Branch Manager and by the Chief Compliance Officer or designee<br>• Reviewed FINRA reports |

ALPINE_LIT167955

### 7.8.1 Complaint Defined

"Complaint" is defined as any written statement by a customer or a person acting on behalf of a customer alleging a grievance involving the activities of a person under the broker-dealer's control in connection with the solicitation or execution of any transaction or the disposition of securities or funds of that customer.

### 7.8.2 Handling Of Customer Complaints

When a written complaint is received, a copy should be forwarded immediately to Compliance for follow-up.

Oral complaints may be resolved by the designated supervisor if the nature of the complaint is operational such as late check, late dividend, or another type of nominal problem. Oral complaints alleging mishandling of the customer's account (unauthorized trading, improper investments, misappropriation, theft or forgery, *etc.*) should be brought to the attention of Compliance for review and resolution.

### 7.8.3 Oral Complaints

Oral complaints should be reported immediately to the designated supervisor for sales practice issues, or to Operations for operational issues. Examples of sales practice issues include complaints regarding losses, improper trades, and other complaints involving the quality of investments or wrongdoing by the RR or Alpine. Examples of operational issues include late dividend checks, errors on monthly statements, etc. RRs should not make independent decisions regarding whether to report complaints; all oral complaints should be reported either to the designated supervisor or Operations.

Some oral complaints involving allegations relating to misappriopriation of funds or securities, theft or forgery must be promptly reported to the Chief Compliance Officer or designee. FINRA has shortened reporting obligations for these types of allegations even if oral in nature. These allegations must be investigated promptly by Compliance.

### 7.8.4 Records Of Complaints

Compliance will maintain a central record of all customer complaints including the following:

- Complainant's name and address
- Account number
- Date the complaint was received
- Name(s) of employee(s) identified in the complaint
- Description of the nature of the complaint
- Disposition of the complaint

### 7.8.4.1 Office Records Of Complaints

Each office where Alpine regularly conducts business (handles funds or securities, solicits or accepts customer orders) is required to maintain a separate file of all written customer complaints. Records of options complaints will be maintained in a separate file (or are separately identifiable) in Compliance and in the office that is the subject of the complaint.

### 7.8.5 Notice To Customers

Each customer is provided with notification of the address and telephone number of the department to which complaints may be directed. The FINOP is responsible for establishing procedures to provide this information to customers.

ALPINE_LIT167956

### 7.8.6 Reporting Of Customer Complaints

[FINRA Rule 4530]

| Responsibility | • Chief Compliance Officer |
|---|---|
| Resources | • Complaints received from customers or referred by RRs, supervisors, or others<br>• FINRA Disclosure Timeliness Report Card |
| Frequency | • Statistical Complaint Report: Quarterly<br>• Form BD, U4s, and U5s (if applicable): Promptly after receipt of complaint |
| Action | • Identify reportable complaints and other reportable events<br>• Report to FINRA the events specified in FINRA Rule 4530 within 10 business days of knowledge of the event<br>• File electronically the quarterly statistical report by the 15th of the month following the calendar quarter |
| Record | • Quarterly complaint reports are maintained in a file for the reports<br>• Copies of events reported within 10 days are retained in the RR's file, or, if no RR is involved, in a Alpine file for reportable events |

The Chief Compliance Officer or designee will file a quarterly statistical report of complaints with FINRA. Complaints reportable in Alpine's Form BD and/or an RR's Form U4 (or an amendment to Form U5, if the RR is terminated) will be promptly forwarded to FINRA.

## 7.9 Customer Privacy Policies And Procedures

[SEC Regulation S-AM and S-P; Securities Industry and Financial Markets Association web page on privacy issues: http://www.sia.com/financial_services/html/breachposition.html; Evolution of a Prototype Financial Privacy Notice: http://www.ftc.gov/privacy/privacyinitiatives/ftcfinalreport060228.pdf]

| Responsibility | • Chief Operating Officer |
|---|---|
| Resources | • Alpine's Privacy Policy<br>• Customer opt-out requests |
| Frequency | • When accounts are opened - provide copy of Privacy Policy and opt-out form<br>• Annually - send notice of Privacy Policy to all customers<br>• As determined by the designated supervisor: training for employees<br>• As necessary - establish procedures for protecting customer information and ensuring information is only shared when it is allowed<br>• As necessary - when new technologies are adopted |
| Action | • Send annual notice to customers<br>• Code accounts for customers opting out<br>• Test internal computer systems periodically<br>• Ensure agreements with third parties receiving customer information |

ALPINE_LIT167957

|  | reflect the third party firm's privacy policies and include a confidentiality agreement<br>• Include maintaining confidentiality of customer information in employee training<br>• When new technologies involving customer information are adopted:<br>   o Determine whether appropriate technological precautions have been taken to protect customer information<br>   o Determine whether existing testing/audits will include the new technology and, if not, adjust testing program<br>   o Review existing policies and procedures to determine if changes/additions are required<br>   o Determine whether added training of employees is necessary and implement, if required |
|---|---|
| **Record** | • Current Privacy Policy<br>• Customer opt-out requests<br>• Record of annually providing notice to all customers<br>• Copies of signed agreements with third parties receiving customer information<br>• Records of periodic privacy audits or other reviews conducted of Alpine's computer system that retains customer information<br>• Records of reviews of outsourced services involving the privacy of customer information (see the section *Outsourcing* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*)<br>• Records of review of new technology involving customer information |

## 7.9.1 Introduction

Alpine has adopted a Privacy Policy which is provided to customers at the time a new account is opened. Notice is also sent to all customers on an annual basis. The Privacy Policy explains the Firm's policies regarding safeguarding of customer information and records and whether Alpine shares information with outside parties. Alpine also publishes its Privacy Policy on its web site.

SEC Regulation S-P ("Privacy Of Consumer Financial Information") applies only to accounts for individuals (*i.e.*, institutional accounts are not affected) and differentiates between "customers," where Alpine has an established relationship with the individual, and "consumers," where there is no pre-established relationship. For purposes of this section, any individual from whom information is obtained (and their legal representative acting on their behalf) to open an account or to obtain services or products from Alpine is considered a "customer." The term "consumer" will be considered synonymous with "customer" for purposes of this section.

The Privacy Policy applies to all individual customers of Alpine, whether U.S. residents or foreign residents.

## 7.9.2 "Public" vs. "Nonpublic" Personal Information About Customers

Generally, information provided to Alpine by a customer or potential customer in the normal course of Alpine offering a product or service is considered "nonpublic personal information." Identifying whether information is "public" or "nonpublic" is important as to Alpine's obligations if Alpine shares information with nonaffiliated third parties. Public information is information that Alpine reasonably believes may be obtained from three sources:

ALPINE_LIT167958

- federal state or local government records;
- widely distributed media; or,
- disclosures to the general public that are required to be made by federal, state, or local law.

Nonpublic personal information also includes any list, description, or other grouping of customers (and publicly available information about them) that is derived from financial information that is not publicly available.

## 7.9.3 Sharing Nonpublic Financial Information

In the normal course of business, Alpine will share customer nonpublic financial information with service providers such as service bureaus. Agreements with such third parties include assurances regarding the protection of customer records and information. (Agreements in existence prior to July 1, 2001 will be amended to include the third party's privacy policy by July 1, 2002.) Information sharing with affiliated companies may also occur, and if applicable, is disclosed in Alpine's Privacy Policy.

Alpine does not share customer nonpublic financial information with non-affiliated companies or non-exempt service providers.

## 7.9.4 Annual Notification

On an annual basis, Alpine will provide all customers with notice regarding Alpine's Privacy Policy.

## 7.9.5 Protection Of Customer Information And Records

[SEC Regulation S-P, Rule 30(a) and SEC Release No. 34-50781; Fair and Accurate Credit Transactions Act of 2003, Section 216; FINRA Notice to Members 05-49]

Alpine has adopted procedures to protect customer information, including the following:

- Customers will be provided the Firm's Privacy Policy at the time an account is opened.
- Accounts that opt out will be coded to block release of nonpublic financial information to nonaffiliated third parties.
- Computerized customer information is accessed by password protection or other established controls within the Firm's system to ensure only authorized persons gain access. For example, sales personnel may access information regarding accounts assigned to them but not the accounts assigned to others.
- The Firm's web site is protected by firewalls, a secure server, and anti-virus programs.
- Employees are prohibited from downloading sensitive information.
- Requests for customer information from outside parties such as regulators, the IRS, and other government or civil agencies, are referred to Compliance for review and response.
- The integrity of the Firm's internal computer systems, including privacy protection, is subject to regular review.
- If required by state law, states will be notified if customer information is stolen making it subject to potential identity theft.

## 7.9.6 Access To Customer Information Via Wi-Fi

Because of risk of unauthorized access by outside parties and the difficulty of ensuring the security of wireless connections to the Internet, employees are not permitted to use wireless fidelity (Wi-Fi) to access customer account information, unless:

- the employee is working on Alpine premises; or

ALPINE_LIT167959

- the employee has installed Firm-required firewalls or other protections and has prior approval from Alpine's designated information officer to use Wi-Fi for Alpine business.

### 7.9.7 Remote Access To Customer Accounts

Some employees may be authorized to work at home or while traveling during which time Alpine's network will be accessed. Authorization must be requested from the designated information officer who will assign passwords and retain a record of authorized employees. Firewalls and other protections are in place to prevent intrusion by outsiders and breaches of confidentiality.

### 7.9.8 Disposal Of Consumer Report Information And Records

[SEC Regulation S-P, Rule 30(b) and SEC Release No. 34-50781; Fair and Accurate Credit Transactions Act of 2003, Section 216]

Consumer report and customer information and records will be disposed of in a manner to prevent unauthorized access or use. Procedures include the following:

- Responsible employees will be identified and trained in proper disposal procedures.
- There will be secure removal of trash involving consumer report information.

## 7.10 Scripts

| Responsibility | • Chief Compliance Officer |
|---|---|
| Resources | • Scripts to be used by RRs or non-registered cold callers |
| Frequency | • As required |
| Action | • Review and revise (as needed)<br>• Scripts for use by non-registered personnel are strictly limited; refer to the section *Cold Callers* for more details<br>• Ensure required elements (as described in the policy) are included in all scripts |
| Record | • Maintain copies of approved scripts in a file - Include initials and date approved |

Scripts used for the purpose of contacting the public are subject to the requirements governing sales literature as outlined in the section *Advertising And Sales Literature*. The general requirements include the following:

- Any scripts involving options require the approval of the Chief Compliance Officer or designee prior to use.
- Scripts for non-option products require the approval of the designated supervisor prior to use.
- Cold callers are restricted to using scripts when making calls (see the section *Cold Callers*). Depending on the content of the script and states where used, the cold caller may require registration and be subject to more stringent state requirements.
- Scripts must clearly include the following, at the beginning or in the introductory portion of the script:
  - the caller's identity
  - the Firm's name

ALPINE_LIT167960

- the address or phone number of the branch office or OSJ where the caller may be contacted
- a statement that the purpose of the call is to solicit interest in a security

These disclosures are not required for a script used by an RR who calls existing customers.

## 7.11 Prohibition Against Payments Involving Publications To Influence Market Prices

[FINRA Rule 5230]

Payments of anything of value, directly or indirectly, are prohibited for the purpose of influencing or rewarding someone in connection with the publication or circulation of information in any electronic or other public media for the purpose of influencing the market price of the subject security. This includes any investment service or similar publication; web sites; newspapers, magazines, or other periodicals; radio; or television program. The prohibition does not apply to clearly-identified paid advertising; a communication that discloses the amount and receipt of compensation; or a research report as defined under FINRA rules.

## 7.12 Pre-recorded Voice Messages And Automatic Telephone Dialing Systems (Autodialers)

[Telephone Consumer Protection Act of 1991; FCC Report and Order dtd 2/15/12: http://transition.fcc.gov/Daily_Releases/Daily_Business/2012/db0215/FCC-12-21A1.pdf; FINRA Rule 3230(k)]

The Firm and its associated persons are prohibited from initiating any outbound telemarketing call that delivers a prerecorded message without a person's express written agreement to receive such calls. The rule also requires that all prerecorded telemarketing calls provide specified opt-out mechanisms so that a person can opt out of future calls. The prohibition does not apply to a prerecorded message permitted for compliance with the "safe harbor" for abandoned calls discussed in the next section.

Alpine does not permit pre-recorded messages or the use of autodialing systems.

## 7.13 Calling (Telemarketing) And Fax Restrictions

[FINRA Rule 3230; NASDAQ Rule 2212; NYSE Rule 3230; Telephone Consumer Protection Act of 1991; Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994; Junk Fax Prevention Act of 2005; FCC Telemarketing Policy web site: http://www.fcc.gov/cgb/policy/telemarketing.html]

| Responsibility | • Chief Compliance Officer |
|---|---|
| Resources | • Requests to conduct telemarketing<br>• Third parties contracted for telemarketing<br>• Do not call requests<br>• Federal/state do not call lists |
| Frequency | • As required |
| Action | • For third party telemarketers, confirm compliance with registration requirements and confirm their ability to comply with requirements<br>• Establish and maintain internal do-not-call list<br>• Obtain federal/state do not call lists and make them available to RRs or establish an internal system for automatically checking outgoing |

ALPINE_LIT167961

| | |
|---|---|
| | calls against lists<br>• For abandoned calls, establish and maintain a method of ensuring compliance with requirements<br>• Train RRs regarding telemarketing prohibitions, use of billing information (if applicable), do-not-call lists, etc. |
| **Record** | • Third party telemarketer compliance reviews<br>• Internal do-not-call list<br>• Records of technology (if employed) to block calls to restricted numbers<br>• Recorded phone calls where billing information is submitted<br>• Records of compliance with abandoned call requirements<br>• Records of training including training materials, who attended when conducted |

This section describes restrictions on telemarketing calls under Federal and FINRA rules and regulations. There may be additional regulations such as state laws and rules. Compliance will communicate any such requirements to RRs.

## 7.13.1 Introduction

[The Firm] and its employees are subject to restrictions that govern telephone solicitations as well as unsolicited facsimile advertisements to residences.

Key points include the following:

- Telephone and facsimile solicitations are allowed when the target individual has an "established business relationship" with [The Firm].
- Calls may not be made to individuals included on a Do Not Call List which includes lists maintained by the federal government, state governments, and [The Firm].
- "Telephone solicitation" is defined as a telephone call initiated for the purposes of encouraging the purchase of or investment in property, goods, or services. The definition exempts calls made by tax-exempt nonprofit organizations.
- "Established business relationship" includes someone who has had a transaction or security position, money balance, or account activity within 18 months preceding the call or fax or has contacted [The Firm] to inquire about a product or service within 3 months preceding the call or fax.

## 7.13.2 Telephone Calls

General requirements include the following:

- The caller must provide the called party, at the beginning or in the introductory portion of the script, the name of the caller; the name of the person or entity on whose behalf the call is being made; a telephone number or address at which the caller may be contacted; and disclosure that the purpose of the call is to solicit the purchase of securities or related services.
- Telephone solicitations to residences may not be made before 8:00 a.m. or after 9:00 p.m. in the time zone of the called party's location.

ALPINE_LIT167962

- A "Do Not Call" list must be established that includes the names of individuals who have specifically requested they not be called for solicitations.
- Prerecorded calls to residences are prohibited unless the person has consented in writing to receive such calls and can opt out of future calls and the Firm complies with the requirements of FINRA Rule 3230(k).
- The telephone number of the sender may not be a 900 number or other number where the called party will incur a charge for notifying the sender of a desire not to be called. Consumers may not be charged to protect their privacy.
- Caller identification information must be transmitted; blocking caller identification information is prohibited.
- Outbound telemarketing calls may not be "abandoned" which means a person answers the call and the call is not connected to someone at the Firm within two seconds of the completed greeting. The Firm employs technology to avoid abandoned calls as included in FINRA Rule 3230(j).

The restrictions do not apply to calls to customers for whom [The Firm] carries accounts and where the account has had some activity in the last 18 months (trading, credit of interest earned, *etc.*). Calls to other broker-dealers also are not covered by these restrictions.

### 7.13.3 Wireless Communications

The rule also applies to outbound telephone calls to wireless telephone numbers.

### 7.13.4 Outsourcing Telemarketing

Compliance must review the use of third party telemarketers before they are engaged. The Firm is responsible for compliance with telemarketing requirements even if the function is outsourced to a third party. Outsource firms may require registration or licensing to conduct telemarketing for the Firm.

### 7.13.5 Unencrypted Consumer Account Numbers

[The Firm] and its associated persons are prohibited from disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing. "Unencrypted" is defined as not only complete, visible account numbers, whether provided in lists or singly, but also encrypted information with a key to its decryption.

### 7.13.6 Submission Of Billing Information

For any telemarketing transaction, [The Firm] or its associated person must obtain the express informed consent of the person to be charged and to be charged using the identified account. If the telemarketing transaction involves pre-acquired account information and a free-to-pay conversion feature, [The Firm] or its associated person must: (1) obtain from the customer, at a minimum, the last four digits of the account number to be charged; (2) obtain from the customer an express agreement to be charged and to be charged using the identified account number; and (3) make and maintain an audio recording of the entire telemarketing transaction. For any other telemarketing transaction involving pre-acquired account information, [The Firm] or its associated person must: (1) identify the account to be charged with sufficient specificity for the customer to understand what account will be charged; and (2) obtain from the customer an express agreement to be charged and to be charged using the identified account number.

### 7.13.7 Abandoned Calls

[The Firm] and its associated persons are prohibited from abandoning any outbound telemarketing call. The abandoned calls prohibition is subject to a "safe harbor" which provides that a firm or its associated person will not be liable for violating the FINRA rule if:

1. [The Firm] or its associated person employs technology that ensures abandonment of no more than three percent of all calls answered by a person, measured over the duration of a

ALPINE_LIT167963

single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues;

2. [The Firm] or its associated person, for each telemarketing call placed, allows the telephone to ring for at least 15 seconds or four rings before disconnecting an unanswered call;

3. whenever an associated person is not available to speak with the person answering the telemarketing call within two seconds after the person's completed greeting, [The Firm] or its associated person promptly plays a recorded message stating the name and telephone number of [The Firm] or associated person on whose behalf the call was placed; and

4. [The Firm] retains records establishing compliance with the "safe harbor."

## 7.13.8 Credit Card Laundering

There is a prohibition against credit card laundering, the practice of depositing into the credit card system a sales draft that is not the result of a credit card transaction between the cardholder and [The Firm]. Except as expressly permitted by the applicable credit card system, the rule prohibits a firm or its associated person from:

1. presenting to or depositing into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and [The Firm];

2. employing, soliciting, or otherwise causing a merchant, or an employee, representative or agent of the merchant, to present to or to deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

3. obtaining access to the credit card system through the use of a business relationship or an affiliation with a merchant, when the access is not authorized by the merchant agreement or the applicable credit card system.

## 7.13.9 Other Prohibited Activities

The following are prohibited when calling customers or prospective customers:

- threats, intimidation, and the use of profane or obscene language
- calling a person repeatedly with intent to annoy, abuse, or harass the called party
- using an alias

## 7.13.10 Do Not Call Lists

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • National Do-Not-Call Registry<br>• State do not call lists<br>• Internal do not call list<br>• Other vendor lists |
| Frequency | • Ongoing |
| Action | • Add names to [The Firm]'s do-not-call list within 30 days of receiving the request<br>• Provide access to do not call lists<br>• Obtain updated national do-not-call registry every 30 days<br>• Include telephone solicitation restrictions in RR education programs |
| Record | • The internal do not call list is maintained by Compliance |

ALPINE_LIT167964

|   | • Federal and state lists are maintained by the vendor (if a vendor is used) or by Compliance |
|---|---|

Phone solicitations may not be made to phone numbers that are included in federal, state, or [The Firm]'s do not call list. **Because fines may be substantial for each call that violates a restriction, it is important to comply with these requirements.**

It is permissible to contact someone with whom [The Firm] has an "established business relationship" (described below); the person called has given express written permission to call outside the applicable time; or the person called is a broker or dealer.

If someone has asked to be included on [The Firm]'s do not call list, that person may not be called regardless of whether they are a current customer or have an established business relationship. Individual states may impose stricter requirements limiting contact with persons on that state's do not call list.

- [list of methods]

### 7.13.11 National Do-Not-Call Registry

The Federal Trade Commission (FTC) and Federal Communications Commission (FCC) established requirements for sellers and telemarketers to participate in a National Do-Not-Call Registry of phone numbers that do not accept phone solicitations. [The Firm] and its employees must avoid solicitation calls to any number on the list unless the person has an "established business relationship" with [The Firm]. The list used must be no older than 31 days prior to the date any call is made.

In general, national do-not-call requirements apply to residential phone numbers. In addition, the FCC includes wireless subscribers in the national registry, presuming these are residential subscribers.

### 7.13.12 State Restrictions

Certain states have enacted restrictions on telephone solicitations to residences. Florida, for example, has a restrictive policy whereby individuals may ask to be included on a state-wide "do not call" list. It is the telephone solicitor's obligation to be aware of any individuals who are included on that list. Contact Compliance if you have questions regarding state restrictions.

### 7.13.13 Internal Do Not Call List

Employees are responsible for reporting to Compliance the names of individuals who do not wish to be called. Compliance maintains a Do Not Call List that is periodically distributed to employees with an explanation of [The Firm]'s telemarketing policy. It is the RR's responsibility to ensure outgoing calls are not made to anyone appearing on [The Firm]'s Do Not Call List.

### 7.13.14 Facsimile Transmissions

General requirements that apply to faxes include:

- A facsimile transmission must include, in a margin at the top or bottom of each transmitted page or on the first page of the transmission, the date and time it is sent and the identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of the sender.
- Unsolicited faxes may only be sent to individuals who have an established business relationship with [The Firm].

ALPINE_LIT167965

### 7.13.15 Established Business Relationship

Calls and faxes to the following are not subject to do-not-call restrictions:

- a person having made a financial transaction or having a security position, a money balance, or account activity with [The Firm] (or its clearing firm if a clearing firm relationship exists) within 18 months immediately preceding a call or fax; or
- [The Firm] is the "broker-dealer of record" (identified on the customer's account application for accounts held directly at a mutual fund or variable insurance product issuer) for the account of the person within the previous 18 months immediately preceding the date of the call or fax; or
- the person has contacted [The Firm] to inquire about a product or service offered by [The Firm] within the previous 3 months immediately preceding the call or fax.

## 7.14 Public Speaking

[FINRA Rule 2210(f)]

| Responsibility | Chief Compliance Officer |
|---|---|
| Resources | <ul><li>Requests for public speaking</li><li>Outlines of subjects to be included</li><li>Charts or other visual aids to be used in conjunction with public speaking</li><li>Written materials to be provided to attendees</li></ul> |
| Frequency | <ul><li>As required</li></ul> |
| Action | <ul><li>Refer requests for contact with media to Compliance</li><li>Review outlines of information to be presented and revise, as needed</li><li>For product-specific presentations, request review by product manager, if necessary</li><li>For mutual fund presentations, materials provided by wholesalers also require the approval of the Chief Compliance Officer or designee</li><li>Option presentations require the review and approval of the Registered Options and Securities Futures Principal</li><li>Review charts and written materials to be presented</li><li>Ensure presentations involving securities being offered by prospectus include provision of prospectuses to attendees</li></ul> |
| Record | <ul><li>Maintain approved outline, samples of visual aids, and written materials in a "Public Speaking" file</li><li>Initial and date all approved materials</li><li>Obtain and maintain in the Public Speaking file a list of attendees who received prospectuses (if applicable)</li><li>The Registered Options and Securities Futures Principal maintains a file of all approved public speaking that includes options</li><li>The Chief Compliance Officer or designee maintains records of approved wholesaler materials</li></ul> |

ALPINE_LIT167966

### 7.14.1 General Guidelines

The general concepts of truthfulness, good taste, and a fair presentation apply to employees engaging in public speaking. Public speaking includes participation in a seminar, forum (including an interactive electronic forum), radio or television interview, or other public appearance or public speaking activity.

### 7.14.2 Approval

Prior to engaging in public speaking, the RR should prepare an outline and submit a Public Appearance/Seminar/Luncheon Request for approval by the designated supervisor. The Request should also include a copy of any proposed advertising about the event if using materials that are not pre-approved by the Firm.

### 7.14.3 Radio, TV, And Other Extemporaneous Presentations

The general standards of communications with the public apply to all public appearances whether scripted or not. The following should be considered when participating in radio, TV, or other non-scripted public appearances. Also refer to the chapter *GENERAL EMPLOYEE POLICIES* and the section *Media Contact Is Limited To Certain Authorized Persons* that explains restrictions on dealing with the media. Most employees are restricted from such contact except with the specific approval of Compliance.

- Specific recommendations of securities must be avoided unless approved by the Chief Compliance Officer or designee or the speaker is authorized under Alpine's "Media Contact" policy. If a recommendation is made, the speaker is required to disclose material information such as when Alpine is a market maker in the stock. The current price and any special risks associated with the security also must be disclosed.
- The Firm's name must be clearly disclosed in conjunction with any securities or services offered.
- The speaker cannot assume a specific level of audience knowledge, experience or suitability. High risk securities may not be appropriate for discussion in a broadcast format available to any listener.
- Media presentations should be clear and understandable. Avoid overly complex messages and technical terminology which may not be understood by the general audience.
- Include products only where the speaker is licensed to sell the product.

For RRs who are approved to engage in radio, TV, or other extemporaneous public speaking, the Chief Compliance Officer or designee is responsible for periodically reviewing the presentations, either on tape or concurrent with broadcast, contacting the RR if unacceptable material is included, and making a record of the review and any action taken.

### 7.14.4 Securities Sold By Prospectus

When presentations include discussion of securities sold by prospectus (mutual funds, variable annuities, *etc.*), participants should receive a copy of the prospectus. A list of participants should be prepared and an indication included that prospectuses were provided.

### 7.14.5 Options

Any presentation that includes a discussion of options must be approved by the Chief Compliance Officer and/or Registered Options and Securities Future Principal or designee prior to the presentation. The Chief Compliance Officer or designee will maintain a written record of any such approved presentations including an outline or description of the presentation.

### 7.14.6 Collateralized Mortgage Obligations (CMOs)

Because of the potential complexity of some CMO investments, review by the designated supervisor of the CMO area is required prior to public speaking on these investments. The chapter *COLLATERALIZED MORTGAGE OBLIGATIONS (CMOs)* should be reviewed for further information.

ALPINE_LIT167967

### 7.14.7 Mutual Funds

Refer to the section *Seminars And Other Public Presentations* in the chapter *MUTUAL FUNDS* for specifics regarding mutual fund seminars.

## 7.15 Cold Callers

[FINRA Notice to Members 95-54]

The following guidelines apply to **unregistered** individuals who engage in cold calling.

### 7.15.1 Cold Caller Requirements

All cold callers will be employees of Alpine and will be subject to the usual background investigations for all new employees. Cold callers are supervised by the designated supervisors of their respective departments.

Cold callers will be provided with a copy of Alpine's policy regarding cold callers and the Calling Restrictions policy as well as Alpine's Do Not Call list. Cold callers will be asked to acknowledge, in writing, receipt of the policies and the list.

### 7.15.2 Permissible Cold Caller Activities

Unregistered cold callers are restricted to the following:

- Inviting prospects to Alpine-sponsored events
- Asking whether a prospect would like to speak to an RR
- Asking whether a prospect would like to receive information about investments

When making a call, the cold caller must identify himself or herself as well as Alpine and the purpose of the call.

Prior to making calls, the caller must check Alpine's Do Not Call List.

### 7.15.3 Prohibited Cold Caller Activities

Unregistered individuals may NOT:

- Solicit prospects to open accounts
- Discuss general or specific products or services
- Pre-qualify prospects by inquiring about financial status or investment objectives
- Use an alias when identifying themselves
- Contact persons included on Alpine's Do Not Call List

### 7.15.4 Telemarketing Restrictions

Cold caller activities are subject to the Telephone Consumer Protection Act of 1991 issued by the Federal Communications Commission, as outlined in the section *Calling Restrictions* of this manual.

### 7.15.5 Scripts

Cold callers will be restricted to Alpine-approved scripts when making calls. Scripts are approved by the designated supervisor prior to use.

## 7.16 Electronic Communications

[FINRA Notices to Members 01-23 and 98-11]

ALPINE_LIT167968

This section outlines requirements and restrictions regarding the use of electronic communications systems including e-mails.

## 7.16.1 Electronic Communications Policy

Alpine has an Electronic Communications Policy that is included in the chapter *GENERAL EMPLOYEE POLICIES*. The policy includes guidance on:

- Use of electronic communication systems for business use
- Monitoring and auditing of electronic communications
- Web sites, chat rooms, and instant messaging

The Policy should be referenced for details of policies.

## 7.16.2 Electronic Mail (E-mail)

### 7.16.2.1 Commercial E-Mail Procedures

[CAN-SPAM Act of 2003]

| | |
|---|---|
| **Responsibility** | Chief Compliance Officer |
| **Resources** | • Notification of recipients wanting to "opt-out" |
| **Frequency** | • Ongoing |
| **Action** | • Include any "opt-out" requests on a "Do-Not-Email" list<br>• To the extent available in the electronic mail system, block outgoing e-mails to those who have opted out |
| **Record** | • Do-Not-Email list<br>• Requests to opt out |

E-mails that are "commercial electronic mail" will comply with the requirements and restrictions under federal law governing such communications. Commercial electronic mail includes, under federal law, any electronic mail message primarily for the purpose of sending a commercial advertisement or promotion of a commercial product or service. It does not include electronic mail relating to transactions or where there is a relationship between the sender and the recipient.

Commercial e-mail will comply with the following federal requirements.

- All e-mails will include clear identification of Alpine, its address and the sender's e-mail address.
- E-mails will be sent using Alpine's computers or other computers specifically authorized for transmission of Alpine e-mails.

ALPINE_LIT167969

- Recipients will be given the opportunity to "opt-out" from receiving future commercial electronic mail.
- Alpine will not use "address harvesting" or "dictionary attacks" to obtain e-mail addresses from the Internet.

### 7.16.2.2 Review And Approval

[FINRA Rule 3010(d)(2), Notices to Members 99-03 and 98-11]

| Responsibility | • Chief Compliance Officer - review of e-mail |
|---|---|
| Resources | • Incoming and outgoing e-mail<br>• Filtered e-mail (if a filtering process is used) |
| Frequency | • Monthly - review of outgoing and incoming e-mails |
| Action | • Review incoming and outgoing e-mails on a sampling basis as follows:<br> ○ "key word" search on all e-mails, done by program purchased for compliance<br>• Review outgoing non-electronic correspondence for appropriateness of communications<br>• For incoming e-mail, identify and respond to complaints<br>• Compliance may, at its discretion, audit an individual employee's computer use and communications<br>• Take corrective action, if necessary, including further education of RR, restricting e-mail privileges, other action in consultation with Compliance |
| Record | • Copies of incoming and outgoing e-mails are retained electronically<br>• Record of review is included in a log or recorded electronically<br>• Corrective action is included in the employee's file<br>• Review findings are maintained in a review file |

Incoming and outgoing customer e-mails are reviewed, on a sampling basis as enumerated above. E-mails may also be subject to review by a filtering program that identifies inappropriate language.

Advertising, sales literature, research, market letters, communications with the press, and other communications for general distribution or release to the media require pre-use review and approval in accordance with policies governing these types of communication. Refer to other sections of this chapter regarding requirements for these communications. Also refer to Alpine's media policy in the chapter *GENERAL EMPLOYEE POLICIES*.

Alpine uses Smarsh for the review of, and the retention of, emails. Emails are retained in accordance with recordkeeping and retention rules.

### 7.16.2.3 E-Mail Policy Violations

When a message is discovered that violates Alpine's policy, Compliance will take the following action:

ALPINE_LIT167970

- Review the employee's file to determine if there have been other violations and whether the employee has responded appropriately.
- Send notification to the employee, with a copy to the employee's supervisor, of the violation including sender's identification; receiver's identification; date/time of message; subject line; and size/name of attachment, if applicable. Any prior violations will also be noted for the employee's and supervisor's information.
- At Compliance's discretion, send a copy to the supervisor's supervisor if a repeat problem and it does not appear an appropriate response was received for prior violation(s).
- Determine disciplinary action, if any.
- Retain a record of notification to the employee and any action taken in the employee's file.
- Where there is a history of violations, Compliance may conduct an electronic audit of the individual's computer files to determine content of information being retained.

### 7.16.2.4 Education And Training

| Responsibility | Chief Compliance Officer |
|---|---|
| Resources | <ul><li>Electronic Communications Policy</li><li>Annual compliance meetings</li><li>Firm Element continuing education</li><li>Annual employee certifications</li><li>Periodic reminders distributed to employees</li></ul> |
| Frequency | <ul><li>At time of hire of new employees</li><li>Annually for:<ul><li>Compliance meetings</li><li>Continuing education</li><li>Certifications</li></ul></li><li>Periodically for reminders</li></ul> |
| Action | <ul><li>Provide Policy to new employees</li><li>Conduct annual compliance meetings</li><li>Conduct continuing education</li><li>Distribute and obtain certifications</li><li>Send periodic reminders</li></ul> |
| Record | <ul><li>New employee acknowledgment of Policy is filed in the employee's personnel file</li><li>Annual compliance meetings are documented in registration and/or branch files</li><li>Records are retained of RRs completing continuing education</li><li>Compliance retains copies of reminders sent to employees</li><li>Annual certifications are filed in registration and/or personnel files</li></ul> |

Alpine uses a number of methods to educate its employees regarding Alpine's policies regarding electronic communications.

- Before employees are permitted to use Alpine-sponsored e-mail, employees are required to read and agree to the Electronic Communications Policy. The Policy is distributed to all new employees who are required to acknowledge receipt in writing.
- Current employees acknowledge their understanding and agreement with the Policy in Alpine's annual certification.

ALPINE_LIT167971

- The Firm Element continuing education program and/or annual compliance meeting for registered employees will periodically include training regarding Alpine's Electronic Communications Policy.
- Periodically Alpine will distribute reminders to employees regarding the Policy.

## 7.16.2.5 Special Reviews

As part of Alpine's supervision of RRs, Compliance may impose different standards of review that may include review of all incoming and outgoing correspondence regardless of form, pre-approval, or other special reviews. Refer to the chapter *EMPLOYMENT, REGISTRATION AND LICENSING* and the section *Heightened Supervision* for further information.

## 7.16.3 Instant Messaging

[FINRA Notice to Members 03-33]

| Responsibility | <ul><li>Chief Compliance Officer: review instant messages</li><li>Compliance: determine extent of permitted instant messaging</li></ul> |
|---|---|
| Resources | <ul><li>Vendor or in-house program or service designed for review, retention, and retrieval of instant messages</li></ul> |
| Frequency | <ul><li>For authorized instant messaging, monthly review</li></ul> |
| Action | <ul><li>Compliance:<ul><li>Determine whether Alpine will permit instant messaging and, if so, what departments and/or personnel are permitted to use instant messages</li><li>Determine system for review, retention, and retrieval of instant messages</li></ul></li><li>Designated supervisor: review instant messages in accordance with sampling or review of all messages as outlined in the section *Outgoing Correspondence*</li></ul> |
| Record | <ul><li>Instant messages are retained electronically</li><li>Record of review is included in a log or recorded electronically</li><li>Compliance retains agreements with outside vendors engaged to provide surveillance and written record of departments and/or personnel authorized to use instant messaging</li></ul> |

Instant messaging is a form of electronic communication that is subject to Alpine's review, record retention policies. Refer to the *Electronic Communications Policy* in the section *Instant Messaging* in the chapter *GENERAL EMPLOYEE POLICIES*, for more information about these requirements.

Alpine uses Smarsh for the review of, and the retention of, Instant Messaging. Instant Messaging communications are retained in accordance with recordkeeping and retention rules.

Departments permitted to use instant messaging include:

- Registered Representatives
- Branch Office

ALPINE_LIT167972

- Back Office
- OTC trading

### 7.16.4 Advertising

Electronic advertising is subject to pre-use review. Refer to the section *Retail Communications* in this chapter.

### 7.16.5 Bulletin Boards, Web Sites And Other Electronic Communication Systems

The use of computer bulletin boards, web sites, or other electronic communication systems on the Internet for the purposes of advertising or soliciting business is subject to the same requirements for approval as other forms of written communications. Participation in electronic communication systems must comply with requirements in this section, and Alpine's Electronic Communications Policy in the chapter *GENERAL EMPLOYEE POLICIES.*

### 7.16.5.1 Firm Web Site

[FINRA Rule 2210; FINRA Notice to Members 07-02; SIPC By-Laws, Article 11 Section 4; SEC Guidance for public companies on the use of company web sites: http://www.sec.gov/rules/interp/2008/34-58288.pdf]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer |
| **Resources** | • Alpine's web site<br>• Requests to include information on Alpine's web site |
| **Frequency** | • Perform periodic reviews of Alpine's website<br>• Perform review at the time a change is made to Alpine's web site |
| **Action** | • Review proposed materials to be included on the web site and approve or disapprove (Determine whether filing with FINRA is required and make the necessary filings)<br>• Review the web site to ensure only previously approved materials are included<br>• If SIPC is referenced on the site, provide a hyperlink to the SIPC web site<br>• If FINRA is referenced on the site, provide a hyperlink to FINRA's home page<br>• Contact supervisors of departments that have included unapproved materials and take corrective action<br>• Corrective action may include changing or deleting the material and/or reminding the supervisor of the pre-use approval requirement |
| **Record** | • Maintain an electronic file of all materials maintained at the web site and the approval of their use (and if applicable, copies of FINRA filings)<br>• Maintain records of periodic reviews<br>• If any corrective action is taken, describe such action |

Alpine has established a web site. Any information to be included on the web site requires the **prior approval** of the Chief Compliance Officer or designee.

ALPINE_LIT167973

If Alpine's site refers to its membership with FINRA, a hyperlink to the FINRA internet home page will be included. If SIPC membership is included on the site, a hyperlink to SIPC's web site will be shown.

### 7.16.5.2 RR Web Sites

RRs are not permitted to establish personal web sites to solicit or conduct business on behalf of Alpine. Participation in other web sites to conduct Alpine's business (other than approved participation in Alpine's web site) through linking or other means of contacting or identifying the RR is prohibited.

### 7.16.5.3 Data Feeds

Any third party data feeds tied to [The Firm]'s or an RR's web site must be reviewed by the Chief Compliance Officer or designee prior to use. Reviews will identify the proficiency and efficacy of the data provider to feed accurate and timely information. Compliance will advise the requestor whether the data provider is approved and will retain records of its review.

### 7.16.5.4 Third-Party Postings

Currently, Alpine does not allow third parties including customers to post to the Firm's website. Should this policy change, Alpine will adopt the following policy: The Chief Compliance Officer or designee must review and approve any requests to include third-party postings on [The Firm]'s web site prior to inclusion of such postings on the site. If third-party postings (including customer postings) are permitted, the following requirements will apply:

- A disclaimer will be included on the web site stating that such posts are not those of [The Firm]; do not reflect the views of [The Firm]; and [The Firm] does not take responsibility for the content of such posts.
- The site will be regularly reviewed and third-party posts will be monitored as part of that review to mitigate any perception that [The Firm] is adopting any post.
- Usage guidelines will be provided to customers or other third parties permitted to post on firm-sponsored sites.
- Compliance may develop standard responses that RRs will be authorized to use in response to third-party postings on social media web sites.

Compliance will retain records of registration and screening of third parties allowed to post.

## 7.16.6 Hyperlinks

[FINRA Interpretation Letter from Thomas M. Selman to the Investment Company Institute, November 11, 1997]

| Responsibility | Chief Compliance Officer |
|---|---|
| Resources | • Proposed web site or other material that includes hyperlinks |
| Frequency | • As required |
| Action | • Confirm hyperlink conforms to requirements for inclusion |
| Record | • Web site or other material maintained in review file |

When hyperlinks to third-party sites are included in Firm communications or on a Firm web site, it is important the hyperlink meets the following conditions to avoid liability for the content or regulatory filing of information included in the third-party site:

ALPINE_LIT167974

- A hyperlink may not be established to a site known (or there is reason to know) to contain false or misleading information.
- The hyperlink must be continuously available to investors who visit the site.
- Investors have access to the hyperlinked site whether or not it contains material favorable to Alpine.
- The linked site can be updated or changed by the third party, following which investors would still be able to use the hyperlink.

## 7.17 Identification Of Sources

When using communications not prepared under the direct supervision of Alpine, it is necessary to identify, on the communication, the person or entity that prepared the material. This includes research reports obtained from outside sources.

ALPINE_LIT167975

# 8 FINANCIAL AND OPERATIONS PROCEDURES

This chapter provides key policies and procedures affecting the financial and operations areas of Alpine. Detailed procedures affecting other areas of operations are included in separate operations procedures manuals.

Alpine has designated a Financial and Operations Principal ("FINOP") who is also the CFO and who is responsible for general oversight of Alpine's financial and operations areas. The CFO is responsible for the day-to-day financial and operational procedures of Alpine.

## 8.1 Qualification Of Operations Personnel

[FINRA Rule 1230(b)(6)(A) and 1250; FINRA Regulatory Notice 11-33; FINRA Qualifications FAQ: http://www.finra.org/Industry/Compliance/Registration/QualificationsExams/P124607]

Certain operations personnel are considered "covered persons" under FINRA Rule 1230 because of their responsibilities for "covered functions" as defined in the Rule. These personnel are required to qualify as "Operations Professionals" by completing the Series 99 qualification examination or by qualifying for an exception because of the person's other registration qualifications. In general the requirements apply to senior management responsible for covered functions; persons designated by senior management to supervise, manage, or approve or authorize work relating to the covered functions; and persons with authority or discretion materially to commit Alpine's capital relating to covered functions. The Rule should be consulted for definitions of covered persons and covered functions.

In addition, covered persons are required to participate in Regulatory Element and Firm Element continuing education. Refer to the chapter *TRAINING AND EDUCATION* for procedures regarding continuing education.

The Operations designated supervisor is responsible for confirming that covered persons complete the necessary requirements for registration and continuing education and to restrict an employee's activities if either requirement is not completed within required timeframes.

## 8.2 Books And Records

[SEC Securities Exchange Act of 1934 Rule 17a-3 and Rule 17a-4; FINRA Rule 4510, 4511 and 4512; FINRA New And Amended Recordkeeping Checklist: http://www.finra.org/web/groups/rules_regs/documents/rules_regs/p006378.pdf; MSRB Rule G-8 and G-9]

### 8.2.1 Introduction

SEC Rule 17a-3 identifies the types of books and records to be retained by Alpine and 17a-4 identifies the period these records are to be retained. SROs also specify certain record retention requirements. Alpine's IT Committee, under the direction of the CFO, is responsible for retaining required records. Supervisors may maintain their own records with respect to their supervisory responsibilities. The FINOP is responsible for establishing and maintaining Alpine's record retention schedule.

### 8.2.2 Electronic Storage Of Records

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)]

| Responsibility | • Alpine's IT Committee |
|---|---|

ALPINE_LIT167976

|  |  |
|---|---|
| **Resources** | • Records required to be retained under SEC and SRO rules |
| **Frequency** | • Ongoing recordkeeping, as required by rule<br>• Audit system - ongoing and periodic |
| **Action** | • Develop internal system, a vendor or other third party meeting rule requirements<br>• Contract with an independent third party download partner, if appropriate<br>• Notify DEA when initiating electronic storage and provide third party representation<br>• Provide revised notifications to DEA if necessary<br>• Obtain senior management approval of system configuration to store records and subsequent changes<br>• Issue passwords to authorized personnel and disable passwords for terminated employees or those no longer requiring access<br>• Take corrective action internally or with outside vendor if anomalies are detected<br>• Establish audit system for accountability regarding the input of records into the storage system |
| **Record** | • Contracts with vendors or other third parties<br>• Notification(s) to DEA<br>• Written approval from senior management regarding system configuration<br>• Record of corrective action taken, if necessary, when anomalies are detected<br>• Record of passwords issued and disabled<br>• Audit system and anomalies detected including corrective action taken |

Alpine utilizes electronic storage media and/or micrographic media for certain records.

### 8.2.2.1 Notification To Examining Authority

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)(2)(i)]

Alpine has provided the required notification to its designated examining authority (DEA) prior to employing electronic storage media. The independent third party with download access is also required to submit an undertaking indicating it agrees to promptly furnish information to regulators.

### 8.2.2.2 Conditions

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)(2)(ii)]

As required by rule, Alpine's electronic storage media meets the following conditions:

- non-rewritable, non-erasable format
- automatic verification of the quality and accuracy of the process
- serialize original (and duplicate units) and time-date for required retention period
- capacity to readily download records

ALPINE_LIT167977

### 8.2.2.3 Ability To Retrieve And Reproduce

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)(3)]

Alpine's electronic or micrographic storage will also meet the following requirements:

- facilities for immediate, easily readable production of records
- ability to provide facsimile enlargements
- duplicate copies stored separately from the originals
- organized and indexed accurately
- current information necessary to access records and indexes

### 8.2.2.4 Audit System

The third party that provides electronic storage services has an audit system to test, on an ongoing basis, the integrity of the Alpine's records retained in electronic storage media. Anomalies reported by the third party will be reviewed by the Alpine's IT Committee on the FINOP's behalf to ensure corrective action has been taken and records are retained as required.

### 8.2.2.5 Confidentiality Of Electronic Records

Alpine (in conjunction with any vendor) protects against unauthorized access to or use of customer records by use of a password system. Passwords will be changed periodically and disabled for terminated employees or employees no longer requiring access.

## 8.3 Calculation And Reporting Of Net Capital

[SEC Securities Exchange Act of 1934 Rule 15c3-1, Rule 17a-5 and Rule 17a-11; FINRA Rule 4110, 4120, 4130, 4140, 4521 and 4524]

| | |
|---|---|
| **Responsibility** | • Designated Supervisor |
| **Resources** | • Financial and transaction records |
| **Frequency** | • Ongoing |
| **Action** | • Maintain ongoing calculation of Alpine's net capital<br>• Report net capital as required<br>• Report net capital deficiencies as required, when necessary |
| **Record** | • Records retained by the FINOP include:<br>  o FOCUS reports<br>  o Other net capital calculations |

The calculation and monitoring of net capital is the responsibility of the FINOP who also is responsible for ensuring the accurate and timely reporting of periodic net capital reports. Some of the FINOP's specific responsibilities include:

- Review and filing of Alpine's financial reports and periodic review of accounting records
- Periodic consideration of whether Alpine's minimum net capital requirements have changed because of changes in Alpine's business
- Supervising additions to, and withdrawals from, the equity capital of Alpine
- Reporting borrowings and subordinated loans for capital purposes

ALPINE_LIT167978

- Establishing procedures for retention of required financial books and records

If Alpine becomes deficient in its net capital position, the FINOP is responsible for making the necessary reports to regulators and communicating any restrictions in business that may result.

## 8.4 Annual Audit Reports

[SEC Securities Exchange Act of 1934 Rule 17a-5(d); FINRA Regulatory Notice 11-46]

The FINOP is responsible for filing of [The Firm]'s annual audited financial statements with regulators, not more than 60 days after the date of the statements, including the oath and affirmation page. Filing is made electronically with FINRA and hard copies are filed with the SEC's Washington office and [The Firm]'s regional SEC office. The FINOP will retain records of the filings including the filings themselves, names of regulators, and date of filing.

Reports will be as of the same fixed or determinable date each year, unless a change is approved in writing by FINRA. A copy of FINRA's written approval will be sent to [The Firm]'s SEC regional office.

## 8.5 Reconciliations And Bank Records

| Responsibility | • FINOP<br>• President |
|---|---|
| Resources | • Bank records |
| Frequency | • Monthly |
| Action | • Reconcile bank accounts against Alpine's records<br>• Make notation of any item which FINOP is unable to reconcile and the date in which it was discovered<br>• Review of reconciliation performed by FINOP (President) |
| Record | • Bank statements and other bank records, retained by FINOP<br>• Record of any items which are unable to reconcile<br>• Record pertaining to review of reconciliation, retained by FINOP |

The FINOP is responsible for establishing procedures for the periodic reconciliation of bank statements, clearing and depository accounts, and other accounting and business records. Proposed procedures shall be reviewed by Compliance prior to implementation.

Records of bank accounts and other reconciled accounts will be maintained in accordance with regulatory requirements. Review of monthly reconciliation may be reviewed by the President and documentation of such review will be maintained with bank statements, bank records and reconciliation.

## 8.6 Financial Reporting

[SEC Securities Exchange Act of 1934 Rule 17a-5 and Rule 17a-11; FINRA Rule 4520 Series]

The FINOP is responsible for financial reporting, payment of fees and assessments and maintaining records of reporting and payment. Some of the requirements include:

ALPINE_LIT167979

- Filing net capital reports
- Reporting net capital deficiencies
- Reporting notice of books and records deficiencies Rule 17a-11(d)
- Preparation and filing of unaudited financial statements
- Engaging outside accountants to conduct Alpine's annual audit and notifying regulators when there is a change of accountant
- Filing audited financial statements with regulators and providing to customers, as required
- Providing statements of accounts to customers pursuant to Rule 2340(a)
- Notifying regulators of any change in Alpine's fiscal year
- Payment of assessments and fees to regulators

Within 17 business days after the end of each month that is not a quarter, as of month-end the FINOP will provide all reporting as detailed in Rule 17a-5.

Alpine recognizes the responsibilities of financial reporting rest primarily on the FINOP. As a contingency plan related to financial reporting, should the FINOP not be available to complete and submit reporting the outside accounting firm of Alpine will be enlisted to complete reporting until a suitable replacement is acquired.

## 8.6.1 Preparation Of Financial Reports

The FINOP is responsible for preparing and reviewing financial reports. While the FINOP may delegate responsibility for gathering information and preparing the reports, the FINOP is ultimately responsible for reporting accurate information.

Preparation of reports will include the following procedures:

- Gathering information through Alpine's records and systems to compile financial information.
- Working with outside auditors, when appropriate.
- Drafting reports.
- Determining the accuracy of calculations and information included in the report.
- Providing information to senior management and others, as appropriate.
- Sending reports to designated regulators.
- Providing information for publication to customers, where required by rule.

The FINOP will maintain files including calculations and other information utilized for preparing financial reports and records of internal, regulatory, and other external distribution of reports, as required.

Alpine recognizes the responsibilities of financial reporting rest primarily on the FINOP. As a contingency plan related to financial reporting, should the FINOP not be available to complete and submit reporting the outside accounting firm of Alpine will be enlisted to complete reporting until a suitable replacement is acquired.

## 8.6.2 Disclosure Of Financial Condition

[FINRA Rule 2261]

Upon request, information about Alpine's financial condition in its most recent balance sheet will be made available to customers and to any member firm that is party to an open transaction or has on

ALPINE_LIT167980

deposit cash or securities with the Firm. The information may be provided in paper or electronic form (if for a customer, the customer must consent to electronic delivery).

## 8.7 Fees And Service Charges

[NASD Rule 2430; NASD Notice to Members 92-11]

| Responsibility | • Board of Directors |
|---|---|
| Resources | • Schedule of fees and charges<br>• Information regarding changes |
| Frequency | • As required |
| Action | Instruct Chief Operating Officer or designee to:<br>• Arrange for written notification to customers<br>• Include notification to new customers when accounts are opened<br>• Update website as needed |
| Record | • Notice provided to new customers<br>• Copy of written notification sent to customers including date sent<br>• Records of website changes and information posted |

Broker-dealers are obligated to disclose fees and service charges to customers. In general, fees and charges are required to be reasonable and not unfairly discriminatory between customers.

If a fee or commission will be charged to redeem a mutual fund and the fund could be sold through the fund company itself without cost, the customer should be notified that the fund could be redeemed without cost by liquidating directly through the mutual fund.

### 8.7.1 Notification Of Customers

Customers will be notified of fees and changes to fees and service charges as follows:

- At the time an account is opened.
- When there is an increase in fees, at least 30 days prior to the increase , Alpine will post the revised fee schedule on Alpine's website.
- If notification is by a method other than a letter (*i.e.,* statement stuffers, newsletters, *etc.*) notification of a fee increase will be clear and conspicuous and in plain English.
- Where a website is used to communicate or interact with customers, all fees will be posted (and kept current) including changes and the projected date of changes.
- For extensive fee changes, a letter may be sent to customers referring them to a website where complete information may be obtained.

## 8.8 Fidelity Bonding

[FINRA Rule 4360]

The FINOP is responsible for obtaining and maintaining fidelity bonding as required by rule and verifying the adequacy of coverage on at least an annual basis when the bond is subject to renewal.

ALPINE_LIT167981

## 8.9 Cash Deposits

Alpine accepts cash or currency from customers subject to Alpine's discretion. The following steps must be followed when cash or currency are received:

- Immediately provide the cash to the cashier or other authorized Operations personnel.
- The cashier or Operations is responsible for counting the cash (2 people must be present to verify the amount) and entering the amount into Alpine's customer account system for credit to the customer's account.
- Immediately thereafter the cash must be taken to Alpine's bank for credit to the account maintained for the benefit of customers or, if no account exists, obtain a cashier's check or money order made payable to Alpine and then send the check/money order to Alpine the same day.
- The CFO is responsible for filing Form 4789 (Currency Transaction Report) with the IRS by the 15th calendar day after receipt for cash in excess of $10,000 for one person on any one day.
- The CFO is responsible for retaining a file of forms filed with the IRS.

# 8.10 Risk Management

[FINRA Notice to Members 99-92]

This section generally outlines Alpine procedures designed to address "risk management." Because these procedures address various lines of business that operate in a constantly changing market environment, they are not static and should be adapted by the CFO to meet the needs of Alpine on an ongoing basis.

## 8.10.1 Risk Assessment

### 8.10.1.1 Recordkeeping Requirements

[SEC Securities Exchange Act of 1934 Rule 17h-1T and Rule 17h-2T; SEC no-action letter to Douglas G. Preston, Securities Industry Association, dated September 30, 1993]

The FINOP is responsible for establishing procedures and determining that Alpine maintains records in accordance with SEC requirements for risk assessment recordkeeping.

### 8.10.1.2 Reporting Requirements

The FINOP is responsible for determining whether Alpine is required to file Form 17-H Risk Assessment Report For Brokers And Dealers and, if applicable, filing the form with the SEC within 60 calendar days of the end of Alpine's fiscal year.

## 8.10.2 Risk Practices Regarding Employment And Employees

Alpine has established procedures regarding the hiring of personnel; conduct and review of employee accounts; granting of authority to act in various capacities on behalf of Alpine; and the integrity of Alpine's systems and financial reporting.

### 8.10.2.1 Background Checks

One of Alpine's first lines of defense is the hiring of qualified people who do not bring high-risk behavior to their positions. Alpine conducts background checks on all applicants for employment with Alpine. All offers of employment are considered conditional pending the outcome of the background checks. These background checks include contact with the applicant's prior employers for at least the past three years. Any adverse information is reviewed by the CFO and the President for consideration prior to finalization of employment.

ALPINE_LIT167982

Also refer to the section *Hiring Procedures* in the chapter *EMPLOYMENT, REGISTRATION AND LICENSING* for more information about hiring procedures.

### 8.10.2.2 Employee Accounts

Employees are subject to policies governing the conduct of their personal securities accounts. Refer to the section *Employee And Employee Related Accounts* in the chapter *GENERAL EMPLOYEE POLICIES* as well as the chapter on *INSIDER TRADING*.

### 8.10.2.3 Authority

Employees may only act on behalf of Alpine within the boundaries of authority granted them by Alpine. The following generally outlines the authority of certain employees or committees and their respective responsibilities.

#### 8.10.2.3.1 Board Of Directors

Alpine's Board of Directors meet annually and as may be needed to take necessary action on behalf of Alpine. On at least an annual basis, the Board of Directors will affirm the authority of designated Board committees, if such have been established, as well as certain employees granted specific powers by the Board. At least annually, the Board of Directors review the activities of those individuals that report directly to them.

#### 8.10.2.3.2 Chief Financial Officer

The CFO (or his/her designee) is responsible for the following on behalf of Alpine:

- Establishing accounting procedures in accordance with generally accepted accounting principles
- Ensuring the accurate and timely filing of Alpine financial reports with regulators and others where financial reports are required
- Establishing bank accounts and designating employees authorized to sign checks and transfer funds on behalf of Alpine
- Interacting with Alpine's public accounting firm and coordinating the providing of information requested during Alpine's annual audit
- Follow up regarding exceptions or recommendations referred by the outside public accounting firm

## 8.10.3 New Accounts

In addition to review and approval by an individual designated as a Supervisor in Chapter 1 of this Manual, new accounts are subject to Alpine's Customer Identification Program (described in the Anti-Money Laundering Program).

## 8.10.4 Handling Customer Funds And Securities

Alpine has procedures for safeguarding customer funds and securities. Refer to the section *Safekeeping Of Customer Funds And Securities* in this chapter.

## 8.10.5 Firm Computers And Computerized Data

Alpine's IT Committee is responsible for establishing procedures regarding Alpine's computers and data maintained on computers, including the following:

- Limiting access to centralized physical data processing and computer sites to authorized personnel only
- Limiting data access to authorized personnel only
- Back-up of data files
- Disaster recovery plans

ALPINE_LIT167983

### 8.10.6 Extension Of Credit

Alpine has established procedures for overseeing compliance with Regulation T. This section includes additional procedures used by Alpine to identify and address risk relating to the extension of credit.

#### 8.10.6.1 Concentrated Securities Positions

Alpine has established procedures for reviewing credit risk for concentrated positions within accounts and credit risk associated with firm-wide concentrated positions.

##### 8.10.6.1.1 Individual Account Concentration

For any margin account where one position represents 50% or more of the value of the account, the account will be reviewed and considered for a higher maintenance requirement or reduction of the concentrated position.

##### 8.10.6.1.2 Firm Concentration

Alpine identifies any securities position where Alpine holds in excess of 10% of the outstanding shares of an issuer.

#### 8.10.6.2 Accounts In Deficit Positions

Alpine regularly reviews accounts in deficit positions to determine corrective action.

### 8.10.7 Proprietary Accounts

Alpine has established procedures to limit risk from proprietary positions.

#### 8.10.7.1 Valuation Of Positions Held

The CFO or designee is responsible for valuing positions held at the end of each business day. The CFO is responsible for establishing procedures for valuation of securities where there is no central or established market valuation (*i.e.,* CMOs, non-rated municipal bonds, *etc.*).

#### 8.10.7.2 Trading Limits

Alpine has established limits on its trading account inventories. In addition to monitoring by the Head Trader, the CFO is responsible for identifying when trading limits are exceeded. Refer to the section(s) *Inventory Positions* in product chapters of this manual for more information on trading limits.

#### 8.10.7.3 Positions Held For Alpine's Investment

The CFO is responsible for monitoring positions owned by Alpine for its own investment purposes.

### 8.10.8 New Products

[FINRA Notice to Members 05-26]

| Responsibility | • CFO |
|---|---|
| Resources | • New Product Review Checklist<br>• Other information available about the new product |
| Frequency | • As required when new products are proposed |
| Action | • Conduct a review to:<br>  ○ Determine the product is beneficial for customers<br>  ○ Determine the types of customers that are the target market<br>  ○ Conduct appropriate due diligence about features and risks of |

ALPINE_LIT167984

| | the product<br>○ Determine whether written disclosures or educational information should be provided to potential purchasers<br>○ Determine what information should be provided to RRs and supervisors, including any additional training<br>• Approve or disapprove the product for distribution |
|---|---|
| **Record** | • Approved New Product Review Checklists are retained in a file for the product<br>• Other reviewed Checklists are retained in a New Product Review Checklist file |

All new products require review and approval by the Board of Directors prior to offering new products to customers. If any questions arise regarding the appropriateness of a new product, the CCO should be consulted. A "new product" may include a product that:

- is new to the marketplace or Alpine.
- was previously sold only to a limited segment of Alpine's customers, such as only to institutional customers and now will be offered to retail customers.
- will be offered by a category of RRs who did not previously offer the product, such as a product new to retail RRs.
- involves material modifications to an existing product including risk, product structure, or fees and costs.
- requires material operational or system changes.
- involves a new or significant change in sales practices.
- raises conflicts that have not been previously identified and addressed.

If there is a question whether a product may be a "new" product, it should be submitted for the new product review.

### 8.10.8.1 New Product Review Checklist

Individuals and departments wanting to offer new products are required to prepare information for the review by completing the New Product Review Checklist. Information to be provided includes a description of the product, to whom the product would be offered, and economic justification of the product. The requestor will be notified regarding approval/disapproval or the need for modifications or additional information.

## 8.11 Business Continuity Plan

[FINRA Rule 4370; FINRA Notice to Members 06-74 and 04-37; NASDAQ Rule 3510; SIFMA Business Continuity Planning website: http://www.sifma.org/Services/Business-Continuity-Planning/]

Alpine has developed a Business Continuity Plan ("BCP" or "Plan") to provide procedures for response and recovery in the event of a significant business disruption. The purpose of the BCP is to identify responsible personnel in the event of a disaster; safeguard employees' lives and firm property; evaluate the situation and initiate appropriate action; recover and resume operations to allow continuation of business; provide customers with access to their funds and securities; and protect books and records. The BCP was developed considering the types of business conducted, systems critical to support business, and geographic dispersion of offices and personnel.

### 8.11.1 Designation Of Responsibilities

The following is a list of those responsible for Alpine's Business Continuity Plan.

| Responsibility | Titles |
|---|---|

ALPINE_LIT167985

| | |
|---|---|
| Maintain and update Plan | CFO<br>CCO |
| Approve Plan and Plan revisions; conduct annual review | CCO |
| Annual testing of Plan | CCO |
| Implementation of Plan when a disruption occurs | CFO and CCO |
| Quarterly review of Emergency Contact Persons and report changes to regulators | CFO |
| Maintain and distribute Emergency Contact List | CFO |
| Maintain and update Books and Records Chart | CFO |
| Provide Plan Information to customers:<br>• At time of account opening<br>• Upon request | COO |
| Post Plan disclosure on Alpine's web site and update, as required | COO |
| Review critical third party assurances or disaster plans or plan summaries:<br>• At initial engagement of third party<br>• Annually when Alpine's Plan is reviewed | Alpine's IT Committee |

### 8.11.2 Retention And Location Of The Plan

Copies of the current and prior versions of the BCP are retained by the CFO. Copies are signed and dated by senior management as of the effective date of the each version of the BCP.

### 8.11.3 Implementation Of The Plan

The Plan has been designed to be implemented in the event of a disaster that results in a significant business disruption. Whether all or only parts of the Plan are implemented depends on the nature of the disruption. Generally, a significant business disruption would include:

- Destruction of one of Alpine's offices or facilities, whether by natural causes or by other means
- Loss of life or major injuries to personnel in an office location that disables that office's ability to conduct business
- Disruption of service from a critical service provider
- Disruption of service due to wide-ranging regional outages such as a power outage

### 8.11.4 Emergency Response Team

Alpine has designated an Emergency Response Team that is responsible for implementing necessary procedures included in this Plan. The Response Team's action will depend on the nature and scope of the disruption. The "first responder" has the primary responsibility for taking action, and the

ALPINE_LIT167986

"secondary responder" acts as a back-up in the event the first responder is unable to act. Where feasible, the two responders are located in different office locations.

| Action | First Responder/Location | Secondary Responder/Location |
|---|---|---|
| Contact emergency services such as police, fire department | CFO | CCO |
| Establish off-site command center and notify employees | CFO | Not applicable |
| Contact employees regarding Plan initiatives | CFO | CCO |
| For affected offices, evaluate business disruption and transfer employees and business operations to other locations | CFO | CCO |
| Appoint individuals to manage business areas where needed | CFO | CCO |
| Assess financial and operations capabilities | CFO | Not applicable |
| Determine financial and credit risk and contact banks and other counter-parties, if necessary, to secure financing to continue operations | CFO | CCO |
| Notify regulators in the event of a capital deficiency | CFO | CCO |
| Interface with SIPC if liquidation of business is initiated | CFO | CCO |
| Contact critical service providers | CFO | Not applicable |
| Transfer mission critical functions that are disrupted | CFO | Not applicable |
| Initiate alternative customer communications systems or procedures | CFO | Not applicable |
| Notify customers regarding alternative access to funds and securities | CFO | CCO |
| Recover back-up records when primary records are destroyed or inaccessible | Alpine's IT Committee | CFO |
| Contact regulators and notify them of contact persons and recovery plans | CFO | CCO |

## 8.11.5 Emergency Contact List

Alpine has established an Emergency Contact List that includes the names, phone numbers (cell and land lines), e-mail addresses, and other contact information for individuals critical to Alpine's business including key employees, key vendors or service providers, regulators, insurance carriers, banks, attorneys, and other key contacts. A copy of the List is provided to each member of the Response Team and other key personnel. This list will be reviewed and updated on at least an annual basis.

ALPINE_LIT167987

### 8.11.6 Alternative Business Locations

In the event employees can no longer conduct business at one of Alpine's office locations, the following actions may be taken:

- Transfer employees to the closest unaffected office location and notify personnel
- Transfer critical systems to another office or a back-up firm or system
- Transfer business operations to another Alpine office unaffected by the disruption
- Transfer business operations to a different broker-dealer or other entity

A list of offices appears in the chapter *DESIGNATION OF SUPERVISORS AND OFFICES* and includes the types of business conducted at each office.

### 8.11.7 Data Back-Up And Recovery

Alpine maintains its books and records in both hard copy and electronic format.

In the event of an internal or external significant business disruption that causes the loss of Alpine's records (whether hard copy or electronic records), back-up records will be recovered from the back-up site.

### 8.11.8 Mission Critical Systems

Mission critical systems are systems that are necessary to ensure prompt and accurate processing of securities transactions including order taking, entry, execution, comparison, allocation, clearance and settlement, maintaining customer accounts, and providing access to customer funds and securities.

The Mission Critical Systems (in the plan) identifies systems (or generally describes procedures) that are critical to the operation of Alpine's business; identifies third parties that provide those systems; and potential alternate procedures or systems for handling these critical functions in the case of a disruption.

### 8.11.9 Financial And Operational Assessments

The following describes procedures for assessing changes in operational, financial, and credit risk exposures in the event of a significant business disruption.

### 8.11.9.1 Operational Risk

In the event of a significant business disruption, alternative systems will be implemented to communicate with customers, employees, critical business constituents (banks, counter-parties, *etc.*), regulators, and other key parties depending on the nature and impact of the disruption. Communication systems are described in the section *Alternative Communications*.

### 8.11.9.2 Financial And Credit Risk

In the event of a significant business disruption, Alpine's financial status will be evaluated to determine the need for additional financing or identify capital deficiencies including the following:

- Review the impact of the disruption on Alpine's ability to conduct business
- Identify inability to satisfy obligations with counter-parties
- Contact banks or other counter-parties to secure needed additional financing
- Notify regulators of capital deficiencies
- Reduce or cease business as may be required due to capital deficiencies or inability to conduct business
- Transfer business to other financial institutions until Alpine may resume conducting business

ALPINE_LIT167988

### 8.11.10 Alternative Communications

Alpine may use a wide range of communication systems to communicate with its customers, employees, counter-parties, and regulators including telephone; mail; fax; e-mail; vendor systems (such as Go-Trader); and personal meetings. Procedures for instituting alternative communications in the event of a significant business disruption include the following, depending on the nature of the disruption:

- Identify the most expedient remaining means of communication
- Notify employees if an off-site command center has been activated
- Notify employees of alternative communication systems to be used
- Transfer communications to another firm

Determination of what communication system will be used depends on the nature of the disruption and which communication systems (electronic mail, telephone calls, *etc.*) are functional and the availability of personnel in the event telephone contact is necessary.

### 8.11.10.1 Between Customers And Alpine

In the event of a significant business disruption that disables communications systems, alternative system procedures will be implemented, including the following:

- Identify the most expedient remaining means of communication
- Notify employees regarding how to contact customers
- Contact customers about how to enter orders, how to access accounts and account assets, and other alternative business operations

### 8.11.10.2 Between Alpine And Its Employees

In addition to the above, Alpine has developed a system to enable senior management to contact employees in the event of an emergency. The system may include, depending on geographic dispersion of employees:

- "Call trees" that provide contact initiated at senior management level and pyramiding down to reach affected personnel
- A central list of all personnel and their contact information

### 8.11.10.3 Between Alpine And Regulators

Communications with regulators will be conducted using the most expedient available communication system. The designated Response Team person will contact regulators regarding any major business disruption and plans for continuing business.

## 8.11.11 Business Constituent, Bank, And Counter-Party Impact

This section describes business continuity procedures regarding third parties that are critical to the conduct of Alpine's business. In most instances, contracts with critical third parties will include assurances regarding the third party's disaster recovery plans. A disruption impacting Alpine's ability to conduct business may occur either at Alpine itself or at the third party.

The Business Constituent, Bank, And Counter-Party's (in the Plan) identifies key parties and potential alternatives in the event of a disruption.

### 8.11.11.1 Business Constituents

- Determine whether the third party is able to continue providing critical services.
- If not, identify and contact an alternate third party to provide services.

ALPINE_LIT167989

### 8.11.11.2 Banks And Other Financial Institutions

- Determine whether the bank/financial institution is able to continue providing financing.
- If not, identify and secure alternative financing.

### 8.11.11.3 Critical Counter-Parties

- Determine whether transactions may be completed with counter-parties.
- If not, contact counter-party directly to make alternative arrangements to complete transactions.

## 8.11.12 Other Obligations To Customers

### 8.11.12.1 Accepting Customer Orders

In the event Alpine's systems for accepting customer orders are disrupted, alternative systems will be communicated to customers and to employees including, where appropriate:

- Accepting orders by telephone or other alternative means
- Communicating orders to trading desks (internal or external) or order execution systems by telephone or other alternative means

### 8.11.12.2 Prompt Access To Funds And Securities

When customer access to funds and securities is impacted by a significant business disruption, customers will be notified by whatever expedient means is available (telephone, e-mail, *etc.*) regarding who may be contacted to request funds or securities. If Alpine is unable to continue business operations, customers will be notified of an alternative financial institution where they may conduct business and access their funds and securities.

### 8.11.12.2.1 SIPC Liquidation

In the event SIPC liquidation of Alpine's business is required, designated personnel will work with the SIPC-appointed trustee to wind down Alpine's operations and transfer customer funds and securities.

### 8.11.12.3 Disclosure Of Business Continuity Plan

[FINRA Rule 4370(e)]

Information about Alpine's Business Continuity Plan is provided to customers as follows:

- At the time of account opening
- On Alpine's web site
- Upon request, by mail

## 8.11.13 Emergency Contact Information

[NASD Rule 1160; FINRA Rule 4370]

Alpine has provided the FINRA with the names of two emergency contact persons who are registered and are members of senior management.

Emergency contact information will be promptly updated, when necessary. The FINRA Executive Representative (or other designated employee) will review the contact information within 17 business days of the end of each year and will retain a written record of the review. If the Executive Representative delegates this responsibility, a written memorandum designating another employee

ALPINE_LIT167990

will be provided to Compliance, where it will be retained with the current Plan. The annual review of the Plan will include verification that only the Executive Representative or delegate is conducting the review and updates.

## 8.11.14 Widespread Health Emergencies

[Federal government Business Pandemic Influenza Planning Checklist: http://www.pandemicflu.gov/plan/pdf/businesschecklist.pdf]

A widespread pandemic or any biologically based threat could have significant impact on the ability of Alpine to continue conducting business. This section outlines the steps Alpine has taken and will take in the event of a widespread pandemic.

### 8.11.14.1 Preparatory Steps

- Document government resources for information about a pending pandemic
- Identify and document an alternative firm or firms to handle Alpine's business for extended periods of time
- Identify and document medical resources to assist employees, including administering vaccinations or other medications
- Stock antibacterial and other hygiene products for use by employees
- Identify employees that can telecommute and establish a list of those employees and what computers and technology will be necessary

### 8.11.14.2 Action If A Pandemic Occurs

The following procedures will be followed in the event of a threatened health emergency.

1. The Emergency Response Team will meet to determine the potential seriousness of the threat and what action to be taken as the threat escalates.
2. Notify employees of:
   o available vaccinations or other medication and whether they are mandated
   o necessary conduct such as avoiding personal contact such as handshaking
   o access to antibacterial or other hygiene products to reduce infections and transmission of communicable diseases
   o requirement to stay home and telecommute
   o transfer of business/functions to other firms
   o contact list of key personnel
3. Restrict access to Alpine by outsiders (customers, vendors, *etc.*).
4. The Emergency Response Team will meet or communicate regularly to determine steps to be taken.

## 8.11.15 Education Of Employees

The Business Continuity Plan is communicated to employees as follows:

- A summary is included in the chapter *GENERAL EMPLOYEE POLICIES* in the section *Emergency Business Recovery Procedures* and is provided to all employees.
- A current copy of the Plan is provided to the Emergency Response Team and key employees with responsibilities for aspects of the Plan.
- The most recent Emergency Contact List is provided to key employees.

## 8.11.16 Updating, Annual Review, And Testing

The Plan will be reviewed on at least an annual basis and revised as needed. Each revision will be approved by the designated senior manager and copies of the revised Plan distributed to the Emergency Response Team and key employees. Some material events require updating the Plan when they occur, including:

ALPINE_LIT167991

- Material changes to Alpine's business
- A change in Alpine's main office location
- Added office locations
- A change in a major service provider

When the Plan is reviewed, the procedures and accompanying lists and charts will be reviewed and updated as needed including the:

- Plan itself
- Emergency Response Team list
- Emergency Contact List
- Books and Records chart
- Mission Critical Systems
- Business Constituent, Bank, and Counter-Party
- *Designation Of Offices* section of the chapter *DESIGNATION OF SUPERVISORS AND OFFICES*
- Any other charts or information related to the Plan

A written record of the annual review including the date reviewed and name and signature of the reviewer will be retained by Compliance.

## 8.12 Customer Payments For Purchases

When an order to purchase securities is accepted from a customer, payment from the customer's bank account or other depository must be authorized in writing by the customer. Payment is not acceptable based only on the customer's oral authorization to withdraw funds. Examples of acceptable payment include:

- a check signed by the customer
- written authorization by the customer to draft funds from the customer's bank checking or savings account

Questions regarding proper payments should be referred to Operations or Compliance.

## 8.13 Regulation T And Extension Of Credit To Customers

[FINRA Rule 4210; Federal Reserve Regulation T]

| Responsibility | • Supervisor set forth in Chapter 1.1 |
|---|---|
| Resources | • Various<br>• Customer Debits Report |
| Frequency | • Ongoing |
| Action | • Monitor accounts for compliance with Regulation T requirements<br>• Request extensions, issue margin calls, *etc.*<br>• Discontinue margin trading for accounts missing required signed margin agreements<br>• Review FINRA report for unsecured debits and take corrective action as necessary which may include consultation with RR and RR's supervisor, closing the account, or other appropriate action |

ALPINE_LIT167992

| | |
|---|---|
| **Record** | • Various records maintained by Operations<br>• FINRA report including notes of action taken |

### 8.13.1 Guaranteed Accounts

A customer (the "guarantor") may provide a written guarantee to cover the balances in another account (the "guaranteed" account) using the equity in the guarantor's account. Written agreements for such guarantees must be provided to Operations.

RRs are prohibited from guaranteeing payment in another customer's account (unless the other customer is an employee-related account and approval has been obtained from Operations).

## 8.14 Transmittals Of Customer Funds And Securities

[NASD Rule 3012(a)(2)(B); FINRA Rule 4514; FINRA Regulatory Alert 09-64]

This section describes Alpine's procedures for transmitting funds or securities from customer accounts. The following summarizes requirements:

Letters of Authorization

A Letter of Authorization (LOA) is an important required document whenever a customer asks that funds or securities are to be sent to a third party out of a customer's account. LOAs are an important record for Alpine, both to ensure the customer's instructions are followed and to ensure that Alpine has a written record in the event there is a question in the future about disbursements from the account.

- All transfers require **written** letters of authorization (LOAs) when funds and/or securities will be transmitted to a third party. LOAs may be received by mail, fax, delivery, or other means including electronic transmission that provides for written authorization with the customer's verifiable signature. Registered representatives and/or their sales assistants are responsible for obtaining completed LOAs, when necessary. Further:
    - A completed LOA is required prior to disbursements to third parties.
    - The customer's signature is required. In the case of a joint account, all joint owners must sign the LOA. For corporations, trust accounts, and other accounts, the authorized person must sign the LOA.
    - Completed LOAs are submitted to Operations and should accompany the request to disburse funds or send securities to a third party.
- If an LOA copy is not presented in person by the customer, the customer's signature will be verified against existing account records.
- Copies of LOAs are retained in the Firm's records.
- Anyone who appears in person to receive assets and who claims to be the customer will be required to present photo identification if the customer is not personally known to the operations personnel releasing funds or securities from the customer's account.
- Any authorized third party receiving a customer's assets in person will be required to present photo ID and the third party authorization (LOA) will be verified.

ALPINE_LIT167993

- Notation will be made on Firm records of the verification of IDs, signatures, and existence of LOAs including who verified, the date verified, and the related transactions (issuance of a check or sending of other assets from the account).
- Suspicious or questionable activity must be brought to the attention of the AML Compliance Officer who is responsible for determining whether a Suspicious Activity Report must be filed.

### 8.14.1 Issuing Checks To Customer

Checks to be paid to customers from their accounts will be paid to the order of the account as it is carried on Alpine's books and sent to the address appearing on the account. No checks are to be issued to a third party or funds transferred to a third party, without approval of a principal and written authorization by the customer. Please refer to the section titled "Transmittals to Third Parties" for more information. Exceptions may include fees to trustees and private placements done through the firm. When checks are to be issued to a third party or funds are transferred to a third party as per an exception, the following procedures apply.

### 8.14.2 Transmittals To Third Parties

| Responsibility | • Back office manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests to send funds/issue checks to third parties |
| Frequency | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| Action | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| Record | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

When a customer wishes funds or securities to be paid to a third party in the third party's name, the customer will be required to provide a signed LOA that specifies to whom the funds are to be paid.

### 8.14.3 Transmittals To An Alternate Address

Funds and securities will be sent to the customer's address of record, unless the customer provides **written** authorization to use an alternative address.

| Responsibility | • Back office manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests to send funds/issue checks to an alternate address |

ALPINE_LIT167994

| **Frequency** | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
|---|---|
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

### 8.14.4 Transmittals To Outside Entities

Customers sometimes request the transfer of funds or securities in their accounts to a bank or other entity on their behalf. A signed LOA must be obtained to effect such a transfer including the customer's account number at the receiving bank or other entity.

| **Responsibility** | • Back office manager or designee, unless noted otherwise |
|---|---|
| **Resources** | • Requests to send funds/issue checks to third parties |
| **Frequency** | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

ALPINE_LIT167995

### 8.14.5 Transmittals Between Customers And Registered Representatives

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Requests to deliver checks<br>• Check Delivery Log |
| Frequency | • As required |
| Action | • Approve (or disapprove) the request to deliver a check<br>• Send a letter to the customer on the same day as check delivery, confirming delivery |
| Record | • Initials on Check Delivery Log<br>• Check delivery letter retained in customer account file |

On occasion, a customer may request that the RR or other Alpine employee personally deliver a check to the customer. This is permitted under the following conditions:

- The designated supervisor must approve the check delivery. The designated supervisor should initial a record maintained by Operations.

### 8.14.6 Prepayments And Extensions

Prepayments (customer requests payment prior to settlement date on a sale) or extensions of time to make payment must be approved by the designated supervisor. Prepayments can be charged additional fees for the service.

### 8.14.7 Suspicious Or Questionable Activities

Employees are responsible for referring suspicious or questionable activities to their designated supervisor. If the activity involves the designated supervisor, the employee should bring the activity to the attention of the Compliance Officer. If the Compliance Officer is involved, the activity should be brought to the attention of someone else in senior management. Such activities may include transfers without required authorizations; failure to obtain secondary approvals where required; a pattern of transfers that have no reasonable business basis, or any other activity the employee considers suspicious.

## 8.15 Safekeeping Of Customer Funds And Securities

[SEC Securities Exchange Act of 1934 Rule 8c-1, Rule 15c2-1, Rule 15c3-3 and Rule 17a-13; NASD Rule 2330 and 3140; NASD Notice to Members 99-44]

### 8.15.1 Introduction

SEC Rule 15c3-3 specifies requirements for broker-dealers to properly protect customers' funds and securities. These rules include segregation of certain funds and securities. Broker-dealers that self-clear are responsible for complying with these rules. Broker-dealers that do not hold customer funds and securities may qualify for exemptive provisions of the Rule. Two significant elements of the Rule are:

ALPINE_LIT167996

1. a formula for a cash reserve which restricts a broker-dealer from using customer funds and securities in their own business; and,
2. a requirement that brokers or dealers maintain and obtain physical possession or control, as defined in the Rule, of fully paid and excess margin securities.

## 8.15.2 Exemption From 15c3-3

Because of the nature of Alpine's business, Alpine qualifies for an exemption under Rule 15c3-3(k). The FINOP is responsible for determining that Alpine qualifies for one of the two following exemptions.

### 8.15.2.1 Stock Receipts

Physical stock certificates received by the firm, must be received into the same name on the account as that on the certificate. Exceptions require approval by a principal and documentation from SIC (Securities Information Center), regarding whether the securities have been reported lost, missing or stolen.

# 8.16 Checking Account Safeguards

## 8.16.1 Checking Account Safeguards

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • N/A |
| Frequency | • Ongoing<br>• Annual - review of supervisory controls |
| Action | • Train personnel regarding required procedures<br>• Maintain list of authorized check signers and request additional signers as necessary<br>• Review checking account safeguards as part of the annual supervisory controls review (Compliance or other reviewer) |
| Record | • Records of checks issued, including approvals, are retained in files in the Operations area and/or records may be retained by a clearing firm |

The following procedures must be followed to safeguard the use of checks.

- Blank checks and check registers must be kept in a secured operations area or locked location with access limited only to authorized personnel.
- At the end of the business day, all blank checks must be locked in a safe or similarly secured area.
- Checks must be used in numerical sequence.
- Alpine maintains a list of authorized check signers. Each business location that issues customer checks must have at least 2 designated check signers.
- Checks **must not** be signed in blank, in anticipation of a check signer's absence. The manager of Operations must be contacted if alternate arrangements are necessary in the absence of an authorized check signer.
- When an employee will personally deliver a customer check, the procedures outlined in the section *Transmittals Between Customers And Registered Representatives* must be followed.

ALPINE_LIT167997

## 8.17 Customer Protection

[SEC Securities Exchange Act of 1934 Rule 15c3-3]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Customer cash and security balances and other operations records |
| Frequency | • Ongoing |
| Action | • Establish special reserve bank account<br>• Obtain letter from bank holding special reserve account<br>• Establish operations procedures to comply with Rule 15c3-3 and related SRO rules<br>• Assign responsibilities to appropriate operations personnel<br>• Train operations personnel |
| Record | • Bank records including letter regarding special reserve account for each bank maintaining such account for the benefit of customers<br>• Reserve formula computations<br>• Records of quarterly security counts<br>• Records of buy-ins and close-outs<br>• Records of daily determination of fully paid/excess securities<br>• Other operations records |

### 8.17.1 Introduction

SEC Rule 15c3-3 specifies requirements for broker-dealers to protect customers' funds and securities. Two significant elements of the Rule are:

1. a formula for a cash reserve which restricts a broker-dealer from using customer funds and securities in their own business; and,
2. a requirement that brokers or dealers maintain and obtain physical possession or control, as defined in the Rule, of fully paid and excess margin securities.

The procedures in this section generally outline some key requirements under Rule 15c3-3 and related regulations. The FINOP is responsible for developing detailed procedures for complying with SEC and SRO requirements.

### 8.17.2 Possession And Control Of Securities

All procedures set forth herein shall be followed with respect to possession and control of securities. All physical certificates received shall be recorded into a location and placed in a secure location. Once it is determined the securities can be forwarded to a clearing agency or onto clearing, they shall be forwarded to such agency. If securities are not being accepted, they are to be returned to the customer. Only back office personnel or designated supervisors shall have access to the location of the securities and allowed to accept securities.

### 8.17.2.1 Fully Paid And Excess Margin Securities

On a daily basis (by the next business day for the preceding business day), Alpine will identify customer fully paid and excess margin securities. Securities will be segregated or located in another control location.

ALPINE_LIT167998

### 8.17.2.2 Close-Outs And Buy-Ins

Alpine will close-out or buy-in positions for unsatisfied customer transactions within prescribed timeframes.

### 8.17.2.2.1 Procedures

Alpine will follow FINRA rules as outlined in UPC Rule 11810 and UPC Rule 11820 regarding Buy-in and Sell-out procedures for broker/dealers.

Buying-In

A contract which has not been completed by the seller according to its terms may be closed by the buyer not sooner than the third business day following the date delivery was due, in accordance with the following procedure:

(1) Written notice of "buy-in" shall be delivered to the seller at his office not later than 12:00 noon, his time, two business days preceding the execution of the proposed "buy-in."

(2) For purposes of this Rule written notice shall include an electronic notice through a medium that provides for an immediate return receipt capability. Such electronic media shall include but not be limited to facsimile transmission, a computerized network facility, etc.

**Notice**

(1) Every notice of "buy-in" shall state the date of the contract to be closed, the quantity and contract price of the securities covered by said contract, the settlement date of said contract and any other information deemed necessary to properly identify the contract to be closed. Such notice shall state further that unless delivery is effected at or before a certain specified time, which may not be prior to 11:30 a.m. local time in the community where the buyer maintains his office, the security may be "bought-in" on the date specified for the account of the seller. If the originator of a "buy-in" in a depository eligible security is a participant in a registered securities depository, the specified delivery time may not be prior to 3:00 p.m. Eastern Time and the "buy-in" may not be executed prior to 3:00 p.m., Eastern Time. Each "buy-in" notice shall also state the name and telephone number of the individual authorized to pursue further discussions concerning the buy-in.

(2) Notice may be redelivered immediately to another broker/dealer from whom the securities involved are due in the form of a re-transmitted notice (re-transmit). A re-transmitted notice of buy-in must be delivered to subsequent broker/dealers not later than 12 noon, recipient's local time, on the business day preceding the time and date of execution of the proposed buy-in, and the time specified for delivery may not be prior to the time specified in the original notice. Selling-Out Upon failure of the buyer to accept delivery in accordance with the terms of the contract, and lacking a properly executed Uniform Reclamation Form or the equivalent deository generated advice for depository eligible securities meeting the requirements prescribed in Rule 11710, the seller may, without notice, "sell-out" in the best available market and for the account and liability of the party in default all or any part of the securities due or deliverable under the contract. Alpine as the party executing the "sell-out" as

ALPINE_LIT167999

prescribed above shall, as promptly as possible on the day of execution, but no later than the close of business, local time, where they buyer maintains his office, notify the broker/dealer for whose account and risk such securities were sold and the quantity sold and the price received. Such notification will be in written or electronic form having immediate receipt capabilities. A formal confirmation of such sale will be forwarded as promptly as possible after the execution of the "sell-out".

A contract which has not been completed by the seller according to its terms may be closed by the buyer not sooner than the third business day following the date delivery was due, in accordance with the following procedure: **(a) Notice of "Buy-In"**

(1) Written notice of "buy-in" shall be delivered to the seller at his office not later than 12:00 noon, his time, two business days preceding the execution of the proposed "buy-in."

(2) For purposes of this Rule written notice shall include an electronic notice through a medium that provides for an immediate return receipt capability. Such electronic media shall include but not be limited to facsimile transmission, a computerized network facility, etc.

(b) Information Contained in "Buy-in" Notice

(1) Every notice of "buy-in" shall state the date of the contract to be closed, the quantity and contract price of the securities covered by said contract, the settlement date of said contract and any other information deemed necessary to properly identify the contract to be closed. Such notice shall state further that unless delivery is effected at or before a certain specified time, which may not be prior to 11:30 a.m. local time in the community where the buyer maintains his office, the security may be "bought-in" on the date specified for the account of the seller. If the originator of a "buy-in" in a depository eligible security is a participant in a registered securities depository, the specified delivery time may not be prior to 3:00 p.m. Eastern Time and the "buy-in" may not be executed prior to 3:00 p.m., Eastern Time. Each "buy-in" notice shall also state the name and telephone number of the individual authorized to pursue further discussions concerning the buy-in.

(2) Notice may be redelivered immediately to another broker/dealer from whom the securities involved are due in the form of a re-transmitted notice (re-transmit). A re-transmitted notice of buy-in must be delivered to subsequent broker/dealers not later than 12 noon, recipient's local time, on the business day preceding the time and date of execution of the proposed buy-in, and the time specified for delivery may not be prior to the time specified in the original notice.

Selling-Out

**(a) Conditions Permitting "Sell-Out"** Upon failure of the buyer to accept delivery in accordance with the terms of the contract, and lacking a properly executed Uniform Reclamation Form or the equivalent depository generated advice for depository eligible securities meeting the requirements prescribed in rule 11710(b), the seller may, without notice, "sell-out" in the best available market and for the account and liability of the party in default all or any part of the securities due or deliverable under the contract. **(b) Notice of "Sell-Out"** The party executing a "sell-out" as prescribed above shall, as promptly as possible on the day of execution, but no later than the close of business, local time, where the buyer maintains his office, notify the broker/dealer for whose account and risk such securities were sold of the quantity sold and the price received. Such notification should be in written

ALPINE_LIT168000

or electronic form having immediate receipt capabilities. A formal confirmation of such sale should be forwarded as promptly as possible after the execution of the "sell-out."

### 8.17.2.3 Quarterly Security Counts

[SEC Securities Exchange Act of 1934 Rule 17a-13]

At least once each calendar quarter, a physical count will be conducted of customer securities against Alpine's books and records. Counts will be conducted more frequently if required by SRO.

### 8.17.3 Special Reserve Bank Account

#### 8.17.3.1 Establishing The Account

The FINOP will establish a special reserve bank account for the exclusive benefit of customers. Funds in this account are not available for use by Alpine for its benefit.

#### 8.17.3.2 Written Notification From The Bank

Each bank where a special reserve bank account is established is required to provide written recognition that the account holds only customer assets, separate and apart from Alpine's own assets.

#### 8.17.3.3 Reserve Formula Computations

Alpine will determine the required balance to be maintained in the account and make any required deposit. The computation must be made either weekly or monthly, on the last business day. The FINOP will determine whether computation is required weekly or monthly.

As part of the calculation, the unallocated position report will be used to determine the potential impact, if any, to the customer reserve and PAIB computations.

Debit balances created from money market redemptions will not be used as a part of the debit in the reserve formula computation.

#### 8.17.3.4  Notification If Required Deposit Not Made

If Alpine fails to make the required deposit, the FINOP will immediately notify the SEC and designated SRO by telegram and promptly in writing.

## 8.18 Customer Confirmations And Statements

[FINRA Rule 2230]

### 8.18.1 Control Of Blank Confirmations And Statements

Blank confirmations and statements are to be retained in a secured location. Only authorized employees are permitted access to blank documents. The FINOP will establish procedures for control of these documents.

### 8.18.2 Change Of Customer Addresses On Accounts

[FINRA Rule 3012(a)(2)(B)]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Request to change address on account from customer or RR |

ALPINE_LIT168001

| | |
|---|---|
| **Frequency** | • As required |
| **Action** | • Change address<br>• Send a confirming letter to the customer's old address, notifying that the address has been changed on the account |
| **Record** | • Copies of confirming letters are retained by Operations |

When a customer requests a change of address, a notification confirming the change of address will be sent to the customer's old address. Customer inquiries responding to the change of address notification will be forwarded to Compliance for follow-up.

### 8.18.3 Holding Customer Mail Prohibited

Alpine will not hold mail on a customer's behalf, even for a short duration. RRs are **not** permitted to hold customer mail. A customer, who cannot receive mail at the address established on the account, must be instructed to provide a third party mailing address that is not related to Alpine or any associate of Alpine.

### 8.18.4 Confirmation Disclosures

[SEC Securities Exchange Act of 1934 Rule 10b-10; FINRA Rule 2232]

| | |
|---|---|
| **Responsibility** | • Designated Supervisor |
| **Resources** | • Trade data |
| **Frequency** | • Daily |
| **Action** | • Establish operations procedures for including necessary disclosures in addition to standard information included on confirmations |
| **Record** | • Copies of confirmations |

The designated supervisor is responsible for establishing procedures to include special required disclosures on customer confirmations. Examples of some types of special disclosures are explained in the following sections.

### 8.18.4.1 Disclosure Of Control

[FINRA Rule 2262]

Whenever Alpine effects transactions in the securities of an issuer that is under common control with Alpine, a disclosure regarding the common control will be included on or with the confirmation.

### 8.18.4.2 Callable Common Stock

Confirmations for transactions in callable common stock will disclose that:

• the security is callable common stock; and,

ALPINE_LIT168002

- the customer may contact Alpine for more information regarding the security.

### 8.18.4.3 Special Disclosures For Principal Transactions

Confirmations for transactions in reported securities where Alpine acts as principal will disclose the reported trade price, the net price to the customer, and the difference between the reported price and the price to the customer (*i.e.,* the markup/markdown or similar remuneration). Reported securities include:

- NASDAQ Global Market (NGM) securities
- NASDAQ Capital Market securities
- All NYSE, AMEX and selected securities on regional exchanges and reported to the Consolidated Tape

Also included in this requirement are riskless principal transactions in reported securities where Alpine acts as market maker in the security. Where Alpine is not a market maker, the confirmation must disclose the net price to the customer and the markup/markdown and similar remuneration.

## 8.19 Subordination Agreements With Investors

[SEC Securities Exchange Act of 1934 Appendix D to Rule 15c3-1; FINRA Notice to Members 02-32 and 02-04; FINRA web site: http://www.finra.org/Industry/Compliance/RegulatoryFilings/subordinations/index.htm]

If Alpine enters into a subordination agreement with an investor, it will provide the investor with a copy of the FINRA Subordination Agreement Investor Disclosure Document and obtain the investor's signature on a copy of the Document. A copy of the signed Disclosure Document will be submitted to the FINRA with the subordination agreement, for approval.

The FINOP is responsible for obtaining and submitting the required documents for subordination agreements.

## 8.20 Expense-Sharing Agreements

[SEC Letter July 11, 2003 to FINRA and NYSE Regarding Recording Certain Broker-Dealer Expenses And Liabilities; FINRA Notice to Members 03-63]

The SEC specifies requirements for incorporating an expense-sharing agreement into a broker-dealer's operations and how these agreements are recorded in the broker-dealer's financial records. The FINOP is responsible for ensuring Alpine complies with the SEC's guidelines if it enters into any such agreements.

In addition, the FINOP is responsible for notifying Alpine's Designated Examining Authority (DEA) if it enters into an expense-sharing agreement and does not record each of the expenses it incurs relating to its business on the reports it is required to file with the SEC or with the DEA. The notice will include the date of the agreement and the names of the parties to the agreement; a copy of the agreement will be provided to the DEA upon request.

## 8.21 Transfer Of Accounts

The FINOP will establish procedures for the timely transfer of customer accounts to another broker-dealer. Such procedures will follow normal industry ACAT rules and policies, including timelines and cut-offs for response and delivery.

ACAT Rules, as established in UPC Rule 11870; will be followed as outlined by the rule below:

ALPINE_LIT168003

**a) Responsibility to Expedite Customer's Request**

(1) When a customer whose securities account is carried by a member (the "carrying member") wishes to transfer securities account assets, in whole or in specifically designated part, to another member (the "receiving member") and gives authorized instructions to the receiving member, both members must expedite and coordinate activities with respect to the transfer.

(2) If a customer desires to transfer a portion of his or her account outside of ACATS, authorized alternate instructions should be transmitted to the carrying member indicating such intent and specifying the designated assets to be transferred. Although such transfers are not subject to the provisions of this Rule, members must expedite all authorized account asset transfers, whether through ACATS or via other means permissible under this Rule, and coordinate their activities with respect thereto. Unless otherwise indicated, the automated customer account transfer capabilities referred to in paragraph (m)(1) of this Rule shall be utilized for partial transfers.

(3) For purposes of this Rule, customer authorization pursuant to a transfer instruction could be the customer's actual signature, or an electronic signature in a format recognized as valid under federal law to conduct interstate commerce.

**(b) Transfer Procedures**(1) Upon receipt from the customer of an authorized broker-to-broker transfer instruction form ("TIF") to receive such customer's securities account assets in whole or in specifically designated part, from the carrying member, the receiving member must immediately submit such instruction to the carrying member. The carrying member must, within one business day following receipt of such instruction, or receipt of a TIF received directly from the customer authorizing the transfer of assets in specifically designated part: (A) validate the transfer instruction to the receiving member (with an attachment reflecting all positions and money balances to be transferred as shown on its books); or (B) take exception to the transfer instruction for reasons other than securities positions or money balance discrepancies and advise the receiving member of the exception taken. The time frame(s) set forth in this paragraph will change, as determined from time-to-time in any publication, relating to the ACATS facility, by the National Securities Clearing Corporation (NSCC).(2) The carrying member and the receiving member must promptly resolve any exceptions taken to the transfer instruction.

**(c) Transfer Instructions**(1) Securities account asset transfers accomplished pursuant to this Rule are subject to the following conditions, which the customer must be informed of, affirm, or authorize (as the case may be) through their inclusion in the transfer instruction the customer is required to authorize to initiate the account asset transfer: (A) To the extent any account assets are not readily transferable, with or without penalties, such assets may not be transferred within the time frames required by this Rule. (B) The customer will be contacted in writing by the carrying member, and/or by the receiving member, with respect to the disposition of nontransferable assets other than proprietary money market fund assets (if any), indicated in an instruction to transfer specifically designated account assets. (See subparagraph (c)(D)(3) below for customer notification requirements pertaining to transfers of securities account assets in whole.) (C) If securities accounts assets in whole other than retirement plan account assets are being transferred, the customer must affirm that he or she has destroyed or returned to the carrying member any credit/debit cards and/or unused checks issued in connection with the account. (D) For purposes of this Rule, a "nontransferable asset" shall mean an asset that is incapable of being transferred from the carrying member to the receiving member because it is: (i) an asset that is a proprietary product of the carrying member; (ii) an asset that is a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account; (iii) an asset that may not be received due to regulatory limitations on the scope of the receiving member's business; (iv) an asset that is a bankrupt issue for which the carrying member

ALPINE_LIT168004

does not possess the proper denominations to effect delivery and no transfer agent is available to re-register the shares; (v) an asset that is an issue for which the proper denominations cannot be obtained pursuant to governmental regulation or the issuance terms of the product (e.g., foreign securities, baby bonds, etc.); (vi) limited partnership interests in retail accounts. (E) The carrying member and the receiving member must promptly resolve and reverse any nontransferable assets that were not properly identified during validation. In all cases, each member shall promptly update its records and bookkeeping systems and notify the customer of the action taken. (2) A proprietary product of the carrying member shall be deemed nontransferable unless the receiving member has agreed to accept transfer of the product. Upon receipt of the asset validation report, the receiving member shall designate any assets that are a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account. The carrying member, upon receipt of such designation, may treat such designated assets as nontransferable and refrain from transferring the designated assets. (3) If securities account assets to be transferred in whole include any nontransferable assets that are proprietary products of the carrying member, the carrying member must provide the customer with a list of the specific assets and request, in writing and prior to or at the time of validation of the transfer instruction, further instructions from the customer with respect to the disposition of such assets. In particular, such request should provide, where applicable, the customer with the following alternative methods of disposition for nontransferable assets: (A) Liquidation, with a specific indication of any redemption or other liquidation-related fees that may result from such liquidation and that those fees may be deducted from the money balance due the customer. (B) Retention by the carrying member for the customer's benefit. (C) Transfer, physically and directly, in the customer's name to the customer. (4) If securities account assets to be transferred in whole include any nontransferable assets that the receiving member has designated as assets that are a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account, the receiving member must provide the customer with a list of the specific assets and request, in writing and prior to the time it makes such designation, further instructions from the customer with respect to the disposition of such assets. In particular, such request should, where applicable, provide the customer with the following alternative methods of disposition for nontransferable assets: (A) Liquidation, with a specific indication of any redemption or other liquidation-related fees that may result from such liquidation and that those fees may be deducted from the money balance due the customer. The indication must also refer the customer to the fund prospectus or to their registered representative at the carrying firm for specific details regarding any such fees. (B) Retention by the carrying member for the customer's benefit. (C) Shipment, physically and directly, in the customer's name to the customer. (D) Transfer to the third party that is the original source of the product, for credit to an account opened by the customer with that third party. (5) If the customer has authorized liquidation or transfer of assets deemed to be nontransferable, the carrying member must distribute the resulting money balance to the customer or initiate the transfer within five (5) business days following receipt of the customer's disposition instructions. (6) With respect to transfers of retirement plan securities account assets, the customer authorizes the custodian/trustee for the account: (A) to deduct any outstanding fees due the custodian/trustee from the credit balance in the account, or (B) if the account does not contain a credit balance, or if the credit balance in the account is insufficient to satisfy any outstanding fees due the custodian/trustee, to liquidate assets in the account to the extent necessary to satisfy any outstanding fees due the custodian/trustee.

**(d) Validation of Transfer Instructions**(1) Upon validation of an instruction to transfer securities account assets in whole, a carrying member must "freeze" the account to be transferred, i.e., all open orders, with the exception of option positions that expire within seven (7) business days, must be canceled and no new orders may be taken. (2) A carrying member may not take exception to a transfer instruction, and therefore deny validation of the transfer instruction, because of a dispute over securities positions or the money balance in the account to be transferred. Such alleged discrepancies notwithstanding, the carrying member must transfer the securities positions and/or money balance reflected on its books for the account. (3) A carrying member may take exception to a transfer instruction only if: (A) additional documentation is required (additional legal documents such as death or marriage needed); (B) the account is "flat" and reflects no transferable assets; (C) the account number is invalid (account number is not on carrying member's books); however, if the carrying

ALPINE_LIT168005

member has changed the account number for purposes of internally reassigning the account to another broker or account executive, it is the responsibility of the carrying firm to track the changed account number, and such reassigned account number shall not be considered invalid for purposes of fulfilling a transfer instruction.; (D) it is a duplicate request; (E) violates member's credit policy; (F) unrecognized residual credit assets (receiving member cannot identify client); (G) client rescinds instruction (client submitted written request to cancel transfer); (H) S.S. number/Tax ID mismatch (number does not correspond to carrying member's); (I) account title mismatch (receiving member's account title does not correspond to carrying member's); (J) account type mismatches (receiving member's account type does not correspond to carrying member's); (K) missing or improper authorization (TIF requires an additional client authorization or successor custodian's acceptance authorization or custodial approval); or (L) Client takes possession (account assets in question are in transfer to deliver direct to customer). (4) If a carrying member takes exception to a transfer instruction because the account is "flat", as provided in subparagraph (3)(B) above, the receiving member may re-submit the transfer instruction only if the most recent customer statement is attached. (5)(A) Upon validation of an instruction to transfer securities account assets in whole or in specifically designated part, the carrying member must return the transfer instruction to the receiving member with an attachment indicating all securities positions, safekeeping positions, and money balances to be transferred as shown on the books of the carrying member. Except as hereinafter provided, the attachment must include a then-current market value for all assets so indicated. If a then-current market value for an asset cannot be determined (e.g., a limited partnership interest), the asset must be valued at original cost. However, delayed delivery assets, nontransferable assets, and assets in transfer to the customer, i.e., in possession of the transfer agent at the time of receipt of the transfer instruction by the carrying member for shipment, physically and directly to the customer, need not be valued, although the "delayed delivery," "nontransferable," or "in-transfer" status, respectively, of such assets must be indicated on the attachment. (B) For purposes of this Rule, a "safekeeping position" shall mean any security held by a carrying member in the name of the customer. (6) Upon validation of an instruction to transfer securities account assets in whole or in specifically designated part, the carrying member must indicate on the instruction, or by attachment, any Regulation T calls outstanding as of the date of validation with respect to the account assets to be transferred. (7) A carrying member must provide the following description, at a minimum, as asset data with respect to any municipal securities positions to be transferred that have not been assigned a CUSIP number: (A) name of the issuer; (B) interest rate and dated date; (C) maturity date and put date, if applicable, and if the securities are limited tax, subject to redemption prior to maturity (callable), or revenue bonds; an indication to such effect, including in the case of revenue bonds, the type of revenue, if necessary for a materially complete description of the securities; and (D) if necessary for a materially complete description of the securities, the name of any company or other person in addition to the issuer obligated, directly or indirectly, with respect to debt service, or if there is more than one such obligor, the statement "multiple obligors" may be shown. (8) After validation of the transfer instruction by the carrying member, a receiving member may reject a transfer of account assets in whole only if the account is not in compliance with the receiving member's credit policies or minimum asset requirements. (A receiving member may deem an account not in compliance with Regulation T requirements as not in compliance with its credit policies.) A receiving member, however, may only reject the entire account for such reasons; it may not reject only a portion of the account assets (e.g., the particular assets not in compliance with the member's credit policies or minimum asset requirement) while accepting the remainder.

**(e) Completion of the Transfer**

Within three business days following the validation of a transfer instruction, the carrying member must complete the transfer of the customer's security account assets to the receiving member. The receiving member and the carrying member must immediately establish fail-to-receive and fail-to-deliver contracts at then-current market values upon their respective books of account against the long/short positions that have not been delivered/received and the receiving/carrying member must debit/credit the related money amount. The customer's security account assets shall thereupon be deemed transferred. The time frame(s) set forth in this paragraph will change, as determined from

ALPINE_LIT168006

time-to-time in any publication, relating to the ACATS facility, by the NSCC.

## 8.22 Solicitation Of Proxies

[SEC Securities Exchange Act of 1934 Section 14]

RRs are not permitted to solicit proxies from customers. Federal securities rules prohibit solicitation of proxies except in very limited situations. Questions should be referred to Compliance.

## 8.23 Customer Requests For References

| | |
|---|---|
| **Responsibility** | • Designated Supervisor |
| **Resources** | • Requests from customers or prospective customers for reference letters |
| **Frequency** | • As required |
| **Action** | • Review requests and determine what, if any, reference letter may be issued<br>• If appropriate, write reference letter with a copy to the RR |
| **Record** | • Letters retained by Compliance |

Customers or prospective customers sometimes request letters of reference from broker-dealers regarding their accounts or future business to be done. Some of these requests in the past have been scams by unscrupulous individuals seeking to capitalize on a broker-dealer's good name. Any such requests should be referred to Compliance for handling.

## 8.24 Audit Letters

| | |
|---|---|
| **Responsibility** | • Designated Supervisor |
| **Resources** | • Letters from auditors requesting verification of balances in customer accounts |
| **Frequency** | • As required |
| **Action** | • Forward requests to Operations for response |
| **Record** | • Operations will maintain copies of responses in customer account files |

Auditors sometimes send letters asking Alpine to verify funds and securities on behalf of their customers who also have accounts with Alpine.

All requests should be forwarded to the manager of Operations for response. In no instance should an RR or other branch personnel respond to these requests.

ALPINE_LIT168007

## 8.25 Annual Disclosure Of FINRA BrokerCheck

[FINRA Rule 2280]

As required by FINRA rule, at least annually Alpine will provide customers with the following information in writing about FINRA BrokerCheck (formerly known as the FINRA Public Disclosure Program):

- the hotline number
- the Web Site address
- a statement regarding the availability of an investor brochure regarding FINRA BrokerCheck

## 8.26 Short Interest Report

[FINRA Rule 4560; FINRA Regulatory Notice 12-38]

| Responsibility | • Chief Financial Officer |
|---|---|
| Resources | • Position reports and other records reflecting short positions for Alpine and customer accounts |
| Frequency | • Twice monthly |
| Action | • File short interest report with NASDAQ and/or DEA |
| Record | • Copies of the monthly reports are retained in a file "Short Interest Reports." |

Alpine will maintain a record of total short positions in all customer and proprietary firm accounts. Alpine will file the required semi-monthly short interest report(s) reflecting short positions in proprietary and customer accounts as follows:

- For exchange-listed securities the report will be filed with Alpine's Designated Examining Authority (DEA).
- For NASDAQ and OTC equity securities the report will be filed with the FINRA.

## 8.27 Electronic Blue Sheets

['34 Act Rule 17a-25; FINRA Notices to Members 06-33 and 05-58]

Regulators may request information regarding customer or Alpine transactions as part of their ongoing market surveillance activities. Information is transmitted electronically through the Electronic Blue Sheet (EBS) system.

The CCO or designee is responsible for responding to EBS requests and retaining records of requests and responses submitted.

ALPINE_LIT168008

## 8.28 Other SEC Regulatory Inquiries

Inquiries regarding Alpine's customer accounts initiated by the national office or by regional offices or the SEC should be directed to the Chief Compliance Officer for review and response. The Chief Compliance Officer determines the customer account number(s) of the individuals or entities for whom the inquires are being made and directs operations personnel to produce the requested information. If questions should arise regarding which customer accounts should be included in the response, the Chief Compliance Officer utilizes the SEC Inquiry Form to gather such information from the appropriate RR. The Chief Compliance Officer responds to the SEC inquiry and retains a copy of the response.

## 8.29 Regulatory Fees And Assessments

[SEC Securities Exchange Act of 1934 Section 31; FINRA By-Laws Schedule A; FINRA Notice to Members 05-11 and 04-63]

The FINOP is responsible for paying fees and assessments required by regulators. A record of information reported and fees or assessments paid are retained in the FINOP's files.

## 8.30 Regulatory Requests

[FINRA Rule 8210]

Responses to regulatory requests may only be provided by authorized employees or departments such as Operations or Compliance. Requests received by employees other than those authorized must be referred to Compliance.

### 8.30.1 Information Provided Via Portable Media Device

[FINRA Regulatory Notice 10-59]

Information provided to FINRA by portable media device in response to requests under FINRA 8210 (Provision of Information and Testimony and Inspection and Copying of Books) will be encrypted using a method that meets industry standards for strong encryption. FINRA staff will be provided with the confidential process or key regarding the encryption in a communication separate from the encrypted information itself (separate email, fax, letter, *etc.*).

The Compliance, Legal, or other authorized person providing the requesting information is responsible for ensuring that the information is encrypted when a portable media device is used for transmission of the information.

## 8.31 INSITE Reporting Requirements

FINRA Rule 3150 ("Reporting Requirements for Firms") requires firms to report data which will be used by the FINRA in its surveillance program. INSITE (Integrated National Surveillance and Information Technology Enhancements) is the FINRA's program for identifying emerging risk patterns at members firms for follow-up reviews or examinations.

Operations is responsible for providing the required data and retaining records of information provided.

## 8.32 Outsourcing

[FINRA Notice to Members 05-48]

| Responsibility | • Alpine's IT Committee |
|---|---|

ALPINE_LIT168009

| | |
|---|---|
| **Resources** | • Third party vendors<br>• Reviews of vendor performance<br>• Customer complaints |
| **Frequency** | • As required |
| **Action** | • Identify areas of Alpine's business where outsourcing is appropriate<br>• Identify third party vendors that provide the needed services<br>• Evaluate potential third parties and determine whether to engage using the Outsourcing Review Worksheet<br>• Execute contract<br>• Establish procedures to determine periodically that outsourced services are fulfilling Alpine's requirements and complying with applicable rules<br>• When problems with outsourced services are identified through customer complaints, monitoring of services, or from the vendor itself:<br>    o Review the problem to determine whether the source is the vendor or is internal<br>    o Take corrective action which may include the following:<br>      ▪ Contact the vendor and determine what corrective action will be taken and follow-up to determine corrective action has been taken<br>      ▪ If the problem continues or is significant, determine whether vendor should be replaced<br>      ▪ If the problem is internal, contact the appropriate supervisor to determine corrective action<br>    o Consult with CCO when necessary to determine action to be taken |
| **Record** | • Contracts with third parties<br>• Records of third party vendor reviews<br>• Records of corrective action taken |

Some services may be outsourced to third parties (vendors). While third parties are responsible for providing agreed-upon services in an accurate manner, regulators have stated that Alpine remains responsible for ultimate compliance with rules governing the outsourced activity.

When choosing an outside vendor, a number of factors will be considered depending on the type of service provided. Factors that may be considered when engaging a third party include:

- Length of time in business
- Financial stability
- Prior knowledge of the vendor
- Other users of the vendor's services
- Technology and ability to deliver services
- Security of customer or other financial information, if applicable
- Who at Alpine is responsible for monitoring the vendor's services

ALPINE_LIT168010

## 8.33 Correspondent Clearing

Alpine Securities operates a correspondent clearing business. Each correspondent firm for which we clear must enter into a clearing agreement that is approved by management. A copy of the agreement will be submitted to FINRA for review and Alpine will not begin trading until FINRA has found the agreement to be acceptable.

Alpine will obtain information from the firm wanting us to clear for them regarding the type of business and financial status of the firm. We will use a checklist to document review of the following items:

- Correspondent's business mix and type of customer activity
- FOCUS reports
- Audited Financial Statements
- CRD history
- Names of officers, directors, and compliance personnel.

Once this information is gathered, the Chief Operations Officer and the President will review the information and make a determination regarding whether or not to proceed with the clearing agreement. A determination regarding the size of clearing deposit and monthly minimum requirements will be made after the review.

On an annual basis, the CFO or designee will perform a review of the financial statements (e.g. Focus reports, audited financials) provided by the correspondents to evaluate if Alpine needs to take any action regarding the clearing agreement or continuation of the clearing relationship. The CFO or designee's review may be evidenced electronically or on the correspondent's submitted financial statements. Any items requiring follow-up will be noted in writing or via the electronic log.

ALPINE_LIT168011

# 9 ANTI-MONEY LAUNDERING (AML) PROGRAM

[FINRA Rule 3310; Bank Secrecy Act]

Money laundering is a serious crime potentially related to the funding of terrorist activities. It is the subject of extensive federal regulations that impose requirements on financial institutions, such as broker-dealers and their employees, to detect and prevent potential money laundering activities. Actions to detect and prevent money laundering is an obligation of each employee of Alpine.

Money laundering is the movement of criminally derived funds to conceal the true source, ownership, or use of the funds. The funds are filtered through a maze or series of transactions, so the funds are "cleaned" to look like proceeds from legal activities.

In general, money laundering occurs in three stages. Cash first enters the financial system at the "placement" stage, where the cash profits derived from criminal activity are converted into monetary instruments, such as money orders or traveler's checks, or deposited into accounts at financial institutions. At the "layering" stage, the funds are transferred or moved into other accounts or other financial institutions to separate further the proceeds from their criminal origin. At the "integration" stage, the funds are reintroduced into the economy and used to purchase legitimate assets or to fund further criminal or legitimate activities.

Engaging in money laundering is a federal crime with severe penalties for those engaged in the associated criminal activities and those who facilitate, intentionally or inadvertently, money laundering. It is important that Alpine, as well as all employees, remain diligent and active participants in Alpine's anti-money laundering (AML) program.

This chapter explains Alpine's Anti-Money Laundering (AML) Program. An explanation of money laundering and guidance for all employees to detect money laundering is included in this chapter. These policies will be updated and appropriate procedures and action effected when new rules are adopted.

## 9.1 Background

The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act (BSA), and its accompanying regulation, is a tool the U.S. government uses to fight drug trafficking, money

ALPINE_LIT168012

laundering, and other crimes. Congress enacted the BSA to prevent financial service providers (such as banks and broker-dealers) from being used as intermediaries for, or to hide the transfer or deposit of, money derived from criminal activity. Money laundering schemes may include the use of wire transfers, cash, bearer instruments, travelers' checks, money orders, cashiers' checks, and other negotiable instruments.

Alpine is required to comply with the reporting, recordkeeping, and record retention requirements of the BSA. The requirements govern the payment, receipt, or transfer of currency within, into and out of the U.S. and foreign financial transactions and accounts.

## 9.2 Shell Companies

[FINCen advisory on shell companies: http://www.fincen.gov/AdvisoryOnShells_FINAL.pdf]

Shell companies may represent potential money laundering risks. "Shell company" refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence (other than a mailing address) and generate little or no independent economic value. It is important for employees to be aware of the risks involved in dealing with shell companies.

Most shell companies are formed for legitimate business purposes such as to hold stock or intangible assets of another business entity or to facilitate domestic and cross-border currency and asset transfers and corporate mergers. Unfortunately, shell companies have become common tools for money laundering and other financial crimes, primarily because they are easy and inexpensive to form and operate, and ownership and transactional information can be concealed from regulatory and law enforcement authorities. Most states do not collect or require disclosure of ownership information at the formation stage or after.

Agents, also known as intermediaries or nominee incorporation services (NIS), can play a central role in the formation and maintenance of shell companies. Agents and NIS firms offer a wide range of services that may include offering an office address, mail-forwarding services, local telephone listings, and other services that may give the appearance of a locally-established business. Some agents and NIS firms also provide nominee services which can preserve a client's anonymity. Some risk indicators of shell companies potentially engaged in money laundering are:

- An inability to obtain (through Internet searches, commercial database searches, or direct inquiries to the company's foreign correspondent bank) information necessary to identify originators or beneficiaries of wire transfers.
- A foreign correspondent bank exceeds the anticipated volume projected in its client profile for wire transfers in a given period or an individual company exhibits a high amount of sporadic activity that is inconsistent with normal business patterns.
- Payments have no stated purpose, do not reference goods or services, or identify only a contract or service number.
- Goods or services of the company do not match the company's profile based on information previously provided.
- Transacting businesses share the same address, provide only a registered agent's address, or raise other address-related inconsistencies.
- An unusually large number and variety of beneficiaries receive wire transfers from one company.
- Frequent involvement of beneficiaries located in high-risk, offshore financial centers.
- Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose.

ALPINE_LIT168013

## 9.3 Penalties

Participation in a money laundering scheme or the knowing receipt of proceeds from criminal activities is a crime. Alpine and its employees are subject to severe criminal, civil, and regulatory penalties if they facilitate or participate in money laundering activities. Violations by employees may result in internal disciplinary action including termination.

An employee may be deemed to be facilitating or participating in money laundering by engaging in a transaction with a customer (accept a deposit, arrange a withdrawal, effect a trade, *etc.*) when he or she is aware of, or willfully ignores, the fact that the customer is engaged in illegal activities.

# 9.4 AML Compliance Officer

[NASD Rule 1160; FINRA Rule 3310(d) and 3310.02]

| Responsibility | • AML Compliance Officer |
|---|---|
| **Resources** | • Computer reports and other programs developed for the Program<br>• Internal audits or outside audits of the Program<br>• Regulations and rules for broker-dealer anti-money laundering programs<br>• OFAC web site<br>• Other sites and resources available |
| **Frequency** | • Annual - review policies and procedures<br>• Annual and more frequently, as needed - develop and schedule AML education for employees<br>• As needed - update program and provide revisions to senior management for review and approval of material changes. Non-material changes to the AML Policy will not require senior management approval.<br>• Annually - review AML contact information on file with FINRA<br>• Ongoing - review new regulations<br>• Ongoing - monitor activity |
| **Action** | • Develop and update Alpine's anti-money laundering program<br>• Obtain senior management approval for any material changes to the program and any material changes to the policy<br>• Monitor (or designate monitoring) the activity of Alpine, its associated persons, and customers to reasonably detect and prevent money laundering activities<br>• Develop AML education program for employees and schedule training<br>• File required reports<br>• Retain required records<br>• Provide contact information to FINRA and update contact information if necessary |
| **Record** | • Designation of AML Compliance Officer<br>• Current and past copies of anti-money laundering program with senior management approval, when and where senior management approval is required<br>• Records of AML education including who attended, date of training, and material covered |

ALPINE_LIT168014

| | • Reports filed<br>• Other records to be retained, as listed in the Program |
|---|---|

Alpine has designated an AML Compliance Officer who is responsible for overseeing Alpine's anti-money laundering program, developing policies, procedures, and internal controls reasonably designed to achieve compliance with AML rules and regulations. Contact the AML Compliance Officer whenever you have questions about Alpine's program, a current or prospective account, or activities or transactions that raise questions about potential money laundering activities. You may also provide information anonymously to the AML Compliance Officer. The AML Compliance Officer is responsible for investigating suspected money laundering activities and taking corrective action when necessary.

## 9.5 Independent Testing

[FINRA Rule 3310.01]

| | |
|---|---|
| **Responsibility** | • AML Compliance Officer |
| **Resources** | • Policies and procedures<br>• Independent testing results |
| **Frequency** | • Annual - schedule, conduct, and follow up testing (unless firm qualifies for testing every two years) |
| **Action** | • Identify person(s) to conduct testing<br>• Conduct testing<br>• Report results to CEO in annual compliance report<br>• Revise policies and procedures as necessary<br>• Conduct follow-up to determine corrective action has been taken |
| **Record** | • Independent testing results including who conducted and dates of review<br>• Report to CEO<br>• Record of changes to policies and procedures resulting from testing<br>• Record of follow-up actions |

The AML Compliance Officer will be responsible for an annual (on a calendar-year basis) independent testing of Alpine's policies and procedures regarding money laundering and the effectiveness of the program, as described in this Chapter 9. The tests performed will be either by an employee of Alpine, if such employee qualifies pursuant to the SRO rules for independence set forth below, or by a qualified non-employee, third party. At the discretion of Alpine's Board of Directors, the AML Compliance Officer may be directed to conduct interim testing of Alpine's policies and procedures regarding money laundering and the effectiveness of the program, if they believe such interim tests are warranted.

SRO rules require that the person(s) conducting the independent testing of Alpine's AML program:

- is not the AML Compliance Officer
- is not performing any AML procedures that are being tested and reviewed

ALPINE_LIT168015

- is not an individual who is supervised by or otherwise reports to the AML Compliance Officer or to someone who performs any AML procedures
- is knowledgeable regarding the Bank Secrecy Act, money laundering activities and related regulations

## 9.6 Training Program

All employees are provided with Alpine's Money Laundering policy when they are hired. In addition, ongoing education will include the firm element continuing education program, periodic circulation of Alpine's policy, and other educational programs directed at specific employees. Training will be delivered at least annually by video, intranet systems, in-person lectures, and other methods including third parties who deliver AML training.

Training will include the following, as well as other subjects identified by the AML Compliance Officer:

- How to identify red flags and signs of money laundering
- What to do once the risk is identified (how, when and to whom to escalate unusual customer activity or other red flags)
- Employees' roles in Alpine's compliance efforts and how to perform them
- Alpine's record retention policy
- Disciplinary consequences (including civil and criminal penalties) for non-compliance

The AML Compliance Officer or designee is responsible for retaining records of employees trained, the dates of training, and the subjects included in training.

## 9.7 OFAC List And Blocked Property

[Dept. of Treasury, various statutes; OFAC web site (http://www.treas.gov/offices/enforcement/ofac/); Foreign Assets Control Regulations For The Securities Industry (http://www.treas.gov/offices/enforcement/ofac/regulations/t11facsc.pdf)]

| | |
|---|---|
| **Responsibility** | <ul><li>RR for a new account</li><li>Supervisor approving new accounts</li><li>AML Compliance Officer as set forth in Chapter 1.1</li></ul> |
| **Resources** | <ul><li>Name / Entity search based on above referenced OFAC web site</li><li>Comparison search program provided by CSS Hosted Solutions, LLC</li><li>Other sight identified below and at(*www.treas.gov/ofac*) (*www.fincen.gov*)</li></ul> |
| **Frequency** | <ul><li>At the time that a new account is opened</li><li>Daily</li></ul> |
| **Action** | <ul><li>RR shall perform an OFAC search for each new customer and attach results to new account card</li><li>Supervisor approving the new account shall only approve an account if an OFAC search is attached to the new</li></ul> |

ALPINE_LIT168016

| | |
|---|---|
| | account card. If a positive identification is made, the AML Compliance Officer shall be notified immediately<br>• If a positive identification is found, the AML Compliance Officer shall:<br>• 1- Block accounts subject to sanctions<br>• 2- Cancel open orders for blocked accounts<br>• 3- Notify the Branch Office Supervisor, the Compliance Officer, and the account's RR, when an account or security is blocked<br>• 4- Notify OFAC by FAX within 10 days of blocking an account<br>• 5- Notify Dreyfus Service Corporation with respect to funds in a blocked account having been swept into the Dreyfus Money Market account.<br>• Daily, CSS Hosted Solutions, LLC will provide Alpine's AML compliance officer with an OFAC screening report.<br>• The daily OFAC screenings report shall be initialed and dated by the AML compliance officer as evidence of its review and such report shall be retained by the AML compliance officer. |
| **Record** | • RR for each new account shall attach the OFAC search results to each customers new account card<br>• The results of each CSS Hosted Solutions, LLC system search, subsequent OFAC searches undertaken, and any actions taken, shall be retained |

The U.S. Treasury Department's Office of Foreign Assets Control (OFAC) is responsible for publishing sanctions against persons, corporations, and other entities including foreign governments that have been identified by the U.S. Government as engaging in criminal activities including drug trafficking and terrorist activities. Alpine is obligated to check its accounts against the lists of blockings to ensure it does not engage in prohibited transactions which include securities transactions and transfer of assets out of a blocked account or to a blocked person or entity. Alpine has procedures to monitor the OFAC lists and comply with requirements to block property and notify OFAC when required. Questions regarding Alpine's program should be referred to the AML Compliance Officer. More information is also available at the OFAC web site at *www.treas.gov/ofac*.

The property of sanctioned persons or entities will be blocked and transfer of assets prevented for persons or entities included on the OFAC list of blocked persons or entities. In addition, Alpine will block securities issued by sanctioned countries and other sanctioned issuers. Information about sanctions is divided into several categories including:

• Persons and entities subject to sanctions, *Special Designated Nationals and Blocked Persons* (SDN list)

ALPINE_LIT168017

- Persons and entities engaged in drug trafficking, *Specially Designated Narcotics Traffickers* (SDNTKs)
- Terrorists and terrorist organizations, *Specially Designated Terrorists* (SDTs)
- Countries, governments, and other entities subject to sanctions

OFAC requirements apply to all persons and entities under U.S. jurisdiction, including foreign branches of U.S. institutions. This also includes foreign institutions that operate in the U.S

The term "OFAC list" in this section includes all sanctions published by OFAC even though the information may appear in multiple lists. Alpine will not permit prohibited transactions with sanctioned parties and will file reports with OFAC when necessary.

### 9.7.1 Prohibited Transactions

Alpine is prohibited from conducting transactions in any account on behalf of a sanctioned party or in certain blocked securities. Securities and funds may not be released and securities transactions may not be executed. Securities and funds may be deposited to a blocked account, but no securities or funds will be released until the account is no longer subject to sanctions. Funds or securities may not be transferred to sanctioned parties.

Because transactions are prohibited, all open orders for a blocked account will be cancelled.

### 9.7.2 Blocking Requirements

Blocking requirements are generally triggered under the following circumstances:

- An account is opened for someone included on an OFAC list.
- The owner of an existing account is added to an OFAC list.
- A security is identified in a customer account where the issuer is the subject of sanctions.
- A request is made by a customer to pay or transfer funds or securities to a blocked person or entity.

While title to blocked property remains with the blocked person or entity, transactions affecting the property (including transfer of the assets) cannot be made without authorization from OFAC. Debits to blocked accounts are prohibited, but credits may be accepted. Cash balances in blocked accounts must earn interest at commercially reasonable rates. Blocked securities may not be paid, withdrawn, transferred (even in book transfer), endorsed, guaranteed, or otherwise dealt in.

It is not a violation to open an account for a blocked person. The violation occurs when the account is not frozen and assets are allowed to transfer out of the account. In addition, OFAC restrictions may vary depending on the blocked person or entity; details of blocking requirements are explained on the OFAC web site.

### 9.7.3 Monitoring Procedures

Monitoring is to be conducted as follows:

- Operations personnel and Supervisors approving new accounts are provided with a list of the countries included on the OFAC countries list, to watch for new accounts to be opened for or requests to transfer funds or securities to residents of those countries. The AML Compliance Officer shall provide an updated list each month by email to all operations personnel and supervisors.
- Alpine undertakes an OFAC search utilizing the www.treas.gov/ofac web site for each new account and retains the OFAC search results in the new account file.

ALPINE_LIT168018

- Alpine continually reviews its existing accounts through the use of the OFAC screenings report provided by CSS Hosted Solutions, LLC. Additionally, on a weekly basis, Alpine undertakes an account rescreening through the use of CSS Hosted Solutions, LLC and generates an OFAC possible matches (rescreening) report. To evidence review, a report is produced that is reviewed, initialed and retained by the AML Compliance Officer.

### 9.7.4 Other Requests To Monitor Accounts

Regulators or law enforcement agencies may ask the industry's cooperation in identifying accounts for individuals or entities under investigation or suspected of criminal activities.

The AML Compliance Officer is responsible for responding to such requests; providing the necessary information; and retaining records of requests, reviews conducted pursuant to requests, and information provided to authorities.

### 9.7.5 Blocking Property And Disbursements

Any blocked account will not be permitted to engage in transactions other than the acceptance of deposits of funds or securities. Open orders of blocked accounts will be cancelled.

Disbursements of funds or securities may not be made to sanctioned parties. The AML Compliance Officer will instruct Alpine's back office to withhold requests for disbursements from blocked accounts and will maintain a log of all accounts that have been blocked.

### 9.7.6 Reporting Blocked Property And Legal Actions

When an account or disbursement is blocked or a blocked security is identified, OFAC will be notified within 10 days of blocking. If Alpine blocks an account or security, the AML Compliance Officer will file the necessary report with OFAC. The AML Compliance Officer will be responsible to retain copies of reports filed by Alpine in a file of blocked accounts or securities. Information to be reported includes:

- Owner or account party
- Property and property location
- Account number
- Actual or estimated value
- Date property was blocked
- Copy of the payment or transfer instructions
- Confirmation that funds have been deposited in a blocked account that is identified as blocked
- Name and phone number of Alpine's AML Compliance Officer

For rejected disbursements, the following information is to be filed:

- Name and address of the transferee financial institution
- Date and amount of the transfer
- Copy of the payment or transfer instructions
- Basis for rejection
- Name and phone number of Alpine's Compliance Officer

### 9.7.6.1 Annual Report Of Blocked Property

On an annual basis by September 30th, the AML Compliance Officer shall file Form TDF 90-22.50 with OFAC for any blocked property held as of June 30.

ALPINE_LIT168019

**9.7.6.2 Legal Actions Involving Blocked Property**

U.S. persons involved in litigation, arbitration, or other binding alternative dispute resolution proceedings regarding blocked property must provide notice to OFAC. Copies of all documents associated with the proceedings will be submitted by the AML Compliance Officer to the OFAC Chief Counsel at the U.S. Treasury Department within 10 days of their filing. In addition, information about the scheduling of any hearing or status conference will be faxed to the Chief Counsel.

## 9.7.7 Reporting Obligations for All Alpine Employees

All employees are obligated to promptly report to the AML Compliance Officer any known or suspected violations of anti-money laundering policies as well as other suspected violations or crimes. If the potential violation implicates the AML Officer, it should be reported to a senior officer of Alpine. All reports are confidential and the employee will suffer no retaliation for making them.

**What to report:** Crimes or suspected crimes by individuals (whether associated with Alpine, a customer, or prospective customer) are required to be reported. This includes suspicion that Alpine is being used as a conduit for criminal activity such as money laundering or structuring transactions (discussed below) to evade the Bank Secrecy Act reporting requirements. There is no clear definition of what constitutes a "crime." If you believe some improper or illegal activity is occurring, it is your obligation to report it.

**SAR reports:** By law, Alpine and its employees cannot disclose to the customer or anyone other than authorized parties that it has filed a SAR or provide information that would reveal the existence of a SAR. Questions regarding SAR filings should be referred to Compliance. If you become aware of an unauthorized disclosure of an SAR or you receive a subpoena for an SAR, **immediately contact the Compliance Department**. Designated Compliance personnel will be responsible for contacting FINCEN to report the unauthorized disclosure.

### 9.7.7.1 Role Of Operations Personnel

Operations personnel are an important first line of defense in preventing transactions with sanctioned parties. The following guidance is provided to assist Operations personnel in identifying blocked parties. Any questioned accounts or transactions should be referred to the AML Compliance Officer.

- On a monthly basis, the AML Compliance Officer shall provide a current list of countries included on the OFAC list. These are countries considered potential havens for money laundering, drug trafficking, or terrorist activities. Information is included on the OFAC web site at *www.treas.gov/ofac*.
- On a periodic basis, the AML Compliance Officer shall provide a current list of countries included on the Financial Action Task Force (FATF) list. The Financial Action Task Force (FATF) is the global standard setting body for anti-money laundering and combating the financing of terrorism. In order to protect the international financial system from money laundering and financing of terrorism risks and to encourage greater compliance with their standards, the FATF identified jurisdictions that have strategic deficiencies and works with them to address those deficiencies that pose a risk to the international financial system.
- When processing the opening of accounts, back office employees shall determine if new accounts have addresses as residents of countries included on the OFAC list and report any that appear on the list to the AML Compliance Officer.
- Questions regarding requests to transfer funds or securities to residents or entities domiciled in any country included on the OFAC list shall be reported to the AML Compliance Officer.

ALPINE_LIT168020

### 9.7.7.2 Role of Retail Brokerage Personnel

Retail sales personnel are also an important first line of defense in identifying, detecting and/or preventing transactions. Retail sales personnel is in a unique position of knowing the client best. It is important that you understand the customer's financial resources, business activities, and sources of funds to identify when purported or actual activity deviates from the standard transactions one expects to see in a customer account. The process of knowing the customer does not end at the time the account established. The process of knowing the customer continues through the ongoing maintenance of the client's account. Any questioned accounts or transactions should be referred to the AML Compliance Officer or designee.

# 9.8 Currency Reporting Requirements

[SEC Securities Exchange Act of 1934 Rule 17a-8; Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart C; FinCEN pamphlet on CTR reporting: http://www.fincen.gov/whatsnew/html/20090224.html]

The Bank Secrecy Act requires broker-dealers to report certain transactions relating to currency transactions, as follows:

- Report cash or currency deposits of more than $10,000, including multiple deposits on the same day that would total more than $10,000. A currency Transaction Report (CTR) is filed with the Financial Crimes Enforcement Network (FinCEN), a bureau of the Treasury Department. Some state regulators also require reporting of currency transactions.
- Report currency or bearer instruments over $10,000 transferred into or out of the U.S. The Currency and Monetary Instrument Transportation Report (CMIR) is filed with the U.S. Customs Service.

The following summarizes the reporting requirements under the Bank Secrecy Act. Alpine's CFO is responsible for maintaining records of any currency reports required to be filed by Alpine and retaining them for five years.

### 9.8.1 Transactions Involving Currency Over $10,000

If Alpine accepts a currency deposit exceeding $10,000, it is required to file a Currency Transaction Report (CTR) with the Financial Crimes Enforcement Network (FinCEN). Multiple transactions by the same person equaling over $10,000 in any one day must also be reported. Alpine's Operations Principal is responsible for filing these reports and maintaining records of them for a period of five years from the filing date.

The back office is responsible for receiving currency and will process these requests in accordance with their standard operating procedures. Currency deposits in the amount greater than $10,000 will be reported to the AML Officer. Multiple transactions by the same person equaling over $10,000 in any one day must also be reported to the AML Officer. The AML Officer will notify Alpine's Operations Principal to complete the required filings.

"Currency" is defined as the coin and paper money of the U.S. or legal tender of other countries. Currency also includes U.S. silver certificates, U.S. notes, federal reserve notes, and official foreign bank notes customarily used and accepted as a medium of exchange in a foreign country.

### 9.8.2 Transactions Involving Currency Or Bearer Instruments Over $10,000 Transferred Into Or Outside The U.S.

Broker-dealers are required to file a Currency and Monetary Instrument Transportation Report (CMIR) with the U.S. Customs Service to report transactions in physical currency and/or bearer instruments which alone or in combination exceed $10,000 and which are shipped or transported into or outside

ALPINE_LIT168021

the U.S. This filing is not required for currency or other monetary instruments mailed or shipped through the postal service or by common carrier. Alpine's Operations Principal is responsible for filing these reports and maintaining records of them for a period of five yeras from the filing date.

### 9.8.3 Prohibition Against Structuring Deposits To Avoid Reporting

Cash or currency deposits or attempted deposits which appear to be part of a deposit structure to avoid IRS or Customs currency reporting requirements or Alpine's limitations, or are otherwise suspicious, may not be accepted and must be reported to the Branch Manager. Employees are prohibited from:

- aiding or advising a customer in structuring a transaction to avoid reporting requirements
- holding instruments for deposit on succeeding days
- transporting cash or cash equivalents or bearer instruments to a bank on behalf of a customer

### 9.8.4 State Reporting Requirements

States have adopted various currency and suspicious activity reporting requirements. Most states have entered into an agreement with FinCEN to provide them with duplicate copies of forms filed by broker-dealers. Some states, however, require duplicate filing with the states themselves at the time the broker-dealer files with a federal agency. Alpine's CFO will file reports as required under state requirements.

## 9.9 Foreign Financial Account Reporting Requirements And Recordkeeping (FBAR)

[Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart C; Form: http://www.fincen.gov/forms/files/f9022-1_fbar.pdf; FinCEN Notice 2012-1]

Certain "United States persons" that maintain accounts (including any account where the person has a financial interest in, or signature or other authority over) in foreign jurisdictions with aggregate balances exceeding $10,000 are required to file a Report of Foreign Bank and Financial Accounts (FBAR) Department of Treasury Form 90-22.1 with FinCEN on or before June 30th of each calendar year for accounts maintained during the previous calendar year. Certain U.S. persons with signature authority over, but no financial interest in, foreign financial accounts of their employers and entities related to their employers have an extension until June 30, 2013 to file Form 90-22.1 (see FinCEN Notice 2012-1). The FINOP is responsible for filing the annual report if it is required for Alpine.

The filing requirement applies to:

- Non-resident aliens and foreign entities "in and doing business" in the U.S.
- All forms of U.S. business entities, trusts, estates with foreign accounts.
- U.S. citizens and residents with signature or other authority over a foreign account.
- Trust beneficiaries with a greater than 50% beneficial interest in a trust with a foreign account.
- U.S. citizens and resident stockholders with greater than 50% of the value or vote of the shares of a corporation with foreign accounts.
- Entities that are disregarded for tax purposes, such as limited liability companies.

The filing requirement does not apply to certain entities or situations. The regulation should be consulted for specific exemptions or conditions of exemptions.

- If the account is maintained in the United States, it is not considered a foreign account even if it holds foreign assets.

ALPINE_LIT168022

- An omnibus account held by a custody bank that holds assets both in the U.S. and outside the U.S. is not considered a foreign account unless the customer has direct access to its foreign holdings maintained at the foreign institution.
- Certain entities are excluded including: foreign hedge funds, venture capital funds, or private equity funds; tax-exempt investors that own offshore "blocker corporations;" government pension funds; pension plan participants and IRA owners (provided the trustee files a FBAR); investment advisers and employees of such advisers that provide advice to SEC-registered entities; remainder interests in trusts and beneficiaries of discretionary trusts; employees of a U.S. or foreign entity that issued a class of foreign equity (including ADRs) registered with the SEC.

There also are exemptions for officers or employees with signature or other authority over certain foreign financial accounts but no financial interest in the reportable account. The regulation should be consulted for details regarding who is not required to notify FinCEN regarding signature or other authority over such an account.

# 9.10 Recordkeeping Requirements

[Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart D]

In addition to maintaining records of reports filed with the IRS or other authorities, broker-dealers are obligated to maintain records of certain transactions, for potential inspection by regulators and other authorities. These records must be retained for five years.

## 9.10.1 Fund Transfers And Transmittals

[Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart D; FINRA Notice to Members 97-13, 96-67 and 95-69; SEC Q&As: http://www.sec.gov/about/offices/ocie/aml2007/fincen-advissu7.pdf; SEC Q&As: http://www.sec.gov/about/offices/ocie/aml2007/fincen-advsiii.pdf]

Broker-dealers are required to collect and retain information (such as name, address, account number of customer, date and amount of wire, payment instructions, name of recipient institution, and name and account information of wire payment recipient) and maintain records for domestic and international funds transfers (including wire fund transfers) of $3,000 or more, with certain exceptions. This includes transfers between accounts that are not for the same owner and transfers to third parties including banks and other financial institutions. Records of transfers are available for inspection by regulators and other appropriate authorities, when requested.

Alpine (and its clearing firm or other third party, if applicable) is responsible for complying with the requirements to record information regarding fund transfers and, when required, verifying information regarding transmitters and recipients who are not established customers. Examples of verification information include:

- Name and address
- ID reviewed (type and number on the ID)
- Taxpayer ID number (or alien ID or passport number including country of issuance)
- Copy or record of method of payment (*e.g.,* credit card, check)

## 9.10.2 Other Recordkeeping Requirements

[Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart D 1023.410]

The Bank Secrecy Act incorporates other records requirements that include records covered by *Books And Records* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*. Alpine will retain all of the following required records:

ALPINE_LIT168023

1. Trading authorizations which are addressed in the chapter *ACCOUNTS*
2. Records under 17a-3 which are addressed in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*
3. A record of each receipt of currency, other monetary instruments, checks, or investment securities and of each transfer of funds or credit, of more than $10,000 received on any one occasion directly and not through a domestic financial institution, for any person, account or place outside the United States.

## 9.11 Detecting Potential Money Laundering

| Responsibility | • AML Compliance Officer<br>• Other designated supervisor for review of AML Compliance Officer accounts |
|---|---|
| Resources | • Internal reports of transactions, available exception reports |
| Frequency | • Daily and ongoing |
| Action | • Review reports of transactions (cash and security transactions) to identify potential money laundering (including employee accounts)<br>• Another designated supervisor will review the AML Compliance Officer's accounts<br>• Report suspicious activity (see the policy in this chapter)<br>• Notify RRs, supervisors, and close accounts when necessary |
| Record | • Reports reviewed<br>• Action taken, when necessary<br>• Suspicious activity reports |

Alpine has an ongoing program to identify potential money laundering. Monitoring will be conducted using available exception reports or review of a sufficient amount of account activity to permit identification of patterns of unusual size, volume, pattern or type of transactions, geographic factors such as whether jurisdictions designated as "non-cooperative" are involved, or involve "red flags" (indicators of potential money laundering) which are included in the *Money Laundering* policy in the chapter *GENERAL EMPLOYEE POLICIES*. Items reviewed include trading and wire transfer transactions in the context of other account activity to determine if a transaction lacks financial sense or is suspicious because it is an unusual transaction or strategy for that customer. Among the information used to determine whether to file a suspicious activity report are exception or transaction reports that include transaction size, location, type, number, and nature of the activity.

Trading accounts will be identified and monitored where a series of financial transactions may help obscure the origins of the funds. This may include effecting securities transactions, closing the account, and transferring funds to a bank or other account, particularly to an offshore location. Trading penny stocks (which may involve unregistered distributions) or engaging in retail forex trading will, in particular, be monitored when they occur.

Alpine has included an educational policy *(Money Laundering)* in the chapter *GENERAL EMPLOYEE POLICIES* to educate employees on money laundering and guidelines for detecting money laundering activities. Periodically detection of money laundering and the obligation to report suspicious activities will be included in continuing education and other educational programs for employees.

ALPINE_LIT168024

### 9.11.1 Foreign Currency Transactions

Foreign financial institutions may purchase U.S.-denominated bonds, generally issued by foreign governments, with the local currency, which are then transferred to a U.S. broker-dealer and sold, with proceeds then transferred offshore. U.S. broker-dealers act as intermediaries in these transactions and may receive foreign bonds or other securities worth millions of U. S. dollars without knowing who or how many underlying customers may be involved. RRs and [The Firm] must be diligent about such transactions which may involve money laundering.

## 9.12 Information Sharing Between Financial Institutions

[USA PATRIOT Act Section 314(b); Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart E; FinCEN certification: http://www.fincen.gov/fi_infoappb.html]

Alpine does not share information with other financial institutions regarding accounts and account activity unless it has filed the requisite certification with the Financial Crimes Enforcement Network ("FinCEN") to allow Alpine to share information pursuant to Section 314(b) of the USA PATRIOT Act. Alpine may share information with an affiliated company, including its parent company, if the financial institution has filed a current 314(b) form with FinCEN.

## 9.13 Alpine's Employee Reporting Obligations

All employees are obligated to promptly report to the AML Compliance Officer or designee any known or suspected violations of anti-money laundering policies as well as other suspected violations or crimes. If the potential violation implicates the AML Officer, it should be reported to a senior officer of Alpine. All reports are confidential and the employee will suffer no retaliation for making them.

**What to report:** Crimes or suspected crimes by individuals (whether associated with Alpine, a customer, or prospective customer) are required to be reported. This includes suspicion that Alpine is being used as a conduit for criminal activity such as money laundering or structuring transactions (discussed below) to evade the Bank Secrecy Act reporting requirements. There is no clear definition of what constitutes a "crime." If you believe some improper or illegal activity is occurring, it is your obligation to be attentive and alert to the red flags and report to the AML Compliance Officer or designee any new or existing customers who may be engaged in violations of anti-money laundering regulations.

**SAR reports:** By law, Alpine and its employees cannot disclose to the customer or anyone other than authorized parties that it has filed a SAR or provide information that would reveal the existence of a SAR. Questions regarding SAR filings should be referred to Compliance. If you become aware of an unauthorized disclosure of an SAR or you receive a subpoena for an SAR, **immediately contact the Compliance Department**. Designated Compliance personnel will be responsible for contacting FINCEN to report the unauthorized disclosure.

## 9.14 Suspicious Activity Reports (SARs)

[USA PATRIOT Act Sec. 356; FinCEN Guidance on Suspicious Activity Report Supporting Documentation: http://www.fincen.gov/Supporting_Documentation_Guidance.pdf; FinCEN Guidance FIN-2008-G005 ]

ALPINE_LIT168025

| Responsibility | • AML Compliance Officer |
|---|---|
| Resources | • Reports from employees of crimes or suspected crimes<br>• Suspicious activities detected through ongoing reviews<br>• Other available information |
| Frequency | • As required |
| Action | • Review and investigate suspicious transactions referred by employees<br>• Determine whether Alpine will file a SAR<br>• If appropriate, file Form SAR-SF with FinCEN and state authorities<br>• Notify senior management, as appropriate, of forms filed |
| Record | • Notes and other documented reviews are retained in a suspicious activity file<br>• Copies of SARs filed by Alpine are retained in the SAR file with notation of when and to whom sent |

Alpine will file Suspicious Activity Reports (SARs) for transactions that may be indicative of money laundering activity. Suspicious activities include a wide range of questionable activities. Examples may include, but are not limited to, trading that constitutes a substantial portion of all trading for the day in a particular security; trading or journaling between/among accounts, particularly between related owners; late day trading; heavy trading in low-priced securities; unexplained wire transfers, including those to known tax havens; unusually large deposits of funds or securities; shares of physical securities of low-priced securities that have an issue date of less than 12 months and are more than one million shares or have a market value over a certain amount.

Determining whether an activity or series of activities is suspicious is a facts and circumstance analysis. Such determinations will be made by the AML Compliance Officer or designee.

### 9.14.1 Potential Risk Indicators

[NASD Notice to Members 02-21]

The following are examples of risk indicators (red flags) that may suggest potential money laundering.

| Red Flags indicating potential Money Laundering |
|---|
| The customer exhibits unusual concern regarding Alpine's compliance with government reporting requirements and Alpine's AML policies, particularly with respect to his or her identity, type of business and assets, or is reluctant or refuses to reveal any information concerning business activities, or furnishes unusual or suspect identification or business documents. |
| The customer wishes to engage in transactions that lack business sense or apparent investment strategy, or are inconsistent with the customer's stated business strategy. |
| The information provided by the customer that identifies a legitimate source for funds is false, misleading, or substantially incorrect. |
| Upon request, the customer refuses to identify or fails to indicate any legitimate source for his or her funds and other assets. |
| The customer (or a person publicly associated with the customer) has a questionable background |

ALPINE_LIT168026

| |
|---|
| or is the subject of news reports indicating possible criminal, civil, or regulatory violations. |
| The customer exhibits a lack of concern regarding risks, commissions, or other transaction costs. |
| The customer appears to be acting as an agent for an undisclosed principal, but declines or is reluctant, without legitimate commercial reasons, to provide information or is otherwise evasive regarding that person or entity. |
| The customer has difficulty describing the nature of his or her business or lacks general knowledge of his or her industry. |
| The customer engages in suspicious activity involving the practice of depositing penny stocks, liquidates them, and wires proceeds. A request to liquidate shares may also represent engaging in an unregistered distribution of penny stocks which may also be a red flag. [FINRA Regulatory Notice 09-05] |
| The customer attempts to make frequent or large deposits of currency, insists on dealing only in cash equivalents, or asks for exemptions from Alpine's policies relating to the deposit of cash and cash equivalents. |
| The customer engages in transactions involving cash or cash equivalents or other monetary instruments that appear to be structured to avoid the $10,000 government reporting requirements, especially if the cash or monetary instruments are in an amount just below reporting or recording thresholds. |
| For no apparent reason, the customer has multiple accounts under a single name or multiple names, with a large number of inter-account or third-party transfers. |
| The customer is from, or has accounts in, a country identified as a non-cooperative country or territory by the Financial Action Task Force (FATF). |
| The customer's account has unexplained or sudden extensive wire activity, especially in accounts that had little or no previous activity. |
| The customer's account shows numerous currency or cashiers check transactions aggregating to significant sums. |
| The customer's account has a large number of wire transfers to unrelated third parties inconsistent with the customer's legitimate business purpose. |
| The customer's account has wire transfers that have no apparent business purpose to or from a country identified as a money laundering risk or a bank secrecy haven |
| The customer's account indicates large or frequent wire transfers, immediately withdrawn by check or debit card without any apparent business purpose. |
| The customer makes a funds deposit followed by an immediate request that the money be wired out or transferred to a third party, or to another firm, without any apparent business purpose. |
| The customer makes a funds deposit for the purpose of purchasing a long-term investment followed shortly thereafter by a request to liquidate the position and transfer of the proceeds out of the account. |
| The customer engages in excessive journal entries between unrelated accounts without any apparent business purpose. |
| The customer requests that a transaction be processed in such a manner to avoid Alpine's normal documentation requirements. |
| The customer, for no apparent reason or in conjunction with other "red flags," engages in transactions involving certain types of securities, such as penny stocks, Regulation "S" (Reg S) stocks, and bearer bonds, which although legitimate, have been used in connection with fraudulent schemes and money laundering activity. (Such transactions may warrant further due diligence to ensure the legitimacy of the customer's activity.) |
| The customer's account shows an unexplained high level of account activity with very low levels of securities transactions. |

ALPINE_LIT168027

| |
|---|
| The customer maintains multiple accounts, or maintains accounts in the names of family members or corporate entities, for no apparent business purpose or other purpose. |
| The customer's account has inflows of funds or other assets well beyond the known income or resources of the customer. |

### 9.14.2 Identifying Potential Suspicious Activity

Alpine uses a number of tools to identify potential suspicious activity including:

- Transaction information including disbursement of funds or securities are reviewed periodically by the Branch Manager and AML compliance officer.
- The AML Compliance Officer provides education to Alpine's RR, to Supervisors approving new accounts, operations personnel and to the Branch Manager.
- Employee reports of potential suspicious activity are given to the AML Compliance Officer
- It is always at the manager or AML Compliance Officer's discretion, when taking into consideration all factors, when a SAR Form should be filed.

All employees have an ongoing obligation to report potentially suspicious activity to the AML Officer or designee.

### 9.14.3 When A Report Must Be Filed

A SAR must be filed for any transaction that, alone or in aggregate, involves at least $5,000 in funds or other assets, if Alpine knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is part) falls into one of the following categories:

- Transactions involving funds derived from illegal activity or intended or conducted to hide or disguise funds or assets derived from illegal activity.
- Transactions designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act (BSA).
- Transactions that appear to serve no business or apparent lawful purpose or are not the sort of transactions in which a particular customer would be expected to engage, and for which Alpine knows of no reasonable explanation after examining the available facts.
- Transactions that involve the use of Alpine to facilitate criminal activity.

Excluded from the filing requirement are violations otherwise reported to law enforcement authorities such as:

- a robbery or burglary that is reported to law enforcement authorities
- lost, missing, counterfeit, or stolen securities reported pursuant to 17f-1
- a violation of federal securities laws or SRO rules by Alpine, its officers, directors, employees, or RRs that are reported to the SEC or SRO, except for violations of Rule17a-8 (filing of Currency and Transaction Reports) which must be reported on a SAR

### 9.14.4 Filing A Report And Emergency Notification

If Alpine determines to file a SAR with FinCEN, the AML Compliance Officer will file:

- within 30 days of becoming aware of the suspicious transaction; or
- if no suspect has been identified within 30 calendar days of detection, reporting may be delayed an additional 30 calendar days or until a suspect has been identified, but no later than 60 days from date of initial detection.

ALPINE_LIT168028

In situations involving violations that require immediate attention (such as terrorist financing or ongoing money laundering schemes), the AML Compliance Officer will immediately notify by telephone an appropriate law enforcement agency. Suspicious transactions that may relate to terrorist activity may also be reported to FinCEN's Financial Institutions Hotline. In either event, a SAR will be filed.

### 9.14.4.1 Emergency Notification

[FINRA Notice to Members 02-21]

When conducting due diligence or opening an account, Federal authorities will be notified immediately by the AML Compliance Officer, when necessary, in the following situations:

- A legal or beneficial account holder or person is engaged in a transaction listed on or located in a country or region listed on the OFAC list.
- An account is held by an entity that is owned or controlled by a person or entity listed on the OFAC list.
- A customer tries to use bribery, coercion, or similar means to open an account or carry out a suspicious activity.
- There is reason to believe a customer is trying to move illicit cash out of the government's reach.
- There is reason to believe the customer is about to use funds to further an act of terrorism.

Emergency contacts include:

- OFAC Hotline
- Financial Institutions Hotline
- Local U.S. Attorney's office
- Local FBI office
- Local SEC office

## 9.14.5 Retention Of Records

The AML Compliance Officer maintains a file of copies of SARs filed with FinCEN and all related documents for a period of 5 years from the filing date.

## 9.14.6 Providing SARs Information To SROs

[SEC letter to CEOs: http://www.sec.gov/about/offices/ocie/brokerdealerletter.htm]

While SARs are to be treated as confidential, [The Firm] will provide SARs and supporting documentation available to any self-regulatory organization (SRO) that examines [The Firm] for compliance with the SAR Rule, upon request of the SEC. The request may be part of a routine examination, an investigation, or part of the SRO's risk assessment effort within its examination program.

## 9.14.7 Prohibition Against Disclosure

By statute and regulation, Alpine may not inform customers or third parties that a transaction has been reported as suspicious. U.S. Treasury and Federal Reserve Board regulations also require Alpine to decline to produce SARs in response to subpoenas and to report to FinCEN and the Federal Reserve Board the receipt of such requests and Alpine's response. Failure to maintain the confidentiality of SARs may subject an employee to civil and criminal penalties under Federal law. Violations may be enforced through civil penalties of up to $100,000 for each violation and criminal penalties of up to $250,000 and/or imprisonment not to exceed five years. Alpine may also be liable for civil money

ALPINE_LIT168029

penalties resulting from AML deficiencies that led to improper SAR disclosure up to $25,000 per day for each day the violation continues.

Procedures to protect the confidentiality of SARs include the following:

- Access to SARs is limited to employees on a "need-to-know" basis
- SARs will be maintained in locked physical or electronic files
- SARs may not be left on desks or on open computer files and must be viewed without access by unauthorized persons
- SARs shared with others will be clearly marked "Confidential"

Compliance (or Alpine's counsel) is responsible for responding to subpoena requests and Compliance will notify FinCEN and our primary federal regulator, where required by law.

### 9.14.7.1 Recipient Of An Unauthorized SAR Disclosure

If you become aware of an unauthorized disclosure of a SAR or if you receive a subpoena request for a SAR, immediately contact the Compliance Department. Compliance will contact FINCEN's Office of Chief Counsel at (703) 905-3590. We may also be required to contact our primary federal regulator.

# 9.15 Requests And Written Notices From Enforcement Agencies

Under the Bank Secrecy Act, financial institutions are required to respond to federal banking agency requests for information relating to anti-money laundering compliance. The Rule requires provision of information and account documentation for any account opened, maintained, administered or managed in the U.S. The AML Compliance Officer or designee maintains records of information provided in response to regulators' requests including the request, date of response, and information provided.

## 9.15.1 Federal Banking Agency Requests -- 120-Hour Rule

[USA PATRIOT Act Section 319(b)]

Upon receiving a request from a Federal banking agency, the AML Compliance Officer will provide the requested information within 5 days (120 hours) of receiving the request or will make available the information for inspection by the banking agency.

## 9.15.2 FinCEN Requests For Information

[Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart E; USA PATRIOT Act Section 314; FinCEN 314(a) Fact Sheet: http://www.fincen.gov/statutes_regs/patriot/pdf/314afactsheet.pdf]

| Responsibility | • AML Compliance Officer |
|---|---|
| Resources | • Deposit records, purchase/sale records, account records, other records as required |
| Frequency | • Upon request |
| Action | • Conduct a search of the required records<br>• If a match is found, submit the Subject Information Form to FinCEN<br>• Retain copy of 314(a) list received |
| Record | • Retain copies of the request |

ALPINE_LIT168030

|  | • Notate records searched, and date of review and initial or sign the 314(a) list received<br>• Information submitted (if a match is found) are retained in a FinCEN information request file<br>• Sign or initial 314(a) Search Self-Verification Page and retain |
|---|---|

The Financial Crimes Enforcement Network (FinCEN) sends law enforcement requests to financial institutions under Section 314(a) of the USA PATRIOT Act.

Requests for information from FinCEN will be forwarded to the AML Compliance Officer for response. Within 2 weeks of receipt of the request, if a match is identified with a named subject, the Subject Information Form (included with FinCEN's request) will be forwarded to FinCEN by electronic mail to *sys314a@fincen.treas.gov* or, if e-mail is not available, by fax at 703-905-3660.

FinCEN requests are confidential and may not be disclosed to the subject of the request. Alpine will not use information provided to FinCEN for any purpose other than (1) to report to FinCEN as required under Section 314; (2) to allow the AML Compliance Officer to determine whether to establish or maintain an account, or to engage in a transaction; or (3) to assist Alpine in complying with any requirement of Section 314.

### 9.15.3 Foreign Bank Correspondent Accounts

[USA PATRIOT Act Section 313]

Upon receipt of a written request from a Federal law enforcement officer for information about a foreign bank correspondent account, the AML Compliance Officer will provide the requested information no later than 7 days after receipt of the request.

The AML Compliance Officer is responsible to terminate any correspondent relationship with a foreign bank within 10 business days of receiving a notice from the Treasury Dept. or the U.S. Attorney General that the foreign bank failed either to comply with a summons or subpoena or to contest it in a U.S. court.

## 9.16 Knowing the Customer

Being familiar with the customer's financial resources, business activities, and sources of funds are avenues for knowing the customer. The process of knowing the customer occurs at the time an account is opened as well as during the operation of a customer's account.

The identity of customers must be verified when a new account is opened. Procedures for verifying customer ID are explained in the chapter *ACCOUNTS* in the section *New Accounts.*

## 9.17 Customer Identification Program (CIP)

[USA PATRIOT Act Section 326; Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart B; FINRA Notice to Members 03-34; FinCEN Frequently Asked Questions: http://www.fincen.gov/cip_faq.html; FinCEN No-Action position on CIP requirements under clearing arrangements: FIN-2008-G002; Guidance on Obtaining and Retaining Beneficial Ownership Information, FinCEN Guidance, FIN-2010-G001 March 5, 2010]

The opening of new accounts is subject to customer identity verification requirements under Alpine's Customer Identification Program (CIP). Requirements for employees opening accounts as explained in the chapter *ACCOUNTS* are duplicated in this section to consolidate all AML requirements within this chapter.

ALPINE_LIT168031

The use of the term "customer" in this section is understood to include prospective customers.

## 9.17.1 Accounts Requiring Approval By The AML Compliance Officer

The following accounts require review and approval by the AML Compliance Officer at the time of opening. The AML Compliance Officer may require additional customer identification information for these accounts.

- **Numbered accounts** (accounts designating a number rather than a name as the account name).
- **Any account requesting confidential handling** of its name, mailing of confirmation and statements, *etc.*
- **Accounts domiciled in high risk countries.** Accounts domiciled in countries identified by OFAC or the Financial Action Task Force on Money Laundering (FATF) as having inadequate anti-money laundering standards or representing high risk for crime and corruption.
- **Foreign public officials.** Includes individuals in high offices of foreign governments, political party officials and their families and close associates (if known and/or readily identifiable).
- **Correspondent and Private Banking accounts.** See the section *Due Diligence For Correspondent And Private Banking Accounts*.

## 9.17.2 Customer Identity Verification

This section is duplicated from the Chapter 11.1.1

| Responsibility | • Registered Principal |
|---|---|
| Resources | • New account application and other customer ID information |
| Frequency | • When accounts are opened |
| Action | • Before the Designated Supervisor approves an account, determine that customer identification (ID) verification information is included with the new account application and that it meets Alpine's requirements<br>• For non-documentary verification, check the information included with the new account application for completeness and consistency with other customer-provided information (name, address, phone number, taxpayer ID number, *etc.*)<br>• For unacceptable verification information (incomplete, inconsistent), return the application to the RR for further information or disapprove the account |
| Record | • Each Customer file shall contain the New Account Application and records that include customer ID verification as well as the Designated Supervisor's signature signifying approval |

When opening new accounts, the customer's identity must be verified, as required by federal law. Customer identification (ID) information must be completed on the new account application.

Customer ID verification does NOT apply to accounts for:

ALPINE_LIT168032

- persons with an existing account at Alpine (unless the account requires approval by the AML Compliance Officer)
- banks
- governmental entities
- issuers of listed equity securities
- other financial institutions subject to regulation by the SEC, CFTC, Federal Reserve Board, OCC, FDIC, Office of Thrift Supervision, or the National Credit Union Administration
- persons opening accounts to participate in an ERISA plan

## 9.17.2.1 Required Customer Information

Basic information required by law **prior to opening the account** includes:

- **Name**
- **Date of birth,** for an individual
- **Address:**
  - for an individual, residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual
  - for a non-individual (corporation, trust, *etc.*) a principal place of business, local office, or other physical location.
- **Taxpayer identification number** for a U.S. person (U.S. citizen or non-individual established or organized under U.S. or state laws).
- **Identification number for non-U.S. person** which may include a taxpayer ID number; passport number and country of issuance; alien identification card number; or the number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photo or similar safeguard.

**In the case of a customer who has applied for a taxpayer identification number but has not yet received it,** notation must be made on the new account application that the taxpayer ID has been applied for. The account will be restricted to liquidating transactions if the taxpayer ID number is not received within 30 days of opening the account.

## 9.17.2.2 Accounts For Individuals

When opening an account for an individual, a photo copy of an unexpired government-issued identification including a photo and residence address (such as a driver's license or passport), is required and made a part of the customer's account file.

## 9.17.2.3 Third Party Accounts

Customer ID required for third party accounts includes the following:

**On behalf of an incompetent person:** Obtain customer ID of the person holding power of attorney.

**With power of attorney or trading authorization held by a third party:** Obtain customer ID of the owner of the account. Customer ID is not necessary for the individual with authority over the account unless that person is unfamiliar to the RR or the circumstances regarding the opening of the account raises questions (customer requires wiring funds to an offshore address; third party is a foreign citizen; *etc.*).

### 9.17.2.3.1 Registered Investor Adviser Accounts

ALPINE_LIT168033

[SEC Division of Market Regulation No-Action Letter to SIFMA dated January 11, 2011:
http://www.sec.gov/divisions/marketreg/mr-noaction/2011/sifma011111.pdf]

For accounts established by registered investment advisers, Alpine may rely on the adviser to have obtained information to comply with federal Customer Identification Program (CIP) rules under the following circumstances:

- it is reasonable to rely on the adviser's assurances;
- the adviser is federally regulated (state-only registered IAs do not qualify); and
- the adviser signs an agreement that it will annually certify to Alpine that it has implemented an anti-money laundering program and will perform (or its agents will perform) specified requirements of Alpine's CIP.

### 9.17.2.3.2 Omnibus And Sub-Accounts

Omnibus and sub-accounts are sometimes established by or on behalf of financial intermediaries for the purpose of executing transactions that will clear or settle at another financial institution or for delivering assets to the custody account of the beneficial owner at another financial institution. Limited information about the beneficial owner is used primarily to assist the financial intermediary with recordkeeping or to establish sub-accounts to hold positions to be transferred to another financial institution. Transactions are initiated by the financial intermediary and the beneficial owner has no direct control over the omnibus or sub-accounts.

Under these circumstances, Alpine is not required to look through the intermediary to the underlying beneficial owners, if the intermediary is identified as the accountholder. In the event the customer's identity cannot be adequately verified using documentary and non-documentary methods, identity information on the persons or entities controlling the account will be required.

[SEC Q and A Regarding the Broker-Dealer Customer Identification Program Rule, October 1, 2003]
Omnibus and sub-accounts are sometimes established by or on behalf of financial intermediaries for the purpose of executing transactions that will clear or settle at another financial institution or for delivering assets to the custody account of the beneficial owner at another financial institution. Limited information about the beneficial owner is used primarily to assist the financial intermediary with recordkeeping or to establish sub-accounts to hold positions to be transferred to another financial institution. Transactions are initiated by the financial intermediary and the beneficial owner has no direct control over the omnibus or sub-accounts.
Under these circumstances, Alpine is not required to look through the intermediary to the underlying beneficial owners, if the intermediary is identified as the accountholder. In the event the customer's identity cannot be adequately verified using documentary and non-documentary methods, identity information on the persons or entities controlling the account will be required.

### 9.17.2.4 Accounts For Non-Individuals

Account documents usually obtained for non-individual accounts (trust instruments, corporate authorization, partnership agreements, government-issued business license, *etc.*) will usually satisfy customer ID requirements. In the case of corporations, a corporate authorization is required. These documents must be obtained within 30 days of account opening to satisfy the requirement.

### 9.17.2.5 Non-Documentary Methods Of Verifying Customer Identification

Non-documentary methods of verifying customer ID involve other procedures. Non-documentary methods must be used in the following circumstances:

- An individual is unable to present acceptable photo ID.

ALPINE_LIT168034

- The documents presented are unfamiliar.
- The account is opened without obtaining documents.
- Other circumstances, at the discretion of the RR's supervisor, New Accounts, and/or the AML Compliance Officer, where Alpine is unable to verify the customer's identity.

In these circumstances, a non-documentary method must be indicated by the RR on the new account application:

- Direct customer contact information
- Information from a consumer reporting agency or other database
- References from another financial institution
- Obtained a financial statement from a bank
- Copy of a utility bill

### 9.17.2.6 Additional Verification For Certain Customers

For the following types of customers, a minimum of TWO forms of customer ID are required in addition to review and approval by the AML Compliance Officer **prior to** opening the account:

- Numbered accounts
- Accounts domiciled in high-risk countries included on the Treasury Dept. OFAC list (check with Operations personnel for a list of those countries or go to *http://www.ustreas.gov/offices/eotffc/ofac/sanctions/index.html*)
- Accounts for foreign public officials (individuals in high office in other countries, their families and close associates, political party officials)

### 9.17.2.7 Lack Of Customer ID Verification

For **customers presenting unacceptable customer ID** at the time of account opening, the account will not be opened.

For **accounts where non-documentary verification results in substantive, unresolved discrepancies** (information that is inconsistent such as name, address, taxpayer ID number, *etc.*), either the account will not be opened or will be immediately closed.

Where inability to verify raises questions about the customer, filing a Suspicious Activity Report will be considered (see the section *Suspicious Activity Reports*).

Questions regarding accounts that do not comply with requirements to verify customer ID should be referred to the AML Compliance Officer.

### 9.17.2.8 Customer Notice

Customers are provided notice, prior to opening an account, that their identification will be verified. This notice may be on Alpine's web site, on new account applications, or in other disclosures provided at the time of account opening.

## 9.17.3 Customer Identification Program Records

Customer identification verification records are retained with new account application records in accordance with rule recordkeeping requirements and the terms of the other financial institution's Customer Identification Program (CIP) including:

- information recorded on the new account application

ALPINE_LIT168035

- documentary verification including information from or copies of government-issued IDs or passports
- non-documentary verification
- account approval or disapproval
- resolution of discrepancies
- referral of the account to the AML Compliance Officer
- closing of an account that fails to meet CIP requirements
- other records as may be required

### 9.17.4 Comparison With Government Lists

As required by law, Alpine compares customer information against government lists. The section *OFAC List And Blocked Property* in the Anti-Money Laundering Program describes comparison of accounts with lists published by the Treasury Dept.

## 9.18 Identity Theft Prevention Program (FTC FACT Act Red Flags Rule)

[Fair and Accurate Credit Transactions Act (FACT Act) Section 114 and 315; FINRA Regulatory Notice 08-69; FINRA Red Flags Rule web site: http://www.finra.org/Industry/Issues/CustomerInformationProtection/p118480; Interagency Guidelines on Identity Theft Detection, Prevention, and Mitigation: http://www.govcollect.org/files/Appendix%20A%20to%20Part%20681.pdf]

| Responsibility | • AML Compliance Officer |
|---|---|
| **Resources** | • New account information<br>• Order records<br>• Transaction information about cash or security transfers<br>• Information reported by employees<br>• Information from third party providers, customers, victims of identity theft, law enforcement agencies or others about potential identity theft |
| **Frequency** | • When new accounts are opened<br>• When account addresses are changed<br>• Ongoing - review of order records and transaction information<br>• As received - employee information<br>• As required - when a third party is engaged, confirm third party providers (including clearing firms) have identity theft program procedures which may be included in an affirmation in the third party's contract with Alpine<br>• Annually - review of controls and procedures<br>• Obtain senior management approval for any material changes to the program and any material changes to the policy<br>• As needed - update program and provide revisions to senior mangaement for review and approval of material changes. Non-material changes to the Policy will not require senior management approval.<br>• If directed by the CEO, provide revised procedures to the Board or Board committee<br>• Annually - report to CEO<br>• Annually (or more frequently) - provide training for employees |
| **Action** | • Establish and maintain the Identity Theft Program<br>  ○ Provide initial Program and subsequent material changes to the Board, a Board Committee or CEO (if no Board exists) for review and approval<br>  ○ Review controls and procedures annually as part of the |

ALPINE_LIT168036

annual testing described in the chapter *SUPERVISORY SYSTEM, PROCEDURES AND CONTROLS*
- Conduct reviews of orders and transactions to identify red flags
- When red flags are identified, take corrective action which may include:
  - Consultation with the RR and/or supervisor
  - Monitoring the account
  - Contacting the customer
  - Changing passwords, security codes, or other security devices that permit access to an account
  - Reopening an account with another account number
  - Not opening a new account
  - Closing an existing account
  - Filing a Suspicious Activity Report
  - Notifying law enforcement
  - Taking no action if warranted
- Conduct other reviews which may include:
  - Periodic use of internet search engines to identify web sites using Alpine's or an RR's name
  - Review online advertising to identify web sites for unauthorized links to promote stock fraud or that appear to be illegitimate
- If Alpine's or an RR's identity is being used in a scam, take action which may include notifying regulators and the FBI, lodging a complaint at www.ftc.gov, and if it involves email solicitation or spoofing, forwarding email to spam@uce.gov
- If a customer's account has been compromised, take action (described in a section that follows)
- Include Identity Theft Prevention Program in the annual report to CEO (see the chapter *SUPERVISORY SYSTEM, PROCEDURES AND CONTROLS*), reporting:
  - Effectiveness of the policies and procedures in addressing the risk of identity theft
  - Third party provider arrangements
  - Significant incidents involving identity theft and management's response
  - Recommendations for material changes to the Program
- Review third party providers (including clearing firms) for adequacy of identity theft programs
  - Contractually require them to have policies and procedures to detect Red Flags included in firm policies and report them to Alpine and/or take appropriate steps of their own to prevent/mitigate identity theft
- Send confirmation of address change to the customer's old address when a change of address is made (see the section *Change Of Addresses On Accounts* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*)
- Training:
  - Include identity theft in AML training
  - Develop training, identify target employees, and administer training

| | |
|---|---|
| **Record** | - Policies and procedures and revisions<br>- Reviews of orders and transactions with record of action taken<br>- Red flags identified and record of action taken<br>- Annual testing of procedures (see *SUPERVISORY SYSTEM,* |

ALPINE_LIT168037

|  | *PROCEDURES AND CONTROLS*)<br>• Annual report to CEO (see *SUPERVISORY SYSTEM, PROCEDURES AND CONTROLS*)<br>• Confirmation that third party providers (including clearing firms) have adequate ITPPs and include in the contracts with third parties<br>• Records of training including subjects included, date, who administered and who attended |
|---|---|

### 9.18.1 Firm Policy

Our firm's policy is to protect our customers and their accounts from identity theft and to comply with the FTC's Red Flags Rule. We will do this by developing and implementing this written Identify Theft Prevention Program (ITPP), which is appropriate to our size and complexity, as well as the nature and scope of our activities. This ITPP addresses 1) identifying relevant identity theft Red Flags for our firm, 2) detecting those Red Flags, 3) responding appropriately to any that are detected to prevent and mitigate identity theft, and 4) updating our ITPP periodically to reflect changes in risks.

Our identity theft policies, procedures and internal controls will be reviewed and updated periodically to ensure they account for changes both in regulations and in our business.

*Rule: 16 C.F.R. § 681.1(d).*

### 9.18.2 ITPP Approval and Administration

Alpine's AML Officer is the designated identity theft prevention officer and is responsible for the oversight, development, implementation and administration (including staff training and oversight of third party service providers of ITTP services) of this ITPP.

Alpine's Executive Committee will review and approve this ITPP whenever there are material modifications to the policy.

*Rule: 16 C.F.R. § 681.1(e) and Appendix A, Section VI.(a).*

### 9.18.3 Relationship to Other Firm Programs

We have reviewed other policies, procedures and plans required by regulations regarding the protection of our customer information, including our policies and procedures under Regulation S-P, and our Customer Identification Program (CIP) and red flags detection under our Anti-Money Laundering (AML) Program in the formulation of this ITPP, and modified either them or this ITPP to minimize inconsistencies and duplicative efforts.

*Rule: 16 C.F.R. § 681.1, Appendix A, Section I.*

### 9.18.4 Identifying Relevant Red Flags

To identify relevant identity theft Red Flags, our firm assessed these risk factors: 1) the types of covered accounts it offers, 2) the methods it provides to open or access these accounts, and 3) previous experience with identity theft. Our firm also considered the sources of Red Flags, including identity theft incidents our firm has experienced, changing identity theft techniques our firm thinks

ALPINE_LIT168038

likely to occur, and applicable supervisory guidance. In addition, we considered Red Flags from the following five <u>categories</u> (and the 26 numbered examples under them) from Supplement A to Appendix A of the FTC's Red Flags Rule, as they fit our situation: 1) alerts, notifications or warnings from a credit reporting agency; 2) suspicious documents; 3) suspicious personal identifying information; 4) suspicious account activity; and 5) notices from other sources. We understand that some of these categories and examples may not be relevant to our firm and some may be relevant only when combined or considered with other indicators of identity theft. We also understand that the examples are not exhaustive or a mandatory checklist, but a way to help our firm think through relevant red flags in the context of our business. Based on this review of the risk factors, sources, and FTC examples of red flags, we have identified our firm's Red Flags, which are contained the first column ("Red Flag") of the attached "Red Flag Identification and Detection Grid" ("Grid").

*Rule: 16 C.F.R. § 681.1(d)(2)(i) and Appendix A, Section II.*

### 9.18.5 Detecting Red Flags

We have reviewed our covered accounts, how we open and maintain them, and how to detect Red Flags that may have occurred in them. Our detection of those Red Flags is based on our methods of getting information about applicants and verifying it under our CIP of our AML policies and procedures, authenticating customers who access the accounts, and monitoring transactions and change of address requests. For opening covered accounts, that can include getting identifying information about and verifying the identity of the person opening the account by using the firm's CIP. For existing covered accounts, it can include authenticating customers, monitoring transactions, and verifying the validity of changes of address. Based on this review, we have included in the second column ("Detecting the Red Flag") of the attached Grid how we will detect each of our firm's identified Red Flags.

*Rule: 16 C.F.R. § 681.1(d)(2)(ii) and Appendix A, Section III.*

### 9.18.6 Preventing and Mitigating Identity Theft

We have reviewed our covered accounts, how we open and allow access to them, and our previous experience with identity theft, as well as new methods of identity theft we have seen or foresee as likely to occur. Based on this and our review of the FTC's identity theft rules and its suggested responses to mitigate identity theft, as well as other sources, we have developed our procedures below to respond to detected identity theft Red Flags.

#### 9.18.6.1 Procedures to Prevent and Mitigate Identity Theft

When we have been notified of a Red Flag or our detection procedures show evidence of a Red Flag, we will take the steps outlined below, as appropriate to the type and seriousness of the threat:

<u>Applicants</u>. For Red Flags raised by someone applying for an account:

1. <u>Review the application</u>. We will review the applicant's information collected for our CIP under our AML Program (e.g., name, date of birth, address, and an identification number such as a Social Security Number or Taxpayer Identification Number).
2. <u>Get government identification</u>. If the applicant is applying in person, we will also check a current government-issued identification card, such as a driver's license or passport.
3. <u>Seek additional verification</u>. If the potential risk of identity theft indicated by the Red Flag is probable or large in impact, we may also verify the person's identity through non-documentary CIP methods, including:
   a. Contacting the customer

ALPINE_LIT168039

      b.  Independently verifying the customer's information by comparing it with information from a credit reporting agency, public database or other source such as a data broker or the Social Security Number Death Master File.

      c.  Checking references with other affiliated financial institutions, or

      d.  Obtaining a financial statement.

4. <u>Deny the application</u>. If we find that the applicant is using an identity other than his or her own, we will deny the account.

5. <u>Report</u>. If we find that the applicant is using an identity other than his or her own, we will report it to appropriate local and state law enforcement; where organized or wide spread crime is suspected, the FBI or Secret Service; and if mail is involved, the US Postal Inspector. We may also, as recommended by FINRA's Customer Information Protection web page's "Firm Checklist for Compromised Accounts," report it to FINRA, ; the SEC and State regulatory authorities.

6. <u>Notification.</u> If we determine personally identifiable information has been accessed, we will prepare any specific notice to customers or other required notice under state law.

<u>Access seekers</u>. For Red Flags raised by someone seeking to access an existing customer's account:

1. <u>Watch</u>. We will monitor, limit, or temporarily suspend activity in the account until the situation is resolved.

2. <u>Check with the customer.</u> We will contact the customer using our CIP information for them, describe what we have found and verify with them that there has been an attempt at identify theft.

3. <u>Heightened risk.</u> We will determine if there is a particular reason that makes it easier for an intruder to seek access, such as a customer's lost wallet, mail theft, a data security incident, or the customer's giving account information to an imposter pretending to represent the firm or to a fraudulent web site.

4. <u>Check similar accounts</u>. We will review similar accounts the firm has to see if there have been attempts to access them without authorization.

5. <u>Collect incident information.</u> For a serious threat of unauthorized account access we may, as recommended by FINRA's Customer Information Protection web page's "Firm Checklist for Compromised Accounts," collect if available:

      a.  Firm information (both introducing and clearing firms):

i. Firm name and CRD number

ii. Firm contact name and telephone number

      b.  Dates and times of activity

      c.  Securities involved (name and symbol)

      d.  Details of trades or unexecuted orders

      e.  Details of any wire transfer activity

      f.  Customer accounts affected by the activity, including name and account number, and

      g.  Whether the customer will be reimbursed and by whom.

6. <u>Report</u>. If we find unauthorized account access, we will report it to appropriate local and state law enforcement; where organized or wide spread crime is suspected, the FBI or Secret Service; and if mail is involved, the US Postal Inspector. We may also, as recommended by FINRA's Customer Information Protection web page's "Firm Checklist for Compromised Accounts," report it to FINRA; the SEC; and State regulatory authorities.

7. <u>Notification.</u> If we determine personally identifiable information has been accessed that results in a foreseeable risk for identity theft, we will prepare any specific notice to customers and to others where required by law or regulation.

8. <u>Review our insurance policy</u>. Since insurance policies may require timely notice or prior consent for any settlement, we will review our insurance policy to ensure that our response to a data breach does not limit or eliminate our insurance coverage.

ALPINE_LIT168040

9. <u>Assist the customer.</u> We will work with our customers to minimize the impact of identity theft by taking the following actions, as applicable:

    a. Offering to change the password, security codes or other ways to access the threatened account;

    b. Offering to close the account;

    c. Offering to reopen the account with a new account number;

    d. Not collecting on the account or selling it to a debt collector; and

    e. Instructing the customer to go to the FTC Identity Theft Web Site to learn what steps to take to recover from identity theft, including filing a complaint using its online complaint form, calling the FTC's Identity Theft Hotline 1-877-ID-THEFT (438-4338), TTY 1-866-653-4261, or writing to Identity Theft Clearinghouse, FTC, 6000 Pennsylvania Avenue, NW, Washington, DC 20580.

*Rule: 16 C.F.R. § 681.1(d)(iii) and Appendix A, Section IV.*

## 9.18.7 Alpine Employees Reporting Obligations

Identity thieves use someone's personal identifying information to open new accounts and misuse existing accounts. Alpine has established an Identity Theft Prevention Program (ITPP) to help detect and prevent identity theft. Many elements of detecting or preventing identity theft utilize similar techniques to that of the anti-money laundering (AML) requirements included within these policies.

The ITPP is based on identifying "red flags" which may indicate an occurrence of identity theft. ***It is the responsibility of all employees to be attentive and alert to the red flags and report to the AML Compliance Officer any new or existing customers who may be engaged in violations of anti-money laundering regulations, identity theft or who have reported an instance of identity theft.***

For a list of potential identity theft red flags, refer to the section titled "*Red Flag Identification and Detection Grid*" located in the ***Identity Theft Prevention Program (FTC Fact Act Red Flags Rule)*** section.

## 9.18.8 Service Providers

We may use other service providers in connection with our covered accounts. In the event we utilize other service providers, we have a process to confirm that any other service provider that performs activities in connection with our covered accounts, especially other service providers that are not otherwise regulated, comply with reasonable policies and procedures designed to detect, prevent and mitigate identity theft by contractually requiring them to have policies and procedures to detect Red Flags and report detected Red Flags to us or take appropriate steps of their own to prevent or mitigate the identify theft.

*Rule: 16 C.F.R. § 681.1(e)(4) and Appendix A, Section VI.(c).*

## 9.18.9 Internal Compliance Reporting

Firm staff responsible for developing, implementing and administering our ITPP will report at least annually to our Executive Committee on compliance with the FTC's Red Flags Rule. The report will address the effectiveness of our ITPP in addressing the risk of identity theft in connection with covered account openings, existing accounts, service provider arrangements, significant incidents involving identity theft and management's response and recommendations for material changes to our ITPP.

*Rule: 16 C.F.R. § 681.1, Appendix A, Section VI.(b).*

ALPINE_LIT168041

### 9.18.10 Updates and Annual Review

Our firm will update this plan whenever we have a material change to our operations, structure, business or location or to those of our clearing firm, or when we experience either a material identity theft from a covered account, or a series of related material identity thefts from one or more covered accounts. Our firm will also follow new ways that identities can be compromised and evaluate the risk they pose for our firm. In addition, our firm will review this ITPP annually, to modify it for any changes in our operations, structure, business, or location or substantive changes to our relationship with our clearing firm.

*Rule: 16 C.F.R. § 681.1 (d)(2)(iv) and Appendix A, Sections V. and VI. (a) & (b).*

### 9.18.11 Red Flag Identification and Detection Grid

| Red Flag | Detecting the Red Flag |
|---|---|
| **Category: Suspicious Documents** | |
| 5. Identification presented looks altered or forged. | Our staff who deal with customers and their supervisors will scrutinize identification presented in person to make sure it is not altered or forged. |
| 6. The identification presenter does not look like the identification's photograph or physical description. | Our staff who deal with customers and their supervisors will ensure that the photograph and the physical description on the identification match the person presenting it. |
| 7. Information on the identification differs from what the identification presenter is saying. | Our staff who deal with customers and their supervisors will ensure that the identification and the statements of the person presenting it are consistent. |
| 8. Information on the identification does not match other information our firm has on file for the presenter, like the original account application, signature card or a recent check. | Our staff who deal with customers and their supervisors will ensure that the identification presented and other information we have on file from the account. |
| 9. The application looks like it has been altered, forged or torn up and reassembled. | Our staff who deal with customers and their supervisors will scrutinize each application to make sure it is not altered, forged, or torn up and reassembled. |
| | |
| **Category: Suspicious Personal Identifying Information** | |

ALPINE_LIT168042

| | |
|---|---|
| 10. Inconsistencies exist between the information presented and other things we know about the presenter or can find out by checking readily available external sources | If we receive a consumer credit report, they will check to see if the addresses on the application and the consumer report match. |
| 11. Inconsistencies exist in the information that the customer gives us | Our staff will check personal identifying information presented to us to make sure that it is internally consistent |
| 12. Personal identifying information presented has been used on an account our firm knows was fraudulent. | Our staff will compare the information presented with addresses and phone numbers on accounts or applications we found or were reported were fraudulent |
| 13. Personal identifying information presented suggests fraud, such as an address that is fictitious, a mail drop, or a prison; or a phone number is invalid, or is for a pager or answering service. | Our staff may validate the information presented when opening an account by looking up addresses on the Internet to ensure they are real and not for a mail drop or a prison, and may call the phone numbers given to ensure they are valid and not for pagers or answering services. |
| 14. The SSN presented was used by someone else opening an account or other customers. | Our staff may compare the SSNs presented to see if they were given by others opening accounts or other customers. |
| 15. The address or telephone number presented has been used by many other people opening accounts or other customers. | Our staff may compare address and telephone number information to see if they were used by other applicants and customers. |
| 16. A person who omits required information on an application or other form does not provide it when told it is incomplete. | Our staff will track when applicants or customers have not responded to requests for required information and will follow up with the applicants or customers to determine why they have not responded. |
| 17. Inconsistencies exist between what is presented and what our firm has on file. | Our staff will verify key items from the data presented with information we have on file. |
| 18. A person making an account application or seeking access cannot provide authenticating information beyond what would be found in a wallet (or consumer credit report, if applicable) or cannot answer a challenge question. | Our staff may authenticate identities for existing customers by asking challenge questions that have been prearranged with the customer and for applicants or customers by asking questions that require information beyond what is readily available from a wallet or a consumer credit report. |

ALPINE_LIT168043

|  |  |
|--|--|
|  |  |

| **Category: Suspicious Account Activity** |
|---|

| 19. Soon after our firm gets a change of address request for an account, we are asked to add additional access means (such as debit cards or checks) or authorized users for the account. | We will verify change of address requests by sending a notice of the change to the old addresses so the customer will learn of any unauthorized changes and can notify us. |
|---|---|
| 20. A new account exhibits fraud patterns, such as where a first payment is not made or only the first payment is made, or the use of securities easily converted into cash, if margin is permitted. | We will review new account activity to ensure that payments are made, and that credit is primarily used for securities easily converted into cash, if margin is permitted. |
| 21. An account develops new patterns of activity, such as nonpayment inconsistent with prior history, a material increase in credit use, or a material change in spending patterns, or electronic funds transfers (if applicable). | We will review our accounts periodic basis and look for suspicious new patterns of activity such as nonpayment, a large increase in credit use, or changes in spending patterns or electronic fund transfers (if applicable). |
| 22. An account that is inactive for a long time is suddenly used again. | We will review our accounts on a periodic basis to see if long inactive accounts become very active. |
| 23. Mail our firm sends to a customer is returned repeatedly as undeliverable even though the account remains active. | We will note any returned mail for an account and immediately check the account's activity. |
| 24. We learn that a customer is not getting his or her paper account statements. | We will record on the account any report that the customer is not receiving paper statements and immediately investigate them. |
| 25. We are notified that there are unauthorized charges or transactions to the account. | We will verify if the notification is legitimate and involves a firm account, and then investigate the report. |
|  |  |

| Category: Notice From Other Sources | |
|---|---|
| 26. We are told that an account has been opened or used fraudulently by a customer, an identity theft victim, or law enforcement. | We will verify that the notification is legitimate and involves a firm account, and then investigate the report. |
| We learn that unauthorized access to the customer's personal information took place or became likely due to data loss (e.g., loss of wallet, birth certificate, or laptop), leakage, or breach. | We will contact the customer to learn the details of the unauthorized access to determine if other steps are warranted. |

## 9.19 Due Diligence For Correspondent And Private Banking Accounts

[Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F; USA PATRIOT Act Section 312 and 313; FinCEN Fact Sheet (http://www.fincen.gov/312factsheet.pdf); FinCEN guidance regarding Rule 312 due diligence requirements: http://www.sia.com/moneyLaundering/pdf/SIA-FIAfromFinCEN05-02-06.pdf]

| Responsibility | • AML Compliance Officer |
|---|---|
| Resources | • New account application<br>• Foreign bank certification<br>• Information about a foreign bank subsequent to opening that indicates it is a foreign shell bank where an account may not be maintained |
| Frequency | • As required when accounts are opened<br>• Monthly - review of accounts identified for due diligence reviews |
| Action | • Conduct due diligence for correspondent and private banking accounts<br>• For foreign bank accounts:<br>  ○ Review certification to determine:<br>    ▪ All required information is included<br>    ▪ Inconsistencies (*i.e.,* location of the foreign bank's regulated affiliate is consistent with the designated banking authority that supervises the foreign bank and its regulated affiliate)<br>  ○ Ensure procedures are in place to restrict transactions in accounts that do not provide certification within 30 days of opening the account<br>  ○ Close existing prohibited accounts for foreign shell banks<br>  ○ Review re-certifications<br>  ○ Ensure procedures are in place to re-certify foreign banks within three years of original certification |
| Record | • Record of the AML Officer's review is maintained in new account |

ALPINE_LIT168045

| | records on the applicable form:<br>    ○ New account application<br>    ○ Certification form<br>    ○ Re-certification form<br>• Records of closing or restricting accounts are retained with new account records |
|---|---|

Due diligence requirements apply when opening and handling correspondent and private banking accounts that are maintained in the U.S. for non-U.S. persons. "Enhanced due diligence" is required for:

- Correspondent accounts for foreign banks in jurisdictions of money laundering concern or operating under an off-shore license
- Private banking accounts for senior foreign political figures

The purpose of these requirements is to detect and report known or suspected money laundering activity.

## 9.19.1 Definitions

**Correspondent account:** Includes any account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign institution, or to handle other financial transactions related to such foreign financial institution. This type of account presumes a formal relationship through which the financial institution provides regular services.

**Private banking account:** A private banking account is an account that is established or maintained for the benefit of one or more non-U.S. persons, requires minimum aggregate deposit of funds or other assets of not less than $1,000,000, and is assigned to a bank employee who is a liaison between the financial institution and the non-U.S. person. If the account otherwise satisfies the definition but the institution does **not** require a minimum balance of $1,000,000, the account does not qualify as a private banking account.

**Senior foreign political figure** includes:

- a current or former senior official in the executive, legislative, administrative, military, or judicial branches of a foreign government, whether or not they are or were elected officials
- a senior official of a major foreign political party
- a senior executive of a foreign government-owned commercial enterprise (Senior executives are individuals with substantial authority over policy, operations, or the use of government-owned resources.)
- immediate family members of the above, and those who are widely and publicly known (or actually known) close associates of a senior foreign political figure
- a corporation, business, or other entity formed by or for the benefit of one of the above individuals
- a person "widely and publicly known" as a close associate of such a person

**Proceeds of foreign corruption:** any asset acquired by, through, or on behalf of a senior foreign political figure through misappropriation, theft, or embezzlement of public funds, the unlawful conversion of property of a foreign government, or through acts of bribery or extortion, and include any other property into which any such assets have been transformed or converted.

ALPINE_LIT168046

**Foreign bank:** defined under the Bank Secrecy Act as a bank organized under foreign law, or an agency, branch, or bank office located outside the United States. The term does not include an agent, agency, branch or office within the U.S. of a bank organized under foreign law.

**Foreign shell bank:** a foreign bank without a physical presence in any country.

**Regulated affiliate:** a foreign shell bank that (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the foreign country regulating such affiliated depository institution, credit union, or foreign bank.

## 9.19.2 Due Diligence For Correspondent Accounts For Foreign Financial Institutions

Due diligence requirements apply to the following types of foreign financial institutions:

- Foreign bank
- Foreign branch of a U.S. Bank
- A business organized under a foreign law that, if located in the U.S., would be a securities broker-dealer, futures commission merchant, introducing broker in commodities, or a mutual fund
- A money transmitter or currency exchanger organized under foreign law

The Dept. of Treasury has established the following minimum due diligence requirements:

- determine whether the account is subject to enhanced due diligence
- assess the money laundering risk posed, based on risk factors
- apply risk-based policies, procedures and controls to each account, including periodic review of activity

Factors considered in determining due diligence include:

- nature of services provided to the account
- length of relationship
- the AML supervisory regime in the account's home country
- any information known or reasonably available about the account's AML record

Due diligence procedures include the following:

Correspondent accounts for foreign financial institutions are forwarded to the AML Compliance Officer, at the time of opening, for review.

- Review the account's home country vs. OFAC lists of jurisdictions of money laundering concern and blocked persons.
    - If identified on an OFAC list, report the account and close it.
- Review new account information about the account including source of revenue and assets, whether the person/entity has existing accounts with Alpine, length of time the RR has known the account, who referred the account, and other available information about account background and how the account came to Alpine.

ALPINE_LIT168047

- If there is inadequate information or due diligence procedures cannot be performed, refuse to open the account or close an existing account.
  - File a SAR, if appropriate.
- If the account is approved for opening, determine whether ongoing review is necessary.
  - If ongoing review is appropriate, establish duplicate statements or another method for review of account activity by the AML Officer.
  - Review will include identifying patterns of securities transactions and securities/money transfers that may be indicative of money laundering activity, and report such activity if necessary and close the account.

### 9.19.2.1 Enhanced Due Diligence For Foreign Banks

Enhanced due diligence is required for a correspondent account for a foreign bank that is operating:

- under an offshore license;
- in a jurisdiction found to be non-cooperative with international AML principles; or
- in a jurisdiction found to be of primary money laundering concern under the USA PATRIOT Act.

The following requirements apply:

Refer the account to the AML Compliance Officer to:

- conduct appropriate enhanced scrutiny;
- determine whether the foreign bank itself offers correspondent accounts to other foreign banks (*i.e.*, nested accounts) and, as appropriate, identify such foreign bank customers and conduct additional due diligence on them; and
- identify the owners of such foreign bank, if its shares are not publicly traded.
- determine whether the account appears on any OFAC list;
- approve or reject the account.
- determine whether ongoing review is necessary.
  - If yes, establish duplicate statements or other method for ongoing review.
- report the account, if appropriate.

### 9.19.2.2 Prohibition Against Correspondent Accounts For Foreign Shell Banks

[Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F; USA PATRIOT Act Section 313]

Alpine is prohibited from establishing, maintaining, administering, or managing a correspondent account in the United States for an unregulated foreign shell bank. The prohibition does not apply to a foreign shell bank that is a regulated affiliate. If an account is inadvertently opened for an unregulated foreign shell bank, the AML Compliance Officer must be notified and the account will be immediately closed.

### 9.19.2.3 Foreign Bank Certification

[FinCEN Frequently Asked Questions re Certification: http://www.fincen.gov/faqsguidance.pdf]

When opening an account for a foreign bank, Alpine is obligated to ensure the bank is not a foreign shell bank and must obtain information about the foreign bank's owners and an agent for service of process. The bank must complete the Foreign Bank Certification which must be submitted to the AML Compliance Officer with a copy of the new account application for review. Every three years the bank is also required to re-certify the information filed with Alpine.

ALPINE_LIT168048

### 9.19.2.4 Special Measures

[USA PATRIOT Act Section 311; Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart F; FINRA Notice to Members 06-41; FinCEN information on all special measures issued: http://www.fincen.gov/reg_section311.html]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • FinCEN notification of special measures against named entities<br>• Transaction records<br>• Customer account records |
| Frequency | • As required when notified by FinCEN |
| Action | • Establish blocks on opening accounts for named entities<br>• Notify correspondent accountholders<br>• Review transactions to identify indirect use of correspondent accounts and close such accounts |
| Record | • Notices from FinCEN<br>• Notification to correspondent accountholders<br>• Transactions reviewed, identification of indirect use, and action taken |

Some foreign jurisdictions, foreign financial institutions, international transactions, or types of accounts are designated to be of "primary money laundering concern" by the Secretary of the Treasury. This designation obligates Alpine to take certain "special measures" against the primary money laundering concern. The Secretary of Treasury announces when an entity is considered to be a primary money laundering concern. These special measures include:

- A prohibition against opening or maintaining a correspondent account in the U.S. for or on behalf of the primary money laundering concern including at the time of announcement, review of existing account records to identify any prohibited accounts
- Notification to correspondent accountholders that the account may not be used to provide the primary money laundering concern with access to Alpine
- Reasonable steps to identify an indirect use of correspondent accounts by the primary money laundering concern by review of transaction-based records

## 9.19.3 Due Diligence For Private Banking Accounts

[Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F]

Private banking accounts:

- include accounts established for a non-U.S. beneficial owner.
- include accounts where the beneficial owner is an individual:
  - who has a level of control over, or entitlement to, the funds in the account
  - who directly or indirectly controls, directs, or manages the account
  - for whom an account is established, maintained, or administered in the U.S.
- exclude accounts for hedge funds (and other pooled vehicles) and corporations (that are not personal investment companies ["PICs"]).
- include accounts for PICs and trusts for the benefit of individual owners.

Requirements for due diligence:

ALPINE_LIT168049

- Determine the identity of all nominal and beneficial owners of the private banking account.
- Determine the purpose and expected use of the account.
- Determine whether any such owner is a senior foreign political official.
- Determine the source(s) of funds deposited into the private banking account and the purpose and expected use of the account.
- Review the account activity:
  - to ensure consistency with information about the account.
  - to report suspected money laundering activity.

Factors considered in determining due diligence include:

- Is the client from a jurisdiction identified by the federal government as a jurisdiction subject to OFAC restrictions or as having weak AML controls?
- Is the customer's business cash intensive?

Alpine cannot rely on foreign institutions to perform due diligence for private banking accounts, and due diligence obligations are ongoing.

### 9.19.4 Enhanced Scrutiny For Accounts Of Senior Foreign Political Figures

Accounts for senior foreign political figures (including persons and entities defined in this section) are subject to enhanced scrutiny:

Prior to opening, the account is referred to the AML Officer for review and approval.

- Review the account's home country vs. OFAC lists of jurisdictions of money laundering concern and blocked persons.
  - If identified on an OFAC list, report the account and close it.
- Review new account information about the account including employment history, sources of income and assets, whether the person/entity has existing accounts with Alpine, length of time the RR has known the account, who referred the account, and other available information about account background of the account and how the account came to Alpine.
- If there is inadequate information or due diligence procedures cannot be performed, refuse to open the account or close an existing account.
  - File a SAR, if appropriate.
- If the account is approved for opening, determine whether ongoing review is necessary.
  - If ongoing review is appropriate, establish duplicate statements or another method for review of account activity by the AML Officer.
  - Review will include identifying patterns of securities transactions and securities/money transfers that may be indicative of money laundering activity, and report such activity if necessary and close the account.

## 9.20 Shell Companies

[FinCEN advisory on shell companies: http://www.fincen.gov/AdvisoryOnShells_FINAL.pdf]

Shell companies can represent a potential money laundering risk. Most shell companies are formed for legitimate business reasons, but some have been used for illicit purposes.

"Shell company" refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence (other than a mailing address) and generate little or no independent economic value. Legitimate purposes including holding stock or intangible assets of

ALPINE_LIT168050

another business entity (such as subsidiary company shares) but are not engaged in active business operations or facilitating domestic and cross-border currency and asset transfers and corporate mergers. State laws allow shell companies to obscure company structure, ownership, and activities, so there is little transparency to enable Alpine to understand with whom they are dealing.

Agents that act as intermediaries or nominee incorporation services (NIS) can play a central role in creating, maintaining, and supporting shell companies. Some agents and NIS firms also provide individuals and businesses with nominee services that preserve the anonymity of underlying officers, directors, and stockholders.

Shell companies are subject to review which may include:

- Checking accounts and owners (if information is available) against OFAC restrictions (applies to all accounts)
- Obtaining information about underlying owners
- Obtaining assurances from the shell company representative that principals have been screened

## 9.20.1 Confidential Reporting of AML Non-Compliance

Employees will report any violations of the firm's AML compliance program to the AML Compliance Officer, unless the violations implicate the AML Compliance Officer, in which case the employee shall report to the firm's CCO. Alpine believes that compliance with the AML policies and procedures set forth herein are of paramount importance and must be facilitated by the firm. All employee reports concerning AML violations will be kept confidential and no employee ramifications will result from its strict adherence.

ALPINE_LIT168051

# 10 INSIDER TRADING

[Insider Trading and Securities Fraud Enforcement Act of 1988; '34 Act 10b-5; FINRA Notice to Members 89-5]

| Responsibility | • Trading department supervisor |
|---|---|
| Resources | • Daily Transaction Report<br>• Employee transactions (see the section *Employee, Employee-Related and Proprietary Trading*)<br>• Inquiries from regulators<br>• Transactions in securities on Alpine's Watch or Restricted Lists (see the sections *Watch List* and *Restricted List*)<br>• Questions or transactions referred by managers or other Alpine personnel |
| Frequency | • Daily and as required |
| Action | • Supervisors reviewing trades: refer questioned trades to the Chief Compliance Officer<br>• Chief Compliance Officer will review the transaction and take appropriate action which may include:<br>    o Determination if further information is necessary<br>    o Consultation with RR or other Alpine personnel regarding the nature of the transaction(s) including reason for transaction, solicited vs. unsolicited<br>    o Review of other transactions by the same customer and/or RR<br>    o Consultation with in-house or outside counsel<br>    o Referral of transaction(s) to appropriate regulator |
| Record | • Initials on Daily Transaction Report by the Trading Department supervisor<br>• If activity is referred to the Chief Compliance Officer, then review is documented in a file of reviewed transactions including who conducted the review; when reviewed; identification of the transaction(s) reviewed; copies of the records used to conduct the review; and notation of action taken. |

## 10.1 Insider Trading Policies And Procedures

Alpine is required to establish, maintain, and enforce policies and procedures to prevent the misuse of material non-public information ("inside information"). These requirements are included in the Insider Trading and Securities Fraud Enforcement Act of 1988. Alpine has established policies and procedures reasonably designed to prevent the misuse of inside information considering Alpine's business, structure, size and other relevant factors.

At the time of hire, employees are provided with the *Firm Policy Memorandum Regarding Insider Trading* included in this chapter. Updates to this policy are provided by the Chief Compliance Officer when required.

ALPINE_LIT168052

## 10.2 Prohibition Against Acting On Or Disclosing Inside Information

Alpine policy prohibits employees and associated persons from effecting securities transactions while in the possession of material, non-public information. Employees are also prohibited from disclosing such information to others. The prohibition against insider trading applies not only to the security to which the inside information directly relates, but also to related securities, such as options or convertible securities.

If employees receive inside information, they are prohibited from trading on that information, whether for the account of Alpine, or their own account, any accounts in which they have a direct or indirect beneficial interest (including accounts for family members) or any other account over which they have control, discretionary authority or power of attorney. Similarly, if employees receive inside information from a client, they are prohibited from trading on that information on behalf of the client account. Employees should refer such cases to Compliance if additional guidance is needed.

## 10.3 Tippees Are Insiders

An employee may, depending on the circumstances, become an "insider" or "tippee" when obtaining **apparently** material, non-public information by happenstance, including information derived from social situations, business gatherings, overheard conversations, "tips" from "insiders," or other third parties. In these situations, the employee must, **unless Compliance advises otherwise**, treat the information as inside information and comply with all of the policies on insider trading.

## 10.4 Misuse Constitutes Fraud

The misuse of material, nonpublic or "inside" information constitutes fraud, a term broadly defined under federal securities laws. Engaging in fraud is subject to civil and criminal penalties (including imprisonment), SEC administrative actions, disgorgement of profits, penalties from exchanges, and dismissal by [The Firm]. There are no circumstances where any person becomes aware of inside information, for whatever purpose, may use that information to trade for personal benefit, for [The Firm]'s benefit, or for the benefit of another. If any employee believes he or she has received inside information, he or she should immediately advise their supervisor or Compliance.

## 10.5 Annual Certification

Employees and associated persons are required to annually certify their knowledge of and compliance with Alpine's insider trading policy. This certification is included in the Annual Certification form.

## 10.6 Firm Policy Memorandum Regarding Insider Trading

This policy memorandum is intended to provide information and guidance concerning the restrictions on insider trading, which is an enforcement priority of the Securities and Exchange Commission and the Department of Justice. It also explains policies adopted by Alpine to prevent fraudulent or deceptive practices relating to trading on material, non-public information ("insider trading"). Trading in securities on the basis of material, non-public information ("inside information") is prohibited and contrary to Alpine policy. The penalties for insider trading can be considerable, including loss of profits plus treble damages, criminal sanctions including incarceration, loss of employment and permanent bar from the securities industry. This policy applies to all associates of Alpine. Specific departments of Alpine may have insider trading policies that supplement this policy.

**READ THIS MEMORANDUM VERY CAREFULLY.** You will be asked to sign a statement affirming that you have read and understand the policies set forth herein and that you will abide by them.

**THE PROHIBITION**

ALPINE_LIT168053

The prohibition against insider trading includes the following: if you are in possession of material non-public information about a company or the market for a company's securities, you must either publicly disclose the information to the marketplace or refrain from trading. Generally, disclosure is not an option and the effect is to require an individual to refrain from trading. You also may not communicate inside information to a second person who has no official need to know the information.

Information is considered material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to buy or sell a security. In addition, information that, when disclosed, is likely to have a direct effect on a security's price should be treated as material. Examples include information concerning impending tender offers, leveraged buy-outs, mergers, sales of subsidiaries, significant earnings changes and other major corporate events.

Information is non-public when it has not been disseminated in a manner making it available to investors generally. Information is public once it has been publicly disseminated, such as when it is reported on the Dow Jones or other news services or in widely disseminated publications, and investors have had a reasonable time to react to the information. Once the information has become public, it may be traded on or disclosed freely.

Generally, a person violates the insider trading prohibition when that person violates a duty owed either to the person on the other side of the transaction or to a third party (such as a customer or employer) by trading on or disclosing the information. The insider trading prohibition applies to an issuer's directors, officers and employees, investment bankers, underwriters, accountants, lawyers and consultants, as well as other persons who have entered into special relationships of confidence with an issuer of securities.

Virtually anyone can become subject to the insider trading prohibition merely by obtaining material non-public information by unlawful means or by lawfully obtaining such information and improperly using it. This is known as misappropriation. If you receive material, non-public information as part of your legitimate business dealings on behalf of Alpine or its customers and you use that information to trade in securities or if you transmit that information to another person for purposes of trading in securities (so-called "tipping"), you would likely be guilty of insider trading. Insider trading liability may also be derivative. A person who has obtained inside information (so-called "tippee") from a person who has breached a duty or who has misappropriated information may also be held liable.

The foregoing is just a synopsis of the insider trading prohibition. Because the law in this area is complex, Alpine has adopted the following guidelines which are designed to prevent violations of the insider trading rules.

**WHEN Alpine IS AN INSIDER**

Alpine may be deemed an insider when it comes into possession of inside information through its various activities such as investment banking and research. Research analysts may become insiders (or tippees) upon receiving inside information from a company officer, director or employee. In addition, the intention to update or downgrade a research recommendation might be material information and should not be disclosed, prior to public dissemination, to anyone outside the Research Department (and in some instances to some within the Research Department) unless there is a need to know the information.

ALPINE_LIT168054

Alpine will remain an insider as long as it has inside information, regardless of whether the prospective banking client decides to engage another investment banking firm or whether Alpine declines to accept the proposed engagement.

## REGULATION FD (FAIR DISCLOSURE)

SEC Regulation FD governs the release by public companies of information that may reasonably be expected to affect the market price of securities issued by the public company. While obligations under the Regulation fall primarily on public companies, it is equally important for employees of Alpine to be aware of the requirements and to act appropriately if an employee becomes privy to inside information about the company.

The goal of the Regulation is to create a "level playing field" so that the dissemination of information that is reasonably likely to affect the market price of a security is released simultaneously to all investors. In general, the issuer, its executive officers, directors, investor relations personnel or other employees with similar duties are prohibited from selectively disclosing material, nonpublic information to securities analysts, to other securities professionals, or to a shareholder when it is foreseeable that a recipient of such information will trade on the information. The Regulation requires action by the issuer if there is intentional or unintentional selective disclosure of such information.

Employees must not expect or seek to obtain, other than in the normal course of confidential investment banking activities, material non-public information from issuers and their employees.

## GUIDELINES

**TREATMENT OF CUSTOMER INFORMATION.** Alpine considers confidential all information concerning its customers including, by way of example, their financial condition, prospects, plans and proposals. The fact that we have been engaged by a company as well as the details of that engagement are also confidential. Alpine's reputation is one of its most important assets. The misuse of customer information can damage that reputation as well as customer relationships.

**WHAT TO DO IF YOU LEARN INSIDE INFORMATION.** It is not illegal to learn inside information. Alpine learns material non-public information from its customers and is permitted to use that information in a lawful manner to advise and assist them. It is, however, illegal for you to trade on such information or to pass it on to others who have no legitimate business reason for receiving such information.

If you believe you have learned inside information, other than in the ordinary course of business (such as investment bankers who learn inside information when working on an engagement), contact the Chief Compliance Officer immediately so that we may address the insider trading issues and preserve the integrity of Alpine's activities. Do not trade on the information or discuss the possible inside information with any other person at Alpine. If you become aware of a breach of these policies or of a leak of inside information, advise the Chief Compliance Officer immediately.

**INVESTIGATIONS OF TRADING ACTIVITIES.** From time to time, the Exchanges, the FINRA and the SEC request information from Alpine concerning trading in specific securities. Requests for information should be referred directly to the Chief Compliance Officer. You may be asked to sign a sworn affidavit that, at the time of such trading, you did not have any inside information about the

ALPINE_LIT168055

securities in question. Your employment may be terminated if you refuse to sign such an affidavit. Alpine may submit these affidavits to the Exchanges, FINRA or SEC.

**STEPS YOU CAN TAKE TO PRESERVE THE CONFIDENTIALITY OF MATERIAL NON-PUBLIC INFORMATION.**

You are in a position with Alpine to access inside information; therefore, these steps must be taken to preserve the confidentiality of inside information:

1. Material inside information should be communicated only when there exists a justifiable reason to do so on a "need to know" basis inside or outside Alpine. Before such information is communicated to persons within Alpine, your department, or another person you believe needs to know, contact your department manager or Compliance.
2. Do not discuss confidential matters in elevators, hallways, restaurants, airplanes, taxicabs or any place where you can be overheard.
3. Do not leave sensitive memoranda on your desk or in other places where they can be read by others. Do not leave a computer terminal without exiting the file in which you are working.
4. Do not read confidential documents in public places or discard them where they can be retrieved by others. Do not carry confidential documents in an exposed manner.
5. On drafts of sensitive documents use code names or delete names to avoid identification of participants.
6. Do not discuss confidential business information with spouses, other relatives or friends.
7. Protect electronic information on laptops and other portable devices by encrypting confidential data (when and where required by law).
8. Avoid even the appearance of impropriety. Serious repercussions may follow from insider trading and the law proscribing insider trading can change. Since it is often difficult to determine what constitutes insider trading, you should consult with the Chief Compliance Officer whenever you have questions about this subject.

**YOUR OWN SECURITIES TRADING.** Alpine policy is to require all employees to maintain their securities accounts at Alpine except with the approval of the Chief Compliance Officer or the Chief Financial Officer. If you have an account outside of Alpine and have not already done so, please advise the Chief Compliance Officer immediately. This includes outside accounts in which you have a financial interest or direct the trading.

**CONCLUSION**

Alpine has a vital interest in its reputation, the reputation of its associates, and in the integrity of the securities markets. Insider trading would destroy that reputation and integrity. Alpine is committed to preventing insider trading and to punishing any employee who engages in this practice or fails to comply with the above steps designed to preserve confidentiality of inside information. These procedures are a vital part of Alpine's compliance efforts and must be adhered to.

# 10.7 Employee, Employee-Related, And Proprietary Trading

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer and/or Chief Financial Officer and/or Designated Supervisor |
| **Resources** | • Security Trade List<br>• Confirmations/statements for employees' outside accounts |
| **Frequency** | • Daily |

ALPINE_LIT168056

| | |
|---|---|
| **Action** | • Identify transactions in securities included on Alpine's Restricted or Watch Lists (refer to sections on those procedures) |
| **Record** | • Notations are included in Compliance's files regarding identified transactions including details of each trade, action taken and initials or signature of reviewer. |

Employee and proprietary trades are reviewed by the Chief Compliance Officer for trades contrary to restrictions because of underwriting activities, other restrictions, and potential insider trading. This review includes review of employees' outside securities accounts to identify transactions in securities on Alpine's Restricted List or Watch List.

## 10.8 Information Barrier Procedures

[FINRA Rule 5280; FINRA Notice to Members 91-45]

| | |
|---|---|
| **Responsibility** | • Chief Financial Officer |
| **Resources** | • Information regarding confidential investment banking activities |
| **Frequency** | • As required |
| **Action** | • Chief Financial Officer notifies the Chief Compliance Officer regarding confidential investment banking activities<br>• The Chief Compliance Officer:<br>  ○ Maintains record of companies subject to investment banking (also see *Restricted List* and *Watch List*)<br>  ○ Maintains record of employees brought "over the wall" including name, date brought over, and the company the subject of confidential activities<br>  ○ Issue restrictions on the "over the wall" employee's activities (issuing research reports, trading in a particular security, *etc.*), as appropriate<br>  ○ Obtain certifications from affected employees |
| **Record** | • The Chief Compliance Officer:<br>1. Retains records of Restricted List and Watch List securities<br>2. Retains records of employees brought over the wall<br>3. Retains certifications in employee's file |
| | |

### 10.8.1 Introduction

Information barriers (also known as "Chinese walls") are established within broker-dealers to prevent the flow of material, non-public information. Alpine may obtain material, non-public information while engaging in investment banking activities. Effective procedures permit Alpine to continue conducting research, trading, and other business activities while another department has knowledge of inside information affecting an issuer of securities. Alpine has established procedures to isolate departments and/or employees with inside information and permit the conduct of business in other areas.

ALPINE_LIT168057

### 10.8.2 Departments Subject To Information Barrier Confidentiality Procedures

The following departments are subject to Alpine's Information Barrier confidentiality procedures:

- Trading Department
- Investment Banking Department

Departments that obtain material, non-public information in the normal course of business must maintain the confidentiality of that information. Other departments potentially affected by inside information (Research, Trading, *etc.*) may continue to conduct normal activities unless they become aware of inside information, in which case they are required to immediately contact Compliance for guidance regarding future activities involving the subject company or companies.

### 10.8.3 Confidentiality Procedures

The designated supervisors of departments subject to Alpine's confidentiality procedures are responsible for implementing and enforcing Alpine's procedures to protect the confidentiality of actual or potential inside information. Many of these departments' activities are considered confidential and may only be shared with those outside the department on a need-to-know basis (see *Bringing An Employee Over the Wall* in this section). Some procedures for maintaining confidentiality include:

- Maintain all paper files in a locked and secured area.
- Limit access to computer files to only authorized persons with passwords to control access to the files.
- Employees of affected departments must refrain from discussing in public areas or with others outside the department (including family members, friends, *etc.*) any activities that are not publicly known.
- Use code names or delete names on sensitive drafts that identify projects or banking clients.
- Physical separation of employees of departments with access to inside information.

### 10.8.4 Access To Confidential Information Limited To Certain Employees

Access to actual or potential inside information obtained in the normal course of Alpine's banking activities is limited to the following employees:

1. Employees within the respective banking department who need to know
2. Alpine's chief compliance officer
3. Alpine's general counsel
4. The Chief Executive Officer
5. Other employees brought "over the wall" in accordance with the procedure outlined in the next section

### 10.8.5 Bringing An Employee "Over the Wall"

There may be occasions where investment banking employees require information from an employee in research, sales, trading, or other business areas of Alpine. Bringing an employee not employed in the investment banking department into confidential discussions is often termed bringing the employee "over the wall." Doing so may result in restrictions on research, trading, or other business of Alpine because the employee is now in possession of material, non-public information and cannot continue to conduct his or her normal responsibilities. Because it is important to both maintain the confidentiality of inside information and consider carefully any action that might restrict Alpine's ability to conduct its business, the manager (or manager's designee) of the investment banking department is required to contact Compliance before bringing another employee over the wall. Compliance will maintain a written record of the:

- date of the action

ALPINE_LIT168058

- name and department of the employee brought over the wall
- the name of the companies which are the subject of the investment banking activity that resulted in bringing the employee over the wall
- name of the person requesting access to the employee

Compliance will also make a determination whether further restrictions on research, trading, or other Alpine activities are appropriate because of the action of bringing an employee over the wall.

### 10.8.6 Notification To Compliance

When Alpine is engaged to provide investment banking services to an issuer, and that engagement may result in obtaining inside information, the designated supervisor is responsible for notifying Compliance of the engagement so that the issuer may be included on Alpine's Watch or Restricted Lists, if appropriate. This includes notification of any "target" companies that may become part of the investment banking transaction.

### 10.8.7 Monitoring The Information Barrier

Compliance monitors trading activities in issues where Alpine may be in possession of material, non-public information through the use of Alpine's Watch or Restricted Lists. The sections *Restricted List* and *Watch List* further explain those procedures.

### 10.8.8 Education And Training Of Employees

To ensure employees are familiar with Alpine's Insider Trading policy Alpine has established the following procedures:

- Employees receive Alpine's Insider Trading policy upon hire and certify their receipt and understanding.
- Annually, employees complete Alpine's Annual Certification which includes their acknowledgment of receipt and understanding of the Insider Trading policy.
- Employees in sensitive departments (investment banking) sign an attestation on an annual basis.
- When procedures are revised, employees will be notified by memorandum.
- Insider Trading is a subject periodically included in Alpine's continuing education and compliance meeting programs.

## 10.9 Watch List

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Notification of confidential investment banking activities<br>• Notification of pending material research reports/recommendations<br>• Daily Transaction Report<br>• Confirmations/statements for employees' outside accounts |
| Frequency | • As required |
| Action | • Maintain confidential Watch List<br>• Review transactions to identify trades in securities on the Watch List<br>• For identified trades:<br>    o Evaluate whether there is a potential breach in Alpine's Information Barriers considering solicited vs. unsolicited; timing or unusual nature of transaction<br>    o For pending research reports, determine whether trading activities must be limited or suspended depending on the |

ALPINE_LIT168059

| | |
|---|---|
| | materiality of the report/recommendation and its likely affect on market prices<br>○ Take corrective action, if necessary |
| **Record** | • Compliance maintains records of:<br>○ Watch Lists, including the date and time a company is added or deleted<br>○ The name of the person adding or deleting the company<br>○ Identified trades, including date of review; accounts involved; underlying records possibly including memos, analyses, and statements/confirmations; summary of disposition; and initials/signature of reviewer. |

Compliance will maintain a confidential Watch List which will include issues where Alpine may be in possession of material, non-public information. The Watch List is available only to specified Alpine personnel. Compliance will monitor trading to identify transactions in securities on the Watch List and take action as necessary. Compliance will also record the date and time when an issue is added to and removed from the Watch List.

ALPINE_LIT168060

# 11 ACCOUNTS

## 11.1 New Accounts

[SEC Securities Exchange Act of 1934 Rule 17a-3(a)(17); FINRA Rule 2090; FINRA Information Notice 10/21/08 New Account Application Template]

When opening and maintaining customer accounts, the Firm and its RRs are obligated to use reasonable diligence to "know the customer" by obtaining essential facts about the customer and the authority of each person acting on behalf of the customer. Key requirements include the following:

- The new account application (which is designed to include information required by rules) must be complete prior to submission for approval. If the customer refuses to provide certain information, this must be indicated on the new account application.
- Where recommendations will be made to a non-institutional customer, account information includes the customer's financial status, tax status, investment objectives, and other information used or to be considered to determine the suitability of recommendations.
- The new account form must be signed by the RR opening the account.
- Under anti-money laundering requirements, the customer's identification must be verified.
- Required account documents, which vary depending on the type of account opened, must be obtained. Failure to obtain required documents may result in closure of the account.
- The customer's new account information will be sent to the customer for verification within 30 days of opening the account and every three years thereafter. When account information is changed, the changed information will be sent to the customer for verification within 30 days of the change.

This section provides an explanation of certain requirements that apply to new accounts.

[SEC Rule 17a-3(a)(17); FINRA Rules 2310 and 3010(c)]
Obtaining information about the customer is important when opening a new account, enabling the RR to "know the customer" and provide suitable recommendations and service to the account. Key requirements include the following:
- The new account application (which is designed to include information required by rules) must be complete prior to submission for approval. If the customer refuses to provide certain information, this must be indicated on the new account application.
- Where recommendations will be made to a non-institutional customer, account information includes the customer's financial status, tax status, investment objectives, and other information used or to be considered to determine the suitability of recommendations.
- The new account form must be signed by the RR opening the account.
- Under anti-money laundering requirements, the customer's identification must be verified.
- Required account documents, which vary depending on the type of account opened, must be obtained. Failure to obtain required documents may result in closure of the account.
- The customer's new account information will be sent to the customer for verification within 30 days of opening the account and every three years thereafter. When account information is changed, the changed information will be sent to the customer for verification within 30 days of the change.

This section provides an explanation of certain requirements that apply to new accounts.

## 11.1.1 Customer Identity Verification

ALPINE_LIT168061

[USA PATRIOT Act Section 326; Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F]

This section is duplicated in Chapter 9.12 [ USA PATRIOT Act Sec. 326 ]

| | |
|---|---|
| **Responsibility** | • Designated Supervisor as set forth in Chapter 1.1 |
| **Resources** | • New account application and other customer ID information |
| **Frequency** | • When accounts are opened |
| **Action** | • Before the Designated Supervisor approves an account, determine that customer identification (ID) verification information is included with the new account application and that it meets Alpine's requirements<br>• For non-documentary verification, check the information included with the new account application for completeness and consistency with other customer-provided information (name, address, phone number, taxpayer ID number, *etc.*)<br>• For unacceptable verification information (incomplete, inconsistent), return the application to the RR for further information or disapprove the account |
| **Record** | • Each Customer file shall contain the New Account Application and records that include customer ID verification as well as the Designated Supervisor's signature signifying approval |

When opening new accounts, the customer's identity must be verified, as required by federal law. Customer identification (ID) information must be completed on the new account application.

Customer ID verification does NOT apply to accounts for:

- persons with an existing account at Alpine (unless the account requires approval by the AML Compliance Officer)
- banks
- governmental entities
- issuers of listed equity securities
- other financial institutions subject to regulation by the SEC, CFTC, Federal Reserve Board, OCC, FDIC, Office of Thrift Supervision, or the National Credit Union Administration
- persons opening accounts to participate in an ERISA plan

### 11.1.1.1 Required Customer Information

Basic information required by law **prior to opening the account** includes:

- **Name**
- **Date of birth,** for an individual
- **Address:**
  - for an individual, residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual

ALPINE_LIT168062

- for a non-individual (corporation, trust, *etc.*) a principal place of business, local office, or other physical location.
- **Taxpayer identification number** for a U.S. person (U.S. citizen or non-individual established or organized under U.S. or state laws).
- **Identification number for non-U.S. person** which may include a taxpayer ID number; passport number and country of issuance; alien identification card number; or the number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photo or similar safeguard.

**In the case of a customer who has applied for a taxpayer identification number but has not yet received it,** notation must be made on the new account application that the taxpayer ID has been applied for. The account will be restricted to liquidating transactions if the taxpayer ID number is not received within 30 days of opening the account.

## 11.1.1.2 Accounts For Individuals

When opening an account for an individual, the following information is required:

- RR shall view an unexpired government-issued identification which includes a photo and nationality or residence such as a driver's license or passport and record the information obtained therefrom on the new account application, **OR**
- RR shall obtain a copy of the photo ID for the new account applicant. (The photo ID [original or copy] must be seen by the employee opening the account to record the information. This information may NOT be taken from the customer over the phone.)
- If the photo ID is not available at the time the new account application is being completed, the RR is to indicate on the new account application whether the customer will provide a copy of photo ID within 30 days of account opening **OR,** if the customer cannot provide a photo ID, the reason why not.
- If the photo ID is not received within 30 days, the account will be restricted to liquidating transactions only until the ID is received.

**If the customer has not appeared in person at Alpine's office,** "non-documentary" information will ALSO be required, as explained in the section that follows.

**If the customer cannot produce the required photo ID,** an explanation must be included on the new account application AND non-documentary information will be required to open the account.

## 11.1.1.3 Third Party Accounts

Customer ID required for third party accounts includes the following:

**On behalf of an incompetent person:** Obtain customer ID of the person holding power of attorney.

**With power of attorney or trading authorization held by a third party:** Obtain customer ID of the owner of the account. Customer ID is not necessary for the individual with authority over the account unless that person is unfamiliar to the RR or the circumstances regarding the opening of the account raises questions (customer requires wiring funds to an offshore address; third party is a foreign citizen; *etc.*).

### 11.1.1.3.1 Registered Investor Adviser Accounts

[SEC Division of Market Regulation No-Action Letters dated 2/12/04 and 2/10/05]

ALPINE_LIT168063

For accounts established by registered investment advisers, Alpine may rely on the adviser to have obtained information to comply with federal Customer Identification Program (CIP) rules under the following circumstances:

- it is reasonable to rely on the adviser's assurances;
- the adviser is federally regulated (state-only registered IAs do not qualify); and
- the adviser signs an agreement that it will annually certify to Alpine that it has implemented an anti-money laundering program and will perform (or its agents will perform) specified requirements of Alpine's CIP.

**11.1.1.3.2 Omnibus And Sub-Accounts**

[SEC Q and A Regarding the Broker-Dealer Customer Identification Program Rule, October 1, 2003]

Omnibus and sub-accounts are sometimes established by or on behalf of financial intermediaries for the purpose of executing transactions that will clear or settle at another financial institution or for delivering assets to the custody account of the beneficial owner at another financial institution. Limited information about the beneficial owner is used primarily to assist the financial intermediary with recordkeeping or to establish sub-accounts to hold positions to be transferred to another financial institution. Transactions are initiated by the financial intermediary and the beneficial owner has no direct control over the omnibus or sub-accounts.

Under these circumstances, Alpine is not required to look through the intermediary to the underlying beneficial owners, if the intermediary is identified as the accountholder.

## 11.1.1.4 Accounts For Non-Individuals

Account documents usually obtained for non-individual accounts (trust instruments, articles of incorporation, partnership agreements, government-issued business license, *etc.*) will usually satisfy customer ID requirements. In the case of corporations, a certified copy of the articles of incorporation is required. These documents must be obtained within 30 days of account opening to satisfy the requirement.

## 11.1.1.5 Non-Documentary Methods Of Verifying Customer Identification

Non-documentary methods of verifying customer ID involve other procedures. Non-documentary methods must be used in the following circumstances:

- An individual is unable to present acceptable photo ID.
- The documents presented are unfamiliar.
- The account is opened without obtaining documents.
- Other circumstances, at the discretion of the RR's supervisor, New Accounts, and/or the AML Compliance Officer, where Alpine is unable to verify the customer's identity.

In these circumstances, a non-documentary method must be indicated by the RR on the new account application:

- Direct customer contact information
- Information from a consumer reporting agency or other database
- References from another financial institution
- Obtained a financial statement

ALPINE_LIT168064

### 11.1.1.6 Additional Verification For Certain Customers

For the following types of customers, a minimum of TWO forms of customer ID are required in addition to review and approval by the AML Compliance Officer **prior to** opening the account:

- Numbered accounts
- Accounts domiciled in high-risk countries included on the Treasury Dept. OFAC list (check with Operations personnel for a list of those countries or go to *http://www.ustreas.gov/offices/eotffc/ofac/sanctions/index.html*)
- Accounts for foreign public officials (individuals in high office in other countries, their families and close associates, political party officials)

### 11.1.1.7 Lack Of Customer ID Verification

For **customers presenting unacceptable customer ID** at the time of account opening, the account will not be opened.

For **customers who fail to provide required ID or documents within 30 days of account opening,** the account will be restricted to liquidating transactions only until satisfactory ID verification is received.

For **accounts where non-documentary verification results in substantive, unresolved discrepancies** (information that is inconsistent such as name, address, taxpayer ID number, *etc.*), either the account will not be opened or will be immediately closed.

Questions regarding accounts that do not comply with requirements to verify customer ID should be referred to the AML Compliance Officer.

### 11.1.1.8 Customer Notice

Customers are provided notice, prior to opening an account, that their identification will be verified. This notice may be on Alpine's web site, on new account applications, or in other disclosures provided at the time of account opening.

### 11.1.1.9 Required Customer Information

[SEC Securities Exchange Act of 1934 Rule 17a-3(a)(17)(i)(A); FINRA Rule 4512]

Basic information required **prior to opening the account** includes:

- **Name**
- **Date of birth,** for an individual
- **Address:**
  - for an individual, residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual
  - for a non-individual (corporation, trust, *etc.*) a principal place of business, local office, or other physical location.
- **Telephone number**
- **Employment status** (including occupation and whether the person is associated with a broker dealer)
- **Annual income**
- **Net worth** (excluding value of primary residence)
- Account's investment objectives

ALPINE_LIT168065

- For joint accounts, information on each joint owner (financial information may be combined)
- **Taxpayer identification number** for a U.S. person (U.S. citizen or non-individual established or organized under U.S. or state laws).
- **Identification number for non-U.S. person** which may include a taxpayer ID number; passport number and country of issuance; alien identification card number; or the number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photo or similar safeguard.

**In the case of a customer who has applied for a taxpayer identification number but has not yet received it,** notation must be made on the new account application that the taxpayer ID has been applied for. The account will be restricted to liquidating transactions if the taxpayer ID number is not received within *[30]* days of opening the account.

In addition, under FINRA Rule 4512 the Firm will retain the name of the RR responsible for the account and, if multiple RRs are assigned to the account, a record indicating the scope of their responsibilities with respect to the account. This requirement does not apply to an institutional account.

## 11.1.1.10 Accounts For Individuals

When opening an account for an individual, the following information is required:

- An unexpired government-issued identification including a photo and nationality or residence such as a driver's license or passport and record information from it on the new account application, **OR**
- A copy of the photo ID with the new account application. (The photo ID [original or copy] must be seen by the employee opening the account to record the information. This information may NOT be taken from the customer over the phone.)

**If the customer has not appeared in person at Alpine's office,** "non-documentary" information will ALSO be required, as explained in a section that follows.

**If the customer cannot produce the required photo ID,** an explanation must be included on the new account application AND non-documentary information will be required to open the account.

## 11.1.1.11 Third Party Accounts

Customer ID required for third party accounts includes the following:

**On behalf of an incompetent person:** Obtain customer ID of the person holding power of attorney.

**With power of attorney or trading authorization held by a third party:** Obtain customer ID of the owner of the account. Customer ID is not necessary for the individual with authority over the account unless that person is unfamiliar to the RR or the circumstances regarding the opening of the account raises questions (customer requires wiring funds to an offshore address; third party is a foreign citizen; *etc.*).

### 11.1.1.11.1 Registered Investor Adviser Accounts

[SEC Division of Market Regulation No-Action Letter to SIFMA dated January 11, 2011: http://www.sec.gov/divisions/marketreg/mr-noaction/2011/sifma011111.pdf]

ALPINE_LIT168066

For accounts established by registered investment advisers, Alpine may rely on the adviser to have obtained information to comply with federal Customer Identification Program (CIP) rules under the following circumstances:

- It is reasonable to rely on the adviser's assurances;
- the adviser is federally regulated (state-only registered IAs do not qualify); and,
- the adviser signs an agreement that it will annually certify to Alpine that it has implemented an anti-money laundering program and will perform (or its agents will perform) specified requirements of Alpine's CIP.

### 11.1.1.11.2 Omnibus And Sub-Accounts

Omnibus and sub-accounts are sometimes established by or on behalf of financial intermediaries for the purpose of executing transactions that will clear or settle at another financial institution or for delivering assets to the custody account of the beneficial owner at another financial institution. Limited information about the beneficial owner is used primarily to assist the financial intermediary with recordkeeping or to establish sub-accounts to hold positions to be transferred to another financial institution. Transactions are initiated by the financial intermediary and the beneficial owner has no direct control over the omnibus or sub-accounts.


Under these circumstances, Alpine is not required to look through the intermediary to the underlying beneficial owners, if the intermediary is identified as the accountholder.

### 11.1.1.12 Accounts For Non-Individuals

Account documents usually obtained for non-individual accounts (trust instruments, articles of incorporation, partnership agreements, government-issued business license, *etc.*) will usually satisfy customer ID requirements. In the case of corporations, a certified copy of the articles of incorporation is required. These documents must be obtained within 30 days of account opening to satisfy the requirement.

### 11.1.1.13 Non-Documentary Methods Of Verifying Customer Identification

Non-documentary methods of verifying customer ID involve other procedures. Non-documentary methods must be used in the following circumstances:

- An individual is unable to present acceptable photo ID
- The documents presented are unfamiliar
- The account is opened without obtaining documents
- The customer opens the account without appearing in person at Alpine
- Other circumstances, at the discretion of the RR's supervisor, New Accounts, and/or the AML Compliance Officer, where Alpine is unable to verify the customer's identity

In these circumstances, a non-documentary method must be indicated by the RR on the new account application:

- Direct customer contact information

### 11.1.1.14 Additional Verification For Certain Customers

For the following types of customers, a minimum of TWO forms of customer ID are required in addition to review and approval by the AML Compliance Officer **prior to** opening the account:

ALPINE_LIT168067

- Accounts domiciled in high-risk countries included on the Treasury Dept. OFAC list (check with Operations personnel for a list of those countries or go to http://www.ustreas.gov/offices/eotffc/ofac/sanctions/index.html)
- Accounts for foreign public officials (individuals in high office in other countries, their families and close associates, political party officials)

### 11.1.1.15 Lack Of Customer ID Verification

For **customers presenting unacceptable customer ID** at the time of account opening, the account will not be opened.

Questions regarding accounts that do not comply with requirements to verify customer ID should be referred to the AML Compliance Officer.

### 11.1.1.16 Customer Notice

Customers are provided notice, prior to opening an account, that their identification will be verified. This notice is part of the new account applications.

## 11.1.2 Identity Theft

[Fair and Accurate Credit Transactions Act (FACT Act) Section 114 and 315]

Identity thieves use someone's personal identifying information to open new accounts and misuse existing accounts. Alpine has established an Identity Theft Program to help detect and prevent identity theft. Many elements of detecting or preventing identity theft are similar to anti-money laundering (AML) requirements that are included in these policies. A more detailed explanation of the Program is included in the section *Identity Theft Program* in the chapter *ANTI-MONEY LAUNDERING (AML) PROGRAM*.

The Identity Theft Program is based on identifying "red flags" that indicate identity theft may have occurred. ***It is the responsibility of all employees to be alert and report to the AML Compliance Officer any new or existing customers who may be engaged in violations of anti-money laundering regulations or identity theft or have reported identity theft.***

## 11.1.3 SIPC Disclosure

[FINRA Rule 2266]

FINRA Rule 2342, Notice to Members 07-29 ]

When new accounts are opened, new customers will be provided information about the Securities Investor Protection Corporation (SIPC) including SIPC's web site address and phone number. This information is also provided annually in writing to all customers.

## 11.1.4 Approval

[SEC Securities Exchange Act of 1934 Rule 17a-3(17)(i)(A); FINRA Rule 4512]

| Responsibility | • Designated Supervisor as set for in Chapter 1.1 |
|---|---|
| Resources | • New Account Form |
| Frequency | • Daily |

ALPINE_LIT168068

| | |
|---|---|
| **Action** | • Review new account form for:<br>    o Completeness<br>    o Proper styling of account<br>    o Unacceptable accounts (accounts in name of minor only, fictitious accounts, numbered accounts without disclosure of owner, *etc.*)<br>    o Potential improper addresses (post office boxes, addressed to RR or Alpine, *etc.*)<br>    o Consistency of investment objectives with financial status, prior investment experience, *etc.*<br>    o Initial transaction consistent with investment objectives<br>    o RR registration in state of customer's residency |
| **Record** | • Supervisor's signature on New Account Form<br> • New account forms are retained by Operations |

A completed new account form, signed by the RR, is required for each new account opened. The Designated Supervisor as set for in Chapter 1.1 is responsible for reviewing the new account form for the necessary information and will promptly approve each new account.

## 11.1.5 Customer Account Information

[SEC Securities Exchange Act of 1934 Rule 17a-3(17)(i)(A); NASD Rule 3012(a)(2)(B)]

| | |
|---|---|
| **Responsibility** | • Designated Supervisor as set for in Chapter 1.1 |
| **Resources** | • New Account Forms or information |
| **Frequency** | • When accounts are opened |
| **Action** | • Establish procedures for sending new account information within 30 days of account opening<br> • Forward customer responses to Compliance<br> • Compliance reviews customer responses and notifies the RR, the RR's supervisor, and New Accounts<br> • If Compliance identifies a pattern of customer responses for a particular RR, Compliance will contact the RR's supervisor to discuss and take corrective action, if necessary, which may include RR training, interview with the RR, a memo of caution to the RR, or other appropriate action |
| **Record** | • Customer's signed copy of the account application acknowledges receipt of the information at the time the account is opened<br> • Changes to new account information are retained in new account files or records<br> • Compliance files retain records of corrective actions taken |

Within 30 days of opening an account (or with the next scheduled account statement), customers will be provided with a copy of the new account information for verification.

ALPINE_LIT168069

Compliance will review customer responses that revise new account information and will notify the RR, the RR's supervisor, and New Accounts of the changes.

## 11.1.6 Addresses On Customer Accounts

[FINRA Rule 3012(a)(2)(B)]

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 |
|---|---|
| Resources | • New account forms |
| Frequency | • When new account is opened |
| Action | • Identify improper address on new account forms at time of approval<br>• When approving new accounts, ensure beneficial owner of the account will receive confirmations consistent with the policy<br>• When a change of address is received by Operations, Operations will send notice to the customer's old address confirming the change to a new address. (See the section *Change Of Customer Addresses On Accounts* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES and in the Supervisory System, Procedures and Controls*) |
| Record | • Supervisor's signature on New Account Form |

Confirmations and statements and other account information will be transmitted to the customer at the address requested by the customer. Alpine or an employee may not be the sole addressee for a customer's account unless the account is for the direct benefit of Alpine or employee.

Acceptable addresses include:

- **for an individual:** residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual
- **for a non-individual (corporation, trust, *etc.*):** a principal place of business, local office, or other physical location.
- **for a P.O. Box address:** a legal address for the customer must also be provided.

Accounts **may not** be addressed to Alpine, an RR or other employee of Alpine with the exception of accounts for the beneficial ownership of the RR or employee or if the RR acts as a principal for the account. Accounts **may not** be addressed care/of (c/o) someone else unless the customer provides written authorization requesting such an address.

Address changes require written instructions from the customer. Upon notification of a change of address, a notice will be sent to the customer's old address confirming that an address change has been made to the account. This occurs under the direction of the Back office manager or designee. (Refer to the Supervisory System, Procedures and Controls chapter for additional information.) Should you have questions about address changes, please contact your supervisor or Alpine's Chief Compliance Officer.

ALPINE_LIT168070

Where the account is opened by a fiduciary such as an investment adviser on behalf of the fiduciary's customer, Alpine will provide either confirmations or periodic account statements to the underlying beneficial account holder. Alpine will make a good faith effort to obtain the information necessary to send confirmations directly to the beneficial owner; however, if this information is not provided by the fiduciary, Alpine will forward confirmations to the owner's custodian or, if there is no custodian or Alpine is the custodian, Alpine will send the confirmation directly to the fiduciary.

### 11.1.7 Account Documents

| Responsibility | • Designated Supervisor as set for in Chapter 1.1 |
|---|---|
| Resources | • New Account Form<br>• Missing Documents Report |
| Frequency | • Daily |
| Action | • Establish procedures to ensure required account documents are obtained for each new account |
| Record | • Most current Missing Documents Report retained for follow up<br>• New account files in Operations include documents obtained |

Additional account documents may be required depending on the type of account opened. The Designated Supervisor as set forth in Chapter 1.1 is responsible for establishing procedures outlining the necessary account documents and follow-up regarding missing documents.

### 11.1.8 Predispute Arbitration Agreements With Customers

[FINRA Rule 2268; FINRA Notice to Members 05-32 and 05-09]

Customers will be provided with copies of any signed agreements that include a predispute arbitration agreement within 30 days of signing; the customer will acknowledge receipt of the arbitration agreement on the agreement itself or on a separate document.

In addition, within 10 days of request by a customer, Alpine will provide a copy of any predispute arbitration agreement the customer has signed as well as relevant arbitration forum rules, if requested. The customer will be notified if the signed agreement cannot be located.

### 11.1.9 Revisions To Customer Agreements

Firm policy does not permit revisions to pre-printed language on customer agreements. Requests for changes should be referred to Compliance for review.

### 11.1.10 Accounts Requiring Notification To Customer's Employer

[NASD Rule 3050]

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 |
|---|---|
| Resources | • New Account Form |

ALPINE_LIT168071

| Frequency | • Daily |
|---|---|
| Action | • Code account for duplicate confirmations and/or statements as requested by other broker-dealers<br>• For accounts of employees of FINRA or the AMEX, code the accounts for duplicate confirmation and statements to FINRA or the AMEX |
| Record | • Record of duplicate confirmations and statements is included with new account records |

### 11.1.10.1 Employees Of Other Broker-Dealers

When opening an account for a person employed by another broker-dealer (including accounts where the employee has control or a personal financial interest), the other broker-dealer must be notified. Alpine will provide duplicate confirmations, statements, or other information requested by the employing broker-dealer.

### 11.1.10.2 Employees Of The FINRA Or The AMEX

[FINRA Rule 2070]

When an account is opened for an employee of FINRA or the AMEX (including accounts where the employee has control or a personal financial interest), duplicate confirmations and statements must be sent to FINRA or the AMEX.

### 11.1.11 Post Office Addresses

If the customer opens an account using a post office address, the street address must also be provided on the new account form. The only exception is for customers who reside in rural areas where the post office address is the only address, which should be noted on the new account form.

### 11.1.12 Unacceptable Accounts

The following are examples of accounts that are unacceptable. Questions regarding whether new accounts may be opened should be referred to Compliance.

Unacceptable accounts include:

- Fictitious accounts in a name other than the name of the legal owner
- Accounts in the name of a minor
- Margin accounts for minors

## 11.2 Accounts And Securities Subject To Blocking

[Various Treasury Department regulations]

Alpine is prohibited from doing business in specific countries or with organizations or individuals which are the subject of Government sanctions. The U. S. Treasury Department's Office of Foreign Assets Control (OFAC) is responsible for administering and enforcing economic and trade sanctions. Sanctions target foreign countries, terrorism sponsoring organizations, narcotics traffickers, money launderers, and other entities and individuals. Sanctions include the freezing of assets and blocking securities issued by embargoed foreign issuers.

ALPINE_LIT168072

As part of its anti-money laundering program, Alpine monitors accounts and securities included on OFAC's lists, available at OFAC's web site at *www.treas.gov/ofac*. OFAC information is updated whenever the Government issues new sanctions that result in blocking requirements.

Blocking will occur under the following circumstances:

- An account is opened for someone included on an OFAC list.
- The owner of an existing account is added to an OFAC list.
- A security is identified in a customer account where the issuer is the subject of blocking requirements.
- A request is made by a customer to pay or transfer funds or securities to a blocked person or entity.

RRs will be notified if one of their customer accounts; a security held in one of their accounts; or a requested transfer of funds or securities is blocked. In addition to the above, open orders will be cancelled for any account that is blocked.

Compliance with blocking requirements is very important. Violations can result in substantial fines against Alpine or persons engaging in prohibited transactions. Questions regarding blocked accounts, transfers, or securities should be referred to Compliance.

## 11.3 Updating Account Information And Periodic Affirmation

['34 Act Rule 17a-3(a)(17); FINRA Rule 3012(a)(2)(B)]

| Responsibility | • Financial Principal or designee |
|---|---|
| Resources | • Information obtained from customer<br>• Responses from customers |
| Frequency | • Within 30 days of opening a new account, provide customer the new account record and request verification of information contained thereon<br>• As required: update account information based on information provided by customer<br>• Within 30 days of changes: send written information about changes to account<br>• At least every 36 months: send customers a copy of new account information |
| Action | • Notify RR of any changes and record changes to customer account record as reported by customer<br>• Within 30 days after a customer requests a change to their account record, reconfirm such change in writing with the customer.<br>• Significant changes to the Customer account record will be reviewed by the RR's supervisor. |
| Record | • New account records<br>• Record of furnishing information within 30 days<br>• If necessary, notation of action by the RR's supervisor for responses received from customers |

ALPINE_LIT168073

|  |  |
|---|---|
|  |  |

RRs should promptly update customer new account information whenever they are informed or become aware of changes. Updates may be recorded by making revisions to existing forms or completing new forms. New forms require the approval of the RR's Supervisor as set forth in Chapter 1.1 and signature of the customer, where required.

Within 30 days of opening a new account or changes to a customer's investment objectives, Alpine will send a copy of new account information, including the change, to the customer with a request for correction of any inaccurate information. This occurs under the direction of the Back office manager or designee. (Refer to the Supervisory System, Procedures and Controls chapter for additional information.)

At least every 36 months customers will be provided with new account information on record for their accounts and will be asked to advise of any changes or updates. Customer responses are forwarded to the Financial Principal and to the RR's supervisor if necessary. This notification is not required for accounts that have been inactive for 36 months or where no recommendations (solicited orders) are made to the customer.

## 11.4 Customer Account Sweeps To Banks

| Responsibility | • Designated Supervisor as set for in Chapter 1.1 |
|---|---|
| Resources | • Proposed new programs or material changes to existing programs |
| Frequency | • As required |
| Action | • Consider net capital/customer protection implications of terminating a program or adopting a new program<br>• Confirm the bank's business continuity program complies with SRO business continuity rule requirements<br>• For programs with banks that allow the customer to make deposits and/or withdrawals, include accounts in AML reviews<br>• Review the new program or changes<br>• Prepare disclosure information for customers<br>• Distribute disclosure information<br>• Arrange for RR training, if necessary<br>• If Alpine has a web site, post interest rates |
| Record | • Copies of programs, contracts with providers, records of distributing disclosures to customers when new programs are implemented or changes occur<br>• Copy of bank's affirmation regarding compliance with business continuity requirements |

Customer accounts may "sweep" available funds into money market, bank, or comparable accounts enabling the customer to earn interest on idle funds. Customers are provided with disclosures when:

ALPINE_LIT168074

- a program is first implemented;
- a new account is opened; and,
- when material changes occur in an existing program.

## 11.5 Third Party Accounts

When a third party who is not the principal or named person on the account will give instructions regarding orders, disposition of funds, or other actions involving an account, Alpine must have a signed third-party trading authorization. The authorization is signed by the principal of the account and the third party, giving the third party authority to act on behalf of the principal. An example of a third party account is an account for a wife whose husband will give instructions regarding his wife's account. The signed trading authorization must be received BEFORE accepting instructions from the third party.

Alpine has two types of trading authorizations:

- Limited trading authorizations limit the third party to giving instructions regarding the purchase and sale of securities and does NOT give authority regarding the disposition of funds or securities.
- Full trading authorizations give the third party authority to give instructions regarding purchases and sales as well as the disposition of funds or securities in the account.

## 11.6 Discretion For Orders And Accounts

[SEC no-action letters regarding cash management accounts (http://sec.gov/divisions/investment/noaction/ubs092905.htm) and family/related accounts (http://sec.gov/divisions/investment/noaction/morganlewis111705.htm)]

Alpine does **not** permit discretionary accounts where the customer signs a discretionary trading authorization and permits the RR to make decisions for the account without consulting with the customer first.

This prohibition does not include temporary or limited discretion in the following examples:

- Price and time discretion for an order.
- Isolated or infrequent discretion, such as when a customer is unavailable for a limited period of time. The customer must sign a trading authorization in advance, an expiration date must be noted on the agreement, and the limited discretion must be approved by the RR's supervisor.
- Exchanging one money market fund for another or its cash equivalent.
- Transactions to satisfy margin requirements.
- Selling bonds and buying similar bonds permitting the customer to take a tax loss on the original purchase.
- Buying a bond with a specified credit rating and maturity.
- Buying or selling a security or type of security within limited specific parameters established by the customer (requires the customer's instructions in writing).
- The RR acts as conservator, trustee, attorney-in-fact, or other agent as a result of a family or personal relationship with the account.

## 11.7 Accounts For Minors

[Uniform Gifts To Minors Act; Uniform Transfers To Minors Act]

ALPINE_LIT168075

There are a number of requirements and restrictions that affect minors' accounts:

- A custodian must be named in and handle the account
- Only one custodian is permitted for each account
- Custodians generally may not delegate authority to another person
- Only one minor may be named in each account
- Margin transactions are not permitted
- Gifts to minors are irrevocable, *i.e.,* the custodian may not direct distribution of assets from the account except for the benefit of the minor
- The minor's social security number must be used when opening the account
- Minors may not be a party to a joint account, investment club, or partnership

## 11.8 Accounts For Senior Investors

[SEC/NASAA 2008 report on Protecting Senior Investors:
http://www.sec.gov/spotlight/seniors/seniorspracticesreport092208.pdf; 2010 addendum to 2008 report:
http://www.sec.gov/spotlight/seniors/seniorspracticesreport081210.pdf; SEC web site Senior Investors:
http://www.sec.gov/divisions/marketreg/seniorinvestors.htm; FINRA Regulatory Notice 11-52 and 07-43]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • New account information<br>• Order records<br>• Daily Transaction Report<br>• Customer monthly transaction records |
| Frequency | • Ongoing |
| Action | • When reviewing investments for seniors, take into particular consideration the factors included in the subsection *Recommendations To Senior Investors*<br>• Refer to new account information when necessary to identify investment objectives and other customer information<br>• Confer with RR regarding suitability questions<br>• Confer with Compliance when necessary<br>• Contact customer when necessary to confirm customer's understanding of and agreement with transactions<br>• Modify or restrict future transactions, as appropriate |
| Record | • Initials and comments of action taken on order records, Daily Transaction Report, monthly transaction records, and other available account information |

### 11.8.1 Diminished Mental Capacity

A difficult issue is a customer who appears to be suffering from diminished mental capacity. If a customer's behavior suggests reduced capacity, it is important to take steps to protect the customer, the RR, and [The Firm]. Relatives or estate beneficiaries may file a complaint or lawsuit if they believe the customer was unable to understand what was occurring in his or her account.

There are a number of steps that may be taken to address the issue:

ALPINE_LIT168076

- Have a conversation with the customer with your supervisor or other party present to assist in making a determination.
- Raise the issue with family members and determine if the customer has given power of attorney to another person.
- Document meetings, conversations, and other exchanges with relatives about the situation.
- Document communications with the customer about investments.
- As a final alternative, decide not to continue doing business with the customer.

Contact Compliance with questions about a proper course of action.

## 11.9 Incompetent Persons

Accounts for incompetent persons may only be opened with the appropriate authority from a court-appointed guardian. If an RR becomes aware that a customer has become incompetent, the RR should contact the branch manager or Compliance for further guidance.

If a customer becomes incompetent while a third party trading authorization is in effect for his or her account, the authority generally is considered invalid and requires a court order for reinstatement. "Durable" powers of attorney, recognized by some states, remain in effect after a person is declared incompetent. Questions related to treatment of incompetent persons should be referred to Compliance.

## 11.10 Trust Accounts

New accounts for trusts require a copy of the trust agreement or a trust certification signed by the authorized trustee. The following activities in trust accounts require **prior** approval as follows:

- Margin trading requires approval by Compliance
- Option trading requires approval by the CROP
- Discretionary accounts require approval by Compliance (if Alpine permits discretionary accounts)

Fiduciaries (executors, trustees, guardians, administrators, conservators, *etc.*) may not be able to delegate their duties to a third party (whether delegation would be to the RR or an outside person) to manage the account unless the trust or other authorizing instrument specifically permits delegation. Some states require the fiduciary to obtain a court order to delegate authority to a third party.

## 11.11 Correspondent And Private Banking Accounts And Accounts For Senior Foreign Political Figures

[Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart F; USA PATRIOT Act Section 312 and 313; FinCEN Fact Sheet (http://www.fincen.gov/312factsheet.pdf)]

Under anti-money laundering (AML) rules, there are special requirements that apply to "correspondent" and "private banking" accounts as well as to accounts for "senior foreign political figures." Definitions of these and other terms follow the summary of requirements. Questions should be referred to the AML Compliance Officer.

### 11.11.1 Summary Of Requirements

- Correspondent accounts require due diligence to determine ownership of the account.
- Accounts cannot be opened for foreign shell banks.

ALPINE_LIT168077

- When opening an account for a foreign bank, the Foreign Bank Certification form must be submitted to the AML Compliance Officer with the New Account Form for review and approval.
- Every three years foreign banks will be required to re-certify the information in the Foreign Bank Certification.
- When opening an account for a senior foreign political figure, the new account application must be submitted to the AML Compliance Officer for review and approval.

## 11.11.2 Definitions

**Correspondent account:** Includes any account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign institution, or to handle other financial transactions related to such foreign financial institution. This type of account presumes a formal relationship through which the financial institution provides regular services. Due diligence requirements apply to correspondent accounts maintained for the following foreign financial institutions:

- Foreign bank
- Foreign branch of a U.S. bank
- Business organized under a foreign law that, if located in the U.S., would be a securities broker-dealer, futures commission merchant, introducing broker in commodities, or a mutual fund
- Money transmitter or currency exchanger organized under a foreign law

**Private banking account:** A private banking account is an account that is established or maintained for the benefit of one or more non-U.S. persons, requires minimum aggregate deposit of funds or other assets of not less than $1,000,000, and is assigned to a bank employee who is a liaison between the financial institution and the non-U.S. person. If the account otherwise satisfies the definition but the institution does **not** require a minimum balance of $1,000,000, the account does not qualify as a private banking account.

**Senior foreign political figure** includes:

- a current or former senior official in the executive, legislative, administrative, military, or judicial branches of a foreign government, whether or not they are or were elected officials
- a senior official of a major foreign political party
- a senior executive of a foreign government-owned commercial enterprise (Senior executives are individuals with substantial authority over policy, operations, or the use of government-owned resources.)
- immediate family members of the above, and those who are widely and publicly known (or actually known) close associates of a senior foreign political figure
- a corporation, business, or other entity formed by or for the benefit of one of the above individuals

**Proceeds of foreign corruption:** any asset acquired by, through, or on behalf of a senior foreign political figure through misappropriation, theft, or embezzlement of public funds, the unlawful conversion of property of a foreign government, or through acts of bribery or extortion, and include any other property into which any such assets have been transformed or converted.

**Foreign bank:** a bank organized under foreign law, or an agency, branch, or bank office located outside the United States. The term does not include an agent, agency, branch or office within the U.S. of a bank organized under foreign law.

ALPINE_LIT168078

**Foreign shell bank:** is defined as a foreign bank without a physical presence in any country.

**Regulated affiliate:** is a foreign shell bank that (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the foreign country regulating such affiliated depository institution, credit union, or foreign bank.

### 11.11.3 Prohibition Against Correspondent Accounts For Foreign Shell Banks

Alpine is prohibited from establishing, maintaining, administering, or managing a correspondent account in the United States for an unregulated foreign shell bank. The prohibition does not apply to a foreign shell bank that is a regulated affiliate. If an account is inadvertently opened for an unregulated foreign shell bank, the AML Compliance Officer should be notified and the account will be immediately closed.

### 11.11.4 Foreign Bank Certification

When opening an account for a foreign bank, Alpine is obligated to ensure the bank is not a foreign shell bank and must obtain information about the foreign bank's owners and an agent for service of process. The bank must complete the Foreign Bank Certification which must be submitted to the AML Compliance Officer with a copy of the New Account Form for review. Every three years the bank is also required to re-certify the information filed with Alpine.

### 11.11.5 Accounts For Foreign Political Figures

Accounts for foreign political figures (as defined above) are subject to special reviews to comply with Bank Secrecy Act requirements. RRs are required to identify, on the new account application, whether an account for a foreigner falls under the definition. The application must be submitted to the AML Compliance Officer for review and approval.

## 11.12 Collateral/Escrow Accounts

Alpine will not maintain accounts for customers where the assets in the account are pledged to a third party and Alpine is asked to acknowledge it is responsible for holding the assets pending instructions from the third party.

## 11.13 Pension And Retirement Accounts

[U.S. Dept. of Labor Retirement Plans web site: http://www.dol.gov/dol/topic/retirement/index.htm]

This section is divided into four areas:

1. A general explanation of ERISA requirements
2. General guidelines when offering retirement plans
3. Individual plans established and funded by the investor
4. Employer-sponsored plans

Because of frequent changes to laws affecting contribution levels and other requirements or limitations, some details are not included in these general explanations; individual plans should be referenced for details.

Questions regarding retirement accounts should be referred to the appropriate marketing specialist or to Compliance.

ALPINE_LIT168079

### 11.13.1 Employee Retirement Income Security Act (ERISA)

This section provides a general overview of ERISA and how it affects pension and retirement accounts; it does not deal with the complex legal requirements of the Act. Legal counsel should be consulted regarding questions about ERISA and its affect on pension or retirement accounts.

#### 11.13.1.1 Introduction

The Employee Retirement Income Security Act of 1974 (ERISA) is a federal law that sets minimum standards for most voluntarily established pension and health plans in private industry and provides protection for individuals in these plans.

ERISA applies to all Internal Revenue Service-qualified pension and profit sharing plans and employee welfare benefit plans. Most IRA accounts, while not covered by ERISA, are subject to the prohibited transaction penalties. Limited exemptions apply to governmental (public employee) plans and certain offshore and church plans.

This section provides a general overview of ERISA. Because of the technical and legal nature of ERISA, questions should be referred to Compliance or outside legal counsel.

#### 11.13.1.2 Key Definitions

A "fiduciary" is generally anyone with discretionary authority or control over the management of a plan, the administration of the plan, or the disposition of plan assets. Fiduciaries must comply with certain statutory duties which include prudence and diversification of investments and the duty to act in accordance with the governing instruments of the plan.

A person or entity providing services to an ERISA plan is considered a "party-in-interest" to the plan. This status generally applies to broker-dealers providing traditional brokerage services to ERISA plans. Alpine's role in relation to ERISA plan accounts generally is as a party-in-interest unless Alpine contracts to provide investment management services or other services where Alpine would become a fiduciary to an ERISA plan.

#### 11.13.1.3 General Requirements When Dealing With ERISA Plans

Because of substantial legal liability, RRs are not permitted to become fiduciaries when dealing with ERISA accounts (unless Alpine has a specific program designed to meet legal requirements in offering those services). The following summarizes requirements and limitations:

- RRs may not accept responsibilities regarding administration of a plan (other than following instructions for contributions, distributions and investments from authorized persons acting on behalf of the plan).
- RRs may not be named trustees to plans (unless specifically authorized by Compliance).
- Recommendations to ERISA plans must be consistent with investment policies of the plans.

#### 11.13.1.4 Disclosures To Plans

[ERISA Section 408(b)(2); Dept. of Labor Fact Sheet: http://www.dol.gov/ebsa/newsroom/fs408b2finalreg.html]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Plan contracts or arrangements<br>• Information regarding services provided and charges for services |
| Frequency | • Disclosures - reasonably in advance of the date the contract or |

ALPINE_LIT168080

|  | · arrangement is entered into and extended or renewed<br>· Changes or errors in disclosures - as required (see below) |
|---|---|
| **Action** | · Identify plans and services subject to 408(b)(2) requirements<br>· Assemble information necessary to make required disclosures<br>· Provide disclosures at time of initial contract/arrangement and when changed, errors are identified, or contracts/arrangements are terminated<br>· Respond to fiduciaries/plan administrators when additional information is requested |
| **Record** | · Covered plans<br>· Disclosures provided including dates provided |

Under ERISA, "covered service providers" are required to provide fee disclosures to covered plans to enable the plan fiduciary to make an informed decision about the reasonableness of fees as required under ERISA Section 404(a)(1). [The Firm]'s obligation to provide disclosures depends on [The Firm]'s role in dealing with a covered plan. This section provides a general explanation of the requirements which are complex; the ERISA section should be consulted for specific requirements.

### 11.13.1.5 Permissible Transactions

Generally, trading in ERISA accounts is subject to the "Prudent Investor Rule" which is discussed in the next section. Allowable transactions are governed by ERISA (and related Department of Labor and IRS rulings), the investment policy of the ERISA plan, and trading guidelines in a managed account program or other trading program if such a program is used.

Some types of transactions (such as margin or certain option transactions) are associated with added risk, and it may be necessary for Compliance to review the plan to determine whether the type of transaction is permissible.

#### 11.13.1.5.1 Definitions

**Covered plan:** An ERISA-covered defined benefit and defined contribution pension plan. Does not include simplified employee pension plans (SEPs), SIMPLE retirement accounts, IRAs, employee welfare benefit plans, and certain annuity contracts and custodial accounts described in ERISA Code section 403(b).

**Covered service provider:** A service provider that enters into a contract or arrangement with the covered plan and expects $1,000 or more in direct or indirect compensation that is received in connection with providing services defined in Section 408(b)(2) including:

- ERISA fiduciary service providers to a covered plan or to a "plan asset" vehicle in which such plan invests
- Investment advisers registered under Federal or State law
- Record-keepers or brokers who make designated investment alternatives available to the covered plan (*e.g.,* a "platform provider")
- Providers of one or more of the following services to the covered plan who also receive "indirect compensation" in connection with such services:

ALPINE_LIT168081

- o Accounting, auditing, actuarial, banking, consulting, custodial, insurance, investment advisory, legal, recordkeeping, securities brokerage, third party administration, or valuation services

### 11.13.1.5.2 Required Disclosures

Disclosures include:

- Description of services
- If applicable, that the services are provided in the role of fiduciary
- Compensation, including:
  - o Description of all direct compensation either in aggregate or by service to be received
  - o Indirect compensation expected to be received
  - o Description that compensation will be paid among related parties including identification of payers and recipients of compensation
  - o Description of any compensation to be received in connection with termination of the contract or arrangement and how any prepaid amounts will be calculated and refunded upon termination
- Recordkeeping services, if applicable, including direct and indirect compensation related to such services or, if not explicitly compensated, a reasonable and good faith estimate of the cost to the covered plan of such services
- Manner of receipt of the compensation
- Fiduciary services provided and related compensation
- Recordkeeping and brokerage services with respect to each designated investment alternative for which recordkeeping or brokerage services are provided

### 11.13.1.5.3 Timing Of Disclosures

- Required disclosures must be provided reasonably in advance of the date the contract or arrangement is entered into and extended or renewed.
- Changes must be provided as soon as practicable but no later than 60 days from the date on which the covered service provider is informed of the change.
- In the event of an error in a disclosure, the covered service provider must correct the information as soon as practicable but no later than 30 days after knowing of the error or omission.
- Requests for other compensation information from the fiduciary or covered plan administrator must be provided within 30 days following receipt of a written request.

## 11.13.1.6 Disclosures To Plan Participants

[ERISA Section 404(a)(5); SEC no-action letter to the Department of Labor dated October 26, 2011: http://www.sec.gov/divisions/investment/noaction/2011/do11102611-482-htm; FINRA Regulatory Notice 12-02]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Plans for participant-directed individual account plans<br>• Performance and cost information required to be disclosed |
| Frequency | • As required |
| Action | • Determine if [The Firm] and any firm-prepared materials for plan participants are subject to disclosure requirements<br>• Assemble information necessary to make required disclosures<br>• If subject investments are investment companies, contact Compliance to determine whether materials must be filed with FINRA (written materials that conform to the ERISA rule requirements are not |

ALPINE_LIT168082

| | |
|---|---|
| | required to be filed per the SEC no-action letter)<br>• Provide disclosures to participants or to plan administrator for distribution to participants |
| **Record** | • Disclosures provided including when and to whom provided |

ERISA Rule 404(a)(5) requires the disclosure of certain plan and investment-related information, including performance information, to participants and beneficiaries in participant-directed individual account plans. Information is required to be presented in a comparative chart format to enable participants to make an informed decision when managing their accounts.

If [The Firm] compiles and/or provides the required information, it will comply with the requirements of Rule 404(a)(5). Where the investment alternatives include investment companies subject to other SEC and FINRA rules regarding communications with the public, the disclosures will comply with those requirements or exemptions to requirements.

### 11.13.1.7 Prudent Investor Rule And Diversification

Trading in ERISA accounts is subject to the "prudent investor" rule (also known as the Prudent Man Rule) which is a standard that is generally understood to mean that individuals involved with investment decision-making, act with the same care, skill, prudence and diligence as a prudent man would in the same capacity given the same set of circumstances. This measure is not judged on the risk of a single investment but by the investment's relationship to the overall portfolio.

ERISA also requires that investments in a covered plan be diversified to minimize the risk of large losses unless it is clearly prudent not to do so.

### 11.13.1.8 Prohibited Transactions

Federal laws prohibit plan assets from being used by a fiduciary for certain transactions (known as "prohibited transactions"). Fiduciaries are prohibited from dealing in plan assets for their own benefit or for the benefit of a third party with whom the fiduciary is affiliated. The Department of Labor (and other government agencies) have issued exemptions from the prohibited transaction rules which allow plans and broker-dealers to engage in some but not all types of securities transactions. The range of permissible transactions varies depending on whether the broker-dealer is a fiduciary to the plan.

## 11.13.2 General Guidelines When Offering Retirement Plans

Plans differ depending on the law under which they are established. Differences include limits on contributions, tax deductibility, costs, types of plan sponsors (employer or otherwise), and who may participate. The following sections provide general explanations of various types of common retirement accounts. Some of the general guidelines that apply to retirement plan sales include the following. Specific plans should be consulted for limitations and requirements.

• Avoid tax-sheltered investments such as annuities and municipal securities, which generally are not suitable for retirement plans since plans already provide tax benefits.
• Consider the cost of investments recommended for retirement plans vs. the benefits.
• Consider the customer's risk profile and investment objectives when considering securities for recommendation for a retirement plan.
• Consider surrender or exit fees or tax penalties if they apply to the potential transaction.

ALPINE_LIT168083

- Understand the type of plans being discussed or recommended.
- Encourage investors to contact their tax counsel to resolve any tax-related questions.

## 11.13.3 Individual Retirement Accounts (IRAs)

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 |
|---|---|
| Resources | • Plan applications<br>• New account applications<br>• Transaction reports<br>• Proposed marketing presentations |
| Frequency | • As required - opening accounts<br>• As required - review and approve/disapprove marketing presentations<br>• Daily - review of transactions<br>• Ongoing - provide training |
| Action | • Review applications/new account forms for consistency of investment objectives with proposed investments/rollovers<br>• Review transactions for consistency with investment objectives and take corrective action when necessary which may include contact with RR to discuss transactions vs. objectives; contact with customer; contact with Compliance; adjustments to current or future investments<br>• Review marketing presentations/seminar presentations regarding accuracy of information to be presented, experience/knowledge of RR making presentation and approve (making adjustments if necessary or disapprove)<br>• Provide training when new plans/products are offered to retirement accounts and when 401(k) plan participants will be targeted for marketing efforts |
| Record | • Plan/new account documents<br>• Transactions reviewed including notes of action taken, if any<br>• Marketing presentations/seminars with approval or disapproval<br>• Records of training regarding products/services, who attended, and when training was provided |

IRAs are established by individuals through a plan sponsor; following are key features:

- Annual contributions are limited by law
- Older investors have higher contribution limits under a "catch-up" provision
- Contributions may or may not be tax deductible, depending on the IRA owner's income level
- Contributions are from earned income (other than contributions to a non-working spouse's IRA)
- Certain types of investments such as precious metals are not permitted in an IRA
- Early withdrawals (prior to age 59 1/2) may result in tax penalties
- Owners of traditional IRAs are required to begin withdrawing by the year following the year the owner turns 70 1/2

There are multiple types of IRAs including:

ALPINE_LIT168084

- Traditional IRAs; contributions may or may not be tax deductible depending on the IRA owner's income
- Roth IRA:
  - all contributions are in after-tax dollars
  - withdrawals are not taxed at the time of withdrawal if the IRA owner is at least 59 1/2 years old and the Roth IRA has been open 5 years or longer
  - some high wage earners are not eligible to open Roth IRAs
  - no mandatory withdrawals after age 70 1/2
- Individual retirement annuity; a traditional or Roth IRA set up with a life insurance company through the purchase of a special annuity contract
- Simplified Employee Pension (SEP-IRA); a traditional IRA set up by an employer for employees; limitations on contributions apply
- Spousal IRA; traditional or Roth IRA funded by a married taxpayer in the name of a spouse who earns less than $2000 annually
- Rollover IRA: funded with money that is already in a qualified retirement plan; allows moving the money without owing any tax at the time of the rollover (assuming the requirements for a rollover are met)

## 11.13.4 Employer-Sponsored Plans

Employers may offer different types of plans including traditional pension and profit-sharing plans that are funded entirely by the employer. All eligible employees participate and employer contributions are above and beyond the employee's salary. This section describes other types of employer-sponsored plans that give eligible employees the opportunity to put a portion of current income into a tax-deferred investment account. Participation may be voluntary or mandatory, and employers may make matching contributions.

The following sections provide a general explanation of these various plans.

### 11.13.4.1 401(k) Plans

- Established by corporations
- Permit their employees to make contributions through payroll deductions from pre-tax income [traditional 401(k) plans]; tax is applied when withdrawals are taken
- 401(k) plans permit employees to make contributions through payroll from after-tax dollars; there is no tax on withdrawals made after age 59 1/2, if the 401(k) has been open 5 years or longer
- Both traditional and Roth 401(k) plans can be rolled over to an IRA (or a new employer's plan, if the plan permits) if the investor leaves the company
- No mandatory withdrawals for Roth 401(k) plans; mandatory scheduled withdrawals apply to traditional 401(k) plans

#### 11.13.4.1.1 Limitations On Advice

[Pension Protection Act of 2006 Title VI; U.S. Department of Labor Field Assistance Bulletin No. 2007-01]

Providing investment advice to 401(k) plan sponsors and participants is subject to strict limitations and requirements. Providing investment advice places the RR in the role of a fiduciary which creates the legal liabilities associated with fiduciaries.

RRs are limited to offering Firm-approved educational material and third-party advisory plans offered through Alpine.

### 11.13.4.2 403(b) Plans

[IRS 403(b) publication: http://www.irs.gov/publications/p571/ch01.html]

ALPINE_LIT168085

A 403(b) plan is a salary reduction plan offered by non-profit, tax-exempt employers such as schools and colleges, hospitals, and foundations. Individual accounts in a 403(b) plan invest in two categories of investments:

- An annuity contract provided through an insurance company (fixed or variable)
- Mutual funds

Features include:

- Individuals cannot establish 403(b) accounts; only employers may set up accounts
- For non-Roth plans:
  - Employees make pre-tax contributions and employers sometimes match contributions
  - Tax on contributions and earnings and gains on investments are paid when the investor begins withdrawing funds
  - Mandatory withdrawals after age 70 1/2
- If the plan is a Roth contribution plan, tax is paid on contributions to the plan but withdrawals are not taxed; no mandatory withdrawals
- Some 403(b) plans impose steep surrender charges

### 11.13.4.3 457 Plans

These plans are offered by a state or local government or a non-profit organization. A 457 plan is a deferred compensation plan similar to 401(k) or 403(b) plans.

- Pre-tax income is contributed
- No tax on contributions; withdrawals are subject to tax
- Technically the portion of salary contributed to the plan is not owned by the employee; the plan sponsor owns all of the 457 plan assets which are held in trust for the employee in an account set up in the employee's name
- Mandatory withdrawals after age 70 1/2
- No early withdrawal tax penalties if funds are paid to the employee when leaving the job prior to reaching age 59 1/2; withdrawal is subject to normal income tax
- May be rolled over to an IRA or a new employer's plan to retain tax-deferred status

### 11.13.4.4 SIMPLEs (Savings Incentive Match Plans For Employees)

- Offered by small companies with 100 or fewer employees who earn at least $5,000 each during the year
- Less complicated to set up and administer than 401(k) or 403(b) plans
- Two types: SIMPLE IRA and SIMPLE 401(k), both with same contribution limits and catch-up contributions for people 50 or older
- Employer must contribute to the plan in one of two ways, a fixed contribution or a matching contribution
- Account must be open for 2 years before the employee can move the money or take it out; early withdrawal is subject to significant tax penalties

## 11.14 Foreign Accounts

Accounts for residents of foreign countries may be subject to special requirements under securities laws of the foreign country. Before opening an account for a person or entity residing in a foreign country, contact Compliance for further information regarding any special restrictions or requirements.

## 11.15 Referrals

[NASD Rule 1060(b) and 2420]

ALPINE_LIT168086

FINRA Rules 1060(b) and 2420

| | |
|---|---|
| **Responsibility** | • Designated Supervisor<br>• Compliance |
| **Resources** | • Requests regarding referral arrangements |
| **Frequency** | • As required |
| **Action** | • Designated Supervisor: identify unauthorized referrals in reviews of public communications and refer them to Compliance for follow up<br>• Compliance:<br>   ○ Review requests for referral arrangements and determine compliance with regulatory and Firm policy requirements and approve or disapprove; for approved arrangements establish guidelines for arrangements including any compensation<br>   ○ For investment adviser referrals:<br>      ▪ If compensation will be received for referrals, determine whether investment adviser registration is required for Alpine and the RR<br>      ▪ Maintain a list of approved IAs<br>      ▪ Review IAs to be included on the approved list including registration status, investment policies, suitability guidelines for investors<br>      ▪ Establish monitoring program and monitor results vs. IA stated performance<br>      ▪ Re-evaluate IA participants at least annually<br>• For hedge fund or other investment referrals, the proposed investment is subject to new product review procedures (see the related section in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*) |
| **Record** | • Designated Supervisor review of communications and referrals to Compliance<br>• Compliance:<br>   ○ Review/approval of referral arrangements<br>   ○ Reviews of IAs included on approved list<br>   ○ Records of monitoring and annual review |

Referrals are an important part of our business. Satisfied customers may refer others to Alpine and may also seek referrals from employees when they need services not provided by Alpine. It is important that referrals to others are based on sound knowledge about the other person or company. In addition, FINRA rules restrict compensation to unregistered persons or entities.

ALPINE_LIT168087

Key requirements regarding referrals include the following:

- Employees are expected to make referrals involving investments or investment advisory services only to persons or companies included in an Alpine-sponsored program or on a list of Alpine-approved providers.
- Employees are prohibited from receiving compensation for referrals except through Alpine-sponsored programs.
- Any proposed compensation, whether for referring or receiving referrals, must be approved **in advance** by Compliance.
- Referrals involving compensation may require disclosure to the customer of potential conflicts of interest.
- Non-cash compensation is subject to the policy described in the chapter *ORDERS*.

## 11.16 Death Of A Customer

When a customer dies, the account assets owned by the deceased person may become subject to a will, estate laws, and other governing laws or documents. The assets are, therefore, frozen in the account until necessary documents are received and legal distribution has been determined. Joint accounts and other accounts where the deceased person is a joint owner with others may be subject to certain distribution requirements depending on the styling of the account.

When a customer dies, the RR should:

- immediately notify Operations
- consider assets in the deceased person's account as "frozen" until distribution of assets has been determined, *i.e.,* accept no orders and do not authorize sending of securities or funds from the account
- cancel all open orders

## 11.17 Customer Portfolio And Cross-Reference Records

| | |
|---|---|
| **Responsibility** | • Designated Supervisor as set forth in Chapter 1.1 |
| **Resources** | • Electronic customer portfolio and security cross-reference records |
| **Frequency** | • Semi-annually |
| **Action** | • Review records for:<br>　○ Completeness<br>　○ Patterns of accumulating securities (cross-reference)<br>　○ Suitability (customer portfolio) |
| **Record** | • |

Alpine provides electronic customer portfolio and security cross-reference information to RRs. The customer portfolio is a cumulative, chronological record of securities transactions, by customer. The security cross-reference is a cumulative, chronological record of transactions, by security, that identifies the customers and details of each transaction.

ALPINE_LIT168088

## 11.18 Active Accounts

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 |
|---|---|
| Resources | • Active Account Report |
| Frequency | • Monthly |
| Action | • Review Active Account Report to identify accounts for further review. Accounts requiring further review may include:<br>    o Fiduciary accounts (trust, pension plans, *etc.*)<br>    o Minor's accounts<br>    o Accounts engaged in higher-risk transactions<br>    o Accounts with high volume of trading<br>    o Other accounts at the Branch Manager's discretion<br>• Further review includes:<br>    o New account documentation for completeness<br>    o Investment objectives for consistency with trading activity<br>    o Consulting with the RR regarding account activity<br>• Compliance may identify selected accounts where further information is requested from the RR through an Active Account Questionnaire. The supervisor should:<br>    o ensure completion of the form<br>    o review and sign the form<br>    o retain a copy in the branch customer file<br>    o send the original to Compliance<br>• Further action may include branch manager contact with the customer in writing or by phone or in person. A record should be made of any such contact. |
| Record | • Initial and date Active Account Report to record review<br>• Active account letters and/or customer contact forms are filed in a branch customer account file<br>• Compliance retains the following records:<br>    o copies of Active Account Questionnaires<br>    o Active Account Reports reviewed by Compliance, initialed and dated by the reviewer and including notations of action taken on selected accounts<br>    o record of supervisor contact |

Compliance will, on a quarterly basis, review accounts that are identified as "active." Items to be reviewed include, depending on the type of account and type of trading activity:

- Review of new account documentation to determine necessary documents are on file and to identify the customer's investment objectives and financial profile
- Review of trading activity in the account including types and size of trades and frequency of trades
- Contact with the RR and Designated Supervisor as set for in Chapter 1.1 to determine additional information regarding the customer and trading activity

Additional reviews that may be conducted include:

ALPINE_LIT168089

- Profit and loss or change of equity calculation
- Turnover calculation
- Contact with the customer (written or oral)

Reviews of active accounts may include these items or other items at the discretion of Compliance. Compliance will establish the criteria and procedures for conducting the active account review.

Compliance, in conjunction with the Designated Supervisor as set forth in Chapter 1.1 of the department or branch handling the account, will determine whether contact will be made with the customer and whether that contact will be in the form of a letter, telephone call, or face-to-face contact to confirm investment objectives and the customer's knowledge regarding the trading activity in the account. All records of customer contact in conjunction with active account reviews (including telephone conversations and face-to-face meetings) are to be maintained in a file for the customer or an active accounts file.

## 11.18.1 Penny Stock Rules

## 11.18.2 Rule 15g□1 et. seq.

The Commission has on two occasions promulgated rules relating to transactions in OTC low priced securities. On the first occasion, the Commission promulgated the so□called "cold call" rule which applied to the solicitation of customer purchases of OTC low priced securities. On the second occasion, the Commission promulgated a series of rules known as the "penny stock" rules which governed disclosure which broker□dealers are required to make in connection with both the purchase and sale of low priced OTC stocks. These rules have now been consolidated into a single set of rules beginning with rule 15g□1 and continuing through rule 15g□9 under the Exchange Act.

The penny stock rules only apply to so□called "penny stocks". The definition of that term is contained in section 3(a)(5)(1) of the Exchange Act. In substance, any equity security is a penny stock unless it falls within of the following exclusions from the definition:

(1) Securities traded on national securities exchanges

(2) Securities traded on NASDAQ (both NASDAQ/NMS and NASDAQ Small Cap)

(3) Securities issued by an investment company registered under the Investment Company Act of 1940

ALPINE_LIT168090

(4) A security whose issuer has net tangible assets in excess of $2,000,000, if the issuer has been in continuous operation for at least three (3) years; or, $5,000,000, if the issuer has been in continuous operation for less than three (3) years; or, average revenue of at least $6,000,000 for the last three (3) years

(5) Any security that is a put or call option issued by the Options Clearing Corporation

(6) Any security that has a price of $5.00 or more

Certain of the foregoing exclusions from the definition of the term "penny stock" are somewhat technical. For instance, the determination of whether or not an issuer has net tangible assets in excess of $2,000,000 or $5,000,000 may require some expert analysis. In addition, the determination of whether or not a security has a price of $5.00 or more can be difficult to determine. Other exclusions are fairly straight forward such as NASDAQ listed stock or a New York Stock Exchange listed stock. Therefore, an appropriate principal should be consulted with respect to any question as to whether or not a particular security falls under the coverage of the penny stock rules.

In addition to the exclusions from the definition of the term penny stock, there are exemptions from the coverage of the penny stock rules. In substance, those exemptions include the following:

(1) Transactions by a broker or dealer whose commission equivalents, markups and markdowns from transactions in penny stocks during each of the immediate preceding three (3) months and during eleven (11) or more of the preceding twelve (12) months or during the immediately preceding six (6) months, did not exceed 5% of his total commissions, commission equivalents, markups and markdowns from transactions during those months.

(2) Transactions by a broker or dealer who has not been a market maker in the penny stock that is the subject of the transaction in the immediately preceding twelve (12) months.

ALPINE_LIT168091

(3) Transactions in which the customer is an institutional accredited investor as defined in rule 501(a)(1), (2), (3), (7) or (8) of Regulation D under the Securities Act.

(4) Transactions that meet the requirements of Regulation D under the Securities Act or transaction with an issuer not involving any public offering pursuant to section 4(2) of the Securities Act.

(5) Transactions in which the customer is the issuer, or a director, officer, general partner, or direct or indirect beneficial owner of more than 5% of any class of equity security of the issuer, of the penny stock that is the subject of the transaction.

(6) Transactions that are not recommended by the broker or dealer, including 144 sales.

Here again, the exemptions from the coverage of the penny stock rules can be somewhat technical. Therefore the appropriate principal should be consulted with respect to whether or not a particular transaction must comply with the penny stock rules.

The portion of the penny stock rules that relate to disclosures which must be made in connection with penny stock transactions consist of rules 15g□1 through 15g□7. The old "cold call" rule, which has now been consolidated with the penny stock rules, is rule 15g□9.

Penny Stock Disclosure Rules

(1) Rule 15g□2 states, in substance, that it is unlawful for a broker or dealer to effect a transaction in any penny stock for or with the account of a customer unless prior to effecting such transaction, the broker or dealer has furnished to the customer a document containing specified information and has obtained from the customer a manually signed and dated written acknowledgement of receipt of that document. This written acknowledgment must be preserved as part of the broker□dealer's books and records for a period of not less than three (3) years. Alpine has obtained printed forms for this purpose

ALPINE_LIT168092

which includes the written acknowledgement of receipt of the document manual signature of the customer.

(2) Rule 15g□3 requires, in substance, that the broker□dealer disclose to the customer the inside bid quotation and the inside offer quotation any penny stock that is the subject of a proposed transaction. The terms inside bid quotation and inside offer quotation mean the highest bid quotation and the lowest offer quotation for the security displayed by a market maker in the security on the FINRA's Bulletin Board at any time in which at least two market makers are contemporaneously displaying bid and offer quotations for the security at specified prices. Although there is a system outlined in rule 15g□3 for disclosure of bid and offer prices when an inside bid and inside offer are not available.

The foregoing disclosure of the inside bid and inside offer must be made on two occasions. The information must be provided to the customer orally or in writing prior to effecting any transaction with or for the customer and is required to be given or sent to the customer again, in writing, at or prior to the time that any written confirmation of the transaction is given or sent to the customer. Due to the fact that Alpine must make a record of the fact that the pre-transaction disclosure was made and keep that record for a period of at least three years, registered representatives will be required to note on the order ticket the inside bid quotation and inside offer quotation disclosed to the customer when the order was taken. The same information will be provided to the customer on the confirmation or in writing which accompanies the confirmation.

(3) Rule 15g□4 requires, in substance, that the broker□dealer disclose to the customer the aggregate amount of any compensation received by the broker□dealer in connection with the penny stock transaction. In this regard, if a broker is acting as an agent for a customer, it must disclose the amount of the total commission which will be received from the customer in connection with the transaction. If a dealer other than a market maker purchases the penny stock, as principa1, from another person to offset a contemporaneous sale to the customer, or after receiving a sell order from a customer, sells the penny stock, as principal to another person to offset a contemporaneous purchase from the customer, the difference between the price to the customer and the price of contemporaneous purchase or sale is the compensation which must be disclosed to the customer. Finally, if the dealer is a market maker in the security and is acting as principal for its own account, the compensation to the firm which must be disclosed is the difference between the price to the customer and the prevailing market price. For purposes of rule 15g□4 only, a market may be deemed to be "active and competitive" in determining the prevailing market price with respect to a transaction by a market maker if the aggregate number of transactions effected by such market maker in the penny stock in the five (5) business days preceding such transaction is less than 20% of the aggregate number of all transactions in the penny stock reported on the FINRA's Bulletin Board during such five (5) day period. Here again, the disclosure of the compensation to be received by the broker□dealer must be made on two occasions: first, it must be made to the customer orally or in writing prior to effecting any transaction with or for the customer for the purchase or sale of the penny stock and secondly, it shall be given or sent to the customer in writing at or prior to the time that any written confirmation of the transaction is given or sent to the customer. As is the case with disclosure of bid and offer quotations, Alpine must make a record of the fact that it made the required disclosure before the transaction was effected. Therefore, the registered representative will also record the amount of compensation to be received by the firm which he or she disclosed to the customer on the order ticket when the customer places the order to buy or sell.

ALPINE_LIT168093

(4) Rule 15g☐5 requires, in substance, that the aggregate amount of cash compensation that any associated person of the broker or dealer who is a natural person and has communicated with a customer concerning the transaction at or prior to receipt of the customers transaction order (other than any person whose function is solely clerical or ministerial) has received or will receive from any source in connection with a transaction and that is determined at or prior to the time of the transaction including separate disclosure, if applicable, of the source and amount of such compensation that is not paid by the broker or dealer. Where a portion of all of the cash or compensation that the associated person may receive in connection with the transaction may be determined and paid following the transaction based on aggregate sales volume levels or other contingencies, the disclosure shall state that fact and describe the basis upon which such compensation is to be determined.

The disclosure requirement in rule 15g☐5 is subject to the same requirements as the disclosure required in rules 15g☐3 and 15g☐4. In other words, disclosure must be made to the customer before the transaction is effected and again at or prior to the time that any written confirmation of the transaction is given to the customer. Again, because Alpine must make a record of the fact that the disclosure was made before the transaction was effected, the registered representative will be required to set forth on the order ticket the amount of compensation to be received by associated persons which he or she disclosed to the customer when the order was taken.

(5) Rule 15g☐6 requires, in substance, that monthly account statements be sent to customers to whom Alpine sold penny stocks. Although there is an exemption from the monthly account statement requirement, because that exemption is on a customer by customer basis, it is not practical to single out individual customers to whom Alpine may not need to send monthly account statements unless account statements are required to be sent to only a few customers of Alpine.

The monthly account statements are required to disclose to the customer, in substance, the identity and number of shares or units of each penny stock held for the customers account, the estimated market value of each penny stock to the extent that such can be determined in accordance with specific provisions of the rule; and, if not, a statement that there is "no estimated market value" with respect to the security. The account statement is also required to include a legend which is in essence a warning that the values set forth in the account statement for the penny stocks may not be reliable.

(6) Rule 15g☐9 is the old "cold call" rule. In substance, this rule requires that the broker☐dealer employ certain procedures whenever it sells a penny stock to a customer.

ALPINE_LIT168094

Prior to the transaction, the broker☐dealer must (1) approve the persons account for transactions in penny stocks in accordance with the procedures set forth below, and (2) must obtain from the person a written agreement to the transaction setting forth the identity and quantity of the penny stock to be purchased. In order to approve the persons account for transactions in penny stocks, the broker☐dealer must obtain information from the person concerning the person's financial situation, investment experience and investment objectives and must reasonably determine, based on said information and any other information known by the broker☐dealer, that transactions in penny stocks are suitable for the person and that the person has sufficient knowledge and experience in financial matters that he or she reasonably may be expected to be capable of evaluating the risks of transactions in penny stocks. It is unlawful for the broker☐dealer to effect a transaction in a penny stock subject to the provisions of rule 15g☐9 unless the broker or dealer has received, prior to the transaction, a written agreement to the transaction from the person; stating in highlighted format immediately preceding the customer's signature line that the broker or dealer is required by this section to provide the person with a written statement and that the person should not sign and return the written statement to the broker or dealer if it does not accurately reflect the person's financial situation, investment experience, and investment objectives. Finally, the broker☐dealer must obtain from the person a manually signed and dated copy of the foregoing written statement.

Alpine has developed specific forms for obtaining a written agreement to any penny stock transaction setting forth the identity and quantity of the penny stock to be purchased and for making the suitability determination. Alpine has also developed a suitability determination form. The suitability determination form contains the written statements which are required to be delivered to the person whose suitability for penny stock transactions is being determined and is used in duplicate form in order to obtain the required manual signature of the prospective customer.

There is one exemption from the coverage of this rule that applies only to rule 15g☐9. This is the exemption for transactions in which the purchaser is an established customer of the broker or dealer. In this regard, the term "established customer" means any person for whom the broker or dealer, or a clearing broker on behalf of such broker or dealer, carries an account, and who in such account has (1) effected a securities transaction, or made a deposit of funds or securities, more than one year previously; or (2) made three purchases of penny stocks that occurred on separate days and involved different issuers.

**Summary**

**Due to the fact that the penny stock disclosure rules and the "cold call" rule were promulgated by the Commission on separate occasions, people in the securities industry have a tendency to apply the "established customer" exemption from the "cold call" rule to the penny stock disclosure rules as well. This is a grievous mistake inasmuch as there are no exemptions from**

ALPINE_LIT168095

**the penny stock disclosure rules for transactions with "established customers". Therefore, if Alpine goes through the process of qualifying customers as "established customers" for purposes of rule 15g☐9, it must still comply with the penny stock disclosure rules (rules 15g☐1 through 15g☐7) in connection with the transactions in penny stocks affected with those "established customers".**

## 11.19 Concentrations

### 11.19.1 Introduction

Alpine has established procedures to detect, monitor and evaluate the risks of potential accumulation of large positions in accounts.

The process for determining whether or not a stock position questionnaire is required for an Alpine client's stock position received into Alpine is subjective and varies. The stock position questionnaire is another tool Alpine uses to better know its customers. Some of the items that are reviewed and analyzed to determine whether or not a stock position questionnaire is required may include the following:

· Number of shares received

· Number of shares outstanding in the Company

· Percentage (%) the stock position represents of the Total Outstanding shares

· Dollar Value of the stock position

· What exchange or market the company trades on

· First time or reoccurring receipt of the same company stock

### 11.19.2 Review Of Firm-Wide Positions

On a quarterly basis, the Chief Compliance Officer will review firm-wide concentrated positions. The Chief Compliance Officer will establish guidelines for the size of positions requiring further monitoring. Items reviewed may include:

- Price and trading characteristics of the security
- Blue sky status of the concentrated position
- Size of the position
- Consideration of possible restrictions on future purchases

ALPINE_LIT168096

# 12 ORDERS

This chapter provides policies and guidelines for the entry and handling of customer orders. References to "order records" in this chapter includes electronic order tickets and manual order records, where appropriate.

## 12.1 Acceptance And Prompt Entry Of Orders

Orders should be accepted only from the beneficial owner of an account or their authorized agent. Authorized agents would include anyone holding third-party power to act on the customer's behalf such as a trustee, court-appointed guardian, authorized investment adviser, *etc.* Orders accepted from an unauthorized third party may result in rescission of the transaction and assigning the loss to the RR. For example, orders should not be accepted from a husband, on behalf of his wife's account, unless the wife has signed a trading authorization giving her husband authority to act on her behalf.

If an employee receives a telephone order from someone they do not recognize or know to be the owner of the account or person authorized to act on behalf of the account, identity should be requested before accepting the order. Identity verification information would include:

- account number; and
- social security number; or
- other identifying information on record.

RRs are obligated to transmit customer orders to the appropriate order execution desk or order facility promptly after receipt. Orders cannot be held for future entry; a limit order should be entered if the customer does not want to effect the transaction at the current market price.

## 12.2 Orders Requiring Approval

| Responsibility | • Head Trader |
|---|---|
| Resources | • Order records<br>• Daily Transaction Report<br>• Order Entry System |
| Frequency | • Daily |
| Action | • Instruct wire operator or other order entry person of orders requiring approval<br>• Review and approve or disapprove orders<br>• Remind RRs and order entry person of requirement for order approval when exceptions are noted<br>• If problem persists, take additional corrective action |
| Record | • Initials on Daily Transaction Report<br>• Notes of action taken on Daily Transaction Report, if appropriate |
| | |

ALPINE_LIT168097

Certain orders require approval because of rule requirements or Alpine policy. This section summarizes the orders requiring approval, when approval is required.

**ORDERS REQUIRING APPROVAL**

| Type of Order | When Approval Required | Designated Supervisor |
|---|---|---|
| Buy or sell order for 100,000 or more shares of penny stock | Time of entry | Head Trader |
| Solicited Buy of non-NASDAQ OTC security priced less than $5.00/share for new account | Prior to entry | Branch Manager |
| Discretionary | Not Allowed | NA |

## 12.3 Solicited And Unsolicited Orders

### 12.3.1 Definition Of Solicited Order

When a transaction is recommended to a customer and the customer enters an order as a result of that recommendation, the resulting order is considered to be solicited. Other actions that may result in an order being deemed solicited include the mailing of a research report or other written communication for the purpose of encouraging the customer to act on the information provided or sending a prospectus on a new issue.

### 12.3.2 Solicited Orders Should Be Indicated

Customer orders that are solicited should be so marked on the order ticket for the transaction.

### 12.3.3 Prohibited Solicitations

| | |
|---|---|
| **Responsibility** | • Registered Representative Supervisor |
| **Resources** | • Order records<br>• Daily Transaction Report |
| **Frequency** | • Daily |
| **Action** | • If prohibited solicitations are identified, take corrective action:<br>  ○ Solicitations contrary to Alpine's Restricted List may require cancellation; contact Compliance for guidance<br>  ○ Other exceptions may require different actions including cancellation of the transactions, removal of commissions, reminder to RRs, *etc.* |
| **Record** | • Initials on Daily Transaction Report |

ALPINE_LIT168098

| | |
|---|---|
| | • Records of cancelled trades maintained with daily orders<br>• Other records as appropriate (reminder memo to RR, notes to Branch Manager Log, *etc.*) |

RRs may NOT solicit transactions listed below:

- Securities included on the Firm's Restricted List
- When securities are being sold under rule 144, purchasers may not be solicited

## 12.4 Suitability Of Recommendations

[FINRA Rule 2111; FINRA Regulatory Notice 12-25 and 12-55; FINRA Suitability web page:
http://www.finra.org/industry/issues/suitability/; SIFMA Institutional Suitability Certificate:
http://www.sifma.org/services/standard-forms-and-documentation/cross-product/]

| Responsibility | • Registered Representative Supervisor |
|---|---|
| Resources | • New account records<br>• Order records<br>• Daily Transaction Report<br>• Available reports<br>• Customer monthly transaction records |
| Frequency | • Daily - review transactions<br>• Monthly - review of accounts<br>• When required - review/approve new accounts<br>• Periodically - training for RRs |
| Action | • Review customer orders for suitability which includes but is not limited to those factors listed below and other information known about the customer:<br>   o Customer new account information<br>   o Other securities held in the customer's account<br>   o Other information regarding the account, such as whether the account is managed by an investment adviser or uses other advisers or consultants in making investment decisions<br>   o Transactional information from daily transaction reports and monthly transaction records<br>   o Information obtained from the RR<br>   o Information obtained by contacting the customer<br>• Refer to new account records when necessary to identify investment objectives and other customer information<br>• Review suitability documentation recorded by the RR and pertaining to a recommended investment or strategy<br>• Confer with RR regarding suitability questions<br>• Confer with Compliance when necessary<br>• Contact customer when necessary to confirm customer's understanding of and agreement with transactions<br>• Modify or restrict future transactions, as appropriate<br>• Train RRs regarding suitability obligations |
| Record | • Initials on order records and Dailly Transaction Report |

ALPINE_LIT168099

| | • Suitability documentation on order records or in RR records<br>• Training including who attended, when it occurred, and subjects included |
|---|---|

## 12.4.1 General Requirements

RRs must have a reasonable basis for believing that a recommended transaction or investment strategy involving a security or securities is suitable for the customer. Recommendations should be based on information obtained through reasonable diligence to ascertain the customer's investment profile which is recorded in the account records, generally at the time the account is opened and updated when necessary. The customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose in connection with the recommendation.


The designated supervisor is responsible for reviewing customer transactions for suitability, where appropriate. There are a number of considerations that may assist the designated supervisor when reviewing the suitability of recommendations or determining suitability requirements. One or more of the following may be appropriate:


- Information included on customer new account forms
- Other securities held in the customer's account
- The RR's record of the customer's transactions
- Other information regarding the account such as whether the account is managed by an investment adviser or uses other advisers or consultants in making investment decisions
- Transaction information from daily transaction reports and monthly statements
- Information obtained from the RR
- Information obtained by contacting the customer

### 12.4.1.1 Investment Strategy

[FINRA Rule 2111.03]

"Investment strategy" is defined in FINRA rules to include, among other things, an explicit recommendation to hold a security or securities. However, the following communications are excluded as long as they do not include (standing alone or in combination with other communications) a recommendation of a particular security or securities:


a. General financial and investment information, including (i) basic investment concepts, such as risk and return, diversification, dollar cost averaging, compounded return, and tax deferred investment, (ii) historic differences in the return of asset classes (*e.g.,* equities, bonds, or cash) based on standard market indices, (iii) effects of inflation, (iv) estimates of future retirement income needs, and (v) assessment of a customer's investment profile;

b. Descriptive information about an employer-sponsored retirement or benefit plan, participation in the plan, the benefits of plan participation, and the investment options available under the plan;

c. Asset allocation models that are (i) based on generally accepted investment theory, (ii) accompanied by disclosures of all material facts and assumptions that may affect a reasonable investor's assessment of the asset allocation model or any report generated by such model, and (iii) in compliance with FINRA Rule 2214 (Requirements for the Use of Investment Analysis Tools) if the asset allocation model is an "investment analysis tool" covered by FINRA Rule 2214; and

ALPINE_LIT168100

d.   Interactive investment materials that incorporate the above.

Alpine registered representatives should maintain detailed notes to support rationale for investment strategy, if unclear. Compliance may audit to policy as part of the branch examinations. We may also request this information periodically outside of the branch examination.

## 12.4.1.2 Components Of Suitability Obligations

[FINRA Rule 2111.05]

As excerpted from the suitability rule, there are three main obligations when making a recommendation: reasonable-basis suitability, customer-specific suitability, and quantitative suitability.

a.   The reasonable-basis obligation requires a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the Firm's or RR's familiarity with the security or investment strategy. Reasonable diligence must provide an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.

b.   The customer-specific obligation requires a reasonable basis to believe that the recommendation is suitable for a particular customer based on that customer's investment profile which includes the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose.

c.   Quantitative suitability refers to avoiding excessive activity and requires a firm or RR who has actual or de facto control over a customer account to have a reasonable basis for believing that a series of recommended transactions, even if suitable when viewed in isolation, are not excessive and unsuitable for the customer when taken together in light of the customer's investment profile. No single test defines excessive activity, but factors such as the turnover rate, the cost-equity ratio, and the use of in-and-out trading in a customer's account may provide a basis for a finding a violation of the quantitative suitability obligation.

Another approach to suitability is portfolio-based that considers the entirety of an investor's investments (or at least those known to the RR). Where a customer has multiple accounts with the Firm and those accounts have inconsistent investment objectives, it is necessary to confirm the customer's intent to use different investment profiles or factors for the different accounts. Notation should be made to the customer's account record and on the order record or the recommendation.

When making customer recommendations, RR's must

- Use reasonable basis to believe recommendations are suitable based on understanding of the product, its risks and rewards and investment strategy used;
- Ensure customer specific recommendations are in the customer's best interest and appear suitable based on information cotnained in the customer's current investment profile;
- Have a reasonable basis to believe a series of recommendations are not excessive and unsuitable; and
- Have a reasonable basis to beleive the customer has the financial ability to meet recommended investment strategy commitment.

ALPINE_LIT168101

### 12.4.1.3 Customer Financial Ability

[FINRA Rule 2111.06]

Rule 2111 prohibits recommending a transaction or investment strategy involving a security or securities or the continuing purchase of a security or securities or use of an investment strategy involving a security or securities unless the member or associated person has a reasonable basis to believe that the customer has the financial ability to meet such a commitment.

### 12.4.1.4 Specific vs. General Recommendations

Suitability obligations apply to specific recommendations as opposed to general investment advice (*i.e.*, a recommendation generally to invest in fixed income securities vs. recommending a specific bond). However, recommending a specific strategy (such as use of a bond ladder, day trading, margin, *etc.*) would be subject to suitability obligations. The narrower the scope of the recommendation, the more likely it is subject to suitability obligations.

### 12.4.1.5 Allocation Models And Educational Materials

To avoid suitability obligations, allocation models or educational materials cannot include recommendations of particular securities such as those comprising the asset allocation model. An explicit recommendation to "hold" specific securities in an asset allocation model constitutes a recommendation. FINRA has indicated that as an allocation recommendation becomes narrower and more specific, suitability obligations may apply.

### 12.4.1.6 Hold Recommendations

Suitability obligations apply to recommendations to hold a security or securities or to continue to use an investment strategy, even if the RR did not recommend the original purchase. RRs should disclose and document (on the order record or the RR's records) that the hold recommendation is based on relevant factors known at the time of the recommendation only, and that continued monitoring or recommendations will not occur (if that is the case). Some hold recommendations should be documented including those for shorter-term investments; those that have a periodic reset or similar mechanism that could alter the investment's character over time; those that are particularly vulnerable to market conditions; or those that are otherwise potentially risky when the recommendation is made. For example, risky investments may include leveraged ETFs, mortgage REITs, an issuer facing significant financial or other material risks, an over-concentrated position, and a security inconsistent with the customer's investment profile. These hold recommendations should be documented in the RR's records. Compliance may audit to policy as part of the branch examinations. We may also request this information periodically outside of the branch examination.

### 12.4.1.7 Complex Products

The suitability of recommendations of complex investments should be documented on the order record or in the RR's records. FINRA provided examples of complex products to include: asset-backed securities secured by a pool of collateral; unlisted REITs; investments with an embedded derivative component; products with contingencies in gains or losses; structured notes with "worst of" features; and investments linked to the performance of markets that may not be understood by investors.

Documentation provides support for the RR and [The Firm] in the event of a future question about suitability, either from a regulator or in a civil (court or arbitration) context.

## 12.4.2 Institutional Accounts

[FINRA Rule 2111(b) and 2111.07; SIFMA Institutional Suitability Certificate: http://www.sifma.org/services/standard-forms-and-documentation/cross-product/]

There is an exemption from suitability obligations for certain institutional accounts. Factors to consider when determining the scope of Alpine's suitability obligation when making recommendations to

ALPINE_LIT168102

institutional customers include: (1) the customer's capability to evaluate investment risk independently, both in general and with regard to particular transactions and investment strategies involving a security or securities, and (2) the institutional customer's affirmation indicating that it is exercising independent judgment in evaluating the recommendations. An institutional customer may indicate that it is exercising independent judgment on a trade-by-trade basis, on an asset-class-by-asset-class basis, or in terms of all potential transactions for its account. Institutional accounts will be requested to provide the Institutional Suitability Certificate to comply with the exemption.

Where an institutional customer has delegated decision making authority to an agent, such as an investment adviser or a bank trust department, these factors are applied to the agent.

Where an RR has reason to believe an institutional investor is not capable of understanding an investment or making an independent decision, the RR is obligated to make a specific suitability determination and should note this action on order records, in the RR's records, or in the account's records.

## 12.4.3 Recommendations Of OTC Equity Securities

[FINRA Rule 2114]

| | |
|---|---|
| **Responsibility** | • Registered Representative Supervisor |
| **Resources** | • Daily Transaction Report<br>• OTC Equity Securities Suitability Forms<br>• Current financial statements (balance sheet, profit and loss statement, publicly available financial statements and reports and information contained in an SEC registration statement or SEC Regulation A filing<br>• Current material information about the issuer |
| **Frequency** | • Daily - review transactions for potential solicitations in low-priced securities<br>• As required - review Forms<br>• As required – review current financial statements and current material information about the issuer |
| **Action** | • Review daily transactions to identify solicited transactions in low-priced securities<br>• For identified transactions, determine whether a Form was previously submitted and approved<br>For identified transactions, review current financial statements and current material information about the issuer<br>• For non-approved transactions, consult with Compliance regarding corrective action which may include cancellation of transactions<br>• For submitted Forms, review financial statements, determining if required information is included with the Form, then approve or disapprove, and notify the RR |

ALPINE_LIT168103

| | |
|---|---|
| **Record** | • Records of daily reviews are included on reviews of Daily Transaction<br>• Reports including the reviewer's initials and date of review and any action taken<br>• Document information reviewed, the date of review and the name of the person performing the review (if a designated principal)<br>• For reviews involving delinquent filers, the review must include an inquiry into the circumstances concerning the failure to make current filings and a written determination that the recommendation is appropriate under the circumstances. |

In cases involving a recommendation of an OTC equity security, FINRA Rule 2114 requires that associated persons review the issuers current financial statement and material business information before recommending a low-priced, over-the-counter (OTC) equity security. Brokers should retain copies of the information relied upon to make the recommendation in the client file. In addition, recommendations in OTC equity securities that (1) are not listed on a national securities exchange (including NASDAQ) or are listed on a regional securities exchange and (2) do not qualify for dissemination of transaction reports via the Consolidated Tape will require completion of Alpine's OTC Equity Securities Suitability Form **prior to** making any recommendation. Securities with a bid of at least $5 and published in a quotation medium are NOT included in this requirement.


The designated principal's reviews of prospective OTC equity security recommendations must cover and document the following items:


- The issuer's current financial statement, including these documents:
    - For non foreign private issuers, balance sheets (as of a date less than 15 months before the recommendation date)
    - For non foreign private issuers, profit and loss statements (for the 12 months preceding the balance sheet date)
    - For non foreign private issuers, publicly available financial statements and reports (filed during the 12 months preceding and up to the recommendation date)
    - For non foreign private issuers, publicly available financial information contained in SEC registration statements or SEC Regulation A filings filed during the 12 months preceding the recommendation date.
    - For foreign issuers, balance sheets (as of a date less than 18 months before the recommendation date)
    - For foreign issuers, profit and loss statements (for the 12 months preceding the balance sheet date)
    - For foreign issuers, if the balance sheet is greater than 9 months preceding the recommendation date, additional statements of profit and loss for the period from the date of the balance sheet to a date less than 9 months before the date of hte recommendation
    - For foreign issuers, publicly available financial statements and reports (filed during the 12 months preceding and up to the recommendation date)
- Current material business information, including information "ascertainable through the reasonable exercise of professional diligence and that a reasonable person would take into account in reaching an investment decision".


OTC equity securities as defined in this section often trade at low prices and may represent a higher risk to the purchaser depending on where and how the security trades. For example, a thinly-traded OTC stock may be subject to volatile price changes and may be difficult to liquidate. There is added risk when the security is purchased on margin, since some of these securities may be difficult to liquidate.

**ALPINE_LIT168104**

**Additional Review Requirement for Delinquent Filers**

If an issuer has not made current filings required by the issuer's principal financial or securities regulatory authority in its home jurisdiction, the principal review must include an inquiry into the circumstances concerning the failure to make current filings, and a written determination, based on all the facts and circumstances, that the recommendation is appropriate under the circumstances. This determination must be made in writing and maintained by the registered principal.

### 12.4.3.1 OTC Equity Securities Suitability Determination

RRs have a higher obligation to determine suitability when recommending the purchase or sale of OTC equity securities. This includes obtaining current financial statements and material business information and completing the OTC Equity Securities Suitability Form described in the next paragraph. For a complete list of required information, please refer to the section titled "Recommendations of OTC Equity Securities".

**Prior to** recommending a security subject to this policy, the RR is also required to complete a copy of the Suitability Form and submit the form for review and approval by the RR's designated supervisor. Upon approval, the RR may recommend the security to customers. Failure to complete the Form and provide the other requested information (enumerated in the section titled "Recommendations of OTC Equity Securities") and obtain the required approval may result in cancellation of the transactions and assessment of resulting losses to the RR.

### 12.4.3.2 Exemptions

The requirement to submit the form and obtain prior approval do not apply to the following recommendations:

- long sales
- transactions meeting the requirements of Rule 504 of Regulation D
- transactions with an issuer not involving a public offering under Section 4(2) of the Securities Act
- to institutional buyers as defined in FINRA Rule 3110(c)(4)
- to a QIB (qualified institutional buyer) under Rule 144A
- to a "qualified purchaser" under Section 2(a)(51) of the Investment Company Act.

In addition, recommendations of the securities of the following issuers are exempted:

- issuers with at least $2 million in net tangible assets and $5 million in shareholder equity
- bank or insurance company subject to regulation by state or federal bank or insurance authority
- issuers with average daily volume of $100,000 during each of the preceding 6 calendar months and any convertible security based on an underlying security that meets this requirement
- securities that have a bid of at least $4 per share as published in a quotation medium

## 12.4.4 Proprietary Products

| Responsibility | • Registered Representative Supervisor |
|---|---|
| Resources | • Proprietary products |

ALPINE_LIT168105

| | |
|---|---|
| **Frequency** | • As required |
| **Action** | • Subject new proprietary products to the new product review procedure<br>• Review transactions in proprietary products for suitability and take corrective action when necessary<br>• Provide training to RRs |
| **Record** | • Records of training provided to RRs<br>• Daily transaction records including date of review and initials of reviewer |

Products developed by Alpine, or an affiliate of Alpine, may be offered for sale to customers. New proprietary products are subject to the new product review described in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*.

RRs are obligated to:

• determine that a proprietary product is suitable for the customer, including consideration of comparable non-proprietary products and related costs to the customer, and
• make recommendations suitable for the customer regardless of the compensation to the RR.

## 12.5 Fair Prices

[NASD Rule 2400; FINRA Regulatory Notice 08-36]

Alpine is required to make a reasonable effort to obtain a price for the customer that is fair and reasonable in relation to prevailing market conditions.

### 12.5.1 Commissions

The Head Trader is responsible for reviewing the reasonableness of commissions on agency transactions. Relevant factors in determining the reasonableness of commissions may include:

• the expense of executing and filling the customer's order
• the value of the services rendered by Alpine
• the amount of any other compensation received by Alpine in connection with the transaction
• factors considered in principal transactions
• any other relevant factors at the time of execution

### 12.5.2 Mark-Ups And Mark-Downs

[NASD IM 2440-1 and 2440-2]

The Head Trader is responsible for reviewing the reasonableness of mark-ups and mark-downs on customer trades. In determining fair and equitable mark-ups or mark-downs, relevant factors may include:

• the best judgment of Alpine as to the fair market value of the securities at the time of the transaction and of any securities exchanged or traded in connection with the transaction

ALPINE_LIT168106

- the expense involved in effecting the transaction
- total dollar amount of the transaction
- availability of the security
- the price or yield of the security
- the maturity of the security
- resulting yield to the customer, as compared to the yield on other securities of comparable quality, maturity, coupon rate, and block size then available in the market
- risk to Alpine in handling the transaction
- the nature of Alpine's business
- any other relevant facts at time of execution

## 12.5.3 Prohibition Against Trading Ahead Of Customer Orders

[SEC Regulation NMS Rule 600(b)(30)(ii); FINRA Rule 5320]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | These reports are intended to assist the Head Trader or designee in the review of customer and proprietary transactions to identify potential trading ahead.<br>• Trades for Executed Orders<br>• Family-related accounts<br>• Employee related accounts |
| **Frequency** | • Daily reviews |
| **Action** | • Review for order protection |
| **Record** | • Record date reviewed (if applicable), reviewer's initials, action taken, if appropriate, on the reports enumerated above<br>• OTC Trading Manager Checklist (evidencing the date reviewed, reviewer's initials and action taken, if appropriate) - completed monthly |

**Applicable Rules:** Rules 2010, IM 2110-2, EDGA Rule 12.6, EDGX Rule 12.6, Nasdaq Rules 2110, IM-2110-2, Nasdaq OMX BX Rules 2110, IM-2110-2; NYSE-Arca Rule 6.16, Rule 2111

A FINRA member firm that accepts and holds an order in an equity security from its own customer or the customer of another broker-dealer without immediately executing the order is prohibited from trading that security on the same side of the market for its own account at a price that would satisfy the customer order, unless it immediately executes the customer order up to the size and at the same price or better price at which it traded for its own account. Pending orders are executed on a first-in/first-out basis (FIFO). "Customer order" in this section applies to orders for [The Firm]'s customers as well as customers of other broker-dealers.

The rule restrictions apply to orders handled during normal market hours and outside normal market hours (if [The Firm] and customer agree to processing the order outside normal market hours).

### 12.5.3.1 Exceptions
There are certain exceptions to the prohibition against trading ahead of customer orders.

ALPINE_LIT168107

**Large orders and institutional accounts.** Regarding orders for institutional accounts [as defined in FINRA Rule 4512(c)] or orders of 10,000 shares or more (unless the orders are less than $100,000 in value), [The Firm] may trade a security on the same side of the market for its own account at a price that would satisfy the customer order providing [The Firm] has provided clear and comprehensive written disclosure to the customer when the account is opened and annually thereafter that:

- Discloses that [The Firm] may trade proprietarily at prices that would satisfy the customer order, and
- Provides the customer with a meaningful opportunity to opt in to the Rule 5320 protections with respect to all or any portion of the order. If the customer doesn't opt in to the Rule 5320 protections, [The Firm] will presume the customer has consented to the exception. In lieu of written disclosure [The Firm] may provide oral disclosure and obtain the customer's consent on an order-by-order basis, which will be documented on the order for which consent is obtained.

Instead of written disclosure at account opening and annually after, oral disclosure may be made and consent obtained on an order-by-order basis and recorded on the order.

**No-knowledge exception.** Regarding NMS stocks and where [The Firm] has effective internal controls and information barriers that prevent one trading unit from obtaining knowledge of customer orders held by a separate trading unit, the other trading units may, in a proprietary capacity, continue to trade at prices that would satisfy the customer orders held by the separate trading unit. A description of how customer orders are handled and when [The Firm]'s proprietary account may trade at prices that would satisfy the customer's order will be provided at account opening and annually thereafter. For OTC equity securities where [The Firm] has similar controls to prevent a non-market-making trading unit from obtaining knowledge of customer orders held by a separate trading unit, the non-market-making trading unit may trade in a proprietary capacity at prices that would satisfy the customer's order.

**Riskless principal exception.** Rule 5320 obligations do not apply to [The Firm]'s proprietary trades if the trades are for the purpose of facilitating the execution, on a riskless principal basis, of an order from a customer ("facilitated order") providing that [The Firm]:

- Identifies the order as riskless principal when reporting to FINRA (or other SRO); and
- Has written policies and procedures for compliance with FINRA rules regarding riskless principal transactions. Refer to the section *Riskless Principal Transactions* in this chapter.

**ISO exception.** The restriction against proprietary trades ahead of customer orders does not apply to trading for [The Firm]'s account that is the result of an ISO (Intermarket Sweep Order) routed in compliance with Regulation NMS where the customer order is received after [The Firm] routed the ISO.

**Odd lot and bona fide error transaction exceptions.** The restrictions do not apply to a proprietary trade that is (1) to offset a customer order that is in an amount less than a normal unit of trading; or (2) to correct a bona fide error.

## 12.5.4 Best Execution

[SEC Regulation NMS; FINRA Rule 5310]

ALPINE_LIT168108

[The Firm] has an obligation to provide best execution for its customers' orders, whether executed internally or routed to other broker-dealers. "Best execution" refers to using reasonable diligence to determine the best market to buy or sell a security and obtaining a price as favorable as possible under prevailing market conditions. [The Firm]'s obligation to provide best execution also extends to handling and executing orders for customers of other broker-dealers routed to [The Firm] (but not orders that simply execute the order against [The Firm]'s quote).

Factors for using "reasonable diligence" include:

- the character of the market for the security, *e.g.*, price, volatility, relative liquidity, and pressure on available communications;
- the size and type of transaction;
- the number of markets checked;
- accessibility of the quotation; and
- the terms and conditions of the order.

The term "markets" is broadly defined, including market centers that are trading a particular security.

### 12.5.4.1 Regular And Rigorous Review Of Execution Quality

[FINRA Rule 5310.09]

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • [The Firm]'s Rule 605 Market Center Reports<br>• Order records/reports for customer and proprietary accounts<br>• Clearing firm or other agent's report of statistics, review rationale, findings (if applicable) |
| **Frequency** | • Quarterly |
| **Action** | • Conduct regular and rigorous reviews of internal executions (if applicable) and order routing to evaluate compliance with best execution responsibilities including:<br>  o Review of data regarding prices and executions<br>  o Review pre-open orders including single or midpoint pricing as factors to consider<br>  o Review of aggregate or order-by-order routing of orders to review quality of executions<br>  o Determine whether to adjust order routing to improve executions<br>  o Review riskless principal transactions; customer block-sized orders; orders with special pricing terms and conditions; other order types<br>• Where order flow is routed to a BD acting as agent for [The Firm] (clearing firm, other executing BD):<br>  o Obtain other BD's report of statistics, rationale of review, and findings<br>  o Review data to confirm agent is using reasonable diligence to provide best execution<br>  o Where deficiencies are noted, consult with agent and, if best execution is determined to be deficient, consider transferring order flow to another BD |

ALPINE_LIT168109

| | |
|---|---|
| **Record** | • Records of reviews of internal or routed customer orders, if applicable (including the date of review (if applicable), reviewer's initials or signature and action taken, if appropriate)<br>• Records of reviews of agent's best execution reviews, action taken, if applicable (including the date of review, if applicable, reviewer's initials and action taken, if appropriate) |

[The Firm] conducts regular reviews of its execution quality to determine whether [The Firm] is meeting its obligation for best execution of customer orders. This includes orders that are routed to other broker-dealers on an automated, non-discretionary basis as well as when [The Firm] internalizes order flow.

Where [The Firm] routes its order flow to another broker-dealer that has agreed to handle that order flow as agent for the customer (*e.g.,* a clearing firm or other executing broker-dealer), [The Firm] will rely on that broker-dealer's regular and rigorous review based on the statistical results and rationale of the review disclosed by the broker-dealer and reviewed by [The Firm].

### 12.5.5 Best Execution

Best Execution - Securities with Limited Quotation or Pricing Information

Applicable Rules: 5310 formerly NASD 2320(f), formerly Three Quote Rule

**<u>Background</u>**

This rule was formerly 2320(f) and is now 5310 which requires that member firms have written policies and procedures in place to address the steps the member will take to determine the best market for a security in the absence of multiple quotations or pricing information and to document how they compliance with those policies and procedures. Rule 5310 became effective on May 31, 2012.

**<u>Regulation:</u>**

In any transaction for or with a customer pertaining to the execution of an order involving any security, equity or debit, for which there is limited quotations or pricing information available, broker-dealers will be expected to address those steps the firm will take to determine the best market for a security in the absence of multiple quotes or pricing information and to document how we comply with those policies and procedures.

ALPINE_LIT168110

In those cases, where there are less than two electronically published quotes or in those cases where there is limited quotations or pricing information available, Alpine brokers will be expected to contact the Trading Department so that they can contact the appropriate broker-dealer including market makers and make a reasonable effort to seek the best bid, absent some written exception.

**Alpine's Policy**

It is the responsibility of each Alpine broker to contact the Trading Department whenever there are less than two electronically published quotes or where there are limited quotations or pricing information available. Alpine's Trading Department will contact the appropriate broker-dealer including market maker(s) as enumerated above.

Once the Alpine broker has contacted the Trading Department, he /she must enter the names of the broker-dealer including market makers and their quotes in the note section in the lower left hand corner of the electronic order ticket on Go-Trader.

**Alpine's Oversight**

The head trader or designee will review the NASDAQ Reg Recon (Regulation NMS report) for compliance with regulation. This report will be reviewed on a daily basis. Evidence of review will occur via signature or initial and the date reviewed, if applicable. If action is taken, the results of the action taken will be documented on the NASDAQ Reg Recon report.

## 12.6 Regulation NMS

Regulation NMS was adopted to strengthen the national market system for equity securities. It requires markets to interact in a way that permits orders to seek the best available market. Rule 611, the Order Protection Rule, is the primary rule that affects broker-dealers and requires broker-dealers to prevent "trade-throughs."

## 12.7 Orders In Volatile Stocks

[FINRA Notice to Members 99-11]

Some securities are characterized by volatility of price and volume. This has, in particular, been a characteristic of some Internet stocks. The RR should know the potential affect of volatility on recommended stocks and discuss these risks when recommending such investments with customers unfamiliar with transactions in these types of securities. Following are some of the conditions potentially affecting volatile stocks:

- High volume in volatile stocks may result in delays in execution at the opening or during the trading day.

ALPINE_LIT168111

- Market orders may be executed at a price significantly different from the current quote. The benefits and risks of market vs. limit orders should be discussed.
- Orders for IPOs in the secondary market may be executed at prices significantly away from the current quote, and, because of "fast market" conditions, the current quote may not be up to date.
- Volatile stocks may be subject to higher commissions and/or collateral requirements.

## 12.8 Illiquid Investments

[FINRA Regulatory Notice 08-30]

Customers may contact an RR, on an unsolicited basis, to sell an illiquid investment, and may have a prospective buyer. To effect the transaction, the following is required:

- The RR must have or obtain the required new account information for both the buyer and the seller.
- Both the buyer and the seller must sign a letter confirming that the orders are unsolicited; that Alpine is not recommending the transactions or making a suitability determination; and Alpine cannot make a determination regarding the sufficiency or competitiveness of pricing of the transactions.
- The RR must have no concerns regarding the ability of both sides to settle the proposed transaction.

The RR may advise the seller of potential buy interest. The letter described above must be signed by both parties and include disclosure that Alpine will receive compensation for effecting the transactions.

If orders for illiquid securities are solicited, the RR is responsible for making a suitability determination in addition to obtaining the written acknowledgments.

## 12.9 Account Designation And Cancels/Rebills

[FINRA Rule 4515]

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 or CFO |
|---|---|
| Resources | • Cancel/Rebill form<br>• Cancel/Rebill Report<br>• FINRA Cancelled and As-Of Trades Report |
| Frequency | • Daily review of forms presented<br>• Monthly review of Report |
| Action | • Frequent cancellations and cancel/rebills may be an indicator of unauthorized trades. It is important that the Supervisor review Forms and Reports to identify patterns that require corrective action.<br>• Review and approve or disapprove cancels and rebills.<br>• For cancels from one account to another, particularly review reason for cancel and rebill prior to approval.<br>• Review Cancel/Rebill Report for patterns by customer and/or by RR.<br>• Where patterns appear, confer with RR.<br>• Where patterns continue to appear, contact customers whose orders were cancelled to confirm orders were originally authorized. |

ALPINE_LIT168112

| | |
|---|---|
| | • If customers advise transactions are unauthorized, contact Compliance.<br>• Compliance: Review FINRA report and follow up regarding patterns of cancelled or as-of trades (contact RR and RR's supervisor, customer contact or other appropriate action) |
| **Record** | • Initials on Cancel/Rebill Form<br>• Initials and date on Cancel/Rebill Report<br>• FINRA Report including notes of action taken retained by Compliance<br>• For patterns of cancellations, notes of review and action taken on reports reviewed or included on supervisor's log, daytimer, or other record, if appropriate. |

Each order, prior to execution, must include the account name or designation on the order.

Whenever an order is cancelled and rebilled to another account (including changes between related or same-owner accounts), the cancel and rebill form must be completed and approved by the designated supervisor and retained with the order record. The supervisor must document the essential facts relied upon to approve the change.

# 12.10 Trading Halts

[FINRA Rule 5260, 6120, 6121 and 6440; NASDAQ Rule 3340, 4120 and 4121]

When trading halts occur, whether they are for specific securities or circuit breakers that close entire markets, orders are handled as follows:

- When trading is resumed on the same trading day, pending and new customer orders are forwarded to the appropriate market for execution upon resumption of trading, unless the customer instructs otherwise.
- When trading is closed for the duration of the trading day, pending and new customer orders are treated as follows:
  - Orders pending at the time of the halt and new orders received after the halt commences are treated as "Good Til Cancelled" and held for execution at the reopening of the next trading session (unless the customer instructs otherwise).
  - "At-the-Close" orders (including "Market-on-Close" orders) pending at the time trading is halted are treated as cancelled orders. No new orders relating to closing prices received during a trading halt are accepted or forwarded to a market.

If Alpine maintains a web page, a notice will be promptly posted stating that circuit breaker halts have closed the markets and explaining how pending or new orders will be handled.

# 12.11 Trade Reporting By Third Parties

[2007 Member Alert: Notice to All TRF, ADF and Other FINRA Facility Participants Regarding AGU and QSR Relationships]

| | |
|---|---|
| **Responsibility** | • Designated Supervisor as set forth in Chapter 1.1 or Head Trader or CFO |
| **Resources** | • Transaction data<br>• FINRA compliance report cards<br>• NSCC Contract Sheets |

ALPINE_LIT168113

|  | • Uncompared unsettled/settled exception reports |
|---|---|
| **Frequency** | • Monthly |
| **Action** | • Execute agreement(s) with third party ("give up agreement") in the form specified by the FINRA and/or a QSR agreement<br>• Review trade data and compliance reports to determine accuracy of third party reporting<br>• If errors are noted:<br>   o Confer with the third party regarding what corrective action will be taken to prevent future errors<br>   o If errors persist, consider changing third party reporting agents |
| **Record** | • Transaction data and reports reviewed (including date reviewed, who reviewed, action taken) |

When a third party is used for clearing, reporting or locking-in trades, whether under an Automated Give Up (AGU), Qualified Service Representative (QSR) or other arrangement, the third party's reporting will be periodically reviewed for compliance with requirements.

## 12.12 Trading Systems And Electronic Transmission Of Orders

[FINRA Notice to Members 04-66]

| **Responsibility** | • Head Trader |
|---|---|
| **Resources** | • Trade data<br>• Operating system procedures<br>• Order Entry system administration access/password controls |
| **Frequency** | • Authorizing access persons - as required<br>• Review of daily errors - as required |
| **Action** | • Provide passwords to persons authorized to access trading systems<br>• Provide training to those with authorized access<br>• Review and correct errors in accordance with Alpine's trade error procedures described in a section of this chapter |
| **Record** | • Errors are documented in accordance with trade error procedures |

This section describes supervisory procedures to prevent errors when entering orders through order-routing and execution systems ("trading systems").

- Only authorized persons are permitted to access trading systems. Access is password-protected.
- Order entry personnel will receive training regarding order entry procedures and proper operation of the system.
- Orders will be validated for accuracy and identification of duplicate or re-transmitted orders.

ALPINE_LIT168114

- Errors due to system failure, order entry errors, or other system-related errors will be corrected internally. The FINRA's "clearly erroneous transaction" procedures are not available to correct such errors.

## 12.13 Order Records

[SEC Securities Exchange Act of 1934 Rule 17a-3 and Rule 17a-4; FINRA Rule 5340 and 7440]

Certain information must be recorded for orders accepted by Alpine. Information to be recorded includes:

- Identification of the account
- Buy or sell
- If sell long, an indication that the seller will deliver the security
- Name of security
- Quantity
- Price (if a limit order)
- Day or GTC (if not a market order)
- Other terms of the order (fill or kill, stop limit, *etc.* )
- Identity of RR responsible for the account, if any
- Identity of other person(s) who entered or accepted the order
- Date and time order is received and entered

## 12.14 Conflicts Of Interest

### 12.14.1 Adverse Interest

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Order records<br>• Daily Transaction Report |
| **Frequency** | • Daily |
| **Action** | • Identify transactions where an RR is on the other side of the trade from the customer<br>• Ensure the customer's confirmation includes a trailer disclosing an employee was on the other side of the transaction, OR,<br>• Send the customer a disclosure letter |
| **Record** | • Customer confirmation, OR<br>• Copy of disclosure letter to customer which is maintained in the branch customer file |

When an RR is on the opposite side of a transaction from a customer (customer sells a security and the RR is the purchaser, or customer buys a security and the RR is the seller), the RR may be considered to have an "adverse interest" in the transaction. The branch manager or other designated supervisor should require a disclosure on the customer's confirmation or a letter to the customer disclosing that an employee was on the opposite side of the transaction.

ALPINE_LIT168115

### 12.14.2 Precedence Of Customer Orders

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Order records<br>• Daily Transaction Reports |
| **Frequency** | • Daily |
| **Action** | • Identify orders where the RR has received a better price for a transaction in the same security, on the same day, and on the same side of the market (buy or sell) as the RR's customer<br>• Adjust the customer's order to the better price, if appropriate |
| **Record** | • Order adjustments are included in records of the day's orders |

The customer's interest has precedence over any employee's personal interest. While there is no standard that applies in every case, in general, RRs will solicit customer orders before entering orders for personal accounts in the same security. When an RR receives a better price in a security the same day the RR's customer executes an order in the same security on the same side of the market (buy or sell), the customer will generally receive the better price unless there are circumstances that justify the RR's better price (time of order entry, inability to reach customer, *etc.*).

## 12.15 Review Of Customer Transactions

### 12.15.1 Review Of Daily Transactions

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Order records<br>• Daily Transaction Report<br>• Go-Trader compliance reports |
| **Frequency** | • Daily |
| **Action** | • Orders are reviewed for, but not limited to, the following information:<br>  o Completeness of order records<br>  o Suitability of transactions<br>  o Discretionary account orders<br>  o Orders requiring approval<br>  o Excessive commissions<br>  o Unauthorized transactions<br>  o Wash sales/prearranged trades<br>  o Prohibited orders<br>• For orders contrary to Alpine policy or rule requirements, take corrective action which may include:<br>  o Confer with the RR to clarify the transaction, if necessary<br>  o Cancel and rebill the transaction to reflect appropriate charges<br>  o Cancel the transaction to Alpine's error account<br>  o Confer with Compliance regarding additional education for the RR and/or disciplinary action |

ALPINE_LIT168116

| | |
|---|---|
| **Record** | • Initials on order records requiring approval<br>• Initials on day's order records |

## 12.15.2 Unauthorized Transactions

Reviews of transactions should include identification, where possible, of unauthorized transactions. Potential indicators of unauthorized transactions may include patterns of:

- Cancellations of transactions
- Cancels and rebills between accounts
- Sellouts for failure to pay for purchases
- Numerous extensions

The Head Trader is expected to take corrective action regarding potential unauthorized transactions. Corrective action may include, depending on the circumstances:

- Confer with the RR
- Contact customers directly to confirm authorization of transactions
- Cancellation of unauthorized transactions
- Confer with Compliance regarding any identified unauthorized transactions

## 12.15.3 Review Of Transactions For Excessive Commissions

[NASD IM 2440]

Alpine has an obligation to charge fair commissions or markups/markdowns on customer transactions. Charges should comply with Alpine's established commission schedule.

The Head Trader is responsible for reviewing daily reports of commission and markups/markdowns on customer transactions to determine compliance with Alpine guidelines. The following factors are considered when determining the fairness of charges:

- type of security
- availability of the security in the market
- price of the security
- amount of money involved in the transaction
- disclosure to the customer of the markup or markdown
- pattern of markups or markdowns
- nature of Alpine's business

In addition, the markup/markdown on "proceeds transactions" must conform to the FINRA's Mark-Up Policy which includes a 5% guideline. Proceeds transactions are transactions where the customer sells a security and uses the proceeds to buy another security at or about the same time. Fairness of the markup/markdown is determined by combining the charges for both transactions. For example, if a 2% markup is added to the buy order, no more than 3% could be charged as a markdown on the sell order.

ALPINE_LIT168117

### 12.15.4 Review Of Account Activity By Designated Supervisors

| Responsibility | • Head Trader |
|---|---|
| Resources | • Customer monthly statements<br>• Posting records<br>• New account forms |
| Frequency | • Semi-annually |
| Action | • Review customer transactions records for suitability of transactions<br>• Refer to new account forms when necessary to identify investment objectives and other customer information<br>• Confer with RR regarding suitability questions<br>• Confer with Compliance when necessary<br>• Contact customer when necessary to confirm customer's understanding of and agreement with transactions<br>• Modify or restrict future transactions, as appropriate |
| Record | • Initials on records reviewed<br>• Branch Manager's Log |

Designated Supervisors are expected to review customer account activity periodically. This may be accomplished by reviewing the monthly statements, posting records, and/or other cumulative transaction information of selected RRs on a rotating basis.

### 12.15.5 Review Of Account Activity By Compliance

Accounts will be selected for review on a periodic basis by Compliance. Criteria for selection and frequency of review will be established by Compliance.

## 12.16 Trade Errors

[SIFMA Policy Statement and Guidelines Regarding Error Trade Policies for Interdealer Brokers: http://www.sifma.org/services/stdforms/pdf/ERROR-TRADE-POLICY-FINAL.pdf]

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 |
|---|---|
| Resources | • Trade Error Form or other |
| Frequency | • Daily |
| Action | • Frequent errors by RRs may indicate poor work habits, insufficient manpower to properly enter orders, deficiencies in understanding proper order entry procedures, or unauthorized trading. It is the Branch Office Supervisor's responsibility to minimize trade errors in the branch; take immediate corrective action when an error is identified; and take follow up corrective action as necessary.<br>   ○ Instruct the wire operator or other order entry person regarding action to correct the error<br>   ○ Approve Trade Error Forms<br>   ○ Identify patterns of errors by individual RRs |

ALPINE_LIT168118

| | o  Where patterns are identified, confer with the RR regarding any order entry problems and the reasons for frequent errors<br>o  Take corrective action as appropriate |
|---|---|
| **Record** | • Initials on Trade Error Forms<br>• Notes regarding corrective action taken by the Branch Office Supervisor in the RR's file or on the supervisor's log, daytimer, or other record, as appropriate |

Trade errors are to be immediately reported by the Trading Supervisor to the Branch Office Supervisor for correction. RRs are not permitted to correct errors themselves.

Alpine may not cover losses for investors by treating transactions as errors when, in fact, they are not errors. Some customers may request such an accommodation in exchange for future business. Absorbing losses is a violation of SRO rules and is not permitted.

## 12.17 Sellouts

| **Responsibility** | • Head Trader |
|---|---|
| **Resources** | • Notices from Operations regarding sellouts<br>• Notification from CFO |
| **Frequency** | • As required |
| **Action** | • Sell out customer securities |
| **Record** | • Sellouts are included in the day's order records |

Customers who fail to pay for transactions will be subject to sellouts to close out the unpaid security position. RRs will be charged for any unpaid balance remaining after the sellout.

A pattern of sellouts may indicate problems with customers or potential unauthorized transactions. The CCO is responsible for directly contacting customers where there is a pattern of sellouts to determine the cause of the sellout and whether the customer authorized the transaction. If unauthorized transactions or other wrongdoing are identified, it is the CCO's responsibility to take corrective action including disciplinary action against the RR. Compliance should be contacted for guidance regarding corrective action.

## 12.18 Time Clock Synchronization

[FINRA Rule 7430; http://www.finra.org/Industry/Compliance/MarketTransparency/OATS/FAQ/P085544]

| **Responsibility** | • Head Trader or designee |
|---|---|
| **Resources** | • Clock Synchronization comparison |
| **Frequency** | • Daily |

ALPINE_LIT168119

| | |
|---|---|
| **Action** | • Take corrective action for failure to synchronize clocks which may include: repair or replacement of clocks (for mechanical failure); additional training of personnel; or other appropriate action in consultation with Compliance. |
| **Record** | • Clock Synchronization failures are recorded via initial or signature, date and any action items taken, if any |

Under FINRA rules, all time clocks (computer system or mechanical) used for recording date and time of orders must be synchronized to ensure the accuracy of recorded time. The following procedures are to be followed to synchronize time clocks used to record order entry and execution times:

- All clocks must reflect Eastern Time (Daylight or Standard, depending on time of year).
- Clocks that have not been checked according to these procedures must **not** be used for recording order information.
- All clocks will be synchronized with the National Institute of Standards and Technology (NIST) system clock **each business day:**
  - prior to the opening; and
  - at least once during the trading day (target time: 12:00 p.m. Eastern Time).
- Failure to conduct required synchronization may result in disciplinary action.

Alpine uses two vendors to ensure that the time-stamps placed on orders and reported to the industry entities are accurate.

Go-Trader obtains clock synchronization by utilizing the Network Time Protocol (NTP), whch is an Internet standard protocol that enables client computers, servers, routers and other network equipment to maintain system time synchronization to the U.S. Naval Observatory Master Clocks in Washington, D.C. and Colorado Springs. NTP runs as a client program on a computer. It sends periodic time requests to one or more servers, obtaining server time stamps and using them to adjust the client's clock. This occurs continuously throughout the day, usually in 30-60 second increments. Accuracy ranges in the 1-30 milliseconds, which is dependent on a number of contributing factors such as the Internet path between the client as server, network congestion, etc. Algorithms within the NTP client are used to obtain the most accurate time. We have multiple servers that run the NTP daemon and logic built-in to detect process failures. Go-Trader also maintains a secondary Amano clock that synchronizes to the Master Clocks via analog phone lines to verify accuracy.

ADP/SIS installed hardware that synchronizes their systems clocks with the GPS satellite system designed by FINRA for OATS reporting. Every five minutes, the NETTIME server queries the satellite system. NTP then synchronizes ADP/SIS systems clock to ensure that it remains in synch with the satellite system.

## 12.19 Blue Sky Of Securities

| **Responsibility** | • Head Trader |
|---|---|
| **Resources** | • Order records<br>• Daily Transaction Report |

ALPINE_LIT168120

| | |
|---|---|
| | • Notification by CFO |
| **Frequency** | • Daily |
| **Action** | • Review order records and Daily Transaction Report for patterns of solicited purchase orders in securities that are potentially not blue-skied including:<br>   o securities that are not potentially exempt<br>   o securities that are low-priced<br>• Compliance: if a violation occurs, determine if rescission is required and offer rescission; assess loss<br>• Consult Compliance regarding transactions in question |
| **Record** | • Initials on order records<br>• Initials on Daily Transaction Report<br>• Notes of questioned transactions on Daily Transaction Report and/or supervisor's log, daytimer, or other record<br>• Records of rescission offered |

### 12.19.1 General Requirements

"Blue sky" refers to state laws that govern the sale of securities and those who sell securities to residents of individual states. Registration of agents is discussed in the chapter *EMPLOYMENT, REGISTRATION AND LICENSING*. This section discusses blue sky requirements of securities sold by Alpine.

Securities must be blue skied in the state of residence of the customer to whom the security is sold. If a security that is not blue skied is sold to a customer in violation of state blue sky laws, the customer likely has a right of "rescission," which means the customer may cancel the transaction and receive a refund of the purchase price. Losses resulting from rescissions will be charged to the RR who sold the security in violation of blue sky requirements. States may also take disciplinary action against firms and individuals for violations of state law.

There are two ways a security may be sold to a state resident under blue sky laws. First, the issuer may register with the state. Second, an exemption may apply. Exemptions generally apply to:

- Securities issued by the federal government and municipalities
- Exchange-listed securities
- NASDAQ Capital Market listed securities
- Securities sold to certain institutions

Because blue sky laws vary from state to state, Compliance should be consulted to determine specific requirements.

## 12.20 Short Sales

[SEC Regulation SHO; SEC Division of Market Regulation Responses to Frequently Asked Questions Concerning Regulation SHO: http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm]

Alpine does not permit short sales by customers. The only short sales which occur are made by Alpine in its bona fide market making capacity.

ALPINE_LIT168121

All long sales are required to be closed out so that they settle within the requirements of Reg SHO. Alpine requires all long sales to be closed out on T 6, (6 days after Trade Date).

Refer to the section titled "Regulation Sho" for additional information.

## 12.20.1 Marking Orders

[SEC Regulation SHO Rule 200(g)]

All sell orders are required to be identified on the order record as "long," or "short exempt" at the time of entry.

A sell order may be marked "long" when the seller owns the security being sold and the security either is in the physical possession or control of Alpine or it is reasonably expected that the security will be in the physical possession or control of Alpine by settlement date.

A sell order should be marked "short exempt" if the seller is entitled to rely on an exception to the short sale rule including the following:

- Sales by a broker-dealer (BD) to offset odd-lot orders for customers
- Sales by a BD to liquidate a long position less than a round lot, if the sale does not change the BD's position by more than one unit of trading
- Sales for a special arbitrage account under certain conditions
- Sales by an underwriter or syndicate or group member participating in a distribution, in connection with an over-allotment of securities, or any layoff sale in connection with a distribution through rights or a standby underwriting commitment

### 12.20.1.1 Exceptions From The Locate Requirement

The following short sale orders are not required to comply with the locate requirement:

- Orders received from another broker-dealer (the originating broker-dealer has the obligation to comply with the locate requirement)
- *Bona-fide* market making transactions

### 12.20.1.1.1 Regulation Sho

Applicable Rules: Reg Sho Rule 204, 204(a)(3)(b), SEC Rule 10b-21

| Responsibility | • Head Trader or designee, where indicated |
|---|---|
| Resources | • CNS Accounting Summary |
| Frequency | • Daily |
| Action | • Review CNS Accounting Summary for short positions |

ALPINE_LIT168122

| | • Notify impacted parties to close positions within T 6 <br> • If a correspondent firm, send notice of SHO close out requirement, T 4 and daily thereafter until resolved. |
|---|---|
| **Record** | • Initials or signature, date of review (if applicable) <br> • Notate any follow-up action taken, if any |

Alpine will allocate the close out requirement responsibility to its correspondents who are responsible for the short position per our correspondent clearing agreements. In addition to the daily reports that each correspondent firm receives, Alpine will give email notice regarding the SHO close out requirement on the morning of T 4 and every morning thereafter if the condition persists. Short sales are required to be closed out by T 4.

## 12.21 Sale Of Control Or Restricted Stock

[SEC Securities Act of 1933 Rule 144 and Rule 145; SEC Rule 144 Guidance: http://www.sec.gov/divisions/corpfin/guidance/rule144interp.htm]

| **Responsibility** | • Chief Compliance Officer and Designated Supervisor and Representative |
|---|---|
| **Resources** | • Proposed 144 or 145 sales |
| **Frequency** | • As required |
| **Action** | • Determine the seller's status (affiliate or non-affiliate) <br> • Determine eligibility for selling the amount and timing of sale <br> • If RR has not done so, assist the customer in preparation of required forms |
| **Record** | • Records of forms filed and determinations are included in a file for Restricted Stock sales |

### 12.21.1 Introduction

SEC Rule 144 provides a method for the resale of restricted or control securities. Rule 144 provides a safe harbor for the resale of restricted and control securities. It includes conditions which, if satisfied, permit holders of such securities to sell them publicly without registration and without being deemed underwriters. Rule 145 governs the offer or sale of securities received in connection with reclassifications, mergers, consolidations and asset transfers. Sellers under Rule 145 are afforded similar safe harbor to Rule 144 sellers.

Compliance should be consulted directly for assistance regarding the processing of Rule 144 and Rule 145 sales. This section is provided for quick reference only.

### 12.21.2 Restricted Securities Defined

Restricted securities generally are securities which were:

ALPINE_LIT168123

- Acquired directly or indirectly from the issuer or from an affiliate of the issuer (as defined below) in a transaction or series of transactions not involving a public offering
- Acquired from the issuer and are subject to the resale limitations of Regulation D under the Securities Act of 1933 or acquired in a transaction or series of transactions not involving a public offering subject to the resale limitations of Regulation D

### 12.21.3 Affiliate Defined

An "affiliate" of an issuer is a person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer. An affiliate can be an individual, certain relatives, trusts, estates, corporations or other entities in which the seller is a 10% beneficial owner, trustee, executor or one in a similar capacity.

### 12.21.4 Control Person And Control Securities

A "control" person is regarded as one who has the power to direct or cause the direction of the management and policies of an issuer of securities through significant stock ownership (generally 10% or more) or by virtue of holding a board or management position with that issuer.

Whether or not a customer has a control relationship with the issuer or is a "statutory underwriter" or holds "restricted securities" are legal questions.

"Control Securities" are those owned by an affiliate of an issuer of the securities.

### 12.21.5 Holding Period

Under Rule 144, the seller of restricted securities is subject to a one-year holding period for non-reporting companies and a six month holding period for reporting companies prior to sale. In addition, if the securities were purchased, they cannot be sold until the full purchase price has been paid. If restricted securities are acquired as a gift, the holding period is assumed to begin the date the donor acquired the shares. The donee's sales are subject to aggregation with sales made by the donor, for purposes of calculating limitations on amount sold.

### 12.21.6 Limitations On Amount Sold

Rule 144 limits the amount of restricted securities that may be sold during any three-month period. The seller's sales are also subject to aggregation with sales of restricted stock by others connected with the seller. The limitations relate to a percentage of the outstanding shares and the average trading volume in the security. Non-affiliates of the issuer may make unlimited resales of restricted securities after a holding period of two years.

### 12.21.7 Filing Requirements

The seller is required to file Form 144 concurrent with placing the order or executing the transaction. Compliance should be consulted regarding the necessary filing requirements.

### 12.21.8 New Account Information Regarding Affiliates

Alpine's new account form includes an inquiry as to whether the customer is an affiliate of an issuer. RRs are responsible for obtaining this information and, if the customer is an affiliate and places an order to sell shares of the issuer, contacting Compliance for instructions on executing the order under Rule 144.

### 12.21.9 Reporting Of Insider Transactions

Under Section 16(a) of the Exchange Act, directors, officers, and >10% holders of equity securities of a publicly-traded company are required to report their purchases and sales of the issuer's securities to the SEC (and, if the security is listed on a national exchange, with the exchange where listed) as follows:

ALPINE_LIT168124

- at the time the security is registered on a national securities exchange or by the effective date of the registration statement
- within 10 days of becoming a 10% beneficial owner, director or officer
- by the end of the second business day following a purchase or sale transaction

Alternate reporting period requirements apply to two categories of transactions in which the insider does not control and may not be able to predict when the transaction will occur:

- Transactions pursuant to a contract, instruction or written plan
- Discretionary transactions pursuant to employee benefit plans such as fund switching transactions

In these instances, the date the executing broker-dealer or plan administrator notifies the insider of the transaction is deemed the date of execution for reporting purposes, as long as the notification is not later than the 3rd business day following trade date. The SEC may also provide different due dates for limited types of transactions where two-day reporting is not feasible.

If the issuer maintains a corporate website, the issuer is required to post the filing on the site no later than the end of the business day following the filing.

Transactions by directors or officers that result in "short-swing" profits but that are exempt from Section 16(b) are also subject to the two-day reporting requirement.

The obligation to report is the responsibility of the insider. Customers should be encouraged to contact their counsel if they have questions, and Section 16 should be referenced for specifics regarding filing requirements.

## 12.22 Unregistered Resales Of Restricted Securities

[FINRA Regulatory Notice 09-05]

FINRA Regulatory Notice 09-05

| Responsibility | • Designated Supervisor<br>• Operations personnel |
|---|---|
| Resources | • New accounts at opening<br>• Proposed sales of potentially unregistered securities<br>• Order records or transaction reports<br>• Physical certificates |
| Frequency | • When new accounts are opened with a potentially questionable transaction<br>• As required - assist RR in evaluating a potential sale<br>• Daily - review of order records/transaction reports<br>• As required - review certificates |

ALPINE_LIT168125

| Action | • Review for "red flags" listed in this section<br>• If a red flag is identified, contact the RR for more information about the customer and the block being sold; contact the customer if necessary to confirm the securities are not unregistered or restricted<br>• Operations personnel should refer questionable certificates to the designated supervisor for follow up with the RR or customer |
|---|---|
| Record | • Order records/transaction reports<br>• New account records<br>• Records of certificates received<br>• Designated supervisor's record of action taken, if applicable, in a log, on the order record, in a daytimer, or in another record |

Broker-dealers are prohibited from selling unregistered securities unless the sale falls within an available exemption such as Rule 144 sales discussed in the prior section. Avoiding such sales is based on knowing the customer and the securities to be sold. The RR should be aware of "red flags" that may indicate a customer is selling unregistered securities, including the following examples:

- A customer opens a new account and delivers physical certificates representing a large block of thinly-traded or low-priced securities.
- A customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale.
- A customer deposits share certificates that are recently issued or represent a large percentage of the float for the security.
- Share certificates reference a company or customer name that has been changed or that does not match the name on the account.
- The lack of a restrictive legend on deposited shares seems inconsistent with the date the customer acquired the securities or the nature of the transaction in which the securities were acquired.
- There is a sudden spike in investor demand for, coupled with a rising price in, a thinly-traded or low-priced security.
- The company was a shell company when it issued the shares.
- A customer with limited or no other assets under management at Alpine receives an electronic transfer or journal transactions of large amounts of low-priced, unlisted securities.
- The issuer has been through several recent name changes, business combinations or recapitalizations, or the company's officers are also officers of numerous similar companies.
- The issuer's SEC filings are not current, are incomplete, or nonexistent.

When confronted with a customer wanting to sell a block of stock where there may be a question about the registered status of the stock, the following questions should be asked:

- How long has the customer held the securities?
- How did the customer acquire the securities?
- Does the customer intend to sell additional shares of the same class of securities through other means?
- Has the customer solicited or made any arrangement for the solicitation of buy orders in connection with the proposed resale of unregistered securities?
- Has the customer made any payment to any other person in connection with the proposed resale of securities?

ALPINE_LIT168126

- How many shares or other units of the class are outstanding, and what is the relevant trading volume?

Additionally, on all deposit of OTC Certificates or DWAC or Unregistered Securities the following procedures must be followed:

- On certificate or DWAC transfers of OTC Certificates or DWAC or Unregistered Securities, prior to receiving the certificate or DWAC, the representative is required to complete a review form prior to acceptance of the certificate or DWAC. The review form must be signed by the broker.

- If the certificate (i) is in an amount that meets Alpine's large position questionnaire criteria, (ii) the certificate is in a non-reporting company or (iii) the certificate has a date within six months but the company is a reporting company, the representative, in addition to the Broker's review form, must require the customer complete a form unless the representative is familiar with the company and client. The representative must sign a representation to the effect they are knowledgeable on the company and client if no form is sent to the client. The back office must also review any representations signed by the broker.

- For certificates or DWAC on OTC companies that have an issuance date within one year, an OTC form is required to be completed by the customer. The representative is required to review the form and update our internal form with the information indicating they have completed a review and verified the securities meet the requirements or Rule 144 or other exemptions. This review shall include verification that the Company issuing the securities is not currently a "shell" company or was not a "shell" company at the time of the issuance of the shares.

- For non SEC reporting companies, if the company is a shell company or was a shell company at the time of the issuance of the shares, Alpine will not accept the certificate. For reporting companies, if the Company was a "shell" or is a "shell," if the Form 10 information set forth in Rule 144 has not been filed, Alpine will not accept the certificate without a legal opinion indicating the shares qualify under Rule 144 or other relevant exemption.

- No shares issued under Rule 504 of Regulation D will be accepted by the firm unless the shares also meet the holding period and other requirements of Rule 144.

- Particular attention should be directed to certificates that have a recent date and for companies on the pink sheets that do not file reports with the SEC. Representatives are required to provide additional backup documents to the back office to reflect they have completed due diligence and the certificates would be eligible under Rule 144.

- All forms, both representative and clients, must be delivered and reviewed by Alpine's operations personnel in the back office prior to the acceptance of certificates or DWAC. If the operational personnel or representative is concerned or red flags are detected the documentation is to be delivered to the responsible principal for review.

- Alpine will request legal opinions on any matters where red flags are present or suspicion is raised prior to the acceptance of certificates or DWAC.

- Alpine will require legal opinions on any certificate deposit with a date that is within one year of the deposit unless otherwise approved in writing by compliance.

ALPINE_LIT168127

- No shares of Pink Sheet companies will be accepted if there is a lack of current information on Pink Sheets as evidenced by Pink Sheets reflecting there is no current information.

- If a customer account has "red flags" as set forth above, no certificates will be accepted unless the certificates meet the requirments of Rule 144 or other applicable exemptions and the shares have been held by the customer for in excess of six months for reporting companies and one year for non-reporting companies. No certificates will be accepted for accounts that have "red flags" if the Company meets the definition of a "shell company" as defined in the rules.

- No certificates will be accepted where the customer has not held the securities for in excess of six months for reporting companies that are current in their reporting and one year for non-reporting companies.

- All certificate deposits shall be reviewed by the back office to determine the percentage of the outstanding shares. If the deposit is in excess of 1% of the issued and outstanding shares a legal opinion will be required on the deposit unless waived in writing by a principal of Alpine.

- The back office will review daily deposits for suspicious activity and if suspicious activity is detected, a principal of Alpine shall review the activity to determine if additional action is required including notifying the AML Compliance officer.

## 12.23 Reporting Of Insider Transactions

[SEC Securities Exchange Act of 1934 Section 16(a); SEC Exchange Act Section 16 and Related rules & Forms (Q & A): http://www.sec.gov/divisions/corpfin/guidance/sec16interp.htm]

Under Section 16(a) of the Exchange Act, directors, officers, and >10% holders of equity securities of a publicly-traded company are required to report their purchases and sales of the issuer's securities to the SEC (and, if the security is listed on a national exchange, with the exchange where listed) as follows:

- at the time the security is registered on a national securities exchange or by the effective date of the registration statement
- within 10 days of becoming a 10% beneficial owner, director or officer
- by the end of the second business day following a purchase or sale transaction

Alternate reporting period requirements apply to two categories of transactions in which the insider does not control and may not be able to predict when the transaction will occur:

- Transactions pursuant to a contract, instruction or written plan
- Discretionary transactions pursuant to employee benefit plans such as fund switching transactions

In these instances, the date the executing broker-dealer or plan administrator notifies the insider of the transaction is deemed the date of execution for reporting purposes, as long as the notification is not later than the 3rd business day following trade date. The SEC may also provide different due dates for limited types of transactions where two-day reporting is not feasible.

ALPINE_LIT168128

If the issuer maintains a corporate website, the issuer is required to post the filing on the site no later than the end of the business day following the filing.

Transactions by directors or officers that result in "short-swing" profits but that are exempt from Section 16(b) are also subject to the two-day reporting requirement.

The obligation to report is the responsibility of the insider. Customers should be encouraged to contact their legal counsel if they have questions, and Section 16 should be referenced for specifics regarding filing requirements.

## 12.24 Penny Stocks

[SEC Securities Exchange Act of 1934 Rule 15g1-9, Rule 15g1-100 and Schedule 15G; FINRA Notice to Members 93-55, 92-42 and 92-38]

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 |
|---|---|
| Resources | • New Account Form<br>• Order Records<br>• Daily Transaction Report<br>• Risk Disclosure Documents |
| Frequency | • Daily |
| Action | • FINOP:<br>   o   Include required disclosures on confirmations<br>• RR's supervisor, for customers who are not "established" customers:<br>   o   Determine required signed risk disclosure document is received prior to effecting the first 3 penny stock purchases and the two-business-day cooling-off period has been satisfied<br>   o   Review new account form and determine investment objectives are consistent with penny stock purchases<br>   o   Submit document to Compliance or New Accounts |
| Record | • Signature on the New Account Form and Risk Disclosure Document<br>• Risk Disclosure Documents are retained in the customer's new account file |

### 12.24.1 General Requirements

[SEC Securities Exchange Act of 1934 Rule 15g-1 through 15g-6 and Rule 15g-9]

Securities that are identified as "designated securities" (penny stocks) are subject to certain requirements including:

- provision of risk disclosure to a customer other than an "established customer"
- a "cooling-off period" of two business days after the risk disclosure is sent before a penny stock may be purchased
- disclosure of certain price information relating to the customer's purchase

ALPINE_LIT168129

- disclosure of compensation received by the broker or dealer
- inclusion of prices of penny stock positions on the customer's monthly statement and a legend regarding the value assigned to the penny stock

There are five primary exemptions from these requirements:

1. The price of the security is $5.00 or more per share.
2. The purchaser is either an accredited investor or established customer or is a principal affiliated with the issuer (as defined in the rule).
3. The transactions are not recommended.
4. The broker-dealer's commissions, mark-ups and mark-downs from penny stock transactions did not exceed 5% of total commissions or mark-ups and mark-downs during the 3 months immediately preceding the transaction, AND, the broker-dealer has not been a market maker in the penny stock to be purchased by the customer for the immediate 12 months preceding the transaction.
5. Any other transaction exempted by the SEC.

The following sections outline Alpine's requirements for penny stock transactions subject to the rules.

## 12.24.2 Penny Stock Defined

[SEC Securities Exchange Act of 1934 Rule 3a51-1; SEC Guide to Broker-Dealer Registration Section V(F)]

Penny stocks are equity securities identified as "designated securities" under the SEC's Penny Stock Rule (the Rule). Penny stocks are low-priced securities (less than $5.00 per share) with the Rule listing securities that are **not** included in the definition, as follows:

The following are **not** considered penny stocks:

- A reported security as defined in Regulation NMS Rule 601.
- The stock is priced at $5.00 or more per share.
- Shares of investment companies.
- The stock is listed on an exchange.
- Security futures.
- The issuer has net tangible assets in excess of $2 million, if the issuer has been in continuous operation for at least 3 years, or $5,000,000 if in continuous operation for less than 3 years; or average revenue of at least $6,000,000 for the last 3 years.

Penny stocks include the equity securities of private companies with no active trading market if they do not qualify for one of the exclusions from the definition of penny stock.

RRs should assume that any unlisted securities priced less than $5.00 per share may be subject to the penny stock requirements.

## 12.24.3 Established Customer Defined

The requirements of the Rule do not apply to penny stock transactions for "established customers." The term established customer includes a customer who:

- has maintained an account (by effecting a transaction, making a deposit of funds or securities) more than one year previously, or
- has made three purchases of penny stocks that occurred on separate days and involved different issuers.

ALPINE_LIT168130

### 12.24.4 Suitability Information

RRs are required to obtain information from the customer including prior investment experience, investment objectives, and financial situation. This information is recorded on Alpine's new account form which must be completed prior to effecting a transaction in a penny stock. With this information, the RR is required to reasonably determine whether transactions in penny stocks are suitable for the customer.

Prior to effecting a transaction in a penny stock, the new account form must be completed and submitted to the designated supervisor for approval. The designated supervisor should review the information included on the form to confirm the suitability of penny stocks for the customer's account.

### 12.24.5 Risk Disclosure Document

Prior to effecting a penny stock transaction for a customer, the RR must furnish the customer with a copy of Alpine's penny stock disclosure document entitled "Important Information On Penny Stocks" and obtain the customer's signature on the disclosure document acknowledging receipt. The disclosure document may NOT be copied on Alpine letterhead but must be reproduced on plain paper.

Furnishing this disclosure and obtaining the customer's signature evidencing receipt is required for each of the first three penny stock transactions prior to any orders being entered.

### 12.24.6 Two-Business-Day Waiting Period

Penny stock transactions may **not** be executed until at least two business days after the suitability statement and agreement to the transaction has been sent either electronically or by mail. These documents must also be signed by the customer and received by Alpine.

### 12.24.7 Disclosure Of Quotations And Other Information

Rule 15g-3 prescribes certain required information that must be disclosed to the customer at or prior to the time of effecting a penny stock transaction. The designated supervisor is responsible for establishing procedures which ensure the necessary disclosures will be included on customers' confirmations. Traders are responsible for including notations on order tickets that include the required information regarding bids or offers. A copy of Rule 15g-3 will be provided to traders responsible for recording the required information. The designated supervisor is responsible for establishing procedures to ensure the bid or offer information is included with customer confirmations of penny stock transactions.

### 12.24.8 Disclosure Of Compensation

Alpine's compensation for penny stock transactions will be disclosed on customer confirmations as follows:

- For agency transactions the amount of the compensation must be disclosed.
- For riskless principal transactions where Alpine is NOT a market maker, the difference between the price to the customer and the contemporaneous purchase or sale price.
- For other principal transactions, the difference between the price to the customer and the prevailing market price.

"Active and competitive" market, for purposes of calculating mark-ups or mark-downs, is defined in the penny stock rules to include a market where the market maker, in the five business days preceding the transaction, executes less than 20% of the aggregate number of all transactions in the penny stock reported to an automated interdealer quotation system. Where Alpine dominates the market, contemporaneous cost will be used to calculate mark-ups or mark-downs.

ALPINE_LIT168131

This information is to be transmitted for inclusion on customer confirmations. The designated supervisor is responsible for establishing procedures for ensuring that required compensation disclosures are included on customer confirmations.

## 12.25 Tax Switching Transactions

Transactions that are effected to accomplish certain tax results (*i.e.,* establishing a gain or a loss) must be handled consistent with prevailing securities and tax rules and laws. Riskless tax switching trades (also known as "wash sales") are not allowed and may represent a violation of rules prohibiting pre-arranged trades.

Under tax laws, a "wash sale" occurs when someone sells a stock, mutual fund, or some other security at a loss and buys the same thing, or something "substantially identical," within 30 days before or after the sale. The seller cannot deduct the loss on that sale on his or her tax return for that year. "Substantially identical" means buying and selling the same security or one that is almost the same, such as selling an index fund and buying another index fund based on the same underlying index. Customers should be referred to their tax advisers when questions arise regarding tax loss strategies and what may be considered a security that is substantially identical.

A cross transaction must represent a beneficial change in ownership of the security sold and purchased. Where a customer wishes to sell a security and buy it back in their own account, this transaction must be effected at the risk of the market with no guarantee of the price at which the security may be repurchased. The prohibition applies to equity and debt securities. The following is an example of this type of transaction:

*A customer wishes to sell Company A at year-end to establish a loss for tax purposes. He also ultimately wants to maintain his position in the security in his account. He asks that you sell the shares and immediately buy them back in his IRA account at the same price.*

This transaction would be prohibited because there is no beneficial change in ownership of the security and the customer would be guaranteed to sell and repurchase the security at the same price. In this example, an appropriate method of handling these orders would be to enter a sell transaction and, after it has been executed, enter a buy transaction. This places both transactions at the risk of the market and does not involve a guaranteed cross.

## 12.26 Order Audit Trail System (OATS)

[FINRA Rule 7400 series; FINRA OATS web page (http://www.finra.org/RegulatorySystems/OATS/index.htm); NASDAQ Rule 6950 series]

This section describes the key requirements of the FINRA Order Audit Trail System (OATS), a mechanism for tracking orders in NASDAQ securities. Detailed information about OATS including a *Subscriber Manual* and *Technical Specifications* are available at the FINRA's OATS web page.

### 12.26.1 Who And What Orders Are Subject To OATS Requirements

All market makers and order-entry firms that handle and/or effect orders in the following securities must comply with rules regarding OATS reporting, including electronic and manual orders:

- NASDAQ securities
- OTC domestic equity securities

ALPINE_LIT168132

- Certain transactions in foreign equity securities

"OTC equity securities" are defined as: (1) securities not listed on a national securities exchange; or (2) securities listed on one or more regional exchanges but that do not qualify for dissemination of transaction reports to the Consolidated Tape. This includes OTCBB and pink sheet securities; preferred securities; and convertible bonds reported to a FINRA equity trade reporting system. Orders in foreign equity securities where the execution is subject to reporting requirements also must be reported.

The definition does NOT include: Direct participation programs (DPPs); restricted securities under SEC Rule 144; PORTAL securities; or TRACE-reportable debt. Orders in foreign equity securities that are not required to be reported are not subject to OATS reporting.

OATS reporting requirements apply to all executed and unexecuted orders other than those specifically excluded and listed in the next section. OATS applies to open orders, orders that have been modified, orders that have been partially executed, and cancelled orders.

### 12.26.1.1 Orders NOT Covered By OATS Rules

The following types of orders are not required to be reported:

- The orders a market maker places for its proprietary market making account
- Proprietary orders executed through NASDAQ National Market Center in the normal course of market making activities
- Proprietary orders placed on an ECN during the normal course of market making activities
- Orders received from another market maker in the same security as Alpine makes a market

### 12.26.2 Registering With OATS

| Responsibility | • Head Trader |
|---|---|
| Resources | • N/A |
| Frequency | • Registration when Alpine initially will become subject to OATS requirements<br>• Update contact person and registration information with the FINRA as needed |
| Action | • Register Alpine with OATS<br>• Update contact person and other registration information |

Firms subject to OATS requirements are required to register with OATS. The OATS Subscriber Initiation and Registration Form is available at the FINRA OATS web page.

An individual at Alpine is named as the FINRA contact (the OSO Administrator) for OATS purposes. The Administrator oversees user accounts and passwords.

### 12.26.3 List Of Contact Persons

The OSO Administrator is responsible for maintaining a current list of contacts with whom OATS technical and regulatory staff may communicate, including e-mail addresses.

ALPINE_LIT168133

### 12.26.4 Capture Of Required OATS Information

[FINRA Rule 3110(h) and 7440]

Alpine is required to capture specific information relating to the handling or execution of electronic and manual orders including recording times of events (receipt from customer, transmittal between trading desks, *etc.*) in hours, minutes, and seconds.

### 12.26.4.1 Manual Orders Accepted

[FINRA OATS Phase III Frequently Asked Questions: http://www.finra.org/RegulatorySystems/OATS/Phase III/NASDW_015884]

Alpine accepts manual orders received via:

- Telephone

Information capture and reporting requirements (for both electronic and manual orders) apply to orders received in branch offices as well as the main office. If orders are not accepted through some communication methods because prompt handling of orders cannot be facilitated, customers will be notified by appropriate disclosure which may be on Alpine's website, disclosure in customer agreements, or another method determined by Alpine.

## 12.26.5 Reporting Of OATS Information

[FINRA Rule 7450]

Alpine will transmit information to FINRA in compliance with OATS requirements.

FINRA resources about OATS reporting include the "OATS Reporting Technical Specifications" and the "OATS Small Firm Reference Manual" available at the FINRA OATS web page.

### 12.26.5.1 Reporting Manual Orders

Manual orders must be reported to OATS including the time the order was received or originated, even if the order is later entered into Alpine's electronic order routing or trading system. (It is not necessary to record the time the order is entered into the electronic system.)

This includes orders received by an RR or independent contractor and recorded on a paper ticket and then later transmitted to the main office.

### 12.26.5.2 Third Party Transmission

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • OATS Web interface data<br>• ROE Rejection Report, to:<br>1. Check for rejections;<br>2. Check for unmatched submissions with TRF submissions;<br>3. Check for unmatched submissions within the OATS system;<br>4. Verify that OATS submissions are accurate and reported on a timely basis;<br>5. Verify that routed orders are matched within the OATS system |
| Frequency | • Initially - Execute contract with the Reporting Agent, confirming |

ALPINE_LIT168134

| | |
|---|---|
| | reviews to be conducted by the Reporting Agent to ensure accurate data submission<br>• Daily: Review ROE Rejection Report (in cases where there is information to report, i.e. rejections, unmatched orders, etc.)<br>• As needed - Update of contract(s) |
| **Action** | • Review ROE Rejection Report or similar report to evaluate compliance with OATS requirements<br>• Contact the third party to discuss exceptions or variances from OATS requirements<br>• Request corrective action from the third party, if necessary<br>• Replace the third party if compliance is not reasonably achieved<br>• Update contract(s) when necessary |
| **Record** | • Initial or signature, date reviewed (if applicable) and action taken, if any on the ROA Rejection report or similar report in the OATS file<br>• Third party agreements |

Alpine has contracted with a third party (Reporting Agent) to transmit OATS information to the FINRA. Alpine's contract with the third party includes assurances regarding compliance with OATS requirements. Alpine also may periodically review data available to evaluate the Reporting Agent's compliance with OATS requirements.

**Applicable Rules:** Rule 7440 & 7450, ADF/TRACS Rules 7230A, 7130

### 12.26.6 Clock Synchronization

Refer to the section *Time Clock Synchronization* in this chapter for procedures for synchronizing time clocks used for recording date and time of orders.

### 12.26.7 OATS Contact Information

[FINRA Notice to Members 02-29]

The CCO or designee will update Alpine's OATS contact person on record with the FINRA when necessary. At least annually, the CCO or designee will confirm that current information is accurate.

## 12.27 Disclosure Of Order Execution Procedures

[SEC Regulation NMS Rule 605]

Since Alpine is engaged in OTC market making or exchange specialist activities, it is required to publish information regarding order executions in National Market System securities on a monthly basis. This information is available on the Internet.

## 12.28 Order Routing And Reporting

[SEC Regulation NMS Rule 601]

ALPINE_LIT168135

As required by Rule, Alpine routes and executes orders in NMS securities only through exchanges and other facilities that have an effective transaction reporting plan filed with the SEC and will promptly report all information required by the reporting plan.

## 12.28.1 Disclosure Of Order Routing

[SEC Regulation NMS Rule 606]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Customer agency order trade data |
| Frequency | • Validate publication of NMS Rule 606 reports (to the Alpine public website) - quarterly<br>• Provide individual customer order routing information - as requested<br>• Notify customers of availability of information - annually |
| Action | • Validate publication of the NMS Rule 606 report on Alpine's public website site by the end of the month following each calendar quarter<br>• Respond to requests from customers for order routing information<br>• Send annual notification to customers |
| Record | • Retain copies of quarterly reports<br>• Retain historical reports that confirm that the quarterly publication was satisfied<br>• Retain records of customer requests and fulfillment of requests<br>• Retain copies of annual customer notification (include notation as to when and how it was delivered). (Notify the back office to send the annual notification). |

Alpine is required to publish quarterly statistics regarding its customer agency order routing practices. The purpose of the report is to provide the public with information on how broker-dealers route their customers' orders, to enable customers (and others) to evaluate order routing practices. The Rule was adopted by the SEC to enhance market transparency and foster competition among market participants.

This information is available on the internet and in hard copy for those who do not have access to the internet. The report is published by the end of the month following the calendar quarter reported. In addition to quarterly reports, information about the routing of individual customer orders is available to customers, upon request, for the prior six months' trading activity.

In addition, Alpine will send an annual notification to customers that the above information is available, as required by the Rule. The head trader or designee will be responsible for including a notation in the file as to when and how it was delivered.

## 12.28.2 Orders Covered By The Rule

The report includes customer orders in exchange-listed securities, NASDAQ securities, and listed options. It does not include the following orders:

• equity orders with a market value of $200,000 or more

ALPINE_LIT168136

- option orders with a market value of $50,000 or more
- firm trading account orders (proprietary orders)
- orders for OTC Bulletin Board securities

### 12.28.3 Information Included In The Reports

Extensive statistical information is available in the reports. In summary, Alpine reports on the top ten venues to which orders are routed (including internal routing) and any other venues that receive more than 5% of Alpine's order flow.

The Rule also requires disclosures regarding internalization of orders and any relationship Alpine has with a venue, such as payment for order flow.

### 12.28.4 Customer Requests For Order Routing Information

Customers may request information on how their individual orders were routed for the past six months. This information may be obtained by making a request to Operations.

## 12.29 Distribution, Consolidation, And Display Of Information

[SEC Regulation NMS Rule 603]

If Alpine is the exclusive source of information regarding quotations or transactions in an NMS stock, it will comply with requirements to provide information to a securities information processor on terms that are fair and reasonable.

## 12.30 Cash And Non-Cash Compensation Policy

[FINRA Rule 2310 and 2320; NASD Rule 2830; MSRB Rule G-20]

| | |
|---|---|
| **Responsibility** | • CCO |
| **Resources** | • Requests from RRs, managers, or outside firms regarding sponsorship of cash or non-cash compensation relating to the sale of securities |
| **Frequency** | • As required |
| **Action** | • Review request and ensure compensation is consistent with rule requirements and limitations<br>• Obtain Sponsor Request Form<br>• Approve or disapprove compensation in writing<br>• Obtain Reimbursement Form from sponsor with RR payment<br>• Establish and maintain required records of approved compensation programs |
| Record | • Requests<br>• Sponsor Request Forms<br>• Reimbursement Forms<br>• Approval/disapproval of compensation arrangement |

Regulators' rules restrict compensation relating to the sale and distribution of debt, equity, direct participation program (DPP), REIT securities, and municipal securities. RRs may not accept (directly

ALPINE_LIT168137

or indirectly) cash or non-cash compensation from outside firms or persons. The only exception includes compensation arrangements specifically approved by Alpine.

## 12.30.1 Definitions

**Cash compensation** is defined as follows:

Any discount, concession, fee, service fee, commission, asset based sales charge, loan or override, or cash employee benefit received in connection with the sale and distribution of securities.

**Non-cash compensation** is defined as follows:

Any form of compensation received in connection with the sale and distribution of securities, other than cash compensation, which includes, but is not limited to, merchandise, gifts and prizes, travel expenses, meals and lodging.

## 12.30.2 Approval

Any compensation as defined in this section and paid directly to the RR requires sponsor submission of the Sponsor Request Form and approval by Compliance **prior to** accepting compensation. The following section outlines types of non-cash compensation permitted without specific approval, unless otherwise noted.

## 12.30.3 Types Of Permissible Non-Cash Compensation

The following types of non-cash compensation are allowed provided they are **not preconditioned on achieving a sales goal:**

- Gifts amounting in aggregate value not exceeding $100 annually, per person. All gifts must be reported to Compliance under Alpine's Gifts, Gratuities and Entertainment policy.
- An occasional meal, ticket to a sporting event or show, or comparable entertainment that is not so frequent nor so extensive as to raise any question of propriety.
- Payment or reimbursement in connection with training or educational meetings, subject to several conditions. *Note:* Prior approval must be obtained from the designated supervisor before participating in such meetings.
- The location of the meeting is appropriate for its purpose, *e.g.,* at or near the sponsoring company's home office; an office of Alpine or facility near an office; or a regional location for a regional meeting. The designated supervisor will determine the appropriateness of the meeting.
- Only expenses incurred by Alpine or its employees are eligible for payment. Expenses for guests of employees (spouse, *etc.*) will not be reimbursed.

Non-cash sales incentive programs **may be preconditioned on achieving a sales goal** provided they are pre-approved in-house incentive programs sponsored by Alpine and meet the following criteria:

- The program must be based on the RR's total production with respect to all of that type of security sold by Alpine (investment company, DPP, *etc.*).
- Credit received for each security is equally weighted.
- Only Alpine employees may participate.
- Other firms may make contributions to the program, provided they do not participate, directly or indirectly, in the organization of the program. However, the outside entity may provide a speaker for the meeting.

ALPINE_LIT168138

## 12.31 Prohibited Transactions And Practices

| | |
|---|---|
| **Responsibility** | • Retail registered representative supervisor |
| **Resources** | • Order records<br>• Daily Transaction Report<br>• Customer monthly statements |
| **Frequency** | • Daily review of order records and Daily Transaction Report<br>• Review of customer monthly statements |
| **Action** | • Reviews of transactions should include consideration of prohibited transactions prescribed in these policies. Action on identified prohibited transactions could include consultation with Compliance to confirm whether transactions in question are prohibited and to identify corrective action.<br>• Some specific guidelines for review include the following. Contact Compliance for guidance regarding corrective action:<br>   o Wash transactions result from cross transactions between two accounts with the same beneficial owner and at no market risk, *i.e.,* the buy and sell are pre-arranged at a set price. Wash transactions should be cancelled and securities sold at the risk of the market.<br>   o Cross transactions on a frequent basis particularly in thinly-traded securities may be an indicator of supporting the market.<br>   o Orders by the same RR frequently marked for "at the opening" or "at the close" may be an indication of an attempt to influence the market.<br>   o A pattern of purchasing securities in one account and transferring to another account at a later date may indicate parking.<br>   o Excessive trading may be an indicator of churning. See the section *Active Accounts* for guidance regarding action on actively traded accounts.<br>   o RRs trading ahead of customer block orders that may affect the market price of a security may indicate frontrunning. |
| **Record** | • Initials on order records<br>• Initials on Daily Transaction Report<br>• Branch Manager's Log<br>• Notes/memos to RR's file, if appropriate |

### 12.31.1 Introduction

RRs are required to handle customer transactions in compliance with regulators' rules. This section highlights certain types of prohibited transactions.

### 12.31.2 Unauthorized Trading

No employee may enter a transaction before contacting the owner of the account (or the authorized agent for the owner) unless the employee has specific written authorization to act on the customer's behalf. Failure to contact the customer or the customer's agent can result in the customer later rescinding the transaction because it was not authorized. Engaging in unauthorized transactions

ALPINE_LIT168139

subjects the employee to regulatory and Firm discipline which may include fines and/or termination depending on the seriousness of the violation. If Alpine determines an RR engaged in unauthorized trading, any related losses will be charged directly to the RR.

RRs must also avoid "inadvertent" unauthorized transactions such as accepting an order from a husband for a wife's account where the wife has not signed a trading authorization giving her husband authority to trade on her behalf. Doing a customer a "favor" by entering an order when he or she cannot be reached may be construed as good customer service by the RR but in reality is a rule violation and subjects the RR and Alpine to potential liability for losses from unauthorized transactions.

### 12.31.3 Prearranged Trading

An offer to sell coupled with an offer to buy back at the same or a higher price, or the reverse, is a prearranged trade and is prohibited. Options or written agreements such as repurchase agreements are not included in this prohibition.

### 12.31.4 Adjusted Trading

Adjusted trading is a prohibited practice that involves the sale by a customer of a security to a broker-dealer at a price above the prevailing market price and the simultaneous purchase of a different security at a price greater than its market value. This may be requested in instances where a bank or other fiduciary does not want to realize a loss on their books and engages in a scheme to avoid, disguise, or postpone losses. Federal banking regulators have stated that adjusted trading by federal financial institutions is an unacceptable and unsuitable investment practice.

### 12.31.5 Overtrading Or Undertrading

These are transactions at prices in excess of or below the prevailing market. Customer transactions must be executed at a price reasonably related to the market; overtrading and undertrading is not permitted.

### 12.31.6 Wash Transactions

Transactions between two accounts with no market risk and where there is no beneficial change in ownership may be considered a "wash sale." Customers sometimes request cross transactions for tax purposes between accounts with the same owner. Such transactions may violate rules and tax losses may be disallowed by the IRS.

There should be no pre-arrangement or guarantee of execution price for both sides of the transaction where there is no change in beneficial ownership. All such transactions should be executed at the risk of the market.

### 12.31.7 Cross Transactions

Firms and their employees may not engage in a practice of effecting cross transactions for the purpose of supporting or maintaining the market price of a security.

### 12.31.8 Orders At The Opening Or Close

Orders entered at the opening or close of the market for purposes of influencing the price of a security are prohibited.

### 12.31.9 Parking Securities

"Parking" is a prohibited practice where a trade or series of trades are effected for a person or entity and held in another person's or entity's account to disguise the investment activities of the original person or entity.

ALPINE_LIT168140

### 12.31.10 Churning

[FINRA Rule 2111.05(c) and 6140(c)]

Churning of a customer's account is prohibited. The term "churning" has a number of elements including:

- Control of the account by the RR
- Excessive transactions
- Intent to defraud which may be defined as the RR acting in the RR's own interest contrary to the customer's interest

An account that is "active" does not necessarily denote churning. An account's activity must be reviewed individually when reviewing for churning including the customer's objectives and the customer's control of the account.

### 12.31.11 Prohibition Against Acting On Knowledge Of Other Orders

Alpine and its employees may not enter orders for their own account to benefit from their knowledge of customers' orders in a particular security ("frontrunning"). This includes orders in securities that are derivatives (options, warrants, *etc.*) of the security being purchased or sold by the customer.

### 12.31.12 Trade Shredding

[FINRA Rule 5290]

"Trade shredding" (also known as "tape shredding") is the practice of breaking orders into multiple smaller orders for the primary purpose of maximizing commissions or other revenue. For example, a firm may receive a rebate from a particular market center for directing a certain number of transactions to that market center. Alpine and its employees are prohibited from engaging in breaking up orders for the purpose of maximizing Alpine's revenues or for any other prohibited purpose.

ALPINE_LIT168141

# 13 OTC EQUITY TRADING AND MARKET MAKING

## 13.1 Minimum Pricing Increment

[SEC Regulation NMS Rule 612; SEC FAQ Concerning Rule 612:
http://www.sec.gov/divisions/marketreg/subpenny612faq.htm; NASDAQ Rule 4613; FINRA Rule 6434]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order data and reports |
| Frequency | • Daily, Weekly or Monthly depending on reports/data available |
| Action | • Confirm compliance with pricing increment requirements when the AQR is not functioning (see the next section) – Orders that violate the pricing increment requirements will be automatically rejected in the system<br>• If exceptions are noted, contact trader; determine system anomalies, or identify other problems allowing exceptions |
| Record | • Reports with reviewer's initials, date reviewed (if applicable), action taken, if appropriate |

Applicable Rules: SEC Rule 612(a) and 612(b)

SEC Rule 612(a) prohibit firms from displaying, ranking or accepting quotations, orders or indications of interest in any NMS stock priced in an increment smaller than $.01 if the quotation, order or indication of interest is priced equal to or greater than $1.00 per share. SEC Rule 612(b) prohibit firms from displaying, ranking or accepting quotations, orders or indications of interest in any NMS stock priced in an increment smaller than $.0001 if the quotation, order or indication of interest is priced less than $1.00 per share. Alpine has established rules through Go-Trader, Alpine's trading platform to automatically reject orders that violate the rules enumerated above.

### 13.1.1 Minimum Quotation Size

[FINRA Rule 6433; FINRA Regulatory Notice 12-37]

For OTC equity securities quotations in an inter-dealer quotation system permitting quotation updates on a real-time basis, the following minimum quotation sizes apply:

| Price (Bid or Offer) | Minimum Quote Size (# of shares) |
|---|---|
| $0.0001 to $0.0999 | 10,000 |
| $0.10 to $0.1999 | 5,000 |

ALPINE_LIT168142

| $0.20 to $0.5099 | 2,500 |
|---|---|
| $0.51 to $0.9999 | 1,000 |
| $1.00 to $174.99 | 100 |
| $175.00 | 1 |

These requirements are subject to a pilot program which expires October 31, 2013.

## 13.2 Introduction

These procedures outline requirements for complying with Alpine and regulatory obligations that apply to OTC equity traders and supervision of traders. All traders and supervisors are required to review and be familiar with these procedures. The policies included in this chapter apply to equity securities only, unless otherwise noted.

User Guides for workstations, ACT, and other services are available at the NASDAQ Trader web site.

### 13.2.1 Supervisory Reviews

| Responsibility | • Head trader or designee | |
|---|---|---|
| Resources | • Go-Trader reports: 5% rule, Employee Trades, Family-Related Accounts, Volume by Security; Combined Executions for Unsolicited Orders; Combined Executions for Solicited Orders<br>• NASDAQ Reg Recon Reports (Regulation NMS Compliance) | |
| Frequency | • Daily | |
| Action | • Review Go-Trader reports and NMS compliance reports to review for accuracy and content of orders and trading records (exceptions)<br>• Record exceptions with explanation of action taken | |
| Record | • Go-Trader reports and NMS compliance reports via initial or signature, date reviewed (if applicable)<br>• Note exceptions with explanation of action | |

ALPINE_LIT168143

| | taken | |
|---|---|---|
| | | |

Applicable Rules: 17a-3 & 17a-4, NASD Rule 3110

## 13.2.2 Regulation NMS

[NASDAQ Head Trader Alert 2007-187; NASDAQ Trader Reg NMS web page: http://www.NASDAQTrader.com/regnms; NASDAQ Reg Recon web site: http://www.nasdaqtrader/trader/tradingservices/productservices/productdescriptions/regrecon.stm; SEC Responses to FAQs Concerning Rules 611 and 610: http://sec.gov/divisions/marketreg/nmsfaq610-11.htm]

Regulation NMS was adopted to strengthen the national market system for equity securities. It requires markets to interact in a way that permits orders to seek the best available market. Rule 611, the Order Protection Rule, is the primary rule that affects broker-dealers and requires broker-dealers to prevent "trade-throughs."

### 13.2.2.1 Key Definitions

[SEC Regulation NMS Rule 600]

**Automated trading center:** a trading center that:

- has implemented systems, procedures and rules to display automated quotations in compliance with Regulation NMS;
- identifies all quotations other than automated quotations as manual quotations;
- immediately identifies its quotations as manual quotations whenever it has reason to believe it is not capable of displaying automated quotations; and
- has adopted reasonable standards limiting when its quotations change from automated to manual quotations, and vice versa, to defined circumstances that promote fair and efficient access to its automated quotations.

**Directed order:** a customer order that the customer specifically instructs the broker or dealer to route to a particular venue for execution.

**Intermarket sweep order (ISO):** a limit order for an NMS stock that meets the following requirements:

- When routed to a trading center, the limit order is identified as an intermarket sweep order; and
- simultaneously with the routing of the ISO limit order, one or more additional limit orders, as necessary, are routed to execute against the full displayed size of any protected bid, in the case of a limit order to sell, or the full displayed size of any protected offer, in the case of limit order to buy, for the NMS stock with a price that is superior to the limit price of the ISO limit order. These additional routed orders also must be marked "ISO."

An ISO is premised on the condition that the trading center or broker-dealer responsible for routing the ISO will have attempted to access all better-priced protected quotations. This exception facilitates the execution of certain types of orders, such as large block orders.

ALPINE_LIT168144

**Market center:** any exchange market maker, OTC market maker, alternative trading system, national securities exchange, or national securities association.

**NMS security:** any security or class of securities for which transaction reports are collected, processed, and made available pursuant to an effective transaction reporting plan, or an effective national market system plan for reporting transactions in listed options.

**Protected quotation:** a quotation in an NMS stock that:

- is displayed by an automated trading center;
- is disseminated pursuant to an effective national market system plan; and
- is an automated quotation that is the best bid or best offer of a national securities exchange (including NASDAQ) or the best bid or best offer of a national securities association.

To be protected, the quotation must be immediately and automatically accessible.

**Trade-through:** the execution of a trade as principal or agent during regular trading hours at a price inferior to protected quotations.

**Trading center:** a national securities exchange or national securities association that operates an SRO trading facility, an alternative trading system, an exchange market maker, an OTC market maker, or any other broker or dealer that executes orders internally by trading as principal or crossing orders as agent.

## 13.2.2.2 Trade-Throughs

[SEC Regulation NMS Rule 611; SEC Division of Market Regulation Responses to Frequently Asked Questions Concerning Rule 611 and Rule 610 of Regulation NMS]

Firms that route orders have the obligation to prevent trade-throughs, **i** .e., execution of orders at prices inferior to protected quotations. Consolidated quotation data includes on each quotation a condition code to identify whether quotations are manual, and thus not protected, or automated and possibly protected. If the Firm routes orders to a market center, that market center is responsible for ensuring the execution complies with the Order Protection Rule. Trades that are internalized (in-house crosses, trades on a proprietary basis with customers) must not violate trade-through requirements and must be reported to a Trade Reporting Facility (TRF).

While the purpose of the NMS is to connect markets to afford orders the best available price, broker-dealers have obligations to seek the best available market. Order routers have three tools available to control the handling of orders to comply with Rule 611:

- a limit price (preclude execution at a price inferior to the limit)
- an immediate-or-cancel (IOC) designation (triggers the requirement for automated quotations and particularly that the trading center provide an immediate response to the order)
- an ISO designation (the BD routing the order assumes responsibility)

### 13.2.2.2.1 Trade Reporting Exception Modifiers

[SEC Regulation NMS Rule 611(a) and Rule 611(b)]

ALPINE_LIT168145

Applicable modifiers will be appended to last-sale transaction reports for trades that fall within the exceptions and exemptions from Rule 611.

| Responsibility | • Head Trader |
|---|---|
| Resources | • Internal or third-party reports on NMS compliance |
| Frequency | • Monthly |
| Action | • Review to determine that trade-throughs are permitted when an exception is available and are used only when permitted<br>  ○ Test transactions with trade-through modifiers to confirm they qualify for an exception and have the appropriate modifier |
| Record | • Internal or third-party reports with records of action taken<br>• NASDAQ reports with records of action taken<br>• OTC Trading Manager Monthly Checklist |

Trade-throughs are permitted under certain exceptions and require modifiers on last-sale transaction reports to identify the exception. Exceptions are explained below.

**Self-help exemption** [Regulation NMS Rule 611(b)(1)]: The trading center displaying the protected quotation that was traded through was experiencing a failure, delay or malfunction. The exemption may be invoked when there is a material delay in response (the trading center repeatedly fails to respond within one second after receipt of an order). **When an electronic notification invoking the "self-help" exception is sent or received, a copy must be forwarded to FINRA.**

**Contracts other than "regular way"** [Regulation NMS Rule 611(b)(2)]: The trade-through transaction is not regular way.

**Single-price opening, reopening, or closing transactions** [Regulation NMS Rule 611(b)(3)]: The trade-through transaction was a single-priced opening, reopening, or closing transaction by the trading center.

**Protected bid** [Regulation NMS Rule 611(b)(4)]: The trade-through transaction was executed at a time when a protected bid was priced higher than a protected offer in the NMS stock.

ALPINE_LIT168146

**Intermarket sweep orders (ISOs)** [Regulation NMS Rule 611(b)(5) & (6)]: The trade-through was an ISO or was effected by a trading center that simultaneously routed an ISO to execute against the full displayed size of any protected quotation in the NMS stock that was traded through.

**Benchmark orders** [Regulation NMS Rule 611(b)(7)]: The trade-through was the execution of an order at a price that was not based, directly or indirectly, on the quoted price of the NMS stock at the time of execution and for which the material terms were not reasonably determinable at the time the commitment to execute the order was made.

**Flickering quotations** [Regulation NMS Rule 611(b)(8)]: The trading center displaying the protected quotation that was traded through had displayed, within one second prior to execution of the transaction that constituted the trade-through, a best bid or best offer, as applicable, for the NMS stock with a price that was equal or inferior to the prior of the trade-through transaction.

**Stopped orders** [Regulation NMS Rule 611(b)(9)]: The trade-through was the execution by a trading center of an order for which, at the time of receipt, the trading center had stopped the order where: (i) the order was for a customer; (ii) the customer agreed to the specified price on an order-by-order basis; and (iii) the price for a stopped buy order was (for the NMS stock at the time of execution) lower than the national best bid or for a stopped sell higher than the national best offer.

The following exceptions are not subject to trade-through requirements or written policies and procedures:

**Errors** [SEC Release No. 34-55884]: A trading center transaction is effected solely to correct a bona fide error (records of facts and circumstances of the error must be maintained and the transaction recorded in the error account).

A "bona fide error" is defined as:

- The inaccurate conveyance or execution of any term of an order including, but not limited to, price, number of shares or other unit of trading; identification of the security; identification of the account for which securities are purchased or sold; lost or otherwise misplaced order tickets; short sales that were instead sold long or vice versa; or the execution of an order on the wrong side of a market
- The unauthorized or unintended purchase, sale, or allocation of securities, or the failure to follow specific customer instructions
- The incorrect entry of data into relevant systems, including reliance on incorrect cash positions, withdrawals, or securities positions reflected in an account
- A delay, outage, or failure of a communication system used to transmit market data prices or to facilitate the delivery or execution of an order

Absent a bona fide error, the exception does not apply to failure to execute a not-held order in accordance with a customer's expectations. The error must be recorded in the error account. The exception applies only to the error transaction itself and not to any subsequent proprietary trades to eliminate a position connected with the error.

**Print protection transactions** [SEC Release No. 34-55883]: An order that afforded print protection as explained in the releases.

ALPINE_LIT168147

**Contingent trades** [SEC Releases No. 34-54389 and 34-57620]: An order involving one or more NMS stocks that are components of a qualified contingent trade as explained in the release.

**Non-convertible preferred securities** [SEC Release No. 34-57621]: Because non-convertible preferred securities have characteristics similar to fixed income instruments, the SEC has exempted transactions in these securities from trade-through requirements

#### 13.2.2.2.2 Best Execution

Complying with trade-through obligations does not supplant the requirement for best execution. The Firm is still obligated to use reasonable diligence to obtain the best execution of customer orders and will continue to conduct best execution reviews of the quality of order routing including orders executed internally.

### 13.2.2.3 Intermarket Sweep Orders (ISOs)

When an order is designated as an ISO, the receiving trading center will execute the order without regard to any better-priced protected quotations at other trading centers. When Alpine enters an ISO, it is required to route additional ISOs to execute against any better-priced quotations at other trading centers.

### 13.2.2.4 Access To Quotations

[SEC Regulation NMS Rule 610]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Fees charged, feedback from others |
| Frequency | • Quarterly |
| Action | • Review fees charged for consistency with SRO charges<br>• Respond to any complaints or concerns expressed by those accessing Alpine's quotations |
| Record | • Record of review of charges<br>• Responses to complaints and corrective action taken |

In its market making activities and role as a trading center, Alpine is prohibited from imposing unfairly discriminatory terms that prevent or inhibit another person's efficient access to Alpine's quotations in NMS stocks displayed through its SRO trading facility or an SRO display-only facility. Alpine is required to provide a level of cost and access substantially equivalent to that of the SRO's facility.

### 13.2.2.5 Third-Party Vendors

| Responsibility | • Head Trader |
|---|---|
| Resources | • Contract with third party |

ALPINE_LIT168148

| | |
|---|---|
| | • Reports available from third party |
| **Frequency** | • Upon inception and periodically at renewal - contract with third party<br>• Timeframes (daily, weekly, monthly, other) corresponding to available reports<br>• Quarterly - conduct best execution reviews |
| **Action** | • Review third party's order handling capabilities and ability to comply with Regulation NMS requirements<br>• Execute contract with third party and review contract at time of renewal<br>• Review reports for compliance with NMS<br>• Where compliance is in question:<br>  ○ Confer with third party<br>  ○ Determine corrective action if necessary<br>  ○ Make adjustments to trades if necessary<br>  ○ Consider alternative third parties if necessary<br>• Conduct best execution reviews to determine quality of executions by third party |
| **Record** | • Contracts with third party<br>• Reports and records of corrective action<br>• Records of best execution reviews |

If Alpine employs a third party to handle orders on its behalf, it will consider the third party's ability to comply with Regulation NMS and regularly review the quality of order executions.

## 13.3 General Requirements For OTC Traders

### 13.3.1 Qualification And Registration Of OTC Traders

[NASD Rule 1031 and 1032(f); NASDAQ Rule 1032(f)]

| | |
|---|---|
| **Responsibility** | • CCO and CFO |
| **Resources** | • New hire information<br>• Change of job status information<br>• Requests for registration |
| **Frequency** | • As required |
| **Action** | • Determine prospective traders are qualified by experience or training<br>• Arrange for necessary training<br>• Identify employees who require registration<br>• Contact Compliance to request registration<br>• Ensure registration is effective prior to engaging in trading activities |
| **Record** | • Registration and licensing records are retained in the employee's registration file |

ALPINE_LIT168149

The following activities involving equity, preferred or convertible debt securities transactions effected over-the-counter require registration as a Series 55 Equity Trader:

- proprietary trading
- execution of transactions on an agency basis
- direct supervision of the foregoing activities

Qualification as a General Securities Representative or a Limited Representative - Corporate Securities is a prerequisite to taking the Series 55 examination and becoming registered as an Equity Trader.

## 13.3.2 Continuing Education

[FINRA Rule 1250; NASDAQ Rule 1120]

[FINRA Rule 1120]; NASDAQ Rule 1120

All traders are subject to the Regulatory Element of continuing education which is administered by the FINRA at designated sites. OTC traders who have contact with public customers are also subject to Firm Element continuing education. Refer to the section *Continuing Education* in the chapter *TRAINING AND EDUCATION* for more information about continuing education requirements.

## 13.3.3 Training

OTC traders will receive training depending on the individual's prior experience and scope of responsibilities. The Head Trader is responsible for determining the type of training necessary for each trader hired for the OTC Trading Department. Among other subjects, areas covered in training include:

- Anti-competitive activities
- Best execution obligations
- Inside information and information barriers ("Chinese walls")
- Traders' personal trading

## 13.3.4 Annual Compliance Meeting

[NASD Rule 3010(a)(7)]

As required by FINRA rules, traders will participate in an annual compliance meeting where OTC trading policies and procedures will be discussed. All traders are required to attend the annual compliance meeting. Traders who are not available to attend a scheduled meeting will meet one-on-one with Compliance or the Head Trader to satisfy the compliance meeting requirement.

Refer to the section *Annual Compliance Meeting* in the chapter *TRAINING AND EDUCATION* for more information.

## 13.3.5 Traders' Personal Accounts

| Responsibility | • CCO |
| --- | --- |

ALPINE_LIT168150

| | |
|---|---|
| **Resources** | • Order tickets or other order records<br>• Confirmations<br>• Statements |
| **Frequency** | • As required |
| **Action** | • Review traders' personal trading accounts to identify:<br>    ○ trades in securities in which the trader makes a market |
| **Record** | • Retain record of corrective action (notes of action, copy of reprimand memo, *etc.,* as appropriate) in employee's file |

Trader's personal accounts (including any account where the trader has a beneficial interest or control, such as a trust account, custodian account, *etc.*) are subject to the following requirements:

• Traders may not cross orders with customers.
• Exceptions require the approval of the designated supervisor.

### 13.3.6 Information Barrier Procedures (Chinese Walls)

Alpine has adopted information barrier procedures which are included in the chapter *INSIDER TRADING*. The purpose of those procedures is to ensure Alpine may continue conducting multiple lines of business (such as trading and research) when another department is in possession of inside information about a public company. Information barriers also limit access to information about orders that, if acted upon, would constitute "frontrunning" and rule violations.

This means that OTC traders should not seek nor expect to receive information from investment bankers regarding activities that may be the subject of confidentiality. Traders may not participate in confidential investment banking activities (brought "over the wall") unless previously approved by Compliance. Compliance may restrict the trader's participation in trading the subject company's securities. Such traders are also subject to maintaining the confidentiality of investment banking activities involving inside information.

Traders also cannot disclose information about pending orders other than to authorized trading personnel, Compliance, and other authorized personnel. For example, a dealer with a proprietary trading desk must shield those traders from information about customer orders, since trading on behalf of the dealer on knowledge of customer orders would constitute a rule violation.

Traders should consult the information barrier procedures or contact Compliance for further information.

### 13.3.7 Annual Certification

| | |
|---|---|
| **Responsibility** | • CCO |
| **Resources** | • Certifications |
| **Frequency** | • Annually |

ALPINE_LIT168151

| | |
|---|---|
| **Action** | • Confirm all traders have completed a certification<br>• Follow up regarding information about outside accounts (request more information, determine whether accounts should be closed)<br>• Follow up regarding use of cell phones, PDAs and smart phones by all traders. If responses indicate use contrary to policy then contact trader to provide further education and/or take any required corrective action |
| **Record** | • Certifications which are to include any and all notations of action(s) taken, if applicable |

Traders will be required to certify in writing, on at least an annual basis, the traders individual knowledge and understanding of Alpine's OTC Trading and Market Making policies and procedures while additionally providing acknowledgment of the obligation of each trader to comply with said policies and procedures.

## 13.3.8 Disciplinary Policy

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Ongoing reviews of trader activities (described in this chapter) that indicate violations of NASDAQ rules and/or Alpine policies or procedures |
| **Frequency** | • As required |
| **Action** | • Confer with trader<br>• Consult with Compliance and take corrective action as required which may include:<br>    o Additional training<br>    o Letter of reprimand<br>    o Restrictions on trading activities<br>    o Special supervision<br>    o Suspension<br>    o Termination<br>    o Other corrective action which may be appropriate |
| **Record** | • Document corrective action taken in trader's file and/or on the OTC Trading Manager Checklist |

Alpine expects traders to comply with the requirements imposed by regulatory rules, NASDAQ requirements, and Alpine policies and procedures. Because of the potential seriousness of violations and their impact on the trader, Alpine, and customers; Alpine has established a disciplinary policy. This disciplinary policy will be supervised and enforced by the Head Trader. The Head Trader must supervise all market making activities of traders and ensure compliance with all applicable rules and regulations.

ALPINE_LIT168152

Disciplinary action taken will be determined by the Trading Manager and depends on the nature of the violation and whether it is a recurring violation.

## 13.4 Initial Market Maker Requirements

[NASDAQ Rule 4600 Series; FINRA Rule 6540]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Market Maker Additions Checklist<br>• Requests to initiate quotes |
| Frequency | • As required |
| Action | • Review security for eligibility for trading considering firm criteria; requirement to file with FINRA for non-exchange-listed securities; blue sky considerations<br>• If filing is required for a non-exchange-listed security, obtain required information and file with FINRA and receive clearance prior to initiating quotations |
| Record | • Market Maker Additions Checklist<br>• Filings and clearance from FINRA |

Prior to a trader quoting an additional security, the security must meet Alpine's selection criteria and Alpine must be registered as a market maker for the particular issue. The Head Trader must ensure that the security meets the selection criteria of Alpine. Additionally, the Head Trader will take measures to ensure that the trader quoting the security has not received payment for these market making activities.

### 13.4.1 Selection Of Securities

In general, Alpine will make markets in securities that meet the following criteria:

- the security is a NGM or NASDAQ Capital Market security
- for non-exchange-listed securities, Alpine has made the required filing and obtained FINRA approval or is eligible to publish a quote under an exemption from Rule 15c2-11 (see the section *Non-Exchange-Listed Securities*)
- Alpine issues research on the security
- Alpine has acted as underwriter for the security
- there is sufficient institutional or retail interest in the security

Prior to making a market in a security, the trader must complete the Market Maker Additions Checklist, which must be approved by the Trading Manager.

### 13.4.2 NGM And NASDAQ Capital Market Securities

For NGM or NASDAQ Capital Market securities already trading in the NASDAQ system, the trader may register the security directly through a NASDAQ terminal. Generally registration will be effective on the same day. A quotation must then be entered within five business days; failure to do so will result in the need to re-register.

ALPINE_LIT168153

### 13.4.3 IPOs And Syndicates

Traders may register immediately for an IPO or any newly authorized issue during the first five days the security is listed with NASDAQ, and quotations may be posted immediately after registering. Registration is made through the NASDAQ workstation or by calling NASDAQ Market Operations, depending on whether the issue is eligible for same-day registration.

## 13.4.4 Non-Exchange-Listed Securities

[SEC Rule 15c2-11; FINRA Rule 6432]

Prior to becoming a registered market maker in a non-exchange-listed security, Alpine must first comply with SEC Rule 15c2-11 and make a filing with FINRA unless an exemption applies. The Head Trader will ensure that all appropriate steps are taken to comply with SEC Rule 15c2-11 when making the filing with FINRA.

### 13.4.4.1 Initiating Quotes

When initiating a market in a non-exchange-listed security, Alpine is required to make a filing with FINRA which must receive the filing at least three business days before publishing or displaying a quote. "Initiating" a quote means a prior market was not published.

The filing requires financial and other information about the company. If the information is available through the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, it is not necessary to obtain and file the information. Where information is not available through EDGAR, the trader must obtain the required information. Regardless of the source of the information, the trader must have a reasonable basis for believing that the information is accurate in all material respects and was obtained from reliable sources. The filing must be reviewed and signed by a designated principal. Clearance must be received from the FINRA **prior to** initiating a quote. The Head Trader will oversee this process to ensure appropriate filings are performed by Alpine **prior to** initiating a quote.

A file should be established for each issue and should include a record of the filing; the information required by Rule 15c2-11; and notation of FINRA's clearance including the date it was received. This information must be maintained by the Head Trader. This information must be retained for three years and is available to customers, upon request.

#### 13.4.4.1.1 Blank Check Company Securities

[FINRA Notice to Members 00-49]

Initiating quotations in blank check company securities may be complicated by the nature of the initial distribution of the securities of certain issuers. Some issuers' securities may require registration with the SEC and may not be free to trade. The SEC has indicated that in most if not all cases, the resale of the securities of blank check companies is restricted and can only be resold through registration.

A "blank check company" is defined as a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person.

Prior to acting as a market maker and initiating or resuming quotations of the security of a blank check company, Alpine is required to provide the FINRA with an independent opinion from counsel why the sale of the securities would not violate the registration requirements of the Securities Act. The Trading Dept. should contact Compliance for assistance in obtaining clearance of blank check company securities.

ALPINE_LIT168154

### 13.4.4.2 Piggy-Back Exemption

If another dealer has initiated quotes in a non-exchange-listed security and complied with the requirements of 15c2-11, Alpine may rely on the "piggy-back" exemption after a 30-calendar day waiting period from the date the initiating firm filed with FINRA. This exemption allows Alpine to publish quotes, relying on the initiating dealer's filing, without making its own filing with the FINRA.

Traders may check their NASDAQ terminals to determine whether Alpine may publish quotes in a non-exchange-listed security. When the symbol for the security is input, one of the following will appear:

***Active -*** Security is cleared for publishing quotes.

***Eligible -*** A 15c2-11 filing has been made but the waiting period has not elapsed. Alpine would be required to also make a 15c2-11 filing to publish quotes before the waiting period has elapsed.

***Ineligible -*** No filing has been made, Alpine would have to make the 15c2-11 filing with FINRA prior to initiating quotes.

Questions regarding filing requirements and whether a stock qualifies for a piggy-back exemption should be referred to Compliance.

### 13.4.4.3 Exemption For Securities Delisted From NASDAQ

[FINRA Notice to Members 97-83]

It is not necessary to file a Form 211 for a security delisted from NASDAQ, if **all** of the following conditions are satisfied:

- the delisting results solely from non-compliance with NASDAQ initial listing or maintenance standards
- the security has been quoted continuously in NASDAQ during the 30 calendar days preceding delisting excluding any trading halt not exceeding one day
- the issuer is not in bankruptcy
- the issuer is current in all of its periodic reporting requirements under Section 13(a) or 15(d) of the Exchange Act
- Alpine has been a market maker in the security being delisted during the 30-day period preceding delisting
- the exemption extends only to classes of securities listed on NASDAQ

The trader must register to trade the security on the OTC Bulletin Board **no later than** the next trading day after delisting by calling NASDAQ Market Operations.

### 13.4.4.4 Other Exemptions From 15c2-11

No filing is required and no issuer information is required before Alpine may enter a quote in the security if:

- the security is listed on NASDAQ or on a U.S. stock exchange and trades occur in the security on the same day or the business day before Alpine submits a quotation.

ALPINE_LIT168155

- the quotation is entered solely on behalf of a customer and is not solicited. See the following subsection for required records relating to unsolicited orders.

### 13.4.4.5 Resuming Quotes After A Trading Suspension

If a non-exchange-listed security is subject to an SEC trading suspension, Alpine must comply with the filing requirements for initiating quotes, even if Alpine was in compliance prior to the suspension. The piggy-back exemption is **not** available immediately following a trading suspension.

Prior to initiating or resuming publication of a quote, the procedures for initiating a quote, as explained in a previous section, must be followed.

### 13.4.5 MPIDs (Market Participant Identifiers)

[FINRA Rule 6160, 6170 and 6480; NASDAQ Rule 4613(a)(2)]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Multiple MPID assignments |
| Frequency | • Quarterly - review to determine traders are using only MPIDs assigned to them<br>• Periodically - in training, remind traders about avoiding improper sharing of order/trading information<br>• Annual - supervisory control reviews |
| Action | • If multiple MPIDs are requested and approval is received, review trader access to confirm traders are using only the MPIDs assigned to them<br>• Include improper information sharing in trader training<br>• In annual supervisory control reviews (conducted by individuals assigned by Compliance), include review of use of multiple MPIDs |
| Record | • Requests for multiple MPIDs and approvals<br>• Assignment of MPIDs to traders<br>• Record of reviews to confirm use only by assigned traders<br>• Records of trader training |

Alpine may obtain supplemental displayable or non-displayable MPIDs. Traders assigned an additional MPID are responsible for using it in accordance with limitations which include:

- use of multiple MPIDs **only** by the trader to whom they are assigned; and
- limiting order/trading information to the assigned trader only and not sharing such information with other traders or personnel.

### 13.4.6 Prohibition Against Receiving Payments

Alpine and its employees are prohibited from receiving any payment or other consideration, directly or indirectly, to publish a quotation, make a market in an issuer's securities, or submit an application to make a market in an issuer's securities.

Alpine's Head Trader will supervise each and every instance of market making to ensure that payments or other consideration, directly or indirectly, are not made to make a market in a security. Head Trader will maintain all relevant documentation and supervise each Trader personally in order to ensure that payments are not made for market making activities.

## 13.5 Quotations

ALPINE_LIT168156

[SEC Regulation NMS Rule 602; FINRA Rule 6000 series; NASDAQ Rule 4613 and 4756]

| | |
|---|---|
| **Responsibility** | • Head Trader (is the Designated Supervisor unless otherwise indicated) or designee |
| **Resources** | • Control Sheet<br>• List of market maker securities<br>• Registered Securities List (formerly Trading Account Securities list)<br>• NASDAQ Compliance Report Cards including the Reg Recon (Regulation NMS Report)<br>• Notification from traders of unresolved backing-away complaints<br>• Withdrawal Request Form(s)<br>• Backing-Away Log<br>• Trading Manager Checklist |
| **Frequency** | • Monthly the CFO - compares Trading Account Securities list vs. MMPR list of securities where Alpine is registered as a market maker<br>• Monthly the CFO - reviews compliance with firm quote obligations for current information availability<br>• As required - assist in resolving backing-away complaints<br>• As required - requests to withdraw quotes |
| **Action** | • Confirm that quoted securities are only those where Alpine is a registered market maker<br>• Confirm that market maker quotations communicated to vendors are only for subject securities<br>• Review for compliance with quote obligations<br>• Review backing away issues:<br>    ○ Confer with trader regarding resolution of unresolved backing-away complaints<br>    ○ Confer with trader who is the subject of multiple backing-away complaints to determine if corrective action is necessary<br>• Review quote withdrawal issues:<br>    ○ Review requests to withdraw quotes and approve or disapprove<br>    ○ For unexcused or accidental withdrawals, consult with trader regarding reason(s) withdrawal occurred<br>• Take corrective action which may include consultation with the trader; additional education for the trader, and/or consult with Compliance regarding corrective action |
| **Record** | • Record initials or signature and date reviewed (if applicable)<br>• Notate any action taken, if any |

This section explains the obligations when publishing quotations where Alpine is a registered market maker in a covered security. A "covered security" is any reported security and any other security where transaction information (trade reports, last sale data, quotation information) is disseminated through an automated quotation system.

Other applicable Rules: 5310 (formerly 2320(f)

ALPINE_LIT168157

### 13.5.1 Quotation Requirements And Obligations

[FINRA Rule 6272(a)]

For each ADF-eligible security where Alpine is registered as a Registered Reporting ADF Market Maker, Alpine is obligated to be willing to buy and sell the security for its own account on a continuous basis during regular market hours and maintain a two-sided market. Quotation size must be at least one normal unit of trading (100 shares). Requirements on the ADF are consistent with those on national exchanges, including the requirements of Regulation NMS.

- The bid price may not be more than the Designated Percentage away from the National Best Bid or, if there is no National Best Bid, no more than the Designated Percentage away from the last reported sale. If the NBB (or if no NBB the reported last sale) increases to a level that causes the bid to be more than the Defined Limit away from the NBB, or if the bid is executed or cancelled, the market maker is obligated to enter a new bid at a price not more than the DP or identify to NASDAQ current resting interest that satisfies the two-sided obligation.
- The same obligation applies to offers.
- Definitions including "Designated Percentage" and "Defined Limit" may be found in FINRA Rule 6272(a)(5) which should be consulted for these and other definitions affecting ADF Market Makers.

## 13.5.2 Dissemination Of Quotations

[SEC Regulation NMS Rule 602]

Quotations may be disseminated only for those CQS or covered securities where Alpine is a registered market maker. This includes placing quotations with market data vendors that publish quotations. Quotations communicated to vendors for display must be only for subject securities (securities where the Firm acts as market maker).

If the Firm is the exclusive source of information regarding quotations or transactions in an NMS stock, it will comply with requirements to provide information to a securities information processor on terms that are fair and reasonable.

## 13.5.3 Firm Quote Obligations

[FINRA Rule 5220 and 5220.01; NASDAQ Rule 4613(b)]

As a market maker in a NASDAQ issue, Alpine is obligated to maintain firm, two-sided continuous quotations during market hours (9:30 a.m. to 4:00 p.m. Eastern Time).

Exceptions to the firm-quote obligation include the following:

- the market maker is updating its quote and has sent the update to NASDAQ before the order is presented; or,
- the market maker has effected or is effecting a transaction when an order sought to be executed is presented and immediately upon completion of the transaction communicates a revised quotation to NASDAQ; or,
- the market maker has a substantial basis for believing the counterparty will not honor the trade (*i.e.,* the counterparty's clearing firm will no longer clear for the counterparty).

ALPINE_LIT168158

### 13.5.4 Non-Exchange Listed Security Quotations Displayed In Multiple Quotation Mediums

[FINRA Rule 6438]

When priced quotations for OTC Equity Securities are displayed on a real-time basis in two or more quotation mediums that permit quotation updates on a real-time basis, quotations must be the same in each medium except when a price quotation represents a customer limit order displayed on an electronic communications network (ECN) consistent with the exception to Rule 6460(b)(5) [a limit order delivered immediately upon receipt to an exchange or an ECN that widely disseminates the order].

### 13.5.5 Requirement To Publish An Inferior Quote
[FINRA Rule 4613(b)(2), Notice to Members 99-61]

A market maker is required to immediately reduce his/her quote to an inferior price whenever it fails to execute the full size of an incoming order that is at least one normal unit of trading greater than its published quotation size. Following is an example illustrating this requirement.

Market Maker #1 (MM1) is bidding $10 for 100 shares of ABCD. Order Entry Firm #1 (OE1) sends an order to MM1 to sell 1,000 shares of ABCD at $10. MM1 partially executes OE1's 1,000-share order by buying 100 shares of ABCD. MM1 must immediately move its quotation to an inferior price for failing to execute the entire 1,000-share order. However, if OE1's 1,000 shares had been offered as an all-or-none order, MM1 would be permitted to decline the order and remain at its current quotation.

### 13.5.6 Reasonable Spreads
Traders are responsible for entering and maintaining quotes reasonably related to the market with reasonable spreads considering current market conditions.

### 13.5.7 Backing-Away

[FINRA Rule 5220; NASDAQ Rule 3320]

Failure to execute transactions at prices displayed in the NASDAQ system or quoted in the NNOTC market is generally known as "backing-away." A market maker must not back away and must execute an order presented to it at a price at least as favorable as its published quotation up to its published quotation size at all times during market hours. Traders are prohibited from backing-away from their published quotation. The FINRA has developed an automated surveillance system (the Firm Quote Compliance System or "FQCS") to permit resolution of backing-away complaints on a real time basis.

Traders should follow the following procedure to file a backing-away complaint:

- Call Market Regulation Department within five (5) minutes of the alleged backing-away (800-925-8156).
- If the trader contacts the counterparty first, the 5-minute period does not apply, however, the trader must **immediately** contact Market Regulation after contact with the other firm.
- Notify the Trading Manager of an unresolved backing-away complaint.
- Document the backing-away complaint and resolution on the Backing-Away Log.

Traders should follow the following procedure to respond to a backing-away complaint from a counterparty:

ALPINE_LIT168159

- Attempt to resolve the complaint with a contemporaneous trade execution, if appropriate.
- Notify the Trading Manager if a contemporaneous trade execution will not be effected.
- Document the backing-away complaint and resolution on the Backing-Away Log.

## 13.5.8 Improving Public Quotes: Limit Orders

[SEC Regulation NMS Rule 604; NASDAQ Rule 3390]

A market maker may have an obligation to improve its quotation when it receives a limit order priced better than the market maker's quote (the "Limit Order Display Rule"). Refer to the section *Limit Orders* regarding these requirements.

## 13.5.9 NNOTC Securities Quoted In Different Quotation Mediums

[FINRA Rule 2320(g)(2)]

If a trader displays quotations for the same NNOTC security in two or more quotation mediums that permit real-time updates (*i.e.,* OTCBB, electronic pink sheets), the trader is obligated to display the same price in each quotation medium.

### 13.5.9.1 Electronic Pink Sheet Quotations

Quotations on the Electronic Pink Sheets (PNK) are limited to the securities of companies that provide current financial information to Alpine, post current financial information on their web page, or otherwise make current financial information available to the public. In addition, the information required by SEC Rule 15c2-11 must be available through the same mediums previously described. Traders are not permitted to continue PNK quotations for the securities of companies where the date of the last audited financial statements and SEC Rule 15c2-11 information is older than 15 months.

## 13.5.10 OTCBB Continuing Quotation Requirements

[FINRA Rule 6530 and 6540]

Quotations on the OTCBB are limited to the securities of companies that report their current financial information to the SEC, banking, or insurance regulators. Traders are not permitted to continue OTCBB quotations for the securities of companies that are not current in their filings.

The FINRA will affix a modifier on the symbol of any security where the issuer is not current in its filings. Additions and changes are reported on the OTCBB Daily List which is available at the OTCBB web site *www.otcbb.com*.

Once an issuer is delinquent in its filings, the security may be quoted on the OTCBB for the following grace periods from the due date of the delinquent report:

- 30 days for issuers who file with the SEC
- 60 days for issuers who file with other regulators

After the grace period has expired, quotations in the security of the delinquent issuer are not permitted on the OTCBB.

## 13.5.11 NASDAQ Market Opening Process

[FINRA Rule 4704]

ALPINE_LIT168160

NASDAQ's market opening includes a pre-market trading session. The following is a summary description of the process. Detailed information is available at *www.NASDAQtrader.com*.

- The purpose is to maximize the number of shares executed at a single opening price and disseminate timely imbalance information.
- It is intended to execute all market-on-open (MOO) orders.
- At 8:00 a.m. E.T., the system opens for all eligible quotes and orders.
- During the pre-market period, all participant quotes are open and firm.
- An Opening Cross process for NASDAQ stocks determines the price at which orders will be executed at the open and executes those orders.
- The process prevents pre-opening locks and crosses.

### 13.5.11.1 Opening Price For Initial Public Offerings (IPOs)
[NASDAQ Head Trader Alert 2004-130]

The NASDAQ Market Opening Process applies to establishing a security's opening price for IPOs. Indicative quoting is permitted for a single 15-minute time window at the end of which NASDAQ releases the security for trading and immediately applies the Market Opening Process.

### 13.5.12 NASDAQ Closing Cross
[FINRA Rule 4709]

NASDAQ has a closing cross process that begins at 4:00 p.m. E.T., and after-hours trading commences when the closing cross concludes. The process determines the price at which orders are executed at the close and executes those orders, including market-on-close (MOC), limit-on-close (LOC), and imbalance-only (IO) orders.

Rule 4709 should be consulted for details explaining the process.

### 13.5.13 Locked And Crossed Markets

[FINRA Rule 6240 and 6437; NASDAQ Rule 4613(e)]

Quotations may not be displayed that lock or cross a market in NMS or OTC equity securities.

Under the NASDAQ System, locked and crossed markets will not occur during normal market hours. If a quote is entered that would lock or cross the market, the quoting party will receive a system warning. For order entry, the system will only send a warning if the order crosses the market and exceeds the allowable deviation. To complete the quote or order entry, the market participant is required to manually override the warning system. If the quote/order is overridden, the order will not be displayed as part of a display quote but will be treated as a marketable limit order and entered into NASDAQ National Market Center as a Non-Directed liability order for execution in time priority.

When entering quotations to the OTCBB and Alternative Display Facility (ADF) markets, quotes should not be entered that would lock or cross an existing quote in the market.

### 13.5.13.1 Locked And Crossed Markets In The ADF
Obligations of a Registered Reporting ADF Market Maker if it is involved in a locked or crossed market include the following:

ALPINE_LIT168161

- When another Market Maker locks/crosses the market prior to 9:20 a.m. E.T., send a Trade-or-Move message to the other Market Maker locking/crossing the market.
- If a Market Maker locks/crosses the market between 9:20 and 9:29:29 a.m. E.T., the Market Maker must immediately send to the Market Maker whose quote it locks/crosses a Trade-or-Move message at the receiving Market Maker's quoted price.
- When receiving a Trade-or-Move message, the receiving Market Maker must either fill the message for the full size of the message or move the bid down (or offer up) by a quotation increment that unlocks/uncrosses the market.
- Quotes cannot be entered that would lock or cross the market between 9:29:30 and 9:29:59 a.m. E.T.
- Messages for securities in the NASDAQ 100 Index or the S and P 400 Index must be for at least 10,000 shares.
- For all other securities, messages must be for at least 5,000 shares.
- The sending party must append a symbol indicating it is a Trade-or-Move message.

## 13.5.14 Quotation Recording And Reporting

[FINRA Rule 6430]

OTC market makers are required to record and report their quotations (bid and/or offer) or unpriced indications of interest that are displayed in an inter-dealer quotation system that permits real-time quotation updates. This includes any changes to quotation price or size or unpriced indication of interest, and the time of any change. This requirement does NOT apply to quotations displayed to an inter-dealer quotation system that is:

- operated by the FINRA or a national securities exchange; or,
- operated by another FINRA member firm.

## 13.5.15 Termination Of Market Maker Registration And Withdrawal Of Quotes

[FINRA Rule 6470; NASDAQ Rule 4620]

Market maker registration in a security may be voluntarily terminated by withdrawing Alpine's quote from the NASDAQ Market Center. Alpine may not re-register for the same security for 20 business days after withdrawal.

If an accidental withdrawal occurs, NASDAQ MarketWatch should be contacted as soon as possible (within one hour of withdrawal) and immediately followed with written notification of the withdrawal and reinstatement request. MarketWatch determines whether to permit immediate reinstatement.

### 13.5.15.1 Excused Withdrawal Due To Fail-To-Deliver Position

[SEC Regulation SHO; FINRA Regulatory Notice 07-45; FINRA Notice to Members 04-93]

Under Regulation SHO, the Firm may not effect short sales in a security where the Firm (or its clearing agency) has a fail to deliver position.

This affects a market maker's ability to enter short sales until the fail to delivery position is closed out. NASDAQ considers this circumstance an excused withdrawal which allows the market maker to resume making the market once the fail to deliver position is closed out or the security becomes borrowable.

ALPINE_LIT168162

### 13.5.15.2 NASDAQ System Quote Withdrawals

[NASDAQ Rule 4120]

NASDAQ may withdraw quotations due to issuer corporate action (dividend, payment, or distribution) or due to a trading halt. To resume quoting the security, the trader is obligated to:

- enter a new two-sided quotation prior to the close of the regular market session on the same day NASDAQ withdrew the quotation; or,
- enter a new two-sided quotation on the day when trading resumes following a trading halt, or, if the resumption of trading occurs when the market is not in regular session, enter a new quotation prior to the opening of the next regular market session; or,
- submit a request to NASDAQ MarketWatch prior to the close of the regular market session on the next regular trading day after the day when a quotation could have been re-entered.

## 13.5.16 After Hours Trading

Traders who open quotations after the regular close of the NASDAQ market are obligated to comply with all applicable limit order protection and display rules while their quotes are open. When trading in a non-market maker capacity there is a continuing obligation to protect customer limit orders when trading for Alpine's account.

## 13.5.17 Prohibited Practices Relating To Publication Of Quotations

[SEC Securities Exchange Act of 1934 Rule 10b-5; FINRA Rule 5210 and 5220.01]

Traders are prohibited from engaging in any of the following practices when publishing quotations:

- Publishing a fictitious quote
- Quoting in increments other than those determined by market forces of supply and demand and/or an independent valuation of the security
- Quoting in sizes that are not reflective of the market forces of supply and demand
- Quoting in sizes contrary to the FINRA rules regarding minimum quotation size
- Displaying quotes in order to help another market maker execute trades to its advantage
- Displaying quotes in order to orchestrate artificial price movements
- Displaying prices with no intention of trading at those prices to help another market maker
- Refusing to honor firm quote obligations, especially in a selective and discriminatory manner

Traders quotes will be monitored and reviewed by Head Trader to ensure compliance with the appropriate trading practices. Head Trader will provide monitoring of trading activity and implement disciplinary measures if necessary.

# 13.6 Handling Orders And Executions

[FINRA Rules 4706, 4710, 4714 and 4719]

FINRA and SEC rules impose requirements when market makers receive and execute orders. Subjects discussed in this section include:

- best execution
- fair prices
- limit orders
- short sales

ALPINE_LIT168163

### 13.6.1 Best Execution

[SEC Regulation NMS; FINRA Rule 5310; NASDAQ Rule 5310A]

| | |
|---|---|
| **Responsibility** | • Head Trader is the Designated Supervisor |
| **Resources** | • NASDAQ Compliance Report Cards<br>• NASDAQ Reg Recon (Regulation NMS compliance)<br>• Order records/reports for customer and proprietary accounts<br>• OTC Trading Manager Checklist |
| **Frequency** | • Daily - review order records and/or reports (reports are reviewed at the frequency they are produced)<br>• Monthly - review of Report Cards |
| **Action** | • Conduct reviews of orders including:<br><br>a) Review orders for securities with limited quotations or pricing for compliance with documentation of best available market<br><br>b) Where interpositioning occurs, review documentation justifying the circumstances<br>• Review market and limit orders for potential trading ahead<br>• Take corrective action which may include adjusting the customer's price on an order, consultation with the trader; additional education for the trader, and/or consult with the CCO regarding corrective action |
| **Record** | • OTC Trading Manager Checklist<br>• NASDAQ Report Cards including date of review (if applicable), reviewer's initials, and action taken, if appropriate<br>• Order records/reports with corrective action noted, if appropriate |

In a transaction for or with a customer (including a customer of another broker-dealer), the Firm must use reasonable diligence to determine the best market for the security and buy or sell in such market so the resulting price is as favorable as possible under prevailing market conditions. This obligation exists whether orders are executed internally or are sent to another dealer for execution. Factors for using "reasonable diligence" include:

- the character of the market for the security, *e.g.,* price, volatility, relative liquidity, and pressure on available communications;
- the size and type of transaction;
- the number of markets checked;
- accessibility of the quotation; and
- the terms and conditions of the order which result in the transaction, as communicated to the Firm.

The term "markets" is broadly defined, including market centers that are trading a particular security.

ALPINE_LIT168164

"Best execution" refers to using reasonable diligence to determine the best market to buy or sell a security and obtaining a price as favorable as possible under prevailing market conditions. Alpine's obligation to provide best execution also extends to handling and executing orders for customers of other broker-dealers routed to Alpine (but not orders that simply execute the order against Alpine's quote).

Alpine conducts regular reviews of execution and order routing (which regulators refer to as "regular and rigorous" review).

### 13.6.1.1 Market Maker Transactions

It is the trader's responsibility to provide customers with the best execution "reasonably available" for securities trades. This does not impose a standard requiring absolutely the best price for every order, however, traders must attempt to obtain the best execution possible considering the factors affecting the order. Such factors may include:

- execution price
- size and type of the order
- number of markets (with "markets" defined broadly, including market centers that are trading a particular security)
- trading characteristics of the security (price volatility, relative liquidity, and pressure on available communications)
- availability of information regarding the most favorable market for executing the trade
- availability of technological aids to process such data
- cost and difficulty of executing the order
- opportunity for price improvement

The trader may execute the order internally or route the order to another dealer or market to obtain best execution on behalf of the customer.

### 13.6.1.2 Marketable Orders

[FINRA Rule 5310.01]

[The Firm] is obligated to make every effort to execute fully and promptly a marketable customer order that it receives.

### 13.6.1.3 Best Execution And Executing Brokers

[FINRA Rule 5310.04]

The duty to provide best execution does not apply when another broker-dealer is simply executing a customer order against [The Firm]'s quote. The duty arises only when an order is routed from another broker-dealer to [The Firm] for the purpose of order handling and execution.

### 13.6.1.4 Interpositioning And Use Of Broker's Broker

[FINRA Rule 5310(a)(2), 5310(b) and 5310.05]

[The Firm] cannot interject a third party between itself and a market maker to execute an order for a customer or the customer of another broker-dealer unless it is to provide an execution advantageous to the customer. Examples of acceptable circumstances are where the customer's order is "crossed" with another retail firm which has a corresponding order on the other side, or where the identity of the firm, if known, would likely cause undue price movements adversely affecting the cost or proceeds to the customer.

ALPINE_LIT168165

The trader is responsible for documenting the acceptable circumstances for doing so on the order record.

### 13.6.1.5 Securities With Limited Quotations Or Pricing Information

[FINRA Rule 5310.06]

<u>**Regulation:**</u>

In any transaction for or with a customer pertaining to the execution of an order involving any security, equity or debit, for which there is limited quotations or pricing information available, broker-dealers will be expected to address those steps the firm will take to determine the best market for a security in the absence of multiple quotes or pricing information and to document how we comply with those policies and procedures.

In those cases, where there are less than two electronically published quotes or in those cases where there is limited quotations or pricing information available, Alpine brokers will be expected to contact the Trading Department so that they can contact the appropriate broker-dealer including market makers and make a reasonable effort to seek the best bid, absent some written exception.

<u>**Alpine's Policy**</u>

It is the responsibility of each Alpine broker to contact the Trading Department whenever there are less than two electronically published quotes or where there are limited quotations or pricing information available. Alpine's Trading Department will contact the appropriate broker-dealer including market maker(s) as enumerated above.

Once the Alpine broker has contacted the Trading Department, he /she must enter the names of the broker-dealer including market makers and their quotes in the note section in the lower left hand corner of the electronic order ticket on Go-Trader.

[FINRA Rule 5310.07]

### 13.6.1.6 Customer Instructions Regarding Order Handling

[FINRA Rule 5310.08]

If the customer gives an unsolicited instruction to route the customer's order to a particular market for execution, [The Firm] is not required to make a best execution determination beyond the customer's specific instruction. If [The Firm] receives a customer order from another broker-dealer where the customer routed the order to [The Firm], [The Firm] has a best execution obligation.

ALPINE_LIT168166

### 13.6.1.7 Principal And Riskless Principal Transactions

[NASDAQ Rule 5310A]

Principal transactions (whether or not acting as a market maker) must be executed at prices that meet best execution requirements.

Prices for riskless principal transactions, where the trader simultaneously has a buy and sell order which are matched and executed through a proprietary account, also must provide the customer(s) with the most favorable price available under best execution obligations. Riskless principal transactions also must be marked as such.

### 13.6.1.8 Sending Orders To Other Markets Or Dealers (Agency Transactions)

A trader may send an order for execution to another market or other dealer. Traders are obliged to use reasonable diligence to route the order to obtain a price as favorable as possible under prevailing market conditions. Factors to consider may include:

- the character of the market for the security (price, volatility, relative liquidity, *etc.*)
- size and type of transaction
- accessibility of markets or dealers and quotation sources
- availability of communications systems

### 13.6.1.9 Regular And Rigorous Review Of Execution Quality

[FINRA Rule 5310.09]

| Responsibility | • Head Trader |
|---|---|
| **Resources** | • NASDAQ Compliance Report Cards<br>• NASDAQ Reg Recon (Regulation NMS compliance)<br>• [The Firm]'s Rule 605 Market Center Reports<br>• Order records/reports for customer and proprietary accounts<br>• Clearing firm or other agent's report of statistics, review rationale, findings (if applicable) |
| **Frequency** | • Quarterly |
| **Action** | • Conduct regular and rigorous reviews of internal executions (if applicable) and order routing to evaluate compliance with best execution responsibilities including:<br>   o Review of data regarding prices and executions<br>   o Review pre-open orders including single or midpoint pricing as factors to consider<br>   o Review of aggregate or order-by-order routing of orders to review quality of executions<br>   o Determine whether to adjust order routing to improve executions<br>   o Review riskless principal transactions; customer block-sized orders; orders with special pricing terms and conditions; other order types<br>   o Review limited quotation/pricing securities for compliance with documentation to determine best execution |

ALPINE_LIT168167

| | <ul><li>Where order flow is routed to a BD acting as agent for [The Firm] (clearing firm, other executing BD):<ul><li>Obtain other BD's report of statistics, rationale of review, and findings</li><li>Review data to confirm agent is using reasonable diligence to provide best execution</li><li>Where deficiencies are noted, consult with agent and, if best execution is determined to be deficient, consider transferring order flow to another BD</li></ul></li></ul> |
|---|---|
| **Record** | <ul><li>Records of reviews of internal or routed customer orders, if applicable</li><li>Records of reviews of agent's best execution reviews, action taken, if applicable</li></ul> |

[The Firm] conducts regular reviews of its execution quality to determine whether [The Firm] is meeting its obligation for best execution of customer orders. This includes orders that are routed to other broker-dealers on an automated, non-discretionary basis as well as when [The Firm] internalizes order flow.

Where [The Firm] routes its order flow to another broker-dealer that has agreed to handle that order flow as agent for the customer (*e.g.,* a clearing firm or other executing broker-dealer), [The Firm] will rely on that broker-dealer's regular and rigorous review based on the statistical results and rationale of the review disclosed by the broker-dealer and reviewed by [The Firm].

### 13.6.1.10 Frontrunning

[NASD IM 2110-2; NASDAQ IM 2110-2 and 2110-3]

| Responsibility | <ul><li>Head Trader</li></ul> |
|---|---|
| **Resources** | <ul><li>Order records</li></ul> |
| **Frequency** | <ul><li>Daily</li></ul> |
| **Action** | <ul><li>Review customer orders vs. proprietary and employee orders to identify potential frontrunning</li><li>If frontrunning is identified, take corrective action which may include:<ul><li>Correcting the customer order for the better price</li><li>Discussion with the trader, enhanced trader education, disciplinary action if appropriate in consultation with Compliance</li></ul></li></ul> |
| **Record** | <ul><li>Order records including reviewer's initials, date reviewed, and action taken, if any</li></ul> |

ALPINE_LIT168168

Providing best execution, by definition, prohibits activities that could be deemed frontrunning including:

- Executing an order on behalf of Alpine or an Alpine employee ahead of an existing customer order and failing to give the customer a required execution, including frontrunning customer orders that are routed elsewhere for execution
- Entering orders based on the knowledge of an impending customer order

### 13.6.2 Fair Prices

[FINRA Rule 2440]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Order records<br>• Internal data regarding market making activities<br>• NASDAQ Daily Volume Report |
| Frequency | • Daily - review markups and markdowns<br>• As required - review for potential dominated/controlled markets<br>• As required - review agency commissions when schedule changes |
| Action | • Review markups and markdowns for compliance with Alpine guidelines and confirm reasons for exceptions are documented:<br>  ○ Cancel and rebill trades, if necessary, to comply with internal guidelines<br>• Determine at time a security is added whether it is likely the market will be in a dominated/controlled market condition:<br>  ○ If it does, notify traders and supervisors that contemporaneous cost must be used in determining fair prices<br>• Review agency commission schedule, when change, to confirm reasonableness |
| Record | • Order records including markup/markdown reviews and documentation of exceptions<br>• Trading Manager Checklist<br>• Agency commission schedule revisions |

Alpine is obligated to provide customers with "fair prices" including charges (markup/markdown or commission).

### 13.6.2.1 Principal Transactions

Traders are responsible for ensuring that markups and markdowns are reasonable and consistent with Alpine policy.

The markup or markdown is generally based on the "prevailing market price" for the security at the time of execution. This may differ depending on where and how the security trades. Markets can be

ALPINE_LIT168169

"dominated and controlled" by a market maker resulting in the use of "contemporaneous cost" as the basis for determining the markup or markdown.

FINRA Notice to Members 92-16 should be referenced for details regarding markup/markdown guidelines. In particular, the Appendix provides guidance for determining the prevailing market price.

### 13.6.2.1.1 FINRA Mark-Up Policy

[FINRA IM 2440-1]

The FINRA guideline for equity securities is 5%; however, a pattern of charging 5% may be deemed inappropriate. When determining fair and equitable markups or markdowns, the following factors may be considered:

- type of security
- availability of security in the market
- price of the security
- amount of money involved in the transaction
- disclosure to the customer of the markup or markdown
- pattern of markups or markdowns
- nature of Alpine's business

The FINRA's Mark-Up Policy applies to:

- Riskless principal transactions
- Principal transactions
- Agency transactions
- Proceeds transactions

"Proceeds transactions" are transactions where the customer sells a security and uses the proceeds to buy another security at or about the same time. Fairness of the markup/markdown is determined by combining the charges for both transactions. For example, if a 2% markup is added to the buy order, no more than 3% could be charged as a markdown on the sell order.

### 13.6.2.1.2 Dominated And Controlled Market

A market that is "dominated and controlled" is often characterized by the following:

- one market maker accounts for a sizeable portion of the wholesale/retail volume
- market demand for the security is essentially in-house
- the security is "thin," *i.e.,* low volume and/or limited liquidity

An active market generally exists when:

- there is more than one market maker having daily or frequent inter-dealer trades.
- no one market maker dominates or controls the trading activity by accounting for a large portion of the wholesale/retail volume.

To determine if Alpine dominates/controls a market, the following should be considered:

- Volume of inter-dealer activity
- Whether other dealers are purchasing and selling the securities

ALPINE_LIT168170

- Whether demand is essentially in-house

If Alpine is considered to dominate and control a market, markups and markdowns must be calculated from Alpine's contemporaneous cost. "Contemporaneous cost" is defined as Alpine's purchases of the security from other dealers closely related in time to the customer transaction. Trades with customers are **not** an indicator of contemporaneous cost.

**13.6.2.1.3 Competitive Inactive Market**

Markets may exist where there are two or three market makers, none of which dominate or control the market. There may be infrequent trades with periods of weeks or longer with no activity. The prevailing market price should be determined using the following, in sequence:

- contemporaneous sales to other broker-dealers
- validated quotes
- contemporaneous cost

**13.6.2.1.4 Principal Non-Market Maker Trades**

Where the trader executes orders on a principal basis and Alpine is not a market maker, the markup or markdown should be calculated from Alpine's contemporaneous cost.

**13.6.2.1.5 Disclosure Of Markups/Markdowns And Market Making**

[SEC Securities Exchange Act of 1934 Rule 10b-10]

In accordance with Rule 10b-10, the following disclosures must be included on customer confirmations:

- If Alpine is NOT a market maker and executes a riskless principal transaction, the amount of the markup or markdown must be disclosed.
- For any OTHER transaction in a reported security, disclose: the trade price reported; the customer's price; and the difference, if any, between the reported trade price and the customer's price.
- If the trade is for a security where Alpine is a market maker, a notation that Alpine acts as a market maker.

**13.6.2.2 Agency Transactions**

Like markups or markdowns on principal transactions, commissions on agency transactions must be reasonable. Commissions on agency transactions will be charged in accordance with the schedule established by Alpine.

Fair commissions and/or service charges take into consideration:

- Market conditions at the time of execution
- Expense of executing the order
- Value of services rendered by Alpine

## 13.6.3 Prohibition Against Trading Ahead Of Customer Orders

[SEC Regulation NMS Rule 600(b)(30)(ii); FINRA Rule 5320; NASDAQ Rule 5320A]

| Responsibility | • Head Trader |
|---|---|

ALPINE_LIT168171

| Resources | • Order records/reports |
|---|---|
| Frequency | • Reviews: daily, weekly or monthly depending on reports available<br>• Disclosures: when account opened and annually |
| Action | • Review for order protection<br>• Provide disclosures (institutional accounts, no-knowledge exception) at account opening and annually thereafter |
| Record | • Order records/reports including date reviewed, reviewer's initials, action taken, if appropriate<br>• Records of providing disclosure at account opening and annually<br>• OTC Trading Manager Checklist |

Rule 5320 generally provides that a broker-dealer that accepts and holds an order (i.e. handling a client order) in an equity security from its own customer or the customer of another broker-dealer without immediately executing the order is prohibited from trading that security on the same side of the market for its own account at a price that would satisfy the customer order, unless the firm immediately executes the client's order up to the size of its own order at the same price or better.

Pending orders are executed on a first-in/first-out basis (FIFO). "Customer order" in this section applies to orders for the Firm's customers as well as customers of other broker-dealers.

The rule restrictions apply to orders handled during normal market hours and outside normal market hours (if the Firm and customer agree to processing the order outside normal market hours).

### 13.6.3.1 Exceptions

While the rule applies broadly to all types of clients and order sizes, the rule allows for exceptions that permit broker-dealers to trade for their account provided certain conditions are met.There are certain exceptions to the prohibition against trading ahead of customer orders.

**Large orders and institutional accounts.** Regarding orders for institutional accounts (as defined in NASD Rule 3110) or orders of 10,000 shares or more (unless the orders are less than $100,000 in value), Alpine may trade a security on the same side of the market for its own account at a price that would satisfy the customer order providing Alpine has provided clear and comprehensive written disclosure to the customer when the account is opened and annually thereafter that:

- Discloses that Alpine may trade proprietarily at prices that would satisfy the customer order, and
- Provides the customer with a meaningful opportunity to opt in to the Rule 5320 protections with respect to all or any portion of the order. If the customer doesn't opt in to the Rule 5320 protections in writing, Alpine will presume the customer has consented to the exception. The written request will only be permitted on a blanket basis only and should not be accepted, on an order-by-order basis. Oral requests and requests on an order-by-order basis should not be accepted due to our inability to reasonably supervise these types of requests.

ALPINE_LIT168172

**No-knowledge exception.** Regarding NMS stocks and where Alpine has effective internal controls and information barriers that prevent one trading unit from obtaining knowledge of customer orders held by a separate trading unit, the other trading units may, in a proprietary capacity, continue to trade at prices that would satisfy the customer orders held by the separate trading unit. A description of how customer orders are handled and when Alpine's proprietary account may trade at prices that would satisfy the customer's order will be provided at account opening and annually thereafter. For OTC equity securities where Alpine has similar controls to prevent a non-market-making trading unit from obtaining knowledge of customer orders held by a separate trading unit, the non-market-making trading unit may trade in a proprietary capacity at prices that would satisfy the customer's order.

**Riskless principal exception.** Rule 5320 obligations do not apply to Alpine's proprietary trades if the trades are for the purpose of facilitating the execution, on a riskless principal basis, of an order from a customer ("facilitated order") providing that Alpine:

- Identifies the order as riskless principal when reporting to FINRA (or other SRO); and
- Has written policies and procedures for compliance with FINRA rules regarding riskless principal transactions. Refer to the section *Riskless Principal Transactions* in this chapter.

**ISO exception.** The restriction against proprietary trades ahead of customer orders does not apply to trading for Alpine's account that is the result of an ISO (Intermarket Sweep Order) routed in compliance with Regulation NMS where the customer order is received after Alpine routed the ISO.

**Odd lot and bona fide error transaction exceptions.** The restrictions do not apply to a proprietary trade that is (1) to offset a customer order that is in an amount less than a normal unit of trading; or (2) to correct a bona fide error.

## 13.6.4 Market Orders

A market maker cannot trade for a proprietary account in NASDAQ or exchange-listed securities at prices that would satisfy a customer market order, unless the customer's order is immediately executed up to the size and at the same price or better at which the market maker traded for the Firm's account. This includes orders for the Firm's customers as well as orders received on behalf of customers of other broker-dealers.

If the customer's order is not immediately executed, the market maker must make every effort to match the pending market order against any market orders, marketable limit orders, or non-marketable limit orders priced better than the best bid or offer, received by the Firm on the other side of the market. The order must be executed at no less than the best bid, no greater than the best offer at the time the subsequent order is received, and consistent with the terms of the pending market order. Where multiple market orders on the same side of the market for the same security are received, orders will be executed on a first-in/first-out (FIFO) basis.

This obligation may be overridden by specific terms and conditions negotiated for a market order on behalf of an institutional customer (as defined in FINRA Rule 3110[c][4]) or a market order that is for 10,000 shares or more, unless the order is less than $100,000 in value. There also is an exception for a facilitation order on a riskless principal basis.

ALPINE_LIT168173

The restriction against proprietary trades ahead of customer orders does not apply to trading for the Firm's account that is the result of an ISO (Intermarket Sweep Order) routed in compliance with Regulation NMS where the customer order is received after the Firm routed the ISO.

[Regulation NMS Rule 600(b)(30)(ii); FINRA Rule 2111, Regulatory Notice 08-31, Notices to Members 06-03 and 05-69; NASDAQ Rule 2111]

A market maker cannot trade for a proprietary account in NASDAQ or exchange-listed securities at prices that would satisfy a customer market order, unless the customer's order is immediately executed up to the size and at the same price or better at which the market maker traded for Alpine's account. This includes orders for Alpine's customers as well as orders received on behalf of customers of other broker-dealers.

If the customer's order is not immediately executed, the market maker must make every effort to match the pending market order against any market orders, marketable limit orders, or non-marketable limit orders priced better than the best bid or offer, received by Alpine on the other side of the market. The order must be executed at no less than the best bid, no greater than the best offer at the time the subsequent order is received, and consistent with the terms of the pending market order. Where multiple market orders on the same side of the market for the same security are received, orders will be executed on a first-in/first-out (FIFO) basis.

This obligation may be overridden by specific terms and conditions negotiated for a market order on behalf of an institutional customer (as defined in FINRA Rule 3110[c][4]) or a market order that is for 10,000 shares or more, unless the order is less than $100,000 in value. There also is an exception for a facilitation order on a riskless principal basis.

The restriction against proprietary trades ahead of customer orders does not apply to trading for Alpine's account that is the result of an ISO (Intermarket Sweep Order) routed in compliance with Regulation NMS where the customer order is received after Alpine routed the ISO.

## 13.6.5 Limit Orders

### 13.6.5.1 Limit Order Display Rule

[SEC Regulation NMS Rule 604; FINRA Rule 6460; FINRA Regulatory Notice 10-42]

SEC and FINRA rules impose obligations on market makers displaying a priced quotation in an NMS stock or an OTC equity security in an inter-dealer quotation system.

A market maker is required to publish immediately a bid or offer that reflects:

- The price and full size of each customer limit order that is at a price that would improve the bid or offer of the market maker in the security; and
- The full size of each customer limit order held by the market maker that:
    - Is priced equal to the market maker's bid or offer for the security;
    - Is priced equal to the NBBO; and
    - Represents more than a *de minimis* change in relation to the size associated with the bid or offer. *De minimis* means size that is equal to or less than 10% of the firm's quotation size.

#### 13.6.5.1.1 Exceptions To The Display Rule

The following customer limit orders are not required to be displayed in the firm's quote:

- An order executed upon receipt of the order.

ALPINE_LIT168174

- An order placed by a customer who expressly requests, either at the time the order is placed or prior to that time (and under a negotiated agreement with the customer regarding such orders), that the order not be displayed.
- An odd-lot order.
- A block-size order (unless the customer requests display). "Block" under Rule 604 applying to NMS stocks is defined as an order for 10,000 or more shares, **or** an order with a market value of $200,000 or more. "Block" under FINRA Rule 6460(d)(2) applying to OTC equity securities means an order for 10,000 or more shares **and** has a market value of $100,000 or more.
- An order delivered immediately to an exchange or FINRA-sponsored system or an ECN or ATS (alternative trading system) that will widely disseminate the order to other broker-dealers in compliance with Regulation NMS Rule 602.
- An order delivered immediately to another exchange member or OTC market maker that complies with requirements of the Display Rule.
- An "all or none" order.
- An order that is priced less than $0.0001 per share.

### 13.6.5.2 Trading Ahead Of Customer Limit Orders ("Manning Rules")

[FINRA Rule 5320.06]

Limit orders are subject to best execution requirements. The Firm may not "trade ahead" of customer limit orders except as allowed by FINRA Rule 5320 as included in a prior section *Prohibition Against Trading Ahead Of Customer Orders.* This obligation applies to limit orders for the Firm's customers and to limit orders received from other broker-dealers for their customers.

### 13.6.5.2.1 Price Improvement Obligations

Limit orders are subject to best execution requirements. The Firm may not "trade ahead" of customer limit orders except as allowed by FINRA Rule 5320. This obligation appliest o limit orders for the Firm's customers and to limit orders received from other broker-dealers for their customers.

Alpine must provide the following minimum level of price improvement to trade ahead of an unexecuted customer limit order:

| Security Type | Price of Customer Limit Order | Minimum Price Improvement Required |
|---|---|---|
| NMS stocks | equal to or less than $1.00 | $0.01 |
| OTC equity securities | equal to or less than $1.00 | The lesser of $0.01 or 1/2 of the current inside spread [FINRA Rule 6434] |
| NMS stocks and OTC equity securities | <$1.00 but equal to or less than $.01 | The lesser of $0.01 or 1/2 of the current inside spread |
| NMS stocks and OTC equity securities | <$.01 but equal to or less than $0.001 | The lesser of $0.001 or 1/2 of the current inside spread |
| NMS stocks and OTC equity securities | <$.001 but equal to or less than $0.0001 | The lesser of $0.0001 or 1/2 of the current inside spread |

ALPINE_LIT168175

| OTC equity securities | <$.0001 but equal to or less than $0.00001 | The lesser of $0.00001 or 1/2 of the current inside spread |
|---|---|---|
| OTC equity securities | <$.00001 | The lesser of $0.000001 or 1/2 of the current inside spread |

- For customer limit orders priced outside the best inside market for the security, the minimum amount of price improvement required must either meet the above standards or Alpine must trade at a price at or inside the best inside market for the security.
- For customer limit orders in securities where there is no published inside market, the minimum amount of price improvement required defaults to the same tiered maximum price improvement standards above.
- For OTC equity securities that are foreign securities traded in foreign currency, the foreign currency must be converted to U.S. dollars for purposes of determining the applicable minimum price improvement standards.

Any better-priced customer limit order must receive protection up to the size of the triggering trade. Once the minimum price-improvement standards trigger the protection of a pending customer limit order, Alpine is required to also protect any more aggressively priced customer limit order(s), even if those limit orders would not be directly triggered by the minimum price improvement standards above. Refer to IM-2110-2 for further explanation and examples.

### 13.6.5.3 Crossing Incoming Orders Against Undisplayed Limit Orders

[SEC Regulation NMS Rule 602 and Rule 604]

When Alpine (as market maker) holds an undisplayed limit order priced better than the quote and it receives a market order on the opposite side of the market from the limit order, Alpine must pass along the price improvement of the limit order to the market order. The following is one example that illustrates Alpine's obligations.

- NASDAQ inside market: 10-10 1/2 10x10
- Alpine holds an undisplayed limit order to buy 1,500 shares at 10 1/4.
- Alpine receives a market order to sell 1,000 shares of the same security.

In this example, Alpine is obligated to execute 1,000 shares of the market sell order at 10 1/4, executing it against the undisplayed limit order to buy or against Alpine's inventory account. If executed against Alpine's inventory, the Manning Rule would require that Alpine protect the limit order at its price. The remaining 500 shares of the buy order would continue to reside undisplayed on Alpine's books.

Other scenarios illustrating Alpine's obligation when holding an undisplayed limit order may be found in FINRA Notice to Members 97-57.

### 13.6.5.4 Priority Of Limit Orders

When Alpine holds multiple limit orders in the same security, the orders, if triggered, will receive executions considering the following priority:

ALPINE_LIT168176

1. Best-priced order (buy side: highest price, sell side: lowest price)
2. Time
3. Size

## 13.6.6 Marking Orders

[SEC Regulation SHO Rule 200(g) and Rule 201]

All sell orders of equity securities are required to be identified on the order record and reported to the Trade Reporting Facility as "long" or "short" at the time of entry.

A sell order may be marked "long" when the seller owns the security being sold and the security either is in the physical possession or control of Alpine or it is reasonably expected that the security will be in the physical possession or control of Alpine by settlement date.

A sell order should be marked "short" when the security being sold is not owned by the seller and will require it to be borrowed to make delivery by settlement date. See the section *Locate And Delivery Requirements* regarding the requirement to borrow securities.

Short sales effected in covered securities when a circuit breaker price test is triggered may be marked "short exempt" if they qualify for the exemption.

The Firm utilizes the NASDAQ AQR system and has set its default to mark offers as "Long" for customer offers. The default setting may be changed for each security; however, the Firm will use the "Long" default for most if not all securities. Traders are responsible for confirming the marking of "Long" is accurate for each customer offer and overriding the function if "Short" or "Short Exempt" apply. A short sale may only be marked "short exempt" under Rule 201(c) when the short sale price test is in effect unless the trader has a reasonable basis to believe the order meets an exception under Rule 201(d) (also see the section *Short Sales* in this chapter).

## 13.6.6.1 Marking Orders

[Regulation SHO, Rule 200(g); '34 Act Rules 10a-1(e)(7) and (8); FINRA Rule 5100(c)(1), IM-5100(a) Notice to Members 06-53]

All sell orders of equity securities are required to be identified on the order record and reported to the NASDAQ Market Center reporting service (formerly named ACT) as "long," "short," or "short exempt" at the time of entry.

A sell order may be marked "long" when the seller owns the security being sold and the security either is in the physical possession or control of Alpine or it is reasonably expected that the security will be in the physical possession or control of Alpine by settlement date.

A sell order should be marked "short" when the security being sold is not owned by the seller and will require it to be borrowed to make delivery by settlement date. See the section *Locate And Delivery Requirements* regarding the requirement to borrow securities.

A sell order should be marked "short exempt" if the seller is entitled to rely on an exception to the short sale rule including the following summary (refer to FINRA Rule 5100 and NASDAQ Rule 3350 for details):

ALPINE_LIT168177

- *Bona-fide* market making transactions in securities subject to bid or tick test requirements (short sales in OTCBB stocks are not marked short exempt since they are not subject to a bid or tick test)*
- Sales by a broker-dealer (BD) to offset odd-lot orders for customers
- Sales by a BD to liquidate a long position less than a round lot, if the sales do not change the BD's position by more than one unit of trading
- Sales for a special arbitrage account under certain conditions
- Sales by an underwriter or syndicate or group member participating in a distribution, in connection with an over-allotment of securities, or any layoff sale in connection with a distribution through rights or a standby underwriting commitment
- Short sales of securities part of the SEC's pilot program under Regulation SHO (securities subject to a "tick test" or price test rules for NASDAQ securities)

*The "bona fide market making" exception requires that the dealer be a market maker registered in the security and does not include transactions unrelated to market making such as index arbitrage and risk arbitrage independent from market making activity. Although such activity may be part of the dealer's overall hedging or risk management strategy, it does not qualify for the bona fide market making exception.

[Regulation SHO, Rule 200(g); '34 Act Rules 10(a)-1(e)(7) and (8); FINRA Rule 5100(c)(1), IM-5100(a), Notice to Members 06-53]

All sell orders of equity securities are required to be identified on the order record and reported to the NASDAQ Market Center reporting service (formerly named ACT) as "long," "short," or "short exempt" at the time of entry.

A sell order may be marked "long" when the seller owns the security being sold and the security either is in the physical possession or control of Alpine or it is reasonably expected that the security will be in the physical possession or control of Alpine by settlement date.

A sell order should be marked "short" when the security being sold is not owned by the seller and will require it to be borrowed to make delivery by settlement date. See the section *Locate And Delivery Requirements* regarding the requirement to borrow securities.

A sell order should be marked "short exempt" if the seller is entitled to rely on an exception to the short sale rule including the following summary (refer to FINRA Rule 5100 and NASDAQ Rule 3350 for details):

- *Bona-fide* market making transactions in securities subject to bid or tick test requirements (short sales in OTCBB stocks are not marked short exempt since they are not subject to a bid or tick test)*
- Sales by a broker-dealer (BD) to offset odd-lot orders for customers
- Sales by a BD to liquidate a long position less than a round lot, if the sales do not change the BD's position by more than one unit of trading
- Sales for a special arbitrage account under certain conditions
- Sales by an underwriter or syndicate or group member participating in a distribution, in connection with an over-allotment of securities, or any layoff sale in connection with a distribution through rights or a standby underwriting commitment
- Short sales of securities part of the SEC's pilot program under Regulation SHO (securities subject to a "tick test" or price test rules for NASDAQ securities)

*The "bona fide market making" exception requires that the dealer be a market maker registered in the security and does not include transactions unrelated to market making such as index arbitrage and risk arbitrage independent from market making activity. Although such activity may be part of the dealer's overall hedging or risk management strategy, it does not qualify for the bona fide market making exception.

## 13.6.6.2 Locate And Delivery Requirements

[Regulation SHO, Rule 203]

Prior to effecting a short sale in an equity security (other than market making transactions which are exempt), there is an obligation to "locate" securities available for borrowing and delivery by settlement date. The "locate" must be made and noted on the order record prior to entry including the name of

ALPINE_LIT168178

the person contacted (and employer if someone outside Alpine), number of shares, and date. An "Easy to Borrow" list may be relied upon if it is less than 24 hours old, and the order record noted of the date of the list used.

Traders are required to record locate information for the following orders:

- Proprietary short sales in securities where Alpine does NOT act as market maker
- Customer short sales (unless already recorded prior to submission to the trader)
- Proprietary short sales for other broker-dealers that are NOT FINRA members unless included in the exceptions listed below

### 13.6.6.2.1 Exceptions From The Locate Requirement

Traders are NOT required to record locate information when they effect short sales in the following situations:

- transactions in corporate debt securities
- transactions in security futures
- when Alpine is effecting trades as a NASDAQ or ADF market maker
- *bona fide* market making transactions in NNOTC securities where Alpine publishes a two-sided quotation in an independent quotation medium
- proprietary transactions in corporate debt securities
- a non-FINRA broker-dealer's proprietary order that is a *bona fide* market making transaction. Notation must be made on the order record of one of these exceptions and who provided the assurance at the other broker-dealer.

For short sales that do not meet any of the above criteria, traders are responsible for contacting Operations to determine locate information. The following must be recorded on the order:

- the name of the person (and their firm name) from whom affirmation was obtained; and,
- the number of shares to be borrowed.

## 13.6.7 Block-Sized Orders

The execution of block-sized orders (orders 10,000 shares or more) may require special considerations including availability of shares to fill a buy order and buying interest for a sell order. It should be communicated to the RR submitting the order (or to the customer directly, if the trader is dealing with the customer) that it may take time to fill the order to prevent undue change to the price of the security which could occur if the order were entered at one time. Block orders are typically handled on a "not held" basis or a maximum or minimum average price, giving the trader the ability to use judgment regarding how much of the order is shown to the market and at what price.

In addition, the trader is responsible for checking multiple markets, where appropriate, to determine the best market or multiple markets to complete the customer's order at the best reasonable price considering the size of the order.

## 13.6.8 Not Held Orders

Customers may enter "not held" orders which are market orders that give the trader time and price discretion in executing the trade to get the best possible price without holding the trader responsible if the best price is not obtained. Block-sized orders are often not held because of the complexity of executing large orders without unduly disrupting the market price.

ALPINE_LIT168179

Time and price discretion is limited to the end of the day on which the order was entered or, if entered after market hours, the end of the next trading day.

### 13.6.9 Orders With Special Terms Or Conditions

Some orders are entered with special terms and conditions such as Market-On-Open (MOO) and Market-On-Close (MOC) orders. Traders are required to enter orders in accordance with special terms or conditions or return the order to the customer or RR if the order cannot be entered as marked.

Traders should particularly watch for a pattern of MOO or MOC orders from a customer or related customers that appear to be entered with the intention of moving the market price, which is a prohibited manipulative activity ("marking the opening" or "marking the close"). Potential marking of the opening or close should be reported to the trading manager.

### 13.6.10 Average Price Transactions

Occasionally customers prefer to receive one confirmation representing an average price for multiple executions of the same security including the volume weighted average price (VWAP) of the trades. SEC Rule 10b-10 mandates that broker-dealers provide confirmations for each transaction; however, the SEC has stated it would permit average pricing of multiple executions if certain conditions are met.

The trader confirming an average price is responsible for ensuring that all of the following information is provided to the customer:

- The execution prices of each individual execution that filled the order must be averaged and the average price reported as the unit price on the confirmation. The confirmation must disclose that the price is an average price and that details regarding actual prices are available to the customer upon request.
- The confirmation must identify the capacity in which Alpine acted (principal; agent; or both principal and agent) and that details regarding capacity of each execution are available upon request.
- The commission, markup, markdown, service charge, or other remuneration must be stated in a single amount for the transaction as a whole.

In addition, the trader's records must include details of each execution comprising the average-priced transaction.

### 13.6.10.1 Volume-Weighted Average Price (VWAP) Customer Transactions

[FINRA Notice to Members 05-51]

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Order records<br>• Daily Transaction and other reports<br>• VWAP transactions |
| **Frequency** | • As required |
| **Action** | • Review proprietary and other transactions in the security for one week prior to VWAP transactions to detect frontrunning or trading anomalies indicative of manipulation<br>• If frontrunning or manipulative activity is possible, take follow-up |

ALPINE_LIT168180

| | action which may include:<br>   o  Contact Compliance (unless Compliance is conducting the review)<br>   o  Interview traders or others entering questioned transactions<br>   o  If appropriate, take corrective action which may include adjusting the VWAP transaction, disciplinary action against the trader or others involved in frontrunning or manipulation<br>   o  Confirm that affirmative consent has been obtained from the customer if disclosure of hedging or other positioning activity is required |
|---|---|
| **Record** | • Order records/reports with initials of reviewer and date of review and action taken<br>• Written affirmation from customers, if applicable |

VWAP transactions typically are large transactions that may impact the market price of the stock. Obligations when handling VWAP transactions include:

- Prohibition against trading ahead in proprietary accounts
- Prohibition against engaging in manipulative activity, such as creating artificial demand for the security or establishing artificially high or low prices by engaging in unnecessary trading, increased quote activity, or entering orders around the close of when a VWAP or other large order is executed
- Prior to receipt and/or execution of the order, obtain an affirmative consent letter from the customer that hedging or other positioning activity by Alpine may take place (if applicable)
- Mark sell orders long or short, as appropriate, and comply with rules governing long and short sales
- Disclosure to the customer, in writing, the specifics of the terms of compensation (*e.g.,* if Alpine will retain or split with the customer any profits that result if Alpine improves on the VWAP)
- Maintain confidentiality when handling VWAP orders

## 13.6.11 Net Trading

[FINRA Rule 2124; FINRA Notice to Members 06-47]

Alpine may, at the request of a customer, confirm a transaction on a net basis. A net transaction is a principal transaction in which the market maker, after having received an order to buy or sell an equity security, buys or sells the security (from or to another dealer or another customer) and then sells to or buys from the customer at a different price.

Institutions that request net basis transactions will be provided with Alpine's negative consent letter regarding the terms and conditions of such transactions. If the institution objects to the terms included in the letter, Alpine will not trade on a net basis with that customer. As an alternative, the terms and conditions for handling the order on a net basis may be orally explained and oral consent obtained from the institutional customer. Oral consent must be noted on the order record.

Net trading with non-institutional customers requires **pre-trade** disclosure and written consent on an order-by-order basis. Orders received from another broker-dealer for their customer do not require disclosure and consent; these are obligations of the other broker-dealer.

ALPINE_LIT168181

If orders are received from a fiduciary for a non-institutional customer, the fiduciary's status determines whether there is an obligation to provide pre-trade disclosure and consent. For example, if the fiduciary is an investment adviser, the adviser is considered an institution and disclosure and consent are not required. If the fiduciary is an individual such as an attorney or an accountant acting on someone's behalf, the fiduciary is considered an individual and pre-trade disclosure and consent are required.

### 13.6.12 Phone Orders

A trader may accept a phone order for execution; however, phone orders must identify each customer by account number at the time the order is phoned in. The only exception is where accounts are under common control (investment adviser directed orders, orders from an individual with authority over multiple accounts); for such orders account numbers may be provided after execution.

### 13.6.13 Rule 144 Transactions

[SEC Rule 144]

Rule 144 transactions are subject to a number of requirements and limitations including:

- Sellers must meet holding period and size limits to qualify under Rule 144.
- Alpine is not permitted to solicit buyers for securities being sold under Rule 144 though it may solicit sellers of 144 stock.
- Securities are required to be sold in a "broker's transaction" which means the broker does no more than execute the order as agent and receives no more than customary commission.
- Alpine may not initiate a quotation for purposes of a 144 transaction. Continued publication of a quotation as market maker is permitted if Alpine has published a quotation on each of at least 12 days within the preceding 30 calendar days (with no more than 4 business days without a two-way quotation).

More detailed information is available in the chapter *ORDERS* in the section *Sale Of Control Or Restricted Stock* and by contacting Compliance.

### 13.6.14 Trading Halts

[FINRA Rule 5260, 6121 and 6440; FINRA charts of types of securities excluded from price bands: http://www.finra.org/Industry/Compliance/MarketTransparency/TRF/LULD/?utm_source=MM&utm_medium=email&utm_campaign=Weekly_Update_022013_FINAL; NASDAQ Rule 3340, 3350, 4120 and 4121; NASDAQ FAQs on Limit Up-Limit Down: http://www.nasdaqtrader.com/content/MarketRegulation/LULD_FAQ.pdf; SEC Regulation NMS Rule 608]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order records: 5% rule, Employee Trades, Family-Related Accounts, Volume by Security; Combined Executions for Unsolicited Orders; Combined Executions for Solicited Orders; rejected orders<br>• Information regarding trading halts<br>• Flextrader (trading system) |
| Frequency | • As required |
| Action | • Review notices received from NASDAQ and other third parties to withdraw quotes<br>• Review notices to third parties to withdraw quotes<br>• Educate traders regarding restrictions during halts and trading halt requirements |

ALPINE_LIT168182

| | |
|---|---|
| **Record** | • Reviews and corrective action taken<br>• BD affirmations<br>• Notifications of third parties to withdraw quotations<br>• Record initials or signature, date of review (if applicable) on the records enumerated above<br>• Note any action item taken, if any |

SROs or the SEC may impose trading halts (the "limit-up/limit-down price bands") in individual securities or market-wide circuit breakers in NMS stocks. The following summarizes halts and circuit breakers:

- The trading curbs are part of a one-year pilot beginning February 4, 2013. They initially apply to S&P 500 and Russell 1000 stocks and a group of ETPs, with price bands calculated at 9:45 a.m. ET until 3:30 p.m. ET. The second phase, which begins six months later, will operate from 9:30 a.m. ET until 4 p.m. ET and will apply to all securities.
- For individual securities, there will be price bands within which each stock will be allowed to move a certain percentage from its five-minute average, with the amount varying based on its closing price the prior day.
- The limit-up/limit-down program also allows the listing market to declare a trading pause when a stock has deviated from its normal trading characteristics and the exchange decides a halt would curtail excessive volatility.

During trading halts, traders are prohibited from publishing quotations or indications of interest. Traders must immediately cease trading in any security where trading has been halted. Orders should not be entered to NASDAQ Market Center during a trading halt.

The following restrictions also apply:

- If an order is sent to a trading facility/system that continues to publish quotations or indications of interest during a trading halt, the order must be pulled back.
- Internal display of quotations or indications of interest within Alpine's proprietary system may continue, but dissemination outside Alpine is prohibited.
- If Alpine sends quotation information or indications of interest to a third party (such as an Internet search engine or web site), Alpine must promptly notify the third party of the trading halt and request removal of the information from the site. A record must be maintained by the Head Trader or designee of any request to withdraw information during a trading halt.

Transactions in a halted security may not be effected directly or indirectly.

Other Applicable Rules: FINRA Rule 6460

# 13.7 NASDAQ Execution Services/BATS/ARCA

Whenever engaged in trading or orders, employees must follow the rules and regulations of the exchanges or markets in which the trades are occurring. Accordingly, in addition to the information set forth below, employees are directed to the rules and regulations or the exchanges or markets including NYSE ARCA and BATS Exchange.

NYSE Arca is a separate self-regulatory organization that has contracted with NYSE Regulation for regulatory services. Access NYSE Arca rules and bylaws via the links below.

http://www.nyse.com/regulation/nysearca/1145486472857.html

BATS Exchange, Inc. ("BATS") received approval on August 18, 2008, from the U.S. Securities and Exchange Commission ("SEC") to operate as a registered national securities exchange. BATS commenced operations as a national securities exchange on October 24, 2008, and completed its transition from the operation of an ECN on November 6, 2008.

The SEC regulates BATS as a national securities exchange, and BATS also has status as a self-regulatory organization ("SRO"). Accordingly, BATS oversees and regulates trading conducted on BATS Exchange. BATS rules and regulations may be accessed by the links below:

http://www.batstrading.com/regulation/

http://www.batstrading.com/resources/regulation/rule_book/BATS_Exchange_Rulebook.pdf

All employees must adhere to the rules and regulations set forth above for NYSE Arca or BATS.

ALPINE_LIT168184

The Head Trader is responsible for assuring that the rules and regulation of NYSE Arca and BATS are followed and no violations of such rules occur.

### 13.7.1 NASDAQ Market Center

[NASDAQ Rule 4611]

NASDAQ Market Center is a voluntary, open-access system that provides alternatives for quoting and trading NASDAQ securities.

The NASDAQ Market Center system provides NASDAQ market participants with the following:

- Ability to quote the dealer's best bid and offer or multiple quotes and orders at multiple price levels
- Prevents locked and crossed markets during regular market hours
- Displays the best prices as well as multiple prices away to give the trader the ability to view market depth at varying prices
- Allows entry of individual orders up to 999,999 shares and quotes of 99,900 shares
- Allows for the following types of orders:
    - Non-Directed (order is not directed to a specific market participant and is automatically executed against a market maker or delivered to or automatically executed against quotes of ECNs)
    - Preferenced (order is identified for delivery to a specific participant against which the order should be executed)
    - Directed (order accesses a specific quote/order in NASDAQ)
- Orders may be entered and executed in actual shares, *i.e.,* round lots, odd lots, and mixed lots

### 13.7.2 Sponsored Access

[NASDAQ Rule 4611(d)]

| Responsibility | • Head Trader as set forth in Chapter 1.1 |
|---|---|
| Resources | • Requests for sponsored access |
| Frequency | • As required for a request for sponsored access |
| Action | • Execute with Sponsored Participant an agreement that includes the Sponsorship Provisions in Rule 4611(d)(2)<br>• File with NASDAQ a User Agreement and Notice of Consent<br>• Review activity by sponsored firm or customer to determine compliance with NASDAQ requirements |
| Record | • Copies of agreement with Sponsored Participant and User Agreement and Notice filed with NASDAQ<br>• Reports/activity reviewed, notes of action taken |

ALPINE_LIT168185

| | |
|---|---|
| | |

Alpine may act as a Sponsoring Member that gives access on an agency basis to another firm or customer ("Sponsored Participant") to execute orders on the NASDAQ Execution System. Access may be:

- Pass-through access where Alpine enters orders that pass through Alpine's systems and then into NASDAQ; or
- Direct access where the Sponsored Member enters orders directly to NASDAQ.

## 13.8 Consolidated Quotation System (CQS) Securities

The Consolidated Quotation Service (CQS) is a consolidated quotation collection system for listed securities. Transactions in listed securities effected in the OTC market are subject to certain requirements described in this section. In addition, general principles of OTC trading apply, including:

- Best execution
- Anti-intimidation/coordination of quotes
- Frontrunning customer orders

These concepts are covered in detail in other sections of this chapter and should be referenced for further information. This section summarizes some of the key requirements specific to OTC orders for listed securities included in the CQS.

### 13.8.1 Trade-Throughs

Traders are obligated to comply with best execution requirements and avoid, as market maker, purchasing or selling an ITS/CAES security (whether as principal or agent) at a price which is lower than the bid or higher than the offer displayed from an ITS Participant Exchange or ITS/CAES Market Maker ("trade-through"). There are limited conditions where exceptions apply. Rule 5262 lists the conditions that would allow a trade-through.

### 13.8.2 Short Sales In CQS Securities

[SEC Rule 10a-1]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Order records for short sales |
| Frequency | • Weekly |
| Action | • Review short sales for record of last reported sale price<br>• For orders lacking that information or executed contrary to the "tick" requirement, take corrective action depending on the nature of the deficiency or violation which may include consulting with the trader, additional education, and consultation with Compliance regarding more formal action against the trader |
| Record | • Order records reviewed including supervisor's initials, date of review, and corrective action taken, if appropriate |

ALPINE_LIT168186

Short sales in CQS securities (whether customer or proprietary orders) must be executed at a price that is at or above the last reported sale price on the exchange where the security is listed or at a price above the next preceding different price for a reported sale. This limitation does not apply to transactions for Alpine's account when it is acting as a market maker.

Sell orders must be marked "long" or "short" and the requirements for affirmative determination must be satisfied (assurance from the customer of delivery of the long stock or determination stock may be borrowed for a short sale).

### 13.8.3 CQS Security Subject To An IPO

When a CQS security is subject to an initial public offering (IPO), the trader may not execute an OTC transaction in the security until the security has first opened for trading on the primary exchange listing the security. This is indicated by dissemination of an opening transaction on the consolidated tape.

### 13.8.4 Reporting Transactions in CQS Securities

[FINRA Rule 6181]

Transactions in eligible securities will be reported in accordance with FINRA reporting requirements.

Refer to the section *Trade Reporting* in this chapter.

#### 13.8.4.1 Reporting Third Market Riskless Principal Transactions

[FINRA Rule 6622(d)(3)(B)]

There are specific requirements when reporting riskless principal transactions in listed securities including marking a capacity indicator and reporting one side of the trade only. The Notice to Members should be referenced for details.

### 13.8.5 Limit Order Protection Interpretation ("Manning Obligations")

[NASD IM 2110-2; NASD Notice to Members 05-64; NASDAQ IM 2110-2]

Requirements for providing price improvement for limit orders when trading for Alpine's account apply to exchange-listed securities. Refer to the section *Limit Orders* in this chapter.

## 13.9 CQS Market Maker Requirements

[SEC Regulation NMS Rule 601 and Rule 602]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order records |
| Frequency | • Quarterly, within 10 business days of the end of each calendar quarter |
| Action | • Determine whether Alpine's volume exceeds 1% of the prior calendar quarter's total volume (whether Alpine has become a "statutory market maker"):<br>    ○ If yes, notify trader of obligation to publish quotations |

ALPINE_LIT168187

| Record | • Trading data, calculation of trading volume, determination, and notice to trader (if applicable) |
|---|---|

If Alpine acts as a market maker in CQS securities, it has the following obligations:

- Quotations must be firm for the size displayed or, if no size is displayed, for the normal unit of trading.
- The quotation must be for at least one normal unit of trading.
- Close proximity to the NASDAQ terminal at which the dealer makes a market.
- Minimum quotation increment is $0.01.

Adherence to the above obligations by Traders will be monitored by and ensured compliance with by the Head Trader.

### 13.9.1 One Percent (1%) Rule (Statutory Market Maker)

[SEC Regulation NMS Rule 600(b)(73)(ii); FINRA Notice to Members 96-65]

Any CQS market maker that accounts for more than one percent of the reported aggregate trading volume in any exchange-listed security during a calendar quarter is required to publicly disseminate quotations in that security, even if the volume is attributable to internalized order flow. The following guidelines apply:

- The 1% calculation includes internalized order flow.
- The 1% Rule applies to all exchange-listed securities (including NASDAQ-listed securities).
- The 1% Rule does not apply when Alpine acts solely as a block positioner in an exchange-listed security.
- Trading strategies (such as program trading) may qualify Alpine for the "block positioner" exemption.
- The 1% Rule does not apply to exchange-listed preferred stock.

If Alpine does not publish quotations in all CQS securities where it makes a market, the Head Trader or designee is responsible for determining whether volume in the non-quoted CQS security obligates Alpine to publish a quotation.

## 13.10 FINRA Alternative Display Facility (ADF)

[FINRA Rule 6200 series; FINRA ADF web site: http://www.finra.org/RegulatorySystems/ADF/index.htm]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Trade data, reports available from the FINRA, internal reports |
| Frequency | • Daily |
| Action | • Establish required access to market participants and others<br>• Monitor the Firm's system on a real-time basis<br>• Review for accurate trade reporting<br>• Where inaccuracies are identified:<br>    ○ Confirm that corrections are reported<br>    ○ Confer with trader and provide additional education if |

ALPINE_LIT168188

|  | necessary |
|---|---|
| **Record** | • Copies of trade reports, trading data, and other information reviewed are retained in the Trading Manager's files including the manager's initials and date of review as well as notes of corrective action, if necessary |

The FINRA ADF is a quotation collection, trade comparison, and trade reporting facility. Market makers and ECNs may post quotations in NASDAQ securities and all FINRA members that participate in the ADF are able to view quotations and report transactions in NASDAQ securities. Rule requirements for participating in the ADF mirror other market maker rule requirements regarding maintaining two-sided quotations, withdrawals of quotations, registering and withdrawing as a market maker, trade reporting, OATS, short sales, trading halts, and other market maker requirements.

Because this is an FINRA-sponsored facility and not a NASDAQ facility, further information is available in the FINRA rules as well as at the FINRA's site at *www.FINRA.com* and, using the search function, search for "Alternative Display Facility."

### 13.10.1 Changing From An Automated To A Manual Quotation

When using the ADF, quotations should be automated unless there is an extraordinary reason to publish a manual quotation such as a system failure (Firm or ADF), power outage, or an event that renders automated quoting impossible. When switching to manual quotations, the supervisor should be consulted to confirm the necessity to make the change. These occurrences must be avoided and only permitted when absolutely necessary. The supervisor and appropriate information services personnel must immediately attempt to rectify the situation unless it is the fault of the ADF itself. When the situation has been corrected, Alpine will immediately resume automated quotations.

The supervisor is responsible for documenting any situations, including the date and reason, for changing from automated to manual quotations and when the quotation is returned to automated. The problem, if Firm-related, must be reviewed by the supervisor and other appropriate personnel to determine any corrective action that must be taken to avoid reoccurrence.

### 13.10.2 Access Requirements

[SEC Regulation NMS Rule 610; FINRA Rule 6250; FINRA list of private-sector connectivity providers: http://www.finra.org/RegulatorySystems/ADF/Participants/index.htm]

The ADF does not provide order routing capability. ADF rules require that market participants (ADF registered market makers, ECNs, or ATSs) provide direct electronic access to other market participants and provide all other FINRA members direct electronic access or allow for indirect electronic access to the participant's quote.

"Direct electronic access" refers to the ability to deliver an order for execution directly against the market participant's best bid or offer without the need for voice communication, *i.e.,* electronic linkage. Access to other participants must be at the same speed, reliability, availability, and cost available to the participant's own customers. For example, market participants may link directly among themselves. "Indirect electronic access" means provision of the ability to route an order to a market participant.

### 13.10.3 ADF Trade Reporting

[FINRA Rule 6280]

ALPINE_LIT168189

For trades required to be reported to FINRA through the ADF, TRACS (Trade Reporting And Comparison System) will be utilized to report transactions. TRACS may also be used for trades eligible for reporting to FINRA.

## 13.11 Other Requirements

### 13.11.1 Inventory Positions

[FINRA Regulatory Notice 08-18]

| | |
|---|---|
| **Responsibility** | • Head Trader as set forth in Chapter 1.1 |
| **Resources** | • Inventory position records |
| **Frequency** | • Daily |
| **Action** | • Monitor inventory positions to ensure limits are not exceeded<br>• For exceeded limits, take corrective action which may include:<br>    ○ Confer with Trader<br>    ○ Reduce position<br>• Review requests for exceptions and approve or disapprove |
| **Record** | • Trading Manager Checklist<br>• Retain notation of requests for inventory limit exceptions on the Checklist or in a file for inventory limits |

Alpine has established limits on market maker inventory positions. Positions held by Alpine affect net capital requirements and represent financial exposure to Alpine.

Traders may not exceed established guidelines without approval.

### 13.11.2 Schedule 13G Reports

[SEC Securities Exchange Act of 1934 Rule 13d-1 and Rule 13d-2]

| | |
|---|---|
| **Responsibility** | • Head Trader as set forth in Chapter 1.1 |
| **Resources** | • Trading Account Costing Report<br>• Annual/Quarterly reports of company's in which Alpine maintains a proprietory position |
| **Frequency** | • Annually by February 14<br>• Daily comparison of shares held by Alpine per the Trading Account Costing Report to company's outstanding shares<br>• Within 10 days after the end of the first month where position exceeds 10% of outstanding shares - amendments |

ALPINE_LIT168190

| | |
|---|---|
| **Action** | • Annually file Schedule 13G to report positions greater than 5% of outstanding shares<br>• File amendments when Alpine's position exceeds 10% |
| **Record** | • Schedule 13G filings including date filed |

When necessary, Alpine will file required reports with the SEC regarding proprietary positions that exceed 5% and 10%.

### 13.11.3 Authorized Use Of NASDAQ Workstations

| | |
|---|---|
| **Responsibility** | • Head Trader as set forth in Chapter 1.1 |
| **Resources** | • N/A |
| **Frequency** | • As required and ongoing |
| **Action** | • Assign traders to workstations and provide passwords for access<br>• Ensure traders are familiar with procedures to ensure only authorized personnel access workstations |
| **Record** | • Retain record of passwords and provide only to those authorized for access to workstations |

Traders will be assigned a password to access their assigned NASDAQ workstations. Traders may not permit unauthorized persons to use workstations and may not disclose their passwords to unauthorized persons outside the OTC trading department.

Traders should log off at the end of the trading day and log on each morning with the assigned password.

### 13.11.4 Adequate Staffing

The Head Trader is responsible for ensuring the trading desk is adequately staffed at all times to meet market demands.

### 13.11.5 Issuer Repurchases Of Common Stock

[SEC Securities Exchange Act of 1934 Rule 10b-18]

Rule 10b-18 provides a safe harbor from violations of anti-manipulation rules when an issuer (or its affiliate) repurchases its outstanding common stock. To come within the safe harbor, the issuer must meet four conditions on each day it bids for and repurchases shares of its common stock (manner of entry, timing, pricing, and volume conditions). Following is a summary of key elements of 10b-18 safe harbor conditions. Because rule requirements are technical and detailed, traders should consult with the Trading Manager or Compliance prior to engaging in issuer repurchases.

**MANNER OF ENTRY:**

ALPINE_LIT168191

- All bids and purchases must be made through or by only one broker or dealer in a single day, with limited exceptions.

**TIMING CONDITION:**

- A purchase may not be the opening reported purchase of the day.
- For issuers having an average daily trading volume of $1 million or more and a public float value of $150 million or more, purchases may be made until the day's last 10 minutes of the primary market trading session in the principal market for the security. Other issuers are limited to purchases until the day's last 30 minutes of the primary trading session in the principal market for the security.

**PRICING CONDITION:**

- Purchases may not be made at a price higher than the highest independent bid or last independent transaction price (whichever is higher) at the time of the purchase.

**VOLUME CONDITION:**

- The number of outstanding common shares purchased by an issuer on any single day may not exceed 25% of the average daily trading volume (ADTV) of the stock for the 4 calendar weeks preceding the week purchases are made.
- Once each week, on any day on which no other Rule 10b-18 purchases are made, the issuer may make a single block purchase (with no limit on the number of shares). "Block" for purposes of this rule is defined as a quantity of stock that has a purchase price of $200,000 or more, or is at least 5,000 shares and has a purchase price of at least $50,000. This block purchase is excluded from the 4-week average trading volume calculation.

**OTHER CONDITIONS:**

- The safe harbor is extended to after-hours trading sessions:
  - Purchases are limited to the lower of the closing price of the primary trading session in the principal market and any lower bids or sale prices subsequently reported in the consolidated system by other markets.
  - A different broker-dealer may be used for 10b-18 purchases than was used in the primary session.
  - The issuer may not purchase as the opening transaction in the after-hours session.
  - The issuer may repurchase securities until termination of the period in which the last sale prices are reported in the consolidated system.
- The safe harbor includes riskless principal purchase trades for the issuer that are analogous to agency trades where both legs are effected at the same price and only one leg is reported to the market.
- During a trading session immediately following a market-wide trading suspension, the issuer may purchase up to 100% of the security's ADTV.
- Purchases during pending mergers, acquisitions or similar transactions are not covered by the 10b-18 safe harbor with two exceptions related to when purchases are made and special volume limitations. There are other conditions applicable to these purchases.
- Issuers are required to make disclosures regarding repurchases in their 10-Q and 10-K filings.

### 13.11.6 Errors

| Responsibility | • Head Trader or designee |
| --- | --- |

ALPINE_LIT168192

| | |
|---|---|
| **Resources** | • Error account<br>• Errors reported by traders<br>• NASDAQ Reg Recon (NMS Regulation Report) |
| **Frequency** | • Weekly - error account<br>• As required - errors reported by traders |
| **Action** | • Review error account to ensure positions are closed out on a timely basis<br>• Recommend corrective action for errors, as needed<br>• Confer with traders with repeat errors, when necessary |
| **Record** | • Initials or signature and date of review (if applicable)<br>• Notate any action taken, if any |

Errors caused by traders must be immediately brought to the attention of the Head Trader or designee and resolved between the inventory account and the error account.

Applicable Rules: EDGA Rule 11.13, EDGE Rule 11.13, Nasdaq Rule 11890, Nasdaq OMX BX Rule 11890, Nasdaq OMX PHLX Rule 3312, NYSE-Arca Rule 7.10, NYSE Rule 128 and NYSE-Amex Rule 128

### 13.11.7 Clearly Erroneous Transaction Procedures

[FINRA Rule 11890 and 11892; NASDAQ Rule 11890; NASDAQ's Clearly Erroneous Transaction Policy page at: https://www.nasdaqtrader.com/trader/tradingservices/marketwatch/clearlyerroneous.stm]

The FINRA and NASDAQ have established procedures for canceling trades executed through NASDAQ systems if those trades are "clearly erroneous." Rules should be consulted for details regarding procedures.

To qualify for these procedures, there must be an obvious error in the terms of the trade such as price, number of shares, identity of the security, *etc.* In general, the procedures include:

- Contact the contra party to rectify the error.
- File request online with NASDAQ Market Operations to cancel the order within specific timeframes:
    - For transactions occurring between 9:30 a.m. and 10:00 a.m. ET, complaints must be received by NASDAQ by 10:30 a.m. ET.
    - For transactions occurring prior to 9:30 a.m. ET and at or after 10:00 a.m. ET, complaints must be received within 30 minutes of execution.
- Review by a NASDAQ officer who makes a determination.

NASDAQ reviews all eligible clearly erroneous requests in non-NASDAQ-listed securities executed:

- before the primary market for the security posts an executable two-sided quote for its regular market trading session, and
- after 4:00 p.m. ET.

ALPINE_LIT168193

For unsuccessful appeals of Clearly Erroneous Rule 11890 adjudications, a fee is charged by NASDAQ.

### 13.11.8 Customer Order Errors

All errors in customer orders must be resolved immediately when discovered. Errors in customer accounts are documented on the Cancel and Rebill/Error Report form, which requires a designated supervisor's approval.

### 13.11.9 System Outages

[FINRA Notice to Members, December 2002 For Your Information]

System outages will be reported to the FINRA by phone. The Trading Manager is responsible for determining whether to report outages.

### 13.11.9.1 Information To Be Reported

Information that will be reported includes the following:

- the date(s) the system problem occurred;
- the specific systems that were affected
- the exact nature of the problem (*e.g.,* complete outage, slow transmission times);
- the time the problem began;
- the time the problem was first detected;
- the time the problem was resolved and a brief description of the resolution;
- the level of activity impacted (*e.g.,* the approximate number of trades not reported) and a description of how the impact will be addressed (*e.g.,* trade reports to be submitted on an "as of" basis the next business day);
- contact name and telephone number; and,
- any additional information deemed relevant.

## 13.12 Distributions Of Securities

[SEC Regulation M; FINRA Rule 6435; FINRA Regulatory Notice 08-74; NASDAQ Rule 4619(e)]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Notice from Syndicate Dept. of underwritings<br>• Requests to engage in passive market making<br>• Determination to enter a stabilizing bid<br>• Determination to enter a penalty bid and engage in syndicate short covering |
| Frequency | • As required |
| Action | • Determine whether passive market making will be conducted:<br>   o If yes, and Alpine is the manager of the underwriting, file the completed underwriting report with FINRA contemplated date and time of commencement of the restricted period no later than one business day prior to commencement of the restricted period<br>   o Notify trader when passive market making may be started or if market making must cease<br>   o Submit a request to FINRA to rescind the passive market |

ALPINE_LIT168194

|  | making status of distribution participants and affiliated purchasers including the date and time of the pricing of the offering, the offering price, and the time the offering terminated (may be submitted on the Underwriting Activity Report)<br>• If passive market making will not be conducted, request an excused withdrawal and later rescind the request<br>• Determine, in consultation with Syndicate Department, whether stabilizing activities will be conducted:<br>   ○ Submit a request to FINRA of intent to enter a stabilizing bid<br>   ○ Send confirmation of the stabilizing bid by the close of the business day the stabilizing bid is entered; notification is sent to FINRA<br>• Prior to imposing a penalty bid or conducting syndicate covering transactions, provide written notice to FINRA Corporate Financing Department |
|---|---|
| **Record** | • Submissions to FINRA regarding the underwriting, stabilizing bids, passive market making, and any other required submissions |

### 13.12.1 Introduction

When Alpine is engaged in a distribution of securities and also acts as a market maker in those securities, Alpine must cease market making activities or comply with rules regarding "passive" market making. These requirements also apply to "reference" securities which are securities that affect the value of the security the subject of the distribution (*e.g.,* a common stock would be a reference security in relation to an offering of warrants dependent on the price of the common stock). Only NASDAQ securities that are the subject of a firm commitment, fixed-price offering are eligible for passive market making.

The approval of the Trading Manager is required prior to engaging in passive market making activities.

### 13.12.2 Overview Of Requirements

The following is a summary of key requirements and exemptions regarding passive market making.

- Securities with average daily trading volume (ADTV) of $1 million or more and a public float of at least $150 million are exempt from passive market making requirements.
- Alpine must notify the FINRA in writing prior to engaging in passive market making.
- The prospectus for the offering must include a disclosure that passive market making will take place.
- When engaged in passive market making, there are restrictions on quotations and limitations on purchases.

### 13.12.3 Restrictions When Passive Market Making Is Not Conducted

When passive market making will not be conducted during the restricted period and no exemption applies, Alpine is required to cease market making activities for either 1 or 5 days prior to pricing and until Alpine completes its participation in the distribution. When participation is completed depends on Alpine's role in the distribution.

Restricted periods are as follows:

ALPINE_LIT168195

- No restriction for securities with ADTV of $1 million or more and a public float of at least $150 million
- One business day restriction for securities with ADTV of at least $100,000 but less than $1 million and a public float of at least $25 million
- Five business days for all other securities

### 13.12.4 Trader Responsibilities

The trader is responsible for the following:

- Request an excused withdrawal if Alpine will not engage in passive market making
- Obtain approval from the Trading Manager prior to engaging in passive market making
- Ensure the requirements for passive market making are met including quotation and purchase limitations

### 13.12.5 Stabilizing Bids

[SEC Regulation M Rule 104; FINRA Rule 6470; NASDAQ Rule 4614]

The following sections describe requirements when Alpine enters stabilizing bids when engaged in an underwriting of a NASDAQ security. Rule 104 of Regulation M should be reviewed for specific details.

#### 13.12.5.1 Securities Subject To Requirements

Securities subject to FINRA rules regarding stabilizing activities include NASDAQ securities that are "subject" or "reference" securities under Rule 101 of Regulation M.

#### 13.12.5.2 Other Limitations And Requirements

- Only one market maker in a security may enter a stabilizing bid.
- A stabilizing bid may not be entered unless there is at least one other market maker entering independent bids.
- The stabilizing bid applies to all freely tradeable outstanding securities of the same class being underwritten.
- Stabilizing bids will include a special identifier in the NASDAQ system.

#### 13.12.5.3 Penalty Bids And Syndicate Covering Transactions

[FINRA Notice to Members 97-80; NASDAQ Rule 4624]

Penalty bids are entered to track sales in the market by syndicate members, and for which selling concessions will be withheld by the underwriter. Penalty bids cannot be entered through the NASDAQ workstation.

#### 13.12.5.4 Transactions Related To Initial Public Offerings (IPOs)

[FINRA Rule 6130]

Traders are prohibited from executing an order for an exchange-listed security that is being sold in an IPO until the security opens for trading on the exchange.

## 13.13 Trade Reporting

[FINRA Rule 6000 series and 7000 series; FINRA Regulatory Notice 11-40, 10-26, 09-21 and 09-08; FINRA Trade Reporting Frequently Asked Questions: http://www.finra.org/Industry/Regulation/Guidance/PO38942; FINRA Trade Reporting Notice September 23, 2011 "Trade Reporting Transactions in OTC Equity Securities and Restricted Equity Securities; FINRA Trade Reporting Notice September 23, 2011 "FINRA Reminds Firms of Their Trade Reporting Obligations Relating to Customer Sales of Low-Value OTC Equity Securities"; NASDAQ Broker-Dealer data: Equity Trader Alert 2009-33]

ALPINE_LIT168196

Other applicable rules: NYSE-Arca 7.16(a), SEC Rule 200(a)&(g), SEC Rule 203(b), TRF and/or ADF/TRACs Rules 6182 and 6624, Nasaq Rule 4755(a), Nasdaq OMX BX Rule 4755(a) and as noted below

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • NASDAQ Compliance Report Cards<br>• NASDAQ Reg Recon (NMS Compliance Report)<br>• Go Trader Reports: 5% rule, Employee Trades, Family-Related Accounts, Volume by Security; Combined Executions for Unsolicited Orders; Combined Executions for Solicited Orders, Rejected Orders.<br>• Nasdaq Interactive Daily Trade Blotter |
| **Frequency** | • Monthly |
| **Action** | • Review report card for compliance with trade reporting requirements, including correct indicator for sales transactions (long, short, or short exempt) and mixed capacity trade reporting (if used), accurate use of trade modifiers<br>• Take corrective action which may include consultation with the trader; additional education for the trader, and/or consult with the CCO regarding corrective action<br>• For trades reported by someone else: Contact the reporting agent regarding reporting discrepancies and determine what corrective action will be taken |
| **Record** | • Trading Manager Checklist<br>• NASDAQ Compliance Report Cards including date of review (if applicable), reviewer's initials, and action taken, if applicable<br>• Record of contact with third party reporting agent, if applicable |

Alpine is obligated to report trades to a Trade Reporting Facility (TRF). The obligation to report depends on the security, the type of transaction (buy or sell), and the capacity in which Alpine executes the transaction.

The following explains some terms and the rules that apply.

**FINRA/NASDAQ TRF:** For reporting NMS securities transactions executed away from an exchange [Rule 4000 series, Rule 4632 "Transaction Reporting"]. Also referred to as the "System" [Rule 6110(m)].

**FINRA/NYSE TRF:** For reporting NMS securities transactions executed away from an exchange [Rule 4000E series, Rule 4632E "Transaction Reporting"].

**OTC Reporting Facility:** For reporting transactions in OTC equity securities (non-exchange-listed securities and certain exchange-listed securities that do not qualify for real-time reporting) [Rule 6600 series, Rule 6620 "Transaction Reporting"]. Transactions in direct participation programs (DPPs) are also reported to the OTC Reporting Facility [Rule 6900 series, Rule 6920 "Transaction Reporting"].

ALPINE_LIT168197

**Clearing and comparison:** The Rule 6100 series explains requirements for clearing agency members and related trade reporting requirements. Some transactions, such as odd-lot transactions, are reported for clearing purposes and not for tape dissemination. Generally all trades (other than those specifically excluded) are required to be reported for clearing and regulatory transaction fee purposes.

## 13.13.1 Trade Reporting Facility (TRF, formerly ACT)

ACT compares trade information and submits locked-in trades to NSCC and handles all NASDAQ trade reporting. NASDAQ execution systems such as NASDAQ Market Center have an automatic interface with the TRF that routes execution reports through the facility for reporting and comparison.

### 13.13.1.1 Key Requirements

[FINRA Rule 6300A series]

Some key requirements include the following:

- Market makers are required to submit trades to the TRF within 90 seconds of execution.
- Transactions not reported within 90 seconds must include the time of execution on the trade report.
- For trades executed between midnight and 9:30 a.m. ET but not reported before 9:30 a.m. on trade date, the trades must be reported on the following day on an "as/of" basis.
- Trades executed outside normal market hours must include a ".T" modifier. The TRF will automatically append .T to trade reports erroneously submitted without the modifier.
- Order-entry firms must submit details of trades or accept/decline the market maker's entry using the TRF browse function on the NASDAQ workstation within 20 minutes of the trade.
- Reporting obligations include reporting cancellations of trades previously reported to the TRF. The member responsible for submitting the original trade report must submit the cancellation report. Deadlines are explained in FINRA Rule 4632(g)(2).

### 13.13.1.2 Mixed Capacity Trading And Allocation Of Executions

[FINRA Notice to Members 01-85]

When executing orders, transactions may be reported on a mixed capacity basis. Market makers are permitted to combine different types of orders (agent, riskless principal and/or principal) in a single quote. While orders should be marked correctly for trading capacity at time of entry into the NASDAQ system, when acting in a mixed capacity adjustments may be made post-execution to reflect the capacity of individual orders.

When orders are combined and all or part of them are executed, it is necessary to allocate the executions in a manner fair to all customers. Executions will be allocated using the following methodology:

- [methodology]

Allocation procedures will be reviewed periodically in best execution reviews. Records will be retained of the original orders received including time of entry and capacity, execution time and allocation among orders, and capacity reported to the TRF.

### 13.13.1.3 Prohibition Against Aggregating (Bunching) Orders

ALPINE_LIT168198

[FINRA Rule 6380A(f)]

Individual executions of orders in a security at the same price may not be aggregated (bunched) into a single transaction report for tape purposes.

For trades not printed to the tape, and for clearing purposes only, individual executions in a security at the same price with the identical contra party may be bunched and submitted as a single report to the TRF.

## 13.13.2 Prohibition Against Delayed Trade Reporting - SEC 21(a) Report

Alpine is prohibited from improperly delaying trade reporting for its own benefit or for the benefit of another market maker. Traders are required to report trades in compliance with trade reporting rules.

## 13.13.3 Riskless Principal Transactions

[FINRA Rule 6380A(d)(3)(B)]

Traders should be aware of the requirements for reporting riskless principal transactions. A "riskless principal transaction" is defined as a trade in which Alpine, after having received an order to buy or sell a security, buys or sells the security at the same price, as principal, in order to satisfy the order to buy or sell. The reporting requirements apply whether or not Alpine is acting as a market maker, and also applies to third market transactions.

Riskless principal transactions may be reported using either of two methods, which are summarized below. Notice to Members 00-79 should be consulted for details regarding proper trade reporting. Riskless principal transactions may be reported using the:

- *Original approach:* Submit a last sale report marked "riskless principal" for the initial leg of the transaction and do not report the offsetting transaction with the customer; OR
- *Alternative approach:* Submit a last sale report marked "principal" for the initial leg of the transaction and submit a non-media, non-tape report (or a clearing-only report) marked "riskless principal" for the offsetting, riskless portion of the trade. To use this alternative approach, specific reports must be submitted to the TRF. See FINRA Notice to Members 00-79 for further explanation and examples of the reporting requirements.

## 13.13.4 Transactions And Transfers Not Requiring Reporting

[FINRA Rule 6282(i), 6380A(e), 6380B(e) and 6622(e)]

The following transactions and transfers are not subject to reporting requirements:

- Transactions that are part of a primary distribution (as defined under Rule 100 of SEC Regulation M) by an issuer or of a registered secondary distribution (other than "shelf distributions") or of an unregistered secondary distribution;
- Transactions made in reliance on Section 4(2) of the Securities Act;
- Transactions reported on or through an exchange;
- The acquisition of securities by a member as principal in anticipation of making an immediate exchange distribution or exchange offering on an exchange;
- Purchase of securities off the floor of an exchange pursuant to a tender offer;
- Transfers of securities made pursuant to an asset purchase agreement (APA) that is subject to the jurisdiction and approval of a court of competent jurisdiction in insolvency matters, provided that the purchase price under the APA is not based on, and cannot be adjusted to

ALPINE_LIT168199

reflect, the current market prices of the securities on or following the effective date of the APA; and

- The transfer of equity securities for the sole purpose of creating or redeeming an instrument that evidences ownership of or otherwise tracks the underlying securities transferred (*e.g.,* an American Depositary Receipt or exchange-traded fund).

The following are not reported for publication purposes but are reported for regulatory transaction fee assessment purposes:

- Transactions where the buyer and seller have agreed to trade at a price substantially unrelated to the current market for the security;
- Purchases or sales of securities effected upon the exercise of an option pursuant to the terms thereof or the exercise of any other right to acquire securities at a pre-established consideration unrelated to the current market; and
- Transfers of proprietary securities positions between a member and another member or non-member broker-dealer where the transfer (1) is effected in connection with a merger of one broker-dealer with the other broker-dealer or a direct or indirect acquisition of one broker-dealer by the other broker-dealer or the other broker-dealer's parent company and (2) is not in furtherance of a trading or investment strategy. Alpine must provide FINRA at least three business days advance written notice of its intent to use this exception, including the basis for determination that the transfer meets the terms of the exception.

## 13.13.5 Short Sales

Procedures are included in Chapter 12.20: ORDERS.

## 13.13.6 Review Of Trade Modifiers

The supervisor set forth in Chapter 13.11 is responsible for periodically reviewing order records for proper use of modifiers reported on trades.

## 13.13.7 Obligation To Provide Accurate Information To The Marketplace

[FINRA Rule 2110; FINRA Notice to Members 06-50]

| Responsibility | • Head Trader set forth in Chapter 1 |
|---|---|
| Resources | • Information provided to service providers |
| Frequency | • Monthly |
| Action | • If errors are found:<br>    ○ Consult with individual responsible for sending the information<br>    ○ Determine what corrective action is necessary including referring the individual to compliance for training/consultation; disciplinary action; publishing corrected data |
| Record | • Notation of review on records used to verify accuracy of published information with corrective action, if any |

If Alpine provides information about its trading volume and trading interest to service providers for dissemination, the information must be accurate and not misleading.

ALPINE_LIT168200

### 13.13.8 Order Audit Trail System (OATS)

OATS reporting procedures are included in Chapter 12.22: *ORDERS*.

### 13.13.9 Trade Reporting By Third Parties

[2007 Member Alert: Notice to All TRF, ADF and Other FINRA Facility Participants Regarding AGU and QSR Relationships]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Transaction data<br>• FINRA compliance report cards<br>• NASDAQ Daily Trade Blotter |
| **Frequency** | • Monthly |
| **Action** | • Execute agreement with third party<br>• Review trade data and compliance reports to determine accuracy of third party reporting<br>• If errors are noted:<br>  o Confer with the third party regarding what corrective action will be taken to prevent future errors<br>  o If errors persist, consider changing third party reporting agents |
| **Record** | • Transaction data and reports reviewed (including date reviewed, who reviewed, action taken) |

When a third party is used for reporting trades, whether under an Automated Give Up (AGU), Qualified Service Representative (QSR) or other arrangement, the third party's reporting will be periodically reviewed for accuracy.

## 13.14 Other Reports

### 13.14.1 Short Interest Report For NASDAQ Securities

Alpine is obligated to file a semi-monthly short interest report with the FINRA for all short customer and proprietary positions in NASDAQ securities. Refer to the section *Short Interest Report* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES* for procedures regarding the filing of this report.

#### 13.14.1.1 Disclosure Of Order Executions

[SEC Regulation NMS Rule 605]

| | |
|---|---|
| **Responsibility** | • Head Trader as set forth in Chapter 1.1 |
| **Resources** | • Market making trade data |
| **Frequency** | • Monthly - publish data<br>• Quarterly - monitor vendor/third party publication of reports, if applicable |

ALPINE_LIT168201

|  | • As required - identify exemption that applies from reporting requirement<br>   o Quarterly - review availability of exemption |
|---|---|
| **Action** | • Collect data and publish order execution report on the internet<br>• Download data to the Designated Participant<br>• If a vendor or other third party is used to publish reports, monitor for publication and accuracy of data<br>• If the Firm qualifies for a reporting exemption, document the exemption and monitor the continued availability of the exemption |
| **Record** | • Copies of monthly order execution reports<br>• If an exemption applies, document exemption and monitoring of continued application |

### 13.14.1.2 Introduction

As a market maker in NASDAQ Global Market (NGM) securities, Alpine is required to publicly publish information on the quality of order executions by "market centers" (market makers, exchange specialists, stock exchanges, NASDAQ, and alternative trading systems [ATSs]). Reports are published on the internet monthly, by the end of the month following the calendar month reported. The Rule was adopted by the SEC to enhance market transparency and foster competition among market participants.

### 13.14.1.3 Orders Included In The Report

The monthly report includes all market orders in NGM securities. In addition, limit orders are included in the report. Orders that require "special handling" such as not held orders, short sales, and other orders that are not immediately executable when entered to the market are not reported.

### 13.14.1.4 Downloading Data To A Designated Participant

SROs joined in a plan to publish SRO market center data. In addition to publishing Alpine's report, Alpine is obligated to download its data on a quarterly basis to a "Designated Participant" in the plan. Alpine provides its OTC market making data to the FINRA in compliance with this requirement.

## 13.15 Large Trader Reporting

[SEC Securities Exchange Act of 1934 Rule 13h-1; SEC Large Trader FAQs: http://www.sec.gov/divisions/marketreg/large-trader-faqs.htm]

***Note: The SEC delayed the effectiveness of certain aspects of this Rule.***

| **Responsibility** | • Head Trader, CCO |
|---|---|
| **Resources** | • Trading records identifying firm trades |
| **Frequency** | • Ongoing - if not already a reporting Large Trader, review trading records to identify when that status is met to initiate identification to the SEC<br>• One time - Identify large trader qualification and notify the SEC<br>• Annually - File Form 13H within 45 days of end of calendar year<br>• Amend Form 13H within 45 days after the end of a calendar quarter if |

ALPINE_LIT168202

| | |
|---|---|
| | the prior filing becomes inaccurate<br>• File "Inactive Status" or make a Termination Filing if appropriate |
| **Action** | • If not already a reporting Large Trader and magnitude of firm trading would potentially require [The Firm] to file as Large Trader at some time, review trading records to identify when that status is met to initiate identification to the SEC within 10 days after meeting or exceeding the identifying activity level<br>• If filing as a Large Trader:<br>   o File Form 13H annually with the SEC<br>   o Amend filings, if necessary<br>   o Provide requested trade data to the SEC<br>• Disclose large trader identification number (LTID)<br>• Retain required records if large traders maintain accounts with the Firm once this portion of the rule becomes effective |
| **Record** | • Review of trading records to make initial filing, if necessary<br>• Annual Form 13H reports<br>• Required records listed in this section |

The SEC requires firms that qualify as "Large Traders" to file reports with the SEC. All broker-dealers who maintain accounts for large traders are required to retain records which are explained in a separate subsection. This section outlines the requirements of a very extensive rule that should be consulted directly for details of requirements.

## 13.15.1 Large Trader Definition

A Large Trader is defined as a person, including a firm or individual, whose transactions in NMS securities equal or exceed (1) 2 million shares or $20 million during any calendar day or (2) 20 million shares or $200 million during any calendar month (the "identifying activity level" for filing Form 13H). "Transactions" for purposes of identifying a Large Trader exclude: (1) transactions part of an offering; and (2) sales by a selling shareholder in connection with an IPO or in a secondary offering if the seller is a current or former employee of the issuer and securities being sold were part of the employee's compensation.

An ownership level of 25% would generally give a person "control" for purposes of Large Trader designation. Multiple persons within a corporate group may qualify as Large Traders. If a natural person or subsidiary entity within a large organization independently qualifies as a Large Trader, a parent company of that Large Trader may file on Form 13H and identify itself as the Large Trader on behalf of the group, removing the requirement of the subsidiary to separately identify as a Large Trader.

## 13.15.2 Identifying Activity Level

It is the identifying activity level that identifies a person as a Large Trader. Offsetting or netting transactions among or within accounts, even for hedged positions, are added to a market participant's activity level in order to show the full extent of a trader's purchase and sale activity. When aggregating transactions, the Large Trader would determine across all accounts over which it has investment discretion:

ALPINE_LIT168203

- The volume or fair market value of transactions in equity securities and the volume or fair market value of the equity securities underlying transactions in options on equity securities, purchased and sold; and
- The fair market value of transactions in options on a group or index of equity securities (or based on the value thereof), purchased and sold.

The rule should be consulted for transactions exempt from the identifying activity level including gifts, journals/bookkeeping entries, issuer offerings, and other exemptions.

### 13.15.3 Large Trader Identification Number (LTID)

The SEC assigns each large trader an LTID. Large traders are obligated to disclose this number to the registered broker-dealers effecting transactions on its behalf and identify for them each account to which it applies. The LTID is one of the elements to be included in consolidated audit trail reporting.

### 13.15.4 Filings

Large traders are required to make filings of Form 13H which is a web-based form.

**Initial filing:** Large Traders are required to identify themselves to the SEC by filing Form 13H [Rule 13h-1(b)]. The initial filing is due within 10 days after the Large Trader meets or exceeds the identifying activity level.

**Annual filing:** Submit an annual filing of Form 13H within 45 days after the end of each calendar year.

**Amended filing:** Inaccurate filings must be promptly corrected following the end of the calendar quarter in which the prior filing becomes inaccurate for any reason. For example, changes to the name, business address, *etc.* would require an amended filing.

**Inactive status:** Form 13H is not required if a person does not meet or exceed the identifying activity level. If the person does not anticipate meeting the level again, it may file for "Inactive Status."

**Reactivated status:** If a person on Inactive Status meets or exceeds the identifying activity level, it must file for Reactivated Status within 10 days.

**Termination filing:** Persons may terminate Large Trader status by submitting a Termination Filing. For example, if a person ceases operations, dissolves, or is acquired.

The CCO will be responsible for filing the Form 13H, when required by regulation.

### 13.15.5 Records

[Electronic Blue Sheet Submissions FAQs: http://www.finra.org/Industry/Compliance/RegulatoryFilings/BlueSheets/P125234]

Records must be maintained for 3 years, 2 years in a readily accessible location.

## 13.16 Procedures For Clock Synchronization

[FINRA Rule 7430; NASDAQ Rule 6953; OATS FAQs: http://www.finra.org/Industry/Compliance/MarketTransparency/OATS/FAQ/P085544]

ALPINE_LIT168204

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Clock Synchronization Log |
| **Frequency** | • Weekly |
| **Action** | • Take corrective action for failure to synchronize clocks which may include: repair or replacement of clocks (for mechanical failure); additional training of personnel; or other appropriate action in consultation with the CCO |
| **Record** | • Clock Synchronization Log is retained in the Head Trader's file |

Under FINRA rules, all time clocks (computer system or mechanical) used for recording date and time of orders must be synchronized to ensure the accuracy of recorded time. The following procedures are to be followed to synchronize clocks in the OTC trading area:

- Traders are responsible for synchronizing their own clocks, each trading day.
- Clocks that have not been checked according to these procedures must **not** be used for recording order information.
- Clocks must be synchronized to within 3 seconds of the National Institute of Standards and Technology (NIST) atomic clock.
- All clocks will be synchronized with the National Institute of Standards and Technology (NIST) system clock **each business day.**

### 13.16.1 Independent Contractors

If an independent contractor immediately transmits orders to the trading department, either electronically or manually, the independent contractor is not required to maintain a separate synchronized clock. If there is any delay in transmitting the order, however, the contractor must maintain a synchronized clock.

## 13.17 Prohibited Activities

### 13.17.1 Acting To Benefit Alpine vs. The Customer

Alpine and its traders may not act to benefit Alpine or other market makers to the detriment of customers. It is incumbent on all employees to recognize that our reputation and relationships with customers are dependent on providing a high level of service consistent with Alpine policy and regulatory requirements. Traders will be supervised by the Head Trader and Firm Principals to ensure compliance with this section.

### 13.17.2 Anti-Competitive And Anti-Trust Procedures

[SEC 21(a) Report; FINRA Rule 5240; NASDAQ IM 2110-5]

The following sections address prohibited anti-competitive activities of broker-dealers.

ALPINE_LIT168205

### 13.17.2.1 Anti-Competitive Activities

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • N/A |
| **Frequency** | • Ongoing - observation of activities<br>• Annual - training and certification |
| **Action** | • Observe traders to identify prohibited anti-competitive activities as follows:<br>• Listen to traders' conversations with other broker-dealers on a spot-check basis<br>• If appropriate, take corrective action which may include:<br>    ○ Consultation with the trader regarding nature of conversation and potential prohibited activity<br>    ○ If necessary, consultation with Compliance regarding corrective action<br>• Conduct annual compliance meeting to discuss the prohibition against anti-competitive activities<br>• Provide new traders with a copy of Alpine's OTC market making policies<br>• Obtain annual written certification from all traders |
| **Record** | • Trading Manager Checklist<br>• Trader Annual Certification |

Traders may not engage in activities that may constitute collusion between broker-dealers to fix prices or spreads. Examples of such activities may include the following:

**Agreeing with another market maker to:**

- adhere to a "quoting convention" (an agreement or common understanding among market makers regarding the manner in which bids and asks would be displayed on NASDAQ)
- fix, raise, lower, or maintain quotes or prices
- fix, increase, decrease, or maintain a spread or size of quote increment
- adhere to any understanding or agreement (other than those relating to one or a series of related trades) requiring a market maker to trade in quantities of shares greater than required or displayed, whichever is greater

**Engaging in harassment or intimidation of any other market maker (whether written, electronic, by phone, or in face-to-face communications) for:**

- decreasing dealer or inside spreads
- refusing to trade in quoted prices in quantities of shares greater than required or displayed, whichever is greater
- displaying a quantity of shares on NASDAQ in excess of the minimum size required by NASDAQ or FINRA rules

**Refusing, or threatening to refuse to trade, (or agree with or encourage any other market maker to refuse to trade) with any market maker at Alpine's published NASDAQ quotes up to**

ALPINE_LIT168206

**the published quotation size because the other market maker decreased its dealer spread or the inside spread in any NASDAQ security, or refused to trade at its quoted prices in a quantity greater than required or displayed.**

**In addition traders may not, for the purpose of violating these prohibitions, exchange with other market makers confidential, proprietary information which may include:**

- information concerning customer orders, including order size and the identification of the customer
- information concerning inventory positions, trading strategies, and intended future quotations

### 13.17.2.2 Obligation To Report

Traders are obligated to report to the trading manager any threats, coercion, or other prohibited activity of which they become aware.

### 13.17.2.3 Antitrust Procedures

Alpine has adopted the following procedures to prevent the activities described in this section:

- At least annually, Alpine's Antitrust Activities policy (as well as other policies included in this chapter) will be reviewed with OTC traders in a compliance meeting conducted for that purpose.
- Traders will be provided with a written copy of Alpine's OTC market making policies.
- Traders will be required to certify, in writing, that they have received and reviewed these policies.

## 13.17.3 Unauthorized Trading

[SEC National Examination Risk Alert: http://www.sec.gov/about/offices/ocie/riskalert-unauthorizedtrading.pdf; FINRA Regulatory Notice 08-18]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Order records |
| Frequency | • Daily - review of orders/positions<br>• As required - training of traders and supervisory personnel |
| Action | • Maintain a supervisory structure that promotes oversight and compliance which may include:<br>   o Reporting lines that facilitate independent reviews and monitoring<br>   o Balance of compensation/incentives relating to level of responsible risk-taking<br>   o Disaggregation of functions performed by one trader or desk<br>   o Limit access to trading systems only to those authorized access including blocking access, when appropriate, when an employee changes positions within [The Firm]<br>• Review of orders/positions<br>   o Contact with traders about portfolios and account positions, particularly anomalies to normal trading<br>   o Reviews of extended settlement trades or customer or firm positions that appear to have excessive roll overs. Contact the |

ALPINE_LIT168207

| | |
|---|---|
| | customer or account contact, if appropriate, to confirm authorization of the transaction<br>   o   Independent trading reviews to check on a trader's strategies and performance and reviews of business performance and risk profile<br>   o   Review of consolidated transaction information when multiple systems are used as various components of transactions<br>   o   Trading limit breaches<br>   o   Sizeable unrealized profit/loss on unsettled transactions<br>   o   Unusual patterns of cancellations and corrections (particularly those involving multiple cancellations or corrections by the same trader or involving the same counterparty)<br>   o   Settlement outside normal cycles or that do not occur on a timely basis<br>   o   Aged unresolved reconciling items and aged outstanding confirmations<br>   o   P&L that exceeds certain de minimis amounts by traders who are supposed to be flat or unusual large one-day P&L reports<br>   o   Details underlying a trader's Value at Risk (VaR); liquidity risk; adequacy of hedges and risks of imperfect hedges (including understanding and reviewing valuation of all positions, particularly positions in exotic instruments or instruments that have little or no market)<br>   o   Repeated or unusual requests for exceptions to position or P&L limits<br>   o   Trading in products where the trader is not approved and is outside the trader's expertise<br>   o   Pattern of aged fails to delivery for long or short sales<br>   o   Any other unusual or significant deviations from normal trading patterns<br>• Training of traders, supervisors, and other personnel<br>   o   Training of traders and supervisors regarding complex products and strategies<br>   o   Training of operations staff on receipt of confirmation acknowledgments and when to escalate issues<br>• Testing of firm controls meant to detect unauthorized trading<br>   o   Conducted by Compliance, Internal Audit, or technology personnel as part of the review of systems and [The Firm]'s business |
| **Record** | • Compensation, supervisory reporting, assignment of trading responsibilities, and authorized/unauthorized access to systems records<br>• Review of orders and positions including notations of when reviewed, who reviewed, and action taken, if any<br>• Training of traders, supervisors, and operations personnel including when conducted, training content, and who was subject to training |

Traders are prohibited from engaging in unauthorized trading which may include the following:

• Unauthorized trading in customer or proprietary accounts

ALPINE_LIT168208

- Trading in excess of firm limits on position exposures, risk tolerance, or losses
- Trading in products/securities where the trader is not authorized
- Purposeful mismarking of positions
- Fabricating nonexistent transactions through the creation of false records
- Accessing trading systems where the trader does not have authorized access
- Sharing access with non-authorized employees

Traders should contact the trading supervisor, Compliance, or other supervisor if there are questions or concerns regarding trading activity, strategies, positions, or other trading issues.

## 13.17.4 Expiration And Rebalance Days

[NASDAQ Head Trader Alert 2006-030]

At the time of quarterly expiration of options and futures based on the NASDAQ-100, S and P 500 and S and P 400, traders must avoid behavior that FINRA considers potentially manipulative activity at or near market open or close including the following:

- Failure to append the appropriate trade reporting modifiers
- Failure to upgrade technology
- Other potentially manipulative activity affecting opening or closing prices

## 13.17.5 Other Prohibited Activities

[FINRA Rule 6140]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Observation of traders' activities<br>• Review of order records |
| Frequency | • Ongoing |
| Action | • Review for patterns or transactions that may indicate:<br>    ○ Marking the opening<br>    ○ Marking the close<br>    ○ Multiple transactions that may indicate painting the tape<br>    ○ Purchases and sales between related accounts at little or no market price difference (wash sales)<br>• Take corrective action depending on the nature of the prohibited activity and/or consult with Compliance |
| Record | • Order records including notations of action taken<br>• Trading Manager Checklist |

## 13.17.5.1 Payments For Market Making

[FINRA Rule 5250; NASDAQ Rule 2460]

Alpine and its traders are prohibited from accepting monetary payment or other consideration, directly or indirectly, from an issuer (or anyone on behalf of an issuer) for publishing a quotation, acting as a market maker, or submitting an application to quote or act as a market maker. The Head Trader is

ALPINE_LIT168209

responsible for ensuring Traders do not perform these prohibited actions or receive monetary compensation for attempting to perform said prohibitions.

### 13.17.5.2 Inside Information

Traders are prohibited from acting on, passing on, or discussing any inside information. Any knowledge of such information must be brought to the attention of the designated supervisor and Compliance. No Alpine proprietary account or employee account may enter a transaction based on material non-public information about the issuer of that security.

### 13.17.5.3 Financial Arrangements

Traders are prohibited from entering into financial arrangements with customers or issuers (*i.e.,* sharing in profits or losses, sharing in commissions, rebating commissions, *etc.*). The Head Trader will monitor the actions of the Traders to ensure the Traders do not enter into such financial arrangements.

### 13.17.5.4 Market Manipulation

[SEC Securities Exchange Act of 1934 Rule 10b-5; FINRA Rule 5210; NASDAQ Rule 2120, 3310 and 3351]

No purchase or sell order may be entered that is designed to raise or lower the price of a security or to give the appearance of trading for purposes of inducing others to buy and sell. Examples of such practices may include:

- **Marking the opening or close:** One or more trades are executed or falsely reported at or near the opening or close of trading with the intention of affecting the opening or closing price of the security.
- **Prearranged trading:** Trading designed to give the appearance of trading activity where there is a prior agreement to buy back the stock at a pre-determined price. Only *bona-fide* stock options or repurchase agreements are permitted where a future price is guaranteed.
- **Painting the tape:** Entering false trades to give the appearance of trading activity.
- **Wash sales:** Purchases and sales between accounts where there is no change in beneficial owner (example: an individual selling to their own IRA account) and where there is no market risk.

### 13.17.5.5 Frontrunning

No Alpine proprietary or employee account may buy or sell a security while in possession of material information about an imminent block-sized transaction on the same side of the market (buy or sell) in that security or a derivative security.

## 13.17.6 Self-Preferencing

Alpine may not trade for its own account ahead of a customer's limit order at the same or better price.

## 13.17.7 Parking Securities

No arrangement may be used to conceal the true ownership of securities through a fictitious sale or transfer to an accommodator who agrees to later sell or transfer the securities to the true owner (or his agent) at the agreed upon time at essentially the same terms.

## 13.17.8 Interpositioning

A trader may not interpose Alpine or any account or any other dealer between a customer order and the best available market.

## 13.17.9 Secret Profits

A trader may not permit the charging of a markup or markdown in addition to a commission on any transaction.

ALPINE_LIT168210

### 13.17.10 Adjusted Trading

Adjusted trading or "overtrading" is a prohibited practice that involves the sale of a security by a customer for a price above the prevailing market price and the simultaneous purchase of a different security at a price lower than the prevailing market price. The purpose of an adjusted trade usually is to assist a customer in avoiding, disguising, or postponing losses.

Other scenarios of adjusted trading include:

- permitting a customer to sell a security at an inflated price and re-selling the security to another customer at the inflated price
- interpositioning the broker-dealer between two customers where the broker-dealer acts as a conduit allowing the two customers to "swap" losing positions by paying an inflated price for each other's securities

All transactions must be executed at prices reasonably related to current market prices.

### 13.17.10.1 Supervision Relevant to Prohibited Activities

The Head Trader will actively monitor the actions of each Trader to ensure that no prohibited activities listed within section 13.16 are entered into by Traders of Alpine. Should the Head Trader become aware of prohibited activities performed by a Trader, it shall take immediate action to notify the Firm Principals and undertake the appropriate disciplinary action. Traders will be trained on all prohibited activities and will be monitored to ensure adherence to all relevant rules and regulations.

## 13.18 Books And Records

[FINRA Rule 4510; NASDAQ Rule 4510A]

The following summarizes records that are to be retained in the OTC Trading area. The Trading supervisor is responsible for establishing files and retaining required records, unless procedures identify another person or department responsible for OTC trading records.

| Type of Record | Period of Retention |
|---|---|
| Traders' personal trading records | 3 years |
| Traders' Annual Certifications | 3 years |
| Records of orders (including cancelled orders) | 3 years |
| Assessment of best execution | 3 years |
| NASDAQ Report Cards | 3 years |
| OTC Trading Manager Checklist | 3 years |
| Market Maker Additions Checklist | 3 years |
| 15c2-11 files including Form 211 Checklist | Retain as long as making a market in the security and at least 3 years thereafter |
| Withdrawal Request (Voluntary) | 3 years |
| Backing-Away Log | 3 years |
| | |
| Underwriting Activity Reports | 3 years |
| Notices of stabilizing activities | 3 years |

ALPINE_LIT168211

| Quote Reporting | 3 years |
|-----------------|---------|
|                 |         |

ALPINE_LIT168212

# 14 MUTUAL FUNDS

[NASD Rule 2830; FINRA Notice to Members 95-80]

## 14.1 Introduction

Mutual funds, for purposes of these policies and procedures, refer to open-end investment companies. In addition to mutual funds, this chapter includes sections on closed-end funds and unit investment trusts (UITs), which also are investment company securities but are not considered "mutual funds."

Key points for consideration when offering mutual funds include the following:

- RRs must consider sales charges when recommending mutual funds and determine the most advantageous cost structure for the customer including class types.
- Customer suitability determination includes consideration of investment objectives, other investments held, financial and tax status, and risk tolerance.
- Fund characteristics to consider include investment objectives, risk, cost structure, and underlying investments and strategies.
- Switching from one fund to another requires the customer's signed acknowledgment.
- RRs cannot "sell dividends" or facilitate customer "late trading" or "market timing."

## 14.2 Mutual Funds Offered By Alpine

| Responsibility | • The CFO |
|---|---|
| **Resources** | • Prospectuses and other information provided by mutual fund companies or other distributors<br>• Selling agreements<br>• Records regarding commission earned from sales of funds and revenue received from revenue sharing agreements or directed brokerage |
| **Frequency** | • As required - signing selling agreements<br>• As required - review potential revenue sharing agreements for compliance with anti-reciprocal rules<br>• Quarterly - compare mutual fund commissions against revenue sharing or directed brokerage, if applicable<br>• Annually - training for marketing, sales, and trading staff, as appropriate, regarding anti-reciprocal prohibitions |
| **Action** | • Review information on mutual funds<br>• Determine which fund companies' products to offer<br>• Review dealer agreements for:<br>   o restrictions or obligations that may affect Alpine's sales of the mutual fund and issue instructions to RRs, if necessary<br>   o representation by the mutual fund company that it uses reasonable criteria when selecting Selling Brokers and has reasonable policies and procedures to avoid formal or informal directed brokerage arrangements |

ALPINE_LIT168213

| | |
|---|---|
| | • Execute dealer agreements with mutual fund companies<br>• Provide education regarding mutual fund sales including prohibitions under the anti-reciprocal rule<br>• Review special sales programs and promotions outside the standard commission schedule to determine compliance with the anti-reciprocal rule<br>• Review for potential correlation between fund sales and directed brokerage commissions that may indicate violations of anti-reciprocal rules<br>• Refer potential directed brokerage arrangements to the CCO for review and determination of corrective action<br>• Review revenue sharing agreements:<br>   o At time of proposal to determine compliance with anti-reciprocal rules<br>   o To develop and provide disclosure to customers<br>   o To determine ongoing compliance with anti-reciprocal rules |
| **Record** | • Information used to determine which funds to sell<br>• Signed dealer agreements<br>• Notices to RRs of special restrictions or requirements included in dealer agreements<br>• Records of special sales programs and promotions including the date of review, reviewer's signature/initials, and notes of action taken, if appropriate<br>• Revenue sharing arrangements and disclosures to customers (initial and quarterly reviews) |

Mutual funds with a range of investments and objectives will be available for investment by customers.

## 14.2.1 Dealer Agreements

[FINRA Member Alert November 22, 2005]

Alpine executes dealer agreements with mutual fund underwriters. Many agreements include restrictions against activities such as late trading or market timing, which are discussed later in this chapter. Any special requirements or restrictions included in dealer agreements and not already covered in this chapter will be communicated to sales personnel.

## 14.2.2 Anti-Reciprocal Rule

[Investment Company Act Rule 12b-1; SEC Release No. IC-26591; NASD Rule 2830(k); FINRA Notice to Members 05-04]

Alpine is prohibited from favoring the sale of mutual funds based on revenues earned (directly or indirectly) from the investment company issuing the mutual fund. This includes:

- *Directed brokerage,* which is a practice where the investment company directs brokerage business to a broker-dealer to reward or compensate the dealer for selling its funds. This includes, directly referring brokerage transactions to the dealer that sells its funds and also "step-out" arrangements where brokerage is directed to another firm and then revenue is shared with the dealer selling the funds.

ALPINE_LIT168214

- *Undisclosed revenue sharing,* where the mutual fund company pays incentives to the broker-dealer to secure a prominent place in the selling dealer's distribution network ("shelf space").

If an employee becomes aware of a prohibited activity, it should be reported immediately to the CCO.

The selection and offer of mutual funds will comply with anti-reciprocal prohibitions. Specifically, Alpine will not:

- Sell shares of, or act as underwriter for, any investment company where Alpine is aware that the investment company or its investment adviser or underwriter have directed brokerage arrangements in place that are intended to promote the sale of investment company securities.
- Favor or disfavor sales of investment companies based on commissions received or expected and tied to sales
- Require such commissions to sell the funds or offer commission to another broker-dealer relating to their sale of funds
- Circulate information about commissions received from an investment company, other than to the Board of Directors for purposes of managing Alpine's business
- Sponsor or encourage an incentive campaign or special sales effort of another dealer financed by commissions received related to the sale of the funds
- For retail sales, provide incentive or special compensation based on the amount of commissions expected to be received from the fund or another source
- Establish recommended, selected, or similar preferred lists of investment companies if based on brokerage commissions
- Allow RRs and other sales personnel to participate in commissions received from investment company portfolio transactions
- Use the sale of investment company shares to negotiate the price or amount of brokerage commissions paid on investment company portfolio transactions

These prohibitions do not prevent execution of investment company portfolio transactions that are not tied to sales of the investment company's shares. RRs and managers may be compensated for sales attributable to them including the use of overrides, accounting credits, or other compensation, provided the extra compensation does not violate anti-reciprocal prohibitions.

### 14.2.2.1 Disclosure Regarding Revenue Sharing

If Alpine engages in revenue sharing, it will clearly disclose such an arrangement to customers purchasing the applicable funds.

## 14.3 Sales Charges

[NASD Rule 2830(d)]

| Responsibility | • The CFO |
| --- | --- |
| Resources | • Order records<br>• Daily Transaction Report<br>• Fund information (*i.e.,* prospectus, Statement of Additional Information)<br>• Exception reports (as available) |
| Frequency | • Daily |

ALPINE_LIT168215

| | |
|---|---|
| **Action** | • Review Breakpoint Worksheets for completeness, determination of sales charge discounts available to purchaser<br>• Review order records to determine that discounts have been considered<br>• Review daily transactions to determine same-day mutual fund purchases are considered for LOI and ROA discounts<br>• Review orders for improper breakpoint sales (near but below common breakpoint levels [$25,000, $50,000, *etc.*])<br>• Review orders for purchases of multiple funds with similar investment objectives and confer with RR about the suitability of multiple purchases<br>• Letter of Intent (LOI) reviews for:<br>    o Notation on Worksheet/order record whether an LOI will apply (including retroactive LOIs if permitted by the fund)<br>• Rights of accumulation (ROA) review for indication on order record whether ROA applies<br>• Where a customer has not been provided an available discount:<br>    o Confer with the RR<br>    o Notify the customer and correct the purchase to include the discount<br>• Provide training to RRs on mutual fund purchases and sales charge discounts |
| **Record** | • Breakpoint Worksheets<br>• Order records<br>• Daily transaction reports<br>• Exception reports (as available) |

When investors purchase mutual funds (other than no-load funds), they incur sales charges that may be front-end or back-end charges. Mutual funds offer investors discounts to sales charges, which are explained in the fund's prospectus. This section describes different types of discounts available to mutual fund purchasers.

**RRs are responsible for understanding the availability of sales charge discounts to provide the customer the opportunity to purchase a mutual fund under the most favorable terms available.** RRs are required to use the Breakpoint Checklist and Worksheet for every mutual fund purchase involving a sales charge. The Checklist and Worksheet are discussed at the end of this section. For a current copy, go to http://www.finra.org/web/groups/industry/@ip/@tools/documents/industry/p009680.pdf. Customers also are provided, at the time of first purchase, with a Breakpoint Disclosure Statement explaining breakpoints and other available discounts.

## 14.3.1 Breakpoints

[FINRA Rule 2342]

For some mutual funds, front-end sales charges decrease as the dollar amount invested increases. These thresholds for reduced sales charges are called breakpoints. Different fund families establish different opportunities to link accounts, transactions, and share classes to qualify purchasers for reduced sales charges.

The RR has an obligation to disclose the existence of breakpoints to enable the customer to evaluate the desirability of making a qualifying purchase. The RR also must indicate on the mutual fund order if

ALPINE_LIT168216

the customer qualifies for a breakpoint because of linked accounts, transactions, or share classes or other basis for meeting a breakpoint by linking the customer's transaction with another.

"Improper breakpoint sales" is a term that denotes selling mutual funds to maximize commissions earned, *i.e.,* selling an amount close to, but below a breakpoint. The customer will, therefore, pay a higher sales charge. This practice is prohibited.

Recommending diversification among several funds with similar investment objectives, particularly if sales occur in amounts just below the breakpoints of one or more funds sold, may not be in the best interests of the customer. If multiple purchases of different mutual funds is appropriate, but will preclude the customer from qualifying for a breakpoint, the customer should sign a letter acknowledging his or her understanding that a breakpoint is being given up by purchasing multiple funds.

Purchases of mutual funds under a breakpoint are not subject to breakpoint violations if the purchases are made as part of a bona fide asset allocation program sponsored by Alpine. Customers who participate in an Alpine-sponsored program are notified, as part of the agreement to participate in the program, that they may not receive breakpoint reductions that otherwise would be available.

### 14.3.1.1 Breakpoint Checklist And Worksheet

When selling a front-end load fund (Class A) to a customer, the RR is required to review the Breakpoint Checklist and complete the Breakpoint Worksheet, which is submitted with the mutual fund purchase order. The purpose of the Worksheet is to document required information about the customer's holdings to determine whether the customer qualifies for a reduced sales charge, including:

- Total holdings at Alpine in the fund, or a related fund in the same family
- Total holdings outside Alpine in the fund, or a related fund in the same family
- Total holdings of related parties (some funds provide discounts when related persons own the same fund, or funds in the same family of funds)

Go to http://www.finra.org/web/groups/industry/@ip/@tools/documents/industry/p009680.pdf for a copy of the Breakpoint Checklist and Worksheet. A copy of the Breakpoint Checklist and Worksheet should be maintained in your client file and should be produced, upon request.

### 14.3.1.2 Breakpoint Search Tool

[http://www.finra.org/fundsearch]

A Breakpoint Search Tool is available from the FINRA online. The tool provides breakpoint schedules and linkage rules for mutual funds with sales charges.

### 14.3.1.3 Breakpoint Disclosure Statement

| Responsibility | • The CFO |
|---|---|
| Resources | • Mutual fund purchases |
| Frequency | • A customer's initial mutual fund purchase |
| Action | • Provide the disclosure statement |

ALPINE_LIT168217

| | |
|---|---|
| **Record** | • Record of providing the disclosure statement is included in customer account records |

Customers who purchase Class A mutual funds, will be provided a Breakpoint Disclosure Statement that explains breakpoints and other discounts available to mutual fund purchasers.

## 14.3.2 Letters Of Intent

[FINRA Notice to Members 02-85]

A letter of intent (LOI) is an investor's written statement of intent to purchase a specified dollar amount of a single mutual fund or funds within a single fund group over a specific period of time. The aggregate investment over time may qualify for a breakpoint and a lower percentage sales charge.

The mutual fund purchase should indicate if the customer will execute a letter of intent so the lower sales charge will apply. Some funds allow investors to use an LOI retroactively to include the value of past purchases in the LOI period. The RR should determine whether the customer made a prior purchase within the allowable period and whether the fund allows backdated LOIs.

## 14.3.3 Rights Of Accumulation

[NASD Rule 2830(d)(1)(B); FINRA Notice to Members 02-85]

Aggregating purchases of a particular fund or family of funds by one investor (and sometimes family-related purchases) may qualify for rights of accumulation. A lower sales charge may apply, based upon the total dollar amount invested. The RR should ask the customer whether the customer has other holdings in the fund or fund family, to determine whether rights of accumulation may be available to the customer.

Mutual funds follow different rules to determine the value of existing holdings and when a customer qualifies for a breakpoint discount. Most funds use current net asset value (NAV) of existing holdings, and a small number of funds use historical cost (cost of the initial purchase). If historical cost is used, it may be necessary for the investor to provide account records to qualify for the breakpoint discount.

The mutual fund purchase should indicate rights of accumulation, if available, and the customer's desire to aggregate purchases to qualify for a lower sales charge.

## 14.3.4 Reinstatement Privilege

Some funds offer shareholders a "reinstatement privilege" allowing the shareholder to reinvest some or all of the proceeds from a prior liquidation of the fund within a specified period of time (for example, 180 days) at a reduced sales load or no sales load. The RR should determine whether the customer qualifies for a reinvestment privilege and, if he or she qualifies, note this on the order at time of entry.

## 14.3.5 Sales Charge Reductions/Waiver Or NAV Transfer Program

A limited number of mutual funds offer a sales charge discount in the form of a waiver or NAV transfer. Investors may purchase Class A shares of a mutual fund without paying a front-end sales charge, if investing some or all of the proceeds from the sale of a mutual fund in a different mutual fund family for which the investor paid a front-end or back-end sales charge within a specified period of time. The period when the discount is available is generally 30 to 90 days from the date the investor purchased the other fund. This type of discount is explained in the fund prospectus and Statement of Additional Information.

ALPINE_LIT168218

Generally, customers will not make short-term sales of mutual funds. In those unusual circumstances, where the customer is making such a sale, the RR should investigate whether a waiver is available on the new purchase.

### 14.3.6 Deferred Sales Charges

[NASD Rule 2830(n)]

If a customer purchases shares of a mutual fund that imposes a deferred sales charge on redemption, the front of the confirmation will include the following legend: "On selling your shares, you may pay a sales charge. For the charge and other fees, see the prospectus."

### 14.3.7 Direct Application And Wire Order Accounts

Mutual funds allow investors to purchase funds directly (sometimes called "application way" or "wire order" purchases or accounts). RRs are not permitted to recommend, or to direct, that a customer make a direct purchase of mutual funds. All such purchases must be made through Alpine.

### 14.3.8 Sales Charge Discounts Must Be Marked On Mutual Fund Orders

Because automated mutual fund order processing systems do not generally provide the ability to monitor application of an available sales charge discount, it is important that all pertinent information be recorded on the order and entered to the system, including whether the customer's purchase qualifies for a sales charge discount. Incomplete mutual fund orders will not be accepted and will be returned to the RR for completion of necessary information about available sales charge discounts.

Order entry procedures, including completeness of orders and proper application of available discounts, will be reviewed as part of the periodic review of sales practices in the office.

## 14.4 Switching

[FINRA Notice to Members 94-16 and 91-39]

| Responsibility | • The CFO |
|---|---|
| Resources | • Order records<br>• Daily Transaction report |
| Frequency | • Daily |
| Action | • Review mutual fund orders for transactions where the customer sells one mutual fund to buy another mutual fund<br>• When switching is identified, ensure the customer provides a signed switch letter |
| Record | • Initials on order records and Daily Transaction Report<br>• Switch letters signed by the customer and maintained in the office files |

Switching is the selling or redemption of one mutual fund with a sales charge to buy another mutual fund with a sales charge. Recommended switches may not be based on the compensation to be received by the RR or Alpine as a result of effecting the switch. As for all recommendations, the RR must have a reasonable basis for believing the switch is suitable for the customer.

ALPINE_LIT168219

The customer may incur multiple sales charges by changing from one fund to another or may be subject to an extended holding period, and there may also be tax consequences because of the switch. The concern is whether the switch is justified and whether the customer understands the consequences of the switch.

Switches between mutual funds that result in potential additional sales charges for the customer (whether front-end or back-end load) require that a letter be obtained from the customer acknowledging an understanding of the consequences of the switch. It is the designated supervisor's responsibility to ensure switch letters are obtained for switch transactions. The letter will be retained with the record of the order and/or in a file for the customer or for switch letters. The FINRA prohibits the use of "negative consent letters," which are used to advise a customer that there will be a switch from one fund to another unless the customer responds before a specified date.

## 14.5 Market Timing Transactions

[FINRA Notice to Members 95-80]

The FINRA has stated that recommendations to fund investors to engage in market timing transactions should be made, if at all, within a single family of funds or where there are no transaction costs associated with the trades. Transactions that do not adhere to this standard may raise suitability questions.

## 14.6 Selling Dividends

Selling dividends is a practice of recommending the purchase of a mutual fund based on an imminent dividend distribution.

Since the price of a mutual fund is reduced by the amount of the dividend, there is no benefit to the customer unless there are specific tax or other advantages to the customer. In fact, there may be increased tax liability for the investor. A related concern is representing that distributions of long term capital gains by the mutual fund are or could be viewed as part of the income yield from the mutual fund.

## 14.7 Misrepresenting "No-Load" Funds

[NASD Rule 2830(d)(4)]

Certain funds impose a sales charge when the customer redeems or liquidates an investment ("back-end load" or contingent deferred sales charge). These charges are generally on a decreasing basis the longer the mutual fund is held. For example, a mutual fund may charge 5% if the shares are sold prior to being held 5 years, 4% if after 5 but before 6 years, *etc*. Other funds have a combined asset-based sales charge and/or service fee exceeding .25 of 1% of average annual assets.

Mutual funds with back-end loads or asset-based sales or service fees exceeding .25 of 1% may not be sold as "no-load" funds.

## 14.8 Reinvestment Of Maturing Certificates Of Deposit In Mutual Funds

[FINRA Notice to Members 93-87]

When funds from maturing certificates of deposit (CDs) are used for the purchase of mutual funds, including money market funds, customers must be advised of the material differences between the

ALPINE_LIT168220

two products, particularly the greater risk to the customer's capital and the absence of any federal insurance or guarantee for assets placed into mutual funds.

## 14.9 Suitability

| | |
|---|---|
| **Responsibility** | • The CFO |
| **Resources** | • Order records<br>• Daily Transaction report<br>• Customer monthly statements |
| **Frequency** | • Daily |
| **Action** | • Review mutual fund transactions for suitability with particular attention to the following:<br>   o Funds with high risk objectives: is the investment consistent with the customer's investment objectives?<br>   o Purchasing multiple funds in different families that may result in higher sales charges: is diversifying funds justifiable and does the customer understand the higher cost, if applicable?<br>   o Large purchases of class B shares that may qualify for lower sales charges if purchased as class A shares<br>   o Confer with RRs regarding any transactions that raise questions<br>• Follow up action may include:<br>   o Requesting written acknowledgement from the customer that the higher costs are understood<br>   o Canceling transactions that appear to be inappropriate |
| **Record** | • Initials on order records and Daily Transaction Report<br>• Notes on Daily Transaction report and/or Branch Manager's Log of follow up action, if appropriate<br>• Customer's signed acknowledgement filed in the customer file, if appropriate |

When recommending that a customer purchase, sell, or exchange a mutual fund, the following should be considered:

- Customer information including financial and tax status, investment objectives, other investments including other mutual funds
- Information regarding the fund to be recommended including sales charges, historical performance and volatility, risk, investment objective, and nature of the securities and investment strategies in the fund (use of leverage, investments in hedge funds or derivatives, *etc.*)
- Risk (fund investment risk and customer's risk tolerance)
- Appropriateness of high concentrations in any particular type of fund or investment

### 14.9.1 Multi-Class Mutual Funds

[FINRA Notice to Members 95-80]

Mutual funds often offer three classes of shares that are based on the same mutual fund portfolio but differ regarding costs incurred by the customer.

ALPINE_LIT168221

**Class A shares:** Generally impose a front-end sales load and no (or a low) ongoing fee to pay for sales and marketing expenses (Rule 12b-1 fees). Usually the front-end sales load will decrease at certain breakpoints depending on the size of the purchase and whether the purchase qualifies for a letter of intent or rights of accumulation which also may result in a lower sales charge. A front-end sales charge means a portion of the customer's funds are not invested and instead pay the front-end charge.

**Class B shares:** Generally do not impose a front-end sales charge but may impose a contingent deferred sales charge (CDSC) on share redemption and relatively high 12b-1 or other asset-based fees. The amount of the CDSC usually declines the longer the shares are held. Class B shares often automatically convert to Class A shares (with lower asset-based fees) after a period of time, usually after the CDSC declines to zero. All of the customer's funds are invested at the time of purchase. These funds may _not_ be referred to as no-load funds since they impose a back-end contingent charge.

**Class C shares:** Have different expense features than A and B shares; may include no front or back-end load or a small back-end load; and higher 12b-1 or other asset-based fees. Class C shares are often used for managed accounts and asset allocation purposes.

In addition, some mutual funds offer other classes that impose no front-end or back-end sales charges and relatively low asset-based fees. These may be offered to limited types of purchasers such as retirement plans or institutional investors.

The following are guidelines for determining which class of shares is best for the customer:

- The cost advantages of one class versus another must be considered.
- Class B or C shares generally should not be recommended to customers making purchases in large amounts that may qualify for lower costs because of breakpoints, letters of intent, or rights of accumulation available through the purchase of class A shares.
- Class B shares should not be purchased for a customer if the RR knows or has reason to know that the customer will be purchasing additional shares that would take a purchase over a Class A breakpoint within 13 months of the initial purchase.
- Class B shares should not be purchased if potential additional purchases would qualify for a NAV price.
- Class A shares may be more appropriate for a customer who intends to remain invested in the fund for a longer period of time. Over time the higher continuing sales charges of Class B and C shares may exceed the initial load and smaller 12b-1 fees of Class A shares.
- Class C shares may be appropriate for a customer who does not qualify for a reduced Class A initial sales charge and who does not intend to remain invested in the fund for a period during which the fund's Class B shares are subject to a CDSC.
- Some funds waive the sales charge under circumstances specified in the prospectus (*e.g.,* purchases by employees of broker-dealers and their immediate family members). If a Class A sales charge waiver is available, Class A shares will be less costly than Class B or C shares. A CDSC may be imposed on early fund redemptions of Class A shares where a waiver is granted; the prospectus should be consulted.

## 14.9.2 Considerations For Newly-Hired RRs

[FINRA Regulatory Notice 07-36; FINRA Notice to Members 07-06]

ALPINE_LIT168222

| Responsibility | • CCO |
|---|---|
| Resources | • Information about transferring customers' investments in investment company products |
| Frequency | • As required for proposed switching of investments because products cannot be transferred or will not be serviced by Alpine in the future |
| Action | • Review existing investments against proposed substitute investments<br>• Prepare and provide information to customers regarding investment options including that the customer may have to hold the existing investment at the prior firm, the cost of switching to another investment, and other considerations before changing investments |
| Record | • Records of accounts reviewed and suitability determination, action taken including information provided to customers |

When a newly-hired RR transfers customers who hold investment company products that Alpine cannot or will not service (inability to transfer products, Alpine does not have a dealer or servicing agreement), the RR and Alpine have suitability obligations. Before liquidating existing investments and reinvesting in new products, disclosure must be made to the customer regarding the costs and benefits of any proposed change in investments and proposed replacement investments must be suitable.

## 14.10 Late Trading And Market Timing

[FINRA Notice to Members 03-50]

| Responsibility | • The CFO |
|---|---|
| Resources | • Records of mutual fund transactions<br>• Reports available to track mutual fund transactions |
| Frequency | • Daily |
| Action | • Review transactions for patterns of late trading<br>• Identify patterns of "as-of" trades in mutual funds that may indicate late trading<br>• Review transactions for indications of market timing (frequent in-and-out transactions in a mutual fund)<br>• Determine whether market timing is permitted for the fund<br>• Consult with the CCO when potential violations of late trading or market timing are identified<br>• Take corrective action which may include contact with the fund, fund sponsor, or other person potentially engaging in the prohibited activities; limiting trading activity; closing the account; or other corrective action appropriate to the situation. |
| Record | • Records reviewed for trading (whether order records or reports) are retained in files including the date reviewed, the initials of the reviewer, and notes of corrective action, if appropriate. |

ALPINE_LIT168223

|  |  |
|---|---|

There are two mutual fund trading activities that may violate SRO rules whether initiated by the RR or the RR facilitates the prohibited activity by assisting a fund manager, an investment adviser, a fund sponsor, a customer, or someone else in engaging in these activities.

**Late trading** is the practice of effecting an after-close mutual fund purchase or redemption at the same day's net asset value (NAV). NAV is usually calculated at 4:00 p.m. E.T., the close of the trading day, and orders received after the close are effected at the next day's closing NAV. Late trading is a violation of fair practices because it potentially permits someone to take advantage of market movements known after the 4:00 deadline and gives the person an advantage in determining whether to buy or sell a fund based on an already established price. **Engaging in late trading or enabling someone else to engage in late trading is prohibited.**

**Market timing** is rapid and repetitive in-and-out trading to take advantage of market movements such as buying an international mutual fund one day and selling it the next day because of movements in foreign markets that impact the fund's value. While trading a mutual fund is not, in itself, illegal or violates a rule, it often violates restrictions established by the fund on short-term market timing trades. **Engaging in market timing or knowingly aiding someone in activity that violates a mutual fund's internal trading guidelines is prohibited.**

There are valid reasons why an occasional mutual fund trade may be entered late and should be processed at the current day's NAV. There may also be funds that do not prohibit market timing. However, RRs must not engage in or assist someone else in engaging in prohibited late trading and market timing. Compliance should be contacted if someone proposes to engage in either activity.

## 14.11 Block Letter Restrictions

| Responsibility | • The CFO |
|---|---|
| Resources | • Mutual fund block letters |
| Frequency | • As required when letters are received |
| Action | • Notify the RR and the President<br>• Monitor the account for potential violations of restrictions<br>• Take corrective action if violations are detected; action will include notifying the RR and the President; potentially closing the account and disciplinary action against the RR as determined by the CCO |
| Record | • Mutual fund block letters<br>• Reviews of blocked accounts and action taken |

Mutual fund companies sometimes issue "block letters" that limit the trading activity of a particular customer. This may occur if the fund detects trading that violates trading restrictions imposed by the fund such as late trading or market timing.

When a block letter is received, the RR and the President will be notified, and the RR is responsible for complying with the restriction. Orders may not be entered for the customer in another account that is beneficially owned by the customer to circumvent any restrictions.

ALPINE_LIT168224

## 14.12 Correspondence

[FINRA Rule 2210]

| | |
|---|---|
| **Responsibility** | • CCO |
| **Resources** | • Outgoing correspondence |
| **Frequency** | • As needed |
| **Action** | • Correspondence regarding mutual funds is subject to specific restrictions limiting what may be included since they are offered by prospectus<br>    o Review RR-generated correspondence to ensure language only indicates a prospectus is enclosed and the RR will call the customer to discuss the investment further<br>    o Ensure sending of only Alpine-approved correspondence other than the limited language described above |
| **Record** | • Initials on correspondence<br>• CCO retains correspondence it reviews |

When reviewing correspondence regarding mutual funds, the CCO should watch for the following in addition to the usual considerations when reviewing correspondence:

- Selling dividends (not permitted)
- Representing a back-end load fund as "no-load" (not permitted)
- Representing a fund with an asset-based sales or service fee exceeding .25 of 1% as "no-load" (not permitted)
- Representations regarding yield (there are specific requirements regarding quotation of yields; RRs should use materials provided by the fund or pre-approved by Alpine)
- Recommendations that include switching or appear to recommend unsuitable diversification among funds
- Letters that include excerpts from the prospectus that would be misleading when taken out of context
- Disclosures, as applicable (see explanation in the section *Disclosure Of Material Facts*)
- Performance is represented accurately and consistent with rule requirements regarding yield and return

RRs should use letters pre-approved by Alpine and include a prospectus.

## 14.13 Disclosure Of Material Facts

[FINRA Notice to Members 95-80]

The FINRA has stated that there are material facts that should be disclosed to a customer when recommending a mutual fund. Items to be disclosed, if applicable or appropriate, include:

- the fund's investment objective
- the fund's portfolio

ALPINE_LIT168225

- historical income or capital appreciation
- the fund's expense ratio and sales charges
- risks of investing in the fund relative to other investments
- the fund's hedging or risk management strategy
- information regarding the structure of multi-class and master-feeder funds sufficient so the customer may understand and evaluate the structure
- potential tax consequences including tax on distributions and capital gains subject to tax
- potential risks if a fund invests in financial derivatives
- if an expense ratio is represented as an advantage of a particular fund, it is explained in the context of and compared with other mutual fund expense ratios

The mutual fund's prospectus and other sales literature generally include many if not most of these disclosures.

## 14.14 Disclosure Of Fees, Expenses And Performance

[FINRA Rule 2210(d)(5)]

Many firms prohibit generally all written discussion of a fund's performance and simply refer to the prospectus. When presenting performance information, an explanation of total return should explain that total return measures overall performance while current yield represents only the interest or dividend paid by the fund. Where appropriate, RRs should explain the difference between return of principal and return on principal. When providing information regarding distribution rates, the RR is responsible for explaining the difference between distribution rate and current yield.

Communications including performance (other than in institutional sales material and public appearances) about mutual funds (other than money market funds) must disclose:

- The standardized performance information required by '34 Act Rule 482 and Rule 34b-1; and
- If applicable:
  - The maximum sales charge on purchases or the maximum deferred sales charge included in the current prospectus; and
  - The total annual fund operating expenses, gross of any fee waivers or expense reimbursements, as stated in the fee table of the current prospectus.

This information must be prominent in the communication, and in any print advertisement in a prominent text box that may also include comparative performance and fee data and disclosures required under Rules 482 and 34b-1.

## 14.15 Prospectuses

RRs should provide a copy of the prospectus when recommending a mutual fund purchase to a customer.

A copy of the fund prospectus will also be sent to each purchaser of a mutual fund. The CFO is responsible for establishing procedures to ensure a prospectus is provided to each mutual fund purchaser.

## 14.16 Advertising And Sales Literature

[FINRA Regulatory Notice 11-49; NASD Notice to Members 93-36]

| Responsibility | • CCO |
|---|---|

ALPINE_LIT168226

| Resources | • Alpine-approved advertising and sales literature |
|---|---|
| Frequency | • Daily |
| Action | • Ensure only Alpine-approved advertising and sales literature is used in conjunction with sales of mutual funds |
| Record | • The CCO retains records of Alpine-approved advertising and sales literature. |

There are specific requirements for advertising and sales literature regarding mutual funds. Advertising must be filed with the FINRA within prescribed periods (see the chapter *COMMUNICATIONS WITH THE PUBLIC* and the section *Special Filing Or Approval Requirements* for details). There also are mandated guidelines on representations regarding performance and yield, including specific requirements when advertisements and sales literature include a TIPs fund's current yield.

RRs may use materials provided by the fund or Alpine-approved materials. Any other advertising or sales literature must be approved by the CCO prior to use.

## 14.17 Dealer-Use-Only Material

[FINRA Notice to Members 95-80]

| Responsibility | • The CCO |
|---|---|
| Resources | • Outgoing correspondence |
| Frequency | • As needed |
| Action | • Ensure the branch does not distribute dealer-use-only materials to the public<br>• Review correspondence to identify inclusion of restricted materials |
| Record | • Initials on correspondence |

Materials provided by fund distributors for dealer-use only may not be provided to customers and must not be displayed in a public area such as a reception area where customers obtain written information regarding investments. Dealer-use-only material is often provided as educational material for dealers and their RRs. There is no requirement to file this material with the FINRA because it is for internal use only.

All dealer-use-only material will be marked as such with limited distribution.

## 14.18 Seminars And Other Public Presentations

| Responsibility | • The CFO |
|---|---|

ALPINE_LIT168227

| Resources | • Outlines of proposed seminars and other public presentations that include mutual funds |
|---|---|
| Frequency | • As required |
| Action | • Review outlines for appropriateness of presentation<br>• Make necessary changes and approve (or disapprove, if appropriate)<br>• Remind the RR of the requirement to provide prospectuses and compile a list of attendees who received prospectuses if specific mutual funds will be offered<br>• If wholesaler sales materials will be included, ensure the CCO approves prior to use |
| Record | • Initials on outlines which are retained in the office Public Speaking file<br>• List of attendees who received prospectuses (if appropriate) retained in the office Public Speaking file |

The following guidelines apply when an RR or Alpine sponsors a seminar for customers or prospective customers and where mutual funds are the subject of the seminar:

- An outline of the seminar must be provided to the designated supervisor prior to conducting the seminar.
- If specific mutual funds are recommended, prospectuses must be provided to those who attend and a list retained of to whom prospectuses were provided. A copy of the list is to be provided to the designated supervisor after the seminar.
- If a wholesaler makes a presentation at the seminar, the sales materials used (*i.e.,* story boards, scripts, handouts, *etc.*) must be approved by the CCO prior to the seminar.

The CFO is responsible for approving and filing the outline of the seminar and the copy of the prospectus list, if applicable. The CCO is responsible for approving any wholesaler sales materials and filing it with the FINRA's Advertising Department within 10 days of use.

## 14.19 Sales Contests And Incentive Programs

The following guidelines apply to sales contests and other incentive programs where mutual funds are the subject of the contest or program. Also refer to the chapter *ORDERS* and the section *Sales Contests* for general guidelines applying to all contests.

- All Sales contests must be approved by the CCO.
- Contests may not be based on the amount of brokerage commissions received or expected to be received from investment companies.
- When Alpine acts as underwriter of investment company shares, Alpine may not sponsor a contest or other incentive campaign of another broker-dealer with respect to the sale of shares of the investment company.
- RRs may not accept (directly or indirectly) cash or non-cash compensation from outside Alpine.

## 14.20 Prompt Transmission Of Applications And Payments

[NASD Rule 2830(m)]

| Responsibility | • The CFO |
|---|---|

ALPINE_LIT168228

| | |
|---|---|
| **Resources** | • Mutual fund/variable annuity applications<br>• Record of when transmitted by the RR such as postmarks on envelopes |
| **Frequency** | • Review applications: as required when applications are received<br>• Review delayed transmittals: Monthly |
| **Action** | • Transmit applications to the payee (underwriter, investment company, or other designee) by:<br>  ○ the end of the 3rd business day following receipt of the customer's order to purchase; or<br>  ○ the end of 1 business day following receipt of the customer's payment, whichever is later<br>• When Alpine acts as underwriter and engages in wholesale transactions of shares received from other members, payments will be transmitted by the end of 2 business days following receipt of the payments<br>• Review customer's signature date vs. postmark or other record of transmittal by the RR<br>• Document transmittals more than 2 business days after customer signature date<br>• Review delayed transmittals and:<br>  ○ for 3 or more occurrences within 12 months, notify the RR's supervisor to meet with the RR<br>  ○ for another occurrence within 12 months, assess a fine to the RR |
| **Record** | • Applications<br>• Documentation of delayed transmittals including record of who reviewed, when reviewed, and action taken |

RRs are obligated to transmit mutual fund (and variable annuity) applications and customer payments to the designated office/application processor **on the same day as they are received**. Alpine is obligated, by FINRA rule, to transmit the customer's payment to the underwriter within a short timeframe after receipt from the customer.

Failure to transmit applications and payments promptly is a violation of FINRA rules. RRs who do not comply with prompt transmission requirements may be subject to disciplinary action.

## 14.21 Redemption Of Outside Funds

If the customer requests liquidation of an outside open-end mutual fund held by the fund, the RR should obtain the customer's signed letter authorizing liquidation. Required signature guarantees should be obtained from Operations, if required, prior to forwarding the letter to the fund.

## 14.22 Closed-End Funds

Closed-end funds are investment companies that issue a finite number of shares that trade in the open market, usually on a stock exchange. Because they trade like other stocks, requirements that apply to open-end mutual funds such as switch letters and prospectuses provided to all purchasers generally do not apply to closed-end funds. Certain features of mutual funds such as breakpoints, letters of intent, and rights of accumulation are not features of closed-end funds.

ALPINE_LIT168229

As for all security recommendations, however, RRs are responsible for making suitability determinations prior to making a recommendation to a customer.

# 14.23 Unit Investment Trusts (UITs)

UITs are investment company securities that invest in a fixed portfolio of securities such as corporate, municipal, or government bonds, mortgage-backed securities, common or preferred stock, or other investment company shares. Unit holders receive an undivided interest in both the principal and the income portion of the portfolio in proportion to the amount of money invested.

Unit investment trusts have a finite life that ends when all securities in the portfolio have matured or are liquidated per the terms of the trust.

### 14.23.1 Suitability

As for other securities, the RR is responsible to making a suitability determination prior to recommending a UIT to a customer. Considerations include the types and safety of securities in the UIT, call features of the trust, and the maturity date for the trust. The length of time the investor intends to hold the investment should be considered when recommending a UIT, since a secondary market for the UIT may not be assured and prices available in the secondary market may vary considerably from the liquidation value of the trust.

### 14.23.2 Primary Offerings

While UITs are not "mutual funds," they have some features similar to mutual funds, particularly in the initial offering of a UIT. The purchaser of a new UIT pays a load or other charges as described in the prospectus. Purchasers are provided a prospectus describing the UIT.

### 14.23.3 Secondary Market Transactions

A secondary market exists for many UITs. Investors may liquidate or purchase a UIT by placing an order to sell or buy it in the secondary market, if one exists. The price the investor pays to purchase in the secondary market may include a premium based on the market value of the securities in the portfolio. The customer may not recover that amount when the trust matures or is called.

Prospective UIT investors must not be misled regarding the potential return of UITs purchased in the secondary market. Any communication regarding the estimated current return should be accompanied by a quotation of the UIT's long-term yield or internal rate of return.

Secondary market purchasers are provided a copy of the UIT prospectus at time of purchase.

### 14.23.4 Other Sales Practice Considerations

Other considerations when offering UITs include:

- **Sales charges:** Some UITs charge front-end and back-end loads and management fees. The RR should determine that costs are reasonable considering alternative investments that have lower costs. Available breakpoints, letters of intent, and rights of accumulation must also be considered.
- **Switching:** Liquidating one UIT to purchase another UIT or mutual fund requires a signed switch letter.

# 14.24 Funds Of Hedge Funds

ALPINE_LIT168230

[FINRA Notice to Members 03-07]

A fund of hedge funds is an investment company that invests in multiple hedge funds and provides some diversification through the underlying investments. A fund of hedge funds allows retail investors who would not otherwise qualify to invest in a hedge fund to do so through the fund.

Because the underlying securities (hedge funds) are generally unregistered, high-risk securities, RRs must consider the risk of the underlying hedge funds prior to recommending the fund to customers.

### 14.24.1 Characteristics And Risks Of Hedge Funds

When recommending a fund of hedge funds, it is important to understand the general characteristics and risks of hedge funds. While a fund of hedge funds provides diversification, the underlying funds represent a higher level of risk that should be considered when making a recommendation to a customer.

Hedge funds have the following general characteristics and risks:

- not registered under the Investment Company Act and exempt from registration under the '33 Act
- high minimum investments, often $1,000,000 or more
- wide differences in the fees for investments in registered vs. unregistered hedge funds. Managers of unregistered hedge funds may receive both a management fee and a direct percentage in the profits earned.
- often engage in leveraging and other speculative investment practices that may increase the risk of investment loss
- can be highly illiquid
- are not required to provide periodic pricing or valuation information to investors
- may involve complex tax structures and delays in distributing important tax information
- are not subject to the same regulatory requirements as mutual funds
- often charge high fees to their direct investors

## 14.25 Exchange-Traded Funds (ETFs)

[FINRA Regulatory Notice 09-31; FINRA Non-Traditional ETFs FAQ:
http://www.finra.org/Industry/Regulation/Guidance/P119781]

ETFs are open-end investment companies or unit investment trusts (UITs) listed on stock exchanges; they can be bought and sold throughout the trading day at the current market price. A typical ETF is based on specific domestic and foreign market indexes. An index-based ETF tracks the performance of an index by holding in its portfolio either securities replicating the index or a representative sample of the securities in the index. ETFs also track non-traditional investments such as commodities and currencies. Some ETFs track indexes inversely (*i.e.,* the ETF rises when the index falls) and new ETFs are continually evolving.

Following are considerations when recommending ETFs:

- It is important to understand what the ETF tracks. Recommendations must consider what the ETF tracks to determine suitability for the proposed investor.
- ETFs are not suitable for a customer who wants to make regular periodic investments since each transaction will generate a commission cost. ETFs are more appropriate for larger lump-sum investments.
- Some ETFs allow investors to cash out their investment with the issuer.

ALPINE_LIT168231

- ETFs that track narrow sector or foreign market indexes can be highly concentrated and highly volatile or might fail to track their indexes properly. They also may have higher fees than ETFs based on broader indexes.
- ETFs may be subject to temporary price disparities during times of highly volatile markets when ETF shares may trade for significantly less than the value of underlying assets. This risk is of particular concern to short-term traders.
- ETF shares can be sold short and bought on margin.
- An ETF that invests in a sampling of the tracked index may not perform consistent with the index.
- For most ETFs, holdings are transparent, *i.e.,* an investor will know what is being held by the ETF by the makeup of the tracked index. However, in the case of an actively-managed ETF, knowledge of investments may not be available to investors.
- ETFs may have lower annual expenses than traditional funds; however, investors incur commission costs for each purchase and sale in the market.
- ETFs may be more tax efficient than regular mutual funds. Since shares are traded in the secondary market, the ETF is not required to liquidate its portfolio to satisfy fund sales and therefore reduces generation of capital gains distributions to investors that result in tax liabilities each year.
- ETFs do not offer dividend reinvestment plans which are available from regular mutual funds.

ALPINE_LIT168232

# 15 PRIVATE PLACEMENTS AND OFFERINGS

[FINRA Frequently Asked Questions: http://www.finra.org/industry/compliance/regulatoryfilings/privateplacements/faq/]

This chapter explains the requirements when offering private placements and engaging in private offerings. Private placements and offerings are subject to strict requirements that are imposed on the issuer and those who sell the issue. The requirements for offering a specific private placement will be announced at the time the private placement becomes available for sale. It is important to understand and comply with the requirements for each offering.

## 15.1 Introduction

This section provides general information about private placements and the regulations that govern their offer and sale. A general understanding of private placements is helpful when considering whether to offer a specific issue to a customer.

There are several general areas of requirements and limitations that affect most private placements.

- No general solicitation of purchasers
- Limits as to the size of the offering
- No advertising or general public meetings about specific private placements
- Issuers must provide information to potential investors
- Securities purchased are generally restricted as to resale
- Number of purchasers is restricted

### 15.1.1 Definition Of Terms

The following are common terms included in this chapter.

| | |
|---|---|
| **Accredited investor** | An investor who meets certain criteria that are indicative of sophistication (see the section Accredited Investors) |
| **Letter of Non-Distributive Intent** | A letter or form signed by the purchaser of a private placement, affirming that the investor is purchasing the securities for their own account and are not to be resold unless registered or subject to an available exemption. |
| **Non-Disclosure Agreement** | An agreement signed by the offeree stating that proprietary information learned about the issuer will not be divulged to third parties. |
| **Offer** | An attempt to sell a security to a potential purchaser |
| **Offeree** | A prospective purchaser to whom an offer is made |
| **Purchaser questionnaire** | A questionnaire completed by an offeree to establish the offeree's suitability to purchase the investment |
| **Purchaser representative** | A person (not affiliated with the issuer or the broker-dealer selling the issue) who acts on the purchaser's behalf to evaluate the investment for the purchaser |
| **Subscription agreement** | The document signed by the purchaser and evaluated by the issuer prior to the purchase |

ALPINE_LIT168233

## 15.1.2 "Private Placement" Defined

A private placement is a sale of securities that is not subject to registration under the Securities Act of 1933. While private placements are exempt from registration requirements, they are subject to the anti-fraud and civil liability provisions of various federal securities laws. The following sections describe the primary exemptions under which private placements are offered.

### 15.1.2.1 Section 4(2) Of The Securities Act Of 1933

Some private placements are offered under Section 4(2) which provides an exemption for "transactions by an issuer not involving any public offering." While the section does not specifically outline the requirements for establishing an exemption, the following is a summary of requirements gleaned from SEC interpretations and court decisions.

- There may be no general solicitation of purchasers.
- Offerees and purchasers must have access to information about the issuer and must be able to comprehend and evaluate the information.
- The issuer, broker-dealer, and others acting for the issuer must conduct due diligence to reasonably insure information given to offerees and purchasers is complete and accurate.
- Offerees must have access to meaningful information concerning the issuer and be able to comprehend and evaluate the information.
- Purchasers must acquire the securities for investment and not for resale.

### 15.1.2.2 Regulation D

Regulation D is a series of six rules, Rules 501-506, that include exemptions from the registration requirements of the 1933 Act. The specific exemptions are included in Rules 504-506 and differ as to the size of the offering and conditions imposed to qualify for the exemption. The following chart summarizes the three exemptions available under Regulation D. This is only a very general summary of requirements and does not include legal definitions and technicalities that may apply to certain types of private placements.

|  | **Rule 505** | **Rule 506** |
|---|---|---|
| Who may invest | Qualified investors | Qualified investors |
| Number of investors | 35 non-accredited, unlimited accredited investors | 35 non-accredited, unlimited accredited investors |
| Size of offering sold in any consecutive 12 months | $5,000,000 | Unlimited |
| Restricted securities? | Yes | Yes |
| Public solicitation/advertising allowed? | No | No |
| Disclosure document required? | Yes* | Yes* |
| Opportunity to ask questions of issuer? | Yes | Yes |

*Under the rule, disclosure documents are not required to be given to accredited investors though a note to Rule 502(b) states that an issuer should consider providing such information to accredited investors in view of anti-fraud statutes.

The reference to "unlimited accredited investors" in the section "Number of investors" above does not imply that a private placement will, in fact, have an unlimited number of accredited investors. The issuer and Alpine will consider limitations on accredited investors, as appropriate, to preserve the exemption as a private placement and avoid the appearance of a broad solicitation of the issue.

ALPINE_LIT168234

## 15.2 Private Investment In Public Equity (PIPE)

This section describes PIPE transactions.

### 15.2.1 Introduction

A PIPE is defined as a privately negotiated sale (*i.e.,* private placement) of securities of an already public company. In a PIPE transaction, a public company sells its unregistered securities (*e.g.,* common stock, preferred stock or convertible securities) in a private placement to a select group of sophisticated individuals or institutions and subsequently files a resale registration statement with the SEC at the completion of the private placement to enable the investors to resell the securities into the public market. Alpine's role in a PIPE transaction is to act as the placement agent for the issuer.

### 15.2.2 Underwriting

PIPE transactions will be managed by Investment Banking (IB) which is also responsible for:

- Obtaining transaction approval from the Investment Banking Commitment Committee;
- Working with other appropriate personnel/departments, as needed (*e.g.,* Compliance, Legal), to execute an engagement letter; and
- Maintaining a Master Log, which includes among other things an investor log and list of firm employees brought "over the wall."

Non-IB employees approached by an issuer to participate in a PIPE should contact Compliance and/or their supervisor immediately and must handle such information as confidential unless advised otherwise by Compliance or Legal.

### 15.2.3 Compliance Notification

All PIPE offerings in which Alpine is involved, including offerings that are reasonably likely to occur or that Alpine is actively pursuing, must promptly be added to Alpine's Watch List. Consistent with Alpine's Information Barrier Policy, the IB manager is responsible for immediately contacting Compliance when there is a reasonable likelihood of receiving a PIPE mandate. Once a company has been added to the Watch List, IB must notify Compliance of any significant developments with respect to the transaction, including intended pricing and announcement dates.

### 15.2.4 Registration Statement Integration

In order to avoid potential registration statement integration (a risk whenever a public and private offering of an issuer's securities are conducted concurrently or within a short period of time to each other), a PIPE offering must be completed before the related resale registration statement is filed. In the event a registration statement covering the same (and/or similar) securities that will be sold in the PIPE offering has been filed but is not yet effective, the issuer must withdraw the registration statement before the PIPE offering can commence. Note the foregoing restriction is not applicable to offerings structured as a registered direct issuance off of an existing/effective registration statement. IB should work with Compliance to ensure compliance with these rules.

### 15.2.5 Eligible Investors

In general, companies are prohibited from selling unregistered securities unless an exemption is available under SEC rules. With respect to the private placement phase of a PIPE transaction, issuers normally rely on the exemption from registration contained in Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"), and the safe harbor provisions of Regulation D. As a general matter, in its role as placement agent, Alpine may only offer and sell PIPEs to investors whom Alpine reasonably believes to be "accredited investors." Generally, Alpine may only solicit potential investors who qualify as accredited investors.

Regulation D does not limit the number of accredited investors who may purchase securities in a private placement.

ALPINE_LIT168235

### 15.2.6 Marketing Restrictions

This section outlines restrictions on marketing pipe offerings.

### 15.2.6.1 Prohibition On General Solicitation And Advertising

The federal private placement exemption prohibits the issuer of a PIPE and any person acting on its behalf (including placement agents such as Alpine) from offering or selling the securities by any form of general solicitation or general advertising. Contacting potential investors with whom Alpine has a **pre-existing, substantive relationship** does not constitute a general solicitation. As a general matter, Alpine may only contact investors with whom Alpine has such a relationship, and generally, initial contact should be made directly with the customer (*i.e.,* contact must be with the ultimate investor with investment discretion).

The general guideline for establishing that a potential investor has had a pre-existing, substantive relationship with Alpine is that such potential investor:

- Has invested in other PIPE offerings where Alpine acted as placement agent; or
- Has maintained an investment advisory account with Alpine (or an affiliate) or a brokerage account or similar relationship with Alpine (or an affiliate) for at least 30 days prior to the distribution of information to such investor concerning the offering; and
- Was not solicited to become a customer of Alpine in contemplation of the offering.

Failure to observe restrictions that may be imposed on Alpine's activities in connection with an offering may have severe consequences, including, depending on the timing of the violation, a forced delay in the ability to market or close the offering or civil and criminal penalties and rescission rights for investors. Any questions concerning whether an activity is appropriate in light of the private nature of a PIPE transaction should be directed to Compliance.

After the **final** closing, "tombstone" advertisements and public statements as to the PIPE offering may be permitted. Compliance should review each such advertisement and statement prior to its publication or use.

### 15.2.6.2 Written Presentation Content

PIPE transactions are generally marketed via an oral presentation. Any written materials used during the presentation must adhere to the content standards specified below and must be collected from attendees at the end of the presentation.

Written materials created for the purpose of marketing a PIPE transaction should never be based on anything other than the issuer's existing publicly available information (typically the 10K) accompanied by the following:

- Offering summary;
- Key investment highlights; and
- Business summary.

Further, the written presentation:

- Must also contain customary legal legends and disclaimers including preamble language related to: (1) forward looking statements; and (2) confidentiality and Regulation FD obligations (to be reviewed by issuer counsel).

ALPINE_LIT168236

- Should always be accompanied by a disclaimer letter from Alpine to prospective investors (to be reviewed by issuer's counsel).
- Should never reference Alpine, except to refer to its role as placement agent, and, when appropriate, to disclose potential conflicts of interest to prospective investors (*e.g.,* a firm employee serving on the issuer's board of directors or a material firm ownership position of securities of the issuer).
- Should never be on firm letterhead or other formats containing the firm logo.
- Should never contain forward-looking projections unless such projections have been publicly disclosed. During the marketing process, if prospective investors ask about projections, they should be directed to existing, publicly available research reports and information.

### 15.2.6.3 FINRA Filings

IB should discuss the specific facts and circumstances of each PIPE transaction with Compliance, Legal and/or external counsel, as necessary, to determine whether to file documents and information with FINRA or whether the offering is clearly exempt from filing.

### 15.2.6.4 Regulation M

Upon receiving a PIPE mandate, Compliance should be contacted to preliminarily determine if the proposed transaction is subject to Regulation M. Based on the issuer's float, trading volume and a determination of whether the PIPE transaction constitutes a distribution, the issuer's securities may be subject to restrictions on engaging in transactions and quotation activity with respect to the issuer's stock for the applicable restricted period (*i.e.,* 0, 1 or 5 trading days) as required by Regulation M.

If subject to Regulation M, the designated supervisor will make required submissions to FINRA. Upon receiving the UAR from FINRA, Underwriting will consult with Compliance to determine the appropriate firm market maker status (passive or active) and the applicable Regulation M restricted period. If co-agents are involved, Underwriting will consult with the co-agents to determine their desired market maker status as well.

Underwriting will notify the FINRA Market Regulation Department and Alpine's trading desk of Alpine's and the other co-agents' market making status during the appropriate Regulation M period. Compliance will add the issuer to Alpine's Restricted List.

After the subject transaction has priced, but no later than the market open on the day following pricing, Underwriting will fax a Regulation M Trading Notification Form (*i.e.,* Reg M Wire) to the FINRA Market Watch Department and the FINRA Market Regulation Department. IB is responsible for notifying Compliance, as well as other co-agents, upon the completion of the PIPE transaction. Compliance will un-restrict the security and notify Trading.

## 15.2.7 Information Flow

This section outlines information flow for PIPE transactions.

### 15.2.7.1 Treatment Of Confidential And Inside Information

Prior to the time that an issuer makes a public announcement of a PIPE transaction, information surrounding the offering is confidential information. As PIPE issuers typically see a drop in their share price following the public announcement of the transaction due to the dilution that results from the issuance of additional shares, a PIPE offering will generally constitute a material transaction for an issuer. Accordingly, knowledge of a PIPE transaction prior to a public announcement by the issuer of the transaction may constitute material nonpublic information ("inside information"). As placement agent for an issuer customer, Alpine has an obligation not to breach the customer's trust by misusing any information furnished during the course of an engagement. Thus, firm employees with knowledge of a PIPE transaction must:

ALPINE_LIT168237

- Not act on or give this information to others;
- Not trade or advise others to trade based upon the information, misappropriate the information or tip other customers or third parties; and
- Immediately notify Compliance and take appropriate steps to protect the information.

Persons guilty of misusing inside information may be subject to civil and criminal penalties (including imprisonment), SEC administrative actions, disciplinary action by various self-regulatory organizations, and dismissal by Alpine.

### 15.2.7.2 Sharing Transaction Details With Potential Investors

Before a firm employee reveals an issuer's name to a prospective investor, commences discussions concerning the details of a PIPE offering, or otherwise furnishes an investor with material nonpublic information regarding an issuer, such employee should mention that the offering constitutes a private transaction and must ask the prospective investor if he/she is interested in learning more about the PIPE transaction. Firm employees, moreover, should obtain from the prospective investor an agreement that the investor will keep such information confidential, and an acknowledgment that the investor understands how such confidential information must be treated under the securities laws. As soon as is practicable and typically within one (1) business day after receipt of a prospective investor's positive response, Alpine will send such prospective investor a follow-up email confirming such prospective investor's receipt of material, nonpublic information and acknowledging such prospective investor's agreement to hold such information in confidence. In addition, the email will remind such prospective investor of his/her obligation not to use any such information in contravention of applicable securities laws.

Investor logs must be maintained by IB during the marketing process and must contain, among other things: (1) the identity of the investors contacted; (2) such investor's level of interest in the subject transaction; and (3) the date that the management presentation was given (in person or via conference call) to such investor. Upon completion of the marketing process, IB must forward to Compliance a copy of the investor log.

### 15.2.7.3 Sharing Information With Sales And Trading Personnel

Any decision to bring sales personnel "over the wall" must be discussed and approved by the designated sales supervisor in consultation with the IB manager and Compliance. Sales personnel brought "over the wall" may continue to conduct their normal sales activities but may not communicate information related to the PIPE transaction to customers. To the extent that sales personnel are asked to assist in the marketing of the PIPE transaction, sales personnel should make the marketing calls off of the trading floor in an area where their conversation cannot be overheard.

Any decision to bring trading personnel "over the wall" must be discussed and approved by the manager of Trading (NASDAQ or Listed) in consultation with the IB manager and Compliance. Trading personnel brought "over the wall" may not trade or make markets in the securities of the issuer subject to the PIPE transaction. The Trading manager should assign trading responsibilities for such securities to another trader without divulging the details of the PIPE transaction. Trading personnel brought "over the wall" may continue to trade and make markets in other securities pursuant to their normal responsibilities but are prohibited from disclosing information regarding the PIPE transaction to anyone that is not already "over the wall."

### 15.2.7.4 Sharing Information With Research Analysts

Any decision to bring a firm research analyst "over the wall" must be discussed and approved by the Research manager and Compliance.

ALPINE_LIT168238

## 15.3 Blue Sky Requirements

State securities laws ("blue sky" laws) that apply to private placements vary from state to state. Some states have differing definitions for accredited investors; some states require registration of a securities issue that is otherwise exempt under Federal securities laws.

Alpine and its sales personnel are required to comply with any blue sky requirements that apply to a specific private placement issue. Requirements may differ depending on where the issue originates and where it is sold.

## 15.4 Alpine's Participation In Private Placements

| Responsibility | • Underwriting and Private Placement Supervisor |
|---|---|
| Resources | • Information provided by the issuer and/or issuer's counsel |
| Frequency | • As required - process the private placement<br>• Within 15 caelendar days of the date of first sale - provide submissions to FINRA |
| Action | • Execute an agreement with the issuer<br>• Conduct due diligence or engage counsel or other qualified person to conduct due diligence<br>• Document the file regarding due diligence<br>• Determine limitations on the offering, including integration issues and obtain representation letter from issuer if needed<br>• Determine what information to provide to sales personnel<br>• Authorize the sale of the offering<br>• Submit private placement memorandum, term sheet or other document (including material amendments) to FINRA or notify FINRA no offering documents were used |
| Record | • The deal file will include due diligence information, the issuer agreement, issuer representation letter and offering materials; and authorization to sell.<br>• Record of submission to FINRA. |

### 15.4.1 Due Diligence

Due diligence will be conducted for each private placement issue to be offered by Alpine and is documented in the file for the private placement. Outside counsel or another third party may be engaged to assist in due diligence and other aspects of the private placement offering. If the counsel or third party is affiliated with or somehow associated with the issuer, the Firm will conduct additional independent due diligence. Due diligence may include the following reviews, as appropriate for the particular potential offering:

- Review financial reports
- Written company assurances as to the accuracy of records and financial statements
- Determination of the issuer's creditworthiness

ALPINE_LIT168239

- Evaluate the validity and integrity of the issuer's business model and how it fits into its business sector
- Review information available from financial and other publishers
- Independent verification of management's representations (contact with issuer's customers; lenders, vendors, lower-level employees, *etc.*)
- Reviewing news articles and industry publications regarding the issuer, its market, and competition
- Review the company's internal documents such as operating plans, product literature, corporate records, financial statements, contracts and lists of distributors and customers
- Physical inspection of the company's facilities
- Contact with the issuer's auditor and other experts knowledgeable about the company
- Contact with outside directors
- Interviews of key personnel or customers
- Determination of the plausibility of expected rates of return as compared to industry benchmarks, particularly considering complex fee structures associated with many of these types of investments
- Updating due diligence as needed until effectiveness of the offering

### 15.4.2 Agreement With The Issuer

Alpine will execute an agreement with the issuer to define the terms of Alpine's role in the offering and the issuer's obligations as well as other covenants of the offering.

### 15.4.3 Dollar Amount Of The Offering And Integration Issues

The designated supervisor is responsible for ensuring the issue is not oversold relative to the dollar amount disclosed in the offering document compared to the limitations provided in the rules. The supervisor should consider any "integration" of similar offerings by the same issuer for substantially identical purposes for determining whether the issuer meets the dollar limitation under the exemption within a 12-month period of time. The supervisor's review for integration may include one of the following or another procedure determined adequate by the supervisor:

- Reviewing the issuer's financial statements for the past 12 months and/or contact directly with the issuer
- Obtaining a representation letter from the issuer that states that no other offerings were distributed during the 6-month period prior to the current private placement offering or will be distributed in a succeeding 6-month period that would cause the exemption to be lost

### 15.4.4 Form D

For issues sold under Regulation D, the issuer is required to prepare a notice on Form D and submit it to the SEC within fifteen days after the first sale of securities in the offering. Some states also require filing of Form D. Issuer's counsel is responsible for submitting this form on behalf of the issuer.

## 15.5 Sales Of Private Placements

| Responsibility | • President |
|---|---|
| Resources | • Offering Memorandum<br>• Purchaser Questionnaire<br>• RRs representations |
| Frequency | • As required |
| Action | • Approval of Customer |

ALPINE_LIT168240

| Record | • Retain information in Issuer File |
|---|---|

## 15.5.1 Suitability

A primary objective when selling a private placement is that all securities will be placed with suitable investors. The RR recommending a private placement is responsible for determining that the recommendation is suitable for the offeree based on information known about the potential offeree. The RR must consider minimum investor requirements and other suitability standards for each private placement offering.

### 15.5.1.1 Accredited Investors

[SEC Securities Act of 1933 Rule 215 and Rule 510]

An accredited investor meets certain financial criteria which may include minimum net worth, minimum income levels and other standards set by federal or state laws and regulations. Typically, accredited investors are not counted toward the limitation on the number of purchasers of a private placement.

Information about each private placement (and where it is sold) must be consulted to determine who qualifies as an "accredited investor" for a particular issue.

### 15.5.1.2 Non-Accredited Investors

Private placements sometimes may be offered to purchasers who do not meet the criteria of accredited investors. The number of allowable non-accredited purchasers will be limited, to preserve the registration exemption and meet requirements specified under federal and state law.

## 15.5.2 Restricted Nature Of Private Placement Securities

Private placement securities are considered "restricted securities," other than those purchased in Rule 504 offerings. Certificates will typically include a legend and securities cannot be resold unless registered or the securities qualify for sale under an exemption.

Purchases must be for investment purposes and not for the purpose of resale. Subscription documents typically include an affirmation that the purchaser is buying the private placement for investment purposes and understands they may not be resold (Letter of Non-Distributive Intent).

RRs must consider the illiquidity of most private placements when making suitability determinations. For example, a private placement would not be a suitable investment for a purchaser who expects to invest his funds on a short-term basis.

## 15.5.3 Purchaser Questionnaires

Where necessary, the potential investor will be requested to complete a Purchaser Questionnaire which confirms that the investor meets certain minimum requirements to participate in the private offering.

When Purchaser Questionnaires are required, the RR is responsible for obtaining the completed Questionnaire from the potential purchaser and submitting it for review and approval within the timeframe established for the offering.

ALPINE_LIT168241

### 15.5.4 Purchaser Representatives

If a purchaser is not sufficiently sophisticated to effectively evaluate the investment opportunity, he or she may have a "purchaser representative" (chosen by the investor and **not** an affiliate of the issuer or broker-dealer) who assists in evaluating the investment. The purchaser representative will be required to sign the offering documents attesting to his or her role acting as purchaser representative.

### 15.5.5 Offering Memorandum

| Responsibility | • Underwriting and Private Placement Supervisor |
|---|---|
| Resources | • Offering memorandum |
| Frequency | • As required for each private placement |
| Action | • Establish a distribution control sheet<br>• Number each offering memorandum, consecutively<br>• Record the number of each offering memorandum and the name of the offeree and the RR or RR number<br>• For unnumbered memoranda, mark copies "File Copy" or "For Information Only"<br>• If changes or corrections are made to the offering memorandum prior to closing, provide copies to each offeree who received the original memorandum and note on the control sheet that copies were provided including the date provided |
| Record | • A copy of the offering memorandum, corrected/changed memorandum, and the control sheet are retained in the deal file. |

An offering memorandum is prepared for each private placement, depending on the specific issue. The offering memorandum includes disclosures of information obtained from the issuer including the nature, character, and risk factors relating to the offering. Purchasers will be required to acknowledge, in writing, that they have received the offering memorandum.

An offering memorandum must be provided to all offerees. Offering memorandums are numbered, to enable Alpine to maintain a record of offerees who received them.

Offering memorandums are available from *[include name or department]*. RRs must provide information regarding the offeree at the time the memorandum is provided to the prospective purchaser.

If it is necessary to update or correct information in the private placement memorandum prior to closing of the issue, the revised information will be provided to offerees, in writing.

### 15.5.6 Oral Representations

RRs must not deviate from written private placement memorandum information or other pre-approved information when discussing private placements with potential investors.

ALPINE_LIT168242

### 15.5.7 Offeree Access To Information

Most private placement memoranda state that it was prepared by counsel from information provided by the issuer. Offerees are invited to meet with representatives of the issuer to make an independent investigation and verification of information in the memorandum.

### 15.5.8 Limits On Solicitation

A key element of private placement exemptions (other than offerings under Rule 504) is that there may be no general solicitation of the issue. This includes the following restrictions or requirements:

- Advertisements, articles, notices or any other communication cannot be published in any public media (newspapers, magazines, radio, TV, *etc.*). Tombstone announcements after the offering is completed are permitted.
- No seminars or meetings may be held regarding an offering unless each invitee is known and qualified in advance.
- Specific offerings or past performance may not be included in generic seminars that discuss the general concept of such investments.

### 15.5.9 Investment Seminars Or Meetings

| Responsibility | • Underwriting and Private Placement Supervisor |
|---|---|
| Resources | • Requests to conduct meetings or seminars |
| Frequency | • As required |
| Action | • Review the outline, written materials, and list of potential invitees<br>• Approve or disapprove, providing any revisions necessary<br>• Require that all invitees receive copies of the offering memorandum |

Because general solicitation is not permitted for private placements, meetings or seminars for potential investors must meet the following requirements:

- Seminars or meetings on specific private placements must be approved by the designated supervisor prior to conducting the seminar or meeting.
- Seminars or meetings cannot be generally advertised or be the subject of a general solicitation (except for Rule 504 offerings).
- Those invited must be limited to investors who meet the criteria for investing in the specific private placement to be discussed. A list of those to be invited, including affirmation the individuals pre-qualify for the investment, must be provided to the designated supervisor prior to conducting the seminar or meeting.
- Attendees must be provided with an offering memorandum. No other written material may be provided, unless previously approved by Alpine.

### 15.5.10 Subscription Agreements

| Responsibility | • Underwriting and Private Placement Supervisor |
|---|---|
| Resources | • Subscription agreements and accompanying checks |
| Frequency | • As required |

ALPINE_LIT168243

| | |
|---|---|
| **Action** | • Log agreements and checks received onto Sales Blotter for the deal<br>• Review subscription agreements and checks for acceptability<br>• Reject unacceptable agreements or checks and return to RR<br>• Forward accepted checks to escrow agent or issuer, retaining a copy in the deal file<br>• Initial accepted agreements<br>• Forward accepted agreements to issuer, retaining a copy in the deal file |
| **Record** | • Retain in deal file:<br>   o Sales blotter<br>   o Copies of subscription agreements and checks |

Each potential purchaser will be required to complete the necessary subscription agreement to purchase a private placement. The agreement must be accompanied by a check for the purchase.

Subscription agreements are processed as follows:

- The RR obtains the signed subscription agreement (and other required offering documents) and a check for payment from the offeree and submits them to the designated supervisor.
- Subscription agreements and checks received are logged into the Sales Blotter for the private placement.
- The designated supervisor reviews the agreement and check for acceptability.
- The check is forwarded to the escrow agent or the issuer, together with the purchaser's name, address, social security number, and number of shares/units, as required.
- Rejected agreements/checks are returned to the RR with an explanation for the rejection.
- Accepted agreements are retained by Alpine, and the original forwarded to the issuer.
- The issuer reviews and accepts or rejects the agreement.

RRs should be aware that **purchasers are not accepted until the issuer accepts them**. Final acceptance rests with the issuer who is responsible for ensuring conditions of the offering are satisfied to qualify under the operative exemption.

## 15.5.11 Section 1031 Tax-Deferred Exchanges

[Internal Revenue Code Section 1031; IRS Revenue Procedure 2002-22; FINRA Notice to Members 05-18]

This section describes considerations when recommending and effecting a 1031 exchange for tenants-in-common (TIC).

Section 1031 of the Internal Revenue Code allows an investor in income-producing or rental real estate to exchange the investment for another like investment of equal or greater value and defer payment of capital gains tax on the original investment. To qualify for the deferral, the investor must acquire an interest in real estate in exchange, and not an interest in a partnership.

TIC exchanges receive favorable tax treatment. A 1031 exchange by TIC would qualify for deferral only if the TIC and the transaction meet 15 IRS conditions outlined in Revenue Procedure 2002-22.

TIC interests offered and sold together with other arrangements generally constitute securities under federal securities laws. The FINRA considers TIC interests to be a type of non-conventional

ALPINE_LIT168244

investment (NCI) subject to due diligence, suitability, training, and internal control requirements. The section *Non-Conventional Investments* in the chapter *ORDERS* explains those requirements.

FINRA Notice to Members 05-18 should be referenced for a detailed discussion of "Private Placements of Tenants-in-Common Interests."

ALPINE_LIT168245

# 16 CORPORATE SECURITIES UNDERWRITING

[SEC Securities Offering Reform Questions and Answers November 30, 2005
(www.sec.gov/divisions/corpfin/faqs/securities_offering_reform-qa.pdf)]

This chapter outlines procedures for participating in corporate securities underwritings and a summary
of key rule requirements. The term "syndicate supervisor" is used in this chapter to denote the person
responsible for supervising underwritings and delegating responsibilities to other employees, where
appropriate.

## 16.1 Deal File

At the initial involvement in a potential underwriting, regardless of Alpine's role, the syndicate
supervisor will establish a "deal file" for the prospective underwriting. Following is a list of items that
should be included in the deal file, depending on Alpine's role in the offering:

- Letter of Intent with issuer
- Due diligence records
- Approval/acceptance of participation in underwriting
- Final registration statement
- Agreement Among Underwriters
- Underwriting Agreement
- Purchase Agreement (for competitive deals)
- Selected Dealer Agreement (selling agreement)
- Regulatory filings
- Preliminary and final prospectus
- Indications of interest
- Reviews for IPO certifications
- Road show materials and lists of potential investors who attended and received preliminary
  prospectuses
- When acting as managing underwriter:
  - Record of providing participants with prospectuses
  - Stabilizing activities
  - Designated orders
  - Other records of syndicate management activities
  - Underwriting Checklist

Drafts should be discarded and final documents retained in the file. Attorney-client privileged
communications may be maintained in a separate file.

## 16.2 Managing Underwriter

As managing underwriter, Alpine is responsible for dealing with the issuer, drafting a registration
statement, developing the prospectus and other offering documents, forming the syndicate (if others
will participate), submitting required regulatory filings, and running the syndicate. If Alpine acts as co-
manager and the other co-manager takes the lead in the offering, some of Alpine's responsibilities will
be more limited with the lead manager assuming many of the syndicate responsibilities.

### 16.2.1 Letter Of Intent

Alpine and the issuer will usually sign a Letter of Intent which is a non-binding agreement that defines
the framework of the potential offering.

ALPINE_LIT168246

### 16.2.2 Due Diligence

[SEC Securities Exchange Act of 1934 Rule 10b-5]

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor |
| **Resources** | • Information from issuer<br>• Information from outside sources<br>• Review by outside counsel or others engaged by Alpine<br>• Review conducted by Alpine personnel |
| **Frequency** | • As required for each potential underwriting |
| **Action** | • Engage outside counsel or others to assist with due diligence review, if appropriate<br>• Evaluate information on the company<br>• Determine structure of issue and potential pricing |
| **Record** | • Records to be retained in due diligence records include records of meetings and interviews; documents reviewed (including summaries or copies as appropriate); visits to facilities; discussions with third-party personnel; reports by investigators or other independent experts engaged to review the issuer; and other records of the review. Where visits, meetings, and interviews occur, the files will include the dates, attendees, and subjects reviewed or discussed. |

Alpine has the primary responsibility for evaluating the potential issuer and the structure of any proposed offering and when and how to bring the issue to market. The extent of due diligence review and the subjects reviewed will vary depending on the issuer, knowledge of and past experience with the issuer, whether the issue is an IPO, and any number of factors that may affect the due diligence process. The types of reviews conducted may include:

- Review financial reports
- Evaluate the issuer's business model and how it fits into its business sector
- Review information available from financial and other publishers
- Independent verification of management's representations (contact with issuer's customers; lenders, vendors, lower-level employees, *etc.*)
- Reviewing news articles and industry publications regarding the issuer, its market, and competition
- Review the company's internal documents such as operating plans, product literature, corporate records, financial statements, contracts and lists of distributors and customers
- Physical inspection of the company's facilities
- Contact with the issuer's auditor and other experts knowledgeable about the company
- Written company assurances as to the accuracy of records and financial statements
- Contact with outside directors
- Interviews of key personnel or customers
- Updating due diligence as needed until effectiveness of the offering

### 16.2.3 Net Capital Considerations

[SEC Securities Exchange Act of 1934 Rule 15c3-1]

ALPINE_LIT168247

If an underwriting commitment may impact Alpine's net capital, the syndicate supervisor is responsible for contacting the FINOP regarding Alpine's prospective commitment and noting in the deal file that net capital requirements will be satisfied for the prospective deal.

## 16.2.4 Forming The Underwriting Group

[FINRA Rule 5160]

If other dealers will be invited to participate in the underwriting, Alpine will:

- Extend invitations to other dealers
- Execute with participants, depending on their invited role:
  - Agreement Among Underwriters (defines rights and obligations of the underwriters with respect to each other)
  - Underwriting Agreement (agreement between underwriters and the issuer committing to purchase the security in a negotiated underwriting)
  - Purchase Agreement (agreement between the issuer and underwriting firms in a competitive bidding)
  - Selected Dealer Agreement (selling group agreement, also covers underwriters whose net take-down exceeds their underwriting commitment)

## 16.2.5 Underwriting Compensation

[FINRA Rule 5110(c)]

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Underwriting agreement with issuer and/or other documents regarding potential compensation |
| Frequency | • As required for each underwriting |
| Action | • Review compensation for fairness and reasonableness and ensure compensation is within rule guidelines.<br>• Identify any patterns of consistent compensation levels among underwritings; such patterns may indicate a failure to negotiate each deal individually to determine pricing of Alpine's services.<br>• Adjust compensation if necessary to comply with Firm and rule requirements and remind personnel of requirements if inconsistencies are identified.<br>• Ensure compensation is disclosed in the prospectus. |
| Record | • Underwriting records, including compensation negotiated with the issuer, are included in the deal file.<br>• The syndicate supervisor's initials or signature is included on records reviewed.<br>• Records of adjustments to compensation. |

Alpine will review underwriting compensation issues to ensure compliance with the FINRA's Corporate Financing Rule. Underwriting compensation earned by Alpine is determined through negotiation with the issuer and is reviewed by the FINRA before the issue may be offered to the public. The FINRA's Corporate Financing Rule regulates underwriting compensation and prohibits unfair arrangements in connection with public offerings of securities.

ALPINE_LIT168248

### 16.2.5.1 Lock-Up Restrictions

[FINRA Rule 5110(g), 5131(d) and 5131.03]

For an offering of equity securities, the issuer and its officers, directors, and principal security holders will generally enter into agreements ("lock-ups") promising not to sell any additional securities of the same class, or any securities convertible or exchangeable into the same class, for a specified period of time after the date of the prospectus. Time periods generally are 180-270 days for IPOs and 90-120 days for secondary offerings. As managing underwriter, Alpine may exempt sales it judges would not disrupt the distribution or have an adverse effect on the aftermarket of the securities being distributed.

## 16.2.6 Preliminary And Final Prospectuses

[SEC Securities Act of 1933 Rule 154, Rule 172, Rule 173, Rule 174, Rule 434, Rule 460, Section 2(a)(10), Section 10 and Section 12; SEC Securities Exchange Act of 1934 Rule 15c2-8; SEC Regulation C Rule 421]

The preparation and filing of the prospectus includes:

- Preparation of the preliminary prospectus
- Filing preliminary prospectus with regulators
- Providing preliminary prospectus with invitations to other potential participants
- File prospectus with SEC
- Prepare final prospectus with price information
- Provide final prospectuses to participants in printed form or provide notice that prospectuses may be accessed electronically ("access equals delivery")

## 16.2.7 Regulatory Filings And Notifications

[SEC Regulation M; FINRA Rule 5190]

All public offerings (including unregistered offerings unless there are restrictions on resale) are subject to regulatory filing requirements.

### 16.2.7.1 Registration Statement

The registration statement is prepared and filed as follows:

- Coincident with due diligence and approval of Alpine's role managing the underwriting, begin the process of drafting the registration statement.
- Finalize registration statement and file Form S-1 with the SEC.
- File registration statement with SROs.
- File interim amendment to registration statement, if necessary, with SEC.
- Registration statement becomes effective.

### 16.2.7.2 FINRA

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Underwritings |
| Frequency | • As required depending on type of filing |
| Action | • File information electronically with the FINRA |

ALPINE_LIT168249

| | |
|---|---|
| | • Request Underwriting Activity Report (UAR) |
| **Record** | • Retain records of information filed and UAR in the deal file |

### 16.2.7.2.1 New Issues
[FINRA Rule 2710, Notice to Members 04-20]

The syndicate supervisor will:

- Determine whether filing with the Corporate Financing Department of the FINRA is required.
- If filing is required, review the information filed prior to submission to the FINRA.
- Ensure the underwriting does not go forward unless a "no objection" letter is received from the FINRA, for those underwritings requiring filing with the FINRA.

If filing is required, two filings will be made with the FINRA Corporate Financing Department using the IPO Distribution Manager through the FINRA's internet COBRADesk:

- An initial filing, filed on or before the offering date, of the initial list of distribution participants and their commitment and retention amounts
- A final filing, filed no later than 3 days after the offering date (T+3) of the final list of distribution participants and their commitment and retention amounts

### 16.2.7.2.2 NASDAQ IPO Process

[NASDAQ Head Trader Alert 2005-096 and 2005-086;
http://www.nasdaqtrader.com/content/productsservices/trading/ipohalt/ipo_factsheet.pdf]

NASDAQ has an IPO process to price a new issue when it comes to market. The lead underwriter is responsible for calling NASDAQ to communicate the IPO offering price by 6:45 p.m. E.T. on the day of pricing (the night before trading will begin). The offering price will be used by NASDAQ as the first bid (represented by the lead underwriter's MPID) in the NASDAQ Market Center at the start of IPO trading.

If the lead underwriter does not provide price information by the deadline, pricing will default to the IPO process.

### 16.2.7.2.3 Underwriting Activity Report
[FINRA Rules 2710(b)(10) and 6540(d), Notice to Members 03-46]

At the time a registration statement or similar offering document is filed with the FINRA's Corporate Finance Department, the SEC, or other regulatory agency, a request will be submitted to the FINRA's Market Regulation Department for an Underwriting Activity Report (UAR). If not filed with any regulatory agency, the request will be filed at least 2 business days prior to the commencement of the restricted period under SEC Rule 101.

### 16.2.7.2.4 TRACE-Eligible Securities

[FINRA Rule 6760]

ALPINE_LIT168250

For IPOs of TRACE-eligible securities, the FINRA Trace Operations Center will be provided with a new issue notification no later than 5:00 p.m. E.T. on the business day preceding the day the registration statement becomes effective or, if no registration is required, the day before the securities are priced. When early closings in TRACE occur, the information will be provided by the early closing time rather than by 5:00 p.m. E.T.

For deals where there is no managing underwriter, the underwriting group is responsible for filing the required information. "Underwriter" includes firms acting as agents for issuers of new TRACE-eligible securities.

**16.2.7.2.5 Designated Orders**
For fixed price underwritings where orders are received designating another broker-dealer to receive credit, a report will be filed with the FINRA within 30 days after the end of the calendar quarter during which the orders are received.

**16.2.7.3 Blue Sky Considerations**
The syndicate supervisor is responsible for determining whether the issue qualifies for the NSMIA exemption from blue sky requirements and if it does not, making the necessary filings and registering the issue with individual states.

## 16.2.8 Road Shows

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Proposals for road shows<br>• Proposed invitees |
| Frequency | • As required |
| Action | • Review road show presentation and approve or disapprove<br>• Provide preliminary prospectuses for invitees<br>• For video or internet road shows, ensure all requirements are completed |
| Record | • Road show presentation and related materials<br>• Record of who attended and received preliminary prospectuses<br>• Record of required items for video or internet road shows |

Alpine may conduct road shows and invite broker-dealers and potential investors to review the proposed underwriting. Those invited may include institutional investors, securities firms, trading and sales personnel, research analysts, and qualified individual investors.

**16.2.8.1 Video And Internet Road Shows**

[SEC No-Action Letters including those to: Wit Capital (July 14, 1999), Private Financial Network (March 12, 1997), Net Roadshow (July 30, 1997) and Charles Schwab and Co. (November 12, 1999 & February 9, 2000), Bloomberg L.P. (October 22, 1997), Thomson Financial Services (September 4, 1998)]

Following are some of the requirements that apply when road shows are conducted via video or the internet:

- The registration statement will be on file with the SEC.

ALPINE_LIT168251

- The audience is limited to pre-selected or pre-qualified investors; for internet road shows, password access will be required.
- The viewer will be provided a prospectus before or concurrently with the transmission.
- Transmission is protected against downloading, copying, and printing.
- Viewers are required to represent they will not copy or distribute the transmission to others.
- The road show will be transmitted in its entirety, except for minor editing to eliminate dead time or to correct mistakes. Viewers may prematurely end the transmission at their option.
- Audio-visual materials (such as slides) will be presented for approximately the same amount of time as in a traditional show.
- The road show will not be transmitted to any one viewer more than a limited number of times or restricts the viewer's access to a limited time period.
- The road show will display a Rule 134(b) legend stating that because the registration statement is not yet effective, the securities cannot yet be sold and offers to buy cannot yet be accepted.

### 16.2.9 Pricing The Underwriting

The deal will be priced considering a wide range of factors which may include:

- The company's real or expected growth
- Company's operating history
- Quality of company's management
- Company's approach to research and development
- Prospects for the industry in which the company operates
- Market comparables, such as price-to-earnings ratio of a similarly-situated company that is publicly traded
- Growth prospects for the company's products and services and the expected impact on those
- General conditions of the securities market at the time of the offering

### 16.2.10 Aftermarket Activities

#### 16.2.10.1 Stabilizing Activities

[SEC Securities Exchange Act of 1934 Rule 17a-2; SEC Regulation M Rule 104; NASDAQ Rule 4614 and 4625]

Alpine may engage in stabilizing activities to prevent or retard the decline in the price of the security. Refer to the chapter *OTC EQUITY TRADING AND MARKET MAKING*, the section *Distribution Of Securities* and the subsection *Stabilizing Bids*.

- Potential stabilizing activities will be disclosed in the prospectus.
- Only one stabilizing bid may be entered.
- Stabilizing transactions will be identified as such when entered.
- Stabilizing transactions will comply with price requirements in the market where entered.

The syndicate supervisor will notify each syndicate or group member of the name and class of the security stabilized and the time when the first stabilizing purchase was effected and when stabilizing was terminated.

#### 16.2.10.2 Penalty Bid And Syndicate Covering Transactions

[SEC Regulation M Rule 100 and Rule 104; NASDAQ Rule 4624; FINRA Rule 5131(c)(2) and 5190]

A penalty bid (reclaiming the selling concession) may be imposed on a syndicate member when the securities originally sold by the syndicate member are purchased in a syndicate covering transaction.

ALPINE_LIT168252

If penalty bids may be imposed, it will be disclosed in the IPO registration statement. The appropriate SRO(s) will be notified when a penalty bid is imposed.

### 16.2.10.3 Records Of Stabilizing, Penalty Bid, and Syndicate Covering Activities

The syndicate supervisor is responsible for maintaining the following records in a separately retrievable format:

- name and class of security stabilized or where syndicate covering transactions were effected or a penalty bid is imposed
- price, date, and time at which each stabilizing purchase or syndicate covering transaction was effected by Alpine or any participant in the syndicate or group and whether any penalties were assessed
- names and addresses of members of the syndicate or group
- commitments or, for a standby or contingent underwriting, the percentage participation of each syndicate or group member
- dates when any penalty bid was in effect

### 16.2.10.4 Settlement Of Syndicate Accounts

[FINRA Rule 5160 and 11880]

- Final settlement will be effected within 90 days following the syndicate settlement date.
- Syndicate members will be provided with, no later than the date of final settlement of the syndicate account, an itemized statement of syndicate expenses.
- The FINRA Uniform Practice Dept. will be notified of any anticipated delay in closing a firm commitment offering beyond the closing date in the offering document or any subsequent delays in the closing date previously reported to the FINRA.

### 16.2.10.5 Payment Of Concessions, Discounts, Allowances

Concessions, discounts, and allowances will be paid only to registered broker-dealers for services rendered in a distribution.

### 16.2.10.6 Designated Orders

Alpine will maintain records of designated orders including:

- name of person making the designation
- identity of brokers or dealers designated
- identity and amount of securities for which each broker/dealer is designated
- date of commencement and termination of the offering

## 16.3 Syndicate Member Procedures

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Invitations to participate as a syndicate group member<br>• Prospectus<br>• Registration statement<br>• Other information provided by the managing underwriter |
| Frequency | • As required for each underwriting |
| Action | • Review agreement, related documents, and accept or decline |

ALPINE_LIT168253

| | |
|---|---|
| | • Notify Compliance of proposed deal for consideration whether to add the security to Alpine's Restricted List and notify Compliance when price and trading restrictions are lifted<br>• Notify Research if necessary<br>• Allocate available securities<br>• Provide prospectuses to purchasers, if required |
| **Record** | • The invitation, signed agreements, prospectus, registration, and other information provided by the managing underwriter as well as Compliance and Research notification and tombstone ads are retained in the deal file. |

When invited to participate as a syndicate member, the syndicate supervisor will review the deal, accept or decline, and oversee the distribution of securities sold by Alpine.

### 16.3.1 Tombstone Ads

Alpine may publish tombstone announcements of participation as a syndicate member. Tombstone ads must be approved by the CCO prior to publication or, if the underwriting supervisor and the CCO are the same person, by the President.

### 16.3.2 Research

If Alpine issues research regarding the subject company, participation as a syndicate member requires compliance with SRO rules regarding research activities. The syndicate supervisor is responsible for notifying the Research Department of pending deals since issuance of research reports may be restricted.

## 16.4 Selling Group Member Procedures

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor |
| **Resources** | • Invitations to participate as a selling group member<br>• Prospectus<br>• Registration statement<br>• Other information provided by the managing underwriter |
| **Frequency** | • As required for each underwriting |
| **Action** | • Review agreement, related documents, and accept or decline<br>• Notify the CCO of proposed deal for consideration whether to add the security to Alpine's Restricted List and notify CCO when price and trading restrictions are lifted<br>• Notify Research if necessary<br>• Allocate available securities<br>• Return unsold allotment to managing underwriter |
| **Record** | • The invitation, signed agreements, prospectus, registration, and other information provided by the managing underwriter as well as CCO and Research notification and tombstone ads are retained in the deal file. |

This section describes procedures when Alpine participates in an underwriting as a selling group member.

ALPINE_LIT168254

### 16.4.1 Returning Unsold Allotment

As a selling group member, Alpine has no financial commitment to sell underwritten shares and will return unsold allotments, unless the terms of the selling agreement dictate otherwise.

Unsold shares will be returned to the managing underwriter within the timeframe specified by the selling group agreement.

### 16.4.2 Tombstone Ads

Alpine may publish tombstone announcements of participation as a selling group member. Tombstone ads must be approved by the CCO prior to publication.

### 16.4.3 Research

If Alpine issues research regarding the subject company, participation as a selling group member requires compliance with SRO rules regarding research activities. The syndicate supervisor is responsible for notifying the Research Department of pending deals since issuance of research reports may be restricted.

## 16.5 Communications Around The Time Of Registered Offerings

[SEC Securities Act of 1933 Rule 134, Rule 135, Rule 163, Rule 163A, Rule 164, Rule 168, Rule 169, Rule 405 and Rule 433; SEC Release No. 34-52056; FINRA Rule 2210; FINRA Regulatory Notice 10-52; JOBS Act, Title I; SEC JOBS Act Frequently Asked Questions: http://www.sec.gov/divisions/corpfin/guidance/cfjjobsactfaq-title-i-general.htm]

Issuing communications (other than the prospectus) to investors around the time of an offering may constitute "gun-jumping." Certain types of communications are permitted or are exempt from gun-jumping restrictions under federal rules. This section summarizes key elements of communications about offerings. The rules are complex and technical; questions should be referred to the CCO.

### 16.5.1 Categories Of Issuers

Permitted communications depend, at least in part, on the category of the issuer, summarized below.

***Well-known seasoned issuer:*** An issuer current and timely in its '34 Act reports for at least one year and has either $700 million of worldwide public common equity float, or has issued $1 billion of non-convertible securities (other than common equity) in registered offerings for cash in the preceding three years.

***Seasoned reporting issuer:*** An issuer eligible to register as a primary offering of securities on Form S-3 (among other requirements). To be Form S-3 eligible for a primary offering, a company must have an aggregate market value of $75 million or more of common equity held by non-affiliates.

***Non-reporting and unseasoned issuers:*** An issuer that does not fall within the above categories (this category is subject to specific restrictions).

***Ineligible issuers:*** Issuers that are ineligible as defined in Rule 405 and where communications outside the prospectus are not permitted. Rule 164 regarding free writing prospectuses also excludes investment companies registered under the Investment Company Act of 1940 and offerings involving an issuer registering a business combination transaction.

ALPINE_LIT168255

***Emerging growth company ("EGC"):*** A company that conducts an IPO after December 8, 2011 and had annual gross revenues of less than $1 billion during its most recent fiscal year. A company will retain EGC status until the earliest of:

- the first fiscal year after its annual revenues reach $1 billion;
- the first fiscal year following the fifth anniversary of its IPO;
- the date on which the company has, during the previous three-year period, issued more than $1 billion in non-convertible debt; and
- the date on which the company becomes a "large accelerated filer."

## 16.5.2 Other Definitions

***Free writing prospectus:*** A written communication (including electronic communications) outside the statutory prospectus that after the filing of the registration statement, may be filed with the SEC, with certain conditions depending on the type of issuer.

***Written communications:*** All methods of communication other than oral communications are defined as "written." Written communications include any communication that is written, printed, a radio or television broadcast, or graphic communication. *Graphic communication* excludes communications that are carried live and in real-time to a live audience, regardless of the method of transmission. All electronic communications (other than telephone and other live, in real-time communications to a live audience) are "written."

***Electronic roadshows:*** Live electronic roadshows, even though transmitted to a live audience via an electronic medium, are not considered "written" material. Electronic road shows that are not live are considered free writing prospectuses. Electronic road shows for IPOs of common equity or convertible equity securities do not have to be filed with the SEC if a version of the bona fide electronic road show is made readily available to an unrestricted audience. No other road shows are subject to filing with the SEC.

## 16.5.3 Permitted Offering Activity And Communications

The following is an overview of permitted communications.

- Well-known seasoned issuers may engage, at any time, in oral and written communications, including the use of a free writing prospectus.
- Emerging Growth Companies (EGCs) are subject to fewer restrictions than other issuers. Contact Compliance for clarification of permitted communications. Some restrictions or permissible activities involving EGCs include:
    - Any firm subject to the Global Settlement remains restricted by any applicable terms of the settlement.
    - When "testing the waters," an underwriter may ask customers for nonbinding indications of interest, including how many shares the customer may seek to purchase, without violating rules requiring the provision of a preliminary prospectus when soliciting orders.
- All reporting issuers may, at any time, continue to publish regularly released factual business information and forward-looking information.
- Non-reporting issuers may, at any time, continue to publish factual business information that is regularly released and intended for use by persons other than in their capacity as investors or potential investors.
- Communications by issuers, more than 30 days before filing a registration statement, are permitted, if they do not reference the securities offering that is the subject of a registration statement.

ALPINE_LIT168256

- All issuers and offering participants may use a free writing prospectus after the filing of the registration statement, subject to conditions. The statutory prospectus has to accompany or precede the free writing prospectus for unseasoned or non-reporting issuers, if the issuer or an offering participant prepares or pays for the free writing prospectus.
- Some routine communications are permitted, including an offering schedule or about account opening procedures.
- Research reports (other than reports on EGCs) may be issued under the safe harbors of Rules 137, 138, and 139. There are no restrictions on issuing research reports on EGCs.
- Media interviews are permitted if they meet the conditions of Rule 433 and conditioned on whether the issuer or participant paid for the media communication.

## 16.6 Sales To The Public

[FINRA Rule 5131]

The following sections outline procedures for selling underwritten issues to Alpine's customers.

### 16.6.1 Indications Of Interest

Indications of interest are accepted prior to the effective date of the underwriting. Indications of interest are not orders and do not become orders until the syndicate supervisor confirms that securities are available to satisfy indications; RRs are responsible for re-confirming the customer's purchase of the securities at the time the issue is effective and allocated to customers. There is no assurance of an adequate quantity of securities to meet indications of interest.

### 16.6.2 Prospectuses And Confirmations To Purchasers

[SEC Securities Act of 1933 Rule 172 and Rule 173]

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Indications of Interest<br>• Record of purchasers |
| Frequency | • As required |
| Action | • Provide preliminary prospectuses to RRs when available<br>• Notify Operations to include the required disclosure on confirmations sent to purchasing customers<br>• If a final prospectus is required to be orovided to investors, obtain prospectuses and forward to appropriate Operations personnel for sending or establish electronic access to the prospectus and notify purchasers |
| Record | • A record of purchasers and sending of prospectuses (if required) is maintained in the deal file or establishment of electronic access and notice provided to purchasers. |

#### 16.6.2.1 Confirmations And Notices Of Allocations Of Shares

Written confirmations and notices of allocations of shares offered, may be sent after the effectiveness of a registration statement (for an issue complying with Rule 172) without being accompanied or preceded by a final prospectus. Written communication from a broker-dealer to a customer, or from an underwriter to participating dealers in the selling group, may notify them of the basic terms of the

ALPINE_LIT168257

transaction or their allocations of the securities. Notices of allocation may include the identity of the securities; CUSIP number; amount allocated; price; date or expected date of settlement; and incidental information.

When final prospectuses are not required, purchasers will be provided, no later than two business days after the sale a notice that the sale was made pursuant to a registration statement or in a transaction in which a final prospectus would not have been required to have been delivered in the absence of Rule 172.

### 16.6.2.2 Preliminary And Final Prospectuses

Preliminary prospectuses will be provided to RRs if available. These should be provided to customers submitting an indication of interest in the new issue.

The issuer is not required to print and physically deliver a final prospectus to investors, if the issuer files the prospectus with the SEC within a prescribed period of time and complies with certain other conditions. For issuers that are required to provide prospectuses, copies will be obtained and forwarded to purchasers.

An investor may request a physical copy of the final prospectus, but the prospectus is not required to be provided prior to settlement.

### 16.6.2.3 Purchases During The Post-Effective Period

[SEC Securities Act of 1933 Rule 174 and Section 4(3)]

There is no obligation to provide a prospectus to purchasers in the post-effective period if the issuer is a reporting company under Section 13 or 15(d) of the '34 Act; is a shelf offering (other than the first bona fide offering); or if the registration statement is on Form F-6. This exemption does **not** apply to blank check companies.

For issues not included above, customers who purchase in the post-effective period and where the issue satisfies the requirements of Rule 172, will be provided with the required notice (see *Confirmations And Notices Of Allocations Of Shares*, above) within two business days of the sale. This requirement applies for a period of 25 calendar days after the offering date.

For issues that do not qualify under Rule 172, purchasers during the period of 25 calendar days after the offering date will be sent a copy of the final prospectus.

### 16.6.2.4 Term Sheets

[SEC Regulation C Rule 421]

Term sheets may be provided to prospective purchasers and will meet the requirements of a plain English summary that includes most material terms of the proposed offering. Bullet points will cross-reference detailed information in the prospectus or other offering document.

Term sheets may also be provided to new issue purchasers who have received a preliminary prospectus. The term sheet is included with the customer's confirmation and supplements the preliminary prospectus to disclose final terms such as price and effective date.

ALPINE_LIT168258

**16.6.2.5 Electronic Delivery Of Prospectuses**

[SEC Securities Exchange Act of 1934 Release No. 37182 (May 1996) and Release No. 36345 (Oct. 1995)]

Where Alpine determines to provide prospectuses through electronic media, the following guidelines apply:

- The prospectus itself may be sent to the investor by disk, tape, email, or similar method.
- If a prospectus is posted on Alpine's web site, separate written notice by email or regular mail will be forwarded to the investor.
- Customers must agree to accept electronic delivery and consent retained in the customer's records.
- Delivery must be evidenced (confirmation document has been downloaded, record of hyper link access; *etc.*)
- Current updated versions of the preliminary prospectus may be posted on Alpine's website available to all potential investors. Notice of updates is sent to investors expected to purchase the offered securities.
- Final prospectuses will be posted to the website and written notice mailed to purchasers notifying them how they may access the prospectus.
- When a prospectus is amended, (1) a postcard or email will be sent to investors notifying them of the availability of the amended prospectus or (2) a paper copy of the amendment will be sent to investors.

## 16.6.3 Restrictions On Purchase And Sale Of IPOs Of Equity Securities

[FINRA Rule 5130]

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor |
| **Resources** | • Indications of interest for IPOs |
| **Frequency** | • As required, when equity IPOs are offered |
| **Action** | • Review indications to determine no purchasers are restricted persons<br>• If potential purchasers are restricted, notify RR and offer the shares to a qualified purchaser |
| **Record** | • Indications of interest and review to identify restricted persons are included in the underwriting file |

When selling IPOs, the distribution of shares must be a *bona fide* public offering and fair distribution to the public. This means sales will not be made to benefit insiders in the securities industry or to other closely-related parties that might unfairly benefit at the expense of public customers. This section describes key elements of the FINRA rule that limits the types of investors that may purchase equity IPOs.

The Rule should be consulted for specific details. Questions regarding restrictions should be directed to the syndicate supervisor or to the CCO.

ALPINE_LIT168259

### 16.6.3.1 Restricted Persons

Equity IPOs **may not be purchased** by "restricted persons" as defined in FINRA Rule 2790 including accounts where the restricted person has a beneficial interest. Restricted persons include:

- **FINRA members or other broker-dealers**
- **Broker-dealer personnel**

1. Any officer, director, general partner, associated person or employee of a member or any other broker-dealer;
2. Any officer, director, general partner, associated person or employee of a member or any other broker-dealer;
3. An immediate family member or a person listed above if the above person:
   - Materially supports, or receives material support from, the immediate family member;
   - Is employed by or associated with the member, or an affiliate of the member, selling the new issue to the immediate family member; or
   - Has the ability to control the allocation of the new issue.

- **Finders and fiduciaries**
   - With respect to the security being offered, a finder or any person acting in a fiduciary capacity to the managing underwriter, including, but not limited to, attorneys, accountants and financial consultants; and
   - An immediate family member of a person above if the person materially supports or receives material support from the immediate family member.
- **Portfolio managers** (any person who has authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor, or collective investment account) and their immediate family members if the person materially supports or receives material support from the immediate family member
- **Persons who have ownership in a broker-dealer including:**
   - **Direct owners** (any person listed, or required to be listed, on Schedule A of Form BD) unless ownership is less than 10%
   - **Indirect owners** (any person listed or required to be listed on Schedule B of Form BD) unless ownership is less than 10%
   - **Persons listed** or required to be listed **on Schedule C** of Form BD
   - **Persons that directly or indirectly own 10% or more of a public reporting company** listed or required to be listed in Schedule A or **persons that directly or indirectly own 25% or more of a public reporting company** listed in Schedule B of Form BD (other than reporting companies listed on an Exchange, the NASDAQ National Market, or that is a limited business broker-dealer)
   - **Immediate family members** of the above, with some exclusions in the Rule

**Excluded** from the definition of "restricted person" is an **employee** or immediate family member of an employee of a **"limited business broker-dealer"** which is defined as any broker-dealer whose business is limited solely to the purchase and sale of investment company/variable contract securities and direct participation program securities.

### 16.6.3.2 General Prohibitions

The following summarizes the general prohibitions that apply to the sale of equity IPOs.

1. Restricted persons are not allowed to purchase IPOs, unless there is an available exemption.
2. A broker-dealer or associated person (AP) may not purchase an equity IPO in an account where the BD or AP has a beneficial interest.
3. A broker-dealer may not continue to hold new issues acquired as underwriter or selling group member except when the issue is under-subscribed (described in a later section).

ALPINE_LIT168260

### 16.6.3.3 Certification Of Non-Restricted Status Required From All Purchasers

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor<br>• President - annual negative consent |
| **Resources** | • Indications of interest<br>• IPO certifications |
| **Frequency** | • As required, when equity IPOs are offered<br>• Annual - negative consent letter |
| **Action** | • Determine whether proposed purchaser has submitted the IPO certification<br>• If not, contact RR or otherwise obtain the required certification<br>• For accounts lacking certification, exclude from IPO purchasers<br>• President - arrange for annual negative consent and change the customer's eligibility to purchase IPOs if the customer's non-restricted status has changed |
| **Record** | • Notation that indications have been reviewed for certifications are included in the underwriting file<br>• Certification is noted on the account record and retained in customer records<br>• Record is retained that the annual negative consent has been sent |

An IPO may not be sold to an account unless, during the prior 12 months, Alpine has received certification that the account is eligible to purchase new issues. This includes certification from conduit accounts (discussed below). Alpine or an RR cannot rely on a certification that it has reason to believe is not accurate.

### 16.6.3.3.1 Initial And Annual Certification

Prior to the first purchase of an equity IPO, and for each equity IPO subsequent thereto, the prospective purchaser must sign and submit the IPO Certification form that certifies that the underlying beneficial owners are not restricted persons. The account will be considered non-restricted based on the customer's certification.

After receiving the initial IPO Certification, Alpine may, rather than sending a new IPO Certification for each subsequent offering, annually send a negative consent letter asking the customer to notify Alpine if the initial certification is no longer accurate.

### 16.6.3.3.2 Conduit Accounts

Certification must be obtained when a potential IPO purchaser is a "conduit" account, which includes, for example, an investment partnership or corporation, a foreign investment company, an investment adviser, and an account for which a bank or trust company is acting as a conduit. The conduit is required to certify that the beneficial owner or ultimate purchaser is not a restricted person.

### 16.6.3.3.3 Third Party Vendor Certifications

[FINRA Interpretive Letter dated 2/17/04 to Tom Fleming of Dealogic]

Alpine may use a third party that obtains certification that potential purchasers are eligible to buy IPOs. Under this approach, the syndicate supervisor is responsible for confirming that the third party has procedures in place that comply with FINRA Rule 2790 and for signing an agreement with the

ALPINE_LIT168261

vendor. When a third party is used, Alpine's records will include verification of IPO purchasers' eligibility against the third party's records and at least annual review that the third party's procedures comply with FINRA requirements. Record of third party certifications is retained in the deal file.

## 16.6.3.4 Exemptions

Equity IPOs **may be sold** to the following types of accounts and are **not subject to** restricted person prohibitions or requirements.

- Registered investment companies.
- Common trust funds with investments from 1000 or more accounts and that do not limit interests in the fund principally to trust accounts of restricted persons.
- Insurance company general, separate, or investment accounts provided that:
  - the account is funded by premiums from 1000 or more policyholders, or, if a general account, the insurance company has 1000 or more policyholders; and,
  - the insurance company does not limit the policyholders whose premiums are used to fund the account principally to restricted persons, or if, a general account, the insurance company does not limit its policyholders to restricted persons.
- *De minimis* exemption for purchase by an account if the beneficial interests of restricted persons do not exceed the aggregate 10% of the account.
- Publicly traded entities listed on a national securities exchange or traded on the NASDAQ Global Market (NGM) or are foreign issuers that meet the quantitative designation criteria for listing on a National securities exchange or NGM. This exemption **does not** include sales to publicly-traded broker-dealers or a publicly-traded affiliate of a broker-dealer.
- Foreign investment companies organized under the laws of a foreign jurisdiction that are listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority provided that no person owning 5% or more of the investment company is a restricted person.
- ERISA benefit plans qualified under Section 401(a) of the Internal Revenue Code (IRC) provided the plan is not sponsored solely by a BD.
- State or municipal government plans subject to state and/or municipal regulation.
- Tax-exempt charity organized under Section 501(c)(3) of the IRC.
- Church plans described in Section 414(e) of the IRC.

## 16.6.3.5 Issuer-Directed Securities

[FINRA Rule 5130(d)]

Issuers often direct the underwriter to offer shares to certain persons. Those sales specifically directed by the issuer are exempt from restricted person prohibitions except that sales to broker-dealer employees, finders, or fiduciaries (as defined under Restricted Persons, above) are exempt **only if** that person, or a member of their immediate family, is an employee or director of the issuer, the issuer's parent, or a subsidiary of the issuer or the issuer's parent.

IPO sales are also exempt if distributed as part of a program sponsored by the issuer, or an affiliate of the issuer, that meets four conditions:

- the opportunity to purchase a new issue under the program is offered to at least 10,000 participants;
- every participant is offered an opportunity to purchase an equivalent number of shares or will receive a specified number of shares under a predetermined formula applied uniformly across all participants;
- if not all participants receive shares under the program, the selection of the eligible participants is based on a random or other non-discretionary allocation method; and,
- the class of participants does not contain a disproportionate number of restricted persons.

ALPINE_LIT168262

Last, the issuer-directed exemption also applies to new issues directed to eligible purchasers as part of a conversion offering conducted in accordance with the standards of the governmental agency or instrumentality having authority to regulate the conversion offering.

### 16.6.3.6 Anti-Dilution

A restricted person that is an existing equity owner of an issuer may purchase shares in the IPO in order to maintain its equity ownership position. To qualify for this exemption, the restricted person must meet the following criteria:

- the account held shares for a period of at least 1 year prior to the offering;
- the sale of the new issue does not increase the account's percentage equity ownership in the issuer above the ownership level as of 3 months prior to the filing of the registration statement for the offering;
- the sale of the new issue to the account does not include any special terms; and,
- the new issue is held for at least 3 months following the effective date of the offering.

### 16.6.3.7 Stand-By Purchasers

Prohibitions on sales of IPOs do not apply if made pursuant to a stand-by agreement that meets four conditions:

1. the stand-by agreement is disclosed in the prospectus;
2. the stand-by agreement is subject to a formal written agreement;
3. the managing underwriter represents in writing that it is unable to find any other purchasers for the securities; and,
4. securities sold under a stand-by agreement are subject to a 3-month lock-up period.

### 16.6.3.8 Under-Subscribed Offerings

If Alpine, as underwriter, is unable to sell all shares for which it has committed, Alpine may place those shares in an Alpine account.

### 16.6.3.9 Definitions Applying To IPO Allocations

[FINRA Rule 5130(i) and 5131(e)]

The following are selected Rule definitions; the Rule should be consulted for other definitions.

**Beneficial interest:** Any economic interest such as the right to share in gains and losses. This excludes receipt of a management or performance-based fee for operating a collective investment account, or other fees for acting in a fiduciary capacity.

**Collective investment account:** Any hedge fund, investment partnership, investment corporation, or any other collective investment vehicle engaged primarily in the purchase or sale of securities. This does not include a family investment vehicle or investment club.

**Immediate family member:** Parents, in-laws, spouse, siblings, and children. The definition also includes anyone else to whom the person provides material support.

**Material support:** Directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with "material support."

ALPINE_LIT168263

**New issue:** Any initial public offering of an equity security as defined in Section 3(a)(11) of the Exchange Act made through a registration statement or offering circular. FINRA Rule 5130(i)(9) excludes a number of offerings from this definition (refer to the rule for details) including sales under Rule 144, 144A, 505, or 506; offerings of exempt securities; commodity pools; rights offerings; exchange offers; investment-grade asset-backed securities; convertible securities; preferred securities; investment companies; ADRs; and DPPs. This list does not include all exempt securities listed in the FINRA rule.

**Penalty bid:** An arrangement that permits the managing underwriter to reclaim a selling concession from a syndicate member in connection with an offering when the securities originally sold by the syndicate member are purchased in syndicate covering transactions.

**Restricted person:** Defined at the beginning of this section.

### 16.6.4 Disclosure Of Interest In Distribution

[SEC Securities Exchange Act of 1934 Rule 15c1-6; FINRA Rule 2269]

Prior to selling securities from a primary or secondary distribution to managed accounts or other accounts where a fee is charged, the customer will be provided with written notice of the existence of Alpine's participation in the distribution.

### 16.6.5 State Blue Sky Requirements

The syndicate supervisor is responsible for reviewing purchasers, prior to confirming transactions, to ensure the issue is sold only to purchasers in states where the issue is blue skied or is eligible for sale under an exemption.

### 16.6.6 Cancellation Policy

Indications of interest are not orders until the customer is contacted and confirms that securities allocated to the customer are accepted. At that point, a confirmation and final prospectus will be provided and the customer will be expected to pay for the transaction.

If the customer then cancels the purchase, the CCO should be contacted to resolve the matter, which may include:

- Consideration of whether the customer received a preliminary prospectus prior to confirming the purchase.
- Determination whether the customer should be held responsible for the purchase or the purchase cancelled.
- If cancelled and all other securities were sold in the underwriting, offer the new issue to another customer whose interest was not filled.
- If no other customer is available to purchase the securities, cancel the purchase to Alpine's account. The RR who sold the shares may be held responsible for any loss incurred due to the cancellation.

### 16.6.7 Designated Orders

When the firm has been designated by a customer and is not acting as underwriting manager, the following information will be retained for 24 months:

ALPINE_LIT168264

- name of customer making designation
- identity and amount of securities designated
- identity of manager or managers of the offering
- date of commencement of the offering

### 16.6.8 Securities Taken In Trade

Alpine may purchase or arrange the purchase of securities "taken in trade" only under the following conditions:

- as principal, at the fair market value
- as agent, charging a normal commission

"Taken in trade" means the customer sells a security pursuant to an agreement or understanding that the customer will purchase securities that are part of a distribution in which Alpine is participating. Any such arrangement requires approval of CCO prior to a transaction involving securities taken in trade.

### 16.6.9 Flipping

[FINRA Rule 5131(c)]

Customers may be limited or prohibited from purchasing future new issues at the syndicate supervisor's discretion because the customer engages in short-term trading of new issues (selling the new issue immediately or shortly after it becomes effective).

## 16.7 Transactions With Related Persons

When engaged in a fixed price offering, Alpine cannot sell to or place securities with anyone related to Alpine unless that person is subject to FINRA rules or is a non-member foreign broker or dealer subject to an agreement granting a selling concession, discount, or other allowance [FINRA Rule 2740(c)]. "Related person" means any person or account which directly or indirectly owns, or is owned by or is under common ownership with Alpine. "Owns" includes a person who directly or indirectly:

- Has the right to participate in more than 25% of the profits of the other person; or
- Owns beneficially more than 25% of the outstanding voting securities of the person.

This prohibition does not apply to placement in or sales to a Firm trading or investment account or a related person of Alpine after termination of the fixed priced offering if a bona fide public offering has been made.

## 16.8 Trading Restrictions While Participating In A Distribution

[SEC Regulation M; FINRA Notice to Members 97-10; FINRA Reg M Frequently Asked Questions: http://www.finra.org/Industry/Regulation/Guidance/P118758]

| Responsibility | • CCO |
|---|---|
| Resources | • Notification from the syndicate supervisor regarding pending deals<br>• Customer transaction reports |
| Frequency | • As required |
| Action | • Add to and remove from the Restricted List securities subject to Regulation M trading restrictions |

ALPINE_LIT168265

| | |
|---|---|
| | • Review transactions for compliance<br>• Where exceptions are identified, contact the RR and RR's supervisor regarding the transaction<br>• Determine whether the transaction must be cancelled |
| **Record** | • Notification from the syndicate supervisor<br>• Record of orders reviewed including exceptions and corrective action and reviewer's initials and date reviewed |

Trading restrictions apply to securities that are the subject of a distribution and also apply to a "reference security," a security into which the distributed security may be converted, exchanged, or exercised or where the terms of the distributed security may determine the value of the reference security. Bids for and purchases of outstanding nonconvertible debt securities are not restricted unless the security being purchased is identical in all terms to the security being distributed. Investment grade nonconvertible debt securities, nonconvertible preferred securities, and asset-backed securities are excluded from restrictions.

## 16.8.1 Distribution Participant Restrictions

[SEC Regulation M Rule 101]

Orders may not be solicited in the outstanding securities of an issue the subject of an underwriting (and reference securities) under certain conditions of Regulation M:

- No restriction for securities with average daily trading volume (ADTV, as defined in Rule 101) of $1 million or more and a public float of at least $150 million
- One business day restriction for securities with ADTV of at least $100,000 but less than $1 million and a public float of at least $25 million
- Five business days for all other securities

The syndicate supervisor will notify the CCO when an issue is subject to these restrictions. The CCO will update Alpine's Restricted List and will monitor daily transactions to inquire whether transactions are solicited or unsolicited, if not included on the order record. If transactions are solicited, the CCO will determine what corrective action is necessary.

The restriction remains in effect until price and trading restrictions are lifted.

## 16.8.2 Issuer And Selling Security Holder Restrictions

[SEC Regulation M Rule 102]

Issuers, selling security holders, and their affiliated purchasers are restricted from engaging in bidding for, purchasing, or attempting to induce someone else to bid or purchase for a distributed security.

## 16.8.3 Short Sales

[SEC Regulation M Rule 105; SEC Release No. 34-56206; SIFMA Capital Markets Committee FAQs about Rule 105: http://www.sifma.org/capital_markets/docs/RegMQAon105.pdf]

Short sellers may not cover short positions using securities purchased in an offering unless the short position was established more than 5 business days prior to pricing of the offering. This restriction does not apply to short sales of derivative securities.

ALPINE_LIT168266

### 16.8.4 Prohibited Conduct

[SEC Release No. 34-51500; SEC Guidance Regarding Prohibited Conduct in Connection with IPO Allocations]

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor |
| **Resources** | • Order records regarding IPO purchase and aftermarket transactions |
| **Frequency** | • As required, when issues are over-subscribed |
| **Action** | • Review purchases of IPOs vs. aftermarket purchases and sales to identify patterns which may indicate prior inducements<br>• Contact President and RRs regarding questionable transactions<br>• If violations are determined, take corrective action in consultation with CCO regarding disciplinary action against the RR |
| **Record** | • Transactions reviewed including reviewer, date reviewed, and action taken, if any |

Underwriters often engage in "bookbuilding" which involves seeking information from potential investors regarding their interest in the prospective issue including number of shares and price. Bookbuilding helps the pricing and success of the new issue.

There are related practices that are prohibited because they constitute attempts to induce aftermarket bids and purchases, which negatively affect the integrity of the distribution process. The following practices are **prohibited**, per the SEC:

1. Agreements to purchase shares in the aftermarket in exchange for an IPO allocation, prior to completion of the distribution. This includes agreements to purchase shares in another less desirable stock to obtain an IPO allocation.
2. Communicating to customers that expressing an interest in or buying shares in the immediate aftermarket would help them obtain allocations of over-subscribed ("hot") IPOs.
3. Soliciting customers before the completion of the distribution about whether and at what price and in what quantity the customer intends to place immediate aftermarket orders for IPO stock where the clear expectation and understanding is that the customer will submit aftermarket orders at the prices and quantities discussed if the customer receives an allocation of shares.
4. Proposing aftermarket prices to customers or encouraging customers who express aftermarket interest to increase the prices at which they are willing to place orders in the immediate aftermarket.
5. Soliciting interest from customers in purchasing aftermarket shares in some fixed proportion to the customer's IPO allocation.
6. Soliciting aftermarket orders from customers before all IPO shares are distributed or rewarding customers for aftermarket orders by allocating additional IPO shares to such customers.
7. Communicating to customers in connection with one offering that expressing an interest or buying in the aftermarket would help them obtain IPO allocations of other over-subscribed IPOs.

# 16.9 Market Making Activities

[SEC Regulation M Rule 103; FINRA Notice to Members 93-29; NASDAQ Rule 4600]

ALPINE_LIT168267

When Alpine is a market maker in an issue in which Alpine is participating in the underwriting, one of the two following procedures will be followed:

- Alpine will withdraw as a market maker during the restricted period, or,
- Alpine will engage in passive market making as defined in Rule 103 of Regulation M.

Passive market making procedures are discussed in the chapter *OTC EQUITY TRADING AND MARKET MAKING.*

The designated supervisor of equity trading is responsible for determining whether Alpine will act as a passive market maker and ensuring the required procedures are followed.

## 16.10 Regulation S Underwritings

### 16.10.1 Introduction

Regulation S provides safe harbor from registration requirements in the U.S. for offers and sales of securities outside the U.S. The Regulation includes extensive requirements for compliance and should be consulted. This section is provided as a synopsis of some of the restrictions and requirements.

The following restrictions apply to sales under Regulation S:

- Purchasers may not be a U.S. citizen or U.S. company
- Purchasers must be outside the U.S. at the time the buy order is originated
- Securities sold under Regulation S are classified as "restricted securities" within the meaning of Rule 144
- Securities may not be re-sold to U.S. persons (unless they are registered, meet the requirements of "Category 1" securities under Regulation S 230.903(b), or are subject to an exemption) during the distribution compliance period as defined in Regulation S (40 days for debt securities; one year for equities ["Category 2 or 3" securities])
- Purchasers must agree not to engage in hedging transactions
- Promissory notes may not be used to pay for securities

### 16.10.2 Purchaser Questionnaires

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Purchaser questionnaires |
| Frequency | • As required, prior to purchases |
| Action | • Review Purchaser Questionnaires to ensure they are complete and prospective purchasers meet the requirements of Regulation S<br>• Approve or disapprove Questionnaires |
| Record | • Questionnaires are signed and dated by the syndicate supervisor and retained in a file for the Regulation S offering |

ALPINE_LIT168268

Each purchaser of securities under Regulation S will be required to complete Alpine's Regulation S Purchaser Questionnaire. The syndicate supervisor is responsible for approving the Questionnaires prior to the purchase of shares.

### 16.10.3 Monitor Of Purchasers

The syndicate supervisor is responsible for establishing procedures to monitor Alpine accounts for customers who purchase securities under Regulation S to ensure the securities are not sold through Alpine within the restricted period.

## 16.11 Regulation A Offerings

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Information obtained regarding issuer from the issuer or other sources |
| Frequency | • As required |
| Action | • Determine issue meets Regulation A requirements and integration issues<br>• Evaluate issuer information and determine Alpine's participation |
| Record | • Regulation A and integration issue determinations and issuer information are retained in the deal file |

### 16.11.1 Introduction

This type of offering is available to domestic or Canadian issuers not subject to '34 Act reporting requirement or disqualification under "bad boy" provisions of Rule 262. Not available to investment companies, blank check companies, or issuers of oil, gas or mineral rights. The offering is limited to $5,000,000 within prior 12 months, but not more than $1,500,000 by selling security holders.

Regulation A is an amendment to the Securities Act of 1933 and provides for reduced requirements for smaller issuers in limited public offerings of issues up to $1.5 million. For a Regulation A offering, a limited registration statement is filed with the SEC. Key considerations for the syndicate supervisor include:

- whether the issuer is disqualified from distributions under Regulation A
- dollar limitations of the offering
- offers cannot be made prior to the filing of the registration statement and sales may not be effected until the offering statement is qualified

### 16.11.2 Dollar Limitation Of Offering

The syndicate supervisor is responsible for ensuring the issue is not oversold relative to the dollar amount disclosed in the offering document compared to the limitations provided in the rules. The supervisor should consider any "integration" of similar offerings by the same issuer for substantially identical purposes for determining whether the issuer meets the dollar limitation under the exemption within a 12-month period of time. The supervisor's review for integration may include one of the following or another procedure determined adequate by the supervisor:

ALPINE_LIT168269

- Reviewing the issuer's financial statements for the past 12 months and/or contact directly with the issuer
- Obtaining a representation letter from the issuer that states that no other offerings will be distributed in a succeeding 6-month period that would cause the exemption to be lost

The supervisor will retain a written record of this review in the offering's underwriting file.

### 16.11.3 Initiation Of Offers And Sales

The syndicate supervisor is responsible for notifying Alpine personnel when a Regulation A offering is available for offering and when the registration statement is qualified to permit sales. A written record of these notices will be retained in a file for the offering.

## 16.12 Best Efforts Underwritings

[SEC Securities Exchange Act of 1934 Rule 10b-9 and Rule 15c2-4; FINRA Notice to Members 84-7]

| Responsibility | • Syndicate Supervisor |
|---|---|
| Resources | • Information obtained regarding issuer from the issuer or other sources |
| Frequency | • As required |
| Action | • Evaluate issuer information and determine Alpine's participation<br>• Establish escrow account when necessary<br>• Confirm purchasers are *bona fide* purchasers where necessary<br>• Identify insiders, Alpine or employee account purchasers and obtain affirmation regarding holding period<br>• Close escrow account and, if contingency met, immediately forward purchaser funds to issuer or, if contingency is not met, immediately return funds to potential purchasers |
| Record | • Escrow account, issuer information and purchaser information are retained in the deal file |

### 16.12.1 Introduction

Best efforts underwritings may take different forms including "all or none," "minimum-maximum," or other offerings contingent on the sale of a certain amount of the issuer's securities. Two primary concerns are that customer funds be transmitted to the issuer or to an escrow account and that only *bona-fide* purchasers are included in order to meet a stated minimum number of shares or units. Where the minimum is not sold within the deadline specified by the prospectus, all customer funds must be refunded.

Sales will be made only to *bona-fide* purchasers to meet any minimum amount of the securities to be sold.

### 16.12.2 Customer Funds - Escrow Account

[SEC Securities Exchange Act of 1934 Rule 15c2-4]

The syndicate supervisor is responsible for establishing procedures for the protection of customer funds including the establishment of an escrow account where required.

ALPINE_LIT168270

- Establish an escrow account and execute Alpine's standard escrow agreement with a bank that is not affiliated with Alpine.
- Maintain copies of bank statements for the escrow account and review the statements when received, to ensure funds are not withdrawn prior to the date the contingency is met.
- Ensure customer funds are promptly deposited to the escrow account.
- Maintain records of all potential purchasers including the quantity to be purchased, when funds are received, and when funds are forwarded to the issuer or escrow account.
- Ensure checks are forwarded to the issuer (where an escrow account is not used) or to an escrow account by noon of the business day following receipt.
- Authorize release of funds to the issuer from an escrow account after the contingency is met and after a review of purchasers, as discussed in the next section, has been conducted.
- If the contingency is not met, promptly refund funds to potential purchasers.

### 16.12.3 Purchasers

The syndicate supervisor is responsible for establishing procedures regarding purchasers of securities issued through a best efforts underwriting including the following:

- Where the offering is contingent upon the sale of a certain quantity of the issue, confirm that all purchasers are *bona-fide* purchasers.
- Identify purchases by issuer insiders, Alpine's proprietary account, or employees of Alpine and, for those identified, obtain a written affirmation that the purchaser intends to hold the security as an investment or, in conjunction with the issuer, determine restrictions on immediate sale by such accounts.
- Record the review of purchasers in the deal file.

## 16.13 Prohibited Activities

### 16.13.1 Misrepresentation Of Registration With Regulators

[SEC Securities Exchange Act of 1934 Rule 15c1-3]

Alpine and its RRs will not misrepresent its affiliation with any regulatory body including an implication that regulatory registration indicates a regulator has passed upon or approved the financial standing, business, or conduct of Alpine or the merits of any security or transaction it performs.

Alpine and its employees may not:

- make material misstatements or omissions in the registration statement.
- fail to comply with applicable registration requirements.
- fail to provide a final prospectus when required.
- engage in fraudulent transactions.

### 16.13.2 Anti-Competitive Activities

The following are prohibited anti-competitive activities:

- The exchange of current price information among competitors to influence another firm's pricing of services
- Directing, requesting, or attempting to influence another member to maintain or adjust a price

ALPINE_LIT168271

- Engaging, directly or indirectly, in any conduct that threatens, harasses, coerces, intimidates, or otherwise attempts improperly to influence another firm or employee of another firm

### 16.13.3 Tying

[FINRA Notice to Members 02-64]

IPOs may not be sold to customers where:

- the purchase is tied to a promise from the customer to buy additional shares once trading begins in the new issue.
- the purchase of a highly desirable IPO is tied to the customer's promise to buy IPOs with less market interest.

### 16.13.4 Laddering

"Laddering" is another prohibited tying arrangement where an underwriter requires IPO investors to submit orders to buy additional shares of the same stock at higher prices after trading begins.

### 16.13.5 Quid Pro Quo

IPOs cannot be allocated based on a potential investor's agreement to pay excessive commissions on trades of unrelated securities.

### 16.13.6 Spinning

IPO shares will not be allocated to the personal brokerage accounts of corporate executives to gain their firm's investment banking or other business. The personal brokerage relationship of any corporate executive customer or prospect cannot be linked, directly or indirectly, to future business from the executive's company.

### 16.13.7 After-Market Sales

Other prohibited after-market activities include:

- attempts to keep investors from selling IPOs in the aftermarket
- soliciting after-market orders during an IPO
- imposing penalties on retail brokers in connection with immediate "flipping" by retail IPO investors but not by other categories of IPO participants, such as institutions
- requiring customers to sell back IPO shares to Alpine

### 16.13.8 Misrepresenting Pricing

[SEC Securities Exchange Act of 1934 Rule 15c1-8]

When participating in a primary or secondary distribution of a security which is not admitted to trading on a national securities exchange, Alpine or any employee cannot make a representation that the security is being offered to a customer "at the market" or at a price related to the market unless Alpine is aware of a *bona fide* market for the security which it or any affiliate does not control.

ALPINE_LIT168272

# 17 SUPERVISORY SYSTEM, PROCEDURES, AND CONTROLS

[Exchange Act Sec. 15(f); FINRA Rules 3010, 3012 and 3013; Notices to Members 04-71, 99-45, 89-34 and 88-84; FINRA web page: http://www.FINRA.com/supervisorycontrol], SEC Rule 15c3-5)

## 17.1 Introduction

Alpine has established a supervisory system, procedures and controls reasonably designed to comply with regulators' rules.

*Supervisory system:* The internal system to oversee business includes the designation of supervisors and allocation of responsibilities; assignment of RRs to appropriate supervisors; identification of areas of business and rules that govern those businesses; and development of procedures.

*Supervisory procedures:* Procedures in this manual (and in other policies or manuals, if referenced in specific chapters) include:

- compliance procedures for RRs and others that explain rule requirements and prohibitions as well as internal policies when conducting sales and other activities; and,
- supervisory procedures that explain how supervisors are to conduct their ongoing responsibilities. Most supervisory procedures are explained in "matrixes" that appear throughout this manual and include the following:

| Responsibility | • Betsy Voter, Chief Legal Officer<br>• Todd Groskreutz, Chief Financial Officer<br>• Douglas Wawzyrinski, Anti-Money Laundering Compliance Officer<br>• Leia Farmer, Chief Compliance Officer |
|---|---|
| Resources | • Supervisors utilize system generated reports and confirmations to conduct supervisory reviews. |
| Frequency | • Frequency of review is determined by the type of review as well as the items being reviewed. For example Trades and Certificates are reviewed for compliance daily. Review of email communications are also reviewed on a daily basis. |
| Action | • Supervision will be conducted in a manner consistent with the item under review. For example, review of and monitoring of email correspondence will be conducted; applications will be reviewed; complete review and analysis of trade certificates, etc. |
| Record | • Records are maintained of supervisory reviews which are conducted. For instance some reviewed documents will be initialed by the reviewer, others will be accompanied by review document which has been completed by the reviewer, review documents are maintained to facilitate further review, if necessary. |

ALPINE_LIT168273

Actions taken by Alpine to review supervisory reviews will test and measure the effectiveness of the review procedures utilized by Alpine. On a regular basis, Alpine will take steps to test systems and review output to ensure review procedures are producing the expected results.

## 17.2 Responsibility

Responsibility for Alpine's supervisory system, policies, and controls includes the following:

- Designated supervisors are responsible for enforcing policies and procedures in their respective business areas as described in Chapter 1 and specifically identified throughout the Written Supervisory Procedures ("WSP").
- The Chief Compliance Officer (CCO) is responsible for establishing and maintaining the supervisory system, policies and procedures for all areas of the firm other than financial and operations procedures.
- Alpine's Financial and Operations Principal ("FINOP") is also Alpine's Chief Financial Officer ("CFO") (FINOP and CFO may be used interchangeably in the WSP) and is responsible for establishing and maintaining systems, policies and controls regarding financial and accounting procedures and reporting.
- Alpine's Chief Operating Officer (COO) is responsible for establishing and maintaining systems, policies and controls regarding Direct Market Access (SEC Rule 15c3-5).

## 17.3 Controls

### 17.3.1 Controls to Ensure Supervisory Procedures Remain Current

The CCO or designee will:

- Subscribe and review FINRA weekly email services which identify proposed and new regulations and appropriate hotlinks to appropriate regulations;
- Review regulatory notices as new regulations are adopted;
- Review exam priorities published by FINRA on an annual basis;
- Review guidance issued by the Continuing Education Regulatory Council about areas for potential training, which provides some information in general on regulatory concerns;
- Evaluate the firm's Membership Agreement, applicable regulations and notices, and firm procedures prior to approval of any new product type for sale;
- Engage in communications with senior management on an as needed and periodic basis to assess any potential changes in business model anticipated.

### 17.3.2 Designation of Principal for Supervisory Control Procedures

Alpine designates the Chief Compliance Officer as responsible for establishing, maintaining, and enforcing a system of supervisory control policies and procedures that 1) test and verify that the member's supervisory procedures are reasonably designed with respect to the activities of the member and its registered representatives and associated persons, to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules and 2) create additional or amend supervisory procedures where the need is identified by such testing and verification.

### 17.3.3 Verification And Testing

At least annually, the CCO or designee will ensure that all testing of our procedures, as required under NASD Rule 3012, is undertaken and documented. The CCO may appoint other individuals to assist in the testing and verification process as long as such individuals are senior or otherwise independent of producing managers. All testing and verification of the adequacy of the supervisory control procedures must be independent of any business considerations that are countervailing to full compliance with applicable securities laws and regulations. Documents utilized in testing and verifying

ALPINE_LIT168274

the supervisory procedures will be maintained in an annual file along with the annual report to senior management and the Board of Directors.

Supervisory Review Procedures and Documentation

NASD Rule 3012 and FINRA Rule 3130 (formerly NASD Rule 3013) require testing to ensure our written supervisory procedures are reasonably designed to achieve compliance with all applicable regulatory laws and requirements. At least annually, Alpine's CCO or designee will ensure that appropriate testing has been undertaken, including these specific areas required under Rule 3012.

- All transmittals of funds (i.e., wires or checks, etc.) or securities from customers to third-party accounts that would result in change of beneficial ownership
- All transmittals of funds or securities from customer accounts to locations other than the customer's primary residence (i.e., post office box, "in care of" addresses or accounts, alternate addresses, etc.)
- All transmittals of customer funds or securities between customers and registered representatives (including the hand-delivery of checks)
- Change of customer addresses
- Change of customer investment objectives

We will maintain documentation of the results of each reviewed procedure in the files, indicating how the testing was done, who undertook the testing, the dates and the findings including any areas of weakness where a determination was made that our procedures either did not effectively serve their purpose or where individuals were not complying with the procedures. Any corrective measures taken as a result of testing findings will be documented as well.

Testing and verification generally include:

- Identifying areas to be reviewed at least annually
- Reviewing procedures and processes to ensure applicable rules and regulations are adequately addressed
- Developing reviews and a schedule for conducting the reviews
- Assigning responsibility for conducting reviews
- Preparing reports of reviews
- Providing reports to management, the audit committee (if applicable), and other appropriate personnel for potential corrective action
- Following up regarding deficiencies in subsequent reviews

Records of testing are maintained by the supervisor responsible for conducting testing and include:

- areas to be reviewed
- schedule of reviews
- reports of findings including a record of distribution of the report and responses from the supervisor of the area examined
- follow-up or corrective action taken

## 17.3.4 Creation and Amendment of Supervisory Procedures as a Result of Verification and Testing

Upon completion of the testing and verification processes, the CCO or designee and other appropriate personnel, as needed, will review the findings and recommendations. In doing so, Alpine will assess

ALPINE_LIT168275

what procedures should be adopted or amended in light of the findings. The firm will then develop and adopt such new or amended procedures and communicate them in accordance to firm policy on new and amended procedures. Alpine will maintain a copy of any changes in procedures as well as any memos of action actions taken in light of the supervisory controls report.

# 17.4 3012 Controls

## 17.4.1 Transmittal of Funds

NASD Rule 3012(a)(1)(2)(B)(i) requires that broker-dealers review and monitor the following activities:

(i) all transmittals of funds (e.g., wires or checks, etc.) or securities from customers to third party accounts (i.e., a transmittal that would result in a change of beneficial ownership); from customer accounts to outside entities (e.g., banks, investment companies, etc.); from customer accounts to locations other than a customer's primary residence (e.g., post office box, "in care of" accounts, alternate address, etc.); and between customers and registered representatives, including the hand-delivery of checks;

The policies and procedures established pursuant to paragraph (a)(2)(B) must include a means or method of customer confirmation, notification, or follow-up that can be documented. If Alpine does not engage in all of the activities enumerated above, we will identify those activities in which we do not engage in our written supervisory control policies and procedures and document in those policies and procedures that additional supervisory policies and procedures for such activities must be in place before we can engage in them.

### 17.4.1.1 Issuing Checks to Customers

Refer to the section titled "Issuing Checks to Customers" in the "Financial and Operations Procedures" Chapter.

### 17.4.1.2 Transmittals To Third Parties

| Responsibility | • Back office manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests to send funds/issue checks to third parties |
| Frequency | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| Action | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures |

ALPINE_LIT168276

|  | • in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
|---|---|
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

When a customer wishes funds or securities to be paid to a third party in the third party's name, the customer will be required to provide a signed LOA that specifies to whom the funds are to be paid.

### 17.4.1.3 Transmittals To An Alternate Address

Funds and securities will be sent to the customer's address of record, unless the customer provides **written** authorization to use an alternative address.

| **Responsibility** | • Back office manager or designee, unless noted otherwise |
|---|---|
| **Resources** | • Requests to send funds/issue checks to an alternate address |
| **Frequency** | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal |

ALPINE_LIT168277

| | |
|---|---|
| | procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

### 17.4.1.4 Transmittals To Outside Entities

Customers sometimes request the transfer of funds or securities in their accounts to a bank or other entity on their behalf. A signed LOA must be obtained to affect such a transfer including the customer's account number at the receiving bank or other entity.

| | |
|---|---|
| **Responsibility** | • Back office manager or designee, unless noted otherwise |
| **Resources** | • Requests to send funds/issue checks to third parties |
| **Frequency** | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

ALPINE_LIT168278

### 17.4.1.5 Transmittal or Withdrawal of Assets Requests Received Via E-Mail

**Background**

From FINRA Regulatory Notice 12-05 (reiterated from Regulatory Notice 09-64): "The requirement that firms have supervisory procedures for reviewing and monitoring transfers of customer assets applies to both clearing and introducing firms."

Alpine may receive transmittal requests via email or other electronic means from an Alpine client or Alpine registered representative (on behalf of the client). Alpine back office generally will receive transmittal instructions from an introducing firm and generally not from a client directly. Associated persons of introducing firms are responsible for their own firm's transmittal policies. Alpine back office is authorized to receive written requests from associated persons of the introducing firm. Instructions received by the back office will be processed in accordance with Alpine's current policies and procedures governing transmittal activities.

### 17.4.1.5.1 Alpine's Policy

Alpine does permit email or other electronic means of requesting funds or assets transmittals or withdrawals from client accounts, as enumerated below. Therefore, we have the following policies and procedures in effect.

- Our CCO or designee is responsible for ensuring that all employees are aware of the required safeguards we have in place to ensure the safety of our client funds and assets by requiring verification of email requests for funds or assets movement. Alpine has policies and procedures to review and monitor disbursements we make from customer accounts at the account holder(s) request.
- One of the risks associated with accepting instructions to withdraw or transfer funds by email and other electronic means is that customers' email accounts are susceptible to being breached by hackers or other intruders who may use the email accounts to commit fraud.
- We have put into effect policies and procedures regarding the acceptance of accepting instructions to withdraw or transfer funds via electronic means which are adequately designed to protect customer accounts from the risk that customers' email accounts may be compromised and used to send fraudulent transmittal or withdrawal instructions.
  - Alpine will accept emails from clients to send checks or stock certificates to the client's address of record.
  - For wire transmittal requests and requests to journal funds between accounts, Alpine will accept emails from clients which are accompanied by the required transmittal form that must be completed by the account holder and approved in writing by a firm principal.
  - Alpine will accept emails from clients for requests to send checks to an address other than the address of record provided that the request is approved by a firm principal. In those cases involving the transmittal of assets to a third party or to an address other than the address of record, Alpine sends a verification letter to the client's address of record.
  - Upon receiving verification that a request has been made by the client, procedures concerning oversight (including AML) of transmittals over a certain threshold, those that appear to be overly urgent, those which appear out of the ordinary based on client history, or those which request transmittal to a third-party account) will be in effect.
  - On a quarterly basis, utilizing exception reports showing movement of assets from client accounts, our AML Officer, CCO or their designees will undertake random sampling and testing of transfers and withdrawals to monitor for compliance.

Clients are advised to notify their registered representative immediately upon becoming aware that their email or other electronic means of communication have been compromised. In instances where

ALPINE_LIT168279

we are advised that the request did not come from the client, individuals are required to immediately notify their supervisor, the CCO or designee or the AML Compliance Officer who will ensure that an appropriate investigation is immediately begun, and that proper authorities (including FinCEN) are notified.

## 17.4.2 Change of Customer Addresses

NASD Rule 3012(a)(1)(2)(B)(i) requires that broker-dealers review and monitor the following activities, relating to customer changes of address and the validation of such address changes.

| Responsibility | • Back office manager or designee, unless noted otherwisec |
|---|---|
| Resources | • Requests for address changes |
| Frequency | • As required - send written notification to the customer<br>• Annual - review procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| Action | • Obtain required written LOA<br>• Process address change request in accordance with procedures<br>• **Send written notification to the customer that an address change has occurred (sent to the prior address of record, i.e. the address before the requested change)**<br>• Annually review procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review requests in branch/office audits including sampling of address change requests (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| Record | • Letters of instruction regarding address change (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

The Back office manager or designee is responsible for ensuring a signed written request for a change in address has been obtained from a client prior to any address change being affected. No

ALPINE_LIT168280

change of address requests will be processed without an appropriate letter of authorization. Change of address requests will be maintained in appropriate files as evidence.

To confirm the accuracy and validity of such changes, a letter will be sent to the client from the firm or its designee to the prior address of record.

### 17.4.3 Change of Investment Objectives

NASD Rule 3012(a)(1)(2)(B)(iii) requires that broker-dealers review and monitor the following activities, relating to customer changes of investment objectives and the validation of such changes of investment objectives.

| | |
|---|---|
| **Responsibility** | • Back office manager or designee, unless noted otherwise |
| **Resources** | • Requests for investment objective changes |
| **Frequency** | • As required - send written notification to the customer<br>• Annual - review notice of investment objective changes and procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain notice of investment objective change<br>• Process change request in accordance with procedures<br>• **Send written notification to the customer that an investment objective change has occurred**<br>• Annually review procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review requests in branch/office audits including sampling of investment objective change notices (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • Notices of investment objective changes (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

ALPINE_LIT168281

The Back office manager or designee is responsible for ensuring that investment objective changes have been obtained from a client prior to any change being affected. No change requests will be processed without appropriate investment objective change documentation. Change requests will be maintained in appropriate files as evidence.

To confirm the accuracy and validity of such changes, a letter will be sent to the client from the firm or its designee to the address of record.

## 17.4.4 Supervision of Producing Managers

NASD Rule 3012(a)(1)(2)(A)(i) requires that a "person who is either senior to, or otherwise independent of", the producing manager must perform such supervisory reviews. For purposes of this Rule, an "otherwise independent" person: may not report either directly or indirectly to the producing manager under review; must be situated in an office other than the office of the producing manager; must not otherwise have supervisory responsibility over the activity being reviewed (including not being directly compensated based in whole or in part on the revenues accruing for those activities); and must alternate such review responsibility with another qualified person every two years or less.

Alpine shall designate any producing managers and assign qualified supervisors to review the producing managers and the customer activity of such producing managers. The supervisor of the producing manager shall not be subject to any intimidation or other threats by such producing managers. If the supervisor of such producing manager believes he or she is being intimidated by such manager, he/she shall report such activity the CCO.

### 17.4.4.1 Reliance on the Limited Size and Resources Exception

Firms, so limited in size and resources that there is no qualified person senior to, or otherwise independent of, the producing manager to conduct reviews, or that do not have sufficient resources to alternate review responsibilities on a two-year cycle, may have the reviews conducted by a principal of the firm as long as that individual is sufficiently knowledgeable of the firm's supervisory control procedures, and provided that the reviews are in compliance with the provisions of Rule 3012(a)(2)(i) to the greatest extent possible.

Due to its size and structure, Alpine has determined that we qualify for the "Limited Size and Resources" exception under NASD Rule 3012(a)(2)(A)(ii) which relieves the duty of supervising a producing manager if there is lacking an "otherwise independent" individual to provide such supervision. Alpine qualifies for the Limited Size and Resource exception as it lacks sufficient number of individuals to perform alternation of reviews, and is unable to segregate an individual's responsibility from performance of supervisory reviews. We have notified FINRA through FINRA's prescribed processes at the time the rule became effective that Alpine relies on and the exception. Pursuant to NASD rule 3012(a)(2)(A)(iii), the CFO or designee will file electronically to notify FINRA of reliance on the Limited Size and Resources Exception on an annual basis.

Alpine has updated our procedures to document the factors (noted above) used in determining complete compliance with all of the provisions of the rule is **NOT** possible and that the firm's supervisory systems and procedures in place with respect to producing managers comply to the extent applicable to requirements for reviewing customer account activity of producing managers.

Should Alpine determine it no longer needs to rely on the exemption, the CCO or designee, within 30 days of ceasing to rely on the exception, will notify FINRA through FINRA prescribed processes of our plans to immediately put into effect a supervisory structure whereby each individual reviewing a producing manager's daily activities is either "senior to" or "otherwise independent of" the producing manager who is reviewed.

ALPINE_LIT168282

### 17.4.4.2 Heightened Supervision of Producing Managers

The CFO or designee is responsible for making a determination as to which offices and registered persons meet criteria for conducting heightened supervision. Alpine will place heightened supervision over any producing manager who is responsible for generating 20 percent or more of the revenue of the business units supervised by the producing manager's supervisor over the course of a rolling, twelve month period. For purposes of determining the 20 percent threshold, Alpine will look at all revenue generated by or credited to the producing manager or the producing manager's office, and that amount shall be included as part of the overall revenues of the business units supervised by the producing manager's supervisor irrespective of Alpine's internal allocation of such revenue.

In carrying out heightened supervision, Alpine will implement one or more of the following procedures:

- Unannounced audits of office locations where the producing manager has supervisory authority will be conducted at more frequent intervals than those prescribed by Alpine procedures on branch audits.
- Sweep reviews will be conducted, meaning Alpine will make special requests of information, such as communications, etc. to ensure compliance with firm policy and applicable regulations.
- Special reviews of activity of registered persons supervised by producing managers, when atypical high levels of production occur, new product sales, or overall level of production of a particular registered person under the producing manager's supervision.
- Special reviews of activity conducted by new registered persons within a branch office supervised by the producing manager.

Records and other material used in conducting heightened supervision will be maintained in supervisory control files.

### 17.4.5 Risk Management

[FINRA Notice to Members 99-92]

Alpine has established risk management procedures which are outlined in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*, in the section *Risk Management*.

### 17.4.6 Outside Auditors

Alpine's outside auditors conduct an annual review of internal financial and operational controls as well as compliance with selected rules and regulations. The FINOP (and other personnel, as required) is responsible for working with the outside auditors and providing them with requested information. The auditors' report is provided to senior management and Alpine's audit committee (if an audit committee has been established) who are responsible for delegating responsibility for taking corrective action on exceptions noted in the report.

The FINOP retains records of outside audits and reports.

## 17.5 Written Compliance And Supervisory Procedures (WSP)

[SEC Securities Exchange Act of 1934 Rule 17a-4(e)(7); NASD Rule 3010(b) and 3012(a)]

The CCO or designee is responsible for maintaining and updating Alpine's compliance and supervisory procedures which are included in this Manual.

This Manual is updated and policies distributed as follows:

ALPINE_LIT168283

- New and amended rules and releases from regulators are provided to Alpine through CCH Wall Street WSP Online ("CCH") service. The CCO reviews these updates when provided (currently every other month) and inserts such changes in the WSP as appropriate to Alpine's business.
- When changes are incorporated in the WSP, CCH includes the date of such revision.
- When policy and procedure changes affect personnel, the CFO or designee will distribute new or revised policies as follows:
  - In written form, where practical
  - By email
- The CCO or designee provides Manuals to new employees and obtains receipts that are maintained in employee files.
- If a new Manual is distributed, receipts will be requested and maintained in employee files.
- Policies may be made available to employees in electronic format. Receipts may also be in electronic format.

## 17.6 Designation of Chief Compliance Officer (CCO)

[FINRA Rule 3130(a)]

[FINRA Rule 3013]
Alpine has designated a CCO who is listed on the *Designation Of Supervisors* chart and on Schedule A of the Form BD. Evidence of this designation will be maintained on the Form BD in the webCRD system.

## 17.7 Annual Compliance Report To Senior Management and The Board of Directors

[FINRA Rule 3130]

The CCO or designee has established procedures to ensure that, at least annually on the anniversary date o fthe last report but no later than April 1st, Alpine submits a report to Alpine's senior management and the Board of Directors that describes:

- Our system of supervisory controls in place
- Summary of all test results
- Significant identified exceptions
- Additional or amended supervisory procedures created in response to test results

The report may also include key compliance issues. The report will be maintained in appropriate firm files on supervisory controls.

### 17.7.1 Annual Report

[FINRA Rule 3130]

The CCO or designee is required to create an annual report that documents the member's processes for establishing, maintaining, reviewing, testing and modifying compliance policies that are reasonably designed to achieve compliance with applicable FINRA rules, MSRB rules and federal securities laws and regulations. The report will include the manner and frequency in which the processes are administered, as well as the identification of the officers and supervisors who have responsibility for

ALPINE_LIT168284

such administration. The report must clearly indicate in title that it is responsive to the requirements of the certification process

The report will be produced prior to execution of the certification and be reviewed by the chief executive officer(s) (or equivalent officer(s)), chief compliance officer(s) and any other officers the member deems necessary to make the certification. Furthermore, the report must be provided to the member's board of directors and audit committee (if applicable) in final form either prior to execution of the certification or at the earlier of their next scheduled meetings or within 45 days of execution of the certification.

The report is available for review by FINRA or other regulatory bodies upon request. The annual report will be maintained in the annual certification files.

### 17.7.1.1 Certification

Per FINRA Rule 3130(b-c), the Chief Executive Officer or equivalent officer is responsible for certifying annually, no later than the anniversary date of the prior year's certification, the firm has in place processes to establish, maintain, review, test, and modify written compliance policies and written supervisory procedures reasonabley designed to achieve compliance with applicable FINRA rules, MSRB rules, and federal securities laws and regulation. The CEO or equivalent officer will further attest to the following:

- He/she has conducted one or more meetings with the CCO(s) in the preceding 12 months to discuss such processes;
- The final report has been submitted to the firm's board of directors and audit committee aor will be submitted to the firm's board of directors and audit committee (or equivalent bodies if they exist) at the earlier of their next scheduled meetings or within 45 days of the date of execution of this certification; and
- The CEO (or equivalent officer(s) has/have consulted with the CCO(s) and other officers where applicable and such other employees, outside consultants, lawyers and accountants, to the extent deemed appropriate, in order to attest to the statements made in this certification.

Certification does not, by itself, establish line supervisory responsibility for those involved in the certification process. Alpine will maintain a copy of the certification, with the required language, in the appropriate compliance file.

## 17.8 Meetings between CEO and CCO

The CEO or equivalent officer will meet once or more in the preceding 12 months with the CCO if not one in the same person, to review compliance matters the subject of the annual certification. The firm will document at a minimum the meeting held with the CEO in conjunction with providing the annual report to the CEO in the form of memo(s) or minute(s) and be maintained alongside the annual report to the CEO in the appropriate compliance file.

### 17.8.1 Required Language for the Annual Certification

The Chief Executive Officer or similarly named individual with the firm is required to annually certify:

1. The firm has in place processes to:

a. establish, maintain and review policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, MSRB rules and federal securities laws and regulations;

ALPINE_LIT168285

b. modify such policies and procedures as business, regulatory and legislative changes and events dictate; and

c. test the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.

2. The chief executive officer(s) (or equivalent officer(s)) has/have conducted one or more meetings with the chief compliance officer(s) in the preceding 12 months, the subject of which satisfy the obligations set forth in IM-3013.

3. The firm's processes, with respect to item 1 above, are evidenced in a report reviewed by the chief executive officer(s) (or equivalent officer(s)), chief compliance officer(s), and such other officers as the firm may deem necessary to make this certification. The final report has been submitted to the firm's board of directors and audit committee or will be submitted to the firm's board of directors and audit committee (or equivalent bodies) at the earlier of their next scheduled meetings or within 45 days of the date of execution of this certification.

4. The chief executive officer(s) (or equivalent officer(s)) has/have consulted with the chief compliance officer(s) and other officers as applicable (referenced in item 3 above) and such other employees, outside consultants, lawyers and accountants, to the extent deemed appropriate, in order to attest to the statements made in this certification The certification will be maintained in the annual certification files.

## 17.9 Direct Market Access

### Background

On November 3, 2010, the SEC adopted a new rule to require broker-dealers to have risk controls in connection with their market access. Rule 15c3-5 is intended to address the risks that can arise as a result of the automated, rapid electronic trading strategies that exist today and bolster the confidence of investors in market integrity. Rule 15c3-5 eliminates the practice known as "unfiltered" or "naked" access to an exchange or an alternative trading system (ATS).

**Effective Dates:**

The majority of SEC Rule 15c3-5 requires compliance to be in effect on July 14, 2011. Paragraph (c)(1)(i) of Rule 15c3-5, for all securities, was postponed until November 30, 2011.

**Definitions:**

Market access: (i) access to trading in securities on an exchange or alternative trading system as a result of being a member or subscriber of the exchange or alternative trading system, respectively; or (ii) access to trading in securities on an alternative trading system provided by a broker-dealer operator of an alternative trading system to a non-broker-dealer. Market access also refers to trading for Alpine's own proprietary accounts.

**Designated Supervising Principal**

ALPINE_LIT168286

Alpine's COO or designee will ensure that our participants' activities comply with all applicable securities rules and regulations, including those of FINRA and the exchange or ATS where orders are executed. Other responsibilities are described below.

**Supervisory Review Procedures and Documentation**

Alpine's COO or designee will ensure that financial risk management controls and supervisory procedures are reasonably designed to:

1.  Prevent the entry of orders that exceed appropriate pre-set credit including sub-limits or capital thresholds including intra-day changes to credit limits;
    a.  This also applies to orders that exceed the individually pre-determined credit thresholds
2.  Prevent the entry of orders that appear to be erroneous and exceed appropriate size and price parameters, including duplicative orders;
3.  Rejecting orders that exceed short period time checks and/or pre-determined price or size parameters;
4.  Prevent the entry of orders unless there has been compliance with all regulatory requirements that must be satisfied on a pre-order entry basis;
5.  Prevent the entry of orders that Alpine or the customer is restricted from trading;
    a.  This section refers to compliance with Regulation Sho, OATS, NMS, etc.
6.  Restrict market access technology and systems to authorized persons;
7.  Ensure appropriate surveillance personnel receive immediate post-trade execution reports.
    a.  Alpine will rely on the following post-trade execution reports utilized by Surveillance personnel as part of the review:
        i.   CNS Accounting Summary
        ii.  Account Monitoring: Security Activity by Account Class
        iii. Trade Blotter
    b.  Other personnel designated by Alpine will have access to the post-trade execution reports as part of the Trading system and related systems used by Alpine. Entitlements will be granted to designated parties.

The COO or designee will ensure that appropriate individuals are involved in the establishment of controls that systematically limit financial exposure arising from the trading activity of sponsored participants, such as establishing pre-set credit thresholds for each participant including Alpine and its proprietary accounts and setting certain prize, size or value parameters that would reject orders that exceed the established parameters. In addition, the COO or designee will follow established protocol to vet and approve customers at the broker-dealer who will be permitted to use the system, maintenance trading systems and restriction of access based on identity validation. Due diligence will also include a review of the individual customer's trading patterns and order entry history when setting order entry parameters.

Further, the COO or designee will monitor the credit thresholds of its customers with market access and make adjustments to the credit thresholds, controls and procedures, when necessary.

Currently, Alpine uses a Trading System to set requirements and to establish parameters for orderreview based on price, size and/or credit thresholds.

**Annual Reviews**

ALPINE_LIT168287

On an annual basis, the CCO or designee will perform a review of our business activity in connection with market access to assure the overall effectiveness of our risk management controls and supervisory procedures. The review will be documented and may be maintained as part of the 3012 report or may be maintained as part of a separate review.

**Annual CEO Certification**

Upon completion of each annual review, our CEO (or equivalent officer) will certify that our risk management controls and supervisory procedures comply with Rule 15c3-5 and that the annual review has been conducted.

**Allocation of Certain Functions Under the Market Access Rule**

The market access rule permits broker-dealers with market access to allocate certain responsibilities to a customer that is a broker-dealer provided that the market access broker-dealer has a reasonable basis for believing that the accessing broker-dealer has better access to the ultimate customer and can better implement those controls. The following activities could be allocated but is not an exhaustive list.

1. Risk management controls and supervisory procedures that require specific knowledge of the ultimate customer and its trading activity (a market access broker-dealer generally would not have access to this information); (examples include suitability and know your customer.
2. Risk management controls to prevent the ultimate customer from trading securities that the customer is restricted from trading
3. Surveillance for manipulation or fraud (e.g. wash sales, marking the close, insider trading)
4. Compliance with the locate requirement of Regulation Sho.

Should Alpine avail itself of this option, Alpine will:

1. Specify in writing which regulatory risk management controls and procedures are being allocated, articulate the scope of the arrangement and the specific responsibilities of each party;
2. Conduct due diligence to establish a reasonable basis for determining that the customer who is a broker-dealer has the capability and better access to the client; broker-dealer.
3. Establish, document and maintain procedures to regularly review the performance of the broker-dealer customer and the effectiveness of the allocated controls and procedures and promptly address any performance weaknesses.

Alpine may only allocate specific risk management controls and supervisory procedures to a customer that is a registered broker-dealer as long as Alpine has a reasonable basis for determining that the customer, based on its relationship with the ultimate customer, can more effectively implement them.

**Allocation of Control Obligations (Third Party Vendors)**

Alpine may permit third parties independent of our market access customers to perform routine maintenance or implement technology upgrades on our risk management controls. Should we avail ourselves of this option, Alpine will conduct reasonable due diligence regarding any changes to the controls and their implementation. Alpine recognizes that we would retain responsibility for the effectiveness of the risk management controls in this area.

ALPINE_LIT168288

## 17.10 Cross Reference To Other WSP Supervisory Control Subjects

The purpose of this section is to identify SRO supervisory control rule subjects that do not appear in the chapter *SUPERVISORY SYSTEM, CONTROLS AND PROCEDURES* and that appear in other chapters of this manual.

| Subject | CHAPTER | Section / Subsection(s) |
|---------|---------|-------------------------|
| Transmission of customer funds and securities to: <br>• Third parties <br>• Outside entities (banks, investment companies, *etc.*) <br>• Post office or c/o addresses <br>• Customer by RRs | FINANCIAL AND OPERATIONS PROCEDURES | Transmittals Of Customer Funds And Securities |
| | ACCOUNTS | • *Addresses On Customer Accounts* <br>• *New Accounts - Post Office Addresses* |
| Confirming changes in customer investment objectives | ACCOUNTS | • *New Accounts - Customer Account Information* <br>• *Updating Account Information And Periodic Affirmation* |
| Customer changes of address | ACCOUNTS | Addresses On Customer Accounts |
| | FINANCIAL AND OPERATIONS PROCEDURES | Customer Confirmations And Statements - Change Of Customer Addresses On Accounts |
| Time and price discretion for orders | ORDERS | Time And Price Discretion |
| Account designation changes on orders | ORDERS | Account Designation And Cancels/Rebills |
| Holding customer mail | FINANCIAL AND OPERATIONS PROCEDURES | Customer Confirmations And Statements - Hold Mail Instructions |
| Office inspections | OFFICES | Office Inspections |

ALPINE_LIT168289

# 18 ALPINE'S INFORMATION DESTRUCTION POLICY

## 18.1 Introduction and Overview

### 18.1.1 Information Destruction Policy

It is the policy of Alpine Securities Corporation (hereafter referred to as "Alpine" or "the firm") to 1) protect the Personal Information of its clients and employees, 2) comply with state and federal regulations to protect/destroy such information when discarded, and 3) protect confidential client-sensitive information and proprietary information. This document implements the official Information Destruction Policy of Alpine and is intended to provide direction to all employees regarding the appropriate retention schedule and acceptable methods for destroying discarded information in order to protect the firm, its clients and employees.

Compliance with the policy and with the requirements herein when discarding or destroying information owned or maintained by the firm is considered a condition of employment.

Failure to adhere to the requirements within this Information Destruction Policy could result in disciplinary action, dismissal, civil proceedings, regulatory penalties, and/or legal prosecution.

### 18.1.2 Policy Development, Implementation and Oversight

#### 18.1.2.1 Policy Development

Alpine's Chief Compliance Officer is responsible for the development and amendments to the firm's Information Destruction Policy. The policy shall be reviewed annually, or at anytime that there is substantive change in regulatory requirements, or under any circumstance that may otherwise provide cause for such a review.

#### 18.1.2.2 Policy Approval

Alpine's Chief Compliance Officer, upon advice from the Legal Counsel, is responsible for the final approval of the Information Destruction Policy or any modifications made to it.

#### 18.1.2.3 Orientation & Training

Alpine's Chief Compliance Officer, is responsible for implementation and documentation of the orientation of employees to the Information Destruction Policy. This training may involve the participation of outside contractors hired to provide information management or destruction services.

#### 18.1.2.4 Contracting/Purchasing

Alpine's Chief Compliance Officer is responsible for the contracting of any third party (Approved Service Provider) to provide information destruction services. Alpine's senior management team may also be responsible for contracting of any third party (Approved Service Provider) to provide information destruction services.

#### 18.1.2.5 Compliance Auditing/Review

Alpine's Chief Compliance Officer or designee is responsible for auditing employee compliance with the Information Destruction Policy on a periodic basis, as well as documenting and retaining a record of violations of the policy.

### 18.1.3 Employee Orientation/Training

ALPINE_LIT168290

### 18.1.3.1 Orientation/Training

Upon hiring, and whenever updated, all employees shall 1) be properly oriented on the firm's information destruction procedures, 2) be issued a copy of the Information Destruction Policy (which may be incorporated as part of the firm's written supervisory procedures or maintained as a separate document and 3) execute the appropriate acknowledgement.

### 18.1.3.2 Acknowledgement

Upon completion of initial and ongoing orientation, employees shall sign the *Information Destruction Program Awareness Acknowledgement (if the policy is maintained as part of a separate document)* verifying their understanding of, and their agreement to comply with, the requisite policies and procedures contained in the Policy. If the policy is included as part of the firm's written supervisory procedures, the employee will be required to acknowledge that he/she has read the firm's written supervisory procedures, including Alpine's Information Destruction Policy.

## 18.1.4 Information Destruction Policy

Employees should direct all questions regarding compliance with the Information Destruction Policy to Alpine's Chief Compliance Officer.

Employees are required to inform their supervisor if at any point they become aware of a potential risk of unauthorized access to client information or any violation of the firm's policy.

In the event that the supervisor is unavailable or is unresponsive, employees should direct questions or report threats and violations to Alpine's Chief Compliance Officer or Alpine's General Counsel.

Alpine will not engage in or tolerate any discrimination, retribution, punishment or persecution of any employee who exposes any potential data breach risk or violation to the Information Destruction Policy.

# 18.2 Information Destruction Procedures

All discarded Information-Bearing Media will be destroyed prior to disposal. Alpine relies on an Approved Service Provider, duly contracted with Rocky Mountain Document Destruction, for all paper media destruction.

## 18.2.1 Paper Media

Paper Media refers to all types of paper business communications bearing information, including but not limited to forms, notes, memos, messages, correspondence, transaction records and reports.

### 18.2.1.1 Authorization for Destruction of Paper Media

#### 18.2.1.1.1 Paper Media (Incidental Records)

No approvals or authorizations are required for the destruction of Paper Media that is NOT subject to the firm's current Records Retention Schedule.

#### 18.2.1.1.2 Paper Media (Retained/Controlled)

Employees shall NOT destroy or otherwise discard any Paper Media that could be construed as being subject to the firm's current Records Retention Schedule without written authorization directly from his/her supervisor.

If there is any question as to whether the media is subject to the firm's current Records Retention Schedule, the employee should seek instruction from his/her supervisor or Alpine's Chief Compliance Officer.

ALPINE_LIT168291

### 18.2.1.2 Securing Paper Media Prior to Destruction

Incidental Paper Media intended for disposal/destruction should be collected in a designated Collection Container prior to leaving the office for the day.

## 18.2.2 Other Media Disposal

Other Media (non-paper media) includes but is not limited to Magnetic Tape &/or Optical Media (CD/DVD), PDAs/Mobile Phones, Computers, Hard Drives, or Stored Records.

### 18.2.2.1 Authorization for Destruction of Other Media Disposal

#### 18.2.2.1.1 Other Media Disposal (Incidental Records)

No approvals or authorizations are required for the destruction of Other Media Records (non-paper media) that are NOT subject to the firm's current Records Retention Schedule.

#### 18.2.2.1.2 Other Media (Retained/Controlled)

Employees shall NOT destroy or otherwise discard any Paper Media that could be construed as being subject to the firm's current Records Retention Schedule without written authorization directly from his/her supervisor. The supervisor should consult with Alpine's IT Committee, if there are questions.

If there is any question as to whether the media is subject to the firm's current Records Retention Schedule, the employee should seek instruction from his/her supervisor or Alpine's Chief Compliance Officer.

# 18.3 Qualifications and Selection of an Approved Service Provider

Alpine relies on a properly contracted Approved Service Provider for destruction services. Only members of the firm's senior management has the authority to select and contract with an Approved Service Provider.

# 18.4 Retention Requirements

## 18.4.1 Books and Records/Retention Requirements

Please bear in mind that Alpine is subject to multiple regulatory regimes and must maintain books and records in accordance with federal, SRO and state securities rules and regulations. The official Books and Records Retention Schedule is available here. If there is any question as to whether the media is subject to the firm's current Books and Records Retention Schedule, the employee should seek instruction from his/her supervisor or Alpine's Chief Compliance Officer.

## 18.4.2 Default Retention Requirement

Certain books and records may not have a retention specifically noted in the Books and Records Retention Schedule. These books and records should be retained for four years.

# 18.5 Policy Compliance

## 18.5.1 Auditing Internal Compliance

Alpine's Chief Compliance Officer or designee shall be responsible to audit compliance with the Information Destruction Policy on a periodic basis.

## 18.5.2 Litigation Hold/Stop Destruction Order

In certain circumstances, it may be necessary to stop the destruction of records related to a specific subject. These include litigation, reasonable expectation of litigation, and internal or regulatory audits.

ALPINE_LIT168292

There are potentially very serious negative consequences to the organization for destroying information or records subject to these circumstances.

In the event of such circumstances arising, Alpine's General Counsel will issue a *Litigation Hold/Stop Destruction Order* to each departmental supervisor with specific instructions. Each supervisor will be responsible for communicating the information with all those employees who report to the supervisor.

Employees will be expect to comply with the *Litigation Hold/Stop Destruction Order* until such time as General Counsel has notified employees in writing that documents can be destroyed in accordance with Alpine's books and records and records policies.

ALPINE_LIT168293

WSP Manual

Copyright (c) 2013 Wolters Kluwer Financial Services. All Rights Reserved.

The Broker Dealer Wizard is designed to create a compliance manual addressing SEC, FINRA, NYSE, and MSRB rules and regulations. It is the subscriber's responsibility to adapt and edit the Broker Dealer manual to ensure the subscriber's written procedures are accurate and adequate to comply with securities rules and regulations applicable to the subscriber's firm. Wolters Kluwer and others ("others") providing information to compile the Broker Dealer manual accept no responsibility for the accuracy or completeness of the subscriber's written procedures. Information in the Broker Dealer Wizard and manual are not intended as substitutes for legal advice or to provide legal guidance of any kind whatsoever. Your Broker Dealer manual is published with the understanding that Wolters Kluwer and others are not engaged in rendering legal or other professional services. Subscribers are advised to confer with experienced legal counsel.

The Broker Dealer Wizard and Broker Dealer manual contents are owned by Wolters Kluwer Financial Services. Contents may not be copied or otherwise reproduced other than for the internal use of the subscribers firm under the terms of the subscription.

ALPINE_LIT168294