# Exhibit 14

# WSP Manual

# Alpine Securities Corporation

**October 01, 2015**

ALPINE_LIT168778

# TABLE OF CONTENTS

INTRODUCTION................................................................................................................1
1 DESIGNATION OF SUPERVISORS AND OFFICES ................................................2
  1.1 Designation Of Supervisors ..................................................................................2
  1.2 Designation Of Offices ...........................................................................................4
  1.3 Supervision of Form Filings ...................................................................................5
  1.4 Organization Chart and Line of Authority ...............................................................6
2 OFFICES ...................................................................................................................8
  2.1 Office Designations ................................................................................................8
    2.1.1 Branch Office .....................................................................................................9
    2.1.2 Non-Branch Locations .......................................................................................9
    2.1.3 Offices Of Supervisory Jurisdiction (OSJ) .......................................................10
    2.1.4 Branch Offices Assigned To OSJs ...................................................................11
    2.1.5 Non-Branch Business Locations .......................................................................11
  2.2 Use Of Office Space By Outsiders .........................................................................12
  2.3 Office Records ........................................................................................................12
    2.3.1 Retention Of Records At The Office ..................................................................13
    2.3.2 Regulatory Requests For Records ....................................................................13
  2.4 Changes In Branch Offices .....................................................................................13
  2.5 Office Inspections ...................................................................................................13
    2.5.1 Risk-Based Inspection Cycle ............................................................................14
    2.5.2 Conducting Inspections ....................................................................................15
    2.5.3 Reports .............................................................................................................15
  2.6 Display Of Certificates ............................................................................................16
  2.7 Availability Of Rules ................................................................................................16
3 GENERAL EMPLOYEE POLICIES ...........................................................................17
  3.1 Standards Of Conduct ............................................................................................17
  3.2 Outside Business Activities .....................................................................................17
  3.3 Private Securities Transactions ...............................................................................18
  3.4 Employee And Employee Related Accounts ...........................................................19
    3.4.1 Employee And Employee Related Accounts Defined ........................................19
    3.4.2 Outside Accounts .............................................................................................19
    3.4.3 Review Of Transactions ...................................................................................20
    3.4.4 Insider Trading .................................................................................................21
    3.4.5 Sharing In Accounts .........................................................................................21
    3.4.6 Prohibition On Purchases Of Initial Public Offerings (IPOs)..............................22
    3.4.7 Research Restrictions .......................................................................................22
    3.4.8 Restrictions On Personal Accounts Of Certain Alpine Personnel ......................22
  3.5 Gifts, Gratuities And Entertainment ........................................................................22
    3.5.1 Gifts To Others .................................................................................................24
    3.5.2 Accepting Gifts .................................................................................................24
    3.5.3 Entertainment ...................................................................................................24
    3.5.4 Gifts, Loans, And Entertainment Involving Unions And Union-Affiliated Individuals .........................25
  3.6 Privacy Policy .........................................................................................................25
  3.7 Reporting Possible Law Or Rule Violations .............................................................26
    3.7.1 Reporting ..........................................................................................................27
    3.7.2 Confidentiality Of Employee Reporting .............................................................27
    3.7.3 Notification To The Chief Compliance Officer ...................................................27
    3.7.4 Investigation .....................................................................................................27
    3.7.5 Anti-Retaliation ................................................................................................27
    3.7.6 Federal Whistleblower Laws And Rules ............................................................27
  3.8 Charitable Contributions .........................................................................................27
  3.9 Media Contact Is Limited To Certain Authorized Employees ...................................28
  3.10 Requests For Information From Outside Sources ...................................................29
  3.11 Internal Reviews And Investigations .....................................................................29

**ALPINE_LIT168779**

3.12 Internal Disciplinary Actions..............................................................................................................30
3.13 Employee Obligation To Notify The Firm And The Firm's Obligation To Report ............................30
   3.13.1 Employee Obligation To Notify The Firm ....................................................................................30
   3.13.2 Alpine's Reporting Requirements ................................................................................................32
3.14 Money Laundering .............................................................................................................................34
   3.14.1 Reports Of AML Non-Compliance And Other Potential Crimes ..................................................34
   3.14.2 Identity Theft ..............................................................................................................................35
   3.14.3 Tape Recording of Registered Persons by Certain Firms-Taping Rule ......................................35
3.15 Emergency Business Recovery Procedures .......................................................................................36
3.16 Prohibited Activities ..........................................................................................................................37
   3.16.1 Registered Representatives .........................................................................................................37
   3.16.2 Use Of Firm Name ......................................................................................................................39
   3.16.3 High Pressure Sales Tactics .......................................................................................................39
   3.16.4 Providing Tax Advice Not Permitted ..........................................................................................39
   3.16.5 Rebates Of Commission ..............................................................................................................39
   3.16.6 Sharing Commissions Or Fees With Non-Registered Persons ....................................................39
   3.16.7 Accepting Compensation From Others ........................................................................................40
   3.16.8 Settling Complaints Or Errors Directly With Customers ...........................................................40
   3.16.9 Borrowing From And Lending To Customers ..............................................................................40
   3.16.10 Personal Funds Deposited In Customer Accounts .....................................................................40
   3.16.11 Prohibition Against Guarantees ...............................................................................................40
   3.16.12 Fees And Other Charges ...........................................................................................................41
   3.16.13 Customer Signatures .................................................................................................................41
   3.16.14 Rumors ......................................................................................................................................41
   3.16.15 Misrepresentations ...................................................................................................................41
   3.16.16 Bribes ........................................................................................................................................41
   3.16.17 Acting Without Registration ....................................................................................................41
   3.16.18 Improperly Influencing Research Analysts ...............................................................................42
3.17 Computer Records, Equipment And Software ....................................................................................42
   3.17.1 Laptop Computers And Other Mobile Devices ...........................................................................43
   3.17.2 Reporting Lost Devices ...............................................................................................................43
   3.17.3 Identifying And Reporting Data Breaches ..................................................................................43
   3.17.4 Software ......................................................................................................................................43
   3.17.5 Prohibited Downloading ............................................................................................................43
3.18 Electronic Communications Policy .....................................................................................................43
   3.18.1 Introduction ................................................................................................................................43
   3.18.2 Summary Of Policy .....................................................................................................................44
   3.18.3 Electronic Communications Defined ...........................................................................................44
   3.18.4 Instant Messaging .......................................................................................................................44
   3.18.5 Guidelines For Proper Use ..........................................................................................................45
   3.18.6 E-Mail ........................................................................................................................................46
   3.18.7 Personal Digital Assistants (PDAs) ............................................................................................47
   3.18.8 Internet .......................................................................................................................................47
   3.18.9 Failure To Comply ......................................................................................................................48
   3.18.10 Consent To Policy ......................................................................................................................48
   3.18.11 Mobile Devices ..........................................................................................................................48
   3.18.12 Final Points Concerning Alpine's Electronic Communications Policy.......................................49
3.19 Advertising And Publishing Activities ...............................................................................................51
3.20 Employees Acting As Trustees, Executors, Or Other Fiduciary Capacities .....................................51
3.21 Use Of Titles .....................................................................................................................................51
3.22 Annual Certification...........................................................................................................................51
3.23 Sales of Unregistered Securities .......................................................................................................52
   3.23.1 Preventing Sales of Unregistered Securities ..............................................................................52
   3.23.2 Knowing the Customer and the Securities ..................................................................................53
   3.23.3 Reports of Suspected or Attempted Sales of Unregistered Securities ........................................53
   3.23.4 Actions to be Taken to Prevent Sales of Unregistered Securities ...............................................53
4 TRAINING AND EDUCATION ................................................................................................................55
4.1 Annual Compliance Meeting................................................................................................................55

ALPINE_LIT168780

4.2 Continuing Education...................................................................................55
    4.2.1 Regulatory Element...............................................................................56
    4.2.2 Firm Element........................................................................................57
    4.2.3 Registered Persons Who Fail To Complete Requirements.....................59
5 EMPLOYMENT, REGISTRATION AND LICENSING.......................................60
    5.1 Employment............................................................................................60
        5.1.1 Hiring Procedures................................................................................60
        5.1.2 Termination Procedures.......................................................................66
    5.2 Registration And Licensing......................................................................68
        5.2.1 CRD Electronic Filings .........................................................................68
        5.2.2 Registration Requirement.....................................................................70
        5.2.3 Requests For Waivers ..........................................................................70
        5.2.4 State Registrations ..............................................................................70
        5.2.5 Parking Registrations ..........................................................................70
        5.2.6 Form U4 ..............................................................................................71
        5.2.7 Amendments To Form U4 Or Form U5 ..................................................71
        5.2.8 Assignment Of RR Numbers .................................................................71
    5.3 Statutorily Disqualified Persons ...............................................................71
        5.3.1 Introduction.........................................................................................72
        5.3.2 Hiring A Statutorily Disqualified Person ...............................................73
        5.3.3 Regulatory Filings...............................................................................73
        5.3.4 Supervision..........................................................................................73
        5.3.5 Reporting Statutory Disqualifications ...................................................73
    5.4 Retiring Representatives ...........................................................................73
    5.5 Broker-Dealer Registration .......................................................................74
        5.5.1 Form BD ...............................................................................................74
        5.5.2 Change In Ownership, Control, Or Business Operations .........................74
        5.5.3 Regulatory Filings...............................................................................75
        5.5.4 Reporting Requirements .......................................................................75
    5.6 Heightened Supervision............................................................................76
        5.6.1 Introduction.........................................................................................76
        5.6.2 Identifying Employees For Heightened Supervision................................77
        5.6.3 Criteria For Identifying Candidates For Heightened Supervision ............77
        5.6.4 Heightened Supervision Memorandum ..................................................77
        5.6.5 Scope Of Potential Heightened Supervision ..........................................77
        5.6.6 Certification By RR's Supervisor ...........................................................78
6 INDEPENDENT CONTRACTORS.....................................................................79
    6.1 Independent Contractor Defined...............................................................79
    6.2 Supervision.............................................................................................79
    6.3 Agreements.............................................................................................79
    6.4 Use And Display Of The Firm's Name .......................................................79
    6.5 Display Of SIPC Symbol ..........................................................................80
    6.6 Use Of Other Names ...............................................................................80
    6.7 ICs As Investment Advisers .....................................................................80
    6.8 Outside Business Activities And Outside Accounts....................................80
7 COMMUNICATIONS WITH THE PUBLIC .........................................................81
    7.1 Definitions...............................................................................................81
    7.2 Retail Communications ............................................................................82
        7.2.1 FINRA Filing Requirements ..................................................................82
    7.3 Institutional Communications ...................................................................84
    7.4 General Standards....................................................................................84
        7.4.1 Comparisons ........................................................................................85
        7.4.2 Disclosure Of The Firm's Name ...........................................................85
        7.4.3 Tax Considerations ..............................................................................85
        7.4.4 Disclosure Of Fees, Expenses And Standardized Performance ...............85
        7.4.5 Recommendations ................................................................................86
        7.4.6 Prospectuses Filed With The SEC .........................................................86
        7.4.7 Limitations On Use Of FINRA's Name And Any Other Corporate Name Owned By FINRA..............86

ALPINE_LIT168781

7.5 Approval ................................................................................................................. 87
7.6 Testimonials ........................................................................................................... 87
7.7 Telemarketing Scripts ............................................................................................ 88
7.8 SIPC Membership ................................................................................................... 88
7.9 Communications Defined as "Research" ................................................................ 88
    7.9.1 Adoption of Policies and Procedures to Comply with Rule 2711 and Annual Certification by Senior
Officer ........................................................................................................................... 88
7.10 Recordkeeping Requirements For Retail And Institutional Communications ........ 89
7.11 Outgoing Communications .................................................................................... 89
    7.11.1 Prohibition Against Sending Correspondence From Personal Computers And Other Non-Firm
Facilities ...................................................................................................................... 89
    7.11.2 Review And Approval ....................................................................................... 89
    7.11.3 Content Guidelines .......................................................................................... 91
    7.11.4 Letters And Notes ........................................................................................... 92
    7.11.5 Facsimiles ....................................................................................................... 92
7.12 Incoming Correspondence .................................................................................... 92
    7.12.1 Review Of Incoming Correspondence .............................................................. 92
    7.12.2 Personal Mail .................................................................................................. 93
7.13 Legends And Footnotes ........................................................................................ 93
7.14 Internal Communications ...................................................................................... 93
    7.14.1 Inter-Office Communications ........................................................................... 93
    7.14.2 Internal Use Only ............................................................................................ 94
    7.14.3 Squawk Box, Conference Calls, And Other Internal Communication Systems ... 94
7.15 Investment Analysis Tools ..................................................................................... 94
    7.15.1 Disclosures ..................................................................................................... 95
    7.15.2 Filing Requirements ......................................................................................... 95
7.16 Complaints ............................................................................................................ 96
    7.16.1 Complaint Defined .......................................................................................... 96
    7.16.2 Handling Of Customer Complaints .................................................................. 96
    7.16.3 Handling of Oral Complaints ........................................................................... 96
    7.16.4 Records Of Complaints .................................................................................... 97
    7.16.5 Notice To Customers ....................................................................................... 97
    7.16.6 Reporting Of Written Customer Complaints ..................................................... 97
7.17 Customer Privacy Policies And Procedures .......................................................... 98
    7.17.1 Introduction ..................................................................................................... 99
    7.17.2 "Public" vs. "Nonpublic" Personal Information About Customers ...................... 99
    7.17.3 Sharing Nonpublic Financial Information .......................................................... 99
    7.17.4 Customer Notification ...................................................................................... 99
    7.17.5 Protection Of Customer Information And Records ............................................ 100
    7.17.6 Access To Customer Information Via Wi-Fi ...................................................... 100
    7.17.7 Remote Access To Customer Accounts ........................................................... 101
    7.17.8 Disposal Of Consumer Report Information And Records .................................. 101
7.18 Regulation S-AM ................................................................................................... 101
7.19 Scripts .................................................................................................................. 101
7.20 Prohibition Against Payments Involving Publications To Influence Market Prices ... 102
7.21 Pre-recorded Voice Messages And Automatic Telephone Dialing Systems (Autodialers)... 102
7.22 Calling (Telemarketing) And Fax Restrictions ...................................................... 102
    7.22.1 Introduction ..................................................................................................... 103
    7.22.2 Telephone Calls ............................................................................................... 104
    7.22.3 Wireless Communications ................................................................................ 104
    7.22.4 Outsourcing Telemarketing .............................................................................. 104
    7.22.5 Unencrypted Consumer Account Numbers ...................................................... 104
    7.22.6 Submission Of Billing Information .................................................................... 104
    7.22.7 Abandoned Calls ............................................................................................. 105
    7.22.8 Credit Card Laundering ................................................................................... 105
    7.22.9 Other Prohibited Activities .............................................................................. 105
    7.22.10 Do Not Call Lists ........................................................................................... 105
    7.22.11 National Do-Not-Call Registry ....................................................................... 106

ALPINE_LIT168782

7.22.12 State Restrictions .................................................................................................. 106
7.22.13 Internal Do Not Call List ...................................................................................... 107
7.22.14 Facsimile Transmissions ....................................................................................... 107
7.22.15 Established Business Relationship ......................................................................... 107
7.23 Public Speaking ............................................................................................................ 107
7.23.1 General Guidelines ................................................................................................. 108
7.23.2 Approval ................................................................................................................. 108
7.23.3 Radio, TV, And Other Extemporaneous Presentations ........................................ 108
7.23.4 Securities Sold By Prospectus ............................................................................... 109
7.23.5 Options ................................................................................................................... 109
7.23.6 Collateralized Mortgage Obligations (CMOs) ..................................................... 109
7.23.7 Mutual Funds ......................................................................................................... 109
7.24 Cold Callers .................................................................................................................. 109
7.24.1 Cold Caller Requirements ..................................................................................... 109
7.24.2 Permissible Cold Caller Activities ........................................................................ 109
7.24.3 Prohibited Cold Caller Activities .......................................................................... 110
7.24.4 Telemarketing Restrictions .................................................................................... 110
7.24.5 Scripts .................................................................................................................... 110
7.25 Electronic Communications .......................................................................................... 110
7.25.1 Electronic Communications Policy ........................................................................ 110
7.25.2 Electronic Mail (E-mail) ....................................................................................... 110
7.25.3 Instant Messaging .................................................................................................. 113
7.25.4 Advertising ............................................................................................................. 114
7.25.5 Bulletin Boards, Web Sites And Other Electronic Communication Systems ......... 114
7.25.6 Hyperlinks .............................................................................................................. 115
7.26 Identification Of Sources ............................................................................................. 116
8 FINANCIAL AND OPERATIONS PROCEDURES ............................................................ 117
8.1 Qualification Of Operations Personnel ......................................................................... 117
8.2 Books And Records ....................................................................................................... 117
8.2.1 Introduction ............................................................................................................ 117
8.2.2 Electronic Storage Of Records .............................................................................. 117
8.3 Calculation And Reporting Of Net Capital ................................................................... 119
8.4 Reports .......................................................................................................................... 120
8.4.1 Annual Audit Reports - Facing Page ..................................................................... 120
8.4.2 Compliance Report ................................................................................................. 121
8.5 Risk Reports .................................................................................................................. 122
8.6 Reconciliations And Bank Records ............................................................................... 122
8.7 Financial Reporting ....................................................................................................... 122
8.7.1 Preparation Of Financial Reports .......................................................................... 123
8.7.2 Financial Statements .............................................................................................. 123
8.7.3 Disclosure Of Financial Condition ......................................................................... 124
8.7.4 Notification Rule ("Early Warning Rule") ............................................................. 124
8.8 Fees And Service Charges ............................................................................................. 124
8.8.1 Notification Of Customers ..................................................................................... 125
8.9 Fidelity Bonding ............................................................................................................ 125
8.10 Cash Deposits .............................................................................................................. 125
8.11 Risk Management ......................................................................................................... 126
8.11.1 Risk Assessment ................................................................................................... 126
8.11.2 Risk Practices Regarding Employment And Employees ....................................... 127
8.11.3 New Accounts ....................................................................................................... 127
8.11.4 Cybersecurity ........................................................................................................ 128
8.11.5 Handling Customer Funds And Securities ............................................................ 131
8.11.6 Extension Of Credit .............................................................................................. 131
8.11.7 Proprietary Accounts ............................................................................................ 131
8.11.8 New Products ........................................................................................................ 132
8.12 Business Continuity Plan ............................................................................................. 133
8.12.1 Designation Of Responsibilities ........................................................................... 133
8.12.2 Retention And Location Of The Plan .................................................................... 134

ALPINE_LIT168783

8.12.3 Implementation Of The Plan ...................................................................................134
8.12.4 Emergency Response Team ..................................................................................134
8.12.5 Emergency Contact List .......................................................................................135
8.12.6 Alternative Business Locations .............................................................................135
8.12.7 Data Back-Up And Recovery ...............................................................................135
8.12.8 Mission Critical Systems .......................................................................................135
8.12.9 Financial And Operational Assessments ..............................................................135
8.12.10 Alternative Communications ...............................................................................136
8.12.11 Business Constituent, Bank, And Counter-Party Impact ...................................137
8.12.12 Other Obligations To Customers ........................................................................137
8.12.13 Emergency Contact Information ..........................................................................138
8.12.14 Widespread Health Emergencies .......................................................................138
8.12.15 Education Of Employees .....................................................................................139
8.12.16 Updating, Annual Review, And Testing ...............................................................139
8.13 Customer Payments For Purchases ...............................................................................139
8.14 Notification Rule ("Early Warning Rule") .........................................................................140
8.15 Regulation T And Extension Of Credit To Customers .....................................................140
8.15.1 Guaranteed Accounts ...........................................................................................141
8.16 Transmittals Of Customer Funds And Securities ............................................................141
8.16.1 Issuing Checks To Customer .................................................................................141
8.16.2 Transmittals involving U.S. account holders who seek to transfer funds internationally (international wire transfers and international ACH transfers) .................................................................142
8.16.3 Transmittals To Third Parties ................................................................................144
8.16.4 Transmittals To An Alternate Address ...................................................................145
8.16.5 Transmittals To Outside Entities ...........................................................................146
8.16.6 Transmittals Between Customers And Registered Representatives ......................146
8.16.7 Prepayments And Extensions ...............................................................................147
8.16.8 Suspicious Or Questionable Activities ...................................................................147
8.16.9 Exemption From 15c3-3 ........................................................................................147
8.17 Checking Account Safeguards ........................................................................................147
8.17.1 Checking Account Safeguards ..............................................................................147
8.18 Customer Protection .......................................................................................................148
8.18.1 Introduction ...........................................................................................................148
8.18.2 Possession And Control Of Securities ..................................................................149
8.18.3 Buy-In Procedures ................................................................................................151
8.18.4 Sell out Procedures ..............................................................................................152
8.18.5 Special Reserve Bank Account .............................................................................152
8.19 Customer Confirmations And Statements .......................................................................153
8.19.1 Control Of Blank Confirmations And Statements ..................................................153
8.19.2 Change Of Customer Addresses On Accounts .....................................................153
8.19.3 Holding Customer Mail Prohibited .........................................................................154
8.19.4 Confirmation Disclosures ......................................................................................154
8.20 Lost Security Holders and Unresponsive Payees (Rule 17Ad-17 and Rule 17a-24)............155
8.20.1 Searches for Lost Securityholders ........................................................................156
8.20.2 Classification as Unresponsive Payees .................................................................156
8.20.3 Unnegotiated Checks ............................................................................................156
8.21 Subordination Agreements With Investors ......................................................................156
8.22 Expense-Sharing Agreements .........................................................................................156
8.23 Transfer Of Accounts ......................................................................................................157
8.24 Solicitation Of Proxies .....................................................................................................160
8.25 Customer Requests For References .................................................................................160
8.26 Audit Letters ...................................................................................................................160
8.27 Annual Disclosure Of FINRA BrokerCheck .....................................................................161
8.28 Short Interest Report .......................................................................................................161
8.29 Electronic Blue Sheets ....................................................................................................161
8.30 Other Regulatory Inquiries/Requests ...............................................................................162
8.30.1 Information Provided Via Portable Media Device ...................................................163
8.31 Regulatory Fees And Assessments .................................................................................163

8.32 INSITE Reporting Requirements ................................................................................................163
8.33 Outsourcing ...............................................................................................................................163
8.34 Protection Of Firm And Customer Systems And Data ..............................................................166
8.35 Correspondent Clearing.............................................................................................................167
9 ANTI-MONEY LAUNDERING (AML) PROGRAM..............................................................................168
9.1 Firm Policy ...................................................................................................................................168
  9.1.1 Background ............................................................................................................................168
9.2 AML Officer Designation and Duties............................................................................................169
9.3 Updates to the FINRA Contact System .......................................................................................169
9.4 General Summary of AML Officer Duties .....................................................................................170
9.5 Giving AML Information to Federal Law Enforcement Agencies and Other Financial Institutions...........170
  9.5.1 Requests and Written Notices From Enforcement Agencies .................................................170
  9.5.2 Federal Banking Agency Requests - 120 Hour Rule............................................................171
  9.5.3 FinCEN Requests Under USA PATRIOT Act Section 314(a) ...............................................171
  9.5.4 National Security Letters .......................................................................................................172
  9.5.5 Grand Jury Subpoenas .........................................................................................................172
  9.5.6 Voluntary Information Sharing with Other Financial Institutions Under USA PATRIOT Act Section
  314(b) .............................................................................................................................................172
9.6 Checking the Office of Foreign Assets Control (OFAC) Listings .................................................173
  9.6.1 Prohibited Transactions.........................................................................................................175
  9.6.2 Blocking Requirements..........................................................................................................175
  9.6.3 Monitoring Procedures ..........................................................................................................176
  9.6.4 Blocking Property And Disbursements ..................................................................................176
  9.6.5 Penalties for Non-Compliance with OFAC Rules and Regulations .......................................177
9.7 Customer Identification Program (CIP).........................................................................................177
  9.7.1 Required Customer Information .............................................................................................178
  9.7.2 Verifying Information .............................................................................................................180
  9.7.3 Recordkeeping ......................................................................................................................182
  9.7.4 Comparison with Government-Provided Lists of Terrorists....................................................182
  9.7.5 Notice to Customers ..............................................................................................................182
  9.7.6 Reliance on Another Financial Institution for Identity Verification ........................................182
9.8 Due Diligence For Correspondent And Private Banking Accounts ..............................................183
  9.8.1 Definitions .............................................................................................................................183
  9.8.2 Due Diligence and Enhanced Due Diligence Requirements For Correspondent Accounts of Foreign
  Financial Institutions.......................................................................................................................185
  9.8.3 Foreign Bank Certification ....................................................................................................188
  9.8.4 Recordkeeping for Correspondent Accounts for Foreign Banks ...........................................188
  9.8.5 Summons or Subpoena of Foreign Bank Records; Termination of Correspondent Relationships with
  Foreign Bank ..................................................................................................................................188
9.9 Due Diligence For Private Banking Accounts ..............................................................................188
  9.9.1 Definitions .............................................................................................................................188
  9.9.2 Enhanced Scrutiny For Accounts Of Senior Foreign Political Figures ..................................190
  9.9.3 Private Banking Accounts Introduced by a Correspondent Firm (or Introducing Firm) ..........190
9.10 Compliance with FinCEN's Issuance of Special Measures Against Foreign Jurisdictions, Financial
Institutions or International Transactions of Primary Money Laundering Concern ............................190
9.11 Detecting Potential Money Laundering .......................................................................................192
  9.11.1 Alpine's Employee Reporting Obligations ...........................................................................192
  9.11.2 Role Of Operations Personnel ............................................................................................193
  9.11.3 Role of Retail Brokerage Personnel ...................................................................................193
  9.11.4 Monitoring Accounts for Suspicious Activity .......................................................................193
  9.11.5 Emergency Notification to Law Enforcement by Telephone .................................................195
  9.11.6 Potential Red Flags .............................................................................................................195
  9.11.7 AML Recordkeeping Requirements .....................................................................................204
9.12 Clearing/Introducing Firm Relationships ...................................................................................206
9.13 Training Programs ......................................................................................................................206
9.14 Independent Testing, Evaluation and Reporting.........................................................................207
9.15 Monitoring Employee Conduct and Accounts Programs .............................................................208
9.16 Confidential Reporting of AML Non-Compliance ........................................................................208

ALPINE_LIT168785

9.17 Penalties for Non-Compliance with Alpine Policy or BSA, USA PATRIOT ACT Or Other AML Rules and Regulations ........................................................................................................................................208
9.18 Additional Risk Areas ..........................................................................................................................208
9.19 Identity Theft Prevention Program (Regulation S-ID: Identity Theft Red Flags) ...............................209
    9.19.1 Identity Theft Prevention Program Firm Policy ............................................................................211
    9.19.2 ITPP Approval and Administration ................................................................................................211
    9.19.3 Relationship to Other Firm Programs ...........................................................................................211
    9.19.4 Identifying Relevant Red Flags .....................................................................................................211
    9.19.5 Detecting Red Flags ......................................................................................................................212
    9.19.6 Preventing and Mitigating Identity Theft .......................................................................................212
    9.19.7 Alpine Employees Reporting Obligations ......................................................................................214
    9.19.8 Service Providers ...........................................................................................................................214
    9.19.9 Internal Compliance Reporting ......................................................................................................214
    9.19.10 Updates and Annual Review .......................................................................................................214
    9.19.11 Red Flag Identification and Detection Grid .................................................................................214
9.20 Senior Manager Approval ....................................................................................................................217
10 INSIDER TRADING ..................................................................................................................................218
10.1 Insider Trading Policies And Procedures .............................................................................................218
10.2 Prohibition Against Acting On Or Disclosing Inside Information .........................................................219
10.3 Tippees Are Insiders ............................................................................................................................219
10.4 Misuse Constitutes Fraud ....................................................................................................................219
10.5 Annual Certification ..............................................................................................................................219
10.6 Firm Policy Memorandum Regarding Insider Trading .........................................................................219
10.7 Employee, Employee-Related, And Proprietary Trading .....................................................................222
10.8 Information Barrier Procedures ............................................................................................................222
    10.8.1 Introduction ...................................................................................................................................223
    10.8.2 Departments Subject To Information Barrier Confidentiality Procedures .....................................223
    10.8.3 Confidentiality Procedures ............................................................................................................223
    10.8.4 Access To Confidential Information Limited To Certain Employees ..............................................224
    10.8.5 Bringing An Employee "Over the Wall" .........................................................................................224
    10.8.6 Notification To Compliance ...........................................................................................................224
    10.8.7 Monitoring The Information Barrier ................................................................................................224
    10.8.8 Education And Training Of Employees ..........................................................................................224
10.9 Watch List .............................................................................................................................................225
11 ACCOUNTS ..............................................................................................................................................226
11.1 New Accounts .......................................................................................................................................226
    11.1.1 Customer Identity Verification .......................................................................................................226
    11.1.2 Identity Theft .................................................................................................................................232
    11.1.3 SIPC Disclosure ............................................................................................................................232
    11.1.4 Approval of New Accounts ............................................................................................................233
    11.1.5 Customer Account Information ......................................................................................................233
    11.1.6 Addresses On Customer Accounts ...............................................................................................234
    11.1.7 Account Documents ......................................................................................................................235
    11.1.8 Predispute Arbitration Agreements With Customers .....................................................................235
    11.1.9 Revisions To Customer Agreements .............................................................................................236
    11.1.10 Accounts Requiring Notification To Customer's Employer ..........................................................236
    11.1.11 Post Office Addresses .................................................................................................................236
    11.1.12 Unacceptable Accounts ..............................................................................................................236
11.2 Accounts And Securities Subject To Blocking .....................................................................................237
11.3 Updating Account Information And Periodic Affirmation ......................................................................237
11.4 Sweep Programs ..................................................................................................................................238
11.5 Third Party Accounts ............................................................................................................................239
11.6 Discretion For Orders And Accounts ...................................................................................................239
11.7 Accounts For Minors ............................................................................................................................240
11.8 Coverdell Education Savings Accounts ...............................................................................................240
11.9 Accounts For Senior Investors .............................................................................................................241
    11.9.1 General Requirements ...................................................................................................................242
    11.9.2 Opening Accounts For Senior Investors ........................................................................................242

ALPINE_LIT168786

11.9.3 Opening Accounts For Senior Investors.................................................................................242
11.9.4 Diminished Mental Capacity...................................................................................................242
11.10 Incompetent Persons............................................................................................................243
11.11 Trust Accounts.......................................................................................................................243
11.12 Correspondent And Private Banking Accounts And Accounts For Senior Foreign Political Figures....243
11.12.1 Summary Of Requirements...................................................................................................243
11.12.2 Definitions.............................................................................................................................244
11.12.3 Prohibition Against Correspondent Accounts For Foreign Shell Banks...............................244
11.12.4 Foreign Bank Certification....................................................................................................245
11.12.5 Accounts For Foreign Political Figures................................................................................245
11.13 Collateral/Escrow Accounts...................................................................................................245
11.14 Wealth Events.......................................................................................................................245
11.15 Pension And Retirement Accounts........................................................................................245
11.15.1 Employee Retirement Income Security Act (ERISA).............................................................246
11.15.2 General Guidelines When Offering Retirement Plans...........................................................249
11.15.3 Individual Retirement Accounts (IRAs).................................................................................249
11.15.4 Employer-Sponsored Plans...................................................................................................252
11.16 Foreign Accounts...................................................................................................................253
11.17 Payments to Unregistered Persons.......................................................................................253
11.17.1 Definition Of Eligibility..........................................................................................................254
11.17.2 Referrals...............................................................................................................................254
11.18 Death Of A Customer.............................................................................................................255
11.19 Customer Portfolio And Cross-Reference Records...............................................................255
11.20 Active Accounts.....................................................................................................................256
11.21 Concentrations.......................................................................................................................256
11.21.1 Penny Stock Rules................................................................................................................257
11.21.2 Rule 15g-1 et. seq..............................................................................................................257
11.22 Concentrated Positions..........................................................................................................261
12 ORDERS..........................................................................................................................................262
12.1 Acceptance And Prompt Entry Of Orders...............................................................................262
12.2 Orders Requiring Approval......................................................................................................262
12.3 Solicited And Unsolicited Orders............................................................................................263
12.3.1 Definition Of Solicited Order...................................................................................................263
12.3.2 Solicited Orders Should Be Indicated....................................................................................263
12.3.3 Prohibited Solicitations..........................................................................................................263
12.4 Suitability Of Recommendations.............................................................................................264
12.4.1 General Requirements............................................................................................................265
12.4.2 Institutional Accounts.............................................................................................................268
12.4.3 Recommendations Of OTC Equity Securities........................................................................268
12.4.4 Proprietary Products..............................................................................................................271
12.5 Fair Prices...............................................................................................................................271
12.5.1 Mark-Up Policy.......................................................................................................................272
12.5.2 Prohibition Against Trading Ahead Of Customer Orders........................................................273
12.5.3 Front Running Of Block Transactions.....................................................................................275
12.6 Regulation NMS......................................................................................................................276
12.7 Orders In Volatile Stocks (Limit Up/Limit Down)....................................................................276
12.8 Illiquid Investments.................................................................................................................276
12.9 Account Designation And Cancels/Rebills..............................................................................277
12.10 Trading Halts..........................................................................................................................277
12.11 Trade Reporting By Third Parties...........................................................................................278
12.12 Trading Systems And Electronic Transmission Of Orders.....................................................279
12.12.1 Clearly Erroneous Transactions...........................................................................................279
12.13 Order Records........................................................................................................................280
12.14 Net Trading............................................................................................................................280
12.15 Extended Hours Trading........................................................................................................280
12.16 Large Trader Rule...................................................................................................................281
12.16.1 Large Trader Definition.........................................................................................................282
12.16.2 Identifying Activity Level.......................................................................................................282

ALPINE_LIT168787

12.16.3 Large Trader Identification Number (LTID) ...........................................................282
12.16.4 Filings ...........................................................................................................................282
12.16.5 Large Trader Monitoring/ Reporting (SEC Rule 13h-1)........................................283
12.16.6 Records .........................................................................................................................284
12.17 Conflicts Of Interest ...............................................................................................................284
12.17.1 Adverse Interest ..........................................................................................................285
12.17.2 Precedence Of Customer Orders ..............................................................................285
12.18 Review Of Customer Transactions .......................................................................................286
12.18.1 Review Of Daily Transactions ...................................................................................286
12.18.2 Unauthorized Transactions .......................................................................................286
12.18.3 Review Of Account Activity By Designated Supervisors ......................................287
12.19 Trade Errors ............................................................................................................................287
12.20 Sellouts ....................................................................................................................................288
12.21 Time Clock Synchronization .................................................................................................288
12.22 Blue Sky Of Securities ...........................................................................................................289
12.22.1 General Requirements .................................................................................................289
12.23 Short Sales ...............................................................................................................................289
12.23.1 Marking Orders ............................................................................................................290
12.23.2 The Locate Rule ...........................................................................................................290
12.23.3 Naked Short Selling (SEC Rule 10b-21) ....................................................................291
12.23.4 Close and Pre-Borrow Rule ........................................................................................291
12.24 Sale of Control or Restricted Stock, (effect. June 23, 2014)..............................................291
12.24.1 Introduction .................................................................................................................291
12.24.2 Definitions ...................................................................................................................292
12.24.3 New Account Information to Identify Affiliates .......................................................293
12.25 Unregistered Resales Of Restricted Securities, (effect. June 23, 2014) ...........................293
12.25.1 Cautionary "Red Flags" .............................................................................................295
12.25.2 Resales under Rule 144 ...............................................................................................296
12.25.3 Overview of Rule 144 Requirements .........................................................................296
12.25.4 Sales under Rule 144 ...................................................................................................301
12.26 Additional Resale Theories ...................................................................................................301
12.26.1 Rule 504 ........................................................................................................................301
12.26.2 Registration Statements on Form S-1 .......................................................................302
12.26.3 Registration Statements on Form S-8 .......................................................................302
12.26.4 Shares Issued through Section 3(a)(10) "Fairness Hearing"...................................303
12.26.5 Securities Issued through 1145 Bankruptcy Proceeding.........................................303
12.26.6 Securities Issued in Company Acquisitions—Rule 145...........................................304
12.26.7 Regulation A .................................................................................................................304
12.26.8 Attorney's Opinions ....................................................................................................304
12.27 Reporting Of Insider Transactions .......................................................................................304
12.28 Penny Stocks ...........................................................................................................................305
12.28.1 General Requirements .................................................................................................306
12.28.2 Penny Stock Defined ...................................................................................................306
12.28.3 Established Customer Defined ...................................................................................307
12.28.4 Suitability Information ................................................................................................307
12.28.5 Risk Disclosure Document .........................................................................................307
12.28.6 Two-Business-Day Waiting Period ............................................................................307
12.28.7 Disclosure Of Quotations And Other Information ..................................................307
12.28.8 Disclosure Of Compensation .....................................................................................307
12.29 Tax Switching Transactions ...................................................................................................308
12.30 Order Audit Trail System (OATS) ........................................................................................308
12.30.1 Who And What Orders Are Subject To OATS Requirements ................................308
12.30.2 Registering With OATS ...............................................................................................309
12.30.3 List Of Contact Persons .............................................................................................310
12.30.4 Capture Of Required OATS Information ..................................................................310
12.30.5 Reporting Of OATS Information ................................................................................310
12.30.6 Clock Synchronization ...............................................................................................312
12.30.7 OATS Contact Information .........................................................................................312

ALPINE_LIT168788

12.31 Disclosure Of Order Execution Procedures ................................................................312
12.32 Order Routing And Reporting ....................................................................................312
    12.32.1 Disclosure Of Order Routing .............................................................................312
    12.32.2 Orders Covered By The Rule .............................................................................313
    12.32.3 Information Included In The Reports ...................................................................313
    12.32.4 Customer Requests For Order Routing Information ...........................................314
12.33 Distribution, Consolidation, And Display Of Information ............................................314
12.34 Cash And Non-Cash Compensation Policy ...............................................................314
    12.34.1 Definitions .........................................................................................................314
    12.34.2 Approval ............................................................................................................315
    12.34.3 Types Of Permissible Non-Cash Compensation ...............................................315
12.35 Prohibited Transactions And Practices .....................................................................315
    12.35.1 Introduction .......................................................................................................316
    12.35.2 Unauthorized Trading ........................................................................................316
    12.35.3 Prearranged Trading .........................................................................................316
    12.35.4 Adjusted Trading ...............................................................................................317
    12.35.5 Overtrading Or Undertrading .............................................................................317
    12.35.6 Wash Transactions ...........................................................................................317
    12.35.7 Cross Transactions ...........................................................................................317
    12.35.8 Orders At The Opening Or Close .......................................................................317
    12.35.9 Parking Securities ..............................................................................................317
    12.35.10 Churning ..........................................................................................................317
    12.35.11 Trade Shredding ..............................................................................................318
12.36 Comission Recapture Programs/Soft Dollar Arrangements .......................................318
12.37 Trading Ahead of Research Reports ..........................................................................318
13 ONLINE TRADING SERVICES ........................................................................................319
13.1 System Controls (NASD NTM 04-66) ..........................................................................319
    13.1.1 Testing System Controls (NASD NTM 04-66) ......................................................319
13.2 Security of Online Trading Activity / Information Security / Data Integrity Review Procedures and
Documentation ....................................................................................................................319
13.3 Customer Accounts (NASD NTM 02-21) .....................................................................319
13.4 Market Access Controls ..............................................................................................319
13.5 Online Information & Disclosures .................................................................................319
13.6 Privacy Policy ..............................................................................................................320
13.7 Orders .........................................................................................................................320
13.8 Online Offerings ..........................................................................................................320
13.9 Margin Requirements and Short Sales ........................................................................320
13.10 Order Review .............................................................................................................320
13.11 Best Execution Procedures and Documentation ........................................................320
13.12 Supervisory Review Procedures and Documentation Regarding Suitability ...............320
13.13 Customer Service .......................................................................................................321
13.14 Advertising .................................................................................................................321
13.15 Complaints .................................................................................................................321
13.16 Extended Hours Trading ............................................................................................321
14 OTC EQUITY TRADING AND MARKET MAKING ...........................................................322
14.1 Automatic Execution Of Orders ..................................................................................322
14.2 Minimum Pricing Increment .........................................................................................322
    14.2.1 Minimum Quotation Size .....................................................................................323
14.3 Introduction .................................................................................................................323
    14.3.1 Supervisory Reviews ...........................................................................................323
    14.3.2 Regulation NMS ..................................................................................................323
14.4 General Requirements For OTC Traders ....................................................................328
    14.4.1 Qualification And Registration Of OTC Traders ..................................................328
    14.4.2 Continuing Education ...........................................................................................329
    14.4.3 Training ...............................................................................................................329
    14.4.4 Annual Compliance Meeting ................................................................................329
    14.4.5 Traders' Personal Accounts ................................................................................329
    14.4.6 Information Barrier Procedures (Chinese Walls) ..................................................330

ALPINE_LIT168789

14.4.7 OTC Trader's Annual Certification ...................................................................330
14.4.8 Disciplinary Policy ......................................................................................330
14.5 Initial Market Maker Requirements ...........................................................................331
14.5.1 Selection Of Securities ................................................................................332
14.5.2 NGM And NASDAQ Capital Market Securities .................................................332
14.5.3 IPOs And Syndicates ..................................................................................332
14.5.4 Non-Exchange-Listed Securities ...................................................................332
14.5.5 MPIDs (Market Participant Identifiers) ...........................................................334
14.5.6 Prohibition Against Receiving Payments ........................................................335
14.6 Quotations ...........................................................................................................335
14.6.1 Quotation Requirements And Obligations ......................................................336
14.6.2 Dissemination Of Quotations .......................................................................337
14.6.3 Firm Quote Obligations ...............................................................................337
14.6.4 Non-Exchange Listed Security Quotations Displayed In Multiple Quotation Mediums ..................337
14.6.5 Requirement To Publish An Inferior Quote .....................................................337
14.6.6 Reasonable Spreads ...................................................................................338
14.6.7 Backing-Away ............................................................................................338
14.6.8 Improving Public Quotes: Limit Orders ..........................................................338
14.6.9 OTC Securities Quoted In Different Quotation Mediums ...................................338
14.6.10 OTCBB Continuing Quotation Requirements .................................................339
14.6.11 NASDAQ Market Opening Process ..............................................................339
14.6.12 NASDAQ Closing Cross .............................................................................339
14.6.13 Locked And Crossed Markets .....................................................................340
14.6.14 Quotation Recording And Reporting ............................................................340
14.6.15 Termination Of Market Maker Registration And Withdrawal Of Quotes ..............341
14.6.16 After Hours Trading ...................................................................................342
14.6.17 Publication of Transactions & Quotations .....................................................342
14.6.18 Prohibited Practices Relating To Publication Of Quotations ............................343
14.7 Handling Orders And Executions ..............................................................................343
14.7.1 Best Execution ...........................................................................................344
14.7.2 Fair Prices .................................................................................................349
14.7.3 Prohibition Against Trading Ahead Of Customer Orders ...................................352
14.7.4 Front Running Of Block Transactions ............................................................353
14.7.5 Market Orders ............................................................................................354
14.7.6 Limit Orders ...............................................................................................355
14.7.7 Marking Orders ...........................................................................................358
14.7.8 Naked Short Selling AntiFraud Rule ..............................................................360
14.7.9 Close and Pre-Borrow Rule ..........................................................................361
14.7.10 Block-Sized Orders ...................................................................................361
14.7.11 Not Held Orders ........................................................................................362
14.7.12 Orders With Special Terms Or Conditions ....................................................362
14.7.13 Average Price Transactions ........................................................................362
14.7.14 Net Trading ..............................................................................................363
14.7.15 Phone Orders ...........................................................................................364
14.7.16 Rule 144 Transactions ...............................................................................364
14.7.17 Self-Trades ..............................................................................................365
14.7.18 Trading Halts ............................................................................................366
14.8 NASDAQ Execution Services/BATS/ARCA ...............................................................367
14.8.2 NASDAQ Market Center ..............................................................................368
14.8.3 Sponsored Access ......................................................................................368
14.9 Consolidated Quotation System (CQS) Securities .......................................................369
14.9.1 Trade-Throughs .........................................................................................369
14.9.2 Short Sales In CQS Securities .....................................................................369
14.9.3 CQS Security Subject To An IPO ..................................................................370
14.9.4 Reporting Transactions in CQS Securities .....................................................370
14.9.5 Limit Order Protection Interpretation ("Manning Obligations") ...........................370
14.10 CQS Market Maker Requirements ...........................................................................370
14.10.1 One Percent (1%) Rule (Statutory Market Maker) .........................................371

ALPINE_LIT168790

14.11 FINRA Alternative Display Facility (ADF) ...................................................................372
   14.11.1 Changing From An Automated To A Manual Quotation ............................................372
   14.11.2 Trading Halts ......................................................................................................373
   14.11.3 Access Requirements ...........................................................................................373
   14.11.4 ADF Trade Reporting ..........................................................................................373
14.12 Other Requirements .............................................................................................373
   14.12.1 Inventory Positions .............................................................................................373
   14.12.2 Schedule 13G Reports ........................................................................................374
   14.12.3 Authorized Use Of NASDAQ Workstations ...............................................................374
   14.12.4 Adequate Staffing ..............................................................................................375
   14.12.5 Issuer Repurchases Of Common Stock ..................................................................375
   14.12.6 Errors ..............................................................................................................376
   14.12.7 Clearly Erroneous Transaction Procedures ............................................................377
   14.12.8 Customer Order Errors ........................................................................................377
   14.12.9 System Outages .................................................................................................377
14.13 Distributions Of Securities ....................................................................................378
   14.13.1 Introduction ......................................................................................................379
   14.13.2 Overview Of Requirements ..................................................................................379
   14.13.3 Restrictions When Passive Market Making Is Not Conducted ......................................379
   14.13.4 Withdrawal Of Quotations ....................................................................................380
   14.13.5 Stabilizing Bids .................................................................................................380
14.14 Trade Reporting ...................................................................................................381
   14.14.1 Trade Reporting Facility (TRF, formerly ACT)..........................................................382
   14.14.2 OTC Reporting Facility: Key Requirements ............................................................383
   14.14.3 "Step-in" And "Step-out" Trades .........................................................................386
   14.14.4 Prohibition Against Delayed Trade Reporting - SEC 21(a) Report ...............................387
   14.14.5 Riskless Principal Transactions ............................................................................387
   14.14.6 Transactions And Transfers Not Requiring Reporting ................................................387
   14.14.7 Short Sales .......................................................................................................388
   14.14.8 Review Of Trade Modifiers ...................................................................................388
   14.14.9 Obligation To Provide Accurate Information To The Marketplace..................................388
   14.14.10 Order Audit Trail System (OATS) ........................................................................389
   14.14.11 Trade Reporting By Third Parties ........................................................................389
14.15 Other Reports .....................................................................................................389
   14.15.1 Short Interest Report For NASDAQ Securities ........................................................389
14.16 Time Clock Synchronization ...................................................................................390
   14.16.1 Independent Contractors .....................................................................................392
14.17 Prohibited Activities .............................................................................................392
   14.17.1 Acting To Benefit Alpine vs. The Customer.............................................................392
   14.17.2 Anti-Competitive And Anti-Trust Procedures ...........................................................392
   14.17.3 Unauthorized Trading .........................................................................................394
   14.17.4 Expiration And Rebalance Days .............................................................................395
   14.17.5 Other Prohibited Activities ..................................................................................395
   14.17.6 Self-Preferencing ...............................................................................................397
   14.17.7 Parking Securities ..............................................................................................397
   14.17.8 Interpositioning .................................................................................................397
   14.17.9 Secret Profits ....................................................................................................398
   14.17.10 Adjusted Trading ..............................................................................................398
14.18 Books And Records ..............................................................................................398
15 MUTUAL FUNDS ......................................................................................................400
15.1 Introduction .........................................................................................................400
15.2 Mutual Funds Offered By Alpine ..............................................................................400
   15.2.1 Dealer Agreements .............................................................................................401
   15.2.2 Anti-Reciprocal Rule ...........................................................................................401
15.3 Sales Charges ......................................................................................................402
   15.3.1 Breakpoints ......................................................................................................403
   15.3.2 Letters Of Intent ................................................................................................404
   15.3.3 Rights Of Accumulation .......................................................................................405

ALPINE_LIT168791

15.3.4 Reinstatement Privilege ....................................................................................................405
15.3.5 Sales Charge Reductions/Waiver Or NAV Transfer Program ......................................405
15.3.6 Deferred Sales Charges ...............................................................................................405
15.3.7 Direct Application And Wire Order Accounts ...............................................................406
15.3.8 Sales Charge Discounts Must Be Marked On Mutual Fund Orders ..........................406
15.4 Switching ....................................................................................................................................406
15.5 Market Timing Transactions .......................................................................................................407
15.6 Selling Dividends ........................................................................................................................407
15.7 Misrepresenting "No-Load" Funds .............................................................................................407
15.8 Reinvestment Of Maturing Certificates Of Deposit In Mutual Funds .........................................407
15.9 Suitability ....................................................................................................................................407
15.9.1 Multi-Class Mutual Funds .............................................................................................408
15.9.2 Considerations For Newly-Hired RRs ..........................................................................409
15.10 Late Trading And Market Timing ...............................................................................................410
15.11 Block Letter Restrictions ...........................................................................................................411
15.12 Communications ........................................................................................................................411
15.13 Disclosure Of Material Facts .....................................................................................................412
15.14 Disclosure Of Fees, Expenses And Performance ....................................................................412
15.15 Prospectuses ............................................................................................................................413
15.16 Retail Communications ..............................................................................................................413
15.17 Dealer-Use-Only Material ..........................................................................................................414
15.18 Seminars And Other Public Presentations ................................................................................414
15.19 Sales Contests And Incentive Programs ...................................................................................415
15.20 Prompt Transmission Of Applications And Payments ...............................................................415
15.21 Redemption Of Outside Funds ..................................................................................................416
15.22 Closed-End Funds .....................................................................................................................416
15.23 Alternative Mutual Funds ...........................................................................................................417
15.23.1 Business Development Companies (BDCs) ...............................................................418
15.24 Leveraged Loan Products ..........................................................................................................418
15.25 Unit Investment Trusts (UITs) ....................................................................................................418
15.25.1 Suitability ....................................................................................................................418
15.25.2 Primary Offerings .......................................................................................................419
15.25.3 Secondary Market Transactions .................................................................................419
15.25.4 Other Sales Practice Considerations .........................................................................419
15.26 Funds Of Hedge Funds .............................................................................................................419
15.26.1 Characteristics And Risks Of Hedge Funds ..............................................................419
15.27 Exchange-Traded Funds (ETFs) ...............................................................................................420
16 OPTIONS .................................................................................................................................................422
17 MARGIN ...................................................................................................................................................423
18 PRIVATE PLACEMENTS AND OFFERINGS ..........................................................................................424
18.1 Registration Activities Involving Investment Banking ..................................................................424
18.2 Rule 144A Transactions ..............................................................................................................424
18.3 Introduction .................................................................................................................................425
18.3.1 Definition Of Terms ......................................................................................................425
18.3.2 "Private Placement" Defined ........................................................................................426
18.4 Private Investment In Public Equity (PIPE) .................................................................................427
18.4.1 Introduction ..................................................................................................................427
18.4.2 Underwriting .................................................................................................................427
18.4.3 Compliance Notification ...............................................................................................427
18.4.4 Registration Statement Integration ..............................................................................427
18.4.5 Eligible Investors ..........................................................................................................428
18.4.6 Marketing Restrictions .................................................................................................428
18.4.7 Information Flow ...........................................................................................................429
18.5 Blue Sky Requirements ...............................................................................................................431
18.6 Alpine's Participation In Private Placements ...............................................................................431
18.6.1 Due Diligence ...............................................................................................................431
18.6.2 Agreement With The Issuer ..........................................................................................432
18.6.3 Dollar Amount Of The Offering And Integration Issues ...............................................432

ALPINE_LIT168792

18.6.4 Form D ................................................................................................................ 432
18.6.5 Submissions To FINRA ...................................................................................... 432
18.7 Sales Of Private Placements ......................................................................................... 432
18.7.1 Suitability ............................................................................................................ 433
18.7.2 Restricted Nature Of Private Placement Securities ............................................ 433
18.7.3 Purchaser Questionnaires .................................................................................. 433
18.7.4 Purchaser Representatives ................................................................................. 433
18.7.5 Offering Memorandum ........................................................................................ 434
18.7.6 Oral Representations .......................................................................................... 434
18.7.7 Offeree Access To Information ........................................................................... 434
18.7.8 Solicitation .......................................................................................................... 435
18.7.9 Investment Seminars Or Meetings ..................................................................... 435
18.7.10 Subscription Agreements .................................................................................. 436
18.8 Regulation D ................................................................................................................... 437
18.8.1 Disqualification Of Felons And Other "Bad Actors" ............................................ 437
18.8.2 Due Diligence ..................................................................................................... 438
18.8.3 Investigation Practices ....................................................................................... 438
19 CORPORATE SECURITIES UNDERWRITING ........................................................................ 441
19.1 Registration Activities Involving Investment Banking .................................................... 441
19.2 Deal File ......................................................................................................................... 441
19.3 Managing Underwriter .................................................................................................... 442
19.3.1 Letter Of Intent ................................................................................................... 442
19.3.2 Due Diligence ..................................................................................................... 442
19.3.3 Net Capital Considerations ................................................................................. 443
19.3.4 Forming The Underwriting Group ....................................................................... 443
19.3.5 Underwriting Compensation ............................................................................... 443
19.3.6 Preliminary And Final Prospectuses .................................................................. 444
19.3.7 Regulatory Filings And Notifications ................................................................... 444
19.3.8 Road Shows ....................................................................................................... 448
19.3.9 Pricing The Underwriting ..................................................................................... 449
19.3.10 Aftermarket Activities ....................................................................................... 449
19.4 Syndicate Member Procedures ...................................................................................... 450
19.4.1 Tombstone Ads ................................................................................................... 451
19.4.2 Research ............................................................................................................. 451
19.5 Selling Group Member Procedures ................................................................................ 451
19.5.1 Returning Unsold Allotment ................................................................................ 451
19.5.2 Tombstone Ads ................................................................................................... 452
19.5.3 Research ............................................................................................................. 452
19.6 Communications Around The Time Of Registered Offerings .......................................... 452
19.6.1 Categories Of Issuers ......................................................................................... 452
19.6.2 Other Definitions ................................................................................................. 453
19.6.3 Permitted Offering Activity And Communications ............................................... 453
19.7 Sales To The Public ........................................................................................................ 453
19.7.1 Indications Of Interest ......................................................................................... 454
19.7.2 Conditional Offers ............................................................................................... 454
19.7.3 Prospectuses And Confirmations To Purchasers ............................................... 454
19.7.4 Restrictions On Purchase And Sale Of IPOs Of Equity Securities ..................... 456
19.7.5 Disclosure Of Interest In Distribution ................................................................. 461
19.7.6 State Blue Sky Requirements ............................................................................. 461
19.7.7 Cancellation Policy ............................................................................................. 461
19.7.8 Designated Orders .............................................................................................. 461
19.7.9 Securities Taken In Trade ................................................................................... 461
19.7.10 Flipping ............................................................................................................. 462
19.8 Transactions With Related Persons ............................................................................... 462
19.9 Trading Restrictions While Participating In A Distribution .............................................. 462
19.9.1 Distribution Participant Restrictions .................................................................... 463
19.9.2 Issuer And Selling Security Holder Restrictions ................................................. 463
19.9.3 Short Sales ......................................................................................................... 463

ALPINE_LIT168793

19.9.4 Prohibited Conduct ........................................................................................463
19.10 Market Making Activities ..................................................................................464
19.11 Regulation S Underwritings .............................................................................465
19.11.1 Introduction .................................................................................................465
19.11.2 Purchaser Questionnaires ...........................................................................465
19.11.3 Monitor Of Purchasers ................................................................................465
19.12 Regulation A Offerings ....................................................................................465
19.12.1 Introduction .................................................................................................466
19.12.2 Dollar Limitation Of Offering .......................................................................466
19.12.3 Initiation Of Offers And Sales .....................................................................466
19.13 Best Efforts Underwritings ...............................................................................467
19.13.1 Introduction .................................................................................................467
19.13.2 Customer Funds - Escrow Account .............................................................467
19.13.3 Purchasers ..................................................................................................468
19.14 Prohibited Activities .........................................................................................468
19.14.1 Misrepresentation Of Registration With Regulators ....................................468
19.14.2 Anti-Competitive Activities ..........................................................................468
19.14.3 Tying ...........................................................................................................468
19.14.4 Laddering ....................................................................................................469
19.14.5 Quid Pro Quo ..............................................................................................469
19.14.6 Spinning ......................................................................................................469
19.14.7 After-Market Sales ......................................................................................469
19.14.8 Misrepresenting Pricing ..............................................................................469
20 SUPERVISORY SYSTEM, PROCEDURES, AND CONTROLS ...................................470
20.1 Conflicts of Interest ...........................................................................................470
20.2 Introduction .......................................................................................................470
20.3 Responsibility ....................................................................................................471
20.4 Controls .............................................................................................................471
20.4.1 Controls to Ensure Supervisory Procedures Remain Current.......................471
20.4.2 Designation of Principal for Supervisory Control Procedures .......................472
20.4.3 Verification And Testing ................................................................................472
20.4.4 Creation and Amendment of Supervisory Procedures as a Result of Verification and Testing ......473
20.5 3012 Controls ....................................................................................................473
20.5.1 Transmittal of Funds.....................................................................................473
20.5.2 Change of Customer Addresses ...................................................................476
20.5.3 Change of Investment Objectives .................................................................477
20.5.4 Risk Management .........................................................................................477
20.5.5 Outside Auditors ..........................................................................................477
20.6 Written Compliance And Supervisory Procedures (WSP) ..................................478
20.7 Designation of Chief Compliance Officer (CCO) ...............................................478
20.8 Internal Inspections ...........................................................................................478
20.9 Review And Testing Of Procedures And Controls .............................................479
20.9.1 Conducting Risk-Based Reviews And Testing ..............................................480
20.9.2 Findings And Follow-Up ...............................................................................480
20.10 Internal Investigations Of Transactions ...........................................................480
20.10.1 Internal Investigation Reports .....................................................................482
20.11 Annual Report and Certification of Compliance and Supervisory Processes To Senior Management and The Board of Directors ......483
20.11.1 Annual Report to CEO (or equivalent officer)..............................................483
20.12 Supervision Of Supervisors .............................................................................484
20.13 Meetings between CEO and CCO.....................................................................485
20.13.1 Required Language for the Annual Certification ..........................................485
20.14 Direct Market Access .......................................................................................486
20.15 Cross Reference To Other Supervisory Control Subjects .................................491
21 ALPINE'S INFORMATION DESTRUCTION POLICY ...................................................492
21.1 Introduction and Overview .................................................................................493
21.1.1 Information Destruction Policy .......................................................................493
21.1.2 Policy Development, Implementation and Oversight......................................493

ALPINE_LIT168794

21.1.3 Employee Orientation/Training ................................................................................................494
21.1.4 Information Destruction Policy ...............................................................................................494
21.2 Information Destruction Procedures ..........................................................................................494
21.2.1 Paper Media ..........................................................................................................................494
21.2.2 Other Media Disposal ............................................................................................................495
21.3 Qualifications and Selection of an Approved Service Provider ..................................................495
21.4 Retention Requirements ...........................................................................................................495
21.4.1 Books and Records/Retention Requirements .........................................................................495
21.4.2 Default Retention Requirement ..............................................................................................499
21.5 Policy Compliance ....................................................................................................................499
21.5.1 Auditing Internal Compliance .................................................................................................499
21.5.2 Litigation Hold/Stop Destruction Order ..................................................................................499
22 CLEARING OPERATIONS ............................................................................................................500
22.1 Introduction ..............................................................................................................................500
22.2 Regulation S-P ..........................................................................................................................500
22.3 Correspondent Clearing/Due Diligence of Correspondent Firms ...............................................500
22.3.1 Notification to FINRA Re: Acceptance of New Correspondent Firm ..............................................501
22.3.2 Minimum Requirements in Clearing/Carrying Agreement ........................................................501
22.3.3 Customer Notification Concerning Responsibilities Allocated to Each Party ................................502
22.3.4 Responding to Customer Complaints Regarding Correspondent Firm Conduct or their Associated
Persons ...........................................................................................................................................503

ALPINE_LIT168795

# INTRODUCTION

Alpine Securities Corporation ("Alpine") will conduct its business consistent with the highest standards of commercial honor and just and equitable principles of trade. Keeping our customers' interest foremost is key to Alpine's success. The trust of our customers and Alpine's reputation are of paramount importance. Effective supervision is an integral part of achieving our goals in serving our customers.

"Compliance" is not a static event; it is a process which evolves in tandem with regulations that govern our industry and the circumstances of each particular interaction. This Written Supervisory Procedures Manual ("WSP" or "Manual") includes Alpine's supervisory policies and procedures to provide guidance to designated supervisors in their oversight of Alpine's business. It is a working document and reference for supervisors and will be updated when necessary.

It is recognized that supervision must be a flexible tool for use by those charged with managing Alpine's various activities. While it is generally expected these procedures will be followed, supervisors are encouraged to adapt these procedures to the needs of Alpine, their particular department, and the employees and customers of Alpine. These procedures are meant to be a basic framework upon which supervisors oversee the Alpine's activities.

This Manual does not attempt to set forth all of the rules and regulations with which employees must be familiar, nor does it attempt to deal with all situations involving unusual circumstances. When questions arise, refer them to the Chief Compliance Officer ("CCO") for assistance.

Supervision may be delegated to others, where appropriate; however, designated supervisors are responsible for ultimate supervision of assigned areas. The term "employee" as used in this Manual includes the registered representative ("RR") (and others as identified by Alpine) who may be an independent contractor for tax and compensation purposes.

This Manual is the property of Alpine and may not be provided to anyone outside of Alpine without the permission of the Chief Compliance Officer, Chief Financial Officer ("CFO") or Alpine's General Counsel.

This Manual should accomplish two objectives:

¨ First, it should provide Alpine's personnel with an awareness of the requirements of the laws, rules, and regulations governing broker-dealer and RRs activities.

¨ Second, it should provide procedures that ensure that Alpine's operations meet those requirements.

This Manual should be kept on hand for easy reference. You are encouraged to ask any questions you may have about the Manual. We expect you to be thoroughly familiar with our procedures and policies as set forth in this Manual. It is extremely important that compliance with these procedures and policies be of utmost importance.

Finally, it is not the intent of this Manual to provide an all inclusive guide concerning the legality of the numerous activities that may give rise to regulatory problems and, should an RR have a question concerning the legality or propriety of a transaction or activity, he or she should seek further guidance from an appropriate principal of Alpine before taking any further action with respect thereto. Ultimately however, it is each RR's personal responsibility to learn and understand the legal and other requirements governing conduct of day-to-day business.

**ALPINE_LIT168796**

# 1 DESIGNATION OF SUPERVISORS AND OFFICES

## 1.1 Designation Of Supervisors

[FINRA Rule 3110(a)]

Applicable Rules: 3012(a)(1), 3010(b)(3), EDGA Rule 5.2, EDGX Rule 5.2, Nasdaq Rule 3012, Nasdaq OMX BX Rule 3012, Nasdaq OMX Phlx Rule 748, NYSE-Arca Rule 6.18

This section includes Alpine's designated supervisors responsible for supervision of the areas of business indicated.

**Date: January 5, 2015, unless noted otherwise**

| Area/Department Supervised | Name/Title/Location of Supervisor | Registration Status | Effective Date of Supervision | Responsibilities |
|---|---|---|---|---|
| FINRA and SEC Compliance; Establish policies and procedures including supervisory controls and testing of those procedures | Chris Frankel, CCO, Salt Lake City | S-7, S-63, S-24 | October 5, 2015 | Compliance |
| Retail Trading | Robert Tew, Head Trader, Salt Lake City | Principal, S-7, S-24, S-55, S-63 | May 1, 2011 | Retail trading |
| Financial Records | David Cazier, Financial and Operations Principal | Principal, S-27 | June 10, 2014 | Relating to Financial Operations |
| CRD Electronic Filings<br><br>Large Trader | David Cazier, Financial and Operations Principal, Salt Lake City<br><br>Chris Frankel, CCO, Salt Lake City<br><br>Tyler Smith, Compliance Officer, Salt Lake City | S-27<br><br>S-7, S-63, S-24<br><br>S-7, S-63, S-24 | June 10, 2014<br><br>October 5, 2015<br><br>April 9, 2014 | Financial and Electronic Reporting Requirements<br><br>Registration, Complaint, Disclosure and other Compliance related filings<br><br>Large Trader Reporting |
| Trading, OATS, Market Making, Order Execution, Best Execution, Order Handling, Trade Reporting, Sales Transactions, NMS Rule 612,<br><br>Regulation Sho | Robert Tew, Head Trader, Salt Lake City<br><br>Randall Jones, Equity Trading Principal, Salt Lake City, Maine | Principal, S-7, S-24, S-55, S-63<br><br>Principal, S-7, S-24, S-55, S-63 | August 1, 2003<br><br>January 5, 2015 | WMX Trading System, Review and Approval of New Accounts, Daily Order Ticket Review, SEC 21(a) Report, Monitoring Insider Trading, Other Trading Related Activities and |

ALPINE_LIT168797

| | | | | Reporting<br><br>Reg Sho |
|---|---|---|---|---|
| Incoming and Outgoing Communications | Robert Tew, OSJ Branch Manager, Salt Lake City | Principal, S-7, S-24, S-55, S-63 | Principal, S-7, S-24, S-55, S-63 | Review Communications including E-mail, Fax and limited Instant Messaging for pilot group |
| Corporate Securities Underwritings and Private Placements | Robert Tew, Syndicate, Underwriting and Private Placement Supervisor, Salt Lake City | S-7, S-24, S-55, S-63, | May 1, 2011 | Private and Public Offerings, Chinese Wall Procedures |
| Anti-Money Laundering (AML)/ Identity Theft Prevention Officer | Holly Peck (formerly Halpin) | S-7, S-63, S-24 | January 5, 2015 | AML Compliance and Reporting; Identity Theft Prevention Program |
| OSJ and Branch Office Management, Mutual Funds and other business line products, Registered Representatives | Rob Tew, President, OSJ Branch Manager, Salt Lake City | S-7, S-24, S-55, S-63, | April 8, 2015 | Manage, Review and Supervise OSJ and Branch Offices, Registered Representatives |
| Information Technology | IT Committee | | September 19, 2012 | Computer and Communication Systems, Data security, back-up, protection, retrieval and cybersecurity (as of 09/30/14) |
| Supervisory Controls, Direct Market Access (SEC Rule 15c3-5)<br><br>All Operations | Rob Tew, President, Salt Lake City<br><br>David Bevins, COO, Salt Lake City | S-7, S-24, S-55, S-63<br><br>S-7,S-24, S-27, S-63 | October 4, 2014<br><br>March 21, 2014 | Establish, maintain, and enforce supervisory control policies and procedures around market access<br><br>Operations |
| Certain Operations Functions<br><br>Legal Matters | Emily Dom, Operations Manager (formerly Back Office Manager), Salt Lake City<br><br>Nate Simmons | Series 99 | October 8, 2012<br><br>February 2014 | certain Operations functions<br><br>Relating only to legal matters and legal staff |

**Continued...**

| Name/Title/Location of Supervisor | Employees/Functions Supervised |
|---|---|
| Chris Frankel, Salt Lake City | Compliance personnel only |
| Robert Tew, President, Salt Lake City | All personnel |

ALPINE_LIT168798

| | |
|---|---|
| David Bevins, COO, Salt Lake City | Only as Specific to Operations |
| David Cazier, Financial and Operations Principal, Salt Lake City | Only as specific to financial and electronic reporting requirements |
| Chris Frankel, CCO, Salt Lake City | Only as specific to Registration, Disclosure, Complaint and Related filings, Retail and Institutional Communications |
| Tyler Smith, Compliance Officer, Salt Lake City | Large Trader, Employee Trade Reviews |
| Robert Tew, Head Trader, Salt Lake City | All Traders |
| Rob Tew, President, OSJ Branch Manager, Salt Lake City | Only Relative to Communications |
| Robert Tew, Syndicate, Underwriting and Private Placement Supervisor, Salt Lake City | Only Relative to Corporate Securities Underwritings and Private Placements |
| Holly Peck (formerly Halpin), AML Officer | AML Compliance and Reporting; Identity Theft Prevention Program |
| Rob Tew, President, OSJ Branch Manager, Salt Lake City | Only as specific to OSJ and Branch Management Functions |
| IT Committee | None |
| Rob Tew | Only as specific to supervisory controls relating to supervisory controls, market access |
| David Bevins | Specific to Operations and IT Committee |
| Emily Dom, Operations Manager | Supervise Operations personnel |
| Rob Tew, President, Branch Manager | Supervise registered representatives |
| Nate Simmons, General Counsel | Relating only to legal matters and supervision of Legal personnel |

## 1.2 Designation Of Offices

[FINRA Rule 3110(e); MSRB Rule G-27(b)(iii) and G-27(g)]

Alpine maintains the following office:

ALPINE_LIT168799

| Office Location | Type of Office* | Designated Supervisor(s) | Designated Person To Explain Office Records | Type(s) of Business Conducted at Office |
|---|---|---|---|---|
| 39 Exchange Place, Salt Lake City, Utah, 84111 | OSJ | OSJ Branch Manager, Robert Tew | OSJ Branch Manager | Retail, Trading; Private Placements; Market Making, Correspondent Clearing |

*OSJ = Office of Supervisory Jurisdiction (must be registered)

*BR = Branch Office (must be registered)

**Non-Branch locations (if applicable):**

*NSA = Non-sales location (limited to customer service, back office functions, *etc.*)

*NSE = Non-securities location (associated person(s) primarily engaged in non-securities activities)

*PR = Primary residence (associated person's primary residence used for securities business)

*OPR = Locations other than primary residences (*e.g.,* other location used less than 30 business days/year for securities business)

*OC = Office of convenience (location used occasionally and exclusively by appointment to meet with customers)

*NON = Location used primarily to engage in non-securities transactions (no more than 25 securities transactions in a calendar year; advertising or sales literature (including business cards) must include location of supervising office)

*TEMP = Temporary office established because of implementation of business continuity plan

# 1.3 Supervision of Form Filings

[NASD Rule 1010]

The CFO/FinOp, CCO and Head Trader are responsible for electronic filings in their respective areas of responsibility. Noted below are the responsibilities of the CFO or designee.

| Responsibility | CFO or designees |
|---|---|
| Resources | Focus reports and other financial filings |
| Frequency | Monthly, quarter or as needed |
| Action | |
| Record/Evidence of Review | |
| Rule References: | NASD Rules: Rule 1013(a)(2), Article IV, Sections 1, 7 and 8, Article V, Sections 2 and 3 of the FINRA by-laws. |

Noted below are the responsibilities of the CCO or designee.

| Responsibility | CCO or designee |
|---|---|

ALPINE_LIT168800

| Resources | Continuing Membership Agreement (Initial Submission and ongoing updates); Form BD/BDW updates; Form U4/U5; NRF filings and terminated filings, Fingerprint processes |
|---|---|
| **Frequency** | As needed |
| **Action** | Retain records relied upon to amend any of the documents noted above. |
| **Record/Evidence of Review** | Submission via FINRA Gateway system or equivalent system |
| **Rule References:** | NASD Rules: Rule 1013(a)(2), Article IV, Sections 1, 7 and 8, Article V, Sections 2 and 3 of the FINRA by-laws. |

Noted below are the responsibilities of the Head Trader or designee.

| Responsibility | Head Trader or designee |
|---|---|
| **Resources** | Trade Reporting – Form T Filing, ACT Reporting |
| **Frequency** | As needed |
| **Action** | Retain records relied upon to amend any of the documents noted above. |
| **Record/Evidence of Review** | Submission via FINRA Gateway system or equivalent system |
| **Rule References:** | FINRA Rule 6282, 6380, 6420, 6622, Securities Act Rule 144A, Act Reporting Rules 6000 series, OATS 6950 |

More information about each area of responsibility can be found in other sections of this Manual.

## 1.4 Organization Chart and Line of Authority

| | |
|---|---|
| Board of Directors: John Hurry, Chairman | |
| The following position(s) and individual(s) report to the Board of Directors: | |
| Chris Frankel, Chief Executive Officer (CEO), CCO | |
| The following position(s) and individual(s) report to the CEO: | |
| Nathan Simmons, General Counsel<br><br>David Cazier, FinOp<br><br>Rob Tew, President/Head Trader, Branch Manager<br><br>David Bevins, COO, CFO | |
| The following position(s) and individual(s) report to the COO, David Bevins: | |
| Non-licensed employees in the back office<br><br>Operations Manager, Emily Dom | |
| The following position(s) and individual(s) report to the General Counsel:<br><br>Non-licensed employees in the Legal Department | |

ALPINE_LIT168801

| | |
|---|---|
| The following position(s) and individual(s) report to the CCO:<br><br>Tyler Smith, Compliance Officer<br><br>Holly Peck (formerly Halpin), AML Officer<br><br>Non-licensed employees in the Compliance Department | |
| | |

**ALPINE_LIT168802**

# 2 OFFICES

This chapter describes the types of offices defined by regulators and requirements for inspections and supervision of offices. **The CCO or designee must be notified:**

- Before a new branch office or other business office is opened (including all types of offices defined in this chapter)
- When an office address changes
- Prior to a change in the types of business conducted in an office
- When an RR changes offices
- Prior to an RR commencing work from a second location, such as a primary residence
- Prior to establishing an office-sharing arrangement with an outside person or entity

## 2.1 Office Designations

[FINRA Rule 3110]

Main Office: 39 Exchange Place, Salt Lake City, Utah 84111

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Information regarding offices including new offices, address changes, office sharing arrangements |
| Frequency | • As required |
| Action | • Identify each office as to type to determine regulatory requirements, maintain list of offices and types<br>• Establish and document supervision for non-branch locations<br>• Make required regulatory filings<br>• Review requests for a principal to supervise more than one OSJ considering the following:<br><br>o whether the on-site principal is qualified by virtue of experience and training to supervise the activities and associated persons in each location;<br>o whether the on-site principal has the capacity and time to supervise the activities and associated persons in each location;<br>o whether the on-site principal is a producing registered representative;<br>o whether the OSJ locations are in sufficiently close proximity to ensure that the on-site principal is physically present at each location on a regular and routine basis; and<br>o the nature of activities at each location, including size and number of associated persons, scope of business activities, nature and complexity of products and services offered, volume of business done, the disciplinary history of persons assigned to such locations, and any other indicators of irregularities or misconduct. |
| Record | • List of offices including types of offices via FINRA CRD Gateway<br>• Regulatory filings (electronic or paper filing)<br>• Approval for one principal to supervise more than one OSJ and document why |

ALPINE_LIT168803

| | such a supervisory structure is reasonable |
|---|---|

This section describes different types of offices and related requirements.

## 2.1.1 Branch Office

[FINRA Rule 3110(a)(3), 3110(a)(4) and 3110(e)]

A branch office is any location where one or more associated persons (*e.g.,* employees, independent contractors) regularly conduct the business of effecting any transactions in, or inducing or attempting to induce the purchase or sale of any security or any location held out as such. Branch offices are required to be registered, and if the "main office" meets the definition of "branch office" (or OSJ) it is required to be registered.

Any office that is responsible for supervising associated persons at one or more non-branch locations is considered to be a branch office.

## 2.1.2 Non-Branch Locations

[FINRA Rule 3110(e)(2)]

There are seven exceptions from the branch office registration requirement. To qualify for an exception, all conditions must be met for the office location. All non-branch offices and their associated persons are assigned to a designated branch office for supervision.

***Non-sales locations:*** Locations established solely for customer service and/or back office functions, not to be held out to the public as a branch office, and no sales activities are conducted from the location.

***Primary residences:*** Any location that is the associated person's primary residence. Only one associated person, or multiple associated persons who reside at the location and are members of the same immediate family, may conduct business from the location. Requirements for primary residence offices include:

- Only one associated person, or multiple associated persons who reside at that location and are members of the same immediate family, conduct business at the location;
- The location is not held out to the public as an office and the associated person does not meet with customers at the location;
- Neither customer funds nor securities are handled at that location;
- The associated person is assigned to a designated branch office, and such designated branch office is reflected on all business cards, stationery, retail communications and other communications to the public by such associated person;
- The associated person's correspondence and communications with the public are subject to Alpine's supervision in accordance with this Rule;
- Electronic communications (*e.g.,* e-mail) are made through the Firm's electronic system;
- All orders are entered through the designated branch office or an electronic system established by the member that is reviewable at the branch office;
- Written supervisory procedures pertaining to supervision of sales activities conducted at the residence are maintained by Alpine; and
- A list of the residence locations is maintained by Alpine's Registration Department (Compliance).

***Locations other than primary residences:*** Other locations used for securities-related activities less than 30 business days in any calendar year that meets the requirements of a primary residence office, above. This would generally include vacation or second homes and other non-primary residences. An RR operating from this type of location will be required to maintain a record of the dates when business is conducted from such a location and submit this information monthly to Compliance. When the "30-business day" exemption is

ALPINE_LIT168804

exhausted, the RR is required to cease conducting business from that location or immediately submitting a request to Compliance to register the location as a branch office.

***Offices of convenience:*** This is a location where an associated person occasionally and exclusively by appointment meets with customers, provided the location is not held out to the public as a branch office. An associated person may not establish business hours at the location or hold out the location in any way (except for signage required at bank locations). Final approval and execution of transactions must be done through the designated supervisory branch office.

***Location used primarily to engage in non-securities transactions:*** Locations where associated persons are primarily engaged in non-securities activities (*e.g.,* insurance sales) and where the associated person effects no more than 25 securities transactions in a calendar year. Retail communications identifying the non-securities location must include the location of the supervising branch office. Compliance is responsible for monitoring the 25-transaction limit.

***Floor of a registered national securities exchange:*** Any location on the floor of a registered national securities exchange where [The Firm] conducts a direct access business with public customers is exempt from the definition of "branch office."

***Temporary location:*** Any temporary location established in response to the implementation of a business continuity plan is exempt from branch office registration.

Regardless of the above exceptions to the definition of "branch office," any location that is responsible for supervising activities of RRs at one or more non-branch locations is considered to be a branch office.


## 2.1.3 Offices Of Supervisory Jurisdiction (OSJ)

[FINRA Rule 3110(a)(3), 3110(a)(4), 3110(e), 3110.02 and 3110.03]

An office that includes any of the following activities will be designated as an Office of Supervisory Jurisdiction (OSJ) with a resident principal responsible for supervision:

- Order execution and/or market making
- Structuring of public offerings or private placements
- Maintaining custody of customers' funds and/or securities
- Final acceptance (approval) of new accounts
- Review and approval of customer orders
- Final approval of retail communications
- Supervision of RRs at one or more other branch offices

In addition, the following factors will be considered on determining whether an office is an OSJ:

- whether registered persons at the location engage in retail sales or other activities involving regular contact with public customers;
- whether a substantial number of registered persons conduct securities activities at, or are otherwise supervised from, such location;
- whether the location is geographically distant from another OSJ of the Firm;
- whether the member's registered persons are geographically dispersed; and
- whether the securities activities at such location are diverse or complex.

Excluded from the definition of OSJ is an office that solely provides final approval of research reports. An OSJ principal will supervise only one OSJ, unless an exception is granted by the CCO in consultation with Alpine's leadership team. If Alpine determines it is necessary to designate and assign one appropriately registered principal to be the on-site principal pursuant to Rule 3110(a)(4) to supervise two or more OSJs, the member must take into consideration, among others, the following factors:

ALPINE_LIT168805

(a) whether the on-site principal is qualified by virtue of experience and training to supervise the activities and associated persons in each location;
(b) whether the on-site principal has the capacity and time to supervise the activities and associated persons in each location;
(c) whether the on-site principal is a producing registered representative;
(d) whether the OSJ locations are in sufficiently close proximity to ensure that the on-site principal is physically present at each location on a regular and routine basis; and
(e) the nature of activities at each location, including size and number of associated persons, scope of business activities, nature and complexity of products and services offered, volume of business done, the disciplinary history of persons assigned to such locations, and any other indicators of irregularities or misconduct.

Alpine will establish, maintain, and enforce written supervisory procedures regarding the supervision of all OSJs. In all cases where Alpine designates and assigns one on-site principal to supervise more than one OSJ, Alpine will document in its written supervisory and inspection procedures the factors used to determine why Alpine considers such supervisory structure to be reasonable and the determination by Alpine will be subject to scrutiny.

## 2.1.4 Branch Offices Assigned To OSJs

Each branch office that is not an OSJ will be assigned to the supervision of an OSJ. The designated supervisor is required to visit non-OSJ branch offices on a periodic basis and record the visit in a memorandum or other record to be retained by the designated supervisor for the branch location. All business transacted by non-OSJ branch offices must be processed through the supervising OSJ. The designated supervisor is responsible for supervision of the branch office's activities and maintaining files for complaints, communications, new accounts, option accounts, advertising, and transactions originating from the branch office.

A branch office may be a "supervisory branch office" that has responsibility to supervise one or more other offices or a "non-supervisory branch office" that has no supervision over other offices.

## 2.1.5 Non-Branch Business Locations

| Responsibility | • OSJ Branch Manager with respect to RRs and locations<br>• CCO with respect to compliance |
|---|---|
| Resources | • The use of a Location of Convenience must be submitted in writing by the RR to the OSJ Branch Manager<br>• List of off-site RRs<br>• Order Records<br>• Daily Transaction Report<br>• Customer Quarterly Statements<br>• Correspondence<br>• Reg T records including prepayment requests, *etc.*<br>• Other various records reviewed by the OSJ Branch Manager for supervision |
| Frequency | • Ongoing |
| Action | • Conduct ongoing supervisory reviews by the OSJ Branch Manager<br>• OSJ Branch Manager will visit the non-branch location at least quarterly or require the RR(s) to visit the OSJ at least quarterly<br>• OSJ Branch Manager completes the Supervisor's Monthly Checklist and submits it monthly to the CCO |
| Record | • OSJ Branch Manager will retain a list of all Locations of Convenience<br>• Records as described in other sections of the Manual<br>• OSJ Branch Manager will record visits to non-branches and/or meetings with |

ALPINE_LIT168806

| | non-branch RRs |
|---|---|

Locations used occasionally and exclusively for appointments from time to time between RRs and Alpine's customers ("Locations of Convenience") and where Alpine has no other tangible presence are not deemed to be "branch offices." RRs conducting business at such locations are required to submit the address of such location to the OSJ Branch Manager and provide each customer with the address and telephone number of the branch office or OSJ supervises the RR.

Each non-branch business location will be assigned to OSJ Branch Manager for supervision. This includes RRs who are assigned to a branch office but transact business at a separate location. These RRs are referred to as off-site RRs. The OSJ Branch Manager is required to visit non-branch business locations and off-site RRs at least once in each quarter and record the visit in a memorandum or other record to be retained by the OSJ Branch Manager in a file for that location. Off-site RRs are required to process all business through the assigned branch office or OSJ. The OSJ Branch Manager is responsible for supervision of the non-branch office's activities and maintaining files for complaints, correspondence, new accounts, option accounts, advertising, and transactions originating from the office.

FINRA Notice To Members 98-38 should be considered part of this manual and consulted regarding supervisory obligations.

## 2.2 Use Of Office Space By Outsiders

Persons not affiliated with Alpine are not permitted to conduct business or maintain offices on Alpine premises. Office-sharing arrangements require the prior approval of the OSJ Branch Manager.

## 2.3 Office Records

[SEC Securities Exchange Act of 1934 Rule 17a-3 and Rule 17a-4]

Each office is required to maintain or have access to certain records relating to the business conducted in the office. "Office," for records purposes, means any location where an associated person conducts business (not including a home office or the office of a customer that an RR visits regularly). "Conducting business" includes handling funds or securities or soliciting/accepting orders. The OSJ Branch Manager is the designated person who can explain the office records to regulators.

Following is a list of office records for the most recent two-year period that must be produced in office locations, upon request by regulators. It is not necessary to maintain physical records in office locations if they can be retrieved and reproduced promptly at the office where they are being requested. "Promptly" is generally understood to mean within 24 hours of the request.

- Order records (daily trade blotters, order tickets/memoranda, including for Alpine's account)
- Receipts/deliveries of securities, receipts/disbursements of cash, all other debits/credits
- Employee records (Forms U4 and U5, employment application, compensation agreements, CRD numbers, internal identifying numbers, offices where RR conducts business)
- Customer account records
- Complaints, until four years after the disposition of the complaint
- Transactions, by RR, including compensation earned, commission schedules, method by which compensation is determined
- Communications with the public (originals of communications received, copies of communications sent; approval of outgoing communications including correspondence, advertising and sales literature, sales scripts, and other outgoing communications requiring the supervisor's approval)
- Record naming the person in the office who can explain records
- Record listing the person responsible for policies and procedures
- WSP, including updates and revisions, until three years after termination of the use of the Manual

ALPINE_LIT168807

### 2.3.1 Retention Of Records At The Office

Offices are required to retain the following records:

- Order records (3 years, 2 recent years in an accessible location)
- New account records (6 years after account closing, in an accessible location)
- Communications, incoming and outgoing (3 years, 2 recent years in an accessible location)
- Advertising (3 years, 2 recent years in an accessible location)
- Operations records including records of receipt/delivery of securities or funds (3 years, 2 recent years in an accessible location)
- Complaints (4 years, 2 recent years in an accessible location)
- All other books and records for which there is no specified period under FINRA rules or applicable Exchange Act rules (6 years, 2 recent years in an accessible location)

### 2.3.2 Regulatory Requests For Records

If a regulator (SEC, SRO, state regulator, or other) requests office records (in person or by another means), the CCO should be contacted immediately. Alpine's CCO is obligated and responsible to provide prompt response to regulators' requests for information, therefore record retrieval procedure must begin immediately or as soon as possible after receipt of the request.

## 2.4 Changes In Branch Offices

[FINRA By-Laws, Article IV Section 8]

The CCO is responsible for filing the uniform branch office registration form (Form BR) with the CRD to reflect changes to existing offices or to register new offices. The CCO retains records of branch registration filings.

In addition, the CCO will verify state requirements before an office is opened and will file any necessary application or documents with state authorities which may include the secretary of state, taxing authorities, and/or broker-dealer licensing authorities.

## 2.5 Office Inspections

[FINRA Rule 3110(c)(1), 3110(c)(2), 3110(c)(3), 3110.13 and 3110.14]

| Responsibility | • CCO |
| --- | --- |
| Resources | • Various reports/information regarding office activities |
| Frequency | • Annual: inspect OSJs and any branch office supervising one or more non-branch locations<br>• Annual: conduct risk-based review to determine inspection cycle of other offices (no less than every 3 years for branch offices)<br>• Annual: prepare inspection schedule<br>• Annual: assign responsibility for conducting inspections<br>• Per inspection schedule: conduct inspections |
| Action | • Conduct risk-based review to determine inspection cycle for non-supervisory offices<br>• Prepare schedule including an explanation of the factors used in determining |

ALPINE_LIT168808

| | |
|---|---|
| | inspection cycles for non-supervisory offices<br>• Assign inspection responsibility considering any potential conflicts of interest including economic, commercial, or financial interests in the associated persons or business being inspected and ensuring the person assigned is not assigned to the business unit and is not directly or indirectly supervised by, or otherwise reporting to, an associated person assigned to the unit or location. Where compliance is not possible due to Alpine's size or business model (only one office; business model where small or single-person offices report directly to an OSJ-manager who is also considered the office's branch office manager), document in the report both the factors used to make this determination and how the inspection otherwise complies with the requirements of Rule 3110(c)(1)<br>• Conduct inspections<br>• Prepare reports and provide to office supervisor and senior management<br>• Obtain response from office supervisor and follow up regarding corrective action (no later than next inspection)<br>• For an office with significant risk profile changes or regulatory/complaint issues, review the need for an immediate "for cause" inspection or acceleration of the inspection cycle<br>• Maintain inspection program (and revise, as needed) |
| **Record** | • The inspection program, schedule of inspections, reports, review of those conducting inspections<br>• Determinations of whether a branch's inspection cycle should be accelerated or a "for cause" inspection should be conducted |

All OSJs, branch offices, and non-branch offices are inspected in accordance with FINRA Rule 3110(c). "Non-supervisory office" in this section refers to branch offices that do not supervise other offices and non-branch offices.

## 2.5.1 Risk-Based Inspection Cycle

Alpine will inspect non-supervisory offices based on a risk-based inspection cycle. The frequency of inspections will be determined as follows.

- Branches will be evaluated to determine whether any factors require the branch to be inspected annually or some other inspection schedule. (The minimum inspection cycle is every three years).
- Consistent with FINRA rules, any office designated as an OSJ will be inspected annually.
- Some offices may be inspected on an unannounced basis.

### 2.5.1.1 "For Cause" Inspections

At any time, a branch office may be identified for an immediate "for cause" inspection, as determined by the CCO or designee. A "for cause" inspection may be initiated considering serious regulatory or disciplinary actions against branch personnel; serious or a pattern of complaints; thefts; fraud; suspected money laundering activities; or other malfeasance by branch personnel.

### 2.5.1.2 Change Of Risk Profile For Offices Inspected Less Frequently Than Annually

The CCO or designee will consider whether a significant change to an office's risk profile triggers a review of the inspection schedule for that branch. Events that may trigger this review include:

- A branch RR comes under SRO/state/Alpine heightened supervision requirements.

ALPINE_LIT168809

- A branch that previously did not supervise other offices now supervises another office (requiring annual inspection).
- A branch or branch employee becomes the subject of a pattern of complaints.
- A branch's level of errors or changes in accounts on orders becomes high compared to other branches.
- Branch personnel become the subject of regulatory action.
- The branch is assigned a new branch manager.
- An existing or newly-hired RR becomes or is subject to a statutory disqualification.

## 2.5.2 Conducting Inspections

Inspections must be conducted by someone independent of supervisors of the office being inspected. Inspections may not be conducted by anyone who:

- supervises the office being inspected (branch manager, *etc.*);
- is another supervisor in that office; or
- is directly or indirectly supervised by either of the prior-listed supervisors or someone who directly supervises those office supervisors.

Inspections generally include the following:

- Assignment of inspection responsibilities to a qualified person
- Pre-inspection document/information review including review of prior report(s) for the office
- Scheduling a visit on either an announced or unannounced basis
- For branch offices, scheduling reviews at the supervising office to examine records of supervision
- During a physical inspection, reviewing records and interviewing personnel in accordance with the inspection program
- Preparing a draft report of findings
- Submitting the draft to the appropriate supervisor for comment and response
- Preparing a final report incorporating the supervisor's responses
- Submission of the final report to the CEO (or equivalent officer), senior management and the Board of Directors (where applicable)

The CCO, at its discretion, initiates unscheduled inspections. (when potential significant problems are identified, a change in office management warrants a special review, at the request of senior management, etc.).

## 2.5.3 Reports

[FINRA Rule 3110(c)(2)]

Written reports of inspections will include:

- the name of the person who conducted the inspection and prepared the report
- the date(s) of the inspection
- areas reviewed which will include, at minimum (depending on types of business conducted in the office)
    - safeguarding customer funds and securities;
    - maintaining books and records;
    - supervision of supervisory personnel;
    - transmittals of funds (*e.g.*, wires or checks, *etc.*) or securities from customers to third party accounts; from customer accounts to outside entities (*e.g.,* banks, investment companies, *etc.*); from customer accounts to locations other than a customer's primary residence (*e.g.,* post office box, "in care of" accounts, alternate address, *etc.*); and between customers and registered representatives, including the hand-delivery of checks; and
    - changes of customer account information, including address and investment objectives changes and validation of such changes.

ALPINE_LIT168810

- for any of the above areas **not** included in the report, an explanation of why they were not included (*i.e.,* the office does not accept funds or securities, the office does not have a producing manager, *etc.*) and a statement that the office may not engage in these activities until policies and procedures for these activities are in place at that location
- observations and exceptions regarding compliance with policies and procedures
- the office supervisor's response regarding exceptions and corrective action

Final reports will be distributed to the CEO (or equivalent officer), senior management and the Board of Directors, where applicable.

## 2.6 Display Of Certificates

[SIPC By-Laws, Article 11 Section 4(b)]

Branch offices are required to display certificates on their premises, including:

- SIPC symbol

## 2.7 Availability Of Rules

Each office that deals with public customers will maintain copies of rules for regulators where Alpine is a member. Where Internet access is available, this requirement is satisfied by providing access to the rules published on the regulators' web sites.

ALPINE_LIT168811

# 3 GENERAL EMPLOYEE POLICIES

## 3.1 Standards Of Conduct

[FINRA Rule 2010]

It is Alpine's policy and mandate to its employees to conduct Alpine's business under the high standards and principles of the rules governing its industry. Employees are expected to deal with customers in a fair and honest way and with the customer's interest of primary concern. It is against Alpine's policy that RRs and non-licensed employees suggest or otherwise encourage a customer to sign a form that has not been completed by that customer.

The CCO will distribute compliance policies and procedures to all employees and from time to time will issue updates, as needed.

As a licensed representative of Alpine Securities, you are engaged in a professional task which requires integrity, know-how and dedication. As such, you are expected to behave in a moral and ethical manner at all times. Any representative acting contrary to the above will be jeopardizing his/her position with the firm.

## 3.2 Outside Business Activities

[FINRA Rule 3270]

| | |
|---|---|
| **Responsibility** | • CCO or designee<br>• President or designee (with respect to the CCO) |
| **Resources** | • Requests to engage in outside business activities<br>• Annual certifications<br>• Other potential indicators such as incoming or outgoing correspondence |
| **Frequency** | • As requests are received<br>• Annually |
| **Action** | • CCO or President (with respect to CCO):<br>  o Question employee regarding potential unapproved outside business activities referenced in correspondence or other indicators of outside business activity<br>  o Refer questionable activities to the Chief Compliance Officer or designee for guidance<br>  o Review requests for any potential conflict with Alpine's business<br>  o Notify employee in writing of approval/disapproval and any limitations |
| **Record** | • Retain request and approval in employee's file |

Employees are required to disclose to Alpine, in writing, any outside business activities prior to engaging in such activity. Charitable activities are not included in this requirement unless the employee is being compensated. Outside business activities may include a wide range of activities including but not limited to the following:

• Employment with an outside entity

ALPINE_LIT168812

- Acting as an independent contractor to an outside party
- Serving as an officer, director, or partner
- Acting as a finder
- Referring someone and receiving a referral fee
- Receiving other compensation for services rendered outside the scope of employment with Alpine

Compensation may include salary, stock options or warrants, referral fees, or providing of services or products as remuneration. Generally, remuneration consisting of anything of present or future value for services rendered may be considered compensation.

Employees requesting approval to engage in outside business activities must complete the Outside Business Activity Request form and submit it to the CCO or **prior to** engaging in the activity. The CCO or designee will approve or disapprove the outside business activity in writing and notify the employee and the employee's supervisor.

## 3.3 Private Securities Transactions

[FINRA Rule 3040]

| Responsibility | • CCO or designee<br>• President (with respect to the CCO) |
|---|---|
| Resources | • Requests to engage in private securities transactions<br>• Annual certifications<br>• Other indications of potential "selling away" such as in correspondence |
| Frequency | • As requests are received |
| Action | • Associated Person submits:<br>  o Requests or indications of private securities transactions to the CCO or designee<br>• CCO or designee or President (with respect to CCO):<br>  o Review requests and certifications<br>  o Follow up with Associated Person regarding indicators of selling away<br>  o Notify Associated Person in writing that private securities transaction is permitted or denied<br>  o Take corrective action which may include:<br>    ▪ Disciplinary action against the Associated Person (examples of disciplinary action may include, but not be limited to, letter of reprimand; fine, suspension; termination)<br>    ▪ Notification to private securities investors that Alpine is not associated with the investment, if an RR. |
| Record | • Both the request and subsequent response are filed in Associated Person's file |

Associated Persons are not permitted to engage in private securities transactions without approval in writing (as defined by the FINRA), whether or not there is compensation paid for effecting the transaction. Private securities transactions are defined by the FINRA as any securities transaction outside the regular course or scope of an Associated Person's employment with Alpine (sometimes referred to as "selling away"). This does not include outside securities accounts approved by Alpine, transactions with immediate family members where the Associated Person receives no selling compensation, and personal transactions in investment company and variable annuity securities.

ALPINE_LIT168813

RRs should note that promissory notes often are securities. Even if a promissory note is not deemed a security, the RR has the obligation to obtain Alpine's permission **before** engaging in any outside business activity involving the offer of promissory notes.

RRs are required to conduct their non-private selling activities through Alpine.

# 3.4 Employee And Employee Related Accounts

## 3.4.1 Employee And Employee Related Accounts Defined

[FINRA Rule 3110(d)(4)]

Employee and employee related accounts ("covered accounts") are subject to review by Alpine. Covered accounts include:

- the spouse of a person associated with the member;
- a child of the person associated with the member or such person's spouse, provided that the child resides in the same household as or is financially dependent upon the person associated with the member;
- any other related individual over whose account the person associated with the member has control; or
- any other individual over whose account the associated person of the member has control and to whose financial support such person materially contributes.

In addition, accounts subject to review include any account where an employee has a beneficial interest or the authority to make investment decisions (for example, trust accounts, accounts for minors, *etc.*). "Accounts" also include securities or commodities accounts at Alpine or other financial institutions including foreign or domestic broker-dealers, investment advisers, banks and other financial institutions ("outside accounts" discussed in the next section).

## 3.4.2 Outside Accounts

[FINRA Rule 3050]

| Responsibility | <ul><li>Compliance Officer</li><li>CCO with respect to Compliance Officer</li></ul> |
|---|---|
| Resources | <ul><li>Requests for outside accounts</li><li>Notification of existing outside accounts at time of hire</li><li>Annual certifications</li><li>Other</li></ul> |
| Frequency | <ul><li>As required</li></ul> |
| Action | <ul><li>Employee:<ul><li>Refer requests to the Compliance Officer</li></ul></li><li>Compliance Officer:<ul><li>Review requests and certifications</li><li>Notify employee by memo of approval or disapproval</li><li>Notify firm carrying the employee's outside account by letter regarding to whom duplicate confirmations and statements should be sent</li><li>Review confirmations and statements as they are received. Review for:<ul><li>Transactions in securities restricted by Alpine</li></ul></li></ul></li></ul> |

ALPINE_LIT168814

|  |  |
|---|---|
|  | ▪ Transactions in new issues<br>▪ Transactions potentially involving insider trading or other rule/law violation<br>▪ Large debit balances, very active trading, or other trading activity that may be of concern<br>○ For transactions in restricted securities, contact the employee and take corrective action which may include cancellation of the transaction<br>○ For trading activity that may be indicative of law or rule violations, conduct an internal investigation |
| **Record** | • Approval/disapproval of the outside account in employee's file or centralized file<br>• Confirmations/statements initialed and filed in employee's file or centralized file<br>• Record of internal investigation, if applicable<br>• Quarterly report to FINRA of internal investigations, if Alpine engages in investment banking activities<br>• Contact with employee and corrective action, if appropriate, is documented on confirmations or statements, in a memo, employee's file or centralized file |

It is the general policy of Alpine to permit employees to maintain their securities accounts at Alpine. Alpine will permit its employees to maintain their securities account at another broker-dealer provided that duplicate statements from the other dealer carrying the employee's account except for accounts set forth below are received by Alpine.

These requirements do not apply to accounts limited exclusively to transactions in unit investment trusts and variable contracts or redeemable securities in mutual funds or managed accounts. Employees are not required to have statements for accounts in unit investment trusts, variable contracts or redeemable securities in mutual funds or in managed accounts delivered to Alpine.

## 3.4.3 Review Of Transactions

[FINRA Rule 3110(d)]

| **Responsibility** | • Compliance Officer |
|---|---|
| **Resources** | • Order Records<br>• Employee and employee related account statements<br>• Employee and employee related trading activity |
| **Frequency** | • Monthly |
| **Action** | • Review employee and employee related accounts for possible concerns regarding:<br>○ Very active trading<br>○ Sizeable debit balances<br>○ Bounced checks<br>○ High risk trading patterns<br>○ Transfers between accounts, particularly employee or related accounts and customer accounts<br>○ Insider trading<br>• Where items of concern are identified, action to be taken depends on the circumstances and may include conducting an internal investigation to identify potential rule/law violations |

ALPINE_LIT168815

| | |
|---|---|
| | • Confer with the employee and his/her supervisor, and with the CCO or designee when and where appropriate |
| **Record** | • Record of review of orders and actions taken, if applicable<br>• Record of internal investigation, if applicable<br>• Record of review of accounts and actions taken, if applicable<br>• Quarterly report to FINRA of internal investigations, if the Firm engages in investment banking activities<br>• Initials or signature and date on order records (including employee statements)<br>• Records retained in employee account files or centralized files |

Employees will be contacted about transactions that are potentially contrary to rules or Alpine policy.

## 3.4.4 Insider Trading

[SEC Securities Exchange Act of 1934 Rule 10b-5 and Section 10]

Employees are prohibited from effecting transactions based on knowledge of material, non-public information. The chapter *INSIDER TRADING* explains Alpine's policy and all employees are expected to be familiar with and adhere to the policy.

## 3.4.5 Sharing In Accounts

[FINRA Rule 2150]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager |
| **Resources** | • New account forms<br>• Requests to open accounts jointly with customers must be approved by the OSJ Branch Manager |
| **Frequency** | • As required |
| **Action** | • OSJ Branch Manager:<br>   o When approving new accounts, identify accounts where an RR is potentially sharing in the account<br>   o Confer with employee as to the nature of the shared account (what is the relationship between the employee and the other account owner, allocation of profits and losses)<br>   o Refer shared accounts or requests to share in an account to the CFO<br>• OSJ Branch Manager:<br>   o Require written request from employee and written authorization from customer<br>   o Review and determine whether shared account is appropriate<br>   o Approve or disapprove the request in writing<br>   o Notify employee of approval or disapproval |
| **Record** | • Copies of employee request, customer's written authorization, and notation of approval or disapproval is retained with the new account records for the |

ALPINE_LIT168816

| | account and in RRs file |
|---|---|

Alpine and its RRs may not share directly or indirectly in the profits or losses of a customer's account (with the exception of performance-based fees specifically permitted under rules governing investment adviser and other permitted arrangements). As a general policy, RRs may not participate in an account that includes customers who are not family members of the employee.

An RR may be a joint owner in an account with a customer only under the following conditions:

- the RR submits a written request to the OSJ Branch Manager accompanied by signed authorization from the customer
- the RR is a disclosed owner of the account
- the RR shares in losses and gains only in proportion to the RR's monetary contribution to the account (not applicable to accounts shared with immediate family members)
- the RR receives written approval from the OSJ Branch Manager

## 3.4.6 Prohibition On Purchases Of Initial Public Offerings (IPOs)

[FINRA Rule 5130]

Employees and their immediate families (parents, spouse, children, in-laws, siblings) are prohibited from purchasing IPOs. This includes sales to anyone materially supported by an employee or a member of the employee's immediate family.

## 3.4.7 Research Restrictions

Employee accounts are restricted from acting on a new or changed research recommendation for 24 hours from the time of announcement or publication. Restrictions are announced internally and trading activity is monitored for compliance. Failure to comply may result in cancellation of the transaction, and any resulting loss will be charged to the employee.

## 3.4.8 Restrictions On Personal Accounts Of Certain Alpine Personnel

Personnel in certain departments such as research, trading, and investment banking may be subject to additional requirements or restrictions on the trading in their personal accounts. Affected personnel will be provided with any additional policies affecting their personal transactions.

# 3.5 Gifts, Gratuities And Entertainment

[FINRA Rule 2310(c)(2)(A), 2320(g)(4)(A), 2830(l)(5)(A) and 3220; FINRA Report on Examination Findings Regarding Gifts and Gratuities: http://www.finra.org/web/groups/rules_regs/documents/rules_regs/p018025.pdf; NASDAQ Rule 3060]

BATS Exchange Rule 3.22

| Responsibility | • CCO or designee (where designated)<br>• President<br>• CFO |
|---|---|
| Resources | • Expense reports<br>• Gift Log<br>• Business Entertainment Log |

ALPINE_LIT168817

| | |
|---|---|
| | • Business Entertainment Request Form<br>• Correspondence Review<br>• Employee Annual certification |
| **Frequency** | • As required |
| **Action** | • CFO or designee<br>  ○ Review expense reports for reasonableness and compliance with expense policies and approve or disapprove<br>• CCO or designee:<br>  ○ Review gift logs (incorporated in the Employee Annual Certification) provided by each associated person each calendar year to determine compliance with the $100 annual limit and with the $50 annual limit for BATS exchange employees, and to monitor for thresholds governing gifts to union representatives (Department of Labor regulations).<br>  ○ Review Business Entertainment Log (incorporated in the Employee Annual Certification) provided by each associated person to ensure adherence to the business entertainment rules and ensure proper request/approval procedures were followed.<br>  ○ Business Entertainment Request Forms are pre-approved prior to the business entertainment event to be held for the purposes of entertaining clients and/or vendors. In addition, the guest list will be pre-approved prior to the event. An attendance log will also be taken and reviewed/approved after the event |
| **Record** | • Expense reports<br>• Employee Annual Certification<br>• Gift log<br>• Business Entertainment Log<br>• Business Entertainment Request Form |

- **Gifts to others are limited to $100 per year per person** (other than "personal gifts" defined in the policy).
    - Multiple gifts to the same person are aggregated, *i.e.,* the total of all gifts in any year cannot exceed $100 to one person.
    - "Personal gifts" are excluded (as discussed below).
    - Lower limits apply with respect to BATS Exchange employees, see below.
- **Gifts and compensation to BATS Exchange employees may not exceed $50 per BATS exchange employee per calendar year.**
- **Receiving** gifts is limited. See section below for more information.
- **Record of Entertainment:** A pre-approved Business Entertainment form must be submitted to the **CCO or designee** prior to the event. An employee will receive an Approval or Rejection notification. An invite list will be provided with the form and an attendee list will be provided to the **CCO or designee** after the event is held. These forms and lists will be retained in the employee files.
- An **employee must host entertainment** to avoid entertainment being considered a "gift" subject to limitations.
- **Records of entertainment** must include details of who was entertained and the nature of entertainment.
- **Gifts to labor union employees** must be reported to the government.
- **The CCO or designee must be notified** of gifts to others on the Gifts and Business Entertainment Log incorporated into the employee annual certification.
- **The** CCO or designee must be notified of gifts received (other than personal gifts) on the Gifts and Entertainment Log incorporated into the employee annual certification.

ALPINE_LIT168818

- Gift requirements (whether the gift is given or received) **do not apply to personal gifts** to immediate family members (parents, children, grandparents, siblings, spouse, in-laws) who also happen to be customers and where the gift is unrelated to Alpine's business. The policy also does not apply to occasional personal gifts to others (such as a wedding gift or a congratulatory gift for the birth of a child).
- **If Alpine pays for the gift** or reimburses the employee for the cost of the gift, the gift is subject to the requirements of this policy.
- **Gifts incidental to entertainment** (*e.g.,* a golf shirt given during a golf outing, *etc.* ) are considered gifts subject to reporting to the CCO or designee and the gift limitations.

## 3.5.1 Gifts To Others

Gifts relating to Alpine's business are limited to $100 per year per person, excluding BATS exchange employees. Gifts relating to Alpine's business are limited to $50 per calendar year per person for BATS exchange employees. Gifts of tickets to sporting events or similar gifts where the employee does not accompany the recipient are subject to the limitations on gifts and gratuities. Such gifts may not be so frequent or so expensive as to raise a suggestion of unethical conduct.

Employees of regulators are also subject to rule limitations regarding gifts to them from broker-dealers and their employees. The CCO should be contacted for guidance before giving gifts to employees of regulators.

Gifts and gratuities are not permitted when given for the purpose of influencing or rewarding the action of a person in connection with the publication of information which has or is intended to have an effect upon the market price of any security.

## 3.5.2 Accepting Gifts

While specific securities rules or regulations do not limit the receipt of anything of value, including gratuities to a set dollar amount, Alpine expects its associated persons to take reasonable steps to mitigate conflicts of interest. Gifts and gratuities are not permitted when given for the purpose of influencing or rewarding the action of a person in connection with the publication of information which has or is not intended to have an effect upon the market price of any security.

Employees may not solicit gifts or gratuities from customers or other persons maintaining business dealings with Alpine. Employees are not permitted to accept gifts from outside vendors currently doing business with Alpine or seeking future business without approval of the President or designee.

Alpine may at its discretion limit the receipt of gifts or gratuities relating to Alpine's business, up to $100 per year. All gifts and gratuities received related to Alpine's business must be reported in accordance with Alpine's general policies governing gifts and gratuities. This policy does not include customary business lunches or entertainment; promotional items (caps, T-shirts, pens, *etc.*); or gifts of nominal (less than $100.00) value.

## 3.5.3 Entertainment

Entertainment of customers or prospective customers must be reasonable and not so expensive it raises a suggestion of unethical conduct. All entertainment and related expenses must be detailed on an expense form with receipts attached for expenses over $100.00. Expense forms should be submitted to the CFO within 30 days of incurring the expenses.

The limitation on gifts and gratuities does not apply to usual business entertainment such as dinners or sporting events where the employee hosts the entertainment, though such expenses should be reasonable. "Entertainment" includes a broad range of activities such as trips, parties, and other activities where an employee hosts someone related to Alpine's business. Questions regarding the reasonableness of proposed entertainment and related expenses should be referred to the CCO.

ALPINE_LIT168819

### 3.5.4 Gifts, Loans, And Entertainment Involving Unions And Union-Affiliated Individuals

[Labor-Management Reporting And Disclosure Act of 1959 (LMRDA) and DOL Q and A
http://www.dol.gov/esa/regs/compliance/olms/LM30_LM10_Trusts_Info.htm; DOL advisory memo at
http://www.dol.gov/esa/regs/compliance/olms/lm10_advisory.htm]

| | |
|---|---|
| **Responsibility** | • CCO or designee, consultation with the CFO or designee |
| **Resources** | • Expense reports<br>• Correspondence Review<br>• Annual Employee Certification |
| **Frequency** | • Monthly<br>• Annually |
| **Action** | • File Form LM-10 within 90 days of fiscal year end<br>• Include reportable gifts, loans, entertainment, *etc.* excluding de minimis amounts of $250 or less<br>• Review Employee Annual Certification to identify union-related gifts, loans, *etc.* and follow up to include item in annual reporting on Form LM-10 |
| **Record** | • Vouchers, worksheets, receipts, and other records<br>• Filed Form LM-10 (retained for 5 years)<br>• Annual Employee Certification with notes of action taken, if any |

The Department of Labor (DOL), under a federal act, requires Alpine to report any payment or loan, direct or indirect, of money or other things of value (including reimbursed expenses), or any promise or agreement to make such payments, to any labor organization or officer, agent, shop steward or other representative or employee of a labor organization. This includes entertainment (cost of meals, *etc.*), expenses, or giving gifts or other things that exceed $250.00 in value where the recipient or beneficiary involves a union or union-affiliated individual.

When reporting gifts, entertainment, loans, and other payments, employees must identify when a union or union-affiliated individual is involved. Employees are obligated to report such items to Alpine regardless of the dollar amount involved.

## 3.6 Privacy Policy

[SEC Regulation S-P]

Information regarding customer accounts for individuals is subject to SEC Regulation S-P "Privacy Of Consumer Financial Information." This section explains employees' obligation to maintain the privacy of information. A section *Customer Privacy Policies And Procedures* in the chapter *COMMUNICATIONS WITH THE PUBLIC* outlines firm procedures.

1. Regulation S-P requirements apply to individual and not institutional accounts and include U.S. and foreign accounts.
2. Protected information is termed "nonpublic personal information." This is information obtained by Alpine that is not deemed "public information" which is defined as information that may be obtained from three sources: federal, state or local government records; widely distributed media; or disclosures to the general public that are required to be made by federal, state, or local law.

ALPINE_LIT168820

3. At the time an account is opened the customer is provided with Alpine's privacy policy and is given the opportunity to opt out of arrangements to share nonpublic information with nonaffiliated third parties. The privacy policy is also provided to customers on an annual basis.

4. Employees are prohibited from sharing or releasing nonpublic personal information other than to authorized parties. This includes a prohibition against:

   o Sending internal reports or other information about firm customers to a non-affiliated 3rd party (unless authorized).
   o Sending internal or other documents that include customer non public information to your personal e-mail address.

Questions about providing customer information should be referred to the CCO or designee.

## 3.7 Reporting Possible Law Or Rule Violations

[SEC Securities Exchange Act of 1934 Section 21F; SEC Rule 21F; FINRA Rule 4530(b)]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer (or, if the CCO is involved in the potential wrongdoing, an alternate senior manager) |
| **Resources** | • Reports of possible law or rule violations from employees<br>• Referrals from outside sources such as regulators |
| **Frequency** | • Investigate reports: As required<br>• Employee education: At least annually |
| **Action** | • Acknowledge the employee's report and advise confidentiality will be maintained and there will be no retaliation for reporting<br>• Determine who will be involved in the investigation and notify those persons of the confidentiality of the investigation<br>• Conduct the investigation using tools appropriate to the issue (interviewing employees, reviewing internal/external reports, engaging counsel, etc.)<br>• Determine whether there was potential wrongdoing and decide whether a report should be made to regulators<br>• Take internal corrective action, as appropriate<br>• Advise the reporting employee of the status of the investigation<br>• Include reporting of possible law or rule violations and Alpine's process for internal investigations as part of regular employee education |
| **Record** | • Report from employee<br>• Information regarding the investigation including records reviewed, who is involved, what steps taken, reports to regulators (if appropriate), conclusion of investigation<br>• Records of employee education including how education is conducted (classes, online education, compliance memos, etc.), who participates, subjects included, and when it occurs |

It is the intent of Alpine to adhere to all laws and regulations that apply to the organization; the underlying purpose of this policy is to support the organization's goal of legal compliance. The support of all employees is necessary to achieve compliance with various laws and regulations.

ALPINE_LIT168821

### 3.7.1 Reporting

Employees should report possible crimes or rule violations involving Alpine, a department, or an employee or employees as well as outside vendors or service providers. Reporting may be made to any or all of the following, particularly where the employee's supervisor may be involved in the possible wrongdoing.

1. Your supervisor
2. Your supervisor's supervisor
3. The Chief Compliance Officer
4. The General Counsel
5. The Chief Executive Officer and/or President

### 3.7.2 Confidentiality Of Employee Reporting

All reports will be treated as confidential. The employee's identification will be kept confidential other than to those who need to know such as the compliance officer or counsel or someone else conducting an investigation. Any person identified in the report as a potential wrongdoer will not be provided the name of the person who has filed a report.

### 3.7.3 Notification To The Chief Compliance Officer

A supervisor or other manager who receives a report of possible violations should immediately refer the matter to the Chief Compliance Officer who is responsible for conducting an investigation and overseeing the review until its conclusion, including potential reporting to a regulator. If the Chief Compliance Officer is involved in the potential wrongdoing, the member of management to whom the issue is reported will be responsible for conducting the investigation.

### 3.7.4 Investigation

Alpine will promptly investigate the reported possible wrongdoing and determine what action is required. Outside counsel may be engaged as part of the investigation. The reporting employee will be advised of the conclusion or resolution of the investigation.

### 3.7.5 Anti-Retaliation

Alpine will not retaliate against an employee who reports some practice of Alpine, a department, or employee(s) or of another individual or entity with whom Alpine has a business relationship that may represent a rule or law violation. Alpine will not retaliate against employees who disclose or threaten to disclose (to Alpine or a public body such as a regulator) any activity, policy, or practice of Alpine that the employee believes is in violation of a law, or a rule, or regulation mandated pursuant to law.

Supervisors and others are prohibited from engaging in discipline, threats, or discriminatory actions against employees for engaging in whistle blowing activities.

### 3.7.6 Federal Whistleblower Laws And Rules

The Securities Exchange Act includes Sec. 21F and the SEC has adopted Rule 21F to implement Sec. 21F that provides for reporting possible violation of federal securities laws and potential rewards for information that leads to successful enforcement of a covered judicial or administrative action where monetary sanctions equal $1,000,000 or more. The Sarbanes-Oxley Act of 2002 (which governs public companies) and the Foreign Corrupt Practices Act (FCPA) also have whistleblower provisions.

## 3.8 Charitable Contributions

ALPINE_LIT168822

[FINRA Notice to Members 06-21]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Requests to make charitable contributions |
| **Frequency** | • As requests are received |
| **Action** | • Review contribution to identify potential conflicts of interest<br>• Approve or disapprove in writing |
| **Record** | • Record of requests and approval or disapproval, including date reviewed and placed in RR's file |

When an employee or an agent of a customer such as a mutual fund, pension plan, or investment manager solicits a substantial charitable contribution from Alpine or an RR, there may be a conflict of interest. For example, if an investment manager requests a $10,000 contribution to a charity, this could be construed as a condition for the investment manager to direct business to Alpine. There can be no quid pro quo between contributions and business conducted with Alpine. To avoid potential conflicts of interest, Alpine has established the following guidelines for handling such requests.

1. Charitable giving by Alpine or foundations created by Alpine is subject to review by the Board of Directors at least annually.
2. Contributions of $10,000 or more solicited by an employee or agent of a customer require the prior approval of the OSJ Branch Manager and will require the approval of someone representing the customer other than the person soliciting the contribution.
3. Contributions cannot be based on the actual or anticipated level of business done by the customer.
4. These requirements do not apply to a retail customer who solicits a charitable contribution when acting in his or her individual capacity.

## 3.9 Media Contact Is Limited To Certain Authorized Employees

| | |
|---|---|
| **Responsibility** | • CCO<br>• General Counsel |
| **Resources** | • Requests to communicate with the media<br>• Indications an unauthorized person has had media contact |
| **Frequency** | • As required |
| **Action** | • For requests, the person at the company who is contacted should, without expanding the conversation, briefly assess the nature of contact, whether the individual is or should be authorized to engage in the contact, and take steps to arrange for a responsible person (the CCO or General Counsel) to further assess the matter and plan any further communications.<br>• This may include, as warranted, notifying the employee whether contact will be permitted and if so, providing guidelines.<br>• For unauthorized contact, confer with the employee as soon as possible to assess the timing and further communications. |
| **Record** | • Maintain a list of authorized persons and limitations on their contact, if |

ALPINE_LIT168823

| | appropriate |
|---|---|

Alpine is sometimes contacted by media representatives (television, radio, newspapers, magazines, and other types of media). Employees who are contacted by media representatives are not permitted to comment but must refer the representative to one of the following individuals within Alpine:

- CCO
- General Counsel

Following any such inquiry or communication initiated by the media, and involvement of the CCO or General Counsel, individuals authorized to speak to the media are expected to make comments in a manner which maintains a positive perception of Alpine in the community, while restricting the communications with media based on instructions received by the employee, accurately stating Alpine's opinion or position on matters discussed, while refusing to comment unless duly authorized in advance. Designated parties (as noted above) are expected to consult with one another as circumstances warrant.

## 3.10 Requests For Information From Outside Sources

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Written or oral requests for information<br>• Subpoenas<br>• Other |
| Frequency | • As required |
| Action | • CCO or designee responds, as appropriate |
| Record | • Retain record of response in legal, regulatory, or other files |

Alpine and its employees are sometimes contacted by outside parties such as regulators (SEC, FINRA, exchanges, state and other regulators), attorneys and governmental agencies (*e.g.,* the IRS) that request information about customer accounts, Alpine activities, or an individual employee's activities.

Information regarding customer accounts, Alpine and its employees is considered confidential and may be released only to those authorized to receive it. Any requests from outside parties (other than the principal or authorized person on behalf of an account requesting information on the account) should be immediately referred to the CCO or designee for response. This includes requests received in any form whether written, by phone, or in person. This also includes visits by regulators. For in-person visits by regulators, proof of identification should be requested and the CCO or designee immediately notified.

## 3.11 Internal Reviews And Investigations

| Responsibility | • CCO/ Executive Team/Director of HR |
|---|---|
| Resources | • Documents pertaining to the investigation or oral requests for information<br>• Interview records<br>• Supporting documentation identified during fact finding proceedings<br>• Documents concerning final disposition |

ALPINE_LIT168824

| | |
|---|---|
| | • Consult with HR personnel, where appropriate |
| **Frequency** | • As required |
| **Action** | • Respond, as appropriate |
| **Record** | • Retain record of interviews, investigation and supporting documentation and outcome<br>• Final disposition of records may also be retained in the employee's HR personnel file. |

Employees may be requested for information that may include an employee's signed written statement and other requested documentation. Failure to provide requested information may result in disciplinary action, including termination.

## 3.12 Internal Disciplinary Actions

| | |
|---|---|
| **Responsibility** | • CCO/Executive Team |
| **Resources** | • Documents pertaining to the investigation or oral requests for information<br>• Interview records<br>• Supporting documentation identified during fact finding proceedings<br>• Documents concerning final disposition<br>• Consult with HR personnel, where appropriate |
| **Frequency** | • As required |
| **Action** | • Implement corrective action, as appropriate |
| **Record** | • Retain record of interviews, investigation and supporting documentation and outcome<br>• Final disposition of records may also be retained in the employee's HR personnel file. |

Alpine's goal in administering discipline is to take measures to maintain the quality of service provided to our customers by encouraging appropriate behavior. The expected result of these measures is the deterrence of inappropriate behavior and, when improper activity occurs, to take corrective action commensurate with the activity.

## 3.13 Employee Obligation To Notify The Firm And The Firm's Obligation To Report

[FINRA Rule 4530]

### 3.13.1 Employee Obligation To Notify The Firm

[FINRA Rule 4530]

ALPINE_LIT168825

| Responsibility | • All Employees |
|---|---|
| Resources | Promptly report to the CCO and OSJ Branch Manager (or their designees), the following events:<br><br>• **Client Complaints/Arbitrations** - If you have ever been named as a respondent in an investment-related action, or other civil litigation; if you have had an award, of any amount awarded against you; or settled the case for $10,000 or more. You must also make a disclosure when a client files a written complaint against you and the amount of the claim is $5000 or if the complaint alleges forgery, theft, misappropriation or conversion of funds, regardless of the amount.<br>• **Civil/Judicial Disclosure** - If you have been named in any civil, investment-related claims, you must amend your Form U4 to reflect the fact that you are a current party to one of these actions.<br>• **Bankruptcy Filing/Compromise with Creditors/Unsatisfied Judgment or Lien\*** – You must disclose when you have made a compromise with your creditors, filed a bankruptcy petition, or if you have been in control of any organization that has filed for bankruptcy or had a trustee appointed due to dissolution of the organization. You must also report unsatisfied judgments or liens against you including any entities which resulted in a bankruptcy, compromise or unsatisfied lien over which you exercised control.<br>• **Regulatory Action(s)** – Any findings against you issued by the SEC, any state regulatory agency, SRO (i.e. FINRA), or other federal agency will likely require disclosure.<br>• **Criminal event(s) (excluding minor traffic violations)** – Disclose any felony charge or misdemeanor charge involving the theft of cash or securities, fraud, making false statements, bribery, forgery, perjury, counterfeiting, extortion or conspiracy to commit any of the above misdemeanors.<br>• **Revocation or suspension of your authorization to act as an attorney, accountant or federal contract**<br>• **Denial, revocation of a bond or payment by a bond company, relating to you.** |
| Frequency | • As required |
| Action | • Notify the CCO or designee to report a material event that requires amending the Form U4<br>• Cooperate with Compliance by reporting information promptly |
| Record | • Retain evidence /supporting documentation provided to the CCO or designee |

Regulators require reporting of certain events and updating of Forms U4 and U5 when previously-filed information changes. **Employees are obligated to notify the CCO or designee and the OSJ Branch Manager if there are changes to Form U4 responses and report other information required by rule or by Alpine.**

Alpine will report specified events involving the firm or an associated person to FINRA via the Regulatory Filings Application on the FINRA Firm Gateway no later than 30 calendar days after Alpine knows of the event. This is in addition to any obligation to update an associated person's U4 or U5 or Alpine's Form BD. Alpine will promptly report to FINRA (not later than 30 calendar days after Alpine has concluded or reasonably should have concluded) that an associated person of Alpine or Alpine itself has violated any securities-, insurance-,

ALPINE_LIT168826

commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body or self-regulatory organization.

### 3.13.2 Alpine's Reporting Requirements

| Responsibility | • CCO or designee |
|---|---|
| Resources | Activities involving the firm and/or its associated persons in the following areas:<br><br>• **Client Complaints/Arbitrations** - If you have ever been named as a respondent in an investment-related action, or other civil litigation; if you have had an award, of any amount awarded against you; or settled the case for $10,000 or more. You must also make a disclosure when a client files a written complaint against you and the amount of the claim is $5000 or if the complaint alleges forgery, theft, misappropriation or conversion of funds, regardless of the amount.<br>• **Civil/Judicial Disclosure** - If you have been named in any civil, investment-related claims, you must amend your Form U4 to reflect the fact that you are a current party to one of these actions.<br>• **Bankruptcy Filing/Compromise with Creditors/Unsatisfied Judgment or Lien\*** – You must disclose when you have made a compromise with your creditors, filed a bankruptcy petition, or if you have been in control of any organization that has filed for bankruptcy or had a trustee appointed due to dissolution of the organization. You must also report unsatisfied judgments or liens against you including any entities which resulted in a bankruptcy, compromise or unsatisfied lien over which you exercised control.<br>• **Regulatory Action(s)** – Any findings against you issued by the SEC, any state regulatory agency, SRO (i.e. FINRA), or other federal agency will likely require disclosure.<br>• **Criminal event(s) (excluding minor traffic violations)** – Disclose any felony charge or misdemeanor charge involving the theft of cash or securities, fraud, making false statements, bribery, forgery, perjury, counterfeiting, extortion or conspiracy to commit any of the above misdemeanors.<br>• **Revocation or suspension of your authorization to act as an attorney, accountant or federal contract**<br>• **Denial, revocation of a bond or payment by a bond company, relating to you.**<br><br>This list is not intended to be an exhaustive list, please refer to FINRA Rule 4530 for additional information.<br><br>• Information provided by employees including information from Annual Employee Certifications<br>• FINRA compliance reports |
| Frequency | • As required |
| Action | • Determine whether information or events are reportable including updating the RR's Form U4 or U5<br>• File information electronically with FINRA |

ALPINE_LIT168827

| | |
|---|---|
| **Record** | • Record of electronic filings<br>• Records of updates to Form U4, Form U5, 4530 and/or Form BD which may be retained electronically or via paper. |

The CCO or designee will report specified events involving the firm or an associated person to FINRA via the Regulatory Filings Application on the FINRA Firm Gateway no later than 30 calendar days after Alpine knows of the event. This is in addition to any obligation to update an associated person's U4 or U5 or Alpine's Form BD. The CCO or designee will promptly report to FINRA (not later than 30 calendar days after Alpine has concluded or reasonably should have concluded) that an associated person of Alpine or Alpine itself has violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body or self-regulatory organization.

Relating to reported events, Alpine will file with FINRA copies of the following. Events already reported on Form U4 with an affirmative request to satisfy Rule 4530 reporting requirements and FINRA findings and actions will not be reported separately.

1. any indictment, information or other criminal complaint or plea agreement for conduct reportable under paragraph (a)(1)(E) of this Rule;
2. any complaint in which a member is named as a defendant or respondent in any securities- or commodities-related private civil litigation, or is named as a defendant or respondent in any financial-related insurance private civil litigation;
3. any securities- or commodities-related arbitration claim, or financial-related insurance arbitration claim, filed against a member in any forum other than the FINRA Dispute Resolution forum;
4. any indictment, information or other criminal complaint, any plea agreement, or any private civil complaint or arbitration claim against a person associated with a member that is reportable under question 14 on Form U4, irrespective of any dollar thresholds Form U4 imposes for notification, unless, in the case of an arbitration claim, the claim has been filed in the FINRA Dispute Resolution forum.

The following events require reporting:

1. the member or an associated person of the member:

- has been found to have violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body, self-regulatory organization or business or professional organization;
- is the subject of any written customer complaint involving allegations of theft or misappropriation of funds or securities or of forgery;
- is named as a defendant or respondent in any proceeding brought by a domestic or foreign regulatory body or self-regulatory organization alleging the violation of any provision of the Exchange Act, or of any other federal, state or foreign securities, insurance or commodities statute, or of any rule or regulation thereunder, or of any provision of the by-laws, rules or
  similar governing instruments of any securities, insurance or commodities domestic or foreign regulatory body or self-regulatory organization;
- is denied registration or is expelled, enjoined, directed to cease and desist, suspended or otherwise disciplined by any securities, insurance or commodities industry domestic or foreign regulatory body or self-regulatory organization or is denied membership or continued membership in any such self-regulatory organization; or is barred from becoming associated with any member of any such self-regulatory organization;
- is indicted, or convicted of, or pleads guilty to, or pleads no contest to, any felony; or any misdemeanor that involves the purchase or sale of any security, the taking of a false oath, the making of a false report, bribery, perjury, burglary, larceny, theft, robbery, extortion, forgery, counterfeiting, fraudulent concealment, embezzlement, fraudulent conversion, or
  misappropriation of funds, or securities, or a conspiracy to commit any of these offenses, or substantially equivalent activity in a domestic, military or foreign court;
- is a director, controlling stockholder, partner, officer or sole proprietor of, or an associated person with, a broker, dealer, investment company, investment advisor, underwriter or insurance company that was

ALPINE_LIT168828

suspended, expelled or had its registration denied or revoked by any domestic or foreign regulatory body, jurisdiction or organization or is associated in such a

capacity with a bank, trust company or other financial institution that was convicted of or pleaded no contest to, any felony or misdemeanor in a domestic or foreign court;

- is a defendant or respondent in any securities- or commodities-related civil litigation or arbitration, is a defendant or respondent in any financial-related insurance civil litigation or arbitration, or is the subject of any claim for damages by a customer, broker or dealer that relates to the provision of financial services or relates to a financial transaction, and such civil

  litigation, arbitration or claim for damages has been disposed of by judgment, award or settlement for an amount exceeding $15,000. However, when the member is the defendant or respondent or is the subject of any claim for damages by a customer, broker or dealer, then the reporting to FINRA shall be required only when such judgment, award or settlement is for an amount exceeding $25,000; or

- is, or is involved in the sale of any financial instrument, the provision of any investment advice or the financing of any such activities with any person who is, subject to a "statutory disqualification" as that term is defined in the Exchange Act. The report shall include the name of the person subject to the statutory disqualification and details concerning the disqualification;
  or

2. an associated person of the member is the subject of any disciplinary action taken by the member involving suspension, termination, the withholding of compensation or of any other remuneration in excess of $2,500, the imposition of fines in excess of $2,500 or is otherwise disciplined in any manner that would have a significant limitation on the individual's activities on a temporary or permanent basis.

# 3.14 Money Laundering

[FINRA Rule 3310; Bank Secrecy Act]

This section provides a brief overview of the employee's responsibilities concerning the prevention and detection of money laundering. Please refer to the chapter titled "*Anti-Money Laundering (AML) Program*" for more detailed information about Alpine's AML Program.

## 3.14.1 Reports Of AML Non-Compliance And Other Potential Crimes

All employees are obligated to promptly report to the AML Compliance Officer or designee any known or suspected violations of anti-money laundering policies as well as other suspected violations or crimes. If the potential violation implicates the AML Officer, it should be reported to a senior officer of Alpine. All reports are confidential and the employee will suffer no retaliation for making them.

**What to report:** Crimes or suspected crimes by individuals (whether associated with Alpine, a customer, or prospective customer) are required to be reported. This includes suspicion that Alpine is being used as a conduit for criminal activity such as money laundering or structuring transactions (discussed below) to evade the Bank Secrecy Act reporting requirements. There is no clear definition of what constitutes a "crime." If you believe some improper or illegal activity is occurring, it is your obligation to be attentive and alert to the red flags and report to the AML Compliance Officer or designee any new or existing customers who may be engaged in violations of anti-money laundering regulations.

**SAR reports:** By law, Alpine and its employees cannot disclose to the customer or anyone other than authorized parties that it has filed a SAR or provide information that would reveal the existence of a SAR. Questions regarding SAR filings should be referred to Compliance. If you become aware of an unauthorized disclosure of an SAR or you receive a subpoena for an SAR, **immediately contact the Compliance Department**. Designated Compliance personnel will be responsible for contacting FINCEN to report the unauthorized disclosure.

ALPINE_LIT168829

### 3.14.2 Identity Theft

Identity thieves use someone's personal identifying information to open new accounts and misuse existing accounts. Alpine has established an Identity Theft Prevention Program (ITPP) to help detect and prevent identity theft. Many elements of detecting or preventing identity theft utilize similar techniques to that of the anti-money laundering (AML) requirements included within these policies.

The ITPP is based on identifying "red flags" which may indicate an occurrence of identity theft. *It is the responsibility of all employees to be attentive and alert to the red flags and report to the AML Compliance Officer any new or existing customers who may be engaged in violations of anti-money laundering regulations, identity theft or who have reported an instance of identity theft.*

For a list of potential identity theft red flags, refer to the section titled "*Red Flag Identification and Detection Grid*" located in the *Identity Theft Prevention Program (FTC Fact Act Red Flags Rule)* section.

### 3.14.3 Tape Recording of Registered Persons by Certain Firms-Taping Rule

FINRA Rule 3170 (replacing NASD Rule 3110(i) and 3010(b)(2). Consolidated Supervision Rules, Regulatory Notice 14-10 available at http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/notices/p465940.pdf.

Collectively, FINRA Rule 3010 and FINRA Rule 3170 states:

"A firm with at least five but fewer than ten registered persons, where 40% or more of its registered persons have been employed by one or more Disciplined Firms within the last three years" and "A firm with at least ten but fewer than twenty registered persons where four or more of its registered persons have been employed by one or more Disciplined Firms within the last three years" or

"A firm with at least twenty registered persons, where 20% or more of its registered persons have been employed by one or more Disciplined Firms within the last three years".

Alpine will, within 30 days of receiving a notification from FINRA, choose a hardware and software to adhere to the rule and will follow the process outlined herein.

| | |
|---|---|
| **Responsibility** | • President with respect to the OSJ Branch Manager<br>• OSJ with respect to Registered Representatives |
| **Resources** | • Recorded phone conversations between registered representatives and potential, current clients and/or any other business related telephone conversations |
| **Frequency** | • As required |
| **Action** | President (as it pertains to the OSJ Branch Manager):<br><br>• Reviews business related telephone conversations of the OSJ Branch Manager to ensure compliance with the securities laws and FINRA rules.<br><br>OSJ Branch Manager, as it pertains to the firm's registered persons:<br><br>• Reviews business related telephone conversations of the registered representatives to ensure compliance with the securities laws and FINRA rules. |
| **Record** | • A minimum of 5% of random phone calls will be reviewed periodically through a hardware/software method to be determined. The reviewer will choose at least |

ALPINE_LIT168830

|  | 5% of the phone calls each day for each registered representative<br>• Each call reviewed will be documented on a supervisor call review sheet indicating key information from the call (including registered representative being reviewed, reviewer name, date and time of review, a summary of the phone call, and a notation of any issues on the call). Any issues will be addressed by the registered representative's supervisor. The supervisor call sheet will be retained in the OSJ supervision files or similar files.<br>• Tape recordings and supervisor call review forms will be maintained for a period of 3 years |
|---|---|

[Insert Section Here]

## 3.15 Emergency Business Recovery Procedures

[FINRA Rule 4370]

Alpine has a *Business Continuity Plan* ("BCP") that assigns responsibilities and outlines procedures in the event of a disaster, emergency or pandemic which impacts the ability of Alpine to continue conducting business (also termed a "significant business disruption"). Examples of a significant business disruption include a regional power outage; disruption at another company that provides services critical to Alpine; and destruction of an office or other facilities by natural causes or by other means. The BCP designates employees who are responsible for employee safety and protection of firm property, records, and customer assets.

In the event of a disruption, employees will be given instructions by authorized personnel. Depending on the nature of the emergency, it may be necessary to use alternate communication systems; transfer personnel and/or business activities to alternate office space; or transfer Alpine's business to other brokerage firms or financial institutions until normal operations can be resumed.

Alpine has established procedures for contacting employees in the event of an emergency. If Alpine conducts a test of its emergency procedures, all employees are required to participate as if the emergency were real. Past emergencies affecting the securities industry have shown that preparedness and cooperation are key to maximizing the safety of employees and minimizing business interruptions. It is important for all employees to follow instructions from senior management and other authorized key personnel during any drill or when an emergency occurs.

Questions regarding Alpine's Business Continuity Plan may be referred to the Chief Operating Officer.

| Responsibility | • COO |
|---|---|
| Resources | • Business Continuity Records |
| Frequency | • Annually or as required |
| Action | • Administer the Business Continuity Plan<br>• Perform annual tests for compliance with the policy |
| Record | • Copies of Alpine's business continuity plan<br>• Copies of dates in which the plan is tested |

[Insert Section Here]

ALPINE_LIT168831

## 3.16 Prohibited Activities

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager |
| **Resources** | • Various (referral of items, direct identification, review of transactions, correspondence, *etc.* depending on the nature of the prohibited activity) |
| **Frequency** | • As required |
| **Action** | • Take corrective action which may include:<br>   o Conferring with the employee<br>   o Referring the matter to the CCO or President<br>   o Issuing a written admonition<br>   o Restricting the activities of or transactions handled by the employee<br>   o Suspending the employee<br>   o Termination |
| **Record** | • The record of action taken depends on the nature and seriousness of the prohibited activity. Records, if needed, may be in different forms, including, but not limited to, the following:<br>   o Designated supervisors may record action taken in supervisory logs, memos to employees' files, *etc.*<br>   o The Branch Manager or President may record action by memo to the employee's file |

### 3.16.1 Registered Representatives

RRs (including principals handling customer accounts) are specifically prohibited from doing any of the following. A RR may not:

(1) Engage in "private" securities transactions or any transaction not sponsored or authorized by Alpine. A RR may not effect securities transactions for any person or entity outside of the scope of his or her employment with Alpine, unless he or she gives the CCO prior written notice of the proposed transaction and the CCO (or the President if this involves the CCO) gives the RR written approval of such transaction. This prohibition is intended to cover any investment transaction;

(2) Raise money individually or as an agent for any business enterprise whatsoever without the advance written consent of the CCO;

(3) Warrant or guarantee the present or future value or price of any security or warrant that any company, partnership, or issuer of securities will meet its obligations, promises, or comply with its representations to investors;

(4) Agree to repurchase a security at some future time from a client for the RR's account, for Alpine's account, or for any other account;

(5) Raise money for a charitable or political organization without informing the OSJ Branch Manager prior to the commencement of such activity;

(6) Act as personal custodian of securities, stock powers, money, or other property belonging to a client;

(7) Arrange for or accept authority to be granted access to a safety deposit box or other safekeeping place belonging to a customer;

ALPINE_LIT168832

(8) Borrow money or securities from a client;

(9) Receive compensation for securities transactions from anyone, including clients or other securities dealers other than from Alpine, for services rendered. This includes finder's fees, purchaser representative fees, investment advisory fees, and commissions of any sort. This prohibition can be waived in writing only by the CCO or President, in advance of any transaction;

(10) Make arrangements for borrowing of monies by a client for the purpose of purchasing securities;

(11) Maintain a joint account in securities with any client, or share any benefit, profit, or loss with any client, resulting from a securities transaction, without prior approval of the OSJ Branch Manager;

(12) Enter into any business transaction or relationship jointly with a client without the specific advance written approval of the OSJ Branch Manager;

(13) Make any written or oral representations regarding securities, other than those contained in the official offering prospectus if the issue is under registration, or in materials specifically authorized by Alpine if the securities are the subject of a private placement;

(14) Accept an account from a customer on a discretionary basis, unless approval is first received from OSJ Branch Manager;

(15) Make arrangements for the purchase or sale of securities for a customer/client, except through Alpine, unless specifically authorized by the OSJ Branch Manager;

(16) Advertise in any newspaper or publication or any other form of the media or social networking sites without obtaining written approval of the CCO;

(17) Offer or sell securities in any state in which the registered representative is not registered with the applicable state securities authority;

(18) Recommend the purchase of securities or the continuing purchase of securities in amounts which are inconsistent with the reasonable expectation that the customer has the financial ability to meet such a commitment;

(19) Compensate any person, firm, or entity, other than a RR of Alpine, for any services rendered in connection with the sale of a security to a customer without express written advance approval of the OSJ Branch Manager;

(20) Forward, or agree to forward, confirmations or statements of account other than to the official post office address of the customer;

(21) Execute an order for the RR's own account prior to executing an order by a customer for the same security when both orders originate at or about the same time;

(22) "Churn" customers' accounts;

(23) Accept a gift in excess of $100 from any customer, business associate, member firm, associated person of a member firm, or person having a beneficial interest during the past twelve months in any issuer in which Alpine makes a market or for which Alpine acted as underwriter or selling agent or giving a gift in the amount of $50 or more to a BATS exchange employee;

(24) Require that the purchase or sale of a security on behalf of a customer be tied to the purchase or sale by the customer of a different security;

(25) Trade on inside information (for further information see "Insider Transactions" below);

ALPINE_LIT168833

(26) Execute transactions for a customer's account if said transactions have not been authorized by the customer;

(27) Engage in any business activity outside of Alpine without first disclosing said business activity to Alpine and obtaining prior written approval of the CCO or designee in writing or President or designee (in the case of the CCO).

- o   Business activity would include but not be limited to, maintaining a brokerage or investment account away from Alpine. The definition specifically excludes any non-equities based insurance products and any bank accounts or products that are FDIC insured. Alpine attributes any brokerage or investment account to which the RR is a beneficial owner to the RR for the purposes of this prohibition. The maintenance of brokerage accounts away from Alpine poses additional compliance problems when the firm is required to monitor a RR's immediate family, or anyone else financial dependent on the RR's personal trading. To remedy this difficulty, a RR who wishes to maintain or be a beneficial owner of a brokerage or investment account away from Alpine must not only disclose the behavior, but have duplicate account statements sent directly to Alpine, c/o Compliance. The records will be kept confidential and will be used only to comply with the Rules prescribed by the FINRA.

## 3.16.2 Use Of Firm Name

No employee may use Alpine's name in any manner which could be reasonably misinterpreted to indicate a tie-in between Alpine and any outside activity of the employee.

## 3.16.3 High Pressure Sales Tactics

Alpine and its RRs will not engage in high pressure sales tactics which may include excessive telephone calls, implying that a price may change on a security if the customer doesn't act immediately, or falsely representing that there is a limited supply of a security at a particular price.

## 3.16.4 Providing Tax Advice Not Permitted

Employees may not give tax advice to customers since Alpine and its employees are not engaged in the practice of providing tax advice. Customers requiring specific tax guidance should be referred to their personal tax advisers.

## 3.16.5 Rebates Of Commission

[FINRA Rule 2040]

Employees are prohibited from rebating to anyone, directly or indirectly, any securities-related commission or securities-related compensation received.

## 3.16.6 Sharing Commissions Or Fees With Non-Registered Persons

[FINRA Rule 2040]

With few exceptions, regulations generally prohibit the sharing of commissions or compensation with non-registered persons. Any payment, finder's fee, or sharing arrangement involving a non-registered person must be referred to Compliance for review.

ALPINE_LIT168834

### 3.16.7 Accepting Compensation From Others

RRs are prohibited from accepting direct or indirect compensation (finders' fees, commissions, *etc.*) for Alpine-related business other than through Alpine-approved products or programs or with the prior approval of Alpine's CCO or designee.

### 3.16.8 Settling Complaints Or Errors Directly With Customers

Employees may not make payments to customers of any kind to resolve an error or customer complaint without express approval from their direct supervisor. Errors and verbal complaints operational in nature must be brought to the attention of the COO or designee for consideration. Errors and verbal complaints relating to sales practice issues should be brought to the attention of the OSJ Branch Manager or designee. Please refer to the section titled "**Handling of Oral Complaints**" for more information.

### 3.16.9 Borrowing From And Lending To Customers

[FINRA Rule 3240; FINRA Notice to Members 04-14]

RRs are generally not permitted to borrow from or lend to customers.

This restriction does NOT apply when a RR enters into a loan arrangement with a customer who is:

1. an immediate family member (defined as parents; grandparents; in-laws; spouse; siblings; children; grandchildren; cousins; aunts or uncles; nieces or nephews; and any other person whom the RR supports, directly or indirectly, to a material extent);
2. a financial institution in the business of providing credit, financing, or loans AND where the terms of the lending arrangement are those that would also be available to the general public doing business with those institutions;
3. another RR of Alpine;
4. someone (or an entity) who has a personal relationship with the RR and the lending arrangement arises from the personal relationship rather than an RR's customer relationship; or,
5. someone (or an entity) that has a business relationship outside the RR's customer relationship.

Any proposed loan with the RR's customer (other than a loan with a family member or financial institution in item numbers 1 and 2 above) requires the PRIOR review and approval by the CCO. RRs requesting exceptions must complete the RR's Customer Lending Arrangement Request form and submit it to the CCO prior to effecting the loan arrangement.

Annually, Alpine includes a question about lending to customers in the annual certification. All employees must complete the certification at the time the certification is presented for completion.

### 3.16.10 Personal Funds Deposited In Customer Accounts

In general, employees are not permitted to deposit personal funds or securities in customers' accounts or deposit customers' personal funds or securities in employee accounts. The same prohibitions apply to withdrawals. Exceptions should be reviewed by the CCO.

### 3.16.11 Prohibition Against Guarantees

[FINRA Rule 2150]

Alpine and its employees are prohibited from guaranteeing a customer against loss in any securities transaction. Designated supervisors are responsible for identifying prohibited guarantees in correspondence or other written communications with public customers. Options or written agreements that establish the future price of a transaction such as repurchase agreements are not included in this prohibition.

ALPINE_LIT168835

### 3.16.12 Fees And Other Charges

Employees are not permitted to charge fees or assess other charges to customers or customers' accounts unless they are expressly permitted by Alpine.

### 3.16.13 Customer Signatures

Employees are not permitted to sign documents on behalf of customers, even when doing so is meant to accommodate a customer's request. Customer signatures must be original (if they are going to be medallion guaranteed) by the customer on all documents.

### 3.16.14 Rumors

[FINRA Rule 6140(e)]

No employee may spread any rumors or misinformation that the employee knows to be false or misleading. This includes rumors of a sensational character that might reasonably be expected to affect market conditions. Discussion of unsubstantiated information published by a widely circulated public media is not prohibited, providing the source and unsubstantiated nature are also disclosed.

### 3.16.15 Misrepresentations

Employees may not disseminate any information that falsely states or implies guarantees or approval of securities by the government or other institution such as government guarantee of securities that carry no such guarantee. SIPC may not be misrepresented as a guarantor of a customer's account against losses from transactions.

### 3.16.16 Bribes

No employee may offer or solicit explicit inducements to or from employees or representatives of other institutions or foreign governmental or political officials to obtain business. Entertainment and gifts in reasonable amounts are not included in this prohibition and are discussed in the section *Gifts, Gratuities And Entertainment*.

### 3.16.17 Acting Without Registration

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • New account forms<br>• Notices of registration status from CCO or designee<br>• Reports of transactions effected by RRs not licensed in the customer's state of residency |
| Frequency | • Ongoing |
| Action | • Review new account forms to identify any out-of-state accounts where the RR may not be registered<br>• Review reports of transactions identifying unlicensed activity and follow up with RR<br>• Immediately refer any RRs requiring state registration to the CCO or designee |
| Record | • Include a notation on the New Account form or report noting action taken |

ALPINE_LIT168836

| | • Supervisor's log or other record, as needed |
|---|---|

No employee may engage in activities that require registration (selling securities, soliciting accounts, trading, *etc.*) unless registered in the appropriate capacities. Questions regarding the need for registration should be referred to the CCO or designee.

### 3.16.18 Improperly Influencing Research Analysts

To the extent that Alpine employs research analysts, non-research personnel are prohibited from attempting to coerce research analysts to: (1) alter their views regarding the content of a research report or the timing of its publication; or (2) change the investment conclusions in a research report other than as appropriate to correct factual inaccuracies or verify market information such as prevailing market prices or to ensure consistency with established firm policies.

## 3.17 Computer Records, Equipment And Software

| Responsibility | • Alpine's IT Committee |
|---|---|
| Resources | • Records of employees with company-issued laptops or other devices<br>• Disks and other computer records maintained by a terminating employee<br>• Reports of lost devices |
| Frequency | • As required |
| Action | • Issue laptops or other mobile devices to employees and maintain a record of laptops<br>• Provide employees with education and policy information about proper use of computer and other electronic equipment including appropriate security measures and accessing customer information<br>• Instruct all employees to secure equipment and information<br>• Secure disks, computers, software, and other property when an employee terminates<br>• Do not permit removal of Alpine's equipment without approval<br>• Take action regarding lost devices including remote deactivation, if available, and assessment of whether a breach of customer information has or may occur |
| Record | • Records of laptops or other devices and to whom they are provided<br>• Confirm to the President that terminated employee's computer and access to Alpine's records have been secured<br>• Records of lost devices and actions taken |

Alpine considers its computer records, systems, and software to be corporate assets. Employees are responsible for protecting these assets from unauthorized use, destruction, or unauthorized modification. This includes a prohibition against violating copyright laws or licensing agreements applicable to computer software.

Physical equipment (PCs, printers, software, diskettes, *etc.*) must be placed in a secure location to avoid theft, tampering, unauthorized use, and environmental hazards (water, smoke, magnets, *etc.*). The use of personal computers for Alpine business is subject to the same guidelines and restrictions as Alpine computers.

When an employee terminates, any disks or other storage medium that includes proprietary information, including customer information, are considered property of Alpine and must be left with Alpine.

ALPINE_LIT168837

### 3.17.1 Laptop Computers And Other Mobile Devices

Employees who use laptops or other mobile devices for Firm business are responsible for the security of the device and the information contained on it. Serious security breaches can occur if a device containing or capable of accessing confidential information is lost or stolen. Employees who use laptops for Alpine business are required to comply with the following requirements:

- Only laptops issued by Alpine may be used for Alpine related business.
- Laptops containing confidential Alpine records such as payroll records and sensitive customer account records (including social security numbers) **cannot be removed** from Alpine's premises unless:
  - The employee is authorized to have such information on a laptop and remove it from Alpine's premises.
  - Confidential information is encrypted.
- All confidential data must be accessed only on Alpine's servers and may not be stored on laptops.
- Employees must use passwords that are changed periodically and include random letters and numbers.
- Laptops must be physically locked with a cable to a stationary object while in use at Alpine's offices or at home.
- When traveling, laptops must be locked up unless tracking software has been installed.
- Employee training includes potential security breaches and proper handling of computer equipment and confidential information.

### 3.17.2 Reporting Lost Devices

- The loss of a mobile device **must be immediately reported to the IT Committee**.

### 3.17.3 Identifying And Reporting Data Breaches

- All employees are required to immediately report an identified potential intrusion into a mobile device or into Alpine's systems to the IT Committee.

### 3.17.4 Software

Software installed and used on electronic devices is limited to software approved by Alpine. Alpine will install or provide authorized software for business use including anti-virus and anti-malware protection.

Employees are strictly prohibited from installing software other than what is authorized by Alpine.

### 3.17.5 Prohibited Downloading

Employees are prohibited from:

- Downloading customer and other confidential information from Alpine's mainframe or other central records, unless specifically authorized
- Using portable devices such as USB key drives, MP3 players, mobile phones, and other devices for downloading information
- Downloading programs from the Web to Alpine's computers unless specifically authorized

## 3.18 Electronic Communications Policy

### 3.18.1 Introduction

This policy governs the use of electronic communications by personnel of Alpine. This policy also extends to off-hours usage of electronic communications systems.

ALPINE_LIT168838

### 3.18.2 Summary Of Policy

The following summarizes key points of this policy. It is important that the policy be read in its entirety.

- All Alpine personnel are subject to this policy.
- Unless prior authorization is received, Alpine's owned electronic communications systems are to be used for Alpine's business purposes.
- Employees are prohibited from using web-based personal e-mail accounts for company business on Alpine-owned systems.
- Electronic communications should not be considered private.
- Electronic communications are subject to monitoring and audit by Alpine.
- E-mails are subject to federal law restricting the sending of unsolicited electronic mail.
- Posting information and participating in chat rooms or instant messaging systems for Alpine-related communications require prior approval.
- Certain public communications require approval and retention.
- To avoid downloading a computer virus, do not open attached documents from unknown sources.

An employee's failure to comply with this policy may lead to disciplinary action.

### 3.18.3 Electronic Communications Defined

The following list identifies, but is not limited to electronic communications:

- Electronic mail (e-mail)
- Third-party e-mail systems
- Internet Telephone
- Facsimile transmissions
- News Groups
- File Transfer Protocol (FTP)
- World Wide Web browsing (WWW)
- Intranet
- Electronic Bulletin Boards
- Internet Relay Chat (IRC) or similar "Chat Rooms"
- Instant Messaging Systems
- Web logs/blogging
- Remote Host Access (Telnet or TN3270)
- Other information transmissions via the Internet

### 3.18.4 Instant Messaging

[FINRA Notice to Members 03-33]

Instant messaging is included in some internet services and provides the ability to conduct instant, online interactive "conversations." Employees must be aware that because instant messaging provides a method of recording and potentially keeping such conversations, they are treated as written communications subject to advertising, sales literature, and correspondence recordkeeping review and retention requirements. The use of instant messaging subjects those communications to review by Alpine, retention in its records, and potential delivery to regulators, legal authorities, or others in civil litigation or arbitrations. Instant messages are not appropriate for "confidential" communications.

**Employees are not permitted to use instant messaging to conduct Alpine's business, except for intra-department communications or personnel specifically authorized to use such method of communication by the CCO or designee.**

ALPINE_LIT168839

### 3.18.5 Guidelines For Proper Use

Alpine electronic communications systems should be used for business purposes only. Electronic communications with customers and/or the public are permitted only through company-sponsored or alternative facilities approved by the Communications Officer.

### 3.18.5.1 Electronic Communications Are Not Private

**Employees should not confuse phone conversations or face-to-face conversations with communications through electronic means.** Newspaper articles, regulatory actions, and legal actions abound with the consequences of employees who do not take what they say in electronic communications seriously. The repercussions of casual or poorly worded communications have potential adverse consequences for both Alpine and the employee. While electronic communications often seem like one-on-one conversations, and many people converse in electronic communications in a casual and non-business manner, it is important to understand that the use of Alpine's electronic communications systems or approved alternative systems are communications that may be seen by others either through Alpine's review system or outsiders who access this information through official and authorized means or sometimes through unauthorized means.

Electronic communications and residual or temporary files resulting from participation in electronic communications can be widely disseminated. It is possible that such communications be saved to disk, printed, forwarded to another party, subpoenaed in litigation, viewed by system administrators or regulatory agents, and/or intercepted by anyone at a variety of points. Electronic communications are not suitable for communications that must remain confidential or private, unless Alpine has arranged for encryption of confidential messages. There should be no expectations of privacy in electronic communications.

### 3.18.5.2 Communications Must Conform To Appropriate Business Standards And The Law

Users of Alpine's electronic communications systems are expected to follow appropriate business communication standards. Sending or receiving communications that are inappropriate, profane, obscene, discriminatory, threatening or otherwise offensive is prohibited. Sending or receiving jokes, puzzles, games, chain messages, pictures, video/sound files and frequent or long personal correspondence are some examples of inappropriate use. Use of electronic communication must comply with applicable local, state, federal and international laws.

### 3.18.5.3 Electronic Communications Are Business Communications And Should Be Treated As Such

- Electronic communications sent should contain the most recent, valid information available.
- Alpine's employees are required to report threatening, harassing or otherwise inappropriate communications to the President, OSJ Branch Manager or CCO.
- Communications received with inappropriate content must be deleted/discarded immediately without forwarding.
- Unauthorized dissemination of proprietary information is prohibited.
- Unauthorized copying or transmitting software or other materials protected by copyright is prohibited. Personnel must obtain Alpine's IT Committee's approval before distributing copyrighted material.
- References and/or links to Web sites may be a form of sales literature or advertising and therefore require the CCO's approval prior to use.
- Newly developed, non-company-sponsored electronic communication technologies are inappropriate for Alpine communications without prior approval of Alpine's IT Committee.
- Because of the nature of electronic communications systems in general, there is no guarantee that a message will reach its destination in a timely manner or that it will reach its destination at all.

### 3.18.5.4 Encryption

- Alpine may require encryption of certain confidential communications.
- Users are responsible for controlling access to their own computer and encrypted messages.

**ALPINE_LIT168840**

- Employees may not use unauthorized encryption unless authorized or directed by Alpine's IT Committee.
- Employees must use encryption when required by Alpine's IT Committee.
- Passwords should be safeguarded.

### 3.18.5.5 Special Requirements/Restrictions

- Securities licensing requirements necessary for public communications apply to electronic communications.
- Recommendations or communications that require an accompanying prospectus may not be sent unless the prospectus can be sent via e-mail.
- If a message is received from a party requesting that they not be contacted, the Alpine employee should notify the designated party responsible for administering Alpine's Do Not Call List.
- E-mail to customers or prospective customers regarding Alpine's products, services, or other Alpine-related business communications may NOT be sent from a home computer and/or using non-company sponsored electronic communications.

### 3.18.5.6 Record Retention Requirements

Regulation's require that Alpine retain records of business communications. Alpine's Communications Officer retains electronic communications in accordance with these regulations.

### 3.18.5.7 Required Pre-Use Review And Approval

Electronic communications sent to external recipients may need approval or pre-approval in accordance with Alpine policies and procedures established for written communications. Refer to the chapter *COMMUNICATIONS WITH THE PUBLIC* for further policies regarding correspondence and other communications with the public.

### 3.18.5.8 Monitoring, Audit And Control

Electronic communications through Alpine's systems are the property of Alpine. Alpine reserves the right to monitor and audit electronic communications at any time for appropriate business usage, standards and compliance with this policy and applicable procedures.

## 3.18.6 E-Mail

### 3.18.6.1 Web-based Personal E-Mail Accounts Prohibited

Employees are prohibited from using their personal web-based e-mail accounts for company business. Using a personal account may expose the employee and Alpine to:

- Regulatory actions for failure to retain e-mails
- Civil court actions for failure to retain e-mails required in litigation
- Access to confidential business communications by unauthorized persons
- Access to Alpine's e-mail systems by hackers, viruses, and other intrusions that may impede or damage Alpine's systems

### 3.18.6.2 Standard Disclosures Included With Outgoing E-Mail Communications

All outgoing e-mail communications transmitted through Alpine's system automatically include standard disclosures regarding Alpine's identity and other necessary or required disclosures.

ALPINE_LIT168841

### 3.18.6.3 System Maintenance

As part of routine maintenance, e-mail messages that are of a certain age or file-size will be automatically deleted from the system.

### 3.18.6.4 Attachments

In order to avoid downloading a computer virus, do not open attachments unless you are familiar with the source.

### 3.18.6.5 Restrictions On Unsolicited E-Mails

[CAN-SPAM Act of 2003]

Federal law imposes restrictions on commercial e-mail, particularly unsolicited "mass" e-mail messages. "Commercial electronic mail" includes any electronic mail message primarily for the purpose of sending a commercial advertisement or promotion of a commercial product or service. It does not include electronic mail relating to transactions or where there is a relationship between the sender and the recipient.

Recipients of commercial e-mail must be provided the opportunity to "opt-out" and not receive future e-mails. Anyone receiving notification from a customer or anyone else asking not to receive electronic mail, must forward that information to the Communications Officer.

Senders of commercial e-mail may not:

- Use false or misleading e-mail header information or deceptive subject headings or otherwise deceive the recipient regarding the sender's address.
- Without prior authorization, use computers owned by others to transmit messages.
- Register for an e-mail address or domain name using materially false information or falsely represent themselves to be the registrants for Internet protocol addresses.
- Use "address harvesting" or "dictionary attacks" to obtain e-mail addresses from the Internet.
- Use automated means to create multiple e-mail addresses from which to send commercial e-mail (*e.g.,* using a computer program to create multiple "Yahoo" accounts).

Each commercial e-mail must include clear and conspicuous identification that the message is an advertisement or solicitation; a valid physical postal address of the sender; and a valid return address or other method for the recipient to "opt-out" from receiving further e-mails.

## 3.18.7 Personal Digital Assistants (PDAs)

If Personal Digital Assistants (PDAs) or similar devices are to be used for Alpine business, they will be issued by Alpine's IT Committee to Alpine's employees. If Alpine issues PDAs, messages will be routed through a central system that permits retention of messages as required by regulations.

## 3.18.8 Internet

**Personnel may not post any Alpine advertising or any business-related information without the CCO or designee's authorization.**

Alpine maintains a corporate Web site as its official Internet presence. Only designated personnel, with prior authorization from the CCO or designee, may direct an individual to post information to the Internet containing any of the following:

- references to or information about Alpine,
- communications involving investment advice,
- references to investment-related issues, or

ALPINE_LIT168842

- links to any of the above.

This includes posting such information to the Internet through such means including, but not limited to, the World Wide Web, Electronic Bulletin Boards, File Transfer Protocol (FTP) sites or any other method to establish their own Internet presence.

### 3.18.8.1 Chat Rooms

As interactive, extemporaneous conversations, chat rooms are considered a public forum. Participation in chat rooms is generally prohibited. If an employee wishes to participate in a chat room for business purposes, he or she must obtain prior written authorization from the CCO or designee.

### 3.18.8.2 Web Logs/Blogging

A web log or "blog" is an Internet online personal journal established and frequently updated by an individual and is of a very public nature. A blog is searchable through Google and other search engines and other blogs can link to it, potentially carrying the blogger's message to millions of viewers. Blogging encourages free-wheeling discussion of topics, the direction of which is often beyond the blogger's control. The millions of potential viewers include Alpine's existing and potential customers and law enforcement officials.

Employees are prohibited from creating or participating in blogs that deal with Alpine, Alpine's employees, its customers, and its business. Unauthorized use of third party intellectual property and disclosure of Alpine's secrets and confidential information can result in criminal and civil liabilities. Such disclosures may violate laws regulating inside information or violate internal "blackout" periods.

Engaging in harmful conduct including disclosure of confidential Alpine information, workplace gossip, posting racially or sexually offensive language or graphics, and disparaging Alpine, co-employees, vendors, and customers will not be tolerated.

Questions regarding blogging and this policy should be referred to the CCO or designee.

## 3.18.9 Failure To Comply

*Failure to comply with this policy may lead to disciplinary action.* Non-compliance may generate one or more of the following:

- Oral and/or written warning or notification of violation communicated to Alpine's personnel involved and their supervisor.
- Suspension of electronic communications privileges permanently or for a set period of time.
- Messages may be blocked or rejected if the message contains inappropriate content.
- Written warning to the employee's file.
- Suspension from work.
- Training/education course related to the infraction, and paid for by the employee.
- Regulatory discipline or censure.
- Suspension or termination of employment.

## 3.18.10 Consent To Policy

Use of Alpine's electronic communications systems represents the employee's consent to the terms outlined in this policy, including consent for Alpine to monitor and audit content and/or usage.

## 3.18.11 Mobile Devices

Mobile computer devices such as (but not limited to) smartphones, Blackberrys and tablets are subject to the following requirements and restrictions:

ALPINE_LIT168843

- The use of mobile devices is limited to those issued and/or authorized by the Firm.
- All employees permitted to use mobile devices will receive training regarding usage, restrictions, risks of using mobile devices, and other requirements.
- All devices will include security and anti-virus programs.
- Operating systems, security and anti-virus programs will be set for automatic updating to prevent security vulnerabilities.
- Alpine has a system to identify threats and intrusions.
- In the event of an intrusion, systems will be checked and access blocked, upgrades or new software may be installed to prevent future intrusions. Compliance and IT will determine whether the intrusion breached customer information security and whether customers should be notified.
- All data will be encrypted on the devices and on removable memory.
- Configuration and security settings will be determined by the Firm; employees may not change settings without approval from Compliance, IT or the designated supervisor.
- Permissible data to be stored on a device is limited to customer/prospect contact information (names, phone numbers, email addresses). Devices may NOT include confidential financial information.
- Only approved applications may be installed on the device. Unnecessary applications or services will be removed prior to assigning the device to an employee.
- Access to Alpine internal systems requires authentication; passwords will be periodically changed.
- Remote access to the Firm's systems (other than Citrix) is limited to those employees authorized such access.
- Data transmission to or from the mobile device will be encrypted.
- Employees may not share devices with others and passwords are confidential to the person assigned the password or other access capability.
- Mobile devices must not be left unattended, even on desks. These devices should be treated like cash, not to be left out in the open.
- When travelling, mobile devices must be carried in carry-on luggage and not in checked luggage.
- If a device is lost or stolen, the employee must immediately, upon discovery, notify Compliance.
- If an employee transfers to another position with the Firm, the assigned mobile device(s) will be wiped or re-set, if necessary, to provide access only to data, internal systems, and other capabilities consistent with the employee's new position.
- Upon termination, employees must return all Firm mobile devices to the Firm. Data will be wiped before re-use, donation, or destruction to ensure data cannot be accessed.
- The Information Technology Department will maintain lists of approved applications.
- The Information Technology Department will retain a record of mobile devices, to whom they are assigned, permitted access to Firm systems (or non-permission), permitted communication or access features (email, text messaging, PIN to PIN, etc.), and other information regarding permissible usage by the assigned employee.
- A periodic review will be conducted by Compliance and IT or Internal Audit to verify proper implementation of policies and controls, including testing of devices (all or a sampling), and assurance that current technology is up to date and functioning to protect Firm and customer information.

### 3.18.12 Final Points Concerning Alpine's Electronic Communications Policy

This policy governs the use of electronic communications by employees. It applies during business hours and after-business hours. ***This is an important policy; employees will be required to certify annually that they are familiar with and will comply with the policy.***

**1. Firm electronic systems or communications devices are for firm business purposes and business communications must conform to accepted business standards and regulatory requirements.**

- Inappropriate communications (profanity, obscenity, threats, otherwise offensive content) are prohibited. Report threatening or harassing communications to Compliance.
- Communications must include current and valid information.
- Copyrighted material cannot be sent unless authorized; contact Compliance for assistance.
- Copyrighted software cannot be copied or transmitted to others unless authorized.

ALPINE_LIT168844

- References and/or links to web sites may be a form of sales literature or advertising requiring Compliance approval prior to use.
- Communications that must be accompanied by a prospectus may not be sent electronically unless the prospectus is available as an electronic attachment or an electronic link is provided to access the prospectus.

**2. Electronic business communications must be accessed and transmitted only through Alpine-sponsored systems.**

- Regulators require retention of business communications and Alpine systems are designed to comply with retention requirements.
- Approved Alpine-sponsored systems include:
    - E-mail and e-faxes through desk-top computers in Alpine offices (the use of personal e-mail accounts for business communications is prohibited)
    - PDAs (personal digital assistants such as Blackberrys) issued by Alpine
    - Instant messaging limited to Compliance-approved departments or employees
    - Compliance-approved external systems/computers (requires specific approval for departments and/or employees)
    - Internal systems for internal-use only (employees are notified of appropriate use of internal-use systems)
- Encryption of information may be required by Alpine; employees may not independently encrypt communications on firm systems.
- Home computers or other personal devices and external systems may not be used for business purposes (unless specifically approved by Compliance).

**3. Consider electronic communications as public communications; protect confidential information.**

- Do not confuse phone conversations or face-to-face communications with electronic communications. Your electronic conversation is subject to review and retention and may be the subject of subpoena in a civil or regulatory action.
- Confidential communications must not be sent on portable devices in public places unless encrypted.
- Do not view confidential information where unauthorized persons may have access (elevators, other public places).
- Safeguard portable devices to avoid unauthorized access to firm business.
- Safeguard passwords.
- Close open pages and sign out when the device is not in use.

**4. There are restrictions on unsolicited e-mails under the CAN-SPAM Act of 2003.**

- Unsolicited "mass" commercial e-mails are prohibited.
- "Commercial" e-mail includes any electronic messages that send a commercial advertisement or promote a commercial product or service. It does not include e-mail where there is an existing business relationship.
- Recipients may "opt-out" of receiving future e-mails. Forward such requests to Compliance.
- "Address harvesting" or "dictionary attacks" may not be used to obtain e-mail addresses off the Internet.
- E-mails sent from firm systems will include required identification of Alpine and disclosures or disclaimers.

**5. Social media sites, blogs, and other electronic forums or communications systems may NOT be used for business communications.**
Employees may not participate in social networking sites (Facebook, LinkedIn, Twitter, etc.), chat rooms, message boards, web logs, blogging, or other electronic forums or external communications systems for business communications. Personal use of social media sites, blogs and other electronic forums or communications systems is permitted.

**6. Electronic communications will be reviewed, monitored and audited by Alpine.**

ALPINE_LIT168845

- All electronic communications are subject to review and retention.
- Communications that require pre-use approval may not be transmitted prior to review by the designated supervisor. This includes:
  - Communications to be sent to 25 or more investors within any 30 calendar-day period and that make any financial or investment recommendation or otherwise promote a product or service.
  - Communications that must be accompanied by a prospectus (Compliance approval required).
  - Advertising, sales literature, and market letters (Compliance approval required).

**7. Use of the Internet related to Alpine's business is subject to restrictions.**

- Employees are prohibited from posting information to the Internet without prior firm approval.
- Accessing offensive sites is prohibited. Alpine may block sites that are offensive or contrary to the conduct of business.

# 3.19 Advertising And Publishing Activities

Prior to issuing any advertising or writing any books, articles, newsletters, or other materials to be published in public media (magazines, newspaper, computer bulletin boards, Internet, *etc.* ) for public access, employees must contact both the President and the CCO for review and approval. Approval is not required for use of Alpine-issued research or other materials approved by Alpine and intended for public distribution.

# 3.20 Employees Acting As Trustees, Executors, Or Other Fiduciary Capacities

Employees usually will not act in a fiduciary capacity (*e.g.,* trustee, executor) for a customer's account unless the account is for a relative of the employee. Exceptions require the approval of the President and the CCO who should be notified by written memo requesting the exception and the reasons for the exception.

# 3.21 Use Of Titles

Employees may not use titles unrelated to their activities with Alpine. The use of any other title requires the prior approval of the CCO. Examples of the types of titles not specifically related to Alpine's activities include (but are not limited to) C.P.A., J.D., M.B.A., or Attorney at Law.

# 3.22 Annual Certification

NYSE ARCA Equities Rule 6.18, BATS-YX Rule 5.5, BATS-ZX Rule 5.5: Chinese Walls/Information Barriers Prohibitions; ensuring associated persons are advised in writing of prohibition against misuse of material non-public information.

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Annual certification form |
| Frequency | • Annual, during January of each year |
| Action | • Send forms to employees for completion<br>• Review completed forms & evidence review by initial or signature and date<br>• Follow-up on open questions raised as part of the review<br>• Note any appropriate action taken on the annual certification form<br>• File updates to the Employee's Form U4, if necessary. |

ALPINE_LIT168846

| | |
|---|---|
| | • Recommend corrective action, where appropriate |
| **Record** | • Evidence review of certifications by initial or signature and date<br>• Certifications which include notations of action(s) taken, if applicable<br>• Retain copies of the annual certifications in each employee file or a centralized file |

Alpine will, on an annual basis, requires employees to complete an Annual Certification form. The purpose of this form is to ensure Alpine's records are current regarding items to be reported to Alpine (outside business activities, outside accounts, *etc.*). The certification is also used by Alpine to remind employees of the firm's insider trading policies including the prohibition against the misuse of material, non-public information.

# 3.23 Sales of Unregistered Securities

### 3.21 Sales of Unregistered Securities

The firm and its registered representatives have a responsibility to assist in the detection and prevention of sales of unregistered securities. In general terms, the sale of unregistered securities involves (i) sales of securities which have not been registered under the Securities Act and for which no exemption from registration is available, and (ii) sales by affiliates of the issuer (its officers, directors and 10% or greater stockholders), other than sales made in compliance with Rule 144.

With respect to securities that have not been registered under the Securities Act, such as private placements, issuers and their transfer agents have primary responsibility for ensuring that unregistered securities are not sold unlawfully. The stock certificates for securities which have not been registered under the Securities Act of 1933 should be imprinted with a restricted stock legend alerting broker-dealers and others that the securities have not been registered. However, in some cases the issuer may have been negligent in not placing a legend on the subject stock certificates or the legend may have been improperly removed. As a result, registered representatives should make inquiry as to how a customer acquired the securities to be sold and if the securities were acquired in a transaction other than an open market purchase, the registered representative should conduct further inquiry to determine whether the securities constitute restricted securities and whether they may be sold without restriction.

With respect to sales of stock by affiliates of the issuer, the issuer's officers, directors and 10% and greater stockholders generally are not permitted to sell securities without complying with Rule 144. With regard to sales by officers and directors, information as to the identity of the issuer's officers and directors is publicly available and registered representatives should know whether their customers are officers or directors of a public company. However, it may be difficult to detect sales by controlling stockholders because the stock certificates may not bear restricted stock legends and the stock may have been acquired in open market transactions, private transactions or a combination thereof. If a stockholder acquires a control position in an issuer's stock, that stock cannot be resold without registration under the Securities Act or compliance with Rule 144. Sales made from a control position without registration or compliance with Rule 144 are sometimes referred to as "sales from a control position" or as "unregistered public distributions of securities." If a customer deposits a substantial block of a little known security, and is reluctant to disclose exactly where the securities came from or if the surrounding circumstances raise a question as to whether or not the ostensible seller may be merely an intermediary for controlling persons or statutory underwriters, then the registered representative should obtain additional information.

## 3.23.1 Preventing Sales of Unregistered Securities

There are a number of ways Alpine and its registered representatives can avoid participating in sales of unregistered securities.

ALPINE_LIT168847

### 3.23.2 Knowing the Customer and the Securities

Being familiar with the customer's financial resources, business activities and employment relationships are avenues for knowing the customer and knowing whether he, she or it is an officer or director of an issuer or the owner of 10% or more of its outstanding securities. Making inquiry of a customer as to original acquisition of securities to be sold, is an avenue for knowing whether the securities were acquired in transactions other than open market transactions, which will require a RR to make further inquiry. Knowing the customer and the securities occurs at the time when a new account is opened as well as during the operation of a customer's account.

### 3.23.2.1 Risk Indicators

The following are examples of risk indicators that may suggest potential sales of unregistered securities.

· A customer attempts to sell a number of shares that is significantly larger than the number of shares that are ordinarily deposited by customers holding securities of companies with similar market capitalization and market value.

· A new customer attempts to sell a large number of shares of a non-reporting issuer about which little public information is available.

· A customer is unwilling to provide information as to how and when it acquired securities to be sold by it or is evasive in responding to such inquiries.

· A customer attempts to make repeated sales of the same security and the aggregate amount of such sales involves a large number of shares in relation to the usual market transaction.

· A customer makes repeated deposits into its account of securities of the same issuer from different sources such as transfers from other broker-dealers and other customer accounts.

· A customer attempts to sell securities that were acquired in a transaction with or involving the issuer or an affiliate of the issuer in reliance on a legal opinion that does not clearly state the facts underlying counsel's conclusion that the shares are freely tradable or which is based solely on hypothetical facts.

· A customer attempts to sell securities that he acquired from a third party or parties and is unwilling to provide information about such person or persons' relationship to the issuer or the number of shares of the issuer's stock owned by such person or persons, or is evasive in responding to such inquiries.

### 3.23.3 Reports of Suspected or Attempted Sales of Unregistered Securities

The sale of unregistered securities for which no exemption is available is a crime. All RRs are obligated to report any suspected or attempted deposits or sales of unregistered securities to the AML Compliance Officer.

### 3.23.4 Actions to be Taken to Prevent Sales of Unregistered Securities

Set forth below are the minimum actions required to detect and prevent sales of unregistered securities. However, there may be situations not covered below in which a prudent person would be suspicious. In those instances, a RR should conduct the investigation specified even though the deposited securities do not meet the specified minimum value.

New Customers. Each new customer shall complete a new account form disclosing whether he, she or it is an officer, director or other affiliate of any public company.

No Street Stock. Alpine will not accept for deposit in any customer's account stock certificates registered in a name other than that of the customer or a person with whom the customer has a family relationship.

ALPINE_LIT168848

<u>Know the Securities Being Sold</u>. Each registered representative shall inquire how and from whom a customer acquired the securities it has deposited in its account. If the securities were acquired other than in open market transactions, the broker shall notify the AML Compliance Officer who shall conduct an additional inquiry to determine the manner in which the securities were acquired and whether they may be freely sold without registration under the Securities Act. This determination may require a legal conclusion that can only be made after the firm has reviewed the facts surrounding the acquisition of the shares. The firm may also require that the customer provide a legal opinion from competent legal counsel that describes the relevant facts in sufficient detail as to provide an adequate basis for the legal conclusion stated.

<u>Special Inquiries</u>. If a customer deposits stock of an issuer (other than issuers listed on the NYSE, AMEX or NASDAQ) having an aggregate value greater than $100,000, the registered representative who handles the account shall conduct further inquiry to determine whether the securities in question constitute more than 5% of the issuer's outstanding shares. If they do or if the registered representative is unable to determine the percentage of outstanding shares owned by the customer, he or she shall conduct additional inquiry as appropriate under the circumstances, which may include any or all of the following:

- review the reports filed by the issuer with the SEC (or 15c2-11 information if the issuer is not a reporting company) to determine whether the customer is an officer, director or 10% stockholder of the Issuer
- inquire of the Issuer's transfer agent as to the number of shares of the Issuer's stock that are issued and outstanding and compare that number to the number of shares owned by the customer
- contact the issuer to obtain written confirmation that the customer is not an affiliate of the Issuer and that such person is not prohibited from selling the shares
- require the customer to obtain an opinion from competent legal counsel that the sale may be made in accordance with applicable laws and regulations.

<u>Correspondent Firms</u>. Correspondent firms of Alpine are responsible for establishing and maintaining their own procedures to detect and prevent the sale of unregistered securities.

ALPINE_LIT168849

# 4 TRAINING AND EDUCATION

## 4.1 Annual Compliance Meeting

[FINRA Rule 3110(a)(7) and 3110.04]

| Responsibility | • CCO or designee |
|---|---|
| Resources | • List of RRs and registered principals (i.e. registered persons) for Alpine |
| Frequency | • Annually |
| Action | • Determine appropriate subjects to include in meetings, depending on registered persons who are participants<br>• Conduct compliance meetings or interviews with registered persons<br>• Ensure all subject registered persons complete the required annual meeting or interview<br>• For registered persons who do not complete the requirement, recommend to the supervising principal/supervisor corrective action including limitations on business activities until the requirement is completed |
| Record | • A record of when and where meetings are conducted, subjects discussed, and who attended is retained by the CCO or designee<br>• E-mail notices and related records may be retained via E-mail, in the registered person's file or a centralized electronic file.<br>• A record (memos, notes, etc.) of recommendations to supervising principals/supervisors of corrective action measures for CE inactive registered persons may be maintained electronically in Alpine's E-mail archiving system, in the employee's file or in a centralized location. |

As required by FINRA rules, registered representatives and registered principals are required to attend an annual compliance meeting or interview on an annual basis.

**Please note:** Registered representatives and registered principals ("registered persons") who join Alpine or who become securities licensed on or before September 1 of each year will be required to participate in the current year's annual compliance meeting or interview. Registered persons who join Alpine or existing employees who become securities licensed, after November 1 will not be required to participate in the current year's annual compliance meeting or interview.

## 4.2 Continuing Education

[FINRA Rule 1250; FINRA CE web site: http://www.finra.org/industry/continuing-education]

Registered employees are subject to SRO continuing education requirements composed of two distinct elements. Registered employees are required to complete both elements at specified time intervals. The two elements are:

**Regulatory Element:** This element is a computer-based training program that focuses on compliance, regulatory, ethical, and sales practice standards. Its content is derived from rules and regulations as well as

ALPINE_LIT168850

standards and practices widely accepted within the industry. This element is administered at designated testing centers or through an in-firm program.

**Firm Element:** All registered employees dealing with public customers and their supervisors are required to complete continuing education administered by Alpine.

## 4.2.1 Regulatory Element

| Responsibility | • CCO or designee |
|---|---|
| Resources | • CRD Firm Queues<br>• CRD E-mail notifications of inactive registrations |
| Frequency | • Ongoing |
| Action | • Review Alpine's CRD queue periodically<br>• Review E-mail notifications received from FINRA<br>• Notify registered persons and their supervisor(s) of requirements initially and periodically until requirement is completed<br>• Provide information for registered persons to schedule computer based training<br>• Review CRD E-mail notifications of inactive registrations<br>• Recommend corrective action to supervising principal/supervisor for registered persons who do not complete requirements. |
| Record | • E-mail notices to registered persons and their supervisors may be retained electronically in Alpine's E-mail archiving system.<br>• Recommendations to supervising principals/supervisors concerning corrective action measures for CE inactive persons may be maintained electronically in Alpine's E-mail archiving system, in the registered person's file or in a centralized location. |

### 4.2.1.1 Who Is Subject To The Requirements

All registered persons are subject to the regulatory element.

### 4.2.1.2 When Requirements Must Be Completed

The regulatory element is to be completed within 120 days of the 2nd anniversary of the individual's original registration date and every three years thereafter. For registered persons who become subject to statutory disqualification or disciplinary action as defined under the rules, the regulatory element must be completed within 120 days of the posting date of the disciplinary action and every three years after that date.

### 4.2.1.3 Regulatory Element Contact Person

[FINRA Rule 1250(a)(7)]

The CCO or designee will notify the FINRA of the name and email address of the contact person to receive CRD notices. On an annual basis (by the 17th business day of the month following the end of the calendar year) the contact person information will be reviewed by the CCO and updated, if necessary.

ALPINE_LIT168851

#### 4.2.1.4 Failure to Complete the Regulatory CE requirement
**Non Compliance with Regulatory CE Requirement**

Registered persons who fail to complete the requirements of the regulatory element continuing education may not engage in any activities that require securities registration or earn commissions or other compensation related to such activities. Registrations are considered "inactive" until continuing education requirements are completed. Any commissions earned during the period the registered person is CE inactive will be forfeited and not subject to reimbursement.

The supervising principal/supervisor or designee will notify affected persons by written memorandum when their registration becomes inactive and when the requirement is satisfied and inactive status is lifted. A copy will be provided to the CCO or designee. Copies of memos may be maintained electronically in Alpine's E-mail archiving system, in the registered person's file or in a centralized location.

### 4.2.2 Firm Element

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Information regarding firm products, services, training needs<br>• Guidance from regulators<br>• Current regulatory concerns<br>• NASD Notice to Members 03-57<br>• Disciplinary actions<br>• Internal and external audits<br>• Results of regulatory CE sessions<br>• Feedback from the Firm Element Committee members<br>• Management input<br>• Customer complaints, arbitrations, and other litigation involving Alpine will be evaluated<br>• New business lines/new initiatives or marketing strategies to identify development or future needs<br>• Review of previously used training materials and other material that may be reveal unaddressed needs;<br>• Focus group discussion with representatives from the various business units<br>• Feedback from the prior year's continuing education program |
| Frequency | • Annually |
| Action | • Develop annual needs analyses; annual training plans; and training materials<br>• Identify employees who are subject to the requirement (covered persons)<br>• Monitor completion of requirements<br>• Propose to supervising principal/supervisor to restrict covered persons who do not complete requirements<br>• Determine whether objectives were met and whether training was effective |
| Record | • Needs analyses; training plans; training materials<br>• Dates of training, contents of training, lists of attendees<br>• Copies of training material used<br>• E-mail notices to covered persons and their supervisors may be retained electronically in Alpine's E-mail archiving system.<br>• Records (memos, notes, etc.) of recommendations to supervising principals/supervisors to restrict /take corrective measures CE inactive covered persons may be maintained electronically in Alpine's E-mail archiving system, in |

ALPINE_LIT168852

| | the covered person's file or in a centralized location. |
|---|---|

## 4.2.2.1 Who Is Subject To The Requirements

All registered persons who do business with the public and their supervisors are subject to the firm element. This group of professionals will be referred to as covered persons as it relates to the Firm Element continuing education requirement. Firm element continuing education is required regardless of the length of registration or employment in the securities industry. Covered persons who join Alpine or who become securities licensed on or before September 1 of each year will be required to participate in the current year's program. Covered persons who join Alpine or existing employees who become securities licensed, after September 1 will not be required to participate in the current year's program.

## 4.2.2.2 Firm Requirements

[The Firm] is required to:

- identify job functions and persons subject to the requirement
- prepare an annual needs analysis including gathering information about products and services and training topics
- determine training objectives
- develop a written training plan
- implement the training plan
- retain a record of participation
- develop a method of evaluating the effectiveness of the training
- consider the evaluations in developing the next year's needs analysis
- restrict covered persons who do not complete the requirement

[The Firm]'s internal program may include videos, computer training, in-person presentations, and other methods of conveying training material including a combination of methods.

## 4.2.2.3 Annual Needs Analysis

An annual needs analysis is prepared for covered persons. In developing the needs analysis, Alpine may employ one or more of the following channels:

- Incorporation of applicable information from regulatory authority and industry organizations (i.e. feedback from regulators including recent audits, regulatory alerts, and other notices)
- Customer complaints, arbitrations, and other litigation involving Alpine will be evaluated
- New business lines/new initatives or marketing strategies to identify development or future needs
- Focus group discussion with representatives from the various business units
- Feedback from the prior year's continuing education program
- Results of the Regulatory Element Continuing Education
- Management input
- NASD Notice to Members 03-57
- Feedback from compliance, legal and internal audit on critical issues
- Review of previously used training materials and other material that may be reveal unaddressed needs;
- External audits

Needs analyses will be completed on an annual basis.

ALPINE_LIT168853

**4.2.2.4 Evaluating The Firm Element Program**

Participants are asked to evaluate the effectiveness of the firm element continuing education program. These evaluations are considered when designing the next year's continuing education program.

## 4.2.3 Registered Persons Who Fail To Complete Requirements

**Non Compliance with Firm Element CE Requirement**

Registered persons who fail to complete the requirements of the firm element continuing education may not engage in any activities that require securities registration or earn commissions or other compensation related to such activities. Registrations are considered "inactive" until continuing education requirements are completed.

The supervising principal/supervisor or designee will notify affected persons by written memorandum when their registration becomes inactive and when the requirement is satisfied and inactive status is lifted. A copy will be provided to the CCO or designee. Copies of memos may be maintained electronically in Alpine's E-mail archiving system, in the registered person's file or in a centralized location.

ALPINE_LIT168854

# 5 EMPLOYMENT, REGISTRATION AND LICENSING

## 5.1 Employment

### 5.1.1 Hiring Procedures

[FINRA Regulatory Notice 07-55]

#### 5.1.1.1 RR Interview Guidelines

[FINRA Notice to Members 07-06]

At the time an RR is being considered for hire, the following are areas that the President should consider:

1. Discuss with the applicant the nature of the applicant's prior customers and the types of securities sold while associated with prior employers. If customers' investments include investment company products (mutual funds, variable annuities), determine whether Alpine has dealer or servicing agreements in place and, if not and the RR is hired, plan for suitability reviews and notification to customers of investment options and costs of switching investments.
2. Obtain the applicant's explanations regarding any customer complaints and regulatory actions to determine the merit, to the extent practicable, of each before hiring.
3. Ask the applicant about the existence of and nature of any pending proceedings, customer complaints, regulatory investigations, or arbitrations not listed in the CRD.
4. Discuss the reasons for the applicant's frequent change of employers, if applicable.
5. Obtain the RR's prior year W-2.
6. Ask the RR whether he or she signed an employment contract with the present or prior employer and if so, obtain a copy from the RR.

#### 5.1.1.2 Qualification Of Supervisors

[FINRA Rule 3110(a)(6)]

[FINRA Rule 3010(a)(6)]

| | |
|---|---|
| **Responsibility** | • Hiring Supervisor - confirm qualifications<br>• CCO or designee - determine registration requirements |
| **Resources** | • Individuals identified as potential supervisors<br>• Background information on candidate including registration status |
| **Frequency** | • As required when a supervisory position is to be filled |
| **Action** | • Hiring supervisor:<br>   ○ Evaluate candidate's qualifications including experience and knowledge **(for a comprehensive list of requirements, please see section titled "Additional Guidance for Hiring Supervisors" below)**<br>   ○ Determine whether the individual is qualified for the supervisory position.<br>   ○ Arrange for training, if necessary<br>• CCO or designee:<br>   ○ Confirm individual has required registration qualifications and, if not, arrange for the individual to complete the required exams |

ALPINE_LIT168855

| | |
|---|---|
| | o   Notify the hiring supervisor of added qualifications required and remind him/her the individual may not act as a supervisor until necessary registrations are obtained (unless a regulator allows for a grace period to act as a supervisor before registration is completed)<br>o   Provide supervisory policies/procedures to the candidate if not already available to him/her |
| **Record** | Hiring Supervisor:<br><br>•   E-mail communications evidencing review (if applicable) and/or<br>•   A notation (electronic or via paper) in the supervisor's HR file/prospective candidate file<br><br>CCO or designee:<br><br>•   Printout of background and registration information in candidate's personnel file/ securities licensing file. If an action step is needed (i.e., the candidate does not have the proper licensure), action steps taken will be memorialized with an initial or signature and date.<br>•   Record of training (if necessary) including a description of training and completion date of training retained in the firm's compliance training and/or HR training records<br>•   Record of providing supervisory policies/procedures along with provision date<br><br>The records listed above may be retained electronically in the firm's e-mail archiving and retention system. |

### Additional Guidance for Hiring Supervisors:

The supervisory person being hired or promoted should be knowledgeable with respect to both regulatory requirements and Alpine's product line, experienced in the activities that take place in the office they are supervising, and capable of exercising authority over their subordinates. In addition, factors such as relevant industry experience, previous employment, and disciplinary history should be taken into account. The manager who hires or appoints a supervisor is responsible for determining that the individual is qualified for the supervisory position.

### 5.1.1.2.1 Multiple CCO Designations

[FINRA Rule 3130.02]

| | |
|---|---|
| **Responsibility** | •   CCO or designee |
| **Resources** | •   Proposed multiple CCOs |
| **Frequency** | •   As required |
| **Action** | •   Confirm principal status of candidate<br>•   Document areas of responsibility and provide to each CCO and his/her supervisor<br>•   Confirm each CCO meets the requirements of Rule 3013 and IM-3013<br>•   Coordinate multiple certifications to the CEO |

ALPINE_LIT168856

| Record | • Records of qualification review<br>• Documentation of areas of responsibility and provision to CCO and supervisor |
|---|---|

If Alpine designates multiple chief compliance officers (CCOs), it will meet the following requirements:

- CCOs will be designated on Schedule A of Form BD.
- Each designated CCO is a principal.
- Each CCO's areas of compliance responsibility are defined and documented with identification of primary responsibility in areas that overlap.
- Each CCO meets the requirements of Rule 3013 and IM-3013 regarding the defined area of primary compliance responsibility.
- The designated CCOs have the responsibilities and expertise enabling them to consult with the CEO on the totality of subject matters included in certification requirements.

### 5.1.1.3 Background Investigation

[FINRA Rule 3110(e)]

FINRA Rule 3110(e) requires member firms like Alpine to develop and implement written procedures that are reasonably designed to verify the information in Form U4 no later than 30 calendar days of filing. Firms like Alpine are required to verify all information in an initial or transfer Form U4 (when a previously registered applicant moves between FINRA members), and to document any items that are not feasible or practical to verify and the reason for such lack of confirmation.

Alpine's written procedures must provide for, at a minimum, a national search of reasonably available public records for the verification of the accuracy and completeness of information provided by a registered representative on his or her Form U4. The search must be completed no later than 30 days after the initial or transfer Form U4 is filed with FINRA.

| Responsibility | • CCO or designee, where designated, in consultation with the Hiring Supervisor and/or Executive Team |
|---|---|
| Resources | • Review CRD history (Form U4)<br>• Employment application/Professional References<br>• Background check authorization and consent form<br>• Form U5 (if previously registered through another member firm) or CFTC Form 8-T, Notice of Termination of Associated Person, NFA Associate, Branch Office Manager, Designated Supervisor or Principal<br>• CRD Pre-Hire authorization form<br>• Public records<br>• Outside background check services<br><br>o Identify outside services, if any to conduct background investigations<br>o Where an outside service is used, review capabilities and references |
| Frequency | • When an employee is seeking to submit an initial or transfer Form U4. (This applies to newly affiliated employees or an existing non-registered employee seeking to open an exam window). |

ALPINE_LIT168857

| | |
|---|---|
| **Action** | CCO or designee:<br><br>At or prior to the time of the submission of the Form U4, send employment verification letters to the employee's prior employer(s) for the period 3 year period<br><br>Not later than 30 calendar days from filing the Form U4, verify information:<br><br>• Conduct a background investigation for all employees (seeking to submit an initial or transfer Form U4) including the following:<br>  ○ Access public records to check criminal and bankruptcy records, civil litigation, judgments and liens, and regulatory actions.<br><br>  ○ Verify the employee's identity and name by checking a valid government-issued identification (passport, state issued driver's license, state issued identification card, etc.)<br><br>  ○ Contact the employee's previous employer (s)for the prior three years (the employment verification letters can be sent to satisfy this portion of the WSP)<br><br>  ○ For registered persons with a current broker-dealer (or similar firm), review the CRD history through FINRA BrokerCheck or current CRD history (validate that a CRD Authorization Form has been completed).<br><br>  o For registered persons, obtain a copy of and review the most recent copy of the registered person's Form U5,including any amendments from the prior firm or inquire for the Form U5 information through the Web CRD system within 60 days of the Form U4 filing. ***If unable to review a copy of the most recent of the Form U5, note all steps taken to reasonably comply with this requirement.*** (Or for registered persons employed with a Futures Commission Merchant (FCM) or Introducing Broker (IB) registered as a commodities firm but "notice-registered" with the SEC because of securities future business, obtain and review a copy of the CFTC Form 8-T, Notice of Termination of Associated Person, NFA Associate, Branch Office Manager, Designated Supervisor or Principal)<br><br>• Obtain records for review<br>• Conduct further investigation where reviews reveal patterns of negative information such as customer complaints, bankruptcies, liens, criminal activity, litigation or other negative information<br>• Where discrepancies or incomplete information are identified, contact the employee for further information and verify/investigate further, if needed<br>• Evaluate negative information and its impact on the employment of the individual, consulting with the employee's supervisor and the Executive Team, where necessary<br>• If circumstances preclude completion of the verification process post-filing period, the verification should be completed as soon as practical and document the basis for the delay<br><br>• If information cannot be verified, document that the information could not be verified and the reasons (including the steps taken to verify the information) |
| **Record** | • Authorized searches of the CRD system (where applicable), including Form U4 review<br>• Copy of government-issued document used to verify employee's identity and |

ALPINE_LIT168858

|  | name<br>• Fingerprint results (this may be retained in the FINRA Gateway system)<br>• Review results of public records search (Record of financial records (including bankruptcy, tax liens, unsatisfied judgments, regulatory history, employment verification (for the prior 10 years)<br>• Form U5 (if employee previously a registered person with another member firm) or CFTC Form 8-T, if applicable<br>• Notes concerning contacts with prior employers for 3 years including contact person name and date(s) contacted (mailing of employment verification letters can satisfy this requirement)<br>• Reviews of discrepancies or missing information and action taken including consultation with employee and supervisor, file amended Form U4<br>• Action taken, if any, after reviews conducted (including cases where circumstances preclude the completion of the verification process post-filing period and/or where information cannot be verified, document that the information could not be verified and the reasons (including the steps taken to verify the information)<br>• Retain copies of the employment verification letters sent and responses received or record the date of review and contact and the name of the reviewer by signature or initial<br>• Retain information reviewed and record of feedback provided (where applicable) in employee's personnel, securities or non-registered fingerprint file (NRF)<br>• Records relating to outside background check services, capabilities and references (responsibility of Due Diligence Committee) |
|---|---|

A review of public records and other required information will be conducted on new and existing employees seeking to submit an initial Form U4 or transfer through Alpine. The information provided by the employee seeking sponsorship through Alpine must submit all information required by Alpine and the information provided must be complete and accurate. Failure to provide information that is complete and accurate, but may result in, up to and including, termination.

Employees will be required to reconcile discrepancies or missing information which may affect the employee's eligibility.

Alpine may satisfy the requirement to conduct a national search of reasonably available public records in several ways. Examples include the following:

(1) receiving a credit report from a major national credit reporting agency that contains public record information (such as bankruptcies, judgments and liens) and the applicant's fingerprint results;

(2) searching a reputable national public records database, such as LexisNexis and reviewing the applicant's fingerprint results; or

(3) reviewing a consolidated report from a specialized provider, such as Business Information Group, Inc. (BIG), that includes financial public records and reviewing the applicant's fingerprint results.


### 5.1.1.4 Fingerprints

[SEC Securities Exchange Act of 1934 Rule 17f-2; FINRA Rule 1010(d)]

['34 Act Rule 17f-2; FINRA Rule 1010(d)]

ALPINE_LIT168859

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Notifications regarding fingerprints and registration status<br>• Fingerprint cards |
| Frequency | • As required |
| Action | • Notify personnel to utilize the services of a third party (local law enforcement officials, *etc.*) to take fingerprints and:<br>   ○ Notify the third party of securities industry fingerprinting requirements including identification verification procedures (when and where necessary)<br>• Obtain fingerprints<br>• Submit electronic filing to CRD<br>• Submit fingerprints to CRD with barcode<br>• Monitor finger print queues. If fingerprints are not received by the CRD within 30 days of filing Form U4, notify the President that activities requiring registration must cease |
| Record | • Registration files for employees include records of CRD filings and submission of fingerprints via CRD<br>• Notify President if registered person's fingerprints have not been received within 30 days of filing the Form U4 in the CRD system. Memorialize action steps taken and retain in the securities licensing folder or similar folder. |

The CCO or designee will obtain and submit fingerprints on all new registered persons for receipt by CRD within 30 days of filing Form U4. Fingerprints for all other personnel will also be obtained and submitted by the CCO or designee.

If fingerprints are not received by CRD within 30 days, the employee must cease engaging in activities that require registration. The CCO will notify the President of deficiencies, and the President is responsible for restricting the applicant's activities until fingerprints have been received by FINRA/CRD.

### 5.1.1.5 Policies And Procedures

| Responsibility | • CCO or designee |
|---|---|
| Resources | • New employee(s)<br>• Policies and procedures |
| Frequency | • As required |
| Action | • Provide new employee with a current copy of Alpine's policies and procedures in hard copy or in electronic format.<br>• Retain the employee acknowledgement in writing or electronically |
| Record | • Retain employee acknowledgement in the employee file, securities licensing file, policies and procedures file, or similar paper or electronic file. |

ALPINE_LIT168860

The Employee will be asked to acknowledge that the policies were received and that the employee is responsible for compliance with Alpine's policies and procedures.

### 5.1.1.6 Enhanced Compensation

[SEC Chairman letter to broker-dealers dated August 31, 2009: http://www.sec.gov/news/press/2009/2009-189-letter.pdf]

| | |
|---|---|
| **Responsibility** | • Executive Committee |
| **Resources** | • Details of RR compensation agreements |
| **Frequency** | • As required when RRs are hired with enhanced compensation agreements |
| **Action** | • Determine the terms of any enhanced compensation, in consultation with the Director of HR or designee.<br>• Where commission targets or higher pay outs on specific securities or products are included in compensation arrangements, include consideration of those incentives in regular reviews of the RR's business during the term of the compensation agreement to identify any improper activity to maximize commissions such as churning or unsuitable recommendations |
| **Record** | • Compensation agreements, which may be retained in the employee's personnel or legal files |

Alpine may hire experienced RRs from other broker-dealers and offer enhanced compensation to attract qualified individuals for employment and to assist in the transition period when an RR moves from another firm. Compensation agreements may include up-front bonuses, higher pay outs for a period of time, payment of licensing fees (where Alpine otherwise would not pay them), and other enhanced compensation determined at the time an offer is made.

## 5.1.2 Termination Procedures

[FINRA Corporation By-Laws, Article V Section 3; FINRA Rule 3110(f)]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee, with respect to registered personnel (where indicated)<br>• Hiring Supervisor, with respect to all other personnel (where indicated)<br>• Director of HR or designee (where indicated) |
| **Resources** | • Notification from RR, non-licensed employee or supervisor of termination |
| **Frequency** | • As required |
| **Action** | OSJ Branch Manager or designee:<br><br>• Notify the CCO, CFO and Director of HR or their designees of terminating registered employees<br>• Reassign accounts |

ALPINE_LIT168861

| | |
|---|---|
| | • Notify customers of newly-assigned RR<br><br>Hiring Supervisor or designee:<br><br>• Notify the CCO, CFO and Director of HR or their designees of terminating non-registered employees<br><br>Director of HR or designee:<br><br>• Notify Alpine's IT Committee to secure computers and computer files<br>• Retrieve office keys, company credit cards, *etc.* from terminated employee |
| **Record** | Director of HR or designee:<br><br>• Retain copies of resignation letters, including any supporting documentation relating to involuntary terminations or other corrective action leading to the termination<br><br>Hiring Supervisor/OSJ Branch Manager or designees:<br><br>• Retain copies of resignation letters, including any supporting documentation relating to involuntary terminations or other corrective action leading to the termination |

## 5.1.2.1 Notification To Compliance

Promptly notify and consult with the CCO or designee in those cases involving an employee termination for cause. Include the following information:

• Name of terminated person and the representative number, if applicable
• Type of termination (voluntary, permitted to resign, discharged, *etc.*)
• If the termination is not voluntary, an explanation of the reason for termination
• Date of termination
• Any known compliance problems at the time of termination

## 5.1.2.2 Securing And Retrieving Alpine Property

The Director of HR or designee is responsible for retrieving Alpine property from terminated employees including office keys, company credit cards, computer files, customer files, and any other items which are the property of Alpine.

## 5.1.2.3 Reassignment Of Accounts

The OSJ Branch Manager or designee is responsible for reassigning the accounts of terminated RRs.

## 5.1.2.4 Responding To Customer Inquiries

The President or CFO, depending on employee, should instruct all other employees, including RRs receiving reassigned accounts or otherwise, to only indicate the employee is no longer with Alpine. No details or speculation regarding the departure should be given to customers or anyone else outside Alpine unless authorized by the CCO.

ALPINE_LIT168862

## 5.2 Registration And Licensing

[FINRA Corporation By-Laws Article V; FINRA Rule 1000 series; NASDAQ Rule 1000 series]

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • Requests for registration<br>• CRD Late Filing Fee Report |
| **Frequency** | • Quarterly - review CRD Late Filing Fee Report<br>• As required for new hires and requests for registration |
| **Action** | • Identify employees who require registration<br>• Submit required filings to the CRD<br>• Acknowledge electronic filings are on behalf of Alpine and its employees<br>• Request employee to schedule examinations if needed<br>• Ensure employees who require registrations obtain them<br>• Review the CRD Late Filing Fee Report to identify late filings and to take corrective action |
| **Record** | • Registration records including CRD notices, approvals, and other registration records are maintained in employee's securities licensing files or in CRD<br>• Where the registered person's signature is not required on U4 amendments, the Firm may rely solely and exclusively on CRD for recordkeeping<br>• Retain evidence and record of review of CRD Late Filing Fee Report (name of reviewer, date of review, initial or signature). Retention and evidence of review may be maintained via paper or electronically. |

## 5.2.1 CRD Electronic Filings

[FINRA Rule 1010]

NASD Rules: Rule 1013(a)(2), Article IV, Sections 1, 7 and 8, Article V, Sections 2 and 3 of the FINRA by-laws.

The CFO, CCO and Head trader are responsible for electronic filings in their areas of responsibility. The CFO is a registered principal and/or a corporate officer and is responsible for reviewing and approving all electronic filings and acknowledging electronically that the forms are filed on behalf of Alpine and its associated persons. The designated registered principal(s) or corporate officer(s) required by paragraph (b)(1) to supervise the member's electronic filings may delegate to an associated person (who need not be registered) the electronic filing of the member's appropriate forms via Web CRD. The registered principal(s) or corporate officer(s) responsible for supervising the member's electronic filings may also delegate to the associated person making the electronic filings the requirement in paragraph (b)(2) to acknowledge, electronically, that he is making the filing on behalf of the member and the member's associated persons. Noted below are the responsibilities of the CFO or designee.

| | |
|---|---|
| **Responsibility** | • CFO or designee |
| **Resources** | • Focus reports and other financial filings |
| **Frequency** | • Monthly, quarterly or as needed |

ALPINE_LIT168863

| Action | • File timely all required and requested financial reporting and retain supporting documentation |
|---|---|
| Record | • Screen prints of approved and submitted reporting and the filing of all supporting schedules, documents, reports, and accounting. |

Noted below are the responsibilities of the CCO or designee. The CCO is a registered principal and is responsible for reviewing and approving electronic filings and acknowledging electronically that the forms are filed on behalf of Alpine and its associated persons.

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Continuing Membership Agreement (Initial Submission and ongoing updates)<br>• Form BD/BDW updates; Form U4/U5<br>• NRF filings and terminated filings<br>• Fingerprint processes |
| Frequency | • As needed |
| Action | • Retain records relied upon to amend any of the documents noted above. |
| Record | • For Form U4 amendments involving disclosures, the associated person's Form U4 accompanied by a signature<br>• Submission via FINRA Gateway system or equivalent system |

Filings of Amendments Involving Disclosure Information: In the event Alpine is not able to obtain an associated person's manual signature or written acknowledgement of amended disclosure information on that person's Form U4 prior to filing of such amendment reflecting the information pursuant to paragraph (c)(3) (examples of reasons why a member may not be able to obtain the manual signature or written acknowledgement may include, but are not limited to, the associated person refuses to acknowledge such information, is on active military service or otherwise is unavailable during the period provided for filing of such amendments under Article V of the FINRA By-Laws), the member shall enter "Representative Refused to Sign/Acknowledge" or "Representative Not Available" or a substantially similar entry in the electronic Form U4 field for the associated person's signature.

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Trade Reporting – Form T Filing, ACT Reporting |
| Frequency | • As needed |
| Action | • Retain records relied upon to amend any of the documents noted above |
| Record | • Submission via FINRA Gateway system or equivalent system |

ALPINE_LIT168864

### 5.2.2 Registration Requirement

All individuals engaged in activities (including selling or trading products such as stocks, bonds, options, insurance, *etc.*) subject to registration requirements of SROs or other regulators must complete the necessary registration and licensing prior to engaging in such activities. Employees may not conduct business with public customers until required registrations or licenses are effective.

RRs who assume duties that require registration with the FINRA as a principal, have 90 calendar days to pass the appropriate principal's examination. RRs may not conduct any activities that require registration as a principal until the appropriate examination(s) are passed.

### 5.2.3 Requests For Waivers

[FINRA Rule 9600]

Regulators seldom grant waivers of training period requirements or examinations. In those very few instances where waivers are granted, the candidate must be able to demonstrate comparable work experience or other successfully completed examinations that could, in the view of the regulator, constitute satisfying their requirements.

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Requests for waiver of training period or securities examinations |
| Frequency | • As required |
| Action | • Submit request through FINRA Gateway system or directly through state regulatory body or other regulatory agency along with supporting documentation |
| Record | • Retain copies of supporting documentation, waiver request and regulatory responses in the employee's securities licensing file |

### 5.2.4 State Registrations

RRs must be registered in the state from which they conduct business and may be required to be registered in other states where customers are domiciled. Most states require successful completion of the Series 63 Uniform State Agent Securities Law Examination. Successful completion of the exam does not automatically confer registered status on the examinee. Application must be made to the CRD to obtain each state registration.

The RR is responsible for notifying Alpine's CCO or designee if he/she desires to be licensed in a particular jurisdiction.

### 5.2.5 Parking Registrations

[NASD Rule 1031(a)]

Alpine does not permit individuals to "park" licenses. Parking occurs when Alpine maintains a registration on behalf of an individual that does not work for Alpine or who does not need that registration for their job function. Registration status is retained only for those persons where it is required. Alpine may, however, maintain registration for legal, compliance, or other non-sales employees as permitted under regulators' rules.

ALPINE_LIT168865

### 5.2.6 Form U4

[FINRA Rule 1010 and 2263]

All applicants for registration are required to complete Form U4. It is the RR's responsibility to include accurate information and promptly notify Alpine of any updates that may require amendment to Form U4.

At the time a new or amended Form U4 is signed, the applicant will be provided the *Form U4 Disclosure To Associated Persons,* which discloses information about the predispute arbitration clause included in Form U4.

### 5.2.7 Amendments To Form U4 Or Form U5

Alpine will submit amendments to Form U4 when an RR advises of updates that require amendment. The CCO or designee is responsible for determining whether reportable events or other matters require the filing of an amendment to an RR's Form U4. The CCO or designee is also responsible for identifying disciplinary or complaint matters to be reported on Form U5 termination notices including amendments required after termination. Required reportable events include the receipt of an SEC Wells notice.

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Updates that require amending Form U4/Form U5 |
| Frequency | • As required |
| Action | • Determine whether reportable events or other matters requiring the filing of an amendment to an employee's Form U4/U5 |
| Record | • Form U5/U4 records submission via FINRA Gateway system or equivalent system<br>• Obtain employee's physical signature if it relates to a Form U4 disclosure (regular and routine updates allow for an electronic signature)<br>• Retain supporting documentation for Form U5 (such as a resignation letter) and Form U4 amendments in the employee's securities licensing file |

### 5.2.8 Assignment Of RR Numbers

RR numbers are assigned by the COO. This task may be performed by a designee of the COO. New numbers will not be assigned to individuals who are not yet registered with Alpine. An RR number may be assigned prior to registration approval when customer accounts are being transferred and the RR number is needed to transfer accounts. However, the number is not approved for conducting business until all registration approvals have been received.

## 5.3 Statutorily Disqualified Persons

[SEC Securities Exchange Act of 1934 Rule 19h-1 and Section 3(a)(39); FINRA By-Laws, Article III Section 3 and Section 4; FINRA Regulatory Notice 09-19; FINRA FAQs for MCDC firms: http://www.finra.org/industry/faq-eligibility-mcdc]

| Responsibility | • CCO or designee, where indicated<br>• OSJ Branch Manager or designee, where indicated |
|---|---|
| Resources | • Employee disclosures |

ALPINE_LIT168866

| | |
|---|---|
| | • Regulatory notices of statutory qualification |
| **Frequency** | • As required |
| **Action** | • CCO or designee<br>   ○ Complete the required regulatory forms<br>   ○ Establish procedures for conducting required supervision<br>• OSJ Branch Manager or designee<br>   ○ Conduct required supervision<br>   ○ Provide the CCO or designee with certifications of supervision, if required |
| **Record** | • Copies of regulatory applications/forms and related documents submitted to the regulatory body<br>• Copy of the supervision plan retained in the RR's file or supervision file<br>• Certifications of supervision, if required, in the RR's file or supervision file |

## 5.3.1 Introduction

Individuals may become subject to statutory disqualifications as a result of a felony conviction or regulatory suspension, revocation of registrations or injunctions (including actions by domestic regulators including the CFTC and actions by foreign regulators). The definition of statutory disqualification is included in Section 3(a)(39) of the Securities Exchange Act of 1934.

The list of disqualifying events are as follows:

- certain misdemeanor and all felony criminal convictions for a period of ten years from the date of conviction.
- temporary and permanent injunctions (regardless of their age) issued by a court of competent jurisdiction involving a broad range of unlawful investment activities.
- expulsions (and current suspensions) from membership or participation in a self-regulatory organization.
- bars (and current suspensions) ordered by the Securities and Exchange Commission (SEC) or self-regulatory organizations.
- denials or revocations of registration by the SEC or Commodity Futures Trading Commission (CFTC).
- findings that a member or person has made certain false statements in applications or reports made to, or in proceedings before, self-regulatory organizations.
- any final order of a State securities commission (or any agency or officer performing like functions), State authority that supervises or examines banks, savings associations, or credit unions, State insurance commission (or any agency or office performing like functions), an appropriate Federal banking agency (as defined in Section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), or the National Credit Union Administration, that
- bars such person from association with an entity regulated by such commission, authority, agency, or officer, or from engaging in the business of securities, insurance, banking, savings association activities, or credit union activities; or
- constitutes a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct.
- findings by the SEC, CFTC or an SRO that a person: 1) "willfully" violated the federal securities or commodities laws, or the Municipal Securities Rulemaking Board (MSRB) rules; 2) "willfully" aided, abetted, counseled, commanded, induced or procured such violations; or 3) failed to supervise another who commits violations of such laws or rules.[2]
- Certain Associations: In determining "association" for purposes of Exchange Act [3(a)(39)(E)], Alpine will use the definition of "associated person" set forth in the Exchange Act [3(a)(21)].

ALPINE_LIT168867

### 5.3.2 Hiring A Statutorily Disqualified Person

All prospective employees (including those engaged solely in clerical and/or ministerial activities) are subject to background investigations that include identification of potential statutory disqualification. Prior to hiring an individual subject to a statutory disqualification, the CCO or designee should be consulted to review the nature of the statutory disqualification and potential special supervision that may be required upon hiring.

### 5.3.3 Regulatory Filings

[FINRA Rule 4517]

The CCO or designee is responsible for completion and filing of the appropriate regulatory form or application, which will be signed by another senior manager, who is a registered principal of Alpine. The Board of Directors may be required to provide prior approval before an individual becomes associated with Alpine. The individual may not conduct any activities requiring registration until approval is received from the appropriate regulatory authorities.

### 5.3.4 Supervision

The CCO or designee will establish procedures to carry out the supervision required under agreement with the SRO reviewing the disqualified person, including records of supervision to be conducted by the OSJ Branch Manager or designee. The OSJ Branch Manager or designee will be provided a copy of the procedures and will be responsible for carrying them out.

### 5.3.5 Reporting Statutory Disqualifications

When an employee becomes subject to a statutory disqualification, the CCO or designee will file the necessary registration updates and, in addition, the required notification on the quarterly complaint report will be made to regulators consistent with those SRO's reporting requirements.

## 5.4 Retiring Representatives

[FINRA Rule 2040(b)]

| | |
|---|---|
| **Responsibility** | • President or designee (in consultation with the CCO or designee) |
| **Resources** | • Requests from retirees to continue commissions |
| **Frequency** | • As required |
| **Action** | • Obtain signed continuing commissions agreement from retiree<br>• Notify designated supervisor and Accounting of agreement |
| **Record** | • Signed agreement retained in retiring employee's personnel file, securities licensing file or similar file |

RRs who retire may be eligible to participate in Alpine's continuing commissions policy program. This program provides for the transfer of accounts from the retiring RR to another RR and gives the retiring RR the opportunity to provide support to the receiving RR as well as deal with customer transition issues. Retirees under the program sign a continuing commissions agreement whereby the retiring RR is prohibited from soliciting new

ALPINE_LIT168868

business, opening new accounts, or servicing the accounts generating the continuing commission payments. Requests to receive continuing commissions should be referred to the President or designee.

The retiring RR continues to be subject to all the rules and regulations governing RRs and is subject to ongoing supervision by the RR's supervising registered principal.

"Retiring registered representative" is an individual who retires from Alpine (including as a result of a total disability) and leaves the securities industry. In the case of death of the retiring registered representative, the retiring registered representative's beneficiary designated in the written contract or the retiring registered representative's estate if no beneficiary is so designated may be the beneficiary of Alpine's agreement with the deceased representative.

## 5.5 Broker-Dealer Registration

### 5.5.1 Form BD

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Information regarding reportable items including civil and regulatory actions<br>• Records regarding officers and directors to be included on Form BD<br>• Other information as required by Form BD |
| Frequency | • Within 30 days of notice of material changes, as required |
| Action | • Prepare updates as required; consult with legal counsel, as required<br>• File Form BD updates |
| Record | • File of BD amendments including information relied upon to submit the filing (Form BD filings will be retained via CRD system) |

### 5.5.2 Change In Ownership, Control, Or Business Operations

[NASD Rule 1011(i) and 1017; FINRA IM 1011-1; FINRA Regulatory Notice 09-21; NASD Notice to Members 06-56; FINRA web site re mergers, acquisitions, and business transfers: http://www.finra.org/Industry/Issues/Mergers/index.htm; FINRA checklist for organizational change: http://www.finra.org/RegistrationQualifications/MemberFirms/p014283; NASDAQ Rule 1017]

When Alpine anticipates a material change in its business, the CCO or designee will file requests for approval by the appropriate SROs. Events that require approval include merger with or acquisition of another broker-dealer or acquisition of 25% or more of the assets of another dealer; a change in ownership or control; and a material change in business operations. In addition, material changes include removing or modifying a membership agreement restriction; market making for the first time; adding business activities that require a higher level of minimum net capital; and engaging in activities beyond proprietary trading as defined in NASDAQ rules.

Certain types of expansions are presumed to not be a "material change in business operations" and do not require FINRA approval. However, this safe harbor is not available to firms that, among other things, have a "disciplinary history" as defined in IM-1011-1. The interpretation must be consulted to determine what changes are not material and what constitutes disciplinary history precluding use of the safe harbor.

If Alpine operates under a Restriction Letter, it will conduct business consistent with the Letter and the CCO or designee will contact FINRA if a change is necessary.

ALPINE_LIT168869

### 5.5.2.1 FINRA and NASDAQ Contact Information

[FINRA Rule 4517; FINRA Contact System web page:http://www.finra.org/Industry/Compliance/RegulatoryFilings/FCS/]

Updates to contact information will be made within 30 days following any change. In addition, by the 17th business day after the end of each calendar year, [The Firm] is required to verify contact information through the FINRA Contact System.

Compliance will update the following information through FINRA's Contact System when necessary and will conduct the mandatory annual verification:

- Executive Representative [NASD By-Laws Article IV, Section 3, FINRA Rule 4517; NASDAQ Rule 1150]
- Regulatory Element Continuing Education Contact Person [FINRA Rule 1250]
- Emergency contact persons [FINRA Rule 4370]
- AML contact person(s) [FINRA Rule 3310.02]
- Other contacts mandated by FINRA rules

Contact information will be provided promptly to FINRA upon request, but no later than 15 days after the request.

## 5.5.3 Regulatory Filings

[NASD Rule 3170; FINRA Regulatory Notice 08-11; NASD Notice to Members 06-61]

Alpine will submit regulatory filings electronically where required. Filing procedures are included in appropriate sections of this manual.

## 5.5.4 Reporting Requirements

[FINRA Rule 4530; FINRA Regulatory Notice 11-32; FINRA FAQs on Rule 4530: http://www.finra.org/Industry/Compliance/RegulatoryFilings/CustomerComplaints/FAQ/index.htm?utm_source=MM&utm_medium=email&utm_campaign=Weekly_Update_072314_FINAL]

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Criminal, civil, and arbitration actions against Alpine<br>• Violations resulting in a potential widespread or widespread impact to Alpine, customers or markets or conduct that arise from a material failure of Alpine's systems, policies or practices involving numerous customers, multiple errors or significant dollar amounts. |
| Frequency | • As required |
| Action | • Determine whether information or events are reportable<br>• File information [including copies of information specified in Rule 4530(e)(1)] with FINRA within 30 calendar days after knowing of the event |
| Record | • Record of filings (refer to FINRA Gateway system) |

The CCO or designee will file information with FINRA for reportable events involving Alpine under FINRA Rule

ALPINE_LIT168870

4530 within 30 calendar days of becoming aware of the reportable event. When the CCO or designee concludes that Alpine has violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body or self-regulatory organization, such reported violations will include only conduct that has widespread or potential widespread impact to Alpine, its customers or markets, or conduct that arises from a material failure of Alpine's systems, policies or practices involving numerous customers, multiple errors or significant dollar amounts.

Refer to the section *Reporting Possible Law Or Rule Violations* in the chapter *GENERAL EMPLOYEE POLICIES* for procedures addressing the identification of violations, escalation of internal reporting, and reporting of internal conclusions.

# 5.6 Heightened Supervision

[NASD Notice to Members 97-19]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee, where designated<br>• CCO or designee, where designated |
| **Resources** | • Form U4 information<br>• CRD<br>• Customer complaints<br>• Regulatory actions<br>• Other activity that may warrant heightened supervision |
| **Frequency** | • As required |
| **Action** | • CCO or designee:<br>   o Identifies employees subject to heightened supervision<br>   o Notifies the OSJ Branch Manager or designee<br>   o Determines the scope of heightened supervision<br>   o Collects certifications from the Branch Manager or designee<br>• OSJ Branch Manager or designee:<br>   o Conducts required heightened supervision<br>   o Prepares and sends certifications to the CCO or designee |
| **Record** | CCO or designee:<br><br>• Reviews of employees for potential heightened supervision are retained in the Compliance files<br><br>OSJ Branch Manager or designee:<br><br>• heightened supervision plan, memos and certifications pertaining to a specific employee are retained in the employee's file or supervision file. |

## 5.6.1 Introduction

Alpine will institute heightened supervision for RRs or other employees when appropriate. The following sections describe Alpine's procedures for identifying those subject to heightened supervision and the types of supervision that may be conducted.

**ALPINE_LIT168871**

## 5.6.2 Identifying Employees For Heightened Supervision

It is the responsibility of the CCO or designee to identify employees for potential heightened supervision. Employees will be identified at the time of hire or when an employee becomes subject to regulatory action and/or a pattern of customer complaints. Unregistered individuals who were previously registered and the subject of customer or regulatory complaints are also subject to consideration for heightened supervision.

## 5.6.3 Criteria For Identifying Candidates For Heightened Supervision

The following are criteria that will trigger a review by the CCO or designee to determine whether an RR should be subject to heightened supervision. Pending as well as resolved matters will be considered. The criteria are subjective and the details of the complaints and/or regulatory actions must be considered in determining whether heightened supervision is necessary.

- Three or more customer complaints alleging sales practice abuse within the past two years (complaints include written complaints, arbitrations, other civil actions)
- Complaint filed by a regulator
- Injunction in connection with an investment-related activity
- Termination for cause or permitted to resign from a former employer where the termination appears to involve a significant sales practice or regulatory violation
- Employment with three or more broker-dealers in the past five years

## 5.6.4 Heightened Supervision Memorandum

When a candidate is identified for possible heightened supervision the CCO or designee will make a recommendation for consideration of heightened supervision. After the determination is made, the OSJ Branch Manager or designee will prepare a memorandum outlining action taken (or not taken).

Where it is determined that Alpine's existing supervision is adequate to address oversight of the candidate, the OSJ Branch Manager or designee will document in the memorandum the reasons why existing supervision is adequate. Where it is decided heightened supervision will be conducted, the CCO or designee will outline the supervision to be conducted (including type, frequency, time period of heightened supervision, and how supervision should be documented) and provide copies of the memorandum to the subject RR and the President outlining the terms of the heightened supervision. The RR and the OSJ Branch Manager or designee will sign and return copies of the memorandum to the CCO or designee.

## 5.6.5 Scope Of Potential Heightened Supervision

Heightened supervision will be established after considering the specifics that apply to the RR. Heightened supervision may take many forms and may include some of the following, to be determined by the CCO or designee. This list does not limit or prescribe how heightened supervision should be structured for any one RR, since each case must be reviewed individually.

- Limits on type of business (option, futures, *etc.*)
- Limits on types of accounts (discretionary, certain age groups or other demographics, *etc.*)
- Verification with customers of new account information when accounts are opened
- Pre-approval of some or all trades entered
- Pre-approval of certain types of accounts
- Contact with the RR's customers by the President
- Pre-approval of all written public communications originated by the RR
- Extra training or continuing education in areas subject to heightened supervision
- Assignment of the RR to a "mentor" or partner

ALPINE_LIT168872

### 5.6.6 Certification By RR's Supervisor

During the term of heightened supervision, the OSJ Branch Manager or designee will certify to the CCO or designee, in writing, that the heightened supervision has been conducted. The form and frequency of certification will be determined by the CCO or designee and will be explained to the OSJ Branch Manager or designee.

ALPINE_LIT168873

# 6 INDEPENDENT CONTRACTORS

[FINRA Notices to Members 01-80, 99-45, 98-38 and 86-65]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Independent Contractor Agreement<br>• Order records or transaction reports for review of sales activities |
| **Frequency** | • At time of hire - obtain contracts<br>• Daily - supervise sales activities |
| **Action** | • Obtain necessary Independent Contractor ("IC") contract and provide a copy to the CCO or designee<br>• Review daily transactions and take corrective action where necessary |
| **Record** | • IC contracts retained in registered representative or personnel files<br>• Evidence of review on order records – Refer to the *Orders* section for more information. |

## 6.1 Independent Contractor Defined

Certain individuals are associated with Alpine as "independent contractors" as defined under current IRS guidelines. Independent contractors are not "employees" of Alpine for purposes of compensation and other considerations under IRS guidelines.

## 6.2 Supervision

Independent contractors are subject to the supervision of Alpine and are responsible for complying with Alpine's policies and procedures and the rules and regulations governing the activities of Alpine and its associated persons.

## 6.3 Agreements

RRs who are ICs will, at the time of association with Alpine, sign an agreement outlining the conditions under which the IC provides services to Alpine. No commission or other payments will be made to the IC until a signed agreement is on file. The OSJ Branch Manager or designee is responsible for ensuring signed agreements are submitted to Alpine prior to making any payments to the IC.

## 6.4 Use And Display Of The Firm's Name

Alpine's name may be used only in conjunction with the products or services provided by Alpine. Alpine's letterhead may be used only for correspondence related to Alpine's business.

Alpine's name may be displayed only in authorized locations and in a manner approved by Alpine.

ALPINE_LIT168874

## 6.5 Display Of SIPC Symbol

In authorized branch locations, the SIPC symbol will be displayed. The CCO is responsible for identifying the office locations that require the necessary SIPC display.

## 6.6 Use Of Other Names

Alpine does not allow IC RRs to use names other than their own and Alpine's in conjunction with the ICs securities business.

## 6.7 ICs As Investment Advisers

[FINRA Rule 3040; FINRA Notice to Members 96-33, 94-44 and 91-32]

Alpine does not allow its IC RRs to be registered as investment advisers.

## 6.8 Outside Business Activities And Outside Accounts

[FINRA Rule 3270; NASD Rule 3050]

As stated previously, ICs are subject to all provisions of Alpine's policies and procedures. An IC status does not relieve the individual from complying with the requirements to disclose and obtain approval of all outside business activities and outside securities accounts. The chapter *GENERAL EMPLOYEE POLICIES* includes the policies in these and other areas affecting all individuals associated with Alpine.

ALPINE_LIT168875

# 7 COMMUNICATIONS WITH THE PUBLIC

## 7.1 Definitions

[FINRA Rule 2210(a)]

There are three broad categories of communications as defined by rule. *"Written communications" include electronic communications.*

**Retail communication:** includes **any** written communication (including advertising, telemarketing and other sales scripts and other written communications) that is published, distributed or made available to **more than** 25 retail investors within any 30 calendar-day period. *Requires pre-use approval except that the following do not require pre-use approval and may be supervised like correspondence:*

- *Communications excepted from the definition of "research report" **unless** the communication makes any financial or investment recommendation;*
- *Any retail communication that is posted on an online interactive electronic forum; and*
- *Any retail communication that does not make any financial or investment recommendation or otherwise promote a product or service of Alpine.*

**Institutional communication:** includes written communications that are distributed or made available only to institutional investors. *(Does not require pre-use approval, reviewed consistent with correspondence requirements.)*

**Correspondence:** Includes any written communication that is distributed or made available to 25 **or fewer** retail investors within any 30 calendar-day period. *(Does not require pre-use approval unless indicated otherwise for specific products or services.)*

Additional definitions include:

**Retail investor:** includes any person other than an institutional investor, regardless of whether the person has an account with Alpine.

**Institutional investor:** includes a:

1. government entity or subdivision thereof;
2. employee benefit plan, or multiple employee benefit plans offered to employees of the same employer, that meet the requirements of Section 403(b) or Section 457 of the Internal Revenue Code and in the aggregate have at least 100 participants, but does not include any participant of such plans;
3. qualified plan, as defined in Section 3(a)(12)(C) of the Exchange Act, or multiple qualified plans offered to employees of the same employer, that in the aggregate have at least 100 participants, but does not include any participant of such plans;
4. FINRA member firm or registered person of such a member; and
5. person acting solely on behalf of any such institutional investor.

Institutional investor also includes [per FINRA Rule 4512(c)] an account for:

1. a bank, savings and loan association, insurance company or registered investment company;
2. an investment adviser registered either with the SEC under Section 203 of the Investment Advisers Act or with a state securities commission (or any agency or office performing like functions); or
3. any other person (whether a natural person, corporation, partnership, trust or otherwise) with total assets of at least $50 million.

ALPINE_LIT168876

## 7.2 Retail Communications

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • Retail communications submitted for review |
| **Frequency** | • As required |
| **Action** | • Review proposed retail communications<br>• Make revisions as needed<br>• Provide requestor with approved copy (include initial or signature and review date) or notify of disapproval<br>• File communication with FINRA, if required; notify requestor of any required delay to receive FINRA approval |
| **Record** | • Dates of first and (if applicable) last use<br>• Copies of reviewed communications, including the reviewer's approval (include initial or signature) and approval date<br>• For communications not requiring pre-approval, the name of the person who prepared or distributed the communication<br>• Information regarding the source of any statistical table, chart, graph or other illustration used in the communication<br>• Copies of communications filed with FINRA (see section *FINRA Filing Requirements*) and FINRA response/approval (as applicable)<br>• If the communication was prepared by another member firm and filed with FINRA, the name of the firm and a copy of FINRA's review letter |

Retail communications, which include advertising, require the **prior approval** of the CCO or designee and may be filed with FINRA depending on the content. The person submitting the retail communication for review (and that person's supervisor, if applicable) will be notified of approval or the need to make changes prior to release.

[FINRA Notice to Members 97-19]

## 7.2.1 FINRA Filing Requirements

[NASD Rule 2210(c); NASD Notice to Members 89-11; FINRA Regulatory Notice 11-49]

Some retail communications must be filed with FINRA. The following chart outlines those requirements and the corresponding rule cite.

- Filings must be accompanied by FINRA's Advertising and Sales Literature Filing Cover Sheet.
- Filings should identify the reference number of any communication previously submitted by Alpine and already reviewed by FINRA that is similar to the current filing.
- All retail communications to be submitted to FINRA must be approved by the CCO or designee prior to submission to FINRA.
- The actual or expected date of first use or publication and the name and CRD number of the approving supervisor must be included with the FINRA filing. [FINRA Rule 2210(c)(5)]

It is not necessary to file any retail communication which has previously been filed and is used without any changes. FINRA rules should be consulted for specific requirements and some exclusions [Rule 2210(c)(7)] from the requirements.

ALPINE_LIT168877

| Retail Communication Content Requiring Filing | When | FINRA Rule |
|---|---|---|
| New member firms only: certain broadly disseminated retail communications such as generally accessible websites, print media communications, and TV and radio commercials. Free writing prospectuses are also included other than those exempt from filing with the SEC. The rule also excludes research reports concerning only securities listed on a national securities exchange [other than those that must be filed under Section 24(b) of the Investment Company Act of 1940] | One-year requirement to file at least 10 business days prior to use starting on the date the firm's membership with FINRA becomes effective, per the CRD. Free writing prospectuses may be filed within 10 business days of first use. | **2210(c)(1)(A)** |
| Investment company using rankings or performance comparison information that is not generally published or is created by the investment company, its underwriter or affiliate (must be filed with corroborating data) | 10 business days prior to first use; cannot use until changes required by FINRA have been made | **2210(c)(2)(A) 2212 2214** |
| Research reports concerning unlisted securities | Within 10 days of distribution | **2210(c)(7)(O)** |
| Research reports which must be filed under Section 24(b) of the Investment Company Act of 1940 | Within 10 days of distribution. | **2210(c)(7)(O)** |
| Security futures (with certain exceptions) | 10 business days prior to first use; cannot use until changes required by FINRA have been made | **2210(c)(2)(B) 2215** |
| Bond mutual funds that include volatility ratings | 10 business days prior to first use; cannot use until changes required by FINRA have been made | **2210(c)(2)(C) 2213** |
| Options communications used prior to the delivery of the Options Disclosure Document | 10 calendar days prior to first use; cannot use until changes required by FINRA have been made | **2220(c)** |
| Public direct participation programs | Within 10 business days of first use | **2210(c)(3)(B)** |
| Templates for written reports produced by or concerning an investment analysis tool *(Retail communications based on templates previously filed with FINRA where the only changes are to update statistical or other non-narrative information do not require re-filing.)* | Within 10 business days of first use or publication | **2210(c)(3)(C)** |
| Registered CMOs | Within 10 business days of first use or publication | **2210(c)(3)(D) 2216** |
| Registered structured products that are derived from or based on a single security, a basket of securities, an index, a commodity, a debt issuance or a foreign currency | Within 10 business days of first use or publication | **2210(c)(3)(E)** |
| Television or video where [The Firm] has filed with FINRA a draft version of a "story board" | Within 10 business days of first use or broadcast | **2210(c)(4)** |
| Certain 529 Plans communications offering registered investment company products | Within 10 business days of first use or publication | **2210(c)(2)(A)** |
| Certain broker-prepared widely disseminated free-writing prospectuses that are required to be filed with the SEC under Securities Act 433(d)(1)(ii) [Excludes those exempt from filing with the SEC] | Within 10 business days of first use or publication | **Regulatory Notice 10-52** |

ALPINE_LIT168878

## 7.3 Institutional Communications

[FINRA Rule 2210(b)(3)]

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Communications sent to institutions (excludes correspondence) which is addressed separately in this manual |
| Frequency | • As required |
| Action | • Communications limited to institutions reviewed after sending:<br>   o Review all; or<br>   o Review on a sampling basis (see Review on a Sampling Basis that follows)<br>• Limit distribution to only institutions by:<br>   o Advising the receiving institution that the material is for institutions only<br>   o Adding a legend to material;<br>   o Asking the receiving institution to affirm materials will be distributed to institutional investors only; or<br>   o Taking other steps to limit distribution<br>• If institutional communications will be distributed to retail customers or Alpine becomes aware they are going to retail customers:<br>   o Subject the communication to reviews required for those sent to retail customers (see *Outgoing Communications*); or<br>   o Cease providing material to the institution<br>• Include institutional communications in training (approval requirements, requirements when institutions forward communications to retail customers, acceptable content, other subjects) |
| Record | • Institutional communications reviewed including record of who reviewed and date reviewed<br>• Institutional affirmations limiting distribution<br>• Action taken if an institution distributes institutional-only communications to retail investors<br>• Training including subjects covered, who attended, date conducted (Where applicable) |

Institutional communications (including electronic communications) are subject to review and retention by Alpine. Communications sent only to institutions do not require approval prior to sending. Those sent to institutions that also will be sent to retail customers (whether by Alpine or forwarded by the institution) require approval described in *Outgoing Communications*, including prior approval for any communication provided to more than 25 retail investors in a 30-day period. Institutions may be asked to provide written affirmation that communications sent to them will NOT be provided to retail customers.

Institutional communications are subject to the general standards that appear below.

## 7.4 General Standards

[FINRA Rule 2210(d)(1)]

ALPINE_LIT168879

Communications must meet general standards which are summarized below. The rules should be consulted for details.

- Communications must be based on principles of fair dealing and good faith, must be fair and balanced, and must provide a sound basis for evaluating the facts and must not omit any material fact where its omission would make the communication misleading.
- Communications may not contain false or misleading statements or any statement Alpine knows to be untrue.
- Information may be placed in a legend or footnote only in the event that such placement would not inhibit an investor's understanding of the communication.
- Statements must be clear and not misleading within the context in which they are made and must provide balanced treatment of risks and potential benefits. Communications must be consistent with the risks of fluctuating prices and the uncertainty of dividends, rates of return and yield inherent to investments.
- The nature of the audience to which the communication will be directed must be considered providing appropriate details and explanations appropriate to the audience.
- Communications may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion or forecast; provided. Exceptions include hypothetical illustrations of mathematical principals, investment analysis tools, or research reports subject to certain conditions.

## 7.4.1 Comparisons

Any comparison in retail communications between investments or services must disclose all material differences between them, including (as applicable) investment objectives, costs and expenses, liquidity, safety, guarantees or insurance, fluctuation of principal or return, and tax features.

## 7.4.2 Disclosure Of The Firm's Name

All retail communications (other than "blind" advertisements used to recruit personnel) and correspondence must:

- prominently disclose Alpine's name, or the name under which business primarily is conducted (per Alpine's Form BD), and may also include a fictional name by which Alpine is commonly recognized or which is required by any state or jurisdiction;
- reflect any relationship between Alpine and any non-member or individual who is also named; and
- if it includes other names, reflect which products or services are being offered by Alpine.

## 7.4.3 Tax Considerations

- References to tax-free income must indicate which income taxes apply, or which do not.
- Communications must not characterize income or investment return as tax-free or exempt when liability is merely postponed.
- A comparative illustration of the mathematical principles or tax-deferred versus taxable compounding must meet seven specified criteria.

## 7.4.4 Disclosure Of Fees, Expenses And Standardized Performance

[FINRA Regulatory Notice 13-23]

Communications about fees must be accurate and balanced. Representing that fees are not charged in connection with retail accounts and IRAs is inaccurate and a violation of rules when the account is subject to other charges or fees. Investment products have their own associated costs including commissions, management fees, and other product-level expenses. For example, stating that there are no fees charged or

ALPINE_LIT168880

highlighting "no fees" and then providing separate, less-prominent disclosure of other fees is misleading. Footnotes do not meet the requirements for disclosure.

Claims regarding fees must be accompanied by clear disclosure of the types of fees that may be charged. A statement that "other account fees, fund expenses, brokerage commissions and service fees may apply" would be consistent with rule requirements. This statement could be hyperlinked to Alpine's web site where fees are explained.

Communications that present certain permitted investment company performance data must disclose performance information required by SEC Rule 482 and Investment Company Act Rule 34b-1, among other things. This information must be set forth prominently, and in any print advertisement, in a prominent text box that contains only the required information.

## 7.4.5 Recommendations

- If a communication includes a recommendation of securities, it must have a reasonable basis and disclose:
  - o whether Alpine is making a market in the recommended security (or in the underlying security if the recommended security is an option or security future) or the security will be bought or sold on a principal basis;
  - o if Alpine or any associated person directly and materially involved in the preparation of the content of the communication has a financial interest in the securities of the issuer; and
  - o if Alpine was a manager or co-manager of a public offering of any securities of an issuer whose securities were recommended within the past 12 months.
- Alpine must provide, or offer to furnish upon request, available investment information supporting the recommendation (including, for corporate equity securities, the price at the time the recommendation is made).
- Generally, a communication may not refer to past specific recommendations of Alpine that were or would have been profitable; however, it may set out or offer to furnish a list of all recommendations as to the same type of securities made by Alpine within the past year if the communication meets certain conditions, including the condition that the communication contain a specified, prominently displayed cautionary legend.
- These requirements do not apply to any communications that meet the definition of "research report" and include required research disclosures.
- The general disclosure requirements for recommendations do not apply to any communication that recommends only registered investment companies or variable insurance products, if such communications have a reasonable basis for the recommendation.

## 7.4.6 Prospectuses Filed With The SEC

Prospectuses, preliminary prospectuses, fund profiles and similar documents that have been filed with the SEC are not subject to the content standards except for investment company prospectuses published pursuant to Rule 482 and broadly disseminated free writing prospectuses that are filed with the SEC pursuant to Securities Act Rule 433(d)(1)(ii).

## 7.4.7 Limitations On Use Of FINRA's Name And Any Other Corporate Name Owned By FINRA

[FINRA Rule 2210(e); FINRA email address for questions: trademarks@finra.org]

Alpine may indicate its FINRA membership in only three ways:

- In a communication that complies with the standards of FINRA Rule 2210 and neither states nor implies that FINRA or any other corporate name or facility owned by FINRA, or any other regulatory organization, endorses, indemnifies or guarantees Alpine's business practices, selling methods, the

ALPINE_LIT168881

class or type of securities offered, or any specific security; references are limited to "Reviewed by FINRA" or "FINRA reviewed;"

- In a confirmation statement for an OTC transaction that includes a specified legend; or
- On Alpine's website (or any related firm website about securities business), as long as Alpine provides a hyperlink to the homepage of FINRA's website in close proximity to Alpine's indication of FINRA membership.

Member firms are prohibited from including FINRA's logo on web sites, business cards, stationery, or other marketing materials. The FINRA trademark or references to membership may not be included in any trademark of Alpine or associated person. Alpine may, however, include "FINRA Member Firm" or "Member of FINRA" on such materials.

## 7.5 Approval

[FINRA Rule 2210(b)]

Supervisory review and approval requirements are outlined in the following chart.

| Type | Approval Required |
|------|-------------------|
| Retail communications | Must be approved by the CCO or designee **before** the earlier of its first use or filing with FINRA.<br><br>Prior approval is **not** required for the following retail communications:<br><br>- Another FINRA member already filed it and received approval and Alpine does not materially a it or use it inconsistent with FINRA's approval<br>- Retail communications supervised as correspondence where: it is excepted from the definition "research report" unless it makes any financial or investment recommendation; it is posted on online interactive electronic forum; and it does not make any financial or investment recommendation or otherwise promote a product or service of the member. |
| Institutional communications | - Reviewed after sending |
| Correspondence | - Reviewed as outlined in the sections Outgoing Correspondence and Incoming Correspondenc |
| Pre-approved form letters, group e-mails, hedge clauses, other pre-approved communications | Requires prior approval by CCO or designee. Once approved, requires no additional approval if used without change |

## 7.6 Testimonials

[FINRA Rule 2210(d)(6)(B); FTC Guides Concerning the Use of Endorsements and Testimonials: http://ftc.gov/os/2009/10/091005revisedendorsementguides.pdf]

ALPINE_LIT168882

There are specific requirements when using testimonials in communications with the public, including disclosure regarding payment of more than $100 in value paid for the testimonial. The CCO or designee should be contacted before preparing any communications that include testimonials.

# 7.7 Telemarketing Scripts

All scripts used for telemarketing calls are considered retail communications and require the approval of the CCO or designee prior to use. The section *Cold Callers* includes further information regarding the use of scripts and callers.

# 7.8 SIPC Membership

[Securities Investor Protection Act of 1970; United States Code Title 15 Chapter 2B-1; SIPC web site at www.sipc.org/how/sipclogo.aspx]

Advertising must include a notation that Alpine is a member of SIPC, *e.g.,* "Member, SIPC." If an explanatory statement will be included in advertising explaining what SIPC is, one of the following two standardized phrases must be included:

- Member of SIPC, which protects securities customers of its members up to $500,000 (including $250,000 for claims for cash). Explanatory brochure available upon request or at http://www.sipc.org.
- Member of SIPC. Securities in your account protected up to $500,000. For details, please see http://www.sipc.org.

The words "Member, SIPC" may be omitted if the official explanatory statement is used in conjunction with the official SIPC symbol.

When SIPC is referenced in Alpine's web site, the site will include a hyperlink to the SIPC web site. "Advertising" is defined under SIPC rules as any promotional material used in or on any newspaper, magazine, or other periodical, radio, television, telephone or tape recording, videotape display, motion picture, slide presentation, telephone directory, sign or billboard, electronic or other public media.

# 7.9 Communications Defined as "Research"

[SEC Regulation AC; FINRA Rule 2711(a)(9)(A)]

Alpine is not subject to this rule because we do not engage in research activities. RRs are **not** permitted to send communications that may be deemed "research" since there are complex requirements that apply to the issuance of research reports. Federal and SRO rule interpretations define "research" as any written communications (including electronic) that includes an analysis of equity securities of individual companies or industries, and that provides information reasonably sufficient upon which to make an investment decision and that is distributed to at least 15 persons. This applies even if the author does not hold the title of "research analyst" and does not work in a research department. There are specific exceptions under SRO rules. Questions regarding whether a communication constitutes "research" should be referred to the CCO or designee.

## 7.9.1 Adoption of Policies and Procedures to Comply with Rule 2711 and Annual Certification by Senior Officer

Alpine is not subject to this rule currently as we do not engage nor do we allow our associated persons to engage in research activities. If this were to change and Alpine were to engage in such activities, Alpine would be required to adopt and implement written supervisory procedures reasonably designed to ensure that the member and its employees comply with the provisions of this rule (including the attestation requirements of Rule 2711(d)(2)), and a senior officer of Alpine must attest annually to FINRA by April 1 of each year that it has adopted and implemented those procedures.

ALPINE_LIT168883

## 7.10 Recordkeeping Requirements For Retail And Institutional Communications

[FINRA Rule 2210(b)(4)(A); SEC Securities Exchange Act of 1934 Rule 17a-4]

Records of retail and institutional communications must include:

- Originals of all communications received and copies of all communications sent
- While not "retail" or "institutional" communications, records of inter-office memoranda and communications relating to Alpine's business [SEC Rule 17a-4(b)(4)]
- The dates of first use and (if applicable) last use
- The name of the registered principal who approved the communication and the date of approval
- For communications not approved by a supervisor prior to first use, the name of the person who prepared or distributed the communication (where clerical staff prepares or distributes the communication, include the name of the person on whose behalf the communication was prepared or distributed)
- The source of statistical tables, charts, graphs and other illustrations
- For a retail communication prepared by another firm and submitted to FINRA, the name of the firm and a copy of FINRA's review letter
- A record that the item was filed with FINRA and when filed (if required)
- Changes recommended by FINRA and approval received from FINRA (if required)

## 7.11 Outgoing Communications

[FINRA Rule 3110(b)(4), 3110.07, 3110.08 and 3110.09]

This section outlines requirements for outgoing communications which includes written and electronic communications. Electronic communications are subject to specific procedures for review; see the section *Electronic Mail* in this chapter and the section *Electronic Communications Policy* in the chapter *GENERAL EMPLOYEE POLICIES*.

### 7.11.1 Prohibition Against Sending Correspondence From Personal Computers And Other Non-Firm Facilities

Outgoing public correspondence must be sent or transmitted only through Alpine sponsored facilities or systems. Written correspondence must be sent through channels that permit review by the CCO, OSJ Branch Manager or their designees. Correspondence may not be sent through an RR's personal computer, PDA (unless issued by Alpine), or other device, third-party system or facility that circumvents Alpine review.

### 7.11.2 Review And Approval

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Outgoing customer correspondence |
| Frequency | • Monthly or in conjunction with sampling described in Section 7.2.4.2 |
| Action | • Review correspondence for appropriateness of language<br>• Identify outgoing correspondence that may constitute "research" and limit distribution to fewer than 15 persons<br>• Consult with designated supervisor to take corrective action, if necessary, |

ALPINE_LIT168884

| | |
|---|---|
| | which may include consultation with the RR, sending corrected correspondence, added training for the RR, restrictions on correspondence, or other action considered appropriate for the circumstance |
| **Record** | • Initial correspondence reviewed and maintained in outgoing customer correspondence files |

Outgoing customer correspondence is subject to review and approval by the OSJ Branch Manager or designee. Pre-approved form letters and group e-mails **used without change** (other than customer name, address) may be sent to customers or prospective customers without additional approval. Records of to whom form letters and group e-mails are sent must be retained in Alpine's records.

## 7.11.2.1 Reviewing On A Sampling Basis

[FINRA Rule 3110.06]

| | |
|---|---|
| **Responsibility** | • CCO or designee: Establish risk-based reviews<br><br>• OSJ Branch Manager or designee: Conduct Reviews |
| **Resources** | • Evaluation of the Alpine's size, types of business, supervisory structure |
| **Frequency** | • At inception of risk-based procedures and ongoing |
| **Action** | • CCO or designee:<br>• Determine scope of risk-based review (size, what is subject to review, who is subject to review)<br>• Develop procedures and update as necessary<br>• Provide procedures and education/training to communications reviewers<br>• Include communications requirements in RR training<br>• Include risk-based procedures in periodic reviews of branches, offices, and supervisory system, controls and procedures<br>• Identify RRs with complaint/disciplinary history necessitating review of ALL communications and notify the RR's supervisor ("heightened supervision")<br>• OSJ Branch Manager or designee:<br>• Review communications for compliance with policies and securities rules/laws<br>• Take corrective action, if necessary, including consulting with RR and/or Compliance, contacting the customer, issuing corrections, *etc.* |
| **Record** | • Procedures for risk-based reviews are included in the WSP manual<br>• Updates to procedures are retained by the CCO or designee<br>• Education and training are documented including how conducted, who attended, and dates of education/training including educational memoranda<br>• Records of "heightened supervision" retained in RR's file<br>• OSJ Branch Manager or designee: Records of reviews and action taken, if any |

The CCO or designee may review written outgoing correspondence on a risk-based basis using the guidelines that follow, or, if risk-based is not adopted, review all outgoing correspondence prior to sending as part of the Corporate Audit/Internal Audit or other review.

ALPINE_LIT168885

Risk-based guidelines include the following. "Pre-review" refers to review and approval of written correspondence **before** it is sent. Correspondence subject to "post-review" may be reviewed after sending. All RRs are subject to review of at least some of their correspondence on a regular basis. risk-based rview is permitted for the following type(s) of outgoing correspondence:

- Written (hard-copy) correspondence
- E-mails
- Instant messaging
- Faxes

- If pre-review is required:
  - All correspondence for any RR with a history of complaints/discipline that necessitates heightened supervision (The CCO or designee will notify the OSJ Branch Manager or designee of RRs subject to heightened supervision)
- Post-review:
  - Alpine has a program that performs a "key word" review on all electronic correspondence
- Refer to the section *Content Guidelines* that follows for guidance on acceptable content
- For correspondence that includes a recommendation, determine that the information presented balances the benefits and risks of the recommendation and, if the subject security is high-risk, determine the recommendation is appropriate for the customer by conferring with the RR and/or reviewing new account information
- If there are problems with an RR's correspondence that is being minimally sampled, reviews will be increased and the change noted in the RR's file or on a supervisory log.

## 7.11.3 Content Guidelines

Items to consider when preparing and reviewing outgoing correspondence (and other forms of written or electronic communications) include:

- Truthfulness and good taste are required.
- Exaggerated, unwarranted, or misleading statements or claims are prohibited.
- Promises or guarantees: past performance may not be used to promise, guarantee, or imply future profits or income from securities.
- Projections and predictions are not permitted.
- Comparisons of personnel, facilities, or charges with those of other broker-dealers should not be made unless supported by the facts, and other firms' names should not be included.
- Correspondence or other written communications regarding securities subject to pending distributions (underwritings) are generally not permitted.
- Correspondence regarding securities sold by prospectus (mutual funds, limited partnerships, *etc.*) must be approved by the CCO or designee prior to sending (except for pre-approved correspondence where no changes are made).
- Only Alpine-approved hedge clauses may be used.
- Tax advice must not be provided; the customer should be referred to his or her tax adviser for such issues.
- Photocopying and distributing copyrighted material may violate copyright laws.
- Profit and loss or other portfolio analyses should include a disclaimer that the customer should rely on customer statements provided by Alpine and any analysis or calculation is provided for information purposes only.
- The use of Alpine letterhead should be restricted to Alpine-related matters.
- Correspondence regarding options is subject to specific requirements which are discussed in the chapter *OPTIONS*.

ALPINE_LIT168886

### 7.11.4 Letters And Notes

Copies of letters, notes, and similar correspondence sent to customers or their representatives (e.g. power of attorney, etc.) must be provided to the OSJ Branch Manager or designee within the timeline prescribed within the "Incoming Correspondence" or "Outgoing Correspondence" sections of this Manual.

### 7.11.5 Facsimiles

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Outgoing faxes to customers |
| **Frequency** | • Monthly |
| **Action** | • Review outgoing faxes as follows:<br>   o Review faxes sent to, or received by, customers<br>• For faxes with questionable content:<br>   o Confer with RR<br>   o Take corrective action which may include:<br>      ▪ Sending a revised fax to the recipient<br>      ▪ Training for RR<br>      ▪ Disciplinary action against RR which may include a reprimand, suspension, or termination |
| **Record** | • Faxes are reviewed and signed off electronically<br>• Records of corrective action taken |

Facsimiles are included in the definition of "outgoing correspondence" and are subject to review by the OSJ Branch Manager.

Facsimile transmissions may NOT be used for unsolicited advertising. Refer to the section *Calling (Telemarketing) And Fax Restrictions* in this chapter.

## 7.12 Incoming Correspondence

[FINRA Rule 3110(b)(4), 3110.07, 3110.08 and 3110.09]

### 7.12.1 Review Of Incoming Correspondence

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager<br>• Operations Manager |
| **Resources** | • Incoming correspondence, including correspondence marked "personal and confidential" |
| **Frequency** | • Periodically as required |
| **Action** | • Review all incoming correspondence<br>• Refer customer securities and checks directly to Operations<br>• Refer customer complaints to the Chief Compliance Officer |

ALPINE_LIT168887

|  | • Refer audit letters to the Branch Manager |
|---|---|
| **Record** | • Retain each original customer correspondence in an incoming correspondence file. |

All incoming written correspondence will be opened by operations personnel and reviewed by the OSJ Branch Manager or designee. This review includes letters, courier deliveries, and other forms of written communication. Electronic mail is subject to specific procedures for review; see the section *Electronic Mail* in this chapter and the section *Electronic Communications Policy* in the chapter *GENERAL EMPLOYEE POLICIES*.

The following guidelines for review apply:

- Correspondence identified as "Confidential" will be forwarded to the CFO, when and where appropriate.
- Obvious non-customer correspondence (bank statements, advertising, *etc.*) will not be opened and will be forwarded directly to the addressee.
- Audit letters (requests from customers' auditors for verification of account positions) will be forwarded directly to the Branch Manager for response.
- Complaints will be immediately forwarded to the Chief Compliance Officer or designee.
- Checks or securities will be immediately deposited with the appropriate operations personnel.
- Original customer correspondence will be retained for Alpine's files and forwarded to the OSJ Branch Manager or designee on a weekly basis. The OSJ Branch Manager or designee will review, initial and retain on behalf of Alpine. The addressee will receive a copy of the original customer correspondence received.

## 7.12.2 Personal Mail

Employees should direct all personal mail to their home address. Personal mail is subject to incoming correspondence and electronic mail review policies.

# 7.13 Legends And Footnotes

[FINRA Rule 2210(d)(1)(C)]

When legends or footnotes are included in public communications, they cannot be placed or sized in a way that limits the investor's ability to read or understand the information. Small fonts may inhibit reading the information or may inappropriately diminish the importance of the information. Bold claims balanced by a footnote may also mislead the reader.

# 7.14 Internal Communications

[FINRA Rule 3110(b)(4)(B), 3110.06, 3110.07, 3110.08 and 3110.09]

## 7.14.1 Inter-Office Communications

[SEC Securities Exchange Act of 1934 Rule 17a-4(b)(4)]

| **Responsibility** | • Chief Compliance Officer or designee |
|---|---|
| **Resources** | • Inter-office communications |

ALPINE_LIT168888

| Frequency | • As needed |
|-----------|-------------|
| Action | • Review a sampling of inter-office communications and identify business-related communications<br>• Review for compliance with policy and rule/law requirements<br>• Where questions arise, take follow up action which may include consultation with the RR, consultation with compliance |
| Record | • Records of inter-office communications (may be retained in Alpine's e-mail archiving system)<br>• Records of reviews and action taken, if any |

You should presume that any Inter-office communication may be subject to regulatory review, and therefore must comply with good business practice as well as Alpine's policies on communications and securities rules and regulations. Inter-office memos and other communications are subject to review and retention requirements.

### 7.14.2 Internal Use Only

Printed or electronic information marked "internal use only" or "investment professional use only" may not be sent or otherwise provided to individuals outside Alpine.

### 7.14.3 Squawk Box, Conference Calls, And Other Internal Communication Systems

Non-employees may not listen to squawk box or conference calls unless specifically allowed by the person controlling the communication or by the Chief Compliance Officer. Proprietary, confidential information communicated to employees in such venues may not be shared with outsiders. For example, sharing information (either by allowing an outsider to listen to or participate in or by giving the information to an outsider) about proprietary trading, block orders, or other information intended for internal use only could give an outsider an unfair advantage to act on the information and is prohibited.

The President should question the participation of outsiders and exclude them unless participation is specifically permitted.

## 7.15 Investment Analysis Tools

[FINRA Rule 2214]

| Responsibility | • Chief Compliance Officer or designee |
|----------------|----------------------------------------|
| Resources | • Description of proposed investment analysis tools |
| Frequency | • As required |
| Action | • Evaluate efficacy of tool, its source, and its proposed use<br>• Approve tool or return to submitter for changes or disapprove<br>• If required, make filing with FINRA |
| Record | • Review of tool including approval or disapproval<br>• Vendors approved |

ALPINE_LIT168889


| | • FINRA filings, if any are required |
|---|---|

Alpine may use investment analysis tools for use by customers either independently or with assistance from an RR. An "investment analysis tool" is an interactive technological tool that produces simulations and statistical analyses that present the likelihood of various investment outcomes if certain investments are made or certain investment strategies or styles are undertaken, serving as a resource to investors in evaluating the potential risks and return of investment choices.

Recommendations based on use of the tool are subject to suitability rule requirements and other rules about fair dealing with customers. **Proposals for investment analysis tools (including methodology, proposed use, types of investors who will use the tool) must be submitted to Compliance for review and approval prior to use unless provided by an already-approved vendor that created the tool. Vendors must be cleared with the Chief Compliance Officer or designee prior to using tools provided by them.**

## 7.15.1 Disclosures

Disclosures are required when using investment analysis tools. Investment analysis tools (including mention in written reports indicating the results generated by such tool and related retail communications) may be used if the tool, written report, or related retail communication:

- describes the criteria and methodology used (including the tool's limitations and key assumptions);
- explains that results may vary with each use and over time;
- if applicable, describes the universe of investments considered, explains how the tool determines which securities to select, and states that other investments not considered may have characteristics similar or superior to those analyzed *(must indicate whether the tool favors certain securities within the universe of securities considered based on Alpine revenue from sales of the securities or understandings between Alpine and the entity that created the tool and whether the tool is limited to searching, analyzing or in any other way favoring securities in which Alpine makes a market, serves as underwriter, or has any other direct or indirect interest)*; and
- displays the following additional disclosure: "IMPORTANT: The projections or other information generated by *(name of investment analysis tool)* regarding the likelihood of various investment outcomes are hypothetical in nature, do not reflect actual investment results and are not guarantees of future results."

Disclosures must be clear and prominent and in written (including electronic) narrative form. Refer to FINRA Rule 2214.06 for exceptions to requirements for incidental references to tools in retail communications. Users may not imply that FINRA endorses or approves the use of any tool or any recommendation based on the tool.

## 7.15.2 Filing Requirements

Within 10 business days of first use, Alpine must:

- provide FINRA's Advertising Regulation Department access to the investment analysis tool; and
- file with FINRA any template for written reports produced by, or retail communications concerning, the tool.

A tool offered exclusively to institutional investors [FINRA Rule 2210(a)(4)] is not subject to the post-use access and filing requirement if the communication relating to or produced by the tool meet the criteria for an "institutional communication" [FINRA Rule 2210(a)(3)]. If the tool or any related report will be used with a retail investor [FINRA Rule 2210(a)(6)] (such as an employee benefit plan participant or retail customer), the tool is subject to the filing and access requirements.

ALPINE_LIT168890

## 7.16 Complaints

[FINRA Rule 3110(b)(5), 4513 and 4530]

BATS Exchange Rule 4.3(a)

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer or designee |
| **Resources** | • Customers' written complaints including electronic |
| **Frequency** | • As required |
| **Action** | • Send initial acknowledgment of receipt of written complaint, if needed<br>• Gather needed information and investigate the complaint<br>• Provide a response and resolution to the customer with a copy to the RR and RR's supervisor, if needed<br>• If necessary, amend the RR's U4 (or, in the case of a terminated RR, amend Form U5)<br>• Include the complaint in the quarterly report of written complaints to Alpine's SRO<br>• Retain record of complaint for a period of not less than four (4) years<br>• For formal civil actions (lawsuits, arbitrations), refer the matter to Alpine's legal counsel for response |
| **Record** | • Copies of written complaint and related correspondence are retained in complaints file<br>• *Note:* options complaints are retained in separate files both by the Branch Manager and by the Chief Compliance Officer or designee<br>• Evidence of quarterly submission via FINRA Gateway's system. Alpine may rely on the electronic filings in FINRA Gateway to satisfy this requirement.<br>• Form U4/U5 records, if the complaint results in an amendment. |

### 7.16.1 Complaint Defined

"Complaint" is defined as any written statement by a customer or a person acting on behalf of a customer alleging a grievance involving the activities of a person under the broker-dealer's control in connection with the solicitation or execution of any transaction or the disposition of securities or funds of that customer.

### 7.16.2 Handling Of Customer Complaints

When a written complaint is received, a copy should be forwarded immediately to the CCO or designee for review and resolution. . Certain types of oral complaints, those alleging mishandling of the customer's account (unauthorized trading, improper investments, misappropriation, theft or forgery, *etc.*) should be brought to the attention of the CCO or designee for review and resolution promptly. FINRA has shortened reporting obligations for these types of allegations even if oral in nature. These allegations must be investigated promptly by Compliance.

### 7.16.3 Handling of Oral Complaints

Oral complaints should be directed to the OSJ Branch Manager for sales practice issues. Oral complaints should be reported immediately to the OSJ Branch Manager or designee for sales practice issues. Examples of sales practice issues include complaints regarding losses, improper trades, and other complaints involving the quality of investments or wrongdoing by the RR or Alpine. Oral complaints related to Operations should be

ALPINE_LIT168891

handled by the COO or designee. Examples of operational issues include late dividend checks or other check delays, stock delivery, late dividend, errors on monthly statements, and other operational issues. RRs should not make independent decisions regarding whether to report complaints; all oral complaints should be reported either to the OSJ Branch Manager or COO or their designees.

Some oral complaints involving allegations relating to misappropriation of funds or securities, theft or forgery must be promptly reported to the Chief Compliance Officer or designee. FINRA has shortened reporting obligations for these types of allegations even if oral in nature. These allegations must be investigated promptly by Compliance.

The COO and the OSJ Branch Manager and their designees will be responsible for retaining records relating to oral customer complaints. These records should be made available upon request by Compliance.

### 7.16.4 Records Of Complaints

The CCO or designee will maintain a central record of all written customer complaints including the following:

- Complainant's name and address
- Account number
- Date the complaint was received
- Name(s) of employee(s) identified in the complaint
- Description of the nature of the complaint
- Disposition of the complaint

### 7.16.4.1 Office Records Of Complaints

Each office where Alpine regularly conducts business (handles funds or securities, solicits or accepts customer orders) is required to maintain a separate file of all written customer complaints. Records of options complaints will be maintained in a separate file (or are separately identifiable) in Compliance and in the office that is the subject of the complaint.

### 7.16.5 Notice To Customers

Alpine is required to provide each customer with notification of the address and telephone number of the department to which complaints may be directed. This information is provided in writing in the customer agreement (provided at the time of account opening), brokerage account statement and annual disclosure. The COO is responsible for establishing procedures to provide this information to customers.

### 7.16.6 Reporting Of Written Customer Complaints

[FINRA Rule 4530]

BATS Exchange Rule 4.3(a) as it relates to retention of records.

| Responsibility | • Chief Compliance Officer or designee |
|---|---|
| Resources | • Complaints received from customers or referred by RRs, supervisors, or others<br>• FINRA Disclosure Timeliness Report Card |
| Frequency | • Statistical Complaint Report: Quarterly<br>• Form BD, U4s, and U5s (if applicable): Promptly after receipt of complaint |
| Action | • Identify reportable complaints and other reportable events |

ALPINE_LIT168892

| | |
|---|---|
| | • Report to FINRA the events specified in FINRA Rule 4530 within 10 business days of knowledge of the event<br>• Retain record of complaint for a period of not less than four (4) years<br>• File electronically the quarterly statistical report by the 15th of the month following the calendar quarter<br>• Amend Form U4/U5 |
| **Record** | • Quarterly complaint reports maintained in the FINRA Gateway system. A copy may also be placed in the written customer complaint file.<br>• Copies of events reported within 10 days are retained in the RR's file, or, if no RR is involved, in an Alpine file for reportable events or may be retained in the FINRA Gateway system.<br>• Form U4/U5 records, if the complaint results in an amendment. Refer to the RR's securities licensing file. |

## 7.17 Customer Privacy Policies And Procedures

[12 CFR Federal Reserve System Regulation P; SEC Regulation S-AM and S-P; Securities Industry and Financial Markets Association web page on privacy issues: http://www.sia.com/financial_services/html/breachposition.html; Evolution of a Prototype Financial Privacy Notice: http://www.ftc.gov/privacy/privacyinitiatives/ftcfinalreport060228.pdf; FINRA web site Customer Information Protection: http://www.finra.org/industry/Issues/CstomerInformationProtection/; Fair Credit Reporting Act]

| | |
|---|---|
| **Responsibility** | • Chief Operating Officer |
| **Resources** | • Alpine's Privacy Policy<br>• Customer opt-out requests (if applicable) |
| **Frequency** | • When accounts are opened - provide copy of Privacy Policy and opt-out form (if opt-out is applicable)<br>• Annually - send notice of Privacy Policy to all customers<br>• As determined by the designated supervisor: training for employees<br>• As necessary - establish procedures for protecting customer information and ensuring information is only shared when it is allowed<br>• As necessary - when new technologies are adopted |
| **Action** | • Send annual notice to customers<br>• Code accounts for customers opting out (if applicable)<br>• Test internal computer systems periodically<br>• Ensure agreements with third parties receiving customer information reflect the third party firm's privacy policies and include a confidentiality agreement<br>• Include maintaining confidentiality of customer information in employee training<br>• When new technologies involving customer information are adopted:<br>    ○ Determine whether appropriate technological precautions have been taken to protect customer information<br>    ○ Determine whether existing testing/audits will include the new technology and, if not, adjust testing program<br>    ○ Review existing policies and procedures to determine if changes/additions are required<br>    ○ Determine whether added training of employees is necessary and implement, if required |
| **Record** | • Current Privacy Policy |

ALPINE_LIT168893

| | |
|---|---|
| | • Customer opt-out requests (if applicable)<br>• Record of annually providing notice to all customers<br>• Copies of signed agreements with third parties receiving customer information<br>• Records of periodic privacy audits or other reviews conducted of Alpine's computer system that retains customer information<br>• Records of reviews of outsourced services involving the privacy of customer information (see the section *Outsourcing* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*)<br>• Records of review of new technology involving customer information |

## 7.17.1 Introduction

Alpine has adopted a Privacy Policy which is provided to customers at the time a new account is opened. Notice is also sent to all customers on an annual basis. The Privacy Policy explains Alpine's policies regarding safeguarding of customer information and records and whether Alpine shares information with outside parties. Alpine also publishes its Privacy Policy on its web site.

SEC Regulation S-P ("Privacy Of Consumer Financial Information") applies only to accounts for individuals (*i.e.,* institutional accounts are not affected) and differentiates between "customers," where Alpine has an established relationship with the individual, and "consumers," where there is no pre-established relationship. For purposes of this section, any individual from whom information is obtained (and their legal representative acting on their behalf) to open an account or to obtain services or products from Alpine is considered a "customer." The term "consumer" will be considered synonymous with "customer" for purposes of this section.

The Privacy Policy applies to all individual customers of Alpine, whether U.S. residents or foreign residents.

## 7.17.2 "Public" vs. "Nonpublic" Personal Information About Customers

Generally, information provided to Alpine by a customer or potential customer in the normal course of Alpine offering a product or service is considered "nonpublic personal information." Identifying whether information is "public" or "nonpublic" is important as to Alpine's obligations if Alpine shares information with nonaffiliated third parties. Public information is information that Alpine reasonably believes may be obtained from three sources:

- federal state or local government records;
- widely distributed media; or,
- disclosures to the general public that are required to be made by federal, state, or local law.

Nonpublic personal information also includes any list, description, or other grouping of customers (and publicly available information about them) that is derived from financial information that is not publicly available.

## 7.17.3 Sharing Nonpublic Financial Information

In the normal course of business, Alpine will share customer nonpublic financial information with service providers such as service bureaus. Agreements with such third parties include assurances regarding the protection of customer records and information. (Agreements in existence prior to July 1, 2001 will be amended to include the third party's privacy policy by July 1, 2002.) Information sharing with affiliated companies may also occur, and if applicable, is disclosed in Alpine's Privacy Policy.

Alpine does not share customer nonpublic financial information with non-affiliated companies or non-exempt service providers.

## 7.17.4 Customer Notification

ALPINE_LIT168894

[12 CFR Federal Reserve System Regulation P; Federal Reserve Privacy of Consumer Financial Information (Regulation P): http://www.federalreserve.gov/boarddocs/supmanual/cch/consumer.pdf]

Alpine will provide notice to customers about Alpine's Privacy Policy. The notice is provided as follows:

- At the time an account is opened.
- On Alpine's web site.
- Annually, in writing, unless Alpine is not required to provide opt-out, as described in the next section.

### 7.17.4.1 Exception To Annual Notice

[CFR Title 12, Chapter X, Part 1016, Subpart C-Exceptions; CFPB amendment to privacy notice requirement: http://files.consumerfinance.gov/f/201410_cfpb_final-rule_annual-privacy-notice.pdf]

If Alpine does not share customer nonpublic financial information that triggers the opt-out requirement, Alpine is only required to post the Privacy Policy on its web site in an accessible and conspicuous way subject to the following conditions:

- The content of the notice most recently provided has not changed.
- Alpine has another channel for the opt-out disclosure required under the Fair Credit Reporting Act, and Alpine uses the Consumer Financial Protection Bureau (CFPB) model privacy notice.
- Customers must be notified in other required notices where to find the online notice; that the notice has not changed; and that the notice will be promptly mailed upon request by calling a telephone number dedicated to that purpose.

Should Alpine avail itself of this option, it will follow the conditions outlined above.

### 7.17.5 Protection Of Customer Information And Records

[SEC Regulation S-P, Rule 30(a) and SEC Release No. 34-50781; Fair and Accurate Credit Transactions Act of 2003, Section 216; FINRA Notice to Members 05-49]

Alpine has adopted procedures to protect customer information, including the following:

- Customers will be provided Alpine's Privacy Policy at the time an account is opened.
- Accounts that opt out will be coded to block release of nonpublic financial information to nonaffiliated third parties.
- Computerized customer information is accessed by password protection or other established controls within Alpines system to ensure only authorized persons gain access. For example, sales personnel may access information regarding accounts assigned to them but not the accounts assigned to others.
- Alpine's web site is protected by firewalls, a secure server, and anti-virus programs.
- Employees are prohibited from downloading sensitive information.
- Requests for customer information from outside parties such as regulators, the IRS, and other government or civil agencies, are referred to Compliance for review and response.
- The integrity of Alpine's internal computer systems, including privacy protection, is subject to regular review.
- If required by state law, states will be notified if customer information is stolen making it subject to potential identity theft.

### 7.17.6 Access To Customer Information Via Wi-Fi

Because of risk of unauthorized access by outside parties and the difficulty of ensuring the security of wireless connections to the Internet, employees are not permitted to use wireless fidelity (Wi-Fi) to access customer account information, unless:

- the employee is working on Alpine premises; or

ALPINE_LIT168895

- the employee has installed Firm-required firewalls or other protections and has prior approval from Alpine's designated information officer to use Wi-Fi for Alpine business.

### 7.17.7 Remote Access To Customer Accounts

Some employees may be authorized to work at home or while traveling during which time Alpine's network will be accessed. Authorization must be requested from the designated information officer who will assign passwords and retain a record of authorized employees. Firewalls and other protections are in place to prevent intrusion by outsiders and breaches of confidentiality.

### 7.17.8 Disposal Of Consumer Report Information And Records

[SEC Regulation S-P, Rule 30(b) and SEC Release No. 34-50781; Fair and Accurate Credit Transactions Act of 2003, Section 216]

Consumer report and customer information and records will be disposed of in a manner to prevent unauthorized access or use. Procedures include the following:

- Responsible employees will be identified and trained in proper disposal procedures.
- There will be secure removal of trash involving consumer report information.

## 7.18 Regulation S-AM

Securities Exchange Act of 1934, Fair Credit Reporting Act (FCRA), Regulation S-AM

Regulation S-AM allows a consumer, in certain limited situations, to block affiliates of covered persons (i.e., brokers, dealers, and other financial institutions) from soliciting the consumer based on eligibility information (i.e., certain financial information, such as information regarding the consumer's transactions or experiences with the covered person) received from the covered person. Unlike Regulation S-P, which implements financial privacy provisions of the Gramm-Leach-Bliley Act, Regulation S-AM does not limit a covered person's ability to share information. Instead, it limits a covered person's ability to use eligibility information received from an affiliate to solicit a consumer for marketing purposes.

Under Regulation S-AM, a covered person is prohibited from using eligibility information that it receives from an affiliate to make a marketing solicitation unless: (1) the potential marketing use of that information has been clearly, conspicuously and concisely disclosed to the consumer; (2) the consumer has been provided a reasonable opportunity and a simple method to opt out of receiving the marketing solicitations; and (3) the consumer has not opted out.

***Alpine does not share consumer information with any of its affiliated firms for marketing purposes. For that reason, Alpine is not subject to this regulation.*** Should Alpine change its policies in this area, Alpine will adopt a policy in this area in compliance with Regulation S-AM.

## 7.19 Scripts

| Responsibility | • Chief Compliance Officer or designee |
|---|---|
| Resources | • Scripts to be used by RRs or non-registered cold callers |
| Frequency | • As required |
| Action | • Review and revise (as needed)<br>• Scripts for use by non-registered personnel are strictly limited; refer to the |

ALPINE_LIT168896

|  | section *Cold Callers* for more details<br>• Ensure required elements (as described in the policy) are included in all scripts |
|---|---|
| **Record** | • Maintain copies of approved scripts in a file - Include initials and date approved |

Scripts used for the purpose of contacting the public are subject to the requirements governing retail communications. The general requirements include the following:

- Any scripts involving options require the approval of the Chief Compliance Officer or designee prior to use.
- Scripts for non-option products require the approval of the Chief Compliance Officer prior to use.
- Cold callers are restricted to using scripts when making calls (see the section *Cold Callers*). Depending on the content of the script and states where used, the cold caller may require registration and be subject to more stringent state requirements.
- Scripts must clearly include the following, at the beginning or in the introductory portion of the script:
    - the caller's identity
    - Alpine's name
    - the address or phone number of the branch office or OSJ where the caller may be contacted
    - a statement that the purpose of the call is to solicit interest in a security

These disclosures are not required for a script used by an RR who calls existing customers.

# 7.20 Prohibition Against Payments Involving Publications To Influence Market Prices

[FINRA Rule 5230]

Payments of anything of value, directly or indirectly, are prohibited for the purpose of influencing or rewarding someone in connection with the publication or circulation of information in any electronic or other public media for the purpose of influencing the market price of the subject security. This includes any investment service or similar publication; web sites; newspapers; magazines, or other periodicals; radio; or television program. The prohibition does not apply to clearly-identified paid advertising; a communication that discloses the amount and receipt of compensation; or a research report as defined under FINRA rules.

# 7.21 Pre-recorded Voice Messages And Automatic Telephone Dialing Systems (Autodialers)

[Telephone Consumer Protection Act of 1991; FCC Report and Order dtd 2/15/12: http://transition.fcc.gov/Daily_Releases/Daily_Business/2012/db0215/FCC-12-21A1.pdf; FINRA Rule 3230(k)]

Alpine and its associated persons are prohibited from initiating any outbound telemarketing call that delivers a prerecorded message without a person's express written agreement to receive such calls. The rule also requires that all prerecorded telemarketing calls provide specified opt-out mechanisms so that a person can opt out of future calls. The prohibition does not apply to a prerecorded message permitted for compliance with the "safe harbor" for abandoned calls discussed in the next section.

Alpine does not permit pre-recorded messages or the use of autodialing systems.

# 7.22 Calling (Telemarketing) And Fax Restrictions

**ALPINE_LIT168897**

[FINRA Rule 3230; NASDAQ Rule 2212; NYSE Rule 3230; MSRB Rule G-39; Telephone Consumer Protection Act of 1991; Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994; Junk Fax Prevention Act of 2005; FCC Telemarketing Policy web site: http://www.fcc.gov/cgb/policy/telemarketing.html]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer or designee |
| **Resources** | • Requests to conduct telemarketing<br>• Third parties contracted for telemarketing<br>• Do not call requests<br>• Federal/ Utah state do not call lists |
| **Frequency** | • As required |
| **Action** | • For third party telemarketers, confirm compliance with registration requirements and confirm their ability to comply with requirements<br>• Establish and maintain internal do-not-call list<br>• Obtain federal/state do not call lists and make them available to RRs or establish an internal system for automatically checking outgoing calls against lists. Please note: Utah has no state-specific do not call list. Follow the national DNC list rules when calling Utah residents.<br>• For abandoned calls, establish and maintain a method of ensuring compliance with requirements<br>• Train RRs regarding telemarketing prohibitions, use of billing information (if applicable), do-not-call lists, etc. |
| **Record** | • Third party telemarketer compliance reviews<br>• Internal do-not-call list(s)<br>• Federal DNC List(s)<br>• Records of technology (if employed) to block calls to restricted numbers<br>• Recorded phone calls where billing information is submitted<br>• Records of compliance with abandoned call requirements<br>• Records of training including training materials, who attended when conducted |

This section describes restrictions on telemarketing calls under Federal and FINRA rules and regulations. There may be additional regulations such as state laws and rules. Compliance will communicate any such requirements to RRs.


## 7.22.1 Introduction

Alpine and its employees are subject to restrictions that govern telephone solicitations as well as unsolicited facsimile advertisements to residences.

Key points include the following:

- Telephone and facsimile solicitations are allowed when the target individual has an "established business relationship" with Alpine.
- Calls may not be made to individuals included on a Do Not Call List which includes lists maintained by the federal government, state governments, and Alpine.
- "Telephone solicitation" is defined as a telephone call initiated for the purposes of encouraging the purchase of or investment in property, goods, or services. The definition exempts calls made by tax-exempt nonprofit organizations.

ALPINE_LIT168898

- "Established business relationship" includes someone who has had a transaction or security position, money balance, or account activity within 18 months preceding the call or fax or has contacted Alpine to inquire about a product or service within 3 months preceding the call or fax.

## 7.22.2 Telephone Calls

General requirements include the following:

- The caller must provide the called party, at the beginning or in the introductory portion of the script, the name of the caller; the name of the person or entity on whose behalf the call is being made; a telephone number or address at which the caller may be contacted; and disclosure that the purpose of the call is to solicit the purchase of securities or related services.
- Telephone solicitations to residences may not be made before 8:00 a.m. or after 9:00 p.m. in the time zone of the called party's location.
- A "Do Not Call" list must be established that includes the names of individuals who have specifically requested they not be called for solicitations.
- Prerecorded calls to residences are prohibited unless the person has consented in writing to receive such calls and can opt out of future calls and Alpine complies with the requirements of FINRA Rule 3230(k).
- The telephone number of the sender may not be a 900 number or other number where the called party will incur a charge for notifying the sender of a desire not to be called. Consumers may not be charged to protect their privacy.
- Caller identification information must be transmitted; blocking caller identification information is prohibited.
- Outbound telemarketing calls may not be "abandoned" which means a person answers the call and the call is not connected to someone at Alpine within two seconds of the completed greeting. Alpine employs technology to avoid abandoned calls as included in FINRA Rule 3230(j).

The restrictions do not apply to calls to customers for whom Alpine carries accounts and where the account has had some activity in the last 18 months (trading, credit of interest earned, *etc.*). Calls to other broker-dealers also are not covered by these restrictions.

## 7.22.3 Wireless Communications

The rule also applies to outbound telephone calls to wireless telephone numbers.

## 7.22.4 Outsourcing Telemarketing

Compliance must review the use of third party telemarketers before they are engaged. Alpine is responsible for compliance with telemarketing requirements even if the function is outsourced to a third party. Outsource firms may require registration or licensing to conduct telemarketing for Alpine.

## 7.22.5 Unencrypted Consumer Account Numbers

Alpine and its associated persons are prohibited from disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing. "Unencrypted" is defined as not only complete, visible account numbers, whether provided in lists or singly, but also encrypted information with a key to its decryption.

## 7.22.6 Submission Of Billing Information

For any telemarketing transaction, Alpine or its associated person must obtain the express informed consent of the person to be charged and to be charged using the identified account. If the telemarketing transaction involves pre-acquired account information and a free-to-pay conversion feature, Alpine or its associated person must: (1) obtain from the customer, at a minimum, the last four digits of the account number to be charged; (2) obtain from the customer an express agreement to be charged and to be charged using the identified account

ALPINE_LIT168899

number; and (3) make and maintain an audio recording of the entire telemarketing transaction. For any other telemarketing transaction involving pre-acquired account information, Alpine or its associated person must: (1) identify the account to be charged with sufficient specificity for the customer to understand what account will be charged; and (2) obtain from the customer an express agreement to be charged and to be charged using the identified account number.

## 7.22.7 Abandoned Calls

Alpine and its associated persons are prohibited from abandoning any outbound telemarketing call. The abandoned calls prohibition is subject to a "safe harbor" which provides that a firm or its associated person will not be liable for violating the FINRA rule if:

1. Alpine or its associated person employs technology that ensures abandonment of no more than three percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues;
2. Alpine or its associated person, for each telemarketing call placed, allows the telephone to ring for at least 15 seconds or four rings before disconnecting an unanswered call;
3. whenever an associated person is not available to speak with the person answering the telemarketing call within two seconds after the person's completed greeting, Alpine or its associated person promptly plays a recorded message stating the name and telephone number of Alpine or associated person on whose behalf the call was placed; and
4. Alpine retains records establishing compliance with the "safe harbor."

## 7.22.8 Credit Card Laundering

There is a prohibition against credit card laundering, the practice of depositing into the credit card system a sales draft that is not the result of a credit card transaction between the cardholder and Alpine. Except as expressly permitted by the applicable credit card system, the rule prohibits a firm or its associated person from:

1. presenting to or depositing into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and Alpine;
2. employing, soliciting, or otherwise causing a merchant, or an employee, representative or agent of the merchant, to present to or to deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or
3. obtaining access to the credit card system through the use of a business relationship or an affiliation with a merchant, when the access is not authorized by the merchant agreement or the applicable credit card system.

## 7.22.9 Other Prohibited Activities

The following are prohibited when calling customers or prospective customers:

- threats, intimidation, and the use of profane or obscene language
- calling a person repeatedly with intent to annoy, abuse, or harass the called party
- using an alias

## 7.22.10 Do Not Call Lists

| Responsibility | • CCO or designee |
|---|---|
| Resources | • National Do-Not-Call Registry |

ALPINE_LIT168900

|  | • State do not call lists<br>• Internal do not call list<br>• Other vendor lists |
| --- | --- |
| **Frequency** | • Ongoing |
| **Action** | • Add names to Alpine's internal do-not-call list within 30 days of receiving the request<br>• Provide access to federal do not call lists. Lists by state will need to be researched and can be provided upon request.<br>• Obtain updated national do-not-call registry every 30 days. Please note: Utah has no state-specific do not call list. Follow the national DNC list rules when calling Utah residents.<br>• Include telephone solicitation restrictions in RR education programs |
| **Record** | • The internal do not call list is maintained by Compliance<br>• Federal list (s) and Utah list(s) are maintained by the vendor (if a vendor is used) or by Compliance |

Phone solicitations may not be made to phone numbers that are included in federal, state, or Alpine's do not call list. **Because fines may be substantial for each call that violates a restriction, it is important to comply with these requirements.**

It is permissible to contact someone with whom Alpine has an "established business relationship" (described below); the person called has given express written permission to call outside the applicable time; or the person called is a broker or dealer.

If someone has asked to be included on Alpine's do not call list, that person may not be called regardless of whether they are a current customer or have an established business relationship. Individual states may impose stricter requirements limiting contact with persons on that state's do not call list.

If you have a question about the DNC list in a particular state, please contact Compliance.

## 7.22.11 National Do-Not-Call Registry
The Federal Trade Commission (FTC) and Federal Communications Commission (FCC) established requirements for sellers and telemarketers to participate in a National Do-Not-Call Registry of phone numbers that do not accept phone solicitations. Alpine and its employees must avoid solicitation calls to any number on the list unless the person has an "established business relationship" with Alpine. The list used must be no older than 31 days prior to the date any call is made.

In general, national do-not-call requirements apply to residential phone numbers. In addition, the FCC includes wireless subscribers in the national registry, presuming these are residential subscribers.

## 7.22.12 State Restrictions
Certain states have enacted restrictions on telephone solicitations to residences. Florida, for example, has a restrictive policy whereby individuals may ask to be included on a state-wide "do not call" list. It is the telephone solicitor's obligation to be aware of any individuals who are included on that list. Contact Compliance if you have questions regarding state restrictions.

ALPINE_LIT168901

### 7.22.13 Internal Do Not Call List

Employees are responsible for reporting to Compliance the names of individuals who do not wish to be called. Compliance maintains a Do Not Call List that is periodically distributed to employees with an explanation of Alpine's telemarketing policy. It is the RR's responsibility to ensure outgoing calls are not made to anyone appearing on Alpine's Do Not Call List.

### 7.22.14 Facsimile Transmissions

General requirements that apply to faxes include:

- A facsimile transmission must include, in a margin at the top or bottom of each transmitted page or on the first page of the transmission, the date and time it is sent and the identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of the sender.
- Unsolicited faxes may only be sent to individuals who have an established business relationship with Alpine.

### 7.22.15 Established Business Relationship

Calls and faxes to the following are not subject to do-not-call restrictions:

- a person having made a financial transaction or having a security position, a money balance, or account activity with Alpine within 18 months immediately preceding a call or fax; or
- Alpine is the "broker-dealer of record" (identified on the customer's account application for accounts held directly at a mutual fund or variable insurance product issuer) for the account of the person within the previous 18 months immediately preceding the date of the call or fax; or
- the person has contacted Alpine to inquire about a product or service offered by Alpine within the previous 3 months immediately preceding the call or fax.

## 7.23 Public Speaking

[FINRA Rule 2210(f)]

| Responsibility | • Chief Compliance Officer or designee |
|---|---|
| Resources | • Requests for public speaking<br>• Outlines of subjects to be included<br>• Charts or other visual aids to be used in conjunction with public speaking<br>• Written materials to be provided to attendees |
| Frequency | • As required |
| Action | • Refer requests for contact with media to Compliance<br>• Review outlines of information to be presented and revise, as needed<br>• For product-specific presentations, request review by product manager, if necessary<br>• For mutual fund presentations, materials provided by wholesalers also require the approval of the Chief Compliance Officer or designee<br>• Option presentations require the review and approval of the Registered Options and Securities Futures Principal<br>• Review charts and written materials to be presented<br>• Ensure presentations involving securities being offered by prospectus include |

ALPINE_LIT168902

| | |
|---|---|
| | provision of prospectuses to attendees |
| **Record** | • Maintain approved outline, samples of visual aids, and written materials in a "Public Speaking" file<br>• Initial and date all approved materials<br>• Obtain and maintain in the Public Speaking file a list of attendees who received prospectuses (if applicable)<br>• The Registered Options and Securities Futures Principal maintains a file of all approved public speaking that includes options<br>• The Chief Compliance Officer or designee maintains records of approved wholesaler materials |

## 7.23.1 General Guidelines

The general concepts of truthfulness, good taste, and a fair presentation apply to employees engaging in public speaking. Public speaking includes participation in a seminar, forum (including an interactive electronic forum), radio or television interview, or other public appearance or public speaking activity.

## 7.23.2 Approval

Prior to engaging in public speaking, the RR should prepare an outline and submit a Public Appearance/Seminar/Luncheon Request for approval by the designated supervisor. The Request should also include a copy of any proposed advertising about the event if using materials that are not pre-approved by Alpine.

## 7.23.3 Radio, TV, And Other Extemporaneous Presentations

The general standards of communications with the public apply to all public appearances whether scripted or not. The following should be considered when participating in radio, TV, or other non-scripted public appearances. Also refer to the chapter *GENERAL EMPLOYEE POLICIES* and the section *Media Contact Is Limited To Certain Authorized Persons* that explains restrictions on dealing with the media. Most employees are restricted from such contact except with the specific approval of Compliance.

- Specific recommendations of securities must be avoided unless approved by the Chief Compliance Officer or designee or the speaker is authorized under Alpine's "Media Contact" policy. If a recommendation is made, the speaker is required to disclose material information such as when Alpine is a market maker in the stock. The current price and any special risks associated with the security also must be disclosed.
- Alpine's name must be clearly disclosed in conjunction with any securities or services offered.
- The speaker cannot assume a specific level of audience knowledge, experience or suitability. High risk securities may not be appropriate for discussion in a broadcast format available to any listener.
- Media presentations should be clear and understandable. Avoid overly complex messages and technical terminology which may not be understood by the general audience.
- Include products only where the speaker is licensed to sell the product.

For RRs who are approved to engage in radio, TV, or other extemporaneous public speaking, the Chief Compliance Officer or designee is responsible for periodically reviewing the presentations, either on tape or concurrent with broadcast, contacting the RR if unacceptable material is included, and making a record of the review and any action taken.

ALPINE_LIT168903

### 7.23.4 Securities Sold By Prospectus

When presentations include discussion of securities sold by prospectus (mutual funds, variable annuities, *etc.*), participants should receive a copy of the prospectus. A list of participants should be prepared and an indication included that prospectuses were provided.

### 7.23.5 Options

Any presentation that includes a discussion of options must be approved by the Chief Compliance Officer and/or Registered Options and Securities Future Principal or designee prior to the presentation. The Chief Compliance Officer or designee will maintain a written record of any such approved presentations including an outline or description of the presentation.

### 7.23.6 Collateralized Mortgage Obligations (CMOs)

Because of the potential complexity of some CMO investments, review by the designated supervisor of the CMO area is required prior to public speaking on these investments. The chapter *COLLATERALIZED MORTGAGE OBLIGATIONS (CMOs)* should be reviewed for further information.

### 7.23.7 Mutual Funds

Refer to the section *Seminars And Other Public Presentations* in the chapter *MUTUAL FUNDS* for specifics regarding mutual fund seminars.

## 7.24 Cold Callers

[FINRA Notice to Members 95-54]

Alpine does not engage in cold calling activities. Should Alpine engage in such activity in the future, Alpine will adopt policies in this area. In general, the following guidelines apply to **unregistered** individuals who engage in cold calling.

### 7.24.1 Cold Caller Requirements

All cold callers will be employees of Alpine and will be subject to the usual background investigations for all new employees. Cold callers are supervised by the designated supervisors of their respective departments.

Cold callers will be provided with a copy of Alpine's policy regarding cold callers and the Calling Restrictions policy as well as Alpine's Do Not Call list. Cold callers will be asked to acknowledge, in writing, receipt of the policies and the list.

### 7.24.2 Permissible Cold Caller Activities

Unregistered cold callers are restricted to the following:

- Inviting prospects to Alpine-sponsored events
- Asking whether a prospect would like to speak to an RR
- Asking whether a prospect would like to receive information about investments

When making a call, the cold caller must identify himself or herself as well as Alpine and the purpose of the call.

Prior to making calls, the caller must check Alpine's Do Not Call List.

ALPINE_LIT168904

### 7.24.3 Prohibited Cold Caller Activities

Unregistered individuals may NOT:

- Solicit prospects to open accounts
- Discuss general or specific products or services
- Pre-qualify prospects by inquiring about financial status or investment objectives
- Use an alias when identifying themselves
- Contact persons included on Alpine's Do Not Call List

### 7.24.4 Telemarketing Restrictions

Cold caller activities are subject to the Telephone Consumer Protection Act of 1991 issued by the Federal Communications Commission, as outlined in the section *Calling Restrictions* of this manual.

### 7.24.5 Scripts

Cold callers will be restricted to Alpine-approved scripts when making calls. Scripts are approved by the CCO or designee prior to use.

## 7.25 Electronic Communications

[FINRA Notices to Members 01-23 and 98-11]

This section outlines requirements and restrictions regarding the use of electronic communications systems including e-mails.

### 7.25.1 Electronic Communications Policy

Alpine has an Electronic Communications Policy that is included in the chapter *GENERAL EMPLOYEE POLICIES*. The policy includes guidance on:

- Use of electronic communication systems for business use
- Monitoring and auditing of electronic communications
- Web sites, chat rooms, and instant messaging

Please refer to that section for more information.

### 7.25.2 Electronic Mail (E-mail)

#### 7.25.2.1 Commercial E-Mail Procedures

[CAN-SPAM Act of 2003]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer or designee |
| **Resources** | • Notification of recipients wanting to "opt-out" |
| **Frequency** | • Ongoing |
| **Action** | • Include any "opt-out" requests on a "Do-Not-Email" list<br>• To the extent available in the electronic mail system, block outgoing e-mails to |

ALPINE_LIT168905

| | those who have opted out |
|---|---|
| **Record** | • Do-Not-Email list<br>• Requests to opt out |

E-mails that are "commercial electronic mail" will comply with the requirements and restrictions under federal law governing such communications. Commercial electronic mail includes, under federal law, any electronic mail message primarily for the purpose of sending a commercial advertisement or promotion of a commercial product or service. It does not include electronic mail relating to transactions or where there is a relationship between the sender and the recipient.

Commercial e-mail will comply with the following federal requirements.

- All e-mails will include clear identification of Alpine, its address and the sender's e-mail address.
- E-mails will be sent using Alpine's computers or other computers specifically authorized for transmission of Alpine e-mails.
- Recipients will be given the opportunity to "opt-out" from receiving future commercial electronic mail.
- Alpine will not use "address harvesting" or "dictionary attacks" to obtain e-mail addresses from the Internet.

## 7.25.2.2 Review And Approval

[FINRA Rule 3010(d)(2), Notices to Members 99-03 and 98-11]

| **Responsibility** | • OSJ Branch Manager - review of e-mail |
|---|---|
| **Resources** | • Incoming and outgoing e-mail<br>• Filtered e-mail (if a filtering process is used) |
| **Frequency** | • Monthly - review of outgoing and incoming e-mails |
| **Action** | • Review incoming and outgoing e-mails on a sampling basis as follows:<br>    ○ "key word" search on all e-mails, done by program purchased for compliance<br>• Review outgoing non-electronic correspondence for appropriateness of communications<br>• Review incoming & outgoing faxes<br>• Review internal communications<br>• For incoming e-mail, identify and forward written complaints to Chief Compliance Officer or designee<br>• Compliance may, at its discretion, audit an individual employee's computer use and communications<br>• Take corrective action, if necessary, including further education of RR, restricting e-mail privileges, other action in consultation with Compliance |
| **Record** | • Copies of incoming and outgoing e-mails are retained electronically<br>• Record of review is included in a log or recorded electronically<br>• Corrective action is included in the employee's file |

ALPINE_LIT168906

| | • Review findings are maintained in a review file |
|---|---|

Incoming and outgoing customer e-mails are reviewed, on a sampling basis as enumerated above. E-mails may also be subject to review by a filtering program that identifies inappropriate language.

Advertising, sales literature, research, market letters, communications with the press, and other communications for general distribution or release to the media require pre-use review and approval in accordance with policies governing these types of communication. Refer to other sections of this chapter regarding requirements for these communications. Also refer to Alpine's media policy in the chapter *GENERAL EMPLOYEE POLICIES*.

Alpine uses Smarsh for the review of, and the retention of, emails. Emails are retained in accordance with recordkeeping and retention rules.


### 7.25.2.3 E-Mail Policy Violations

When a message is discovered that violates Alpine's policy, the OSJ Branch Manager, in consultation with Compliance, will take the following action:

- Review the employee's file to determine if there have been other violations and whether the employee has responded appropriately.
- Send notification to the employee, with a copy to the employee's supervisor, of the violation including sender's identification; receiver's identification; date/time of message; subject line; and size/name of attachment, if applicable. Any prior violations will also be noted for the employee's and supervisor's information.
- At Compliance's suggestion, send a copy to the supervisor's supervisor if a repeat problem and it does not appear an appropriate response was received for prior violation(s).
- Determine disciplinary action, if any.
- Retain a record of notification to the employee and any action taken in the employee's file.
- Where there is a history of violations, Compliance may conduct an electronic audit of the individual's computer files to determine content of information being retained.


### 7.25.2.4 Education And Training

| Responsibility | • Chief Compliance Officer or designee |
|---|---|
| Resources | • Electronic Communications Policy<br>• Annual compliance meetings<br>• Firm Element continuing education<br>• Annual employee certifications<br>• Periodic reminders distributed to employees |
| Frequency | • At time of hire of new employees<br>• Annually for:<br>    ○ Compliance meetings<br>    ○ Continuing education<br>    ○ Certifications<br>• Periodically for reminders |
| Action | • Provide Policy to new employees<br>• Conduct annual compliance meetings<br>• Conduct continuing education<br>• Distribute and obtain certifications |

ALPINE_LIT168907

| | |
|---|---|
| | • Send periodic reminders |
| **Record** | • New employee acknowledgment of Policy is filed in the employee's personnel file<br>• Annual compliance meetings are documented in registration and/or branch files<br>• Records are retained of RRs completing continuing education<br>• Compliance retains copies of reminders sent to employees<br>• Annual certifications are filed in registration and/or personnel files |

Alpine uses a number of methods to educate its employees regarding Alpine's policies regarding electronic communications.

- Before employees are permitted to use Alpine-sponsored e-mail, employees are required to read and agree to the Electronic Communications Policy. The Policy is distributed to all new employees who are required to acknowledge receipt in writing.
- Current employees acknowledge their understanding and agreement with the Policy in Alpine's annual certification.
- The Firm Element continuing education program and/or annual compliance meeting for registered employees will periodically include training regarding Alpine's Electronic Communications Policy.
- Periodically Alpine will distribute reminders to employees regarding the Policy.

### 7.25.2.5 Special Reviews

As part of Alpine's supervision of RRs, Compliance may impose different standards of review that may include review of all incoming and outgoing correspondence regardless of form, pre-approval, or other special reviews. Refer to the chapter *EMPLOYMENT, REGISTRATION AND LICENSING* and the section *Heightened Supervision* for further information.

## 7.25.3 Instant Messaging

[FINRA Notice to Members 03-33]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager: review instant messages<br>• CCO or designee: determine extent of permitted instant messaging |
| **Resources** | • Vendor or in-house program or service designed for review, retention, and retrieval of instant messages |
| **Frequency** | • For authorized instant messaging, monthly review |
| **Action** | • Compliance:<br>  o Determine whether Alpine will permit instant messaging and, if so, what departments and/or personnel are permitted to use instant messages<br>  o Determine system for review, retention, and retrieval of instant messages<br>• OSJ Branch Manager: review instant messages in accordance with sampling or review of all messages as outlined in the section *Outgoing Communications* |
| **Record** | • Instant messages are retained electronically<br>• Record of review is included in a log or recorded electronically<br>• Compliance retains agreements with outside vendors engaged to provide |

ALPINE_LIT168908

| | surveillance and written record of departments and/or personnel authorized to use instant messaging |
|---|---|

Instant messaging is a form of electronic communication that is subject to Alpine's review, record retention policies. Refer to the *Electronic Communications Policy* in the section *Instant Messaging* in the chapter *GENERAL EMPLOYEE POLICIES*, for more information about these requirements.

Alpine uses Smarsh for the review of, and the retention of, Instant Messaging. Instant Messaging communications are retained in accordance with recordkeeping and retention rules.

Departments and/or personnel permitted to use instant messaging include:

- OTC trading personnel
- Compliance personnel limited to audit and surveillance purposes

## 7.25.4 Advertising

Electronic advertising is subject to pre-use review. Refer to the section *Retail Communications* in this chapter.

## 7.25.5 Bulletin Boards, Web Sites And Other Electronic Communication Systems

The use of computer bulletin boards, web sites, or other electronic communication systems on the Internet for the purposes of advertising or soliciting business is subject to the same requirements for approval as other forms of written communications. Participation in electronic communication systems must comply with requirements in this section, and Alpine's Electronic Communications Policy in the chapter *GENERAL EMPLOYEE POLICIES*.

### 7.25.5.1 Firm Web Site

[FINRA Rule 2210; FINRA Notice to Members 07-02; SIPC By-Laws, Article 11 Section 4; SEC Guidance for public companies on the use of company web sites: http://www.sec.gov/rules/interp/2008/34-58288.pdf]

| | |
|---|---|
| **Responsibility** | • Chief Compliance Officer or designee |
| **Resources** | • Alpine's web site<br>• Requests to include information on Alpine's web site |
| **Frequency** | • Perform periodic reviews of Alpine's website<br>• Perform review at the time a change is made to Alpine's web site |
| **Action** | • Review proposed materials to be included on the web site and approve or disapprove (Determine whether filing with FINRA is required and make the necessary filings)<br>• Review the web site to ensure only previously approved materials are included<br>• If SIPC is referenced on the site, provide a hyperlink to the SIPC web site<br>• If FINRA is referenced on the site, provide a hyperlink to FINRA's home page<br>• Contact supervisors of departments that have included unapproved materials and take corrective action<br>• Corrective action may include changing or deleting the material or reminding the supervisor of the pre-use approval requirement |

ALPINE_LIT168909

| **Record** | • Maintain an electronic file of all materials maintained at the web site and the approval of their use (and if applicable, copies of FINRA filings)<br>• Maintain records of periodic reviews<br>• If any corrective action is taken, describe such action |
|---|---|

Alpine has established a web site. Any information to be included on the web site requires the **prior approval** of the Chief Compliance Officer or designee.

If Alpine's site refers to its membership with FINRA, a hyperlink to the FINRA internet home page will be included. If SIPC membership is included on the site, a hyperlink to SIPC's web site will be shown.

## 7.25.5.2 RR Web Sites

RRs are not permitted to establish personal web sites to solicit or conduct business on behalf of Alpine. Participation in other web sites to conduct Alpine's business (other than approved participation in Alpine's web site) through linking or other means of contacting or identifying the RR is prohibited.

## 7.25.5.3 Data Feeds

[FINRA Regulatory Notice 11-39]

Any third party data feeds tied to Alpine's or an RR's web site must be reviewed by the Chief Compliance Officer or designee prior to use. Reviews will identify the proficiency and efficacy of the data provider to feed accurate and timely information. Compliance will advise the requestor whether the data provider is approved and will retain records of its review.

## 7.25.5.4 Third-Party Postings

Currently, Alpine does not allow third parties including customers to post to Alpine's website. Should this policy change, Alpine will adopt the following policy: The Chief Compliance Officer or designee must review and approve any requests to include third-party postings on Alpine's web site prior to inclusion of such postings on the site. If third-party postings (including customer postings) are permitted, the following requirements will apply:

- A disclaimer will be included on the web site stating that such posts are not those of Alpine; do not reflect the views of Alpine; and Alpine does not take responsibility for the content of such posts.
- The site will be regularly reviewed and third-party posts will be monitored as part of that review to mitigate any perception that Alpine is adopting any post.
- Usage guidelines will be provided to customers or other third parties permitted to post on firm-sponsored sites.
- Compliance may develop standard responses that RRs will be authorized to use in response to third-party postings on social media web sites.

Compliance will retain records of registration and screening of third parties allowed to post.

## 7.25.6 Hyperlinks

[FINRA Interpretation Letter from Thomas M. Selman to the Investment Company Institute, November 11, 1997]

| **Responsibility** | • Chief Compliance Officer or designee |
|---|---|
| **Resources** | • Proposed web site or other material that includes hyperlinks |

ALPINE_LIT168910

| Frequency | • As required |
|---|---|
| Action | • Confirm hyperlink conforms to requirements for inclusion |
| Record | • Web site or other material maintained in review file |

When hyperlinks to third-party sites are included in Firm communications or on a Firm web site, it is important the hyperlink meets the following conditions to avoid liability for the content or regulatory filing of information included in the third-party site:

- A hyperlink may not be established to a site known (or there is reason to know) to contain false or misleading information.
- The hyperlink must be continuously available to investors who visit the site.
- Investors have access to the hyperlinked site whether or not it contains material favorable to Alpine.
- The linked site can be updated or changed by the third party, following which investors would still be able to use the hyperlink.

## 7.26 Identification Of Sources

When using communications not prepared under the direct supervision of Alpine, it is necessary to identify, on the communication, the person or entity that prepared the material. This includes research reports obtained from outside sources.

ALPINE_LIT168911

# 8 FINANCIAL AND OPERATIONS PROCEDURES

This chapter provides key policies and procedures affecting the financial and operations areas of Alpine. Detailed procedures affecting other areas of operations are included in separate operations procedures manuals.

Alpine has designated a Financial and Operations Principal ("FINOP") who is also the CFO and who is responsible for general oversight of Alpine's financial and operations areas. The CFO is responsible for the day-to-day financial and operational procedures of Alpine.

## 8.1 Qualification Of Operations Personnel

[FINRA Rule 1230(b)(6)(A) and 1250; FINRA Regulatory Notice 11-33; FINRA Qualifications FAQ: http://www.finra.org/Industry/Compliance/Registration/QualificationsExams/P124607]

Certain operations personnel are considered "covered persons" under FINRA Rule 1230 because of their responsibilities for "covered functions" as defined in the Rule. These personnel are required to qualify as "Operations Professionals" by completing the Series 99 qualification examination or by qualifying for an exception because of the person's other registration qualifications. In general the requirements apply to senior management responsible for covered functions; persons designated by senior management to supervise, manage, or approve or authorize work relating to the covered functions; and persons with authority or discretion materially to commit Alpine's capital relating to covered functions. The Rule should be consulted for definitions of covered persons and covered functions.

In addition, covered persons are required to participate in Regulatory Element and Firm Element continuing education. Refer to the chapter *TRAINING AND EDUCATION* for procedures regarding continuing education.

The COO or designee is responsible for confirming that covered persons complete the necessary requirements for registration and continuing education and to restrict an employee's activities if either requirement is not completed within required timeframes.

## 8.2 Books And Records

[SEC Securities Exchange Act of 1934 Rule 17a-3 and Rule 17a-4; FINRA Rule 4510, 4511 and 4512; FINRA New And Amended Recordkeeping Checklist: http://www.finra.org/web/groups/rules_regs/documents/rules_regs/p006378.pdf; MSRB Rule G-8 and G-9]

### 8.2.1 Introduction

SEC Rule 17a-3 identifies the types of books and records to be retained by Alpine and 17a-4 identifies the period these records are to be retained. SROs also specify certain record retention requirements. Alpine's IT Committee, under the direction of the CFO, is responsible for retaining required records. Supervisors may maintain their own records with respect to their supervisory responsibilities. The FINOP is responsible for establishing and maintaining Alpine's record retention schedule.

### 8.2.2 Electronic Storage Of Records

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)]

| Responsibility | • Alpine's IT Committee |
|---|---|

ALPINE_LIT168912

| Resources | • Records required to be retained under SEC and SRO rules |
|---|---|
| Frequency | • Ongoing recordkeeping, as required by rule<br>• Audit system - ongoing and periodic |
| Action | • Develop internal system, a vendor or other third party meeting rule requirements<br>• Contract with an independent third party download partner, if appropriate<br>• Notify DEA when initiating electronic storage and provide third party representation<br>• Provide revised notifications to DEA if necessary<br>• Obtain senior management approval of system configuration to store records and subsequent changes<br>• Issue passwords to authorized personnel and disable passwords for terminated employees or those no longer requiring access<br>• Take corrective action internally or with outside vendor if anomalies are detected<br>• Establish audit system for accountability regarding the input of records into the storage system |
| Record | • Contracts with vendors or other third parties<br>• Notification(s) to DEA<br>• Written approval from senior management regarding system configuration<br>• Record of corrective action taken, if necessary, when anomalies are detected<br>• Record of passwords issued and disabled<br>• Audit system and anomalies detected including corrective action taken |

Alpine utilizes electronic storage media and/or micrographic media for certain records.

## 8.2.2.1 Notification To Examining Authority

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)(2)(i)]

Alpine has provided the required notification to its designated examining authority (DEA) prior to employing electronic storage media. The independent third party with download access is also required to submit an undertaking indicating it agrees to promptly furnish information to regulators.

## 8.2.2.2 Conditions

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)(2)(ii)]

As required by rule, Alpine's electronic storage media meets the following conditions:

- non-rewritable, non-erasable format
- automatic verification of the quality and accuracy of the process
- serialize original (and duplicate units) and time-date for required retention period
- capacity to readily download records

## 8.2.2.3 Ability To Retrieve And Reproduce

ALPINE_LIT168913

[SEC Securities Exchange Act of 1934 Rule 17a-4(f)(3)]

Alpine's electronic or micrographic storage will also meet the following requirements:

- facilities for immediate, easily readable production of records
- ability to provide facsimile enlargements
- duplicate copies stored separately from the originals
- organized and indexed accurately
- current information necessary to access records and indexes

### 8.2.2.4 Audit System

The third party that provides electronic storage services has an audit system to test, on an ongoing basis, the integrity of the Alpine's records retained in electronic storage media. Anomalies reported by the third party will be reviewed by the Alpine's IT Committee on the FINOP's behalf to ensure corrective action has been taken and records are retained as required.

### 8.2.2.5 Confidentiality Of Electronic Records

Alpine (in conjunction with any vendor) protects against unauthorized access to or use of customer records by use of a password system. Passwords will be changed periodically and disabled for terminated employees or employees no longer requiring access.

## 8.3 Calculation And Reporting Of Net Capital

[SEC Securities Exchange Act of 1934 Rule 15c3-1, Rule 17a-5 and Rule 17a-11; FINRA Rule 4110, 4120, 4130, 4140, 4521 and 4524]

| Responsibility | • FinOp |
|---|---|
| Resources | • Financial and transaction records |
| Frequency | • Ongoing |
| Action | • Maintain ongoing calculation of Alpine's net capital<br>• Report net capital as required<br>• Report net capital deficiencies as required, when necessary |
| Record | • Records retained by the FINOP include:<br>   o FOCUS reports<br>   o Other net capital calculations |

The calculation and monitoring of net capital is the responsibility of the FINOP who also is responsible for ensuring the accurate and timely reporting of periodic net capital reports. Some of the FINOP's specific responsibilities include:

- Review and filing of Alpine's financial reports and periodic review of accounting records
- Periodic consideration of whether Alpine's minimum net capital requirements have changed because of changes in Alpine's business
- Supervising additions to, and withdrawals from, the equity capital of Alpine
- Reporting borrowings and subordinated loans for capital purposes
- Establishing procedures for retention of required financial books and records

ALPINE_LIT168914

If Alpine becomes deficient in its net capital position, the FINOP is responsible for making the necessary reports to regulators and communicating any restrictions in business that may result.

## 8.4 Reports

| Responsibility | FINOP |
|---|---|
| **Resources** | Audited Financials, including oath and affirmation page (performed by an accounting firm that is registered with the Public Company Accounting Oversight Board (PCAOB) |
| **Frequency** | • Annually or as material changes are needed<br>• Within 60 days after the date of the statements |
| **Action** | • Submit audited financials to FINRA via CRD<br>• Provide physical copies to various regulatory bodies as enumerated below<br>• Retain records of filings, names of regulators and date of filing |
| **Record** | • Underlying records that support audited financials<br>• Record pertaining to submission of electronic filings and hard copies mailed to regulators |

Rule 17a-5(a)(6)

The FINOP is responsible for filing required reports and retaining records of all filings. Reports will be as of the same fixed or determinable date each year, unless a change is approved in writing by FINRA.

Mailing List.

- SEC's principal office (Washington, D.C.)
- SEC's regional office (Salt Lake City, UT)
- FINRA's principal office (Maryland)
- State regulatory agencies*
- All other SROs of which Alpine is a member*
- DTCC

* if asterisked, these agencies may allow records to be sent electronically. Alpine maintains a list of regulators and other parties to whom the annual audited financial statements must be sent. Please consult the full list for additional information.

### 8.4.1 Annual Audit Reports - Facing Page

The "Annual Audited Report, Form X-17A-5, Part III, Facing Page" must be completed and attached to the front of each of each copy of the audited financial statements.

### 8.4.1.1 Annual Audit Reports - Required Notarized Oath or Affirmation

Alpine must complete the "Oath or Affirmation" on the Facing Page (or must attach the oath or affirmation to the audited financial statements in accordance with Exchange Act Rule 17a-5(e)(2)). The oath or affirmation must be notarized. As a corporation, Alpine's "Oath or Affirmation" must be notarized by a duly authorized officer.

ALPINE_LIT168915

#### 8.4.1.1.1 Annual Audit Reports - Confidentiality

Rule 17a-5(e)(3) provides that the audited financial statements "shall be public, except that, if the Statement of Financial Condition . . . is bound separately from the balance of the annual audited financial statements . . . the balance of the annual audited financial statements shall be deemed confidential, except that they shall be available for official use . . ."

In order to receive confidential treatment for the financial statements other than the Statement of Financial Condition in accordance with Rule 17a-5(e)(3), the broker-dealer should do the following:

- Bind the Statement of Financial Condition separately from the balance of the annual audited financial statements or place it in a separate package. Complete and attach an "Annual Audited Report, Form X-17A-5, Part III, Facing Page" to the Statement of Financial Condition. Mark the Facing Page "Public."
- Bind the balance of the annual audited financial statements separately or place them in a separate package. Complete and attach an "Annual Audited Report, Form X-17A-5, Part III, Facing Page" to these statements. Mark the Facing Page "Confidential Treatment Requested."

The public and non-public portions of the financial statements must be clearly segregated and the Facing Page must be appropriately marked. For example, the Facing Page attached to the Statement of Financial Condition should not be marked "Confidential." Further, if the Statement of Financial Condition is not bound separately or placed in a separate package, then, in accordance with Rule 17a-5(e)(3), none of the statements will be accorded confidential treatment.

Rule 17a-5(e)(3) does not require the submission of a letter requesting confidential treatment. It is not necessary to mark the mailing envelope "Confidential."

## 8.4.2 Compliance Report

[SEC Securities Exchange Act of 1934 Rule 17a-5]

Alpine will annually file (within 60 calendar days after the fiscal year-end as part of Alpine's annual compliance audit with the SEC the required Compliance Report. Alpine's PCAOB-registered independent public account firm will also prepare a report based on an examination of certain statements in the Compliance Report.

### 8.4.2.1 Custody Report and Requirements

| Responsibility | • FINOP |
|---|---|
| Resources | • General Ledger Trial Balance for Correspondent Broker Balances<br>• Exchange Traded Commission Statements (various)<br>• Correspondent Broker Income Statements |
| Frequency | • Quarterly Annually or as material changes are needed<br>• Within 60 days after the date of the statements |
| Action | • File Form Custody Report that contains information about whether and how Alpine maintains custody of customer assets<br>• Allow SEC and SRO staff access to review working papers of Alpine's PCAOB accounting firm if requested in writing as part of an examination<br>• Allow regulators to discuss findings of the PCAOB firm with Alpine's accounting staff<br>• Facilitate regulators' access |

ALPINE_LIT168916

| Record | • Underlying records that support Form Custody<br>• Record pertaining to submission of the Form Custody Report |
|---|---|

## 8.5 Risk Reports

If Alpine computes capital charges under 15c3-1e (limitations on the withdrawal of equity capital), it is required to file additional reports with the SEC. The FinOp is required to file this report within 17 business days after the end of each month that is not a quarter and within 17 business days after the end of each quarter. Refer to SEC Rule 17a-5(a)(6) for details of what must be reported.

## 8.6 Reconciliations And Bank Records

| Responsibility | • FINOP<br>• President |
|---|---|
| Resources | • Bank records |
| Frequency | • Monthly |
| Action | • Reconcile bank accounts against Alpine's records<br>• Make notation of any item which FINOP is unable to reconcile and the date in which it was discovered<br>• Review of reconciliation performed by FINOP (President) |
| Record | • Bank statements and other bank records, retained by FINOP<br>• Record of any items which are unable to reconcile<br>• Record pertaining to review of reconciliation, retained by FINOP |

The FINOP is responsible for establishing procedures for the periodic reconciliation of bank statements, clearing and depository accounts, and other accounting and business records. Proposed procedures shall be reviewed by Compliance prior to implementation.

Records of bank accounts and other reconciled accounts will be maintained in accordance with regulatory requirements. Review of monthly reconciliation may be reviewed by the President and documentation of such review will be maintained with bank statements, bank records and reconciliation.

## 8.7 Financial Reporting

[SEC Securities Exchange Act of 1934 Rule 17a-5 and Rule 17a-11; SEC FAQs regarding financial responsibility rules: http://www.sec.gov/divisions/marketreg/amendments-to-broker-dealer-financial-responsibility-rule-faq.htm; FINRA Rule 4520 Series]

The FINOP is responsible for financial reporting, payment of fees and assessments and maintaining records of reporting and payment. Some of the requirements include:

- Filing net capital reports
- Reporting net capital deficiencies
- Reporting notice of books and records deficiencies Rule 17a-11(d)
- Preparation and filing of unaudited financial statements
- Engaging outside accountants to conduct Alpine's annual audit and notifying regulators when there is a change of accountant

ALPINE_LIT168917

- Filing audited financial statements with regulators and providing to customers, as required
- Providing statements of accounts to customers pursuant to Rule 2340(a)
- Notifying regulators of any change in Alpine's fiscal year
- Payment of assessments and fees to regulators

Within 17 business days after the end of each month that is not a quarter, as of month-end the FINOP will provide all reporting as detailed in Rule 17a-5.

Alpine recognizes the responsibilities of financial reporting rest primarily on the FINOP. As a contingency plan related to financial reporting, should the FINOP not be available to complete and submit reporting the outside accounting firm of Alpine will be enlisted to complete reporting until a suitable replacement is acquired.


## 8.7.1 Preparation Of Financial Reports

The FINOP is responsible for preparing and reviewing financial reports. While the FINOP may delegate responsibility for gathering information and preparing the reports, the FINOP is ultimately responsible for reporting accurate information.

Preparation of reports will include the following procedures:

- Gathering information through Alpine's records and systems to compile financial information.
- Working with outside auditors, when appropriate.
- Drafting reports.
- Determining the accuracy of calculations and information included in the report.
- Providing information to senior management and others, as appropriate.
- Sending reports to designated regulators.
- Providing information for publication to customers, where required by rule.

The FINOP will maintain files including calculations and other information utilized for preparing financial reports and records of internal, regulatory, and other external distribution of reports, as required.

Alpine recognizes the responsibilities of financial reporting rest primarily on the FINOP. As a contingency plan related to financial reporting, should the FINOP not be available to complete and submit reporting the outside accounting firm of Alpine will be enlisted to complete reporting until a suitable replacement is acquired.


## 8.7.2 Financial Statements

SEC Release No. 34-70073

| Responsibility | - FinOp |
|---|---|
| Resources | - Audited Financials |
| Frequency | Audited statements<br><br>- Statements must be provided to customers within 105 days after the end of Alpine's fiscal year end or<br>- Within 30 days of that date if sent with the next mailing of quarterly customer statements<br>- Posted at www.alpine-securities.com no later than 90 days after the date of the audited financials. ***Special rules apply to website postings, see action below for more information.*** |

ALPINE_LIT168918

| | |
|---|---|
| | Unaudited financial statements<br><br>• Dated 6 months from the date of the audited statements must be provided to customers within 65 days after the date of the unaudited statement or<br>• 70 days after that time if sent with the next mailing of customer quarterly statements.<br>• Posted at www.alpine-securities.com no later than 75 days after the date of the unaudited financials. ***Special rules apply to website postings, see action below for more information.*** |
| **Action** | Send statements via mail or email (if customer consent is on file) within timelines prescribed above or post to Alpine's website or post statement to website.<br><br>If posted to website, the following rules apply:<br><br>• Statements must be accessible by hyperlinks in either textual or button format, separate prominent links that are clearly visible, and are placed in each of the following locations:<br>• On the Firm's website home page; **and**<br>• On each page where a customer can enter or log in to the website. |
| **Record** | • Dates financial statements sent to customers or posted to website |

Alpine maintains a toll-free number that customers may call to request statements. Alpine is required to send statements promptly after request at no cost to the customer. Alpine must not have been required, during the year prior to the date of the statement, to give notice and transmit a report to the SEC under 17a-11(e).

### 8.7.3 Disclosure Of Financial Condition

[FINRA Rule 2261]

Upon request, information about Alpine's financial condition in its most recent balance sheet will be made available to customers and to any member firm that is party to an open transaction or has on deposit cash or securities with the Firm. The information may be provided in paper or electronic form (if for a customer, the customer must consent to electronic delivery).

### 8.7.4 Notification Rule ("Early Warning Rule")

[SEC Securities Exchange Act of 1934 Rule 17a-11]

The FINOP is responsible for notifying (within 24 hours) the SEC and other securities regulators upon the occurrence of certain events (insolvency, decrease of net capital below required minimum, or Alpine's repurchase and securities lending activities exceed 25 times its tentative net capital). As an alternative to notification regarding repurchase and securities lending activities, Alpine may report monthly as to its stock loan and repurchase activities to its DEA. The FINOP is responsible for maintaining records of any early warning notifications (or monthly reports).

## 8.8 Fees And Service Charges

[FINRA Rule 2122; NASD Notice to Members 92-11]

ALPINE_LIT168919

| Responsibility | • Board of Directors |
|---|---|
| Resources | • Schedule of fees and charges<br>• Information regarding changes |
| Frequency | • As required |
| Action | Instruct Chief Operating Officer or designee to:<br><br>• Arrange for written notification to customers<br>• Include notification to new customers when accounts are opened<br>• Update website as needed |
| Record | • Notice provided to new customers<br>• Copy of written notification sent to customers including date sent<br>• Records of website changes and information posted |

Broker-dealers are obligated to disclose fees and service charges to customers. In general, fees and charges are required to be reasonable and not unfairly discriminatory between customers.

If a fee or commission will be charged to redeem a mutual fund and the fund could be sold through the fund company itself without cost, the customer should be notified that the fund could be redeemed without cost by liquidating directly through the mutual fund.

### 8.8.1 Notification Of Customers

Customers will be notified of fees and changes to fees and service charges as follows by the COO:

- At the time an account is opened.
- When there is an increase in fees, at least 30 days prior to the increase , Alpine will post the revised fee schedule on Alpine's website.
- If notification is by a method other than a letter (*i.e.,* statement stuffers, newsletters, *etc.*) notification of a fee increase will be clear and conspicuous and in plain English.
- Where a website is used to communicate or interact with customers, all fees will be posted (and kept current) including changes and the projected date of changes.
- For extensive fee changes, a letter may be sent to customers referring them to a website where complete information may be obtained.

The tasks above may be performed by a designee of the COO.

## 8.9 Fidelity Bonding

[FINRA Rule 4360]

The FINOP is responsible for obtaining and maintaining fidelity bonding as required by rule and verifying the adequacy of coverage on at least an annual basis when the bond is subject to renewal.

## 8.10 Cash Deposits

Alpine accepts cash or currency from customers subject to Alpine's discretion. The following steps must be followed when cash or currency are received:

ALPINE_LIT168920

- Immediately provide the cash to the cashier or other authorized Operations personnel.
- The cashier or Operations is responsible for counting the cash (2 people must be present to verify the amount) and entering the amount into Alpine's customer account system for credit to the customer's account.
- Immediately thereafter the cash must be taken to Alpine's bank for credit to the account maintained for the benefit of customers or, if no account exists, obtain a cashier's check or money order made payable to Alpine and then send the check/money order to Alpine the same day.
- The CFO is responsible for filing Form 4789 (Currency Transaction Report) with the IRS by the 15th calendar day after receipt for cash in excess of $10,000 for one person on any one day.
- The CFO is responsible for retaining a file of forms filed with the IRS.

# 8.11 Risk Management

[FINRA Notice to Members 99-92; SEC Securities Exchange Act of 1934 Rule 17a-3(a)(23), Rule 17h-1T and Rule 17h-2T]

This section generally outlines Alpine procedures designed to address "risk management." Because these procedures address various lines of business that operate in a constantly changing market environment, they are not static and should be adapted by the CFO to meet the needs of Alpine on an ongoing basis.

## 8.11.1 Risk Assessment

### 8.11.1.1 Recordkeeping Requirements

[SEC Securities Exchange Act of 1934 Rule 17h-1T and Rule 17h-2T; SEC no-action letter to Douglas G. Preston, Securities Industry Association, dated September 30, 1993]

The FINOP is responsible for establishing procedures and determining that Alpine maintains records in accordance with SEC requirements for risk assessment recordkeeping.

### 8.11.1.2 Reporting Requirements

The FINOP is responsible for determining whether Alpine is required to file Form 17-H Risk Assessment Report For Brokers And Dealers and, if applicable, filing the form with the SEC within 60 calendar days of the end of Alpine's fiscal year.

### 8.11.1.3 Financial Controls

The CFO is responsible for establishing financial controls to ensure the financial safety of Alpine from undue exposure and errors when orders are entered. These limits are established in conjunction with senior management and committees (if they exist) with responsibility for oversight of specified areas of Alpine. Risk exposure is also considered as part of the new product review process described in the chapter *FINANCIAL AND OPERATIONS PROCEDURES* and as part of Alpine's risk management controls.

Financial risk controls may include the following:

- trading limits for Alpine and/or its customers
- inventory limits
- commitments to and trading in financial instruments that pose a potential risk to Alpine
- limits to credit extended to certain customers or on behalf of a trading desk

ALPINE_LIT168921

## 8.11.2 Risk Practices Regarding Employment And Employees

Alpine has established procedures regarding the hiring of personnel; conduct and review of employee accounts; granting of authority to act in various capacities on behalf of Alpine; and the integrity of Alpine's systems and financial reporting.

### 8.11.2.1 Background Checks

One of Alpine's first lines of defense is the hiring of qualified people who do not bring high-risk behavior to their positions. Alpine conducts background checks on all applicants for employment with Alpine. All offers of employment are considered conditional pending the outcome of the background checks. These background checks include contact with the applicant's prior employers for at least the past three years. Any adverse information is reviewed by the Director of HR and the President or their designees, in consultation with the Executive Committee for consideration prior to finalization of employment.

Also refer to the section *Hiring Procedures* in the chapter *EMPLOYMENT, REGISTRATION AND LICENSING* for more information about hiring procedures.

### 8.11.2.2 Employee Accounts

Employees are subject to policies governing the conduct of their personal securities accounts. Refer to the section *Employee And Employee Related Accounts* in the chapter *GENERAL EMPLOYEE POLICIES* as well as the chapter on *INSIDER TRADING*.

### 8.11.2.3 Authority

Employees may only act on behalf of Alpine within the boundaries of authority granted them by Alpine. The following generally outlines the authority of certain employees or committees and their respective responsibilities.

#### 8.11.2.3.1 Board Of Directors

Alpine's Board of Directors meet annually and as may be needed to take necessary action on behalf of Alpine. On at least an annual basis, the Board of Directors will affirm the authority of designated Board committees, if such have been established, as well as certain employees granted specific powers by the Board. At least annually, the Board of Directors review the activities of those individuals that report directly to them.

#### 8.11.2.3.2 Chief Financial Officer

The CFO (or his/her designee) is responsible for the following on behalf of Alpine:

- Establishing accounting procedures in accordance with generally accepted accounting principles
- Ensuring the accurate and timely filing of Alpine financial reports with regulators and others where financial reports are required
- Establishing bank accounts and designating employees authorized to sign checks and transfer funds on behalf of Alpine
- Interacting with Alpine's public accounting firm and coordinating the providing of information requested during Alpine's annual audit
- Follow up regarding exceptions or recommendations referred by the outside public accounting firm

## 8.11.3 New Accounts

In addition to review and approval by an individual designated as a Supervisor in Chapter 1 of this Manual, new accounts are subject to Alpine's Customer Identification Program (described in the Anti-Money Laundering Program).

ALPINE_LIT168922

## 8.11.4 Cybersecurity

[SEC Regulation S-P Rule 30; SEC Release No. 34-50781; SEC National Exam Program Risk Alert on Cybersecurity: http://www.sec.gov/ocie/announcement/Cybersecurity+Risk+Alert++%2526+Appendix+-+4.15.14.pdf; DOJ Cybersecurity Unit report on best practices re victim response and reporting: http://www.justice.gov/sites/default/files/opa/speeches/attachments/2015/04/29/criminal_division_guidance_on_best_practices_for_victim_response_and_reporting_cyber_incidents2.pdf; FINRA Notice to Members 05-49; FINRA web page: Customer Information Protection http://www.finra.org/Industry/Issues/CustomerInformationProtection/index.htm; FINRA web page: Firm Checklist for Compromised Accounts: http://www.finra.org/Industry/Issues/CustomerInformationProtection/p117443; Fair and Accurate Credit Transactions Act of 2003 Section 216; FTC Safeguards Rule; National Institute of Technology (NIST) Framework for Improving Critical Infrastructure of Cybersecurity: http://www.nist.gov/cyberframework/upload/cybersecurity-framework-021214-final.pdf; SIFMA cybersecurity web page: http://www.sifma.org/issues/operations-and-technology/cybersecurity/overview/]

| | |
|---|---|
| **Responsibility** | • IT Committee |
| **Resources** | • Internal and external systems, electronic devices, programs, *etc.* |
| **Frequency** | • Annual: Identify risks<br>• Periodically: conduct risk assessments<br>• As required: review third party cybersecurity risks<br>• Ongoing: notify business managers of risks in their business units and their responsibilities relating to mitigating risk<br>• Ongoing: Assign responsible employees<br>• As required: respond to potential intrusions<br>• Annual: provide report to senior management |
| **Action** | • Identify risks as outlined in this section<br>• Develop a risk assessment schedule and conduct reviews<br>• Identify third party vendors that have access to Alpine's systems or otherwise may represent a cybersecurity risk; review their cybersecurity policies; monitor activity<br>• Assign employees responsible for cybersecurity<br>• Oversee monitoring of Alpine's networks and devices<br>• Coordinate responses to intrusions and recovery<br>• Prepare and deliver a report to senior management about Alpine's cybersecurity risks and actions taken |
| **Record** | • Summary of annual identification of risk<br>• Schedule of risk assessments and findings<br>• Records of intrusions and responses including reports to regulators, notification of customers, actions taken<br>• Annual report to senior management<br>• Business unit managers' responses regarding deficiencies and corrective action |

Alpine's business is dependent, to a great extent, on digital technology to process its business and interface with customers. This section summarizes Alpine's program for addressing cybersecurity risks and references other policies and procedures that deal with cybersecurity issues. These procedures are modeled after the NIST Framework for Improving Critical Infrastructure of Cybersecurity and are guidance for Alpine's cybersecurity

ALPINE_LIT168923

oversight.Some of these procedures will be conducted by [The Firm]'s clearing firm, if applicable, and will be subject to the section on third party vendors.

## 8.11.4.1 Assignment Of Responsibility

Cybersecurity oversight is the responsibility of the IT Committee, which may be comprised of employees from one or more of the following business units/departments.

- Legal
- Operations
- Executive
- Compliance
- Finance

Because the list of the IT committee may change periodically, the IT Committee Chairperson will maintain a list of current participants in the IT Committee files.

## 8.11.4.2 Identification Of Risks

Risks in Alpine's systems will be identified, reviewed annually, and updated when necessary, including the following.

- Initial inventory of physical devices and systems, software applications and platforms*(updated as necessary, particularly where new systems or devices are added)*
- Mapping of network resources, connections, and data flows (including locations where customer data is housed)
- Cataloguing of connections to Alpine's network from external sources
- Prioritization of resources (hardware, data, and software) for protection based on their sensitivity and business value
- Review of logging capabilities and practices for adequacy, appropriate retention, and secure maintenance
- Identification of third parties with access to the Alpine's systems and data

## 8.11.4.3 Risk Assessments

Risk assessments will be conducted periodically.

- Frequency is determined by Alpine's IT Committee who will maintain a schedule and update as necessary.
- Assessments will review to identify cybersecurity threats, vulnerabilities, and potential business consequences.
- Assessments will also review physical security threats and vulnerabilities bearing on cybersecurity (access to systems or equipment by unauthorized persons, *etc.*).
- Moderate or high risks identified in prior reviews are followed up to determine whether corrective action has been taken.
- Findings from the risk assessment will be included in a report provided to senior management. Reports will also be provided to business unit managers regarding risks in their business areas. Risks from prior reports where corrective action has not been taken will be included in reports to senior management and business unit managers. Business unit managers are required to respond regarding corrective action taken, which is also forwarded to senior management.

## 8.11.4.4 Protection of Firm Networks and Information

Procedures to protect Firm and customer systems and information are included in the section *Protection of Firm and Customer Systems and Data.*

ALPINE_LIT168924

### 8.11.4.5 Third Party Vendors

Third party vendors that will have access to Alpine's systems or devices will be reviewed, prior to engagement, to:

- Evaluate the vendor's cybersecurity safeguards
- Include cybersecurity assurances in Alpine's contract with the third party

### 8.11.4.6 Detection Of Unauthorized Activity

Procedures to detect unauthorized activity on networks and devices include the following:

- Employees are assigned responsibilities for detecting and reporting suspected unauthorized activity. The IT Committee is responsible for identifying those responsibilities, who is responsible, and communicating to the designated employees.
- Baseline information regarding expected events on the Alpine's network is maintained along with aggregating and correlating event data from multiple sources.
- Written incident alert thresholds are established and communicated to appropriate employees.
- Alpine's network and physical environment are monitored to detect potential cybersecurity events.
- Software is used to detect malicious code on Alpine's networks and mobile devices and to prevent loss of data.
- Activity of third party service providers with access to Alpine's networks is monitored.
- Monitoring is conducted for unauthorized users, devices, connections and software on Alpine's networks.
- Remote requests for transfer of customer assets are evaluated to identify anomalous and potentially fraudulent requests.
- Penetration tests and vulnerability scans are conducted periodically.

### 8.11.4.7 Response

Procedures to detect unauthorized activity on networks and devices include the following:

- Limiting access to affected systems or devices
- Diverting computer resources to a safe system
- Engaging a third party to process data until Alpine's system is safe
- Engaging a third party to assess the intrusion
- Assessing data loss
- Notifying regulators and customers
- Evaluating potential financial losses
- Taking corrective action to prevent a future intrusion

### 8.11.4.8 Recovery

Alpine has procedures for data backup and recovery of data. Refer to the *Business Continuity Plan* for further information.

### 8.11.4.9 Reports To Senior Management

On at least an annual basis, the IT Committee, under the direction of the IT Chairperson will provide a report to designated senior management regarding risk assessments and unauthorized activities or intrusions and corrective action taken. This may be provided in conjunction with the annual compliance report to the CEO.

ALPINE_LIT168925

**8.11.4.10 Other Policies**

The following other policies in this manual address issues under cybersecurity:

- Privacy Policy (GENERAL EMPLOYEE POLICIES)
- Electronic Communications Policy (GENERAL EMPLOYEE POLICIES)
- Mobile Devices (GENERAL EMPLOYEE POLICIES)
- Computer Records, Equipment And Software (GENERAL EMPLOYEE POLICIES)
- Identity Theft Prevention Program (Red Flags Rule) (ANTI-MONEY LAUNDERING [AML] PROGRAM)
- Electronic Communications Systems And Devices (COMMUNICATIONS WITH THE PUBLIC)
- Protection Of Customer Information And Records (FINANCIAL AND OPERATIONS PROCEDURES)
- Business Continuity Plan (FINANCIAL AND OPERATIONS PROCEDURES)

## 8.11.5 Handling Customer Funds And Securities

Alpine has procedures for safeguarding customer funds and securities. Refer to the section *Safekeeping Of Customer Funds And Securities* in this chapter.

## 8.11.6 Extension Of Credit

Alpine has established procedures for overseeing compliance with Regulation T. This section includes additional procedures used by Alpine to identify and address risk relating to the extension of credit.

### 8.11.6.1 Concentrated Securities Positions

Alpine has established procedures for reviewing credit risk for concentrated positions within accounts and credit risk associated with firm-wide concentrated positions.

#### 8.11.6.1.1 Individual Account Concentration

For any margin account where one position represents 50% or more of the value of the account, the account will be reviewed and considered for a higher maintenance requirement or reduction of the concentrated position.

#### 8.11.6.1.2 Firm Concentration

Alpine identifies any securities position where Alpine holds in excess of 10% of the outstanding shares of an issuer.

### 8.11.6.2 Accounts In Deficit Positions

Alpine regularly reviews accounts in deficit positions to determine corrective action.

## 8.11.7 Proprietary Accounts

Alpine has established procedures to limit risk from proprietary positions.

### 8.11.7.1 Valuation Of Positions Held

The CFO or designee is responsible for valuing positions held at the end of each business day. The CFO is responsible for establishing procedures for valuation of securities where there is no central or established market valuation (*i.e.*, CMOs, non-rated municipal bonds, *etc.*).

**ALPINE_LIT168926**

**8.11.7.2 Trading Limits**

Alpine has established limits on its trading account inventories. In addition to monitoring by the Head Trader, the CFO is responsible for identifying when trading limits are exceeded. Refer to the section(s) *Inventory Positions* in product chapters of this manual for more information on trading limits.

**8.11.7.3 Positions Held For Alpine's Investment**

The CFO is responsible for monitoring positions owned by Alpine for its own investment purposes.

## 8.11.8 New Products

[FINRA Notice to Members 05-26]

| | |
|---|---|
| **Responsibility** | • Due Diligence Committee |
| **Resources** | • New Product Review Checklist<br>• Other information available about the new product |
| **Frequency** | • As required when new products are proposed |
| **Action** | • Conduct a review to:<br>    ○ Determine the product is beneficial for customers<br>    ○ Determine the types of customers that are the target market<br>    ○ Conduct appropriate due diligence about features and risks of the product<br>    ○ Determine whether written disclosures or educational information should be provided to potential purchasers<br>    ○ Determine what information should be provided to RRs and supervisors, including any additional training<br>• Approve or disapprove the product for distribution |
| **Record** | • Approved New Product Review Checklists are retained in a file for the product<br>• Other reviewed Checklists are retained in a New Product Review Checklist file |

All new products require review and approval by the Due Diligence Committee prior to offering new products to customers. If any questions arise regarding the appropriateness of a new product, the CCO should be consulted. A "new product" may include a product that:

- is new to the marketplace or Alpine.
- was previously sold only to a limited segment of Alpine's customers, such as only to institutional customers and now will be offered to retail customers.
- will be offered by a category of RRs who did not previously offer the product, such as a product new to retail RRs.
- involves material modifications to an existing product including risk, product structure, or fees and costs.
- requires material operational or system changes.
- involves a new or significant change in sales practices.
- raises conflicts that have not been previously identified and addressed.

If there is a question whether a product may be a "new" product, it should be submitted for the new product review.

ALPINE_LIT168927

### 8.11.8.1 New Product Review Checklist

Individuals and departments wanting to offer new products are required to prepare information for the review by completing the New Product Review Checklist. Information to be provided includes a description of the product, to whom the product would be offered, and economic justification of the product. The requestor will be notified regarding approval/disapproval or the need for modifications or additional information.

# 8.12 Business Continuity Plan

[FINRA Rule 4370; FINRA Regulatory Notice 13-25; FINRA Notice to Members 06-74 and 04-37; NASDAQ Rule 3510; SIFMA Business Continuity Planning website: http://www.sifma.org/Services/Business-Continuity-Planning/]

Alpine has developed a Business Continuity Plan ("BCP" or "Plan") to provide procedures for response and recovery in the event of a significant business disruption. The purpose of the BCP is to identify responsible personnel in the event of a disaster; safeguard employees' lives and firm property; evaluate the situation and initiate appropriate action; recover and resume operations to allow continuation of business; provide customers with access to their funds and securities; and protect books and records. The BCP was developed considering the types of business conducted, systems critical to support business, and geographic dispersion of offices and personnel.

## 8.12.1 Designation Of Responsibilities

The following is a list of those responsible for Alpine's Business Continuity Plan.

| Responsibility | Titles |
|---|---|
| Maintain and update Plan | COO<br>CCO |
| Approve Plan and Plan revisions; conduct annual review | CCO |
| Annual testing of Plan | CCO |
| Implementation of Plan when a disruption occurs | COO |
| Quarterly review of Emergency Contact Persons and report changes to regulators | COO |
| Maintain and distribute Emergency Contact List | COO |
| Maintain and update Books and Records Chart | COO |
| Provide Plan Information to customers:<br><br>• At time of account opening<br>• Upon request | COO |
| Post Plan disclosure on Alpine's web site and update, as required | COO |
| Review critical third party assurances or disaster plans or plan summaries:<br><br>• At initial engagement of third party<br>• Annually when Alpine's Plan is reviewed | Alpine's IT Committee |

ALPINE_LIT168928

### 8.12.2 Retention And Location Of The Plan

Copies of the current and prior versions of the BCP are retained by the CFO. Copies are signed and dated by senior management as of the effective date of the each version of the BCP.

### 8.12.3 Implementation Of The Plan

The Plan has been designed to be implemented in the event of a disaster that results in a significant business disruption. Whether all or only parts of the Plan are implemented depends on the nature of the disruption. Generally, a significant business disruption would include:

- Destruction of one of Alpine's offices or facilities, whether by natural causes or by other means
- Loss of life or major injuries to personnel in an office location that disables that office's ability to conduct business
- Disruption of service from a critical service provider
- Disruption of service due to wide-ranging regional outages such as a power outage

### 8.12.4 Emergency Response Team

Alpine has designated an Emergency Response Team that is responsible for implementing necessary procedures included in this Plan. The Response Team's action will depend on the nature and scope of the disruption. The "first responder" has the primary responsibility for taking action, and the "secondary responder" acts as a back-up in the event the first responder is unable to act. Where feasible, the two responders are located in different office locations.

| Action | First Responder/Location | Secondary Responder/Location |
|---|---|---|
| Contact emergency services such as police, fire department | CFO | CCO |
| Establish off-site command center and notify employees | CFO | Not applicable |
| Contact employees regarding Plan initiatives | CFO | CCO |
| For affected offices, evaluate business disruption and transfer employees and business operations to other locations | CFO | CCO |
| Appoint individuals to manage business areas where needed | CFO | CCO |
| Assess financial and operations capabilities | CFO | Not applicable |
| Determine financial and credit risk and contact banks and other counter-parties, if necessary, to secure financing to continue operations | CFO | CCO |
| Notify regulators in the event of a capital deficiency | CFO | CCO |
| Interface with SIPC if liquidation of business is initiated | CFO | CCO |
| Contact critical service providers | CFO | Not applicable |
| Transfer mission critical functions that are disrupted | CFO | Not applicable |

ALPINE_LIT168929

| Initiate alternative customer communications systems or procedures | CFO | Not applicable |
| Notify customers regarding alternative access to funds and securities | CFO | CCO |
| Recover back-up records when primary records are destroyed or inaccessible | Alpine's IT Committee | CFO |
| Contact regulators and notify them of contact persons and recovery plans | CFO | CCO |

### 8.12.5 Emergency Contact List

Alpine has established an Emergency Contact List that includes the names, phone numbers (cell and land lines), e-mail addresses, and other contact information for individuals critical to Alpine's business including key employees, key vendors or service providers, regulators, insurance carriers, banks, attorneys, and other key contacts. A copy of the List is provided to each member of the Response Team and other key personnel. This list will be reviewed and updated on at least an annual basis.

### 8.12.6 Alternative Business Locations

In the event employees can no longer conduct business at one of Alpine's office locations, the following actions may be taken:

- Transfer employees to the closest unaffected office location and notify personnel
- Transfer critical systems to another office or a back-up firm or system
- Transfer business operations to another Alpine office unaffected by the disruption
- Transfer business operations to a different broker-dealer or other entity

A list of offices appears in the chapter *DESIGNATION OF SUPERVISORS AND OFFICES* and includes the types of business conducted at each office.

### 8.12.7 Data Back-Up And Recovery

Alpine maintains its books and records in both hard copy and electronic format.

In the event of an internal or external significant business disruption that causes the loss of Alpine's records (whether hard copy or electronic records), back-up records will be recovered from the back-up site.

### 8.12.8 Mission Critical Systems

Mission critical systems are systems that are necessary to ensure prompt and accurate processing of securities transactions including order taking, entry, execution, comparison, allocation, clearance and settlement, maintaining customer accounts, and providing access to customer funds and securities.

The Mission Critical Systems (in the plan) identifies systems (or generally describes procedures) that are critical to the operation of Alpine's business; identifies third parties that provide those systems; and potential alternate procedures or systems for handling these critical functions in the case of a disruption.

### 8.12.9 Financial And Operational Assessments

The following describes procedures for assessing changes in operational, financial, and credit risk exposures in the event of a significant business disruption.

ALPINE_LIT168930

### 8.12.9.1 Operational Risk

In the event of a significant business disruption, alternative systems will be implemented to communicate with customers, employees, critical business constituents (banks, counter-parties, *etc.*), regulators, and other key parties depending on the nature and impact of the disruption. Communication systems are described in the section *Alternative Communications*.

### 8.12.9.2 Financial And Credit Risk

In the event of a significant business disruption, Alpine's financial status will be evaluated to determine the need for additional financing or identify capital deficiencies including the following:

- Review the impact of the disruption on Alpine's ability to conduct business
- Identify inability to satisfy obligations with counter-parties
- Contact banks or other counter-parties to secure needed additional financing
- Notify regulators of capital deficiencies
- Reduce or cease business as may be required due to capital deficiencies or inability to conduct business
- Transfer business to other financial institutions until Alpine may resume conducting business

## 8.12.10 Alternative Communications

Alpine may use a wide range of communication systems to communicate with its customers, employees, counter-parties, and regulators including telephone; mail; fax; e-mail; vendor systems (such as CSS Hosted Solutions, LLC); and personal meetings. Procedures for instituting alternative communications in the event of a significant business disruption include the following, depending on the nature of the disruption:

- Identify the most expedient remaining means of communication
- Notify employees if an off-site command center has been activated
- Notify employees of alternative communication systems to be used
- Transfer communications to another firm

Determination of what communication system will be used depends on the nature of the disruption and which communication systems (electronic mail, telephone calls, *etc.*) are functional and the availability of personnel in the event telephone contact is necessary.

### 8.12.10.1 Between Customers And Alpine

In the event of a significant business disruption that disables communications systems, alternative system procedures will be implemented, including the following:

- Identify the most expedient remaining means of communication
- Notify employees regarding how to contact customers
- Contact customers about how to enter orders, how to access accounts and account assets, and other alternative business operations

### 8.12.10.2 Between Alpine And Its Employees

In addition to the above, Alpine has developed a system to enable senior management to contact employees in the event of an emergency. The system may include, depending on geographic dispersion of employees:

- "Call trees" that provide contact initiated at senior management level and pyramiding down to reach affected personnel
- A central list of all personnel and their contact information

ALPINE_LIT168931

**8.12.10.3 Between Alpine And Regulators**

Communications with regulators will be conducted using the most expedient available communication system. The designated Response Team person will contact regulators regarding any major business disruption and plans for continuing business.

## 8.12.11 Business Constituent, Bank, And Counter-Party Impact

This section describes business continuity procedures regarding third parties that are critical to the conduct of Alpine's business. In most instances, contracts with critical third parties will include assurances regarding the third party's disaster recovery plans. A disruption impacting Alpine's ability to conduct business may occur either at Alpine itself or at the third party.

The Business Constituent, Bank, And Counter-Party's (in the Plan) identifies key parties and potential alternatives in the event of a disruption.

### 8.12.11.1 Business Constituents

- Determine whether the third party is able to continue providing critical services.
- If not, identify and contact an alternate third party to provide services.

### 8.12.11.2 Banks And Other Financial Institutions

- Determine whether the bank/financial institution is able to continue providing financing.
- If not, identify and secure alternative financing.

### 8.12.11.3 Critical Counter-Parties

- Determine whether transactions may be completed with counter-parties.
- If not, contact counter-party directly to make alternative arrangements to complete transactions.

## 8.12.12 Other Obligations To Customers

### 8.12.12.1 Accepting Customer Orders

In the event Alpine's systems for accepting customer orders are disrupted, alternative systems will be communicated to customers and to employees including, where appropriate:

- Accepting orders by telephone or other alternative means
- Communicating orders to trading desks (internal or external) or order execution systems by telephone or other alternative means

### 8.12.12.2 Prompt Access To Funds And Securities

When customer access to funds and securities is impacted by a significant business disruption, customers will be notified by whatever expedient means is available (telephone, e-mail, *etc.*) regarding who may be contacted to request funds or securities. If Alpine is unable to continue business operations, customers will be notified of an alternative financial institution where they may conduct business and access their funds and securities.

#### 8.12.12.2.1 SIPC Liquidation

In the event SIPC liquidation of Alpine's business is required, designated personnel will work with the SIPC-appointed trustee to wind down Alpine's operations and transfer customer funds and securities.

ALPINE_LIT168932

### 8.12.12.3 Disclosure Of Business Continuity Plan

[FINRA Rule 4370(e)]

Information about Alpine's Business Continuity Plan is provided to customers as follows:

- At the time of account opening
- On Alpine's web site
- Upon request, by mail

## 8.12.13 Emergency Contact Information

[FINRA Rule 4370 and 4517]

Alpine has provided the FINRA with the names of two emergency contact persons who are registered and are members of senior management.

Emergency contact information will be promptly updated, when necessary. The FINRA Executive Representative (or other designated employee) will review the contact information within 17 business days of the end of each year and will retain a written record of the review. If the Executive Representative delegates this responsibility, a written memorandum designating another employee will be provided to Compliance, where it will be retained with the current Plan. The annual review of the Plan will include verification that only the Executive Representative or delegate is conducting the review and updates.

## 8.12.14 Widespread Health Emergencies

[Federal government Business Pandemic Influenza Planning Checklist: http://www.pandemicflu.gov/plan/pdf/businesschecklist.pdf]

A widespread pandemic or any biologically based threat could have significant impact on the ability of Alpine to continue conducting business. This section outlines the steps Alpine has taken and will take in the event of a widespread pandemic.

### 8.12.14.1 Preparatory Steps

- Document government resources for information about a pending pandemic
- Identify and document an alternative firm or firms to handle Alpine's business for extended periods of time
- Identify and document medical resources to assist employees, including administering vaccinations or other medications
- Stock antibacterial and other hygiene products for use by employees
- Identify employees that can telecommute and establish a list of those employees and what computers and technology will be necessary

### 8.12.14.2 Action If A Pandemic Occurs

The following procedures will be followed in the event of a threatened health emergency.

1. The Emergency Response Team will meet to determine the potential seriousness of the threat and what action to be taken as the threat escalates.
2. Notify employees of:
   - available vaccinations or other medication and whether they are mandated
   - necessary conduct such as avoiding personal contact such as handshaking
   - access to antibacterial or other hygiene products to reduce infections and transmission of communicable diseases

ALPINE_LIT168933

- o   requirement to stay home and telecommute
- o   transfer of business/functions to other firms
- o   contact list of key personnel
3. Restrict access to Alpine by outsiders (customers, vendors, *etc.*).
4. The Emergency Response Team will meet or communicate regularly to determine steps to be taken.

## 8.12.15 Education Of Employees

The Business Continuity Plan is communicated to employees as follows:

- A summary is included in the chapter *GENERAL EMPLOYEE POLICIES* in the section *Emergency Business Recovery Procedures* and is provided to all employees.
- A current copy of the Plan is provided to the Emergency Response Team and key employees with responsibilities for aspects of the Plan.
- The most recent Emergency Contact List is provided to key employees.

## 8.12.16 Updating, Annual Review, And Testing

The Plan will be reviewed on at least an annual basis and revised as needed. Each revision will be approved by the designated senior manager and copies of the revised Plan distributed to the Emergency Response Team and key employees. Some material events require updating the Plan when they occur, including:

- Material changes to Alpine's business
- A change in Alpine's main office location
- Added office locations
- A change in a major service provider

When the Plan is reviewed, the procedures and accompanying lists and charts will be reviewed and updated as needed including the:

- Plan itself
- Emergency Response Team list
- Emergency Contact List
- Books and Records chart
- Mission Critical Systems
- Business Constituent, Bank, and Counter-Party
- *Designation Of Offices* section of the chapter *DESIGNATION OF SUPERVISORS AND OFFICES*
- Any other charts or information related to the Plan

A written record of the annual review including the date reviewed and name and signature of the reviewer will be retained by Compliance.

# 8.13 Customer Payments For Purchases

When an order to purchase securities is accepted from a customer, payment from the customer's bank account or other depository must be authorized in writing by the customer. Payment is not acceptable based only on the customer's oral authorization to withdraw funds. Examples of acceptable payment include:

- a check signed by the customer
- written authorization by the customer to draft funds from the customer's bank checking or savings account

Questions regarding proper payments should be referred to Operations or Compliance.

ALPINE_LIT168934

## 8.14 Notification Rule ("Early Warning Rule")

[SEC Release No. 34-70073]

| | |
|---|---|
| **Responsibility** | • FinOp |
| **Resources** | • Financial Notifications Form electronically submitted on the FINRA Firm Gateway |
| **Frequency** | • As required |
| **Action** | Within 24 hours, notify the SEC or FINRA upon the occurrence of certain events, e.g.<br><br>• Insolvency,<br>• Decrease of net capital below required minimum, or<br>• Alpine's repurchase and securities lending activities exceed 25 times its tentative net capital<br><br>As an alternative to notification regarding repurchase and securities lending activities, Alpine may report monthly as to its stock loan and repurchase activities to FINRA.<br><br>Maintain records of any early warning notifications (or monthly reports) |
| **Record** | • Notices to regulators<br>• Early warning notifications (or monthly reports) |

## 8.15 Regulation T And Extension Of Credit To Customers

[FINRA Rule 4210; Federal Reserve Regulation T]

| | |
|---|---|
| **Responsibility** | • COO |
| **Resources** | • Various<br>• Customer Debits Report |
| **Frequency** | • Ongoing |
| **Action** | • Monitor accounts for compliance with Regulation T requirements<br>• Request extensions, issue margin calls, *etc.*<br>• Discontinue margin trading for accounts missing required signed margin agreements<br>• Review FINRA report for unsecured debits and take corrective action as necessary which may include consultation with RR and RR's supervisor, closing the account, or other appropriate action |
| **Record** | • Various records maintained by Operations<br>• FINRA report including notes of action taken |

This task may be performed by a designee of the COO.

ALPINE_LIT168935

### 8.15.1 Guaranteed Accounts

A customer (the "guarantor") may provide a written guarantee to cover the balances in another account (the "guaranteed" account) using the equity in the guarantor's account. Written agreements for such guarantees must be provided to Operations.

RRs are prohibited from guaranteeing payment in another customer's account (unless the other customer is an employee-related account and approval has been obtained from Operations).

## 8.16 Transmittals Of Customer Funds And Securities

[FINRA Rule 4514; FINRA Rule 3110(a)(2), FINRA Regulatory Alert 12-05 and 09-64]

This section describes Alpine's procedures for transmitting funds or securities from customer accounts. The following summarizes requirements:

<u>Letters of Authorization</u>

A Letter of Authorization (LOA) is an important required document whenever a customer asks that funds or securities are to be sent to a third party out of a customer's account. LOAs are an important record for Alpine, both to ensure the customer's instructions are followed and to ensure that Alpine has a written record in the event there is a question in the future about disbursements from the account.

- All transfers require **written** letters of authorization (LOAs) when funds and/or securities will be transmitted to a third party. LOAs may be received by mail, fax, delivery, or other means including electronic transmission that provides for written authorization with the customer's verifiable signature. Registered representatives and/or their sales assistants are responsible for obtaining completed LOAs, when necessary. Further:
    - o A completed LOA is required prior to disbursements to third parties.
    - o The customer's signature is required. In the case of a joint account, all joint owners must sign the LOA. For corporations, trust accounts, and other accounts, the authorized person must sign the LOA.
    - o Completed LOAs are submitted to Compliance/Legal for review and should accompany the request to disburse funds or send securities to a third party.
    - o LOAs relating to the transfer of securities must be accompanied by all information and documents Alpine may require in connection with its review of the proposed transfer, and in appropriate circumstances, the Customer may be required to supplement the representations set forth elsewhere in this Manual.
- If an LOA copy is not presented in person by the customer, the customer's signature will be verified against existing account records.
- Copies of LOAs are retained in the Firm's records.
- Anyone who appears in person to receive assets and who claims to be the customer will be required to present photo identification if the customer is not personally known to the operations personnel releasing funds or securities from the customer's account.
- Any authorized third party receiving a customer's assets in person will be required to present photo ID and the third party authorization (LOA) will be verified.
- Notation will be made on Firm records of the verification of IDs, signatures, and existence of LOAs including who verified, the date verified, and the related transactions (issuance of a check or sending of other assets from the account).
- Rule 3012 letters are printed and mailed to the delivering side client.
- Suspicious or questionable activity must be brought to the attention of the AML Compliance Officer who is responsible for determining whether a Suspicious Activity Report must be filed.

### 8.16.1 Issuing Checks To Customer

Checks to be paid to customers from their accounts will be paid to the order of the account as it is carried on Alpine's books and sent to the address appearing on the account. No checks are to be issued to a third party or

ALPINE_LIT168936

funds transferred to a third party, without approval of a principal and written authorization by the customer. Please refer to the section titled "Transmittals to Third Parties" for more information. Exceptions may include fees to trustees and private placements done through the firm. When checks are to be issued to a third party or funds are transferred to a third party as per an exception, the following procedures apply.

## 8.16.2 Transmittals involving U.S. account holders who seek to transfer funds internationally (international wire transfers and international ACH transfers)

Rule: Section 1073 Dodd-Frank Act, Remittance Transfers and Regulation E

Rule: Consumer Financial Protection Bureau

Beginning October 28, 2013, broker-dealers and other financial institutions will be required to provide written, pre-payment disclosures as well as receipts that include the same disclosure and other information for certain international wires and international ACH transfers at or prior to the time the account holder pays for the remittance transfer. This rule applies to remittance transfers 1) greater than $15.00; 2) made by a consumer located in the U.S. and 3) sent to a person or company in a foreign country. Domestic wires and ACH transfers are not impacted by this rule.

This rule also does not apply:

- To firms that make less than 100 remittance transfers in the previous and current calendar year. If company exceeds the 100 transfer threshold, must comply with the regulation within 6 months of exceeding threshold.
- Transfers less than $15
- Transfers made by international customers to international customers

***Alpine's current policy is to not process international wire and international ACH requests from customers located in the U.S.*** Should Alpine change this policy, Alpine will adopt the following procedures as it relates to processing international wire and international ACH requests, error resolution procedures and cancellation and refund procedures.

## 8.16.2.1 Processing International Wire and International ACH requests from Customers located in the U.S.

| | |
|---|---|
| **Responsibility** | • Operations Manager<br><br>This task may be performed by a designee. |
| **Resources** | • International wire and international ACH requests from U.S. based customers |
| **Frequency** | • As required |
| **Action** | • Provide pre-payment disclosure and receipt in advance of payment for remittance transfer<br>• Pre-payment disclosure notice must contain: a. exchange rate*; b. front-end taxes and fees; c. covered 3rd party fees; d. the amount of money expected to be transferred, not including certain fees charged to the recipient of foreign taxes.<br>• Receipt (includes pre-payment disclosure and related disclosure. Also: a. receipt must repeat the same information in the pre-payment disclosure or proof of payment; b. date of availability; c. name of designated recipient; d. error resolution/cancellation rights; e. remittance transfer provider contact information; f. state regulator and CFPB contact information; g. transfer date.<br>• For both the pre-payment disclosure and receipt: Alpine may also disclose that |

ALPINE_LIT168937

| | |
|---|---|
| | the sender could lose the transfer amount if the account numbers and recipient institution identifiers provided by the consumer are in accurate. <br> • Provide consolidated disclosure plus proof of payment. Could utilize this option provided the firm provides proof of payment when the payment is made. <br> • Additional rules governing preauthorized transfers apply (see the section titled "Pre-authorized transfers below). <br><br> *Exemptions may apply from the exchange rate disclosure requirement for certain countries. See the section titled "Safe Harbor from Exchange Rate Information" for more information. |
| **Record** | • International wire and international ACH requests from U.S. based customers <br> • Document when required disclosures provided to client in advance of payment for remittance transfer |
| **Retain** | • Retain records noted in the "Record" section for 3 years, the first year in an easily accessible place |

**Preauthorized Transfers (International ACH & International Wires)**

1. Separate disclosure requirements must occur prior to the transfer date for preauthorized remittance transfers
2. Applies to one-time transfer or the first in a series of preauthorized remittance transfers five or more business days before the transfer date
3. Alpine must estimate certain information in the pre-payment disclosure and the receipt provided when payment is made.
4. Also required to provide an additional receipt with accurate figures no later than one business day after the date of the transfer. If a customer elects to cancel an international ACH or international wire, he/she must do so within 30 minutes of Alpine sending the payment to fund the transaction.

**Safe Harbor From Exchange Rate Information**

Regulation 1073 allows for companies to estimate exchange rates if they meet the following criteria:

1. The recipient country is on the CFPB's Safe Harbor list (as of 11/2013).
   a. Aruba
   b. Brazil
   c. China
   d. Ethiopia
   e. Libya

Alpine will update this list as needed. Updated list can be found at
http://files.consumerfinance.gov/f/201209_CFPB_Remittance-Rule-Safe-Harbor-Countries-List.pdf

2. Alpine will need to make the determination that the laws of other recipient countries, not on this list, do not permit a determination of an exact amount (and therefore should be subject to the safe harbor).
3. Alpine relies on SEC No-Action Relief initiated by the Financial Information Forum's Regulation E Working Group. The SEC will not recommend enforcement action against broker-dealers who provide remittance transfers in the same way as "insured institutions" BD's must follow section 1005.32(a) and Section 1005.32(c ) of Regulation E to obtain relief. Source: http://www.sec.gov/divisions/marketreg/mr-noaction/2012/financial-information-forum-121412-rege.pdf.

ALPINE_LIT168938

### 8.16.2.2 Error Resolution Procedures

*Alpine's current policy is to not process international wire and international ACH requests from customers located in the U.S.* Should Alpine change this policy, Alpine will adopt the following error resolution procedures:

1. Alpine will use reasonably available means to verify the recipient's account number and recipient institution identifier.
2. Alpine is responsible for mistakes made by its employees.
3. If sent to an incorrect account due to erroneous information provided by the customer, Alpine must make reasonable efforts to recover the amount that was to be received
   a. including: calling or contacting the institution that received the transfer, either directly or indirectly through any correspondent or other service provider;
   b. Using a messaging service through a funds transfer system; and
   c. Acting promptly after being notified that funds were not received.
   d. If the funds cannot be recovered, Alpine does not have to refund the transfer amount.
4. Customers must report error within 180 days of disclosed date of availability. If a customer reports an error, the company must investigate it.
5. Alpine must investigate and make determination within 90 days
6. Alpine must report results to customer within 3 business days after completing investigation.
7. If error occurred must correct error within 1 business day, or as soon as reasonably practicable, of receiving customer's instructions.
8. If no error occurred, Alpine must provide a written explanation of investigation results and notify the customer that he/she has a right to request any documentation you relied upon in making the determination. A written explanation must also be provided if Alpine determines an error occurred but the error is of a different type or amount than the error the customer reported.
9. Alpine must retain notices of error, related documentation and firm's investigation findings.

**<u>Not an error:</u>**A change in the amount or type of currency received by the recipient from the original type or amount disclosed to the sender if Alpine relied on the information provided by the sender in making the disclosure.

### 8.16.2.3 Cancellation and Refund Procedures

*Alpine's current policy is to not process international wire and international ACH requests from customers located in the U.S.* Should Alpine change this policy, Alpine will adopt cancellation and refund procedures.

1. If a customer elects to cancel an international ACH or international wire, he/she must do so within 30 minutes of Alpine sending the payment to fund the transaction.
2. The client must verbally or in writing notify us of a cancellation request that provides the customer name, address or phone number and the particular transfer to be cancelled and the transferred funds have not been picked up by the designated recipient or deposited into the client's account.
3. After cancellation, Alpine must refund (at no cost to the client), the total amount of funds to be refunded must include any fees and taxes imposed in connection with the transfer.
4. Refund must occur within 3 business days of receiving the cancellation request.

## 8.16.3 Transmittals To Third Parties

| Responsibility | • Operations Manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests to send funds/issue checks to third parties |
| Frequency | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures |

ALPINE_LIT168939

| | |
|---|---|
| | • As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

When a customer wishes funds or securities to be paid to a third party in the third party's name, the customer will be required to provide a signed LOA that specifies to whom the funds are to be paid.

## 8.16.4 Transmittals To An Alternate Address

Funds and securities will be sent to the customer's address of record, unless the customer provides **written** authorization to use an alternative address.

| | |
|---|---|
| **Responsibility** | • Operations Manager or designee, unless noted otherwise |
| **Resources** | • Requests to send funds/issue checks to an alternate address |
| **Frequency** | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

ALPINE_LIT168940

### 8.16.5 Transmittals To Outside Entities

Customers sometimes request the transfer of funds or securities in their accounts to a bank or other entity on their behalf. A signed LOA must be obtained to effect such a transfer including the customer's account number at the receiving bank or other entity.

| Responsibility | • Operations Manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests to send funds/issue checks to third parties |
| Frequency | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| Action | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| Record | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

### 8.16.6 Transmittals Between Customers And Registered Representatives

| Responsibility | • Operations Manager or designee |
|---|---|
| Resources | • Requests to deliver checks<br>• Check Delivery Log |
| Frequency | • As required |
| Action | • Approve (or disapprove) the request to deliver a check<br>• Send a letter to the customer on the same day as check delivery, confirming delivery |
| Record | • Initials on Check Delivery Log<br>• Check delivery letter retained in customer account file |

On occasion, a customer may request that the RR or other Alpine employee personally deliver a check to the customer. This is permitted under the following conditions:

ALPINE_LIT168941

- The designated supervisor must approve the check delivery. The designated supervisor should initial a record maintained by Operations.

### 8.16.7 Prepayments And Extensions

Prepayments (customer requests payment prior to settlement date on a sale) or extensions of time to make payment must be approved by the designated supervisor. Prepayments can be charged additional fees for the service. Reg-T extensions must be approved by the COO or designee.

### 8.16.8 Suspicious Or Questionable Activities

Employees are responsible for referring suspicious or questionable activities to their designated supervisor. If the activity involves the designated supervisor, the employee should bring the activity to the attention of the Compliance Officer. If the Compliance Officer is involved, the activity should be brought to the attention of someone else in senior management. Such activities may include transfers without required authorizations; failure to obtain secondary approvals where required; a pattern of transfers that have no reasonable business basis, or any other activity the employee considers suspicious.

### 8.16.9 Exemption From 15c3-3

Because of the nature of Alpine's business, Alpine qualifies for an exemption under Rule 15c3-3(k). The FINOP is responsible for determining that Alpine qualifies for one of the two following exemptions.

### 8.16.9.1 Stock Receipts

Physical stock certificates received by the firm, must be received into the same name on the account as that on the certificate. Exceptions require approval by a principal and documentation from SIC (Securities Information Center), regarding whether the securities have been reported lost, missing or stolen.

## 8.17 Checking Account Safeguards

### 8.17.1 Checking Account Safeguards

| | |
|---|---|
| **Responsibility** | • CFO |
| **Resources** | • N/A |
| **Frequency** | • Ongoing<br>• Annual - review of supervisory controls |
| **Action** | • Train personnel regarding required procedures<br>• Maintain list of authorized check signers and request additional signers as necessary<br>• Review checking account safeguards as part of the annual supervisory controls review (Compliance or other reviewer) |
| **Record** | • Records of checks issued, including approvals, are retained in files in the Operations area and/or records may be retained by a clearing firm |

The following procedures must be followed to safeguard the use of checks.

- Blank checks and check registers must be kept in a secured operations area or locked location with access limited only to authorized personnel.

ALPINE_LIT168942

- At the end of the business day, all blank checks must be locked in a safe or similarly secured area.
- Checks must be used in numerical sequence.
- Alpine maintains a list of authorized check signers. Each business location that issues customer checks must have at least 2 designated check signers.
- Checks **must not** be signed in blank, in anticipation of a check signer's absence. The manager of Operations must be contacted if alternate arrangements are necessary in the absence of an authorized check signer.
- When an employee will personally deliver a customer check, the procedures outlined in the section *Transmittals Between Customers And Registered Representatives* must be followed.

## 8.18 Customer Protection

[SEC Securities Exchange Act of 1934 Rule 8c-1, Rule 15c2-1, Rule 15c3-3 and Rule 17a-13; NASD Rule 2330 and 3140; NASD Notice to Members 99-44; NYSE Rule 402]

| | |
|---|---|
| **Responsibility** | • CFO or designee |
| **Resources** | • Customer cash and security balances and other operations records |
| **Frequency** | • Ongoing |
| **Action** | • Establish special reserve bank account<br>• Obtain letter from bank holding special reserve account<br>• Establish operations procedures to comply with Rule 15c3-3 and related SRO rules<br>• Assign responsibilities to appropriate operations personnel<br>• Train operations personnel |
| **Record** | • Bank records including letter regarding special reserve account for each bank maintaining such account for the benefit of customers<br>• Reserve formula computations<br>• Records of quarterly security counts<br>• Records of buy-ins and close-outs<br>• Records of daily determination of fully paid/excess securities<br>• Other operations records |

The procedures in this section generally outline some key requirements under Rule 15c3-3 and related regulations. The FINOP is responsible for developing detailed procedures for complying with SEC and SRO requirements.

### 8.18.1 Introduction

SEC Rule 15c3-3 specifies requirements for broker-dealers to protect customers' funds and securities. Two significant elements of the Rule are:

1. a formula for a cash reserve which restricts a broker-dealer from using customer funds and securities in their own business; and,
2. a requirement that brokers or dealers maintain and obtain physical possession or control, as defined in the Rule, of fully paid and excess margin securities.

ALPINE_LIT168943

### 8.18.1.1 Prompt Transmission Of Customer Funds And Securities

[SEC No-Action Letter dated March 12, 2015 to NYLIFE Securities: http://www.sec.gov/divisions/marketreg/mr-noaction/2015/nylife-securities-031215-15c3.pdf]

| Responsibility | • Designated Supervisor |
|---|---|
| Resources | • Customer checks or securities |
| Frequency | • As required |
| Action | • Determine that timeframes for "prompt transmission" are adhered to<br>• Approve or disapprove transactions for deferred variable annuities or subscription-way transactions<br>• Notify RR if transaction is disapproved and return customer's check<br>• Provide notice to customers of handling of checks payable to issuers for subscription-way securities transactions |
| Record | • Records of checks and securities and when they are received<br>• Review and approval/disapproval of applicable transactions<br>• Forwarding of checks to the clearing firm, insurance company, or issuer<br>• Forwarding of securities to clearing firm<br>• Return of checks to customers where transactions are disapproved<br>• Record of notification provided to customer of handling of checks for subscription-way securities transactions |

One of the requirements for an exemption under 15c3-3(k) is the prompt transmission of funds and securities. The following outlines the requirements as they apply to different securities.

1. For checks payable to an insurance company for the purchase of a deferred variable annuity product, prompt transmission is no later than noon of the business day following the date a registered principal reviews and determines whether he or she approves of the purchase or exchange of a deferred variable annuity.
2. When an RR recommends the sale of a security on a subscription-way basis:
   a. Promptly prepare and forward a complete and correct application package to an OSJ;
   b. Perform a suitability review and approval (or disapproval) by a registered principal within 7 days after receipt of a complete and correct package at the OSJ;
   c. Transmit the check to the issuer no later than noon of the business day following the date the registered principal reviews and approves;
   d. Return the package and the check to the RR if the transaction is disapproved;
   e. Maintain a record of the check, when received, date transmitted to the issuer if approved, or date returned to the customer if disapproved;
   f. Customers will be notified of [The Firm]'s process for handling customer checks payable to issuers for subscription-way securities transactions before such transactions. Notice may be included in customer statements or another form of notice.
3. For all other securities, prompt transmission of a check to the clearing firm is defined as no later than noon of the next business day after received.

## 8.18.2 Possession And Control Of Securities

All procedures set forth herein shall be followed with respect to possession and control of securities. All physical certificates received shall be recorded into a location and placed in a secure location. Once it is determined the

ALPINE_LIT168944

securities can be forwarded to a clearing agency or onto clearing, they shall be forwarded to such agency. If securities are not being accepted, they are to be returned to the customer. Only back office personnel or designated supervisors shall have access to the location of the securities and allowed to accept securities.

## 8.18.2.1 Fully Paid And Excess Margin Securities

On a daily basis (by the next business day for the preceding business day), Alpine will identify customer fully paid and excess margin securities. Securities will be segregated or located in another control location.

## 8.18.2.2 Close-Outs And Buy-Ins

Alpine will close-out or buy-in positions for unsatisfied customer transactions within prescribed timeframes.

### 8.18.2.2.1 Procedures

Alpine will follow FINRA rules as outlined in UPC Rule 11810 and UPC Rule 11820 regarding Buy-in and Sell-out procedures for broker/dealers.

Buying-In

A contract which has not been completed by the seller according to its terms may be closed by the buyer not sooner than the third business day following the date delivery was due, in accordance with the following procedure:
(1) Written notice of "buy-in" shall be delivered to the seller at his office not later than 12:00 noon, his time, two business days preceding the execution of the proposed "buy-in."

(2) For purposes of this Rule written notice shall include an electronic notice through a medium that provides for an immediate return receipt capability. Such electronic media shall include but not be limited to facsimile transmission, a computerized network facility, etc.

**Notice**
(1) Every notice of "buy-in" shall state the date of the contract to be closed, the quantity and contract price of the securities covered by said contract, the settlement date of said contract and any other information deemed necessary to properly identify the contract to be closed. Such notice shall state further that unless delivery is effected at or before a certain specified time, which may not be prior to 11:30 a.m. local time in the community where the buyer maintains his office, the security may be "bought-in" on the date specified for the account of the seller. If the originator of a "buy-in" in a depository eligible security is a participant in a registered securities depository, the specified delivery time may not be prior to 3:00 p.m. Eastern Time and the "buy-in" may not be executed prior to 3:00 p.m., Eastern Time. Each "buy-in" notice shall also state the name and telephone number of the individual authorized to pursue further discussions concerning the buy-in.

(2) Notice may be redelivered immediately to another broker/dealer from whom the securities involved are due in the form of a re-transmitted notice (re-transmit). A re-transmitted notice of buy-in must be delivered to subsequent broker/dealers not later than 12 noon, recipient's local time, on the business day preceding the time and date of execution of the proposed buy-in, and the time specified for delivery may not be prior to the time specified in the original notice.
Selling-Out
Upon failure of the buyer to accept delivery in accordance with the terms of the contract, and lacking a properly executed Uniform Reclamation Form or the equivalent deository generated advice for depository eligible securities meeting the requirements prescribed in Rule 11710, the seller may, without notice, "sell-out" in the best available market and for the account and liability of the party in default all or any part of the securities due or deliverable under the contract.
Alpine as the party executing the "sell-out" as prescribed above shall, as promptly as possible on the day of execution, but no later than the close of business, local time, where they buyer maintains his office, notify the broker/dealer for whose account and risk such securities were sold and the quantity sold and the price received. Such notification will be in written or electronic form having immediate receipt capabilities. A formal confirmation of such sale will be forwarded as promptly as possible after the execution of the "sell-out".

ALPINE_LIT168945

### 8.18.3 Buy-In Procedures

A contract which has not been completed by the seller according to its terms may be closed by the buyer not sooner than the third business day following the date delivery was due, in accordance with the following procedure:

**(a) Notice of "Buy-In"**

(1) Written notice of "buy-in" shall be delivered to the seller at his office not later than 12:00 noon, his time, two business days preceding the execution of the proposed "buy-in."

(2) For purposes of this Rule written notice shall include an electronic notice through a medium that provides for an immediate return receipt capability. Such electronic media shall include but not be limited to facsimile transmission, a computerized network facility, etc.

**(b) Information Contained in "Buy-In" Notice**

(1) Every notice of "buy-in" shall state the date of the contract to be closed, the quantity and contract price of the securities covered by said contract, the settlement date of said contract and any other information deemed necessary to properly identify the contract to be closed. Such notice shall state further that unless delivery is effected at or before a certain specified time, which may not be prior to 11:30 a.m. local time in the community where the buyer maintains his office, the security may be "bought-in" on the date specified for the account of the seller. If the originator of a "buy-in" in a depository eligible security is a participant in a registered securities depository, the specified delivery time may not be prior to 3:00 p.m. Eastern Time and the "buy-in" may not be executed prior to 3:00 p.m., Eastern Time. Each "buy-in" notice shall also state the name and telephone number of the individual authorized to pursue further discussions concerning the buy-in.

(2) Notice may be redelivered immediately to another broker/dealer from whom the securities involved are due in the form of a re-transmitted notice (re-transmit). A re-transmitted notice of buy-in must be delivered to subsequent broker/dealers not later than 12 noon, recipient's local time, on the business day preceding the time and date of execution of the proposed buy-in, and the time specified for delivery may not be prior to the time specified in the original notice.

Selling-Out

### 8.18.3.1 Buy-In Procedures

A fail to deliver (FTD) normally refers to when the settler of a security does not deliver that security to the buyer within the standard three-day settlement period. FTDs can also arise from various processing errors, delays in obtaining physical stock certificates or human error in entering the incorrect stock symbol.

When a fail is deliver is identified by Operations, an investigation will commence to determine if the fail was caused by an internal or processing error such as an incorrect contra party identifier, incorrect account number, DTCC number, CUSIP number or stock symbol, or another error made in coding the trade. Action steps taken will be noted in the fail to deliver records.

| Responsibility | • COO or designee |
|---|---|
| Resources | • Exclearing Fail Report<br>• Balance Order Fails<br>• Notifications via SMART Tracks, email or via phone |

ALPINE_LIT168946

| Frequency | <ul><li>Daily (review of reports)</li><li>Upon notice of buy-in notice, as needed</li></ul> |
|---|---|
| Action | <ul><li>Review Exclearing Fail and Balance Order Fail reports</li><li>Identify fails to deliver by customers or in threshold securities within T+5 through T+35,(in the case of restricted securities, corporate reorgs, etc.)</li><li>Buy-in positions within T+5 through T+35 (in the case of restricted securities, corporate reorgs, etc.)</li><li>Upon notification of a buy-in notice (via Smart Tracks, phone or via email), open Fail Cleanup module to verify if there is a fail. If no fail, let buy-in party know.</li><li>Upon notification of a buy-in notice (open Stock Record module), verify location.</li><li>If security is in transfer, contact transfer agent and request reason for delay and report back to buy-in party. Request extension where applicable</li><li>If customer is short, put registered representative of record on notice and request reason for short and report back to buy-in party. Request extension where applicable</li></ul> |
| Record | <ul><li>Fail reports (Balance Order Fails and Exclearing Fail Report) including signature or initial, date of review and action taken, if any</li><li>Buy-in notices</li></ul> |

## 8.18.4 Sell out Procedures

**(a) Conditions Permitting "Sell-Out"**
Upon failure of the buyer to accept delivery in accordance with the terms of the contract, and lacking a properly executed Uniform Reclamation Form or the equivalent depository generated advice for depository eligible securities meeting the requirements prescribed in rule 11710(b), the seller may, without notice, "sell-out" in the best available market and for the account and liability of the party in default all or any part of the securities due or deliverable under the contract.

**(b) Notice of "Sell-Out"**
The party executing a "sell-out" as prescribed above shall, as promptly as possible on the day of execution, but no later than the close of business, local time, where the buyer maintains his office, notify the broker/dealer for whose account and risk such securities were sold of the quantity sold and the price received. Such notification should be in written or electronic form having immediate receipt capabilities. A formal confirmation of such sale should be forwarded as promptly as possible after the execution of the "sell-out."

### 8.18.4.1 Quarterly Security Counts

[SEC Securities Exchange Act of 1934 Rule 17a-13]

At least once each calendar quarter, a physical count will be conducted of customer securities against Alpine's books and records. Counts will be conducted more frequently if required by SRO. The Operations Manager is responsible for ensuring that this task occurs as noted in this WSP.

## 8.18.5 Special Reserve Bank Account

### 8.18.5.1 Establishing The Account

The FINOP will establish a special reserve bank account for the exclusive benefit of customers. Funds in this account are not available for use by Alpine for its benefit.

ALPINE_LIT168947

### 8.18.5.2 Written Notification From The Bank

Each bank where a special reserve bank account is established is required to provide written recognition that the account holds only customer assets, separate and apart from Alpine's own assets.

### 8.18.5.3 Reserve Formula Computations

Alpine will determine the required balance to be maintained in the account and make any required deposit. The computation must be made either weekly or monthly, on the last business day. The FINOP will determine whether computation is required weekly or monthly.

As part of the calculation, the unallocated position report will be used to determine the potential impact, if any, to the customer reserve and PAIB computations.

Debit balances created from money market redemptions will not be used as a part of the debit in the reserve formula computation.

### 8.18.5.4  Notification If Required Deposit Not Made

If Alpine fails to make the required deposit, the FINOP will immediately notify the SEC and designated SRO by telegram and promptly in writing.

## 8.19 Customer Confirmations And Statements

[FINRA Rule 2230]

### 8.19.1 Control Of Blank Confirmations And Statements

Blank confirmations and statements are to be retained in a secured location. Only authorized employees are permitted access to blank documents. The FINOP will establish procedures for control of these documents.

### 8.19.2 Change Of Customer Addresses On Accounts

| Responsibility | • Operations Manager or designee |
|---|---|
| Resources | • Request to change address on account from customer or RR |
| Frequency | • As required |
| Action | • Change address<br>• Send a confirming letter to the customer's old address, notifying that the address has been changed on the account |
| Record | • Copies of confirming letters are retained by Operations |

When a customer requests a change of address, a notification confirming the change of address will be sent to the customer's old address. Customer inquiries responding to the change of address notification will be forwarded to Compliance for follow-up.

ALPINE_LIT168948

### 8.19.3 Holding Customer Mail Prohibited

Alpine will not hold mail on a customer's behalf, even for a short duration. RRs are **not** permitted to hold customer mail. A customer, who cannot receive mail at the address established on the account, must be instructed to provide a third party mailing address that is not related to Alpine or any associate of Alpine.

## 8.19.4 Confirmation Disclosures

[SEC Securities Exchange Act of 1934 Rule 10b-10; FINRA Rule 2232]

| Responsibility | • COO |
|---|---|
| Resources | • Trade data |
| Frequency | • Daily |
| Action | • Establish operations procedures for including necessary disclosures in addition to standard information included on confirmations |
| Record | • Copies of confirmations |

The COO is responsible for establishing procedures to include special required disclosures on customer confirmations. Examples of some types of special disclosures are explained in the following sections. This task may be performed by a designee of the COO.

### 8.19.4.1 Disclosure Of Control

[FINRA Rule 2262]

Whenever Alpine effects transactions in the securities of an issuer that is under common control with Alpine, a disclosure regarding the common control will be included on or with the confirmation.

### 8.19.4.2 Callable Common Stock

Confirmations for transactions in callable common stock will disclose that:

- the security is callable common stock; and,
- the customer may contact Alpine for more information regarding the security.

### 8.19.4.3 Special Disclosures For Principal Transactions

Confirmations for transactions in reported securities where Alpine acts as principal will disclose the reported trade price, the net price to the customer, and the difference between the reported price and the price to the customer (*i.e.,* the markup/markdown or similar remuneration). Reported securities include:

- NASDAQ Global Market (NGM) securities
- NASDAQ Capital Market securities
- All NYSE, AMEX and selected securities on regional exchanges and reported to the Consolidated Tape

ALPINE_LIT168949

Also included in this requirement are riskless principal transactions in reported securities where Alpine acts as market maker in the security. Where Alpine is not a market maker, the confirmation must disclose the net price to the customer and the markup/markdown and similar remuneration.

## 8.20 Lost Security Holders and Unresponsive Payees (Rule 17Ad-17 and Rule 17a-24)

| | |
|---|---|
| **Responsibility** | • Operations Manager |
| **Resources** | • Customers with returned undeliverable correspondence (e.g. tax forms (1099), returned checks, account statements, general correspondence)<br>• Customer checks not negotiated |
| **Frequency** | • Lost Security Holder (database searches) – semi-annually<br>• Unresponsive payees (as required) |
| **Action** | • Identify returned correspondence and checks not negotiated<br>• For returned correspondence:<br>  ○ Send letter (if returned, note as "first attempt" or similar language and record date)<br>  ○ Send letter (if returned, note as "2nd attempt" or similar language and record date) 2nd letter triggers database search<br>  ○ Conduct database searches<br>  ○ Conduct 1st search within 3 and 12 months (see "searches for lost security holders" section below)<br>  ○ Conduct 2nd search within 6 and 12 months after first search (see "searches for lost security holders" section below)<br>  ○ Update the customer's record if an address is found<br>• For checks not negotiated:<br>  ○ Send written notification to customer<br>  ○ Issue a new check if the original was lost or not received by the customer |
| **Record** | • Undeliverable correspondence, record dates of 1st & 2nd attempt<br>• Searches conducted, dates of searches and results<br>• Action taken pursuant to searches and notification<br>• Unnegotiated checks<br>• Notice sent to customers regarding unnegotiated checks |
| **Retention** | • Retain records noted in the "Record" section for 3 years, the first year in an easily accessible place |

Alpine is required to search for holders of securities with whom it has lost contact and to provide notifications to persons who have not negotiated checks that have been sent to them. "Lost securityholders" are customers to whom any correspondence was sent and returned as undeliverable and for whom an updated address has not been received or is not obtainable from the customer. **The requirement does not apply when the securityholder is not a natural person.**

ALPINE_LIT168950

### 8.20.1 Searches for Lost Securityholders

Searches will be conducted through an information database service that contains addresses for the entire U.S. including the names of at least 50% of the U.S. adult population, is indexed by taxpayer ID number or name and is updated at least four times a year. The search will be conducted by taxpayer ID number or, if that search is not likely to locate the person, by name. Security holders may not be charged for these mandatory searches.

Searches will be conducted between three and twelve months from the later of:

- the date upon which the correspondence is returned as undeliverable or
- if returned correspondence is re-sent within one month from the date it was returned and is again returned as undeliverable, the date on which the re-sent item is returned as undeliverable.

A second search will be conducted between six and twelve months after the first search.

Searches will not be conducted when (i) Alpine receives documentation the security holder is deceased or (ii) the total value of assets in the account is less than $25.

### 8.20.2 Classification as Unresponsive Payees

If a check that is sent to a security holder is not negotiated before the earlier of the firm's sending the next regularly scheduled check or the elapsing of six months after the sending of a not yet negotiated check, the security holder will be considered an "unresponsive payee". If within 7 months, the check is still unnegotiated, Alpine must send a notification letter to the client. Refer to the section titled "Unnegotiated Checks" for information about the timing of the written notification letters. A regularly scheduled check includes interest and dividend payments and other regularly scheduled periodic payments from the issuer of securities to be distributed to security holders as a class. The term regularly scheduled check excludes checks for payment solely to an individual security holder established at their request or a third party on their behalf.

### 8.20.3 Unnegotiated Checks

Alpine must provide written notice to customers who do not negotiate checks sent to them within 7 months after sending the not yet negotiated check. This notification may be sent along with a check or other mailing. **However, Alpine may not rely on the brokerage account statement as notification.** This rule does not apply to checks worth less than $25. Written notice may also include notices sent via email provided the client has consented to the receipt of such information.

## 8.21 Subordination Agreements With Investors

[SEC Securities Exchange Act of 1934 Appendix D to Rule 15c3-1; FINRA Notice to Members 02-32 and 02-04; FINRA web site: http://www.finra.org/Industry/Compliance/RegulatoryFilings/subordinations/index.htm]

If Alpine enters into a subordination agreement with an investor, it will provide the investor with a copy of the FINRA Subordination Agreement Investor Disclosure Document and obtain the investor's signature on a copy of the Document. A copy of the signed Disclosure Document will be submitted to the FINRA with the subordination agreement, for approval.

The FINOP is responsible for obtaining and submitting the required documents for subordination agreements.

## 8.22 Expense-Sharing Agreements

[SEC Letter July 11, 2003 to FINRA and NYSE Regarding Recording Certain Broker-Dealer Expenses And Liabilities; FINRA Notice to Members 03-63]

ALPINE_LIT168951

The SEC specifies requirements for incorporating an expense-sharing agreement into a broker-dealer's operations and how these agreements are recorded in the broker-dealer's financial records. The FINOP is responsible for ensuring Alpine complies with the SEC's guidelines if it enters into any such agreements.

In addition, the FINOP is responsible for notifying Alpine's Designated Examining Authority (DEA) if it enters into an expense-sharing agreement and does not record each of the expenses it incurs relating to its business on the reports it is required to file with the SEC or with the DEA. The notice will include the date of the agreement and the names of the parties to the agreement; a copy of the agreement will be provided to the DEA upon request.

## 8.23 Transfer Of Accounts

The COO will establish procedures for the timely transfer of customer accounts to another broker-dealer. Such procedures will follow normal industry ACAT rules and policies, including timelines and cut-offs for response and delivery. This task may be performed by a designee of the COO.

ACAT Rules, as established in UPC Rule 11870; will be followed as outlined by the rule below:

**a) Responsibility to Expedite Customer's Request**

(1) When a customer whose securities account is carried by a member (the "carrying member") wishes to transfer securities account assets, in whole or in specifically designated part, to another member (the "receiving member") and gives authorized instructions to the receiving member, both members must expedite and coordinate activities with respect to the transfer.
(2) If a customer desires to transfer a portion of his or her account outside of ACATS, authorized alternate instructions should be transmitted to the carrying member indicating such intent and specifying the designated assets to be transferred. Although such transfers are not subject to the provisions of this Rule, members must expedite all authorized account asset transfers, whether through ACATS or via other means permissible under this Rule, and coordinate their activities with respect thereto. Unless otherwise indicated, the automated customer account transfer capabilities referred to in paragraph (m)(1) of this Rule shall be utilized for partial transfers.
(3) For purposes of this Rule, customer authorization pursuant to a transfer instruction could be the customer's actual signature, or an electronic signature in a format recognized as valid under federal law to conduct interstate commerce.
**(b) Transfer Procedures**
(1) Upon receipt from the customer of an authorized broker-to-broker transfer instruction form ("TIF") to receive such customer's securities account assets in whole or in specifically designated part, from the carrying member, the receiving member must immediately submit such instruction to the carrying member. The carrying member must, within one business day following receipt of such instruction, or receipt of a TIF received directly from the customer authorizing the transfer of assets in specifically designated part: (A) validate the transfer instruction to the receiving member (with an attachment reflecting all positions and money balances to be transferred as shown on its books); or (B) take exception to the transfer instruction for reasons other than securities positions or money balance discrepancies and advise the receiving member of the exception taken. The time frame(s) set forth in this paragraph will change, as determined from time-to-time in any publication, relating to the ACATS facility, by the National Securities Clearing Corporation (NSCC).
(2) The carrying member and the receiving member must promptly resolve any exceptions taken to the transfer instruction.
**(c) Transfer Instructions**
(1) Securities account asset transfers accomplished pursuant to this Rule are subject to the following conditions, which the customer must be informed of, affirm, or authorize (as the case may be) through their inclusion in the transfer instruction the customer is required to authorize to initiate the account asset transfer:
(A) To the extent any account assets are not readily transferable, with or without penalties, such assets may not be transferred within the time frames required by this Rule.
(B) The customer will be contacted in writing by the carrying member, and/or by the receiving member, with respect to the disposition of nontransferable assets other than proprietary money market fund assets (if any), indicated in an instruction to transfer specifically designated account assets. (See subparagraph (c)(D)(3) below for customer notification requirements pertaining to transfers of securities account assets in whole.)

ALPINE_LIT168952

(C) If securities accounts assets in whole other than retirement plan account assets are being transferred, the customer must affirm that he or she has destroyed or returned to the carrying member any credit/debit cards and/or unused checks issued in connection with the account.

(D) For purposes of this Rule, a "nontransferable asset" shall mean an asset that is incapable of being transferred from the carrying member to the receiving member because it is:

(i) an asset that is a proprietary product of the carrying member;

(ii) an asset that is a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account;

(iii) an asset that may not be received due to regulatory limitations on the scope of the receiving member's business;

(iv) an asset that is a bankrupt issue for which the carrying member does not possess the proper denominations to effect delivery and no transfer agent is available to re-register the shares;

(v) an asset that is an issue for which the proper denominations cannot be obtained pursuant to governmental regulation or the issuance terms of the product (e.g., foreign securities, baby bonds, etc.);

(vi) limited partnership interests in retail accounts.

(E) The carrying member and the receiving member must promptly resolve and reverse any nontransferable assets that were not properly identified during validation. In all cases, each member shall promptly update its records and bookkeeping systems and notify the customer of the action taken.

(2) A proprietary product of the carrying member shall be deemed nontransferable unless the receiving member has agreed to accept transfer of the product. Upon receipt of the asset validation report, the receiving member shall designate any assets that are a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account. The carrying member, upon receipt of such designation, may treat such designated assets as nontransferable and refrain from transferring the designated assets.

(3) If securities account assets to be transferred in whole include any nontransferable assets that are proprietary products of the carrying member, the carrying member must provide the customer with a list of the specific assets and request, in writing and prior to or at the time of validation of the transfer instruction, further instructions from the customer with respect to the disposition of such assets. In particular, such request should provide, where applicable, the customer with the following alternative methods of disposition for nontransferable assets:

(A) Liquidation, with a specific indication of any redemption or other liquidation-related fees that may result from such liquidation and that those fees may be deducted from the money balance due the customer.

(B) Retention by the carrying member for the customer's benefit.

(C) Transfer, physically and directly, in the customer's name to the customer.

(4) If securities account assets to be transferred in whole include any nontransferable assets that the receiving member has designated as assets that are a product of a third party (e.g., mutual fund/money market fund) with which the receiving member does not maintain the relationship or arrangement necessary to receive/carry the asset for the customer's account, the receiving member must provide the customer with a list of the specific assets and request, in writing and prior to the time it makes such designation, further instructions from the customer with respect to the disposition of such assets. In particular, such request should, where applicable, provide the customer with the following alternative methods of disposition for nontransferable assets:

(A) Liquidation, with a specific indication of any redemption or other liquidation-related fees that may result from such liquidation and that those fees may be deducted from the money balance due the customer. The indication must also refer the customer to the fund prospectus or to their registered representative at the carrying firm for specific details regarding any such fees.

(B) Retention by the carrying member for the customer's benefit.

(C) Shipment, physically and directly, in the customer's name to the customer.

(D) Transfer to the third party that is the original source of the product, for credit to an account opened by the customer with that third party.

(5) If the customer has authorized liquidation or transfer of assets deemed to be nontransferable, the carrying member must distribute the resulting money balance to the customer or initiate the transfer within five (5) business days following receipt of the customer's disposition instructions.

(6) With respect to transfers of retirement plan securities account assets, the customer authorizes the custodian/trustee for the account:

(A) to deduct any outstanding fees due the custodian/trustee from the credit balance in the account, or

ALPINE_LIT168953

(B) if the account does not contain a credit balance, or if the credit balance in the account is insufficient to satisfy any outstanding fees due the custodian/trustee, to liquidate assets in the account to the extent necessary to satisfy any outstanding fees due the custodian/trustee.

**(d) Validation of Transfer Instructions**

(1) Upon validation of an instruction to transfer securities account assets in whole, a carrying member must "freeze" the account to be transferred, i.e., all open orders, with the exception of option positions that expire within seven (7) business days, must be canceled and no new orders may be taken.

(2) A carrying member may not take exception to a transfer instruction, and therefore deny validation of the transfer instruction, because of a dispute over securities positions or the money balance in the account to be transferred. Such alleged discrepancies notwithstanding, the carrying member must transfer the securities positions and/or money balance reflected on its books for the account.

(3) A carrying member may take exception to a transfer instruction only if:

(A) additional documentation is required (additional legal documents such as death or marriage needed);

(B) the account is "flat" and reflects no transferable assets;

(C) the account number is invalid (account number is not on carrying member's books); however, if the carrying member has changed the account number for purposes of internally reassigning the account to another broker or account executive, it is the responsibility of the carrying firm to track the changed account number, and such reassigned account number shall not be considered invalid for purposes of fulfilling a transfer instruction.;

(D) it is a duplicate request;

(E) violates member's credit policy;

(F) unrecognized residual credit assets (receiving member cannot identify client);

(G) client rescinds instruction (client submitted written request to cancel transfer);

(H) S.S. number/Tax ID mismatch (number does not correspond to carrying member's);

(I) account title mismatch (receiving member's account title does not correspond to carrying member's);

(J) account type mismatches (receiving member's account type does not correspond to carrying member's);

(K) missing or improper authorization (TIF requires an additional client authorization or successor custodian's acceptance authorization or custodial approval); or

(L) Client takes possession (account assets in question are in transfer to deliver direct to customer).

(4) If a carrying member takes exception to a transfer instruction because the account is "flat," as provided in subparagraph (3)(B) above, the receiving member may re-submit the transfer instruction only if the most recent customer statement is attached.

(5)(A) Upon validation of an instruction to transfer securities account assets in whole or in specifically designated part, the carrying member must return the transfer instruction to the receiving member with an attachment indicating all securities positions, safekeeping positions, and money balances to be transferred as shown on the books of the carrying member. Except as hereinafter provided, the attachment must include a then-current market value for all assets so indicated. If a then-current market value for an asset cannot be determined (e.g., a limited partnership interest), the asset must be valued at original cost. However, delayed delivery assets, nontransferable assets, and assets in transfer to the customer, i.e., in possession of the transfer agent at the time of receipt of the transfer instruction by the carrying member for shipment, physically and directly to the customer, need not be valued, although the "delayed delivery," "nontransferable," or "in-transfer" status, respectively, of such assets must be indicated on the attachment.

(B) For purposes of this Rule, a "safekeeping position" shall mean any security held by a carrying member in the name of the customer.

(6) Upon validation of an instruction to transfer securities account assets in whole or in specifically designated part, the carrying member must indicate on the instruction, or by attachment, any Regulation T calls outstanding as of the date of validation with respect to the account assets to be transferred.

(7) A carrying member must provide the following description, at a minimum, as asset data with respect to any municipal securities positions to be transferred that have not been assigned a CUSIP number:

(A) name of the issuer;

(B) interest rate and dated date;

(C) maturity date and put date, if applicable, and if the securities are limited tax, subject to redemption prior to maturity (callable), or revenue bonds; an indication to such effect, including in the case of revenue bonds, the type of revenue, if necessary for a materially complete description of the securities; and

(D) if necessary for a materially complete description of the securities, the name of any company or other person in addition to the issuer obligated, directly or indirectly, with respect to debt service, or if there is more than one such obligor, the statement "multiple obligors" may be shown.

(8) After validation of the transfer instruction by the carrying member, a receiving member may reject a transfer of account assets in whole only if the account is not in compliance with the receiving member's credit policies or

ALPINE_LIT168954

minimum asset requirements. (A receiving member may deem an account not in compliance with Regulation T requirements as not in compliance with its credit policies.) A receiving member, however, may only reject the entire account for such reasons; it may not reject only a portion of the account assets (e.g., the particular assets not in compliance with the member's credit policies or minimum asset requirement) while accepting the remainder.

**(e) Completion of the Transfer**
Within three business days following the validation of a transfer instruction, the carrying member must complete the transfer of the customer's security account assets to the receiving member. The receiving member and the carrying member must immediately establish fail-to-receive and fail-to-deliver contracts at then-current market values upon their respective books of account against the long/short positions that have not been delivered/received and the receiving/carrying member must debit/credit the related money amount. The customer's security account assets shall thereupon be deemed transferred. The time frame(s) set forth in this paragraph will change, as determined from time-to-time in any publication, relating to the ACATS facility, by the NSCC.

## 8.24 Solicitation Of Proxies

[SEC Securities Exchange Act of 1934 Section 14]

RRs are not permitted to solicit proxies from customers. Federal securities rules prohibit solicitation of proxies except in very limited situations. Questions should be referred to Compliance.

## 8.25 Customer Requests For References

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager |
| **Resources** | • Requests from customers or prospective customers for reference letters |
| **Frequency** | • As required |
| **Action** | • Review requests and determine what, if any, reference letter may be issued<br>• If appropriate, write reference letter with a copy to the RR |
| **Record** | • Letters retained by OSJ Branch Manager |

Customers or prospective customers sometimes request letters of reference from broker-dealers regarding their accounts or future business to be done. Some of these requests in the past have been scams by unscrupulous individuals seeking to capitalize on a broker-dealer's good name. Any such requests should be referred to the OSJ Branch Manager for handling.

## 8.26 Audit Letters

| | |
|---|---|
| **Responsibility** | • CFO |
| **Resources** | • Letters from auditors requesting verification of balances in customer accounts |
| **Frequency** | • As required |
| **Action** | • Forward requests to Operations for response |

ALPINE_LIT168955

| Record | • Operations will maintain copies of responses in customer account files |
|---|---|

Auditors sometimes send letters asking Alpine to verify funds and securities on behalf of their customers who also have accounts with Alpine.

All requests should be forwarded to the manager of Operations for response. In no instance should an RR or other branch personnel respond to these requests.

## 8.27 Annual Disclosure Of FINRA BrokerCheck

[FINRA Rule 2280]

As required by FINRA rule, at least annually Alpine will provide customers with the following information in writing about FINRA BrokerCheck (formerly known as the FINRA Public Disclosure Program):

- the hotline number
- the Web Site address
- a statement regarding the availability of an investor brochure regarding FINRA BrokerCheck

## 8.28 Short Interest Report

[FINRA Rule 4560; FINRA Regulatory Notice 12-38]

| Responsibility | • Chief Financial Officer |
|---|---|
| Resources | • Position reports and other records reflecting short positions for Alpine and customer accounts |
| Frequency | • Twice monthly |
| Action | • File short interest report with NASDAQ and/or DEA |
| Record | • Copies of the monthly reports are retained in a file "Short Interest Reports." |

Alpine will maintain a record of total short positions in all customer and proprietary firm accounts. Alpine will file the required semi-monthly short interest report(s) reflecting short positions in proprietary and customer accounts as follows:

- For exchange-listed securities the report will be filed with Alpine's Designated Examining Authority (DEA).
- For NASDAQ and OTC equity securities the report will be filed with the FINRA.

## 8.29 Electronic Blue Sheets

['34 Act Rule 17a-25; FINRA Notices to Members 06-33 and 05-58]

Regulators may request information regarding customer or Alpine transactions as part of their ongoing market surveillance activities. Information is transmitted electronically through the Electronic Blue Sheet (EBS) system via FINRA Gateway, SIAC or other regulatory channel authorized or requested by the regulatory agency.

ALPINE_LIT168956

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Bluesheet request from SEC, FINRA or other regulatory body<br>• Service Bureau Provider's Blue Sheet Transmission Module: Blue sheet transmission request for reporting of certain information as requested by Regulatory Staff<br>• Legacy systems: Blue Sheet transmissions for reporting of certain information as requested by Regulatory Staff |
| Frequency | • As needed |
| Action | • Respond to bluesheet requests and similar requests by regulators<br><br>• Submit requests through Service Bureau Provider's Blue Sheet transmission process<br><br>• Validate that submissions have been received through FINRA Gateway, SIAC or other regulatory channels as requested by the regulator<br>• Retain records of requests and responses submitted |
| Record | • Submission of regulatory requests through Blue Sheet process on Blue Sheet spreadsheet, including the date of submission and submitter name<br>• Submission that records have been received through FINRA Gateway, SIAC or other regulatory channels as requested by the regulator |
| Evidence of Review | • Notation on Blue Sheet spreadsheet<br><br>• Retention of EBS requests and responses submitted through Alpine's email archiving and email retention system or physical files. |
| Retention | • Retain records for 3 years, the first 2 years in an easily accessible place |

## 8.30 Other Regulatory Inquiries/Requests

FINRA Rule 8210, '34 Act

Inquiries regarding Alpine's customer accounts and/or transactions initiated by a regulatory agency should be directed to the CCO or designee for review and response. The CCO or designee determines the customer account number(s) of the individuals or entities for whom the inquiries are being made and directs operations personnel and other company personnel to produce the requested information to Compliance for further review. Responses to regulatory requests may only be provided by the CCO or designee or persons authorized by the CCO or designee.

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Receipt of regulatory request or regulatory inquiry |
| Frequency | • As needed |
| Action | • Process the inquiry including the following |

ALPINE_LIT168957

| | |
|---|---|
| | • Record date of receipt<br>• Flag due date in a log or other record<br>• Assemble and review response<br>• Encrypt responses prior to sending where required<br>• Request and record any extension of due date, if necessary<br>• Forward response, retaining a copy<br>• Consult with other department personnel as needed<br>• Respond to regulatory inquiry or request, retaining a copy |
| **Record** | • Copy of regulatory request or inquiry, Alpine's response to regulatory request or inquiry, and notations of when received, extensions (if applicable), and when response was sent.<br>• Records may be maintained in electronic, in paper format or a combination thereof |

## 8.30.1 Information Provided Via Portable Media Device

[FINRA Regulatory Notice 10-59]

Information provided to FINRA by portable media device in response to requests under FINRA 8210 (Provision of Information and Testimony and Inspection and Copying of Books) will be encrypted using a method that meets industry standards for strong encryption. FINRA staff will be provided with the confidential process or key regarding the encryption in a communication separate from the encrypted information itself (separate email, fax, letter, *etc.*).

# 8.31 Regulatory Fees And Assessments

[SEC Securities Exchange Act of 1934 Section 31; FINRA By-Laws Schedule A; FINRA Notice to Members 05-11 and 04-63]

The FINOP is responsible for paying fees and assessments required by regulators. A record of information reported and fees or assessments paid are retained in the FINOP's files.

# 8.32 INSITE Reporting Requirements

FINRA Rule 3150 ("Reporting Requirements for Firms") requires firms to report data which will be used by the FINRA in its surveillance program. INSITE (Integrated National Surveillance and Information Technology Enhancements) is the FINRA's program for identifying emerging risk patterns at members firms for follow-up reviews or examinations.

The COO is responsible for providing the required data and retaining records of information provided. This may be performed by a member of the Operations team.

# 8.33 Outsourcing

[FINRA Notice to Members 05-48]

| | |
|---|---|
| **Responsibility** | • Due Diligence Committee (where indicated)<br>• Alpine's IT Committee (where indicated)<br>• CCO or designee (where indicated)<br>• AML Officer or designee (where indicated)<br>• Head Trader or designee (where indicated)<br>• General Counsel or designee (where indicated) |

ALPINE_LIT168958

| | |
|---|---|
| | • COO or designee (where indicated)<br>• FinOp or designee (where indicated) |
| **Resources** | • Third party vendors<br>• Reviews of third party vendor performance<br>• Customer complaints<br>• Third party vendor contracts<br>• Service Provider Due Diligence Review Form<br>• Service Provider Periodic Due Diligence Review Form |
| **Frequency** | • Contracts involving the mutual data flow of information (Annually)<br>• All other relationships (periodic basis) |
| **Action** | Due Diligence Committee<br><br>• Identify areas of Alpine's business where outsourcing is appropriate<br>• Identify third party vendors that provide the needed services<br>• Evaluate potential third parties and determine whether to engage<br>• Execute contract<br><br>IT Committee, where there is a mutual data flow of information<br><br>• Monitor third party vendors to ensure that outsourced services are fulfilling Alpine's requirements and complying with applicable rules using the Service Provider Periodic Due Diligence Review Form<br>• Monitor for compliance with terms of agreement between Alpine and the third party vendor<br>• Assess third party vendor's fitness and ability to perform activities being outsourced, including reviews of SSAE16 control reports, if available<br><br>CCO, AML Officer, Head Trader, FinOP, COO, IT Committee, General Counsel or their designees, where each business lines engages a third party vendor to perform functions on behalf of the department. On a periodic basis (depending on the type of service provided) using the Service Provider Periodic Due Diligence Review Form.<br><br>   ○ Monitor department specific third party vendor(s) to ensure that outsourced services are fulfilling Alpine's requirements and complying with applicable rules<br>   ○ Monitor for compliance with terms of agreement between Alpine and the third party vendor<br>   ○ Assess third party vendor's fitness and ability to perform activities being outsourced, including reviews of SSAE16 control reports, if available<br><br>IT Committee, CCO, COO, AML Officer, FinOp, General Counsel, Head Trader or their designees, when problems arise with outsourced services<br><br>• Review the problem to determine whether the source is the vendor or an internal one<br>• Take corrective action which may include the following:<br>   ○ Contacting the vendor and determining what corrective action will be taken and follow-up to determine corrective action has been taken<br>   ○ If the problem continues or is significant, determine whether the vendor should be replaced<br>   ○ If the problem is internal, contact the appropriate supervisor to determine corrective action |

ALPINE_LIT168959

| | |
|---|---|
| | o   Consult with CCO when necessary to determine action to be taken |
| **Record** | • Due Diligence records (Service Provider Periodic Due Diligence Review Form), including review date(s), approval date(s) and parties involved in the approval/review<br>• Contracts with third party vendors<br>• Records of third party vendor reviews (Service Provider Periodic Due Diligence Review Form), including SSAE 16 report [include review date and reviewer name (initial or signature), if applicable]<br>• Records of corrective action taken |

**Initial Due Diligence**

Alpine may contract with outside third party vendors to perform certain required functions. While Alpine may not contract its supervisory and compliance activities away from its direct control, Alpine may outsource certain activities that support the performance of its supervisory and compliance responsibilities. Areas where Alpine may outsource include, but are not limited to, the following:

- Accounting/finance (payroll, expense account reporting, etc.)
- Legal and compliance
- Information Technology (IT)
- Operations functions (e.g., statement production, disaster recovery services, etc.)
- Administrative functions (e.g., human resources, internal audits, etc.)

When choosing an outside vendor, Alpine will consider a number of factors to determine whether the activity that Alpine is contemplating outsourcing is appropriate for outsourcing. These factors may change depending on the type of service provided pursuant to the proposed outsourcing agreement. Factors that may be considered when engaging a third party include, but are not limited to the following:

- Third party vendor's internal procedures
- Industry (regulatory) knowledge
- Capacity to conform with regulatory requirements and changes in requirements
- Business disruption preparedness
- Privacy Policy
- Length of time in business
- Financial stability
- Prior knowledge of the third party vendor
- Other users of the third party vendor's services
- Technology and ability to deliver services
- Competitive pricing
- Material litigation or other adverse findings involving key personnel

**Ongoing Due Diligence**

While third parties are responsible for providing agreed-upon services in an accurate manner, Alpine understands that it remains responsible for ultimate compliance with rules governing the outsourced activity. Alpine further understands that it has a continuing responsibility to oversee, supervise and monitor the service provider's performance of covered activities. Depending on the services being performed, each responsible party where designated above will perform reviews (at the frequency specified above) to confirm the accuracy and quality of the work product, adherence to both contract terms and regulatory requirements (both existing and changing) and the third party vendor's application of its own procedures. Each responsible party identified above is free to develop additional policies as necessary and may include periodic meetings with the third party vendor and/or status reports or some other means of periodic reporting from the third party vendor.

ALPINE_LIT168960

## 8.34 Protection Of Firm And Customer Systems And Data

[SEC Regulation S-P Rule 30(a); SEC Release No. 34-50781; FINRA Notice to Members 05-49; FINRA web page: Customer Information Protection http://www.finra.org/Industry/Issues/CustomerInformationProtection/index.htm; FINRA web page: Firm Checklist for Compromised Accounts: http://www.finra.org/Industry/Issues/CustomerInformationProtectection/p117443; Fair and Accurate Credit Transactions Act of 2003 Section 216; FTC Safeguards Rule; NIST Framework for Improving Critical Infrastructure Cybersecurity: http://www.nist.gov/cyberframework/upload/cybersecurity-framework-021214-final.pdf; SIFMA Cybersecurity Resource Center: http://www.sifma.org/issues/operations-and-technology/cybersecurity/overview]

| Responsibility | • IT Committee |
|---|---|
| **Resources** | • Internal and outside security systems<br>• Computers, phones, PDAs, other data-retaining devices<br>• Customer and Firm data |
| **Frequency** | • Clearing of data from devices: when device is to be retired or re-assigned<br>• Ongoing: review of integrity of systems, monitoring for breaches<br>• Ongoing: assigning and disabling passwords<br>• Annual: review of internal controls and procedures<br>• As required: when intrusions are detected<br>• Annual: provide training to employees |
| **Action** | • Clear data from retired or re-assigned devices (internally or using an outside service)<br>• Establish controls including firewalls and encryption of data<br>• Require installation of security application software to all laptops or other remote devices used to access firm and customer data<br>• Require encryption of data on laptops and other mobile devices<br>• Limit access to customer information to employees who have a reason to see it<br>• Monitor on an ongoing basis for breaches including review of web server logs to reveal intrusions<br>• When system intrusions are detected, follow protocol for compromised data<br>• Conduct due diligence/obtain affirmation from third parties with access to firm data<br>• Issue passwords to authorized personnel including use of strong passwords through validation or periodic password changes and forced password expiration; disable them when an authorized person terminates or transfers from an authorized position, including shared user names and passwords when one of the users terminates or is no longer an authorized person<br>• Provide training to personnel (may be part of annual compliance or other meetings, or media) including: keeping customer information secure and confidential; limitations on use of computers, software, access to accounts; locking and securing mobile devices when not in use; customer breaches: identifying, reporting to CCO or designee<br>• Test systems regularly and correct anomalies<br>• Conduct periodic audits and review of internal controls and procedures (Compliance or other assigned personnel) including audits of employee computers to confirm installation of security software and use of encryption; use of authorized software only (if applicable); follow up regarding audit findings (internal or external) |
| **Record** | • Record of clearing data from retired or re-assigned devices<br>• Record of due diligence/affirmation from third parties<br>• Record of passwords issued and disabled including names of authorized persons, their departments, issued or disabled |

ALPINE_LIT168961

|  | • Record of training provided |
|  | • Record of compromised data and actions taken |
|  | • Record of periodic audits and reviews including findings and follow up action taken |

Alpine's IT Committee is responsible for developing and implementing procedures to protect Alpine's internal systems and data.

## 8.35 Correspondent Clearing

More information about Alpine Securities' correspondent clearing business policies and procedures can be found in the Chapter titled "Correspondent Clearing/Due Diligence for Correspondent Firms located elsewhere in this Manual.

ALPINE_LIT168962

# 9 ANTI-MONEY LAUNDERING (AML) PROGRAM

## 9.1 Firm Policy

Alpine revised this policy, which became effective on June 30th, 2014.

It is the policy of Alpine Securities Corporation (Alpine) to prohibit and actively prevent money laundering and any activities that facilitates money laundering or the funding of terrorist or criminal activities by complying with all applicable requirements under the Bank Secrecy Act (BSA) and its implementing regulations.

Money laundering is a serious crime potentially related to the funding of terrorist activities. It is the subject of extensive federal regulations that impose requirements on financial institutions, such as broker-dealers and their employees, to detect and prevent potential money laundering activities. Taking actions to detect and prevent money laundering is an obligation of each Alpine employee.

Money laundering is generally defined as engaging in acts designed to conceal or disguise the true origins of criminally derived proceeds so that the proceeds appear to have derived from legitimate origins or constitute legitimate assets. Generally, money laundering occurs in three stages. Cash first enters the financial system at the "placement" stage, where the cash generated from criminal activity is converted into monetary instruments, such as money orders or traveler's checks, or deposited into accounts at financial institutions. At the "layering" stage, the funds are transferred or moved into other accounts or other financial institutions to further separate the money from its criminal origin. At the "integration" stage, the funds are reintroduced into the economy and used to purchase legitimate assets or to fund other criminal or legitimate business activities.

Terrorist financing may not involve the proceeds of criminal conduct, but rather may be an attempt to conceal either the origin of the funds or their intended use, which could be for criminal purposes. Legitimate sources of funds are a key difference between terrorist financiers and traditional criminal organizations. In addition to charitable donations, legitimate sources include foreign government sponsors, business ownership and personal employment. Although the motivation differs between traditional money launderers and terrorist financiers, the actual methods used to fund terrorist operations can be the same as or similar to methods used by other criminals to launder funds. Funding for terrorist attacks does not always require large sums of money and the associated transactions may not be complex.

Engaging in money laundering and terrorist financing is a federal crime with severe penalties for those engaged in the associated criminal activities and those who facilitate, intentionally or inadvertently, money laundering. It is important that Alpine and all employees, remain diligent and active participants in Alpine's Anti-Money Laundering (AML) Program.

This chapter explains Alpine's Anti-Money Laundering (AML) Program. An explanation of money laundering and guidance for all employees to detect money laundering is included in this chapter. These policies will be updated and appropriate procedures and action effected when new rules are adopted.

### 9.1.1 Background

The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act (BSA), and its accompanying regulation, is a tool the U.S. government uses to fight drug trafficking, money laundering, and other crimes. Congress enacted the BSA to prevent financial service providers (such as banks and broker-dealers) from being used as intermediaries for, or to hide the transfer or deposit of, money derived from criminal activity. Money laundering schemes may include the use of wire transfers, cash, bearer instruments, travelers' checks, money orders, cashiers' checks, and other negotiable instruments.

Alpine is required to comply with the reporting, recordkeeping, and record retention requirements of the BSA. The requirements govern the payment, receipt, or transfer of currency within, into and out of the U.S. and foreign financial transactions and accounts.

ALPINE_LIT168963

## 9.2 AML Officer Designation and Duties

[FINRA Rule 3310(d) and 3310.02]

Rules/Resources: FINRA Rule 4517 (fka NASD Rule 1160); FINRA Rule 3310; Bank Secrecy Act, 31 C.F.R. 103.120(c)

Alpine has designated an AML Officer who is responsible for overseeing Alpine's anti-money laundering program, developing policies, procedures, and internal controls reasonably designed to achieve compliance with AML rules and regulations. Please refer to Alpine's Form BD for the contact name of the AML Officer. The AML Officer has a working knowledge of the BSA and its implementing regulations and is qualified by experience, knowledge and training. The duties of the AML Officer or designee will also include monitoring the firm's compliance with AML obligations and overseeing communication and training for employees. The AML Officer or designee will also ensure that suspicious activity reports (SAR-SFs) are filed with the Financial Crimes Enforcement Network (FinCEN) when appropriate.

Contact the AML Officer or designee whenever you have questions about Alpine's program, a current or prospective account, or activities or transactions that raise questions about potential money laundering or other illicit activities. You may also provide information anonymously to the AML Officer or designee. The AML Officer or designee is responsible for investigating suspected money laundering activities and taking corrective action when necessary.

## 9.3 Updates to the FINRA Contact System

Rules/Resources: 31 C.F.R. § 103.120; FINRA Rule 3310, FINRA Rule 4517.

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • FINRA Contact System |
| **Frequency** | • As required as material information becomes inaccurate; and<br>• Annual confirmations within 17 business days following the end of the calendar year |
| **Action** | • Provide AML Officer name and contact information to FINRA via the FINRA Contact System (FCS), initially<br>• Notify FINRA promptly of any material changes in the AML Officer's contact information for the AML Officer within 30 days following the change.<br>• Confirm information via FINRA Contact System (FCS) annually within 17 business days following the end of the calendar year |
| **Record** | • Updates via FINRA Contacts System (through FINRA Gateway) |

Alpine will provide FINRA with contact information for the AML Officer, including: (1) name; (2) title; (3) mailing address; (4) email address; (5) telephone number; and (6) facsimile number through the FINRA Contact System (FCS) within 30 days following the material change. The CCO or designee will promptly notify FINRA of any material change in this information through FCS and will review, on an annual basis and if necessary update, this information within 17 business days after the end of each calendar year.

ALPINE_LIT168964

## 9.4 General Summary of AML Officer Duties

Rules/Resources: FINRA Rule 4517; FINRA Rule 3310(d) and 3310.02

| | |
|---|---|
| **Responsibility** | • AML Officer or designee |
| **Resources** | • Computer reports and other programs developed for the Program<br>• Internal audits or outside audits of the Program<br>• Regulations and rules for broker-dealer anti-money laundering programs<br>• OFAC web site<br>• Other sites and resources available |
| **Frequency** | • Annual - review policies and procedures<br>• Annual and more frequently, as needed - develop and schedule AML education for employees<br>• As needed - update program and provide revisions to senior management for review and approval of material changes. Non-material changes to the AML Policy will not require senior management approval.<br>• Annually - review AML contact information on file through the FINRA Contact System (FCS)<br>• Ongoing - review new regulations<br>• Ongoing - monitor activity |
| **Action** | • Develop and update Alpine's anti-money laundering program<br>• Obtain senior management approval for any material changes to the program or policy<br>• Monitor (or designate monitoring) the activity of Alpine, its associated persons, and customers to reasonably detect and prevent money laundering activities<br>• Develop AML education program for employees and schedule training<br>• File required reports<br>• Retain required records<br>• Provide contact information via the FINRA Contact System (FCS) and update contact information if necessary |
| **Record** | • Designation of AML Officer<br>• Retain current and past copies of anti-money laundering program with senior management approval, when and where senior management approval is required<br>• Retain records of AML education including who attended, date of training, and material covered<br>• Reports filed along with supporting documentation, where applicable<br>• Retain other records, as listed in the Program |

## 9.5 Giving AML Information to Federal Law Enforcement Agencies and Other Financial Institutions

### 9.5.1 Requests and Written Notices From Enforcement Agencies

Under the Bank Secrecy Act, financial institutions are required to respond to federal banking agency requests for information relating to anti-money laundering compliance. The Rule requires provision of information and account documentation for any account opened, maintained, administered or managed in the U.S. The AML

ALPINE_LIT168965

Officer or designee maintains records of information provided in response to regulators' requests including the request, date of response, and information provided.

## 9.5.2 Federal Banking Agency Requests - 120 Hour Rule

Rules/Resources: USA PATRIOT Act Section 319(b)

Upon receiving a request from a Federal banking agency, the AML Officer or designee will provide the requested information within 5 days (120 hours) of receiving the request or will make available the information for inspection by the banking agency.

## 9.5.3 FinCEN Requests Under USA PATRIOT Act Section 314(a)

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart E; USA PATRIOT Act Section 314; FinCEN 314(a) Fact Sheet: http://www.fincen.gov/statutes_regs/patriot/pdf/314afactsheet.pdf, *31 C.F.R.* □ *103.100.*

*Resources:FinCEN press release (2/6/03);FinCEN press release (2/12/03);NASD Member Alert (2/14/03);FinCEN's 314(a) Fact Sheet (11/18/08)*, Frequently Asked Questions (FAQs)

| Responsibility | • AML Officer or designee |
|---|---|
| Resources | • Deposit records, purchase/sale records, account records, other records as required |
| Frequency | • Upon request |
| Action | • Conduct a search of the required records<br>• If a match is found, submit the Subject Information Form to FinCEN using the Secure Information Sharing System<br>• Retain copy of 314(a) list received |
| Record | • Retain copies of the request<br>• Notate date of review and initial or sign the 314(a) list received<br>• Information submitted (if a match is found) are retained in a FinCEN information request file<br>• Sign or initial 314(a) Search Self-Verification Page and retain |

The Financial Crimes Enforcement Network (FinCEN) sends law enforcement requests to financial institutions under Section 314(a) of the USA PATRIOT Act, on typically, a bi-weekly basis.

Alpine will respond to a Financial Crimes Enforcement Network (FinCEN) 314(a) Request concerning accounts and transactions by immediately searching our records to determine whether we maintain or have maintained any account for, or have engaged in any transaction with, each individual, entity or organization named in the 314(a) Request as outlined in the Frequently Asked Questions (FAQ) located on FinCEN's secure Web site. Alpine understands that we have 14 days (unless otherwise specified by FinCEN) from the transmission date of the request to respond to a 314(a) Request. If the search parameters differ from those mentioned above (for example, if FinCEN limits the search to a geographic location), the AML Officer or designee will structure the search accordingly. Unless otherwise stated in the 314(a) Request or specified by FinCEN, Alpine is required to search those documents outlined in FinCEN's FAQ . If Alpine finds a match, the AML Officer or designee will report it to FinCEN using FinCEN's Secure Information Sharing System. If we find a match with a named

ALPINE_LIT168966

subject, the AML Officer or designee can stop its search on that subject; as we are not required to search our records further for other matches with that specific subject unless and until we have been contacted by the requesting federal law enforcement agency for additional information. If the 314(a) Request contains multiple subjects, the AML Officer or designee will continue to search our records for an account or transaction matching any of the other named subjects. The AML Officer or designee will ensure that all searches have been completed prior to reporting any matches, as we will not be able to submit the response more than once for any review period. The AML Officer or designee should not send any record of an account or a transaction (other than a report, as described above, notifying FinCEN of a match) when responding to a 314(a) Request.

If the AML Officer or designee searches Alpine's records and does not find a matching account or transaction, then the AML Officer or designee will not reply to the 314(a) Request. Alpine will maintain documentation that we have performed the required search by following the processes outlined above.

Alpine will not disclose the fact that FinCEN has requested or obtained information from us, except to the extent necessary to comply with the information request. The AML Officer or designee will review, maintain and implement procedures to protect the security and confidentiality of requests from FinCEN similar to those procedures established to satisfy the requirements of Section 501 of the Gramm-Leach-Bliley Act with regard to the protection of customers' nonpublic information.

Unless otherwise stated in the 314(a) Request, Alpine will not be required to treat the information request as continuing in nature, and Alpine will not be required to treat the periodic 314(a) Requests as a government provided list of suspected terrorists for purposes of the customer identification and verification requirements.

## 9.5.4 National Security Letters

Rules/Resources: FinCEN SAR Activity Review, Trends, Tips & Issues, Issue 8 (National Security Letters and Suspicious Activity Reporting) (4/2005).

National Security Letters (NSLs) are written investigative demands that may be issued by the local Federal Bureau of Investigation and other federal government authorities conducting counterintelligence and counterterrorism investigations to obtain, among other things, financial records of broker-dealers. NSLs are highly confidential. No broker-dealer, officer, employee or agent of the broker-dealer can disclose to any person that a government authority or the FBI has sought or obtained access to records. Alpine has policies in place to process and maintain the confidentiality of NSLs. If we file a Suspicious Activity Report (SAR-SF) after receiving a NSL, the SAR-SF should not contain any reference to the receipt or existence of the NSL.

## 9.5.5 Grand Jury Subpoenas

Resources: FinCEN SAR Activity Review, Trends, Tips & Issues, Issue 10 (Grand Jury Subpoenas and Suspicious Activity Reporting) (5/2006).

Alpine understands that the receipt of a grand jury subpoena concerning a customer does not in itself require that we file a Suspicious Activity Report (SAR-SF). Alpine further understand that none of our officers, employees or agents may directly or indirectly disclose to the person who is the subject of the subpoena its existence, its contents or the information we used to respond to it. To maintain the confidentiality of any grand jury subpoena we receive, Alpine will process and maintain the subpoena in accordance with our departmental policies and procedures. If Alpine files a SAR-SF after receiving a grand jury subpoena, the SAR-SF will not contain any reference to the receipt or existence of the subpoena. The SAR-SF will only contain detailed information about the facts and circumstances of the detected suspicious activity.

## 9.5.6 Voluntary Information Sharing with Other Financial Institutions Under USA PATRIOT Act Section 314(b)

ALPINE_LIT168967

### 9.5.6.1 Information Sharing Between Financial Institutions

Rules/Resources: USA PATRIOT Act Section 314(b); Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart E; FinCEN certification: http://www.fincen.gov/fi_infoappb.html, Rule: 31 C.F.R. § 103.110., FinCEN Financial Institution Notification Form; FIN-2009-G002: Guidance on the Scope of Permissible Information Sharing Covered by Section 314(b) Safe Harbor of the USA PATRIOT Act (06/16/2009).

Alpine will share information with other financial institutions regarding individuals, entities, organizations and countries for purposes of identifying and, where appropriate, reporting activities that we suspect may involve possible terrorist activity or money laundering. The AML Officer or designee will ensure that the firm files with FinCEN an initial notice before any sharing occurs and annual notices thereafter. Alpine will use the notice form found at FinCEN's Web site. Before Alpine shares information with another financial institution, Alpine will take reasonable steps to verify that the other financial institution has submitted the requisite notice to FinCEN, either by obtaining confirmation from the financial institution or by consulting a list of such financial institutions that FinCEN will make available. Alpine understands that this requirement applies even to financial institutions with which we are affiliated and that Alpine will obtain the requisite notices from affiliates and follow all required procedures.

Alpine will employ strict procedures both to ensure that only relevant information is shared and to protect the security and confidentiality of this information, for example, by segregating it from the firm's other books and records.

Alpine also will employ procedures to ensure that any information received from another financial institution shall not be used for any purpose other than:

- Identifying and, where appropriate, reporting on money laundering or terrorist activities;
- Determining whether to establish or maintain an account, or to engage in a transaction; or
- Assisting the financial institution in complying with performing such activities.

### 9.5.6.2 Joint Filing of SARS by Broker-Dealers and Other Financial Institutions

Rules/Resources: 31 C.F.R. §103.19; 31 C.F.R. § 103.38; 31 C.F.R. § 103.110.

Alpine may file joint SARs in certain circumstances. Alpine may share information about a particular suspicious transaction with any broker-dealer, as appropriate, involved in that particular transaction for purposes of determining whether we will file jointly a SAR-SF.

If Alpine determines it is appropriate to jointly file a SAR-SF, Alpine understands that we cannot disclose that we have filed a SAR-SF to any financial institution except the financial institution that is filing jointly. If Alpine determine it is not appropriate to file jointly (*e.g.*, because the SAR-SF concerns the other broker-dealer or one of its employees), Alpine understands that we cannot disclose that we have filed a SAR-SF to any other financial institution.

### 9.5.6.3 Sharing SAR-SFs with Parent Companies

Rules/Resources: FinCEN Guidance on Sharing of Suspicious Activity Reports by Securities Broker-Dealers, Futures Commission Merchants, and Introducing Brokers in Commodities (1/20/06).

Because Alpine is a subsidiary, Alpine may share SAR-SFs with its parent company, if the financial institution has filed a current 314(b) information sharing form with FinCEN. Before Alpine shares SAR-SFs with our parent company, Alpine will have in place written confidentiality agreements or written arrangements that Alpine's parent company protects the confidentiality of the SAR-SFs through appropriate internal controls.

## 9.6 Checking the Office of Foreign Assets Control (OFAC) Listings

Rules/Resources: Dept. of Treasury, various statutes; OFAC web site (http://www.treas.gov/offices/enforcement/ofac/); Foreign Assets Control Regulations For The Securities

ALPINE_LIT168968

Industry (http://www.treas.gov/offices/enforcement/ofac/regulations/t11facsc.pdf),SEC AML Source Tool, Item 12; OFAC Lists Web page (including links to the SDN List and lists of sanctioned countries); FINRA's OFAC Search Tool. You can also subscribe to receive updates on the OFAC Subscription Web page. See also the following OFAC forms: Blocked Properties Reporting Form; Voluntary Form for Reporting Blocked Transactions; Voluntary Form for Reporting Rejected Transactions; OFAC Guidance Regarding Foreign Assets Control Regulations for the Securities Industry.

| | |
|---|---|
| **Responsibility** | <ul><li>RR for a new account</li><li>OSJ Branch Manager and/or President or their designees ("Designated Supervisor(s)")</li><li>AML Officer or designee, where designated</li></ul> |
| **Resources** | <ul><li>Name / Entity search based on above referenced OFAC web site</li><li>Comparison search program provided by CSS Hosted Solutions, LLC, (hereafter referred to as the OFAC screening report)</li><li>Other sites identified below (such as *www.treas.gov/ofac* or *www.fincen.gov*</li></ul> |
| **Frequency** | <ul><li>At the time that a new account is opened</li><li>Daily for the OFAC screening report</li></ul> o   Weekly for the following reports: <ul><li>Account Activity in Non-Cooperative and Blocked Countries Report</li><li>Account in Non-Cooperative Countries Report</li><li>Foreign Account Activity Report</li></ul> |
| **Action** | <ul><li>RR shall perform an OFAC search for each new customer and attach results to the new account card</li><li>Designated Supervisor(s) approving the new account shall only approve an account if an OFAC search is attached to the new account card. If a positive identification is made, the AML Compliance Officer or designee shall be notified immediately.</li></ul> AML Officer or designee: If a positive identification is found, <ol><li>Block accounts subject to sanctions</li><li>Cancel open orders for blocked accounts</li><li>Notify the OSJ Branch Manager and the account's RR, when an account or security is blocked</li><li>Notify OFAC by FAX within 10 days of blocking an account</li><li>Notify Dreyfus Service Corporation with respect to funds in a blocked account having been swept into the Dreyfus Money Market account.</li></ol> AML Officer or designee: <ul><li>Review, initial (or sign), date and retain the OFAC screening report</li><li>Maintain log of blocked accounts</li></ul> |
| **Record** | <ul><li>Record of each new account accompanied by the OFAC search results</li><li>OFAC screening report results, subsequent OFAC searches undertaken, if any, and any actions taken</li><li>Notifications to OFAC</li></ul> |

ALPINE_LIT168969

The U.S. Treasury Department's Office of Foreign Assets Control (OFAC) is responsible for publishing sanctions against persons, corporations, and other entities including foreign governments that have been identified by the U.S. Government as engaging in criminal activities including drug trafficking and terrorist activities. OFAC requirements apply to all persons and entities under U.S. jurisdiction, including foreign branches of U.S. institutions. This also includes foreign institutions that operate in the U.S. Alpine is obligated to check its accounts against the lists of blockings to ensure it does not engage in prohibited transactions which include securities transactions and transfer of assets out of a blocked account or to a blocked person or entity. Alpine has procedures to monitor the OFAC lists and comply with requirements to block property and notify OFAC when required. Questions regarding Alpine's program should be referred to the AML Officer or designee. More information is also available at the OFAC web site at *www.treas.gov/ofac*.

Before opening an account, and on an ongoing basis, the parties enumerated above will check to ensure that a customer does not appear on the SDN list or is not engaging in transactions that are prohibited by the economic sanctions and embargoes administered and enforced by OFAC prior to approving or opening an account.

Because the SDN list and listings of economic sanctions and embargoes are updated frequently, Alpine will consult them on a regular basis and subscribe to receive any available updates when they occur. With respect to the SDN list, Alpine may also access that list through various software programs to ensure speed and accuracy. *See also* FINRA's OFAC Search Tool that screens names against the SDN list.

If Alpine determines that a customer is on the SDN list or is engaging in transactions that are prohibited by the economic sanctions and embargoes administered and enforced by OFAC, we will reject the transaction and/or block the customer's assets and file a blocked assets and/or rejected transaction form with OFAC within 10 days. Alpine will also call the OFAC Hotline at (800) 540-6322 immediately.

The property of sanctioned persons or entities will be blocked and transfer of assets prevented for persons or entities included on the OFAC list of blocked persons or entities. In addition, Alpine will block securities issued by sanctioned countries and other sanctioned issuers. Information about sanctions is divided into several categories including:

- Persons and entities subject to sanctions, *Specially Designated Nationals and Blocked Persons* (SDN list)
- Persons and entities engaged in drug trafficking, *Specially Designated Narcotics Traffickers* (SDNTKs)
- Terrorists and terrorist organizations, *Specially Designated Terrorists* (SDTs)
- Countries, governments, and other entities subject to sanctions

The term "OFAC list" in this section includes all sanctions published by OFAC even though the information may appear in multiple lists.

## 9.6.1 Prohibited Transactions

Alpine is prohibited from conducting transactions in any account on behalf of a sanctioned party or in certain blocked securities. Securities and funds may not be released and securities transactions may not be executed. Securities and funds may be deposited to a blocked account, but no securities or funds will be released until the account is no longer subject to sanctions. Funds or securities may not be transferred to sanctioned parties.

Because transactions are prohibited, all open orders for a blocked account will be cancelled.

## 9.6.2 Blocking Requirements

Blocking requirements are generally triggered under the following circumstances:

- An account is opened for someone included on an OFAC list.
- The owner of an existing account is added to an OFAC list.
- A security is identified in a customer account where the issuer is the subject of sanctions.
- A request is made by a customer to pay or transfer funds or securities to a blocked person or entity.

ALPINE_LIT168970

While title to blocked property remains with the blocked person or entity, transactions affecting the property (including transfer of the assets) cannot be made without authorization from OFAC. Debits to blocked accounts are prohibited, but credits may be accepted. Cash balances in blocked accounts must earn interest at commercially reasonable rates. Blocked securities may not be paid, withdrawn, transferred (even in book transfer), endorsed, guaranteed, or otherwise dealt in.

It is not a violation to open an account for a blocked person. The violation occurs when the account is not frozen and assets are allowed to transfer out of the account. In addition, OFAC restrictions may vary depending on the blocked person or entity; details of blocking requirements are explained on the OFAC web site.

### 9.6.3 Monitoring Procedures

Monitoring is to be conducted as follows:

- o   Operations personnel and Supervisors approving new accounts are provided with a list of the countries included on the OFAC countries list, to watch for new accounts to be opened for or requests to transfer funds or securities to residents of those countries. The AML Officer or designee shall provide an updated list each month by email to all operations personnel and supervisors.
- o   Alpine's retail sales staff undertakes an OFAC search utilizing the www.treas.gov/ofac web site for each new account and attaches the OFAC search results to the new account form.
- o   Alpine's AML Officer or designee performs a daily review of the OFAC screenings report provided by CSS Hosted Solutions, LLC. The OFAC screening report identifies potential matches to the OFAC SDN List or Specially Designated Nationals Alias List for new or changed accounts. In addition, the AML Officer or designee performs a bi-weekly review of the following reports for trade and/or transmittal activities involving accounts that reside in a non-cooperative countries and/or blocked countries:
    - o   Account Activity in Non-Cooperative and Blocked Countries Report
    - o   Account in Non-Cooperative Countries Report
    - o   Foreign Account Activity Report:

To evidence review, a report is produced that is reviewed, initialed (or signed) and retained by the AML Officer or designee.

### 9.6.3.1 Other Requests To Monitor Accounts

Regulators or law enforcement agencies may ask the industry's cooperation in identifying accounts for individuals or entities under investigation or suspected of criminal activities.

The AML Officer or designee is responsible for responding to such requests; providing the necessary information; and retaining records of requests, reviews conducted pursuant to requests, and information provided to authorities.

### 9.6.4 Blocking Property And Disbursements

Any blocked account will not be permitted to engage in transactions other than the acceptance of deposits of funds or securities. Open orders of blocked accounts will be cancelled.

Disbursements of funds or securities may not be made to sanctioned parties. The AML Officer or designee will instruct Alpine's Operations Department to withhold requests for disbursements from blocked accounts and will maintain a log of all accounts that have been blocked.

### 9.6.4.1 Reporting Blocked Property And Legal Actions

When an account or disbursement is blocked or a blocked security is identified, OFAC will be notified within 10 days of blocking. If Alpine blocks an account or security, the AML Officer or designee will file the necessary report with OFAC. The AML Officer or designee will be responsible to retain copies of reports filed by Alpine in a file of blocked accounts or securities. Information to be reported includes:

ALPINE_LIT168971

- Owner or account party
- Property and property location
- Account number
- Actual or estimated value
- Date property was blocked
- Copy of the payment or transfer instructions
- Confirmation that funds have been deposited in a blocked account that is identified as blocked
- Name and phone number of Alpine's AML Officer

For rejected disbursements, the following information is to be filed:

- Name and address of the transferee financial institution
- Date and amount of the transfer
- Copy of the payment or transfer instructions
- Basis for rejection
- Name and phone number of Alpine's AML Officer

U.S. persons involved in litigation, arbitration, or other binding alternative dispute resolution proceedings regarding blocked property must provide notice to OFAC. Copies of all documents associated with the proceedings will be submitted by the AML Officer or designee to the OFAC Chief Counsel at the U.S. Treasury Department within 10 days of their filing. In addition, information about the scheduling of any hearing or status conference will be faxed to OFAC's Chief Counsel.

### 9.6.4.2 Annual Report Of Blocked Property

On an annual basis by September 30th, the AML Officer or designee shall file Form TDF 90-22.50 with OFAC for any blocked property held as of June 30.

### 9.6.5 Penalties for Non-Compliance with OFAC Rules and Regulations

Depending on the program, criminal penalties for willful violations can include fines ranging up to $20 million and imprisonment of up to 30 years, and up to $1,075,000 in civil penalties for each violation.

## 9.7 Customer Identification Program (CIP)

Rules/Resources:USA PATRIOT Act Section 326; Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart B; FINRA Notice to Members 03-34; FinCEN Frequently Asked Questions: http://www.fincen.gov/cip_faq.html; FinCEN No-Action position on CIP requirements under clearing arrangements: FIN-2008-G002; Guidance on Obtaining and Retaining Beneficial Ownership Information, FinCEN Guidance, FIN-2010-G001 March 5, 2010

In addition to the information Alpine must collect under FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade), FINRA Rule 2111 (Recommendations to Customers - Suitability), NASD 3110 (Books and Records) and Securities Exchange Act of 1934 (Exchange Act) Rules 17a-3(a)(9) (Beneficial Ownership regarding Cash and Margin Accounts) and 17a-3(a)(17) (Customer Accounts), Alpine has established, documented and maintained a written Customer Identification Program (CIP). Alpine will collect certain minimum customer identification information from each customer who opens an account; utilize risk-based measures to verify the identity of each customer who opens an account; record customer identification information and the verification methods and results; provide the required adequate CIP notice to customers that Alpine will seek identification information to verify their identities; and compare customer identification information with government-provided lists of suspected terrorists, once such lists have been issued by the government.

Requirements for employees opening accounts as explained in the chapter *ACCOUNTS* are duplicated in this section to consolidate all AML requirements within this chapter.

ALPINE_LIT168972

### 9.7.1 Required Customer Information

Prior to opening an account, Alpine will collect the following information for all accounts, if applicable, for any person, entity or organization that is opening a new account and whose name is on the account, absent some exceptions:

- **Name**
- **Date of birth,** for an individual
- **Address:**
  - for an individual, residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual
  - for a non-individual (corporation, trust, *etc.*) a principal place of business, local office, or other physical location.
- **Taxpayer identification number** for a U.S. person (U.S. citizen or non-individual established or organized under U.S. or state laws).
- **Identification number for non-U.S. person** which may include a taxpayer ID number; passport number and country of issuance; alien identification card number; or the number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photo or similar safeguard.

**In the case of a customer who has applied for a taxpayer identification number but has not yet received it,** notation must be made on the new account application that the taxpayer ID has been applied for. The account will be restricted to liquidating transactions if the taxpayer ID number is not received within 30 days of opening the account.

Alpine may rely on another financial institutional to obtain this information, prior to opening an account. Please refer to the section titled "Reliance on Another Financial Institution for Identity Verification". The use of the term "customer" in this section is also intended to include prospective customers.

### 9.7.1.1 Customer Identity Verification

This section is duplicated from Chapter 11.

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager, President or their designees ("Designated Supervisor(s)") |
| **Resources** | • New account application and other customer ID information |
| **Frequency** | • When accounts are opened |
| **Action** | • Before the Designated Supervisor approves an account, determine that customer identification (ID) verification information is included with the new account application and that it meets Alpine's requirements<br>• For non-documentary verification, check the information included with the new account application for completeness and consistency with other customer-provided information (name, address, phone number, taxpayer ID number, *etc.*)<br>• For unacceptable verification information (incomplete, inconsistent), return the application to the RR for further information or disapprove the account |
| **Record** | • Each Customer file shall contain the New Account Application and records that include customer ID verification as well as the Designated Supervisor's signature signifying approval |

ALPINE_LIT168973

When opening new accounts, the customer's identity must be verified, as required by federal law. Customer identification (ID) information must be completed on the new account application.

### 9.7.1.2 Exclusions from the CIP Rule

Customer ID verification does NOT apply to accounts for:

- persons with an existing account at Alpine (unless the account requires approval by the AML Officer or designee)
- banks
- governmental entities
- issuers of listed equity securities
- other financial institutions subject to regulation by the SEC, CFTC, Federal Reserve Board, OCC, FDIC, Office of Thrift Supervision, or the National Credit Union Administration
- persons opening accounts to participate in an ERISA plan
- Intermediaries not identified as the accountholder (such as underlying beneficial owners or sub-account holders. See the section titled "Omnibus and Sub-Accounts" for more information.

### 9.7.1.3 Customers Who Refuse to Provide Information

If a potential or existing customer either refuses to provide the information described above when requested or appears to have intentionally provided misleading information, Alpine will not open a new account and, after considering the risks involved, may consider closing any existing account. In either case, our AML Officer or designee should be notified so that we can determine whether we should report the situation to FinCEN on a SAR-SF.

### 9.7.1.4 Accounts Requiring Approval By The AML Officer or Designee

The following accounts require review and approval by the AML Officer or designee at the time of opening. The AML Officer or designee may require additional customer identification information for these accounts.

- **Numbered accounts** (accounts designating a number rather than a name as the account name).
- **Any account requesting confidential handling** of its name, mailing of confirmation and statements, *etc.*
- **Accounts domiciled in high risk countries.** Accounts domiciled in countries identified by OFAC or the Financial Action Task Force on Money Laundering (FATF) as having inadequate anti-money laundering standards or representing high risk for crime and corruption.
- **Foreign public officials.** Includes individuals in high offices of foreign governments, political party officials and their families and close associates (if known and/or readily identifiable).
- **Correspondent and Private Banking accounts.** See the section *Due Diligence For Correspondent And Private Banking Accounts*.

If the accounts noted above are introduced by a correspondent firm, Alpine may rely on another financial institution to perform the customer identification program requirements. Please refer to the section titled "Reliance on Another Financial Institution for Identity Verification".

### 9.7.1.5 Omnibus And Sub-Accounts

Rules/Resources: SEC Q and A Regarding the Broker-Dealer Customer Identification Program Rule, October 1, 2003

Omnibus and sub-accounts are sometimes established by or on behalf of financial intermediaries for the purpose of executing transactions that will clear or settle at another financial institution or for delivering assets to the custody account of the beneficial owner at another financial institution. Limited information about the

ALPINE_LIT168974

beneficial owner is used primarily to assist the financial intermediary with recordkeeping or to establish sub-accounts to hold positions to be transferred to another financial institution. Transactions are initiated by the financial intermediary and the beneficial owner has no direct control over the omnibus or sub-accounts.

Under these circumstances, Alpine is not required to look through the intermediary to the underlying beneficial owners, if the intermediary is identified as the accountholder. In the event the intermediary identified as the account holder's identity cannot be adequately verified using documentary and non-documentary methods, identity information on the persons or entities controlling the account will be required.

### 9.7.1.6 Third Party Accounts

Please refer to Chapter 11 of Alpine's written supervisory procedures for information on the documentation requirements for third party accounts in the section titled "Third Party Accounts".

### 9.7.1.7 Accounts For Non-Individuals

Account documents usually obtained for non-individual accounts (trust instruments, corporate authorization, partnership agreements, government-issued business license, *etc.*) will usually satisfy customer ID requirements. In the case of corporations, a corporate authorization is required. These documents must be obtained within 30 days of account opening to satisfy the requirement.

## 9.7.2 Verifying Information

Based on the risk, and to the extent reasonable and practicable, Alpine will ensure that we have a reasonable belief that we know the true identity of our customers by using risk-based procedures to verify and document the accuracy of the information Alpine receives about our customers. The OSJ Branch Manager or designee will analyze the information we obtain to determine whether the information is sufficient to form a reasonable belief that we know the true identity of the customer (*e.g.*, whether the information is logical or contains inconsistencies). With respect to customers introduced by correspondent firm, Alpine will reasonably rely on the performance of the financial institution with respect to customer verification. Please refer to the section titled "Reliance on Another Financial Institution for Identity Verification" for more information.

Alpine will verify customer identity through documentary means, non-documentary means or both as enumerated below. Alpine will use documents to verify customer identity when appropriate documents are available. In light of the increased instances of identity fraud, we will supplement the use of documentary evidence by using the non-documentary means described below whenever necessary. Alpine may also use non-documentary means, if Alpine is still uncertain about whether we know the true identity of the customer. In verifying the information, Alpine will consider whether the identifying information that we receive, such as the customer's name, street address, zip code, telephone number (if provided), date of birth and Social Security number, allow us to determine that we have a reasonable belief that we know the true identity of the customer (*e.g.*, whether the information is logical or contains inconsistencies).

Appropriate documents for verifying the identity of customers include the following:

- For an individual, an unexpired government-issued identification evidencing nationality or residence and bearing a photograph or similar safeguard, such as a driver's license or passport; and
- For a person other than an individual, documents showing the existence of the entity, such as certified articles of incorporation, a government-issued business license, a partnership agreement or a trust instrument.

Alpine understands that we are not required to take steps to determine whether the document that the customer has provided to us for identity verification has been validly issued and that we may rely on a government-issued identification as verification of a customer's identity. If, however, we note that the document shows some obvious form of fraud, we must consider that factor in determining whether we can form a reasonable belief that we know the customer's true identity.

ALPINE_LIT168975

Alpine will verify the information within a reasonable time before or after the account is opened. Depending on the nature of the account and requested transactions, Alpine may refuse to complete a transaction before we have verified the information, or in some instances when we need more time, Alpine may, pending verification, restrict the types of transactions or dollar amount of transactions. If Alpine find suspicious information that indicates possible money laundering, terrorist financing activity, or other suspicious activity, Alpine will, after internal consultation with the firm's AML Officer or designee, file a SAR-SF in accordance with applicable laws and regulations.

### 9.7.2.1 Non-Documentary Methods Of Verifying Customer Identification

Alpine will use non-documentary methods of verification when:

- (1) the customer is unable to present an unexpired government-issued identification document with a photograph or other similar safeguard;
- (2) the firm is unfamiliar with the documents the customer presents for identification verification;
- (3) the customer and firm do not have face-to-face contact; and
- (4) there are other circumstances that increase the risk that the firm will be unable to verify the true identity of the customer through documentary means.
- (5) Other circumstances, at the discretion of the RR's supervisor, New Accounts, and/or the AML Officer or designee, where Alpine is unable to verify the customer's identity.

In these circumstances, a non-documentary method must be indicated by the RR on the new account application:

- Direct customer contact information
- Information from a consumer reporting agency or other database
- References from another financial institution
- A financial statement from a bank
- Copy of a utility bill

### 9.7.2.2 Additional Verification For Certain Customers

Alpine recognizes that the risk that we may not know the customer's true identity may be heightened for certain types of accounts, such as an account opened in the name of a corporation, partnership or trust that is created or conducts substantial business in a jurisdiction that has been designated by the U.S. as a primary money laundering jurisdiction, a terrorist concern, or has been designated as a high-risk or non-cooperative country or territory. Alpine will identify customers that pose a heightened risk of not being properly identified. Alpine will also take the following additional measures that may be used to obtain information about the identity of the individuals associated with the customer when standard documentary methods prove to be insufficient.

For the following types of customers, a minimum of TWO forms of customer ID are required in addition to review and approval by the AML Officer or designee **prior to** opening the account:

- Numbered accounts
- Accounts domiciled in high-risk countries included on the Treasury Dept. OFAC list (check with Operations personnel for a list of those countries or go to http://www.ustreas.gov/offices/eotffc/ofac/sanctions/index.html)
- Accounts for foreign public officials (individuals in high office in other countries, their families and close associates, political party officials)

### 9.7.2.3 Lack Of Customer ID Verification

When Alpine cannot form a reasonable belief that we know the true identity of a customer, Alpine will:

1. not open an account;

ALPINE_LIT168976

2. impose terms under which a customer may conduct transactions while we attempt to verify the customer's identity;
3. close an account after attempts to verify customer's identity fail; and
4. determine whether it is necessary to file a SAR-SF in accordance with applicable laws and regulations.

Questions regarding accounts that do not comply with requirements to verify customer ID should be referred to the AML Officer or designee.

### 9.7.3 Recordkeeping

Alpine will document our verification, including all identifying information provided by a customer, the methods used and results of verification, and the resolution of any discrepancies identified in the verification process. Alpine will keep records containing a description of any document that we relied on to verify a customer's identity, noting the type of document, any identification number contained in the document, the place of issuance, and if any, the date of issuance and expiration date. With respect to non-documentary verification, Alpine will retain documents that describe the methods and the results of any measures we took to verify the identity of a customer. Alpine will also keep records containing a description of the resolution of each substantive discrepancy discovered when verifying the identifying information obtained. Alpine will retain records of all identification information for five years after the account has been closed and will retain records made about verification of the customer's identity for five years after the record is made.

### 9.7.4 Comparison with Government-Provided Lists of Terrorists

At such time as Alpine receives notice that a federal government agency has issued a list of known or suspected terrorists and identified the list as a list for CIP purposes, Alpine will, within a reasonable period of time after an account is opened (or earlier, if required by another federal law or regulation or federal directive issued in connection with an applicable list), determine whether a customer appears on any such list of known or suspected terrorists or terrorist organizations issued by any federal government agency and designated as such by Treasury in consultation with the federal functional regulators. Alpine will follow all federal directives issued in connection with such lists.

Alpine will continue to comply separately with OFAC rules prohibiting transactions with certain foreign countries or their nationals.

### 9.7.5 Notice to Customers

Rules/Resources: 31 C.F.R. □103.122(b)(5)

Alpine will provide notice to customers that Alpine is requesting information from them to verify their identities, as required by federal law. Customers are provided notice, prior to opening an account, that their identification will be verified. This notice may be on Alpine's web site, on new account applications, or in other disclosures provided at the time of account opening and may include, but not be limited to, the following:

**Important Information about Procedures for Opening This Account**

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Client is required to provide the following information, among other items, on new account forms; name, address, date of birth and other information that will allow Alpine to confirm Client's identity. In addition, your broker may ask to see a valid driver's license or other identifying documents.

### 9.7.6 Reliance on Another Financial Institution for Identity Verification

Rules/Resources: 31 C.F.R. § 103.122(b)(6), No-Action Letters to the Securities Industry and Financial Markets Association (SIFMA) (formerly known as the Securities Industry Association (SIA)) (February 12, 2004; February 10, 2005; July 11, 2006; and January 10, 2008). (The letters provide staff guidance regarding the extent to

ALPINE_LIT168977

which a broker-dealer may rely on an investment adviser to conduct the required elements of the CIP rule, prior to such adviser being subject to an AML rule.)

In its clearing functions, Alpine will, under the following circumstances, rely on the performance by another financial institution (including an affiliate) of some or all of the elements of our CIP with respect to any customer that is opening an account or has established an account or similar business relationship with the other financial institution to provide or engage in services, dealings or other financial transactions:

- when such reliance is reasonable under the circumstances;
- when the other financial institution is subject to a rule implementing the anti-money laundering compliance program requirements of 31 U.S.C. § 5318(h), and is regulated by a federal functional regulator; and
- when Alpine has entered into a contract with the other financial institution to perform these functions and requiring it to certify annually to us that it has implemented its anti-money laundering program and that it will perform (or its agent will perform) specified requirements of the customer identification program.

### 9.7.6.1 Reliance on Registered Investor Adviser Accounts

Rules/Resources:SEC Division of Market Regulation No-Action Letter to SIFMA dated January 11, 2011: http://www.sec.gov/divisions/marketreg/mr-noaction/2011/sifma011111.pdf

For accounts established by registered investment advisers, Alpine may rely on the adviser to have obtained information to comply with federal Customer Identification Program (CIP) rules under the following circumstances:

- o it is reasonable to rely on the adviser's assurances;
- o the adviser is federally regulated (state-only registered IAs do not qualify); and
- o the adviser signs an agreement that it will annually certify to Alpine that it has implemented an anti-money laundering program and will perform (or its agents will perform) specified requirements of Alpine's CIP.

## 9.8 Due Diligence For Correspondent And Private Banking Accounts

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F; USA PATRIOT Act Section 312 and 313; FinCEN Fact Sheet (http://www.fincen.gov/312factsheet.pdf)

### 9.8.1 Definitions

**Correspondent account:** Includes any account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign institution, or to handle other financial transactions related to such foreign financial institution. This type of account presumes a formal relationship through which the financial institution provides regular services.

For broker-dealers, correspondent accounts established on behalf of foreign financial institutions include, but are not limited to: (1) accounts to purchase, sell, lend, or otherwise hold securities, including securities repurchase programs; (2) prime brokerage accounts that clear and settle securities transactions for clients; (3) accounts for trading foreign currency; (4) custody accounts for holding securities or other assets in connection with securities transactions as collateral; and (5) over-the-counter derivative contracts.

**Account:** Any formal relationship established with a broker or dealer in securities to provide regular services to effect transactions in securities, including but not limited to, the purchase or sale of securities and securities loaned and borrowed activity, and to hold securities or other assets for safekeeping or as collateral.

ALPINE_LIT168978

**Foreign bank:** defined under the Bank Secrecy Act as a bank organized under foreign law, or an agency, branch, or bank office located outside the United States. The term does not include an agent, agency, branch or office within the U.S. of a bank organized under foreign law.

**Foreign financial institution:** defined as:

(1) a foreign bank;

(2) any branch or office located outside the United States of a broker-dealer; futures commission merchant or introducing broker; or open-end mutual fund company;

(3) any other person organized under foreign law (other than a branch or office of such person in the United States) that, if it were located in the United States, would be a broker-dealer; futures commission merchant or introducing broker; or open-end mutual fund company; and

(4) any person organized under foreign law (other than a branch or office of such person in the United States) that is engaged in the business of, and is readily identifiable as: (a) a currency dealer or exchanger; or (b) a money transmitter.

A person, however, is not "engaged in the business" of a currency dealer, a currency exchanger or a money transmitter if such transactions are merely incidental to the person's business.

**Foreign shell bank:** a foreign bank without a physical presence in any country.

**Regulated affiliate:** a foreign shell bank that (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the foreign country regulating such affiliated depository institution, credit union, or foreign bank.

| Responsibility | • AML Officer or designee |
|---|---|
| Resources | • New account application<br>• Foreign bank certification<br>• Information about a foreign bank subsequent to opening that indicates it is a foreign shell bank where an account may not be maintained |
| Frequency | • As required when accounts are opened<br>• Monthly - review of accounts identified for due diligence reviews |
| Action | • Conduct due diligence for correspondent and private banking accounts<br>• For foreign bank accounts:<br>  o Review certification to determine:<br>    ▪ All required information is included<br>    ▪ Inconsistencies (*i.e.*, location of the foreign bank's regulated affiliate is consistent with the designated banking authority that supervises the foreign bank and its regulated affiliate)<br>  o Ensure procedures are in place to restrict transactions in accounts that do not provide certification within 30 days of opening the account<br>  o Close existing prohibited accounts for foreign shell banks<br>  o Review re-certifications<br>  o Ensure procedures are in place to re-certify foreign banks within three years of original certification |
| Record | • Record of the AML Officer's or designee's review is maintained in new account |

ALPINE_LIT168979

| | records on the applicable form:<br>    ○  New account application<br>    ○  Certification form<br>    ○  Re-certification form<br><br>• Records of closing or restricting accounts are retained with new account records |
| --- | --- |

### 9.8.2 Due Diligence and Enhanced Due Diligence Requirements For Correspondent Accounts of Foreign Financial Institutions

Rules/Resources: 31 C.F.R. §§ 103.175, 103.176, FIN-2006-G009 Application of the Regulations Requiring Special Due Diligence Programs for Certain Foreign Accounts to the Securities and Futures Industries (May 10, 2006).

Alpine will conduct an inquiry to determine whether a foreign financial institution has a correspondent account established, maintained, administered or managed by the firm.

If Alpine has correspondent accounts for foreign financial institutions, Alpine will assess the money laundering risk posed, based on a consideration of relevant risk factors. Alpine can apply all or a subset of these risk factors depending on the nature of the foreign financial institutions and the relative money laundering risk posed by such institutions.

The U.S. Department of Treasury has established the following minimum due diligence requirements:

• determine whether the account is subject to enhanced due diligence
• assess the money laundering risk posed, based on risk factors
• apply risk-based policies, procedures and controls to each account, including periodic review of activity

The relevant risk factors can include:

• The nature of the foreign financial institution's business and the markets it serves; the type, purpose and anticipated activity of such correspondent account;
• the nature and duration of the firm's relationship with the foreign financial institution and its affiliates;
• the anti-money laundering and supervisory regime of the jurisdiction that issued the foreign financial institution's charter or license and, to the extent reasonably available, the jurisdiction in which any company that is an owner of the foreign financial institution is incorporated or chartered; and
• any information known or reasonably available to the covered financial institution about the foreign financial institution's anti-money laundering record.

Alpine will apply our risk-based due diligence procedures and controls to each financial foreign institution correspondent account on an ongoing basis. This includes periodically reviewing the activity of each foreign financial institution correspondent sufficient to ensure whether the nature and volume of account activity is generally consistent with the information regarding the purpose and expected account activity and to ensure that the firm can adequately identify suspicious transactions. Ordinarily, Alpine will not conduct this periodic review by scrutinizing every transaction taking place within the account. One procedure Alpine may use instead is to use any account profiles for our correspondent accounts (if we maintain these) that we ordinarily use to anticipate how the account might be used and the expected volume of activity to help establish baselines for detecting unusual activity.

Correspondent accounts for foreign financial institutions are forwarded to the AML Officer or designee, at the time of opening, for review.

ALPINE_LIT168980

- Review the account's home country vs. OFAC lists of jurisdictions of money laundering concern and blocked persons.
  - If identified on an OFAC list, report the account and close it.
- Review new account information about the account including source of revenue and assets, whether the person/entity has existing accounts with Alpine, length of time the RR has known the account, who referred the account, and other available information about account background and how the account came to Alpine.
- If there is inadequate information or due diligence procedures cannot be performed, refuse to open the account or close an existing account.

  - File a SAR, if appropriate.

- If the account is approved for opening, determine whether ongoing review is necessary.

  - If ongoing review is appropriate, establish duplicate statements or another method for review of account activity by the AML Officer.
  - Review will include identifying patterns of securities transactions and securities/money transfers that may be indicative of money laundering activity, and report such activity if necessary and close the account.

### 9.8.2.1 Correspondent Accounts Introduced by a Correspondent Firm (or Introducing Firm)

In those cases where Alpine has a formal relationship with any final institution with which it has executed a clearing or carrying agreement, Alpine understands its obligation to perform due diligence pursuant to the correspondent rule with respect to its carrying agreement with a foreign financial institution. However, Alpine will not have a formal relationship and thus will not have an account subject to the due diligence provisions of the correspondent account rule, with a foreign financial institution introduced to us under a clearing agreement unless Alpine engages in activities that obligate us to make a suitability determination with respect to securities transactions conducted through the introduced foreign financial institution accounts.

In these cases, Alpine will consider the money laundering risks posed by the introducing firm, including any information Alpine acquires about the account base of the introducing firm's ordinary course of business and through the application of the introducing firm's anti-money laundering policies, procedures and controls.

### 9.8.2.2 Enhanced Due Diligence For Foreign Banks

Rules/Resources: 31 C.F.R. §§ 103.175, 103.176.

Alpine will assess (and perform enhanced due diligence) any correspondent accounts for foreign financial institutions to determine whether they are correspondent accounts that have been established, maintained, administered or managed for any foreign bank that operates under:

(1) an offshore banking license;

(2) a banking license issued by a foreign country that has been designated as high-risk or non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member and with which designation the U.S. representative to the group or organization concurs; or

(3) a banking license issued by a foreign country that has been designated by the Secretary of the Treasury as warranting special measures due to money laundering concerns.

If Alpine determines that it has any correspondent accounts for these specified foreign banks, Alpine will perform enhanced due diligence on these correspondent accounts. The enhanced due diligence that we will perform for each correspondent account will include, at a minimum, procedures to take reasonable steps to:

ALPINE_LIT168981

(1) conduct enhanced scrutiny of the correspondent account to guard against money laundering and to identify and report any suspicious transactions. Such scrutiny will not only reflect the risk assessment that is described in Section 8.a. above, but will also include procedures to, as appropriate:

(i) obtain (e.g., using a questionnaire) and consider information related to the foreign bank's AML program to assess the extent to which the foreign bank's correspondent account may expose us to any risk of money laundering;

(ii) monitor transactions to, from or through the correspondent account in a manner reasonably designed to detect money laundering and suspicious activity (this monitoring may be conducted manually or electronically and may be done on an individual account basis or by product activity); and

(iii) obtain information from the foreign bank about the identity of any person with authority to direct transactions through any correspondent account that is a payable-through account (a correspondent account maintained for a foreign bank through which the foreign bank permits its customer to engage, either directly or through a subaccount, in banking activities) and the sources and beneficial owners of funds or other assets in the payable-through account.

(2) determine whether the foreign bank maintains correspondent accounts for other foreign banks that enable those other foreign banks to gain access to the correspondent account under review and, if so, to take reasonable steps to obtain information to assess and mitigate the money laundering risks associated with such accounts, including, as appropriate, the identity of those other foreign banks; and

(3) if the foreign bank's shares are not publicly traded, determine the identity of each owner and the nature and extent of each owner's ownership interest. We understand that for purposes of determining a private foreign bank's ownership, an "owner" is any person who directly or indirectly owns, controls or has the power to vote 10 percent or more of any class of securities of a foreign bank. Alpine also understands that members of the same family shall be considered to be one person.

Refer the account to the AML Officer or designee to:

- conduct appropriate enhanced scrutiny;
- determine whether the foreign bank itself offers correspondent accounts to other foreign banks (*i.e.,* nested accounts) and, as appropriate, identify such foreign bank customers and conduct additional due diligence on them; and
- identify the owners of such foreign bank, if its shares are not publicly traded.
- determine whether the account appears on any OFAC list;
- approve or reject the account.
- determine whether ongoing review is necessary.
    - If yes, establish duplicate statements or other method for ongoing review.

- report the account, if appropriate.

## 9.8.2.3 Special Procedures When Due Diligence or Enhanced Due Diligence Cannot Be Performed

Rules/Resources: 31 C.F.R. §§ 103.175, 103.176.

In the event there are circumstances in which Alpine cannot perform appropriate due diligence with respect to a correspondent account, the AML Officer or designee will determine, at a minimum, whether to refuse to open the account, suspend transaction activity, file a SAR-SF, close the correspondent account and/or take other appropriate action.

## 9.8.2.4 Prohibition Against Correspondent Accounts For Foreign Shell Banks

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F; USA PATRIOT Act Section 313

ALPINE_LIT168982

Alpine is prohibited from establishing, maintaining, administering, or managing a correspondent account in the United States for an unregulated foreign shell bank. The prohibition does not apply to a foreign shell bank that is a regulated affiliate. If an account is inadvertently opened for an unregulated foreign shell bank, the AML Officer or designee must be notified and the account will be immediately closed.

### 9.8.3 Foreign Bank Certification

Rules/Resources: FinCEN Frequently Asked Questions re Certification: http://www.fincen.gov/faqsguidance.pdf, Rules: 31 C.F.R. §§ 103.175, 103.177, 31 C.F.R., Pt. 103, Subpt. I, App. A (Certification Regarding Correspondent Accounts for Foreign Banks); FIN-2006-G003: Frequently Asked Questions: Foreign Bank Recertifications under 31 C.F.R. § 103.77 (February 3, 2006).

When opening an account for a foreign bank, Alpine is obligated to ensure the bank is not an unregulated foreign shell bank and must obtain information about the foreign bank's owners and an agent for service of process. Alpine will require our foreign bank account holders to identify the owners of the foreign bank if it is not publicly traded, the name and street address of a person who resides in the United States and is authorized and has agreed to act as agent for acceptance of legal process, and an assurance that the foreign bank is not a shell bank nor is it facilitating activity of a shell bank. In lieu of this information the foreign bank may submit the Certification Regarding Correspondent Accounts For Foreign Banks provided in the BSA regulations to the AML Officer or designee. Alpine will re-certify when we believe that the information is no longer accurate or at least once every three years.

### 9.8.4 Recordkeeping for Correspondent Accounts for Foreign Banks

Rules/Resources: 31 C.F.R. §§ 103.175, 103.177.

Alpine will keep records identifying the owners of foreign banks with U.S. correspondent accounts and the name and address of the U.S. agent for service of legal process for those banks.

### 9.8.5 Summons or Subpoena of Foreign Bank Records; Termination of Correspondent Relationships with Foreign Bank

Rules/Resources: USA PATRIOT Act Section 313

Upon receipt of a written request from a federal law enforcement officer for information identifying the non-publicly traded owners of any foreign bank for which we maintain a correspondent account for a foreign bank in the United States and/or the name and address of a person residing in the United States who is an agent to accept service of legal process for a foreign bank's correspondent account, the AML Officer or designee will provide that information to the requesting officer not later than 7 days after receipt of the request.

The AML Officer or designee will close, within 10 days, any correspondent account for a foreign bank that we learn from FinCEN or the Department of Justice has failed to comply with a summons or subpoena issued by the Secretary of the Treasury or the Attorney General of the United States or has failed to contest such a summons or subpoena. We will scrutinize any foreign bank's correspondent account activity during that 10-day period to ensure that any suspicious activity is appropriately reported and to ensure that no new positions are established in these foreign bank's correspondent accounts.

## 9.9 Due Diligence For Private Banking Accounts

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F

### 9.9.1 Definitions

**Private banking account:** A private banking account is an account that is established or maintained for the benefit of one or more non-U.S. persons, requires minimum aggregate deposit of funds or other assets of not

ALPINE_LIT168983

less than $1,000,000, and is assigned to a bank employee who is a liaison between the financial institution and the non-U.S. person. If the account otherwise satisfies the definition but the institution does **not** require a minimum balance of $1,000,000, the account does not qualify as a private banking account.

**Senior foreign political figure** includes:

- a current or former senior official in the executive, legislative, administrative, military, or judicial branches of a foreign government, whether or not they are or were elected officials
- a senior official of a major foreign political party
- a senior executive of a foreign government-owned commercial enterprise (Senior executives are individuals with substantial authority over policy, operations, or the use of government-owned resources.)
- immediate family members of the above, and those who are widely and publicly known (or actually known) close associates of a senior foreign political figure
- a corporation, business, or other entity formed by or for the benefit of one of the above individuals
- a person "widely and publicly known" as a close associate of such a person

**Proceeds of foreign corruption:** any asset acquired by, through, or on behalf of a senior foreign political figure through misappropriation, theft, or embezzlement of public funds, the unlawful conversion of property of a foreign government, or through acts of bribery or extortion, and include any other property into which any such assets have been transformed or converted.

Alpine will review our accounts to determine whether we offer any private banking accounts and we will conduct due diligence on such accounts. This due diligence will include, at least, (1) ascertaining the identity of all nominal holders and holders of any beneficial ownership interest in the account (including information on those holders' lines of business and sources of wealth); (2) ascertaining the source of funds deposited into the account; (3) ascertaining whether any such holder may be a senior foreign political figure; and (4) detecting and reporting, in accordance with applicable laws and regulations, any known or suspected money laundering, or use of the proceeds of foreign corruption.

Alpine will review public information, including information available in Internet databases, to determine whether any private banking account holders are senior foreign political figures. If we discover information indicating that a particular private banking account holder may be a senior foreign political figure, and upon taking additional reasonable steps to confirm this information, we determine that the individual is, in fact, a senior foreign political figure, we will conduct additional enhanced due diligence to detect and report transactions that may involve money laundering or the proceeds of foreign corruption.

In so doing, Alpine will consider the risks that the funds in the account may be the proceeds of foreign corruption by determining the purpose and use of the private banking account, location of the account holder(s), source of funds in the account, type of transactions conducted through the account and jurisdictions involved in such transactions. The degree of scrutiny we will apply will depend on various risk factors, including, but not limited to, whether the jurisdiction the senior foreign political figure is from is one in which current or former political figures have been implicated in corruption and the length of time that a former political figure was in office. Our enhanced due diligence might include, depending on the risk factors, probing the account holder's employment history, scrutinizing the account holder's source(s) of funds, and monitoring transactions to the extent necessary to detect and report proceeds of foreign corruption, and reviewing monies coming from government, government controlled or government enterprise accounts (beyond salary amounts).

If Alpine does not find information indicating that a private banking account holder is a senior foreign political figure, and the account holder states that he or she is not a senior foreign political figure, then Alpine may make an assessment if a higher risk for money laundering, nevertheless, exists independent of the classification. If a higher risk is apparent, we will consider additional due diligence measures.

In either case, if due diligence (or the required enhanced due diligence, if the account holder is a senior foreign political figure) cannot be performed adequately, Alpine will, after consultation with the firm's AML Officer or designee and, as appropriate, not open the account, suspend the transaction activity, file a SAR-SF or close the account.

ALPINE_LIT168984

### 9.9.2 Enhanced Scrutiny For Accounts Of Senior Foreign Political Figures

Accounts for senior foreign political figures (including persons and entities defined in this section) are subject to enhanced scrutiny. Prior to opening, the account is referred to the AML Officer or designee for review and approval and may consider the following steps:

- Review the account's home country vs. OFAC lists of jurisdictions of money laundering concern and blocked persons.
  - o   If identified on an OFAC list, report the account and close it.
- Review new account information about the account including employment history, sources of income and assets, whether the person/entity has existing accounts with Alpine, length of time the RR has known the account, who referred the account, and other available information about account background of the account and how the account came to Alpine.
- If there is inadequate information or due diligence procedures cannot be performed, refuse to open the account or close an existing account.

  - o   File a SAR, if appropriate.

- If the account is approved for opening, determine whether ongoing review is necessary.

  - o   If ongoing review is appropriate, establish duplicate statements or another method for review of account activity by the AML Officer or designee.
  - o   Review will include identifying patterns of securities transactions and securities/money transfers that may be indicative of money laundering activity, and report such activity if necessary and close the account.

### 9.9.3 Private Banking Accounts Introduced by a Correspondent Firm (or Introducing Firm)

In those cases where Alpine does not impose aggregate minimum account requirements of not less than $1,000,000 on an introduced account for a non-U.S. person and does not assign an officer, employee, or agent to act as a liaison between the clearing firm and such an account, the introduced account will not be considered a private banking account of the clearing firm.

In these cases, Alpine will consider the money laundering risks posed by the introducing firm, including any information Alpine firm acquires about the account base of the introducing firm's ordinary course of business and through the application of the introducing firm's anti-money laundering policies , procedures and controls.

## 9.10 Compliance with FinCEN's Issuance of Special Measures Against Foreign Jurisdictions, Financial Institutions or International Transactions of Primary Money Laundering Concern

Rules/Resources: USA PATRIOT Act Section 311; Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart F; FINRA Notice to Members 06-41; FinCEN information on all special measures issued: http://www.fincen.gov/reg_section311.html

| Responsibility | • AML Officer or designee |
|---|---|
| Resources | • FinCEN notification of special measures against named entities<br>• Transaction records<br>• Customer account records |

ALPINE_LIT168985

| Frequency | • As required when notified by FinCEN |
|---|---|
| Action | • Establish blocks on opening accounts for named entities<br>• Notify correspondent accountholders<br>• Review transactions to identify indirect use of correspondent accounts and close such accounts |
| Record | • Notices from FinCEN<br>• Notification to correspondent accountholders<br>• Transactions reviewed, identification of indirect use, and action taken |

If FinCEN issues a final rule imposing a special measure against one or more foreign jurisdictions or financial institutions, classes of international transactions or types of accounts deeming them to be of primary money laundering concern, Alpine understands that we must read FinCEN's final rule and follow any prescriptions or prohibitions contained in that rule. For example, if the final rule deems a certain bank and its subsidiaries (Specified Bank) to be of primary money laundering concerns, a special measure may be a prohibition from opening or maintaining a correspondent account in the United States for, or on behalf of, the Specified Banks. In that case, Alpine will take the following steps:

(1) The AML Officer or designee will review our account records, including correspondent account records, to ensure that our accountholders and correspondent accountholders maintain no accounts directly for, or on behalf of, the Specified Banks; and

(2) Alpine will apply due diligence procedures to our correspondent accounts that are reasonably designed to guard against indirect use of those accounts by the Specified Banks.

• Notification to Correspondent Accountholders

Alpine will notify our correspondent accountholders that the account may not be used to provide the Specified Banks with access to us. Ultimately, Alpine has flexibility in determining the language used in the sample notification language. For example, Alpine may use the following sample language, but is not limited in using the specific language detailed below:

"*Notice*: Pursuant to U.S. regulations issued under section 311 of the USA

PATRIOT Act, 31 CFR 103.192, we are prohibited from opening or maintaining a

correspondent account for, or on behalf of, [the Specified Banks]. The regulations also require us to notify you that your correspondent account with our financial institution may not be used to provide [the Specified Banks] with access to our financial institution. If we become aware that [the Specified Banks] are indirectly using the correspondent account you hold at our financial institution, we will be required to take appropriate steps to prevent such access, including terminating your account."

Alpine will transmit a one-time notice to our correspondent accounts by mail, fax or email, or including the information in the next regularly occurring transmittal to correspondent accountholders and document our compliance with the notification requirement.

• Identification of Indirect Use

Alpine will take reasonable steps in order to identify any indirect use of our correspondent accounts by the Specified Banks. We will determine if such indirect use is occurring from transactional records that we maintain in the normal course of business. We will take a risk-based approach when deciding what, if any, additional due diligence measures we should adopt to guard against the indirect use of correspondent accounts by the

ALPINE_LIT168986

Specified Banks, based on risk factors such as the type of services offered by, and geographic locations of, their correspondents.

Alpine understands its ongoing obligation to take reasonable steps to identify all correspondent account services our correspondent accountholders may directly or indirectly provide to the Specified Banks.

## 9.11 Detecting Potential Money Laundering

| | |
|---|---|
| **Responsibility** | • AML Officer or designee<br>• Other designated supervisor(s) for review of AML Officer accounts<br>• All other employees |
| **Resources** | • Internal reports of transactions, available exception reports<br>• Performance of tasks and other duties, typically handled as part of routine work |
| **Frequency** | • As required |
| **Action** | All:<br><br>• Review reports of transactions (cash and security transactions) to identify potential money laundering (including employee accounts) , including the AML Officer's accounts<br>• Review daily reports and identify potentially suspicious activity<br>• Report suspicious activity (see the policy in this chapter)<br><br>AML Officer or designee:<br><br>• Notify RRs, supervisors, and close accounts, in consultation with business unit leaders, when necessary |
| **Record** | • Reports reviewed<br>• Action taken, when necessary<br>• Suspicious activity reports and supporting documentation |

Alpine has an ongoing program to identify potential money laundering. Monitoring will be conducted using available exception reports or reviews of other reports of account activity to permit identification of patterns of unusual size, volume, pattern or type of transactions, geographic factors such as whether jurisdictions designated as high risk or "non cooperative" are involved, or involve "red flags" (indicators of potential money laundering) which are included in the *Money Laundering* policy in the chapter *GENERAL EMPLOYEE POLICIES*. Items reviewed include trading and wire transfer transactions in the context of other account activity to determine if a transaction lacks financial sense or is suspicious because it is an unusual transaction or strategy for that customer. Among the information used to determine whether to file a suspicious activity report are exception or transaction reports that include transaction size, location, type, number, and nature of the activity.

### 9.11.1 Alpine's Employee Reporting Obligations

Alpine has included an educational policy *(Money Laundering)* in the chapter *GENERAL EMPLOYEE POLICIES* to educate employees on money laundering and guidelines for detecting money laundering activities. Periodic detection of money laundering and the obligation to report suspicious activities will be included in continuing education and other educational programs for employees.

ALPINE_LIT168987

All employees are obligated to promptly report to the AML Officer or designee any known or suspected violations of anti-money laundering policies as well as other suspected violations or crimes. If the potential violation implicates the AML Officer, it should be reported to a senior officer of Alpine. All reports are confidential and the employee will suffer no retaliation for making them.

**What to report:** Crimes or suspected crimes by individuals (whether associated with Alpine, a customer, or prospective customer) are required to be reported. This includes suspicion that Alpine is being used as a conduit for criminal activity such as money laundering or structuring transactions (discussed below) to evade the BSA reporting requirements. There is no clear definition of what constitutes a "crime." If you believe some improper or illegal activity is occurring, it is your obligation to be attentive and alert to the red flags and report to the AML Officer or designee any new or existing customers who may be engaged in potential violations of anti-money laundering regulations.

**SAR reports:** By law, Alpine and its employees cannot disclose to the customer or anyone other than authorized parties that it has filed a SAR or provide information that would reveal the existence of a SAR. Questions regarding SAR filings should be referred to Compliance. If you become aware of an unauthorized disclosure of an SAR or you receive a subpoena for an SAR, **immediately contact the Compliance Department**. Designated Compliance personnel will be responsible for contacting FINCEN to report the unauthorized disclosure.

## 9.11.2 Role Of Operations Personnel

Operations personnel are an important first line of defense in preventing transactions with sanctioned parties. The following guidance is provided to assist Operations personnel in identifying blocked parties. Any questioned accounts or transactions should be referred to the AML Officer or designee.

- On a monthly basis, the AML Officer or designee shall provide a current list of countries included on the OFAC list. These are countries considered potential havens for money laundering, drug trafficking, or terrorist activities. Information is included on the OFAC web site at www.treas.gov/ofac.
- On a periodic basis, the AML Officer or designee shall provide a current list of countries included on the Financial Action Task Force (FATF) list. The Financial Action Task Force (FATF) is the global standard setting body for anti-money laundering and combating the financing of terrorism. In order to protect the international financial system from money laundering and financing of terrorism risks and to encourage greater compliance with their standards, the FATF identified jurisdictions that have strategic deficiencies and works with them to address those deficiencies that pose a risk to the international financial system.
- When processing the opening of accounts, Operations employees shall determine if new accounts have addresses as residents of countries included on the OFAC list and report any that appear on the list to the AML Officer or designee.
- Questions regarding requests to transfer funds or securities to residents or entities domiciled in any country included on the OFAC list shall be reported to the AML Officer or designee.

## 9.11.3 Role of Retail Brokerage Personnel

Retail sales personnel are also an important first line of defense in identifying, detecting and/or preventing transactions. Retail sales personnel are in a unique position of knowing the client best. It is important that you understand the customer's financial resources, business activities, and sources of funds to identify when purported or actual activity deviates from the standard transactions one expects to see in a customer account. The process of knowing the customer does not end at the time the account established. The process of knowing the customer continues through the ongoing maintenance of the client's account. Any questioned accounts or transactions should be referred to the AML Officer or designee.

## 9.11.4 Monitoring Accounts for Suspicious Activity

Rules/Resources: USA PATRIOT Act Sec. 356; FinCEN Guidance on Suspicious Activity Report Supporting Documentation: http://www.fincen.gov/Supporting_Documentation_Guidance.pdf; FinCEN Guidance FIN-2008-G005

ALPINE_LIT168988

| Responsibility | • AML Officer or designee |
|---|---|
| Resources | • Reports from employees of crimes or suspected crimes<br>• Suspicious activities detected through ongoing reviews<br>• Other available information |
| Frequency | • As required |
| Action | • Review and investigate suspicious transactions referred by employees<br>• Determine whether Alpine will file a SAR<br>• If appropriate, file Form SAR-SF with FinCEN and state authorities<br>• Notify senior management, as appropriate, of forms filed |
| Record | • Notes and other documented reviews are retained in a suspicious activity file<br>• Copies of SARs filed by Alpine are retained in the SAR file with notation of when and to whom sent |

Alpine will file Suspicious Activity Reports (SARs) for transactions that may be indicative of money laundering activity. Suspicious activities include a wide range of questionable activities. Examples may include, but are not limited to, trading that constitutes a substantial portion of all trading for the day in a particular security; trading or journaling between/among accounts, particularly between related owners; late day trading; heavy trading in low-priced securities; activities indicative of market manipulation or insider trader; unexplained wire transfers, including those to known tax havens; unusually large deposits of funds or securities; shares of physical securities of low-priced securities that have an issue date of less than 12 months and are more than one million shares or have a market value over a certain amount.

Determining whether an activity or series of activities is suspicious is a facts and circumstance analysis and will be made by the AML Officer or designee.

Alpine will monitor account activity for unusual size, volume, pattern or type of transactions, taking into account risk factors and red flags that are appropriate to our business. (Red flags are identified below.) Alpine will conduct the following reviews of activity that our monitoring system detects:

| Report Name | Report Description |
|---|---|
| OFAC Report | This report is used to identify potential matches between the OFAC SDN List and the customer/prospective customer. |
| Accounts in Non-Cooperative countries | This report compares the account holder's address against the FATF list of non-cooperative countries to screen for matches. |
| Foreign Account Activity | This report lists all Cash Movements or ACH activities in accounts not domiciled or organized in the US or USA. |
| Account Activity in Non-Cooperative and Blocked Countries | This report displays any trade activity for accounts with addresses in non-cooperative or blocked countries for the previous business day. |
| Foreign Correspondents | This report lists all foreign correspondent banks to comply with PATRIOT Act sections 312, 313, and 319(b). |
| Currency Activity $5K or greater | This report lists all cash movements or ACH activities between $5,000 and $1,000,000. |
| Transmittal Activity | This report/query lists all transmittal activity. |

ALPINE_LIT168989

| **Trade Blotters** | This report lists all trading activity. |
|---|---|

The AML Officer or designee will document our monitoring and reviews as follows:

- Denote the review date, reviewer name (or initial or signature) and action taken on the electronic or paper report; or
- Other format as authorized by the AML Officer or designee.

The AML Officer or designee will conduct an appropriate investigation and review relevant information from internal or third-party sources before a SAR-SF is filed which is further discussed in the section titled "Responding to Red Flags and Suspicious Activity".

The AML Officer or designee will be responsible for this monitoring, will review any activity that our monitoring system detects, will determine whether any additional steps are required, will document when and how this monitoring is carried out, and will report suspicious activities to the appropriate authorities.

## 9.11.5 Emergency Notification to Law Enforcement by Telephone

Rules/Resources: FINRA Notice to Members 02-21

In situations involving violations that require immediate attention, such as terrorist financing or ongoing money laundering schemes, the AML Officer or designee will immediately call an appropriate law enforcement authority. If a customer or company appears on OFAC's SDN list, the AML Officer or designee will call the OFAC Hotline at (800) 540-6322. Other contact numbers Alpine will use are: FinCEN's Financial Institutions Hotline (866- 556-3974) (especially to report transactions relating to terrorist activity), local U.S. Attorney's office (801-524-5682), local FBI office (*801-579-1400*) and local SEC office (801-524-5796*)* (to voluntarily report such violations to the SEC in addition to contacting the appropriate law enforcement authority). If Alpine notifies the appropriate law enforcement authority of any such activity, Alpine must still file a timely SAR-SF.

Although Alpine is not required to, in cases where we have filed a SAR-SF that may require immediate attention by the SEC, we may contact the SEC via the SEC SAR Alert Message Line at (202) 551-SARS (7277) to alert the SEC about the filing. Alpine understands that calling the SEC SAR Alert Message Line does not alleviate our obligations to file a SAR-SF or notify an appropriate law enforcement authority.

## 9.11.6 Potential Red Flags

Rules/Resources: NASD Notice to Members 02-21

The following are examples of risk indicators (red flags) that may suggest potential money laundering. This is not an all-inclusive list.

| **Red Flags indicating potential Money Laundering** |
|---|
| **Customers – Insufficient or Suspicious Information** |
| The customer exhibits unusual concern regarding Alpine's compliance with government reporting requirements and Alpine's AML policies, particularly with respect to his or her identity, type of business and assets, or is reluctant or refuses to reveal any information concerning business activities, or furnishes unusual or suspect identification or business documents that cannot readily be verified. |
| The customer wishes to engage in transactions that lack business sense or apparent investment strategy, or are inconsistent with the customer's stated business |

ALPINE_LIT168990

| |
|---|
| strategy. |
| The information provided by the customer that identifies a legitimate source for funds is false, misleading, or substantially incorrect. |
| The customer refuses to identify or fails to indicate any legitimate source for his or her funds and other assets, when requested. |
| The customer (or a person publicly associated with the customer) has a questionable background or is the subject of news reports indicating possible criminal, civil, or regulatory violations. |
| The customer exhibits a lack of concern regarding risks, commissions, or other transaction costs. |
| The customer appears to be acting as an agent for an undisclosed principal, but declines or is reluctant, without legitimate commercial reasons, to provide information or is otherwise evasive regarding that person or entity. |
| The customer has difficulty describing the nature of his or her business or lacks general knowledge of his or her industry. |
| Customer appears reluctant to provide complete information about nature and purpose of business, officers and directors or business location. |
| Customer has no discernable reason for utilizing the firm's services. |
| **Efforts to Avoid Reporting and Recordkeeping** |
| Customer attempts to persuade an employee not to file required reports or not to maintain required records. |
| Customer is reluctant to provide information needed to file reports or fails to proceed with a transaction when information is requested. |
| Customer engages in transactions involving cash or cash equivalents or other monetary instruments that appear to be structured to avoid the $10,000 government reporting requirements, especially if the cash or monetary instruments are in an amount just below reporting or recording thresholds. |
| **Certain Funds Transfer Activities** |
| The customer engages in activity involving the practice of depositing penny stocks, liquidating them, and wiring proceeds. A request to liquidate shares may also represent engaging in an unregistered distribution of penny stocks which may also be a red flag. [FINRA Regulatory Notice 09-05] |
| The customer attempts to make frequent or large deposits of currency, insists on dealing only in cash equivalents, or asks for exemptions from Alpine's policies relating to the deposit of cash and cash equivalents. |
| The customer engages in transactions involving cash or cash equivalents or other monetary instruments that appear to be structured to avoid the $10,000 government reporting requirements, especially if the cash or monetary instruments are in an amount just below reporting or recording thresholds. |
| For no apparent reason, the customer has multiple |

ALPINE_LIT168991

accounts under a single name or multiple names, with a large number of inter-account or third-party transfers.

The customer is from, or has accounts in, a country identified as a non-cooperative country or territory by the Financial Action Task Force (FATF).

The customer's account has unexplained or sudden extensive wire activity, especially in accounts that had little or no previous activity.

The customer's account shows numerous currency or cashier's check transactions aggregating to significant sums.

The customer's account has a large number of wire transfers to unrelated third parties inconsistent with the customer's legitimate business purpose.

The customer's account has wire transfers that have no apparent business purpose to or from a country identified as a money laundering risk or a bank secrecy haven

The customer makes a funds deposit followed by an immediate request that the money be wired out or transferred to a third party, or to another firm, without any apparent business purpose.

The customer makes a funds deposit for the purpose of purchasing a long-term investment followed shortly thereafter by a request to liquidate the position and transfer of the proceeds out of the account.

The customer engages in excessive journal entries between unrelated accounts without any apparent business purpose.

The customer requests that a transaction be processed in such a manner to avoid Alpine's normal documentation requirements.

**Certain Deposits or Dispositions of Physical Certificates**

Physical certificate is titled differently than the account.

Physical certificate does not bear restrictive legend, but based on history of the stock and/or volume of shares trading, it should have such a legend.

Customer's explanation of how he or she acquired the certificate does not make sense or changes.

Customer deposits the certificate with a request to journal the shares to multiple accounts, or to sell or otherwise transfer ownership of the shares.

**Certain Securities Transactions**

The customer, for no apparent reason or in conjunction with other "red flags," engages in transactions involving certain types of securities, such as penny stocks, Regulation "S" (Reg S) stocks, and bearer bonds, which although legitimate, have been used in connection with fraudulent schemes and money laundering activity. (Such transactions may warrant further due diligence to ensure the legitimacy of the customer's activity.)

The customer's account shows an unexplained high level of account activity with very low levels of securities transactions.

The customer maintains multiple accounts, or

ALPINE_LIT168992

maintains accounts in the names of family members or corporate entities, for no apparent business purpose or other purpose.

The customer's account has inflows of funds or other assets well beyond the known income or resources of the customer.

Customer journals securities between unrelated accounts for no apparent business reason.

Customer engages in prearranged or other non-competitive trading, including wash or cross trades of illiquid securities.

The entering of a sell (or buy) order by a client knowing that a corresponding buy (or sell) order of substantially the same size, at substantially the same time and at substantially the same price has been or will be entered by another client.

Trades by single clients or clients trading in coordination that consists of large percentages of the securities volume.

Parties that use algorithms to trade in a particular security by placing and then cancelling layers of orders in that security, creating fluctuations in the national best bid or offer of that security, increasing order book depth and using the non-bona fide orders to send false signals regarding the demand for such security, which the algorithms misinterpreted as reflecting sincere demand. Layering orders are intended to deceive certain algorithms into buying (or Selling) stocks from (or to) the layering traders bona fide trade at prices that are artificially raised (or lowered) by the layering trader.

Customer's trading patterns suggest that he or she may have inside information.

**Transactions Involving Penny Stock Companies**

Company has no business, no revenues and no product

Company has experienced frequent or continuous changes in business structure.

Officers or insiders of the issuer are associated with multiple penny stock issuers.

Company undergoes frequent material changes in business strategy or its line of business.

Officers or insiders of the issuer have a history of securities violations.

Company has not made disclosures in SEC or other regulatory filings.

Company has been the subject of a prior trade suspension.

**Other Suspicious Customer Activity**

Funds deposits for purchase of a long-term investment followed shortly by a request to liquid the position and transfer proceeds out of the account.

Law enforcement subpoenas.

Large number of securities transactions across a number of jurisdictions.

Buying and selling securities with no purpose or in unusual circumstances (*e.g.* churning at customer's request).

ALPINE_LIT168993

| |
|---|
| Payment by third-party check or money transfer without an apparent connection to the customer. |
| Payments to third-party without apparent connection to customer. |

In view of the risk factors listed in the section titled "Potential Red Flags" as well as perhaps other circumstances, Alpine frequently conducts additional inquiries to determine whether filing a SAR is warranted. Further, as part of its efforts to review the proposed resale of restricted or control securities, Alpine frequently gains additional information about its customer or proposed securities transactions. Additional investigation may either heighten Alpine's suspicions about activity or demonstrate that initial concerns are not confirmed and that the subject person's proposed activities appear legal, reasonable, and for a legitimate business purpose when all of the circumstances are considered as a whole. Where such further inquiry demonstrates that filing a SAR is warranted, it is Alpine's policy to do so. Similarly, in some circumstances stock may be tendered in circumstances that suggest or make one suspicious that the proposed resale may be part of a scheme to illegally distribute stock without registration (e.g. Section 5 violations). In those circumstances, Alpine would ordinarily file an SAR. Conversely, when such further investigations overcome the initial suspicions or risk factors and suggest that the proposed activities or transactions are legal, reasonable, and for a legitimate business purpose, Alpine will not file a SAR.

### 9.11.6.1 Potential Red Flags cont.d

In view of the risk factors listed in the section titled "Potential Red Flags" as well as perhaps other circumstances, Alpine frequently conducts additional inquiries to determine whether filing a SAR is warranted. Further, as part of its efforts to review the proposed resale of restricted or control securities, Alpine frequently gains additional information about its customer or proposed securities transactions. Additional investigation may either heighten Alpine's suspicions about activity or demonstrate that initial concerns are not confirmed and that the subject person's proposed activities appear legal, reasonable, and for a legitimate business purpose when all of the circumstances are considered as a whole. Where such further inquiry demonstrates that filing a SAR is warranted, it is Alpine's policy to do so. Similarly, in some circumstances stock may be tendered in circumstances that suggest or make one suspicious that the proposed resale may be part of a scheme to illegally distribute stock without registration (e.g. Section 5 violations). In those circumstances, Alpine would ordinarily file an SAR. Conversely, when such further investigations overcome the initial suspicions or risk factors and suggest that the proposed activities or transactions are legal, reasonable, and for a legitimate business purpose, Alpine will not file a SAR.

### 9.11.6.2 Circumstances In Which A SAR May Not Be Filed

The following circumstances, intended to be illustrative and not exhaustive, tend to suggest that initial suspicions may not warrant filing a SAR.

- A foreign customer provides evidence respecting the legitimacy of the source of the funds or securities deposited with Alpine as part of regular, common business activity, such as investing in restricted securities.
- Multiple transaction in securities result from contractual limitations for resales or a person's desire to limit negative market impacts.
- Several investors in a single issuer seek to liquidate their securities acquired to provide legitimate financing to such issuer.
- Offshore accounts are held in jurisdictions that are not identified by the Financial Action Task Force as maintaining an inadequate AML/CFT regime.
- Customers provide information requested even though the accounts are maintained in jurisdictions where local laws, regulations, or provisions (such as privacy laws) prevent or limit the collection of client identification information.

ALPINE_LIT168994

- Customers are not senior political or government officials ("politically exposed persons") of a foreign government.
- Customers that are closely held corporations, partnerships, limited liability companies or similar entities appear to have been formed for legitimate and lawful purposes.
- Entities that appear to be engaged in some sort of financial services or investment activities appear properly licensed in their home jurisdiction.
- Customers who are non-resident aliens have legitimate business activities and purposes.
- Entities are willing to disclose their beneficial owners and the persons who own the securities beneficially.
- Securities issued by foreign investment funds or other issuers are engaged in legitimate activities and do not appear to provide financing to sanctioned governments or parties.
- Foreign securities are issued in registered, as opposed to bearer, form.
- Transparent ownership, control, and activities.
- Full identification (i.e., passport or similar photo identification) of principals and beneficial owners.
- Transactions in recognized financial markets.
- Fully disclosed details about accounts or proposed activities, notwithstanding the availability of local privacy or information shield laws.

In some circumstances customers tender restricted stock for public resale without restriction that, upon investigation and review, does not appear eligible for resale. In the absence of special incriminating circumstances such as evidence of part of a larger scheme to illegally distribute stock without registration, the fact that Alpine determines that the stock is not currently eligible for resale without registration is not deemed to warrant filing an SAR. Requests for other Alpine action that it ultimately determines not to effect are considered similarly and treated similarly with respect to not filing a SAR.

## 9.11.6.3 Exclusions from SAR Filing

The AML Officer or designee is not required to file a SAR involving violations otherwise reported to law enforcement authorities such as:

- a robbery or burglary that is reported to law enforcement authorities
- lost, missing, counterfeit, or stolen securities reported pursuant to 17f-1
- a violation of federal securities laws or SRO rules by Alpine, its officers, directors, employees, or RRs that are reported to the SEC or SRO, except for violations of Rule17a-8 (filing of Currency and Transaction Reports) which must be reported on a SAR

## 9.11.6.4 Responding to Red Flags and Suspicious Activity

When an Alpine employee detects any red flag, or other activity that may be suspicious, the employee must notify the AML Officer or designee. Under the direction of the AML Officer or designee, Alpine will determine whether or not and how to further investigate the matter. This may include gathering additional information internally or from third-party sources, contacting the government, freezing the account and/or filing a SAR-SF.

## 9.11.6.5 Identifying Potential Suspicious Activity

Alpine uses a number of tools to identify potential suspicious activity including:

- Transaction information including disbursement of funds or securities are reviewed periodically by the OSJ Branch Manager and Trading personnel (as it relates to trading activity) and AML Officer or their designees.
- The AML Officer or designee provides education to Alpine's RR, to Supervisors approving new accounts, operations personnel and to the OSJ Branch Manager.
- Employee reports of potential suspicious activity are given to the AML Officer or designee.
- It is always at the AML Officer's (or designee's) discretion, when taking into consideration all factors, whether a SAR should be filed.

ALPINE_LIT168995

All employees have an ongoing obligation to report potentially suspicious activity to the AML Officer or designee.

## 9.11.6.6 Suspicious Transactions and BSA Reporting

### 9.11.6.6.1 Filing A SAR

Alpine will file SAR-SFs with FinCEN for any transactions (including deposits and transfers) conducted or attempted by, at or through our firm involving $5,000 or more of funds or other assets (either individually or in the aggregate) where Alpine knows, suspects, or has reason to suspect:

- The transaction involves funds derived from illegal activity or intended or conducted to hide or disguise funds or assets derived from illegal activity as part of a plan to violate or evade federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation.
- the transaction is designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act (BSA).
- The transaction has no business or apparent lawful purpose or is not one in which the customer would normally be expected to engage, and after examining the background, possible purpose of the transaction and other facts, Alpine knows of no reasonable explanation for the transaction, or
- The transaction involves the use of Alpine to facilitate criminal activity.

### 9.11.6.6.2 SAR Filing Deadlines

The AML Officer or designee will report suspicious transactions by completing a SAR-SF, and will collect and maintain supporting documentation as required by the BSA regulations. The AML Officer or designee will file a SAR-SF no later than 30 calendar days after the date of the initial detection of the facts that constitute a basis for filing a SAR-SF. If no suspect is identified on the date of initial detection, we may delay filing the SAR-SF for an additional 30 calendar days pending identification of a suspect, but in no case will the reporting be delayed more than 60 calendar days after the date of initial detection. The phrase "initial detection" does not mean the moment a transaction is highlighted for review. The 30-day (or 60-day) period begins when an appropriate review is conducted and a determination is made that the transaction under review is "suspicious" within the meaning of the SAR requirements. A review should be initiated promptly upon identification of unusual activity that warrants investigation.

## 9.11.6.7 Currency Transaction Reporting

Rules/Resources: SEC Securities Exchange Act of 1934 Rule 17a-8; Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart C; FinCEN pamphlet on CTR reporting: http://www.fincen.gov/whatsnew/html/20090224.html]

### 9.11.6.7.1 Definitions

"Currency" is defined as the coin and paper money of the U.S. or legal tender of other countries. Currency also includes U.S. silver certificates, U.S. notes, federal reserve notes, and official foreign bank notes customarily used and accepted as a medium of exchange in a foreign country.

The Bank Secrecy Act requires broker-dealers to report certain transactions relating to currency transactions, as follows:

- Report cash or currency deposits of more than $10,000, including multiple deposits on the same day that would total more than $10,000. A currency Transaction Report (CTR) is filed with the Financial Crimes Enforcement Network (FinCEN), a bureau of the Treasury Department. Some state regulators also require reporting of currency transactions.
- Report currency or bearer instruments over $10,000 transferred into or out of the U.S. The Currency and Monetary Instrument Transportation Report (CMIR) is filed with the U.S. Customs Service.

ALPINE_LIT168996

The following summarizes the reporting requirements under the Bank Secrecy Act. Alpine's CFO or designee is responsible for maintaining records of any currency reports required to be filed by Alpine and retaining them for five years.

### 9.11.6.7.2 Transactions Involving Currency Over $10,000

If Alpine accepts a currency deposit exceeding $10,000, it is required to electronically file a Currency Transaction Report (CTR, Form 104) with the Financial Crimes Enforcement Network (FinCEN). Multiple transactions by the same person equaling over $10,000 in any one day must also be reported. Alpine's COO or designee is responsible for filing these reports by the 15th calendar day after the day of the transaction and maintaining records of them for a period of five years from the filing date.

Operations personnel are responsible for receiving currency and will process these requests in accordance with their standard operating procedures. Currency deposits in the amount greater than $10,000 will be reported to the AML Officer or designee. Multiple transactions by the same person equaling over $10,000 in any one day must also be reported to the AML Officer or designee. The AML Officer or designee will notify Alpine's COO or designee to complete the required filings.

### 9.11.6.8 1.12.2 Transactions Involving Currency Or Bearer Instruments Over $10,000 Transferred Into Or Outside The U.S.

Broker-dealers are required to file a Currency and Monetary Instrument Transportation Report (CMIR, Form 105) with the U.S. Customs Service to report transactions in physical currency and/or bearer instruments which alone or in combination exceed $10,000 and which are shipped or transported into or outside the U.S. This filing is not required for currency or other monetary instruments mailed or shipped through the postal service or by common carrier. Alpine's COO or designee is responsible for filing these reports and maintaining these records for the required retention period. Refer to the section titled "Recordkeeping Requirements" for more information. The COO or designee will file a CMIR with the Commissioner of Customs if we discover that we have received or caused or attempted to receive from outside of the U.S. currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time (on one calendar day or, if for the purposes of evading reporting requirements, on one or more days). The COO or designee will also file a CMIR if we discover that we have physically transported, mailed or shipped or caused or attempted to physically transport, mail or ship by any means other than through the postal service or by common carrier currency or other monetary instruments of more than $10,000 at one time (on one calendar day or, if for the purpose of evading the reporting requirements, on one or more days). Alpine will use the CMIR Form provided on FinCEN's Web site.

### 9.11.6.9 Prohibition Against Structuring Deposits To Avoid Reporting

Cash or currency deposits or attempted deposits which appear to be part of a deposit structure to avoid IRS or Customs currency reporting requirements or Alpine's limitations, or are otherwise suspicious, may not be accepted and must be reported to the OSJ Branch Manager. Employees are prohibited from:

- aiding or advising a customer in structuring a transaction to avoid reporting requirements
- holding instruments for deposit on succeeding days
- transporting cash or cash equivalents or bearer instruments to a bank on behalf of a customer

### 9.11.6.10 State Reporting Requirements

States have adopted various currency and suspicious activity reporting requirements. Most states have entered into an agreement with FinCEN to provide them with duplicate copies of forms filed by broker-dealers. Some states, however, require duplicate filing with the states themselves at the time the broker-dealer files with a federal agency. Alpine's CFO or designee will file reports as required under state requirements.

ALPINE_LIT168997

## 9.11.6.11 Foreign Financial Account Reporting Requirements And Recordkeeping (FBAR)

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart C; Form: http://www.fincen.gov/forms/files/f9022-1_fbar.pdf; FinCEN Notice 2012-1

Certain "United States persons" that maintain accounts (including any account where the person has a financial interest in, or signature or other authority over) in foreign jurisdictions and with aggregate balances exceeding $10,000 are required to electronically file a Report of Foreign Bank and Financial Accounts (FBAR) Department of Treasury Form 90-22.1 with FinCEN on or before June 30th of each calendar year for accounts maintained during the previous calendar year. Certain U.S. persons with signature authority over, but no financial interest in, foreign financial accounts of their employers and entities related to their employers have an extension until June 30, 2013 to file Form 90-22.1 (see FinCEN Notice 2012-1). The FINOP or designee is responsible for filing the annual report if it is required for Alpine.

The filing requirement applies to:

- Non-resident aliens and foreign entities "in and doing business" in the U.S.
- All forms of U.S. business entities, trusts, estates with foreign accounts.
- U.S. citizens and residents with signature or other authority over a foreign account.
- Trust beneficiaries with a greater than 50% beneficial interest in a trust with a foreign account.
- U.S. citizens and resident stockholders with greater than 50% of the value or vote of the shares of a corporation with foreign accounts.
- Entities that are disregarded for tax purposes, such as limited liability companies.

The filing requirement does not apply to certain entities or situations. The regulation should be consulted for specific exemptions or conditions of exemptions.

- If the account is maintained in the United States, it is not considered a foreign account even if it holds foreign assets.
- An omnibus account held by a custody bank that holds assets both in the U.S. and outside the U.S. is not considered a foreign account unless the customer has direct access to its foreign holdings maintained at the foreign institution.
- Certain entities are excluded including: foreign hedge funds, venture capital funds, or private equity funds; tax-exempt investors that own offshore "blocker corporations;" government pension funds; pension plan participants and IRA owners (provided the trustee files a FBAR); investment advisers and employees of such advisers that provide advice to SEC-registered entities; remainder interests in trusts and beneficiaries of discretionary trusts; employees of a U.S. or foreign entity that issued a class of foreign equity (including ADRs) registered with the SEC.

There also are exemptions for officers or employees with signature or other authority over certain foreign financial accounts but no financial interest in the reportable account. The regulation should be consulted for details regarding who is not required to notify FinCEN regarding signature or other authority over such an account.

## 9.11.6.12 Monetary Instrument Purchases

Rules/Resources: 31 C.F.R. § 103.29. See also 31 C.F.R. 103.22(b), 52 Fed. Reg. 52250 (October 17, 1994) (Final Rule Amendments to BSA Regulations Relating to Identification Required to Purchase Bank Checks and Drafts, Cashier's Checks, Money Orders, and Traveler's Checks).

Alpine does not issue bank checks or drafts, cashier's checks, money orders or traveler's checks in the amount of $3,000 or more.

ALPINE_LIT168998

### 9.11.6.13 Fund Transmittals of $3,000 or More Under the Travel Rule

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart D; FINRA Notice to Members 97-13, 96-67 and 95-69; SEC Q&As: http://www.sec.gov/about/offices/ocie/aml2007/fincen-advissu7.pdf; SEC Q&As: http://www.sec.gov/about/offices/ocie/aml2007/fincen-advsiii.pdf

When Alpine is the transmittor's financial institution in funds of $3,000 or more for domestic and international funds transfers (including wire fund transfers), Alpine will retain either the original or a copy (*e.g.*, microfilm, electronic record) of the transmittal order. Alpine will also record on the transmittal order the following information: (1) the name and address of the transmitter; (2) if payment is ordered from an account, the account number; (3) the amount of the transmittal order; (4) the execution date of the transmittal order; and (5) the identity of the recipient's financial institution. In addition, Alpine will include on the transmittal order as many of the following items of information as are received with the transmittal order: (1) the name and address of the recipient; (2) the account number of the recipient; (3) any other specific identifier of the recipient; and (4) any form relating to the transmittal of funds that is completed or signed by the person placing the transmittal order.

Alpine is not required to retain this information if it involves transfers between accounts that are not for the same owner and transfers to third parties including banks and other financial institutions.

Alpine will also verify the identity of the person placing the transmittal order (if we are the transmitting firm), provided the transmittal order is placed in person and the transmitter is not an established customer of the firm (*i.e.*, a customer of the firm who has not previously maintained an account with us or for whom we have not obtained and maintained a file with the customer's name, address, taxpayer identification number, or, if none, alien identification number or passport number and country of issuance). If a transmitter or recipient is conducting business in person, Alpine will obtain:

1. the person's name and address;
2. the type of identification reviewed and the number of the identification document (*e.g.*, driver's license); and
3. the person's taxpayer identification number (*e.g.,* Social Security or employer identification number) or, if none, alien identification number or passport number and country of issuance, or a notation in the record the lack thereof.

If a transmitter or recipient is not conducting business in person, Alpine will obtain the person's name, address, and a copy or record of the method of payment (*e.g.*, check or credit card transaction). In the case of transmitters only, Alpine will also obtain the transmitters' taxpayer identification number (*e.g.*, Social Security or employer identification number) or, if none, alien identification number or passport number and country of issuance, or a notation in the record of the lack thereof. In the case of recipients only, Alpine will obtain the name and address of the person to which the transmittal was sent.

Records of transfers are available for inspection by regulators and other appropriate authorities, when requested.

### 9.11.6.14 Foreign Currency Transactions

Foreign financial institutions may purchase U.S.-denominated bonds, generally issued by foreign governments, with the local currency, which are then transferred to a U.S. broker-dealer and sold, with proceeds then transferred offshore. U.S. broker-dealers act as intermediaries in these transactions and may receive foreign bonds or other securities worth millions of U. S. dollars without knowing who or how many underlying customers may be involved. RRs and Alpine must be diligent about such transactions which may involve money laundering.

## 9.11.7 AML Recordkeeping Requirements

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart D

      a. **Responsibility for Required AML Records and SAR-SF Filing**

ALPINE_LIT168999

Alpine's AML Officer or designee is responsible for ensuring that SAR-SFs are filed as required and retaining all related documentation for a period of five years from the filing date. Each of the parties responsible for filing the CTRs, CMIRs, FBARs and relevant documentation on customer identity and verification and funds transmittals will be responsible for ensuring that such records are maintained properly at least five years from the filing date. Alpine will keep other documents according to existing BSA and other recordkeeping requirements, including certain SEC rules that require six-year retention periods (*e.g.*, Exchange Act Rule 17a-4(a) requiring firms to preserve for a period of not less than six years, all records required to be retained by Exchange Act Rule 17a-3(a)(1)-(3), (a)(5), and (a)(21)-(22) and Exchange Act Rule 17a-4(e)(5) requiring firms to retain for six years account record information required pursuant to Exchange Act Rule 17a-3(a)(17)).

### b. SAR-SF Maintenance and Confidentiality

Alpine will hold SAR-SFs and any supporting documentation confidential. Alpine will not inform anyone outside of FinCEN, the SEC, an SRO registered with the SEC or other appropriate law enforcement or regulatory agency about a SAR-SF. Alpine will refuse any subpoena requests for SAR-SFs or for information that would disclose that a SAR-SF has been prepared or filed and immediately notify FinCEN of any such subpoena requests that we receive. Alpine will segregate SAR-SF filings and copies of supporting documentation from other firm books and records to avoid disclosing SAR-SF filings. Our AML Officer or designee will handle all subpoenas or other requests for SAR-SFs. Alpine may share information with another financial institution about suspicious transactions in order to determine whether Alpine will jointly file a SAR according to the provisions set forth elsewhere in this Policy. In cases in which Alpine file a joint SAR for a transaction that has been handled both by us and another financial institution, both financial institutions will maintain a copy of the filed SAR.

### i. Providing SARs Information To SROs

Rules/Resources: SEC letter to CEOs: http://www.sec.gov/about/offices/ocie/brokerdealerletter.htm

While SARs are to be treated as confidential, Alpine will provide SARs and supporting documentation available to any self-regulatory organization (SRO) that examines Alpine for compliance with the SAR Rule, as requested by the SEC (see SEC letter to CEOs referenced above). The request may be part of a routine examination, an investigation, or part of the SRO's risk assessment effort within its examination program.

### ii. Prohibition Against Disclosure

By statute and regulation, Alpine may not inform customers or third parties that a transaction has been reported as suspicious. U.S. Treasury and Federal Reserve Board regulations also require Alpine to decline to produce SARs in response to subpoenas and to report to FinCEN and the Federal Reserve Board the receipt of such requests and Alpine's response. Failure to maintain the confidentiality of SARs may subject an employee to civil and criminal penalties under Federal law. Violations may be enforced through civil penalties of up to $100,000 for each violation and criminal penalties of up to $250,000 and/or imprisonment not to exceed five years. Alpine may also be liable for civil money penalties resulting from AML deficiencies that led to improper SAR disclosure up to $25,000 per day for each day the violation continues.

Procedures to protect the confidentiality of SARs may include, but not be limited to, the following:

- Access to SARs is limited to employees on a "need-to-know" basis
- SARs may be maintained in locked physical or contained to electronic files
- SARs may not be left on desks or on open computer files and may not be viewed by unauthorized persons
- SARs shared with others will be clearly marked "Confidential"

The CCO or designee (or Alpine's legal department) is responsible for responding to subpoena requests and the AML Officer or designee for will notify FinCEN and our primary federal regulator, where required by law.

### iii. Recipient of an Unauthorized SAR Disclosure

ALPINE_LIT169000

If you become aware of an unauthorized disclosure of a SAR or if you receive a subpoena request for a SAR, immediately contact the Compliance Department. Compliance will contact FINCEN's Office of Chief Counsel at (703) 905-3590. Alpine may also be required to contact our primary federal regulator.

**c. Additional Records**

Rules/Resources: Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart D 1023.410

Alpine shall retain either the original or a microfilm or other copy or reproduction of each of the following:

- A record of each extension of credit in an amount in excess of $10,000, except an extension of credit secured by an interest in real property. The record shall contain the name and address of the person to whom the extension of credit is made, the amount thereof, the nature or purpose thereof and the date thereof;
- A record of each advice, request or instruction received or given regarding any transaction resulting (or intended to result and later canceled if such a record is normally made) in the transfer of currency or other monetary instruments, funds, checks, investment securities or credit, of more than $10,000 to or from any person, account or place outside the U.S.;
- A record of each advice, request or instruction given to another financial institution (which includes broker-dealers) or other person located within or without the U.S., regarding a transaction intended to result in the transfer of funds, or of currency, other monetary instruments, checks, investment securities or credit, of more than $10,000 to a person, account or place outside the U.S.;
- Each document granting signature or trading authority over each customer's account;
- Each record described in Exchange Act Rule 17a-3(a): (1) blotters, (2) ledgers for assets and liabilities, income, and expense and capital accounts, (3) ledgers for cash and margin accounts, (4) (securities log), (5) (ledgers for securities in transfer, dividends and interest received, and securities borrowed and loaned), (6) (order tickets), (7) (purchase and sale tickets), (8) (confirms), and (9) (identity of owners of cash and margin accounts);
- A record of each remittance or transfer of funds, or of currency, checks, other monetary instruments, investment securities or credit, of more than $10,000 to a person, account or place, outside the U.S.; and
- A record of each receipt of currency, other monetary instruments, checks or investment securities and of each transfer of funds or credit, of more than $10,000 received on any one occasion directly and not through a domestic financial institution, from any person, account or place outside the U.S.

# 9.12 Clearing/Introducing Firm Relationships

Rules/Resources: 31 CFR 103.110; FINRA Rule 3310, NASD Rule 3230, FIN-2006-G003: Frequently Asked Questions: Foreign Bank Recertifications under 31 C.F.R. § 103.77 (February 3, 2006).

Alpine will exchange information, records, data and exception reports as necessary to comply with our contractual obligations and with AML laws.

In our clearing agreements, Alpine has addressed how Alpine and each correspondent firm will apportion customer and transaction functions and how we will share information. Alpine understands that the apportionment of functions will not relieve either of us from our independent obligation to comply with AML laws, except as specifically allowed under the BSA and its implementing regulations.

# 9.13 Training Programs

Rules/Resources: FINRA Rule 3310, See NTM 02-21, FinCEN SAR Narrative Guidance Package (11/2003), FinCEN Suggestions for Addressing Common Errors Noted in Suspicious Activity Reporting (10/10/2007)

Alpine will develop ongoing employee training under the leadership of the AML Officer or designee with input from senior management. This training may be developed in-house or Alpine may engage the services of an online training vendor or utilize other media such as educational pamphlets, videos, explanatory memos. This

ALPINE_LIT169001

training will occur on at least an annual basis and will be based on our firm's size, its customer base, and its resources and be updated as necessary to reflect any new developments in the law. The AML Officer or designee will maintain records to show the persons trained, the dates of training and the subject matter of their training. The AML Officer or designee reserves the right to require specialized training for certain groups within Alpine, such as Operations, Compliance, Retail sales, etc.

Our training will include, at a minimum: (1) how to identify red flags and signs of money laundering that arise during the course of the employees' duties; (2) what to do once the risk is identified (including how, when and to whom to escalate unusual customer activity or other red flags for analysis and, where appropriate, the filing of SAR-SFs); (3) what employees' roles are in the firm's compliance efforts and how to perform them; (4) the firm's record retention policy; and (5) the disciplinary consequences (including civil and criminal penalties) for non-compliance with the BSA

# 9.14 Independent Testing, Evaluation and Reporting

Rules/Resources: FINRA Rule 3310.01

| Responsibility | • AML Officer or designee |
|---|---|
| Resources | • Policies and procedures<br>• Independent testing results |
| Frequency | • Annual - schedule, conduct, and follow up testing (unless firm qualifies for testing every two years) |
| Action | • Identify person(s) to conduct testing<br>• Conduct testing<br>• Report results to CEO in annual compliance report<br>• Revise policies and procedures as necessary<br>• Conduct follow-up to determine corrective action has been taken |
| Record | • Independent testing results including who conducted and dates of review<br>• Report to CEO<br>• Record of changes to policies and procedures resulting from testing<br>• Record of follow-up actions |

The AML Officer or designee will be responsible for an annual (on a calendar-year basis) independent testing of Alpine's policies and procedures regarding money laundering and the effectiveness of the program, as described in this chapter. The tests performed will be either by an employee of Alpine, if such employee qualifies pursuant to the SRO rules for independence set forth below, or by a qualified non-employee, third party. At the discretion of Alpine's Board of Directors, the AML Officer or designee may be directed to conduct interim testing of Alpine's policies and procedures regarding money laundering and the effectiveness of the program, if they believe such interim tests are warranted.

SRO rules require that the person(s) conducting the independent testing of Alpine's AML program:

- is not the AML Officer
- is not performing any AML procedures that are being tested and reviewed
- is not an individual who is supervised by or otherwise reports to the AML Officer or to someone who performs any AML procedures
- is knowledgeable regarding the Bank Secrecy Act, money laundering activities and related regulations

ALPINE_LIT169002

After Alpine has completed the independent testing, the AML Officer or designee will report its findings to senior management. Alpine, under the leadership of the Executive Team will promptly address each of the resulting recommendations and keep a record of how each noted deficiency was resolved.

## 9.15 Monitoring Employee Conduct and Accounts Programs

Alpine will subject employee accounts to the same AML procedures as customer accounts, as noted elsewhere in Alpine's written supervisory procedures. Provisions for the review of the AML Officer or designee's personal accounts are also addressed elsewhere in Alpine's written supervisory procedures. Please refer to the section titled "Employee and Employee Related Accounts" for more information.

## 9.16 Confidential Reporting of AML Non-Compliance

Employees will promptly report any violations of the firm's AML compliance program to the AML Officer, unless the violations implicate the AML Officer, in which case the employee shall report to the firm's CCO or other senior leadership. Alpine believes that compliance with the AML policies and procedures set forth herein are of paramount importance and must be facilitated by the firm. All employee reports concerning AML violations will be kept confidential and no employee ramifications will result from its strict adherence.

## 9.17 Penalties for Non-Compliance with Alpine Policy or BSA, USA PATRIOT ACT Or Other AML Rules and Regulations

An employee may be deemed to be facilitating or participating in money laundering by engaging in a transaction with a customer (accept a deposit, arrange a withdrawal, effect a trade, *etc.*) when he or she is aware of, or willfully ignores, the fact that the customer is engaged in illegal activities.

Participation in a money laundering scheme or the knowing receipt of proceeds from criminal activities is a crime. Alpine and its employees are subject to severe criminal, civil, and regulatory penalties if they facilitate or participate in money laundering activities. Violations by employees may result in internal disciplinary action, up to and including, termination.

## 9.18 Additional Risk Areas

Rules/Resources: FinCEN advisory on shell companies: http://www.fincen.gov/AdvisoryOnShells_FINAL.pdf

Alpine has reviewed areas of its business to identify potential money laundering risks that may not be covered in the procedures described above. Other potential risk areas of risk include shell companies as enumerated below.

Shell companies can represent a potential money laundering risk. Most shell companies are formed for legitimate business reasons, but some have been used for illicit purposes.

"Shell company" refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence (other than a mailing address) and generate little or no independent economic value. Legitimate purposes including holding stock or intangible assets of another business entity (such as subsidiary company shares) but are not engaged in active business operations or facilitating domestic and cross-border currency and asset transfers and corporate mergers. Some shell companies have become common tools for money laundering and other financial crimes, primarily because they are easy and inexpensive to form and operate, and ownership and transactional information can be concealed from regulatory and law enforcement authorities. Most states do not collect or require disclosure of ownership information at the formation stage or after (i.e., shell companies can obscure company structure, ownership, and activities), thus, there is little transparency to enable Alpine to understand with whom they are dealing.

Agents that act as intermediaries or nominee incorporation services (NIS) can play a central role in creating, maintaining, and supporting shell companies. Some agents and NIS firms also provide individuals and

ALPINE_LIT169003

businesses with nominee services that preserve the anonymity of underlying officers, directors, and stockholders.

Some risk indicators of shell companies potentially engaged in money laundering are:

- An inability to obtain (through Internet searches, commercial database searches, or direct inquiries to the company's foreign correspondent bank) information necessary to identify originators or beneficiaries of wire transfers.
- A foreign correspondent bank exceeds the anticipated volume projected in its client profile for wire transfers in a given period or an individual company exhibits a high amount of sporadic activity that is inconsistent with normal business patterns.
- Payments have no stated purpose, do not reference goods or services, or identify only a contract or service number.
- Goods or services of the company do not match the company's profile based on information previously provided.
- Transacting businesses share the same address, provide only a registered agent's address, or raise other address-related inconsistencies.
- An unusually large number and variety of beneficiaries receive wire transfers from one company.
- Frequent involvement of beneficiaries located in high-risk, offshore financial centers.
- Multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose.

Additional procedures to address this area may include, but not be limited to, the following:

- Checking accounts and owners (if information is available) against OFAC restrictions (applies to all accounts)
- Obtaining information about underlying owners
- Obtaining assurances from the shell company representative that principals have been screened

## 9.19 Identity Theft Prevention Program (Regulation S-ID: Identity Theft Red Flags)

[SEC Securities Exchange Act of 1934 Regulation S-ID; Fair and Accurate Credit Transactions Act (FACT Act) Section 114 and 315; FINRA Regulatory Notice 08-69; FINRA Red Flags Rule web site: http://www.finra.org/Industry/Issues/CustomerInformationProtection/p118480; Interagency Guidelines on Identity Theft Detection, Prevention, and Mitigation: http://www.govcollect.org/files/Appendix%20A%20to%20Part%20681.pdf]

| Responsibility | • AML Officer or designee |
|---|---|
| Resources | • New account information<br>• Order records<br>• Transaction information about cash or security transfers<br>• Information reported by employees<br>• Information from third party providers, customers, victims of identity theft, law enforcement agencies or others about potential identity theft |
| Frequency | • When new accounts are opened<br>• Questionable account addresses changes<br>• Ongoing - review of order records and transaction information<br>• As received - employee information<br>• As required - when a third party is engaged, confirm third party providers have identity theft program procedures which may be included in an affirmation in the third party's contract with Alpine<br>• Annually - review of controls and procedures |

ALPINE_LIT169004

| | |
|---|---|
| | • Obtain senior management approval for any material changes to the program and any material changes to the policy<br>• As needed - update program and provide revisions to senior management for review and approval of material changes. Non-material changes to the Policy will not require senior management approval.<br>• If directed by the CEO, provide revised procedures to the Board or Board committee<br>• Annually - report to CEO<br>• Annually (or more frequently) - provide training for employees |
| **Action** | • Establish and maintain the Identity Theft Program<br>   o Provide initial Program and subsequent material changes to the Board, a Board Committee or CEO (if no Board exists) for review and approval<br>   o Review controls and procedures annually as part of the annual testing described in the chapter *SUPERVISORY SYSTEM, PROCEDURES AND CONTROLS*<br>• Conduct reviews of orders and transactions to identify red flags<br>• When red flags are identified, take corrective action which may include:<br>   o Consultation with the RR and/or supervisor<br>   o Monitoring the account<br>   o Contacting the customer<br>   o Changing passwords, security codes, or other security devices that permit access to an account<br>   o Reopening an account with another account number<br>   o Not opening a new account<br>   o Closing an existing account<br>   o Filing a Suspicious Activity Report<br>   o Notifying law enforcement<br>   o Taking no action if warranted<br>• Conduct other reviews which may include:<br>   o Periodic use of Internet search engines to identify web sites using Alpine's or an RR's name<br>   o Review online advertising to identify web sites for unauthorized links to promote stock fraud or that appear to be illegitimate<br>• If Alpine's or an RR's identity is being used in a scam, take action which may include notifying regulators and the FBI, lodging a complaint at www.ftc.gov, and if it involves email solicitation or spoofing, forwarding email to spam@uce.gov<br>• If a customer's account has been compromised, take action (described in a section that follows)<br>• Include Identity Theft Prevention Program in the annual report to CEO (see the chapter *SUPERVISORY SYSTEM, PROCEDURES AND CONTROLS*), reporting:<br>   o Effectiveness of the policies and procedures in addressing the risk of identity theft<br>   o Third party provider arrangements<br>   o Significant incidents involving identity theft and management's response<br>   o Recommendations for material changes to the Program<br>• Review third party providers for adequacy of identity theft programs<br>   o Contractually require them to have policies and procedures to detect Red Flags included in firm policies and report them to Alpine and/or take appropriate steps of their own to prevent/mitigate identity theft<br>• Training:<br>   o Include identity theft in AML training<br>   o Develop training, identify target employees, and administer training |
| **Record** | • Policies and procedures and revisions<br>• Reviews of orders and transactions with record of action taken<br>• Red flags identified and record of action taken<br>• Annual testing of procedures (see *SUPERVISORY SYSTEM, PROCEDURES AND CONTROLS*)<br>• Annual report to CEO (see *SUPERVISORY SYSTEM, PROCEDURES AND CONTROLS*) |

ALPINE_LIT169005

| | • Confirmation that third party providers have adequate ITPPs and include in the contracts with third parties<br>• Records of training including subjects included, date, who administered and who attended |
|---|---|

SEC Securities Exchange Act of 1934 Regulation S-ID: Identity Theft Red Flags ("Red Flags Rule"); FINRA Regulatory Notice 08-69; FINRA Red Flags Rule web site: http://www.finra.org/Industry/Issues/CustomerInformationProtection/p118480; Interagency Guidelines on Identity Theft Detection, Prevention, and Mitigation:
http://www.govcollect.org/files/Appendix%20A%20to%20Part%20681.pdf

## 9.19.1 Identity Theft Prevention Program Firm Policy

Rules/Resources: Regulation S-ID, *17 C.F.R. § 248.201(b)*

Our firm's policy is to protect our customers and their accounts from identity theft and to comply with the Regulation S-ID: Identity Theft Red Flags ("Red Flags Rule"). We will do this by developing and implementing this written Identify Theft Prevention Program (ITPP), which is appropriate to our size and complexity, as well as the nature and scope of our activities. This ITPP addresses 1) identifying relevant identity theft Red Flags for our firm, 2) detecting those Red Flags, 3) responding appropriately to any that are detected to prevent and mitigate identity theft, and 4) updating our ITPP periodically to reflect changes in risks.

Our identity theft policies, procedures and internal controls will be reviewed and updated periodically to ensure they account for changes both in regulations and in our business.

## 9.19.2 ITPP Approval and Administration

Rules/Resources: *17 C.F.R§ 248.201(e)* and Appendix A, Section VI.(a)

Alpine's AML Officer is the designated identity theft prevention officer and is responsible for the oversight, development, implementation and administration (including staff training and oversight of third party service providers of ITTP services) of this ITPP.

Alpine's Executive Committee will review and approve this ITPP whenever there are material modifications to the policy.

## 9.19.3 Relationship to Other Firm Programs

Rules/Resources: Appendix A, Section I

We have reviewed other policies, procedures and plans required by regulations regarding the protection of our customer information, including our policies and procedures under Regulation S-P, and our Customer Identification Program (CIP) and red flags detection under our Anti-Money Laundering (AML) Program in the formulation of this ITPP, and modified either them or this ITPP to minimize inconsistencies and duplicative efforts.

## 9.19.4 Identifying Relevant Red Flags

Rules/Resources: 16 C.F.R. § 681.1(d)(2)(i) and Appendix A, Section II

To identify relevant identity theft Red Flags, our firm assessed these risk factors: 1) the types of covered accounts it offers, 2) the methods it provides to open or access these accounts, and 3) previous experience with identity theft. Our firm also considered the sources of Red Flags, including identity theft incidents our firm has experienced, changing identity theft techniques our firm thinks likely to occur, and applicable supervisory guidance. In addition, we considered Red Flags from the following five categories (and the 26 numbered

ALPINE_LIT169006

examples under them) from Supplement A to Appendix A of the FTC's Red Flags Rule, as they fit our situation: 1) alerts, notifications or warnings from a credit reporting agency; 2) suspicious documents; 3) suspicious personal identifying information; 4) suspicious account activity; and 5) notices from other sources. We understand that some of these categories and examples may not be relevant to our firm and some may be relevant only when combined or considered with other indicators of identity theft. We also understand that the examples are not exhaustive or a mandatory checklist, but a way to help our firm think through relevant red flags in the context of our business. Based on this review of the risk factors, sources, and FTC examples of red flags, we have identified our firm's Red Flags, which are contained the first column ("Red Flag") of the attached "Red Flag Identification and Detection Grid" ("Grid").

## 9.19.5 Detecting Red Flags

Rules/Resources: 17 C.F.R. § 248.201(d)(2)(ii) and Appendix A, Section III

We have reviewed our covered accounts, how we open and maintain them, and how to detect Red Flags that may have occurred in them. Our detection of those Red Flags is based on our methods of getting information about applicants and verifying it under our CIP of our AML policies and procedures, authenticating customers who access the accounts, and monitoring transactions and change of address requests. For opening covered accounts, that can include getting identifying information about and verifying the identity of the person opening the account by using the firm's CIP. For existing covered accounts, it can include authenticating customers, monitoring transactions, and verifying the validity of changes of address. Based on this review, we have included in the second column ("Detecting the Red Flag") of the attached Grid how we will detect each of our firm's identified Red Flags.

## 9.19.6 Preventing and Mitigating Identity Theft

We have reviewed our covered accounts, how we open and allow access to them, and our previous experience with identity theft, as well as new methods of identity theft we have seen or foresee as likely to occur. Based on this and our review of the Red Flags Rule and its suggested responses to mitigate identity theft, as well as other sources, we have developed our procedures below to respond to detected identity theft Red Flags.

### 9.19.6.1 Procedures to Prevent and Mitigate Identity Theft

Rules/Resources: 17 C.F.R. ☐ 248.201(d)(iii) and Appendix A, Section IV

When we have been notified of a red flag or our detection procedures show evidence of a red flag, we will take the steps outlined below, as appropriate to the type and seriousness of the threat:

Applicants. For red flags raised by someone applying for an account:

1. Review the application. We will review the applicant's information collected for our CIP under our AML Program (e.g., name, date of birth, address, and an identification number such as a Social Security Number or Taxpayer Identification Number).
2. Get government identification. If the applicant is applying in person, we will also check a current government-issued identification card, such as a driver's license or passport.
3. Seek additional verification. If the potential risk of identity theft indicated by the red flag is probable or large in impact, we may also verify the person's identity through non-documentary CIP methods, including:
   a. Contacting the customer
   b. Independently verifying the customer's information by comparing it with information from a credit reporting agency, public database or other source such as a data broker or the Social Security Number Death Master File.
   c. Checking references with other affiliated financial institutions, or
   d. Obtaining a financial statement.
4. Deny the application. If we find that the applicant is using an identity other than his or her own, we will deny the account.

ALPINE_LIT169007

5. <u>Report</u>. If we find that the applicant is using an identity other than his or her own, we will report it to appropriate local and state law enforcement; where organized or wide spread crime is suspected, the FBI or Secret Service; and if mail is involved, the US Postal Inspector. We may also, as recommended by FINRA's Customer Information Protection web page's "Firm Checklist for Compromised Accounts," report it to FINRA, the SEC and State regulatory authorities.

6. <u>Notification</u>. If we determine personally identifiable information has been accessed, we will prepare any specific notice to customers or other required notice under state law.

<u>Access seekers</u>. For Red Flags raised by someone seeking to access an existing customer's account:

1. <u>Watch</u>. We will monitor, limit, or temporarily suspend activity in the account until the situation is resolved.

2. <u>Check with the customer.</u> We will contact the customer using our CIP information for them, describe what we have found and verify with them that there has been an attempt at identify theft or partner with the correspondent firm if it involves one of their direct customers.

3. <u>Heightened risk.</u> We will determine if there is a particular reason that makes it easier for an intruder to seek access, such as a customer's lost wallet, mail theft, a data security incident, or the customer's giving account information to an imposter pretending to represent the firm or to a fraudulent web site.

4. <u>Check similar accounts</u>. We will review similar accounts the firm has to see if there have been attempts to access them without authorization.

5. <u>Collect incident information.</u> For a serious threat of unauthorized account access we may, as recommended by FINRA's Customer Information Protection web page's "Firm Checklist for Compromised Accounts," collect if available:

   a. Correspondent firm information, if an introducing brokerage firm
   b. Firm contact name and telephone number
   c. Dates and times of activity
   d. Securities involved (name and symbol)
   e. Details of trades or unexecuted orders
   f. Details of any wire transfer activity
   g. Customer accounts affected by the activity, including name and account number, and
   h. Whether the customer will be reimbursed and by whom.

6. <u>Report</u>. If we find unauthorized account access, we will report it to appropriate local and state law enforcement; where organized or wide spread crime is suspected, the FBI or Secret Service; and if mail is involved, the US Postal Inspector. We may also, as recommended by FINRA's Customer Information Protection web page's "Firm Checklist for Compromised Accounts," report it to FINRA; the SEC; and State regulatory authorities.

7. <u>Notification</u>. If we determine personally identifiable information has been accessed that results in a foreseeable risk for identity theft, we will prepare any specific notice to customers and to others where required by law or regulation.

8. <u>Review our insurance policy</u>. Since insurance policies may require timely notice or prior consent for any settlement, we will review our insurance policy to ensure that our response to a data breach does not limit or eliminate our insurance coverage.

9. <u>Assist the customer.</u> We will work with our customers to minimize the impact of identity theft by taking the following actions, as applicable:

   a. Offering to change the password, security codes or other ways to access the threatened account;
   b. Offering to close the account;
   c. Offering to reopen the account with a new account number;
   d. Not collecting on the account or selling it to a debt collector; and
   e. Instructing the customer to go to the <u>FTC Identity Theft Web Site</u> to learn what steps to take to recover from identity theft, including filing a complaint using its <u>online complaint form</u>, calling the FTC's Identity Theft Hotline 1-877-ID-THEFT (438-4338), TTY 1-866-653-4261, or writing to Identity Theft Clearinghouse, FTC, 6000 Pennsylvania Avenue, NW, Washington, DC 20580.

ALPINE_LIT169008

### 9.19.7 Alpine Employees Reporting Obligations

Identity thieves use someone's personal identifying information to open new accounts and misuse existing accounts. Alpine has established an Identity Theft Prevention Program (ITPP) to help detect and prevent identity theft. Many elements of detecting or preventing identity theft utilize similar techniques to that of the anti-money laundering (AML) requirements included within these policies.

The ITPP is based on identifying "red flags" which may indicate an occurrence of identity theft. ***It is the responsibility of all employees to be attentive and alert to the red flags and report to the AML Officer or designee any new or existing customers who may be engaged in violations of anti-money laundering regulations, identity theft or who have reported an instance of identity theft.***

For a list of potential identity theft red flags, refer to the section titled "*Red Flag Identification and Detection Grid*" located in the ***Identity Theft Prevention Program (Red Flags Rule)*** section.

### 9.19.8 Service Providers

Rules/Resources: 16 C.F.R. § 681.1(e)(4) and Appendix A, Section VI.(c)

We may use other service providers in connection with our covered accounts. In the event we utilize other service providers, we have a process to confirm that any other service provider that performs activities in connection with our covered accounts, especially other service providers that are not otherwise regulated, comply with reasonable policies and procedures designed to detect, prevent and mitigate identity theft by contractually requiring them to have policies and procedures to detect Red Flags and report detected Red Flags to us or take appropriate steps of their own to prevent or mitigate the identify theft.

### 9.19.9 Internal Compliance Reporting

Rules/Resources: Appendix A, Section VI.(b)

Firm staff responsible for developing, implementing and administering our ITPP will report at least annually to our Executive Committee on compliance with the Red Flags Rule. The report will address the effectiveness of our ITPP in addressing the risk of identity theft in connection with covered account openings, existing accounts, service provider arrangements, significant incidents involving identity theft and management's response and recommendations for material changes to our ITPP.

### 9.19.10 Updates and Annual Review

Our firm will update this plan whenever we have a material change to our operations, structure, business or location or to those of our clearing firm, or when we experience either a material identity theft from a covered account, or a series of related material identity thefts from one or more covered accounts. Our firm will also follow new ways that identities can be compromised and evaluate the risk they pose for our firm. In addition, our firm will review this ITPP annually, to modify it for any changes in our operations, structure, business, or location or substantive changes to our relationship with our clearing firm.

*Rule: 17 C.F.R. § 248.201 (d)(2)(iv) and Appendix A, Sections V. and VI. (a) & (b).*

### 9.19.11 Red Flag Identification and Detection Grid

| Red Flag | Detecting the Red Flag |
|---|---|
| **Category: Suspicious Documents** | |
| 1. Identification presented looks altered or forged. | Our staff who deal with customers and their supervisors will scrutinize identification presented in person to make sure it is not altered or forged. Note: Alpine is not required to take |

ALPINE_LIT169009

| | |
|---|---|
| | steps to determine whether the document has been validly issued. We may rely on government issued identification as verification of a customer's identity. |
| 2. The identification presenter does not look like the identification's photograph or physical description. | Our staff who deal with customers and their supervisors will ensure that the photograph and the physical description on the identification match the person presenting it. |
| 3. Information on the identification differs from what the identification presenter is saying. | Our staff who deal with customers and their supervisors will ensure that the identification and the statements of the person presenting it are consistent. |
| 4. Information on the identification does not match other information our firm has on file for the presenter, like the original account application, signature card or a recent check. | Our staff who deal with customers and their supervisors will ensure that the identification presented is matched to known information we have on file for the account. |
| 5. The application looks like it has been altered, forged or torn up and reassembled. | Our staff who deal with customers and their supervisors will scrutinize each application to make sure it is not altered, forged, or torn up and reassembled. |
| | |
| **Category: Suspicious Personal Identifying Information** | |
| 6. Inconsistencies exist between the information presented and other things we know about the presenter or can find out by checking readily available external sources | If we receive a consumer credit report, they will check to see if the addresses on the application and the consumer report match. |
| 7. Inconsistencies exist in the information that the customer gives us | Our staff will check personal identifying information presented to us to make sure that it is internally consistent |
| 8. Personal identifying information presented has been used on an account our firm knows was fraudulent. | Our staff will compare the information presented with addresses and phone numbers on accounts or applications we found or were reported were fraudulent |
| 9. Personal identifying information presented suggests fraud, such as an address that is fictitious, a mail drop, or a prison; or a phone number is invalid, or is for a pager or answering service. | Our staff may validate the information presented when opening an account by looking up addresses on the Internet to ensure they are real and not for a mail drop or a prison, and may call the phone numbers given to ensure they are valid and not for pagers or answering services. |
| 10. The SSN presented was used by someone else opening an account or other customers. | Our staff may compare the SSNs presented to see if they were given by others opening accounts or other customers. |
| 11. The address or telephone number presented has been used by many other people opening accounts or other customers. | Our staff may compare address and telephone number information to see if they were used by other |

ALPINE_LIT169010

| | applicants and customers. |
|---|---|
| 12. A person who omits required information on an application or other form does not provide it when told it is incomplete. | Our staff will track when applicants or customers have not responded to requests for required information and will follow up with the applicants or customers to determine why they have not responded. |
| 13. Inconsistencies exist between what is presented and what our firm has on file. | Our staff will verify key items from the data presented with information we have on file. |
| 14. A person making an account application or seeking access cannot provide authenticating information beyond what would be found in a wallet (or consumer credit report, if applicable) or cannot answer a challenge question. | Our staff may authenticate identities for existing customers by asking challenge questions that have been prearranged with the customer and for applicants or customers by asking questions that require information beyond what is readily available from a wallet or a consumer credit report. |
| **Category: Suspicious Account Activity** | |
| 15. Soon after our firm gets a change of address request for an account, we are asked to add additional access means (such as debit cards or checks) or authorized users for the account. | We will verify change of address requests by sending a notice of the change to the old addresses so the customer will learn of any unauthorized changes and can notify us. |
| 16. A new account exhibits fraud patterns, such as where a first payment is not made or only the first payment is made, or the use of securities easily converted into cash, if margin is permitted. | We will review new account activity to ensure that payments are made, and that credit is primarily used for securities easily converted into cash, if margin is permitted. |
| 17. An account develops new patterns of activity, such as nonpayment inconsistent with prior history, a material increase in credit use, or a material change in spending patterns, or electronic funds transfers (if applicable). | We will review our accounts periodic basis and look for suspicious new patterns of activity such as nonpayment, a large increase in credit use, or changes in spending patterns or electronic fund transfers (if applicable). |
| 18. An account that is inactive for a long time is suddenly used again. | We will review our accounts on a periodic basis to see if long inactive accounts become very active, if the circumstances suggest that the activity may be potentially suspicious in nature. |
| 19. Mail our firm sends to a customer is returned repeatedly as undeliverable even though the account remains active. | We will note any returned mail for an account andmay check the account's activity, if the circumstances suggest that the activity may be potentially suspicious in nature. |
| 20. We learn that a customer is not getting his or her paper account statements. | We will record on the account any report that the customer is not receiving paper statements and may investigate, if the circumstances suggest that the activity may be potentially suspicious in nature |

ALPINE_LIT169011

| 21. We are notified that there are unauthorized charges or transactions to the account. | We will verify if the notification is legitimate and involves a firm account, and then investigate the report. |
|---|---|
| **Category: Notice From Other Sources** | |
| 22. We are told that an account has been opened or used fraudulently by a customer, an identity theft victim, or law enforcement. | We will verify that the notification is legitimate and involves a firm account, and then investigate the report. |
| 23. We learn that unauthorized access to the customer's personal information took place or became likely due to data loss (e.g., loss of wallet, birth certificate, or laptop), leakage, or breach. | We will contact the customer to learn the details of the unauthorized access to determine if other steps are warranted. |

## 9.20 Senior Manager Approval

The AML Officer or designee will seek and obtain written approval from the senior management team for any and all material changes to Alpine's AML policy. Changes that do not result in a material change to the policy will not require approval. Please refer to the section titled "AML Officer" for more information.

ALPINE_LIT169012

# 10 INSIDER TRADING

[Insider Trading and Securities Fraud Enforcement Act of 1988; '34 Act 10b-5; FINRA Notice to Members 89-5]

NYSE ARCA Equities Rule 6.18, BATS-YX Rule 5.5, BATS-ZX Rule 5.5: Chinese Walls/Information Barriers Prohibitions; ensuring associated persons are advised in writing of prohibition against misuse of material non-public information.

| | |
|---|---|
| **Responsibility** | • Head Trader or designee<br>• CCO or designee (where designated) |
| **Resources** | • Daily Transaction Report<br>• Employee transactions (see the section *Employee, Employee-Related and Proprietary Trading*)<br>• Inquiries from regulators<br>• Transactions in securities on Alpine's Watch or Restricted Lists (see the sections *Watch List* and *Restricted List*)<br>• Questions or transactions referred by managers or other Alpine personnel<br>• Employee WSP Acknowledgement Form (CCO or designee) |
| **Frequency** | • Daily and as required |
| **Action** | • CCO or designee: Ensure that each associated person is advised in writing of the firm's prohibition against misuse of material, non-public information (upon an associated person's initial affiliation and as the firm's written supervisory procedures change)<br>• Supervisors reviewing trades: refer questioned trades to the Chief Compliance Officer<br>• Chief Compliance Officer will review the transaction and take appropriate action which may include:<br>   ○ Determination if further information is necessary<br>   ○ Consultation with RR or other Alpine personnel regarding the nature of the transaction(s) including reason for transaction, solicited vs. unsolicited<br>   ○ Review of other transactions by the same customer and/or RR<br>   ○ Consultation with in-house or outside counsel<br>   ○ Referral of transaction(s) to appropriate regulator |
| **Record** | • Initials on Daily Transaction Report by the Head Trader or Designee<br>• If activity is referred to the Chief Compliance Officer, then review is documented in a file of reviewed transactions including who conducted the review; when reviewed; identification of the transaction(s) reviewed; copies of the records used to conduct the review; and notation of action taken.<br>• Receipt of Employee WSP Acknowledgement Form (CCO or designee) |

## 10.1 Insider Trading Policies And Procedures

Alpine is required to establish, maintain, and enforce policies and procedures to prevent the misuse of material non-public information ("inside information"). These requirements are included in the Insider Trading and Securities Fraud Enforcement Act of 1988. Alpine has established policies and procedures reasonably designed to prevent the misuse of inside information considering Alpine's business, structure, size and other relevant factors.

ALPINE_LIT169013

At the time of hire, employees are provided with the *Firm Policy Memorandum Regarding Insider Trading* included in this chapter. In addition, employees and associated persons are require to certify their knowledge of and compliance with Alpine's insider trading policy whenever there is a material change to the firm's written supervisory procedures.

## 10.2 Prohibition Against Acting On Or Disclosing Inside Information

Alpine policy prohibits employees and associated persons from effecting securities transactions while in the possession of material, non-public information. Employees are also prohibited from disclosing such information to others. The prohibition against insider trading applies not only to the security to which the inside information directly relates, but also to related securities, such as options or convertible securities.

If employees receive inside information, they are prohibited from trading on that information, whether for the account of Alpine, or their own account, any accounts in which they have a direct or indirect beneficial interest (including accounts for family members) or any other account over which they have control, discretionary authority or power of attorney. Similarly, if employees receive inside information from a client, they are prohibited from trading on that information on behalf of the client account. Employees should refer such cases to Compliance if additional guidance is needed.

## 10.3 Tippees Are Insiders

An employee may, depending on the circumstances, become an "insider" or "tippee" when obtaining **apparently** material, non-public information by happenstance, including information derived from social situations, business gatherings, overheard conversations, "tips" from "insiders," or other third parties. In these situations, the employee must, **unless Compliance advises otherwise**, treat the information as inside information and comply with all of the policies on insider trading.

## 10.4 Misuse Constitutes Fraud

The misuse of material, nonpublic or "inside" information constitutes fraud, a term broadly defined under federal securities laws. Engaging in fraud is subject to civil and criminal penalties (including imprisonment), SEC administrative actions, disgorgement of profits, penalties from exchanges, and dismissal by Alpine. There are no circumstances where any person becomes aware of inside information, for whatever purpose, may use that information to trade for personal benefit, for Alpine's benefit, or for the benefit of another. If any employee believes he or she has received inside information, he or she should immediately advise their supervisor or Compliance.

## 10.5 Annual Certification

Employees and associated persons are required to annually certify their knowledge of and compliance with Alpine's insider trading policy. This certification is included in the Annual Certification form.

## 10.6 Firm Policy Memorandum Regarding Insider Trading

This policy memorandum is intended to provide information and guidance concerning the restrictions on insider trading, which is an enforcement priority of the Securities and Exchange Commission and the Department of Justice. It also explains policies adopted by Alpine to prevent fraudulent or deceptive practices relating to trading on material, non-public information ("insider trading"). Trading in securities on the basis of material, non-public information ("inside information") is prohibited and contrary to Alpine policy. The penalties for insider trading can be considerable, including loss of profits plus treble damages, criminal sanctions including incarceration, loss of employment and permanent bar from the securities industry. This policy applies to all associates of Alpine. Specific departments of Alpine may have insider trading policies that supplement this policy.

ALPINE_LIT169014

**READ THIS MEMORANDUM VERY CAREFULLY.** You will be asked to sign a statement affirming that you have read and understand the policies set forth herein and that you will abide by them.

## THE PROHIBITION

The prohibition against insider trading includes the following: if you are in possession of material non-public information about a company or the market for a company's securities, you must either publicly disclose the information to the marketplace or refrain from trading. Generally, disclosure is not an option and the effect is to require an individual to refrain from trading. You also may not communicate inside information to a second person who has no official need to know the information.

Information is considered material if there is a substantial likelihood that a reasonable investor would consider it important in deciding to buy or sell a security. In addition, information that, when disclosed, is likely to have a direct effect on a security's price should be treated as material. Examples include information concerning impending tender offers, leveraged buy-outs, mergers, sales of subsidiaries, significant earnings changes and other major corporate events.

Information is non-public when it has not been disseminated in a manner making it available to investors generally. Information is public once it has been publicly disseminated, such as when it is reported on the Dow Jones or other news services or in widely disseminated publications, and investors have had a reasonable time to react to the information. Once the information has become public, it may be traded on or disclosed freely.

Generally, a person violates the insider trading prohibition when that person violates a duty owed either to the person on the other side of the transaction or to a third party (such as a customer or employer) by trading on or disclosing the information. The insider trading prohibition applies to an issuer's directors, officers and employees, investment bankers, underwriters, accountants, lawyers and consultants, as well as other persons who have entered into special relationships of confidence with an issuer of securities.

Virtually anyone can become subject to the insider trading prohibition merely by obtaining material non-public information by unlawful means or by lawfully obtaining such information and improperly using it. This is known as misappropriation. If you receive material, non-public information as part of your legitimate business dealings on behalf of Alpine or its customers and you use that information to trade in securities or if you transmit that information to another person for purposes of trading in securities (so-called "tipping"), you would likely be guilty of insider trading. Insider trading liability may also be derivative. A person who has obtained inside information (so-called "tippee") from a person who has breached a duty or who has misappropriated information may also be held liable.

The foregoing is just a synopsis of the insider trading prohibition. Because the law in this area is complex, Alpine has adopted the following guidelines which are designed to prevent violations of the insider trading rules.

### WHEN Alpine IS AN INSIDER

Alpine may be deemed an insider when it comes into possession of inside information through its various activities such as investment banking and research. Research analysts may become insiders (or tippees) upon receiving inside information from a company officer, director or employee. In addition, the intention to update or downgrade a research recommendation might be material information and should not be disclosed, prior to public dissemination, to anyone outside the Research Department (and in some instances to some within the Research Department) unless there is a need to know the information.

Alpine will remain an insider as long as it has inside information, regardless of whether the prospective banking client decides to engage another investment banking firm or whether Alpine declines to accept the proposed engagement.

### REGULATION FD (FAIR DISCLOSURE)

SEC Regulation FD governs the release by public companies of information that may reasonably be expected to affect the market price of securities issued by the public company. While obligations under the Regulation fall

ALPINE_LIT169015

primarily on public companies, it is equally important for employees of Alpine to be aware of the requirements and to act appropriately if an employee becomes privy to inside information about the company.

The goal of the Regulation is to create a "level playing field" so that the dissemination of information that is reasonably likely to affect the market price of a security is released simultaneously to all investors. In general, the issuer, its executive officers, directors, investor relations personnel or other employees with other duties are prohibited from selectively disclosing material, nonpublic information to securities analysts, to other securities professionals, or to a shareholder when it is foreseeable that a recipient of such information will trade on the information. The Regulation requires action by the issuer if there is intentional or unintentional selective disclosure of such information.

Employees must not expect or seek to obtain, other than in the normal course of confidential investment banking activities, material non-public information from issuers and their employees.

**GUIDELINES**

**TREATMENT OF CUSTOMER INFORMATION.** Alpine considers confidential all information concerning its customers including, by way of example, their financial condition, prospects, plans and proposals. The fact that we have been engaged by a company as well as the details of that engagement are also confidential. Alpine's reputation is one of its most important assets. The misuse of customer information can damage that reputation as well as customer relationships.

**WHAT TO DO IF YOU LEARN INSIDE INFORMATION.** It is not illegal to learn inside information. Alpine learns material non-public information from its customers and is permitted to use that information in a lawful manner to advise and assist them. It is, however, illegal for you to trade on such information or to pass it on to others who have no legitimate business reason for receiving such information.

If you believe you have learned inside information, other than in the ordinary course of business (such as investment bankers who learn inside information when working on an engagement), contact the Chief Compliance Officer immediately so that we may address the insider trading issues and preserve the integrity of Alpine's activities. Do not trade on the information or discuss the possible inside information with any other person at Alpine. If you become aware of a breach of these policies or of a leak of inside information, advise the Chief Compliance Officer immediately.

**INVESTIGATIONS OF TRADING ACTIVITIES.** From time to time, the Exchanges, the FINRA and the SEC request information from Alpine concerning trading in specific securities. Requests for information should be referred directly to the Chief Compliance Officer. You may be asked to sign a sworn affidavit that, at the time of such trading, you did not have any inside information about the securities in question. Your employment may be terminated if you refuse to sign such an affidavit. Alpine may submit these affidavits to the Exchanges, FINRA or SEC.

**STEPS YOU CAN TAKE TO PRESERVE THE CONFIDENTIALITY OF MATERIAL NON-PUBLIC INFORMATION.**

You are in a position with Alpine to access inside information; therefore, these steps must be taken to preserve the confidentiality of inside information:

1. Material inside information should be communicated only when there exists a justifiable reason to do so on a "need to know" basis inside or outside Alpine. Before such information is communicated to persons within Alpine, your department, or another person you believe needs to know, contact your department manager or Compliance.
2. Do not discuss confidential matters in elevators, hallways, restaurants, airplanes, taxicabs or any place where you can be overheard.
3. Do not leave sensitive memoranda on your desk or in other places where they can be read by others. Do not leave a computer terminal without exiting the file in which you are working.
4. Do not read confidential documents in public places or discard them where they can be retrieved by others. Do not carry confidential documents in an exposed manner.
5. On drafts of sensitive documents use code names or delete names to avoid identification of participants.

ALPINE_LIT169016

6. Do not discuss confidential business information with spouses, other relatives or friends.
7. Protect electronic information on laptops and other portable devices by encrypting confidential data (when and where required by law).
8. Avoid even the appearance of impropriety. Serious repercussions may follow from insider trading and the law proscribing insider trading can change. Since it is often difficult to determine what constitutes insider trading, you should consult with the Chief Compliance Officer whenever you have questions about this subject.

**YOUR OWN SECURITIES TRADING.** Alpine policy is to require all employees to maintain their securities accounts at Alpine except with the approval of the Chief Compliance Officer or the Chief Financial Officer. If you have an account outside of Alpine and have not already done so, please advise the Chief Compliance Officer immediately. This includes outside accounts in which you have a financial interest or direct the trading.

**CONCLUSION**

Alpine has a vital interest in its reputation, the reputation of its associates, and in the integrity of the securities markets. Insider trading would destroy that reputation and integrity. Alpine is committed to preventing insider trading and to punishing any employee who engages in this practice or fails to comply with the above steps designed to preserve confidentiality of inside information. These procedures are a vital part of Alpine's compliance efforts and must be adhered to.

# 10.7 Employee, Employee-Related, And Proprietary Trading

| Responsibility | • Chief Compliance Officer and/or Chief Financial Officer and/or Designated Supervisor |
| --- | --- |
| Resources | • Security Trade List<br>• Confirmations/statements for employees' outside accounts |
| Frequency | • Daily |
| Action | • Identify transactions in securities included on Alpine's Restricted or Watch Lists (refer to sections on those procedures) |
| Record | • Notations are included in Compliance's files regarding identified transactions including details of each trade, action taken and initials or signature of reviewer. |

Employee and proprietary trades are reviewed by the Chief Compliance Officer for trades contrary to restrictions because of underwriting activities, other restrictions, and potential insider trading. This review includes review of employees' outside securities accounts to identify transactions in securities on Alpine's Restricted List or Watch List.

# 10.8 Information Barrier Procedures

[FINRA Rule 5280; FINRA Notice to Members 91-45]

| Responsibility | • President or designee |
| --- | --- |
| Resources | • Information regarding confidential investment banking activities |

ALPINE_LIT169017

| Frequency | • As required |
|---|---|
| Action | • President or designee notifies the Chief Compliance Officer or designee regarding confidential investment banking activities<br>• The Chief Compliance Officer or designee, upon notification:<br>   ○ Maintains record of companies subject to investment banking (also see *Restricted List* and *Watch List*)<br>   ○ Maintains record of employees brought "over the wall" including name, date brought over, and the company the subject of confidential activities<br>   ○ Issue restrictions on the "over the wall" employee's activities (issuing research reports, trading in a particular security, *etc.*), as appropriate<br>   ○ Obtain certifications from affected employees |
| Record | • The Chief Compliance Officer or designee:<br><br>1. Retains records of Restricted List and Watch List securities<br>2. Retains records of employees brought over the wall<br>3. Retains certifications in employee's file |
|  |  |

## 10.8.1 Introduction

Information barriers (also known as "Chinese walls") are established within broker-dealers to prevent the flow of material, non-public information. Alpine may obtain material, non-public information while engaging in investment banking activities. Effective procedures permit Alpine to continue conducting research, trading, and other business activities while another department has knowledge of inside information affecting an issuer of securities. Alpine has established procedures to isolate departments and/or employees with inside information and permit the conduct of business in other areas.

## 10.8.2 Departments Subject To Information Barrier Confidentiality Procedures

The following departments are subject to Alpine's Information Barrier confidentiality procedures:

- Trading Department
- Investment Banking Department

Departments that obtain material, non-public information in the normal course of business must maintain the confidentiality of that information. Other departments potentially affected by inside information (Research, Trading, *etc.*) may continue to conduct normal activities unless they become aware of inside information, in which case they are required to immediately contact Compliance for guidance regarding future activities involving the subject company or companies.

## 10.8.3 Confidentiality Procedures

The designated supervisors of departments subject to Alpine's confidentiality procedures are responsible for implementing and enforcing Alpine's procedures to protect the confidentiality of actual or potential inside information. Many of these departments' activities are considered confidential and may only be shared with those outside the department on a need-to-know basis (see *Bringing An Employee Over the Wall* in this section). Some procedures for maintaining confidentiality include:

- Maintain all paper files in a locked and secured area.
- Limit access to computer files to only authorized persons with passwords to control access to the files.

ALPINE_LIT169018

- Employees of affected departments must refrain from discussing in public areas or with others outside the department (including family members, friends, *etc.*) any activities that are not publicly known.
- Use code names or delete names on sensitive drafts that identify projects or banking clients.
- Physical separation of employees of departments with access to inside information.

## 10.8.4 Access To Confidential Information Limited To Certain Employees

Access to actual or potential inside information obtained in the normal course of Alpine's banking activities is limited to the following employees:

1. Employees within the respective banking department who need to know
2. Alpine's chief compliance officer
3. Alpine's general counsel
4. The Chief Executive Officer
5. Other employees brought "over the wall" in accordance with the procedure outlined in the next section

## 10.8.5 Bringing An Employee "Over the Wall"

There may be occasions where investment banking employees require information from an employee in research, sales, trading, or other business areas of Alpine. Bringing an employee not employed in the investment banking department into confidential discussions is often termed bringing the employee "over the wall." Doing so may result in restrictions on research, trading, or other business of Alpine because the employee is now in possession of material, non-public information and cannot continue to conduct his or her normal responsibilities. Because it is important to both maintain the confidentiality of inside information and consider carefully any action that might restrict Alpine's ability to conduct its business, the manager (or manager's designee) of the investment banking department is required to contact Compliance before bringing another employee over the wall. Compliance will maintain a written record of the:

- date of the action
- name and department of the employee brought over the wall
- the name of the companies which are the subject of the investment banking activity that resulted in bringing the employee over the wall
- name of the person requesting access to the employee

Compliance will also make a determination whether further restrictions on research, trading, or other Alpine activities are appropriate because of the action of bringing an employee over the wall.

## 10.8.6 Notification To Compliance

When Alpine is engaged to provide investment banking services to an issuer, and that engagement may result in obtaining inside information, the designated supervisor is responsible for notifying Compliance of the engagement so that the issuer may be included on Alpine's Watch or Restricted Lists, if appropriate. This includes notification of any "target" companies that may become part of the investment banking transaction.

## 10.8.7 Monitoring The Information Barrier

Compliance monitors trading activities in issues where Alpine may be in possession of material, non-public information through the use of Alpine's Watch or Restricted Lists. The sections *Restricted List* and *Watch List* further explain those procedures.

## 10.8.8 Education And Training Of Employees

To ensure employees are familiar with Alpine's Insider Trading policy Alpine has established the following procedures:

ALPINE_LIT169019

- Employees receive Alpine's Insider Trading policy upon hire and certify their receipt and understanding.
- Annually, employees complete Alpine's Annual Certification which includes their acknowledgment of receipt and understanding of the Insider Trading policy.
- Employees in sensitive departments (investment banking) sign an attestation on an annual basis.
- When procedures are revised, employees will be notified by memorandum.
- Insider Trading is a subject periodically included in Alpine's continuing education and compliance meeting programs.

## 10.9 Watch List

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager |
| **Resources** | • Notification of confidential investment banking activities<br>• Notification of pending material research reports/recommendations<br>• Daily Transaction Report<br>• Confirmations/statements for employees' outside accounts |
| **Frequency** | • As required |
| **Action** | • Maintain confidential Watch List<br>• Review transactions to identify trades in securities on the Watch List<br>• For identified trades:<br>    o Evaluate whether there is a potential breach in Alpine's Information Barriers considering solicited vs. unsolicited; timing or unusual nature of transaction<br>    o For pending research reports, determine whether trading activities must be limited or suspended depending on the materiality of the report/recommendation and its likely affect on market prices<br>    o Take corrective action, if necessary |
| **Record** | • Compliance maintains records of:<br>    o Watch Lists, including the date and time a company is added or deleted<br>    o The name of the person adding or deleting the company<br>    o Identified trades, including date of review; accounts involved; underlying records possibly including memos, analyses, and statements/confirmations; summary of disposition; and initials/signature of reviewer. |

The OSJ Branch Manager will maintain a confidential Watch List which will include issues where Alpine may be in possession of material, non-public information. The Watch List is available only to specified Alpine personnel. The OSJ Branch Manager will monitor trading to identify transactions in securities on the Watch List and take action as necessary. The OSJ Branch Manager will also record the date and time when an issue is added to and removed from the Watch List.

ALPINE_LIT169020

# 11 ACCOUNTS

## 11.1 New Accounts

[SEC Securities Exchange Act of 1934 Rule 17a-3(a)(17); FINRA Rule 2090; FINRA Information Notice 10/21/08 New Account Application Template]

When opening and maintaining customer accounts, the Firm and its RRs are obligated to use reasonable diligence to "know the customer" by obtaining essential facts about the customer and the authority of each person acting on behalf of the customer. Key requirements include the following:

- The new account application (which is designed to include information required by rules) must be complete prior to submission for approval. If the customer refuses to provide certain information, this must be indicated on the new account application.
- Where recommendations will be made to a non-institutional customer, account information includes the customer's financial status, tax status, investment objectives, and other information used or to be considered to determine the suitability of recommendations.
- The new account form must be signed by the RR opening the account.
- Under anti-money laundering requirements, the customer's identification must be verified.
- Required account documents, which vary depending on the type of account opened, must be obtained. Failure to obtain required documents may result in closure of the account.
- The customer's new account information will be sent to the customer for verification within 30 days of opening the account and every three years thereafter. When account information is changed, the changed information will be sent to the customer for verification within 30 days of the change.

This section provides an explanation of certain requirements that apply to new accounts.

### 11.1.1 Customer Identity Verification

[USA PATRIOT Act Section 326; Bank Secrecy Act 31 CFR Chapter X Part 1023 Subpart F]

This section is duplicated in Chapter 9.12 [ USA PATRIOT Act Sec. 326 ]

| Responsibility | • OSJ Branch Manager |
|---|---|
| Resources | • New account application and other customer ID information |
| Frequency | • When accounts are opened |
| Action | • Before the OSJ Branch Manager or designee approves an account, determine that customer identification (ID) verification information is included with the new account application and that it meets Alpine's requirements<br>• For non-documentary verification, check the information included with the new account application for completeness and consistency with other customer-provided information (name, address, phone number, taxpayer ID number, *etc.*) |

ALPINE_LIT169021

| | |
|---|---|
| | • For unacceptable verification information (incomplete, inconsistent), return the application to the RR for further information or disapprove the account |
| **Record** | • Each Customer file shall contain the New Account Application and records that include customer ID verification as well as the OSJ Branch Manager or designee's signature signifying approval |

When opening new accounts, the customer's identity must be verified, as required by federal law. Customer identification (ID) information must be completed on the new account application.

Customer ID verification does NOT apply to accounts for:

- persons with an existing account at Alpine (unless the account requires approval by the AML Compliance Officer)
- banks
- governmental entities
- issuers of listed equity securities
- other financial institutions subject to regulation by the SEC, CFTC, Federal Reserve Board, OCC, FDIC, Office of Thrift Supervision, or the National Credit Union Administration
- persons opening accounts to participate in an ERISA plan


## 11.1.1.1 Required Customer Information

Basic information required by law **prior to opening the account** includes:

- **Name**
- **Date of birth,** for an individual
- **Address:**
    - for an individual, residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual
    - for a non-individual (corporation, trust, *etc.*) a principal place of business, local office, or other physical location
- **Taxpayer identification number** for a U.S. person (U.S. citizen or non-individual established or organized under U.S. or state laws).
- **Identification number for non-U.S. person** which may include a taxpayer ID number; passport number and country of issuance; alien identification card number; or the number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photo or similar safeguard.

**In the case of a customer who has applied for a taxpayer identification number but has not yet received it,** notation must be made on the new account application that the taxpayer ID has been applied for. The account will be restricted to liquidating transactions if the taxpayer ID number is not received within 30 days of opening the account.


## 11.1.1.2 Accounts For Individuals

When opening an account for an individual, the following information is required:

- RR shall view an unexpired government-issued identification which includes a photo and nationality or residence such as a driver's license or passport and record the information obtained therefrom on the new account application, **OR**

ALPINE_LIT169022

- RR shall obtain a copy of the photo ID for the new account applicant. (The photo ID [original or copy] must be seen by the employee opening the account to record the information. This information may NOT be taken from the customer over the phone.)
- If the photo ID is not available at the time the new account application is being completed, the RR is to indicate on the new account application whether the customer will provide a copy of photo ID within 30 days of account opening **OR,** if the customer cannot provide a photo ID, the reason why not.
- If the photo ID is not received within 30 days, the account will be restricted to liquidating transactions only until the ID is received.

**If the customer has not appeared in person at Alpine's office,** "non-documentary" information will ALSO be required, as explained in the section that follows.

**If the customer cannot produce the required photo ID,** an explanation must be included on the new account application AND non-documentary information will be required to open the account.


## 11.1.1.3 Third Party Accounts

Customer ID required for third party accounts includes the following:

**On behalf of an incompetent person:** Obtain customer ID of the person holding power of attorney.

**With power of attorney or trading authorization held by a third party:** Obtain customer ID of the owner of the account. Customer ID is not necessary for the individual with authority over the account unless that person is unfamiliar to the RR or the circumstances regarding the opening of the account raises questions (customer requires wiring funds to an offshore address; third party is a foreign citizen; *etc.*).


### 11.1.1.3.1 Registered Investor Adviser Accounts

[SEC Division of Market Regulation No-Action Letters dated 2/12/04 and 2/10/05]

For accounts established by registered investment advisers, Alpine may rely on the adviser to have obtained information to comply with federal Customer Identification Program (CIP) rules under the following circumstances:

- it is reasonable to rely on the adviser's assurances;
- the adviser is federally regulated (state-only registered IAs do not qualify); and
- the adviser signs an agreement that it will annually certify to Alpine that it has implemented an anti-money laundering program and will perform (or its agents will perform) specified requirements of Alpine's CIP.


### 11.1.1.3.2 Omnibus And Sub-Accounts

[SEC Q and A Regarding the Broker-Dealer Customer Identification Program Rule, October 1, 2003]

Omnibus and sub-accounts are sometimes established by or on behalf of financial intermediaries for the purpose of executing transactions that will clear or settle at another financial institution or for delivering assets to the custody account of the beneficial owner at another financial institution. Limited information about the beneficial owner is used primarily to assist the financial intermediary with recordkeeping or to establish sub-accounts to hold positions to be transferred to another financial institution. Transactions are initiated by the financial intermediary and the beneficial owner has no direct control over the omnibus or sub-accounts.

Under these circumstances, Alpine is not required to look through the intermediary to the underlying beneficial owners, if the intermediary is identified as the accountholder.

ALPINE_LIT169023

### 11.1.1.4 Accounts For Non-Individuals

Account documents usually obtained for non-individual accounts (trust instruments, articles of incorporation, partnership agreements, government-issued business license, *etc.*) will usually satisfy customer ID requirements. In the case of corporations, a certified copy of the articles of incorporation is required. These documents must be obtained within 30 days of account opening to satisfy the requirement.

### 11.1.1.5 Non-Documentary Methods Of Verifying Customer Identification

Non-documentary methods of verifying customer ID involve other procedures. Non-documentary methods must be used in the following circumstances:

- An individual is unable to present acceptable photo ID.
- The documents presented are unfamiliar.
- The account is opened without obtaining documents.
- Other circumstances, at the discretion of the RR's supervisor, New Accounts, and/or the AML Compliance Officer, where Alpine is unable to verify the customer's identity.

In these circumstances, a non-documentary method must be indicated by the RR on the new account application:

- Direct customer contact information
- Information from a consumer reporting agency or other database
- References from another financial institution
- Obtained a financial statement

### 11.1.1.6 Additional Verification For Certain Customers

For the following types of customers, a minimum of TWO forms of customer ID are required in addition to review and approval by the AML Compliance Officer **prior to** opening the account:

- Numbered accounts
- Accounts domiciled in high-risk countries included on the Treasury Dept. OFAC list (check with Operations personnel for a list of those countries or go to *http://www.ustreas.gov/offices/eotffc/ofac/sanctions/index.html*)
- Accounts for foreign public officials (individuals in high office in other countries, their families and close associates, political party officials)

### 11.1.1.7 Lack Of Customer ID Verification

For **customers presenting unacceptable customer ID** at the time of account opening, the account will not be opened.

For **customers who fail to provide required ID or documents within 30 days of account opening,** the account will be restricted to liquidating transactions only until satisfactory ID verification is received.

For **accounts where non-documentary verification results in substantive, unresolved discrepancies** (information that is inconsistent such as name, address, taxpayer ID number, *etc.*), either the account will not be opened or will be immediately closed.

Questions regarding accounts that do not comply with requirements to verify customer ID should be referred to the AML Compliance Officer.

ALPINE_LIT169024

**11.1.1.8 Customer Notice**

Customers are provided notice, prior to opening an account, that their identification will be verified. This notice may be on Alpine's web site, on new account applications, or in other disclosures provided at the time of account opening.

## 11.1.1.9 Required Customer Information

[SEC Securities Exchange Act of 1934 Rule 17a-3(a)(17)(i)(A); FINRA Rule 4512]

Basic information required **prior to opening the account** includes:

- **Name**
- **Date of birth,** for an individual
- **Address:**
  - for an individual, residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual
  - for a non-individual (corporation, trust, *etc.*) a principal place of business, local office, or other physical location.
- **Telephone number**
- **Employment status** (including occupation and whether the person is associated with a broker dealer)
- **Annual income**
- **Net worth** (excluding value of primary residence)
- Account's investment objectives
- For joint accounts, information on each joint owner (financial information may be combined)
- **Taxpayer identification number** for a U.S. person (U.S. citizen or non-individual established or organized under U.S. or state laws).
- **Identification number for non-U.S. person** which may include a taxpayer ID number; passport number and country of issuance; alien identification card number; or the number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photo or similar safeguard.

**In the case of a customer who has applied for a taxpayer identification number but has not yet received it,** notation must be made on the new account application that the taxpayer ID has been applied for. The account will be restricted to liquidating transactions if the taxpayer ID number is not received within *[30]* days of opening the account.

In addition, under FINRA Rule 4512 the Firm will retain the name of the RR responsible for the account and, if multiple RRs are assigned to the account, a record indicating the scope of their responsibilities with respect to the account. This requirement does not apply to an institutional account.

## 11.1.1.10 Accounts For Individuals

When opening an account for an individual, the following information is required:

- An unexpired government-issued identification including a photo and nationality or residence such as a driver's license or passport and record information from it on the new account application, **OR**
- A copy of the photo ID with the new account application. (The photo ID [original or copy] must be seen by the employee opening the account to record the information. This information may NOT be taken from the customer over the phone.)

**If the customer has not appeared in person at Alpine's office,** "non-documentary" information will ALSO be required, as explained in a section that follows.

ALPINE_LIT169025

**If the customer cannot produce the required photo ID,** an explanation must be included on the new account application AND non-documentary information will be required to open the account.

## 11.1.1.11 Third Party Accounts

Customer ID required for third party accounts includes the following:

**On behalf of an incompetent person:** Obtain customer ID of the person holding power of attorney.

**With power of attorney or trading authorization held by a third party:** Obtain customer ID of the owner of the account. Customer ID is not necessary for the individual with authority over the account unless that person is unfamiliar to the RR or the circumstances regarding the opening of the account raises questions (customer requires wiring funds to an offshore address; third party is a foreign citizen; *etc.*).

### 11.1.1.11.1 Registered Investor Adviser Accounts

[SEC Division of Market Regulation No-Action Letter to SIFMA dated January 9, 2015: http://www.sec.gov/divisions/marketreg/mr-noaction/2015/sifma-010915-17a8.pdf]

For accounts established by registered investment advisers, Alpine may rely on the adviser to have obtained information to comply with federal Customer Identification Program (CIP) rules under the following circumstances:

- It is reasonable to rely on the adviser's assurances;
- the adviser is federally regulated (state-only registered IAs do not qualify); and,
- the adviser signs an agreement that it will annually certify to Alpine that it has implemented an anti-money laundering program and will perform (or its agents will perform) specified requirements of Alpine's CIP.

### 11.1.1.11.2 Omnibus And Sub-Accounts

Omnibus and sub-accounts are sometimes established by or on behalf of financial intermediaries for the purpose of executing transactions that will clear or settle at another financial institution or for delivering assets to the custody account of the beneficial owner at another financial institution. Limited information about the beneficial owner is used primarily to assist the financial intermediary with recordkeeping or to establish sub-accounts to hold positions to be transferred to another financial institution. Transactions are initiated by the financial intermediary and the beneficial owner has no direct control over the omnibus or sub-accounts.

Under these circumstances, Alpine is not required to look through the intermediary to the underlying beneficial owners, if the intermediary is identified as the accountholder.

## 11.1.1.12 Accounts For Non-Individuals

Account documents usually obtained for non-individual accounts (trust instruments, articles of incorporation, partnership agreements, government-issued business license, *etc.*) will usually satisfy customer ID requirements. In the case of corporations, a certified copy of the articles of incorporation is required. These documents must be obtained within 30 days of account opening to satisfy the requirement.

## 11.1.1.13 Non-Documentary Methods Of Verifying Customer Identification

Non-documentary methods of verifying customer ID involve other procedures. Non-documentary methods must be used in the following circumstances:

- An individual is unable to present acceptable photo ID
- The documents presented are unfamiliar

ALPINE_LIT169026

- The account is opened without obtaining documents
- The customer opens the account without appearing in person at Alpine
- Other circumstances, at the discretion of the RR's supervisor, New Accounts, and/or the AML Compliance Officer, where Alpine is unable to verify the customer's identity

In these circumstances, a non-documentary method must be indicated by the RR on the new account application:

- Direct customer contact information

## 11.1.1.14 Additional Verification For Certain Customers

For the following types of customers, a minimum of TWO forms of customer ID are required in addition to review and approval by the AML Compliance Officer **prior to** opening the account:

- Accounts domiciled in high-risk countries included on the Treasury Dept. OFAC list (check with Operations personnel for a list of those countries or go to http://www.ustreas.gov/offices/eotffc/ofac/sanctions/index.html)
- Accounts for foreign public officials (individuals in high office in other countries, their families and close associates, political party officials)

## 11.1.1.15 Lack Of Customer ID Verification

For **customers presenting unacceptable customer ID** at the time of account opening, the account will not be opened.

Questions regarding accounts that do not comply with requirements to verify customer ID should be referred to the AML Compliance Officer.

## 11.1.1.16 Customer Notice

Customers are provided notice, prior to opening an account, that their identification will be verified. This notice is part of the new account applications.

## 11.1.2 Identity Theft

[Fair and Accurate Credit Transactions Act (FACT Act) Section 114 and 315; SEC Securities Exchange Act of 1934 Regulation S-ID]

Identity thieves use someone's personal identifying information to open new accounts and misuse existing accounts. Alpine has established an Identity Theft Program to help detect and prevent identity theft. Many elements of detecting or preventing identity theft are similar to anti-money laundering (AML) requirements that are included in these policies. A more detailed explanation of the Program is included in the section *Identity Theft Program* in the chapter *ANTI-MONEY LAUNDERING (AML) PROGRAM*.

The Identity Theft Program is based on identifying "red flags" that indicate identity theft may have occurred. *It is the responsibility of all employees to be alert and report to the AML Compliance Officer any new or existing customers who may be engaged in violations of anti-money laundering regulations or identity theft or have reported identity theft.*

## 11.1.3 SIPC Disclosure

[FINRA Rule 2266]

FINRA Rule 2342, Notice to Members 07-29 ]

ALPINE_LIT169027

When new accounts are opened, new customers will be provided information about the Securities Investor Protection Corporation (SIPC) including SIPC's web site address and phone number. This information is also provided annually in writing to all customers.

## 11.1.4 Approval of New Accounts

[SEC Securities Exchange Act of 1934 Rule 17a-3(17)(i)(A); FINRA Rule 4512]

| Responsibility | • President, OSJ Branch Manager or their designees |
|---|---|
| Resources | • New Account Form |
| Frequency | • Daily |
| Action | • Review new account form for:<br>  ○ Completeness<br>  ○ Proper styling of account<br>  ○ Unacceptable accounts (accounts in name of minor only, fictitious accounts, numbered accounts without disclosure of owner, *etc.*)<br>  ○ Potential improper addresses (post office boxes, addressed to RR or Alpine, *etc.*)<br>  ○ Consistency of investment objectives with financial status, prior investment experience, *etc.*<br>  ○ Initial transaction consistent with investment objectives<br>  ○ RR registration in state of customer's residency |
| Record | • OSJ Branch Manager, President or designee's signature on New Account Form<br>• New account forms are retained by Operations |

A completed new account form, signed by the RR, is required for each new account opened. The OSJ Branch Manager, President or their designees are responsible for reviewing the new account form for the necessary information and will promptly approve each new account. Only a Series 24 licensed principal may approve a new account form.

## 11.1.5 Customer Account Information

[SEC Securities Exchange Act of 1934 Rule 17a-3(17)(i)(A)]

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • New Account Forms or information |
| Frequency | • When accounts are opened |
| Action | • Establish procedures for sending new account information within 30 days of account opening<br>• Forward customer responses to Compliance<br>• Compliance reviews customer responses and notifies the RR, the RR's supervisor, and New Accounts |

ALPINE_LIT169028

| | |
|---|---|
| | • If Compliance identifies a pattern of customer responses for a particular RR, Compliance will contact the RR's supervisor to discuss and take corrective action, if necessary, which may include RR training, interview with the RR, a memo of caution to the RR, or other appropriate action |
| **Record** | • Customer's signed copy of the account application acknowledges receipt of the information at the time the account is opened<br>• Changes to new account information are retained in new account files or records<br>• Compliance files retain records of corrective actions taken |

Within 30 days of opening an account (or with the next scheduled account statement), customers will be provided with a copy of the new account information for verification.

Compliance will review customer responses that revise new account information and will notify the RR, the RR's supervisor, and New Accounts of the changes.

## 11.1.6 Addresses On Customer Accounts

[FINRA Rule 3012(a)(2)(B)]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • New account forms |
| **Frequency** | • When new account is opened |
| **Action** | • Identify improper address on new account forms at time of approval<br>• When approving new accounts, ensure beneficial owner of the account will receive confirmations consistent with the policy<br>• When a change of address is received by Operations, Operations will send notice to the customer's old address confirming the change to a new address. (See the section *Change Of Customer Addresses On Accounts* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES and in the Supervisory System, Procedures and Controls*) |
| **Record** | • OSJ Branch Manager or designee's signature on New Account Form |

Confirmations and statements and other account information will be transmitted to the customer at the address requested by the customer. Alpine or an employee may not be the sole addressee for a customer's account unless the account is for the direct benefit of Alpine or employee.

Acceptable addresses include:

- **for an individual:** residential or business street address. If no street address exists or is available, an APO or FPO box number or the residential or business street address of a next of kin or another contact individual
- **for a non-individual (corporation, trust, *etc.*):** a principal place of business, local office, or other physical location
- **for a P.O. Box address:** a legal address for the customer must also be provided.

ALPINE_LIT169029

Accounts **may not** be addressed to Alpine, an RR or other employee of Alpine with the exception of accounts for the beneficial ownership of the RR or employee or if the RR acts as a principal for the account. Accounts **may not** be addressed care/of (c/o) someone else unless the customer provides written authorization requesting such an address.

Address changes require written instructions from the customer. Upon notification of a change of address, a notice will be sent to the customer's old address confirming that an address change has been made to the account. This occurs under the direction of the Back office manager or designee. (Refer to the Supervisory System, Procedures and Controls chapter for additional information.) Should you have questions about address changes, please contact your supervisor or Alpine's Chief Compliance Officer.

Where the account is opened by a fiduciary such as an investment adviser on behalf of the fiduciary's customer, Alpine will provide either confirmations or periodic account statements to the underlying beneficial account holder. Alpine will make a good faith effort to obtain the information necessary to send confirmations directly to the beneficial owner; however, if this information is not provided by the fiduciary, Alpine will forward confirmations to the owner's custodian or, if there is no custodian or Alpine is the custodian, Alpine will send the confirmation directly to the fiduciary.

## 11.1.7 Account Documents

| Responsibility | • Operations Manager or designee |
|---|---|
| Resources | • New Account Form<br>• Missing Documents Report |
| Frequency | • Daily |
| Action | • Establish procedures to ensure required account documents are obtained for each new account |
| Record | • Most current Missing Documents Report retained for follow up<br>• New account files in Operations include documents obtained |

Additional account documents may be required depending on the type of account opened. The Operations Manager or designee is responsible for establishing procedures outlining the necessary account documents and follow-up regarding missing documents.

## 11.1.8 Predispute Arbitration Agreements With Customers

[FINRA Rule 2268; FINRA Notice to Members 05-32 and 05-09]

Customers will be provided with copies of any signed agreements that include a predispute arbitration agreement within 30 days of signing; the customer will acknowledge receipt of the arbitration agreement on the agreement itself or on a separate document.

In addition, within 10 days of request by a customer, Alpine will provide a copy of any predispute arbitration agreement the customer has signed as well as relevant arbitration forum rules, if requested. The customer will be notified if the signed agreement cannot be located.

ALPINE_LIT169030

### 11.1.9 Revisions To Customer Agreements

Firm policy does not permit revisions to pre-printed language on customer agreements. Requests for changes should be referred to Compliance for review.

### 11.1.10 Accounts Requiring Notification To Customer's Employer

[NASD Rule 3050]

| | |
|---|---|
| **Responsibility** | • COO |
| **Resources** | • New Account Form |
| **Frequency** | • Daily |
| **Action** | • Code account for duplicate confirmations and/or statements as requested by other broker-dealers<br>• For accounts of employees of FINRA or the AMEX, code the accounts for duplicate confirmation and statements to FINRA or the AMEX |
| **Record** | • Record of duplicate confirmations and statements is included with new account records |

This task may be performed by a designee of the COO.

#### 11.1.10.1 Employees Of Other Broker-Dealers

When opening an account for a person employed by another broker-dealer (including accounts where the employee has control or a personal financial interest), the other broker-dealer must be notified. Alpine will provide duplicate confirmations, statements, or other information requested by the employing broker-dealer.

#### 11.1.10.2 Employees Of The FINRA Or The AMEX

[FINRA Rule 2070]

When an account is opened for an employee of FINRA or the AMEX (including accounts where the employee has control or a personal financial interest), duplicate confirmations and statements must be sent to FINRA or the AMEX.

### 11.1.11 Post Office Addresses

If the customer opens an account using a post office address, the street address must also be provided on the new account form. The only exception is for customers who reside in rural areas where the post office address is the only address, which should be noted on the new account form.

### 11.1.12 Unacceptable Accounts

The following are examples of accounts that are unacceptable. Questions regarding whether new accounts may be opened should be referred to Compliance.

Unacceptable accounts include:

ALPINE_LIT169031

- Fictitious accounts in a name other than the name of the legal owner
- Accounts in the name of a minor
- Margin accounts for minors

## 11.2 Accounts And Securities Subject To Blocking

[Various Treasury Department regulations]

Alpine is prohibited from doing business in specific countries or with organizations or individuals which are the subject of Government sanctions. The U. S. Treasury Department's Office of Foreign Assets Control (OFAC) is responsible for administering and enforcing economic and trade sanctions. Sanctions target foreign countries, terrorism sponsoring organizations, narcotics traffickers, money launderers, and other entities and individuals. Sanctions include the freezing of assets and blocking securities issued by embargoed foreign issuers.

As part of its anti-money laundering program, Alpine monitors accounts and securities included on OFAC's lists, available at OFAC's web site at *www.treas.gov/ofac*. OFAC information is updated whenever the Government issues new sanctions that result in blocking requirements.

Blocking will occur under the following circumstances:

- An account is opened for someone included on an OFAC list.
- The owner of an existing account is added to an OFAC list.
- A security is identified in a customer account where the issuer is the subject of blocking requirements.
- A request is made by a customer to pay or transfer funds or securities to a blocked person or entity.

RRs will be notified if one of their customer accounts; a security held in one of their accounts; or a requested transfer of funds or securities is blocked. In addition to the above, open orders will be cancelled for any account that is blocked.

Compliance with blocking requirements is very important. Violations can result in substantial fines against Alpine or persons engaging in prohibited transactions. Questions regarding blocked accounts, transfers, or securities should be referred to Compliance.

## 11.3 Updating Account Information And Periodic Affirmation

['34 Act Rule 17a-3(a)(17); FINRA Rule 3012(a)(2)(B)]

| Responsibility | • COO<br><br>This task may be performed by the COO's designee. |
|---|---|
| Resources | • Information obtained from customer<br>• Responses from customers |
| Frequency | • Within 30 days of opening a new account, provide customer the new account record and request verification of information contained thereon<br>• As required: update account information based on information provided by customer<br>• Within 30 days of changes: send written information about changes to account<br>• At least every 36 months: send customers a copy of new account information |
| Action | • Notify RR of any changes and record changes to customer account record as reported by customer<br>• Within 30 days after a customer requests a change to their account record, |

ALPINE_LIT169032

| | |
|---|---|
| | reconfirm such change in writing with the customer.<br>• Significant changes to the Customer account record will be reviewed by the RR's supervisor. |
| **Record** | • New account records<br>• Record of furnishing information within 30 days<br>• If necessary, notation of action by the RR's supervisor for responses received from customers |

RRs should promptly update customer new account information whenever they are informed or become aware of changes. Updates may be recorded by making revisions to existing forms or completing new forms. New forms require the approval of the RR's supervising principal and signature of the customer, where required.

Within 30 days of opening a new account or changes to a customer's investment objectives, Alpine will send a copy of new account information, including the change, to the customer with a request for correction of any inaccurate information. This occurs under the direction of the Back office manager or designee. (Refer to the Supervisory System, Procedures and Controls chapter for additional information.)

At least every 36 months customers will be provided with new account information on record for their accounts and will be asked to advise of any changes or updates. Customer responses are forwarded to the Financial Principal and to the RR's supervisor if necessary. This notification is not required for accounts that have been inactive for 36 months or where no recommendations (solicited orders) are made to the customer.

## 11.4 Sweep Programs

[SEC Securities Exchange Act of 1934 Rule 15c3-3(j)(2)(i); SEC FAQs regarding financial responsibility rules: http://www.sec.gov/divisions/marketreg/amendments-to-broker-dealer-financial-responsibility-rule-faq.htm; NASD Rule 2510]

| | |
|---|---|
| **Responsibility** | • CFO or designee |
| **Resources** | • Proposed new programs or material changes to existing programs |
| **Frequency** | • As required |
| **Action** | • Consider net capital/customer protection implications of terminating a program or adopting a new program<br>• Confirm the bank's business continuity program complies with SRO business continuity rule requirements<br>• For programs with banks that allow the customer to make deposits and/or withdrawals, include accounts in AML reviews<br>• Review the new program or changes<br>• Prepare/provide disclosure information for customers<br>• Include required disclosures with quarterly statements<br>• Obtain customer written consents to participate<br>• Send 30-day prior notice of program changes<br>• Arrange for RR training, if necessary<br>• If Alpine has a web site, post interest rates |
| **Record** | • Copies of programs, contracts with providers, records of distributing disclosures to customers when new programs are implemented or changes occur<br>• Copy of bank's affirmation regarding compliance with business continuity |

ALPINE_LIT169033

| | requirements<br>• Customer oral consents and record of providing disclosures<br>• Customer written consents |
| --- | --- |

Free credit balances held in a customer's securities account may be transferred to a product in Alpine's sweep program or a customer's interest may be transferred between sweep programs. Four conditions regarding customer disclosures apply:

- The customer must give prior written affirmative consent to having free credit balances included in the sweep program after being notified of (a) the general terms and conditions of the Program; and (b) that Alpine may change the products available under the Program. Through September 30, 2015, a customer's oral consent to participate in the sweep program (after the customer receives the disclosures just mentioned) will be accepted and must be recorded on the account records. Failure to obtain written consent within 90 days of oral consent will result in the customer's participation in the sweep program being terminated.
- Disclosures and notices required by SROs will be provided to customers.
- Quarterly notice is included with statements that swept funds or money market shares can be liquidated and remitted to the customer.
- 30-day prior written notice of any changes to the sweep program and sweep products will be provided.

Written consents are part of new account documents.

## 11.5 Third Party Accounts

When a third party who is not the principal or named person on the account will give instructions regarding orders, disposition of funds, or other actions involving an account, Alpine must have a signed third-party trading authorization. The authorization is signed by the principal of the account and the third party, giving the third party authority to act on behalf of the principal. An example of a third party account is an account for a wife whose husband will give instructions regarding his wife's account. The signed trading authorization must be received BEFORE accepting instructions from the third party.

Alpine has two types of trading authorizations:

- Limited trading authorizations limit the third party to giving instructions regarding the purchase and sale of securities and does NOT give authority regarding the disposition of funds or securities.
- Full trading authorizations give the third party authority to give instructions regarding purchases and sales as well as the disposition of funds or securities in the account.

## 11.6 Discretion For Orders And Accounts

[SEC no-action letters regarding cash management accounts (http://sec.gov/divisions/investment/noaction/ubs092905.htm) and family/related accounts (http://sec.gov/divisions/investment/noaction/morganlewis111705.htm)]

Alpine does **not** permit discretionary accounts where the customer signs a discretionary trading authorization and permits the RR to make decisions for the account without consulting with the customer first.

This prohibition does not include temporary or limited discretion in the following examples:

- Price and time discretion for an order.
- Isolated or infrequent discretion, such as when a customer is unavailable for a limited period of time. The customer must sign a trading authorization in advance, an expiration date must be noted on the agreement, and the limited discretion must be approved by the RR's supervisor.
- Exchanging one money market fund for another or its cash equivalent.

ALPINE_LIT169034

- Transactions to satisfy margin requirements.
- Selling bonds and buying similar bonds permitting the customer to take a tax loss on the original purchase.
- Buying a bond with a specified credit rating and maturity.
- Buying or selling a security or type of security within limited specific parameters established by the customer (requires the customer's instructions in writing).
- The RR acts as conservator, trustee, attorney-in-fact, or other agent as a result of a family or personal relationship with the account.

# 11.7 Accounts For Minors

[Uniform Gifts To Minors Act; Uniform Transfers To Minors Act]

There are a number of requirements and restrictions that affect minors' accounts:

- A custodian must be named in and handle the account
- Only one custodian is permitted for each account
- Custodians generally may not delegate authority to another person
- Only one minor may be named in each account
- Margin transactions are not permitted
- Gifts to minors are irrevocable, *i.e.,* the custodian may not direct distribution of assets from the account except for the benefit of the minor
- The minor's social security number must be used when opening the account
- Minors may not be a party to a joint account, investment club, or partnership

# 11.8 Coverdell Education Savings Accounts

[IRS site: http://www.irs.gov/uac/Coverdell-Education-Savings-Accounts; 26 USC §530 - Coverdell Education Savings Accounts]

A Coverdell Education Savings Account (ESA) is an account created as an incentive to help parents and students save for education expenses. For more information, refer to the IRS site above; plan sponsors; and the customer's tax adviser.

The following summarizes some of the key features of Coverdell accounts.

- The maximum annual contribution is $2,000 subject to limits on the donor's modified adjusted gross income.
- Contributions are made from after-tax dollars; there is no tax deduction for contributions.
- ESAs are available for beneficiaries (students) who are under the age of 18 when the account is established. There are exceptions for beneficiaries with special needs.
- The funds are controlled by the account owner (*e.g.,* the parent) at all times.
- Investment choices are broad but may not include life insurance contracts.
- Assets may be used for elementary- and secondary-school tuition as well as for higher education.

The following compares some features of Coverdell and 529 plans.

| Feature | Coverdell Account | 529 Plan |
|---------|-------------------|----------|
| Contribution limits | $2000 annual | No restrictions up to maximum lifetime contribution |
| Allowable investments | Allows almost all types of investments including stocks, bonds, and mutual funds (parallels rules for IRAs) | Limited to state-run allocation programs |

ALPINE_LIT169035

| Distribution of assets | Must be disbursed on qualified education expenses by the beneficiary's 30th birthday or given to another family member below the age of 30 | No age limit |
|---|---|---|
| | Federal tax-free if used for qualified education expenses; some states offer tax benefits | Same |
| | Income tax and penalties may apply for ineligible distributions | Same |
| Qualified education | Elementary and secondary schools; higher education | Does not allow elementary and secondary education expenses |
| Income limits affecting contributions | Limits on modified adjusted gross income at certain levels | No limits |
| Ownership of assets | Owned by person establishing the account, not the child | Same |
| Designation of new beneficiary | Must be eligible family member of the previous beneficiary to avoid taxes or penalties | Same |

## 11.9 Accounts For Senior Investors

[SEC/NASAA 2008 report on Protecting Senior Investors: http://www.sec.gov/spotlight/seniors/seniorspracticesreport092208.pdf; 2010 addendum to 2008 report: http://www.sec.gov/spotlight/seniors/seniorspracticesreport081210.pdf; SEC web site Senior Investors: http:/www.sec.gov/divisions/marketreg/seniorinvestors.htm; FINRA Regulatory Notice 11-52 and 07-43]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • New account information<br>• Order records<br>• Daily Transaction Report<br>• Customer monthly transaction records |
| **Frequency** | • Ongoing |
| **Action** | • When reviewing investments for seniors, take into particular consideration the factors included in the subsection *Recommendations To Senior Investors*<br>• Refer to new account information when necessary to identify investment objectives and other customer information<br>• Confer with RR regarding suitability questions<br>• Confer with Compliance when necessary<br>• Modify or restrict future transactions, as appropriate<br>• Review product-specific guidelines when reviewing for suitability of investments<br><br>• For escalated issues:<br><br>    o Consider direct contact with the customer to confirm customer's understanding of and agreement with transactions<br>    o Notify state or other authorities (after conferring with Compliance) regarding potential elder abuse |
| **Record** | • Initials and comments of action taken on order records, Daily Transaction Report, monthly transaction records, and other available account information |

ALPINE_LIT169036

### 11.9.1 General Requirements

When opening and handling accounts for senior investors, there are certain considerations in addition to usual account handling procedures. There is no benchmark for what constitutes a "senior" or "older" investor, but generally these are individuals who are approaching or have achieved retirement.

### 11.9.2 Opening Accounts For Senior Investors

When opening accounts, the following should be considered when serving senior investors:

- encourage customers to identify a 3rd-party emergency contact and obtain permission to contact that person in the event there is an issue or event that requires clarification (such as the customer suffers diminished mental capacity in the future)
- indicate "retired" on the new account form to assist in evaluating the investor's status as someone potentially withdrawing from investments vs. accumulating assets
- obtain "lifestyle" information such as when the investor plans to retire, if not already retired; how much money will be needed after retirement; whether there are prospects for future employment; whether a dependent is supported by the investor; other expenses including healthcare expenses anticipated by the investor; the existence of a will and financial power of attorney

Accounts must NOT be opened for a senior investor if there is evidence of financial abuse or diminished capacity; orders should not be accepted under such circumstances, either.

### 11.9.3 Opening Accounts For Senior Investors

When opening accounts, the following should be considered when serving senior investors:

- encourage customers to identify a 3rd-party emergency contact and obtain permission to contact that person in the event there is an issue or event that requires clarification (such as the customer suffers diminished mental capacity in the future)
- indicate "retired" on the new account form to assist in evaluating the investor's status as someone potentially withdrawing from investments vs. accumulating assets
- obtain "lifestyle" information such as when the investor plans to retire, if not already retired; how much money will be needed after retirement; whether there are prospects for future employment; whether a dependent is supported by the investor; other expenses including healthcare expenses anticipated by the investor; the existence of a will and financial power of attorney

Accounts must NOT be opened for a senior investor if there is evidence of financial abuse or diminished capacity; orders should not be accepted under such circumstances, either.

### 11.9.4 Diminished Mental Capacity

A difficult issue is a customer who appears to be suffering from diminished mental capacity. If a customer's behavior suggests reduced capacity, it is important to take steps to protect the customer, the RR, and Alpine. Relatives or estate beneficiaries may file a complaint or lawsuit if they believe the customer was unable to understand what was occurring in his or her account.

There are a number of steps that may be taken to address the issue:

- Have a conversation with the customer with your supervisor or other party present to assist in making a determination.
- Raise the issue with family members and determine if the customer has given power of attorney to another person.
- Document meetings, conversations, and other exchanges with relatives about the situation.
- Document communications with the customer about investments.

ALPINE_LIT169037

- As a final alternative, decide not to continue doing business with the customer.

Contact Compliance with questions about a proper course of action.

## 11.10 Incompetent Persons

Accounts for incompetent persons may only be opened with the appropriate authority from a court-appointed guardian. If an RR becomes aware that a customer has become incompetent, the RR should contact the branch manager or Compliance for further guidance.

If a customer becomes incompetent while a third party trading authorization is in effect for his or her account, the authority generally is considered invalid and requires a court order for reinstatement. "Durable" powers of attorney, recognized by some states, remain in effect after a person is declared incompetent. Questions related to treatment of incompetent persons should be referred to Compliance.

## 11.11 Trust Accounts

New accounts for trusts require a copy of the trust agreement or a trust certification signed by the authorized trustee. The following activities in trust accounts require **prior** approval as follows:

- Margin trading requires approval by the OSJ Branch Manager or designee
- Option trading requires approval by the Registered Options Securities Futures Principal
- Discretionary accounts require approval by the OSJ Branch Manager or designee, in consultation with, Compliance (if Alpine permits discretionary accounts)

Fiduciaries (executors, trustees, guardians, administrators, conservators, *etc.*) may not be able to delegate their duties to a third party (whether delegation would be to the RR or an outside person) to manage the account unless the trust or other authorizing instrument specifically permits delegation. Some states require the fiduciary to obtain a court order to delegate authority to a third party.

## 11.12 Correspondent And Private Banking Accounts And Accounts For Senior Foreign Political Figures

[Bank Secrecy Act 31 CFR Chapter X Part 1010 Subpart F; USA PATRIOT Act Section 312 and 313; FinCEN Fact Sheet (http://www.fincen.gov/312factsheet.pdf)]

Under anti-money laundering (AML) rules, there are special requirements that apply to "correspondent" and "private banking" accounts as well as to accounts for "senior foreign political figures." Definitions of these and other terms follow the summary of requirements. Questions should be referred to the AML Compliance Officer.

### 11.12.1 Summary Of Requirements

- Correspondent accounts require due diligence to determine ownership of the account.
- Accounts cannot be opened for foreign shell banks.
- When opening an account for a foreign bank, the Foreign Bank Certification form must be submitted to the AML Compliance Officer with the New Account Form for review and approval.
- Every three years foreign banks will be required to re-certify the information in the Foreign Bank Certification.
- When opening an account for a senior foreign political figure, the new account application must be submitted to the AML Compliance Officer for review and approval.

ALPINE_LIT169038

## 11.12.2 Definitions

**Correspondent account:** Includes any account established for a foreign financial institution to receive deposits from, or to make payments or other disbursements on behalf of, the foreign institution, or to handle other financial transactions related to such foreign financial institution. This type of account presumes a formal relationship through which the financial institution provides regular services. Due diligence requirements apply to correspondent accounts maintained for the following foreign financial institutions:

- Foreign bank
- Foreign branch of a U.S. bank
- Business organized under a foreign law that, if located in the U.S., would be a securities broker-dealer, futures commission merchant, introducing broker in commodities, or a mutual fund
- Money transmitter or currency exchanger organized under a foreign law

**Private banking account:** A private banking account is an account that is established or maintained for the benefit of one or more non-U.S. persons, requires minimum aggregate deposit of funds or other assets of not less than $1,000,000, and is assigned to a bank employee who is a liaison between the financial institution and the non-U.S. person. If the account otherwise satisfies the definition but the institution does **not** require a minimum balance of $1,000,000, the account does not qualify as a private banking account.

**Senior foreign political figure** includes:

- a current or former senior official in the executive, legislative, administrative, military, or judicial branches of a foreign government, whether or not they are or were elected officials
- a senior official of a major foreign political party
- a senior executive of a foreign government-owned commercial enterprise (Senior executives are individuals with substantial authority over policy, operations, or the use of government-owned resources.)
- immediate family members of the above, and those who are widely and publicly known (or actually known) close associates of a senior foreign political figure
- a corporation, business, or other entity formed by or for the benefit of one of the above individuals

**Proceeds of foreign corruption:** any asset acquired by, through, or on behalf of a senior foreign political figure through misappropriation, theft, or embezzlement of public funds, the unlawful conversion of property of a foreign government, or through acts of bribery or extortion, and include any other property into which any such assets have been transformed or converted.

**Foreign bank:** a bank organized under foreign law, or an agency, branch, or bank office located outside the United States. The term does not include an agent, agency, branch or office within the U.S. of a bank organized under foreign law.

**Foreign shell bank:** is defined as a foreign bank without a physical presence in any country.

**Regulated affiliate:** is a foreign shell bank that (1) is an affiliate of a depository institution, credit union, or foreign bank that maintains a physical presence in the United States or a foreign country, as applicable; and (2) is subject to supervision by a banking authority in the foreign country regulating such affiliated depository institution, credit union, or foreign bank.

## 11.12.3 Prohibition Against Correspondent Accounts For Foreign Shell Banks

Alpine is prohibited from establishing, maintaining, administering, or managing a correspondent account in the United States for an unregulated foreign shell bank. The prohibition does not apply to a foreign shell bank that is a regulated affiliate. If an account is inadvertently opened for an unregulated foreign shell bank, the AML Compliance Officer should be notified and the account will be immediately closed.

ALPINE_LIT169039

### 11.12.4 Foreign Bank Certification

When opening an account for a foreign bank, Alpine is obligated to ensure the bank is not a foreign shell bank and must obtain information about the foreign bank's owners and an agent for service of process. The bank must complete the Foreign Bank Certification which must be submitted to the AML Compliance Officer with a copy of the New Account Form for review. Every three years the bank is also required to re-certify the information filed with Alpine.

### 11.12.5 Accounts For Foreign Political Figures

Accounts for foreign political figures (as defined above) are subject to special reviews to comply with Bank Secrecy Act requirements. RRs are required to identify, on the new account application, whether an account for a foreigner falls under the definition. The application must be submitted to the AML Compliance Officer for review and approval.

## 11.13 Collateral/Escrow Accounts

Alpine will not maintain accounts for customers where the assets in the account are pledged to a third party and Alpine is asked to acknowledge it is responsible for holding the assets pending instructions from the third party.

## 11.14 Wealth Events

Wealth events refer to those situations where an investor faces the decision about what to do with a large amount of money arising from an inheritance, life insurance payout, sale of a business or other major asset, divorce settlement or an IRA rollover, among other events. RRs must consider the following when advising a customer about investing such funds:

- Many wealth events have tax consequences. RRs are prohibited from providing tax advice; the customer should be advised to contact their tax adviser.
- Suitability requirements are important and must be considered by the RR prior to making any recommendation.
- RRs may not infer that the customer's only choice or sound option is rolling funds to an IRA managed by Alpine; also, IRAs cannot be represented as "free" or without cost or fees.

## 11.15 Pension And Retirement Accounts

[U.S. Dept. of Labor Retirement Plans web site: http://www.dol.gov/dol/topic/retirement/index.htm]

This section is divided into four areas:

1. A general explanation of ERISA requirements
2. General guidelines when offering retirement plans
3. Individual plans established and funded by the investor
4. Employer-sponsored plans

Because of frequent changes to laws affecting contribution levels and other requirements or limitations, some details are not included in these general explanations; individual plans should be referenced for details.

Questions regarding retirement accounts should be referred to the appropriate marketing specialist or to Compliance.

ALPINE_LIT169040

## 11.15.1 Employee Retirement Income Security Act (ERISA)

This section provides a general overview of ERISA and how it affects pension and retirement accounts; it does not deal with the complex legal requirements of the Act. Legal counsel should be consulted regarding questions about ERISA and its affect on pension or retirement accounts.

### 11.15.1.1 Introduction

The Employee Retirement Income Security Act of 1974 (ERISA) is a federal law that sets minimum standards for most voluntarily established pension and health plans in private industry and provides protection for individuals in these plans.

ERISA applies to all Internal Revenue Service-qualified pension and profit sharing plans and employee welfare benefit plans. Most IRA accounts, while not covered by ERISA, are subject to the prohibited transaction penalties. Limited exemptions apply to governmental (public employee) plans and certain offshore and church plans.

This section provides a general overview of ERISA. Because of the technical and legal nature of ERISA, questions should be referred to Compliance or outside legal counsel.

### 11.15.1.2 Key Definitions

A "fiduciary" is generally anyone with discretionary authority or control over the management of a plan, the administration of the plan, or the disposition of plan assets. Fiduciaries must comply with certain statutory duties which include prudence and diversification of investments and the duty to act in accordance with the governing instruments of the plan.

A person or entity providing services to an ERISA plan is considered a "party-in-interest" to the plan. This status generally applies to broker-dealers providing traditional brokerage services to ERISA plans. Alpine's role in relation to ERISA plan accounts generally is as a party-in-interest unless Alpine contracts to provide investment management services or other services where Alpine would become a fiduciary to an ERISA plan.

### 11.15.1.3 General Requirements When Dealing With ERISA Plans

Because of substantial legal liability, RRs are not permitted to become fiduciaries when dealing with ERISA accounts (unless Alpine has a specific program designed to meet legal requirements in offering those services). The following summarizes requirements and limitations:

- RRs may not accept responsibilities regarding administration of a plan (other than following instructions for contributions, distributions and investments from authorized persons acting on behalf of the plan).
- RRs may not be named trustees to plans (unless specifically authorized by Compliance).
- Recommendations to ERISA plans must be consistent with investment policies of the plans.

### 11.15.1.4 Disclosures To Plans

[ERISA Section 408(b)(2); Dept. of Labor Fact Sheet: http://www.dol.gov/ebsa/newsroom/fs408b2finalreg.html]

| Responsibility | • COO |
|---|---|
| Resources | • Plan contracts or arrangements<br>• Information regarding services provided and charges for services |
| Frequency | • Disclosures - reasonably in advance of the date the contract or arrangement is entered into and extended or renewed |

ALPINE_LIT169041

| | |
|---|---|
| | • Changes or errors in disclosures - as required (see below) |
| **Action** | • Identify plans and services subject to 408(b)(2) requirements<br>• Assemble information necessary to make required disclosures<br>• Provide disclosures at time of initial contract/arrangement and when changed, errors are identified, or contracts/arrangements are terminated<br>• Respond to fiduciaries/plan administrators when additional information is requested |
| **Record** | • Covered plans<br>• Disclosures provided including dates provided |

Under ERISA, "covered service providers" are required to provide fee disclosures to covered plans to enable the plan fiduciary to make an informed decision about the reasonableness of fees as required under ERISA Section 404(a)(1). Alpine's obligation to provide disclosures depends on Alpine's role in dealing with a covered plan. This section provides a general explanation of the requirements which are complex; the ERISA section should be consulted for specific requirements. This task may also be performed by a designee of the COO.

## 11.15.1.5 Permissible Transactions

Generally, trading in ERISA accounts is subject to the "Prudent Investor Rule" which is discussed in the next section. Allowable transactions are governed by ERISA (and related Department of Labor and IRS rulings), the investment policy of the ERISA plan, and trading guidelines in a managed account program or other trading program if such a program is used.

Some types of transactions (such as margin or certain option transactions) are associated with added risk, and it may be necessary for Compliance to review the plan to determine whether the type of transaction is permissible.

### 11.15.1.5.1 Definitions

**Covered plan:** An ERISA-covered defined benefit and defined contribution pension plan. Does not include simplified employee pension plans (SEPs), SIMPLE retirement accounts, IRAs, employee welfare benefit plans, and certain annuity contracts and custodial accounts described in ERISA Code section 403(b).

**Covered service provider:** A service provider that enters into a contract or arrangement with the covered plan and expects $1,000 or more in direct or indirect compensation that is received in connection with providing services defined in Section 408(b)(2) including:

- ERISA fiduciary service providers to a covered plan or to a "plan asset" vehicle in which such plan invests
- Investment advisers registered under Federal or State law
- Record-keepers or brokers who make designated investment alternatives available to the covered plan (*e.g.,* a "platform provider")
- Providers of one or more of the following services to the covered plan who also receive "indirect compensation" in connection with such services:
    - Accounting, auditing, actuarial, banking, consulting, custodial, insurance, investment advisory, legal, recordkeeping, securities brokerage, third party administration, or valuation services

### 11.15.1.5.2 Required Disclosures

Disclosures include:

ALPINE_LIT169042

- Description of services
- If applicable, that the services are provided in the role of fiduciary
- Compensation, including:
  - Description of all direct compensation either in aggregate or by service to be received
  - Indirect compensation expected to be received
  - Description that compensation will be paid among related parties including identification of payers and recipients of compensation
  - Description of any compensation to be received in connection with termination of the contract or arrangement and how any prepaid amounts will be calculated and refunded upon termination
- Recordkeeping services, if applicable, including direct and indirect compensation related to such services or, if not explicitly compensated, a reasonable and good faith estimate of the cost to the covered plan of such services
- Manner of receipt of the compensation
- Fiduciary services provided and related compensation
- Recordkeeping and brokerage services with respect to each designated investment alternative for which recordkeeping or brokerage services are provided


**11.15.1.5.3 Timing Of Disclosures**

- Required disclosures must be provided reasonably in advance of the date the contract or arrangement is entered into and extended or renewed.
- Changes must be provided as soon as practicable but no later than 60 days from the date on which the covered service provider is informed of the change.
- In the event of an error in a disclosure, the covered service provider must correct the information as soon as practicable but no later than 30 days after knowing of the error or omission.
- Requests for other compensation information from the fiduciary or covered plan administrator must be provided within 30 days following receipt of a written request.


## 11.15.1.6 Disclosures To Plan Participants

[ERISA Section 404(a)(5); SEC no-action letter to the Department of Labor dated October 26, 2011: http://www.sec.gov/divisions/investment/noaction/2011/do1102611-482-htm; FINRA Regulatory Notice 12-02]

| Responsibility | • COO |
|---|---|
| Resources | • Plans for participant-directed individual account plans<br>• Performance and cost information required to be disclosed |
| Frequency | • As required |
| Action | • Determine if [The Firm] and any firm-prepared materials for plan participants are subject to disclosure requirements<br>• Assemble information necessary to make required disclosures<br>• If subject investments are investment companies, contact Compliance to determine whether materials must be filed with FINRA (written materials that conform to the ERISA rule requirements are not required to be filed per the SEC no-action letter)<br>• Provide disclosures to participants or to plan administrator for distribution to participants |
| Record | • Disclosures provided including when and to whom provided |

ALPINE_LIT169043

This task may also be performed by a designee of the COO. ERISA Rule 404(a)(5) requires the disclosure of certain plan and investment-related information, including performance information, to participants and beneficiaries in participant-directed individual account plans. Information is required to be presented in a comparative chart format to enable participants to make an informed decision when managing their accounts.

If Alpine compiles and/or provides the required information, it will comply with the requirements of Rule 404(a)(5). Where the investment alternatives include investment companies subject to other SEC and FINRA rules regarding communications with the public, the disclosures will comply with those requirements or exemptions to requirements.

### 11.15.1.7 Prudent Investor Rule And Diversification

Trading in ERISA accounts is subject to the "prudent investor" rule (also known as the Prudent Man Rule) which is a standard that is generally understood to mean that individuals involved with investment decision-making, act with the same care, skill, prudence and diligence as a prudent man would in the same capacity given the same set of circumstances. This measure is not judged on the risk of a single investment but by the investment's relationship to the overall portfolio.

ERISA also requires that investments in a covered plan be diversified to minimize the risk of large losses unless it is clearly prudent not to do so.

### 11.15.1.8 Prohibited Transactions

Federal laws prohibit plan assets from being used by a fiduciary for certain transactions (known as "prohibited transactions"). Fiduciaries are prohibited from dealing in plan assets for their own benefit or for the benefit of a third party with whom the fiduciary is affiliated. The Department of Labor (and other government agencies) have issued exemptions from the prohibited transaction rules which allow plans and broker-dealers to engage in some but not all types of securities transactions. The range of permissible transactions varies depending on whether the broker-dealer is a fiduciary to the plan.

## 11.15.2 General Guidelines When Offering Retirement Plans

Plans differ depending on the law under which they are established. Differences include limits on contributions, tax deductibility, costs, types of plan sponsors (employer or otherwise), and who may participate. The following sections provide general explanations of various types of common retirement accounts. Some of the general guidelines that apply to retirement plan sales include the following. Specific plans should be consulted for limitations and requirements.

- Avoid tax-sheltered investments such as annuities and municipal securities, which generally are not suitable for retirement plans since plans already provide tax benefits.
- Consider the cost of investments recommended for retirement plans vs. the benefits.
- Consider the customer's risk profile and investment objectives when considering securities for recommendation for a retirement plan.
- Consider surrender or exit fees or tax penalties if they apply to the potential transaction.
- Understand the type of plans being discussed or recommended.
- Encourage investors to contact their tax counsel to resolve any tax-related questions.

## 11.15.3 Individual Retirement Accounts (IRAs)

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Plan applications<br>• New account applications<br>• Transaction reports |

ALPINE_LIT169044

| | |
|---|---|
| | • Proposed marketing presentations |
| **Frequency** | • As required - opening accounts<br>• As required - review and approve/disapprove marketing presentations<br>• Daily - review of transactions<br>• Ongoing - provide training |
| **Action** | • Review applications/new account forms for consistency of investment objectives with proposed investments/rollovers<br>• Review transactions for consistency with investment objectives and take corrective action when necessary which may include contact with RR to discuss transactions vs. objectives; contact with customer; contact with Compliance; adjustments to current or future investments<br>• Review marketing presentations/seminar presentations regarding accuracy of information to be presented, experience/knowledge of RR making presentation and approve (making adjustments if necessary or disapprove)<br>• Provide training when new plans/products are offered to retirement accounts and when 401(k) plan participants will be targeted for marketing efforts |
| **Record** | • Plan/new account documents<br>• Transactions reviewed including notes of action taken, if any<br>• Marketing presentations/seminars with approval or disapproval<br>• Records of training regarding products/services, who attended, and when training was provided |

IRAs are established by individuals through a plan sponsor; following are key features:

• Annual contributions are limited by law
• Older investors have higher contribution limits under a "catch-up" provision
• Contributions may or may not be tax deductible, depending on the IRA owner's income level
• Contributions are from earned income (other than contributions to a non-working spouse's IRA)
• Certain types of investments such as precious metals are not permitted in an IRA
• Early withdrawals (prior to age 59 1/2) may result in tax penalties
• Owners of traditional IRAs are required to begin withdrawing by the year following the year the owner turns 70 1/2

There are multiple types of IRAs including:

• Traditional IRAs; contributions may or may not be tax deductible depending on the IRA owner's income
• Roth IRA:
  ○ all contributions are in after-tax dollars
  ○ withdrawals are not taxed at the time of withdrawal if the IRA owner is at least 59 1/2 years old and the Roth IRA has been open 5 years or longer
  ○ some high wage earners are not eligible to open Roth IRAs
  ○ no mandatory withdrawals after age 70 1/2
• Individual retirement annuity; a traditional or Roth IRA set up with a life insurance company through the purchase of a special annuity contract
• Simplified Employee Pension (SEP-IRA); a traditional IRA set up by an employer for employees; limitations on contributions apply
• Spousal IRA; traditional or Roth IRA funded by a married taxpayer in the name of a spouse (who has limited earnings)
• Rollover IRA: funded with money that is already in a qualified retirement plan; allows moving the money without owing any tax at the time of the rollover (assuming the requirements for a rollover are met)

ALPINE_LIT169045

### 11.15.3.1 Rollovers

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Rollovers |
| **Frequency** | • Ongoing |
| **Action** | • Review rollovers for:<br>  ○ Conflict of interest earning commissions vs. fees and what is more appropriate for the customer<br>  ○ Suitability<br>• Include topic in periodic training, when and where appropriate |
| **Record** | • Review of rollovers and action taken<br>• Training including content and attendance records |

Alpine and its RRs have responsibilities when recommending a rollover or transfer of assets in an employer-sponsored retirement plan to an IRA and when marketing IRAs and associated services. A plan participant leaving an employer has typically four options (which may include a combination of options):

- Leave the money at the employer's plan, if permitted
- Roll over assets to a new employer's plan, if available and permitted
- Roll over to an IRA
- Cash out the account value

When recommending a rollover to an IRA, some considerations include the following:

- Investment options may be broader in an IRA, but the customer may be satisfied with options under an employer plan.
- Fees and expenses may be higher for an IRA; an employer may pay fees and expenses in its plan; IRA fees may include administrative, account set-up and custodial fees.
- Services may differ between employer plans and various IRAs; such services include planning tools, telephone help lines, workshops, educational material, *etc.*
- Penalty-free withdrawals are available from an employer plan to an employee leaving a job between age 55 and 59 1/2, and it may be easier to borrow from the plan. Such withdrawals may be made from an IRA only after the investor reaches the age of 59 1/2.
- Unlimited protection from creditors and legal judgments is available to plan assets under federal law. IRA assets are protected in bankruptcy only; state laws vary in protecting IRAs in lawsuits.
- Required minimum distributions apply to individuals reaching the age 70 1/2 for both plans and IRAs. However, if the individual continues working past 70 1/2, minimum distributions from the current employer's plans are delayed past 70 1/2.
- Appreciated employee stock in a plan will be subject to negative tax consequences of taxation at ordinary income tax rates vs. long term capital gains if rolled into an IRA. A balancing factor is if the employee is overly-concentrated in the employer stock and is unable to reduce exposure in the plan.
- IRAs cannot be promoted as "no-fees" since the term could mislead investors who typically pay fees in some way to maintain an account. For example, the cost of a "no-fee" account may be subject to higher commissions instead of highlighted as a separate charge. This promotional strategy could attract investors into a rollover that may ultimately be more costly than staying in an employer plan.

RRs have the obligation to consider the suitability of any recommended rollover considering the above factors and others that may apply to the customer and the customer's investment objectives, tax situation, and finances. Explanation of the reason and justification for a rollover must accompany the rollover transaction.

ALPINE_LIT169046

### 11.15.4 Employer-Sponsored Plans

Employers may offer different types of plans including traditional pension and profit-sharing plans that are funded entirely by the employer. All eligible employees participate and employer contributions are above and beyond the employee's salary. This section describes other types of employer-sponsored plans that give eligible employees the opportunity to put a portion of current income into a tax-deferred investment account. Participation may be voluntary or mandatory, and employers may make matching contributions.

The following sections provide a general explanation of these various plans.

### 11.15.4.1 401(k) Plans

- Established by corporations
- Permit their employees to make contributions through payroll deductions from pre-tax income [traditional 401(k) plans]; tax is applied when withdrawals are taken
- 401(k) plans permit employees to make contributions through payroll from after-tax dollars; there is no tax on withdrawals made after age 59 1/2, if the 401(k) has been open 5 years or longer
- Both traditional and Roth 401(k) plans can be rolled over to an IRA (or a new employer's plan, if the plan permits) if the investor leaves the company
- No mandatory withdrawals for Roth 401(k) plans; mandatory scheduled withdrawals apply to traditional 401(k) plans

#### 11.15.4.1.1 Limitations On Advice

[Pension Protection Act of 2006 Title VI; U.S. Department of Labor Field Assistance Bulletin No. 2007-01]

Providing investment advice to 401(k) plan sponsors and participants is subject to strict limitations and requirements. Providing investment advice places the RR in the role of a fiduciary which creates the legal liabilities associated with fiduciaries.

RRs are limited to offering Firm-approved educational material and third-party advisory plans offered through Alpine.

### 11.15.4.2 403(b) Plans

[IRS 403(b) publication: http://www.irs.gov/publications/p571/ch01.html]

A 403(b) plan is a salary reduction plan offered by non-profit, tax-exempt employers such as schools and colleges, hospitals, and foundations. Individual accounts in a 403(b) plan invest in two categories of investments:

- An annuity contract provided through an insurance company (fixed or variable)
- Mutual funds

Features include:

- Individuals cannot establish 403(b) accounts; only employers may set up accounts
- For non-Roth plans:
    - Employees make pre-tax contributions and employers sometimes match contributions
    - Tax on contributions and earnings and gains on investments are paid when the investor begins withdrawing funds
    - Mandatory withdrawals after age 70 1/2
- If the plan is a Roth contribution plan, tax is paid on contributions to the plan but withdrawals are not taxed; no mandatory withdrawals

ALPINE_LIT169047

- Some 403(b) plans impose steep surrender charges

### 11.15.4.3 457 Plans

These plans are offered by a state or local government or a non-profit organization. A 457 plan is a deferred compensation plan similar to 401(k) or 403(b) plans.

- Pre-tax income is contributed
- No tax on contributions; withdrawals are subject to tax
- Technically the portion of salary contributed to the plan is not owned by the employee; the plan sponsor owns all of the 457 plan assets which are held in trust for the employee in an account set up in the employee's name
- Mandatory withdrawals after age 70 1/2
- No early withdrawal tax penalties if funds are paid to the employee when leaving the job prior to reaching age 59 1/2; withdrawal is subject to normal income tax
- May be rolled over to an IRA or a new employer's plan to retain tax-deferred status

### 11.15.4.4 SIMPLEs (Savings Incentive Match Plans For Employees)

- Offered by small companies with 100 or fewer employees who earn at least $5,000 each during the year
- Less complicated to set up and administer than 401(k) or 403(b) plans
- Two types: SIMPLE IRA and SIMPLE 401(k), both with same contribution limits and catch-up contributions for people 50 or older
- Employer must contribute to the plan in one of two ways, a fixed contribution or a matching contribution
- Account must be open for 2 years before the employee can move the money or take it out; early withdrawal is subject to significant tax penalties

## 11.16 Foreign Accounts

Accounts for residents of foreign countries may be subject to special requirements under securities laws of the foreign country. Before opening an account for a person or entity residing in a foreign country, contact Compliance for further information regarding any special restrictions or requirements.

## 11.17 Payments to Unregistered Persons

[SEC Securities Exchange Act of 1934 Section 15(a); FINRA Rule 2040; FINRA Regulatory Notice 15-07]

FINRA Rules 1060(b) and 2420

| Responsibility | • OSJ Branch Manager or designee<br>• CCO or designee |
|---|---|
| Resources | • Requests regarding referral arrangements |
| Frequency | • Review of requests: As required |
| Action | • OSJ Branch Manager or designee: identify unauthorized referrals in reviews of public communications and refer them to the CCO or designee for follow up<br>• CCO or designee:<br>   o Confirm whether an unregistered person proposed to receive compensation is required to be registered by:<br>     ▪ Reviewing regulatory releases, no-action letters or interpretations |

ALPINE_LIT169048

| | |
|---|---|
| | • Requesting an SEC no-action letter<br>• Obtaining a legal opinion from counsel<br>o Review requests for referral arrangements and determine compliance with regulatory and firm policy requirements and approve or disapprove; for approved arrangements establish guidelines for arrangements including any compensation<br>o For investment adviser referrals:<br> ▪ If compensation will be received for referrals, determine whether investment adviser registration is required for Alpine and the RR<br> ▪ Maintain a list of approved IAs<br> ▪ Review IAs to be included on the approved list including registration status, investment policies, suitability guidelines for investors<br> ▪ Establish monitoring program and monitor results vs. IA stated performance<br> ▪ Re-evaluate IA participants at least annually<br>o For foreign finders, conduct due diligence as outlined in *Referrals from Nonregistered Foreign Finders*, provide customer disclosure and obtain acknowledgement; and establish disclosure on customer confirmations<br><br>o For hedge fund or other investment referrals, the proposed investment is subject to new product review procedures (see the related section in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*) |
| **Record** | • OSJ Branch Manager or designee: Review of communications and referrals to CCO or designee<br>• CCO or designee:<br>o Review/approval of referral arrangements<br>o Reviews of IAs included on approved list<br>o Reviews of nonregistered foreign persons; customer disclosure and acknowledgement<br>o Records of monitoring and reviews |

This section explains limitations and requirements for proposed payments to outside persons or entities and referral payments to other Firm employees or departments. Any such payments require **prior approval** by the CCO or designee.

## 11.17.1 Definition Of Eligibility

FINRA rules prohibit firms or associated persons from directly or indirectly paying compensation, fees, concessions, discounts, commissions or other allowances to:

- any person that is not registered as a broker-dealer under Exchange Act Section 15(a); or
- any registered person unless such payment complies with all applicable federal securities laws, FINRA rules and Exchange Act rules and regulations.

Rule 2040(a) directs firms to look to SEC rules to determine whether the activities in question require registration as a broker-dealer under Exchange Act Section 15(a).

## 11.17.2 Referrals

Referrals are an important part of our business. Satisfied customers may refer others to [The Firm] and may also seek referrals from employees when they need services not provided by [The Firm]. It is important that

ALPINE_LIT169049

referrals to others are based on sound knowledge about the other person or company. In addition, FINRA rules restrict compensation to unregistered persons or entities.

Key requirements regarding referrals include the following:

- Employees are expected to make referrals involving investments or investment advisory services only to persons or companies included in a firm-sponsored program or on a list of firm-approved providers.
- Employees are prohibited from receiving compensation for referrals except through firm-sponsored programs.
- Any proposed compensation, whether for referring or receiving referrals, must be approved **in advance** by Compliance.
- Referrals involving compensation may require disclosure to the customer of potential conflicts of interest.
- Non-cash compensation is subject to the policy described in the chapter *ORDERS*.

## 11.18 Death Of A Customer

When a customer dies, the account assets owned by the deceased person may become subject to a will, estate laws, and other governing laws or documents. The assets are, therefore, frozen in the account until necessary documents are received and legal distribution has been determined. Joint accounts and other accounts where the deceased person is a joint owner with others may be subject to certain distribution requirements depending on the styling of the account.

When a customer dies, the RR should:

- immediately notify Operations
- consider assets in the deceased person's account as "frozen" until distribution of assets has been determined, *i.e.,* accept no orders and do not authorize sending of securities or funds from the account
- cancel all open orders

## 11.19 Customer Portfolio And Cross-Reference Records

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Electronic customer portfolio and security cross-reference records |
| **Frequency** | • Semi-annually |
| **Action** | • Review records for:<br>　○ Completeness<br>　○ Patterns of accumulating securities (cross-reference)<br>　○ Suitability (customer portfolio) |
| **Record** | • |

Alpine provides electronic customer portfolio and security cross-reference information to RRs. The customer portfolio is a cumulative, chronological record of securities transactions, by customer. The security cross-reference is a cumulative, chronological record of transactions, by security, that identifies the customers and details of each transaction.

ALPINE_LIT169050

## 11.20 Active Accounts

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Transaction Reports<br>• Written correspondence (including electronic) |
| Frequency | • Daily |
| Action | • Review daily trade blotters to identify trends of unnecessary and excessive trading where a broker could potentially be churning an account to generate excess commissions, particularly solicited transactions.<br>• Review correspondence (electronic & written) for evidence of churning activities, Including, but not limited to:<br>    ○ Client expressing concern about commissions/fees<br>    ○ Client asking about unauthorized trading in account<br>    ○ RR using verbiage conducive to deceptive trading practices<br>      -etc…<br>• Take correction action, if appropriate, which may include:<br>    ○ Conferring with the RR<br>    ○ Contacting the customer<br>    ○ Consulting with Compliance<br>    ○ Cancelling Trades<br>    ○ Disciplinary action against RR |
| Record | • Daily transaction reports electronically reviewed, initialed, and stored<br>• Any action taken, adverse or other, noted and retained in employee file |

Alpine does not permit discretionary trading in any form. Due to Alpine's current business model, generally speaking, Alpine's RR's do not typically solicit transactions. Alpine's trading activity is reviewed and signed off on daily by the OSJ Branch manager or designee. Any solicited transaction is scrutinized and a trend of solicitations would be scrutinized to a greater extent. Due to the illiquid and unpredictable nature of OTC Penny stocks, it is Alpine's policy that the RR must speak with a client and receive verbal and/or written instructions prior to entering an order for a client. A RR may use limited time and price discretion as long as the order is properly entered for the appropriate duration and noted accordingly. These and other factors may increase the amount of transactions that occur in a client account. If there is the appearance or suspicion of excessive trading (churning), the OSJ Branch Manager will address the situation as appropriate on a case-by-case basis.

## 11.21 Concentrations

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order records<br>• Transaction reports<br>• Margin records<br>• New account records |
| Frequency | • As needed |
| Action | In those cases involving a margin account or where a RR has made a recommendation |

ALPINE_LIT169051

| | involving a microcap security, the OSJ Branch Manager will:<br><br>• Identify concentrated positions<br>• If the security is a low-cap or other unknown security, check blue sky status<br>• Review the customer's new account profile, particularly the investment objectives<br>• Confer with the RR about concentrations, if necessary<br>• Confer with the customer, if appropriate<br>• Restrict future purchases for individual or all customers, if appropriate |
|---|---|
| **Record** | • Reviews of concentrated positions including action taken |

Accounts that are concentrated in certain security positions may increase risk for the customer, particularly if the security is purchased on margin. RRs must consider the following factors for concentrated customer accounts:

• Is the concentrated position in a margin account?
• Do trading characteristics (thinly-traded, limited markets) create added risk to the customer?
• If the concentrated position is higher-risk, is the customer aware of this risk and suitable for such a position or positions?
• Should the concentrated position be mitigated by reducing margin exposure or selling off some of the position?

Alpine will adopt the policy outlined above as it relates to margin accounts or in those cases where a RR recommends securities that meet the criteria noted above. Otherwise, this policy will typically not apply based on Alpine's current business model.


## 11.21.1 Penny Stock Rules


## 11.21.2 Rule 15g-1 et. seq.

The Commission has on two occasions promulgated rules relating to transactions in OTC low priced securities. On the first occasion, the Commission promulgated the so-called "cold call" rule which applied to the solicitation of customer purchases of OTC low priced securities. On the second occasion, the Commission promulgated a series of rules known as the "penny stock" rules which governed disclosure which broker-dealers are required to make in connection with both the purchase and sale of low priced OTC stocks. These rules have now been consolidated into a single set of rules beginning with rule 15g-1 and continuing through rule 15g-9 under the Exchange Act.

The penny stock rules only apply to so-called "penny stocks". The definition of that term is contained in section 3(a)(5)(1) of the Exchange Act. In substance, any equity security is a penny stock unless it falls within the following exclusions from the definition:

(1) Securities traded on national securities exchanges

(2) Securities traded on NASDAQ (both NASDAQ/NMS and NASDAQ Small Cap)

(3) Securities issued by an investment company registered under the Investment Company Act of 1940

(4) A security whose issuer has net tangible assets in excess of $2,000,000, if the issuer has been in continuous operation for at least three (3) years; or, $5,000,000, if the issuer has been in continuous operation for less than three (3) years; or, average revenue of at least $6,000,000 for the last three (3) years

(5) Any security that is a put or call option issued by the Options Clearing Corporation

ALPINE_LIT169052

(6) Any security that has a price of $5.00 or more

Certain of the foregoing exclusions from the definition of the term "penny stock" are somewhat technical. For instance, the determination of whether or not an issuer has net tangible assets in excess of $2,000,000 or $5,000,000 may require some expert analysis. In addition, the determination of whether or not a security has a price of $5.00 or more can be difficult to determine. Other exclusions are fairly straight forward such as NASDAQ listed stock or a New York Stock Exchange listed stock. Therefore, an appropriate principal should be consulted with respect to any question as to whether or not a particular security falls under the coverage of the penny stock rules.

In addition to the exclusions from the definition of the term penny stock, there are exemptions from the coverage of the penny stock rules. In substance, those exemptions include the following:

(1) Transactions by a broker or dealer whose commission equivalents, markups and markdowns from transactions in penny stocks during each of the immediate preceding three (3) months and during eleven (11) or more of the preceding twelve (12) months or during the immediately preceding six (6) months, did not exceed 5% of his total commissions, commission equivalents, markups and markdowns from transactions during those months.

(2) Transactions by a broker or dealer who has not been a market maker in the penny stock that is the subject of the transaction in the immediately preceding twelve (12) months.

(3) Transactions in which the customer is an institutional accredited investor as defined in rule 501(a)(1), (2), (3), (7) or (8) of Regulation D under the Securities Act.

(4) Transactions that meet the requirements of Regulation D under the Securities Act or transaction with an issuer not involving any public offering pursuant to section 4(2) of the Securities Act.

(5) Transactions in which the customer is the issuer, or a director, officer, general partner, or direct or indirect beneficial owner of more than 5% of any class of equity security of the issuer, of the penny stock that is the subject of the transaction.

(6) Transactions that are not recommended by the broker or dealer, including 144 sales.

Here again, the exemptions from the coverage of the penny stock rules can be somewhat technical. Therefore the appropriate principal should be consulted with respect to whether or not a particular transaction must comply with the penny stock rules.

The portion of the penny stock rules that relate to disclosures which must be made in connection with penny stock transactions consist of rules 15g-1 through 15g-7. The old "cold call" rule, which has now been consolidated with the penny stock rules, is rule 15g-9.

Penny Stock Disclosure Rules

(1) Rule 15g-2 states, in substance, that it is unlawful for a broker or dealer to effect a transaction in any penny stock for or with the account of a customer unless prior to effecting such transaction, the broker or dealer has furnished to the customer a document containing specified information and has obtained from the customer a manually signed and dated written acknowledgement of receipt of that document. This written acknowledgement must be preserved as part of the broker-dealer's books and records for a period of not less than three (3) years. Alpine has obtained printed forms for this purpose which includes the written acknowledgement of receipt of the document manual signature of the customer.

(2) Rule 15g-3 requires, in substance, that the broker-dealer disclose to the customer the inside bid quotation and the inside offer quotation any penny stock that is the subject of a proposed transaction. The terms inside bid quotation and inside offer quotation mean the highest bid quotation and the lowest offer quotation for the security displayed by a market maker in the security on the FINRA's Bulletin Board at any time in which at least

ALPINE_LIT169053

two market makers are contemporaneously displaying bid and offer quotations for the security at specified prices. Although there is a system outlined in rule 15g-3 for disclosure of bid and offer prices when an inside bid and inside offer are not available.

The foregoing disclosure of the inside bid and inside offer must be made on two occasions. The information must be provided to the customer orally or in writing prior to effecting any transaction with or for the customer and is required to be given or sent to the customer again, in writing, at or prior to the time that any written confirmation of the transaction is given or sent to the customer. Due to the fact that Alpine must make a record of the fact that the pre-transaction disclosure was made and keep that record for a period of at least three years, registered representatives will be required to note on the order ticket the inside bid quotation and inside offer quotation disclosed to the customer when the order was taken. The same information will be provided to the customer on the confirmation or in writing which accompanies the confirmation.

(3) Rule 15g-4 requires, in substance, that the broker-dealer disclose to the customer the aggregate amount of any compensation received by the broker-dealer in connection with the penny stock transaction. In this regard, if a broker is acting as an agent for a customer, it must disclose the amount of the total commission which will be received from the customer in connection with the transaction. If a dealer other than a market maker purchases the penny stock, as principal, from another person to offset a contemporaneous sale to the customer, or after receiving a sell order from a customer, sells the penny stock, as principal to another person to offset a contemporaneous purchase from the customer, the difference between the price to the customer and the price of contemporaneous purchase or sale is the compensation which must be disclosed to the customer. Finally, if the dealer is a market maker in the security and is acting as principal for its own account, the compensation to the firm which must be disclosed is the difference between the price to the customer and the prevailing market price. For purposes of rule 15g-4 only, a market may be deemed to be "active and competitive" in determining the prevailing market price with respect to a transaction by a market maker if the aggregate number of transactions effected by such market maker in the penny stock in the five (5) business days preceding such transaction is less than 20% of the aggregate number of all transactions in the penny stock reported on the FINRA's Bulletin Board during such five (5) day period. Here again, the disclosure of the compensation to be received by the broker-dealer must be made on two occasions: first, it must be made to the customer orally or in writing prior to effecting any transaction with or for the customer for the purchase or sale of the penny stock and secondly, it shall be given or sent to the customer in writing at or prior to the time that any written confirmation of the transaction is given or sent to the customer. As is the case with disclosure of bid and offer quotations, Alpine must make a record of the fact that it made the required disclosure before the transaction was effected. Therefore, the registered representative will also record the amount of compensation to be received by the firm which he or she disclosed to the customer on the order ticket when the customer places the order to buy or sell.

(4) Rule 15g-5 requires, in substance, that the aggregate amount of cash compensation that any associated person of the broker or dealer who is a natural person and has communicated with a customer concerning the transaction at or prior to receipt of the customers transaction order (other than any person whose function is solely clerical or ministerial) has received or will receive from any source in connection with a transaction and that is determined at or prior to the time of the transaction including separate disclosure, if applicable, of the source and amount of such compensation that is not paid by the broker or dealer. Where a portion of all of the cash or compensation that the associated person may receive in connection with the transaction may be determined and paid following the transaction based on aggregate sales volume levels or other contingencies, the disclosure shall state that fact and describe the basis upon which such compensation is to be determined.

The disclosure requirement in rule 15g-5 is subject to the same requirements as the disclosure required in rules 15g-3 and 15g-4. In other words, disclosure must be made to the customer before the transaction is effected and again at or prior to the time that any written confirmation of the transaction is given to the customer. Again, because Alpine must make a record of the fact that the disclosure was made before the transaction was effected, the registered representative will be required to set forth on the order ticket the amount of compensation to be received by associated persons which he or she disclosed to the customer when the order was taken.

(5) Rule 15g-6 requires, in substance, that monthly account statements be sent to customers to whom Alpine sold penny stocks. Although there is an exemption from the monthly account statement requirement, because

ALPINE_LIT169054

that exemption is on a customer by customer basis, it is not practical to single out individual customers to whom Alpine may not need to send monthly account statements unless account statements are required to be sent to only a few customers of Alpine.

The monthly account statements are required to disclose to the customer, in substance, the identity and number of shares or units of each penny stock held for the customers account, the estimated market value of each penny stock to the extent that such can be determined in accordance with specific provisions of the rule; and, if not, a statement that there is "no estimated market value" with respect to the security. The account statement is also required to include a legend which is in essence a warning that the values set forth in the account statement for the penny stocks may not be reliable.

(6) Rule 15g-9 is the old "cold call" rule. In substance, this rule requires that the broker-dealer employ certain procedures whenever it sells a penny stock to a customer.

Prior to the transaction, the broker-dealer must (1) approve the persons account for transactions in penny stocks in accordance with the procedures set forth below, and (2) must obtain from the person a written agreement to the transaction setting forth the identity and quantity of the penny stock to be purchased. In order to approve the persons account for transactions in penny stocks, the broker-dealer must obtain information from the person concerning the person's financial situation, investment experience and investment objectives and must reasonably determine, based on said information and any other information known by the broker-dealer, that transactions in penny stocks are suitable for the person and that the person has sufficient knowledge and experience in financial matters that he or she reasonably may be expected to be capable of evaluating the risks of transactions in penny stocks. It is unlawful for the broker-dealer to effect a transaction in a penny stock subject to the provisions of rule 15g-9 unless the broker or dealer has received, prior to the transaction, a written agreement to the transaction from the person; stating in highlighted format immediately preceding the customer's signature line that the broker or dealer is required by this section to provide the person with a written statement and that the person should not sign and return the written statement to the broker or dealer if it does not accurately reflect the person's financial situation, investment experience, and investment objectives. Finally, the broker-dealer must obtain from the person a manually signed and dated copy of the foregoing written statement.

Alpine has developed specific forms for obtaining a written agreement to any penny stock transaction setting forth the identity and quantity of the penny stock to be purchased and for making the suitability determination. Alpine has also developed a suitability determination form. The suitability determination form contains the written statements which are required to be delivered to the person whose suitability for penny stock transactions is being determined and is used in duplicate form in order to obtain the required manual signature of the prospective customer.

There is one exemption from the coverage of this rule that applies only to rule 15g-9. This is the exemption for transactions in which the purchaser is an established customer of the broker or dealer. In this regard, the term "established customer" means any person for whom the broker or dealer, or a clearing broker on behalf of such broker or dealer, carries an account, and who in such account has (1) effected a securities transaction, or made a deposit of funds or securities, more than one year previously; or (2) made three purchases of penny stocks that occurred on separate days and involved different issuers.

**Summary**

**Due to the fact that the penny stock disclosure rules and the "cold call" rule were promulgated by the Commission on separate occasions, people in the securities industry have a tendency to apply the "established customer" exemption from the "cold call" rule to the penny stock disclosure rules as well. This is a grievous mistake inasmuch as there are no exemptions from the penny stock disclosure rules for transactions with "established customers". Therefore, if Alpine goes through the process of qualifying customers as "established customers" for purposes of rule 15g-9, it must still comply with the penny stock disclosure rules (rules 15g-1 through 15g-7) in connection with the transactions in penny stocks affected with those "established customers".**

ALPINE_LIT169055

## 11.22 Concentrated Positions

Alpine has established procedures to detect, monitor and evaluate the risks of potential accumulation of large positions of a certain security in particular accounts. The process for determining whether or not a stock position questionnaire is required for an Alpine client's stock position received into Alpine is based on the reviews performed by individuals, at various levels within the company. The stock position questionnaire is another tool Alpine uses to better know its customers and to assess risk of manipulation or market domination, based on the size of a position or transaction or related transactions, in a particular security. Some of the items that are reviewed and analyzed to determine whether or not a stock position questionnaire is required may include the following:

☐ Number of shares received
☐ Number or Percentage (%) the stock position represents of the Total Outstanding shares or the numbers of publicly-traded shares (sometimes referred to as the "float")
☐ Dollar Value of the stock position
☐ What exchange or market the company trades on
☐ First time or reoccurring receipt of the same company stock

☐ Publicly available information, including information on the company and securities transactions

| Responsibility | • General Counsel or designee (in consultation with compliance, where appropriate) |
|---|---|
| Resources | • upon receipt of pending deposit |
| Frequency | • As needed |
| Action | • Review deposit requests for potential accumulation of large positions in accounts.<br>• Refer potential large positions to Compliance for further review, where applicable |
| Record | • Referrals (this information may be captured electronically through Alpine's e-mail archiving and retention system) or via paper format |

ALPINE_LIT169056

# 12 ORDERS

This chapter provides policies and guidelines for the entry and handling of customer orders. References to "order records" in this chapter includes electronic order tickets and manual order records, where appropriate.

## 12.1 Acceptance And Prompt Entry Of Orders

Orders should be accepted only from the beneficial owner of an account or their authorized agent. Authorized agents would include anyone holding third-party power to act on the customer's behalf such as a trustee, court-appointed guardian, authorized investment adviser, *etc.* Orders accepted from an unauthorized third party may result in rescission of the transaction and assigning the loss to the RR. For example, orders should not be accepted from a husband, on behalf of his wife's account, unless the wife has signed a trading authorization giving her husband authority to act on her behalf.

If an employee receives a telephone order from someone they do not recognize or know to be the owner of the account or person authorized to act on behalf of the account, identity should be requested before accepting the order. Identity verification information would include:

- account number; and
- social security number; or
- other identifying information on record.

RRs are obligated to transmit customer orders to the appropriate order execution desk or order facility promptly after receipt. Orders cannot be held for future entry; a limit order should be entered if the customer does not want to effect the transaction at the current market price.

## 12.2 Orders Requiring Approval

| Responsibility | • Head Trader<br>• OSJ Branch Manager or Designee (For Penny Stock Solicitations) |
|---|---|
| Resources | • Order records<br>• Daily Transaction Report<br>• Order Entry System<br>• Solicited Penny Stock Request Form |
| Frequency | • Daily<br>• When received/as needed (Solicited Penny Stock Request Form) |
| Action | • Instruct wire operator or other order entry person of orders requiring approval<br>• Review and approve or disapprove orders<br>• Remind RRs and order entry person of requirement for order approval when exceptions are noted<br>• If problem persists, take additional corrective action<br>• For solicitation of penny stocks, the Solicited Penny Stock Request form must be approved by OSJ Branch Manager or designee prior to the broker inputting order |
| Record | • Initials on Daily Transaction Report<br>• Notes of action taken on Daily Transaction Report, if appropriate<br>• Solicited Penny Stock Request Form retained on file |

ALPINE_LIT169057

| | • Daily trade blotter review (For Penny Stock Solicitations) |
|---|---|
| | |

Certain orders require approval because of rule requirements or Alpine policy. This section summarizes the orders requiring approval, when approval is required.

**ORDERS REQUIRING APPROVAL**

| Type of Order | When Approval Required | Designated Supervisor |
|---|---|---|
| Buy or sell order for 100,000 or more shares of penny stock | Time of entry | Head Trader |
| Solicited Buy of non-NASDAQ OTC security priced less than $5.00/share for new account | Prior to entry | OSJ Branch Manager or designee |
| Discretionary | Not Allowed | NA |

## 12.3 Solicited And Unsolicited Orders

### 12.3.1 Definition Of Solicited Order

When a transaction is recommended to a customer and the customer enters an order as a result of that recommendation, the resulting order is considered to be solicited. Other actions that may result in an order being deemed solicited include the mailing of a research report or other written communication for the purpose of encouraging the customer to act on the information provided or sending a prospectus on a new issue.

### 12.3.2 Solicited Orders Should Be Indicated

Customer orders that are solicited should be so marked on the order ticket for the transaction.

### 12.3.3 Prohibited Solicitations

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order records<br>• Daily Transaction Report |
| Frequency | • Daily |
| Action | • If prohibited solicitations are identified, take corrective action:<br>    o Solicitations contrary to Alpine's Restricted List may require cancellation; contact Compliance for guidance<br>    o Other exceptions may require different actions including cancellation of the transactions, removal of commissions, reminder to RRs, *etc.* |
| Record | • Initials on Daily Transaction Report<br>• Records of cancelled trades maintained with daily orders<br>• Other records as appropriate (reminder memo to RR, notes made on trade blotter, *etc.*) |

RRs may NOT solicit transactions listed below:

ALPINE_LIT169058

- Securities included on the Firm's Restricted List
- When securities are being sold under rule 144, purchasers may not be solicited

## 12.4 Suitability Of Recommendations

[FINRA Rule 2111; FINRA Regulatory Notice 13-31, 12-55 and 12-25; FINRA Suitability web page:
http://www.finra.org/industry/issues/suitability/; SIFMA Institutional Suitability Certificate: http://www.sifma.org/services/standard-forms-and-documentation/cross-product/]

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| **Resources** | • New account records<br>• Order records<br>• Transaction Reports<br>• Other available reports<br>• Customer monthly transaction records<br>• Institutional Suitability Certificates |
| **Frequency** | • Daily - review transactions<br>• Monthly - review of accounts<br>• When required - review/approve new accounts<br>• Periodically - training for RRs |
| **Action** | • Institutional Suitability Certificates<br>   ○ Where an institutional account fails to provide the Certificate, flag the account noting the form is not on file<br>   ○ Where the institution does not affirm its independence for all investments, flag the account regarding what investments are or are not affirmed<br><br>• Review customer orders for suitability which includes but is not limited to those factors listed below and other information known about the customer:<br>   ○ Customer new account information<br>   ○ Other securities held in the customer's account<br>   ○ Other information regarding the account, such as whether the account is managed by an investment adviser or uses other advisers or consultants in making investment decisions<br>   ○ Transactional information from daily transaction reports and monthly transaction records<br>   ○ Information obtained from the RR<br>   ○ Information obtained by contacting the customer<br>• Refer to new account records when necessary to identify investment objectives and other customer information<br>• Review suitability documentation recorded by the RR and pertaining to a recommended investment or strategy<br>• Where investment profile information is incomplete, contact the RR to obtain further information or if none is available, determine whether there is a reasonable basis for making recommendations<br>• For "hold" recommendations, confirm the RR has included adequate documentation<br>• Where there are suitability questions:<br>   ○ Confer with RR regarding suitability questions<br>   ○ Confer with Compliance when necessary<br>   ○ Contact customer when necessary to confirm customer's understanding |

ALPINE_LIT169059

| | |
|---|---|
| | of and agreement with transactions<br>    o  Modify or restrict future transactions, as appropriate<br>• Train RRs regarding suitability obligations |
| **Record** | • Initials (or signature) or other record of review on order records and reports<br>• Institutional Suitability Certificates<br>• Suitability documentation on order records or in RR records<br>• Training including who attended, when it occurred, and subjects included |

## 12.4.1 General Requirements

RRs must have a reasonable basis for believing that a recommended transaction or investment strategy involving a security or securities is suitable for the customer. Recommendations should be based on information obtained through reasonable diligence to ascertain the customer's investment profile which is recorded in the account records, generally at the time the account is opened and updated when necessary. The customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose in connection with the recommendation.

The OSJ Branch Manager or designee is responsible for reviewing customer transactions for suitability, where appropriate. There are a number of considerations that may assist the designated supervisor when reviewing the suitability of recommendations or determining suitability requirements. One or more of the following may be appropriate:

- Information included on customer new account forms
- Other securities held in the customer's account
- The RR's record of the customer's transactions
- Other information regarding the account such as whether the account is managed by an investment adviser or uses other advisers or consultants in making investment decisions
- Transaction information from daily transaction reports and monthly statements
- Information obtained from the RR
- Information obtained by contacting the customer

There are exceptions to suitability obligations when dealing with certain institutional accounts as discussed in the following section *Institutional Accounts*.

### 12.4.1.1 Investment Strategy

[FINRA Rule 2111.03]

"Investment strategy" is defined in FINRA rules to include, among other things, an explicit recommendation to hold a security or securities. However, the following communications are excluded as long as they do not include (standing alone or in combination with other communications) a recommendation of a particular security or securities:

    a.  General financial and investment information, including (i) basic investment concepts, such as risk and return, diversification, dollar cost averaging, compounded return, and tax deferred investment, (ii) historic differences in the return of asset classes (*e.g.,* equities, bonds, or cash) based on standard market indices, (iii) effects of inflation, (iv) estimates of future retirement income needs, and (v) assessment of a customer's investment profile;

    b.  Descriptive information about an employer-sponsored retirement or benefit plan, participation in the plan, the benefits of plan participation, and the investment options available under the plan;

    c.  Asset allocation models that are (i) based on generally accepted investment theory, (ii) accompanied by disclosures of all material facts and assumptions that may affect a reasonable investor's assessment of the asset allocation model or any report generated by such model, and (iii) in compliance with FINRA

ALPINE_LIT169060

Rule 2214 (Requirements for the Use of Investment Analysis Tools) if the asset allocation model is an "investment analysis tool" covered by FINRA Rule 2214; and

d.   Interactive investment materials that incorporate the above.

Alpine registered representatives should maintain detailed notes to support rationale for investment strategy, if unclear. Compliance may audit to policy as part of the branch examinations. We may also request this information periodically outside of the branch examination.

## 12.4.1.2 Components Of Suitability Obligations

[FINRA Rule 2111.05]

As excerpted from the suitability rule, there are three main obligations when making a recommendation: reasonable-basis suitability, customer-specific suitability, and quantitative suitability.

a.   The reasonable-basis obligation requires a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the Firm's or RR's familiarity with the security or investment strategy. Reasonable diligence must provide an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule.

b.   The customer-specific obligation requires a reasonable basis to believe that the recommendation is suitable for a particular customer based on that customer's investment profile which includes the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose.

c.   Quantitative suitability refers to avoiding excessive activity and requires a firm or RR who has actual or de facto control over a customer account to have a reasonable basis for believing that a series of recommended transactions, even if suitable when viewed in isolation, are not excessive and unsuitable for the customer when taken together in light of the customer's investment profile. No single test defines excessive activity, but factors such as the turnover rate, the cost-equity ratio, and the use of in-and-out trading in a customer's account may provide a basis for a finding a violation of the quantitative suitability obligation.

Another approach to suitability is portfolio-based that considers the entirety of an investor's investments (or at least those known to the RR). Where a customer has multiple accounts with the Firm and those accounts have inconsistent investment objectives, it is necessary to confirm the customer's intent to use different investment profiles or factors for the different accounts. Notation should be made to the customer's account record and on the order record or the recommendation.

When making customer recommendations, RR's must

- Use reasonable basis to believe recommendations are suitable based on understanding of the product, its risks and rewards and investment strategy used;
- Ensure customer specific recommendations are in the customer's best interest and appear suitable based on information cotnained in the customer's current investment profile;
- Have a reasonable basis to believe a series of recommendations are not excessive and unsuitable; and
- Have a reasonable basis to beleive the customer has the financial ability to meet recommended investment strategy commitment.

## 12.4.1.3 Customer Financial Ability

[FINRA Rule 2111.06]

ALPINE_LIT169061

Rule 2111 prohibits recommending a transaction or investment strategy involving a security or securities or the continuing purchase of a security or securities or use of an investment strategy involving a security or securities unless the member or associated person has a reasonable basis to believe that the customer has the financial ability to meet such a commitment.

### 12.4.1.4 Specific vs. General Recommendations

Suitability obligations apply to specific recommendations as opposed to general investment advice (*i.e.,* a recommendation generally to invest in fixed income securities vs. recommending a specific bond). However, recommending a specific strategy (such as use of a bond ladder, day trading, margin, *etc.*) would be subject to suitability obligations. The narrower the scope of the recommendation, the more likely it is subject to suitability obligations.

### 12.4.1.5 Allocation Models And Educational Materials

To avoid suitability obligations, allocation models or educational materials cannot include recommendations of particular securities such as those comprising the asset allocation model. An explicit recommendation to "hold" specific securities in an asset allocation model constitutes a recommendation. FINRA has indicated that as an allocation recommendation becomes narrower and more specific, suitability obligations may apply. The CCO or designee must review and approve any models or analytic tools **prior to** use.

### 12.4.1.6 Hold Recommendations

Suitability obligations apply to recommendations to hold a security or securities or to continue to use an investment strategy, even if the RR did not recommend the original purchase. RRs should disclose and document (on the order record or the RR's records) that the hold recommendation is based on relevant factors known at the time of the recommendation only, and that continued monitoring or recommendations will not occur (if that is the case). Some hold recommendations should be documented including those for shorter-term investments; those that have a periodic reset or similar mechanism that could alter the investment's character over time; those that are particularly vulnerable to market conditions; or those that are otherwise potentially risky when the recommendation is made. For example, risky investments may include leveraged ETFs, mortgage REITs, an issuer facing significant financial or other material risks, an over-concentrated position, and a security inconsistent with the customer's investment profile. These hold recommendations should be documented in the RR's records. Compliance may audit to policy as part of the branch examinations. We may also request this information periodically outside of the branch examination.

### 12.4.1.7 Complex Products

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Third party distributors<br>• Orders for complex products<br>• Account records |
| Frequency | • As required |
| Action | • When third parties are used to distribute products originated by Alpine:<br>    o Review distributor's sales practices, training, investor education efforts, and compliance efforts including how over-concentration or other potential issues are identified<br>• Subject new complex products to the new product review process<br>• Review applications/orders for (depending on the product):<br>    o Age/retirement status of investor for suitability<br>    o Compliance with Firm-established suitability guidelines |

ALPINE_LIT169062

| | |
|---|---|
| | <ul><li>○ Concentration of the investment in the customer's account and compliance with Alpine and state-established guidelines</li><li>○ Compliance with state suitability standards and customer's state of residence liquid net worth definition, state concentration limits</li><li>○ Affect of early withdrawal fees, taxes or penalties on the customer and his/her liquid net worth calculation</li><li>○ Use of most current version of the application form</li></ul><ul><li>Provide training to RRs and supervisors regarding the products, suitability standards, and required reviews</li><li>Perform post-issuance review after release of a new complex product including an assessment of whether the product performs in accordance with its design and whether distributors and other sellers sold the product to the types of investors for which it was intended</li></ul> |
| **Record** | <ul><li>Reviews of third-party distributors</li><li>New product reviews and post-issuance reviews</li><li>Reviews of applications/orders and action taken, if any</li><li>Records of training including who attended, when conducted, subjects included</li></ul> |

FINRA guidance has indicated that complex products warrant particular care in how they are scrutinized and sold to retail customers. FINRA indicates that a product that is complex is one that "presents an additional risk to retail investors because its complexity adds a further dimension to the investment decision process beyond the fundamentals of market forces." This is only a general description since all the potential variations in products make it difficult to clearly define the term. The last subsection of this section includes examples of complex products from FINRA Regulatory Notice 12-03.

## 12.4.2 Institutional Accounts

[FINRA Rule 2111(b), 2111.07 and 4512(c); SIFMA Institutional Suitability Certificate: http://www.sifma.org/services/standard-forms-and-documentation/cross-product/]

There is an exemption from customer-specific recommendation obligations when recommendations are made to institutional customers defined by Rule 4512(c). Factors to consider when determining the scope of Alpine's suitability obligation when making recommendations to institutional customers include: (1) the customer's capability to evaluate investment risk independently, both in general and with regard to particular transactions and investment strategies involving a security or securities, and (2) the institutional customer's affirmation indicating that it is exercising independent judgment in evaluating the recommendations. An institutional customer may indicate that it is exercising independent judgment on a trade-by-trade basis, on an asset-class-by-asset-class basis, or in terms of all potential transactions for its account. Institutional accounts will be requested to provide the Institutional Suitability Certificate to comply with the exemption.

Where an institutional customer has delegated decision making authority to an agent, such as an investment adviser or a bank trust department, these factors are applied to the agent.

Where an RR has reason to believe an institutional investor is not capable of understanding an investment or making an independent decision, the RR is obligated to make a specific suitability determination and should note this action on order records, in the RR's records, or in the account's records.

## 12.4.3 Recommendations Of OTC Equity Securities

[FINRA Rule 2114]

ALPINE_LIT169063

| Responsibility | • Registered Representative Supervisor |
|---|---|
| Resources | • Daily Transaction Report<br>• OTC Equity Securities Suitability Forms<br>• Current financial statements (balance sheet, profit and loss statement, publicly available financial statements and reports and information contained in an SEC registration statement or SEC Regulation A filing<br>• Current material information about the issuer |
| Frequency | • Daily - review transactions for potential solicitations in low-priced securities<br>• As required - review Forms<br>• As required – review current financial statements and current material information about the issuer |
| Action | • Review daily transactions to identify solicited transactions in low-priced securities<br>• For identified transactions, determine whether a Form was previously submitted and approved<br><br>• For identified transactions, review current financial statements and current material information about the issuer<br><br>• For non-approved transactions, consult with Compliance regarding corrective action which may include cancellation of transactions<br>• For submitted Forms, review financial statements, determining if required information is included with the Form, then approve or disapprove, and notify the RR |
| Record | • Records of daily reviews are included on reviews of Daily Transaction<br>• Reports including the reviewer's initials and date of review and any action taken<br>• Document information reviewed, the date of review and the name of the person performing the review (if a designated principal)<br>• For reviews involving delinquent filers, the review must include an inquiry into the circumstances concerning the failure to make current filings and a written determination that the recommendation is appropriate under the circumstances. |

In cases involving a recommendation of an OTC equity security, FINRA Rule 2114 requires that associated persons review the issuers current financial statement and material business information before recommending a low-priced, over-the-counter (OTC) equity security. Brokers should retain copies of the information relied upon to make the recommendation in the client file. In addition, recommendations in OTC equity securities that (1) are not listed on a national securities exchange (including NASDAQ) or are listed on a regional securities exchange and (2) do not qualify for dissemination of transaction reports via the Consolidated Tape will require completion of Alpine's OTC Equity Securities Suitability Form **prior to** making any recommendation. Securities with a bid of at least $5 and published in a quotation medium are NOT included in this requirement.

The designated principal's reviews of prospective OTC equity security recommendations must cover and document the following items:

- The issuer's current financial statement, including these documents:
  - For non foreign private issuers, balance sheets (as of a date less than 15 months before the recommendation date)
  - For non foreign private issuers, profit and loss statements (for the 12 months preceding the balance sheet date)

ALPINE_LIT169064

- o For non foreign private issuers, publicly available financial statements and reports (filed during the 12 months preceding and up to the recommendation date)
- o For non foreign private issuers, publicly available financial information contained in SEC registration statements or SEC Regulation A filings filed during the 12 months preceding the recommendation date.
- o For foreign issuers, balance sheets (as of a date less than 18 months before the recommendation date)
- o For foreign issuers, profit and loss statements (for the 12 months preceding the balance sheet date)
- o For foreign issuers, if the balance sheet is greater than 9 months preceding the recommendation date, additional statements of profit and loss for the period from the date of the balance sheet to a date less than 9 months before the date of the recommendation
- o For foreign issuers, publicly available financial statements and reports (filed during the 12 months preceding and up to the recommendation date)
- Current material business information, including information "ascertainable through the reasonable exercise of professional diligence and that a reasonable person would take into account in reaching an investment decision".

OTC equity securities as defined in this section often trade at low prices and may represent a higher risk to the purchaser depending on where and how the security trades. For example, a thinly-traded OTC stock may be subject to volatile price changes and may be difficult to liquidate. There is added risk when the security is purchased on margin, since some of these securities may be difficult to liquidate. Customer trading in low-priced and microcap securities may also be an indicator of money laundering, depending on the scope and size of the trading. Any suspicious trading should be reported immediately to the AML Officer or designee.

**Additional Review Requirement for Delinquent Filers**

If an issuer has not made current filings required by the issuer's principal financial or securities regulatory authority in its home jurisdiction, the principal review must include an inquiry into the circumstances concerning the failure to make current filings, and a written determination, based on all the facts and circumstances, that the recommendation is appropriate under the circumstances. This determination must be made in writing and maintained by the registered principal.

## 12.4.3.1 OTC Equity Securities Suitability Determination

RRs have a higher obligation to determine suitability when recommending the purchase or sale of OTC equity securities. This includes obtaining current financial statements and material business information and completing the OTC Equity Securities Suitability Form described in the next paragraph. For a complete list of required information, please refer to the section titled "Recommendations of OTC Equity Securities".

**Prior to** recommending a security subject to this policy, the RR is also required to complete a copy of the Suitability Form and submit the form for review and approval by the RR's designated supervisor. Upon approval, the RR may recommend the security to customers. Failure to complete the Form and provide the other requested information (enumerated in the section titled "Recommendations of OTC Equity Securities") and obtain the required approval may result in cancellation of the transactions and assessment of resulting losses to the RR.

## 12.4.3.2 Exemptions

The requirement to submit the form and obtain prior approval do not apply to the following recommendations:

- long sales
- transactions meeting the requirements of Rule 504 of Regulation D
- transactions with an issuer not involving a public offering under Section 4(2) of the Securities Act
- to institutional buyers as defined in FINRA Rule 3110(c)(4)
- to a QIB (qualified institutional buyer) under Rule 144A
- to a "qualified purchaser" under Section 2(a)(51) of the Investment Company Act.

ALPINE_LIT169065

- transactions in the securities of issuers with at least $50 million in assets and $10 million in shareholder equity
- transactions in securities of a bank or insurance company subject to regulation by state or federal bank or insurance authority
- transactions in a security that has a bid price published in a quotation medium of at least $50 per share. If the security is a unit composed of one or more securities, the bid price of the unit divided by the number of shares of the unit that are not warrants, options, rights, or similar securities must be at least $50.

In addition, recommendations of the securities of the following issuers are exempted:

- issuers with at least $2 million in net tangible assets and $5 million in shareholder equity
- bank or insurance company subject to regulation by state or federal bank or insurance authority
- issuers with average daily volume of $100,000 during each of the preceding 6 calendar months and any convertible security based on an underlying security that meets this requirement
- securities that have a bid of at least $4 per share as published in a quotation medium

## 12.4.4 Proprietary Products

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Proprietary products |
| Frequency | • As required |
| Action | • Subject new proprietary products to the new product review procedure<br>• Review transactions in proprietary products for suitability and take corrective action when necessary<br>• Provide training to RRs |
| Record | • Records of training provided to RRs<br>• Daily transaction records including date of review and initials of reviewer |

Products developed by Alpine, or an affiliate of Alpine, may be offered for sale to customers. New proprietary products are subject to the new product review described in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*.

RRs are obligated to:

- determine that a proprietary product is suitable for the customer, including consideration of comparable non-proprietary products and related costs to the customer, and
- make recommendations suitable for the customer regardless of the compensation to the RR.

Alpine does not develop products or offer proprietary products for sale to customers. For that reason, this WSP does not apply. Should Alpine offer proprietary products in the future for sale to customers, Alpine will adopt the following written supervisory procedures.

## 12.5 Fair Prices

[NASD Rule 2400; FINRA Rule 2121]

ALPINE_LIT169066

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order records<br>• Transaction reports |
| Frequency | • Daily |
| Action | • Review orders and available reports to identify commission or mark-ups/mark-downs that are inconsistent with Alpine guidelines<br>• Where necessary, take corrective action which may include canceling/rebilling the transaction to correct charges, consult with the RR if charges were initiated by him/her, notify trading personnel of inconsistent charges, or consult with Compliance |
| Record | • Orders records/reports with notations of review, review date, name of reviewer (name, initial or signature) and any corrective action taken |

Alpine is required to make a reasonable effort to obtain a price for the customer that is fair and reasonable in relation to prevailing market conditions.

## 12.5.1 Mark-Up Policy

[FINRA Rule 2121.01]

Following is FINRA's Mark-Up Policy in Rule 2121.

### 12.5.1.1 General Considerations

1. The historical "5% Policy" is a guide, not a rule.
2. A member may not justify mark-ups on the basis of expenses which are excessive.
3. The mark-up over the prevailing market price is the significant spread from the point of view of fairness of dealings with customers in principal transactions. In the absence of other bona fide evidence of the prevailing market, a member's own contemporaneous cost is the best indication of the prevailing market price of a security.
4. A mark-up pattern of 5% or even less may be considered unfair or unreasonable under the "5% Policy."
5. Determination of the fairness of mark-ups must be based on a consideration of all the relevant factors, of which the percentage of mark-up is only one.

### 12.5.1.2 Relevant Factors

Relevant factors to consider when determining the fairness of a mark-up are as follows:

1. **The Type of Security Involved:** Some securities customarily carry a higher mark-up than others. For example, a higher percentage of mark-up customarily applies to a common stock transaction than to a bond transaction of the same size. Likewise, a higher percentage applies to sales of units of direct participation programs and condominium securities than to sales of common stock.
2. **The Availability of the Security in the Market:** In the case of an inactive security, the effort and cost of buying or selling the security, or any other unusual circumstances connected with its acquisition or sale, may have a bearing on the amount of mark-up justified.
3. **The Price of the Security:** While there is no direct correlation, the percentage of mark-up or rate of commission generally increases as the price of the security decreases. Even where the amount of

money is substantial, transactions in lower priced securities may require more handling and expense and may warrant a wider spread.

4. **The Amount of Money Involved in a Transaction:** A transaction which involves a small amount of money may warrant a higher percentage of mark-up to cover the expenses of handling.

5. **Disclosure:** Any disclosure to the customer, before the transaction is effected, of information which would indicate (A) the amount of commission charged in an agency transaction or (B) mark-up made in a principal transaction is a factor to be considered. Disclosure itself, however, does not justify a commission or mark-up which is unfair or excessive in light of all other relevant circumstances.

6. **The Pattern of Mark-Ups:** While each transaction must meet the test of fairness, FINRA believes that particular attention should be given to the pattern of a member's mark-ups.

7. **The Nature of the Member's Business:** FINRA recognizes there are differences in the services and facilities which are needed by, and provided for, customers of members. If not excessive, the cost of providing such services and facilities, particularly when they are of a continuing nature, may properly be considered in determining the fairness of a member's mark-ups.

### 12.5.1.3 Applicability Of Policy

The Policy applies to all securities, whether oil royalties or any other security, in the following types of transactions:

1. A transaction in which a member buys a security to fill an order for the same security previously received from a customer. This transaction would include the so-called "riskless" or "simultaneous" transaction.

2. A transaction in which the member sells a security to a customer from inventory. In such a case the amount of the mark-up would be determined on the basis of the mark-up over the bona fide representative current market. The amount of profit or loss to the member from market appreciation or depreciation before, or after, the date of the transaction with the customer would not ordinarily enter into the determination of the amount or fairness of the mark-up.

3. A transaction in which a member purchases a security from a customer. The price paid to the customer or the mark-down applied by the member must be reasonably related to the prevailing market price of the security.

4. A transaction in which the member acts as agent. In such a case, the commission charged the customer must be fair in light of all relevant circumstances.

5. Transactions wherein a customer sells securities to, or through, a broker/dealer, the proceeds from which are utilized to pay for other securities purchased from, or through, the broker/dealer at or about the same time. In such instances, the mark-up shall be computed in the same way as if the customer had purchased for cash and in computing the mark-up there shall be included any profit or commission realized by the dealer on the securities being liquidated, the proceeds of which are used to pay for securities being purchased.

The Mark-Up Policy is not applicable to the sale of securities where a prospectus or offering circular is required to be delivered and the securities are sold at the specific public offering price.

## 12.5.2 Prohibition Against Trading Ahead Of Customer Orders

[SEC Regulation NMS Rule 600(b)(30)(ii); FINRA Rule 5320]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | These reports are intended to assist the Head Trader or designee in the review of customer and proprietary transactions to identify potential trading ahead.<br><br>• Trades for Executed Orders<br>• Family-related accounts |

ALPINE_LIT169068

| | |
|---|---|
| | • Employee related accounts |
| **Frequency** | • Daily reviews |
| **Action** | • Review for order protection |
| **Record** | • Record date reviewed (if applicable), reviewer's initials, action taken, if appropriate, on the reports enumerated above<br>• OTC Trading Manager Checklist (evidencing the date reviewed, reviewer's initials and action taken, if appropriate) - completed monthly |

**Applicable Rules:** Rules 2010, IM 2110-2, EDGA Rule 12.6, EDGX Rule 12.6, Nasdaq Rules 2110, IM-2110-2, Nasdaq OMX BX Rules 2110, IM-2110-2; NYSE-Arca Rule 6.16, Rule 2111

A FINRA member firm that accepts and holds an order in an equity security from its own customer or the customer of another broker-dealer without immediately executing the order is prohibited from trading that security on the same side of the market for its own account at a price that would satisfy the customer order, unless it immediately executes the customer order up to the size and at the same price or better price at which it traded for its own account. Pending orders are executed on a first-in/ first-out basis (FIFO). "Customer order" in this section applies to orders for [The Firm]'s customers as well as customers of other broker-dealers.

The rule restrictions apply to orders handled during normal market hours and outside normal market hours (if [The Firm] and customer agree to processing the order outside normal market hours).

### 12.5.2.1 Exceptions

There are certain exceptions to the prohibition against trading ahead of customer orders.

**Large orders and institutional accounts.** Regarding orders for institutional accounts [as defined in FINRA Rule 4512(c)] or orders of 10,000 shares or more (unless the orders are less than $100,000 in value), [The Firm] may trade a security on the same side of the market for its own account at a price that would satisfy the customer order providing [The Firm] has provided clear and comprehensive written disclosure to the customer when the account is opened and annually thereafter that:

• Discloses that [The Firm] may trade proprietarily at prices that would satisfy the customer order, and
• Provides the customer with a meaningful opportunity to opt in to the Rule 5320 protections with respect to all or any portion of the order. If the customer doesn't opt in to the Rule 5320 protections, [The Firm] will presume the customer has consented to the exception. In lieu of written disclosure [The Firm] may provide oral disclosure and obtain the customer's consent on an order-by-order basis, which will be documented on the order for which consent is obtained.

Instead of written disclosure at account opening and annually after, oral disclosure may be made and consent obtained on an order-by-order basis and recorded on the order.

**No-knowledge exception.** Regarding NMS stocks and where [The Firm] has effective internal controls and information barriers that prevent one trading unit from obtaining knowledge of customer orders held by a separate trading unit, the other trading units may, in a proprietary capacity, continue to trade at prices that would satisfy the customer orders held by the separate trading unit. A description of how customer orders are handled and when [The Firm]'s proprietary account may trade at prices that would satisfy the customer's order will be provided at account opening and annually thereafter. For OTC equity securities where [The Firm] has similar controls to prevent a non-market-making trading unit from obtaining knowledge of customer orders held by a separate trading unit, the non-market-making trading unit may trade in a proprietary capacity at prices that would satisfy the customer's order.

ALPINE_LIT169069

**Riskless principal exception.** Rule 5320 obligations do not apply to [The Firm]'s proprietary trades if the trades are for the purpose of facilitating the execution, on a riskless principal basis, of an order from a customer ("facilitated order") providing that [The Firm]:

- Identifies the order as riskless principal when reporting to FINRA (or other SRO); and
- Has written policies and procedures for compliance with FINRA rules regarding riskless principal transactions. Refer to the section *Riskless Principal Transactions* in this chapter.

**ISO exception.** The restriction against proprietary trades ahead of customer orders does not apply to trading for [The Firm]'s account that is the result of an ISO (Intermarket Sweep Order) routed in compliance with Regulation NMS where the customer order is received after [The Firm] routed the ISO.

**Odd lot and bona fide error transaction exceptions.** The restrictions do not apply to a proprietary trade that is (1) to offset a customer order that is in an amount less than a normal unit of trading; or (2) to correct a bona fide error.

## 12.5.3 Front Running Of Block Transactions

[FINRA Rule 5270]

Knowingly trading ahead of block orders is a manipulative activity that violates securities rules. Alpine and its employees are prohibited from entering or executing an order to buy or sell a security or related or underlying financial instrument when Alpine or employee has knowledge of material, non-public information about an imminent block transaction in that security or related or underlying financial instrument (stock, option, warrant, *etc.*). The prohibition applies until the information has been made publicly available or has otherwise become stale or obsolete.

This applies to executions in any account where Alpine or employee has an interest, has discretionary authority, or for accounts of customers or affiliates of Alpine when the customer or affiliate has been provided the block information by Alpine or an employee.

"Related financial instrument" means any option, derivative, security-based swap, or other financial instrument overlying a security where the value of the security is materially related to, or otherwise acts as a substitute for, the security, as well as any contract that is the functional equivalent of a position in the security.

"Block transaction" means a transaction involving 10,000 shares or more of a security, underlying security, or related financial instrument.

Exceptions include:

- Transactions where Alpine has information barriers to prevent disclosure of information
- Transactions in the same security related to a prior customer order in that security
- Transactions to correct bona fide errors
- Transactions to offset odd-lot orders
- Facilitation of block orders (with conditions in the Rule)

Though the Rule specifically applies to block transactions, front running of other orders is not permitted where the interests of Alpine or an employee are placed ahead of the interests of the customer or where misuse of information about an imminent order violates other rules. Refer to FINRA Rule 5270 for specific details regarding the prohibition.

ALPINE_LIT169070

## 12.6 Regulation NMS

Regulation NMS was adopted to strengthen the national market system for equity securities. It requires markets to interact in a way that permits orders to seek the best available market. Rule 611, the Order Protection Rule, is the primary rule that affects broker-dealers and requires broker-dealers to prevent "trade-throughs."

## 12.7 Orders In Volatile Stocks (Limit Up/Limit Down)

[FINRA Notice to Members 99-11]

Some securities are characterized by volatility of price and volume. This has, in particular, been a characteristic of some Internet stocks. The RR should know the potential affect of volatility on recommended stocks and discuss these risks when recommending such investments with customers unfamiliar with transactions in these types of securities. On April 5, 2011, national securities exchanges and the Financial Industry Regulatory Authority, Inc. (FINRA) filed a proposal to establish a new "limit up-limit down" rule to address extraordinary market volatility in U.S. equity markets. The Limit Up-Limit Down (LULD) mechanism is intended to prevent trades in National Market System (NMS) securities from occurring outside of specified price bands. The bands would be set at a percentage level above and below the average reference price of the security over the immediately preceding five-minute period. To accommodate more fundamental price moves, there would be a five-minute trading pause – similar to the pause triggered by the current single-stock circuit breakers – only if trading is unable to occur within the specified price band after 15 seconds. Following are some of the conditions potentially affecting volatile stocks:

- High volume in volatile stocks may result in delays in execution at the opening or during the trading day.
- Market orders may be executed at a price significantly different from the current quote. The benefits and risks of market vs. limit orders should be discussed.
- Orders for IPOs in the secondary market may be executed at prices significantly away from the current quote, and, because of "fast market" conditions, the current quote may not be up to date.
- Volatile stocks may be subject to higher commissions and/or collateral requirements.

For information on how the firm supervises compliance with the Limit Up/Limit Down rules, refer to the section titled "*Trading Halts*" in the **OTC Equity and Market Making** Chapter.

## 12.8 Illiquid Investments

[FINRA Regulatory Notice 08-30]

Customers may contact an RR, on an unsolicited basis, to sell an illiquid investment, and may have a prospective buyer. To effect the transaction, the following is required:

- The RR must have or obtain the required new account information for both the buyer and the seller.
- Both the buyer and the seller must sign a letter confirming that the orders are unsolicited; that Alpine is not recommending the transactions or making a suitability determination; and Alpine cannot make a determination regarding the sufficiency or competitiveness of pricing of the transactions.
- The RR must have no concerns regarding the ability of both sides to settle the proposed transaction.

The RR may advise the seller of potential buy interest. The letter described above must be signed by both parties and include disclosure that Alpine will receive compensation for effecting the transactions.

If orders for illiquid securities are solicited, the RR is responsible for making a suitability determination in addition to obtaining the written acknowledgments.

ALPINE_LIT169071

## 12.9 Account Designation And Cancels/Rebills

[FINRA Rule 4515]

| Responsibility | • Designated Supervisor as set forth in Chapter 1.1 or CFO |
|---|---|
| Resources | • Cancel/Rebill form<br>• Cancel/Rebill Report<br>• FINRA Cancelled and As-Of Trades Report |
| Frequency | • Daily review of forms presented<br>• Monthly review of Report |
| Action | • Frequent cancellations and cancel/rebills may be an indicator of unauthorized trades. It is important that the Supervisor review Forms and Reports to identify patterns that require corrective action.<br>• Review and approve or disapprove cancels and rebills.<br>• For cancels from one account to another, particularly review reason for cancel and rebill prior to approval.<br>• Review Cancel/Rebill Report for patterns by customer and/or by RR.<br>• Where patterns appear, confer with RR.<br>• Where patterns continue to appear, contact customers whose orders were cancelled to confirm orders were originally authorized.<br>• If customers advise transactions are unauthorized, contact Compliance.<br>• Compliance: Review FINRA report and follow up regarding patterns of cancelled or as-of trades (contact RR and RR's supervisor, customer contact or other appropriate action) |
| Record | • Initials on Cancel/Rebill Form<br>• Initials and date on Cancel/Rebill Report<br>• FINRA Report including notes of action taken retained by Compliance<br>• For patterns of cancellations, notes of review and action taken on reports reviewed or included on supervisor's log, daytimer, or other record, if appropriate. |

Each order, prior to execution, must include the account name or designation on the order.

Whenever an order is cancelled and rebilled to another account (including changes between related or same-owner accounts), the cancel and rebill form must be completed and approved by the designated supervisor and retained with the order record. The supervisor must document the essential facts relied upon to approve the change.

## 12.10 Trading Halts

[FINRA Rule 5260, 6120, 6121 and 6440; NASDAQ Rule 3340, 4120 and 4121]

When trading halts occur, whether they are for specific securities or circuit breakers that close entire markets, orders are handled as follows:

No member or person associated with a member shall, directly or indirectly, effect any transaction or publish a quotation, a priced bid and/or offer, an unpriced indication of interest (including "bid wanted" and "offer wanted" and name only indications), or a bid or offer accompanied by a modifier to reflect unsolicited customer interest,

ALPINE_LIT169072

in any security as to which a trading halt is currently in effect, except as permitted under the Regulation NMS Plan to Address Extraordinary Market Volatility. If FINRA closes trading in a security pursuant to its authority under Rule 6120(a)(3), members would not be prohibited from trading through other markets for which trading is not halted.

- When trading is resumed on the same trading day, pending and new customer orders are forwarded to the appropriate market for execution upon resumption of trading, unless the customer instructs otherwise.
- When trading is closed for the duration of the trading day, pending and new customer orders are treated as follows:
  - Orders pending at the time of the halt and new orders received after the halt commences are treated as "Good Til Cancelled" and held for execution at the reopening of the next trading session (unless the customer instructs otherwise).
  - "At-the-Close" orders (including "Market-on-Close" orders) pending at the time trading is halted are treated as cancelled orders. No new orders relating to closing prices received during a trading halt are accepted or forwarded to a market.

If Alpine maintains a web page, a notice will be promptly posted stating that circuit breaker halts have closed the markets and explaining how pending or new orders will be handled.

For information about the firm's supervisory procedures governing trading halts, refer to the section titled "*Trading Halts*" in the **OTC Equity Trading and Market Making** chapter.


## 12.11 Trade Reporting By Third Parties

[2007 Member Alert: Notice to All TRF, ADF and Other FINRA Facility Participants Regarding AGU and QSR Relationships]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Transaction data<br>• FINRA compliance report cards<br>• NSCC Contract Sheets<br>• Uncompared unsettled/settled exception reports |
| **Frequency** | • Monthly |
| **Action** | • Execute agreement(s) with third party ("give up agreement") in the form specified by the FINRA and/or a QSR agreement<br>• Review trade data and compliance reports to determine accuracy of third party reporting<br>• If errors are noted:<br>  ○ Confer with the third party regarding what corrective action will be taken to prevent future errors<br>  ○ If errors persist, consider changing third party reporting agents |
| **Record** | • Transaction data and reports reviewed (including date reviewed, who reviewed, action taken) |

When a third party is used for clearing, reporting or locking-in trades, whether under an Automated Give Up (AGU), Qualified Service Representative (QSR) or other arrangement, the third party's reporting will be periodically reviewed for compliance with requirements.

ALPINE_LIT169073

## 12.12 Trading Systems And Electronic Transmission Of Orders

[FINRA Notice to Members 04-66]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Trade data<br>• Operating system procedures<br>• Order Entry system administration access/password controls |
| Frequency | • Authorizing access persons - as required<br>• Review of daily errors - as required |
| Action | • Provide passwords to persons authorized to access trading systems<br>• Provide training to those with authorized access<br>• Review and correct errors in accordance with Alpine's trade error procedures described in a section of this chapter |
| Record | • Errors are documented in accordance with trade error procedures |

This section describes supervisory procedures to prevent errors when entering orders through order-routing and execution systems ("trading systems").

- Only authorized persons are permitted to access trading systems. Access is password-protected.
- Order entry personnel will receive training regarding order entry procedures and proper operation of the system.
- Orders will be validated for accuracy and identification of duplicate or re-transmitted orders.
- Errors due to system failure, order entry errors, or other system-related errors will be corrected internally. The FINRA's "clearly erroneous transaction" procedures are not available to correct such errors.

## 12.12.1 Clearly Erroneous Transactions

NTM 04-66

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Trade data<br>• Operating system procedures<br>• Clearly Erroneous Transaction reports |
| Frequency | • As required |
| Action | • File the "Clearly Erroneous Transaction" report with FINRA/ NASDAQ if needed using (https://www.nasdaqtrader.com/EASP/TraderEASP.aspx?id=CEForm) for listed securities. For unlisted file on the site and call FINRA Operations 866-776-0800; or<br>• Accept filing against Alpine<br>• Review and correct transaction if needed |

ALPINE_LIT169074

| Record | • Transactions as needed |
|--------|--------------------------|

## 12.13 Order Records

[SEC Securities Exchange Act of 1934 Rule 17a-3 and Rule 17a-4; FINRA Rule 5340 and 7440]

Certain information must be recorded for orders accepted by Alpine. Information to be recorded includes:

- Identification of the account
- Buy or sell
- If sell long, an indication that the seller will deliver the security
- Name of security
- Quantity
- Price (if a limit order)
- Day or GTC (if not a market order)
- Other terms of the order (fill or kill, stop limit, *etc.* )
- Identity of RR responsible for the account, if any
- Identity of other person(s) who entered or accepted the order
- Date and time order is received and entered

## 12.14 Net Trading

[FINRA Rule 2124; FINRA Notice to Members 06-47]

Alpine may, at the request of a customer, confirm a transaction on a net basis. A net transaction is a principal transaction in which the market maker, after having received an order to buy or sell an equity security, buys or sells the security (from or to another dealer or another customer) and then sells to or buys from the customer at a different price.

Institutions that request net basis transactions will be provided with Alpine's negative consent letter regarding the terms and conditions of such transactions. If the institution objects to the terms included in the letter, Alpine will not trade on a net basis with that customer. As an alternative, the terms and conditions for handling the order on a net basis may be orally explained and oral consent obtained from the institutional customer. Oral consent must be noted on the order record.

Net trading with non-institutional customers requires pre-trade disclosure and written consent on an order-by-order basis. Orders received from another broker-dealer for their customer do not require disclosure and consent; these are obligations of the other broker-dealer.

If orders are received from a fiduciary for a non-institutional customer, the fiduciary's status determines whether there is an obligation to provide pre-trade disclosure and consent. For example, if the fiduciary is an investment adviser, the adviser is considered an institution and disclosure and consent are not required. If the fiduciary is an individual such as an attorney or an accountant acting on someone's behalf, the fiduciary is considered an individual and pre-trade disclosure and consent are required.

It is the responsibility of each registered representative to notify the Trading Department when he/she receives a net trading request. It is also the responsibility of the registered representative to denote this on the order record as noted above. For more information about Alpine's written supervisory procedures in this area, please refer to the "*OTC Equity Trading and Market Making"* chapter.

## 12.15 Extended Hours Trading

Rule 2265

ALPINE_LIT169075

Alpine does not typically engage in extended hours trading. However, should a customer or correspondent customer wish to participate in extended hours trading, Alpine will adopt the following policy:

Alpine will not permit any customer to engage in extended hours trading, unless the customer has been provided with a disclosure statement highlighting the risks specific to extended hours trading, in paper or electronic form.

Alpine may provide the model disclosure provided below or may provide an alternative disclosure statement, provided that such alternative disclosure statement is substantially similar to the model disclosure statement set forth in paragraph (a) addressing, at a minimum, the six risks enumerated below:

**Model Extended Hours Trading Risk Disclosure Statement**
You should consider the following points before engaging in extended hours trading. "Extended hours trading" means trading outside of "regular trading hours." "Regular trading hours" generally means the time between 9:30 a.m. and 4:00 p.m. Eastern Standard Time.
• Risk of Lower Liquidity. Liquidity refers to the ability of market participants to buy and sell securities. Generally, the more orders that are available in a market, the greater the liquidity. Liquidity is important because with greater liquidity it is easier for investors to buy or sell securities, and as a result, investors are more likely to pay or receive a competitive price for securities purchased or sold. There may be lower liquidity in extended hours trading as compared to regular trading hours. As a result, your order may only be partially executed, or not at all.
• Risk of Higher Volatility. Volatility refers to the changes in price that securities undergo when trading. Generally, the higher the volatility of a security, the greater its price swings. There may be greater volatility in extended hours trading than in regular trading hours. As a result, your order may only be partially executed, or not at all, or you may receive an inferior price when engaging in extended hours trading than you would during regular trading hours.
• Risk of Changing Prices. The prices of securities traded in extended hours trading may not reflect the prices either at the end of regular trading hours, or upon the opening the next morning. As a result, you may receive an inferior price when engaging in extended hours trading than you would during regular trading hours.
• Risk of Unlinked Markets. Depending on the extended hours trading system or the time of day, the prices displayed on a particular extended hours trading system may not reflect the prices in other concurrently operating extended hours trading systems dealing in the same securities. Accordingly, you may receive an inferior price in one extended hours trading system than you would in another extended hours trading system.
• Risk of News Announcements. Normally, issuers make news announcements that may affect the price of their securities after regular trading hours. Similarly, important financial information is frequently announced outside of regular trading hours. In extended hours trading, these announcements may occur during trading, and if combined with lower liquidity and higher volatility, may cause an exaggerated and unsustainable effect on the price of a security.
• Risk of Wider Spreads. The spread refers to the difference in price between what you can buy a security for and what you can sell it for. Lower liquidity and higher volatility in extended hours trading may result in wider than normal spreads for a particular security.

This information may be inserted in the new account form, statement disclosure and/or website at www.alpine-securities.com.

# 12.16 Large Trader Rule

[SEC Securities Exchange Act of 1934 Rule 13h-1; SEC Large Trader FAQs: http://www.sec.gov/divisions/marketreg/large-trader-faqs.htm]

The SEC requires firms that qualify as "Large Traders" to file reports with the SEC. All broker-dealers who maintain accounts for large traders are required to retain records which are explained in a separate subsection. This section outlines the requirements of a very extensive rule that should be consulted directly for details of requirements.

ALPINE_LIT169076

## 12.16.1 Large Trader Definition

A Large Trader is defined as a person, including a firm or individual, whose transactions in NMS securities equal or exceed (1) 2 million shares or $20 million during any calendar day or (2) 20 million shares or $200 million during any calendar month (the "identifying activity level" for filing Form 13H). "Transactions" for purposes of identifying a Large Trader exclude: (1) transactions part of an offering; and (2) sales by a selling shareholder in connection with an IPO or in a secondary offering if the seller is a current or former employee of the issuer and securities being sold were part of the employee's compensation.

An ownership level of 25% would generally give a person "control" for purposes of Large Trader designation. Multiple persons within a corporate group may qualify as Large Traders. If a natural person or subsidiary entity within a large organization independently qualifies as a Large Trader, a parent company of that Large Trader may file on Form 13H and identify itself as the Large Trader on behalf of the group, removing the requirement of the subsidiary to separately identify as a Large Trader.

## 12.16.2 Identifying Activity Level

It is the identifying activity level that identifies a person as a Large Trader. Offsetting or netting transactions among or within accounts, even for hedged positions, are added to a market participant's activity level in order to show the full extent of a trader's purchase and sale activity. When aggregating transactions, the Large Trader would determine across all accounts over which it has investment discretion:

- The volume or fair market value of transactions in equity securities and the volume or fair market value of the equity securities underlying transactions in options on equity securities, purchased and sold; and
- The fair market value of transactions in options on a group or index of equity securities (or based on the value thereof), purchased and sold.

The rule should be consulted for transactions exempt from the identifying activity level including gifts, journals/bookkeeping entries, issuer offerings, and other exemptions.

## 12.16.3 Large Trader Identification Number (LTID)

The SEC assigns each large trader an LTID. Large traders are obligated to disclose this number to the registered broker-dealers effecting transactions on its behalf and identify for them each account to which it applies. The LTID is one of the elements to be included in consolidated audit trail reporting.

## 12.16.4 Filings

Large traders are required to make filings of Form 13H which is a web-based form.

**Initial filing:** Large Traders are required to identify themselves to the SEC by filing Form 13H [Rule 13h-1(b)]. The initial filing is due within 10 days after the Large Trader meets or exceeds the identifying activity level.

**Annual filing:** Submit an annual filing of Form 13H within 45 days after the end of each calendar year.

**Amended filing:** Inaccurate filings must be promptly corrected following the end of the calendar quarter in which the prior filing becomes inaccurate for any reason. For example, changes to the name, business address, *etc.* would require an amended filing.

**Inactive status:** Form 13H is not required if a person does not meet or exceed the identifying activity level. If the person does not anticipate meeting the level again, it may file for "Inactive Status."

**Reactivated status:** If a person on Inactive Status meets or exceeds the identifying activity level, it must file for Reactivated Status within 10 days.

ALPINE_LIT169077

**Termination filing:** Persons may terminate Large Trader status by submitting a Termination Filing. For example, if a person ceases operations, dissolves, or is acquired.

## 12.16.5 Large Trader Monitoring/ Reporting (SEC Rule 13h-1)

[SEC Securities Exchange Act of 1934 Rule 13h-1; SEC Large Trader FAQs: http://www.sec.gov/divisions/marketreg/large-trader-faqs.htm]

| Responsibility | • Compliance Officer |
|---|---|
| Resources | • Transaction records<br>• CSS Report Distribution Reports (daily)<br>• CSS Compliance Tool<br>• Alpine Broker's and correspondent Compliance Officers/Brokers<br>• Client Self-Identification<br>• CSS Report: Blue Sheet Transmission for reporting of certain information as requested by FINRA Staff |
| Frequency | • Ongoing - if not already a reporting Large Trader, review transaction records to identify potential Large Trader status of Alpine or its customers<br>• Daily and monthly<br>• One time - Notify the SEC if Alpine is subject to Large Trader requirements<br>• Annually - File Form 13H within 45 days of end of calendar year<br>• Amend Form 13H within 45 days after the end of a calendar quarter if the prior filing becomes inaccurate<br>• As required - provide requested trade data to SEC<br>• File "Inactive Status" or make a Termination Filing if appropriate |
| Action | • If not already a reporting Large Trader and magnitude of firm trading would potentially require Alpine to file as Large Trader at some time, review trading records to identify when that status is met to initiate identification to the SEC within 10 days after meeting or exceeding the identifying activity level<br>• If filing as a Large Trader:<br>   ○ File Form 13H annually with the SEC (for Alpine only, if applicable)<br>   ○ Amend filings, if necessary<br>   ○ Provide requested trade data to the SEC<br>• Disclose large trader identification number (LTID)<br>• Review transaction records to identify customers who may be Large Traders<br>• Retain required records if large traders maintain accounts with Alpine<br><br>When breach occurs (Alpine initiated):<br><br>  ▪ Generate ULTID#<br>  ▪ Advise Alpine's Customer Cashiering Dept. to input into client profile<br>  ▪ Advise Alpine Broker/Correspondent Compliance Officer/contact that account holder may be potential large trader and notify those persons of their self-identification requirements under Rule 13h-1, in writing<br>  ▪ Await resolution from Alpine Broker or Correspondent Compliance Officer<br><br>When Client/Broker/Correspondent self-identifies:<br><br>  ▪ Alpine Broker/Correspondent contacts Customer Cashiering Dept. and provides LTID.<br>  ▪ Customer Cashier inputs into Client Profile tab. |

ALPINE_LIT169078

| | |
|---|---|
| | • Customer Cashier advises Alpine Compliance Officer/Designee of LTID |
| **Record** | • Review of trading/ transaction records to make initial filing, if necessary<br>• CSS Report Distribution Daily Reports: 'Large Trader Daily Breach' & 'Large Trader Monthly Breach'<br>• Email notification to correspondent firm or Alpine broker<br>• Record ULTID number and the date communication was made to the Alpine broker/Correspondent firm<br>• Annual Form 13H reports (for Alpine only, if applicable)<br>• Trading data provided to the SEC upon their request<br>• Required records listed in this section |
| **Evidence of Review** | • Reviewed reports will be stored electronically in the Compliance folder. |
| **Retention Requirement** | • Retain records for 3 years, the first 2 years in an easily accessible place |

Beginning November 1, 2013, broker-dealers will be required to monitor for and reporting trading activity that triggers certain trading thresholds in compliance with the large trade identification rule. The SEC defines a 'large trader' as a person who directly or indirectly, through the exercise of "investment discretion" effects transactions in NMS securities that exceed, in the aggregate $20 million fair market value or 2 million shares on any calendar day, or $200 million fair market value or 20 million shares over the course of any calendar month. This WSP addresses monitoring obligations only. For information on Alpine's reporting obligations under Large Trader, please refer to the section titled "Electronic Blue Sheets".


### 12.16.6 Records

Broker-dealers that maintain accounts for large traders are required to maintain the following records:

- Records of transactions effected in accounts identified to it as Large Trader accounts as well as Unidentified Large Traders[*] including the LTID and trade execution times, in addition to all of the other information collected by the Electronic Blue Sheet (EBS) system
- Electronically report Large Trader transaction information to the SEC upon request
- Monitor compliance with Rule 13h-1
- If the broker-dealer is a Large Trader, any proprietary or other account over which the BD exercises investment discretion
- Where a non-broker-dealer carries an account for a Large Trader, the BD effecting transactions directly or indirectly for the Large Trader must maintain records of all of the same information


[*]An "Unidentified Large Trader" is defined in 13h-1(a)(9) as a person who has not complied with large trader registration and self-ID requirements and that Alpine knows or has reason to know is a large trader based on the person's transactions in NMS securities effected by or through Alpine. Alpine will look for potential Unidentified Large Traders by monitoring its trading activity with others. In the event one is found, the person/firm will be treated as an Unidentified Large Trader and will be notified of their obligation to self-report and obtain an LTID. Records of monitoring and contact with Unidentified Larger Traders will be maintained with other Large Trader records.


# 12.17 Conflicts Of Interest

ALPINE_LIT169079

### 12.17.1 Adverse Interest

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order records<br>• Daily Transaction Report |
| Frequency | • Weekly |
| Action | • Identify transactions where an RR is on the other side of the trade from the customer<br>• Ensure the customer's confirmation includes a trailer disclosing an employee was on the other side of the transaction, OR,<br>• Send the customer a disclosure letter |
| Record | • Customer confirmation, OR<br>• Copy of disclosure letter to customer which is maintained in the branch customer file |

When an RR is on the opposite side of a transaction from a customer (customer sells a security and the RR is the purchaser, or customer buys a security and the RR is the seller), the RR may be considered to have an "adverse interest" in the transaction. The OSJ Branch Manager or designee should require a disclosure on the customer's confirmation or a letter to the customer disclosing that an employee was on the opposite side of the transaction.

### 12.17.2 Precedence Of Customer Orders

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order records<br>• Daily Transaction Reports |
| Frequency | • Weekly |
| Action | • Identify orders where the RR has received a better price for a transaction in the same security, on the same day, and on the same side of the market (buy or sell) as the RR's customer<br>• Adjust the customer's order to the better price, if appropriate |
| Record | • Order adjustments are included in records of the day's orders |

**The customer's interest has precedence over any employee's personal interest.** While there is no standard that applies in every case, in general, RRs will solicit customer orders before entering orders for personal accounts in the same security. When an RR receives a better price in a security the same day the RR's customer executes an order in the same security on the same side of the market (buy or sell), the customer will generally receive the better price unless there are circumstances that justify the RR's better price (time of order entry, inability to reach customer, *etc.*).

ALPINE_LIT169080

## 12.18 Review Of Customer Transactions

### 12.18.1 Review Of Daily Transactions

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Order records<br>• Daily Transaction Report<br>• WMX compliance reports |
| **Frequency** | • Daily |
| **Action** | • Orders are reviewed for, but not limited to, the following information:<br>   o Completeness of order records<br>   o Suitability of transactions<br>   o Discretionary account orders<br>   o Orders requiring approval<br>   o Excessive commissions<br>   o Unauthorized transactions<br>   o Wash sales/prearranged trades<br>   o Prohibited orders<br>• For orders contrary to Alpine policy or rule requirements, take corrective action which may include:<br>   o Confer with the RR to clarify the transaction, if necessary<br>   o Cancel and rebill the transaction to reflect appropriate charges<br>   o Cancel the transaction to Alpine's error account<br>   o Confer with Compliance regarding additional education for the RR and/or disciplinary action |
| **Record** | • Initials on order records requiring approval<br>• Initials on Daily Trade Review Attestation |

### 12.18.2 Unauthorized Transactions

Reviews of transactions should include identification, where possible, of unauthorized transactions. Potential indicators of unauthorized transactions may include patterns of:

- Cancellations of transactions
- Cancels and rebills between accounts
- Sellouts for failure to pay for purchases
- Numerous extensions

The Head Trader or designee is expected to take corrective action regarding potential unauthorized transactions. Corrective action may include, depending on the circumstances:

- Confer with the RR
- Contact customers directly to confirm authorization of transactions
- Cancellation of unauthorized transactions
- Confer with Compliance regarding any identified unauthorized transactions

ALPINE_LIT169081

### 12.18.3 Review Of Account Activity By Designated Supervisors

| Responsibility | • Head Trader |
|---|---|
| Resources | • Customer monthly statements<br>• Posting records<br>• New account forms |
| Frequency | • Semi-annually |
| Action | • Review customer transactions records for suitability of transactions<br>• Refer to new account forms when necessary to identify investment objectives and other customer information<br>• Confer with RR regarding suitability questions<br>• Confer with Compliance when necessary<br>• Contact customer when necessary to confirm customer's understanding of and agreement with transactions<br>• Modify or restrict future transactions, as appropriate |
| Record | • Initials on records reviewed<br>• Branch Manager's Log |

Designated Supervisors are expected to review customer account activity periodically. This may be accomplished by reviewing the monthly statements, posting records, and/or other cumulative transaction information of selected RRs on a rotating basis.

## 12.19 Trade Errors

[SIFMA Policy Statement and Guidelines Regarding Error Trade Policies for Interdealer Brokers: http://www.sifma.org/services/stdforms/pdf/ERROR-TRADE-POLICY-FINAL.pdf]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Trade Error Form or other |
| Frequency | • Daily |
| Action | • Frequent errors by RRs may indicate poor work habits, insufficient manpower to properly enter orders, deficiencies in understanding proper order entry procedures, or unauthorized trading. It is the Branch Office Supervisor's responsibility to minimize trade errors in the branch; take immediate corrective action when an error is identified; and take follow up corrective action as necessary.<br>   o Instruct the wire operator or other order entry person regarding action to correct the error<br>   o Approve Trade Error Forms<br>   o Identify patterns of errors by individual RRs<br>   o Where patterns are identified, confer with the RR regarding any order entry problems and the reasons for frequent errors<br>   o Take corrective action as appropriate |

ALPINE_LIT169082

| Record | • Initials on Trade Error Forms<br>• Notes regarding corrective action taken by the Branch Office Supervisor in the RR's file or on the supervisor's log, daytimer, or other record, as appropriate |
| --- | --- |

Trade errors are to be immediately reported by the Trading Supervisor to the Branch Office Supervisor for correction. RRs are not permitted to correct errors themselves.

Alpine may not cover losses for investors by treating transactions as errors when, in fact, they are not errors. Some customers may request such an accommodation in exchange for future business. Absorbing losses is a violation of SRO rules and is not permitted.

## 12.20 Sellouts

| Responsibility | • Head Trader or designee (process liquidation requests)<br>• COO or designee |
| --- | --- |
| Resources | • Notices from Operations regarding sellouts |
| Frequency | • As required |
| Action | • Notify the RR and supervisor that customer's payment is due<br>• If the customer does not pay for the trade, sell out the customer's position<br>• Remove the transactions from the customer's account through cancel/rebill<br>• Review the circumstances of the sell out<br>• If there is a loss, charge the RR (unless an exception is warranted)<br>• Identify patterns of customer reneges which may reflect<br><br>   o Potential unauthorized transactions<br>   o A customer whose account should be closed<br><br>• Take corrective action, if necessary, which may include discussing sellouts with the RR; reviewing new account form documentation; containing the customer, closing the account; contacting Compliance regarding possible disciplinary action against the RR |
| Record | • Sellouts are included in the day's order records<br>• Review of sellout, cancel/rebill of transactions<br>• Investigation of repeat sell outs and corrective action taken |

Customers who fail to pay for transactions will be subject to sellouts to close out the unpaid security position. RRs will be charged for any unpaid balance remaining after the sellout.

## 12.21 Time Clock Synchronization

[FINRA Rule 7430; http://www.finra.org/Industry/Compliance/MarketTransparency/OATS/FAQ/P085544]

For information concerning the firm's supervisory procedures concerning Time Clock Synchronization, please refer to the section titled "*Time Clock Synchronization*" in the **OTC Equity Trading and Market Making** Chapter.

ALPINE_LIT169083

## 12.22 Blue Sky Of Securities

| Responsibility | • Head Trader |
|---|---|
| Resources | • Order records<br>• Daily Transaction Report<br>• Notification by CFO |
| Frequency | • Daily |
| Action | • Review order records and Daily Transaction Report for patterns of solicited purchase orders in securities that are potentially not blue-skied including:<br>   o securities that are not potentially exempt<br>   o securities that are low-priced<br>• Compliance: if a violation occurs, determine if rescission is required and offer rescission; assess loss<br>• Consult Compliance regarding transactions in question |
| Record | • Initials on order records<br>• Initials on Daily Transaction Report<br>• Notes of questioned transactions on Daily Transaction Report and/or supervisor's log, daytimer, or other record<br>• Records of rescission offered |

### 12.22.1 General Requirements

"Blue sky" refers to state laws that govern the sale of securities and those who sell securities to residents of individual states. Registration of agents is discussed in the chapter *EMPLOYMENT, REGISTRATION AND LICENSING*. This section discusses blue sky requirements of securities sold by Alpine.

Securities must be blue skied in the state of residence of the customer to whom the security is sold. If a security that is not blue skied is sold to a customer in violation of state blue sky laws, the customer likely has a right of "rescission," which means the customer may cancel the transaction and receive a refund of the purchase price. Losses resulting from rescissions will be charged to the RR who sold the security in violation of blue sky requirements. States may also take disciplinary action against firms and individuals for violations of state law.

There are two ways a security may be sold to a state resident under blue sky laws. First, the issuer may register with the state. Second, an exemption may apply. Exemptions generally apply to:

- Securities issued by the federal government and municipalities
- Exchange-listed securities
- NASDAQ Capital Market listed securities
- Securities sold to certain institutions

Because blue sky laws vary from state to state, Compliance should be consulted to determine specific requirements.

## 12.23 Short Sales

[SEC Regulation SHO; SEC Division of Market Regulation Responses to Frequently Asked Questions Concerning Regulation SHO: http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm]

ALPINE_LIT169084

Alpine does not engage in margin activities nor does it permit its customers to engage in short sales. Similarly, Alpine does not engage in short selling activity on behalf of its customers.

The only short sales which occur are made by Alpine in its bona fide market making capacity. All long sales are required to be closed out so that they settle within the requirements of Reg SHO. Alpine requires all long sales to be closed out on T 6, (6 days after Trade Date).

Refer to the section titled "Regulation Sho" for information on Alpine's supervisory policies and procedures.

## 12.23.1 Marking Orders

[SEC Regulation SHO Rule 200(g)]

SEC Rule 200(a)

All sell orders are required to be identified on the order record as "long," or "short exempt" at the time of entry. Alpine does not engage in margin activity, thus, there should not be any orders for short sales.

A sell order may be marked "long" when the seller owns the security being sold and the security either is in the physical possession or control of Alpine or it is reasonably expected that the security will be in the physical possession or control of Alpine by settlement date.

A sell order should be marked "short exempt" if the seller is entitled to rely on an exception to the short sale rule including the following:

- Sales by a broker-dealer (BD) to offset odd-lot orders for customers
- Sales by a BD to liquidate a long position less than a round lot, if the sale does not change the BD's position by more than one unit of trading
- Sales for a special arbitrage account under certain conditions
- Sales by an underwriter or syndicate or group member participating in a distribution, in connection with an over-allotment of securities, or any layoff sale in connection with a distribution through rights or a standby underwriting commitment

For information about Alpine's supervisory policies and procedures concerning "Marking Orders", please refer to the *"OTC Equity and Market Making"* Chapter.

## 12.23.2 The Locate Rule

*SEC Rule 203(b)(1)*
Refer to the section titled "Locate and Delivery Requirements" in the OTC Equity Trading and Market Making Chapter for more information on locate and delivery requirements.

### 12.23.2.1 Exceptions From The Locate Requirement

Refer to the section titled "Exceptions from the Locate Requirement" in the OTC Equity Trading and Market Making Chapter for more information on exceptions to the locate and delivery requirements.

#### 12.23.2.1.1 Regulation Sho

Applicable Rules: Reg Sho Rule 204, 204(a)(3)(b), SEC Rule 10b-21

| Responsibility | • Head Trader or designee |
|---|---|

ALPINE_LIT169085

| Resources | • CNS Accounting Summary |
|---|---|
| Frequency | • Daily |
| Action | • Review CNS Accounting Summary for short positions<br>• Notify impacted parties to close positions within T 6<br>• If a correspondent firm, send notice of SHO close out requirement, T 4 and daily thereafter until resolved. |
| Record | • Initials or signature, date of review (if applicable)<br>• Notate any follow-up action taken, if any |

Alpine will allocate the close out requirement responsibility to its correspondents who are responsible for the short position per our correspondent clearing agreements. In addition to the daily reports that each correspondent firm receives, Alpine will give email notice regarding the SHO close out requirement on the morning of T 4 and every morning thereafter if the condition persists. Short sales are required to be closed out by T 4.


### 12.23.3 Naked Short Selling (SEC Rule 10b-21)

Alpine does not engage in margin trading and thus does not engage in "Naked Short Selling". Please refer to the section titled "Naked Short Selling" in the OTC Equity and Market Making Chapter for more information about the firm's written supervisory procedures in this area.


### 12.23.4 Close and Pre-Borrow Rule

Alpine does not engage in margin trading and thus does not engage in short selling. Thus, this regulation does not apply. Should Alpine engage in such activity in the future, Alpine will develop and implement written supervisory procedures in this area. Please refer to the section titled "Naked Short Selling" in the OTC Equity and Market Making Chapter for more information about the firm's written supervisory procedures in this area.


## 12.24 Sale of Control or Restricted Stock, (effect. June 23, 2014)

### 12.24.1 Introduction

SEC Rule 144 provides a "safe harbor" method for the resale of restricted securities for all persons and for restricted and other securities owned by "affiliates" (e.g., controlling shareholders, directors, and executive officers). It includes conditions that, if satisfied, permit holders of such securities to sell them publicly without registration and without being deemed underwriters. Rule 144:

- limits the number of shares sold in any three-month period (affiliates only);
- requires current public information about the issuer;
- imposes a holding period on shares prior to sale;
- places restrictions on how shares may be sold;
- requires affiliates to file Form 144 (Notice of Intent to Sell); and
- requires that the issuer has never been a shell, unless provisions of Rule 144(i)(2) are met

Rule 145 governs the offer or sale of securities received in connection with reclassifications, mergers, consolidations, and asset transfers. Rule 145 applies only to affiliates selling securities of a shell company.

This section is provided for quick reference only. Compliance should be consulted for assistance with questions relating to the processing Rule 144 and Rule 145 sales.

ALPINE_LIT169086

Rule 144 is not exclusive, so non-affiliates also can avail themselves of the law outside of Rule 144 as set forth in Section 4(a)(1) of the Securities Act to sell their shares.

## 12.24.2 Definitions

**"Restricted securities"**: Restricted securities are generally securities that were acquired:

- from the issuer, or from an affiliate of the issuer, in any transaction or series of transactions not involving a public offering ( i.e., in Regulation D offerings and other "private placements");
- in any transaction under Rule 701(c) or Rules 505 or 506 of Regulation D, all of which have restrictions on resale;
- in any Rule 144A transaction relating to resales by securities holders to "qualified institutional buyers";
- in any Regulation CE (California only) or Regulation S, Rule 801 or Rule 802 transaction, generally relating to the offshore sale of securities; and
- in any Section 4(6) transaction.

The following situations commonly indicate that securities are or may be restricted:

- securities that are offered and sold in a private placement to accredited investors under Regulation D of the Securities Act;
- private sales by an affiliate, or an affiliate's spouse who has the same residence as an affiliate, to a buyer who meets certain informational and purchaser requirements (the so-called 4(a)(1½) exemption);
- private issuances of stock to founders or promoters for cash or the transfer of assets in connection with the organization of a company;
- exercises of options by employees not made pursuant to a registration statement;
- issuances of bonus stock by the issuer;
- corporate reorganizations in which the acquiring entity issues stock under Regulation D to the shareholders of the acquired company; and
- payment of stock to independent contractors in exchanges for services provided.

**"Debt securities"**: Any security other than an equity security, nonparticipatory stock (nonconvertible capital stock where holders are entitled to a preference for dividends and a share of assets upon liquidation of the company but not entitled to participate in residual earnings or assets), and asset-backed securities [Rule 144(a)(4)].

**"Affiliate"**: A person who directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the issuer. An affiliate can be an individual, certain relatives, trusts, estates, corporations, or other entities in which the seller is a 10% beneficial owner, trustee, executor, or one acting in a similar capacity. The term applies for purpose of Rule 144 sales to anyone who had affiliate status within 90 days before the sale and for the 90 days after ceasing to have affiliate status.

**"Reporting issuer"**: An issuer who is, and has been for a period of at least 90 days prior to the 144 sale, subject to SEC reporting requirements and has filed all required reports during the 12 months preceding the sale.

**"Nonreporting issuer"**: An issuer not subject to SEC reporting requirements but for which there is publicly available information as specified by Rule 144.

**"Control securities"**: Securities owned by an affiliate of an issuer; these securities are considered "restricted" and "control" securities.

**"Shell Company"**: An issuer that is, or at any time previously been an issuer, that has: A) No or nominal operations, and B) either: 1) No or nominal assets; 2) assets consisting solely of cash and cash equivalents and nominal other assets.

ALPINE_LIT169087

**"Control Person":** One who has the power to direct or cause the direction of the management and policies of an issuer of securities through significant stock ownership (generally 10% or more) or by virtue of holding a board or management position with that issuer. Whether or not, a customer has a control relationship with the issuer or is a "statutory underwriter" or holds "restricted securities" are legal questions.

### 12.24.3 New Account Information to Identify Affiliates

Alpine's new account form records whether the Customer is an affiliate of an issuer. RRs are responsible for obtaining this information. In addition, Customers depositing securities with Alpine for resale are required to represent specifically about their relationship with the issuer, particularly regarding the factual basis for determining whether the Customer is an affiliate of the issuer.

## 12.25 Unregistered Resales Of Restricted Securities, (effect. June 23, 2014)

[FINRA Regulatory Notice 09-05; SEC FAQs http://www.sec.gov/divisions/marketreg/faq-broker-dealer-duty-section4.htm; SEC National Exam Program Risk Alert: http://www.sec.gov/about/offices/ocie/broker-dealer-controls-microcap-securities.pdf]

Alpine revised this policy, which became effective on June 23rd, 2014.

FINRA Regulatory Notice 09-05, [SEC Securities Act of 1933 Rule 144 and Rule 145; SEC Rule 144 Guidance: http://www.sec.gov/divisions/corpfin/guidance/rule144interp.htm]

| Responsibility | • President or designee<br>• OSJ Branch Manager or designee<br>• Registered Representative |
|---|---|
| Resources | • Customer Deposited Securities Representations Form(s), which may include one or more of the following:<br>    ○ Customer Deposited Securities Representations Form<br>    ○ Customer Consulting Services Representations Form - Addendum A, if applicable<br>    ○ Customer Debt Conversion Representations Form - Addendum B, if applicable<br>• Alpine Securities Deposit Worksheet<br>• Third-party legal opinions (if necessary)<br>• Filing information from EDGAR and other OTC markets<br>• Internet searches (if applicable)<br>• Review by outside counsel (if necessary)<br>• In the case of sales by affiliates under Rule 144, the customer and broker representation letters and Form 144 (Notice of Proposed Sale of Securities Pursuant to Rule 144 Under the Securities Act of 1933) |
| Frequency | • Upon receipt of stock (physical or electronic)<br>• As requested – assist RR in evaluating a potential sale |
| Action | • Review, analyze, and fact-check the information provided by the Customer in the relevant Alpine Customer Deposited Securities Representations Form and supplemental information.<br>• Conduct additional research on issuer and customer, if applicable.<br>• Communicate with RR and other Alpine principals, if applicable.<br>• Search for relevant information on EDGAR, OTC Markets, Pink Sheets, and other |

ALPINE_LIT169088

| | |
|---|---|
| | Internet resources. |
| | • Review for "red flags" noted below and conduct appropriate inquiry (i.e. contact the RR for more information about the customer and the security being sold). |
| | • Communicate with outside counsel (if necessary). |
| | • Review charts regarding volume and price (if necessary). |
| **Record** | • Alpine Customer Deposited Securities Representations Form, including Customer Affiliation Representations, Customer Consulting Services Representations and Customer Debt Conversion Representations (where applicable). Also, in the case of sales by affiliates under Rule 144, customer and broker representation letters, and Form 144 (Notice of Proposed Sale of Securities Pursuant to Rule 144 Under the Securities Act of 1933) |
| | • Alpine Securities Deposit Worksheet |
| | • EDGAR and other Pink Sheet filing information and related information, and Internet searches |
| | • Legal opinions (if necessary) |
| | • Communications with outside counsel and RR, and other Alpine personnel. These records may be maintained in Alpine's email archiving and retention system. |
| | • Charts regarding volume and price (if necessary) |
| | • Note any follow-up action taken |
| | • Electronic record of admin reviewer and final reviewer and date of review for final or rejected reviews |

Broker-dealers are prohibited from selling securities unless the securities are registered or the securities or the transaction meets an exemption from registration, such as Rule 144. When a Customer deposits its securities with Alpine, either in certificate form, electronic transfer or a book-entry transfer, the Customer is required to complete and sign the **Customer Deposited Securities Representation Form** that contains important agreements and representations which governs Alpine's relationship with the Customer in the clearance process and provides specified general information. This form is signed by the Customer under penalty of perjury. In the Customer Deposited Securities Representation form, the Customer agrees to provide all information and documents that Alpine may require in connection with its review of the proposed resale, and in appropriate circumstances, the Customer may be required to supplement the representations set forth in the above forms. The RR may interview the Customer to obtain information that can be included in the forms, but the Customer must review and sign each form. Facsimile or electronic signatures are accepted.

After the Customer provides the requisite information, the RR will complete the **Securities Deposit Worksheet** and may pull publicly available documents to be included in the file for further Alpine review as outlined below. The RR will submit the completed the **Customer Deposited Securities Representation** form, the **Customer Consulting Services Representations Form – Addendum A** (if applicable) or the **Customer Debt Conversion Representations Form – Addendum B** (if applicable) and the **Securities Deposited Worksheet,** along with any supporting documentation, to the Compliance Department. Compliance personnel will perform an initial review, verifying the accuracy and inclusion of mandatory documents and signatures. Compliance personnel will create a review cover sheet based on information obtained from the **Customer Deposited Securities Representations Form** and any applicable supporting documentation and the **Securities Deposited Worksheet**, Alpine's Legal Counsel will review the forms noted above and complete the **Legal Review Form**. The **Legal Review Form** is Alpine's attorney-work product and will not be included with the rest of the due diligence material. As necessary, Legal Counsel may request additional documentation and representations from the Customer.

It is imperative that the information gathering forms and worksheets be wholly and accurately completed, so that Alpine may make a proper determination of the eligibility for resale of the shares and maintain a record of its review.

None of the subject securities will be sold until all of the foregoing procedures are completed and the proposed transaction is approved by Legal Counsel.

ALPINE_LIT169089

On a periodic basis, the AML Officer or designee, will undertake an internal audit of the procedures outlined above.

## 12.25.1 Cautionary "Red Flags"

It is crucial that the RRs and each individual involved in the review of the proposed resale of restricted and control securities watch for "red flags" indicating the potential illegal sale of unregistered securities. These "red flags," as noted in FINRA's Notice to Members 09-05, "Unregistered Resales of Restricted Securities," include, but are not limited to, the following:

- A Customer opens a new account and delivers physical certificates representing a large block of thinly traded or low-priced securities.
- A Customer has a pattern of depositing physical share certificates, immediately selling the shares, and then wiring out the proceeds of the resale.
- A Customer deposits share certificates that are recently issued or represent a large percentage of the float for the security.
- Share certificates reference a company or Customer name that has been changed or that does not match the name on the account.
- The lack of a restrictive legend on deposited shares seems inconsistent with the date the Customer acquired the securities or the nature of the transaction in which the securities were acquired.
- There is a sudden spike in investor demand for, coupled with a rising price in, a thinly traded or low-priced security.
- The issuer was a shell company when it issued the shares.
- A Customer with limited or no other assets under management at Alpine receives an electronic transfer or journal transactions of large amounts of low-priced, unlisted securities.
- The issuer has been through several recent name changes, business combinations, or recapitalizations, or its officers are also officers of numerous similar companies.
- The issuer is not current in its SEC filings, has never filed with the SEC, or the filings are incomplete.
- The issuer has recently terminated its SEC reporting status and has not filed for public access on PinkSheets.com.
- The Customer purchased the shares from a person or entity other than the issuer.
- A significant amount of the issuer's stock was issued in noncash transactions.
- The apparent public "float" (the portion of an issuer'soutstandingshares that is in the hands of publicinvestors, as opposed to the issuer's officers, directors, or controlling-interest investors) is a relatively small percentage of the outstanding stock.
- The Customer deposits a large number of shares that he/she then transfers to a number of different internal accounts.
- After receiving a share transfer from another Customer, a Customer then transfers shares to numerous other accounts.
- Several Customers who have acquired shares in a noncash transaction deposit a large number of shares of the same issuer.

Alpine's policies and procedures are intended to address and record the presence of potential red flags, including documentation discussed above, that it uses regarding the resale of restricted securities, such as, but not limited to, the following:

1. How long has the Customer owned the securities?
2. From where did the Customer obtain the securities?
3. Is this the total amount of the shares of this issuer the Customer is seeking to sell?
4. Did the Customer make arrangement for the solicitation of, or solicit buy orders in connection with, the proposed resale of the unregistered securities?
5. Has the Customer made any payments to any other person in connection with the proposed resale of securities?
6. What is the trading volume of the securities?
7. How many shares of the class are outstanding?

ALPINE_LIT169090

In some circumstances, additional inquiry, documentation, and investigation is warranted if any of these, or other, potential red flags are detected or if an RR or other person involved in the process questions the availability of an exemption from registration for the resale of the securities.

It is Alpine's policy to report the presence of potential red flags by filing Suspicious Activity Reports (SARs) for transactions that may be indicative of money laundering activity or other suspicious activity pursuant to section 9.14 of this manual. The party identifying the suspicious activity reports the potential red flags to the AML Compliance Officer or her designee, who then follows steps as outlined in section 9.14.

Please refer to the "Red Flags" section of Alpine's Anti-Money Laundering for more information.

## 12.25.2 Resales under Rule 144

| | Affiliate or Person Selling on Behalf of an Affiliate | Nonaffiliate (and Has Not Been an Affiliate During the Prior Three Mo |
|---|---|---|
| **Restricted Securities of Reporting Issuers** | During six-month holding period — no resales under Rule 144 permitted.<br><br>After six-month holding period — may resell in accordance with all Rule 144 requirements including:<br><br>• current public information;<br>• volume limitations;<br>• manner of sale requirements for equity securities;<br>• company has never been a shell or has cured pursuant to 144(i)(2) and<br>• filing of Form 144. | During six-month holding period — no resales under Rule 144 permitted.<br><br>After six-month holding period but be one year — unlimited public resales u Rule 144 except that the current publ information requirement and Rule 144 and (2) still apply.<br><br>After one-year holding period — unlir public resales under Rule 144; need comply with any other Rule 144 requirements except 144(i)(1) and (2 |
| **Restricted Securities of Non-Reporting Issuers** | During one-year holding period — no resales under Rule 144 permitted.<br><br>After one-year holding period — may resell in accordance with all Rule 144 requirements, including:<br><br>• current public information,<br>• volume limitations,<br>• manner of sale requirements for equity securities,<br>• the company is not now, and has never been, a shell; and<br>• filing of Form 144. | During one-year holding period — no resales under Rule 144 permitted.<br><br>After one-year holding period — unlir public resales under Rule 144; need comply with any other Rule 144 requirements provided the company i now, and has never been, a shell. |

## 12.25.3 Overview of Rule 144 Requirements

To use Rule 144, a person must satisfy the following six conditions, all of which are discussed in detail below:

1. Current Public Information

Rule 144(c) requires that the issuer make available to the public specified current information about the company. For a reporting issuer, this means that it must be current in filing its annual and quarterly reports. This rule is designed to ensure accurate and up-to-date disclosure.

2. Holding Period

ALPINE_LIT169091

Rule 144(d) requires a six-month holding period for "restricted securities" issued by a reporting issuer that has been a reporting issuer for at least 90 days and a one-year holding period for "restricted securities" of a nonreporting issuer.

3. Volume Limitation

Rule 144(e) requires affiliates and persons who were affiliates during the preceding 90 days to limit their sales under the rule during any three-month period to the greater of: (i) 1% of the outstanding securities of the class being sold; or (ii) the average weekly trading volume during the preceding four weeks preceding the filing of the notice of the transaction, as reported on an eligible trading market other than the OTC market.

4. Manner of Sale

Rule 144 (f) and (g) require securities to be held by affiliates and person who were affiliates during the preceding 90 days to be sold in: (i) unsolicited "brokers' transactions"; (ii) directly to a "market maker"; or (ii) "riskless principal transactions," all as defined under the securities laws.

5. Form 144—Notice of Sale

Rule 144(h) requires that if the seller is an affiliate, and sales during a three-month period either exceed 5,000 shares or other units or have an aggregate sale price in excess of $50,000, the seller must file with the SEC a notice of sale on Form 144 at the time the sell order is placed with the broker.

6. Shell Company Status

Rule 144 is not available for the resale of any securities that were issued by an issuer that was at the time of issuance or ever had been a "shell company" unless certain criteria are met.

Each of the foregoing six conditions is discussed more fully below.

***Current Public Information***

The issuer is required by Rule 144(c) to make available current and adequate public information about itself.

1. **Reporting issuers** must have been subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act for a period of at least 90 days and have filed all reports required during the preceding 12 months or such shorter period that they were required to file. *See* Rule 144(c)(1).
2. **Nonreporting issuers** must make available to the public the information specified in Rule 15c2-11(a)(5) under the Exchange Act. Generally this requires periodic updates similar to quarterly reports required of a reporting issuer. *See* Rule 144(c)(2).
3. **Insurance companies** satisfy the public information requirement if they are regulated by the state in which they are domiciled and are current in their filings with the insurance regulator in that state. *See* Rule 144(c)(2) and Section 12(g)(2)(G)(i) of the Exchange Act.

The current public information requirement must be complied with at the time of each sale under the rule.

***Holding Period***

Holding periods were created to help determine whether the person purchasing the security did so with the intent to invest or with a view toward distribution. It is intended to ensure that the holder of restricted securities has assumed the economic risk of ownership for a long enough time to show that the holder did not obtain the securities as a conduit for the issuer in a distribution.

For reporting issuers, any person that is not an affiliate of the issuer at the time of the resale, and has not been an affiliate for 90 days prior to that time, may resell restricted securities that have been held for at least six months. During the period from six months to one year, a nonaffiliate may resell securities of a reporting issuer if

ALPINE_LIT169092

the issuer has current public information available. After one year, a nonaffiliate may resell securities of a reporting issuer with or without current public information about the issuer.

For nonreporting issuers, a nonaffiliate of the issuer may resell securities after a one year holding period.

Rule 144 permits affiliate holders to resell securities subject to the same six-month and one-year holding periods set forth above, subject to the other resale conditions of Rule 144.

<u>Special Circumstances and Exceptions</u>

Rule 144(d) provides that if the securities are financed through the seller, the holding period begins immediately upon purchase of the securities provided that: (i) the loan provides for full recourse against the purchase; (ii) the loan is fully collateralized by assets other than the securities; and (iii) is fully paid prior to the sale of the securities.

If the securities are financed through a third party independent of the issuer, and the loan is made on a full-recourse basis, the securities are considered fully paid at the time of purchase. However, if the issuer collateralized the loan from the third party, the securities are not considered fully paid.

<u>Determination of Holding Period</u>

Rule 144 generally allows for the "tacking" of holding periods from one nonaffiliate to another. It also provides for the adjustment or waiving of the holding period in special circumstances. The holding period commences on the date the securities were last purchased from the issuer or an affiliate of the issuer. Typically, the holding period begins to run when the purchase price is paid in full in cash, services rendered, or other consideration.

If newly acquired securities merely continue the investment in another form, tacking based on prior holding of different securities is generally allowed, such as the following:

i.   The holding period for securities acquired through dividends, splits, and recapitalizations include the holding period for the underlying stock on which the dividend, spit, or recapitalization is based.
ii.  Upon conversion of restricted securities, securities of the same issuer acquired without additional consideration are deemed to have been acquired as convertible securities whether the securities were not convertible when surrendered and were not exchangeable by their terms.
iii. Securities issued as part of a contingent payout in a merger or business combination if the issuer was committed to issue the securities subject only to the conditions, other than payment of further consideration, are deemed to have been acquired at the time of the business combination.
iv.  The pledge under a loan, donee, trustee, or beneficiary of a trust or estate (or beneficiary thereof), may tack to the holding period of a pledgor, donor, settler, trust, or decedent that was an affiliate of the issuer; however, no holding period is required if the estate or beneficiary is not an affiliate of the issuer.
v.   If the securities to be sold were acquired from the issuer solely in a cashless exercise of options or warrants, the securities shall be deemed to have been acquired when the corresponding options and warrants were acquired, even if the original options or warrants did not provide for cashless exercise.

Tacking is not permitted in the exercises of a decedent's stock options by the estate or purchases of restricted securities in private transactions from an affiliate.

<u>Tolling</u>

Tolling applies to promissory notes that fail to meet the following three Rule 144(d)(2) requirements:

        o   full-recourse against the purchaser;
        o   fully collateralized by other assets; and
        o   fully paid prior to sale.

Installment purchases must satisfy the same Rule 144(d)(2) requirements as promissory notes.

ALPINE_LIT169093

*Limitation on Amount of Securities Sold*

Sales by affiliates are subject to the following limitations.

1. Equity Securities. The amount of securities permitted to be sold by an affiliate of the issuer under Rule 144 during any three-month period cannot exceed the greater of: (i) 1% of the securities of that outstanding class as shown on the most recent report or statement published by the issuer; and (ii) the average weekly trading volume in such securities as reported on all national securities exchanges or automated quotation systems during the four weeks preceding the filing of the Rule 144 notice, or if no notice is required, the date of the receipt of the order for the transaction.
2. Debt Securities. Sales by affiliates within any three-month period are generally subject to the same limitations described above.

*Calculation of Amount, Aggregation*

Sales are permitted in the maximum amount in successive three-month periods, as measured from the date of each new sale.

*Convertible Securities*

When both convertible securities and the underlying securities are sold, the amount of convertible securities sold will be deemed to be the amount of the underlying securities into which they are convertible for purpose of determining the aggregate amount of securities of both classes sold.

*Pledged or Donated Securities and Securities Held by Trusts and Estates*

Sales by a pledgee, donee, or trust during any three-month period within the six months, or in the case of a nonreporting issuer, one year following the transaction, must be aggregated with sales of the pledgor, donor, or settlor of the trust. However, sales by two separate pledgees will not be aggregated unless they are acting in concert. In the event of death, sales by the estate of a deceased person or any beneficiary of a deceased person will be aggregated with sales by the deceased person during the same three-month period prior to death.

*Acting in Concert*

If two or more affiliates or other persons agree to act in a concert for the purpose of timing their sales and quantities to be sold, the sale of all securities of the same class by such persons during the three-month period must be aggregated for the purpose of determining the limitation.

*Calculation Exclusions*

Securities that are registered, exempt from registration under Section 4 of the Securities Act, or sold pursuant to Regulation S are not required to be included for the purposes of calculating the amount sold.

**Manner of Sale Limitations**

An affiliate selling securities under the Rule 144 exemption must sell such securities in a "brokers' transaction," a transaction directly with a market maker, or a riskless principal transactions. This does not apply to sales of securities by nonaffiliates.

*Brokers' Transaction*

Section 4(a)(4) of the Securities Act defines a "brokers' transaction" to include those transactions in which the broker's activity is limited to the execution of the orders to buy or sell securities as agent for the seller. The broker is prohibited from soliciting or arranging for a Customer's order to buy the securities that would be sold in a transaction and must not receive more than the usual and customary commission. The restrictions on solicitation found in Rule 144 exclude the following:

ALPINE_LIT169094

i.   inquiries from other brokers or dealers that have indicated an interest in the securities within the preceding 60 days;
ii.  inquiries by the brokers of other Customers that have indicated an "unsolicited bona fide interest" in the securities within the past 10 business days; and
iii. publication by the broker of the bid and ask quotations in an interdealer quotation system, if the dealer regularly publishes such quotations.

After making a "reasonable inquiry," a broker cannot be aware of circumstances indicating that the person for whose account the securities are being sold is an "underwriter" of the securities or that the transaction is part of a distribution of the securities. The reasonable inquiry required should include, but not necessarily be limited to, the following questions:

1. How long have the securities have been held by the Customer for whose account they are to be sold?
2. Is it practicable to do a physical inspection of the securities?
3. How were the securities were acquired?
4. How many securities of the same class sold during the past three months by all persons whose sales are required to be taken into consideration pursuant to paragraph (e) of the rule?
5. Does the Customer intend to sell additional securities of the same class through any other means?
6. Has the Customer solicited or made any arrangement for the solicitation of buy orders in connection with the proposed sale of securities?
7. Has the Customer made any payment to any other person in connection with the proposed sale of the securities?
8. How many shares or other units of the class are outstanding?
9. What is the relevant trading volume?

The securities resale policies and procedures outlined here are designed to meet this "reasonable inquiry" requirement.

### *Market Maker Transaction*

Rule 144(f) allows securities to be sold directly to market makers. The term "market maker" is defined in Section 3(a)(38) of the Exchange Act and includes specialists, block positioners, and dealers. The market maker is typically a brokerage firm that regularly publishes a firm bid and ask quotation in a given security by standingready, willing, and able to buy or sell at publicly quoted prices (called making a market). Market makers display bid and offer prices for specific numbers of specific securities, and if these prices are met, they will immediately buy for their own accounts.

A "block positioner" is a registered member of the SEC who dealssecurities and takes a long or short position in a stock or bond to accommodate a seller or buyer of a large block of securities. Such dealer must take on a "block" of securities to qualify under Rule 144.

### *Riskless Principal Transaction*

Rule 144(f)(1)(iii) states that a "riskless principal" transaction is an acceptable method of selling securities under the rule. A "riskless principal transaction" is a principal transaction in which, after having received an order to buy from a Customer, a broker or dealer purchases the security as principal in the market to satisfy the order to buy, or after having received an order to sell from a Customer, sells the security as principal to the market to satisfy the order to sell.

### **Form 144 Notice**

### *Filing Requirement*

Subsection (h) of Rule 144 provides that a notice of sale on Form 144 must be filed by a person whose account securities are being sold under the rule if the person: (i) is an affiliate of the issuer at the time of sale or was an affiliate during the preceding 90 days; and (ii) is selling, during any three-month period, an amount that exceeds

ALPINE_LIT169095

5,000 shares or has an aggregate sale price in excess of $50,000. This requirement does not apply to nonaffiliates.

### *Due Dates and Effective Dates of Notice*

The notice of sale on Form 144 must be filed at the time the order to sell is placed with the broker. If the Customer's intention changes, a new Form 144 must be filed or the form must be amended. The form is effective for 90 days. Form 144 does not obligate the Customer to sell under Rule 144, and there is no penalty for not selling as planned.

It is the Customer's responsibility to file Form 144 concurrent with placing the order or executing the transaction.

### **Shell Company Status**

Rule 144 is not available for the resale of any securities that were issued by an issuer that was at the time of issuance or ever had been a "shell company." A shell company is defined as follows: "An issuer may be considered a "shell company" if it has no or nominal operations and any of the following: (i) no or nominal assets; (ii) assets consisting solely of cash and cash equivalents; or (iii) assets consisting of any amount of cash and cash equivalents and nominal other assets."

## 12.25.4 Sales under Rule 144

Sales under Rule 144 require special documentation in addition to Alpine's regular procedures discussed above when restricted or control securities are deposited for resale. In order to pre-clear a proposed sale under Rule 144, Alpine requires that the Customer sign a **Seller's Rule 144 Representation Letter** and a completed and signed **Notice on Form 144**. Typically, preapproval of the issuer requires that Alpine sign a **Broker's Rule 144 Representation Letter** that is delivered, along with the **Seller's Rule 1444 Representation Letter**, either directly or through the transfer agent. Before selling the stock, Alpine typically requires that the stock be transferred into its name without restriction or that the issuer remove the legend if the sale is effected in accordance with the representations of the Customer and Alpine. However, in some cases, the Transfer Agent may not lift the restriction without evidence/documentation that a sale has taken place. It is the RR's responsibility to enter the trade in such a manner in Alpine's order management system to reflect the same.

After the foregoing measures are complete, Alpine and the Customer will file the Form 144, if required, and begin sales.

## 12.26 Additional Resale Theories

There are other theories under the Securities Act under which outstanding securities may be eligible for resale without registration in addition to the resale of securities pursuant to Rule 144. Some of the addition theories include the following:

## 12.26.1 Rule 504

***No shares issued under Rule 504 of Regulation D will be accepted by the firm unless the shares also meet the holding period and other requirements of Rule 144.***

In limited cases, if an exception is sought and granted, Alpine will adopt the following with respect to this section only.

Rule 504 of Regulation D, provides an exemption from registration under the Securities Act for the sale of up to $1,000,000 in securities within 12 months by an issuer that is not a reporting issuer, an investment company, or a development-stage company, and that either has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified entity, if it meets the following conditions:

ALPINE_LIT169096

i.    neither the issuer nor any other person acting on its behalf engages in general solicitation in connection with the offering; and

ii.    the securities are purchased for investment and can only be resold as restricted securities, i.e., under Rule 144 as discussed above; *provided*, *however*, that the prohibition on general solicitation and the requirement that the securities be taken for investment does not apply if the offering is made:

1.    exclusively in one or more states that provide for the registration of securities and require the filing and delivery of a prospectus and the offering is conducted in accordance with those requirements;

2.    in one or more states without any registration or prospectus delivery requirements if the securities have been registered in at least one state and offered in accordance with such requirements; or

3.    exclusively according to state law exemptions from registration that permit general solicitation and general advertising as long as sales are made only to "accredited investors" as defined in Regulation D.

Some states (*see*, e.g., at one time, Minnesota and Texas) have or had statutory or regulatory provisions that appear to meet the parameters of clause (ii)(3) above that would permit public resales of shares sold in a state-registered offering meeting these requirements of Rule 504. Under such provisions, accredited investors in such state-registered public offerings thereafter may seek to sell those securities without restriction in a public market. Note that although the Securities Act does not impose resale restrictions on such securities, the state laws under which the issuer made those offerings frequently require that such securities be acquired "for investment," which is generally inconsistent with an immediate public resale of such securities.

Persons depositing securities for resale that have been acquired in an offering claimed to be exempt from registration under Rule 504 of Regulation D will ordinarily be required to provide a legal opinion, subject to review and approval by Alpine, to the effect that the securities can be resold as requested.

## 12.26.2 Registration Statements on Form S-1

S-1 registration is the initial registration form for new securities for publicly reporting companies. Form S-1 requires companies to provide information on the planned use of capital proceeds, detail the current business models and competition, as well as provide a brief prospectus of the planned security, offering price methodology, and any dilution that will occur to other listed securities. The SEC also requires the disclosure of any material business dealings between the company and its directors and outside counsel. The S-1 registration statement must be made effective prior to the sale of securities.

When Alpine receives securities issued under an S-1 registration, it customarily obtains and reviews a copy of the registration statement and notice of effectiveness under which the subject securities were purportedly registered and, depending on the facts and circumstances, may seek additional information concerning the purchase of the securities.

## 12.26.3 Registration Statements on Form S-8

A reporting issuer that has filed all reports required to be filed during the preceding 12 months (or such shorter period as it has been subject to such reporting requirements) and has not been a shell company for at least 60 calendar days previously, and if it has been a shell company at any time previously, has filed Form 10 information with the SEC at least 60 calendar days previously reflecting that it is not a shell company, may register securities to be offered under any employee benefit plan for the employees of its subsidiaries or parents. An "employee" is defined as any employee, director, general partner, trustee, officer, or consultant or adviser. In the case of consultants and advisers, a reporting issuer may issue securities to such persons only if they are natural persons, provide bona fide services to the issuer, the services are not in connection with the offer and sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the issuer's securities.

When Alpine receives securities issued under an S-8 registration, it customarily obtains and reviews a copy of the registration statement under which the subject securities were purportedly registered and, depending on the facts and circumstances, may seek additional information concerning whether or not the foregoing circumstances or other circumstances might be present upon which to conclude that the claimed use of the Form S-8 registration statement was improper. Alpine also receives a copy of the service agreement and a

ALPINE_LIT169097

specific description of the services provided. Alpine will not accept shares issued under S-8 registration which were issued in connection with promotional or investor relations contracts or in connection with capital raising activities. Alpine also ensures the shares were issued to a natural person. In appropriate circumstances, Alpine may require a formal legal opinion or obtain other specific legal advice.

## 12.26.4 Shares Issued through Section 3(a)(10) "Fairness Hearing"

Section 3(a)(10) of the Securities Act provides an exemption from registration for offers and sales of securities in specified exchange transactions. Before the issuer can rely on the exemption, however, the following conditions must be met:

1. The securities must be issued in exchange for securities, claims, or property interests; they cannot be offered for cash.
2. A court or authorized governmental entity must approve the fairness of the terms and conditions of the exchange.
3. The reviewing court or authorized governmental entity must:
    i. find, before approving the transaction, that the terms and conditions of the exchange are fair to those to whom securities will be issued; and
    ii. be advised before the hearing that the issuer will rely on the Section 3(a)(10) exemption based on the court's or authorized governmental entity's approval of the transaction.
4. The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and conditions of the transaction.
5. A governmental entity must be expressly authorized by law to hold the hearing, although it is not necessary that the law require the hearing.
6. The fairness hearing must be open to everyone to whom securities would be issued in the proposed exchange.
7. Adequate notice must be given to all those persons.
8. There cannot be any improper impediments to the appearance by those persons at the hearing.
9. Persons holding securities issued in a Section 3(a)(10) fairness hearing must resell the securities in the manner set forth by Securities Act Rule 145(c) and (d). These Rule 145(c) and (d) resale restrictions apply only to holders that were affiliates of any party to the exchange at the time of the Section 3(a)(10)-exempt sale.

Alpine will not sell securities issued in a Section 3(a)(10) fairness hearing by any issuer that is or has been a shell company, unless it has filed Form 10 Information for at least one year, as discussed above.

Persons depositing securities for resale that have been acquired through a Section 3(a)(10) "fairness hearing" will ordinarily be required to provide a legal opinion, subject to review and approval by Alpine, to the effect that the securities can be resold as requested.

## 12.26.5 Securities Issued through 1145 Bankruptcy Proceeding

Title 11 of the United States Bankruptcy Code, Section 1145 provides a limited exemption to the registration requirements of the Securities Act of 1933 (and any equivalent state or local securities or "blue sky" laws) under certain circumstances.

Pursuant to Section 1145(a)(1), the securities laws do not apply to the offer or sale under a plan of a security of: (1) the debtor, (2) the debtor's affiliate participating in a joint plan or (3) the debtor's successor under the plan as long as the offer or sale is either: (a) in exchange for: (i) a claim against, (ii) an interest in, or (iii) a claim for an administrative expense in the case concerning the debtor or its affiliate; or (b) principally in such exchange and partly for cash or property.

Furthermore, pursuant to Section 1145(c), any such offer or sale of securities is considered to be a public offering, providing more flexibility for subsequent resale than would be the case if the issuance were considered an exempt private offering (such as private placements under Rule 144A of the Securities Act of 1933).

Section 1145(a)(2) provides the securities laws do not apply to: (1) the offer of a security or (2) the sale upon the

ALPINE_LIT169098

exercise of: (a) a warrant, (b) an option, (c) a right to subscribe, or (d) a conversion privilege that was sold as described under Section 1145(a)(1).

The securities laws do not apply to the offer or sale outside of a plan of a security of an issuer other than the debtor or an affiliate if: (1) the debtor owned the security as of the petition date, (ii) the issuer of the security meets the specifications of Section 1145(a)(3)(B), and (iii) the offer or sale does not exceed the limits of Section 1145(a)(3)(C).

However, Section 1145 is not available to an entity that qualifies as an underwriter, as defined in 1145(b).

Persons depositing securities for resale that have been acquired through Section 1145 will ordinarily be required to provide a legal opinion, subject to review and approval by Alpine, to the effect that the securities can be resold as requested.

### 12.26.6 Securities Issued in Company Acquisitions—Rule 145

Generally, Rule 145(d) provides three methods for unregistered resales by such holders:

1. Resales that meet all of the Rule 144 requirements, except for the holding period and notice filing requirements set forth in Rule 145(d)(1);
2. Resales by nonaffiliates of the issuer that have held the securities for at least one year from the date of the Section 145 exempt transaction without regard to Rule 144, except for the current public information requirement set forth in Rule 145(d)(2); and
3. Resales by persons who are not, and for the past three months have not been, affiliates of the issuer and have held the securities for at least two years from the date of the Section 145-exempt transaction without regard to Rule 144 (Rule 145(d)(3)).

### 12.26.7 Regulation A

Regulation A, as implemented under Section 3(b) of the Securities Act of 1933 provides an exemption from SEC registration for securities offerings of up to $5 million, including up to $1.5 million by selling security holders, within a 12 month period. Regulation A is not available to companies currently registered under the Exchange Act of 1934. Regulation A requires the offering company to file an offering statement with the SEC, which must be qualified prior to offering any securities. Regulation A offerings must also comply with state blue sky laws. As a result, Alpine requires specific information regarding the offering and its qualification per state and also requires a legal opinion specific to each shareholder seeking to sell under Regulation A.

Regulation A was amended in 2012 by the Jumpstart our Business Startup Act of 2012 (the "JOBS" Act), however, the amendments have not yet been implemented.

### 12.26.8 Attorney's Opinions

Alpine may seek the opinion of outside counsel that Alpine has retained to the effect that Alpine has conducted a reasonable investigation and has a reasonable basis for determining that an exemption from registration is available for the proposed resale of control or restricted securities. The formality of such legal advice may vary according to the circumstances.

## 12.27 Reporting Of Insider Transactions

[SEC Securities Exchange Act of 1934 Section 16(a); SEC Exchange Act Section 16 and Related rules & Forms (Q & A): http://www.sec.gov/divisions/corpfin/guidance/sec16interp.htm]

Under Section 16(a) of the Exchange Act, directors, officers, and >10% holders of equity securities of a publicly-traded company are required to report their purchases and sales of the issuer's securities to the SEC (and, if the security is listed on a national exchange, with the exchange where listed) as follows:

ALPINE_LIT169099

- at the time the security is registered on a national securities exchange or by the effective date of the registration statement
- within 10 days of becoming a 10% beneficial owner, director or officer
- by the end of the second business day following a purchase or sale transaction

Alternate reporting period requirements apply to two categories of transactions in which the insider does not control and may not be able to predict when the transaction will occur:

- Transactions pursuant to a contract, instruction or written plan
- Discretionary transactions pursuant to employee benefit plans such as fund switching transactions

In these instances, the date the executing broker-dealer or plan administrator notifies the insider of the transaction is deemed the date of execution for reporting purposes, as long as the notification is not later than the 3rd business day following trade date. The SEC may also provide different due dates for limited types of transactions where two-day reporting is not feasible.

If the issuer maintains a corporate website, the issuer is required to post the filing on the site no later than the end of the business day following the filing.

Transactions by directors or officers that result in "short-swing" profits but that are exempt from Section 16(b) are also subject to the two-day reporting requirement.

The obligation to report is the responsibility of the insider. Customers should be encouraged to contact their legal counsel if they have questions, and Section 16 should be referenced for specifics regarding filing requirements.

## 12.28 Penny Stocks

[SEC Securities Exchange Act of 1934 Rule 15g1-9, Rule 15g1-100 and Schedule 15G; FINRA Notice to Members 93-55, 92-42 and 92-38]

| | |
|---|---|
| **Responsibility** | - OSJ Branch Manager or designee |
| **Resources** | - New Account Form<br>- Order Records<br>- Daily Transaction Report<br>- Risk Disclosure Documents |
| **Frequency** | - Daily |
| **Action** | - FINOP:<br>  o  Include required disclosures on confirmations<br>- RR's supervisor, for customers who are not "established" customers:<br>  o  Determine required signed risk disclosure document is received prior to effecting the first 3 penny stock purchases and the two-business-day cooling-off period has been satisfied<br>  o  Review new account form and determine investment objectives are consistent with penny stock purchases<br>  o  Submit document to Compliance or New Accounts |
| **Record** | - Signature on the New Account Form and Risk Disclosure Document<br>- Risk Disclosure Documents are retained in the customer's new account file |

ALPINE_LIT169100

## 12.28.1 General Requirements

[SEC Securities Exchange Act of 1934 Rule 15g-1 through 15g-6 and Rule 15g-9]

Securities that are identified as "designated securities" (penny stocks) are subject to certain requirements including:

- provision of risk disclosure to a customer other than an "established customer"
- a "cooling-off period" of two business days after the risk disclosure is sent before a penny stock may be purchased
- disclosure of certain price information relating to the customer's purchase
- disclosure of compensation received by the broker or dealer
- inclusion of prices of penny stock positions on the customer's monthly statement and a legend regarding the value assigned to the penny stock

There are five primary exemptions from these requirements:

1. The price of the security is $5.00 or more per share.
2. The purchaser is either an accredited investor or established customer or is a principal affiliated with the issuer (as defined in the rule).
3. The transactions are not recommended.
4. The broker-dealer's commissions, mark-ups and mark-downs from penny stock transactions did not exceed 5% of total commissions or mark-ups and mark-downs during the 3 months immediately preceding the transaction, AND, the broker-dealer has not been a market maker in the penny stock to be purchased by the customer for the immediate 12 months preceding the transaction.
5. Any other transaction exempted by the SEC.

The following sections outline Alpine's requirements for penny stock transactions subject to the rules.


## 12.28.2 Penny Stock Defined

[SEC Securities Exchange Act of 1934 Rule 3a51-1; SEC Guide to Broker-Dealer Registration Section V(F)]

Penny stocks are equity securities identified as "designated securities" under the SEC's Penny Stock Rule (the Rule). Penny stocks are low-priced securities (less than $5.00 per share) with the Rule listing securities that are **not** included in the definition, as follows:

The following are **not** considered penny stocks:

- A reported security as defined in Regulation NMS Rule 601.
- The stock is priced at $5.00 or more per share.
- Shares of investment companies.
- The stock is listed on an exchange.
- Security futures.
- The issuer has net tangible assets in excess of $2 million, if the issuer has been in continuous operation for at least 3 years, or $5,000,000 if in continuous operation for less than 3 years; or average revenue of at least $6,000,000 for the last 3 years.

Penny stocks include the equity securities of private companies with no active trading market if they do not qualify for one of the exclusions from the definition of penny stock.

RRs should assume that any unlisted securities priced less than $5.00 per share may be subject to the penny stock requirements.

ALPINE_LIT169101

### 12.28.3 Established Customer Defined

The requirements of the Rule do not apply to penny stock transactions for "established customers." The term established customer includes a customer who:

- has maintained an account (by effecting a transaction, making a deposit of funds or securities) more than one year previously, or
- has made three purchases of penny stocks that occurred on separate days and involved different issuers.

### 12.28.4 Suitability Information

RRs are required to obtain information from the customer including prior investment experience, investment objectives, and financial situation. This information is recorded on Alpine's new account form which must be completed prior to effecting a transaction in a penny stock. With this information, the RR is required to reasonably determine whether transactions in penny stocks are suitable for the customer.

Prior to effecting a transaction in a penny stock, the new account form must be completed and submitted to the OSJ Branch Manager or designee for approval. The OSJ Branch Manager or designee should review the information included on the form to confirm the suitability of penny stocks for the customer's account.

### 12.28.5 Risk Disclosure Document

Prior to effecting a penny stock transaction for a customer, the RR must furnish the customer with a copy of Alpine's penny stock disclosure document entitled "Important Information On Penny Stocks" and obtain the customer's signature on the disclosure document acknowledging receipt. The disclosure document may NOT be copied on Alpine letterhead but must be reproduced on plain paper.

Furnishing this disclosure and obtaining the customer's signature evidencing receipt is required for each of the first three penny stock transactions prior to any orders being entered.

### 12.28.6 Two-Business-Day Waiting Period

Penny stock transactions may **not** be executed until at least two business days after the suitability statement and agreement to the transaction has been sent either electronically or by mail. These documents must also be signed by the customer and received by Alpine.

### 12.28.7 Disclosure Of Quotations And Other Information

Rule 15g-3 prescribes certain required information that must be disclosed to the customer at or prior to the time of effecting a penny stock transaction. The designated supervisor is responsible for establishing procedures which ensure the necessary disclosures will be included on customers' confirmations. Traders are responsible for including notations on order tickets that include the required information regarding bids or offers. A copy of Rule 15g-3 will be provided to traders responsible for recording the required information. The designated supervisor is responsible for establishing procedures to ensure the bid or offer information is included with customer confirmations of penny stock transactions.

### 12.28.8 Disclosure Of Compensation

Alpine's compensation for penny stock transactions will be disclosed on customer confirmations as follows:

- For agency transactions the amount of the compensation must be disclosed.
- For riskless principal transactions where Alpine is NOT a market maker, the difference between the price to the customer and the contemporaneous purchase or sale price.

ALPINE_LIT169102

- For other principal transactions, the difference between the price to the customer and the prevailing market price.

"Active and competitive" market, for purposes of calculating mark-ups or mark-downs, is defined in the penny stock rules to include a market where the market maker, in the five business days preceding the transaction, executes less than 20% of the aggregate number of all transactions in the penny stock reported to an automated interdealer quotation system. Where Alpine dominates the market, contemporaneous cost will be used to calculate mark-ups or mark-downs.

This information is to be transmitted for inclusion on customer confirmations. The designated supervisor is responsible for establishing procedures for ensuring that required compensation disclosures are included on customer confirmations.

## 12.29 Tax Switching Transactions

Transactions that are effected to accomplish certain tax results (*i.e.,* establishing a gain or a loss) must be handled consistent with prevailing securities and tax rules and laws. Riskless tax switching trades (also known as "wash sales") are not allowed and may represent a violation of rules prohibiting pre-arranged trades.

Under tax laws, a "wash sale" occurs when someone sells a stock, mutual fund, or some other security at a loss and buys the same thing, or something "substantially identical," within 30 days before or after the sale. The seller cannot deduct the loss on that sale on his or her tax return for that year. "Substantially identical" means buying and selling the same security or one that is almost the same, such as selling an index fund and buying another index fund based on the same underlying index. Customers should be referred to their tax advisers when questions arise regarding tax loss strategies and what may be considered a security that is substantially identical.

A cross transaction must represent a beneficial change in ownership of the security sold and purchased. Where a customer wishes to sell a security and buy it back in their own account, this transaction must be effected at the risk of the market with no guarantee of the price at which the security may be repurchased. The prohibition applies to equity and debt securities. The following is an example of this type of transaction:

*A customer wishes to sell Company A at year-end to establish a loss for tax purposes. He also ultimately wants to maintain his position in the security in his account. He asks that you sell the shares and immediately buy them back in his IRA account at the same price.*

This transaction would be prohibited because there is no beneficial change in ownership of the security and the customer would be guaranteed to sell and repurchase the security at the same price. In this example, an appropriate method of handling these orders would be to enter a sell transaction and, after it has been executed, enter a buy transaction. This places both transactions at the risk of the market and does not involve a guaranteed cross.

## 12.30 Order Audit Trail System (OATS)

[FINRA Rule 7400 series; FINRA OATS web page (http://www.finra.org/RegulatorySystems/OATS/index.htm); NASDAQ Rule 6950 series]

This section describes the key requirements of the FINRA Order Audit Trail System (OATS), a mechanism for tracking orders in NASDAQ securities. Detailed information about OATS including a *Subscriber Manual* and *Technical Specifications* are available at the FINRA's OATS web page.

### 12.30.1 Who And What Orders Are Subject To OATS Requirements

Firms that meet the definition of "Reporting Member" under FINRA rules are required to comply with OATS requirements; this means a member firm that receives or originates an order and has an obligation to record and

ALPINE_LIT169103

report information under FINRA Rules 7440 and 7450. A member is not considered a "Reporting Member" in connection with an order if the following conditions are met:

- The member engages in a non-discretionary order routing process where it immediately routes, by electronic or other means, all of its orders to a single receiving Reporting Member; or two receiving Reporting Members, provided that:
  - Orders are routed by the member to each receiving Reporting Member on a pre-determined schedule approved by FINRA; and
  - Orders are routed to two receiving Reporting Members under a schedule for a time period not to exceed one year; and
- The member does not direct and does not maintain control over subsequent routing or execution by the Receiving Member;
- The receiving Reporting member(s) record(s) and report(s) all information required under Rules 7440 and 7450 with respect to the order; and
- The member has a written agreement with the receiving Reporting Member(s) specifying the respective functions and responsibilities of each party to full effect compliance with the requirements of Rules 7440 and 7450.

Orders in the following securities are subject to OATS reporting requirements:

- NASDAQ securities
- OTC domestic equity securities
- Certain transactions in foreign equity securities

"OTC equity securities" are defined as: (1) securities not listed on a national securities exchange; or (2) securities listed on one or more regional exchanges but that do not qualify for dissemination of transaction reports to the Consolidated Tape. This includes OTCBB and pink sheet securities; preferred securities; and convertible bonds reported to a FINRA equity trade reporting system. Orders in foreign equity securities where the execution is subject to reporting requirements also must be reported. The definition does **NOT** include: Direct participation programs (DPPs).

OATS reporting requirements apply to all executed and unexecuted orders other than those specifically excluded and listed in the next section. OATS applies to open orders, orders that have been modified, orders that have been partially executed, and cancelled orders.

### 12.30.1.1 Orders NOT Covered By OATS Rules
The following types of orders are not required to be reported:

- The orders a market maker places for its proprietary market making account
- Proprietary orders executed through NASDAQ National Market Center in the normal course of market making activities
- Proprietary orders placed on an ECN during the normal course of market making activities
- Orders received from another market maker in the same security as Alpine makes a market

### 12.30.2 Registering With OATS

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • N/A |
| Frequency | • Registration when Alpine initially will become subject to OATS requirements<br>• Update contact person and registration information with the FINRA as needed |

ALPINE_LIT169104

| **Action** | • Register Alpine with OATS<br>• Update contact person and other registration information |
|---|---|

Firms subject to OATS requirements are required to register with OATS. The OATS Subscriber Initiation and Registration Form is available at the FINRA OATS web page.

An individual at Alpine is named as the FINRA contact (the OSO Administrator) for OATS purposes. The Administrator oversees user accounts and passwords.

## 12.30.3 List Of Contact Persons

The OSO Administrator is responsible for maintaining a current list of contacts with whom OATS technical and regulatory staff may communicate, including e-mail addresses.

## 12.30.4 Capture Of Required OATS Information

[FINRA Rule 3110(h) and 7440]

Alpine is required to capture specific information relating to the handling or execution of electronic and manual orders including order ID, Routed Order ID, other order specific information up to and including the recording times of events (receipt from customer, transmittal between trading desks, *etc.*) in hours, minutes, and seconds and milliseconds. Alpine is also reviews a test sample of OATS records against the Flextrade Order Blotter to ensure accurate reporting to OATS. This is done on a weekly basis.

Refer to the section titled "*Trading Reporting"* in the **OTC Equity Trading and Marketing Making** Chapter for additional information concerning the firm's supervisory procedures concerning compliance with OATS reporting

### 12.30.4.1 Manual Orders Accepted

[FINRA OATS Phase III Frequently Asked Questions: http://www.finra.org/RegulatorySystems/OATS/Phase III/NASDW_015884]

Alpine accepts manual orders received via:

• Telephone

Information capture and reporting requirements (for both electronic and manual orders) apply to orders received in branch offices as well as the main office. If orders are not accepted through some communication methods because prompt handling of orders cannot be facilitated, customers will be notified by appropriate disclosure which may be on Alpine's website, disclosure in customer agreements, or another method determined by Alpine.

## 12.30.5 Reporting Of OATS Information

[FINRA Rule 7450]

Alpine will transmit information to FINRA in compliance with OATS requirements.

FINRA resources about OATS reporting include the "OATS Reporting Technical Specifications" and the "OATS Small Firm Reference Manual" available at the FINRA OATS web page.

ALPINE_LIT169105

### 12.30.5.1 Reporting Manual Orders

Manual orders must be reported to OATS including the time the order was received or originated, even if the order is later entered into Alpine's electronic order routing or trading system. (It is not necessary to record the time the order is entered into the electronic system.)

This includes orders received by an RR or independent contractor and recorded on a paper ticket and then later transmitted to the main office.

### 12.30.5.2 Third Party Transmission

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • OATS Web interface data<br>• ROE Rejection Report, to:<br><br>1. Check for rejections;<br>2. Check for unmatched submissions with TRF submissions;<br>3. Check for unmatched submissions within the OATS system;<br>4. Verify that OATS submissions are accurate and reported on a timely basis;<br>5. Verify that routed orders are matched within the OATS system |
| Frequency | • Initially - Execute contract with the Reporting Agent, confirming reviews to be conducted by the Reporting Agent to ensure accurate data submission<br>• Daily: Review ROE Rejection Report (where there is information to report, i.e. rejections, unmatched orders, etc.)<br>• As needed - Update of contract(s) |
| Action | • Review ROE Rejection Report or similar report to evaluate compliance with OATS requirements<br>• Contact the third party to discuss exceptions or variances from OATS requirements<br>• Periodically check review data to evaluate the Reporting Agent's compliance with OATS requirements<br>• Request corrective action from the third party, if necessary<br>• Document ROA report daily and initial, store in Traders folder of the S drive under "OATS"<br>• Replace the third party if compliance is not reasonably achieved<br>• Update contract(s) when necessary |
| Record | • Initial or signature, date reviewed (if applicable) and action taken, if any on the ROA Rejection report or similar report in the OATS file<br>• Third party agreements |

Alpine has contracted with a third party (Reporting Agent) to transmit OATS information to the FINRA. Alpine's contract with the third party includes assurances regarding compliance with OATS requirements. Alpine also may periodically review data available to evaluate the Reporting Agent's compliance with OATS requirements.

**Applicable Rules:** Rule 7440 & 7450, ADF/TRACS Rules 7230A, 7130

ALPINE_LIT169106

### 12.30.6 Clock Synchronization

Refer to the section *Time Clock Synchronization* in this chapter for procedures for synchronizing time clocks used for recording date and time of orders.


### 12.30.7 OATS Contact Information

[FINRA Notice to Members 02-29]

The CCO or designee will update Alpine's OATS contact person on record with the FINRA when necessary. At least annually, the CCO or designee will confirm that current information is accurate. In addition, changes must occur within 30 days of the material occurrence.


## 12.31 Disclosure Of Order Execution Procedures

[SEC Regulation NMS Rule 605; SEC FAQS Regulation NMS Rule 605: http://www.sec.gov/divisions/marketreg/nmsfaq605.htm]

[SEC Regulation NMS Rule 605; SEC FAQS Regulation NMS Rule 605: http://www.sec.gov/divisions/marketreg/nmsfaq605.htm]

Since Alpine is engaged in OTC market making or exchange specialist activities, it is required to publish information regarding order executions in National Market System securities on a monthly basis, unless a proper exemption is met. Alpine is exempt from Rule 605 reporting pursuant to the Exemption for Small Market Centers in SEC Staff Legal Bulletin No. 12R, question 26 dated June 22, 2001: https://www.sec.gov/interps/legal/slbim12a.htm#q26.

The exemption covers any market center that reported fewer than 200 transactions per trading day on average over the preceding six month period in securities that are covered by the Rule (that is, national market system securities that do not qualify for the inactively traded security exemption), but only if more than 90% of such transactions were in securities that are not included in the Nasdaq-100 Index or the S&P 500 Composite Stock Price Index. Once a market center's average daily reported transactions for the preceding six-month period reach 200, or the percentage of its reported transactions in Nasdaq-100 and S&P 500 securities reaches 10% or greater for the preceding six-month period, the market center would cease to qualify for the exemption. The market center then would be required to begin collecting the requisite order data for the following full month and make its monthly report for that month publicly available by the end of the next month thereafter. For example, if the market center ceased to qualify for the exemption based on trading during the six-month period from January through June, the market center must begin collecting order data for August and make its monthly report (covering August) publicly available by the end of September.

A broker-dealer that routes orders to a market center that does not generate monthly execution quality reports continues to have a duty to monitor the quality of executions received to obtain the best execution of those orders.


## 12.32 Order Routing And Reporting

[SEC Regulation NMS Rule 601]

As required by Rule, Alpine routes and executes orders in NMS securities only through exchanges and other facilities that have an effective transaction reporting plan filed with the SEC and will promptly report all information required by the reporting plan.


### 12.32.1 Disclosure Of Order Routing

ALPINE_LIT169107

[SEC Regulation NMS Rule 606]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Customer agency order trade data |
| Frequency | • Validate publication of NMS Rule 606 reports (to the Alpine public website) - quarterly<br>• Provide individual customer order routing information - as requested<br>• Notify customers of availability of information - annually |
| Action | • Validate publication of the NMS Rule 606 report on Alpine's public website site by the end of the month following each calendar quarter<br>• Respond to requests from customers for order routing information<br>• Send annual notification to customers |
| Record | • Retain copies of quarterly reports<br>• Retain historical reports that confirm that the quarterly publication was satisfied<br>• Retain records of customer requests and fulfillment of requests<br>• Retain copies of annual customer notification (include notation as to when and how it was delivered). (Notify the back office to send the annual notification). |

Alpine is required to publish quarterly statistics regarding its customer agency order routing practices. The purpose of the report is to provide the public with information on how broker-dealers route their customers' orders, to enable customers (and others) to evaluate order routing practices. The Rule was adopted by the SEC to enhance market transparency and foster competition among market participants.

This information is available on the internet and in hard copy for those who do not have access to the internet. The report is published by the end of the month following the calendar quarter reported. In addition to quarterly reports, information about the routing of individual customer orders is available to customers, upon request, for the prior six months' trading activity.

In addition, Alpine will send an annual notification to customers that the above information is available, as required by the Rule. The head trader or designee will be responsible for including a notation in the file as to when and how it was delivered.

## 12.32.2 Orders Covered By The Rule

The report includes customer orders in exchange-listed securities, NASDAQ securities, and listed options. It does not include the following orders:

- equity orders with a market value of $200,000 or more
- option orders with a market value of $50,000 or more
- firm trading account orders (proprietary orders)
- orders for OTC Bulletin Board securities

## 12.32.3 Information Included In The Reports

Extensive statistical information is available in the reports. In summary, Alpine reports on the top ten venues to which orders are routed (including internal routing) and any other venues that receive more than 5% of Alpine's order flow.

ALPINE_LIT169108

The Rule also requires disclosures regarding internalization of orders and any relationship Alpine has with a venue, such as payment for order flow.

### 12.32.4 Customer Requests For Order Routing Information

Customers may request information on how their individual orders were routed for the past six months. This information may be obtained by making a request to Operations.

## 12.33 Distribution, Consolidation, And Display Of Information

[SEC Regulation NMS Rule 603]

If Alpine is the exclusive source of information regarding quotations or transactions in an NMS stock, it will comply with requirements to provide information to a securities information processor on terms that are fair and reasonable.

## 12.34 Cash And Non-Cash Compensation Policy

[FINRA Rule 2310 and 2320; NASD Rule 2830; MSRB Rule G-20]

| | |
|---|---|
| **Responsibility** | • CCO |
| **Resources** | • Requests from RRs, managers, or outside firms regarding sponsorship of cash or non-cash compensation relating to the sale of securities |
| **Frequency** | • As required |
| **Action** | • Review request and ensure compensation is consistent with rule requirements and limitations<br>• Obtain Sponsor Request Form<br>• Approve or disapprove compensation in writing<br>• Obtain Reimbursement Form from sponsor with RR payment<br>• Establish and maintain required records of approved compensation programs |
| **Record** | • Requests<br>• Sponsor Request Forms<br>• Reimbursement Forms<br>• Approval/disapproval of compensation arrangement |

Regulators' rules restrict compensation relating to the sale and distribution of debt, equity, direct participation program (DPP), REIT securities, and municipal securities. RRs may not accept (directly or indirectly) cash or non-cash compensation from outside firms or persons. The only exception includes compensation arrangements specifically approved by Alpine.

### 12.34.1 Definitions

**Cash compensation** is defined as follows:

Any discount, concession, fee, service fee, commission, asset based sales charge, loan or override, or cash employee benefit received in connection with the sale and distribution of securities.

ALPINE_LIT169109

**Non-cash compensation** is defined as follows:

Any form of compensation received in connection with the sale and distribution of securities, other than cash compensation, which includes, but is not limited to, merchandise, gifts and prizes, travel expenses, meals and lodging.

### 12.34.2 Approval

Any compensation as defined in this section and paid directly to the RR requires sponsor submission of the Sponsor Request Form and approval by Compliance **prior to** accepting compensation. The following section outlines types of non-cash compensation permitted without specific approval, unless otherwise noted.

### 12.34.3 Types Of Permissible Non-Cash Compensation

The following types of non-cash compensation are allowed provided they are **not preconditioned on achieving a sales goal:**

- Gifts amounting in aggregate value not exceeding $100 annually, per person. All gifts must be reported to Compliance under Alpine's Gifts, Gratuities and Entertainment policy.
- An occasional meal, ticket to a sporting event or show, or comparable entertainment that is not so frequent nor so extensive as to raise any question of propriety.
- Payment or reimbursement in connection with training or educational meetings, subject to several conditions. *Note:* Prior approval must be obtained from the CCO or designee before participating in such meetings.
- The location of the meeting is appropriate for its purpose, *e.g.,* at or near the sponsoring company's home office; an office of Alpine or facility near an office; or a regional location for a regional meeting. The CCO or designee will determine the appropriateness of the meeting.
- Only expenses incurred by Alpine or its employees are eligible for payment. Expenses for guests of employees (spouse, *etc.*) will not be reimbursed.

Non-cash sales incentive programs **may be preconditioned on achieving a sales goal** provided they are pre-approved in-house incentive programs sponsored by Alpine and meet the following criteria:

- The program must be based on the RR's total production with respect to all of that type of security sold by Alpine (investment company, DPP, *etc.*).
- Credit received for each security is equally weighted.
- Only Alpine employees may participate.
- Other firms may make contributions to the program, provided they do not participate, directly or indirectly, in the organization of the program. However, the outside entity may provide a speaker for the meeting.

## 12.35 Prohibited Transactions And Practices

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order records<br>• Daily Transaction Report<br>• Customer monthly statements |
| Frequency | • Daily review of order records and Daily Transaction Report<br>• Review of customer monthly statements |
| Action | • Reviews of transactions should include consideration of prohibited transactions |

ALPINE_LIT169110

| | |
|---|---|
| | prescribed in these policies. Action on identified prohibited transactions could include consultation with Compliance to confirm whether transactions in question are prohibited and to identify corrective action.<br>• Some specific guidelines for review include the following. Contact Compliance for guidance regarding corrective action:<br>    o Wash transactions result from cross transactions between two accounts with the same beneficial owner and at no market risk, *i.e.,* the buy and sell are pre-arranged at a set price. Wash transactions should be cancelled and securities sold at the risk of the market.<br>    o Cross transactions on a frequent basis particularly in thinly-traded securities may be an indicator of supporting the market.<br>    o Orders by the same RR frequently marked for "at the opening" or "at the close" may be an indication of an attempt to influence the market.<br>    o A pattern of purchasing securities in one account and transferring to another account at a later date may indicate parking.<br>    o Excessive trading may be an indicator of churning. See the section *Active Accounts* for guidance regarding action on actively traded accounts.<br>    o RRs trading ahead of customer block orders that may affect the market price of a security may indicate frontrunning. |
| **Record** | • Initials on order records<br>• Initials on Daily Transaction Report<br>• Branch Manager's Log<br>• Notes/memos to RR's file, if appropriate |

## 12.35.1 Introduction

RRs are required to handle customer transactions in compliance with regulators' rules. This section highlights certain types of prohibited transactions.

## 12.35.2 Unauthorized Trading

No employee may enter a transaction before contacting the owner of the account (or the authorized agent for the owner) unless the employee has specific written authorization to act on the customer's behalf. Failure to contact the customer or the customer's agent can result in the customer later rescinding the transaction because it was not authorized. Engaging in unauthorized transactions subjects the employee to regulatory and Firm discipline which may include fines and/or termination depending on the seriousness of the violation. If Alpine determines an RR engaged in unauthorized trading, any related losses will be charged directly to the RR.

RRs must also avoid "inadvertent" unauthorized transactions such as accepting an order from a husband for a wife's account where the wife has not signed a trading authorization giving her husband authority to trade on her behalf. Doing a customer a "favor" by entering an order when he or she cannot be reached may be construed as good customer service by the RR but in reality is a rule violation and subjects the RR and Alpine to potential liability for losses from unauthorized transactions.

## 12.35.3 Prearranged Trading

An offer to sell coupled with an offer to buy back at the same or a higher price, or the reverse, is a prearranged trade and is prohibited. Options or written agreements such as repurchase agreements are not included in this prohibition.

ALPINE_LIT169111

### 12.35.4 Adjusted Trading

Adjusted trading is a prohibited practice that involves the sale by a customer of a security to a broker-dealer at a price above the prevailing market price and the simultaneous purchase of a different security at a price greater than its market value. This may be requested in instances where a bank or other fiduciary does not want to realize a loss on their books and engages in a scheme to avoid, disguise, or postpone losses. Federal banking regulators have stated that adjusted trading by federal financial institutions is an unacceptable and unsuitable investment practice.

### 12.35.5 Overtrading Or Undertrading

These are transactions at prices in excess of or below the prevailing market. Customer transactions must be executed at a price reasonably related to the market; overtrading and undertrading is not permitted.

### 12.35.6 Wash Transactions

[FINRA Rule 6140(a) and 6140(b)]

Firms and individuals are prohibited, for purposes of creating or inducing a false or misleading appearance with respect to the market in such security, from:

- Executing any transaction in a security which involves no change in beneficial ownership;
- Entering any order or orders for the purchase of a security with the knowledge that an order or orders of substantially the same size, and at substantially the same price, for the sale of the security has been or will be entered by or for the same or different parties; or
- Entering any order or orders for the sale of any security with the knowledge that an order or orders of substantially the same size, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

### 12.35.7 Cross Transactions

Firms and their employees may not engage in a practice of effecting cross transactions for the purpose of supporting or maintaining the market price of a security.

### 12.35.8 Orders At The Opening Or Close

Orders entered at the opening or close of the market for purposes of influencing the price of a security are prohibited.

### 12.35.9 Parking Securities

"Parking" is a prohibited practice where a trade or series of trades are effected for a person or entity and held in another person's or entity's account to disguise the investment activities of the original person or entity.

### 12.35.10 Churning

[FINRA Rule 2111.05(c) and 6140(c)]

Churning of a customer's account is prohibited. The term "churning" has a number of elements including:

- Control of the account by the RR
- Excessive transactions
- Intent to defraud which may be defined as the RR acting in the RR's own interest contrary to the customer's interest

ALPINE_LIT169112

An account that is "active" does not necessarily denote churning. An account's activity must be reviewed individually when reviewing for churning including the customer's objectives and the customer's control of the account.

## 12.35.11 Trade Shredding

[FINRA Rule 5290]

"Trade shredding" (also known as "tape shredding") is the practice of breaking orders into multiple smaller orders for the primary purpose of maximizing commissions or other revenue. For example, a firm may receive a rebate from a particular market center for directing a certain number of transactions to that market center. Alpine and its employees are prohibited from engaging in breaking up orders for the purpose of maximizing Alpine's revenues or for any other prohibited purpose.

# 12.36 Comission Recapture Programs/Soft Dollar Arrangements

Alpine does engage in soft dollar arrangements or commission recapture programs. Should Alpine engage in such activity in the future, it will develop and implement policies and procedures in this area and amend this Manual to reflect them.

### _Definitions:_

Commission recapture is a process where an institutional investor receives a rebate resulting from brokerage transactions incurred through the investor's investment manager. This rebate represents a portion of commissions or markups/markdowns on these investment transactions. "Directed brokerage" is where plan sponsors direct investment managers to execute a portion of their trades through a selected brokerage firm to the extent the brokerage firm is competitive in price and trade execution. The rebate is paid directly to the investor, usually as hard-dollar payments sent to the investor's custodian. The overriding requirement is that recaptured commissions must benefit the fund or pension plan which may reinvest the funds or pay for authorized expenses. The net effect is to save money for the investor by lowering transaction costs.

Soft dollars: Payment for brokerage firm services that is provided by commissions generated from trades. Thus, an investor who does significant trading might be provided with "complimentary" subscriptions to market letters or an at-home quote system. Payment can occur in the form of large commissions paid to the brokerage firm.

# 12.37 Trading Ahead of Research Reports

_FINRA Rule 5280, BATS rule 12.13, and ARCA Rule 6.7_

Alpine does not engage in research activities, nor does Alpine have a research department or employees who engage in such activities. For that reason, FINRA Rule 5280, BATS Rule 12.13 and ARCA Rule 6.7 do not apply and Alpine is not required to restrict or limit the flow of information between research department personnel and trading personnel. Should Alpine engage in such activity in the future, Alpine will establish, maintain and enforce policies and procedures reasonably designed to restrict or limit the flow of information between both specified groups.

ALPINE_LIT169113

# 13 ONLINE TRADING SERVICES

This chapter became effective on June 18, 2014.

This chapter outlines Alpine's policies and procedures governing online trading services offered by Alpine. Alpine may grant online trading services to clients, and may revoke such access at any time for any reason.

## 13.1 System Controls (NASD NTM 04-66)

Online trading services are offered by Alpine through vendors such as CSS Hosted Solutions, LLC ("CSS"). Alpine works closely with clients to establish access and provided access and password support for online trading through CSS's trade portal. Alpine is responsible for testing and evaluating CSS' systems integrity, security and capacity of CSS' trading controls on a periodic basis. Alpine should ensure that it does not test its systems' connectivity to the applicable trading system by sending orders that are not executable, such as by sending orders during normal market hours that are priced far outside a security's current price. Alpine must test pursuant to established protocols and test messages should be clearly denoted as such.

### 13.1.1 Testing System Controls (NASD NTM 04-66)

## 13.2 Security of Online Trading Activity / Information Security / Data Integrity Review Procedures and Documentation

Alpine will be responsible for ensuring that prior to being permitted to trade on line, the customer is issued a User ID and Password, which will be verified by our computer programs. Alpine will maintain its web site in a secure fashion, overseen and ensured by the designated principal, including the responsibility for ensuring information security, appropriate encryption, authentication, evaluation of maximum capacity of its systems and back up procedures for possible system outages. Alpine will also ensure our ability to undertake the appropriate responsibility for ensuring that all controls and safeguards.

## 13.3 Customer Accounts (NASD NTM 02-21)

Alpine may grant online trading services to clients, and may revoke such access at any time for any reason.

Customers that trade their accounts online will follow the same procedures for opening an account as any other customer. Please refer to the "Accounts" section of this WSP for more information.

## 13.4 Market Access Controls

Alpine's current policies governing trading limits and parameters will be the same for online trades as are currently in place for orders placed through the customer's servicing representative.

## 13.5 Online Information & Disclosures

Clients are required to complete the online trading authorization form (and must evidence their acknowledgement of Alpine's Online Trading Terms and Conditions) prior to engaging in the activity. The registered representative and the supervising principal must also sign the form to evidence their acceptance and approval, respectively. Alpine will post similar disclosures online at www.alpine-securities.com.

ALPINE_LIT169114

## 13.6 Privacy Policy

Alpine will provide online trading clients with its Privacy Policy in the same manner and method in which it offers the privacy policy to all of its other clients.

## 13.7 Orders

Online trading orders will be entered by the client or authorized agent (as directed by the customer). Limits and restrictions are placed on online-line accounts such as type, size, price and destination. Currently, customers will not be able to place orders for fixed income securities, mutual funds, exchange traded funds. The client can only enter buy orders under 9,999,999 shares and must have funds in the account. Sell orders can only be entered when the client has the same security in the account, the order must be done ex-clearing.

## 13.8 Online Offerings

Alpine does not engage in online offerings. Should Alpine do so, it will develop processes for the approval of online information, indications of interest, use of hyperlinks and online prospectuses.

## 13.9 Margin Requirements and Short Sales

Alpine does not engage in, nor does it offer margin activity to its customers. Similarly, Alpine does not engage in short selling activity on behalf of its customers. Thus, short sales and other marginable activity are not available for online trading at this time.

## 13.10 Order Review

Alpine will meet our order review obligations for online trades in the same manner in which all other transactions are reviewed. Please refer to the section titled "Order Review" located elsewhere in this written supervisory procedure for more information.

## 13.11 Best Execution Procedures and Documentation

It is Alpine's responsibility to provide to on-line customers information concerning best execution efforts undertaken by this broker/dealer, including the execution quality available on different market centers, our order handling practices and inducements for receiving payment for order flow. Alpine will perform best execution reviews for online trades in the same manner in which we perform such reviews for all trades executed through the firm. Please refer to the "Best Execution" section of this WSP for more information.

## 13.12 Supervisory Review Procedures and Documentation Regarding Suitability

It is our responsibility to ensure that online trades are handled appropriately in terms of suitability and principal approval. Any trades that have, in any manner, been "recommended" are required to undergo all appropriate suitability checks, even though the trades may have been entered on-line by the customer. While the vast majority of transactions undertaken on line by our customers will be non-recommended (unsolicited) transactions, we are fully cognizant of the increased suitability responsibilities for all recommended (solicited) transactions.

Alpine will meet our suitability obligations for recommended online trades in the same manner in which all other transactions are monitored for suitability. Please refer to the section titled "Suitability" for more information.

ALPINE_LIT169115

## 13.13 Customer Service

Clients will have access to the online portal and Alpine's home page, both of which provide Alpine's contact information. The client's broker should be the main contact for the account and can provide the customer with information about online trading access.

## 13.14 Advertising

[NASD Notice to Members 01-23]

Advertising of online services is subject to the same review procedures outlined in the chapter *COMMUNICATIONS WITH THE PUBLIC* and the section *Retail Communications*. Refer to that chapter for more information.

## 13.15 Complaints

Grievances by customers will be handled in the same manner for online trading as they are currently handled with other grievances. Please refer to the section titled "Complaints" for more information.

## 13.16 Extended Hours Trading

Alpine does not typically permit extended hours trading. Should Alpine engage in such activity, it will follow the policies and procedures outlined in the section titled "Extended Hours Trading".

ALPINE_LIT169116

# 14 OTC EQUITY TRADING AND MARKET MAKING

## 14.1 Automatic Execution Of Orders

Alpine may provide automatic execution of orders that qualify for execution through its internal system.

In times of extreme market conditions where there may be large order imbalances and/or significant price volatility, the following procedure(s) will be followed:

- Orders will revert to a manual execution mode.
- Executions will be assigned on a first-in/first-out basis.
- Orders will be routed to an alternative market or trading system.
- Partial executions will be provided up to a specified size.

Alpine will provide disclosure to customers (and order entry firms) of alternative handling of orders during extreme market conditions.

## 14.2 Minimum Pricing Increment

[SEC Regulation NMS Rule 612; SEC FAQ Concerning Rule 612: http://www.sec.gov/divisions/marketreg/subpenny612faq.htm; NASDAQ Rule 4613; FINRA Rule 6434]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Order data and reports |
| **Frequency** | • Daily, Weekly or Monthly depending on reports/data available |
| **Action** | • Confirm compliance with pricing increment requirements when the AQR is not functioning (see the next section) – Orders that violate the pricing increment requirements will be automatically rejected in the system<br>• If exceptions are noted, contact trader; determine system anomalies, or identify other problems allowing exceptions |
| **Record** | • Reports with reviewer's initials or signature, date reviewed (if applicable), action taken, if appropriate |

Applicable Rules: SEC Rule 612(a) and 612(b)

SEC Rule 612(a) prohibit firms from displaying, ranking or accepting quotations, orders or indications of interest in any NMS stock priced in an increment smaller than $.01 if the quotation, order or indication of interest is priced equal to or greater than $1.00 per share. SEC Rule 612(b) prohibit firms from displaying, ranking or accepting quotations, orders or indications of interest in any NMS stock priced in an increment smaller than $.0001 if the quotation, order or indication of interest is priced less than $1.00 per share. Alpine has established rules through Flextrade, Alpine's trading platform to automatically reject orders that violate the rules enumerated above.

ALPINE_LIT169117

### 14.2.1 Minimum Quotation Size

[FINRA Rule 6433; FINRA Regulatory Notice 12-37]

For OTC equity securities quotations in an inter-dealer quotation system permitting quotation updates on a real-time basis, the following minimum quotation sizes apply:

| Price (Bid or Offer) | Minimum Quote Size (# of shares) |
|---|---|
| $0.0001 to $0.0999 | 10,000 |
| $0.10 to $0.1999 | 5,000 |
| $0.20 to $0.5099 | 2,500 |
| $0.51 to $0.9999 | 1,000 |
| $1.00 to $174.99 | 100 |
| $175.00 | 1 |

## 14.3 Introduction

These procedures outline requirements for complying with Alpine and regulatory obligations that apply to OTC equity traders and supervision of traders. All traders and supervisors are required to review and be familiar with these procedures. The policies included in this chapter apply to equity securities only, unless otherwise noted.

User Guides for workstations, ACT, and other services are available at the NASDAQ Trader web site.

### 14.3.1 Supervisory Reviews

| Responsibility | • Head trader or designee |
|---|---|
| Resources | • CSS Order management/trading reports as needed: Employee Trades, Family-Related Accounts, Volume by Security; Combined Executions for Unsolicited Orders; Combined Executions for Solicited Orders<br>• PinkLink OTC Link History |
| Frequency | • Daily |
| Action | • Review CSS Order management/trading reports, NMS compliance and PinkLink OTC link history reports to review for accuracy and content of orders and trading records (exceptions)<br>• Record exceptions with explanation of action taken |
| Record | • CSS order management/ trading reports, NMS compliance and Pink Link OTC Link History reports via initial or signature, date reviewed (if applicable)<br>• Note exceptions with explanation of action taken |

Applicable Rules: 17a-3 & 17a-4, NASD Rule 3110

### 14.3.2 Regulation NMS

ALPINE_LIT169118

[NASDAQ Head Trader Alert 2007-187; NASDAQ Trader Reg NMS web page: http://www.NASDAQTrader.com/regnms; NASDAQ Reg Recon web site: http://www.nasdaqtrader/trader/tradingservices/productservices/productdescriptions/regrecon.stm; SEC Responses to FAQs Concerning Rules 611 and 610: http://sec.gov/divisions/marketreg/nmsfaq610-11.htm]

Regulation NMS was adopted to strengthen the national market system for equity securities. It requires markets to interact in a way that permits orders to seek the best available market. Rule 611, the Order Protection Rule, is the primary rule that affects broker-dealers and requires broker-dealers to prevent "trade-throughs."

### 14.3.2.1 Key Definitions

[SEC Regulation NMS Rule 600]

**Automated trading center:** a trading center that:

- has implemented systems, procedures and rules to display automated quotations in compliance with Regulation NMS;
- identifies all quotations other than automated quotations as manual quotations;
- immediately identifies its quotations as manual quotations whenever it has reason to believe it is not capable of displaying automated quotations; and
- has adopted reasonable standards limiting when its quotations change from automated to manual quotations, and vice versa, to defined circumstances that promote fair and efficient access to its automated quotations.

**Directed order:** a customer order that the customer specifically instructs the broker or dealer to route to a particular venue for execution.

**Intermarket sweep order (ISO):** a limit order for an NMS stock that meets the following requirements:

- When routed to a trading center, the limit order is identified as an intermarket sweep order; and
- simultaneously with the routing of the ISO limit order, one or more additional limit orders, as necessary, are routed to execute against the full displayed size of any protected bid, in the case of a limit order to sell, or the full displayed size of any protected offer, in the case of limit order to buy, for the NMS stock with a price that is superior to the limit price of the ISO limit order. These additional routed orders also must be marked "ISO."

An ISO is premised on the condition that the trading center or broker-dealer responsible for routing the ISO will have attempted to access all better-priced protected quotations. This exception facilitates the execution of certain types of orders, such as large block orders.

**Market center:** any exchange market maker, OTC market maker, alternative trading system, national securities exchange, or national securities association.

**NMS security:** any security or class of securities for which transaction reports are collected, processed, and made available pursuant to an effective transaction reporting plan, or an effective national market system plan for reporting transactions in listed options.

**Protected quotation:** a quotation in an NMS stock that:

- is displayed by an automated trading center;
- is disseminated pursuant to an effective national market system plan; and
- is an automated quotation that is the best bid or best offer of a national securities exchange (including NASDAQ) or the best bid or best offer of a national securities association.

To be protected, the quotation must be immediately and automatically accessible.

**Trade-through:** the execution of a trade as principal or agent during regular trading hours at a price inferior to protected quotations.

ALPINE_LIT169119

**Trading center:** a national securities exchange or national securities association that operates an SRO trading facility, an alternative trading system, an exchange market maker, an OTC market maker, or any other broker or dealer that executes orders internally by trading as principal or crossing orders as agent.

## 14.3.2.2 Trade-Throughs

[SEC Regulation NMS Rule 611; SEC Division of Market Regulation Responses to Frequently Asked Questions Concerning Rule 611 and Rule 610 of Regulation NMS]

Firms that route orders have the obligation to prevent trade-throughs, **i** .e., execution of orders at prices inferior to protected quotations. Consolidated quotation data includes on each quotation a condition code to identify whether quotations are manual, and thus not protected, or automated and possibly protected. If the Firm routes orders to a market center, that market center is responsible for ensuring the execution complies with the Order Protection Rule. Trades that are internalized (in-house crosses, trades on a proprietary basis with customers) must not violate trade-through requirements and must be reported to a Trade Reporting Facility (TRF).

While the purpose of the NMS is to connect markets to afford orders the best available price, broker-dealers have obligations to seek the best available market. Order routers have three tools available to control the handling of orders to comply with Rule 611:

- a limit price (preclude execution at a price inferior to the limit)
- an immediate-or-cancel (IOC) designation (triggers the requirement for automated quotations and particularly that the trading center provide an immediate response to the order)
- an ISO designation (the BD routing the order assumes responsibility)

### 14.3.2.2.1 Trade Reporting Exception Modifiers

[SEC Regulation NMS Rule 611(a) and Rule 611(b)]

Applicable modifiers will be appended to last-sale transaction reports for trades that fall within the exceptions and exemptions from Rule 611.

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Internal or third-party reports on NMS compliance |
| Frequency | • Monthly |
| Action | • Review to determine that trade-throughs are permitted when an exception is available and are used only when permitted<br>    ○ Test transactions with trade-through modifiers to confirm they qualify for an exception and have the appropriate modifier |
| Record | • Internal or third-party reports with records of action taken<br>• NASDAQ reports with records of action taken<br>• OTC Trading Manager Monthly Checklist |

Trade-throughs are permitted under certain exceptions and require modifiers on last-sale transaction reports to identify the exception. Exceptions are explained below.

**Self-help exemption** [Regulation NMS Rule 611(b)(1)]: The trading center displaying the protected quotation that was traded through was experiencing a failure, delay or malfunction. The exemption may be invoked when

ALPINE_LIT169120

there is a material delay in response (the trading center repeatedly fails to respond within one second after receipt of an order). **When an electronic notification invoking the "self-help" exception is sent or received, a copy must be forwarded to FINRA.**

**Contracts other than "regular way"** [Regulation NMS Rule 611(b)(2)]: The trade-through transaction is not regular way.

**Single-price opening, reopening, or closing transactions** [Regulation NMS Rule 611(b)(3)]: The trade-through transaction was a single-priced opening, reopening, or closing transaction by the trading center.

**Protected bid** [Regulation NMS Rule 611(b)(4)]: The trade-through transaction was executed at a time when a protected bid was priced higher than a protected offer in the NMS stock.

**Intermarket sweep orders (ISOs)** [Regulation NMS Rule 611(b)(5) & (6)]: The trade-through was an ISO or was effected by a trading center that simultaneously routed an ISO to execute against the full displayed size of any protected quotation in the NMS stock that was traded through.

**Benchmark orders** [Regulation NMS Rule 611(b)(7)]: The trade-through was the execution of an order at a price that was not based, directly or indirectly, on the quoted price of the NMS stock at the time of execution and for which the material terms were not reasonably determinable at the time the commitment to execute the order was made.

**Flickering quotations** [Regulation NMS Rule 611(b)(8)]: The trading center displaying the protected quotation that was traded through had displayed, within one second prior to execution of the transaction that constituted the trade-through, a best bid or best offer, as applicable, for the NMS stock with a price that was equal or inferior to the prior of the trade-through transaction.

**Stopped orders** [Regulation NMS Rule 611(b)(9)]: The trade-through was the execution by a trading center of an order for which, at the time of receipt, the trading center had stopped the order where: (i) the order was for a customer; (ii) the customer agreed to the specified price on an order-by-order basis; and (iii) the price for a stopped buy order was (for the NMS stock at the time of execution) lower than the national best bid or for a stopped sell higher than the national best offer.

The following exceptions are not subject to trade-through requirements or written policies and procedures:

**Errors** [SEC Release No. 34-55884]: A trading center transaction is effected solely to correct a bona fide error (records of facts and circumstances of the error must be maintained and the transaction recorded in the error account).

A "bona fide error" is defined as:

- The inaccurate conveyance or execution of any term of an order including, but not limited to, price, number of shares or other unit of trading; identification of the security; identification of the account for which securities are purchased or sold; lost or otherwise misplaced order tickets; short sales that were instead sold long or vice versa; or the execution of an order on the wrong side of a market
- The unauthorized or unintended purchase, sale, or allocation of securities, or the failure to follow specific customer instructions
- The incorrect entry of data into relevant systems, including reliance on incorrect cash positions, withdrawals, or securities positions reflected in an account
- A delay, outage, or failure of a communication system used to transmit market data prices or to facilitate the delivery or execution of an order

Absent a bona fide error, the exception does not apply to failure to execute a not-held order in accordance with a customer's expectations. The error must be recorded in the error account. The exception applies only to the error transaction itself and not to any subsequent proprietary trades to eliminate a position connected with the error.

ALPINE_LIT169121

**Print protection transactions** [SEC Release No. 34-55883]: An order that afforded print protection as explained in the releases.

**Contingent trades** [SEC Releases No. 34-54389 and 34-57620]: An order involving one or more NMS stocks that are components of a qualified contingent trade as explained in the release.

**Non-convertible preferred securities** [SEC Release No. 34-57621]: Because non-convertible preferred securities have characteristics similar to fixed income instruments, the SEC has exempted transactions in these securities from trade-through requirements

#### 14.3.2.2.2 Best Execution

Complying with trade-through obligations does not supplant the requirement for best execution. The Firm is still obligated to use reasonable diligence to obtain the best execution of customer orders and will continue to conduct best execution reviews of the quality of order routing including orders executed internally.

### 14.3.2.3 Intermarket Sweep Orders (ISOs)

When an order is designated as an ISO, the receiving trading center will execute the order without regard to any better-priced protected quotations at other trading centers. When Alpine enters an ISO, it is required to route additional ISOs to execute against any better-priced quotations at other trading centers.

### 14.3.2.4 Access To Quotations

[SEC Regulation NMS Rule 610]

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Fees charged, feedback from others |
| **Frequency** | • Quarterly |
| **Action** | • Review fees charged for consistency with SRO charges<br>• Respond to any complaints or concerns expressed by those accessing Alpine's quotations |
| **Record** | • Record of review of charges<br>• Responses to complaints and corrective action taken |

In its market making activities and role as a trading center, Alpine is prohibited from imposing unfairly discriminatory terms that prevent or inhibit another person's efficient access to Alpine's quotations in NMS stocks displayed through its SRO trading facility or an SRO display-only facility. Alpine is required to provide a level of cost and access substantially equivalent to that of the SRO's facility.

### 14.3.2.5 Third-Party Vendors

Refer to the section titled "Outsourcing" located elsewhere in this manual for Alpine's policies and procedures governing the oversight of third party vendors.

ALPINE_LIT169122

## 14.4 General Requirements For OTC Traders

### 14.4.1 Qualification And Registration Of OTC Traders

[NASD Rule 1031 and 1032(f); NASDAQ Rule 1032(f)]

| Responsibility | • Head Trader or designee: confirm qualifications<br>• CCO or designee: determine registration requirements |
|---|---|
| Resources | • New hire information<br>• Change of job status information<br>• Requests for registration |
| Frequency | • As required |
| Action | Head Trader or designee:<br><br>• Evaluate and determine prospective traders candidate's qualifications including experience, knowledge and training<br>• Contact Compliance to request registration<br>• Arrange for necessary training<br>• Ensure registration is effective prior to engaging in trading activities<br><br>CCO or designee:<br><br>• Confirm individual has required registration qualifications and, if not, arrange for the individual to complete the required exams<br>• Notify the Head Trader or designee of added qualifications required and remind him/her the individual may not act as a OTC trader until necessary registrations are obtained<br>• Provide policies/procedures to the candidate if not already available to him/her |
| Record | • Printout of background and registration and licensing information are retained in the candidate's personnel / securities licensing file. If an action step is needed (i.e., the candidate does not have the proper licensure), action steps taken will be memorialized with an initial or signature and date.<br>• Record of training (if necessary) including a description of training and completion date of training retained in the firm's compliance training/ HR training records<br>• Record of providing supervisory policies/procedures along with provision date<br><br>The records listed above may be retained electronically in the firm's e-mail archiving and retention system. |

The following activities involving equity, preferred or convertible debt securities transactions effected over-the-counter require registration as a Series 55 Equity Trader:

- proprietary trading
- execution of transactions on an agency basis
- direct supervision of the foregoing activities

ALPINE_LIT169123

Qualification as a General Securities Representative or a Limited Representative - Corporate Securities is a prerequisite to taking the Series 55 examination and becoming registered as an Equity Trader.

## 14.4.2 Continuing Education

[FINRA Rule 1250; NASDAQ Rule 1120]

[FINRA Rule 1120]; NASDAQ Rule 1120

This section is covered elsewhere in this written supervisory procedure. Refer to the section *TRAINING AND EDUCATION* in the chapter *CONTINUING EDUCATION* for more information about continuing education requirements.

## 14.4.3 Training

OTC traders will receive training depending on the individual's prior experience and scope of responsibilities. The Head Trader is responsible for determining the type of training necessary for each trader hired for the OTC Trading Department. Among other subjects, areas covered in training include:

- Anti-competitive activities
- Best execution obligations
- Inside information and information barriers ("Chinese walls")
- Traders' personal trading

## 14.4.4 Annual Compliance Meeting

[FINRA Rule 3110(a)(7)]

This section is covered elsewhere in this written supervisory procedure. Refer to the section *Annual Compliance Meeting* in the chapter *TRAINING AND EDUCATION* for more information.

## 14.4.5 Traders' Personal Accounts

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order tickets or other order records<br>• Confirmations<br>• Statements |
| Frequency | • As required |
| Action | • Review traders' personal trading accounts to identify:<br>    ○ trades in securities in which the trader makes a market |
| Record | • Retain record of corrective action (notes of action, copy of reprimand memo, *etc.*, as appropriate) in employee's file |

Trader's personal accounts (including any account where the trader has a beneficial interest or control, such as a trust account, custodian account, *etc.*) are subject to the following requirements:

ALPINE_LIT169124

- Traders may not cross orders with customers.
- Exceptions require the approval of the OSJ Branch Manager or designee.

## 14.4.6 Information Barrier Procedures (Chinese Walls)

Alpine has adopted information barrier procedures which are included in the chapter *INSIDER TRADING*. The purpose of those procedures is to ensure Alpine may continue conducting multiple lines of business (such as trading and research) when another department is in possession of inside information about a public company. Information barriers also limit access to information about orders that, if acted upon, would constitute "frontrunning" and rule violations.

This means that OTC traders should not seek nor expect to receive information from investment bankers regarding activities that may be the subject of confidentiality. Traders may not participate in confidential investment banking activities (brought "over the wall") unless previously approved by Compliance. Compliance may restrict the trader's participation in trading the subject company's securities. Such traders are also subject to maintaining the confidentiality of investment banking activities involving inside information.

Traders also cannot disclose information about pending orders other than to authorized trading personnel, Compliance, and other authorized personnel. For example, a dealer with a proprietary trading desk must shield those traders from information about customer orders, since trading on behalf of the dealer on knowledge of customer orders would constitute a rule violation.

Traders should consult the information barrier procedures or contact Compliance for further information.

## 14.4.7 OTC Trader's Annual Certification

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Annual certifications form |
| Frequency | • Annually, typically during January of each year |
| Action | • Send forms to all OTC traders for completion<br>• Review completed forms and evidence review by initial or signature and date<br>• Follow up on open questions raised as part of review<br>• Note any appropriate action taken on the annual certification form<br>• File updates to the Employee's Form U4, if necessary.<br>• Recommend corrective action, where appropriate |
| Record | • Retain copies of the annual certifications in each employee file or a centralized file with evidence of review by initial or signature and date<br>• Certifications which include notations of action(s) taken, if applicable |

Traders will be required to certify in writing, on at least an annual basis, the traders individual knowledge and understanding of Alpine's OTC Trading and Market Making policies and procedures while additionally providing acknowledgment of the obligation of each trader to comply with said policies and procedures.

## 14.4.8 Disciplinary Policy

| Responsibility | • Head Trader |
|---|---|

ALPINE_LIT169125

| Resources | • Ongoing reviews of trader activities (described in this chapter) that indicate violations of NASDAQ rules and/or Alpine policies or procedures |
|---|---|
| Frequency | • As required |
| Action | • Confer with trader<br>• Consult with Compliance and take corrective action as required which may include:<br>    ○ Additional training<br>    ○ Letter of reprimand<br>    ○ Restrictions on trading activities<br>    ○ Special supervision<br>    ○ Suspension<br>    ○ Termination<br>    ○ Other corrective action which may be appropriate |
| Record | • Document corrective action taken in trader's file and/or on the OTC Trading Manager Checklist |

Alpine expects traders to comply with the requirements imposed by regulatory rules, NASDAQ requirements, and Alpine policies and procedures. Because of the potential seriousness of violations and their impact on the trader, Alpine, and customers; Alpine has established a disciplinary policy. This disciplinary policy will be supervised and enforced by the Head Trader. The Head Trader must supervise all market making activities of traders and ensure compliance with all applicable rules and regulations.

Disciplinary action taken will be determined by the Trading Manager and depends on the nature of the violation and whether it is a recurring violation.

## 14.5 Initial Market Maker Requirements

[NASDAQ Rule 4600 Series; FINRA Rule 6540]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Market Maker Additions Checklist<br>• Requests to initiate quotes |
| Frequency | • As required |
| Action | • Review security for eligibility for trading considering firm criteria; requirement to file with FINRA for non-exchange-listed securities; blue sky considerations<br>• If filing is required for a non-exchange-listed security, obtain required information and file with FINRA and receive clearance prior to initiating quotations |
| Record | • Market Maker Additions Checklist<br>• Filings and clearance from FINRA |

ALPINE_LIT169126

Prior to a trader quoting an additional security, the security must meet Alpine's selection criteria and Alpine must be registered as a market maker for the particular issue. The Head Trader must ensure that the security meets the selection criteria of Alpine. Additionally, the Head Trader or designee will take measures to ensure that the trader quoting the security has not received payment for these market making activities.

## 14.5.1 Selection Of Securities

In general, Alpine will make markets in securities that meet the following criteria:

- the security is a NGM or NASDAQ Capital Market security
- for non-exchange-listed securities, Alpine has made the required filing and obtained FINRA approval or is eligible to publish a quote under an exemption from Rule 15c2-11 (see the section *Non-Exchange-Listed Securities*)
- Alpine issues research on the security
- Alpine has acted as underwriter for the security
- there is sufficient institutional or retail interest in the security

Prior to making a market in a security, the trader must complete the Market Maker Additions Checklist, which must be approved by the Trading Manager.

## 14.5.2 NGM And NASDAQ Capital Market Securities

For NGM or NASDAQ Capital Market securities already trading in the NASDAQ system, the trader may register the security directly through a NASDAQ terminal. Generally registration will be effective on the same day. A quotation must then be entered within five business days; failure to do so will result in the need to re-register.

## 14.5.3 IPOs And Syndicates

Traders may register immediately for an IPO or any newly authorized issue during the first five days the security is listed with NASDAQ, and quotations may be posted immediately after registering. Registration is made through the NASDAQ workstation or by calling NASDAQ Market Operations, depending on whether the issue is eligible for same-day registration.

## 14.5.4 Non-Exchange-Listed Securities

[SEC Rule 15c2-11; FINRA Rule 6432]

Prior to becoming a registered market maker in a non-exchange-listed security, Alpine must first comply with SEC Rule 15c2-11 and make a filing with FINRA unless an exemption applies. The Head Trader will ensure that all appropriate steps are taken to comply with SEC Rule 15c2-11 when making the filing with FINRA.

### 14.5.4.1 Initiating Quotes

When initiating a market in a non-exchange-listed security, Alpine is required to make a filing with FINRA which must receive the filing at least three business days before publishing or displaying a quote. "Initiating" a quote means a prior market was not published.

The filing requires financial and other information about the company. If the information is available through the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, it is not necessary to obtain and file the information. Where information is not available through EDGAR, the trader must obtain the required information. Regardless of the source of the information, the trader must have a reasonable basis for believing that the information is accurate in all material respects and was obtained from reliable sources. The filing must be reviewed and signed by a designated principal. Clearance must be received from the FINRA **prior to**

ALPINE_LIT169127

initiating a quote. The Head Trader will oversee this process to ensure appropriate filings are performed by Alpine **prior to** initiating a quote.

A file should be established for each issue and should include a record of the filing; the information required by Rule 15c2-11; and notation of FINRA's clearance including the date it was received. This information must be maintained by the Head Trader. This information must be retained for three years and is available to customers, upon request.

### 14.5.4.1.1 Blank Check Company Securities

[FINRA Notice to Members 00-49]

Initiating quotations in blank check company securities may be complicated by the nature of the initial distribution of the securities of certain issuers. Some issuers' securities may require registration with the SEC and may not be free to trade. The SEC has indicated that in most if not all cases, the resale of the securities of blank check companies is restricted and can only be resold through registration.

A "blank check company" is defined as a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person.

Prior to acting as a market maker and initiating or resuming quotations of the security of a blank check company, Alpine is required to provide the FINRA with an independent opinion from counsel why the sale of the securities would not violate the registration requirements of the Securities Act. The Trading Dept. should contact Compliance for assistance in obtaining clearance of blank check company securities.

### 14.5.4.2 Piggy-Back Exemption

If another dealer has initiated quotes in a non-exchange-listed security and complied with the requirements of 15c2-11, Alpine may rely on the "piggy-back" exemption after a 30-calendar day waiting period from the date the initiating firm filed with FINRA. This exemption allows Alpine to publish quotes, relying on the initiating dealer's filing, without making its own filing with the FINRA.

Traders may check their NASDAQ terminals to determine whether Alpine may publish quotes in a non-exchange-listed security. When the symbol for the security is input, one of the following will appear:

*Active -* Security is cleared for publishing quotes.

*Eligible -* A 15c2-11 filing has been made but the waiting period has not elapsed. Alpine would be required to also make a 15c2-11 filing to publish quotes before the waiting period has elapsed.

*Ineligible -* No filing has been made, Alpine would have to make the 15c2-11 filing with FINRA prior to initiating quotes.

Questions regarding filing requirements and whether a stock qualifies for a piggy-back exemption should be referred to Compliance.

### 14.5.4.3 Exemption For Securities Delisted From NASDAQ

[FINRA Notice to Members 97-83]

It is not necessary to file a Form 211 for a security delisted from NASDAQ, if **all** of the following conditions are satisfied:

- the delisting results solely from non-compliance with NASDAQ initial listing or maintenance standards

ALPINE_LIT169128

- the security has been quoted continuously in NASDAQ during the 30 calendar days preceding delisting excluding any trading halt not exceeding one day
- the issuer is not in bankruptcy
- the issuer is current in all of its periodic reporting requirements under Section 13(a) or 15(d) of the Exchange Act
- Alpine has been a market maker in the security being delisted during the 30-day period preceding delisting
- the exemption extends only to classes of securities listed on NASDAQ

The trader must register to trade the security on the OTC Bulletin Board **no later than** the next trading day after delisting by calling NASDAQ Market Operations.

## 14.5.4.4 Other Exemptions From 15c2-11

No filing is required and no issuer information is required before Alpine may enter a quote in the security if:

- the security is listed on NASDAQ or on a U.S. stock exchange and trades occur in the security on the same day or the business day before Alpine submits a quotation.
- the quotation is entered solely on behalf of a customer and is not solicited. See the following subsection for required records relating to unsolicited orders.

## 14.5.4.5 Resuming Quotes After A Trading Suspension

If a non-exchange-listed security is subject to an SEC trading suspension, Alpine must comply with the filing requirements for initiating quotes, even if Alpine was in compliance prior to the suspension. The piggy-back exemption is **not** available immediately following a trading suspension.

Prior to initiating or resuming publication of a quote, the procedures for initiating a quote, as explained in a previous section, must be followed.

## 14.5.5 MPIDs (Market Participant Identifiers)

[FINRA Rule 6160, 6170 and 6480; NASDAQ Rule 4613(a)(2)]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Multiple MPID assignments |
| Frequency | • Quarterly - review to determine traders are using only MPIDs assigned to them<br>• Periodically - in training, remind traders about avoiding improper sharing of order/trading information<br>• Annual - supervisory control reviews |
| Action | • If multiple MPIDs are requested and approval is received, review trader access to confirm traders are using only the MPIDs assigned to them<br>• Include improper information sharing in trader training<br>• In annual supervisory control reviews (conducted by individuals assigned by Compliance), include review of use of multiple MPIDs |
| Record | • Requests for multiple MPIDs and approvals<br>• Assignment of MPIDs to traders<br>• Record of reviews to confirm use only by assigned traders |

ALPINE_LIT169129

| | |
|---|---|
| | • Records of trader training |

Alpine may obtain supplemental displayable or non-displayable MPIDs. Traders assigned an additional MPID are responsible for using it in accordance with limitations which include:

- use of multiple MPIDs **only** by the trader to whom they are assigned; and
- limiting order/trading information to the assigned trader only and not sharing such information with other traders or personnel.

### 14.5.6 Prohibition Against Receiving Payments

Alpine and its employees are prohibited from receiving any payment or other consideration, directly or indirectly, to publish a quotation, make a market in an issuer's securities, or submit an application to make a market in an issuer's securities.

Alpine's Head Trader or designee will supervise each and every instance of market making to ensure that payments or other consideration, directly or indirectly, are not made to make a market in a security. The Head Trader or designee will maintain all relevant documentation and supervise each Trader personally in order to ensure that payments are not made for market making activities.

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Annual certification |
| Frequency | • Annually |
| Action | • Review annual certification |
| Record | • Record initials or signature and date reviewed (if applicable)<br>• Notate any action taken, if any |

## 14.6 Quotations

[SEC Regulation NMS Rule 602; FINRA Rule 6000 series; NASDAQ Rule 4613 and 4756]

| Responsibility | • Head Trader or designee (unless otherwise indicated)<br>• CFO |
|---|---|
| Resources | • Control Sheet<br>• List of market maker securities<br>• Registered Securities List (formerly Trading Account Securities list)<br>• NASDAQ Compliance Report Cards including the Reg Recon (Regulation NMS Report)<br>• Notification from traders of unresolved backing-away complaints<br>• Withdrawal Request Form(s)<br>• Backing-Away Log<br>• Trading Manager Checklist |
| Frequency | • Monthly the CFO - compares Trading Account Securities list vs. MMPR list of |

ALPINE_LIT169130

| | |
|---|---|
| | securities where Alpine is registered as a market maker<br>• Monthly the CFO - reviews compliance with firm quote obligations for current information availability<br>• As required - assist in resolving backing-away complaints<br>• As required - requests to withdraw quotes |
| **Action** | • Confirm that quoted securities are only those where Alpine is a registered market maker<br>• Confirm that market maker quotations communicated to vendors are only for subject securities<br>• Review for compliance with quote obligations<br>• Review backing away issues:<br>   o Confer with trader regarding resolution of unresolved backing-away complaints<br>   o Confer with trader who is the subject of multiple backing-away complaints to determine if corrective action is necessary<br>• Review quote withdrawal issues:<br>   o Review requests to withdraw quotes and approve or disapprove<br>   o For unexcused or accidental withdrawals, consult with trader regarding reason(s) withdrawal occurred<br>• Take corrective action which may include consultation with the trader; additional education for the trader, and/or consult with Compliance regarding corrective action |
| **Record** | • Record initials or signature and date reviewed (if applicable)<br>• Notate any action taken, if any |

This section explains the obligations when publishing quotations where Alpine is a registered market maker in a covered security. A "covered security" is any reported security and any other security where transaction information (trade reports, last sale data, quotation information) is disseminated through an automated quotation system.

Other applicable Rules: 5310 (formerly 2320(f))


## 14.6.1 Quotation Requirements And Obligations

[FINRA Rule 6272(a) and 6272(b)]

For each ADF-eligible security where Alpine is registered as a Registered Reporting ADF Market Maker, Alpine is obligated to be willing to buy and sell the security for its own account on a continuous basis during regular market hours and maintain a two-sided market. Quotation size must be at least one normal unit of trading (100 shares). Requirements on the ADF are consistent with those on national exchanges, including the requirements of Regulation NMS.

• The bid price may not be more than the Designated Percentage away from the National Best Bid or, if there is no National Best Bid, no more than the Designated Percentage away from the last reported sale. If the NBB (or if no NBB the reported last sale) increases to a level that causes the bid to be more than the Defined Limit away from the NBB, or if the bid is executed or cancelled, the market maker is obligated to enter a new bid at a price not more than the DP or identify to NASDAQ current resting interest that satisfies the two-sided obligation.
• The same obligation applies to offers.
• Definitions including "Designated Percentage" and "Defined Limit" may be found in FINRA Rule 6272(a)(5) which should be consulted for these and other definitions affecting ADF Market Makers.

ALPINE_LIT169131

- The minimum increment for quotations below $1.00 in all ADF-eligible securities is $0.00001.

## 14.6.2 Dissemination Of Quotations

[SEC Regulation NMS Rule 602]

Quotations may be disseminated only for those CQS or covered securities where Alpine is a registered market maker. This includes placing quotations with market data vendors that publish quotations. Quotations communicated to vendors for display must be only for subject securities (securities where the Firm acts as market maker).

If the Firm is the exclusive source of information regarding quotations or transactions in an NMS stock, it will comply with requirements to provide information to a securities information processor on terms that are fair and reasonable.

## 14.6.3 Firm Quote Obligations

[FINRA Rule 5220 and 5220.01; NASDAQ Rule 4613(b)]

As a market maker in a NASDAQ issue, Alpine is obligated to maintain firm, two-sided continuous quotations during market hours (9:30 a.m. to 4:00 p.m. Eastern Time).

Exceptions to the firm-quote obligation include the following:

- the market maker is updating its quote and has sent the update to NASDAQ before the order is presented; or,
- the market maker has effected or is effecting a transaction when an order sought to be executed is presented and immediately upon completion of the transaction communicates a revised quotation to NASDAQ; or,
- the market maker has a substantial basis for believing the counterparty will not honor the trade (*i.e.,* the counterparty's clearing firm will no longer clear for the counterparty).

## 14.6.4 Non-Exchange Listed Security Quotations Displayed In Multiple Quotation Mediums

[FINRA Rule 6438]

When priced quotations for OTC Equity Securities are displayed on a real-time basis in two or more quotation mediums that permit quotation updates on a real-time basis, quotations must be the same in each medium except when a price quotation represents a customer limit order displayed on an electronic communications network (ECN) consistent with the exception to Rule 6460(b)(5) [a limit order delivered immediately upon receipt to an exchange or an ECN that widely disseminates the order].

## 14.6.5 Requirement To Publish An Inferior Quote
[FINRA Rule 4613(b)(2), Notice to Members 99-61]

A market maker is required to immediately reduce his/her quote to an inferior price whenever it fails to execute the full size of an incoming order that is at least one normal unit of trading greater than its published quotation size. Following is an example illustrating this requirement.

Market Maker #1 (MM1) is bidding $10 for 100 shares of ABCD. Order Entry Firm #1 (OE1) sends an order to MM1 to sell 1,000 shares of ABCD at $10. MM1 partially executes OE1's 1,000-share order by buying 100

ALPINE_LIT169132

shares of ABCD. MM1 must immediately move its quotation to an inferior price for failing to execute the entire 1,000-share order. However, if OE1's 1,000 shares had been offered as an all-or-none order, MM1 would be permitted to decline the order and remain at its current quotation.

## 14.6.6 Reasonable Spreads

Traders are responsible for entering and maintaining quotes reasonably related to the market with reasonable spreads considering current market conditions.

## 14.6.7 Backing-Away

[FINRA Rule 5220; NASDAQ Rule 3320]

Failure to execute transactions at prices displayed in the NASDAQ system or quoted in the NNOTC market is generally known as "backing-away." A market maker must not back away and must execute an order presented to it at a price at least as favorable as its published quotation up to its published quotation size at all times during market hours. Traders are prohibited from backing-away from their published quotation. The FINRA has developed an automated surveillance system (the Firm Quote Compliance System or "FQCS") to permit resolution of backing-away complaints on a real time basis.

Traders should follow the following procedure to file a backing-away complaint:

- Call Market Regulation Department within five (5) minutes of the alleged backing-away (800-925-8156).
- If the trader contacts the counterparty first, the 5-minute period does not apply, however, the trader must **immediately** contact Market Regulation after contact with the other firm.
- Notify the Trading Manager of an unresolved backing-away complaint.
- Document the backing-away complaint and resolution on the Backing-Away Log.

Traders should follow the following procedure to respond to a backing-away complaint from a counterparty:

- Attempt to resolve the complaint with a contemporaneous trade execution, if appropriate.
- Notify the Trading Manager if a contemporaneous trade execution will not be effected.
- Document the backing-away complaint and resolution on the Backing-Away Log.

## 14.6.8 Improving Public Quotes: Limit Orders

[SEC Regulation NMS Rule 604; NASDAQ Rule 3390]

A market maker may have an obligation to improve its quotation when it receives a limit order priced better than the market maker's quote (the "Limit Order Display Rule"). Refer to the section *Limit Orders* regarding these requirements.

## 14.6.9 OTC Securities Quoted In Different Quotation Mediums

[FINRA Rule 2320(g)(2)]

If a trader displays quotations for the same OTC security in two or more quotation mediums that permit real-time updates (*i.e.,* OTCBB, electronic pink sheets), the trader is obligated to display the same price in each quotation medium.

### 14.6.9.1 Electronic Pink Sheet Quotations

Quotations on the Electronic Pink Sheets (PNK) are limited to the securities of companies that provide current financial information to Alpine, post current financial information on their web page, or otherwise make current

ALPINE_LIT169133

financial information available to the public. In addition, the information required by SEC Rule 15c2-11 must be available through the same mediums previously described. Traders are not permitted to continue PNK quotations for the securities of companies where the date of the last audited financial statements and SEC Rule 15c2-11 information is older than 15 months.

## 14.6.10 OTCBB Continuing Quotation Requirements

[FINRA Rule 6530 and 6540]

Quotations on the OTCBB are limited to the securities of companies that report their current financial information to the SEC, banking, or insurance regulators. Traders are not permitted to continue OTCBB quotations for the securities of companies that are not current in their filings.

The FINRA will affix a modifier on the symbol of any security where the issuer is not current in its filings. Additions and changes are reported on the OTCBB Daily List which is available at the OTCBB web site *www.otcbb.com*.

Once an issuer is delinquent in its filings, the security may be quoted on the OTCBB for the following grace periods from the due date of the delinquent report:

- 30 days for issuers who file with the SEC
- 60 days for issuers who file with other regulators

After the grace period has expired, quotations in the security of the delinquent issuer are not permitted on the OTCBB.

## 14.6.11 NASDAQ Market Opening Process

[FINRA Rule 4704]

NASDAQ's market opening includes a pre-market trading session. The following is a summary description of the process. Detailed information is available at *www.NASDAQtrader.com*.

- The purpose is to maximize the number of shares executed at a single opening price and disseminate timely imbalance information.
- It is intended to execute all market-on-open (MOO) orders.
- At 8:00 a.m. E.T., the system opens for all eligible quotes and orders.
- During the pre-market period, all participant quotes are open and firm.
- An Opening Cross process for NASDAQ stocks determines the price at which orders will be executed at the open and executes those orders.
- The process prevents pre-opening locks and crosses.

### 14.6.11.1 Opening Price For Initial Public Offerings (IPOs)

[NASDAQ Head Trader Alert 2004-130]

The NASDAQ Market Opening Process applies to establishing a security's opening price for IPOs. Indicative quoting is permitted for a single 15-minute time window at the end of which NASDAQ releases the security for trading and immediately applies the Market Opening Process.

## 14.6.12 NASDAQ Closing Cross

[FINRA Rule 4709]

ALPINE_LIT169134

NASDAQ has a closing cross process that begins at 4:00 p.m. E.T., and after-hours trading commences when the closing cross concludes. The process determines the price at which orders are executed at the close and executes those orders, including market-on-close (MOC), limit-on-close (LOC), and imbalance-only (IO) orders.

Rule 4709 should be consulted for details explaining the process.

## 14.6.13 Locked And Crossed Markets

[FINRA Rule 6240 and 6437; NASDAQ Rule 4613(e)]

Quotations may not be displayed that lock or cross a market in NMS or OTC equity securities.

Under the NASDAQ System, locked and crossed markets will not occur during normal market hours. If a quote is entered that would lock or cross the market, the quoting party will receive a system warning. For order entry, the system will only send a warning if the order crosses the market and exceeds the allowable deviation. To complete the quote or order entry, the market participant is required to manually override the warning system. If the quote/order is overridden, the order will not be displayed as part of a display quote but will be treated as a marketable limit order and entered into NASDAQ National Market Center as a Non-Directed liability order for execution in time priority.

When entering quotations to the OTCBB and Alternative Display Facility (ADF) markets, quotes should not be entered that would lock or cross an existing quote in the market.

### 14.6.13.1 Locked And Crossed Markets In The ADF

Obligations of a Registered Reporting ADF Market Maker if it is involved in a locked or crossed market include the following:

- When another Market Maker locks/crosses the market prior to 9:20 a.m. E.T., send a Trade-or-Move message to the other Market Maker locking/crossing the market.
- If a Market Maker locks/crosses the market between 9:20 and 9:29:29 a.m. E.T., the Market Maker must immediately send to the Market Maker whose quote it locks/crosses a Trade-or-Move message at the receiving Market Maker's quoted price.
- When receiving a Trade-or-Move message, the receiving Market Maker must either fill the message for the full size of the message or move the bid down (or offer up) by a quotation increment that unlocks/uncrosses the market.
- Quotes cannot be entered that would lock or cross the market between 9:29:30 and 9:29:59 a.m. E.T.
- Messages for securities in the NASDAQ 100 Index or the S and P 400 Index must be for at least 10,000 shares.
- For all other securities, messages must be for at least 5,000 shares.
- The sending party must append a symbol indicating it is a Trade-or-Move message.

## 14.6.14 Quotation Recording And Reporting

[FINRA Rule 6430]

OTC market makers are required to record and report their quotations (bid and/or offer) or unpriced indications of interest that are displayed in an inter-dealer quotation system that permits real-time quotation updates. This includes any changes to quotation price or size or unpriced indication of interest, and the time of any change. This requirement does NOT apply to quotations displayed to an inter-dealer quotation system that is:

- operated by the FINRA or a national securities exchange; or,
- operated by another FINRA member firm.

ALPINE_LIT169135

### 14.6.15 Termination Of Market Maker Registration And Withdrawal Of Quotes

[FINRA Rule 6470; NASDAQ Rule 4620]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • OTC Markets - Market Maker List |
| **Frequency** | • As needed |
| **Action** | • If Alpine is terminating market making status in a security, fill out ad/drop form and send to Operations |
| **Record** | • Add/Drop Form with notes, reviewer and record date |

Market maker registration in a security may be voluntarily terminated by withdrawing Alpine's quote from the NASDAQ Market Center. Alpine may not re-register for the same security for 20 business days after withdrawal.

If an accidental withdrawal occurs, NASDAQ MarketWatch should be contacted as soon as possible (within one hour of withdrawal) and immediately followed with written notification of the withdrawal and reinstatement request. MarketWatch determines whether to permit immediate reinstatement.

### 14.6.15.1 Excused Withdrawals

[NASDAQ Rule 4619]

There are a number of reasons why a market maker may request an excused withdrawal from publishing quotations; Rule 4619 should be consulted regarding the circumstances that qualify for an excused withdrawal. The following is a summary of some of these circumstances.

- Systemic equipment problems
- Demonstrated legal or regulatory requirements, religious holidays, vacation, illness
- Failure to maintain a clearing arrangement with a registered clearing agency or member of an agency
- Participation in a distribution (see the section *Distributions Of Securities - Withdrawal Of Quotations* in this chapter)

### 14.6.15.2 Excused Withdrawal Due To Fail-To-Deliver Position

[SEC Regulation SHO; FINRA Regulatory Notice 07-45; FINRA Notice to Members 04-93]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • OTC Markets - Market Maker List |
| **Frequency** | • As needed |
| **Action** | • If Alpine is terminating market making status in a security, fill out ad/drop form and send to Operations |

ALPINE_LIT169136

| Record | • Add/Drop Form with notes, reviewer and record date |
|---|---|

Under Regulation SHO, Alpine may not effect short sales in a security where Alpine has a fail to deliver position.

This affects a market maker's ability to enter short sales until the fail to delivery position is closed out. NASDAQ considers this circumstance an excused withdrawal which allows the market maker to resume making the market once the fail to deliver position is closed out or the security becomes borrowable.

### 14.6.15.3 NASDAQ System Quote Withdrawals

[NASDAQ Rule 4120]

NASDAQ may withdraw quotations due to issuer corporate action (dividend, payment, or distribution) or due to a trading halt. To resume quoting the security, the trader is obligated to:

- enter a new two-sided quotation prior to the close of the regular market session on the same day NASDAQ withdrew the quotation; or,
- enter a new two-sided quotation on the day when trading resumes following a trading halt, or, if the resumption of trading occurs when the market is not in regular session, enter a new quotation prior to the opening of the next regular market session; or,
- submit a request to NASDAQ MarketWatch prior to the close of the regular market session on the next regular trading day after the day when a quotation could have been re-entered.

## 14.6.16 After Hours Trading

Traders who open quotations after the regular close of the NASDAQ market are obligated to comply with all applicable limit order protection and display rules while their quotes are open. When trading in a non-market maker capacity there is a continuing obligation to protect customer limit orders when trading for Alpine's account. If routing an order to another market maker for after hours trading the trader should be aware of the criteria which needs to be met. This pertains to certain qualifiers on the order. The trader should confirm with the market maker of their specific intention to trade after normal market hours as Alpine doesn't generally engage in after hours trading.

FINRA Rule 2265 (Extended Hours Trading Disclosure)

Pursuant to FINRA Rule 2265, Alpine provides written notification to customers disclosing the material risks associated with trading outside of normal market hours. The disclosure is included in Alpine's new account opening form.

## 14.6.17 Publication of Transactions & Quotations
*SEC rule 10b-5, FINRA Rule 5210 (formerly NASD Rule 3310) and 5220.01 and NASD NTM 04-66*

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • OTC Pink Link<br>• Nasdaq Work Station |
| Frequency | • Ongoing basis |
| Action | • Restrict use of trading system to authorized persons only - See the section titled "Market Access" for information on Alpine's written supervisory |

ALPINE_LIT169137

| | procedures<br>• Ensure appropriate safeguards (operation, testing and maintenance) of firm's trading system<br>• Test Alpine trading system pursuant to established controls<br>• Implement reasonable controls to ensure that orders are not entered into in error in a manner inconsistent with NASD Rule- See the section titled "Market Access" for information on Alpine's written supervisory procedures |
|---|---|
| **Record** | • Record of initials, signature or name of reviewer, review date and a notation as to any action taken |

## 14.6.18 Prohibited Practices Relating To Publication Of Quotations

[SEC Securities Exchange Act of 1934 Rule 10b-5; FINRA Rule 5210 and 5220.01]

*SEC rule 10b-5, FINRA Rule 5210 (formerly NASD Rule 3310) and 5220.01 and NASD NTM 04-66*

| **Responsibility** | • Head Trader or designee |
|---|---|
| **Resources** | • OTC Pink Link<br>• Nasdaq Work Station |
| **Frequency** | • As needed |
| **Action** | • Review to adjust and ensure that quotes are appropriate. Systems provide error messages if the quote does not meet requirements. |
| **Record** | • Screen prints for any error messages, as needed<br>• Record of initials or signature, review date and a notation as to any action taken |

Traders are prohibited from engaging in any of the following practices when publishing quotations:

- Publishing a fictitious quote
- Quoting in increments other than those determined by market forces of supply and demand and/or an independent valuation of the security
- Quoting in sizes that are not reflective of the market forces of supply and demand
- Quoting in sizes contrary to the FINRA rules regarding minimum quotation size
- Displaying quotes in order to help another market maker execute trades to its advantage
- Displaying quotes in order to orchestrate artificial price movements
- Displaying prices with no intention of trading at those prices to help another market maker
- Refusing to honor firm quote obligations, especially in a selective and discriminatory manner

Traders quotes will be monitored and reviewed by the Head Trader or designee to ensure compliance with the appropriate trading practices. The Head Trader or designee will provide monitoring of trading activity and implement disciplinary measures if necessary.

# 14.7 Handling Orders And Executions
[FINRA Rules 4706, 4710, 4714 and 4719]

ALPINE_LIT169138

FINRA and SEC rules impose requirements when market makers receive and execute orders. Subjects discussed in this section include:

- best execution
- fair prices
- limit orders
- short sales

## 14.7.1 Best Execution

[SEC Regulation NMS; FINRA Rule 5310; NASDAQ Rule 5310A]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • FINRA Compliance Report Cards (Best Execution)<br>• Order records/reports for customer and proprietary accounts where applicable<br>• OTC Trading Manager Checklist |
| Frequency | • When the FINRA Best Execution report card is published<br>• Weekly, firm order records |
| Action | • Conduct reviews of Best Execution report card and form order records for the following:<br><br>a) Review for any "alerts" on the FINRA Best Execution report card and review the entire Firm "Best Execution Report"<br><br>b) As needed spot check against Order Blotter. Determine if best interdealer price was given if needed<br><br>c) Where best execution was not given, research and note the circumstances and inform the head trader and take correction action<br><br>Where interpositioning occurs, review documentation justifying the circumstances s<br><br>• Review market and limit orders for potential trading ahead<br>• Take corrective action which may include adjusting the customer's price on an order, consultation with the trader; additional education for the trader, and/or consult with the CCO regarding corrective action |
| Record | • OTC Trading Manager Checklist<br>• FINRA Report Cards including date of review (if applicable), reviewer's initials, and action taken, if appropriate<br>• Order records/reports with corrective action noted, if appropriate<br>• All reviews and records should be initialed, dated and stored in the Traders folder of the S drive under "Best Execution." |

Alpine has an obligation to provide best execution for its customers' orders, whether executed internally or routed to other broker-dealers. "Best Execution" refers to using reasonable diligence to determine the best market to buy or sell a security and obtaining a price as favorable as possible under prevailing market conditions. Alpine's obligation to provide best execution also extends to handling and executing orders for

ALPINE_LIT169139

customers of other broker-dealers routed to Alpine (but not orders that simply execute the order against Alpine's quote).

In a transaction for or with a customer (including a customer of another broker-dealer), the Firm must use reasonable diligence to determine the best market for the security and buy or sell in such market so the resulting price is as favorable as possible under prevailing market conditions. The Firm must also accept and if needed route away all orders in a timely manner.This obligation exists whether orders are executed internally or are sent to another dealer for execution. Factors for using "reasonable diligence" include:

- the character of the market for the security, *e.g.,* price, volatility, relative liquidity, and pressure on available communications;
- the size and type of transaction;
- the number of markets checked;
- accessibility of the quotation; and
- the terms and conditions of the order which result in the transaction, as communicated to the Firm.

The term "markets" is broadly defined, including market centers that are trading a particular security.

Alpine conducts regular reviews of execution and order routing (which regulators refer to as "regular and rigorous" review).

## 14.7.1.1 Regular And Rigorous Review Of Execution Quality

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • FINRA Compliance Report Cards<br>• Alpine's Rule 605 Market Center Reports, absent an exemption<br>• Order records/reports for customer and proprietary accounts<br>• Clearing firm or other agent's report of statistics, review rationale, findings (if applicable) |
| Frequency | • Quarterly |
| Action | • Conduct regular and rigorous reviews of executions (if applicable) and order routing to evaluate compliance with best execution responsibilities including:<br>  ○ Review of data regarding prices and executions<br>  ○ Review pre-open orders including single or midpoint pricing as factors to consider<br>  ○ Review of aggregate or order-by-order routing of orders to review quality of executions<br>  ○ Determine whether to adjust order routing to improve executions<br>  ○ Review riskless principal transactions; customer block-sized orders; orders with special pricing terms and conditions; other order types<br>  ○ Review limited quotation/pricing securities for compliance with documentation to determine best execution<br>• Where order flow is routed to a BD acting as agent for Alpine (clearing firm, other executing BD), Alpine may rely on another broker-dealer's regular and rigorous review as long as the results and rationale for the review are fully disclosed to Alpine and Alpine periodically reviews how the review is conducted, as well as the results of the review.<br>  ○ Obtain other BD's report of statistics, rationale of review, and findings<br>  ○ Conduct review on a security-by-security basis, type-of-order basis<br>  ○ Where deficiencies are noted, consult with agent and, if best execution is |

ALPINE_LIT169140

|  | determined to be deficient, consider transferring order flow to another BD |
|---|---|
| **Record** | • Records of reviews of internal or routed customer orders, if applicable, (including the date of review (if applicable), reviewer's initials or signature and action taken, if appropriate)<br>• Records of reviews of agent's best execution reviews, action taken, if applicable, (including the date of review (if applicable), reviewer's initials or signature and action taken, if appropriate) |

Alpine conducts regular reviews of its execution quality to determine whether Alpine is meeting its obligation for best execution of customer orders. This includes orders that are routed to other broker-dealers on an automated, non-discretionary basis as well as when Alpine internalizes order flow.

## 14.7.1.2 Regular And Rigorous Review Of Execution Quality cont. - Reliance on Other Broker-Dealers

Where Alpine routes its order flow to another broker-dealer that has agreed to handle that order flow as agent for the customer (*e.g.,* a clearing firm or other executing broker-dealer), Alpine may rely on that broker-dealer's regular and rigorous review based on the statistical results and rationale of the review disclosed by the broker-dealer and reviewed by Alpine. Alpine may also elect not to rely on another broker-dealer to perform a regular and rigorous review. If Alpine chooses to rely another firm, Alpine will seek to obtain the statistical results on a quarterly basis by contacting each market maker through whom Alpine conducts business. Reasonable attempts will be made to obtain the requested information. In these cases, Alpine is not required to perform a review on an order-by-order basis. Instead, Alpine is required to conduct the review on a security-by-security, type-of-order basis (e.g. limit order, market order, market on order, etc.).

In conducting our review, Alpine will determine whether any material differences in execution quality exist among the markets trading the security and, if so, modify Alpine's routing arrangement or justify why Alpine is not modifying our routing arrangement. Alpine must compare, among other things, the quality of the executions the member is obtaining via current order routing and execution arrangements (including the internalization of order flow) to the quality of the executions that the member could obtain from competing markets. In reviewing and comparing the execution quality of its current order routing and execution arrangements to the execution quality of other markets, Alpine may consider the following factors:

- price improvement opportunities (i.e., the difference between the execution price and the best quotes prevailing at the time the order is received by the market);
- differences in price disimprovement (i.e., situations in which a customer receives a worse price at execution than the best quotes prevailing at the time the order is received by the market);
- the likelihood of execution of limit orders;
- the speed of execution;
- the size of execution;
- transaction costs;
- customer needs and expectations; and
- the existence of internalization or payment for order flow arrangements.

Further, Alpine may only rely on another broker-dealer's regular and rigorous review as long as the statistical results and rationale of the review are fully disclosed to Alpine and Alpine periodically reviews how the other firm's review is conducted, as well as the results of the review.

Should Alpine not obtain the results and reasonable requests have been made, the matter will be escalated for further review and resolution within the Trading Department. The disposition of the matter will be documented in the Best Execution file.

ALPINE_LIT169141

### 14.7.1.3 Market Maker Transactions

It is the trader's responsibility to provide customers with the best execution "reasonably available" for securities trades. This does not impose a standard requiring absolutely the best price for every order, however, traders must attempt to obtain the best execution possible considering the factors affecting the order. Such factors may include:

- execution price
- size and type of the order
- number of markets (with "markets" defined broadly, including market centers that are trading a particular security)
- trading characteristics of the security (price volatility, relative liquidity, and pressure on available communications)
- availability of information regarding the most favorable market for executing the trade
- availability of technological aids to process such data
- cost and difficulty of executing the order
- opportunity for price improvement

The trader may execute the order internally or route the order to another dealer or market to obtain best execution on behalf of the customer.

### 14.7.1.4 Marketable Orders

[FINRA Rule 5310.01]

[The Firm] is obligated to make every effort to execute fully and promptly a marketable customer order that it receives.

### 14.7.1.5 Best Execution And Executing Brokers

[FINRA Rule 5310.04]

The duty to provide best execution does not apply when another broker-dealer is simply executing a customer order against [The Firm]'s quote. The duty arises only when an order is routed from another broker-dealer to [The Firm] for the purpose of order handling and execution.

### 14.7.1.6 Interpositioning And Use Of Broker's Broker

[FINRA Rule 5310(a)(2), 5310(b) and 5310.05]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Order records from WMX and Flextrade<br>• FINRA Records<br>• 606 reports |
| **Frequency** | • Quarterly |
| **Action** | • Review 606 report and if Alpine is found to use inter-positioning, document the reason why<br>• If inter-positioning is acceptable, document the acceptable circumstances on the order record |

ALPINE_LIT169142

| | |
|---|---|
| **Record** | • Initial or signature of reviewer/ date of review and action steps taken, if any<br>• If exceptions are made, denote the acceptable circumstances on the order record |

Alpine cannot interject a third party between itself and a market maker to execute an order for a customer or the customer of another broker-dealer unless it is to provide an execution advantageous to the customer. Examples of acceptable circumstances are where the customer's order is "crossed" with another retail firm which has a corresponding order on the other side, or where the identity of the firm, if known, would likely cause undue price movements adversely affecting the cost or proceeds to the customer.

The Head Trader or designee is responsible for documenting the acceptable circumstances for doing so on the order record.

## 14.7.1.7 Securities With Limited Quotations Or Pricing Information

[FINRA Rule 5310.06]

Best Execution - Securities with Limited Quotation or Pricing Information

Applicable Rules: 5310 formerly NASD 2320(f), formerly Three Quote Rule

**Background**

This rule was formerly 2320(f) and is now 5310 which requires that member firms have written policies and procedures in place to address the steps the member will take to determine the best market for a security in the absence of multiple quotations or pricing information and to document how they compliance with those policies and procedures. Rule 5310 became effective on May 31, 2012.

**Regulation:**

In any transaction for or with a customer pertaining to the execution of an order involving any security, equity or debit, for which there is limited quotations or pricing information available, broker-dealers will be expected to address those steps the firm will take to determine the best market for a security in the absence of multiple quotes or pricing information and to document how we comply with those policies and procedures.

In those cases, where there are less than two electronically published quotes or in those cases where there is limited quotations or pricing information available, Alpine brokers will be expected to contact the Trading Department so that they can contact the appropriate broker-dealer including market makers and make a reasonable effort to seek the best bid, absent some written exception.

**Alpine's Policy**

It is the responsibility of each Alpine broker to contact the Trading Department whenever there are less than two electronically published quotes or where there are limited quotations or pricing information available. Alpine's Trading Department will contact the appropriate broker-dealer including market maker(s) as enumerated above.

Once the Alpine broker has contacted the Trading Department, he /she must enter the names of the broker-dealer including market makers and their quotes in the note section of the electronic order ticket on the WMX Order Management System/trading platform.

[FINRA Rule 5310.07]

## 14.7.1.9 Customer Instructions Regarding Order Handling

ALPINE_LIT169143

[FINRA Rule 5310.08]

If the customer gives an unsolicited instruction to route the customer's order to a particular market for execution, Alpine is not required to make a best execution determination beyond the customer's specific instruction. If Alpine receives a customer order from another broker-dealer where the customer routed the order to Alpine, Alpine has a best execution obligation.

## 14.7.1.10 Principal And Riskless Principal Transactions

[NASDAQ Rule 5310A]

Principal transactions (whether or not acting as a market maker) must be executed at prices that meet best execution requirements.

Prices for riskless principal transactions, where the trader simultaneously has a buy and sell order which are matched and executed through a proprietary account, also must provide the customer(s) with the most favorable price available under best execution obligations. Riskless principal transactions also must be marked as such.

## 14.7.1.11 Sending Orders To Other Markets Or Dealers (Agency Transactions)

A trader may send an order for execution to another market or other dealer. Traders are obliged to use reasonable diligence to route the order to obtain a price as favorable as possible under prevailing market conditions. Factors to consider may include:

- the character of the market for the security (price, volatility, relative liquidity, *etc.*)
- size and type of transaction
- accessibility of markets or dealers and quotation sources
- availability of communications systems

## 14.7.2 Fair Prices

[NASD Rule 2440; FINRA Rule 2121]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order records<br>• Internal data regarding market making activities |
| Frequency | • Daily - review markups and markdowns<br>• As required - review for potential dominated/controlled markets<br>• As required - review agency commissions when schedule changes |
| Action | • Review markups and markdowns for compliance with Alpine guidelines and confirm reasons for exceptions are documented:<br>  ○ Cancel and rebill trades, if necessary, to comply with internal guidelines<br>• Determine at time a security is added whether it is likely the market will be in a dominated/controlled market condition:<br>  ○ If it does, notify traders and supervisors that contemporaneous cost must be used in determining fair prices<br>• Review agency commission schedule, when change, to confirm reasonableness |
| Record | • Order records including markup/markdown reviews and documentation of |

ALPINE_LIT169144

| | exceptions<br>• Commission schedule revisions |
|---|---|

Alpine is obligated to provide customers with "fair prices" including charges (markup/markdown or commission). Traders are responsible for determining that mark-ups and mark-downs are reasonable and consistent with Alpine's policy.

### 14.7.2.1 Mark-Up Policy

[FINRA Rule 2121.01]

Following is FINRA's Mark-Up Policy in Rule 2121.

### 14.7.2.1.1 General Considerations

1. The historical "5% Policy" is a guide, not a rule.
2. A member may not justify mark-ups on the basis of expenses which are excessive.
3. The mark-up over the prevailing market price is the significant spread from the point of view of fairness of dealings with customers in principal transactions. In the absence of other bona fide evidence of the prevailing market, a member's own contemporaneous cost is the best indication of the prevailing market price of a security.
4. A mark-up pattern of 5% or even less may be considered unfair or unreasonable under the "5% Policy."
5. Determination of the fairness of mark-ups must be based on a consideration of all the relevant factors, of which the percentage of mark-up is only one.

### 14.7.2.1.2 Relevant Factors

Relevant factors to consider when determining the fairness of a mark-up are as follows:

1. **The Type of Security Involved:** Some securities customarily carry a higher mark-up than others. For example, a higher percentage of mark-up customarily applies to a common stock transaction than to a bond transaction of the same size. Likewise, a higher percentage applies to sales of units of direct participation programs and condominium securities than to sales of common stock.
2. **The Availability of the Security in the Market:** In the case of an inactive security, the effort and cost of buying or selling the security, or any other unusual circumstances connected with its acquisition or sale, may have a bearing on the amount of mark-up justified.
3. **The Price of the Security:** While there is no direct correlation, the percentage of mark-up or rate of commission generally increases as the price of the security decreases. Even where the amount of money is substantial, transactions in lower priced securities may require more handling and expense and may warrant a wider spread.
4. **The Amount of Money Involved in a Transaction:** A transaction which involves a small amount of money may warrant a higher percentage of mark-up to cover the expenses of handling.
5. **Disclosure:** Any disclosure to the customer, before the transaction is effected, of information which would indicate (A) the amount of commission charged in an agency transaction or (B) mark-up made in a principal transaction is a factor to be considered. Disclosure itself, however, does not justify a commission or mark-up which is unfair or excessive in light of all other relevant circumstances.
6. **The Pattern of Mark-Ups:** While each transaction must meet the test of fairness, FINRA believes that particular attention should be given to the pattern of a member's mark-ups.
7. **The Nature of the Member's Business:** FINRA recognizes there are differences in the services and facilities which are needed by, and provided for, customers of members. If not excessive, the cost of providing such services and facilities, particularly when they are of a continuing nature, may properly be considered in determining the fairness of a member's mark-ups.

### 14.7.2.1.3 Applicability Of Policy

ALPINE_LIT169145

The Policy applies to all securities, whether oil royalties or any other security, in the following types of transactions:

1. A transaction in which a member buys a security to fill an order for the same security previously received from a customer. This transaction would include the so-called "riskless" or "simultaneous" transaction.
2. A transaction in which the member sells a security to a customer from inventory. In such a case the amount of the mark-up would be determined on the basis of the mark-up over the bona fide representative current market. The amount of profit or loss to the member from market appreciation or depreciation before, or after, the date of the transaction with the customer would not ordinarily enter into the determination of the amount or fairness of the mark-up.
3. A transaction in which a member purchases a security from a customer. The price paid to the customer or the mark-down applied by the member must be reasonably related to the prevailing market price of the security.
4. A transaction in which the member acts as agent. In such a case, the commission charged the customer must be fair in light of all relevant circumstances.
5. Transactions wherein a customer sells securities to, or through, a broker/dealer, the proceeds from which are utilized to pay for other securities purchased from, or through, the broker/dealer at or about the same time. In such instances, the mark-up shall be computed in the same way as if the customer had purchased for cash and in computing the mark-up there shall be included any profit or commission realized by the dealer on the securities being liquidated, the proceeds of which are used to pay for securities being purchased.

The Mark-Up Policy is not applicable to the sale of securities where a prospectus or offering circular is required to be delivered and the securities are sold at the specific public offering price.

## 14.7.2.2 Dominated And Controlled Market

A market that is "dominated and controlled" is often characterized by the following:

- one market maker accounts for a sizeable portion of the wholesale/retail volume
- market demand for the security is essentially in-house
- the security is "thin," *i.e.,* low volume and/or limited liquidity

An active market generally exists when:

- there is more than one market maker having daily or frequent inter-dealer trades.
- no one market maker dominates or controls the trading activity by accounting for a large portion of the wholesale/retail volume.

To determine if Alpine dominates/controls a market, the following should be considered:

- Volume of inter-dealer activity
- Whether other dealers are purchasing and selling the securities
- Whether demand is essentially in-house

If Alpine is considered to dominate and control a market, markups and markdowns must be calculated from Alpine's contemporaneous cost. "Contemporaneous cost" is defined as Alpine's purchases of the security from other dealers closely related in time to the customer transaction. Trades with customers are **not** an indicator of contemporaneous cost.

### 14.7.2.2.1 Competitive Inactive Market

Markets may exist where there are two or three market makers, none of which dominate or control the market. There may be infrequent trades with periods of weeks or longer with no activity. The prevailing market price should be determined using the following, in sequence:

ALPINE_LIT169146

- contemporaneous sales to other broker-dealers
- validated quotes
- contemporaneous cost

**14.7.2.2.2 Principal Non-Market Maker Trades**

Where the trader executes orders on a principal basis and Alpine is not a market maker, the markup or markdown should be calculated from Alpine's contemporaneous cost.

**14.7.2.2.3 Disclosure Of Markups/Markdowns And Market Making**

[SEC Securities Exchange Act of 1934 Rule 10b-10]

In accordance with Rule 10b-10, the following disclosures must be included on customer confirmations:

- If Alpine is NOT a market maker and executes a riskless principal transaction, the amount of the markup or markdown must be disclosed.
- For any OTHER transaction in a reported security, disclose: the trade price reported; the customer's price; and the difference, if any, between the reported trade price and the customer's price.
- If the trade is for a security where Alpine is a market maker, a notation that Alpine acts as a market maker.

## 14.7.3 Prohibition Against Trading Ahead Of Customer Orders

[SEC Regulation NMS Rule 600(b)(30)(ii); FINRA Rule 5320; NASDAQ Rule 5320A]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order records/reports<br>• PinkLink OTC Link History |
| Frequency | • Reviews: daily, weekly or monthly depending on reports available<br>• Disclosures: when account opened and annually |
| Action | • Review for order protection<br>• Provide disclosures (institutional accounts, no-knowledge exception) at account opening and annually thereafter |
| Record | • Order records/reports including date reviewed, reviewer's initials, action taken, if appropriate<br>• Records of providing disclosure at account opening and annually<br>• OTC Trading Manager Checklist |

Rule 5320 generally provides that a broker-dealer that accepts and holds an order (i.e. handling a client order) in an equity security from its own customer or the customer of another broker-dealer without immediately executing the order is prohibited from trading that security on the same side of the market for its own account at a price that would satisfy the customer order, unless the firm immediately executes the client's order up to the size of its own order at the same price or better.

ALPINE_LIT169147

Pending orders are executed on a first-in/first-out basis (FIFO). "Customer order" in this section applies to orders for the Firm's customers as well as customers of other broker-dealers.

The rule restrictions apply to orders handled during normal market hours and outside normal market hours (if the Firm and customer agree to processing the order outside normal market hours).

### 14.7.3.1 Exceptions

While the rule applies broadly to all types of clients and order sizes, the rule allows for exceptions that permit broker-dealers to trade for their account provided certain conditions are met.There are certain exceptions to the prohibition against trading ahead of customer orders.

**Large orders and institutional accounts.** Regarding orders for institutional accounts (as defined in NASD Rule 3110) or orders of 10,000 shares or more (unless the orders are less than $100,000 in value), Alpine may trade a security on the same side of the market for its own account at a price that would satisfy the customer order providing Alpine has provided clear and comprehensive written disclosure to the customer when the account is opened and annually thereafter that:

- Discloses that Alpine may trade proprietarily at prices that would satisfy the customer order, and
- Provides the customer with a meaningful opportunity to opt in to the Rule 5320 protections with respect to all or any portion of the order. If the customer doesn't opt in to the Rule 5320 protections in writing, Alpine will presume the customer has consented to the exception. The written request will only be permitted on a blanket basis only and should not be accepted, on an order-by-order basis. Oral requests and requests on an order-by-order basis should not be accepted due to our inability to reasonably supervise these types of requests.

**No-knowledge exception.** Regarding NMS stocks and where Alpine has effective internal controls and information barriers that prevent one trading unit from obtaining knowledge of customer orders held by a separate trading unit, the other trading units may, in a proprietary capacity, continue to trade at prices that would satisfy the customer orders held by the separate trading unit. A description of how customer orders are handled and when Alpine's proprietary account may trade at prices that would satisfy the customer's order will be provided at account opening and annually thereafter. For OTC equity securities where Alpine has similar controls to prevent a non-market-making trading unit from obtaining knowledge of customer orders held by a separate trading unit, the non-market-making trading unit may trade in a proprietary capacity at prices that would satisfy the customer's order.

**Riskless principal exception.** Rule 5320 obligations do not apply to Alpine's proprietary trades if the trades are for the purpose of facilitating the execution, on a riskless principal basis, of an order from a customer ("facilitated order") providing that Alpine:

- Identifies the order as riskless principal when reporting to FINRA (or other SRO); and
- Has written policies and procedures for compliance with FINRA rules regarding riskless principal transactions. Refer to the section *Riskless Principal Transactions* in this chapter.

**ISO exception.** The restriction against proprietary trades ahead of customer orders does not apply to trading for Alpine's account that is the result of an ISO (Intermarket Sweep Order) routed in compliance with Regulation NMS where the customer order is received after Alpine routed the ISO.

**Odd lot and bona fide error transaction exceptions.** The restrictions do not apply to a proprietary trade that is (1) to offset a customer order that is in an amount less than a normal unit of trading; or (2) to correct a bona fide error.

## 14.7.4 Front Running Of Block Transactions

[FINRA Rule 5270]

ALPINE_LIT169148

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Order records |
| **Frequency** | • Daily |
| **Action** | • Review customer orders vs. proprietary and employee orders to identify potential front running<br>• If front running is identified, take corrective action which may include:<br>   ○ Correcting the customer order for the better price<br>   ○ Discussion with the trader, enhanced trader education, disciplinary action if appropriate in consultation with Compliance |
| **Record** | • Order records including reviewer's initials (or signature), date reviewed, and action taken, if any |

Knowingly trading ahead of block orders is a manipulative activity that violates securities rules. Alpine and its employees are prohibited from entering or executing an order to buy or sell a security or related or underlying financial instrument when Alpine or employee has knowledge of material, non-public information about an imminent block transaction in that security or related or underlying financial instrument (stock, option, warrant, *etc.*). The prohibition applies until the information has been made publicly available or has otherwise become stale or obsolete.

This applies to executions in any account where Alpine or employee has an interest, has discretionary authority, or for accounts of customers or affiliates of Alpine when the customer or affiliate has been provided the block information by Alpine or an employee.

"Related financial instrument" means any option, derivative, security-based swap, or other financial instrument overlying a security where the value of the security is materially related to, or otherwise acts as a substitute for, the security, as well as any contract that is the functional equivalent of a position in the security.

"Block transaction" means a transaction involving 10,000 shares or more of a security, underlying security, or related financial instrument.

Exceptions include:

• Transactions where Alpine has information barriers to prevent disclosure of information
• Transactions in the same security related to a prior customer order in that security
• Transactions to correct bona fide errors
• Transactions to offset odd-lot orders
• Facilitation of block orders (with conditions in the Rule)

Though the Rule specifically applies to block transactions, front running of other orders is not permitted where the interests of Alpine or an employee are placed ahead of the interests of the customer or where misuse of information about an imminent order violates other rules. Refer to FINRA Rule 5270 for specific details regarding the prohibition.

## 14.7.5 Market Orders

A market maker cannot trade for a proprietary account in NASDAQ or exchange-listed securities at prices that would satisfy a customer market order, unless the customer's order is immediately executed up to the size and

ALPINE_LIT169149

at the same price or better at which the market maker traded for the Firm's account. This includes orders for the Firm's customers as well as orders received on behalf of customers of other broker-dealers.

If the customer's order is not immediately executed, the market maker must make every effort to match the pending market order against any market orders, marketable limit orders, or non-marketable limit orders priced better than the best bid or offer, received by the Firm on the other side of the market. The order must be executed at no less than the best bid, no greater than the best offer at the time the subsequent order is received, and consistent with the terms of the pending market order. Where multiple market orders on the same side of the market for the same security are received, orders will be executed on a first-in/first-out (FIFO) basis.

This obligation may be overridden by specific terms and conditions negotiated for a market order on behalf of an institutional customer (as defined in FINRA Rule 3110[c][4]) or a market order that is for 10,000 shares or more, unless the order is less than $100,000 in value. There also is an exception for a facilitation order on a riskless principal basis.

The restriction against proprietary trades ahead of customer orders does not apply to trading for the Firm's account that is the result of an ISO (Intermarket Sweep Order) routed in compliance with Regulation NMS where the customer order is received after the Firm routed the ISO.

### 14.7.6 Limit Orders

### 14.7.6.1 Limit Order Display Rule

[SEC Regulation NMS Rule 604; FINRA Rule 6460; FINRA Regulatory Notice 10-42]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Flextrade OMS<br>• OTC Markets Pink Link<br>• NASDAQ Workstation |
| **Frequency** | • As needed |
| **Action** | • Update quotations on securities the firm makes, showing the best priced orders |
| **Record** | • Record anomalies as needed and action steps taken, if any |

SEC and FINRA rules impose obligations on market makers displaying a priced quotation in an NMS stock or an OTC equity security in an inter-dealer quotation system.

A market maker is required to publish immediately a bid or offer that reflects:

ALPINE_LIT169150

- The price and full size of each customer limit order that is at a price that would improve the bid or offer of the market maker in the security; and
- The full size of each customer limit order held by the market maker that:
  - Is priced equal to the market maker's bid or offer for the security;
  - Is priced equal to the NBBO; and
  - Represents more than a *de minimis* change in relation to the size associated with the bid or offer. *De minimis* means size that is equal to or less than 10% of the firm's quotation size.

## 14.7.6.1.1 Exceptions To The Display Rule

The following customer limit orders are not required to be displayed in the firm's quote:

- An order executed upon receipt of the order.
- An order placed by a customer who expressly requests, either at the time the order is placed or prior to that time (and under a negotiated agreement with the customer regarding such orders), that the order not be displayed.
- An odd-lot order.
- A block-size order (unless the customer requests display). "Block" under Rule 604 applying to NMS stocks is defined as an order for 10,000 or more shares, **or** an order with a market value of $200,000 or more. "Block" under FINRA Rule 6460(d)(2) applying to OTC equity securities means an order for 10,000 or more shares **and** has a market value of $100,000 or more.
- An order delivered immediately to an exchange or FINRA-sponsored system or an ECN or ATS (alternative trading system) that will widely disseminate the order to other broker-dealers in compliance with Regulation NMS Rule 602.
- An order delivered immediately to another exchange member or OTC market maker that complies with requirements of the Display Rule.
- An "all or none" order.
- An order that is priced less than $0.0001 per share.

## 14.7.6.2 Trading Ahead Of Customer Limit Orders ("Manning Rules")

[FINRA Rule 5320.06]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • FINRA Best Execution Report<br>• Firm order records |
| Frequency | • As needed |
| Action | • Review order records (as needed) to ensure appropriate procedures were followed if trading ahead occurred<br>• Retain records reviewed |
| Record | • Initial or signature of reviewer/ date of review and action steps taken, if any |

Limit orders are subject to best execution requirements. The Firm may not "trade ahead" of customer limit orders except as allowed by FINRA Rule 5320 as included in a prior section *Prohibition Against Trading Ahead Of Customer Orders*. This obligation applies to limit orders for the Firm's customers and to limit orders received from other broker-dealers for their customers.

ALPINE_LIT169151

**14.7.6.2.1 Price Improvement Obligations**

Limit orders are subject to best execution requirements. The Firm may not "trade ahead" of customer limit orders except as allowed by FINRA Rule 5320. This obligation applies to limit orders for the Firm's customers and to limit orders received from other broker-dealers for their customers.

Alpine must provide the following minimum level of price improvement to trade ahead of an unexecuted customer limit order:

| Security Type | Price of Customer Limit Order | Minimum Price Improvement Required |
|---|---|---|
| NMS stocks | equal to or less than $1.00 | $0.01 |
| OTC equity securities | equal to or less than $1.00 | The lesser of $0.01 or 1/2 of the current inside spread [FINRA Rule 6434] |
| NMS stocks and OTC equity securities | <$1.00 but equal to or less than $.01 | The lesser of $0.01 or 1/2 of the current inside spread |
| NMS stocks and OTC equity securities | <$.01 but equal to or less than $0.001 | The lesser of $0.001 or 1/2 of the current inside spread |
| NMS stocks and OTC equity securities | <$.001 but equal to or less than $0.0001 | The lesser of $0.0001 or 1/2 of the current inside spread |
| OTC equity securities | <$.0001 but equal to or less than $0.00001 | The lesser of $0.00001 or 1/2 of the current inside spread |
| OTC equity securities | <$.00001 | The lesser of $0.000001 or 1/2 of the current inside spread |

- For customer limit orders priced outside the best inside market for the security, the minimum amount of price improvement required must either meet the above standards or Alpine must trade at a price at or inside the best inside market for the security.
- For customer limit orders in securities where there is no published inside market, the minimum amount of price improvement required defaults to the same tiered maximum price improvement standards above.
- For OTC equity securities that are foreign securities traded in foreign currency, the foreign currency must be converted to U.S. dollars for purposes of determining the applicable minimum price improvement standards.

Any better-priced customer limit order must receive protection up to the size of the triggering trade. Once the minimum price-improvement standards trigger the protection of a pending customer limit order, Alpine is required to also protect any more aggressively priced customer limit order(s), even if those limit orders would not be directly triggered by the minimum price improvement standards above. Refer to IM-2110-2 for further explanation and examples.

## 14.7.6.3 Crossing Incoming Orders Against Undisplayed Limit Orders

[SEC Regulation NMS Rule 602 and Rule 604]

When Alpine (as market maker) holds an undisplayed limit order priced better than the quote and it receives a market order on the opposite side of the market from the limit order, Alpine must pass along the price

ALPINE_LIT169152

improvement of the limit order to the market order. The following is one example that illustrates Alpine's obligations.

- NASDAQ inside market: 10-10 1/2 10x10
- Alpine holds an undisplayed limit order to buy 1,500 shares at 10 1/4.
- Alpine receives a market order to sell 1,000 shares of the same security.

In this example, Alpine is obligated to execute 1,000 shares of the market sell order at 10 1/4, executing it against the undisplayed limit order to buy or against Alpine's inventory account. If executed against Alpine's inventory, the Manning Rule would require that Alpine protect the limit order at its price. The remaining 500 shares of the buy order would continue to reside undisplayed on Alpine's books.

Other scenarios illustrating Alpine's obligation when holding an undisplayed limit order may be found in FINRA Notice to Members 97-57.


### 14.7.6.4 Priority Of Limit Orders

When Alpine holds multiple limit orders in the same security, the orders, if triggered, will receive executions considering the following priority:

1. Best-priced order (buy side: highest price, sell side: lowest price)
2. Time
3. Size


## 14.7.7 Marking Orders

[SEC Regulation SHO Rule 200(g) and Rule 201; NASDAQ Rule 4711(a)(6)]

SEC Regulation SHO Rule 200(g) and Rule 201], SEC Rule 200(a) and (g), NASDAQ Rule 3010, Rule 4755(a), Nasdaq OMX BX Rule 4755(a), Nasdaq PHLX Rule 3305(a), BATS-ZX Rule 11.19, BATS-YX Rule 11.19, NYSE-ARCA Rule 6.18, BATS –YX Rule 5.1, BATS –ZX Rule 5.1

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order records provided by Flextrade and Talisys (Order Blotter)<br>• PinkLink OTC Link History (for market making) |
| Frequency | • Weekly |
| Action | • Review order data for compliance with requirements to accurately identify "buy", "short", "short sale" and "long sale", including short exempts.<br>• For orders entered into Pinklink, review orders to ensure they are marked SS (short sale) for any riskless principal and S (sale) for any long position)<br>• If short exempt, the order must be marked as such.<br>• Review order data for compliance with accurately identifying orders involving Alpine's capacity (riskless principal, agency, principal)<br>• If upon review, an order is marked inaccurately, make a record and correct the transaction and report to the Head Trader as needed.<br>• Document the review and escalation in the Traders folder of the S drive. |
| Record | • Order records/reports with initials or signature of reviewer and date of review and action taken, if appropriate. These records may be retained electronically. |

ALPINE_LIT169153

All sell orders of equity securities are required to be identified on the order record and reported to the Trade Reporting Facility as "long" or "short" at the time of entry.

A sell order may be marked "long" when the seller owns the security being sold and the security either is in the physical possession or control of Alpine or it is reasonably expected that the security will be in the physical possession or control of Alpine by settlement date.

A sell order should be marked "short" when the security being sold is not owned by the seller and will require it to be borrowed to make delivery by settlement date. Alpine does not short securities unless a bona fide market making exemption is in place (see below).

Short sales effected in covered securities when a circuit breaker price test is triggered may be marked "short exempt" if they qualify for the exemption. A sell order should be marked "short exempt" if the seller is entitled to rely on an exception to the short sale rule including the following summary (refer to FINRA Rule 5100 and NASDAQ Rule 3350 for details):

- *Bona-fide* market making transactions in securities subject to bid or tick test requirements (short sales in OTCBB stocks are not marked short exempt since they are not subject to a bid or tick test)*
- Sales by a broker-dealer (BD) to offset odd-lot orders for customers
- Sales by a BD to liquidate a long position less than a round lot, if the sales do not change the BD's position by more than one unit of trading
- Sales for a special arbitrage account under certain conditions
- Sales by an underwriter or syndicate or group member participating in a distribution, in connection with an over-allotment of securities, or any layoff sale in connection with a distribution through rights or a standby underwriting commitment
- Short sales of securities part of the SEC's pilot program under Regulation SHO (securities subject to a "tick test" or price test rules for NASDAQ securities)

- *The "bona fide market making" exception requires that the dealer be a market maker registered in the security and does not include transactions unrelated to market making such as index arbitrage and risk arbitrage independent from market making activity. Although such activity may be part of the dealer's overall hedging or risk management strategy, it does not qualify for the bona fide market making exception.

See the section *Locate And Delivery Requirements* regarding the requirement to borrow securities. Alpine does not typically engage in short selling as the firm does not have margin accounts. On occasion Alpine's proprietary trading account will have a short position resulting from market making activities. In these cases the locate and borrow rules do not apply. Refer to exceptions to the locate and borrow requirements found elsewhere in this chapter.


## 14.7.7.1 Locate And Delivery Requirements (Locate Rule)

[Regulation SHO, Rule 203]

Alpine does not engage in margin activities, thus this section does not apply. Should Alpine engage in such activity that would require that we observe the locate and delivery requirements, Alpine will adopt the following policies and procedures:

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Easy to Borrow List<br>• Other market makers and clients |
| Frequency | • As needed |

ALPINE_LIT169154

| | |
|---|---|
| **Action** | • Document the steps taken in each case and where the stock came from<br>• Document exceptions<br>• Document the firm and party contacted for shares to be borrowed and the number of shares to be borrowed |
| **Record** | • Correspondence, Easy to Borrow List and record initials or signature and date reviewed<br>• Notate any action taken, if any |

**14.7.7.1.1 Exceptions From The Locate Requirement**

The following are exceptions from the locate requirement and traders are NOT required to record locate information when they effect short sales in the following situations:

**a. Broker-Dealer Accepting Short Sale Order from Another Broker-Dealer — Rule 203(b)(2)(i)**
Rule 203(b)(2)(i) provides an exception from the uniform locate requirement of Rule 203(b)(1) for a registered broker or dealer that receives a short sale order from another registered broker or dealer that is required to comply with 203(b)(1). For example, where a correspondent firm submits a short sale order for execution, either on a principal or agency basis, to Alpine, the correspondent firm has the responsibility of complying with the locate requirement, not Alpine, unless Alpine contractually undertook to do so or the short sale order came from a person that is not a registered broker-dealer.

**b. Bona-fide Market Making transactions in OTC securities where Alpine publishes a two-sided quotation in an independent quotation medium.**

Or a non-FINRA broker-dealer's proprietary order that is a bona fide market making transaction. Notation must be made on the order record of one of these exceptions and who provided the assurance at the other broker-dealer.

**c. Additional Exception from the Locate Requirement — Rule 203(b)(2)(ii)**
Rule 203(b)(1) provides an exception for situations where Alpine effects a sale on behalf of a customer that is deemed to own the security pursuant to Rule 200, although, through no fault of the customer or Alpine, it is not reasonably expected that the security will be in the physical possession or control of the broker-dealer by settlement date, and is thus a "short" sale under the marking requirements of Rule 200(g) as adopted. Such circumstances could include the situation where a convertible security, option, or warrant has been tendered for conversion or exchange, but the underlying security is not reasonably expected to be received by settlement date. Delivery should be made on the sale as soon as all restrictions on delivery have been removed, and in any event no later than 35 days after trade date, at which time the broker-dealer that sold on behalf of the person must either borrow securities or close out the open position by purchasing securities of like kind and quantity.

d. transactions in corporate debt securities
e. transactions in security futures
f. when Alpine is effecting trades as a NASDAQ or ADF market maker
g. proprietary transactions in corporate debt securities

For short sales that do not meet any of the above criteria, traders are responsible for contacting Operations to determine locate information. The following must be recorded on the order:

• the name of the person (and their firm name) from whom affirmation was obtained; and,
• the number of shares to be borrowed .

# 14.7.8 Naked Short Selling AntiFraud Rule

*(SEC Rule 10b-21)*

ALPINE_LIT169155

Alpine does not engage in margin trading and thus does not engage in short selling. Thus, this regulation does not apply. Should Alpine engage in such activity in the future, Alpine will develop and implement written supervisory procedures in this area.

In general, if a short sale were to occur, Alpine would first have to be able to borrow the security. If a client engages in "naked short selling" in contravention of Alpine's procedures, the Head Trader or designee will document the event and refer the matter Compliance for consultation.

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • CNS Accounting Summary |
| Frequency | • Daily |
| Action | • Review CNS Accounting Summary<br>• Consult with Compliance, where required |
| Record | • Record initials or signature and date reviewed (if applicable)<br>• Notate any action taken, if any |

## 14.7.9 Close and Pre-Borrow Rule

*SEC Rule 204*

Alpine does not engage in margin trading and thus does not engage in short selling. Thus, this regulation does not apply. Should Alpine engage in such activity in the future, Alpine will develop and implement written supervisory procedures in this area. From time to time, there could be a fail to deliver (FTD) on a position being cleared for resale by Alpine. If in the event of a FTD, Alpine will buy the position to meet the delivery requirements. Please refer to the section titled "Regulation Sho" located elsewhere in this chapter for information about Alpine's supervisory policies and procedures.

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • CNS Accounting Summary |
| Frequency | • Daily |
| Action | • Review CNS Accounting Summary<br>• Consult with Compliance, where required |
| Record | • Record initials or signature and date reviewed (if applicable)<br>• Notate any action taken, if any |

## 14.7.10 Block-Sized Orders

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Order records<br>• Daily Transaction and other reports |

ALPINE_LIT169156

| | |
|---|---|
| | • Registered Representatives submitting orders |
| **Frequency** | • As required |
| **Action** | • Notify the RR who submits the order (or customer if trader is the RR) that is may take time to fill the order to prevent any undue changes to the price of the security<br>• Notify that block orders are typically handled as "not held" which gives the trader the ability to use their judgment on how to best execute the order<br>• The trader should check multiple markets to determine the best market for the order |
| **Record** | • As needed record communications with clients regarding block orders<br>• Record initials or signature and date reviewed (if applicable)<br>• Note in trailer which markets were checked, if any |

## 14.7.11 Not Held Orders

Customers may enter "not held" orders which are market orders that give the trader time and price discretion in executing the trade to get the best possible price without holding the trader responsible if the best price is not obtained. Block-sized orders are often not held because of the complexity of executing large orders without unduly disrupting the market price.

Time and price discretion is limited to the end of the day on which the order was entered or, if entered after market hours, the end of the next trading day.

## 14.7.12 Orders With Special Terms Or Conditions

Some orders are entered with special terms and conditions such as Market-On-Open (MOO) and Market-On-Close (MOC) orders. Traders are required to enter orders in accordance with special terms or conditions or return the order to the customer or RR if the order cannot be entered as marked.

Traders should particularly watch for a pattern of MOO or MOC orders from a customer or related customers that appear to be entered with the intention of moving the market price, which is a prohibited manipulative activity ("marking the opening" or "marking the close"). Potential marking of the opening or close should be reported to the trading manager.

## 14.7.13 Average Price Transactions

Occasionally customers prefer to receive one confirmation representing an average price for multiple executions of the same security including the volume weighted average price (VWAP) of the trades. SEC Rule 10b-10 mandates that broker-dealers provide confirmations for each transaction; however, the SEC has stated it would permit average pricing of multiple executions if certain conditions are met.

The trader confirming an average price is responsible for ensuring that all of the following information is provided to the customer:

- The execution prices of each individual execution that filled the order must be averaged and the average price reported as the unit price on the confirmation. The confirmation must disclose that the price is an average price and that details regarding actual prices are available to the customer upon request.
- The confirmation must identify the capacity in which Alpine acted (principal; agent; or both principal and agent) and that details regarding capacity of each execution are available upon request.
- The commission, markup, markdown, service charge, or other remuneration must be stated in a single amount for the transaction as a whole.

ALPINE_LIT169157

In addition, the trader's records must include details of each execution comprising the average-priced transaction. This will be monitored by the Head Trader or designee during order reviews. Please see supervisory matrix below.

## 14.7.13.1 Volume-Weighted Average Price (VWAP) Customer Transactions

[FINRA Notice to Members 05-51]

| Responsibility | • Head Trader or designee |
| --- | --- |
| Resources | • Order records<br>• Daily Transaction and other reports<br>• VWAP transactions |
| Frequency | • As required |
| Action | • Review proprietary and other transactions in the security for one week prior to VWAP transactions to detect frontrunning or trading anomalies indicative of manipulation<br>• If frontrunning or manipulative activity is possible, take follow-up action which may include:<br>  o Contact Compliance (unless Compliance is conducting the review)<br>  o Interview traders or others entering questioned transactions<br>  o If appropriate, take corrective action which may include adjusting the VWAP transaction, disciplinary action against the trader or others involved in frontrunning or manipulation<br>  o Confirm that affirmative consent has been obtained from the customer if disclosure of hedging or other positioning activity is required |
| Record | • Order records/reports with initials of reviewer and date of review and action taken<br>• Written affirmation from customers, if applicable |

VWAP transactions typically are large transactions that may impact the market price of the stock. Obligations when handling VWAP transactions include:

- Prohibition against trading ahead in proprietary accounts
- Prohibition against engaging in manipulative activity, such as creating artificial demand for the security or establishing artificially high or low prices by engaging in unnecessary trading, increased quote activity, or entering orders around the close of when a VWAP or other large order is executed
- Prior to receipt and/or execution of the order, obtain an affirmative consent letter from the customer that hedging or other positioning activity by Alpine may take place (if applicable)
- Mark sell orders long or short, as appropriate, and comply with rules governing long and short sales
- Disclosure to the customer, in writing, the specifics of the terms of compensation (*e.g.,* if Alpine will retain or split with the customer any profits that result if Alpine improves on the VWAP)
- Maintain confidentiality when handling VWAP orders

## 14.7.14 Net Trading

[FINRA Rule 2124; FINRA Notice to Members 06-47]

ALPINE_LIT169158

[FINRA Rule 2124; FINRA Notice to Members 06-47]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Upon notification by Registered Representative |
| Frequency | • As required |
| Action | • Monitor net trading<br>• Document requests for net trading<br>• Periodically review order tickets to ensure that proper disclosure has occurred |
| Record | • Retain records of personnel requesting a net trade<br>• Review of order tickets |

Alpine may, at the request of a customer, confirm a transaction on a net basis. A net transaction is a principal transaction in which the market maker, after having received an order to buy or sell an equity security, buys or sells the security (from or to another dealer or another customer) and then sells to or buys from the customer at a different price.

Institutions that request net basis transactions will be provided with Alpine's negative consent letter regarding the terms and conditions of such transactions. If the institution objects to the terms included in the letter, Alpine will not trade on a net basis with that customer. As an alternative, the terms and conditions for handling the order on a net basis may be orally explained and oral consent obtained from the institutional customer. Oral consent must be noted on the order record.

Net trading with non-institutional customers requires pre-trade disclosure and written consent on an order-by-order basis. Orders received from another broker-dealer for their customer do not require disclosure and consent; these are obligations of the other broker-dealer.

If orders are received from a fiduciary for a non-institutional customer, the fiduciary's status determines whether there is an obligation to provide pre-trade disclosure and consent. For example, if the fiduciary is an investment adviser, the adviser is considered an institution and disclosure and consent are not required. If the fiduciary is an individual such as an attorney or an accountant acting on someone's behalf, the fiduciary is considered an individual and pre-trade disclosure and consent are required.

It is the responsibility of each registered representative to notify the Trading Department when he/she receives a net trading request. It is also the responsibility of the registered representative to denote this on the order record as described above.

## 14.7.15 Phone Orders

A trader may accept a phone order for execution; however, phone orders must identify each customer by account number at the time the order is phoned in. The only exception is where accounts are under common control (investment adviser directed orders, orders from an individual with authority over multiple accounts); for such orders account numbers may be provided after execution.

## 14.7.16 Rule 144 Transactions

[SEC Rule 144]

Rule 144 transactions are subject to a number of requirements and limitations including:

ALPINE_LIT169159

- Sellers must meet holding period and size limits to qualify under Rule 144.
- Alpine is not permitted to solicit buyers for securities being sold under Rule 144 though it may solicit sellers of 144 stock.
- Securities are required to be sold in a "broker's transaction" which means the broker does no more than execute the order as agent and receives no more than customary commission.
- Alpine may not initiate a quotation for purposes of a 144 transaction. Continued publication of a quotation as market maker is permitted if Alpine has published a quotation on each of at least 12 days within the preceding 30 calendar days (with no more than 4 business days without a two-way quotation).

More detailed information is available in the chapter *ORDERS* in the section *Sale Of Control Or Restricted Stock* and by contacting Compliance.


## 14.7.17 Self-Trades

[FINRA Rule 5210.02; FINRA Regulatory Notice 14-28]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Trading records for trading desks or from algorithms<br>• Flextrade Order window and WMX Order Activity |
| **Frequency** | • Daily: review trades<br>• As required: identify discrete trading desks and algorithms |
| **Action** | • Identify discrete trading desks and algorithms within Alpine<br>• Review trading from these discrete units to identify self-trades<br>• If self-trades are identified, take corrective action which may include:<br>    ○ Adjusting the algorithm to prevent self-trades<br>    ○ Consulting with trading desk personnel about preventing self-trades<br>    ○ For repeat self-trades in a discrete unit, consult with Compliance regarding corrective action which may include re-programming algorithms, additional training for traders or formal disciplinary action for traders engaging in self-trades |
| **Record** | • Review to identify discrete trading desks and algorithms<br>• Review of daily transactions to identify self-trades and corrective action taken, if any<br>• Note initials (or signature), date of review, where applicable |

A "wash sale," a purchase and sale of a security without a change in beneficial owner, is considered a violation of rules prohibiting the reporting of a transaction that is not a bona fide purchase or sale. On some occasions a "self-trade" within a firm may occur. Firms are obligated to prevent self-trades and identify them when they occur, to take necessary corrective action.

Self-trades are transactions in a security resulting from the **unintentional** interaction of orders originating from the same firm that involve no change in the beneficial ownership of the security. This applies to orders that originate from a single algorithm or trading desk, or related algorithms or trading desks. FINRA considers discrete units within a firm are subject to these requirements. Multiple algorithms or trading desks within a discrete unit that would be permitted to communicate with each other or would be under the supervision of the same people are considered to be related.

ALPINE_LIT169160

Orders that originate from **unrelated** algorithms or separate and distinct trading desks within Alpine are generally considered bona fide transactions not subject to the reviews described in this section. Examples of unrelated units could include:

- Those with information barriers between separate units
- Different personnel are responsible for managing or supervising the algorithms or desks
- Algorithms or desks operate independently from one another in other ways

When participating in a NASDAQ Cross, each cross results in a bulk execution as part of a single-priced transaction with NASDAQ standing in the middle of each execution. While orders entered into the crosses do not trade with one another on a one-for-one basis, it is conceivable that engaging in a pattern or practice of entering trades in low-volume crosses could be viewed as problematic where (1) they account for a significant amount of volume in a security and potentially adversely affect the price discovery process; (2) they are effected by a single algorithm or trading desk or related algorithms or trading desks; and (3) there is little or no possibility of a change in beneficial ownership.

Traders are obligated to avoid self-trades within their discrete trading unit.


## 14.7.18 Trading Halts

[FINRA Rule 5260, 6121 and 6440; FINRA Regulatory Notice 13-12; FINRA charts of types of securities excluded from price bands: http://www.finra.org/Industry/Compliance/MarketTransparency/TRF/luld; NASDAQ Rule 3340, 3350, 4120 and 4121; NASDAQ FAQs on Limit Up-Limit Down: http://www.nasdaqtrader.com/content/MarketRegulation/LULD_FAQ.pdf; SEC Regulation NMS Rule 608]

Other Applicable Rules: FINRA Rule 6460

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Order records: 5% rule, Employee Trades, Family-Related Accounts, Volume by Security; Combined Executions for Unsolicited Orders; Combined Executions for Solicited Orders; rejected orders<br>• Information regarding trading halts<br>• Flextrade (trading system) |
| **Frequency** | • As required |
| **Action** | • Cease trading in halted security<br>• Monitor trading activity during a trading halt<br>• Review notices received from NASDAQ and other third parties to withdraw quotes<br>• Review notices to third parties to withdraw quotes<br>• Educate traders regarding restrictions during halts and trading halt requirements |
| **Record** | • Reviews and corrective action taken<br>• BD affirmations<br>• Notifications of third parties to withdraw quotations<br>• Record initials or signature, date of review (if applicable) on the records enumerated above<br>• Note any action item taken, if any |

SROs or the SEC may impose trading halts (the "limit-up/limit-down price bands") in individual securities or market-wide circuit breakers in NMS stocks. The following summarizes halts and circuit breakers:

ALPINE_LIT169161

- Trading curbs operate from 9:30 a.m. ET until 4 p.m. ET and apply to all securities.
- For individual securities, there will be price bands within which each stock will be allowed to move a certain percentage from its five-minute average, with the amount varying based on its closing price the prior day.
- The limit-up/limit-down program also allows the listing market to declare a trading pause when a stock has deviated from its normal trading characteristics and the exchange decides a halt would curtail excessive volatility.

During trading halts, traders are prohibited from publishing quotations or indications of interest. Traders must immediately cease trading in any security where trading has been halted. Orders should not be entered to NASDAQ Market Center during a trading halt. No member or person associated with a member shall, directly or indirectly, effect any transaction or publish a quotation, a priced bid and/or offer, an unpriced indication of interest (including "bid wanted" and "offer wanted" and name only indications), or a bid or offer accompanied by a modifier to reflect unsolicited customer interest, in any security as to which a trading halt is currently in effect, except as permitted under the Regulation NMS Plan to Address Extraordinary Market Volatility. If FINRA closes trading in a security pursuant to its authority under Rule 6120(a)(3), members would not be prohibited from trading through other markets for which trading is not halted.

The following restrictions also apply:

- If an order is sent to a trading facility/system that continues to publish quotations or indications of interest during a trading halt, the order must be pulled back.
- Internal display of quotations or indications of interest within Alpine's proprietary system may continue, but dissemination outside Alpine is prohibited.
- If Alpine sends quotation information or indications of interest to a third party (such as an Internet search engine or web site), Alpine must promptly notify the third party of the trading halt and request removal of the information from the site. A record must be maintained by the Head Trader or designee of any request to withdraw information during a trading halt.

Transactions in a halted security may not be effected directly or indirectly.

## 14.8 NASDAQ Execution Services/BATS/ARCA

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Observation of traders' activities<br>• Review of order records |
| Frequency | • Ongoing |
| Action | • Review for violations of NASDAQ Execution Services/BATS/ARCA<br>• Take corrective action depending on the nature of the prohibited activity and/or consult with Compliance |
| Record | • Order records including the name of the reviewer (by initial or signature or name), date of review and notations of action taken, if any |

Whenever engaged in trading or orders, employees must follow the rules and regulations of the exchanges or markets in which the trades are occurring. Accordingly, in addition to the information set forth below, employees are directed to the rules and regulations or the exchanges or markets including NYSE ARCA and BATS Exchange.

NYSE Arca is a separate self-regulatory organization that has contracted with NYSE Regulation for regulatory services. Access NYSE Arca rules and bylaws via the links below.

ALPINE_LIT169162

http://www.nyse.com/regulation/nysearca/1145486472857.html

BATS Exchange, Inc. ("BATS") received approval on August 18, 2008, from the U.S. Securities and Exchange Commission ("SEC") to operate as a registered national securities exchange. BATS commenced operations as a national securities exchange on October 24, 2008, and completed its transition from the operation of an ECN on November 6, 2008.

The SEC regulates BATS as a national securities exchange, and BATS also has status as a self-regulatory organization ("SRO"). Accordingly, BATS oversees and regulates trading conducted on BATS Exchange. BATS rules and regulations may be accessed by the links below:

http://www.batstrading.com/regulation/

http://www.batstrading.com/resources/regulation/rule_book/BATS_Exchange_Rulebook.pdf

All employees must adhere to the rules and regulations set forth above for NYSE Arca or BATS.

The Head Trader is responsible for assuring that the rules and regulation of NYSE Arca and BATS are followed and no violations of such rules occur.

## 14.8.2 NASDAQ Market Center

[NASDAQ Rule 4611]

NASDAQ Market Center is a voluntary, open-access system that provides alternatives for quoting and trading NASDAQ securities.

The NASDAQ Market Center system provides NASDAQ market participants with the following:

- Ability to quote the dealer's best bid and offer or multiple quotes and orders at multiple price levels
- Prevents locked and crossed markets during regular market hours
- Displays the best prices as well as multiple prices away to give the trader the ability to view market depth at varying prices
- Allows entry of individual orders up to 999,999 shares and quotes of 99,900 shares
- Allows for the following types of orders:
    - Non-Directed (order is not directed to a specific market participant and is automatically executed against a market maker or delivered to or automatically executed against quotes of ECNs)
    - Preferenced (order is identified for delivery to a specific participant against which the order should be executed)
    - Directed (order accesses a specific quote/order in NASDAQ)
- Orders may be entered and executed in actual shares, *i.e.,* round lots, odd lots, and mixed lots

## 14.8.3 Sponsored Access

[NASDAQ Rule 4611(d)]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Requests for sponsored access |
| Frequency | • As required for a request for sponsored access |

ALPINE_LIT169163

| | |
|---|---|
| **Action** | • Execute with Sponsored Participant an agreement that includes the Sponsorship Provisions in Rule 4611(d)(2)<br>• File with NASDAQ a User Agreement and Notice of Consent<br>• Review activity by sponsored firm or customer to determine compliance with NASDAQ requirements |
| **Record** | • Copies of agreement with Sponsored Participant and User Agreement and Notice filed with NASDAQ<br>• Reports/activity reviewed, notes of action taken |

Alpine may act as a Sponsoring Member that gives access on an agency basis to another firm or customer ("Sponsored Participant") to execute orders on the NASDAQ Execution System. Access may be:

- Pass-through access where Alpine enters orders that pass through Alpine's systems and then into NASDAQ; or
- Direct access where the Sponsored Member enters orders directly to NASDAQ.

# 14.9 Consolidated Quotation System (CQS) Securities

The Consolidated Quotation Service (CQS) is a consolidated quotation collection system for listed securities. Transactions in listed securities effected in the OTC market are subject to certain requirements described in this section. In addition, general principles of OTC trading apply, including:

- Best execution
- Anti-intimidation/coordination of quotes
- Frontrunning customer orders

These concepts are covered in detail in other sections of this chapter and should be referenced for further information. This section summarizes some of the key requirements specific to OTC orders for listed securities included in the CQS.

## 14.9.1 Trade-Throughs

Traders are obligated to comply with best execution requirements and avoid, as market maker, purchasing or selling an ITS/CAES security (whether as principal or agent) at a price which is lower than the bid or higher than the offer displayed from an ITS Participant Exchange or ITS/CAES Market Maker ("trade-through"). There are limited conditions where exceptions apply. Rule 5262 lists the conditions that would allow a trade-through.

## 14.9.2 Short Sales In CQS Securities

[SEC Rule 10a-1]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Order records for short sales |
| **Frequency** | • Weekly |
| **Action** | • Review short sales for record of last reported sale price<br>• For orders lacking that information or executed contrary to the "tick" requirement, take corrective action depending on the nature of the deficiency or |

ALPINE_LIT169164

| | |
|---|---|
| | violation which may include consulting with the trader, additional education, and consultation with Compliance regarding more formal action against the trader |
| **Record** | • Order records reviewed including supervisor's initials, date of review, and corrective action taken, if appropriate |

Short sales in CQS securities (whether customer or proprietary orders) must be executed at a price that is at or above the last reported sale price on the exchange where the security is listed or at a price above the next preceding different price for a reported sale. This limitation does not apply to transactions for Alpine's account when it is acting as a market maker.

Sell orders must be marked "long" or "short" and the requirements for affirmative determination must be satisfied (assurance from the customer of delivery of the long stock or determination stock may be borrowed for a short sale).

## 14.9.3 CQS Security Subject To An IPO

When a CQS security is subject to an initial public offering (IPO), the trader may not execute an OTC transaction in the security until the security has first opened for trading on the primary exchange listing the security. This is indicated by dissemination of an opening transaction on the consolidated tape.

## 14.9.4 Reporting Transactions in CQS Securities

[FINRA Rule 6181]

Transactions in eligible securities will be reported in accordance with FINRA reporting requirements.

Refer to the section *Trade Reporting* in this chapter.

### 14.9.4.1 Reporting Third Market Riskless Principal Transactions

[FINRA Rule 6622(d)(3)(B)]

There are specific requirements when reporting riskless principal transactions in listed securities including marking a capacity indicator and reporting one side of the trade only. The Notice to Members should be referenced for details.

## 14.9.5 Limit Order Protection Interpretation ("Manning Obligations")

[NASD IM 2110-2; NASD Notice to Members 05-64; NASDAQ IM 2110-2]

Requirements for providing price improvement for limit orders when trading for Alpine's account apply to exchange-listed securities. Refer to the section *Limit Orders* in this chapter.

# 14.10 CQS Market Maker Requirements

[SEC Regulation NMS Rule 601 and Rule 602]

| **Responsibility** | • Head Trader or designee |
|---|---|

ALPINE_LIT169165

| | |
|---|---|
| **Resources** | • Order records |
| **Frequency** | • Quarterly, within 10 business days of the end of each calendar quarter |
| **Action** | • Determine whether Alpine's volume exceeds 1% of the prior calendar quarter's total volume (whether Alpine has become a "statutory market maker"):<br>   ○ If yes, notify trader of obligation to publish quotations |
| **Record** | • Trading data, calculation of trading volume, determination, and notice to trader (if applicable) |

If Alpine acts as a market maker in CQS securities, it has the following obligations:

- Quotations must be firm for the size displayed or, if no size is displayed, for the normal unit of trading.
- The quotation must be for at least one normal unit of trading.
- Close proximity to the NASDAQ terminal at which the dealer makes a market.
- Minimum quotation increment is $0.01.

Adherence to the above obligations by Traders will be monitored by and ensured compliance with by the Head Trader.


## 14.10.1 One Percent (1%) Rule (Statutory Market Maker)

[SEC Regulation NMS Rule 600(b)(73)(ii); FINRA Notice to Members 96-65]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Trade data<br>• 606 reports |
| **Frequency** | • Quarterly |
| **Action** | • Review and determine if Alpine has reported 1% or more of any CQS security<br>• If Alpine has reported 1% or more it must disseminate quotations in that security |
| **Record** | • Copies of trade reports, trading data, 606 reports<br>• Initial or signature of reviewer/ date of review and action steps taken, if any |

Any CQS market maker that accounts for more than one percent of the reported aggregate trading volume in any exchange-listed security during a calendar quarter is required to publicly disseminate quotations in that security, even if the volume is attributable to internalized order flow. The following guidelines apply:

- The 1% calculation includes internalized order flow.
- The 1% Rule applies to all exchange-listed securities (including NASDAQ-listed securities).
- The 1% Rule does not apply when Alpine acts solely as a block positioner in an exchange-listed security.
- Trading strategies (such as program trading) may qualify Alpine for the "block positioner" exemption.
- The 1% Rule does not apply to exchange-listed preferred stock.

ALPINE_LIT169166

If Alpine does not publish quotations in all CQS securities where it makes a market, the Head Trader or designee is responsible for determining whether volume in the non-quoted CQS security obligates Alpine to publish a quotation.

# 14.11 FINRA Alternative Display Facility (ADF)

[FINRA Rule 6200 series; FINRA ADF web site: http://www.finra.org/RegulatorySystems/ADF/index.htm]

Regulatory Notices 07-38 & 09-54, FINRA Rules 7130, 7230A, 7230B, 7330

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Trade data, reports available from the FINRA, internal reports |
| **Frequency** | • Daily |
| **Action** | • Establish required access to market participants and others<br>• Monitor the Firm's system on a real-time basis<br>• Review for accurate trade reporting<br>• Where inaccuracies are identified:<br>   o Confirm that corrections are reported<br>   o Confer with trader and provide additional education if necessary |
| **Record** | • Copies of trade reports, trading data, and other information reviewed are retained in the Trading Manager's files including the manager's initials and date of review as well as notes of corrective action, if necessary |

The FINRA ADF is a quotation collection, trade comparison, and trade reporting facility. Market makers and ECNs may post quotations in NASDAQ securities and all FINRA members that participate in the ADF are able to view quotations and report transactions in NASDAQ securities. Rule requirements for participating in the ADF mirror other market maker rule requirements regarding maintaining two-sided quotations, withdrawals of quotations, registering and withdrawing as a market maker, trade reporting, OATS, short sales, trading halts, and other market maker requirements.

Because this is an FINRA-sponsored facility and not a NASDAQ facility, further information is available in the FINRA rules as well as at the FINRA's site at *www.FINRA.com* and, using the search function, search for "Alternative Display Facility." For more information about Alpine's written supervisory procedures relating to Alpine's oversight of related market center codes, refer to the section titled "*Trade Reporting*".

## 14.11.1 Changing From An Automated To A Manual Quotation

When using the ADF, quotations should be automated unless there is an extraordinary reason to publish a manual quotation such as a system failure (Firm or ADF), power outage, or an event that renders automated quoting impossible. When switching to manual quotations, the supervisor should be consulted to confirm the necessity to make the change. These occurrences must be avoided and only permitted when absolutely necessary. The supervisor and appropriate information services personnel must immediately attempt to rectify the situation unless it is the fault of the ADF itself. When the situation has been corrected, Alpine will immediately resume automated quotations.

The supervisor is responsible for documenting any situations, including the date and reason, for changing from automated to manual quotations and when the quotation is returned to automated. The problem, if Firm-related,

ALPINE_LIT169167

must be reviewed by the supervisor and other appropriate personnel to determine any corrective action that must be taken to avoid reoccurrence.

## 14.11.2 Trading Halts

[FINRA Rule 6120 and 6272(a)(2)]

FINRA may impose trading halts when necessary including closing the ADF. If FINRA halts trading in a particular security, trading may not occur in the security in any other market. If the ADF is closed because it is unable to transmit real-time quotation or trade reporting information, Alpine may continue trading on other markets for which trading is not halted.

The suspension of pricing obligations for ADF Market Makers applies during a trading halt except as permitted under limit-up/limit-down requirements (see "Trading Halts" under the section *Handling Orders and Executions* in this chapter).

## 14.11.3 Access Requirements

[SEC Regulation NMS Rule 610; FINRA Rule 6250; FINRA list of private-sector connectivity providers: http://www.finra.org/RegulatorySystems/ADF/Participants/index.htm]

The ADF does not provide order routing capability. ADF rules require that market participants (ADF registered market makers, ECNs, or ATSs) provide direct electronic access to other market participants and provide all other FINRA members direct electronic access or allow for indirect electronic access to the participant's quote.

"Direct electronic access" refers to the ability to deliver an order for execution directly against the market participant's best bid or offer without the need for voice communication, *i.e.,* electronic linkage. Access to other participants must be at the same speed, reliability, availability, and cost available to the participant's own customers. For example, market participants may link directly among themselves. "Indirect electronic access" means provision of the ability to route an order to a market participant.

## 14.11.4 ADF Trade Reporting

[FINRA Rule 6280]

FINRA Regulatory Notice 09-54 & 07-38], FINRA Rules 7130, 7230A, 7230B, 7330

For trades required to be reported to FINRA through the ADF, TRACS (Trade Reporting And Comparison System) will be utilized to report transactions. TRACS may also be used for trades eligible for reporting to FINRA. For information about Alpine's written supervisory procedures relating to Alpine's oversight of accurate reporting of related market center codes, refer to the section titled "Trade Reporting".

# 14.12 Other Requirements

## 14.12.1 Inventory Positions

[FINRA Regulatory Notice 08-18]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Inventory position records |

ALPINE_LIT169168

| Frequency | • Daily |
|---|---|
| Action | • Monitor inventory positions to ensure limits are not exceeded<br>• For exceeded limits, take corrective action which may include:<br>    ○ Confer with Trader<br>    ○ Reduce position<br>• Review requests for exceptions and approve or disapprove |
| Record | • Trading Manager Checklist<br>• Retain notation of requests for inventory limit exceptions on the Checklist or in a file for inventory limits |

Alpine has established limits on market maker inventory positions. Positions held by Alpine affect net capital requirements and represent financial exposure to Alpine. Traders may not exceed established guidelines without approval.

## 14.12.2 Schedule 13G Reports

[SEC Securities Exchange Act of 1934 Rule 13d-1 and Rule 13d-2]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Trading Account Costing Report<br>• Annual/Quarterly reports of company's in which Alpine maintains a proprietory position |
| Frequency | • Annually by February 14<br>• Daily comparison of shares held by Alpine per the Trading Account Costing Report to company's outstanding shares<br>• Within 10 days after the end of the first month where position exceeds 10% of outstanding shares - amendments |
| Action | • Annually file Schedule 13G to report positions greater than 5% of outstanding shares<br>• File amendments when Alpine's position exceeds 10% |
| Record | • Schedule 13G filings including date filed |

When necessary, Alpine will file required reports with the SEC regarding proprietary positions that exceed 5% and 10%.

## 14.12.3 Authorized Use Of NASDAQ Workstations

| Responsibility | • Head Trader or designee |
|---|---|

ALPINE_LIT169169

| Resources | • NASDAQ Workstation |
|---|---|
| Frequency | • As required and ongoing |
| Action | • Assign traders to workstations and provide passwords for access<br>• Ensure traders are familiar with procedures to ensure only authorized personnel access workstations |
| Record | • Retain record of passwords and provide only to those authorized for access to workstations |

Traders will be assigned a password to access their assigned NASDAQ workstations. Traders may not permit unauthorized persons to use workstations and may not disclose their passwords to unauthorized persons outside the OTC trading department.

Traders should log off at the end of the trading day and log on each morning with the assigned password.

## 14.12.4 Adequate Staffing

The Head Trader is responsible for ensuring the trading desk is adequately staffed at all times to meet market demands.

## 14.12.5 Issuer Repurchases Of Common Stock

[SEC Securities Exchange Act of 1934 Rule 10b-18]

Rule 10b-18 provides a safe harbor from violations of anti-manipulation rules when an issuer (or its affiliate) repurchases its outstanding common stock. To come within the safe harbor, the issuer must meet four conditions on each day it bids for and repurchases shares of its common stock (manner of entry, timing, pricing, and volume conditions). Following is a summary of key elements of 10b-18 safe harbor conditions. Because rule requirements are technical and detailed, traders should consult with the Trading Manager or Compliance prior to engaging in issuer repurchases.

**MANNER OF ENTRY:**

• All bids and purchases must be made through or by only one broker or dealer in a single day, with limited exceptions.

**TIMING CONDITION:**

• A purchase may not be the opening reported purchase of the day.
• For issuers having an average daily trading volume of $1 million or more and a public float value of $150 million or more, purchases may be made until the day's last 10 minutes of the primary market trading session in the principal market for the security. Other issuers are limited to purchases until the day's last 30 minutes of the primary trading session in the principal market for the security.

**PRICING CONDITION:**

• Purchases may not be made at a price higher than the highest independent bid or last independent transaction price (whichever is higher) at the time of the purchase.

ALPINE_LIT169170

**VOLUME CONDITION:**

- The number of outstanding common shares purchased by an issuer on any single day may not exceed 25% of the average daily trading volume (ADTV) of the stock for the 4 calendar weeks preceding the week purchases are made.
- Once each week, on any day on which no other Rule 10b-18 purchases are made, the issuer may make a single block purchase (with no limit on the number of shares). "Block" for purposes of this rule is defined as a quantity of stock that has a purchase price of $200,000 or more, or is at least 5,000 shares and has a purchase price of at least $50,000. This block purchase is excluded from the 4-week average trading volume calculation.

**OTHER CONDITIONS:**

- The safe harbor is extended to after-hours trading sessions:
  - Purchases are limited to the lower of the closing price of the primary trading session in the principal market and any lower bids or sale prices subsequently reported in the consolidated system by other markets.
  - A different broker-dealer may be used for 10b-18 purchases than was used in the primary session.
  - The issuer may not purchase as the opening transaction in the after-hours session.
  - The issuer may repurchase securities until termination of the period in which the last sale prices are reported in the consolidated system.
- The safe harbor includes riskless principal purchase trades for the issuer that are analogous to agency trades where both legs are effected at the same price and only one leg is reported to the market.
- During a trading session immediately following a market-wide trading suspension, the issuer may purchase up to 100% of the security's ADTV.
- Purchases during pending mergers, acquisitions or similar transactions are not covered by the 10b-18 safe harbor with two exceptions related to when purchases are made and special volume limitations. There are other conditions applicable to these purchases.
- Issuers are required to make disclosures regarding repurchases in their 10-Q and 10-K filings.

## 14.12.6 Errors

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Error account<br>• Errors reported by traders |
| Frequency | • Weekly - error account<br>• As required - errors reported by traders |
| Action | • Review error account to ensure positions are closed out on a timely basis<br>• Recommend corrective action for errors, as needed<br>• Confer with traders with repeat errors, when necessary |
| Record | • Initials or signature and date of review (if applicable)<br>• Notate any action taken, if any |

Errors caused by traders must be immediately brought to the attention of the Head Trader or designee and resolved between the inventory account and the error account.

ALPINE_LIT169171

Applicable Rules: EDGA Rule 11.13, EDGE Rule 11.13, Nasdaq Rule 11890, Nasdaq OMX BX Rule 11890, Nasdaq OMX PHLX Rule 3312, NYSE-Arca Rule 7.10, NYSE Rule 128 and NYSE-Amex Rule 128

## 14.12.7 Clearly Erroneous Transaction Procedures

[FINRA Rule 11890 and 11892; NASDAQ Rule 11890; NASDAQ's Clearly Erroneous Transaction Policy page at: https://www.nasdaqtrader.com/trader/tradingservices/marketwatch/clearlyerroneous.stm]

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • • FINRA "Clearly Erroneous" transaction form<br>• Other market makers |
| Frequency | • • As required |
| Action | • • File the "Clearly Erroneous" transaction form with FINRA.<br>• Contact the contra-party<br>• Document the clearly erroneous transaction and steps taken to fix. |
| Record | • Initials or signature and date of review (if applicable)<br>• Notate any action taken, if any |

The FINRA and NASDAQ have established procedures for canceling trades executed through NASDAQ systems if those trades are "clearly erroneous." Rules should be consulted for details regarding procedures.

To qualify for these procedures, there must be an obvious error in the terms of the trade such as price, number of shares, identity of the security, *etc.* In general, the procedures include:

- Contact the contra party to rectify the error.
- File request online with NASDAQ Market Operations to cancel the order within specific timeframes:
  - For transactions occurring between 9:30 a.m. and 10:00 a.m. ET, complaints must be received by NASDAQ by 10:30 a.m. ET.
  - For transactions occurring prior to 9:30 a.m. ET and at or after 10:00 a.m. ET, complaints must be received within 30 minutes of execution.
- Review by a NASDAQ officer who makes a determination.

NASDAQ reviews all eligible clearly erroneous requests in non-NASDAQ-listed securities executed:

- before the primary market for the security posts an executable two-sided quote for its regular market trading session, and
- after 4:00 p.m. ET.

For unsuccessful appeals of Clearly Erroneous Rule 11890 adjudications, a fee is charged by NASDAQ.

## 14.12.8 Customer Order Errors

All errors in customer orders must be resolved immediately when discovered. Errors in customer accounts are documented on the Cancel and Rebill/Error Report form, which requires a designated supervisor's approval.

## 14.12.9 System Outages

ALPINE_LIT169172

[FINRA Notice to Members, December 2002 For Your Information]

System outages will be reported to the FINRA by phone. The Head Trader or designee is responsible for determining whether to report outages. Any time there is an outage it will be documented and kept on file with the Trading department.

### 14.12.9.1 Information To Be Reported

Information that will be reported includes the following:

- the date(s) the system problem occurred;
- the specific systems that were affected
- the exact nature of the problem (*e.g.,* complete outage, slow transmission times);
- the time the problem began;
- the time the problem was first detected;
- the time the problem was resolved and a brief description of the resolution;
- the level of activity impacted (*e.g.,* the approximate number of trades not reported) and a description of how the impact will be addressed (*e.g.,* trade reports to be submitted on an "as of" basis the next business day);
- contact name and telephone number; and,
- any additional information deemed relevant.

# 14.13 Distributions Of Securities

[SEC Regulation M; FINRA Rule 6435; FINRA Regulatory Notice 08-74; NASDAQ Rule 4619(e)]

| Responsibility | • Head Trader |
|---|---|
| Resources | • Notice from Syndicate Dept. of underwritings<br>• Requests to engage in passive market making<br>• Determination to enter a stabilizing bid<br>• Determination to enter a penalty bid and engage in syndicate short covering |
| Frequency | • As required |
| Action | • Determine whether passive market making will be conducted:<br>  o If yes, and Alpine is the manager of the underwriting, file the completed underwriting report with FINRA contemplated date and time of commencement of the restricted period no later than one business day prior to commencement of the restricted period<br>  o Notify trader when passive market making may be started or if market making must cease<br>  o Submit a request to FINRA to rescind the passive market making status of distribution participants and affiliated purchasers including the date and time of the pricing of the offering, the offering price, and the time the offering terminated (may be submitted on the Underwriting Activity Report)<br>• If passive market making will not be conducted, request an excused withdrawal and later rescind the request<br>• Determine, in consultation with Syndicate Department, whether stabilizing activities will be conducted:<br>  o Submit a request to FINRA of intent to enter a stabilizing bid<br>  o Send confirmation of the stabilizing bid by the close of the business day the stabilizing bid is entered; notification is sent to FINRA |

ALPINE_LIT169173

|  | • Prior to imposing a penalty bid or conducting syndicate covering transactions, provide written notice to FINRA Corporate Financing Department |
|---|---|
| **Record** | • Submissions to FINRA regarding the underwriting, stabilizing bids, passive market making, and any other required submissions |

## 14.13.1 Introduction

When Alpine is engaged in a distribution of securities and also acts as a market maker in those securities, Alpine must cease market making activities or comply with rules regarding "passive" market making. These requirements also apply to "reference" securities which are securities that affect the value of the security the subject of the distribution (*e.g.,* a common stock would be a reference security in relation to an offering of warrants dependent on the price of the common stock). Only NASDAQ securities that are the subject of a firm commitment, fixed-price offering are eligible for passive market making.

The approval of the Trading Manager is required prior to engaging in passive market making activities.

## 14.13.2 Overview Of Requirements

The following is a summary of key requirements and exemptions regarding passive market making.

- Securities with average daily trading volume (ADTV) of $1 million or more and a public float of at least $150 million are exempt from passive market making requirements.
- Alpine must notify the FINRA in writing prior to engaging in passive market making.
- The prospectus for the offering must include a disclosure that passive market making will take place.
- When engaged in passive market making, there are restrictions on quotations and limitations on purchases.

## 14.13.3 Restrictions When Passive Market Making Is Not Conducted

| **Responsibility** | • Head Trader |
|---|---|
| **Resources** | • Market making materials, company filings |
| **Frequency** | • As needed |
| **Action** | • When passive market making will not be conducted during the restrictive period and no exemption applies, Alpine will cease market making activities for 1 or 5 days prior to pricing and until Alpine completes participation in the distribution. When participation ends depends on Alpines role in the distribution<br>• Restricted periods are as follows:<br>   o No restriction for securities with ADTV of $1 million or more and a public float of at least $150 million<br>   o One business day restriction for securities with ADTV of at least $100,000 but less than $1 million and a public float of at least $25 million<br>   o Five business days for all other securities<br>• The trader is responsible for the following:<br>   o Request an excused withdrawal if Alpine will not engage in passive market making |

ALPINE_LIT169174

| | |
|---|---|
| | o  Obtain approval from the Trading Manager prior to engaging in passive market making<br>o  Ensure the requirements for passive market making are met including quotation and purchase limitations |
| **Record** | •  Filings, market making materials, quotation materials should all be used to document these instances. This will be kept on file with the Trading department. |

## 14.13.4 Withdrawal Of Quotations

[FINRA Rule 6275 and 6470; NASDAQ Rule 4619]

If Alpine is publishing a quotation in a security (subject to Regulation M Rules 101 or 102) on the ADF or for an OTC equity security and is acting as a distribution participant, affiliated purchaser, selling security holder, or issuer, the quotation will be withdrawn for the restricted period. An excused withdrawal request must be filed for quotations on the ADF; no request is required for OTC securities.

A notice of intent to be reinstated must be filed with NASDAQ. When NASDAQ confirms the market maker is reinstated, market maker obligations (NASDAQ Rule 4613) must be met within 10 minutes of reinstatement.

## 14.13.5 Stabilizing Bids

[SEC Regulation M Rule 104; FINRA Rule 6470; NASDAQ Rule 4614]

The following sections describe requirements when Alpine enters stabilizing bids when engaged in an underwriting of a NASDAQ security. Rule 104 of Regulation M should be reviewed for specific details.

### 14.13.5.1 Securities Subject To Requirements

Securities subject to FINRA rules regarding stabilizing activities include NASDAQ securities that are "subject" or "reference" securities under Rule 101 of Regulation M.

### 14.13.5.2 Other Limitations And Requirements

- Only one market maker in a security may enter a stabilizing bid.
- A stabilizing bid may not be entered unless there is at least one other market maker entering independent bids.
- The stabilizing bid applies to all freely tradeable outstanding securities of the same class being underwritten.
- Stabilizing bids will include a special identifier in the NASDAQ system.

### 14.13.5.3 Penalty Bids And Syndicate Covering Transactions

[FINRA Notice to Members 97-80; NASDAQ Rule 4624]

Penalty bids are entered to track sales in the market by syndicate members, and for which selling concessions will be withheld by the underwriter. Penalty bids cannot be entered through the NASDAQ workstation.

### 14.13.5.4 Transactions Related To Initial Public Offerings (IPOs)

[FINRA Rule 6130]

**ALPINE_LIT169175**

Traders are prohibited from executing an order for an exchange-listed security that is being sold in an IPO until the security opens for trading on the exchange.

# 14.14 Trade Reporting

[FINRA Rule 6000 series and 7000 series; FINRA Regulatory Notice 14-23, 11-40, 10-26, 09-21 and 09-08; FINRA Trade Reporting Frequently Asked Questions: http://www.finra.org/Industry/Regulation/Guidance/PO38942; FINRA Trade Reporting Notice September 23, 2011 "Trade Reporting Transactions in OTC Equity Securities and Restricted Equity Securities; FINRA Trade Reporting Notice September 23, 2011 "FINRA Reminds Firms of Their Trade Reporting Obligations Relating to Customer Sales of Low-Value OTC Equity Securities"; NASDAQ Broker-Dealer data: Equity Trader Alert 2009-33]

Other applicable rules: Regulatory Notices 07-38 & 09-54, FINRA Rules 7130, 7230A, 7230B, 7330, NYSE-Arca 7.16(a), SEC Rule 200(a)&(g), SEC Rule 203(b), TRF and/or ADF/TRACs Rules 6182 and 6624, Nasaq Rule 4755(a), Nasdaq OMX BX Rule 4755(a), FINRA Rule 7000 series, below NASDAQ Rule 3010, Rule 4755(a), Nasdaq OMX BX Rule 4755(a), Nasdaq PHLX Rule 3305(a), BATS-ZX Rule 11.19, BATS-YX Rule 11.19, NYSE-ARCA Rule 6.18, BATS –YX Rule 5.1, BATS –ZX Rule 5.1 and as noted below.

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • FINRA Compliance Report Cards<br>• FINRA ORF<br>• OATS: Daily Report Card, OATS records through OATS system<br>• OATS records provided by Flextrade, on behalf of Alpine<br>• CSS & Flextrade: Employee Trades, Family-Related Accounts, Volume by Security; Combined Executions for Unsolicited Orders; Combined Executions for Solicited Orders, Rejected Orders, Trade Blotter.<br>• Nasdaq Interactive Daily Trade Blotter |
| Frequency | • Monthly<br>• Daily for FINRA ORF<br>• OATS, weekly |
| Action | • Review report card and trade blotter for compliance with trade reporting requirements, including correct indicator for sales transactions (long, short or short sale, or short exempt) and mixed capacity trade reporting (if used), accurate use of trade modifiers and timely trade reporting<br>• Submit non-tape reports for the offsetting leg of a riskless principal transaction with the required Market Center information no later than the end of the trade day<br>• Review FINRA ORF and OATS for compliance with accurate reporting of related market center codes and timeliness of trade reporting<br>• Review FINRA ORF each day for unmatched trades or those reported incorrectly. Document as needed.<br>• Review a sampling of OATS reports (ROE Rejection Report, other OATS web interface data, FINRA Daily Report Card) against order records to ensure that OATS data is submitted accurately to OATS and to the TRF. Look for anomalies relating to proper reporting of order ID, Routed Order ID, other specific information up to and including the recording times of events in hours, minutes, seconds and milliseconds). Include review of records provided to OATS by Flextrade on behalf of Alpine<br>• Review order data for compliance with accurately identifying and reporting orders involving Alpine's capacity as riskless principal, principal or agency<br>• If upon review, an order is marked inaccurately, make a record and correct the transaction and report to the Head Trader as needed. Document the review and |

ALPINE_LIT169176

| | |
|---|---|
| | • escalation in the Traders folder of the S drive<br>• Take corrective action which may include consultation with the trader; additional education for the trader, and/or consult with the CCO regarding corrective action<br>• For trades reported by someone else: Contact the reporting agent regarding reporting discrepancies and determine what corrective action will be taken<br>• Initial (or sign) and date each document reviewed, store the review in the Traders folder of the S drive. |
| **Record** | • Trading Manager Checklist<br>• Order Blotter<br>• FINRA Compliance Report Cards<br>• FINRA ORF<br>• OATS records - Daily Report Card<br>• OATS records provided by reporting vendor, Flextrade<br>• Denote date of review (if applicable), reviewer's initials (or signature), and action taken, if applicable.These records may be retained electronically.<br>• Record of contact with third party reporting agent, if applicable. |

Alpine is obligated to report trades to a Trade Reporting Facility (TRF). The obligation to report depends on the security, the type of transaction (buy or sell), and the capacity in which Alpine executes the transaction. Alpine may act as Principal, Agent of Riskless Principal when executing transactions. Alpine reviews the OATS reports, the Order Blotter and other data to ensure the capacity is reported accurately. Transactions must be reported to a FINRA trade reporting facility unless transactions in eligible securities are reported on or through an exchange. Rules specify the latest time ("no later than _") by which a trade must be reported, but the obligation is to report "as soon as practicable," *i.e.,* without delay after execution or cancellation.

The following explains some terms and the rules that apply.

**FINRA (NASD) / NASDAQ TRF (formerly ACT):** The FINRA/NASDAQ Trade Reporting Facility (TRF) compares trade information and submits locked-in trades to NSCC and handles all NASDAQ trade reporting. NASDAQ execution systems such as NASDAQ Market Center have an automatic interface with the TRF that routes execution reports through the facility for reporting and comparison.

**FINRA/NYSE TRF:** For reporting NMS securities transactions executed away from an exchange

**OTC Reporting Facility:** For reporting transactions in OTC equity securities (non-exchange-listed securities and certain exchange-listed securities that do not qualify for real-time reporting). Transactions in foreign securities and direct participation programs (DPPs) are also reported to the OTC Reporting Facility.

**Clearing and comparison:** The Rule 7000 series explains requirements for clearing agency members and related trade reporting requirements. Some transactions, such as odd-lot transactions, are reported for clearing purposes and not for tape dissemination. Generally all trades (other than those specifically excluded) are required to be reported for clearing and regulatory transaction fee purposes.

More information about the firm's operational process relating to the review of related market center codes can be found in the section titled "*Trade Reporting – Related Market Center Codes*".

## 14.14.1 Trade Reporting Facility (TRF, formerly ACT)

Regulatory Notices 07-38 & 09-54, FINRA Rules 7130, 7230A, 7230B, 7330

ALPINE_LIT169177

TRF compares trade information and submits locked-in trades to NSCC and handles all NASDAQ trade reporting. NASDAQ execution systems such as NASDAQ Market Center have an automatic interface with the TRF that routes execution reports through the facility for reporting and comparison.

For information about Alpine's written supervisory procedures relating to Alpine's oversight of accurate reporting of related market center codes, refer to the section titled "*Trade Reporting*".

## 14.14.1.1 FINRA/NASDAQ Trade Reporting Facility: Key Requirements

[FINRA Rule 6300A series]

Some key requirements include the following:

- Executing parties are required to submit trades to the TRF no later than 10 seconds of execution. (If the TRF is unavailable, report to FINRA/NASDAQ Trade Reporting Facility Operations Department.) Trades not reported within 10 seconds are considered late, and a pattern of late reports may result in disciplinary action against the trader and/or the Firm.
- 10-second reporting also applies to stop stock and prior reference price trades. If the trade is executed within 10 seconds of the time the parties agree to the stop stock price, the stop stock modifier is not used. If the trade is executed within 10 seconds of the prior reference point in time, the prior reference price modifier is not used.
- All order records must be time-stamped at the time of execution based on Eastern Time.
- Required modifiers must be included with trade reports.
- Individual executions at the same price may not be aggregated into a single transaction report but must be reported individually. Aggregating reports is **only** permitted for clearing purposes.
- Time must be expressed in milliseconds when reporting trades if the Firm's system captures time in milliseconds.
- Reporting obligations include reporting cancellations of trades previously reported to the TRF. "Cancellations" are trades cancelled on the date of execution. "Reversals" occur when trades are cancelled on a day after the date of execution. The member responsible for submitting the original trade report must submit the cancellation report. Cancelled trades may be reported as follows:
    - If cancelled during normal market hours, report no later than 10 seconds after cancellation
    - If canceled after 4 p.m. ET and before the TRF closes, use best efforts to report on the date of execution, otherwise report on the following business day
    - If canceled after the TRF closes, report on the following business day
    - Reversals must identify the original trade including the control number generated by the reporting facility and report date for the original trade report.

Please note: The effective date for ADF and TRFs (millisecond reporting) has been extended to November 10, 2014. It is likely that the effective date may be extended again to 2015.

## 14.14.2 OTC Reporting Facility: Key Requirements

[FINRA Rule 6622]

Regulatory Notices 07-38 & 09-54, FINRA Rules 7130, 7230A, 7230B, 7330

Some key requirements include the following:

- Trade reports must be transmitted as soon as practicable but no later than 10 seconds after execution during normal market hours; trades must be reported without delay after execution.
- The executing party always reports unless, where it is not clear which firm is the executing party responsible for trade reporting (*e.g.,* manually negotiated trades between two members via the telephone), the sell-side reports unless both parties agree otherwise in which case the sell-side must document the agreement.

ALPINE_LIT169178

- Required modifiers must be included with trade reports.
- Time must be expressed in milliseconds when reporting trades if Alpine's system captures time in milliseconds.
- Reporting obligations include reporting cancellations of trades previously reported to the Reporting Facility. "Cancellations" are trades cancelled on the date of execution. "Reversals" occur when trades are cancelled on a day after the date of execution. The member responsible for submitting the original trade must submit the cancellation report. This includes trades reported for public dissemination that do not clear and settle. Cancelled trades may be reported as follows:
    o  If cancelled during normal market hours, report no later than 10 seconds after cancellation
    o  If canceled after 4 p.m. ET and before the TRF closes, use best efforts to report on the date of execution, otherwise report on the following business day
    o  If canceled after the TRF closes, report on the following business day
    o  The 10-second reporting requirement also applies to stop stock and prior reference price trades; manual orders are also included in the requirement though the complexity and manual nature of the trade may necessitate a longer timeframe
    o  Reversals must identify the original trade including the control number generated by the reporting facility and report date for the original trade report.
- Transactions in restricted equity securities traded pursuant to SEC Rule 144A must be reported to the OTC Reporting Facility no later than 8 p.m. ET. Transactions in these securities executed between 8 p.m. ET and midnight must be reported the following business day (T 1) by 8 p.m.

For information about Alpine's written supervisory procedures relating to Alpine's oversight of accurate reporting of related market center codes, refer to the section titled "Trade Reporting".


## 14.14.2.1 Other Requirements

[FINRA Trade Reporting Notice September 23, 2011 "Trade Reporting Transactions in OTC Equity Securities and Restricted Equity Securities"; FINRA Trade Reporting Notice September 23, 2011 "FINRA Reminds Firms of Their Trade Reporting Obligations Relating to Customer Sales of Low-Value OTC Equity Securities"]

- If a reportable trade is for a security that does not have a valid symbol at time of execution, Alpine is obligated to obtain a symbol to fulfill reporting obligations.
- OTC trades in restricted equity securities under Securities Act Rule 144A must be reported. If necessary, contact the CCO or designee to determine whether a security would be considered restricted. Transactions in restricted equity securities that are NOT effected under Rule 144A are NOT reportable.
- Sales of "worthless" securities as an accommodation to customers are reportable. (Sometimes these positions are not sold on a per-share basis but may be sold for one penny or one dollar ["penny for the lot" transaction].)
- Non-business day trades and T+365 trades are reported electronically to the FINRA reporting facilities. Non-business day trades are reported on an as/of basis by 8:15 a.m. the next business day following execution with a unique trade modifier denoting execution outside normal market hours (trades not reported by 8:15 a.m. are marked late). T+365 trades are reported on an as/of basis and marked late.
- Where both sides submit a clearing-only report to effectuate a step-out, both sides must report a step-out or step-in depending on their role.


## 14.14.2.2 Trade Reporting – Related Market Center Codes

The Head Trader or designee is responsible for compliance with accurate reporting of related market center codes and the timely reporting by the end of the trade day (as it relates to non-tape reports only).

Certain over-the-counter (OTC) equity transactions (including OTC transactions in NMS stocks and OTC equity securities, such as OTC Bulletin Board and Pink Sheets securities) are reported to FINRA in related tape and non-tape reports.

ALPINE_LIT169179

E.g. a riskless principal transaction can be submitted to FINRA as a single tape report properly marked as riskless principal, or

as two separate reports: (1) a tape report to reflect the initial leg of the transaction and (2) a non-tape report to reflect the

offsetting, "riskless" leg of the transaction.

Agency transactions in which a firm acts as agent on behalf of another member firm also are reported in related tape and non-tape reports. Under FINRA rules, firms **are not required** to submit related tape and non-tape reports to the same FINRA Facility for such riskless principal and agency transactions.

Because a non-tape report provides no specific information linking it to a related tape report, it is difficult for FINRA to determine with certainty where the associated trade was reported, especially if that trade was reported through an exchange or to another FINRA Facility Firms must identify the Related Market Center (RMC) in any non-tape report (either a non-tape, non-clearing report or clearing-only report) submitted to a FINRA Facility associated with a previously executed trade that was not reported to that same FINRA Facility.

Alpine is required to retain and produce to FINRA, upon request, documentation relating to the associated trade (e.g., a confirmation from the exchange identifying the "street side" of a riskless principal transaction).

E.g., if the initial leg of a riskless principal (or agency) transaction is executed on and reported through Exchange A and a firm

submits a non-tape report for the offsetting leg of the transaction to a FINRA Facility, the non-tape report must include the unique

indicator to identify Exchange A as the Related Market Center.

E.g.2., if the initial leg is executed OTC and reported to TRF A and a firm submits a non-tape report for the offsetting leg to

another FINRA Facility, the non-tape report must include the unique indicator to identify TRF A as the Related Market Center.

E.g.3., if, the initial leg is executed on and reported through a foreign exchange and a firm submits a non-tape report for the

offsetting leg to a FINRA Facility, the non-tape report must include the unique indicator to identify "foreign exchange" as the

Related Market Center. When a firm submits a non-tape report to FINRA, the firm should have an affirmative basis to believe the

underlying transaction has been properly reported to the tape, and FINRA expects firms to provide as much information pertaining

to the Related Market Center as is available at the time the non-tape report is submitted.

Firms have until the end of the day on trade date to submit non-tape reports with the required Related Market Center information, unless a shorter reporting time is required under other FINRA rules. The submission of non-tape reports is not subject to the 90-second reporting requirement under FINRA trade reporting rules

Each Trader is responsible for using the correct code when executing a transaction. The RMC can be found in the dropdown of the Order Management System's (OMS) execution screen (see below for a list of Related Market Center Codes).

ALPINE_LIT169180

After the execution and report are made, each Trader is responsible for ensuring the correct RMC was used on the report. If any incorrect reports are made, the Head Trader or designee is required to document the issue and denote the corrective action taken in the "Traders" folder of the S drive under "Incorrect Reports."

**Related Market Center Code Lists**

| Q | NASDAQ Exchange trade |
|---|---|
| N | New York Stock Exchange trade |
| A | NYSE MKT trade |
| B | NASDAQ BX trade |
| I | International Securities Exchange trade |
| M | Chicago Stock Exchange trade |
| P | NYSE ARCA trade |
| W | Chicago Board Options Exchange trade |
| X | NASDAQ PSX trade |
| O | Unknown Market Center |
| U | Unspecified Multiple Market trades |
| 0 | ADF |
| 1 | FINRA/NASDAQ TRF |
| 3 | FINRA/NYSE TRF |
| F | Foreign Market |
| H | BATS Exchange trade |
| G | BATS Y Exchange trade |
| J | Direct Edge A Exchange trade |
| K | Direct Edge X Exchange trade |

The process outlined above is the operational process to review for compliance with accurate reporting of related market center codes. Refer to the section titled "*Trade Reporting*" for the associated written supervisory procedure concerning the same.


## 14.14.2.3 Mixed Capacity Trading And Allocation Of Executions

[FINRA Notice to Members 01-85]

When executing orders, transactions may be reported on a mixed capacity basis. Market makers are permitted to combine different types of orders (agent, riskless principal and/or principal) in a single quote. While orders should be marked correctly for trading capacity at time of entry into the NASDAQ system, when acting in a mixed capacity adjustments may be made post-execution to reflect the capacity of individual orders.

When orders are combined and all or part of them are executed, it is necessary to allocate the executions in a manner fair to all customers. Executions will be allocated using the following methodology:

- First In, First Out (FIFO) for same priced orders

Allocation procedures will be reviewed periodically in best execution reviews. Records will be retained of the original orders received including time of entry and capacity, execution time and allocation among orders, and capacity reported to the TRF.


## 14.14.3 "Step-in" And "Step-out" Trades

For a "step-out" trade one firm is stepping out of (or transferring) the position and the other firm is stepping into (or receiving) the position. An order may be executed entirely by one broker-dealer that gives credits or commissions to other firms for portions of the trade, or executed by several broker-dealers that are each

ALPINE_LIT169181

assigned portions of the trade by another broker-dealer. Each BD receives credits or commissions for the share of the trade that it executes.

Where both sides are submitting a clearing-only report to effectuate a step-out, the firm transferring out of the position must report a step-out and the firm receiving the position must report a step-in. FINRA facilities that offer matching, such as the OTC Reporting Facility, will match corresponding step-out and step-in submissions but will not match two step-in or two step-out submissions. Step-out and step-in reporting is not used for reporting riskless principal or agency "flip" transactions, both of which involve a change in beneficial ownership.

### 14.14.3.1 Prohibition Against Aggregating (Bunching) Orders

[FINRA Rule 6380A(f)]

Individual executions of orders in a security at the same price may not be aggregated (bunched) into a single transaction report for tape purposes.

For trades not printed to the tape, and for clearing purposes only, individual executions in a security at the same price with the identical contra party may be bunched and submitted as a single report to the TRF.

## 14.14.4 Prohibition Against Delayed Trade Reporting - SEC 21(a) Report

Alpine is prohibited from improperly delaying trade reporting for its own benefit or for the benefit of another market maker. Traders are required to report trades in compliance with trade reporting rules.

## 14.14.5 Riskless Principal Transactions

[FINRA Rule 6380A(d)(3)(B)]

Traders should be aware of the requirements for reporting riskless principal transactions. A "riskless principal transaction" is defined as a trade in which Alpine, after having received an order to buy or sell a security, buys or sells the security at the same price, as principal, in order to satisfy the order to buy or sell. The reporting requirements apply whether or not Alpine is acting as a market maker, and also applies to third market transactions.

Riskless principal transactions may be reported using either of two methods, which are summarized below. Notice to Members 00-79 should be consulted for details regarding proper trade reporting. Riskless principal transactions may be reported using the:

- *Original approach:* Submit a last sale report marked "riskless principal" for the initial leg of the transaction and do not report the offsetting transaction with the customer; OR
- *Alternative approach:* Submit a last sale report marked "principal" for the initial leg of the transaction and submit a non-media, non-tape report (or a clearing-only report) marked "riskless principal" for the offsetting, riskless portion of the trade. To use this alternative approach, specific reports must be submitted to the TRF. See FINRA Notice to Members 00-79 for further explanation and examples of the reporting requirements.

## 14.14.6 Transactions And Transfers Not Requiring Reporting

[FINRA Rule 6282(i), 6380A(e), 6380B(e) and 6622(e)]

The following transactions and transfers are not subject to reporting requirements:

ALPINE_LIT169182

- Transactions that are part of a primary distribution (as defined under Rule 100 of SEC Regulation M) by an issuer or of a registered secondary distribution (other than "shelf distributions") or of an unregistered secondary distribution;
- Transactions made in reliance on Section 4(2) of the Securities Act;
- Transactions reported on or through an exchange;
- The acquisition of securities by a member as principal in anticipation of making an immediate exchange distribution or exchange offering on an exchange;
- Purchase of securities off the floor of an exchange pursuant to a tender offer;
- Transfers of securities made pursuant to an asset purchase agreement (APA) that is subject to the jurisdiction and approval of a court of competent jurisdiction in insolvency matters, provided that the purchase price under the APA is not based on, and cannot be adjusted to reflect, the current market prices of the securities on or following the effective date of the APA; and
- The transfer of equity securities for the sole purpose of creating or redeeming an instrument that evidences ownership of or otherwise tracks the underlying securities transferred (*e.g.,* an American Depositary Receipt or exchange-traded fund).

The following are not reported for publication purposes but are reported for regulatory transaction fee assessment purposes:

- Transactions where the buyer and seller have agreed to trade at a price substantially unrelated to the current market for the security;
- Purchases or sales of securities effected upon the exercise of an option pursuant to the terms thereof or the exercise of any other right to acquire securities at a pre-established consideration unrelated to the current market; and
- Transfers of proprietary securities positions between a member and another member or non-member broker-dealer where the transfer (1) is effected in connection with a merger of one broker-dealer with the other broker-dealer or a direct or indirect acquisition of one broker-dealer by the other broker-dealer or the other broker-dealer's parent company and (2) is not in furtherance of a trading or investment strategy. Alpine must provide FINRA at least three business days advance written notice of its intent to use this exception, including the basis for determination that the transfer meets the terms of the exception.

## 14.14.7 Short Sales

Procedures are included in Chapter 12.20: ORDERS.

## 14.14.8 Review Of Trade Modifiers

The supervisor set forth in Chapter 13.11 is responsible for periodically reviewing order records for proper use of modifiers reported on trades.

## 14.14.9 Obligation To Provide Accurate Information To The Marketplace

[FINRA Rule 2110; FINRA Notice to Members 06-50]

| Responsibility | • Head Trader set forth in Chapter 1 |
|---|---|
| Resources | • Information provided to service providers |
| Frequency | • Monthly |
| Action | • If errors are found:<br>  o Consult with individual responsible for sending the information |

ALPINE_LIT169183

| | o   Determine what corrective action is necessary including referring the individual to compliance for training/consultation; disciplinary action; publishing corrected data |
|---|---|
| **Record** | •   Notation of review on records used to verify accuracy of published information with corrective action, if any |

If Alpine provides information about its trading volume and trading interest to service providers for dissemination, the information must be accurate and not misleading.

## 14.14.10 Order Audit Trail System (OATS)

OATS reporting procedures are included in Chapter 12.22: *ORDERS*.

## 14.14.11 Trade Reporting By Third Parties

[2007 Member Alert: Notice to All TRF, ADF and Other FINRA Facility Participants Regarding AGU and QSR Relationships]

| **Responsibility** | •   Head Trader or designee |
|---|---|
| **Resources** | •   Transaction data<br>•   FINRA compliance report cards<br>•   NASDAQ Daily Trade Blotter |
| **Frequency** | •   Monthly |
| **Action** | •   Execute agreement with third party<br>•   Review trade data and compliance reports to determine accuracy of third party reporting<br>•   If errors are noted:<br>    o   Confer with the third party regarding what corrective action will be taken to prevent future errors<br>    o   If errors persist, consider changing third party reporting agents |
| **Record** | •   Transaction data and reports reviewed (including date reviewed, who reviewed, action taken) |

When a third party is used for reporting trades, whether under an Automated Give Up (AGU), Qualified Service Representative (QSR) or other arrangement, the third party's reporting will be periodically reviewed for accuracy.

# 14.15 Other Reports

## 14.15.1 Short Interest Report For NASDAQ Securities

Alpine is obligated to file a semi-monthly short interest report with the FINRA for all short customer and proprietary positions in NASDAQ securities. Refer to the section *Short Interest Report* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES* for procedures regarding the filing of this report.

ALPINE_LIT169184

### 14.15.1.1 Disclosure Of Order Executions

[SEC Regulation NMS Rule 605; SEC FAQS Regulation NMS Rule 605: http://www.sec.gov/divisions/marketreg/nmsfaq605.htm]

| Responsibility | • Head Trader as set forth in Chapter 1.1 |
|---|---|
| Resources | • Market making trade data |
| Frequency | • Monthly - publish data<br>• Quarterly - monitor vendor/third party publication of reports, if applicable<br>• As required - identify exemption that applies from reporting requirement<br>    o Quarterly - review availability of exemption |
| Action | • Collect data and publish order execution report on the internet<br>• Download data to the Designated Participant<br>• If a vendor or other third party is used to publish reports, monitor for publication and accuracy of data<br>• If the Firm qualifies for a reporting exemption, document the exemption and monitor the continued availability of the exemption |
| Record | • Copies of monthly order execution reports<br>• If an exemption applies, document exemption and monitoring of continued application |

### 14.15.1.2 Introduction

As a market maker in NASDAQ Global Market (NGM) securities, Alpine is required to publicly publish information on the quality of order executions by "market centers" (market makers, exchange specialists, stock exchanges, NASDAQ, and alternative trading systems [ATSs]). Reports are published on the internet monthly, by the end of the month following the calendar month reported. The Rule was adopted by the SEC to enhance market transparency and foster competition among market participants.

### 14.15.1.3 Orders Included In The Report

The monthly report includes all market orders in NGM securities. In addition, limit orders are included in the report. Orders that require "special handling" such as not held orders, short sales, and other orders that are not immediately executable when entered to the market are not reported.

### 14.15.1.4 Downloading Data To A Designated Participant

SROs joined in a plan to publish SRO market center data. In addition to publishing Alpine's report, Alpine is obligated to download its data on a quarterly basis to a "Designated Participant" in the plan. Alpine provides its OTC market making data to the FINRA in compliance with this requirement.

## 14.16 Time Clock Synchronization

[FINRA Rule 7430; NASDAQ Rule 6953; OATS FAQs: http://www.finra.org/Industry/Compliance/MarketTransparency/OATS/FAQ/P085544]

ALPINE_LIT169185

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Clock Synchronization report from Flextrade |
| **Frequency** | • Daily |
| **Action** | • Review report to determine if there were any variations outside of the 50 millisecond timeframe.<br>• Take corrective action for failure to synchronize clocks which may include: repair or replacement of clocks (for mechanical failure); additional training of personnel; or other appropriate action in consultation with the CCO<br>• Initial and store report in Traders folder of the S drive in the subfolder (Clock Sync Reports) |
| **Record** | • Clock Synchronization failures are recorded via initial or signature, date and any action items taken, if any, on the OTC Trading Manager Checklist |

Under FINRA rules, all time clocks (computer system or mechanical) used for recording date and time of orders must be synchronized to ensure the accuracy of recorded time. The following procedures are to be followed to synchronize clocks used to record order entry and execution times:

- All clocks must reflect Eastern Time (Daylight or Standard, depending on time of year).
- Clocks that have not been checked according to these procedures must **not** be used for recording order information.
- All clocks will be synchronized with the National Institute of Standards and Technology (NIST) system clock **each business day.**

- o prior to the opening; and
- o at least once during the trading day (target time: 12:00 p.m. Eastern Time).

- Failure to conduct required synchronization may result in disciplinary action.

Alpine uses two vendors (Flextrade and CSS Hosted Solutions, LLC) to ensure that the time-stamps placed on orders and reported to the industry entities are accurate.

Flextrade's ColorPalette uses "Domain Time II" for clock synchronization on production servers, along with internal NTP servers and third party global atomic time servers. Domain Time is an agent based application that has been installed on all ColorPalette servers at FlexTrade. The Domain Time agent is configured to update the system time every five minutes from the FlexTrade Domain Time Server. The FlexTrader Domain Time Server is configured to synchronize every forty five minutes with FlexTrade Network Time Protocol ("NTP") servers. The NTP servers are configured to synchronize with global atomic time servers every fifteen minutes.

CSS Hosted Solutions, LLC (a service bureau) utilizes a Network Time Server that references a GPS Time Server to maintain an accurate time. Additionally, a utility called "TimeSync" is installed on all Domain Controllers. TimeSync runs as a Windows® service and provides options to control the synchronization process more precisely than the standard built-in Windows Time Service. The following options are used with the TimeSync Service:
• /adjust: A gradual clock adjustment to make up for any small deviations.
• /max_deviation: The maximum tolerated deviation (10 minutes). If the time is over this value then it will NOT be changed and a faulty clock source will be assumed. This prevents the introduction of a bogus time to the systems.
• /nt_machine: Specifies the Top-Level Domain Controller to use as the time reference for all other Domain Controllers.

ALPINE_LIT169186

### 14.16.1 Independent Contractors

If an independent contractor immediately transmits orders to the trading department, either electronically or manually, the independent contractor is not required to maintain a separate synchronized clock. If there is any delay in transmitting the order, however, the contractor must maintain a synchronized clock.

## 14.17 Prohibited Activities

[NASDAQ FAQs on business conduct: http://www.nasdaqtrader.com/Content/FAQBusinessConductGuidelines.pdf]

### 14.17.1 Acting To Benefit Alpine vs. The Customer

Alpine and its traders may not act to benefit Alpine or other market makers to the detriment of customers. It is incumbent on all employees to recognize that our reputation and relationships with customers are dependent on providing a high level of service consistent with Alpine policy and regulatory requirements. Traders will be supervised by the Head Trader and Firm Principals to ensure compliance with this section.

### 14.17.2 Anti-Competitive And Anti-Trust Procedures

[SEC 21(a) Report; FINRA Rule 5240; NASDAQ IM 2110-5]

The following sections address prohibited anti-competitive activities of broker-dealers.

### 14.17.2.1 Anti-Competitive Activities

| Responsibility | • Head Trader |
|---|---|
| Resources | • N/A |
| Frequency | • Ongoing - observation of activities<br>• Annual - training and certification |
| Action | • Observe traders to identify prohibited anti-competitive activities as follows:<br>• Listen to traders' conversations with other broker-dealers on a spot-check basis<br>• If appropriate, take corrective action which may include:<br>   o Consultation with the trader regarding nature of conversation and potential prohibited activity<br>   o If necessary, consultation with Compliance regarding corrective action<br>• Conduct annual compliance meeting to discuss the prohibition against anti-competitive activities<br>• Provide new traders with a copy of Alpine's OTC market making policies<br>• Obtain annual written certification from all traders |
| Record | • Trading Manager Checklist<br>• Trader Annual Certification |

Traders may not engage in activities that may constitute collusion between broker-dealers to fix prices or spreads. Examples of such activities may include the following:

ALPINE_LIT169187

**Agreeing with another market maker to:**

- adhere to a "quoting convention" (an agreement or common understanding among market makers regarding the manner in which bids and asks would be displayed on NASDAQ)
- fix, raise, lower, or maintain quotes or prices
- fix, increase, decrease, or maintain a spread or size of quote increment
- adhere to any understanding or agreement (other than those relating to one or a series of related trades) requiring a market maker to trade in quantities of shares greater than required or displayed, whichever is greater

**Engaging in harassment or intimidation of any other market maker (whether written, electronic, by phone, or in face-to-face communications) for:**

- decreasing dealer or inside spreads
- refusing to trade in quoted prices in quantities of shares greater than required or displayed, whichever is greater
- displaying a quantity of shares on NASDAQ in excess of the minimum size required by NASDAQ or FINRA rules

**Refusing, or threatening to refuse to trade, (or agree with or encourage any other market maker to refuse to trade) with any market maker at Alpine's published NASDAQ quotes up to the published quotation size because the other market maker decreased its dealer spread or the inside spread in any NASDAQ security, or refused to trade at its quoted prices in a quantity greater than required or displayed.**

**In addition traders may not, for the purpose of violating these prohibitions, exchange with other market makers confidential, proprietary information which may include:**

- information concerning customer orders, including order size and the identification of the customer
- information concerning inventory positions, trading strategies, and intended future quotations

## 14.17.2.2 Obligation To Report

Traders are obligated to report to the trading manager any threats, coercion, or other prohibited activity of which they become aware.

## 14.17.2.3 Antitrust Procedures

| Responsibility | • Head Trader |
|---|---|
| Resources | • Anti-Trust Certification |
| Frequency | • Annually |
| Action | • • At least annually, Alpine's Antitrust Activities policy (as well as other policies included in this chapter) will be reviewed with OTC traders in a compliance meeting conducted for that purpose.<br>• Traders will be provided with a written copy of Alpine's OTC market making policies.<br>• Traders will be required to certify, in writing, that they have received and reviewed these policies. |
| Record | • Topics covered, list of attendees, participation dates for the meeting |

ALPINE_LIT169188

| | |
|---|---|
| | • Trading Manager Checklist with evidence of review, signature or initial of reviewer and any action steps taken, if any<br>• Trader Annual Certification with evidence of review, signature or initial of reviewer and any actions steps taken, if any |

## 14.17.3 Unauthorized Trading

[SEC National Examination Risk Alert: http://www.sec.gov/about/offices/ocie/riskalert-unauthorizedtrading.pdf; FINRA Regulatory Notice 08-18]

| | |
|---|---|
| **Responsibility** | • Head Trader or designee |
| **Resources** | • Order records |
| **Frequency** | • Daily - review of orders/positions<br>• As required - training of traders and supervisory personnel |
| **Action** | • Maintain a supervisory structure that promotes oversight and compliance which may include:<br>    ○ Reporting lines that facilitate independent reviews and monitoring<br>    ○ Balance of compensation/incentives relating to level of responsible risk-taking<br>    ○ Disaggregation of functions performed by one trader or desk<br>    ○ Limit access to trading systems only to those authorized access including blocking access, when appropriate, when an employee changes positions within [The Firm]<br>• Review of orders/positions<br>    ○ Contact with traders about portfolios and account positions, particularly anomalies to normal trading<br>    ○ Reviews of extended settlement trades or customer or firm positions that appear to have excessive roll overs. Contact the customer or account contact, if appropriate, to confirm authorization of the transaction<br>    ○ Independent trading reviews to check on a trader's strategies and performance and reviews of business performance and risk profile<br>    ○ Review of consolidated transaction information when multiple systems are used as various components of transactions<br>    ○ Trading limit breaches<br>    ○ Sizeable unrealized profit/loss on unsettled transactions<br>    ○ Unusual patterns of cancellations and corrections (particularly those involving multiple cancellations or corrections by the same trader or involving the same counterparty)<br>    ○ Settlement outside normal cycles or that do not occur on a timely basis<br>    ○ Aged unresolved reconciling items and aged outstanding confirmations<br>    ○ P&L that exceeds certain de minimis amounts by traders who are supposed to be flat or unusual large one-day P&L reports<br>    ○ Details underlying a trader's Value at Risk (VaR); liquidity risk; adequacy of hedges and risks of imperfect hedges (including understanding and reviewing valuation of all positions, particularly positions in exotic instruments or instruments that have little or no market)<br>    ○ Repeated or unusual requests for exceptions to position or P&L limits<br>    ○ Trading in products where the trader is not approved and is outside the trader's expertise<br>    ○ Pattern of aged fails to delivery for long or short sales<br>    ○ Any other unusual or significant deviations from normal trading patterns |

ALPINE_LIT169189

| | |
|---|---|
| | • Training of traders, supervisors, and other personnel<br>    ○ Training of traders and supervisors regarding complex products and strategies<br>    ○ Training of operations staff on receipt of confirmation acknowledgments and when to escalate issues<br>• Testing of firm controls meant to detect unauthorized trading<br>    ○ Conducted by Compliance, Internal Audit, or technology personnel as part of the review of systems and [The Firm]'s business |
| **Record** | • Compensation, supervisory reporting, assignment of trading responsibilities, and authorized/unauthorized access to systems records<br>• Review of orders and positions including notations of when reviewed, who reviewed, and action taken, if any<br>• Training of traders, supervisors, and operations personnel including when conducted, training content, and who was subject to training |

Traders are prohibited from engaging in unauthorized trading which may include the following:

- Unauthorized trading in customer or proprietary accounts
- Trading in excess of firm limits on position exposures, risk tolerance, or losses
- Trading in products/securities where the trader is not authorized
- Purposeful mismarking of positions
- Fabricating nonexistent transactions through the creation of false records
- Accessing trading systems where the trader does not have authorized access
- Sharing access with non-authorized employees

Traders should contact the trading supervisor, Compliance, or other supervisor if there are questions or concerns regarding trading activity, strategies, positions, or other trading issues.

## 14.17.4 Expiration And Rebalance Days

[NASDAQ Head Trader Alert 2006-030]

At the time of quarterly expiration of options and futures based on the NASDAQ-100, S andP 500 and S and P 400, traders must avoid behavior that FINRA considers potentially manipulative activity at or near market open or close including the following:

- Failure to append the appropriate trade reporting modifiers
- Failure to upgrade technology
- Other potentially manipulative activity affecting opening or closing prices

## 14.17.5 Other Prohibited Activities

[FINRA Rule 6140]

| | |
|---|---|
| **Responsibility** | • Head Trader |
| **Resources** | • Observation of traders' activities |

ALPINE_LIT169190

| | • Review of order records |
|---|---|
| **Frequency** | • Ongoing |
| **Action** | • Review for patterns or transactions that may indicate:<br>    ○ Marking the opening<br>    ○ Marking the close<br>    ○ Multiple transactions that may indicate painting the tape<br>    ○ Purchases and sales between related accounts at little or no market price difference (wash sales)<br>• Take corrective action depending on the nature of the prohibited activity and/or consult with Compliance |
| **Record** | • Order records including notations of action taken<br>• Trading Manager Checklist |

## 14.17.5.1 Payments For Market Making

[FINRA Rule 5250 and 6432(b); FINRA Regulatory Notice 14-26; NASDAQ Rule 2460]

Alpine and its traders are prohibited from accepting monetary payment or other consideration (such as receiving shares of stock), directly or indirectly, from an issuer (or anyone on behalf of an issuer) for publishing a quotation, acting as a market maker, or submitting an application to quote or act as a market maker (Form 211). The Head Trader is responsible for ensuring Traders do not perform these prohibited actions or receive monetary compensation for attempting to perform said prohibitions.

This prohibition does **not** apply under the following circumstances:

1. payment for bona fide services including, but not limited to, investment banking services (including underwriting compensation and fees);
2. reimbursement of any payment for registration imposed by the SEC or state regulatory authorities and for listing of an issue of securities imposed by a self-regulatory organization; and
3. any payment expressly provided for under the rules of a national securities exchange that are effective after being filed with, or filed with and approved by, the SEC pursuant to the requirements of the Exchange Act.

Alpine is required to certify on Form 211 that neither Alpine nor its associated persons have accepted or will accept any payment or other consideration, directly or indirectly, from the issuer of the security to be quoted, or any affiliate or promoter, for publishing a quotation or acting as market maker in the security to be quoted.

## 14.17.5.2 Inside Information

Traders are prohibited from acting on, passing on, or discussing any inside information. Any knowledge of such information must be brought to the attention of the designated supervisor and Compliance. No Alpine proprietary account or employee account may enter a transaction based on material non-public information about the issuer of that security.

## 14.17.5.3 Financial Arrangements

| **Responsibility** | • Head Trader or designee |
|---|---|

ALPINE_LIT169191

| | |
|---|---|
| **Resources** | • Observation of traders' activities<br>• Annual Certification |
| **Frequency** | • Ongoing<br>• Annually (with respect to certification) |
| **Action** | • Have traders certify annually that they have not made any financial arrangements with customers or issuers |
| **Record** | • Date of review, reviewers name, signature or initial and notation as to any action steps taken, if any<br>• Trading Manager Checklist, date of review, reviewers name, signature or initial and notation as to any action steps taken, if any |

Traders are prohibited from entering into financial arrangements with customers or issuers (*i.e.*, sharing in profits or losses, sharing in commissions, rebating commissions, *etc.*). The Head Trader or designee will monitor the actions of the Traders to ensure the Traders do not enter into such financial arrangements.

#### 14.17.5.4 Market Manipulation

[SEC Securities Exchange Act of 1934 Rule 10b-5; FINRA Rule 5210; NASDAQ Rule 2120, 3310 and 3351]

No purchase or sell order may be entered that is designed to raise or lower the price of a security or to give the appearance of trading for purposes of inducing others to buy and sell. Examples of such practices may include:

- **Marking the opening or close:** One or more trades are executed or falsely reported at or near the opening or close of trading with the intention of affecting the opening or closing price of the security.
- **Prearranged trading:** Trading designed to give the appearance of trading activity where there is a prior agreement to buy back the stock at a pre-determined price. Only *bona-fide* stock options or repurchase agreements are permitted where a future price is guaranteed.
- **Painting the tape:** Entering false trades to give the appearance of trading activity.
- **Wash sales:** Purchases and sales between accounts where there is no change in beneficial owner (example: an individual selling to their own IRA account) and where there is no market risk.

### 14.17.6 Self-Preferencing
Alpine may not trade for its own account ahead of a customer's limit order at the same or better price.

### 14.17.7 Parking Securities
No arrangement may be used to conceal the true ownership of securities through a fictitious sale or transfer to an accommodator who agrees to later sell or transfer the securities to the true owner (or his agent) at the agreed upon time at essentially the same terms.

### 14.17.8 Interpositioning
A trader may not interpose Alpine or any account or any other dealer between a customer order and the best available market.

ALPINE_LIT169192

### 14.17.9 Secret Profits

A trader may not permit the charging of a markup or markdown in addition to a commission on any transaction.

### 14.17.10 Adjusted Trading

Adjusted trading or "overtrading" is a prohibited practice that involves the sale of a security by a customer for a price above the prevailing market price and the simultaneous purchase of a different security at a price lower than the prevailing market price. The purpose of an adjusted trade usually is to assist a customer in avoiding, disguising, or postponing losses.

Other scenarios of adjusted trading include:

- permitting a customer to sell a security at an inflated price and re-selling the security to another customer at the inflated price
- interpositioning the broker-dealer between two customers where the broker-dealer acts as a conduit allowing the two customers to "swap" losing positions by paying an inflated price for each other's securities

All transactions must be executed at prices reasonably related to current market prices.

#### 14.17.10.1 Supervision Relevant to Prohibited Activities

| Responsibility | • Head Trader or designee |
|---|---|
| Resources | • Observation of traders' activities<br>• Annual Certification |
| Frequency | • Ongoing<br>• Annually (with respect to certification) |
| Action | • Actively monitor the actions of each Trader to ensure that no prohibited activities listed within section 13.16 are entered into by Traders of Alpine.<br>• Upon becoming aware of prohibited activities performed by a Trader, the head trader or designee shall take immediate action to notify the Firm Principals and undertake the appropriate disciplinary action.<br>• Traders will be trained on all prohibited activities and will be monitored to ensure adherance to all relevant rules and regulations . |
| Record | • Where applicable, retain topics, list of attendees and training dates<br>• Record actions where a prohibited activity has occurred, including the date of review, reviewer's name, signature or initial and notation as to any action steps taken, if any |

## 14.18 Books And Records

[FINRA Rule 4510; NASDAQ Rule 4510A]

FINRA Rule 4510, NASDAQ Rule 4510A and SEC Rule 17a-3

The following summarizes records that are to be retained in the OTC Trading area. The Head Trader or designee is responsible for establishing files and retaining required records, unless procedures identify another person or department responsible for OTC trading records.

ALPINE_LIT169193

| Type of Record | Period of Retention |
|---|---|
| Traders' personal trading records | 3 years |
| Traders' Annual Certifications | 3 years |
| Records of orders (including cancelled orders) | 3 years |
| Assessment of best execution | 3 years |
| NASDAQ Report Cards | 3 years |
| OTC Trading Manager Checklist | 3 years |
| Market Maker Additions Checklist | 3 years |
| 15c2-11 files including Form 211 Checklist | Retain as long as making a market in the security and at least 3 years thereafter |
| Withdrawal Request (Voluntary) | 3 years |
| Backing-Away Log | 3 years |
| General Recordkeeping | 3 years |
| Underwriting Activity Reports | 3 years |
| Notices of stabilizing activities | 3 years |
| Quote Reporting | 3 years |
|  |  |

ALPINE_LIT169194

# 15 MUTUAL FUNDS

[NASD Rule 2830; FINRA Notice to Members 95-80]

## 15.1 Introduction

Mutual funds, for purposes of these policies and procedures, refer to open-end investment companies. In addition to mutual funds, this chapter includes sections on closed-end funds and unit investment trusts (UITs), which also are investment company securities but are not considered "mutual funds."

Key points for consideration when offering mutual funds include the following:

- RRs must consider sales charges when recommending mutual funds and determine the most advantageous cost structure for the customer including class types.
- Customer suitability determination includes consideration of investment objectives, other investments held, financial and tax status, and risk tolerance.
- Fund characteristics to consider include investment objectives, risk, cost structure, and underlying investments and strategies.
- Switching from one fund to another requires the customer's signed acknowledgment.
- RRs cannot "sell dividends" or facilitate customer "late trading" or "market timing."

## 15.2 Mutual Funds Offered By Alpine

| | |
|---|---|
| **Responsibility** | <ul><li>CFO</li><li>COO (where designated)</li><li>OSJ Branch Manager</li></ul> |
| **Resources** | <ul><li>Prospectuses and other information provided by mutual fund companies or other distributors</li><li>Selling agreements</li><li>Records regarding commission earned from sales of funds and revenue received from revenue sharing agreements or directed brokerage</li></ul> |
| **Frequency** | <ul><li>As required - signing selling agreements (President)</li><li>As required - review potential revenue sharing agreements for compliance with anti-reciprocal rules (CFO)</li><li>Quarterly - compare mutual fund commissions against revenue sharing or directed brokerage, if applicable - CFO</li><li>Annually - training for marketing, sales, and trading staff, as appropriate, regarding anti-reciprocal prohibitions - OSJ Branch Manager</li></ul> |
| **Action** | <ul><li>Review information on mutual funds (CFO)</li><li>Determine which fund companies' products to offer (Due Diligence Committee)</li><li>Review dealer agreements for (General Counsel):<ul><li>restrictions or obligations that may affect Alpine's sales of the mutual fund and issue instructions to RRs, if necessary</li><li>representation by the mutual fund company that it uses reasonable criteria when selecting Selling Brokers and has reasonable policies and procedures to avoid formal or informal directed brokerage arrangements</li><li>Notify OSJ Branch Manager of special restrictions or requirements</li></ul></li></ul> |

ALPINE_LIT169195

|  | included in dealer agreements<br>• Execute dealer agreements with mutual fund companies (President)<br>• Provide education regarding mutual fund sales including prohibitions under the anti-reciprocal rule (OSJ Branch Manager)<br>• Review special sales programs and promotions outside the standard commission schedule to determine compliance with the anti-reciprocal rule (CFO)<br>• Review for potential correlation between fund sales and directed brokerage commissions that may indicate violations of anti-reciprocal rules (CFO)<br>• Refer potential directed brokerage arrangements to the CCO for review and determination of corrective action (CFO)<br>• Review revenue sharing agreements (CFO):<br>   o At time of proposal to determine compliance with anti-reciprocal rules<br>   o To develop and provide disclosure to customers<br>   o To determine ongoing compliance with anti-reciprocal rules |
|---|---|
| **Record** | • Information used to determine which funds to sell (Due Diligence Committee)<br>• Signed dealer agreements (President)<br>• Notices to RRs of special restrictions or requirements included in dealer agreements (OSJ Branch Manager)<br>• Records of special sales programs and promotions including the date of review, reviewer's signature/initials, and notes of action taken, if appropriate (CFO)<br>• Revenue sharing arrangements and disclosures to customers (initial and quarterly reviews) (CFO) |

Mutual funds with a range of investments and objectives will be available for investment by customers.


## 15.2.1 Dealer Agreements

[FINRA Member Alert November 22, 2005]

Alpine executes dealer agreements with mutual fund underwriters. Many agreements include restrictions against activities such as late trading or market timing, which are discussed later in this chapter. Any special requirements or restrictions included in dealer agreements and not already covered in this chapter will be communicated to sales personnel.


## 15.2.2 Anti-Reciprocal Rule

[Investment Company Act Rule 12b-1; SEC Release No. IC-26591; NASD Rule 2830(k); FINRA Notice to Members 05-04]

Alpine is prohibited from favoring the sale of mutual funds based on revenues earned (directly or indirectly) from the investment company issuing the mutual fund. This includes:

- *Directed brokerage,* which is a practice where the investment company directs brokerage business to a broker-dealer to reward or compensate the dealer for selling its funds. This includes, directly referring brokerage transactions to the dealer that sells its funds and also "step-out" arrangements where brokerage is directed to another firm and then revenue is shared with the dealer selling the funds.
- *Undisclosed revenue sharing,* where the mutual fund company pays incentives to the broker-dealer to secure a prominent place in the selling dealer's distribution network ("shelf space").

If an employee becomes aware of a prohibited activity, it should be reported immediately to the CCO.

ALPINE_LIT169196

The selection and offer of mutual funds will comply with anti-reciprocal prohibitions. Specifically, Alpine will not:

- Sell shares of, or act as underwriter for, any investment company where Alpine is aware that the investment company or its investment adviser or underwriter have directed brokerage arrangements in place that are intended to promote the sale of investment company securities.
- Favor or disfavor sales of investment companies based on commissions received or expected and tied to sales
- Require such commissions to sell the funds or offer commission to another broker-dealer relating to their sale of funds
- Circulate information about commissions received from an investment company, other than to the Board of Directors for purposes of managing Alpine's business
- Sponsor or encourage an incentive campaign or special sales effort of another dealer financed by commissions received related to the sale of the funds
- For retail sales, provide incentive or special compensation based on the amount of commissions expected to be received from the fund or another source
- Establish recommended, selected, or similar preferred lists of investment companies if based on brokerage commissions
- Allow RRs and other sales personnel to participate in commissions received from investment company portfolio transactions
- Use the sale of investment company shares to negotiate the price or amount of brokerage commissions paid on investment company portfolio transactions

These prohibitions do not prevent execution of investment company portfolio transactions that are not tied to sales of the investment company's shares. RRs and managers may be compensated for sales attributable to them including the use of overrides, accounting credits, or other compensation, provided the extra compensation does not violate anti-reciprocal prohibitions.

### 15.2.2.1 Disclosure Regarding Revenue Sharing

If Alpine engages in revenue sharing, it will clearly disclose such an arrangement to customers purchasing the applicable funds.

# 15.3 Sales Charges

[NASD Rule 2830(d)]

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order records<br>• Daily Transaction Report<br>• Fund information (*i.e.,* prospectus, Statement of Additional Information)<br>• Exception reports (as available) |
| Frequency | • Daily |
| Action | • Review Breakpoint Worksheets for completeness, determination of sales charge discounts available to purchaser<br>• Review order records to determine that discounts have been considered<br>• Review daily transactions to determine same-day mutual fund purchases are considered for LOI and ROA discounts<br>• Review orders for improper breakpoint sales (near but below common breakpoint levels [$25,000, $50,000, *etc.*])<br>• Review orders for purchases of multiple funds with similar investment |

ALPINE_LIT169197

| | |
|---|---|
| | objectives and confer with RR about the suitability of multiple purchases<br>• Letter of Intent (LOI) reviews for:<br>    o Notation on Worksheet/order record whether an LOI will apply<br>      (including retroactive LOIs if permitted by the fund)<br>• Rights of accumulation (ROA) review for indication on order record whether<br>ROA applies<br>• Where a customer has not been provided an available discount:<br>    o Confer with the RR<br>    o Notify the customer and correct the purchase to include the discount<br>• Provide training to RRs on mutual fund purchases and sales charge discounts |
| **Record** | • Breakpoint Worksheets<br>• Order records<br>• Daily transaction reports<br>• Exception reports (as available) |

When investors purchase mutual funds (other than no-load funds), they incur sales charges that may be front-end or back-end charges. Mutual funds offer investors discounts to sales charges, which are explained in the fund's prospectus. This section describes different types of discounts available to mutual fund purchasers.

**RRs are responsible for understanding the availability of sales charge discounts to provide the customer the opportunity to purchase a mutual fund under the most favorable terms available.** RRs are required to use the Breakpoint Checklist and Worksheet for every mutual fund purchase involving a sales charge. The Checklist and Worksheet are discussed at the end of this section. For a current copy, go to http://www.finra.org/web/groups/industry/@ip/@tools/documents/industry/p009680.pdf. Customers also are provided, at the time of first purchase, with a Breakpoint Disclosure Statement explaining breakpoints and other available discounts.


## 15.3.1 Breakpoints

[FINRA Rule 2342]

For some mutual funds, front-end sales charges decrease as the dollar amount invested increases. These thresholds for reduced sales charges are called breakpoints. Different fund families establish different opportunities to link accounts, transactions, and share classes to qualify purchasers for reduced sales charges.

The RR has an obligation to disclose the existence of breakpoints to enable the customer to evaluate the desirability of making a qualifying purchase. The RR also must indicate on the mutual fund order if the customer qualifies for a breakpoint because of linked accounts, transactions, or share classes or other basis for meeting a breakpoint by linking the customer's transaction with another.

"Improper breakpoint sales" is a term that denotes selling mutual funds to maximize commissions earned, *i.e.,* selling an amount close to, but below a breakpoint. The customer will, therefore, pay a higher sales charge. This practice is prohibited.

Recommending diversification among several funds with similar investment objectives, particularly if sales occur in amounts just below the breakpoints of one or more funds sold, may not be in the best interests of the customer. If multiple purchases of different mutual funds is appropriate, but will preclude the customer from qualifying for a breakpoint, the customer should sign a letter acknowledging his or her understanding that a breakpoint is being given up by purchasing multiple funds.

Purchases of mutual funds under a breakpoint are not subject to breakpoint violations if the purchases are made as part of a bona fide asset allocation program sponsored by Alpine. Customers who participate in an Alpine-

ALPINE_LIT169198

sponsored program are notified, as part of the agreement to participate in the program, that they may not receive breakpoint reductions that otherwise would be available.

### 15.3.1.1 Breakpoint Checklist And Worksheet

When selling a front-end load fund (Class A) to a customer, the RR is required to review the Breakpoint Checklist and complete the Breakpoint Worksheet, which is submitted with the mutual fund purchase order. The purpose of the Worksheet is to document required information about the customer's holdings to determine whether the customer qualifies for a reduced sales charge, including:

- Total holdings at Alpine in the fund, or a related fund in the same family
- Total holdings outside Alpine in the fund, or a related fund in the same family
- Total holdings of related parties (some funds provide discounts when related persons own the same fund, or funds in the same family of funds)

Go to http://www.finra.org/web/groups/industry/@ip/@tools/documents/industry/p009680.pdf for a copy of the Breakpoint Checklist and Worksheet. A copy of the Breakpoint Checklist and Worksheet should be maintained in your client file and should be produced, upon request.

### 15.3.1.2 Breakpoint Search Tool

[http://www.finra.org/fundsearch]

A Breakpoint Search Tool is available from the FINRA online. The tool provides breakpoint schedules and linkage rules for mutual funds with sales charges.

### 15.3.1.3 Breakpoint Disclosure Statement

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Mutual fund purchases |
| Frequency | • A customer's initial mutual fund purchase |
| Action | • Provide the disclosure statement |
| Record | • Record of providing the disclosure statement is included in customer account records |

Customers who purchase Class A mutual funds, will be provided a Breakpoint Disclosure Statement that explains breakpoints and other discounts available to mutual fund purchasers.

## 15.3.2 Letters Of Intent

[FINRA Notice to Members 02-85]

A letter of intent (LOI) is an investor's written statement of intent to purchase a specified dollar amount of a single mutual fund or funds within a single fund group over a specific period of time. The aggregate investment over time may qualify for a breakpoint and a lower percentage sales charge.

ALPINE_LIT169199

The mutual fund purchase should indicate if the customer will execute a letter of intent so the lower sales charge will apply. Some funds allow investors to use an LOI retroactively to include the value of past purchases in the LOI period. The RR should determine whether the customer made a prior purchase within the allowable period and whether the fund allows backdated LOIs.

## 15.3.3 Rights Of Accumulation

[NASD Rule 2830(d)(1)(B); FINRA Notice to Members 02-85]

Aggregating purchases of a particular fund or family of funds by one investor (and sometimes family-related purchases) may qualify for rights of accumulation. A lower sales charge may apply, based upon the total dollar amount invested. The RR should ask the customer whether the customer has other holdings in the fund or fund family, to determine whether rights of accumulation may be available to the customer.

Mutual funds follow different rules to determine the value of existing holdings and when a customer qualifies for a breakpoint discount. Most funds use current net asset value (NAV) of existing holdings, and a small number of funds use historical cost (cost of the initial purchase). If historical cost is used, it may be necessary for the investor to provide account records to qualify for the breakpoint discount.

The mutual fund purchase should indicate rights of accumulation, if available, and the customer's desire to aggregate purchases to qualify for a lower sales charge.

## 15.3.4 Reinstatement Privilege

Some funds offer shareholders a "reinstatement privilege" allowing the shareholder to reinvest some or all of the proceeds from a prior liquidation of the fund within a specified period of time (for example, 180 days) at a reduced sales load or no sales load. The RR should determine whether the customer qualifies for a reinvestment privilege and, if he or she qualifies, note this on the order at time of entry.

## 15.3.5 Sales Charge Reductions/Waiver Or NAV Transfer Program

Some mutual funds waive fees for eligible retirement plans and charities. RRs are obligated to apply waivers where they are available.

A limited number of mutual funds offer a sales charge discount in the form of a waiver or NAV transfer. Investors may purchase Class A shares of a mutual fund without paying a front-end sales charge, if investing some or all of the proceeds from the sale of a mutual fund in a different mutual fund family for which the investor paid a front-end or back-end sales charge within a specified period of time. The period when the discount is available is generally 30 to 90 days from the date the investor purchased the other fund. This type of discount is explained in the fund prospectus and Statement of Additional Information.

Generally, customers will not make short-term sales of mutual funds. In those unusual circumstances, where the customer is making such a sale, the RR should investigate whether a waiver is available on the new purchase.

## 15.3.6 Deferred Sales Charges

[NASD Rule 2830(n)]

If a customer purchases shares of a mutual fund that imposes a deferred sales charge on redemption, the front of the confirmation will include the following legend: "On selling your shares, you may pay a sales charge. For the charge and other fees, see the prospectus."

ALPINE_LIT169200

### 15.3.7 Direct Application And Wire Order Accounts

Mutual funds allow investors to purchase funds directly (sometimes called "application way" or "wire order" purchases or accounts). RRs are not permitted to recommend, or to direct, that a customer make a direct purchase of mutual funds. All such purchases must be made through Alpine.

### 15.3.8 Sales Charge Discounts Must Be Marked On Mutual Fund Orders

Because automated mutual fund order processing systems do not generally provide the ability to monitor application of an available sales charge discount, it is important that all pertinent information be recorded on the order and entered to the system, including whether the customer's purchase qualifies for a sales charge discount. Incomplete mutual fund orders will not be accepted and will be returned to the RR for completion of necessary information about available sales charge discounts.

Order entry procedures, including completeness of orders and proper application of available discounts, will be reviewed as part of the periodic review of sales practices in the office.

## 15.4 Switching

[FINRA Notice to Members 94-16 and 91-39]

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Order records<br>• Daily Transaction report |
| Frequency | • Daily |
| Action | • Review mutual fund orders for transactions where the customer sells one mutual fund to buy another mutual fund<br>• When switching is identified, ensure the customer provides a signed switch letter |
| Record | • Initials on order records and Daily Transaction Report<br>• Switch letters signed by the customer and maintained in the office files |

Switching is the selling or redemption of one mutual fund with a sales charge to buy another mutual fund with a sales charge. Recommended switches may not be based on the compensation to be received by the RR or Alpine as a result of effecting the switch. As for all recommendations, the RR must have a reasonable basis for believing the switch is suitable for the customer.

The customer may incur multiple sales charges by changing from one fund to another or may be subject to an extended holding period, and there may also be tax consequences because of the switch. The concern is whether the switch is justified and whether the customer understands the consequences of the switch.

Switches between mutual funds that result in potential additional sales charges for the customer (whether front-end or back-end load) require that a letter be obtained from the customer acknowledging an understanding of the consequences of the switch. It is the OSJ Branch Manager or designee's responsibility to ensure switch letters are obtained for switch transactions. The letter will be retained with the record of the order and/or in a file for the customer or for switch letters. The FINRA prohibits the use of "negative consent letters," which are used to advise a customer that there will be a switch from one fund to another unless the customer responds before a specified date.

ALPINE_LIT169201

## 15.5 Market Timing Transactions

[FINRA Notice to Members 95-80]

The FINRA has stated that recommendations to fund investors to engage in market timing transactions should be made, if at all, within a single family of funds or where there are no transaction costs associated with the trades. Transactions that do not adhere to this standard may raise suitability questions.

## 15.6 Selling Dividends

Selling dividends is a practice of recommending the purchase of a mutual fund based on an imminent dividend distribution.

Since the price of a mutual fund is reduced by the amount of the dividend, there is no benefit to the customer unless there are specific tax or other advantages to the customer. In fact, there may be increased tax liability for the investor. A related concern is representing that distributions of long term capital gains by the mutual fund are or could be viewed as part of the income yield from the mutual fund.

## 15.7 Misrepresenting "No-Load" Funds

[NASD Rule 2830(d)(4)]

Certain funds impose a sales charge when the customer redeems or liquidates an investment ("back-end load" or contingent deferred sales charge). These charges are generally on a decreasing basis the longer the mutual fund is held. For example, a mutual fund may charge 5% if the shares are sold prior to being held 5 years, 4% if after 5 but before 6 years, *etc.* Other funds have a combined asset-based sales charge and/or service fee exceeding .25 of 1% of average annual assets.

Mutual funds with back-end loads or asset-based sales or service fees exceeding .25 of 1% may not be sold as "no-load" funds.

## 15.8 Reinvestment Of Maturing Certificates Of Deposit In Mutual Funds

[FINRA Notice to Members 93-87]

When funds from maturing certificates of deposit (CDs) are used for the purchase of mutual funds, including money market funds, customers must be advised of the material differences between the two products, particularly the greater risk to the customer's capital and the absence of any federal insurance or guarantee for assets placed into mutual funds.

## 15.9 Suitability

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Order records<br>• Daily Transaction report<br>• Customer monthly statements |
| **Frequency** | • Daily |

ALPINE_LIT169202

| | |
|---|---|
| **Action** | • Review mutual fund transactions for suitability with particular attention to the following:<br>  ○ Funds with high risk objectives: is the investment consistent with the customer's investment objectives?<br>  ○ Purchasing multiple funds in different families that may result in higher sales charges: is diversifying funds justifiable and does the customer understand the higher cost, if applicable?<br>  ○ Large purchases of class B shares that may qualify for lower sales charges if purchased as class A shares<br>  ○ Confer with RRs regarding any transactions that raise questions<br>• Follow up action may include:<br>  ○ Requesting written acknowledgement from the customer that the higher costs are understood<br>  ○ Canceling transactions that appear to be inappropriate |
| **Record** | • Initials on order records and Daily Transaction Report<br>• Notes on Daily Transaction report and/or OSJ Branch Manager's Log of follow up action, if appropriate<br>• Customer's signed acknowledgement filed in the customer file, if appropriate |

When recommending that a customer purchase, sell, or exchange a mutual fund, the following should be considered:

- Customer information including financial and tax status, investment objectives, other investments including other mutual funds
- Information regarding the fund to be recommended including sales charges, historical performance and volatility, risk, investment objective, and nature of the securities and investment strategies in the fund (use of leverage, investments in hedge funds or derivatives, *etc.*)
- Risk (fund investment risk and customer's risk tolerance)
- Appropriateness of high concentrations in any particular type of fund or investment

## 15.9.1 Multi-Class Mutual Funds

[FINRA Notice to Members 95-80]

Mutual funds often offer three classes of shares that are based on the same mutual fund portfolio but differ regarding costs incurred by the customer.

**Class A shares:** Generally impose a front-end sales load and no (or a low) ongoing fee to pay for sales and marketing expenses (Rule 12b-1 fees). Usually the front-end sales load will decrease at certain breakpoints depending on the size of the purchase and whether the purchase qualifies for a letter of intent or rights of accumulation which also may result in a lower sales charge. A front-end sales charge means a portion of the customer's funds are not invested and instead pay the front-end charge.

**Class B shares:** Generally do not impose a front-end sales charge but may impose a contingent deferred sales charge (CDSC) on share redemption and relatively high 12b-1 or other asset-based fees. The amount of the CDSC usually declines the longer the shares are held. Class B shares often automatically convert to Class A shares (with lower asset-based fees) after a period of time, usually after the CDSC declines to zero. All of the customer's funds are invested at the time of purchase. These funds may <u>not</u> be referred to as no-load funds since they impose a back-end contingent charge.

**Class C shares:** Have different expense features than A and B shares; may include no front or back-end load or a small back-end load; and higher 12b-1 or other asset-based fees. Class C shares are often used for managed accounts and asset allocation purposes.

ALPINE_LIT169203

In addition, some mutual funds offer other classes that impose no front-end or back-end sales charges and relatively low asset-based fees. These may be offered to limited types of purchasers such as retirement plans or institutional investors.

The following are guidelines for determining which class of shares is best for the customer:

- The cost advantages of one class versus another must be considered.
- Class B or C shares generally should not be recommended to customers making purchases in large amounts that may qualify for lower costs because of breakpoints, letters of intent, or rights of accumulation available through the purchase of class A shares.
- Class B shares should not be purchased for a customer if the RR knows or has reason to know that the customer will be purchasing additional shares that would take a purchase over a Class A breakpoint within 13 months of the initial purchase.
- Class B shares should not be purchased if potential additional purchases would qualify for a NAV price.
- Class A shares may be more appropriate for a customer who intends to remain invested in the fund for a longer period of time. Over time the higher continuing sales charges of Class B and C shares may exceed the initial load and smaller 12b-1 fees of Class A shares.
- Class C shares may be appropriate for a customer who does not qualify for a reduced Class A initial sales charge and who does not intend to remain invested in the fund for a period during which the fund's Class B shares are subject to a CDSC.
- Some funds waive the sales charge under circumstances specified in the prospectus (*e.g.,* purchases by employees of broker-dealers and their immediate family members). If a Class A sales charge waiver is available, Class A shares will be less costly than Class B or C shares. A CDSC may be imposed on early fund redemptions of Class A shares where a waiver is granted; the prospectus should be consulted.

## 15.9.2 Considerations For Newly-Hired RRs

[FINRA Regulatory Notice 07-36; FINRA Notice to Members 07-06]

| | |
|---|---|
| **Responsibility** | • CCO |
| **Resources** | • Information about transferring customers' investments in investment company products |
| **Frequency** | • As required for proposed switching of investments because products cannot be transferred or will not be serviced by Alpine in the future |
| **Action** | • Review existing investments against proposed substitute investments<br>• Prepare and provide information to customers regarding investment options including that the customer may have to hold the existing investment at the prior firm, the cost of switching to another investment, and other considerations before changing investments |
| **Record** | • Records of accounts reviewed and suitability determination, action taken including information provided to customers |

When a newly-hired RR transfers customers who hold investment company products that Alpine cannot or will not service (inability to transfer products, Alpine does not have a dealer or servicing agreement), the RR and Alpine have suitability obligations. Before liquidating existing investments and reinvesting in new products,

ALPINE_LIT169204

disclosure must be made to the customer regarding the costs and benefits of any proposed change in investments and proposed replacement investments must be suitable.

## 15.10 Late Trading And Market Timing

[FINRA Notice to Members 03-50]

| Responsibility | • OSJ Branch Manager or designee |
|---|---|
| Resources | • Records of mutual fund transactions<br>• Reports available to track mutual fund transactions |
| Frequency | • Daily |
| Action | • Review transactions for patterns of late trading<br>• Identify patterns of "as-of" trades in mutual funds that may indicate late trading<br>• Review transactions for indications of market timing (frequent in-and-out transactions in a mutual fund)<br>• Determine whether market timing is permitted for the fund<br>• Consult with the CCO when potential violations of late trading or market timing are identified<br>• Take corrective action which may include contact with the fund, fund sponsor, or other person potentially engaging in the prohibited activities; limiting trading activity; closing the account; or other corrective action appropriate to the situation. |
| Record | • Records reviewed for trading (whether order records or reports) are retained in files including the date reviewed, the initials of the reviewer, and notes of corrective action, if appropriate. |

There are two mutual fund trading activities that may violate SRO rules whether initiated by the RR or the RR facilitates the prohibited activity by assisting a fund manager, an investment adviser, a fund sponsor, a customer, or someone else in engaging in these activities.

**Late trading** is the practice of effecting an after-close mutual fund purchase or redemption at the same day's net asset value (NAV). NAV is usually calculated at 4:00 p.m. E.T., the close of the trading day, and orders received after the close are effected at the next day's closing NAV. Late trading is a violation of fair practices because it potentially permits someone to take advantage of market movements known after the 4:00 deadline and gives the person an advantage in determining whether to buy or sell a fund based on an already established price. **Engaging in late trading or enabling someone else to engage in late trading is prohibited.**

**Market timing** is rapid and repetitive in-and-out trading to take advantage of market movements such as buying an international mutual fund one day and selling it the next day because of movements in foreign markets that impact the fund's value. While trading a mutual fund is not, in itself, illegal or violates a rule, it often violates restrictions established by the fund on short-term market timing trades. **Engaging in market timing or knowingly aiding someone in activity that violates a mutual fund's internal trading guidelines is prohibited.**

ALPINE_LIT169205

There are valid reasons why an occasional mutual fund trade may be entered late and should be processed at the current day's NAV. There may also be funds that do not prohibit market timing. However, RRs must not engage in or assist someone else in engaging in prohibited late trading and market timing. Compliance should be contacted if someone proposes to engage in either activity.

## 15.11 Block Letter Restrictions

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Mutual fund block letters |
| **Frequency** | • As required when letters are received |
| **Action** | • Notify the RR and the President<br>• Monitor the account for potential violations of restrictions<br>• Take corrective action if violations are detected; action will include notifying the RR and the President; potentially closing the account and disciplinary action against the RR as determined by the OSJ Branch Manager or President, in consultation with the CCO or designee. |
| **Record** | • Mutual fund block letters<br>• Reviews of blocked accounts and action taken |

Mutual fund companies sometimes issue "block letters" that limit the trading activity of a particular customer. This may occur if the fund detects trading that violates trading restrictions imposed by the fund such as late trading or market timing.

When a block letter is received, the RR and the President will be notified, and the RR is responsible for complying with the restriction. Orders may not be entered for the customer in another account that is beneficially owned by the customer to circumvent any restrictions.

## 15.12 Communications

[FINRA Rule 2210]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Outgoing communications |
| **Frequency** | • As needed |
| **Action** | • Communications regarding mutual funds is subject to specific restrictions limiting what may be included since they are offered by prospectus<br>    ○ Review RR-generated communications to ensure language only indicates a prospectus is enclosed and the RR will call the customer to discuss the investment further<br>    ○ Ensure sending of only Alpine-approved communications other than the |

ALPINE_LIT169206

| | limited language described above |
|---|---|
| **Record** | • Initials on communications<br>• OSJ Branch Manager or designee retains communications it reviews |

When reviewing communications regarding mutual funds, the OSJ Branch Manager or designee should watch for the following in addition to the usual considerations when reviewing communications:

- Selling dividends (not permitted)
- Representing a back-end load fund as "no-load" (not permitted)
- Representing a fund with an asset-based sales or service fee exceeding .25 of 1% as "no-load" (not permitted)
- Representations regarding yield (there are specific requirements regarding quotation of yields; RRs should use materials provided by the fund or pre-approved by Alpine)
- Recommendations that include switching or appear to recommend unsuitable diversification among funds
- Letters that include excerpts from the prospectus that would be misleading when taken out of context
- Disclosures, as applicable (see explanation in the section *Disclosure Of Material Facts*)
- Performance is represented accurately and consistent with rule requirements regarding yield and return

RRs should use letters pre-approved by Alpine and include a prospectus or limit communications to stating that a prospectus is enclosed and the RR will be in contact with the customer.

## 15.13 Disclosure Of Material Facts

[FINRA Notice to Members 95-80]

The FINRA has stated that there are material facts that should be disclosed to a customer when recommending a mutual fund. Items to be disclosed, if applicable or appropriate, include:

- the fund's investment objective
- the fund's portfolio
- historical income or capital appreciation
- the fund's expense ratio and sales charges
- risks of investing in the fund relative to other investments
- the fund's hedging or risk management strategy
- information regarding the structure of multi-class and master-feeder funds sufficient so the customer may understand and evaluate the structure
- potential tax consequences including tax on distributions and capital gains subject to tax
- potential risks if a fund invests in financial derivatives
- if an expense ratio is represented as an advantage of a particular fund, it is explained in the context of and compared with other mutual fund expense ratios

The mutual fund's prospectus many if not most of these disclosures.

## 15.14 Disclosure Of Fees, Expenses And Performance

[FINRA Rule 2210(d)(5)]

Many firms prohibit generally all written discussion of a fund's performance and simply refer to the prospectus. When presenting performance information, an explanation of total return should explain that total return measures overall performance while current yield represents only the interest or dividend paid by the fund.

ALPINE_LIT169207

Where appropriate, RRs should explain the difference between return of principal and return on principal. When providing information regarding distribution rates, the RR is responsible for explaining the difference between distribution rate and current yield.

Correspondence and retail communications including performance about mutual funds (other than money market funds) must disclose:

- The standardized performance information required by '34 Act Rule 482 and Rule 34b-1; and
- If applicable:
  - The maximum sales charge on purchases or the maximum deferred sales charge included in the current prospectus; and
  - The total annual fund operating expenses, gross of any fee waivers or expense reimbursements, as stated in the fee table of the current prospectus.

This information must be prominent in the communication, and in any print advertisement in a prominent text box that may also include comparative performance and fee data and disclosures required under Rules 482 and 34b-1.

## 15.15 Prospectuses

RRs should provide a copy of the prospectus when recommending a mutual fund purchase to a customer.

A copy of the fund prospectus will also be sent to each purchaser of a mutual fund. The CFO is responsible for establishing procedures to ensure a prospectus is provided to each mutual fund purchaser.

## 15.16 Retail Communications

[FINRA Regulatory Notice 11-49; NASD Notice to Members 93-36]

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Alpine-approved retail communications |
| Frequency | • As needed |
| Action | • Review proposed retail communications<br>• Make revisions as needed<br>• Provide requestor with approved copy (including signature or initial and approval date) or notify of disapproval<br>• File communication with FINRA, if required; notify requestor of any required delay to receive FINRA approval |
| Record | • Dates of first and (if applicable) last use<br>• Copies of reviewed communications, including the reviewer's approval (by initial or signature) and approval date<br>• For communications not requiring pre-approval, the name of the person who prepared or distributed the communication<br>• Information regarding the source of any statistical table, chart, graph or other illustration used in the communication<br>• Copies of communications filed with FINRA (see section FINRA Filing |

ALPINE_LIT169208

| | Requirements) and FINRA response/approval (as applicable)<br>• If the communication was prepared by another member firm and filed with FINRA, the name of the firm and a copy of FINRA's review letter |
|---|---|

There are specific requirements for retail communications regarding mutual funds. Advertising must be filed with the FINRA within prescribed periods (see the chapter *COMMUNICATIONS WITH THE PUBLIC* and the section *Special Filing Or Approval Requirements* for details). There also are mandated guidelines on representations regarding performance and yield, including specific requirements when retail communications include a TIPs fund's current yield.

RRs may use materials provided by the fund or Alpine-approved materials. Any other retail communications must be approved by the CCO or designee prior to use.

## 15.17 Dealer-Use-Only Material

[FINRA Notice to Members 95-80]

| Responsibility | • CCO or designee |
|---|---|
| Resources | • Outgoing communications |
| Frequency | • As needed |
| Action | • Ensure the branch does not distribute dealer-use-only materials to the public<br>• Review communications to identify inclusion of restricted materials |
| Record | • Initials or signature and review date on communications |

Materials provided by fund distributors for dealer-use only may not be provided to customers and must not be displayed in a public area such as a reception area where customers obtain written information regarding investments. Dealer-use-only material is often provided as educational material for dealers and their RRs. There is no requirement to file this material with the FINRA because it is for internal use only.

All dealer-use-only material will be marked as such with limited distribution.

## 15.18 Seminars And Other Public Presentations

| Responsibility | • OSJ Branch Manager |
|---|---|
| Resources | • Outlines of proposed seminars and other public presentations that include mutual funds |
| Frequency | • As required |
| Action | • Review outlines for appropriateness of presentation<br>• Make necessary changes and approve (or disapprove, if appropriate) |

ALPINE_LIT169209

|  | • Remind the RR of the requirement to provide prospectuses and compile a list of attendees who received prospectuses if specific mutual funds will be offered<br>• If wholesaler sales materials will be included, ensure the CCO approves prior to use |
|---|---|
| **Record** | • Initials or signature (and review date) on outlines which are retained in the office Public Speaking file<br>• List of attendees who received prospectuses (if appropriate) retained in the office Public Speaking file |

The following guidelines apply when an RR or Alpine sponsors a seminar for customers or prospective customers and where mutual funds are the subject of the seminar:

- An outline of the seminar must be provided to the OSJ Branch Manager or designee prior to conducting the seminar.
- If specific mutual funds are recommended, prospectuses must be provided to those who attend and a list retained of to whom prospectuses were provided. A copy of the list is to be provided to the OSJ Branch Manager or designee after the seminar.
- If an RR makes a presentation at the seminar, the sales materials used (*i.e.,* story boards, scripts, handouts, *etc.*) must be approved by the CCO prior to the seminar.

The OSJ Branch Manager is responsible for gathering the outline of the seminar and copy of the prospectus list and forwarding to the CCO or designee for review and approval. The CCO or designee is responsible for approving any wholesaler sales materials and filing it with the FINRA's Advertising Department within 10 days of use.

## 15.19 Sales Contests And Incentive Programs

The following guidelines apply to sales contests and other incentive programs where mutual funds are the subject of the contest or program. Also refer to the chapter *ORDERS* and the section *Sales Contests* for general guidelines applying to all contests.

- All Sales contests must be approved by the OSJ Branch Manager or designee, consultation with the CCO or designee).
- Contests may not be based on the amount of brokerage commissions received or expected to be received from investment companies.
- When Alpine acts as underwriter of investment company shares, Alpine may not sponsor a contest or other incentive campaign of another broker-dealer with respect to the sale of shares of the investment company.
- RRs may not accept (directly or indirectly) cash or non-cash compensation from outside Alpine.

## 15.20 Prompt Transmission Of Applications And Payments

[NASD Rule 2830(m); FINRA Regulatory Notice 15-23]

| **Responsibility** | • The CFO |
|---|---|
| **Resources** | • Mutual fund/variable annuity applications<br>• Record of when transmitted by the RR such as postmarks on envelopes |
| **Frequency** | • Review applications: as required when applications are received |

ALPINE_LIT169210

| | |
|---|---|
| | • Review delayed transmittals: Monthly |
| **Action** | • Transmit applications to the payee (underwriter, investment company, or other designee) by:<br>    ○ the end of the 3rd business day following receipt of the customer's order to purchase; or<br>    ○ the end of 1 business day following receipt of the customer's payment, whichever is later<br>• When Alpine acts as underwriter and engages in wholesale transactions of shares received from other members, payments will be transmitted by the end of 2 business days following receipt of the payments<br>• Review customer's signature date vs. postmark or other record of transmittal by the RR<br>• Document transmittals more than 2 business days after customer signature date<br>• Review delayed transmittals and:<br>    ○ for 3 or more occurrences within 12 months, notify the RR's supervisor to meet with the RR<br>    ○ for another occurrence within 12 months, assess a fine to the RR |
| **Record** | • Applications<br>• Documentation of delayed transmittals including record of who reviewed, when reviewed, and action taken |

RRs are obligated to transmit mutual fund (and variable annuity) applications and customer payments to the designated office/application processor **on the same day as they are received**. Alpine is obligated, by FINRA rule, to transmit the customer's payment to the underwriter within a short timeframe after receipt from the customer.

Failure to transmit applications and payments promptly is a violation of FINRA rules. RRs who do not comply with prompt transmission requirements may be subject to disciplinary action.

## 15.21 Redemption Of Outside Funds

If the customer requests liquidation of an outside open-end mutual fund held by the fund, the RR should obtain the customer's signed letter authorizing liquidation. Required signature guarantees should be obtained from Operations, if required, prior to forwarding the letter to the fund.

## 15.22 Closed-End Funds

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee |
| **Resources** | • Record of mutual fund transactions |
| **Frequency** | • Weekly or as needed |
| **Action** | • Review closed end funds trading for:<br>    ○ Solicited transactions involving short-term trading<br>    ○ Suitability of solicited trades<br>• Take corrective action, if appropriate, which may include:<br>    ○ Conferring with the RR |

ALPINE_LIT169211

|  | <ul><li>○ Contacting the customer</li><li>○ Consulting with Compliance</li><li>○ Cancelling trades</li></ul><ul><li>Include closed end funds in training, particularly the disadvantages of short-term trading</li></ul> |
|---|---|
| **Record** | <ul><li>Mutual fund transaction report electronically reviewed and stored</li><li>Initials and review date</li><li>Note any instance of adverse action taken against the broker and resolution</li></ul> |

Closed-end funds are investment companies that issue a finite number of shares that trade in the open market, usually on a stock exchange. Because they trade like other stocks, requirements that apply to open-end mutual funds such as switch letters and prospectuses provided to all purchasers generally do not apply to closed end funds. Certain features of mutual funds such as breakpoints, letters of intent, and rights of accumulation are not features of closed-end funds.

Since closed end funds trade like stocks, requirements regarding handling orders in the chapter *ORDERS* apply. For example, RRs may not recommend or engage in excessive trading of closed end funds, and recommendations are subject to suitability requirements.

Recommendations to purchase an IPO for a closed end fund may not be appropriate for short-term investors since there is a built-in sales charge. After the offering, closed end funds typically trade at a discount from the IPO price. Recommending the sale of a closed end fund IPO after the penalty bid period (during which the RR would not earn commissions on the purchase) at a loss and then recommending the purchase of another closed end fund would be unsuitable.

The high distribution rates may be composed of dividends, interest income, capital gains and/or return of capital. RRs should consider and communicate to investors, where it applies, that a high rate of return may be a return of capital and not actual income for the investor and the funds trade at a high premium compared to NAV.

## 15.23 Alternative Mutual Funds

| **Responsibility** | <ul><li>OSJ Branch Manager or designee</li></ul> |
|---|---|
| **Resources** | <ul><li>Funds proposed for sale</li><li>Order records</li></ul> |
| **Frequency** | <ul><li>As required: review new funds</li><li>Ongoing: review orders</li><li>Annual or when new products are offered: training</li></ul> |
| **Action** | <ul><li>Subject new alternative mutual funds to new product review</li><li>Review orders for suitability</li><li>Conduct training on alternative mutual funds</li></ul> |
| **Record** | <ul><li>Review of new funds (see *New Products* in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*)</li><li>Review of orders including action taken, if appropriate</li><li>Records of training</li></ul> |

ALPINE_LIT169212

Alternative mutual funds typically employ investment tactics traditionally only found in hedge funds including the use of leverage, derivatives, and short selling. These funds allow investors to gain access to a wide range of traditionally exclusive hedge fund strategies including merger arbitrage, convertible arbitrage, long/short equity, macro trading, leverage, *etc*. They are marketed as a way for retail investors to invest in sophisticated, actively-managed hedge fund-like strategies that may perform well in a variety of market environments. Alternative mutual funds are also represented to reduce volatility, increase diversification, and produce non-correlated returns and higher yields compared to traditional long-only equity and fixed-income funds, all while offering daily liquidity. Alternative mutual funds typically involve non-traditional asset classes, non-traditional strategies or illiquid assets.

These funds have obvious differences and risks from conventional mutual funds. RRs must understand the strategy in which the fund's adviser will engage in various market scenarios. Acceptance of risk must be included in prospective investors' investment objectives.

### 15.23.1 Business Development Companies (BDCs)

BDC funds may represent higher risk that must be considered when recommending them and communicating risks to investors. Following are some of the risk factors that must be considered.

- BDCs primarily invest in the corporate debt and equity of private companies which may offer higher yield through leveraged high credit risk exposure.
- Fueled by the availability of low-cost financing, BDCs may over-leverage illiquid portfolios.
- Non-traded BDCs are illiquid and investors may be limited to selling only through periodic share repurchases by the BDC at high discounts.

## 15.24 Leveraged Loan Products

Leveraged loans are adjustable-rate loans extended by financial institutions to companies of low credit quality that have a high amount of debt relative to equity. Floating-rate bonds do not trade on an organized exchange, making them relatively illiquid and hard to value. Funds investing in these loans may be marketed as less vulnerable to interest rate fluctuations and offer inflation protection, but the underlying loans held by the fund are subject to significant credit valuation and liquidity risks unclear to investors. RRs must consider and communicate these risks when making recommendations to investors.

## 15.25 Unit Investment Trusts (UITs)

UITs are investment company securities that invest in a fixed portfolio of securities such as corporate, municipal, or government bonds, mortgage-backed securities, common or preferred stock, or other investment company shares. Unit holders receive an undivided interest in both the principal and the income portion of the portfolio in proportion to the amount of money invested.

Unit investment trusts have a finite life that ends when all securities in the portfolio have matured or are liquidated per the terms of the trust.

### 15.25.1 Suitability

As for other securities, the RR is responsible to making a suitability determination prior to recommending a UIT to a customer. Considerations include the types and safety of securities in the UIT, call features of the trust, and the maturity date for the trust. The length of time the investor intends to hold the investment should be considered when recommending a UIT, since a secondary market for the UIT may not be assured and prices available in the secondary market may vary considerably from the liquidation value of the trust.

ALPINE_LIT169213

### 15.25.2 Primary Offerings

While UITs are not "mutual funds," they have some features similar to mutual funds, particularly in the initial offering of a UIT. The purchaser of a new UIT pays a load or other charges as described in the prospectus. Purchasers are provided a prospectus describing the UIT.

### 15.25.3 Secondary Market Transactions

A secondary market exists for many UITs. Investors may liquidate or purchase a UIT by placing an order to sell or buy it in the secondary market, if one exists. The price the investor pays to purchase in the secondary market may include a premium based on the market value of the securities in the portfolio. The customer may not recover that amount when the trust matures or is called.

Prospective UIT investors must not be misled regarding the potential return of UITs purchased in the secondary market. Any communication regarding the estimated current return should be accompanied by a quotation of the UIT's long-term yield or internal rate of return.

Secondary market purchasers are provided a copy of the UIT prospectus at time of purchase.

### 15.25.4 Other Sales Practice Considerations

Other considerations when offering UITs include:

- **Sales charges:** Some UITs charge front-end and back-end loads and management fees. The RR should determine that costs are reasonable considering alternative investments that have lower costs. Available breakpoints, letters of intent, and rights of accumulation must also be considered.
- **Switching:** Liquidating one UIT to purchase another UIT or mutual fund requires a signed switch letter.

## 15.26 Funds Of Hedge Funds

[FINRA Notice to Members 03-07]

A fund of hedge funds is an investment company that invests in multiple hedge funds and provides some diversification through the underlying investments. A fund of hedge funds allows retail investors who would not otherwise qualify to invest in a hedge fund to do so through the fund.

Because the underlying securities (hedge funds) are generally unregistered, high-risk securities, RRs must consider the risk of the underlying hedge funds prior to recommending the fund to customers.

### 15.26.1 Characteristics And Risks Of Hedge Funds

When recommending a fund of hedge funds, it is important to understand the general characteristics and risks of hedge funds. While a fund of hedge funds provides diversification, the underlying funds represent a higher level of risk that should be considered when making a recommendation to a customer.

Hedge funds have the following general characteristics and risks:

- not registered under the Investment Company Act and exempt from registration under the '33 Act
- high minimum investments, often $1,000,000 or more
- wide differences in the fees for investments in registered vs. unregistered hedge funds. Managers of unregistered hedge funds may receive both a management fee and a direct percentage in the profits earned.
- often engage in leveraging and other speculative investment practices that may increase the risk of investment loss
- can be highly illiquid

ALPINE_LIT169214

- are not required to provide periodic pricing or valuation information to investors
- may involve complex tax structures and delays in distributing important tax information
- are not subject to the same regulatory requirements as mutual funds
- often charge high fees to their direct investors

## 15.27 Exchange-Traded Funds (ETFs)

[SEC investor article: http://www.sec.gov/answers/etf.htm; FINRA Regulatory Notice 09-31; FINRA Non-Traditional ETFs FAQ: http://www.finra.org/Industry/Regulation/Guidance/P119781; NASDAQ Rule 5705]

| | |
|---|---|
| **Responsibility** | • OSJ Branch Manager or designee<br>• New Product Committee (where designated) |
| **Resources** | • Descriptions of proposed ETF products to be sold<br>• Transactions and proposed transactions in ETFs<br>• Transaction reports<br>• New account information |
| **Frequency** | • Daily |
| **Action** | • New Product Committee: Determine the type of investor for whom the product is suitable and include this in training and marketing materials<br>• OSJ Branch Manager or designee<br>   ○ Review for suitability of recommended ETFs, particularly non-traditional ETFs<br>   ○ Consult with RRs, where appropriate, when non-traditional ETFs are sold to individual investors<br>   ○ Include ETFs in training, particularly for non-traditional ETFs |
| **Record** | • New Product Committee: Records of review of proposed products and determination of for whom the product is suitable<br>• OSJ Branch Manager or designee: Order records including notation of action taken, if any |

ETFs are open-end investment companies or unit investment trusts (UITs) listed on stock exchanges; they can be bought and sold throughout the trading day at the current market price. A typical ETF is based on specific domestic and foreign market indexes. An index-based ETF tracks the performance of an index by holding in its portfolio either securities replicating the index or a representative sample of the securities in the index. ETFs also track non-traditional investments such as commodities and currencies. Some ETFs track indexes inversely (*i.e.*, the ETF rises when the index falls) and new ETFs are continually evolving. Following are considerations when recommending ETFs:

- Purchasers must be provided with a prospectus or "product description." Some ETFs have obtained exemptive relief from the SEC allowing provision of a description instead of a prospectus.
- Purchasers of Portfolio Depository Receipts must be provided with a written description of the terms and characteristics of the securities, no later than the time a confirmation of the first transaction in such series is delivered to such purchaser. The description must also be included with any sales material provided to customers or the public. Any other written materials making specific reference to a series of Portfolio Depository Receipts as an investment vehicle must include a statement: "A circular describing the terms and characteristics of [the series of Portfolio Depository Receipts] has been prepared by [Trust name] and is available from your broker or NASDAQ. It is recommended that you obtain and

ALPINE_LIT169215

review such circular before purchasing [the series of Portfolio Depository Receipts]. In addition, upon request you may obtain from your broker a prospectus for [the series of Portfolio Depository Receipts]." Non-NASDAQ members participating in an omnibus agreement are also subject to this obligation.

- Recommendations must consider what the ETF tracks to determine suitability for the proposed investor.
  - o Where a commodity such as oil underlies the fund, it is important that the customer understands how the ETF is impacted by changes in price of the underlying commodity.
  - o ETFs that track narrow sector or foreign market indexes can be highly concentrated and highly volatile or might fail to track their indexes properly. They also may have higher fees than ETFs based on broader indexes.
  - o An ETF that invests in a sampling of the tracked index may not perform consistent with the index.
- Some ETFs sell short, others use leverage, and others use a combination of the two. Some ETFs are more complex financial instruments that offer leverage or are designed to perform inversely to the index or benchmark they track, or both. Leveraged ETFs amplify daily index moves; short selling provides the inverse daily return of market indexes. Targeted leverage levels don't necessarily meet targets over long periods due to compounding returns. Investors in these types of ETFs must be willing to assume higher risk.
- Some inverse ETFs track broad indices, some are sector-specific, and still others are linked to commodities or currencies.
- Most leveraged and inverse ETFs "reset" daily, meaning that they are designed to achieve their stated objectives on a daily basis. The effect of compounding affects their performance over longer periods of time when their performance can differ significantly from the underlying index or benchmark during the same time period. Volatile markets can magnify this effect.
- ETFs are not suitable for a customer who wants to make regular periodic investments since each transaction will generate a commission cost. ETFs are more appropriate for larger lump-sum investments.
- Some ETFs allow investors to cash out their investment with the issuer.
- ETFs may be subject to temporary price disparities during times of highly volatile markets when ETF shares may trade for significantly less than the value of underlying assets. This risk is of particular concern to short-term traders.
- ETF shares can be sold short and bought on margin.
- For most ETFs, holdings are transparent, *i.e.,* an investor will know what is being held by the ETF by the makeup of the tracked index. However, in the case of an actively-managed ETF, knowledge of investments may not be available to investors.
- ETFs may have lower annual expenses than traditional funds; however, investors incur commission costs for each purchase and sale in the market.
- ETFs may be more tax efficient than regular mutual funds. Since shares are traded in the secondary market, the ETF is not required to liquidate its portfolio to satisfy fund sales and therefore reduces generation of capital gains distributions to investors that result in tax liabilities each year.
- ETFs do not offer dividend reinvestment plans which are available from regular mutual funds.
- Funds of ETFs (complete portfolios of multiple ETFs) may be considerably more expensive than buying the underlying ETFs directly.

ALPINE_LIT169216

# 16 OPTIONS

Alpine does not engage in options trading. Should Alpine engage in such activity in the future, it will develop and implement supervisory policies and procedures in this area.

ALPINE_LIT169217

# 17 MARGIN

Alpine does not engage in margin activities nor does Alpine engage in short selling activity on behalf of its customers. Alpine does not permit its customers to engage in pattern day trading, which requires a margin account. Should Alpine engage in such activity in the future, it will develop and implement supervisory policies and procedures in this area.

ALPINE_LIT169218

# 18 PRIVATE PLACEMENTS AND OFFERINGS

## 18.1 Registration Activities Involving Investment Banking

NASD Rule 1032(i) requires an associated person to register with FINRA as a Limited Representative - Investment Banking (Investment Banking Representative and pass a corresponding qualification examination (Series 79) if such person's activities involve:

- advising on or facilitating debt or equity securities offerings through a private placement or a public offering, including but not limited to origination, underwriting, marketing, structuring, syndication, and pricing of such securities and managing the allocation and stabilization activities of such offerings, or
- advising on or facilitating mergers and acquisitions, tender offers, financial restructurings, asset sales, divestitures or other corporate reorganizations or business combination transactions, including, but not limited to, rendering a fairness, solvency or similar opinion.

The registration category does not cover individuals whose investment banking work is limited to public (municipal) finance or direct participation programs as defined in NASD Rule.

This information is provided generally about the registration and licensure requirements relating to investment banking. For information about Alpine's written supervisory procedures concerning licensing and registration, refer to the section titled "*Registration and Licensing*".

## 18.2 Rule 144A Transactions

[SEC Securities Act of 1933 Rule 144A]

| Responsibility | • President or designee |
|---|---|
| Resources | • Requests to purchase securities under 144A<br>• Trader referrals of potential 144A transactions |
| Frequency | • As required |
| Action | • Confirm the securities to be sold qualify for sale under Rule 144A<br>• Review potential purchasers to ensure they meet the qualification for Qualified Institutional Buyers (QIB) prior to purchase<br>• Provide written notification to all purchasers disclosing the nature of the 144A transaction and confirming that it is Alpine's understanding that the purchaser is a QIB as defined in Rule 144A<br>• Notify traders regarding securities that are to be sold only under the restrictions of 144A<br>• When Alpine includes 144A securities in its inventory, determine the marketability of the securities for net capital purposes and notify the FINOP of the status of such securities in inventory |
| Record | • Review of securities for qualification for sale under 144A<br>• Review of customers for qualification as QIBs and copies of 144A letters<br>• Notification to traders<br>• Records of the written notification provided to purchasers including the date and |

ALPINE_LIT169219

| | to whom provided |
|---|---|

Rule 144A permits private placement of securities with certain institutional purchasers that qualify as Qualified Institutional Buyers (QIBs) as defined in Rule 144A. While general solicitation and advertising is permitted for these offerings, all purchasers must qualify as QIBs. The seller (issuer) and anyone acting on behalf of the seller must reasonably believe the purchase meets the qualification of a QIB.

For 144A transactions in TRACE-eligible debt securities, traders are required to comply with TRACE requirements. For more information, refer to the section *TRACE* in the chapter *CORPORATE FIXED INCOME SALES AND TRADING*.

[FINRA Frequently Asked Questions: http://www.finra.org/industry/compliance/regulatoryfilings/privateplacements/faq/]

This chapter explains the requirements when offering private placements and engaging in private offerings. Private placements and offerings are subject to strict requirements that are imposed on the issuer and those who sell the issue. The requirements for offering a specific private placement will be announced at the time the private placement becomes available for sale. It is important to understand and comply with the requirements for each offering.


# 18.3 Introduction

This section provides general information about private placements and the regulations that govern their offer and sale. A general understanding of private placements is helpful when considering whether to offer a specific issue to a customer.

There are several general areas of requirements and limitations that affect most private placements.

- No general solicitation of purchasers other than those permitted under Rule 506(c) and 144A
- Limits as to the size of the offering
- No advertising or general public meetings about specific private placements other than those permitted under Rule 506(c) and 144A
- Issuers must provide information to potential investors
- Securities purchased are generally restricted as to resale
- Number of purchasers is restricted


## 18.3.1 Definition Of Terms

The following are common terms included in this chapter.

| | |
|---|---|
| **Accredited investor** | An investor who meets certain criteria that are indicative of sophistication (see the section *Accredited Investors*) |
| **Letter of Non-Distributive Intent** | A letter or form signed by the purchaser of a private placement, affirming that the investor is purchasing the securities for their own account and are not to be resold unless registered or subject to an available exemption. |
| **Non-Disclosure Agreement** | An agreement signed by the offeree stating that proprietary information learned about the issuer will not be divulged to third parties. |
| **Offer** | An attempt to sell a security to a potential purchaser |
| **Offeree** | A prospective purchaser to whom an offer is made |
| **Purchaser questionnaire** | A questionnaire completed by an offeree to establish the offeree's suitability to purchase the investment |
| **Purchaser representative** | A person (not affiliated with the issuer or the broker-dealer selling the issue) |

ALPINE_LIT169220

| | |
|---|---|
| | who acts on the purchaser's behalf to evaluate the investment for the purchaser |
| **Subscription agreement** | The document signed by the purchaser and evaluated by the issuer prior to the purchase |

## 18.3.2 "Private Placement" Defined

A private placement is a sale of securities that is not subject to registration under the Securities Act of 1933. While private placements are exempt from registration requirements, they are subject to the anti-fraud and civil liability provisions of various federal securities laws. The following sections describe the primary exemptions under which private placements are offered.

### 18.3.2.1 Section 4(2) Of The Securities Act Of 1933

Some private placements are offered under Section 4(2) which provides an exemption for "transactions by an issuer not involving any public offering." While the section does not specifically outline the requirements for establishing an exemption, the following is a summary of requirements gleaned from SEC interpretations and court decisions.

- There may be no general solicitation of purchasers other than those permitted under Rule 506(c) and 144A.
- Offerees and purchasers must have access to information about the issuer and must be able to comprehend and evaluate the information.
- The issuer, broker-dealer, and others acting for the issuer must conduct due diligence to reasonably insure information given to offerees and purchasers is complete and accurate.
- Offerees must have access to meaningful information concerning the issuer and be able to comprehend and evaluate the information.
- Purchasers must acquire the securities for investment and not for resale.

### 18.3.2.2 Regulation D

Regulation D is a series of six rules, Rules 501-506, that include exemptions from the registration requirements of the 1933 Act. The specific exemptions are included in Rules 504-506 and differ as to the size of the offering and conditions imposed to qualify for the exemption. The following chart summarizes the three exemptions available under Regulation D. This is only a very general summary of requirements and does not include legal definitions and technicalities that may apply to certain types of private placements.

| | **Rule 505** | **Rule 506** |
|---|---|---|
| Who may invest | Qualified investors | Qualified investors |
| Number of investors | 35 non-accredited, unlimited accredited investors | 35 non-accredited, unlimited accredited investors |
| Size of offering sold in any consecutive 12 months | $5,000,000 | Unlimited |
| Restricted securities? | Yes | Yes |
| Public solicitation/advertising allowed? | No | No |
| Disclosure document required? | Yes[*] | Yes[*] |
| Opportunity to ask questions of issuer? | Yes | Yes |

[*]Under the rule, disclosure documents are not required to be given to accredited investors though a note to Rule 502(b) states that an issuer should consider providing such information to accredited investors in view of anti-fraud statutes.

ALPINE_LIT169221

The reference to "unlimited accredited investors" in the section "Number of investors" above does not imply that a private placement will, in fact, have an unlimited number of accredited investors. The issuer and Alpine will consider limitations on accredited investors, as appropriate, to preserve the exemption as a private placement and avoid the appearance of a broad solicitation of the issue.

# 18.4 Private Investment In Public Equity (PIPE)

This section describes PIPE transactions.

### 18.4.1 Introduction

A PIPE is defined as a privately negotiated sale (*i.e.,* private placement) of securities of an already public company. In a PIPE transaction, a public company sells its unregistered securities (*e.g.,* common stock, preferred stock or convertible securities) in a private placement to a select group of sophisticated individuals or institutions and subsequently files a resale registration statement with the SEC at the completion of the private placement to enable the investors to resell the securities into the public market. Alpine's role in a PIPE transaction is to act as the placement agent for the issuer.

### 18.4.2 Underwriting

PIPE transactions will be managed by Investment Banking (IB) which is also responsible for:

- Obtaining transaction approval from the Investment Banking Commitment Committee;
- Working with other appropriate personnel/departments, as needed (*e.g.,* Compliance, Legal), to execute an engagement letter; and
- Maintaining a Master Log, which includes among other things an investor log and list of firm employees brought "over the wall."

Non-IB employees approached by an issuer to participate in a PIPE should contact Compliance and/or their supervisor immediately and must handle such information as confidential unless advised otherwise by Compliance or Legal.

### 18.4.3 Compliance Notification

All PIPE offerings in which Alpine is involved, including offerings that are reasonably likely to occur or that Alpine is actively pursuing, must promptly be added to Alpine's Watch List. Consistent with Alpine's Information Barrier Policy, the IB manager is responsible for immediately contacting Compliance when there is a reasonable likelihood of receiving a PIPE mandate. Once a company has been added to the Watch List, IB must notify Compliance of any significant developments with respect to the transaction, including intended pricing and announcement dates.

### 18.4.4 Registration Statement Integration

In order to avoid potential registration statement integration (a risk whenever a public and private offering of an issuer's securities are conducted concurrently or within a short period of time to each other), a PIPE offering must be completed before the related resale registration statement is filed. In the event a registration statement covering the same (and/or similar) securities that will be sold in the PIPE offering has been filed but is not yet effective, the issuer must withdraw the registration statement before the PIPE offering can commence. Note the foregoing restriction is not applicable to offerings structured as a registered direct issuance off of an existing/effective registration statement. IB should work with Compliance to ensure compliance with these rules.

ALPINE_LIT169222

### 18.4.5 Eligible Investors

In general, companies are prohibited from selling unregistered securities unless an exemption is available under SEC rules. With respect to the private placement phase of a PIPE transaction, issuers normally rely on the exemption from registration contained in Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act"), and the safe harbor provisions of Regulation D. As a general matter, in its role as placement agent, Alpine may only offer and sell PIPEs to investors whom Alpine reasonably believes to be "accredited investors." Generally, Alpine may only solicit potential investors who qualify as accredited investors.

Regulation D does not limit the number of accredited investors who may purchase securities in a private placement.

## 18.4.6 Marketing Restrictions

This section outlines restrictions on marketing pipe offerings.

### 18.4.6.1 Prohibition On General Solicitation And Advertising

The federal private placement exemption prohibits the issuer of a PIPE and any person acting on its behalf (including placement agents such as Alpine) from offering or selling the securities by any form of general solicitation or general advertising. Contacting potential investors with whom Alpine has a **pre-existing, substantive relationship** does not constitute a general solicitation. As a general matter, Alpine may only contact investors with whom Alpine has such a relationship, and generally, initial contact should be made directly with the customer (*i.e.,* contact must be with the ultimate investor with investment discretion).

The general guideline for establishing that a potential investor has had a pre-existing, substantive relationship with Alpine is that such potential investor:

- Has invested in other PIPE offerings where Alpine acted as placement agent; or
- Has maintained an investment advisory account with Alpine (or an affiliate) or a brokerage account or similar relationship with Alpine (or an affiliate) for at least 30 days prior to the distribution of information to such investor concerning the offering; and
- Was not solicited to become a customer of Alpine in contemplation of the offering.

Failure to observe restrictions that may be imposed on Alpine's activities in connection with an offering may have severe consequences, including, depending on the timing of the violation, a forced delay in the ability to market or close the offering or civil and criminal penalties and rescission rights for investors. Any questions concerning whether an activity is appropriate in light of the private nature of a PIPE transaction should be directed to Compliance.

After the **final** closing, "tombstone" advertisements and public statements as to the PIPE offering may be permitted. Compliance should review each such advertisement and statement prior to its publication or use.

### 18.4.6.2 Written Presentation Content

PIPE transactions are generally marketed via an oral presentation. Any written materials used during the presentation must adhere to the content standards specified below and must be collected from attendees at the end of the presentation.

Written materials created for the purpose of marketing a PIPE transaction should never be based on anything other than the issuer's existing publicly available information (typically the 10K) accompanied by the following:

- Offering summary;
- Key investment highlights; and
- Business summary.

ALPINE_LIT169223

Further, the written presentation:

- Must also contain customary legal legends and disclaimers including preamble language related to: (1) forward looking statements; and (2) confidentiality and Regulation FD obligations (to be reviewed by issuer counsel).
- Should always be accompanied by a disclaimer letter from Alpine to prospective investors (to be reviewed by issuer's counsel).
- Should never reference Alpine, except to refer to its role as placement agent, and, when appropriate, to disclose potential conflicts of interest to prospective investors (*e.g.,* a firm employee serving on the issuer's board of directors or a material firm ownership position of securities of the issuer).
- Should never be on firm letterhead or other formats containing the firm logo.
- Should never contain forward-looking projections unless such projections have been publicly disclosed. During the marketing process, if prospective investors ask about projections, they should be directed to existing, publicly available research reports and information.

### 18.4.6.3 FINRA Filings

IB should discuss the specific facts and circumstances of each PIPE transaction with Compliance, Legal and/or external counsel, as necessary, to determine whether to file documents and information with FINRA or whether the offering is clearly exempt from filing.

### 18.4.6.4 Regulation M

Upon receiving a PIPE mandate, Compliance should be contacted to preliminarily determine if the proposed transaction is subject to Regulation M. Based on the issuer's float, trading volume and a determination of whether the PIPE transaction constitutes a distribution, the issuer's securities may be subject to restrictions on engaging in transactions and quotation activity with respect to the issuer's stock for the applicable restricted period (*i.e.,* 0, 1 or 5 trading days) as required by Regulation M.

If subject to Regulation M, the President or designee will make required submissions to FINRA. Upon receiving the UAR from FINRA, Underwriting will consult with Compliance to determine the appropriate firm market maker status (passive or active) and the applicable Regulation M restricted period. If co-agents are involved, Underwriting will consult with the co-agents to determine their desired market maker status as well.

Underwriting will notify the FINRA Market Regulation Department and Alpine's trading desk of Alpine's and the other co-agents' market making status during the appropriate Regulation M period. Compliance will add the issuer to Alpine's Restricted List.

After the subject transaction has priced, but no later than the market open on the day following pricing, Underwriting will fax a Regulation M Trading Notification Form (*i.e.,* Reg M Wire) to the FINRA Market Watch Department and the FINRA Market Regulation Department. IB is responsible for notifying Compliance, as well as other co-agents, upon the completion of the PIPE transaction. Compliance will un-restrict the security and notify Trading.

## 18.4.7 Information Flow

This section outlines information flow for PIPE transactions.

### 18.4.7.1 Treatment Of Confidential And Inside Information

Prior to the time that an issuer makes a public announcement of a PIPE transaction, information surrounding the offering is confidential information. As PIPE issuers typically see a drop in their share price following the public announcement of the transaction due to the dilution that results from the issuance of additional shares, a PIPE offering will generally constitute a material transaction for an issuer. Accordingly, knowledge of a PIPE transaction prior to a public announcement by the issuer of the transaction may constitute material nonpublic information ("inside information"). As placement agent for an issuer customer, Alpine has an obligation not to

ALPINE_LIT169224

breach the customer's trust by misusing any information furnished during the course of an engagement. Thus, firm employees with knowledge of a PIPE transaction must:

- Not act on or give this information to others;
- Not trade or advise others to trade based upon the information, misappropriate the information or tip other customers or third parties; and
- Immediately notify Compliance and take appropriate steps to protect the information.

Persons guilty of misusing inside information may be subject to civil and criminal penalties (including imprisonment), SEC administrative actions, disciplinary action by various self-regulatory organizations, and dismissal by Alpine.

## 18.4.7.2 Sharing Transaction Details With Potential Investors

Before a firm employee reveals an issuer's name to a prospective investor, commences discussions concerning the details of a PIPE offering, or otherwise furnishes an investor with material nonpublic information regarding an issuer, such employee should mention that the offering constitutes a private transaction and must ask the prospective investor if he/she is interested in learning more about the PIPE transaction. Firm employees, moreover, should obtain from the prospective investor an agreement that the investor will keep such information confidential, and an acknowledgment that the investor understands how such confidential information must be treated under the securities laws. As soon as is practicable and typically within one (1) business day after receipt of a prospective investor's positive response, Alpine will send such prospective investor a follow-up email confirming such prospective investor's receipt of material, nonpublic information and acknowledging such prospective investor's agreement to hold such information in confidence. In addition, the email will remind such prospective investor of his/her obligation not to use any such information in contravention of applicable securities laws.

Investor logs must be maintained by IB during the marketing process and must contain, among other things: (1) the identity of the investors contacted; (2) such investor's level of interest in the subject transaction; and (3) the date that the management presentation was given (in person or via conference call) to such investor. Upon completion of the marketing process, IB must forward to Compliance a copy of the investor log.

## 18.4.7.3 Sharing Information With Sales And Trading Personnel

Any decision to bring sales personnel "over the wall" must be discussed and approved by the designated sales supervisor in consultation with the IB manager and Compliance. Sales personnel brought "over the wall" may continue to conduct their normal sales activities but may not communicate information related to the PIPE transaction to customers. To the extent that sales personnel are asked to assist in the marketing of the PIPE transaction, sales personnel should make the marketing calls off of the trading floor in an area where their conversation cannot be overheard.

Any decision to bring trading personnel "over the wall" must be discussed and approved by the manager of Trading (NASDAQ or Listed) in consultation with the IB manager and Compliance. Trading personnel brought "over the wall" may not trade or make markets in the securities of the issuer subject to the PIPE transaction. The Trading manager should assign trading responsibilities for such securities to another trader without divulging the details of the PIPE transaction. Trading personnel brought "over the wall" may continue to trade and make markets in other securities pursuant to their normal responsibilities but are prohibited from disclosing information regarding the PIPE transaction to anyone that is not already "over the wall."

## 18.4.7.4 Sharing Information With Research Analysts

Any decision to bring a firm research analyst "over the wall" must be discussed and approved by the Research manager and Compliance.

ALPINE_LIT169225

## 18.5 Blue Sky Requirements

State securities laws ("blue sky" laws) that apply to private placements vary from state to state. Some states have differing definitions for accredited investors; some states require registration of a securities issue that is otherwise exempt under Federal securities laws.

Alpine and its sales personnel are required to comply with any blue sky requirements that apply to a specific private placement issue. Requirements may differ depending on where the issue originates and where it is sold.

## 18.6 Alpine's Participation In Private Placements

| | |
|---|---|
| **Responsibility** | • Underwriting and Private Placement Supervisor or designee |
| **Resources** | • Information provided by the issuer and/or issuer's counsel |
| **Frequency** | • As required - process the private placement<br>• Within 15 calendar days of the date of first sale - provide submissions to FINRA |
| **Action** | • Execute an agreement with the issuer<br>• Conduct due diligence or engage counsel or other qualified person to conduct due diligence<br>• Document the file regarding due diligence<br>• Determine limitations on the offering, including integration issues and obtain representation letter from issuer if needed<br>• Determine what information to provide to sales personnel<br>• Authorize the sale of the offering<br>• Submit private placement memorandum, term sheet or other document (including material amendments) to FINRA or notify FINRA no offering documents were used |
| **Record** | • The deal file will include due diligence information, the issuer agreement, issuer representation letter and offering materials; and authorization to sell.<br>• Record of submission to FINRA. |

### 18.6.1 Due Diligence

Due diligence will be conducted for each private placement issue to be offered by Alpine and is documented in the file for the private placement. Outside counsel or another third party may be engaged to assist in due diligence and other aspects of the private placement offering. If the counsel or third party is affiliated with or somehow associated with the issuer, the Firm will conduct additional independent due diligence. Due diligence may include the following reviews, as appropriate for the particular potential offering:

• Review financial reports
• Written company assurances as to the accuracy of records and financial statements
• Determination of the issuer's creditworthiness
• Evaluate the validity and integrity of the issuer's business model and how it fits into its business sector
• Review information available from financial and other publishers
• Independent verification of management's representations (contact with issuer's customers; lenders, vendors, lower-level employees, *etc.*)
• Reviewing news articles and industry publications regarding the issuer, its market, and competition
• Review the company's internal documents such as operating plans, product literature, corporate records, financial statements, contracts and lists of distributors and customers
• Physical inspection of the company's facilities

ALPINE_LIT169226

- Contact with the issuer's auditor and other experts knowledgeable about the company
- Contact with outside directors
- Interviews of key personnel or customers
- Determination of the plausibility of expected rates of return as compared to industry benchmarks, particularly considering complex fee structures associated with many of these types of investments
- Updating due diligence as needed until effectiveness of the offering

## 18.6.2 Agreement With The Issuer

Alpine will execute an agreement with the issuer to define the terms of Alpine's role in the offering and the issuer's obligations as well as other covenants of the offering.

## 18.6.3 Dollar Amount Of The Offering And Integration Issues

The Underwriting and Private Placement Supervisor or designee is responsible for ensuring the issue is not oversold relative to the dollar amount disclosed in the offering document compared to the limitations provided in the rules. The Underwriting and Private Placement Supervisor should consider any "integration" of similar offerings by the same issuer for substantially identical purposes for determining whether the issuer meets the dollar limitation under the exemption within a 12-month period of time. The Underwriting and Private Placement Supervisor's review for integration may include one of the following or another procedure determined adequate by the supervisor:

- Reviewing the issuer's financial statements for the past 12 months and/or contact directly with the issuer
- Obtaining a representation letter from the issuer that states that no other offerings were distributed during the 6-month period prior to the current private placement offering or will be distributed in a succeeding 6-month period that would cause the exemption to be lost

## 18.6.4 Form D

For issues sold under Regulation D, the issuer is required to prepare a notice on Form D and submit it to the SEC within fifteen days after the first sale of securities in the offering. Some states also require filing of Form D. Issuer's counsel is responsible for submitting this form on behalf of the issuer.

## 18.6.5 Submissions To FINRA

[FINRA Rule 5123; FINRA Regulatory Notice 13-26 and 12-40]

For private placements sold by Alpine (other than those exempt under Rule 5123), filings will be made electronically with FINRA within 15 calendar days of the date of first sale including the private placement memorandum, term sheet or other offering document (including any material amendments). If no offering documents were used, FINRA will be notified.

# 18.7 Sales Of Private Placements

| Responsibility | Underwriting and Private Placement Supervisor |
|---|---|
| Resources | <ul><li>Offering Memorandum</li><li>Purchaser Questionnaire</li><li>RR's representations</li></ul> |
| Frequency | As required |
| Action | Approval of Customer |
| Record | Retain information in Issuer File |

ALPINE_LIT169227

### 18.7.1 Suitability

A primary objective when selling a private placement is that all securities will be placed with suitable investors. The RR recommending a private placement is responsible for determining that the recommendation is suitable for the offeree based on information known about the potential offeree. The RR must consider minimum investor requirements and other suitability standards for each private placement offering.

#### 18.7.1.1 Accredited Investors

[SEC Securities Act of 1933 Rule 215 and Rule 510]

An accredited investor meets certain financial criteria which may include minimum net worth, minimum income levels and other standards set by federal or state laws and regulations. Typically, accredited investors are not counted toward the limitation on the number of purchasers of a private placement.

Information about each private placement (and where it is sold) must be consulted to determine who qualifies as an "accredited investor" for a particular issue.

#### 18.7.1.2 Non-Accredited Investors

Private placements sometimes may be offered to purchasers who do not meet the criteria of accredited investors. The number of allowable non-accredited purchasers will be limited, to preserve the registration exemption and meet requirements specified under federal and state law.

### 18.7.2 Restricted Nature Of Private Placement Securities

Private placement securities are considered "restricted securities," other than those purchased in Rule 504 offerings. Certificates will typically include a legend and securities cannot be resold unless registered or the securities qualify for sale under an exemption.

Purchases must be for investment purposes and not for the purpose of resale. Subscription documents typically include an affirmation that the purchaser is buying the private placement for investment purposes and understands they may not be resold (Letter of Non-Distributive Intent).

RRs must consider the illiquidity of most private placements when making suitability determinations. For example, a private placement would not be a suitable investment for a purchaser who expects to invest his funds on a short-term basis.

### 18.7.3 Purchaser Questionnaires

Where necessary, the potential investor will be requested to complete a Purchaser Questionnaire which confirms that the investor meets certain minimum requirements to participate in the private offering.

When Purchaser Questionnaires are required, the RR is responsible for obtaining the completed Questionnaire from the potential purchaser and submitting it for review and approval within the timeframe established for the offering.

### 18.7.4 Purchaser Representatives

If a purchaser is not sufficiently sophisticated to effectively evaluate the investment opportunity, he or she may have a "purchaser representative" (chosen by the investor and **not** an affiliate of the issuer or broker-dealer) who assists in evaluating the investment. The purchaser representative will be required to sign the offering documents attesting to his or her role acting as purchaser representative.

ALPINE_LIT169228

## 18.7.5 Offering Memorandum

| | |
|---|---|
| **Responsibility** | • Underwriting and Private Placement Supervisor or designee |
| **Resources** | • Offering memorandum |
| **Frequency** | • As required for each private placement |
| **Action** | • Establish a distribution control sheet<br>• Number each offering memorandum, consecutively<br>• Record the number of each offering memorandum and the name of the offeree and the RR or RR number<br>• For unnumbered memoranda, mark copies "File Copy" or "For Information Only"<br>• If changes or corrections are made to the offering memorandum prior to closing, provide copies to each offeree who received the original memorandum and note on the control sheet that copies were provided including the date provided |
| **Record** | • A copy of the offering memorandum, corrected/changed memorandum, and the control sheet are retained in the deal file. |

An offering memorandum is prepared for each private placement, depending on the specific issue. The offering memorandum includes disclosures of information obtained from the issuer including the nature, character, and risk factors relating to the offering. Purchasers will be required to acknowledge, in writing, that they have received the offering memorandum.

An offering memorandum must be provided to all offerees. Offering memorandums are numbered, to enable Alpine to maintain a record of offerees who received them.

Offering memorandums are available from the President or designee. RRs must provide information regarding the offeree at the time the memorandum is provided to the prospective purchaser.

If it is necessary to update or correct information in the private placement memorandum prior to closing of the issue, the revised information will be provided to offerees, in writing.

## 18.7.6 Oral Representations

RRs must not deviate from written private placement memorandum information or other pre-approved information when discussing private placements with potential investors.

## 18.7.7 Offeree Access To Information

Most private placement memoranda state that it was prepared by counsel from information provided by the issuer. Offerees are invited to meet with representatives of the issuer to make an independent investigation and verification of information in the memorandum.

ALPINE_LIT169229

## 18.7.8 Solicitation

[SEC Regulation D Rule 506(c); SEC Compliance & Disclosure Interpretations (C&Dis) on verification methods, see 255.48, 255.49, 260.35, 260.36, 260.37, 260.38: http://www.sec.gov/divisions/corpfin/guidance/securitiesactrules-interps.htm#255.48; SIFMA Guidance on Rule 506(c) verification: http://www.sifma.org/issues/item.aspx?id=8589949595]

| | |
|---|---|
| **Responsibility** | • Underwriting and Private Placement Supervisor or designee |
| **Resources** | • Rule 506 offerings with general solicitations and/or advertising |
| **Frequency** | • As required |
| **Action** | • Confirm that the issuer has determined that all purchasers qualify as accredited investors or conduct verification of purchasers |
| **Record** | • Record of confirming accredited investor status of all purchasers |

Advertising and general solicitation of private placements sold under Rule 506 are permitted subject to the following restrictions:

- They may only be sold to qualified investors.
- The issuer is obligated to take reasonable steps to verify that purchasers are accredited investors under Rule 501 of Regulation D. Depending on Alpine's role, Alpine may be responsible for verification.

Under Rule 501, a person qualifies as an accredited investor if he or she has either:

- An individual net worth or joint net worth with a spouse that exceeds $1 million at the time of the purchase, excluding the value (and any related indebtedness) of a primary residence.
- An individual annual income that exceeded $200,000 in each of the two most recent years or a joint annual income with a spouse exceeding $300,000 for those years, and a reasonable expectation of the same income level in the current year.

The SEC has provided a non-exclusive list of methods that issuers (or someone acting on behalf of the issuer) may use to satisfy the verification requirement for individual investors, including:

- Reviewing copies of any IRS form that reports the income of the purchaser and obtaining a written representation that the purchaser will likely continue to earn the necessary income in the current year.
- Receiving a written confirmation from a registered broker-dealer, SEC-registered investment adviser, licensed attorney, or certified public accountant that such entity or person has taken reasonable steps to verify the purchaser's accredited status.

The verification rule **DOES NOT** apply if there is no advertising or general solicitation.

## 18.7.9 Investment Seminars Or Meetings

| | |
|---|---|
| **Responsibility** | • Underwriting and Private Placement Supervisor or designee |
| **Resources** | • Requests to conduct meetings or seminars |
| **Frequency** | • As required |

ALPINE_LIT169230

| | |
|---|---|
| **Action** | • Request a written outline of the information to be presented, including any written materials to be provided to those attending<br>• Request information about how the seminar or meeting will be publicized<br>• Review the outline, written materials, and method of publication<br>• Approve or disapprove, providing any revisions necessary<br>• Require that all invitees receive copies of the offering memorandum |
| **Record** | • Include copies of the outline, list of attendees, written materials, and the approver's initials (or signature) and date of approval/disapproval in the deal file. |
| | |

Rule 504 offerings may be solicited without limitation. There may be general solicitation for Rule 506 and 144A offerings though the issuer is subject to requirements to verify that purchasers are accredited investors (Rule 506) or QIBs (Rule 144A). See the sections *Solicitations* and *Rule 144A Transactions* for more information.

• Seminars or meetings on specific private placements must be approved by the Underwriting and Private Placement Supervisor or designee prior to conducting the seminar or meeting. Prior to approval provide the Underwriting and Private Placement Supervisor with:
  o a written outline of information to be presented and any graphic or written materials to be provided to attendees.
  o a description of how the seminar or meeting will be publicized to prospective attendees.
• Attendees must be provided with an offering memorandum. No other written material may be provided, unless previously approved by Alpine.

## 18.7.10 Subscription Agreements

| | |
|---|---|
| **Responsibility** | • Underwriting and Private Placement Supervisor or designee |
| **Resources** | • Subscription agreements and accompanying checks |
| **Frequency** | • As required |
| **Action** | • Log agreements and checks received onto Sales Blotter for the deal<br>• Review subscription agreements and checks for acceptability<br>• Reject unacceptable agreements or checks and return to RR<br>• Forward accepted checks to escrow agent or issuer, retaining a copy in the deal file<br>• Initial accepted agreements<br>• Forward accepted agreements to issuer, retaining a copy in the deal file |
| **Record** | • Retain in deal file:<br>  o Sales blotter<br>  o Copies of subscription agreements and checks |

Each potential purchaser will be required to complete the necessary subscription agreement to purchase a private placement. The agreement must be accompanied by a check for the purchase.

Subscription agreements are processed as follows:

ALPINE_LIT169231

- The RR obtains the signed subscription agreement (and other required offering documents) and a check for payment from the offeree and submits them to the President or designee.
- Subscription agreements and checks received are logged into the Sales Blotter for the private placement.
- The President or designee reviews the agreement and check for acceptability.
- The check is forwarded to the escrow agent or the issuer, together with the purchaser's name, address, social security number, and number of shares/units, as required.
- Rejected agreements/checks are returned to the RR with an explanation for the rejection.
- Accepted agreements are retained by Alpine, and the original forwarded to the issuer.
- The issuer reviews and accepts or rejects the agreement.

RRs should be aware that **purchasers are not accepted until the issuer accepts them**. Final acceptance rests with the issuer who is responsible for ensuring conditions of the offering are satisfied to qualify under the operative exemption.

## 18.8 Regulation D

[SEC Securities Act of 1933 Regulation D; FINRA Regulatory Notice 10-22]

Regulation D is a series of six rules, Rules 501-506, that include exemptions from the registration requirements of the 1933 Act. The specific exemptions are included in Rules 504-506 and differ as to the size of the offering and conditions imposed to qualify for the exemption. The following chart summarizes the three exemptions available under Regulation D. This is only a very general summary of requirements and does not include legal definitions and technicalities that may apply to certain types of private placements.

|  | Rule 504 | Rule 505 | Rule 506 |
|---|---|---|---|
| Who may invest | Anyone suitable for the investment | Qualified investors | Qualified investors |
| Number of investors | Unlimited | 35 non-accredited, unlimited accredited investors | 35 non-accredited, unlimited accredited investors |
| Size of offering sold in any consecutive 12 months | $1,000,000 | $5,000,000 | Unlimited |
| Restricted securities? | No | Yes | Yes |
| Public solicitation/advertising allowed? | Yes | No | Yes |
| Disclosure document required? | No | Yes[*] | Yes[*] |
| Opportunity to ask questions of issuer? | No | Yes | Yes |

[*] Under the rule, disclosure documents are not required to be given to accredited investors though a note to Rule 502(b) states that an issuer should consider providing such information to accredited investors in view of anti-fraud statutes.

The reference to "unlimited accredited investors" in the section "Number of investors" above does not imply that a private placement will, in fact, have an unlimited number of accredited investors. The issuer and Alpine will consider limitations on accredited investors, as appropriate, to preserve the exemption as a private placement and avoid the appearance of a broad solicitation of the issue.

## 18.8.1 Disqualification Of Felons And Other "Bad Actors"

[SEC Regulation D Rule 506(d)(1)]

ALPINE_LIT169232

Rule 506 is a frequently-used exemption from registration under Regulation D. The exemption is NOT available if the issuer or any person covered by the disqualification rule had a "disqualifying event." Disqualifying events include certain criminal convictions; SEC and CFTC actions; and other events. Refer to the rule cited above for a list of covered persons and disqualifying events.

There is an exception from disqualification if the issuer can show it did not know, and in the exercise of reasonable care, could not have known that a covered person with a disqualifying event participated in the offering.

## 18.8.2 Due Diligence

This section includes due diligence guidelines provided by FINRA. Alpine will conduct due diligence appropriate for the particular Regulation D offering and document its reviews and investigations in the deal file. Please refer to the "New Products" section of Alpine's WSPs for more information.

When engaging in a Regulation D offering, due diligence will include, at minimum, reasonable investigation of:

- the issuer and its management;
- the business prospects of the issuer;
- the assets held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering (including whether investors' money is likely to be applied according to the stated use of proceeds, and whether the stated use of proceeds is reasonable in light of the issuer's business purpose and prospects).

The scope of investigation may depend on a number of specific factors included in FINRA guidance, described below.

**BD affiliation with the issuer.** If there is affiliation with the issuer, Alpine must not compromise its independence in performing a thorough and independent investigation and must resolve any conflict of interests impairing that responsibility.

**BD that prepares the private placement memorandum or other offering document.** Alpine has a duty to investigate the securities offered and representations made by the issuer. Where a Alpine assists with preparation of a memorandum or document, Alpine is subject to FINRA communications rules. **Retail communications are subject to FINRA rule requirements whether or not Alpine assisted in their preparation.**

"Red flags" (such as an issuer's refusal to provide information for Alpine to meet its obligation to investigate or inaccurate financial statements) must be reviewed and simple reliance on representations by the issuer's management is not sufficient to meet the Alpine's investigatory obligations.

The use of counsel or experts to perform an investigation on Alpine's behalf must be done by firms and individuals that Alpine is satisfied are qualified and competent. When Alpine is a member of a syndicate or selling group, it may rely upon the reasonable investigation by the syndicate manager if Alpine believes the syndicate manager has the expertise and absence of conflicts to conduct the investigation. Reliance may be substantiated by meeting with the manager; obtaining a description of the manager's reasonable investigation efforts; and inquiry regarding the independence and thoroughness of the investigation.

## 18.8.3 Investigation Practices

The following are FINRA guidelines for what may be included in a reasonable investigation of a Regulation D offering. Alpine will conduct investigation into the issuer as appropriate for the proposed offering.

**A. Issuer and Management**

ALPINE_LIT169233

Reasonable investigations of the issuer and its management concerning the issuer's history and management's background and qualifications to conduct the business might include:

- For Rule 506 offerings, determine whether the issuer or any covered person under Rule 506(d)(1) has been the subject of a disqualifying event precluding the use of the Rule 506 exemption.
- Examining the issuer's governing documents, including any charter, bylaws and partnership agreement, noting particularly the amount of its authorized stock and any restriction on its activities. If the issuer is a corporation, a BD might determine whether it has perpetual existence.
- Examining historical financial statements of the issuer and its affiliates, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management.
- Looking for any trends indicated by the financial statements.
- Inquiring about the business of affiliates of the issuer and the extent to which any cash needs or other expectations for the affiliate might affect the business prospects of the issuer.
- Inquiring about internal audit controls of the issuer.
- Contacting customers and suppliers regarding their dealing with the issuer.
- Reviewing the issuer's contracts, leases, mortgages, financing arrangements, contractual arrangements between the issuer and its management, employment agreements and stock option plans.
- Inquiring about past securities offerings by the issuer and the degree of their success while keeping in mind that simply because a certain product or sponsor historically met obligations to investors, there are no guarantees that it will continue to do so, particularly if the issuer has been dependent on continuously raising new capital. This inquiry could be especially important for any blind pool or blank-check offering.
- Inquiring about pending litigation of the issuer or its affiliates.
- Inquiring about previous or potential regulatory or disciplinary problems of the issuer. A BD might make a credit check of the issuer.
- Making reasonable inquiries concerning the issuer's management. A BD might inquire about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change. For example, a BD might inquire about any regulatory or disciplinary history on the part of management and any loans or other transactions between the issuer or its affiliates and members of management that might be inappropriate or might otherwise affect the issuer's business.
- Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A BD might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issuer.
- Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

## B. Issuer's Business Prospects

Reasonable investigations of the issuer's business prospects, and the relationship of those prospects to the proposed price of the securities being offered, might include:

- Inquiring about the viability of any patent or other intellectual property rights held by the issuer.
- Inquiring about the industry in which the issuer conducts its business, the prospects for that industry, any existing or potential regulatory restrictions on that business and the competitive position of the issuer.
- Requesting any business plan, business model or other description of the business intentions of the issuer and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A BD might test models with information from representative assets to validate projected returns, break-even points and similar information provided to investors.
- Requesting financial models used to generate projections or targeted returns.
- Maintaining in the BD's files a summary of the analysis that was performed on financial models provided by the issuer that detail the results of any stress tests performed on the issuer's assumptions and projections.

ALPINE_LIT169234

**C. Issuer's Assets**

Reasonable investigations of the quality of the assets and facilities of the issuer might include:

- Visiting and inspecting a sample of the issuer's assets and facilities to determine whether the value of assets reflected in the financial statements is reasonable and that management's assertions concerning the condition of the issuer's physical plants and the adequacy of its equipment are accurate.
- Carefully examining any geological, land use, engineering or other reports by third-party experts that may raise red flags.
- Obtaining, with respect to energy development and exploration programs, expert opinions from engineers, geologists and others are necessary as a basis for determining the suitability of the investment prior to recommending the security to investors.

ALPINE_LIT169235

# 19 CORPORATE SECURITIES UNDERWRITING

## 19.1 Registration Activities Involving Investment Banking

NASD Rule 1032(i) requires an associated person to register with FINRA as a Limited Representative - Investment Banking (Investment Banking Representative and pass a corresponding qualification examination (Series 79) if such person's activities involve:

- advising on or facilitating debt or equity securities offerings through a private placement or a public offering, including but not limited to origination, underwriting, marketing, structuring, syndication, and pricing of such securities and managing the allocation and stabilization activities of such offerings, or
- advising on or facilitating mergers and acquisitions, tender offers, financial restructurings, asset sales, divestitures or other corporate reorganizations or business combination transactions, including, but not limited to, rendering a fairness, solvency or similar opinion.

The registration category does not cover individuals whose investment banking work is limited to public (municipal) finance or direct participation programs as defined in NASD Rule.

This information is provided generally about the registration and licensure requirements relating to investment banking. For information about Alpine's written supervisory procedures concerning licensing and registration, refer to the section titled "*Registration and Licensing*".

[SEC Securities Offering Reform Questions and Answers November 30, 2005 (www.sec.gov/divisions/corpfin/faqs/securities_offering_reform-qa.pdf)]

This chapter outlines procedures for participating in corporate securities underwritings and a summary of key rule requirements. The term "syndicate supervisor" is used in this chapter to denote the person responsible for supervising underwritings and delegating responsibilities to other employees, where appropriate.

## 19.2 Deal File

At the initial involvement in a potential underwriting, regardless of Alpine's role, the syndicate supervisor will establish a "deal file" for the prospective underwriting. Following is a list of items that should be included in the deal file, depending on Alpine's role in the offering:

- Letter of Intent with issuer
- Due diligence records
- Approval/acceptance of participation in underwriting
- Final registration statement
- Agreement Among Underwriters
- Underwriting Agreement
- Purchase Agreement (for competitive deals)
- Selected Dealer Agreement (selling agreement)
- Regulatory filings
- Preliminary and final prospectus
- Indications of interest
- Reviews for IPO certifications
- Road show materials and lists of potential investors who attended and received preliminary prospectuses
- When acting as managing underwriter:
  - Record of providing participants with prospectuses
  - Stabilizing activities
  - Designated orders

ALPINE_LIT169236

- o  Other records of syndicate management activities
- o  Underwriting Checklist

Drafts should be discarded and final documents retained in the file. Attorney-client privileged communications may be maintained in a separate file.

# 19.3 Managing Underwriter

As managing underwriter, Alpine is responsible for dealing with the issuer, drafting a registration statement, developing the prospectus and other offering documents, forming the syndicate (if others will participate), submitting required regulatory filings, and running the syndicate. If Alpine acts as co-manager and the other co-manager takes the lead in the offering, some of Alpine's responsibilities will be more limited with the lead manager assuming many of the syndicate responsibilities.

### 19.3.1 Letter Of Intent

Alpine and the issuer will usually sign a Letter of Intent which is a non-binding agreement that defines the framework of the potential offering.

### 19.3.2 Due Diligence

[SEC Securities Exchange Act of 1934 Rule 10b-5]

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Information from issuer<br>• Information from outside sources<br>• Review by outside counsel or others engaged by Alpine<br>• Review conducted by Alpine personnel |
| Frequency | • As required for each potential underwriting |
| Action | • Engage outside counsel or others to assist with due diligence review, if appropriate<br>• Evaluate information on the company<br>• Determine structure of issue and potential pricing |
| Record | • Records to be retained in due diligence records include records of meetings and interviews; documents reviewed (including summaries or copies as appropriate); visits to facilities; discussions with third-party personnel; reports by investigators or other independent experts engaged to review the issuer; and other records of the review. Where visits, meetings, and interviews occur, the files will include the dates, attendees, and subjects reviewed or discussed. |

Alpine has the primary responsibility for evaluating the potential issuer and the structure of any proposed offering and when and how to bring the issue to market. The extent of due diligence review and the subjects reviewed will vary depending on the issuer, knowledge of and past experience with the issuer, whether the issue is an IPO, and any number of factors that may affect the due diligence process. The types of reviews conducted may include:

- • Review financial reports

ALPINE_LIT169237

- Evaluate the issuer's business model and how it fits into its business sector
- Review information available from financial and other publishers
- Independent verification of management's representations (contact with issuer's customers; lenders, vendors, lower-level employees, *etc.*)
- Reviewing news articles and industry publications regarding the issuer, its market, and competition
- Review the company's internal documents such as operating plans, product literature, corporate records, financial statements, contracts and lists of distributors and customers
- Physical inspection of the company's facilities
- Contact with the issuer's auditor and other experts knowledgeable about the company
- Written company assurances as to the accuracy of records and financial statements
- Contact with outside directors
- Interviews of key personnel or customers
- Updating due diligence as needed until effectiveness of the offering

## 19.3.3 Net Capital Considerations

[SEC Securities Exchange Act of 1934 Rule 15c3-1]

If an underwriting commitment may impact Alpine's net capital, the Syndicate Supervisor or designee is responsible for contacting the FINOP regarding Alpine's prospective commitment and noting in the deal file that net capital requirements will be satisfied for the prospective deal.

## 19.3.4 Forming The Underwriting Group

[FINRA Rule 5160]

If other dealers will be invited to participate in the underwriting, Alpine will:

- Extend invitations to other dealers
- Execute with participants, depending on their invited role:
  - Agreement Among Underwriters (defines rights and obligations of the underwriters with respect to each other)
  - Underwriting Agreement (agreement between underwriters and the issuer committing to purchase the security in a negotiated underwriting)
  - Purchase Agreement (agreement between the issuer and underwriting firms in a competitive bidding)
  - Selected Dealer Agreement (selling group agreement, also covers underwriters whose net take-down exceeds their underwriting commitment)

## 19.3.5 Underwriting Compensation

[FINRA Rule 5110(c)]

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Underwriting agreement with issuer and/or other documents regarding potential compensation |
| Frequency | • As required for each underwriting |
| Action | • Review compensation for fairness and reasonableness and ensure compensation is within rule guidelines. |

ALPINE_LIT169238

| | |
|---|---|
| | • Identify any patterns of consistent compensation levels among underwritings; such patterns may indicate a failure to negotiate each deal individually to determine pricing of Alpine's services.<br>• Adjust compensation if necessary to comply with Firm and rule requirements and remind personnel of requirements if inconsistencies are identified.<br>• Ensure compensation is disclosed in the prospectus. |
| **Record** | • Underwriting records, including compensation negotiated with the issuer, are included in the deal file.<br>• The Syndicate Supervisor or designee's initials or signature is included on records reviewed.<br>• Records of adjustments to compensation. |

Alpine will review underwriting compensation issues to ensure compliance with the FINRA's Corporate Financing Rule. Underwriting compensation earned by Alpine is determined through negotiation with the issuer and is reviewed by the FINRA before the issue may be offered to the public. FINRA's Corporate Financing Rule regulates underwriting compensation and prohibits unfair arrangements in connection with public offerings of securities.

## 19.3.5.1 Lock-Up Restrictions

[FINRA Rule 5110(g), 5131(d) and 5131.03]

For an offering of equity securities, the issuer and its officers, directors, and principal security holders will generally enter into agreements ("lock-ups") promising not to sell any additional securities of the same class, or any securities convertible or exchangeable into the same class, for a specified period of time after the date of the prospectus. Time periods generally are 180-270 days for IPOs and 90-120 days for secondary offerings. As managing underwriter, Alpine may exempt sales it judges would not disrupt the distribution or have an adverse effect on the aftermarket of the securities being distributed.

## 19.3.6 Preliminary And Final Prospectuses

[SEC Securities Act of 1933 Rule 154, Rule 172, Rule 173, Rule 174, Rule 434, Rule 460, Section 2(a)(10), Section 10 and Section 12; SEC Securities Exchange Act of 1934 Rule 15c2-8; SEC Regulation C Rule 421]

The preparation and filing of the prospectus includes:

- Preparation of the preliminary prospectus
- Filing preliminary prospectus with regulators
- Providing preliminary prospectus with invitations to other potential participants
- File prospectus with SEC
- Prepare final prospectus with price information
- Provide final prospectuses to participants in printed form or provide notice that prospectuses may be accessed electronically ("access equals delivery")

## 19.3.7 Regulatory Filings And Notifications

[SEC Regulation M; FINRA Rule 5110 and 5190; FINRA Regulatory Notice 14-22]

| **Responsibility** | • Syndicate Supervisor or designee |
|---|---|

ALPINE_LIT169239

| | |
|---|---|
| **Resources** | • Underwritings |
| **Frequency** | • As required depending on type of filing |
| **Action** | • For registration statement filings:<br><br>○ Engage counsel to draft registration statement<br>○ Follow procedures listed in Registration Statement below<br><br>• Determine filing requirement:<br><br>○ If Alpine is managing underwriter, under Rule 101 determine one-day or five-day restricted period or if the security is "actively traded" without a restricted period<br>○ If Alpine is an issuer or selling security holder of a security that is a covered security subject to a restricted period under Rule 102<br>○ Whether another member has assumed filing requirements, in writing<br><br>• File information electronically with the FINRA, when required<br>• Notify of cancellation or postponement of an issue where a prior notice was filed<br>• Request Underwriting Activity Report (UAR) |
| **Record** | • Determination of restricted period and filing requirements<br>• Notifications<br>• Written consent when another firm agrees to make filings (occurs when there is no managing underwriter)<br>• Retain records of information filed and UAR in the deal file |

Underwritings are subject to FINRA notification requirements. All public offerings (including unregistered offerings unless there are restrictions on resale) are subject to regulatory filing requirements unless exempt under FINRA Rule 5110(b)(8).

- ***Covered security*** means any security that is the subject of a distribution, or any reference security.
- ***Distribution*** means an offering of securities, whether or not subject to registration under the Securities Act, that is distinguished from ordinary trading transactions by the magnitude of the offering and the presence of special selling efforts and selling methods.
- ***Rule 101*** prohibits distribution participants (underwriters, selling group members, *etc.*) from engaging in manipulative activity that would influence the price of the security in a distribution.
- ***Rule 102*** prohibits issuers and selling security holders from engaging in manipulative activity that would influence the price of the security in a distribution.

## 19.3.7.1 Registration Statement
The registration statement is prepared and filed as follows:

- Coincident with due diligence and approval of Alpine's role managing the underwriting, begin the process of drafting the registration statement.
- Finalize registration statement and file Form S-1 with the SEC.
- File registration statement with SROs.
- File interim amendment to registration statement, if necessary, with SEC.
- Registration statement becomes effective.

ALPINE_LIT169240

### 19.3.7.2 Regulation M Notification Requirements

Distribution participants are required to file Regulation M notifications with FINRA. The following are responsible for electronic filing the required notification which may be assumed by another firm if the obligation to file is in writing.

- The member firm acting as manager (or in a similar capacity); if no member firm acts as manager, each firm participating in the distribution is required to file unless one firm has assumed responsibility in writing for compliance
- A firm that is an issuer or selling security holder
- A firm that intends to impose a penalty bid or effect a syndicate covering transaction

Alpine must update any submitted notification as necessary (*e.g.,* the manager would update for any distribution participants added after the restricted period commenced; if a deal was oversubscribed; the over-allotment was exercised; *etc.*).

Firms with an obligation to file notification under FINRA and NASDAQ requirements are only required to file with FINRA.

### 19.3.7.3 Summary Chart of Notification Requirements

| Notification Requirement | Rule | Form | Deadline for Filing |
|---|---|---|---|
| Determination of applicable restricted period, including contemplated commencement of restricted period | 5190(c)(1)(A) | Regulation M Restricted Period Notification | No later than the business day prior to the first complete trading session of the applicable restricted period |
| Determination that no restricted period applies under the "actively traded" securities exception | 5190(d)(1) | Regulation M Restricted Period Notification | No later than the close of business the next business day following the pricing of the distribution |
| Pricing of distribution (applicable to distributions subject to a restricted period and distributions of "actively traded" securities) | 5190(c)(1)(B) 5190(d)(2) | Regulation M Restricted Period Notification | No later than the close of business the next business day following the pricing of the distribution |
| Cancellation or postponement of distribution (applicable where prior notice of commencement of restricted period has been provided) | 5190(c)(1)(C) | Regulation M Restricted Period Notification | Immediately upon cancellation or postponement |
| Intent to effect syndicate covering transaction | 5190(e)(1) | Regulation M Notice of Intent to Impose a Penalty Bid and/or Effect a Syndicate Covering Transaction | Prior to effecting transaction |
| Confirmation of syndicate covering transaction | 5190(e)(2) | Regulation M Trading Notification | Within one business day of completion |
| Intent to impose penalty bid | 5190(e)(1) | Regulation M Notice of Intent to Impose a Penalty Bid and/or Effect a Syndicate Covering Transaction | Prior to effecting bid |

ALPINE_LIT169241

| Confirmation of penalty bid | 5190(e)(2) | Regulation M Trading Notification | Within one business day of bid |
|---|---|---|---|

### 19.3.7.4 New Issues

[FINRA Rule 2710, Notice to Members 04-20]

The Syndicate Supervisor or designee will:

- Determine whether filing with the Corporate Financing Department of the FINRA is required.
- If filing is required, review the information filed prior to submission to the FINRA.
- Ensure the underwriting does not go forward unless a "no objection" letter is received from the FINRA, for those underwritings requiring filing with the FINRA.

If filing is required, two filings will be made with the FINRA Corporate Financing Department using the IPO Distribution Manager through the FINRA's internet COBRADesk:

- An initial filing, filed on or before the offering date, of the initial list of distribution participants and their commitment and retention amounts
- A final filing, filed no later than 3 days after the offering date (T 3) of the final list of distribution participants and their commitment and retention amounts

### 19.3.7.4.1 NASDAQ IPO Process

[NASDAQ Head Trader Alert 2005-096 and 2005-086;
http://www.nasdaqtrader.com/content/productsservices/trading/ipohalt/ipo_factsheet.pdf]

NASDAQ has an IPO process to price a new issue when it comes to market. The lead underwriter is responsible for calling NASDAQ to communicate the IPO offering price by 6:45 p.m. E.T. on the day of pricing (the night before trading will begin). The offering price will be used by NASDAQ as the first bid (represented by the lead underwriter's MPID) in the NASDAQ Market Center at the start of IPO trading.

If the lead underwriter does not provide price information by the deadline, pricing will default to the IPO process.

### 19.3.7.4.2 Underwriting Activity Report

[FINRA Rules 2710(b)(10) and 6540(d), Notice to Members 03-46]

At the time a registration statement or similar offering document is filed with the FINRA's Corporate Finance Department, the SEC, or other regulatory agency, a request will be submitted to the FINRA's Market Regulation Department for an Underwriting Activity Report (UAR). If not filed with any regulatory agency, the request will be filed at least 2 business days prior to the commencement of the restricted period under SEC Rule 101.

### 19.3.7.4.3 TRACE-Eligible Securities

[FINRA Rule 6760]

For IPOs of TRACE-eligible securities, the FINRA Trace Operations Center will be provided with a new issue notification no later than 5:00 p.m. E.T. on the business day preceding the day the registration statement becomes effective or, if no registration is required, the day before the securities are priced. When early closings in TRACE occur, the information will be provided by the early closing time rather than by 5:00 p.m. E.T.

For deals where there is no managing underwriter, the underwriting group is responsible for filing the required information. "Underwriter" includes firms acting as agents for issuers of new TRACE-eligible securities.

ALPINE_LIT169242

**19.3.7.4.4 Designated Orders**

For fixed price underwritings where orders are received designating another broker-dealer to receive credit, a report will be filed with the FINRA within 30 days after the end of the calendar quarter during which the orders are received.

**19.3.7.5 Blue Sky Considerations**

The Syndicate Supervisor or designee is responsible for determining whether the issue qualifies for the NSMIA exemption from blue sky requirements and if it does not, making the necessary filings and registering the issue with individual states.

## 19.3.8 Road Shows

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor or designee |
| **Resources** | • Proposals for road shows<br>• Proposed invitees |
| **Frequency** | • As required |
| **Action** | • Review road show presentation and approve or disapprove<br>• Provide preliminary prospectuses for invitees<br>• For video or internet road shows, ensure all requirements are completed |
| **Record** | • Road show presentation and related materials<br>• Record of who attended and received preliminary prospectuses<br>• Record of required items for video or internet road shows |

Alpine may conduct road shows and invite broker-dealers and potential investors to review the proposed underwriting. Those invited may include institutional investors, securities firms, trading and sales personnel, research analysts, and qualified individual investors.

**19.3.8.1 Video And Internet Road Shows**

[SEC No-Action Letters including those to: Wit Capital (July 14, 1999), Private Financial Network (March 12, 1997), Net Roadshow (July 30, 1997) and Charles Schwab and Co. (November 12, 1999 & February 9, 2000), Bloomberg L.P. (October 22, 1997), Thomson Financial Services (September 4, 1998)]

Following are some of the requirements that apply when road shows are conducted via video or the internet:

- The registration statement will be on file with the SEC.
- The audience is limited to pre-selected or pre-qualified investors; for internet road shows, password access will be required.
- The viewer will be provided a prospectus before or concurrently with the transmission.
- Transmission is protected against downloading, copying, and printing.
- Viewers are required to represent they will not copy or distribute the transmission to others.
- The road show will be transmitted in its entirety, except for minor editing to eliminate dead time or to correct mistakes. Viewers may prematurely end the transmission at their option.
- Audio-visual materials (such as slides) will be presented for approximately the same amount of time as in a traditional show.

ALPINE_LIT169243

- The road show will not be transmitted to any one viewer more than a limited number of times or restricts the viewer's access to a limited time period.
- The road show will display a Rule 134(b) legend stating that because the registration statement is not yet effective, the securities cannot yet be sold and offers to buy cannot yet be accepted.

## 19.3.9 Pricing The Underwriting

The deal will be priced considering a wide range of factors which may include:

- The company's real or expected growth
- Company's operating history
- Quality of company's management
- Company's approach to research and development
- Prospects for the industry in which the company operates
- Market comparables, such as price-to-earnings ratio of a similarly-situated company that is publicly traded
- Growth prospects for the company's products and services and the expected impact on those
- General conditions of the securities market at the time of the offering

## 19.3.10 Aftermarket Activities

### 19.3.10.1 Stabilizing Activities

[SEC Securities Exchange Act of 1934 Rule 17a-2; SEC Regulation M Rule 104; NASDAQ Rule 4614 and 4625]

Alpine may engage in stabilizing activities to prevent or retard the decline in the price of the security. Refer to the chapter *OTC EQUITY TRADING AND MARKET MAKING*, the section *Distribution Of Securities* and the subsection *Stabilizing Bids*.

- Potential stabilizing activities will be disclosed in the prospectus.
- Only one stabilizing bid may be entered.
- Stabilizing transactions will be identified as such when entered.
- Stabilizing transactions will comply with price requirements in the market where entered.

The Syndicate Supervisor or designee will notify each syndicate or group member of the name and class of the security stabilized and the time when the first stabilizing purchase was effected and when stabilizing was terminated.

### 19.3.10.2 Penalty Bid And Syndicate Covering Transactions

[SEC Regulation M Rule 100 and Rule 104; NASDAQ Rule 4624; FINRA Rule 5131(c)(2) and 5190]

A penalty bid (reclaiming the selling concession) may be imposed on a syndicate member when the securities originally sold by the syndicate member are purchased in a syndicate covering transaction. If penalty bids may be imposed, it will be disclosed in the IPO registration statement. The appropriate SRO(s) will be notified when a penalty bid is imposed.

### 19.3.10.3 Records Of Stabilizing, Penalty Bid, and Syndicate Covering Activities

The Syndicate Supervisor or designee is responsible for maintaining the following records in a separately retrievable format:

- name and class of security stabilized or where syndicate covering transactions were effected or a penalty bid is imposed

ALPINE_LIT169244

- price, date, and time at which each stabilizing purchase or syndicate covering transaction was effected by Alpine or any participant in the syndicate or group and whether any penalties were assessed
- names and addresses of members of the syndicate or group
- commitments or, for a standby or contingent underwriting, the percentage participation of each syndicate or group member
- dates when any penalty bid was in effect

### 19.3.10.4 Settlement Of Syndicate Accounts

[FINRA Rule 5160 and 11880]

- Final settlement will be effected within 90 days following the syndicate settlement date.
- Syndicate members will be provided with, no later than the date of final settlement of the syndicate account, an itemized statement of syndicate expenses.
- The FINRA Uniform Practice Dept. will be notified of any anticipated delay in closing a firm commitment offering beyond the closing date in the offering document or any subsequent delays in the closing date previously reported to the FINRA.

### 19.3.10.5 Payment Of Concessions, Discounts, Allowances

Concessions, discounts, and allowances will be paid only to registered broker-dealers for services rendered in a distribution.

### 19.3.10.6 Designated Orders

Alpine will maintain records of designated orders including:

- name of person making the designation
- identity of brokers or dealers designated
- identity and amount of securities for which each broker/dealer is designated
- date of commencement and termination of the offering

## 19.4 Syndicate Member Procedures

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor or designee |
| **Resources** | • Invitations to participate as a syndicate group member<br>• Prospectus<br>• Registration statement<br>• Other information provided by the managing underwriter |
| **Frequency** | • As required for each underwriting |
| **Action** | • Review agreement, related documents, and accept or decline<br>• Notify Compliance of proposed deal for consideration whether to add the security to Alpine's Restricted List and notify Compliance when price and trading restrictions are lifted<br>• Notify Research if necessary<br>• Allocate available securities<br>• Provide prospectuses to purchasers, if required |
| **Record** | • The invitation, signed agreements, prospectus, registration, and other |

ALPINE_LIT169245

| | information provided by the managing underwriter as well as Compliance and Research notification and tombstone ads are retained in the deal file. |
|---|---|

When invited to participate as a syndicate member, the Syndicate Supervisor or designee will review the deal, accept or decline, and oversee the distribution of securities sold by Alpine.

### 19.4.1 Tombstone Ads

Alpine may publish tombstone announcements of participation as a syndicate member. Tombstone ads must be approved by the CCO prior to publication or, if the underwriting supervisor and the CCO are the same person, by the President.

### 19.4.2 Research

If Alpine issues research regarding the subject company, participation as a syndicate member requires compliance with SRO rules regarding research activities. The President or designee is responsible for notifying the Research Department of pending deals since issuance of research reports may be restricted.

## 19.5 Selling Group Member Procedures

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Invitations to participate as a selling group member<br>• Prospectus<br>• Registration statement<br>• Other information provided by the managing underwriter |
| Frequency | • As required for each underwriting |
| Action | • Review agreement, related documents, and accept or decline<br>• Notify the CCO of proposed deal for consideration whether to add the security to Alpine's Restricted List and notify CCO when price and trading restrictions are lifted<br>• Notify Research if necessary<br>• Allocate available securities<br>• Return unsold allotment to managing underwriter |
| Record | • The invitation, signed agreements, prospectus, registration, and other information provided by the managing underwriter as well as CCO and Research notification and tombstone ads are retained in the deal file. |

This section describes procedures when Alpine participates in an underwriting as a selling group member.

### 19.5.1 Returning Unsold Allotment

As a selling group member, Alpine has no financial commitment to sell underwritten shares and will return unsold allotments, unless the terms of the selling agreement dictate otherwise.

ALPINE_LIT169246

Unsold shares will be returned to the managing underwriter within the timeframe specified by the selling group agreement.

### 19.5.2 Tombstone Ads

Alpine may publish tombstone announcements of participation as a selling group member. Tombstone ads must be approved by the CCO prior to publication.

### 19.5.3 Research

If Alpine issues research regarding the subject company, participation as a selling group member requires compliance with SRO rules regarding research activities. The syndicate supervisor is responsible for notifying the Research Department of pending deals since issuance of research reports may be restricted.

## 19.6 Communications Around The Time Of Registered Offerings

[SEC Securities Act of 1933 Rule 134, Rule 135, Rule 163, Rule 163A, Rule 164, Rule 168, Rule 169, Rule 405 and Rule 433; SEC Release No. 34-52056; FINRA Rule 2210; FINRA Regulatory Notice 10-52; JOBS Act, Title I; SEC JOBS Act Frequently Asked Questions: http://www.sec.gov/divisions/corpfin/guidance/cfjjobsactfaq-title-i-general.htm]

Issuing communications (other than the prospectus) to investors around the time of an offering may constitute "gun-jumping." Certain types of communications are permitted or are exempt from gun-jumping restrictions under federal rules. This section summarizes key elements of communications about offerings. The rules are complex and technical; questions should be referred to the CCO.

### 19.6.1 Categories Of Issuers

Permitted communications depend, at least in part, on the category of the issuer, summarized below.

***Well-known seasoned issuer:*** An issuer current and timely in its '34 Act reports for at least one year and has either $700 million of worldwide public common equity float, or has issued $1 billion of non-convertible securities (other than common equity) in registered offerings for cash in the preceding three years.

***Seasoned reporting issuer:*** An issuer eligible to register as a primary offering of securities on Form S-3 (among other requirements). To be Form S-3 eligible for a primary offering, a company must have an aggregate market value of $75 million or more of common equity held by non-affiliates.

***Non-reporting and unseasoned issuers:*** An issuer that does not fall within the above categories (this category is subject to specific restrictions).

***Ineligible issuers:*** Issuers that are ineligible as defined in Rule 405 and where communications outside the prospectus are not permitted. Rule 164 regarding free writing prospectuses also excludes investment companies registered under the Investment Company Act of 1940 and offerings involving an issuer registering a business combination transaction.

***Emerging growth company ("EGC"):*** A company that conducts an IPO after December 8, 2011 and had annual gross revenues of less than $1 billion during its most recent fiscal year. A company will retain EGC status until the earliest of:

- the first fiscal year after its annual revenues reach $1 billion;
- the first fiscal year following the fifth anniversary of its IPO;
- the date on which the company has, during the previous three-year period, issued more than $1 billion in non-convertible debt; and
- the date on which the company becomes a "large accelerated filer."

ALPINE_LIT169247

### 19.6.2 Other Definitions

***Free writing prospectus:*** A written communication (including electronic communications) outside the statutory prospectus that after the filing of the registration statement, may be filed with the SEC, with certain conditions depending on the type of issuer.

***Written communications:*** All methods of communication other than oral communications are defined as "written." Written communications include any communication that is written, printed, a radio or television broadcast, or graphic communication. *Graphic communication* excludes communications that are carried live and in real-time to a live audience, regardless of the method of transmission. All electronic communications (other than telephone and other live, in real-time communications to a live audience) are "written."

***Electronic roadshows:*** Live electronic roadshows, even though transmitted to a live audience via an electronic medium, are not considered "written" material. Electronic road shows that are not live are considered free writing prospectuses. Electronic road shows for IPOs of common equity or convertible equity securities do not have to be filed with the SEC if a version of the bona fide electronic road show is made readily available to an unrestricted audience. No other road shows are subject to filing with the SEC.

### 19.6.3 Permitted Offering Activity And Communications

The following is an overview of permitted communications.

- Well-known seasoned issuers may engage, at any time, in oral and written communications, including the use of a free writing prospectus.
- Emerging Growth Companies (EGCs) are subject to fewer restrictions than other issuers. Contact Compliance for clarification of permitted communications. Some restrictions or permissible activities involving EGCs include:
  - Any firm subject to the Global Settlement remains restricted by any applicable terms of the settlement.
  - When "testing the waters," an underwriter may ask customers for nonbinding indications of interest, including how many shares the customer may seek to purchase, without violating rules requiring the provision of a preliminary prospectus when soliciting orders.
- All reporting issuers may, at any time, continue to publish regularly released factual business information and forward-looking information.
- Non-reporting issuers may, at any time, continue to publish factual business information that is regularly released and intended for use by persons other than in their capacity as investors or potential investors.
- Communications by issuers, more than 30 days before filing a registration statement, are permitted, if they do not reference the securities offering that is the subject of a registration statement.
- All issuers and offering participants may use a free writing prospectus after the filing of the registration statement, subject to conditions. The statutory prospectus has to accompany or precede the free writing prospectus for unseasoned or non-reporting issuers, if the issuer or an offering participant prepares or pays for the free writing prospectus.
- Some routine communications are permitted, including an offering schedule or about account opening procedures.
- Research reports (other than reports on EGCs) may be issued under the safe harbors of Rules 137, 138, and 139. There are no restrictions on issuing research reports on EGCs.
- Media interviews are permitted if they meet the conditions of Rule 433 and conditioned on whether the issuer or participant paid for the media communication.

## 19.7 Sales To The Public

[FINRA Rule 5131]

The following sections outline procedures for selling underwritten issues to Alpine's customers.

ALPINE_LIT169248

### 19.7.1 Indications Of Interest

Indications of interest are accepted prior to the effective date of the underwriting. Indications of interest are not orders and do not become orders until the syndicate supervisor confirms that securities are available to satisfy indications; RRs are responsible for re-confirming the customer's purchase of the securities at the time the issue is effective and allocated to customers. There is no assurance of an adequate quantity of securities to meet indications of interest.

### 19.7.2 Conditional Offers

Alpine may allow "conditional offers" for an underwriting; RRs will be notified if such orders are allowed and during what period the customer may revoke the order.

### 19.7.3 Prospectuses And Confirmations To Purchasers

[SEC Securities Act of 1933 Rule 172 and Rule 173]

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Indications of Interest<br>• Record of purchasers |
| Frequency | • As required |
| Action | • Provide preliminary prospectuses to RRs when available<br>• Notify Operations to include the required disclosure on confirmations sent to purchasing customers<br>• If a final prospectus is required to be provided to investors, obtain prospectuses and forward to appropriate Operations personnel for sending or establish electronic access to the prospectus and notify purchasers |
| Record | • A record of purchasers and sending of prospectuses (if required) is maintained in the deal file or establishment of electronic access and notice provided to purchasers. |

### 19.7.3.1 Confirmations And Notices Of Allocations Of Shares

Written confirmations and notices of allocations of shares offered, may be sent after the effectiveness of a registration statement (for an issue complying with Rule 172) without being accompanied or preceded by a final prospectus. Written communication from a broker-dealer to a customer, or from an underwriter to participating dealers in the selling group, may notify them of the basic terms of the transaction or their allocations of the securities. Notices of allocation may include the identity of the securities; CUSIP number; amount allocated; price; date or expected date of settlement; and incidental information.

When final prospectuses are not required, purchasers will be provided, no later than two business days after the sale a notice that the sale was made pursuant to a registration statement or in a transaction in which a final prospectus would not have been required to have been delivered in the absence of Rule 172.

### 19.7.3.2 Preliminary And Final Prospectuses

Preliminary prospectuses will be provided to RRs if available. These should be provided to customers submitting an indication of interest in the new issue.

ALPINE_LIT169249

The issuer is not required to print and physically deliver a final prospectus to investors, if the issuer files the prospectus with the SEC within a prescribed period of time and complies with certain other conditions. For issuers that are required to provide prospectuses, copies will be obtained and forwarded to purchasers.

An investor may request a physical copy of the final prospectus, but the prospectus is not required to be provided prior to settlement.

### 19.7.3.3 Purchases During The Post-Effective Period

[SEC Securities Act of 1933 Rule 174 and Section 4(3)]

There is no obligation to provide a prospectus to purchasers in the post-effective period if the issuer is a reporting company under Section 13 or 15(d) of the '34 Act; is a shelf offering (other than the first bona fide offering); or if the registration statement is on Form F-6. This exemption does **not** apply to blank check companies.

For issues not included above, customers who purchase in the post-effective period and where the issue satisfies the requirements of Rule 172, will be provided with the required notice (see *Confirmations And Notices Of Allocations Of Shares*, above) within two business days of the sale. This requirement applies for a period of 25 calendar days after the offering date.

For issues that do not qualify under Rule 172, purchasers during the period of 25 calendar days after the offering date will be sent a copy of the final prospectus.

### 19.7.3.4 Term Sheets

[SEC Regulation C Rule 421]

Term sheets may be provided to prospective purchasers and will meet the requirements of a plain English summary that includes most material terms of the proposed offering. Bullet points will cross-reference detailed information in the prospectus or other offering document.

Term sheets may also be provided to new issue purchasers who have received a preliminary prospectus. The term sheet is included with the customer's confirmation and supplements the preliminary prospectus to disclose final terms such as price and effective date.

### 19.7.3.5 Electronic Delivery Of Prospectuses

[SEC Securities Exchange Act of 1934 Release No. 37182 (May 1996) and Release No. 36345 (Oct. 1995)]

Where Alpine determines to provide prospectuses through electronic media, the following guidelines apply:

- The prospectus itself may be sent to the investor by disk, tape, email, or similar method.
- If a prospectus is posted on Alpine's web site, separate written notice by email or regular mail will be forwarded to the investor.
- Customers must agree to accept electronic delivery and consent retained in the customer's records.
- Delivery must be evidenced (confirmation document has been downloaded, record of hyper link access; *etc.*)
- Current updated versions of the preliminary prospectus may be posted on Alpine's website available to all potential investors. Notice of updates is sent to investors expected to purchase the offered securities.
- Final prospectuses will be posted to the website and written notice mailed to purchasers notifying them how they may access the prospectus.
- When a prospectus is amended, (1) a postcard or email will be sent to investors notifying them of the availability of the amended prospectus or (2) a paper copy of the amendment will be sent to investors.

ALPINE_LIT169250

### 19.7.4 Restrictions On Purchase And Sale Of IPOs Of Equity Securities

[FINRA Rule 5130]

| | |
|---|---|
| **Responsibility** | • Syndicate Supervisor or designee |
| **Resources** | • Indications of interest for IPOs |
| **Frequency** | • As required, when equity IPOs are offered |
| **Action** | • Review indications to determine no purchasers are restricted persons<br>• If potential purchasers are restricted, notify RR and offer the shares to a qualified purchaser |
| **Record** | • Indications of interest and review to identify restricted persons are included in the underwriting file |

When selling IPOs, the distribution of shares must be a *bona fide* public offering and fair distribution to the public. This means sales will not be made to benefit insiders in the securities industry or to other closely-related parties that might unfairly benefit at the expense of public customers. This section describes key elements of the FINRA rule that limits the types of investors that may purchase equity IPOs.

The Rule should be consulted for specific details. Questions regarding restrictions should be directed to the syndicate supervisor or to the CCO.

### 19.7.4.1 Restricted Persons

Equity IPOs **may not be purchased** by "restricted persons" as defined in FINRA Rule 2790 including accounts where the restricted person has a beneficial interest. Restricted persons include:

- **FINRA members or other broker-dealers**
- **Broker-dealer personnel**

1. Any officer, director, general partner, associated person or employee of a member or any other broker-dealer;
2. Any officer, director, general partner, associated person or employee of a member or any other broker-dealer;
3. An immediate family member or a person listed above if the above person is:
    - Materially supports, or receives material support from, the immediate family member;
    - Is employed by or associated with the member, or an affiliate of the member, selling the new issue to the immediate family member; or
    - Has the ability to control the allocation of the new issue.

- **Finders and fiduciaries**
    - With respect to the security being offered, a finder or any person acting in a fiduciary capacity to the managing underwriter, including, but not limited to, attorneys, accountants and financial consultants; and
    - An immediate family member of a person above if the person materially supports or receives material support from the immediate family member.
- **Portfolio managers** (any person who has authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor, or collective investment

ALPINE_LIT169251

account) and their immediate family members if the person materially supports or receives material support from the immediate family member

- **Persons who have ownership in a broker-dealer including:**
  - **Direct owners** (any person listed, or required to be listed, on Schedule A of Form BD) unless ownership is less than 10%
  - **Indirect owners** (any person listed or required to be listed on Schedule B of Form BD) unless ownership is less than 10%
  - **Persons listed** or required to be listed **on Schedule C** of Form BD
  - **Persons that directly or indirectly own 10% or more of a public reporting company** listed or required to be listed in Schedule A or **persons that directly or indirectly own 25% or more of a public reporting company** listed in Schedule B of Form BD (other than reporting companies listed on an Exchange, the NASDAQ National Market, or that is a limited business broker-dealer)
  - **Immediate family members** of the above, with some exclusions in the Rule

**Excluded** from the definition of "restricted person" is an **employee** or immediate family member of an employee of a **"limited business broker-dealer"** which is defined as any broker-dealer whose business is limited solely to the purchase and sale of investment company/variable contract securities and direct participation program securities.

## 19.7.4.2 General Prohibitions

The following summarizes the general prohibitions that apply to the sale of equity IPOs.

1. Restricted persons are not allowed to purchase IPOs, unless there is an available exemption.
2. A broker-dealer or associated person (AP) may not purchase an equity IPO in an account where the BD or AP has a beneficial interest.
3. A broker-dealer may not continue to hold new issues acquired as underwriter or selling group member except when the issue is under-subscribed (described in a later section).

## 19.7.4.3 Certification Of Non-Restricted Status Required From All Purchasers

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Indications of interest<br>• IPO certifications |
| Frequency | • As required, when equity IPOs are offered<br>• Annual - negative consent letter |
| Action | • Determine whether proposed purchaser has submitted the IPO certification<br>• If not, contact RR or otherwise obtain the required certification<br>• For accounts lacking certification, exclude from IPO purchasers<br>• President - arrange for annual negative consent and change the customer's eligibility to purchase IPOs if the customer's non-restricted status has changed |
| Record | • Notation that indications have been reviewed for certifications are included in the underwriting file<br>• Certification is noted on the account record and retained in customer records<br>• Record is retained that the annual negative consent has been sent |

ALPINE_LIT169252

An IPO may not be sold to an account unless, during the prior 12 months, Alpine has received certification that the account is eligible to purchase new issues. This includes certification from conduit accounts (discussed below). Alpine or an RR cannot rely on a certification that it has reason to believe is not accurate.

### 19.7.4.3.1 Initial And Annual Certification

Prior to the first purchase of an equity IPO, and for each equity IPO subsequent thereto, the prospective purchaser must sign and submit the IPO Certification form that certifies that the underlying beneficial owners are not restricted persons. The account will be considered non-restricted based on the customer's certification.

After receiving the initial IPO Certification, Alpine may, rather than sending a new IPO Certification for each subsequent offering, annually send a negative consent letter asking the customer to notify Alpine if the initial certification is no longer accurate.

### 19.7.4.3.2 Conduit Accounts

Certification must be obtained when a potential IPO purchaser is a "conduit" account, which includes, for example, an investment partnership or corporation, a foreign investment company, an investment adviser, and an account for which a bank or trust company is acting as a conduit. The conduit is required to certify that the beneficial owner or ultimate purchaser is not a restricted person.

### 19.7.4.3.3 Indirect Beneficial Owners

[FINRA Rule 5131.02(b)]

Where it is difficult to identify indirect beneficial owners such as participants in unaffiliated private funds (such as a fund of funds), [The Firm] may rely on a written representation obtained within 12 months by a person authorized to represent an account that does not look through to the beneficial owners of any unaffiliated private fund invested in the account, except for beneficial owners that are control persons of the investment adviser to the private fund. An unaffiliated private fund that qualifies under this exception:

- is managed by an investment adviser;
- has assets greater than $50 million;
- owns less than 25% of the account and is not a fund in which a single investor has a beneficial interest of 25% or more; and
- was not formed for the specific purpose of investing in the account.

An "unaffiliated private fund" is a private fund defined in Section 202(a)(29) of the Investment Advisers Act, whose investment adviser does not have a control person in common with the investment adviser to the account.

### 19.7.4.3.4 Third Party Vendor Certifications

[FINRA Interpretive Letter dated 2/17/04 to Tom Fleming of Dealogic]

Alpine may use a third party that obtains certification that potential purchasers are eligible to buy IPOs. Under this approach, the syndicate supervisor is responsible for confirming that the third party has procedures in place that comply with FINRA Rule 2790 and for signing an agreement with the vendor. When a third party is used, Alpine's records will include verification of IPO purchasers' eligibility against the third party's records and at least annual review that the third party's procedures comply with FINRA requirements. Record of third party certifications is retained in the deal file.

ALPINE_LIT169253

**19.7.4.4 Exemptions**

Equity IPOs **may be sold** to the following types of accounts and are **not subject to** restricted person prohibitions or requirements.

- Registered investment companies.
- Common trust funds with investments from 1000 or more accounts and that do not limit interests in the fund principally to trust accounts of restricted persons.
- Insurance company general, separate, or investment accounts provided that:
  - the account is funded by premiums from 1000 or more policyholders, or, if a general account, the insurance company has 1000 or more policyholders; and,
  - the insurance company does not limit the policyholders whose premiums are used to fund the account principally to restricted persons, or if, a general account, the insurance company does not limit its policyholders to restricted persons.
- *De minimis* exemption for purchase by an account if the beneficial interests of restricted persons do not exceed the aggregate 10% of the account.
- Publicly traded entities listed on a national securities exchange or traded on the NASDAQ Global Market (NGM) or are foreign issuers that meet the quantitative designation criteria for listing on a National securities exchange or NGM. This exemption **does not** include sales to publicly-traded broker-dealers or a publicly-traded affiliate of a broker-dealer.
- Foreign investment companies organized under the laws of a foreign jurisdiction that are listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority provided that no person owning 5% or more of the investment company is a restricted person.
- ERISA benefit plans qualified under Section 401(a) of the Internal Revenue Code (IRC) provided the plan is not sponsored solely by a BD.
- State or municipal government plans subject to state and/or municipal regulation.
- Tax-exempt charity organized under Section 501(c)(3) of the IRC.
- Church plans described in Section 414(e) of the IRC.


**19.7.4.5 Issuer-Directed Securities**

[FINRA Rule 5130(d)]

Issuers often direct the underwriter to offer shares to certain persons. Those sales specifically directed by the issuer are exempt from restricted person prohibitions except that sales to broker-dealer employees, finders, or fiduciaries (as defined under Restricted Persons, above) are exempt **only if** that person, or a member of their immediate family, is an employee or director of the issuer, the issuer's parent, or a subsidiary of the issuer or the issuer's parent.

IPO sales are also exempt if distributed as part of a program sponsored by the issuer, or an affiliate of the issuer, that meets four conditions:

- the opportunity to purchase a new issue under the program is offered to at least 10,000 participants;
- every participant is offered an opportunity to purchase an equivalent number of shares or will receive a specified number of shares under a predetermined formula applied uniformly across all participants;
- if not all participants receive shares under the program, the selection of the eligible participants is based on a random or other non-discretionary allocation method; and,
- the class of participants does not contain a disproportionate number of restricted persons.

Last, the issuer-directed exemption also applies to new issues directed to eligible purchasers as part of a conversion offering conducted in accordance with the standards of the governmental agency or instrumentality having authority to regulate the conversion offering.

ALPINE_LIT169254

### 19.7.4.6 Anti-Dilution

A restricted person that is an existing equity owner of an issuer may purchase shares in the IPO in order to maintain its equity ownership position. To qualify for this exemption, the restricted person must meet the following criteria:

- the account held shares for a period of at least 1 year prior to the offering;
- the sale of the new issue does not increase the account's percentage equity ownership in the issuer above the ownership level as of 3 months prior to the filing of the registration statement for the offering;
- the sale of the new issue to the account does not include any special terms; and,
- the new issue is held for at least 3 months following the effective date of the offering.

### 19.7.4.7 Stand-By Purchasers

Prohibitions on sales of IPOs do not apply if made pursuant to a stand-by agreement that meets four conditions:

1. the stand-by agreement is disclosed in the prospectus;
2. the stand-by agreement is subject to a formal written agreement;
3. the managing underwriter represents in writing that it is unable to find any other purchasers for the securities; and,
4. securities sold under a stand-by agreement are subject to a 3-month lock-up period.

### 19.7.4.8 Under-Subscribed Offerings

If Alpine, as underwriter, is unable to sell all shares for which it has committed, Alpine may place those shares in an Alpine account.

### 19.7.4.9 Definitions Applying To IPO Allocations

[FINRA Rule 5130(i) and 5131(e)]

The following are selected Rule definitions; the Rule should be consulted for other definitions.

**Beneficial interest:** Any economic interest such as the right to share in gains and losses. This excludes receipt of a management or performance-based fee for operating a collective investment account, or other fees for acting in a fiduciary capacity.

**Collective investment account:** Any hedge fund, investment partnership, investment corporation, or any other collective investment vehicle engaged primarily in the purchase or sale of securities. This does not include a family investment vehicle or investment club.

**Immediate family member:** Parents, in-laws, spouse, siblings, and children. The definition also includes anyone else to whom the person provides material support.

**Material support:** Directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with "material support."

**New issue:** Any initial public offering of an equity security as defined in Section 3(a)(11) of the Exchange Act made through a registration statement or offering circular. FINRA Rule 5130(i)(9) excludes a number of offerings from this definition (refer to the rule for details) including sales under Rule 144, 144A, 505, or 506; offerings of exempt securities; commodity pools; rights offerings; exchange offers; investment-grade asset-backed securities; convertible securities; preferred securities; investment companies; ADRs; and DPPs. This list does not include all exempt securities listed in the FINRA rule.

ALPINE_LIT169255

**Penalty bid:** An arrangement that permits the managing underwriter to reclaim a selling concession from a syndicate member in connection with an offering when the securities originally sold by the syndicate member are purchased in syndicate covering transactions.

**Restricted person:** Defined at the beginning of this section.

## 19.7.5 Disclosure Of Interest In Distribution

[SEC Securities Exchange Act of 1934 Rule 15c1-6; FINRA Rule 2269]

Prior to selling securities from a primary or secondary distribution to managed accounts or other accounts where a fee is charged, the customer will be provided with written notice of the existence of Alpine's participation in the distribution.

## 19.7.6 State Blue Sky Requirements

The syndicate supervisor is responsible for reviewing purchasers, prior to confirming transactions, to ensure the issue is sold only to purchasers in states where the issue is blue skied or is eligible for sale under an exemption.

## 19.7.7 Cancellation Policy

Indications of interest are not orders until the customer is contacted and confirms that securities allocated to the customer are accepted. At that point, a confirmation and final prospectus will be provided and the customer will be expected to pay for the transaction.

If the customer then cancels the purchase, the CCO should be contacted to resolve the matter, which may include:

- Consideration of whether the customer received a preliminary prospectus prior to confirming the purchase.
- Determination whether the customer should be held responsible for the purchase or the purchase cancelled.
- If cancelled and all other securities were sold in the underwriting, offer the new issue to another customer whose interest was not filled.
- If no other customer is available to purchase the securities, cancel the purchase to Alpine's account. The RR who sold the shares may be held responsible for any loss incurred due to the cancellation.

## 19.7.8 Designated Orders

When the firm has been designated by a customer and is not acting as underwriting manager, the following information will be retained for 24 months:

- name of customer making designation
- identity and amount of securities designated
- identity of manager or managers of the offering
- date of commencement of the offering

## 19.7.9 Securities Taken In Trade

Alpine may purchase or arrange the purchase of securities "taken in trade" only under the following conditions:

- as principal, at the fair market value
- as agent, charging a normal commission

ALPINE_LIT169256

"Taken in trade" means the customer sells a security pursuant to an agreement or understanding that the customer will purchase securities that are part of a distribution in which Alpine is participating. Any such arrangement requires approval of CCO prior to a transaction involving securities taken in trade.

### 19.7.10 Flipping

[FINRA Rule 5131(c)]

Customers may be limited or prohibited from purchasing future new issues at the syndicate supervisor's discretion because the customer engages in short-term trading of new issues (selling the new issue immediately or shortly after it becomes effective).

## 19.8 Transactions With Related Persons

When engaged in a fixed price offering, Alpine cannot sell to or place securities with anyone related to Alpine unless that person is subject to FINRA rules or is a non-member foreign broker or dealer subject to an agreement granting a selling concession, discount, or other allowance [FINRA Rule 2740(c)]. "Related person" means any person or account which directly or indirectly owns, or is owned by or is under common ownership with Alpine. "Owns" includes a person who directly or indirectly:

- Has the right to participate in more than 25% of the profits of the other person; or
- Owns beneficially more than 25% of the outstanding voting securities of the person.

This prohibition does not apply to placement in or sales to a Firm trading or investment account or a related person of Alpine after termination of the fixed priced offering if a bona fide public offering has been made.

## 19.9 Trading Restrictions While Participating In A Distribution

[SEC Regulation M; FINRA Notice to Members 97-10; FINRA Reg M Frequently Asked Questions: http://www.finra.org/Industry/Regulation/Guidance/P118758]

| | |
|---|---|
| **Responsibility** | • CCO |
| **Resources** | • Notification from the syndicate supervisor regarding pending deals<br>• Customer transaction reports |
| **Frequency** | • As required |
| **Action** | • Add to and remove from the Restricted List securities subject to Regulation M trading restrictions<br>• Review transactions for compliance<br>• Where exceptions are identified, contact the RR and RR's supervisor regarding the transaction<br>• Determine whether the transaction must be cancelled |
| **Record** | • Notification from the syndicate supervisor<br>• Record of orders reviewed including exceptions and corrective action and reviewer's initials and date reviewed |

ALPINE_LIT169257

Trading restrictions apply to securities that are the subject of a distribution and also apply to a "reference security," a security into which the distributed security may be converted, exchanged, or exercised or where the terms of the distributed security may determine the value of the reference security. Bids for and purchases of outstanding nonconvertible debt securities are not restricted unless the security being purchased is identical in all terms to the security being distributed. Investment grade nonconvertible debt securities, nonconvertible preferred securities, and asset-backed securities are excluded from restrictions.

## 19.9.1 Distribution Participant Restrictions

[SEC Regulation M Rule 101]

Orders may not be solicited in the outstanding securities of an issue the subject of an underwriting (and reference securities) under certain conditions of Regulation M:

- No restriction for securities with average daily trading volume (ADTV, as defined in Rule 101) of $1 million or more and a public float of at least $150 million
- One business day restriction for securities with ADTV of at least $100,000 but less than $1 million and a public float of at least $25 million
- Five business days for all other securities

The syndicate supervisor will notify the CCO when an issue is subject to these restrictions. The CCO will update Alpine's Restricted List and will monitor daily transactions to inquire whether transactions are solicited or unsolicited, if not included on the order record. If transactions are solicited, the CCO will determine what corrective action is necessary.

The restriction remains in effect until price and trading restrictions are lifted.

## 19.9.2 Issuer And Selling Security Holder Restrictions

[SEC Regulation M Rule 102]

Issuers, selling security holders, and their affiliated purchasers are restricted from engaging in bidding for, purchasing, or attempting to induce someone else to bid or purchase for a distributed security.

## 19.9.3 Short Sales

[SEC Regulation M Rule 105; SEC Release No. 34-56206; SIFMA Capital Markets Committee FAQs about Rule 105: http://www.sifma.org/capital_markets/docs/RegMQAon105.pdf]

Short sellers may not cover short positions using securities purchased in an offering unless the short position was established more than 5 business days prior to pricing of the offering. This restriction does not apply to short sales of derivative securities.

## 19.9.4 Prohibited Conduct

[SEC Release No. 34-51500; SEC Guidance Regarding Prohibited Conduct in Connection with IPO Allocations]

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Order records regarding IPO purchase and aftermarket transactions |

ALPINE_LIT169258

| Frequency | • As required, when issues are over-subscribed |
|---|---|
| Action | • Review purchases of IPOs vs. aftermarket purchases and sales to identify patterns which may indicate prior inducements<br>• Contact President and RRs regarding questionable transactions<br>• If violations are determined, take corrective action in consultation with CCO regarding disciplinary action against the RR |
| Record | • Transactions reviewed including reviewer, date reviewed, and action taken, if any |

Underwriters often engage in "bookbuilding" which involves seeking information from potential investors regarding their interest in the prospective issue including number of shares and price. Bookbuilding helps the pricing and success of the new issue.

There are related practices that are prohibited because they constitute attempts to induce aftermarket bids and purchases, which negatively affect the integrity of the distribution process. The following practices are **prohibited**, per the SEC:

1. Agreements to purchase shares in the aftermarket in exchange for an IPO allocation, prior to completion of the distribution. This includes agreements to purchase shares in another less desirable stock to obtain an IPO allocation.
2. Communicating to customers that expressing an interest in or buying shares in the immediate aftermarket would help them obtain allocations of over-subscribed ("hot") IPOs.
3. Soliciting customers before the completion of the distribution about whether and at what price and in what quantity the customer intends to place immediate aftermarket orders for IPO stock where the clear expectation and understanding is that the customer will submit aftermarket orders at the prices and quantities discussed if the customer receives an allocation of shares.
4. Proposing aftermarket prices to customers or encouraging customers who express aftermarket interest to increase the prices at which they are willing to place orders in the immediate aftermarket.
5. Soliciting interest from customers in purchasing aftermarket shares in some fixed proportion to the customer's IPO allocation.
6. Soliciting aftermarket orders from customers before all IPO shares are distributed or rewarding customers for aftermarket orders by allocating additional IPO shares to such customers.
7. Communicating to customers in connection with one offering that expressing an interest or buying in the aftermarket would help them obtain IPO allocations of other over-subscribed IPOs.

# 19.10 Market Making Activities

[SEC Regulation M Rule 103; FINRA Notice to Members 93-29; NASDAQ Rule 4600]

When Alpine is a market maker in an issue in which Alpine is participating in the underwriting, one of the two following procedures will be followed:

• Alpine will withdraw as a market maker during the restricted period, or,
• Alpine will engage in passive market making as defined in Rule 103 of Regulation M.

Passive market making procedures are discussed in the chapter *OTC EQUITY TRADING AND MARKET MAKING*.

The Head Trader or designee of equity trading is responsible for determining whether Alpine will act as a passive market maker and ensuring the required procedures are followed.

ALPINE_LIT169259

## 19.11 Regulation S Underwritings

### 19.11.1 Introduction

Regulation S provides safe harbor from registration requirements in the U.S. for offers and sales of securities outside the U.S. The Regulation includes extensive requirements for compliance and should be consulted. This section is provided as a synopsis of some of the restrictions and requirements.

The following restrictions apply to sales under Regulation S:

- Purchasers may not be a U.S. citizen or U.S. company
- Purchasers must be outside the U.S. at the time the buy order is originated
- Securities sold under Regulation S are classified as "restricted securities" within the meaning of Rule 144
- Securities may not be re-sold to U.S. persons (unless they are registered, meet the requirements of "Category 1" securities under Regulation S 230.903(b), or are subject to an exemption) during the distribution compliance period as defined in Regulation S (40 days for debt securities; one year for equities ["Category 2 or 3" securities])
- Purchasers must agree not to engage in hedging transactions
- Promissory notes may not be used to pay for securities

### 19.11.2 Purchaser Questionnaires

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Purchaser questionnaires |
| Frequency | • As required, prior to purchases |
| Action | • Review Purchaser Questionnaires to ensure they are complete and prospective purchasers meet the requirements of Regulation S<br>• Approve or disapprove Questionnaires |
| Record | • Questionnaires are signed and dated by the syndicate supervisor and retained in a file for the Regulation S offering |

Each purchaser of securities under Regulation S will be required to complete Alpine's Regulation S Purchaser Questionnaire. The syndicate supervisor is responsible for approving the Questionnaires prior to the purchase of shares.

### 19.11.3 Monitor Of Purchasers

The syndicate supervisor is responsible for establishing procedures to monitor Alpine accounts for customers who purchase securities under Regulation S to ensure the securities are not sold through Alpine within the restricted period.

## 19.12 Regulation A Offerings

[SEC Regulation A]

ALPINE_LIT169260

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Information obtained regarding issuer from the issuer or other sources |
| Frequency | • As required |
| Action | • Determine issue meets Regulation A requirements and integration issues<br>• Evaluate issuer information and determine Alpine's participation |
| Record | • Regulation A and integration issue determinations and issuer information are retained in the deal file |

## 19.12.1 Introduction

This type of offering is available to domestic or Canadian issuers not subject to '34 Act reporting requirement or disqualification under "bad boy" provisions of Rule 262. Not available to investment companies, blank check companies, or issuers of oil, gas or mineral rights. The offering is limited to $5,000,000 within prior 12 months, but not more than $1,500,000 by selling security holders.

Regulation A is an amendment to the Securities Act of 1933 and provides for reduced requirements for smaller issuers in limited public offerings of issues up to $1.5 million. For a Regulation A offering, a limited registration statement is filed with the SEC. Key considerations for the syndicate supervisor include:

- whether the issuer is disqualified from distributions under Regulation A
- dollar limitations of the offering
- offers cannot be made prior to the filing of the registration statement and sales may not be effected until the offering statement is qualified

## 19.12.2 Dollar Limitation Of Offering

The syndicate supervisor is responsible for ensuring the issue is not oversold relative to the dollar amount disclosed in the offering document compared to the limitations provided in the rules. The supervisor should consider any "integration" of similar offerings by the same issuer for substantially identical purposes for determining whether the issuer meets the dollar limitation under the exemption within a 12-month period of time. The supervisor's review for integration may include one of the following or another procedure determined adequate by the supervisor:

- Reviewing the issuer's financial statements for the past 12 months and/or contact directly with the issuer
- Obtaining a representation letter from the issuer that states that no other offerings will be distributed in a succeeding 6-month period that would cause the exemption to be lost

The supervisor will retain a written record of this review in the offering's underwriting file.

## 19.12.3 Initiation Of Offers And Sales

The syndicate supervisor is responsible for notifying Alpine personnel when a Regulation A offering is available for offering and when the registration statement is qualified to permit sales. A written record of these notices will be retained in a file for the offering.

ALPINE_LIT169261

## 19.13 Best Efforts Underwritings

[SEC Securities Exchange Act of 1934 Rule 10b-9 and Rule 15c2-4; FINRA Notice to Members 84-7]

| Responsibility | • Syndicate Supervisor or designee |
|---|---|
| Resources | • Information obtained regarding issuer from the issuer or other sources |
| Frequency | • As required |
| Action | • Evaluate issuer information and determine Alpine's participation<br>• Establish escrow account when necessary<br>• Confirm purchasers are *bona fide* purchasers where necessary<br>• Identify insiders, Alpine or employee account purchasers and obtain affirmation regarding holding period<br>• Close escrow account and, if contingency met, immediately forward purchaser funds to issuer or, if contingency is not met, immediately return funds to potential purchasers |
| Record | • Escrow account, issuer information and purchaser information are retained in the deal file |

### 19.13.1 Introduction

Best efforts underwritings may take different forms including "all or none," "minimum-maximum," or other offerings contingent on the sale of a certain amount of the issuer's securities. Two primary concerns are that customer funds be transmitted to the issuer or to an escrow account and that only *bona-fide* purchasers are included in order to meet a stated minimum number of shares or units. Where the minimum is not sold within the deadline specified by the prospectus, all customer funds must be refunded.

Sales will be made only to *bona-fide* purchasers to meet any minimum amount of the securities to be sold.

### 19.13.2 Customer Funds - Escrow Account

[SEC Securities Exchange Act of 1934 Rule 15c2-4]

The syndicate supervisor is responsible for establishing procedures for the protection of customer funds including the establishment of an escrow account where required.

- Establish an escrow account and execute Alpine's standard escrow agreement with a bank that is not affiliated with Alpine.
- Maintain copies of bank statements for the escrow account and review the statements when received, to ensure funds are not withdrawn prior to the date the contingency is met.
- Ensure customer funds are promptly deposited to the escrow account.
- Maintain records of all potential purchasers including the quantity to be purchased, when funds are received, and when funds are forwarded to the issuer or escrow account.
- Ensure checks are forwarded to the issuer (where an escrow account is not used) or to an escrow account by noon of the business day following receipt.

ALPINE_LIT169262

- Authorize release of funds to the issuer from an escrow account after the contingency is met and after a review of purchasers, as discussed in the next section, has been conducted.
- If the contingency is not met, promptly refund funds to potential purchasers.

### 19.13.3 Purchasers

The syndicate supervisor is responsible for establishing procedures regarding purchasers of securities issued through a best efforts underwriting including the following:

- Where the offering is contingent upon the sale of a certain quantity of the issue, confirm that all purchasers are *bona-fide* purchasers.
- Identify purchases by issuer insiders, Alpine's proprietary account, or employees of Alpine and, for those identified, obtain a written affirmation that the purchaser intends to hold the security as an investment or, in conjunction with the issuer, determine restrictions on immediate sale by such accounts.
- Record the review of purchasers in the deal file.

## 19.14 Prohibited Activities

### 19.14.1 Misrepresentation Of Registration With Regulators

[SEC Securities Exchange Act of 1934 Rule 15c1-3]

Alpine and its RRs will not misrepresent its affiliation with any regulatory body including an implication that regulatory registration indicates a regulator has passed upon or approved the financial standing, business, or conduct of Alpine or the merits of any security or transaction it performs.

Alpine and its employees may not:

- make material misstatements or omissions in the registration statement.
- fail to comply with applicable registration requirements.
- fail to provide a final prospectus when required.
- engage in fraudulent transactions.

### 19.14.2 Anti-Competitive Activities

The following are prohibited anti-competitive activities:

- The exchange of current price information among competitors to influence another firm's pricing of services
- Directing, requesting, or attempting to influence another member to maintain or adjust a price
- Engaging, directly or indirectly, in any conduct that threatens, harasses, coerces, intimidates, or otherwise attempts improperly to influence another firm or employee of another firm

### 19.14.3 Tying

[FINRA Notice to Members 02-64]

IPOs may not be sold to customers where:

- the purchase is tied to a promise from the customer to buy additional shares once trading begins in the new issue.

ALPINE_LIT169263

- the purchase of a highly desirable IPO is tied to the customer's promise to buy IPOs with less market interest.

## 19.14.4 Laddering

"Laddering" is another prohibited tying arrangement where an underwriter requires IPO investors to submit orders to buy additional shares of the same stock at higher prices after trading begins.

## 19.14.5 Quid Pro Quo

IPOs cannot be allocated based on a potential investor's agreement to pay excessive commissions on trades of unrelated securities.

## 19.14.6 Spinning

IPO shares will not be allocated to the personal brokerage accounts of corporate executives to gain their firm's investment banking or other business. The personal brokerage relationship of any corporate executive customer or prospect cannot be linked, directly or indirectly, to future business from the executive's company.

## 19.14.7 After-Market Sales

Other prohibited after-market activities include:

- attempts to keep investors from selling IPOs in the aftermarket
- soliciting after-market orders during an IPO
- imposing penalties on retail brokers in connection with immediate "flipping" by retail IPO investors but not by other categories of IPO participants, such as institutions
- requiring customers to sell back IPO shares to Alpine

## 19.14.8 Misrepresenting Pricing

[SEC Securities Exchange Act of 1934 Rule 15c1-8]

When participating in a primary or secondary distribution of a security which is not admitted to trading on a national securities exchange, Alpine or any employee cannot make a representation that the security is being offered to a customer "at the market" or at a price related to the market unless Alpine is aware of a *bona fide* market for the security which it or any affiliate does not control.

ALPINE_LIT169264

# 20 SUPERVISORY SYSTEM, PROCEDURES, AND CONTROLS

## 20.1 Conflicts of Interest

Alpine has an obligation to mitigate potential conflicts of interest and put the customer's interest before its own. Potential conflicts are addressed in the following sections which also address supervision of these potential conflicts.

1. Alpine's general employee policies (and other standards of conduct) addresses the following issues:
   - o Confidentiality of Alpine's business, its employees, customers, suppliers or consumers
   - o Actions constituting acting in self-interest
   - o Gifts and entertainment
   - o Privacy of customer information and requests for information from affiliates
   - o Holding outside offices or appointments
   - o Internal accounting controls
   - o Reporting violations and disciplinary action
   - o Trading in the stock of Alpine customers, suppliers, or vendors
   - o Full and fair disclosure regarding documents filed on behalf of Alpine
   - o Employee compliance with Alpine policies and rule requirements, obligations to report
   - o Contacts regarding disciplinary issues
   - o Supervision vested in supervisors
   - o Administration of Alpine's general employee policies and other standards of conduct
2. Insider trading *(see the chapter INSIDER TRADING)*
3. Policies regarding employee outside business activities, outside accounts *(see the chapter GENERAL EMPLOYEE POLICIES)*
4. Customer privacy policies and procedures *(see the chapter COMMUNICATIONS WITH THE PUBLIC)*
5. Identity theft *(see the chapter ACCOUNTS)*

[Exchange Act Sec. 15(f); FINRA Rules 3010, 3012 and 3013; Notices to Members 04-71, 99-45, 89-34 and 88-84; FINRA web page: http://www.FINRA.com/supervisorycontrol], SEC Rule 15c3-5)

## 20.2 Introduction

Alpine has established a supervisory system, procedures and controls reasonably designed to comply with regulators' rules.

***Supervisory system:*** The internal system to oversee business includes the designation of supervisors and allocation of responsibilities; assignment of RRs to appropriate supervisors; identification of areas of business and rules that govern those businesses; and development of procedures.

***Supervisory procedures:*** Procedures in this manual (and in other policies or manuals, if referenced in specific chapters) include:

- compliance procedures for RRs and others that explain rule requirements and prohibitions as well as internal policies when conducting sales and other activities; and,
- supervisory procedures that explain how supervisors are to conduct their ongoing responsibilities. Most supervisory procedures are explained in "matrixes" that appear throughout this manual and include the following:

| Responsibility | <ul><li>Nathan Simmons, General Counsel</li><li>David Bevins, Chief Operating Officer</li><li>Holly Peck, Anti-Money Laundering Compliance Officer</li><li>David Cazier, Financial Operations Principal (FinOp)</li></ul> |
|---|---|

ALPINE_LIT169265

| | |
|---|---|
| | • Leia Farmer, Chief Compliance Officer |
| **Resources** | • Supervisors utilize system generated reports and confirmations to conduct supervisory reviews. |
| **Frequency** | • Frequency of review is determined by the type of review as well as the items being reviewed. For example Trades and Certificates are reviewed for compliance daily. Review of email communications are also reviewed on a daily basis. |
| **Action** | • Supervision will be conducted in a manner consistent with the item under review. For example, review of and monitoring of email correspondence will be conducted; applications will be reviewed; complete review and analysis of trade certificates, etc. |
| **Record** | • Records are maintained of supervisory reviews which are conducted including review dates. For instance some reviewed documents will be initialed or signed by the reviewer, others will be accompanied by review document which has been completed by the reviewer, review documents are maintained to facilitate further review, if necessary. |

Actions taken by Alpine to review supervisory reviews will test and measure the effectiveness of the review procedures utilized by Alpine. On a regular basis, Alpine will take steps to test systems and review output to ensure review procedures are producing the expected results.

## 20.3 Responsibility

Responsibility for Alpine's supervisory system, policies, and controls includes the following:

- Designated supervisors are responsible for enforcing policies and procedures in their respective business areas as described in Chapter 1 and specifically identified throughout the Written Supervisory Procedures ("WSP").
- The Chief Compliance Officer (CCO) is responsible for establishing and maintaining the supervisory system, policies and procedures for all areas of the firm other than financial and operations procedures.
- Alpine's Financial and Operations Principal ("FINOP") is also Alpine's Chief Financial Officer ("CFO") (FINOP and CFO may be used interchangeably in the WSP) and is responsible for establishing and maintaining systems, policies and controls regarding financial and accounting procedures and reporting.
- Alpine's Chief Operating Officer (COO) is responsible for establishing and maintaining systems, policies and controls regarding Direct Market Access (SEC Rule 15c3-5).

## 20.4 Controls

### 20.4.1 Controls to Ensure Supervisory Procedures Remain Current

The CCO or designee will:

- Subscribe and review FINRA weekly email services which identify proposed and new regulations and appropriate hotlinks to appropriate regulations;
- Review regulatory notices as new regulations are adopted;
- Review exam priorities published by FINRA on an annual basis;

ALPINE_LIT169266

- Review guidance issued by the Continuing Education Regulatory Council about areas for potential training, which provides some information in general on regulatory concerns;
- Evaluate the firm's Membership Agreement, applicable regulations and notices, and firm procedures prior to approval of any new product type for sale;
- Engage in communications with senior management on an as needed and periodic basis to assess any potential changes in business model anticipated.

## 20.4.2 Designation of Principal for Supervisory Control Procedures

Alpine designates the Chief Compliance Officer as responsible for establishing, maintaining, and enforcing a system of supervisory control policies and procedures that 1) test and verify that the member's supervisory procedures are reasonably designed with respect to the activities of the member and its registered representatives and associated persons, to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules and 2) create additional or amend supervisory procedures where the need is identified by such testing and verification.

## 20.4.3 Verification And Testing

At least annually, the CCO or designee will ensure that all testing of our procedures, as required under NASD Rule 3012, is undertaken and documented. The CCO may appoint other individuals to assist in the testing and verification process as long as such individuals are senior or otherwise independent of producing managers. All testing and verification of the adequacy of the supervisory control procedures must be independent of any business considerations that are countervailing to full compliance with applicable securities laws and regulations. Documents utilized in testing and verifying the supervisory procedures will be maintained in an annual file along with the annual report to senior management and the Board of Directors.

Supervisory Review Procedures and Documentation

NASD Rule 3012 and FINRA Rule 3130 (formerly NASD Rule 3013) require testing to ensure our written supervisory procedures are reasonably designed to achieve compliance with all applicable regulatory laws and requirements. At least annually, Alpine's CCO or designee will ensure that appropriate testing has been undertaken, including these specific areas required under Rule 3012.

- All transmittals of funds (i.e., wires or checks, etc.) or securities from customers to third-party accounts that would result in change of beneficial ownership
- All transmittals of funds or securities from customer accounts to locations other than the customer's primary residence (i.e., post office box, "in care of" addresses or accounts, alternate addresses, etc.)
- All transmittals of customer funds or securities between customers and registered representatives (including the hand-delivery of checks)
- Change of customer addresses
- Change of customer investment objectives

We will maintain documentation of the results of each reviewed procedure in the files, indicating how the testing was done, who undertook the testing, the dates and the findings including any areas of weakness where a determination was made that our procedures either did not effectively serve their purpose or where individuals were not complying with the procedures. Any corrective measures taken as a result of testing findings will be documented as well.

Testing and verification generally include:

- Identifying areas to be reviewed at least annually
- Reviewing procedures and processes to ensure applicable rules and regulations are adequately addressed
- Developing reviews and a schedule for conducting the reviews
- Assigning responsibility for conducting reviews
- Preparing reports of reviews

ALPINE_LIT169267

- Providing reports to management, the audit committee (if applicable), and other appropriate personnel for potential corrective action
- Following up regarding deficiencies in subsequent reviews

Records of testing are maintained by the supervisor responsible for conducting testing and include:

- areas to be reviewed
- schedule of reviews
- reports of findings including a record of distribution of the report and responses from the supervisor of the area examined
- follow-up or corrective action taken

### 20.4.4 Creation and Amendment of Supervisory Procedures as a Result of Verification and Testing

Upon completion of the testing and verification processes, the CCO or designee and other appropriate personnel, as needed, will review the findings and recommendations. In doing so, Alpine will assess what procedures should be adopted or amended in light of the findings. The firm will then develop and adopt such new or amended procedures and communicate them in accordance to firm policy on new and amended procedures. Alpine will maintain a copy of any changes in procedures as well as any memos of action actions taken in light of the supervisory controls report.

## 20.5 3012 Controls

### 20.5.1 Transmittal of Funds

NASD Rule 3012(a)(1)(2)(B)(i) requires that broker-dealers review and monitor the following activities:

(i) all transmittals of funds (e.g., wires or checks, etc.) or securities from customers to third party accounts (i.e., a transmittal that would result in a change of beneficial ownership); from customer accounts to outside entities (e.g., banks, investment companies, etc.); from customer accounts to locations other than a customer's primary residence (e.g., post office box, "in care of" accounts, alternate address, etc.); and between customers and registered representatives, including the hand-delivery of checks;

The policies and procedures established pursuant to paragraph (a)(2)(B) must include a means or method of customer confirmation, notification, or follow-up that can be documented. If Alpine does not engage in all of the activities enumerated above, we will identify those activities in which we do not engage in our written supervisory control policies and procedures and document in those policies and procedures that additional supervisory policies and procedures for such activities must be in place before we can engage in them.

#### 20.5.1.1 Issuing Checks to Customers

Refer to the section titled "Issuing Checks to Customers" in the "Financial and Operations Procedures" Chapter.

#### 20.5.1.2 Transmittals To Third Parties

| Responsibility | • Operations Manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests to send funds/issue checks to third parties |
| Frequency | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures |

ALPINE_LIT169268

| | |
|---|---|
| | • Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

When a customer wishes funds or securities to be paid to a third party in the third party's name, the customer will be required to provide a signed LOA that specifies to whom the funds are to be paid.

### 20.5.1.3 Transmittals To An Alternate Address

Funds and securities will be sent to the customer's address of record, unless the customer provides **written** authorization to use an alternative address.

| | |
|---|---|
| **Responsibility** | • Operations Manager or designee, unless noted otherwise |
| **Resources** | • Requests to send funds/issue checks to an alternate address |
| **Frequency** | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

### 20.5.1.4 Transmittals To Outside Entities

Customers sometimes request the transfer of funds or securities in their accounts to a bank or other entity on their behalf. A signed LOA must be obtained to affect such a transfer including the customer's account number at the receiving bank or other entity.

ALPINE_LIT169269

| Responsibility | • Operations Manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests to send funds/issue checks to third parties |
| Frequency | • As required - issue transmittals to third parties and send written notification to the customer<br>• Annual - review transmittal procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| Action | • Obtain required LOA<br>• Issue check/funds in accordance with procedures<br>• **Send written notification to the customer that funds (or securities) have been sent to a third party**<br>• Annually review transmittal procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review transmittals in branch/office audits including sampling of LOAs and transmittals (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| Record | • LOAs (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

## 20.5.1.5 Transmittal or Withdrawal of Assets Requests Received Via E-Mail

**Background**

From FINRA Regulatory Notice 12-05 (reiterated from Regulatory Notice 09-64): "The requirement that firms have supervisory procedures for reviewing and monitoring transfers of customer assets applies to both clearing and introducing firms."

Alpine may receive transmittal requests via email or other electronic means from an Alpine client or Alpine registered representative (on behalf of the client). Alpine back office generally will receive transmittal instructions from an introducing firm and generally not from a client directly. Associated persons of introducing firms are responsible for their own firm's transmittal policies. Alpine back office is authorized to receive written requests from associated persons of the introducing firm. Instructions received by the back office will be processed in accordance with Alpine's current policies and procedures governing transmittal activities.

### 20.5.1.5.1 Alpine's Policy

Alpine does permit email or other electronic means of requesting funds or assets transmittals or withdrawals from client accounts, as enumerated below. Therefore, we have the following policies and procedures in effect.

- Our CCO or designee is responsible for ensuring that all employees are aware of the required safeguards we have in place to ensure the safety of our client funds and assets by requiring verification of email requests for funds or assets movement. Alpine has policies and procedures to review and monitor disbursements we make from customer accounts at the account holder(s) request.
- One of the risks associated with accepting instructions to withdraw or transfer funds by email and other electronic means is that customers' email accounts are susceptible to being breached by hackers or other intruders who may use the email accounts to commit fraud.
- We have put into effect policies and procedures regarding the acceptance of accepting instructions to withdraw or transfer funds via electronic means which are adequately designed to protect customer accounts from the risk that customers' email accounts may be compromised and used to send fraudulent transmittal or withdrawal instructions.
  - Alpine will accept emails from clients to send checks or stock certificates to the client's address of record.

ALPINE_LIT169270

- o For wire transmittal requests and requests to journal funds between accounts, Alpine will accept emails from clients which are accompanied by the required transmittal form that must be completed by the account holder and approved in writing by a firm principal.
- o Alpine will accept emails from clients for requests to send checks to an address other than the address of record provided that the request is approved by a firm principal. In those cases involving the transmittal of assets to a third party or to an address other than the address of record, Alpine sends a verification letter to the client's address of record.
- o Upon receiving verification that a request has been made by the client, procedures concerning oversight (including AML) of transmittals over a certain threshold, those that appear to be overly urgent, those which appear out of the ordinary based on client history, or those which request transmittal to a third-party account) will be in effect.
- o On a quarterly basis, utilizing exception reports showing movement of assets from client accounts, our AML Officer, CCO or their designees will undertake random sampling and testing of transfers and withdrawals to monitor for compliance.

Clients are advised to notify their registered representative immediately upon becoming aware that their email or other electronic means of communication have been compromised. In instances where we are advised that the request did not come from the client, individuals are required to immediately notify their supervisor, the CCO or designee or the AML Compliance Officer who will ensure that an appropriate investigation is immediately begun, and that proper authorities (including FinCEN) are notified.

## 20.5.2 Change of Customer Addresses

NASD Rule 3012(a)(1)(2)(B)(i) requires that broker-dealers review and monitor the following activities, relating to customer changes of address and the validation of such address changes.

| | |
|---|---|
| **Responsibility** | • Operations Manager or designee, unless noted otherwise |
| **Resources** | • Requests for address changes |
| **Frequency** | • As required - send written notification to the customer<br>• Annual - review procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| **Action** | • Obtain required written LOA<br>• Process address change request in accordance with procedures<br>• **Send written notification to the customer that an address change has occurred (sent to the prior address of record, i.e. the address before the requested change)**<br>• Annually review procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review requests in branch/office audits including sampling of address change requests (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| **Record** | • Letters of instruction regarding address change (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

The Operations Manager or designee is responsible for ensuring a signed written request for a change in address has been obtained from a client prior to any address change being affected. No change of address requests will be processed without an appropriate letter of authorization. Change of address requests will be maintained in appropriate files as evidence.

ALPINE_LIT169271

To confirm the accuracy and validity of such changes, a letter will be sent to the client from the firm or its designee to the prior address of record.

### 20.5.3 Change of Investment Objectives

NASD Rule 3012(a)(1)(2)(B)(iii) requires that broker-dealers review and monitor the following activities, relating to customer changes of investment objectives and the validation of such changes of investment objectives.

| Responsibility | • Operations Manager or designee, unless noted otherwise |
|---|---|
| Resources | • Requests for investment objective changes |
| Frequency | • As required - send written notification to the customer<br>• Annual - review notice of investment objective changes and procedures<br>• As scheduled - review branch/office procedures<br>• Annual (or more frequently, as necessary) - provide training to employees |
| Action | • Obtain notice of investment objective change<br>• Process change request in accordance with procedures<br>• **Send written notification to the customer that an investment objective change has occurred**<br>• Annually review procedures in the annual review of supervisory systems and controls (Compliance or other reviewer)<br>• Review requests in branch/office audits including sampling of investment objective change notices (Compliance or other reviewer)<br>• Include in employee training transmittal procedures in continuing education or other employee training (Compliance) |
| Record | • Notices of investment objective changes (in Operations and/or clearing firm's files)<br>• Records of employee training (Compliance) |

The Operations Manager or designee is responsible for ensuring that investment objective changes have been obtained from a client prior to any change being affected. No change requests will be processed without appropriate investment objective change documentation. Change requests will be maintained in appropriate files as evidence. To confirm the accuracy and validity of such changes, a letter will be sent to the client from the firm or its designee to the address of record.

### 20.5.4 Risk Management

[FINRA Notice to Members 99-92]

Alpine has established risk management procedures which are outlined in the chapter *FINANCIAL AND OPERATIONS PROCEDURES*, in the section *Risk Management*.

### 20.5.5 Outside Auditors

Alpine's outside auditors conduct an annual review of internal financial and operational controls as well as compliance with selected rules and regulations. The FINOP (and other personnel, as required) is responsible for working with the outside auditors and providing them with requested information. The auditors' report is provided to senior management and Alpine's audit committee (if an audit committee has been established) who are responsible for delegating responsibility for taking corrective action on exceptions noted in the report. The FINOP retains records of outside audits and reports.

ALPINE_LIT169272

## 20.6 Written Compliance And Supervisory Procedures (WSP)

[SEC Securities Exchange Act of 1934 Rule 17a-4(e)(7); FINRA Rule 3110(b)(7) and 3110.11]

The CCO or designee is responsible for maintaining and updating Alpine's compliance and supervisory procedures which are included in this manual. This manual is updated and policies distributed as follows:

- New and amended rules and releases from regulators are reviewed on an ongoing basis and changes considered for written procedures and incorporate where necessary.
- Changes are incorporated in written procedures including the date of revision.
- Prior versions of the manual are archived for books and records purposes.
- When policy and procedure changes affect personnel, the CCO or designee will distribute new or revised policies as follows:
  - In written form, where practical
  - By email
- The CCO or designee provides manuals to new employees and obtains receipts or acknowledgements that are maintained in employee files or centralized files.
- If a new Manual is distributed, receipts or acknowledgments will be obtained and maintained in employee files or electronic files.
- Policies may be made available to employees in electronic format. Acknowledgements and/or receipts may also be in electronic format.

## 20.7 Designation of Chief Compliance Officer (CCO)

[FINRA Rule 3130(a)]

## 20.8 Internal Inspections

[FINRA Rule 3110(c)]

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • Records, reports, policies and procedures |
| **Frequency** | • Annual (or more frequently for certain high-risk areas) |
| **Action** | • Identify business areas subject to review<br>• Prepare schedule of inspections considering the risk profile of each business area<br>• Assign inspection responsibility considering any potential conflicts of interest including economic, commercial, or financial interests in the associated persons or business being inspected and ensuring the person assigned does not work in the business unit and is not directly or indirectly supervised by, or otherwise reporting to, an associated person assigned to the unit or location. Where compliance is not possible due to Alpine's size or business model, document in the report both the factors used to make this determination and how the inspection otherwise complies with the requirements of Rule 3110(c)(1)<br>• Prepare draft report of review and provide to appropriate supervisory personnel |

ALPINE_LIT169273

| | |
|---|---|
| | for comment<br>• Prepare final report and send to supervisor of the business area and senior management<br>• Obtain response regarding corrective action from the supervisor<br>• Follow up regarding deficiencies (at the latest at the next inspection) |
| **Record** | • Records of internal inspections including when conducted, who conducted them, and reports and responses |

Alpine reviews, at least annually on a calendar-year basis, the businesses in which it engages to identify potential non-compliance with Alpine policies and procedures and regulatory rules, laws, and regulations.

Reviews may be conducted through a number of resources including (but not necessarily limited to):

- Compliance
- Internal audit (if a separate department)
- Outside auditors
- Outside consultants
- Risk management

Reviews conducted internally may use different approaches:

- Review of a specific period of time
- Review based on a sampling of the activity
- Other reviews appropriate to the area of business

OSJ and branch office inspections are described in the chapter *OFFICES* in the section *Office Inspections*.

## 20.9 Review And Testing Of Procedures And Controls

[FINRA Rule 3120(a)]

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • Records, reports, policies and procedures |
| **Frequency** | • Annual (or more frequently for certain high-risk areas) |
| **Action** | • Rank risk of business areas for review/testing as low, medium, or high (or similar ranking)<br>• Test procedures/controls<br>• Identify gaps in procedures and document<br>• Revise procedures where necessary<br>• Notify business area supervisors of deficiencies were appropriate<br>• Follow up regarding deficiencies to determine corrective action taken |
| **Record** | • Documentation of reviews and testing<br>• Revised policies and procedures, as appropriate |

ALPINE_LIT169274

|  | • Notification to business areas and follow up of deficiencies |
| --- | --- |

Alpine conducts reviews of its supervisory procedures and controls at least annually to confirm procedures are current and include all areas of business. Procedures and controls are also tested to determine they achieve the necessary levels of compliance. Findings from internal inspections are also considered in this review.

Reviews and testing may be conducted through a number of resources including (but not necessarily limited to):

- Compliance including internal audit
- Business line supervisors
- Outside Auditors
- Outside Consultants
- Risk Management

Reviews conducted internally may use different approaches:

- Review of a specific period of time
- Reviewed based on a sampling of the activity
- Other reviews appropriate to the area of business

### 20.9.1 Conducting Risk-Based Reviews And Testing

Reviews and testing will be documented on the *Supervisory Policies, Procedures, And Controls Review & Testing* form or through similar types of reports or forms. This includes identifying who is conducting the review/testing and assigning risk levels to different areas of business. Areas of higher risk will be subject to more frequent and/or more extensive reviews which may include look-backs, larger samples and/or longer time periods for review, certifications by supervisors, or other reviews determined by the reviewer(s).

### 20.9.2 Findings And Follow-Up

Findings from reviews and testing are included in the CEO report and annual certification discussed in the next section. Compliance is responsible for:

- Amending policies and procedures to address gaps
- Reporting deficiencies (found in testing) to supervisors of appropriate business areas
- Follow up to determine deficiencies have been addressed
- Assembling findings for inclusion with the CEO report and annual certification (next section)

## 20.10 Internal Investigations Of Transactions

[FINRA Rule 3110(d)]

| Responsibility | • CCO or designee (where designated)<br>• Compliance Officer or designee (where designated)<br>• Head Trader or designee (where designated) |
| --- | --- |
| Resources | • Review trades that meet the criteria specified below<br>• Orders identified as requiring further review regarding potential insider trading including proprietary and employee trading (see *Review Of Transactions* in the chapter *GENERAL EMPLOYEE POLICIES* and the chapter *INSIDER TRADING*) |

ALPINE_LIT169275

| | |
|---|---|
| **Frequency** | Head Trader, Compliance Officer or their designees<br><br>• Ongoing: review of transactions<br><br>CCO or designee<br><br>• Within 5 business days: Upon completion of an internal investigation, file report with FINRA<br>• Quarterly: file report within 10 business days following the end of the calendar quarter, with FINRA |
| **Action** | Compliance Officer and Head Trader and their designees:<br><br>• Review transactions for potentially violative trades<br><br>CCO or designee:<br><br>• Investigate trades as needed:<br>   o Refer investigation to outside counsel or others, if appropriate<br>• Determine whether corrective action should be taken which may include:<br>   o Cancellation of transactions<br>   o Education of personnel<br>   o Disciplinary action depending on the nature of the violation<br>• Within 5 business days of completing an internal investigation where it is determined a violation has occurred, file written report with FINRA<br>• File quarterly written report with FINRA regarding internal investigations within 10 business days following the end of a calendar quarter. If Alpine did not have an open internal investigation or either initiate or complete an internal investigation during the particular calendar quarter, Alpine is NOT required to submit a report for the quarter. |
| **Record** | • Order records (for Head Trader, Compliance Officer or their designees)<br><br>CCO or designee:<br><br>• Records of internal investigations and action taken<br>• Reports filed with FINRA within 5 business days of completion of an investigation<br>• Quarterly reports filed with FINRA: Due within 10 business days following the end of the calendar quarter |

The Compliance Officer, Head Trader or their designees reviews securities transactions to identify trades that may violate provisions of the Exchange Act and its rules, rules of exchanges, or FINRA rules prohibiting insider trading and manipulative and deceptive devices. The accounts subject to these reviews include:

• accounts of Alpine;
• accounts introduced or carried by Alpine in which a person associated with Alpine has a beneficial interest or the authority to make investment decisions;
• outside accounts of a person associated with Alpine (see *Outside Accounts* in the chapter *GENERAL EMPLOYEE POLICIES*); and
• covered accounts (see definition below).

"Covered accounts" include any account introduced or carried by Alpine that is held by:

• the spouse of a person associated with the member;

ALPINE_LIT169276

- a child of the person associated with the member or such person's spouse, provided that the child resides in the same household as or is financially dependent upon the person associated with the member;
- any other related individual over whose account the person associated with the member has control; or
- any other individual over whose account the associated person of the member has control and to whose financial support such person materially contributes.

For questioned trades, a prompt internal investigation will be conducted to determine whether a violation of laws or rules has occurred.

## 20.10.1 Internal Investigation Reports

Alpine engages in investment banking services as defined in FINRA Rule 3110(d)(4)(B) and is required to file reports of internal investigations of transactions. Potentially violative trades include:

- Trades in securities on Firm restricted lists
- Trading ahead of customer orders
- Trading ahead of block orders (frontrunning)
- Trading by research personnel in securities the subject of research recommendations
- Trading by investment banking or public finance personnel in securities the subject of banking engagements
- Trades in securities of companies before significant market-moving events affecting the company's securities

When a potential violation is identified, the CCO or designee will:

- review the circumstances of the transaction including contact with the RR and RR's supervisor.
- determine whether a violation has occurred.
- determine (in consultation with outside counsel or others, if necessary) what corrective action should be taken.
- report to FINRA within 5 business days any internal investigation that concludes a violation has occurred.
- file a quarterly report with FINRA of internal investigations within 10 business days of the end of each calendar quarter.
- determine whether the violation must be reported in another form such as updating Form U4 or U5.

**Quarterly Reporting**

For quarterly reports, Alpine must file written reports to FINRA within ten business days following the end of the calendar quarter describing each internal investigation initiated in the previous calendar quarter, including the following:

- the firm's identity.
- The commencement date of each internal investigation.
- the status of each open internal investigation.
- the resolution of any internal investigation reached during the previous calendar quarter.
- With respect to each internal investigation, the following:
  - Security
  - Trades
  - Accounts
  - Firm's associated persons or family members of such associated persons holding a covered account, under review
  - Copy of Alpine's insider trading review policies and procedures

**Reporting Insider Trading Violations**

ALPINE_LIT169277

If Alpine determines after an initial investigation that a trade has violated provisions of the Exchange Act, its regulations or FINRA rules prohibiting insider trading and manipulative and deceptive devices, Alpine must, file a written report within five business days of completing its internal investigation. The report must detail the completion of the investigation, including investigation results, any internal disciplinary action taken, and any referral of the matter to FINRA, another SRO, the SEC or any other federal, state or international regulatory authority.

## 20.11 Annual Report and Certification of Compliance and Supervisory Processes To Senior Management and The Board of Directors

[FINRA Rule 3120 and 3130]

The CCO or designee has established procedures to ensure that, at least annually on the anniversary date of the last report but no later than April 1st, Alpine submits a report to Alpine's senior management and the Board of Directors that describes:

- Our system of supervisory controls in place
- Summary of all test results
- Significant identified exceptions
- Additional or amended supervisory procedures created in response to test results

The report may also include key compliance issues. The report will be maintained in appropriate firm files on supervisory controls.

### 20.11.1 Annual Report to CEO (or equivalent officer)

The CCO or designee will prepare and provide the CEO (or equivalent officer) with an annual report that includes a review of Alpine's supervisory system and procedures and key compliance issues. The report will also include a summary of testing results including significant identified exceptions and any amended supervisory procedures adopted in response to the test results.The CCO will meet with the CEO (or equivalent officer) to discuss and review the report and will meet at other times as needed, to discuss other compliance matters. If Alpine designates multiple CCOs, each CCO will meet with and prepare a report for the CEO (or equivalent officer) annually.

The report will be produced prior to execution of the certification and be reviewed by the chief executive officer(s) (or equivalent officer(s)), chief compliance officer(s) and any other officers the member deems necessary to make the certification. Furthermore, the report will be provided to the member's board of directors and audit committee (if applicable) in final form either prior to execution of the certification or at the earlier of their next scheduled meetings or within 45 days of execution of the certification.

The report is available for review by FINRA or other regulatory bodies upon request. The annual report will be maintained in the annual certification files.

### 20.11.1.1 Firms With Annual Gross Revenue Of $200 Million Or More

[FINRA Rule 3120(b)]

Currently, this regulation does not apply to Alpine based on our current gross revenue numbers. Should this change and Alpine meets the gross revenue requirements in a calendar year, Alpine will adopt the following policy: If Alpine has reported $200 million or more in gross revenue in the previous calendar year, the report to the CEO must include the following, to the extent applicable to Alpine's business. The CCO or designee is responsible for confirming whether this requirement applies.

ALPINE_LIT169278

(1) a tabulation of the reports pertaining to customer complaints and internal investigations made to FINRA during the preceding year; and

(2) discussion of the preceding year's compliance efforts, including procedures and educational programs, in each of the following areas:

- trading and market activities;
- investment banking activities;
- antifraud and sales practices;
- finance and operations;
- supervision; and
- anti-money laundering.

For purposes of this requirement, "gross revenue" means:

(1) total revenue as reported on FOCUS Form Part II or IIA (line item 4030) less commodities revenue (line item 3990), if applicable; or

(2) total revenue as reported on FOCUS Form Part II CSE (line item 4030) less, if applicable, (A) commissions on commodity transactions (line item 3991); and (B) commodities gains or losses (line items 3924 and 3904).

### 20.11.1.2 Certification

Annually ( after receipt and review of the report), the Chief Executive Officer or equivalent officer will certify that Alpine has in place processes to establish, maintain, review, test, and modify written compliance policies and written supervisory procedures reasonably designed to achieve compliance with applicable FINRA rules, MSRB rules, and federal securities laws and regulation. The CEO or equivalent officer will further attest to the following:

- He/she has conducted one or more meetings with the CCO(s) in the preceding 12 months to discuss such processes;
- The final report has been submitted to the firm's board of directors and audit committee or will be submitted to the firm's board of directors and audit committee (or equivalent bodies if they exist) at the earlier of their next scheduled meetings or within 45 days of the date of execution of this certification; and
- The CEO (or equivalent officer(s) has/have consulted with the CCO(s) and other officers where applicable and such other employees, outside consultants, lawyers and accountants, to the extent deemed appropriate, in order to attest to the statements made in this certification.

Certification does not, by itself, establish line supervisory responsibility for those involved in the certification process. Alpine will maintain a copy of the certification, with the required language, in the appropriate compliance file.

## 20.12 Supervision Of Supervisors

[FINRA Rule 3110(b)(6)(c) and 3110.10]

| Responsibility | <ul><li>President or designee (where designated)</li><li>CCO or designee</li></ul> |
|---|---|
| Resources | <ul><li>Designation of supervisors</li></ul> |
| Frequency | <ul><li>Ongoing</li></ul> |

ALPINE_LIT169279

| | |
|---|---|
| **Action** | • Identify and designate supervision of supervisors and include in the "*Designation Of Supervisors*" chart, confirming supervision complies with the requirements of this section ensuring supervisors do not report to someone they supervise or have compensation determined by such a person<br>• Identify producing managers and establish supervision of accounts and account transactions<br>• Where compliance with these requirements is not possible because of Alpine's size or a supervisor's position in Alpine, document the factors used in making such a determination and how an alternative arrangement complies with the requirements<br>• Ensure designated supervisors are aware of the designation and their responsibilities<br>• Include review of supervision in inspections of offices |
| **Record** | • Designation of supervisors confirmation such designations do not conflict with requirements to exclude supervision by those reporting to the supervisor or who determines the supervisor's compensation<br>• Documentation of exceptions<br>• Reviews of producing managers' accounts and transactions maintained by the designated supervisor<br>• Review of supervision as part of inspection reports |

Supervisors are subject to supervision of their activities by other designated supervisors. Supervisors are not permitted to:

- supervise their own activities; and
- report to, or have their compensation or continued employment determined by, a person or persons they are supervising.

Where it is not feasible to comply with these requirements, [The Firm]'s records will be documented justifying the exception and how supervisory requirements will be met. Rule exceptions include instances where:

- [The Firm] is a sole proprietor in a single-person firm;
- a registered person is [The Firm]'s most senior executive officer (or similar position); or
- a registered person is one of several of [The Firm]'s most senior executive officers (or similar positions).

## 20.13 Meetings between CEO and CCO

The CEO or equivalent officer will meet once or more in the preceding 12 months with the CCO if not one in the same person, to review compliance matters the subject of the annual certification. The firm will document at a minimum the meeting held with the CEO in conjunction with providing the annual report to the CEO in the form of memo(s) or minute(s) and be maintained alongside the annual report to the CEO in the appropriate compliance file.

### 20.13.1 Required Language for the Annual Certification

The Chief Executive Officer or similarly named individual with the firm is required to annually certify:

1. The firm has in place processes to:

a. establish, maintain and review policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, MSRB rules and federal securities laws and regulations;

ALPINE_LIT169280

b. modify such policies and procedures as business, regulatory and legislative changes and events dictate; and

c. test the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.

2. The chief executive officer(s) (or equivalent officer(s)) has/have conducted one or more meetings with the chief compliance officer(s) in the preceding 12 months, the subject of which satisfy the obligations set forth in IM-3013.

3. The firm's processes, with respect to item 1 above, are evidenced in a report reviewed by the chief executive officer(s) (or equivalent officer(s)), chief compliance officer(s), and such other officers as the firm may deem necessary to make this certification. The final report has been submitted to the firm's board of directors and audit committee or will be submitted to the firm's board of directors and audit committee (or equivalent bodies) at the earlier of their next scheduled meetings or within 45 days of the date of execution of this certification.

4. The chief executive officer(s) (or equivalent officer(s)) has/have consulted with the chief compliance officer(s) and other officers as applicable (referenced in item 3 above) and such other employees, outside consultants, lawyers and accountants, to the extent deemed appropriate, in order to attest to the statements made in this certification The certification will be maintained in the annual certification files.

## 20.14 Direct Market Access

*SEC Rule 15c3-5, FINRA Notice to Members 04-66*

**Background**

On November 3, 2010, the SEC adopted a new rule to require broker-dealers to have risk controls in connection with their market access. Rule 15c3-5 is intended to address the risks that can arise as a result of the automated, rapid electronic trading strategies that exist today and bolster the confidence of investors in market integrity. Rule 15c3-5 eliminates the practice known as "unfiltered" or "naked" access to an exchange or an alternative trading system (ATS).

**Effective Dates:**

The majority of SEC Rule 15c3-5 requires compliance to be in effect on July 14, 2011. Paragraph (c)(1)(i) of Rule 15c3-5, for all securities, was postponed until November 30, 2011.

**Definitions:**

Market access: (i) access to trading in securities on an exchange or alternative trading system as a result of being a member or subscriber of the exchange or alternative trading system, respectively; or (ii) access to trading in securities on an alternative trading system provided by a broker-dealer operator of an alternative trading system to a non-broker-dealer. Market access also refers to trading for Alpine's own proprietary accounts.

**Designated Supervising Principal**

Alpine's COO or designee will ensure that our participants' activities comply with all applicable securities rules and regulations, including those of FINRA and the exchange or ATS where orders are executed. Other responsibilities are described below.

**Supervisory Review Procedures and Documentation**

Alpine's head trader or designee will ensure that financial risk management controls and supervisory procedures are reasonably designed to:

ALPINE_LIT169281

1. Prevent the entry of orders that exceed appropriate pre-set credit including sub-limits or capital thresholds including intra-day changes to credit limits;
   a. This also applies to orders that exceed the individually pre-determined credit thresholds
2. Prevent the entry of orders that appear to be erroneous and exceed appropriate size and price parameters, including duplicative orders;
3. Rejecting orders that exceed short period time checks and/or pre-determined price or size parameters;
4. Prevent the entry of orders unless there has been compliance with all regulatory requirements that must be satisfied on a pre-order entry basis;
5. Prevent the entry of orders that Alpine or the customer is restricted from trading;
   a. This section refers to compliance with Regulation Sho, OATS, NMS, etc.

Alpine's COO or designee will ensure that financial risk management controls and supervisory procedures are reasonably designed to:

1. Restrict market access technology and systems to authorized persons;

Alpine's Operations Manager or designee will monitor access to our technology and systems to authorized persons on an annual basis. Updates to the Entitlements Module in CSS will be made based on the results of the annual review.

7. Ensure appropriate surveillance personnel receive immediate post-trade execution reports.

    a. Alpine will rely on the following post-trade execution reports utilized by Surveillance personnel as part of the review:
        i. CNS Accounting Summary
        ii. Trade Blotter
    b. Other personnel designated by Alpine will have access to the post-trade execution reports as part of the Trading system and related systems used by Alpine. Entitlements will be granted to designated parties by the COO or designee.

The Credit Committee or designee will ensure that appropriate individuals are involved in the establishment of controls that systematically limit financial exposure arising from the trading activity of sponsored participants, such as establishing pre-set credit thresholds for each participant including Alpine and its proprietary accounts and setting certain prize, size or value parameters that would reject orders that exceed the established parameters.

**Pre-Set Credit Limits for Correspondent Firms and Customers**

Alpine has established the following pre-set limits for our correspondent firms and Alpine:

$100,000 applies to Primary and ACAP. $200,000 applies to Vertical and Spencer Edwards. $500,000 applies to Alpine and Scottsdale.

Alpine has established the following pre-set limits for Alpine's retail customers and the retail customers of our correspondent firms:

a. 1 year or less: $5,000 unless approved for more by a registered principal;
b. After a year the broker can have the credit limit increases to a threshold they feel is more acceptable based on the following criteria:

- Net worth.
- Cash and other assets in the account.
- Client trading and payment history.
- Length of time the account has been open.

ALPINE_LIT169282

Registered Representatives will be required to notify a firm principal of requests to increase credit limits (and may be required to submit a form) for signature by a firm principal. The firm principal will notify the COO or designee to have the adjustment made in the firm's systems.

***Due Diligence of Customers Permitted to Use Trade Systems***

| | |
|---|---|
| **Responsibility** | Due Diligence Committee |
| **Resources** | As needed: Vet and approve correspondent firms and customers (of the correspondent firms) at the broker-dealer who will be permitted to use the trading system, maintenance trading systems & restriction of access based on identity validation. <br><br>Ongoing due diligence may include a review of the individual's trading patterns and order entry history when setting order entry parameters. <br><br>• Trade reviews <br>• Order entry history |
| **Frequency** | As needed |
| **Action** | • Review reports <br>• Document action steps taken (if any) <br>• Evidence review via initial or signature and date |
| **Record** | Retain copy of reviewed reports |
| **Responsibility** | Head Trader or designee |
| **Resources** | As it relates to retail customers, as needed: Vet and approve customers at the broker-dealer who will be permitted to use the trading system, maintenance trading systems & restriction of access based on identity validation. Due diligence includes a review of the individual's trading patterns and order entry history when setting order entry parameters. <br><br>• Trade reviews <br>• Order entry history |
| **Frequency** | As needed |
| **Action** | • Review reports <br>• Document action steps taken (if any) <br>• Evidence review via initial or signature and date |
| **Record** | Retain copy of reviewed reports |

***Monitoring Credit Thresholds***

| | |
|---|---|
| **Responsibility** | COO or designee, where indicated <br><br>Executive Committee or designee, where indicated |
| **Resources** | COO or designee: Daily: Monitor debit balances through the requirement reporting module |

ALPINE_LIT169283

| | Executive Committee or designee: Monthly: Monitor credit thresholds of Alpine, retail customers, inventory accounts and correspondent firms and adjust controls as necessary<br><br>• Credit Limit Exceeded Entity<br>• Credit Limit Exceeded Primary Tax ID<br>• Credit Limit Exceeded Broker-Dealer<br><br>As needed:<br><br>• Account Audit Credit Limit<br>• Entity Audit Credit Limit<br>• Credit Limit Early Warning Entity<br>• Credit Limit Early Warning Primary Tax ID<br>• Credit Limit Early Warning Broker Dealer and Inventory |
|---|---|
| **Frequency** | Monthly (unless indicated otherwise) |
| **Action** | • Review reports<br>• Document action steps taken (if any)<br>• Evidence review via initial or signature and date |
| **Record** | Retain copy of reviewed reports |

## Trading Controls

Alpine has established parameters for order review based on price, size and/or credit thresholds in our order management system offered through CSS Hosted Solutions. The trading controls for Alpine, its retail customers and our correspondent firms as follows:

- 9,999,999 shares for buy orders only
- 99,999 shares for sell orders only
- $49.99 per share (buys and sales)
- 99,999 limit (total value of trade)

Orders that exceed the parameters noted above are manually reviewed by Alpine's head trader or designee. If after review by Alpine's head trader or designee, appropriate trading staff determine that the order can be processed, the order is then routed to the street in accordance with Alpine's order routing processes.

### *Due Diligence Concerning Trading Controls*

| **Responsibility** | Head Trader (or designee) |
|---|---|
| **Resources** | • Notices from Flextrade concerning material changes to trading controls<br>• Notices from CSS Hosted Solutions concerning material changes to trading controls |
| **Frequency** | As needed |
| **Action** | • Receive & retain notice(s) from vendor of upcoming or newly implemented material changes to the trading controls<br>• Test controls (and retain records of the testing results) to ensure that material changes made |

ALPINE_LIT169284

| | |
|---|---|
| | • or upcoming changes to be made yield intended results<br>• Report issues to vendor, when issues are identified<br>• Record resolution of escalated issues brought to the vendors attention<br>• Update electronic or paper log to reflect the changes noted above |
| **Record** | • Retain notice(s) from vendor of upcoming or newly implemented material changes to the trade controls<br>• Retain records of the testing results<br>• Maintain log of material changes made, testing date(s), date of escalation to the vendor for report of material issues, and further action taken, if any, in the Trading Department shared folder. |

**Annual Reviews**

On an annual basis, the CCO or designee will perform a review of our business activity in connection with market access to assure the overall effectiveness of our risk management controls and supervisory procedures. The review will be documented and may be maintained as part of the 3012 report or may be maintained as part of a separate review.

**Annual CEO Certification**

Upon completion of each annual review, our CEO (or equivalent officer) will certify that our risk management controls and supervisory procedures comply with Rule 15c3-5 and that the annual review has been conducted.

**Allocation of Certain Functions Under the Market Access Rule**

The market access rule permits broker-dealers with market access to allocate certain responsibilities to a customer that is a broker-dealer provided that the market access broker-dealer has a reasonable basis for believing that the accessing broker-dealer has better access to the ultimate customer and can better implement those controls. The following activities could be allocated but is not an exhaustive list.

1. Risk management controls and supervisory procedures that require specific knowledge of the ultimate customer and its trading activity (a market access broker-dealer generally would not have access to this information); (examples include suitability and know your customer.
2. Risk management controls to prevent the ultimate customer from trading securities that the customer is restricted from trading
3. Surveillance for manipulation or fraud (e.g. wash sales, marking the close, insider trading)
4. Compliance with the locate requirement of Regulation Sho.

Should Alpine avail itself of this option, Alpine will:

1. Specify in writing which regulatory risk management controls and procedures are being allocated, articulate the scope of the arrangement and the specific responsibilities of each party;
2. Conduct due diligence to establish a reasonable basis for determining that the customer who is a broker-dealer has the capability and better access to the client; broker-dealer.
3. Establish, document and maintain procedures to regularly review the performance of the broker-dealer customer and the effectiveness of the allocated controls and procedures and promptly address any performance weaknesses.

ALPINE_LIT169285

Alpine may only allocate specific risk management controls and supervisory procedures to a customer that is a registered broker-dealer as long as Alpine has a reasonable basis for determining that the customer, based on its relationship with the ultimate customer, can more effectively implement them.

**Allocation of Control Obligations (Third Party Vendors)**

Alpine may permit third parties independent of our market access customers to perform routine maintenance or implement technology upgrades on our risk management controls. Should we avail ourselves of this option, Alpine will conduct reasonable due diligence regarding any changes to the controls and their implementation. Alpine recognizes that we would retain responsibility for the effectiveness of the risk management controls in this area.

## 20.15 Cross Reference To Other Supervisory Control Subjects

The purpose of this section is to identify SRO supervisory control rule subjects that do not appear in the chapter *SUPERVISORY SYSTEM, CONTROLS AND PROCEDURES* and that appear in other chapters of this manual.

| Subject | CHAPTER | Section / Subsection(s) |
|---|---|---|
| Transmittals of customer funds and securities to:<br><br>• Third parties<br>• Outside entities (banks, investment companies, *etc.*)<br>• Post office or c/o addresses<br>• Customer by RRs | FINANCIAL AND OPERATIONS PROCEDURES | Transmittals Of Customer Funds And Securities |
| Customer changes of address | ACCOUNTS | • Addresses On Customer Accounts<br>• New Accounts - Post Office Addresses |
| Customer changes of address | FINANCIAL AND OPERATIONS PROCEDURES | Customer Confirmations And Statements - Change Of Customer Addresses On Accounts |
| Confirming changes in customer investment objectives ['34 Act Rule 17a-3(17)(i)(A)] | ACCOUNTS | • New Accounts - Customer Account Information<br>• Updating Account Information And Periodic Affirmation |
| Time and price discretion for orders [NASD Rule 2510] | ORDERS | Time And Price Discretion |
| Account designation changes on orders [FINRA Rule 4515] | ORDERS | Account Designation And Cancels/Rebills |
| Holding customer mail | FINANCIAL AND OPERATIONS PROCEDURES | Customer Confirmations And Statements - Hold Mail Instructions |
| Office inspections | OFFICES | Office Inspections |

ALPINE_LIT169286

# 21 ALPINE'S INFORMATION DESTRUCTION POLICY

| | |
|---|---|
| **Responsibility** | • CCO or designee (where indicated)<br>• General Counsel or designee (where indicated) |
| **Resources** | • Information Destruction Policy |
| **Frequency** | CCO or designee:<br><br>• Annually<br><br>General Counsel or designee:<br><br>• As needed |
| **Action** | CCO or designee:<br><br>• Review policy annually or when there is a material change in regulatory requirements that impact the policy<br>• Approve policy and any material modifications<br>• Record employee involvement in training<br>• Contract with third parties to provide information destruction services<br>• Audit employee compliance with policy on a periodic basis<br>• Document and retain a record of violations of the policy<br><br>General Counsel or designee:<br><br>• Issue notices or other communications, as appropriate, with respect to regulatory inquiries, investigations, or other matters with potential legal issues to assure documents are kept or maintained, or otherwise provide notices, instructions, and communications involving documents and information (whether in paper, electronic or other media form)<br>• Issue a Litigation Hold/Stop Destruction and any other applicable instructions based on matter at issue |
| **Record** | CCO or designee:<br><br>• Evidence of annual review of information destruction policy or when material change in regulatory requirements impacting the policy occur<br>• Evidence of approval<br>• Employee involvement in training<br>• Audit records which may be performed in response to the 3012 testing or corporate audit<br>• Record of violations and resulting action items taken, if any<br><br>General Counsel or designee:<br><br>• Records and information in whatever form or format, including not only such items relating to inquiries, investigations, litigation, or potential or threatened inquiries, investigations, claims, and administrative proceedings, with hold/stop destruction notices, but also setting forth actions taken and communications with both company personnel but also persons outside of company (such as |

ALPINE_LIT169287

| | record storage or IT providers). |
|---|---|

# 21.1 Introduction and Overview

## 21.1.1 Information Destruction Policy

It is the policy of Alpine Securities Corporation (hereafter referred to as "Alpine" or "the firm") to 1) protect the Personal Information of its clients and employees, 2) comply with state and federal regulations to protect/destroy such information when discarded, and 3) protect confidential client-sensitive information and proprietary information. This document implements the official Information Destruction Policy of Alpine and is intended to provide direction to all employees regarding the appropriate retention schedule and acceptable methods for destroying discarded information in order to protect the firm, its clients and employees.

Compliance with the policy and with the requirements herein when discarding or destroying information owned or maintained by the firm is considered a condition of employment.

Failure to adhere to the requirements within this Information Destruction Policy could result in disciplinary action, dismissal, civil proceedings, regulatory penalties, and/or legal prosecution.

As another matter of general applicability, the CCO will include General Counsel with the issues concerning document and record retention and destruction as provided herein as the CCO deems warranted or necessary.

## 21.1.2 Policy Development, Implementation and Oversight

### 21.1.2.1 Policy Development

Alpine's Chief Compliance Officer is responsible for the development and amendments to the firm's Information Destruction Policy. The policy shall be reviewed annually, or at anytime that there is substantive change in regulatory requirements, or under any circumstance that may otherwise provide cause for such a review.

### 21.1.2.2 Policy Approval

Alpine's Chief Compliance Officer, upon advice from the Legal Counsel, is responsible for the final approval of the Information Destruction Policy or any modifications made to it.

### 21.1.2.3 Orientation & Training

Alpine's Chief Compliance Officer, is responsible for implementation and documentation of the orientation of employees to the Information Destruction Policy. This training may involve the participation of outside contractors hired to provide information management or destruction services.

### 21.1.2.4 Contracting/Purchasing

Alpine's Chief Compliance Officer is responsible for the contracting of any third party (Approved Service Provider) to provide information destruction services. Alpine's senior management team may also be responsible for contracting of any third party (Approved Service Provider) to provide information destruction services.

ALPINE_LIT169288

### 21.1.2.5 Compliance Auditing/Review

Alpine's Chief Compliance Officer or designee is responsible for auditing employee compliance with the Information Destruction Policy on a periodic basis, as well as documenting and retaining a record of violations of the policy.

## 21.1.3 Employee Orientation/Training

### 21.1.3.1 Orientation/Training

Upon hiring, and whenever updated, all employees shall 1) be properly oriented on the firm's information destruction procedures, 2) be issued a copy of the Information Destruction Policy (which may be incorporated as part of the firm's written supervisory procedures or maintained as a separate document and 3) execute the appropriate acknowledgement.

### 21.1.3.2 Acknowledgement

Upon completion of initial and ongoing orientation, employees shall sign the *Information Destruction Program Awareness Acknowledgement (if the policy is maintained as part of a separate document)* verifying their understanding of, and their agreement to comply with, the requisite policies and procedures contained in the Policy. If the policy is included as part of the firm's written supervisory procedures, the employee will be required to acknowledge that he/she has read the firm's written supervisory procedures, including Alpine's Information Destruction Policy.

## 21.1.4 Information Destruction Policy

Employees should direct all questions regarding compliance with the Information Destruction Policy to Alpine's Chief Compliance Officer.

Employees are required to inform their supervisor if at any point they become aware of a potential risk of unauthorized access to client information or any violation of the firm's policy.

In the event that the supervisor is unavailable or is unresponsive, employees should direct questions or report threats and violations to Alpine's Chief Compliance Officer or Alpine's General Counsel.

Alpine will not engage in or tolerate any discrimination, retribution, punishment or persecution of any employee who exposes any potential data breach risk or violation to the Information Destruction Policy.

# 21.2 Information Destruction Procedures

All discarded Information-Bearing Media will be destroyed prior to disposal. Alpine relies on an Approved Service Provider, duly contracted with Rocky Mountain Document Destruction, for all paper media destruction.

## 21.2.1 Paper Media

Paper Media refers to all types of paper business communications bearing information, including but not limited to forms, notes, memos, messages, correspondence, transaction records and reports.

### 21.2.1.1 Authorization for Destruction of Paper Media

#### 21.2.1.1.1 Paper Media (Incidental Records)

No approvals or authorizations are required for the destruction of Paper Media that is NOT subject to the firm's current Records Retention Schedule.

ALPINE_LIT169289

**21.2.1.1.2 Paper Media (Retained/Controlled)**

Employees shall NOT destroy or otherwise discard any Paper Media that could be construed as being subject to the firm's current Records Retention Schedule without written authorization directly from his/her supervisor.

If there is any question as to whether the media is subject to the firm's current Records Retention Schedule, the employee should seek instruction from his/her supervisor or Alpine's Chief Compliance Officer.

**21.2.1.2 Securing Paper Media Prior to Destruction**

Incidental Paper Media intended for disposal/destruction should be collected in a designated Collection Container prior to leaving the office for the day.

## 21.2.2 Other Media Disposal

Other Media (non-paper media) includes but is not limited to Magnetic Tape &/or Optical Media (CD/DVD), PDAs/Mobile Phones, Computers, Hard Drives, or Stored Records.

### 21.2.2.1 Authorization for Destruction of Other Media Disposal

**21.2.2.1.1 Other Media Disposal (Incidental Records)**

No approvals or authorizations are required for the destruction of Other Media Records (non-paper media) that are NOT subject to the firm's current Records Retention Schedule.

**21.2.2.1.2 Other Media (Retained/Controlled)**

Employees shall NOT destroy or otherwise discard any Paper Media that could be construed as being subject to the firm's current Records Retention Schedule without written authorization directly from his/her supervisor. The supervisor should consult with Alpine's IT Committee, if there are questions.

If there is any question as to whether the media is subject to the firm's current Records Retention Schedule, the employee should seek instruction from his/her supervisor or Alpine's Chief Compliance Officer.

# 21.3 Qualifications and Selection of an Approved Service Provider

Alpine relies on a properly contracted Approved Service Provider for destruction services. Only members of the firm's senior management has the authority to select and contract with an Approved Service Provider.

# 21.4 Retention Requirements

## 21.4.1 Books and Records/Retention Requirements

Please bear in mind that Alpine is subject to multiple regulatory regimes and must maintain books and records in accordance with federal, SRO and state securities rules and regulations. Noted below is a general list of recordkeeping and retention requirements. This list is not meant to be an all-exhaustive one. If there is any question as to whether the media is subject to the firm's current Books and Records Retention Schedule, the employee should seek instruction from his/her supervisor or Alpine's Chief Compliance Officer.

| Description of Record | Retention Requirement |
|---|---|
| Retention of Rule 17a-3 Records | |
| Blotters (or other original entry records) containing itemized | Six (6) years, with the first two (2) years in an easily accessible place. |

ALPINE_LIT169290

| | |
|---|---|
| daily records of securities purchases and sales, securities<br>receipts and deliveries, cash receipts and disbursements, and<br>other debits and credits.<br>(Required by Rule 17a-3(a)(1)) | (Rule 17a-4(a)) |
| Ledgers reflecting assets, liabilities, income, expense and<br>capital accounts.<br>(Required by Rule 17a-3(a)(2)) | Six (6) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(a)) |
| Ledgers itemizing for each customer and firm account all<br>purchases, sales, receipts, deliveries of securities and commodities, and other debits and credits.<br>(Required by Rule 17a-3(a)(3)) | Six (6) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(a)) |
| Ledgers reflecting securities in transfer, dividends and interest<br>received, securities borrowed and loaned, money borrowed and<br>loaned, securities failed to receive and deliver, long and short<br>securities record differences, and repurchase and reverse<br>repurchase agreements.<br>(Required by Rule 17a-3(a)(4)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Ledgers reflecting by security all long and short positions.<br>(Required by Rule 17a-3(a)(5)) | Six (6) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(a)) |
| Order tickets for brokerage orders.<br>(Required by Rule 17a-3(a)(6)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Order tickets for dealer transactions.(Required by Rule 17a-3(a)(7)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Copies of confirmations.<br>(Required by Rule 17a-3(a)(8)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Records of beneficial ownership of cash and margin accounts.<br>(Required by Rule 17a-3(a)(9)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Records of puts, calls, spreads, straddles and other options in<br>which firm has a direct or indirect interest.<br>(Required by Rule 17a-3(a)(10)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Trial balances, and computation of aggregate indebtedness and<br>net capital.<br>(Required by Rule 17a-3(a)(11)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(5)) |
| Records pertaining to each "associated person."<br>(Required by Rule 17a-3(a)(12)) | Three (3) years, in an easily accessible place, after termination of employment and other connection with firm.<br>(Rule 17a-4(e)(1)) |
| Fingerprint records.<br>(Required by Rules 17a-3(a)(13) and 17f-2(d)) | Three (3) years, in an easily accessible place, after termination of employment or association with the firm.<br>(Rule 17a-4(e)(2)) |
| Records pertaining to missing, lost, counterfeit or stolen securities. | Three (3) years in an easily accessible place.<br>(Rule 17a-4(e)(4)) |

ALPINE_LIT169291

| (Required by Rules 17a-3(a)(14) and 17f-1) | |
|---|---|
| Fingerprint exemption notices.<br>(Required by Rules 17a-3(a)(15) and 17f-2(e)) | Retention, in an easily accessible place, for the life of the enterprise.<br>(Rule 17a-4(e)(3)) |
| Records regarding internal broker-dealer trading systems.<br>(Required by Rule 17a-3(16)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule17a-4(b)(1)) |
| Account record information.<br>(Required by Rule 17a-3(a)(17)) | Six (6) years, in an easily accessible place, after account<br>closing or after date information replaced or updated.<br>(Rule 17a-4(e)(5)) |
| Customer complaint records.(Required by Rule 17a-3(a)(18)), BATS Exchange Rules 4.3(a) | Four (4) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Associated person compensation records.<br>(Required by Rule 17a-3(a)(19)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Records of approvals for public communications.<br>(Required by Rule 17a-3(a)(20)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(1)) |
| Records identifying persons capable of explaining the firm's<br>records.<br>(Required by Rule 17-3(a)(21)) | Six (6) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(a)) |
| Records identifying principals.<br>(Required by Rule 17a-3(a)(22)) | Six (6) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(a)) |
| **Retention of Firm's Financial and Other Business Records** | |
| Checkbooks, bank statements, cancelled checks, cash reconciliations. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(2)) |
| Bills receivable or payable, paid or unpaid. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(3)) |
| Trial balances, computations of aggregate indebtedness and net<br>capital, financial statements, branch office reconciliations,<br>internal audit working papers. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(5)) |
| All agreements relating to the firm's business. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(7)) |
| Certain records supporting the firm's annual financial statements. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(8)) |
| Records made as part of an OTC derivatives dealer's internal<br>risk management control system, and results of periodic reviews<br>relating to such systems.<br>(Required by Rule 15c3-4(d)) | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(10)) |
| **Retention of Communications** | |
| Communications sent or received by the firm, including inter-office and e-mail communications. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(4)) |
| "Approvals" of communications the firm sends. | Three (3) years, with the first two (2) years in an easily |

ALPINE_LIT169292

| | |
|---|---|
| | accessible place.<br>(Rule 17a-4(b)(4)) |
| Communications that must be kept under SRO rules on "communications with the public," including any advertising actually published or otherwise distributed to the public. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(4)) |
| Sales scripts used in communicating with the public (even though the scripts themselves are typically not delivered to the public). | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(4)) |
| **Retention of Account Records** | |
| Account guarantees, powers of attorney, other documents granting discretionary authority, resolutions allowing agent to act for corporation. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(6)) |
| All agreements concerning any account. | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(7)) |
| Notices to customers concerning any internal broker-dealer system (for example, notices concerning hours of operation, access instructions and changes in procedures). | Three (3) years, with the first two (2) years in an easily accessible place.<br>(Rule 17a-4(b)(11)) |
| Customer account cards and records concerning terms and conditions of account opening and maintenance. | Six (6) years after account closing.<br>(Rule 17a-4) |
| **Retention of Organizational Documents** | |
| All firm partnership articles, articles of incorporation or charter, minute books and stock certificate books. | Retention for the life of the firm and for the life of any successor firm.<br>(Rule 17a-4(d)) |
| Similar organizational records for firms organized as other forms of entities, for example, limited liability corporations or limited liability partnerships. | Retention for the life of the firm and for the life of any successor firm.<br>(Rule 17a-4(d)) |
| Forms BD (registering a broker-dealer under 17 C.F.R. 249.501) and BDW (withdrawing a broker-dealer registration under 17 C.F.R. 249-501a), and amendments to these forms. | Retention for the life of the firm and for the life of any successor firm.<br>(Rule 17a-4(d)) |
| Registration documents and licenses with all securities regulators. | Retention for the life of the firm and for the life of any successor firm.<br>(Rule 17a-4(d)) |
| **Retention of Reports** | |
| Reports requested or required from the firm by any securities regulator under any order or settlement with the regulator. | Three (3) years in an easily accessible place after the date of the report.<br>(Rule17a-4(e)(6)) |
| Examination reports by any securities regulator. | Three (3) years in an easily accessible place after the date of the report.<br>(Rule17a-4(e)(6)) |
| Reports of unusual activity in customer accounts (or the ability to regenerate these reports from a computer system). | Eighteen (18) months, in an easily accessible place, after the date of the report.<br>(Rule 17a-4(e)(8)) |

ALPINE_LIT169293

| Retention of Compliance, Supervisory and Procedures Manuals | |
|---|---|
| Compliance, Supervisory and procedures manuals. | Three (3) years in an easily accessible place after termination of use of the manual. (Rule 17a-4(e)(7)) |
| Updates, modifications and revisions to compliance, supervisory and procedures manuals. | Three (3) years in an easily accessible place after termination of use of the manual. (Rule 17a-4(e)(7)) |

### 21.4.2 Default Retention Requirement

Certain books and records may not have a retention specifically noted in the Books and Records Retention Schedule. These books and records should be retained for four years.

## 21.5 Policy Compliance

### 21.5.1 Auditing Internal Compliance

Alpine's Chief Compliance Officer or designee shall be responsible to audit compliance with the Information Destruction Policy on a periodic basis.

### 21.5.2 Litigation Hold/Stop Destruction Order

In certain circumstances, it may be necessary to stop the destruction of records related to a specific subject or matter, including probable, threatened or actual legal claims and/or litigation, internal or external investigations or audits, other legal issues, whether originating through regulatory organizations. There are potentially very serious negative consequences to the organization for destroying information or records subject to these circumstances or even changing the format, media upon which the information is contained (e.g., paper or various electronic formats).

In the event of such circumstances arising, Alpine's General Counsel will issue a *Litigation Hold/Stop Destruction Order* or other appropriate document or communication to each departmental supervisor or other personnel, as appropriate, including possibly external vendors or service providers, with specific instructions. Each supervisor will be responsible for communicating the information with all those employees who report to the supervisor.

Employees will be expect to comply with the *Litigation Hold/Stop Destruction Order* or other documents or communications until such time as General Counsel has notified employees in writing that documents can be destroyed in accordance with Alpine's books and records and records policies.

ALPINE_LIT169294

# 22 CLEARING OPERATIONS

## 22.1 Introduction

Alpine Securities Corporation (Alpine) is also a clearing firm and provides clearing, execution and settlement services for other introducing broker-dealers (also referred to as correspondent firms). This Chapter is intended to provide, in summary form, a general overview and matrix setting forth the components of Alpine's clearing operations. Other areas that concerning Alpine's correspondent clearing business are also covered elsewhere in this Manual.

## 22.2 Regulation S-P

[SEC Regulation S-P]
Information regarding customer accounts for individuals is subject to SEC Regulation S-P "Privacy Of Consumer Financial Information." Regulation S-P defines customer relationship as a continuing relationship between a consumer and a financial institution; it does not make a distinction between retail and correspondent firms in terms of the definition. Please refer to the section "Customer Privacy Policies And Procedures" in the chapter COMMUNICATIONS WITH THE PUBLIC for Alpine's policies and procedures.

## 22.3 Correspondent Clearing/Due Diligence of Correspondent Firms

| | |
|---|---|
| **Responsibility** | • Due Diligence Committee<br>• CFO or designee (where indicated) |
| **Resources** | • Request from a prospective candidate<br>• Financial statements (CFO or designee) |
| **Frequency** | • As needed<br>• Quarterly (CFO or designee) |
| **Action** | • Conduct a review to:<br>  ○ Determine whether to approve or reject the prospective candidate's request to become a correspondent of Alpine<br>• Request/conduct a review of correspondent financials (CFO or designee) |
| **Record** | • Retain documents submitted by prospective correspondent firm<br>• Approved prospective correspondent firms<br>• Rejected prospective correspondent firms<br>• Review of correspondent financial statements on the electronic log or on the correspondent firm's financial statements (CFO or designee)<br>• Note any actions requiring follow-up on the financial statement or via the electronic log (CFO or designee) |

Alpine will obtain information from the firm wanting us to clear for them regarding the type of business and financial status of the firm. We will use a checklist to document review of the following items:

- Correspondent's business mix and type of customer activity
- FOCUS reports
- Audited Financial Statements

ALPINE_LIT169295

- CRD history
- Names of officers, directors, and compliance personnel.

Once this information is gathered, the Due Diligence Committee will review the information and make a determination regarding whether or not to proceed with the clearing agreement. A determination regarding the size of clearing deposit and monthly minimum requirements will be made after the review.

On a quarterly basis, the CFO or designee will perform a review of the financial statements (e.g. Focus reports, audited financials) provided by the correspondents to evaluate if Alpine needs to take any action regarding the clearing agreement or continuation of the clearing relationship. The CFO or designee's review may be evidenced electronically or on the correspondent's submitted financial statements. Any items requiring follow-up will be noted in writing on the financial statements or via the electronic log.

## 22.3.1 Notification to FINRA Re: Acceptance of New Correspondent Firm
*FINRA Rule 4300 and 4311,* 4311(b)((3)

| Responsibility | COO or designee |
|---|---|
| Resources | • Notice of new correspondent firm relationship |
| Frequency | • Within 10 business days prior to carrying accounts of any new correspondent firm, notify FINRA of correspondent firm name, and CRD number and any additional information FINRA may require |
| Action | • Notification to FINRA |
| Record | • Retain record of notification |

## 22.3.2 Minimum Requirements in Clearing/Carrying Agreement
*FINRA Rule 4300 and 4311,* Rule 4311(c)(1)

Alpine Securities operates a correspondent clearing business. Each correspondent firm for which we clear must enter into a clearing agreement that is approved by management. A copy of the agreement will be submitted to FINRA for final approval, including any material changes of a previously approved carrying agreement, before such changes become effective. If Alpine used a standardized form of agreement that has been approved by FINRA, with other U.S. registered brokers or dealers, without the resubmission and re-approval of the agreement. If Alpine uses a standardized agreement for use with a non U.S. registered broker or dealer, the agreement must be submitted to FINRA for final approval.

| Responsibility | • General Counsel or designee<br>• COO or designee (Submission of Clearing/Carrying Agreement) to FINRA only, where designated |
|---|---|
| Resources | • Carrying Agreements between Alpine and correspondent firms |

ALPINE_LIT169296

| Frequency | • As needed |
|---|---|
| Action | • Ensure that each carrying agreement specifies the responsibilities of each party to the agreement as enumerated below:<br>  o Opening and approving accounts<br>  o Acceptance of orders<br>  o Transmission of orders for execution<br>  o Execution of orders<br>  o Extension of credit<br>  o Receipt and delivery of funds and securities<br>  o Preparation and transmission of confirmations<br>  o Maintenance of books and records<br>  o Monitoring of accounts<br>  o Denote Alpine's responsibility for the safegarding of funds and securities pursuant to SEA Rule 15c3-3.<br>  o Denote Alpine's responsibility for preparing and transmitting statements of accounts to customers, in the absence of authorizing the correspondent firm to perform this function subject to FINRA approval<br>• Ensure that each carrying agreement expressly:<br>  o States that if a particular responsibility is allocated to one party, the other party or parties will supply the responsible organization all appropriate data in their possession pertinent to the proper performance and supervision of that responsibility.<br>  o Authorizes and directs the carrying firm to furnish promptly to the correspondent firm and its designated examining authority any written customer complaint received regarding the conduct of the correspondent firm or firms and its associated person, notify the customer in writing that it has received the complaint and that such complaint has been furnished to the correspondent firm and its designated examining authority. |
| Record | • Retain copies of carrying agreements submitted to, and approved by, FINRA |

### 22.3.3 Customer Notification Concerning Responsibilities Allocated to Each Party
4311(d)

| Responsibility | • General Counsel or designee (new account form)<br>• COO or designee (Periodic notices) |
|---|---|
| Resources | • New Account Form upon account opening<br>• Periodic notifications to customers of material changes to the allocation of responsibilities or in the event of any change to any of the parties to the agreement |

ALPINE_LIT169297

| | |
|---|---|
| **Frequency** | • As needed |
| **Action** | • Ensure there are proper notices in the new account form (in writing) upon account opening of the existence of the carrying agreement and the responsibilities allocated to each respective party.<br>• Upon notice of a material change to the allocation of responsibilities, promptly notify the customer in writing (COO or designee)<br>• In the event of any change to any of the parties to the agreement, promptly notify the customer (COO or designee) |
| **Record** | • Retain copies of communications and new account forms |

### 22.3.4 Responding to Customer Complaints Regarding Correspondent Firm Conduct or their Associated Persons

4311(g)(1)

| | |
|---|---|
| **Responsibility** | • CCO or designee |
| **Resources** | • Written communications identified a customer complaint involving conduct of the correspondent firm and its associated persons |
| **Frequency** | • As needed |
| **Action** | • Upon receipt of a written customer complaint involving conduct of the correspondent firm and its associated persons,<br><br>o Furnish promptly to the correspondent firm and its designated examining authority any written customer complaint received regarding the conduct of the introducing firm or firms and its associated person<br>o Notify the customer in writing that it has received the complaint and that such complaint has been furnished to the correspondent firm and its designated examining authority |
| **Record** | • Retain copies of communication received by, and sent to, customer (in paper format) or may be retained electronically via Alpine's e-mail archiving and retention system;<br>• Retain copies of communications sent to the correspondent firm and its designated examining authority (in paper format) or may be retained electronically via Alpine's e-mail archiving and retention system |

ALPINE_LIT169298

### 22.3.4.1 Furnishing List of Reports to Correspondent Firm - Initially and Annually
4311(h)(1)

| | |
|---|---|
| **Responsibility** | • COO or designee - initial notification (upon affiliation of a new correspondent firm)<br>• CCO or designee (annually) |
| **Resources** | • Communication |
| **Frequency** | • As needed |
| **Action** | • At commencement of the carrying agreement, furnish a list of all reports available to assist the correspondent firm with the responsibilities allocated to it pursuant to the carrying agreement<br>• Annually, but not later than July 1 of each year, notify the correspondent firm's CEO and CCO in writing of the list of reports offered to, requested by and supplied to the introducing firm as of the date of the notice (CCO or designee) |
| **Record** | • Retain copies of lists furnished to the correspondent firm, including the date of notification |

WSP Manual

Copyright (c) 2015 Wolters Kluwer Financial Services. All Rights Reserved.

The Broker Dealer Wizard is designed to create a compliance manual addressing SEC, FINRA, NYSE, and MSRB rules and regulations. It is the subscriber's responsibility to adapt and edit the Broker Dealer manual to ensure the subscriber's written procedures are accurate and adequate to comply with securities rules and regulations applicable to the subscriber's firm. Wolters Kluwer and others ("others") providing information to compile the Broker Dealer manual accept no responsibility for the accuracy or completeness of the subscriber's written procedures. Information in the Broker Dealer Wizard and manual are not intended as substitutes for legal advice or to provide legal guidance of any kind whatsoever. Your Broker Dealer manual is published with the understanding that Wolters Kluwer and others are not engaged in rendering legal or other professional services. Subscribers are advised to confer with experienced legal counsel.

The Broker Dealer Wizard and Broker Dealer manual contents are owned by Wolters Kluwer Financial Services. Contents may not be copied or otherwise reproduced other than for the internal use of the subscribers firm under the terms of the subscription.

ALPINE_LIT169299