# Exhibit 202



The SAR Activity Review

*Trends Tips & Issues*

Issue 15

In focus: The Securities and Futures Industries

Published under the auspices of the BSA Advisory Group.

May 2009

*Financial Crimes Enforcement Network*

# *The SAR Activity Review*

## *Trends*
## *Tips &*
## *Issues*

## *Issue 15*

In focus: The Securities and Futures Industries

**Published under the auspices of the BSA Advisory Group.**
**May 2009**

*Financial Crimes Enforcement Network*

# *Table of Contents*

**Introduction** .......................................................................................... **1**

**Section 1 – Director's Forum** ................................................................ **4**

**Section 2 – Trends & Analysis** .............................................................. **6**

An Assessment of Suspicious Activity Reports Filed by
the Securities and Futures Industry ................................................... **6**

Suspicious Activity Reports in the Securities Industry:
How to File a SAR, How SARs are Used,
and the Consequences for Failure to File ...................................... **14**

Suspicious Activity Reviews by Securities Regulators ................... **20**

**Section 3 – Law Enforcement Cases** ................................................... **26**

Investigations Assisted by Bank Secrecy Act Data ......................... **26**

**Section 4 – Issues & Guidance** ............................................................ **38**

Identifying and Reporting Suspicious Transactions for
Introducing and Clearing Broker-Dealers ...................................... **38**

SAR Form Completion When Reporting Identity Theft ................. **41**

Global Resolution of Potential Enforcement Actions ..................... **43**

**Section 5 – Industry Forum** ................................................................. **44**

Ensuring Effective Broker-Dealer SAR Programs .......................... **44**

**Section 6 – Feedback Form** .................................................................. **50**

*The SAR Activity Review* **Index** is now available on the FinCEN website at:
http://www.fincen.gov/news_room/rp/files/reg_sar_index.html
For your convenience, topics are indexed alphabetically by subject matter.

The **Archive of Law Enforcement Cases** published in *The SAR Activity Review* can be
accessed through the following link:
http://www.fincen.gov/news_room/rp/sar_case_example.html

*Financial Crimes Enforcement Network*

# *Introduction*

*T*he SAR Activity Review – Trends, Tips & Issues is a product of continuing dialogue and close collaboration among the nation's financial institutions, law enforcement officials, and regulatory agencies[1] to provide meaningful information about the preparation, use, and value of Suspicious Activity Reports (SARs) and other Bank Secrecy Act reports filed by financial institutions.

This edition focuses on the securities and futures industry and addresses several noteworthy topics. Articles in the *Trends & Analysis* section include an assessment of SARs filed by the securities and futures industry by FinCEN's Office of Regulatory Analysis as well as information from staff of the Securities and Exchange Commission (SEC) on how to file SARs, the SEC's use of SARs and the consequences to regulated institutions for failure to file. An article by staff from the SEC and FINRA (Financial Industry Regulatory Authority) looks at how securities regulators review SARs during examinations.

As always, the law enforcement cases in Section 3 demonstrate how important and valuable BSA data is to the law enforcement community. Cases in this section cover the securities industry, Ponzi schemes and mortgage fraud cases. In the *Issues & Guidance* section, we provide guidance on identifying and reporting suspicious transactions for introducing and clearing brokerage firms and SAR form completion when reporting identity theft. FinCEN's Office of Enforcement also discusses why covered financial institutions should consider seeking global resolution to potential enforcement actions. In the *Industry Forum* section, we get an industry viewpoint on how broker-dealers can ensure effective SAR programs.

---

1.  Participants include, among others, the American Bankers Association; Independent Community Bankers of America; American Institute of Certified Public Accountants; Securities and Financial Markets Association; Board of Governors of the Federal Reserve System; Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation; Office of Thrift Supervision; National Credit Union Administration; U.S. Securities and Exchange Commission; U.S. Department of Justice's Criminal Division and Asset Forfeiture & Money Laundering Section and the Federal Bureau of Investigation; Drug Enforcement Administration; U.S. Department of Homeland Security's Bureau of Immigration and Customs Enforcement and U.S. Secret Service; U.S. Department of the Treasury's Office of Terrorism and Financial Intelligence, Internal Revenue Service, and the Financial Crimes Enforcement Network.

*Financial Crimes Enforcement Network*

*The SAR Activity Review* is possible only as a result of the extraordinary work of many FinCEN employees and FinCEN's regulatory, law enforcement and industry partners.  In order to recognize that hard work, we acknowledge contributors throughout the Review.

## Feedback from FinCEN

Readers of *The SAR Activity Review* frequently inquire through their feedback to us about the frequency and focus of the publication.  Specifically, readers want to know how often it is published, whether it can be published more frequently (such as quarterly, or even once a month for "hot topics"), and whether issues can be published specific to a geographic region or industry.

Beginning with Issue 11, published in May 2007, FinCEN moved to a semi-annual publication schedule for the *Trends, Tips & Issues* publication.  It is now published in May and October each year.  Because of limited resources, we are unable to publish a SAR Activity Review specific to each industry or to a geographic region or more frequently than the current schedule.

In 2008, FinCEN began including information regarding Currency Transaction Report (CTR) filings in *The SAR Activity Review*.  Another change we have made, beginning with a securities industry theme as the focus for much of this issue, is to alternate between a theme-based issue for the May publication and our standard general issue for the October publication.  With each May issue, we will explore a different industry or issue in more depth and we encourage readers to consider how the information presented can be applied to their own industry.

FinCEN relies on the valuable contributions of people from the financial industry and our regulatory and law enforcement partners, as well as FinCEN staff, to develop the articles for each issue.  Many of the contributors to the publication also lend their support and expertise to a number of our other publications, such as *The SAR Activity Review – By the Numbers*, the companion piece to *Trends, Tips & Issues*, as well as our numerous analytical products, such as the Insurance SAR study and the Mortgage Loan Fraud studies.

