# Exhibit 203

# The SAR Activity Review

*Trends*

*Tips &*

*Issues*

# The
# SAR
# Activity
# Review

## *Trends*

## *Tips &*

## *Issues*

Published under the auspices of the Bank Secrecy Act Advisory Group

*October 2000*

# Table of Contents

Introduction ....................................................... 1

Section 1 –SAR Statistics .................................................. 2

Section 2 –National Trends and Analyses ......................... 11

            1.  Highlighted Trend .............................. 11

            2.  Other Notable Trends ......................... 12

            3.  Other SAR Analysis Issues ................ 14

Section 3 –Law Enforcement Cases ................................... 16

Section 4 –Tips on SAR Form Preparation and Filing ...... 24

Section 5 –Issues and Guidance ........................................ 27

Section 6 –Industry Forum ............................................... 29

Feedback Form ................................................................. 30

# Introduction

The *SAR Activity Review—Trends, Tips and Issues* is the product of a continuing collaboration among the nation's financial institutions, federal law enforcement, and regulatory agencies to provide meaningful information about the preparation, use, and utility of Suspicious Activity Reports (SARs) filed by financial institutions.

This publication reflects the recognition of both the relevant government agencies and the nation's financial institutions of the desirability of a continuing public exchange of information about the SAR System and its results. These include, among others, the American Bankers Association; Independent Bankers Association; Independent Community Bankers of America; American Institute of Certified Public Accountants; Securities Industry Association; Non-Bank Funds Transmitters Group; Federal Reserve Board; Office of the Comptroller of the Currency; Federal Deposit Insurance Corporation; Office of Thrift Supervision; National Credit Union Administration; Federal Bureau of Investigation; U.S. Department of Justice's Asset Forfeiture and Money Laundering Section; U.S. Department of Justice's Criminal Division; U.S. Department of Treasury's Office of Enforcement; U.S. Customs Service; U.S. Secret Service; Internal Revenue Service; and Financial Crimes Enforcement Network.

The *SAR Activity Review* will be published semiannually in October and April, beginning in October 2000. Analytic reports, issue papers, and other publications related to or resulting from information contained in the *Review* may be published separately.

Questions, comments or other feedback concerning the *SAR Activity Review* will be most welcome. Where possible, Email contact points are provided for each section of the *Review*. A feedback sheet is included as the last page. Comments may also be addressed to either or both of the *SAR Activity Review* project co-chairpersons:

John J. Byrne
Senior Counsel & Compliance Mgr.
American Bankers Assoc.
(ABA)
1120 Connecticut Ave. NW
Washington, DC 20036
(202) 663-5029 (phone)
(202) 828-5052 (fax)
jbyrne@aba.com

David M. Vogt
Assistant Director
Financial Crimes Enforcement Network
(FinCEN)
2070 Chain Bridge Road, Suite 200
Vienna, VA 22182
(703) 905-3525 (phone)
(703) 905-3698 (fax)
vogtd@fincen.treas.gov

1

# Section 1
## Suspicious Activity Report Statistics[1]
### 1 April 1996 - 31 August 2000

The statistics on the following pages relate to SARs filed since April 1996 by depository institutions (i.e., banks, thrifts, and credit unions). A small part of the total volume relates to reports filed by affiliates of depository institutions or, in some cases, filed voluntarily by brokers and dealers in securities, money services businesses, or gaming businesses.

**Note:** SAR data is continuously updated as additional forms are filed and processed. For this reason, there may be minor discrepancies between the statistical figures contained in various portions of this report.

### Chart 1
### SAR Filings by Year[2] and Month

| Month | Number of Filings | | | | |
|---|---|---|---|---|---|
| | 1996 | 1997 | 1998 | 1999 | 2000 |
| January | 261 | 5794 | 7600 | 8621 | 10789 |
| February | | 5522 | 7107 | 9950 | 9910 |
| March | | 6967 | 8718 | 10986 | 14923 |
| April | 2022 | 7628 | 8293 | 9759 | 11928 |
| May | 3315 | 6814 | 7646 | 10625 | 13364 |
| June | 5756 | 6414 | 8163 | 10715 | 13908 |
| July | 6882 | 6844 | 9061 | 8759 | 12031 |
| August | 6785 | 6930 | 7696 | 10014 | 13500 |
| September | 6139 | 7221 | 8625 | 8735 | |
| October | 7269 | 7486 | 8223 | 10049 | |
| November | 5060 | 6384 | 7577 | 10540 | |
| December | 6297 | 7593 | 8223 | 11753 | |
| **Subtotal** | **49,786** | **81,597** | **96,932** | **120,506** | **100,353**[3] |
| **Total Filings** | **449,177** | | | | |

---

[1] Statistics generated for this study were based on the Record Control Number of each record within the SAR system. Numeric discrepancies between total number of filings and the combined number of filings of States and/or territories is a result of multiple filers listed on one or more SARs.

[2] SARs were erroneously filed for the years 1937 (1); 1988 (1); and 1994 (1).

[3] Represents those SARs currently in the system as of 31 August 2000.

**Chart 2**
**SAR Filings[4] by States & Territories**
**(Matrix)**

| State/Territory | Total Filings | | | | |
|---|---|---|---|---|---|
| | 1996 | 1997 | 1998 | 1999 | 2000[5] |
| Alabama | 352 | 451 | 407 | 528 | 407 |
| Alaska | 63 | 59 | 132 | 157 | 240 |
| American Samoa | 2 | | 7 | 2 | 8 |
| Arizona | 1817 | 3100 | 2428 | 2505 | 2494 |
| Arkansas | 197 | 335 | 298 | 430 | 325 |
| California | 12217 | 18151 | 23370 | 25042 | 27354 |
| Colorado | 844 | 1081 | 1480 | 1702 | 1155 |
| Connecticut | 398 | 785 | 950 | 4449 | 3228 |
| Delaware | 1097 | 1426 | 1664 | 2006 | 1888 |
| District of Columbia | 166 | 234 | 281 | 285 | 292 |
| Fed. States Micronesia | 1 | 3 | 3 | 1 | |
| Florida | 3971 | 6637 | 7131 | 7969 | 6642 |
| Georgia | 869 | 1504 | 1688 | 2205 | 1799 |
| Guam | 25 | 80 | 56 | 84 | 55 |
| Hawaii | 390 | 535 | 553 | 575 | 475 |
| Idaho | 106 | 155 | 124 | 186 | 262 |
| Illinois | 1471 | 2768 | 2899 | 3866 | 3112 |
| Indiana | 556 | 769 | 969 | 1186 | 881 |
| Iowa | 251 | 363 | 326 | 427 | 288 |
| Kansas | 254 | 284 | 363 | 555 | 305 |
| Kentucky | 262 | 388 | 426 | 754 | 516 |
| Louisiana | 480 | 594 | 714 | 926 | 1311 |
| Maine | 115 | 186 | 194 | 213 | 147 |
| Marshall Islands | | | | 1 | |
| Maryland | 615 | 937 | 1201 | 1537 | 1371 |
| Massachusetts | 857 | 1402 | 1848 | 213 | 1929 |
| Michigan | 1119 | 1717 | 1858 | 2753 | 2377 |
| Minnesota | 950 | 2263 | 2212 | 2513 | 1866 |
| Mississippi | 152 | 251 | 222 | 283 | 343 |
| Missouri | 604 | 960 | 1153 | 1215 | 922 |
| Montana | 71 | 107 | 101 | 156 | 130 |
| Nebraska | 178 | 248 | 316 | 371 | 391 |
| Nevada | 662 | 1488 | 2009 | 2062 | 2135 |
| New Hampshire | 244 | 503 | 419 | 573 | 255 |
| New Jersey | 888 | 1536 | 2437 | 3450 | 2536 |

[4] SARs were erroneously filed for the years 1937 (1-GA); 1988 (1); and 1994 (1-CA).
[5] Represents those SARs currently in the system as of 31 August 2000.

