UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION,

　　　　Plaintiff,

v.

ALPINE SECURITIES CORPORATION,

　　　　Defendant.

Civil No. 1:17-CV-04179-DLC

Honorable Judge Denise L. Cote
Magistrate Judge Ronald L. Ellis

## ALPINE SECURITIES CORP.'S
### (I) RESPONSE TO SEC'S STATEMENT OF MATERIAL FACTS, AND
### (II) ADDITIONAL STATEMENT OF MATERIAL FACTS

## I.   ALPINE'S RESPONSE TO SEC'S STATEMENT OF MATERIAL FACTS

　　　　Alpine Securities Corporation ("Alpine"), by and through its undersigned counsel,

pursuant to Local Rule 56.1, hereby submits this Response to the SEC's Statement of Material

Facts ("SOF") in Support of its Motion for Summary Judgment on Liability.

## BACKGROUND

**SEC'S SOF No. 1.**  Clearing brokers like Alpine have relationships with introducing

brokers, which are firms that provide investing advice or counsel to an investor, but do not

actually handle the transactions. Clearing brokers execute the trades on the introducing broker's

instructions. Declaration of Alma Angotti ¶ 10, attached hereto as Exhibit 1 ("Angotti

Declaration").

**ALPINE'S RESPONSE TO SOF No. 1.**  Alpine disputes the conclusion in SOF 1 that "introducing brokers . . . do not actually handle the transaction" as vague, incomplete and inaccurate.

As a clearing broker, Alpine provided "clearance and settlement services" for introducing brokers during the period in question, May 17, 2011 through December 31, 2015 (the "relevant period").  Those services included "back-end" or back-office processing of securities transactions – the "recording of the transaction, the exchange of funds, [and] the delivery of securities to consummate a transaction."  *See* Deposition of Christopher Frankel, as Alpine designee pursuant to Rule 30(b)(6), March 13, 2018, ("Alpine Dep."), at 15:19-16:15, relevant portions of which are attached hereto as Ex. 3; *see also* Declaration of Alpine Rebuttal Expert Beverly E. Loew, July 9, 2018, ("Loew Expert Decl.") at ¶ 112, Ex. 5.  When providing clearing services for introducing brokers, Alpine "has no direct relationship with the customers of an introducing broker."  *Id*., at ¶113, Ex. 5.  Alpine is paid for its clearance and settlement services by the introducing broker, not the owner of the introduced account.  Alpine Dep., at 17:6-8, Ex. 3.

As a result of this limited clearing role, it is not accurate that introducing brokers do not "actually handle the transaction."  The clearing broker's "'involvement in any given transaction typically begins *after* the execution of the trade.'"  *See* Loew Expert Decl., at ¶ 112, Ex. 5, (quoting *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 457-58 (2d Cir. 2013) (emphasis added)).  Prior to that, the introducing broker handles the transaction, and even after the transaction is submitted to a clearing broker for processing, the introducing broker "'typically retains all customer-contact functions, including soliciting customers, recommending the

purchase or sale of securities to customers, and monitoring customers' transactions.'" *Id.*, at ¶ 112 (quoting *Levitt*, 710 F.3d at 457-58). The SEC's attempt to impose all responsibility for "handl[ing] the transaction[s]" to Alpine, and away from the introducing brokers, is thus disputed.

**SEC'S SOF No. 2.** Clearing firms usually maintain records of all trading, receive and deliver funds pursuant to instructions, and issues trade confirmations and statements. This type of relationship allows smaller firms that may not have the resources to implement their own clearing operations to enter into and participate in the securities markets. Angotti Decl. ¶ 11.

**ALPINE'S RESPONSE TO SOF No. 2.** Undisputed.

**SEC'S SOF No. 3.** Clearing firms cannot delegate or allocate away its BSA responsibilities. Angotti Decl. ¶¶ 12-13.

**ALPINE'S RESPONSE TO SOF No. 3.** Alpine disputes SOF 3 as constituting a legal conclusion, rather than a statement of fact. Further, that the SEC cites to its expert's declaration in support of this statement does not change its character. *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (stating that experts cannot "communicate 'a legal standard – explicit or implicit – to the jury'" and that "[t]his principle requires the exclusion of testimony that states a legal conclusion . . . ." (citations and footnotes omitted)).[1]

Alpine also disputes SOF 3 as inaccurate because it fails to account for the differing

---

[1] Alpine is making objections to evidence in this Response the SEC's 56.1 Statement and its Memorandum in Opposition to the SEC Motion for Summary Judgment pursuant to Rule 56.1. *See Mergers & Acquisition Servs., Inc. v. Eli Glob., LLC*, No. 1:15-CV-3723-GHW, 2017 U.S. Dist. LEXIS 45028, at *52 (S.D.N.Y. Mar. 27, 2017) ("Subdivision [56](c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike.* If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." (emphasis in original).

AML responsibilities under the BSA between introducing brokers and clearing brokers. As detailed below in Alpine's Additional Statement of Fact ("Add'l SOF") ¶¶ 1-13, which are supported by the Loew Expert Declaration and the sources cited therein, introducing brokers and clearing brokers have different AML responsibilities and obligations under the BSA with respect to a particular transaction, including with respect to monitoring introduced accounts and the underlying customer transactional motivations for suspicious activity and SAR reporting. *Id.* Clearing brokers may also allocate their customer due diligence, know-your-customer, and certain other BSA obligations to introducing brokers pursuant to fully disclosed clearing agreement, which Alpine had in place with each of its introducing brokers with respect to the transactions at issue. *See* SCA Fully Disclosed Clearing Agreement, Ex. 8. Furthermore, contrary to this statement, the pertinent SAR regulation expressly allows introducing and clearing brokers to allocate the responsibilities for filing a SAR on a particular transaction. 31 C.F.R. § 1023.320(a)(3); *see also* 67 Fed. Reg. 44,048, 44,051-52 (July 1, 2002) (stating, *inter alia,* that "[t]he purpose of including this provision in the rule is to allow two broker-dealers that have participated in the same transaction to file only one SAR-BD.").

**SEC'S SOF No. 4.** As a clearing firm for many microcap securities transactions, Alpine was obligated to consider the known risks and abuses in the penny stock and microcap markets when discharging its obligations imposed by Section 1023.320. Angotti Decl. ¶ 14

**ALPINE'S RESPONSE TO SOF No. 4.** Alpine objects to SOF 4 as constituting an impermissible legal conclusion, rather than a statement of fact, as to what Alpine "was obligated" to know or consider. *See* Alpine's Response to SOF 3. Alpine also disputes SOF 4 on the basis that it is conclusory and vague as to what is meant by "known risks and abuses." To

the extent there are factual statements in SOF 4, Alpine does not dispute that it considered in good faith potential risks and abuses in the market through its AML compliance program on each transaction it processed.  *See* Alpine Add'l SOF ¶¶ 27-59 (detailing Alpine's AML review process).

**SEC'S SOF No. 5.**  Large deposits of low-priced securities, or "penny stocks," may involve fraud, market manipulation, and other violations of securities laws. Angotti Decl. ¶ 15.

**ALPINE'S RESPONSE TO SOF No. 5.**  Alpine disputes SOF 5 to the extent it implies that only large deposits of low-priced securities may involve "fraud, market manipulation or other violations of securities laws."  These are risks that may be involved in the trading of any volume and per-share value of stock.  Further, the SEC expert stated in her Rebuttal Report, served after the declaration, that "[t]he fact that such risks exist [in penny stocks and microcap securities] does not always mean that there is some kind of inherent criminality in a particular client type, securities type, jurisdiction or other risk attribute."  *See* Navigant Response to Rebuttal Report, at 17, "Navigant Rebuttal Report," July 27, 2018, Ex. 17 (emphasis added).

**SEC'S SOF No. 6.**  Penny stocks generally are those securities with low prices that are not traded on an exchange or quoted on NASDAQ; instead, they typically are quoted over-the-counter ("OTC"). OTC trading is basically any trading that occurs off an established marketplace. Angotti Decl. ¶ 16.

**ALPINE'S RESPONSE TO SOF No. 6.**  Alpine does not dispute that SOF 6 "generally" describes the definition of penny stocks.  However, the description is incomplete.  According the SEC's website:

> The term 'penny stock' generally refers to a security issued by a very small company that trades at less than $5 per share. Penny stocks generally are quoted over-the-counter, such

as on the OTC Bulletin Board (**which is a facility of FINRA**) or OTC Link LLC (which is owned by OTC Markets Group, Inc., formerly known as Pink OTC Markets Inc.); penny stocks may, however, also trade on securities exchanges, including foreign securities exchanges. In addition, the definition of penny stock can include the securities of certain private companies with no active trading market.[2]

Alpine also directs the Court to the SEC's definition of "penny stocks," at Exchange Act Rule 3a51-1, 17 C.F.R. § 240.3a51-1.[3]

Furthermore, the so-called "over-the-counter market" is not akin to a black market or even an unregulated market.  Rather, as acknowledged by the SEC on its website, the OTC Bulletin Board is operated by FINRA, and OTC Link, LLC is registered with the SEC as a broker-dealer and as an Alternative Trading System, and is a member of FINRA.[4]

**SEC'S SOF No. 7.**  As a general matter, the companies issuing penny stocks typically do not meet requirements necessary to be listed on an exchange, such as meeting thresholds for the number of publicly traded shares and having those shares trade above a minimum price. Angotti Decl. ¶ 16.

**ALPINE'S RESPONSE TO SOF No. 7.**  Undisputed.

**SEC'S SOF No. 8.**  Small-cap, or microcap stocks, are stocks with a small market capitalization. A penny stock is one that trades at a low price and trades over-the-counter. Angotti Decl. ¶ 17.

---

[2]  *See* https://www.sec.gov/fast-answers/answerspennyhtm.html (emphasis added).

[3]  Rule 3a51-1 generally defines a penny stock as "any equity security other than a security that: (a) is an NMS stock (*See* Rule 600(b)(47)) listed on a 'grandfathered' national securities exchange, (b) is an NMS stock listed on a national securities exchange or an automated quotation system sponsored by a registered national securities association (including Nasdaq) that satisfies certain minimum quantitative listing standards, (c) has a transaction price of five dollars or more, (d) is issued by a registered investment company or by the Options Clearing Corporation, (e) is a listed security futures product, or (f) is a security whose issuer has met certain net tangible assets or average revenues."  *See* https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm.html#8 (citing Rule 3a51-1).

[4] *See* https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html.

**ALPINE'S RESPONSE TO SOF No. 8.**  Alpine disputes SOF 8 to the extent it implies that microcap stocks can be distinguished from penny stocks on the basis that a penny stock "trades over-the counter."  According to the SEC's website, "[m]any microcap stocks trade in the 'over-the-counter' (OTC) market, rather than on a national securities exchange such as the New York Stock Exchange or NASDAQ. They are quoted on OTC systems, such as the OTC Bulletin Board (OTCBB) or OTC Link LLC (OTC Link)."[5]

**SEC'S SOF No. 9.**  The definition of a microcap stock is based only on the company's market capitalization, that is, the total value of the company's stock. Angotti Decl. ¶ 17.

**ALPINE'S RESPONSE TO SOF No. 9.**  Undisputed.

**SEC'S SOF No. 10.**  Before selling stock in reliance on an exemption available in Section 4 of the Securities Act, clearing firms must take appropriate steps to ensure that the transaction qualifies for the exemption. Angotti Decl. ¶ 19

**ALPINE'S RESPONSE TO SOF No. 10.**  Alpine disputes SOF 10 on the basis that it constitutes an impermissible legal conclusion, rather than a statement of fact.  *See* Alpine's Response to SOF 3.

**SEC'S SOF No. 11.**  Among other things, a clearing firm must ensure that the sale does not involve an issuer, a person in control with an issuer, or an underwriter, with a view to offer or sell the securities in connection with an unregistered distribution. This exemption is available only if a broker is not aware, after a reasonable inquiry, of circumstances indicating that the selling customer is participating in a distribution of securities. Angotti Decl. ¶ 19

---

[5] *See* https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html.

**ALPINE'S RESPONSE TO SOF No. 11.**  Alpine disputes SOF 11 on the basis that it constitutes an impermissible legal conclusion, rather than a statement of fact.  *See* Alpine's Response to SOF 3.

**SEC'S SOF No. 12.**  Securities Act Rule 144 creates a non-exclusive "safe harbor" from a firm being deemed an underwriter if the securities are sold in compliance with its requirements. An unregistered security that is not freely transferable is considered a "restricted security" if is acquired in a private transaction or is acquired by a control person of the issuer. Angotti Decl. ¶ 20.

**ALPINE'S RESPONSE TO SOF No. 12.**   Alpine disputes SOF 12 on the basis that it constitutes an impermissible legal conclusion, rather than a statement of fact.  *See* Alpine's Response to SOF 3.

**SEC'S SOF No. 13.**  Firms like Alpine who clear large deposits of low-priced securities also must be aware that Section 5 violations are often associated with large deposits of low-priced securities. Many of the SARs filed by Alpine involved the heightened sensitivity around accounts that historically made deposits of large volumes of low-priced securities. Angotti Decl. ¶ 21.

**ALPINE'S RESPONSE TO SOF No. 13.**  Alpine disputes SOF 13 on the basis that it constitutes an impermissible legal conclusion that large deposits of low-priced securities are "often associated" with "Section 5 violations."  *See* Alpine's Response to SOF 3.  Alpine also disputes the insinuation in SOF 13 that large deposits of low priced securities are *per se* suspicious of Section 5 violations and that Alpine facilitated or participated in Section 5 violations by providing clearing and settlement services for large deposits of low priced

securities.  In fact, the SEC's own expert confirmed that she did not identify one instance in which Alpine had cleared a deposit that was later found to constitute a violation of Section 5. *See* Angotti Dep., at 179-180, Ex. 10; *id*. at 248-250 (confirming that Alpine's Section 5 analysis looked at the existence of the issuer, the history of the acquisition of the stock, and confirmation that the company is not a shell in the supporting files).

Large deposits of low priced securities are not implicitly suspicious of Section 5 violations or criminal conduct.  As detailed by Alpine's expert, Congress's adoption of the Penny Stock Reform Act, indicates that Congress appears to have concluded that the value of the market outweighs any view that the transactions therein are inherently suspect. The same applies to the more recent Jumpstart Our Business Startups (JOBS) Act; Congress has determined that access to capital for companies *of all sizes* is critical to the health of the U.S. economy.  *See* Loew Expert Decl., at ¶ 170, Ex. 5.  The microcap and penny stock markets serve legitimate economic functions, which includes providing a means by which start-up and small companies may access capital and a means by which holders of stock in these companies may lawfully seek buyers for their holdings.  *Id.* at ¶ 180.

The SEC's expert also agreed that large deposits of low priced securities are not inherently suspicious of unregistered distributions, stating, *inter alia,* "[i]n fact, large deposits of penny stocks are often not suspicious without the subsequent liquidation, because it is the liquidation that is the mechanism to consummate the market manipulation or sale of unregistered securities."  *See* Navigant Rebuttal Report, at 18, Ex. 17.  Additional statements from the SEC's expert that conflicts with SOF 13 are set forth in Alpine's Response to SOF 27.

Further, as set forth in greater detail in Alpine's Response to SOF 27, there is significant and undisputed evidence that Alpine was cognizant of Section 5 and employed a robust due-diligence process for ensuring Section 5 compliance on all of its transactions, including a legal review of each stock deposit and stock sale it processed. *See e.g.* Alpine Dep., at 35:18-37:19; 40:19-41:1, Ex. 3; *see also* Add'l SOF ¶¶ 118-135 (discussing at length Alpine's Section 5 analysis and the SEC's expert confirmation of that analysis).

**SEC'S SOF No. 14.**  Penny stocks are vulnerable to abusive practices, including for the following reasons:

a. they can be sold at a large volume, frequently to unsophisticated investors, generating enormous profits for unscrupulous broker-dealers;

b. they are usually issued by smaller, little-known companies that attract little attention outside that generated by the offering broker-dealer; and

c. there is no reliable quotation system for the non-NASDAQ OTC market, providing an opportunity for decreased supervision and increased abuse.

Angotti Decl. ¶ 22.

**ALPINE'S RESPONSE TO SOF No. 14.**  Alpine disputes SOF 14 on the bases set forth in Alpine's Response to SOF 13, including that regardless of the potential for abuse, trading in penny or microcap stock is expressly permitted and lawful.  Alpine further disputes any insinuation in SOF 14 that an alleged "vulnerability to abusive practices" makes penny stocks *per se* suspicious as disputed by both Alpine's expert in the Loew Expert Declaration and the SEC's expert in the Navigant Rebuttal Report, provided after the cited declaration.  *See* Alpine's Responses to SOF 5, 13, 27 and 28.  For example, the Navigant Rebuttal Report states:

"The fact that such risks [regarding penny stocks and microcap securities] exist does not always mean that there is some kind of inherent criminality in a particular client type, securities type, jurisdiction or other risk attribute." *See* Navigant Rebuttal Report, at 17, Ex. 17.

**SEC'S SOF No. 15.**  One common abuse of penny stocks is the pump and dump scheme. This scheme involves thinly traded stocks (penny stocks or microcap stocks). In such a scheme, promoters will tout a thinly-traded microcap stock through false and misleading statements about the company. They purchase the stock at a low price, and then pump the stock price higher by creating the appearance of market activity. Then they dump the stock to make profits by selling it into the market at the higher price. Angotti Decl., ¶ 23.

**ALPINE'S RESPONSE TO SOF No. 15.**  Alpine does not dispute the general legal description of a "pump and dump scheme" provided in SOF 15.  Alpine also directs the Court to its Response to SOF 28 in responding to SOF 15.

**SEC'S SOF No. 16.**  Deposits of physical security certificates can also be a sign of suspicious activity. The stock deposits that were reported to have been deposited at Alpine occurred in either physical or electronic form. As the clearing firm for the transactions, Alpine dealt with the Depository Trust & Clearing Corporation Company ("DTCC"), which clears and settles nearly all broker-to-broker transactions in the U.S. equities markets. The transactions that were the subject of Alpine's SARs were handled by one of the DTCC subsidiaries, the Depository Trust Company, the central securities depository subsidiary of DTCC. Angotti Decl. ¶ 24-25.

**ALPINE'S RESPONSE TO SOF No. 16.**  Alpine disputes the statement in SOF 16 that the deposit of physical security certificates is itself a sign of suspicious activity within the

meaning of the BSA on the basis that it constitutes an impermissible legal conclusion, *see* Alpine's Response to SOF 3, and on the basis that it conclusory.

The cited portions of the Angotti Declaration provide no analysis or applicable legal support for this conclusion.  Rather, Ms. Angotti cites FINRA Notice 09-05 in support of this conclusion.  However, as explained in Alpine's prior filings, FINRA has no authority to issue rules or regulations governing SAR filing requirements under the BSA, or to issue binding interpretive guidance.  The Court itself did not cite this guidance as creating SAR obligations in its March 30, 2018 Opinion (*see* March 30, 2018 Opinion), and Ms. Angotti admitted during her deposition that this "is not surprising" because FINRA Notice 09-05 pertains to "Section 5 resale issues."  *See* Angotti Dep., at 356, Ex. 10.  The SEC's expert further states in the Navigant Rebuttal Report, provided *after* her declaration, that "I do not believe that FINRA guidance mandates SAR filing requirements."  *See* Navigant Rebuttal Report, at 14, Ex. 17.

Furthermore, FINRA Notice to Members 09-05 does not state that physical share certificates are *per se* suspicious, but rather that "[f]irms should try to physically inspect share certificates, if possible, as an opportunity to identify red flags and deter risks from forgery and fraudulent certificates."  *See* FINRA Notice to Members 09-05, at 5, available at https://www.finra.org/sites/default/files/NoticeDocument/p117716.pdf.  The duty, according to FINRA, is to "make an inquiry," and take "reasonable" and "appropriate steps," including following "procedures designed to avoid becoming participants in the potential unregistered distribution of securities."  *Id.*, at 2-3, 5.  Alpine directs the Court to Add'l SOF ¶¶ 118-135, for a detailed description of the processes and procedures Alpine designed and employed to ensure

compliance with Section 5 and to avoid becoming participants in unregistered distribution of securities.

Additionally, if physical security certificates were themselves suspicious, then DTC, "as a depository for trillions of dollars worth of physical stock certificates," *Olde Monmouth Stock Transfer Co., Inc. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 389 (S.D.N.Y. 2007), would be required to file millions of SARs per day and would be considered the largest facilitator of securities related crime in the world. The SEC's expert's superficial analysis is illogical and unsupported, and should be disregarded by the Court.

**SEC'S SOF No. 17.** DTC provides settlement services for virtually all broker-to-broker equity transactions in the U.S. which is registered with the SEC as a clearing agency. Trade settlement is a consolidated end-of-day process and the final step of a securities trade; it completes the transfer between trading parties of securities ownership and cash. The DTC's Deposit and Withdrawal at Custodian (DWAC) service provides participants with the ability to make electronic book-entry deposits and withdrawals of eligible securities into and out of their DTC book-entry accounts. Angotti Decl. ¶ 25.

**ALPINE'S RESPONSE TO SOF No. 17.** Undisputed.

**SEC'S SOF No. 18.** Deposits of physical certificates representing large amounts of low priced securities have been associated with illegal unregistered distributions. FINRA has noted that red flags involving the deposits of physical certificates include: A customer opens a new account and delivers physical certificates representing a large block of thinly traded or low-priced securities, or a customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale. Angotti Decl. ¶ 25.

**ALPINE'S RESPONSE TO SOF No. 18.**  Alpine disputes SOF 18 as taken out of context, unsupported and immaterial on the bases set forth in Alpine's Response to SOF 16 and 27.

**SEC'S SOF No. 19.**  Regardless of whether low-priced securities are in physical form or in electronic form, the fact that the stocks are low-priced makes them susceptible to market manipulation and fraud. Angotti Decl. ¶ 26.

**ALPINE'S RESPONSE TO SOF No. 19.**  Alpine disputes SOF 19 on several grounds.

First, Alpine disputes and objects to SOF 19 and to the cited support on the basis that they provide an impermissible legal conclusion.  *See* Alpine's Response to SOF 3.

Second, Alpine disputes and objects to SOF 19 on the basis that it is conclusory and unsupported.  The cited paragraph of the Angotti Declaration provides no foundation, no explanation and no support.  Such conclusory opinions have long been held improper and must be excluded.  "'It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment." *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989 ) (quoting *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 627 (1944) (Frankfurter, J., dissenting)).  For, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Id.*  Courts in this circuit have held similarly.  *See, e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (stating that expert testimony should be excluded if it is "speculative or conjectural" or is "conclusory."); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (If an expert "fail[s] to establish a basis for his opinion," where his report and affidavit "offer credentials rather than analysis," and the opinions

are merely conclusory, a court is within its discretionary power to strike the affidavit as being unreliable and unhelpful); *Kelsey v. City of New York*, No. 03-CV-5978 (JBF) (KAM), 2007 U.S. Dist. LEXIS 33465, at \*16 (E.D.N.Y. May 7, 2007) ("[c]onclusory affidavits, even from expert witnesses, do not provide a basis upon which to grant or deny motions for summary judgment"); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) ("An expert opinion is inadmissible if it 'is connected to existing data only by the *ipse dixit* of the expert' . . . ." (citation omitted)).

In further dispute of SOF 19, Alpine also directs the Court to its Response to SOF 13, setting forth the properly supported opinion of Alpine's expert that regardless of the potential for abuse, trading in penny or microcap stock is expressly permitted and lawful, and to its Responses to SOF 5, 14 and 28, which set forth additional statements from Alpine's expert and the SEC's expert in the Navigant Rebuttal report that, *inter alia,* that the existence of a "risk" in a particular securities type does not indicate "inherent criminality." Alpine further directs the Court to Add'l SOF ¶ 182.

**SEC'S SOF No. 20.**  Randall Jones is a current Alpine employee and was the AML Officer of Alpine during part of 2012. Deposition of Randall Jones at 10[13-15], 30[23]-31[1]; attached as Exhibit 13 ("Jones Dep.").

**ALPINE'S RESPONSE TO SOF No. 20.**  Undisputed.

**SEC'S SOF No. 21.**  Mr. Jones has no memory of facts specific to any transaction. Dep.at 43[11]-44[4] ("I can't speak to that, just by virtue of the fact that I don't remember the transaction. It was six years ago….Again, I don't remember the specific transaction with six years later, almost seven at this point. Do I remember writing this narrative? No, I don't. Could I

have? Potentially."); *see also id.* at 45[10-11]; 51[20]-52[3]; 53[9-24]; 60[16-21]; 62[15-25]; 65[13-15]; 66[22-24]; 68[16-20]; 71[21-24].

**ALPINE'S RESPONSE TO SOF No. 21.**  Alpine disputes SOF 21 on the basis that it is taken out of context, as not supported by the cited source, and as immaterial.   Mr. Jones testified only that he did not have a memory of the few specific transactions or SARs shown to him or on which he was questioned during the deposition.  *See* R. Jones Dep., at 45:10-11; 51:20-52:3; 53:9-24; 60:16-21; 62:15-25; 65:13-15; 66:22-24; 68:16-20; 71:21-24, March 20, 2018, Ex. 15.

Further, Mr. Jones' memory of a specific transaction from six to seven years earlier is immaterial because Alpine detailed its reasons for filing a SAR on a particular transaction in the SAR itself.  *See, e.g.*, Alpine Dep., at 121:3-11; 129:9-130:24; 138:25-139:24, Ex. 3.

**SEC'S SOF No. 22.**  Mr. Jones has no memory of his thought processes used to make decisions to include red flags in the narrative section of specific SARs. Jones Dep. at 76[4-16].

**ALPINE'S RESPONSE TO SOF No. 22.**  Alpine disputes SOF 22 as taken out of context, as not supported by the cited source, and as immaterial. When asked, "As AML officer, did you ever consider including potential red flags in a SAR narrative?," Mr. Jones responded: "If I determined something to be suspicious and needed it to be included in the SAR, I would have put it in the SAR."  *See* R. Jones Dep., at 75:23-76:3, Ex. 15; *see also* SEC's Ex. 13.  While sitting at the deposition, Mr. Jones could not recall "specific instances" in the transactions shown to him.  *Id.* at 76:11-13.

Alpine also directs the Court to its Response to SOF 21.

**SEC'S SOF No. 23.**  Alpine has no institutional memory of the mindset of the individuals at Alpine who prepared SARs. See, e.g., Alpine Rule 30(b)(6) Deposition of

Christopher L. Frankel at 121[21-24], attached hereto as Exhibit 14 ("Alpine Dep.") ("I can't speak directly to the mindset of the person that prepared the SARs….I can speculate."); 154[23]-155[8]; 156[1-2] ("Again, I just can't crawl in the mind of the preparer."); 160[10-18]; 166[1-20] ("I can't necessarily get in the mind of the author."); 179[4-11].

**ALPINE'S RESPONSE TO SOF No. 23.**  Alpine disputes SOF 23 as taken out of context, misleading, and immaterial.  The SEC relies upon Christopher Frankel's Deposition pursuant to Rule 30(b)(6) in support of SOF 23.  Mr. Frankel provided the above-quoted testimony in response to the specific transactions or SARs shown to him and on which he was questioned during the deposition.  Mr. Frankel communicated Alpine's institutional memory of its practices and policies for when it determined to file a SAR and what to put in a SAR narrative, including, specifically, that Alpine had a practice of including within the SAR narratives information that was relevant to why it was filing a SAR.  *See, e.g.*, Alpine Dep., at 68:14-22; 70:2-11; 73:23-74:4; 123:1-8; 137:23-138:2, Ex. 3.

Further, Mr. Frankel's institutional memory of the mindset of the individuals at Alpine who prepared the specific SARs on which he was questioned is immaterial because Alpine detailed its reasons for filing a SAR on a particular transaction in the SAR itself.  Mr. Frankel made this clear numerous times during his deposition.  *See, e.g.*, Alpine Dep., at 121:3-11; 129:9-130:24; 138:25-139:24, Ex. 3.

Alpine also directs the Court to testimony of individuals who prepared and filed the SARs at issue in Add'l SOF ¶¶ 27-56 in further dispute of SOF 23.

**A.  Deficient SARs**

**SEC'S SOF No. 24.**  The table attached to Exhibit 10 summarizes the "Deficient SARs" on which the Commission seeks Judgment. Exhibit 10 summarizes the information from the seven subcategories that was missing from the narratives of each SAR reflected in the Exhibit and also identifies the customer who ordered the underlying transactions. Each of the SARs that appear in Exhibit 10 also appear in one or more of Exhibits 3-9 to the Motion, which list the Deficient SARs by subcategory of red flags: Basic Customer and Suspicious Information (Exhibit 3) Criminal or Regulator History. (Exhibit 4), Shell Company or Derogatory History of Stock (Exhibit 5), Stock Promotion (Exhibit 6) Unverified Users (Exhibit 7), Low Trading Volume (Exhibit 8), and Foreign Involvement (Exhibit 9). Angotti Decl. ¶ 29-31. The documents summarized in Exhibits 3-10 are in Alpine's possession and can be made available to Alpine or the Court for examination, copying, or both. *See* Fed. R. Evid. 1006

**ALPINE'S RESPONSE TO SOF No. 24.**  Alpine does not dispute that the SEC's Exhibit 10 summarizes the SARs on which the SEC seeks summary judgment.  However, Alpine disputes the characterization of the SARs on the SEC's Exhibits as "Deficient SARs" as argument rather than a statement of fact, which is unsupported and incorrect for the reasons addressed in Alpine's Memorandum of Law in Opposition to the SEC's Motion for Summary Judgment.

Alpine also objects to the admissibility of the summary charts, Ex. 3-10, which were prepared by Navigant, on the basis that they lack the reliability necessary for the admissibility. The expert's summary charts are purportedly offered pursuant to F.R.E. 1006.  However, because charts were prepared by the SEC's expert, and contain the expert's conclusions, the

charts are also subject to the same standards for the admission of expert testimony, as well as F.R.E. 1006.

Where, as here, the summary judgment motion is based on a declaration and submissions from an expert, "the district court functions as the gatekeeper for expert testimony," whether the testimony is offered at trial or in connection with a motion for summary judgment.  *See, e.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996).  The Court must consider "(1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *Scentsational Techs., LLC v. Pepsi, Inc*., No. 13-cv-8645 (KBF), 2018 U.S. Dist. LEXIS 24375, at *4 (S.D.N.Y. Apr. 18, 2018) (rejecting expert testimony where the opinions were "unreliable"); *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).  Among other things, "the *Daubert* requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citation omitted) (emphases in original).  To determine whether testimony is reliable, the court must consider whether "(1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case."  *Lynch v. Trek Bicycle Corp.*, 374 F. App'x 204, 206 (2d Cir. 2010).

Further, F.R.E. 1006 contains its own foundational standards for admissibility.  Courts have long required that district courts ascertain that summary charts "fairly represent and

summarize the evidence upon which they are based." *United States v. Citron*, 783 F.2d 307, 316

(2d Cir. 1986).  Thus they must be "accurate and nonprejudicial," cannot contain legal argument,

and cannot be used to assume facts of the alleged offense that the government is required to

prove.  *See United States v. Younes*, 194 F. App'x 302, 311 (6th Cir. 2006) ("[A] summary

document must be accurate and nonprejudicial. This means first that the information on the

document summarizes the information contained in the underlying documents accurately,

correctly, and in a nonmisleading manner."); 2 McCormick On Evidence § 241 (7th ed. updated

June 2016) ("[C]ourts must be scrupulous in assuring that the summary accurately portrays the

contents of the underlying material" and thus "guard against summaries that contain … outright

argument."); *UPS Store, Inc. v. Hagan*, No. 14CV1210, 2017 U.S. Dist. LEXIS 121352, at *16

(S.D.N.Y. Aug. 2, 2017) (holding summary evidence prepared by an expert inadmissible because

"it is suffused with argument"); *PEAT, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159-60

(11th Cir. 2004) ("And because summaries are elevated under Rule 1006 to the position of

evidence, care must be taken to omit argumentative matter in their preparation lest the jury

believe that such matter is itself evidence of the assertion it makes."); *United States v. Saunders*,

No. 12-141, 2013 U.S. Dist. LEXIS 83297, at *17 (E.D. La. June 13, 2013) ("Rule 1006 does not

allow the Government to rely on summary charts to assume facts of the alleged offense that the

Government is required to prove." (citing *U.S. v. Hart*, 295 F.3d 451, 459 (5th Cir. 2002)).

  Here, the expert's summary declaration and charts fail to comply with these admissibility

requirements.  First, the essential contentions of the expert, i.e., the presence of "red flags"

within certain Alpine supporting files, was fundamentally flawed.  Second, the expert confirmed

that she did not conduct any comprehensive review of the documents herself, but relied on others

at Navigant to perform the review who were not subject to cross-examination. *See* Angotti Depo., at 138-144, Ex. 10. *See Washington v. Vogel*, 880 F. Supp. 1545 (M.D. Fla. 1995) (court excluded the testimony of an expert who intended to testify about a study conducted by someone else, when the expert had not independently verified the study).

Further, the expert confirmed both in her deposition and her reports that a reference in the file to a flag does not demonstrate that the information was required to be included in the narrative, particularly where it is not relevant or material, or where there are items of "green flag" information in the files, much less the testimony of Alpine's witnesses, relating to the kind of review that would have resolved the purported red flag. *See* Angotti Decl., at ¶¶ 45, 47, SEC's Ex. 1; *see also* Navigant Rebuttal Report, at 2, 17, 18, Ex. 17; Angotti Dep., at 277, Ex. 10 (confirming that identified red flags generally might need to be included in the narrative, but "it depends on what the fact is"); *see also id.* at 280-281, Ex. 10 (confirming that a red flag itself does not mean that a transaction is reportable; it means it's something that the firm should look at, and if the activity is suspicious, it needs to be included in the SAR); *id.* at 282, Ex. 10 (stating that red flag should be discussed in the narrative when they are "material"). But the expert does not establish that this view was communicated to the Navigant experts. In fact, the SEC expert's declaration confirms that the charts were prepared through the simple process of looking for red flags in the support files. *See* Angotti Decl., at ¶¶ 43, 45, 47-49, 51-52, SEC's Ex. 1.

These methodological errors are reflected in the summary charts, Exhibits 3-10, which are riddled with inaccuracies. In summary:

- There are 17 instances of SARs that are listed on the SEC's Ex. 10 twice, as two separate violations. Notably, despite these SARs being duplicates, in several circumstances, the reviewer actually claimed different omissions. *See* Add'l SOF ¶ 260.

- The SEC's expert's tables includes 295 SARs where the only allegedly omitted "red flag" is failure to state the "5Ws" of "who, what, when, where, and why," meaning, that there is no reason to suspect any criminal activity on these SARs.  *See* SEC's SOF, No. 31 (stating that "1302 out of the 1594" SARs "involve one or more of the six subcategories of red flags" which does not include the "5Ws") (the foregoing amount is calculated to 292 as the SEC omitted three additional 5W only SARs from the SEC's expert's table A and A-1 without any explanation).  *See* SEC's expert's A-1 (SEC's Ex. 3); *see also* Angotti Dep., at 240-241, Ex. 10 (SEC's expert unable to explain what criminal activity could possibly be at issue on these SAR because there are no red flags omitted).

- The SEC's expert's Table A-1 claims that many of the SAR narratives omitted basic client information and the reason why Alpine filed the SAR – without providing the Court any SAR narratives in support.  However, many of the SARs in this category objectively show details of why Alpine filed the SAR.  *See* Add'l SOF at ¶¶ 178(a)-(e) (providing examples and attaching multiple SARs in support).

- The SEC's expert's Table A-2 claims 98 violations for "3rd-party" criminal or regulatory history without any analysis of its relation to the issuer, client, or transaction.  *See* Add'l SOF at ¶ 186(a).

- The SEC's expert's Table A-2 claims violations for omitting "███████████████" from SAR narratives where the support files show that "████████████████" is connected to the transaction and is a different person from the "████████████████ ████████" with a regulatory history.  *See* Add'l SOF at ¶¶ 186(c)-(e).  *See also* Angotti Dep., at 327-333, Ex. 10 (SEC's expert admits that admits that her team "must have missed that" in regards to ████████████████).

- The SEC's expert's Table A-2 claims multiple violations for omitted criminal or regulatory histories, without providing any SARs or support files in support, and, in fact, the SARs and support files show that the history was disclosed.  *See e.g.* Add'l SOF at ¶ 186(h).

- The SEC's expert's Table A-2 claims multiple omitted criminal or regulatory histories (the defined "red flag") but the support file shows only omitted "civil" or other non-regulatory actions.  *See* Add'l SOF ¶¶ 186(f),(g),(i).

- The SEC's expert's Table A-3 includes 104 SARs where the alleged omission is a "former" shell company without any regard to SEC's filing and Alpine's finding within the support file showing that the company is no longer a shell.  *See* Table A-3 (SEC's Ex. 5); Add'l SOF ¶ 186.

- The SEC did not provide the Court with any SARs or support files confirming the information alleged on Table A-3; however, as shown on Alpine's Table A-3, along with submitted support files, the support files negate the SEC's claimed SAR violations.  *See* Add'l SOF at ¶ 198 (showing table wherein each alleged "former" shell company has Form 10-Ks and 10-Qs).  Furthermore, the SEC's expert testified during her deposition that the finding of a violation for failure to disclose a shell where the file clearly reflects Form 10-Qs and 10-Ks would be an error, or when the actual support file states, "not a shell."  *See* Angotti Dep., at 353-354, Ex. 10.

- The SEC's expert's Table A-4 claims information regarding stock promotions were omitted without providing the Court with the support files confirming such information.  However, Alpine has submitted the support files and outlines each SAR and the information confirming that the stock promotions were ***not*** ongoing at the time of the deposit – some as long as a year old.  *See* Add'l SOF at ¶ 203 (showing table wherein is listed all the dates of the deposit and the promotional activity).

- The SEC's expert's Table A-5 alleges information regarding "unverified issuers" was omitted from the SAR without providing the support files confirming this allegation.  However, as shown in the support files provided by Alpine and as outlined above, the support files show, for example, websites functioning, and Form 10s evidencing active and functioning companies.  *See* Add'l SOF at ¶ 207 (showing table wherein SEC's claims are refuted by citations to the support file).

- The SEC's expert's Table A-6 alleges that Alpine omitted low trading volume on multiple SARs without providing any SAR narratives in support.  However, Alpine, on multiple occasions, outlined and discussed the trading volume in SAR narratives which are quoted in full and provided to the Court.  *See* Add'l SOF at ¶¶ 211(a)-(g).

- The SEC's expert's Table A-7 alleges that Alpine omitted foreign actor involvement on multiple SARs without providing any SARs in support.  However, Alpine, on multiple occasions, provided the actual address of the foreign jurisdiction within the SAR form and disclosed the foreign jurisdiction within the SAR narrative.  *See* Add'l SOF at ¶¶ 215(a)-(d).

- The chart's citation to the support file are frequently vague.  For example, the majority of the citations in the criminal/regulatory history category just include a Bates Label number, without identifying what history is purportedly omitted or the individual or entity to which it supposedly relates, let alone the relevance of that history or person to transaction at issue. (SECs' Ex. 4, 10.)  This is also an issue on the purported evidence of "stock promotion history" – just a Bates Label is provided.  These are significant issues because the relevance or materiality of these items to the transactions at issue is sharply disputed.

The summary charts also contain embedded legal argument.  Each SAR identified on the charts as omitting the alleged "5 Ws" constitutes a legal analysis of the narratives and a conclusion that the SAR narratives identified therein are deficient.  *See* SEC Exs. 3, 10.  Notably, this is legal conclusion on one of the ultimate issues in this case.

These inaccuracies and analytical flaws are compounded by the fact that the SEC's presentation does not include the information – the SARs and SAR support files – that would enable the Court to assess the reliability of the conclusions by the expert in the declaration and charts when ruling on the sufficiency of Alpine's SAR narratives.   Thus, for all these reasons, Alpine objects to, and disputes, the summary charts and asks that the Court strike or disregard them.  These inaccuracies and analytical flaws are compounded by the fact that the SEC's presentation does not include the information – the SARs and SAR support files – that would enable the Court to assess the reliability of the conclusions by the expert in the declaration and charts when ruling on the sufficiency of Alpine's SAR narratives.

**SEC'S SOF No. 25.** Each of the Deficient SARs involved at least $5,000 of assets or funds. See Exhibits 3-9.

**ALPINE'S RESPONSE TO SOF No. 25.**   Alpine disputes the SEC's characterization of the SARs on Exhibits 3-9 as "Deficient SARs" and objects to the charts referenced for the reasons set forth in Alpine's Response to SOF No. 24.

Alpine does not dispute that each of the SARs listed on Exhibits 3-9 involved a transaction of $5,000 or more.  However, the SEC's original Table A, which the SEC claimed contained deficient SAR narrative violations by Alpine, included 213 SARs that were below the $5,000 threshold.  *See* Navigant Report, at p. 37 n. 142, SEC's Ex. 2.  By excluding these SARs

from its Motion for Summary Judgment, the SEC admits that: (a) each of at least those 213

SARs were non-mandatory or voluntary SAR filings; (b) Alpine had a practice of filing a

significant number of non-mandatory or voluntary SARs.  Alpine also directs the Court to Add'l

SOF ¶¶ 60-75 for additional evidence regarding Alpine's practice of filing voluntary SARs on

certain transactions involving large deposits of low-priced securities.  *See SEC v. Lyon*, 605 F.

Supp. 2d 531, 543 (S.D.N.Y. 2009) ("Evidence of an organization's routine practice is

admissible provided the proponent of the evidence establishes that the organization acted with

regularity over substantially all occasions . . . ." (citations and internal quotation marks omitted)).

**SEC'S SOF No. 26.**  Because stock cannot be sold on a large scale and the price cannot

be manipulated without first placing the securities into the financial system through a broker-

dealer like Alpine, a large deposit of low priced securities is a necessary step to unregistered

securities offerings or market manipulation. Angotti Decl. ¶ 36, Ex. 10.

**ALPINE'S RESPONSE TO SOF No. 26.**  Alpine disputes SOF 26 as lacking

admissible evidentiary support and as specious, attenuated and contradicted by other evidence.

SOF 26 lacks admissible evidentiary support because it relies entirely upon Paragraph 36

of the Angotti Declaration.  The cited paragraph of the Angotti Declaration merely repeats the

conclusory statement from SOF 26 without providing any foundational analysis or support, and

instead impermissibly relying instead entirely upon the expert's *ipsit dixit*.  *See* Alpine's

Response to SEC SOF 19 for authorities stating that conclusory expert testimony should not be

admitted.

Alpine also disputes the statements in SOF 26 on the basis that the potential unlawful

conduct referenced by the SEC expert involves a transaction associated with the trading of stock,

i.e., market manipulation or unregistered securities offerings, not the deposit of stock.  The

SEC's expert identifies no potentially unlawful activity associated with a mere deposit

transaction, even a large deposit of low priced securities.  The SEC expert acknowledges this in

her Rebuttal Report, filed after the cited declaration, where she states:  "In fact, large deposits of

penny stocks are often not suspicious without the subsequent liquidation because it is the

liquidation that is the mechanism to consummate the market manipulation or the sale of

unregistered securities."  *See* Navigant Rebuttal Report, at 18, Ex. 17.

  The SEC expert's attempt to tie the large deposits of low-priced securities to

manipulation or Section 5 violations by arguing a deposit is a "necessary step" to such trading

misconduct is so attenuated and speculative as to be illogical.

  First and foremost, SEC and its expert ignore that the deposit of any security, regardless

of size or share value, would be a first step in *every* securities trade, including all legitimate

trades.  Further highlighting the flaws in this reasoning, neither the SEC, nor its expert, identifies

any actual market manipulation or unregistered securities offerings, or any objective facts that

would give rise to such a suspicion, involved in *or stemming from* any of the deposit transactions

at issue in this case.  *See* SEC's 56.1 Statement *and* Ex. 1 thereto.  Nothing is provided to even

attempt to link the large deposits of low priced securities at issue to any market manipulation

scheme or unregistered securities offering.  *See id.*  Instead, SOF 26 simply presents the often

criticized, and impermissible, "house that jack built" theory of causation in which inferences are

stacked upon inferences *ad infinitum.  See Obiegbu v. Hollingsworth*, No. 13-5576 (RMB), 2013

U.S. Dist. LEXIS 141257, at *6 n.6 (D.N.J. Oct. 1, 2003) ("legal 'adjudication cannot rest on any

such house that Jack built' foundation.'" (quoting *Salyer Land Co. v. Tulare Lake Basin Water*

*Storage Dist.,* 410 U.S. 719, 731 (1973)).[6]  By analogy, one cannot commit a computer crime without first turning on a computer, but certainly no reasonable person could or would suspect that a computer crime is in progress from the mere act of turning on the computer. Indeed, if a large deposit of stock was considered the first step in a securities related crime, or were sufficient to give rise to a reasonable suspicion of a potential market manipulation or unregistered distribution for which a SAR was required, then the SAR program would be valueless (Loew Expert Decl., ¶ 174, Ex. 5), and DTC, as the largest depository of stock certificates in the world, would be required to file millions of SARs per day.  *See* Alpine's Response to SOF 16.   Further, and more importantly, as detailed in Alpine's Responses to SOF 27 and 28, the SEC's expert refutes the notion that a large deposit of low-priced securities itself, or even in connection with a red flag, creates a reason to suspect in criminality.

**SEC'S SOF No. 27.**  Large deposits of low-priced securities provide a broker-dealer a reason to suspect an unregistered offer or sale of securities. Angotti Decl. ¶ 37.

**ALPINE'S RESPONSE TO SOF No. 27.**  Alpine disputes SOF 27 on the basis that it constitutes a legal conclusion on an ultimate issue rather than a statement of fact.  *See* Alpine's Response to SOF 3.  Alpine further disputes SOF 27 on the bases that it is not supported by the cited source, as lacking foundation, and as disputed by other facts.

SOF 27 is not supported by the cited source, Paragraph 37 of the Angotti Declaration, which states: "Large deposits of low-priced securities *can* provide a broker-dealer a reason to

---

[6] *See also United States v. A.L.A. Schechter Poultry Corp.*, 76 F.2d 617, 624 (2d Cir.1935) (L.Hand, J., concurring) ("In an industrial society bound together by means of transport and communication as rapid and certain as ours, it is idle to seek for any transaction, however apparently isolated, which may not have an effect elsewhere; such a society is an elastic medium which transmits all tremors throughout its territory; the only question is of their size."), *aff'd in part and rev'd in part on other grounds*, 295 U.S. 495 (1935); *U.S. v. Patton*, 451 F.3d 615, 628 (10th Cir. 2006) (warning "against overly expansive notion of cause and effect" by noting that "a butterfly flapping its wings in China might bring about a change of weather in New York").

suspect that there has been an unregistered offer or sale of securities . . . ."  *See* Angotti Decl.,

¶ 37, Ex. 10 (emphasis added).  Thus, the SEC's expert opines that a large deposit of low priced

securities *could* create a reason to suspect an unregistered offer or sale of securities.  This is

different from the SEC's statement in SOF 27 that it *always* creates a reason to suspect an

unregistered distribution. Thus, the SOF 27 lacks foundational and evidentiary support, and

should be disregarded.

      SOF 27 is also affirmatively disputed by numerous statements by the SEC's own expert.

To the extent the SEC claims that a large deposit of low-priced securities is itself a red flag that

gives rise to a reason to suspect unlawful activity to require a SAR filing, the SEC's expert

stated, "[t]he presence of red flags alone, of course, does not mean that a transactions is

suspicious and reportable."  *See* Navigant Expert Report, at 20, SEC's Ex. 2.  Alpine's expert

agrees that a "red flag" does not make a transaction reportable, but rather "is an indication that

the transaction should be examined by the firm."  *See* Loew Expert Decl., at ¶ 184, Ex. 5.  This is

also consistent with guidance issued by FinCEN,[7] the FFIEC,[8] and the even the SEC.[9]

---

[7] FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual (Feb. 27, 2015) ("FFIEC Manual") at Apdx. F-1, stating, "the following examples are red flags that, when encountered, <u>may</u> warrant additional scrutiny. The mere presence of a red flag is not by itself evidence of criminal activity.  Closer scrutiny should help to determine whether the activity is suspicious or one for which there does not appear to be a reasonable business or legal purpose."  The FFIEC Manual is available at
https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_106.htm

[8] Fin-2017-A007, at 4 (Oct 31 2017) Advisory to Financial Institutions Regarding Disaster – Related Fraud, stating "The presence or absence of a red flag in any given transaction is not by itself determinative of whether a transaction is suspicious."  This advisory is available at https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2017-a007-0

[9] OCIE, Risk Alert: *Broker-Dealer Controls Regarding Customer Sales of Microcap Securities*, at p. 5 n.17 (October 9, 2014), stating:  "The Staff does not contend that the existence of any of these examples, which <u>may</u> indicate suspicious activity, necessarily triggers the broker-dealer's obligation to file a SAR. Whether the broker-dealer has such an obligation depends on <u>the totality of facts and circumstances in a particular situation</u>. (emphasis added).  This risk alert is available at https://www.sec.gov/about/offices/ocie/broker-dealer-controls-microcap-securities.pdf

The SEC's expert undermined SOF 27 even further through numerous statements in her Rebuttal Report, including:

- Stating that it is "incorrect" that "the deposit of a large quantity of low priced securities was the reason <u>why</u> the transaction was suspicious.  Alpine's expert appears to conflate red flags with suspicious activity.  Of course, the deposit of low priced securities was a red flag, <u>but taken in isolation</u>, the fact of this deposit does not describe what made the transaction suspicious. . . . the [Loew] report, however, contends, that I view the 'deposit of large quantities of low-priced securities as the why, the reason the transaction was suspicious.  <u>That mischaracterizes my opinion.</u>" Navigant Rebuttal Report, at 2-3, Ex. 17 (internal quotations omitted) (first emphasis in original).

- "Of course, I do not believe that all penny stocks and microcap securities are illegal or unlawful or criminal."  Navigant Rebuttal Report, at 17, Ex. 17.

- Discussing risk associated with penny stocks and microcap securities, the SEC's expert states: "The fact that such risks exist does not always mean that there is some kind of inherent criminality in a particular client type, securities types, jurisdiction or other risk attribute."  Navigant Rebuttal Report, at 17, Ex. 17.

- "In fact, large deposits of penny stocks are often not suspicious without the subsequent liquidation, because it is the liquidation that is the mechanism to consummate the market manipulation or sale of unregistered securities." Navigant Rebuttal Report, at 18, Ex. 17.

Furthermore, Alpine's expert refutes the notion that a transaction involving low-priced and thinly traded securities are inherently suspicious.  *See, e.g.*, Loew Expert Decl., at ¶¶ 170-174, 183, Ex. 5.  "It simply is not the law or the factual reality that every transaction involving 'low-priced' securities is inherently suspect. Insofar as the SEC's expert witness's conclusion that the SARs were mandatory is based on the simple fact that they involved 'low-priced' securities, that is not, in and of itself, a sufficient basis for concluding that the SARs were mandatory." *Id.,* at ¶ 183.  A contrary conclusion, "if adopted, effectively would trigger a SAR filing for every large deposit of illiquid and 'low-priced' securities," imposing "an unnecessary and destructive burden on firms and on the market," and result in "an inordinately large number

of SARs that were filed on activity that would not be suspicious under any of the four prongs of the SAR rule and volumes of information that would be valueless to law enforcement and that would clog the BSA database." *Id.*, at ¶ 174.

Finally, the purported concerns regarding Section 5 compliance with large deposits of low priced securities raised by SOF 27 is entirely speculative as applied to Alpine.  As indicated, Alpine employed a robust process of due diligence to review each transaction for Section 5 compliance and guard against concerns of participating in an unregistered distribution.  *See* Add'l SOF ¶¶ 118-135, to a discussion of Alpine's Section 5 process.  Importantly, the SEC's expert admitted during her deposition that the Section 5 analysis is a "detailed, difficult analysis," and that following her review of the transactions at issue she was unable to "cite to an instance where Alpine's Section 5 analysis was wrong."  *See* Angotti Dep., at p. 179:22-180:2, Ex. 10.

**SEC'S SOF No. 28.**  Large deposits of low-priced securities also provide a broker-dealer a reason to suspect pump-and-dump and other manipulation schemes. *See* Angotti Decl. ¶ 38, SEC's Ex. 1.

**ALPINE'S RESPONSE TO SOF No. 28.**  Alpine disputes SOF 28 on the basis that it constitutes a legal conclusion on an ultimate issue rather than a statement of fact.  *See* Alpine's Response to SOF 3.  Alpine further disputes SOF 28 on the bases that it is not supported by the cited source, as lacking foundation, and as disputed by other facts.

Paragraph 38 of the Angotti Declaration – the sole support for SOF 28 – states:  "Large deposits of low-priced securities *can* also provide a broker-dealer a reason to suspect pump-and-dump and other manipulation schemes."  *See* Angotti Decl., ¶ 38, SEC's Ex. 1 (emphasis

added)).  As in Paragraph 37 of her declaration, the SEC's expert only opines that a large deposit of low priced securities *could* create a reason to suspect a pump and dump or other market manipulation schemes.  This is different from the SEC's statement in SOF 28 that it *always* creates a reason to suspect such schemes. Thus, the SOF 28 lacks foundational and evidentiary support, and should be disregarded.

Alpine directs the Court to its Response to SOF 27 for citations to additional affirmative evidence, including by both the SEC's own expert and Alpine's expert, disputing SOF 28. SOF 28 is therefore not supported by the cited source and lacks foundational and evidentiary support, and should be disregarded.

Furthermore, the term "market manipulation scheme" is vague, as neither the SEC nor its expert defines what is meant by or is involved in such an alleged scheme.  A market manipulation scheme also has specific attributes.  "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure," plus evidence of "wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity."  *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 77 (S.D.N.Y. 2015).  As set forth in Alpine's Add'l SOF ¶ 210, where Alpine saw evidence of market manipulation in trading activity, it filed SARs.

A pump-and-dump scheme requires "conspirators [to] manipulate the price and volume of a particular stock through the dissemination of ***false and misleading*** promotional materials." *See SEC v. Alpine Sec. Corp.*, 308 F. Supp. 3d 775, 803 (S.D.N.Y. 2018) (emphasis added); *see also* http://www.sec.gov/answers/pumpdump.htm (describing a pump-and-dump scheme as "the touting of a company's stock (typically microcap companies) through false and misleading

statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market."); *see also* SEC SOF 15.

In support of this statement, the SEC has not introduced any objective facts or evidence that any of the necessary attributes of a market manipulation or pump and dump scheme exist in the mere fact of a large deposit of low-priced securities, such that a reasonable broker dealer would have a reason to suspect it was facilitating these crimes. Thus the conclusion in SOF 28 is disputed for this reason also.

**SEC'S SOF No. 29.**  Low-priced and thinly traded securities have long been subject to abusive practices known to broker-dealers like Alpine. Angotti Decl. ¶ 39.

**ALPINE'S RESPONSE TO SOF No. 29.**  Alpine disputes SOF 29 as not supported by a cited source, and as vague and conclusory, and as disputed by other evidence.

SOF 29 is unsupported because Paragraph 39 of the Angotti Declaration does not contain the conclusion for which it is cited, and SOF 29 should therefore be disregarded as unsupported. SOF 29 is also vague in its use of the term "abusive practices," and conclusory because no testimony or other evidence is provided by the SEC that Alpine or any other broker-dealers have long "known" of purported abusive practices with "low-priced and thinly traded securities." Certainly, no evidence has been provided that Alpine knew and failed to report any purported "abusive practices" occurring in, or associated with, any of the transactions at issue in this case.

Finally, Alpine directs the Court to its Responses to SOF 13, 27 and 28 in responding to SOF 29.

**SEC'S SOF No. 30.**  FINRA advised Alpine that FINRA had defined a large deposit of low-priced securities as suspicious. Alpine Dep. at 43[4]-45[4]; 98[8-23].

**ALPINE'S RESPONSE TO SOF No. 30.**  Alpine does not dispute the SEC's concession in SOF 30 that FINRA told Alpine it wanted SARs filed on all large deposits of low priced securities.  As detailed in Alpine's Add'l SOF ¶¶ 60-75, Alpine developed a practice and policy of voluntarily filing on transactions involving large deposits of low priced securities, even though it did not find such transactions suspicious within the meaning of the BSA, in response to FINRA's statements.

However, to the extent the SEC implies that FINRA's view created mandatory SAR filing obligations under BSA, it is an incorrect statement of the law and renders SOF 30 immaterial.  As detailed in Alpine's prior summary judgment briefing, only FinCEN has been delegated rule making authority under the BSA, including to define SAR filing requirements.  Alpine also directs the Court to the Loew Expert Declaration for a detailed discussion of FINRA's limited role in the BSA regulatory scheme, and establishing that FINRA has no authority to impose SAR filing obligations under the BSA.  *See* Loew Expert Decl., at ¶¶ 26, 36-38, 54, 74-83, 147-154, Ex. 5.

Furthermore, as set forth in Alpine's responses to SOF 26-28, the insinuation that large deposits of low priced securities are by definition suspicious of some form of criminal conduct is disputed.

**SEC'S SOF No. 31.**  1302 out of the 1594 of the transactions reported in the SARs summarized in Exhibit 10 involved one or more of the six subcategories of red flags set forth in the Order that provided Alpine with reason to suspect criminal activity: criminal or regulatory history (particularly history involving securities or other financial frauds), involvement a shell company or derogatory history of stock, evidence of stock promotion history, unverifiable

issuers, low trading volume, and the involvement of foreign entities. Angotti Decl. ¶ 32; see also Exhibits 3-9.

**ALPINE'S RESPONSE TO SOF No. 31.**  Alpine disputes SOF 31 on several grounds.

First, SOF 31 contains a legal conclusion on an ultimate issue:  that the "six subcategories of red flags . . . provided Alpine with reason to suspect criminal activity."  As stated in Alpine's Response to SOF 3, that the SEC cites to its expert's declaration in support of this statement does not change its character or make it admissible.  *See In re Rezulin Prod. Liab. Litig*., 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004).

Second, SOF 31 lacks admissible evidentiary support because it relies entirely upon Paragraph 32 of the Angotti Declaration.  The cited paragraph of the Angotti Declaration merely repeats the conclusory statement from SOF 31 without providing any foundational analysis or support, and instead impermissibly relying entirely upon the expert's *ipsit dixit.  See* Alpine's Response to SEC SOF 19 for authorities discussing inadmissibility of conclusory expert testimony.

Third, SOF 31 is disputed by other evidence.  As indicated in Alpine's Response to SOF 27-28, which are incorporated herein, both Alpine's expert and the SEC's expert, as well as guidance issued by the FFIEC, FinCEN and SEC, agree that the presence of red flags does not mean a transaction is suspicious, but merely triggers a duty to take a closer look at the transaction.  In the Rebuttal Report, the SEC's expert further provides numerous statements directly rebutting that SEC's expert herself offers several opinions that dispute SOF 34.  *See* Alpine's Responses to SOF 27 and 28. Furthermore, the SEC admits that no red flag is even identified for 202 of the deposit transactions, and thus there is not even a basis under its expert's

analysis to conclude that those SARs are required.

Fourth, the charts referenced in SOF 31, SEC Exhibits 3-10, are not admissible for the reasons set forth in Alpine's Response to SOF 24.

**SEC'S SOF No. 32.**  1466 out of 1594 of the transactions reported in the SARs summarized in Exhibit 10 were cleared by Alpine for the accounts of just six customers, whom were connected to criminal or regulatory history involving securities or other financial fraud. Angotti Decl. ¶ 33. 702 of the Deficient SARs described deposits made for the account of "Customer A," which was tightly connected to an individual with regulatory history. Angotti Decl. ¶ 33.

**ALPINE'S RESPONSE TO SOF No. 32.**  Alpine disputes SOF 32 as vague, lacking in foundation and not supported by the cited source, and as based on an opinion by its expert that was not disclosed in expert report.

SOF 32 is vague, lacking in foundation and not supported by the cited source because no evidence is provided to identify who is what is meant by "connected to," what "criminal and regulatory history" the identified customers are purportedly connected, or how this information was determined.  The SEC's Exhibit 10 and 4, for example, identifies only 675 SARs in which Alpine purportedly failed to disclose criminal or regulatory history in the SAR narrative.

Further, this opinion is not contained in the Navigant Report, SEC Ex. 2, and therefore should be disregarded or struck.  Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure "requires that an expert's report contain, among other things, a complete statement of *all opinions* that witnesses will express and the basis and reasons for them."  *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 470 (S.D.N.Y. 2016) (emphasis added).  "Under Rule

37(c)(1), if a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.* "[T]he non-disclosing party has the burden to demonstrate that the failure to disclose was substantially justified or that the failure was harmless." *Id.*

"[E]xpert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)." *Advanced Analytics, Inc. v. Citigroup Global Markets, Inc.*, 301 F.R.D. 31, 36 (S.D.N.Y. 2014). "The duty to disclose information concerning expert testimony is intended to allow opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and, perhaps, arrange for expert testimony from other witnesses." *Id.* The Second Circuit Court of Appeals has identified four factors to be considered in determining whether an order of preclusion is appropriate where a party has failed to disclose an expert's opinion: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance. *Id.*

The SEC has offered no basis for failing to disclose this opinion in the original Navigant Report. Further, Alpine would be substantially prejudiced by consideration of this opinion because it was submitted for the first time in summary judgment. The Court should strike or disregard Paragraph 33 of the Angotti declaration and disregard SOF 32 on the basis that it is not supported.

**SEC'S SOF No. 33.**  Alpine did not state in the narrative section of its SARs that Alpine viewed the SARs to be voluntary. Alpine Dep. at 147[7-15].

**ALPINE'S RESPONSE TO SOF No. 33.**  Alpine does not dispute that it did not use the term "voluntary" in its SAR narratives, however, Alpine disputes SOF 32 on this basis that this is immaterial and that Alpine filed voluntary SARs is disputed by other evidence.

SOF 32 is immaterial because, as detailed by both the SEC's and Alpine's expert, the SAR regulation expressly allow for the filing of voluntary SARs, even when a filing is not required by law.  *See* Loew Expert Decl., at ¶ 175, Ex. 5, citing to SEC Expert Report, at 49 (SEC Ex. 2).  However, there is no statutory or regulatory directive that a filer distinguish between a SAR that must be reported or one has been reported voluntarily or to expressly provide that a SAR is being filed voluntarily.  *See* Loew Expert Decl., at ¶¶ 177-179, Ex. 5.  Nor is there any rule requiring firms that file voluntary SARs to justify their conclusion that the activity is not, in the firm's view, suspicious, or that the SAR may not actually be required.  *Id.* at ¶ 179.

Any contention in SOF 32 that Alpine did not file SARs that were voluntary, or not mandatory filings under the BSA, is also disputed by other evidence.  As set forth in Alpine's Response to SOF 25 and in Add'l SOF ¶¶ 60-75, there is significant evidence that Alpine had a practice of frequently filing SARs on transactions involving large deposits of low priced securities that it did not find suspicious within the meaning of the BSA, including testimony from Alpine, Ms. Farmer, Mr. Jones and Ms. Green, and by the over 200 SARs that Alpine filed that were on the SEC's original Table A, but which were below the $5,000 threshold and removed by Navigant from Exhibit 10.  Alpine refers the Court to Add'l SOF ¶¶ 60-75 for a

discussion of this evidence.  Additionally, Ms. Farmer testified that when Alpine used language

in the SAR narrative indicating "it is our policy" to file a SAR on a large deposit or low-priced

securities or with respect to a certain type of account, such language "indicate[s] that the SAR is

being filed because of that policy as opposed to a finding of suspiciousness."  *See* L. Farmer

Dep., at 216:15-25, Ex. 16.

> **SEC'S SOF No. 34.**  A large deposit of a low-priced security coupled with either
>
> suspicious red flags or larger patterns of SARs filed on the same accounts (and often both) gave
>
> Alpine reason to suspect that the transactions reported in the Deficient SARs involved criminal
>
> activity because a reasonable broker-dealer in similar circumstances would have suspected
>
> criminal activity involving the customer depositing the stock. Angotti Decl. ¶ 41.

> **ALPINE'S RESPONSE TO SOF No. 34.**  Alpine disputes SOF 34 as constituting a
>
> legal conclusion, rather than statement of fact, as conclusory and lacking foundation, and as
>
> disputed by other evidence.

First, SOF 34 constitutes a legal conclusion based on an ultimate issue in the case:

whether Alpine had a reason to suspect criminal activity on the transactions at issue on the SEC's

charts.  As stated in Alpine's Response to SOF 3, that the SEC cites to its expert's declaration in

support of this statement does not change its character or make it admissible.  *See In re Rezulin*,

309 F. Supp. 2d at 541.

Second, SOF 34 lacks admissible evidentiary support because it relies entirely upon

Paragraph 41 of the Angotti Declaration.  The cited paragraph of the Angotti Declaration merely

repeats the conclusory statement from SOF 34 without providing any foundational analysis or

support, and instead impermissibly relying instead entirely upon the expert's *ipsit dixit.  See*

Alpine's Response to SEC SOF 19 for authorities discussing inadmissibility of conclusory expert testimony.

Third, SOF 34 is disputed by other evidence.  As indicated in Alpine's Response to SOF 27-28, which are incorporated herein, both Alpine's expert and the SEC's expert, as well as guidance issued by the FFIEC, FinCEN and SEC, agree that the presence of red flags does not mean a transaction is suspicious, but merely triggers a duty to take a closer look at the transaction.  In the Rebuttal Report, the SEC's expert further provides numerous statements that dispute SOF 34.  *See* Alpine's Responses to SOF 27 and 28.

Finally, Paragraph 41 of the Angotti Declaration should be disregarded and/or struck by the Court because it employs an inadequate methodology and is not reliable.  *See Lynch v. Trek Bicycle Corp.*, 374 F. App'x 204, 206 (2d Cir. 2010) (stating that, to be reliable, expert testimony must be "grounded on sufficient facts or data," be "the product of reliable principles and methods," and the witness must have "applied the principles and methods reliably to the facts of the case"); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2010) (requiring these factors be satisfied for "each step in the analysis.").

As detailed by Alpine's expert, which is supported by an adequate foundation – including citations to FinCEN guidance, statements, her long experience as a FinCEN employee and other relevant evidence – "'[t]he cornerstone of the Bank Secrecy Act, suspicious activity reporting, requires financial institutions to make judgment calls,' and those judgment calls are to be based on all of the facts and circumstances of a transaction."  *See* Loew Expert Decl., ¶ 164, Ex. 5.  "With respect to Alpine, however, the SEC's expert witness has not offered any such examination of the facts and circumstances of any transaction applicable at the time Alpine

would have reviewed the transactions to determine whether to file a SAR." *Id.* at ¶ 182.

According to Alpine's expert, this failure "to do so is fundamentally inconsistent with the SAR

rule and makes the conclusion in this instance hollow and unsupportable." *Id.* Alpine's expert

discussed this methodological failing at length during her deposition, opining that reviewing the

SARs and support files is not sufficient to determining whether a SAR was required or

insufficient because it would require a review of Alpine's program as a whole, including

discussion with Alpine's compliance personnel who were making decisions on individual

transactions. Loew Dep., at 160:9-165:25, Ex. 82. Alpine also directs the Court to Alpine's

Add'l SOF ¶¶ 166-176 for additional facts regarding the inadequacy of the Navigant

methodology.

      **SEC'S SOF No. 35.** Exhibit 3 (also referred to as Exhibit A-1) shows 1,015 SARs that

did not include basic customer and suspicious information. Navigant created Exhibit 3 by

reviewing each SAR narrative to determine whether on its face, a SAR included all sufficient

pertinent information about the subject parties, the transactions, and other indications of what

Alpine knew, suspected, or had reason to suspect about the transaction in relation to the four

categories in the SAR Rule. Angotti Decl. ¶¶ 42-43.

      **ALPINE'S RESPONSE TO SOF No. 35.** Alpine disputes SOF 35 on several grounds.

      First, Alpine disputes SOF 35 on the basis that the summary chart, Exhibit 3, is not

admissible for the reasons set forth in Alpine's Response to SOF 24. In fact, Exhibit 3 is the one

of the worst offenders among the SEC's charts because the entire chart constitutes legal

argument by the SEC's expert that the SARs identified thereon are deficient on their face for

failure to include the so-called "5Ws." *See UPS Store, Inc v. Hagan*, No. 14CV1210, 2017 U.S.

Dist. LEXIS 121352, at *16 (S.D.N.Y. Aug. 2, 2017) (holding summary evidence prepared by an expert inadmissible because "it is suffused with argument"). The SEC has not provided a single SAR in support of summary judgment to allow the Court to even evaluate the SEC's or Navigant's summary legal conclusions in Exhibit 3.  Further, as indicated in Alpine's Response to SOF 24, the chart was prepared by the SEC's expert's assistants, not by the SEC's expert herself.  The SEC's expert only reviewed a sample of the transactions.  *See* Angotti Dep., at 138-144, Ex. 10.  The SEC has not attempted to qualify the Navigant assistants as experts, and they are not subject to cross-examination, precluding consideration or reliance on their legal conclusions that Alpine's SARs are deficient.  *See Scentsational Techs., LLC v. Pepsi, Inc*., No. 13-cv-8645 (KBF), 2018 U.S. Dist. LEXIS 24375, at *4-5 (S.D.N.Y. Apr. 18, 2018)  (stating the expert must be qualified as an expert in n the area in which he or she intends to testify).

Second, Exhibit 3 constitutes an impermissible legal conclusion on an ultimate issue in the case – whether the SARs thereon are deficient.  *See* Alpine's Response to SOF 3.

Third, SOF 35 is disputed by other evidence.  This assertion fail to account for the reasons Alpine actually filed these SARs, and what they were designed to report – Alpine's policy, in place during 2011-12, of filing SARs on large deposits of low-priced securities.  *See* Add'l SOF ¶¶ 60-75.  These were also not the only types of SARs Alpine filed during this period.  Where it saw something it actually found suspicious, it filed a different type of SAR, which were not included among the SARs cherry-picked by the SEC for this action.  *See* Add'l SOF ¶¶ 89(a)-(e) for samples of these SARs. Further, Alpine expert, upon reviewing the templates used in the SARs on Exhibit 3, concluded that they provided all of the required information.  *See* Loew Expert Decl., at ¶¶ 206-215, Ex. 5

**SEC'S SOF No. 36.**  Exhibit 4 (also referred to as Exhibit A-2) shows 675 SARs that omitted criminal or regulatory history of an individual or entity involved in the underlying transaction. Exhibit 4 was created by reviewing the supporting documents for indications of criminal or regulatory actions involving any of the subject parties, where such indications were not identified in the SAR narrative. Where appropriate, Exhibit 4 identifies the missing information about criminal or regulatory history, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 44-45.

**ALPINE'S RESPONSE TO SOF No. 36.**  Alpine disputes SOF 36 on the basis that the summary chart, Exhibit 4, is not admissible for the reasons set forth in Alpine's Response to SOF 24.  Alpine further directs the Court to Add'l SOF ¶¶ 179-188 (including subparagraphs) for specific additional errors and omissions in this summary chart that undermine its reliability and admissibility.

**SEC'S SOF No. 37.**  Exhibit 5 (also referred to as Exhibit A-3) shows 241 SARs that omitted evidence that the stock involved in the transaction was a shell or former shell company, or subject to suspension or other derogatory history. Exhibit 5 was created by reviewing supporting documents indicating shell company involvement or derogatory history as to the issuer. Where appropriate, Exhibit 5 identifies the missing information, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 46-47.

**ALPINE'S RESPONSE TO SOF No. 37.**  Alpine disputes SOF 37 on the basis that the summary chart, Exhibit 5, is not admissible for the reasons set forth in Alpine's Response to SOF 24.  Alpine further directs the Court to Add'l SOF ¶¶ 189-198 (including subparagraphs and the referenced chart) for specific additional errors and omissions in this summary chart that

undermine its reliability and admissibility.

**SEC'S SOF No. 38.**  Exhibit 6 (also referred to as Exhibit A-4) shows 55 SARs that omitted information about stock promotion history. Exhibit 6 was created by reviewing supporting documents indicating the existence of stock promotions and comparing them to the narrative section of related SARs. Where appropriate, Exhibit 6 identifies the missing information about stock promotional activity, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 48-49.

**ALPINE'S RESPONSE TO SOF No. 38.**  Alpine disputes SOF 38 on the basis that the summary chart, Exhibit 6, is not admissible for the reasons set forth in Alpine's Response to SOF 24.  Alpine further directs the Court to Add'l SOF ¶¶ 199-203 (including subparagraphs and the referenced chart) for specific additional errors and omissions in this summary chart that undermine its reliability and admissibility.

**SEC'S SOF No. 39.**  Exhibit 7 (also referred to as Exhibit A-5) shows 42 SARs that omitted critical information about problems with the issuers of securities. Exhibit 7 was created by reviewing supporting documents indicating the presence of unverified issuers and comparing them to the narrative section of related SARs. Where appropriate, Exhibit 7 identifies the missing information about unverified issuers, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶ 49.

**ALPINE'S RESPONSE TO SOF No. 39.**   Alpine disputes SOF 39 on the basis that the summary chart, Exhibit 7, is not admissible for the reasons set forth in Alpine's Response to SOF 24.  Alpine further directs the Court to Add'l SOF ¶¶ 204-207 (including subparagraphs and the

referenced chart) for specific additional errors and omissions in this summary chart that undermine its reliability and admissibility.

**SEC'S SOF No. 40.**  Exhibit 8 (also referred to as Exhibit A-6) shows 707 SARS that omitted low or nonexistent trading volume. To create Exhibit 8, Navigant identified stocks with low or nonexistent trading volume by identifying circumstances in which the reported deposit of a security was, according to the support file provided by Alpine, approximately 300% or more of that security's average daily trading volume, for the three months preceding that deposit. Where appropriate, Exhibit 8 identifies the missing information about low trading volume, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 50-51.

**ALPINE'S RESPONSE TO SOF No. 40.**  Alpine disputes SOF 40 on the basis that the summary chart, Exhibit 4, is not admissible for the reasons set forth in Alpine's Response to SOF 24.  Alpine further directs the Court to Add'l SOF ¶¶ 208-211 (including subparagraphs) for specific additional errors and omissions in this summary chart that undermine its reliability and admissibility.

**SEC'S SOF No. 41.**  Exhibit 9 (also referred to as Exhibit A-7) shows 298 SARs that omitted involvement in the reported transaction of a foreign individual or entity. Exhibit 9 was created by reviewing supporting documents indicating the existence of foreign involvement. Where appropriate, Exhibit 9 identifies the missing information about foreign involvement, together with the citation to the pertinent supporting documentation. Angotti Decl. ¶¶ 52.

**ALPINE'S RESPONSE TO SOF No. 41.**   Alpine disputes SOF 41 on the basis that the summary chart, Exhibit 9, is not admissible for the reasons set forth in Alpine's Response to SOF 24.  Alpine further directs the Court to Add'l SOF ¶¶ 212-215 (including subparagraphs) for

specific additional errors and omissions in this summary chart that undermine its reliability and admissibility.

### B. Unreported Liquidations

**SEC'S SOF No. 42.**  Exhibit 11 summarizes the "Unreported Liquidations" by grouping related sales and deposits together. Navigant created Exhibit 11 by arranging the sale information provided by the Commission and deposit information derived from SARs filed on deposits, separately, as to each customer and each security in chronological order. Navigant combined the tables by linking the deposits to subsequent liquidations of the same security, by the same customer, as identified in Alpine's blotter information. Each separate grouping of related transactions has been assigned a "group number" for reference purposes. A total of 1,242 groups appear in this Exhibit 11. SEC staff members reviewed the SAR narratives for information regarding the stated volume and value of each transaction and supplied that data to Navigant. Navigant reviewed a sample of this information to confirm its accuracy and included it in Exhibit 11. Angotti Decl. ¶ 54.

**ALPINE'S RESPONSE TO SOF No. 42.**  Alpine disputes the "groups" of deposits and liquidations created by Navigant for Exhibit 11 as lacking foundation, unreliable and as arbitrary and should be excluded or disregarded under F.R.E. 702, 403, as well as disputed by Alpine's expert.

Although not described as such, the "groups" created by Navigant are ostensibly an effort to identify the number of purported deposit-sale patterns to try to fit within the Court's ruling on

March 30, 2018.[10]  (*See* March 30, 2018 Opinion, at 66.) To the extent the SEC or its expert

maintains that the groupings it created of deposits and liquidations constitute *suspicious*

"patterns" that requires reporting in a SAR under the BSA, it is disputed.  Not only is such a

conclusion not supported by Ex. 11 or the SEC's other facts in support of this category (SOF 42-

47), but as observed by Alpine's expert, based on the FinCEN's definition of a "pattern" in the

adopting release, 67 Fed. Reg. 44,048, 44,053 (July 1, 2002):

> Here, to my knowledge, there is no allegation that each liquidation was part of a pattern
> of transactions, other than that it related to a deposit, which does not in and of itself make
> a pattern.  Indeed, one liquidation is not a pattern of transactions, as a pattern involves a
> series of transactions.  Moreover, if a SAR is filed on the deposit, the liquidation standing
> alone is not part of a series of transactions, and therefore a SAR is not required.   Indeed,
> without more, a pattern of activity in and of itself is not suspicious.

*See* Loew Expert Decl., at ¶ 247, Ex. 5.

Alpine also objects to the "groups" created by Navigant because Navigant provided no

foundation or rationale explaining how it created the groups or why it is appropriate to "group"

each sale identified in Exhibit 11 to a particular deposit SAR, i.e., how it determined they were

"related" and belonged in a group together. (*See* Angotti Decl., ¶ 54.)  It is completely

arbitrary.  If it is intended to group deposits and sales by the same customer of the same share

together on the basis that they are related, than a group consist of all deposits and sales of the

same stock ticker by the customer.  But as Exhibit 11 makes clear, what was done instead was to

create a separate group for each deposit SAR, even if the deposit and sales involve the same

customer and same stock ticker. The sole purpose of this is to artificially, and arbitrarily, increase

---

[10]   It is still unclear whether the SEC is proceeding on a pattern theory because the SEC ignores the "groups" in its
argument and claims Alpine was required to file a separate SAR on each sales transaction and is therefore liable for
3,568 (the number of sales transactions on Exhibit 11) violations of Rule 17a-8.  (SEC Motion, at 17.)  To the extent
this is the SEC's theory, and by all indications it is, the "groups" on Exhibit 11 are also disputed as irrelevant.

the number of "groups." Done correctly, the number of groups would fall from 1242 to a few hundred. (*See* Ex. 11.)

The arbitrariness of the groupings does not stop here. In many instances, Navigant grouped sales transactions with a deposit even though the sale transaction(s) happened weeks or months after the deposit, including sometimes over a year later.  (*See, e.g.,* SEC Ex. 11 at groups 4, 1207, 1220, 1221, 1224-27, 1233, 1236, 1237.) In other occasions, where there are multiple separate deposits and sales of the same share type by the same customer over time, Navigant has created separate groups, purportedly because  a new deposit was made and a new SAR was filed thereon, even though the first deposit was large enough to cover all of the shares sold in another group.  For example, in groups 860-862, the deposit in group 860 of approximately 500,000,000 shares was large enough to cover the number of shares sold in groups 861 and 862 as well.  In these circumstances, logic would dictate that there should be at best a single group, but Navigant has made them into three separate groups without any explanation, but ostensibly in an effort to artificially increase the number of groups at issue.  (*See* SEC Ex. 11, at groups 860-862; *see also* Angotti Decl., at ¶ 54.)  There are many other examples, including for example, groups 885-888, 1195-1196, 1241-1242.  In other yet circumstances, the amount of shares sold far exceeds the amount of shares deposited, but Navigant has made this into a separate group.  (*See, e.g.,* Ex. 12 groups 890, 904, 906, 959. 962, 996, 1203)  In still others, the sale in the group is actually before the date of the deposit.  *See*, *e.g.*, 1203, 1228-1232. These examples further add to confounding nature of the rationale employed in Exhibit 11 and demonstrate that the purpose was simply to increase the number of groups wherever possible.

Where no rationale is provided by the expert explaining the methodology or establishing

that it is reliable, the opinion should be rejected.  *See Granite Ridge Energy, LLC v. Allianz Global Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 390 (S.D.N.Y. 2013) (stating "proposed expert evidence must be 'the product of reliable principles and methods . . . reliably applied . . . to the facts of the case,'" and excluding expert opinion that "gave no rationale in its report for why the data" was a "reliable basis" for a calculation); *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (stating "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").  Alpine also directs the Court to its Responses to SOF 19 and 24 for additional authorities.  At the very least, there is a fact dispute over the number of purported deposit-sale groups at issue.

**SEC'S SOF No. 43.**  The information about sales in Exhibit 11 was provided to the Commission by Alpine. Declaration of L. James Lyman ¶¶ 12-13, attached hereto as Exhibit 15 ("Lyman Decl."). The documents summarized in Exhibit 11 are in Alpine's possession and can be made available to Alpine or the Court for examination, copying, or both. See Fed. R. Evid. 1006.

**ALPINE'S RESPONSE TO SOF No. 43.**  Alpine objects to SOF 43 on the basis that it relies on inadmissible evidence, the Declaration of L. James Lyman.  Lyman was not disclosed as a potential witness on the SEC's initial disclosures.  (*See* SEC Initial Disclosures and Supplemental Disclosures, Ex. 245.)  Rule 26(a)(1)(A) obligates a party, to disclose the identities of any witnesses "likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses. . . ."  "The purpose of the rule is to prevent the practice of sandbagging an opposing party with new evidence." *Haas v. Del. & Hudson Ry. Co.*, 282 Fed. App'x 84, 86 (2d Cir. 2008).

Under Rule 37(c)(1), a party's non-compliance with Rule 26 results in the preclusion of improperly disclosed witnesses, unless the Court finds that the non-compliance was "harmless."  The "sanction" of preclusion in Rule 37 for failing to disclose witnesses as required by Rules 26(a) and 26(e)(1) is "self-executing" and "automatic":

> The revision provides a *self-executing sanction* for failure to make a disclosure required by Rule 26(a), without need for a motion. Paragraph (1) prevents a party from using as evidence any witnesses or information that, without substantial justification, has not been disclosed as required by Rules 26(a) and 26(e)(1). This *automatic sanction* provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at trial, at a hearing, or on a motion, such as one under Rule 56.

Fed. R. Civ. P. 37 Advisory Committee Notes to 1993 Amendments (emphases added).

The SEC failed to disclose Mr. Lyman as a witness, or to subjects of information known to Mr. Lyman,  as required by Rule 26(a) and that failure is harmful to Alpine because it was unable to conduct any discovery regarding Mr. Lyman's testimony.  Despite this failure, Alpine nevertheless attempted to conduct discovery related to Mr. Lyman through a 30(b)(6) deposition of the SEC and a deposition of Mr. Lyman himself.  In response, the SEC objected and moved to quash the subpoenas and thwart Alpine's discovery efforts, without disclosing that it intended to make Lyman a key witness in this case and submit a declaration from Lyman as the primary support for its arguments on the both the "unreported liquidations," and "missing support files" allegations in this case.  *See* SEC SOF 42-44, and 53-60.  Based on the SEC's representations, the Court quashed the subpoenas and blocked discovery related to Mr. Lyman.  *See* Hearing Transc., at 5, Ex. 246; *see also* Letter Motion to Quash, Dkt. 97, and Court's grant, Dkt. 106.

By submitting the Lyman Declaration on summary judgment the SEC is attempting to do precisely what Rule 26(a) prohibits.  It is offering testimony from witness it never disclosed in Rule 26(a) disclosures and who it successfully shielded from the discovery process.  The SEC

made a calculated decision to block Mr. Lyman's involvement in this matter and it cannot now

unblock him when it serves the SEC's purposes.  Admitting the Lyman Declaration would

condone the SEC's sandbagging tactics and substantially prejudice Alpine ability to defend

against the Lyman Declaration and the exhibits that rely on his testimony. For these reasons,

Lyman's testimony in his declaration should therefore be disregarded and his Declaration should

be struck by the Court, and SOF 43 should be disregarded for lack of evidentiary support.

Alpine also lacks sufficient information to respond to SOF 43 because it was not

permitted to take Lyman's deposition.  Alpine does not dispute that it provided trade blotter

information to Lyman.  However, because Alpine was not permitted to depose Lyman, Alpine

has no way to test the veracity of the steps claims Lyman claimed he used in his declaration to

create Table B, on which Exhibit 11 is purportedly based.  *See* Lyman Decl., at ¶ 14.  The same

issue exists with respect to the steps Lyman purportedly took to look for Alpine's support files,

that are described in Paragraphs 5-12 of the Lyman Declaration, and are the entire basis for the

SEC's claim on the alleged missing SAR support files.  *See* SEC SOF 53-59. In the event the

Court does not strike the Lyman Declaration, attached hereto as Ex. 247 is a Declaration of

Counsel pursuant to Fed. R. Civ. P. 56(d) requesting the court deny or delay ruling on summary

judgment until Alpine has had an opportunity to depose Lyman.

**SEC'S SOF No. 44.**  Exhibit 11 contains 3,568 separate liquidation transactions grouped

with 1,667 deposits. Exhibit 11.

**ALPINE'S RESPONSE TO SOF No. 44.**  Alpine does not dispute that SOF 44

describes the SEC's Exhibit 11.  However, Alpine disputes the "groups" identified on Exhibit 11

on the bases set forth in Alpine's Response to SOF 42.

**SEC'S SOF No. 45.**  Alpine did not file SARs on the liquidations listed in Exhibit 11. Lyman Decl. ¶ 14; Alpine Securities Corporation's Response to SEC's First Set of Written Discovery at Responses to Request for Admission No. 2 at pp. 4-5, attached hereto as Exhibit 16 ("Alpine's First Discovery Responses").

**ALPINE'S RESPONSE TO SOF No. 45.**  Undisputed.

**SEC'S SOF No. 46.** In approximately 40% of the Unreported Liquidations, the liquidation happened so quickly that the stock was already liquidated before Alpine even filed a SAR on the deposit. See Exhibit 11.

**ALPINE'S RESPONSE TO SOF No. 46.**  Alpine disputes SOF 46 on the basis that it is conclusory and lacks foundation.  The SEC offers no foundation for how it calculated the 40% figure, and it is not readily apparent from Exhibit 11.  Because the SEC has not identified its method of calculating the 40% figure, there is no way for Alpine or the Court to check the veracity of the SEC's assertion, particularly in a chart as long and dense as Exhibit 11.

Moreover, there are immediate questions as to the SEC's methodology even from a cursory review of Exhibit 11.  For example, it is unclear whether the SEC included SARs filed the same day as the liquidation in the 40% figure.  Additionally, where the chart indicates that the first sale was before the SAR was filed, but there are multiple additional later liquidations, it is unclear whether the SEC's 40% figure includes just that first sale in the group that occurred before the SAR, or every sale in the group.  *See, e.g.*, SEC Ex. 11, groups 7 and 8.  This is also a significant issue where there are multiple deposits listed on the chart within a single group before the first sale.  For example, in group 1227, there was a deposit on March 27, 2012 for 10,000,000 shares (SAR filed April 10, 2012) and another deposit on May 24, 2012 (SAR filed June 14,

2012).  The first sale was June 6, 2012 for 500,000 shares.  *See* Ex. 11, at group 1227.  It is unclear whether the SEC counted this sale in its 40% calculation or not, even though it should not have because the shares sold would be from March deposit, on a first-in-first-out principle. Thus, the Court should strike or disregard SOF 46 for inadequate support.

Alpine also disputes the SEC's characterization of the sales transactions as "Unreported Liquidation" on the basis that it is argumentative insomuch as it presumes that Alpine had a duty to file SARs to report the sales transactions.  As demonstrated in the argument section of Alpine's Memorandum of Law in Opposition to the Summary Judgment, the SEC has failed to establish that Alpine had any such duty as a matter of law.

**SEC'S SOF No. 47.**  Alpine's AML process to determine whether to file a SAR focused on deposits. Alpine did not routinely check potential sales for related deposits when clearing the sales for customers because, in Alpine's view, deposits are "somewhat synonymous" with sales because customers do not "park" their deposits in Alpine's "coffers" and instead sell them "as soon as possible." Alpine Dep. at 174[6]-176[5]; see also 179[1-11]; Jones Dep. at 78[19]-80[1].

**ALPINE'S RESPONSE TO SOF No. 47.**  Alpine disputes SOF 47 on the basis that it ignores additional relevant evidence establishing that Alpine reviews every sale transaction for signs of suspicious trading activity, generally through employees in the market surveillance department within the compliance department.   Alpine directs the Court to Add'l SOF ¶ 227 for a detailed discussion and citations to testimony on this issue.   In further response to SOF 47, Alpine notes that Ms. Farmer's testimony is instructive on Alpine's process with respect to AML review of sales:

> Q:  How did Alpine evaluate whether a SAR should be filed in connection with sales of stock?

A.  We would look at the – evaluate the history of the client, consult with the introducing broker-dealers to the extent that it was one of their clients to assess whether the activity was – whether it deviated from what we knew about that particular client.

Q   Okay.

A   And to the extent that it did, we would file a SAR.

\*        \*        \*

Q   Did Alpine also look at the trading activity that was occurring in connection with liquidations of stock?  Would they look at the pattern of trading activity occurring in the marketplace?

A   We would.

Q   Okay.  And who – who handled that job?

A.  That was our surveillance. We had a surveillance analyst within the – within the compliance department.

Q   Okay.  And what was he looking for, if you know?

A   He was looking for really, you know, movement in the market, looking for activity that moved the market in a particular direction.

Q   Okay.  So he's looking for indicators that there is – is some kind of improper conduct or manipulation occurring in the market?

A   That is correct.

Q   And if a liquidation of stock was occurring and those indicators were present, would that trigger the filing of a SAR?

A   That would trigger a referral for – for additional review.

Q.   Okay. And who did that referral go to?

A   That would go to the AML officer or the designee.

*See, e.g.*, L. Farmer Dep., at 85:22-87:15, Ex. 16.  Some examples of SARs filed by Alpine on

trading activity that it believes was potentially suspicious are identified in Add'l SOF ¶¶ 230(a)-

(e).

Further, the cited pages of Mr. Jones deposition do not support SOF 47.  Mr. Jones

testified that the AML department looks at the blotter for potentially suspicious trading activity,

i.e., manipulative trading, matched trading and wash sales.  *See* R. Jones Dep., at 78:6-18, Ex.

15.  Also, Mr. Jones testified, for the period he was AML Officer, he would know whether a

SAR was filed on a deposit when he was reviewing sales, but that he could not recall specific

instances during his deposition.  *Id.*, at 78:19-80:1, Ex. 15.  This is consistent with Alpine's

testimony on the question of whether there was a procedure or control in place for "someone

reviewing a potential sale to know whether a SAR was filed on a related deposit in the recent

time span":

> The AML officer would know.  I mean all those things are – they are indeed, you know,
> so they can sit there and see when they go to file a SAR if it's on a particular security or a
> particular account or a particular account number or a date range.  I mean there's six or
> seven different indexing fields that they would know that a SAR was filed for that
> particular stock for that particular client. They could look at it and see why. Generally
> they would have approved the filing.

*See* Alpine Dep., at 173:11-174:2, Ex. 3.

Finally, as set forth by Alpine's expert:

> it is not the case, based on my experience, that every liquidation following a deposit is
> necessarily suspicious.  Of note, it is relatively common in the markets associated with
> this case that liquidations of securities follow deposits of "low-priced" securities,
> including those in the form of physical certificates, and that fact alone is not *per se*
> suspicious.  Consistent with the relevant guidance, courts and regulators need to
> understand the facts and circumstances surrounding the liquidations to determine whether
> the liquidation is, in fact, potentially suspicious.

Loew Expert Decl., at ¶ 244, Ex. 5.  Alpine's expert also noted, based on her experience, that

requiring SARs to be filed on all sales because a SAR was filed on a deposit  is overkill,

requiring firms to over-paper the SAR database, making the data therein more difficult to parse

through and less useful for law enforcement and regulatory authorities.  *Id.* at ¶ 245, Ex. 5.

### C.  Late-Filed SARs

**SEC'S SOF No. 48.**  Exhibit 12 to the Motion is a summary of dates of SARs filed by

Alpine and the dates of the deposits reported in the SARs. Exhibit 12 also details the number of

days between the deposit and the SAR filing, and the number of days after the 30-day time

period permitted for filing. Exhibit 12 also identifies each SAR by Bates number. Angotti Decl.

¶ 56.  These documents are in Alpine's possession and can be made available to Alpine or the

Court for examination, copying, or both.  *See* Fed. R. Evid. 1006.

**ALPINE'S RESPONSE TO SOF No. 48.**  Alpine does not dispute that SOF 48

describes the SEC's Exhibit 12.  However, Alpine disputes the SEC's attempt to use a summary

chart to present its legal argument that the SARs were "late," i.e., "number of days after the 30-

day time period permitted for filing."

As set forth in Alpine's Response to SOF 24, a summary chart cannot be used as a

vehicle to present legal argument.  *See, e.g.*, *UPS Store, Inc. v. Hagan*, No. 14CV1210, 2017

U.S. Dist. LEXIS 121352, at *16 (S.D.N.Y. Aug. 2, 2017) (holding summary evidence prepared

by an expert inadmissible because "it is suffused with argument"); *United States v. Saunders*,

No. 12-141, 2013 U.S. Dist. LEXIS 83297, at *17 (E.D. La. June 13, 2013) ("Rule 1006 does not

allow the Government to rely on summary charts to assume facts of the alleged offense that the

Government is required to prove.").  The column in Exhibit 12, entitled "Number of Days Late,"

violates these principles because is pure legal argument, i.e., that the SARs were late. There is also no foundation or analysis provided by the SEC expert, who prepared Exhibit 12, to support the categorization of these SARs as late.  The sole paragraph in the Angotti Declaration addressing the alleged untimely SARs at issue simply states: "Exhibit 12 summarizes the dates that SARs were filed and the dates of the underlying transactions as stated in the SAR narratives."  *See* Angotti Decl., ¶ 56, SEC's Ex. 1.  Thus, not only does describing the SARs as "late" constitute a legal conclusion, but it is also unsupported.  Thus, Ex. 12 should be struck or disregarded in whole or in part.  Notably, nothing has been provided by the SEC in support of summary judgment on these SARs besides this chart to support its position that any of the SARs thereon were late.  *See* SEC SOF 49-52.

     The remaining "facts" provided by the SEC in this category (SOF 49-52) discuss only Alpine's lookback of certain transactions, during early 2012.  However, this does not even cover the majority of the SARs on Exhibit 12.  Specifically, lines 118-251 on Exhibit 12 are alleged to be anywhere from a matter of days to a couple of weeks late, based solely on the transaction date.  *See* SEC Ex. 12.  The SEC provides no evidence that these SARs were filed more than 30 days after the date the determination was made to file the SAR to support the conclusion in Exhibit 12 that these SARs are "late."  Any such inference is further disputed because it takes time, frequently more than 30 days, to review a transaction for a SAR filing decision.  *See* Loew Expert Decl., at ¶ 251, Ex. 5.  At Alpine specifically, depending the circumstances and nature of the transaction, it can take anywhere from a day to a matter of weeks for Alpine complete its review of the transaction for Section 5 compliance and AML concerns, depending on the Section 5 and AML issues present, the facts and circumstances of the deposit, the timeframe and

availability of personnel in the legal department or the AML Officer for escalation of issues, and general workflow issues of completing work. *See* Add'l SOF ¶ 237. Alpine directs the Court to Add'l SOF ¶ 27-59, 118-135 for a detailed discussion of Alpine's Section 5 and AML process in further response to SOF 48.

Alpine also directs the Court to its Memorandum of Law in Opposition to Summary Judgment in response to the SEC's legal argument that the SARs were "late."

**SEC'S SOF No. 49.**  In the spring of 2012, Alpine's AML Officer, Randall Jones, reviewed a set of deposits for which Alpine filed no SAR. Alpine engaged in this so-called "lookback" because it determined that a former employee may not have been filing SARs on suspicious transactions and the AML Officer and his team determined to "have this lookback to determine whether I found anything out of these depositions to be suspicious. If I did, then to file a SAR." Deposition of Randall Jones at 31[11]-32[14]; 33[14-23].

**ALPINE'S RESPONSE TO SOF No. 49.**  Alpine disputes the statement in SOF 49 as not supported by the cited sources and as disputed by other evidence.

Mr. Jones did not testify that a former employee "may not have been filing SARs on suspicious transactions . . . ."  SOF 49 (Emphasis added).  Mr. Jones testified simply that, for a period of time, that the former Alpine employee did not file SARs; he did not testify that the former Alpine employee determined they were suspicious and still did not file them.  *See* R. Jones Dep., at 31:11-17, Ex. 15.  To the contrary, Mr. Jones testified that it was his understanding that the former Alpine employee did not file SARs because she changed her criteria for determining whether activity on large deposits of low-priced securities was suspicious.  (Jones Dep., at 33:9-15, Ex. 15.  The former Alpine employee's decision not to file

the SARs came at the heels of comments from FINRA that Alpine was filing too many SARs, which Alpine explained in a response to a FINRA examination letter.  *See* L. Farmer Dep., at 53-21-54:20, Ex. 16; *see also* Alpine's Response to FINRA Examination Letter, at 6, October 24, 2012, attached as Ex. 21.

As indicated, when Alpine became aware that no SARs were being filed, it conducted a lookback of these transactions, which included large deposits of low priced securities.  *See* R. Jones Decl., at ¶ 12, Ex. 205.  Mr. Jones testified that, while he did not find any transactions during the lookback that the former Alpine employee had identified as suspicious, he determined to prepare and file SARs on the large-deposits of low priced securities transactions, in light of FINRA's comments, even though he did not necessarily agree that large deposits of low-priced securities were suspicious within the meaning of the regulation, and filed the SARs within 30 days of this determination.  *See* R. Jones Decl., at ¶ 15, Ex. 205.  Because Mr. Jones did not conclude the transactions were suspicious within the meaning of the BSA, he did not identify the transactions as "suspicious" in the narratives of the SARs filed as a result of the lookback.  *Id.* at ¶ 18.

Filing SARs on such transactions, even though Alpine did not view them as suspicious, was consistent with Alpine's general practice and policy at the time.  *See* Add'l SOF ¶¶ 60-75.  Ms. Farmer confirmed, from the investigation she conducted to respond to FINRA's examination report, both this tension and Alpine's policy and practice to during this period to file SARs on large deposits of low-priced securities even though Alpine did not find them suspicious.  *See* L. Farmer Dep., at 51:6-55:4, Ex. 16.  Ms. Farmer also confirmed that the SARs filed by Alpine as a result of the lookback were filed because Alpine understood regulators wanted to see those kinds of deposit filings, not because they were predicated on a determination that the transactions

were suspicious.  *Id.*, at 55:23-57:1, at Ex. 16

**SEC'S SOF No. 50.**  During this lookback review, Mr. Jones reviewed documents related to a deposit in a packet that had been assembled at the time of deposit. Jones Dep. at 35[4-14]; 35[25]-36[25]. When determining whether to file a SAR during the lookback, Alpine relied only on information available at the time of the deposit. Jones Dep. at 43[1]-45[4].

**ALPINE'S RESPONSE TO SOF No. 50.**  Alpine disputes SOF 50 as not being supported by the cited source and as disputed by other evidence.  Mr. Jones did not testify that he relied only on the deposit packet in reviewing the transactions during the lookback period. Rather, he testified that while the packets would have typically been assembled at the time they came into Alpine, he did not remember on the specific transactions he was questioned about during the deposition, as they were six years old.  *See* R. Jones Dep., at 34:22-36:25, 43:1-21, 45:5-17, Ex. 15.  Mr. Jones also testified that, during the lookback, he used the same AML process that they used to evaluate other transactions for SAR filings, which included reviewing a "laundry list" of information, including, *inter alia*, the deposit packets, and OTC websites (*id.* at 14:25-15:14; 20:15-22, 34:22-35:3), and that additional matters may have been reviewed in connection with the lookback, but he did not remember with respect to the transactions he was questioned about.  *Id.*, at 43:9-21.

Alpine also directs the Court to its Response to SOF 48 and Add'l SOF ¶¶ 27-59, 118-135 for a detailed discussion of Alpine's Section 5 and AML process during the relevant period in further response to SOF 50.

**SEC'S SOF No. 51.**  In the narrative section of some of the SARs filed as a result of the lookback, Alpine stated that the deposit occurred over a range of dates. For example, Exhibit 37

to Mr. Jones's deposition was a SAR filed by Alpine in which the narrative section stated that the
deposit occurred "[o]n or around 12-8-2011 to 5-4-2012." Jones Dep. at 39[9]-40[10]. Alpine
used date ranges for the deposit not because the deposit took five months, but because the
deposit occurred on the first date and Alpine determined that the deposit was suspicious on the
second date. Id. at 44[5]-45[4].

**ALPINE'S RESPONSE TO SOF No. 51.**   Undisputed.  However, Alpine also directs
the Court to Add'l SOF 234-248 for additional evidence regarding the lookback, and the SARs
filed as a result thereof, in response to SOF 51.

**SEC'S SOF No. 52.**   According to Alpine's AML Officer at the time, using a date range
to describe when the deposit occurred was the "open and honest" way to explain that Alpine
received the information about a deposit on the first date and determined it was suspicious on the
second date. Jones Dep. at 53[9-24]. For these SARs, Alpine made the decision that the deposit
was suspicious on the date it filed the SAR. Jones Dep. at 51[5]-52[3] ("The date I found it
suspicious would have been the date that I filed the SAR….[the date Alpine found the
information to be suspicious] would have been the date that I signed the SAR.").

**ALPINE'S RESPONSE TO SOF No. 52.**   Undisputed. However, Alpine also directs
the Court to Add'l SOF 234-248 for additional evidence regarding the lookback, and the SARs
filed as a result thereof, in response to SOF 52.

### D.  Missing Support Documents

**SEC'S SOF No. 53.**   Exhibit 17 lists 496 SARs with "Missing Support Documents."
Lyman Decl. ¶ 9.  These are SARs for which the Commission requested support documents from
Alpine and for which the Commission has searched multiple times and found no evidence of

support files produced in 2016. Lyman Decl. ¶¶ 9-11. The SARs listed in Exhibit 17 are documents in Alpine's possession and can be made available to Alpine or the Court for examination, copying, or both. See Fed. R. Evid. 1006.

**ALPINE'S RESPONSE TO SOF No. 53.** Alpine disputes and objects to SOF 53 on multiple grounds, and asks the Court to strike or disregard both Lyman Declaration and Exhibit 17.

First, Alpine disputes the SEC's characterization of Exhibit 17 as identifying "Missing Support Documents." This is an attempt by the SEC to link this claim to the claim it actually brought: that Alpine did not maintain SAR support files for the 1,249 SARs originally listed on the SEC's Table E. *See* SEC's Complaint, ¶¶ 43, 46 [dkt. 1]; *see also* SEC's Table E, attached hereto as Ex. 248. The SEC has provided no evidence that any of the documents identified on Exhibit 17 are missing or that it does not have them. Alpine provided SAR support files for the SARs listed on Table E to the SEC during this action and, notably, the SEC and its expert, Navigant, has used a number of them to compile its Exhibits 3-10 to identify red flags in support of its argument that Alpine's SAR narratives are deficient. Every document identified by the Bates Label "ALPINE-LITXXXXXX" on the Navigant charts was a document produced by Alpine during discovery in this case. There are hundreds of examples.

Second, the evidence establishes that Alpine compiled and produced the SAR support files at issue in 2016 to the SEC's subpoena and Lyman's requests. Erin Green (formerly Erin Zipprich), who is Alpine's current AML Officer and served as a compliance or AML analyst for the majority of the relevant period in this case, testified that during early 2016, she was involved in copying Alpine's supporting files in response to the SEC's rolling requests for such files, and

that she helped produce all of the supporting files the SEC requested.  *See* E. Zipprich Decl., at

¶ 40, Ex. 1.  Ms. Green further testified that after completing the production of supporting files

pursuant to the SEC's requests, she received a spreadsheet that she understood came from the

SEC.  The spreadsheet identified support files that the SEC claimed it could not locate in

Alpine's production.  *Id.* at ¶ 41.  From her review of Table E, she believes that it identified the

same files on the spreadsheet.  *Id.* at ¶ 43.  Ms. Green testified that she then again copied the

supporting files listed on the SEC's spreadsheet for production to the SEC, and made them

available to Alpine's former counsel, and believes that they were produced.  *Id.* at ¶¶ 42, 44-45.

During her deposition, Mrs. Green confirmed that she pulled the SAR support files from

Alpine's document management software multiple times: first, in response to the SEC's

subpoena, and again when she received the list of allegedly missing support files that Lyman sent

Alpine's counsel in August of 2016, referenced at page 7(e) the Lyman's declaration.  (E. Green

Dep., at 135:12-138:21, Ex. 2.)

    Importantly, Lyman's own declaration confirms Ms. Green's testimony and further

disputes the overarching contention in SOF 53-60 that Alpine did not produce the SAR support

files in 2016.  Lyman admits that Alpine produced supporting files in several different traunches

in 2016.  (Lyman Decl., at ¶¶ 5, 7(e)-(h))  Lyman describes the steps that he, and individuals

working at his "direction and supervision," undertook between May and November 2016 to

search for support files from Alpine's 2016 production:  (a) searching by "Filing Name," which

included the customer name, date of the deposit, and ticker symbol," which located several SAR

support files; and (b) an alternative search for "documents containing both the ticker symbol and

the customer name or account number," which located several additional SAR support files.  (*Id.*

at ¶ 7(a)-(c).) Lyman then claims he created Table E, produced by the SEC in September of 2017, from the support files he could not locate during these searches.  *Id.,* at ¶¶ 6-7.

However, the SEC's original Table E alleged there were 1,249 missing support files. *See* SEC Table E, Ex. 248 hereto.  The SEC's current Exhibit 17, however, only identifies 496 SARs for which support files are purportedly missing.  Thus, when conducting the search of the files Alpine produced in 2016 in anticipation of the instant summary judgment motion, Lyman somehow located over 750 SAR support files that the SEC previously claimed were missing.  Moreover, Lyman claims that he located the all of these SAR support files in the new search only by searching by "Filing Name," but does not indicate that he made any effort to use the alternative search described above that yielded several additional hits the first time through. *See* Lyman Decl., ¶ 9(a).  It is unknown how many additional documents would be found if the additional search would have been performed.  The fact that Lyman located so many support files from Alpine's 2016 production that the SEC previously claims were not produced, based on a more cursory search, further disputes SOF 53.  Lyman's attempts to explain the discrepancy in his giving credit to Alpine for files in which some support document was produced. *See* Lyman Decl., at ¶ 7.  The SEC now admits that Alpine produced support files in 2016 which it formerly claimed Alpine did not maintain at all, and thus Lyman's explanation only highlights the existence of fact disputes on this issue.

Third, the Lyman Declaration and Exhibit 17 should be struck or disregarded by the Court for the reasons stated in Alpine's Response to SOF 43, i.e., because Lyman is the only witness offered in support of this claim, and he was not identified as a witness by the SEC and Alpine was not permitted to depose him.  Thus, Alpine has not had an opportunity to test the

veracity of his search, which is made more compelling by the fact that the number of purportedly missing support files has changed significantly based upon further searches by Lyman. Alternatively, the Court should defer or deny summary judgment on this claim until Alpine has had a chance to depose Lyman.

Finally, this fact is immaterial as well as disputed. As indicated, the SEC's allegation on this issue was that Alpine violated Rule 17a-8 by failing to make, keep or retain SAR support files for the 1,249 SARs listed on Table E.  *See* SEC's Complaint, at ¶¶ 43, 46, Dkt. 1. A claim for an alleged failure to produce SAR support files when requested is not actionable under Rule 17a-8 because it is not a "reporting, recordkeeping, and record retention requirement[] of chapter X of title 31 of the Code of Federal Regulations."  240 C.F.R. § 240.17a-8.  Rather, a claim for a claim for failure to produce records falls under Rule 17a-4(j), which provides:

> Every member, broker and dealer subject to this section shall furnish promptly to a representative of the Commission legible, true, complete, and current copies of those records of the member, broker or dealer that are required to be preserved under this section, or any other records of the member, broker or dealer subject to examination under section 17(b) of the Act ( 15 U.S.C. 78q(b)) that are requested by the representative of the Commission.

17 C.F.R. § 240.17a-4(j).  The SEC's Wells Notice to Alpine prior to filing this action makes clear that an alleged failure to produce support files does not fall under Rule 17a-8, by stating that the contemplated enforcement action against Alpine would allege violations of Rule 17a-8 for purported inadequate narratives, failure to file SARs on liquidations and filing SARs late, and that Alpine violated "Rules 17a-3 and 17a-4 . . . by failing to make and keep and/or by failing to promptly provide to the [SEC] certain books and records relating to its business."  *See* SEC's Wells Notice to Alpine, Ex. 249.  Thus, because the SEC brought no claim under Rules 17a-3 or

17a-4 against Alpine, SOF 53 is also immaterial to the extent it is based on an alleged failure to produce.

**SEC'S SOF No. 54.**  The Commission requested the Missing Support Documents, among other things, in an investigatory subpoena served in June 2015. Lyman Decl. ¶¶ 4-5.

**ALPINE'S RESPONSE TO SOF No. 54.**  Alpine does not Dispute SOF 54, but directs the Court to its response to SOF 53.

**SEC'S SOF No. 55.**  The Commission also requested the documents by emails of January 14, February 19, and March 8, and August 8, 2016. Lyman Decl. 5.

**ALPINE'S RESPONSE TO SOF No. 55.**  Alpine does not Dispute SOF 55, but directs the Court to its response to SOF 55.

**SEC'S SOF No. 56.**  The Commission searched for them several times and requested them several times. Lyman Decl. ¶¶ 6-7.

**ALPINE'S RESPONSE TO SOF No. 56.**  Alpine disputes SOF 56 on the bases set forth in its Response to SOF 53.

**SEC'S SOF No. 57.**  Alpine's counsel produced some supporting documents, but failed to produce many other. On November 15, counsel for Alpine explained during a telephone call that some missing support documents "simply don't exist" and that Alpine was trying to gather and organize others. Lyman Decl. ¶ 8.

**ALPINE'S RESPONSE TO SOF No. 57.**  Alpine disputes SOF 57 on the basis that the alleged conversation with Alpine's former counsel, who is not even identified, is immaterial.  As detailed in Alpine's Response to SOF 53, regardless of this purported conversation, the SEC has through a new, more cursory, search, located at least 750 support files from Alpine's 2016

production that it previously claimed were omitted.  Further, this contention by Lyman further highlights the necessity of allowing Alpine to take Lyman's deposition in advance of trial.

**SEC'S SOF No. 58.**  Alpine failed to identify any of the Missing Support Documents by Bates number or other means in its discovery responses served on November 17, 2017. Ex. 16 at Responses to Interrogatory 4 on p. 10 and Request for Production No. 2 at p. 13.

**ALPINE'S RESPONSE TO SOF No. 58.**  Alpine disputed SOF 58 on the basis that it mischaracterizes both the Interrogatory and Request for Production, and Alpine's responses thereto.  In these discovery requests, the SEC asked Alpine to produce the support files on Table E.  *See* SEC's Ex 16, Responses to Interrogatory 4, at 10; Response to Request for Production No. 2, at 13.  As the SEC knows, Alpine reproduced the SAR support files on Table E, and placed new bates numbers on the production, in response to these discovery requests.

**SEC'S SOF No. 59.**  Alpine lacks the knowledge whether its counsel actually produced the Missing Support Documents to the Commission. Alpine Dep. at 186[6]-187[6]. Similarly, the Alpine employee who stated in a declaration in support of Alpine's opposition to the Partial Motion that "I believe that these files have been previously produced to the SEC….I have again copied the supporting files of the SARs listed on Table E and made them available to Alpine's legal counsel," Doc. No. 88-1 ¶¶ 44-45, later testified that, in fact, she has no personal knowledge that the documents were produced to the Commission. Deposition of Erin Green at 137[17-20]; 139[24]-140[2]; 146[9-23], attached hereto as Exhibit 18.

**ALPINE'S RESPONSE TO SOF No. 59.**  Alpine disputes SOF 59 on the basis that it is immaterial.  As detailed in Alpine's Response to SOF 53, Ms. Green testified that she compiled and copied the documents on multiple occasions in 2016, and made them available to Alpine's

former counsel, specifically for production to the SEC.  It is nonsensical that, having gone

through this effort, they were not produced.  More importantly, as indicated, the SEC confirms

that the documents were *in fact* produced because it admits it has located, through a new, more

cursory, search, at least 750 support files from Alpine's 2016 production that it previously

claimed were omitted.  *See* Alpine's Response to SOF 53.

**SEC'S SOF No. 60.**  The Commission served an interrogatory asking Alpine to identify

by Bates number each document Alpine contends is "supporting documentation" within the

meaning of 31 C.F.R. § 1023.320(d) for each of the SARs identified by the Commission as

missing support files. In its responses served on March 28, 2018, Alpine failed to identify any of

the Missing Documents by Bates number or otherwise. Alpine Securities Corporation's

Response to SEC's Second Set of Written Discovery at Responses to Interrogatory Nos. 9-10 at

pp. 4-5 & Response to Request for Production No. 5 at p. 6, attached hereto as Exhibit 19.

**ALPINE'S RESPONSE TO SOF No. 60.**  Alpine disputes the SEC's characterization

of the discovery requests and Alpine's responses thereto in SOF 60.  The SEC asked Alpine to

identify the Bates Label of the documents it contends is supporting documentation.  *See*

Interrogatory 9, SEC's Ex. 19.  In response, and subject to its objections, Alpine identified the

Bates Label range of the documents in produced in response to the SEC's discovery requests of

the SARs on the SEC's Table E.  *See* Alpine's Response to Interrogatory No. 10, at 5, SEC's Ex.

19.  Alpine further directs the Court to its Response to SOF 53 in disputing SOF 60.

## II.   ALPINE'S ADDITIONAL STATEMENT OF MATERIAL FACTS

Alpine, by and through undersigned counsel, pursuant to Local Rule 56.1, hereby submits this Additional Statement of Material Facts ("Add'l SOF") in Support of its Memorandum in Opposition to the SEC's Motion for Summary Judgment.

### Table of Contents of Statement of Facts

Part 1 – Background of Alpine

    I.    Alpine's Background and Its Role as a Clearing Firm ..........................................88

    II.    Overview of Alpine's Written AML Program Requirements................................96

    III.    Overview of Alpine's AML Review Process and Assessment of Red Flags ........99

    IV.    Voluntary and Template SAR Filings.................................................................113

    V.    Ongoing Improvements to Alpine's AML Program ...........................................122

    VI.    Alpine's AML Program ......................................................................................135

    VII.    Alpine's Sec. 5 Review.......................................................................................138

Part 2 – SEC's Allegations

    I.    Microcap SAR Determinations...........................................................................142

    II.    Purpose of SARs.................................................................................................144

    III.    Purpose of Red Flags ..........................................................................................147

    IV.    SAR Filing Requirements ...................................................................................148

    V.    SAR Content Requirements................................................................................150

    VI.    Deficiencies in Navigant's Presentation ............................................................153

    VII.    Alleged Facially Deficient SARs (Table A)

        A.    Basic Customer Information ...................................................................161

B.      Criminal or Regulatory History ...............................................................168

C.      Involvement of a Shell Company or Derogatory History of a Stock.......180

D.      Stock Promotion.....................................................................................221

E.      Unverified Issuer....................................................................................234

F.      Low Trading Volume ..............................................................................242

G.      Foreign Actor or Jurisdiction ................................................................249

VIII.   Alleged Failure to File SARs on Liquidations (Table B) ....................................253

IX.     Alleged Late Filed SARs (Tables C & D) ............................................................263

X.      Alleged Failure to Maintain Support Files (Table E) ...........................................273

XI.     Overview of Errors and Irregularities in the SEC's Tables .................................274

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
| --- | --- |
| 1 | E. Zipprich Dec. |
| 2 | E. Green Dep. |
| 3 | Alpine Dep. |
| 4 | T. Groskreutz On the Record |
| 5 | Loew Expert Decl. |
| 6 | Santangelo, Betty & Davis, Harry, *Broker Dealer Regulation* |
| 7 | Updated Small Firm Template (Jan. 1, 2010) |
| 8 | SCA Fully Disclosed Clearing Agreement, Feb. 26 2009 |
| 9 | Irving M. Einhorn, Opinion Letter |
| 10 | Angotti Dep. |
| 11 | NASD Notice 02-21 |
| 12 | Alpine WSP April 11, 2013 |
| 13 | Alpine WSP August 29, 2014 |
| 14 | Alpine WSP October 1, 2015 |
| 15 | R. Jones Dep. |
| 16 | L. Farmer Dep. |
| 17 | Intentionally Omitted |
| 18 | Intentionally Omitted |
| 19 | Intentionally Omitted |
| 20 | FINRA's Report of Examination, dated September 28, 2012 |
| 21 | Alpine's Response to FINRA's Report of Examination, dated October 24, 2012 |
| 22 | SAR, ███████████ 02.28.11 |
| 23 | SAR, ██████████ 08132012 |
| 24 | SAR, ██████████ 082712 |
| 25 | SAR, ██████████ 08292012 |
| 26 | SAR, █████████ 020111 |
| 27 | SAR, ███████████████ S071612 |
| 28 | SAR, █████████ 08072012 |
| 29 | SAR, ███████████ 08202012 |
| 30 | SAR, █████████████ 082312 |
| 31 | SAR, █████████ 020111 |
| 32 | SAR, ██████████ 08212012 |
| 33 | SAR, █████████ 07172012 |
| 34 | SAR, ██████████ 08302012 |

## EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
| --- | --- |
| 35 | SAR, ███████████ 022811 |
| 36 | SAR, ███████████████ 0712012 |
| 37 | SAR, █████████ 02.23.11 |
| 38 | SAR, ████████ 08242012 |
| 39 | SAR, ████████████████████ 081712 |
| 40 | SAR, ████████ 08292012 |
| 41 | SAR, ████████ 08162012 |
| 42 | SAR, ████ 08302012 |
| 43 | SAR, ██████ 020111 |
| 44 | SAR, ████████ 08202012 |
| 45 | SAR, ████████████ 08302012 |
| 46 | SAR, ██████████ 071012 |
| 47 | SAR, ██████ 08092012 |
| 48 | SAR, ████████ 8232012 |
| 49 | SAR, ██████ 082712 |
| 50 | SAR, ████████ 08202012 |
| 51 | SAR, ███████████ 08312012 |
| 52 | SAR, ██████ 07132012 |
| 53 | SAR, ████████████ 06182012 |
| 54 | SAR, ████ 08062012 |
| 55 | Exhibit A with Chart, Subcategory Quarterly |
| 56 | SAR, ████ 080814 |
| 57 | SAR, ██████ 091014 |
| 58 | SAR, ██ 092614 |
| 59 | SAR, ██████ 060514 |
| 60 | SAR, ████████ 0301-070813 |
| 61 | SAR, ████ 061814 |
| 62 | SAR, ████████ 031314 |
| 63 | SAR, ███████ 052314 |
| 64 | SEC's Expert's Table A-1 |
| 65 | OCIE's Examination Report, dated April 9, 2015 |
| 66 | Alpine's Response to OCIE's Examination Report, dated May 20, 2015 |
| 67 | R. Jones Supp. Decl. |
| 68 | Example of a Checklist |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
| --- | --- |
| 69 | NASD Notice 02-47 |
| 70 | FinCEN Guidance (FIN-2006-G013), October 4, 2006 |
| 71 | FinCEN Form 111, SAR BD Form |
| 72 | Beverly E. Loew Decl. |
| 73 | Intentionally Ommitted |
| 74 | SAR, No. 127 |
| 75 | SAR, No. 745 |
| 76 | SAR, No. 171 |
| 77 | SAR, No. 175 |
| 78 | SAR, No. 20 |
| 79 | SAR, No. 665 |
| 80 | SAR, No. 1834 |
| 81 | SAR, No. 1823 |
| 82 | Loew Dep |
| 83 | SAR Violation No. 1847 |
| 84 | SAR Violation No. 297 |
| 85 | SAR Violation No. 294 |
| 86 | SAR Violation No. 255 |
| 87 | Violation Nos 280 |
| 88 | Violation Nos 453 |
| 89 | Violation Nos 500 |
| 90 | Violation Nos 588 |
| 91 | Violation Nos 629 |
| 92 | Violation Nos 1605 |
| 93 | Violation Nos 1606 |
| 94 | Violation Nos 1610 |
| 95 | Violation Nos 1618 |
| 96 | Violation Nos 1622 |
| 97 | Violation Nos 1630 |
| 98 | Violation Nos 1633 |
| 99 | Violation Nos 1639 |
| 100 | Violation Nos 1644 |
| 101 | Violation Nos 1674 |
| 102 | Violation Nos 1717 |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 103 | Violation Nos 1731 |
| 104 | Violation Nos 1762 |
| 105 | Violation Nos 1763 |
| 106 | Violation Nos 1769 |
| 107 | Violation Nos 1781 |
| 108 | Violation Nos 1798 |
| 109 | Violation Nos 1799 |
| 110 | Violation Nos 1805 |
| 111 | Violation Nos 703 |
| 112 | Violation No. 703 Support File |
| 113 | Violation No. 1861 Support File |
| 114 | Violation No. 515 |
| 115 | Violation No. 515 Support File |
| 116 | Violation No. 612 |
| 117 | Violation No. 612 Support File |
| 118 | Violation No. 701 |
| 119 | Violation No. 701 Support File |
| 120 | Violation No. 748 |
| 121 | Violation No. 748 Support File |
| 122 | Violation No. 1970 |
| 123 | Violation No. 1970 Support File |
| 124 | Violation No. 1971 |
| 125 | Violation No. 1971 Support File |
| 126 | Violation No. 859 |
| 127 | Violation No. 859 Support File |
| 128 | Violation No. 904 |
| 129 | Violation No. 904 Support File |
| 130 | Violation No. 1222 |
| 131 | Violation No. 1222 Support File |
| 132 | Order Instituting Administrative Proceedings |
| 133 | ███████ Memorandum |
| 134 | Legal Opinion, dated July 26, 2011, SEC-FINRA-E-00997052 |
| 135 | SAR Violation Nos. 744, 1827 |
| 136 | SEC Press Release |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
| --- | --- |
| 137 | ████ Memorandum |
| 138 | Article about ████'s settlement |
| 139 | FIN-2006-G014, November 9, 2006 |
| 140 | Violation Nos. 197 and 329 |
| 141 | Violation No. 652 |
| 142 | Violation No. 652 Support File |
| 143 | Violation No. 462 |
| 144 | Violation No. 462 Support File |
| 145 | Violation No. 2001 |
| 146 | Violation No. 2001 Support File |
| 147 | Violation No. 1975 |
| 148 | Violation No. 1975 Support File |
| 149 | Violation No. 467 |
| 150 | Violation No. 467 Support File |
| 151 | Violation No. 1430 |
| 152 | Violation No. 1430 Support File |
| 153 | Violation No. 326 |
| 154 | Violation No. 326 Support File |
| 155 | Violation No. 341 |
| 156 | Violation No. 341 Support File |
| 157 | Violation No. 717 |
| 158 | Violation No. 717 Support File |
| 159 | Violation No. 1797 |
| 160 | Violation No. 1797 Support File |
| 161 | Violation No. 463 |
| 162 | Violation No. 463 Support File |
| 163 | Violation No. 1897 Support File |
| 164 | Violation No. 438 |
| 165 | Violation No. 438 Support File |
| 166 | Violation No. 385 |
| 167 | Violation No. 385 Support File |
| 168 | Violation No. 464 |
| 169 | Violation No. 464 Support File |
| 170 | Violation No. 465 |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
| --- | --- |
| 171 | Violation No. 465 Support File |
| 172 | Violation No. 1941 |
| 173 | Violation No. 190 |
| 174 | Violation No. 1931 |
| 175 | Violation No. 2001 |
| 176 | Violation No. 1947 |
| 177 | Violation No. 1767 |
| 178 | Violation No. 511 |
| 179 | Violation No. 348 |
| 180 | Violation No. 1781 |
| 181 | Violation No. 1798 |
| 182 | SEC's Table A-7 |
| 183 | Violation No. 237 |
| 184 | Violation No. 660 |
| 185 | Violation No. 250 |
| 186 | Violation No. 230 |
| 187 | Violation No. 25 |
| 188 | Violation No. 85 |
| 189 | Violation No. 134 |
| 190 | Violation No. 179 |
| 191 | Violation No. 229 |
| 192 | Violation No. 231 |
| 193 | Violation No. 240 |
| 194 | Violation No. 243 |
| 195 | Violation No. 249 |
| 196 | Violation No. 493 |
| 197 | Violation No. 881 |
| 198 | Violation No. 1905 |
| 199 | Violation No. 1906 |
| 200 | Violation No. 1924 |
| 201 | Violation No. 1932 |
| 202 | "The SAR Activity Review: Trends, Tips & Issues," Issue No. 15 |
| 203 | "The SAR Activity Review: Trends, Tips & Issues," Issue No. 1 |
| 204 | E. Green Supp. Decl. |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 205 | R. Jones Decl. |
| 206 | Table showing duplicates between Tables C and D with Table A |
| 207 | Violation No. 94 |
| 208 | Violation No. 19 |
| 209 | Violation No. 24 |
| 210 | Violation No. 27 |
| 211 | Violation No. 33 |
| 212 | Violation No. 39 |
| 213 | Violation No. 41 |
| 214 | Violation No. 43 |
| 215 | Violation No. 46 |
| 216 | Violation No. 52 |
| 217 | Violation No. 59 |
| 218 | Violation No. 62 |
| 219 | Violation No. 69 |
| 220 | Violation No. 79 |
| 221 | Violation No. 82 |
| 222 | Violation No. 91 |
| 223 | Violation No. 93 |
| 224 | Violation No. 113 |
| 225 | Violation No. 114 |
| 226 | Violation No. 127 |
| 227 | Violation No. 132 |
| 228 | Violation No. 134 |
| 229 | Violation No. 136 |
| 230 | Violation No. 138 |
| 231 | Violation No. 141 |
| 232 | Violation No. 147 |
| 233 | Violation No. 197 |
| 234 | Violation No. 202 |
| 235 | Violation No. 210 |
| 236 | Violation No. 211 |
| 237 | Violation No. 15 |
| 238 | Violation No. 30 |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 239 | Violation No. 31 |
| 240 | Violation No. 32 |
| 241 | FinCEN Guidance (Fin-2007-G003, June 13, 2007) |
| 242 | Table A Duplicates Chart |
| 243 | Intentionally Omitted |
| 244 | Intentionally Omitted |
| 245 | SEC's Initial Disclosures |
| 246 | Hearing Transcript |
| 247 | Rule 56(d) Declaration |
| 248 | Table E |
| 249 | Wells Notice |
| 250 | SAR 119 Support File |
| 251 | SAR 147 Support File |
| 252 | SAR 160 Support File |
| 253 | SAR 169 Support File |
| 254 | SAR 188 Support File |
| 255 | SAR 194 Support File |
| 256 | SAR 196 Support File |
| 257 | SAR 197 Support File |
| 258 | SAR 198 Support File |
| 259 | SAR 287 Support File |
| 260 | SAR 329 Support File |
| 261 | SAR 350 Support File |
| 262 | SAR 355 Support File |
| 263 | SAR 356 Support File |
| 264 | SAR 360 Support File |
| 265 | SAR 368 Support File |
| 266 | SAR 369 Support File |
| 267 | SAR 370 Support File |
| 268 | SAR 371 Support File |
| 269 | SAR 372 Support File |
| 270 | SAR 399 Support File |
| 271 | SAR 454 Support File |
| 272 | SAR 462 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 273 | SAR 467 Support File |
| 274 | SAR 515 Support File |
| 275 | SAR 517 Support File |
| 276 | SAR 553 Support File |
| 277 | SAR 586 Support File |
| 278 | SAR 612 Support File |
| 279 | SAR 616 Support File |
| 280 | SAR 647 Support File |
| 281 | SAR 652 Support File |
| 282 | SAR 666 Support File |
| 283 | SAR 667 Support File |
| 284 | SAR 703 Support File |
| 285 | SAR 713 Support File |
| 286 | SAR 718 Support File |
| 287 | SAR 743 Support File |
| 288 | SAR 778 Support File |
| 289 | SAR 787 Support File |
| 290 | SAR 788 Support File |
| 291 | SAR 794 Support File |
| 292 | SAR 823 Support File |
| 293 | SAR 826 Support File |
| 294 | SAR 828 Support File |
| 295 | SAR 856 Support File |
| 296 | SAR 863 Support File |
| 297 | SAR 864 Support File |
| 298 | SAR 961 Support File |
| 299 | SAR 974 Support File |
| 300 | SAR 990 Support File |
| 301 | SAR 1031 Support File |
| 302 | SAR 1032 Support File |
| 303 | SAR 1041 Support File |
| 304 | SAR 1047 Support File |
| 305 | SAR 1051 Support File |
| 306 | SAR 1068 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 307 | SAR 1093 Support File |
| 308 | SAR 1119 Support File |
| 309 | SAR 1124 Support File |
| 310 | SAR 1126 Support File |
| 311 | SAR 1132 Support File |
| 312 | SAR 1133 Support File |
| 313 | SAR 1134 Support File |
| 314 | SAR 1137 Support File |
| 315 | SAR 1138 Support File |
| 316 | SAR 1140 Support File |
| 317 | SAR 1142 Support File |
| 318 | SAR 1145 Support File |
| 319 | SAR 1150 Support File |
| 320 | SAR 1153 Support File |
| 321 | SAR 1156 Support File |
| 322 | SAR 1170 Support File |
| 323 | SAR 1175 Support File |
| 324 | SAR 1177 Support File |
| 325 | SAR 1189 Support File |
| 326 | SAR 1206 Support File |
| 327 | SAR 1207 Support File |
| 328 | SAR 1208 Support File |
| 329 | SAR 1211 Support File |
| 330 | SAR 1214 Support File |
| 331 | SAR 1216 Support File |
| 332 | SAR 1219 Support File |
| 333 | SAR 1220 Support File |
| 334 | SAR 1221 Support File |
| 335 | SAR 1222 Support File |
| 336 | SAR 1225 Support File |
| 337 | SAR 1226 Support File |
| 338 | SAR 1227 Support File |
| 339 | SAR 1228 Support File |
| 340 | SAR 1230 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 341 | SAR 1236 Support File |
| 342 | SAR 1241 Support File |
| 343 | SAR 1243 Support File |
| 344 | SAR 1247 Support File |
| 345 | SAR 1248 Support File |
| 346 | SAR 1256 Support File |
| 347 | SAR 1259 Support File |
| 348 | SAR 1260 Support File |
| 349 | SAR 1261 Support File |
| 350 | SAR 1262 Support File |
| 351 | SAR 1264 Support File |
| 352 | SAR 1271 Support File |
| 353 | SAR 1283 Support File |
| 354 | SAR 1285 Support File |
| 355 | SAR 1287 Support File |
| 356 | SAR 1293 Support File |
| 357 | SAR 1295 Support File |
| 358 | SAR 1297 Support File |
| 359 | SAR 1300 Support File |
| 360 | SAR 1309 Support File |
| 361 | SAR 1310 Support File |
| 362 | SAR 1313 Support File |
| 363 | SAR 1315 Support File |
| 364 | SAR 1316 Support File |
| 365 | SAR 1324 Support File |
| 366 | SAR 1325 Support File |
| 367 | SAR 1326 Support File |
| 368 | SAR 1327 Support File |
| 369 | SAR 1332 Support File |
| 370 | SAR 1341 Support File |
| 371 | SAR 1346 Support File |
| 372 | SAR 1358 Support File |
| 373 | SAR 1360 Support File |
| 374 | SAR 1364 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 375 | SAR 1366 Support File |
| 376 | SAR 1367 Support File |
| 377 | SAR 1376 Support File |
| 378 | SAR 1391 Support File |
| 379 | SAR 1392 Support File |
| 380 | SAR 1394 Support File |
| 381 | SAR 1395 Support File |
| 382 | SAR 1396 Support File |
| 383 | SAR 1397 Support File |
| 384 | SAR 1398 Support File |
| 385 | SAR 1404 Support File |
| 386 | SAR 1407 Support File |
| 387 | SAR 1408 Support File |
| 388 | SAR 1411 Support File |
| 389 | SAR 1419 Support File |
| 390 | SAR  1430 Support File |
| 391 | SAR 1431 Support File |
| 392 | SAR 1432 Support File |
| 393 | SAR 1434 Support File |
| 394 | SAR 1436 Support File |
| 395 | SAR 1440 Support File |
| 396 | SAR 1445 Support File |
| 397 | SAR 1446 Support File |
| 398 | SAR 1447 Support File |
| 399 | SAR 1448 Support File |
| 400 | SAR 1451 Support File |
| 401 | SAR 1457 Support File |
| 402 | SAR 1458 Support File |
| 403 | SAR 1459 Support File |
| 404 | SAR 1460 Support File |
| 405 | SAR 1465 Support File |
| 406 | SAR 1468 Support File |
| 407 | SAR 1478 Support File |
| 408 | SAR 1491 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 409 | SAR 1492 Support File |
| 410 | SAR 1500 Support File |
| 411 | SAR 1501 Support File |
| 412 | SAR 1502 Support File |
| 413 | SAR 1504 Support File |
| 414 | SAR 1509 Support File |
| 415 | SAR 1518 Support File |
| 416 | SAR 1523 Support File |
| 417 | SAR 1533 Support File |
| 418 | SAR 1534 Support File |
| 419 | SAR 1539 Support File |
| 420 | SAR 1543 Support File |
| 421 | SAR 1545 Support File |
| 422 | SAR 1546 Support File |
| 423 | SAR 1551 Support File |
| 424 | SAR 1555 Support File |
| 425 | SAR 1556 Support File |
| 426 | SAR 1557 Support File |
| 427 | SAR 1564 Support File |
| 428 | SAR 1585 Support File |
| 429 | SAR 1587 Support File |
| 430 | SAR 1616 Support File |
| 431 | SAR 1620 Support File |
| 432 | SAR 1621 Support File |
| 433 | SAR 1627 Support File |
| 434 | SAR 1641 Support File |
| 435 | SAR 1648 Support File |
| 436 | SAR 1652 Support File |
| 437 | SAR 1659 Support File |
| 438 | SAR 1663 Support File |
| 439 | SAR 1669 Support File |
| 440 | SAR 1674 Support File |
| 441 | SAR 1675 Support File |
| 442 | SAR 1687 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 443 | SAR 1689 Support File |
| 444 | SAR 1693 Support File |
| 445 | SAR 1701 Support File |
| 446 | SAR 1702 Support File |
| 447 | SAR 1709 Support File |
| 448 | SAR 1712 Support File |
| 449 | SAR 1713 Support File |
| 450 | SAR 1718 Support File |
| 451 | SAR 1720 Support File |
| 452 | SAR 1725 Support File |
| 453 | SAR 1726 Support File |
| 454 | SAR 1729 Support File |
| 455 | SAR 1730 Support File |
| 456 | SAR 1733 Support File |
| 457 | SAR 1734 Support File |
| 458 | SAR 1740 Support File |
| 459 | SAR 1743 Support File |
| 460 | SAR 1761 Support File |
| 461 | SAR 1780 Support File |
| 462 | SAR 1781 Support File |
| 463 | SAR 1790 Support File |
| 464 | SAR 1791 Support File |
| 465 | SAR 1794 Support File |
| 466 | SAR 1802 Support File |
| 467 | SAR 1805 Support File |
| 468 | SAR 1822 Support File |
| 469 | SAR 1825 Support File |
| 470 | SAR 1830 Support File |
| 471 | SAR 1841 Support File |
| 472 | SAR 1847 Support File |
| 473 | SAR 1861 Support File |
| 474 | SAR 1869 Support File |
| 475 | SAR 1872 Support File |
| 476 | SAR 1885 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 477 | SAR 1888 Support File |
| 478 | SAR 1907 Support File |
| 479 | SAR 1908 Support File |
| 480 | SAR 1967 Support File |
| 481 | SAR 1968 Support File |
| 482 | SAR 1969 Support File |
| 483 | SAR 1970 Support File |
| 484 | SAR 1971 Support File |
| 485 | SAR 1975 Support File |
| 486 | SAR 1984 Support File |
| 487 | SAR 1987 Support File |
| 488 | SAR 1992 Support File |
| 489 | SAR 2001 Support File |
| 490 | SAR 2003 Support File |
| 491 | SAR 7 Support File |
| 492 | SAR 9 Support File |
| 493 | SAR 196 Support File |
| 494 | SAR 202 Support File |
| 495 | SAR 218 Support File |
| 496 | SAR 219 Support File |
| 497 | SAR 220 Support File |
| 498 | SAR 225 Support File |
| 499 | SAR 255 Support File |
| 500 | SAR 318 Support File |
| 501 | SAR 326 Support File |
| 502 | SAR 333 Support File |
| 503 | SAR 340 Support File |
| 504 | SAR 341 Support File |
| 505 | SAR 343 Support File |
| 506 | SAR 349 Support File |
| 507 | SAR 355 Support File |
| 508 | SAR 360 Support File |
| 509 | SAR 368 Support File |
| 510 | SAR 369 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 511 | SAR 370 Support File |
| 512 | SAR 371 Support File |
| 513 | SAR 372 Support File |
| 514 | SAR 394 Support File |
| 515 | SAR 430 Support File |
| 516 | SAR 457 Support File |
| 517 | SAR 480 Support File |
| 518 | SAR 498 Support File |
| 519 | SAR 566 Support File |
| 520 | SAR 583 Support File |
| 521 | SAR 592 Support File |
| 522 | SAR 664 Support File |
| 523 | SAR 717 Support File |
| 524 | SAR 748 Support File |
| 525 | SAR 810 Support File |
| 526 | SAR 1194 Support File |
| 527 | SAR 1380 Support File |
| 528 | SAR 1409 Support File |
| 529 | SAR 1423 Support File |
| 530 | SAR 1437 Support File |
| 531 | SAR 1442 Support File |
| 532 | SAR 1624 Support File |
| 533 | SAR 1757 Support File |
| 534 | SAR 1788 Support File |
| 535 | SAR 1793 Support File |
| 536 | SAR 1805 Support File |
| 537 | SAR 1915 Support File |
| 538 | SAR 1941 Support File |
| 539 | SAR 1943 Support File |
| 540 | SAR 1948 Support File |
| 541 | SAR 1952 Support File |
| 542 | SAR 1953 Support File |
| 543 | SAR 1956 Support File |
| 544 | SAR 1988 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
| --- | --- |
| 545 | SAR 2005 Support File |
| 546 | SAR 80 Support File |
| 547 | SAR 109 Support File |
| 548 | SAR 366 Support File |
| 549 | SAR 385 Support File |
| 550 | SAR 438 Support File |
| 551 | SAR 463 Support File |
| 552 | SAR 464 Support File |
| 553 | SAR 465 Support File |
| 554 | SAR 492 Support File |
| 555 | SAR 565 Support File |
| 556 | SAR 574 Support File |
| 557 | SAR 584 Support File |
| 558 | SAR 587 Support File |
| 559 | SAR 589 Support File |
| 560 | SAR 658 Support File |
| 561 | SAR 693 Support File |
| 562 | SAR 716 Support File |
| 563 | SAR 779 Support File |
| 564 | SAR 805 Support File |
| 565 | SAR 839 Support File |
| 566 | SAR 1607 Support File |
| 567 | SAR 1722 Support File |
| 568 | SAR 1735 Support File |
| 569 | SAR 1797 Support File |
| 570 | SAR 1828 Support File |
| 571 | SAR 1836 Support File |
| 572 | SAR 1840 Support File |
| 573 | SAR 1842 Support File |
| 574 | SAR 1856 Support File |
| 575 | SAR 1858 Support File |
| 576 | SAR 1861 Support File |
| 577 | SAR 1865 Support File |
| 578 | SAR 1867 Support File |

# EXHIBIT LIST

| EXHIBIT # | DESCRIPTION |
|---|---|
| 579 | SAR 1872 Support File |
| 580 | SAR 1874 Support File |
| 581 | SAR 1894 Support File |
| 582 | SAR 1897 Support File |
| 583 | SAR 1898 Support File |
| 584 | SAR 1899 Support File |
| 585 | SAR 1901 Support File |
| 586 | SAR 1903 Support File |
| 587 | SAR 1904 Support File |

# PART 1

## BACKGROUND OF ALPINE

I.    **Alpine's Background and Its Role as a Clearing Firm**

1.    Alpine is primarily a clearing broker-dealer.  Alpine's business involves, among other things, clearing microcap securities that are traded in the over-the-counter marketplace.  As part of its clearing agency function, it clears trades for other introducing brokers on a "fully disclosed" basis pursuant to contractual clearing agreements.  *See* E. Zipprich Decl., at ¶ 3, Ex. 1; *see also* E. Green Dep., at 19-20, Ex. 2 (discussing functions of a clearing firm, what it means to "clear a trade" and Alpine's focus on clearing "microcap low price[d] securities") (Erin Green changed her name to "Green" after her Declaration and prior to her deposition testimony).

2.    Alpine's "clearance and settlement services" for introducing brokers included "back-end" or back-office processing of securities transactions – the "recording of the transaction, the exchange of funds, [and] the delivery of securities to consummate a transaction." Alpine Dep., at 15-16, Ex. 3; *see also* T. Groskreutz On the Record, at 155, Ex. 4 (hereinafter "T. Groskreutz OTR") (describing Alpine's role as a clearing broker as doing "back office accounting" for the introducing broker but also with AML duties); *see also* Loew Expert Decl., at ¶¶ 112-113, Ex. 5 (When providing clearing services for introducing brokers, Alpine "has no direct relationship with the customers of an introducing broker.").

3.    Alpine is paid for its clearance and settlement services by the introducing broker, not the owner of the introduced account.  *See* Alpine Dep., at 17, Ex. 3.

4.    Introducing and clearing brokers acting under contractual clearing arrangements typically divide responsibilities based on their respective capabilities and expertise.  As a general

rule, the introducing brokers have the "know-your-customer" obligations, including knowing "essential facts" regarding the client; "opening, approving and monitoring customer accounts"; directly interacting with the client; and "executing customer orders."  A clearing broker, conversely, generally has "back office" or "ministerial duties," such as "preparing written trade confirmations and account statements for the introducing broker's customer"; "receiving or delivering funds or securities to or from the introducing firm's customers"; "maintaining accounts' books and records"; "maintaining custody of customer funds and securities"; and "clearing and settling transactions in customer accounts." *See* Santangelo, Betty & Davis, Harry, *Broker Dealer Regulation,* Chapter 24, at pp. 3-6 (citing authorities), attached as Ex. 6 (hereinafter "*Broker Dealer Regulation*") (excerpt only).

5. Accordingly, a clearing broker's "'involvement in any given transaction typically begins *after* the execution of the trade.'"  Loew Expert Decl., at ¶ 112, Ex. 5 (quoting *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 457-58 (2d Cir. 2013)).  Prior to that, the introducing broker handles the transaction, and even after the transaction is submitted to a clearing broker for processing, the introducing broker "'typically retains all customer-contact functions, including soliciting customers, recommending the purchase or sale of securities to customers, and monitoring customers' transactions.'"  *Id.*, at ¶ 112, Ex. 5 (quoting *Levitt*, 710 F.3d at 457-58).

6. The Department of the Treasury has explained that the "clearing broker has a due diligence obligation with respect to the financial institution with which it has a clearing or carrying agreement," but does not have a "due diligence obligation . . . with respect to the introduced accountholder unless the clearing broker establishes a relationship with the introduced accountholder such that the clearing broker is obligated to make a suitability

determination with respect to the securities transactions conducted through the introduced account." This division of "due diligence" obligations applies to "foreign correspondent accounts" and relationships with "foreign introducing brokers." *Id.*, at 13-18, Ex. 5 (citing authorities).

7.      FINRA's Updated Small Firm Template states the following regarding the differing obligations between introducing firms and clearing firms: "Note that a clearing firm does not have an obligation to perform CIP [customer identification program] for an introduced customer if the clearing firm and the introducing firm have entered into a clearing agreement under which the functions of opening and approving customer accounts and directly receiving and accepting orders from the introduced customer are allocated exclusively to the introducing firm and the functions of extending credit, safeguarding funds and securities, and issuing confirmations and statements are allocated to the clearing firm." *See* Updated Small Firm Template (Jan. 1, 2010), at p. 11, Ex. 7.

8.      Alpine, as a clearing firm, entered into and executed a "Fully Disclosed Clearing Agreement" on February 26, 2009, with Scottsdale Capital Advisors, Inc. ("SCA") serving as the introducing firm. *See* SCA Fully Disclosed Clearing Agreement, Ex. 8.

9.      Alpine's Fully Disclosed Clearing Agreement provides that SCA has the sole responsibility for (1) complying with all applicable laws, regulations, and self-regulatory requirements regarding transactions and accounts, including AML, (2) maintaining procedures to ensure compliance, and (3) knowledge of the customer, including "all essential facts" relating to each customer and their accounts. *See* SCA Fully Disclosed Clearing Agreement, at Sec. 4.1.4, 5.1-5.3 and 6.1-6.8, Ex. 8.

10.     Alpine's Fully Disclosed Clearing Agreement with SCA provides that Alpine "may rely without inquiry on the validity of all customer information furnished to it by broker." *See id.*, at Sec. 6.4, Ex. 8. In fact, pursuant to the Fully Disclosed Clearing Agreement, Alpine's "customer" is only the introducing broker as "all customers receiving services pursuant to this Agreement shall remain customers of Broker [SCA]." *See* SCA Fully Disclosed Clearing Agreement, at Sec. 3.2, 6.4, Ex. 8.

11.     Alpine sought a legal opinion in October of 2010 from Irving Einhorn, who had been the head of the SEC's Los Angeles regional office.  After analyzing the relevant facts and applicable law governing clearing firms, Mr. Einhorn confirmed that Alpine performs primarily a cashiering or ministerial function with respect to the physical certificate business, in keeping with the clearing firm's typical functions.  Among other things, Mr. Einhorn concluded that the contractual relationships between Alpine and its introducing firms, including the allocation of suitability and "Know Your Customer" obligations, were fully consistent with applicable law. As a clearing firm, "Alpine cannot be held responsible for the wrongful conduct of either the introducing firm or the introducing firm's customer and has no obligation, absent actual knowledge of an impropriety, to conduct any further inquiry into a security tendered for deposit into the account of a customer of the introducing firm." *See* Irving M. Einhorn, Opinion Letter, Ex. 9; *accord* T. Groskreutz OTR, at 93, Ex. 4 (Alpine used Mr. Einhorn several times for legal opinions and training).

12.     The SEC's expert confirmed that there is a distinction between customer related obligations of clearing firms as opposing to introducing brokers.  *See* Angotti Dep., at 61, 173-176, Ex. 10.

13.     Alpine's expert discussed the following implications of Alpine's role as a clearing broker.

a.      It is not true that any customer of an introducing firm operating pursuant to a standard allocation of responsibilities in its clearing agreement is also the customer of a clearing firm for purposes of applying the SAR rules, or any other AML rule, for that matter.  *See* Loew Expert Decl., at ¶ 111, Ex. 5.

b.      The customer of a clearing firm in these circumstances is the introducing broker, while the underlying introduced accountholder is the customer of the introducing broker.  In light of the customary allocation of responsibilities between clearing and introducing brokers recognized by the Second Circuit, and because the clearing firm is not in the same position as the introducing firm with respect to interaction with accountholders and persons authorized to effect transactions for them, the AML regulatory framework requires that clearing firms file SARs, but does so in the context of the greater responsibility placed on the introducing broker for substantive information concerning introduced accounts.  *Id.*, at ¶ 112, Ex. 5.

c.      Under its functional allocation with its introducing brokers, a firm such as Alpine has no direct relationship with the customers of an introducing broker, and therefore is not assumed to have the same understanding of the customer's background as the introducing broker.  That introducing broker will be in the best position to provide more detailed information in their SAR filings and, given its greater knowledge of a customer, may also possess information that causes the introducing broker not to file a SAR based on its determination that a customer's activity is not suspicious.  *Id.*, at ¶ 113,

Ex. 5.

d.      This disparity in information has been expressly recognized by FinCEN,

which has stated that the SAR rule "does not require a firm to alter its relationship with

its customers in a way that is inconsistent with industry practice," and has adopted a

common sense approach that takes into consideration industry norms whereby "based on

the nature of the services that a broker-dealer provides to their customers, certain types of

broker-dealers will have more information available to them in making suspicious

activity determinations than other types of broker-dealers." *Id.*, at ¶ 114, Ex. 5(citing

FinCEN guidance).

e.      That acknowledgement of the different roles of clearing and introducing

firms stems in part from guidance that was issued shortly after the adoption of FinCEN's

regulations implementing section 312 of the USA PATRIOT Act, which was authored

primarily by Alpine's expert. Responding to a request for interpretive guidance from the

securities industry, FinCEN stated:

> a clearing firm is not subject to the due diligence requirements of the
> correspondent account rule in circumstances where it has not established a
> relationship with an introduced accountholder that would cause it to
> recommend securities or strategies to that accountholder.

*Id.*, at ¶ 115, Ex. 5 (quoting FinCEN guidance).

f.      Though written in the context of foreign introducing firms, the guidance is

equally applicable to domestic introducing firms that operated under the same

transactional arrangements with a clearing firm. The only meaningful distinction between

foreign and domestic introducing firms, in terms of the level of due diligence to be

performed by a clearing broker, is that foreign introducing firms are subject to special

due diligence because, unlike domestic introducing firms, they are not subject to U.S. regulation and are not subject to BSA compliance examinations.  *Id*., at ¶ 116, Ex. 5 (citing the Federal Financial Institutions Examination Council).

        g.     The distinctions inherent in the applicability of AML laws to clearing and introducing brokers was further elaborated in an administrative ruling drafted solely by Alpine's expert witness in 2008, in which it was stated:

> FinCEN previously clarified that the relationship between a clearing firm and a customer that has been introduced to it is not a formal relationship for the purposes of complying with the correspondent account rule when the customer is introduced to the clearing firm according to a fully disclosed clearing agreement under which an introducing firm, and not the clearing firm, is responsible for receiving and accepting orders for securities from the customer … A clearing firm typically is not required to look through the fully disclosed clearing relationship to perform due diligence directly on the customers that may be introduced to it by a foreign introducing firm … The clearing firm is expected to monitor transactions conducted for introduced customers through the fully disclosed clearing agreement with the foreign introducing broker incorporating, among other information, any information the clearing firm acquires about the customers that are introduced by the foreign introducing firm in the ordinary course of its business.

*Id*., at ¶ 117, Ex. 5 (citing FinCEN guidance).

        h.     Again, though written in the context of foreign introducing firms, the administrative ruling is equally applicable to domestic introducing firms operating under the same transactional arrangements with a clearing firm. Moreover, with respect to clearing and introducing firms subject to U.S. regulation, it has been clarified that "while [FinCEN does] recognize that clearing brokers often play important roles as service providers to introducing firms and have made accommodations for that in our rule makings, [FinCEN effectively has] clarified that [it does] not expect that clearing brokers

will operate as *de facto* regulators of introducing firms, or vice versa."  *Id.*, at ¶ 118, Ex. 5 (quoting and citing to various FinCEN statements and guidance).

   i. In short, contrary to the view of the SEC's expert witness, a clearing firm such as Alpine has no direct relationship with any introduced customer and generally handles far greater volumes and types of activities than any one of its introducing firms. Accordingly, FinCEN has recognized, by application of the interpretive guidance presented above, that clearing firms like Alpine will be less able to provide a substantial SAR narrative than an introducing firm. As a result, contrary to the SEC's expert witness's opinion, it is both typical and expected that clearing firm SAR narratives will not contain the level of information regarding the underlying customer as those of an introducing firm and instead most frequently focus on transaction activity including trading activity.  *Id.*, at ¶ 119, Ex. 5.

   j. The SEC's expert witness appears to ignore the substantial body of guidance issued by FinCEN on clearing and introducing broker obligations with respect to BSA compliance in general and SAR filing in particular. Ignoring it allows the SEC's expert witness apparently to conclude that Alpine is in no different position than its introducing brokers to examine and understand, for example, the transactional motivations of a customer with whom it does not have a direct and meaningful relationship as lawfully established by contract. It further enables the SEC's expert witness to assert that clearing and introducing brokers are equally responsible for monitoring introduced accounts for suspicious activity and reporting suspicious activity, and may be expected to do so together.  *Id.*, at ¶ 120, Ex. 5 (citing the Navigant Report).

k.      There is no requirement in the SAR rules that would require a clearing and introducing firm to engage in joint SAR monitoring or reporting activities. To the contrary, though the SAR rules permit Alpine to file SARs jointly with its introducing firms, it is not obligated to and there may be valid business reasons for not doing so. Among them, a clearing firm may not wish to expose its AML compliance program to risks it is unable to sufficiently mitigate with respect to the AML compliance program of an introducing firm.  *Id*., at ¶ 121, Ex. 5 (citing the Navigant Report).

l.      Clearing brokers are not expected to be the *de facto* regulators of introducing firms, and the costs of auditing an introducing firm to develop a comfort level with respect to SAR monitoring and filing would involve examining an introducing broker in the manner a regulator or other examining authority would do. FinCEN apparently did not impose such a requirement on domestic clearing firms because introducing brokers are subject to BSA compliance examinations just as clearing brokers are. Even with respect to a foreign introducing firm, clearing brokers are merely required to conduct special due diligence under the rules implementing section 312 of the USA PATRIOT Act, which requires the clearing firm to consider the AML regime in which the foreign firm is located.  *Id*., at ¶ 122, Ex. 5 (citing BSA regulations and FinCEN guidance).

## II.      Overview of Alpine's Written AML Program Requirements

14.      A broker-dealer is required to "develop and implement a written anti-money laundering program reasonably designed to achieve and monitor the [broker-dealer's] compliance with the requirements of the Bank Secrecy Act (31 U.S.C. § 5311, et seq.), and the

implementing regulations promulgated thereunder by the Department of the Treasury." FINRA Rule 3310; *see also* 31 U.S.C. § 5318(h); 31 C.F.R. § 1023.210 (setting forth minimum requirements for "anti-money laundering programs").

15.     NASD Notice 02-21 states: "Members should keep in mind that the obligation to develop and implement an AML compliance program is not a 'one-size-fits-all' requirement. The general nature of the requirement reflects Congressional intent that each financial institution should have the flexibility to tailor its AML program to fit its business." *See* NASD Notice 02-21, at p. 4, Ex. 11.

16.     In its Written Standard Procedures ("WSPs"), Alpine developed and implemented procedures for both AML review and suspicious activity reporting under the BSA. *See* Alpine's WSPs, dated April 11, 2013, August 29, 2014, and October 1, 2015, attached hereto as Exhibits 12 through 14 respectively (excerpts only).

17.     Alpine's AML program includes risk-based procedures that are reasonably designed to detect and report known or suspected money laundering activity, including monitoring for suspicious activity and complying with the suspicious activity reporting and recordkeeping requirements of the BSA. *See* E. Zipprich Dec., ¶ 14, Ex. 1; *see also* WSPs, April 11, 2013, at Sec. 3.14 and 9, Ex. 12; WSPs, August 29, 2014, at Sec. 3.14 and 9, Ex. 13; WSPs, October 1, 2015, at Sec. 3.14 and 9, Ex. 14.

18.     Alpine continually updates its WSPs, including the AML program and SAR requirements, to address and reflect new developments and incorporate issues and advice from regulators regarding potential money laundering activities, and to ensure that its AML and suspicious activity monitoring programs are effective. *See* E. Zipprich Decl., at ¶ 15, Ex. 1.

19.     Alpine's WSPs confirm, *inter alia,* that "Alpine will file Suspicious Activity Reports (SARs) for transactions that may be indicative of money laundering."  *See* WSPs, April 11, 2013, at p. 152, Ex. 12; WSPs, August 29, 2014, at p. 180, Ex. 13; WSPs, October 1, 2015, at p. 194, Ex. 14.

20.     Alpine's WSPs define "money laundering" as "the movement of criminally derived funds to conceal the true source, ownership, or use of the funds.  The funds are filtered through a maze or series of transactions, so the funds are 'cleaned' to look like proceeds from legal activities."  *See* WSPs, April 11, 2013, at p. 138, Ex. 12; *see also similar language in* WSPs, August 29, 2014, at p. 153-154, Ex. 13 and WSPs, October 1, 2015, at p. 168, Ex. 14.

21.     As to when a SAR "must be filed," Alpine's WSPs state that:

> A SAR must be filed for any transaction that alone, or in the aggregate, involves at least $5,000 in funds or other assets, if Alpine knows, suspects or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is part) falls into one of the following categories:

> - Transactions involving funds derived from illegal activity or intended or conducted to hide or disguise funds or assets derived from illegal activity.
> - Transactions designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act (BSA).
> - Transactions that appear to serve no business or apparent lawful purpose or are not the sort of transactions in which a particular customer would be expected to engage, and for which Alpine knows of no reasonable explanation after examining the available facts.
> - Transactions that involve the use of Alpine to facilitate criminal activity.

*See* WSPs, April 11, 2013, at p. 154, Ex. 12; WSPs, August 29, 2014, at p. 186, Ex. 13; WSPs, October 1, 2015, at p. 201, Ex. 14.

22.     In accordance with FinCEN's guidance, all of Alpine's WSPs make clear:  "It is always at the manager or AML compliance officer's discretion, when taking into consideration

all factors, when a SAR[] should be filed." *See* WSPs, April 11, 2013, at p. 154, Ex. 12; WSPs,

August 29, 2014, at p. 186, Ex. 13; WSPs, October 1, 2015, at p. 200, Ex. 14.

      23.    Alpine's WSPs, as of April 11, 2013, further state, again in accordance with

FinCEN's guidance, that "[d]etermining whether an activity or series of activities is suspicious is

a facts and circumstance analysis.  Such determinations will be made by the AML Compliance

Officer or designee." *See* WSPs, April 11, 2013, at p. 152, Ex. 12; WSPs, August 29, 2014, at p.

180, Ex. 13; WSPs, October 1, 2015, at p. 194, Ex. 14.

      24.    All of Alpine's WSP's contain "examples of risk indicators (red flags) that may

suggest potential money laundering" to be considered by employees in the SAR decision making

process. *See* WSPs, April 11, 2013, at p. 152, Ex. 12; WSPs, August 29, 2014, at p. 181, Ex. 13;

WSPs, October 1, 2015, at p. 195, Ex. 14.

      25.    Notably, none of Alpine's WSP's state that Alpine must file a SAR where any of

the "risk indicators" exist or that Alpine will include any specific "risk indicator" in the narrative

of any and all SARs filed. *See id.*

      26.    Rather, as indicated by NASD Notice 02-21, Alpine's WSPs note that "[i]f a

broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding

with the transaction." *See* NASD Notice 02-21, at 10, Ex. 11.

### III.    Overview of Alpine's AML Review Process and Assessment of Red Flags

      27.    During the relevant time period at issue in this action (May 17, 2011 through

December 31, 2015), Alpine received a due diligence packet for each stock deposit from the

introducing firm.  The due diligence packet contained information regarding the customer and

the transaction. *See* E. Zipprich Decl., at ¶ 18, Ex. 1; *see also* SEC Complaint, Dkt. No. 1, at ¶ 3.

28.     SCA prepared the due diligence packets and filled out the "Deposited Securities Checklist."  *See* Alpine Dep., at 124, Ex. 3.

29.     Since around 2010, Alpine has utilized DocuWare software to facilitate the workflow process of reviewing and approving stock deposits.  *See* E. Zipprich Decl., at ¶ 19, Ex. 1.

30.     Alpine's compliance personnel reviewed every deposit made by a correspondent firm that cleared through Alpine for potential AML concerns and potential unregistered distributions/sales, including considering any sudden increase in the price or volume of a stock\ and the historic price and volume of a stock.  *See* T. Groskreutz OTR, at 41, Ex. 4; *see also* R. Jones Dep., at 14, 54-55, Ex. 15 (Randy Jones, a previous AML Officer at Alpine, testified that since he has been at Alpine, "[e]very single deposit that comes in the door is reviewed.").

31.     The review process begins when Alpine's compliance analyst receives the due diligence packet from the introducing firm and fills-out a "cover sheet" which includes all the basic information about the deposit.  *See* E. Zipprich Decl., at ¶ 20, Ex. 1; *see also* Alpine Dep., at 36, Ex. 3 (discussing the cover sheet).

32.     The compliance analyst was directed by Alpine's compliance, legal, and senior management personnel to consider various pre-determined issues of focus.  *See* E. Zipprich Decl., at ¶ 21, Ex. 1.

33.     Among the issues that an analyst was instructed to consider were those listed in (a) the regulations, and (b) the specific circumstances of the transaction.  *See* E. Zipprich Decl., at ¶ 22, Ex. 1.

34.     Among the circumstances to be considered, at all times, included the following:

- Transactions involving funds derived from illegal activity or intended or conducted to hide or disguise funds or assets derived from illegal activity.

- Transactions designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act (BSA).

- Transactions that appear to serve no business or apparent lawful purpose or are not the sort of transactions in which a particular customer would be expected to engage, and for which Alpine knows of no reasonable explanation after examining the available facts.

- Transactions that involve the use of Alpine to facilitate criminal activity.

*See* E. Zipprich Decl., at ¶ 23, Ex. 1.

35.     The items to be evaluated have evolved over time as Alpine has responded to changes in the industry and sought to ensure that it is compliant with record keeping and reporting under the BSA.  *See* E. Zipprich Decl., at ¶ 24, Ex. 1.

36.     At times, Alpine utilized a checklist of threshold matters and when any deposit met the requirements of the checklist, the transaction received closer scrutiny.  *See* R. Jones Dep., at 16, Ex. 15; *see also* Alpine Dep., at 36, Ex. 3 (checklist included objective information, such as "concerned a large deposit of penny stocks").

37.     Among the items that an analyst was directed to consider was whether an account was subject to "heightened supervision."  The "heightened supervision" list was developed by Alpine as an aid to Alpine employees conducting AML review, and to ensure Alpine's own enhanced scrutiny of transactions.  The reasons for inclusion on the list vary and inclusion on the list, or reference to the list, did not constitute any finding by Alpine that there was anything criminally suspicious about the transaction itself.  In filing SARs on this basis, and highlighting the list in the SAR narrative, Alpine was providing what it understood to be useful information to regulators, even though a SAR filing was not required.  *See* E. Zipprich Decl., at ¶ 25, Ex. 1.

38.     Accounts subject to "heightened supervision" would receive a more substantial

review of the deposit and paperwork and trading activity.  *See* R. Jones Dep., at 26-27, Ex. 15.

39.     Accounts subject to "heightened supervision" "may have been a reason why [Alpine] would have filed a SAR."  *See* E. Green Dep., at 65, Ex. 2; *accord* Alpine Dep., at 51, Ex. 3 (stating that the mere placement on the heightened supervisory list is not, by itself, the reason to file a SAR).

40.     Alpine continuously updated its directives to incorporate industry guidance as well as circumstances that it *independently determined were applicable to Alpine's particular business*.  *See* E. Zipprich Decl., at ¶ 26, Ex. 1 (emphasis added).

41.     Based on the review process, a compliance analyst would prepare initial drafts of SARs including a basic narrative describing the facts of the transactions.  *See* E. Zipprich Decl., at ¶ 28, Ex. 1.

42.     The SAR draft was then reviewed by the AML Officer, CCO, and/or a legal analyst.  Further review of a transaction included, among other things, and depending on the facts of the transaction, additional review of the due diligence packet from the introducing broker, additional research on Google of the parties involved, research of any stock promotions, and review of trading volume, including discussions with the trading desk if necessary.  *See* E. Zipprich Decl., at ¶ 29, Ex. 1.

43.     Alpine's legal group's review of a deposit included a review to ensure compliance with Section 5 and whether there were AML issues that required further review and assessment. This review included the background of the account holder, sometimes people associated with the issuer, and the actual depositor or their associates as well.  *See* Alpine Dep., at 36-37, Ex. 3; *see also* Part 2, Sec. VII, *infra*, regarding Alpine's Section 5 review.

44.     Then, the deposit would be vetted by the operations group for both clearing and settlement issues and well as other AML red flags.  *See* Alpine Dep., at 37, Ex. 3.

45.     If Alpine's legal group and/or operations group found AML red flags, then the deposit would receive further review and assessment from the AML group "to make a determination of whether a SAR[] should be filed.  Some of those determinations were objective. Some of them were subjective."  *See* Alpine Dep., at 37, Ex. 3; *see also id.* at 153, Ex. 3 (discussing the "highly subjective" nature of SAR filings on the filer on what is deemed suspicious).

46.     In accordance with the WSPs, the final decision on whether to file a SAR on a transaction is in the discretion of the AML Officer or his or her designee.  *See* E. Zipprich Decl., at ¶ 31, Ex. 1; *accord* Alpine Dep., at 42-43, Ex. 3 (AML Officer does an investigation and determines whether to file a SAR).

47.     There may be circumstances where the file may contain a red flag but would not cause Alpine to file a SAR because the process of determining whether activity is suspicious is a subjective one.  There may be times when Alpine's AML Officer will determine not to file a SAR on certain referred activity due to the firm's familiarity with the client and whether the activity is consistent with their normal course of business.  *See* L. Farmer Dep., at 69-70, Ex. 16.

48.     The existence of any factor which required consideration of a particular circumstance did not automatically trigger a duty to include that factor in the SAR narrative or file a SAR at all.  Those circumstances only triggered a duty to further investigate and consider all facts before an ultimate decision was made as to whether any particular factor or fact raised suspicion to the degree that it was appropriate to file a SAR or include certain information in a

SAR narrative.  *See* E. Zipprich Decl., at ¶ 32, Ex. 1; *see also* NASD Notice 02-21, at p. 10, Ex. 11 ("[b]roker/dealers need to look for signs of suspicious activity that suggest money laundering. If a broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding with the transaction.").

49.     The SEC's expert acknowledged in her Rebuttal Report that a SAR does not have to include all red flags.  *See* Navigant Rebuttal Report, at 11, Ex. 17.  Continuing, the SEC's expert stated that it is not necessary to include all red flags; what is required is "enough details in the SAR to advise regulators and law enforcement officials *why* the financial institution filed it." *Id*. (emphasis added); *see also* Angotti Dep., at 277, Ex. 10 (confirming that identified red flags generally might need to be included in the narrative, but "it depends on what the fact is"); *see also id*. at 280-281, Ex. 10 (confirming that a red flag itself does not mean that a transaction is reportable; it means it's something that the firm should look at, and if the activity is suspicious, it needs to be included in the SAR); *id*. at 282, Ex. 10 (stating that red flag should be discussed in the narrative when they are "material"); *see also* the Navigant Report, SEC's Ex. 2 ("The presence of red flags alone, of course, does not mean that a transaction is suspicious and reportable.").

50.     Leia Farmer, Alpine's AML Officer during the relevant time period, testified that a red flag "is simply a trigger.  It's simply a flag or something that we would then review, monitor more carefully, look more closely to determine whether it really truly – whether the activity, based on what we knew about the client either directly or indirectly, meaning through the introducing broker-dealer, would be enough to determine whether to file or not file a SAR." Thus, the "trigger" is not a trigger to file a SAR but a trigger to review and determine whether

"that activity is suspicious in nature" and determine "whether, if it is suspicious, to file a SAR." *See* L. Farmer Dep., at 82-83, Ex. 16; *see also* Alpine Dep., at 68, Ex. 3 ("In general, Alpine would use red flags in its program to cause the activity that would trigger a red flag to be subject to further review."); *id*. at 68-70, Ex. 3 ("if that red flag was relevant to the reason why the SARs was filed, it should be on the SARs" but if a red flag is not included in the SAR narrative then "the filer of that SAR didn't feel it was relevant to the reason why the SAR was filed"); *id*. at 76, Ex. 3 ("I'd say generally these were red flag indicators that would cause a transaction to come under heightened scrutiny" and "…merit looking further into."); E. Green Dep., at 119, Ex. 2 ("Red flags should be considered."); R. Jones Dep., at 75-76, Ex. 15 ("If I determine something to be suspicious and needed it to be included in the SAR, I would have put it in the SAR.").

51.     Leia Farmer also testified as to her understanding of Notice 09-05 references to so-called "red flags" as follows: "My recollection is that FINRA put together a list of – of, you know, bulleted points where they believed that the activity could be suspicious in nature. They were very clear to say it could be, not necessarily that it was, but that firms ought to consider this as part of their program." *See* L. Farmer Dep., at 84, Ex. 16.

52.     Alpine did not believe that the items listed in Notice 09-05 "by definition had to be part of the narrative." *See* L. Farmer Dep., at 89, Ex. 16.

53.     Notably, although the SEC's expert referred to and relied upon the list of red flags identified in Notice 09-05, she admitted during her deposition testimony that 09-05 was not relied upon by the Court because it addresses Section 5 analysis. *See* Angotti Dep., at 256-57, Ex. 10.

54.     "The Alpine process was designed to identify red flags that would merit further

review, to determine its **relevancy**, as well as – as well as its **applicability**" to the transaction. *See* L. Farmer Dep., at 186, Ex. 16 (emphasis added).

55.     Erin Green, Alpine's current AML Officer, summarized her approach to investigations and working through the AML process when she was a compliance analyst.  First, Ms. Green would review all of the account documentation and stock deposits, perform Google searches, and searches on Lexus Nexus.  Once she completed her initial research and investigation, Ms. Green stated the following: "If it was appropriate or I had any questions, I would escalate the situation, discuss it with Leia [Farmer, AML Officer], prepare a SAR, if she required it. Write her a memo, portray it to the legal staff if I thought it was pertinent. Like I said, anything and everything that I felt I needed to do.  Most importantly, if I identified a red flag, and it was, you know, to escalate it to the appropriate person in that role." *See* E. Green Dep., at 128-130 Ex. 2; *see also* T. Groskreutz OTR, at 160, Ex. 4 (stating that Alpine escalates red flags to the CCO, and potentially other departments such as legal and trading and sometimes senior management, but generally this is the function of compliance to analyze the issues).

56.     Todd Groskreutz, Alpine's previous CCO from May 2011 through May 2012, in an on-the-record testimony, stated the following: "I think we're very cognizant of our role in the industry and we do a good job on monitoring and looking for all these red flags.  And when there are red flags, we bring it to the appropriate supervisor, broker dealer firm or entity level that it needs to be escalated to.  So, of course, we try our best to make sure that we're not facilitating, in your words, any type of illegal activity.  We don't – I'm sorry, I do take alittle bit of offense to that [question regarding facilitating illegal conduct], because I do think we have good processes, I do think we're doing our job, and I think we're doing all we can.  You are correct, there are

risks involved.  That's why we escalate it to the appropriate people that have the authority to take

the appropriate action."  T. Groskreutz OTR, at 149-152, Ex. 4.

57.    The SEC's expert herself, in her Rebuttal Report, acknowledged that SAR filing

decisions incorporate a "subjective element" of "whether a reasonable broker dealer could have

come to a different conclusion in considering whether to file a particular SAR."  *See* Navigant

Rebuttal Report, at 15, Ex. 17.  She concedes that "reasonable people can sometimes disagree,"

and thus "[i]f a reasonable broker-dealer could have come to a different decision, *then a decision*

*to file or not to file should be left to the broker-dealer*."  *Id.*, Ex. 17. (emphasis added); *accord*

Angotti Dep., at 63, Ex. 10.

58.    Notably, the SEC's expert also advocates a risk-focused approach for a particular

business and clientele: "the BSA requires financial institutions to design programs tailored to the

risk of their particular businesses, clients, produces and services and geographies," and "focus its

compliance efforts" on those "parts of its business that present the most risk."  *See* Navigant

Rebuttal Report, at 17, Ex. 17.  The SEC's expert also concedes that the focus must be on the

program: "The fact that such risks exist does not always mean that there is some kind of inherent

criminality in a particular client type, securities type, jurisdiction or other risk attribute."  *Id.*, Ex.

17.

59.    Alpine's expert witness, Beverly E. Loew, stated the following regarding the

significance of red flags with respect to Alpine's SARs:

a.    Fundamentally, the SEC's expert witness's view regarding SAR filing

requirements appears to be that when a broker-dealer is alerted to a potential red flag

regarding customer activity in the context of microcap or penny stocks, the firm is

required to file a SAR, and to include in the SAR narrative every possible red flag the firm knows or should have known about that customer, the transaction, the issuer, the security and its trading history, and whether there is any foreign involvement whatsoever. That view ignores the SAR regulations themselves, as well as the well-established SAR-filing principles and practice, particularly with respect to clearing firms, and it depends for its validity on cherry-picked guidance, settled (not litigated) disciplinary actions, a skewed view of the penny stock and microcap spaces, and the supposed inability of users of the SAR database to understand the purpose and content of the SAR filing. *See* Loew Expert Decl., at ¶ 184, Ex. 5 (citing the Navigant Report).

   b.  In addition to improperly relying on guidance, the SEC's expert witness's analysis fundamentally misstates the significance of red flags, even according to the very guidance she relies upon.  The SEC's expert witness ultimately takes the position in her Report that if a firm identifies "red flags" associated with a customer's activity, the firm must, as a matter of law, file a SAR and include such "red flags" in the SAR narratives.  Not only is that inaccurate, but such a requirement would hopelessly muddy the SAR database with useless information.  To try to figure out what the issue is in connection with a particular SAR, a law enforcement or supervisory agency would have to weed through all the "red flags" that turned out to be red herrings to try to determine which one may have turned out, after examination, to have been an actual indicator of suspicious activity and, thus, triggered the SAR filing.  *Id*., at ¶ 193, Ex. 5 (citing the Navigant Report).

   c.  Notwithstanding its final conclusions, even the Navigant Report actually

confirms that the presence of supposed "red flags" does not mean "that a transaction is suspicious and reportable."  The SEC's Office of Compliance Inspections and Examinations ("OCIE") has expressly acknowledged as much in guidance as well. Thus, as OCIE itself concedes: "[t]he Staff does not contend that the existence of any of these examples, which may indicate suspicious activity, necessarily triggers the broker-dealer's obligation to file a SAR.  Whether the broker-dealer has such an obligation depends on the totality of facts and circumstances in a particular situation."  *Id*., at ¶ 194, Ex. 5 (citing and quoting from the Navigant Report and OCIE's National Examination Program Risk Alert).

       d.     Moreover, Navigant also agrees that red flags should not be viewed as automatic triggers; instead they "require the firm to 'ask the next logical question' to understand whether there is a reasonable explanation for the transaction.  If there is no reasonable explanation, the firm must file a SAR."  That focus on whether there is a "reasonable explanation" for a transaction is appropriate and critical: money laundering transactions frequently involve economically unreasonable transfers.  Yet the Navigant Report then abandons that rational approach in favor of its myopic focus on the mere presence of a red flag.  The SEC expert never goes the next step of applying its own analysis, and does not reach any conclusion that Alpine failed to conclude that there were reasonable explanations for the transactions at issue.  Rather, the SEC's expert witness presumes as much from the fact that there is no written record outlining the firm's rationale.  *Id*., at ¶ 195, Ex. 5 (citing and quoting from the Navigant Report); *accord* Angotti Dep., at 68-69, Ex. 10 (confirming that if there is a reasonable explanation for a

transaction, there is no basis to believe that it is facilitating criminality).

       e.      Nor is there any requirement in the SAR instructions or guidance requiring the discussion of specific, or any, "red flags."  While FinCEN has provided instructions in the SAR Form regarding items to consider including in the narrative, none of the "red flags" articulated in the Navigant Report are included in that list.  To read these requirements into the rule imposes obligations over and above what is mandated. Loew Expert Decl., at ¶ 196, Ex. 5.

       f.      Based on Alpine's expert witness's experience, "red flags" are not *per se* suspicious scenarios, but rather, are indicators that might prompt an inquiry into an activity that may or may not rise to the level of reportable activity.  "Red flags" are, in other words, simply a means by which a firm may identify activity that should be examined to determine if there may be suspicious activity for which a SAR should be filed.  However, the "red flag" often will have nothing to do with suspicious activity that may ultimately be identified.  *Id.*, at ¶ 197, Ex. 5.

       g.      If firms are required to identify and include every "red flag" in the firm's possession in the SAR narrative, regardless of whether such "red flag," upon investigation, is truly indicative of suspicious activity, there is a significant risk that SAR narratives will include irrelevant and extraneous information, which will water down the information contained in the BSA database and ultimately be counterproductive to law enforcement that utilizes the database.  In other words, if firms are required to include in their narratives every potential red flag regarding the transaction and relevant parties, the basis for the firm's decision that the activity is suspicious may well get lost in the weeds.

Moreover, it is also not always possible for a firm to develop "red flag" information because that information may be unavailable to the firm and the firm will not have, as law enforcement and regulatory authorities do, police powers that may be used to compel production of the information. *Id*., at ¶ 198, Ex. 5.

h.   Insofar as the SEC's expert witness argues that particular "red flags" must necessarily be included in the SAR narrative as a matter of law whenever such information is available to the firm, that position is not consistent with the fundamental purpose of the narrative: to identify the firm's basis for concluding that the activity at issue is suspicious. If that "red flag" did not lead to the firm's decision to file a SAR, it is not a required element of the SAR narrative. Indeed, firms may well conclude, after investigating, that the "red flags" that prompted their investigation were not sufficient to warrant a SAR filing, but that other information the firm uncovers in its investigation does warrant a SAR filing. In that instance, the information that led to the SAR filing should be included in the SAR narrative, not the "red flags" that the firm concluded after investigation could be explained or were irrelevant. *Id*., at ¶ 199, Ex. 5.

i.   Further, the "red flag" rule created by Navigant is, as a practical matter, unfair and unworkable. There is no published, comprehensive list of "red flags" that industry participants can use to satisfy the standard the SEC's expert witness would have the Court adopt. While there are some advisories and various and sundry pieces of guidance that discuss certain potential "red flags" for particular kinds of activity, products, clients, and markets, those lists are neither comprehensive nor stagnant. Rather, as demonstrated by the fact that the SEC was relegated to relying on settled

enforcement cases to identify certain "red flags" it claims Alpine should have included in its SAR narratives, regulators and industry participants are continually identifying new "red flags" as criminals become more sophisticated or change strategies, financial products change and evolve, and as industry participants and regulators identify new ways of identifying potentially illegal conduct.  *Id.*, at ¶ 200, Ex. 5 (citing from FinCEN guidance).

j.      To suggest that firms are required to include in each SAR narrative each "red flag" that the SEC has in its mind, when those "red flags" are not defined in a comprehensive manner in any particular piece (or even pieces) of guidance by the SEC (or any other regulator) is fundamentally unfair to industry participants and sets a changing and evolving standard that, practically speaking, no firm can ever live up to. Moreover, insofar as the SEC and the SEC's expert witness have relied on "red flags" identified for the first and only time in settled cases, the SEC and SEC's expert witness seek to elevate not only guidance but also settled cases to settled law, bypassing appropriate rule-making procedures or even independently adjudicated decision-making. *Id.*, at ¶ 201, Ex. 5 (citing *In re Albert Fried & Co.*, SEC Release No. 77971, 2016 WL 3072175, at *5 (June 1, 2016)).

k.      Not only is it fundamentally unfair, unwieldy, and inconsistent with regulatory guidance to require firms to include in each SAR narrative every "red flag" it happens to have information about, it is also unnecessary.  It should be recognized that there are all types of SARs.  Some necessitate more explanation than others, and, in the case of some SARs, the checkboxes associated with common "red flags" on the SAR

form, combined with a concise narrative, provide sufficient information to law enforcement and applicable regulators.  *Id*., at ¶ 202, Ex. 5.

l.      Indeed, as noted above, the SAR form, now established in electronic forms, contains searchable fields separate from the narrative component that answers these questions with sufficient detail to permit enforcement agencies to query persons, types of transactions, common suspicious activities, and geographic locations, and unlike the narrative, are far more efficiently queried because of their standardization than the narrative, which is free form.  Regardless of what is in the narrative, a search result permits an enforcement agency to query the filing firm and seek additional information about the transaction in the form of the SAR supporting information.  *Id*., at ¶ 203, Ex. 5.

m.      The SEC's expert witness's analysis with respect to the SAR narratives she has analyzed is erroneous not just for the reasons set forth above, but also because (i) the selection of the particular red flags she has identified as a basis for critiquing Alpine is arbitrary, providing no cogent methodology for the identification of required red flags or adequate explanation for the selection of the particular red flags she chose to highlight, and (ii) her analysis and application of the red flags she selected is misguided.  *Id*., at ¶ 204, Ex. 5.

## IV.      Voluntary and Template SAR Filings

60.      Based on evolving standards in the industry as found in various changes and updates to FINRA and FinCEN guidance, communications with regulators, including during exams, and Alpine's own risk assessment of policies and procedures in filing SARs, Alpine routinely filed voluntary SARs on transactions that did not meet the requirements for when "[a]

SAR must be filed," under Alpine's WSPs and the governing BSA regulation 31 C.F.R.

§ 1023.320.  *See* E. Zipprich Decl., at ¶ 27, Ex. 1; *see also* E. Green Dep., at 110, Ex. 2

(discussing evolving industry standards and stating, "Standards of what Alpine should consider

in – in making risk assessments and SAR determinations, changing policies and procedures.

Constantly working towards culture of compliance every day.  Taking everything that I can

that's applicable into account.").

     61.     NASD states that "voluntary reporting is useful to the government and helpful to

firms in order to provide a defense to charges of aiding and abetting money laundering

violations." at 11.  *See* NASD Notice 02-21, at 11, Ex. 11.

     62.     Thus, Alpine understood that outside of the four fundamental tenets of the BSA,

the firm may file a voluntary SAR.  *See* Alpine Dep., at 44, Ex. 3.

     63.     Alpine "very often" filed SARs that it did not think were suspicious during the

relevant time period.  *See* Alpine Dep., at 45, 97, Ex. 3.

     64.     As an objective example, Alpine filed many SARs involving transactions which

did not meet the $5,000 threshold, including 213 SARs at issue in this matter.  *See* Navigant

Report, at 37, n. 142, SEC's Ex. 2.

     65.     Mr. Frankel testified during Alpine's deposition that the "firm basically had a

practice in place that, for example, where they would file on a voluntary SARs on a large deposit

of microcap securities.  And the criteria for making that determination was largely a very

objective criteria for commencing with that action."  *See* Alpine Dep., at 43, Ex. 3.

     66.     Mr. Frankel also testified that "for the most part" filing a SAR on a large deposit

of microcap securities was an automatic filing "in an attempt to comply with what the firm felt

FINRA was looking for the firm to do." *See* Alpine Dep., at 43-45, 95, Ex. 3.

67.     Thus, Alpine's voluntary filings of SARs included transactions of large deposits of low-priced securities, that Alpine did not believe were suspicious, but filed because of regulatory notices and comments that regulators may view those deposits as suspicious. *See* L. Farmer Dep., at 51-54, Ex. 16 (discussed the "balancing act" for defensive filing by trying to comply with the regulators but filing on transactions that are not suspicious).

68.     Accordingly, Mr. Frankel testified: "I would say that again, in the opinion of the firm, that a huge number of the SARs that are at issue in this case, which concern the large deposit of penny stocks, would constitute a voluntary disclosure." *See* Alpine Dep., at 95, Ex. 3.

69.     Leia Farmer, Alpine's AML Officer during the relevant time period, verified that at the time that she came to Alpine, it was "routinely filing SARs on large deposits of low-priced securities regardless of whether Alpine determined them to be suspicious." *See* L. Farmer Dep., at 36, Ex. 16.  Subsequently, Alpine began refining the reason why it was filing the SAR.  *Id*. at 37, Ex. 16.

70.     The SEC's expert not only agrees that penny and microcap stocks are neither illegal nor criminal, but also stated in regards to large deposits: "[i]n fact, large deposits of penny stocks ***are often not suspicious without [a] subsequent liquidation***, because it is the liquidation that is the mechanism to consummate the market manipulation or sale of unregistered securities." *See* Navigant Rebuttal Report, at 17 – 18, Ex. 17.

71.     Moreover, the SEC's expert also states that a large deposit of a penny stock is not "on its face unlawful and reportable. . . " *See* Navigant Rebuttal Report, at 3, Ex. 17; *see also* Angotti Decl., at ¶¶ 37-38, SEC's Ex. 1 (stating that a large deposit of a low-priced securities

"can" provide a reason to suspect, not automatically); *see also* Angotti Dep., at 227-228, Ex. 10 (testifying that a large deposit of low-priced securities, in and of itself, would not automatically be deficient because there could be a "reasonable explanation that makes sense" that makes it not reportable, even though the transaction appears to be very suspicious); *id*. at 230, Ex. 10 (stating that a large deposit of low-priced securities does not always require a filing of a SAR).

72.     Alpine created templates for the very purpose of filing voluntary or defensive SARs which it did not think were suspicious but that FINRA wanted Alpine nonetheless to file. *See* Alpine Dep., at 45-46, 87, Ex. 3 ("…the templates were created with an eye toward what Alpine thought regulators wanted to see?  Yes."); *see also* L. Farmer Dep., at 90, Ex. 16 (stating that the deposit SARs, large volume of low-priced securities, were filed in response to what Alpine's regulators wanted to see).

73.     A SAR narrative which stated "it is Alpine's policy to file a SAR" on a transaction or account is an indication that the SAR is being filed because of Alpine's policy, not because of a finding of suspiciousness.  *See* L. Farmer Dep., at 216, Ex. 16.

74.     Alpine stated in its response to the 2015 OCIE Examination that "Alpine's main business is providing clearing and trade processing services for microcap stocks.  The firm is well aware of the regulatory scrutiny of such transactions and the wide-ranging cases the SEC and other regulators have brought to reduce violative activity in this area.  Alpine wants the various regulatory agencies to have the benefit of seeing information it has in its possession." Leia Farmer testified that this statement is in reference to Alpine continuing to report deposits even if it had not found the transaction to be suspicious within the meaning of the BSA.  *See* L. Farmer Dep., at 76-77, Ex. 16 (quoting Alpine's response to the 2015 OCIE Examination, dated

May 20, 2015, at p. 4).

75.     Alpine's expert witness, Beverly E. Loew, stated the following regarding

voluntary SAR filings:

a.      As the SEC's expert witness correctly states, "[t]he rule concerning SARs

contemplates that a broker-dealer may file a voluntary SAR, even when a filing is not

required by law."  Firms may file voluntary SARs in a variety of situations, including

where:

- the activity being reported in aggregate does not reach the $5,000 reporting
  threshold,

- the activity has been determined not to fall into one of the four filing
  categories, but nonetheless is determined by the broker-dealer to be
  worthy of reporting for some reason,

- the activity involves activity that is excepted from the reporting
  requirement in the rule including robbery, burglary, or attempts that are
  reported to law enforcement, or for lost, missing, counterfeit, or stolen
  securities that are reported to the SEC, or activity that is reported on a Form
  U4 or U5, or

- is being filed based upon the suggestion or determination by a third-party
  that a SAR should be filed, even though the broker-dealer had determined
  the activity in question was not required to be reported.

*See* Loew Expert Decl., at ¶ 175, Ex. 5 (citing the Navigant Report and FinCEN
guidance).

b.      Congress adopted a safe harbor into the SAR statutory scheme and applied

it to all voluntary reports of suspicious activity.  By making the safe harbor applicable to

voluntary SARs, neither regulators nor the courts would have to struggle to second-guess

whether the determination of a financial institution to file a SAR was voluntary or

mandatory under the BSA; the safe harbor would insulate the filing firm from liability to

the subject for harm resulting from report, regardless of whether the SAR was voluntary or mandatory.  *Id.*, at ¶ 176, Ex. 5.

       c.       There is no statutory or regulatory directive requiring that a filer distinguish between a SAR that must be reported or one that has been reported voluntarily. In light of this, no special requirements have been adopted for when a firm may determine to file a SAR voluntarily or do so inadvertently.  *Id.*, at ¶ 177, Ex. 5.

       d.       When determining whether some or all of the SARs filed by Alpine were "mandatory" or voluntary SARs, the SEC's expert witness erroneously asserts that there are standards that would apply to voluntary SARs. Contrary to the suggestion of the SEC's expert witness, there is no requirement that voluntary SARs be identified as such on the face of the SAR, that a SAR can only be considered to be voluntary when it does not meet the $5,000 aggregate threshold, or that the SAR narrative or supporting documentation must show that the firm conducted an investigation and "uncovered facts to negate a reason to suspect criminal activity."  *Id.*, at ¶ 178, Ex. 5.

       e.       The SEC's expert witness cited no authority for the propositions above, nor is there any authority she could cite to support those views. There is no rule requiring that firms expressly provide that a SAR is being filed voluntarily. Nor is there any rule requiring firms that file voluntary SARs to justify their conclusion that the activity is not, in the firm's view suspicious, or that the SAR may not actually be required.  *Id.*, at ¶ 179, Ex. 5.

       f.       Nor do the contents of a firm's AML program cause a SAR that is not required to be reported to become "mandatory," as the SEC's expert witness asserts. The

conclusion that "Alpine's own procedures indicate that the practice of a customer who deposits penny stocks, liquidates the shares, and wires out the proceeds is suspicious activity," and that Alpine's SARs therefore were "mandatory" is, quite frankly, baseless. *Id*., at ¶ 180, Ex. 5.

g.     The SEC's expert witness's conclusion appears to be premised on the belief that the establishment of a risk-based AML program under the BSA and its implementing regulations, which leaves room for a firm to make judgment calls, cannot be applied flexibly once adopted by management. Indeed, it appears that the SEC's expert witness has developed a unique interpretation of "a pattern of transactions" in order to permit the aggregation of the deposit and liquidation of a single deposit-for-sale transaction in order to cause many of the low dollar transactions effected through Alpine to exceed the $5,000 filing threshold and become reportable. Neither the conclusion nor the interpretation has any basis in law, nor does the SEC's expert witness make any credible attempt to cite one. *Id*., at ¶ 181, Ex. 5.

h.     In Alpine's expert's opinion, the SEC's expert witness has not established that Alpine SARs were, in every instance, required filings or that those SARs were deficient or untimely and, in fact, there is significant evidence to the contrary. Based on Alpine's expert's review of the Navigant Report and attached exhibits, it appears to Alpine's expert that Alpine implemented guidelines established to detect and manage risk and detect and report suspicious activity. The SAR supporting documentation files to which Navigant cites, and the SEC expert witness's analysis of the SARs themselves, show that Alpine had robust due diligence practices they employed and which they

improved and enhanced over time.  *Id*., at ¶ 33, Ex. 5.

       i.     First, as the SEC's expert witness herself acknowledges elsewhere in the Navigant Report, penalizing a firm for failing to file a SAR requires evidence that the firm knew or suspected that the transaction involved criminal activity, the firm found no reasonable explanation for the transaction, or that—at the least—"on the facts existing at the time, a reasonable broker-dealer in similar circumstances would have suspected the transaction was subject to SAR reporting." With respect to Alpine, however, the SEC's expert witness has not offered any such examination of the facts and circumstances of any transaction applicable at the time Alpine would have reviewed the transactions to determine whether to file a SAR. Failing to do so is fundamentally inconsistent with the SAR rule and makes the conclusion in this instance hollow and unsupportable. As such, it should be rejected.  *Id*., at ¶ 182, Ex. 5.

       j.     Second, the SEC's expert witness's apparent antagonism toward the microcap and penny stock markets, as discussed above, colors her conclusions in inappropriate ways. It simply is not the law or the factual reality that every transaction involving "low-priced" securities is inherently suspect. Insofar as the SEC's expert witness's conclusion that the SARs were mandatory is based on the simple fact that they involved "low-priced" securities, that is not, in and of itself, a sufficient basis for concluding that the SARs were mandatory.  *Id*., at ¶ 183, Ex. 5.

       k.     Third, as the SEC's expert witness herself acknowledges earlier in the Navigant Report, "[t]he presence of red flags alone, of course, does not mean that a transaction is suspicious and reportable." Rather, a red flag is an indication that the

transaction should be examined by the Firm. Here, there can be no real dispute that the transactions were, in fact, examined and SARs were filed. Insofar as the SEC's expert witness takes issue with the fact that Alpine did not explain the basis for a decision not to file a SAR, the SEC's expert witness has cited no authority imposing such a requirement. Nor is Alpine's expert aware of any. In fact, even if Alpine did not file a SAR at all, there is no regulatory requirement that a firm document its rationale for every conclusion that a SAR is not required. *Id.*, at ¶ 184, Ex. 5.

l.      Finally, it is worth noting that, although the SEC's expert witness repeatedly states that Alpine possessed sufficient information to suspect that the transactions at issue either had no apparent business or lawful purpose or resulted from the use of Alpine to facilitate criminal activity—particularly the sale of unregistered securities—neither the SEC nor Navigant has pointed to a single transaction that actually did amount to an unregistered sale of securities, or any evidence that Alpine could have discovered that the securities were unregistered at the relevant time. *Id.*, at ¶ 185, Ex. 5.

m.      In sum, the analyses and conclusions in the Navigant Report about the voluntary or "mandatory" nature of the Alpine SARs appear to be based more on generalized suspicion and assumptions, rather than a thorough analysis by Navigant of all of the facts and circumstances relating to a transaction. *Id.*, at ¶ 186, Ex. 5.

## V.      <u>Ongoing Improvements to Alpine's AML Program</u>

76.      Alpine was founded in 1984 and has always been involved in the penny stock market. *See* T. Groskreutz OTR, 105, Ex. 4.

77.     The SEC's expert acknowledge during her deposition that when Alpine was acquired in 2011, it had only limited compliance staff.  *See* Angotti Dep., at 336, Ex. 10.

78.     After the acquisition of Alpine in 2011 by new ownership, Alpine "hired a lot more personnel, compliance personnel in particular."  *See* T. Groskreutz OTR, at 107, Ex. 4.

79.     Alpine has improved its suspicious activity monitoring and reporting over time. *See* E. Zipprich Decl., at ¶ 33, Ex. 1.

80.     Alpine has had various methods of training in AML review at Alpine, including third-party continuing education modules, in house staff meetings to discuss various issues, on the job mentoring and training, and external law firms that came into Alpine to discuss AML procedures and training.  *See* Alpine Dep., at 62-63, Ex. 3; R. Jones Dep., at 18, Ex. 15 (discussing the value of on the job training); *see also* T. Groskreutz OTR, at 95, Ex. 4 ("We hired an AML officer. We hired a chief compliance officer. We retained outside counsel. We registered – all employees took continuing education classes through FINRA…But those were all designed to increase our training, awareness, dealing with all suspicious activity, not just specifically a foreign financial institution.").

81.     Alpine has always diligently sought to hire and retain employees devoted to compliance.  In 2012, during the timeframe of a FINRA Exam, Alpine hired additional qualified compliance employees for its AML program, including Leia Farmer, who has a strong background in compliance.  *See* E. Zipprich Decl., at ¶ 34, Ex. 1.

82.     Leia Farmer, had 13 years of experience in the securities industry before joining Alpine as CCO around April of 2012, including positions as a compliance officer, CCO, and AML Officer for Securities America and Brecek & Young.  Ms. Farmer held the following

licenses: Series 7 (general securities); Series 63 (state examination); series 4 (options principal license); 24 (general securities principal); 66 (investment advisory – for a time; lost because Alpine was not a registered investment advisory firm).  *See* L. Farmer Dep., at 7-10, Ex. 16.

83.    During 2012, Ms. Farmer asked that compliance personnel draft Standard Operating Procedures regarding specific tasks assigned to their area of compliance to further help define each employee's role and assist in the overall AML program goals of a culture of compliance.  *See* E. Zipprich Decl., at ¶ 35, Ex. 1; *see also* L. Farmer Dep., at 34-35, Ex. 16. The document referenced in the Navigant Report at 36 is an example of one of those documents; it describes the task of a compliance analyst, *not* the process relating to SAR filings.  *See* Navigant Report, at 36, SEC's Ex. 2.

84.    Also, in an effort to improve compliance and AML, Alpine hired additional compliance personnel including attorneys and separated the AML officer and compliance officer positions and hired a full-time compliance officer.  *See* T. Groskreutz OTR, at 94-95, Ex. 4.

85.    Throughout 2012, Alpine continuously updated its AML review process.  Alpine updated its back-office computers software which included multiple new compliance features and generated new compliance reports.  Alpine's compliance personnel could run a number of different queries, including the use of searching the Office of Foreign Assets Control ("OFAC") report.  *See* E. Zipprich Decl., at ¶ 37, Ex. 1.

86.    FINRA conducted an examination of Alpine during September of 2012.  *See* FINRA's Report of Examination, dated September 28, 2012, Ex. 20; *see also* Alpine's Response to FINRA's Report of Examination, dated October 24, 2012, Ex. 21.

87.    Notably, FINRA's Report of Examination during 2012 found that Alpine's SAR

were "substantively inadequate" which was a direct reference to Alpine use of template language in its SAR filings.  *See* L. Farmer Dep., at 57, Ex. 16 (discussing FINRA's exception and Alpine's response in its letter dated October 24, 2012) (FINRA's allegation refers to "two basic formats or templates used by [Alpine], neither of which were substantively adequate as they failed to fully describe why the activity was suspicious.").

88.     As stated above, Alpine "very often" filed SARs which it did not think were suspicious nor required, and, "for the most part" the filing of template SARs on large deposits of low-priced securities (to which FINRA found to be inadequate) were filed only because that is what Alpine previously believed FINRA wanted it to do.  *See* ¶¶ 60-75, *supra*.

89.     However, in addition to the template, voluntary SARs on large deposits of low-priced securities that Alpine did not find to be suspicious of criminal activity, Alpine also filed SARs during 2011 and 2012 evidencing its robust AML review and analysis of red flags when those flags resulted in suspicion.  The following SAR narratives are such examples, none of which were included by to the SEC in its claim:

a.     A SAR narrative dated 02/28/2011 states the following:





*See* SAR, ████████████02.28.11, Ex. 22.

b.    A SAR narrative dated 08/13/2012 states the following:





*See* SAR, ███████████08132012, Ex. 23.

c.      A SAR narrative dated 08/27/2012 states the follow:







*See* SAR, ████████082712, Ex. 24.

d.      A SAR narrative dated 08/29/2012 states the following:



*See* SAR, ████████08292012, Ex. 25.

e.      ████████████████████████████████



*See* SAR, ██████020111, Ex. 26.

*See* also the SARs attached as Ex. 27 through 54 for further examples of

comprehensive SAR narratives filed during 2011 and 2012 at a time when the

SEC claims Alpine's SARs were templates and Alpine alleges that the templates

are voluntary filings as opposed to the SARs referenced in this paragraph.

Notably, the SEC's expert witness testified that she did not conduct any other

sampling of SARs filed by Alpine; she only considered the SARs given to her by

the SEC.  *See* Angotti Dep., at 222-223, Ex. 10.

90.     FINRA's Report of Examination for 2012 did not state that Alpine's SAR

narratives were deficient for failure to include every single red flag that has been cited in

FinCEN guidance.  *See* FINRA's Report of Examination, dated September 28, 2012, Ex. 20.

91.     Alpine did not ignore FINRA's Examination and criticisms but took it as a further

opportunity to develop the AML program.  *See* L. Farmer Dep., at 89, Ex. 16.

92.     The SEC's expert acknowledged during testimony that Navigant's own review

and its data prove that Alpine's program developed and demonstrably improved from 2012

forward.  *See* Angotti Dep., at 308-309, 337-338, Ex. 10 (stating, among other things, "Let's just

say I saw improvements in the quality of the SARs as time went by and, in fact, some that were

vary late in the period we didn't find any omissions at all."); *id*. at 340-342, Ex. 10 (the SEC's

expert cannot say that during 2015 that Alpine's AML program was a failure, although she says

that there were still deficient SARs but they were improving).

93.     In fact, of the 1597 total SARs on the SEC's expert's Table A-8, 1075 of those

SARs (roughly 68%) were filed on or before September 28, 2012 – the date of the FINRA

Examination – leaving only 522 SARs at issue in this matter after the 2012 FINRA Examination.

*See* Table A-8 (SEC's Ex. 10); *see also* FINRA's Report of Examination, dated September 28,

2012, Ex. 20.

94.     Notably, the SEC's expert prepared and provide with the Navigant Report a chart

and graph that illustrates the large decrease of alleged SAR violations after 2012.  *See* Exhibit A

with Chart, Subcategory Quarterly, Ex. 55 (the SEC did not provide these charts to the Court).

95.     During the period after the 2012 FINRA Examination until the end of 2015,

Alpine continuously filed SARs which have not been alleged to be deficient.  *See e.g.* SARs

identified as Ex. 56 through 63.

96.     In addition, of the 1,015 SARs which the SEC's expert claims were insufficient

on their face for failing to include the so-called "5Ws," (Table A-1) only twenty (20) are alleged

to take place after Alpine received FINRA's examination report in September of 2012.  *See*

SEC's Expert's Table A-1, Ex. 64; *see also* Navigant Report, at 52, SEC's Ex. 2; *see also*

Angotti Dep., at 297, Ex. 10 (confirming that roughly 1000 of the deposit SARs – large deposit

of low-priced securities – are dated from May of 2011 to August of 2012).

97.     Leia Farmer gave the following testimony in regards to FINRA's finding that

Alpine filed 823 deficient SARs identified in its 2012 Examination: "My view of that [over 800 identified deficient SARs because of the use of templates], which I believe I responded to previously, is that based on the review of the SARs that I looked at, I saw an opportunity to enhance them.  And ideally the goal was to give – give the team more training but also to address the concerns that FINRA had and to be a better partner with law enforcement, to be able to provide the level of detail that made – that helped them identify – of help – yes, help them to identify the next case for them. . . . There was an opportunity here to be a better partner with law enforcement and to identify areas where we could augment our narratives."  *See* L. Farmer Dep., at 203-204, Ex. 16.

98.     FINRA did not file an action against Alpine as a result of its 2012 Examination. *See* L. Farmer Dep., at 217-218, Ex. 16.

99.     Alpine's expert witness, citing the Navigant Report and findings, stated the following regarding Alpine's response to FINRA's criticism and rapid correction in its SAR filings:

> The sufficiency of its AML program was evidenced also by the rapid decline in so-called fatally deficient SAR filings. As reflected in the Navigant exhibits, that decline began in 2012, even before the FINRA compliance examination was concluded, and continued past the SEC compliance examination in 2015. The SEC's expert witness's criticism is based almost entirely on SARs filed before 2013. Of the 1,597 SARs listed on Tables A-1 through A-7, for example, 1,157 of those SARs were filed before January 1, 2013. Of the 1,015 SARs listed on Table A-1, 990 SARs are dated before 8/22/2012. The SEC's expert witness wholly ignores the fact that, in the wake of criticism by FINRA, Alpine immediately began completing more robust narratives. It is clear that compliance personnel at Alpine implemented processes to comply with its AML obligations and continuously developed and improved its AML procedures.

Loew Expert Decl., at ¶ 266, Ex. 5.

100.     Since 2012, Alpine has continued to improve its AML program by implementing,

among other things, an improved mechanism to track drafted SAR reports during the review

stage, an improved escalation process to senior management of any accounts of concern, and

additional training on trade surveillance.  *See* E. Zipprich Decl., at ¶ 38, Ex. 1.

101.    Prior to Alpine's 2015 OCIE Examination, Alpine never received notice during its

previous exams with regulators that Alpine was failing to include in the SAR narratives every

single red flag.  *See* L. Farmer Dep., at 57-58, 64, Ex. 16 (stating that Alpine was not told during

a 2014 OCIE Examination that a SAR narrative must automatically include all red flags).

102.    Regulators had never communicated to Alpine an identifiable list of red flags that

would have to be included in a SAR narrative.  *See* L. Farmer Dep., at 58, Ex. 16.

103.    In fact, the SEC's expert witness added to the illusive nature of what is a red flag

and where they can be found by confirming that "there is not complete list of red flags of

suspicious information" and testifying during her deposition that "you don't need a particular

citation for a red flag anyway. A red flag is a red flag."  *See* Rebuttal at 7; Angotti Dep., at 357,

Ex. 10.

104.    To Alpine's understanding the SAR narrative should include the pertinent details

of the transaction and answer the "why" aspect of the filing, meaning, articulate why the broker-

dealer believes the activity may be suspicious in nature and what is it about this activity that

deviates from what the broker-dealer knows about that customer.  *See* L. Farmer Dep., at 58-59,

Ex. 16; *see also id*. at 88-89 (In discussing the five "Ws", in regards to the question "why", "the

intent was to address why the firm believed the activity to be suspicious in nature.").

105.    Moreover, the SAR itself provided contact information for Alpine in order to

allow a regulator to contact the firm and AML Officer to request additional information.  Leia

Farmer testified that it was "not uncommon for someone who reviewed the SAR to contact our office and request supporting documentation."  *See* L. Farmer Dep., at 60, Ex. 16.

106.    Erin Green, Alpine's current AML Officer, and employed in Alpine's AML department since 2012, testified that she never believed at any point that Alpine's SARs were deficient.  *See* E. Green Dep., at 95, Ex. 2.

107.    Leia Farmer, Alpine's AML Officer during the relevant period, testified that as CCO and AML Officer she made her best efforts to ensure that Alpine was complying with the AML requirements, including the SAR filing requirements, and never sought to evade those laws.  *See* L. Farmer Dep., at 90, Ex. 16.

108.    Leia Farmer testified that changes and improvements to Alpine's AML Program since 2012 included bringing in a surveillance team, creating an AML analyst position, focus on the training activity occurring within the organization, and expanding the AML personnel, refine the policies and procedures, and have members of the AML team become ACAMS certified. *See* L. Farmer Dep., at 91, Ex. 16.

109.    Erin Green testified and while employed in the AML department at Alpine during the time when Leia Farmer was the AML Officer and CCO, they "had discussions on how to improve [the AML program] constantly based on industry guidance, feedback, you know, things released by FinCEN.  So [they] had those types of discussions about improvement always. That's always been [her] goal, and it was always [Leia Farmer's] as well."  E. Green Dep., at 95, Ex. 2; *see also* E. Green Dep., at 110, Ex. 2 ("Constantly working towards culture of compliance every day.").

110.    Alpine's AML program had the support from Alpine's management to continue to

develop and grow the program.  *See* L. Farmer Dep., at 93, Ex. 16.

111.    Alpine also conducted an independent audit of its AML Program in which someone who was not affiliated or associated with the firm conducted an annual review.  The review group had to be PCAOB certified (Public Company Accounting Oversight Board), review actual SARs, and performed this function on an annual basis.  *See* L. Farmer Dep., at 61, Ex. 16.

112.    Alpine addressed any issues raised by the independent audit.  *Id.*, at 61-62, Ex. 16.

113.    OCIE conducted its examination during 2015.  *See* OCIE's Examination Report, dated April 9, 2015, Ex. 65; *see also* Alpine's Response to OCIE's Examination Report, dated May 20, 2015, Ex. 66.

114.    Alpine used outside legal counsel in preparing its response to the 2015 OCIE Examination.  *See* L. Farmer Dep., at 65, Ex. 16.

115.    Starting in 2016, after the time period at issue in this case, Alpine has continued to make improvements and changes to its AML program.  Mr. Frankel testified during Alpine's deposition that because of "confusion" as to what its regulators wanted to be filed with FinCEN, "the firm no longer filed SARs based upon what it thought a regulator thought was suspicious, or somebody outside the firm.  And so beginning January 1st of 2016, the firm ensured that we were filing SARs on transactions of which ***we purely deemed to be suspicious***."  Alpine Dep., at 84-85, Ex. 3 (emphasis added).

116.    Mr. Frankel testified at Alpine's Deposition that no one at Alpine has ever consciously omitted any information from a SAR or attempted to evade the SAR filing rules in any manner.  *See* Alpine Dep., at 156, Ex. 3; *see also* L. Farmer Dep., at 90, Ex. 16 (testifying

that in her capacity as CCO and AML Officer at Alpine she always made her made efforts to ensure that Alpine was complying with the AML requirements and SAR filing requirements and never sought to evade those requirements, even when filing defensive template SARs on large deposits of low-priced securities because those filings were done as a result of feedback from regulators).

VI.    **Alpine's AML Program**

117.    Alpine's expert witness, Beverly E. Loew, provided the following rebuttal expert testimony to the SEC's expert's position that Alpine had a structural failures in its AML program:

a.    The SEC's expert witness takes the position that "Alpine did not comply with its own written procedures and did not act as a reasonable broker-dealer would in the design and implementation of its BSA/AML program." As set forth on page 1 of the Navigant Report, however, that contention is beyond the scope of that which the SEC's expert witness was asked to consider. Nor is it within the scope of this proceeding. The SEC does not have an AML program rule nor did the SEC in this action charge Alpine for AML program failures. That the SEC's expert witness nonetheless proffered an opinion on that issue, in the absence of any adequate information concerning Alpine's personnel or program, is improper.  Loew Expert Decl., at ¶ 261, Ex. 5 (citing the Navigant Report and pleadings).

b.    Of note, while Alpine and other BSA-regulated financial institutions have an obligation to establish and implement an AML program that enables them to comply with the BSA and to protect themselves from being used for money laundering and other

illicit financial activity, an AML program is not a hard-and-fast rulebook, against which penalties may be imposed whenever a circumstance may indicate that a deviation or evolution is appropriate. *Id*. at ¶ 262, Ex. 5.

        c.      Moreover, the SEC's expert witness bases her conclusion on statements of policy and guidance, as well as communications about the Alpine program that obviously were issued in the context of attempting to improve the program. It does not appear, even as the SEC's expert witness claims that Alpine failed to apply its own procedures, that any specific program procedures were even cited. Indeed, there is nothing in the Navigant Report other than bald conclusions based on insufficient facts to support the conclusion drawn on this point. *Id*. at ¶ 263, Ex. 5.

        d.      The evidence reflected in the Navigant Report actually supports a contrary conclusion. Information regarding Alpine's compliance personnel, their actual processes, the evolution and development of the program evidenced by the data presented in the report, the firm's consideration of Section 5 issues, and its market surveillance activities, all demonstrate that Alpine had in place processes and controls that were targeted to its principal risks and permitted it to identify and report suspicious activity. *Id*. at ¶ 264, Ex. 5.

        e.      Certainly Alpine filed many SARs, which belies a claim that it did not have a reasonable AML program that reviewed and considered SAR filing issues. The Navigant report is replete with examples that demonstrate that Alpine had a robust system for conducting due diligence on a transaction to determine whether a SAR should be filed. *Id*. at ¶ 265, Ex. 5.

f.      Fundamentally, this case is about whether Alpine improperly failed to file SARs with respect to certain liquidations during a defined time period in which it filed SARs that provided all the information needed for law enforcement to conduct an inquiry into suspect market activity in the related security or into the suspects reported in the SAR, whether the contents of the SARs Alpine did file contained sufficient information to serve their purpose, and whether Alpine should be disciplined for filing SARs following a voluntary lookback and attempting to figure out the correct way to file the form when the lookback was triggered by a self-regulatory examination. *Id.* at ¶ 267, Ex. 5.

g.      It is Alpine's expert witness's view that even assuming the SEC and Navigant were successful in convincing the factfinder as to each of these SAR related issues, that would not be sufficient to warrant a conclusion that there was a programmatic failure here. But, as set forth above, it is Alpine's expert witness's view that the SEC's expert witness is wrong with respect to the failures she alleges as predicates for her conclusion that Alpine had a structural AML program failure. Alpine was not, as a matter of law, required to file on the liquidations about which the SEC and SEC's expert witness complain. Moreover, the SEC's and SEC's expert witness's views with respect to the sufficiency of the SAR narratives are not well-founded. And, finally, the fact that Alpine conducted a lookback and ultimately filed SARs following that lookback should not be the basis of a charge of failing to timely file SARs. Indeed, each of these allegations is not supported by long-established BSA policy and the BSA regulations themselves. *Id.* at ¶ 268, Ex. 5.

VII.   **Alpine's Section 5 Review**

118.    Every deposit of an Over-the-Counter ("OTC") security is reviewed to determine whether there is a free-trading basis for the customer to sell the stock in the OTC market place. *See* R. Jones Supp. Decl., at ¶ 9, Ex. 67; s*ee also* Add'l SOF, at ¶ 30, *supra*, stating "Alpine's compliance personnel reviewed every deposit made by a correspondent firm that cleared through Alpine for potential AML concerns and potential unregistered distributions/sales (issues associated with Section 5 of the Securities Act of 1933) including the questions raised in FINRA Regulatory Notice 09-05 (for example, how securities were acquired, when, how much they were paid, are they eligible for re-sale).  Alpine also analyzed whether the shares could be traded, including whether there was a Form S1, S-8 or other registration statement in effect, or whether the shares qualified for an exemption to registration, such as SEC Rule 144."

119.    The types of deposits include physical certificates, electronic transfers from the transfer agent ("DTC") and electronic transfers from other broker-dealers who may have already cleared the OTC security for sale ("ACAT Transfers").  *See* R. Jones Supp. Decl., at ¶ 10, Ex. 67.

120.    This due diligence review stems in part from Section 5 of the 1933 Securities Act which requires that every sale of a security requires registration under the Act, unless an exemption from registration is available.  *Id*., at ¶ 11, Ex. 67.

121.    As an additional compliance measure, each security that came into Alpine was held in a restricted location to ensure it was not traded prior to its reasonable inquiry review, including an analysis of the questions raised in FINRA Regulatory Notice 09-05 (for example, how securities were acquired, how much was paid, whether they are eligible for re-sale, AML reviews, different trigger

points for a SAR review).  *See* T. Groskreutz OTR, at 48-49, Ex. 4.

122.    Alpine reviews registered securities to ensure the purchase and sale by the customer meet the requirements of the registered offering.  *See* R. Jones Supp. Decl., at ¶ 12, Ex. 67.

123.    For non-registered security deposits, Alpine's customers reply primarily on three exemptions: Rule 144, Sec. 4(a)(1), and Sec. 3(a)(10).  *Id*., at ¶ 13, Ex. 67.

124.    Of the three, Rule 144 is the most predominant exception relied upon by Alpine's customers.  *Id*., at ¶ 14, Ex. 67.

125.    Each exemption has its own requirements and Alpine ensures these requirements are met by reviewing transaction documents, issuer public filings, internet research, transfer agent records, customer legal opinions, issuer and customer attestations and anything Alpine can gleam from the daily interactions from the customer and its business practices.  Employees at Alpine, including Jones, are in constant communication with Alpine's Legal Review department regarding any Section 5 related questions about any customer, transaction or deposit.  *Id*., at ¶ 15, Ex. 67.

126.    Alpine reviews, registered deposits with the same process and scrutiny as unregistered deposits.  *Id*., at ¶ 16, Ex. 67.

127.    In each due diligence packet from the client, a "Deposited Securities Checklist" ("Checklist") is included and filled out by the client. Among other things, the primary elements outlined in the Checklist applicable to all free trading reviews include the following information with multiple questions in each section: (1) Affiliate / Control Person; (2) Holding Period / Transaction History; (3) Issuer Reporting / Shell Status; (4) Current Information Available; and

(5) Disciplinary Background.  *Id.*, at ¶ 17, Ex. 67; *see also* Angotti Dep., at 143, Ex. 10 (SEC's expert confirming that the Checklist were typically present in the support files); *see also* an example of a Checklist, Ex. 68.

128.     The Checklist is accompanied by relevant documentation such as: purchase/consulting agreements or the documentation showing why the shares were issued, letters from the issuer and client attesting to affiliate and shell status, issuance resolutions, issuance letters to the Transfer Agent, acknowledgments from the Transfer Agent regarding issuance and free trading/no holds and if needed coverage of a registration statement, a conversion tracker if a repeat conversion and essentially, any and all paperwork regarding the share history/issuance. The information is then supplemented by the Team with due diligence on the issuer, client and deal itself. Much of this is obtained in public documents, Lexus Nexus and any other available source. All of the documentation is carefully reviewed by members of the Team and then Alpine Legal.  R. Jones Supp. Decl., at ¶ 18, Ex. 67.

129.     Affiliate status includes the affiliate status of the customer and each party in the relevant chain of the transaction. The relevancy of affiliate status of the customer and relevant parties in the chain of transactions (also referred to as prior holders/sellers) depends on the free trading basis.  For instance, if a customer is the President (a control person and hence an affiliate) and deposits stock that is the subject of an S-1 registration statement, he can freely sell that stock in accordance with Rule 144 as it relates to affiliate sales (1% every 90 days).  Alpine will have inquired and verified affiliate status both with the client and using public information. Alpine will verify the S-1, when it became effective, ensure it has not expired, that the stock actually received is covered by the S-1 through TA records, and that the sales are made in

accordance with the S-1.  *Id*., at ¶ 19, Ex. 67.

130.    If a customer is claiming the exemption as a nonaffiliated person, Alpine will
verify his/her non-affiliate status for each prior seller whose holding period is relied upon (i.e.,
tacking) by reviewing issuer filings going back one year or more, new account documentation,
third party background reports, internet searches and other information, including but not
limited, depending on the circumstances, issuer representations, legal opinions, third party
representations and CIP.  *Id*., at ¶ 20, Ex. 67.

131.    For Holding Period / Transaction History, the Checklist describes the history of
stock – sometimes from original issuance by the issuer through each intermediary, prior holder,
to the customer.  *Id*., at ¶ 21, Ex. 67.

132.    The Issuer Reporting / Shell Status section includes whether the issuer is SEC
reporting or alternative reporting through OTC Markets, the availability of current information
regarding management, operations, financial information, and shell status.  *Id*., at ¶ 22, Ex. 67.

133.    Again, the relevancy and materiality of this information depends on the free
trading basis.  Under Rule 144, if the issuer is SEC reporting and has current information, the
holding period is six months. If non-SEC reporting or no current information is available, the
holding period is one year.  Rule 144 is not available for shells or prior shell companies who
have not cured their prior shell status in the manner prescribed in the rule. See OTC Procedures
and Internal 144 Legal Procedures for discussion.  *Id*., at ¶ 23, Ex. 67.

134.    The disciplinary background section shows search results and findings of any of
the parties to the transaction, including issuer, prior holders, customer, and includes any legal
opinions. Other information may include stock promotions, trading history, deposit history and

regulatory inquiries on any of the foregoing.  This information may have no bearing on the free trading basis but may be considered along with other risk factors for red flag reviews.  *Id*., at ¶ 24, Ex. 67.

135.    The SEC's expert confirmed that she did not identify one instance in which Alpine had cleared a deposit that was later found to constitute a violation of Section 5.  *See* Angotti Dep., at 179-80, Ex. 10; *id*. at 248-50, Ex. 10 (confirming that Alpine's Section 5 analysis looked at the existence of the issuer, the history of the acquisition of the stock, and confirmation that the company is not a shell in the supporting files); *see also id*. at 177-78, Ex. 10 (SEC's expert identified most significant risks to Alpine as Section 5 and market manipulation).

## PART 2

## SEC's ALLEGATIONS

### I.    Microcap SAR Determinations

136.    At the heart of the SEC's expert witness's conclusions in this case is a deep-seated skepticism of the penny stock and microcap markets.  Indeed, the Navigant Report states expressly the SEC's expert witness's view that "Section 5 violations are often associated with large deposits of low-priced securities" and that "substantial deposits also may be involved in fraud in the penny stock market, which has long been subject to abusive practices."  *See* Loew Expert Decl., at ¶ 169, Ex. 5 (citing the Navigant Report); *see also* Angotti Decl., at ¶ 37, SEC's Ex. 1 ("Large deposits of low-priced securities ***can*** provide a broker-dealer a reason to suspect that there has been an unregistered offer or sale of securities . . . .") (emphasis added).

137.    While risks are inherent in all markets, particularly in those that are thinly traded

and lacking in transparency in varying degrees, the adoption by Congress of the Penny Stock

Reform Act, cited by Navigant, indicates that Congress appears to have concluded that the value

of the market outweighs any view that the transactions therein are inherently suspect.  The same

applies to the more recent Jumpstart Our Business Startups (JOBS) Act; Congress has

determined that access to capital for companies *of all sizes* is critical to the health of the U.S.

economy.  Loew Expert Decl., at ¶ 170, Ex. 5 (citing various guidance and publications).

138.    The microcap and penny stock markets serve legitimate economic functions,

which include providing a means by which start-up and small companies may access capital and

a means by which holders of securities may lawfully seek buyers for their holdings.

Nonetheless, the SEC's expert witness effectively treats penny stock and microcap securities,

and transactions in them, as *per se* illegitimate in the conclusions she draws about the SARs filed

by Alpine.  *Id*., at ¶ 171, Ex. 5.

139.    Displacement of legitimate business activities by outsized BSA concerns with

respect to segments of the financial services industry is not a new concept, and it can have

disruptive, even destructive effects. A notable example in the domestic economy is the fear that

spread throughout the banking industry in 2004, which resulted in the de-banking of money

services businesses over more than a decade.  *Id*., at ¶ 172, Ex. 5 (citing FinCEN guidance).

140.    It is concerning, therefore, that the implementation of the approach implied by the

Navigant Report has great potential to chill the microcap markets, as financial institutions that

facilitate access to them fear regulatory retaliation for merely engaging in transactions in those

securities.  While this may have a positive effect on the fraudsters that operate in the margins of

all markets, those who will be harmed most will be legitimate companies and investors who will

be foreclosed from accessing the markets if for no other reason than divesting themselves of their holdings. *Id.*, at ¶ 173, Ex. 5.

141. Moreover, the conclusion the SEC's expert witness appears to reach, if adopted, effectively would trigger a SAR filing for every large deposit of illiquid and "low-priced" securities. Not only would this impose an unnecessary and destructive burden on firms and on the markets, it would render SAR filings in that market useless by the sheer volume of them. The result would include an inordinately large number of SARs that were filed on activity that would not be suspicious under any of the four prongs of the SAR rule and volumes of information that would be valueless to law enforcement and that would clog the BSA database to the point that meaningful SARs related to microcap and penny stock fraud would be difficult, if not impossible, to identify. *Id.*, at ¶ 174, Ex. 5.

**II.    Purpose of SARs**

142. SARs serve two significant purposes under the BSA. First, they may provide tips to law enforcement, regulatory, and supervisory agencies with authority to conduct criminal, tax, or regulatory investigations and to prosecute any alleged violations. Second, as discussed above, they may assist law enforcement, regulatory, supervisory, and intelligence agencies, as part of a broader database of reports, to "follow the money" with respect to an investigatory matter, whether or not the matter resulted from a tip in the SAR itself. *See* Loew Expert Decl., at ¶ 103, Ex. 5 (citing statement made before Congress).

143. Critically, though, reporting a possible violation of law or regulation on a SAR by a broker-dealer or any other institution subject to SAR filing is not meant to substitute for the surveillance, investigative, or other powers of a law enforcement or regulatory agency. Rather,

the reporting is supposed to give an agency data points that may lead to a new investigation or support current surveillance or investigatory matters and supplement the inherently objective transaction reports that had been required to be filed since the 1970s by gathering all of the reports required of BSA-defined financial institutions, among others, in a single repository. *Id*., at ¶ 104, Ex. 5 (citing proposed amendment to BSA regulations).

144.    Stated simply, the purpose of SARs is to provide discrete information so that law enforcement and regulators can identify the people and institutions relevant to potentially suspicious activity, to permit law enforcement to inquire about the activity by seeking the SAR documentation of the filing firm and, *inter alia,* to use its own, much more powerful, investigative abilities and specialized knowledge to determine whether the activity reported should be prosecuted or if it identifies a trail of funds from institution-to-institution. *Id*., at ¶ 105, Ex. 5 (citing FinCEN guidance).

145.    Perhaps most importantly, the information contained in SARs has been used to establish a database, available to law enforcement to gather information relating to any of the innumerable data fields and transactions that are reported in a SAR. The significance of a SAR filing lies not in the information presented in any individual filing but in the fact that data is continuously collected from multiple sources across the financial industry and compiled in a searchable database. Based on Alpine's expert witness's professional experience, law enforcement does not expect that all of the information about suspicious activity will come from any one source. It is not seeking to have a financial institution do its investigatory footwork for it or describe in narrative fashion the elements of criminal conduct. Rather, it is seeking from financial institutions the pieces of a puzzle that law enforcement can put together to initiate a

new investigation or support one that is ongoing.  *Id.*, at ¶ 106, Ex. 5 (citing statements made before Congress).

146.    The SEC's expert witness failed to identify how law enforcement uses far more objective transactional information contained in other reports required to be filed pursuant to the BSA and its implementing regulations. Information provided in SAR filings is generally accessed not through the review of a particular SAR but through searches of that database which will provide search results of all data previously input relating to the subject of the search. Thus, a search of a particular individual will aggregate all of the data filed by any financial entity to provide a comprehensive view of any information and activity contained in any of those filings. *Id.*, at ¶ 107, Ex. 5.

147.    A search of the SAR database will elicit not an individual SAR filing by a clearing firm, but instead an aggregation of the data generated by introducing firms that filed a SAR on the same activity and even a bank through which the funds associated with the transaction may have flowed. Other BSA forms also may be obtained, providing law enforcement and regulatory agencies with the information contained in other BSA transactional reports, such as Currency Transaction Reports ("CTRs"), Reports of Foreign Financial Accounts ("FBARs"), Report of International Transportation of Currency or Monetary Instruments ("CMIRs"), and Reports of Cash Payments Over $10,000 Received in a Trade or Business (Form 8300).  *Id.*, at ¶ 108, Ex. 5 (citing regulations).

148.    Those SARs are used and reviewed by experienced law enforcement, regulatory, and supervisory personnel who are well trained in locating relevant information in the SARs that are filed, who locate information using the whole SAR – not just the narrative portion – and who

can access reports other than SARs that may be related to a suspicious activity or suspect. Contrary to the SEC's expert witness's intimation, SARs are not, in other words, reviewed by individuals or groups who do not know what they are looking at or who are unfamiliar with securities. Indeed, it is well known that law enforcement in general and the SEC, in particular, have established task forces for reviewing the information reported in SAR filings. It is also well-known that the SEC works closely with the Department of Justice to refer matters that may be related to criminal violations of the securities acts. *Id.*, at ¶ 109, Ex. 5 (citing the "Navigant Report", statements by the SEC, and BSA guidance).

### III.   Purpose of Red Flags

149.   "Red flags" are no indicative of criminality; they are factors supporting for the review of the transaction. As state in NASD Special Notice to Members 02-21, "[b]roker/dealers need to look for signs of suspicious activity that suggest money laundering. If a broker/dealer detects 'red flags,' it should perform additional due diligence before proceeding with the transaction." *See* NASD Notice 02-21, at p. 10, Ex. 11.

150.   NASD Notice 02-21 further states that "an awareness of the 'red flags' will help ensure that broker/dealer personnel can identify circumstances ***warranting further due diligence***," and indicates that "[a]ppropriate 'red flags' should be described in the written policies and AML compliance procedures of the broker/dealer." *Id.* at p. 11, Ex. 11 (emphasis added).

151.   NASD Notice 02-47, refers to NASD Notice 02-21 as being pertinent to a determination of "whether activities vary substantially from normal practice as to raise suspicions of possible illegality." NASD Notice 02-47, at p. 459, August 2002, Ex. 69.

IV.     **SAR Filing Requirements**

152.     The Navigant Report refers to the fact that 31 C.F.R. § 1023.320(a)(2) requires that a SAR be filed when a broker-dealer has "reason to suspect" that the transaction requires the filing and concludes that language establishes an "objective test."  The reason to suspect test is meant to require the filing institution to view activity that may be suspicious as an objective, reasonable, and informed person would view it.  *See* Loew Expert Decl., at ¶ 159, Ex. 5 (citing the Navigant Report); *see also* L. Farmer Dep., at 140, Ex. 16 (testifying that she believed that the "reason to suspect" language meant that "[t]here is a reasonable belief that the activity is suspicious in nature").

153.     Regulators, however, have consistently taken the position that, when it comes to enforcement of this requirement, so long as firms have effective SAR-decision making processes, they will not second-guess a firm's decision as to whether there is "reason to suspect" that the transaction in question requires a filing. This is so even when a regulator may have come to a different conclusion.  Loew Expert Decl., at ¶ 160, Ex. 5 (citing BSA regulations and FinCEN guidance).

154.     In *Department of Enforcement v. Sterne, Agee & Leach, Inc.*, a FINRA Hearing Panel cited the FFIEC Examination Manual's subjectivity standard as the appropriate standard.  In that case, FINRA's Enforcement Division disagreed with Sterne, Agee & Leach, Inc.'s decision not to file SARs with respect to various introduced accounts and insisted that the firm should have "gone further in investigating the accounts," including with respect to large blocks of stock being deposited and liquidated.  *Id.*, at ¶ 161, Ex. 5.

155.     The Hearing Panel disagreed with the Enforcement Division, and, while noting

that the firm "might have learned more with further investigation," held that the firm's investigations were adequate under the facts and circumstances given that Sterne Agee obtained a substantial amount of information about these accounts, monitored them, discussed them, and came to a reasonable conclusion that there was a reasonable business explanation for the activity in the accounts.  *Id.*, at ¶ 162, Ex. 5 (citing to *Dep't of Enforcement v. Sterne, Agee & Leach, Inc.*, No. E052005007501 at 31-33 (Mar. 5, 2010).

156.    In reaching this conclusion, the Hearing Panel relied on testimony by the firm's expert regarding the sufficiency of the firm's processes of monitoring the introduced accounts and explaining that the decision to file a SAR is "not based on a mathematical formula."  *Id.*, at ¶ 163, Ex. 5 (citing *Sterne, Agee*).

157.    There are sound reasons behind the SAR enforcement policy, derived from FinCEN regulatory policy and the penalty provisions of the BSA, as articulated in the FFIEC Examination Manual and by the Hearing Panel, which are integral to the development of a firm's AML program and the SAR filing framework.  Significantly, regulators themselves have recognized that, if compliance becomes about second-guessing individual judgment calls as to whether activity is suspicious or not, there is a significant danger that firms will defensively file SARs, which "results when an institution files a suspicious activity report on an activity or transaction that really is not suspicious" in order to protect themselves from regulator risk.  If that occurs, the SAR filing system will become overwhelmed with worthless SARs, and the entire purpose of SAR filings will be undermined.  *Id.*, at ¶ 165, Ex. 5 (citing and quoting from a FinCEN speech).

158.    FinCEN guidance states the following regarding the evolving nature of suspicious

activities and the need for firms to consider "all" facts and "circumstances": "The means of commerce and the techniques of money launderers are continually evolving, and there is no way to provide an exhaustive list of potentially suspicious transactions.  A mutual fund must consider *all of the facts and circumstances related to the transaction* and the customer in question."  *See* FinCEN Guidance (FIN-2006-G013), October 4, 2006, at pp. 3-4, Ex. 70 (emphasis added).

### V.   SAR Content Requirements

159.   The purpose of the narrative is to explain why the firm, *in its subjective determination*, concluded—based on, among other things, the firm's knowledge of the client, the client's historic and anticipated activity, and the product at issue—that the particular transaction at issue was potentially suspicious. The "why," in other words, is the *firm's rationale* for filing the SAR at the time, not the rationale of another hypothetical third party who might have filed the SAR for different, or additional reasons, typically with the benefit of hindsight and additional time.  *See* Loew Expert Decl., at ¶ 139, Ex. 5.

160.   Contrary to the suggestions by the SEC's expert witness, the instructions to SAR forms used by the securities industry between 2002 and 2012 (Form 101 or SAR-SF) and 2012 to the present (FinCEN Form 111, which is an electronic form submitted online through the BSA E-filing portal) (collectively, "SAR-BD Forms") do not impose specific requirements for what must be included in a SAR narrative. The instructions for the narrative section of the SAR-BD Forms state "Filers *must* provide a clear, complete and concise description of the activity, including what was unusual or irregular *that caused suspicion*." The SAR-BD Forms, then, require only that the broker-dealer provide in the narrative section an account of what *the broker-dealer determined, with its experience in the particular market and information concerning the*

*transaction,* was suspicious about the transaction. Indeed, that is the very point of the narrative: to help law enforcement understand what the firm concluded about the nature and circumstance of the activity at issue that led to the judgment that the activity at issue was suspicious.  *Id*., at ¶ 144, Ex. 5 (citing and quoting from FinCEN guidance and SAR instructions); *see also* FinCEN Form 101, SAR BD Form, Ex. 71.

161.    The instructions also include "checklists" couched in permissive, rather than mandatory language: "[f]ilers *should* use the following checklist as a *guide* for preparing the narratives." This checklist on the SAR Form is as close as FinCEN has come to defining what should be included by the filer in the SAR narrative but even then, by using permissive language, FinCEN chose not to require inclusion of all checklist categories in the SAR narrative. Purposely, there is no requirement concerning what must be included in a SAR narrative in either the SAR regulations itself (31 C.F.R. § 1023.320 (2016)) or in the instructions to the SAR-BD Form. This is directly a result of the fact that the decisions to file a SAR and what to include in a SAR narrative are subjective ones and the circumstances that give rise to the suspicion vary. Loew Expert Decl., at ¶ 145, Ex. 5 (citing SAR instructions).

162.    Notably, even if the SAR Form checklists were considered mandatory – not the "guides" that they are -- those checklists do not even contain the various "red flag" categories identified by the SEC and so actually contradict the SEC's position.  *Id*., at ¶ 146, Ex. 5.

163.    Seeking to justify the SEC's theory that thousands of SARs that were filed by Alpine were "fatally deficient," the Navigant Report concludes that SAR narratives "should" "include any information readily available to the filer regarding the transactions or the customers that has been obtained through the account opening process and during any due diligence effort."

Although ultimately stopping just short of pronouncing a rule that each and every red flag must be included in each and every SAR narrative, as applied, that is effectively the rule that would be established if Navigant's analysis were adopted. Indeed, the majority of the SEC expert witness's analysis of the SARs in Category A, which are the filed SARs the SEC claims are deficient, consists of identifying red flags that were missing from the SAR narratives and concluding that, on the basis of those missing red flags, the relevant SARs were "inadequate on their face," "deficient" or otherwise "improper." *Id.*, at ¶ 187, Ex. 5 (citing the Navigant Report); *see also* Beverly E. Loew Decl., *generally*, and at ¶¶ 57-88, Ex. 72 (addressing the "fatally deficient" SAR theory).

164.     But that standard is plainly overbroad and untethered to applicable regulations. In fact, the SAR narrative need only include "a clear, complete and concise description" of the activity *that caused the firm suspicion*. There is no rule or regulation that requires a firm to include "all information readily available to the filer," and the Report does not consider the authority confirming that the content of a SAR narrative is also a subjective determination by the firm. *See* Loew Expert Decl., at ¶ 188, Ex. 5 (citing materials from FinCEN's electronic filing requirements).

165.     There is no provision of the SAR rules that would support penalizing a firm that filed a SAR that contains the requisite data—the identification of an account, a description of the transaction, the rationale for filing the SAR if one can be articulated beyond the mere fact that the transaction occurred, and other information that enables a querying law enforcement or regulatory or supervisory agency to request additional information during an investigation or proceeding related to some aspect of the report—or that would support imposing penalties on the

filer to the same extent as if no SAR had been filed at all.  *Id.*, at ¶ 189, Ex. 5.

**VI.    Deficiencies in Navigant's Presentation**

*Overview of Navigant's Charts*

166.    As an initial factual matter, the SEC is wholly relying upon its tables and
conclusions from its expert that the individual SARs omit particular information and thus the
narratives are defective as a matter a law, without providing the Court with a single SAR
narrative to review.  Thus, the Court is being asked to rule that thousands of SAR narratives are
defective without analyzing a single document, relying on the Navigant tables.  In fact, multiple
times during the SEC's expert deposition, she was unable to address specific questions about a
specific SAR by only looking at her Tables and without the aid of the file.  *See e.g.* Angotti Dep.,
at 237-241, Ex. 10 (stating that she would need to go back and look at the files for information
which is not in her report).

167.    Notably, the SEC's Table A included 2013 alleged SAR violations.  The SEC's
expert's Table A including only 1800 alleged violations as it excludes 213 transactions on the
SEC's Table A which were under $5,000 (listed on the SEC's Expert's Table A-9).  Thus, the
SEC original claim included 213 alleged violations which were excused by its own expert.  *See*
Navigant Report, at 37, n. 142, SEC's Ex. 2.

168.    The SEC's expert's tables includes 295 SARs where the only allegedly omitted
"red flag" is failure to state the "5Ws" of "who, what, when, where, and why", meaning, that
there is no reason to suspect any criminal activity on these SARs.  *See* SEC's SOF, No. 31
(stating that "1302 out of the 1594" SARs "involve one or more of the six subcategories of red
flags" which does not include the "5Ws") (the foregoing amount is calculated to 292 as the SEC

omitted three addition 5W only SARs from the SEC's expert's table A and A-1 without any explanation).  *See* SEC's Expert's Table A-1 (SEC's Ex. 3), *see also* Navigant Report, at 37, n.142, SEC's Ex. 2; s*ee also* A. Angotti Dep., at 136, 227, 296, Ex. 10.

169.    In addition, the SEC's expert excluded an additional 205 SAR from its Table A-8 because she did not find any omitted red flags.  Accordingly, the SEC's Table A-8 (total alleged violations of all red flag categories) consists of only 1597 alleged SAR violations, which omits the alleged violation under $5,000 (Table A-9) and 205 SARs that did not contain any violations. *See* SEC's Ex. 10; s*ee also* A. Angotti Dep., at 136, 227, 296, Ex. 10.

170.    The 205 alleged SAR violations that as to which SEC's expert witness did not find any deficiencies is yet another example of disagreement between the SEC and its own expert witness.  Below are some examples of SAR narratives that the SEC claims are violations of the BSA reporting requirements but its own expert witness disagrees and states there are no violations and thus the SEC is ***not*** moving for summary judgment on these 205 SARs:

a.    ***Violation No. 127:***  The SAR narrative for violation No. 127 states:





*See* SAR, No. 127, Ex. 74.

      b.     ***Violation No. 745:***  The SAR narrative for violation No. 745 states:



*See* SAR, No. 745, Ex. 75.

      c.     ***Violation No. 171:***  The SAR narrative for violation No. 171 states:





*See* SAR, No. 171, Ex. 76.

      d.    ***Violation No. 175:***  The SAR narrative for violation No. 175 states:



*See* SAR, No. 175, Ex. 77.

      e.    ***Violation No. 20:***  The SAR narrative for violation No. 20 states:



*See* SAR, No. 20, Ex. 78.

      f.    ***Violation No. 665:***  The SAR narrative for violation No. 665 states:





*See* SAR, No. 665, Ex. 79.

g.      ***Violation No. 1834:*** The SAR narrative for violation No. 1834 states:



*See* SAR, No. 1834, Ex. 80.

h.      ***Violation No. 1823:*** The SAR narrative for violation No. 1823 states:





171.     *See* SAR, No. 1823, Ex. 81.

**Defects in Navigant's Process and Methodology**

172.     The SEC did not provide the Court with any SARs or support files for **any** of the alleged violations with its Motion.  The SEC only provided a Bates number for many of the alleged deficient SAR narratives.  *See* Add'l SOF No. 186(b), *infra*, stating Table A-2 identifies 476 SARs only by Bates Number, without any other information regarding what the violation is or who it is about – and more importantly – without providing the Court with the actual support files and the cited Bates Number pages).

173.     The SEC's expert confirmed in her deposition that she did not conduct any comprehensive review of the documents herself, but relied on others at Navigant to perform the review who were not subject to cross-examination.  *See* Angotti Dep., at 138-144, Ex. 10 (stating, among other things, "I verified some SARs in each category."); *see also id*. at 136-137 (stating the Navigant started their analysis of the SARs at issue, based on their own categories

not the SEC's before the Court's decision and then realigned the categories once the Court ruled).

174.   The SEC's expert testified during her deposition that the finding of a violation for failure to disclose a shell where the file clearly reflects Form 10-Qs and 10-Ks would be an error – or when the actual support file says, "not a shell" would be error.  *See* Angotti Dep., at 351-354, Ex. 10; *see also id*. at 143-144, Ex. 10 (stating that if there were handwritten notes of information in the support file that is inconsistent with the categories or claimed deficiency, then the SEC's expert would have expected her staff to see that and take it into account).

175.   *See* Angotti Dep., at 327-333, Ex. 10 (expert's Table A-2 (SEC's Ex. 4) acknowledged error in because it assrted regulatory history was omitted from the SAR narrative, but the support file conclusively shows that the individual with the regulatory history is not the same person involved in the transaction.

176.   Alpine's expert discussed the SEC's expert's methodological failing at length during her deposition, including stating that the SEC's expert's methodology of reviewing SARs and support files is not sufficient to determine whether a SAR was required or insufficient because it would require a review of Alpine's program as a whole, including discussion with Alpine's compliance personnel who were making decisions on individual transactions.  *See* Loew Dep., at 160-165, Ex. 82; *see also id*. at 130 (discussing an example of Martha Stewart in highlighting the SEC's expert's methodological failings in assessing violations).

## VII.   SEC's Alleged Facially Deficient SARs (Table A)

### A.   *Basic Customer Information*

177.   As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's

expert witness stated the following rebuttal testimony:

a.      The SEC's expert witness criticizes 1,015 of Alpine's filed SARs, and particularly the SARs that contained Alpine's narrative template language, on the basis that the SARs did not adequately describe the "Who, What, When, Where, and Why" relating to the transactions being reported. Specifically, as asserted by Navigant, many SARs filed by Alpine contained a bare-bones narrative, "identifying only the name of the depositor, introducing firm, and the security, the quantity, ticker symbol, price, and the value of the transaction." What is particularly interesting about the Navigant discussion of the SAR deficiencies it identified with respect to "basic customer and suspiciousness information" is that it provides nothing but bare-bones, conclusory statements as to why certain information should have been included in an Alpine SAR. Navigant's criticisms with respect to the alleged deficiencies in this category are also misplaced for the following reasons:

b.      There is no regulatory requirement that firms report in every SAR the information the SEC's expert witness now claims is required as a matter of law. The SEC's expert witness's opinion is based entirely on selected excerpts from various forms of guidance, which plainly does not have the force of law.  *See* Loew Expert Decl.. at ¶ 207, Ex. 5.

c.      Second, the SEC's expert witness is wrong insofar as she claims that many, if not most, of Alpine's SARs did not contain sufficient information to comply with the broker-dealer SAR rule. This includes not only those that were filed using the two templates criticized by the SEC and its expert witness, but also a substantial number

of the SARs described by the SEC's expert witness in Exhibits to the Navigant Report.

*Id.* at ¶ 208, Ex. 5.

   d.  As reflected by the example that Navigant itself uses, the information that

Alpine included in its SAR narratives did present the "who/what/where/when/why" that

the SEC and Navigant claim was missing from the SARs:

NAVIGANT EXAMPLE

Alpine Narrative: John Doe is a client of Scottsdale Capital a firm for which Alpine
Securities provides clearing services. On or around 06/21/2012, John Doe deposited a
large quantity (1,234,567 shares) of ABCDEFG (ABCD), a "low-priced" ($0.001/share)
security. This transaction amounted to approximately $1,234.00.

| | |
|---|---|
| Who: | John Doe, through Scottsdale Capital |
| What: | Deposit of 1,234,567 shares of ABCDEFG (ABCD) |
| When: | On or about 6/21/2012 |
| Where: | Through Alpine, via Scottsdale Advisors |
| Why: | Deposit of large quantity of a "low-priced" security (cited by Navigant and the SEC as a red flag) |

   *Id.* at ¶ 209, Ex. 5.

   e.  The "customer and suspiciousness" information provided by Alpine,

together with the standardized and searchable fields in the electronic form would have

permitted any enforcement agency seeking information about large quantity, "low-

priced" securities, which are common traits of transactions in penny stocks and microcap

securities, or about persons who were reported in the SAR, to identify the Alpine

transactions and make inquiries of the firm.  *Id.* at ¶ 210, Ex. 5.

   f.  Because Alpine's SARs obviously explained the actual transaction being

162

reported, *e.g.*, a specific quantity of low priced securities deposited by an identified customer at a particular time, the Navigant Report is left to argue only the claimed absence of a "why," the reason for the filing. Given the fact that Navigant insists that a large deposit of "low-priced" securities is a red flag in and of itself, it cannot also claim that the identification of that transaction would leave the reader mystified as to the reason for the filing. *Id*. at ¶ 211, Ex. 5.

g.      The Navigant Report also criticizes SARs that stated in the narrative that the subject was on Alpine's Heightened Supervisory List.  In addition to the information provided in the narrative, of course, Alpine provided other information in the SAR, specifically in the searchable, non-free form fields of the SAR form. These completed fields include, for example, subject information, including identifying information; suspicious activity information, including what the SEC and the SEC's expert witness would call "red flag" information, such as the customer's location (domestic or foreign), any identifiable securities fraud, transaction out of pattern for customer(s), transaction with no apparent business or lawful purpose, proceeds sent to or received from an unrelated third party, insider trading, market manipulation; product information, such as microcap securities; instrument type or "payment mechanism" including "market where traded;" and sub-type of financial institution, including clearing broker— securities and introducing broker—securities. *Id*. at ¶ 212, Ex. 5 (citing the Navigant Report and *Update and Revision of the FinCEN Suspicious Activity Reports Electronic Data Fields*).

h.      Third, although the Navigant Report contains a discussion of allocations of responsibilities between clearing and introducing firms, and the authorities the SEC's

expert witness cites acknowledge that clearing firms generally do not have as much information regarding the customer, in particular, as the introducing firms, the SEC's expert witness apparently disregards these allocations and relative disparities in both information and emphasis. In reaching her conclusions regarding what information Alpine was required to include in its SARs, the SEC's expert witness has wholly overlooked FinCEN's plain statement that the SAR filing standard is meant to be "a flexible standard that adequately takes into account the differences in operating realities among various types of broker-dealers". *Id*. at ¶ 213, Ex. 5 (citing the Navigant Report).

      i.      Finally, to the extent the SEC's expert witness's general criticism is premised on the fact that the SARs did not provide sufficient information for law enforcement, it is Alpine's expert witness's view that the template narrative, together with other information provided elsewhere in the SAR narrative, should, as a general matter, have provided law enforcement with sufficient information to perform their jobs. This is particularly true given that law enforcement has the right to request any supporting documentation for the SARs Alpine filed, and the SEC's expert witness herself implicitly acknowledges that such supporting documentation provides additional information not necessarily discussed in the SAR narratives. *Id*. at ¶ 214, Ex. 5.

      j.      Moreover, if those SARs were required filings, law enforcement should have had access to SARs from at least two other sources to fill in any information it purportedly needed. Specifically, the introducing broker would have filed a SAR with respect to the same general transaction. Likewise, if the transaction involved moving customer funds in and out of bank accounts, U.S. banks would have been involved; those

institutions also have SAR reporting obligations. No single financial institution is required to be the source of all potentially helpful information. *Id*. at ¶ 215, Ex. 5.

178.    In the following examples of SARs taken from the SEC's Table A-1 alleging violations for failure to include basic client information, Alpine's SAR narratives do give very detailed information and clearly answer the question as to "why" Alpine was filing the SAR:

    a.    ***Violation No. 1847:*** The SAR narrative of violation No. 1847 states:



*See* SEC Table A-1 (SEC's Ex. 3); SAR Violation No. 1847, Ex. 83.

    b.    ***Violation No. 297:*** The SAR narrative of violation No. 297 states:





*See* SEC Table A-1 (SEC's Ex. 3); SAR Violation No. 297, Ex. 84.

c. ***Violation No. 294:*** The SAR narrative of violation No. 294 states:



*See* SEC Table A-1 (SEC's Ex. 3); SAR Violation No. 294, Ex. 85.

d. ***Violation No. 255:*** The SAR narrative of violation No. 255 states:





*See* SEC Table A-1 (SEC's Ex. 3); SAR Violation No. 255, Ex. 86.

e.      Further examples, similar to the SAR narratives shown above, of detailed narratives showing "why" Alpine filed a SAR are found in the following transactions: SEC Table A-1 (SEC's Ex. 3) Violation Nos. 280 (Ex. 87), 453 (Ex. 88), 500 (Ex. 89), 588 (Ex. 90), 629 (Ex. 91), 1605 (Ex. 92), 1606 (Ex. 93), 1610 (Ex. 94), 1618 (Ex. 95), 1622 (Ex. 96), 1630 (Ex. 97), 1633 (Ex. 98), 1639 (Ex. 99), 1644 (Ex. 100), 1674 (Ex. 101), 1717 (Ex. 102), 1731 (Ex. 103), 1762 (Ex. 104), 1763 (Ex. 105), 1769 (Ex. 106), 1781 (Ex. 107), 1798 (Ex. 108), 1799 (Ex. 109), and 1805 (Ex. 110).

### B.      *Criminal or Regulatory History*

179.    As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's expert witness stated the following rebuttal testimony:

a.      The SEC's expert witness's conclusion that 675 SARs were deficient because they lacked information about criminal or regulatory history is flawed for several reasons.  Loew Expert Decl., at ¶ 216, Ex. 5 (citing to the Navigant Report).

b.      First, the SEC's expert witness fails to point to any basis for the requirement to include in the narrative that particular item of information, and fails even

to acknowledge that the SAR Form Instruction is much narrower, noting on the checklist the existence of "related litigation."  *Id*. at ¶ 217, Ex. 5.

        c.      There is no basis in law or regulation that requires the contents that Navigant asserts is critical, and it fails to demonstrate any that the regulatory histories formed the basis for Alpine's determination to file the SARs in question.  *Id*. at ¶ 218, Ex. 5.

        d.      Perhaps because there is no such articulated requirement, the SEC's expert witness herself is not even consistent about whose criminal or regulatory history is relevant. At some points, she suggests that it is the history of Alpine's customers, at other points it is the history of the SAR subjects (which may not be Alpine's customers), and at yet other points, it is the history of undefined "related parties." Likewise, the standard she has articulated – that the firm must "refer to, or adequately describe" criminal or regulatory history – is entirely too vague. Is it sufficient to mention the criminal or regulatory history? Or does the narrative have to go into specifics with regard to that history? To suggest that Alpine should be penalized for failing to include information, but not even be clear about what information was omitted, or about whom, is simply not a fair standard, nor is such a rule consistent with industry standard.  *Id*. at ¶ 219, Ex. 5 (citing Navigant Report).

        e.      Second, the fact that a person or entity with a criminal or regulatory history – information equally accessible to law enforcement – conducts a financial transaction does not necessarily indicate that the transaction is inherently suspicious. If so, every transaction over $5,000 of every felon who is now gainfully employed,

including a routine paycheck, would trigger a suspicious activity inquiry and filing. The

fact that an issuer's CEO was convicted of a DUI when he was 22, with no subsequent

criminal history in the next 40 years, may well not be relevant to an analysis as to

whether that issuer's stock is the subject of market manipulation. And providing that

information in a SAR will not likely be helpful to law enforcement. Accordingly, creating

a bright-line rule, for the first time in the history of the BSA, that criminal or regulatory

history must be included in the narrative as a matter of law simply does not advance the

fundamental purpose of SARs; in fact, it is counterproductive. *Id*. at ¶ 220, Ex. 5.

      f.     Of course, there may be circumstances in which a firm determines that the

history is relevant to its actual determination that the activity being investigated is

suspicious. But the fact that information about past criminal or regulatory history may

have been contained in Alpine SAR documentation does not mean it should be contained

in all SARs. *Id*. at ¶ 221, Ex. 5.

180.    The SAR form does not ask anywhere on the form whether the customer has a

criminal or regulatory history. *See* L. Farmer Dep., at 98, Ex. 16.

181.    Leia Farmer, Alpine's AML Officer during the relevant time period of this action,

testified that evidence of criminal or regulatory history may "not necessarily" be included in a

SAR narrative. *See* L. Farmer Dep., at 70, Ex. 16. For example, Alpine will "look at the specific

activity occurring in the account to determine its relevance to that adverse history." *Id*. Factors

which may make a customer's history relevant or not relevant "depends on the facts and

circumstances in that case" including, the "proximity of the activity" to the transaction at hand,

and whether the specific criminal or regulatory history is relevant to the transaction at hand. *Id*.

at 70-71, Ex. 16.

182.     In fact, the SEC's expert also reinforces the common-sense conclusion that past

abuses in a particular market does not create an objective reason to suspect a crime may be

occurring in a specific transaction in that market, stating, "The fact that such risks exist does not

always mean that there is some kind of inherent criminality in a particular client type, securities

type, jurisdiction or other risk attribute."  *See* Navigant Rebuttal Report, at 17, Ex. 17.

183.     Moreover, the SEC's expert confirmed during her deposition that if there is a

reasonable explanation for a transaction, there is no basis to believe that it is facilitating

criminality.  *See* Angotti Dep., at 68-69, Ex. 10.

184.     Alpine would not include information regarding a customer when Alpine is not

aware of particular activity, or has determined that the particular activity is not necessarily

relevant or specific to a deposit transaction, but may be more relevant to any subsequent

transaction.  *See* L. Farmer Dep., at 78-79, Ex. 16.

185.     Furthermore, when a criminal or regulatory action is pending, not concluded,

Alpine again may or may not find that activity suspicious and "would look at that to determine

relevancy" to the SAR.  *See* L. Farmer Dep., at 79-80, Ex. 16.

186.     In the following examples of SARs taken from the SEC's table A-2 alleging

violations for failure to include information criminal or regulatory history, the SAR narrative

does discuss the relevant history or the support file supports Alpine's omission of such irrelevant

information:

a.     Initially, of the 675 alleged violations on Table A-2, 98 involve the

allegation that an alleged "3rd-party" criminal or regulatory violation was omitted

without any analysis regarding the relevancy of the "3rd-party" to the transaction at issue. *See* Table A-2 (SEC's Ex. 4), Violation Nos. 1601, 1847, 1869, 1967, 1971, 1970, 1968, 794, 1969, 1383, 824, 1991, 1618, 193, 1769, 1090, 1098, 1107, 1111, 1119, 1124, 1162, 1179, 1219, 1220, 1222, 1225, 1226, 1551, 1236, 1237, 1243, 1249, 1271, 904, 1278, 1493, 1366, 1369, 1379, 1380, 1396, 1539, 982, 1404, 1409, 1411, 1423, 1432, 1434, 1437, 1442, 1450, 1452, 1459, 960, 1021, 1611, 1664, 1700, 1705, 1724, 699, 701, 748, 778, 818, 828, 1218, 1653, 1599, 1723, 1586, 846, 1974, 1898, 1894, 1901, 1902, 1895, 1893, 649, 1750, 1751, 1619, 304, 300, 305, 314, 313, 308, 309, 294, 301, 857, 164, 190, and 1881.

b.      Furthermore, after the 98 "3rd-party" SARs, Table A-2 identifies 476 of the remaining 577 SARs only by Bates Number, without any other information regarding what the violation is or who it is about – and more importantly – without providing the Court with the actual support files and the cited Bates Number pages.  *See* Table A-2 (SEC's Ex. 4).

c.      ***Violation No. 703:*** Table A-2 states that Alpine omitted the following information: "ALPINE00286858 pg 4 (███████████████)."  However, page 4 of the support file shows the research for "████████████" had a result for "████████ ████████"  Thereafter, on page 26 of the same support file, it shows that "████████ ████████" is the individual associated with transaction, not "████████████████" the unrelated individual cited by the SEC.  *See* SEC Table A-2 (SEC's Ex. 4), No. 703, Ex. 111; *see also* SAR Support File No. 703, pp. 4, 26, Ex. 112; *see also* Violation No. 1861 Support File, at p. 63, of the Support File, Ex. 113, a previous transaction showing that

Alpine was aware that █████████████ is not the same as the "████████

████████" with an SEC history.

      d.     ***Violation No. 515:***  Table A-2 states that Alpine omitted the following

information: "ALPINE00278788 pg 3 (██████████████)."  However, page 3 of the

support file shows the research for "██████████████" had a result for "█████████

████████."  Thereafter, on page 29 of the same support file, it shows that "████████

████████" is the individual associated with the transaction (CFO of the company), not

"██████████████" the unrelated individual cited by the SEC.  *See* SEC Table A-2

(SEC's Ex. 4), No. 515, Ex. 114; *see also* ALPINE00278790, 278816, pp. 3, 29 of the

Support File, Ex. 115.

      e.     ***Violation No. 612:***  Table A-2 states that Alpine omitted the following

information: "ALPINE00283682 pg 3 (SAR mentions ████, omits ████████

████████)."  However, page 3 of the support file shows the research for "████████

████████" had a result for "██████████████."  There is no reference to a ████████

████████.  Thereafter, on page 23 of the same support file, it shows that "████████

████████" is the individual associated with the transaction, not "██████████████"

the unrelated individual cited by the SEC.  *See* SEC Table A-2 (SEC's Ex. 4), No. 612,

Ex. 116; *see also* ALPINE00283684, 283704, pp. 3, 23 of the Support File, Ex. 117.

      f.     ***Violation No. 701:***  Table A-2 states that Alpine omitted the following

information: "3rd party - ALPINE00286686 pg 3."  However, page 3 of the support file

states: "civil action filed against ██████████████ alleging securities fraud, no regulatory

action."  Thus, this is a third-party, non-regulatory private action.  *See* SEC Table A-2

(SEC's Ex. 4), No. 701, Ex. 118; *see also* p. 3 of the Support File, Ex. 119.

g.     ***Violation No. 748:***  Table A-2 states that Alpine omitted the following

information: "3rd party - ALPINE00288551 pg 3."  However, page 3 of the support file

states: "██████████████ charged with bribery kickback scheme selling computers to

████████████████████████████."  Thus, this is another third-party, non-

regulatory private action.  Moreover, the non-regulatory action occurred in 2001 and the

transaction occurred 14 years later in 2015.  Finally, the SAR narrative itself contained a

robust narrative regarding the ongoing regulatory history of ██████████ and ██████████,

although not cited by the SEC as a violation, calls into question why this SAR as a whole

should be deficient as a matter of law for failure to include regulatory or criminal history

only because of a 14 years old non-regulatory matter.  The SAR narrative states:





*See* SEC Table A-2 (SEC's Ex. 4), No. 748, Ex. 120; *see also* p. 3 of the Support File,

Ex. 121.

      h.    ***Violation No. 1970:***  Table A-2 states that Alpine omitted the following

information: "3rd parties - ALPINE00285491 pg 3."  However, page 3 of the support file

states: "█████████ and █████████ are the subject of ongoing SEC action, ██

█████████████████ listed in civil suit alleging securities fraud for

misrepresentations."  The SAR narrative states:





Accordingly, although a third-party civil suit is not a regulatory action or relevant, it was nonetheless still disclosed in the SAR narrative, along with the ongoing regulatory action. *See* SEC Table A-2 (SEC's Ex. 4), No. 1970, Ex. 122; *see also* p. 3 of the Support File, Ex. 123 (emphasis added).

   i. ***Violation No. 1971:***  Table A-2 states that Alpine omitted the following information: "3rd parties - ALPINE00285106 pg 3."  However, page 3 of the support file states: "██████████████████ are the subject of ongoing SEC action, ████ ██████████████ listed in civil suit alleging securities fraud for misrepresentations."  The SAR narrative refers to the ongoing regulatory action and only omitted the "3rd parties" from a non-regulatory "civil suit."  *See* SEC Table A-2 (SEC's Ex. 4), No. 1971, Ex. 124; *see also* p. 3 of the Support File, Ex. 125.

   j. ***Violation No. 859:***  Table A-2 states that Alpine omitted the following information: "Broker - ALPINE00308951 pg 4."  Page 4 of the support file states: "an unrelated broker is in litigation for investing client's money in issuer without disclosing risks associated with microcap securities."  Thus, not only is an unrelated person, but the actual SAR narrative is very robust as follows:

███████████████████████████████████



*See* SEC Table A-2 (SEC's Ex. 4), No. 859, Ex. 126; *see also* p. 4 of the Support File, Ex. 127.

k.     ***Violation No. 904:***  Table A-2 states that Alpine omitted the following information: "3rd party - ALPINE00190316 pg 4."  Page 4 of the support file states:

"  "  This transaction occurred in in December of 2012.  Thus, the SEC is alleging that activity by a "3rd party" that occurred 24 years prior, settled 18 years prior, must be disclosed or the SAR is deficient as a matter of law.  *See* SEC Table A-2 (SEC's Ex. 4), No. 904, Ex. 128; *see also* p. 4 of the Support File, Ex. 129.

l.     ***Violation No. 1222:***  Table A-2 states that Alpine omitted the following

information: "3rd party - ALPINE00184217 pg 4."  Page 4 of the support file states:

"█████████████████████████████████████████████████████

███████"  Similar to Violation No. 904 above, this activity occurred 24 year prior to the

transaction and the support file specifically found that its "non-issuer related."  *See* SEC

Table A-2 (SEC's Ex. 4), No. 1222, Ex. 130; *see also* p. 4 of the Support File, Ex. 131.

187.     The SEC's Statement of Facts No. 32, states that 1466 out of 1594 transactions

reported in the SARs that were cleared by Alpine came from only "six customers, whom were

connected to criminal or regulatory history."  *See* SEC's SOF, No. 32, Dkt. 148.  The SEC's

statement of fact cite a Declaration from its expert witnesses stating that the six customers are (1)

████, (2) ██████████, (3) █████████, (4) ██████, (5) ████████████, and (6) ██████.  *Id.* (citing A.

Angotti Decl., at ¶ 33, Ex. 1 to SEC's SOF, Dkt. 148.

188.     The following facts relate to the criminal and/or regulatory histories of more

frequently cited customers by the SEC on Table A-2:

a.     ████████: ████████ comprises 337 SARs on Table A-2, and also

include 35 SARs from ████████, an issuer of ████████.  *See* Table A-2 (SEC's Ex. 4).

As stated in the SAR narratives that disclosed ████████' and ████████'s "ongoing"

SEC investigation (*see e.g.* Violation Nos. 745, 1837, 1847, 748, 1970, 1971 disclosed in

this SOF), the investigation was "ongoing" and was not completed until February of 2018

– after this current action was filed.  *See* Order Instituting Administrative Proceedings,

Ex. 132, found at ████████████████████████████  In addition,

████, the introducing broker for ████████, in addition to ████████████████,

and , sent a detailed memorandum to Alpine requesting an exception to

Alpine's float limit policy.  *See* ███████ Memorandum, Ex. 133.  Among other things,

the ███████ Memorandum states the following:

> SCA is unaware of any material regulatory issues that would negatively
> impact our business relationship.  SCA is aware that, on October 25, 2010,
> the SEC filed a complaint against ███████████, ███████ and various
> ██████████, the former manager of ███████ and various
> other hedge funds, and its CEO, ███████, alleging that ███████
> ██████ and ████ overvalued the funds' largest holdings and that they
> made material misrepresentation to investors and misused investor funds
> to pay legal and administrative expenses of other funds managed by
> ███████████, ████████████'s attorney, ███████████, provided
> a statement to SCA describing the allegations as administrative in nature
> and confirming that the complaint does not seek to limit the activities of
> ████████████ or its related entities.  A copy of the statement from
> ████████████ is attached for your reference.  The SEC action is currently
> ongoing, and ███████ no longer manages money for outside investors.

*Id*. at 1-2, Ex. 133.  In the legal opinion letter referenced and attached to the ███████

███████, it states, "Neither complaint seeks to limit the activities of the Firm

pending the outcome of the litigation.  As such, the Firm maintains the ability to continue

the business of managing the funds, and the funds managed by the Firm can continue to

make portfolio investments pending the conclusion of the litigations or an interim order

in either litigation that may be granted in the future."  *Id*. at 3, Ex. 133.

    More importantly, the foregoing legal opinion was also included in ███████'s

"New Account Check List", dated June 26, 2011, when ███████ first opened an

account at Alpine.  *See* Legal Opinion, dated July 26, 2011, SEC-FINRA-E-00997052,

Ex. 134 (final page of the "New Account Check List packet).  Accordingly, the first SAR

for ███████ on Table A-2 (No. 744 and 1827 for ███████) occurred on January 13,

2012 – well after the foregoing introductory packet and legal opinion regarding ███████

███████████'s ***ongoing*** regulatory action.  *See* Table A-2 (SEC's Ex. 4) SAR

Violation Nos. 744, 1827, Ex. 135.  Thus, there is a material fact in dispute as to whether

Alpine acted reasonably in not included ██████████████'s ongoing

regulatory matter on the 372 SARs at issue for ████████████ because the

regulatory matter was not resolved and in light of the representations made in the cited

legal opinion.

        b.      ██████: ████ comprises 93 SARs on Table A-2.  *See* Table A-2 (SEC's

Ex. 4).  As evidenced on Table A-2 regarding SARs for ████, the SEC alleges

specifically that 48 of the 93 SARs failed to include information regarding third-parties,

and allege many other violations against named third-parties.  *Id.*  The remaining SAR

involve an ████ SEC settlement involving ████████ that occurred in ████, but was

in relation to other firms, not ████.  *See* SEC Press Release, Ex. 136, found at

████████████████████████.  In addition, SCA, the introducing

broker for ████, sent a detailed memorandum to Alpine requesting an exception to

Alpine's float limit policy.  *See* ████ Memorandum, Ex. 137.  Among other things, the

████ Memorandum states the following:

> SCA is unaware of any material regulatory issues that would negatively
> impact our business relationship.  SCA is aware that, on ██████████,
> ████, ████████████████, an entity affiliated with ████, and
> SEC agreed to settle a complaint related to selling unregistered securities
> in improper reliance on the rule 504 exemption.  ████████████
> ████████, provided a statement to SCA indicating that ████████ did not
> commit any intentional wrongdoing or fraud and that the complaint related
> to transactions that took place as long as 9 years ago.  SCA does not
> accept deposits from in reliance on the rule 504 exemption.  The legal
> issues concerning 504 offerings are subtle and the subject of conflicting
> debate among many in the legal community.  In addition, the SEC has not
> provided much guidance in this area.  T our knowledge, ████ has never

attempted to deposit a 504 transaction with SCA and  no longer invests in such transactions.

*Id*. at 1-2, Ex. 137.

c.     ████: ████ comprises 34 SARs on Table A-2.  *See* Table A-2 (SEC's Ex. 4).  The first SAR on Table A-2 is dated October 26, 2014 (No. 124) and the final SAR is dated April 10, 2015 (No. 172).  *Id*.  The "██████████████████████" cited through Table A-2 on ████ SARs relates to a settlement between ████████ and the DOJ regarding activity with ██████████████, unrelated to ████, mortgage fraud which is not related to the transaction at issues in matter, and was resolved during ████ – at least four years prior to the SARs on issue in this matter.  *See* Article about ████'s settlement, Ex. 138, found at ██████████████████████████ ██████████████████████.

## C.     *Involvement of a Shell Company or Derogatory History of a Stock*

189.    As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's expert witness stated the following rebuttal testimony:

a.     The SEC's expert witness claims that 241 SARs omitted "shell company involvement or derogatory history of stock." As support for this "red flag" category, the Navigant Report relies on a 2006 FinCEN issuance concerning money laundering risks relating to shell companies. But that FinCEN guidance specifically explains that "[t]he term 'shell company' . . . refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence." Likewise, the SAR Activity Review uses the term "shell company" or "shell corporation" to describe a company that "is registered or licensed in the state or country in which it is incorporated,

is not traded on a securities exchange, and does not operate on its own." In other words, "shell companies" – as that term is defined and applied by FinCEN – are not publicly traded; the SEC expert witness's criticism of Alpine for purportedly failing to disclose in certain SARs "information about the issuer of stock being a shell," which by definition confirms that the company is publicly trading, is nonsensical.  Loew Expert Decl., at ¶ 224, Ex. 5 (citing to the Navigant Report and FinCEN guidance).

b.      The SEC's expert witness's analysis of shell company involvement, moreover, is not tethered to any discussion of how such involvement would have contributed to a conclusion that the activity being reported was suspicious. Nor does the Navigant Report suggest in any manner that shell company involvement was the basis for Alpine's decision to file the SAR.  *Id*. at ¶ 225, Ex. 5.

c.      Moreover, to the extent the SEC's expert witness is suggesting that the fact that an issuer is "a shell or former shell company" is a red flag that must automatically be reported in a SAR, that reflects a fundamental misunderstanding of the relevant guidance. Specifically, the SEC's expert witness's analysis fails to acknowledge that there is no guidance that would support the creation of a red flag where the issuer was formerly a shell company at some time previous to the issuance of the securities that are involved in the transaction at issue. Yet of the 241 SARs with which she takes issue, 104 of those SARs involved issuers that were "formerly" shell companies.  *Id*. at ¶ 226, Ex. 5.

d.      Contrary to the SEC's expert witness's view, however, FinCEN guidance says nothing at all about a former shell company being a potential risk factor, let alone

inherently suspicious. In fact, FinCEN recognizes that most shell companies are formed and used for legitimate business purposes. For that reason, the guidance explains that a financial institution should file a SAR and report shell company involvement in the narrative "if a financial institution discovers suspicious activities such as those listed above and knows, suspects or has reason to suspect the transactions involve the use of United States or foreign-based shell business entities to launder illicit funds or to enable the furtherance of a crime." That is, according to FinCEN, the key is not the presence of a shell company in a transaction; the key is whether there are indications that a company is presently a shell company that is being used for money laundering or in furtherance of a crime. *Id*. at ¶ 227, Ex. 5 (citing FinCEN guidance).

190.    Alpine's WSPs also state the following regarding the use of a shell company, cited by the SEC as a red flag: "Shell companies can represent a potential money laundering risk. Most shell companies are formed for legitimate business reasons, but some have been used for illicit purposes. . . . Shell companies *are subject to review* which may include [multiple issues]." *See* WSPs, April 11, 2013, at pp. 176-177, Ex. 12; WSPs, August 29, 2014, at p. 194, Ex. 13; WSPs, October 1, 2015, at pp. 208-209, Ex. 14.

191.    Alpine's WSPs regarding shell companies derives from FinCEN guidance from November of 2006.  The FinCEN guidance does not state that the fact that an issuer is or was a shell is a red flag.  Rather, FinCEN states that "[m]ost shell companies are formed by individuals and businesses for legitimate reasons," but warns that "these entities have also been used for illicit purposes," and thus reminds financial institutions to "assess the risks involved in each shell company relationship and take steps to ensure that the risks are appropriately and effectively

identified and managed in accordance with their BSA obligations." *See* FIN-2006-G014, November 9, 2006, Ex. 139.

192.    The FinCEN guidance also includes a list of potentially suspicious activities that commonly involve a shell company, such as an "inability to obtain . . . information necessary to identify originators or beneficiaries of wire transfers," or that the "goods and services of the [shell] company do not match the company's profile based on information previously provided to financial institutions," or "multiple high-value payments or transfers between shell companies with no apparent legitimate business purpose." *See* FIN-2006-G014, November 9, 2006, Ex. 139.  Importantly, in accordance with 31 C.F.R. § 1023.320(a)(2), FinCEN then states that "if a financial institution discovers suspicious activities such as those listed above *and* knows, suspects or has reason to suspect the transactions involve the use of a United States or foreign-based shell business entities *to **launder illicit funds or enable the furtherance of a crime***, the institution must file a [SAR]" and use the narrative to describe the suspicious conduct that prompted the SAR.  *Id.* (emphasis added).

193.    Leia Farmer, Alpine's AML Officer during the relevant time period, testified that the fact that an issuer was at some point in its life a shell company was not necessarily suspicious or needed to be incorporated into a SAR narrative.  Stating further, "the mere fact that a company was a shell company and no longer ceases to be a shell company wasn't necessarily indicative of suspicious activity.  It is something that we would look at on a facts and circumstance analysis to determine whether that specific fact was relevant to that particular filing."  *See* L. Farmer Dep., at 104-106, Ex. 16.

194.    In fact, the SEC's expert concedes in her Rebuttal Report, as she must, that not all

shell companies are always suspicious." *See* Navigant Rebuttal Report, at 5, Ex. 17.

195.    Furthermore, the SEC's expert testified during her deposition that the finding of a violation for failure to disclose a shell where the file clearly reflects Form 10-Qs and 10-Ks would be an error, or when the actual support file states, "not a shell." *See* Angotti Dep., at 353-354, Ex. 10; *see also id*. at 143-144, Ex. 10 (stating that if there were handwritten notes of information in the support file that is inconsistent with the categories or claimed deficiency, then the SEC's expert would have expected her staff to see that and take it into account).

196.    Finally, the SEC's expert testified during her deposition that there is no specific guidance that she is aware of that would suggest that former shell status is actually a red flag that needs to be considered. *See* Angotti Dep., at 356, Ex. 10.

197.    In the following examples of the different categories of SARs taken from the SEC's Table A-3, the support file contradicts the SEC's position or shows that the subject issue has been cured:

a.    First, the SEC's Table A-3 does not identify what is missing in regards to two SARs and only provides a Bates Label.  *See* Table A-3 (SEC's Ex. 5), Nos. 197, 329, Ex. 140.

b.    ***Violation No. 652:*** Table A-3 states that Alpine omitted the following: "Shell company - ALPINE00239571 pg 2."  However, page 2 of the SAR support file states that the shell status is "cured," and the issuer ceased being a shell on 11/10/11 as reported by S-1, and identifies that the 10-Ks and 10-Q as stating that the company is not a shell.  Moreover, it states, "Form 10 information shows non-cash assets and expenses indicating ongoing operations beginning in October of 2010."  Thus, page 3 states it is

144 eligible.  *See* SEC Table A-3 (SEC's Ex. 5), No. 652, Ex. 141; *see also*
ALPINE00239571, pp. 2-3 of the SAR Support File, Ex. 142.

      c.     ***Violation No. 462:*** Table A-3 states that Alpine omitted the following:
"Shell - ALPINE00229878 pg 2."  However, page 2 of the SAR support file shows that
both boxes of "yes" and no" were checked to the question of whether "the issuer" was
ever "a shell."  However, all Form 10-Qs and 10-Ks, dating back to 2010 "all report
company as non shell" and there is a hand written notes stating "no shell."  *See* SEC
Table A-3 (SEC's Ex. 5), No. 462, Ex. 143; *see also* ALPINE00229878, p. 2 of the SAR
Support File, Ex. 144.

      d.     ***Violation No. 2001:*** Table A-3 states that Alpine omitted the following:
"Shell - ALPINE00216496 pg 1."  However, the SAR support file states that it was a
shell "within the last year" but that "free trading basis confirmed by S-1 registration."
The S-1 filed in July 2008, shows that "purchased from a 3rd party non-affiliate who held
shares taking back to S-1.".  *See* SEC Table A-3 (SEC's Ex. 5), No. 2001, Ex. 145; *see
also* ALPINE00216496, pp. 1-2, 8 of the SAR Support File, Ex. 146; *see also* S-1 Form,
10-Q and 10K, collectively, Ex. 146.

      e.     ***Violation No. 1975:*** Table A-3 states that Alpine omitted the following:
"Former shell - ALPINE_LIT167225 pg 2."  However, page 2 of the SAR support file
states that the former shell status was cured under Rule 144 and is verified by legal
opinions and Form 10s.  *See* SEC Table A-3 (SEC's Ex. 5), No. 1975, Ex. 147; *see also*
ALPINE_LIT167225, pp. 2-3, 9 of the SAR Support File, Ex. 148.

      f.     ***Violation No. 467:*** Table A-3 states that Alpine omitted the following:

"Former shell - ALPINE00230228 pg 2."  However, the SAR support file states the

former shell status was cured under rule 144 as verified from a legal opinion, 10Qs from

12/31/10-12/31/13 and "all filings and amendments report company as non-shell."  The

file also states, "First reported as non-shell 10QSB filed 11/19/07."  *See* SEC Table A-3

(SEC's Ex. 5), No. 467, Ex. 149; *see also* ALPINE00230228, pp. 2-3, 13 of the SAR

Support File, Ex. 150.

      g.    ***Violation No. 1430:*** Table A-3 states that Alpine omitted the following:

"Former shell - ALPINE_LIT010479 pg 2."  However, the SAR support file states,

"Shell Status Cured," and cites Form 10s from 2011 through June of 2012 which "reports

shell status cured."  *See* SEC Table A-3 (SEC's Ex. 5), No. 1430, Ex. 151; *see also*

ALPINE_LIT010479, pp. 2-3 of the SAR Support File, Ex. 152.

198.    The Table below shows in column (1) each alleged SAR violation on Table A-3

(SEC's Ex. 5), in column (2) the SEC's expert's allegation for the claim with citation to the

support file but without providing the support file to the Court for confirmation or foundation,

and in column (3) Alpine's submitted citations in each support file, all attached as Exhibits,

refuting the SEC's expert's claim and allegations:

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 119 | Former shell - ALPINE_LIT107887 pg 2 | ██████████████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 147 | Former shell - ALPINE_LIT106349 pg 2 | |
| 160 | Former shell - ALPINE_LIT108709 pg 2 | |
| 169 | Former shell - ALPINE_LIT107716 pg 2 | |
| 188 | Former shell - ALPINE_LIT110183 pg 2 | |
| 194 | Shell - ALPINE_LIT112232 pg 2 | |
| 196 | Shell - ALPINE_LIT112662 pg 3 | |
| 197 | SEC-ALPINE-E-1690740 | |
| 198 | Shell - ALPINE_LIT112133 pg 8 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ███████████ |
| 287 | Former shell ALPINE00270201 pg 2 | █████████████ |
| 329 | ALPINE00152211 pg 3 | █████████████ |
| 350 | Former shell ALPINE00299265 pg 2 | █████████████ |
| 355 | Former shell - ALPINE00300165 pg 3 | █████████████ |
| 356 | Former shell - ALPINE00257780 pg 2 | █████████████ |
| 360 | Former shell - ALPINE00257922 pg 2 | █████████████ |
| 368 | Former shell - ALPINE00265191 pg 2 | █████████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
|  |  | ██████████████ |
| 369 | Former shell - ALPINE00265414 pg 2 | ██████████████ |
| 370 | Former shell - ALPINE00265095 pg 2 | ██████████████ |
| 371 | former shell - ALPINE00265240 pg 2 | ██████████████ |
| 372 | former shell - ALPINE00265148 pg 2 | ██████████████ |
| 399 | Former shell - ALPINE00226399 pg 2 | ██████████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| **454** | Former shell - ALPINE00229243 pg 2 | |
| **462** | Shell - ALPINE00229878 pg 2 | |
| **467** | Former shell - ALPINE00230228 pg 2 | |
| **515** | Issuer trading suspension - ALPINE00278788 pg 3 | |
| **517** | Possibly former shell - ALPINE00232630 pg 2 | |
| **553** | Shell company - ALPINE00280661 pg 2 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ▮▮▮▮▮▮▮▮▮▮▮ |
| 586 | Former shell - ALPINE00282917 pg 2 | ▮▮▮▮▮▮▮▮▮▮ |
| 612 | Issuer trading suspension - ALPINE00283682 pg 3 | ▮▮▮▮▮▮▮▮▮▮ |
| 616 | Issuer trading suspension - ALPINE00283825 pg 4 | ▮▮▮▮▮▮▮▮▮▮ |
| 647 | Shell company - ALPINE00280661 pg 2 | ▮▮▮▮▮▮▮▮▮▮ |
| 652 | Shell company - ALPINE00239571 pg 2 | ▮▮▮▮▮▮▮▮▮▮ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 666 | Former shell - ALPINE00240078 pg 2 | |
| 667 | Former shell - ALPINE00162898 pg 3 | |
| 703 | Issuer trading suspension - ALPINE00286858 pg 4 | |
| 713 | Former shell - ALPINE00287056 pg 2 | |
| 718 | Caveat Emptor status - ALPINE00164157 pg 2 | |
| 743 | Former shell - ALPINE00288308 pg 2 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 778 | Former shell - ALPINE00289546 pg 2 | |
| 787 | Former shell - ALPINE00290037 pg 2 | |
| 788 | Former shell - ALPINE00246289 pg 2 | |
| 794 | Former shell - ALPINE00290242 pg 2 | |
| 823 | Issuer selling unregistered shares - ALPINE_LIT022229 pg 3 | |
| 826 | Issuer selling unregistered shares - ALPINE_LIT021894 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ████████████ |
| 828 | Issuer cease and desist - ALPINE_LIT021497 pg 3 | ████████ |
| 856 | Former shell - ALPINE_LIT024593 pg 2 | ████████ |
| 863 | Former shell - ALPINE_LIT024859 pg 2 | ████████ |
| 864 | Former shell - ALPINE_LIT027795 pg 2 | ████████ |
| 961 | Frequent name change - ALPINE00182447 pg 3 | ████████ |
| 974 | Fromer shell - ALPINE00175350 pg 3 | ████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 990 | Former shell - ALPINE00180061 pg 3 | |
| 1031 | Former shell - ALPINE00211009 pg 3 | |
| 1032 | issuer was delisted - ALPINE00182668 pg 70 | |
| 1041 | Former shell - ALPINE00200996 pg 3 | |
| 1047 | Former shell - ALPINE00177050 pg 3 | |
| 1051 | Former shell - ALPINE00178450 pg 3 | |
| 1068 | Former shell - ALPINE00213288 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1093 | Former shell - ALPINE00167805 pg 3 | |
| 1119 | Frequent name change - ALPINE00171444 pg 3 | |
| 1124 | Frequent name change - ALPINE00171820 pg 4 | |
| 1126 | Frequent name change - ALPINE00171969 pg 3 | |
| 1132 | Frequent name change - ALPINE00172650 pg 3 | |
| 1133 | Frequent name change - ALPINE00172731 pg 3 | |
| 1134 | Former shell - ALPINE00172801 p 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1137 | Frequent name change - ALPINE00173366 pg 3 | |
| 1138 | Frequent name change - ALPINE00173445 pg 3 | |
| 1140 | Frequent name change - ALPINE00173702 pg 3 | |
| 1142 | Frequent name change - ALPINE00173937 pg 3 | |
| 1145 | Former shell - ALPINE00174362 pg 3 | |
| 1150 | Issuer delisted - ALPINE00174726 pg 75 | |
| 1153 | Frequent name change - ALPINE00175120 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| **1156** | Frequent name change - ALPINE00175429 pg 3 | |
| **1170** | Frequent name change - ALPINE00177282 pg 3 | |
| **1175** | Frquent name change - ALPINE00177844 pg 8 | |
| **1177** | Caveat Emptor status - ALPINE00178067 pg 2 | |
| **1189** | Frequent name change - ALPINE00179557 pg 3 | |
| **1206** | Former shell - ALPINE00182013 pg 3 | |
| **1207** | Frequent name change - ALPINE00182087 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| **1208** | Frequent name change - ALPINE00182372 pg 3 | |
| **1211** | Former shell - ALPINE_LIT011118 pg 5 | |
| **1214** | Frequent name change - ALPINE00183442 pg 3 | |
| **1216** | Frequent name change - ALPINE00183593 pg 3 | |
| **1219** | Frequent name change - ALPINE00183986 pg 3 | |
| **1220** | Frequent name change - ALPINE00184068 pg 3 | |
| **1221** | Frequent name change - ALPINE00184147 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1222 | Frequent name change - ALPINE00184217 pg 3 | |
| 1225 | Frequent name change - ALPINE00184523 pg 3 | |
| 1226 | Frequent name change - ALPINE00184646 pg 3 | |
| 1227 | Frequent name change - ALPINE00184721 pg 3 | |
| 1228 | Frequent name change - ALPINE00184793 pg 3 | |
| 1230 | Frequent name change - ALPINE00185157 pg 3 | |
| 1236 | Frequent name change - ALPINE00185940 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1241 | Frequent name change - ALPINE00186341 pg 3 | |
| 1243 | Former shell - ALPINE00186574 pg 3 | |
| 1247 | Frequent name change - ALPINE00187127 pg 3 | |
| 1248 | Frequent name change - ALPINE00187203 pg 3 | |
| 1256 | Frequent name change - ALPINE00188052 pg 2 | |
| 1259 | Frequent name change - ALPINE00188334 pg 3 | |
| 1260 | Frequent name change - ALPINE00188414 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1261 | Frequent name change - ALPINE00188499 pg 3 | |
| 1262 | Frequent name change - ALPINE00188573 pg 3 | |
| 1264 | Former shell - ALPINE00188720 pg 3 | |
| 1271 | Frequent name change - ALPINE00189558 pg 3 | |
| 1283 | Frequent name change - ALPINE00191023 pg 3 | |
| 1285 | Frequent name change - ALPINE00191239 pg 3 | |
| 1287 | Frequent name change - ALPINE00191394 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1293 | Frequent name change - ALPINE00192024 pg 3 | |
| 1295 | Former shell - ALPINE00192220 pg 3 | |
| 1297 | Frequent name change - ALPINE00192579 pg 3 | |
| 1300 | Frequent name change - ALPINE00192794 pg 2 | |
| 1309 | Frequent name change - ALPINE00193516 pg 3 | |
| 1310 | Frequent name change - ALPINE00193587 pg 3 | |
| 1313 | Frequent name change - ALPINE00193870 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1315 | Frequent name change - ALPINE00193991 pg 3 | |
| 1316 | Frequent name change - ALPINE00194148 pg 3 | |
| 1324 | Frequent name change - ALPINE00195057 pg 3 | |
| 1325 | Frequent name change - ALPINE00195136 pg 3 | |
| 1326 | Frequent name change - ALPINE00195271 pg 3 | |
| 1327 | Former shell - ALPINE00195332 pg 3 | |
| 1332 | Frequent name change - ALPINE00196089 pg 3 | |
| 1341 | Frequent name change - ALPINE00197309 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ███████████████ |
| 1346 | Former shell - ALPINE00197952 pg 3 | ████████████████ |
| 1358 | Frequent name change - ALPINE00199668 pg 3 | ████████████████ |
| 1360 | Frequent name change - ALPINE00199978 pg 3 | ████████████████ |
| 1364 | Frequent name change - ALPINE00200635 pg 3 | ████████████████ |
| 1366 | Frequent name change ALPINE00200845 pg 3 | ████████████████ |
| 1367 | Former shell - ALPINE00201195 pg 3 | ████████████████ |
| 1376 | Former shell - ALPINE00202325 pg 3 | ████████████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | █████████ |
| 1391 | Frequent name change - ALPINE00204404 pg 3 | █████████ |
| 1392 | Former shell - ALPINE00204481 pg 3 | █████████ |
| 1394 | Frequent name change - ALPINE00204641 pg 3 | █████████ |
| 1395 | Former shell - ALPINE00204725 pg 3 | █████████ |
| 1396 | Frequent name change - ALPINE00204802 pg 3 | █████████ |
| 1397 | Former shell - ALPINE00204881 pg 3 | █████████ |
| 1398 | Frequent name change - ALPINE00205022 pg 3 | █████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | |
| 1404 | Frequent name change - ALPINE00205974 pg 3 | |
| 1407 | Former shell - ALPINE00206487 pg 3 | |
| 1408 | Former shell - ALPINE00206723 pg 3 | |
| 1411 | Frequent name change - ALPINE00207074 pg 3 | |
| 1419 | Frequent name change - ALPINE00207932 pg 3 | |
| 1430 | Former shell - ALPINE_LIT010479 pg 2 | |
| 1431 | Former shell - ALPINE_LIT008601 pg 2 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ██████████████ |
| **1432** | Frequent name change - ALPINE00209786 pg 3 | ████████████████████ |
| **1434** | Frequent name change - ALPINE00209938 pg 3 | ████████████████████ |
| **1436** | Former shell - ALPINE00210305 pg 3 | ████████████████████ |
| **1440** | Former shell - ALPINE00210929 pg 3 | ████████████████████ |
| **1445** | Former shell - ALPINE00211502 pg 3 | ████████████████████ |
| **1446** | Frequent name change - ALPINE00211579 pg 3 | ████████████████████ |
| **1447** | Former shell - ALPINE00211710 pg 3 | ████████████████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ███████████████ |
| 1448 | Frequent name change - ALPINE00211782 pg 3 | ███████████████ |
| 1451 | Frequent name change - ALPINE00212093 pg 3 | ███████████████ |
| 1457 | Frequent name change - ALPINE00213424 pg 3 | ███████████████ |
| 1458 | Frequent name change - ALPINE00213503 pg 3 | ███████████████ |
| 1459 | Frequent name change - ALPINE00213582 pg 3 | ███████████████ |
| 1460 | Frequent name change - ALPINE00213662 pg 3 | ███████████████ |
| 1465 | Frequent name change - ALPINE00214343 pg 3 | ███████████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | |
| 1468 | Frequent name change - ALPINE00214933 pg 3 | |
| 1478 | Former shell - ALPINE00183094 pg 3 | |
| 1491 | Former shell - ALPINE00194222 pg 3 | |
| 1492 | Frequent name change - ALPINE00172042 pg 3 | |
| 1500 | Former shell - ALPINE00208459 pg 3 | |
| 1501 | Former shell - ALPINE00178981 pg 1 | |
| 1502 | Former shell - ALPINE00178375 pg 1 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
|  |  |  |
| 1504 | Frequent name change - ALPINE00170491 pg 3 |  |
| 1509 | Former shell - ALPINE00178529 pg 3 |  |
| 1518 | Former shell - ALPINE00194066 pg 3 |  |
| 1523 | Frequent name change - ALPINE00200474 pg 3 |  |
| 1533 | Former shell - ALPINE00191163 pg 3 |  |
| 1534 | Former shell - ALPINE00195636 pg 3 |  |
| 1539 | Frequent name change - ALPINE00205439 pg 3 |  |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ████████████████ |
| 1543 | Frequent name change - ALPINE00169440 pg 3 | ████████████████ |
| 1545 | Former shell - ALPINE00183752 pg 3 | ████████████████ |
| 1546 | Former shell - ALPINE00180545 pg 3 | ████████████████ |
| 1551 | Frequent name change - ALPINE00185864 pg 3 | ████████████████ |
| 1555 | Frequent name change - ALPINE00181421 pg 3 | ████████████████ |
| 1556 | Former shell - ALPINE00206269 pg 3 | ████████████████ |
| 1557 | Frequent name change - ALPINE00172118 pg 3 | ████████████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | |
| 1564 | Frequent name change - ALPINE00205145 pg 3 | |
| 1585 | Former shell - ALPINE00216440 pg 3 | |
| 1587 | Former shell - ALPINE00216510 pg 3 | |
| 1616 | Former shell - ALPINE00217810 pg 4 | |
| 1620 | Former shell - ALPINE00217921 pg 3 | |
| 1621 | Shell - ALPINE_LIT080825 pg 2 | |
| 1627 | Former shell - ALPINE_LIT080436 pg 2 | |
| 1641 | Former shell - ALPINE00218606 pg 13 | |
| 1648 | Former shell - ALPINE00218823 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | |
| **1652** | Former shell - ALPINE00218930 pg 3 | |
| **1659** | Frequent name change - ALPINE00218177 pg 3 | |
| **1663** | Former shell - ALPINE00216440 pg 3 | |
| **1669** | Former shell - ALPINE00219482 pg 8 | |
| **1674** | Former shell - ALPINE00219627 pg 3 | |
| **1675** | Former shell - ALPINE00219661 pg 3 | |
| **1687** | Former shell - ALPINE00220021 pg 3 | |
| **1689** | Former shell - ALPINE00220081 pg 7 | |
| **1693** | Shell - ALPINE00220199 pg 11 | |
| **1701** | Shell - ALPINE00220480 pg 3 | |
| **1702** | Shell - ALPINE00220504 pg 7 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1709 | Delisted - ALPINE00220744 pg 4 | |
| 1712 | Shell - ALPINE00220903 pg 9 | |
| 1713 | Frequent name change - ALPINE00220913 pg 1 | |
| 1718 | Former shell - ALPINE00221151 pg 3 | |
| 1720 | Frequent name change - ALPINE00221264 pg 3 | |
| 1725 | Shell - ALPINE00221458 pg 3 | |
| 1726 | Frequent name change - ALPINE00221488 pg 3 | |
| 1729 | Former shell - ALPINE00221612 pg 3 | |
| 1730 | Shell - ALPINE00221654 pg 14 | |
| 1733 | Shell - ALPINE00221694 pg 3 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | |
| 1734 | Frequent name change - ALPINE00221769 pg 3 | |
| 1740 | Frequent name change - ALPINE00221884 pg 3 | |
| 1743 | Former shell - ALPINE_LIT080501 pg 2 | |
| 1761 | Former shell - ALPINE00247804 pg 4 | |
| 1780 | Former shell - ALPINE00248416 pg 3 | |
| 1781 | Frequent name change - ALPINE00152350 pg 3 | |
| 1790 | Frequent name change - ALPINE00248750 pg 3 | |
| 1791 | Former shell - ALPINE00296317 pg 2 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | |
| 1794 | Former shell -ALPINE00248911 pg 3 | |
| 1802 | Frequent name change - ALPINE00249163 pg 2 | |
| 1805 | Former shell - ALPINE00298240 pg 2 | |
| 1822 | Former shell - ALPINE00249815 pg 3 | |
| 1825 | 2007 trading suspension - ALPINE00276648 pg 4 | |
| 1830 | 2007 trading suspension - ALPINE00288660 pg 3 | |
| 1841 | Caveat emptor status - ALPINE00166644 pg 2 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
|  |  | ██████████ |
| 1847 | 2007 trading suspension - ALPINE00276710 pg 3 | ██████████ |
| 1861 | 2007 trading suspension - ALPINE00226076 pg 3 | ██████████ |
| 1869 | 2007 trading suspension - ALPINE00276788 pg 3 | ██████████ |
| 1872 | 2007 trading suspension - ALPINE00276839 pg 3 | ██████████ |
| 1885 | Former shell - ALPINE_SUPP_PROD_SEC 00014516 pg 2 | ██████████ |
| 1888 | Former shell - ALPINE00305547 pg 2 | ██████████ |
| 1907 | Shell - ALPINE00250037 pg 3 | ██████████ |
| 1908 | Shell - ALPINE00269215 pg 26 | ██████████ |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| | | ████████████ |
| **1967** | Former shell - ALPINE00281882 pg 2 | |
| **1968** | Former shell - ALPINE00285891 pg 2 | |
| **1969** | Former shell - ALPINE00290359 pg 2 | |
| **1970** | Former shell - ALPINE00285491 pg 2 | |
| **1971** | Former shell - ALPINE00285106 pg 2 | |
| **1975** | Former shell - ALPINE_LIT167225 pg 2 | |

| SAR Violation | Shell Company Involvement or Derogatory History of Stock | Description & Bates Number |
|---|---|---|
| 1984 | Former shell - ALPINE_LIT033831 pg 3 | |
| 1987 | Former shell - ALPINE00268091 pg 99 | |
| 1992 | Shell - ALPINE00268399 pg 5 | |
| 2001 | Shell - ALPINE00216496 pg 1 | |
| 2003 | Shell - ALPINE00220199 pg 11 | |

### D.    *Stock Promotion*

199.    As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's expert witness stated the following rebuttal testimony:

a.    The SEC's expert witness claims that 55 of the SARs Alpine filed omitted "evidence of stock promotion."  Loew Expert Decl., at ¶ 228, Ex. 5 (citing the Navigant Report).

b.    Stock promotion, like missing information, is a "red flag" of Navigant's making. The Report does not and cannot claim that promotion is unlawful nor does it offer any support for the claim that a filer must report every instance in which stock promotion has occurred or is occurring.  *Id.*, at ¶ 230, Ex. 5.

c. Further, even if "stock promotion" was a recognized "red flag," as with the other categories of red flags, the SEC's expert witness's analysis is not tied to any discussion of how such evidence would have contributed to a conclusion that the activity being reported was suspicious. Nor does the SEC's expert witness suggest in any manner that evidence of stock promotion or lack of issuer verification was the basis for Alpine's decision to file the SAR. *Id.* at ¶ 231, Ex. 5.

200. Leia Farmer, Alpine's AML Officer during the relevant time period, testified that the fact that a stock promotion is occurring during the time of a deposit is not necessarily viewed as suspicious or something that should be included in a SAR narrative. A stock promotion would be relevant to a filing if "the client is somehow involved or associated with the promotional activity." For example, if the actual promoter was depositing stock, although relevant, does not automatically require a SAR filing or inclusion in a SAR narrative, but Alpine would investigate it further and give it a closer look to see if it is suspicious. *See* L. Farmer Dep., at 80-82, Ex. 16 ("Where the firm's investigation reveals that the promotion activity is not germane to the intent of the SAR filing, the firm employs its best judgment on which information may be relevant to provide.").

201. *In re Albert Fried & Co.*, relied upon by the Court in its Partial Summary Judgment Decision, states that the company "had ***ongoing*** penny stock promotional campaigns . . ." and that "Albert Fried knew or should have known that two of the issuers were the subject of promotional campaigns ***at the time of Customer A's trading***." *In re Albert Fried & Co.*, SEC Release No. 77971, 2016 WL 3072175, at *3, 5 (June 1, 2016) (emphasis added). *See also* Court's Opinion and Order dated 03/30/18, at 54, Dkt. 101 (the Court cites *Albert Fried* for

support regarding legal standard of promotional campaign as a red flag).

202.     In the following examples of SARs taken from the SEC's table alleging violations for failure to include information regarding a stock promotion, the SEC's table simply cites pages in the SAR support file but fails to includes such pages which give more details regarding the promotional activity and either answers the question as to "why" the activity was not included in the SAR narrative or, at the very least, creates a factual question:

a.     ***Violation No. 326:*** Table A-4 states that Alpine omitted stock promotional activity on pages 3 and 82 of the support file.  However, page 3 of the SAR support file states: "2 promoters of ███ found on Stockpromoters.com in past 30 days – no connection to client. Client no promo rep attached."  *See* SEC Table A-4 (SEC's Ex. 6), No. 326, Ex. 153; *see also* pp. 3, 82 of the SAR Support File, Ex. 154.

b.     ***Violation No. 341:*** Table A-4 states that Alpine omitted stock promotional activity on pages 3 and 51 of the support file.  However, page 3 of the SAR support file states: "No promotions of ████ found on Stockpromoters.com in past 30 days (last promotion 05/14/2013)."  Page 51 verifies the date of last promotion.  *See* SEC Table A-4 (SEC's Ex. 6), No. 341, dated Jan. 11, 2014, Ex. 155; pp. 3, 51 of the SAR Support File, Ex. 156.

c.     ***Violation No. 717:*** Table A-4 states that Alpine omitted stock promotional activity on pages 3 and 124 of the support file.  However, page 3 of the SAR support file states: "Promotions from 9/25 – 9/30, appear unrelated to deposits. Increase in vol. but little change in price."  *See* SEC Table A-4 (SEC's Ex. 6), No. 717, Ex. 157; *see also* pp. 3, 124 of the SAR Support File, Ex. 158.

203.    The Table below shows in column (1) each alleged SAR violation on Table A-4 (SEC's Ex. 6), in column (2) the date of the SAR filing, in column (3) the SEC's expert's allegation of a stock promotion and citation to the support file but without providing the support file to the Court for confirmation or foundation, and in column (4) Alpine's submitted citations in each support file, all attached as Exhibits, addressing the SEC's claims:

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
| 7 | 12/13/2013 | ALPINE00308713 pg 3, pg 31 | ████████████ |
| 9 | 8/29/2013 | ALPINE00238600 pg 92-93 | ████████████ |
| 196 | 6/6/2012 | ALPINE_LIT112662 pg 4 | ████████████ |
| 202 | 1/29/2014 | ALPINE00298097 pg 66 | ████████████ |
| 218 | 10/29/2014 | ALPINE00263925 pg 40 | ████████████ |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
| 219 | 5/8/2014 | ALPINE00264068 pg 3, 37 | |
| 220 | 1/8/2015 | ALPINE00300319 pg 45 | |
| 225 | 4/8/2014 | ALPINE00263966 pg 34 | |
| 255 | 3/20/2014 | ALPINE00267320 | |
| 318 | 10/18/2013 | ALPINE00292357 pg 3, 96 | |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
|  |  |  |  |
| 326 | 1/11/2014 | ALPINE00293592 pg 3, 82 |  |
| 333 | 10/30/2013 | ALPINE00295097 pg 4, 63 |  |
| 340 | 10/5/2013 | ALPINE00296812 pg 107 |  |
| 341 | 1/11/2014 | ALPINE00296927 pg 3, 51 |  |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
|  |  |  | ███████████ |
| 343 | 8/12/2013 | ALPINE00297264 pg 52 | ███████████ |
| 349 | 10/5/2013 | ALPINE00299175 pg 60 | ███████████ |
| 355 | 1/11/2014 | ALPINE00300165 pg 69 | ███████████ |
| 360 | 7/18/2013 | ALPINE00257922 pg 106 | ███████████ |
| 368 | 8/4/2014 | ALPINE00265191 pg 39 | ███████████ |
| 369 | 3/25/2014 | ALPINE00265414 pg 42 | ███████████ |
| 370 | 3/7/2014 | ALPINE00265095 pg 45 | ███████████ |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
| | | | |
| 371 | 5/15/2014 | ALPINE00265240 pg 33 | |
| 372 | 9/2/2014 | ALPINE00265148 pg 36 | |
| 394 | 10/27/2013 | ALPINE00274046 pg 3, 124 | |
| 430 | 1/11/2014 | ALPINE00276569 pg 3, 45 | |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
| | | | ███████████████ |
| 457 | 8/26/2013 | ALPINE00229539 pg 96 | ████████████████ |
| 480 | 10/18/2013 | ALPINE00277648 pg 68 | ████████████████ |
| 498 | 9/28/2013 | ALPINE00278294 pg 91 | ████████████████ |
| 566 | 7/15/2013 | ALPINE00235641 pg 85 | ████████████████ |
| 583 | 8/26/2013 | ALPINE00236287 pg 100 | ████████████████ |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
| 592 | 7/2/2013 | ALPINE00236835 pg 66 | |
| 664 | 11/9/2013 | ALPINE00285228 pg 3, 144 | |
| 717 | 10/18/2013 | ALPINE00287216 pg 3, 124 | |
| 748 | 6/2/2015 | ALPINE00288551 pg 29 | |
| 810 | 9/28/2013 | ALPINE00290637 pg 124 | |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
| | | | ██████████████ |
| 1194 | 7/16/2012 | ALPINE00180428 pg 111 | ████████████████ |
| 1380 | 7/11/2012 | ALPINE00202789 pg 109 | ████████████████ |
| 1409 | 4/25/2012 | ALPINE00206802 pg 109 | ████████████████ |
| 1423 | 5/2/2012 | ALPINE00208685 pg 110 | ████████████████ |
| 1437 | 6/12/2012 | ALPINE00210447 pg 109 | ████████████████ |
| 1442 | 7/19/2012 | ALPINE00211176 pg 105 | ████████████████ |
| 1624 | 6/14/2012 | ALPINE00218109 pg 28 | ████████████████ |
| 1757 | 1/11/2014 | ALPINE00291825 pg 62 | ████████████████ |
| 1788 | 11/21/2013 | ALPINE00295988 pg 7, 111 | ████████████████ |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
|  |  |  |  |
| 1793 | 11/9/2013 | ALPINE00296718 pg 87 |  |
| 1805 | 12/13/2013 | ALPINE00298240 pg 59 |  |
| 1915 | 8/26/2013 | ALPINE00259994 pg 64 |  |
| 1941 | 1/28/2015 | ALPINE00303908 pg 68 |  |
| 1943 | 10/18/2013 | ALPINE00304547 pg 108 |  |

| SAR Violation | Date SAR Filed | Evidence of Stock Promotion History | Documentation and Citation |
|---|---|---|---|
| 1948 | 10/5/2013 | ALPINE00291951 pg 110 | |
| 1952 | 4/29/2014 | ALPINE00298988 pg 88 | |
| 1953 | 12/14/2013 | ALPINE00299597 pg 88 | |
| 1956 | 8/20/2014 | ALPINE00258287 pg 78 | |
| 1988 | 7/25/2013 | ALPINE00268201 pg 114 | |
| 2005 | 8/6/2013 | ALPINE00301135 pg 131 | |

E.    *Unverified Issuer*

204.    As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's

expert witness stated the following rebuttal testimony:

a.    The SEC's expert witness claims that 42 of the SARs Alpine filed omitted

information "showing that issuers could not be verified."  Loew Expert Decl., at ¶ 228,

Ex. 5 (citing the Navigant Report).

b.    Initially, the SEC's expert witness's suggestion that the SAR narratives at

issue were deficient because they were "missing information about unverified issuers" is

wrong because it is a made-up "red flag." The SEC expert not only does not explain what

this term means, but does not cite to even a single law, regulation, rule, or guidance that

uses this term. There is no support for the proposition that Alpine can or should be

penalized for failing to include in its narratives a category of information that is conjured

by an expert witness years after the SARs at issue were filed.  *Id.* at ¶ 229, Ex. 5 (citing

the Navigant Report).

c.    Further, even if "unverified issuers" and "stock promotion" were

recognized "red flags," as with the other categories of red flags, the SEC's expert

witness's analysis is not tied to any discussion of how such evidence would have

contributed to a conclusion that the activity being reported was suspicious. Nor does the

SEC's expert witness suggest in any manner that evidence of stock promotion or lack of

issuer verification was the basis for Alpine's decision to file the SAR.  *Id.* at ¶ 231, Ex. 5.

205.    Leia Farmer, Alpine's AML Officer during the relevant time period, testified that

that the fact that Alpine was unable to, for example, access an issuer's website, would not necessarily, in and of itself, be viewed suspicious or indicative of criminal activity.  *See* L. Farmer Dep., at 107, Ex. 16.

206.     In the following examples of SARs taken from the SEC's Table A-5 alleging various omissions regarding "unverified issuers", such as company website not functioning, not current in SEC filings, and expiration of business licenses, the support file contradicts the SEC's assertions or provided a factual basis for the omission:

a.       ***Violation No. 1797:*** Table A-5 states that Alpine omitted the following: "Current info not available - ALPINE00152725 pg 4."  However, the support file identifies Form 10s and the OTC Website print out states, "U.S. Registered and Reporting."  The support file also contains a google search print out that references an 8-K from February 28, 2012.  *See* SEC Table A-5 (SEC's Ex. 7), No. 1797, Ex. 159; *see also* ALPINE00152725, pp. 4, 40-45, and 49 of the SAR Support File, Ex. 160.

b.       ***Violation No. 463:*** Table A-5 states that Alpine omitted the following: "Not current on SEC filings, no website - ALPINE00229919 pg 3."  However, the SAR narrative states that ████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████"  *See* SEC Table A-5 (SEC's Ex. 7), No. 463, Ex. 161, *see also* ALPINE00229919, pp. 3 of the Sar Support File, Ex. 162.

c.       ***Violation No. 1897:*** Table A-5 states that Alpine omitted the following: "Not current on SEC filings, no website - ALPINE00234825 pg 2."  However, the SAR narrative states that there is an OTC Stop and that █████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████    *See* SEC Table A-5 (SEC's Ex. 7), No. 1897, Ex.

163.

        d.     **Violation No. 438:** Table A-5 states that Alpine omitted the following:

"Current info not available - ALPINE00156058 pg 4."  However, the support file states,

"Fully SEC reporting, current in filings" which is also verified by an OTC Website

printout.  *See* SEC Table A-5 (SEC's Ex. 7), No. 438, Ex. 164; *see also*

ALPINE00156058, pp. 4, 40 of the SAR Support File, Ex. 165.

        e.     **Violation No. 385:** Table A-5 states that Alpine omitted the following:

"Issuer's business license expired - ALPINE00225622 pg 50."  However, the support file

includes OTC websites that indicate that the company is a reporting company and cites

latest Form 10.  The support file also lists Form 10s from 2010 forward.  *See* SEC Table

A-5 (SEC's Ex. 7), No. 385, Ex. 166; *see also* ALPINE00225622, pp. 2, 52 of the SAR

Support File, Ex. 167; *see also* Table A-5, Violation Nos. 574, 693, and 716 that involve

the same issuer, same SEC allegation, and same defense.

        f.     **Violation No. 464:** Table A-5 states that Alpine omitted the following:

"Website not working - ALPINE00231548 pg 2."  However, page 2 of the support file

states that the website is current.  *See* SEC Table A-5 (SEC's Ex. 7), No. 464, Ex. 168;

*see also* ALPINE00231548, p. 2 of the SAR Support File, Ex. 169.

        g.     **Violation No. 465:** Table A-5 states that Alpine omitted the following:

"Website not working - ALPINE00235463 pg 2."  However, page 2 of the support file

has no reference to a website.  *See* SEC Table A-5 (SEC's Ex. 7), No. 465, Ex. 170; *see*

*also* ALPINE00235463, p. 2 of the SAR Support File, Ex. 171.

207.    The Table below shows in column (1) each alleged SAR violation on Table A-5 (SEC's Ex. 7), in column (2) the SEC's expert's allegation for the claim with citation to the support file but without providing the support file to the Court for confirmation or foundation, and in column (3) Alpine's submitted citations in each support file, all attached as Exhibits, refuting the SEC's expert's claim and allegations:

| SAR Violation | Unverified Issuers | Description & Bates Number |
|---|---|---|
| 80 | Business registration in default - ALPINE_LIT107167 pg 21 | |
| 109 | Business registration in default - ALPINE_LIT108853 pg 24 | |
| 366 | Original holder anonymous - ALPINE00263696 pg 28 | |
| 385 | Issuer's business license expired - ALPINE00225622 pg 50 | |
| 438 | Current info not available - ALPINE00156058 pg 4 | |
| 463 | Not current on SEC filings, no website - ALPINE00229919 pg 3 | |

| SAR Violation | Unverified Issuers | Description & Bates Number |
|---|---|---|
| | | ███████████████ |
| **464** | Website not working - ALPINE00231548 pg 2 | |
| **465** | Website not working - ALPINE00235463 pg 2 | |
| **492** | Website not working - ALPINE00231548 pg 2 | |
| **565** | Website not working - ALPINE00235463 pg 2 | |
| **574** | Issuer's business license expired - ALPINE00235969 pg 82 | |
| **584** | Website not functioning - ALPINE00236393 pg 2 | |
| **587** | Website not functioning - ALPINE00236579 pg 2 | |
| **589** | Website not working - ALPINE00236695 pg 2 | |

| SAR Violation | Unverified Issuers | Description & Bates Number |
|---|---|---|
| | |  |
| 658 | Not current on SEC filings - ALPINE00239780 pg 1 | |
| 693 | Issuer's business license expired - ALPINE00241690 pg 72 | |
| 716 | Issuer's business license expired - ALPINE00243106 pg 51 | |
| 779 | Website not working - ALPINE00245821 pg 2 | |
| 805 | Not current on SEC filings - ALPINE00246773 pg 2 | |
| 839 | No current info - ALPINE_LIT027357 pg 2 | |
| 1607 | Current info not available - ALPINE00221822 pg 2 | |
| 1722 | Current info not available - ALPINE00221328 pg 8 | |
| 1735 | Current info not available - ALPINE00221822 pg 2 | |
| 1797 | Current info not available - ALPINE00152725 pg 4 | |

| SAR Violation | Unverified Issuers | Description & Bates Number |
|---|---|---|
| 1828 | Website not functioning - ALPINE00226337 pg 2 | |
| 1836 | Website not functioning - ALPINE00228073 pg 2 | |
| 1840 | Website not functioning - ALPINE00228902 pg 2 | |
| 1842 | Website not functioning - ALPINE00235732 pg 2 | |
| 1856 | Website not functioning - ALPINE00239959 pg 2 | |
| 1858 | Website not functioning - ALPINE00231101 pg 2 | |
| 1861 | Website not functioning - ALPINE00226076 pg 2 | |
| 1865 | Website not functioning - ALPINE00238236 pg 2 | |

| SAR Violation | Unverified Issuers | Description & Bates Number |
|---|---|---|
| 1867 | Website not functioning - ALPINE00244238 pg 2 | |
| 1872 | Website not functioning - ALPINE00276839 pg 2 | |
| 1874 | Website not functioning - ALPINE00234609 pg 2 | |
| 1894 | Website is dead link - ALPINE_LIT031491 pg 2 | |
| 1897 | Not current on SEC filings, no website - ALPINE00234825 pg 2 | |
| 1898 | Website is dead link - ALPINE_LIT031491 pg 2 | |
| 1899 | Website not working - ALPINE00237673 pg 3 | |
| 1901 | Website is dead link - ALPINE_LIT032386 pg 2 | |
| 1903 | Not current on SEC filings, no website - ALPINE00243434 pg 2 | |
| 1904 | Website not working - ALPINE_SUPP_PROD_SEC 00001687 pg 2 | |

### F.     *Low Trading Volume*

208.     As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's expert witness stated the following rebuttal testimony:

      a.      The SEC's expert witness claims that 707 SARs that Alpine filed failed to explicitly mention that the securities identified in the SARs had low trading volumes. This criticism is not well-founded for at least three reasons. Loew Expert Decl., at ¶ 232, Ex. 5 (citing Navigant Report).

      b.      First, low trading volume is not a red flag. To the contrary, it is a hallmark of microcap stocks and it does not provide any basis to conclude that a transaction is being used to facilitate criminal activity. Further, to the extent it is clear from the filed SARs that the stock involved in the transaction was a microcap, low trading volume should – and would have been – understood and assumed by law enforcement and the SEC regulators reviewing the SARs. The converse also is true: if low volume were a red flag, then filing would be required on the majority of microcap transactions. *Id*. at ¶ 233, Ex. 5 (citing guidance).

      c.      Second, the SEC's expert witness has not defined what "low trading volume" means. If, as she claims, low trading volume must be reported as a matter of law and in every circumstance it exists, one would expect that regulators would have provided clarity about what quantity of trading volume would qualify as sufficiently "low" to require reporting. The SEC's expert witness posits a calculation of 300 percent of average trading volume over the three months preceding the deposit. Once again, the Navigant Report cites to no authority to support that purported SAR filing obligation. *Id*.

at ¶ 234, Ex. 5 (citing Navigant Report).

      d.     Third, as with many of the other categories of information the SEC's

expert witness claims renders Alpine's filed SARs fatally deficient, information about

trading volumes is publicly available, and certainly available to law enforcement.

Accordingly, while perhaps helpful to law enforcement, information about the stock's

trading volume is not critical information for SAR narratives or information that is

uniquely within Alpine's knowledge.  *Id*. at ¶ 235, Ex. 5.

209.    Of the 707 SARs the SEC claims omits "low trading volume" (Table A-7), in 256

of those SARs, low trading volume is the only red flag identified.  *See* SEC's Ex. 10.

210.    Low trading volume may be something to consider, but by itself, it is not

necessarily suspicious.  Randy Jones, a past AML Officer at Alpine, was asked during his

deposition whether "the size of a deposit, relative to the average trading volume, have anything

to do, in your mind, with those kinds of market manipulations . . .?"  Mr. Jones answered as

follows: "It can. I don't think it always does. Just, I mean, there's – there's a laundry list of items

that you would bring into consideration when you look at manipulative trading. It's not just the

deposit and the number of shares that were deposited. This – in this case this client could have

taken six months to get out of that. Could have taken a week. I don't know the time line in which

they got out of that stock. You could have an instance where the CEO of an issuer wants to

deposit stock. They have a large block. It has low trading volume, but they have a large block,

and they just want to put it in for safe keeping. So they give us this large block, knowing that

they will need to sell under 144, have these 90 day windows. They will need to notify the SEC

when they're – they're selling through the 144 grid. But I don't – I don't think it's necessarily

suspicious to have that CEO put the stock in just for safe keeping. And I don't know specifically what the trading was on this account with this security after this. So I – I wouldn't be able to tell you whether this is suspicious or not."  *See* R. Jones Dep., at 72-73, Ex. 15.

211.    In the following examples of SARs taken from the SEC's table alleging violations for failure to include information regarding low trading volume, the SARs at issue actually discuss the trading volume alleged to be ignored by the SEC and clearly answer the question of "why" Alpine is filing the SAR:

a.    ***Violation No. 1941:*** Table A-6 states that Alpine omitted low volume trading activity on page 5 of the support file.  However, the SAR narrative states the follow:



*See* SEC Table A-6 (SEC's Ex. 8), No. 1941, Ex. 172 (emphasis added).

        b.      ***Violation No. 190:*** Table A-6 states that Alpine omitted low volume trading activity on page 5 of the support file.  However, the SAR narrative states the follow:



*See* SEC Table A-6 (SEC's Ex. 8), No. 190, Ex. 173 (emphasis added).

        c.      ***Violation No. 1931:*** Table A-6 states that Alpine omitted low volume trading activity on page 5 of the support file.  However, the SAR narrative states the follow:





*See* SEC Table A-6 (SEC's Ex. 8), No. 1931, Ex. 174 (emphasis added).

   d.  ***Violation No. 2001:*** Table A-6 states that Alpine omitted low volume trading activity on page 4 of the support file.  However, the SAR narrative states the follow:



*See* SEC Table A-6 (SEC's Ex. 8), No. 2001, Ex. 175 (emphasis added).

   e.  ***Violation No. 1947:*** Table A-6 states that Alpine omitted low volume trading activity on page 5 of the support file.  However, the SAR narrative states the follow:





*See* SEC Table A-6 (SEC's Ex. 8), No. 1947, Ex. 176 (emphasis added).

       f.      ***Violation No. 1767:*** Table A-6 states that Alpine omitted low volume trading activity on page 8 of the support file.  However, the SAR narrative states the follow:



*See* SEC Table A-6 (SEC's Ex. 8), No. 1767, Ex. 177 (emphasis added).

       g.      ***Violation No. 511:*** Table A-6 states that Alpine omitted low volume trading activity on page 5 of the support file. However, the SAR narrative states the follow:



> of its correspondent firms (see account details below), which may also be potentially suspicious. 1. 142757640 - ASC Recap LLC 2. 717849590 - SC Advisors Inc. 3. 743950800 - Southridge Partners 4. 743951220 - Southridge Partners 5. 706880794 - Tarpon Bay Partners For the reasons stated above, collectively, Alpine is filing this SAR.

*See* SEC Table A-6 (SEC's Ex. 8), No. 511, Ex. 178 (emphasis added).  Notably, for

Violation No. 511, the alleged omission of low trading volume is the only alleged omitted

red flag.  *See also* Angotti Dep., at 363-364, Ex. 10 (SEC's expert concedes that she

would not have charged this SAR with a violation).

### G.    *Foreign Actor or Jurisdiction*

212.    As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's

expert witness stated the following rebuttal testimony:

a.    The SEC's expert witness opines that 298 SARs were deficient because

they omitted information regarding foreign involvement. The Navigant Report is flawed

insofar as it contains this opinion, for several reasons.  Loew Expert Decl., at ¶ 236, Ex. 5

(citing the Navigant Report).

b.    First, like other categories of red flags discussed above, the SEC's expert

witness's analysis does not include any discussion of how or whether the involvement of

foreign individuals or entities were the basis for the SAR filings at issue. The obligation

on financial institutions in completing a SAR narrative is to "provide a clear, complete,

and concise description of the activity, including what was unusual or irregular that

caused suspicion." The SEC's expert witness, however, does not purport to claim that the

foreign involvement was, in fact, what was unusual or irregular that caused Alpine

suspicion. Nor does the SEC's expert witness provide any rationale as to why the foreign

involvement should have caused Alpine to view the transaction as unusual or irregular, or otherwise suspicious. *Id*. at ¶ 237, Ex. 5 (citing FinCEN guidance).

        c.      In sum and substance, therefore, the SEC's expert witness's opinion would effectively create a bright line rule that every transaction involving a foreign person or entity will be a suspicious transaction for which a SAR should be filed, and whether or not that foreign involvement is, in fact, suspicious or irregular, it must be included in the SAR narrative. That is not the law, nor should it be. The fact that there may be an international aspect to a particular transaction does not necessarily indicate that the transaction is inherently suspicious, and where it is not, including such information in the SAR narrative is likely to cause confusion and runs counter to the principle that SAR narratives must be concise. *Id*. at ¶ 238, Ex. 5.

        d.      Second, the SEC's expert witness's analysis is flawed insofar as it assumes that any and all non-U.S. involvement in the transaction should be reported, even if that activity involves a jurisdiction that is not high-risk, such as the United Kingdom or Canada. And, in fact, Canada and the United Kingdom are among the "foreign jurisdictions" that were involved in the 298 SARs that the SEC's expert witness criticizes. *Id*. at ¶ 239, Ex. 5 (citing information from Financial Action Task Force).

        e.      Third, the SAR form itself identifies the pertinent information relating to the foreign nature of the transaction, specifically seeking information about transfers to foreign jurisdictions. The SEC's expert witness asserts that Alpine's SARs were deficient because the narratives failed to report foreign involvement. She implicitly acknowledges that foreign involvement will be indicated in other fields of the SAR form, for example,

when the SAR filer reports foreign addresses for the persons and entities that are subject

of the SARs, or completes the "Country Code", or "Non-US Financial Institution" fields.

She argues, however, that completing such information does not satisfy the filer's

obligations, and that the BSA was nonetheless violated. The SEC's expert witness offers

no authority for this position, nor is Alpine's expert witness aware of any. *Id*. at ¶ 240,

Ex. 5 (citing Fields 12 and 24 from the Electronic SAR Test Form).

f.      Notably, any information in the data fields on the SAR form is searchable.

*Id*. at ¶ 101, Ex. 5.  Perhaps most importantly, the information contained in SARs has

been used to establish a database, available to law enforcement to gather information

relating to any of the innumerable data fields and transactions that are reported in a SAR.

The significance of a SAR filing lies not in the information presented in any individual

filing but in the fact that data is continuously collected from multiple sources across the

financial industry and compiled in a searchable database.  Based on my professional

experience, law enforcement does not expect that all of the information about suspicious

activity will come from any one source.  It is not seeking to have a financial institution do

its investigatory footwork for it or describe in narrative fashion the elements of criminal

conduct.  Rather, it is seeking from financial institutions the pieces of a puzzle that law

enforcement can put together to initiate a new investigation or support one that is

ongoing. *Id*. at ¶¶ 203, 210, and 212, Ex. 5.

213.    Leia Farmer, Alpine's AML Officer during the relevant time period, testified that

Alpine never learned from a regulator or from AML guidance that a "red flag" includes a

transaction which involves any foreigner.  Thus, Alpine did not view as a red flag or indicator of

criminal activity if a client resided in another country.  However, Alpine would review and

adhere to any country listed by The Office of Foreign Assets Control ("OFAC") or any other rule

or regulation.  *See* L. Farmer Dep., at 100-102, Ex. 16.

214.    The SEC's expert testified during her deposition deposits by offshore companies

of large blocks of low-priced securities which are then sold with the money wired are not

automatically requirements for the filing of a SAR and explicitly testified, "We've never said

they were automatic requirements for the filing of the SAR. They are risk indicators."  *See*

Angotti Dep., at 70-71, Ex. 10.

215.    In the following examples of SARs taken from the SEC's table alleging violations

for failure to include information regarding involvement of a foreign jurisdiction or entity, the

SARs include the information alleged to be omitted either in SAR form or in the narrative:

a.      ***Violation No. 348:*** Table A-7 states the following as the alleged violation:

"Subaccount holder resident of Belize - ALPINE00249301 pg 3; client based in Belize -

ALPINE00249301 pg 18."  The SAR form shows the full address in Belize and the

narrative states, "███████████████████████████████████

████"  *See* SEC Table A-7 (SEC's Ex. 9), No. 348, Ex. 179.

b.      ***Violation No. 1781:*** Table A-7 states the following as the alleged

violation: "████ is a foreign broker dealer and subaccount holder is foreign (Belize) - pg

3, 7."  The SAR form shows the full address in Belize in the address box.  *See* SEC Table

A-7 (SEC's Ex. 9), No. 1781, Ex. 180.

c.      ***Violation No. 1798:*** Table A-7 states the following as the alleged

violation: "████ is a foreign broker dealer (Belize) - ALPINE00152792 pg 7."  The SAR

251

form shows the full address in Belize and the narrative states, "███████████

████████████████████████████████████████████"

*See* SEC Table A-7 (SEC's Ex. 9), No. 1798, Ex. 181.

        d.      On each SAR on Table A-7 where the SEC alleges that "Belize" was

omitted from the SAR, the SEC's fails to account for an address in Belize on page 2 of

the SAR.  *See* SEC's Table A-7, Ex. 182.

## VIII.    <u>Alleged Failure to File SARS on Liquidations (Table B)</u>

    216.    As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's

expert witness stated the following rebuttal testimony:

        a.      The SEC's expert witness opines in conclusory fashion that Alpine should

have filed SARs on the liquidations listed on Table B. In support of her position, the

SEC's expert witness argues that if the deposits of the securities at issue were suspicious

and reported on SARs, the liquidations, too, are necessarily suspicious and were required

to be reported "to continue to advise law enforcement and regulators of further

potentially fraudulent activity in microcap securities." The SEC's expert witness's

opinion and reasoning for her opinion are, in Alpine's expert witness's view, overly

simplistic and misguided.  Loew Expert Decl., at ¶ 241, Ex. 5 (citing to the Navigant

Report).

        b.      First, the decision whether to file a SAR is a judgment call by a firm based

on all the facts and circumstances and information available to the firm at the time of its

determination as to whether to file a SAR. Regulators have clearly stated that those

judgment calls ought not be second-guessed absent good reason.  *Id*. at ¶ 242, Ex. 5.

c.      Second, given that SAR decision-making is based on the facts and circumstances available to the firm, rendering an opinion without reference to the testimony of or rationales from the individuals at the firm who actually reviewed the transaction, and if necessary, made the decision not to file a SAR, to understand why they determined that a SAR was not necessary, is improper, particularly considering there is no requirement that a firm document the bases for the conclusion that activity does not warrant a SAR filing.  *Id*. at ¶ 243, Ex. 5 (citing that FFIEC Examination Manual 2014 at 68; FFIEC Examination Manual 2010 at 75-76).

d.      Third, it is not the case, based on Alpine's expert witness's experience, that every liquidation following a deposit is necessarily suspicious. Of note, it is relatively common in the markets associated with this case that liquidations of securities follow deposits of "low-priced" securities, including those in the form of physical certificates, and that fact alone is not *per se* suspicious. Consistent with the relevant guidance, courts and regulators need to understand the facts and circumstances surrounding the liquidations to determine whether the liquidation is, in fact, potentially suspicious.  *Id*. at ¶ 244, Ex. 5.

e.      Fourth, the SEC's expert witness's argument that it is "crucial" to law enforcement to report liquidations of "low-priced" securities where a firm previously filed a SAR on deposits of those "low-priced" securities is not accurate. When a firm files a SAR on deposits of "low-priced" securities, and identifies the depositor, the securities, and the size of the position, law enforcement has sufficient information to follow up on the transaction if they think there is misconduct occurring in the market for that security.

Requiring SARs in these circumstances is overkill, requiring firms to over-paper the SAR database, making the data therein more difficult to parse through and less useful for law enforcement and regulatory authorities.  *Id*. at ¶ 245, Ex. 5.

> f.      Fifth, insofar as the SEC's expert witness concluded that SARs needed to be filed on liquidations because the liquidations were a "pattern of activity," as the SEC's expert witness herself acknowledges, the "AML/BSA regulations do not define the term 'pattern of transactions' found in the FinCEN rule." The notice of final rulemaking that the expert herself cites, however, makes clear that "[t]he language in the rule requiring the reporting of patterns of transactions is not intended to impose an additional reporting burden on broker-dealers," but instead is simply meant to make explicit the rule that if transactions viewed in isolation do not trigger suspicion, but, taken together, a "series of transactions" form a suspicious pattern of activity, a SAR ought to be filed.  *Id*. at ¶ 246, Ex. 5 (citing and quoting from the Navigant Report, which quotes FinCEN, Amendment to the Bank Secrecy Act Regulations – Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048, 44,053 (July 1, 2002)).

> g.      Here, to Alpine's expert witness's knowledge, there is no allegation that each liquidation was part of a pattern of transactions, other than that it related to a deposit, which does not in and of itself make a pattern. Indeed, one liquidation is not a pattern of transactions, as a pattern involves a series of transactions. Moreover, if a SAR is filed on the deposit, the liquidation standing alone is not part of a series of transactions, and therefore a SAR is not required. Indeed, without more, a pattern of activity in and of itself is not suspicious.  *Id*. at ¶ 247, Ex. 5.

h.      Finally, insofar as the SEC's expert witness's opinion was premised on a view that firms are required to file continuing activity SARs, Alpine's expert notes that the SEC apparently did not rely on a continuing activity theory. Nor could it have, given that FinCEN's instructions regarding continuing activity SARs are guidance and are not required by law. In fact, the SEC could not rely on a continuing activity theory because a liquidation or sale is not the same as a deposit, and certainly is not a continuation of the same activity. As a result, by definition, a continuing activity SAR would not have been required as a matter of law.  *Id.* at ¶ 248, Ex. 5 (citing from the Navigant Report and additional sources in support).

217.    Deposits and close in proximity sales of securities at Alpine may differ from other broker-dealers or financial institutions because Alpine specializes only in clearing OTC microcap securities.  Alpine's current CEO, Christopher Frankel, testified during Alpine's Rule 30(b)(6) deposition that based on the nature of the microcap industry and Alpine's customers participating in that industry, "People didn't deposit securities generally at Alpine to leave securities long in their brokerage account.  So [the deposit and quick sale of that deposit] was kind of one and the same."  *See* Alpine Dep., at 41, Ex. 3.

218.    Elaborating further, Mr. Frankel stated: "I don't know whether this is purposeful or not purposeful, but I think one of the things where there's a, a miscommunication is that, I think, Alpine views that any time somebody deposits a security, there's going to be a sale. Nobody deposits securities in general and parks them in Alpine's coffers.  It's not the business that they are in."  *See* Alpine Dep., at 175, Ex. 3.

219.    For example, Alpine stated in response to its 2015 OCIE Examination, "As the

majority of Alpine's business involves the deposit of penny stock, Alpine strives to achieve balance between understanding when the activity is suspicious and acknowledging when the activity aligns with the client's typical account activity.  In these cases, the AML Officer has the sole and exclusive right to determine whether a transaction in question is or is not suspicious in nature."  *See* L. Farmer Dep., at 68-69, Ex. 16 (confirming statement from Alpine's response to the 2015 OCIE Examination).

220.    Leia Farmer, Alpine's former AML Officer, testified that "the deposit and liquidation of low-priced securities, even when done repeatedly – need not, without more, be considered suspicious."  *See* L. Farmer Dep., at 54-55, Ex. 16.

221.    Because a SAR filing on a large deposit of a low-priced security did not necessarily mean that Alpine believed the transaction was suspicious, in turn, Alpine did not necessarily file a SAR on subsequent liquidations of such transactions.  *See* L. Farmer Dep., at 85, Ex. 16.

222.    In order to evaluate whether a SAR should be filed in connection with the sales of the stock, Alpine would look at the history of the client, consult with introducing brokers to assess whether the activity deviated from what Alpine knew about that particular client, and, if it did, Alpine would file a SAR.  *See* L. Farmer Dep., at 86, Ex. 16.

223.    Alpine's CEO, Christopher Frankel, testified that he believed the SEC's theory that filing a SAR on a deposit automatically necessitated a filing of a SAR on all subsequent sales of the stock is a "novel" and "new" theory.  *See* Alpine Dep., at 177, Ex. 3.

224.    Alpine also reviewed trading activity that was occurring in connection with liquidations of stock, and for patterns of trading activity occurring in the marketplace.  *See* L.

Farmer Dep., at 86, Ex. 16.

225.    When reviewing trades, Alpine's employees in the market surveillance and

trading departments look for any sudden spikes in share prices or volume of a stock.  In addition,

Alpine looks for any signs of wash trades, match trades, or coordinated sales and give referrals to

the current AML Officer regarding any suspicion.  *See* R. Jones Supp. Decl., at ¶ 28, Ex. 67; *see*

*also* T. Groskreutz OTR, at 41, Ex. 4 (stating that a review would be triggered by a "sudden

increase in the price or volume").

226.    Alpine has a market surveillance analyst in the compliance department that

reviews trades and patterns and looks for activities that move the market, or for other indications

that there is some kind of improper conduct or manipulation occurring.  *See* L. Farmer Dep., at

86-87, Ex. 16; *see also* examples of SARs showing market surveillance, *infra*, at ¶¶ 230(a)-(e).

227.    Alpine reviews every sale of securities for potential SAR and AML issues and has

a supervisor sign off on trade blotters every day.  *See* Alpine Dep., at 177, 179, Ex. 3; *see also* E.

Green Dep., at 133, Ex. 2 (states that trades are reviewed); L. Farmer Dep., at 86, Ex. 16 (Alpine

did "look at the pattern of trading activity occurring in the marketplace . . . in connection with

liquidations of stock"); R. Jones Dep., at 77-78, Ex. 15 (testifying that he reviews trading

information for manipulative trading practices and makes referrals to the AML Officer

accordingly).

228.    Thus, when a SAR is filed *after* a liquidation had occurred, the liquidation is not

mentioned in the SAR filing because the filer did not find the liquidation suspicious.  *See* Alpine

Dep., at 176, Ex. 3.

229.    Mr. Frankel testified on behalf of Alpine in response to the SEC's question of

whether there is some safeguard, procedure, or control in which somebody reviewing a potential

sale would know that a SAR was filed on a related deposit as follows: "The AML officer would

know.  I mean all those things are – they are indeed, you know, so they can sit there and see

when they go to file a SAR if it's on a particular security or a particular account or a particular

account number or a date range.  I mean there's six or seven different indexing fields that they

would know that a SAR was filed for that particular stock for that particular client. They could

look at it and see why. Generally they would have approved the filing."  *See* Alpine Dep., at 173-

174, Ex. 3.

   230. Below are examples of SARs showing that Alpine performed trading surveillance,

all of which the SEC's expert found that there are no violations related to these SAR as no red

flag are omitted (*see* ¶ 169, *supra*, discussing 205 SARs omitted on the SEC's experts Table A-8

and deposition testimony confirming):

   a. ***Violation No. 237:***  The SAR narrative of alleged violation No. 237 states:





*See* SAR for No. 237, Ex. 183.

b.    ***Violation No. 660:*** The SAR narrative of alleged violation No. 660 states:





*See* SAR for No. 660, Ex. 184.

c.    ***Violation No. 250:*** The SAR narrative of alleged violation No. 250 states:





*See* SAR for No. 250, Ex. 185.

    d.    ***Violation No. 230:*** The SAR narrative of alleged violation No. 230 states:



███████████████████████████████████████

*See* SAR for No. 230, Ex. 186.

e.      Alpine performed a review of trading activity and filed corresponding SARs (similar to the SARs referenced above) for the following transactions: Violation Nos. 25 (Ex. 187), 85 (Ex. 188), 134 (Ex. 189), 179 (Ex. 190), 229 (Ex. 191), 231 (Ex. 192), 240 (Ex. 193), 243 (Ex. 194), 249 (Ex. 195), 493 (Ex. 196), 881 (Ex. 197), 1905 (Ex. 198), 1906 (Ex. 199), 1924 (Ex. 200), and 1932 (Ex. 201).

## IX.      Alleged Late Filed SARs (Tables C & D)

231.      As the SEC relies wholly upon its expert witness in regards to this claim, Alpine's expert witness stated the following rebuttal testimony:

a.      The SEC's expert witness opines that 251 SARs were late. This opinion, however, wholly disregards the fact that FinCEN guidance makes clear, as does industry expectation, that FinCEN does not measure timeliness from the time when the transaction occurs, or even when the activity is alerted, but, instead, from the time when the firm reaches a decision that the activity was suspicious. Accordingly, the SEC's expert witness's measurement of the time period in which Alpine was required to file a SAR from "the first date mentioned in the date range specified in the SAR," *i.e.*, when the transaction occurred, or any time other than when Alpine decided that the activity was suspicious, is contrary to FinCEN guidance and industry practice.  Loew Expert Decl., at ¶ 249, Ex. 5 (citing to the Navigant Report).

b.      Under the SAR Rule, required SARs are to be filed: [N]o later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts

that may constitute a basis for filing a [SAR] under this section. If no suspect is identified

on the date of such initial detection, a broker-dealer may delay filing a SAR for an

additional 30 calendar days to identify a suspect, but in no case shall reporting be delayed

more than 60 calendar days after the date of such initial detection.  *Id*. at ¶ 250, Ex. 5

(citing 31 C.F.R. § 1023.320(b)(3) (originally, 31 C.F.R. § 103.19(b)(3)).

        c.      As firms were beginning to comply with the rules, many firms were

concerned that with the volume of alerts that they were receiving, they could not research

the associated activity to determine whether a SAR was required to be filed within the

time periods set forth in the SAR rule without incurring outsized costs. They needed the

time and flexibility FinCEN subsequently afforded the industry to adequately review and

assess alerts. Even after the alerts are reviewed and indicia of something suspicious

appears, cases need to be opened and an inquiry must be conducted. Those inquiries

require time, frequently more than 30 days.  *Id*. at ¶ 251, Ex. 5.

        d.      As a result of discussions between FinCEN and the BSAAG, guidance

was issued to reinforce the liberal interpretation of the term "initial detection," which had

first been issued prior to the 2001 enactment of the USA PATRIOT Act. In particular,

FinCEN explained in guidance that the term "initial detection" was not meant to be

construed narrowly, and specifically not from the time when a firm first received an

activity alert, or "red flag," but rather from the time when the decision was reached after

analysis that the activity was suspicious.  *Id*. at ¶ 252, Ex. 5 (citing from various issues of

the SAR Activity Review).

        e.      Thus, the strict interpretation in the Navigant Report about when the SAR

filing clock starts ticking appears to be uninformed by any meaningful knowledge of the manner in which of the SAR rules have been applied for close to 20 years, nor by the BSA regulations and interpretations that play into them. *Id*. at ¶ 253, Ex. 5 (citing 31 C.F.R. § 1010.610(a)(3) (requiring periodic reviews for foreign correspondent accounts); 31 C.F.R. § 1010.620(b)(4) (reviews of foreign private banking accounts); 31 C.F.R. § 1020.315(d), (g)(2)(ii), and (h)(2) (annual reviews and monitoring systems related to currency transactions by exempt persons).

f.      Moreover, there are numerous reasons why a firm may file SARs long after a transaction has been effected.  Among them, the transaction may not appear to be suspicious until subsequent activity raises a red flag that indicates that the prior activity should be reviewed, as the "pattern of transaction" language in the SAR rule is meant to cover. Additionally, in some instances, FinCEN due diligence regulations require periodic reviews of accounts on a risk-assessed basis. One of these periodic reviews may reveal activity that was not identified as being suspicious when it was first effected. Internal or external audits, as well as regulatory scrutiny and auditor or regulatory second-guessing, also may result in SAR filings that occur outside the 30-day reporting period, whether narrowly or liberally reviewed.  *Id*. at ¶ 254, Ex. 5 (citation omitted).

g.      SARs filed outside the 30-day period for these various reasons typically should not be viewed as untimely. A periodic review or internal or external audit, for example, should be reviewed as a program control to ensure that monitoring programs are properly calibrated and activity that may have been suspicious in the first instance, or that may, with hindsight, appear to be suspicious, eventually is reported and included in the

SAR database for use by law enforcement in conjunction with other BSA reports. There are frequently instances in which a compliance examiner may have an alternative view about whether a transaction or series of transactions should be subject to SAR filing. Before FinCEN adopted electronic filing for SARs, examiners often would file a SAR themselves in paper format. Now, any SAR filing that may result from the substitution of an examiner's judgment most likely will be filed, if at all, by the firm being examined. *Id*. at ¶ 255, Ex. 5.

h.      With that as backdrop, it appears that the determination that the Alpine SARs were late overlooked facts and circumstances that appear to be evident from the Navigant Report itself and contained in the SEC's complaint. The SEC identified a date range that was reported on Alpine SARs as being from December 2011 through May 2012. It also revealed that a FINRA examination of Alpine was conducted beginning "in or about May 2012," the same month as the SAR filings. In consequence, it appears to me, based on the timing of the filing of the SARs at issue that the firm may have filed the allegedly untimely SARs after it was encouraged or directed by an examiner to do a lookback with respect to certain transactions. Lookbacks are often undertaken after internal or external audits or compliance examinations. When the firm conducted its review of prior activity, for whatever reason, and then determined to file a SAR based on the results of that prior review, the time frame for filing the SAR begins then, and not before.  *Id*. at ¶ 256, Ex. 5 (citing Navigant Report and pleadings in this matter).

i.      Alpine should not, in Alpine's expert witness's opinion, be penalized for filing SARs late, when it filed such SARs in good faith to satisfy its regulators and upon

undertaking a voluntary lookback to satisfy them. There is nothing in the Navigant report or the SEC's complaint and other filings other than pure speculation that Alpine filed the SARs late in bad faith. Penalizing Alpine in such circumstances is both contrary to good policy – it would discourage firms from undertaking periodic lookbacks – and also the applicable guidance and industry standard, which provides that the time within which a SAR must be filed runs from the date the firm determines that there is reportable activity, not from some earlier date. *Id*. at ¶ 257, Ex. 5.

j.       Finally, the SEC's expert witness has determined, without consideration of any facts and circumstances beyond that date range that appears in the SARs, that the date range used on the SARs by Alpine was a willful attempt to obscure a violation of the SAR rules. That bald conclusion is wholly unfounded, as a full analysis of the facts and circumstances presented by the SEC and Navigant indicates that Alpine was attempting to respond in good faith to a regulatory inquiry. *Id*. at ¶ 258, Ex. 5.

k.       As is clear from the FINRA examination report and Alpine's response thereto, activity occurred in late 2011 that was determined at the time not to be suspicious. On a second review concluding in May 2012, a determination was made that SARs should be filed. Thus, it may be reasonable for Alpine to use, in the SAR, the date on or about the suspicious activity occurred, and the date on which the suspicious activity was determined to be suspicious and therefore identified. *Id*. at ¶ 259, Ex. 5.

l.       With these circumstances viewed in context, there appears to be no reason for Alpine to have attempted to cover anything up. Rather, it appears that Alpine was attempting, in good faith, to figure out a way to file SARs to appease a third-party's

judgment when it may not have not believed that the SARs were required according to their judgment either in December or the following May. Trying to figure out a way to do that, by using the date ranges that it did to demonstrate that the activity occurred in the past, but that the determination to file a SAR was the result of actions that occurred months later, in no way appears to have been an improper cover-up by Alpine. *Id.* at ¶ 260, Ex. 5.

232.    With respect to a SAR being filed within 30 days of "detection" (31 C.F.R. § 1023.320(b)(3)), FinCEN guidance states that "'initial detection' does not mean the moment a transaction is highlighted for review." *See* "The SAR Activity Review: Trends, Tips & Issues," Issue No. 15, at 15, Ex. 202.

233.    Instead, FinCEN states:  "It may be appropriate for organizations to conduct a review of the activity to determine whether a need exists to file a SAR. The fact that a review of customer activity or transactions is determined to be necessary is not necessarily indicative of the need to file a SAR, even if a reasonable review of the activity or transactions might take an extended period of time.  The time to file a SAR starts when the organization, in the course of its review or on account of other facts, reaches the position in which it knows, or has reason to suspect, that the activity under review meets one or more of the definitions of suspicious activity. Specifically, the 30-day (or 60-day) period ***does not begin until an appropriate review is conducted and a determination is made that the transaction under review is 'suspicious' within the meaning of the SAR regulation***." *See* "The SAR Activity Review: Trends, Tips & Issues," Issue No. 1, at 28, Ex. 203 (emphasis added); *see also* Angotti Dep., at 195-196, Ex. 10 (confirming that the foregoing FinCEN guidance was issued in response to industry concerns

about the timing of SAR filings).

234.     Leia Farmer, Alpine's former AML Officer, testified that "the view is that one has 30 days to file a SAR upon making the determination that the activity is suspicious in nature." *See* L. Farmer Dep., at 56, Ex. 16.

235.     Likewise, the SEC's expert agree that the time period to file a SAR generally begins on the date a determination is made to file the SAR, not from the date the firm receives the file.  *See* Angotti Dep., at 199, Ex. 10.

236.     Accordingly, the rule does not "mean that the SAR must be filed within 30 days of the transaction."  Therefore, Ms. Farmer continued, that it was her "understanding that once Alpine made the determination that the activity ***was suspicious in nature***, a filing subsequently occurred."  *See* L. Farmer Dep., at 56, Ex. 16 (emphasis added); *see also id.* at 95.

237.     "The AML review of a stock deposit can take up to a numbers of days to weeks to determine whether a SAR should or should not be filed, depending on the AML issues present, the facts and circumstances of the deposit, the timeframe and availability of personnel in the legal department or the AML Officer for escalation of issues, and general workflow issues of completing work.  Certainly, there are times when the AML review of a stock deposit and the decision of whether or not to file a SAR has started and been completed in one day as well."  *See* E. Green Supp. Decl., at ¶ 14, Ex. 204; *accord* R. Jones Supp. Decl., at ¶ 26, Ex. 67; *see also* R. Jones Dep., at 37, Ex. 15 (when discussing a particular stock deposit packet, stated, "If [the deposit packet] came into Alpine on that day, then they came into Alpine on that day.  It does not necessarily mean I reviewed them on that day.").

238.     Ms. Farmer testified, based on her investigation of concerns raised by FINRA

about the timing of these SAR filings, that Alpine made the SAR filings at issue during the

lookback, not because it determined they were suspicious, but because it understood that was

what regulators wanted to see.  *See* L. Farmer Dep., at 51, 56-57, Ex. 16.

239.    During September of 2011, through March of 2012, Elisha Werner was the AML

Officer for Alpine and was responsible for the filing of SARs.  *See* R. Jones Decl., at ¶ 10, Ex.

205.

240.    As noted in FINRA Examination Report of Alpine from September 2012, James

Walker, the AML Officer prior to Ms. Werner, had "numerous conversations with different

regulators" who "indicated that Alpine Securities was filing too many SARs."  Thus, Mr. Walker

"reexamined the thresholds that the firm established and more closely examined the criteria

outlined in the SARs report to determine what should be filed.  Mr. Walker's "review indicated

that nothing needed to be filed based on his analysis and criteria."  *See* FINRA Report of

Examination, September 28, 2012, at p. 4, Ex. 20.

241.    Accordingly to Ms. Werner, when she then became Alpine's AML Officer, she

also determined that none of the transactions required SARs, and therefore did not file SARs,

including on the transactions involved in the Subject SARs.  *Id.*

242.    Ms. Werner left Alpine in March of 2012 and Randall D. Jones became the AML

Officer at that time.  *See* R. Jones Decl., at ¶ 11, Ex. 205

243.    After Ms. Werner's exit, Alpine decided to review transactions which occurred

during her time as the AML Officer.  Alpine employees engaged in a "look-back" of the

transactions during Ms. Werner tenure as the AML Officer, including the five sample

transactions at issue in the SEC's Motion for Partial Summary Judgment, to determine whether

any of those transactions warranted the filing of a SAR filing.  *See id*. at ¶ 12, Ex. 205; *see also* R. Jones Dep., at 31-32, Ex. 15 (stating that Alpine "looked at each and every deposit that came into Alpine" during the time in question that Elisha Werner was not filing SARs).

244.    Randall Jones was part of Alpine's review team of the transactions that occurred during Ms. Werner's tenure as AML Officer.  *See* R. Jones Decl.. at ¶ 8, Ex. 205.

245.    Based on Alpine's review of the transactions that had occurred during Ms. Werner tenure as the AML Officer, Alpine did not find any transactions that Ms. Werner had identified as suspicious or earmarked for a SAR filing.  *See* R. Jones Decl., at ¶ 14, Ex. 205.

246.    Although Mr. Jones did not necessarily agree that the transactions involving large deposits of low-priced securities were suspicious within the meaning of the regulation, in light of FINRA's comments, he specifically focused on transactions involving large deposits of low-priced securities.  Because of the communication from FINRA, Mr. Jones determined to file SARs on transactions involving large deposits of low-priced securities.  *See id*. at ¶ 5, Ex. 205.

247.    Mr. Jones did not conclude that the transactions were "suspicious" within the meaning of the BSA and so did not include in the narrative a reason for that conclusion.  *See id*. at ¶ 18, Ex. 205.

248.    Mr. Jones confirmed in his deposition that he filed the subject SARs within 30 days of his review and when he deemed that he should file.  *See* R. Jones Dep., at 44-51, Ex. 15.

249.    Beginning on Line No. 118 of SEC's Ex. 12, the numbers of days alleged to be late significantly decreases from the previous allegations.  The alleged days late on the SEC's chart are calculated ***solely*** from the date of deposit, which assumes that in every instance Alpine determined to file a SAR always on the date of the deposit.  *See* SEC's Ex. 12.

250.    187 of the 251 SARs at issue on the SEC's Exhibit 12 (combination of Tables C and D), are duplicates of SAR on Table A.  *See* Table showing duplicates between Tables C and D with Table A, Ex. 206.

251.    34 of the 251 SARs on the SEC's Exhibit 12 are **below** the requirement $5,000 threshold, and thus were not required filings and cannot form the basis of a violation.  *See* Narrative sections for each of the following SARs stating amount at issue: Nos. 118 on Ex. 12 (Table D No. 94) Ex. 207, 219 on Ex. 12 (Table D No. 19) Ex. 208, 224 on Ex. 12 (Table D No. 24) Ex. 209, 227 on Ex. 12 (Table D No. 27) Ex. 210, 233 on Ex. 12 (Table D No. 33) Ex. 211, 238 on Ex. 12 (Table D No. 39) Ex. 212, 172 on Ex. 12 (Table D No. 41) Ex. 213, 174 on Ex. 12 (Table D No. 43) Ex. 214, 177 on Ex. 12 (Table D No. 46) Ex. 215, 181 on Ex. 12 (Table D No. 52) Ex. 216, 188 on Ex. 12 (Table D No. 59) Ex. 217, 191 on Ex. 12 (Table D No. 62) Ex. 218, 125 on Ex. 12 (Table D No. 69) Ex. 219, 135 on Ex. 12 (Table D No. 79) Ex. 220, 138 on Ex. 12 (Table D No. 82) Ex. 221, 147 on Ex. 12 (Table D No. 91) Ex. 222, 149 on Ex. 12 (Table D No. 93) Ex. 223, 42 on Ex. 12 (Table D No. 113) Ex. 224, 21 on Ex. 12 (Table D No. 114) Ex. 225, 111 on Ex. 12 (Table D No. 127) Ex. 226, 63 on Ex. 12 (Table D No. 132) Ex. 227, 65 on Ex. 12 (Table D No. 134) Ex. 228, 67 on Ex. 12 (Table D No. 136) Ex. 229, 69 on Ex. 12 (Table D No. 138) Ex. 230, 25 on Ex. 12 (Table D No. 141) Ex. 231, 31 on Ex. 12 (Table D No. 147) Ex. 232, 33 on Ex. 12 (Table D No. 197) Ex. 233, 48 on Ex. 12 (Table D No. 202) Ex. 234, 78 on Ex. 12 (Table D No. 210) Ex. 235, 100 on Ex. 12 (Table D No. 211) Ex. 236, 5 on Ex. 12 (Table C No. 15) Ex. 237, 11 on Ex. 12 (Table C No. 30) Ex. 238, 12 on Ex. 12 (Table C No. 31) Ex. 239, 13 on Ex. 12 (Table C No. 32) Ex. 240.

252.    SAR Violation No. 201 on SEC's Ex. 12, shows that the Deposit occurred on

January 5, 2011, outside of the SEC's stated time period at issue in this case. *See* No. 201,

SEC's Ex. 12.

## X.      Alleged Failure to Maintain Support Files (Table E)

253.    FinCEN guidance states that "'[s]upporting documentation' refers to all

documents or records that assisted the financial institution in making the determination that

certain activity ***required a SAR filing***." *See* FinCEN Guidance (Fin-2007-G003, June 13, 2007),

Ex. 241 (emphasis added).

254.    Prior to the commencement of this action, the SEC served document subpoenas

on Alpine to produce both SARs and their supporting files. During 2016, Alpine produced in

good faith all the supporting files that the SEC requested. *See* E. Zipprich Decl., at ¶ 40, Ex. 1.

255.    After completing the production of supporting files pursuant to the SEC's

requests, Alpine received a spreadsheet from the SEC listing SAR files as to the SEC alleged it

could not locate the supporting files in Alpine's production. *See* E. Zipprich Decl., at ¶ 41, Ex.

1.

256.    Erin Zipprich, Alpine's AML Officer, who worked on the initial production of

Alpine's supporting files to the SEC, again copied the supporting files listed on the SEC's

spreadsheet. *See* E. Zipprich Decl., at ¶ 42, Ex. 1; *see also* E. Green Dep., at 135-139, Ex. 2

(confirming her statements made in her Declaration).

257.    The SEC's Table E, appears to be the same list as the spreadsheet that was

previously sent to Alpine during 2016. *See* E. Zipprich Decl., at ¶ 43, Ex. 1.

258.    Alpine believes that the supporting files listed on Table E have been previously

produced to the SEC. *See* E. Zipprich Decl., at ¶ 44, Ex. 1.

259.     Alpine again copied the supporting files for the SARs listed on Table E and

produced all files to the SEC labeled as ALPINE_LIT000001-ALPINE_167366.

## XI.     Overview of Errors and Irregularities in the SEC's Tables

260.     There are 17 instances of SARs that are listed on the SEC's Ex. 10 twice, as two

separate violations.  Notably, despite these SARs being duplicates, in several circumstances, the

reviewer actually claimed different omissions.  *See* Table A Duplicates Chart, Ex. 242.

261.     There are 187 duplicate SARs on Table A and Tables C and D.  *See* Tables A, C,

and D Duplicates Chart, Ex. 206.

262.     The SEC's Table A included 2013 alleged SAR violations.  The SEC's expert's

Table A including only 1800 alleged violations as it excludes 213 transaction on the SEC's Table

A which were under $5,000 (listed on the SEC's Expert's Table A-9).  Thus, the SEC original

claim included 213 alleged violations which were denied by its own expert.  *See* Navigant

Report, at 37, n. 142, Ex. 18, SEC's Ex. 2; s*ee also* A. Angotti Dep., at 136, 227, 296, Ex. 10.

263.     The SEC's expert's tables includes 295 SARs where the only allegedly omitted

"red flag" is failure to state the "5Ws" of "who, what, when, where, and why", meaning, that

there is no reason to suspect any criminal activity on these SARs.  *See* SEC's SOF, No. 31

(stating that "1302 out of the 1594" SARs "involve one or more of the six subcategories of red

flags" which does not include the "5Ws") (the foregoing amount is calculated to 292 as the SEC

omitted three addition 5W only SARs from the SEC's expert's table A and A-1 without any

explanation).  *See* SEC's expert's A-1 (SEC's Ex. 3); *see also* Angotti Dep., at 240-241, Ex. 10

(SEC's expert unable to explain what criminal activity could possibly be at issue on these SAR

because there are no red flags omitted).

264.    The SEC's expert excluded an additional 205 SAR from its Table A-8 because she did not find any omitted red flags.  *See* Angotti Dep., at 136, 296, Ex. 10.  Accordingly, the SEC's Table A-8 (total alleged violations of all red flag categories) consists of only 1597 alleged SAR violations, which omits the alleged violation under $5,000 (Table A-9) and 205 SARs that the SEC's expert did not find any violations.  *See* Navigant Report, at 37, n. 142, SEC's Ex. 2; s*ee also* A. Angotti Dep., at 136, 227, 296, Ex. 10.

265.    The SEC's expert's Table A-1 claims that many of the SAR narratives omitted basic client information and the reason why Alpine filed the SAR – without providing the Court any SAR narratives in support.  However, many of the SARs in this category objectively show details of why Alpine filed the SAR.  *See* Add'l SOF at ¶¶ 178(a)-(e), *supra*.

266.    The SEC's expert's Table A-2 claims 98 violations for "3rd-party" criminal or regulatory history without any analysis of its relation to the issuer, client, or transaction.  *See* Add'l SOF at ¶ 186(a), *supra*.

267.    The SEC's expert's Table A-2 claims violations for omitting " █████████ ██████████ " from SAR narratives where the support files show that " ████████████████ " is connected to the transaction and is a different person from the " ██████████████████ " with a regulatory history.  *See* Add'l SOF at ¶¶ 186(c)-(e), *supra*.

268.    The SEC's expert's Table A-2 claims multiple violations for omitted criminal or regulatory histories, without providing any SARs or support files in support, and, in fact, the SARs and support files show that the history was disclosed.  *See e.g.* Add'l SOF at ¶ 186(h), *supra*.

269.    The SEC's expert's Table A-2 claims multiple omitted criminal or regulatory histories (the defined "red flag") but the support file shows only omitted "civil" actions.  *See* Add'l SOF at ¶¶ 186(f),(g),(i), *supra*.

270.    The SEC's expert's Table A-3 claims two violations without any information as to what is alleged to be missing.  *See* Add'l SOF at ¶ 197(a), *supra*.

271.    The SEC's expert's Table A-3 includes 104 SARs where the alleged omission is a "former" shell company without any regard to SEC's filing and Alpine's finding within the support file showing that the company is no longer a shell.  *See* Table A-3 (SEC's Ex. 5); Add'l SOF at ¶¶ 189(c), 198 (including chart), *supra*.

272.    The SEC did not provide the Court with any SARs or support files confirming the information alleged on Table A-3; however, as shown on Alpine's Table A-3, along with submitted support files, the support files negates the SEC's claimed SAR violations.  *See* Add'l SOF at ¶ 198 (including chart), *supra*.

273.    The SEC's expert's Table A-4 claims information regarding stock promotions were omitted without providing the Court with the support files confirming such information. However, Alpine has submitted the support files and outlines each SAR and the information confirming that the stock promotions were ***not*** ongoing at the time of the deposit – some as long as a year old.  *See* Add'l SOF at ¶ 203 (showing table wherein is listed all the dates of the deposit and the promotional activity).

274.    The SEC's expert's Table A-5 alleges information regarding "unverified issuers" was omitted from the SAR without providing the support files confirming this allegation. However, as shown in the support files provided by Alpine and as outlined above, the support

files shows, for example, websites functioning, and Form 10s evidencing active and functioning companies.  *See* Add'l SOF at ¶ 207 (showing table wherein SEC's claims are refuted by citations to the support file).

275.    The SEC's expert's Table A-6 alleges that Alpine omitted low trading volume on multiple SARs without providing any SAR narratives in support.  As show above, Alpine, in multiple occasions, outlined and discussed the trading volume in SAR narratives which are quoted in full and provided to the Court.  *See* Add'l SOF at ¶¶ 211(a)-(g).

276.    The SEC's expert's Table A-7 alleges that Alpine omitted foreign actor involvement on multiple SARs without providing any SARs in support.  As show above, Alpine, in multiple occasions, provided the actual address of the foreign jurisdiction within the SAR form and disclosed the foreign jurisdiction within the SAR narrative.  *See* Add'l SOF at ¶¶ 215(a)-(d).

DATED this 14th day of August, 2018.

/s/ *Maranda E. Fritz*
Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email:  Maranda.Fritz@thompsonhine.com

Brent R. Baker (BB 8285)
Aaron D. Lebenta (*Pro Hac Vice*)
Jonathan D. Bletzacker (*Pro Hac Vice*)
**CLYDE SNOW & SESSIONS**
One Utah Center
201 South Main Street, Suite 1300

Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email: brb@clydesnow.com
adl@clydesnow.com
jdb@clydesnow.com

*Attorneys for Defendant Alpine Securities Corporation*