UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>  Defendant. | Civil No. 1:17-CV-04179-DLC<br><br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis<br><br>**ECF CASE**<br><br>PUBLIC VERSION |

**DEFENDANT ALPINE SECURITIES CORPORATION'S MEMORANDUM IN
OPPOSITION TO PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE
COMMISSION'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY**



335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680



One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

  1.  Alpine's Acquisition and the Development of its Compliance Programs ......................... 4

  2.  Issues Surrounding Large Deposits of Low-Priced Securities ......................... 11

SUMMARY JUDGMENT STANDARD ................................................................ 14

ARGUMENT ................................................................................................... 15

POINT I    THE SEC FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT
ALPINE VIOLATED THE SAR PROVISIONS OF THE BSA AS A
MATTER OF LAW BY FILING DEFICIENT SARS ............................. 15

  A.  The SEC Failed to Establish That the SARs At Issue Were Required Filings ................ 15

    1.  The SEC and its Expert Improperly Failed to Consider Critical Aspects of
the Firm's AML Program ......................................................... 17

    2.  The SEC Failed to Address, Much Less Establish As a Matter of Law, That
Alpine Would Have Reason to Suspect Criminal Activity ......................... 23

    3.  The SEC Relies Only on Generalities and Improper Assumptions and Fails to
Identify Any Specific and Articulable Bases On Which Alpine Would Have
Concluded That the Transactions Facilitated Criminal Activity ................ 25

      a.  Large Deposits of Microcap Securities Are Not Indicative of Criminal
Activity and Do Not Automatically Require A SAR Filing ..................... 25

      b.  Adding In Another Generic Red Flag Does Not Establish That the
Transaction Involves Criminal Activity ....................................... 28

  B.  The SEC Failed to Establish that Alpine's Narratives were
Deficient as a Matter of Law ......................................................... 32

    1.  The Court Should Exclude or Reject the Opinions Contained in the SEC's
Expert Report and Summary Charts. ................................................ 32

    2.  The SEC's Wrongly Assumes that the Court Held that Any Red Flag,
Omitted From any SAR Constitutes a Violation of the BSA ..................... 37

    3.  The SEC Failed to Establish the Omitted Red Flags Are Material to the
Transactions ....................................................................... 39

    4.  Specific Defects in the Navigant SAR Narrative Analysis ....................... 40

      a.  Criminal or Regulatory History ................................................. 40

      b.  Shell Company or Derogatory History of Stock ................................ 45

      c.  Ongoing Stock Promotion ....................................................... 47

      d.  Unverified Issuers ............................................................. 48

     e.    Low Trading Volume ........................................................................ 49

     f.    Foreign Actor or Jurisdiction ............................................ 51

POINT II    THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PURPORTED DEPOSIT-LIQUIDATION "PATTERNS" ...................................... 52

POINT III   THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PURPORTED LATE SARS. ...................................................................... 57

   1.  The SEC has not established that any of the allegedly late SARs were required filings ......................................................... 57

   2.  There Are Material Issues of Fact on Whether the SARs were Timely Filed. ........... 60

   3.  Alpine Cannot Be Held Liable for Multiple Violations Stemming from the Same SAR or For Purportedly Late-Filing a SAR on a Transaction under $5,000.... 62

POINT IV   THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS ARGUMENT THAT ALPINE FAILED TO TIMELY PRODUCE ITS SAR SUPPORT FILES ........................................................................ 62

   1.  Material Issues of Fact and the Need for Additional Discovery Preclude Summary Judgment for the SEC .................................................. 63

   2.  The SEC Did Not Bring A Claim that Alpine Failed to Timely Produce the Files in 2016 ........................................................................ 65

CONCLUSION ........................................................................................ 67

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Balko v. Ukrainian Nat'l Fed. Credit Union*,
No. 13 Civ. 1333 (LAK) (AJP), 2014 U.S. Dist. LEXIS 42427
(S.D.N.Y. Mar. 28, 2014) ................................................................................................14

*Chambers v. TRM Conv. Ctrs. Corp.*,
43 F.3d 29 (2d Cir. 1994)................................................................................................15

*Dancy v. McGinley*,
843 F.3d 93 (2d Cir. 2016)..............................................................................................24

*Daubert v. Merrill Dow Pharm.*,
509 U.S. 579 (1993).........................................................................................................32

*DeVillalba v. Coutts & Co. Int'l*,
250 F.3d 1351 (11th Cir. 2001) ......................................................................................24

*Enzo Biochem, Inc. v. Amersham PLC*,
981 F. Supp. 2d 217 (S.D.N.Y. 2013).............................................................................65

*Garber v. Legg Mason Inc.*,
347 F. App'x 665 (2d Cir. 2009) .....................................................................................39

*In re GE Secs. Litig*,
856 F. Supp. 2d 645 (S.D.N.Y. 2012).............................................................................39

*Giannullo v. City of New York*,
322 F.3d 139 (2d Cir. 2003).......................................................................................56, 60

*Gill v. DOJ*,
246 F. Supp. 3d 1264 (N.D. Cal. 2017) ..........................................................................24

*Haywood v. Bureau of Immigration*,
372 F. App'x 122 (2d Cir. 2010) .....................................................................................66

*Kokesh v. SEC*,
137 S. Ct. 1635 (2017).....................................................................................................61

*Lifeguard Licensing Corp. v. Kozak*,
No. 15 Civ. 8459 (LGS) (JCF), 2016 WL 3144049 (S.D.N.Y. May 23, 2016) .....................65

*Lynch v. Trek Bicycle Corp.*,
374 F. App'x 204 (2d Cir. 2010 ) ....................................................................................33

iv

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)....................................................................................32

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994).....................................................................................33

*Peat, Inc. v. Vanguard Research, Inc.*,
    378 F.3d 1154 (11th Cir. 2004) ..............................................................................33

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................................................................33

*Scentsational Techs., LLC v. Pepsi, Inc.*,
    No. 13-cv-8645 (KBF), 2018 U.S. Dist. LEXIS 24375
    (S.D.N.Y. Feb. 14, 2018) ......................................................................................32

*SEC v. Falstaff Brewing Corp.*,
    629 F.2d 62 (D.C. Cir. 1980) .................................................................................39

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)......................................................................27

*In re Sterne Agee & Leach Inc.*,
    No. E052005007501 (Mar. 5, 2010) .................................................................18, 19

*United States v. Citron*,
    783 F.2d 307 (2d Cir. 1986)...................................................................................33

*United States v. Hassanshahi*,
    75 F. Supp. 3d 101 (D.C. Cir. 2014)......................................................................24

*United States v. Saunders*,
    No, 12-cr-141, 2013 WL 2903071 (E.D. La. June 13, 2013) .................................33

*United States v. Walden*,
    146 F.3d 487 (7th Cir. 1998) .................................................................................24

*United States v. Younes*,
    194 F. App'x 302 (6th Cir. 2006) ..........................................................................33

*UPS Store, Inc. v. Hagan*,
    No. 14-cv-210 (WHP), 2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017) ....................33

*Washington v. Vogel*,
    880 F. Supp. 1545 (M.D. Fla. 1995) ......................................................................34

**Statutes and Rules**

U.S.C. § 2462....................................................................................................................61

15 U.S.C. § 77q(b) ..................................................................................................30

17 C.F.R. § 240.17a-4(j) ...................................................................................62, 66

28 C.F.R. Part 23 ....................................................................................................24

28 C.F.R. § 23.20(a) ...............................................................................................24

28 C.F.R. § 23.20(c) ...............................................................................................24

28 C.F.R. § 23.20(o) ...............................................................................................24

31 C.F.R. § 1010.100(b)(b)(b)(1) ...........................................................................52

31 C.F.R. § 1023.320(a)(2) ...............................................................................55, 57

31 C.F.R. § 1023.320(b)(3) ...............................................................................57, 60

31 C.F.R. § 1023.320(d) ..........................................................................................66

240 C.F.R. § 240.17a-8 ............................................................................................66

67 Fed. Reg. at 44,048 .............................................................................................18

67 Fed. Reg. 44,048, 44,053 (July 1, 2002) ............................................................18

## INTRODUCTION

By this motion, the SEC seeks a massive judgment on thousands of alleged violations based on as many transactions spanning five years – a judgment which it claims would entitle it to seek hundreds of millions in penalties -- based on a paltry and perfunctory presentation.   This Court made clear in its prior decision that the SEC would be required to establish, first, that each of the thousands of SARs was a required filing and, second, that a claimed omission rendered the SAR narrative deficient and a violation of the SAR filing requirements of the Bank Secrecy Act ("BSA").   That decision also made clear that the mere presence of "red flags" in relation to a transaction did not satisfy the SEC's burden of proving that a filing was required.   The Court explained that the SEC would have to provide undisputed evidence, as to each of the transactions, that Alpine had a filing obligation, *i.e.*, that Alpine knew, suspected or had reason to suspect that the transaction was being used to facilitate criminal activity.

The SEC, in response, offers the Court nothing more than the same "red flag" approach that it used in its prior motion, this time buttressed only by an assertion by its private expert consultant, Navigant, that it found those "red flags" in SAR support files.  The SEC and its expert deliberately abjure any consideration of the facts and circumstances of specific transactions; in fact, as to each of the transactions, they provide for the Court less information than the fairly cursory discussion that was provided in relation to the Sample SARs.

The SEC's submission, grounded almost entirely on the Navigant presentation, does not satisfy its burden as to either of the critical issues: whether the SARs were required and, if so, whether the narratives constitute a violation of the BSA.   The Navigant presentation is, in fact, so lacking in credibility and reliability that it should be rejected by the Court on any number of grounds:

- The SEC has not provided a single SAR for the Court to review, relying wholly on Navigant's opinion presented in a few summary charts.

- The expert did not conduct the review or validate the results and in fact those results are replete with errors and inconsistencies.

- The expert did not adhere to her own purported methodology of simply applying this Court's prior ruling, and instead puts forth claimed omissions untethered to the ruling or the language of the Court.

- The Navigant reviewers looked only to any mention of a "red flag" and assiduously ignored all of the documentation contained in the SAR files that established that the flag did not exist or had been considered, resolved and cleared by Alpine;

- Navigant's presentation assumes that the omission of a red flag is improper even though the expert herself states unequivocally that "red flags" are neither filing nor narrative requirements; and

- Navigant presents its conclusions in a form that is so conclusory, so lacking in explanation, that the Court has no way to evaluate the nature or significance of the claimed omission in the context of the actual narrative.

- The Report fails to address the threshold question of whether, on the facts and circumstances of the transaction, Alpine had a reason to suspect that the transaction involved criminal activity.

- It does not articulate specific facts that would support a finding of reasonable suspicion, define the crime that Alpine would supposedly believe was involved, or even claim that the transactions were unusual for the particular customer or unlawful.

The Navigant presentation tells the Court nothing other than that red flags were referenced in oftentimes voluminous SAR support files that also include everything from an issuer's public filings to legal opinions to handwritten notations reflecting analysis. It offers no articulation of reasonable suspicion except to reiterate the same theory: where there is a large deposit of low priced securities, perhaps with one or more other unspecific "red flag" items, a SAR filing is required.  In fact, the SEC's wholesale reliance on the conclusory opinions of a single hired consultant to define what the law requires with respect to SAR reporting creates significant due process and fair notice issues.

Alpine, on the other hand, has amply demonstrated that there are material factual issues as to the essential components of all of the SEC's claims.

- Testimony of Alpine witnesses including Leia Farmer, Erin Zipprich Green, Todd Groskreutz and Randy Jones explains Alpine's Section 5 and AML processes, including its SAR filing procedures and decision making, and confirms that all of its compliance personnel worked diligently at all times to comply with AML and other regulatory requirements.

- Testimony of Alpine witnesses also explain the issues that existed early on, particularly in relation to whether SARs needed to be filed on all large deposits of low priced securities, and the reasons that filings in relation to large deposits were or were not made, particularly in the period following Alpine's acquisition.

- Alpine witnesses confirm, and the SEC has not and cannot dispute, that the firm routinely filed voluntary SARs as to those large deposits.

- Alpine Support Files establish that there are material facts in dispute as to whether filings were required, and whether its narratives were sufficient.

- Alpine SARs establish that, while Alpine at times filed SARs that were limited to the reporting of a deposit, it also continuously filed SARs with extensive narratives that cannot be adjudged deficient.

- As confirmed even in the SEC's expert report, Alpine's compliance processes and performance continuously improved from its acquisition in 2011 through 2015. The deficiencies identified by FINRA in 2012 were addressed and, after the FINRA report, the SEC has cited only 20 SARs that it claims are facially deficient.

- Alpine has also compiled and provides for the Court extensive SAR documentation and detailed analysis that not only illustrates the defects of Navigant's approach but also refutes Navigant's claim that material information was omitted from the narrative.

That evidence establishes that Alpine acted reasonably in its evaluation of the existence of reasonable suspicion and in its filings. As confirmed by the SEC's expert, under those circumstances where "reasonable people can disagree," there is no basis for a finding, as a matter of law, that Alpine violated the BSA.

Finally, the SEC's presentation on the other alleged categories of violations – whether SARs were required on sales transactions and whether some of Alpine's early SARs were

untimely – is even more conclusory.  No attempt was made to comply with the Court's directive

to show these filings were required, and Alpine's submission establishes clear disputes of fact on

each of these issues.  The SEC's claim on the purported "missing" support files  fares no better.

The evidence, including the declaration of an SEC employee who was not previously disclosed

as a witness, establishes that the SEC has all the files and confirms Alpine's testimony that it

produced the files in 2016.  Further, the law and the SEC's own admissions in its Wells Notice to

Alpine establish that a claim for an alleged failure to produce records is not actionable under

Rule 17a-8.

## BACKGROUND

### 1.      Alpine's Acquisition and the Development of its Compliance Programs

Alpine is a self-clearing broker-dealer headquartered in Utah and registered with the SEC

since 1984.  Add'l SOF ¶ 76.  Its business is focused primarily on clearance and settlement

services for microcap securities transactions introduced to Alpine by retail broker-dealers with

whom Alpine has contractual clearing arrangements.  *Id.* ¶ 1.  The clearing services provided by

Alpine include "back-end" or back-office processing of securities transactions, e.g.,  the

"recording of the transaction, the exchange of funds, [and] the delivery of securities to

consummate a transaction."  *Id.* ¶ 2.

Alpine was acquired by new ownership in March of 2011.  *Id.* ¶ 77.  After ownership

changed, Alpine began to hire more personnel, with a particular focus on compliance personnel.

*Id.* ¶ 78.  Todd Groskreutz, the Chief Financial Officer of the firm and a former owner, continued

on with the new ownership and took over the role as Alpine's Chief Compliance Officer

("CCO") in approximately May of 2011, and held the position through May of 2012.  Alpine

created the position of General Counsel and hired additional attorneys including Elisha Werner

and Doug Wawrinski, and, later, Betsy Voter, who served as General Counsel for most of the

relevant period.  It hired others to serve as compliance analysts, separated the AML officer and compliance officer positions, and hired a full-time compliance officer.  *Id.* ¶ 84.  Alpine hired external law firms, including Gerald Russello of Bingham McCutcheon, who came into Alpine to discuss AML procedures and training and worked with and were available to in house counsel and compliance personnel on issues including the requisites of the Bank Secrecy Act ("BSA").  *Id.* ¶ 80.

