UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
                                       :           17cv4179(DLC)
UNITED STATES SECURITIES AND EXCHANGE :
COMMISSION,                        :        OPINION & ORDER
                                         :
                        Plaintiff,   :
                                         :
                 -v-                     :
                                         :
ALPINE SECURITIES CORPORATION,       :
                                         :
                        Defendant.   :
                                         :
--------------------------------------X

APPEARANCES

For plaintiff United States Securities and Exchange Commission:
Zachary T. Carlyle
Terry R. Miller
U.S. Securities and Exchange Commission
1961 Stout Street, 17th Floor
Denver, CO 80294

For defendant Alpine Securities Corporation:
Maranda E. Fritz
Thompson Hine
335 Madison Avenue, 12th Floor
New York, NY 10017

Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker
Clyde Snow & Sessions
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111

DENISE COTE, District Judge:

Procedural History............................................ 3

Background.................................................... 5

  I. The Low-Priced Securities Market ........................ 5

  II. Alpine's Business ...................................... 10

III. 2011-2012 FINRA Examination ........................... 10

IV. Alpine's Improvements of its AML Program and SAR Filing Program ..................................................... 13

V. 2014 OCIE Examination .................................... 14

Discussion.................................................. 16

I. Regulatory Framework .................................... 18

II. General Arguments ...................................... 29

III. Admissibility of Summary Tables ...................... 36

IV. Deficient Narratives .................................. 43

  A. Mandatory Filing ..................................... 44

  B. Red Flags Omitted From SAR Narratives ............... 52

    1. Related Litigation.................................. 54

      a. Three Customers .................................. 58

      b. Ten SARs ......................................... 63

      c. Summary .......................................... 66

    2. Shell Companies or Derogatory History of Stock........ 67

    3. Stock Promotion..................................... 71

    4. Unverified Issuers.................................. 77

    5. Low Trading Volume................................. 80

    6. Foreign Involvement................................ 83

    7. Five Essential Elements............................ 86

  V. Deposit-and-Liquidation Patterns ..................... 89

  VI. Late-Filed SARs ...................................... 96

  VII. Failure to Maintain Support Files .................. 97

Conclusion.................................................. 100

Plaintiff United States Securities and Exchange Commission ("SEC") has sued clearing broker Alpine Securities Corporation ("Alpine"), alleging that between the years 2011 and 2015 Alpine repeatedly filed deficient suspicious activity reports ("SARs") and failed altogether to file other SARs and to maintain support

files for SARs when required by law to do so.  The SEC asserts
that this conduct violated 17 C.F.R. § 240.17a-8 ("Rule 17a-8"),
which obligates a broker-dealer to comply with certain
regulations promulgated under the Bank Secrecy Act ("BSA"),
including 31 C.F.R. § 1023.320 ("Section 1023.320"), which
dictates when a broker-dealer must file SARs.

The SEC has moved for summary judgment as to liability on
thousands of violations of Rule 17a-8.  For the reasons that
follow, the SEC's motion is granted in part.

## Procedural History

The SEC filed this action on June 5, 2017.  Following an
unsuccessful effort to dismiss the action for lack of personal
jurisdiction and improper venue, Alpine answered the complaint
on September 29, 2017.  It filed an amended answer on October
27.

As invited by the Court, the parties made preliminary
summary judgment motions to articulate the legal standards that
govern the SEC's claims and Alpine's defenses.  The SEC moved
for partial summary judgment on December 6, 2017, submitting
thirty-six SARs under seal as examples of four categories of
purported Rule 17a-8 violations.  Alpine cross-moved for summary
judgment and for judgment on the pleadings on January 19, 2018.
Alpine declined the opportunity to submit additional SARs for

review in connection with the SEC's motion.  Alpine's motions principally argued that the SEC does not have jurisdiction to bring this action and that the SEC's complaint was deficient for failing to plead that Alpine acted with wrongful intent.  An Opinion of March 30, 2018 (the "March Opinion") denied Alpine's motions and granted in part the SEC's motion.  See SEC v. Alpine Sec. Corp., 308 F. Supp. 3d 775 (S.D.N.Y. 2018).[1]

On June 22, 2018, Alpine and its affiliate, Scottsdale Capital Advisors ("SCA"),[2] filed an action in the United States District Court for the District of Utah (the "Utah Action"). See Alpine Sec. Corp. v. SEC, No. 18cv504(CW) (D. Utah filed June 22, 2018).  The Utah Action sought, inter alia, to enjoin the SEC from pursuing this action before this Court.  The SEC moved to enjoin the Utah Action on July 3.  That motion was granted on July 11.  See SEC v. Alpine Sec. Corp., No. 17cv4179(DLC), 2018 3377152 (S.D.N.Y. July 11, 2018).  Alpine's appeal of the July 11 injunction is pending before the Court of

---

[1] On April 20, 2018, Alpine filed motions to reconsider the rulings in the March Opinion, and for certification of certain issues for interlocutory appeal.  These motions were denied on June 18.  See SEC v. Alpine Sec. Corp., No. 17cv4179(DLC), 2018 WL 3198889 (S.D.N.Y. June 18, 2018).  On June 22, Alpine filed a petition for writ of mandamus with the United States Court of Appeals for the Second Circuit.  That petition was denied on August 7.  See In re Alpine Sec. Corp., No. 18-1875 (2d Cir. Aug. 7, 2018).

[2] SCA and Alpine are owned by the same individual.  For many of the transactions at issue here, SCA served as Alpine's introducing broker.

Appeals for the Second Circuit.  See SEC v. Alpine Sec. Corp., No. 18-2045 (2d Cir. filed July 12, 2018).

Following the conclusion of discovery, the SEC filed this summary judgment motion on July 13.  The motion became fully submitted on September 14.

## Background

Much of the relevant factual and regulatory background is recited in the March Opinion.  Familiarity with the March Opinion is assumed.

## I. The Low-Priced Securities Market

The SAR transactions at issue involve penny stocks and microcap stocks.[3]  Penny stocks are securities that trade at less than $5 per share.  Microcap stocks are defined based on the market capitalization of the issuer; these stocks tend to have a share price of less than one cent.  Penny stocks and microcap stocks are primarily traded in "over-the-counter" markets.  See March Opinion, 308 F. Supp. 3d at 781 & n.1.

The markets for these low-priced securities ("LPS") have

---

[3] The parties do not suggest that the issues in this case turn on any distinction between the terms share and stock and the terms are used in this Opinion interchangeably to refer to units of securities.  Similarly, for purposes of this motion, no distinction is made between deposits of securities with Alpine in the form of physical certificates or in electronic transactions.  Cf. Delaware v. New York, 507 U.S. 490, 496 (1993) (explaining immobilization of physical certificates of securities).

long been the subject of congressional and regulatory scrutiny
due to the unique characteristics of those markets.  In 1990,
Congress enacted the Penny Stock Reform Act of 1990.  See Pub.
L. No. 101-429, sec. 501, 104 Stat. 931, 951.  That Act includes
congressional findings that "[u]nscrupulous market practices and
market participants have pervaded the 'penny stock' market with
an overwhelming amount of fraud and abuse."  Id. sec. 502(4),
104 Stat. at 951.  Congress concluded that one key problem with
the penny stock market was "a serious lack of adequate
information concerning price and volume of penny stock
transactions, the nature of th[e] market, and the specific
securities in which [individuals] are investing."  Id.
sec. 502(6), 104 Stat. at 951.  In addition, Congress stated
that "[c]urrent practices do not adequately regulate the role of
'promoters' and 'consultants' in the penny stock market," and
that individuals "banned from the securities markets" "ended up
in promoter and consultant roles, contributing substantially to
fraudulent and abusive schemes."  Id. sec. 502(7), 104 Stat. at
951.  Congress also found that "shell corporations . . . are
used to facilitate market manipulation schemes" in the penny
stock markets.  Id. sec. 502(8), 104 Stat. at 951.

The SEC has promulgated rules pursuant to the Penny Stock
Reform Act.  It revised those rules in 2005 in order to better
combat "fraudulent sales practices" and "the diversion of

substantial capital to unscrupulous promoters and broker-dealers" in the LPS markets.  See SEC, Amendments to the Penny Stock Rules, SEC Release No. 49037, 2004 WL 51685, at *3 (Jan. 8, 2004).

Financial regulators frequently warn investors about the risks of fraud connected to investments in LPS.  The SEC, for instance, has observed that "information about microcap companies can be extremely difficult to find, making them more vulnerable to investment fraud schemes and making it less likely that quoted prices in the market will be based on full and complete information about the company."  SEC, Microcap Stock.[4] Similarly, FINRA[5] has warned investors "about the dangers of penny stocks," focusing on the lack of publicly available or verifiable information about issuers and the possibility that the issuer may be a shell company.[6]  See FINRA, Beware Dormant

---

[4] SEC, Microcap Stock:  A Guide for Investors (Sept. 18, 2013), https://www.sec.gov/reportspubs/investor-publications/ investorpubsmicrocapstockhtm.html.

[5] FINRA, or the Financial Industry Regulatory Authority, is a self-regulatory organization ("SRO") that supervises broker-dealers.  See Fiero v. Financial Industry Regulatory Auth., Inc., 660 F.3d 569, 571 & n.1 (2d Cir. 2011).  Its responsibilities include monitoring broker-dealers' anti-money laundering ("AML") programs.  See March Opinion, 308 F. Supp. 3d at 794-95.

[6] A shell company is a company with no or nominal operations, and either no or only nominal assets, assets "consisting solely of cash and cash equivalents," or "[a]ssets consisting of any amount of cash and cash equivalents and nominal other assets."

Shell Companies.[7]

The SEC has explained in an administrative decision that "[p]enny stocks present risks of trading abuses due to the lack of publicly available information about the penny stock market in general and the price and trading volume of particular penny stocks." In re Bloomfield, SEC Release No. 9553, 2014 WL 768828, at *2 (SEC Feb. 27, 2014), aff'd, 649 F. App'x 546 (9th Cir. 2016).  In that decision, the SEC noted that penny stocks are vulnerable to pump-and-dump schemes that manipulate a stock price in order to enrich stock promoters. Id. at *3.  The SEC added that

> [m]oney laundering activities can also be facilitated
> through the trading of penny stocks.  Some money
> laundering red flags include:  a customer who has a
> questionable background or is the subject of news
> reports indicating possible criminal, civil, or
> regulatory violations; multiple accounts in the names
> of family members or corporate entities for no
> apparent business or other purpose; wire transfers to
> or from countries identified as money laundering risks
> or tax havens; and excessive journal entries between
> unrelated accounts.

Id.

As noted, a frequent tool of market manipulation is the use of shell companies.  See FINRA, Dormant Shell Companies;[8] SAR

---

17 C.F.R. § 240.12b-2; 17 C.F.R. § 230.405.

[7] FINRA, Beware Dormant Shell Companies (Mar. 14, 2016), http://www.finra.org/investors/beware-dormant-shell-companies.

[8] FINRA, Dormant Shell Companies -- How to Protect Your Portfolio

Activity Review, Issue 1, at 11.[9]  FinCEN[10] has warned that shell companies "are an attractive vehicle for those seeking to launder money or conduct illicit activity" with significant potential for "abuse" in the form of money laundering or pump-and-dump schemes.  FinCEN Domestic Shell Company Report at 2, 4.[11]  FinCEN has explained that shell companies are "common tools for money laundering and other financial crimes, primarily because they are easy and inexpensive to form and operate."  FinCEN Shell Company Guidance at 2.[12]

Alpine does not dispute these risks of investing in the LPS markets.  Alpine points out, however, that these markets provide access to capital for smaller companies.

_____

from Fraud (Oct. 30, 2014), http://www.finra.org/investors/alerts/dormant-shell-companies-portfolio-fraud.

[9] FinCEN, The SAR Activity Review:  Trends, Tips & Issues, Issue 1 (Oct. 2000), https://www.fincen.gov/sites/default/files/shared/sar_tti_01.pdf.

[10] FinCEN, the Financial Crimes Enforcement Network, is a division of the United States Department of the Treasury (the "Treasury Department").  It is responsible for, as relevant here, administering the BSA.  See March Opinion, 308 F. Supp. 3d at 791.

[11] FinCEN, The Role of Domestic Shell Companies in Financial Crime and Money Laundering:  Limited Liability Companies (Nov. 2006), https://www.fincen.gov/sites/default/files/shared/LLCAssessment_FINAL.pdf.

[12] FinCEN, FIN-2006-G014, Potential Money Laundering Risks Related to Shell Companies (Nov. 9, 2006), https://www.fincen.gov/sites/default/files/guidance/AdvisoryOnShells_FINAL.pdf.

## II. Alpine's Business

Alpine is a clearing broker.  Clearing brokers provide
clearance and settlement services for introducing brokers.  This
involves handling the recording of transactions, the exchange of
funds, and the delivery of securities after a transaction has
been executed.  Clearing firms typically maintain records of all
trading and issue trade confirmations and statements.

Alpine was founded in 1984.  In early 2011, Alpine was
acquired by its current owner.

## III. 2011-2012 FINRA Examination

Alpine is regulated by FINRA and other regulators.  Between
March 2, 2011 and January 22, 2012, FINRA conducted a financial,
operational, and sales practices examination of Alpine.  FINRA
conducted an exit meeting with Alpine on July 23, 2012, where it
shared its highly critical findings with Alpine.  FINRA issued a
seven-page report of that examination on September 28, 2012
("FINRA Report").

The FINRA Report listed ten exceptions to Alpine's
practices, five of which have particular relevance to the issues
raised in this lawsuit.  The FINRA Report discloses that Alpine
did not file any SARs for over six months in 2011 -- March 1
through May 10 and August 16 through December 19 -- and found
that Alpine was not in compliance with a FINRA SAR reporting
rule and two federal reporting regulations, including Section

1023.320.[13]  The FINRA Report recited the explanations Alpine
provided for its failure to file these SARs, including that its
compliance officer had determined that these filings were
discretionary and that it was unnecessary to file them.
Alpine's chief of operations explained that once he had learned
that no SARs had been filed for the period August 16 through
December 19, 2011, Alpine filed SARs to reflect certain
transactions that had occurred during that period.  The FINRA
Report found that these filings were all late and should have
been filed no later than thirty days after the initial detection
of the suspicious activity reported in them.  It concluded that
Alpine had "failed to establish and enforce procedures
reasonably designed to detect and report suspicious activity."

        The FINRA Report also determined that the narrative
sections of the 823 SARs that Alpine did file during the period
March 7, 2011 through January 22, 2012 were "substantively
inadequate" and in violation of Section 1023.320(a)(1).  It
explained that

        [t]he narratives for all SARs reviewed were
        substantively inadequate as they failed to fully
        describe why the activity was suspicious.  For the
        SARs reviewed, the narrative just described isolated
        events of activity without any detail or support of
        why the firm actually considered the activity to be

---

[13] The three regulations are FINRA Rule 3310, Section 1023.320,
and 31 C.F.R. § 1010.520, which requires broker-dealers to
provide certain information about terrorist activity and money
laundering to law enforcement agencies upon request.

suspicious and therefore failing to justify at the
basic core the legitimacy of the SAR filing.

The FINRA Report recited the "two basic formats or templates"
that Alpine had used in these SARs, "neither of which were
substantively adequate as they failed to fully describe why the
activity was suspicious." As quoted in the FINRA Report, the
first boilerplate, barebones narrative read:

> On or around December 09, 2011 ABC LLC deposited a
> large quantity (40,000,000 shares) of XYZ Corp, a low-
> priced ($0.0001/share) security.

The second read:

> ABC Inc. is a client of ACAP Financial, a firm for
> which Alpine Securities provides securities clearing
> services. Due to the activity within this account, it
> has been placed on a Heightened Supervisory list. It
> is policy of Alpine to file a SARs [sic] related to
> each deposit of securities into accounts of this
> nature. On or around 12/23/2011, ABC Inc. deposited a
> large quantity (5,097,312) of XYZ Corp, a low-priced
> ($.0045 /share) security. This transaction amounted
> to approximately $22,938.00.

The FINRA Report notes that the first template was used in 559
SARs and the second template was used in 264 SARs.

