ZACHARY T. CARLYLE
carlylez@sec.gov
TERRY R. MILLER
millerte@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | **17-cv-4179-DLC** |
| Plaintiff, | |
| - against - | **ECF CASE** |
| ALPINE SECURITIES CORPORATION, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF THE SEC'S MOTION FOR REMEDIES

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT .........................................................................................................2

    A.    The High Volume of Violations and Alpine's Refusal to Acknowledge
them Render Future Violations Likely Absent Injunctive Relief ..........................2

        i.    Alpine's systematic misconduct resulted in thousands of
violations and shows that future violations are likely................................3

        ii.    Alpine at least recklessly disregarded its legal obligations
related to SARs. ....................................................................................4

        iii.    Alpine continues to assert that its misconduct was "blameless." ...............7

        iv.    Alpine's role as a clearing-broker for microcap securities
presents countless opportunities for future violations. ...............................7

    B.    The Facts and Circumstances Here Warrant a Per-Violation Penalty of
$10,000 for the Deficient SAR and Failure to Report Violations, and
$1,000 for the Document Retention Violations. ....................................................8

        i.    Analysis of the penalty factors demonstrates that substantial
civil penalties against Alpine are warranted. ................................................9

        ii.    The Court should order a civil penalty of $10,000 for
each of the Deficient SAR and Failure to Report Violations,
and $1,000 for each of the Document Retention Violations......................11

i

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps">Cases</span>

*Otis & Co. v. SEC*, 106 F.2d 579, 584 (6th Cir. 1939) ................................................12

*SEC v. Alpine Sec. Corp.*, 308 F. Supp. 3d 775 (S.D.N.Y. 2018) ("*Alpine I*") ...........4, 5, 7, 10, 11

*SEC v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396
      (S.D.N.Y. 2018) ("*Alpine II*")........................................1, 3, 4, 5, 6, 7, 8, 10, 12

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998). .......................................................2, 3

*SEC v. Cavanagh,* No. 98 Civ. 1818 (DLC), 2004 WL 1594818
      (S.D.N.Y. July 16, 2004) ...............................................................3, 7, 9

*SEC v. Cope*, No. 14 Civ. 7575 (DLC), 2018 WL 3628899 (S.D.N.Y. Jul. 30, 2018) ................11

*SEC v. Colonial Inv. Mgmt., LLC*, 381 F. App'x 27 (2d Cir. 2010)................................12

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) .....................................3, 4

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) ...........................................................8

*SEC v. Kane*, No. 97 Civ. 2931 (CBM), 2003 WL 1741293 (S.D.N.Y. Apr. 1, 2003) ................11

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).................................................................9

*SEC v. Lazare Indus., Inc.*, 294 F. App'x 711 (3d Cir. 2008) .......................................12

*SEC v. Lorin*, 76 F.3d 458 (2d Cir. 1996).............................................................3, 7

*SEC v. Lybrand*, 281 F. Supp. 2d 726 (S.D.N.Y. 2003) ...........................................9, 10

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972).....................................2

*SEC v. McNulty,* 137 F.3d 732 (2d Cir. 1998) ...........................................................7

*SEC v. Mgmt. Dynamics Inc.,* 515 F.2d 801 (2d Cir.1975) .............................................3

*SEC v. Milan Capital Group, Inc.,* No. 00 Civ. 0108 (DLC)
      2001 WL 921169 (S.D.N.Y. Aug. 14, 2001)...................................................11

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013)............................12

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013).....................................................8, 12

*United States v. Carson*, 52 F.3d 1173 (2d Cir. 1995).................................................3

S<small>TATUTES</small>

15 U.S.C. § 78u(d) ............................................................................................2

15 U.S.C. § 78u(d)(3) ....................................................................................8, 12

15 § U.S.C. 78u(d)(3)(B) ...................................................................................9


17 C.F.R. § 201.1004; Table IV to Subpart E of Part 201 ...............................9

17 C.F.R. § 201.1005; Table V to Subpart E of Part 201 ................................9


O<small>THER</small>


Debt Collection Improvement Act of 1996  .....................................................8

