# EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>Defendant. | Civil No. 1:17-CV-04179-DLC<br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis |

## DECLARATION OF ERIN ZIPPRICH

I, Erin Zipprich, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

1. My name is Erin Zipprich and I am a resident of Salt Lake County, Utah, am over 18 years of age, and make the statements herein based on my personal knowledge.

2. I am the Anti-Money Laundering ("**AML**") Officer at Alpine Securities Corporation ("**Alpine**"), the Defendant in the above-entitled matter.

3. Alpine is primarily a clearing broker-dealer. Alpine's business involves, among other things, clearing microcap securities that are traded in the over-the-counter marketplace. As part of its clearing agency function, it clears trades for other introducing brokers on a "fully disclosed" basis pursuant to contractual clearing agreements.

4. I work at Alpine's headquarters in Salt Lake City, Utah.

5. I was hired at Alpine in March of 2012 as a customer cashier. Within the first month of my employment, I became a compliance analyst. Subsequently, I became an AML analyst in 2014 and then the AML Officer in 2017.

1

6. Accordingly, I have been involved in Alpine's AML program since 2012.

7. As the AML Officer, my primary responsibilities and duties are to implement and oversee Alpine's AML program, including filing of Suspicious Activity Reports ("**SARs**").

8. I am a certified Anti-Money Laundering Specialist ("**CAMs**") as designated by the Association of Certified Anti-Money Laundering Specialists.

9. In my capacity as the AML Officer, I have worked closely with Alpine's compliance analyst, legal counsel, Chief Compliance Officers ("**CCO**"), and other Alpine executives in order to effectively administer and implement Alpine's AML procedures.

10. I am familiar with and have worked closely with Alpine's other AML Officers, including Leia Farmer, Holly Peck, and Todd Groskreutz (none of whom are currently employed by Alpine).

11. I am familiar with AML rules, laws, regulations, and industry guidance.

12. I am familiar with Alpine's AML policies and procedures as specified in Alpine's Written Supervisory Procedures Manuals ("**WSPs**").

13. In Alpine's WSPs, Alpine has developed and implemented procedures for both AML review and suspicious activity reporting under the Bank Secrecy Act ("**BSA**").

14. Alpine's AML program includes risk-based procedures that are reasonably designed to detect and report known or suspected money laundering activity, including monitoring for suspicious activity and complying with the suspicious activity reporting and recordkeeping requirements of the BSA.

15. Alpine continually updates its WSPs over time, including the AML program and SAR requirements, to address and reflect new developments and incorporate issues and advice from regulators regarding potential money laundering activities, and to ensure that its AML and

2

suspicious activity monitoring programs were effective.

16. I am familiar with the above-entitled action and the Securities and Exchange Commission's ("**SEC**") allegations against Alpine regarding Alpine's AML program, including its AML policies and procedures regarding record keeping and reporting requirements in compliance with the BSA.

17. I have reviewed the transactions and SARs cited by the SEC in its Motion for Partial Summary Judgment against Alpine and have determined that each of the transactions at issue in this matter were introduced to Alpine by other broker-dealers. In the narrative section of each SAR submitted by the SEC, it indicates that the account was introduced by Scottsdale Capital Advisors, except for the SEC's Sample SAR D (Exhibit 17) which was introduced by ACAP Financial Corporation. Alpine performs clearing functions for both Scottsdale Capital Advisors and ACAP Financial Corporation pursuant to a Fully Disclosed Clearing Agreement.

*Overview of Alpine's Written AML Program Requirements*

18. During the relevant time period at issue in this action (May 17, 2011 through December 31, 2015), Alpine received a due diligence packet for each stock deposit from the introducing firm. The due diligence packet contained information regarding the customer and the transaction.

19. Since around 2010, Alpine has utilized DocuWare software to facilitate the workflow process of reviewing and approving the stock deposit.

20. The review process begins when Alpine's compliance analyst receives the due diligence packet from the introducing firm and fills-out a "cover sheet" which includes all the basic information about the deposit.

21. The compliance analyst was directed by Alpine's compliance, legal, and senior

3

management personnel to consider various pre-determined issues of focus.

22. Among the issues that an analyst was instructed to consider were those listed in (a) the regulations, and (b) the specific circumstances of the transaction.

23. Among the circumstances to be considered, at all times, included the following:

- Transactions involving funds derived from illegal activity or intended or conducted to hide or disguise funds or assets derived from illegal activity.
- Transactions designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act (BSA).
- Transactions that appear to serve no business or apparent lawful purpose or are not the sort of transactions in which a particular customer would be expected to engage, and for which Alpine knows of no reasonable explanation after examining the available facts.
- Transactions that involve the use of Alpine to facilitate criminal activity.

