UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>      Defendant. | Civil No. 1:17-CV-04179-DLC<br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis |

**ALPINE SECURITIES CORPORATION'S MEMORANDUM IN OPPOSITION
TO THE SEC'S MOTION FOR REMEDIES**

THOMPSON
HINE

335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680

ClydeSnow
ATTORNEYS AT LAW
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 4

POINT I THE SEC'S REQUEST FOR A $22.736 MILLION TIER 1 PENALTY
PREDICATED ON CLAIMS OF WILLFUL OR RECKLESS CONDUCT IS
CONTRARY TO PRECEDENT AND THE RECORD AND SHOULD BE
REJECTED ............................................................................................ 4

    A.    Relevant Authority Confirms an Appropriate Penalty Range of $65,000 to
$800,000 ............................................................................................. 6

    B.    The SEC's Claim that Alpine Acted with Scienter is Baseless and Contrary
to the Uncontroverted Record. ............................................................ 13

        1.    The Record is Devoid of Any Evidence That Alpine Acted Recklessly
or Willfully. ................................................................................ 14

        2.    The Uncontroverted Evidence Demonstrates that Alpine and Its
Employees Developed and Implemented their AML and SAR
Programs in Good Faith. ............................................................. 16

        3.    Alpine Continually Improved its SAR Reporting and AML Program. ... 23

    C.    The Repetitive Nature of the SAR Deficiencies Does Not Support a Finding of
Recklessness. ..................................................................................... 27

    D.    The SEC's Assertion that Alpine "Deliberately" Established an AML Program
that Did Not Monitor Sales is Directly Contradicted in the Record. ........... 28

    E.    Alpine's Legal Position Is Not Evidence of Recklessness. ..................... 30

    F.    An Evidentiary Hearing Is Required in Order to Find that Alpine Acted Willfully
or Recklessly. ...................................................................................... 33

POINT II THE SEC'S REQUEST FOR A $22.736 MILLION TIER 1 PENALTY IS BASED
ON AN UNDULY PUNITIVE AND INAPPROPRIATE METHODOLOGY, IS
NOT SUPPORTED BY THE FACTS AND CIRCUMSTANCES, AND IS
UNCONSTITUTIONALLY EXCESSIVE. ........................................................ 34

    A.    The Court Should Reject the SEC's Per-Violation Methodology and Total Penalty
Demand. .............................................................................................. 34

        1.    The SEC's Per Violation Methodology is Unduly Punitive and Should Be
Rejected in Favor of Formula that is Based on the Courses of Conduct or
Regulatory Provisions Actually at Issue. ...................................... 34

        2.    Even if the Court Adopts the SEC's Methodology, the Amount of the
Penalty Should be Reduced. ........................................................ 40

            a.    A penalty for a violation of the SAR regulations of the
BSA cannot exceed the penalty limits prescribed by Congress
within the BSA. .................................................................. 41

i

   b. The SEC has overstated the number of "violative" acts for calculating penalties. ..................................................................... 44

B. The Facts and Circumstances of this Case and Application of the Public Interest Penalty Factors Support the Imposition of a Reasonable Penalty That Will Not Force the Closure of the Firm. ............................................................. 45

  1. The SEC offers no argument except that the conduct was recurrent. ........ 46

  2. The SEC failed to establish Alpine acted egregiously. ............................ 47

  3. The SEC failed to show any loss or substantial risk of loss. ................... 48

  4. Alpine Is Unable to Pay a Penalty More Than its Available Excess Regulatory Net Capital. ......................................................... 49

  5. The Goals of Penalty Would be Fully Satisfied by a Monetary Penalty less than Available Net Cap and Affirmative Undertakings ........................... 55

C. The Amount Sought by the SEC is Unconstitutionally Excessive. ...................... 57

CONCLUSION ............................................................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advance Pharm., Inc. v. United States*,
391 F.3d 377 (2d Cir. 2004)...................................................................51

Alpine's Exhibit
B-7...................................................................................................20, 21

*American Bus Ass'n v. Slater*,
231 F.3d 1 (D.C. Cir. 2000)...................................................................42

*Bloomfield v. SEC*,
649 F. App'x 546 (9th Cir. 2016).................................................6, 9, 40

*Boggs v. Alto Trailer Sales, Inc.*,
511 F.2d 114 (5th Cir. 1975)..................................................................51

*Collins v. SEC*,
736 F.3d 521 (D.C. Cir. 2013)....................................................4, 34, 58

*Garden City Boxing Club, Inc. v. Salcedo*,
No. 04 Civ. 5027 (DFE), 2005 WL 2898233 (S.D.N.Y. Nov. 3, 2005)................................51

*L.P. Steuart & Bros. v. Bowles*,
322 U.S. 398 (1944).................................................................................42

*Martincic v. Urban Redev. Auth. of Pittsburgh*,
844 F. Supp. 1073 (W.D. Pa. 1994)......................................................25

*McLean v. Garage Mgmt. Corp.*,
No. 09 Civ. 9325 (DLC), 2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012) ......................*passim*

*Milpitas Care Ctr. v. CMS*,
2003 WL 974618 (H.H.S., Fed. 5, 2003)..............................................51

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
414 U.S. 453 (1974).................................................................................42

*Otis & Co. v. SEC*,
106 F.2d 579 (6th Cir. 1939) .................................................................11

*Rapoport v. SEC*,
682 F.3d 98 (D.C. Cir. 2012).....................................................................4

*In re Raymond J. Lucia, Cos., Inc.*,
Initial Decision Release No. 540, 2013 WL 6384274 (Dec. 6, 2013) ....................39

*Robare Grp., Ltd. v. SEC*,
No. 16-1453, 2019 U.S. App. LEXIS 12944 (D.C. Cir. Apr. 30, 2019) ..........................15, 16

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009).....................................................................14

*S.E.C. v. Colonial Inv. Mgmt., LLC*,
381 F. App'x 27 (2d Cir. 2010) ........................................................................11

*Sanders v. Jackson*,
209 F.3d 998 (7th Cir. 2000) ...........................................................................51

*SEC v. Alpine*,
354 F. Supp. 3d 396 (S.D.N.Y. 2018) ......................................................... *passim*

*SEC v. Alpine Secs. Corp.*,
308 F. Supp. 3d 775 (S.D.N.Y. 2018) ...................................................32, 35, 36

*SEC v. Alternative Green Techs., Inc.*,
No. 11 Civ. 9056 (SAS), 2014 WL 7146032 (S.D.N.Y. Dec. 15, 2014) .................5

*SEC v. Bausch & Lomb, Inc.*,
565 F.2d 8 (2d Cir. 1977) .................................................................................56

*SEC v. Benger*,
No. 09 Civ 676, 2016 WL 561893 (N.D. Ill. Feb. 10, 2016) .............................49

*SEC v. BIC Real Estate Dev. Corp.*,
No. 1:16-cv-00344-LJO-JLT, 2017 WL 1740136 (E.D. Cal. May 4, 2017) ..........36

*SEC v. Bocchino*,
No. 98 Civ. 7525 (JGK)(RLE), 2002 WL 31528472 (S.D.N.Y. Nov. 8, 2002) ......12

*SEC v. Brown*,
643 F. Supp. 2d 1088 (D. Minn. 2009) .............................................................36

*SEC v. Cavanagh*,
No. 98 Civ. 1818 (DLC), 2004 WL 1594818 (S.D.N.Y. July 16, 2004), *aff'd*,
445 F.3d 105 (2d Cir. 2006) ..........................................................................5, 39

*SEC v. Chester Holdings, Ltd.*,
41 F. Supp. 2d 505 (D.N.J. 1999) ......................................................................9

*SEC v. Clay Capital Mgmt., LLC*,
No. 2:11-cv-05020-DMC-JBC, 2013 WL 5946989 (D.N.J. Nov. 6, 2013) ..........49

*SEC v. CMKM Diamonds, Inc.*,
635 F. Supp. 2d 1185 (D. Nev. 2009) ...............................................................39

*SEC v. Converge Global, Inc.*,
No. 04 Civ. 8084, 2006 WL 907567 (S.D. Fla. Mar. 10, 2006) ........................12

*SEC v. Cope*,
No. 14-cv-7575 (DLC), 2018 WL 3628899 (S.D.N.Y. July 30, 2018) .......34, 35, 36

*SEC v. Elliot*,
No. 09 Civ. 7594 (KBF), 2012 WL 2161647 (S.D.N.Y. June 12, 2012) .......33, 38, 44

*SEC v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) ........................................................................31

*SEC v. Haligiannis*,
470 F. Supp. 2d 373 (S.D.N.Y. 2007), The SEC ....................................46, 50, 56

iv

*SEC v. Howard*,
    376 F.3d 1136 (D.C. Cir. 2004) ........................................................................16

*SEC v. iShopnomarkup.com, Inc.*,
    126 F. Supp. 3d 318 (E.D.N.Y. 2015), *aff'd*, 694 F. App'x 853 (2d Cir. 2017)..............4, 5, 39

*SEC v. J.W. Korth & Co.*,
    991 F. Supp. 1468 (S.D. Fla. 1998) ................................................................45

*SEC v. Johnson*,
    No. 03 Civ. 177 (JFK), 2006 WL 2053379 (S.D.N.Y. July 24, 2006) ...............9, 31

*SEC v. Lawbaugh*,
    359 F. Supp. 2d 418 (D. Md. 2005) ................................................................12

*SEC v. Lazare Indus., Inc.*,
    294 F. App'x 711 (3d Cir. 2008) ....................................................................11

*SEC v. Mattera*,
    No. 11 Civ. 8323 (PKC), 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ...........15, 33

*SEC v. Milan Capital Grp., Inc.*,
    No. 00 Civ. 0108 (DLC), 2001 WL 921169 (S.D.N.Y. Aug. 14, 2001)..............11, 12, 39, 40

*SEC v. Moran*,
    944 F. Supp. 286 (S.D.N.Y. 1996) ...........................................................4, 5, 16

*SEC v. Murray*,
    No. 05 Civ. 4643 (MKB)(DRH), 2013 WL 839840 (E.D.N.Y. Mar. 6, 2013) .....................35

*SEC v. Opulentica, LLC*,
    479 F. Supp. 2d 319 (S.D.N.Y. 2007)..............................................................12

*SEC v. Orr*,
    No. 11-2251-SAC, 2012 WL 1327786 (D. Kan. Apr. 17, 2012)...........................49

*SEC v. Pardue*,
    367 F. Supp. 2d 773 (E.D. Pa. 2005) ...........................................................49, 50

*SEC v. Pentagon Capital Mgmt., PLC*,
    725 F.3d 279 (2d Cir. 2013).............................................................................11

*SEC v. Pentagon Capital Mgmt. PLC*,
    No. 08 Civ. 3324 (RWS), 2012 WL 1036087 (S.D.N.Y. Mar. 28, 2012),
    *aff'd in part, vacated in part*, 725 F.3d 279 (2d Cir. 2013) ..................................11

*SEC v. Robinson*,
    No. 00 Civ. 7452 (RMB)(AJP), 2002 WL 1552049 (S.D.N.Y. July 16, 2002).............. *passim*

*SEC v. Rubin*,
    No. 91 Civ. 6531 (MBM), 1993 WL 405428 (S.D.N.Y. Sept. 24, 1993) ........................50, 52

*SEC v. Save the World Air, Inc.*,
    No. 01 Civ. 11586 (GBD)(FM), 2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005)....................12

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ..........................................................................14

*SEC v. Shehyn*,
No. 04 Civ. 2003 (LAP), 2010 WL 3290977 (S.D.N.Y. Aug. 9, 2010) ................................36

*SEC v. Slocum, Gordon & Co.*,
334 F. Supp. 2d 144 (D.R.I. 2004) ................................................................................ *passim*

*SEC v. Snyder*,
No. H-03-04658, 2006 WL 6508273 (S.D. Tex. Aug. 22, 2006) .....................................47, 56

*SEC v. Softpoint, Inc.*,
958 F. Supp. 846 (S.D.N.Y. 1997) ...........................................................................4, 9, 12

*SEC v. Steadman*,
967 F.2d 636 (D.C. Cir. 1992) ...................................................................................27, 56

*SEC v. Svoboda*,
409 F. Supp. 2d 331 (S.D.N.Y. 2006) ................................................................................50

*SEC v. Syndicated Food Serv. Int'l, Inc.*,
No. 04-CV-1303 (NGG)(VLS), 2014 WL 1311442 (E.D.N.Y. Feb. 14, 2014) ...............34, 35

*SEC v. Todd*,
No. 03-cv-2230 (BEN), 2007 WL 1574756 (S.D. Cal. May 30, 2007),
*aff'd in part, rev'd in part on other grounds*, 642 F.3d 1207 (9th Cir. 2011) ........................56

*SEC v. Todt*,
No. 98 Civ. 3980 (JGK), 2000 WL 223836 (S.D.N.Y. Feb. 25, 2000) ..................................49

*SEC v. Universal Major Indus.*,
546 F.2d 1044 (2d Cir. 1976) ............................................................................................56

*SEC v. Wolfson*,
No. 02 Civ. 1086, 2006 WL 1214994 (D. Utah May 4, 2006) ...............................................12

*SEC v. Yun*,
148 F. Supp. 2d 1287 (M.D. Fla. 2001), *aff'd in part and vacated in part on
other grounds*, 327 F.3d 1263 (11th Cir. 2003) ........................................................................50

*In re Spring Hill Capital Mkts., LLC, et al.*,
Initial Decision No. 919, 21 (Nov. 30, 2015) ........................................................................10

*In re Sterne, Agee & Leach, Inc.*,
No. E052005007501 (Mar. 5, 2010) ....................................................................................19

*In re Thomas C. Gonnella*,
Initial Decision No. 706, 33 n.41 (Nov. 13, 2014) ...........................................................10, 40

*In re Thomas Delaney II & Charles Yancy*,
Initial Decision No. 755 (Mar. 18, 2015) ...............................................................................10

*U.S. v. Viloski*,
814 F.3d 104 (2d Cir. 2016) ................................................................................................59

*United States v. LaPorta*,
46 F.3d 152 (2d Cir. 1994) ................................................................................................43

*United States v. Maes*,
No. 5-07-005 (GGH), 2007 WL 611246 (E.D. Cal. Feb. 27, 2007) .......................................42

vi

*Waste Action Project v. Astro Auto Wrecking, LLC*,
  274 F. Supp. 3d 1133 (W.D. Wash. 2017)...................................................................51

*WHX Corp. v. SEC*,
  362 F.3d 854 (D.C. Cir. 2004) ......................................................................................31

*In re Workers' Comp. Refund*,
  46 F.3d 813 (8th Cir. 1995) .............................................................................................9

*Wyche v. Advanced Drainage Sys.*,
  No. 17-743-cv, 2017 WL 4570663 (2d Cir. Oct. 13, 2017) ..........................................14

**Statutes**

5 U.S.C. § 558(b) ................................................................................................................43

12 U.S.C. § 1818(i)(4) ........................................................................................................43

31 U.S.C. ...........................................................................................................................41

31 U.S.C. 5321 ...................................................................................................................43

31 U.S.C. § 5316(a)(1)(A) .................................................................................................47

31 U.S.C. § 5321 ...............................................................................................42, 43, 58

31 U.S.C. § 5321(a)(6) .......................................................................................................41

31 C.F.R. § 1010.820(i) ......................................................................................................41

31 C.F.R. §1010.820(h) ......................................................................................................41

31 C.F.R. § 1010.821 ..........................................................................................................41

31 C.F.R. § 1023.320 ................................................................................................. *passim*

31 C.F.R. § 1023.320(a) ......................................................................................................41

31 C.F.R. § 1023.320(a) and (d) ........................................................................................41

USA Patriot Act of 2001, Pub. L. No. 107-56 § 371, 116 Stat. 272..................................47

Alpine Securities Corporation ("Alpine") hereby submits this Memorandum in Opposition to the SEC's Motion and Memorandum of Law for Remedies ("SEC Mem.").

## INTRODUCTION

As Alpine has long known, the SEC is seeking a corporate death penalty in this case. Its request for $22 million is tens of millions more than the firm could pay, would force the closure of the firm, and is exponentially greater than any penalties imposed in similar non-scienter cases.[1] The SEC puts forth, in support of that request for massive penalties, not one citation to testimony, not one case that is comparable, not one item of evidence of any ongoing violative conduct, not one cogent rationale for the "per violation" penalty amount that it appears to have plucked from a hat. The SEC cites no evidence of losses to others or gain to the firm, although those figures often guide courts in their calculation of penalties. The SEC recoils from consideration of the firm's financial wherewithal or the substantial evidence of its remediation to demand a penalty that would be, as the courts have often said, "unduly harsh and penalizing." Its submission rests on an accumulation of one baseless accusation after another, unsupported and often contradicted by the record and by the abundant authorities relating to violations of the suspicious activity reporting ("SAR") provisions of the Bank Secrecy Act ("BSA").

The SEC shuns all of the approaches and analysis that would ordinarily form the basis for a determination of penalties, and it does so for a clear reason: every applicable factor, analysis or comparable proceeding demonstrates that the SEC's arbitrary demand is a hundred times the amount that would constitute an appropriate penalty in this case. In this submission, Alpine

---

[1] As detailed in Point II, *infra*, and supported by the Declaration of David Brant, Ex. 1 hereto, the SEC is fully familiar with the firm's financial condition since it receives reports from Alpine detailing its revenue and assets. ██████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ If a penalty is imposed in an amount that allows Alpine to continue operating, Alpine is also proposing a series of undertakings implemented by new management that will ensure compliance going forward.

provides those authorities for the Court, discussing instances in which penalties have been imposed for a strict liability offense or for SAR violations.  Notably, many of those cases involve similar underlying issues relating to microcap transactions, and address pervasive and "willful" misconduct far more severe than exists here.  Even in that context, the resolutions are strikingly consistent, with penalties ranging from $65,000 to $800,000.

