UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Civil No. 1:17-CV-04179-DLC |
| Plaintiff, | |
| v. | Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis |
| ALPINE SECURITIES CORPORATION, | **ECF CASE** |
| Defendant. | |

**DEFENDANT ALPINE SECURITIES CORPORATION'S MEMORANDUM IN
SUPPORT OF MOTION FOR RECONSIDERATION IN LIGHT OF
THE SUPREME COURT DECISION IN *KISOR v. WILKIE***



335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680



One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

POINT I RECONSIDERATION OF THE COURT'S PRIOR SUMMARY JUDGMENT OPINIONS IS PROPER BASED ON THE RECENT SUPREME COURT RULING IN KISOR. ................................................................................................... 2

    A.    Reconsideration is Warranted Because *Kisor* Constitutes an Intervening Change or Development of Controlling Law. ................................................................ 2

    B.    The *Kisor* Constraints on Agency Deference. ............................................................ 4

    C.    This Court, in its Opinions on Summary Judgment, Failed to Conduct the Analysis Mandated by *Kisor* Prior to "Resort[ing]" to *Auer* Deference. .................................. 7

        1.    This Court "Jumped the Gun" in its Application of *Auer* Deference. ............. 7

        2.    The District Court Failed Properly to Interpret Section 17 of the Exchange Act. ................................................................................................................... 7

        3.    This Court Failed  Properly to Interpret Rule 17a-8. .................................... 11

    D.    The Court Failed to Evaluate Whether Statements to Which it Deferred Were "of the Sort that Congress Would Want to Receive Deference." .............................. 16

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berman v. N.Y. State Pub. Emp. Fed'n*,
No. 16-cv-204 (DLI) (RLM), 2019 WL 1472582 (E.D.N.Y. Mar. 31, 2019) ..........................2

*In re Bloomfield*,
SEC Release No. 9553, 2014 WL 768828 (Feb. 24, 2014) ....................................................15

*Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*,
101 F. Supp. 2d 236 (S.D.N.Y. 2000), *aff'd*, 24 F. App'x 16 (2d Cir. 2001)....................2, 3, 4

*Clinton v. Brown & Williamson Holdings, Inc.*,
652 F. Supp. 2d 528 (S.D.N.Y. 2009)....................................................................................3, 10

*Cudahy Packing Co. v. Holland*,
315 U.S. 357 (1942)....................................................................................................................10

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)......................................................................................................................9

*Filler v. Hanvit Bank*,
Nos. 01 Civ. 9510 (MGC), 02 Civ. 8251 (MGC), 2003 WL 21729978
(S.D.N.Y. July 23, 2003) ..............................................................................................................3

*Halverson v. Slater*,
129 F.3d 180 (D.C. Cir. 1997)....................................................................................................11

*Hassett v. Welch*,
303 U.S. 313-14 (1938) ..............................................................................................................13

*Idaho Falls v. F.E.R.C.*,
629 F.3d 222 (D.C. Cir. 2011) ....................................................................................................14

*Kisor v. Wilkie*,
No. 18-15, --- S. Ct. ---, 2019 WL 2605554 (June 26, 2019) .........................................*passim*

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*,
729 F.3d 99 (2d Cir. 2013)............................................................................................................2

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
962 F. Supp. 2d 606 (S.D.N.Y. 2013)........................................................................................15

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
23 F. Supp. 3d 203 (S.D.N.Y. 2014)............................................................................................2

*New York State Office of Children & Family Servs. v. United States Dep't of*
   *Health & Human Servs.*,
   556 F.3d 90 (2d Cir. 2009)...............................................................................13

*Nutritional Health Alliance v. F.D.A.*,
   318 F.3d 92 (2d Cir. 2003)............................................................................9, 10

*Pratt & Whitney Aircraft, Div. of United Techs. Corp. v. Donovan*,
   715 F.2d 57 (2d Cir. 1983)...............................................................................15

*Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*,
   No. 03 Civ. 10254 (JFK), 2009 WL 4667102 (S.D.N.Y. Dec. 9, 2009) ..................................3

*SEC v. Alpine Secs. Corp.*,
   308 F. Supp. 3d 775 (S.D.N.Y. 2018)............................................................ *passim*

*SEC v. Alpine Secs. Corp.*,
   354 F. Supp. 3d 396 (S.D.N.Y. 2018)..................................................................11

*SEC v. Lek Secs. Corp.*,
   No. 17-cv-1789 (DLC), 2019 WL 2114067 (S.D.N.Y. May 8, 2019) ......................................2

*SEC v Sloan*,
   436 U.S. 103 (1978)........................................................................................15

*United States v. Picciotto*,
   875 F.2d 345 (D.C. Cir. 1989) .........................................................................14

**Statutes**

1 C.F.R. § 51.1(a)-(c)................................................................................13

1 C.F.R. § 51.1(f)....................................................................................13

1 C.F.R. § 51.5(b)(2)................................................................................13

31 C.F.R. § 1010.810(a).............................................................................10

31 C.F.R. § 1023.320...........................................................................10, 11, 12

31 U.S.C. § 5318(g)................................................................................10

31 U.S.C. § 5321.....................................................................................10

## INTRODUCTION

In *Kisor v. Wilkie*, No. 18-15, --- S. Ct. ---, 2019 WL 2605554 (June 26, 2019) (copy attached), a divided Supreme Court ultimately decided not to "abandon" *Auer* but denounced what it described as "reflexive" overly expansive application of agency deference, reversing the Federal Circuit Court's decision and remanding so that the court could adhere to the prerequisites and significant limitations of the *Auer* doctrine.[1]

