ZACHARY T. CARLYLE
carlylez@sec.gov
TERRY R. MILLER
millerte@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br> - against -<br><br>ALPINE SECURITIES CORPORATION,<br><br>       Defendant. | **17-cv-4179-DLC**<br><br><br><br>**ECF CASE** |

**REPLY IN SUPPORT OF THE SEC'S MOTION FOR REMEDIES**

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

ARGUMENT ...............................................................................................................2

   I.    ALPINE'S CONDUCT WARRANTS THE REQUESTED RELIEF ...............................2

       A.  The Matters Cited By Alpine Should Carry No Weight.................................2

       B.  Alpine Does Not Confront The Evidence That It's Violations Flowed From
           Deliberate And Reckless Policy Decisions.............................................5

            1.  Alpine's conduct was reckless ........................................6

            2.  Alpine's evidence of its employees' purported good faith is not
                credible..........................................................................7

            3.  Alpine's persistent refusal to acknowledge its bad faith policies
                undermines any evidence of improvement in alpine's SAR
                narratives ......................................................................8

       C.  Together With Other Direct and Circumstantial Evidence, The Volume Of
           Violations Supports A Finding Of Recklessness ...................................9

       D.  Alpine Concedes That It's Failure To Review And Report Sales Connected To
           Large Deposits Resulted From A Deliberate AML Policy ..................10

       E.  Alpine's Protestation Of Innocence Supports The Requested Remedies .............11

       F.  Additional Discovery And An Evidentiary Hearing Are Not Required ...............12

  II.    ALPINE PROVIDES NO GROUNDS FOR A DIFFERENT PENALTY .....................13

       A.  Alpine's Proposed Methodologies Do Not Recognize The Number Or Seriousness
           Of Separate Violations Here ...........................................13

            1.  The penalty framework for violations of the BSA does not govern
                the penalties applicable to violations of the Exchange Act ..........15

            2.  Alpine's support file violations warrant separate penalties ..........16

       B.  Relevant Factors do not Support a Decrease in the Penalties Sought...................17

i

1.  Alpine's application of factors to its conduct and the harm it caused

does not weigh against the remedies sought ..................................18

2.  Alpine has failed to show that its financial condition warrants a

reduced penalty ............................................................................19

i.  ███  Alpine's financial condition also includes ███

████████████ and future earnings...........20

ii.  Alpine's financial condition should be given little

weight..............................................................................22

C.  The Penalties Sought do not Violate the Eighth Amendment ..............................24

CONCLUSION.....................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**

Bloomfield v. SEC, 649 F. App'x 5465 (9th Cir. 2016)...................................................... 2

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
    553 F.3d 187 (2d Cir.2009)............................................................................................ 7

McLean v. Garage Mgmt. Corp., No. 09 CIV. 9325 DLC,
    2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012)............................................................... 6

Radzanower v. Touche Ross & Co., 426 U.S. 148 (1976) ............................................... 16

SEC v. Aerokinetic Energy Corp., 8:08-CV-1409, 2010 WL 5174509,
    (M.D.FL., Dec. 15, 2010) ............................................................................................ 24

SEC v. Cavanagh, No. 98 Civ. 1818 (DLC), 2004 WL 1594818
    (S.D.N.Y. July 16, 2004) ............................................................................................. 20

SEC v. Cope, No. 14 Civ. 7575 (DLC), 2018 WL 3628899 (S.D.N.Y. Jul. 30, 2018)............... 23

SEC v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989) ...................................... 12

SEC v. Inorganic Recycling Corp.,  No. 99 Civ. 10159 (GEL. ), 2002 WL 1968341,
    (S.D.N.Y. Aug. 23, 2002) ............................................................................................ 23

SEC v. Kane, No. 97 Civ. 2931(CBM), 2003 WL 1741293 (S.D.N.Y., April 1, 2003) .............. 23

SEC v. Koenig, 469 F.2d 198 (2d Cir. 1972) .................................................................. 13

SEC v. Lorin, 76 F.3d 458 (2d Cir. 1996) ...................................................................... 12

SEC v. Lybrand, 281 F. Supp. 2d 726 (S.D.N.Y. 2003)................................................. 20

SEC v. Markusen, 143 F.Supp.3d 877 (D. Minn. 2015).................................................. 23

SEC v. Miller, 744 F.Supp.2d 1325 (N.D. Ga. 2010)...................................................... 23

SEC v. Moran, 944 F. Supp. 286 (S.D.N.Y. 1996).......................................................... 3

SEC v. Slocum, Gordan & Co., 334 F. Supp. 2d 144 (D.R.I. 2004) ............................... 4

SEC. v. Warren, 534 F.3d 1368 (11th Cir. 2008) ................................................... 23, 24

United States v. Bajakajian, 524 U.S. 321 (1998) ...................................... 18, 19, 25

United States v. Batchelder, 442 U.S. 114 (1979) ....................................................... 16

Plaintiff United States Securities and Exchange Commission ("SEC") submits this memorandum of law in reply to Alpine Securities Corporation's ("Alpine") Memorandum in Opposition to the SEC's Motion for Remedies (Doc. No. 205, "Opposition" or "Opp.") and in support of its Motion for Remedies (Doc. No. 196; Doc. No. 197 (Memorandum), "Motion").

