UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>     Defendant. | Civil No. 1:17-CV-04179-DLC<br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis |

**MEMORANDUM OF LAW IN SUPPORT OF
ALPINE'S MOTION TO STRIKE PORTIONS OF THE SEC'S REPLY
MEMORANDUM IN SUPPORT OF ITS MOTION FOR REMEDIES, OR, IN THE
ALTERNATIVE, REQUEST FOR LEAVE TO FILE A SUR-REPLY IN RESPONSE
TO THE SEC'S REPLY MEMORANDUM**



335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680



ATTORNEYS AT LAW
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

LEGAL STANDARDS ....................................................................................... 3

ARGUMENT ...................................................................................................... 5

POINT I. THE COURT SHOULD STRIKE OR GRANT ALPINE LEAVE TO FILE A SUR-REPLY TO FULLY ADDRESS THE SEC'S NEW AND BASELESS ARGUMENTS .... 5

    A.    The SEC's Untimely New Arguments.................................................. 5

    B.    The SEC's New Arguments are Unsupported, Irrelevant and Meritless. ............... 8

        1.    The Financial Condition of Alpine's "Ownership" has No Bearing on Alpine's Ability to Pay a Penalty. ............................................................ 9

        2.    The SEC Has Misstated the Facts Concerning Both "Ownership" and Alpine's Distributions of Funds. ............................................................ 13

POINT II. THE COURT SHOULD STRIKE THE SEC'S ARGUMENT THAT ALPINE HAS NOT PREVIOUSLY OFFERED UNDERTAKINGS OR GRANT ALPINE LEAVE TO FILE A SUR-REPLY TO RESPOND TO THIS CONTENTION ....................................... 16

CONCLUSION.................................................................................................. 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Fiber Techs. Trust v. J & L Fiber Servs., Inc.*,
   No. 1:07-cv-1191 (LEK/DRH), 2010 WL 1948242 (N.D.N.Y. May 12, 2010) .....................4

*Albright v. Attorney's Title Ins. Fund*,
   504 F. Supp. 2d 1187 (D. Utah 2007) ...................................................................................11

*In re Arbitration Between Westchester Fire Ins. Co. v. Massamont Ins. Agency,*
   *Inc.*, 420 F. Supp. 2d 223 (S.D.N.Y. 2005) ..............................................................................4

*Baird v. Boies, Schiller & Flexner LLP*,
   219 F. Supp. 2d 510 (S.D.N.Y. 2002).....................................................................................17

*Complex Sys., Inc. v. ABN AMBRO Bank N.V.*,
   No. 08 Civ. 7497 (KBF), 2014 WL 1055263 (S.D.N.Y. Mar. 13, 2014) ...............................17

*Continental Trend Res., Inc. v. Oxy USA, Inc.*,
   810 F. Supp. 1520 (W.D. Okla.1992), *aff'd in relevant part*, 44 F.3d 1465
   (10th Cir. 1995), *vacated on other grounds*, 517 U.S. 1216 (1996).......................................12

*Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*,
   No. 11 Civ. 3130 (DLC) 2012 WL 4049955 (S.D.N.Y. Sept. 14, 2012) .........................2, 4, 8

*In re Harris*,
   464 F.3d 263 (2d Cir. 2006)......................................................................................................3

*McGraw v. Lee*,
   No. 09 Civ. 8541 (DLC) (FM), 2011 WL 1682633 (S.D.N.Y. Apr. 27, 2011)........................3

*Mohamed v. Nolan Law Grp.*,
   574 F. App'x 45 (2d Cir. 2014) ................................................................................................8

*Myers v. Andzel*,
   No. 06-14420 (RWS), 2007 WL 3256879 (S.D.N.Y. 2007) .....................................................8

*Orlob v. Wasatch Mgmt.*,
   33 P.3d 1078 (Utah Ct. App. 2001) ........................................................................................10

*Perez v. Manna 2nd Avenue LLC*,
   No. 15 Civ. 4655, 2016 WL 7489040 (S.D.N.Y. Dec. 28, 2016)..................................4, 16, 18

*Playboy Enters., Inc. v. Dumas*,
   960 F. Supp. 710 (S.D.N.Y. 1997) ...................................................................3, 8

*In re The Reserve Fund Secs. and Derivative Litig.*,
   673 F. Supp. 2d 182 (S.D.N.Y. 2009).................................................................13

*Ross v. Miller*,
   No. 14-cv-3098 (RA) (JLC), 2016 WL 1376611 (S.D.N.Y. Apr. 7, 2016)............................3

*SEC v. Aerokinetic*,
   8:08-cv-1409, 2010 WL 5174509 (M.D. Fla. Dec. 15, 2010) ..................................5

*SEC v. Alpine*,
   354 F. Supp. 2d 396 (S.D.N.Y. 2018)................................................................2, 7

*SEC v. Haligiannis*,
   470 F. Supp. 2d 373 (S.D.N.Y. 2007)........................................................5, 6, 9, 14

*Sigmon v. Parker Chapin Flattau & Klimpl*,
   901 F. Supp. 667 (S.D.N.Y. 1995) ......................................................................9

*Trans Pac. Ins. Co. v. Trans-Pac. Ins. Co.*,
   136 F.R.D. 385 (E.D. Pa. 1991)...........................................................................8

*Travelers Ins. Co. v. Buffalo Reinsurance Co.*,
   735 F. Supp. 492 (S.D.N.Y. 1990) ......................................................................2

*Trustees of Hollow Metal Tr. Fund v. FHA Firedoor Corp.*,
   No. 12-cv-7069 (PAC), 2013 WL 1809673 (S.D.N.Y. Apr. 30, 2013)....................................3

