UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>ALPINE SECURITIES CORPORATION,<br><br>    Defendant. | Civil No. 1:17-CV-04179-DLC<br><br>Honorable Judge Denise L. Cote<br>Magistrate Judge Ronald L. Ellis<br><br>**ECF CASE** |

**DEFENDANT ALPINE SECURITIES CORPORATION'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO STRIKE PORTIONS OF THE SEC'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR REMEDIES, OR, IN THE ALTERNATIVE, REQUEST FOR LEAVE TO FILE A SUR-REPLY IN RESPONSE TO THE SEC'S REPLY MEMORANDUM**



335 Madison Avenue, 12th Floor
New York, New York 10017
(212) 344-5680



One Utah Center
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111-2216
(801) 322-2516

*Attorneys for Alpine Securities Corp.*

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

I.     THE SEC PROPOUNDS NO EXCUSE OR AUTHORITY TO SUPPORT ITS FOCUS ON IRRELEVANT ALLEGATIONS AND ITS ARGUMENTS SHOULD BE STRICKEN OR DISREGARDED ........................................................................................ 2

     A.     The SEC's Position Concerning Historical Data and Third Parties Is Improper.... 2

     B.     The SEC's Injection of Baseless Claims Regarding Discovery is Improper.......... 6

     C.     The Court Should Disregard the SEC's Use of a FINRA Complaint..................... 7

     D.     The Court Should Strike the SEC's Claim That Alpine Had Not Previously Offered Undertakings........................................................................................... 10

CONCLUSION............................................................................................................................. 11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Cont'l Trend Res., Inc. v. Oxy USA, Inc.*,
   810 F. Supp. 1520 (W.D. Okla.1992) .......................................................................................4

*Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*,
   No. 11 Civ. 3130 (DLC), 2012 WL 4049955 (S.D.N.Y. Sept. 14, 2012) ................................3

*Playboy Enters., Inc. v. Dumas*,
   960 F. Supp. 710 (S.D.N.Y. 1997), *aff'd without opinion by*,
   159 F.3d 1347 (2d Cir. 1998)....................................................................................................3

*SEC v. Haligiannis*,
   470 F. Supp. 2d 373 (S.D.N.Y. 2007).......................................................................................1

*United States v. Bestfoods*,
   541 U.S. 51 (1998)....................................................................................................................4

*United States v. Dico, Inc.*,
   4 F.Supp.3d 1047 (S.D. Iowa 2014) .........................................................................................4

*United Techs. Corp v. Am. Home Assurance Corp.*,
   118 F. Supp. 2d 174 (D. Conn. 2000).......................................................................................4

*White Rosebay Shipping, S.A. v. HNA Grp. Co.*,
   No. C-12-096, 2012 WL 6858239 (S.D. Tex. Dec. 5, 2012).....................................................4

## **INTRODUCTION**

By this Motion, Alpine sought to address the SEC's injection of information, irrelevant to the issue of ability to pay, to distract from the fact of Alpine's actual financial condition. Alpine demonstrated that the SEC's references to data from years earlier, and to third parties, was at odds with the plain language of Section 21(d)(3) of the Exchange Act, that the penalty may be imposed only against "the person who committed such violation," and the accepted formulation of the "ability to pay" penalty factor, which directs courts to consider the "***defendant's*** demonstrated ***current and future financial condition***." *See, e.g., SEC v. Haligiannis,* 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (emphasis added). Alpine cited analogous cases establishing that the SEC's attempt to convince this Court to consider a nonparty owners' assets when assessing civil penalties against a corporate defendant violates established principles of limited liability and basic principles of corporate law. Alpine Opening Mem. at 9-13.

In response, the SEC concedes that the information that it puts forth is irrelevant to any legal issue before the Court.[1] It instead offers patently pretextual rationalizations for injection of the information and then, remarkably, improperly tosses *additional new allegations* into the mix.[2] Lacking any proper legal or factual support for its penalty request, the SEC is determined

---

[1] The SEC confirms that it "does not seek a judgment against any person or entity other than Alpine" and that it "is not asking the Court to pierce a corporate veil or claw back distributions." SEC's Opp. at 6. Those issues are, however, the only ones as to which the distributions would be relevant.

