UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
UNITED STATES SECURITIES AND EXCHANGE  :
COMMISSION,                            :
                                       :
                    Plaintiff,         :          17cv4179(DLC)
                                       :
              -v-                      :          REDACTED
                                       :          OPINION AND ORDER
ALPINE SECURITIES CORPORATION,         :
                                       :
                    Defendant.         :
                                       :
-------------------------------------- X

For the plaintiff:
Zachary T. Carlyle
Terry R. Miller
U.S. Securities and Exchange Commission
1961 Stout Street, 17th Floor
Denver, CO 80294

For the defendant:
Maranda E. Fritz
Thompson Hine LLP
335 Madison Avenue, 12th Floor
New York, NY 10017

Brent R. Baker
Aaron D. Lebenta
Jonathan D. Bletzacker
Clyde Snow & Sessions
One Utah Center, 201 South Main Street, Suite 1300
Salt Lake City, Utah 84111

DENISE COTE, District Judge:

     Plaintiff United States Securities and Exchange Commission

("SEC") seeks an injunction and imposition of $22,736,000 in

civil penalties against defendant Alpine Securities Corporation

("Alpine") for Alpine's 2,720 violations of its obligation to

file suspicious activity reports ("SARs").  Alpine opposes imposition of any injunction and contends that the civil penalties should not exceed $720,000.  For the following reasons, an injunction will issue against Alpine and civil penalties are assessed in the amount of $12,000,000.

## Background

Much of the factual and regulatory background relevant to this motion is described in the two summary judgment Opinions issued in March and December 2018.  See SEC v. Alpine Sec. Corp., 308 F. Supp. 3d 775 (S.D.N.Y. 2018) ("March Opinion"); SEC v. Alpine Sec. Corp., 354 F. Supp. 3d 396 (S.D.N.Y. 2018) ("December Opinion").[1]  Familiarity with those Opinions is assumed and they are incorporated by reference.

The Low-Priced Securities Market

Alpine principally provides brokerage clearing services for penny stocks and microcap securities traded in the over-the-counter market.[2]  The markets for these low-priced securities

---

[1] The March Opinion granted summary judgment on certain exemplar SARs.  Applying the legal standards articulated in the March Opinion, the December Opinion addressed all of the individual SARs on which the SEC sought summary judgment and granted that motion in part.

[2] The term "over-the-counter market" is used to describe "the trading of securities other than on a formal centralized

("LPS") are rife with fraud and abuse.  The Penny Stock Reform

Act of 1990, for example, identified as problems with the penny

stock markets "a serious lack of adequate information concerning

price and volume of penny stock transactions," involvement by

individuals banned from the securities markets in roles such as

"promoters" or "consultants," and the use of shell corporations

to facilitate market manipulation schemes.  Pub. L. No. 101-29,

§ 502(6)-(8), 104 Stat. 931, 951; see also December Opinion, 354

F. Supp. 3d at 406.

    Financial regulators like FINRA,[3] FinCEN,[4] and the SEC have

warned investors of the risks of fraud connected to investments

in LPS.  FINRA has warned investors, in particular, about the

risk that the issuer of a penny stock may be a shell company for

those seeking to launder money or conduct illicit activity.[5]  The

---

exchange" such as the New York Stock Exchange.  4 Hazen,
Treatise on the Law of Securities Regulation § 14:3 (2017).

[3] FINRA, or the Financial Industry Regulatory Authority, is a
self-regulatory organization ("SRO") that supervises broker-
dealers.  See Fiero v. Financial Industry Regulatory Auth.,
Inc., 660 F.3d 571 & n.1 (2d Cir. 2011).

[4] FinCEN, or the Financial Crimes Enforcement Network, is a
division of the U.S. Department of the Treasury ("Treasury
Department") responsible for administering the Bank Secrecy Act
("BSA"), among other things.  See March Opinion, 308 F. Supp. 3d
at 791.

[5] See FINRA, Beware Dormant Shell Companies (Mar. 14, 2016),
http://www.finra.org/investors/beware-dormant-shell-companies;
see also FinCEN, The Role of Domestic Shell Companies in
Financial Crime and Money Laundering: Limited Liability

SEC has observed that "information about microcap companies can be extremely difficult to find, making them more vulnerable to investment fraud schemes and making it less likely that quoted prices in the market will be based on full and complete information about the company."[6]

Regulatory Framework

The Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311, et seq., first enacted in 1982, requires broker-dealers like Alpine to file SARs.  Under the BSA, the Secretary of the Treasury may "require any financial institution . . . to report any suspicious transaction relevant to a possible violation of law or regulation."  31 U.S.C. § 5318(g)(1).  The Secretary has delegated this authority to FinCEN,[7] and, in 2002, the Treasury Department and FinCEN promulgated 31 C.F.R. § 1023.320 ("Section 1023.320").[8]

---

Companies (Nov. 2006), https://www.fincen.gov/sites/default/files/shared/LLCAssessment_FINAL.pdf.

[6] SEC, Microcap Stock: A Guide for Investors (Sept. 18, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html.

[7] See Treasury Order 180-01, 67 Fed. Reg. 64,697, 64,697 (Oct. 21, 2002).

[8] See FinCEN, Amendment to the Bank Secrecy Act Regulations -- Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048 (July 1, 2002) ("FinCEN Section 1023.320 Notice").  The USA PATRIOT ACT of 2001, Pub. L. No. 107-56, 115 Stat. 272 (the "Patriot Act"), significantly expanded the scope of the BSA.

