# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2019

ARGUED: MARCH 31, 2020
DECIDED: DECEMBER 4, 2020

No. 19-3272

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee,*

*v.*

ALPINE SECURITIES CORPORATION,
*Defendant-Appellant.*

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, CABRANES, and SACK, *Circuit Judges.*

————

The Securities and Exchange Commission (SEC) filed a civil enforcement action against Alpine Securities Corporation (Alpine), a registered broker-dealer specializing in penny stocks and micro-cap securities. The SEC claimed that Alpine's failure to comply with the

reporting requirements for filing Suspicious Activity Reports (SARs) violated the reporting, recordkeeping, and record retention obligations under Section 17(a), of the Securities Exchange Act of 1934 (Exchange Act), and Rule 17a-8 promulgated thereunder. The district court granted in part and denied in part the SEC's motion for summary judgment and denied Alpine's motion for summary judgment.

On appeal, Alpine argues that the district court erred: (1) in concluding that the SEC has authority to bring an enforcement action under Section 17(a) and Rule 17a-8 on the basis of Alpine's failure to comply with the SAR provisions of the Bank Secrecy Act (BSA); (2) in concluding that Rule 17a-8 is valid; (3) in concluding that Rule 17a-8 does not violate the Administrative Procedure Act (APA); and (4) in finding Alpine liable for violations of Section 17(a) and Rule 17a-8 on the basis of its deficient SAR practices. Alpine further challenges the district court's imposition of a civil penalty under the Exchange Act in the amount of $12 million.

For the reasons that follow, we AFFIRM the judgment of the district court.

————

RACHEL M. MCKENZIE, Senior Counsel (Michael A. Conley, Solicitor; Daniel Staroselsky, Senior Litigation Counsel, *on the brief*), *for* Robert B. Stebbins, General Counsel, Securities and

Exchange Commission, Washington, D.C., *for Plaintiff-Appellee*.

MARANDA FRITZ, Thompson Hine LLP, New York, NY (Brent R. Baker, Jonathan D. Bletzacker, Aaron D. Lebenta, Clyde Snow & Sessions, Salt Lake City, UT, *on the brief*) for *Defendant-Appellant*.

_____

JOHN M. WALKER, JR., *Circuit Judge*:

The Securities and Exchange Commission (SEC) filed a civil enforcement action against Alpine Securities Corporation (Alpine), a registered broker-dealer specializing in penny stocks and micro-cap securities.  The SEC claimed that Alpine's failure to comply with the reporting requirements for filing Suspicious Activity Reports (SARs) violated the reporting, recordkeeping, and record retention obligations under Section 17(a), of the Securities Exchange Act of 1934 (Exchange Act), and Rule 17a-8 promulgated thereunder.  The District Court for the Southern District of New York (Denise L. Cote, *J.*), granted in part and denied in part the SEC's motion for summary judgment and denied Alpine's motion for summary judgment.

On appeal, Alpine argues that the district court erred: (1) in concluding that the SEC has authority to bring an enforcement action under Section 17(a) and Rule 17a-8 on the basis of Alpine's failure to comply with the SAR provisions of the Bank Secrecy Act (BSA); (2) in concluding that Rule 17a-8 is valid; (3) in concluding that Rule 17a-8

does not violate the Administrative Procedure Act (APA); and (4) in finding Alpine liable for violations of Section 17(a) and Rule 17a-8 on the basis of its deficient SAR practices. Alpine further challenges the district court's imposition of a civil penalty under the Exchange Act in the amount of $12 million.

For the reasons that follow, we AFFIRM the judgment of the district court.

## BACKGROUND

Prior to examining the issues in this case, a brief review of the relevant statutory and regulatory authority will be helpful.

### i.    The Bank Secrecy Act

Congress enacted the Foreign Transactions Reporting Act of 1970, or Bank Secrecy Act (BSA), in 1970 due to concerns over (1) the adequacy of records retained by domestic financial institutions, (2) the failure of such institutions to report to the government large deposits and withdrawals of currency,[1] and (3) the use of foreign financial institutions to evade "domestic criminal, tax, and regulatory enactments."[2]

---

[1] *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 27-28 (1974).

[2] *Id.*; *see also Ratzlaf v. United States*, 510 U.S. 135, 138 (1994) ("Congress enacted the Currency and Foreign Transactions Reporting Act (Bank Secrecy Act) in 1970, Pub.L. 91–508, Tit. II, 84 Stat. 1118, in response to increasing use of banks and other institutions as financial intermediaries by persons engaged in criminal activity. The Act imposes a variety of reporting requirements on individuals and institutions regarding foreign and domestic financial transactions.").

The BSA authorizes the Secretary of the Treasury to mandate certain recordkeeping and reporting requirements for United States financial institutions.[3]  In enacting the BSA, Congress concluded that such records and reports "have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings."[4]

When the BSA was initially enacted, Treasury regulations only required broker-dealers to retain records and file reports relating to domestic and foreign transactions above a certain dollar amount.[5]  In 2001, however, Congress amended the BSA through the USA PATRIOT Act to require the Treasury, after consultation with the SEC and Board of Governors of the Federal Reserve System, to publish regulations requiring broker-dealers to report suspicious transactions.[6]  The Secretary of the Treasury delegated that responsibility to the Financial Crimes Enforcement Network (FinCEN) within the Treasury Department.[7]

In 2002, FinCEN promulgated 31 C.F.R. § 1023.320, which requires every broker-dealer to file a report of any suspicious

---

[3] *California Bankers Ass'n*, 416 U.S. at 26.