You can subscribe to FinCEN Updates under "What's New" on the FinCEN website, www.fincen.gov, to receive notification of when *The SAR Activity Review* is published. As always, your comments and feedback are important to us.  We have included a feedback form in Section 6; please take a moment to let us know if the topics chosen for this issue are helpful.

*Financial Crimes Enforcement Network*

Your comments may also be addressed to either or both of *The SAR Activity Review* project co-chairs:

Lilly Thomas
Regulatory Counsel
Independent Community Bankers of America
1615 L Street, NW, Suite 900
Washington, DC  20036-5623
Phone: 202-821-4409
lilly.thomas@icba.org
www.icba.org

Barbara Bishop
Regulatory Outreach Project Officer
Financial Crimes Enforcement Network (FinCEN)
PO Box 39
Vienna, VA 22183
Phone: 202-354-6400
sar.review@fincen.gov

*Please do not submit questions regarding suspicious activity reports to The SAR Activity Review mailbox.*

*Financial Crimes Enforcement Network*

<div style="background:black;color:white;">

# *Section 1 — Director's Forum*

</div>



Welcome to the fifteenth edition of *The SAR Activity Review - Trends, Tips & Issues*, FinCEN's semi-annual publication designed to continue the dialogue among those of us in the law enforcement, financial, and regulatory fields who share common interests in the value of Suspicious Activity Reports (SARs) and the wealth of vital information they contain. This dialogue among SAR users and providers has rarely, if ever, been as important as it is today. America's financial system is undergoing unusual and persistent strains that not only create opportunities for fraud and abuse but also challenge compliance professionals and law enforcement officials to remain vigilant under stressful circumstances and limited resources.

It is becoming more apparent that the current urgent conditions we together face have melted away many debates of the past and have strengthened the partnership and spirit of cooperation between our community of users and providers of SARs. Few now question the tremendous value that SARs present to law enforcement, and recent reports from the Government Accountability Office (GAO) as well as FinCEN's strategic mortgage fraud reports have provided ample and compelling evidence of the importance of SARs. Last month, the Obama Administration launched a major initiative to target mortgage loan modification and foreclosure rescue scams and coordinate anti-fraud activities across federal and state government lines and with the private sector. As key players, Treasury and FinCEN announced an advanced targeting effort, centered around the collection and synthesis of a wide range of information, including SARs and other BSA data, about bad actors in the loan modification industry, to combat these schemes. A critical part of this effort depends on financial institutions and in order to help institutions provide more useful information to law enforcement, FinCEN has issued an advisory alerting financial institutions to the risks of emerging schemes. It identifies certain "red flags" that may indicate a scam and requests that financial institutions include the phrase "foreclosure rescue scam" in the narrative sections of all relevant SARs. Our community should be very proud of this recognition of the power and utility of SARs.

*Financial Crimes Enforcement Network*

Every industry with SAR filing responsibilities is an equally important member of the team. Law enforcement investigators depend on the experience and instincts of compliance professionals to form the frontline against fraud. As recent market occurrences have shown, no industry is immune from the damage that fraud and money laundering can bring and, as illustrated by FinCEN's recent report, *Mortgage Loan Fraud Connections with Other Financial Crime*, criminals are not containing their activities to any single industry, or for that matter, country.

This issue of *The Review* emphasizes the role and responsibilities of the Securities and Futures Industries. Though relatively new to SAR filing responsibilities – brokers and dealers in securities have been required to report suspicious transactions since 2003; futures commission merchants and introducing brokers in commodities since 2004; and mutual funds since 2006 – the information that law enforcement gains from this sector is increasingly valuable. For example, the Commodities and Futures Trading Commission (CFTC) has recently credited FinCEN and SAR data with a number of important enforcement actions concerning Ponzi schemes and fraud.

Inside this *Review*, the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) have provided articles that offer in-depth looks at their use of SAR data. Also, the *Industry Forum* offers advice from experts on the challenges of spotting unusual market activity when recent market activity has been historically unusual.

As usual, you will also find outlines of many more law enforcement cases which describe the successful use of SARs and Currency Transaction Reports (CTRs) to combat crime. Again, I sincerely look forward to your feedback and comments.

James H. Freis, Jr.
Director
Financial Crimes Enforcement Network

*Financial Crimes Enforcement Network*

# *Section 2 - Trends & Analysis*

This section of *The SAR Activity Review* focuses on suspicious activity reporting by the securities and futures industry.  An article by FinCEN's Office of Regulatory Analysis highlights findings of an assessment of SAR-SF filings. An article by SEC staff provides guidance on how to file SARs and discusses how SARs are used and the consequences to a financial institution when they fail to file SARs.  Finally, staff from the SEC and FINRA provide feedback on some of the questions raised during the examination process.

## An Assessment of Suspicious Activity Reports Filed by the Securities and Futures Industry
### *By FinCEN Office of Regulatory Analysis*

Brokers and dealers in securities have been required to file suspicious activity reports since January 1, 2003.[2]  In May 2004, the regulatory definition of "financial institution" was expanded to include futures commission merchants and introducing brokers in commodities, requiring that they also comply with the recordkeeping and reporting requirements of the Bank Secrecy Act (BSA).  In this article, we highlight key findings from an assessment of Suspicious Activity Reports filed by the Securities and Futures Industries (SAR-SF) between January 1, 2003 and December 31, 2008, for money laundering, terrorist financing and other financial crimes.[3]

---

2.  See 31 CFR § 103.19 and 67 F.R. 44048 (July 1, 2002).

3.  Please note: Futures commission merchants and introducing brokers in commodities were not required to report suspicious activity until May 2004, although the analysis for this study dates back to January 1, 2003.  Insurance companies do not have a dedicated SAR form, and so they have been instructed to use the SAR-SF.  Insurance companies filing SAR-SFs are included in the totals; however, analysts eliminated these from the study group. For information regarding suspicious activity reporting by certain insurance companies, see FinCEN's *Insurance Industry Suspicious Activity Reporting:  An Assessment of Suspicious Activity Report Filings April 2008* at http://www.fincen.gov/news_room/rp/reports/pdf/Insurance_Industry_SAR.pdf.