3

## Chart 2 (cont.)

| State/Territory | Total Filings | | | | |
|---|---|---|---|---|---|
| New Mexico | 220 | 237 | 286 | 314 | 247 |
| New York | 5259 | 9679 | 13441 | 17931 | 11710 |
| North Carolina | 893 | 1625 | 2119 | 2392 | 2042 |
| North Dakota | 42 | 215 | 213 | 122 | 148 |
| Northern Mariana Islands | 22 | 5 | 13 | 33 | 42 |
| Ohio | 903 | 1721 | 2230 | 2297 | 1897 |
| Oklahoma | 379 | 497 | 506 | 698 | 525 |
| Oregon | 555 | 1129 | 1201 | 1807 | 1699 |
| Overseas | 12 | 39 | 7 | 2 | 19 |
| Pennsylvania | 1452 | 2482 | 2544 | 3571 | 2244 |
| Puerto Rico | 146 | 562 | 456 | 316 | 714 |
| Rhode Island | 155 | 290 | 285 | 503 | 314 |
| South Carolina | 279 | 563 | 640 | 669 | 473 |
| South Dakota | 316 | 430 | 574 | 675 | 163 |
| Tennessee | 525 | 802 | 922 | 998 | 973 |
| Texas | 3805 | 4906 | 6231 | 7606 | 6286 |
| U.S. Virgin Islands | 3 | 8 | 12 | 14 | 15 |
| Unknown/Blank | 318 | 205 | 28 | 26 | 17 |
| Utah | 374 | 882 | 1114 | 1384 | 1476 |
| Vermont | 55 | 91 | 68 | 58 | 44 |
| Virginia | 598 | 1206 | 1564 | 1537 | 1221 |
| Washington | 753 | 1766 | 2192 | 3147 | 2334 |
| West Virginia | 109 | 151 | 680 | 737 | 137 |
| Wisconsin | 360 | 552 | 677 | 755 | 614 |
| Wyoming | 26 | 43 | 54 | 40 | 37 |

4

## Chart 3
## SAR Filings Since 1996 Ranked by States & Territories

| Rank | State/Territory | Filings (Overall) | Percentage[6] (Overall) |
|------|-----------------|-------------------|-------------------------|
| 1 | California | 106134 | 23.5% |
| 2 | New York | 58020 | 13% |
| 3 | Florida | 32350 | 7.2% |
| 4 | Texas | 28834 | 6.5% |
| 5 | Illinois | 14116 | 3.15% |
| 6 | Arizona | 12344 | 2.75% |
| 7 | Pennsylvania | 12293 | 2.75% |
| 8 | New Jersey | 10847 | 2.4% |
| 9 | Washington | 10192 | 2.25% |
| 10 | Michigan | 9824 | 2.2% |
| 11 | Connecticut | 9810 | 2.2% |
| 12 | Minnesota | 9804 | 2.2% |
| 13 | North Carolina | 9071 | 2% |
| 14 | Ohio | 9048 | 2% |
| 15 | Nevada | 8356 | 1.85% |
| 16 | Delaware | 8081 | 1.8% |
| 17 | Georgia | 8065 | 1.8% |
| 18 | Oregon | 6391 | 1.4% |
| 19 | Colorado | 6262 | 1.4% |
| 20 | Massachusetts | 6249 | 1.4% |
| 21 | Virginia | 6126 | 1.35% |
| 22 | Maryland | 5661 | 1.25% |
| 23 | Utah | 5230 | 1.15% |
| 24 | Missouri | 4854 | 1% |
| 25 | Indiana | 4361 | Less than 1% |
| 26 | Tennessee | 4220 | Less than 1% |
| 27 | Louisiana | 4025 | Less than 1% |
| 28 | Wisconsin | 2958 | Less than 1% |
| 29 | South Carolina | 2624 | Less than 1% |
| 30 | Oklahoma | 2605 | Less than 1% |
| 31 | Hawaii | 2528 | Less than 1% |
| 32 | Kentucky | 2346 | Less than 1% |
| 33 | Puerto Rico | 2194 | Less than 1% |
| 34 | South Dakota | 2158 | Less than 1% |
| 35 | Alabama | 2145 | Less than 1% |
| 36 | New Hampshire | 1994 | Less than 1% |

[6] All percentages are approximate.

5

## Chart 3 (cont.)

| Rank | State/Territory | Filings (Overall) | Percentage (Overall) |
|------|------------------|-------------------|----------------------|
| 37 | West Virginia | 1814 | Less than 1% |
| 38 | Kansas | 1761 | Less than 1% |
| 39 | Iowa | 1655 | Less than 1% |
| 40 | Arkansas | 1585 | Less than 1% |
| 41 | Rhode Island | 1547 | Less than 1% |
| 42 | Nebraska | 1504 | Less than 1% |
| 43 | New Mexico | 1304 | Less than 1% |
| 44 | District of Columbia | 1258 | Less than 1% |
| 45 | Mississippi | 1251 | Less than 1% |
| 46 | Maine | 855 | Less than 1% |
| 47 | Idaho | 833 | Less than 1% |
| 48 | North Dakota | 740 | Less than 1% |
| 49 | Alaska | 651 | Less than 1% |
| 50 | Unknown/Blank | 594 | Less than 1% |
| 51 | Montana | 565 | Less than 1% |
| 52 | Vermont | 316 | Less than 1% |
| 53 | Guam | 300 | Less than 1% |
| 54 | Wyoming | 200 | Less than 1% |
| 55 | Northern Mariana Islands | 115 | Less than 1% |
| 56 | Overseas | 79 | Less than 1% |
| 57 | U.S. Virgin Islands | 52 | Less than 1% |
| 58 | American Samoa | 19 | Less than 1% |
| 59 | Fed. States of Micronesia | 8 | Less than 1% |
| 60 | Marshall Islands | 1 | Less than 1% |

6

## Chart 4
## SAR Filings Since 1996 Ranked
## by Characterization of Suspicious Activity

| Rank | Violation | Filings (Overall) | Percentage[7] (Overall) |
|---|---|---|---|
| 1 | BSA/Structuring/Money Laundering | 221402 | 45.3% |
| 2 | Check Fraud | 64237 | 13.15% |
| 3 | Other | 35646 | 7.3% |
| 4 | Counterfeit Check | 25670 | 5.25% |
| 5 | Defalcation/Embezzlement | 22700 | 4.65% |
| 6 | Credit Card Fraud | 21856 | 4.5% |
| 7 | Unknown/Blank[8] | 18561 | 3.8% |
| 8 | Check Kiting | 18392 | 3.75% |
| 9 | False Statement | 10441 | 2.15% |
| 10 | Consumer Loan Fraud | 10347 | 2.1% |
| 11 | Mortgage Loan Fraud | 10276 | 2.1% |
| 12 | Mysterious Disappearance | 8097 | 1.65% |
| 13 | Misuse of Position or Self Dealing | 7455 | 1.5% |
| 14 | Commercial Loan Fraud | 4301 | Less than 1% |
| 15 | Debit Card Fraud | 3021 | Less than 1% |
| 16 | Wire Transfer Fraud | 2737 | Less than 1% |
| 17 | Counterfeit Credit/Debit Card | 1746 | Less than 1% |
| 18 | Counterfeit Instrument (Other) | 1326 | Less than 1% |
| 19 | Bribery/Gratuity | 473 | Less than 1% |
| 20 | Computer Intrusion[9] | 9 | Less than 1% |

[7] All percentages are approximate.