In 2012, Alpine also hired Leia Farmer as the CCO.  Ms. Farmer came to Alpine with an extensive background in compliance, including 13-years of experience at firms such as E-Trade, Securities America and Brecek & Young.  *Id.* ¶¶ 81-82.  She served as CCO and then AML Officer through most of the period at issue in this matter.  Ms. Farmer testified unequivocally that she sought to continuously update herself concerning SAR requirements and that she made every effort, at all times, to ensure that Alpine was complying with its AML requirements, considering regulatory scrutiny "as an opportunity to develop – further develop the program for all of us to be more educated about – about how we might be a better partner for law enforcement."  *Id.* ¶ 97.[1]

Also during and after 2012, Alpine revised its WSPs numerous times, conducted regular AML and compliance training, and sent compliance personnel to continuing education programs.  Alpine's compliance and AML teams also met approximately bi-weekly to evaluate its program and SAR issues to determine if Alpine was taking appropriate steps and whether Alpine should be doing

---

[1] *See also* L. Farmer Dep., at 90, Ex. 16 (stating that she made her best efforts to ensure that Alpine was complying with the AML requirements, including the SAR filing requirements, and never sought to evade those laws); T. Groskreutz OTR, at 149-152, Ex. 4 ("I think we're very cognizant of our role in the industry and we do a good job on monitoring and looking for all these red flags. And when there are red flags, we bring it to the appropriate supervisor, broker dealer firm or entity level that it needs to be escalated to... I do think we have good processes, I do think we're doing our job, and I think we're doing all we can.  You are correct, there are risks involved. That's why we escalate it to the appropriate people that have the authority to take the appropriate action."); E. Green Dep., at 95, Ex. 2; see also E. Green Dep., at 110, Ex. 2 ("Constantly working towards culture of compliance every day."); R. Jones Dep., at 75, Ex. 15 ("At no point in my career, whether it be at Goldman, Alpine or anywhere else, have I ever thought, ah, it's AML. Who cares? … And one of the things I have loved about Alpine is that it is a culture of compliance. Everybody does the best they can possibly do, and we try and improve things when we can.").

more. *Id.* ¶¶ 18, 80. Alpine also updated its back-office computers software in 2012, which included multiple new compliance features, generated new compliance reports, and enabled Alpine's compliance personnel to run a number of different queries relating to, among other things, Office of Foreign Assets Control ("OFAC") issues. *Id.* ¶ 85. Alpine had annual reviews of its AML program from certified independent audit firms. *Id.* ¶¶ 111-12.

In terms of the operation and components of its AML program, the firm had assessed and fully appreciated the primary risks associated with its business line in the microcap markets, *i.e.,* market manipulation and sale of unregistered securities in violation of Section 5. Consistent with the risk assessment, the firm developed a comprehensive Section 5 review process designed to ensure that securities were, in fact, freely tradeable and that the firm would not be facilitating any sale of unregistered securities. *Id.* ¶¶ 118-135. Every deposit was subject to a thorough review consistent with the questions raised in FINRA Regulatory Notice 09-05 including receipt and review of complete documentation concerning how and when the shares were acquired. Alpine's process included a "Deposited Securities Checklist" ("Checklist") which contained information concerning *inter alia* (1) Affiliate /Control Person Status; (2) Holding Period/ Transaction History; (3) Issuer Reporting / Shell Status; (4) Current Information Available; and (5) Disciplinary Background. *Id.* ¶ 127. Where a registration statement was in place relating to the securities, Alpine reviewed the transaction to ensure that the purchase and sale by the customer met the requirements of the registered offering. *Id.* ¶ 122. For securities that were not the subject of a registration statement, Alpine reviewed the  exemptions relied on by the customer, e.g., Rule 144, Sec. 4(a)(1), and Sec. 3(a)(10), to ensure that the shares were eligible for resale. *Id.* ¶ 123.

In conjunction with its new account and Section 5 analysis, Alpine reviewed incoming

deposits for AML issues, including suspicious activity reporting.  *Id.* ¶¶ 118, 121. Where the due diligence material referenced one of more AML issues, that was noted in an initial review by a compliance analyst and a SAR was "prepped" for further review.  *Id.* ¶¶ 31, 41-42.  Any AML issues, including the kind of "red flags" that are the focus of this case, were then considered by compliance personnel and resolved or included in a SAR filing as appropriate.  Add'l SOF ¶¶ 48-56.

Leia Farmer explained the analysis and approach that she employed in that process including Alpine's identification and evaluation of "red flags."  With respect to evidence of criminal or regulatory history, for example, Ms. Farmer testified that the information may "not necessarily" be included in a SAR narrative.  *Id.* ¶ 181.  Alpine would "look at the specific activity occurring in the account to determine its relevance to that adverse history."  *Id.*  Whether the customer's history is relevant "depends on the facts and circumstances in that case" including, the "proximity of the activity" to the transaction at hand, and whether the specific criminal or regulatory history is relevant to the transaction at hand.  *Id.*  When a criminal or regulatory action is pending, not yet adjudicated, Alpine again may or may not find that activity suspicious; it "would look at that to determine relevancy" to the SAR.  *Id.* ¶ 185.

The Section 5 analysis of whether the stock could be resold specifically incorporated any questions regarding the shell status of an issuer. *Id.* ¶¶ 127-28, 132-33, 135.  Ms. Farmer explained: "the mere fact that a company was a shell company and no longer, ceases to be a shell company wasn't necessarily indicative of suspicious activity.  It is something that we would look at on a facts and circumstance analysis to determine whether that specific fact was relevant to that particular filing."  *Id.* ¶ 193.  Alpine considered, in relation to any shell issue, a combination of documents including Form 10-Ks, 10-Qs, S-1 registrations, and legal opinions. *Id.* ¶¶ 197-98.

Each of those documents contains information pertaining to the issuer's financial and operational activity, with the legal opinion providing a textual analysis of both tradability and shell status. Those documents, maintained in the SAR support files, confirm among other things that Alpine at all times considered and resolved issuer status and ensured that the shares were free trading. A chart reflecting the inclusion in the support files of this data is found at Add'l SOF ¶ 198.

Alpine's analysis also took into account the existence of a stock promotion. Ms. Farmer testified that the fact that a stock promotion was occurring was not viewed as necessarily suspicious or as something that should be included in a SAR narrative. A stock promotion would be relevant to a filing, for example, if "the client is somehow involved or associated with the promotional activity." *Id.* ¶ 200. Where evidence of promotional activity existed, Alpine would consider the information to see if a filing were required under the BSA and include the information in a SAR if relevant to the reason for the filing. *Id.* Any actual impact of a stock promotion in terms of movement in share price or trading volume would, at the same time, trigger a market surveillance review, and if the a determination was made that it reflected a potentially suspicious trading activity or pattern, Alpine would file a SAR. Some examples of SARs filed by Alpine on such activity are identified in Add'l SOF ¶ 230(a)-(e).

As for any negative items of information concerning an issuer, the SAR support files in this case reflect that Alpine sought to verify the issuer's business, including websites, and obtained Form 10s and legal opinion letters that provided ample evidence that the issuers in question were functioning and active companies. *Id.* ¶ 207 (chart). In the context of that extensive documentation, Leia Farmer explained that Alpine did not consider as necessarily "suspicious" or indicative of criminality an inability to access an issuer's website. *Id.* ¶ 205.

With respect to low trading volume – a characteristic of most of these securities – Alpine considered that typical, not suspicious.[2]  Randy Jones, a past AML Officer at Alpine, was asked during his deposition whether "the size of a deposit, relative to the average trading volume, have anything to do, in your mind, with those kinds of market manipulations . . .?"  Mr. Jones explained that "there's a laundry list of items that you would bring into consideration when you look at manipulative trading. It's not just the deposit and the number of shares that were deposited … You could have an instance where the CEO of an issuer wants to deposit stock. They have a large block. It has low trading volume, but they have a large block, and they just want to put it in for safe keeping."  *Id.* ¶ 211. The common circumstance of thin trading would not render the deposit suspicious; in fact, volume assumed significance in connection with sales of stock more than in relation to deposits.  *Id.* ¶¶ 70, 208(e).

Alpine considered any "foreign involvement," but only particular circumstances and jurisdictions were considered a red flag by Leia Farmer.  Alpine was never advised by a regulator or from AML guidance that a "red flag" includes any involvement by any foreigner in any aspect of the securities deposit.  Alpine did, however, review and adhere to any listing by the Office of Foreign Assets Control ("OFAC") and any other alert or listing focused on concerns involving particular jurisdictions.  *Id.* ¶¶ 85, 213.  Of course, any foreign customer's address was a prominent part of the SAR form and, where relevant, Alpine also discussed foreign actors and jurisdictions in the SAR narrative.  *Id.* ¶ 215(a)-(d).

Through these reviews by Ms. Farmer and other compliance and legal personnel, even from the early timeframe of 2011 through 2012, Alpine filed thorough SARs when it determined

---

[2]  According to the SEC's expert, it is actually high volume that could be indicative of unusual or improper activity.  Navigant Report, SEC Ex. 2, at 62 ("A large sudden and unusual increase in trading volume can be prime evidence of manipulation.")

that certain activities were suspicious and a SAR filing was required.  For example, the following is **only a portion** of one SAR narrative dated August 27, 2012:



*See* Add'l SOF ¶ 89(c) and Exs. 27-34 to Fritz Decl. for multiple examples of other robust SARs filed during 2011 and 2012.

In addition to Section 5 analysis and reviews, and because microcap stocks are typically thinly traded and pose a risk of manipulation, Alpine also developed and implemented a market surveillance process focused on identification of movement in share price or trading volume and any indication of wash trades, match trades, or coordinated sales.  Where those trading issues were observed, the matter was referred to the AML Officer for review and for consideration of a SAR filing.  Add'l SOF ¶¶ 225-26.  Alpine's market surveillance activities are reflected in the

SAR below, which was triggered by and explains the specific trading issues that, in Alpine's view, warranted the filing of a SAR.  Notably, this SAR was listed as a violation on the SEC's original table but then removed by the SEC's own expert along with 204 other SARs:



*See* Add'l SOF ¶ 230(c) (citing SAR No. 250).  Eighteen additional and similarly robust SARs are identified in Add'l SOF ¶¶ 230(a), (b), (d) and (e).

## 2.    Issues Surrounding Large Deposits of Low-Priced Securities

As it was building and expanding its compliance function in 2011 and into 2012, Alpine and its compliance personnel sought to address issues concerning deposits of low priced securities, including attempting to navigate through various forms of guidance and publications and communications from regulators.  Add'l SOF ¶¶ 65-72, 246.  Early on, based on publications such as Regulatory Notice 09-05 and communications with FINRA, Alpine filed SARs on all large deposits of a low-priced security, SARs that were markedly different from the ones quoted

11

above.  *Id.* ¶ 60.  Because those SARs were filed on deposits that Alpine did not consider

reportable under the BSA, those SARs were voluntary.[3]  Multiple witnesses have testified to this

practice, and Alpine identified this same practice in a response to a FINRA examination report in

October 2012.  *See generally* Add'l SOF ¶¶ 60-74 (including statements from Leia Farmer that

Alpine "routinely" filed SARs on large deposits it did not find suspicious, and during Alpine's

30(b)(6) deposition that Alpine "very often" filed voluntary SARs, including the 213 SARs

identified in this matter which were below the requirements $5,000 threshold).

At other times during this early period, particularly during the tenure of Elisha Werner,

SARs were not filed based solely on large deposits because she did not view them as reportable.

Add'l SOF ¶¶ 239-241, 245.

The issue of filing SARs based on a large deposit of low priced securities was raised by

FINRA when it conducted an examination of Alpine in 2012.  FINRA criticized Alpine's filing

of SARs that reported a deposit but did not describe a basis for believing that the transaction was

suspicious, stating that Alpine's failure to describe the reason for the filing rendered the SAR

"substantively inadequate."  *Id.* ¶ 87.  At the same time, FINRA also criticized Alpine for the

lack of filings by Ms. Werner.  *Id.* ¶ 240 (*see* FINRA Report, Ex. 20).

Alpine responded to FINRA's examination report, explaining the varied views that were

being propounded, within and outside the firm, in relation to deposits of low priced securities.

> Alpine, like other broker dealers, must often choose between filing SARs when there is
> no indicia of suspicious activity other than activity that in general has been the subject of
> scrutiny of FINRA, such as activity in low-priced securities, and not filing at all and
> risking backward-looking criticism.

---

[3] Another example of Alpine's practice in filing voluntary SARs is evident from the 213 SARs on the SEC's Table A that its own
expert removed because they each were under the mandatory $5,000 threshold – and thus, objectively voluntary filings.  Add'l
SOF ¶ 64.

*Id.* ¶ 67 (citing L. Farmer's discussion of the FINRA examination).  Ms. Farmer described this concern as a "balancing act" between "filing for everything" and not filing and having it "questioned later," and explained that Alpine felt "it needed to perform these types of filings based on feedback it has received in the past from FINRA."  *Id.*

Alpine also immediately took steps to correct deficiencies noted by FINRA and improve its AML program.  *Id.* ¶¶ 91-92.  Even as the FINRA exam continued, Alpine conducted a lookback of transactions that occurred while Ms. Werner was AMLO, and filed SARs on transactions involving large deposits of low priced securities, consistent with its belief that FINRA wanted those deposits reported.  *Id.* ¶ 243.

Alpine also addressed FINRA's criticism of the SAR narratives, changing its practices in ways that are evident even from the SEC's own presentation. *Id.* ¶¶ 92-94.  A review of the SEC's summary charts show that the vast majority of SARs at issue in this action consist of "template" SARs that were filed more than six years ago, in the period following the acquisition of Alpine in 2011.  In fact, of the 1594 total SARs on the SEC's expert's Exhibit 10, 1075 of those SARs (roughly 68%) were filed on or before September 28, 2012 – the date of the FINRA Examination – leaving only 522 SARs at issue in this matter after the 2012 FINRA Examination. Of the 1,015 SARs which the SEC's expert claims were insufficient on their face for failing to include the so-called "5 Ws," only twenty (20) were filed after Alpine received FINRA's examination report.  *Id.* ¶ 96.

Notably, FINRA's Report of Examination for 2012 did *not* include any assertion that Alpine was required to include "red flags" in its SAR narratives.  *Id.* ¶ 90.  Further, and as Alpine continuously worked and improved its program, FINRA took no action against the firm

relating to Alpine's 2011 SAR filings.[4]  *Id.* ¶ 98.  Thus, Alpine addressed and corrected the issue

raised by FINRA while continuing to understand that its SAR narratives should contain the

pertinent details of the transaction and the reason for the firm's filing, *i.e.,* why the broker-dealer

believes the activity falls within the BSA categories and what is unusual or irregular about the

activity compared to the customer's other transactions.  *Id.* ¶¶ 95-97, 100-116.

It was not until OCIE's examination of Alpine in 2015 that Alpine was advised of the

SEC's theory here, that Alpine was required to include in the SAR narratives every red flag

mentioned  in the support file, whether relevant or not.  *Id.* ¶ 101.  Alpine's outside legal counsel

prepared its response to the 2015 OCIE Examination, responding to the SEC's contentions and

emphasizing that no one at Alpine had ever deliberately omitted relevant information from a

SAR or attempted to evade the SAR filing rules in any manner.  *Id.* ¶¶ 107, 114, 116.  While

Alpine disagreed with the standard set forth in the OCIE examination, it once again revised its

procedures to comply with those directives.  *Id.* ¶ 116.

## SUMMARY JUDGMENT STANDARD

Where a motion for summary judgment is properly supported by admissible evidence, the

burden shifts to the opposing party to proffer admissible evidence that sets forth specific facts

showing a genuinely disputed factual issue that is material.  Fed. R. Civ. P. 56(e).  The evidence

proffered by the non-movant "is to be believed, and all justifiable inferences are to be drawn in

his favor."  *Balko v. Ukrainian Nat'l Fed. Credit Union*, No. 13 Civ. 1333 (LAK) (AJP), 2014

U.S. Dist. LEXIS 42427, at *24 (S.D.N.Y. Mar. 28, 2014) (citation omitted).  "If, as to the issue

on which summary judgment is sought, there is any evidence in the record from any source from

---

[4]  This case therefore includes different allegations being leveled by the SEC as to the same SARs that were involved in FINRA's 2011 review and as to which no action was taken, illustrating the kind of inconsistent positions that have been taken by regulators regarding SAR filing and content requirements.

which a reasonable inference could be drawn in favor of the mon-moving party, summary judgment is improper." *Chambers v. TRM Conv. Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

**ARGUMENT**

**POINT I**

**THE SEC FAILED TO MEET ITS BURDEN OF ESTABLISHING THAT ALPINE VIOLATED THE SAR PROVISIONS OF THE BSA AS A MATTER OF LAW BY FILING DEFICIENT SARS**

**A.      The SEC Failed to Establish That the SARs At Issue Were Required Filings**

This Court held that the SEC bears the "burden to prove that a SAR was required to be filed" on each transaction at issue.  (March 30, 2018 Opinion, at 46). As the Court explained, "[t]he SEC will have the burden to show that a SAR had to be filed . . . by looking at the information that is contained in Alpine's own files and by presenting testimony from Alpine witnesses, either current or former employees, and potentially . . . through the development of expert testimony," and it "will have to march through it SAR by SAR or transaction by transaction if no SAR was filed to maintain its case."  Hearing Tr. Mar. 30, 2018, at 6:20-7:3. To satisfy that burden and obtain judgment on the issue of whether the thousands of SARs at issue were required, the SEC must establish that Alpine knew, suspected or had reason to suspect that each of those transactions fell into one of the four BSA categories, taking into account all of the facts and circumstances of a transaction – red flags, green flags, relevant testimony and information regarding Alpine's processes. The SEC asserts that all of the SARs in this case were required filings under the fourth category of the SAR regulation, *see* SEC Motion at 10, and so is required to show that Alpine had reason to suspect that all of the transactions involved the use of the firm to facilitate criminal activity.