The FINRA Report also criticized Alpine for failing to
review requests from FinCEN for information, and for the
inadequacies in its AML program, including the program's failure
to detect and report suspicious activity. As disclosed in the
Report, Alpine had failed to enforce its own AML procedures,
including the requirement that it file a SAR within thirty days
of becoming aware of a suspicious transaction.

In response to the FINRA examination, Alpine filed 251 SARs between December 2011 and May 2012 for transactions that had occurred between August 17, 2011 and February 3, 2012, and for which it had previously filed no SARs.  Alpine explains in opposition to this motion for summary judgment that it filed these SARs only because FINRA informed Alpine that it expected to see SARs filed on all transactions involving large deposits of LPS.  The SEC contends that Alpine violated Rule 17a-8 by failing to file these SARs within the thirty-day period imposed by Section 1023.320(b)(3).  These SARs will be referred to as the Late-Filed SARs.

## IV. Alpine's Improvements of its AML Program and SAR Filing Program

In response to this motion for summary judgment, Alpine freely acknowledges that before the change in ownership in 2011, Alpine had had only limited compliance staff.  Alpine's current owners hired more compliance personnel in 2011 and 2012. Beginning in the Fall of 2012, Alpine arranged for an annual audit of its AML program.  Also in 2012, Alpine created standard operating procedures for compliance with AML regulations. Alpine has submitted three versions of its AML procedures, dated April 11, 2013, August 29, 2014, and October 1, 2015.

The SEC's motion for summary judgment is premised in part on 1,593 SARs that Alpine filed and which the SEC contends

contain deficiencies in their narratives.  Of those 1,593 SARs, approximately two-thirds were filed before September 28, 2012, when Alpine received the FINRA Report.

The following is the narrative section of SAR 1763, which is one of the post-FINRA Report SARs at issue here.  It was filed in September 2013, approximately one year after the FINRA Report.  It reads:

> [Customer] is a client of [SCA], a firm for which Alpine Securities provides clearing services.  This account is a foreign broker-dealer.  This account historically makes deposits of large volumes of low-priced securities.  For that reason this transaction may be suspicious in nature.  On or around [date, Customer] deposited physical stock certificate(s) representing a large quantity (2,---,--- shares) of [issuer], a low-priced ($.05/share) security into brokerage account [number.]  The brokerage account is maintained through Alpine Securities.  This transaction amounted to approximately $1--,---.--. The return on the initial investment of $2-,---.-- on [date six months before transaction] considering the relatively short time period.  [sic]

The SEC contends that this SAR narrative is deficient for failing to disclose (a) basic customer information, (b) that the deposit was significantly disproportionate to the average daily trading volume of the LPS, and (c) that the sub-account holder is foreign.

## V. 2014 OCIE Examination

The SEC Office of Compliance Inspections and Examinations ("OCIE") conducted a one-week on-site review of Alpine in July 2014.  OCIE reviewed 252 of the over 4,600 SARs filed by Alpine

between January 2013 and July 2014, and concluded in a report issued on April 9, 2015 ("OCIE Report") that 50% of those 252 SARs "failed to completely and accurately disclose key information of which [Alpine] was aware at the time of filing." OCIE found that the narrative sections of Alpine's SARs "generally contained 'boilerplate' language." It criticized Alpine for omitting mention of many red flags for suspicious activity, such as a customer's civil, regulatory, or criminal history; foreign involvement with the transactions; concerns about an issuer; stock promotion activity; and that an issuer had been a shell company. In bringing this lawsuit, the SEC relies on the existence of these red flags in Alpine's support files for the SARs Alpine filed.

The OCIE Report found as follows:

All of the information noted above was of critical importance to adequately and accurately describe the nature and extent of the suspicious activity that was the subject of each SAR. And, as evidenced by Alpine's own investigative files, Alpine knew of the omitted information at the time each SAR was filed. By excluding the information described above, Alpine failed to "provide a clear, complete, and concise description of the activity, including what was unusual or irregular that caused suspicion:" and failed to show the degree of care required by FinCEN to complete the narrative. (In fact, we note that the amount and type of actual material information in SARs filed by Alpine is very similar to the sample SAR that FinCEN has identified in its public guidance as being

insufficient or incomplete.)[14]   This rendered the SARs
less valuable to investigators trying to understand
the activity and any criminal or administrative
implications thereof.  As a result, the Firm is in
contravention of FinCEN's SAR Rule and Exchange Act
Rule l7a-8.

(Footnotes omitted.)

The OCIE Report also noted that Alpine filed SARs on

certain customers' deposits of LPS but "[i]nexplicably" failed

to file SARs when those customers sold those LPS.  The OCIE

Report describes Alpine's failures as "recidivist activity"

because of FINRA's 2012 findings that Alpine was filing

substantively inadequate SARs.  It concluded that Alpine's SAR

practices "obscured the true nature of the suspicious activity,"

and that it appeared that Alpine was "intentionally trying to

obfuscate or distort the truly suspicious nature of the activity

that the Firm is required to report to law enforcement."


## Discussion

The SEC seeks summary judgment as to Alpine's liability for

---

[14] The OCIE Report referred to FinCEN published guidance which
gave the following example of an "insufficient or incomplete"
SAR narrative:
    Account was opened in 2002.  Assets were transferred
    in by wire.  50 checks for $250 were deposited,
    securities were liquidated and money was paid out in
    May 2003.
FinCEN, Guidance on Preparing a Complete & Sufficient Suspicious
Activity Report Narrative 27 (Nov. 2003), https://www.fincen.gov
/sites/default/files/shared/sarnarrcompletguidfinal_112003.pdf
("SAR Narrative Guidance").

several thousand violations of Rule 17a-8.  The SEC's motion is largely addressed to four discrete alleged deficiencies in Alpine's compliance between 2011 and 2015 with SAR reporting requirements.  For each alleged deficiency, it has submitted a table that identifies hundreds of deficient or missing SARs or missing support files for SARs.[15]

"Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Jaffer v. Hirji, 887 F.3d 111, 114 (2d Cir. 2018) (citation omitted).  "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113 (2d Cir. 2017) (citation omitted).  "Where the movant has the burden" of proof at trial, "its own submissions in support of the motion must entitle it to judgment as a matter of law." Albee Tomato, Inc. v. A.B. Shalom Produce Corp., 155 F.3d 612, 618 (2d Cir. 1998)

When the moving party has asserted facts showing that it is entitled to judgment, the opposing party must "cit[e] to particular parts of materials in the record" or "show[] that the

---

[15] The SARs and tables in this case have been filed under seal. As explained in the March Opinion, the SAR reporting regime is premised on the secrecy of the SARs.  See generally 308 F. Supp. 3d at 783 n.4.

materials cited [by the movant] do not establish the absence
. . . of a genuine dispute" in order to show that a material
fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1).  "A party
may not rely on mere speculation or conjecture as to the true
nature of the facts to overcome a motion for summary judgment,"
as "[m]ere conclusory allegations or denials cannot by
themselves create a genuine issue of material fact where none
would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d
Cir. 2010) (citation omitted).  Only disputes over "facts that
might affect the outcome of the suit under the governing law"
will properly preclude the entry of summary judgment.  Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary
judgment may be granted if the evidence cited by the nonmovant
is "merely colorable or is not significantly probative."  Id. at
249 (citation omitted).

I. Regulatory Framework

This case concerns the interplay of regulations promulgated
under two federal statutes:  the BSA, 31 U.S.C. § 5311, et seq.,
first enacted in 1982, and the Securities Exchange Act of 1934
(the "Exchange Act"), 15 U.S.C. § 78a, et seq.  The BSA allows
the Secretary of the Treasury to "require any financial
institution . . . to report any suspicious transaction relevant
to a possible violation of law or regulation."  31 U.S.C.
§ 5318(g)(1).  The Secretary has delegated this authority to

FinCEN.[16]  Pursuant to these delegations, in 2002 the Treasury Department and FinCEN promulgated Section 1023.320.[17]  There are similar suspicious activity reporting regulations that apply to other types of financial institutions, such as banks, casinos, and mutual funds.  See, e.g., 31 C.F.R. §§ 1020.320 (banks), 1021.320 (casinos), 1024.320 (mutual funds).

Rule 17a-8 was promulgated by the SEC in 1981 under authority delegated to it by Congress in the Exchange Act.  See March Opinion, 308 F. Supp. 3d at 796.  The Rule requires a broker-dealer to "comply with the reporting, recordkeeping and record retention requirements of chapter X of title 31 of the Code of Federal Regulations."  17 C.F.R. § 240.17a-8.

The reporting and record-keeping requirements found in Chapter X of Title 31 of the Code of Federal Regulations and incorporated by Rule 17a-8 include Section 1023.320, which, among other things, requires a broker-dealer to file SARs. Section 1023.320 states in pertinent part:

> (1) Every broker or dealer in securities within the
> United States (for purposes of this section, a
> "broker-dealer") shall file with FinCEN, to the extent

---

[16] See Treasury Order 180-01, 67 Fed. Reg. 64,697, 64,697 (Oct. 21, 2002).

[17] See FinCEN, Amendment to the Bank Secrecy Act Regulations -- Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048 (July 1, 2002) ("FinCEN Section 1023.320 Notice").  The USA PATRIOT ACT of 2001, Pub. L. No. 107-56, 115 Stat. 272 (the "Patriot Act"), significantly expanded the scope of the BSA.

and in the manner required by this section, <u>a report of any suspicious transaction</u> relevant to a possible violation of law or regulation.  A broker-dealer may also file with FinCEN a report of any suspicious transaction that it believes is relevant to the possible violation of any law or regulation but whose reporting is not required by this section. . . .

(2) <u>A transaction requires reporting under the terms of this section if</u> it is conducted or attempted by, at, or through a broker-dealer, it involves or aggregates funds or other assets of at least $5,000, and <u>the broker-dealer knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part)</u>:

(i) Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation;

(ii) Is designed, whether through structuring or other means, to evade any requirements of this chapter or of any other regulations promulgated under the Bank Secrecy Act;

(iii) Has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

(iv) <u>Involves use of the broker-dealer to facilitate criminal activity</u>.

31 C.F.R. § 1023.320(a) (emphasis supplied).

The regulation also provides that a SAR must be filed

<u>no later than 30 calendar days</u> after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing a SAR

under this section.  If no suspect is identified on the date of such initial detection, a broker-dealer may delay filing a SAR for an additional 30 calendar days to identify a suspect, but in no case shall reporting be delayed more than 60 calendar days after the date of such initial detection.

31 C.F.R. § 1023.320(b)(3) (emphasis supplied).

In addition, a broker-dealer is required to retain support files for SARs for five years, as follows:

Retention of records.  A broker-dealer shall maintain a copy of any SAR filed and the original or business record equivalent of any supporting documentation for a period of five years from the date of filing the SAR.  Supporting documentation shall be identified as such and maintained by the broker-dealer, and shall be deemed to have been filed with the SAR.  A broker-dealer shall make all supporting documentation available to FinCEN or any Federal, State, or local law enforcement agency, or any Federal regulatory authority that examines the broker-dealer for compliance with the Bank Secrecy Act, upon request . . . .

31 C.F.R. § 1023.320(d) (emphasis supplied).

SARs are currently submitted to FinCEN via an electronic SAR Form.[18]  Part I of the Form is titled "Subject Information"

---

[18] Over the period at issue in this action, two versions of the SAR Form were in effect:  one from 2002 to 2012 (the "2002 SAR Form") and one after 2012 (the "2012 SAR Form").  See March Opinion, 308 F. Supp. 3d at 792-93.  The 2002 SAR Form includes instructions for what information to include in the narrative section on the form.  See 2002 SAR Form at 3.  A copy of the 2002 SAR Form is attached as an Exhibit to this Opinion.  FinCEN published notices with drafts of the 2002 and 2012 SAR Forms in the Federal Register and solicited public comment before requiring regulated parties to use those forms.  See March Opinion, 308 F. Supp. 3d at 792 & nn.10-11.  In connection with the 2012 SAR Form, FinCEN published an instructional document. See FinCEN, FinCEN Suspicious Activity Report (FinCEN SAR)

and requires a filer to provide identifying information about the subject of the SAR.  2002 SAR Form at 1.  The subject of a SAR is defined in guidance as the individuals or entities "involved in the suspicious activity."  SAR Narrative Guidance at 3.  "If more than one individual or business is involved in the suspicious activity," a filer must "identify all suspects and any known relationships amongst them in the Narrative Section."  Id.; see also 2012 SAR Instructions at 88 (directing filers to provide subject information for "each known subject involved in the suspicious activity").

Part II of the SAR Form requires the filer to identify the suspicious activity being reported.  A filer must provide the date or date range of suspicious activity and the dollar amount involved.  In addition, there is a list of financial instruments, such as "Bonds/Notes," "Stocks," and "Other securities."  2002 SAR Form at 1.[19]  A filer is directed to check all that apply to the transaction.  A filer must also check

Electronic Filing Instructions (2012), https://www.fincen.gov/sites/default/files/shared/FinCEN%20SAR%20ElectronicFiling Instructions-%20Stand%20Alone%20doc.pdf ("2012 SAR Instructions").  The 2012 SAR Instructions and the 2002 SAR Form contain essentially identical instructions for completing the SAR narrative.  The parties do not contend that there are any differences in those instructions that are material to the issues in dispute here.

[19] The 2012 SAR Form replaced the list of financial "instruments" with a list of "product type(s) involved in the suspicious activity."  That list includes a box to check for "Penny stocks/Microcap securities."  2012 SAR Form at 7.

boxes identifying the type of suspicious activity, which includes "Commodity futures/options fraud," "Insider trading," "Market manipulation," "Money laundering/structuring," "Prearranged or other non-competitive trading," "Securities fraud," "Wash or other fictitious trading," and "Wire fraud." Id.  This list also includes an option to check "Other," with an instruction to "[d]escribe" the activity in the narrative portion of the SAR.  Id.  A FinCEN instructional document for this Form directs filers to "[p]rovide a brief explanation in [the SAR narrative] of why each box is checked."  2002 Form Instructions at 3.[20]

The SAR Form also contains directions for SAR filers about how to complete the narrative portion of the SAR.[21]  The instructions state that the narrative

> section of the report is **critical**.  The care with
> which it is completed may determine whether or not the
> described activity and its possible criminal nature
> are clearly understood by investigators.  Provide a
> clear, complete and chronological description . . . of
> the activity, including what is unusual, irregular or
> suspicious about the transaction(s), using the
> checklist below as a guide.

---

[20] FinCEN, Form 101a, Suspicious Activity Report (SAR-SF) Instructions (May 22, 2004), https://www.fincen.gov/sites /default/files/shared/fin101_instructions_only.pdf.

[21] The following excerpts are taken from the 2002 SAR Form.  As explained in the March Opinion, materially similar directions are included in an instructional document created by FinCEN for the post-2012 electronic filing system.  See 308 F. Supp. 3d at 793 (citing 2002 SAR Form and 2012 SAR Instructions).

(Emphasis in original.)  The checklist has twenty-two items,
each addressed to a specific type of information.  The following
items are particularly relevant to the SEC's motion for summary
judgment:

> h.  Indicate whether the suspicious activity is an
> isolated incident or relates to another transaction.
>
> i.  Indicate whether there is any related litigation.
> If so, specify the name of the litigation and the
> court where the action is pending.
>
> . . .
>
> k.  Indicate whether any information has been excluded
> from this report; if so, state reasons.
>
> l.  Indicate whether U.S. or foreign currency and/or
> U.S. or foreign negotiable instrument(s) were
> involved.  If foreign, provide the amount, name of
> currency, and country of origin.
>
> . . .
>
> o.  Indicate any additional account number(s), and any
> foreign bank(s) account number(s) which may be
> involved.
>
> p. Indicate for a foreign national any available
> information on subject's passport(s), visa(s), and/or
> identification card(s).  Include date, country, city
> of issue, issuing authority, and nationality.
>
> q. Describe any suspicious activities that involve
> transfer of funds to or from a foreign country, or
> transactions in a foreign currency.  Identify the
> country, sources and destinations of funds.