Exchange Act Release No. 34-59449, Feb. 25, 2009 (effective March 3, 2009) ...........................9

Exchange Act Release No. 34-68994, Feb. 27, 2013 (effective March 5, 2013) ...........................9

Penny Stock Reform Act of 1990, § 502(4)) .........................................1, 8, 10

USA Patriot Act of 2001, Pub. L. No. 107-56, 115 Stat. 272.......................11



Order Accepting Offer of Settlement,
*In the Matter of FINRA Department of Enforcement v.*
*Scottsdale Capital Advisors Corp. and Justine Hurry*,
Disciplinary No. 2008011593301, (Nov. 14, 2011) ......................................6

Plaintiff United States Securities and Exchange Commission ("SEC") submits this memorandum of law in support of its application for injunctive and monetary relief against Alpine Securities Corporation ("Alpine") based on the violations of Section 17(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 17a-8 thereunder as to which the Court has found Alpine liable on summary judgment.

## INTRODUCTION

The Court found Alpine liable on summary judgment for 2,720 violations for its many failures to report suspicious activity. *SEC v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396, 422-45 (S.D.N.Y. 2018) ("*Alpine II*"); Order, Doc. No. 195; Section B.ii., *infra*. The violations occurred over a course of years and related to transactions well-known for "[u]nscrupulous market practices" and "an overwhelming amount of fraud and abuse." *Alpine II*, 354 F. Supp. 3d at 406 (*citing* Penny Stock Reform Act of 1990 § 502(4)). The sheer volume of violations cannot be explained by neglect or mistake.

While the SEC is not required to demonstrate reckless conduct to support the relief requested, the evidence submitted in this case and the Court's orders all show that these many violations resulted from Alpine's stubborn and deliberate refusal to fully report the suspicious activity that Alpine knew was flowing through its firm. Faced with a high volume of suspicious transactions presented by its introducing broker—a firm under common ownership that had itself been the subject of a FINRA enforcement action involving failure to file SARs and deficient SAR filings—Alpine disregarded clear SAR rules and filing instructions and approached its SAR obligations with impunity. Alpine claims to have thought that broker-dealers' SAR obligations are never triggered unless the broker-dealer believes they are triggered. Alpine claims that it

1

*never* believed its SAR obligations were triggered so, according to Alpine, every SAR decision it made was "voluntary." As a result: (1) Alpine filed thousands of SARs that failed to describe suspicious activity ("Deficient SAR Violations"); (2) Alpine failed to report suspicious liquidations of low-priced securities that closely followed suspicious deposits ("Failure to Report Violations"); and (3) Alpine refused to comply with document retention requirements ("Document Retention Violations").

The SEC has elected to forgo trial on the hundreds of remaining claims for additional violations and now seeks (1) a permanent injunction against further violations of Section 17(a) and Rule 17a-8; and (2) civil penalties in the amount of $10,000 for each Deficient SAR Violation and Failure to Report Violation and $1,000 for each Document Retention Violation, for a penalty amount of $22,736,000.

## ARGUMENT

### A.  The High Volume of Violations and Alpine's Refusal to Acknowledge them Render Future Violations Likely Absent Injunctive Relief.

"Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws." *SEC v. Cavanagh,* 155 F.3d 129, 135 (2d Cir. 1998); Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. "The critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972). To determine the likelihood of future violations, courts generally consider the following factors:

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that

> his past conduct was blameless; and whether, because of his
> professional occupation, defendant might be in a position where
> future violations could be anticipated.