24. The items to be evaluated has evolved over time as Alpine has responded to changes in the industry and sought to ensure that it is compliant with record keeping and reporting under the BSA.

25. Among the items that an analyst was directed to consider was whether an account was subject to "heightened supervision." The "heightened supervision" list was developed by Alpine as an aid to Alpine employees conducting AML review, and to ensure Alpine's own enhanced scrutiny of transactions. The reasons for inclusion in the list vary and inclusion on the list, or reference to the list, did not constitute any finding by Alpine that there was anything criminally suspicious about the transaction itself. In filing SARs on this basis, and highlighting the list in the SAR narrative, Alpine was providing what it understood to be useful information to regulators, even though a SAR filing was not required.

26. Alpine continuously updated its directives to incorporate industry guidance as well as circumstances that it independently determined were applicable to Alpine's particular business.

4

27. Based on evolving standards in the industry as found in various changes and updates to FINRA and FinCEN guidance, communications with regulators, including during exams, and Alpine's own risk assessment of policies and procedures in filing SARs, Alpine routinely filed voluntary SARs on transactions that did not meet the requirements for when a SAR must be filed, under Alpine's WSPs and the governing BSA regulation 31 C.F.R. § 1023.320.

28. Based on the review process, a compliance analyst would prepare initial drafts of SARs after initial review of transactions and prepare narratives based on the facts of the transactions.

29. The SAR draft was then reviewed by the AML Officer, CCO, and/or a legal analyst. Further review of a transaction included, among other things, and depending on the facts of the transaction, additional review of the due diligence packet from the introducing broker, additional research on Google of the parties involved, research of any stock promotions, and review of trading volume, including discussions with the trading desk if necessary.

30. After completion of the review, the reviewing attorney would ask the compliance analyst to either include additional information in a previously drafted SAR or to prepare a SAR if a draft did not exist.

31. In accordance with the WSPs, final decision on whether to file a SAR on a transaction is in the discretion of the AML Officer or his or her designee.

32. The existence of any factor which required consideration of a particular circumstance did not automatically trigger a duty to include that factor in the SAR narrative or file a SAR at all. Those circumstances only triggered a duty to further investigate and consider all facts before an ultimate decision was made that any particular factor or fact raised suspicion

5

to the degree that it was appropriate to file a SAR or include certain information in a SAR narrative.

### *Ongoing Improvements to Alpine's AML Program*

33.     Alpine has improved its suspicious activity monitoring and reporting over time.

34.     Alpine has always diligently sought to hire and retain employees devoted to compliance. Particularly, in 2012, during the timeframe of a FINRA Exam, Alpine hired additional qualified compliance employees for its AML program, including myself, a certified Anti-Money Laundering Specialist, and Leia Farmer, who has a strong background in compliance.

35.     During 2012, Compliance personnel drafted Standard Operating Procedures regarding specific tasks assigned to their area of compliance to further help define each employee's role and assist in the overall AML program goals of a culture of compliance.

36.     Throughout 2012, Alpine continuously updated its AML review process.

37.     Also during 2012, Alpine updated its back-office computers software which included multiple new compliance features and generated new compliance reports. Alpine's compliance personnel could run a number of different queries, including the use of searching the Office of Foreign Assets Control ("**OFAC**") report.

38.     Since 2012, Alpine has continued to improve its AML program by implementing, among other things, an improved mechanism to track drafted SAR reports during the review stage, an improved escalation process to senior management of any accounts of concern, and additional training on trade surveillance.

### *SEC's Allegation that Alpine Failed to Maintain Supporting Files*

39.     I am familiar with the SEC's allegations in the above-entitled matter regarding its

claim that Alpine failed to maintain certain supporting files for SAR. I have reviewed the spreadsheet referred to as "Table E" listing the SARs that the SEC's claims Alpine lacks supporting files.

40. Before the above-entitled action was commenced, the SEC served document subpoenas on Alpine to produce both SARs and their supporting files. During early 2016, I was involved in coping Alpine's supporting files in response to the SEC's rolling requests for such files. I helped Alpine to produce in good faith all the supporting files that the SEC requested.

41. After completing the production of supporting files pursuant to the SEC's requests, I received a spreadsheet that I understood came from the SEC and contained SAR files as to the SEC alleged it could not locate the supporting files in Alpine's production.

42. I copied the supporting files listed on the SEC's spreadsheet.

43. In reviewing Table E, it appears to be the same list as the spreadsheet that I reviewed during 2016.

44. I believe that these files have been previously produced to the SEC.

45. Since the filing of the above-entitled action, I have again copied the supporting files of the SARs listed on Table E and made them available to Alpine's legal counsel.

WHEREFORE, I declare under penalty of perjury that the foregoing is true and correct.

DATED this 19th day of January, 2018.

/s / Erin Zipprich
Erin Zipprich
*[electronically signed with permission]*

7