The SEC, effectively acknowledging that its demand for skyscraping penalties is unheard of and insupportable in a Tier 1 case, now injects into this case the claim that Alpine engaged in willful misconduct.  As support for those claims of scienter, propounded as the cornerstone for its penalty amount, the SEC cites only one fact: the number of violations.  That sole component of this case is repeated by the SEC over and over to try to establish not only scienter but also every other prong of the relevant multi-factor analysis.  According to the SEC, no other aspect of the case and none of the testimony warrants consideration, whether it is the time period of the violation, the content or significance of the omission from the narrative compared to its overall description of the reason for the filing, or the basis for the decisions made by the people at Alpine who actually filed the SARs.  This is not the law and the SEC's singular focus on the numbers, as opposed to the uncontroverted factual record of the circumstances surrounding Alpine's SAR decisions, runs directly counter to the purpose of and process involved in a penalty determination.  As discussed in Point I, those claims of willful or reckless conduct that underpin the SEC's penalty position are not merely unsupported, they are flatly contradicted by the record.

After establishing in Point I that the SEC's request is contrary to law and to the record, this submission then turns to the methodologies applied by courts in similar circumstances, and the factors applied by the courts in their penalty determinations.  Here, the SEC seeks a per-violation penalty that is grossly excessive and would lead to absurd results.  For example, under the SEC's approach, the Court would impose a separate $10,000 penalty for each of the 372

times that Alpine failed to list Customer E's unresolved regulatory action in a SAR narrative.

Similarly, Alpine would face a separate $10,000 penalty for each of the 289 times it failed to list

foreign involvement in the narrative, even though Alpine identified that foreign involvement in

other areas of the SAR.  There is no evidence Alpine omitted this or any other information

willfully, in bad faith, for profit, or that it caused any actual losses.  Yet, the SEC maintains that

these omissions alone warrant penalties of $3,720,000 or $2,890,000, respectively.  The SEC's

arithmetic does not provide any rational basis for those penalties; they are untethered to the

factual record and legal precedent, and cannot be sustained.

The authorities confirm that consideration of the perspectives that inform a penalty

decision – including the lack of intentional wrongdoing, the age of the violations and the firm's

remediation of them, the absence of any gain to the firm or loss to others, and the firm's current

financial condition – all lead to roughly the same range as an appropriate penalty.  Based on the

SEC's single claim for violation of a single rule, Rule 17a-8, the maximum Tier 1 penalty would

be $80,000.  Even considering Section 17(a), Rule 17a-8, and 31 C.F.R. § 1023.320 as distinct

provisions, the maximum penalty would be $240,000.  Breaking the SEC's claim into the

courses of conduct that have been the mode of analysis throughout this case, the appropriate

penalty at Tier 1 maximums range from $240,000 to $720,000, directly in-line with precedent.

Alpine is also willing to agree to a number of affirmative undertakings not sought by the

SEC, including retention of an independent compliance consultant.  Such undertakings provide a

more powerful assurance against future violations than the obey-the-law injunction or the

draconian penalty the SEC has sought, but has not proven its entitlement to on this record.

A penalty between $80,000 and $720,000, combined with these undertakings, would

conform to both the record evidence and precedent, and satisfy both the punitive and deterrent

purposes of the remedies framework.  Penalties in the range sought by the SEC that would force

the closure of the firm would stand as a glaring and insupportable outlier.

## ARGUMENT

### POINT I

**THE SEC'S REQUEST FOR A $22.736 MILLION TIER 1 PENALTY
PREDICATED ON CLAIMS OF WILLFUL OR RECKLESS CONDUCT IS
CONTRARY TO PRECEDENT AND THE RECORD AND SHOULD BE REJECTED**

To determine an appropriate penalty, courts evaluate the conduct under several "public

interest" factors, and decide upon an appropriate methodology for calculating the penalty to

reach a determination that is warranted by the "facts and circumstances" of the case, the nature

of the conduct at issue, and is not "unduly penalizing."  *See, e.g., SEC v. iShopnomarkup.com,*

*Inc.*, 126 F. Supp. 3d 318, 332–33 (E.D.N.Y. 2015), *aff'd*, 694 F. App'x 853 (2d Cir. 2017).

While each case must be determined on "its own particular facts and circumstances," courts have

"recognize[d] the usefulness of utilizing [prior SEC] cases to put the current matter in clearer

perspective" and ensure that the penalties to be imposed were "commensurate" with others

"previously imposed."  *SEC v. Moran,* 944 F. Supp. 286, 297 (S.D.N.Y. 1996) (analyzing prior

SEC administrative decisions); *cf. Collins v. SEC,* 736 F.3d 521, 525-26 (D.C. Cir. 2013)

(although adherence to "mechanical formulae" is not required, penalty determinations should not

be  "oblivious to history and precedent" or "out of line with the agency's decisions in other

cases"); *Rapoport v. SEC,* 682 F.3d 98, 104 (D.C. Cir. 2012) (reversing administrative penalty

determination and stating that agencies "may not depart from precedent without explaining

why"); *SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 868 (S.D.N.Y. 1997) (reducing penalty from

$847,248 sought by SEC to $100,000 because of "fundamental inconsistency" with amount

imposed on other defendants for same conduct).

Courts routinely confront and reject overly aggressive penalty recommendations from the SEC, and instead impose lower amounts that are consistent with penalties imposed in analogous contexts or more appropriate under the facts and circumstances. *See, e.g., SEC v. Cavanagh*, No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004) (SEC sought over $15 million in penalties based on "each sale or offer to sell"; *this Court* imposed $1 million), *aff'd*, 445 F.3d 105 (2d Cir. 2006); *SEC v. Robinson,* No. 00 Civ. 7452 (RMB)(AJP), 2002 WL 1552049, at *12 (S.D.N.Y. July 16, 2002) (SEC sought $22.7 million based on 207 defrauded investors multiplied by $110,000; court imposed $100,000); *iShopnomarkup.com*, 126 F. Supp. 3d at 332–33 (SEC sought $38.5 million based on sales to more than 350 investors multiplied by $110,000; court imposed $330,000); *SEC v. Alternative Green Techs., Inc.*, No. 11 Civ. 9056 (SAS), 2014 WL 7146032, at *6 (S.D.N.Y. Dec. 15, 2014) (SEC sought penalties of $36.4 million based on the number of "separate acts that violated the securities laws"; court imposed single penalty of $650,000).

Here, the SEC failed to include in its submission any discussion of the quantity of the comparable cases that would provide for the Court the "clearer perspective" that would ensure an equitable determination.  *Moran,* 944 F. Supp. at 297.  It cites no authority to support an arbitrary and astonishing penalty under Tier 1 of more than $22.7 million, an amount that far exceeds Alpine's annual revenue and would result in the closure of the firm.  Nor can it.  There is no precedent for imposition of a Tier 1 penalty that would destroy a firm where, as here, there is no evidence of fraud or intentional misconduct, or loss to other persons, and where the conduct at issue, even as described by the SEC, "concerns the inadequacy of Alpine's records."  SEC Mem. in Support of Mtn. to Strike, Dkt. 55, at 2.

The SEC knows it cannot begin to justify a penalty of this amount and this impact for a strict liability, books-and-records offense under Tier 1 and so it now insists Alpine acted with

scienter.  The SEC has so tied its request to that theory that virtually every page of its submission

is dedicated to this cause, right down to the fact that it cites only fraud cases in support of its

recommendation.   As demonstrated below, that belated assertion is belied by the record.

> **A.**      **Relevant Authority Confirms an Appropriate Penalty Range of $65,000 to $800,000.**

In a series of cases involving multi-year and "recurrent" violations of Rule 17a-8,

including failures to file SARs, courts and the SEC have imposed penalties ranging from $65,000

to $800,000.

- *Bloomfield v. SEC,* 649 F. App'x 546, 550 (9th Cir. 2016) (emphasis added):  In the lone adjudicated SAR case under Rule 17a-8, the SEC imposed a single penalty on individuals for aiding and abetting SAR filing violations of $65,000 "for all of the SAR violations, *regardless of total number.*"   The broker-dealer itself was not charged.

- *In re Albert Fried & Co., LLC,* SEC Release No. 77971 (June 1, 2016):  SEC imposed a single penalty of $300,000 against a self-clearing broker-dealer who willfully violated Rule 17a-8 by never filing a single SAR over a five-year period, despite the fact that the firm routinely processed large deposits of low-priced securities transactions and trading of hundreds of millions of shares of low priced securities.  *See* https://www.sec.gov/litigation/admin/2016/34-77971.pdf.

- *In re Windsor St. Capital,* SEC Release No. 81254 (July 28, 2017):  SEC imposed a single penalty against a broker-dealer of $200,000 for numerous willful violations of Section 5 and willful violations of Rule 17a-8 by failing to file "dozens" of SARs.  *See* https://www.sec.gov/litigation/admin/2017/33-10392.pdf.

- *In re Aegis Capital Corp.,* SEC Release No. 82956 (Mar. 28, 2018):  SEC imposed a single penalty of $750,000 against a broker-dealer for willfully violating Rule 17a-8 by failing to file SARs "on hundreds of transactions," over a two year period, including no SARs on low-priced securities transactions, even after Aegis received AML alerts from its clearing firms about the transactions.  According to the decision, Aegis had total annual revenues between $98 million and $123 million during the relevant period.  *See* https://www.sec.gov/litigation/admin/2018/34-82956.pdf.

- *In re COR Clearing, LLC,* SEC Release No. 84309 (Sept. 28, 2018):  SEC imposed a single penalty of $800,000 against a broker-dealer for willfully violating Rule 17a-8 by failing to file SARs on 193 customer accounts that "deposited a large block of low-priced securities and sold the securities into the market shortly thereafter, and, later, withdrew the proceeds of these sales from its accounts," between January 2015 and June 2016.  *See* https://www.sec.gov/litigation/admin/2018/34-84309.pdf.

- *In re Vision Fin. Mkts., LLC,* SEC Release No. 85460 (Mar. 29, 2019): SEC imposed a single penalty of $625,000 against a broker-dealer for willfully violating Rule 17a-8 by failing to timely file SARs with respect to over 100 accounts "in more than 250 instances of the suspicious deposit-sale-wire pattern," and failing "to file any SAR at all [on these patterns] pertaining to 88 of these accounts," between August 2013 and December 2014. *See* https://www.sec.gov/litigation/admin/2019/34-85460.pdf.

- *In re Wilson-Davis & Co., Inc.,* SEC Release No. 85867 (May 15, 2019):  SEC imposed a single penalty of $300,000 against a broker-dealer with 7,000-8,000 active customer accounts, whose primary business is the liquidation of microcap stocks, for willfully violating Rule 17a-8 between July 2013 and July 2017 where broker-dealer "ignored numerous red flags listed in its AML policies, failed to properly investigate certain conduct, and ultimately failed to file SARs" on "numerous transactions" involving "the deposit of physical certificates, liquidation of the securities, and the immediate wiring of funds out of the customer's account."  *See* https://www.sec.gov/litigation/admin/2019/34-85867.pdf.

- *In re Gilford Secs., Inc., et al.,* SEC Release No. 65450 (Sept. 30, 2011):  SEC imposed a single penalty on broker-dealer (Gilford) of $260,000, together with $275,000 of disgorgement and $77,113 in prejudgment interest, for willfully violating Sections 5(a) and 5(c) of the Securities Act, Sections 15(b)(7) and 17(a) of the Exchange Act, and Rules 15b-7, 17a-3(a)(12) and 17a-8, and Rule 10 of Regulation S-P.  The Rule 17a-8 violation was based on Gilford's fail to file SAR on, *inter alia,* "suspiciously timed trading in low-priced, little known securities corresponding with the issuance of spam e-email, $30 million in international wire activity primarily to China and Cyprus," and the CEO of one of the issuers acting as a undisclosed beneficial owner and forgery of Rule 144 documents.  *See* https://www.sec.gov/litigation/admin/2011/33-9264.pdf.

- *In re Central States Capital Mkts., LLC,* SEC Release No. 84851 (Dec. 19, 2018):  This is a follow-on action to a *criminal* case against a broker-dealer for willful failure to file SARs regarding known illegal activities of its customers, that resulted in a deferred prosecution agreement and the payment of penalty of $400,000 collected through forfeiture.  In the follow-on action, the SEC held that broker-dealer willfully violated Rule 17a-8 by failing to file SARs, but imposed *no separate penalty.*  *See* https://www.sec.gov/litigation/admin/2018/34-84851.pdf.

In each of these matters, the SEC imposed penalty amounts that were a fraction of what it asks this Court to impose on Alpine. It did not seek penalties based on each individual SAR decision, nor did it propose $10,000 for each filing or for each failure to file.  Indeed, even where the broker-dealer criminally violated the BSA, the SEC considered the $400,000 penalty imposed by the prosecution to be sufficient. *See In re Central States Capital, supra.*

Furthermore, while there are some similarities between the types of SAR violations found here and in these matters, particularly the *COR Clearing*, *Vision Financial* and *Wilson-Davis* matters, those cases involved more serious violations.  Every one of those firms committed "willful" violations and failed over the course of years to file any SARs on transactions involving low-priced securities. Albert Fried received a $300,000 penalty where it filed *no SARs at all* for five years.  *In re Albert Fried & Co., supra.* Not only is there no evidence Alpine acted willfully, but also Alpine filed SARs on every transaction at issue, including the deposit side of the "deposit-liquidation patterns."

The SEC ignored all of these decisions, not even acknowledging for the Court the obvious inconsistency in its approach or offering any explanation for a penalty request that is many multiples  – between 28 and 350 times – of the penalties imposed in matters against comparably sized firms (although Aegis is much larger).[2]  The penalty sought by the SEC here for the "deposit-liquidation pattern" violations alone – $12,140,000 – is approximately 15 times

---

[2]  Alpine acknowledges there are other matters involving SARs brought by the SEC with higher penalties. But they involve willful violations by massive firms, such as Wells Fargo, UBS, Merrill Lynch and Oppenheimer. *See In re Wells Fargo Advisors, LLC,* SEC Release No. 82054 (Nov. 13, 2017) ($3.5 million penalty for "willful" failures to timely file "at least" 50 SARs); *In re UBS Fin. Servs., Inc.* SEC Release No. 84828 (Dec. 17, 2018) ($5 million penalty for "willful" failures in AML program and failure to file an undisclosed number of SARs on non-resident alien ("NRA") accounts; UBS branch at issue had nearly 6,000 NRA accounts through which over $9 billion was moved); *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.,* SEC Release No. 82382 (Dec. 21, 2017) ($13 million penalty for willful AML violations and failure to file SARs on "numerous suspicious money movements" over a six year period and filing late SARs); *In re Oppenheimer & Co.,* SEC Release No. 9711 (Jan. 27, 2015) (imposing undifferentiated $5,078,129 penalty, together with $4,168,000 in disgorgement and $753,471 in prejudgment interest for total of $10 million, for recidivist and  "willful": Section 5 violations, unregistered broker-dealer violations, violations of Rule 17a-3(a)(2), and failure to file an undisclosed  number of SARs).

Based on the comparative size and revenue of these firms – each of these firms has annual revenues of at least $15 billion, ███████████████████████████████████████ – the penalties imposed constitute a fraction of the firms' total revenues. For example, the $3.5 million penalty to Wells Fargo is 0.000036% of its $97 billion revenue; the $5 million penalty to UBS is 0.00015% of its $34 billion annual revenue; and the $13 million penalty to Merrill Lynch is .00087% of its $15 billion revenue.  Public revenue figures for these firms can be found at: https://www.macrotrends.net/. In a case involving a local Utah firm, similar to Alpine, *In re Wilson-Davis,* the $300,000 penalty was 2.8% of the firm's revenue of approximately $10.5 million. *See* http://www.wdco.com/uploads/files/157/2018-Wilson-Davis-Financials.pdf.

the penalty imposed in *COR Clearing,* 19 times that imposed in *Vision Financial,* and 41 times that imposed in *Wilson-Davis,* for a similar type of violation.

While the SEC may argue that those are settled matters and therefore not relevant, not only is that not true for the *Bloomfield* decision, but also the sole fact that Alpine has litigated this matter cannot justify the vast disparity of more than $20 million between the penalties imposed in these cases and the amount it seeks against Alpine. After all, the SEC has stated that "[t]he Commission believes it important to provide the maximum possible degree of clarity, consistency, and predictability in explaining the way that its corporate penalty authority will be exercised."[3] Its resolutions in those cases would have been predicated on its judgment that those amounts, at a fraction of the those firm's revenues, properly penalized the conduct and fulfilled the purpose of deterrence. *See In re Wilson-Davis* ($300,000 penalty was 2.8% of firm's total revenue of approximately $10.5 million); *In re Wells Fargo* ($3.5 million penalty was 0.000036% of firm's $97 billion revenue). Alpine should not be subject to a "litigation penalty" of more than $20 million, on these facts, because it contested liability, particularly where, as indicated below, Alpine has been and remains willing to consent to a number of affirmative undertakings to ensure against any risk of future violations. *See SEC v. Chester Holdings, Ltd.,* 41 F. Supp. 2d 505, 529 (D.N.J. 1999) (criticizing SEC's request for "large penalties" against some defendants "in comparison to those sought" against another defendant who "signed a consent order" and thus declining to impose penalties).[4]

---

[3] Press Release, SEC, Statement of the Sec. & Exch. Comm'n Concerning Financial Penalties (Jan. 4, 2006), http://www.sec.gov/news/press/2006-4.htm.