This Court's March 30, 2018 and December 11, 2018 opinions, in which the Court relied extensively on the concept of agency deference to rule in favor of the SEC on critical issues in this case, are not consistent with the law as now defined by the Supreme Court in *Kisor*. The Supreme Court in *Kisor* laid out the principles and process of statutory construction that must be applied *before* a court "resort[s] to agency deference;" this Court did not engage in that "multi-step multi-factor inquiry" that "the [Supreme] Court now holds is required," failing to acknowledge or apply critical authorities governing construction of the relevant provisions. The Supreme Court made clear that only "authoritative" statements of the agency that possesses relevant "expertise" are entitled to deference; this Court relied extensively on materials that fall well outside the parameters set by the *Kisor* Court. Like the Federal Circuit Court in *Kisor*, this Court appears to have proceeded too quickly to employ *Auer* deference without first applying exhausting the tools available to construe the provisions at issue, without determining whether the interpretation advanced by the SEC was "reasonable," and without conducting the necessary "independent inquiry" to determine *if* "the character and context of the [SEC's] interpretation entitles it to controlling weight," i.e., that it reflects the agency's "authoritative" or "official"

---

[1]  The Supreme Court had granted certiorari in *Kisor* on the specific question of whether it should overrule *Auer*, and four Justices were clearly inclined to do so.  Chief Justice Roberts ultimately joined the majority that decided to limit and cabin *Auer* as opposed to overruling it.  Justice Gorsuch, on the other hand, looked forward to the day when the Court, instead of "neuter[ing]" *Auer*, "will find the nerve it lacks today and inter *Auer* at last."  *Id.* at *16.

position, implicating its "substantive expertise, as opposed to a "convenient litigating position."

*See id.* at *9-*10.  As a result, this Court should reconsider its prior opinions and undertake the

analysis mandated by the Supreme Court.

**ARGUMENT**

**POINT I**

**RECONSIDERATION OF THE COURT'S PRIOR SUMMARY JUDGMENT OPINIONS IS PROPER BASED ON THE RECENT SUPREME COURT RULING IN *KISOR*.**

> **A.      Reconsideration is Warranted Because *Kisor* Constitutes an Intervening Change or Development of Controlling Law.**

"'A motion for reconsideration should be granted only when the defendant identifies an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice.'"  *SEC v. Lek Secs. Corp.*, No. 17-cv-1789 (DLC), 2019

WL 2114067, at *1 (S.D.N.Y. May 8, 2019) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc.*

*v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)).  An "intervening change of controlling

law," also referred to as "new developments of controlling law," is proper grounds for

reconsideration "[b]ecause the law is constantly evolving, [thus] 'a new decision ***clarifying the***

***applicable substantive law*** may justify reexamining a denial of summary judgment.'"

*Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp.*, 101 F. Supp. 2d 236, 239 (S.D.N.Y.

2000) (citation omitted) (emphasis added), *aff'd*, 24 F. App'x 16 (2d Cir. 2001) (additional

citations omitted); *see also In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 23 F.

Supp. 3d 203, 207 (S.D.N.Y. 2014) (granting motion for reconsideration because a recent ruling

"has certainly been an intervening change of controlling law.").[2]

---

[2]  Traditional deadlines for seeking reconsideration prior to entry of final judgment do not apply where reconsideration is sought because of an intervening change of controlling law. *See, e.g., Berman v. N.Y. State Pub. Emp. Fed'n*, No. 16-cv-204 (DLI) (RLM), 2019 WL 1472582, at *3 (E.D.N.Y. Mar. 31, 2019) (granting motion to reconsider after time period in S.D.N.Y. Local Rule 6.3 because "[j]ustice requires the exercise of this discretion when, for example, there is an intervening change in controlling law, such as the issuance of a relevant United States

The Supreme Court's recent opinion in *Kisor* constitutes the type of "new development[]" of controlling law" that warrants this Court's reconsideration of its prior summary judgment rulings. *Caribbean Wholesales*, 101 F. Supp. 2d at 239.  In *Kisor,* the Supreme Court granted certiorari to determine whether to overrule the doctrine of *Auer* deference, pursuant to which courts defer to an "agency's construction of its own regulations."  2019 WL 2605554, at *4.  The majority of the Supreme Court declined to overturn *Auer* on the basis of *stare decisis,* but that majority hinged on the Court's redefining of the scope of the doctrine.  As emphasized by Justice Kagan, the Court took "the opportunity to restate" and "expand on" the limitations of the doctrine in order to "clear up some mixed messages we have sent" and to "cabin[] *Auer's* scope in varied and critical ways." *Id.* at *8, *10.

The concurring opinion of Justice Gorsuch also makes clear the extent of changes wrought by the majority's opinion, describing the majority's opinion as having "transformed *Auer.*"  *Id.* at *16 (Gorsuch, J., concurring).[3]  Justice Gorsuch observed that lower courts have "afforded *Auer* deference mechanically, without conducting the inquiry the Court ***now*** holds is required."  *Id.* at *33 (emphasis added).  Justice Gorsuch confirmed that *Auer* was "reengineered" by the majority to require "a multi-step, multi-factor inquiry" in which courts must "'exhaust all the traditional tools of construction' before they even consider deferring to an agency."  *Id.*  In fact, according to Justice Gorsuch, the majority imposed "so many new . . .