## INTRODUCTION

The Motion showed that injunctive relief and civil penalties are appropriate under the relevant factors because (i) Alpine's thousands of violations were systematic and not isolated, Motion at 3-4; (ii) Alpine's conduct was deliberate and flowed from the reckless view that all of its SARs were "voluntary" and, as a result, Alpine <u>never</u> had a reporting obligation for <u>any</u> of the transactions it cleared, *id.* at 4-7; (iii) Alpine persistently denies wrongdoing by blaming others, *id.* at 7; (iv) Alpine's role as a clearing broker provides opportunities for likely future violations, *id.* at 7-8; (v) Alpine's misconduct created a substantial risk of loss to investors and the international financial system, *id.* at 10-11; and (vi) Alpine's financial condition does not weigh against the remedies sought, *id.* at 11. Alpine does not dispute that its wrongdoing was systemic. It does not dispute that its position that not a single deposit of low-priced securities or related sale cleared by Alpine was suspicious could not have been held in good faith. Instead, Alpine minimizes the 2,720 separate violations found on summary judgment to a single "technical" or "recordkeeping" violation—or at most a handful of them. Alpine does not even begin to apply the factors routinely used by courts, including an honest assessment of the egregious nature of its wrongdoing and its scienter and refuses to acknowledge wrongdoing.

The evidence has demonstrated and the Court has found that Alpine was a serial violator of the securities laws. Alpine has wholly failed to take responsibility for that massive failing. Indeed,

1

Alpine has failed to take reasonable steps to remedy its systematic failures and only offers now to agree to certain affirmative undertakings, if it is combined with the lightest of monetary slaps on the wrists; a penalty as low as $24 per violation calculated to accommodate its balance sheet after Alpine's ownership systematically withdrew millions of profits. As explained below, the analysis proposed by Alpine fundamentally distorts the factors courts consider for remedies and fails to recognize the separate violations found by the Court on summary judgment.

## ARGUMENT

### I.   ALPINE'S CONDUCT WARRANTS THE REQUESTED RELIEF.

#### A.   The Matters Cited by Alpine Should Carry No Weight.

Alpine first argues that a handful of selected settlements "confirms" an appropriate penalty range of $65,000 to $800,000, which results in a range of $24 to $294 per violation found on summary judgment.[1] Not only are these cases readily distinguishable as the penalty in those matters were the result of settlement with willing firms, for at least the following reasons, Alpine's analysis of penalties imposed in other matters should be given no weight.

First, the analysis is flawed because Alpine's revenue is the only fact specific to Alpine that Alpine cites, and it does so only to distinguish settlements that do not fit within the range it claims was "confirmed" by other settlements. Opp. at 8 n.2. The analysis ignores the egregious nature of Alpine's violations; its deliberate and reckless disregard of SAR reporting rules; its stubborn refusal

---

[1] Alpine cites one case upholding penalties imposed by the SEC in a litigated administrative proceeding, *Bloomfield v. SEC*, 649 F. App'x 546, 550 (9th Cir. 2016). The facts of the case are fundamentally distinguishable. For example, the SAR-related penalties were imposed against individuals for limited conduct, not against a broker-dealer for systemic violations, and the penalties were imposed in the context of additional civil penalties ordered against the individuals for other violations. The relief imposed in *Bloomfield* should be given no weight in this case.

to provide SAR files as required by law; and its refusal to accept responsibility. It bears no resemblance to the factors courts consider in assessing penalties. Motion at 9-10.

Second, even if considered in conjunction with the penalty factors, the cases cited by Alpine do not weigh against the penalties sought here. A survey of settlements reached with other defendants in other matters, or decisions by other judges or agencies, should carry little or no weight because, "[c]onsidering the discretionary nature of the civil penalty framework, prior decisions and consent decrees are of little comparative value for any individual matter." *SEC v. Moran*, 944 F. Supp. 286, 297 (S.D.N.Y. 1996). This is particularly true in this case, which is the first case in which a Court found a defendant broker-dealer liable for thousands of SAR-related violations in three distinct categories: deficient SARs, failure to file SARs, and failure to produce SAR records. Settlements of administrative proceedings involving handfuls of isolated SAR violations should not establish the "appropriate penalty range" advanced by Alpine.

Third, for the same reasons that these matters carry little comparative value here, they cannot credibly be used as a baseline to support Alpine's claim that the SEC seeks to impose a litigation "penalty." Opp. at 9. As explained in the Motion, the penalty sought is roughly 10% of the amount permissible by statute. Alpine's related suggestion that it is willing to consent to undertakings – as part of an improbably low financial penalty – does not make Alpine comparable to defendants who actually do consent to undertakings and work toward compliance. Good faith compliance does not wait for a bargain on the amount of penalties for past violations.

Fourth, Alpine's effort to distinguish settlements with higher penalties in a footnote is another reason why its analysis should be given no weight. Opp. at 8 n.2. The settlements cited in the footnote all entailed penalties for willful violations of SAR reporting rules and yet none of them

involved the volume of reckless violations at issue here. Nor did they involve systemic failures across the firms' primary business like the violations at issue here. If anything, these settlements support an even higher penalty than that requested here. Further, Alpine's effort to distinguish these settlements based on the size of the firms finds no support in the cited settlements. None of them suggest that the firms in these matters were penalized for generating more revenue than Alpine. That is because a defendant's financial condition is not the starting point for the determination of a penalty and is often given little or no weight.

Fifth, Alpine's citation to what it pejoratively deems cases involving violations of a "'technical' or recordkeeping nature" should also be given no weight. Opp. at 10-11. For example, unlike the three violations in *SEC v. Slocum, Gordan & Co.,* which the court determined were not deliberate or willful and for which the defendant "took every step possible to rectify the situation as quickly as possible" after it was informed of a potential violation, Alpine violated three separate SAR reporting rules thousands of times after receiving notice that none of its SARs were adequate. 334 F. Supp. 2d 144 at 185-186 (D.R.I. 2004), *see also* Motion at 6 & n.1. Alpine's characterization of the thousands of violations here as "technical" and "recordkeeping in nature" only shows that Alpine does not accept responsibility.  Alpine's analysis also mischaracterizes the SEC's reliance on cases cited by the SEC. Opp. at 11. The SEC did not cite these cases for comparable penalty amounts; these cases were cited to support the requested methodology. Motion at 11-12.