*TVT Records v. Island Def Jam Music Grp.*,
   279 F. Supp. 2d 413 (S.D.N.Y. 2003).................................................................12

*United States v. Bestfoods*,
   541 U.S. 51 (1998)....................................................................................10, 11

*United States v. Dico, Inc.*,
   4 F. Supp. 3d 1047 (S.D. Iowa 2014), *affirmed in part and reversed in part,
   on other grounds*, 808 F.3d 342 (8th Cir. 2015)......................................................11

*United States v. Funds Held ex rel. Wetterer*,
   210 F.3d 96 (2d Cir. 2000)..............................................................................11

*United Techs. Corp v. Am. Home Assurance Corp.*,
   118 F. Supp. 2d 174 (D. Conn. 2000).................................................................12

*White Rosebay Shipping, S.A. v. HNA Grp. Co.*,
   No. C-12-096, 2012 WL 6858239 (S.D. Tex. Dec. 5, 2012)...........................................11, 12

iii

**Statutes**

15 U.S.C. § 78u(d)(3) ....................................................................................................................9

**Rules**

Fed. R. Civ. P. 30(g)(2) .................................................................................................................8

Fed. R. Civ. P. 37(d)(1) .................................................................................................................8

Fed. R. Evid. 408(b) .....................................................................................................................17

FINRA Rule 4110(a)(2) ..........................................................................................................14, 15

Local Rule 37 .................................................................................................................................7

Alpine Securities Corporation ("Alpine") respectfully submits this Memorandum of Law in Support of Alpine's Motion to Strike Portions of the SEC's Reply Memorandum in Support of its Motion for Remedies ("Remedies Reply"), or, in the Alternative, Request for Leave to File a Sur-Reply.

## INTRODUCTION

In its Remedies Reply, the SEC raised two new material issues (and related sub-issues) that the Court should either strike or permit Alpine to fully address by sur-reply.  First, with respect to the "ability to pay" factor, the SEC now contends, for the first time, that the financial condition of Alpine's "ownership" must be taken into account in determining an appropriate penalty, in the process misstating the pertinent facts and ignoring the relevant law.    SEC Remedies Mem. at 21.  Second, in support of its claim that the Court should ignore all of the resolutions in comparable cases, the SEC improperly delved into protected settlement communications, incorrectly asserting that Alpine has not previously offered to agree to compliance undertakings.  The Court should not permit the SEC to benefit from this one-sided presentation of new arguments, particularly where the SEC's positions are legally meritless and factually wrong.  Those claims should be stricken but, if the Court declines to do so, Alpine should be given the opportunity to respond and correct the record.

The SEC, in its opening memorandum, elected to devote a single, conclusory paragraph to the "ability to pay" factor, urging the Court to ignore the factor by arguing only that "Alpine's financial condition is – at best – a neutral factor."  SEC Remedies Mem. at 11.  In response, Alpine referred the Court to numerous authorities confirming the importance of this factor to the penalty determination, and provided sworn declarations and financial records explaining Alpine's financial circumstances and demonstrating that a multimillion dollar penalty – let alone

the SEC's requested $23 million penalty – would put the firm out of business.  *See* Alpine's Remedies Opp. at 49-54.

In its Remedies Reply, the SEC does not attempt to refute Alpine's evidence of *Alpine's* financial condition or the economic impact of the penalty request upon *Alpine*.  Rather than acknowledging that this factor weighs heavily against its penalty demand, the SEC fashioned a new argument, pressing the Court to consider the "financial condition of Alpine's ownership." SEC Remedies Mem. at 20.  It cites to no authority supporting its novel approach, not surprising since it is contrary to the penalty provisions of the Exchange Act and would upend settled principles of limited liability and corporate separateness exemplified by the approaches taken by courts in analogous contexts.  Even more concerning, it flatly misstates the actual facts as to the ownership of Alpine, injects inaccurate prejudicial assertions, and attempts to blame Alpine for the SEC's own decision to curtail discovery.

The SEC's skewed presentation appears designed to distract from – not inform – the penalty determination.  Alpine is the only defendant and it is Alpine alone whose financial condition is, or could be, relevant.  Alpine would have readily rebutted these arguments had the SEC timely raised them in its moving papers.  Now, absent the relief requested herein, this unfounded and improper argument will be before the Court and Alpine will have had no opportunity to rebut it.  The Court should avoid any such prejudice and strike this erroneous new argument or, alternatively, permit Alpine to submit a sur-reply to fully address it.[1]

---

[1]  In accordance with local practice, Alpine has not attached the sur-reply or any new evidence to this Motion.  *See Travelers Ins. Co. v. Buffalo Reinsurance Co.*, 735 F. Supp. 492, 495 (S.D.N.Y. 1990) ("the proposed [*sur-reply*] papers should not accompany the request for leave to submit them") (citation omitted)); *but see Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*, No. 11 Civ. 3130 (DLC) 2012 WL 4049955, at *6 (S.D.N.Y. Sept. 14, 2012) (considering sur-reply papers attached to motion of leave to file, "[r]egardless of any procedural impropriety," because plaintiff's reply raised "new issues material to the disposition of the question[s] before the court" (further quotation and citation omitted)).  Alpine will promptly submit a sur-reply and  supporting evidence in the event leave is granted.