[2] If the Court decides to consider the FINRA document attached by the SEC, it should be noted that it actually proves each of the points that Alpine has made in relation to penalties, *i.e.*, that its financial condition has changed dramatically by virtue of this proceeding and other events; that its new management decided last year to cease even to carry retail accounts for those who conduct microcap transactions; that the firm now presently holds, in excess of its net capital, less than $500,000.00; that its NSCC deposit requirements were recently increased again; and that imposition of a penalty in this case unquestionably puts the firm at risk. *See* FINRA Complaint at ¶ 1 ("By late 2018, Alpine Securities Corporation [faced] significant and mounting financial difficulties"; *id.* ¶¶ 13-14 (noting the SEC's request for a $22 million penalty and stating that "Alpine maintains nowhere near that amount of capital. In fact, the Firm reported to FINRA that it maintained only $1,753,679 in excess net capital" in its May 2019 FOCUS report); *id.* ¶15 ("While litigating the SEC's action, Alpine experienced financial difficulties" and "posted net losses of approximately $44,700 in the second quarter of 2018 and approximately $71,200 in the third quarter of 2018"); *id.* ¶ 16 ("Alpine has been subject to an excess net capital requirement of $1 million by the National Securities Clearing Corporation and Alpine was barely able to meet that requirement in the third quarter of 2018 when in

to present any available negative information about Alpine because it is convinced that it will induce this Court to impose a more punitive sanction. That extraneous and prejudicial material, including the new allegations added in its opposition to this motion, should be disregarded.

Perhaps most striking is that, while the SEC is more than willing to put forth any kind of speculation or allegation that might bolster its penalty demand, it has presented *nothing* that alters the fact that Alpine cannot survive a penalty that would force it out of compliance with net capital requirements. The SEC's ***only*** argument pertaining to Alpine's present financial condition involves a claim that payments of roughly $1 million, made to its landlord and lender, should be characterized as capital withdrawals. Obviously the SEC's focus on amounts of $1 million only underscores the precise point: the SEC's request of $22 million – in fact, any penalty that will destroy Alpine's ability to remain in business – is unprecedented, baseless and inappropriate.

I. **THE SEC PROPOUNDS NO EXCUSE OR AUTHORITY TO SUPPORT ITS FOCUS ON IRRELEVANT ALLEGATIONS AND ITS ARGUMENTS SHOULD BE STRICKEN OR DISREGARDED**

   A. **The SEC's Position Concerning Historical Data and Third Parties Is Improper**

The SEC effectively concedes that its references to capital distributions that occurred in prior years are not relevant to Alpine's present ability to pay. SEC Opp. at 6. It does not and could not argue, for example, that routine capital distributions in 2014 or 2015 are evidence of the present financial condition of *any* individual or entity, much less Alpine. It cannot suggest that those figures are reflective of Alpine's present profitability because they are not. Rather, the

---

reported excess net capital of only approximately $1.04 million"); *id.* ¶ 17 ("[a]dding to the Firm's financial difficulties, on or about July 11, 2019, the Depository Trust & Clearing Corporation notified Alpine that it would be imposing on the Firm a minimum clearing fund requirement of $2.3 million, effective July 12, 2019"); *id.* ¶ 33 n.2 ("NSCC requires firms to maintain on deposit specific funds in connection with the volatility and mark-to-market risk posed by the transaction. Due to the nature of Alpine's credit rating at NSCC, the Firm is required to make a deposit related to these factors and an illiquidity assessment as well.")

unsurprising fact is that Alpine's business declined since the filing of this case and its present circumstances are dramatically diminished.