As described in greater detail in the December Opinion, Section 1023.320 provides that "[e]very broker or dealer in securities within the United States . . . shall file with FinCEN, to the extent and in the manner required by this section, a report of any suspicious transaction relevant to a possible violation of a law or regulation."  31 C.F.R. § 1023.320(a)(1) (emphasis added).  Under Section 1023.320, a transaction requires reporting if it is "conducted or attempted by, at, or through a broker-dealer," "involves or aggregates funds or other assets of at least $5,000," and the broker-dealer "knows, suspects, or has reason to suspect" that the transaction (or pattern of transactions) "[i]nvolves use of the broker-dealer to facilitate criminal activity."  Id. § 1023.320(a)(2)(iv).

In addition, Section 1023.320 requires a broker-dealer to retain a copy of any SAR filed and supporting documentation "for a period of five years from the date of filing the SAR."  Id. § 1023.320(d).  It further requires a broker-dealer to "make all supporting documentation available to FinCEN or any Federal, State, or local law enforcement agency, or any Federal regulatory authority that examines a broker-dealer for compliance with the Bank Secrecy Act, upon request."  Id.

SARs are currently submitted to FinCEN via an electronic

SAR Form.[9]  The SAR Form states that the narrative section of the SAR "is **critical**."  2002 SAR Form at 3 (emphasis in original).  It further provides,

> The care with which [the narrative section] is completed may determine whether or not the described activity and its possible criminal nature are clearly understood by investigators.  Provide a clear, complete and chronological description . . . of the activity, including what is unusual, irregular or suspicious about the transaction(s), using the checklist below as a guide.

Id. (emphasis in original).

FinCEN has issued several guidance documents explaining the scope of the SAR reporting duty in the narrative section of the SAR Form.  A summary of that guidance, including examples of relevant information identified by FinCEN, is provided in the December Opinion.  See 354 F. Supp. 3d at 415. 1

As the Treasury Department has explained, the SEC enforces SAR regulations pursuant to Section 17(a) of the Securities

---

[9] As explained in the December Opinion, two versions of the SAR Form were in effect during the period at issue in this litigation:  one version from 2002 to 2012 (the "2002 SAR Form") and another version after 2012 (the "2012 SAR Form").  See December Opinion, 354 F. Supp. 3d at 413 n.18.  In connection with the 2012 SAR Form, FinCEN published an instructional document. See FinCEN, FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Instructions (2012), https://www.fincen. gov/sites/default/files/shared/FinCEN% 20SAR% 20ElectronicFiling Instructions-% 20Stand% 20Alone% 20doc.pdf ("2012 SAR Instructions").  The 2012 SAR Instructions are similar to those in the 2002 SAR Form in all respects that are material to this litigation.

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a, et seq.,
and SEC Rule 17a-8.  Rule 17a-8 requires a broker-dealer to
"comply with the reporting, recordkeeping and record retention
requirements of chapter X of title 31 of the Code of Federal
Regulations."  17 C.F.R. § 240.17a-8.  The reporting,
recordkeeping, and retention requirements incorporated by Rule
17a-8 include those described in Section 1023.320.  See December
Opinion, 354 F. Supp. 3d at 411-12.

Alpine's Failure to Comply with SAR Regulations

Alpine is a clearing broker that primarily provides
clearance and settlement services for microcap securities traded
in the over-the-counter market.  It was purchased by its current
owner in early 2011.  That owner also owns Alpine's affiliate
Scottsdale Capital Advisors ("SCA"), the introducing broker for
most of the transactions at Alpine that are at issue here.  SCA
settled a FINRA enforcement action in November 2011 that the SEC
had brought for, among other things, SCA's own failure to file
SARs and its omission of material information from the SARs it
did file.[10]

From March 2, 2011 through January 22, 2012, FINRA

_____

[10] See Order Accepting Offer of Settlement, In the Matter of
FINRA Department of Enforcement v. Scottsdale Capital Advisors
Corp. and Justine Hurry, Disciplinary No. 2008011593301 at 11-
12, 21-22 (Nov. 14, 2011), https://www.finra.org/sites/default/
files/fda_documents/2008011593301_FDA_TX93804.pdf.

conducted a financial, operational, and sales practices examination of Alpine.  On July 23, 2012, FINRA shared its highly critical findings with Alpine during an exit meeting.  On September 28, 2012, FINRA issued its seven-page report of that examination ("FINRA Report"), documenting Alpine's widespread failures to comply with its obligations under the regulations that govern its industry.

The FINRA Report identified ten exceptions to Alpine's practices.  It disclosed that Alpine failed to timely file any SARs for over six months in 2011 (from March 1 through May 10, and from August 16 through December 19).  FINRA concluded that the SARs Alpine later filed for transactions occurring during this period were all filed late.  The FINRA Report concluded more generally that Alpine had "failed to establish and enforce procedures reasonably designed to detect and report suspicious activity."

In addition, the FINRA Report determined that the narrative sections of the 823 SARs that Alpine filed during the examination period were "substantively inadequate" and in violation of Section 1023.320.  The FINRA report emphasized that the narratives for Alpine's SARs "failed to fully describe why the activity was suspicious" and therefore "fail[ed] to justify at the basic core the legitimacy of the SAR filing."  It criticized Alpine for submitting SARs in the form of two basic,

8

boilerplate templates, "neither of which were substantively adequate as they failed to fully describe why the activity was suspicious."

As the December Opinion confirmed, Alpine's SAR narratives were woefully inadequate.  Over half of the SARs on which the December Opinion granted summary judgment were deficient in several significant respects, failing to include multiple pieces of information that the SAR Form and its instructions require to be included.  See December Opinion, 354 F. Supp. 3d at 420.

During and after the FINRA examination, Alpine's ownership hired additional legal and compliance personnel and took some measures to improve its anti-money laundering ("AML") program. Beginning in the fall of 2012, for example, Alpine arranged for an annual audit of its AML program and created standard operating procedures for compliance with AML regulations.