[4] *Id.* (citing 12 U.S.C. §§ 1829b(a)(2), 1951; 31 U.S.C. § 1051).

[5] *See id.* at 30-38.

[6] Financial Crimes Enforcement Network; Amendment to the Bank Secrecy Act Regulations–Requirement that Brokers or Dealers in Securities Report Suspicious Transactions, 67 Fed. Reg. 44,048 (July 1, 2002) (SAR Regulation Adopting Release).

[7] Treasury Order 180-01(a)-(b); Financial Crimes Enforcement Network, 67 Fed. Reg. 64,697 (Oct. 21, 2002).

transaction relevant to a possible violation of law or regulation. Specifically, broker-dealers must file a SAR if a transaction "is conducted or attempted by, at, or through a broker-dealer, it involves or aggregates funds or other assets of at least $5,000, and the broker-dealer knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):" (1) "[i]nvolves funds derived from illegal activity;" (2) is designed, "whether through structuring or other means, to evade" the BSA and its regulations; (3) "[h]as no business or apparent lawful purpose;" or (4) "[i]nvolves use of the broker-dealer to facilitate criminal activity."[8] Section 1023.320 also requires broker-dealers to retain a copy of any SAR filed "for a period of five years from the date of filing" and to "make all supporting documentation available to FinCEN or any Federal, State, or local law enforcement agency, or any Federal regulatory authority that examines the broker-dealer for compliance with the Bank Secrecy Act, upon request."[9]

Upon the issuance of this regulation, FinCEN announced that the "regulation of the securities industry in general and of broker-dealers in particular relies on both the Securities and Exchange

---

[8] 31 C.F.R. § 1023.320(a)(2).

[9] 31 C.F.R. § 1023.320(d).

Commission . . . and the registered securities associations and national securities exchanges."[10]

> ii.     *The Exchange Act*

The Exchange Act delegates to the SEC broad authority to regulate brokers and dealers in securities.[11]   Section 17(a) of the Exchange Act authorizes the SEC to promulgate rules to carry out Section 17(a)'s requirement that brokers and dealers "make and keep for prescribed periods such records . . . and disseminate such reports as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter."[12]

In 1981, the SEC promulgated Rule 17a-8 under Section 17(a). Rule 17a-8, instead of duplicating the reporting and retention requirements of the BSA, incorporated those requirements by mandating that every registered broker or dealer "who is subject to the requirements of the Currency and Foreign Transactions Reporting Act of 1970 [Bank Secrecy Act] shall comply with the reporting, recordkeeping and record retention requirements of chapter X of title 31 of the Code of Federal Regulations."[13]   Chapter X of Title 31

---

[10] SAR Regulation Adopting Release, 67 Fed. Reg. at 44,049.
[11] *See* 15 U.S.C. § 78b; *id*. § 78q–1.
[12] 15 U.S.C. § 78q(a)(1).
[13] 17 C.F.R. § 240.17a-8.

concerns the Treasury's rules for brokers or dealers in securities, including FinCEN's SAR requirements under Section 1023.320.

The SEC observed that by not duplicating the existing BSA Treasury requirements, Rule 17a-8 would impose "no burden on competition."[14] The SEC further specified that the Rule was not confined to any specific identifiable reports and records so as to allow for any revisions to reporting requirements that the Treasury may adopt in the future.[15] No comments were received from the public in response to the proposed rule.[16] In 2011, the SEC amended Rule 17a-8 to make clear that it still considered the Treasury's reporting obligations, which at that point included the SAR reporting requirement, as promoting the goals of the Exchange Act.[17]

### iii.    Current Enforcement Action

Alpine is a registered broker-dealer and Financial Industry Regulatory Authority (FINRA) member that "acts as a clearing firm."[18] Over the years, the SEC and FINRA, which is overseen by the SEC, found numerous deficiencies in Alpine's SAR reporting standards and submissions. In 2012, FINRA found that Alpine failed

---

[14] Recordkeeping by Brokers and Dealers, 46 Fed. Reg. 61,454, 61,455 (Dec. 17, 1981) (Rule 17a-8 Adopting Release).

[15] *Id.*

[16] *Id.*

[17] Technical Amendments to Rule 17a-8: Financial Recordkeeping and Reporting of Currency and Foreign Transactions, 76 Fed. Reg. 11,327 (Mar. 2, 2011).

[18] App'x 48, 50.

to file SARs over a two-month and a four-month period in 2011 and that many SARs that Alpine did file were inadequate.  In 2015, the SEC found that for half of the SARs it reviewed, Alpine failed to provide a clear and complete description of the financial activity reported and that frequently Alpine was intentionally trying to obscure the suspicious nature of that activity.

On June 5, 2017, the SEC filed this civil action against Alpine to enforce reporting and recordkeeping requirements of the securities laws.  The SEC alleged that, through non-compliant SAR practices, Alpine violated the reporting, recordkeeping, and record retention obligations under Section 17(a) and Rule 17a-8.  The SEC moved for partial summary judgment, submitting SARs to exemplify the categories of Section 17(a) and Rule 17a-8 violations it was alleging. Alpine cross-moved for summary judgment, principally arguing that the SEC lacked authority to bring such a suit because the Treasury had sole authorization to enforce the BSA requirements.