---

*Financial Crimes Enforcement Network*

FinCEN analysts examined SAR-SFs to identify trends and patterns relating to filing volume, type of reporting institution, characterization of suspected activities, and filings by instrument type. We also include summaries from a sample of SAR-SF narratives reviewed to identify typologies and potential emerging threats to this industry. FinCEN continues to examine SAR-SFs and plans to release a more detailed assessment later in 2009.

## Filing Trends

In 2003, the first year suspicious activity reporting was required for securities brokers and dealers, the securities industries filed 4,267 SARs. The annual volume of SAR-SF filings has increased every year since then, with 15,104 reports received by FinCEN in 2008. In the six year period since suspicious activity reporting requirements were extended to the securities and futures industries, covered institutions have filed a total of 53,022 SAR-SFs.[4] Graph 1 depicts the annual filing volume and the percentage change in reporting from year to year.

**Graph 1**



---

4. See *By the Numbers*, FinCEN's bi-annual companion publication to *The SAR Activity Review-Trends, Tips & Issues*, for more numerical information at
http://www.fincen.gov/news_room/rp/sar_by_number.html.

*Financial Crimes Enforcement Network*

# Types of Reported Suspicious Activity

Between January 1, 2003 and December 31, 2008, filers marked the "Other" field (Field 30t) on the SAR-SF form as the most prevalent characterization of suspicious activity, followed by Money Laundering/Structuring (Field 30l).  Exhibit 1 identifies the top five characterizations of suspicious activity reported for the review period.  These five characterizations together comprise 61 percent of all suspicious activity reported in SAR-SFs filed since 2003.

*Exhibit 1: Top Five Characterizations of Suspicious Activity\**

| Type of Suspicious Activity | Filings | Percentage |
|---|---|---|
| Other | 17,998 | 20.74% |
| Money Laundering/Structuring | 14,637 | 16.87% |
| Identity Theft | 7,512 | 8.66% |
| Significant Wire or Other Transactions Without Economic Purpose | 6,700 | 7.72% |
| Check Fraud | 6,125 | 7.06% |

*Some SAR-SFs may list multiple suspicious activities.

Exhibit 2 depicts the percentage change observed in 2008 SAR filings compared to the previous year for all categories of suspicious activity listed in Part II, Field 30. Reported activities that showed an increase from 2007 to 2008 are highlighted.

*Financial Crimes Enforcement Network*

### Exhibit 2: Suspicious Activity Comparison*: CY 2007 to CY 2008

| Type of Suspicious Activity | 2007 | 2008 | Percentage Change |
|---|---|---|---|
| Bribery/Gratuity | 52 | 44 | -15% |
| Check Fraud | 1,232 | 1,197 | -3% |
| Computer Intrusion | 1,241 | 967 | -22% |
| Credit/Debit Card Fraud | 410 | 800 | 95% |
| Embezzlement/Theft | 592 | 851 | 44% |
| Forgery | 392 | 492 | 26% |
| Futures Fraud | 20 | 27 | 35% |
| Identity Theft | 2,089 | 1,947 | -7% |
| Insider Trading | 388 | 499 | 29% |
| Mail Fraud | 326 | 523 | 60% |
| Market Manipulation | 1,470 | 1,460 | -1% |
| Money Laundering/Structuring | 3,994 | 4,037 | 1% |
| Other | 3,938 | 5,288 | 34% |
| Prearranged or Other Non-Competitive Trading | 145 | 143 | -1% |
| Securities Fraud | 1,520 | 1,856 | 22% |
| Significant Wire or Other Transactions Without Economic Purpose | 1,413 | 1,813 | 28% |
| Suspicious Documents or ID Presented | 808 | 802 | -1% |
| Terrorist Financing | 50 | 32 | -36% |
| Unknown/Blank | 145 | 122 | -16% |
| Wash or Other Fictitious Trading | 194 | 181 | -7% |
| Wire Fraud | 1,615 | 1,831 | 13% |

*Some SAR-SFs may list multiple suspicious activities.

## Filing Institutions

SAR filings from the securities and futures industries were received from a variety of filing institutions. While many of the institutional categories identified in Field 51 (Type of Institution or Individual) on the SAR-SF form are not mutually exclusive, the majority of the institutions self-identified as either clearing securities brokers

*Financial Crimes Enforcement Network*

or introducing securities brokers.  Furthermore, collectively, the clearing securities brokers, introducing securities brokers, and securities dealers filed the majority of the SAR-SFs during the entire period of the study.  Six types of reporting institutions filed more than 1,000 SAR-SFs in 2008. Exhibit 3 lists those types of institutions.

*Exhibit 3: Top Six Reporting Institutions in 2008\**

| Type of Institution | Number of SARS Filed |
|---|---|
| Securities Brokers-Clearing | 5,391 |
| Securities Brokers-Introducing | 4,626 |
| Securities Dealer | 3,469 |
| Investment Company–Mutual Fund | 1,874 |
| Affiliate of Bank Holding Company | 1,853 |
| Investment Advisor[5] | 1,430 |

*Some SAR-SFs may list multiple reporting institutions.

## Instrument Type Reported

"Cash or equivalent" (Field 23b) remains the most commonly reported instrument type used in transactions or activities that have been identified by filers as suspicious. The top five corresponding characterizations of suspicious activity reported where "cash or equivalent" was the instrument type were check fraud, identity theft, money laundering/structuring, significant wire or other transactions without economic purpose, and wire fraud.  Furthermore, SAR-SF filers listed "stocks" as the second most reported instrument type.  Computer intrusion, identity theft, market manipulation, securities fraud, and wire fraud ranked as the top five characterizations of suspicious activity associated with stocks.