[8] The **Unknown/Blank** classification encompasses those alpha and/or numeric characters which do not correspond to an established violation, fields containing unrelated symbols or nothing more than carriage returns, or instances where the field is null (void of any data or action).

[9] Violation did not appear until Revised June 2000 TD F 90-22.47

7

**Chart 5**
**SAR Filings by Characterization**
**of Suspicious Activity**
**(Matrix)**

| Violation | 1996 | 1997 | 1998 | 1999 | 2000[10] |
|---|---|---|---|---|---|
| BSA/Structuring/ Money Laundering | 20565 | 35949 | 47509 | 61007 | 56371 |
| Bribery/Gratuity | 91 | 109 | 93 | 101 | 79 |
| Check Fraud | 8639 | 13274 | 13832 | 16239 | 12253 |
| Check Kiting | 2747 | 4298 | 4037 | 4061 | 3249 |
| Commercial Loan Fraud | 554 | 960 | 905 | 1080 | 802 |
| Computer Intrusion | 0 | 0 | 0 | 0 | 9 |
| Consumer Loan Fraud | 1148 | 2048 | 2185 | 2549 | 2417 |
| Counterfeit Check | 2317 | 4244 | 5918 | 7396 | 5795 |
| Counterfeit Credit/Debit Card | 385 | 387 | 182 | 351 | 441 |
| Counterfeit Instrument (Other) | 212 | 292 | 265 | 321 | 236 |
| Credit Card Fraud | 3375 | 5083 | 4383 | 4938 | 4077 |
| Debit Card Fraud | 245 | 610 | 566 | 721 | 879 |
| Defalcation/Embezzlement | 3136 | 5306 | 5260 | 5179 | 3819 |
| False Statement | 1807 | 2204 | 1978 | 2376 | 2076 |
| Misuse of Position or Self Dealing | 914 | 1537 | 1645 | 2063 | 1296 |
| Mortgage Loan Fraud | 1265 | 1719 | 2268 | 2936 | 2088 |
| Mysterious Disappearance | 1168 | 1767 | 1855 | 1857 | 1450 |
| Wire Transfer Fraud | 284 | 499 | 594 | 772 | 588 |
| Other | 4600 | 6777 | 8696 | 8755 | 6817 |
| Unknown/Blank | 1652 | 2317 | 2728 | 7295 | 4569 |

[10] Represents those SARs currently in the system as of 31 August 2000.

## Chart 6
## SAR Filings by Primary Federal Regulator

| Regulator | Total Filings by Year | | | | |
|---|---|---|---|---|---|
| | 1996 | 1997 | 1998 | 1999 | 2000[11] |
| Federal Reserve Board | 5486 | 9676 | 10798 | 14656 | 11790 |
| Federal Deposit Insurance Corporation | 9839 | 14908 | 14735 | 15883 | 12818 |
| Office of the Comptroller of the Currency | 25072 | 41722 | 51879 | 64946 | 59299 |
| Office of Thrift Supervision | 2071 | 2624 | 2846 | 3041 | 2159 |
| National Credit Union Association | 5760 | 9133 | 11463 | 12316 | 9798 |
| Unspecified[12] | 1558 | 3534 | 5211 | 9664 | 6031 |

[11] Represents those SARs currently in the system as of 31 August 2000.

[12] *Unspecified* regulator may include those financial and/or non-bank financial institutions not regulated by one of the five agencies listed above.  Such entities include, but are not limited to Money Services Businesses, Insurance Companies and Securities Brokers/Dealers.

9

## Chart 7
## Direct Referrals of SARs by Financial Institutions
## to Law Enforcement[13] & Regulatory Agencies

| Agency | Referrals |
|---|---|
| **Federal Law Enforcement** | |
| Federal Bureau of Investigation | 10849 |
| Internal Revenue Service | 6937 |
| United States Secret Service | 3522 |
| United States Postal Inspection Service | 1396 |
| United States Attorney's Office | 167 |
| Department of the Treasury | 117 |
| United States Customs Service | 98 |
| Department of State | 43 |
| Naval Criminal Investigative Service | 18 |
| Drug Enforcement Administration | 17 |
| Detroit Computing Center | 14 |
| Department of Justice | 11 |
| **Total Federal Law Enforcement** | **23,189** |
| | |
| **Federal Regulatory Agencies** | |
| Federal Deposit Insurance Corporation | 44 |
| Federal Reserve Board | 32 |
| Office of the Comptroller of the Currency | 30 |
| **Total Regulatory Agencies** | **106** |
| | |
| **State and Local Law Enforcement** | |
| City Police Department | 9424 |
| County/Parish | 1391 |
| State Police | 598 |
| State/District Attorney's Office | 207 |
| State (Other) | 41 |
| **Total State and Local Law Enforcement** | **11,661** |
| | |
| **Other** | **594** |
| | |
| **Unspecified** | **486** |

[13] Figures reflect those entities receiving ten (10) or more SAR referrals. Some SARs may reference making referrals to multiple law enforcement agencies.

# Section 2
# National Trends and Analyses

This section of the *SAR Activity Review* outlines examples and patterns of suspicious activity reported in the national database. Some of the information has been published previously, but it is included here for ease of reference.

## 1. Highlighted Trend

### Shell Company Activity

SARs filed during the first half of 2000 reflect several complexes of activity involving suspicious wire transfer patterns. As reported in the SAR narratives, many of these suspicious wire transfer patterns involve shell companies—*i.e.*, corporations that engage in no apparent business activity and that only serve as a conduit for funds or securities. Often the activities also involve foreign transactors located in jurisdictions considered non-compliant or problematic, as reported in FinCEN Advisories.

Several complexes of suspicious wire transfer transactions have been observed, each involving geographically complicated wire transfer routing (originator, beneficiary, or transit/intermediary banks) and/or geographically complex originator and beneficiary activity. More than $500 million in suspicious wire transfers have been reported in connection with this type of activity.

These complexes display common patterns of underlying suspicious activity:

- A lack of evidence of legitimate business activity, or any business operations at all, undertaken by many of the companies;
- Unusually large numbers of wire transfers (several thousand wires totaling more than $500 million);
- Transactions conducted in bursts of activities within a short period of time;
- Beneficiaries maintaining accounts at foreign banks that have been the subject of previous SAR reporting due to suspicious wire transfer activity;
- Reappearing beneficiary banks based in offshore locations, the account of at least one of which has been closed by the reporting financial institution due to overall suspect activity.

Financial institutions should carefully review transactions involving companies registered in the United States when those companies are unknown to the financial institution, *and:*

- represent themselves as financial institutions, *or*
- appear as groupings of companies tied to the same set of transactors, *or*
- are co-located at the same address or have a common resident agent, *or*
- are involved in unduly complex patterns of transactions, especially multiple transactors and large volume wire transfers, *or*
- are involved in patterns of circular transactions, *or*
- are involved in transactions originating in or destined for non-compliant or other problematic jurisdictions identified in FinCEN Advisories, *or*
- appear in association with transactions conducted in bursts and even currency amounts, *or*
- engage in transactions inconsistent with the stated business purpose, *or*
- are bearer share corporations, *or*
- cannot be identified as legitimate companies through normal business verification checks, *or*
- cannot or will not provide adequate information about business activities when asked.