The SEC has provided no such analysis.  It reiterates the same claims concerning the presence of generic red flags that formed the basis for its prior motion.  It provides the Navigant

15

Report but Navigant represents that it did nothing more than take this Court's prior ruling and look for similar "flags" in other SAR support files, which it then purported to summarize in a chart. *See* Angotti Decl., SEC Ex. 1, at ¶¶ 45, 47-49, 51, 52; Add'l SOF ¶ 173. The only additional information contained in the SEC's Motion is the expert's negative assessment of the microcap markets, presented as if that combination of any variation on a red flag plus the microcap market equals a SAR filing requirement. It is based on that arithmetic assertion that the SEC declares that it has established that Alpine had a "reason to suspect" that every one of those transactions involved the use of Alpine *to facilitate criminal activity*.

That mechanical and perfunctory analysis does not demonstrate, as matter of law, that each of the SARs at issue was a required filing. The Angotti Declaration provides not a shred of analysis concerning the facts and circumstances of the underlying transactions. It does not provide the Court with a description or even a summary of the actual nature of the claimed red flags or provide any assessment of their significance; it does not distinguish information that actually relates to the customer as opposed to others; it provides no sense of the remoteness of the claimed flag in time or the severity of that purported flag. It fails to address whether the claimed omission would be material, either in and of itself or in the context of the SAR narrative, and it offers no cogent explanation for why each and every one of the various red flags – without exception – adds up to reasonable suspicion that the transaction is facilitating a crime. Its assertions are completely circular: according to the SEC's expert, the narratives are deficient because the Court found that the red flags needed to be included in the sample SAR narratives and all of the filings were required because there are red flags. Had the presence of red flags been sufficient to determine that the filing was required, the Court would have granted judgment to the SEC on its prior motion, but it did not. Simply repeating the same claims here, followed

by rote and conclusory assertions that the filings were required because Alpine had a reason to suspect that it was being used by the customer on each of nearly 1,600 transactions to facilitate some possible unspecified criminal activity fails to provide the Court with any basis on which to conclude that there are no material fact in dispute on that critical issue.

That fundamental deficiency is exacerbated by Navigant's obvious and abject failure to consider or even acknowledge not only evidence provided by Alpine's witnesses but also the incontrovertible "green flags" and clarifying information in the support files.  Navigant looked for and identified *only* negative information in those files. There is abundant information in those same files that demonstrates the inaccuracy of Navigant's claim, evidences the *bona fides* of the issuer, or reflects Alpine's consideration and resolution of the particular flag.  Yet, in not one instance did Navigant acknowledge that information or confirm that the flag had been reviewed and resolved by Alpine.  As a result, the Report lacks any credible methodology to assess whether particular "red flags" actually existed and should have been disclosed; it was only a "find-the-flag" exercise that is probative of nothing and should be rejected.

1.      **The SEC and its Expert Improperly Failed to Consider Critical Aspects of the Firm's AML Program**

By trying to construct a violation of the BSA based only on issues concerning alleged omissions from the narrative portions of a SAR, without considering all of the facts and circumstances concerning both the transactions at issue and the firm's AML program as a whole, the SEC has also disregarded an essential component of the analysis that should be applied to evaluate claimed violations of the BSA.  Through decades of consistent statements to the industry and enforcement policies, FinCEN has long made clear that compliance with the SAR provisions of the BSA does not turn on individual SAR decisions.  Loew Decl. ¶¶ 156-58, 160-65 (citing sources), Ex. 5.  Rather, any assessment of BSA compliance has to include

17

consideration of the program as a whole, and whether the firm developed and implemented an

AML program tailored to its risks, reasonably designed to detect and manage those risks and

ensure appropriate reporting of transactions.  *See* 67 Fed. Reg. 44,048, 44,053 (July 1, 2002);

Loew Decl. ¶¶ 33, 181.  Notably, the SEC's expert advocates the same risk-focused approach:

"the BSA requires financial institutions to design programs tailored to the risk of their particular

businesses, clients, produces and services and geographies," and "focus its compliance efforts"

on those "parts of its business that present the most risk."  Navigant Rebuttal Report, at 17,

SEC's Ex. 2.  The SEC's expert also concedes that consideration of the mere existence of red

flags does not resolve the issue of compliance with BSA requirements:  "The fact that such risks

exist does not always mean that there is some kind of inherent criminality in a particular client

type, securities type, jurisdiction or other risk attribute."  *Id*.

    Despite acknowledging the correct approach to evaluate a firm's BSA compliance, the

SEC and its expert then proceed to take the opposite tack, applying "automatic" rules to  cherry-

picked examples of its output, without considering the firm's market, its process and the

rationale for its decisions.  That this myopic focus on "red flags" utilized by the SEC's expert is

demonstrably improper is strikingly clear from the fact that it was the approach that she caused

FINRA to put forth, and that was rejected, in the *Sterne Agee* matter.[5]  The expert witness for the

defense in that case, Peter Djinis, who was the principal author of the SAR BD rules,[6] offered a

decidedly different view of the correct approach to the allegation of failures to file SARs.  In

testimony that was accepted and credited by the hearing panel in *Sterne Agee,* he explained that

the issue of whether a firm complied with the BSA required an evaluation of its process, not just

its SAR filing decisions.  *Sterne Agee,* at 31-32. As the *Sterne Agee* decision makes clear,

---

[5]  *See In re Sterne Agee & Leach Inc.,* No. E052005007501, at 32-33 (Mar. 5, 2010).

[6] *See* 67 Fed. Reg. at 44,048.

presented even with an accumulation of purported red flags, a firm is permitted to make decisions not to file SARs where there are reasonable business explanations for the transactions. *Id.* at 32-33.  That result was reached under circumstances very similar to this case: a clearing firm was accused of improperly failing to file SARs where there were offshore entities that were depositing and selling large quantities of low-priced securities and then wiring the proceeds, often with the presence of "other red flag" circumstances as well, including evidence of a customer's disciplinary history, involvement of foreign jurisdictions, and the wiring of proceeds offshore.  The Hearing Panel noted that such investments were part of the customer's regular activity of private investment in public equity ("PIPE"), and found that even that firm's conduct, which consisted of ***not*** filing a SAR at all, did not violate the BSA.  *Id.*

Significantly, the SEC expert in this case acknowledged the role that she played in formulating the red flag approach used in *Sterne,* and the Panel's repudiation of her approach. Angotti Dep., at 57:10-67:21, Ex. 10.  Rather than accepting the decision of that panel, however, she continued since then, even in this case, to hold to and advocate her own view, deeming the FINRA panel wrong.  *Id.* at 70:14-71:13, 75:1-18, Ex. 10.  Notably, she did not dispute the panel's conclusion that the firm's filing decisions were reasonable; she just feels that her view is "more" reasonable: "I think reasonable people can disagree over – over whether that is reportable, and I think it is more reasonable to say that you should file."  *Id.* at 72:16-73:9, Ex. 10.  And she agrees that the "objective standard" under the BSA incorporates that same "subjective element" of "whether a reasonable broker dealer could have come to a different conclusion in considering whether to file a particular SAR."  Navigant Rebuttal Report, at 15, Ex. 17.  She concedes that "reasonable people can sometimes disagree," and that "[i]f a reasonable broker-dealer could have come to a different decision, *then a decision to file or not to*

19

*file should be left to the broker-dealer.*" (*Id.* emphasis added.)  Thus, even the SEC's expert agrees that a review of Alpine's SAR filing decisions is not subject to the type of black-and-white analysis suggested by the SEC's presentation and certainly cannot be evaluated based solely on a count-the-flag approach and without consideration of all the facts and circumstances regarding the transaction and the firm's process.

Consider, for example, the claim of the SEC here that omission of "low trading volume" from a SAR constitutes a violation of the BSA.[7]   This is a perfect example of an after-the-fact creation and application of a rule that is essentially nonsensical: since low trading volume is an inherent characteristic of most microcap stocks, it cannot be a SAR filing trigger and a firm may not have viewed the inclusion of that circumstance in the narrative as being an essential component of every SAR.[8]  In the context of Alpine's actual SARs, it makes even less sense. For example, the SEC claims the following SAR narrative, violation 511 on the SEC's Table A, is deficient for failing to disclose low-trading volume:



---

[7]   The SEC claims that 707 SARs are deficient for failing to include "low trading volume" in the narrative.  (SEC Motion, at 14.) Additionally, in 255 SARs, this is the *only* omitted red flag identified.  (*See* SEC Ex. 10.)

[8]    The only guidance cited to support this category as a "red flag" is ambiguous and appears simply to be describing the characteristics of a microcap stock.  *See* March 30, 2018 Opinion, at 58 (citing SAR Activity Review, Issue 15 at 24 that "a substantial deposit, transfer or journal of very low-priced and thinly traded securities" as the sole support for low trading volume being a red flag that must be reported).



Add'l SOF ¶ 211(g).

Notwithstanding the extensive discussion contained in this narrative, and the fact that it reflects the inner workings of an active AML program, the SEC and its expert have claimed the SAR is deficient as a matter of law because it omits low trading volume.  Confronted with this SAR during her deposition, even the SEC's expert conceded that she would *not* have charged it just because it omitted low trading volume.  Angotti Dep., at 364:13-20, Ex. 10.

And that is not an isolated example. There were hundreds of other instances in which the SEC originally claimed that a particular SAR violated the BSA, but that SAR was excised by its own expert because she could find nothing wrong with the narrative.  *Id.* at 136:8-15; 227:11-18, Ex. 10.  This is *in addition* to the 213 SARs that the SEC's expert removed from the SEC's Table A because they fell below the $5,000 threshold.  *Id.* ¶ 262.  In the end, roughly *one quarter*

of the 2,013 SARs included by the SEC in its Table A were removed by the SEC's own expert, again highlighting that "reasonable people can disagree."  In the SARs that remain, there are many more examples of extensive narratives that are nonetheless claimed by Navigant to be deficient only for failure to include a red flag, without any explanation proffered for why that red flag would be relevant to the transaction or to the reason Alpine actually filed the SAR.  *Id.* ¶ 264. The SEC, however, has not even provided those SARs to the Court for its review; it expects the Court instead to simply accept Navigant's purported conclusions contained on its summary chart.

The vagaries inherent in the SEC's approach reinforce FinCEN's admonition to avoid second-guessing specific SAR filing decisions and instead focus on the firm's AML process and its assessment and management of the risk in its business.  Those risks, in relation to Alpine, are easily identified and not disputed: market manipulation and sales of unregistered securities in violation of Section 5 of the Securities Act.  *See* Navigant Report, SEC Ex. 2 at 21; Angotti Rebuttal, at 17, Ex. 17; Angotti Dep., at 177:16-178:24, Ex. 10.   The SEC and its expert, however, do not even acknowledge the substantial steps taken by Alpine  to guard against and mitigate those risks.  As indicated, the firm maintained a stringent section 5 review process, but that circumstance was ignored by the SEC's expert.  *Id.* ¶¶ 118-135.  The firm carefully reviewed trading for any signs of manipulation, and filed SARs as appropriate; that too was ignored.  *Id.* ¶¶ 210, 226.  Yet, having ignored those essential components of Alpine's program, the SEC's expert nonetheless proceeded apace to offer her opinion regarding Alpine's overall program. Navigant Report, SEC Ex. 2, at 66-69.

The SEC expert's own testimony confirmed that her conclusion regarding Alpine's program not only lacks foundation but also is contrary to the evidence that she herself presented.

While her Report contains sweeping and conclusory assertions, she grudgingly conceded during her deposition that she had observed from her own data the improvements in Alpine's program, stating "I saw improvements in the quality of the SARs as time went by and, in fact, some that were very late in the period we didn't find any omissions at all."  *Id.* ¶ 92.  The expert's own data, however, confirms that improvements begin far before 2015.  For instance, the principal deficiency noted by Navigant in 2011 and the first half of 2012 was in the category of the "5Ws," specifically a failure to articulate the reason for the filing.  That issue was then aired when FINRA examiners came into the firm in 2012, and Alpine responded to the criticism.  The Navigant analysis proves that point.  Beginning in the third quarter of 2012 and continuing through the end of the relevant period in December of 2015, the Navigant report's identification of that claimed deficiency all but disappears; only 20 SARs in the remaining three years are alleged to be "facially deficient." *Id.* ¶ 94.[9]  Similarly, *all* of the allegedly "late filed" SARs involved transactions occurring on or before March of 2012.  *See* SEC Ex. 12.  That the expert was able to discern the improvements in Alpine's program from only the negative data that she considered is a testament to the fact that the changes, which corresponded both to regulatory advice and to Alpine's ability to bring in more experienced compliance personnel, were substantial.

### 2.   The SEC Failed to Address, Much Less Establish As a Matter of Law, That Alpine Would Have Reason to Suspect Criminal Activity

Consideration of whether a SAR is required under the BSA ordinarily focuses on whether a firm knew or suspected that transactions were reportable but failed to file.  Here, there is not

---

[9] Of the 1,594 SARs at issue in this category, 1075 of those SARs were filed before Alpine received the FINRA exam report on September 28, 2012.  Add'l SOF ¶ 93.  And, that number continues to dwindle by year and quarter by quarter, such that there are only four even at issue after second quarter of 2015 (and only fourteen at issue in the second quarter itself).  *Id.* ¶ 94.  Notably, the OCIE examination letter that first disclosed the SEC's new theory that a SAR can be deficient for not including red flags is dated April of 2015.  *Id.* ¶ 101.  Just as with FINRA, when Alpine received regulatory criticism, it responded, even when it does not agree with the criticism.

even a claim that Alpine knew or suspected that the transactions were reportable.  The SEC and

its expert rely solely on the contention that Alpine had "reason to suspect" that the transaction

involved criminal conduct.  Here, therefore, the issue of whether a filing was required has to

begin with consideration of that standard of reasonable suspicion.

The reasonable suspicion standard is well developed in the law; it has defined

characteristics that govern determinations across a host of legal rights and obligations.  It does

not include speculation or a generalized notion that there is something sketchy about a

transaction or the customer.  "Reasonable suspicion requires more than 'an inchoate suspicion or

a mere hunch.'" *Dancy v. McGinley,* 843 F.3d 93, 106 (2d Cir. 2016) (citation omitted). "It

demands 'specific and articulable facts which, taken together with rational inferences from those

facts,' provide . . .  a 'particularized and objective basis for suspecting legal wrongdoing.'" *Id.*

(citations omitted).  The question of whether reasonable suspicion exists "can only be answered

by considering the totality of the circumstances" viewed from the perspective of the one making

the determination.  *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 123 (D.C. Cir. 2014).  It

does not allow for decisions based on pure bias or stereotypes concerning individuals or

jurisdictions. And it does not require or even permit the assumption that one who is the subject of

a pending claim, has entered into a settlement of a claim, or even has engaged in wrongdoing in

the past, will repeat that conduct.[10]  In responding to cross-examination, Alpine's expert used the

---

[10] *Hassanshahi*, 75 F. Supp. 3d at 120 ("Federal circuit courts have consistently held, however, that a person's criminal history is insufficient to create reasonable suspicion by itself."); *United States v. Walden*, 146 F.3d 487, 490 (7th Cir. 1998) ("Reasonable suspicion of criminal activity cannot be based solely on a person's prior criminal record.").  *See also DeVillalba v. Coutts & Co. Int'l*, 250 F.3d 1351, 1354 (11th Cir. 2001) (where customer sued bank for reporting allegedly suspicious activity, court applied reasonable suspicion standard to find that disclosure was permissible and "congressional concern for privacy was sufficiently observed by not revealing any details of the purported recipient of the funds").