2002 SAR Form at 3.

FinCEN has issued a number of guidance documents explaining
the scope of the SAR reporting duty in the narrative section of

the SAR Form.  FinCEN guidance interpreting Section 1023.320 is
entitled to deference.  See March Opinion, 308 F. Supp. 3d at
791.  That guidance includes the instruction that a SAR
narrative should include the who, what, when, why, where, and
how of the suspicious activity (the "Five Essential Elements").[22]
See SAR Narrative Guidance at 3-6; SAR Activity Review, Issue
22, at 39-40;[23] 2012 SAR Instructions at 110-12.  See generally
308 F. Supp. 3d at 791-95.  To interpret the scope of Section
1023.320, this Opinion principally relies on the instructions on
the 2002 SAR Form, the 2012 SAR Instructions, and the SAR
Narrative Guidance issued in 2003.  Both the 2002 SAR Form (and
its list of instructions) and the 2012 SAR Form were promulgated
after FinCEN published a notice in the Federal Register with a
draft version of the form and invited public comment.  See
FinCEN 2002 SAR Form Notice, 67 Fed. Reg. at 50,751;[24] FinCEN

---

[22] FinCEN guidance refers to the who, what, where, when, and why,
as the "five essential elements" of a SAR narrative, but also
adds that a sixth element, "the method of operation (or how?)[,]
is also important."  SAR Narrative Guidance at 3.  This Opinion
follows FinCEN's lead in calling these six elements the Five
Essential Elements of a SAR.

[23] FinCEN, The SAR Activity Review:  Trends, Tips & Issues, Issue
22 (Oct. 2012), https://www.fincen.gov/sites/default/files
/shared/sar_tti_22.pdf.

[24] FinCEN, Proposed Collection, Comment Request, Suspicious
Activity Report by the Securities and Futures Industry, 67 Fed.
Reg. 50,751 (Aug. 5, 2002).

2012 SAR Form Notice, 75 Fed. Reg. at 63,545.[25]  The 2012 SAR

Instructions are similar in all respects that are material to

this litigation to those instructions contained in the 2002 SAR

Form.[26]

The SAR Narrative Guidance was issued by FinCEN in 2003

with the "purpose" of "educat[ing] SAR filers on how to organize

and write narrative details that maximize[] the value of each

SAR form."  SAR Narrative Guidance at 1.  This "guidance

document" describes in detail the Five Essential Elements of a

SAR narrative, describes how a SAR narrative should be

structured, and provides examples of sufficient and insufficient

narratives for each type of filing entity.  See id. at 1-2.

The "who" of the Five Essential Elements encompasses the

"occupation, position or title . . . , and the nature of the

suspect's business(es);" the "what" includes "instruments or

mechanisms involved" such as wire transfers, shell companies,

and "bonds/notes;" and the "why" includes "why the activity or

transaction is unusual for the customer; consider[ing] the types

of products and services offered by the [filer's] industry, and

the nature and normally expected activities of similar

---

[25] FinCEN, Proposed Collection, Comment Request, Bank Secrecy Act
Suspicious Activity Report Database Proposed Data Fields, 75
Fed. Reg. 63,545 (Oct. 15, 2010).

[26] Alpine does not argue that its SAR obligations changed when
the filing format changed in 2012.

customers."[27]  SAR Narrative Guidance at 3-4.  The "how" includes the "method of operation of the subject conducting the suspicious activity," by giving "as completely as possible a full picture of the suspicious activity involved."  Id. at 6. The obligation to identify involved parties in a transaction extends to all "subject(s) of the filing," and "filers should include as much information as is known to them about the subject(s)."  SAR Activity Review, Issue 22, at 39.

Examples of relevant information listed by FinCEN include "bursts of activities within a short period of time," SAR Narrative Guidance at 5, whether foreign individuals, entities, or jurisdictions are involved, 2012 SAR Instructions at 112, or the involvement of unregistered businesses, SAR Narrative Guidance at 5.  A common scenario identified by FinCEN as suspicious involves a "[s]ubstantial deposit . . . of very low-priced and thinly traded securities" followed by the "[s]ystematic sale of those low-priced securities shortly after being deposited."  SAR Activity Review, Issue 15, at 24.[28]

---

[27] The SAR Narrative Guidance also directs filers to find "[o]ther examples of suspicious activity . . . in previously published FinCEN Advisories, SAR Bulletins, and editions of The SAR Activity Review – Trends, Tips & Issues."  SAR Narrative Guidance at 6 n.5.  Those sources are cited in this Opinion and in the March Opinion.

[28] FinCEN, The SAR Activity Review:  Trends, Tips & Issues, Issue 15 (May 2009), https://www.fincen.gov/sites/default/files/shared/sar_tti_15.pdf.

FinCEN has explained that "[t]ransactions like these are red flags for the sale of unregistered securities, and possibly even fraud and market manipulation," and firms need to "investigate[] thoroughly" such questions as "the source of the stock certificates, the registration status of the shares, how long the customer has held the shares and how he or she happened to obtain them, and whether the shares were freely tradable." Id.

Broker-dealers are also required by regulation to maintain written AML policies that define how the broker-dealer detects potential money laundering and implements the duty to file SARs. This requires broker-dealers to engage in "ongoing customer due diligence," which includes

> (i) Understanding the nature and purpose of customer relationships for the purpose of developing a customer risk profile; and

> (ii) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information . . . includ[ing] information regarding the beneficial owners of legal entity customers.

31 C.F.R. § 1023.210(b)(5).

In 2002, FinCEN delegated its BSA authority over broker-dealer AML programs to the SEC and SROs including FINRA.[29]

---

[29] See FinCEN, Anti-Money Laundering Programs for Financial Institutions, 67 Fed. Reg. 21,110, 21,111 (Apr. 29, 2002) (interim final rule effective April 24, 2002); see also 31 C.F.R. § 1023.210(c) (requiring a broker-dealer AML program to "[c]ompl[y] with the rules, regulations, or requirements of its self-regulatory organization governing such programs").

Pursuant to its supervisory authority over SROs, the SEC reviewed and approved AML best practices submitted by the SROs.[30] FINRA Rule 3310 has governed its members' AML programs since 2009.[31]  Rule 3310 requires member firms to have a written AML policy that receives approval from FINRA's senior management and that "[e]stablish[es] and implement[s] policies, procedures, and internal controls reasonably designed to achieve compliance with the Bank Secrecy Act and the implementing regulations thereunder."  FINRA Rule 3310(b) (2015).[32]  The Rule also requires that member firms "[e]stablish and implement policies and procedures that can be reasonably expected to detect and cause the reporting of transactions required under 31 U.S.C. 5318(g) and the implementing regulations thereunder."  FINRA Rule 3310(a).

II. General Arguments

    The SEC makes four categories of claims, each of which is separately addressed below.  It asserts that Alpine filed SARs

---

[30] See SEC, Order Approving Proposed Rule Changes Relating to Anti-Money Laundering Compliance Programs, 67 Fed. Reg. 20,854 (Apr. 26, 2002).

[31] See SEC, Order Approving Proposed Rule Change to Adopt FINRA Rule 3310 (Anti-Money Laundering Compliance Program) in the Consolidated FINRA Rulebook, SEC Release No. 60645, 2009 WL 2915633 (Sept. 10, 2009).  Prior to 2009, substantially similar rules governed broker-dealer AML programs administered by FINRA's predecessor organizations.  See id. at *1.

[32] Found at http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=8656.

that failed to report in their narrative sections one or more of seven different types of information.  It then asserts that Alpine failed to file SARs reporting suspicious sales following large deposits of LPS.  The third set of claims concerns SARs that the SEC asserts were filed later than allowed by Section 1023.320.  Finally, the SEC asserts that Alpine violated the law by not maintaining support files for many of the SARs it filed. Before addressing the specific violations on which the SEC seeks summary judgment, this Opinion addresses Alpine's general arguments about the propriety of this action.

Alpine contests whether the SEC has authority to bring this suit.[33]  In large part, these arguments were addressed in the March Opinion.  See 308 F. Supp. 3d at 795-97.  Alpine argues that the SEC has not been empowered to sue for violations of the BSA.  See id. at 795-96.  According to Alpine, the Treasury Department, and in particular FinCEN, are empowered to enforce the BSA, and FinCEN has delegated to the SEC only the authority to examine a broker-dealer for compliance with the BSA but not the authority to enforce the BSA.

Alpine is correct that FinCEN has not expressly delegated

---

[33] Alpine principally presents its legal argument in the expert declaration Alpine submitted with its opposition papers.  These legal arguments may not be presented through an expert.  See DiBella v. Hopkins, 403 F.3d 102, 121 (2d Cir. 2005) ("Expert witness statements embodying legal conclusions exceed the permissible scope of opinion testimony under the Federal Rules of Evidence." (citation omitted.)).

BSA enforcement authority to the SEC.  But, that ignores the
separate statutory authority at issue here.  The SEC has its own
independent authority to require broker-dealers to make reports,
and has enforcement authority over those broker-dealer reporting
obligations.  It was efficient for the Treasury Department to
delegate its own duty to examine broker-dealers to the agency
primarily responsible for regulating broker-dealers.

The Exchange Act requires broker-dealers to "make . . .
such reports as the Commission . . . prescribes as necessary or
appropriate in the public interest, for the protection of
investors, or otherwise in furtherance of the purposes of [the
Exchange Act]."  15 U.S.C. § 78q(a)(1).  One of the rules the
SEC has promulgated pursuant to this statute is Rule 17a-8.  As
explained in the March Opinion, Rule 17a-8 is a valid exercise
of the broad authority Congress conferred on the SEC in 15
U.S.C. § 78q(a)(1).[34]  Rule 17a-8 incorporates the reporting

---

[34] Alpine and its expert fail to engage with the analysis
provided in the March Opinion.  In particular, they do not
account for the SEC's interpretation of Rule 17a-8 as
encompassing the duty to file a SAR and otherwise comply with
Section 1023.320 in a formal adjudication.  See In re
Bloomfield, SEC Release No. 9553, 2014 WL 768828, at *15-*17
(Feb. 24, 2014).  As explained in the March Opinion, it is
axiomatic that agencies may announce rules by rulemaking or
through a formal adjudication, and when an agency acts through
adjudication, its rules are necessarily retrospective.  See 308
F. Supp. 3d at 788 (citing SEC v. Chenery Corp., 332 U.S. 194,
201-02 (1947) and Bowen v. Georgetown Univ. Hosp., 488 U.S. 204,
221 (1988) (Scalia, J., concurring)).  The March Opinion thus

obligations imposed on broker-dealers in that section of the Code of Federal Regulations in which the SAR regime is contained.  See March Opinion, 308 F. Supp. 3d at 797.

Alpine also makes a related argument that the FinCEN guidance on which the SEC relies was not meant to create rules of law, but rather provided a number of suggestions that broker-dealers could consider when filing SARs.  Alpine also contends that it lacked notice about its SAR obligations because some guidance documents were issued after certain transactions occurred.  Neither argument is persuasive.

First, while FinCEN guidance is informative and useful, its role in this action can be overstated.  The violations that the SEC asserts occurred here arose from Alpine's failure to comply with Section 1023.320's mandates and the SAR Form's instructions, including the requirement that it provide in its SARs' narratives a "clear, complete and chronological description [of] what is unusual, irregular or suspicious about the transaction(s)."  2002 SAR Form at 3.  These instructions have the force of law, having been issued as FinCEN regulations following a notice and comment period.[35]

Second, it has long been established that an agency's

---

provided two bases for concluding that the SEC may bring this action under Rule 17a-8.

[35] See FinCEN 2002 SAR Form Notice, 67 Fed. Reg. 50,751.

guidance documents receive deference when they reasonably
interpret an agency's ambiguous regulation.  See Nat. Res. Def.
Council v. EPA, 808 F.3d 556, 569 (2d Cir. 2015); see also March
Opinion, 308 F. Supp. 3d at 791 (concluding that Section
1023.320 is ambiguous and that FinCEN guidance is entitled to
deference).  Alpine does not argue that Section 1023.320,
including its injunction that a broker-dealer report suspicious
transactions, is unambiguous.  Indeed, that regulation is
designed to capture the breadth of ways in which a broker-dealer
could be "use[d]" to "facilitate criminal activity."  31 C.F.R.
§ 1023.320(a)(2)(iv).  Nor does Alpine argue that FinCEN
guidance unreasonably interprets either Section 1023.320 or the
SAR Form.  The FinCEN guidance cited by the SEC explains that
certain fact patterns are typical of suspicious activity and
should be reported by SAR filers.  See SAR Narrative Guidance at
4-6 (listing "[e]xamples of some common patterns of suspicious
activity" that should be included in a SAR narrative).  These
guidance documents, responding to the broad legal requirement
contained in Section 1023.320, give content to a broker-dealer's
obligation to file SARs.

Alpine also contends it is inappropriate to rely on some
guidance documents cited by the SEC because those documents were
promulgated after the SARs at issue were filed.  The principal
source of guidance cited here is the 2003 SAR Narrative

Guidance.  That document predates all of the SARs at issue.  In addition, this Opinion cites several issues of the SAR Activity Review from 2000, 2009, and 2012.  The 2012 issue is only cited, however, in conjunction with earlier guidance documents.

Alpine makes two additional arguments about its interactions with FINRA and the SEC.  Alpine first argues that it did not have notice of the SEC's theory of this case until it received the OCIE Report in 2015 and that it is accordingly unfair to hold it liable for failing to include mention of red flags in its SARs' narratives that the SEC asserts it improperly omitted.  This argument fails.  The SEC has the burden to show that Alpine's failures violated Section 1023.320.  The standards at issue here are those that have existed since the issuance of the 2002 SAR Form, which provided the mechanism by which broker-dealers comply with the requirements of Section 1023.320.  Nothing OCIE did or said in 2015 can increase the scope of that duty.[36]  In addition, Section 1023.320 uses an objective standard to measure compliance.  See March Opinion, 308 F. Supp. 3d at 799.  This standard obligated Alpine to file SARs when it had reason to suspect criminal activity.  Its ignorance of its legal obligations or its intent in failing to comply with those

---

[36] Similarly, this Opinion cites the FINRA and OCIE Reports solely to give context to arguments Alpine has made in opposition to this motion.  These Reports are not the source of any legal obligation or of any finding that Alpine violated Section 1023.320.

obligations may be relevant to an award of damages, but they are not defenses to this motion regarding its liability.

Alpine next contends that its level of compliance with Section 1023.320 increased over time, and that it has shown that it tried in good faith to comply with its SAR obligations.  It is true that approximately two-thirds of the SARs at issue in the SEC's motion predate the FINRA Report.  But even if Alpine is correct that its program improved over time, this does not immunize Alpine for its past failures to include required information in any SAR narrative, or to file a SAR when it was required to do so.  A broker-dealer's duty to maintain an AML program reasonably calculated to ensure compliance with the BSA is distinct from the duty to file a complete report of suspicious transactions.

Finally, Alpine asserts that holding it liable under the SEC's theory in this case would be extraordinary and wreak havoc with the SAR regime and the broker-dealer industry.  Not so. This Opinion holds the SEC to the well-established summary judgment standard.  The SEC is required to demonstrate that no question of fact exists regarding whether Alpine complied with Section 1023.320 for each SAR, missing SAR, or missing SAR support file on which it seeks summary judgment.  To defeat the SEC's motion, all Alpine must do is raise a question of fact. Alpine has done so in a number of instances -- both as to

individual SARs and as to entire categories of SARs.  This
Opinion denies summary judgment to the SEC wherever its
presentation is deficient, and wherever Alpine identifies a
question of fact as to the specific SAR or transaction at issue.

As described below, the SEC has shown that the failures in
Alpine's SAR-reporting regime were stark.  Tellingly, Alpine
does not contest in a large number of instances that it failed
to include information in SAR narratives that the SAR Form
itself directs a broker-dealer to include.  Given the sheer
number of lapses at issue in this case, there is no basis to
conclude that a broker-dealer that reasonably attempts to follow
the requirements of Section 1023.320 will be at risk.  And
questions about what effect this action will have on the SAR
regime are ultimately about policy, not the law a court must
apply.  This Opinion resolves the SEC's motion by applying well-
established principles of administrative law and summary
judgment.  Following those principles, the SEC's motion is
granted in part.

III. Admissibility of Summary Tables

Before addressing the various deficiencies in Alpine's
compliance with the SAR reporting regimen that are asserted by
the SEC, a threshold evidentiary issue must be resolved.
Relying on Rule 1006, Fed. R. Evid., the SEC has supported its
motion for summary judgment with ten tables that identify the

SARs or transactions as to which it is asserting each alleged
deficiency.