*SEC v. Cavanagh,* No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *28 (S.D.N.Y. July 16, 2004)

*(quoting SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (citation omitted)). While no single

factor is determinative, a permanent injunction is particularly appropriate where a violation is

"founded on systematic wrongdoing, rather than an isolated occurrence" and where "persistent

refusals to admit any wrongdoing ma[k]e it rather dubious that [the offenders] are likely to avoid

such violations of the securities laws in the future in the absence of an injunction." *SEC v. First*

*Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997) (*quoting*

*United States v. Carson*, 52 F.3d 1173, 1184 (2d Cir. 1995)) and *SEC v. Lorin*, 76 F.3d 458, 461

(2d Cir. 1996) (internal quotation marks omitted)). Here, all these factors weigh strongly in favor

of a permanent injunction that prohibits Alpine from violating Section 17(a) of the Exchange Act

and Rule 17a-8 thereunder.

   i.   **Alpine's systematic misconduct resulted in thousands of violations
        and shows that future violations are likely.**

First, the Court has found Alpine liable not for an "isolated" violation, but for thousands

of separate violations of Section 17(a) and Rule 17a-8 that were "stark" and occurred over the

course of years. *See, e.g.*, *Alpine II*, 354 F. Supp. 3d at 418-419. These many past violations are

"highly suggestive of the likelihood of future violations...." *SEC v. Cavanagh,* No. 98 Civ. 1818

(DLC), 2004 WL 1594818, at *28 (S.D.N.Y. July 16, 2004) (quotation omitted); *id.* ("[P]ast

violations may in certain circumstances justify an inference that a defendant is likely to violate

the law in the future if not enjoined."); *see also SEC v. Mgmt. Dynamics Inc.,* 515 F.2d 801, 807

(2d Cir.1975) (a permanent injunction may be appropriate despite "defendant's disclaimer of an

intent to violate the law in the future, or even cessation of the illegal acts"). A permanent injunction is particularly warranted where, as here, the violations involve "systematic wrongdoing rather than an isolated occurrence." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997). Alpine's thousands of past violations show its propensity to violate the securities laws and strongly suggest that Alpine is likely to commit violations in the future in the absence of a permanent injunction.

    ii.    **Alpine at least recklessly disregarded its legal obligations related to SARs.**

    While scienter is not an element of violations of Section 17(a) of the Exchange Act and Rule 17a-8, *Alpine II*, 354 F. Supp. 3d at 427, the record shows that Alpine acted at least recklessly. Alpine has never claimed, nor could it, that its high volume of violations resulted from inadvertent filings or administrative or mechanical error. Instead, all of Alpine's SAR decisions were deliberate.

    Alpine claims that its failures resulted from its purported view that, under the SAR filing rules, a SAR was not mandatory so long as Alpine deemed it "voluntary." *Alpine II*, 354 F. Supp. 3d at 418; *SEC v. Alpine Sec. Corp.*, 308 F. Supp. 3d 775, 799 (S.D.N.Y. 2018) ("*Alpine I*"). This excuse has never been credible. Under Alpine's stated view, a broker-dealer could file anything it wanted or nothing at all so long as it believed it was not required to file a SAR and regardless of whether the broker-dealer had a reason to suspect transaction were suspicious. In other words, Alpine had no obligation unless it believed it had an obligation. *See also* Doc. No. 158, Alpine Memorandum in Opposition to Motion for Summary Judgment at 12 ("Because those SARs were filed on deposits that Alpine did not consider reportable under the BSA, those

SARs were voluntary."). This purported view of what the law requires is so at odds with the text of SAR filing rules and common sense that Alpine could not have held that view in good faith.

For instance, the plain language of Section 1023.320 and basic common sense flatly defeat the notion that a broker-dealer's obligations are triggered only when the broker-dealer says so. As the Court has stated multiple times, the plain language in Section 1023.320 imposes SAR filing obligations when a broker-dealer "has reason to suspect" a transaction is suspicious in addition to instances where the broker-dealer actually knows or suspects a transaction is suspicious. *Alpine I*, 308 F. Supp. 3d at 799; *Alpine II*, 354 F. Supp. 3d at 418. Alpine's stated theory makes no room for this clear language.