[4] *See also SEC v. Softpoint,* 958 F. Supp. 846, 868 (S.D.N.Y. 1997) (reducing penalty for "fundamental inconsistency" with amount imposed on other defendants for same conduct); *SEC v. Johnson,* No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *6 (S.D.N.Y. July 24, 2006) (refusing to punish the defendant for "simply mounting a vigorous defense"); *In re Workers' Comp. Refund,* 46 F.3d 813, 822 (8th Cir. 1995) (holding a "litigation penalty" can violate the constitutional right to access the courts where it includes "retaliatory action . . . designed either to punish [an individual] for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future").

The amount sought by the SEC here is also far in excess of the amounts generally imposed in other types of Tier 1 or records cases.  In these types of proceedings, both the amount of the penalty, and the methodology used to calculate that penalty, are reflective of the "technical" or recordkeeping nature of the violation.  For example:

- *SEC v. Slocum, Gordon & Co.,* 334 F. Supp. 2d 144, 187 (D.R.I. 2004) (imposing $1,000 penalty for "technical" violations of three statutory and regulatory provisions, for a total penalty against the firm of $3,000, because the defendants' violations "were not willful, and as no actual loss to clients resulted . . . this nominal penalty is appropriate").

- *In re Thomas C. Gonnella,* Initial Decision No. 706, 33 n.41 (Nov. 13, 2014) (despite finding multiple violations of the antifraud provisions of the Securities Act and Exchange Act and multiple recordkeeping violations of Section 17(a) of the Exchange Act, imposing one penalty of $75,000 for all of the antifraud violations as one course of conduct and one penalty of $7,500 for all of the record keeping violations as another course of conduct, for a total penalty of $82,500, and noting with respect to the recordkeeping violation, "[a]lthough [respondent] caused books and records violations each time he traded with [the counterparty], because I regard his actions as a single course of conduct, I impose a single penalty for the books and records violations." *See* https://www.sec.gov/alj/aljdec/2014/id706jeg.pdf.

- *In re Spring Hill Capital Mkts., LLC, et al.,* Initial Decision No. 919, 21 (Nov. 30, 2015) (where defendants operated as an unregistered broker dealer over a 10-month period, and after registering as a broker-dealer, then violated the recordkeeping, net capital and reporting requirements, ALJ did not separately penalize defendants for each transaction or each recordkeeping, net capital and reporting requirement violation, but treated these as two "courses of action" – one involving all of the acts and omissions associated with being an unregistered broker-dealer, and the other being all of the violations occurring after registration as a broker-dealer – for a total penalty of $82,500). *See* https://www.sec.gov/alj/aljdec/2015/id919cff.pdf.

- *In re Thomas Delaney II & Charles Yancy,* Initial Decision No. 755 (Mar. 18, 2015) (during a three year period, CCO of a clearing firm caused at least 1,500 violations of Reg Sho based on the firm's failure to timely close out fails to deliver. Where multiplying each violation by the maximum penalty could have led to liability, the ALJ imposed a $20,000 penalty for four units of violation ($5,000 each), each of which constituted a separate act of negligence – failure to convene a meeting of relevant personnel, incorrect assumption that company's stock loan department was compliant, failure to raise the issue with the individual charged with testing, and failure to follow up on a FINRA exit report to ensure compliance). *See* https://www.sec.gov/alj/aljdec/2015/id755jsp.pdf.

Lacking any authorities to support such a huge penalty against Alpine, under Tier 1 and for a non-scienter violation, the SEC cites only to cases involving a high degree of scienter and/or fraud, illicit profit and significant victim losses.[5]  Such cases are distinguishable on their face by the nature of the conduct at issue. Yet, with one exception, the *Tier 3* penalties imposed in these cases were far below what the SEC seeks against Alpine here, or were not awarded at all.[6]  And in that one exception, the *Pentagon* case, the district court did *not* ultimately base the penalty on an arithmetic calculation; it based the penalty on the amount of the defendants' ill-gotten gains. *SEC v. Pentagon Capital Mgmt. PLC*, No. 08 Civ. 3324 (RWS), 2012 WL 1036087, at *3-4 (S.D.N.Y. Mar. 28, 2012) (imposing "civil penalties in the amount equal to the pecuniary gain for the late trades through TW & Co., a sum of $38,416,500"), *aff'd in part, vacated in part*, 725 F.3d 279 (2d Cir. 2013).

In fact, the amount the SEC seeks against Alpine under Tier 1 is far more than is generally imposed in fraud cases under Tier 3. Over and over again, in cases involving substantial violations of the antifraud provisions, illicit gains, and significant investor losses, courts have consistently held to a single penalty within the tier range or equal to the illicit gain. For example, in *Robinson,* the defendant violated the anti-fraud provisions of the securities laws by fraudulently inducing over 207 investors to purchase stock. 2002 WL 1552049, at *1. Although the court described the defendant's conduct as "nothing but a polite form of theft" and his misrepresentations as "'flagrant, indeed one might say outrageous'" *id.* at *5 (citation

---

[5] *See* SEC Mem., at 11-12, citing *SEC v. Pentagon Capital Mgmt., PLC*, 725 F.3d 279, 288 n.7 (2d Cir. 2013); *SEC v. Milan Capital Grp., Inc.,* No. 00 Civ. 0108 (DLC), 2001 WL 921169, at *3 (S.D.N.Y. Aug. 14, 2001); *SEC v. Lazare Indus., Inc.,* 294 F. App'x 711, 715 (3d Cir. 2008); *Otis & Co. v. SEC,* 106 F.2d 579, 584 (6th Cir. 1939).  In the lone case that did not involve fraud, *SEC v. Colonial Investment Management, LLC,* 381 F. App'x 27, 32 (2d Cir. 2010), the court found that the defendants acted with a "high degree of scienter," and undertook actions to mask their violations of a short selling regulation in order to reap substantial profits.

[6]  *See Milan Capital, supra* ($10 million penalty); *Colonial, supra* ($450,000 penalty); *Lazare, supra* ($1,000,000 penalty on the firm and $500,000 penalty on owner and operator for 54 fraudulent stock sales, demonstrating the court did not impose a penalty for each separate sale). No penalties were imposed in *Otis & Co. See* 106 F.2d at 584.

11

omitted), and noted that he continued to make misrepresentations even after the court had entered a preliminary injunction against him, the court nonetheless imposed a single Tier 3 penalty of $100,000. *Id.* at *12. The court flatly rejected the SEC's request for a $22.77 million civil penalty ($110,000 per violation, multiplied by 207 investors). *Id.*[7]

The SEC's citation to this Court's decision in *Milan Capital* also warrants further discussion because that decision is notable primarily for its distinctions. That case involved a massive fraudulent scheme, with the defendants liable "for securities fraud and for aiding and abetting [a broker-dealer's] violation of broker-dealer registration requirements." 2001 WL 921169, at *1. In imposing a $10 million Tier 3 penalty, the Court emphasized that the violations "involved fraud and deceit" and resulted in "substantial losses to other persons," to wit over $8 million to investors and millions of dollars of additional investor funds that had "not been traced and remain missing." *Id.* at *3. The amount of the penalty was close to the amount of disgorgement and prejudgment interest awarded (approximately $9.4 million). *Id.* at *2.

Such facts are not present here: this case does not involve fraud, there is no evidence that anyone at Alpine acted with scienter, and there is no evidence that Alpine's violations caused any loss or resulted in any illicit gain.

---

[7] *See also SEC v. Bocchino*, No. 98 Civ. 7525 (JGK)(RLE), 2002 WL 31528472 (S.D.N.Y. Nov. 8, 2002) (defendant violated the anti-fraud provisions; the court ordered disgorgement of $35,090 and a single Tier 3 penalty of $35,090); *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 332 (S.D.N.Y. 2007) (defendant violated §§ 17(a), 5(a) and 5(c) of the Securities Act, and § 10(b) and Rule 10b-5 of the Exchange Act; the court imposed a single civil penalty of $120,000); *Softpoint*, 958 F. Supp. at 868 (defendant violated §§ 17(a) and 5 of the Securities Act, and § 10(b) and Rules 10b-5 and 13b2-1 of the Exchange Act in connection with his participation in the preparation and dissemination of a company's misstated 1992, 1993, and 1994 public filings; the court imposed a single civil penalty of $100,000); *SEC v. Save the World Air, Inc*., No. 01 Civ. 11586 (GBD)(FM), 2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005) (defendant violated § 17(a) of the Securities Act and §§ 10(b), 13(a), 13(b), and § 16(a) and Rule 10b-5 of the Exchange Act by making a series of fraudulent misstatements about a product over a year and a half; the court determined that a single civil penalty of $100,000 was appropriate); *SEC v. Converge Global, Inc.,* No. 04 Civ. 8084, 2006 WL 907567 (S.D. Fla. Mar. 10, 2006) (the defendant violated § 10(b) and Rule 10b-5; the court imposed a single $25,000 third-tier penalty); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 428-29 (D. Md. 2005) (defendant violated § 10(b) and Rule 10b-5 of the Exchange Act, § 17(a) of the Securities Act, and §§ 17(e)(1), 34(a), 34(b) and 37 of the Investment Company Act of 1940; court ordered disgorgement of $4.15 million and a single Tier 3 penalty of $120,000); *SEC v. Wolfson*, No. 02 Civ. 1086, 2006 WL 1214994 (D. Utah May 4, 2006) (defendants violated §§ 17(a), 5(a) and 5(c) of the Securities Act, and § 10(b) of the Exchange Act; court imposed a single civil penalty of $110,000 on each defendant).

**B.      The SEC's Claim that Alpine Acted with Scienter is Baseless and Contrary to the Uncontroverted Record.**

The SEC's contention that its unprecedented penalty request is warranted because Alpine acted with scienter is flatly contradicted by uncontroverted record evidence. The SEC fully embraced this Court's confirmation that it has no burden to prove scienter because this is a strict liability, books-and-records provision, successfully arguing to this Court that there were no issues of material fact in dispute because scienter was not at issue. *See SEC v. Alpine,* 354 F. Supp. 3d 396, 427 (S.D.N.Y. 2018). Even at the last conference with the Court, in response to a question from the Court regarding whether an evidentiary hearing would be required on penalties, the SEC told the Court that it was seeking only Tier 1 penalties. *See* April 12, 2019 Transcript, at 27:21-24.

It turns out, however, that the SEC wants the best of both worlds: it wants to not have to prove scienter but it also wants to procure a massive penalty entirely predicated on its conclusory assertion that Alpine engaged in willful and/or reckless conduct. Those conclusory claims permeate its brief, underpin the SEC's discussion of every one of the factors that pertains to penalties, and stand as the only purported justification for its request for a death penalty for Alpine.[8] If one strips those claims of scienter from the SEC's submission, nothing remains except an arithmetic calculation that is completely out of line with any penalty imposed for a strict liability offense. Without question, the SEC's penalty position here is entirely dependent on its *ipse dixit* allegations of deliberate misconduct and recklessness.

---

[8] *See* SEC's Mem. at 1 ("stubborn and deliberate refusal to fully report the suspicious activity that Alpine knew was flowing through the firm" and acted "with impunity" [sic]); at 4 (Alpine "recklessly disregarded its legal obligations" its "SAR decisions were deliberate"); at 6 ("Alpine's deliberate, wrong, and reckless view of the what law required made a mockery of a regulatory scheme" and Alpine "acted with reckless disregard of its legal obligations"); at 10-11 (Alpine's "reckless disregard" and Alpine's "misconduct undermined regulations intended to combat "terrorist" financing); at 13 (Alpine's "systematic and blatant violations of the law").

Because the SEC's request for skyscraping penalties depends on its allegations of scienter, this Court has to determine, first, whether the SEC has established the foundation of willfulness or recklessness that purportedly supports that result.  The answer is abundantly clear: it did not. The SEC was unable to cite to *any* testimony of the Alpine's employees who filed the SARs in support of its scienter claim.  As shown below, the undisputed evidence confirms that Alpine employees engaged in a continuous good faith effort to understand and comply with the requirements of the BSA, accomplished a marked improvement in its process in the wake of the 2012 FINRA exam, and experienced only limited issues from 2013 through 2015.

### 1.    The Record is Devoid of Any Evidence That Alpine Acted Recklessly or Willfully.

To prevail on the claim that Alpine engaged in reckless or willful misconduct, the SEC would be required to demonstrate that the ***employees*** of Alpine who filed those SARs "'knew or showed reckless disregard for the matter of whether its conduct was prohibited[.]'"  *McLean v. Garage Mgmt. Corp.*, No. 09 Civ. 9325 (DLC), 2012 WL 1358739, at *7 (S.D.N.Y. Apr. 19, 2012) (citation omitted); *Wyche v. Advanced Drainage Sys.*, No. 17-743-cv, 2017 WL 4570663, at *2 (2d Cir. Oct. 13, 2017) (in relation to a corporate entity, allegation of scienter requires that "'facts [] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter'") (citation omitted).

"Reckless disregard of a fact requires 'subjective awareness' of the probability of the existence of the fact."  *McLean*, 2012 WL 1358739, at *7.  "'Mere negligence is insufficient.'"  *Id.* (citation omitted); *accord S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 109 (2d Cir. 2009) ("[R]eckless disregard" requires "a state of mind approximating actual intent and not merely a heightened form of negligence") (emphasis omitted); *SEC v. Shanahan,* 646 F.3d 536, 543-44 (8th Cir. 2011) ("[R]ecklessness is 'the functional equivalent for intent,' requiring proof of 'something more egregious than even "white heart/empty head" good faith.'" (citations

omitted)); *SEC v. Mattera*, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *16-17 (S.D.N.Y. Dec. 9, 2013) (same).

The SEC's submission in this case is strikingly devoid of any articulation, or application, of the proper legal standard for willfulness or recklessness. The SEC has not argued, let alone put forth any evidence, that any of Alpine's officers or employees had actual knowledge that its SAR reporting violated the requirements of 31 C.F.R. § 1023.320. Nor has the SEC identified any evidence that any of Alpine's corporate officers acted in reckless disregard of the law, i.e., that they "were ***subjectively aware*** of a substantial danger" that their SAR reporting or decisions violated the SAR regulation, "but chose to stick with it nonetheless." *McLean*, 2012 WL 1358739, at *7 (emphasis added).

Rather, as in *McLean*, the SEC's claim of willfulness is based on nothing other than the Court's conclusion that strict liability violations occurred, with not even the assertion that Alpine employees were aware of, but violated, SAR filing requirements. The SEC's admits as much, again insisting that "the sheer number" of violations show that Alpine did not "'*reasonably attempt* [] to follow the requirements of Section 1023.320' and instead acted with *reckless disregard* of its legal obligations . . . ." SEC Mem. at 6 (citation omitted; emphasis added). This Court has rejected that type of argument, explaining in *McLean* that the existence of a violation, and even a finding that the defendant's conduct was unreasonable, does not translate to scienter. The SEC cannot "meet [its] burden" to show that "violations were willful for essentially the same reasons that they were unreasonable." *McLean*, 2012 WL 1358739, at *8. The D.C. Circuit also recently held that the SEC, having found that "repeated failures to adequately disclose" were "no more than negligent" in one context, "could not rely on the same failures as evidence of 'willful[]' conduct" in another context. *Robare Grp., Ltd. v. SEC*, No. 16-1453, 2019 U.S. App. LEXIS 12944, at *22 (D.C. Cir. Apr. 30, 2019) ("'Any given act may be

15

intentional or it may be negligent, but it cannot be both.'" (citation omitted)); *see also Moran,* 944 F. Supp. at 297 ("It is illogical to view negligent actions in the same light as intentional wrongdoing.").

Here, too, the SEC has not carried its burden.  It added nothing to its summary judgment presentation and it ignored everything in the record that bears on scienter – a record that is replete with abundant and undisputed evidence of Alpine's employees' good faith efforts to comply with the BSA reporting requirements, and which squarely refutes the SEC's claim that Alpine acted recklessly or willfully. *See SEC v. Howard,* 376 F.3d 1136, 1147 (D.C. Cir. 2004) (observing that "evidence of good faith" is "a relevant consideration in evaluating a defendant's scienter"); *Robare,* 2019 U.S. App. LEXIS 12944, at *21-22 (rejecting SEC's claim that defendants "'acted intentionally, as opposed to involuntarily' because they 'intentionally chose the language contained in the Forms ADV and intentionally filed those Forms,'" and rejecting the SEC's position that "neither the principals' 'alleged good faith mindset' nor their 'subjective belief that their disclosures were proper . . . is relevant to willfulness." (further quotations omitted) (ellipses in original)).

### 2.   The Uncontroverted Evidence Demonstrates that Alpine and Its Employees Developed and Implemented their AML and SAR Programs in Good Faith.

The allegations in this case begin with the period after March 2011, when Alpine was acquired.  The evidence shows, that at the time of that acquisition, Alpine had only limited compliance staff.[9]  Alpine immediately began bringing in legal and compliance personnel, hiring Elisha Werner, an attorney, within days of the acquisition.  Alpine went on to hire additional attorneys, including Betsy Voter, to serve as General Counsel, and retained Gerald Russello of

---

[9] *See* Declaration of Maranda Fritz in Opposition to the SEC's Motion for Remedies ("Fritz Decl.") Ex. 1 (Angotti Dep.), at 336. Also cited and attached to Alpine's Additional Statement of Facts in response to the SEC's Motion for Summary Judgment on Liability ("Alpine's Add'l SOF"), ¶ 77 [Dkt. 154].