---

Supreme Court decision.") (citing *Filler v. Hanvit Bank*, Nos. 01 Civ. 9510 (MGC), 02 Civ. 8251 (MGC), 2003 WL 21729978, at *1 (S.D.N.Y. July 23, 2003)); *Sea Trade Co. Ltd. v. FleetBoston Fin. Corp.*, No. 03 Civ. 10254 (JFK), 2009 WL 4667102, at *3 (S.D.N.Y. Dec. 9, 2009) ("'Justice requires the exercise of this discretion [to accept a late filed motion for reconsideration] when, for example, there is an intervening change in controlling law, such as the issuance of a relevant United States Supreme Court decision.'") (quoting *Clinton v. Brown & Williamson Holdings, Inc.*, 652 F. Supp. 2d 528, 530 (S.D.N.Y. 2009) (granting motion for reconsideration filed two months after Supreme Court ruling)).

[3] Chief Justice Roberts, in his opinion concurring in part, underscored the extent and importance of the constraints that the majority imposed on *Auer* deference, stating that given the majority's delineation of "the prerequisites for, and limitations on *Auer* deference," "the distance between the majority and Justice Gorsuch is not as great as may initially appear." *Id.* at *15.

qualifications and limitations on *Auer* . . . [that] the doctrine emerges maimed and enfeebled – in truth, zombified." *Id*. at *16.

Because the Federal Circuit Court had failed to employ the required analytical process, the *Kisor* Court reversed and remanded the matter.  *Id*. at *2, *15.  Here too, *Kisor's* new qualifications and limitations on the metes and bounds of *Auer* deference, discussed below, constitute "new developments . . . clarifying the applicable substantive law" relied upon by this Court in its March and December Opinions, and require reconsideration of this Court's opinions. *See Caribbean Wholesales,* 101 F. Supp. 2d at 239.

> **B.    The *Kisor* Constraints on Agency Deference.**

The Supreme Court, in restating and expanding "the limits inherent in the *Auer* doctrine," acknowledged that it had contributed to the confusion surrounding *Auer*, at times improperly applying "*Auer* deference without significant analysis of the underlying regulation," or "without careful attention to the nature and context of the interpretation." *Kisor*, 2019 WL 2605554, at *8. The Supreme Court emphasized that the "classic formulation of the test – whether an agency's construction is 'plainly erroneous or inconsistent with the regulation' – may suggest a caricature of the doctrine, in which deference is 'reflexive.'"  *Id*. (citations omitted).

To address the courts' misuse of *Auer*, the Supreme Court set out to circumscribe when and how the doctrine is properly employed.  It defined the proper purpose and scope of the doctrine, and imposed a number of analytical inquiries that courts must make *before* deferring to the agency's interpretation.  *See id.* at *7-*11.  "First and foremost, a court should not afford *Auer* deference unless the regulation is genuinely ambiguous" because where "uncertainty does not exist, there is no plausible reason for deference."  *Id.* at *8.  "[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction," which requires the court to "'carefully consider[]' the text, structure, history, and purpose of a

regulation, in all the ways it would if it had no agency to fall back on." *Id.* (citations omitted). Far from automatic, the Supreme Court explained that *Auer* only applies when "the law runs out"; "if the law gives an answer – if there is only one reasonable construction of a regulation – then a court has no business deferring to any other reading." *Id.* "[O]nly when that legal toolkit is empty and the interpretative question still has no single right answer can a judge conclude that it is 'more [one] of policy than of law.'" *Id.* (citation omitted).

Second, even "[i]f genuine ambiguity remains . . . the agency's reading must still be 'reasonable.'" *Id.* (citation omitted). "In other words, it must come within the zone of ambiguity the court has identified after employing all its interpretive tools," with analysis of "the text, structure, history, and so forth … establish[ing] the outer bounds of permissible interpretation." *Id.* The Supreme Court made clear that this requirement, that the agency's view be "reasonable" and within those "outer bounds," is not superficial:  "And, let there be no mistake: That is a requirement an agency can fail." *Id.*

Third, even a "reasonable agency reading of a genuinely ambiguous rule" may not be entitled to *Auer* deference.  *Id.* at *9.  Rather, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* Within this requirement reside several key considerations that limit or "cabin" the extent of *Auer* deference.  As Justice Kagan explained, the notion of *Auer* deference stems from a presumption that Congress would have wanted courts to consider the views of the agency *to which Congress delegated authority.  Id.*  To begin with, therefore, the regulatory interpretation must be one actually made by "the agency" that received that delegation and possesses the relevant expertise, and it must be the product of deliberation.  And "it must be the agency's 'authoritative' or 'official position' rather than any more ad hoc statement not reflecting the

agency's views." *Id*. "The interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context." *Id*.  "Next, the agency's interpretation must in some way implicate its substantive expertise," for the "basis for deference ebbs when the '[t]he subject matter of the [dispute is] distan[t] from the agency's ordinary duties' or 'fall[s] within the scope of another agency's authority." *Id*. (alterations in original) (citation omitted).

 "Finally, an agency's reading of a rule must reflect [its] 'fair and considered judgment,'" which means "a court should decline to defer to a merely 'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Id*. at *10 (alterations in original) (citations omitted).

Having defined the proper analysis that must precede and accompany *Auer* deference, the Supreme Court reversed and remanded to the Federal Circuit, ordering "a redo" for two primary reasons.  *Id*. at *14.  The Supreme Court first held that "the Federal Circuit jumped the gun in declaring the regulation ambiguous" because it did not first "bring all its interpretive tools to bear before finding that to be so." *Id*.  "It is not enough to casually remark, as the [lower] court did here, that '[b]oth parties insist that the plain regulatory language supports their case, and neither party's position strikes us as unreasonable.'" *Id*.  The lower court "must make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning." *Id*.