In short, the Court should give no weight to Alpine's argument for a penalty as low as $24 per violation because the matters cited carry little comparative value especially because Alpine's analysis is focused exclusively on Alpine's revenue.

    **B.**    **Alpine Does not Confront the Evidence that its Violations Flowed from Deliberate and Reckless Policy Decisions.**

The SEC showed that it need not prove recklessness to establish violations of Section 17(a) and Rule 17a-8, or to obtain a Tier 1 penalty, but that, in any event, Alpine acted recklessly in violating Section 17(a) and Rule 17a-8 thousands of times because (1) Alpine's excuse that it believed no transaction was mandatory is not credible; (2) there is no evidence that Alpine actually held the incredible view of SAR requirements at the time of the violations; and (3) the excuse that Alpine's AML program improved after notice from regulators is defeated by the volume of violations before and after it received notice. Motion at 4-7. The SEC cited findings by the Court and Alpine's own arguments on each point. In response, Alpine asserts numerous overlapping arguments about whether its conduct met the legal threshold for reckless behavior. Opp. at 13-33. Each specific argument is addressed below. At the outset, however, the framework of Alpine's arguments is wrong in two fundamental ways. Opp. at 13.

*First*, the SEC does not need to prove, and the Court does not need to find, that Alpine's conduct meets the legal standard for recklessness. To be sure, the SEC submits that it does. But Alpine misses the point of the factors for injunctive relief and penalties by focusing on the binary decision of whether Alpine acted recklessly. The Court has discretion in this context to determine that Alpine's degree of culpability supports the remedies sought without a specific finding that the culpability meets the threshold for recklessness.

*Second*, the SEC did not rely on its *ipse dixit*. Opp. at 13-14. The SEC cited the Court's findings about Alpine's implausible explanations and the absence of any evidence supporting a theory that its SAR violations were mere mistakes. Motion at 4-7. These factual findings support an inference of reckless conduct. Alpine's refusal to confront the SEC's actual contention (an obstinate

5

tactic throughout this litigation) is another indication that the remedies sought by the SEC are appropriate. If a valid competing inference existed Alpine would have offered it.

In short, the question is not simply whether the number of violations by itself meets the threshold for recklessness. Instead, the issue is whether the degree of Alpine's culpability—an inference drawn from facts found by the Court and from Alpine's own admissions—weighs in favor of the injunctive relief and civil penalties requested by the SEC. The SEC's Memorandum shows that it does. Alpine's Opposition does not confront this issue in a meaningful way.

### 1.      Alpine's conduct was reckless.

Alpine argues that the SEC's claim of recklessness is based "on nothing other" than the fact that violations occurred. Opp. at 14-16. As noted above, this argument should be given no weight because it fails to confront the claim that an inference of reckless conduct should be drawn from its bad faith position on voluntary SARs and its reporting obligations. *See* Motion at 4-7. The cases cited by Alpine about recklessness do not help. Opp. at 14-15.

Alpine relies primarily on *McLean v. Garage Mgmt. Corp.*, where a violation flowed from the defendant's unreasonable reliance on government investigations, but plaintiff failed to show that the defendant was aware of a substantial risk that it was violating the law. No. 09 CIV. 9325 DLC, 2012 WL 1358739 (S.D.N.Y. Apr. 19, 2012). This case is distinguishable here on numerous grounds. The investigations in *McLean* did not provide direct notice that the defendant was violating the law, *id.* at *4, but here FINRA told Alpine unequivocally that all its SAR narratives were deficient. Motion at 6. Despite this direct notice Alpine chose to "stick with it nonetheless." *See McLean*, 2012 WL 1358739, at *7. Even before FINRA told Alpine that it was violating the law on a systemic basis, the "template" SAR narratives routinely used by Alpine were so woefully at

odds with the plain instructions on the SAR form that the danger Alpine was violating the law on a daily basis was "so obvious that [Alpine] must have been aware of it." *Id.* at *7 (citing *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir.2009) (citation omitted) (securities fraud)). This obvious danger makes the absence of any contemporary evidence supporting Alpine's explanation critical: unlike in *McLean*, Alpine's post hoc explanation that it did not think any of the transactions at its firm were suspicious is simply not credible.

Alpine's citation to cases analyzing the standard for recklessness are also not helpful for the additional reason that here the issue concerns Alpine's degree of scienter and, even without a specific finding of that its conduct was reckless, the evidence that Alpine acted deliberately and recklessly weighs in favor of the remedies sought.

### 2.     Alpine's evidence of its employees' purported good faith is not credible.

Alpine also argues that its conduct does not meet the legal threshold for recklessness by citing evidence of purported "good faith" of its employees. Opp. at 16-23. The evidence cited by Alpine does not weigh against the remedies sought by the SEC for several reasons.

First, Alpine's exclusive focus on the employees who prepared SARs misses the point. The SEC showed that Alpine's decision to use a truncated AML procedure to handle its high flow of suspicious transactions was deliberate and created an obvious danger that deposit SARs would omit required information and related liquidations would not be reported at all. Motion at 4-7. This was a corporate decision that warrants the remedies sought here. Evidence that employees executed this flawed policy in good faith does not weigh against the remedies sought.

Second, the argument that employees acted in good faith is not credible. The SEC cited the Court's finding that there is no contemporary evidence that Alpine employees actually believed that it filed SARs on a "voluntary" basis, Motion at 5, and Alpine responded with none. Instead it continues to rely on the circular claim that the omission of a red flag from a SAR narrative is proof that the AML employee who prepared a narrative actually considered the red flag. Opp. at 20; *see also* Alpine Depo. at 155:1-8, attached as Ex 1 ("Alpine Depo.") ("Q. [w]hy was that information not included in the SAR? A. Because the filer of the SAR didn't feel it was relevant to the reason why they filed. Q. Is that something you can tell by looking at the SAR, or is that just an assumption that you make from the fact that it's not in there? A. The latter.").The omission of a red flag is not credible evidence that Alpine actually considered the red flag in good faith but determined to file a "voluntary" SAR without it.