Additionally, the SEC claims in its Remedies Reply that the range of settlements that Alpine points to – roughly $200,000 to $300,000 – is irrelevant because Alpine did not settle the case and has only "now" offered to agree to a compliance undertaking.  SEC Remedies Mem. at 2.  That claim is, first, improper because it speaks to confidential settlement communications, and should be stricken.  Absent that relief, and because the SEC has flung wide the door on the issue, Alpine seeks the opportunity to file a sur-reply demonstrating that Alpine has repeatedly, before and during this proceeding, offered to consent to compliance undertakings as part of a resolution but was in every instance met with the SEC's demands for enormous monetary penalties in the range reflected in its present application.

## LEGAL STANDARDS

"Generally, courts 'do not consider issues raised in a reply brief for the first time, because if a litigant raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.'"  *Ross v. Miller*, No. 14-cv-3098 (RA) (JLC), 2016 WL 1376611, at *26 (S.D.N.Y. Apr. 7, 2016) (quoting, among others, *In re Harris*, 464 F.3d 263, 268 n.3 (2d Cir. 2006)) (internal brackets removed).  Courts in this District have routinely declined to consider new matters raised in reply briefs.  *See Trustees of Hollow Metal Tr. Fund v. FHA Firedoor Corp.*, No. 12-cv-7069 (PAC), 2013 WL 1809673, at *5 (S.D.N.Y. Apr. 30, 2013) ("Since this argument was first raised in Defendants' reply brief and the Funds lacked an adequate opportunity to respond to it, ***the Court declines to address it***.") (citations omitted) (emphasis added); *Playboy Enters., Inc. v. Dumas,* 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments raised for the first time in a reply brief need not be considered by a court" because such "behavior should not be rewarded," and citing cases rejecting new arguments in reply briefs); *McGraw v. Lee*, No. 09 Civ. 8541 (DLC) (FM), 2011 WL 1682633, at *10 (S.D.N.Y. Apr. 27, 2011) (refusing to "consider[] these newly-raised claims.").

In addition to striking new material from reply papers, courts have discretion to permit the non-moving party to file a sur-reply.  The Court held in *Perez v. Manna 2nd Avenue LLC*, No. 15 Civ. 4655 (JCF), 2016 WL 7489040 (S.D.N.Y. Dec. 28, 2016), that "[a] court may strike portions of reply submissions if they add new material that should have been included in the opening papers, as long as the new material is not merely in response to a new issue raised by the opposition papers."  *Id.* at *4.  "However, the 'court has discretion in deciding whether to strike portions of reply papers,' and – to cure any potential prejudice – the court may instead permit the aggrieved party to file a sur-reply."  *Id.* (internal citations and brackets removed); *See also Advanced Fiber Techs. Trust v. J & L Fiber Servs., Inc.*, No. 1:07-cv-1191 (LEK/DRH), 2010 WL 1948242, at *2-3 (N.D.N.Y. May 12, 2010) (granting a motion to strike and for leave to file a sur-reply because the new arguments set forth in the reply papers should have been raised in the original motion).

This Court also noted in Grocery Haulers, that courts have "'broad discretion'" to permit sur-reply submissions, "particularly when new arguments are put forth in a reply brief."  *See Grocery Haulers*, 2012 WL 4049955, at *6 (citation omitted).  The Court held that because the reply brief "put forth a number of new arguments and even submitted new evidentiary materials," the non-moving party was authorized to file a sur-reply to address "'new issues material to the disposition of the question[s] before the court'" raised in the reply.  *Id.* (alteration in original) (citation omitted); *see also In re Arbitration Between Westchester Fire Ins. Co. v. Massamont Ins. Agency, Inc.,* 420 F. Supp. 2d 223, 226 (S.D.N.Y. 2005) (granting leave to file a sur-reply memorandum to "to address specific and limited legal and factual errors set forth in the Petitioners' Reply Memorandum").

4

## ARGUMENT

## POINT I.

## THE COURT SHOULD STRIKE OR GRANT ALPINE LEAVE TO FILE A SUR-REPLY TO FULLY ADDRESS THE SEC'S NEW AND BASELESS ARGUMENTS

### A.    The SEC's Untimely New Arguments.

Among the factors that Courts in this district consider in making a penalty determination is "whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).   In its opening memorandum, the SEC treated this "ability to pay" factor dismissively, arguing in a single terse paragraph only that "Alpine's financial condition is – at best – a neutral factor in the civil penalty analysis," because it is "but one of many a court considers when exercising its discretion." SEC Remedies Mem. at 11 (quotations and citation omitted).   The SEC made a strategic choice to try to convince this Court to simply ignore this factor; it made no other argument and it presented no evidence regarding Alpine's financial condition.

In response, Alpine cited to numerous authorities holding that the defendant's ability to pay is a "critical factor" to consider in making a penalty determination, and reducing penalties based upon this factor.[2]   Alpine Remedies Opp. at 49-52.   Alpine also provided the Court with evidence of its own financial condition and net assets, including copies of financial statements it files with the SEC (the FOCUS reports), and a declaration from its Chief Financial Officer.   *Id.* at 52-54, and Decl. of David Brandt (and exhibits thereto). Alpine detailed the economic impact

---

[2]   Contrary to the SEC's indication, *SEC v. Aerokinetic,* 8:08-cv-1409, 2010 WL 5174509, at *6 (M.D. Fla. Dec. 15, 2010), illustrates the courts' consideration of inability to pay.   The SEC omits from its discussion of this case the district court's statement, in affirming the magistrate judge's penalty recommendation, that:  "[t]he Magistrate also accounted for Defendants' financial situation in considering the investors' declarations which asked that the company not be jeopardized by the imposition of substantial penalties." *See id.* The SEC also omitted the fact that the Magistrate recommended a "substantially lesser penalty" against the company than either the maximum allowed by the statute, *or the amount sought by the SEC*.'"   Magistrate Report and Recommendation, Case No. 8:08-cv-1409-T-27TGW, Dkt. No. 73, at p. 2 (M.D. Fla. Sept. 9, 2010) (SEC sought $500,000 against the company; magistrate recommended (and district court affirmed) penalty of $250,000).

of a significant penalty on its ability to continue to operate, including the effect of a penalty on

its net capital requirement.  As demonstrated in that filing, the entry of any multi-million dollar

penalty would put Alpine out of business, an outcome that has never been obtained by the SEC

in any case cited by either party. See id.  In short, Alpine carried its burden to show that any

penalty should be reduced to the range imposed in comparable cases because of Alpine's

"demonstrated current and future financial condition." *Haligiannis*, 470 F. Supp. 2d at 386.