Because there is no credible argument that its claims are relevant, the SEC instead offers a flurry of justifications, every one of which is semantics or pretense. The SEC claims, first, that its focus on distributions to Alpine's parent was a proper response to Alpine's description of its condition in its Remedies Opposition. SEC Opp. at 3-4. To the contrary, it was neither proper nor relevant. The SEC, in its initial brief, made the deliberate decision to decline to address Alpine's financial condition, although it possessed all of its FOCUS reports and its enormous penalty request of $22 million drove the issue of ability to pay into the forefront. It allotted only a single paragraph to Alpine's "ability to pay" and asked the Court *to ignore this factor* claiming that "Alpine's financial condition is – at best – a neutral factor." SEC Remedies Mem. at 11. Had the SEC wanted to present an argument that Alpine had the wherewithal to pay a fine, it would have presented its claim at that time and Alpine would have had the opportunity to respond. Instead, the SEC made a conspicuous decision to ignore the entire issue of Alpine's finances, apparently planning to present its contentions regarding Alpine's ownership only on reply and when Alpine would be unable to respond. That tactic is improper.[3]

The SEC's contentions are also not proper response because they are irrelevant as a matter of law. As Alpine demonstrated, attempts to persuade the Court to consider a nonparty's assets when assessing civil penalties against a corporate defendant violate established principles

---

[3] *See, e.g., Playboy Enters., Inc. v. Dumas,* 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) (refusing to consider defendant's new argument "made for the first time in a reply brief" where the basis for the new argument "existed well before [defendant] filed her initial memorandum, and the Court is aware of no reason for [defendant's] manipulative omission of the argument from her first submission."), *aff'd without opinion by*, 159 F.3d 1347 (2d Cir. 1998); *Grocery Haulers, Inc. v. C&S Wholesale Grocers, Inc.*, No. 11 Civ. 3130 (DLC), 2012 WL 4049955, at *6 (S.D.N.Y. Sept. 14, 2012) (granting leave to file sur-reply where reply brief put forth "a number of new arguments and even submitted new evidentiary materials").

of limited liability[4] and are "at odds with the basic principle of corporate law that each incorporated business entity enjoys a separate legal existence. . . ." *United States v. Dico, Inc.,* 4 F.Supp.3d 1047, 1064-65 *and* n.43 (S.D. Iowa 2014) ("declin[ing] to consider the assets of [its parent] when evaluating Dico's ability to pay" the penalty) (citing *United States v. Bestfoods,* 541 U.S. 51, 61 (1998)), *aff'd in part and reversed in part, on other grounds*, 808 F.3d 342 (8th Cir. 2015); *see also United Techs. Corp v. Am. Home Assurance Corp.,* 118 F. Supp. 2d 174, 180 (D. Conn. 2000) (finding it "improper to use [the parent company's] value as a measure of exemplary damages" where the parent company was "not a named defendant"); *Cont'l Trend Res., Inc. v. Oxy USA, Inc.*, 810 F. Supp. 1520, 1533 (W.D. Okla.1992) ("The financial worth of a parent corporation is generally irrelevant in assessing punitive damages on a subsidiary . . . ."). As reflected in those authorities, financial distributions to parent companies or third parties are a fact of corporate life that do not pertain to the penalty analysis. The SEC does not even address the import of those cases, and no argument exists that there was any proper purpose for pointing to information from a bygone period that plainly does not reflect Alpine's present ability to pay.

The SEC also insists that its arguments were permissible because Alpine's presentation of its financial condition was "incomplete." The SEC claims the information was provided "in the interest of fairness," and that its "only purpose" of presenting the information was to "rebut" Alpine's position. SEC Opp. at 1. According to the SEC, its "argument that Alpine provided incomplete information in its opposition papers was a natural and foreseeable consequence of Alpine's reliance on its financial condition to ask for a lower penalty." SEC Opp. at 4. It was *not,* however, natural and foreseeable that the SEC, rather than addressing the proper legal issue, would segue to prior years and to third parties to skew the relevant facts.