Roughly two-thirds of the SARs that the SEC contends Alpine filed with deficient narrative sections were filed before September 28, 2012, the date on which Alpine received the FINRA Report.  Alpine's faulty practices, however, continued well beyond that date.  Roughly one-third of the SARs at issue in this action were filed after October 1, 2012, including in 2013, 2014, and 2015.  The December Opinion granted summary judgment on hundreds of separate violations of Section 1023.320 that occurred in both 2013 and 2014, many of which were the failure

to file a SAR when Alpine had the obligation to do so.  The SEC identified comparatively few violations that occurred during the year 2015.

There is a snapshot of Alpine's practices as they existed about two years after the FINRA exit interview in July 2012.  In July 2014, the SEC Office of Compliance Inspections and Examinations ("OCIE") conducted a one-week on-site review of Alpine's compliance practices.  The OCIE Report reviewed 252 of the over 4,600 SARs filed by Alpine between January 2013 and July 2014.  On April 9, 2015, OCIE issued a report ("OCIE Report") strongly critical of Alpine.

The OCIE Report found that 50% of the 252 SARs "failed to completely and accurately disclose key information of which [Alpine] was aware at the time of filing."  It concluded that Alpine's SAR "narratives generally contained 'boilerplate' language and very little -- if any -- specific and material information that Alpine identified in its investigations of the matters."  It criticized Alpine for omitting mention of many red flags for suspicious activity, such as a customer's civil, regulatory, or criminal history; foreign involvement with the transactions; concerns about an issuer; stock promotion activity; or that an issuer had been a shell company.  According to the OCIE Report, Alpine's failure to disclose key information "rendered the SARs less valuable to investigators trying to

understand the activity and any criminal or administrative implications thereof."

The OCIE report described Alpine's conduct as "**recidivist** activity" (emphasis in original) since it persisted notwithstanding the 2012 FINRA examination.  The OCIE Report concluded that Alpine's compliance practices violated Rule 17a-8 and "obscured the true nature of the suspicious activity."  It further concluded that many of Alpine's SARs appeared to indicate that Alpine was "intentionally trying to obfuscate or distort the truly suspicious nature of the activity that [Alpine] is required to report to law enforcement."  These conclusions are entirely consistent with the Court's own assessment based on its review of materials submitted by the parties in connection with the summary judgment motions.

The SEC's Action Against Alpine

The SEC filed this action against Alpine on June 5, 2017. Its complaint alleged violations of Rule 17a-8 during a period of May 17, 2011 through December 31, 2015.  As invited by the Court, the SEC moved for partial summary judgment based on exemplar SARs in each of four categories that it alleged revealed violations of Rule 17a-8.[11]  See March Opinion, 308 F.

---

[11] Alpine declined to submit exemplars to assist in the development of the legal framework that would govern this action.  December Opinion, 354 F. Supp. 3d at 405.

Supp. 3d at 781.

Relying on the guidance given in the March Opinion regarding the legal standards that would be applied in this action, the SEC thereafter moved for summary judgment as to Alpine's liability for several thousand individual violations of Rule 17a-8.  The SEC's motion focused on four categories of deficiencies in Alpine's compliance with SAR reporting requirements: (i) filing SARs with deficient narratives ("Deficient Narrative SARs"), (ii) failing to file SARs reflecting sales that followed large deposits of LPS ("Failure to Report Violations"), (iii) filing SARs long after the transactions were completed ("Late-Filed SARs"),[12] and (iv) failing to maintain and produce support files for SARs ("Support Files Violations").  The December Opinion granted in part the SEC's motion for summary judgment, finding thousands of violations of Rule 17a-8 based on Alpine's Deficient Narrative SARs, Failure to Report Violations, and Support Files Violations.  354 F. Supp. 3d at 422-45.

The findings in the December Opinion are highly relevant to

---

[12] The December Opinion denied summary judgment as to this category because the SEC did not show that Alpine had an obligation to file these SARs.  To show that Alpine had an obligation to file the SARs, the SEC had relied exclusively on the fact that FINRA had ordered Alpine to file the SARs.  See December Opinion, 354 F. Supp. 3d at 443.

this decision on penalties.  While those findings are incorporated by reference and will not be repeated here, the granularity of the findings and the extent to which they reveal how widespread the deficiencies were in Alpine's SAR-filing system bear emphasis.

The December Opinion is significant as well for the determination of penalties because it is a decision rendered on a summary judgment motion.  It reflects an extremely conservative finding regarding the extent of Alpine's disregard of its legal obligations.  In identifying those circumstances in which there could be no factual dispute regarding Alpine's failure to abide by those legal obligations, the December Opinion relied on a narrow set of measurements.  A few examples suffice.  Although the SEC had argued that SARs were deficient for failing to include information that there was a history of stock promotion activity in connection with deposited LPS up to eighteen months before the SAR was filed, the December Opinion granted summary judgment only for those SARs that failed to report stock promotion activity that occurred within six months of a substantial deposit of LPS.  Id. at 433.  Similarly, the SEC sought summary judgment for SARs that failed to disclose the comparatively low trading volume in deposited LPS where the deposit represented at least three times the average daily trading volume of the stock when measured over the three months

13

preceding the deposit.  The December Opinion granted summary
judgment only where the ratio between the shares deposited in a
single transaction was at least twenty times the average daily
trading volume over the three-month period prior to the deposit.
Id. at 437.  As a final example, while Alpine may have had a
duty to file as many as 3,568 SARs to report the liquidations
that followed the deposit of a large number of shares of LPS,
the December Opinion adopted a conservative measure and found
only 1,218 violations.[13]  Id. at 441.  Using such conservative
measures, summary judgment was entered for over 2,200 SAR-
related violations.[14]

---

[13] The SEC asserted that Alpine had a duty to file a SAR
reflecting certain patterns of sales that followed a large
deposit of LPS.  The SEC identified 1,242 deposit-and-
liquidation groups, which together include 3,568 individual
sales of shares worth $5,000 or more.  Although the liquidation
of a deposit of a large number of shares of LPS is a hallmark of
market manipulation, Alpine had filed no SARs for those sales.
December Opinion, 354 F. Supp. 3d at 441.