The district court granted the SEC's motion in part, but deferred its resolution of categories of allegedly deficient SARs pending discovery and additional briefing. The district court also denied Alpine's motion, rejecting Alpine's argument that the SEC was improperly enforcing the BSA and upholding the SEC's authority to

Case: 17-3272   Document: 255-1   Filed: 02/26/21   Page: 10 of 35
Case 1:17-cv-04179-DLC   Document 106-2   Filed 03/02/21   Page 10 of 35

10                                                          No. 19-3272

enforce the reporting and recordkeeping provisions of the Exchange Act on the basis of non-compliance with SAR requirements.[19]

The district court determined that Rule 17a-8 was a reasonable interpretation of the Exchange Act because the SEC concluded that the SARs, which assist the Treasury Department in targeting illegal securities transactions, would also serve to protect investors by providing information relevant to determining whether there is any market manipulation.[20] The district court further found that nothing in the Exchange Act or the BSA expressly precluded FinCEN and the SEC from exercising concurrent regulatory and enforcement authority.[21]

The district court also rejected Alpine's argument that the SEC violated the APA when promulgating Rule 17a-8. Specifically, the district court noted that the "text of the regulation itself, as well as the SEC's 1981 notice of final rule, unambiguously demonstrate[d] the SEC's intent [that] the nature of the Rule 17a-8 reporting obligation [would] evolve over time through the Treasury's regulations."[22] The district court observed that Rule 17a-8's evolving nature "made

---

[19] *United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 308 F. Supp. 3d 775, 789 (S.D.N.Y. 2018), *reconsideration denied*, No. 17CV4179(DLC), 2018 WL 3198889 (S.D.N.Y. June 18, 2018), *and reconsideration denied*, No. 17CV4179(DLC), 2019 WL 4071783 (S.D.N.Y. Aug. 29, 2019).

[20] *Id*. at 796.

[21] *Id*.

[22] *Id*. at 797.

government more efficient by incorporating the obligations that had been and would be imposed by the Treasury."[23]

After discovery and additional briefing, the SEC moved for summary judgment as to Alpine's liability for thousands of Rule 17a-8 violations based on deficient SARs reporting and recordkeeping practices. Evaluating the specific violations alleged, the district court granted summary judgment to the SEC as to 2,720 violations of Rule 17a-8 on the basis of Alpine's SARs reporting and recordkeeping practices in three categories: submitting SARs with deficient narratives, failing to submit SARs on deposit-and-sales patterns, and failing to retain support files for SARs. The district court denied summary judgment as to hundreds of other alleged violations by Alpine, which the SEC then declined to prosecute further.[24]

The district court then imposed a $12 million civil penalty and enjoined Alpine from future violations of Section 17(a) and Rule 17a-8. This appeal followed.

## DISCUSSION

On appeal, Alpine argues (1) this enforcement action is invalid because the SEC lacks authority to enforce the SAR provisions of the

---

[23] *Id.*

[24] *See, e.g., United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 354 F. Supp. 3d 396, 430-31, 443 (S.D.N.Y. 2018), *reconsideration denied*, No. 17CV4179(DLC), 2019 WL 4071783 (S.D.N.Y. Aug. 29, 2019).

Case 1:17-cv-04179-DLC    Document 255-1    Filed 02/26/21    Page 12 of 35

BSA; (2) Rule 17a-8, which requires compliance with BSA requirements, is invalid because it is not a reasonable interpretation of the Exchange Act; (3) Rule 17a-8 is invalid because its promulgation did not comply with the APA; and (4) the district court erred in finding that Alpine violated Section 17(a) and Rule 17a-8 on the basis of SAR compliance.  Alpine further argues that the district court erred in imposing a civil penalty of $12 million on Alpine.

We review motions for summary judgment *de novo*.[25]

## I.   The SEC Has Authority to Enforce Section 17(a) of the Exchange Act Through This Civil Action

Alpine first contends that the SEC is not authorized to bring this civil enforcement action because the Treasury Department has sole authority to enforce the BSA.  We disagree.

This enforcement action was brought solely under Section 17(a) of the Exchange Act and Rule 17a-8 promulgated thereunder.  This suit therefore falls within the SEC's independent authority as the primary federal regulator of broker-dealers to ensure that they comply with reporting and recordkeeping requirements of those provisions.[26]   The fact that Rule 17a-8 requires broker-dealers to

---

[25] *See United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016) (quoting *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006)); *Mario v. P & C Food Mkts, Inc.,* 313 F.3d 758, 763 (2d Cir. 2002).

[26] *See, e.g., VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011) (enforcement action for violation of Section 17(a)).

adhere to the dictates of the BSA in order to comply with the recordkeeping and reporting provisions of the Exchange Act does not constitute SEC enforcement of the BSA.  We thus reject Alpine's argument that the SEC is enforcing the BSA, and not the Exchange Act.

## II.  Rule 17a-8, Which Requires Compliance with BSA Requirements, Is a Reasonable Interpretation of Section 17(a) of the Exchange Act

Alpine next challenges the validity of Rule 17a-8, which requires compliance with BSA requirements, on that basis that it is not a reasonable interpretation of the Exchange Act.

We review questions of statutory interpretation *de novo*.[27] Because this issue centers on an agency's interpretation of a statute, we turn to the analytical framework established in *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*[28]  "[A] reviewing court must first ask whether Congress has directly spoken to the precise question at issue."[29]  Only if the statute is ambiguous or silent on the question need a court proceed in the analysis.  If Congress has not clearly

---

[27] *See United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016) (quoting *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006))

[28] 467 U.S. 837 (1984).