---

5.  This statistic reflects Investment Advisors who identified themselves as such on the SAR-SF (box 51j). Investment advisors are not currently subject to AML requirements and SAR filing requirements but may voluntarily file a SAR.

*Financial Crimes Enforcement Network*

# Suspicious Activity Identified in SAR-SF Narratives

The following list of the most frequently cited alleged suspicious activities includes examples of specific activities included in the SAR narratives.

<u>Structured Deposits and Withdrawals:</u>

- Structured check withdrawals from funds that originated from a margin loan against the assets held in the customer's account. No trade had occurred in the account since it had been opened.

- Deposits of multiple postal money orders and cashiers checks in amounts under the BSA reporting requirements. When asked about the deposits, the customer stated the purchasers who bought his home gave him postal money orders and cashier checks as part of the payment.

- Structured cashiers check purchases, check or money order deposits, cash withdrawals and wire transfer activity done to avoid the Currency Transaction Report (CTR) filing requirements. On occasion, individuals purchased money orders or cashiers checks at the same location but with different tellers and, at other times, at different locations. Destinations for some wire transfers included Africa, Australia, Brazil, China, New Zealand, Singapore, Switzerland and Taiwan.

- Structured deposits from an electronic payment and money transfer business, which did not correspond to the purchase of any merchandise.

<u>Identity Theft:</u>

- Individuals with trade accounts who became victims of identity theft.

<u>Possible Terrorist Financing:</u>

- Customers purportedly having business relationships with individuals and charitable organizations suspected of financing terrorist organizations.

- Login history of customer trade accounts from Internet protocol addresses routed through Canada, France, Iran, Jordan, Nigeria, United Arab Emirates, and United Kingdom. Filing institutions expressed concern that the account holders supposedly violated sanctions by accessing U.S. financial institutions online while in Iran. Furthermore, SAR narratives stated that deposit and withdrawal activity and unusual address connections might have indicated money laundering and/or terrorist financing.

*Financial Crimes Enforcement Network*

- Client's withdrawals structured to possibly avoid the CTR reporting requirements. Further review by the filer of the source of funds revealed a dissident of an African country who is currently residing in Europe. According to the SAR-SF narrative, officers of the securities firm suspected the account holder's business, supposedly a shell company, was designed to facilitate the laundering of illicit funds. The filer further stated that potential ties to this particular African country presented concern that the funds involved possibly were used for terrorist financing.

## Suspected Money Laundering or Tax Evasion:

- Trading account indicating an attempt to launder funds through stock transfers.

- Brokerage account receiving an excessive number of money order deposits which, according to the filer, resembled money laundering/structuring.

- Multiple postal money order deposits in amounts that appeared structured, possibly to avoid currency reporting requirements. The deposits did not support trading activity, and may have indicated an attempt to launder funds or evade taxes.

- Multiple customers with trade accounts internally transferring assets and funds. The utilization of the same address was the common thread between the parties. The filer stated that the activity might have indicated money laundering or terrorist financing.

## Suspicious Wire Transfers:

- An unusual and unexplainable pattern of activity involving deposits from an electronic payment and money transfer business and incoming wire transfers followed by ATM withdrawals or wire transfers to foreign locations.

- An account with debit card purchases and cash advance transactions in South and Central America and the United States. Also, wire transfers from New York and from Miami, Florida disbursed at locations throughout one South American country known for its drug cartels and for having connections to a terrorist organization.

- A trading firm detected a pattern of funds flowing through a customer's account where wire transfers were deposited into the customer's account from a bank. The customer then used the funds to write checks or make wire transfer withdrawals paid to the order of a casa de cambio located in Mexico.

*Financial Crimes Enforcement Network*

<u>Other Notable Suspicious Activity:</u>

- Amounts deposited into trading accounts that exceeded the customer's annual income and net worth.

- An individual submitting three account applications online to a registered broker-dealer firm. A check for approximately $150,000 was deposited into one of the accounts. When attempting to verify the check, the filer learned that it was counterfeit and immediately closed the account. Further investigation by the firm revealed that the individual used a false social security number, date of birth, name and address.

- A customer identifying himself as a tax attorney was concerned with commission amounts and looking for "no-load" mutual funds. It appeared that the activity in the account did not correspond with the selected time horizon of 10+ years. Also, the filer's search of an attorneys' database did not reveal any name matches for the customer despite his claims to being a tax attorney.

## Conclusion

SAR-SF narratives analysis revealed much of the reported suspicious activity to be structuring of deposits or withdrawals using cash or equivalent to evade CTR filing requirements, which filers believed may have represented possible tax evasion, money laundering, terrorist financing or other financial crimes. Several SAR-SF narratives noted clients attempting to utilize their trading accounts for purposes other than investments or conducting unusual and unexplainable patterns of deposits followed by withdrawals or wire transfers to international locations. Multiple SAR-SF narratives reported alleged terrorist financing through charitable organizations. The filers noted some clients engaged in business relationships with individuals and organizations allegedly financing terrorist organizations. Later this year, FinCEN plans to publish a full report describing the findings from its assessment of SAR-SFs filed since 2003.

*Financial Crimes Enforcement Network*

# Suspicious Activity Reports in the Securities Industry: How to File a SAR, How SARs are Used, and the Consequences for Failure to File

*By Staff of the Securities and Exchange Commission[6]*

One of the cornerstones of the Bank Secrecy Act (BSA)[7] is the requirement that financial institutions monitor for, and report to the Financial Crimes Enforcement Network (FinCEN), suspicious activity. This reporting is critical to the United States' ability to utilize financial information to combat terrorism, terrorist financing, money laundering, and other financial crimes.

Following the USA PATRIOT Act's[8] amendments to the BSA, broker-dealers and mutual funds (in 2003 and 2006, respectively) became subject to regulations requiring them to file Suspicious Activity Reports (SARs) with FinCEN on Form 101, generally referred to as the SAR-SF form.[9] The BSA, SEC and self-regulatory organization rules and regulations collectively require firms to establish and implement procedures that can reasonably be expected to detect and cause the reporting of suspicious transactions.