## 2. *Other Notable Trends*

### *Possible Reflections of Russian Criminal Activity*

Law enforcement information indicates a steady increase in Russian organized criminal activity in the U.S. since the early 1990s. Senior law enforcement officials requested assistance in understanding the scope of financial activity that may be linked to Russian Organized Crime groups in the U.S. An analysis of Bank Secrecy Act (BSA) data indicates that SARs filed by U.S. financial institutions for suspected structuring/money laundering activity involving Russian transactors, owners or citizenship averages approximately $200 million per year. A correlation of SARs, Currency Transaction Reports (CTRs) and Currency and Monetary Instrument Reports (CMIRs) for Russian transactions indicates some level of financial activity in 45 states, with heavier concentrations in the metropolitan areas of New York, Boston, Washington D.C., Chicago, Miami, Los Angeles, San Francisco, and Seattle. There are also indications of unusual patterns of suspicious financial activity in Texas (i.e., San Antonio, Houston, Dallas/Ft. Worth, El Paso, and along the U.S.-Mexico border).

### *Increased SAR Reporting Involving Mexico*

Law enforcement information and SARs filed by U.S. financial institutions confirm a shift in suspected money laundering activity involving Mexico. Rather than transiting through Mexico *en route* to Colombia or other Central and

South American destinations, a shift has been made toward using techniques and schemes in which drug proceeds are cycled through Mexico directly back into the U.S. As reported in SARs, for example, patterns of large wire transactions ($1.5 million or more per transaction) moving funds to U.S. payees from Mexican money exchange houses and other financial institutions have been observed that may at least, in part, be attributable to changes in the laundering cycle. Generally speaking, such changes in patterns are believed to stem from the heightened profile of Mexico-based criminal groups in drug trafficking in the U.S. which, in turn, creates a corresponding increased threat of money laundering activity linked to Mexico.

### Suspicious Activity Reported by Casinos

A review of SARs filed voluntarily with FinCEN by gaming establishments reveals patterns of suspicious activity in which casino accounts are used to transfer significant amounts of funds through non-bank financial transaction channels. The funds are cashed out by the client or moved to other accounts with minimal or no gaming activity. SAR filings by casinos located in Connecticut, Illinois, Mississippi, Nevada, and New Jersey during 1998-1999 indicate that wire transfers and cashiers checks are used to put funds on deposit as credits, or "front money," for use by the client for subsequent gambling activity at the casino. All of the SARs indicate that the client gambles minimally or not at all, and in the majority of the cases, takes the balance out in cash on the same day or within a matter of days. (Refer to *FinCEN SAR Bulletin* Vol. 2, No. 1, August 2000, for additional information).

### Regional Money Remitter Activity

An analysis of SARs reflects suspicious activity involving money remitters strongly reminiscent of the money laundering activity that resulted in the issuance of a Geographic Targeting Order (GTO) for the New York metropolitan area during the 1990s. The activity reported in the SARs includes structuring, unusually large and frequent deposits (i.e., cash, checks, third party checks, or money orders) and unusual wire transfer activity which is atypical for the businesses involved.

### Update on Suspicious Automated Teller Machine (ATM) Activity

Follow-up analysis of SAR reporting on ATM transactions (see *FinCEN SAR Bulletin* Vol. 1, No.1, June 1999) confirms a continuing trend in suspicious transactions in which funds are wired to/through a U.S. financial institution from a foreign source and then withdrawn in cash in a third country using ATMs. SARs

13

indicate such ATM withdrawals in at least 57 nations, with the highest incidence in Colombia (408 occurrences), followed by Venezuela (145), Mexico (119), and Argentina (31). The wire transfers that start the cycle originate primarily in Switzerland, Italy, Germany, and England. Amounts up to several hundred thousand dollars have been withdrawn over several months using this method.

## 3. Other SAR Analysis Issues

### Role of SARS in High-Risk Money Laundering & Related Financial Crime Areas

*The National Money Laundering Strategy for 2000*[14] established a requirement to focus anti-money laundering law enforcement resources in "High-Risk Money Laundering and Related Financial Crime Areas," or HIFCAs. A HIFCA should be understood as a geographic area, industry, sector or institution, or group of financial institutions which is being victimized by, or is particularly vulnerable to, money laundering and related financial crimes and, therefore, warrants concentrated law enforcement efforts at the federal, state and local levels. During 2000, three metropolitan HIFCAs have been designated: Los Angeles, New York/New Jersey, and San Juan, Puerto Rico. A fourth HIFCA, reflecting the systemic problem of cross-border currency movements, was created for the southwest border areas of Arizona and Texas. Additional designations are expected.

SARs are important to the HIFCA process in two key ways. First, the number of SARs filed in a geographic area is used as a factor in identifying the overall scope of potential financial crime in the area, and in ranking the area for possible HIFCA designation in comparison to other geographic areas. Second, and even more importantly, the number of SARs filed provides HIFCA action teams with a road map to assist in identifying potential criminal financial activity for the coordinated federal, state and local law enforcement initiatives envisioned by *The National Money Laundering Strategy for 2000.*

Real advancements have been made over the past year in building the tools needed to create such SAR "road maps." Each HIFCA will have access, through an on-site FinCEN analyst, to a prototype SAR data-mining capability that significantly enhances law enforcement's ability to identify organized criminal

---

[14] The National Money Laundering Strategies of 1999 and 2000 were jointly developed by the Departments of Justice and Treasury to describe detailed plans to combat money laundering as required by The Money Laundering and Financial Crimes Strategy Act of 1998, P.L. 105-310 (October 30, 1998). See 31 U.S. Code 5341(b) and 5342(b).

financial activity over large geographic areas. HIFCAs will use this new tool to help guide their anti-money laundering initiatives and to beta test it for wider distribution to law enforcement.

### Non-Compliant Countries—Post Advisory SAR Analysis

In July 2000, FinCEN issued 15 Advisories concerning deficiencies in the anti-money laundering controls of the following nations—Bahamas, Cayman Islands, Cook Islands, Dominica, Israel, Lebanon, Liechtenstein, Marshall Islands, Nauru, Niue, Panama, Philippines, Russian Federation, St. Kitts & Nevis, and St. Vincent & the Grenadines. Financial institutions were instructed to consider such deficiencies in determining whether transactions involving each of the 15 nations required the filing of a SAR.

FinCEN is in the process of analyzing SAR filings for each of the designated nations to determine if the overall volume of SARs and the nature of the suspicious activity have changed as a result of the Advisory process. Feedback on the results of the post-Advisory analysis will be provided at a subsequent date once sufficient data has been accumulated to allow a meaningful comparison with the pre-Advisory baseline information for each of the affected nations.

For questions or comments on Section 2, National Trends and Analyses, please contact the Office of Strategic Analysis at FinCEN by Email: ora@fincen.treas.gov.

15

# Section 3
# Law Enforcement Cases

This section of the *SAR Activity Review* provides law enforcement agencies the opportunity to summarize investigative activity in which SARs and other BSA information played an important role in a successful investigation and/or prosecution of criminal financial activity. Each subsequent issue of the *SAR Activity Review* will include new examples based on information received from law enforcement during the preceding six months.