28 C.F.R. Part 23 was enacted to ensure that systems used to receive, analyze and disseminate intelligence comported with the "privacy and constitutional rights of individuals."  28 C.F.R. § 23.20(o).  It specifically provides that such information may be collected and maintained "only if there is reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity."  28 C.F.R. § 23.20(a).  "Reasonable Suspicion" is "established when information exists which establishes sufficient facts … to believe that there is a reasonable possibility that an individual or organization is involved in a *definable* criminal activity or enterprise."  28 C.F.R. § 23.20(c) (emphasis added); s*ee also Gill v.*

example of Martha Stewart: a firm is not required, or even permitted, to assume that Martha Stewart will engage in insider trading in every transaction.  Add'l SOF ¶ 176; Loew Dep., at 130:4-19, Ex. 82.

Only if that ascertainable standard is satisfied is a SAR filing required; it is not required where one can say no more than that a transaction "could" turn out to involve some illegality because it involves a deposit of a microcap.  As demonstrated below, neither the SEC nor its expert even attempted to address that standard or put forth "specific and articulable facts" to support the claim that Alpine would have had a reasonable suspicion of incessant criminality, particularly where none was occurring.[11]  Instead, the SEC asserts in conclusory terms, based on the existence of red flags, that all of the transactions are indicative of some undefined form of illegality -- perhaps unregistered offerings, market manipulation or pump and dumps – without identifying any fact that would provide a particularized and objective basis to suspect "definable criminal activity."

> **3.**    **The SEC Relies Only on Generalities and Improper Assumptions and Fails to Identify Any Specific and Articulable Bases On Which Alpine Would Have Concluded That the Transactions Facilitated Criminal Activity**
>
> > **a.**    **Large Deposits of Microcap Securities Are Not Indicative of Criminal Activity and Do Not Automatically Require A SAR Filing**

In support of its claim that all of the SARs were required filings, the SEC first argues that Alpine had a reason to suspect that crimes were occurring in relation to each deposit because they involved large deposits of low priced securities.  SEC Motion, at 10.  The SEC maintains

---

*DOJ*, 246 F. Supp. 3d 1264, 1270-71 (N.D. Cal. 2017) (where plaintiff argued that Part 23 applied to National Suspicious Reporting Activity Initiative, held that it applied to information gathering programs funded under the Omnibus Crime Control and Safe Streets Act of 1968.  This provision thus indicates that reporting on an individual for which there is no reasonable suspicion of a "definable" criminal activity, or of irrelevant information is improper, including for example, the Navigant opinion that Alpine should have report extraneous information regarding third parties who are not the subject of the SAR.

[11]  In most BSA matters, the issue arises because criminal activity actually occurred and there is an allegation that the indications of that offense were known to the firm.  The SEC's argument here is completely different; it does not claim that any of the customers at issue actually engaged in criminal conduct through Alpine, or even elsewhere during the period at issue, but contends that Alpine should have determined that they might.

that, because a stock cannot be sold at a large scale and the price cannot be manipulated without first placing the securities into the financial system through a broker-dealer like Alpine, a large deposit of low-priced securities is suspicious because it is "a necessary step to unregistered securities offerings or market manipulation." *Id*. In the next breath, the SEC takes this position even further, blithely stating that, in and of itself, "a large deposit of low-priced securities provides a reason to suspect an unregistered offer or sale of securities," as well as "pump and dump and other market manipulation schemes." *Id*.[12]

In support of these blanket conclusions, the SEC purports to rely on its expert's declaration. However, this is not what the SEC's expert states. She says that large-deposits of low-priced securities *could* give rise to a reason to suspect unregistered securities offerings or market manipulation. *See* Sec Ex. 1 at ¶¶ 37-38. This qualification is necessary, of course, because the position that every large deposit of a microcap or penny stock is *per se* suspicious of a crime is patently unsupportable given that trading in penny and microcap stocks is lawful and serves legitimate economic functions, including providing a means by which start-up and small companies may access capital and by which holders of such securities may lawfully seek buyers for their holdings. Loew Decl. ¶¶ 170-71, Ex. 5. Moreover, after the SEC's expert provided this declaration, she retreated from the SEC's position even further, not only agreeing that penny and microcap stocks are not "illegal or unlawful or criminal," Angotti Rebuttal, at 17, but also indicating that it is *"incorrect[]"* to view her opinion as stating that "the deposit of a large quantity of a low-priced security was the reason <u>why</u> the transaction was suspicious." She

---

[12] Notably, there are 292 SARs on the SEC's Exhibit 10 on which no other purported "red flag" is even identified. *See* Add'l SOF ¶ 168; *see also* Angotti Dep., at 240-241, Ex. 10 (SEC's expert unable to explain what criminal activity could possibly be at issue on these SARs because there are no red flags omitted).

criticized Alpine's expert for appearing "to conflate red flags with suspicious activity" and emphasized that:

> [T]he deposit of low priced securities was a red flag, but taken in isolation, the fact of this deposit does not describe what made the transaction suspicious. . . [T]he [Loew] report, however, contends, that I view the 'deposit of large quantities of low-priced securities as the why, the reason the transaction was suspicious.  That mischaracterizes my opinion.

*Id.* at 2, Ex. 17; *see also* Alpine Response to SEC SOF 27 for additional similar statements by the SEC's expert.

Nor does the presence of fraud in the microcap market automatically render microcap transactions reportable under the BSA.  The SEC's own expert reinforces the common-sense conclusion that the fact that fraud has occurred in the microcap does not create an objective reason to suspect a crime may be occurring in a specific transaction in that market. "The fact that such risks exist does not always mean that there is some kind of inherent criminality in a particular client type, securities type, jurisdiction or other risk attribute."  *Id.* at 17.  Although there are any number of significant disputes between the parties' experts, on this point they agree: the mere existence of generic red flags is not indicative of criminal activity.

Even the SEC cannot articulate why a large deposit of low priced securities would create a reason to suspect any of the identified criminal or unlawful activity.  If the concern is that the transaction could involve a sale of unregistered securities, that issue is reviewed and resolved through the Section 5 review process.  Add'l SOF ¶¶ 118-135.  If the concern is that, at some point in the future, there might be market manipulation, Alpine carefully monitored trading and acted when there was "evidence of "wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity.'" *Sharette v. Credit Suisse Int'l,* 127 F. Supp. 3d 60, 77 (S.D.N.Y. 2015) (defining these as

essential elements of market manipulation) (citation omitted).  *See* Add'l SOF ¶¶ 225-26

(Alpine's process) and *id.* ¶¶ 230(a)-(e) (for samples of SARs filed on such activity).

Particularly in relation to a deposit, the SEC has identified no objective facts that would give a

reasonable broker dealer a reason to suspect that the transaction involved a defined crime.

### b.   Adding In Another Generic Red Flag Does Not Establish That the Transaction Involves Criminal Activity

The SEC next claims that SARs were required because, in addition to involving large

deposits of low-priced securities, many of the support files on the transactions included a

reference to one or more other red flags identified in the Court's order.  But this cyclical reliance

on unspecified red flags only highlights the invalidity of that approach.  The notion that the

presence of "red flags" resolves the issue of whether a filing is required is definitively

contradicted by the same guidance on which the Court relied to elevate those "flags" to narrative

requirements.  *All* of the relevant guidance, and the experts in this case, agree that a generic red

flag is not in and of itself suspicious (or entire swaths of transactions would have to be reported

without any credible basis to suspect that they involved criminal activity).  As the SEC's expert

states:  "[t]he presence of red flags, alone of course, does not mean that a transaction is

suspicious and reportable." SEC Ex. 2, at 20.  Alpine's expert agrees.  Loew Decl. ¶ 184, Ex. 5.

This is also consistent with guidance issued by FinCEN,[13] the FFIEC,[14] and the even the SEC.[15]

---

[13] FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual (Feb. 27, 2015) ("FFIEC Manual") at Apdx. F-1, stating, "the following examples are red flags that, when encountered, may warrant additional scrutiny.  The mere presence of a red flag is not by itself evidence of criminal activity.  Closer scrutiny should help to determine whether the activity is suspicious or one for which there does not appear to be a reasonable business or legal purpose."  The FFIEC Manual is available at https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_106.htm

[14] Fin-2017-A007, at 4 (Oct 31 2017) Advisory to Financial Institutions Regarding Disaster – Related Fraud, stating "The presence or absence of a red flag in any given transaction is not by itself determinative of whether a transaction is suspicious.".  This advisory is available at https://www.fincen.gov/resources/advisories/fincen-advisory-fin-2017-a007-0

[15] OCIE, Risk Alert: *Broker-Dealer Controls Regarding Customer Sales of Microcap Securities*, at p. 5 n.17 (Oct. 9, 2014), stating:  "The Staff does not contend that the existence of any of these examples, which may indicate suspicious activity, necessarily triggers the broker-dealer's obligation to file a SAR.  Whether the broker-dealer has such an obligation depends on the totality of facts and circumstances in a particular situation. (emphasis added).  This risk alert is available at https://www.sec.gov/about/offices/ocie/broker-dealer-controls-microcap-securities.pdf

A red flag means that the firm should consider the circumstance and take a look at the transaction *to see if* there is an indication of criminal activity, but ultimately the purported red flag may be "cleared" through review or it may end up being irrelevant.[16]  The presence of criminal or regulatory history is, even according to the SEC's expert, "not determinative" of whether reporting is required.  Angotti Rebuttal at 4, 7, Ex. 17.  For example, one of the introduced customers on which the SEC relies heavily (Customer E in the Angotti Decl. ¶ 33) in this category, had nothing more than unresolved allegations of a regulatory violation, and the evidence shows that Alpine had received an explanation from the customer's attorney demonstrating the immateriality of the charges as of the time it opened the account.  Add'l SOF ¶ 188(a).  Further, to require a SAR filing when a customer has a disciplinary or regulatory history is to presume propensity, an assumption that is certainly anathema in our system and may be entirely unwarranted dependent on the nature or remoteness of the conduct at issue, or whether there was even any adjudication of the conduct.  Those are not the views that would be held by a reasonable broker-dealer operating in the microcap market, and those are not and should not be the assumptions of those who regulate those markets.  Yet, for 275 of the deposit transactions at issue, this is the only identified omitted red flag. SOF _.

There is even a lesser basis to rely on low trading volume as a basis for reasonable suspicion of manipulation or other unlawful activity, yet this is the only red flag identified in 255 of transactions at issue.  Add'l SOF ¶ 209.  In fact, in the majority of the transactions at issue (1,005), there is either no red flag or a single red flag identified to support the determination that

---

[16] Loew Decl. ¶ 184, Ex. 5; Angotti Dep., at 68:19-24, Ex. 10 ("[Y]ou could have any category of suspicion, and if there's a reasonable explanation for it . . . the reasonable broker-dealer wouldn't have to report."); Angotti Dep., at 70:23-71:1, Ex. 10 ("We've never said they [red flags] were automatic requirements for the filing of a SAR. . . . They are risk factors.") Angotti Dep., 227:19-228:9, Ex. 10 (stating that FINRA wouldn't define a large deposit of low-priced securities as being suspicious and reportable "because if there's a reasonable explanation, right, for any of the – the reddest flag and the most suspicious . . . its not reportable, even though it could look very, very suspicious," and agreeing that "this really is a facts and circumstances of the transaction" analysis); *see also* fns. 16-18.

a reasonable broker dealer would have suspected the transaction facilitated criminal conduct. *See* SEC Ex. 10.

The SEC's expert likewise agrees, as she must, that shell companies are not automatically suspicious. Add'l SOF ¶ 194. As FinCEN notes, in a discussion focused on concerns regarding *customers* shells, "most shell companies are formed . . . for legitimate reasons." *Id.* ¶ 191. With respect to shell status of an issuer, that issue was resolved in Alpine's Section 5 review, and Alpine's support files contain information demonstrating that all of the alleged shell companies identified by the SEC's expert were either no longer shell companies or had existing registration statements on file with the SEC, a Form 10, S-8 or S-1, and/or had assets and ongoing business operations. *Id.* ¶ 198. While Navigant ignored that information in its review, the SEC's expert admitted during her deposition that Navigant's reviewers should have taken that information into account and that her identification of a company as a shell under those circumstances was error. Angotti Dep., at 354:2-14, Ex. 10.

The same applies to Navigant's review of the so-called "unverified issuer" category: Alpine's support files show either active business or SEC filings for every identified deposit transaction in this category. Add'l SOF ¶ 207 (chart). Thus, any potential suspicion that these issuers are not real companies because, for example, a website could not be located, was resolved by information in the support file.

The existence of evidence of stock promotion likewise fails to support the view that a customer is engaging in criminal activity. Stock promotion is certainly not impermissible; to the contrary, it is expressly permitted and governed by section 17(b) of the Securities Act, provided disclosures of compensation are made. 15 U.S.C. § 77q(b). To even identify stock promotion as a red flag, the SEC and this Court were forced to rely on a settled SEC administrative action

*from 2016* – a year after the end of the relevant period at issue in this case – *In re Albert Fried & Co.,* SEC Release No. 7791, 2016 WL 3072175 (June 1, 2016).  And that decision was expressly predicated on the fact that promotions were ongoing at the time of the transactions.  *See id.* at *5. Here, no evidence is cited to establish that any of the promotions identified by the SEC or its expert were ongoing at the time of the transactions, or were connected to the customer or account making the deposit – circumstances Alpine looked for when conducting its review.  Add'l SOF ¶ 203 (chart).  In fact, nearly all of Alpine's support files in this category contain documentation establishing that there was no recent promotional activity, or that the promotion was not connected to client.  *Id.*

These are but a few examples of the flaws in the SEC's argument that the presence of red flags translates to a SAR filing requirement.  Its contention is refuted by its own expert (*see fn. 20, supra*) and her purported analysis falls well short of the kind of review necessary to evaluate whether a filing is required.  That assessment requires consideration of not just red flags but the green ones also, along with the other documentation contained in the SAR files and any other relevant facts and circumstances relating to the transaction.  Here, the proper analysis of these transactions has not been done and cannot be done on this record.  The SEC's expert did not even purport to engage in an analysis of the circumstances of the transaction; her reviewers looked only for items of negative information, ignored all green flags or consideration of the flag, and combined that with pure supposition to conclude that a reasonable broker-dealer would suspect that each and every one of nearly 1,600 transactions was designed to facilitate criminal activity.

The SEC's expert all but conceded during her deposition that the existence of red flags cannot resolve the issue of whether a filing is required.  Asked what information supported the

claim that a particular transaction was reportable, the witness continuously reverted to the only possible response: I would have to take a look at the entire file to identify whether there was a basis to conclude that the filing was required.  Angotti Dep., at 237-241, Ex. 10 (stating that she would need to go back and look at the files for information which is not in her report).  That was not, however, the information provided to the Court.  From the information provided, there is no basis for this Court to conclude, as a matter of law, that all of the SARs were required filings.

**B.      The SEC Failed to Establish that Alpine's Narratives were Deficient as a Matter of Law**

The SEC asks the Court to enter summary judgment in its favor, finding violations of the BSA in relation to 1,594 filed SARs, on the basis that the narratives are deficient as a matter of law.  Notably, despite its request that the Court rule on the sufficiency of Alpine's SAR narratives, the SEC *did not file a single SAR* for the Court's review in connection with summary judgment.  Instead, it relies on Navigant's conclusory statements and summary charts, Exhibits 3-10, that purport to identify omitted flags.  Both the SEC's presentation of its case, and its expert's "find the flag" approach are deficient: the expert's chart-based submission should be excluded because it is neither admissible nor reliable; the underlying review conducted by Navigant failed to consider or communicate to the Court whether the allegedly omitted information was material; and there remain substantial factual issues in dispute, arising both from documents and testimony, concerning the presence, the significance, the relevance and the materiality of the purported flags.