Rule 1006 provides that

[t]he proponent may use a summary, chart, or
calculation to prove the content of voluminous
writings, recordings, or photographs that cannot be
conveniently examined in court.  The proponent must
make the originals or duplicates available for
examination or copying, or both, by other parties at a
reasonable time and place.  And the court may order
the proponent to produce them in court.

Fed. R. Evid. 1006.  Such a summary must be "based on foundation

testimony connecting it with the underlying evidence summarized

and must be based upon and fairly represent competent [and

admissible] evidence."  Fagiola v. Nat'l Gypsum Co. AC&S, 906

F.2d 53, 57 (2d Cir. 1990) (citation omitted).  Objections that

a summary "d[oes] not fairly represent the [underlying]

documents and [is] excessively confusing and misleading go more

to [the summary's] weight than to its admissibility."  U.S. ex

rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr.

Corp., 95 F.3d 153, 163 (2d Cir. 1996) (citation omitted).

The SEC's ten tables include seven that correspond to the

seven alleged deficiencies in the SAR narratives.[37]  These seven

---

[37] The ten tables are labelled in the SEC papers as Exhibits 3
through 12.  Exhibits 3 through 9 are also labelled Tables A-1
through A-7 to Exhibit 2 in the SEC's submissions.  Tables A-1
through A-7 are referred to in this Opinion as Tables 1 through
7.  SEC Exhibits 10 through 12 are referred to as Tables 10
through 12.  Using this numbering system, this Opinion does not
refer to any Table 8 or 9.

deficiencies are the omission of (1) basic customer information, (2) "related" litigation, (3) shell company status or derogatory history of the stock, (4) stock promotion activity, (5) unverified issuers, (6) low trading volume, and (7) foreign involvement.

Each of these seven tables has six columns.  The columns list the SAR item number,[38] date filed, SAR Bates stamp, volume of shares in the transaction, value stated in the SAR narrative, and a final column with a heading describing the type of violation and a Bates stamp page number where the missing information was found in Alpine's support file for that SAR.

Table 10 is itself a summary table for Tables 1 though 7. It lists all 1,594 SARs for which the SEC contends the SAR narratives were deficient.  Table 10 contains columns identifying the SAR number,[39] the Alpine customer identified in the SAR, and the SAR Bates stamp number.  Table 10 also has seven columns corresponding to the seven types of deficient

---

[38] The item number is a number assigned to each SAR in Tables 1 through 7.  The numbering system is nonconsecutive and does not correspond to any chronological or other apparent order.

[39] The SAR number is a number assigned to each allegedly deficient SAR, consecutively from 1 to 1,594.  The number is different than the item number, and the SEC has not provided a table that matches an item number to a SAR number.  As a result, the item number and the SAR number may only be matched by comparing the Bates numbers between Table 10 and Tables 1 through 7.  As was true with the item number, the SAR number does not correspond to chronological or other apparent order.

narratives for which the SEC seeks summary judgment.  Many SARs have entries in multiple deficiency columns.  Those columns have a Bates stamp page number that gives the location in the Alpine SAR support file where information missing from the SAR narrative is found.

The two remaining tables are Tables 11 and 12.  Table 11 lists sales-and-liquidation patterns.  The SEC contends that Alpine had a duty to file SARs reflecting these sales, but did not do so.  Table 11 lists 1,242 groups of transactions, organized as follows.  The right half of the table lists a deposit date, the volume of the deposit, the value of the deposit, the date a SAR was filed reporting the deposit, and the Bates stamp number for that SAR.  The left portion of the table lists a group number, the customer name, a liquidation date, the number of shares sold, and the stock symbol.  The SEC contends that Alpine should have filed a SAR for at least each of the 1,242 groups.

Table 12 lists the SARs that the SEC alleges were filed late.  It lists the SAR number, the Bates stamp number, the date of the transaction reported, the date the SAR was filed, the number of days between the transaction and SAR, and the number of days the SAR was late.  The number of days late is calculated by subtracting 30 from the number of days between date of the transaction and the date the SAR was filed.

These tables summarize voluminous evidence that is not subject to convenient examination in court.  This evidence is organized by subject matter.  Each type of violation alleged in the case has its own separate table, and one table also allows the fact-finder to determine whether a single SAR is alleged to reflect multiple violations.  The SEC seeks summary judgment as to approximately 1,800 SARs, and moves for summary judgment as to approximately 3,500 other transactions that are listed in Alpine's transaction records.  Accordingly, the threshold for Rule 1006 -- that a summary be used to prove the content of voluminous writings -- is met.  Alpine does not suggest that it has not had access to the underlying documentation -- which came from its files -- or that the SARs and the SAR support files referenced in the tables are not admissible documents.

To the extent that the tables list information such as an item number, date of SAR filing, Bates stamp number, volume of shares in the underlying transaction, and the value stated in a SAR, these are classic examples of information that is appropriately captured in a summary table.  The SEC has merely taken a number or date from a voluminous quantity of admissible documents and placed the data in a convenient format for the fact finder.  On this basis, there can be little debate that these components of Tables 1 through 7 and 10 through 12 are admissible.

To the extent that a column in a Table identifies a particular alleged deficiency in a SAR and lists a Bates stamp page number from the SAR's support file upon which the SEC relies to show that deficiency, those columns also summarize the contents of voluminous files and are admissible to prove the contents of those files. Alpine is free to argue that there are inaccuracies in the tables -- in fact, it has raised a few such arguments as to each of the tables. Subject to specific challenges by Alpine, therefore, these tables are admissible as summaries of the contents of voluminous admissible documents -- the Alpine SARs and their support files, and Alpine transaction records.

Alpine argues that a column heading identifying the particular deficiency at issue for a SAR is an expert opinion. It is not. That column heading reflects the SEC's contention and includes as well a citation to the documents supporting that contention. This citation permitted Alpine, and permits the fact finder, to assess whether that contention is proven in the case of an individual SAR. Indeed, expert testimony would be inadmissible to prove these violations. An expert's opinion may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." United States v. Stewart, 433 F.3d 273, 311 (2d Cir. 2006) (citation omitted). A

fact finder, advised of the governing law would have to assess whether Alpine complied with the law in filing each SAR identified in a table (or violated the law in failing to file a SAR for each group of transactions for which there was no SAR filed, again as identified in a table).  For instance, advised by the court of what constitutes "related" litigation, does the SAR support file contain a description of such litigation, and was that information omitted from the SAR narrative?

Alpine also argues that Table 11 is inadmissible because the groups listed in Table 11 reflect expert conclusions unsupported by a reliable methodology.  Not so.  The group numbers are used by the SEC as a contention that each of the deposits and liquidations listed in a group form a suspicious pattern that had to be reported in a SAR.  This is a question of fact to be resolved under the governing law.  The SEC may have relied on an expert and consulting group to assist it in assembling the groups of transactions on which the SEC would focus in this action, but that task could have been done as well by an SEC attorney or an SEC paralegal.  It reflects no more than the SEC's contentions.  The fact finder, applying the controlling law, will have to examine the facts summarized in Table 11 and determine for each group whether there is an actionable pattern of suspicious trading that triggered Alpine's duty to file a SAR reporting the sales listed within a group.

An expert cannot tread on that duty, which rests on the shoulders of a fact finder.  Of course, a qualified expert could properly provide testimony generally about illicit and manipulative market activities and practices to inform a fact finder's examination of each of the listed groups, and improve its understanding of suspicious patterns, but the table by itself does not do that.

Finally, Alpine contends that the SEC has failed to carry its burden of proof by relying exclusively on the tables without also offering each of the SARs and support files to which the tables refer.  That objection is not well founded.  In connection with the partial summary judgment motion, the SEC submitted exemplar SARs and support files; Alpine chose not to do so.  The legal framework for the litigation of the SEC's claims having been described in the March Opinion, the SEC appropriately relied on Rule 1006 to present in convenient and summary form the voluminous evidence on which it relies.  Alpine has had a full opportunity to raise questions of fact in response and to submit SARs and support files where it takes issue with the SEC's assertions.  This Opinion examines that evidence, and where appropriate, denies the SEC's summary judgment motion.

IV. Deficient Narratives

The first of the four categories of claims brought by the

SEC concerns 1,593 SARs that Alpine filed.[40]  The SEC claims that
Alpine was required by law to include information in 1,593 SAR
narratives that Alpine omitted.  The omitted information is
found in the Alpine support files for each of these SARs.  These
alleged deficiencies in the SAR narratives fall into seven
categories.  Before addressing each of the claimed deficiencies,
the SEC's allegation that Alpine was required to file each of
these SARs is assessed.

    A. Mandatory Filing

    The issue of whether Alpine was in fact required by law to
file the 1,593 SARs it did file became significant during the
parties' briefing of the preliminary summary judgment motion.[41]
Here, the SEC asserts that Alpine was required by law to file
each of these SARs.  See 31 C.F.R. § 1023.320(a)(2) (describing
when a SAR must be filed).  The SEC advances a two-part test to
determine whether the duty to file a SAR was triggered in this

---

[40] The SEC initially sought summary judgment as to 1,594 SARs
with allegedly deficient narratives.  In two categories --
unverified issuers and low trading volume -- the SEC withdrew
its motion as to six and seven SARs, respectively.  Of these
thirteen affected SARs, twelve are also identified as having
other deficiencies.  One SAR (item number 511; SAR number 299),
however, does not have any other identified deficiency.
Accordingly, the SEC's motion now pertains to 1,593 SARs.

[41] The portion of the SEC's motion for partial summary judgment
addressed to the allegedly deficient SAR narratives was denied
because Alpine argued that it routinely filed "voluntary" SARs
and the SEC had failed to explain why Alpine was obliged to file
the exemplar SARs on which its motion was based.  See March
Opinion, 308 F. Supp. 3d at 799-800.

case because Alpine had reason to suspect that a transaction may involve use of a broker-dealer to facilitate criminal activity.

The SEC contends that, in the circumstances at issue here, Alpine had a duty to file a SAR where the underlying transaction involved a large deposit of LPS, and the transaction also involved either one of six red flags it has identified or the transaction was conducted by a certain customer. Each of the 1,593 SARs reported customer deposits of LPS worth at least $5,000. Many reported far larger deposits.[42] Of those 1,593 transactions, 1,465 were cleared by Alpine for just six customers, which the parties identify as customers A through F.[43] Ranking them in order of the largest number of SARs that Alpine filed for each of these customers, it filed 702 for A, 443 for E, 149 for C, 116 for F, thirty-seven for D, and eighteen for B.

Of the 1,593 SARs, the SEC contends that one or more of its identified red flags appears in the Alpine support files for 1,302 of those transactions, but is not mentioned in the SAR narrative. For the remaining SARs, the SEC relies on an alleged pattern of suspicious trading, specifically, that Alpine filed a

---

[42] For instance, of the 1,014 deposits listed in Table 1, the deposits ranged in value from $5,000 to $31,619,250, the mean value was $132,025, and the median value was $23,228.

[43] This Opinion uses the term "customer" or "client" to refer to the entity whose transaction in LPS was reported in a given SAR. The parties largely use this formulation as well, although Alpine also contends that its customer was the introducing broker.

45

large number of SARs for the same customer.

As described earlier in this Opinion, it is uncontested that the market for LPS is vulnerable to securities fraud and market manipulation schemes.  These schemes depend on the deposit of a large amount of securities with a broker-dealer so that those securities can enter the market.  Alpine does not take issue with either of these propositions.

Moreover, it is not unreasonable to infer from Alpine's very act of filing a SAR that the reported transaction had sufficient indicia of suspiciousness to mandate the creation and filing of a SAR.  None of these SARs suggests that the filing was simply a voluntary act or otherwise filed outside of Alpine's attempt to comply with its duties under the law.[44] After all, Alpine did have some version of an AML program in

---

[44] Without identifying any particular SAR, Alpine asserts that it filed numerous voluntary SARs on transactions involving more than 5 million shares or $50,000 worth of microcap securities. Alpine has not identified any means by which a regulator or a fact-finder could identify such a "voluntary" SAR.  It has not pointed to any disclosure in the 1,593 SARs that they were "voluntary" filings.  Nor has it pointed to any portion of the SAR's support file reflecting an analysis of the reporting obligation and a conclusion that the SAR was not required to be filed.  Alpine's vague and conclusory assertion is insufficient to raise a triable question of fact as to whether any SAR was filed voluntarily as opposed to pursuant to Alpine's obligation under the law to make the filing.

Moreover, more than a few of the 1,593 SARs state explicitly that Alpine thought the transaction was suspicious. For instance, the narrative portion of SAR 348 states that "Alpine is filing this SAR because of the potentially suspicious nature of depositing large volumes of shares involving a low-priced security(ies)."

place during the time it filed these SARs, even if Alpine
improved its AML program over time.  And, for reasons already
explained in the March Opinion, in the absence of an explicit
statement that a SAR was a voluntary filing, it would have been
unreasonable for anyone filing a SAR to assume that FinCEN or
the SEC would know that a filed SAR was simply a "voluntary"
filing, as opposed to one filed to comply with the law's
mandates to alert regulators to suspicious trading activity.
March Opinion, 308 F. Supp. 3d at 799 & n.20.

In addition, with one exception,[45] Alpine does not contest
that the red flags on which the SEC relies are indeed red flags
and that a broker-dealer should focus on these issues when
reviewing transactions.[46]  Accordingly, the SEC has shown that
Alpine had a duty to file each of these 1,593 SARs so long as it
also shows, as discussed below, that Alpine's support files for

---

[45] Alpine appears to contend that foreign involvement in a
transaction is only noteworthy when the foreign jurisdiction has
been designated by our government as a "high-risk" jurisdiction.

[46] Alpine's own AML procedures, which it has submitted in
connection with this motion, define a number of "Red Flags
indicating potential Money Laundering" that mirror the red flags
on which the SEC relies, such as the "customer (or a person
publicly associated with the customer) ha[ving] a questionable
background or [being] the subject of news reports indicating
possible criminal, civil, or regulatory violations," the
"practice of depositing penny stocks, liquidat[ing] them, and
wir[ing] the proceeds," and the customer "for no apparent reason
or in conjunction with other 'red flags,' engages in
transactions involving certain types of securities, such as
penny stocks."

the SARs contained information about a qualifying red flag.

Alpine makes two arguments in opposition to the SEC's assertion that it was required to file these SARs.  First, Alpine argues that there is no liability under the law for a broker-dealer's failure to file a SAR, only for failing to establish an adequate AML regime.  Not so.  While a deficient AML program may create liability, the failure to timely file a complete SAR may also create liability.  This case involves the latter type of violation.  As Section 1023.320(a)(1) states, in mandatory terms, a broker-dealer "shall file" a SAR "relevant to a possible violation of law or regulation."  Alpine's position was also expressly rejected in 2002 by the Treasury Department when it promulgated Section 1023.320.  The Treasury Department stated that "[a] regulator's review of the adequacy of a broker-dealer's anti-money laundering compliance program is not a substitute for, although it could be relevant to, an inquiry into the failure of a broker-dealer to report a particular suspicious transaction."  FinCEN Section 1023.320 Notice, 67 Fed. Reg. at 44,053.

Alpine argues as well that the "sizeable LPS transaction-plus red flag" test proposed by the SEC for deposits of LPS fails to establish the reasonable suspicion that exists in

criminal law pursuant to the Fourth Amendment.[47]  According to

Alpine, that standard imposes on the SEC the duty to point to

"specific and articulable" facts in Alpine's possession that

would have given it a basis to believe there was a reasonable

possibility that an entity or individual was involved "in a

definable criminal activity or enterprise."  (Emphasis supplied

by Alpine.)  Furthermore, it asserts that it would not be

permissible under the reasonable suspicion standard for Alpine

to rely on knowledge that the entity or person had engaged in

wrongdoing in the past, had a claim pending against it, or had

settled a claim.