Alpine's claim that it actually held this view of what the SAR-filing rules required also finds no credible evidentiary support in Alpine's records. Pressed numerous times on this matter in the course of this action, Alpine presented no credible evidence that it actually believed, in good faith, that Alpine had an obligation to file SARs only if it agreed that it did:

> Alpine has not identified any means by which a regulator or a fact-finder could identify such a "voluntary" SAR. It has not pointed to any disclosure in the 1,593 SARs that they were "voluntary" filings. Nor has it pointed to any portion of the SAR's support file reflecting an analysis of the reporting obligation and a conclusion that the SAR was not required to be filed. Alpine's vague and conclusory assertion is insufficient to raise a triable question of fact as to whether any SAR was filed voluntarily as opposed to pursuant to Alpine's obligation under the law to make the filing.

*Alpine II*, 354 F. Supp. 3d at 423 n.44. Thus, during a nearly four-period in which Alpine cleared thousands of transactions in a market known for abuse and fraud, Alpine's incredible excuse that it believed **none** of these transactions triggered a mandatory SAR has no contemporaneous transaction-specific support. Accordingly, a good faith mistake of what the law required did not

cause Alpine's many violations. Instead, Alpine's deliberate, wrong, and reckless view of what the law required made a mockery of a regulatory scheme designed to aid law enforcement's efforts to protect the American public and the integrity of the international financial system.

Alpine's frequent excuse that its program improved after receipt of notice from regulators should also be rejected. Actual good faith compliance does not wait until regulatory detection of patently obvious failures. Further, Alpine continued to file high volumes of deficient SARs even after it received the September 28, 2012, FINRA Report that informed it that FINRA had determined that 823 SARs that Alpine filed during the period of March 7, 2011 through January 22, 2012 were "substantively inadequate as they failed to fully describe why the activity was suspicious." *Alpine II*, 354 F. Supp. 3d at 408-409.[1] These facts, and "the sheer number of lapses at issue in this case" show that Alpine did not "reasonably attempt[] to follow the requirements of Section 1023.320" and instead acted with reckless disregard of its legal obligations under Section 17(a) and Rule 17a-8. *See id.* at 419. And, of course, the notion that Alpine's program improved cannot explain away the 1,214 violations for a failure to file SARs on suspicious patterns of deposits and liquidations because Alpine deliberately set up an AML program that did not monitor sales that followed deposits throughout the relevant time period. *Id.* at 441-442

---

[1] Moreover, prior to receipt of the FINRA Report, Alpine's affiliate Scottsdale Capital Advisors, which shares common ownership with Alpine, *id.* at 405, was the subject of a FINRA enforcement action in November 2011 alleging, among other things, violations based on Scottsdale's failure to file SARs and omission of material information from SARs similar to Alpine's violations that are the subject of this enforcement action. *See* Order Accepting Offer of Settlement, *In the Matter of FINRA Department of Enforcement v. Scottsdale Capital Advisors Corp. and Justine Hurry*, Disciplinary No. 2008011593301, (Nov. 14, 2011) at 11-12, 21-22 (available at http://www.finra.org/sites/default/files/fda_documents/2008011593301_FDA_TX93804.pdf).

("Alpine … argues that its AML review of the deposits confirmed that the shares were freely tradable, and that was all that the law required" with respect to sales).

### iii.   Alpine continues to assert that its misconduct was "blameless."

In addition to Alpine's incredible argument that it did not understand basic SAR filing requirements, Alpine tries to shift responsibility for its compliance to its introducing broker and regulators such as the SEC's Office of Compliance Inspections and Examinations and FINRA, and appears to assert that many of its violations should be excused because these regulators did not discover them sooner. *Alpine II*, 354 F. Supp. 3d at 418-19; *Alpine I*, 308 F. Supp. 3d at 799. "[T]he court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive relief is advisable." *Lorin*, 76 F.3d at 461; *see also SEC v. McNulty,* 137 F.3d 732, 741 (2d Cir. 1998) (affirming injunction based in part on defendant's efforts to "shift responsibility to others" and "persistent denial" of any wrongdoing). Alpine's attempts to shift responsibility for its conduct to others and "persistent refusals to admit any wrongdoing ma[k]e it rather dubious that" Alpine is "likely to avoid such violations of the securities laws in the future in the absence of an injunction." *Lorin*, 76 F.3d at 461 (internal quotation marks omitted).