Bingham McCutchen and Sidley Austin as the firm's outside counsel.[10]  Both of these individuals were available at all times to assist the staff with compliance issues.  As explained by its then-Chief Executive Officer, Todd Groskreutz, Alpine hired an AML officer, a chief compliance officer, retained outside counsel and had employees participate in continuing education classes through FINRA, all to advance their training and increase awareness.[11]

The hiring process continued in 2012 when Alpine was able to persuade Leia Farmer, an experienced compliance professional, to accept a position at Alpine and move to Salt Lake City. Ms. Farmer had 13 years' experience in the securities industry, serving as a CCO and AML Officer for Securities America and Brecek & Young.[12]  In addition to Ms. Farmer, Alpine brought in at least five more individuals in 2012 and 2013 to serve as analysts and compliance professionals.  Ms. Farmer testified that changes and improvements to Alpine's AML Program since 2012 included bringing in a surveillance team, creating an AML analyst position, focusing on training activity, expanding the AML personnel, refining the policies and procedures, and having members of the AML team become ACAMS certified.[13]

Each of the witnesses confirmed that no one at Alpine ever consciously omitted any pertinent information from a SAR narrative or attempted to evade the SAR filing rules in any manner.[14]  Christopher Frankel, as Alpine's Rule 30(b)(6) deponent, testified: "to the best of my knowledge that I can tell, in speaking to everybody that I have spoken with at Alpine, there was

---

[10] *See id.* Ex. 2 (Alpine Dep.), at 62-63; *id.* Ex. 3 (R. Jones Dep.), at 18; *id.* Ex. 4 (T. Groskreutz OTR), at 94-95; *id.* Ex. 5 (L. Farmer Dep.), at 65 (Alpine's Add'l SOF, ¶¶ 80, 114 [Dkt. 154]).

[11] *See id.* Ex. 4 (T. Groskreutz OTR), at 94-95 (Alpine's Add'l SOF, ¶¶ 80, 84 [Dkt. 154]).

[12] *See id.* Ex. 5 (L. Farmer Dep.), at 7-10 (Alpine's Add'l SOF, ¶ 82 [Dkt. 154]).

[13] *See id.* at 91 (Alpine's Add'l SOF, ¶ 108 [Dkt. 154]).

[14] *See id.* Ex. 6 (E. Green Dep.), at 95, 110; *id.* Ex. 2 (Alpine Dep.), at 156; *id.* Ex. 5 (L. Farmer Dep.), at 90 (Alpine's Add'l SOF, ¶¶ 109, 116 [Dkt. 154]).

zero conscious error to omit any information from a SAR[]."[15]  Likewise, Leia Farmer, who

continued as CCO and AML Officer through 2015, testified that she always made her best efforts

to ensure that Alpine was complying with the AML requirements and SAR filing requirements

and that her decisions were based on her belief that they fulfilled requirements.[16]  Erin Green,

who was employed in the AML department at Alpine when Leia Farmer was the AML Officer

and CCO, testified that they "had discussions on how to improve [the AML program] constantly

based on industry guidance, feedback, you know, things released by FinCEN.  So [they] had

those types of discussions about improvement always.  That's always been [her] goal, and it was

always [Leia Farmer's] as well."[17]  And Alpine's AML program had support from Alpine's

management to continue to develop and grow the program.[18]  These are uncontested facts.

    With respect to the filing of SARs, Ms. Farmer explained that she acted diligently to

understand the BSA requirements and apply them in the context of the business in which she was

employed and with a focus on the particular risks associated with Alpine's business.[19]  She

confirmed Alpine's position that "[a]s the majority of Alpine's business involves the deposit of

penny stock, Alpine strives to achieve balance between understanding when the activity is

suspicious and acknowledging when the activity aligns with the client's typical account

activity."[20]  Substantial resources were, therefore, devoted to the Section 5 analysis and, as

confirmed by the SEC's expert, the SEC has not even alleged that Alpine failed in that critical

---

[15] See id. Ex. 2 (Alpine Dep.), at 156; see also id. Ex. 5 (L. Farmer Dep.), at 90 (Alpine's Add'l SOF, ¶ 116 [Dkt. 154]).

[16] See id. Ex. 5 (L. Farmer Dep.), at 90 (Alpine's Add'l SOF, ¶ 116 [Dkt. 154]).

[17] See id. Ex. 6 (E. Green Dep.), at 95, 110 (Alpine's Add'l SOF, ¶ 109 [Dkt. 154]).

[18] See id. Ex. 5 (L. Farmer Dep.), at  93 (Alpine's Add'l SOF, ¶ 110 [Dkt. 154]).

[19] See id. Ex. 7 (E. Zipprich Decl.), ¶ 35; id. Ex. 5 (L. Farmer Dep.), at 34-35, 58-59, 68-69, 88-89, 203-204 (Alpine's Add'l SOF, ¶¶ 83, 97, 104, 219 [Dkt. 154]).

[20] See id. Ex. 5 (L. Farmer Dep.), at 68-69 (Alpine's Add'l SOF, ¶ 219 [Dkt. 154]).

analysis.[21]  Ms. Farmer also testified that she was aware and relied on the ruling in *Sterne Agee,*

the leading published opinion at the time which had flatly rejected the notion that there were

hard-and-fast rules for the content of a SAR narrative, and held that the firm was reasonable in

including in the narrative those circumstances that it considered significant while excluding other

red flag characteristics.[22]  She understood from that decision and other guidance "that the

assessment of SAR filings was to be looked at in the overall context of the program."[23]  She was

familiar also with that court's conclusion that "the deposit and liquidation of low-priced

securities, even when done repeatedly – need not, without more, be considered suspicious."[24]

Ms. Farmer explained that the failure to include particular items of "red flag" information

in the narrative of the SAR was not the result of a disregard of a known obligation; it was, in her

view, consistent with the extensive guidance she had reviewed and FinCEN's consistent

direction that the firm state in the SAR narrative the firm's reason for filing the SAR.

> [A red flag] is simply a trigger.  It's simply a flag or something that we would then
> review, monitor more carefully, look more closely to determine whether it really truly –
> whether the activity, based on what we knew about the client either directly or indirectly,
> meaning through the introducing broker-dealer, would be enough to determine whether to
> file or not file a SAR.[25]

Continuing, Ms. Farmer testified,

---

[21] *See generally* Alpine's Add'l SOF, ¶¶ 118-135 [Dkt. 154] (Alpine's discussion of its robust Section 5 compliance review and efforts); Fritz Decl. Ex. 1 (Angotti Dep.), at 177-180 (Alpine's Add'l SOF, ¶ 135) (SEC's expert confirmed that she did not identify one instance in which Alpine had cleared a deposit that was later found to constitute a violation of Section 5).

[22] *See In re Sterne, Agee & Leach, Inc.,* No. E052005007501, at 32-33 (Mar. 5, 2010) found at: https://www.sec.gov/litigation/admin/2015/33-9844.pdf.

[23] *See* Fritz Decl. Ex. 5 (L. Farmer Dep.), at 75.

[24] *See id.*, at 54-55.

[25] *See id.*, at 82-83; *id.* Ex. 2 (Alpine Dep.), at 68-70, 76; *id.* Ex. 6 (E. Green Dep.), at 119, *id.* Ex. 3 (R. Jones Dep.), at 75-76 (Alpine's Add'l SOF, ¶ 50 [Dkt. 154]). This is also consistent with the Examination Manual of the Federal Financial Institution Examination Counsel ("FFIEC"), at Apdx. F-1 (listing 129 "red flags of money laundering and terrorist financing" and stating these "examples are red flags that, when encountered, may warrant additional scrutiny.  The mere presence of a red flag is not by itself evidence of criminal activity.  Closer scrutiny should help to determine whether the activity is suspicious or one for which there does not appear to be a reasonable business or legal purpose."); *id. at Suspicious Activity Reporting – Overview* ("By their nature, SAR narratives are subjective, and examiners generally should not criticize the [financial institution's] interpretation of the facts.").

FINRA put together a list of – of, you know, bulleted points where they believed that the activity could be suspicious in nature. They were very clear to say it could be, not necessarily that it was, but that firms ought to consider this as part of their program.[26]

Based on her understanding of guidance, Leia Farmer did not believe that the items listed in FINRA Notice 09-05 "by definition had to be part of the narrative."[27]

With respect to the red flags at issue in this case, the SEC failed to show that Alpine ignored those red flags in its assessment of the transactions or preparation of the narratives.[28] While the SEC asserts in conclusory fashion that individuals at Alpine held a "wrong, and reckless view of what the law required" which "made a mockery" of the AML regulatory provisions, it does not and cannot cite to any evidence that Alpine employees were "subjectively aware" of an automatic requirement that particular red flag items be included in the narrative or that they knowingly failed to comply with that obligation.  In fact, the evidence demonstrated the opposite: in each of the red flag categories, Alpine considered and reviewed those circumstances, often cleared them through its analysis, and also included a reference to them in the narrative where they contributed to the firm's finding of suspiciousness.[29]

With respect to related litigation, for example, Ms. Farmer testified that Alpine will "look at the specific activity occurring in the account to determine its relevance to that adverse history" and that the decision as to whether to discuss a customer's history "depends on the facts and

---

[26] *See id.* Ex. 5 (L. Farmer Dep.), at 84 (Alpine's Add'l SOF, ¶ 51 [Dkt. 154]).

[27] *See id.* at 89 (Alpine's Add'l SOF, ¶ 52 [Dkt. 154]).

[28] The separate issues of the use of "templates" and the deposit-liquidation patterns are discussed *infra,* at Point I, Sections B(3), and D.

[29] *See e.g.* Alpine's Add'l SOF, ¶ 198 [Dkt. 154] (chart showing analysis in the support file resolving each SAR in the shell company or derogatory history of stock category); *id.* ¶ 203 (chart showing analysis in the support file resolving each SAR in the stock promotion category); *id.* ¶ 207 (chart showing analysis in the support file resolving each SAR in the unverified issuer category).  Furthermore, Alpine submitted "fulsome" SAR narratives for SARs found deficient for an omission of a red flag but addressed one or more other red flags in the narrative.  For example, Alpine's disclosed related criminal or regulatory history in the following SAR narratives: 4, 363, 394, 430, 480, 498, 515, 553, 586, 612, 616, 647, 664, 699, 701, 703, 717, 778, 794, 809, 810, 813, 818, 1783, 1825, 1830, 1847, 1869, 1872, 1908, 1938, 1967, 1968, 1969, 1970, 1971.  *See* Alpine's Exhibit B-7 [Dkt. 183-10].

circumstances in that case" including, the "proximity of the activity" to the transaction at hand,

and whether the specific criminal or regulatory history is relevant to the transaction at hand."[30]

She also considered whether a particular litigation was still pending, as opposed to concluded, in

evaluating whether it was indicative of suspiciousness or should be discussed in the narrative.[31]

Ms. Farmer also reviewed and considered stock promotional activity including its relation

to potential manipulation.  Given the fact that stock promotion was and remains lawful, subject

to the specific disclosure requirements contained in Section 17(b) of the Exchange Act, Ms.

Farmer did not consider it automatically indicative of criminal activity, but did view a promotion

as relevant to a SAR filing if "the client is somehow involved or associated with the promotional

activity."[32]  For example, if the actual promoter was depositing stock, Alpine would investigate it

further to assess whether the transaction was suspicious.  On the other hand, "[w]here the firm's

investigation reveals that the promotion activity is not germane to the intent of the SAR filing,

the firm employs its best judgment on which information may be relevant to provide."[33]  As

reflected in each of the support files of the SARs at issue, Alpine's employees analyzed the stock

promotion, some outside Alpine's 30-day look-back window, and disclosed promotional

activities where it fell within its parameters.[34]

Similarly, with respect to negative information relating to issuers, Alpine believed the

fact that a company was a shell at some point, had been subject to name changes or had been

delinquent in filings was not so unusual for start-up or emerging companies as to suggest

---

[30] *See* Fritz Decl. Ex. 5 (L. Farmer Dep.), at 70-71 (Alpine's Add'l SOF, ¶ 181 [Dkt. 154]).

[31] See *id*. at 79-80 (Alpine's Add'l SOF, ¶ 185 [Dkt. 154]).

[32] *See id.*, at 80-82 (Alpine's Add'l SOF, ¶ 200 [Dkt. 154]).

[33] *Id*.

[34] Alpine submitted "fulsome" SAR narratives wherein a red flag was omitted but other red flags were identified.  For example, Alpine cited to promotional activities in SAR Nos.: 180, 204, 234, 668, 785, 1938, 1940).  *See* Alpine's Exhibit B-7 [Dkt. 183-10].

criminality.  Ms. Farmer testified that "the mere fact that a company was a shell company and no longer ceases to be a shell company wasn't necessarily indicative of suspicious activity.  It is something that we would look at on a facts and circumstance analysis to determine whether that specific fact was relevant to that particular filing."[35]  Alpine addressed issuer status in relation to each and every SAR at issue and provided for the Court the page number in every support file that reflected Alpine's belief that any deficiency was cleared by the filing of 10-Ks and 10-Qs.[36]

Finally, where the transaction involved a foreign jurisdiction, Ms. Farmer testified that Alpine did not view the foreign location of a customer as necessarily suspicious or indicative of criminal activity.  Alpine would review and adhere to any country listed by the Office of Foreign Assets Control ("OFAC") or any other specific rule or regulation.[37]  Alpine also included the foreign address of its customer in the SAR form.[38]

In its review of the transactions and its preparation of the narratives, Alpine acted with both diligence and good faith: it reviewed each of the transactions at issue, assessed the red flags and filed SARs on all of the large deposits of low-priced securities at issue.  Alpine's employees' failures to include particular items of information in SAR narratives were neither deliberate nor reckless, but were instead a product of the view that those items were not relevant to their filing decision or otherwise a required part of the narrative. This Court has disagreed with Alpine's employee's subjective determinations of what was suspicious about a transaction, and ruled on objective grounds that Alpine's view was not the correct interpretation of SAR filing and narrative requirements.  But the fact that Alpine employees did not act in deliberate or reckless

---

[35] *See* Fritz Decl. Ex. 5 (L. Farmer Dep.), at 104-106 (Alpine's Add'l SOF, ¶ 193 [Dkt. 154]).

[36] *See* Alpine's Add'l SOF, ¶¶ 206-207 [Dkt. 154] (chart showing Alpine's analysis of every SAR at issue).

[37] *See* Fritz Decl. Ex. 5 (L. Farmer Dep.), at 100-102 (Alpine's Add'l SOF, ¶ 213 [Dkt. 154]).

[38] *See* Alpine's Add'l SOF, ¶ 215(d) [Dkt. 154] (stating, on each SAR on Table A-7 where the SEC alleged that "Belize" was omitted from the SAR (107 SARs in total), the SEC failed to account for an address in Belize on page 2 of the SAR).

disregard of known SAR filing requirements is uncontroverted.  *McLean,* 2012 WL 1358739, at

*8 (acting incorrectly or unreasonably is insufficient to show willful or reckless noncompliance).

### 3.    Alpine Continually Improved its SAR Reporting and AML Program.

Alpine's good faith efforts to comply with its reporting obligations is evidenced also by

the demonstrable and substantial improvements to its program and performance, including to its

SAR narratives.  A substantial portion of the violations in this case involved Alpine's filing of

"template" SARs during the first year after its acquisition and prior to the hiring of Leia Farmer

and the 2012 FINRA examination.  During that period, Alpine filed SARs on all large deposits of

low-priced securities, regardless of whether it considered the transaction to be indicative of

criminal activity.  Again, the evidence is clear that it did so not in defiance of regulatory

requirements, but because it understood from discussions with FINRA that it was expected to do

so.[39]  Those SAR narratives frequently cited Alpine's "policy" of filing SARs, even in the

absence of an indication of criminal activity, and they contained only a brief description of the

actual stock deposit. *See* Alpine's Add'l SOF, ¶¶ 60-74 [Dkt. 154].

Equally clear from this record is that Alpine filed other SARs that were markedly

different from those "template" SARs, and which illustrate Alpine's attention to and ongoing

efforts to comply with SAR filing obligations.  Thus, where Alpine found the transaction

suspicious and reportable, the SAR narrative described the firm's analysis including the firm's

robust Section 5 review and stated the reasons the firm considered the transaction suspicious.[40]

The issue of Alpine's use of template narratives was specifically addressed in the 2012

FINRA examination.  That report, although not articulating any rules for inclusion of red flags in

---

[39] *See generally* Alpine's Add'l SOF, ¶¶ 60-75, 88 [Dkt. 154] (testimony regarding Alpine's filing of voluntary and template SARs).

[40] *See* Alpine's Add'l SOF, ¶ 89(a)-(e) [Dkt. 154] (providing to the Court 32 examples of SARs filed during 2011 and 2012 with fulsome SAR narratives discussing at length red flags and Alpine's reasons for suspicion).

a SAR narrative, did criticize Alpine for the templates as providing "insufficient narratives."[41] After receiving that examination report, Alpine corrected that deficiency.  The SEC has obtained judgment on 1,015 instances where the narrative failed to include the "five essential elements."[42] The SEC's expert's analysis showed that, out of those 1,015 deficiencies, only 22 occurred after the 2012 FINRA examination.[43]  The SEC's expert acknowledged that Alpine's program developed and demonstrably improved from 2012 forward.[44]  When asked "whether there were any changes or developments in Alpine's AML program during that period" in 2012 forward, she responded that "I think they got a new compliance officer around that time, a new AML compliance officer."[45]  And, by 2015, the SEC's expert no longer viewed Alpine's AML program as "failing" and stated, "we did not find any omissions at all."[46]

Although this Court held that Alpine's good faith effort to improve its reporting over time did not immunize it from liability, it does further undermine the SEC's theory of recklessness. As this Court confirmed in *McLean*, even where "the relevant provisions of the labor law were clear at all times," and there were "prior government investigations" which "sufficed to acquaint the defendant with the general requirements of the law," there was no basis to find recklessness because there was no "evidence" that defendants were "subjectively aware of a substantial danger" that their procedures violated the law" or "knowingly risked violating the [law] in order to save money."  2012 WL 1358739, at *7-8. Similarly, there is no such evidence here.