"[S]econd, the Federal Circuit assumed too fast that *Auer* deference should apply in the event of genuine ambiguity," failing to evaluate whether the agency has put forth a sufficiently authoritative and reasoned "interpretation [] of the sort that Congress would want to receive deference." *Id*. at *15.

C.     **This Court, in its Opinions on Summary Judgment, Failed to Conduct the Analysis Mandated by *Kisor* Prior to "Resort[ing]" to *Auer* Deference.**

1.     **This Court "Jumped the Gun" in its Application of *Auer* Deference.**

A comparison of the blunt admonitions of the Supreme Court in *Kisor*, with this Court's March and December Opinions, squarely implicates the first of the issues that formed the basis for reversal in *Kisor*, *i.e.*, whether this Court, before even considering deference, engaged in a "conscientious effort to determine" the proper meaning of the provision at issue through application of "all the standard tools of interpretation." *Id.* at *7, *14.  In fact, in so readily acceding to the SEC's position on these issues, this Court did exactly what *Kisor* has now directed courts not to do.  *See id.* at *8 (describing "reflexive" deference to agency position as a "caricature of the [*Auer*] doctrine").  This Court's precipitous embrace of judicial deference, as opposed to traditional statutory construction, was actually more pronounced than the Federal Circuit's treatment of the VA regulation that was found by the *Kisor* Court to be inadequate.  *See id.* at *7-*8, *14-*15.  These threshold issues, which are outcome determinative, should be reconsidered and revised consistent with the existing authority that confirms that the SEC lacks jurisdiction to enforce the Bank Secrecy Act ("BSA") and that Rule 17a-8 does not and cannot accomplish the acrobatic maneuver of indefinite "incorporation" of statutory provisions that do not yet exist.

2.     **The District Court Failed Properly to Interpret Section 17 of the Exchange Act.**

This Court, in concluding that the SEC possesses jurisdiction to pursue enforcement actions for violations of the BSA, interpreted and applied *Auer* deference in a manner that is no longer permissible.  This Court placed its iteration of rules of deference at the literal forefront of its discussion, and it relied upon the same "classic formulation" of the *Auer* doctrine that the Supreme Court termed a "caricature" that impermissibly led to "reflexive" deference.  *See SEC*

*v. Alpine Secs. Corp.*, 308 F. Supp. 3d 775, 789 (S.D.N.Y. 2018) ("March Opinion") (stating, "a court must defer to an agency's 'interpretation of its own regulations unless that interpretation is plainly erroneous or inconsistent with the regulation.'").

The Court's entire discussion of the SEC's jurisdictional authority not only was imbued with the concept of deference but also improperly abjured application of critical principles of statutory construction. *Id.* at 795-96. Presented with the fact that Congress delegated authority to administer and enforce the BSA to the Department of Treasury, the Court was required to carefully consider the legal precepts that govern resolution of that jurisdictional issue before *ever* "fall[ing] back" to the notion that the issue is "'more [one] of policy than of law,'" or one that Congress intended to give the SEC deference to resolve. *Kisor*, 2019 WL 2605554, at *8 (citation omitted).

This Court declined to work through that analysis. On the threshold issue of whether Section 17(a) could be interpreted to empower the SEC to assert enforcement authority over the BSA, this Court stated that Congress' "express delegation of rulemaking authority" in Section 17 (a) of the Exchange Act "satisfies the *Chevron* test" because "Congress has directly spoken to the precise question at issue." March Opinion, 308 F. Supp. 3d at 788, 796. Without reference to any other decisional authority or principle, this Court appeared to suggest that, with the passage of Section 17 of the Exchange Act of 1934, Congress envisioned some future effort by the SEC to "incorporate" provisions of a separate statutory scheme and empowered the SEC to take action in derogation of any subsequent express Congressional delegation of enforcement authority to a different agency. But the words of the statute do not say that. In fact, the statute does not aspire to sweep in substantive issues of money laundering; it is a narrow books and records provision and even the concept that it could incorporate obligations to "report"

transactions that are indicative of criminal activity is a significant reach.

Regardless, this Court's characterization of the statute misapprehends the actual "question at issue" of whether the SEC could confer on itself enforcement authority that was delegated by Congress to Treasury. *Id.* at 788. No language in Section 17 permits the SEC to invade the authority *that was subsequently conferred by Congress to another agency in another statute.* The words of that provision of the 1934 Exchange Act can neither override nor provide rights to enforce not yet written legislation. This Court's suggestion that the language of Section 17(a) or principles of deference resolve what is actually an important and discrete issue of statutory construction constitutes a failure to conduct the analysis that is mandated by *Kisor.*

There are ample tools of statutory construction that establish the error of the SEC's position and that needed to be considered before any discussion of deference. The most important tool of construction that controls this question is the requirement, espoused by the Supreme Court in the *Brown & Williamson Tobacco* decision, that a court must consider the "implications" and "policy" expressed in a "later federal statute."

> The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand . . . . "[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended."

*F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (citation omitted).

The Second Circuit relied on this principle in an analogous context to hold that the FDA did not have authority to regulate "packaging" of drugs and dietary supplements for "poison prevention purposes," despite the FDA's "broad authority" under the FDCA to regulate "food and drugs in order to protect public health." *Nutritional Health Alliance v. F.D.A.*, 318 F.3d 92, 95, 98 (2d Cir. 2003). To determine the scope of the FDA's authority, the Second Circuit

observed that, under *Brown & Williamson* and similar authorities, it was required to consider not just the FDCA, but also later-enacted statutes that specifically targeted poison-prevention packaging and gave the regulation of poison-prevention packaging from the FDA to another agency, the Consumer Product Safety Commission ("CPSC").  *Id.* at 94, 102-03. The Second Circuit refused to defer to the FDA's position on the scope of its own authority and held that the subsequent specific delegation of authority to the CPSC precluded the exercise of authority by the FDA, stating that the FDA's claim of concurrent jurisdiction struck a "discordant tone" and would "circumvent the detailed regulatory scheme" put in place by Congress.  *Id.* at 104.