Alpine's citation to SARs that *did* report red flags cannot help Alpine because Alpine has never been able to explain why it reported the red flags for some transactions but not others. For example, Alpine cites SARs where it reported criminal or regulatory history as evidence that it considered all red flags. Opp. at 20 n.29. But Alpine cannot explain why red flags about customers were included in some SARs but not others without the same circular claim that the omission of a red flag must be evidence that the preparer considered the red flag and nevertheless deemed the SAR "voluntary". *See* Ex. 1, Alpine Depo. at 137:12-138:20; 160:2-161:3.

### 3. Alpine's persistent refusal to acknowledge its bad faith policies undermines any evidence of improvement in Alpine's SAR narratives.

Alpine also tries to show good faith by pointing to the fact that the number of violations found on summary judgment decreased during the relevant time period (albeit not to zero violations). Despite all its efforts to show "improvement" in its SAR filings, Alpine ***still*** cannot

admit that any of the transactions at its firm from 2011 to 2015 triggered a mandatory SAR with complete narratives. Motion at 5. This refusal to move from its absurd view that none of the transactions at its firm required SARs is not progress. It also does not bode well for the likelihood that violations will stop without the remedies requested.

The purported efforts to increase staff and training cited by Alpine, Opp. at 23, also do not address the problem here because that staff continued to labor under the policy imposed by Alpine that utterly disregarded the objective component of the SAR filing rules. Alpine cannot credibly claim good faith progress by employing a robust and competent staff (it did not) if Alpine directs that staff to execute a bad faith policy.

Further, the fact that the Court imposed a higher burden on some SARs than requested by the SEC does not show that Alpine acted in good faith. The higher burdens cited by Alpine, Opp. at 25-26, were imposed on summary judgment, not trial. To the extent any ambiguity exists in the SAR rules, the violations established on summary judgment under these higher burdens were numerous and "stark," as the Court has found. *Alpine II*, 354 F. Supp. 3d at 419.

And, of course, the fact that the SEC had to file a lawsuit and submit a motion for partial summary judgment before Alpine produced records that were required to be produced upon request in 2016 undermines any claim of progress or good faith.

C.     **Together with other Direct and Circumstantial Evidence, the Volume of Violations Supports a Finding of Recklessness.**

Alpine argues that the volume of SAR filings and volume of violations does not support a finding of recklessness. Opp. at 27-28. The argument also is wrong for at least three reasons. First, the high volume of violations is evidence supporting the inference that Alpine made a deliberate policy decision to substitute the investigation and reporting required by the SAR rules with a

truncated investigation and reporting scheme based on checklists and templates. The volume of violations rules out the possibility that the violations resulted from one-off mistakes.

Second, Alpine is wrong that there was no benefit or motive for the deliberate choice to truncate its AML program with checklists and templates. Opp. at 27. Alpine admitted that the templates were used, at least in part, to efficiently handle the high volume of filings at the firm. See Ex. 1, Alpine Depo. at 99:4-20. Thus, the motive was at least in part money—it did not want to pay for the staff necessary to handle the volume and type of transactions flowing through its firm.

Third, the fact that some of Alpine's violations were repeated many times does not help Alpine in any respect. Opp. at 28. The repetition shows the flaws were systemic and that the violations are likely to continue absent injunctive relief and civil penalties.

> **D.    Alpine Concedes that its Failure to Review and Report Sales Connected to Large Deposits Resulted from a Deliberate AML Policy.**

Liquidations following a deposit of a large number of shares of low-priced securities ("LPS") create a pattern of transactions that "is a hallmark of market manipulation." *Alpine II*, 354 F. Supp. 3d at 441. The Court concluded that Alpine could not discharge its duty to file SARs on liquidations by filing only a SAR for a suspicious deposit and granted summary judgment on 1,214 groups of deposits and unreported sales. *Alpine II*, 354 F. Supp. 3d at 441-442. The Court rejected Alpine's argument that "since its business model treated each deposit as if the deposited LPS would be sold shortly thereafter, its careful review of the need to file a SAR for the deposit fulfilled all of its obligations under the law[,]" and also rejected Alpine's argument that in other instances Alpine reported patterns of matched trading and wash trading as not the subject of this lawsuit. *Id.* at 442 & n.82.

Alpine asserts these arguments again, contending that its failure to file thousands of SARs was not the consequence of a deliberate choice, Opp. at 28-30, but, in fact, these arguments concede that it was. Alpine argues that it employed a policy to not investigate or report sales related to a deposit reported in a SAR because Alpine viewed the sales as synonymous with the reported deposit. Opp. at 30; *see also* SEC SOF 47 (Doc. No. 148 at 10-11). Alpine never communicated this policy in its SARs. The reader had no way of knowing about the volume or dates of related sales or whether the sales even occurred, and this is a consequence of Alpine's deliberate policy developed to handle a large volume of suspicious transactions flowing through its firm. Thousands of failures to report were not caused by thousands of independent mistakes—they were caused by deliberate choices to ignore the sales.

And of course this deliberate policy disregarded a known risk. *See* Opp. at 30. The policy created a risk that suspicious sales would go unreported. Alpine knew this was a risk based on, among other things, the fact that it "assumed" the sales were so closely related to suspicious deposits that it need not even report them and the large volume of patterns of transactions that are hallmarks of market manipulation. The failure to report these sales was reckless. *See also Alpine II*, 354 F. Supp. 3d at 418 ("Given the sheer number of lapses at issue in this case, there is no basis to conclude that a broker-dealer that reasonably attempts to follow the requirements of Section 1023.320 will be at risk.").