In its Remedies Reply, the SEC makes no attempt to refute Alpine's presentation of its

own financial condition or the economic impact of the penalty upon Alpine.  The SEC does not,

for example, claim that Alpine has the financial capacity to pay a multi-million dollar penalty, or

that a penalty would not count against Alpine's net capital.[3]  Instead, the SEC shifts gears from

its prior position to now raise the following new arguments:

- "[T]he Court should consider the financial condition of Alpine's ownership, not just Alpine's balance sheet" in assessing Alpine's ability to pay the penalty requested, and that Alpine was affirmatively required to "show[] that its ownership could not pay the penalty requested by the SEC."  SEC Remedies Mem. at 21.

- That Alpine has "siphoned" funds to its ownership.  *Id.* at 20.

- That Alpine has "dodged any discovery on the issue" of its *ownership's* ability to pay the penalty requested by the SEC, by which the SEC purportedly refers to

---

[3]  The SEC relegates the entirety of its discussion of the net capital issue to a footnote.  *See* SEC Remedies Reply Mem. at 22 n.7.  The SEC does not dispute Alpine's analysis of the impact a significant penalty would have, or Alpine's calculation of the amounts it could pay as a result of the net capital requirements.  Instead, the SEC demurs, arguing that Alpine's discussion is too cursory to address this "complicated" issue.  *Id.*  This is an insufficient response.  The SEC imposes the net capital requirements, and if it believes Alpine has misstated these requirements, it had the opportunity to so state.  The SEC also appears to agree with Alpine with respect to the timing of when Alpine would have to book a penalty as a liability for net capital purposes – after exhaustion of appeals – but insinuates that this somehow means the net capital requirements should have no impact on the size of the penalty.  This is not the case.  The SEC agrees that if this Court's judgment were affirmed on appeal,  any penalty imposed as a liability  would obviously and immediately count against its net capital (i.e., Alpine would have to try to acquire additional capital to cover the liability, in addition to its existing operational costs).  These impacts should be factored in on the front end in determining an appropriate penalty under the facts and circumstances of this case, including Alpine's ability to pay.  After all, the SEC does not dispute Alpine's ultimate point: because Alpine is an entity, if a penalty is imposed above Alpine's ability to pay, including its ability to meet net capital requirements, it will go out of business and have *no future earnings*.

Alpine's objections to appearing for a deposition without service of a subpoena on Mr. Hurry. *Id.* at 21.

Each of these arguments is untimely and should not be considered, particularly without giving Alpine a chance to respond. The SEC obviously recognized that "ability to pay" is a significant issue in this case, and it possessed all of the information necessary to make these arguments in its opening memorandum. The FOCUS reports, upon which the SEC relies to support most of these arguments and which detail Alpine's assets, liabilities, revenue, profits, losses, distributions, excess net capital, and other pertinent information regarding Alpine's financial condition, are filed with the SEC each month, and have been provided again to the SEC in discovery. Rather than timely addressing that issue, the SEC chose to "sandbag," saving its claims for its reply, knowing Alpine would be unable to respond.

As for the SEC's complaints relating to Mr. Hurry's deposition, the SEC did not even bother to pursue that matter with the Court, likely because it knew that Mr. Hurry had no relevant information. More to the point, a reply brief on remedies is not a proper procedure to introduce a discovery dispute.[4] *See* S.D.N.Y. Local Rule 37. 2 *and* J. Cote Individual Practices in Civil Cases, Rule 2(C) (a party must first "meet and confer," and then "file a letter motion . . . explaining the nature of the dispute and requesting an informal conference."). That the SEC now suddenly complains about its own failure to obtain that discovery illustrates that the SEC,

---

[4] In its December 11, 2018 Opinion, this Court held that Alpine's request for a deposition of an SEC employee, James L. Lyman, which Alpine sought under Rule 56(d) to fully respond to the SEC's summary judgment arguments, was "untimely" because Alpine did not "renew its earlier request to depose" Mr. Lyman. *See SEC v. Alpine,* 354 F. Supp. 2d 396, 444 n.89 (S.D.N.Y. 2018). The Court made this ruling despite the fact that Alpine had earlier filed a letter motion to compel Mr. Lyman's deposition, which the Court denied. *See* Order [Dkt. 106]. The SEC made no such effort with respect to their purported desire to depose Mr. Hurry. If Alpine's request with respect to Mr. Lyman was untimely, then the SEC's effort to raise the issue for the first time in a reply brief on remedies is even more untimely.

lacking any credible or appropriate response on the issue, is grasping at any means to prejudice Alpine and distract from the unprecedented enormity and impact of its penalty demand.[5]

The SEC's conduct here is particularly egregious because, as demonstrated below, each of these new arguments is meritless, and would have been rebutted by Alpine in its Opposition. To avoid prejudice to Alpine, the Court should decline to "reward" the SEC's behavior by striking these arguments or, in the alternative, grant Alpine leave to submit a sur-reply to fully address them. *See Playboy,* 960 F. Supp. at 720 n.7 (refusing to consider defendant's new argument "made for the first time in a reply brief" where the basis for the new argument "existed well before [defendant] filed her initial memorandum, and the Court is aware of no reason for [defendant's] manipulative omission of the argument from her first submission."); *see also Grocery Haulers,* 2012 WL 4049955, at *6 (granting leave to file a sur-reply where moving party's "reply raised 'new issues material to the disposition of the question[s] before the court.'" (citation omitted)).