Nor was Alpine's presentation in any way "incomplete." Alpine provided all of the

---

[4] *White Rosebay Shipping, S.A. v. HNA Grp. Co.*, No. C-12-096, 2012 WL 6658239, at *7 (S.D. Tex. Dec. 5, 2012).

relevant FOCUS reports and the present net capital and deposit requirements under which Alpine operates.[5] The SEC's contentions only obfuscate; they complete nothing and rebut nothing. In its Remedies Reply, the SEC did not provide any additional or counter financial information showing that *Alpine* can pay a penalty over $800,000, yet alone its request for nearly $23 million. The SEC did not dispute that the penalty it seeks will result in the closure of Alpine, a company that has existed for over 35 years and plays a vital clearing role in the microcap market.

Particularly galling is the SEC's additional argument that it provided information concerning distributions occurring years ago because that historical information should be "considered when assessing the likelihood that Alpine's fortunes will improve one day" and the SEC will be able to collect. SEC Opp. at 7. As the SEC well knows, this is not like a judgment imposed on an individual or even an entity that can sit for years with little or no concrete impact while the SEC waits to see if the defendant will strike it rich. In the regulated environment of Alpine, a judgment will have *an immediate impact* on its deposit and net capital requirements. Any multi-million-dollar judgment will result in Alpine being unable to conduct transactions. Alpine's "fortunes" will not improve because it will no longer exist.

The SEC, citing inapposite case law that does not address the question at bar, also implies that FINRA-approved distributions are "artificially diminish[ing]" capital and that Alpine is making itself "judgment proof." *See* SEC's Opp. at 6-7. Both claims are inaccurate. There is nothing "artificial" about the fact that Alpine's business has declined while regulators have dramatically increased its net capital and deposit requirements. There is nothing "artificial" about the fact that the SEC has aggressively pressed for a penalty that would result in the closure of the firm many times over. And there has never been an issue of whether Alpine was

---

[5] Actually, as reflected in the document attached by the SEC, Alpine's deposit requirements were recently increased to $2.3 million. FINRA Complaint at ¶ 17.

5

"judgment proof." Alpine was always incapable of satisfying a judgment of the kind sought by the SEC. It was and remains obvious that the SEC never intended for its requested judgment to be satisfied; it was instead engaged in a determined effort to obtain a corporate death penalty.

### B. The SEC's Injection of Baseless Claims Regarding Discovery is Improper

Remarkably, in response to Alpine's Motion objecting to the SEC's propounding irrelevant material to try to prejudice Alpine, the SEC proceeds to do the same thing again! The SEC now – well past even the eleventh hour – decides to complain about what was actually its own failure to pursue discovery. The SEC, having engaged in what can only be described as entirely inadequate service of subpoenas, elected not to pursue the issue further with either counsel or the Court. After dropping the issue completely during the proceedings, the SEC now misrepresents those events to try to suggest that it was not able to get some unspecified information.

That current claim is, however, contradicted by the SEC's own statements to this Court. On this Motion, the SEC argues that "John Hurry was and is a managing agent of the firm [Alpine]" and "was properly served." SEC's Opp. at 4. The SEC then goes a giant leap further, claiming that "his failure to appear to discuss the firm's financial condition [] tends to show that Alpine is not presenting evidence of its financial condition transparently or in good faith." *Id*. In it prior submission, however, the SEC presented a more accurate description, advising the Court that "Mr. Hurry apparently refused to accept service through counsel" and that "the SEC made several **attempts** to personally serve Mr. Hurry, **to no avail**." SEC's Remedies Reply at 21 n.4 (emphasis added). Reflected in the correspondence between counsel, attached to the SEC's Remedies Reply, are Alpine's statements that Mr. Hurry was not a Director of Alpine and was not properly served. That correspondence also confirms that the SEC did not hold a deposition at which Mr. Hurry failed to appear; it fully understood that service was contested and stated that

it was planning on making a motion to this Court to argue that its service was valid. *See* Ex. 8 [Dkt. 214-8]. The SEC never did so. Now, having abandoned its fairly insubstantial effort to depose Mr. Hurry, it wants this Court to find that Alpine's supposed failure to produce Mr. Hurry at a deposition that was never properly set up and never occurred supports the SEC's contention that Alpine did "not present[] evidence of its financial condition transparently or in good faith." SEC Opp. at 4. The SEC's position runs counter to the facts and should be rejected.