[14] In opposition to the SEC's request for remedies, Alpine
defends its actions by arguing that the law's requirements were
less than clear.  As explained in the March Opinion, however,
the standards governing Alpine's SAR obligations are clearly
established by Section 1023.320, the SAR Forms, and FinCEN
guidance documents.  See March Opinion, 308 F. Supp. 3d at 789-
95.  Moreover, Alpine was warned of violations of its SAR
obligations as early as July 23, 2012, when FINRA conducted an
exit meeting concerning the deficiencies in Alpine's AML program
and the SARs it had filed.  To the extent Alpine relies in part
on the December Opinion's refusal to grant summary judgment for
all of the SARs at issue, Alpine's argument mistakes the summary
judgment standard, which seeks only to identify material,
disputed issues of fact, with a verdict at trial, which
determines whether a violation occurred by resolving those

The December Opinion also revealed in other ways the risks to market integrity represented by Alpine's decision to ignore its regulatory obligations.  For instance, in establishing that Alpine had a legal duty to file the SARs that the SEC asserted had been filed with a deficient narrative section, the SEC identified six red flags which triggered a broker-dealer's duty to file a SAR.  These red flags were derived from the SAR Form and its instructions as well as FinCEN and other guidance interpreting Section 1023.320.  The red flags "take into account the unique characteristics of the LPS markets such as the difficulty in obtaining objective information about issuers, the risk of abuse by undisclosed insiders, and the opportunity for market manipulation schemes."  Id. at 425-26.

The six red flags are:  (1) the existence of any related litigation; (2) the issuer's status as a shell company or a history of derogatory information regarding the issuer; (3) a history of stock promotion in connection with the LPS being deposited; (4) the existence of an unverified issuer, e.g., an issuer with an expired business license or nonfunctioning website; (5) a comparatively low average daily trading volume

---

factual disputes.  Alpine has not identified any uncertainty in the law that excused its violations, as found in the December Opinion.  Had there been a finding of additional violations at trial, it is highly doubtful that Alpine would have been able to do so at that time either.

compared to the amount of stock being deposited in a single transaction; and (6) involvement in the transaction by a foreign entity or individual.  Id. at 425-39.  Alpine admitted, with one exception, that the red flags identified by the SEC required Alpine to investigate the transaction to determine whether a SAR had to be filed.  Id. at 426.  These red flags existed in thousands of transactions at issue in the motion.  Frequently there were multiple red flags for a single transaction.

The March and December Opinions also illuminate the extent to which Alpine has continued right up until today to deny that it had a deficient SAR-filing regime.  For example, it took the extreme position in this litigation that its filing of a SAR could not be taken as an admission that it had any duty to file a SAR in connection with the transaction.  It argued that the SEC had to independently show that Alpine had such a duty to file a SAR for each transaction because Alpine's filings were simply "voluntary" filings as opposed to filings made pursuant to the law's mandates to alert regulators to suspicious trading activity.  March Opinion, 308 F. Supp. 3d at 799 & n.20.

One more example is useful to illustrate Alpine's continued resistance to its legal obligations.  In opposition to summary judgment Alpine argued that, even if it was required to file a SAR, it did not have to disclose the existence of a red flag in the SAR's narrative section.  This argument was rejected for

several reasons.  December Opinion, 354 F. Supp. 3d at 426.
Among those reasons was the substance of the SARs themselves.
Nearly all of Alpine's SARs used "template narratives that
failed to include any details, positive or negative, about the
transactions."  Id.  The December Opinion found that, while a
fulsome SAR narrative could have presented a question of fact as
to whether it also should have included a discussion of the red
flags in the SAR narratives, "except in rare instances Alpine
has not shown that its SAR narratives contained sufficient
information to create [such] a question of fact."  Id.

       After the December Opinion was issued, a conference on
April 12 and an Order of April 30, 2019 resolved all remaining
disputes on that Opinion's findings.  As the parties now agree,
the December Opinion granted summary judgment as to 2,720
violations comprising 1,010 Deficient Narrative SARs, 1,214
Failure to Report Violations, and 496 Support Files Violations.

       The SEC has decided to forgo trial on the remainder of the
alleged violations of Rule 17a-8.  Its motion for remedies was
filed on May 3 and became fully submitted on July 11.


## **Discussion**

       "Once the district court has found federal securities law
violations, it has broad equitable power to fashion appropriate
remedies."  SEC v. Frohling, 851 F.3d 132, 138 (2d Cir. 2016)

(citation omitted).  These remedies may include both civil penalties and injunctive relief.  Id.

I.  Civil Penalties

Section 21(d)(3) of the Exchange Act authorizes an award of civil penalties "for both deterrent and punitive purposes."  Id. at 139; see also 15 U.S.C. § 78u(d)(3)(A).  Pursuant to Section 21(d)(3), three tiers of civil penalties may be imposed.  Id.

> [A] first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

SEC v. Razmilovic, 738 F.3d 14, 38 (2d Cir. 2013) (citation omitted).  "[F]or each violation" within each tier, "the amount of the penalty shall not exceed the greater of a specified monetary amount or the defendant's gross pecuniary gain."  Id. (citation omitted).

As modified by the Debt Collection Improvement Act of 1996 and corresponding SEC regulations, the maximum amounts specified for non-natural persons are as follows.  For each violation occurring between March 4, 2009 and March 5, 2013, the maximum amount specified is $75,000 at tier one, $375,000 at tier two, and $725,000 at tier three.  15 U.S.C. § 78u(d)(3)(B); Exchange

Act Release No. 34-59449, Feb. 25, 2009 (effective Mar. 3, 2009); 17 C.F.R. § 201.1001; Table I to 17 C.F.R. § 201.1001.[15] For each violation occurring between March 6, 2013 and November 2, 2015, these amounts increase to $80,000, $400,000, and $775,000, respectively.  17 C.F.R. § 201.1001; Table I to 17 C.F.R. § 201.1001.