[29] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (internal quotation marks omitted) (quoting *Chevron*, 467 U.S. at 842).

spoken, "a reviewing court must respect the agency's construction of the statute so long as it is permissible."[30]

The Exchange Act expressly delegates to the SEC the authority to determine which reports from covered entities, including brokers and dealers, are "necessary or appropriate" to further the goals of the Exchange Act.  The SEC, pursuant to that authority, may promulgate rules defining the recordkeeping and reporting obligations of broker-dealers that the SEC deems necessary to pursue those statutory aims.[31]

That is exactly what the SEC has done by promulgating Rule 17a-8.  The Exchange Act aims to protect the national securities market and "safeguard[] . . . securities and funds related thereto."[32]  The SEC determined that the SARs, which assist the Treasury Department in targeting illegal securities transactions, would also serve to further the aims of the Exchange Act by protecting investors and helping to guard against market manipulation.  For example, SARs facilitate the SEC's effective enforcement with regard to market abuses associated with penny stock trading.[33]    The SEC thus

---

[30] *Id*. (citing *INS v. Aguirre-Aguirre,* 526 U.S. 415, 424 (1999)).

[31] 15 U.S.C. § 78q(a)(1).

[32] 15 U.S.C. § 78b; *see also* 15 U.S.C. § 78q–1.

[33] *See* Ronald S. Bloomfield, Robert Gorgia, & John Earl Martin, Sr., S.E.C. Release No. 9553 (Feb. 27, 2014), *vacated in part on other grounds*, Robert Gorgia, S.E.C. Release No. 9743 (Apr. 8, 2015) ("Penny stocks present risks of trading abuses due to the lack of publicly available information about the

promulgated Rule 17a-8, which requires compliance with those BSA regulations.  In promulgating Rule 17a-8, the SEC acted pursuant to an express delegation of rulemaking authority.  We thus hold that the SEC's interpretation of Section 17(a), as expressed in Rule 17a-8, is reasonable.[34]

Alpine contends that in authorizing the Treasury to regulate suspicious activity in recordkeeping and reporting by broker-dealers under the BSA, Congress has precluded the SEC from regulating recordkeeping and reporting under the Exchange Act.

When "[c]onfronted with two Acts of Congress allegedly touching on the same topic, this Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to

---

penny stock market in general and the price and trading volume of particular penny stocks."); *see also Testimony Before the S. Comm. on Banking, Housing and Urban Affairs*, 2002 WL 169600 (Jan. 29, 2002) (Annette L. Nazareth, Director, SEC Division of Market Regulation) (stating that the "SEC and Treasury staff readily reached consensus" on extending comparable SAR obligations to combat "money laundering risks.").

[34] Alpine's argument that the district court improperly applied *Auer* deference lacks merit. *See Auer v. Robbins*, 519 U.S. 452 (1997).  As an initial matter, in *Kisor v. Wilkie*, the case on which Alpine relies, the Supreme Court held that "*Auer* deference retains an important role in construing agency regulations." 139 S. Ct. 2400, 2408 (2019).  Here, the text of Rule 17a-8 unambiguously encompasses the suspicious activity recordkeeping and reporting requirements of Section 1023.320 by referring to the chapter of the Code of Federal Regulations in which those provisions appear.  To the extent there is any ambiguity in Rule 17a-8, the SEC's interpretation is reasonable and not "plainly erroneous or inconsistent with the regulation." *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 569 (2d Cir. 2015) (citation omitted).

give effect to both.'"[35]  Because Alpine's position is that the Exchange Act and the BSA cannot be "harmonized," it "bears the heavy burden" of showing, based upon "a clearly expressed congressional intention," that such a result should follow.[36]  Such an intention must be "clear and manifest," and courts "come armed with the stron[g] presum[ption] that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute."[37]

Here, the statutory and regulatory provisions are easily harmonized.  Rule 17a-8 requires broker-dealers to comply with the duties imposed by the Treasury Department through the BSA.[38]  Far from conflicting, those duties imposed on broker-dealers by the BSA are "consistent with the purposes of the Exchange Act and the [SEC]'s obligation to enforce broker-dealer recordkeeping requirements."[39]  Rule 17a-8's incorporation of the BSA's reporting obligation serves

[35] *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (some internal quotation marks omitted) (quoting *Morton v. Mancari,* 417 U.S. 535, 551 (1974)).

[36] *Id.* (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)).

[37] *Id.* (internal citations and quotation marks omitted).

[38] Specifically,  the rule requires that "[e]very registered broker or dealer who is subject to the requirements of the Currency and Foreign Transactions Reporting Act of 1970 [Bank Secrecy Act] shall comply with the reporting, recordkeeping and record retention requirements of chapter X of title 31 of the Code of Federal Regulations."  17 C.F.R. § 240.17a-8.

[39] Rule 17a-8 Adopting Release*, 46 Fed. Reg. at 61,455.

the goal of regulatory enforcement by minimizing regulatory costs on broker-dealers, who need only comply with one set of reporting requirements.[40]  And the Treasury and the SEC have plainly worked in tandem, issuing policy statements and reports, and initiating enforcement actions since the BSA's inception.[41]  For example, FinCEN's adoption of the SAR regulation in 2002 expressly referenced Rule 17a-8 when it stated that "both the SEC and SROs [self-regulatory organizations] will address broker-dealer compliance" with the SAR reporting rule.[42]

The two cases upon which Alpine relies, *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*[43] and *Nutritional Health All. v. Food & Drug Admin,*[44] are unavailing.  In *Brown & Williamson*, the Supreme Court rejected the claimed authority of the Food and Drug Administration (FDA) to regulate tobacco products through the Food,

---

[40] Congress was fully aware of this enforcement design.  *See Testimony Before the S. Comm. on Banking, Housing and Urban Affairs*, 2002 WL 169600 (Jan. 29, 2002) (Annette L. Nazareth, Director, SEC Division of Market Regulation) (stating that the SEC expected that, after Section 1023.320's promulgation, "bank-affiliated broker-dealers should be subject to Treasury's rule, rather than two separate SAR rules").