---

6. This article was prepared by staff in the Securities and Exchange Commission's (SEC or Commission) Division of Trading and Markets, with assistance from the staff in the Commission's Division of Enforcement (Enforcement) and Office of Compliance Inspections and Examinations (OCIE), but does not necessarily represent staff views. The Securities and Exchange Commission, as a matter of policy, disclaims responsibility for any private publication or statement by any of its employees. The views expressed in this document do not necessarily represent the views of the Commission, or the members of the staff of the Commission.

7. The Currency and Foreign Transactions Reporting Act of 1970 (commonly referred to as the Bank Secrecy Act) is codified at 31 U.S.C. 5311, *et seq.* The regulations implementing the Bank Secrecy Act are located at 31 CFR Part 103.

8. Pub. L. No. 107-56, 115 Stat. 272 (2001).

9. See 31 CFR 103.19 and 103.15. The SAR-SF form is available at http://fincen.gov/forms/bsa_forms/.

*Financial Crimes Enforcement Network*

# Factors to Consider When Filing SARs

## *Mechanics of Filing*

A SAR can either be mailed to a processing center or filed electronically on a secure website accessible on the Internet using the BSA E-Filing system.[10]  In addition to supporting electronic filing of individual or batch BSA forms, such as SAR-SF forms, the system also allows filers to exchange secure messages with FinCEN.  FinCEN also uses the system to issue advisories and system updates to the user community. FinCEN promotes the use of BSA E-Filing because it is more efficient, faster, and more secure than paper filing.

## *Process for Filing*

The SAR must be filed no later than 30 calendar days from the date of the initial detection of the suspicious activity.  If no suspect can be identified, the time period for filing a SAR is extended to 60 days.  FinCEN has provided guidance that "initial detection" does not mean the moment a transaction is highlighted for review.[11]  The time to file a SAR starts when a firm, in the course of its review or on account of other factors, is able to make the determination that it knows, or has reason to suspect, that the activity or transactions under review meet one or more of the definitions of suspicious activity.  Specifically, the 30-day (or 60-day) period does not begin until an appropriate review is conducted and a determination is made that the transaction under review is "suspicious" within the meaning of the SAR regulations.  Of course, a review must be initiated promptly and completed in a reasonable period of time.[12] Firms should maintain some type of record reflecting the date the transaction was

---

10. Additional enrollment information about FinCEN's BSA Direct E-Filing system is available at http://bsaefiling.fincen.treas.gov.

11. The SAR Activity Review, Trends Tips & Issues, Issue 10, at 44-46 (May 2006).  See http://www.fincen.gov/sarreviewissue10.pdf.

12. An expeditious review is recommended and can be of significant assistance to law enforcement.

---

*Financial Crimes Enforcement Network*

deemed suspicious.  In situations involving violations of law requiring immediate attention, the firm should immediately notify appropriate law enforcement and supervisory authorities,[13] in addition to filing a SAR.

Firms also should remain cognizant of the need to comply with suspicious activity reporting obligations even where other BSA obligations, such as customer identification requirements, may not apply.  For example, every clearing firm's anti-money laundering program should contain risk-based policies, procedures, and controls for assessing the money laundering risk posed by its clearing arrangements, for monitoring and mitigating that risk, and for detecting and reporting suspicious activity.[14]

Unless jointly filing a SAR, each broker-dealer involved in a transaction must individually identify and report suspicious activity.  Only one SAR is required to be filed by a firm so long as the SAR includes all the relevant facts concerning the transaction and the names of all entities.  In the case of a jointly filed SAR, each entity should keep a copy of the SAR.  In addition, in adopting the SAR rule, FinCEN acknowledged that the rule does not require a firm to alter its relationship with its customers in a way that is inconsistent with industry practice.[15]  FinCEN noted, for example, that based on the nature of the services that a broker-dealer provides to their customers, certain types of broker-dealers will have more information available to them in making suspicious activity determinations than other types of broker-dealers.[16]

---

13. See, e.g., AML Source Tool for Broker-Dealers, Part 14: Useful Contact Information, available at http://www.sec.gov/about/offices/ocie/amlsourcetool.htm. As provided in the SAR rules, in situations involving violations that require immediate attention, firms must immediately telephone an appropriate law enforcement authority in addition to filing a SAR. Additionally, firms wishing to voluntarily report suspicious transactions that may relate to terrorist activity can call the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) hotline at 1-866-556-3974. Broker-dealers may also, but are not required to, contact the SEC to report situations that may require immediate attention by the SEC. The SEC SAR Alert Message Line number (202-551-SARS (7277)) should only be used in cases where a broker-dealer has filed a SAR that may require immediate attention by the SEC and wants to alert the SEC to the filing. Calling the SEC SAR Alert Message Line or FinCEN's hotline does not alleviate the broker-dealer's obligation to file a SAR or notify an appropriate law enforcement authority.

14. See Customer Identification Program Rule No-Action Position Respecting Broker-Dealers Operating Under Fully Disclosed Clearing Agreements According to Certain Functional Allocations (FIN-2008-G002; March 4, 2008), available at http://www.fincen.gov/statutes_regs/guidance/html/fin-2008-g002.html.

15. Financial Crimes Enforcement Network; Amendment to the Bank Secrecy Act Regulations—Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 FR 44054 (July 1, 2002).

16. Id.

---

*Financial Crimes Enforcement Network*

Finally, a firm may use its reasonable business judgment to decide whether to close an account after a SAR filing has been made. It would be prudent for a firm to implement additional monitoring of an account that is the subject of a SAR filing, particularly if numerous SAR filings are involved.[17]

## SAR Quality Considerations

Firms are required to file SARs that are complete, thorough, and timely. Some common errors found on SAR-SF forms include: incomplete narratives (e.g., the form does not identify all relevant parties and/or accounts to a transaction), missing identifying information (e.g., account numbers, social security numbers, addresses and telephone numbers), inaccurate information such as applicable dates of suspicious activity (e.g., typographical errors), and including supporting documents as attachments (supporting documents should not be filed with the form). Of course, there may be legitimate reasons why certain information may not be provided in a SAR, such as when a firm does not have the information.