### SAR Filing Uncovers Investment Fraud Scheme

The submission of a SAR filing led to the uncovering of a $28 million investment fraud scheme in which approximately 140 individuals were victimized. The subject convinced the victims/investors that he was a successful businessman who operated many highly profitable business ventures. The subject would make periodic payments to some investors using monies paid to him by other investors. He also provided false and misleading reports to the victims/investors about the performance of their investments. In fact, the subject used the monies paid to him by the investors to support his lavish lifestyle, gambling, and speculative stock trades. The subject pled guilty to mail fraud and engaging in monetary transactions in property derived from specified unlawful activity. He is awaiting sentencing. *(Source: U.S. Attorney's Office, Northern District of California)*

### SAR Filing Leads to 125-Count Indictment in $2.7 Million Embezzlement Case

A SAR filing by a credit union in Rapid City, South Dakota was instrumental in uncovering a massive scheme by individuals to embezzle approximately $2.7 million from a South Dakota College. The investigation was conducted by IRS-CID, FBI, the Department of the Interior, and the Department of Education and it produced a 125-count indictment of seven individuals charged with money laundering, structuring, conspiracy, obstruction of justice, and tax evasion. The SAR filing indicated that the defendants were structuring currency deposits in amounts under $10,000. The primary defendant in the case received a sentence of 10 years in custody and was ordered to pay restitution in the amount of $2.6 million. The co-defendants received sentences ranging from 24 months to 97 months in custody. *(Source: IRS-Criminal Investigation Division)*

### SAR Filing Unveils Customs Fraud

A U.S. Customs Service investigation in the Washington, D.C. area was initiated after a Virginia-based bank reported suspicious currency activity on a suspected money launderer. The information indicated possible structuring of financial transactions. The suspect had no visible means of support yet more than $4 million was deposited in his account and a comparable amount was withdrawn over a one-year period. A subsequent investigation revealed that the defendants were engaged in Customs fraud through the overvaluation of Generalized System of Preferences (GSP) merchandise. Based upon the suspicious referral provided by the bank, six people were ultimately indicted, arrested, and convicted on money laundering charges. *(Source: U.S. Customs Service)*

### SAR Filing Uncovers Additional Counterfeit Check Fraud

In a Florida case, a SAR filing led to the identification of additional fraud perpetrated by a subject already under investigation by special agents within the U.S. Secret Service's (USSS) Tampa Field Office. From December 1996 through May 1997, investigators identified an individual who deposited counterfeit commercial checks into various bank accounts opened under aliases and then almost immediately wired the funds from the accounts to Nigeria. Since these checks were drawn against true bank accounts, several days would pass before the counterfeit checks were detected. In some cases, the counterfeit checks actually cleared the bank that the checks were drawn upon. In total, the subject had deposited and collected on $400,000 in counterfeit commercial checks.

In June of 1997, a financial institution filed a SAR form stating in part that the subject (using an alias) had opened an account at the bank using a small amount of money. Just a few days later, $85,000 in commercial checks was deposited into the account. A short time later, the subject attempted to wire a large portion of the $85,000 to Nigeria via a bank in New York City. Personnel within the original bank inquired about the sporadic account activity and the wire transfer, and as a result, did not wire the funds and identified the commercial checks as counterfeit. This information was included on the SAR form filed by the financial institution. The USSS investigators then learned that the subject used the name identified by the bank as an alias. As a result of this SAR filing, investigators were able to make the necessary link and attribute additional fraud losses to the defendant. The defendant was arrested, convicted and sentenced to 48 months in prison. *(Source: U.S. Secret Service)*

17

### *Organized Crime Network Attacked with the Help of SARs*

The U.S. Customs Service in Chicago conducted an investigation of a Russian and Lithuanian organized crime group that was heavily involved in the smuggling of stolen luxury vehicles out of the U.S. into Europe. Independent analysis of a SAR filing showed suspicious behavior that related to the Russian organized crime network that was under investigation. The SAR filing was later brought to the attention of the Customs case agent who used the filing to identify additional associates and bank accounts. The information contained in the SAR filing contributed to the successful prosecution of the suspects and the seizure and forfeiture of assets. *(Source: U.S. Customs Service)*

### *Analysis of SAR Filings and CTRs Leads to Indictments of Criminal Organization*

A U.S. Customs Service investigation in Houston of a criminal organization involved in the repackaging and exportation of stolen commercial baby formula was aided by an analysis of SAR filings and CTRs. The criminal network, which operated in several states, laundered their illicit profits through financial institutions to the Middle East. An analysis of CTRs monitored the movement of these funds. Subsequently, SAR filings were discovered which highlighted the suspected transactions. An analysis of the SAR filings and CTRs, coupled with a combination of various investigative techniques, led to multiple indictments on numerous federal offenses, including money laundering, and the identification and seizure of several bank accounts. *(Source: U.S. Customs Service)*

### *Operation Mule Train*

On July 1, 1998, the Chief Financial Officer, President, and Vice-President of a check cashing company were arrested on money laundering charges stemming from a two-year investigation conducted by the Los Angeles office of the FBI and the Los Angeles Police Department. According to corporate filings, the company was one of the largest check cashing enterprises operating in the western U.S., and purported to be one of the leading U.S. money transfer agents providing services to Mexico and Latin America. It was considered a significant and growing company among the increasing number of independent non-bank financial institutions operating in many inner-city neighborhoods where banks have reduced their presence.

The three executives, along with six other employees and associates, were arrested after a federal grand jury returned a 67-count indictment against 11 defendants, charging multiple conspiracies, money laundering, evading currency reporting requirements, aiding and abetting, and criminal forfeiture.

The initial target of the investigation was a company store in Reseda, California. Investigators, working in an undercover capacity, approached the manager, who agreed to launder "drug" money in exchange for a cash fee. Specifically, the manager converted large amounts of cash into money orders issued by the company. As larger sums were laundered, the manager sought the assistance of his associates working at other store locations. When a new manager took over operations at the Reseda store in April 1997, he brought in the company's corporate officers, including the CEO, the President, and the Senior Vice-President. Pocketing the cash fee, the corporate officers authorized the issuance of money orders and the wire transfers of large sums of "drug" money to a secret bank account in Miami, Florida while the cash was used to maintain operations at the company stores.

To avoid detection by law enforcement, no SAR forms or CTRs were filed by the company for any of these transactions; however, SAR forms and CTRs were filed by the banks into which the cash deposits were made, and these filings significantly enhanced the value of other information received. In total, the defendants laundered over $3.2 million dollars of "drug" money. The investigation is believed to be one of the largest money laundering "sting" operations targeting a check cashing business in U.S. history. (*Source: DOJ*)

### *Six People Arrested for Allegedly Bilking Millions of Dollars of Goods from Food Bank*

On October 7, 1999, a man and woman, their lawyer and three private investigators in their employ were arrested for alleged involvement in an elaborate conspiracy. The conspiracy included bilking millions of dollars worth of goods from a food bank, burning buildings for insurance, stalking, and trying to corrupt the judicial system. Another lawyer is being sought. The 266-count criminal complaint stemmed from a 29-month investigation conducted by the San Bernardino County District Attorney's Office. The couple was charged with a total of 107 counts including conspiracy to commit grand theft, insurance fraud, money laundering, obstruction of justice, arson, and assault with a deadly weapon.

The couple was accused of selling nearly 3 million pounds of food and other merchandise they obtained for free from the Second Harvest Food Bank in Riverside, CA, beginning in 1991. The food was obtained using the tax-exempt status

19

of a nonprofit group without the group's knowledge.  In addition, the couple allegedly used private investigators to stalk and harass the husband's ex-wife, her boyfriend and others; filed false lawsuits to force judges off court cases in which he was involved; set fire to their Rancho Cucamonga home and collected $600,000 in insurance; and conspired to set fire to a warehouse.