**1.      The Court Should Exclude or Reject the Opinions Contained in the SEC's Expert Report and Summary Charts.**

Where, as here, the summary judgment motion is based on an declaration from an expert, "'the district court functions as the gatekeeper for expert testimony,' whether the testimony is offered at trial or in connection with a motion for summary judgment."  *Scentsational Techs.,*

32

*LLC v. Pepsi, Inc.*, No. 13-cv-8645 (KBF), 2018 U.S. Dist. LEXIS 24375, at *3 (S.D.N.Y. Feb. 14, 2018) (citation omitted).  The Court must consider "(1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact." *Id.* at *4 (rejecting expert testimony where the opinions were "unreliable"); *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).  Among other things, *Daubert v. Merrill Dow Pharm.*, 509 U.S. 579 (1993) requires that an expert illustrate the reliability of his methodology and analysis at every step.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). To determine whether testimony is reliable, the court must consider whether "(1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." *Lynch v. Trek Bicycle Corp.*, 374 F. App'x 204, 206 (2d Cir. 2010 ). In addition, experts cannot "communicate a 'legal standard – explicit or implicit – to the jury'"; "[t]his principle requires the exclusion of testimony that states a legal conclusion." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (citation omitted).[17]

---

[17] The expert's summary charts, Exhibits 3-10 to the SEC's motion, are purportedly offered pursuant to F.R.E. 1006.  However, because charts were prepared by the SEC's expert, and contain the expert's conclusions, the charts are also subject to the same standards for the admission of expert testimony.  Further, F.R.E. 1006 contains its own foundational standards for admissibility. Courts have long required that district courts ascertain that summary charts "'fairly represent and summarize the evidence upon which they are based.'" *United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986) (citation omitted).  Thus they must be "accurate and nonprejudicial," cannot contain legal argument, and cannot be used to assume facts of the alleged offense that the government is required to prove.  *United States v. Younes*, 194 F. App'x 302, 311 (6th Cir. 2006) ("[A] summary document must be accurate and nonprejudicial. This means first that the information on the document summarizes the information contained in the underlying documents accurately, correctly, and in a nonmisleading manner."); 2 McCormick On Evidence § 241 (7th ed. updated June 2016) ("[C]ourts must be scrupulous in assuring that the summary accurately portrays the contents of the underlying material" and thus "guard against summaries that contain … outright argument."); *UPS Store, Inc. v. Hagan*, No. 14-cv-210 (WHP), 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) (holding summary evidence prepared by an expert inadmissible because "it is suffused with argumentation"); *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159–60 (11th Cir. 2004) ("And because 'summaries are elevated under Rule 1006 to the position of evidence, care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes.'") (citation omitted); *United States v. Saunders*, No, 12-cr-141, 2013 WL 2903071, at *5 (E.D. La. June 13, 2013) ("Rule 1006 does not allow the Government to rely on summary charts to assume facts of the alleged offense that the Government is required to prove.") (citing *U.S. v. Hart*, 295 F.3d 451, 459 (5th Cir. 2002)).  Alpine refers the Court to its Responses to SEC SOF 24 and 25-41 for additional discussion of these principles as applied to the SEC's charts.

The SEC's expert's summary declaration and charts fail to comply with basic requisites of a credible methodology and a reliable process. The Navigant methodology -- the presentation of a chart with little more than boxes checked allegedly for unspecified omitted red flags -- is not an established, appropriate or reliable way to determine a violation of the BSA. Further, the expert did not herself conduct any comprehensive review of the documents herself nor did she cross check or purport to verify those results; she relied on others at Navigant, who were not subject to cross-examination, to perform the review. Add'l SOF ¶ 173. *See Washington v. Vogel*, 880 F. Supp. 1545, 1547-48 (M.D. Fla. 1995) (court excluded the testimony of an expert who intended to testify about a study conducted by someone else, when the expert had not independently verified the study).

The Navigant Report should be rejected also because the instructions that the expert apparently provided to the reviewers did not comport with the expert's own view of SAR narrative requirements. The expert confirmed both in her deposition and her reports that a reference in the file to a flag does not demonstrate that the information was required to be automatically included in the narrative, particularly where it is not relevant or material, or where there are items of "green flag" information in the files. *See, e.g.*, Angotti Rebuttal, at 2, 17, 18; Angotti Dep., at 240-41, 277, 280-82. But the expert does not establish that this view was communicated to the Navigant reviewers. In fact, the SEC expert's declaration confirms that the charts were prepared through the simple process of looking for red flags in the support files. *See* Angotti Decl. ¶¶ 43, 45, 47-49, 51-52, SEC's Ex. 1.

The Navigant process was also at odds with the Court's rulings. The expert claims in the Report that the Navigant charts are based on the Court's rulings, but those who looked at the file were told only to "find flags," regardless of whether those characteristics actually corresponded

to this Court's decision, and then failed to identify those that are outside the scope of the Court's ruling.  Angotti Dep., at 133, Ex. 10.  The Navigant Report completely ignores not only the fact that the Court focused on the extent of the information contained in the narratives but also that the Court's rulings as to required items of information were derived from identified guidance and were specific.  Again and again, the Navigant Report simply disregards the Court's specific holdings in favor of much broader and ill-defined categories that are unsupported by either guidance or the Court's decision.

Perhaps the clearest evidence of the lack of credibility of the Navigant review process is the utter lack of any analytical or objective consideration of the contents of the support files.  Those at Navigant who conducted the analysis completely ignored all items of "green flag" information in the files, and the testimony of Alpine's witnesses relating to the kind of review and information that would have resolved the purported red flag.  The reviewers focused exclusively on spotting negative items, while those same files demonstrate Alpine's treatment and resolution of the issue and establish the existence of material factual disputes concerning the reliability of Navigant's analysis and the relevance and even the existence of those red flag characteristics.

That the Navigant report and the summary charts should be rejected by the Court and found insufficient as a basis for a decision, particularly on summary judgment, is supported also by the fact that the charts, which purport to summarize the expert's analysis, are opaque at best and riddled with inaccuracies, as discussed in further detail in Add'l SOF ¶¶ 260-276 and Alpine's Responses to SEC SOF ¶¶ 24, 35-41.  By way of example:

- There are 17 instances of SARs that are listed on the SEC's Ex. 10 twice, as two separate violations.  Notably, despite these SARs being duplicates, in several circumstances, the reviewers actually identified different omissions.  *See* Add'l SOF ¶ 260.

- The charts frequently claim the SARs omit information that they actually included. *Id.* ¶¶ 207 (chart showing multiple inaccuracies), 275-76.

- The charts frequently disregard that the SAR support file actually confirms that the "flag" was resolved or is just simply wrong. *Id.* For example, the SARs identified on the chart that purport to omit "shell company" involvement, all confirm that the issuer has registration statements on file, handwritten notes indicating it is "not a shell" or other information that confirm it is not a shell. *Id.* ¶¶ 195, 197(b). The expert agreed during her deposition that the information that was ignored by the reviewers was critical to whether it should have been identified as an omission, and agreed that those were errors. *Id.* ¶ 174.

- The SEC's expert's tables includes 295 SARs where the only allegedly omitted "red flag" is failure to state the "5Ws" of "who, what, when, where, and why", meaning, that there is no reason to suspect any criminal activity on these SARs. *See* SEC's SOF, No. 31 (stating that "1302 out of the 1594" SARs "involve one or more of the six subcategories of red flags" which does not include the "5Ws") (the foregoing amount is calculated to 292 as the SEC omitted three additional 5W only SARs from the SEC's expert's table A and A-1 without any explanation). *See* SEC's expert's A-1, SEC's Ex. 3; *see also* Angotti Dep., at 240-241, Ex. 10 (SEC's expert unable to explain what criminal activity could possibly be at issue on these SAR because there are no red flags omitted).

- The chart's citation to the support file are frequently vague. For example, the majority of the citations in the criminal/regulatory history category just include a Bates Label number, without identifying what history is purportedly omitted or the individual or entity to which it supposedly relates, let alone the relevance of that history or person to transaction at issue. SECs' Ex. 4, 10. This is also an issue on the purported evidence of "stock promotion history" – just a Bates Label is provided. These significant issues, because as described in Section _ below, the relevance or materiality of these items to the transactions at issue is sharply disputed.

These inaccuracies and analytical flaws are compounded by the fact that the SEC's presentation does not include the information – the SARs and SAR support files – that would enable the Court to assess the reliability of the conclusions by the expert and the accompanying charts when ruling on the sufficiency of Alpine's SAR narratives.

Finally, both the expert's declaration and charts are replete with impermissible legal conclusions. For example, the expert's declaration states that "[a]s a result, all of these facts, especially when coupled with other red flags . . . give a broker dealer a reason to suspect that a large deposit of low-priced shares is the first step to unlawful or criminal activity by the

customer depositing those shares." Angotti Decl. ¶ 41. This is a legal conclusion on one of the ultimate issues in this case, and it is a completely bald one, with no foundation provided. *See id.* In addition, the expert contradicted that claim in both her Rebuttal Report and deposition. *See* Angotti Rebuttal, at 2, 17-18, Ex. 17; Angotti Dep., at 49, Ex. 10. The same defect exists in Paragraphs 21, 26, and 32-40 of the Declaration. The summary charts also contain embedded legal argument. Each SAR identified on the charts as omitting the alleged "5 Ws" constitutes a legal analysis of the narratives and a conclusion that those SAR narratives are deficient. *See* SEC Exs. 3, 10.

A credible and reliable expert assessment of whether material information existed in SAR support files, whether that issue was properly resolved by the firm, and/or whether that information needed to be included in the narrative, would have required a very different and far more substantive and reliable process. Neither the expert declaration nor her charts provide a sufficient, reliable basis upon which to rule, particularly as a matter of law, that any of Alpine's SARs are deficient. The Court should strike or disregard the expert's declaration and summary charts in Exhibits 3-10 and deny summary judgment.

## 2. The SEC's Wrongly Assumes that the Court Held that Any Red Flag, Omitted From any SAR Constitutes a Violation of the BSA

The SEC's presentation appears to presume that the Court already resolved this issue in its favor by reviewing a few Sample SARs. Alpine does not believe the Court went so far. Rather, the Court held that certain described conduct had to be included in SARs that had been hand-picked by the SEC and, as repeatedly emphasized by the Court, contained very little information. The Court repeatedly confirmed that its rulings were based on the "paucity" or opaqueness of the narratives that were presented, and acknowledged that the issue may not be susceptible of summary judgment where "a SAR had a fulsome disclosure of the Five Essential

Elements and other information pertinent to the transaction that the law requires a broker dealer to disclose." (March 30, 2018 Opinion, at 48, 51, 56, 62, 65.)

Here, many of the SARs at issue were filed in later years and not even Navigant claims they are "facially deficient."  The evidence establishes that, particularly in 2011 and 2012, Alpine filed two different types of SARs for different reasons.  Regarding the template SARs in 2011 and 2012, Alpine has presented more than sufficient evidence of voluntariness to preclude any grant of summary judgment, including consistent testimony from numerous witnesses and hundreds of SARs Alpine filed on transactions below $5,000.  *See* Add'l SOF ¶¶ 60-75.

A different kind of SAR was filed after 2012 as Alpine refined and improved its process. While the expert removed hundreds of those even from the SEC's hand-picked selection, there are another approximately 580 SARs which the SEC's expert agreed satisfied the "5 Ws" and were otherwise sufficient on their face, but which are allegedly deficient because of an omitted flag.[18]  The contention, therefore, in relation to this category of SARs, is that notwithstanding filing of a SAR containing a sufficient discussion of the transaction and the reason for the filing, Alpine violated the BSA because it omitted some purported red flag.  That contention is unprecedented, unsupported and unfair.

Further, as discussed below in relation to each of the red-flag categories, determination of the sufficiency of the narrative requires consideration of a host of facts and circumstances including the evidence in the support files that Alpine cleared those flags or determined that the flags at issue were not material to the transaction or the reason it was filing the SAR – and the SAR itself!  The SEC has not provided the relevant documentation, and provides the Court with

---

[18]  There is no dispute that neither the SEC nor Navigant did any representative sampling of the Alpine SARs.  The SEC selected only SARs that it viewed as being deficient – which determination, as indicated, its own expert disagreed with in hundreds of instances – and it should be inferred that the SARs that it presented from 2013 through 2015 were the ones it believed were the worst it could find.

no way to evaluate Navigant's conclusory assertions or independently assess the materiality of the allegedly omitted red flag or evaluate its significance in the context of the actual SAR narrative.

The SEC's argument regarding Alpine's SAR narratives also ignores the fact that a "reasonable broker-dealer" could well have adhered to stated instructions concerning the required content of a SAR narrative.  The SAR forms instruct "[f]ilers" to "describe conduct that raised suspicion."  (SOF _.)  The pertinent SAR narrative guidance issued by FinCEN likewise states that the "why" portion of the narrative means "[w]hy does *the filer* think the activity is suspicious."[19] Consistent with this, in its examination manual, FFIEC states: "[b]y their nature, SAR narratives are subjective, and examiners generally should not criticize the [financial institution's] interpretation of the facts."[20] Alpine's expert, a longtime FinCEN employee, likewise refuted the SEC's position that SAR narratives must identify all red flags in the narrative, regardless of the reason the firm decided to file the SAR. (Loew Decl. ¶¶181-193).  To the contrary, Ms. Loew opines, FinCEN has deliberately sought to incorporate the material components of a SAR into the form fields so that they would be searchable, and has not sought to have filers distend a narrative with extraneous and irrelevant information.  *Id.* ¶ 197.

### 3.     The SEC Failed to Establish the Omitted Red Flags Are Material to the Transactions

Both the SEC and Navigant ignore the fundamental concept of materiality, a consideration embedded throughout the securities laws in relation to any claimed "omission" of information.  *See SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 71 (D.C. Cir. 1980) (held that failure to disclose "material information" in a Form 8K violated Rule 12b-20); *Garber v. Legg*

---

[19]   Guidance on Preparing a Complete and Sufficient Suspicious Activity Report Narrative, at 4 (Nov. 2003), available at https://www.fincen.gov/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf.

[20]   *See* FFIEC Manual, Suspicious Activity Reporting – Overview.

*Mason Inc.,* 347 F. App'x 665, 667-68 (2d Cir. 2009) (dismissing complaint alleging omission in registration statement for failure to adequately allege that omission was material); *In re GE Secs. Litig*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012) (stating that omission is material if it "significantly altered the 'total mix' of information available") (citation omitted).  The SEC's reliance on generic "red flag" buckets fails to acknowledge that not all flags are created equal. Some items of information that fall into a "red flag" category may be significant, some may have been addressed and resolved through the firm's AML review or Section 5 analysis, and some would be immaterial.

All parties certainly agree that not every item of information in every one of the "red flag" categories is always suspicious or would have to be included in a narrative. The SEC's expert admits this repeatedly. *See* Add'l SOF ¶ 149.  But the analysis conducted by Navigant and presented by its summary charts provides no allowance for the immateriality of the flag to a particular transaction.  It opts for the oversimplified approach of simply searching for a red flag in a pre-defined category in Alpine's support files and then declaring the SAR insufficient if it omits the flag.  Since Navigant has generally provided no information regarding the specifics of the red flags, or their relevance to a particular transaction, the Court has no way to evaluate whether the omission of a red flag rendered a particular SAR narrative deficient.

### 4.     Specific Defects in the Navigant SAR Narrative Analysis

#### a.     Criminal or Regulatory History

In its Opinion on this category, the Court cited the SAR Form Instructions, which state that the filer should "indicate whether there is any related litigation and if so specify the name of the litigation and the court where the action is pending."[21]  The Court found that as to Sample

---

[21] The Court also noted language in a SAR Activity Review confirming that firms should use information regarding "a customer's criminal or regulatory history" when evaluating whether a transaction is suspicious and reportable.  March 30, 2018

SARs D, E and F, Alpine's support files "contained information that the customer was the subject of criminal or regulatory proceedings."[22]   March 30, 2018 Opinion at 47; *see also id.* at 49 (stating that the "duty" to disclose in the narrative the regulatory and criminal history of "*the customer* is contained in the 2002 SAR Form and the 2012 SAR Form Instructions as well as the FinCEN Narrative Guidance") (emphasis added).   Noting that the sample SAR narratives contained "minimal information," and did not discuss the customer's criminal or regulatory history, the Court found that those SAR narratives were deficient.