Alpine does not explain why a Fourth Amendment concept

should apply to the SAR reporting framework.  Applying the

standard used to determine the legality of a temporary,

---

[47] In support of this argument, Alpine points to 28 C.F.R. part
23.  These regulations are the Department of Justice's "policy
standards" that are "applicable to all criminal intelligence
systems operating through support under the Omnibus Crime
Control and Safe Streets Act of 1968."  28 C.F.R. § 23.3.  28
C.F.R. § 23.20 allows collection of "criminal intelligence
information" about individuals "only if there is reasonable
suspicion that the individual is involved in criminal conduct or
activity and the information is relevant to that criminal
conduct or activity."  28 C.F.R. § 23.20(a).  Reasonable
suspicion "is established when information exists which
establishes sufficient facts to give a trained law enforcement
or criminal investigative agency officer, investigator, or
employee a basis to believe that there is a reasonable
possibility that an individual or organization is involved in a
definable criminal activity or enterprise."  28 C.F.R.
§ 23.20(c).  Alpine's citation to 28 C.F.R. part 23 is
inapposite.

warrantless investigative detention of a person -- particularly as Alpine defines the standard[48] -- would make little sense. Broker-dealers operate in a highly regulated industry, and both FinCEN and the SEC have broad mandates regarding broker-dealer reporting regimes for securities transactions.  The SAR reporting system was designed to allow law enforcement to monitor activity before any determination of unlawfulness is made.

By design, the SAR regime does not depend on or require a broker-dealer to make any finding of wrongdoing before it files a SAR.  Section 1023.320 makes this clear:  filing is required whenever a broker-dealer "has reason to suspect" that the transaction involves criminal activity.  When FinCEN promulgated Section 1023.320, it considered and rejected the view that it would be "overly burdensome to require a broker-dealer to report transactions that could not definitively be linked to wrongdoing."  FinCEN Section 1023.320 Notice, 67 Fed. Reg. at 44,051.  Congress, when it enacted the legislation that authorized Section 1023.320, "sought to increase the reporting of transactions that potentially involved money laundering." March Opinion, 308 F. Supp. 3d at 791 (emphasis supplied) (citing the Patriot Act, sec. 302, 115 Stat. at 296-97).

---

[48] Because it is irrelevant, this Opinion need not define the contours of the reasonable suspicion standard under the Fourth Amendment.

Section 1023.320, accordingly, "target[s] all <u>possible</u> types of illegal activity."[49]  <u>Id.</u> (emphasis supplied).

As significantly, while Part II of the SAR Form provides boxes to check to identify the "Type of suspicious activity," these are broad categories such as "Market manipulation" or simply "Securities fraud."  2002 SAR Form at 1.  The Form instructions also permit a filer to check "[m]ore than one box" and to check a box entitled "Other" with an explanation in the narrative.  2002 SAR Form at 1-2.  The Form cannot be read to impose on the filer the duty to select "a definable criminal activity" when filing the SAR, or relieve a broker-dealer of the duty to file unless it can define the criminal activity in which the subject may be engaged.

Similarly, Alpine's argument that a broker-dealer may not consider the litigation history of its customer or the issuer, or their affiliates, is flatly contradicted by the SAR Form, which requires disclosure of "related litigation."  <u>See</u> 2002 SAR Form at 3; 2012 SAR Instructions at 112.  The SEC's proposed

---

[49] This standard is somewhat analogous to the standard that governs whistleblower suits under 18 U.S.C. § 1514A, a provision of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").  A whistleblower is entitled to protection under Sarbanes-Oxley if, <u>inter alia</u>, an employee in his or her position would have reasonably believed that the conduct complained of violated federal law.  <u>See</u> <u>Nielsen v. AECOM Tech. Corp.</u>, 762 F.3d 214, 221 (2d Cir. 2014).  A whistleblower's complaint need not relate "definitively and specifically" to any one statute covered by Sarbanes-Oxley.  <u>See</u> <u>id.</u> at 220-21.

test -- which begins with the large deposit of LPS and adds other red flags -- is faithful to the language and purpose of Section 1023.320.

### B. Red Flags Omitted From SAR Narratives

As noted, the SEC contends that the SAR narratives in 1,593 SARs were legally deficient because they omitted information from the Alpine support files for the SARs that the law requires to be included in the narratives.  The SEC also contends that, with respect to these six red flags, their existence is another reason that a broker-dealer would have had reason to suspect that the transaction involved use of the broker-dealer to facilitate criminal activity, which triggered its duty to file a SAR.

In each instance, the SEC's identified red flags have been derived from the SAR Form and its instructions, as well as FinCEN and other guidance interpreting Section 1023.320.  They take into account the unique characteristics of the LPS markets such as the difficulty in obtaining objective information about issuers, the risk of abuse by undisclosed insiders, and the opportunity for market manipulation schemes.

Alpine argues that, although it was required to scrutinize these red flags, it had to do so in the context of all of the facts and circumstances surrounding the transaction and consider as well information that Alpine refers to as "green flags."

Even if Alpine was required to file a SAR, Alpine's view is that the red flag that triggered a duty to investigate and report did not necessarily need to be disclosed in the SAR's narrative.

There are several problems with this approach.  First, with the very limited exceptions described below, Alpine has not pointed to any evidence that it omitted reference to a red flag in any particular SAR's narrative because its examination of other information in that SAR's support file led it to conclude that the red flag was, after all, not indicative of suspicious trading activity.  Second, Alpine's omission of a red flag from the discussion in the narrative is also at odds with FinCEN's view, as expressed on the SAR Form itself, that a SAR filer should provide in the narrative a "clear, complete and chronological description . . . of the activity, including what is unusual, irregular or suspicious about the transaction(s)." 2002 SAR Form at 3.  The SAR Form adds that a filer should "[i]ndicate whether any information has been excluded from this report; if so, state reasons."  Id.  Finally, this contention is undermined by an examination of those SARs that Alpine did file that are in the record, that is, those the SEC submitted with its partial summary judgment motion and those Alpine has submitted in opposition to this motion.  Alpine repeatedly used template narratives that failed to include any details, positive or negative, about the transactions.  While a fulsome SAR

narrative could present a question of fact as to whether the
narrative was deficient, except in rare instances Alpine has not
shown that its SAR narratives contained sufficient information
to create a question of fact.  Each of the six red flags is now
discussed in turn.

### 1. Related Litigation

The SEC contends that 675 SARs omit a description of
"related" litigation from the SARs' narratives.  The 2002 SAR
Form directs a filer to "indicate whether there is any related
litigation, and if so, specify the name of the litigation and
the court where the action is pending" in the narrative portion
of a SAR.  2002 SAR Form at 3.  Materially similar instructions
are included in the 2012 SAR Instructions.  See 2012 SAR
Instructions at 112.

Webster's dictionary defines "related" as "having
relationship" or "connected by reason of an established or
discoverable relation."  The relevant definition of relation is
"an aspect or quality . . . that can be predicated only of two
or more things taken together," or a "connection."  The SEC is
thus entitled to summary judgment to the extent it shows that
there is no question of fact as to the (1) presence of
information about the litigation in the SAR support file, and
(2) a connection between the litigation and the reported
transaction.  That connection is established where the

litigation at issue concerns either the issuer of the securities in the transaction or the customer engaged in the transaction.

In connection with the partial summary judgment motion, the SEC proved that three SARs were deficient as a matter of law because Alpine failed to include information in the SAR narrative about related litigation.  The omitted information, which was present in Alpine's support files for the SARs, indicated that the SEC had sued one customer and its CEO for fraud in connection with asset valuations and improper allocations of expenses, that another customer had pleaded guilty to conspiracy related to counterfeiting, and that yet another customer had a history of being investigated by the SEC for misrepresentations.  See id.

In Table 2, the SEC identifies the pages from the Alpine support files that describe the related litigation which the SEC contends should have been disclosed in the SAR, but was not. Alpine does not contend that the pages listed in the table do not include descriptions of litigation or that the SARs actually did include the information.  It does argue for most of the 675 SARs, however, that it had no duty to include the missing information in the SAR narratives for one or more of the following reasons.

First, Alpine appears to argue that civil litigation with a private party is never "related" litigation, and need never be

disclosed.  To the extent it is relying on the March Opinion for
that proposition, that reliance is mistaken.[50]  While civil
litigation with a private party may be unrelated to the
securities transaction, where it is "related" it must be
disclosed.

Alpine next contends that summary judgment cannot be
granted to the SEC because Alpine was diligent about obtaining
information about its customers and others.  According to
testimony given by the AML Officer who began to work at Alpine
in 2012, Alpine only disclosed litigation in its SARs where
Alpine concluded that it was "actually . . . relevant to the
activity" reported in the SAR.  In doing so, Alpine considered
"the proximity" of "the infraction" to the transaction being
reported.

As explained above, a broker-dealer must have a reasonably
effective AML compliance program and also file SARs on all
suspicious transactions.  This action involves the latter duty,
and Alpine's efforts in 2012 and beyond to improve its AML
compliance program cannot save it from liability under Section
1023.320 and Rule 17a-8 where it did not file required SARs.

---

[50] Although the March Opinion used the phrase "criminal or
regulatory history" (which described the omitted information
from the three exemplar SARs) and the phrase "related
litigation" somewhat interchangeably, the March Opinion did not
purport to change the scope of the reporting obligation
established by the SAR Form and FinCEN guidance.  The duty to
report is not confined to criminal or regulatory litigation.

And, as previously explained, when proving a violation of Rule
17a-8, the SEC has no burden to prove that a broker-dealer acted
with scienter.  Section 1023.320 imposes an objective test:  A
SAR must be filed when the broker-dealer has "reason to suspect"
that the transaction requires a filing.  31 C.F.R.
§ 1023.320(a)(2).  Finally, Alpine has provided no testimony
regarding its analysis and decision-making process that led it
to omit from any individual SAR the information about related
litigation that appears in any particular SAR's support file.
Nor has it pointed to any recorded analysis in a support file
that reflects the decision that the information about the
litigation need not be included.  Its conclusory assertions
would not raise a question of fact even if its subjective intent
were relevant.

Finally, Alpine complains that the SEC has not described
separately for each of these 675 SARs why the omitted
information needed to be disclosed.  But, that exercise was
conducted in connection with the briefing of the partial summary
judgment motion so that the parties would have an early
understanding of the legal standards that would be applied to
the SEC claims regarding the many SARs at issue in this lawsuit.
To the extent that Alpine has raised a question of fact now as
to whether the omitted information identified by the SEC in
Table 2 for any particular SAR was in fact "related" litigation

or did not for some other reason need to be disclosed, then those assertions are addressed next.  Alpine has raised specific factual disputes regarding the omissions from each of the SARs filed by three customers and from ten other individual SARs.

### a. Three Customers

Alpine contends that the SEC's motion should be denied as to 499 SARs that Alpine filed for transactions conducted by Customers A, D, and E.  The assertions will be addressed in order of the customers for which Alpine filed the largest number of SARs.

Customer E is a capital management firm and 372 SARs in Table 2 relate to Customer E alone.  The Alpine support files indicate that on October 25, 2010 the SEC sued Customer E, its former manager, and its CEO for (a) overvaluing Customer E's largest holdings, (b) making material misrepresentations to investors, and (c) misusing investor funds.

This is related litigation.  The SEC has shown it is entitled to summary judgment with respect to its claim that Alpine was required to file SARs for every large deposit of LPS made by Customer E and that the Customer E SARs Alpine did file were deficient if they failed to disclose the ongoing SEC litigation against Customer E for securities law violations.

Alpine contends, however, that it was entitled to omit mention of the SEC lawsuit from its SARs because Alpine's office

files included a request by its affiliated introducing broker,
SCA, that Alpine make an exception to its float limit policy
despite the ongoing litigation that the SEC had filed against
Customer E.[51]  SCA principally argued in its request that
Customer E no longer managed money for outside investors and
that the SEC did not seek to limit the activities of Customer E
pending the outcome of the litigation.  Alpine argues that the
documents it received from SCA, and the fact that the SEC
litigation was not yet resolved, create a question of fact as to
whether Alpine acted reasonably in not disclosing the existence
of the SEC action in the Customer E SARs.  They do not.  The
duty to report related litigation extends not just to litigation
that has been resolved, but also to ongoing litigation.  The
2002 SAR Form directs a filer to indicate "<u>any</u> related
litigation" and to name the court "where the action is <u>pending</u>."
2002 SAR Form at 3 (emphasis supplied).  A materially similar
instruction appears in the 2012 SAR Instructions.  <u>See</u> 2012 SAR
Instructions at 112.[52]  Under the objective standard that applies
to the SEC claims in this action, Alpine had an obligation to
disclose the pending SEC action as related litigation, and no

---

[51] While Alpine relies on the SCA request in opposing this
summary judgment motion, that request was not found in the
support files for these SARs.

[52] Tellingly, Alpine's expert does not opine that the pending SEC
lawsuit against Customer E did not constitute "related"
litigation.

reasonable jury could conclude otherwise.

The next customer at issue is Customer A.  Alpine argues that SEC litigation against an affiliate of Customer A did not need to be disclosed.  While Alpine makes arguments as to each of the ninety-three SARs Alpine filed for Customer A that are listed in Table 2, its argument ultimately has significance for only eight of the SARs.[53]

Alpine failed to disclose the following in SARs it filed for Customer A.  In November of 2013, the SEC and an entity affiliated with Customer A settled an action that charged the affiliate with selling unregistered securities in improper reliance on the Rule 504 exemption.[54]  The president of Customer

---

[53] There are ninety-three SARs for Customer A listed in Table 2. Alpine argues that, as a general matter, it had no duty to disclose the existence of litigation brought by private parties, and for that reason had no duty to supplement the narrative sections for forty-eight of the ninety-three SARs.  As discussed above, litigation with private parties may be related litigation and Alpine has not presented evidence to raise a question of fact that that litigation was not related litigation.  For the remaining forty-five SARs, Alpine makes the specific objection addressed above.  For thirty-seven of those forty-five SARs, however, Table 2 refers to pages in the SAR supporting files that describe at least one additional related legal action not disclosed in the SARs.  Accordingly, Alpine's objection has significance for only eight of the ninety-three SARs for Customer A.

[54] Rule 504 refers to 17 C.F.R. § 230.504.  This regulation exempts certain public offerings of securities of up to $5 million in a 12-month period from registration under the Securities Act of 1933, 15 U.S.C. § 77a, et seq.  See 17 C.F.R. § 230.504.  The SEC, however, "retain[s] authority under the antifraud provisions of the federal securities laws to pursue

A was also the president of the affiliate.  As a matter of law, this is related litigation and Alpine had a duty to file SARs to report Customer A's large deposits of LPS and to disclose its affiliate's litigation with the SEC in those SARs.

Alpine does not contend that the SEC action against the affiliate was not "related" litigation.  Instead, it relies again on a memorandum sent to it by its affiliated introducing broker, SCA, which requested an exception to Alpine's float limit policy in connection with Customer A, to excuse the nondisclosure.  The memorandum argued that the issues concerning Rule 504 are "subtle" and that Customer A itself no longer invested in such transactions.  This memorandum, which was not in the support files for the SARs but in Alpine's office files, is not sufficient to create a question of material fact as to whether the SEC action against Customer A's affiliate, which was also controlled by Customer A's own president, was related to the transaction being reported and had to be disclosed.  Summary judgment is accordingly granted as to Customer A's SARs listed in Table 2.

---

enforcement action against issuers and other persons involved in [Rule 504] offerings."  SEC, Exemptions to Facilitate Intrastate and Regional Securities Offerings, 81 Fed. Reg. 83,494, 83,530 (Nov. 21, 2016).  In one significant revision to Rule 504 in 1999, for instance, the SEC noted a rise in fraudulent schemes "involv[ing] the securities of microcap companies" issued under Rule 504.  SEC, Revision of Rule 504 of Regulation D, The "Seed Capital" Exemption, 64 Fed. Reg. 11,090, 11,091 (Mar. 8, 1999).

The third customer for which Alpine attempts to raise a
question of fact is Customer D, as to whom Alpine filed thirty-
four SARs included in Table 2.  Alpine's SAR support files
included information that Customer D's president and others had
engaged in a mortgage fraud scheme in 2010.  Alpine has
submitted a 2011 press report which describes the scheme as
follows:  Customer D's president convinced unsophisticated
buyers to purchase property at inflated prices, falsified loan
documents, and fraudulently secured loans that all ended in
default, costing the government millions of dollars.  The
president of Customer D owned the entity engaged in the mortgage
fraud scheme, and along with his co-defendants was required to
pay damages and penalties to the government.