### iv.   Alpine's role as a clearing-broker for microcap securities presents countless opportunities for future violations.

Finally, a permanent injunction against Alpine also is warranted because Alpine is "in a position where future violations could be anticipated." *SEC v. Cavanagh,* No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *28 (quotation omitted). Alpine is a registered broker-dealer that provides clearing services for microcap securities traded in the over-the-counter market, *Alpine I*, 308 F. Supp. 3d at 781, and "[u]nscrupulous market practices and participants have pervaded the

'penny stock' market with an overwhelming amount of fraud and abuse." *Alpine II*, 354 F. Supp. 3d at 406 (*citing* Penny Stock Reform Act of 1990, § 502(4)). Each suspicious transaction cleared by Alpine presents a risk that it will commit an additional violation of Section 17(a) and Rule 17a-8. A permanent injunction against further violations of these provisions is necessary to restrain Alpine's future violations.

### B.   The Facts and Circumstances Here Warrant a Per-Violation Penalty of $10,000 for the Deficient SAR and Failure to Report Violations, and $1,000 for the Document Retention Violations.

Section 21(d)(3) of the Exchange Act authorizes the Court to order civil monetary penalties for Alpine's violations of the federal securities laws. *See* 15 U.S.C. § 78u(d)(3). Civil monetary penalties are authorized by the Exchange Act "for both deterrent and punitive purposes." *SEC v. Frohling*, 851 F.3d 132, (2d Cir. 2016) (*citing SEC v. Razmilovic*, 738 F.3d 14, 38–39 (2d Cir. 2013)). The Exchange Act provides that the amount of the civil penalty is to be determined "in light of the facts and circumstances" and establishes three tiers of potential penalties. *See* 15 U.S.C. § 78u(d)(3). Under the Exchange Act,

> a first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons,"

*SEC v. Razmilovic*, 738 F.3d at 38.

The Court is authorized to impose a penalty that does not exceed <u>the greater of</u> the defendant's "pecuniary gain" from the violation, or the applicable penalty amount based on the tier of each violation. *See* 15 U.S.C. § 78u(d)(3). For example, for first-tier penalties, Section 21(d)(3), as modified for inflation by the Debt Collection Improvement Act of 1996 and

corresponding SEC regulations, provides that for violations occurring after March 3, 2009, but before March 5, 2013, the penalty for an entity (*i.e.*, a person other than a "natural person") shall not exceed the greater of $75,000 per violation or the gross amount of pecuniary gain. The maximum penalty amount per violation increases to $375,000 per violation for second-tier penalties and to $775,000 for third-tier penalties. *See* Section 21(d)(3)(B) of the Exchange Act [15 § U.S.C. 78u(d)(3)(B)]; Exchange Act Release No. 34-59449, Feb. 25, 2009 (effective March 3, 2009); 17 C.F.R. § 201.1004; Table IV to Subpart E of Part 201 (adjustment of civil penalty amounts for inflation).[2] Beyond these restrictions, "[d]istrict courts have discretion in determining the appropriate amount of any penalty" imposed under the Exchange Act. *SEC v. Lybrand*, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).