---

[41] Notably, FINRA did not bring an action against Alpine for those same SARs and issues that now form the basis for this action.

[42] *See* SEC's expert's chart and graph, Fritz Decl. Ex. 8.

[43] *Id.*, Ex. 8.  In the Court's December 11 Opinion, the Court found that "Of those 1,593 SARs, approximately two-thirds were filed before September 28, 2012, when Alpine received the FINRA Report."  *See SEC v. Alpine Secs. Corp.*, 354 F. Supp. 3d 396, 409 (S.D.N.Y. 2018).

[44] *See* Fritz Decl. Ex. 1 (Angotti Dep.), at 308-309, 337-338, 340-342 (Alpine's Add'l SOF, ¶ 92 [Dkt. 154]).

[45] *See id.*, at 266.

[46] *See id.* at 308-309, 337-338, 340-342 (Alpine's Add'l SOF, ¶ 92 [Dkt. 154]).

That the SEC failed to demonstrate that Alpine's employees consciously disregarded any clear requisites is illustrated even by the arguments and the decisions in this proceeding. From the outset, the SEC made clear that this is a "case of first impression."[47] This Court has held that 31 C.F.R. § 1023.320 is "ambiguous," and confirmed that a lack of awareness of the obligations under the SAR regulation "may be relevant to an award of damages." *Alpine,* 354 F. Supp. 3d at 418; *see also Martincic v. Urban Redev. Auth. of Pittsburgh*, 844 F. Supp. 1073, 1076 (W.D. Pa. 1994) (courts "will not penalize a party for choosing the narrower and less burdensome interpretation of an ambiguous regulation.").

From the outset of this litigation, it became clear that even those involved with the SEC did not agree on the requirements for a SAR narrative, or when a SAR must be filed. Initially, the SEC's narrative SAR table (missing "red flags") included 2,013 SARs, although, in early conferences with the Court, the SEC stated that they could not identify *what* was even deficient in Alpine's SAR narratives.[48] Hundreds were then removed because both the SEC's expert did not agree with the SEC's claim.[49] As the case went on, most of the "red flags" categories defined by the SEC were also altered or refined by the Court. The SEC insisted that there were obvious and automatic requirements for inclusion of any information, no matter how remote or tangential, involving the background of the customer and the issuer. The Court fashioned a narrower requirement. The SEC initially insisted there was a clear requirement that any stock

---

[47] *See* SEC's Opposition to Alpine's Motion to Dismiss, at 1 [Dkt. 30].

[48] *See* November 2, 2017 Hearing Transcript, at 21-22, 38 [Dkt. 61]. In fact, during that hearing the SEC alleged and discussed purported deficiencies in three sample SARs, Item Nos. 48, 199, and 287. It did not obtain summary judgment on a single one of these SARs. *See* SEC's Revised Table [Dkt. 193-1]. Two of these sample SARs, Nos. 48 and 199, were removed from consideration by the SEC's expert because she found nothing wrong with them, and the Court denied summary judgment for the SEC on SAR No. 287.

[49] For example, the SEC's expert confirmed that even among the SARs that were initially identified by the SEC as violations, "we actually saw some that were good, that were adequate. 200 of them" and removed them from the listing of violations. *See* Fritz Decl. Ex. 1 (A. Angotti Dep.), at 227, 292-93; *accord id.* at 135-36 (confirming "after we looked at them, we did find some SARs that appeared on their face to be sufficient and there were no – was no information, supporting documentation that we felt was omitted.")*; accord* at 296 (reiterating same point).

promotion information had to be referenced in the narrative; the Court again established a more limited requirement.  The SEC initially maintained that a BSA violation occurred whenever the filer failed to note that that the transaction involved a deposit equal to or greater than the average daily trading volume.[50]  The SEC's expert disagreed, changing that "red flag" to a deposit that was three times the average daily trading volume, and the Court described a different one yet. Again, recently, the Court rejected the SEC's contention that 495 SARs should be included in the grant of summary judgment because those SARs are based on "the frequency and high volume of the large deposits of LPS by Customer A."  *See* Order, at 3 [Dkt. 195].  While the SEC argued there were clear automatic requirements for when or SAR must be filed or for what must be included in a SAR narrative, again and again those purportedly "clear" requisites were not accepted by its expert or by the Courts views of those requirements.[51] Even SEC Commissioner Hester M. Peirce recently remarked that "there is no clear rule delineating when firms should file a SAR, so they and their compliance officers are left to exercise their own judgment," and cautioned that "enforcement actions" should not be brought "because we disagree, in hindsight, with their judgment."[52]

In summary, the SEC has failed to point to any evidence from the record that Alpine's employees acted in willful or reckless disregard of the SAR obligations.

---

[50] *See* November 2, 2017 Hearing Transcript, at 8:15-9:20 [Dkt. 61].

[51] Further evidence of the novel issues in this case, and the absence of prior clear and comprehensive guidance, can be found in the numerous articles written regarding the "new" standards set forth in the Court's Opinion. "I have already seen in my practice some regulators inquiring about the red flags that show up in this order," a New York-based compliance attorney who declined to be identified told moneylaudering.com. "To have an opinion that goes into such painstaking detail about what broker-dealers should and shouldn't include is something they can use."  *See* "Federal Ruling May Prompt Detailed SARS from U.S. Broker-Dealers," Bao Nguyen, found at: https://kaufmanrossin.com/news/federal-ruling-may-prompt-detailed-sars-from-u-s-broker-dealers/  In another article, titled "Decision Provides Rare Judicial Guidance on SAR Filing Requirements," the author notes that "[b]ecause most SAR-related enforcement actions are resolved without litigation, this decision is a rare instance of a court's detailed examination of SAR filing requirements."   *See* "Court Upholds SEC Authority and Finds Broker-Dealer Liable for Thousands of Suspicious Activity Reporting Violations," H. Christopher Boehning *et al*., found at: https://wp.nyu.edu/compliance_enforcement/2019/01/10/court-upholds-sec-authority-and-finds-broker-dealer-liable-for-thousands-of-suspicious-activity-reporting-violations/

[52] Alpine provided this speech to the Court as supplemental authority on November 21, 2018 [Dkt. 173].

### C.      The Repetitive Nature of the SAR Deficiencies Does Not Support a Finding of Recklessness.

As virtually the only factual basis for its claim of reckless or willful conduct (and for every other relevant consideration), the SEC points to the "high volume of violations."  SEC's Mem., at 4; *see also id.* at 1, 6, 10.  This numerical emphasis ignores and distorts critical facts apparent in this record. First, according to the SEC, Alpine filed more SARs "than any other individual broker-dealer." Compl., at 8 [Dkt. 1].  That act alone shows that Alpine was attempting to comply in good faith with reporting requirements.  As explained by Alpine's expert, "Certainly Alpine filed many SARs, which belies a claim that it did not have a reasonable AML program that reviewed and considered SAR filing issues."[53]

The volume of its filings also supports the view that it was continuously monitoring the issues that corresponded to the risks of the market in which it operated.  The SARs that were filed reflect its scrutiny of Section 5 issues and its efforts, albeit unsuccessful at times, to include a proper narrative which identified and discussed many of the red flags at issue in this proceeding.  Those narratives omitted other red flags referenced in the support file but there is no benefit, intent, or motive for Alpine to file a SAR, address one red flag, and purposefully not include a second red flag.  There is similarly no motive for Alpine to file a SAR on a deposit and then purposefully fail to file on a subsequent sale.  That such occurred bespeaks error or misapprehension, not deliberate or reckless omissions. *See SEC v. Steadman,* 967 F.2d 636, 642 (D.C. Cir. 1992) (reversing finding of recklessness where there was no evidence of "any motive" for defendants to not register their shares under state Blue Sky laws and observing that "[a]ny accusation of bad faith would seem unfounded, because [defendants] had little, if anything to gain from discontinuing Blue Sky registration."); *McLean*, 2012 WL 1358739, at *8 (no

---

[53] *See* Alpine's Add'l SOF, ¶ 117(e) [Dkt. 154].

recklessness where there was no evidence "defendant knowingly risked violating the [law] in order to save money." ).

Nor does a singular focus on the number of deficiencies accurately reflect the events and decisions that were made by the employees of Alpine. For example, in hundreds of instances, the omission of an item relating to regulatory history occurred in relation to an original SAR filing, and subsequent filings simply repeated the exact same verbiage. As noted by the SEC's own expert, 1,466 of the 1,594 transactions reported in the SARs summarized on SEC's Exhibit 10 in summary judgment were cleared by Alpine for the accounts of just six customers.[54] Similarly, the vast majority of the 675 related litigation issues involve only three customers with the same omission repeated. The parties' jointly filed "Schedule of SARs as to which Court Granted Summary Judgment" [Dkt. 186 at 4] demonstrates that there are a limited number of errors made by Alpine's compliance personnel but hundreds of instances of that error appearing in a subsequent filing. The emphasis should be *not* on whether those errors were repeated but on whether the initial SAR filing decisions relating to the omission of that information was either deliberate or reckless. The evidence and circumstances demonstrate that it was not.[55]

### D.   The SEC's Assertion that Alpine "Deliberately" Established an AML Program that Did Not Monitor Sales is Directly Contradicted in the Record.

In regards to the deposit/liquidation SARs, the SEC asserts that "Alpine deliberately set up an AML program that did not monitor sales that followed deposits throughout the relevant time period." SEC's Mem. at 6. Again, the SEC failed to provide any support for that allegation. Conversely, the undisputed record evidence confirmed that Alpine had a surveillance team and reviewed sales.

---

[54] *See* Alpine's Add'l SOF, ¶ 187 [Dkt. 154] (citing the SEC's expert's Declaration at ¶ 33, Ex. 1 to SEC's SOF [Dkt. 148].

[55] The circumstance of a violation that recurs is precisely contemplated by the penalty factors which plainly envision that a particular act or omission would be the subject of a penalty with that penalty enhanced if the violation occurred repeatedly.

Leia Farmer testified that Alpine "had a surveillance analyst within the compliance department" that looked for "activity that moved the market in a particular direction."[56] Furthermore, she testified that if a liquidation of a stock was occurring and those indicators were present, "[t]hat would trigger a referral for additional review" to "the AML officer or the designee." *Id.*  Likewise, Randall Jones, a past Alpine AML Officer, stated that when reviewing trades, Alpine's employees in the market surveillance and trading departments look for any sudden spikes in share prices or volume of a stock.[57]  In addition, Alpine properly surveilled for indicia of manipulation, e.g., wash trades, match trades, coordinated sales, spikes, or oversized returns and referred any issues to the AML Officer.[58]  Alpine's Rule 30(b)(6) designee testified that ***Alpine reviews every sale*** of securities for potential SAR and AML issues and has a supervisor sign off on trade blotters every day.[59]  Its SARs also confirm that Alpine reviewed trades and filed SARs regarding concerning trading activities; Alpine submitted to this Court approximately 20 SARs that reflected Alpine's surveillance, analysis and reporting of trading issues.[60]  Notably, these SARs were part of the group of 205 SARs that the SEC originally asserted contained deficiencies, but the SEC's own expert disagreed and removed them from the submitted tables on summary judgment.[61]

Nor did Alpine, having filed SARs on the deposit side of every "deposit-liquidation" group at issue, deliberately fail to then file additional SARs in relation to the sales.  Alpine's employees focused on and reviewed the transaction at the time of the deposit, before the shares

---

[56] *See* Fritz Decl. Ex. 5 (L. Farmer Dep.), at 85-87 (Alpine's Response to SEC's SOF No. 47, at 52 [Dkt. 154]).

[57] *See id.* Ex. 9 (R. Jones Supp. Decl.), ¶ 28 (Alpine's Add'l SOF, ¶ 225 [Dkt. 154]).

[58] *See id.*; *see also id.* Ex. 4 (T. Groskreutz OTR), at 41 (Alpine's Add'l SOF, ¶ 225 [Dkt. 154]).

[59] *See id.* (Alpine Dep.), at 177, 179; *id.* Ex. 6 (Green Dep.), at 133; *id.* Ex. 5 (L. Farmer Dep.), at 86; *id.* Ex. 3 (R. Jones Dep.), at 77-78 (Alpine's Add'l SOF, ¶ 227 [Dkt. 154] (emphasis added)).

[60] *See* Alpine's Add'l SOF, ¶¶ 230(a)-(e) [Dkt. 154].

[61] *Id.* (referencing Exhibits 183-201 attached thereto).

entered the market, because it understood that the stock was being deposited for the purpose of liquidation.[62]  Alpine's review of the deposit assumed and considered that it was being deposited for purposes of sale; if the stock was not going to be sold, if it was just going to sit in the account, then issues like stock promotional activity or issuer status have no relevance and the transaction would possess none of the attributes of unlawful activity.  Alpine, therefore, assuming that liquidation would follow, reviewed the transaction in that context and filed its SARs.[63]  When that sale then occurred, Alpine's employees did not view that as a new, separate and suspicious event unless it had the other suspicious circumstances identified above.[64]  While the Court held that the view of Alpine's compliance professionals was not correct, there is no evidence that any of them intentionally or recklessly disregarded a known risk.[65]

### E.    Alpine's Legal Position Is Not Evidence of Recklessness.

Lacking any other factual basis for its penalty demand, the SEC resorts to venting its frustration at Alpine's defense of this case, claiming Alpine's litigation position evinces scienter and supports a harsher penalty.  The SEC argues that Alpine's recklessness is evidenced by its attempt "to shift responsibility for its compliance to its introducing broker and regulators such as [OCIE] and [FINRA]."  SEC's Mem. at 7.  It argues that Alpine claims to be "blameless" –

---

[62] *See id.* Ex. 2 (Alpine Dep.), at 41, 175 (Alpine's Add'l SOF, ¶¶ 217-218 [Dkt. 154]) (Christopher Frankel, Alpine's Rule 30(b)(6) designee, testified that "People didn't deposit securities generally at Alpine to leave securities long in their brokerage account.  So [the deposit and quick sale of that deposit] was kind of one and the same."  Continuing, Mr. Frankel stated that "Alpine views that any time somebody deposits a security, there's going to be a sale. Nobody deposits securities in general and parks them in Alpine's coffers.  It's not the business that they are in.").

[63] Alpine's review of the deposit assumed and considered that it was being deposited for purposes of sale; if the stock was not going to be sold, if it was just going to sit in the account, then issues like stock promotional activity or issuer status have no relevance and the transaction would possess none of the attributes of unlawful activity.

[64] *See* Fritz Decl. Ex. 5 (L. Farmer Dep.), at 54-55, (Alpine's Add'l SOF, ¶ 220) (Leia Farmer testified that "the deposit and liquidation of low-priced securities, even when done repeatedly – need not, without more, be considered suspicious."); *see Id.* Ex. 2 (Alpine Dep.), at 176, (Alpine Add'l SOF, ¶ 228 (stating that when a SAR is filed *after* a liquidation had occurred, the liquidation is not mentioned in the SAR filing because the filer did not find the liquidation suspicious.)

[65] There were no cases of which Alpine is aware that recognized such an obligation during the relevant time period, and it was not raised during the 2012 FINRA examination. This is a new enforcement initiative that is being pursued by the SEC, and the *COR Clearing, Wilson-Davis,* and *Vision Financial* cases were filed after *this* litigation. Alpine filed SARs on all of the stock deposits, and would have filed on the sales too, if it were aware of this requirement.

without any citation to where Alpine has made such a statement.  Not only are those assertions a

distortion of Alpine's arguments but also it is unseemly at best for the SEC to contend that

properly developed and relevant arguments, made in the course of these proceedings, are

evidence of Alpine's scienter at the time of the transactions or that they constitute a proper basis

for imposition or enhancement of a penalty. As the D.C. Circuit has observed:

> The securities laws do not require defendants to behave like Uriah Heep in order
> to avoid injunctions. ***They are not to be punished because they vigorously
> contest the government's accusations***. We think 'lack of remorse' is relevant
> only where defendants have previously violated court orders, or otherwise
> indicate that they did not feel bound by the law. As such, it is really only another
> indication as to whether it is 'reasonably likely' that future violations will occur in
> the absence of an injunction.

*SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989) (emphasis added); *accord*

*SEC v. Johnson*, No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *6 (S.D.N.Y. July 21, 2006)

(adopting the D.C. Circuit's rationale, and refusing to penalize defendant for "simply mounting a

vigorous defense"); *cf. WHX Corp. v. SEC,* 362 F.3d 854, 860-61 (D.C. Cir. 2004) ("Finding a

violation 'serious' and 'willful' simply because of a failure to comply immediately with the

staff's interpretation effectively punishes parties who make Wells submissions that are ultimately

unsuccessful. To do so is arbitrary and capricious . . . .").

The SEC also misrepresents Alpine's position. Alpine has not tried to "shift

responsibility" to its introducing broker.  SEC Mem. at 7. Although Alpine pointed out that

introducing and clearing brokers have different AML responsibilities, which is true, Alpine never

claimed it was not bound by the SAR regulations.  Nor did Alpine claim that its violations should

be excused because the regulators did not "discover them sooner." *Id.*  The SEC does not cite to

any evidence to support that assertion, and it should be disregarded.