The Second Circuit in the *Nutritional Health* decision laid out the correct analysis plainly, all while expressly and properly rejecting any deference to the agency's view of its own jurisdiction.  Here, the BSA,[4] the regulations promulgated thereunder,[5] and FinCEN's own consistent statements[6] make clear that enforcement authority for violations of the requirements of Section 1023.320 resides exclusively in Treasury, and not the SEC.  Yet this Court did not engage in the analysis of the statutory provisions that is reflected in *Brown & Williamson* and *Nutritional Health*, and now mandated by *Kisor*.  Application of those authorities that govern construction of the statute, including *Nutritional Health* and other fundamental principles of

---

[4]  *See* 31 U.S.C. § 5318(g) (delegating to the Treasury Secretary the authority to require financial institutions to "report any suspicious transactions"); 31 U.S.C. § 5321 (delegating to the Treasury Secretary the authority to impose civil money penalties for violations of regulations promulgated under the BSA, including Section 1023.320).

[5]  *See* 31 C.F.R. § 1010.810(a) (stating "[o]verall authority for enforcement and compliance, including coordination and direction of procedures and activities of all other agencies exercising delegated authority under this chapter, is delegated to the Director, FinCEN.").  FinCEN also retained the exclusive "[a]uthority for the imposition of civil penalties for violations of" the BSA and its implementing regulations.  *See id.* § 1010.810(a), (d); 52 Fed. Reg. at 11,436, 11,440 cmt. 19 (Apr. 8, 1987).

[6]  *See Bank Regulation*, Banking & Fin. Servs. Pol'y Rep., Dec. 2016, at 36, 39-40 [ECF No. 85-4] (stating, "FinCEN is responsible for the overall administration and enforcement of the BSA.  Although it delegates BSA compliance examination authority to other federal regulators, FinCEN retains enforcement authority, including the authority to impose CMPs [civil monetary penalties] for violations.").

construction,[7] demonstrate that Section 17 cannot and does not authorize the SEC's invasion of authority delegated by Congress to a different agency.[8]

### 3.   This Court Failed  Properly to Interpret Rule 17a-8.

The Court's acquiescence to agency positions continued as it considered specific issues concerning a proper interpretation of Rule 17a-8. This Court held that Rule 17a-8 "encompass[ed] the duty to file a [Suspicious Activity Report] and otherwise comply with Section 1023.320" even though Rule 17a-8 was passed two decades before the SAR regulations existed and was never formally amended. *See SEC v. Alpine Secs. Corp.*, 354 F. Supp. 3d 396, 417 & n.34 (S.D.N.Y. 2018) ("December Opinion").  The deference shown by this Court to the SEC's position on the scope of Rule 17a-8 also ran afoul of the principles announced in *Kisor*.

First, as with the analysis of Section 17, the principles of statutory construction that apply to the jurisdictional grant contained in the BSA should have governed the interpretation of Rule 17a-8.  Application of those principles requires a finding that the SEC could not and did not confer BSA enforcement authority on itself where that authority was delegated to, and remained within, the Department of Treasury.  Notably, on this issue of enforcement authority, the Court in its opinion seemed to fail to distinguish *enforcement* authority from the role of the SEC and SROs in conducting *examinations* of firms.  The court's discussion includes the curious statement that "[t]o some extent, Alpine's papers can be read to assert that the SEC lacks jurisdiction to enforce suspicious activity reporting regulations."  March Opinion, 308 F. Supp. 3d at 795 n.16.  But that argument was not put forth by Alpine "[t]o some extent" it was made by

---

[7]  *See, e.g., Cudahy Packing Co. v. Holland,* 315 U.S. 357, 364 (1942) ("[T]he grant of authority to delegate the power of inspection, and the omission of authority to delegate the subpoena power, shows a legislative intention to withhold the latter.").  Moreover, under the canon *expressio unius est exclusio alterius,* that FinCEN delegated only the authority to examine broker-dealers to the SEC shows an intent to prevent the SEC from exercising any other authority.  *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997).

[8]  Furthermore, in light of the foregoing, any contention by the SEC that it has authority to bring an enforcement action for violations of the SAR regulation pursuant to Rule 17a-8 also fails the reasonableness test.

Alpine at highest volume and with extensive analysis and discussion.  By way of another example, the Court stated that FinCEN "saw Rule 17a-8 the way the SEC does," but then quotes a portion of the notice of final rule that confirms precisely the opposite.  *Id*. at 797.  That notice explains that, under Rule 17a-8, the self-regulatory organizations ("SROs") have authority "'*to examine* for BSA compliance.'"  *Id*. (quoting 31 C.F.R. § 1023.320) (emphasis added).  Those and other portions of this Court's decisions on this issue leave open the possibility that this Court interpreted Alpine's argument to be a denial that the SEC possessed any authority in relation to the BSA, without appreciating the critical distinction between examination and enforcement authority.  As discussed at length in Alpine's submission, and reflected in innumerable FinCEN statements, *examination authority* relating to broker-dealers was delegated to the SEC while authority to administer, interpret and *enforce the BSA* was retained by Treasury. *See fns. 3-5, supra.*