E.     **Alpine's Protestation of Innocence Supports the Requested Remedies.**

The Motion shows that Alpine's continued protestation of innocence is one factor that weighs in favor of injunctive relief, citing clear Second Circuit precedent "the court may properly view a culpable defendant's continued protestations of innocence as an indication that injunctive

relief is advisable." Motion at 7 (citing *SEC v. Lorin*, 76 F.3d 458, 461 (2d Cir. 1996)). In response, Alpine claims incorrectly that the SEC pointed to its protestations of innocence as evidence of recklessness. Opp. at 30-33. It did not. The SEC points to Alpine's protestation of innocence as an indication that injunctive relief is advisable—not to prove Alpine's state of mind at the time it of its thousands of violation. Alpine does not address *Lorin* or otherwise dispute this point. Instead, Alpine quotes a case agreeing with the principle in *Lorin* that a "lack of remorse" can be an indication that violations will continue in the absence of an injunction. Opp. at 31 (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989) ("As such, it is really only another indication as to whether it is 'reasonably likely' that future violations will occur in the absence of an injunction.").

Finally, Alpine is wrong in arguing that the SEC cited no support for its assertions that (i) Alpine tries to shift responsibility for its SAR failures to its introducing broker; and (ii) Alpine argues that it should not be liable because regulators did not directly notify Alpine of its deficiencies sooner. Opp. at 31. The SEC cited the Court's orders in this case on both points:

- "Alpine argues that it was entitled to rely on SARs filed by the introducing broker for the transaction, and that the SEC has the burden to disprove the existence of such a SAR." *Alpine I*, 308 F. Supp. 3d at 799;

- "Alpine first argues that it did not have notice of the SEC's theory of this case until it received the OCIE Report in 2015 and that it is accordingly unfair to hold it liable for failing to include mention of red flags in its SARs' narratives that the SEC asserts it improperly omitted." *Alpine II*, 354 F. Supp. 3d at 418.

Motion at 7. It is appropriate for the Court to consider Alpine's repetitive effort to blame others as an indication that violations will continue absent an injunction.

   **F.    Additional Discovery and an Evidentiary Hearing are not Required.**

The Court should deny Alpine's requests for discovery and an evidentiary hearing on the issue of its own state of mind because they are not necessary. Courts routinely decide remedies without a hearing. *See, e.g., SEC v. Koenig*, 469 F.2d 198, 202 (2d Cir. 1972) ("There was sufficient undisputed evidence in the extensive record to render the holding of an evidentiary hearing unnecessary and to support the district court's findings of fact and conclusions of law.")

No hearing is necessary for Alpine to further develop its opposition. Alpine can—and did— submit evidence from witnesses under its control and a witness who it deposed during discovery. No discovery is needed because the evidence of Alpine's recklessness is entirely in Alpine's control and Alpine articulates no evidence that it was unable to present with its Opposition. Alpine also makes no proffer to explain how any evidence it has already presented would be different at a hearing. Moreover, the SEC relies on facts found by the Court (Alpine is wrong that the SEC did not "offer any factual support or citation to the record"). To be sure, Alpine could have argued about what weight the Court should give these findings when assessing remedies, but a hearing and discovery are not necessary to develop these facts further.

## II.     ALPINE PROVIDES NO GROUNDS FOR A DIFFERENT PENALTY.

### A.     Alpine's Proposed Methodologies do not Recognize the Number or Seriousness of Separate Violations Here.

The SEC requested penalties on per-violation basis and cited precedent for that methodology. Motion at 11-13. The amounts requested per penalty were on the lower-end of the permissible penalty range and distinguished the seriousness of different types of violations. *Id.* In lieu of this methodology, Alpine argues for a single penalty or a handful of penalties based on its construction of courses of conduct, which it makes for the first time in this lawsuit. Opp. at 34-40.

The Court has discretion to select a methodology and should decline Alpine's invitation because it does not recognize the individual violations established on summary judgment.

Contrary to Alpine's argument in the Opposition (at 35-37), the parties and the Court never grouped alleged violations into courses of conduct. At the Court's suggestion, the SEC moved for partial summary judgment in order to establish legal principles to apply to thousands of alleged violations on an individualized basis. The SEC embraced the burden to prove each violation by presenting evidence of each SAR and each SAR support file, and confirmed that Alpine had no other transaction-specific evidence related to each SAR. Indeed, the parties and the Court have spent an enormous amount of time and resources analyzing the violations on SAR by SAR basis. Accordingly, Alpine's argument that the SEC has shifted its approach from an emphasis on courses of conduct to individual transactions is wrong. Opp. at 37.

In addition, Alpine never suggested that presenting individualized evidence on each alleged violation was not necessary or inefficient because just a sampling of violations could have established a course of conduct. Instead, Alpine vigorously opposed specific violations at every opportunity. Alpine treated each alleged violation as a separate matter that requires separate proof ever since the initial stages of discovery. *See e.g.*, Doc. No. 42 at 2 ("But Table A does nothing more than list thousands of SARs; it does not identify or describe the alleged deficiency or violation; it does not even describe the particular 'material red flag' that Alpine supposedly omitted from the SAR."). As another example, Alpine has already prevailed in grouping together violations for the failure to file SARs based on the text of the SAR rules, which treats transactions or patterns of transactions as separate events that trigger separate obligations. Thus, the parties' and Court's

treatment of violations as separate violations does not support Alpine's new suggestion to group violations into classes or courses of conduct.

The individualized proof and nature of each violation makes this case unlike the cases relied on by Alpine, including *SEC v. Cavanagh*, where the same evidence of conduct was used to establish violations as to multiple victims. Opp. at 38-39. Moreover, in support of its requested methodology Alpine again relies on cases involving what Alpine considers "technical" or "bookkeeping" violations. Opp. at 39-40. For the reasons above, including that Alpine acted deliberately and recklessly, these cases carry little comparative value.