### B. The SEC's New Arguments are Unsupported, Irrelevant and Meritless.

The SEC's new arguments should also be stricken on the grounds that they are unsupported, irrelevant to any issue in this case, and wholly meritless. *See Mohamed v. Nolan Law Grp.*, 574 F. App'x 45, 46 n.1 (2d Cir. 2014) (motion to strike granted as to argument raised for first time in reply brief and where new argument was "without merit").

---

[5] To the extent the Court considers this untimely argument, the SEC's attempt to blame Alpine for its own failure to obtain discovery from Mr. Hurry is baseless. The SEC acknowledges it failed to serve Mr. Hurry with a subpoena, *see* SEC Remedies Mem. at 21 n. 4 and Exhibits 6-8 thereto, and thus Alpine rightfully objected to the deposition. As Alpine explained to the SEC, Mr. Hurry is not a party to this case, and was not Alpine's "officer, director or managing agent" whose deposition could be compelled solely by issuing a notice of deposition. The SEC was required to personally serve him with a subpoena to compel his deposition. *See e.g.*, *Myers v. Andzel*, No. 06-14420 (RWS), 2007 WL 3256879, at *1 (S.D.N.Y. 2007) ("Discovery of non-parties must be conducted by subpoena pursuant to Fed. R. Civ. P. 45."); *Trans Pac. Ins. Co. v. Trans-Pac. Ins. Co.*, 136 F.R.D. 385, 392 (E.D. Pa. 1991) ("If the deponent is not a party and does not consent to attend, then his attendance can be compelled only by a subpoena issued under Fed. R. Civ. P. 45.") *see also* Fed. R. Civ. P. 37(d)(1). In fact, had the SEC insisted on going forward with the deposition despite failing to effect personal service of a subpoena on Mr. Hurry, Alpine would have been entitled to recover its attorney's fees and expenses. *See* Fed. R. Civ. P. 30(g)(2).

### 1. The Financial Condition of Alpine's "Ownership" has No Bearing on Alpine's Ability to Pay a Penalty.

Even as it improperly injects new and inaccurate material into its reply, the SEC argues that, "in fairness," the Court should consider "the financial condition of Alpine's ownership, not just Alpine's balance sheet," in considering Alpine's ability to pay the penalty requested by the SEC.  SEC Remedies Mem. at 21.  Notably, the SEC cites no authority to support the novel assertion that the financial condition of a non-party is relevant to evaluating a party-defendant's ability to pay a civil penalty. This alone indicates that this new argument should be disregarded. *See Sigmon v. Parker Chapin Flattau & Klimpl*, 901 F. Supp. 667, 677 n.5 (S.D.N.Y. 1995) (refusing to consider argument where defendant raised it for the "first time in its reply brief" and where defendant "***did not provide citation to any legal authority***" to support new argument) (emphasis added).

Consideration of the authority assiduously ignored by the SEC demonstrates that its claim runs counter to fundamental principles of corporate liability and separateness.  First, the text of Section 21(d)(3) of the Exchange Act only gives the Court "jurisdiction to impose, ***upon a proper showing***, a civil penalty to be paid ***by the person who committed such violation.***"  15 U.S.C. § 78u(d)(3) (emphasis added).  Obviously, the SEC has not established that any person or entity involved or associated with Alpine's ownership "committed [the] violation" for which the SEC seeks a civil penalty.  And the "ability to pay" factor, which comprises part of the "proper showing," and which has been cited by both parties, directs the Court to review "whether the penalty should be reduced due to ***the defendant's*** demonstrated current and future financial condition" – not shareholders, members of the same corporate family or other entities that may be able to contribute to penalty payments.  *Haligiannis*, 470 F. Supp. 2d at 386 (emphasis added).

9

Second, the SEC's argument violates settled principles of limited liability and corporate separateness.  *See United States v. Bestfoods,* 541 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries.") (citation omitted).  "'Limited liability is the rule, not the exception,'" and "'[a] corporation and its stockholders are generally to be treated as separate entities.'"  Id. (citation omitted). By asking the Court to look past Alpine's own financial condition and consider whether its "ownership" – separate legal entities – could pay a penalty, the SEC fails to pay even lip-service to these fundamental principles.

The rule of limited liability is designed to avoid exactly what the SEC seeks to accomplish.  Shareholders, whether corporate parents or individuals, are not to be put at risk of losing more than the amount they invest.  *See, e.g., id.* ("Thus it is hornbook law that 'the exercise of the "control" which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary.'") (citations omitted).  Not surprisingly, Utah – Alpine's state of incorporation – also adheres to this hornbook law of corporate separateness. *See, e.g., Orlob v. Wasatch Mgmt.*, 33 P.3d 1078, 1082 (Utah Ct. App. 2001) ("'[T]he general rule is that a corporation is an entity separate and distinct from its officers, shareholders and directors and that they will not be held personally liable for the corporation's debts and obligations.'") (citations omitted).