### C. The Court Should Disregard the SEC's Use of a FINRA Complaint

Continuing its approach of improperly injecting any information that might serve its purpose, the SEC also attaches a Complaint recently filed by FINRA Enforcement ("Enforcement"), purportedly to reference *allegations* that Alpine's payment of its expenses can be unilaterally recharacterized by FINRA as a capital withdrawal. Unquestionably the Court should ignore what is a mere allegation in a proceeding in which the answer is not even due. Suffice to say, Alpine has substantial and detailed responses to each issue raised in that filing and it would be patently unfair for the Court to give any credence to the one-sided depiction of Alpine contained in that arguably hyperbolic and conveniently timed filing. Whether or not the actions of the SEC and FINRA are coordinated, it is inappropriate for the Court to make findings in favor of the SEC here based on FINRA's unproven allegations. This Court should disregard and strike any reference to the FINRA Enforcement action.

But, in reality, the damage may be done. The SEC has provided to this Court, on the eve of the Court's penalty determination, a document that is a complete distortion of Alpine's decision, in the wake of this proceeding and other regulatory actions directed at microcap transactions, to cease carrying retail accounts. The particular portion of Enforcement's complaint cited by the SEC involves allegations that amounts paid by Alpine to its landlord and its lender were "unauthorized capital withdrawals." As acknowledged even by Enforcement, the

7

payment to the landlord, SCAP 9, was based on "Common Area Maintenance" ("CAM") charges. Complaint at ¶ 96. The second payment at issue consisted of an increased fee that was negotiated in order for Alpine to maintain its much needed $5 million line of credit. And Alpine had paid both of those entities, the landlord and the lender, for years in connection with its lease and its line of credit without any claims by Enforcement that those were "unauthorized withdrawals." It appears to be Enforcement's position that, because those amounts increased in 2019, the payments suddenly should be characterized as "capital withdrawals" as opposed to continued payment of its lease and its financing expense.

Alpine disputes Enforcement's assertions and is presently defending that action. It will, over the course of that proceeding, demonstrate both the contractual underpinnings and the business reasons for the costs imposed on its counterparties. By way of example, Alpine's lease clearly requires payment of operating costs including CAM charges and CAM charges are a typical aspect of a commercial lease. With respect to the increase in its financing costs, it is decidedly disingenuous for the SEC to feign a lack of understanding of the increased risk now posed by Alpine to a lender: after all, it is the SEC that, in December 2018, emphatically argued for a massive penalty that will close the firm. After that development, the terms of the line of credit were renegotiated with various changes to the conditions under which Alpine could access that line. All of those issues will be aired in the Enforcement action, but Alpine has no present opportunity to litigate any of those developments and issues before this Court.

The remainder of the Enforcement action attached by the SEC distills down to claims that Alpine charged an "exorbitant" account fee and that it failed to follow proper procedures in its identification of "abandoned" and "worthless" securities. Those events are an outgrowth of Alpine's decision to no longer carry retail accounts which followed literally years of Alpine

8

being the subject of FINRA's, the SEC's and DTC's aggressive actions directed at firms that participate in transactions in microcap securities. Finally, after years of regulatory activity and assertions that Alpine failed properly to review its customers' microcap transactions, Alpine elected to return to its core business as a clearing firm.