Beyond these restrictions, the amount of the penalty is within "the discretion of the district court," Razmilovic, 738 F.3d at 38 (citation omitted), and should be determined "in light of the facts and circumstances" surrounding the violations.  15 U.S.C. § 78u(d)(3).  In determining the proper amount for a civil penalty, courts in this district have looked to a number of factors, including

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

SEC v. Haligiannis, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007); see also SEC v. Cope, No. 14cv7575(DLC), 2018 WL 3628899, at *6 (S.D.N.Y. July 30, 2018) (same); SEC v. Tavella, 77 F. Supp. 3d 353, 362-63 (S.D.N.Y. 2015) (same).  The Haligiannis factors

---

[15] Table I to 17 C.F.R. § 201.1001 was previously found at 17 C.F.R. § 201.1004 and Table IV to Subpart E of Part 201.

"are not to be taken as talismanic." SEC v. Rajaratnam, 918 F.3d 36, 45 (2d Cir. 2019).  It is appropriate to consider as well factors such as a defendant's financial condition, id., a defendant's failure to admit wrongdoing, SEC v. Alt. Green Techs., Inc., No. 11cv9056(SAS), 2014 WL 7146032, at *4 (S.D.N.Y. Dec. 15, 2014), and a defendant's lack of cooperation with authorities.  SEC v. Cavanagh, No. 98cv1818(DLC), 2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004); see also SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003).  The "brazenness, scope, and duration" of illegal conduct may warrant "a significant penalty."  Rajaratnam, 918 F.3d at 45.

The SEC seeks civil penalties in the amount of $10,000 for each Deficient Narrative SAR and Failure to Report Violation. It seeks a penalty of $1,000 for each Support File Violation. Combined, it requests a total civil penalty of $22,736,000.

Examining the first Haligiannis factor, it is easy to find that Alpine's misconduct was egregious.  It has not just been found liable, it has been found liable for illegal conduct on a massive scale.  The breadth and regularity of Alpine's violations of Rule 17a-8 warrant a substantial civil penalty.

As described in the December Opinion, the SEC met its burden to prove on summary judgment 2,720 separate violations of Rule 17a-8 premised on thousands of deficient narratives in the SARs it filed, its failure to report the massive sell-offs of

large deposits of LPS, and Alpine's failure to produce hundreds
of support files as required by Section 1023.320.[16]  Although
each of the 1,010 Deficient Narrative SARs has been counted as
only a single violation of Rule 17a-8 for the purposes of
summary judgment, over half of the SARs to which the December
Opinion granted summary judgment contained multiple deficiencies
-- any one of which would have been sufficient to justify a
civil penalty.  December Opinion, 354 F. Supp. 3d at 420.
Alpine's SARs omitted references to multiple red flags
indicative of suspicious activity and failed to disclose
transaction sequences that reflected "a hallmark of market
manipulation."  Id. at 441.  In a large number of instances,
Alpine failed to include information in the SAR narratives that
the SAR Form itself specifically directs a broker-dealer to
include.

     The next factor to be considered in assessing a penalty is
the degree of Alpine's scienter.  Although a finding of scienter
is not required to impose the tier-one penalty sought by the

_____

[16] Section 1023.320 requires both the maintenance of records for
five years after a SAR is filed and the production of records at
the request of a federal regulatory agency such as the SEC.  See
March Opinion, 308 F. Supp. 3d at 811-12.  In connection with
its motion for summary judgment, the SEC submitted evidence that
Alpine failed to produce support files for 496 SARs when
requested by the SEC in 2016.  See December Opinion, 354 F.
Supp. 3d at 444.

SEC, the evidence supports a finding that Alpine acted knowingly and with disregard for its obligations under the law.[17]  As a threshold matter, the scale and duration of Alpine's violations of Rule 17a-8 undermine Alpine's assertion that its conduct was, at worst, merely negligent.  Alpine's violations were systemic and enduring, occurring over a course of years and involving conduct that was plainly in violation of federal law reporting requirements.  Moreover, Alpine was aware of the nature and extent of its SAR violations at least as early as July 23, 2012, when FINRA conducted an exit meeting with Alpine to discuss findings later summarized in the FINRA Report.[18]  Although Alpine took some steps to improve its AML compliance practices, it continued to resist regulators' demands to fully comply with its SAR obligations.  Based on Alpine's persistent failure to file substantively adequate SARs, the 2014 OCIE Report concluded that

---

[17] Alpine disputes that it acted willfully or recklessly.  Alpine recites its history of improving compliance and asserts that it acted with diligence and in good faith.  It asserts that before any finding can be made that it was willful or reckless, Alpine must conduct discovery and a hearing must be held.  Alpine has access to its own employees; it has not explained what additional discovery would achieve.  Nor is a hearing on its scienter necessary.  The Court has considered Alpine's arguments and evidence submitted in opposition to this motion.  See SEC v. Koenig, 469 F.2d 198, 202 (2d Cir. 1972).

[18] Almost two years earlier, Alpine's affiliate SCA, which was the introducing broker for many of the transactions at issue here, was charged with similar violations of SAR regulations.

Alpine was "intentionally trying to obfuscate or distort the truly suspicious nature of the activity that [Alpine] is required to report to law enforcement."