[41] *See, e.g.*, Pinnacle Capital Markets, LLC, FinCEN No. 2010-4 (Aug. 26, 2010); Oppenheimer & Co., Inc., SEC Release No. 74141, 2015 WL 331117 (Jan. 27, 2015); SEC & FinCen, SEC and FinCEN Sign Information Sharing Agreement (Dec. 21, 2006).

[42] SAR Regulation Adopting Release, 67 Fed. Reg. at 44,049.

[43] 529 U.S. 120 (2000).

[44] 318 F.3d 92, 104 (2d Cir. 2003).

Drug, and Cosmetic Act (FDCA).[45]  In support, the Court pointed out that such FDA authority would conflict with congressional intent because, if that were the case, the FDCA would "require the agency to ban [cigarettes]" which would "contradict Congress' clear intent as expressed in its more recent, tobacco-specific legislation."[46]  The Court supported its holding by pointing out that: (1) Congress had "considered and rejected bills that would have granted the FDA such jurisdiction"; and (2) the FDA had taken the "long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products."[47]  Nothing approaching these circumstances is present here.  Fully aware that the SEC enforces the SAR provisions, Congress has never indicated its disapproval of joint SAR reporting enforcement.

In *Nutritional Health*, we found that congressional intent conflicted with FDA jurisdiction over certain products.[48]  The FDA claimed delegated authority under the FDCA to regulate the packaging of dietary supplements and drugs for the purpose of poison prevention.[49]  We held the FDA's interpretation of its authority to be unreasonable because Congress had later passed the Poison Prevention Packing Act (PPP Act), which "specifically targeted the

---

[45] 529 U.S. at 126.

[46] *Id*. at 137, 143.

[47] *Id*. at 144.

[48] 318 F.3d at 95.

[49] *Id*. at 94.

problem of accidental poisoning,"[50] and the PPP Act "expressly prohibited the FDA from prescribing 'specific packaging designs, product content, package quantity, or with [one] exception . . . [,] labeling.'"[51]  In our view, the FDA's interpretation was impermissible because the PPP Act "specifically and unambiguously" targeted and prescribed its own regulatory approach to addressing the accidental poisoning problem through packaging standards, and the Consumer Product Safety Act "unambiguously transferred authority to administer and enforce the PPP Act from the FDA to the [Consumer Product Safety Commission (CPSC)]."[52]  In both *Brown & Williamson* and *Nutritional Health*, a history of expressed congressional intent compelled the conclusion that the FDA lacked authority.  No such history is present here.

Alpine contends that *Nutritional Health* requires us to hold that the later-enacted SAR provision "specifically and unambiguously" demonstrates congressional intent for the Treasury to possess sole authority to "address money laundering and terrorist financing through the compilation of data derived from various financial institutions."  According to Alpine, this "specific authorization" to the

---

[50] *Id*. at 102.

[51] *Id*. at 104.

[52] *Id*. (citing *Brown & Williamson*, 529 U.S. at 132-33)).

Treasury Department trumps the general authorization to the SEC. We disagree.

The SEC's *Rule 17a-8 Adopting Release*, in 1981, expressly stated that the "Treasury has delegated to the Commission the responsibility for assuring compliance with the Currency Act and Treasury regulations."[53]  No comments, or objections, were received from the public in response to proposed Rule 17a-8.[54]  Later, when FinCEN adopted the SAR reporting requirements through 31 C.F.R. § 1023.320, it expressly stated that the Exchange Act enables "the SROs, subject to SEC oversight, to examine for BSA compliance" and therefore "both the SEC and SROs will address broker-dealer compliance with this rule."[55]  That Congress never proposed to silo SAR enforcement authority in the Treasury strongly suggests that Congress intended for the SEC to maintain its compliance authority and from the outset, it was envisioned by both agencies that the SEC would have enforcement authority over broker-dealers.

In sum, Alpine has not met its "heavy burden" to show that Congress "clearly expressed [its] intention"[56] to preclude the SEC

---

[53] Rule 17a-8 Adopting Release, 46 Fed. Reg. at 61,454.

[54] *Id.*  Additionally, when this rule was proposed, FinCEN recognized that the SEC played a primary role in "reporting and maintaining data about securities law violations" and that the SEC had the authority, under Rule 17a-8, to examine for BSA compliance.  SAR Regulation Adopting Release, 67 Fed. Reg. at 44,051.

[55] SAR Regulation Adopting Release, 67 Fed. Reg. at 44,049.

[56] *See Epic Sys. Corp.*, 138 S. Ct. at 1624.

from examining for SAR compliance in conjunction with FinCEN and pursuant to authority delegated under the Exchange Act.

### III.   Rule 17a-8 Does Not Violate the Administrative Procedure Act

Alpine next contends that, even if the SEC does have rulemaking authority under Section 17(a), Rule 17a-8 violates the APA.  Specifically, Alpine argues that the open-ended nature of Rule 17a-8, which permits the automatic incorporation of future BSA requirements, impermissibly allows the SEC to bypass the notice-and-comment requirements of the APA.  We disagree.

The APA "requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'"[57]  The public had an opportunity to comment on both Rule 17a-8 and Section 1023.320(a)(2) of the BSA regulations.