Care should be used to ensure that SARs are completed in a thorough and accurate manner. For instance, a firm should include all known information regarding the person suspected of engaging in suspicious activity and provide a thorough and complete narrative.[18] Inaccurate information on a SAR, or an incomplete or disorganized narrative, may make further analysis difficult, if not impossible, thereby undermining the usefulness of the filing. In particular, the SAR narrative section is critical because it is the only area where a firm may explain why the activity was suspicious.

---

17. "As a general rule of thumb, organizations should report continuing suspicious activity with a report being filed at least every 90 days." <u>See</u> The SAR Activity Review Trends, Tips & Issues, October 2000, available at http://www.fincen.gov/sarreviewforweb.pdf.

18. More specific guidance on writing the SAR narrative is available in the FFIEC Manual, Appendix L (SAR Quality Guidance). The FFIEC Manual was prepared by federal banking regulators for banks and bank examiners and is not determinative of broker-dealers obligations; however, it may provide information that is helpful to broker-dealers. Comprehensive guidance is available from FinCEN (Guidance on Preparing a Complete & Sufficient Suspicious Activity Report Narrative) at http://www.fincen.gov/statutes_regs/files/sarnarrcompletguidfinal_112003.pdf.

---

*Financial Crimes Enforcement Network*

## SEC's Use of SARs Filed by Firms

SEC Enforcement and the Office of Compliance Inspections and Examinations (OCIE) review, in both the enforcement and examination contexts, all new SAR-SF forms that are filed.  SARs are reviewed by the SEC for three primary purposes:  (i) to identify any information that may relate to existing SEC Enforcement investigations or OCIE examinations, (ii) to identify any ongoing matters that should be referred for a possible new Enforcement investigation or OCIE examination, and (iii) to identify any ongoing securities fraud matters that merit further investigation or examination by the Financial Industry Regulatory Authority or a state or federal law enforcement agency.

The SEC's proactive review of SARs has resulted in a number of new investigations and examinations and has assisted in many active investigations and examinations.  These investigations have included matters concerning insider trading, offering frauds, market manipulation, embezzlement of client funds by a registered representative, unregistered broker-dealer or investment adviser conduct, and advance fee schemes.  For example, based on information from a SAR review, the Commission filed an emergency enforcement action to halt an alleged ongoing Ponzi scheme and obtained a temporary restraining order that included a substantial asset freeze.  In addition, based on a SAR review, SEC staff initiated a cause examination of a broker-dealer to investigate, among other things, whether a firm was attempting to avoid its prime broker's credit limits on trades by cancelling a series of trades in a client's accounts in violation of the Commission's short sale requirements.  This examination resulted in a deficiency letter to the firm addressing the firm's failures to ensure the safety of client assets, properly allocate trades, and properly designate discretionary adviser transactions.

## SEC Enforcement Actions for Failure to File

The vast majority of firms appear to take their responsibilities to file SARs seriously and expend a considerable amount of resources to diligently file SARs in accordance with their legal obligations.  Similarly, promoting compliance with SAR reporting obligations is a Commission priority.[19]

---

19. Pursuant to federal securities laws, the SEC has the authority to examine broker-dealers, investment companies, investment advisors, and other securities industry participants for compliance with federal securities laws, and to take enforcement action for violations of such laws.

*Financial Crimes Enforcement Network*

Two recent cases illustrate the Commission's commitment to promoting SAR compliance.  In the first case, the Commission charged Park Financial Group, Inc. (Park Financial), a broker-dealer, with playing a role in a pump-and-dump scheme involving pink sheets stock of Spear and Jackson, Inc. (Spear and Jackson) and failing to file a SAR despite obvious red flags.[20]  The scheme primarily was operated through three accounts for British Virgin Island companies (unusual for Park Financial) that required the written approval of at least two authorized individuals before a transaction could occur.  The CEO of Spear and Jackson, who did not have trading authority, controlled the accounts, which bought and sold only Spear and Jackson stock.  The three accounts also transferred large amounts of Spear and Jackson stock to a stock promoter, who was actively promoting Spear and Jackson.  During the relevant period, the stock price was sharply increasing.  Park Financial and its principal executed more than 200 trades in Spear and Jackson stock for the three accounts, generating approximately $2.5 million in proceeds.  Park Financial, among other violations, never reported any suspicious activity and as a result was required to pay a penalty of over $30,000.

In the second case, the Commission sanctioned Ferris, Baker Watts, Inc. (Ferris) for supervisory failures surrounding a scheme to manipulate stock and for failure to file a SAR as required by 31 C.F.R. § 103.19.[21]  Failure to file a SAR is a violation of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.  A registered representative of Ferris, a customer and a registered representative of another firm participated in a scheme to manipulate the market for a publicly traded company.  The parties acquired shares of the company through various accounts they controlled.  After acquiring a significant amount of the public float for the stock, the parties used a number of manipulative trading practices, such as marking the close of the stock, engaging in matched and wash trades, and attempting to artificially create down-bids to suppress short selling.  The information about the manipulative practices was made available to senior executives at Ferris through a number of memorandums discussing the manipulative conduct and a recommendation to file a SAR.  Ferris, however, failed to

---

20.  In the Matter of Park Financial Group, Inc. and Gordon C. Cantley, Securities Exchange Act Release No. 55614 (April 11, 2007) and Securities Exchange Act Release No. 56902. (December 5, 2007) available at
http://www.sec.gov/litigation/admin/2007/34-55614.pdf and http://www.sec.gov/litigation/admin/2007/34-56902.pdf.