The California Department of Justice, Bureau of Narcotics Enforcement, assisted investigators from the San Bernardino County District Attorney's Office by conducting a review of the Currency and Banking Retrieval System (CBRS) database for BSA reports relating to the subjects.  The review was accomplished through FinCEN's Gateway System.  Three Suspicious Activity Reports, nine CTRs, and two Currency Transaction Reports by Casino (CTRCs) were filed. The lead investigator said the BSA documents provided to him assisted in justifying probable cause to obtain several signed search warrants.  He further stated that it gave him a much better sense of the way cash was used by the husband, his primary subject.  The documents also helped him to locate a bank that the husband was using to withdraw large amounts of cash.  A total of 45 search warrants were served in this case.

All remain jailed, with bail ranging from $500,000 to $7.5 million each.
*(Source:  Lead Investigator, San Bernardino County District Attorney's Office)*

### Biggest Worker's Compensation Scam in Southern California Totaling more than $3 Million Dollars

On June 25, 1999, a doctor from southern California, was ordered to pay $250,000 in fines and was sentenced to five years' probation after his conviction in Los Angeles County Superior Court on three money laundering charges.  The doctor is awaiting trial on securities and insurance fraud charges.  Both cases were brought by the Los Angeles District Attorney's Office in connection with the doctor's role as the alleged mastermind of what authorities call one of the biggest worker's compensation scams in southern California during the late 1980s and early 1990s.

The California Department of Justice, Bureau of Narcotics Enforcement, assisted the Los Angeles District Attorney's Office by conducting a review of the Currency and Banking Retrieval System (CBRS) database for BSA reports relating to the doctor.  The review was accomplished through FinCEN's Gateway System.  Four Suspicious Activity Reports, 33 CTRs, eight Currency Transaction Report by Casino (CTRCs), 16 Foreign Bank Account Reports (FBARs), and one Currency or Monetary Instrument Report (CMIR) were filed.  The Deputy District Attorney (DDA) handling the prosecution said the documents revealed that no

CTRs had been filed for 1989-1992. A certified document stating that no CTRs were filed during this time was introduced into evidence. This was very important to forestall the defense claim that CTRs in fact were filed. The DDA further said the one-month trial has ended with a conviction on three counts of violating the State of California's money laundering law, with the intent to commit California tax fraud.

The DDA indicated, in preparing documents for sentencing, that because the case involved the laundering of $3 million, it is the state's largest money laundering case to date. *(Source: Deputy District Attorney, Los Angeles District Attorney's Office)*

### *Stock Fraud Cheats Elderly Out of $100 Million*

Indictments announced on July 8, 1999, in Manhattan, New York allege that a stock broker from Naples, Florida and other defendants bilked investors by lying to them, performing unauthorized trades, ignoring sell orders, engaging in forgery, and committing outright theft. Some investors, mostly elderly, were persuaded to get as much cash as possible from their credit cards, or withdraw money from retirement accounts, to invest with the stock broker. Virtually all of that money was lost.

The brokerage firm, which was started in 1994, was created to steal money from investors. At its peak, it had more than 300 brokers and 50,000 customer accounts at offices in Iselin, New Jersey and Naples, Florida. The defendants, all from New York, New Jersey, Connecticut, and Florida, were charged variously with enterprise corruption, grand larceny, scheme to defraud, falsification of business records, money laundering, and related crimes.

The District Attorney's Office of New York County, Manhattan Office, conducted a review of the Currency and Banking Retrieval System (CBRS) database for BSA reports relating to the stock broker and members of his brokerage firm they identified in their investigation. The review was accomplished through the use of FinCEN's Gateway System. The reports included two Suspicious Activity Reports, 97 CTRs, and nine Currency Transaction Reports by Casino (CTRCs). Investigators reported that BSA data obtained provided information about the individuals and the entities and their inter-relationship. It helped identify and/or confirm identities of those under investigation and provided some specific information regarding bank transactions and account information. Investigators noted that BSA data identified over 12 bank accounts for the subjects that were not previously known. Of those account holders, about five were eventually charged in felony indictments. The BSA data also identified important financial transac-

21

tions in Atlantic City, New Jersey. Overall, Gateway saved the investigators time and effort, and helped focus investigative resources more efficiently.

The Manhattan District Attorney's Office has begun a civil court proceeding to recover $99,269,688 as the proceeds of the defendants' criminal acts. *(Source: Investigators, District Attorney's Office of New York County, Manhattan Office)*

## Man Pleads Guilty to Laundering $5.9 Million in Drug Proceeds

An individual from Catlettsbury, Kentucky pleaded guilty in U.S. District Court on May 19, 1999, to laundering $5.9 million in drug proceeds from the sale of marijuana in West Virginia and Kentucky. The indictment alleged that the individual, his brothers, his stepbrother, and three other suspects, conspired to sell marijuana and transfer the profits between bank accounts in West Virginia, Kentucky, Ohio, and Florida in an effort to make the money appear legitimate.

The Cabell County Federal Drug Task Force, which consists of FBI, IRS Criminal Investigation Division (CID) agents, West Virginia State Police, Cabell County Sheriff's Office, and Huntington City Police Department officers, conducted an investigation which targeted the individual. The task force requested the West Virginia Intelligence Exchange to conduct a review of the Currency and Banking Retrieval System (CBRS) database for BSA reports relating to members of this drug trafficking organization. This review was accomplished through FinCEN's Gateway System. The reports included one Suspicious Activity Report and 17 CTRs. The analyst said information obtained from BSA data helped them to identify assets, and to locate bank accounts used by this drug trafficking organization.

As part of a plea agreement, the individual admitted to laundering money from 1992 to 1996, and to selling marijuana during that period. He also agreed to cooperate in forfeiting money and other property, including three luxury cars, six homes, and a warehouse. *(Source: Analyst, West Virginia State Police)*

## Reports Filed under the BSA Critical to Largest Medicaid Fraud Case in the Nation

The Newark U.S. Attorney's Office and the IRS utilized reports filed under the BSA to help build the largest Medicaid fraud case in the nation to date. This multi-agency investigation, also involving the FBI and the FDA, uncovered a New Jersey pharmacist who defrauded the Medicaid program by fraudulently obtaining Medicaid numbers and prescription slips and then falsely billing federal and state medical assistance programs for prescription items that were never

22

dispensed. Reports filed under the BSA helped investigators piece together their case. Once the primary target of the investigation became a cooperative defendant, investigators were also able to bring to culmination three other associated cases. Using the forfeiture procedures available in money laundering cases, the government has recovered a total of $5.5 million in fraud proceeds that the subjects laundered through various bank and investment accounts. (*Source: U.S. Attorney's Office, New Jersey and IRS*)

23

# Section 4
## Tips on SAR Form Preparation & Filing

The information obtained from the filing of SARs plays an important role in identifying potential and actual illegal activities, such as money laundering, fraud and abuse, and it assists in the detection and prevention of the flow of illicit funds through our financial system. For these reasons, it is critical that the information being conveyed in SAR filings be as accurate and complete as is possible. The following tips will assist in ensuring the accuracy and completeness of SAR filings:

■ The narrative section of the SAR should provide a detailed description of the known or suspected violation of law or suspicious activity. While detailed suspect information may not always be available (*e.g.*, in situations involving non-account holders), such information should be included to the maximum extent possible.

■ Supporting documents should *never* be attached to a SAR form. If a filer has documentation relating to the suspicious activity being reported, reference should be made to the existence of the documentation in the narrative section of the SAR form. However, the actual documentation should be maintained on file at the organization for a minimum period of five years.