Supposedly based on the Court's prior Opinion, the SEC has submitted Table A-2 claiming that 675 SARs wrongfully omitted criminal or regulatory history from the SAR narrative.  Add'l SOF ¶ 179.  But that Table does not confine itself to the Court's ruling concerning the customer's criminal or regulatory history; it goes far afield and picks up any reference to negative background information even where the individual bears no identifiable relation to the transaction.   It does not articulate any criteria by which regulatory or criminal history would be considered relevant;  nor does it attach any timeframe for inclusion of past offenses or differentiate  unresolved and pending actions.   *Id.*[23]   Consequently, the SEC's Table A-2 is overly broad, mixing together third-party offenses (98 in total), unrelated actions which are decades old, pending actions, and even ***civil*** actions – which are neither criminal nor regulatory.   *Id.*

---

Opinion at 47.  As with much of the cited guidance, that language advises the firm to ***consider*** those circumstances but does not suggest that it is establishing an automatic requirement for the SAR narrative.

[22]  The Court later shifts to a reference to criminal or regulatory history of a "related party" but that language does not appear to reflect the actual holding.  March 30, 2018 Opinion at 49.

[23]  On this point, Alpine's expert criticizes the SEC's expert's vague and elusive standard by, at some points, referring to the history of Alpine's customers, at other points it is the history of the SAR subjects (which may not be Alpine's customers), and at yet other points, it is the history of undefined "related parties."  Add'l SOF ¶ 179.  Thus, the SEC's is "creating a bright-line rule, for the first time in the history of the BSA, that criminal or regulatory history must be included in the narrative as a matter of law simply does not advance the fundamental purpose of SARs; in fact, it is counterproductive."  *Id.*

The Navigant presentation on this issue also lacks even the most basic information concerning its assertion. Notably, after listing 98 instances of undefined alleged "3rd-party" information, Table A-2 then identifies 476 of the remaining 577 SARs only by Bates Number, without any other information regarding what the violation is or who it is about – and more importantly – without providing the Court with the actual support files and the cited Bates Number pages. Add'l SOF ¶ 186. Thus, the SEC is asking the Court to significantly extend its prior ruling, without authority, and to then rely wholly on the assertions in Table A-2 without the relevant documents or even argument concerning the relevance of the past regulatory or criminal history to the assertion that the transaction facilitated criminal activity.[24]

Relevant testimony and even the support files themselves, inconsistent with but ignored by Navigant, also raise factual disputes concerning the accuracy and the significance of the limited information contained in the Navigant charts. Leia Farmer testified that Alpine's AML process includes a review of past criminal and regulatory actions and that Alpine will "look at the specific activity occurring in the account to determine its relevance to that adverse history." *Id.* ¶ 181. Alpine would not include information, even regarding a customer, when it determined that the particular activity is not necessarily relevant, and may not include the information , when a criminal or regulatory action is pending, not adjudicated or settled. *Id.*

Alpine's documents also establish the extent of the information that it would obtain and consider in assessing background information including supplemental information from the introducing broker. *Id.* ¶¶ 181-85. This was particularly true in relation to customers that

---

[24] Alpine's expert discussed at length the nonsensical result of requiring disclose of any and all history without any analysis as to its relevancy as follows: "Navigant did not and cannot establish that the past regulatory history of persons and entities would cause every transaction they effected to lack an apparent business or lawful purpose or constitute an attempt by them to use of Alpine to facilitate criminal activity. It does not stand to reason that every transaction conducted by those entities or individuals over the past seven years lacks any legitimate business or lawful purpose or is one that involves the use of Alpine to facilitate criminal activity, merely because they consented to a FINRA disciplinary action or were alleged by FINRA to have been engaged in misconduct." Add'l SOF ¶ 179.

engaged in substantial business, significant here because the SEC asserts that the vast majority of the alleged offenses relate to the same "six customers." *See* SEC SOF ¶ 32. Alpine's documentation establishes that it was in communication with its introducing broker regarding these customers, knew of their histories in details, received legal opinions regarding ongoing regulatory actions, and continuously assessed that information. Add'l SOF ¶ 188(a); L. Farmer Dep., at 85, Ex. 16. For example, where a background issue existed, Alpine received detailed memos from SCA at the time of account opening that addressed the issue, and took that information into account in its SAR decision making. *Id.* The SEC's expert did not even consider Alpine's treatment of these issues or the reasonableness of its approach, and the question whether Alpine acted as a reasonable broker-dealer in its treatment of past criminal and regulatory history of customers cannot be resolved on summary judgment.

That the Navigant presentation is a wholly deficient predicate for any grant of summary judgment is underscored by the fact that apparently there was no verification of the data that was being presented to the Court, and the data is full of errors and contradictions. One of the more egregious errors includes multiple alleged violations for omitting a "████████████████" from the SAR narrative where the support files clearly show that "████████████████" regulatory history was captured in a search for "████████████" but the support files also shows that Alpine understood that this individual was different from the "████████████████" who is connected to the deposit and is the signatory on multiple documents in the support files. *Id.* ¶¶ 186, 267. The SEC expert readily agreed that it was a mistake, that her reviewers should have caught that. Angotti Dep., at 144, Ex. 10.

The chart also tosses any prior litigation into the category of "Criminal and Regulatory History." In SAR Violation No. 701, the SEC asserts a violation for omitted "criminal or

regulatory" history on the basis of a *civil* private action against a third party.  Add'l SOF ¶ 186(f).  SAR Violation No. 748 has only a reference to a third-party, a page, and Bates number ("3rd party - ALPINE00288551 pg 3").  However, the referenced page of the support file shows the past activity as ███████ and ███████ and the third-party as a "FL bankruptcy court (2001 – not reg action), another third-party, non-regulatory private action which had occurred 14 years earlier.  *Id.*  Notably, in that instance, the claimed omission is asserted in the context of a robust narrative that *includes* the ongoing regulatory history of ███████ and ███████. The SAR narrative states:



Add'l SOF ¶ 186(d).  The SEC's methodology of collecting omitted red flags, without any

consideration of the contents of the narrative or the comparative significance of the claimed

omission, leads to absurd results: the SEC here, for example, is arguing that an entire and

detailed SAR is a violation as a matter of law for lack of an item of remote and plainly irrelevant

information.   Other similar examples of the SEC's nonsensical approach and methodology to its

Table A-2 claims, along with errors and contradictions from the actual SARs and supporting files

not provided to the Court by the SEC, are discussed in Add'l SOF ¶¶ 172-76.

### b.      Shell Company or Derogatory History of Stock

In relation to "shell" status, the Court cited the FinCEN memo, Potential Money

Laundering Risks, which addressed issues arising from transactions with *non-publicly trading*

shell entities as to which beneficial ownership may be difficult or impossible to determine.

March 30, 2018 Opinion at 50 (citing FinCEN 2006-G014).  The Court stated that omission of

this "customer information" as to shell status was a violation of law.  *Id*. at 51.  Again relying  on

"the paucity of information in the SAR narratives," the Court concluded that, for SARs A and C,

the identity of "*the customer as a shell*" engaged in a large deposit of penny stock shares was

"particularly critical."  *Id.* at 51-52 (emphasis added).  The Court later stated that the narrative

had to disclose that the transactions "were conducted through a shell company," (*Id*. at 52) which

again appears to refer to a customer shell.

Notably, the SEC has failed to identify a single instance of failure to disclose a customer

shell.  Navigant entirely ignores the Court's ruling and its reference to customers as shells. It puts

forth only SARs that involve *issuer* shell status, which is not the subject of the FinCEN memo

but is instead a component of  the Section 5 analysis and consistently addressed by Alpine.  *See*

Add'l SOF ¶¶ 118-135 (regarding Sec. 5 analysis and review).

The Navigant analysis not only deviates from the Court's holding but then goes the additional step of including instances where not even the issuer is a shell.  Table A-3, SEC Ex.5, includes 103 "former" shell companies, a circumstance not even raised in guidance or  addressed by this Court.  *See* Add'l SOF ¶ 189.  As explained by Alpine's expert witness "FinCEN guidance says nothing at all about a former shell company being a potential risk factor, let alone inherently suspicious."  *Id.*  Leia Farmer also confirmed that the fact that an issuer was at some point a shell company was not necessarily suspicious nor would it need to be incorporated into a SAR narrative.  *Id.* ¶ 193.  "[T]he mere fact that a company was a shell company and no longer ceases to be a shell company wasn't necessarily indicative of suspicious activity.  It is something that we would look at on a facts and circumstance analysis to determine whether that specific fact was relevant to that particular filing."  *Id.*

In addition, and ignored by Navigant, shell status and "derogatory" history of a stock were part of Alpine's review.  In fact, the SAR support files demonstrate that each issue concerning issuer shell status was addressed and resolved.  Multiple support files show the Section 5 analysis that a former shell was "cured," with handwritten notes stating, "not a shell." *Id*. ¶ 197. Supporting evidence includes S-1 registrations, Form 10-Qs and Form 10-Ks, and multiple legal opinions.  *Id.*  And again, the SEC expert readily agreed that Navigant should have, but failed to, consider those entries.  Angotti Dep., Ex. 10.  Alpine directs the Court to Add'l SOF ¶ 198, which details documents from the support file for the SARs on A-3 confirming that the alleged violation was cured or rebutted.   On this issue as well, there exist material factual disputes concerning the claimed omission of "shell" information.

Navigant's expansion of this category extends even beyond "former shell" to include any other negative references regarding the issuers in the file, again notwithstanding glaring green

flags contained in the same file.  It includes, for example, the notion of "frequent name changes" without any reference to law, regulations, or guidance as to the parameters of this claim.  And it ignores the substantial current financial information, Form 10-Ks and 10-Qs, and legal opinions in the support files that confirm that these companies were current and active.  *Id*.  These facts create a genuine issue of material fact as to whether a reasonable broker-dealer would determine that a SAR relating to an active publicly trading entity would have to include that historical information in the narrative.

### c. Ongoing Stock Promotion

The Court cited a 2016 settled SEC action, *In re Albert Fried*, as the basis for concluding that failure to cite an ongoing stock promotion constituted a violation. March 30, 2018 Opinion, at 54.  *Albert Fried* states that the company "had ***ongoing*** penny stock promotional campaigns . . ." and that "Albert Fried knew or should have known that two of the issuers were the subject of promotional campaigns ***at the time of Customer A's trading***."  *Albert Fried,* 2016 WL 3072175, at *3, 5 (emphasis added).  The Court held that Alpine's support files "indicated that stock promotion was occurring."  March 30, 2018 Opinion at 55.  In two of the instances, according to the Court, the Alpine file included some information that the stock "was being promoted."  *Id.*

Again, Navigant then provided an analysis that fails to correspond with the *Albert Fried* decision or the Court's ruling.  It certainly corraled references in the support files to any stock promotion, but it failed to differentiate, or provide the Court with any means to evaluate, the content or quality of that information, whether the information was historical as opposed to current, or Alpine's consideration of it.  Alpine's AML Officer explained, for example, that she focused on whether "the client is somehow involved or associated with the promotional activity." Add'l SOF ¶ 200. Accordingly, Alpine assessed the stock promotion and its support files reflect instances in which Alpine confirmed that there was no connection to the client. *Id.* ¶ 202.

Alpine also properly considered whether the promotion was occurring at the time of the transaction, and the support files demonstrate that the information cited by Navigant often referred to  stock promotions that were not "ongoing" at the time of the transactions, and in most instances were significantly in the past.  *See* Add'l SOF ¶ 273.  Alpine's SOF ¶ 203 contains a chart outlining multiple examples of past stock promotions showing that ***each*** claim on the SEC's Table A-4 is negated by the facts in the supporting files – completed with citations and submission of the supporting files.  Ample factual disputes exist regarding whether Alpine's review process and determinations, under the particular circumstances of those transactions, were reasonable.

### d.    Unverified Issuers

In relation to the category of "unverified issuers," the Court cited general guidance concerning businesses that are "unregistered/unlicensed," and language in a 2012 publication that a firm should include "as much information as is known to them about *the subject* of a SAR."  March 30, 2018 Opinion, at 56 (emphasis added).  The Court again concluded that the three sample SARs "reported very little additional information" beyond the fact of the large deposit of low priced securities.  *Id.*  Based on those circumstances, the Court concluded that the narratives in Sample SARs G, K and L were deficient as a matter of law because Alpine failed to include in the SAR narratives that it could not verify the issuer's website (SARs G and K) and that the issuer's corporate registration was in "default." (SAR L).  *See* March 30, 2018 Opinion, at 56-57.

Not only has Alpine's expert confirmed that this is a "made up red flag," (Loew Decl. ¶ 229), but as confirmed by the SEC's expert, that information could be significant to the extent that it raises questions concerning *the existence* of the issuer.  Angotti Rebuttal, at 7.  But, again, Navigant ignored the documentation in the files reflecting that Alpine had considerable

information confirming that the issuers were active and functioning entities, regardless of whether its web site was working.  As  Leia Farmer explained, given the information gathered and reviewed by Alpine, the fact that Alpine was unable to, for example, access an issuer's website, would not necessarily, in and of itself, be viewed suspicious or indicative of criminal activity.

In *each* of the support files for *every* SAR listed on the SEC's Table A-5, there are documents reflecting  that the company is  functioning, e.g.,  current SEC filings and legal opinions.  Add'l  SOF ¶ 207 (containing a chart showing the citations to support file of each violations on Table A-5 The chart provided by Alpine also includes citations to the support file establishing that the Navigant claim was wrong.  SAR Violation No. 464 shows that the website "is current", directly contradicting Table A-5).  *Id.* ¶ 206.  On SAR Violation No. 1797, Table A-5 alleges "current info no available" but the support file identifies Form 10s and the OTC Website print out states, "U.S. Registered and Reporting."  The support file also contains a google search print out that references an 8-K from February 28, 2012.  *Id.* ¶ 206(a).  For SAR Violation No. 438, Table A-5 states that "Current info not available" but the support file states, "Fully SEC reporting, current in filings" which is also verified by an OTC Website printout.  *Id.* ¶ 206(d).  Thus, Table A-5 is replete with errors and contradictions and Alpine has established the existence of factual disputes as to each SAR on the Table, complete  with citations to the support file.

### e.   Low Trading Volume

According to the Court's previous ruling, a 2009 SAR Activity Review "notes that one element of a transaction that is suspicious and should be reported is a '[s]ubstantial deposit, transfer or journal of very low priced and thinly traded securities."  March 30, 2018 Opinion at 58.  The Court concluded, with respect to the Sample SARs M, N and P, that as a result, Alpine

"had a duty to disclose" "sizable deposits, when combined with the low trading volume of a low priced security." *Id.* at 59.[25]

Alpine's expert witness has provided the following key points as to this supposed "red flag" as follows:

- First, low trading volume is not a red flag. To the contrary, it is a hallmark of microcap stocks and it does not provide any basis to conclude that a transaction is being used to facilitate criminal activity. Further, to the extent it is clear from the filed SARs that the stock involved in the transaction was a microcap, low trading volume should – and would have been – understood and assumed by law enforcement and the SEC regulators reviewing the SARs. The converse also is true: if low volume were a red flag, then filing would be required on the majority of microcap transactions. Add'l SOF ¶ 212(b).

- Second, the SEC's expert witness has not defined what "low trading volume" means. If, as she claims, low trading volume must be reported as a matter of law and in every circumstance it exists, one would expect that regulators would have provided clarity about what quantity of trading volume would qualify as sufficiently "low" to require reporting. The SEC's expert witness posits a calculation of 300 percent of average trading volume over the three months preceding the deposit. Once again, the Navigant Report cites to no authority to support that purported SAR filing obligation. *Id.* ¶ 212(c).

- Third, as with many of the other categories of information the SEC's expert witness claims renders Alpine's filed SARs fatally deficient, information about trading volumes is publicly available, and certainly available to law enforcement. Accordingly, while perhaps helpful to law enforcement, information about the stock's trading volume is not critical information for SAR narratives or information that is uniquely within Alpine's knowledge. *Id.* ¶ 212(d).

Because of the vague nature of the SEC's claim regarding "low trading volume" without any parameters given in law, regulation, or guidance, and the fact that its claim would relate to trading of stock and not the deposits listed on Table A-6, the SEC's claim as to these SARs fails on its face, particularly with respect to the 255 SARs at issue where this is the *only* red flag.

---

[25]In addition, many of the SARs on Table A-6 actually do discuss in detail the trading volume yet somehow remain on the Table. *See* Add'l SOF ¶¶ 211(a)-(g) for examples.