Alpine contends that there are questions of fact as to
whether it had to include information about the settlement in
the SARs because Customer D's president had committed the fraud
in connection with another entity that he owned, and the
settlement had been reached in 2011, while the SARs were filed
between three and four years later.[55]  These arguments do not
raise a question of material fact about the duty to include the
omitted information in the SARs.  The settlement was not so
distant in time that the highly pertinent information about a

---

[55] While Alpine indicates that the settlement was reached in
2010, the press report on which it relies indicates the
settlement was reached at the end of 2011.

fraudulent scheme in which Customer D's president participated
had become irrelevant when these transactions occurred.

b. Ten SARs

Finally, Alpine argues that it had no duty to include
certain litigation information in the narrative section of ten
of the SARs listed on Table 2.  These are SARs 515, 612, 701,
703, 748, 859, 904, 1222, 1970, and 1971.[56]  The SEC has not
responded to the specific arguments that Alpine has made
regarding these ten SARs except to say that private litigation
and civil litigation can be related litigation.  But, both the
SEC and Alpine have discussed the general principles that
underlie Alpine's arguments regarding several of these SARs.
For the following reasons, summary judgment is granted to the
SEC as to SARs 701, 1970, and 1971, and denied as to the
remaining SARs to the extent the SEC relies on the omission of
related litigation listed in Table 2.

Table 2 identifies the omission from SAR 701 as the failure
to include information about third-party litigation.  The
support files for SAR 701 reveal that a director of the issuer
had been sued for securities fraud.  Alpine argues that it has
no duty to disclose this information because the litigation is

_____

[56] These are the item numbers assigned to the SARs in Tables 1
through 7.  Except where otherwise indicated, this Opinion uses
item numbers to identify SARs and not the SAR numbers provided
in Table 10.

neither a regulatory nor criminal action.  As noted above, it is wrong.  Nothing in the 2002 SAR Form or the 2012 SAR Instructions limits the disclosure of related litigation to regulatory actions filed by the SEC or criminal actions filed by a prosecutor's office.  So long as there is a connection between the litigation and the reported transaction, there is a duty to disclose the litigation.  No reasonable jury could find that a pending lawsuit for securities fraud against an issuer's director was not connected to the deposit of a large quantity of that issuer's LPS.

The support files for SARs 1970 and 1971 each state that Alpine's customer is the subject of an ongoing SEC Action, and that the CEO and CFO of the issuer have been "listed in civil suit alleging securities fraud for misrepresentation."  The narrative for SAR 1970 reports the SEC action against the customer but omits mention of the civil suit against the CEO and the CFO of the issuer.  The narrative for SAR 1971 reports an SEC "investigation" of the customer and again omits mention of the securities fraud action against the CEO and CFO of the issuer.  The securities fraud action against two officers of the issuer was litigation related to the large deposit of the issuer's LPS, and as a matter of law Alpine had a duty to disclose it in these SARs' narratives.

Table 2 identifies the omission from SARs 515 and 703 as

the failure to identify an ongoing SEC action for accounting violations against an officer of the issuer who is identified in Table 2 as a person with the middle initial W.[57]  The first and last names of the individual are not unusual.  This description of the officer comes directly from material contained in the Alpine support files.  At least two other entries in those same support files, however, indicate that the officer's name bears the middle initial H., not W.  Since there is a question of fact as to whether Alpine's support files misidentified the issuer's officer, summary judgment is denied.[58]

SAR 748 was filed in 2015 and reports that Alpine's customer had been named in an SEC complaint and charged with fraud.  It omits, however, the fact that the CEO of the issuer had been charged with a kickback scheme in 2001, which is fourteen years earlier.  Given the passage of time, a question of fact exists as to whether the 2001 litigation was sufficiently related to the 2014 transaction to require Alpine to include it in the SAR.

Table 2 indicates that SAR 859 did not disclose information

---

[57] This same problem appears to arise with respect to SAR 612, but the version of Table 2 submitted to the Court does not include the complete notice of deficiency.  Therefore, summary judgment is denied as to SAR 612.

[58] In opposition to the motion for summary judgment, Alpine has offered search results appearing in other SARs' support files which appear to indicate that the SEC action was brought against the person with the middle initial W.

about a broker.  According to SAR 859's support file, an "unrelated" broker was "in litigation for investing client's money" in the issuer without disclosing risks associated with LPS.  Without more information about how the litigation relates to the transaction reported in the SAR, summary judgment is denied.

Lastly, Table 2 indicates that SARs 904 and 1222, which reported transactions that occurred in 2011 and 2012, omitted information from their support files regarding the CEO of the issuer -- the same individual in both SARs.  That CEO had disgorged almost $75,000 in settlement of a 1994 SEC action for violating Section 57(a)(1) of the Investment Company Act of 1940 through sales than occurred in 1988.[59]  Given the passage of time between the events described in the support files and the transactions in the SARs, summary judgment is denied.

### c. Summary

The SEC is entitled to summary judgment as to 668 SARs in Table A-2.  As to those SARs, the SEC has shown both that Alpine was required to file those SARs, and that the filed SARs were deficient due to the omission of information contained in the Alpine support files that is identified in Table 2.  Alpine has

---

[59] Section 57(a)(1) of the Investment Company Act of 1940, 15 U.S.C. § 80a-56(a)(1), prohibits the sale of certain securities to a business development company by persons closely affiliated with the business development company.

identified a question of material fact as to the following seven SARs, as to which the SEC's motion is denied:  SARs 515, 612, 703, 748, 859, 904, and 1222.

### 2. Shell Companies or Derogatory History of Stock

The SEC claims that 241 SARs listed in Table 3 were deficient for failing to disclose derogatory information regarding the history of a stock, including that the issuer was a shell company or formerly a shell company.  Other types of derogatory information include such things as the issuer's frequent name changes and trading suspensions.

The SAR Form requires a filer to provide "a clear, complete and chronological description" of the suspicious activity, "including what is unusual, irregular or suspicious about the transaction(s)."  2002 SAR Form at 3.  FinCEN has identified the "inability to obtain . . . information necessary to identify originators or beneficiaries of wire transfers" as an example of suspicious activity that should be disclosed in a SAR.  FinCEN Shell Company Guidance at 3-5.  FinCEN guidance also explains that a company being a "suspected shell entit[y]" is one of several "common patterns of suspicious activity."  SAR Narrative Guidance at 5.  Although "most shell companies are formed by individuals and businesses for legitimate purposes," FinCEN counsels that "a SAR narrative should use the term 'shell' as appropriate."  FinCEN Shell Company Guidance at 5.  For these

reasons, the March Opinion concluded that "[a]ny complete description [in a SAR narrative] of the facts responsive to the Five Essential Elements" should include "the presence of a shell company" in a transaction.  308 F. Supp. 3d at 802.

In its preliminary motion for summary judgment, the SEC identified three SARs as exemplars of this type of deficiency. One SAR omitted that the issuer of the deposited stock was a shell company.  Another omitted that the issuer had been a shell company within the last year.[60]  A final omitted information that the issuer was not current in its SEC filings, that no company website was found for the issuer, and that the over-the-counter market's website for the issuer marked its stock with a stop sign.  Id.  All of the omitted information was found in the Alpine support files for those SARs.  Id.

In opposition to this portion of the SEC's motion, Alpine has submitted its own table, which lists information in the support file for SARs which, Alpine contends, rebuts the SEC's claim that it had a duty to include the omitted derogatory information identified by the SEC in Table 3.  Alpine's table and its arguments in opposition to this portion of the SEC's motion fall into three broad categories.

Alpine first contends that the March Opinion did not hold

---

[60] The SAR's support file included a handwritten notation "within last year" in response to the question "Is the issuer, or was it ever, a shell company?" on its "Deposited Securities Checklist."

that Alpine had a duty to disclose in its SARs that the <u>issuer</u>, as opposed to the customer, was a shell.  Alpine is wrong. Indeed, in each of the three instances described in the March Opinion, Alpine's SARs were deficient because Alpine failed to disclose derogatory information about the issuer.  <u>Id.</u>  The SEC now seeks to apply that ruling to transactions in which over $5,000 worth of LPS were deposited with Alpine.  The SEC has carried its burden to show both that Alpine was required to file SARs for such transactions in which there was derogatory information about the customer or issuer, and that the filed SARs were deficient for failing to disclose that either is a shell company.[61]  As already discussed, use of shell companies is a hallmark of certain market manipulation schemes.  Alpine was required to disclose large deposits of LPS issued by shells.

Alpine next argues that the SEC has failed to carry its burden of showing that Alpine must always disclose that an issuer was once a shell corporation.[62]  Alpine is correct.  In support of this motion, the SEC has not offered any argument or expert testimony addressed to the significance of an issuer's

---

[61] Alpine appears to argue as well that it did not need to disclose that an issuer was a shell when the support file confirmed that the issuer had filed Form 10-Qs or 10-Ks.  Those filings did not relieve Alpine of the duty in transactions of the nature at issue here to disclose that the issuer is a shell.

[62] Alpine calculates that the SEC has identified 103 SARs as deficient for failing to disclose that the issuer was once a shell company.

former status as a shell company, or attempted to explain for how long or in what circumstances such former shell status remains relevant to the SAR reporting regime.[63]  Therefore, summary judgment is granted as to the SARs in Table 3 where the issuer was a shell company when the transaction occurred or had been a shell company within one year preceding the transaction.

The third and final category of omitted negative information concerning issuers that Alpine contests includes frequent name changes by an issuer, trading being suspended on an issuer's security, the issuer having a "caveat emptor" designation, the issuer having sold unregistered shares, and the issuer having been delisted.  Table 3 apparently includes 113 SARs in which derogatory information of this kind was omitted. These types of derogatory information may indicate that the issuer is engaging in unlawful distributions of securities or is attempting to evade requirements of the securities laws. Neither Alpine nor its expert suggest otherwise.[64]  Accordingly,

---

[63] While the preliminary summary judgment motion included as an exemplar a SAR in which Alpine omitted to disclose that the issuer had been a shell company within the year preceding the transaction, the SEC has given no indication that the many SARs which it lists as deficient for their failure to disclose that the issuer was a "former" shell or "possibly former" shell were similarly cabined in time.

[64] Alpine does complain that the SEC has highlighted instances of "frequent name changes" by an issuer without referring to any law, regulations, or guidance about the relevance of name changes to securities law violations.  The SEC has relied on

Alpine had a duty to file SARs for the deposits of over $5,000 worth of LPS for such issuers, and to include the derogatory information in the 113 SARs identified by the SEC in Table 3.

Instead of disputing the significance of this derogatory information, Alpine opposes summary judgment on these 113 SARs by arguing that the support files included information showing that the issuers were "current" in their SEC filings of Forms 10-K and 10-Q and had freely tradable securities under SEC Rule 144.[65]  This additional information does not create a question of fact as to whether Alpine was required to file these SARs and include the derogatory information identified by the SEC in these SARs' narratives.  An issuer's compliance with Rule 144 or its SEC reporting duties did not relieve Alpine of the duty to comply with its SAR reporting obligations.

### 3. Stock Promotion

The SEC claims that the narratives in the fifty-five SARs listed in Table 4 were deficient for failing to include

---

this Court's description of the relevant law in the March Opinion, and that description is sufficient to encompass this type of derogatory information, which would have given Alpine "reason to suspect" that the transaction involved use of the broker-dealer to facilitate criminal activity.  308 F. Supp. 3d at 801-02.

[65] Rule 144, 17 C.F.R. § 230.144, provides a safe harbor for certain sales of restricted securities.  See generally SEC v. Kern, 425 F.3d 143, 148 (2d Cir. 2005).  Rule 144 is an interpretation of Section 4(a)(1) of the Securities Act of 1933. See id.

information that there was a history of stock promotion in connection with the LPS being deposited with Alpine.  The unreported stock promotion activity occurred between one week and eighteen months before the SAR was filed.  The fifty-five SARs reported deposits ranging from 500,000 to 800 million shares of LPS.  The SEC has shown that Alpine was required to file those SARs that reported a substantial deposit of LPS where the stock promotion occurred within six months of the deposit and to include information about the stock promotion activity in the SAR narrative.  Summary judgment is therefore granted on forty-one of the fifty-five SARs.

The SAR Form's instructions explain that the SAR narrative must "[p]rovide a clear, complete and chronological description . . . of the activity, including what is unusual, irregular or suspicious about the transaction(s)."  2002 SAR Form at 3. According to FinCEN, a common scenario of suspicious trading activity is a substantial deposit of a low-priced and thinly traded security, followed by the systematic sale of that LPS shortly after the deposit.  SAR Activity Review, Issue 15, at 24; March Opinion, 308 F. Supp. 3d at 792.  The systematic sale of shares is typically accompanied by systematic promotion of the stock.  Indeed, promotion of an issuer's stock is a classic indicator that a low-priced stock's price is being manipulated as part of a pump-and-dump scheme.  See March Opinion, 308 F.

Supp. 3d at 803 (citing <u>Fezzani v. Bear, Stearns & Co.</u>, 716
F.3d 18, 21 (2d Cir. 2013)).  In administrative proceedings, the
SEC has found an entity's AML program inadequate where it did
not file SARs for transactions where an issuer was "the subject
of promotional campaigns at the time of the customer's trading."
<u>In re Albert Fried & Co.</u>, SEC Release No. 77971, 2016 WL
3072175, at *5 (June 1, 2016).

In its preliminary summary judgment motion, the SEC
identified three Alpine SARs that described sizable deposits of
LPS, but included only a barebones narrative in the SARs.  The
SARs failed to disclose information regarding stock promotion
contained in the Alpine SAR support files that had occurred
between two weeks to two months before the reported transaction,
including information found in Google search results,
screenshots of websites, and news articles.  March Opinion, 308
F. Supp. 3d at 803.  Alpine acknowledged in connection with that
motion practice that evidence of stock promotion activity is
relevant if connected to a pump-and-dump scheme.  <u>Id</u>.

In opposition to this current motion, Alpine does not
dispute that it had a duty to include in its SAR narratives
information in its possession about stock promotion activities
when it was reporting a sizeable deposit of a LPS.  It argues,
however, that it was only required to disclose stock promotion

activities when the stock promotion was "ongoing."[66]

Neither the SEC nor Alpine has directly addressed when a history of stock promotion is stale for SAR reporting purposes. The one month cut-off which Alpine proposes in opposition to this motion is clearly too short a period.  Pump-and-dump schemes can last months or even years, and promotion campaigns can occur in several cycles over that period.  See, e.g., Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 63-64 (2d Cir. 2012) (describing "cycles of fraudulent trading of securities" over "approximately three years" with different phases including stock promotion, misrepresentations to investors, and fraudulent transactions through Cayman Island hedge funds and investment manager); SEC v. Cavanagh, 445 F.3d 105, 108-09 (2d Cir. 2006) (promotional campaign beginning in December 1997, with manipulated trading extending to March

---

[66] Alpine also objects to the March Opinion's reliance on the SEC's 2016 decision in In re Albert Fried & Co., SEC Release No. 77971, 2016 WL 3072175, at *5 (June 1, 2016), for the proposition that stock promotion can constitute suspicious activity.  It argues that the Fried decision was issued after the events at issue here.  Alpine's objection is not well founded.  Stock promotion has been recognized as a hallmark of pump-and-dump schemes involving LPS since at least the 1990s. See, e.g., SEC Charges 41 People in 13 Actions Involving More than $25 Million in Microcap Fraud, SEC News Release 98-92, 1998 WL 779347 (Sept. 24, 1998) (manipulation of stock price of microcap companies).  The dissemination of false information to promote a stock has been a component of securities fraud for much longer, of course.  See, e.g., Berko v. SEC, 316 F.2d 137, 139 (2d Cir. 1963) (Marshall, J.) (describing distribution through mails of "deceptive and misleading" "brochures" to promote securities).

1998); United States v. Salmonese, 352 F.3d 608, 612-13 (2d Cir.
2003) (pump-and-dump schemes involving, inter alia, bribing
brokers to sell securities at inflated prices over seven month
period).  Alpine's search results indicating promotional
activity within at least the six months preceding the deposit
could focus law enforcement attention on ongoing schemes and
allow law enforcement to connect the recent promotional activity
with stock manipulation.