> **i.  Analysis of the penalty factors demonstrates that substantial civil penalties against Alpine are warranted.**

In determining the appropriate amount of a civil penalty, courts typically consider factors similar to those discussed above with respect to injunctions, including: (1) the egregiousness of the violations; (2) a defendant's scienter; (3) the repeated nature of the violations; (4) a defendant's failure to admit wrongdoing; (5) whether a defendant's conduct created substantial losses or the risk of substantial losses to others; (6) a defendant's lack of cooperation with authorities; and (7) whether the penalty that would otherwise be appropriate should be reduced due to a defendant's demonstrated current and future financial condition. *See SEC v.*

---

[2] For violations that occurred after March 5, 2013, but before November 3, 2015, the maximum amount of penalties per violation for a non-natural person (such as Alpine) was $80,000, $400,000, and $775,000 for first, second, and third tier violations, respectively. Exchange Act Release No. 34-68994, Feb. 27, 2013 (effective March 5, 2013); 17 C.F.R. § 201.1005; Table V to Subpart E of Part 201 (adjustment of civil penalty amounts for inflation).

*Cavanagh,* No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004) (*citing*

*SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (collecting Southern District of New

York cases analyzing these factors)).

      All of these factors, taken together, demonstrate that a substantial penalty is warranted in

this case. The first four factors analyzed above each weigh in favor of a severe penalty. As

discussed above, Alpine's reckless disregard for its SAR reporting obligations spanned years and

resulted in thousands of violations for which Alpine has repeatedly disclaimed responsibility.

      In addition, the "risk of loss" factor weighs in favor of a significant penalty for each of

Alpine's violations. Alpine's misconduct created a substantial risk of loss to potential victims of

the suspicious activity Alpine failed to report. Alpine "is a broker-dealer that primarily provides

clearing services for microcap securities traded in the over-the-counter market." *Alpine I*, 308 F.

Supp. 3d at 781. It is settled that unscrupulous market practices and participants pervade this

market with "an overwhelming amount of fraud and abuse." *Alpine II*, 354 F. Supp. 3d at 406

(*citing* Penny Stock Reform Act of 1990, § 502(4)). Further, there is no dispute that the market

for these securities is at risk to pump-and-dump market manipulation schemes, money

laundering, and other illicit financial activity. *Alpine II*, 354 F. Supp. 3d at 407 ("Alpine does not

dispute these risks of investing in the LPS [low priced securities] markets."). While acting as a

conduit through which hundreds of millions of shares of these securities entered the market,

Alpine's routine violations of SAR filing rules obscured and concealed suspicious activity from

law enforcement and increased the risk that investors would lose money as a result of illegal

activity. Further, Alpine's misconduct undermined regulations intended to address the concerns

of Congress set forth in the Patriot Act, including that "money laundering was being used to

finance terrorist organizations" *See Alpine I*, 308 F. Supp. 3d at 791 (*citing* USA Patriot Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 at 296-98).

Alpine's financial condition is—at best—a neutral factor in the civil penalty analysis. "While consideration of a defendant's financial condition is a factor to be considered in assessing a civil penalty, it is but one of many a court considers when exercising its discretion." *SEC v. Cope*, No. 14 Civ. 7575 (DLC), 2018 WL 3628899, at *8 (S.D.N.Y. Jul. 30, 2018), *appeal filed*, No. 18-2564 (2d Cir. Aug. 29, 2018). One of the goals of a civil money penalty is "deterrence," and, although a court may take a defendant's current financial condition into account when considering a civil money penalty, "a defendant's claims of poverty cannot defeat the imposition of a civil money penalty by the court." *SEC v. Kane*, No. 97 Civ. 2931 (CBM), 2003 WL 1741293, at *4 (S.D.N.Y. Apr. 1, 2003) ("If the defendant is indeed impecunious, the SEC will ultimately not be able to collect on the judgment. … While the court may take the defendant's current financial difficulties into account, these circumstances alone cannot negate the need for a severe civil penalty.").