The SEC also complains about Alpine's argument that a significant quantity of its filings

were voluntary.  But Alpine's assertions were legally relevant, factually supported and properly

presented.  The SEC's allegations in this case required that it prove, as a threshold issue, that the filings were mandatory.  As held by this Court, "[t]he burden rests on the SEC, however, to prove that a SAR was required to be filed." *SEC v. Alpine Secs. Corp.,* 308 F. Supp. 3d 775, 800 (S.D.N.Y. 2018).  Alpine put forth substantial evidence including contemporaneous documents establishing that many of the filings at issue were not predicated  on any  determination by Alpine that the transaction was "suspicious," and therefore constituted voluntary filings, contemplated and permitted under with BSA.  Leia Farmer, for example, testified that Alpine filed SARs on large deposits of low-priced securities based on feedback from regulators and in response to regulatory notices suggesting that regulators may view certain deposits as suspicious even if Alpine did not.[66]  And guidance at the time from the NASD confirmed that "voluntary reporting is useful to the government."[67]

Under those unique circumstances, Alpine's insistence that the SEC first show that each SAR at issue was a required filing was critical to a proper evaluation of the SARs at issue. While most SAR cases involve allegations of a failure to file, this case primarily involved the contents of filed SARs.  With already filed SARs, one could mistakenly assume from the fact of a filing that it must have been a required filing, and then look to whether the narrative fully described the basis for the filing, *i.e.,* the circumstances which led the firm to conclude that the transaction was indicative of criminal activity.  Since a voluntary filing was not predicated on a finding of suspiciousness, and so would not have that explanation, it was critical to distinguish one from the other.[68]

---

[66] Fritz Decl. Ex. 5 (L. Farmer Dep.), at 51-54, 90, *id.* Ex. 2; (Alpine Dep.), at 156 (Alpine's Add'l SOF, ¶¶ 67 and 116 [Dkt. 154].

[67] *See* Alpine's Add'l SOF, ¶ 61 [Dkt. 154] (citing and attaching, as Exhibit 11, NASD Notice 02-21, at p. 11).

[68] That those were proper issues to raise has been borne out by the progress of the case. For example, as indicated, the SEC's expert removed 213 SARs that were under the $5,000 threshold and so not required filings.  And the SEC ultimately declined to pursue violations based on all allegedly late SARs and another 495 SARs because it could not prove the SARs were mandatory.

Perhaps because of the absence of any evidence that any Alpine employee acted willfully or recklessly in relation to the SAR filings, the SEC improperly resorts to use of the substantial legal arguments presented in this case as evidence of Alpine's recklessness.  Those arguments do not evidence recklessness, nor do they pertain to the state of mind of Alpine's employees at the *time of the filings*.  The SEC's argument should be rejected.

      **F.**    **An Evidentiary Hearing Is Required in Order to Find that Alpine Acted Willfully or Recklessly.**

The Court should reject the SEC's attempt to now inject the issue of scienter into this case because it is flatly refuted by the substantial record evidence detailed above.  However, to the extent the Court entertains those allegations, Alpine is entitled to conduct further discovery on issues relating to scienter and an evidentiary hearing at which Alpine's employees and its expert will have the opportunity to testify directly to the Court regarding Alpine's conduct and the regulatory environment in which it occurred.  *See, e.g., SEC v. Elliot*, No. 09 Civ. 7594 (KBF), 2012 WL 2161647 (S.D.N.Y. June 12, 2012) (resolving issues regarding a defendant's "state of mind" and "scienter" in connection with SEC's request for permanent injunction and penalties are issues of fact that require an "evidentiary hearing"); *SEC v. Mattera,* No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *16–17 (S.D.N.Y. Dec. 9, 2013) (ordering evidentiary hearing to determine whether defendant had sufficient scienter to warrant Tier 2 or 3 penalties because "[t]he question of scienter is typically for the fact-finder, even when liability has already been established.").  Further, because the SEC failed to offer any factual support or citation to the record in its penalties submission, but may attempt to do so for the first time on reply, an evidentiary hearing would be required to preserve Alpine's right to respond to the SEC's claims and fully and fairly present its position.

## POINT II

### THE SEC'S REQUEST FOR A $22.736 MILLION TIER 1 PENALTY IS BASED ON AN UNDULY PUNITIVE AND INAPPROPRIATE METHODOLOGY, IS NOT SUPPORTED BY THE FACTS AND CIRCUMSTANCES, AND IS UNCONSTITUTIONALLY EXCESSIVE.

**A.** **The Court Should Reject the SEC's Per-Violation Methodology and Total Penalty Demand.**

**1.** **The SEC's Per Violation Methodology is Unduly Punitive and Should Be Rejected in Favor of Formula that is Based on the Courses of Conduct or Regulatory Provisions Actually at Issue.**

The SEC asks the Court to impose 2,720 separate penalties for each SAR and support file at issue, at an arbitrary $10,000 per SAR and $1,000 per support file. The SEC insinuates that this is the appropriate methodology by pretending it is the only methodology that exists. It is not. "Courts have employed various methodologies to define the number of 'violations' relevant to civil penalties." *SEC v. Syndicated Food Serv. Int'l, Inc.*, No. 04-CV-1303 (NGG)(VLS), 2014 WL 1311442, at *24 (E.D.N.Y. Feb. 14, 2014). Here, use of an alternative methodology based on the discrete courses of conduct, the number of claims, or regulatory provisions at issue, would result in a more appropriate Tier 1 penalty for a non-scienter, books-and-records violation.

As a starting point, courts commonly tie the amount of penalties to the amount of disgorgement, because ill-gotten gains are an appropriate gauge of the seriousness of the violation. *See, e.g.*, *Collins*, 736 F.3d at 525 (discussing trend of cases with a "fairly close approximation" between penalties and disgorgement amounts). *This Court* used this formula for two defendants in a case involving fraud and Section 5 violations. *See SEC v. Cope*, No. 14-cv-7575 (DLC), 2018 WL 3628899, at *8-9  (S.D.N.Y. July 30, 2018) (determining a smaller Tier 2 penalty equal to disgorgement – $58,753 – on defendant Mastromatteo was "appropriate" "given the relatively small amount of pecuniary gains" he received; imposing larger Tier 3 penalty equal to disgorgement of $4.2 million on defendant De Maison because she had a more "significant

role" and received a large "personal benefit" from the violations).   Here, it is undisputed that there was *no* personal gain to Alpine from the violations.

Courts also look to the number of claims asserted by the SEC.  *SEC v. Murray,* No. 05 Civ. 4643 (MKB)(DRH), 2013 WL 839840, at *3 (E.D.N.Y. Mar. 6, 2013) *and Syndicated Food,* 2014 WL 1311442, at *24.  Other courts look to the number of regulatory provisions violated by the defendant.  *See, e.g.*, *Slocum,* 334 F. Supp. 2d at 187.  In fact, in *Cope*, this Court calculated Tier 2 penalties against defendant Malone based upon the number of regulatory provisions violated instead of making it equal to disgorgement because the court determined her conduct did not warrant that "maximum" penalty.  *Cope*, 2018 WL 3628899, at *9 & n.15 (imposing Tier 2 penalties against Malone of "$25,000 per violation, totaling $125,000" because: "[t]he Amended Complaint alleged that Malone violated Sections 5, 17(a)(1), and 17(a)(3) of the Securities Act; Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, totaling five violations.").

Here, the SEC brought a single claim against Alpine for violation of Section 17(a) and Rule 17a-8 thereunder.  *See* SEC Complaint, at p. 18.  The Court also described the SEC's claim as a failure to comply with § 1023.320 and a violation of Rule 17a-8:

> The SEC's ***principal allegation in its complaint*** is that Alpine's AML program and WSPs "did not accurately represent what Alpine did in practice," and that in reality, Alpine's AML program failed to comply with Section 1023.320, and that Alpine thereby violated Rule 17a–8.

*Alpine*, 308 F. Supp. 3d at 783 (emphasis added).

Given the charge filed by the SEC, a single Tier 1 penalty would be appropriate, calibrated based on the seriousness of that single violation and taking into account whether it was recurrent. *See Murray*, 2013 WL 839840, at *3; *Syndicated Food*, 2014 WL 1311442, at *24.

Alternatively, the Court could impose three penalties based upon the view that the SEC alleged violations of three provisions, Section 17(a), § 1023.320 and Rule 17a-8. *See Cope,* 2018 WL 3628899, at *9; *SEC v. Shehyn*, No. 04 Civ. 2003 (LAP), 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010) (same methodology); *Slocum,* 334 F. Supp. 2d at 187 (same).

Given the SEC's presentation of its case, it would have been appropriate for it to argue for a course-of-conduct methodology, the most commonly employed methodology. *SEC v. BIC Real Estate Dev. Corp.*, No. 1:16-cv-00344-LJO-JLT, 2017 WL 1740136, at *6 n.2 (E.D. Cal. May 4, 2017) ("[T]he weight of authority favors interpreting each violation to mean each scheme in which the defendant was involved" and citing cases); *see also*, *e.g.*, *SEC v. Brown*, 643 F. Supp. 2d 1088, 1093 (D. Minn. 2009) (imposing a single penalty where defendant violated three statutes during a single course of conduct).

Here, the Court identified four specific courses of conduct in its March 30, 2018 opinion:

> ***The complaint divides this general allegation into four categories of failures****.* The SEC alleges that Alpine has (1) failed to include pertinent information in approximately 1,950 SARs, (2) failed to file additional or continuing SARs for certain suspicious patterns of transactions in approximately 1,900 instances, (3) filed at least 250 SARs after the 30–day period for filing had elapsed, and (4) failed to maintain supporting information for approximately 1,000 SARs as it is required to do for five years after filing.

*Alpine*, 308 F. Supp. 3d at 783 (emphasis added); *see also* SEC Complaint, ¶¶ 3, 46. The SEC continued to follow, and successfully used, this categorical approach to obtain summary judgment on liability with respect to a number of SARs in each category, except for the alleged late-filed SARs.  *See* SEC Mem. in Support Summary Judgment on Liability, Dkt. 147, at 8-20. The Court adhered to that same approach, dividing its analysis, and its ruling, by the four categories of conduct maintained by the SEC. *See Alpine*, 354 F. Supp. 3d at 410-11 ("The SEC's motion is largely addressed to four discrete alleged deficiencies in Alpine's compliance between 2011 and 2015 with SAR reporting requirements") (emphasis added); *see also id.* at

416, 422-25 (stating, "[t]he SEC makes four categories of claims" and analyzing the SEC's claim in accordance with those categories).

The SEC continues this same categorical approach in seeking remedies, even as it inconsistently asks the Court to treat each SAR decision and support file separately in calculating penalties. The SEC does not attempt to show Alpine acted recklessly with respect to any individual SAR decision, or even in relation to its SAR decisions concerning particular red flags. It instead argues generically that the number of violations is indicative of a reckless disregard for SAR obligations and that each should be punished through an identical amount that happens to total more than $22 million. All of the SEC's penalty arguments are generalized, dependent on this Court *not* looking at the evidentiary record to consider Alpine's SAR filing decisions, its interaction with regulators, or its remedial actions.[69]

The Court should not allow the SEC to now shift its theories and claim that each SAR should be viewed individually for purposes of penalties. Since the SEC has pled and obtained liability on three broad categories of conduct, the penalty should be calculated based on these three categories of conduct, for a total maximum penalty of no greater than $240,000. Alternatively, although Alpine believes the circumstances of this case most strongly support three categories of conduct, the Court could recognize nine discrete categories of conduct by considering the various omissions the Court identified as separate courses of conduct or acts, for a total for a total maximum penalty of no greater than $720,000.[70]

_____

[69] For instance, the SEC's equally baseless assertion that Alpine's SAR decisions caused "substantial losses" to other persons is also dependent upon broad categorical assertions regarding generalized potential risks in the market. The SEC has not attempted to establish that any purported risk resulted from any particular SAR decision.

[70] The nine categories under this formation reflected in the listing of violations submitted jointly by the parties are: (1) omission of "shell company or derogatory history of the stock" information; (2) omission of information regarding "stock promotion"; (3) omission of information regarding "unverified issuers"; (4) omission of "low trading volume" information; (5) omission of information regarding "foreign involvement"; (6) omission of "related litigation" information; (8) failure to include the "five essential elements"; (7) failure to file SARs on sales in deposit-liquidation patterns; (9) failure to produce support files upon Commission request in 2016. *See* SEC's Revised Table [Dkt. 193-1].

Both of these approaches provide a more equitable and rational way to calculate penalties than the SEC's unduly punitive per-SAR methodology.  The conduct at issue in this case consists of Alpine failing to include in narratives certain specific categories of information and failing to report sales that closely followed large deposits of low-priced securities.  Those failures were then incorporated into and repeated in its subsequent filings.  But, under the SEC's methodology, these reporting omissions form the bases for staggering liability that bears little relation to the nature and gravity of the violation: e.g., $3,720,000 for omitting Customer E's ongoing regulatory action in the narrative; $2,890,000 for failing to identify foreign involvement in the narratives where that information appeared elsewhere in the SAR; $12,140,000 for failing to report sales following a deposit.  Equally irrational and severe penalties for every instance in which an error was repeated is the inevitable and unwarranted result of the SEC's methodology.

The use of a course of conduct methodology is consistent also with approaches taken in comparable SAR resolutions discussed in Point I, and other high volume cases, where imposing penalties based on each discrete "act or omission" can lead to an aggregate penalty which is unduly punitive.  As one Court explained, in rejecting the SEC's request that the Court calculate third tier penalties by considering the "sale to each of the more than 350 investors as separate violations, yielding a penalty of $38,500,000":

> As discussed above, the defendant's actions involved fraud, deceit and resulted in substantial losses to investors, i.e., the $2.3 million described above. However, while the Court finds that civil monetary penalties are appropriate in this case, **considering each sale to the 350 investors as a separate violation results in an "unduly penalizing" amount**. *See S.E.C. v. Elliot,* 2012 WL 2161647, at *11 (S.D.N.Y. June 12, 2012). Instead, the Court will calculate the civil penalty by considering Knights involvement in the three unregistered stock offerings as separate violations, resulting in a civil monetary penalty of $330,000. The Court deems this amount appropriate to both punish defendant for his conduct and deter future violations . . . .

*iShopnomarkup.com, Inc.*, 126 F. Supp. 3d at 332–33 (emphasis added); *accord SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009) (rejecting SEC's request to "impose $10,000 civil penalties for each of the 569 fraudulent transactions" because it "would result in excessive penalties" and observing "[t]his calculation is both unjust and inequitable" because it exceeds the total amount the defendant fraudulently obtained).  In *SEC v. Griffin*, the court noted an additional concern in refusing to impose "multiple [third tier] penalties" in a fraudulent scheme to induce "roughly 150 people" to make large investments by widely disseminating a fraudulent private placement memorandum:  "Each of the [defendants'] misrepresentations and omissions were part of a single scheme to raise funds for the Three Well Program, *and the Court has already considered the [defendants'] recurring conduct when deciding that a $100,000 penalty is appropriate*."  No. 4:16-cv-902, 2018 WL 4896096, at *4 (E.D. Tex. Oct. 9, 2018) (emphasis added).[71]

> This Court has rejected the SEC's request to impose penalties for "each sale or offer sell" in a case involving a pump-and-dump scheme and the sale of unregistered securities, based on a formula of "$100,000 multiplied by four statutory violations multiplied by each of these defendants' sales or offers to sell." *SEC v. Cavanagh*, No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004).  This Court instead imposed a $1 million penalty on each defendant, even though the total loss to investors exceeded $15 million.  *Id.*  In *Milan Capital* this Court also declined to impose separate penalties for repeated violations of the broker-dealer registration requirements; the penalties were imposed for the "defrauded investors," based on the anti-fraud violations. *See* 2001 WL 921169, at *2-3. The Court also

---

[71] *See also In re Raymond J. Lucia, Cos., Inc.*, Initial Decision Release No. 540, 2013 WL 6384274 (Dec. 6, 2013) (where defendants presented misleading data in seminars conducted for roughly 50,000 people, ALJ imposed $250,000 penalty against the company, and observed that although defendants "technically violated the statute hundreds of times" imposing penalties on that basis "would plainly be disproportionate and unreasonable"); *Robinson*, 2002 WL 1552049, at *12, discussed *supra*.

denied the SEC's "request for an even larger penalty" of $20 million ($100,000 per defrauded investor), based on the SEC's failure to "show[] that the defendants are able to satisfy a judgment of even [$10 million]." *Id.*

These representative cases involved fraud, with a high degree of scienter and proof of actual losses to third parties.  In cases involving a technical or books-and-records violations, like *this* case, there is even greater reason to reject the SEC's overly punitive approach:  imposing a separate penalty for each record – each SAR decision, each support file – de-emphasizes critical facts relating to the nature of the conduct – that the defendant acted in good faith or without intent – to a degree that they become immaterial, and instead makes the total number of "inadequate records" the primary, if not the only, thing that matters. To avoid this concern, both district and administrative courts frequently decline to calculate penalties by counting the number of acts in cases involving a high volume of reporting and record-keeping infractions, and choose a different methodology, as demonstrated by the authorities discussed in Point 1.[72]

Consistent with these authorities, and with the SEC's own categorical approach in other SAR cases and in this case, the Court should use a methodology based on the number of discrete claims, regulatory provisions, or courses of conduct at issue to impose penalties in the range of $80,000 and $720,000.

> ### 2. Even if the Court Adopts the SEC's Methodology, the Amount of the Penalty Should be Reduced.

To the extent the Court were inclined to adopt the SEC's methodology, the amount of the penalty must still be reduced for two primary reasons.