A proper and exhaustive analysis of Rule 17a-8 – a prerequisite to any consideration of deference under *Kisor* – also required that the court consider and address two other time-honored principles of construction: first, the provision as interpreted by the SEC violated the authorities regarding "incorporation by reference," and second, it flatly contravened the requirements of the APA.  Instead of addressing those issues, this court utilized an approach that again contradicted what the *Kisor* court requires.  Seeming to intermix statutory construction with deference, this Court began with the statement that Rule 17a-8 is "unambiguous" but also stated that the SEC's description of Rule 17a-8 as perpetually incorporating any new provisions of the BSA is "reasonable." March Opinion, 308 F. Supp. 3d at 796.  The extensive and well-reasoned authorities that govern the use of "incorporation by reference," and that were discussed by Alpine in its motion, were not discussed, distinguished or even acknowledged by this Court.  To

the contrary, the Court stated that Alpine did "not cite any authority to support that counter-intuitive proposition" that the SEC could not use incorporation by reference to encompass future statutes.  *Id.*

But the applicable law is both clear and imminently logical, and precludes an agency's incorporation of not-yet existing provisions of a separate statutory scheme.  An agency cannot *dynamically* incorporate another agency's presently nonexistent regulations, such that a rule would, as this Court stated, "evolve over time."  *Id.* at 797.  The regulations of the Office of the Federal Register ("OFR"), *which are controlling authority on incorporation by reference under the Administrative Procedure Act ("APA"),*[9] require agencies to identify the particular version of any material incorporated by reference, and obtain formal approval to incorporate any materials by reference.[10]  More important here, the OFR regulations expressly state that "incorporation by reference of a publication is limited to the edition of the publication that is approved.  *Future amendments or revisions of the publication are not included.*"  1 C.F.R. § 51.1(f) (emphasis added); *see also id.* § 51.11(a) (providing unambiguous instructions to agencies regarding the formal procedure necessary to amend or update material incorporated by reference, including publishing notice of the change in the Federal Register).[11]  And for good reason, since no regulator could or should assume the propriety of incorporating not-yet-written rules, and the

---

[9] *See* 1 C.F.R. § 51.1(a)-(c).

[10] *See* 1 C.F.R. § 51.5(b)(2) (requiring approval of the Director of the OFR for all materials incorporated by reference), § 51.9 (requiring that any incorporation by reference "state[] the title, date, edition, author, publisher and identification number of the publication" to be incorporated.).

[11]  A similar principle applies for statutes, as a matter of statutory construction.  *See, e.g.*, *New York State Office of Children & Family Servs. v. United States Dep't of Health & Human Servs.' Admin. for Children & Families*, 556 F.3d 90, 99 (2d Cir. 2009) ("'Where one statute adopts the particular provisions of another by a specific and descriptive reference to the statute or provisions adopted . . . [s]uch adoption takes the statute as it exists at the time of adoption and does not include subsequent additions or modifications by the statute so taken unless it does so by express intent.'") (quoting *Hassett v. Welch*, 303 U.S. 313-14 (1938)).

APA prohibits that kind of transparent effort to circumvent its requirements.[12]  This Court's conclusion that the SEC intended for the rule to "evolve" over time, and that an agency iteration can do so, flouts all of those relevant principles of statutory construction.

Nor would the SEC's view of Rule 17a-8 – that it empowered the SEC to bring an enforcement action for violations of the SAR provisions of the BSA – satisfy the requirement in *Kisor* that the agency's view be within the bounds of "permissible interpretation" and "reasonable."  *Kisor*, 2019 WL 2605554, at *8.  That claim by the SEC, an interloping agency that was *not* entrusted with administration and enforcement of the BSA, that it can invade a province entrusted and retained exclusively by Treasury, is not reasonable.  *Id.* ("The text, structure, history, and so forth at least establish the outer bounds of permissible interpretation").

These principles of law define with precision the only proper interpretation of Rule 17a-8: that it did not automatically subsume the later enacted SAR provisions of the BSA.  Here, as explained in *Kisor*, "the law gives an answer – [] there is only one reasonable construction of a regulation – [and] a court has no business deferring to any other reading." *Id.* at *8.

Finally, there is no indication that the SEC's claim that Rule 17a-8 encompasses the power to enforce the SAR regulations is "entitle[d] . . . to controlling weight." *Id.* at *9. There is no indication that the positions taken by the SEC's Division of Enforcement in litigation are any more than "ad hoc statement[s] not reflecting the agency's views," or "convenient litigating position," as opposed to the Commission's "fair and considered judgment." *Id.* at *9-*10. Perhaps more importantly, because this interpretation of Rule 17a-8 purports to impinge upon the

---

[12] *Idaho Falls v. F.E.R.C.*, 629 F.3d 222, 227-29 (D.C. Cir. 2011) (held that both "incorporation" of a materially different fee schedule *and* passive acceptance of material developed by another agency violated APA); *United States v. Picciotto*, 875 F.2d 345, 346-47 (D.C. Cir. 1989) (where Park Service claimed that it had granted to itself "a valid exemption to the APA for all future regulations [regarding restrictions on Park activity]" was therefore "free of APA's troublesome rulemaking procedures forever after," held that its reading of its regulation was "implausible as well as unlawful.").

delegated agency's authority, it would be FinCEN's and not the SEC's view that would be entitled to deference.  As observed in *Kisor,* "the basis for deference ebbs when '[t]he subject matter of the [dispute is] distan[t] from the agency's ordinary' duties or *'fall[s] within the scope of another agency's authority.*" *Id.* at *9 (alterations in original) (emphasis added) (citation omitted).  Even where Congress expressly "divide[s] regulatory power between two entities" a court must "presume[] Congress intended to invest interpretative power in whichever actor was 'best position[ed] to develop' expertise about a particular problem."  *Id.* (alterations in original) (citations omitted).