Here, the individualized nature of each violation, the fact that no other monetary remedy will provide deterrence here (as in cases like *Cavanagh* with high disgorgement amounts) and the fact that the requested penalty amounts already account for the volume of violations here by seeking amounts at the lower range of the amount permitted by statute all weigh in favor of a methodology that gives meaning to each violation. Alpine's request for a volume discount in the form of a different methodology should be denied.

> **1.     The penalty framework for violations of the BSA does not govern the penalties applicable to violations of the Exchange Act.**

The Exchange Act authorizes the Court to impose civil penalties for violations of the Exchange Act based on the facts and circumstances of the violations and sets the limits of the penalties. *See* Motion at 8-9. Alpine's argument that the BSA imposes a lower limit on a civil penalty for Alpine's violations of the Exchange Act in this case makes no sense.

This argument again asserts that this case is governed by the entirely separate regulatory scheme promulgated under the BSA. It is not. Alpine's citations and arguments are based on the false premise that the SEC has made a "request for per-violation or total penalties for violations of §

1023.320 that exceed the amounts authorized under the specific provisions of the BSA…" Opp. at 43. However, as the court recognized, the SEC brought this enforcement action against Alpine for its violations of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder. *Alpine I*, 308 F. Supp. 3d at 795. The fact that Alpine's conduct could give rise to liability under both the BSA and the Exchange Act does not mean that Alpine's liability under the Exchange Act is constrained by that separate regulatory scheme.

Further, the difference in the penalty frameworks under the Exchange Act and BSA do not present "an irreconcilable anomaly" as Alpine contends. Opp. at 42. As the Supreme Court held in *United States v. Batchelder*, 442 U.S. 114, 118, 122 (1979), even criminal statutes imposing different maximum terms of imprisonment for nearly identical conduct were "fully capable of coexisting." *See also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) ("It is not enough to show that the two statutes produce differing results when applied to the same factual situation."). Instead, the penalty framework created by Congress for violations of the Exchange Act reflects its determination of the penalties necessary to punish and deter violations of that Act by broker-dealers like Alpine and others.

As a registered broker-dealer, Alpine is a gatekeeper of our financial markets. Through the nature of its business Alpine has voluntarily subjected itself to the penalties applicable to violations of the Exchange Act. The fact that Congress determined that a different penalty framework should apply to violations of the Exchange Act and BSA is "persuasive authority" (*see* Opp. at 43-44) that the Court should apply the penalty framework of the Exchange Act, not the BSA, to Alpine's violations of the Exchange Act in this case.

## 2. Alpine's support file violations warrant separate penalties.

The Court ruled that "[a] failure to either maintain or produce a SAR's supporting documents…violates Section 1023.320 and, as a result, violates Rule 17a-8 as well." *Alpine I*, 308 F.Supp.3d at 811-12. The Court also ruled that "[t]o the extent Alpine seeks to avoid liability on this claim by relying on a more recent production of supporting files in the course of discovery, the effort is futile" because "Alpine was required to produce the files when they were requested in 2016." *Id.* The SEC submitted evidence that Alpine failed to produce the support files in 2016 and specifically argued, consistent with the Court's summary judgment order, that because "the documents were not produced until 2018 in the course of discovery" Alpine "cannot defeat these claims." Doc. 167 at 34-35. The Court ultimately ruled that the SEC established Alpine violated Rule 17a-8 "by showing that Alpine was unable to make [496 SAR support files] available to the SEC in 2016." *Alpine II*, 354 F. Supp. 3d at 445. Contrary to Alpine's claim, the SEC did not advance new arguments in the Motion and Alpine's complaint that the SEC is now seeking penalties based on the violations found by the Court is unfounded.

For all of the reasons discussed above, the Court should not grant Alpine a volume discount on its failure "to make [496 SAR support files] available to the SEC in 2016." *Id*. Alpine's proposed methodology would treat its failures regarding hundreds of SARs the same as if it failed to produce one and would not adequately punish or deter Alpine's violations. Alpine's violations reflect its lack of good faith compliance and warrant a substantial penalty.

**B.        Relevant Factors do not Support a Decrease in the Penalties Sought.**

The SEC showed that the relevant penalty factors support a substantial penalty. Motion at 9-11. Alpine responds by, once again, misstating the SEC's position and minimizing the weight of its conduct. Opp. at 46-49. Alpine also argues that the Court should craft a penalty around its current

17

balance sheet but fails to explain that ████████████████████████████████
████████████████████████████████████████ The omission of Alpine's complete

financial condition alone should render the financial condition factor neutral.

### 1. Alpine's application of factors to its conduct and the harm it caused does not weigh against the remedies sought.

Degree of Scienter.  Alpine first repeats its argument that the SEC relies only on the volume

of violations to show Alpine's degree of scienter. Opp. at 46-47. This argument fails for the reasons

stated above—Alpine handled the large volume of suspicious transactions through its firm with a

policy decision to use a truncated review and reporting scheme under the absurd view that it had no

objective standards so long as it claimed that all SARs were "voluntary". The SEC showed this

policy decision was deliberate and reckless, and Alpine does not dispute this point in its Opposition.

Motion at 4-7. Alpine's decision to instead misstate the SEC's position as reliant only on the

number of violations helps confirm that there is no innocent or even negligent explanation for

Alpine's conduct.

Egregious Conduct.  Alpine next claims that its conduct was not egregious by minimizing

the SAR rules and ignoring its role as a registered clearing-broker. Opp. at 47-48. Citing the Court's

opinions in this case, the SEC explained that Alpine is a registered broker-dealer that provides

services to a market fraught with fraud. Motion at 6, 10. Alpine accepted a role as a gatekeeper to

the financial markets and its witnesses repeatedly testified that SAR obligations are important.

Alpine does not recognize its responsibilities as a registered broker in response. Instead, Alpine

cites a case that, according to Alpine, means that its mere reporting violations are not egregious.