The SEC offers no basis to overrider the "general rule" of corporate separateness.  In fact, absent proof satisfying the strict requirements of veil-piercing – which the SEC does not mention, let alone attempt to prove[6] – a corporate parent is not required to invest additional

---

[6]  Not even the SEC argues that there is any basis for veil piercing in this case and, in any event, it would require a detailed, multi-factored analysis, involving the examination of evidence that is not before the Court.  Even then, "it is only in 'extreme circumstances' that 'the corporate form will be disregarded and the personal assets of a controlling shareholder or shareholders may be attached in order to satisfy the debts and liabilities of the

capital to meet its subsidiary's obligations.   Rather, the choice whether to make further investments is within the shareholder parent's discretion based on expected returns.   To assume as a matter of law that Alpine's "ownership" must invest more capital in Alpine to cover any penalty "is inconsistent with the very notion of limited liability – limitation of risk of loss from an investment."   *White Rosebay Shipping, S.A. v. HNA Grp. Co.*, No. C-12-096, 2012 WL 6858239, at *7 (S.D. Tex. Dec. 5, 2012) ("Plaintiff's position that a parent corporation must continue supporting a doomed subsidiary with regular cash transfusions, however, is inconsistent with the very notion of limited liability – limitation of the risk of loss from investment.").

Although Alpine is aware of no case that has addressed the issue in the context of an SEC penalty proceeding – itself a powerful argument that it is patently improper – courts tasked with setting civil monetary penalties under federal environmental laws and in deciding punitive damages have recognized that the assets of parent corporations should not be considered in assessing penalties.   For example, in *United States v. Dico, Inc.,* the court expressly "decline[d] to consider the assets of [its parent] when evaluating Dico's ability to pay" the penalty.   *See* 4 F. Supp. 3d 1047, 1064-65 *and* n.43 (S.D. Iowa 2014), *affirmed in part and reversed in part, on other grounds*, 808 F.3d 342 (8th Cir. 2015)*.   The Court explained:

> [T]he proposition of considering the assets of the parent company, which is not a party to the lawsuit, when assessing civil penalties against a subsidiary is somewhat at odds with the basic principle of corporate law that each incorporated business entity enjoys a separate legal existence. . . . *see also United States v. Bestfoods et al*., 524 U.S. 51, 61–62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) ("[I]t is hornbook law that the exercise of the control which stock ownership give to the

---

corporation.'" *Albright v. Attorney's Title Ins. Fund*, 504 F. Supp. 2d 1187, 1209 (D. Utah 2007) (citation omitted). This is because "[t]he corporate structure is an artificial construct of the law, a substantial purpose of which is to create an incentive for investment by limiting exposure to personal liability. The insulation of a stockholder from the debts and obligations of his corporation is the norm, not the exception.'" *Id.* (citation omitted).   The law is no different in the Second Circuit. *See United States v. Funds Held ex rel. Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000) ("Courts must be extremely reluctant to disregard corporate form.").   Moreover, no actions taken by Alpine would suggest that a veil-piercing would be proper in these circumstances. There is no evidence to suggest that Alpine has not followed all corporate formalities or is undercapitalized. The absence of such facts point powerfully against piercing the corporate veil.

stockholders ... will not create liability beyond the assets of the subsidiary ..., [and] nothing in CERCLA purports to reject this bedrock principle ...." (internal citations and quotation marks omitted)).

*Id.*

Courts have also honored the fundamental rule of limited parent/shareholder liability in the punitive damage context.  For example, in *United Technologies Corp v. American Home Assurance Corp.,* 118 F. Supp. 2d 174 (D. Conn. 2000), the Court, citing *Best Foods,* rejected plaintiff's formula for calculating punitive damages based on defendant's "parent company's net worth."  *Id.* at 180.  The Court explained:

> [The parent company] is not a party to this lawsuit, and the Court therefore finds it improper to use [the parent company's] value as a measure of exemplary damages. Most of the cases cited by plaintiff are distinguishable, in that either the parent company was a named defendant, or there had been some showing that the subsidiary was merely an alter ego for the parent[.] [Plaintiff] made no such showing at trial, nor do the post-trial submissions suffice to persuade the Court other factors are present which adequately address ***the due process concerns inherent in assessing penalties against a non-party***.

*Id.* at 180-81 (internal citations omitted) (emphasis added); *see also TVT Records v. Island Def Jam Music Grp*., 279 F. Supp. 2d 413, 451 (S.D.N.Y. 2003) (holding that punitive damages awarded by the jury were excessive in relation to compensatory damages, and observing that the jury's punitive damage award may have "been tainted by the jury having given undue weight to . . . ***impermissible factors*** such as . . . Defendant's affiliations with large and rich parent companies or out-of-state businesses."  (emphasis added) (citing *United Tech. Corp.,* 118 F. Supp. 2d at 180), *rev'd and remanded on other grounds*, 412 F.3d 82 (2d Cir. 2005)); *Continental Trend Res., Inc. v. Oxy USA, Inc.*, 810 F. Supp. 1520, 1533 (W.D. Okla.1992) (noting that "[t]he financial worth of a parent corporation is generally irrelevant in assessing punitive damages on a subsidiary unless the corporate veil is pierced"), *aff'd in relevant part*, 44 F.3d 1465 *(*10th Cir. 1995), *vacated on other grounds*, 517 U.S. 1216 (1996).

Here, as in each of the above-cited cases, Alpine is the party-defendant; its "ownership" is not a party and the non-party's assets are not relevant.  Pursuant to these settled principles of corporate separateness and limited liability, this Court should reject the SEC's argument that a defendant's ability to pay should be evaluated by reference to a non-party's assets.