To accomplish the closing of those accounts, Alpine began in August 2018 notifying customers of changes in its business and its fees. Alpine explained in the account statement that, after 35 years in the business, and given "the current landscape," Alpine would be ceasing to carry retail accounts. The notice explained that, in connection with the change in its business, Alpine had added a new account fee to cover the escalating costs associated with the business of microcap securities. In the notice on the account statement dated January 2019, Alpine advised customers that it understood that customers may not want to avoid incurring that fee and so Alpine was "working with every customer to close their account and avoid the fee by (1) liquidating positions currently held in the account; (2) returning all securities and funds to you as the accountholder; (3) writing off any worthless securities or (4) referring you to our affiliated firm Scottsdale Capital Advisors to conduct ongoing business."

With respect to innumerable accounts at Alpine, however, customers failed to respond or take any action. That is perhaps not surprising since many of them were "orphan" accounts, *i.e.*, customers of brokerage firms that have ceased operating. Other customers had likely lost interest in their accounts because, as often happens, their microcap securities no longer had value. Others, as FINRA insists is the case, may have simply not bothered to open their statements. In any event, Alpine was confronted with a quantity of accounts where its customers had no interest in the account or had decided to ignore the notices.

Finally, after nine months of various notices, Alpine in June evaluated the remaining accounts to determine if there were worthless or abandoned securities and journaled those stocks to designated accounts of Alpine. Notably, no securities were ever actually sold by the firm; all securities were held so that, if a customer contacted the firm, the securities could be forwarded as requested by the customer. Whether the procedures that it employed comported with industry practice will be the subject of the Enforcement action, and have no place in this case.

### D. The Court Should Strike the SEC's Claim That Alpine Had Not Previously Offered Undertakings

The SEC attempts again to use semantics to justify its argument to this Court that Alpine had not previously offered compliance undertakings. SEC Remedies Reply at 2. The SEC attempts to downplay the impact of this statement by adding more words to it, but the import of its argument was clear: the SEC plainly insinuated that Alpine had not previously agreed to a compliance undertaking. That claim is false and Alpine should be allowed to prove its falsity now that the SEC has opened the door.

The Court should also reject the SEC's argument that the monetary penalty offered by Alpine along with the compliance undertaking during those prior discussions was a "negligible penalty." In those discussions, as here, Alpine identified a penalty range that was appropriate for the conduct at issue, that Alpine could actually survive to pay, and which was directly in line with recent SEC settlements involving SAR penalties well below $1 million. The penalty range Alpine identified would result in a significant penalty, and *to this day, the SEC has cited no Tier 1 penalty that is anywhere close to what it seeks to impose against Alpine.* Alpine's continued offer to provide a compliance undertaking that is far more onerous than an obey-the-law injunction reflects that Alpine accepts responsibility and is committed to preventing any future violation of the SAR regulations even as it opposes the death penalty sought by the SEC.

**CONCLUSION**

For the foregoing reasons, and those set forth in Alpine's opening memorandum, the Court should grant Alpine's Motion to Strike, or, in the alternative, grant Alpine leave to file a sur-Reply Memorandum to the SEC's Reply Memorandum.

DATED this 12th day of August, 2019.

>  /s/ *Maranda E. Fritz*
>  Maranda E. Fritz
>  **THOMPSON HINE**
>  335 Madison Avenue, 12th Floor
>  New York, New York 10017-4611
>  Tel. 212.344.5680
>  Fax 212.344.6101
>  Email:  Maranda.Fritz@thompsonhine.com
>
>  Brent B. Baker (BB 8285)
>  Aaron D. Lebenta (*Pro Hac Vice*)
>  Jonathan D. Bletzacker (*Pro Hac Vice*)
>  **CLYDE SNOW & SESSIONS**
>  One Utah Center
>  201 South Main Street, Suite 1300
>  Salt Lake City, Utah 84111-2216
>  Telephone 801.322.2516
>  Facsimile 801.521.6280
>  Email: brb@clydesnow.com
>  adl@clydesnow.com
>  jdb@clydesnow.com
>
>  *Attorneys for Defendant Alpine Securities Corporation*