Alpine's failure to acknowledge its wrongdoing throughout this litigation provides further evidence that it acted with scienter.  That failure also independently counsels in favor of a substantial civil penalty.  As described in the March and December Opinions, a principal defense asserted by Alpine -- aside from its jurisdictional arguments -- has been that Alpine had no duty to file the thousands of SARs that have been the focus of this litigation.  See March Opinion, 308 F. Supp. 3d at 782, 799-800; December Opinion, 354 F. Supp. 3d at 422-425.  It has asserted this defense even with respect to SARs that it did file, claiming that they were simply "voluntary" filings and not mandatory filings.  Alpine has maintained this position notwithstanding warnings from FINRA and OCIE and despite Opinions of this Court ruling otherwise.  Moreover, Alpine has failed to produce credible evidence of a good faith belief that it had no obligation to file the SARs it did file.  As explained in the December Opinion,

> Alpine has not identified any means by which a
> regulator or a fact-finder could identify such a
> "voluntary" SAR.  It has not pointed to any disclosure
> in the 1,593 SARs that they were "voluntary" filings.
> Nor has it pointed to any portion of the SAR's support
> file reflecting an analysis of the reporting
> obligation and a conclusion that the SAR was not

> required to be filed.  Alpine's vague and conclusory
> assertion is insufficient to raise a triable question
> of fact as to whether any SAR was filed voluntarily as
> opposed to pursuant to Alpine's obligation under the
> law to make the filing.

December Opinion, 354 F. Supp. 3d at 423 n.44.

As for the next factor, Alpine's contempt for the SAR reporting regime increased the risk to investors that they would suffer substantial losses.  Alpine's violations prevented regulators from obtaining information necessary to timely investigate and squelch fraudulent and abusive trading practices.  The missing information included derogatory information about a stock's issuer or the Alpine customer, the use of shell companies, or the price, volume, and timing of suspicious transactions.  As the OCIE Report concluded, Alpine's failure to adequately and accurately describe the nature of suspicious activity in its SARs "rendered the SARs less valuable to investigators" and impeded their ability to understand the suspicious activity and its criminal or administrative implications.  Given the sheer scale of Alpine's violations and the risk of fraud inherent in the LPS markets, Alpine's violations of Rule 17a-8 risked substantial losses to investors in those markets.

As for the fourth factor, and as already discussed, Alpine's misconduct was not isolated; it was recurrent. Alpine's violations of Rule 17a-8 occurred over the course of

years.  The SEC's complaint and this litigation have focused on
Alpine's practices in filing and neglecting to file SARs, and in
refusing to produce SAR-related files, during the period 2011 to
2015.  Alpine disregarded its legal obligations regarding SARs
throughout this period.  The deficiencies persisted
notwithstanding an intensive examination by FINRA in 2011 and a
highly critical FINRA Report issued in 2012.  Although the
extraordinary scale of Alpine's violations decreased over the
years, the violations did not cease.

As reflected in the 2014 OCIE Report, Alpine never adopted
a satisfactory SAR compliance program during the period examined
in this litigation.  As the OCIE Report emphasized, Alpine's
SARs remained woefully deficient even years after the FINRA
Report issued.  It reported that over 50% of the SARs OCIE
reviewed omitted reference to suspicious activity of which
Alpine knew at the time the SAR was filed.  It further stated
that "the amount and type of actual material information in SARs
filed by Alpine is very similar to the sample SAR that FinCEN
has identified in its public guidance as being insufficient or
incomplete."  The examination of individual SARs undertaken
during the summary judgment process confirmed that finding.

The final Haligiannis factor is whether a penalty should be
reduced due to Alpine's demonstrated current and future
financial condition.  In fiscal year 2018, Alpine's annual

revenue was roughly ███████████.  It currently has excess net capital of ███████████; it generally maintains an average of approximately ███████████ in excess net capital.  Alpine's business is highly profitable.  From 2014 to May 2019, its owner withdrew over ███████████ of Alpine's equity.  Over ███████████ of this amount was withdrawn from capital in 2014 alone.[19]

An additional factor that is relevant here is Alpine's failure to admit wrongdoing and its lack of cooperation with authorities.  Much of the evidence relevant to this factor has been discussed as indicative of Alpine's scienter.  Nonetheless, it bears emphasis that at no step of this eight-year saga has Alpine forthrightly confronted the glaring deficiencies in its SAR reporting regime.  When new ownership took over Alpine in early 2011 it did so without putting in place a competent compliance system.  While Alpine did upgrade its AML capability following the FINRA examination, it did not use the FINRA

---

[19] On July 22, 2019, Alpine filed a motion to strike portions of the SEC's brief to the extent it suggested that "the financial condition of Alpine's 'ownership' must be taken into account in determining an appropriate penalty."  Alpine's July 22 motion to strike, and its alternative request for leave to file a sur-reply, is denied.  The financial condition of Alpine's ownership is not relevant to this motion and no discovery is needed regarding its ownership's "ability to pay."  The figures describing withdrawals by Alpine's ownership are relevant evidence of the financial condition of Alpine.  There is no dispute as to the figures, which are contained in Alpine's reports.

examination and the substantial guidance in the FINRA Report as an opportunity to admit its deficiencies and to thoroughly reform its practices to bring them into compliance with the law. Thus, the 2014 OCIE examination revealed that Alpine was still using boilerplate language in its SAR narratives, omitting critical information from its SARs, and acting to "obscure[] the true nature" of the suspicious activity it was assisting as a broker-dealer.  Moreover, in response to the OCIE Report, Alpine repeated many of the same specious defenses that it had previously asserted during the course of the FINRA examination. In a letter of May 20, 2015, Alpine disputed each of OCIE's findings point by point, arguing that its SARs should be considered in the nature of an "alternative, voluntary filing process" and that "the process for determining whether activity is suspicious is a subjective one."