As discussed earlier, Rule 17a-8 was promulgated in 1981 before FinCEN adopted its current SAR reporting requirements.  At the time, the BSA regulations required broker-dealers to submit reports of currency transactions and transactions involving foreign accounts.  The SEC indicated, when it proposed Rule 17a-8, that

---

[57] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (quoting 5 U.S.C. § 553(b)(3)).

requiring broker-dealers to comply with the BSA was "consistent with the purposes of the Exchange Act and the [SEC]'s obligation to enforce broker-dealer recordkeeping requirements."[58]

Moreover, when it was published for notice and comment, the proposed Rule 17a-8 expressly stated that it did "not specify the required reports and records so as to allow for any revisions the Treasury may adopt in the future."[59] When the SEC formally adopted the Rule, in its *Rule 17a-8 Adopting Release*, the SEC further made clear that the Rule would "allow for any revisions the Treasury may adopt in the future."[60]

Accordingly, we conclude that the public was afforded the requisite notice and opportunity to comment on Rule 17a-8 and, in particular, its potential to require additional reporting requirements should the Treasury regulations specify them.

---

[58] *Recordkeeping by Brokers & Dealers*, Release No. 18073 (Aug. 31, 1981).

[59] Rule 17a-8 Adopting Release, 46 Fed. Reg. at 61,455. Alpine argues that the SEC's *Rule 17a-8 Adopting Release* also acknowledged that its role, with respect to the BSA, was limited to merely examination authority. That seems to be a mischaracterization. *Rule 17a-8 Adopting Release* stated that "most effective means of enforcing compliance" with the BSA requirements was through on-site "examinations" but there is no indication that SEC was limited to mere examination and could not enforce the BSA provisions. The same notice stated that the "Treasury has delegated to the Commission the responsibility for assuring compliance with the Currency Act and Treasury regulations." 46 Fed. Reg. at 61,454.

[60] Rule 17a-8 Adopting Release, 46 Fed. Reg. at 61,454.

The suspicious activity recordkeeping and reporting requirements of Section 1023.320(a)(2), incorporated into Rule 17a-8, were also subject to public notice-and-comment. In 2002, when it proposed Section 1023.320(a)(2), FinCEN publicly stated that both the SEC and SROs would "address broker-dealer compliance" with its requirements, including through enforcement actions, as they had done with other BSA recordkeeping and reporting requirements for decades.[61] In response to comments it received, FinCEN revised its proposed rule in "significant respects" and provided extensive guidance regarding, among other matters, the standard and scope of reporting.[62] The publication of the SAR regulations under Section 1023.320(a)(2) provided ample notice-and-comment opportunities in satisfaction of the APA's requirements.

We reject Alpine's argument that the SEC was required to seek future public comments each time FinCEN issued new BSA reporting requirements to avoid an "improper delegation [to Treasury] of rulemaking authority under the Exchange Act." Alpine Br. 42-43.

"An agency delegates its authority when it shifts to another party almost the entire determination of whether a specific statutory

---

[61] Financial Crimes Enforcement Network; Proposed Amendment to the Bank Secrecy Act Regulations—Requirement of Brokers or Dealers in Securities to Report Suspicious Transactions, 66 Fed. Reg. 67,670 (Dec. 31, 2001).

[62] SAR Regulation Adopting Release, 67 Fed. Reg. at 44,049.

requirement . . . has been satisfied, or where the agency abdicates its final reviewing authority."[63]   But Rule 17a-8 does not charge the Treasury with deciding which recordkeeping and reporting requirements would further the purposes of the Exchange Act. Instead, the SEC determined, through notice-and-comment rulemaking, that any reporting requirements that the Treasury imposed on broker-dealers pursuant to its independent authority under the BSA would be "consistent with the purposes of the Exchange Act and the [SEC's] obligation to enforce the broker-dealer recordkeeper requirements."[64]

Moreover, the SEC has not taken the position that Rule 17a-8 obliges the SEC to automatically adopt any changes the Treasury may make to the BSA's recordkeeping and reporting requirements, regardless of whether they are consistent with the purposes of the Exchange Act.   Rather, the SEC has worked together with FinCEN on the SAR regulation, "update[d] the reference to the BSA implementing regulations" in 2011, and in a formal adjudication, reiterated that requiring broker-dealers to maintain records and file reports of suspicious activity is consistent with the purposes of the

---

[63] *Fund for Animals v. Kempthorne*, 538 F.3d 124, 133 (2d Cir. 2008) (internal citations and quotation marks omitted).

[64] Rule 17a-8 Adopting Release, 46 Fed. Reg. at 61,455.

Exchange Act.[65]  Alpine has failed to demonstrate either that the SEC has impermissibly delegated authority to the Treasury under the Exchange Act, or that it has abdicated its final reviewing authority relating to broker-dealer recordkeeping and reporting requirements.

Accordingly, in this case, there are no APA concerns because the public was fully aware of the interrelated and cohesive nature of the regulations of both agencies.  Holding otherwise would only serve to waste governmental resources and hinder efficient enforcement.

Because both Rule 17a-8 and the SAR regulation were open to public comment, this situation is distinguishable from *United States v. Picciotto*[66] and *City of Idaho Falls v. F.E.R.C.*[67] on which Alpine relies. Neither case is apposite.

In *United States v. Picciotto*, the D.C. Circuit held that additional conditions that were added to regulations governing the United States Park Service violated the APA, notwithstanding that the regulation contained an open-ended provision that had gone through notice and comment.[68]  But, unlike this case, in which the SAR requirement had been promulgated by the Treasury in compliance

---

[65] Technical Amendments to Rule 17a-8, 76 Fed. Reg. at 11,328; *see also* Ronald S. Bloomfield et al., Release No. 71632, 2014 WL 768828 (Feb. 27, 2014).

[66] 875 F.2d 345 (D.C. Cir. 1989).

[67] 629 F.3d 222 (D.C. Cir. 2011).