21.  In the Matter of Ferris, Baker, Watts Inc., Securities Exchange Act Release No. 59372, Investment Adviser's Act Release No. 2837 (February 10, 2009) ("Ferris Order") available at
http://www.sec.gov/litigation/admin/2009/34-59372.pdf.

*Financial Crimes Enforcement Network*

file a SAR relating to the manipulative conduct despite the available information. As a result of this and other violations, Ferris was ordered to pay a civil money penalty of $500,000, in addition to disgorgement payments.

These enforcement cases illustrate that some firms have had serious failings with respect to complying with their SAR obligations. Accordingly, it is useful for all firms to consider how to manage the money laundering and terrorist financing risks posed by their business and to take this risk profile into account when designing SAR monitoring programs.

# Suspicious Activity Reviews by Securities Regulators
*By Staff of the Financial Industry Regulatory Authority and the Securities and Exchange Commission[22]*

In recent years, broker-dealers—and regulators—have dedicated more time and resources to anti-money laundering (AML) compliance. The U.S. Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA)[23] conduct the majority of AML compliance examinations of broker-dealers.

---

22. This article was prepared by staff from the Financial Industry Regulatory Authority (FINRA) and the Securities and Exchange Commission's (SEC or Commission) Division of Trading and Markets and the Office of Compliance Inspections and Examinations (OCIE), but does not necessarily represent any staff views. The Securities and Exchange Commission, as a matter of policy, disclaims responsibility for any private publication or statement by any of its employees. The views expressed in this document do not necessarily represent the views of the Commission, or the members of the staff of the Commission.

23. FINRA was created in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the NYSE (the consolidation transaction). FINRA operates subject to the oversight of the SEC and is the largest non-governmental regulator for all securities firms doing business in the United States. FINRA is dedicated to investor protection and market integrity through effective and efficient regulation. FINRA oversees nearly 5,000 brokerage firms, about 173,000 branch offices and approximately 656,000 registered securities representatives.

---

*Financial Crimes Enforcement Network*

Following the USA PATRIOT Act's amendments to the Bank Secrecy Act, FINRA published NASD Rule 3011, effective April 2002. NASD Rule 3011 requires each member firm to have an AML compliance program in place that is reasonably designed to achieve and monitor the firm's ongoing compliance with the requirements of the Bank Secrecy Act and the implementing regulations promulgated thereunder. The New York Stock Exchange (NYSE) promulgated a comparable rule, NYSE Rule 445, in April 2002, which FINRA incorporated into its rulebook as part of the consolidation.[24] Compliance with NASD Rule 3011 or NYSE Rule 445 also constitutes compliance with the Bank Secrecy Act's AML compliance program requirements.[25]

The SEC and FINRA both examine broker-dealers for compliance with the Bank Secrecy Act and its implementing regulations, as well as for compliance with Rule 17a-8 under the Securities Exchange Act of 1934 (Exchange Act), NASD Rule 3011 and NYSE Rule 445.[26]  Each year since 2002, the SEC and FINRA have conducted over 2,000 examinations of broker-dealers that have included an AML review.  Even prior to the passage of the USA PATRIOT Act, which expanded the scope of a broker-dealer's AML obligations, FINRA conducted examinations of securities firms for compliance with the AML obligations in place at the time, such as Currency Transaction Reporting (CTR), structuring and the joint and travel rules.

A significant focus of the SEC and FINRA's AML examination programs is on the broker-dealers' policies and procedures to identify and report suspicious activity. These are examined as part of the examiners' review of Exchange Act Rule 17a-8, which requires broker-dealers to comply with the reporting, recordkeeping and record retention requirements of the implementing regulations under the Bank Secrecy Act.  They are also examined to ensure compliance with NASD Rule 3011(a), which requires that firms registered with FINRA establish and implement policies and procedures that can be reasonably expected to detect and cause the reporting of transactions under 31 U.S.C. 5318(g) and the underlying implementation of those policies and procedures as part of 31 CFR 103.19, which requires broker-dealers to report suspicious transactions.

---

24. The current FINRA rulebook includes (1) FINRA Rules, (2) NASD Rules and (3) rules incorporated from NYSE. For more information about the rulebook consolidation process, see FINRA *Information Notice* 03/12/08 (Rulebook Consolidation Process).

25. See 31 CFR 103.120; see also 31 U.S.C. 1538(h)(1).

26. Throughout this document, NASD Rule 3011 citations have a comparable NYSE Rule 445 citation for members of the New York Stock Exchange.

*Financial Crimes Enforcement Network*

There are three questions firms most often ask of the securities regulators in connection with examinations of a firm's suspicious activity reporting: (1) what are the examiners looking for when conducting their reviews, (2) will the examiner "second-guess" a decision not to file a Suspicious Activity Report (for the Securities and Futures Industries, or SAR-SF); and (3) what are the examiners finding during their examinations?

## Examination Priorities

To address the first question, when conducting an examination for Exchange Act Rule 17a-8, NASD 3011(a) and 31 CFR 103.19, examiners generally focus their review on four items:

1. Written Policies and Procedures – Examiners review the policies and procedures of the firm to see if they are designed to address the risk of the firm's business, such as its size, where its customers and branch offices are located, how accounts are opened, and the types of customers and products handled by the firm. In addition, examiners review procedures to determine whether they address the specific requirements of 31 CFR 103.19, which include the filing of SAR-SFs and the safeguarding of SAR-SF information along with the notification to law enforcement, when required.

2. Implementation of the Written Policies and Procedures – Equally important to having policies and procedures is their implementation. Examiners test the procedures to determine whether the firm is actually following its procedures.

3. Monitoring for Suspicious Activity – Examiners assess whether the firm's transaction-monitoring system and the adequacy of the system, either automated or manual, is reasonably designed to identify potential suspicious activity and whether the firm files SAR-SFs when appropriate. Examiners also review any exception reports used by the firm to monitor activity.