■ Filers are encouraged to adopt and utilize a *standardized* format for identifying the reporting organization on the SAR form (*e.g.*, Community Bank of the U.S.A., or Community Bank of the United States of America). Along with the organization name and EIN, a complete address, including city, state, and zip code, should always be included on the SAR form.

■ A SAR should *always* identify the organization's primary Federal regulator.

■ When reporting the "total dollar amount involved in known or suspicious activity," only whole dollar amounts should be listed, no cents (*e.g.*, indicate $10,000, **not** $10,000.74). If there is no actual dollar amount connected to the suspicious activity, "0" should be entered on the form. Monetary values reflected on the SAR form should always be entered as U.S. dollars. If a suspicious transaction involves a foreign currency, indicate this fact in the narrative section of the SAR form--also provide the type/name of the foreign currency, the amount of the transaction, and the conversion rate used to reach the U.S. dollar figure.

24

■ SARs are *properly filed* with the IRS' Detroit Computing Center (DCC). Magnetically filed (disk) and paper SARs should be addressed to "FinCEN, Detroit Computing Center, P.O. Box 33980, Detroit, MI 48232-0908."

## SAR Form Completion—National Overview

The following chart provides a statistical breakout of the percentage completion rate for each field on the SAR form for all SARs in the national database (approximately 400,000 records at time of this report). Each row of the chart is keyed to successive fields on the SAR form. Additional columns represent all financial institutions, grouped under the appropriate regulator as reported by the institution. Intersection of a row and column shows the percentage completion rate for the specific field for all financial institutions for each regulator, and indicates if the percentage completion rate varies statistically above (A) or below (B) the national average for that field. (The "Other" column represents SARs filed either by non-bank financial institutions or by banks that did not identify their regulator.)

### SAR Form Completion Rate—National Database

| Field | | FRB | FDIC | NCUA | OCC | OTS | OTHER |
|---|---|---|---|---|---|---|---|
| | Number of Filings | 18,064 | 21,352 | 3,948 | 78,108 | 16,363 | 258,582 |
| 1 | Report Type | 93.62A | 93.11A | 96.22A | 92.41A | 91.70A | 7.00B |
| 2 | Name of Financial Institution | 98.64 | 98.45 | 97.24 | 99.49A | 99.29 | 98.17B |
| 3 | Primary Federal Regulator | 100.00A | 100.00A | 100.00A | 100.00A | 100.00A | .00B |
| 4 | Address of Financial Institution | 99.96 | 99.98 | 99.86 | 99.98 | 99.99 | 99.86 |
| 5 | City | 99.97 | 99.99 | 99.92 | 99.99 | 99.99 | 99.87 |
| 6 | State | 99.88 | 99.95 | 99.86 | 99.99 | 99.97 | 99.76 |
| 7 | Zip Code | 99.81 | 99.86 | 99.76 | 99.97 | 99.96 | 99.72 |
| 8 | EIN or TIN | 94.62 | 95.81 | 80.50B | 98.02A | 98.15A | 92.89B |
| 10 | Address of Branch Office(s) | 100 | 100 | 100 | 100 | 100 | 100 |
| 15a | Account Number(s) Affected | 76.26B | 81.51A | 81.97A | 83.19A | 86.74A | 72.24B |
| 15b | Account Number(s) Affected | 9.26B | 13.70A | 11.65 | 11.2 | 12.39A | 10.00B |
| 16 | Related Accounts Closed? | 0 | 0 | 0 | 0 | 0 | 0 |
| 17,18,19 | Suspect Name | 98.74 | 99.37 | 98.74 | 99.59 | 99.7 | 99.33 |
| 20 | Address | 86.43B | 93.32A | 95.24A | 89.07B | 97.04A | 91.18 |
| 21 | SSN, EIN, or TIN | 65.76B | 79.71A | 85.99A | 71.35A | 78.04A | 67.39B |
| 22 | City | 88.10B | 93.46A | 95.09A | 89.29B | 97.05A | 91.26 |
| 23 | State | 84.88B | 91.31A | 94.37A | 86.92B | 92.94A | 88.32 |
| 24 | Zip Code | 80.06B | 89.24A | 93.50A | 84.63B | 92.16A | 85.82 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 25 | Country | 63.68A | 46.85B | 28.03B | 60.20A | 62.72A | 42.14B |
| 26 | Date of Birth | 55.81 | 62.42A | 88.29A | 52.20B | 71.13A | 55.11B |
| 27 | Phone Number - Residence | 53.34B | 62.43A | 85.45A | 46.79B | 73.11A | 56.75A |
| 28 | Phone Number - Work | 33.08B | 43.82A | 42.80A | 39.06A | 46.93A | 35.07B |
| 29 | Occupation | 49.77A | 66.00A | 59.64A | 41.79B | 46.25 | 44.97B |
| 30a-d | Forms of Identification | 42.20B | 58.47A | 71.61A | 39.18B | 66.31A | 47.54A |
| 30e | IDN Number | 34.47B | 49.86A | 52.84A | 34.06B | 61.23A | 39.25B |
| 30f | Issuing Authority | 31.23B | 44.81A | 41.79A | 31.10B | 57.77A | 34.89B |
| 31 | Relationship to Fin Inst | 0 | 0 | 0 | 0 | 0 | 0 |
| 32 | Insider Suspect Still Affiliated? | 0 | 0 | 0 | 0 | 0 | 0 |
| 33 | Date: Susp/Term/Resign | 0 | 0 | 0 | 0 | 0 | 0 |
| 34 | Admission/Confession | 0 | 0 | 0 | 0 | 0 | 0 |
| 35 | Suspicious Activity Date | 90.96B | 90.54B | 87.74B | 96.84A | 97.81A | 93.34B |
| 36 | Violation Dollar Amount | 100 | 100 | 100 | 100 | 100 | 100 |
| 37a-r | Violation | 83.12B | 98.10A | 95.98 | 97.96A | 96.95 | 96.09 |
| 37r-desc | Violation (Other) | 97.37A | 98.23A | 97.39A | 95.78A | 97.33A | 5.37B |
| 38 | Loss Prior to Recovery | 100 | 100 | 100 | 100 | 100 | 100 |
| 39 | Amount of Recovery | 100 | 100 | 100 | 100 | 100 | 100 |
| 40 | Soundness Affected? | 100.00A | 100.00A | 100.00A | 100.00A | 100.00A | 7.51B |
| 41 | Bonding Co. Notified? | 0 | 0 | 0 | 0 | 0 | 0 |
| 42 | Law Enforce Referral | 17.78 | 23.59A | 33.40A | 13.95B | 15.43B | 20.54A |
| 43 | Address | 13.59 | 17.85A | 25.80A | 10.46B | 12.97B | 15.96A |
| 44 | City | 15.5 | 19.81A | 28.43A | 12.12B | 13.87B | 17.74A |
| 45 | State | 15.44 | 19.81A | 28.03A | 12.13B | 13.94B | 17.61A |
| 46 | Zip Code | 13.76B | 18.53A | 25.61A | 10.81B | 13.16B | 16.79A |
| 47,48,49 | Witness Name | 98.64 | 99.22 | 98.56 | 99.13 | 99.13 | 98.72 |
| 50 | Address | 80.35B | 88.6 | 92.56A | 88.58 | 96.29A | 89.55A |
| 51 | SSN | 39.48B | 58.89A | 75.00A | 36.84B | 51.93A | 47.60A |
| 52 | City | 85.74 | 90.41A | 91.72A | 78.81B | 94.81A | 87.83A |
| 53 | State | 89.69A | 91.31A | 91.30A | 76.99B | 94.74A | 87.25A |
| 54 | Zip Code | 76.26B | 85.82A | 90.19A | 73.01B | 93.24A | 84.09A |
| 55 | Date of Birth | 29.18A | 39.08A | 55.73A | 23.80A | 34.84A | 10.76B |
| 56 | Title | 0 | 0 | 0 | 0 | 0 | 0 |
| 57 | Phone Number | 69.43B | 86.57B | 89.35 | 91.94A | 90.97A | 89.55A |
| 58 | Interviewed? | 0 | 0 | 0 | 0 | 0 | 0 |
| 59,60,61 | Preparer Information | 98.26A | 97.20A | 95.90A | 98.83A | 98.87A | 7.20B |
| 62 | Title | 97.68A | 96.89A | 93.91A | 98.65A | 98.53A | 6.97B |
| 63 | Phone Number | 0 | 0 | 0 | 0 | 0 | 0 |
| 64 | Date | 0 | 0 | 0.02 | 0 | 0 | 0 |
| 65,66,67 | Contact for Assistance | 67.04A | 60.45A | 42.92A | 43.89A | 58.60A | 3.81B |
| 68 | Title | 66.40A | 59.13A | 40.14A | 43.45A | 58.30A | 3.75B |
| Part VII | Narrative | 97.60A | 94.69 | 76.33B | 98.23A | 99.05A | 93.08B |