### f.    Foreign Actor or Jurisdiction

On the issue of foreign "involvement," the Court cited the SAR Form instructions that refers to "whether foreign currency" or "foreign negotiable instruments" were involved and, if so, seeks additional detail.  March 30, 2018 Opinion at 60.  The Form also includes in the checklist whether funds are being transferred to or from a foreign country.  *Id.*  The Court also quoted the language from FinCEN guidance stating that a filer should specify if "the suspected activity or transaction(s) involve a foreign jurisdiction." *Id.* at 61.  From that, the Court concluded that, given the limited and "opaque" narrative in the Sample SARs, those SAR was deficient because Alpine failed to include particular information about "foreign connections." *Id.* at 62.

As confirmed by Alpine's expert,  the SEC's approach  is flawed because, first,  it assumes that any and all non-U.S. involvement in the transaction should be reported, even if that activity involves a jurisdiction that is not high-risk, and, secondly, because Navigant claims, contrary to the SAR instructions, that information contained in the form must be repeated in the narrative. With respect to the extent to which foreign "involvement" must be discussed, the SEC claims that failure to disclose any mention of *any* foreign jurisdictions, however benign, constitutes a violation.  Add'l SOF ¶ 212.  The SEC provides no basis on which a firm should conclude that any foreign location is indicative of criminal activity, and Ms. Farmer testified that Alpine was never advised  by a regulator or from AML guidance that this "red flag" includes anyone associated with the transaction, whether or not it is the customer.  *Id.*  Rather, Alpine focused on those countries listed by The Office of Foreign Assets Control ("OFAC") and other pertinent alerts, rules or regulations.  *Id.* ¶ 213.

As for the location of the customer, whether foreign or domestic, that information is always part of the SAR, and Alpine's expert explained that the information in the data fields on

the SAR form is actually more valuable to law enforcement because it is searchable. *Id.* ¶ 59. The SEC's expert fails to account for the actual foreign address listed on page 2 of the SAR form and the Form instructions provide that information contained within the Form need not be repeated in the narrative. Contrary to those specific Form instructions, Navigant insists that Alpine violated the BSA even where the supposedly omitted information is contained in the Form. *Id.* ¶ 212.  Further, with respect to many SARs listed on Table A-6, while Navigant asserts that the foreign location was omitted, Alpine has provided the SAR narrative showing that the allegedly omitted location was in fact disclosed in the SAR narrative.

## POINT II

### THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PURPORTED DEPOSIT-LIQUIDATION "PATTERNS"

The SEC claims that Alpine violated Section 17(a) and Rule 17a-8 as a matter of law each time Alpine failed to file SARs on "liquidation transactions that were part of suspicious patterns of transactions." (SEC Motion, at 15.)  The SEC claims that the pattern consists of the large deposit of low priced securities, on which Alpine filed a SAR, followed "shortly" by "sales by the same customer of the same recently deposited stock." (*Id.,* at 15-16.)  The SEC claims there are 3,568 liquidation transactions on which Alpine did not file SARs, or a total of 1,242 groups of alleged "related" deposits and liquidations identified on the SEC's Exhibit 11.  (*See* SEC SOF 42; SEC Ex. 1, at ¶ 54; SEC Ex. 11.)  Because the SEC has failed to establish as a matter of law that those transactions appeared to facilitate criminal activity or were otherwise reportable under the BSA, and because the evidence supports the view that Alpine monitored trading activity and properly actually filed in any instance that it detected suspicious trading, summary judgment should be denied.

Initially, the SEC did not even claim that the liquidations were suspicious; instead it claimed that the filing of a deposit SAR proves the need to file on liquidation.  The SEC's novel and oversimplified theory is baseless. A sale of stock is a separate transaction from a deposit under the BSA regulations. 31 C.F.R. § 1010.100(b)(b)(b)(1) (defining a transaction to mean, *inter alia,* a "purchase or sale of any stock" (emphasis added)). The SEC cited to no regulation, guidance or even testimony from its expert to support a ruling that a SAR filed on the deposit of stock mandates a SAR on the liquidation of the stock, or that a reasonable broker-dealer would file SARs on a sale of stock solely because it filed a SAR on the deposit of that stock.  *See* SEC Motion, at 15-17; SEC 56.1 Statement ¶¶ 42-47.  Further, as set forth by Alpine's expert:

> it is not the case, based on my experience, that every liquidation following a deposit is necessarily suspicious.  Of note, it is relatively common in the markets associated with this case that liquidations of securities follow deposits of "low-priced" securities, including those in the form of physical certificates, and that fact alone is not *per se* suspicious.

Loew Decl. ¶ 244, Ex. 5.  Consistent with this, Alpine confirmed during its deposition that, because its business model did not generally involve people depositing securities "long" into their brokerage account, Alpine treated each deposit as if it would be sold shortly thereafter, and would thus perform its Section 5 and other AML review on the deposit with the eventual sale in mind.  Add'l SOF ¶¶ 217-18.

Furthermore, the position advocated by the SEC would lead to absurd, unworkable and undesirable consequences for firms and law enforcement.  If, as the SEC insists, a SAR filed on the deposit automatically creates a duty to file a SAR on every subsequent sale, regardless of whether there was anything suspicious about the sale itself, it would result in thousands upon thousands of additional SARs and "over-paper the SAR database, making the data therein more difficult to parse through and less useful for law enforcement and regulatory authorities." *Id.*

¶ 245.   Here, the SEC claims that Alpine alone should have filed over 3,500 additional SARs to report the sales in this case; imposing such a senseless rule to all broker-dealers and other financial institutions (including banks) would result in tens if not hundreds of thousands of additional SARs filed on transactions *with no independent indicia of suspicion.*

The SEC argues, however, that FinCEN identifies the "systematic sale of [a substantial deposit] of low-priced securities shortly after being deposited, transferred or journaled into the account" as a red flag.  (SEC Motion, at 15, citing SAR Activity Review, Issue # 15 at 24.)  However, the SEC omits the rest of the discussion which makes clear that Alpine took the precise steps that were recommended in response to this "red flag."

Transactions like these are red flags for the sale of unregistered securities, and possibly even fraud and market manipulation; they need to be investigated thoroughly by the firm. However, several firms failed to obtain information regarding the source of the stock certificates, the registration status of the shares, how long the customer has held the shares and how he or she happened to obtain them, and whether the shares were freely tradable and no longer restricted resulting in unregistered offerings.  (SAR Activity Review, Issue #15 at 24 (emphasis added)).

Alpine did exactly as that guidance suggests.  Its process involved, *inter alia,* looking at the history of the client, consulting with the introducing broker to assess whether the activity deviated from what Alpine knew about the market, and reviewing trading activity for that stock in the market place to see if there were any suspicious trading patterns or other indicia of suspicion.  Add'l SOF ¶ 222.  When anything potentially suspicious was observed, the transaction was referred to Alpine's AML Officer for review and a potential SAR filing.  *Id.* ¶ 225. The evidence of Alpine's review process was present in its support files and in the

narratives themselves.  Again, however, the SEC and its expert looked only for negative information and ignored all evidence of the resolution of that issue.  *Id.* ¶¶ 198, 207.

In the wake of the Court's decision, the SEC shifted its argument and now asserts that each deposit and sale by the same customer of the same type of stock constitutes a pattern that must be reported.[26]  While the SEC asserts that the Court held that any deposit, followed by a sale, is a suspicious pattern, the Court did not and could not go that far.  The Court held that the SEC is entitled to summary judgment "to the extent it carries its burden of showing the existence of the deposit-and-sales patterns on which it relies." (March 30, 2018 Opinion, at 66.)   And the pertinent SAR regulation plainly requires the reporting of a "pattern of transactions" only when they are suspicious within the meaning of the BSA.  31 C.F.R. § 1023.320(a)(2).

The SEC's Motion is devoid of any admissible evidence, and no lay or expert testimony, that a reasonable broker-dealer would have concluded that a deposit followed by a sale equals a suspicious pattern.[27]  (*See* SEC's Motion, at 15-17; SEC 56.1 Statement ¶¶ 42-47.)  Rather, in the securities industry, a suspicious pattern of trading arises, for example, where there is indicia of matched or wash trading or trades apparently designed to manipulate the market or achieve market domination.  Alpine filed SARs where it detected such activity.  Add'l SOF ¶¶ 230(a)-(e). for examples. The corollary is also true, where Alpine did not see such activity, it did not file

---

[26] Although now relying on a pattern theory, the SEC claims that Alpine committed a separate violation for each sale on which it did not file a SAR – a purported 3,568 violations.  However, where the SEC has relied on a pattern theory, this calculation could not be correct, even if the SEC had established that Alpine was required to file SARs on each of the alleged deposit-sale patterns. If a sale were only required to be reported because it formed a suspicious pattern with the deposit, then a single SAR would be required to report both the deposit and sale. This is what the SEC's expert attempted to do in Exhibit 11 by creating groups of deposits and liquidations. At best, the upper limit of liability on this claim would be fixed by the number of groups, or at 1242.

[27]   As one example of the arbitrary nature of the SEC's argument on this issue, in group 639 on Exhibit 11, the SEC claims that Alpine was required to file a SAR to report the sale of shares in a very well-established publicly traded company that is listed on the DOW, in transactions occurring six and eight months after the transaction.  (Ex. 11, at group 639.) This cannot possibly be a suspicious sale.

a SAR on trading just because it filed a SAR on the deposit. The SEC has not established that any of the deposit-sale transactions were indicative of criminality and required reporting.

There are, in any event, issues of fact as to what constitutes a deposit-sale pattern that are not susceptible to resolution summary judgment. Alpine's expert disputes that a deposit and sale of stock itself constitutes a pattern within the meaning of the SAR regulation. SOF 2.[28] Additionally, as discussed in greater detail in Alpine's Response to SEC SOF 42, the chart created by Navigant to purportedly identify patterns (while calling them reference "groups") is also lacking in foundation and offers no rationale for its seemingly arbitrary "groupings". *See* Angotti Decl. ¶ 54. If it is intended to group deposits and sales by the same customer of the same share together on the basis that they are related, then a group should consist of all deposits and sales of the same stock ticker by the customer. But as Exhibit 11 makes clear, what was done instead was to create a separate group for each deposit SAR, even if the deposit and sales involve the same customer and same stock ticker. Done correctly, the number of groups would fall from 1242 to a few hundred. *See* SEC Ex. 11. Furthermore, the amount of stock sold in each transaction is generally less, usually substantially less, than the amount of the deposit, as the position is liquidated over time. *Id.* The SEC offers no support for the position that this type of selling activity is in any way suspicious; rather, it would be both common and prudent, particularly in a thinly traded market, to lessen or avoid market disruption.[29]

Thus, whether many of the sales at issue were "shortly" after or related to the deposit to form a purported pattern, let alone a suspicious pattern, is thus also disputed by Ex. 11 itself.

---

[28] In its earlier summary judgment, the SEC primarily relied on sales occurring before the deposit SAR was filed. Those sample transactions are not representative of the majority of the transactions on the SEC's Exhibit 11. The SEC represents, albeit without any support or foundation, that those circumstances are only present in 40% of the transactions in Exhibit 11. SEC SOF 46 and Alpine's Response thereto.

[29] Additional examples of the arbitrary nature of the groups selected by Navigant are detailed in Alpine's Response to SOF 42. For example, often times the groups include sales occurring significantly later than the deposit to which it is grouped, or identifies a sale that actually occurs *before* the deposit to which it is attached. *See* Alpine's Response to SOF 42.

Summary judgment must be denied. *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003).[30]

## POINT III

## THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE PURPORTED LATE SARS.

The SEC maintains that it is entitled to summary judgment on each of the 251 SARs identified on Exhibit 12 to its Summary Judgment Motion on the basis that none of these SARs were filed within the time period required by 31 C.F.R. § 1023.320(b)(3).  The SEC's Motion should be denied because (1) the SEC has failed to provide any analysis or evidence, let alone undisputed evidence, to carry its burden that any of these SARs were mandatory filings under 31 C.F.R. § 1023.320(a)(2); (2) the SEC has failed to carry its burden to provide undisputed evidence that these SARs were not filed within 30 days of the date that Alpine conducted an appropriate review and determined to file the SARs; and (3) a significant number of SARs on the SEC's Exhibit 12 are not actionable as separate violations or as a separate basis for liability because they either involve transactions below the $5,000 reporting threshold or are duplicative of SARs the SEC claims have defective narratives (so-called Table A SARs).

1.      **The SEC has not established that any of the allegedly late SARs were required filings**

Most significantly, the SEC has not provided any evidence or analysis, including from its expert, to carry its burden to prove that any of the 251 allegedly late filed SARs were required

---

[30] Despite purportedly relying on a pattern theory, the SEC claims that Alpine committed a separate violation for each sale on which it did not file a SAR – a purported 3,568 violations.  However, to the extent the SEC relies on a pattern theory to support this claim, this calculation could not be correct, even if the SEC had established that Alpine was required to file SARs on each of the alleged deposit-sale patterns.  If a sale were only required to be reported because it formed a suspicious pattern with the deposit, then a single SAR would be required to report both the deposit and sale. This is what the SEC's expert attempted to do in Exhibit 11 by creating groups of deposits and liquidations. At best, the upper limit of liability on this claim would be fixed by the number of groups, or at 1242, and, as indicated, should be substantially less.

filings under 31 C.F.R. § 1023.320(a)(2).[31]  For example, no potential criminal activity (i.e.,

fraud or manipulation) is even suggested for these SARs, let alone any objective facts that would

give rise to a reason to suspect that these transaction involved the use of Alpine to facilitate a

crime.  Instead, the SEC's evidence on these SARs consists entirely of a chart, Exhibit 12, that

purports to be a "summary of the dates of SARs filed by Alpine and the dates of the deposits

reported in the SARs," and some depositions excerpts regarding Alpine's "lookback" of certain

transactions in 2012. (*See* SEC's SOF 48-52.) Indeed, the SEC did not even introduce any of the

SARs at issue into evidence. (*See id.*) Thus, the SEC is again impermissibly asking this Court to

side-step or presume the critical issue of whether these SARs were required filings, and to jump

directly to the issue of whether the SARs were timely filed.

The evidentiary failings of the SEC's presentation take on particular significance here

because each of the 251 SARs at issue was filed by Alpine before May of 2012.  Notably, all of

the transaction at issue occurred in or before March of 2012, and there is no allegation that

Alpine filed late SARs on transactions thereafter.  *See* SEC Ex. 12.  As discussed above, there

was uncertainty at Alpine during this period, shortly after it was acquired by new ownership and

new compliance personnel was brought in, about when it should file SARs.  This uncertainty was

created, in part, by inconsistent comments and guidance from FINRA that, on the one hand,

Alpine was filing too many SARs and, on the other hand, that FINRA wanted to see SARs filed

on all large deposits of low-priced securities.  Add'l SOF ¶¶ 239-41. In response, Alpine at times

adopted a practice of filing SARs on all large deposits of low priced securities, even though

Alpine did not find the transactions to be suspicious within the meaning of the BSA.  *Id.* ¶ 246.

---

[31]Thirty-four (34) of the SARs on the SEC's Ex. 12 are indisputably voluntary because they involve transactions that are below $5,000.  (Add'l Fact _.) *See* 31 C.F.R. § 1023.320(a)(2).

The notion that these SARs associated with the lookback were required filings is, in fact, specifically countered by testimony.  Alpine's AML officer at the time, Elisha Werner, reviewed the transactions and determined they were not suspicious simply because they involved a large deposit of low priced securities. *Id.* ¶¶ 239-41. This cannot be considered an unreasonable determination: as indicated, the SEC's own expert agrees that large deposits of low priced securities are not themselves necessarily suspicious. *See id.* ¶¶ 70-71. Thus, because no determination was made by Alpine's AML officer at the time that the transactions were suspicious within the meaning of the BSA, the time to file had not yet begun.

After that AML officer left Alpine, other Alpine employees undertook a voluntary lookback of the transactions cleared through Alpine during the former AML officer's tenure to determine whether they warranted a SAR filing. *Id.* ¶ 243.  According to Alpine's expert, "[l]ookbacks are often undertaken after internal or external audits or compliance examinations," and should be viewed "as a program control to ensure that monitoring programs are properly calibrated" to ensure proper reporting.  *Id.* ¶ 231.