In light of the legal authority cited above, the SEC will
be granted summary judgment for those SARs, which account for
roughly forty-one of the fifty-five, in which the SAR support
files had evidence of stock promotion activity occurring within
six months of the large-scale deposit of the LPS with Alpine.
While a fact finder must determine the outer limit, stock
promotion activity that occurs within six months of these
deposits constituted, as a matter of law, a red flag requiring
disclosure in the SAR.

Despite arguing that it had no duty to report stock
promotion activity unless it had occurred within one month of
the deposit reported in its SARs, Alpine did not disclose that
near contemporaneous activity in over a dozen of its SARs.[67]  It

---

[67] An examination of the pages in the support files cited by the
parties indicates that Alpine filed about fifteen SARs without
reporting that stock promotion activities had occurred within
roughly a month of the sizable deposit of LPS with Alpine.

asserts that it used a second screening test to do so.  It
contends that it chose to omit mention of the stock promotion so
long as it uncovered "no connection" between that activity and
the customer who deposited the shares.  As an example, Alpine's
support file for SAR 9 -- a SAR that reported a deposit of LPS
worth $9,497 -- indicates that a generically named LLC (the
"Promoter") had been compensated for a promotion of the issuer's
stock by another generically named entity, and that the
Promoter's website had been registered by yet another
generically named LLC.  The support file also indicates that,
because Alpine did not have evidence that the Promoter was
"connected" to Alpine's customer, it determined that it need not
refer to the stock promotion activity in the SAR.

     As discussed above, a broker-dealer has a duty to file a
SAR when it has reason to suspect that the transaction may
involve use of the broker-dealer to violate the law, and to
include in the SAR a "clear" and "complete" description of
activity that is "unusual, irregular, or suspicious" about the
transaction.  See 2002 SAR Form at 3.  Alpine's lack of
information about the ownership and control of generically named
LLCs involved in promotion of the LPS did not relieve it of the
duty to report the stock promotion activity.  After all, the SAR
Form instructions also require filers to "[i]ndicate whether any
information has been excluded from this report; if so, state

reasons."  Id.

> 4. Unverified Issuers

The SEC claims that thirty-six SARs listed in Table 5 were deficient for failing to disclose in their narratives the problems with the issuers described in the Alpine support files for the SARs, even though millions of shares of that issuer's LPS were deposited with Alpine.[68]  The SEC contends that Alpine improperly omitted that the issuer had an expired business license, a nonfunctioning website, or no current SEC filings. Summary judgment is granted to the SEC on all thirty-six SARs.

The SAR Form requires filers to provide a "clear" and "complete" description of what is "unusual, irregular or suspicious about the transaction(s)."  2002 SAR Form at 3. FinCEN has explained that suspicious activity "common[ly]" includes transactions involving "parties and businesses that do not meet the standards of routinely initiated due diligence and anti-money laundering oversight programs (e.g., unregistered/unlicensed businesses)."  SAR Narrative Guidance at 5.

The SEC's preliminary motion for summary judgment identified three SARs in which Alpine reported deposits of

---

[68] Table 5 lists forty-two SARs.  In its reply papers, the SEC withdrew its motion as to six of these SARs.  The SEC continues to assert, however, that those six SARs are deficient for reasons other than those listed in Table 5.

millions of shares of LPS.  The SARs failed to disclose that Alpine was either unable to locate a company website for the issuer or that the issuer's corporate registration was in default.  The March Opinion concluded that a SAR reporting a deposit of an enormous quantity of LPS without also disclosing such problems with the issuer was deficient as a matter of law. 308 F. Supp. 3d at 804.

Alpine contends that it only needed to report that the issuer's website was not functioning, that its business registration was in default, or that it had no current SEC filings if Alpine could not confirm that the issuer was an "active and functioning" entity.  Alpine asserts that it was able to confirm that each of the issuers for these SARs was an "active" company based on an examination of the issuer's SEC filings, documentation that its stock was "free trading" for the purposes of SEC Rule 144, or indications that the issuer was not a shell company.

Each SAR must, of course, be examined individually.  When that is done, Alpine's defense evaporates.  But, there is a larger point that is relevant here.  If a SAR must be filed for a transaction, then the information casting doubt on the legitimacy of the issuer must be included in the SAR.  And that is so even when other information also exists that suggests the issuer may be a functioning business.  The duty of the filer is

not to weigh and balance the competing inferences to be drawn
from the negative and the more reassuring pieces of information,
but to disclose "as much information as is known to" the filer
about the subjects of the filing.  SAR Activity Review, Issue
22, at 39.  The SAR Form advises filers to "[i]ndicate whether
any information has been excluded from this report; if so, state
reasons."  2002 SAR Form at 3.

The SEC has carried its burden of showing that Alpine had a
duty to file each of these thirty-six SARs.  Each of these SARs
reflects the deposit of between 110,000 and 164 million shares
of LPS,[69] and Alpine's files contained information casting doubt
on the legitimacy of or the regularity in the business of the
issuer of the deposited LPS.

In filing the required SARs, Alpine had a duty to disclose
that the issuer's business license was expired, its website was
nonfunctioning, or there were irregularities in its SEC filings.
Such information is part of the "Five Essential Elements" of a
transaction.  The fact that the issuer's shares may be tradable
under a different SEC regulation does not change the scope of
the SAR reporting obligation.

---

[69] The mean number of shares was 28,892,783, and the median was
14,200,000.  The value of the transactions ranged from $5,710 to
$112,200, with a mean of $18,285 and a median of $10,764.

### 5. Low Trading Volume

The SEC claims that 700 SARs[70] listed on Table 6 were deficient for failing to disclose the comparatively low trading volume in the LPS that these SARs reported were being deposited with Alpine.  In the 700 SARs, the number of deposited shares was substantial, often amounting to millions of shares, and it represented at least three times the average daily trading volume of the stock, measured over the three months preceding the deposit.  For the following reasons, summary judgment is granted to the SEC as to the SARs where the ratio between the shares deposited in a single transaction was at least twenty times the average daily trading volume over the three-month period prior to the deposit.[71]

The SAR Form requires a filer to "[d]escribe conduct that raised suspicion," and to do so with a "clear, complete and chronological" description of the suspicious activity.  2002 SAR Form at 3.  One type of transaction that may be suspicious is a "[s]ubstantial deposit, transfer or journal of very low-priced

---

[70] Table 6 lists 707 SARs.  In its reply papers, the SEC withdrew seven of these SARs from its motion, reducing the total from 707 to 700.  Because six of these seven SARs are also alleged to be deficient in other ways, the number of SARs subject to this part of the SEC's motion for summary judgment is reduced from 1,594 to 1,593.

[71] Twenty times reflects roughly one month's trading volume, calculated on the basis of four weeks of five trading days per week.

and thinly traded securities." SAR Activity Review, Issue 15,
at 24.  The March Opinion held that when such a deposit has been
made the SAR must report each of three elements:  "the
substantial deposit of a security, the low price of the
security, and the low trading volume in the security."  308 F.
Supp. 3d at 804.  The March Opinion granted summary judgment to
the SEC as to three SARs where the reported deposits were for
share amounts that ranged from fifty to 600 times the average
daily trading volume of the LPS.[72]  Id. at 805.

In response to the instant motion, Alpine first argues that
low trading volume is not a red flag because it is a "hallmark
of microcap stocks."  That argument misses the point.  Low
trading volume need not be disclosed in a vacuum.  But, if there
is a deposit of LPS that is substantial in comparison with the
average volume of trading in that LPS, then there is a duty to
report both the size of the deposit and the relatively thin
trading volume.

Alpine next questions why comparatively thin trading volume
must be reported when the differential between the volume of
shares in a transaction and the average trading volume is only
300%, as opposed to some other figure.  The SEC has not provided

---

[72] The March Opinion listed the figures for the deposits and
average trading volume correctly in the summary of the SARs, but
incorrectly referred later in that Opinion to one ratio as ten.
Compare 308 F. Supp. 3d at 786-87 (correctly stating figures)
with id. at 805 (giving incorrect deposit and ratio for SAR M).

expert testimony or any other basis to conclude that a ratio of
three is the appropriate demarcation for reporting the
transaction and the trading volume in LPS.  The SEC relied on
three exemplars in connection with the preliminary summary
judgment motion, and their ratios were fifty, 100 and 600.[73]
Those ratios are extraordinary and do not provide a basis to
conclude that the SAR reporting requirements are only triggered
by such extreme ratios.  But, given the undeveloped evidentiary
record, a trial will be necessary to determine the precise ratio
that triggers the duty to include the average trading volume.
It is safe to find, however, that a failure to report the
average trading volume when the substantial deposit exceeds a
month's worth of the average daily trading in the LPS will
always be a violation of the SAR reporting obligations.
Therefore, the summary judgment motion is granted to the extent
that Alpine failed to include in its SAR narratives the trading
volume for a substantial deposit of LPS when the deposit was
greater than twenty times the average daily trading volume,
measured over the three months prior to the deposit.  When such
a ratio is present, Alpine had a duty to file the SAR and to
report the average trading volume as well.

---

[73] Alpine did not argue in opposition to that motion, and does
not argue now that those ratios, or even the ratio of ten
reported in the March Opinion, were too low to trigger SAR
reporting requirements.

Finally, Alpine argues that it had no obligation to add
information about trading volumes to its SARs because such
information is already available to law enforcement.  This
argument is meritless.  Other categories of information, such as
related litigation, are publicly available but must be included
in the SAR.  The purpose of a SAR is to provide law enforcement
with timely and "complete" access to information that permits
them to understand what is suspicious about the reported
activity.  2002 SAR Form at 3.  Nothing in the SAR reporting
regime provides the exception which Alpine suggests for
information available to the government through other means.
See March Opinion, 308 F. Supp. 3d at 789-94.

### 6. Foreign Involvement

The SEC moves for summary judgment as to 289 SARs where a
foreign entity or individual was involved in the transaction
reported by Alpine in its SAR, but Alpine did not disclose that
foreign involvement in the SAR narrative.  For the following
reasons, the SEC is granted summary judgment as to these 289
SARs.

The 2002 SAR Form directs filers to "[i]ndicate" in the SAR
narrative "whether U.S. or foreign currency and/or U.S. or
foreign negotiable instrument(s) were involved.  If foreign,
provide the amount, name of currency, and country of origin,"
and to include in the narrative "foreign bank(s) account

number(s)," and "passport(s), visa(s), and/or identification
card(s)" belonging to an involved "foreign national."  2002 SAR
Form at 3.  The 2012 SAR Instructions direct filers to include
essentially the same information in the SAR narrative.  See 2012
SAR Instructions at 111-12.  Both sets of instructions also
state that filers should "identify" in the narrative "the
country, sources, and destinations of funds" if funds have been
"transfer[red] to or from a foreign country."  In addition, SAR
guidance issued by FinCEN directs a filer to "[s]pecify" in the
SAR narrative

> if the suspected activity or transaction(s) involve a
> foreign jurisdiction.  If so, provide the name of the
> foreign jurisdiction, financial institution, address
> and any account numbers involved in, or affiliated
> with the suspected activity or transaction(s).

SAR Narrative Guidance at 4.

In its preliminary motion for summary judgment, the SEC
submitted three SARs in which Alpine reported enormous deposits
of LPS.  One SAR listed a foreign address for the customer but
omitted from the SAR narrative information about foreign
correspondent accounts that were involved in the underlying
transaction.  Another SAR provided a foreign address for the
customer in the subject information boxes of the SAR, but
omitted in the narrative any reference to the foreign nature of
the transaction, much less that the country in question has been
identified as a jurisdiction of primary concern for money

laundering activity.  The last SAR did not disclose any foreign involvement with the transaction, omitting that the deposited shares were purchased by the customer through a transfer of funds to a foreign bank account.  The March Opinion held that, regardless of whether a SAR filer has disclosed a foreign entity in other parts of the SAR, "a broker-dealer is required by law to include information constituting the Five Essential Elements and foreign connections to the transaction in the narrative section of any SAR that the filer is required to file."  308 F. Supp. 3d at 806.

Alpine was required to file each of the 289 SARs.  Each reported a substantial deposit of LPS and had a foreign connection to the transaction.  As summarized above, the SAR Form instructions required Alpine to include information in the SAR narrative that described the foreign connections to the transaction.

Alpine first argues that it need only include information in the SAR narrative about foreign involvement in the transaction where the foreign jurisdiction is a "high-risk" jurisdiction.  This argument may be swiftly rejected.  Neither the SAR Form instructions nor FinCEN guidance creates a distinction between high-risk and other foreign jurisdictions.[74]

---

[74] If the involvement of a high-risk jurisdiction in a transaction were the only factor triggering the filing of a SAR,

Alpine next argues that its inclusion of foreign addresses in other parts of the SAR form obviated the need to disclose a foreign connection to the transaction in the SAR narrative. Not so. See id. The SAR Forms contain specific instructions that apply to the narrative portion of a SAR. Those instructions specifically require the disclosure in the narrative of foreign connections to the transaction being reported.

Finally, Alpine argues that in three of the 289 SARs it adequately disclosed the foreign connection to the transaction in the SAR narratives because it disclosed that its customer had acquired the shares from a resident of Belize. In none of these SARs did Alpine indicate in the narrative, however, that Alpine's customer was itself a foreign entity. The narratives are accordingly deficient, and the SEC is entitled to summary judgment as to these three SARs as well.

### 7. Five Essential Elements

Finally, the SEC seeks summary judgment as to approximately 295 SARs listed on Table 1 filed by Alpine in connection with large deposits of LPS made by three customers.[75] It is

---

then of course, the involvement of that kind of foreign jurisdiction may be of importance. Such a distinction between foreign jurisdictions is not relevant here, however, given the unusual nature of the transactions, i.e., the substantial deposit of LPS.

[75] The SEC asserts that 1,105 SARs listed on Table 1 were deficient because they omitted from their narratives the

undisputed that these SARs omitted the basic customer
information in the SAR narrative which FinCEN refers to as the
Five Essential Elements.  Alpine contends that it had no duty to
file these SARs, and therefore, the deficiencies in their filed
SARs do not violate the SAR regulations.

Each of these SARs reported a large deposit of a LPS.  In
addition, each relates to a deposit by one of three Alpine
customers: Customers A, C and E.  As described above, Customers
A and E had significant "related" litigation.  For Customer A,
there was a settled SEC action with an affiliate of Customer A,
whose president was also the president of Customer A.  For
Customer E, there was an ongoing SEC action against Customer E,
its CEO, and its former manager.

The SEC has carried its burden of showing that a reasonable
broker-dealer would have had reason to suspect that substantial
deposits of LPS by Customers A and E involved use of the broker-
dealer to facilitate criminal activity.  The SEC has shown,
therefore, that Alpine had a duty to file the SARs it filed for
these transactions by Customers A and E and that it is entitled

---

information known as the Five Essential Elements.  Because
Alpine does not dispute that assertion, all that is in dispute
in this part of the motion is whether Alpine had a legal duty to
file each of these SARs.  For all but approximately 295 of these
1,105 SARs, the SEC relies on the identified the six red flags
discussed above to support its argument that it has shown that
the SARs were required filings.  Accordingly, this section of
this Opinion is necessary for at least the remaining 295 SARs.

to summary judgment as to those SARs.

The SEC further contends that the twenty-two SARs filed for large LPS deposits by Customer C were required filings.[76]  If the SAR narrative reported that Alpine was filing the SAR "because of the potentially suspicious nature of depositing large volumes of shares involving a low-priced security" there cannot be a credible argument that the Alpine SARs were "voluntary" SARs. If there are SARs, however, that do not include such notice, or its equivalent, then there is a question of fact as to whether Alpine was required to file these SARs.

In arguing that Alpine was required to file these SARs, the SEC does not appear to be relying on any evidence that either Customer C or the issuer of the LPS reported in the SAR was the subject of "related" litigation or derogatory information. Instead, it appears to rely on the fact that Customer C frequently conducted other transactions in which the issuers of the securities had had significant regulatory or criminal actions brought against them.  The SEC has not explained why Customer C's transactions in LPS issued by questionable issuers would give a broker-dealer a reason to suspect that all of Customer C's LPS transactions involved questionable issuers.

---

[76] 149 of the 1,593 SARs that are listed in Table 10 were filed by Alpine for transactions conducted by Customer C.  The SEC has alleged a separate narrative deficiency as to all but twenty-two, however.