> ii.    **The Court should order a civil penalty of $10,000 for each of the Deficient SAR and Failure to Report Violations, and $1,000 for each of the Document Retention Violations.**

The SEC requests that the Court impose civil penalties against Alpine based on each Deficient SAR Violation, Failure to Report Violation, and Document Retention Violation as to which summary judgment was granted. This Court and numerous other courts have held that a per-violation penalty calculation may be based on each violative act as measured by the number of violative transactions. *See SEC v. Milan Capital Group, Inc.,* No. 00 Civ. 0108 (DLC), 2001 WL 921169, at *3 (S.D.N.Y. Aug. 14, 2001) (calculating and ordering a civil penalty of $10

million based on $50,000 for each of at least 200 transactions); *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 n. 7 (2d Cir. 2013) (finding no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation); *SEC v. Colonial Inv. Mgmt., LLC*, 381 F. App'x 27, 32 (2d Cir. 2010) (affirming penalty of $25,000 for each of the defendant's eighteen violative transactions); *SEC v. Lazare Indus., Inc.*, 294 F. App'x 711, 715 (3d Cir. 2008) (statute permits penalty equal to the maximum tier amount multiplied by the 54 illegal sales of stock); *Otis & Co. v. SEC*, 106 F.2d 579, 584 (6th Cir. 1939) (each sale of stock constitutes a separate violative act).

Here, the Court ruled on summary judgment that Alpine committed over 2,700 separate violations. These violations are comprised of: 1,010 Deficient SAR Violations, Order, Dkt. No. 195; *Alpine II*, 354 F. Supp. 3d at 422-40; 1,214 Failure to Report Violations, *Alpine II*, 354 F. Supp. 3d at 440-43; and 496 Document Retention Violations, *Alpine II*, 354 F. Supp. 3d at 443-45.

While at least second-tier penalties would be appropriate based on Alpine's "deliberate or reckless disregard of [] regulatory requirement[s]," first-tier penalties for each of Alpine's violations are adequate to punish and deter Alpine's violations in this case. *See* 15 U.S.C. § 78u(d)(3); *SEC v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (a first-tier penalty may be imposed for any violation). The maximum civil penalty for Alpine's violations based on a maximum first-tier penalty for each violation is at least $204,000,000.[3]

---

[3]  This amount is calculated by multiplying the total amount of Alpine's violations (1,010 + 1,214 + 496= 2,720 violations) by $75,000, which is the maximum first-tier penalty amount for violations that occurred between March 3, 2009 and March 2013. A higher maximum first-tier penalty of $80,000 would apply to the many violations Alpine committed after March 2013.

Due to the volume of violations here, the SEC asks that the Court impose civil penalties that are substantially less than the maximum amount permitted by the statute, but in the aggregate appropriately reflect the seriousness of Alpine's systematic and blatant violations of the law regarding broker-dealer SAR filings. Specifically, the SEC requests that the Court impose a civil penalty against Alpine of $10,000 for each Deficient SAR Violation and Failure to File Violation and a $1,000 civil penalty for each Document Retention Violation. This methodology for calculating the civil penalties against Alpine results in a total requested civil penalty of $22,736,000 as reflected below:

| Violation | Number of Violations | Requested Penalty per Violation | Total |
|---|---|---|---|
| Deficient SARs | 1,010 | $10,000 | $10,100,000 |
| Failure to Report Suspicious Liquidations | 1,214 | $10,000 | $12,140,000 |
| Failure to Maintain SAR Support Files | 496 | $1,000 | $496,000 |
| **Total Proposed Civil Penalty** | 2,720 | | **$22,736,000** |

For the reasons discussed in the analysis of the factors above, these civil penalties are appropriate and necessary to punish and deter Alpine's flouting of its legal obligations as a broker-dealer to report suspicious activity to law enforcement.

Respectfully submitted this 3rd day of May, 2019.

*/s/ Zachary T. Carlyle*
Zachary T. Carlyle (*pro hac*)
Terry R. Miller (*pro hac*)

## CERTIFICATE OF SERVICE

I certify that on May 3, 2019, a copy of the foregoing document was served via ECF upon the following:

Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker
CLYDE SNOW & SESSIONS
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah 84111-2216

Maranda E. Fritz
Thompson Hine LLP (NYC)
335 Madison Avenue, 12th Floor
New York, NY 10017

*Counsel for Alpine Securities Corporation*

*/s/ Elinor E. Blomgren*
Elinor E. Blomgren

14