---

[72] *See, e.g., Bloomfield*, 649 F. App'x at 550 (imposing a single $65,000 penalty "for all of the SAR violations, regardless of the total number."); *Slocum*, 334 F. Supp. 2d at 187 (imposing a "nominal penalty" of $1,000 for each of regulatory provisions violated for "technical" violation that was "not willful" and caused "no actual loss to clients"); *In re Thomas C. Gonella*, Initial Decision No. 706 (Nov. 13, 2014) (imposing single penalty of $7,500 for all  recordkeeping violations under Section 17(a) of the Exchange Act as a "single course of conduct").

a.   **A penalty for a violation of the SAR regulations of the BSA cannot exceed the penalty limits prescribed by Congress within the BSA.**

The SAR reporting and recordkeeping requirements that are at issue in this case are located in 31 C.F.R. § 1023.320(a) and (d).  *See Alpine*, 354 F. Supp. 3d at 412. As this Court recognized, this regulation was passed by the Secretary of the Treasury pursuant to authority delegated and by Congress in 31 U.S.C. § 5318(g) of the BSA, and which authority is currently held by FinCEN pursuant to delegation from the Secretary.  *Id.* at 411.  Both Congress and the Treasury Secretary have carefully enacted frameworks governing civil penalties for violations of provisions of the BSA and regulations promulgated thereunder, including 31 C.F.R. § 1023.320.

Specifically, Congress and the Treasury Secretary, pursuant to delegated authority, expressly defined the upward limit of penalties for negligent violations of § 1023.320:

> The Secretary of the Treasury may impose a civil money penalty of ***not more than $500*** on any financial institution . . . which ***negligently*** violates any provision of this subchapter or ***any regulation*** prescribed under this subchapter.

31 U.S.C. § 5321(a)(6) (emphases added).  The Treasury Secretary imposed the same limit under its delegated rulemaking authority under the BSA.  31 C.F.R. §1010.820(h).[73]

The allowable penalties for a violation of this regulation cannot change based on the identity of the agency that brings an enforcement action, even assuming *arguendo* that the SEC had the authority to pursue that enforcement action.[74]  In light of these provisions, the Court must reject the SEC's request for a separate penalty of $10,000 for each SAR the Court determined failed to comply with 31 C.F.R. § 1023.320(a), and $1,000 for each support file the Court ruled Alpine failed to produce in 2016, in violation of § 1023.320(d).  As demonstrated above, there is

---

[73]   The adjustments for inflation referenced in 31 C.F.R. § 1010.820(i) and 31 C.F.R. § 1010.821 do not apply because the conduct at issue all occurred before August 1, 2016, and involve conduct occurring in or before 2015.  See 81 Fed. Reg. 42,503, 42,505-06 (June 30, 2016).

[74]  Alpine does not waive, but expressly reserves for the record, its position that the SEC lacks authority to bring this enforcement action.  The argument presented here is distinct and is based on the penalty limits built into the BSA.

no evidence that there were any "willful" violations of § 1023.320.  The most that could be imposed for any negligent violation is $500.

The SEC cannot rely on the assertion that it is pursuing a violation of Rule 17a-8 to circumvent the penalty limits of the BSA, particularly in light of the Court's ruling that Rule 17a-8 "incorporated . . . Section 1023.320."  *Alpine*, 354 F. Supp. 3d at 412.  The Court literally required the SEC to establish that Alpine violated § 1023.320 – and *only* § 1023.320 – to acquire judgment as to liability.  It is neither logical, lawful nor constitutional that a defendant could face a maximum penalty of $500 per negligent violation of § 1023.320 in all contexts except when the SEC is the plaintiff, where liability blooms to a maximum of $80,000 for the exact same violation, of the exact same regulation, committed with the exact same mental state.  To do so would create an irreconcilable anomaly:  if the SEC had actually been delegated authority to enforce § 1023.320 directly, it would undoubtedly be circumscribed by the limits of § 5321; it cannot skirt those limits by trying to indirectly enforce that same regulation under the Exchange Act. *See United States v. Maes*, No. 5-07-005 (GGH), 2007 WL 611246, at *1 (E.D. Cal. Feb. 27, 2007) (stating "agencies do not have the authority to repeal or make ineffective Congressional statutes regulating conduct in a comprehensive fashion which are passed separately from the agency's enabling or organic act," and reasoning that if an agency could change the penalties for unlawful conduct "then Congress' careful legislative penalty judgments on all manner of crime, e.g., child pornography, environmental crimes, computer fraud and the like, could all fall before the regulator's pen if the [agency] determined to regulate such conduct pursuant to its general regulatory authority.").[75]

---

[75]  *See also, e.g.*, *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("When legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *L.P. Steuart & Bros. v. Bowles*, 322 U.S. 398, 404 (1944) ("[I]t is for Congress to prescribe the penalties for the laws which it writes. It would transcend both the judicial and the administrative function to make additions to those which Congress has placed behind a statute."); *American Bus Ass'n v. Slater*, 231 F.3d 1, 5 (D.C. Cir. 2000) (holding the Department of

In fact, Congress made clear that agencies cannot rely on general penalty authority to circumvent the "specific" penalty provisions of § 5321.  In 1989, Congress passed 12 U.S.C. § 1818(i)(4) under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), which gave federal banking agencies "general civil penalty authority" over financial institutions for violations of "any law or regulation relating to financial institutions." 135 Cong. Rec. S2379-02, 135 Cong. Rec. S2379-02, S2393, 1989 WL 171463 (daily ed. Mar. 8, 1989).  Congress included an explicit statement in the legislative record indicating that the authority to impose a penalty under the new statute would not be appropriate if it contravened the specific penalty in 31 U.S.C. § 5321:

> It is anticipated generally that use of this authority by a federal banking agency would not be appropriate if there was a civil penalty authority under a more specific penalty statute such as 31 U.S.C. 5321.

*Id.*  This is consistent with the well-established rule that a "'more specific statute will be given precedence over a more general one, regardless of their temporal sequence.'" *United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir. 1994) (citation omitted). Thus, the SEC's request for per-violation or total penalties for violations of § 1023.320 that exceed amounts authorized under the specific provisions of BSA must be rejected.

Finally, even if the Court were to determine it was not bound by these penalty caps based upon the reasoning that the SEC is pursuing a violation of Rule 17a-8, as distinct from §1023.320, the Court should still observe these limits in determining the appropriate penalty. Certainly, the position of Congress and the Treasury Secretary are at least persuasive authority as to the appropriate amount of a penalty for the conduct at issue here, and show that the amount

---

Transportation exceeded its statutory authority in promulgating a rule imposing monetary sanctions that conflicted with the "precise conditions" specified by Congress for when monetary sanctions would be available for violation of the ADA, and stating "[b]y specifying the circumstances under which monetary relief will be available, Congress evinced its intent that damages would be available in no others."); 5 U.S.C. § 558(b) ("A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law").

sought by the SEC is unduly punitive. *See SEC v. Elliott*, No. 09 Civ. 7594 (KBF), 2012 WL 2161647, at *11 (S.D.N.Y. June 12, 2012) ("While this Court finds that defendants' actions meet the standard for imposing Second or Third Tier penalties, given the number of transactions and the amounts that could be assessed per transaction, such an award would be unduly penalizing.").

> **b.    The SEC has overstated the number of "violative" acts for calculating penalties.**

The SEC claims there are 2,720 separate "violative acts" upon which separate penalties should be imposed.  This number is overstated in two primary ways.

First, no penalties, or at most a single penalty based on a single violation, should be imposed with respect to the support files.  The SEC seeks a separate penalty for each of the 496 support files at issue, which it now refers to as "Document <u>Retention</u> Violations," insinuating that Alpine has failed to *maintain* these support files. SEC Mem. at 2.  And that was the original allegation in its Complaint.  However, the SEC knew that Alpine did in fact maintain those files and had produced them early in discovery, at the latest[76].  Tellingly, it did not even argue on summary judgment that Alpine failed to *maintain* any of the SAR support files; it shifted instead to the claim that "Alpine violated Section 17(a) and Rule 17a-8 because it failed to *produce* the Missing Support Documents upon request by the Commission *in 2016*." SEC's Summary Judgment Mem., at 18 (emphasis added).  As Alpine stated in opposing summary judgment, the SEC not only received but actually used many of these support files to identify additional omitted "red flags" in the "deficient narrative" category.[77]

The SEC originally shifted to the theory that Alpine failed to produce the support files in

---

[76]   For the record, Alpine maintains that it gathered and produced the files in 2016, and submitted evidence to that effect in opposition to summary judgment.

[77] *See* Alpine's Opp. to MSJ [Dkt. 158], at 66, n.36 ("True to their word, the SEC used a substantial number of support files Alpine produced in discovery in this case to allege additional violations in Table A through purportedly omitted red flags. Every document identified by the Bates Label "ALPINE-LITXXXXXX" on the SEC expert's charts and the SEC's Ex. 10 was a document produced by Alpine during discovery in this case. There are hundreds of examples. *See* SEC Ex. 10.").

2016 in response to the Court's March 30, 2018 ruling.  It now tries to shift its theory again to a "Retention Violation[]"  in response to the Court's rulings on December 11, 2018 that producing the files would defeat the SEC's motion: "[i]f Alpine maintained the missing files, then all it needs to do *to defeat* this prong of the SEC's motion *is to produce them now* . . . ." *Alpine*, 354 F. Supp. 3d at 444 (emphases added); and that "[i]f Alpine produced the missing files now . . . this portion of the summary judgment motion regarding the failure to maintain the files would likely have been *mooted*."  *Id.* at 444 n.88 (emphasis added).  Rather than acknowledging to the Court that Alpine maintained these support files and had produced them well before summary judgment, the SEC now looks to capitalize on that December 2018 ruling by seeking a $496,000 penalty on an issue it knows should not have formed the basis for any liability.  This is a compelling basis to deny the SEC any penalty on this issue.

Further, there could not be 496 separate "violative acts" with respect to the support files at issue. At most, there could be one: a failure to produce upon request in 2016. *See SEC v. J.W. Korth & Co.*, 991 F. Supp. 1468, 1471, 1473 (S.D. Fla. 1998) (disagreeing with the SEC's request for multiple penalties for the defendants' repeated refusal to turn over certain certificates in their books and records, even after being subject to a TRO to produce the documents, and imposing a single Tier 1 penalty on each defendant because "[r]egardless of how many times the SEC asked for the certificates, Defendants' statutory violations occurred by their failure to produce the certificate numbers.").

**B.     The Facts and Circumstances of this Case and Application of the Public Interest Penalty Factors Support the Imposition of a Reasonable Penalty That Will Not Force the Closure of the Firm.**

"In determining whether civil penalties should be imposed, and the amount," courts look to the following factors:  "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of

substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).[78]

**1.     The SEC offers no argument except that the conduct was recurrent.**

The SEC, in its discussion of these factors, continues its approach of repeating the same claim over and over: according to the SEC, the number of violations proves scienter, egregiousness and recurrence, and justifies its request for a harsh and unprecedented penalty. But the repetition of the alleged violations does not satisfy every component of the penalty determination: it pertains to only one of the factors, recurrence of the violation, and even then would apply only if the Court looks to courses of conduct as the basis for imposition of a penalty.[79]   Repetition does not establish scienter nor does it render particular conduct egregious. Those determinations by definition depend on consideration of evidence of the circumstances surrounding the conduct including the basis for the firm's decisions, and the firm's response to directives from regulators. *See Alpine*, 354 F. Supp. 3d at 418 (noting that issues such as Alpine's good faith, improvements to AML program, and "ignorance of its legal obligations or its intent in failing to comply with those obligations may be relevant to an award of damages . . . .").

As discussed above, the uncontroverted testimony, and the SEC's own expert, establish that the employees were acting in good faith and accomplished substantial remediation; they

---

[78]   The SEC adds two other factors: "a defendant's failure to admit wrongdoing" and "a defendant's lack of cooperation with authorities."  SEC Mem. at 9.  The SEC makes the same baseless arguments regarding Alpine's alleged "failure to admit wrongdoing" in support of scienter, and Alpine has addressed it in Point 1(B), including by citation to authority holding that it is improper to penalize a party for defending itself. With respect to Alpine's purported lack of cooperation, Alpine has demonstrated that it cooperated with regulator's requests to make changes to its SAR reporting, and the SEC has cited to no evidence to support a claim that it did not cooperate with its regulators.

[79]   If each violation were considered and penalized separately, then it would not also be recurring; if, on the other hand, the number of violations are determined by the statutory provisions violated or courses of conduct, then repetition of a violation is properly considered and the penalty could be increased based on that recurrence. It is improper to try to obtain thousands of substantial individualized penalties but still refer to each as recurrent. *See Griffin*, 2018 WL 4896096, at *4, *supra*.

were not consciously disregarding or deliberately evading any regulatory requirements.

Certainly, there is no evidence of the high "degree" of scienter that would warrant an enormous

penalty.

### 2. The SEC failed to establish Alpine acted egregiously.

The SEC has failed to put forth any evidence that Alpine's conduct had any deleterious

impact on regulation of the markets or on market participants.  In fact, despite acknowledging

this important factor, the SEC does not separately address it.  This failure is likely due to the fact

that, while SAR reporting unquestionably serves a significant governmental interest, courts have

recognized that it is still a reporting obligation, a violation of which is a far cry from fraudulent

conduct designed to harm investors.[80]

The Supreme Court's analysis in *U.S. v. Bajakajian*, is instructive on this point.  524 U.S.

321 (1998), *superseded by statute on other grounds*, USA Patriot Act of 2001, Pub. L. No. 107-

56 § 371, 116 Stat. 272.  In *Bajakajian,* the defendant was criminally convicted for willfully

violating the currency transaction reporting ("CTR") requirements of the BSA, 31 U.S.C. §

5316(a)(1)(A), for failing to report that he was transporting more than $10,000 out of the

country. *Id.* at 324-25.  When asked if he was carrying more than $10,000 the defendant lied, and

a subsequent search of his belonging revealed he was carrying $357,511.  *Id.*  The government

sought and acquired forfeiture of the entire $357,511.  *Id.* at 325-26.

In the context of determining that the penalty violated the Excessive Fines Clause of the

Eighth Amendment, the Supreme Court analyzed the "gravity of the defendant's offense."  *Id.* at

---

[80]    *SEC v. Snyder*, No. H-03-04658, 2006 WL 6508273, at *12 (S.D. Tex. Aug. 22, 2006) is instructive:

> The SEC first asserts that the gravity and seriousness of the disclosure requirements of public companies
> make Defendant's false reporting violation, by its very nature, an egregious act. The Court disagrees,
> however, as such a conclusion would render it unnecessary for a court ever to undertake an inquiry of
> egregiousness in cases involving fraudulent reporting violations of Section 10(b) of the Exchange Act.
> Although the disclosure obligations of public companies are, and must be considered to be, of critical
> importance to financial markets and to the integrity of federal securities regulation, their importance does not
> inevitably mean that every violation is necessarily egregious.

337. The Court held that that the defendant's "crime was solely a reporting offense," and thus

that he had a "minimal level of culpability." *Id.* at 337-39. The Court further observed:

> The harm that respondent caused was also minimal. Failure to report his currency
> affected only one party, the Government, and in a relatively minor way. There was no
> fraud on the United States, and respondent caused no loss to the public fisc.

*Id.* at 339.

Here, too, the SEC has failed to establish the existence of "harm that respondent caused."

CTRs and SARs serve similar functions:  both are financial reporting forms mandated by the

BSA that track activity in the financial system for criminal investigation and enforcement. *See*

*FinCEN Amendment to the Bank Secrecy Act Regulations – Exemptions from the Requirement to*

*Report Transactions in Currency*, 73 Fed. Reg. 74,010, 74,011 (Dec. 5, 2008) (FinCEN

describes CTRs and SARs as "complementary sources of information for law enforcement").

The evidence on this record serves to confirm that Alpine certainly filed SARs to report large

deposits of low priced securities, contributing to the SAR data base and to authorities' awareness

of the transactions.

### 3.    The SEC failed to show any loss or substantial risk of loss.

Consideration of whether Alpine's conduct created a risk of loss also weighs against

imposing the enormous penalty sought by the SEC.  Certainly there is no evidence that Alpine

caused any loss to any person or that investors were harmed by the transactions that were cleared

through Alpine. Nevertheless, the SEC insists that Alpine's SAR decisions created a "risk of

loss," claiming those SARs "obscured and concealed suspicious activity from law enforcement

and increased the risk that investors would lose money as a result of illegal activity." SEC Mem.

at 10. It offers nothing but the generic assertion that losses occur in the OTC markets. *Id.*

This factor, which is worded similarly to the statutory requirement for an enhancement to

a Tier 3 penalty, is not satisfied by such generalized and speculative assertions. It requires

evidentiary analysis of causation because "[h]ypothesis is not proof" to be used "as a basis for determining the amount of a civil penalty."[81]  To show Alpine's SAR reporting created a substantial risk of loss, the SEC would have to put forth credible evidence that unlawful activity occurred, and went undetected because it was not adequately reported.  Not only has the SEC identified no actual unlawful conduct that occurred, it has identified no victims and no losses, let alone substantial losses.