The SEC's action in *In re Bloomfield,* relied on by this Court to support its position that the SEC has jurisdiction to pursue enforcement actions for violations of the SAR provisions of the BSA, fails, on a number of grounds, to satisfy the requisites laid out in *Kisor*.  This Court pointed to the fact that the SEC in *Bloomfield* addressed SAR issues and thereby "announced" that it had authority to pursue those enforcement actions.  March Opinion, 308 F. Supp. 3d at 797 (citing SEC Release No. 9553, 2014 WL 768828, at *15–*17 (Feb. 24, 2014)).  The *Bloomfield* matter does not constitute an authoritative or reasoned judgment of the relevant agency because, first, it was espoused by the wrong agency and, secondly, the issue of the SEC's authority was not challenged or adjudicated in *Bloomfield.  See also SEC v Sloan,* 436 U.S. 103, 117-18 (1978) (refusing to give deference to SEC's "consistent and longstanding" interpretation of a statute as authorizing consecutive summary suspension orders because there is no indication that "[t]he Commission actually addressed in any detail the statutory authorization under which it took that action," and noting that "the existence of a prior administrative practice, even a well-explained one, does not relieve us of our responsibility to determine whether that practice is

consistent with the agency's statutory authority").[13]

Here, FinCEN is plainly in a better position to define and enforce the SAR regulations; it was actually delegated such authority and FinCEN has stated loud and clear that it retains *exclusive* enforcement authority.   There is absolutely no evidence that Congress believed the SEC had any "comparative expertise" in anti-money laundering efforts across the full spectrum of the financial industry.  *Kisor*, 2019 WL 2605554, at *9.  This Court did not undertake the requisite "independent inquiry" of these issues, which alone requires reconsideration.  *Id.*

### D.   The Court Failed to Evaluate Whether Statements to Which it Deferred Were "of the Sort that Congress Would Want to Receive Deference."

Having concluded that Rule 17a-8 managed to incorporate subsequently enacted SAR provisions, without notice and comment, the Court then interpreted the content of the SAR requirement by reference to particular arguments and materials that, *Kisor* confirmed, are not the sort to which deference applies. The Supreme Court was clear that "not all reasonable agency constructions of those truly ambiguous rules are entitled to deference." *Id.* at *7.  Deference is "unwarranted," for example, where the interpretation propounded by the agency "does not reflect an agency's authoritative, expertise-based, 'fair[, or] considered judgment.'" *Id.* (alterations in original) (citation omitted).  Where there is any issue as between more than one agency, the court is to "presume[ed] Congress intended to invest interpretive power' in whichever actor was 'best position[ed] to develop' expertise about the given problem.  *Id.* at *9 (alterations in original) (citation omitted).  And "[a]n agency…gets no 'special authority to interpret its own words when, instead of using its expertise to formulate a regulation, *it has elected merely to paraphrase*

---

[13] *See also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 614 (S.D.N.Y. 2013) (held that "we need not defer to statements made in the Barclays settlement order" and citing additional authorities); *Cf. Pratt & Whitney Aircraft, Div. of United Techs. Corp. v. Donovan*, 715 F.2d 57, 62 (2d Cir. 1983) ("Neither the Secretary by regulation nor the Commission by decision can extend the scope of [a statute] beyond the boundaries defined by Congress" and noting in support that "'[a]n agency may not bootstrap itself into an area in which it has no jurisdiction by repeatedly violating its statutory mandate.'" (citations omitted)).

*the statutory language*.'"   *Id.* at *9 n.5 (emphasis added) (citation omitted).

As applied to this case, the *Kisor* decision plainly holds that *no* deference should have been afforded the positions advanced by the SEC in relation to an analysis of jurisdiction over or the content of the provisions of the BSA.  The SEC was not the agency to which Congress delegated administrative or rulemaking authority or "invest[ed] interpretative power" and so the entire rationale of *Auer* deference fails.

In addition, other clear warnings from *Kisor* apply here and demonstrate the inappropriateness of deferring to the SEC.  The SEC, in its invocation of the BSA in Rule 17a-8, did not even paraphrase the language of the statute; it simply parroted it.  According to *Kisor,* therefore, it has "no special authority to interpret its words."  *Id.*  FinCEN did not initiate this case and is not before the Court.  FinCEN has not stated to this Court, or in any context in which Alpine is aware, that failing to include the 5 Ws or red flags culled from guidance in a SAR narrative, or failing to file SARs on "deposit-liquidation patterns" based on red flags also culled from guidance, constitutes a violation of the BSA.  That is the SEC's extrapolation, developed by steadfastly ignoring the persuasive statements of FinCEN and cobbling together snippets from industry publications.  Yet the Court on a series of crucial issues deferred to the arguments and extrapolations of the SEC.  This is impermissible under *Kisor* because there is no indication that Congress believed the SEC has any special expertise in interpreting either the provisions of the BSA or the meaning of public statements or publications of FinCEN.

"Authoritative" statements of FinCEN, on the other hand, would at least fit within *Kisor's* definition of pronouncements that could be entitled to deference, but this Court failed to consider the quantity of "authoritative" statements of various FinCEN executives who repeatedly and consistently underscored that SAR filing decisions are subjective, that they are "judgment

calls" made by a firm that has experience with the industry, market, transaction and customer.[14]

It ignored the agency's confirmation that compliance with the BSA would be evaluated based on

the firm's program and whether it was reasonably designed to ensure reporting.[15]  Nowhere in

the Court's analysis does it even acknowledge much less apply those and other statements from

the agency that possesses both the expertise and the authority to administer the BSA.