Opp. at 47-48 (citing *United States v. Bajakajian*, 524 U.S. 321 (1998)). This case is distinguishable

on several grounds. The defendant in *Bajakajian* was not a registered entity like Alpine. The

18

violation at issue in *Bajakajian* was isolated—the defendant violated a reporting obligation just once; not over 2,000 times like Alpine. Moreover, the total monetary sentence affirmed in *Bajakajian* for a single violation was $20,000 ($15,000 forfeiture, three years of probation, and a fine of $5,000). *Id.* at 326. Here, the SEC seeks a penalty of $10,000 per violation against a registered broker-dealer who systemically violated the law over the course of years. A case where an individual paid twice that amount for a single violation does not undermine the egregiousness of Alpine's conduct.

Substantial Risk of Loss.  The SEC relied on this Court's orders to demonstrate the risk of loss caused by Alpine's years of systemic violations. Motion at 48-49. In response, Alpine argues that the SEC has not met the burden to show a loss applicable to a request for third-tier penalties and has not shown any actual loss. Opp. at 48-49. It is true that the SEC did not present evidence of actual loss that would have been averted if Alpine had properly reported suspicious transactions, but that type of evidence is not required to understand the risk created by Alpine's systemic SAR reporting violations or whether that risk causes this factor to weigh in favor of a first-tier penalty. Alpine's response does not dispute that its routine violations obscured and concealed suspicious activity from law enforcement that increased risk to investors, and Alpine does not dispute its conduct undermined regulations intended to protect the integrity of international markets. This risk of loss weighs in favor of the requested penalties.

**2.      Alpine has failed to show that its financial condition warrants a reduced penalty.**

It is apparently Alpine's position that an entity can avoid the consequences of its serious and repeated securities laws violations simply by ███████████████████████████ █████████ Opp. at 49-54. That is not the law. The Court has discretion to impose a penalty that in

its judgment appropriately deters and punishes Alpine's violations of the securities laws. However, a defendant's "demonstrated current and future financial condition" is only one of the several factors that Courts weigh when determining an appropriate civil penalty. *See* SEC v. *Cavanagh,* No. 98 Civ. 1818 (DLC), 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004) (*citing SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (collecting Southern District of New York cases analyzing these factors)). This factor should be given little weight here because Alpine's discussion of its financial condition omitted the fact that ███████████████████████████ █████████████████████. The Court should not ███████████████████████████ ███████████ and reducing penalties to fit Alpine's balance sheet.

> **i.      Alpine's financial condition also includes ███████████ and future earnings.**

Any assessment of Alpine's financial condition should include ██████████████████ ███████ During the relevant time period, Alpine has been a private company owned and controlled by John Hurry and his family through various entities.[2] ███████████████████████ ███████████████████████████████████████████████████████████ ██████████████[3] Alpine is appealing to fairness and equity when asking for a penalty that fits

---

[2] *See, e.g.*, Motion to Stay Sanctions, In the Matter of the Application of John J. Hurry (CRD. No. 2146449), SEC Admin Proc. File No. 3-18612, filed June 24, 2018, ("Motion to Stay"), available at https://www.sec.gov/litigation/apdocuments/3-18612-event-6.pdf. In this motion, counsel for Mr. Hurry states "[i]n 2012, Mr. Hurry indirectly acquired Alpine, a registered broker-dealer and clearing firm, through a holding company that is owned by his family trusts," Motion to Stay at 5, and "[t]hrough the trusts, Mr. and Mrs. Hurry are management trustees." Motion to Stay at 2, fn. 3.

[3] ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

its financial condition and, in fairness, the Court should consider the financial condition of Alpine's

ownership, not just Alpine's balance sheet, to the extent the Court gives any weight to this factor.

However, ███████████████████████████████████, Alpine has not put in

any evidence of its ownership's financial condition. In fact, Mr. Hurry has refused to provide any

evidence in this litigation.[4] Because Alpine has not made any showing that its ownership could not

pay the penalty requested by the SEC, and has dodged any discovery on the issue, the Court should

give no weight to Alpine's professed inability to pay it.

Additionally, if the Court gives any weight to Alpine's "ability-to-pay," Alpine's own

business activities demonstrate why the Court must look to Alpine's ownership when assessing it.



---

[4]  The SEC made several attempts to depose Mr. Hurry. The SEC attempted to reach agreement for
service of a F.R.C.P 45 deposition subpoena on Mr. Hurry through Alpine's counsel, whom the
SEC understands personally represents him in other matters. Mr. Hurry apparently refused to accept
service through counsel. *See* Ex. 4. The SEC made several attempts to personally serve Mr. Hurry,
to no avail. *See* Ex. 5. The SEC served Alpine with a notice for Mr. Hurry's deposition pursuant to
F.R.C.P 30(b)(1), 32, and 37. *See* Ex. 6; Ex. 7. Through counsel for Alpine, Mr. Hurry refused to
appear. *See* Ex. 8.



It could do so to pay a penalty. That Alpine's CFO represented ███████, Opp. at 54, is unsurprising and totally irrelevant to what an appropriate penalty is based on Alpine's violations. If the Court is inclined to consider Alpine's ability to pay independent of its ownership, the Court should consider Alpine's ability to pay a judgment based on additional earnings. Alpine has ███████,[6] and certainly could pay a significant judgment over time.

ii.    **Alpine's financial condition should be given little weight.**

Alpine's claimed inability to pay a penalty[7] does not constrain the Court's discretion in determining a penalty to punish and deter Alpine's violations. Many courts have recognized that



although a defendant's ability to pay a penalty is one factor to be considered when determining a

penalty, the Court has discretion to impose a penalty that a defendant claims it cannot pay to serve

the goals of a penalty. "While consideration of a defendant's financial condition is a factor to be

considered in assessing a civil penalty, it is but one of many a court considers when exercising its

discretion." *SEC v. Cope*, No. 14 Civ. 7575 (DLC), 2018 WL 3628899, at *8 (S.D.N.Y. Jul. 30,