### 2. The SEC Has Misstated the Facts Concerning Both "Ownership" and Alpine's Distributions of Funds.

The SEC has not even correctly identified Alpine's "ownership" nor has it offered any cogent claim concerning Alpine's, or any other entity's, *present* condition.  The SEC suggests Alpine is owned by Mr. Hurry, ostensibly to fit within its false narrative that Alpine has "dodged any discovery" by objecting to Mr. Hurry's subpoena-less deposition (*see* fn. 5, *supra*), and to try to convince the Court to evaluate Alpine's ability to pay a penalty by reference to Mr. Hurry's assets.  Alpine is not owned by Mr. Hurry.  As the SEC well knows, Alpine is owned by a holding company, SCA Clearing, LLC, which is in turn owned by family trusts.[7]  As the SEC has not even correctly identified the owner whose assets it wants the Court to consider, the very premise of the SEC's argument is flawed and unsupported, as is its corollary and self-inflicted issue about not getting discovery from Mr. Hurry.

The SEC also mischaracterizes the nature of the capital withdrawals. They do not represent proceeds of any relevant, much less improper, activity; they are distributions of profits from periods that primarily post-date and have little or nothing to do with the recordkeeping violations at issue. The SEC has not alleged, nor could it, that these distributions represent unlawful proceeds from the violations that could be clawed back.  *See In re The Reserve Fund Secs. and Derivative Litig.,* 673 F. Supp. 2d 182, 208-09 (S.D.N.Y. 2009) (holding that an

---

[7]  The SEC knows this because, as a registered broker-dealer, Alpine is required to disclose the identity of, and any changes to, its direct and indirect ownership and so has filed BD Amendments identifying SCA Clearing as its owner and various family trusts as indirect owners through their ownership of SCA Clearing.

equitable "claw back" action is only available to recover funds from third parties who have received "ill-gotten funds," as from a fraudulent scheme, to which "they did not have a legitimate claim," and refusing to authorize claims to "claw back" funds that "represented the return of monies the shareholders had originally invested in the Primary Fund" because "the investors had a 'valid claim' to th[ose] funds.") (internal quotations omitted).  And while the SEC may claim that it is not trying to claw back any funds, that is the precise effect of its argument:  by seeking a penalty that exceeds Alpine's current ability to pay, it attempts to force its ownership to pay that penalty or close the business.

Further, the amounts cited by the SEC bear little or no relation to the *present* condition of Alpine, or any other entity or individual.  Those figures date back to the first quarter of 2014, before Alpine was sued in this case and before material changes in the industry and its operations that have rendered Alpine much less profitable.  It plainly ignores the fact that capital distributed four or five years ago was not only subject to taxes but also likely is not still intact.  Its assertions do not purport to address the proper consideration: Alpine's "current and future financial condition." *Haligiannis*, 470 F. Supp. 2d at 386.

The SEC's attempt to suggest that amounts were distributed from Alpine because of this case is worse than rank speculation, it is a deliberate distortion.  First, the SEC fails to inform the Court that FINRA, which the SEC supervises, must approve distributions of profit from a broker-dealer to its ownership.  *See* FINRA Rule 4110(a)(2).[8]  FINRA reviewed and approved Alpine's capital distributions in accordance with this rule.  Further, those distributions discussed in the SEC's Remedies Reply shows that Alpine routinely made monthly distributions of profit dating

---

[8] *See* FINRA Rule 4110(a)(2) ("A carrying or clearing member shall not, without the prior written approval of FINRA, withdraw capital, pay a dividend or effect a similar distribution that would reduce such member's equity, or make any unsecured advance or loan to a stockholder, partner, sole proprietor, employee or affiliate, where such withdrawals, payments, reductions, advances or loans in the aggregate, in any 35 rolling calendar day period, on a net basis, exceeds 10% of its excess net capital.").

back to March 31, 2014, well before this case.  Times changed, however, both in the industry and by virtue of this case.[9] Alpine became less profitable, and it made no distributions after April 1, 2018 through the end of 2018.  In fact, and as even the SEC acknowledges, Alpine's ownership had to inject a an additional $ 1 million in capital at the end of 2018.  *See* Brant Decl., Ex. B-15 [Dkt. 206], at p. 12, Line 4260 ($1 million capital addition).

Oddly, the SEC cites to that capital infusion in support of the claim that the Court should "look to Alpine's ownership when assessing" Alpine's ability to pay.  Because it assisted the business last year, says the SEC, "[i]t could do so to pay a penalty."  This is not only inconsistent with the relevant legal principles but also completely nonsensical - an infusion of $1 million in capital to fund business operations in no way suggests that Alpine could pay the kind of enormous penalty sought by the SEC or that its present value supports a further infusion.  To the contrary, it underscores the firm's significant decline in profitability since the filing of this action.

With respect to the proper consideration of Alpine's *present* condition, this year it resumed some distributions of profits but has primarily distributed funds to return the capital infusion.   In its current fiscal year, Alpine disbursed a total to ownership of $1,753,929. Notably, FINRA pre-approved $1,293,929 of the $1,753,929.  The remaining $460,000 that was not pre-approved by FINRA, was taken out in two installments, the size of each were below the threshold that required pre-approval by FINRA.  *See* FINRA Rule 4110(a)(2). Thus, of the $1,753,929 of distribution, $1,184,130 came from earnings in the current fiscal year and $569,799 came from retained earnings derived in prior fiscal years.  Contrary to the SEC's

---

[9] Among other things, Alpine in 2018 had its ability to conduct trades dramatically reduced by virtue of massive deposit requirements imposed by the National Securities Settlement Corp.  In the first eight months of its current 2019 fiscal year (through May 31, 2019), Alpine has earned net income of $1,184,130.  The modest amounts that Alpine now earns undermines the SEC's claim.

insinuations, the FOCUS reports submitted to the Court demonstrate that, not surprisingly, Alpine's revenue and financial condition have been deeply impacted by this proceeding and market conditions such that it does not have the ability to pay even a multi-million dollar penalty, much less the astronomical one sought by the SEC.