Alpine's lack of remorse and denial of wrongdoing has persisted to this day.[20]  Confronted with this lawsuit, Alpine did not admit that any of its SAR filings were deficient or that

---

[20] In opposition to this motion for remedies, Alpine argues that it acted in good faith in not filing SARs when its customers liquidated substantial deposits of LPS because Alpine "assumed" every deposit would be sold and therefore it was sufficient to merely report the deposit.  This attitude and argument reflect, at best, a poor understanding of the SAR reporting regime and the risks to the market when suspicious liquidations are not timely reported to regulators.

it had a duty to file more SARs than it had filed.  It even argued that it had no duty to file the SARs that it did file. Without any evidentiary support, and in the face of overwhelming evidence to the contrary, it asserted that its SARs were "voluntary" filings and denied that they had been filed because of any legal duty to do so.[21]

As noted above, the SEC seeks a civil penalty of $22,736,000.  Alpine opposes the imposition of a civil penalty of this magnitude on several grounds.  It suggests instead that a penalty in the range of $80,000 to $720,000, combined with certain undertakings to improve its compliance practices, would be sufficient to satisfy the punitive and deterrent purposes of the civil remedies provisions of the Exchange Act.  It would not.

First, Alpine asserts that the penalty the SEC seeks is a corporate death penalty.  While the SEC's requested penalty is large, so is the misconduct that prompts it.  Alpine's financial records indicate that the application of ███████████████ of its profits would suffice to pay the penalty the SEC requests. Since the SEC has established that Alpine's systematic and

---

[21] Alpine has also disputed throughout this litigation that the SEC has enforcement authority over the SAR violations asserted here.  Whatever one might think of the legal merits of that argument, Alpine does not contest generally that, as a broker-dealer, it had a duty to comply with the SAR regulations.

widespread evasion of the law lasted more than ███████, this benchmark does not suggest that the SEC's request is out of sync with the magnitude of the violations shown.

Next, Alpine asserts that the penalty should not be set by the number of individual violations on which the SEC was granted summary judgment, but by some other less onerous method.  It argues that the SEC is seeking to impose a staggering penalty by separately counting each time the same type of deficiency, which it describes as relatively few in number, affected a different SAR.  For instance, by its calculation millions of dollars would be assessed for failing to report in its SARs the same customer's involvement in an ongoing regulatory action.  It contends as well that the penalty requested by the SEC is higher in the aggregate than penalties imposed in other cases where there were recurrent, multi-year violations of the SAR reporting requirements.  While Alpine admits that almost all of the cases to which it points were settled matters, it argues that it should not be subject to what it terms a "litigation penalty."[22] Thus, it suggests that, in this tier-one penalty case where the

---

[22] The SEC has pointed to instances in which far larger penalties were imposed as well.  See, e.g., In re Wells Fargo Advisors, LLC, SEC Release No. 82054, 2017 WL 5248280 (Nov. 13, 2017) (imposing penalty of $3,500,000 for 50 unreported or untimely SAR filings).  Alpine argues that each of those cases is distinguishable.

SEC has not shown a "high degree of scienter" or fraud or significant victim losses, the proper measure of penalties should be set per course of conduct, and not per SAR.[23] According to Alpine, there were three, or at most nine, courses of conduct at issue here.[24]

If coupled with prompt internal reform and a timely admission of the deficiencies in its SAR filings, Alpine's plea for alternative measures of the penalty or for a penalty set at an even more minimal level than that selected by the SEC would have more appeal.  Alpine can point to neither.  For at least three years after the period examined by FINRA, Alpine continued to obfuscate suspicious activity and to avoid its duties under the law.  The summary judgment record confirms that Alpine's obstruction of government oversight of the LPS market was an

---

[23] Alpine also suggests that the penalty could be pegged to disgorgement by measuring Alpine's ill-gotten gains.  If this measurement had been pursued by the SEC, it is by no means clear that that measure would have reduced the requested penalty. Alpine's business model appears to have been exceedingly profitable and to have relied in large part on the business of a few customers specializing in LPS whose transactions Alpine did not properly report in SARs.

[24] The three courses of conduct Alpine identifies are (1) its Deficient Narrative SARs, (2) its Failure to Report Violations, and (3) its Support Files Violations.  The nine courses of conduct Alpine identifies are (1)-(6) the six red flags discussed above, (7) its failure to describe in its SARs the "Five Essential Elements" as defined by FinCEN guidance, (8) its Failure to Report Violations, and (9) its Support Files Violations.

ingrained, multi-year enterprise.  Instead of undertaking the scrutiny and reporting of individual transactions required by law, Alpine chose to run a high-volume business in the LPS market and use templates for many of the SARs it filed.  Even today, in its opposition to this motion for remedies, Alpine continues to minimize and excuse its offenses.

The SEC is entitled under the law to seek a penalty for each separate violation of the SAR reporting obligations. Alpine required, as it was entitled to, that the SEC separately prove with respect to each SAR that Alpine had both a duty to file the SAR, and, if it had filed one, that the SAR was legally deficient.  The SEC carried that burden to the extent found in the December Opinion.  For those individual SARs, and within the range of penalties permitted at tier one, the SEC has selected civil penalty amounts that fall toward to the bottom of the range.[25]  Alpine has not shown that the SEC's request is inappropriate or excessive based on the record recited above.

Third, Alpine asserts that any penalty imposed for its violations of Section 17a-8 cannot exceed the penalty limits prescribed in the BSA.  This argument is merely a reprise of

---

[25] Applying the maximum penalties available for a tier-one violation, Alpine's 2,720 violations would result in an aggregate penalty of more than $204,000,000.  See 15 U.S.C. § 78u(d)(3)(B).  The SEC seeks roughly 10% of that figure.