[68] 875 F.2d at 346-47.

with the APA, the additional regulatory conditions in *Picciotto* were never issued in compliance with the APA.[69]

In *City of Idaho Falls v. F.E.R.C*, the Federal Energy Regulatory Commission (FERC) had previously approved a methodology, used by the Forest Service, for setting rental fees.[70] FERC then incorporated a new Forest Service rental fee schedule without providing an opportunity for notice and comment.[71] The D.C. Circuit held that "[b]ecause FERC previously approved and used the old Forest Service methodology, its implicit acceptance of the new methodology in the 2009 Update marked a change in its own regulations" which required notice-and-comment rulemaking.[72] Our case differs from *City of Idaho Falls* because all changes to FinCEN reporting regulations are open to public comment and will be APA compliant whenever such changes occur, as happened with the issuance of Section 1023.320.

In sum, we find that because: (1) the SEC made clear in its request for public comment that Rule 17a-8 incorporated present and future Treasury SAR reporting requirements, and would be modified accordingly; (2) FinCEN itself published its SAR reporting requirements for public comment; and (3) FinCEN expressly notified

---

[69] *Id.*

[70] 629 F.3d at 223.

[71] *Id.* at 227-29.

[72] *Id.* at 231.

the public that the SEC would continue to enforce the BSA's reporting changes, Rule 17a-8 did not violate the notice-and-comment requirements of the APA.

### IV.   The District Court Did Not Err in Granting Summary Judgment with Respect to the SARs

The district court granted summary judgment to the SEC as to 2,720 violations of Rule 17a-8 on the basis of certain of Alpine's SARs reporting and recordkeeping practices—specifically, submitting SARs with deficient  narratives, failing to submit SARs on deposit-and-sales patterns, and failing to retain support files for SARs.  Alpine argues that the district court erred when it: (1) deferred to the SEC's interpretation of FinCEN guidance; and (2) applied a "purely mechanical" test in finding that Alpine did not adequately comply with its SAR reporting requirements.  Both arguments are without merit.

First, there is no indication in this record that the district court improperly deferred to the SEC.  The district court did nothing other than independently interpret the supporting FinCEN documentation, which was consistent with the SEC's interpretation.

The district court stated that it was relying on "instructions on the 2002 SAR Form, the 2012 SAR Instructions, and the SAR Narrative Guidance issued [by FinCEN] in 2003."[73]  As relevant here, the 2002

---

[73] *Alpine Sec. Corp.*, 354 F. Supp. 3d at 414.

SAR Form makes clear that the narrative section of the SAR "is **critical**."[74]  It further provides,

> The care with which [the narrative section] is completed
> may determine whether or not the described activity and its
> possible criminal nature are clearly understood by
> investigators.  Provide a clear, complete and chronological
> description . . . of the activity, including what is unusual,
> irregular or suspicious about the transaction(s), using the
> checklist below as a guide.[75]

The district court read the totality of the FinCEN guidance, in the 2002 SAR Form, 2003 Narrative Guidance, and 2012 Instructions, to indicate that certain "red flags" may evidence SAR reporting violations.  The "red flags" included:  (1) related litigation; (2) shell companies and derogatory stock history; (3) stock promotion; (4) unverified issuers; (5) low trading volume; (6) foreign involvement; (7) basic customer information.[76]

    As one example, the district court found that Alpine failed on multiple occasions to provide SAR information regarding related litigation.  Specifically, Alpine "omitted information, which was present in Alpine's support files for the SARs, [that] indicated that the

---

[74] *Id*. at 413 (emphasis in original); 2002 SAR Form at 3 (emphasis in original).

[75] *Alpine Sec. Corp.*, 354 F. Supp. 3d at 413-14 (emphasis in original).

[76] *Id*. at 426-40.

SEC had sued one customer and its CEO for fraud in connection with asset valuations and improper allocations of expenses, that another customer had pleaded guilty to conspiracy related to counterfeiting, and that yet another customer had a history of being investigated by the SEC for misrepresentations."[77]

Once the district court determined that such "red flags" triggered certain SAR obligations, it then used an objective test to determine whether summary judgment was warranted. We agree with the district court's approach to summary judgment in this case and reject Alpine's argument that its own subjective belief as to what needed to be reported sufficed.

Importantly, the text of 31 C.F.R. § 1023.320(a)(2) supports the district court's finding that the SAR regulation imposes an objective test (*i.e.*, broker-dealers shall file an SAR if it "knows, suspects, *or has reason to suspect*" that a transaction is suspicious). Alpine points to isolated parts of FinCEN guidance in support of its argument that a subjective test must be utilized.[78] But, Alpine does so while ignoring FinCEN's express statement that the SAR reporting provision requires an objective standard:

> The final rule retains the "has reason to suspect" language.
>
> FinCEN believes that compliance with the rule cannot be

---

[77] *Id.* at 426-27.

[78] Alpine Br. 49.

> adequately enforced without an *objective* standard. The reason-to-suspect standard means that, on the facts existing at the time, a reasonable broker-dealer in similar circumstances would have suspected the transaction was subject to SAR reporting. This is a flexible standard that adequately takes into account the differences in operating realities among various types of broker-dealers, and is the standard contained in the existing SAR rules for depository institutions and money services businesses.[79]

While subjective factors may be relevant where the enforcing agency shows that the broker-dealer actually "knows" or "suspects" that the transaction is subject to SAR reporting, the "reason to suspect" standard sensibly permits the use of objective "red flags" that would alert reasonable broker-dealers to the fact that that the transaction required a SAR report.[80] Accordingly, the district court did not err in its determination that an objective analysis was proper.