4. Reporting of Suspicious Activity – Examiners review a sample of SAR-SFs that the firm filed to determine the accuracy of the filing, including the timeliness of the filing, whether the firm correctly completed the SAR-SF form, whether the firm maintained proper supporting documentation and whether the SAR-SFs have been kept confidential. In addition, examiners also conduct an independent review for undetected suspicious activity.

*Financial Crimes Enforcement Network*

## Suspicious Activity Reporting

To address the second question, examiners will accept a firm's decision not to file a SAR-SF as long as the firm demonstrates that it had reasonable, risk-based controls and a reasonable decision-making process, and the examiners must find that the firm's decision not to file a particular SAR-SF was reasonable under the facts and circumstances. However, examiners have found that some firms did not implement reasonable, risk-based controls and as a result, they failed to identify transactions showing "red flags" for suspicious activity that were identified in the firm's own procedures.

For example, during one examination, a firm's records showed excessive wire activity and penny stock transactions that indicated the customer might be involved in a market manipulation. The firm did not follow up to analyze these red flags as required by the firm's procedures and, hence, did not file a SAR-SF. In such cases, FINRA and the SEC would likely cite the firm for failing to implement its procedures and may cite the firm for failing to file a SAR-SF.

## Common Examination Findings

Regarding the third question about common examination findings, one of the more common findings is that firms fail to have adequate suspicious activity reporting procedures. The procedures are deemed inadequate based on the nature of the firm's business and its clientele. For example, one firm had an online business and customers located in higher-risk jurisdictions, neither of which was addressed in its procedures. In many instances, firms also fail to identify suspicious customer activity and file SAR-SFs where required. For other firms, the procedures failed to set forth the process under which a SAR-SF filing is to be made, how often reviews are conducted, what documents are reviewed, who conducts the reviews, and who within the firm has the authority to make a determination as to whether to file a SAR-SF. Additional findings include the following:

- Failure to document reviews of suspicious activity;
- Incomplete SAR-SF Forms;
- SAR-SFs in which items are completed inaccurately;

*Financial Crimes Enforcement Network*

- SAR-SFs in which the narrative section fails to adequately describe why the activity was suspicious;

- SAR-SFs that include attachments even though the Form SAR-SF specifically states that supporting documentation should not be filed with the report;

- SAR-SFs not being filed in a timely manner; and

- Inadequate due diligence conducted once potentially suspicious activity is identified; for example, a firm may fail to use readily available public information about a customer's criminal or regulatory history when evaluating potentially suspicious activity for a SAR-SF filing.

More frequently, examiners find that firms have failed to identify and report, as necessary, potentially suspicious transactions involving low-priced securities known as "penny-stocks." The following scenario has been identified on several examinations:

1. Substantial deposit, transfer or journal of very low-priced and thinly traded securities;

2. Journaling of those shares between related and unrelated accounts;

3. Systematic sale of those low-priced securities shortly after being deposited, transferred or journaled into the account;

4. Multiple wire transfers out of the accounts—usually to third parties and many times to offshore tax havens; and

5. Little to no other activity in the accounts other than the deposit of low-priced securities, liquidation of shares and the wiring out of funds.

Transactions like these are red flags for the sale of unregistered securities, and possibly even fraud and market manipulation; they need to be investigated thoroughly by the firm. However, several firms failed to obtain information regarding the source of the stock certificates, the registration status of the shares, how long the customer has held the shares and how he or she happened to obtain them, and whether the shares were freely tradable and no longer restricted resulting in unregistered offerings. Often times, these transactions involve the deposit of physical certificates, which have their own red flags, such as the shares were not issued in the

*Financial Crimes Enforcement Network*

name of the customer, or were recently issued or sequentially numbered. In several instances, firms did not flag this activity for further review and no SAR-SFs were filed where appropriate.[27] In January 2009, FINRA issued *Regulatory Notice 09-05* reminding firms of their obligations in this area.[28]

Firms have an obligation to report any suspicious transactions "by, at or through" the firm.[29] Examinations have disclosed that some firms review reports that show journals of money, large wire transfers, large money movements and checks distributed from client accounts, but fail to review trading activity or securities movements in order to identify patterns of suspicious activity involving securities. Recent enforcement actions have highlighted the importance of broker-dealers monitoring all aspects of their business and not just money movements.[30] The expectation is for firms to monitor potentially suspicious trading in customers' accounts, as well as the flow of funds and securities into and out of accounts.

Both clearing and introducing firms have independent obligations to review for suspicious activity. Yet, despite this requirement, examiners have found instances where the clearing firms were relying on their correspondent firms who introduce their business to them to conduct suspicious activity reviews, with the clearing firms conducting little to no reviews of their own.[31] Conversely, despite the clearing firm making reports available to its correspondent introducing firms to assist them in their review for suspicious activity, some correspondent introducing firms were not conducting suspicious activity reviews of their own, but rather were relying on their clearing firm to conduct the review.

The monitoring of suspicious activity and the filing of SAR-SFs are cornerstones of any firm's AML program. Broker-dealers should expect examiners to review their suspicious activity reporting program whenever an AML review is conducted.

---

27. *In the Matter of Franklin Ross* (20060046142) (2007); *In the Matter of James I Black and Jess Tucker,* 2006007424601(2008); *See Newwest Securities Corporation* (E022004011201) (2007), in which FINRA found that the firm's decision not to file a SAR was unreasonable under the circumstances.

28. See FINRA *Regulatory Notice 09-05* (FINRA Reminds Firms of Their Obligations to Determine Whether Securities are Eligible for Public Sale) issued January 2009.

29. See 31 CFR §103.19.

30. *In the Matter of E\*Trade Securities LLC and E\*Trade Clearing LLC* (2006004297301) (2008); Southwest Securities Inc. (2005002895501) (2008).

31. *Southwest Securities Inc.* (2005002895501) (2008); Wells Fargo Investments LLC (20070073069) (2008).

---