A = Statistically above the national average
B = Statistically below the national average

# Section 5
## Issues & Guidance

This section of the *SAR Activity Review* discusses current issues of common interest raised with regard to the preparation and filing of SARs. The discussion is intended to identify SAR-related issues and then provide explanations so that filing organizations can reasonably address these issues. This section represents the collective opinions of the government agencies that require organizations to file SARs.

### Repeated SAR Filings on the Same Activity

One of the purposes of filing SARs is to identify violations or potential violations of law to the appropriate law enforcement authorities for criminal investigation. This is accomplished by the filing of a SAR that identifies the activity of concern. Should this activity continue over a period of time, it is useful for such information to be made known to law enforcement (and the bank supervisors). As a general rule of thumb, organizations should report continuing suspicious activity with a report being filed at least every 90 days. This will serve the purposes of notifying law enforcement of the continuing nature of the activity, as well as provide a reminder to the organization that it must continue to review the suspicious activity to determine if other actions may be appropriate, such as terminating its relationship with the customer or employee that is the subject of the filing.

### Cessation of Relationship/Closure of Account

The closure of a customer account as the result of the identification of suspicious activity is a determination for an organization to make in light of the information available to the organization. A filing of a SAR, on its own, should not be the basis for terminating a customer relationship. Rather, a determination should be made with the knowledge of the facts and circumstances giving rise to the SAR filing, as well as other available information that could tend to impact on such a decision. It may be advisable to include the organization's counsel, as well as other senior staff, in such determinations.

### Timing for SAR filings

The SAR rules require that a SAR be filed no later than 30 calendar days from the date of the initial detection of the suspicious activity, unless no suspect can be identified, in which case, the time period for filing a SAR is extended to 60 days.

It may be appropriate for organizations to conduct a review of the activity to determine whether a need exists to file a SAR. The fact that a review of customer activity or transactions is determined to be necessary is not necessarily indicative of the need to file a SAR, even if a reasonable review of the activity or transactions might take an extended period of time. The time to file a SAR starts when the organization, in the course of its review or on account of other factors, reaches the position in which it knows, or has reason to suspect, that the activity or transactions under review meets one or more of the definitions of suspicious activity.

Of course, an expeditious review, wherever possible, is recommended and can be of significant assistance to law enforcement. In situations involving violations of law requiring immediate attention, the organization should immediately notify appropriate law enforcement and supervisory authorities, in addition to filing a SAR.

### *Disclosure of SARs and Underlying Suspicious Activity*

Federal law (31 U.S.C. 5318(g)(2)) prohibits the notification of any person that is involved in the activity being reported on a SAR that the activity has been reported. This prohibition effectively precludes the disclosure of a SAR or the fact that a SAR has been filed. However, this prohibition does not preclude, under federal law, a disclosure in an appropriate manner of the facts that are the basis of the SAR, so long as the disclosure is not made in a way that indicates or implies that a SAR has been filed or that the information is included on a filed SAR.

The prohibition against disclosure can raise special issues when SAR records are sought by subpoena or court order. The SAR regulations direct organizations facing those issues to contact their primary supervisor, as well as FinCEN, to obtain guidance and direction on how to proceed. In several matters to date, government agencies have intervened to ensure that the protection for filing organizations and the integrity of the data contained within the SAR database remain intact.

# Section 6
## Industry Forum

In each issue of the *SAR Activity Review*, representatives from the financial services industry will offer insight into some aspect of fraud prevention. In this issue, the American Bankers Association (ABA) offers their "Check Fraud Loss Report" from the first quarter of 2000. One interesting statistic is the relatively high percentage of losses due to new account fraud in the western part of the U.S. For more information, please contact John Byrne, ABA Senior Counsel and Compliance Manager, at jbyrne@aba.com.

### *CHECK FRAUD LOSS REPORT*
*First Quarter 2000*

### National Summary

**TOP FIVE LOSS CATEGORIES** (by Number of Accounts)
1. Return losses excluding closed accounts, NSFs, and stop payment (other return loss reasons) (1)*
2. Forged maker's signature (3)
3. Counterfeit (2)
4. NSFs (4)
5. Closed accounts (6)

Last quarter's rank in parentheses.

- Check-related losses decreased from $1.12 per transaction account to $0.94 in the first quarter. A year ago, check-related losses totaled $1.26 per transaction account.

- Compared with the same period a year ago, losses were lower in the Northeast, Southeast, and West, but were higher in the Central and Southwest regions. By type of fraud, lower losses were reported for most categories. The most significant improvement appears to be losses associated with return items.

- The Central region had the highest losses (at $1.41 per transaction account), followed by the Southwest ($1.18), West ($1.02), Southeast ($0.90), and Northeast ($0.65) regions.

- "Other return loss reasons" was the leading loss category in the Central, Southwest, and West regions. In the Northeast and Southeast, the top loss category was counterfeit. A year ago, the leading loss categories included counterfeit (the Northeast) and "other return loss reasons" (all other regions).

- Combining all classifications, losses per case averaged $1,838, down from $2,007 in the fourth quarter and $1,972 a year ago. Losses per case averaged $1,307 in the West, $1,649 in the Southwest, $2,425 in the Southeast, $3,028 in the Northeast, and $3,185 in the Central region.

- New account losses amounted to $0.19 per transaction account or $6.04 per new account opened, compared with $0.31 and $8.01, respectively in the fourth quarter, and $0.38 and $8.70, respectively, a year ago. Except for the West, all regions reported a decrease in new account losses in the first quarter. The West experienced an increase in new account losses per new account opened.

- Nationally, 20 percent of fraud losses were associated with new accounts, a substantial improvement from the 30 percent in the first quarter 1999. By region, losses attributed to new accounts ranged from 7 percent in the Central region to 25 percent in the West.

Survey results reveal that losses associated with true name fraud appear to be rising, particularly in the Northeast.

29

# Feedback Form

Department of the Treasury • Financial Crimes Enforcement Network

To:        FinCEN Office of Strategic Analysis
Fax 703-905-3698
ora@fincen.treas.gov
or
American Bankers Association
FAX 202-828-5052
jbyrne@aba.com

Subject:    The SAR Activity Review--October 2000

From: _____

Title: _____

Office/Agency: _____

Telephone: (include area code) _____

Email Address: _____

Comments:

30