During the lookback Alpine specifically focused on identifying large deposits of microcap stock because of its understanding that FINRA wanted to see SARs on these transactions. *Id.* ¶ 246. Alpine elected to file SARs on the transactions at issue within 30 days of the review in order to comply with its understandings of FINRA's directives.  *Id.* ¶ 248.  The AML Officer at that time, Randy Jones, testified that he did not conclude that any of the SARs filed during the lookback were suspicious, but instead filed them because they involved large deposits of low priced securities, and he understood that FINRA wanted SARs filed on such deposits.  *Id.* ¶¶ 246-47. Ms. Farmer similarly testified, based on her investigation of concerns raised by FINRA about the timing of these SAR filings, that Alpine made the SAR filings at

issue during the lookback, not because it determined they were suspicious, but because it understood that was what regulators wanted to see.  *Id.* ¶ 238.

As set forth by Alpine's expert, "[w]hen the firm conducted its review of prior activity, for whatever reason, and then determined to file a SAR based on the results of that prior review, the time frame for filing the SAR begins then, and not before."  *Id.* ¶ 231(h).

Thus, the SEC has failed to carry its burden to show that each of the allegedly late-filed SARs were required filings under the BSA, and its Motion for Summary Judgment on this issue must be denied.  *Giannullo,* 322 F.3d at 140–41.

### 2.      There Are Material Issues of Fact on Whether the SARs were Timely Filed.

The SEC's motion also fails because it has failed to establish, on undisputed facts, that any of the 251 SARs at issue in this category were filed late.  The SEC's theory that each of these SARs were filed late is predicated on the erroneous position that the time period to file a SAR begins on the day of the deposit transaction reported in the SAR. This is insufficient to establish that these SARs were late because there are facts in dispute as to whether Alpine conducted its suspicious activity review and made the determination to file a SAR on the transactions within 30 days of filing the SARs at issue.

Contrary to the SEC's position, the time to file a SAR does not begin on the date of the transaction.  Rather, the SAR rule provides that a "SAR shall be filed no later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing a SAR under this section."  31 C.F.R. § 1023.320(b)(3).  As explained by Alpine's expert, FinCEN issued this "liberal interpretation of the term 'initial detection'" in response to industry concern that, "with the volume of alerts that they were receiving, [firms] could not research the associated activity to determine whether a SAR was required to be filed within the time periods set forth in the SAR rule without incurring outsized

costs."  Add'l SOF ¶ 231 "Even after the alerts are reviewed and indicia of something suspicious appears, cases need to be opened and an inquiry must be conducted.  Those inquiries require time, frequently more than 30 days."  *Id.*

The SEC's expert also confirmed that FinCEN issued this guidance in response to industry concerns about the timing of SAR filings.  (Angotti Depo., at 195:24-196:21.)  And that expert agrees that the time period to file a SAR generally begins on the date a determination is made to file the SAR, not from the date the firm receives the file.  (*Id.,*  at 199:18-25; *see also* SEC Ex. 2 at 18; *see also* Loew Decl. ¶ _.)

The SEC has presented no evidence, let alone undisputed evidence, to establish that Alpine did not file the SARs within 30 days of the date it made the determination to file the SAR to establish any of the SARs at issue were not timely filed, basing its analysis of untimeliness instead solely on the date of the deposit.  *See* SEC Ex. 12. This alone is fatal to its position.

Second, the SEC relies on the Court's March 30, 2018 Opinion in relation to the SARs filed by Alpine during its AML "lookback" for support for its theory that that the filing period starts on the date of the deposit, and that the SAR filed during the lookback were late.  However, the majority of the SARs on the SEC's Exhibit 12 did not occur during the lookback, but rather were filed much closer in time to the deposit.  For example, the SEC's Exhibit 12, starting at line 118, is filled with SARs that the SEC claims were late even though they were filed between 33-40 days after the transaction, and nearly every SAR between lines 118-251 (133 total) were filed less than 50 days after the transaction.[32]  Because it takes time after a deposit comes in to review it for Section 5 compliance and potentially suspicious activity and make a determination as to whether to file a SAR, Add'l SOF ¶¶ 118-135, there is no basis on this record to hold that these

---

[32]   The one notable exception, line 201, the SAR was filed 373 days after the transaction. (Ex. 12, line 201). However, the transaction date for the SAR at issue (January 5, 2011), predates the relevant period and is barred by the 5 year statute of limitations in U.S.C. § 2462.  *See Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017).

SARs were late as a matter of law simply because they were filed more than 30 days after the

transaction.  At the least, whether Alpine conducted the lookback and made these filings within a

reasonable period of time under these circumstances is an issue of fact that must be resolved by

the jury.[33]

> **3.     Alpine Cannot Be Held Liable for Multiple Violations Stemming from the
> Same SAR or For Purportedly Late-Filing a SAR on a Transaction under
> $5,000.**

The SEC's motion on the alleged late filed SARs must also be denied for at least 188

SARs listed on Exhibit 12 for two additional legal reasons, even assuming *arguendo* that they

were late-filed.  First, as indicated, 34 of the SARs on Exhibit 12 report transactions that are

below the $5,000 SAR-filing threshold, and thus cannot serve as the basis for a violation, for the

reasons stated above.  Add'l SOF ¶ 251. Second, 154 of the SARs on the SEC's Exhibit 12 are

also separately claimed as violations for purportedly having deficient narratives.  *Id.* ¶ 250.

Alpine cannot be held liable for two separate violations based on the same SAR filing.

**POINT IV**

**THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS ARGUMENT
THAT ALPINE FAILED TO TIMELY PRODUCE ITS SAR SUPPORT FILES**

The SEC claims that it is entitled to summary judgment for Alpine purported failure to

produce 496 SAR support files "upon request by the Commission in 2016."  This argument fails

because (1) there are material issues of fact as to whether Alpine produced the SAR support files

in 2016; and (2) the SEC has not brought a claim for failure to produce the SAR support files –

which would fall under Rule 17a-4(j), 17 C.F.R. § 240.17a-4(j) – but rather claimed that Alpine

failed to maintain or retain support files under Rule 17a-8.

---

[33] *See* SAR Activity Review, Issue # 10, at 46 ("What constitutes a reasonable period of time will <u>vary according to the facts and circumstances</u> of the particular matter being reviewed and the effectiveness of the SAR monitoring, reporting and decision-making process of each institution.  <u>The key factor is that an institution has established adequate procedures for reviewing and assessing facts and circumstances identified as potentially suspicious</u> . . . ." (emphasis added)).

1.     **Material Issues of Fact and the Need for Additional Discovery Preclude Summary Judgment for the SEC**

There are significant issues of material fact that preclude summary judgment for the SEC on its claim that Alpine failed to produce 496 SAR support files to the SEC in 2016.  The SEC's claim in this regard is entirely based on the declaration of James L. Lyman ("Lyman"), Ex. 19 to the SEC's Motion.  Despite being the sole source of evidence for this claim, Lyman is not listed on the SEC's initial disclosures as a potential witness and, as the Court will recall, the SEC opposed Alpine's efforts to depose Lyman, which the Court granted, on the basis that it would not be offering testimony from SEC employees.  *See* Alpine's Responses to SOF 43, 53.   Given that sequence of events, Alpine objects to consideration of this declaration.

Lyman's iteration of events is also disputed on several grounds and cannot form the basis for summary judgment.  Lyman claims that he contacted Alpine's former counsel between January and March of 2016 with specific lists of SAR supporting files that should be "prioritized."  (Lyman Decl. ¶ 5.)  Lyman admits that Alpine produced supporting files between February and May 2016, (*see id.*), but claims that he could not locate certain support files in the production, and thus that he again reached out to Alpine's former counsel with a list of SARs for which supporting files could not be found a couple of times between after August of 2016 and that Alpine again produced supporting documents in October of 2016 (*Id.* ¶¶ 7(e)-(h)).  Lyman describes the steps that he, and individuals working at his "direction and supervision," undertook between May and November 2016 to locate Alpine's support files as searching electronically by (a) "Filing Name," which included the customer name, date of the deposit, and ticker symbol," which located several SAR support files; and (b) an alternative search for "documents containing both the ticker symbol and the customer name or account number," which located several

additional SAR support files.  (*Id.* ¶¶ 7(a)-(c).) Lyman then claims he created the SEC's Table E

from the support files he could not locate during these searches.  (*Id.* ¶¶ 6-7.)

Lyman's assertion that Alpine failed to produce the support files when requested is

disputed on several grounds.  First, Lyman omits that the SEC's original Table E, which was

prepared by Lyman and produced by the SEC in support of this claim in September of 2017,

alleged there were 1,249 missing support files.  SEC Table E, Ex. 248. Thus, when conducting

the search of the files Alpine produced in 2016 in anticipation of the instant summary judgment

motion, Lyman somehow located over 750 SAR support files that the SEC previously claimed

were missing.  Moreover, Lyman claims he located the all of these SAR support files in the new

search only by searching by "Filing Name," but does not indicate that he made any effort to use

the alternative search described above that yielded several additional hits the first time through.

(Lyman Decl. ¶ 9(a)). It is unknown how many additional documents would be found if the

additional search would have been performed.  The fact that Lyman located so many support

files from Alpine's 2016 production that the SEC previously claims were not produced, based on

a more cursory search, itself is an issue of fact that precludes summary judgment.[34]

Second, Lyman's sudden discovery of nearly 750 files coincides with Erin Green's

(formerly Erin Zipperich's) testimony that she gathered and produced the support files in

response to the SEC's subpoena and Lyman's spreadsheets in 2016.  *See* Alpine's Responses to

SOF 53.  Mrs. Green confirmed during her deposition that she pulled the SAR support files from

Alpine's document management software multiple times: first, in response to the SEC's

subpoena, and again when she received the list of allegedly missing support files that Lyman sent

---

[34] Lyman attempts to explain the discrepancy between the 1249 allegedly "missing" SAR support files on Table E and the 496
now at issue by claiming that he is now giving Alpine credit for those files in which some support document was produced.
(Lyman Decl. ¶ 7(c).)  However, this belies the point:  the SEC now admits that Alpine produced support files in 2016 which it
formerly claimed Alpine did not maintain at all.  Further, this assertion only highlights the existence of fact disputes on this issue
and the need for to develop this issue further through a deposition of Lyman and/or at trial.

Alpine's counsel in August of 2016, referenced at page 7(e) of his declaration. *See id.* This creates a classic issue of fact through conflicting testimony. The SEC attempts to neutralize Mrs. Green's testimony by arguing that Mrs. Green does not have personal knowledge whether Alpine's former counsel produced these documents to the SEC after she gathered them. (SEC Motion, at 19.) This is immaterial, however, because the fact that Lyman located at least 750 documents from Alpine's 2016 production proves they were produced. Moreover, Mrs. Green gathered them in response to the SEC's subpoena and requests for production; it is nonsensical that, having gone through this effort, they would not have been produced.

Finally, Alpine has submitted a declaration pursuant to Rule 56(d) requesting further discovery on this issue, including a deposition of Lyman and his team on what was done on in 2016 and 2018 to search for the purportedly missing support files. This additional discovery is necessary before the Court can properly consider and rule on this issue, and is warranted given the conflicting testimony and Lyman's sudden discovery of over 750 support files.

## 2. The SEC Did Not Bring A Claim that Alpine Failed to Timely Produce the Files in 2016

The SEC's Complaint on this issue alleged that "Alpine violated Exchange Act 17(a) and Rule 17a-8 by . . . failing to maintain and/or retain SAR documentation as required by the BSA and its implementing regulations." (SEC Complaint ¶ 46; *see also id.* ¶ 43 – "For as many as 1,000 SARs filed by Alpine during the relevant period, the underlying files either never existed or were lost.") The SEC did not allege, anywhere in the Complaint, that Alpine is liable for failure to produce the files in 2016, and this is not a subpoena enforcement action.[35] Furthermore, in describing its claim at the November 2, 2017 hearing, counsel for the SEC represented that "If

---

[35] *See, e.g., Enzo Biochem, Inc. v. Amersham PLC,* 981 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) ("A plaintiff may not pivot from its stated claims to new ones at the summary judgment stage simply because it inserted a few vague catch-all phrases into its pleadings."); *Lifeguard Licensing Corp. v. Kozak,* No. 15 Civ. 8459 (LGS) (JCF), 2016 WL 3144049 at *3 (S.D.N.Y. May 23, 2016) (observing "the federal rules prohibit discovery on unpled claims.")

there's a complete supporting file, obviously it would eliminate the one from table E. And our expert needs to look to see if that will then trigger the grounds for violation in A." Hearing Trans., Nov. 2, 2017 at 20: 2-17 (emphasis added).[36]   It is well established that a statement by an attorney during a proceeding "'binds his client,'" "'absent egregious circumstances.'" *Haywood v. Bureau of Immigration*, 372 F. App'x 122, 124 (2d Cir. 2010) (citation omitted).

Nevertheless, because Alpine has established that it does maintain and retain SAR support files and thus that there cannot be held liable on the SEC's claim, the SEC attempts to remake its claim on the fly as a failure to produce the files in 2016.  Not only is this disputed because Alpine did produce the documents in 2016, but the SEC's new iteration of its claim fails because it is not covered by Rule 17a-8.  Rule 17a-8 requires broker-dealers to "comply with the *reporting*, *recordkeeping*, and *record retention* requirements of chapter X of title 31 of the Code of Federal Regulations."  240 C.F.R. § 240.17a-8 (emphasis added).  Noticeably absent from the list of obligations under Rule 17a-8 is a duty to furnish SAR records, upon request, to the SEC.

Rather, a claim for failure to produce records must be brought under Rule 17a-4(j), which provides:

> Every member, broker and dealer subject to this section shall furnish promptly to a representative of the Commission legible, true, complete, and current copies of those records of the member, broker or dealer that are required to be preserved under this section, or any other records of the member, broker or dealer subject to examination under section 17(b) of the Act (15 U.S.C. § 78q(b)) that are requested by the representative of the Commission.

17 C.F.R. § 240.17a-4(j). The SEC's Wells Notice to Alpine makes clear that Rule 17a-8 is not a proper basis for an alleged failure-to-produce claim.  After detailing the alleged violations of Rule 17a-8, the Wells Notice states that the action would also allege that Alpine violated "Rules

---

[36] It is also unclear what the alleged prejudice to the SEC is here. True to their word, the SEC used a substantial number of support files Alpine produced in discovery in this case to allege additional violations in Table A through purportedly omitted red flags.  Every document identified by the Bates Label "ALPINE-LITXXXXXX" on the SEC expert's charts and the SEC's Ex. 10 was a document produced by Alpine during discovery in this case.  There are hundreds of examples.  *See* SEC Ex. 10.

17a-3 and 17a-4 . . . by failing to make and keep and/or by failing to promptly provide to the [SEC] certain books and records relating to its business."  (*See* Wells Notice, Ex. _.) The SEC brought no claim under Rules 17a-3 or 17a-4 against Alpine.

Although Alpine recognizes that the Court ruled in its March 30, 2018 Opinion that 31 C.F.R. § 1023.320(d) requires broker-dealers to "make all supporting documentation available to FinCEN and . . . any Federal regulatory authority that examines the broker-dealer for compliance with the [BSA], upon request," Rule 17a-8 expressly does not incorporate this production requirement.   Thus, the Court should hold the SEC to the claim it actually brought, and to its counsel's representations to the Court, and deny summary judgment for the SEC on this claim. *See* F.R.C.P. 54(b) (allowing courts to revise no final orders at any time prior to final decision). In fact, because the SEC apparently no longer claims that Alpine failed to maintain SAR support files, the Court should dismiss this claim outright.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that the SEC's Motion for Summary Judgment should be denied in its entirety.  In the alternative, Alpine requests additional discovery pursuant to FRCP 56(d).

DATED this 14th day of August 2018.

/s/Maranda E. Fritz
Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email: Maranda.Fritz@thompsonhine.com

Brent R. Baker (BB 8285)
Aaron D. Lebenta (*Pro Hac Vice*)
Jonathan D. Bletzacker (*Pro Hac Vice*)
**CLYDE SNOW & SESSIONS**
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email: brb@clydesnow.com
adl@clydesnow.com
jdb@clydesnow.com

*Attorneys for Defendant*
*Alpine Securities Corporation*

4818-5149-2208.2