There is accordingly a question of fact as to whether Alpine was required to file SARs for Customer C where the only information missing from the narrative is the Five Essential Elements and the narrative does not include a statement that Alpine considered the transaction suspicious.

## V. Deposit-and-Liquidation Patterns

In its second category of claims, the SEC seeks summary judgment as to 3,568 sales of LPS listed in Table 11.  In each instance, Alpine filed a SAR reflecting a large deposit of a LPS but did not file a SAR reflecting the sales that followed those deposits.  The SEC contends that, when a SAR is filed on a large deposit of LPS, a broker-dealer is obligated to file new or continuing SARs when the shares are sold within a short period of time.  In Table 11, the SEC has identified 1,242 deposit-and-liquidation groups, which together include 3,568 individual sales of shares, each sale being worth $5,000 or more.  For the following reasons, the SEC's motion is granted as to 1,218 groups where Alpine failed to file a SAR reporting a customer's sales after the customer had made a substantial deposit of LPS in a thinly traded market.[77]

---

[77] Alpine challenges as arbitrary the inclusion of twenty-four groups (groups 639, 860, 861, 862, 885, 886, 887, 888, 890, 904, 906, 959, 962, 996, 1195, 1196, 1203, 1228, 1229, 1230, 1231, 1232, 1241, and 1242) among the 1,242 groups identified by the SEC.  The SEC has not responded to that challenge.  Therefore, this Opinion is addressed to the remaining 1,218 groups.

Section 1023.320 requires reporting of a suspicious transaction "if the transaction or a pattern of transactions of which the transaction is a part meets certain criteria."  31 C.F.R. § 1023.320(a)(2) (emphasis supplied).  FinCEN guidance explains that the "[s]ubstantial deposit . . . of very low-priced and thinly traded securities," followed by the "[s]ystematic sale of those low-priced securities shortly after being deposited" is suspicious and subject to reporting under Section 1023.320.  SAR Activity Review, Issue 15, at 24 (footnote omitted).  Such patterns, in FinCEN's view, present "red flags for the sale of unregistered securities, and possibly even fraud and market manipulation."  Id.

In its preliminary summary judgment motion, the SEC provided evidence that one customer deposited over twelve million shares of a LPS in February 2012, and then sold in twelve transactions ten million shares in February and March of 2012.  That pattern repeated itself in April through August 2012, with the customer depositing a very large number of shares in the same LPS and within weeks selling a large proportion of those shares in a series of smaller transactions.  Alpine had timely filed SARs of the deposits, but not for the sales.  The SEC also provided evidence that two other customers had each deposited a large number of physical certificates of a LPS, and then sold an almost equal amount of shares in that LPS in a

series of small transactions over the weeks immediately
following the deposits.  The March Opinion granted summary
judgment to the SEC, conditioned on it establishing that its
charts of the trading activity were accurate.  See 308 F. Supp.
3d at 808-09.

Alpine first argues that not every liquidation following a
deposit is suspicious, and therefore it was not required to file
SARs for liquidations just because it filed a SAR to report the
deposit.  If the liquidations followed the deposit of a large
number of shares of LPS, then the precedent recited above
forecloses this argument.  This pattern of transactions is a
hallmark of market manipulation.

Alpine next argues that the filing of SARs for every such
liquidation would flood regulators with thousands of additional
SARs and be unworkable.  But, as the SEC points out, multiple
transactions may be reported in a single SAR.  In fact, Alpine
reported multiple transactions in some of the SARs it submitted
in its opposition to this motion.  Both the 2002 SAR Form and
2012 SAR Instructions allow filers to describe multiple
transactions; they direct filers to describe suspicious
activities and transactions.[78]  Moreover, SAR reports are

---

[78] See, e.g., 2002 SAR Form at 3 (describing the narrative as the
"[e]xplanation/description of suspicious activity(ies)" and
directing filers to disclose "what is unusual, irregular or
suspicious about the transaction(s)"); 2012 SAR Instructions at

generally only due to be filed within thirty days of the transaction.  See 31 C.F.R. § 1023.320(b)(3).  Thus, all the sales occurring within a thirty-day period could be reported together with the deposit.  The SEC estimates that roughly 40% of the unreported liquidations occurred before Alpine had even filed a SAR for the deposit.[79]  Many of the liquidations reflected in Table 11 are packed tightly together, occurring several times in a single day, multiple times in a single week, and many times in a single month.

Alpine next argues that its AML review of the deposits confirmed that the shares were freely tradable, and that was all that the law required.  It explains that, since its business model treated each deposit as if the deposited LPS would be sold shortly thereafter, its careful review of the need to file a SAR for the deposit fulfilled all of its obligations under the law.[80] Filing a SAR for a suspicious deposit of LPS did not relieve

---

111-12 (directing filers to, inter alia, "[d]escribe the conduct or transaction(s) that caused suspicion" in the SAR narrative).

[79] Alpine does not present an alternative calculation for this phenomenon, but complains that the SEC has failed to explain, among other things, whether the 40% figure includes sales that occurred the same day as the deposit and includes as well every sale tethered to a deposit so long as at least one of those sales occurred before the SAR was filed.

[80] Alpine adds that it filed SARs as well for certain patterns of market manipulation, such as matched trading and wash trading. These SARs are not the subject of the SEC's lawsuit against Alpine.

Alpine of the duty to file SARs for other suspicious transactions, including potentially the sale of the deposited shares.  Moreover, as already explained, the duty to maintain an AML program does not excuse compliance with the separate duty to file SARs for suspicious transactions.  See Section 1023.320 Notice, 67 Fed. Reg. at 44,053.  Alpine violated Section 1023.320 if it failed to file a SAR when it was required to do so.

Alpine next contends that, if this portion of the SEC's motion is granted, that should result in a finding that Alpine violated its SAR reporting obligations at most 1,242 times, and not 3,568 times.[81]  The former figure reflects the number of deposit and sale groups the SEC has identified in Table 11; the latter represents the number of sales.  For the following reasons, this Opinion assumes that the maximum number of violations is, as adjusted to remove certain groups to which Alpine has made a specific objection, 1,218.

The duty that Alpine is alleged to have violated is the duty to file a SAR.  Those missing SARs would have reported

---

[81] Alpine also argues that the correct number should fall to a few hundred because all deposits and sales by a customer in a single issuer's securities should be grouped together, instead of creating a separate group for the liquidations that followed deposits closely in time.  That argument is rejected.  The pattern at issue that was suspicious and that Alpine failed to report was the liquidation in multiple transactions of a large deposit that had been reported in a SAR filed by Alpine, not all sales of a particular LPS.

patterns of suspicious trading.  The text of Section 1023.320

states that "[a] transaction requires reporting" if it is

conducted through a broker-dealer and the broker dealer "has

reason to suspect that the transaction (or a pattern of

transactions of which the transaction is a part)" involves

illegal activity.  31 C.F.R. § 1023.320(a)(2).  The Section

1023.320 Notice explains FinCEN's view that

> [t]he language in the rule requiring the reporting of
> patterns of transactions is not intended to impose an
> additional reporting burden on broker-dealers.
> Rather, it is intended to recognize the fact that a
> transaction may not always appear suspicious standing
> alone.

Section 1023.320 Notice, 67 Fed. Reg. at 44,051.  Alpine

therefore had a duty to file SARs that reported each sale that

was part of a suspicious pattern.[82]  The SEC has carried its

burden of showing that Alpine violated the law by failing to

file such SARs.  Because Alpine failed to file any such SARs, as

opposed to filing incomplete SARs that reported some but not all

of the sales in a pattern, resolution of how many SARs Alpine

should have filed would require a fact intensive examination of

the patterns of sales that followed deposits.  At a minimum, the

SEC has shown that Alpine failed to file at least 1,218 SARs to

---

[82] Alpine also had the option of filing continuing SARs, an
option provided on the SAR forms that the parties do not
discuss.  See SAR Activity Review, Issue 1, at 27; FinCEN, SAR
Activity Review:  Trends, Tips & Issues, Issue 21 (May 2012), at
53, https://www.fincen.gov/sites/default/files/shared/sar_tti_
21.pdf; 2012 SAR Form at 1.

report the suspicious pattern of sales following the large deposits of LPS.

Finally, Alpine objects to eleven groups identified in Table 11 on the ground that the sales occurred too long after the deposit to require Alpine to file a SAR.[83]  The SEC's motion is granted as to seven of these eleven groups; Alpine has raised a question of fact as to groups 1207, 1225, 1236, and 1237.  A description of two of the seven groups is sufficient to explain why Alpine has failed to raise a material question of fact as to its duty to file a SAR to report the pattern of trading in the seven groups.

Group 1221 begins with a deposit of 8- million[84] shares of a LPS, with a value of $1- million, in early February 2012.  In early March 2012, Alpine filed a SAR reporting the deposit.  Six weeks after the deposit and two weeks after the SAR was filed, Alpine's customer began to sell shares.[85]  All told, the customer sold 7- million shares, or 87% of the initial deposit, in six

---

[83] These are groups 4, 1207, 1220, 1221, 1224, 1225, 1226, 1227, 1233, 1236, and 1237.

[84] "8- million" indicates an amount between 80 million and 89,999,999.  These less than precise numbers are used in this Opinion, as they were in the March Opinion, to accommodate the secrecy of the SAR reporting regime.

[85] On four consecutive days, Alpine's customer made sales in amounts of 1- million shares, 7 million shares, 5 million shares, and 1- million shares.  Five days later, the customer sold 1- million shares.  One week later, the customer sold 1- million shares.

transactions over fifteen days.

Group 1233 consists of one deposit of 1- million shares valued at $1- million in mid-November 2012.  Alpine filed a SAR the next day.  Nineteen days later, the customer began the selloff.[86]  Over a three-month period, Alpine's customer sold 7 million shares in nineteen separate transactions, 78% of the deposit.

VI. Late-Filed SARs

The SEC moves for summary judgment as to 251 SARs identified in Table 12 that were filed long after the transactions they reported, often more than six months later. Section 1023.320 directs that "a SAR shall be filed no later than 30 calendar days after the date of the initial detection by the reporting broker-dealer of facts that may constitute a basis for filing a SAR under this section."  31 C.F.R. § 1023.320(b)(3).  Summary judgment is denied due to the SEC's

---

[86] The first sale was of 5- thousand shares.  One month after the first sale, the customer sold 2-- thousand shares.  The next day, the customer sold 2-- thousand shares and 9- thousand shares in two separate transactions.  The next week, the customer made five sales in three days, of 2-- thousand shares, 9- thousand shares, 3-- thousand shares, 1-- thousand shares, and 1-- thousand shares.  The following week, the customer made four sales in two days, of 5-- thousand shares, 2-- thousand shares, 4-- thousand shares, and 2-- thousand shares.  Two weeks thereafter, the customer made three sales in three days, in amounts of 5-- thousand, 5-- thousand, and 1 million shares. The following week, the customer made two sales of 6 thousand and 1 million shares.  Three weeks later, the customer made one sale of 1 million shares.

failure to show that Alpine had an obligation to file these SARs.  <u>See</u> March Opinion, 308 F. Supp. 3d at 800.

To establish Alpine's duty to file each of these SARs, the SEC relies on the fact that Alpine filed the SARs to comply with an order from FINRA to do so.  This is not sufficient to establish for purposes of this lawsuit that Alpine had an independent duty to file the SARs.[87]

VII. Failure to Maintain Support Files

The final portion of the SEC's motion is directed to Alpine's failure to maintain support files for 496 of its SARs. The motion is granted.

A broker-dealer is required to maintain support files for its SARs.  Section 1023.320(d) provides as follows:

> Retention of Records.  <u>A broker-dealer shall maintain</u> a copy of any SAR filed and <u>the original or business record equivalent of any supporting documentation for a period of five years from the date of filing the SAR.</u>  Supporting documentation shall be identified as such and maintained by the broker-dealer, and shall be deemed to have been filed with the SAR.  <u>A broker-dealer shall make all supporting documentation available to</u> FinCEN or any Federal, State, or local law enforcement agency, or <u>any Federal regulatory authority that examines the broker-dealer</u> for compliance with the Bank Secrecy Act, upon request; or to any SRO that examines the broker-dealer for compliance with the requirements of this section, upon the request of the Securities and Exchange Commission.

---

[87] Thirty-four of the SARs reported transactions worth less than $5,000.  Generally, there is no duty to file SARs for transactions in an amount less than $5,000.  <u>See</u> 31 C.F.R. § 1023.320(a)(2) (requiring reporting if a transaction "involves or aggregates funds or other assets of at least $5,000").

31 C.F.R. § 1023.320(d) (emphasis supplied).  Section 1023.320

> is cast in mandatory terms and requires two acts:  the
> maintenance of records for five years after a SAR is
> filed, and the production of such records at the
> request of a federal regulatory agency such as the
> SEC.  A failure to either maintain or produce a SAR's
> supporting documents . . . violates Section 1023.320
> and, as a result, violates Rule 17a-8 as well.

March Opinion, 308 F. Supp. 3d at 811-12 (citation omitted).

The SEC's evidence of Alpine's failure to maintain files rests on the efforts the SEC made in 2015 and 2016 to collect the Alpine support files for SARs under investigation.  In 2016, Alpine produced some of the files that the SEC subpoenaed, but no support files for the 496 SARs that are the subject of this motion.  The SEC provided Alpine with a list of SARs for which it could not locate any support files in the Alpine document productions.  Alpine's counsel represented during a November 2016 telephone call that some support documents "simply don't exist."  Despite additional requests during the discovery period for Alpine to supplement its document production and produce the missing files, Alpine has not produced the missing files.

In opposition to this motion, Alpine has not provided evidence that it ever provided the SEC with the support files for these 496 SARs.  Instead, Alpine makes two meritless arguments.  First, it seeks a Rule 56(d) deposition of the SEC affiant who has described the search through the Alpine document

productions in a fruitless effort to locate the missing support
files.  If Alpine maintained the missing files, then all it
needs to do to defeat this prong of the SEC's motion is to
produce them now,[88] or identify by Bates number the copies it
produced to the SEC in 2016.  It has done neither.  A deposition
of the person who conducted the SEC search is unnecessary.[89]  See
Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir.
1994).

Second, Alpine argues that a failure to maintain files is
not a violation of Rule 17a-8, which is the Rule upon which the
SEC's action is predicated.  Alpine argues that the SEC's
recourse, if any, was to sue for a violation of 17 C.F.R.
§ 240.17a-4(j) ("Rule 17a-4").[90]  Rule 17a-8, however, requires a

---

[88] If Alpine produced the missing files now, then the SEC may
have a different application regarding the untimely production,
but this portion of the summary judgment motion regarding the
failure to maintain the files would likely have been mooted.

[89] The request for the deposition is also untimely.  At the time
the Court issued the March Opinion on the preliminary summary
judgment motion, the Court gave Alpine an opportunity to request
this very deposition after it had completed its review of the
March Opinion.  Following that review, Alpine made other
discovery requests, but did not renew its earlier request to
depose this affiant.

[90] Rule 17a-4(j) provides that broker-dealers must
     furnish promptly to a representative of the [SEC]
     legible, true, complete, and current copies of those
     records of the [broker-dealer] that are required to be
     preserved under this section, or any other records of
     the member, broker or dealer subject to examination
     under section 17(b) of the [Exchange] Act.

broker-dealer to comply with "the reporting, recordkeeping and record retention requirements of chapter X of title 31 of the Code of Federal Regulations," the chapter containing Section 1023.320.  17 C.F.R. § 240.17a-8.  Section 1023.320(d), which is quoted above, is titled "Retention of Records".  31 C.F.R. § 1023.320(d).  Accordingly, the SEC has shown that Alpine violated the record-retention provision of Section 1023.320 by showing that Alpine was unable to "make [496 SAR support files] available to" the SEC in 2016.  Id.  This constitutes a violation of Rule 17a-8.

## Conclusion

The SEC's July 13, 2018 motion for summary judgment is granted in part.  The SEC has shown as a matter of law that Alpine violated Rule 17a-8 repeatedly by filing required SARs with deficient narratives, failing to file SARs for groups of suspicious liquidation transactions, and failing to maintain and produce SAR support files.

Dated:    New York, New York
          December 11, 2018

                              _____
                              DENISE COTE
                         United States District Judge

---

17 C.F.R. § 240.17a-4(j).