### 4.  Alpine Is Unable to Pay a Penalty More Than its Available Excess Regulatory Net Capital.

As the SEC well knows, Alpine cannot pay a penalty of $22.7 million or anything close to it, and that factor weighs heavily against the SEC's request.  "A defendant's finances are relevant to the size of a civil penalty." *Robinson*, 2002 WL 1552049, at *12.  In fact, "courts recognize that a defendant's net worth is a ***critical factor*** in determining the amount of civil penalty to award."  *SEC v. Clay Capital Mgmt., LLC*, No. 2:11-cv-05020-DMC-JBC, 2013 WL 5946989, at *8 (D.N.J. Nov. 6, 2013) (emphasis added) (citing *SEC v. Pardue*, 367 F. Supp. 2d 773, 777 (E.D. Pa. 2005) (rejecting SEC's argument that a defendant's "impecuniousness should have no effect on the Court's determination" of what civil penalty to assess on the grounds that ignoring a defendant's present financial condition would entail "doing considerable misjustice"); *see also SEC v. Orr*, No. 11-2251-SAC, 2012 WL 1327786, at *11 (D. Kan. Apr. 17, 2012) ("The defendant's net worth and corresponding ability to pay has proven to be one of the most important factors that district courts consider when determining how much of a civil penalty to assess in insider-trading cases," and applying this rationale to reduce penalties under Section 21(d)(3)).  Thus, courts consider "whether the penalty should be reduced due to the defendant's

---

[81]  *SEC v. Benger*, No. 09 Civ 676, 2016 WL 561893, at *3 (N.D. Ill. Feb. 10, 2016); *see also SEC v. Todt*, No. 98 Civ. 3980 (JGK), 2000 WL 223836, at *12 (S.D.N.Y. Feb. 25, 2000) (showing the depth of analysis required by holding that there was "never a significant risk of substantial loss," even though defendant's conduct involved fraud, because there was no evidence that the "would-be victims" of the fraud "ever seriously entertained transferring funds on the basis of the [fraudulent] Certificate.").

demonstrated current and future financial condition" (*Haligiannis*, 470 F. Supp. 2d at 386), and frequently reduce the amount of the civil penalty sought by the SEC on this basis.[82]

Specifically, in relation to corporate entities, courts have looked at their financial condition in order to determine the impact of a penalty and have made clear that penalties should not be employed in a manner that would result in the company closing. *See, e.g.*, S. Rep. No. 101-337, The Securities Law Enforcement Remedies Act of 1990, 1990 WL 263550, at 15 (1990) ("The Committee also believes that the ability of respondents to pay a civil penalty is an important consideration in determining the amount of the penalty to be imposed …. Such evidence, for example, could include information relating to the extent of the respondent's ability to continue in business, [and] the collectability of the penalty . . . ."). The Commission has confirmed that a company's inability to pay a penalty may warrant **no** penalty at all.  *In the Matter of Philip A. Lehman and Tower Equities, Inc.*, Securities Act Release No. 7889, Exchange Act Release No. 43262, Investment Advisors Act No. 1896, Investment Company Act No. 24636, Admin. Proceeding File No. 3-10024, Sept. 7, 2000, at Sec. II(Q) (Tower Equities, a broker-dealer, violated Sections 17(a), 10(b) and 15(c)(1) and Rules 10b-5 and 15c1-2, yet was not assessed a penalty because "[t]he Commission has reviewed the sworn financial statement and other evidence provided by Tower Equities and has determined that Tower Equities does not have the financial ability to pay a civil penalty.").[83] The consideration of financial condition in

---

[82]  *See, e.g.*, *SEC v. Rubin*, No. 91 Civ. 6531 (MBM), 1993 WL 405428, at *7 (S.D.N.Y. Sept. 24, 1993) (imposing a penalty of only $1,000 based on defendant's "impecunious . . . financial condition" and rejecting the SEC's request for a penalty 18x higher while refuting SEC's claim that "it is exercising restraint" through its penalty demand); *SEC v. Svoboda*, 409 F. Supp. 2d 331, 347-49 (S.D.N.Y. 2006) (imposing civil penalties of $150,000 and $250,000, respectively, against two defendants who engaged in fraud for considerable profit, despite SEC's request for penalties over $3 million each "in light of their financial condition"); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1295, 1297-98 (M.D. Fla. 2001) (imposing civil penalty of $100,000 despite SEC request for $807,000 penalty and defendant's "significant levels of misconduct" because defendant's net worth was only $264,282), *aff'd in part and vacated in part on other grounds*, 327 F.3d 1263 (11th Cir. 2003); *Pardue*, 367 F. Supp. 2d at 777–78 (imposing civil penalty of $25,000 despite SEC's request for $136,697 fine and defendant's "very serious" securities law violations due to defendant's negative net worth).

[83] *In the Matter of Philip A. Lehman and Tower Equities, Inc.*, is found at: https://www.sec.gov/litigation/admin/33-7889.htm.

assessing penalties serves a "protective" function: to "ensure[] that defendants are not forced to liquidate their companies in order to satisfy an award." *Sanders v. Jackson*, 209 F.3d 998, 1002 (7th Cir. 2000).[84]

Nonetheless, and despite the substantial authorities discussed above, the SEC blithely claims this factor "is – at best – [] neutral" because ability to pay is but one factor courts consider and the goal of penalties is "deterrence." SEC's Mem. at 11. The SEC's suggestion that the Court should simply disregard Alpine's inability to pay is so contrary to reason and precedent as to support the concern that has existed from the outset of this case: that this case is being used to shut down a firm that engages in the market segment that is most disfavored by the SEC, the microcap securities. The SEC does not cite a single authority holding that the "deterrent" purpose of the civil penalty framework is served by imposing a Tier I penalty on a non-scienter, books-and-records violation in an amount that has the effect, if not the purpose, of putting a firm out of business. The SEC's reference to deterrence is, in fact, pretense: the SEC has made it clear, by sanctioning comparably-sized firms between $200,000 and $800,000 in similar cases, that those amounts fully satisfy the need for deterrence. Moreover, the SEC's position is remarkably similar to one rejected by the court in *SEC v. Rubin*:

---

[84] *See also id.* (noting that the "net worth" clause in fair debt collection practices act, was "designed to address a problem often associated with fixed monetary penalties: they sometimes penalize smaller companies too harshly but are also insufficiently punitive for larger businesses….Thus, by making the extent of the penalty directly proportional to a percentage of the defendant's net worth, ***Congress hoped that punishment might be meted out according to a business's ability to absorb the penalty***.") (emphasis added); *Boggs v. Alto Trailer Sales, Inc.*, 511 F.2d 114, 118 (5th Cir. 1975) (stating that net worth clause in TILA was designed to protect businesses from catastrophic damages awards); *Garden City Boxing Club, Inc. v. Salcedo*, No. 04 Civ. 5027 (DFE), 2005 WL 2898233, at *2 (S.D.N.Y. Nov. 3, 2005) ("Although I agree with plaintiff that defendant's conduct should not be tolerated and that considerations of general deterrence are relevant to the determination of the amount of the penalty, I do not believe that defendant's violation is so serious as to warrant the imposition of a penalty that would necessarily drive defendant out of business."); *Milpitas Care Ctr. v. CMS*, 2003 WL 974618, at 12 (H.H.S., Fed. 5, 2003) ("The proper standard for ability to pay is whether the penalty amount would put the facility out of business."); *Waste Action Project v. Astro Auto Wrecking, LLC*, 274 F. Supp. 3d 1133, 1140 (W.D. Wash. 2017) ("Although the CWA authorizes the Court to impose a substantial penalty on Astro, a large penalty will only hamper Astro's efforts to comply with the stipulated injunctive relief and implement its Land Technology Plan. Further, a substantial penalty will most likely put Astro out of business."); *cf. Advance Pharm., Inc. v. United States*, 391 F.3d 377, 400 (2d Cir. 2004) (upholding district court's consideration of "the company's ability to continue operating profitably" in determining penalty).

The SEC does not dispute [defendant's] showing that he is impecunious, but merely argues that lack of funds is not a defense to entry of judgment on ordinary debts of various kinds, and should not be a defense to imposition of a penalty. This wooden approach disregards the distinction between an ordinary debt that arises from a particular and definable liability, and a penalty that is designed to punish and is imposed based on an exercise of discretion. Considering [defendant's] financial condition, that [defendant] himself received neither the profits resulting from his tip nor any other discernible benefit, and, again, the relatively small financial consequences of the underlying conduct here, an additional penalty of $1000 against Williams is sufficient.

*Rubin*, 1993 WL 405428, at *7 (internal citations omitted).

This factor of a party's ability to pay a penalty is more acute in this case because we are dealing with a registered broker-dealer, subject to strict net capital requirements. As mandated in Exchange Act Rule 15c3-1, Alpine is required to maintain minimum amounts of net capital in order to be permitted by the SEC to continue to purchase or sell securities. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



In summary, the Court should reject the SEC's proposed penalty amount for at least the following reasons: (1) as cited above, Courts routinely impose lower penalties based on a defendant's inability to pay; (2) the SEC has not cited to one case, and Alpine is aware of none, where a penalty has been imposed in an amount that forces the closure of the business; (3) there certainly is no precedent to support forcing the closure of a business as a result of a Tier 1, negligent, non-scienter, books-and-records penalty; and (4) if able to stay in business, Alpine will consent to undertakings that make the excessive penalty and injunction unnecessary.

### 5.       The Goals of Penalty Would be Fully Satisfied by a Monetary Penalty less than Available Net Cap and Affirmative Undertakings

Although Alpine cannot withstand a penalty greater than its available excess net capital, the goals and purpose of a civil penalty – both penalty and deterrence – would be fully satisfied by a lesser monetary penalty combined with undertakings that will ensure its future compliance.

As outlined in the Declaration signed by Alpine's current CEO, Christopher Doubek, Alpine has new management in place, including a new CEO and CCO, who are committed to doing whatever it takes to ensure Alpine remains compliant with the SAR provisions going forward. [86]  *See* Doubek Decl. ¶¶ 9, 15-17. To that end, to the extent a penalty is imposed in an amount that is within Alpine's excess net capital restrictions as would be necessary to allow Alpine to continue to operate, Alpine is willing to consent to a number of affirmative, forward-looking undertakings – similar to what the SEC has requested of other firms in SAR cases – to confirm its commitment to compliance.

Specifically, Alpine is willing to engage in all of the undertakings that the SEC recently required of the broker-dealer in *In re Wilson-Davis & Co., Inc.,* SEC Release No. 85867 (May 15, 2019), including (as summarized here) to: (1) hire at Alpine's cost an independent compliance consultant, who is subject to approval by the SEC and cannot be terminated without SEC approval, to conduct a comprehensive review of Alpine's AML compliance program and the implementation and effectiveness of Alpine's AML policies and procedures, who will submit a written report to the SEC; (2) adopt all recommendations contained in the report, unless unduly burdensome and impractical, and the SEC approves an alternative approach designed to achieve the same purpose; (3) provide for continuing review and monitoring by the compliance

---

[86]  As detailed above, Alpine began taking such remedial action well before the SEC filed its Complaint, making changes to its SAR narratives to address concerns raised by examiners, and there is no allegations of any AML program or SAR reporting violations by Alpine between January 1, 2016 and the present date.

consultant on an annual basis; (4) certify to the SEC and compliance consultant that Alpine has adopted and implemented the recommendations in the report and its compliance with all undertakings; and (5) retain a record of its compliance with the undertakings for six years. *See id.* at 9-10; *see also* Doubek Decl., ¶ 16.

These are intrusive measures, to be certain. But, they will be far more effective at deterrence, at guaranteeing against future violations, than either the draconian penalty or the vague obey-the-law injunction sought by the SEC. In fact, these undertakings make any injunction unnecessary because to obtain an injunction the SEC must go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence. *See SEC v. Universal Major Indus.*, 546 F.2d 1044, 1048 (2d Cir. 1976); *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977) ("[T]he Commission cannot obtain [injunctive] relief without positive proof of a reasonable likelihood that past wrong-doing will recur.") *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) (A permanent injunction is "a drastic remedy and should not be granted lightly, especially when the conduct has ceased.").

Alpine would consent to those undertakings even though, as a matter of law, the SEC has not met the requirements for an injunction on this record.[87] As indicated, the SEC has failed to prove that Alpine's officers or employees acted with any "degree of scienter."[88] Similarly, as indicated, the SEC has failed to even discuss, much less prove, that Alpine's conduct was "egregious." The "sincerity" of Alpine's "assurances against future violations" is amply

---

[87] In reviewing a request for a permanent injunction, district courts consider "(1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations." *Haligiannis*, 470 F. Supp. 2d at 384.

[88] *See Slocum*, 334 F. Supp. 185-86 (holding that a permanent injunction was "unnecessary" where the defendants "only securities violations were non-scienter based, technical violations"); *SEC v. Todd*, No. 03-cv-2230 (BEN), 2007 WL 1574756, at *17 (S.D. Cal. May 30, 2007) ("Defendants erred, and at the end of the day made accounting choices which were later deemed incorrect. This is not the level of scienter for which an injunction, permanent or otherwise, is appropriate."), *aff'd in part, rev'd in part on other grounds*, 642 F.3d 1207 (9th Cir. 2011).

demonstrated by its willingness to consent to an undertaking to hire an outside compliance consultant who will report to the SEC.

In fact, the only factor that supports the SEC's request for an injunction – similar to its penalty request – is that violations recurred between 2011 and 2015.  However, these historical issues alone are not sufficient to establish they will recur in the future to support an injunction, particularly in light of the undertaking, and the facts that Alpine's violations tailed off well before the end of that time period, Alpine has no prior AML or SAR violations, and Alpine has no such violations in the four years that have elapsed since end of the relevant period. *See Snyder*, 2006 WL 6508273, at *4 (observing, in denying request for an injunction, "[t]hough this particular case involved more than one charge, however, this does not demonstrate that Defendant has engaged in recurrent violations. There is no evidence that Defendant engaged in or was accused of engaging in the violation of any securities laws prior to the events of early 1999. Further, there is no evidence that Defendant violated the securities laws subsequent to the events underlying the present case.").  The SEC's request for an injunction should therefore be denied.

### C.    The Amount Sought by the SEC is Unconstitutionally Excessive.

"The Excessive Fines Clause [in the Eighth Amendment of the Constitution] . . . limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Bajakajian*, 524 U.S. at 328.  "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture [or fine] must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334. "If the amount of the forfeiture [or fine] is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."  *Id.* at 337.

The SEC's demand for a Tier 1 penalty in excess of $22.7 million for a non-scienter, reporting violation violates the Eighth Amendment.  As indicated, in *Bajakajian*, the Supreme Court, in setting aside the forfeiture of $357,000 as contrary to the Excessive Fines Clause, relied upon, *inter alia*, the fact that the defendant was convicted of a "reporting offense" for failing to file a CTR under the BSA, which had a "minimal level of culpability."  *Id.* at 337-39.  As detailed above, Alpine has similarly been found liable for violating reporting and record-keeping requirements of the BSA.  There is no basis to conclude that a violation of the SAR requirements of the BSA are more "grave" than a violation of the "complementary" CTR requirements of the same statute.  As in *Bajakajian*, there is no evidence that Alpine's violations caused any harm or risk of harm to third persons to warrant the massive penalty sought by the SEC.

There are additional components that render the SEC's requested penalty constitutionally infirm.  First, as indicated, the penalties the SEC seeks against Alpine are significantly higher – between 28 and 350 times – than those imposed for SAR violations against comparably sized firms.  In *Bajakajian*, the Supreme Court supported its decision that the forfeiture was "grossly disproportionate to the gravity of the offense" with a hypothetical: "[i]t is impossible to conclude, for example, that the harm respondent caused is anywhere near 30 times greater than that caused by a hypothetical drug dealer who willfully fails to report taking $12,000 out of the country in order to purchase drugs."  *Id.* at 339.  It is similarly impossible to conclude here that Alpine caused 28-350 times greater the harm than the defendants in those SAR cases. The amount sought by the SEC ($22.736 million) is also approximately 17 times the maximum allowable penalty for this type of violation under 31 U.S.C. § 5321 ($1.36 million, $500 x 2,720 violations).  Similar to *Bajakajian,* the gross disproportionality of such a fine makes it unconstitutionally excessive.  *Id.*; *cf. also Collins*, 736 F.3d at 527 ("A penalty that is *not far out*

*of line with similar penalties imposed on others* and that generally meets the statutory objective seems highly unlikely to qualify as excessive in constitutional terms.") (emphasis added).

Second, the SEC knows that Alpine cannot pay the fine it seeks and that such a fine would put Alpine out of business many times over.  In *U.S. v. Viloski*, 814 F.3d 104 (2d Cir. 2016), the Court observed that an "especially important" factor to consider in analyzing whether a fine violates the Eighth Amendment is "that a fine should not deprive a wrongdoer of his livelihood."  *Id.* at 111.  Where the SEC knows the fine it seeks would put Alpine out of business, and put all of its employees out of work, it is unconstitutionally excessive.

Finally, that the "per violation" penalty amounts are within the statutory maximums for Tier 1 under Section 21(d) of the Exchange Act does not make the penalty sought constitutionally permissible here.  As indicated above, the per-violation amounts sought by the SEC are far in excess of the maximum amounts Congress and the Treasury Secretary imposed for negligent violations of 31 C.F.R. § 1023.320.  It is thus clear that the fine sought is grossly disproportionate to the gravity of the conduct at issue, and must be rejected by the Court.

## **CONCLUSION**

For the reasons stated above, the SEC's request for a Tier 1 penalty of $22,736,000 and a permanent injunction should be denied.  The Court should instead enter an order confirming Alpine's consent to an undertaking, and impose a Tier 1 penalty between $80,000 and $720,000.

DATED this 10th day of June, 2019.

/s/ *Maranda E. Fritz*
Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email:  Maranda.Fritz@thompsonhine.com

Brent B. Baker (BB 8285)
Aaron D. Lebenta (*Pro Hac Vice*)
Jonathan D. Bletzacker (*Pro Hac Vice*)
**CLYDE SNOW & SESSIONS**
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email:  brb@clydesnow.com
          adl@clydesnow.com
          jdb@clydesnow.com

*Attorneys for Defendant Alpine Securities*
*Corporation*