     In lieu of considering those pronouncements, this Court relied on precisely the kind of

publications that do not possess the imprimatur of the agency and, in many instances, were not

even written by individuals at FinCEN.  The most glaring example is the Court's substantial

reliance on the "Tips and Trends" publications, amalgams of dozens of pages of comment from

various sources.  As confirmed by both the guidance documents themselves, and Alpine's expert,

the portions of those publications relied upon were not drafted by FinCEN, but rather by the SEC

and FINRA, with cautionary language stating that they cannot be relied upon to as presenting the

views of the Commission.[16]  Even FinCEN's 2003 SAR Narrative Guidance, which was

---

[14] "Compliance should not be about second guessing individual judgment calls on whether a particular transaction is suspicious."  Statement of William J. Fox, Director Financial Crimes Enforcement United States Department of Treasury Before the House of Representatives, June 16, 2004.

[15] The GAO Report on the Bank Secrecy Act, states: "The SAR guidance in the interagency examination manual that regulators use states that the decision to file a SAR is inherently subjective and directs examiners to focus on whether the institution has an effective SAR decision making process, rather than on individual SAR filing decisions. According to the manual, in those instances where the institution has an established SAR decision making process; has followed existing policies, procedures, and processes; and has decided not to file a SAR, examiners generally should not criticize the institution for not filing a SAR."  GAO-09-226, "Suspicious Activity Report Use Is Increasing, but FinCEN Needs to Further Develop and Document Its Form Revision Process," at p. 19 (Feb. 2009).

[16]  *See SAR Activity Review, Trends, Tips and Issues,* Issue # 15, at 20 and n. 22 (stating that pages 20-25 were prepared by FINRA and the SEC, and that "[t]he views expressed in this document ***do not necessarily represent the views of the Commission, or the members of the staff of the Commission***.").  Moreover, Alpine's expert witness explained on summary judgment that, contrary to the suggestions by the SEC's expert witness, the instructions to SAR forms used by the securities industry between 2002 and 2012 (Form 101 or SAR-SF) and 2012 to the present (FinCEN Form 111, which is an electronic form submitted online through the BSA E-filing portal) (collectively, "SAR-BD Forms") do not impose specific requirements for what must be included in a SAR narrative. The instructions for the narrative section of the SAR-BD Forms state "Filers *must* provide a clear, complete and concise description of the activity, including what was unusual or irregular *that caused suspicion*." The SAR-BD Forms, then, require only that the broker-dealer provide in the narrative section an account of what *the broker- dealer determined, with its experience in the particular market and information concerning the transaction,* was suspicious about the transaction. Indeed, that is the very point of the narrative: to help law enforcement understand what the

extensively relied upon by the Court, makes clear that it does not purport to create binding

narrative content rules; the guidance states it "is provided *solely* to assist respective financial

institutions," and describes the "5 Ws" in permissive terms, like "should identify" and "[w]e

suggest."[17]  Such publications were never intended to be used in the manner in which they were

used in this case, to construct rigid rules that would then constitute a basis for imposition of

penalties.  *See Kisor*, 2019 WL 2605554, at *9 (court must determine whether "character and

context of the agency interpretation entitles it to controlling weight").

   Finally, the *Kisor* Court emphasized that a court may not defer to an interpretation "that

creates 'unfair surprise' to regulated parties."  *Id*. at *10.

> We have therefore only rarely given *Auer* deference to an agency construction
> 'conflicting with a prior one.' … This Court…recently refused to defer to an
> interpretation that would have imposed retroactive liability on parties for
> longstanding conduct that the agency had never before addressed.  Here too, lack
> of fair warning outweighed the reasons to apply *Auer*.

*Id.*  Here, the SEC has sought to use this case of "first impression" to construct a particular set of

hard and fast rules pertaining to SAR narratives, and impose retroactive liability on Alpine for

events that occurred primarily in 2011 and 2012.   The SEC's argument, that a BSA violation

occurs when a firm files a SAR to report a transaction, but fails to refer to a red flag in a SAR

narrative, had not previously been endorsed by any tribunal.  There is an issue of fair warning

that should outweigh an acceptance of the SEC's theory of prosecution.[18]

---

firm concluded about the nature and circumstance of the activity at issue that led to the judgment that the activity at issue was suspicious.  *See* Alpine's Add'l SOF, No. 160 [Dkt. 154].

[17]  SAR Narrative Guidance, at 2-4.

[18]   In prior filings, the SEC has argued that Alpine's legal positions demonstrate a failure to accept responsibility and warrant a more severe punishment, and it may make the same argument in relation to this motion.  In fact, Alpine's legal positions cannot and should not be used to enhance penalties nor do they reflect any failure to accept and to comply with SAR regulations.  The record demonstrates that Alpine markedly improved its SAR filings after the 2012 examination, and it has continuously improved its program since then, implementing new rules and decisions, including those of this Court, even as it defends against claims that it failed to comply with the BSA.

**CONCLUSION**

For the foregoing reasons, it is respectfully submitted that Alpine's Motion for

Reconsideration should be granted.

DATED this 3rd day of July, 2019.

/s/Maranda E. Fritz                    
Maranda E. Fritz
THOMPSON HINE
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email: Maranda.Fritz@thompsonhine.com

Brent R. Baker (BB 8285)
Aaron D. Lebenta (Pro Hac Vice)
Jonathan D. Bletzacker (Pro Hac Vice)
CLYDE SNOW & SESSIONS
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email: brb@clydesnow.com
        adl@clydesnow.com
        jdb@clydesnow.com

*Attorneys for Defendant*
*Alpine Securities Corporation*