2018), *appeal filed*, No. 18-2564 (2d Cir. Aug. 29, 2018). "[N]othing in the securities laws

expressly prohibits a court from imposing penalties or disgorgement liability in excess of a

violator's ability to pay." *SEC. v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

In many cases, Courts have determined that penalties greater than defendants' professed

ability to pay are necessary and appropriate to punish and deter violations. *See, e.g., SEC v. Kane*,

No. 97 Civ. 2931(CBM), 2003 WL 1741293, *4 (S.D.N.Y., April 1, 2003) ("a defendant's claims of

poverty cannot defeat the imposition of a civil penalty by a court."); *SEC v. Inorganic Recycling*

*Corp.*,  No. 99 Civ. 10159 (GEL. ), 2002 WL 1968341, *4 (S.D.N.Y. Aug. 23, 2002) (the

defendant's claim of inability to pay cannot defeat the need to impose a civil penalty); *SEC v.*

*Markusen*, 143 F.Supp.3d 877, 895-98, (D. Minn. 2015) (imposing civil penalty against defunct

company); *SEC v. Miller*, 744 F.Supp.2d 1325, 1346 (N.D. Ga. 2010) (imposing $75,000 penalty

when defendant had $5,000 of assets). And the fact that Alpine is an entity, and that a penalty could

lead to the demise of Alpine (assuming its ownership elects not to pay), makes little difference. *See*

*SEC v. Aerokinetic Energy Corp.*, 8:08-CV-1409, 2010 WL 5174509, at *(M.D.FL., Dec. 15, 2010)

("Defendants suggest that a substantial penalty would lead to the demise of the company, which is

another way of saying the company is unable to pay such a penalty. This factor, however, 'does not merit significant weight in comparison to the other equities.'" (*quoting SEC v. Warren*, at 1370, and imposing a civil penalty against the entity)). The authority cited by Alpine does not suggest otherwise.[8]

Accordingly, the Court should exercise its discretion and impose a penalty based on the thousands of violations found by the Court and it should not be reduced because ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ that do not want to pay a penalty.

### C.    The Penalties Sought do not Violate the Eighth Amendment.

Alpine argues that the requested penalties violate the Eighth Amendment prohibition against excessive fines with the same arguments that fail for the reasons discussed above: (1) misplaced reliance on *Bajakajian*; (2) an incomplete picture of Alpine's financial condition; and (3) misplaced reliance on penalties allowed under the BSA. Opp. at 57-59. The penalties sough here do not violate the Eighth Amendment because they are not "grossly disproportional" to the nature of Alpine's offenses based on the four factors used to assess proportionality. *See Bajakajian*, 524 U.S. at 337-39.

---

[8] The authority cited by Alpine simply confirms that Courts have discretion when assessing penalties. S. Rep. No. 101-337, The Securities Law Enforcement Remedies Act of 1990, 1990 WL 263550, at p. 16, (1990) ("Report"). It does not, as Alpine claims, "ma[k]e clear" that penalties must always be specifically calibrated to ensure that they do not "result in the company closing." Opp. at p. 50. Rather, the Report confirms why civil penalties are important: "The proposed civil money penalties also will provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws. . . . the possibility of civil money penalties will improve compliance with the law and have a significant remedial effect." The Report further confirms that "the district court will have discretion to determine whether a penalty should be imposed and the amount of such penalty." Report at p. 16. Alpine's citations to a settled administrative proceeding where the SEC determined not to assess a civil penalty and cases involving other statutory schemes are facially irrelevant to this litigated District Court enforcement action under the Exchange Act and do not merit further discussion.

With respect to the first factor, the essence of Alpine's misconduct, has been discussed extensively: the misconduct was egregious because it was systemic, deliberate, reckless, and created a substantial risk of harm to investors and law enforcement's ability to detect and prevent financial crimes. The second factor weighs against Alpine because as a registered broker Alpine fits squarely into the class of persons for whom the BSA, Section 17(a), and Rule 17a-8 were principally designed. The third factor weighs against Alpine because the maximum first-tier penalties that could have been imposed is much higher than $10,000 per violation: $75,000 to $80,000 per violation for a total of over $200 million. *See* Motion at 12 & n.3; *see also Collins v. SEC,* 736 F.3d 521, 527 (D.C. Cir. 2013) (distinguishing *Bajakajian* because "though Collins's penalty was at the upper end of the second-tier penalties, we cannot say that this is inappropriate. This factor mattered in *Bajakajian*…. Here, by contrast, we have indications that Collins may have been eligible for an even larger penalty, as suggested by the ALJ's application of a third-tier penalty."). Finally, the fourth factor weighs against Alpine because the repeated and serious nature of Alpine's misconduct and its role in the securities industry do not make the penalties sought grossly disproportionate. Even the penalty affirmed in *Bajakajian* was higher than the $10,000 sought here for each violation, and nothing in the Opposition entitles Alpine to a "wholesale" discount for its repeated conduct.

## **<u>CONCLUSION</u>**

For the reasons above and in the SEC's Motion, the Court should impose the remedies requested in the Motion.

Respectfully submitted this 11th day of July, 2019.

_/s/ Zachary T. Carlyle_____
Zachary T. Carlyle (*pro hac*)
Terry R. Miller (*pro hac*)

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 11, 2019, a copy of the foregoing document was served via ECF upon

the following:

Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker
CLYDE SNOW & SESSIONS
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah 84111-2216

Maranda E. Fritz
Thompson Hine LLP (NYC)
335 Madison Avenue, 12th Floor
New York, NY 10017

*Counsel for Alpine Securities Corporation*

<u>s/ Nicole L. Nesvig</u>