Accordingly, the SEC's conclusory new argument is not only untimely and unsupported factually and legally, but is actually contrary to proper penalty determinations under the Exchange Act, to penalty decisions made by courts in analogous contexts, and to sound logic and reason. The Court should disregard these arguments or, in the alternative, grant Alpine leave to file a sur-reply to fully address them.

### POINT II.

### THE COURT SHOULD STRIKE THE SEC'S ARGUMENT THAT ALPINE HAS NOT PREVIOUSLY OFFERED UNDERTAKINGS OR GRANT ALPINE LEAVE TO FILE A SUR-REPLY TO RESPOND TO THIS CONTENTION

Alpine argued in its opposition brief that the goals of a civil monetary penalty would be fully satisfied with a penalty in the range imposed in comparable cases, along with affirmative undertakings. *See* Alpine's Opp. at 55-57. Alpine's offered undertakings are consistent with the undertakings agreed upon in the SEC's recent settlement with another similarly-situated broker-dealer – *In re Wilson-Davis & Co., Inc.*, SEC Release No. 85867 (May 15, 2019). *Id.* Alpine also cited many other cases supporting its contention that although the SEC has not met its burden for injunctive relief, Alpine is nonetheless willing to consent to undertakings that exceed the scope and effect of any injunction, including an independent compliance consultant reporting directly to the SEC. *Id.*

In its Remedies Reply, the SEC wholly ignored Alpine's enumerated list of undertakings, reference to similar settlements, and additional case law citations. Instead, the SEC sidestepped the issue, claiming that those resolutions should be ignored because Alpine did not settle and

claiming that Alpine "***only offers now*** to agree to certain affirmative undertakings."   SEC's Remedies Reply Mem. at 2 (emphasis added).   This claim improperly invokes Rule 408 settlement discussions between the parties and is false.

The parties have long engaged in settlement discussions, which began prior to the filing of the Complaint in this matter and continued through multiple mediations during the pendency of this case.   The SEC now makes its claim without citing any legal justification or standard under Rule 408 for informing the Court about what Alpine ***has or has not offered*** in terms of undertakings prior to Alpine's submission to the Court.   By doing so, the SEC has opened the door to communications regarding the same.[10]

If the Court does not strike this new argument as both untimely and impermissible under Rule 408, then Alpine should be granted leave to file a sur-reply with declarations refuting this statement.   Settlement discussions may be offered "for another purpose, such as proving a witness's bias or prejudice, [or] negating a contention of undue delay…" under Rule 408.  Fed. R. Evid. 408(b).   "As a general proposition, a trial court has broad discretion as to whether to admit evidence of settlement negotiations offered for 'another purpose.'"   *Complex Sys., Inc. v. ABN AMBRO Bank N.V.*, No. 08 Civ. 7497 (KBF), 2014 WL 1055263, at *2 (S.D.N.Y. Mar. 13, 2014) (citation omitted).   "Another purpose" includes "prov[ing] or disprove[ing] the validity of the claims that the offers were meant to settle."   *Id*. (citation omitted).   Here, the SEC has opened the door to settlement discussions and offered a false account of those discussions.   To avoid prejudice, Alpine should be permitted to refute the SEC's claims with declarations addressing

---

[10] *See, e.g.*, *Baird v. Boies, Schiller & Flexner LLP*, 219 F. Supp. 2d 510, 516 n.2 (S.D.N.Y. 2002) ("Although settlement discussions and offers to compromise are normally inadmissible, *see* Fed. R. Evid. 408, plaintiffs 'opened the door' by disclosing details of the conference in their moving papers. Defendants followed plaintiffs' lead in their opposing papers, by disclosing further details of the conference as well. By the parties' actions, therefore, these facts are now a matter of public record.").

negotiations and offers both before the filing of the SEC's complaint and throughout the pendency of this case in multiple mediation conferences.

## CONCLUSION

For the foregoing reasons, the Court should strike and/or disregard the SEC's untimely new arguments that: (1) the Court should include Alpine's ownership's financial condition in assessing Alpine's ability to pay a penalty, (2) Alpine has "siphoned" funds to its ownership; (3) that Alpine has "dodged discovery" on its ownership's financial condition; and (4) that Alpine has never before offered a compliance undertaking.  In the alternative, the Court should grant Alpine leave to file a sur-reply to further address these issues.

DATED this 22nd day of July, 2019.

/s/ *Maranda E. Fritz*

Maranda E. Fritz
**THOMPSON HINE**
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Tel. 212.344.5680
Fax 212.344.6101
Email:  Maranda.Fritz@thompsonhine.com

Brent R. Baker (BB 8285)
Aaron D. Lebenta (*Pro Hac Vice*)
Jonathan D. Bletzacker (*Pro Hac Vice*)
**CLYDE SNOW & SESSIONS**
One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
Telephone 801.322.2516
Facsimile 801.521.6280
Email: brb@clydesnow.com
        adl@clydesnow.com
        jdb@clydesnow.com

*Attorneys for Defendant Alpine Securities Corporation*