Alpine's repeatedly rejected argument that the BSA, rather than Rule 17a-8 and the Exchange Act, provides the governing law for this case.  See March Opinion, 308 F. Supp. 3d at 795; SEC v. Alpine Sec. Corp., No. 17cv4179(DLC), 2018 WL 3198889, at *2 (S.D.N.Y. June 18, 2018) (denying reconsideration of the March Opinion); see also December Opinion, 308 F. Supp. 3d at 416-17; SEC v. Alpine Sec. Corp., No. 17cv4179(DLC), 2019 WL 4071783, at *2 (S.D.N.Y. Aug. 29, 2019) (denying reconsideration of the December and March Opinions).  Although the BSA limits the maximum civil penalty that the Secretary of the Treasury may impose for negligent violations of Section 1023.320, see 31 U.S.C. § 5321(a)(6), the SEC brought this case and it brought it under Section 17(a) of the Exchange Act and Rule 17a-8. Accordingly, it is the penalty provisions of the Exchange Act, not of the BSA, that provide the maximum civil penalty available.  Cf. Kokesh v. SEC, 137 S. Ct. 1635, 1643 (2017) (noting that disgorgement, one of several inherently punitive sanctions the SEC may impose, "further[s] the Commission's public policy mission of protecting investors and safeguarding the integrity of the markets").

Finally, Alpine argues that the SEC's requested remedy would violate the Eighth Amendment's prohibition against

excessive fines.  See U.S. Const. amend. VIII.[26]  Under the
Eighth Amendment, however, a fine is unconstitutionally
excessive only if it is "grossly disproportional to the gravity
of a defendant's offense."  United States v. Sabhnani, 599 F.3d
215, 262 (2d Cir. 2010) (quoting United States v. Bajakajian,
524 U.S. 321, 334 (1998)); see also United States v. Viloski,
814 F.3d 104, 111 (2d Cir. 2016) (explaining that courts may
consider fine's impact on future ability to earn a livelihood).
While courts consider numerous factors to determine whether a
particular fine is grossly disproportional, see Sabhnani, 599
F.3d at 262, the Eighth Amendment proportionality analysis is
substantially similar to the analysis required by the factors
described and considered above.  A civil penalty of $22,736,000,
while substantial, is not grossly disproportional to the gravity
of Alpine's 2,720 violations of the federal securities laws.

Having considered the above factors, the circumstances
surrounding Alpine's 2,720 violations of Rule 17a-8, and each of
Alpine's arguments in opposition to the SEC's request for
remedies, a tier-one civil penalty in the amount of $12,000,000
is assessed.  This penalty is substantial; it reflects the
seriousness of Alpine's violations and the need for a remedy

---

[26] "The Eighth Amendment protects against excessive civil fines,
including forfeitures."  Hudson v. United States, 522 U.S. 93,
103 (1997).

that is adequate to punish and deter such violations.  A
$12,000,000 penalty, however, is also a small fraction of the
maximum tier-one remedies available and substantially less than
the amount the SEC has requested.[27]  While the SEC's requested
penalty falls within the range of penalties that could
reasonably be imposed in this case, consideration of several
factors, but principally of Alpine's financial condition, make a
penalty of $12,000,000 more appropriate.  A $12,000,000 penalty
is reasonable in light of all the facts and circumstances
described above.

II.  Permanent Injunction

In addition to civil penalties, Congress has expressly
authorized the use of injunctive relief to proscribe future
violations of the federal securities laws.  15 U.S.C.
§ 17u(d)(1).  Injunctive relief is only warranted where "there
is a substantial likelihood of future violations of illegal
securities conduct."  SEC v. Cavanagh, 155 F.3d 129, 135 (2d
Cir. 1998); see also SEC v. Manor Nursing Centers, Inc., 458

---

[27] Whereas the SEC has requested remedies of $10,000 per
Deficient Narrative SAR and Failure to Report Violation, an
aggregate penalty of $12,000,000 is roughly equivalent to a
tier-one penalty of just over $5,000 per Deficient Narrative SAR
and Failure to Report Violation, in addition to a penalty of
$1,000 per Support File Violation.

F.2d 1082, 1100 (2d Cir. 1972).  When making this determination,
courts consider:

> [1] the fact that the defendant has been found liable
> for illegal conduct; [2] the degree of scienter
> involved; [3] whether the infraction is an isolated
> occurrence; [4] whether defendant continues to
> maintain that his past conduct was blameless; and [5]
> whether, because of his professional occupation, the
> defendant might be in a position where future
> violations could be anticipated.

Cavanagh, 155 F.3d at 135 (citation omitted).  The imposition of
permanent injunctive relief is "within the court's discretion,"
and is particularly appropriate "where a violation was founded
on systematic wrongdoing, rather than an isolated occurrence"
and where the defendant's "persistent refusals to admit any
wrongdoing make it rather dubious that the [defendant is] likely
to avoid such violations of the securities laws in the future in
the absence of an injunction."  Frohling, 851 F.3d at 139
(citation and emphasis omitted).

For many of the reasons already discussed, a permanent
injunction against further violations of Section 17(a) and Rule
17a-8 is warranted in this case.  The December Opinion found
Alpine liable for 2,720 violations of Rule 17a-8, which occurred
over a course of years and which persisted on a systemic basis
notwithstanding clear warnings by FINRA and OCIE.  As discussed
above, Alpine continues to maintain that many of the SARs on
which summary judgment was granted were not required to be filed

and to argue, in the face of clear regulatory guidance to the contrary, that it engaged in no wrongdoing.  Alpine's persistent refusal to admit wrongdoing and its record of noncompliance with SAR reporting obligations demonstrate a substantial likelihood that Alpine will continue to violate federal securities laws in the future.  Given its function as a broker-dealer, Alpine remains in a position where future violations could be anticipated.

## Conclusion

The SEC's May 3 motion for remedies is granted in part. Alpine shall pay a civil penalty in the amount of $12,000,000. An injunction will be entered against Alpine.


Dated:    New York, New York
          September 12, 2019

                              _____
                              DENISE COTE
                        United States District Judge