We also reject Alpine's claim that the district court's examination was "purely mechanical." The district court inspected the allegedly deficient SARs before making its determination. In its 100-page opinion, the district court recognized that each "SAR must,

---

[79] SAR Regulation Adopting Release, 67 Fed. Reg. at 44,053 (emphasis added).

[80] *See* SEC Br. 65.

of course, be examined individually" and, without announcing a mechanical or bright-line test, reviewed all of the alleged deficiencies before concluding that, given the "sheer number of [Alpine's] lapses at issue in this case[,]" summary judgment was warranted.[81]  Indeed, Alpine did not "contest in a large number of instances that it failed to include information in SAR narratives that the SAR Form itself directs a broker-dealer to include."[82]

Alpine finally argues that the district court "ignore[d]" that certain assertions created genuine disputes of fact.[83]  We disagree.  As noted above, in many instances, Alpine did not dispute the fact that it failed to include required information in SAR narratives.  When Alpine raised properly supported factual disputes as to specific SARs, the district court ruled in its favor.[84]  But, for example, the district court did not err in rejecting as "vague and conclusory" Alpine's assertion that it filed SARs for large deposits of low-priced securities even though it concluded it was not required to do so.[85]  Plainly, when Alpine's evidence did create genuine disputes of material fact as to particular SARs, the district court considered it.

---

[81] *Alpine Sec. Corp.*, 354 F. Supp. 3d at 419, 436 (emphasis added).

[82] *Id*. at 419.

[83] Alpine Br. 69.

[84] *See, e.g., Alpine Sec. Corp.*, 354 F. Supp. 3d at 431.

[85] *Id.* at 423 n.44.

In sum, the district court did not err in granting summary judgment to the SEC as to Alpine's liability on the basis of 2,720 violations of the reporting, recordkeeping, and record retention requirements of Section 17(a) and Rule 17a-8.

## V.   In Imposing the Civil Penalty, the District Court Did Not Abuse Its Discretion

Alpine finally challenges the district court's imposition of a $12 million civil penalty for the 2,720 SAR violations of the reporting, recordkeeping, and record retention requirements of Section 17(a) and Rule 17a-8.  The SEC requested that the district court impose a tier-one civil penalty of $10,000 for each SAR violation and $1,000 for each support-file violation, totaling $22.7 million.[86]  Alpine argued that the total penalty should fall between $80,000 and $720,000.[87]

Section 21(d) of the 1934 Exchange Act authorizes monetary penalties for statutory violations.[88]  In assessing a penalty, a court may impose "a first-tier penalty . . . for any violation," regardless of mental state or other factors.[89]  Within the maximum penalty authorized by the statute, the "actual amount of the penalty" is left "up to the discretion of the district court."  Because the amount of the penalty is

---

[86] *United States Sec. & Exch. Comm'n v. Alpine Sec. Corp.*, 413 F. Supp. 3d 235, 245 (S.D.N.Y. 2019).

[87] *Id.* at 248.

[88] *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).

[89] *SEC v. Ramilovic*, 738 F.3d 14, 38 (2d Cir. 2013).

left to the sound discretion of the district court, we review an award of penalties for abuse of discretion.[90]

Here, we conclude that the district court did not abuse its discretion in imposing the $12 million civil penalty. The breadth and duration of Alpine's deficient reporting and recordkeeping activity supports the district court's imposition of the civil penalty. The district court did recognize that Alpine "took some steps to improve . . . compliance."[91] But as the district court noted, "[a]lthough the extraordinary scale of Alpine's violations decreased over the years, the violations did not cease."[92] The district court found that the "scale and duration" of the violations "undermine[d] Alpine's assertion that its conduct was, at worst, merely negligent."[93]

Alpine's arguments to the contrary are without merit. Insofar as Alpine's challenge to the civil penalty is based on the premise that the district court erroneously concluded that Alpine acted with "scienter," the district court expressly noted that "a finding of scienter is *not* required to impose the tier-one penalty sought by the SEC."[94] Nor does the "sheer, unprecedented" amount of the penalty itself rise

---

[90] *Id.*

[91] Sp. App'x 253.

[92] Sp. App'x 256.

[93] Sp. App'x 253.

[94] Sp. App'x 252-53 (emphasis added).

to the level of abuse of discretion.[95]  The total amount was driven by the "unprecedented number of violations" of Section 17(a) and Rule 17a-8 committed by Alpine.[96]  Alpine's argument that the district court disregarded evidence of the firm's financial condition is similarly unavailing.  The district court expressly stated that Alpine's financial records indicated that it would have had the ability to pay the $22.7 million penalty requested by the SEC, but it still imposed a penalty that was "substantially less" due to Alpine's financial condition.[97]

All in all, the district court acted within its discretion to impose the $12 million civil penalty in light of the particular facts and circumstances of this case, namely, Alpine's "systematic and widespread evasion of the law."[98]

We have considered Alpine's remaining arguments on appeal and conclude that they are without merit.

---

[95] Alpine Br. 81.  Notably, Alpine itself does not argue that the individual $5,000 penalty for failing to file an SAR or filing a deficient SAR, or $1,000 penalty for failing to produce a SAR support file upon request, are unreasonable.

[96] *See* SEC Br. 100.  Alpine's argument that the penalty is excessive in light of the BSA's comparable penalty provisions is of no moment.  As discussed, the SEC brought this enforcement action pursuant to Section 17 of the Exchange Act.

[97] Sp. App'x 265.

[98] Sp. App'x 259-60.

Case 1:17-cv-04179-DLC Document 255-1 Filed 02/26/21 Page 35 of 35

## CONCLUSION

For the reasons stated above, the judgment of the district court is AFFIRMED.